```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                      EASTERN DISTRICT OF VIRGINIA
 2                        Alexandria Division

 3   UNITED STATES OF AMERICA,         )
                                       )
 4                  Plaintiff,         )
                                       ) Crim. No. 1:14cr306
 5        vs.                          )
                                       )
 6   JOSE LOPEZ TORRES, ALVIN GAITAN   ) April 4, 2016
     BENITEZ, CHRISTIAN LEMUS CERNA,   )
 7   OMAR DeJesus CASTILLO, DOUGLAS    )
     DURAN CERRITOS, MANUEL ERNESTO    )
 8   PAIZ GUEVARA, and JESUS ALEJANDRO )
     CHAVEZ,                           )
 9                                     )
                    Defendants.        )
10   _____)

11

12                          JURY TRIAL

13        ** EXCERPT:  TESTIMONY OF LILIANA PORTWINE **

14
     BEFORE:      THE HONORABLE GERALD BRUCE LEE
15                UNITED STATES DISTRICT JUDGE

16
     APPEARANCES:
17
     FOR GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
18                    BY:  JULIA MARTINEZ, AUSA
                           STEPHEN M. CAMPBELL, AUSA
19                         TOBIAS TOBLER, AUSA

20
                            ---
21

22   OFFICIAL COURT REPORTER:

23                    RENECIA A. SMITH-WILSON, RMR, CRR
                      U.S. District Court
24                    401 Courthouse Square, 5th Floor
                      Alexandria, VA 22314
25                    (703)501-1580
```

1    APPEARANCES (Continued)

2    FOR DEFENDANT JOSE LOPEZ TORRES

3            BYNUM & JENKINS, PLLC
             BY:  ROBERT L. JENKINS, JR., ESQ.
4            THE LEIVA LAW FIRM, PLC
             BY:  MANUEL E. LEIVA, ESQ.
5
     FOR DEFENDANT ALVIN GAITAN BENITEZ
6
             LAW OFFICE OF AMY LEIGH AUSTIN
7            BY:  AMY LEIGH AUSTIN, ESQ.
             SMITH & ZIMMERMAN, PLLC
8            BY:  JEFFREY D. ZIMMERMAN, ESQ.

9    FOR DEFENDANT CHRISTIAN LEMUS CERNA

10           LAW OFFICE OF CHRISTOPHER AMOLSCH
             BY:  CHRISTOPHER AMOLSCH, ESQ.
11           FRANK SALVATO, ESQ.

12   FOR DEFENDANT OMAR DeJesus CASTILLO

13           FIRSTPOINT LAW GROUP, PC
             BY:  KATHERINE MARKELL, ESQ.
14           OLD TOWN ADVOCATES, PC
             BY:  MEREDITH M. RALLS, ESQ.
15
     FOR DEFENDANT DOUGLAS DURAN CERRITOS
16
             LAW OFFICE OF J.R. CONTE, PLLC
17           BY:  JOSEPH R. CONTE, ESQ.
             LAW OFFICE OF DWIGHT CRAWLEY
18           BY:  DWIGHT E. CRAWLEY, ESQ.

19   FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

20           LAW OFFICE OF W. MICHAEL CHICK, JR.
             BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
21
     FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
22
             JEROME P. AQUINO, ESQ.
23           ELITA C. AMATO, ESQ.

24                              ---

25

1                          <u>INDEX</u>

2

3    <u>WITNESS (Government)</u> <u>DIRECT</u>   <u>CROSS</u>      <u>REDIRECT</u>      <u>RECROSS</u>

4    Liliana Portwine                 5          34

5

6       (End of excerpt)

7                            ---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Thereupon, the following was heard in open
 2      court at 10:07 a.m.)
 3                    THE CLERK:  1:14 Criminal 306, United States
 4      versus Jose Lopez Torres, Alvin Gaitan Benitez, Christian
 5      Lemus Cerna, Omar DeJesus Castillo, Douglas Duran
 6      Cerritos, Manuel Ernesto Paiz Guevara, and Jesus
 7      Alejandro Chavez.
 8                    THE COURT:  Good morning.
 9                    Good morning, Counsel.
10                    Good morning, defendants.
11                    Ready to proceed?
12                    MR. LEIVA:  Your Honor, if I may, my client
13      is having difficulty.
14                    THE COURT:  Okay.  Let's see if it's working.
15                    THE INTERPRETER:  It's okay.  Try it again.
16                    THE COURT:  Is that better?
17                    THE INTERPRETER:  Yes.
18                    MR. LEIVA:  Thank you.
19                    THE COURT:  You can bring the witness back.
20                    Oh, okay.  The record should reflect, the six
21      interpreters are present, being previously sworn.
22                    You can bring the witness back, Mr. Toliver;
23      Ms. Portwine.
24                    You can bring the jury out.
25                    (Jury present.)
```

```
 1                    (Witness resumed stand.)

 2                    THE COURT:  You may be seated.

 3                    Good morning, ladies and gentlemen.

 4                    Good morning, Mr. Jose Lopez Torres.

 5                    Good morning, Mr. Alvin Gaitan Benitez.

 6                    Good morning, Mr. Douglas Duran Cerritos.

 7                    Good morning, Mr. Christian Lemus Cerna.

 8                    Good morning, Mr. Omar DeJesus Castillo.

 9                    Good morning, Mr. Manuel Ernesto Paiz

10      Guevara.

11                    And good morning, Mr. Jesus Alejandro Chavez.

12                    Counsel ready to proceed?

13                    Good morning, Ms. Portwine.

14                    THE WITNESS:  Good morning.

15                    THE COURT:  You may proceed.

16                    MR. LEIVA:  I apologize, Your Honor.

17                    THE COURT:  No problem.

18                    THEREUPON, LILIANA PORTWINE, previously duly

19      sworn, testified further as follows:

