```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                        EASTERN DISTRICT OF VIRGINIA
 2                           Alexandria Division

 3     UNITED STATES OF AMERICA,        )
                                        )
 4                          Plaintiff,  )
                                        ) Crim. No. 1:14cr306
 5          vs.                         )
                                        )
 6     JOSE LOPEZ TORRES, ALVIN GAITAN  )
       BENITEZ, CHRISTIAN LEMUS CERNA,  ) April 7, 2016
 7     OMAR DEJESUS CASTILLO, DOUGLAS    )
       DURAN CERRITOS, MANUEL ERNESTO    )
 8     PAIZ GUEVARA, and JESUS ALEJANDRO )
       CHAVEZ,                          )
 9                                      )
                            Defendants. )
10     _____ )

11

12                            JURY TRIAL

13          ** EXCERPT:  TESTIMONY OF VANIA VARGAR **

14
       BEFORE:     THE HONORABLE GERALD BRUCE LEE
15                 UNITED STATES DISTRICT JUDGE

16
       APPEARANCES:
17
       FOR GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
18                      BY:  JULIA MARTINEZ, AUSA
                             STEPHEN M. CAMPBELL, AUSA
19                           TOBIAS TOBLER, AUSA

20
                              ---
21

22     OFFICIAL COURT REPORTER:

23                      RENECIA A. SMITH-WILSON, RMR, CRR
                        U.S. District Court
24                      401 Courthouse Square, 5th Floor
                        Alexandria, VA 22314
25                      (703)501-1580
```

1    APPEARANCES (Continued)

2    FOR DEFENDANT JOSE LOPEZ TORRES

3            BYNUM & JENKINS, PLLC
             BY:  ROBERT L. JENKINS, JR., ESQ.
4            THE LEIVA LAW FIRM, PLC
             BY:  MANUEL E. LEIVA, ESQ.
5
     FOR DEFENDANT ALVIN GAITAN BENITEZ
6
             LAW OFFICE OF AMY LEIGH AUSTIN
7            BY:  AMY LEIGH AUSTIN, ESQ.
             SMITH & ZIMMERMAN, PLLC
8            BY:  JEFFREY D. ZIMMERMAN, ESQ.

9    FOR DEFENDANT CHRISTIAN LEMUS CERNA

10           LAW OFFICE OF CHRISTOPHER AMOLSCH
             BY:  CHRISTOPHER AMOLSCH, ESQ.
11           FRANK SALVATO, ESQ.

12   FOR DEFENDANT OMAR DEJESUS CASTILLO

13           FIRSTPOINT LAW GROUP, PC
             BY:  KATHERINE MARTELL, ESQ.
14           OLD TOWN ADVOCATES, PC
             BY:  MEREDITH M. RALLS, ESQ.
15
     FOR DEFENDANT DOUGLAS DURAN CERRITOS
16
             LAW OFFICE OF J.R. CONTE, PLLC
17           BY:  JOSEPH R. CONTE, ESQ.
             LAW OFFICE OF DWIGHT CRAWLEY
18           BY:  DWIGHT E. CRAWLEY, ESQ.

19   FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

20           LAW OFFICE OF W. MICHAEL CHICK, JR.
             BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
21
     FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
22
             JEROME P. AQUINO, ESQ.
23           ELITA C. AMATO, ESQ.

24
                            ---
25

```
1                            INDEX

2

3   WITNESS (Government) DIRECT   CROSS   REDIRECT   RECROSS

4   Vania Vargas           4       20      ---        ---

5       (End of excerpt)

6

7                            ---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>PROCEEDINGS</u>
(Requested Excerpt)

...(Court in session at 2:31 p.m.)

MR. TOBLER:  United States calls Vania Vargas.

THE COURT:  Ms. Martinez, were you able to locate the glossary?

MS. MARTINEZ:  We have, Your Honor, and it has been provided --

THE COURT:  Thank you.

MS. MARTINEZ:  -- to defense counsel.  We also have copies for other defense counsel, if they would like copies.

THE COURT:  All right.  Thank you.

(Witness sworn.)

THE WITNESS:  Yes.

THE COURT:  You may proceed.

THEREUPON, VANIA VARGAS, having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TOBLER:

Q.  Good afternoon, ma'am.

A.  Hello.

Q.  Could you please state your name and spell it for the record.

1    A.   Vania Vargas, V-a-n-i-a, V-a-r-g-a-s.

2    Q.   Where do you work, ma'am?

3    A.   At Washington Field Office.

4    Q.   For what organization?

5    A.   The FBI.

6    Q.   What is your position with the FBI?

7    A.   I'm a contract linguist.

8    Q.   How long have you been in that position?

9    A.   Almost ten years.

10   Q.   What languages do you speak?

11   A.   Spanish and English.

12   Q.   How long have you spoken Spanish?

13   A.   It's my first language.

14   Q.   Where did you learn Spanish?

15   A.   In Bolivia.

16   Q.   Are you from Bolivia?

17   A.   Yes.

18   Q.   How long have you spoken English?

19   A.   I -- since I was four.

20   Q.   Where did you work prior to the FBI?

21   A.   Bank of America.

22   Q.   How long did you work at the Bank of America?

23   A.   About seven years.

24   Q.   Where was the bank branch in which you worked?

25   A.   I worked in different ones:  Woodley Park,

1    Wheaton and Gaithersburg.

2        Q.   What was your position at the bank?

3        A.   A banker.

4        Q.   In your role as a banker, did you use your

5    Spanish skills?

6        A.   I did.

7        Q.   How so?

8        A.   I interacted with Spanish-speaking customers.

9        Q.   From what countries were the people you spoke to

10   in Spanish?

11       A.   Most of them, Central Americans.

12       Q.   What countries within Central America?

13       A.   El Salvador, Honduras, Guatemala.

14       Q.   And what would you -- when you spoke to these

15   folks from Central America, what would you speak to them

16   about?

17       A.   I would help them with their banking, their

18   mortgage, their investment.

19       Q.   Were you able to communicate with those

20   individuals from Central America?

21       A.   Yes.

22       Q.   Based on your experience, would you agree that

23   Spanish speakers from different Spanish speaking

24   countries have different manners of speaking the

25   language?

1    A.  Yes.

2    Q.  With what dialects of Spanish are you familiar?

3    A.  Central Americans, Mexicans, Dominicans, Puerto

4    Ricans.

5    Q.  When you say Central American, does that include

6    Salvadoran?

7    A.  Yes.

8    Q.  How are you familiar with the Salvadoran dialect?

9    A.  They have -- -- can you rephrase the question for

10   me?

11   Q.  What experiences have you had in which you have

12   become familiar with the Salvadoran dialect?

13   A.  By working at the bank, I help with the customers

14   with their banking needs, their mortgage needs.  And

15   then when I transferred to the FBI, I started working

16   with a lot of Central Americans and -- and different

17   other countries.

18           THE COURT:  Can you rephrase the question?

19   I don't think she understood your question.

20   BY MR. TOBLER:

21   Q.  Um --

22           THE COURT:  His question had to do with your

23   familiarity with the Salvadorian dialect.  Can you

24   explain that?

25           THE WITNESS:  Yes.  I started learning and

1    getting acquaintance with the language, with Salvadorian

2    slang, when I worked at Bank of America, because I had

3    many customers who were from El Salvador.  And in order

4    for me to understand their needs, I had to get used to

5    the different type of Spanish they spoke to the one I

6    was used to.

7    BY MR. TOBLER:

8        Q.   When you were hired by the FBI, were you required

9    to take any language proficiency exams?

10       A.   I was.

11       Q.   Did you successfully qualify to be a contract

12   language monitor?

13       A.   Yes.

14       Q.   What do you do as a -- as a contract language

15   monitor?

16       A.   I do interpreting.  I do summaries verbatim.  I

17   do wire taps.

18       Q.   What types of materials do you interpret?

19       A.   CDs, audios, any type of audio, video.

20       Q.   Do you interpret documents?

21       A.   I do.

22       Q.   Do you also conduct in-person interpretation?

23       A.   Yes.

24       Q.   And I believe you mentioned that you interpret

25   recordings as well.

1      A.   I'm sorry?

2      Q.   I believe you mentioned you interpret recordings

3 as well.

4      A.   I translate recordings.

5      Q.   When you translate, do you translate from Spanish

6 to English?

7      A.   Yes.

8      Q.   Do you also translate from English to Spanish?

9      A.   Sometimes.

10      Q.   What experience do you have translating Spanish

11 in the Salvadorian dialect?

12      A.   Um, about seven years.  I started with

13 Salvadorian Title III drug cases, MS-13 cases.

14      Q.   When you were working on a wire tap, what were

15 your duties?

16      A.   To listen to the call and to do a summary of the

17 call.

18      Q.   Did you ever complete verbatim transcripts?

19      A.   Not from T-IIIs.

20      Q.   When you're working on a wire tap, approximately

21 how many hours per week are you listening to recordings?

22      A.   At least 30.

23      Q.   And just so we're clear, when you're listening to

24 the recordings, what language are the recordings in?

25      A.   Spanish.

1    Q.   And you are translating them into what English --
2    excuse me -- into what language?
3    A.   English.
4    Q.   And, how long -- how long does a wire tap
5    typically last?
6    A.   It can go from 30 days up to six months or a
7    year, or even more.
8    Q.   Approximately what percentage of your work
9    translating Spanish involves MS-13?
10   A.   Fifty percent.
11   Q.   In your experience, do people involved with MS-13
12   speak Spanish in a distinctive manner?
13   A.   I'm sorry?
14   Q.   In your experience, do people involved with MS-13
15   speak Spanish in a distinctive way?
16   A.   Yes.
17   Q.   How so?
18   A.   Slang, different slang.
19   Q.   How have you educated yourself to understand
20   Spanish as spoken by MS-13 members?
21   A.   On the job.
22   Q.   Could you please describe what you mean by "on
23   the job"?
24   A.   On the job, just by listening to their
25   conversations and, just talking to other people who have

1    more experience.

2        Q.   Who have you talked to, to help you understand

3    MS-13 slang?

4        A.   I started with senior linguists at work.  And, on

5    the first case I worked I actually spoke to somebody who

6    came from El Salvador to help us out.

7        Q.   Who was that person who came from --

8        A.   He was a task force officer from -- a gang task

9    force officer from El Salvador.

10       Q.   Do you know what his position was in El Salvador?

11       A.   I don't recall.

12       Q.   Was he a member of Salvadoran law enforcement?

13       A.   Yes.

14            MR. TOBLER:  Your Honor, we would move that

15   the witness be recognized as an expert Spanish linguist,

16   with expertise in the Salvadorian dialect.

17            MR. LEIVA:  Subject to cross-examination.

18            THE COURT:  Subject to cross-examination,

19   she will be allowed to testify to a reasonable degree of

20   certainty in her field, as an expert in the Spanish

21   language with expertise in the Salvadorian dialect.

22   BY MR. TOBLER:

23       Q.   Ma'am, please describe the process by which you

24   prepare a verbatim translation of a Spanish language

25   recording.

1    A.   Sure.  I'm given the recording.  I will listen to

2    the recording from beginning to end the first time.  The

3    second time around I'll take notes on the recording.

4    And then I'll start translating into English after --

5    after my notes.

6    Q.   What do you do after -- well, let me ask you this

7    question first:  What equipment do you use during that

8    process?