20                         CROSS-EXAMINATION

21      BY MR. LEIVA:

22         Q.  Good morning, Ms. Portwine.

23         A.  Good morning.

24         Q.  Ms. Portwine, why don't we start first with your

25      work experience and also your qualifications.  Can we do
```

1   that?

2       A.   Yes.

3       Q.   Yes.

4            So, right now, are you currently employed by the

5   FBI or are you a contractor with the FBI?

6       A.   I'm a contractor.

7       Q.   You're a contractor.

8       A.   Yes.

9       Q.   So, which company do you work for?  Or do you have

10  your own private company?

11      A.   I'm an independent contractor.

12      Q.   Independent --

13      A.   -- I don't have --

14      Q.   -- contractor.  Very well.

15           I was reviewing your resumé and I see that you are

16  not a member of the American Translators Association; is

17  that correct?

18      A.   That's correct.

19      Q.   Okay.  And, you have not taken the American

20  Translators Association's certified test, have you?

21      A.   I have not.

22      Q.   Okay.  You are also not a member of the

23  International Association of Professional Translators and

24  Interpreters, are you?

25      A.   I am not.

1    Q.   You are not a member of the National Capital Area
2    Translators Association.
3    A.   I am not.
4    Q.   And, you are also not a member of the National
5    Association for Interpretation, are you?
6    A.   I am not.
7    Q.   Okay.  So, in other words, you are -- you are not
8    certified to be an interpreter or translator, are you?
9    A.   That's correct, I'm not.
10   Q.   Okay.  So, for example, the gentlemen and ladies
11   who have been helping us in this court proceedings are
12   certified to be federal court interpreters.  You have not
13   taken that test or been certified to be able to translate
14   in a federal court.
15   A.   Correct.
16   Q.   Now, on direct examination, Ms. Martinez asked you
17   about Spanish and how it's spoken differently in Latin
18   America.  If we can go into a little more of that, if you
19   wouldn't mind.
20   A.   No.
21   Q.   So, Latin American is a pretty big place, isn't
22   it?
23   A.   Correct.
24   Q.   All right.  And, the Spanish that's spoken across
25   Latin America is not the same country to country, is it?

1     A.   It -- it's not the same.

2     Q.   It varies by -- there's different dialects?

3     A.   Correct.

4     Q.   Different accents?

5     A.   Correct.

6     Q.   All right.  And even within close proximate

7  neighbors, let's say, for example, Mexico and Nicaragua,

8  you have different colloquialisms that you use, right?

9     A.   Correct.

10     Q.   One word can mean one thing in Nicaragua and can

11  mean another thing in Mexico.

12     A.   Yes.

13     Q.   All right.  And someone who speaks Spanish in

14  Argentina will not necessarily be able to understand

15  someone who speaks Spanish in El Salvador.

16          I mean, there may be some difficulty.  Let me put

17  it that way.

18     A.   I'm not sure.  I -- I don't think that would be

19  correct.  I think they could communicate.

20     Q.   So you think they can communicate.  So, for

21  example, someone from Boston would be able to communicate

22  without any problems with someone from out in the country

23  in Mississippi.

24     A.   Sure.  Yeah.

25     Q.   And, you had mentioned earlier about some of the

1  dialect or slang that's used in El Salvador.  Let's focus

2  on that.

3       You would agree with me that Salvadorans for the

4  most part respect their own dialect, right?

5  A.  Yes.

6  Q.  Okay.  And, they use a lot of slang when they

7  speak?

8  A.  Yes.

9  Q.  In other words, it's not proper or formal Spanish,

10  is it?

11  A.  A lot of it is not proper formal Spanish, yes.

12  Q.  Okay.  And, in cases where you believe you are

13  listening to phone conversations that are between gang

14  members, you have gang slang thrown into the slang that's

15  spoken among Salvadorans.

16  A.  Correct.

17  Q.  And, I believe you testified that you weren't

18  raised in Mexico; you were actually born in Mexico and

19  immigrated to the United States when you were ten.

20  A.  Correct.

21  Q.  So, most of your formal education was in this

22  country, I assume?

23  A.  Yes.

24  Q.  It was in English, right?

25  A.  It was in English.

1    Q.   In other words, you didn't attend an emergent

2    school or bilingual school?

3    A.   No.

4    Q.   And, if you don't mind telling me, where in the

5    United States were you raised?

6    A.   Los Angeles; in Montebello, specifically.

7    Q.   So, I would -- well, let me not assume anything.

8    Let me ask you this question, Ms. Portwine.  I'm assuming

9    the Spanish that you learned was initially in Mexico?

10   A.   Correct.

11   Q.   All right.  Then, I'm assuming, also, that you

12   continued with your Spanish because that's what was

13   spoken at home?

14   A.   Correct.

15   Q.   And, I'm assuming since you were born in Mexico,

16   your parents were not Salvadoran.

17   A.   They're not.

18   Q.   Okay.  So, your formative years of learning

19   Spanish were in the household where Salvadoran slang

20   wasn't spoken?

21   A.   Correct.

22   Q.   And I'm also going to assume that Salvadoran gang

23   slack wasn't spoken.

24   A.   It was not.

25   Q.   So, when you started working for the FBI and you

1    started hearing this form of Salvadoran slang -- I'm not

2    referring to the gang slang, but El Salvadoran slang --

3    who did you go to for assistance with that?

4         A.   When we first began, like I said, as -- when I

5    started working for the FBI, we -- we started working

6    with some -- I started working with the agents and we

7    started working a case that was specific to El

8    Salvadorans.

9              So, we were -- the agent brought us dictionaries,

10   glossaries from other previous linguists and stuff like

11   that.  So --

12        Q.   Okay.  So, I'm assuming that you requested these

13   dictionaries and glossaries because these were words that

14   you had never heard before?

15        A.   Yeah.

16        Q.   Okay.  Well, let's go back a little -- and let me

17   be fair to you -- in chronological order, so we can kind

18   of develop your work history here.

19             So, it's listed on your resumé that you served as

20   a teacher/parent aid, right?

21        A.   As a teacher what?

22        Q.   I would say a teacher's aid, to help facilitate

23   communication with parents of school children?

24        A.   That was -- it was for teacher/parent conferences,

25   or teacher/parent administrators conferences, not -- I

1    was a substitute teacher and I was a translator.

2        Q.   Okay.  But let's focus on the translator portion

3    of your duties.

4        A.   Okay.

5        Q.   So you would assist parents who were not fluent in

6    English when it came to parent/teacher conferences,

7    right?

8        A.   Correct.

9        Q.   And that happened, what, two times a year?

10       A.   Um, let's say, yes, twice a year.

11       Q.   And, the length of the parent/teacher conference

12   for a student lasted what, maybe five, ten minutes?

13       A.   Approximately, yes.

14       Q.   And, that's where you came into contact with

15   people who were Salvadoran?

16       A.   Correct.

17       Q.   And, I'm assuming that given the subject matter,

18   the conversations that they you were translating dealt

19   with school work?

20       A.   Correct.

21       Q.   And, even though Salvadorans speak in slang -- and

22   correct me if I'm wrong -- I'm assuming that when they

23   went to meet their children's teachers, they attempted to

24   formalize their Spanish and not speak in so much slang?

25       A.   Um -- I don't know.

1    Q.   Do you recall ever having an occasion during these

2    teacher/parent conferences, when you were a translator

3    for Salvadoran parents, where you had to ask them to

4    define a certain term or word that they were using?

5    A.   No.

6    Q.   So, you also have listed in your work history

7    that -- and I believe that you had mentioned on direct

8    that you worked for a trucking company?

9    A.   Correct.

10   Q.   All right.  And, here's where I lost a little bit

11   about what you said.  You said you called for

12   directories?

13   A.   No.  I -- I called the CEOs of companies, Mexican

14   trucking companies, and I got detailed information about

15   their -- their product or their trucks, their --

16   Q.   Was it a sales call that you were performing?

17   A.   It was not a sales call.

18   Q.   Okay.  But it was information that you were

19   obtaining, I'm assuming, for the company salesmen, for

20   the company you worked for, their sales people?

21   A.   Not for the sales people.  The information was

22   gathered to be put into a directory, and then the

23   directory is sold.  When a different company would make

24   use of the directory, that's because they wanted to hire

25   a truck, a refrigerated truck, perhaps.

1    Q.   So, let me ask you this question, which may seem

2    silly, but I need to ask it nonetheless:  So, when you

3    spoke to the CEOs of trucking companies, they spoke to

4    you in proper Spanish, correct?

5    A.   Correct.

6    Q.   Not in slang?

7    A.   Correct.

8    Q.   Not in gang slang?

9    A.   Correct.

10   Q.   All right.  And, then you also worked for an

11   airliner?

12   A.   Correct.

13   Q.   And, it sounds like you were more of a customer

14   service rep.

15   A.   That's correct.

16   Q.   So, the subject matter that you dealt with when

17   dealing with airline clients was just about connecting

18   flights or missed flights or lost luggage?

19   A.   Yes.

20   Q.   So, you were working at a call center, much like

21   when we call now, we get someone from India who speaks

22   English.  Is that -- was that your -- is that where you

23   were employed, at a call center for the airline?

24   A.   For one airline, yes.  For the other one, I was at

25   the airport.

1      Q.   At the airport.

2      A.   Uh-huh.

3      Q.   Okay.  And again, when you were dealing with

4  people who may not have been fluent in English, when you

5  spoke to them, they were speaking to you in proper formal

6  Spanish, for the most part?

7      A.   For the most part.

8      Q.   So, let's get back, now, to when you started

9  dealing with gang cases.  So, you said that you had --

10  you were unfamiliar with certain terms and you had to ask

11  that someone provide you -- or a glossary or a dictionary

12  was provided to you, right?

13      A.   Correct.

14      Q.   And, this was -- from what you know, it was

15  compiled by agents?

16      A.   Agents, linguists, yes.

17      Q.   Well, did you -- what, if any, independent

18  research did you do yourself to make sure that it was

19  compiled by linguists or people who should know what

20  they're doing?

21      A.   Um --

22      Q.   Did you do anything, or you just took it at face

23  value?

24      A.   Normally, the glossaries or the dictionaries, they

25  have a name that you can verify, and usually has the

1   linguist or whoever compiled its name on there.  But,

2   yeah, I basically, I just took it for face value, yeah.

3       Q.   All right.  Now, let's talk about this particular

4   assignment, this particular case.

5       A.   Okay.

6       Q.   Were you told what type of case this was?

7       A.   No.

8       Q.   So, were you told what nationality you believed

9   that the people who were on those phone calls -- where

10  they were from?

11      A.   I was told where they were from, yes.

12      Q.   Who told you that?

13      A.   The agent.

14      Q.   Which agent?

15      A.   I believe it was Greg Horner.

16      Q.   All right.  And so he -- is that something that

17  you needed to know or is it standard practice just to go

18  in there and you independently listen to these phone

19  calls and do the translation?

20          Or is it the practice that you find out where

21  these people are from, or maybe get some more

22  information?

23          MS. MARTINEZ:  Objection, Your Honor.

24  Compound question.

25          THE COURT:  Sustained.

L. Portwine - Cross                                                     17