9    A.   Start-Stop.

10   Q.   What is Start-Stop?

11   A.   Start-Stop is a system that allows me to pause

12   the recording with my foot.  It makes -- leaves my hands

13   free so I'm able to type.

14   Q.   Does that equipment alter the recording in any

15   way?

16   A.   Not at all.

17   Q.   Do you wear headphones when you're performing

18   translations?

19   A.   I do.

20   Q.   Do the headphones you wear alter the recordings

21   in any way?

22   A.   Not at all.

23   Q.   When you're translating, what do you do when you

24   come across a word that you do not understand?

25   A.   I talk to my fellow colleagues, and I have them

1    listen to the recording to see if they could understand

2    it.  If not, I try to, like, slow down the recording to

3    see if I can hear it better.

4        Q.   What if you can hear the word but you don't

5    necessarily understand the meaning, or you have

6    questions about the meaning?

7        A.   I will once again approach my colleagues, the

8    senior linguists who I work with, and sometimes I will

9    use the Internet.

10       Q.   And, after you consult -- what role, if any, does

11   context play in helping you understand the meaning of a

12   word?

13       A.   It depends on the type of conversation the

14   subject is having, like, what are they talking about.

15   Like the whole conversation has a lot to do with the

16   meaning of the word.

17       Q.   When you're making an assessment of the meaning

18   of a word, who -- upon whose judgment do you ultimately

19   rely?

20       A.   Mine.

21       Q.   And in your experience, is it common practice for

22   a contract language monitor to rely on the resources you

23   just described when translating words or phrases?

24       A.   Yes.

25       Q.   What do you do after you've prepared a draft

1   translation?

2       A.   I review it a couple more times to make sure I --
3   I'm happy with the results that I have.

4       Q.   And what about after that?

5            Is there a -- is there a review process in place
6   for these --

7       A.   Yes.

8       Q.   -- translations?

9       A.   Somebody else will review my work as well.

10      Q.   Have you ever served as a reviewer for another
11  linguist's translations?

12      A.   Yes.

13      Q.   What do you do when you conduct a review of
14  another linguist's translations?

15      A.   I review -- I listen to the conversation from
16  beginning to end.  Then I get the document and I review
17  with the audio.  I go with the audio.

18      Q.   What do you do after that, as a reviewer?

19      A.   Then I give it back to the linguist.

20      Q.   What do you include with what you give back to
21  the linguist?

22      A.   Suggestions.  I help fill out the blanks, or
23  things that I understood better.  I'll make suggestions
24  of what I hear and what I understand.

25      Q.   When you're the original linguist, what do you do

V. Vargas - Direct                                          15

1    when the review is complete?

2        A.   I go over the -- the audio as well again, and I

3    review the corrections that have been made.  And if I

4    agree with the corrections, I will take them.  If I

5    don't agree with the corrections, I will keep what I

6    have written.

7        Q.   By the time you complete the entire process,

8    approximately how many times have you listened to the

9    recording that you are translating?

10       A.   About ten.

11       Q.   As part of this case, were you asked to perform

12   Spanish to English translation services?

13       A.   Yes.

14            MR. TAYLOR:  With the assistance of

15   Mr. Toliver, I would like to show you what has been

16   marked in the exhibit binders for identification as

17   Government's Exhibit 8-A, 9-A and 22-A.

18   BY MR. TOBLER:

19       Q.   Do you recognize these exhibits, ma'am?

20       A.   Yes, I do.

21       Q.   What are they?

22       A.   They are the recordings.

23       Q.   Recordings of what?

24       A.   Of conversations.

25       Q.   Were these recordings -- were these conversations

V. Vargas - Direct                                              16

1    translated?

2        A.   Yes.

3        Q.   By whom?

4        A.   By me.

5        Q.   How do you recognize these exhibits?

6        A.   I have my initials on the CDs.

7        Q.   What did you do before initialing those CDs?

8        A.   I sat down and I listened to the recording and I

9    read the document.

10       Q.   When you say "the document," what document are

11   you referring to?

12       A.   The translations.

13       Q.   Please turn, if you would, in the binder to

14   Government's Exhibits 8-A-1, 9-A-1, and 22-A-1.

15            Did you have an opportunity to see all of them?

16       A.   Yes.

17       Q.   Do you recognize these exhibits?

18       A.   Yes.

19       Q.   What are they?

20       A.   They're CDs.

21       Q.   I'm actually asking you to look at Government's

22   Exhibit 8-A-1, so the dash-1 afterwards.

23       A.   Oh, I'm sorry.

24       Q.   No problem.

25            It should be behind the disks, I believe.

1    A.   Oh, I see.  Sorry.  Thank you.  Got it.  Thanks.

2    Q.   Feel free to take them out.

3    A.   Okay.  Thank you.

4    Q.   Is that 8-A-1?

5    A.   Yes.

6    Q.   Please also review 9-A-1.

7         And then, lastly, please review 22-A-1.

8    A.   Sorry.

9    Q.   No need to apologize.  Thank you.

10   A.   Thank you, sir.

11        Okay.  Yes.

12   Q.   Do you recognize Government's Exhibits 8-A-1,

13   9-A-1 and 22-A-1?

14   A.   I do.

15   Q.   What are they?

16   A.   These are my translations.

17   Q.   What is Government's Exhibit 8-A-1 a translation

18   of?

19   A.   Conversations.

20   Q.   And, where are those conversations located?

21        Are those the conversations that are in

22   Government's Exhibit 8-A?

23   A.   Yes.

24   Q.   What is Government's Exhibit 9-A-1 a translation

25   of?

1    A.   Conversations.

2    Q.   The conversations in Government's Exhibit 9-A?

3    A.   Yes.

4    Q.   What is Government's Exhibit -- well, is

5    Government's Exhibit 22-A-1 a translation of

6    Government's Exhibit 22-A?

7    A.   Yes.

8    Q.   When you created these translations, did you

9    follow the process you described previously in your

10   testimony?

11   A.   I did.

12   Q.   Do these translations identify the speakers in

13   the recordings?

14   A.   Some.

15   Q.   Was it part of your translation responsibility to

16   identify the actual speakers in these recordings?

17   A.   No.

18   Q.   What was the source of that information?

19   A.   It was given to me.

20   Q.   Do you have personal knowledge -- who gave it to

21   you?

22   A.   The case agent.

23   Q.   Do you have personal knowledge of where the case

24   agent got that information?

25   A.   No.

V. Vargas - Direct                                      19

1     Q.   On the first page of each translation, is there
2   information about the time and date of the call?
3     A.   Yes.
4     Q.   Where does that information come from?
5     A.   The CD.
6     Q.   Other than the information we just discussed,
7   including the identity of the speakers, are these
8   translations your own work product?
9     A.   Yes.
10    Q.   As preparation for your testimony, have you
11   reviewed Government's Exhibit 8-A-1, 9-A-1, and 22-A-1,
12   and compared their contents against Government's
13   Exhibits 8-A, 9-A and 22-A?
14    A.   Yes.
15    Q.   Based on your training and experience, is
16   Government's Exhibit 8-A-1 a true and accurate
17   translation of the contents of 8-A?
18    A.   Yes.
19    Q.   Based on your training and experience, is
20   Government's Exhibit 9-A-1 a true and accurate
21   translation of the contents of 9-A?
22    A.   Yes.
23    Q.   Based on your training and experience, is
24   Government's Exhibit 22A-1 a true and accurate
25   translation of the contents of 22-A?

1    A.   Yes.

2         MR. TOBLER:   Your Honor, at this time the

3    government moves for admission of Government's

4    Exhibits 8-A, 8-A-1, 9-A, 9-A-1, 22-A, and 22-A-1,

5    conditional upon the government establishing the

6    evidence as relevant.

7         MR. AQUINO:   Judge, renew the same

8    objection.

9         THE COURT:   All right.   Subject to the

10   objection, the standing objection concerning these

11   transcripts, concerning whether or not they are verbatim

12   whether or not -- whether they're relevant, and whether

13   or not the translation as related to gang dialect are

14   accurate, they will be received.

15        MR. TOBLER:   No further questions, Your

16   Honor.

17                    CROSS-EXAMINATION

18   BY MR. LEIVA:

19   Q.   Good afternoon, Ms. Vargas.

20   A.   How are you?

21   Q.   So, you're Bolivian?

22   A.   Yes.

23   Q.   *Pacena*?

24   A.   I'm sorry?

25   Q.   *Pacena*?

1    A.   Yes.

2              MR. LEIVA:   That's p-a-c-e-n-a.

3    BY MR. LEIVA:

4    Q.   Am I correct, then, to infer that you were raised

5    in Bolivia?

6    A.   Yes.

7    Q.   Okay.   How old were you when you came to the

8    United States?

9    A.   Eleven.

10   Q.   Eleven years old.   All right.

11        Okay.   So you were mostly raised here in the

12   States, then, not Bolivia?

13   A.   Well --

14   Q.   Or half-half?

15   A.   Half.

16   Q.   Half-half; I'll take that.

17        And, Ms. Vargas, the Spanish -- and I know this

18   is going to sound like a silly question, but I need to

19   ask it.   The Spanish that you learned was in Bolivia.

20   A.   Yes.

21   Q.   All right.   And, just so you know, I'm half

22   Salvadoran and half Bolivian.

23   A.   Okay.

24   Q.   So, the -- the Spanish that you learned, I think

25   we established was in Bolivia, right?

V. Vargas - Cross                                                22

1    A.   Yes.

2    Q.   And, within Latin America, would you agree that

3    the Spanish spoken in Bolivia tends to have the

4    reputation of being the truest form of Spanish, in the

5    sense that it follows all the correct grammatical rules

6    in Spanish?

7         You've never heard that before?

8    A.   No.

9    Q.   Okay.  All right.  Would you agree with me that

10   the Spanish spoken in Bolivia tends to have very little

11   slang?

12   A.   No.

13   Q.   All right.  Would you agree with me that the

14   Spanish spoken by Salvadorians is laden with slang?

15        (Pause.)

16        Well, let me ask it this way:  You testified on

17   direct --

18             THE COURT:  I'm sorry.  I didn't hear an

19   answer.  Did you answer?

20             THE WITNESS:  No, Your Honor, I didn't.

21   He's going to --

22             MR. LEIVA:  Well, let me rephrase it then.

23   BY MR. LEIVA:

24   Q.   Salvadorian Spanish -- the way Salvadorians speak

25   Spanish, they use a lot of slang, do they not?

1     A.   Not all of them.

2     Q.   That's not what I asked you.  I didn't ask you,

3  all of them.  I asked you if -- if the Spanish spoken by

4  Salvadorians, if they tend to use a lot of slang?

5     A.   Yes.

6     Q.   Okay.  And, the reason I'm asking that, because

7  when you testified on direct, when counsel was eliciting

8  your experience with Salvadorians, you used the phrase

9  "it took some getting used to."

10    A.   Correct.

11    Q.   All right.  So, if your position today is that

12 they don't really use a lot of slangs, what were you

13 getting used to?

14    A.   May I answer?

15    Q.   Yes.

16    A.   Okay.  So, they speak -- for -- for my Spanish,

17 it was just they used different words for different

18 things that I would use a different word for.

19    Q.   All right.  So you're saying that the dialect is

20 different?