```
 1                   One question, Mr. Leiva.
 2                   MR. LEIVA:  Yes, Your Honor.  I apologize.
 3                   THE COURT:  No problem.
 4    BY MR. LEIVA:
 5      Q.   So, Ms. Portwine, is it your standard practice
 6    that you ask where the individuals are from?
 7      A.   I don't -- I don't ask.  It's not a standard
 8    practice that I ask.
 9      Q.   Okay.  So, then, someone just volunteered that
10    information to you?
11           This particular agent just came in and volunteered
12    it to you?
13      A.   Correct.
14      Q.   Is it standard practice within -- and I'm going to
15    call what you do, let's say, your industry, okay --
16    within the translation world, that you should not receive
17    information other than what's -- what you're hearing in
18    order to transcribe?
19           Does that make sense?
20      A.   No, it doesn't.
21      Q.   Okay.  I -- um, you believe the standard practice
22    within your industry is to just listen to the calls, and
23    then you translate what is being heard, or that you
24    gather as much information as possible in order to
25    understand what's being heard?
```

1    A.   I -- I don't understand the question.  I'm not

2  sure what you're asking.

3    Q.   Okay.  So, you weren't told that this was an MS-13

4  related investigation, were you?

5    A.   I was not told it was MS-13.

6    Q.   But, you were told that there were Salvadorans who

7  were speaking with each other?

8    A.   Correct.

9    Q.   And, I believe you also testified on direct -- and

10  correct me if I'm wrong -- that your translations were

11  verbatim?

12    A.   That's correct.

13    Q.   Okay.  What does "verbatim" mean to you,

14  Ms. Portwine?

15    A.   It means to translate exactly what is said, word

16  for word.

17    Q.   So, in other words, it's to translate exactly what

18  is said, not what you think is being said.

19    A.   Correct.

20    Q.   So, if someone is using a term like "*loco*," what

21  does "*loco*" mean?

22           MR. LEIVA:  That's l-o-c-o, Madam Court

23  Reporter.

24           THE WITNESS:  It could mean -- it could have

25  very many different meanings, even.

BY MR. LEIVA:

Q.   Okay.  What's the generally accepted term within Latin American or Spanish when someone says "*loco*"?

A.   A dude.

Q.   A dude, right?

A.   Uh-huh.

Q.   But, in these particular translations, you interpreted "dude" to "homeboy" or "homie."  Do you recall that?

A.   Yes.

Q.   Okay.  And, the reason I'm asking you is because the members of the jury and Judge Lee heard from a gang expert and a former gang member of how one achieves the certain ranks of homie, homeboy, and *chequeo*.

A.   Uh-huh.

Q.   So, what prompted you, then, to give the designation of someone, who you're listening to, the status of homeboy or homie when all they did was use the word "*loco*"?

A.   Well, I did -- I did grow up in Los Angeles, so, I do know a little bit more about gangs than -- than, maybe just anybody.

Q.   Yeah, but you told me you didn't know that this was a gang case.

A.   Okay.  So, I've been working in this case for a

L. Portwine - Cross                                        20

 1    lot longer than just a verbatim.  I mean, I talked to the

 2    prosecutor as well.  Like, I had worked this case from

 3    the very beginning --

 4        Q.   Okay.

 5        A.   -- that, when I was just only told it's El

 6    Salvadoran.

 7             THE COURT:  Do you recall his question?

 8             THE WITNESS:  Yeah.

 9             THE COURT:  His question was:  Can you

10    describe why you chose "homeboy" for the word "*loco*"?

11             Can you answer that question?

12             THE WITNESS:  Yeah.  So, because I was using

13    the gang-specific language to translate the word "*loco*."

14    BY MR. LEIVA:

15        Q.   Okay.  So, how is that verbatim, then,

16    Ms. Portwine?

17             If the term "*loco*" means dude, how do you jump

18    from that, when you're saying you're translating

19    verbatim, to designating someone as homeboy or homie,

20    since you said that you've been working on this case and

21    you know about gangs, know that that's a specific

22    designation that someone has to earn?

23        A.   Um --

24        Q.   Were you making a judgment call?

25        A.   No.

1    Q.   You, yourself, deeming that someone reached that

2    level?

3    A.   No, no.

4         Can you ask the question again, please.

5    Q.   All right.  So, how do you make that jump, then,

6    to designate someone a homie or homeboy, when the word

7    that was used during any particular conversation was

8    "*loco*"?

9    A.   Well, like I said, "*loco*" is dude for the most

10   part.  But since I did -- I did ask, once I started doing

11   the verbatim, I asked -- I knew it was already a gang

12   case.

13   Q.   Okay.  So --

14   A.   That's why I made the assuming to use "homie,"

15   because "dude" doesn't apply any more.

16   Q.   Well, let me stop you there.  You said you asked.

17   Who did you ask and what did you ask?

18   A.   Um, I would ask the agent.

19   Q.   Which agents?

20   A.   At the time, Fernando Uribe.

21   Q.   And what would you ask Agent Uribe?

22   A.   I just asked him, are they gang members?

23   Q.   That's it?  Nothing more?

24   A.   Yeah, I mean -- no, not really.

25   Q.   So, then, am I correct to assume, then, that when

1    you were doing this verbatim, as you call it,

2    translation, you were now doing it through the filter of,

3    this is the FBI going after MS-13?

4         A.   No.

5         Q.   Well, you said that you were involved in this case

6    from the beginning.  What does that mean?

7              What was your involvement with this case from the

8    beginning?

9         A.   I was doing the summaries.  I was listening to the

10   consensual recorded conversations and doing, translating

11   the summaries, translating into summaries.

12        Q.   So it would be fair to say, then, Ms. Portwine,

13   that you weren't a neutral party, right?

14             You're not walking in here as a neutral

15   translator.

16        A.   Yes, I am.

17        Q.   Okay.  So, you were employed with the FBI.  You've

18   been involved in this case since the beginning.  You were

19   told that this is a gang case.  You were told they were

20   Salvadorans.  And certain words that have certain common

21   meanings, you were skewing them more to fit this

22   narrative that this is a gang case.

23             MS. MARTINEZ:  Objection, Your Honor.

24   Compound question.

25             THE COURT:  Overruled.

1    BY MR. LEIVA:

2        Q.   Isn't that what you were doing?

3        A.   That's -- that's what is necessary when you

4    translate.  That's what you do.

5        Q.   So, when you're translating, like you say,

6    verbatim, you're saying it's necessary to skew it to one

7    way or the other?

8        A.   You know -- yeah, to -- to -- to what you're

9    listening.

10       Q.   Now, I see that there are names that were

11   associated in these transcripts.  Did you put those names

12   in your -- your transcripts, or did someone else do them?

13            And by that -- I'm sorry.  What I mean by "name,"

14   I don't mean the names in the actual context of the

15   conversations, but who they are attributed to, who made

16   what as far as statements.  Did you decipher those names

17   or did someone give you those names to put in there?

18       A.   Someone gave me the names.

19       Q.   Okay.  Who is the person that gave you the names?

20       A.   Fernando Uribe.

21       Q.   Okay.  The same agent who told you that this was

22   an MS case?

23       A.   Yes.

24       Q.   What does *caen que caen* mean to you?

25            THE COURT:  Spell that, please.

1    BY MR. LEIVA:

2        Q.   C-a-e-n, space, separate word is q-u-e, separate

3    worth is c-a-e-n.

4        A.   *Caen que caen*?

5             You're asking me what it means?

6        Q.   Yes, I'm asking you what it means.  What is the

7    verbatim translation of that?

8        A.   I'm sorry -- put me on the spot.  Um, whoever

9    falls, falls.

10       Q.   Okay.  Now, do you recall translating a call where

11   you assert that the person was saying:  We get them, we

12   get them, or do you mean here?

13       A.   I would need to hear it.

14       Q.   Okay.

15       A.   I don't recall.

16       Q.   That's fine.

17            MR. LEIVA:  Your Honor, I think for -- what I

18   can do to make this a little more expeditious is let me

19   finish my questions, and I can go back and -- and play

20   that.

21            THE COURT:  Okay.

22   BY MR. LEIVA:

23       Q.   Now, you also talked about how your work is

24   reviewed by your supervisor.  Is it a supervisor or is it

25   just a colleague?

1     A.  It's a colleague.

2     Q.  It's a colleague.

3     A.  Uh-huh.

4     Q.  And, how is it that your colleague goes about

5  reviewing what you just translated?

6          Does your colleague listen to the audio portion

7  and then they come up with their own transcript and

8  compare it to yours, or how is it done?

9     A.  Um, the -- I don't know how they do it, but the

10  way I do it, the way we're supposed to do it in the

11  office, is that they listen and they make -- they track

12  changes on the Word document, make suggestions, and the

13  changes are tracked.

14    Q.  Now, I noticed that your transcripts are different

15  from what I've seen before, and let me -- let me give you

16  a little background.  I've seen some where there's two

17  columns --

18    A.  Uh-huh.

19    Q.  -- what's written out in Spanish, transcribed,

20  what they've heard -- what the translator has heard, and

21  then next to it is what it is in English, so that person

22  can see line from line what's being said and what's being

23  translated to English.

24    A.  Right.

25    Q.  You didn't do that in this case, right?

1    A.   I did not.

2    Q.   Okay.  So, are you telling us, then, when your

3   colleague reviews your work, they don't have something

4   like that right next to each other to compare, to see

5   whether your translation is accurate or not?

6    A.   They do not have anything like that, no.

7    Q.   Okay.  They just listen to it?

8    A.   They listen to it, yes.

9    Q.   So, the colleague who was reviewing your work,

10  when it came to this issue of home boys and homies, did

11  the same thing that you did, right?

12       They heard the word "*loco*" and determined that

13  that is the equivalent of a homeboy or a homie?

14   A.   I -- I imagine so, yeah.

15   Q.   And how many times do you think your colleague

16  reviewed the work that you did?

17       Now, when I mean (sic) how many times, I mean for

18  each transcript.  Do they just review it once or do they

19  review it several times?

20   A.   Um, I would -- if -- when I'm doing it, I do it

21  several times.  I don't know how many times they would do

22  it.

23   Q.   And, if they believe that you made a mistake --

24   A.   Uh-huh.

25   Q.   -- how is that brought to your attention?