21    A.   The dialect is different.

22    Q.   All right.  And the words that they used, they

23 tended to be slang words; would you agree with that?

24    A.   Yes.

25    Q.   Okay.  And so, even in the setting as simple as

V. Vargas - Cross                                                    24

1    you dealing with someone's banking issues, initially you

2    had difficulty understanding them?

3        A.   Yes.

4        Q.   And I'm assuming that when people came to you

5    seeking assistance for banking issues, they weren't

6    talking in gang slang, right?

7        A.   No.

8        Q.   Right.

9             And, you would think that someone that's coming

10   to seek assistance for banking issues would try to use

11   little slang when dealing with someone professional, as

12   yourself?

13       A.   Yes.

14       Q.   All right.  But, what you found is, even that the

15   Spanish that they used -- they were using -- let's --

16   let me characterize it as they cleaned up their Spanish,

17   was still difficult initially for you to understand?

18       A.   Initially.

19       Q.   And, you would agree that throughout Latin

20   America there are differences in dialect, right?

21       A.   Yes.

22       Q.   And, words have different meanings?

23       A.   Yes.

24       Q.   Okay.  Now, if you would indulge me here.  I tend

25   to be more of a hands-on type of learner.  Either I need

1   to see things or hear things.  And if I may play a clip

2   for you, all right, and if you can tell the members,

3   ladies and gentlemen of the jury and Judge Lee whether

4   this is a correct analogy of someone from Bolivia

5   listening to someone from El Salvador speak, all right?

6   If I may.

7       A.  Okay.

8       Q.  What I'm going to play to you is someone from

9   Liverpool, England, speaking English.  And you let me

10  know if you think that's an appropriate analogy.

11              MR. TOBLER:  Your Honor, we would object to

12  the relevance of the analogy.

13              MR. LEIVA:  I think it's an example, because

14  right now we're talking abstract.

15              MR. TOBLER:  We would also object to it

16  being published to the jury without her having a chance

17  to listen.

18              THE COURT:  I think he's going to let her

19  listen to something now.

20              MR. LEIVA:  Yeah, I was going to play it

21  right now.

22              THE COURT:  Well, she's an expert, so

23  experts can be asked that type of question.  Objection

24  overruled.

25              (Audio played.)

1    BY MR. LEIVA:

2       Q.   Would you say that's a fair analogy?

3               MR. TOBLER:  Your Honor, we would again

4    renew our objection.  This isn't English language.  And

5    it's being published before the jury without her

6    having --

7               MR. LEIVA:  Well, she --

8               THE COURT:  I'm sorry.  I'm sorry.

9               What's your objection?

10              MR. TOBLER:  It's being published without --

11   before the jury without her having an opportunity to

12   hear it first.

13              We would object to the relevance.  He's

14   playing something, from, I believe he said it was from

15   Liverpool.  I don't see why that is relevant, given the

16   fact that we're talking about Spanish, Spanish language

17   testimony.

18              MR. LEIVA:  Your Honor, it's a simple yes or

19   no answer.  She can say yes, it is analogous to what

20   someone from Bolivia would -- would -- when listening to

21   someone speaking Salvadorian sounds like, in English

22   terms, or she can just say no, it's not a proper

23   analogy.

24              THE COURT:  Objection overruled.

25              THE WITNESS:  I'm sorry?

V. Vargas - Cross                                          27

BY MR. LEIVA:

Q.   So, you are an English speaker, right?

A.   Yes.

Q.   And I just played a clip of someone from Liverpool speaking English as they do in Liverpool.

A.   Yes.

Q.   All right.  Now, someone who is Bolivian, South American, speaking -- or hearing someone from El Salvador speak, would you say that the analogies are kind of the same, that initially you don't catch things and you kind of have to listen hard to understand what's being said by a Salvadorian, someone with your background, initially from Bolivia?

A.   Yes.  And if I may give an example, it's -- well, it's like if you take somebody from Boston and send them to the deep South, you know, he gets in his car and he goes to the South, within a week, within a few days, he'll be able to understand.

So, yes, I'm Bolivian, but if you give me a recording and I'm working on this for so many years, I will be able to understand.

Q.   All right.  So, you're saying at some point you start to hear and fine-tune certain things?

A.   Yeah.  I have the ear for it.

Q.   Okay.  So, let's go to -- before we get to the

1    actual translations, let me jus ask you some very basic

2    questions about your background.

3        A.   Sure.

4        Q.   Are you a member of the American Translators

5    Association?

6        A.   No.

7        Q.   Are you a member of the International Association

8    of Professional Translators and Interpreters?

9        A.   No.

10       Q.   Are you a member of the National Capital Area

11   Translators Association?

12       A.   No.

13       Q.   Are you member of the National Association for

14   Interpretation?

15       A.   No.

16       Q.   Are you certified to provide interpretation or

17   translating services in federal court?

18       A.   No.

19       Q.   Before testifying here today, did you talk to any

20   of your colleagues who testified here previously?

21       A.   Yes.

22       Q.   Okay.  Who did you speak with?

23       A.   My colleagues.

24       Q.   No, who?

25            Ms. D'Sa --

1    A.   Ms. D'Sa.

2    Q.   Ms. D'Sa.  And, she told you about what she

3    testified here today?

4    A.   No.

5    Q.   Okay.  Did she tell you about what kind of

6    questions were asked of her?

7    A.   No.

8    Q.   All right.  What, if anything, did she say about

9    her experience here in court?

10   A.   She was nervous.

11   Q.   She was nervous.  All right.

12        And how did that topic come up between you and

13   Ms. D'Sa?

14   A.   We are colleagues.  We have -- we do a lot of

15   work together, so we have to talk at least once a day.

16   Q.   I understand that.

17        But did you approach her and say, "Hey, how did

18   it go in court," or did she just volunteer that

19   information to you?

20   A.   It just came out, out of the conversation.

21   Q.   And she didn't expand on why she was nervous?

22   A.   No.

23   Q.   She just left it at that, "I was nervous."

24   A.   Yeah.

25   Q.   How many times did you testify that you reviewed

V. Vargas - Cross                                              30

1   these recordings before you were okay with the final

2   product?

3       A.   About ten.

4       Q.   Ten times.  Okay.

5            If I could have you look at Government's

6   Exhibit 8-A-1.

7            Do you have that in front of you?

8       A.   I do.

9       Q.   Okay.  And, this is a -- a recording that you

10  reviewed, correct?

11      A.   Yes.

12      Q.   All right.  And it's a recording that you

13  reviewed at least ten times?

14      A.   Yes.

15      Q.   Okay.  All right.  Now, we've -- the jury has

16  heard some -- some questions about this word "*loco*,"

17  right?

18           What does the word "*loco*" mean to you?

19      A.   I'm sorry?

20      Q.   What does the word "*loco*" mean to you?

21      A.   Homeboy.

22      Q.   "*Loco*" --

23      A.   Like a buddy.

24      Q.   "Loco" means homeboy?

25      A.   Like a buddy.

1    Q.   All right.  So, when someone says to you, "Hey, I
2    don't speak Spanish, but my buddy just said hey -- he
3    used the term '*loco*' on me," your first response is that
4    it means homeboy?
5    A.   Buddy, yeah, my friend, my buddy.
6    Q.   Well, hold on.  Buddy and homeboy are two
7    different things.
8    A.   Depends on the context.
9    Q.   All right.  Does it -- so you say it depends on
10   the context.  So when you were reviewing this audio
11   recording, were you told that this was an MS-13 case?
12   A.   No, not at first.
13   Q.   Not at first.
14        When did you get involved with listening to
15   recordings about this case?
16   A.   When?
17   Q.   Yeah, when.
18   A.   I think September.
19   Q.   September of 2014?
20   A.   No, last year, 2015.
21   Q.   2015?
22   A.   Yeah.
23   Q.   Okay.  And so when you initially started
24   listening to these audio recordings, you were not told
25   that it was an MS-13 case?

```
1      A.   I knew -- when did I --
2            THE COURT:  I'm sorry?  You didn't complete
3   your answer.  I couldn't hear you.
4            THE WITNESS:  I'm sorry, Your Honor.  I'm
5   thinking, because I do a lot of cases --
6            THE COURT:  Okay.  All right.
7            THE WITNESS:  -- at the same time, so --
8   yeah, I work a lot of cases at the same time.
9            Um, I think when I started was September --
10  August, September.
11  BY MR. LEIVA:
12     Q.   Okay.  All right.
13           THE COURT:  Of what year?
14           THE WITNESS:  Last year.
15           THE COURT:  Thank you.  2015.
16           THE WITNESS:  2015.
17  BY MR. LEIVA:
18     Q.   All right.  If I could draw your attention to
19  page two of that exhibit, Government's 8-A-1.  And if we
20  could go down to the fourth line with "OC," do you see
21  that?
22     A.   On page two?
23     Q.   Page two, yes, ma'am.
24     A.   And what did you say again?  "OC"?
25     Q.   I guess your -- your page is probably different
```

1   than -- it may appear to be -- it would be, I guess,

2   your page four.

3       A.   Okay.

4       Q.   It would be the sixth line down, starting with

5   "OC," with, "Yeah, man."

6            Do you see that?

7       A.   I see it.

8       Q.   Okay.  If I could play you the recording of that

9   section.

10            MR. LEIVA:  If I may, Your Honor?

11            THE COURT:  Go ahead.

12   BY MR. LEIVA:

13       Q.   And what I'm specifically asking you to look for

14   is -- or to listen for is the word "*loco*"?

15       A.   Okay.

16       Q.   Okay?

17            (Audio played.)

18            Did you hear that?

19       A.   No, I'm sorry.  Could you play it again.

20       Q.   Yes.

21            I'll go back a little further for you.

22       A.   Thank you.

23            (Audio played.)

24       Q.   Did you hear the word "*loco*"?

25       A.   I'm sorry.  Could you play it one more time,

1    please?

2        Q.   Yes.

3             (Audio played.)

4        Q.   Did you hear the word "*locos*"?

5        A.   I did.

6        Q.   And, you transcribed "*locos*" in that context as

7    dudes, right?

8        A.   Yes.

9        Q.   Okay.  Let me have you go down to the bottom, the

10   last statement that's made, that starts with "homie."

11       A.   Okay.

12            (Audio played.)

13       Q.   All right.  And you heard the actual word "homie"

14   being said, right?

15       A.   Yes.

16       Q.   Okay.

17            (Pause.)

18            Let me play another section -- another -- well,

19   let me do this, Let me do this, rather than go through

20   every single "*loco*" that's there.  So just on that page

21   alone --

22       A.   Uh-huh.

23       Q.   -- all right, on a transcript that you claim that

24   you reviewed ten different times -- right?

25       A.   Yes.

V. Vargas - Cross                                                      35

1    Q.   Well, sorry.  Strike that.

2         Let me have you just listen to one more, okay?

3    The word "*loco*."

4         (Audio played.)

5    Q.   Did you hear the word "*loco*"?

6    A.   I did.  But what page are you on?

7    Q.   Excuse me?

8    A.   What page were you on?

9    Q.   I'm sorry.  It's the same page that we were on --

10   I'm sorry.  It's -- it's -- let me look at yours,

11   because ours are different.

12        It would be your page six -- actually, go back.

13   It's the beginning of your page five.  I don't know why

14   our -- what you have and what I have are misnumbered.