```
 1          How is that dealt with?
 2     A.   Like I said, it's underlined or it's in red.  It
 3   track changes on Word software.  So, it turns red and
 4   there's a line through it.
 5     Q.   All right.  And how ultimately is it revolved?
 6          Who gets the last call on this --
 7     A.   That --
 8     Q.   -- as far as who is right?
 9     A.   That would be the original linguist.
10     Q.   I'm sorry?
11     A.   The original person, the original linguist.
12     Q.   So then, when you see your colleagues review it,
13   it's more just a suggestion.  If they think that
14   something may have a different meaning, they just suggest
15   that you, but ultimately it's your decision whether you
16   make the change or not?
17     A.   Yes.
18     Q.   And, I believe the -- the woman who reviewed your
19   work is a Ms. LaSalle?
20     A.   Correct.
21     Q.   Okay.  Where is she from?
22     A.   She's from Mexico.
23     Q.   Mexico as well.
24     A.   Uh-huh.
25     Q.   Okay.  Ms. Portwine, I'm going to see if this
```

```
 1   works, okay?  I've got a speaker here, and I'm --
 2   hopefully you'll be able to hear it.
 3               MR. LEIVA:  Let me see if I can find this.
 4               MS. MARTINEZ:  Your Honor, I would ask
 5   that -- that Mr. Leiva identify the exhibit number, and
 6   also allow Ms. Portwine to look at the transcript while
 7   she's listening.
 8               MR. LEIVA:  I will.
 9               Ms. Portwine, Counsel, it will be
10   Exhibit 7-A, page nine, the eighth sentence on page nine.
11               THE COURT:  I want to make sure I understand.
12   I thought you said this transcript was not in Spanish.
13   It's just English, right?
14               MR. LEIVA:  It is in English.
15               THE COURT:  Well, doesn't she speak Spanish?
16               MR. LEIVA:  Yes.
17               THE COURT:  So why does she need to look at
18   the transcript, if she wrote it?
19               MR. LEIVA:  The government is the one who has
20   asked that I reference the transcript, Your Honor.  I
21   mean -- so, there's going to be some contention as to
22   what she translated in English.
23               THE COURT:  Well, let's let her hear what she
24   heard first, and then she can translate it.
25               MR. LEIVA:  I will, Your Honor.
```

```
 1              THE COURT:  She doesn't need to look at it
 2  yet.
 3              Just listen.  We want to know how you did it.
 4  Just listen.  Okay?
 5              THE WITNESS:  Okay.
 6              (Pause.)
 7              MR. LEIVA:  I apologize, Your Honor.  I had
 8  to cue it up.
 9              THE COURT:  Take your time.
10              MR. LEIVA:  Your Honor, may I do it this way?
11  May I let my co-counsel go forward, because apparently --
12              THE COURT:  Sure.  Go ahead.
13              MR. LEIVA:  And then I'll just find the
14  actual CD?  Because I have a backup system and I can't
15  find it.  So --
16              THE COURT:  Okay.
17              MR. LEIVA:  -- if I could reserve?
18              THE COURT:  Sure.
19              MR. LEIVA:  Yes.
20                   CROSS-EXAMINATION
21  BY MR. AQUINO:
22     Q.  Good morning.  Jerry Aquino on behalf of Jesus
23  Chavez, along with my co-counsel, Ms. Amato.
24     A.  Good morning.
25     Q.  I just have a few questions for you.
```

1    A.   Yes, sir.

2    Q.   You indicated, as to the speakers, that you got

3    the information as to who the speakers were from the FBI;

4    is that correct?

5    A.   Correct.

6    Q.   And specifically, Agent Uribe; is that accurate?

7    A.   That's correct.

8    Q.   So you're relying upon information that Mr. Uribe

9    provides you to be accurate; is that correct?

10   A.   Yes.

11   Q.   Okay.  And do you know where the agent got his

12   information as to who the speakers were?

13   A.   I don't know where.

14   Q.   Okay.  Now, did you ever meet, in this case, with

15   any gang members themselves?

16   A.   Never did.

17   Q.   Okay.  So, you never got, for example, an actual

18   El Salvadoran gang member's assistance in going through

19   some of the information that you have in this case?

20   A.   We -- we actually did, but it wasn't -- it wasn't

21   a gang member for this particular.  But we had, through

22   the agent, we would ask questions for meanings and stuff

23   like that --

24   Q.   Okay.  And so --

25   A.   -- with other people that the agent knows.

1     Q.  And again, you're making the assuming that the

2   gang member who was providing the information to the

3   agent was being truthful; is that correct?

4     A.  Correct.

5           MR. AQUINO:  That's all the questions I have.

6           THE COURT:  Anyone else?

7           (No response.)

8           THE COURT:  Okay.

9           Mr. Leiva, are you done?

10          MR. LEIVA:  Your Honor, no.  Someone else?

11          I just need five minutes, Your Honor.

12          THE COURT:  Okay.

13          MR. LEIVA:  I just don't know where I got

14  it -- where it went.

15          (Pause).

16          MR. LEIVA:  Your Honor, may I speak to

17  counsel real quick?

18          THE COURT:  Sure.

19          (Pause.)

20          MR. CRAWLEY:  Your Honor?

21          THE COURT:  Yes.

22          MR. CRAWLEY:  My client needs to use the

23  restroom.  So while he's waiting on this --

24          THE COURT:  All right.  We'll take a brief

25  recess.  Thank you.  Let's make it 15 minutes.

```
 1                    (Court recessed at 10:45 a.m. and reconvened
 2                at 11:02 a.m.)
 3                THE COURT:  Bring our jury out, please.
 4                You may be seated.
 5                Ready to proceed?
 6                MR. LEIVA:  Yes, Your Honor.  Again I
 7    apologize.  Thank you for your patience.
 8                     FURTHER CROSS-EXAMINATION
 9    BY MR. LEIVA:
10       Q.   Ms. Portwine, let me ask you -- have you listen to
11    the little segment, and let me know if you can hear it.
12                (Audio played.)
13                MR. LEIVA:  Just rewind it back just a little
14    bit.
15                (Audio played.)
16    BY MR. LEIVA:
17       Q.   What did you hear?
18       A.   (Spanish spoken).
19       Q.   Well, can you say *hijos*?
20            Did you hear the word *hijos* in there?
21       A.   Play it again.
22       Q.   Yes, ma'am.
23                THE COURT:  You will have to interpret this
24    for us English-speaking people.
25                MR. LEIVA:  Yes.
```

```
 1                    (Audio played.)
 2   BY MR. LEIVA:
 3      Q.   So, I'd like you to focus on caen que caen.  What
 4   is the verbatim translation of caen que caen?
 5      A.   Fall that they fall.
 6      Q.   Okay.  Good.  All right.
 7           And if you could look at page nine -- do you still
 8   have that in front of you, Ms. Portwine?
 9           (Pause.)
10      A.   Yes.
11      Q.   All right.  You just said that the verbatim
12   translation of that was, if they fall, they fall.
13      A.   Yes.
14      Q.   What you transcribed is:  We get them, we get
15   them.
16           That's completely different from if they fall,
17   they fall.  Would you agree?
18      A.   Yes.
19      Q.   So, you -- would you agree that the --
20           MR. LEIVA:  Well, that's all I have, Your
21   Honor.
22           Excuse me.
23           (Off the record with counsel.)
24           MR. LEIVA:  That's all I have, Your Honor.
25           Thank you, Ms. Portwine.
```

```
 1                  THE COURT:  Redirect.
 2                    REDIRECT EXAMINATION
 3   BY MS. MARTINEZ:
 4      Q.  Good morning, Ms. Portwine.
 5      A.  Good morning.
 6      Q.  Defense counsel asked you a lot about different
 7   dialects of Spanish, right?
 8      A.  Right.
 9      Q.  Where in LA did you grow up?
10      A.  Los Angeles, in Montebello.
11      Q.  What's significant about Montebello?
12      A.  It's right in the middle of gang territory.
13      Q.  What is it known for?
14      A.  Um, not much.
15      Q.  Are you familiar with the history of MS-13?
16      A.  I am.
17              MR. AQUINO:  Objection, Judge.  I think she's
18   altering now this person's scope of ability that has been
19   noticed.
20              THE COURT:  Sustained.
21   BY MS. MARTINEZ:
22      Q.  What is -- the neighborhood where you grew up,
23   was --
24              MR. AQUINO:  Same objection, Judge.
25              THE COURT:  Are you focusing on her testimony
```