15   So it would be your page number five.

16   A.   Okay.

17   Q.   Okay?  So, if you go down to your page number

18   five, down one, two, three, four, five, six, seven,

19   eight, nine, ten, the tenth person that's speaking,

20   "OC".

21   A.   Okay.

22   Q.   Which starts, "Imagine the big..."

23   A.   Okay.

24   Q.   That's what I'm going to play for you.

25        (Audio played.)

V. Vargas - Cross                                                    36

1    Q.   Do you hear the word "locos"?

2    A.   I did.

3    Q.   Okay.  So, here's my question, Ms. Vargas:  So,

4    you heard what was on your page number four and number

5    five.  On page number four, they initially use "locos"

6    and you translate that as dudes, right?

7    A.   Yes.

8    Q.   Okay.  Then at the bottom of that page, they use

9    the word "homie," and you translate that correctly to

10   homie?

11   A.   Yes.

12   Q.   And then on the next page they use "locos" again,

13   and you translate that to homies.

14   A.   Yes.

15   Q.   All right.  Why the inconsistencies, if you

16   reviewed this ten times?

17   A.   Because they're talking about their buddies,

18   they're talking about their friends.

19   Q.   But, listening to these MS-13 tapes, as you've

20   claimed that you have experience, you know that a

21   homeboy and a homie has special status within the gang?

22   A.   Yes.

23   Q.   Okay.  And, you correctly noted that when someone

24   used the word "homie," you attribute that in your

25   transcript, that they used the word "homie"?

1      A.   Yes.

2      Q.   But, then when someone uses a term other than

3   "homie," like "*loco*," you assign the definition of homie

4   to that, or homeboy to that?

5      A.   Yes.

6      Q.   Right.  That's my question:  Why the

7   inconsistency?

8      A.   Because I use them both as homie and as a buddy,

9   my buddy, my pal.

10              THE REPORTER:  Can you repeat that?

11              THE WITNESS:  I'm sorry?

12              THE COURT:  Can you repeat your answer,

13   please?

14              THE WITNESS:  Yes, sir.

15              I used it both as my homie, my buddy, my

16   friend, my buddy, my pal.

17   BY MR. LEIVA:

18      Q.   And, are you familiar with the word "*vato*"?

19      A.   Yes.

20      Q.   And what does "*vato*" mean?

21      A.   It's similar, like my buddy, my homeboy.

22      Q.   Okay.  My friend, my dude, right?

23      A.   Yes.

24      Q.   But, in this case, when someone use the word

25   "*vato*," you assigned homeboy to that.

1          (Pause.)

2          You want me to play it for you?

3     A.   Sure.

4     Q.   Okay.  Same page, the next line, underneath the

5 one that we just listened to.

6     A.   I'm sorry, what page was that again?

7     Q.   The same page, that would be your --

8     A.   Five?

9     Q.   Your five, right.

10         So I'll play it for you.  I'll start a little

11 back.

12    A.   Okay.

13         (Audio played.)

14    Q.   All right.  So, did you hear the word "*vato*"

15 being used, two times?

16    A.   I did, but, let me --

17    Q.   And in one of them, you translated "*vato*" as

18 being man, and in the other one, you translated it as

19 homeboy.

20              THE COURT:  Is that a question?

21              MR. LEIVA:  Yes.  Well, no, that's not a

22 question.

23 BY MR. LEIVA:

24    Q.   My question is, again, there seems to be

25 inconsistency here.  Did someone else review this and

1    make changes without -- without your permission?

2      A.   Well, somebody else did review it, and I reviewed

3    with the changes and I'm the one that made the final

4    decisions on it.

5      Q.   So, can you explain to us, then, why two people

6    reviewed this, and within just that one segment

7    attribute different meaning to the word "*vato*"?

8          (Pause.)

9          Do you have an explanation or --

10               THE COURT:  Let her answer.

11               THE WITNESS:  I'm sorry?

12               THE COURT:  We're waiting for your answer.

13               THE WITNESS:  Yes.  Thank you, sir.

14          To me, they're talking to their friends, so

15    therefore, "*vato*" is my homeboy, my buddy.  And, I used

16    different words for it, but at the end it's the same

17    meaning, because they're talking about their friends.

18    BY MR. LEIVA:

19      Q.   But, there's no concern about keeping things

20    consistent, so if someone who is not a native Spanish

21    speaker, just doesn't speak Spanish at all, just reads

22    that one page, and you've given one, two -- two to three

23    definitions for the same word.

24      A.   I did.

25      Q.   When you said you consulted with your colleagues,

1    did you ever consult with someone by the name of Junior?

2       A.   No.

3       Q.   All right.  Or someone that said that they were

4    Officer Junior?

5       A.   No.

6       Q.   Did you ever consult with anyone by the name of

7    Osman Alfaro Fuentes?

8       A.   No.

9       Q.   Anyone by the name of Jose Del Cid?

10      A.   No.

11      Q.   Or by the moniker, Duende?

12      A.   No.

13      Q.   Anyone named Genaro Sen Garcia?

14      A.   No.

15      Q.   Anyone with the last name Santiago Villanueva?

16      A.   No.

17      Q.   Did you consult with any gang members at all --

18      A.   No.

19      Q.   -- or who you were told were gang members?

20      A.   No.

21      Q.   What about a gentleman named Jose Aparicio

22   Garcia?

23      A.   No.

24      Q.   So as far as outside references go, you mentioned

25   that you went on the Internet, right?

1    A.   Yes.

2    Q.   Okay.  And, the people who you also consulted who

3  you say were your colleagues, who were they?

4    A.   Senior linguists.

5    Q.   Who?  Which linguists?

6    A.   The ones that work with me at my office.

7    Q.   Well, I'm asking.  I don't know who works with

8  you.

9    A.   Oh.  You need names?

10   Q.   That would be fine.

11   A.   America Leister.

12   Q.   She's the only one?

13   A.   Basically.

14   Q.   Okay.  So, in this case, how many times do you

15  believe you consulted with Ms. Leister?

16   A.   A couple of times.  I wouldn't be able to tell

17  you an exact number.

18   Q.   All right.  So, in other words, even though

19  you've been listening to some MS-13 recordings, you

20  still sometimes would hit a point where certain words

21  were not recognizable to you?

22   A.   Or I just wanted to make sure I was listening to

23  the right thing.

24   Q.   Now, you testified on direct that you would

25  listen to these audio recordings and that you would

1    provide summaries of these audio recordings.

2        A.   Not from this.

3        Q.   Excuse me?

4        A.   From what audio recordings?

5        Q.   Well, from the wire taps that you testified to,

6    you would provide summaries.

7        A.   Yes.

8        Q.   Okay.  And you would provide summaries to the

9    agents working the case?

10       A.   Yes.

11       Q.   And, so, it would be fair to say that the bulk of

12   your work as a contractor for the FBI as a linguist is

13   to provide the agents with -- with translations as soon

14   as humanly possible?

15       A.   Yes.

16       Q.   Right?

17            Because, they're listening to wire taps, they may

18   not know what's being said and they need somebody to

19   tell them right away what's being said.

20       A.   Yes.

21       Q.   Okay.  So when you're compiling these

22   transcripts, your target audience is the FBI agents.

23       A.   Yes.

24       Q.   All right.  It's not necessarily that it's going

25   to be used in court.  It's to have the agents have them

V. Vargas - Cross                                                    43

1    at their disposal?

2        A.   Yes.

3        Q.   Okay.  And so, when you're preparing these, for

4    example, the words that we just covered, the words

5    "*vato*" and "*loco*," you put that MS-13 spin on them

6    because it's for the agents to review?

7        A.   I'm sorry.  Can you repeat that again?

8        Q.   Yes.  So, given that the bulk of your work is to

9    provide these agents with realtime translations of the

10   wire taps that they're listening to, or recording,

11   right, and not so much that you're concerned

12   about being -- it being used in court, when certain

13   words come up like "*vato*" and "*loco*," you're putting

14   that MS-13 spin on them just so you keep somewhat

15   consistent -- keep it somewhat consistent for the

16   agents.  Does that make sense or not?

17            MR. TOBLER:  Objection, Your Honor.

18   Compound question.

19            THE COURT:  It is.  If you would do them one

20   at a time, Mr. Leiva.

21            MR. LEIVA:  Yes, Your Honor.

22   BY MR. LEIVA:

23       Q.   We've established that you prepare summaries for

24   the case agents when they give you these wire taps.

25       A.   Yes.

1      Q.   And we've established that the target audience of

2  your summaries are the case agents.

3      A.   Yes.

4      Q.   And, at some point during this case you realized

5  that this was an MS-13 case?

6      A.   But --

7      Q.   Upon listening to these wire taps, you realized

8  it was an MS-13 case, or someone told you it was an

9  MS-13 case?

10     A.   Yes.

11     Q.   Okay.  So then, to keep things consistent, any

12 terms that you heard which may be neutral in nature, you

13 put an MS-13 spin on them.  Would that be fair to say?

14     A.   No.

15     Q.   Okay.  So, when we went over these terms of

16 "*vato*" and "*loco*," which you agree means buddy -- or you

17 used the word "buddy," I used the word "dude" --

18     A.   Uh-huh.

19     Q.   -- you translated that as homeboys, right?

20     A.   Yes.

21     Q.   For the most part.

22     A.   Yes.

23     Q.   All right.  And, that was done because you

24 thought that was the correct and accurate translation of

25 that word, or did you do it because you knew the agents

1  were dealing with an MS-13 case?

2      A.   Because I thought it was a more closely related

3  word to the Spanish word --

4      Q.   So --

5      A.   -- based on the conversation.

6      Q.   Between MS-13 members?

7      A.   Between my -- the two people that were speaking.

8      Q.   Okay.  But here's where -- and I'm not going to

9  keep beating a dead horse, but here is where I'm getting

10 confused.  Is that your testimony under oath is that the

11 word "*loco*" in Spanish means homeboy, and the word

12 "*vato*" in Spanish means homeboy.  That's what I'm

13 getting from what you're just telling me.

14          THE COURT:  If you could ask one question at

15 a time, that might help.

16          MR. LEIVA:  Yes, Your Honor.  I apologize.

17          THE COURT:  Ask one question.

18          MR. LEIVA:  Yes.

19 BY MR. LEIVA:

20     Q.   So your testimony is that the correct and

21 accurate translation of "loco" is homeboy?

22     A.   Yes.

23     Q.   Okay.  And the correct and accurate translation

24 of "*vato*" is homeboy?

25     A.   Depends on the context.

```
 1              MR. LEIVA:  That's all the questions I have,
 2   Your Honor.
 3              Thank you, Ms. Vargas.
 4                    CROSS-EXAMINATION
 5   BY MR. AQUINO:
 6      Q.  Good afternoon, ma'am.
 7      A.  Hello.
 8      Q.  My name is Jerry Aquino.  Along with my
 9   co-counsel, Ms. Amato, we represent Jesus Chavez.  I
10   just have a few questions for you.
11      A.  Sure.
12      Q.  Would you agree that translating is neither black
13   nor white?
14      A.  Can you repeat that again, please?
15      Q.  Sure.  Would you agree that translating is
16   neither black nor white?