```
 1   or --
 2                MS. MARTINEZ:  Her Spanish language
 3   abilities, Your Honor.
 4                THE COURT:  All right.  Well, what was your
 5   question?  What is the neighborhood known for?
 6                MS. MARTINEZ:  I was actually going to ask
 7   about her -- was asking -- I first asked what was the
 8   neighborhood known for, which Your Honor sustained.
 9                I was moving on to a question about her
10   experience in her neighborhood.
11                THE COURT:  Experience with the language?
12                MS. MARTINEZ:  Yes, Your Honor.
13                THE COURT:  Well, focus the question on
14   experience with the language.  Let me hear the question
15   first.  Go ahead.
16   BY MS. MARTINEZ:
17     Q.   You said that you grew up in the Montebello
18   neighborhood in Los Angeles; is that right?
19     A.   That's correct.
20     Q.   And you also said that Montebello is the middle of
21   gang territory; is that correct?
22     A.   That's correct.
23     Q.   Growing up, did you have experience listening to
24   people whom you believed were gang members?
25                MR. AQUINO:  I renew the objection.  Same
```

```
 1   objection.
 2                 THE COURT:  Sustained.
 3   BY MS. MARTINEZ:
 4       Q.   When was the first time you heard Salvadoran
 5   Spanish?
 6       A.   A long time ago, in high school.
 7       Q.   Where were you in high school?
 8       A.   In Montebello.
 9       Q.   And how was it that you heard Salvadoran Spanish
10   in Montebello?
11       A.   There were other Salvadorians in the area.
12       Q.   Were you able to understand them?
13       A.   Yes.
14       Q.   In high school when you heard Salvadorans speaking
15   Spanish, was there times when they spoke in slang?
16       A.   Yes.
17       Q.   And were you able to understand them?
18       A.   Yes.
19       Q.   Now, moving forward to your experience with the
20   FBI, you were asked a number of questions about how you
21   became familiar with MS-13 slang and dialect.
22       A.   Yes.
23       Q.   During your time with the FBI, have you ever
24   worked with or consulted law enforcement officers from El
25   Salvador?
```

1    A.   Yes.

2         MR. AQUINO:   Judge, I note the objection is

3    the same objection, starting to morph here from what's

4    been noticed.

5         THE COURT:   Sustained.

6         MS. MARTINEZ:   Your Honor, may we approach on

7    that issue?

8         THE COURT:   No.  Go ahead.

9    BY MS. MARTINEZ:

10   Q.   How have you become familiar with dialects spoken

11   by those from El Salvador?

12   A.   Again, we have glossaries.  I have done research

13   on the Internet --

14        MR. AQUINO:   Same objection, Judge, again.

15        THE COURT:   Well, the answer demonstrates.

16   The objection IS  sustained.

17        MS. MARTINEZ:   Your Honor, if I may, Your

18   Honor, we had moved previously to recognize Ms. Portwine

19   as an expert in Spanish language, with additional

20   expertise on El Salvadoran dialect and MS-13 dialect.  At

21   this point we would ask the Court to recognize her as

22   such.

23        MR. AQUINO:   I object, to the extent that

24   they're attempting to morph the designation to something

25   more than what's been provided.

1              THE COURT:  She's qualified as a Spanish

2    language linguist, not for an expert in El Salvadoran or

3    MS-13 dialect, is that right, Ms. Martinez?

4              MS. MARTINEZ:  Your Honor --

5              THE COURT:  She was never qualified as an

6    MS-13 expert on language, was she?

7              MS. MARTINEZ:  Not on MS-13, Your Honor, but

8    on dialects.  And as she has established and as defense

9    counsel has established, in different countries, natives

10   from different countries speak different dialects.  And I

11   believe, Your Honor, during direct examination on

12   Thursday, we moved to have her acknowledged as an expert

13   in the Spanish language, as well as dialects,

14   specifically from El Salvador and MS-13.  And we would

15   renew that at this time, Your Honor.

16             THE COURT:  I don't recall that.  I don't

17   recall her being qualified as an -- to testify about El

18   Salvadoran -- MS-13 or El Salvador.  I recall her being a

19   linguist.

20             MS. MARTINEZ:  Not -- not about El Salvador

21   or about MS-13, Your Honor.  I want to make sure I'm very

22   clear and very clear for the record.  I'm talking about

23   her linguist abilities.

24             And so based on the foundation that she's

25   established about different dialects being spoken by

1    individuals from different countries, Your Honor, we had

2    asked that she be recognized as an expert Spanish

3    linguist with expertise in the El Salvadoran dialects,

4    the spoken Spanish language by those who are native El

5    Salvadorans, as well as those who are associated with

6    MS-13, based on the foundation she laid that there are

7    different dialects spoken.

8              MR. AQUINO:  Objection --

9              MS. MARTINEZ:  Only as to the Spanish

10   language, Your Honor, not as to culture or anything like

11   that.

12             MR. AQUINO:  I think they are morphing her,

13   essentially, into a gang expert, and she has not been

14   notified for that.

15             THE COURT:  All right.  The clerk's notes

16   says Spanish language translation and El Salvadoran.  It

17   says MS-13, but I don't remember saying anything about

18   MS-13, because I don't have any evidence that she's

19   expert on MS-13.

20             So she can testify as to El Salvadoran

21   dialects, but not necessarily MS-13.  As far as we know,

22   she just gathered information from the police.

23             MS. MARTINEZ:  And just to be clear, the

24   request is not that she be able to testify about MS-13,

25   Your Honor, but about dialects spoken by gang members.

1           If Your Honor would like, I can walk through

2    that foundation again, but --

3           THE COURT:  No, I just want to make sure

4    we're saying the same thing.

5           MS. MARTINEZ:  Yes, Your Honor.

6           THE COURT:  She can testify about Salvadoran

7    dialects, but she cannot testify about what MS-13 gang

8    parlance is, except to the extent she testified about

9    what she received from glossaries from the police.  She

10   has already testified about that, right?

11          MS. MARTINEZ:  She -- she has also testified

12   about other ways in which she's familiar with gang slang,

13   not just from glossaries, Your Honor, and that includes

14   her experience growing up on the streets of Los Angeles

15   in -- right -- right in the middle of gang territory.

16          THE COURT:  She never said anything about

17   MS-13 about where she grew up, having -- I don't want

18   to -- I don't want to prolong this any more than

19   necessary.

20          MS. MARTINEZ:  Yes, Your Honor.

21          THE COURT:  If you want to focus on

22   Salvadoran dialect.  Go ahead.