17      A.  Yes.
18      Q.  And it requires your opinion to give meaning; is
19   that accurate?
20      A.  No.
21      Q.  Explain.
22      A.  Because when you're translating, you're
23   translating on what you're listening to, not -- you're
24   not trying to make a meaning out of it.  So, you
25   translate what they're saying.
```

V. Vargas - Cross                                              47

1     Q.   But, you get meaning from different sources,
2  correct?
3     A.   Explain, please.
4     Q.   For example, I believe you testified that you
5  consulted a law enforcement officer from El Salvador; is
6  that correct?
7     A.   Many, many years ago, yes.
8     Q.   Do you remember his name?
9          MR. TOBLER:  Objection.
10 BY MR. AQUINO:
11    Q.   I'm not asking that you repeat it.  Do you
12 remember his name?
13    A.   It was years ago.  I'm sorry.
14    Q.   And he provided you assistance in forming
15 opinions; is that accurate?
16    A.   No.  He provided me assistance on vocabulary
17 terms.
18    Q.   Vocabulary terms.
19         And you don't know anything about any biases that
20 officer might have had before -- in discussing his
21 vocabulary with you, do you?
22    A.   No.
23    Q.   Okay.  And he works -- he worked for law
24 enforcement, right?
25    A.   Yes.

1      Q.   And, you work for law enforcement; is that

2    accurate?

3      A.   Yes.

4      Q.   Now, is there a difference in language and

5    pronunciation between San Salvador, the capital of El

6    Salvador, and San Miguel?

7      A.   I don't know.

8      Q.   Have you spent an extended period of time in El

9    Salvador?

10     A.   No.

11     Q.   Have you spent a day in El Salvador?

12     A.   No.

13     Q.   Now, earlier you testified that there was a

14   review process --

15     A.   Yes.

16     Q.   -- correct?

17     A.   Yes.

18     Q.   Okay.  Did you make notes along the way?

19     A.   If I -- from --

20     Q.   Notes in the course of your review process, for

21   example, like a rough draft?

22     A.   On the computer.

23     Q.   Okay.  And, did you keep any of the rough drafts

24   that --

25     A.   No.

1    Q.   -- you went through?

2    A.   No.

3    Q.   Those were all erased?

4    A.   It's on the computer, same paper.

5    Q.   But, I mean, they no longer exist?

6    A.   They don't.

7    Q.   Okay.  And in terms of guidance you received, you

8    said you get some guidance through the Internet.  Is

9    that accurate?

10   A.   Yes.

11   Q.   Okay.  How often, for example, in an average week

12   do you go on the Internet?

13   A.   For what purpose?

14   Q.   To help you with your job.

15   A.   Five times a day.

16   Q.   Five times a day.

17        And, do you use any translation service provided

18   over the Internet to assist you?

19   A.   No.

20   Q.   Is it normal for someone in your office to use a

21   translation service provided over the Internet?

22   A.   Yeah.

23   Q.   Okay.  You don't use it?

24   A.   What type of service do you mean?  Like if I type

25   in a word in Spanish and use the English?

V. Vargas - Cross                                                          50

1    Q.   Yes.

2    A.   Of course I do.

3    Q.   So you use that, too.

4         And in terms of seeking guidance, you -- I

5    believe you got some guidance from Ms. Leister; is that

6    accurate?

7    A.   Yes.

8    Q.   Do you speak to her daily?

9    A.   Yes.

10   Q.   Do you solicit her advice daily?

11   A.   Yes.

12        MR. AQUINO:   That's all the questions I

13   have.

14        Thank you, Judge.

15        THE WITNESS:   Thank you.

16                CROSS-EXAMINATION

17   BY MS. MARTELL:

18   Q.   Good afternoon, Ms. Vargas.

19   A.   Hello.

20   Q.   How are you?

21   A.   Good.   How are you?

22   Q.   You testified that your job at the FBI is

23   contract language monitor; is that correct?

24   A.   Yes.

25   Q.   And, that's different than being a contract

1    linguist, correct?

2       A.   Yes.

3       Q.   And if you were to take a look at that

4    Exhibit 8-A that you have in front of you -- do you

5    still have that?

6       A.   Yes, I do.

7       Q.   If you look at the first page, the one with the

8    exhibit sticker --

9       A.   Yes.

10      Q.   -- it says, middle of the page, "Name and office

11   of linguist:  CLM Vania Vargas."  CLM, that stands for

12   contract language monitor, correct?

13      A.   Linguist monitor.

14      Q.   And, that's different, also, than a language

15   analyst, an LA, correct?

16      A.   It's the same thing.

17      Q.   A language analyst is a full-time employee with

18   the FBI?

19      A.   Yes, a contractor.

20      Q.   You're an independent contractor, correct?

21      A.   Yes.

22      Q.   And, you're aware of FBI regulations and rules

23   concerning your position?

24      A.   Yes.

25      Q.   Are you also aware, then, a contract language

1    monitor differs from a contract linguist in their job

2    description, correct?

3        A.   Yes.

4        Q.   And that's because a contract language monitor,

5    as yourself, they're to perform only summary

6    translations, correct?

7        A.   Yes.

8        Q.   Not verbatim translations?

9        A.   Yes.

10       Q.   And they're not supposed to testify in court,

11   either, right?

12       A.   Yes.

13       Q.   To follow up on what Mr. Leiva asked you

14   regarding the word "*loco*," l-o-c-o, the word "*loco*"

15   means, literally, crazy, correct?

16       A.   Correct.

17       Q.   However, like many words, it's also used as a

18   slang term, correct?

19       A.   Yes.

20       Q.   And in slang terminology, "*loco*" can mean dude,

21   correct?

22       A.   Yes.

23       Q.   However, during the portion that Mr. Leiva showed

24   you of your -- of the transcript that you prepared, you

25   translated the word "*loco*" both as dude in one part and

V. Vargas - Cross                                        53

1   homie in another, correct?

2       A.   Yes, correct.

3       Q.   Am I correct, then, as well, that -- but you

4   didn't mean anything different by that.  You meant it as

5   just dude, or, my buddy, as you testified, correct?

6       A.   Yes.

7       Q.   There was no MS-13 connection, correct?

8       A.   I translate whatever they say.  I put it in

9   Spanish.  So, it doesn't matter if they're MS-13 --

10  bless you, sorry.  If they're MS-13, drug deals,

11  whatever it is, I'm not looking to make up something.

12  I'm just doing a translation of what they're saying, not

13  what they're meaning.

14      Q.   Correct.

15           Because you don't know if the speakers -- you

16  don't know the speakers of this audio.

17      A.   No.

18      Q.   And you don't know if they're MS-13 members,

19  homeboys, correct?

20      A.   Correct.

21      Q.   I also -- I want to play for you another part of

22  this.  And if you can turn your attention to that page

23  five that you were looking at earlier.

24      A.   Sure.

25      Q.   Middle of the page, seventh th speaker, JR.

1    A.   Okay.

2    Q.   Go ahead and take a listen.

3         (Pause.)

4              MS. MARTELL:  Court's indulgence.  Try not

5    to get the microphone so you can hear this.

6              (Audio played.)

7              THE WITNESS:  I can't hear it.

8              (Audio played.)

9              THE WITNESS:  I could barely hear it.

10             MS. MARTELL:  Let's play it one more time.

11             (Audio played.)

12   BY MS. MARTELL:

13   Q.   Did you hear that?

14   A.   I did.

15   Q.   Okay.  Did you hear the word "*fierro*?

16   A.   I did.

17   Q.   F-i-e-r-r-o?

18   A.   I did.

19   Q.   What is "*fierro*"?

20   A.   A gun.

21   Q.   Isn't it true that "*fierro*" means knife in slang?

22   A.   Could be.

23   Q.   Do you ever consult glossaries?

24   A.   Yes, I do.

25   Q.   And, have you ever consulted a glossary that the

1    FBI has regarding MS-13 -- an MS-13 glossary with

2    different words and their meanings?

3        A.   Not one from -- I consulted a glossary made by my

4    colleague, but --

5        Q.   And which colleague was that?

6        A.   Sandy D'Sa.

7        Q.   And Ms. D'Sa's glossary, isn't it true that the

8    word "*fierro*" is defined as a weapon, knife or machete?

9        A.   I don't recall.

10       Q.   Have you ever heard the word "*fierro*" used as

11   weapon?

12       A.   Just as -- as a translation, *fierro* to weapon?

13       Q.   Yes.

14       A.   No.

15       Q.   There's another term that we heard in that, and

16   it was "*sale barba*," first word s-a-l-e, second word

17   b-a-r-b-a.

18            What does that term mean to you?

19       A.   Depending on the -- once again, depends on the

20   context, how it will translate into English.

21            So, you would have to play it for me again so I

22   can hear it.

23            (Audio played.)

24       A.   It will catch up to you.

25       Q.   In this translation you translated it, however,

V. Vargas - Cross                                                      56

1   as, "it will backfire," correct?

2      A.   Okay.  I can't -- I can't -- I'm not being able

3   to follow my writing right now, but, yeah.

4      Q.   You also translated it in the same page as

5   consequences, correct?

6      A.   Can you tell me exactly what you are reviewing?

7      Q.   We're looking at page five --

8      A.   Uh-huh.

9      Q.   -- the 13th speaker.

10      A.   Yes.

11      Q.   Do you see that translation there?

12      A.   I see it.

13      Q.   Okay.  And then again, the following page, third

14   speaker?

15      A.   Okay.

16      Q.   Translated there again as, where it says third

17   speaker in the middle, "You know what I mean about the

18   entire problem."

19              MR. TOBLER:  Objection, Your Honor.  I don't

20   think she was allowed to hear it.

21              MS. MARTELL:  I'll play it again if you

22   want.  She just heard it.

23              THE COURT:  Play it again.

24              (Audio played.)

25

1   BY MS. MARTELL:

2       Q.   Did you hear that?

3       A.   No.  You would have to replay it for me.  I'm

4   sorry.  It's -- the audio is just --

5            THE COURT:  We'll play it right after the

6   recess.

7            Fifteen minutes.  Thank you.

8            (Court recessed at 3:30 p.m. and reconvened

9            at 3:46 p.m.)

10           (Witness resumed stand.)

11           THE COURT:  Ready to bring the jury out?

12           You can bring the jury out, Mr. Toliver.

13   Thank you.

14           You may be seated.

15           Counsel, you may proceed.

16           MS. MARTELL:  Thank you, Your Honor.

17             CROSS-EXAMINATION (Continued)

18   BY MS. MARTELL:

19      Q.   Ms. Vargas, if you can bear with me, I'm going to

20   play a recording.

21      A.   Okay.

22      Q.   And then I'm actually going to direct you on that

23   page five that you have, about 13 lines down, JR,

24   starting with, "Then that's another problem."  Do you

25   see that?

V. Vargas - Cross                                              58

1      A.  I see it.

2      Q.  Okay.  That's the section that I'm going to focus

3  on.  So just if you could follow along with me.

4          (Audio played.)

5          Did you hear that?

6      A.  I did.

7      Q.  Okay.  And, were you able to follow along with

8  your translation?