23          MS. MARTINEZ:  Thank you.

24          THE COURT:  But as far as we can tell, her

25   information about MS-13 slang came from the police.

1        MS. MARTINEZ:  Your Honor, I would like to

2   have permission on redirect to explore that further,

3   because --

4        THE COURT:  If you have glossaries here and

5   the dictionaries here, let me see them.

6        MS. MARTINEZ:  Your Honor --

7        THE COURT:  Go ahead.

8        MS. MARTINEZ:  -- if I may, I just want to

9   ask questions beyond the -- about how she learned this

10  slang in addition to glossaries.  May I?

11       THE COURT:  If you can lay a foundation, go

12  ahead.

13       MS. MARTINEZ:  Yes, Your Honor.

14  BY MS. MARTINEZ:

15  Q.   During your time working with the FBI, have you

16  worked with law enforcement officials from El Salvador?

17  A.   Yes.

18  Q.   What was the purpose of working with law

19  enforcement officials from El Salvador?

20  A.   It was to learn the language and the way they --

21  the way they speak.

22  Q.   And when you say "they," who are you talking

23  about?

24  A.   Um, gang members, Salvadorians, gang members.

25       MR. AQUINO:  Judge, I renew the objection.  I

1      think she is morphing into a gang expert.

2                 THE COURT:  An expert can rely upon hearsay

3      from others.  But I think it will be necessary for her to

4      give some more information about who were the police

5      officers she spoke to, and when all that occurred.

6                 And a policeman is not a gang member, right?

7                 MS. MARTINEZ:  Correct, Your Honor.

8                 THE COURT:  All right.

9      BY MS. MARTINEZ:

10        Q.   Now, you said a -- we talked about law enforcement

11     from El Salvador.  What kind of law enforcement?

12        A.   Um, I believe it's the Anti-gang Unit.

13        Q.   And, how many of these law enforcement officials

14     have you worked with or learned from during your

15     experience at the FBI?

16        A.   At least two.

17        Q.   When was that?

18        A.   The first one was five years ago, when -- with my

19     very first case, and the last one was just recently.  And

20     there was a couple in between, but, I don't recall

21     exactly when.

22        Q.   Prior to your experience at FBI, have you ever

23     listened to, been exposed to, gang slang?

24        A.   Yes.

25        Q.   MS-13 specifically?

1      A.   Yes.

2      Q.   When?

3      A.   Um, when I worked for --

4           MR. AQUINO:  Objection, Judge.  Again, I

5      think she is essentially getting into MS-13 parlance, as

6      some type of expert, apparently.  The government is

7      trying to elicit that from her.

8           THE COURT:  That isn't what you're trying to

9      do?  That isn't what you're trying to do.

10          MS. MARTINEZ:  Not necessarily parlance, Your

11     Honor, but dialect, and the fact that different people

12     from different cultures and different countries speak

13     slightly differently.

14          Defense counsel drew this out, and she

15     answered on cross- -- direct -- excuse me --

16     cross-examination, that there are words in Spanish that

17     may have many different meanings, depending on context or

18     depending on the origin of the person who is speaking.

19          I'm laying the foundation that she is able to

20     understand these different dialects and translate them

21     properly.  She must be able to do so in order to

22     translate the calls that she's heard.

23          I have other foundation to lay as well.  We

24     believe we laid foundation on direct examination, but she

25     has ample experience, both listening to and translating

1    El Salvadoran Spanish as well as Spanish generally.

2             She also has significant experience, both

3    within the FBI and outside of the FBI, of listening to

4    and understanding Spanish spoken by gang members.

5             MR. LEIVA:  Yes, Your Honor.  What came out

6    on cross-examination was that she was unfamiliar with the

7    MS-13 gang slang; therefore, she relied on police

8    officers and/or glossaries.

9             That's what came out.  There was nothing came

10   out that she knew what these terms were used by MS-13

11   before that.  She wasn't familiar with it.  And she was

12   given these -- this dictionary or the glossary that was

13   compiled by the police.

14            MS. MARTINEZ:  Your Honor, I think that's an

15   exaggeration of what --

16            THE COURT:  Well, let me do this --

17            MS. MARTINEZ:  -- defense counsel

18   established.

19            THE COURT:  Let me do this -- I'll be the

20   judge of that.

21            I'll sustain the objection.

22            MS. MARTINEZ:  Thank you.

23   BY MS. MARTINEZ:

24   Q.  I would like to talk about the list of terms or

25   the dictionaries that you were referencing on

1     cross-examination.

2         A.   Yes.

3         Q.   When you are listening to Spanish language

4     recordings, in addition to consulting dictionaries, how

5     do you go about understanding what's being said in the

6     Spanish language recordings?

7         A.   Well, when you listen to it, you have to put

8     everything in context.  So --

9         Q.   Tell us what that means.  What do you mean by "put

10    it in context"?

11        A.   Well, when you -- when you're listening to

12    something, um, you -- you have to listen to it, and you

13    cannot just translate it word for word, because sometimes

14    it's not going to make sense.

15            It's -- it's -- some things just don't translate

16    directly.  There's no direct word-for-word translation.

17    Even in English words have more than one meaning, so, the

18    same thing with Spanish and the same thing when I

19    translate.

20            And -- (pause) --

21        Q.   You also testified that you listened to thousands

22    of hours of recordings in this case specifically; is that

23    right?

24        A.   That's right.

25        Q.   Can you estimate approximately how many hours of

1    recordings you've listened to in this case?

2        A.   Um, in this particular case, it was about 3,000 or

3    more hours.

4        Q.   And, in the -- while listening to those

5    3,000 hours of recordings, how, if at all, did that

6    inform your ability to understand what was being spoken

7    in the recordings?

8        A.   Well, again, by the context of the conversation,

9    and context clues, sentence clues, the way they speak,

10   the way they talk, the way they talk to each other.

11          Um, like he said, like for homie, I mean, you

12   can't just put "dude" on there because they don't say

13   homie -- they don't say "dude" to just about anybody.

14   They only say it to certain people, *loco*, you know.

15          So, you just have to put it in context.  You

16   cannot just say, oh *loco* -- well, "*loco*" means crazy,

17   too, but is that the context?  It doesn't fit.