9      A.  I did.

10     Q.  Okay.  Now, I'm going to play another section.

11  If you could turn your attention -- and I believe it's

12  going to be your page nine, at the top, it says, "OC:

13  Uh-huh."

14     A.  Okay.

15     Q.  And then, okay, I'm actually going to be

16  referring to about, again, 11, 12 lines down, JR

17  starting with, "No, I'm only saying..."

18          Do you see that part?

19     A.  I do.

20     Q.  Okay.  That's the part I'm going to play.

21          (Audio played.)

22          Okay.  In those two sections that I referred you

23  to --

24     A.  Yes.

25     Q.  -- we have the same speaker use the same phrase,

1    correct?

2        A.   Yes.

3        Q.   However, you translated it in each instance

4    differently, correct?

5        A.   Yes.

6        Q.   Why the lack of consistency, Ms. Vargas?

7        A.   Because of the context of the conversation, of

8    the sentence.

9        Q.   In both sections, the context is pretty much the

10   same, that this is something that's going to grow legs,

11   correct?

12            Would you agree that "*sale barba*," s-a-l-e,

13   second word b-a-r-b-a, is the same as in the English way

14   of saying, that's something that can grow legs, correct?

15       A.   Yes.

16       Q.   So why would the same speaker, if the context is

17   the same, that this is something that could become a

18   problem, why would you translate it differently?

19            Why not use the same, either consequences, as you

20   said that that means?

21            Why not use the same phrase -- word in both

22   instances?

23       A.   I just chose something different.

24       Q.   I want to talk to you about the review process

25   that you discussed earlier.  You testified, when

V. Vargas - Cross                                                    60

1   Ms. Martinez [sic] asked you that sometimes you take

2   notes, correct?

3       A.   Correct.

4       Q.   Why -- where are those notes?

5            What happens to them?

6       A.   They are basically underneath this, so they get

7   deleted.

8       Q.   Is that the process that all contract linguists

9   use?

10      A.   No.

11      Q.   They go over their notes?

12      A.   What do you mean, go over them?

13      Q.   Meaning that they write over their notes or

14  delete them?

15      A.   That's my process.

16      Q.   Okay.  So, some other linguists, they keep their

17  notes?

18      A.   Could be.

19      Q.   And if you were to keep your notes, we would see

20  places where perhaps another linguist suggested another

21  word or a different meaning?

22      A.   No.

23           THE COURT:  Excuse me.

24           Tell me how you keep your notes.

25           THE WITNESS:  When I'm listening to a

V. Vargas - Cross                                                    61

1   recording, and if I need to take notes, I take it on the
2   Word Perfect document I'm writing on.  So once I know
3   what I want to translate, I just delete the Spanish or
4   whatever I wrote, and I wrote -- I write what I'm
5   writing, basically.
6            THE COURT:  Come to sidebar, please.
7            (Thereupon, the following side-bar
8   conference was had.)
9            THE COURT:  I don't know how Word Perfect
10  works, but I know in Word, that when you make
11  modifications, it's not deleted, it's just there.  You
12  just accept the final version.
13           Now I'm not sure about Word Perfect, but in
14  my experience with some sort of computer, it's not
15  deleted.  It's still there.
16           So, I just want to make that point.  And I
17  don't know if you all use Word Perfect.  I'm sure how it
18  is in Word, in Word you can't erase.  You can see all
19  the modifications.
20           MS. MARTELL:  Your Honor, that's my
21  understanding of Word Perfect as well, That there is --
22  the program code or the metatags, as you would say,
23  maintain those different versions.
24           When she saves this, they're -- these other
25  formats that she had or these notes are still there.

V. Vargas - Cross

1    They could be retrieved.  That's what the metatags or

2    the coding of the documents would be.

3              So, at the -- based on that, we would be

4    making -- we would ask the government to provide those

5    file formats, because that data can be extracted, if we

6    were provided the actual Word Perfect documents.

7              THE COURT:  Well, you've got to lay a

8    foundation for that.

9              MS. MARTINEZ:  Your Honor, may I respond?

10             THE COURT:  Sure, you can respond.

11             MS. MARTINEZ:  The response -- I'm not sure

12   that there's any basis for discovery request of drafts

13   and work product from one linguist.  A linguist is

14   sitting there making notes, making changes, creating a

15   draft, revising the draft.  I'm not sure there's any

16   basis in the rules of discovery for the production of

17   that kind of work product.

18             THE COURT:  I'll let you all brief that.

19   Thank you.

20             MS. AUSTIN:  Your Honor, I didn't come up to

21   the bench and I sat and watched the witness look at --

22   the witness look at the jurors, smile, make eye contact,

23   roll her eyes like this (indicating), "It's just

24   terrible."

25             And I think it's completely inappropriate,

1  what she's doing with the members of the jury.  And I

2  wanted to alert the Court to it, because nobody was up

3  there to see it.  But I sat there and watched it.

4              THE COURT:  You've got a chance to question

5  her.  You can bring that up.  Go ahead.

6              MR. AMOLSCH:  What's the question?

7              THE COURT:  Did you understand?

8              MR. AMOLSCH:  I didn't hear.

9              MR. SALVATO:  I'll let him know.

10             MS. AUSTIN:  I mean, she should be

11 instructed that she's not to communicate in any way with

12 the jury, especially during a sidebar when we're here

13 and she's making eyes, she's rolling her eyes, like,

14 "Oh, this is just awful," and then smiling at all the

15 members of the jury.  It's completely out of line.

16             THE COURT:  Ms. Austin, do you think that

17 reflects bias?

18             MS. AUSTIN:  Yes, I do.

19             THE COURT:  Then you should question her

20 about it.

21             (Thereupon, the side-bar conference was

22 concluded.)

23 BY MS. MARTELL:

24   Q.  Ms. Vargas, is it correct, then, that the version

25 when you -- when you start to translate an audio such as

V. Vargas - Cross                                                    64

1    this, you open a Word Perfect document; is that correct?

2       A.   Yes.

3       Q.   And, that document you start typing and making

4    notes, correct?

5       A.   Yes.

6       Q.   And then, ultimately, you delete some of those

7    notes as you create your final product?

8       A.   Yes.

9       Q.   But those notes, those were notes that you used

10   in arriving at this final product, correct?

11      A.   I go by sessions.  So -- can I -- do you need an

12   explanation?

13           This is my personal way of doing it.  Let's say

14   I've listened to the CD for, you know, the first time I

15   listen throughout the whole thing, and, you know, I'll

16   make a note or two, but, I'm actually listening to begin

17   with.

18           And then I keep listening to it again, like a

19   second time, and then I start writing.

20           So, whenever I hear a speaker, I will write what

21   the speaker says, in Spanish.  And then I will go back,

22   listen to it again, listen to it again, and I will write

23   it in English.  But, therefore, I'm writing on top of

24   what I wrote in Spanish, so the Spanish part gets

25   deleted.

1       And then I keep going and going and going until
2   I'm done with the recording.  And then once again, if I
3   have certain parts that I'm not sure about, I'll go back
4   to the recording and I'll listen to it again, I'll type
5   what I think it is or what it is.
6       And then if I'm not satisfied with what I wrote,
7   then I'll go over it again and again until I'm
8   satisfied.
9       But, I'm basically typing on top of what I
10  already typed, so there is no paper, there is no --
11  Q.   I understand.
12      And you save -- ultimately, you save that
13  document in the same Word Perfect format?
14  A.   Yes.
15  Q.   And so there exists a saved copy somewhere of
16  that document, correct?
17  A.   A final one, yes.
18  Q.   And that file would be in a Word Perfect document
19  format?
20  A.   Yeah.  It's here.
21  Q.   Well, this is the printout.  This isn't the
22  document in that Word Perfect format.
23  A.   I have the same thing you do.
24  Q.   So you do have the same product saved as a Word
25  Perfect document somewhere?

V. Vargas - Cross                                          66

1    A.   Yes.

2    Q.   Ms. Vargas, in addition to that process that you

3  go through, someone then reviews the translation that

4  you've prepared, and they use that with track changes,

5  correct?

6    A.   Yes.

7    Q.   When they make their suggestions?

8    A.   Yes.

9    Q.   And, that's in that same Word Perfect document

10 that you -- that you have saved?

11   A.   That I submitted, yes.

12   Q.   And, then, you decide whether you're going to

13 keep those changes or reject them, correct?

14   A.   Correct.

15   Q.   And ultimately, that decision is up to you?

16   A.   Yes.

17   Q.   You reviewed these about ten times, you

18 testified?

19   A.   Yes.

20   Q.   So, did there come a time that the inconsistency

21 stood out to you when you were reviewing it?

22   A.   No.

23        MS. MARTELL:  I don't have any further

24 questions.  Thank you.

25

                        CROSS-EXAMINATION

1   BY MR. CONTE:

2      Q.   Good afternoon, Ms. Vargas.

3      A.   Good afternoon.

4      Q.   My name is Joseph Conte.  Mr. Dwight Crawley and
5   I represent Douglas Duran Cerritos.

6           Do you ever do translations where you list the
7   Spanish on one side of the paper and then the English
8   translation on the other?

9      A.   No.

10     Q.   That's never done in the FBI?

11     A.   It is.

12     Q.   It is?

13     A.   But I personally have not.

14     Q.   Do you know under what occasions they would do
15  a -- a translation like that?

16     A.   It's up to the case agent, whatever their needs
17  are.

18     Q.   So, the possibility exists to put the Spanish and
19  English on one page.  It's up to the case agent to make
20  that decision?

21     A.   Yes.

22     Q.   And is that -- to your knowledge, is that
23  dictated by the time necessary to prepare for trial?

24     A.   I don't know.

1              MR. CONTE:  All right.  I have nothing
2   further.
3              Thank you, Your Honor.
4                   CROSS-EXAMINATION
5   BY MR. AMOLSCH:
6      Q.   Good afternoon, Ms. Vargas.
7      A.   Hello.
8      Q.   I understand that you've been a contract linguist
9   with the FBI for ten years?
10     A.   Yes.
11     Q.   And you're a contract language -- what's the "M"
12  stand for?
13     A.   Monitor.
14     Q.   Monitor.
15          How does your contract with the FBI -- does that
16  work?
17          Is it a year-long contract, job by job?
18     A.   It's yearly.
19     Q.   It's yearly.  So you sign a year contract every
20  year.
21          And, are you paid based on the number of hours
22  you work, the amount of pages of transcription you
23  produce?
24     A.   Hourly.
25     Q.   Okay.  When you sign your contract, do you know

V. Vargas - Cross                                                69

1   what jobs you're going to be assigned to?
2       A.   Yes.
3       Q.   Okay.  How does that work?
4            Do you request it?
5            Do they tell you where you're going to be?
6       A.   I'm sorry.
7       Q.   Do you request to be on a particular assignment?
8       A.   No, I don't.
9       Q.   Okay.  So, when you say at the beginning -- at
10  the beginning of this year, is that when you signed your
11  new contract?
12      A.   Fiscal year.
13      Q.   Sorry?
14      A.   Fiscal year, yes.
15      Q.   At the end of the fiscal year.
16           When is the fiscal year?
17      A.   September, I think.
18      Q.   I'm sorry.  I need you to speak into the
19  microphone.
20      A.   I'm sorry.  I don't recall.  September?
21      Q.   September.
22           So in September, we will say, you signed your
23  contract for the following year, to expire at the end of
24  August?
25      A.   Yes.

V. Vargas - Cross                                               70

1    Q.   At that time, were you told where you would be
2    contracted to?