18          And that's what we're taught in school, too, like,

19   look at sentence clues, look at other things, to make

20   sure that it makes sense to the whole conversation.

21          And that's part of the reason why I also -- I also

22   read it without the audio.  Does it make sense in the

23   whole conversation?

24       Q.   Well, you keep talking about context.  Is context

25   something that someone else is telling you, or is that

1   coming from your own observations?

2       A.   That's my own observations.

3       Q.   And your own observations doing what?

4       A.   Listening, knowing, learning every day, listening

5   to what's going on, and -- just -- (pause).

6       Q.   After listening to approximately 3,000 hours of

7   Spanish language recordings in this case, was it apparent

8   to you what country of origin most of the speakers were

9   from?

10      A.   Absolutely.

11      Q.   And, setting aside this case, but just generally

12  speaking, when you listen to lengthy Spanish recordings,

13  are you able to tell what country of origin, what dialect

14  they're using?

15      A.   Yes.

16      Q.   So, in other words, do you need someone to tell

17  you what dialect it is?

18      A.   No.

19      Q.   What country of origin were most of the speakers

20  in these 3,000 hours of recordings you listened to from?

21      A.   El Salvador.

22      Q.   All right.  And in addition to -- setting aside

23  what anyone may or may not have told you, were you able

24  to tell, by listening to these 3,000 hours of recordings,

25  whether or not some of the speakers spoke like gang

1    members?

2       A.   Yes.

3       Q.   And did they?

4       A.   They did.

5       Q.   And, did -- how, if at all, did that inform the

6    way --

7                   MR. LEIVA:  Objection.

8    BY MS. MARTINEZ:

9       Q.   -- that you translated these calls?

10                  MR. LEIVA:  Objection.

11                  THE COURT:  The objection?

12                  MR. LEIVA:  The last comment.  She's asked

13   for an opinion now.  She's basically testifying as a gang

14   expert.

15                  She's now asked the jury for her to make the

16   decision on ultimate fact that's an issue of one of these

17   counts, is whether someone is a gang member or not.

18                  THE COURT:  Objection sustained.

19   BY MS. MARTINEZ:

20      Q.   When you're listening to a Spanish language

21   recording and you come to your own conclusion about what

22   dialog they're speaking -- dialect they're speaking, how,

23   if at all, does that affect your ability -- the way that

24   you translate that recording?

25      A.   Well, it affects it because that's -- those are

1    the kinds of words I'm going to look for to translate it,

2    and I'm going to go to that specific dialect, those

3    meanings, the way they -- the way they make up -- the way

4    they speak.

5        Q.   But you used the word "*loco*," l-o-c-o, as an

6    example.

7        A.   Right.

8        Q.   What are some of the meanings that "*loco*" can

9    have, setting aside context?

10       A.   Crazy, dude, um, man, um -- I mean, those are just

11   three that I can think of right now.

12       Q.   And, homeboy, too, right?

13            MR. AQUINO:  Objection.

14   BY MS. MARTINEZ:

15       Q.   That's what defense counsel --

16            MR. AQUINO:  Objection.

17            THE COURT:  Sustained.  Sustained.

18   BY MS. MARTINEZ:

19       Q.   When you hear the word "*loco*" in a Spanish

20   language recording, how do you tell what to translate it

21   as?

22       A.   Again, by what was said before, by what they're

23   talking about, by what's said afterwards.  You don't just

24   look at each word and that's it.  You look at the whole

25   thing, the whole sentence.

1    Q.   Now, defense counsel also asked you about the

2   names, the identities of the speakers in these

3   recordings.

4    A.   Yes.

5    Q.   Okay.  Now, you weren't responsible for

6   identifying who was speaking in the recordings; is that

7   right?

8    A.   That's correct.

9    Q.   When you initially prepared your verbatim, did you

10   include the names of the people who were speaking?

11    A.   Initially, no, I did not.

12    Q.   And, in the versions that we looked at on

13   Thursday, the exhibits for this court case, were there

14   names included to identify the speakers?

15    A.   Yes, they were.

16    Q.   Do you know who was responsible for identifying

17   those names?

18    A.   I -- I believe -- it's an assumption, but Fernando

19   Uribe, the agent.

20    Q.   Do you know, from your personal knowledge, who was

21   responsible for identifying the speakers in these many

22   calls?

23    A.   No.

24    Q.   And just to be clear about what your work product

25   is in these transcripts --

1    A.   Uh-huh.

2    Q.   -- the cover page of these transcripts includes

3    date, time, phone numbers, that sort of thing; is that

4    right?

5    A.   That's correct.

6    Q.   Where does that information come from?

7    A.   It comes from the recordings.

8    Q.   Defense counsel also asked about the review

9    process for some of these -- these verbatim recordings --

10        MR. AQUINO:  Objection, Judge.  It's implicit

11   in that question that these are verbatim recordings.

12   That subject is in dispute.  I submit that the testimony

13   has been they're not verbatim.

14        THE COURT:  Well, this is her witness.  I'm

15   going to allow her to use the word.

16        Go ahead.

17   BY MS. MARTINEZ:

18   Q.   Defense counsel asked you about the review process

19   for these verbatim translations that you prepared for

20   this case.

21   A.   Yes.

22   Q.   Setting this case aside, in your standard work

23   within the FBI, is your work reviewed from time to time?

24   A.   Yes, it is.

25   Q.   And, why is it reviewed from time to time?

1     A.   To make sure that I'm accurate and I'm doing a

2  good job.

3     Q.   How often is your work reviewed?

4     A.   At least once a year.

5     Q.   And what happens after the review?

6          Are you informed of any sort of conclusion?

7     A.   Yes.

8     Q.   And, what is the nature of how you're -- of what

9  you're informed?

10              MR. AQUINO:  Objection as to hearsay, Judge.

11              THE COURT:  You asked her to report the

12  report of a review of her work.  That would be hearsay,

13  wouldn't it?

14              MS. MARTINEZ:  Your Honor, perhaps it was a

15  bad question, but I was asking, in other words, what were

16  the options of the responses.

17              MR. AQUINO:  Objection.  Again, I think it's

18  attempting to elicit hearsay.

19              THE COURT:  It is.

20              MS. MARTINEZ:  In other words, is it

21  pass/fail?  Is there a grade?  Is there a score?  The way

22  that she gets feedback.

23              THE COURT:  Ask that question.  That was not

24  the question you asked.

25              MS. MARTINEZ:  It was perhaps a bad question.