3    A.   Meaning what office?
4    Q.   Were you told you would be contracted to the FBI?
5    A.   I'm my own contractor, so, I think that's what
6    it's called.  So I contract my services to the FBI, just
7    the FBI.
8    Q.   Just the FBI.
9         Do you do work with any other --
10   A.   I do not.
11   Q.   On a Monday when you come in, do you say, "I want
12   to work in that department," or do they tell you where
13   you're going to work on a particular day?
14   A.   When I come in on Monday, my supervisor gives me
15   an assignment and I work on the assignment.
16   Q.   All right.  The job application process, I think
17   you have to renew every year.  How is it determined
18   whether your contract is renewed?
19   A.   On my work.
20   Q.   Okay.  And how is that -- based on what?
21   A.   Every year, my work gets pulled, depending on how
22   many cases and different things I've worked.  My
23   supervisor pulls my works and sends it out for review.
24   And either I -- and I've passed every single review.
25   That's why I'm still here.

1    Q.   When you say it's sent out for review, what does

2    that mean?

3    A.   It means that somebody else in some other state

4    will get an audio, and let's say my summaries or

5    anything else that I've worked on, and they will review

6    my quality of work.

7    Q.   So I understand, an independent auditor listens

8    to an audio recording and compares that audio recording

9    to your translation?

10   A.   Correct.

11   Q.   Do you choose what audio recording gets sent?

12   A.   I do not.

13   Q.   Do you know if this independent auditor is also a

14   contract attorney -- a contract linguist with law

15   enforcement?

16   A.   It's in the language department.  It's with

17   somebody within the language department of the FBI.

18   Q.   At the FBI.

19        Have you ever not had your contract renewed?

20   A.   No.

21   Q.   Okay.  And do you know anybody that you work with

22   who has ever not had their contract renewed?

23   A.   Not that I'm aware of.

24   Q.   You spoke about taking a language proficiency

25   exam and having passed that.

1    A.   Yes.

2    Q.   Okay.  What is a language proficiency exam?

3    A.   It's basically when you speak Spanish or test,

4  you have to write from English to Spanish, Spanish to

5  English, in various forms, be able to speak in Spanish,

6  be able to speak in English.

7    Q.   Are you -- is it a pass/fail, or do you get a

8  numerical?

9    A.   You get a numerical assignment to your -- your

10  score.

11    Q.   Is it a scale of one to a hundred?

12    A.   I don't know.

13    Q.   Do you remember what your score was?

14    A.   I do not.

15    Q.   Do you remember if the exam had, as part of it,

16  your understanding of regional Central American

17  dialects?

18    A.   I don't recall.

19    Q.   How many times have you taken this language

20  proficiency exam?

21    A.   Once.

22    Q.   And when did you do that?

23    A.   Almost ten -- oh, more than ten years ago.

24    Q.   So, since -- so, ten years ago, you were

25  proficient, but nobody has given you an exam in ten

1    years to see if you're still proficient?

2        A.   Yes.

3            MR. AMOLSCH:   Court's indulgence.

4            (Pause.)

5    BY MR. AMOLSCH:

6        Q.   My understanding from your testimony was that you

7    have not received any specialized training in the El

8    Salvadorian dialect of Spanish.  Is that correct?

9        A.   Correct.

10       Q.   My understanding from -- is also that you have

11   not spent any time -- any time at all in El Salvador.

12   Is that correct?

13       A.   Correct.

14       Q.   That means you have not spent time there as a

15   vacation?

16       A.   No.

17       Q.   As a day visitor?

18       A.   No.

19       Q.   Never been to the capital?

20       A.   No.

21       Q.   MS-13 cases largely involve people from El

22   Salvador, correct?

23       A.   Yes.

24       Q.   And your testimony is you have no experience,

25   professional experience -- you've never been trained to

V. Vargas - Cross                                                        74

1    interpret El Salvadorian Spanish?

2           MR. TOBLER:  Objection, Your Honor.

3    Compound.

4           THE COURT:  Sustained.  One question at a

5    time, please.

6           MR. AMOLSCH:  My apologies, Your Honor.

7           THE COURT:  No problem.

8    BY MR. AMOLSCH:

9       Q.  You would agree with me that MS-13 gang members

10   largely communicate in the El Salvadorian dialect of

11   Spanish.

12      A.  Yes.

13      Q.  And your testimony is that you have not received

14   any specialized training in understanding El Salvadorian

15   dialect of Spanish.

16      A.  I train on the job.

17      Q.  That wasn't my question.

18      A.  I'm sorry.

19      Q.  My question wasn't whether you learned from on

20   the job, because we're going to get to that.  My

21   question was whether you received any specialized

22   training.

23      A.  No.

24      Q.  Has anybody from the FBI asked you to get that

25   training?

1    A.  No.

2    Q.  Do you know if anybody in your office has that

3    training?

4    A.  I don't know.

5    Q.  Have you inquired whether that training is

6    available?

7    A.  No.

8    Q.  What does the word "verbatim" mean to you?

9    A.  Word by word.

10   Q.  Do we agree, then, that if I were to tell you the

11   definition of "verbatim" is in exactly the same words as

12   were used originally --

13   A.  Yes.

14   Q.  -- you would agree with me, that is what

15   "verbatim" means?

16   A.  Yes.

17   Q.  Based on the questions you received from other

18   lawyers here, you would agree with me that your

19   translations are not verbatim, correct?

20   A.  No.

21   Q.  You would not agree with me?

22   A.  No.

23   Q.  You would agree with me -- and I don't mean to

24   beat a dead horse, but I can't understand your answers

25   on the question as relates to the word "*loco*."  You

1    heard questions that "*loco*" can be translated as dude,

2    correct?

3        A.   Yes.

4        Q.   Yet, you sometimes wrote it down as homeboy,

5    correct?

6        A.   Yes.

7        Q.   You would agree with me that "dude" and "homeboy"

8    are not the same words, correct?

9        A.   It is the same.

10       Q.   Dude is spelled d-u-d-e --

11       A.   I know --

12       Q.   -- correct?

13       A.   -- how it's spelled, thank you.

14       Q.   Okay.  So you agree with me that the word "dude"

15   is not the exact same word as the word "homeboy"?

16       A.   Yes.

17       Q.   Can we agree on this?

18       A.   Yes.

19       Q.   If a verbatim translation, which we just agreed

20   is exactly the same words as they were used

21   originally --

22       A.   Yes.

23       Q.   -- would you agree with me that your translations

24   are not verbatim?

25       A.   No.

V. Vargas - Cross                                                    77

1   Q.   So, your testimony is that even though "dude" and
2   "homeboy" are different words, they are nevertheless the
3   same words?
4   A.   Not the same words, but it's got the same meaning
5   of they're talking to a friend.
6   Q.   But I didn't ask you about meaning.  I asked you
7   if we agreed on the definition of the word --
8   A.   Yes.
9   Q.   -- "verbatim."
10  A.   Yes.
11  Q.   Do you remember what the definition was?
12  A.   Yes.
13  Q.   Exactly the same words; not your impression of
14  the same meaning, correct?
15  A.   Yes.
16  Q.   But exactly the same words.
17       So, again --
18  A.   Yes.
19  Q.   -- would you agree with me that these are not
20  exactly the same words?
21  A.   Yes.
22  Q.   So, this -- these are not verbatim translations.
23  Can you agree with me on this?
24  A.   No.
25  Q.   Is that because you work for the FBI?

1    A.   No.  It's because it's my work.

2    Q.   What is the difference, again, between somebody

3    who is a contract linguist moderator -- is that the

4    right word?

5    A.   Monitor.

6    Q.   -- monitor and a contract linguist analyst?

7         You answered some questions earlier, and I missed

8    the answer.

9    A.   Because I'm contractor, I'm not an analyst.  But

10   people who are not contractors are analysts.

11   Q.   Did you testify earlier that you are not supposed

12   to be testifying about translations?

13   A.   Correct.

14   Q.   So, you should not even be in the courtroom

15   testifying?

16   A.   I was given permission by Language Services to

17   work on this case, and --

18   Q.   But --

19   A.   -- to work on this.

20   Q.   But according to your designation in your level,

21   which I assume is what a contract linguist monitor is,

22   you should not be testifying in this court?

23             MR. TOBLER:  Objection, Your Honor.  Asked

24   and answered.

25             THE COURT:  Overruled.

1          THE WITNESS:  I was allowed by Language
2    Services to do it, so --
3    BY MR. AMOLSCH:
4      Q.   That wasn't my question.  I didn't ask you if you
5    were allowed to do it.  I ask you, based on you being a
6    contract language monitor, you should not even be
7    testifying in this court?
8      A.   If we go to the way you're --
9      Q.   Yes or no?
10     A.   Yes.
11     Q.   Are you supposed to be creating -- I'm going to
12   use the word -- are you supposed to be creating anything
13   other than summary translations?
14     A.   No.
15     Q.   Yet, what the government has asked you to do is
16   create full translations, not summaries, correct?
17     A.   Yes.
18     Q.   So, you should not have done that, either?
19     A.   No, I should.
20     Q.   I understand someone gave you permission to do
21   so.  But based on your being a contract language
22   monitor, you shouldn't have done that, either?
23     A.   I'm --
24     Q.   Yes or no?
25     A.   No, I should have.  Yes.

V. Vargas - Cross                                                80

1      Q.   Earlier in your testimony you referenced a
2   conversation you had, I believe, with a Ms. D'Sa.
3      A.   Correct.
4      Q.   And I believe she talked to you, or you talked to
5   her, about her testimony here in court.  Is that
6   correct?
7      A.   We talked -- I asked her how she was doing.
8           She said she was stressed.
9      Q.   Okay.  Let's talk about how that conversation
10  happened.  Does Ms. D'Sa work in your office?
11     A.   No.
12     Q.   Where did you see her?
13     A.   I haven't.
14     Q.   I'm sorry?
15     A.   I have not seen her.
16     Q.   This conversation happened on the telephone?
17     A.   Correct.
18     Q.   Okay.  Did you call her or did she call you?
19     A.   She called me.
20     Q.   Okay.  And what did she -- what did she tell you
21  was the reason for her phone call?
22     A.   D'Sa and I are actually co-workers and we're
23  friends, and we talk at least once a day.
24     Q.   That's great.
25          What did she tell you was the reason for her

1    phone call?

2        A.   I didn't know there had to be a reason for her to

3    call me.

4        Q.   Did she not give you one?

5        A.   She said she was stressed because she had to go

6    pick up Adrienne, her daughter.

7        Q.   So your testimony earlier today was about the

8    fact that you had a conversation with Ms. D'Sa about

9    your testimony here -- about her testimony here in

10   court, and she said she was stressed.

11       A.   Yes.

12       Q.   Now, you're telling me the testimony -- she said

13   she was stressed, not about her testimony here, but

14   about picking up her daughter?

15       A.   Well, the person -- the other lawyer rephrased

16   the question differently.  She said:  Why did she say?

17            I said:  She was stressed.

18       Q.   The question that you got from the other lawyer

19   was about your testimony in court.

20            And your response, if I remember correctly, was

21   that you had a conversation with her about her testimony

22   in court, and that she said she was stressed.  Is that

23   correct?