```
 1    I apologize.
 2    BY MS. MARTINEZ:
 3        Q.   When your work is reviewed and you get feedback,
 4    what is the nature of that feedback?
 5             In other words, is it a pass/fail?
 6             Do you get a score?
 7                  MR. AQUINO:  Same objection, Judge.
 8                  THE COURT:  It doesn't call for hearsay.  She
 9    didn't ask what score she received.  That would be
10    hearsay.
11                  You can ask her.
12    BY MS. MARTINEZ:
13        Q.   What is the nature of the response that you get
14    when your work is reviewed?
15             Not a specific review; what is the nature of that
16    response?
17        A.   It's just a pass/fail.
18        Q.   And, over the course of your experience as a
19    contractor linguist with the FBI, approximately how many
20    times has your work been reviewed?
21        A.   At least six times.
22        Q.   Are you currently in good standing as a contract
23    linguist with the FBI?
24                  MR. AQUINO:  She's asking for hearsay, Your
25    Honor.
```

1          THE COURT:  Overruled.

2    BY MS. MARTINEZ:

3       Q.  Are you currently in good standing as a contract

4    linguist with the FBI?

5       A.  Yes, I am.

6       Q.  Now, you also testified about the review of the

7    transcripts that you prepared for this case.

8       A.  Yes.

9       Q.  And, you testified that you are the final arbiter

10   of any disputes.

11      A.  That's correct.

12      Q.  Were there significant disputes?

13      A.  Not really, no.

14          MS. MARTINEZ:  Thank you, Your Honor.

15          THE COURT:  All right.

16          May the witness be excused?

17          MS. MARTINEZ:  Yes, Your Honor.

18          THE COURT:  You're free to leave.  Thank you

19   for coming.

20          (Thereupon, the witness withdrew from the

21   stand)...

22          (End of requested excerpt.)

23

24                    ---

25

CERTIFICATE OF REPORTER

I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the excerpt testimony in the case of UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

I further certify that I was authorized and did report by stenotype the proceedings in said excerpt testimony, and that the foregoing pages, numbered 1 to 54, inclusive, REQUESTED EXCERPT, constitute the official transcript of said proceedings as taken from my shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this  22nd  day of  April , 2016.


                              /s/
_____
                   Renecia Wilson, RMR, CRR
                   Official Court Reporter

RENECIA A. SMITH-WILSON, RMR, CRR