24       A.   I don't recall.

25       Q.   Well, let's talk about it again now.

V. Vargas - Cross

1    A.    Please, go ahead.

2    Q.    Have you had a conversation with Ms. D'Sa about

3    her testimony here in court, even if that testimony

4    included the phrase, "I'm stressed"?

5    A.    No.

6    Q.    Have you had a conversation with Ms. D'Sa at all

7    about her testimony here in court?

8    A.    No.

9    Q.    Have you had a conversation with anybody about

10   their testimony here in court?

11   A.    No.

12   Q.    You mentioned that you referred to glossaries

13   when you were doing these translations.  Is that

14   correct?

15   A.    Yes.

16   Q.    Where did you get those glossaries from?

17   A.    Google.

18   Q.    I'm sorry?

19   A.    Internet.

20   Q.    You downloaded your own glossaries?

21   A.    No, I didn't.

22   Q.    Well, let's take them one by one.  I'm going to

23   show you some glossaries --

24            THE COURT:  No, no.  Follow up with the

25   first question.

V. Vargas - Cross                                            83

1          MR. AMOLSCH:  I'm sorry?

2          THE COURT:  She said she went on Google.

3    There's a followup question to that, isn't there?

4          MR. AMOLSCH:  Okay.

5    BY MR. AMOLSCH:

6    Q.  You went -- explain that to me.  You went on

7    Google?

8    A.  Urban Dictionary.

9    Q.  That's where you got your translations, Urban

10   Dictionary?

11   A.  I get ideas of what certain -- of -- when you go

12   to Google, you know, you can put in a word and it will

13   give you different definition of a specific word.

14         So based on the context of the conversation and

15   what I'm looking for, I pick the word that I understand

16   fits my needs.

17   Q.  So, just to summarize where we are so far, before

18   I move on, you're here testifying when you shouldn't be,

19   correct?

20   A.  No.

21   Q.  You have provided -- you have completed trans- --

22   translations that you should not have, because they're

23   not summaries, correct?

24         (Pause.)

25         You need to answer.

```
 1              THE COURT:  She didn't answer.
 2              THE WITNESS:  Oh, I need to answer?
 3              THE COURT:  Yeah.  When he asks you a
 4    question, he expects you to answer.
 5              THE WITNESS:  I'm sorry.  I thought he was
 6    going to keep on going.
 7              MR. AMOLSCH:  That's why we're here.
 8    BY MR. AMOLSCH:
 9       Q.  So, yes?
10       A.  No.
11       Q.  And, you are using Urban Dictionary --
12       A.  Yes.
13       Q.  -- as one of your sources --
14       A.  Yes.
15       Q.  -- for your translations here?
16       A.  Yes.
17       Q.  These are some glossaries that were provided to
18    us by the government.
19       A.  Okay.
20       Q.  I'm going to ask you to take a look at these and
21    see if these are some that you've used or not.
22       A.  Okay.
23       Q.  The first one is called Dirty Spanish.  Have you
24    ever seen this?
25       A.  Never.
```

V. Vargas - Cross                                                        85

1    Q.  Do you know anybody in your office who has used

2    this?

3    A.  No.

4    Q.  Talk Dirty Spanish.

5    A.  No.

6    Q.  Have you ever seen this?

7    A.  No.

8    Q.  Have you ever used it?

9    A.  Nope.

10   Q.  Dictionary of Spanish Slang.  Do you recognize

11   this?

12   A.  I don't own one.

13   Q.  Have you ever seen anybody in your office use it?

14   A.  I don't know.

15   Q.  Have you ever seen Ms. D'Sa use these?

16   A.  No.

17   Q.  Ms. D'Sa is your good friend, correct?

18   A.  Yeah.

19   Q.  Streetwise Spanish; ever seen this?

20   A.  No.

21   Q.  Ever used this?

22   A.  No.

23   Q.  Ever seen anybody else use it?

24   A.  No.

25   Q.  Ever seen Ms. D'Sa use it?

1    A.  No.

2    Q.  Oops.

3        There's another glossary of words, handwritten

4    and typed.  I'm going to ask you to look at these and

5    tell me if you recognize them or have any idea where

6    they came from.

7            MR. AMOLSCH:  I'll ask Mr. Toliver to show

8    you this.

9            THE COURT:  We'll mark that for

10   identification.

11           MR. AMOLSCH:  Yes.

12           THE COURT:  Not offered into evidence, but

13   just marked for identification.

14           MR. AMOLSCH:  Yes, Your Honor.  We'll mark

15   it as -- I'm for Mr. Cerna, Judge, so, Cerna 1?

16           THE COURT:  All right.  Just for

17   identification.

18           MR. AMOLSCH:  It's been marked Cerna 1, Your

19   Honor, for identification purposes.

20           THE COURT:  All right.

21           THE WITNESS:  Thank you.

22   BY MR. AMOLSCH:

23   Q.  Have you had a look at that?

24   A.  Uh-huh.

25   Q.  Do you recognize it?

1    A.   I've seen something similar.

2    Q.   Have you ever used that?

3    A.   Yes.

4    Q.   Do you have any idea where it came from?

5    A.   I got a copy like -- similar to this from Sandy.

6    Q.   Who is Sandy?

7    A.   Sandra D'Sa.

8    Q.   Sandra D'Sa.

9         Do you know where she got it?

10   A.   No.

11   Q.   Do you know if that's reliable in any way?

12   A.   Yes.

13   Q.   How do you know that it's reliable?

14   A.   Because she's had it for a long time.

15   Q.   I understand Sandy's had it for a long time.  My

16   question is:  How do you know that the information

17   contained in that document is reliable?

18   A.   Because whenever I have a question on a word, I

19   also talk to my colleagues regarding the word, even

20   though if it's in the glossary and I find the word on

21   Google, I find the word in the glossary, I will go to my

22   senior linguist and be like, "This is where I am.  This

23   is what I have.  I need your input on this."  And then I

24   will make my own final decision.

25   Q.   Other than Sandy, have you ever seen anybody else

1    use this?

2        A.   No.

3        Q.   So, you and Sandy use this.

4             Do you know if Sandy has had this approved by

5    anybody at the FBI?

6        A.   We work in different offices.

7        Q.   Do you know if Sandy has had --

8        A.   I don't know.

9        Q.   -- this approved by anybody at the FBI?

10       A.   I don't know.

11       Q.   May I have that back?

12            This document is an 11-page document, "Mara

13   Salvatrucha Gang Terminology," prepared by the Criminal

14   Investigative Division, from 2008.

15            Have you seen this document?

16       A.   If I could see a little bit closer, I would be

17   able to see it.

18            MR. AMOLSCH:  I'm going to mark this one as

19   well, Judge.

20            THE COURT:  Yes.

21            MR. AMOLSCH:  It's marked for identification

22   purposes as Cerna 2, Your Honor.

23            THE WITNESS:  Thank you.

24   BY MR. AMOLSCH:

25       Q.   Do you recognize that document?

1     A.   Yes.

2     Q.   Have you seen it?

3     A.   I have.

4     Q.   Have you used it?

5     A.   Yes.

6     Q.   When was the last time you used it?

7     A.   About six months ago.

8     Q.   So, your -- and that document is dated 2008; is

9  that correct?

10    A.   Yes.

11    Q.   Okay.  Can you look in that document and point to

12  me the definition of the word "*loco*"?

13    A.   It's not here.

14    Q.   Not in there?

15    A.   No.

16         MR. AMOLSCH:  Can I have that back?

17         THE WITNESS:  Sure.  Thank you.

18         MR. AMOLSCH:  Thank you, Mr. Toliver.

19         Court's indulgence.  I'm sorry.

20  BY MR. AMOLSCH:

21    Q.   I'm going to hand these to you.  I'm going to ask

22  you to identify which of any of these documents you

23  recognize as having -- you having used them during your

24  translations.

25    A.   Okay.

1          THE COURT:  Translations in this case or

2    translations in general?

3          MR. AMOLSCH:  Translations in this case.

4          THE COURT:  Okay.  All right.

5          MR. AMOLSCH:  Thank you.

6          And when you've identified them, hand them

7    back to me and we'll go through them.

8          THE WITNESS:  Okay.

9          THE COURT:  This is Cerna 3?

10         MR. AMOLSCH:  Yes, sir, Cerna 3, the entire

11   lot of them.

12   BY MR. AMOLSCH:

13     Q.  Are you finished?

14     A.  Yes.

15     Q.  Do you recognize any of those documents?

16     A.  Some.

17     Q.  Can you identify for me the ones -- pull out the

18   ones that you recognize as you having used in your

19   translations.

20         MR. TOBLER:  Your Honor, just to be clear,

21   she's transferring to translations in --

22         MR. AMOLSCH:  In this case.  I apologize.

23   Always in this case, Judge.  I apologize.  In this case.

24         Thank you, Mr. Tobler.

25   BY MR. AMOLSCH:

V. Vargas - Cross                                                    91

1    Q.  That's it?

2    A.  Uh-huh.

3          MR. AMOLSCH:  Mr. Toliver, thank you, sir.

4          THE WITNESS:  You want the stack?

5    BY MR. AMOLSCH:

6    Q.  So, my understanding, you had all of this at your

7    disposal, and never once referred to it?

8    A.  No, I -- (pause) --

9    Q.  And, what you've identified is something put

10   together by Ms. America Lester, right?

11   A.  Leister.

12   Q.  Leister.  That's who we spoke about before,

13   right?

14   A.  Yes.

15   Q.  Last name, L-e-i-s-t-e-r?

16   A.  Yes.

17   Q.  This was prepared -- there's a date on top of

18   here that says June 4th, 2004.

19   A.  I saw it.

20   Q.  Twelve years ago?

21       And this is what you used?

22   A.  May I be a little specific?

23   Q.  Sure.

24   A.  Ms. Leister updates her glossary.

25   Q.  Do you know that?

1    A.   Uh-huh.

2    Q.   Have you seen her do that?

3    A.   Yes.

4    Q.   When did -- when was it most -- when did she most

5    recently update it?

6    A.   I don't recall, but she does it.

7    Q.   Can you point to me -- I'm going to hand this

8    back to Mr. Toliver -- where the word "*loco*" is on any

9    of this?

10   A.   Thank you.

11        It's not on this one.

12             MR. AMOLSCH:  Thank you.

13             No further questions, Judge.

14             THE COURT:  Is that it from the defense?

15             (No audible response.)

16             THE COURT:  Redirect.

17             MR. TOBLER:  No, Your Honor, no redirect.

18             THE COURT:  All right.

19             May the witness be excused?

20             (No audible response.)

21             THE COURT:  You're free to leave.  Thank you

22   very much.

23             THE WITNESS:  Thank you.

24             MR. AQUINO:  Judge, may we approach?

25             THE COURT:  Let's do it at the end of the

1    day.

2                    MR. AQUINO:  Sure.

3                    (End of requested excerpt.)

4

5                                ---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the jury trial in the case of UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

I further certify that I was authorized and did report by stenotype the proceedings in said jury trial, and that the foregoing pages, numbered 1 to 93, inclusive, REQUESTED EXCERPT, constitute the official transcript of said proceedings as taken from my shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this  24th  day of  April , 2016.


                              /s/
                              _____
                              Renecia Wilson, RMR, CRR
                              Official Court Reporter