```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                    EASTERN DISTRICT OF VIRGINIA
 2                       Alexandria Division

 3    UNITED STATES OF AMERICA,      )
                                     )
 4                    Plaintiff,     )
                                     ) Crim. No. 1:14cr306
 5        vs.                        )
                                     )
 6    JOSE LOPEZ TORRES, ALVIN GAITAN ) March 30, 2016
      BENITEZ, CHRISTIAN LEMUS CERNA, )
 7    OMAR DEJESUS CASTILLO, DOUGLAS  )
      DURAN CERRITOS, MANUEL ERNESTO  )
 8    PAIZ GUEVARA, and JESUS ALEJANDRO )
      CHAVEZ,                         )
 9                                   )
                      Defendants.    )
10    _____)

11

12                    JURY TRIAL TESTIMONY

13

14    BEFORE:     THE HONORABLE GERALD BRUCE LEE
                  UNITED STATES DISTRICT JUDGE
15

16
      APPEARANCES:
17
      FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
18                      BY:  JULIA MARTINEZ, AUSA
                             STEPHEN M. CAMPBELL, AUSA
19                           TOBIAS TOBLER, AUSA

20
                            ---
21

22    OFFICIAL COURT REPORTER:

23                      RENECIA A. SMITH-WILSON, RMR, CRR
                        U.S. District Court
24                      401 Courthouse Square, 5th Floor
                        Alexandria, VA 22314
25                      (703)501-1580
```

APPEARANCES (Continued)

FOR DEFENDANT JOSE LOPEZ TORRES

       BYNUM & JENKINS, PLLC
       BY:  ROBERT L. JENKINS, JR., ESQ.
       THE LEIVA LAW FIRM, PLC
       BY:  MANUEL E. LEIVA, ESQ.

FOR DEFENDANT ALVIN GAITAN BENITEZ

       LAW OFFICE OF AMY LEIGH AUSTIN
       BY:  AMY LEIGH AUSTIN, ESQ.
       SMITH & ZIMMERMAN, PLLC
       BY:  JEFFREY D. ZIMMERMAN, ESQ.

FOR DEFENDANT CHRISTIAN LEMUS CERNA

       LAW OFFICE OF CHRISTOPHER AMOLSCH
       BY:  CHRISTOPHER AMOLSCH, ESQ.
       FRANK SALVATO, ESQ.

FOR DEFENDANT OMAR DEJESUS CASTILLO

       FIRSTPOINT LAW GROUP, PC
       BY:  KATHERINE MARTELL, ESQ.
       OLD TOWN ADVOCATES, PC
       BY:  MEREDITH M. RALLS, ESQ.

FOR DEFENDANT DOUGLAS DURAN CERRITOS

       LAW OFFICE OF J.R. CONTE, PLLC
       BY:  JOSEPH R. CONTE, ESQ.
       LAW OFFICE OF DWIGHT CRAWLEY
       BY:  DWIGHT E. CRAWLEY, ESQ.

FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

       LAW OFFICE OF W. MICHAEL CHICK, JR.
       BY:  WILLIAM MICHAEL CHICK, JR., ESQ.

FOR DEFENDANT JESUS ALEJANDRO CHAVEZ

       JEROME P. AQUINO, ESQ.
       ELITA C. AMATO, ESQ.

---

1                                    INDEX

2

3    WITNESS (Government) DIRECT  CROSS   REDIRECT    RECROSS

4    Claudio Saa                5    28 (Not completed)

5
         (Court recessed)
6

7                                 ---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

...(Court in session at 4:04 p.m.)

THE COURT:  Hearing no objection, you can bring our jury out, Mr. Toliver.  Thank you.

Who is going to pass them out?  Thank you.

(Jury present at 4:05 p.m.)

THE COURT:  You may be seated.  Thank you.

Ladies and gentlemen, I had my staff -- normally when I have a trial -- prepare a seating chart for me.  And I'm going to give you a copy of it.

Now, this seating chart is just a seating chart of the way I see the courtroom.  It's not evidence of any kind.  It is just to assist you in recognizing the names of the individual lawyers and the parties in the courtroom.

Put your own name on your seating chart and keep it with your notes.

(Pause.)

THE COURT:  Call your first witness.

MR. CAMPBELL:  Your Honor, the government calls Sergeant Claudio Saa.

(Witness sworn.)

THE WITNESS:  I do.

THE COURT:  You may proceed.

```
 1              THEREUPON, CLAUDIO SAA, having been duly
 2   sworn, testified as follows:
 3                       DIRECT EXAMINATION
 4   BY MR. CAMPBELL:
 5      Q.   Good afternoon, sir.
 6      A.   Good afternoon.
 7      Q.   Please state your full name and spell it for the
 8   record.
 9      A.   First name is Claudio, C-l-a-u-d-i-o, last name
10   is Saa, S-a-a.
11      Q.   Sir, where were you born?
12      A.   Quillota, Chile, South America.
13      Q.   What languages do you speak?
14      A.   Spanish and English.
15      Q.   What languages do you read?
16      A.   Spanish and English.
17      Q.   And how proficient are you in Spanish?
18      A.   Fluent.
19      Q.   Where do you work?
20      A.   I work with the Town of Herndon Police
21   Department.
22      Q.   And how long have you served as a law enforcement
23   officer?
24      A.   Since September of 1999.
25      Q.   What is your current position?
```

C. Saa - Direct                                                        6

1      A.   I am in charge of the criminal investigation

2   section of the department, where I supervise six

3   detectives.

4      Q.   And what other positions have held in the Herndon

5   Police Department?

6      A.   As a patrol officer, I was assigned as the gang

7   coordinator, which I was in charge of the -- obtaining

8   information on gang related activity in the town, and

9   dissemination of that information throughout the

10  department as well outside agencies.

11          And in 2003, I was assigned as a gang detective

12  with the Northern Virginia regional gang task force,

13  which was a multi-jurisdictional task force encompassed

14  of 14 different agencies of the Northern Virginia

15  region, both local and federal, which we investigated

16  gang activity in the Northern Virginia region.

17          And in 2012 I was promoted to sergeant.

18     Q.   What were your duties as a detective on the gang

19  task force?

20     A.   It was the investigation of gang activity in the

21  region, wherever these cases led to.  Some led outside

22  of the region, some led internationally.

23     Q.   And between your duties as a gang coordinator

24  with the Herndon Police Department, and a detective

25  assigned to the Northern Virginia gang task force, how

1  many years have you focused on gang investigations?

2      A.  I would say -- I -- I'm still involved in

3  investigating some gang activity now, so I would say in

4  my 16 and a half years, I would say my entire career, to

5  include when I got released off of field training, where

6  I started investigating gang crime as a patrol officer.

7  So that would be 16 years total.

8      Q.  Sir, what gangs have you investigated?

9      A.  MS-13, 18th Street, Bloods, Cripps, Latin Kings.

10     Q.  And, what percentage would you estimate of those

11 gangs focused on MS-13 investigations?

12     A.  85 percent.

13     Q.  What training have you received for conducting

14 gang investigations?

15     A.  In-service training at police academies, attended

16 numerous network gang intelligence network sharing,

17 conferences.  I've attended conferences in El Salvador,

18 five to be -- five different conferences, five different

19 years, which were international gangs symposium

20 conferences, and various amounts of different training.

21     Q.  Sergeant, can you explain a little further for

22 the jury what type of topics were presented at those

23 international gang --

24     A.  Changes in --

25     Q.  -- conferences?

1    A.   -- trends in gang activity.  Some of the

2    conferences were specific to the MS-13 gang, so they

3    spoke on the changes, the methods of operation,

4    networking and sharing with outside agencies.

5    Q.   Have you provided instruction and training, as

6    well as receiving instruction and training, on the gang?

7    A.   Yes, I have.

8    Q.   And to whom?

9    A.   Law enforcement, military, law enforcement in

10   Central America, actually, I've taught gang training for

11   Iraqi police, civic groups, parent organizations,

12   community events.

13   Q.   How many, do you estimate, of these

14   investigations you've conducted involving MS-13?

15   A.   Over 75.

16   Q.   And, have you assisted other agencies or police

17   departments in their investigations, as well as your own

18   investigations?

19   A.   Yes.

20   Q.   And how many times would you estimate you've done

21   that?

22   A.   Over 75.

23   Q.   What other departments or agencies have you

24   assisted in the course of your 15-year career?

25   A.   Actually, all the Northern Virginia region, local

C. Saa - Direct                                                    9

1   agencies, FBI, CIA, the Department of Homeland Security,

2   Secret Service, ATF, DEA and El Salvadorian police.

3        Q.   How many times would you estimate that you

4   conducted surveillance operations for MS-13

5   investigations?

6        A.   Over 75 times.

7        Q.   How many times would you estimate you executed

8   arrest warrants and search warrants?

9        A.   Over a hundred.

10       Q.   How many times would you estimate you interviewed

11   MS-13 gang members?

12       A.   Over a hundred.

13       Q.   Have you ever testified as an expert in court on

14   MS-13?

15       A.   Yes, I have.

16       Q.   How many times?

17       A.   Thirteen.

18       Q.   What courts have you testified in?

19       A.   Fairfax County Circuit, Fairfax County General

20   District, Fairfax County Juvenile and Domestic Relations

21   Court, Baltimore Court Circuit Court, Spottsylvania

22   County Circuit Court, as well as EDVA.

23       Q.   And --

24            THE COURT:  I'm sorry.  Did you say "EDVA"?

25            THE WITNESS:  Yes, sir.

1        THE COURT:  All right.

2   BY MR. CAMPBELL:

3      Q.   Sergeant, with the assistance of the court

4   security officer, if I may ask you to look at what's

5   been marked as Government's Exhibit 137 and 137-A.

6      A.   Yes, sir.

7      Q.   Sir, do you recognize those documents?

8      A.   Yes, sir.

9      Q.   And what are they?

10     A.   My CV or resumé.

11          MR. CAMPBELL:  Your Honor, at this time the

12   government moves the sergeant as an expert witness on

13   gang MS-13, including the history, structure, and rules

14   and activities of the gang.

15          THE COURT:  Gang expert on the structure,

16   rules, and activity?

17          MR. CAMPBELL:  And history of the gang.

18          THE COURT:  You're not moving his CV; you

19   just want to be referring to the CV; is that correct?

20          MR. CAMPBELL:  That's correct.

21          MR. JENKINS:  May it please the Court.

22          THE COURT:  Yes.

23          MR. JENKINS:  Subject to cross-examination.

24          THE COURT:  Of course.

25          If you would elicit more information about

1    what judge he's testified in front of in this Court.

2                  MR. CAMPBELL:  Do I have a list of them?

3                  THE COURT:  If you could ask him to tell me

4    that now.

5                  MR. CAMPBELL:  Oh.

6    BY MR. CAMPBELL:

7       Q.  Sergeant --

8                  THE COURT:  And Ms. Bull, can I see the CV?

9    BY MR. CAMPBELL:

10      Q.  Could you provide for the Court the list of the

11   courts and judges you've testified --

12                 THE COURT:  In the federal courthouse, in

13   this courthouse.

14                 THE WITNESS:  I don't have the judges.  I

15   have the actual defendant cases on it.

16                 THE COURT:  Have you seen the list?

17                 MR. CAMPBELL:  The list has been provided to

18   the defense.

19                 THE COURT:  The defense has seen it?

20                 Let me see it.  I haven't seen it.

21                 MR. JENKINS:  Yes, Your Honor.

22                 Your Honor, I believe it's Government's

23   Exhibit 137-A.

24                 THE COURT:  Okay.

25                 MR. JENKINS:  Or should I say the

1    information contained in there.

2              THE COURT:  Say again?

3              MR. JENKINS:  The information is contained

4    in there, if you look through it.

5              THE COURT:  Oh, I see.

6              Oh, my goodness.  Okay.

7              Sir, if I'm looking at this correctly, is it

8    page four of six that you listed federal court

9    appearances?

10             THE WITNESS:  Excuse me.  Yes, sir.

11             THE COURT:  You're saying you testified in

12   each of those cases?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  So, it's just three cases, not

15   five, is that right?

16             Am I reading this correctly, just three

17   cases, not five?

18             THE WITNESS:  One, two, three, four, five.

19   There's one in the back.

20             THE COURT:  Well, on page four of six, I

21   see --

22             THE WITNESS:  I'm sorry.  Yeah, it's

23   actually broken down chronologically, so I have actually

24   four of six, five of six and six of six.  And six

25   were -- there is one on page five, and one on page six.

1        THE COURT:  Okay.

2            Subject to cross-examination, the witness

3    will be permitted to testify as an expert on gang

4    structure, function, history, and rules for MS-13, to a

5    reasonable degree of certainty based upon his experience

6    in the field; of course subject to cross-examination.

7            Go ahead.

8            MR. CAMPBELL:  Thank you, Your Honor.

9    BY MR. CAMPBELL:

10    Q.  Sir, what do the initials "MS" stand for in

11    MS-13?

12    A.  Mara Salvatrucha.

13    Q.  And what does the number "13" stand for?

14    A.  It stands for the 13th letter of the alphabet,

15    which is the M.  The 13th letter of the alpha- -- the

16    "13" was adopted by MS-13 back in the '80s and '90s when

17    they established themselves as a gang in -- in Los

18    Angeles, California, specifically the Pico-Union area of

19    Los Angeles.

20            Before, they used to be called MS Stoners, when

21    they first came over to the United States, when the

22    Salvadorian nationals fled the civil war.  A large

23    percentage of the Salvadorian nationals settled in that

24    area in Los Angeles to get away from the civil war.

25            When they started living in this area, they

1    became -- became victims of the already-established

2    gangs in that area, that had been around for many, many

3    years.  So they formed this group, called themselves MS

4    Stoners, for protection and for them to just have

5    somebody they can be with.

6           Little by little, this group of MS Stoners became

7    this full-fledged criminal street gang, and they dropped

8    the "Stoners" name of the -- of the MS part of it and

9    adopted the number 13, because in the gang culture, a

10   Sureños gang, which is a southern gang, is overseen by

11   the Mexican mafia on the West Coast.  And to pay homage

12   to the Mexican mafia, which is also known as the Eme,

13   which is the 13th letter of the alphabet, is the M, they

14   adopted that number "13" to go along with the MS part of

15   it.

16   Q.   What country are the gang members primarily from?

17   A.   El Salvador, Honduras, Guatemala, Nicaragua,

18   Mexico, and now you've seen some from South America,

19   Peru, Chile.

20   Q.   And you testified that the gang originated in Los

21   Angeles.  How far has it spread within the United

22   States?

23   A.   Throughout the entire United States.

24   Q.   When did the gang arrive here in Virginia?

25   A.   Early '90s.

1    Q.   And what type of presence has the gang had here

2    since then?

3    A.   They've instilled fear and intimidation in the

4    community.

5    Q.   As far as size, what type of presence have they

6    had here?

7    A.   In the region?

8    Q.   In the Northern Virginia area.

9    A.   They grow in numbers.  They're estimated numbers,

10   from 2,000 to 3,000.

11   Q.   As a law enforcement officer, when did you first

12   encounter MS-13 here in Northern Virginia?

13   A.   As soon as I put my uniform on and started

14   patrolling the Town of Herndon.

15   Q.   And what year was that?

16   A.   2000.

17   Q.   Can you tell the jury how MS-13 is organized?

18   A.   They're organized by leadership.  They have a top

19   leadership -- they're organized by cliques.  And I'll

20   give you this example.  MS would be the NFL.  The

21   cliques or the subsets would be the cliques, the teams

22   under the NFL.

23        And within each clique, there's a leader or two,

24   and soldiers, or the homeboys, and sometimes then they

25   have the hang-arounds that are referred to as *paros* or

1   *paisas*.

2                   THE COURT:  Can you spell that for us?

3                   THE WITNESS:  Paro, p-a-r-o; *paisa*,

4   p-a-i-s-a.

5   BY MR. CAMPBELL:

6       Q.   Sir, what is the basic hierarchy of MS-13?

7       A.   Within the clique, they have a, one leader or

8   two, usually referred to as the *primera voz* or *segunda*

9   *voz*, standing for first voice or second voice.

10          Then they have the homeboys, who would be

11  considered the soldiers or the foot soldiers.

12          Then they have the *paisas*, which would be the

13  hang-arounds or the ones who are in the process of being

14  indoctrinated to the next level.  And that level is

15  called *chequeo*.

16          But as far as the entire structure, you have --

17  they are broken down into programs in the Northern

18  Virginia region or East Coast, which all fall under the

19  flag of MS.

20                  THE COURT:  How is *chequeo* spelled?

21                  THE WITNESS:  *Chequeo*, c-h-e-q-u-e-o.

22                  THE COURT:  Thank you.

23  BY MR. CAMPBELL:

24      Q.   So as you described it, sir, you have the cliques

25  at the bottom?

1    A.   Yes.

2    Q.   And then the programs in the middle?

3    A.   Yes.

4    Q.   And what's at the top of the --

5    A.   MS.

6    Q.   -- MS-13 organization?

7         Where is that located?

8    A.   The national, or you would think is -- the

9  motherland would be El Salvador.

10    Q.   How many cliques are there, generally speaking,

11 to your knowledge, in Northern Virginia?

12    A.   Presently, there's about five to six active

13 cliques.

14    Q.   And please tell the jury the most prominent

15 cliques in this area.

16    A.   PVLA, Pinos, V -- Vatos Locos, Salvatruchos and

17 Virginia Locos, and it fluctuates, and Western.

18              THE COURT:  It would help us all if you

19 would spell it, because we can't -- we don't know it as

20 well as you do.

21              THE WITNESS:  Okay.  PVLS is Park View Locos

22 Salvatruchos, which is P-a-r-k, V-i-e-w. Vatos Locos,

23 V-a-t-o-s, L-o-c-o-s.  You have Western,

24 W-e-s-t-e-r-n-o -- -e-r-n, excuse me.

25              I lost track there.

1    BY MR. CAMPBELL:

2        Q.   Each of the cliques you listed has Locos

3    Salvatruchos is part of its name.  What is the

4    significance of Locos Salvatruchos?

5        A.   Locos Salvatruchos, Crazy Salvadorians.

6        Q.   What is the origin of the PVLS, the Park View

7    clique that you --

8        A.   Park View clique, the origins are from Park View

9    Street in Los Angeles, California.  Park View is one of

10   the original cliques of MS.  It started back in the '80s

11   and is considered an international clique because it's

12   not just in the United States.  It's also in Central

13   America and in Canada.

14       Q.   Now, you described a moment ago the leaders as

15   the first word and the second word; is that correct?

16       A.   Yes, sir.

17       Q.   If you're not in leadership, what is the general

18   term used to refer to the members or associates --

19       A.   Homeboys.

20       Q.   -- of MS-13?

21            Who does -- who does MS-13 recruit to become gang

22   members?

23       A.   Strength in numbers; whoever they can get into

24   the gang.

25       Q.   Is there a particular age range, from your

1    experience?

2        A.   From my experience over the years, it's gotten

3    much younger.  Age range can be from anywhere from 10 to

4    16, 11 to 18, the -- it's much younger.

5        Q.   And why does the gang focus on recruits of that

6    age?

7        A.   I guess in their mind, they feel that if these --

8             MR. JENKINS:  Objection, Your Honor.  Calls

9    for speculation.

10            MR. CAMPBELL:  Your Honor, he's an expert

11   witness.

12            MR. JENKINS:  He said "I guess."

13            THE COURT:  He can identify behaviors, but

14   he can't speak for their minds.

15   BY MR. CAMPBELL:

16       Q.   What does being jumped in involve?

17            MR. CONTE:  Objection, leading.

18            THE COURT:  A question that begins with

19   "what" is not leading.  Objection overruled.

20            THE WITNESS:  Jump in is the process of

21   being indoctrinated into the gang.  It's the recruitment

22   aspect of it.  You're basically beat up for 13 seconds

23   by selected members in -- in the specific clique.  And

24   either they -- one member is assigned to count as the

25   other selected ones kick you, punch you, and you take

1    the beat-down.

2    BY MR. CAMPBELL:

3        Q.   What type of name is given to a recruit once they

4    get beaten into or jumped into?

5        A.   They're given a nickname.

6        Q.   And what is the purpose of that nickname?

7        A.   Some are based on their personality, their

8    temperament.  Some, because of the activity they've

9    done, so they're given a nickname to fit that person or

10   that new recruit.

11       Q.   And what is the effect of the use of those

12   nicknames on law enforcement investigations?

13       A.   It makes it very difficult to identify these gang

14   members, because some of them, even within their own

15   group, don't know their true names and they only know

16   them by the nicknames.

17       Q.   What are the various levels of membership or

18   association within a clique?

19       A.   Within a clique, you have, like I said, the

20   *paisa*, or the hang-around.  And once that *paisa* or

21   hang-around has proven his loyalty to the gang, you go

22   to the next level or the higher part of the *paisa*, *paro*,

23   and you --

24       Q.   Before you go to that next level --

25       A.   Yes, sir.

1    Q.   -- and I think you just mentioned it, in addition
2    to *paisa*, is there another term that is used for that
3    entry level or the hang-around, as you described?
4    A.   Yes, *paro.*  They're both interchangeable.
5    Q.   And what type of roles does a *paro* or a *paisa*
6    perform?
7    A.   They run the errands.  They do all the manual
8    labor, if you can put it in those terms.  They're the
9    lookouts.  They'll deliver packages, but they're not
10   allowed to look inside the packages.  They do the menial
11   work.
12   Q.   After serving as a *paro*, what is the next level?
13   A.   The next level would be the *chequeo.*
14   Q.   And what are the responsibilities of a *chequeo*?
15   A.   The *chequeo*, basically you've -- you've proven
16   your alliance and loyalty to the gang, and now it's
17   your -- your turn to become the full-fledged member.
18   Q.   Can you give the jury some examples of the types
19   of tasks or missions that *chequeos* are assigned to
20   performed?
21   A.   Homicides, crimes of violence, narcotics dealing.
22   Q.   After serving as a *chequeo*, what is the next
23   level of advancement within a clique?
24   A.   Homeboy.
25   Q.   What does the term "homeboy" signify?

1     A.   You're a full-fledged member.

2     Q.   How do you advance from a *chequeo* to a

3  full-fledged member, a homeboy?

4     A.   Violence, homicide.

5     Q.   What, if any, meetings must a gang member attend

6  for MS-13?

7     A.   Within the clique, they have -- they can have

8  biweekly or monthly meetings.  They have a meeting

9  called a *misa*, which is, translates to church, m-i-s-a,

10  in Spanish.  And that's attended by the leadership of

11  the cliques in the region.

12     Q.   Where do they hold these clique meetings?

13     A.   Soccer fields, hotels, apartments, anywhere where

14  it's not easy accessible for law enforcement.

15     Q.   And what is the purpose of these meetings?

16     A.   The purpose is to discuss gang business.

17     Q.   What are the dues for that are paid by these

18  members?

19     A.   During these meetings, there's dues are

20  collected, and those dues -- the large majority go

21  down to -- excuse me -- are sent down to El Salvador, or

22  used for the members who are incarcerated, as well as

23  some other members that are incarcerated in the United

24  States, used to purchase weapons and narcotics.

25     Q.   How do the clique members generate money to pay

1    those dues?

2        A.   In our regions, most -- not "most" -- some

3    members have -- work full-time jobs.  Then you have the

4    illegal activity of narcotics dealing, stealing, theft

5    of property and sold for money, or actual robberies of

6    cash.

7        Q.   Can you go back to what you described before?

8            After the clique meetings, the internal clique

9    meetings, you discussed a program meeting.  I think you

10   referred to it as a *misa*.  Can you refer the purpose

11   behind the program meeting?

12       A.   Yeah.  The program meeting is also called a

13   universal meeting, because that's held in the grander, I

14   guess, scheme of things.  It's more interactive with the

15   leadership in El Salvador, as -- even though you have a

16   clique meeting and you may discuss MS meeting, and you

17   may talk to one or two ranking leaders in El Salvador,

18   when you go to the universal program meeting, now you're

19   talking to the very higher, top ranking leaders of MS in

20   El Salvador.

21       Q.   What about regionally, for example within

22   Virginia; is there a program meeting within Virginia?

23       A.   Yes.

24       Q.   And who attends those meetings?

25       A.   The top leadership of the cliques.

1   Q.   How often are those meetings held?

2   A.   It's usually like -- it's usually once a month,

3   but, at any point in time, depending on what the

4   situation may be, they can call a meeting, within hours

5   or days.

6   Q.   What is the motto of MS-13?

7   A.   "*Mata, viola, controla.*"

8   Q.   And what does that translate into English?

9   A.   Kill, rape, and control.

10  Q.   What are the objectives of MS-13?

11  A.   To instill fear and intimidation in the

12  community.

13  Q.   And how does MS-13 accomplish that?

14  A.   By violence.

15  Q.   With respect to the acts of violence, are there

16  any particular weapons associated with MS-13 crimes?

17  A.   Edge weapons -- machetes, knives -- blunt

18  instruments and hand- -- some, right now, handguns or

19  long guns.

20  Q.   How do gang members show their identity, with

21  respect to MS-13, belonging to MS-13?

22  A.   By hand sign.

23  Q.   Are there any other methods by which they show

24  their identity?

25  A.   Just greeting themselves as members.

1     Q.   What colors do MS-13 wear?

2     A.   Blue and white.

3     Q.   With respect to the hand signs, can you please

4  show us any of the hand signs that you understood are

5  used by MS-13?

6     A.   (Indicating) This is called the *garrucha*,

7  sometimes referred to as the devil's claw, the devil's

8  horn.

9          MR. CAMPBELL:  Your Honor, may the record

10  reflect that the witness is holding up his index finger

11  and has extended that, and his pinky finger, and has

12  folded his middle fingers underneath his thumb?

13          THE COURT:  So noted.

14  BY MR. CAMPBELL:

15     Q.   Can you demonstrate -- excuse me.  What is the

16  significance of the devil horns themselves, with respect

17  to MS-13?

18     A.   Evil.

19     Q.   And how is that represented?

20     A.   By violence.

21     Q.   When do MS-13 members display these hand signs?

22     A.   When facing the rival gang members, when they

23  greet themselves to identify themselves, or try to

24  identify a rival gang member.

25     Q.   What about with respect to tattoos; what type of

1    tattoos do MS-13 members usually have to show their

2    identity with the gang?

3        A.   They will be MS-specific tattoos by the -- any --

4    different variations of the word "MS" or "13," and also

5    a clique initials and their nickname.

6        Q.   How has the wearing of the tattoos changed over

7    the years?

8        A.   Over the years, I mean -- when I first started

9    investigating MS, it was vastly visible out there.  But

10   over the years, tattooing has gone by the wayside as far

11   as we encounter MS gang members who don't even have a

12   single tattoo.

13       Q.   What about graffiti; how is that associated with

14   the gang?

15       A.   They use it to establish their presence in a

16   community, in a town, in a region.

17       Q.   What are the basic, fundamental rules for MS-13?

18       A.   You don't cooperate with the police.  Attack on

19   sight on your enemies.  MS-13 is number one.

20       Q.   When you say "enemies," how do they refer to

21   their enemies?

22       A.   *Chavalas*.

23       Q.   What does it mean that the gang comes first, or

24   it's number one?

25       A.   Can't -- the gang is over mother, over God.  It's

1    the utmost for them.

2        Q.   When are MS-13s supposed to attack the rival gang

3    members, or *chavalas*?

4        A.   Upon sight, or when the opportunity arises.

5        Q.   What does the term "patrolling" mean with respect

6    to gang members?

7        A.   Patrolling is when members really go out and

8    patrol, looking for rival gang members.

9        Q.   What does the gang use as a term for people that

10   cooperate against the gang with law enforcement?

11       A.   *Ratas*, rats.

12       Q.   What are the consequences if a gang member is

13   found or believed to have been cooperating with law

14   enforcement?

15       A.   They're given what is considered -- or not

16   "considered" -- what's called a green light, which is a

17   death sentence.

18       Q.   What are the types of punishments that the gang

19   is known to administer?

20       A.   It's called a *calentón*, c-a-l-e-n-t-o-n, which is

21   a beat-down.  Like the one you receive, the member

22   received when he came into the gang, you get one of

23   those, but it's much harsher and more violent, and it's

24   for 13 seconds.

25       Q.   And when you referred a moment ago to a green

1  light and you described it as an authorization to commit

2  murder, who is responsible for issuing that

3  authorization?

4      A.   Leaders.

5      Q.   And who is responsible in the gang for carrying

6  out the green light?

7      A.   Homeboys.

8      Q.   And if a gang member carries out the green light,

9  what are the consequences for him?

10     A.   You gain status in the gang.

11          MR. CAMPBELL:  Your Honor, I have no further

12 questions for this witness.

13          THE COURT:  Cross-examination.

14          MR. JENKINS:  Thank you, Your Honor.

15                 CROSS-EXAMINATION

16 BY MR. JENKINS:

17     Q.   Good afternoon, Detective Saa.

18     A.   Good afternoon.

19     Q.   Detective Saa, do I understand it correctly, you

20 have arrested over 100 members of MS-13 over the last 16

21 and a half years?  Correct?

22     A.   I've been involved in the arrest of more than a

23 hund- -- yes, sir.

24     Q.   And, you've had occasion to interview, I believe

25 you testified, at least a hundred or more MS members,

1    correct?

2        A.   Yes.

3        Q.   And these were, can I say -- is it fair to say

4    that these were members who agreed to speak with you?

5    Correct?

6        A.   Yes.

7        Q.   They agreed to break the rules, correct?

8        A.   Yes.

9        Q.   They agreed to cooperate with law enforcement,

10   correct?

11       A.   Yes.

12       Q.   And, the MS gang, generally speaking, the

13   membership is made up of criminals, correct?

14       A.   Correct.

15       Q.   People who commit crimes, correct?

16       A.   Correct.

17       Q.   People who steal, correct?

18       A.   Yes.

19       Q.   People who break our laws, correct?

20       A.   That is correct.

21       Q.   Fair to say that they're not the most trustworthy

22   members of our community?

23       A.   In perspective, no, they're not.

24       Q.   They're the type of people who steal, correct?

25       A.   Yes.

C. Saa - Cross                                                        30

1    Q.   They're the type of people who rob, correct?

2    A.   Yes.

3    Q.   They're the type of people who act in their own

4    self-interest, correct?

5    A.   In terms of MS, they do it for the gang.

6    Q.   Yeah, but, that's because they identify their

7    interests with the gang, correct?

8    A.   They're part of the gang.

9    Q.   And, for these types of individuals, that's their

10   number one goal, and that is, advancing their own

11   interest, correct?

12   A.   Their goal is to advance within the gang, and

13   it's done by violence.  I mean, you named a number of

14   different criminal acts.  I would like to add homicide

15   to be part of that as well.

16   Q.   And because these individuals are -- can we say,

17   untrustworthy?  Would that be appropriate?

18   A.   Maybe in -- in our eyes, but maybe within their

19   own group, I can't speak on that.

20   Q.   Well, in our general community's eyes?

21   A.   In our community's eyes, yes.

22   Q.   Untrustworthy.

23   A.   Yes.

24   Q.   And because of that, as a law enforcement person

25   with over 16 years of experience of investigating this

1    gang, you have learned that you can't always believe
2    what they say, correct?
3        A.   Yes.
4        Q.   Because, they lie, correct?
5        A.   Not all the time, to us.
6        Q.   But sometimes they do?
7        A.   Like I say, and that's -- if you're specifically
8    talking about MS, I've also interviewed numerous other
9    criminals, using your words, who have also lied.  So,
10   across the board, I've encountered a lot of individuals
11   I've arrested who have lied, and some who have been
12   totally honest.
13       Q.   Detective Saa, if you could help us out here,
14   this case is about MS-13.  So when I ask you questions,
15   can you just go ahead and take for granted that I'm
16   speaking about MS-13?  Correct?
17       A.   Yes, sir.
18       Q.   All right.  Now, MS-13, again, because these
19   individuals are untrustworthy, you know, as a 16-year
20   veteran of the investigating them, that it would be a
21   good idea to attempt to corroborate information that
22   they give you, correct?
23       A.   Yes.
24       Q.   Because, when they lie, they don't discriminate,
25   correct?

1    A.   But they don't lie all the time.

2    Q.   I understand that.

3         I asked you when they lie, do they discriminate?

4    A.   Can you explain that?  I don't understand what

5    you're saying.

6    Q.   That is, they lie to law enforcement, correct?

7    A.   Yes.

8    Q.   They lie to non-cops, correct?

9    A.   I guess.

10   Q.   They lie to their family members, correct?

11   A.   I'm assuming that they do.

12   Q.   They lie to prosecutors, correct?

13   A.   I'm assuming they do.

14   Q.   They lie to judges, correct?

15   A.   Okay.

16   Q.   And they even lie to each other; isn't that

17   correct?

18   A.   I can't speak on all of them.

19   Q.   Well, you've had 16 and a half years of

20   experience, right?

21   A.   Yes.

22   Q.   In those 16 and a half years of experience, that

23   100 arrests that you've conducted, the 100 interviews

24   you've conducted, have you ever experienced a situation

25   where a member of MS-13 lied to another member of MS-13?

1       A.   Yes.

2       Q.   And, one of the reasons why they do that is, in

3    MS-13 reputations are really big.  They're really

4    important, aren't they?

5       A.   Yes.

6       Q.   In fact, it helps to define your status in the

7    gang, correct?

8       A.   Correct.

9       Q.   The more important your reputation is, the higher

10   you're rank can be, correct?

11      A.   That is correct.

12      Q.   And you can go from being a *paison* (sic), or what

13   do you call it, a hanger-on?

14      A.   A *paro*.

15      Q.   Right on up to the very top, based on your

16   reputation, correct?

17      A.   Well, their acts that -- that's their reputation.

18      Q.   Well, more accurately, the acts that people

19   believe you have committed, correct?

20      A.   Well, that's -- I can't speak on that as

21   specifically.  If you -- basing me -- on my

22   investigations, if I'm arresting somebody because they

23   actually had committed a crime.  I can't speak on what's

24   going on internally.

25      Q.   Let -- let me ask you this:  Before you came here

1    today --

2         A.   Yes.

3         Q.   -- you were told -- you were given a subpoena,

4    correct?

5         A.   Correct.

6         Q.   And you were told by members of the U.S.

7    Attorney's Office that they desired to have you serve as

8    a gang expert, correct?

9         A.   That is correct.

10        Q.   And you heard the government counsel just offered

11   you as a gang expert, correct?

12        A.   That is correct.

13        Q.   Now, when they offered you as a gang expert, what

14   did that mean to you?

15        A.   I have knowledge of the gang.

16        Q.   It would be fair for me to ask you questions

17   about the gang, correct?

18        A.   That is correct.

19        Q.   Now, again, these members, their reputation, it

20   can be predicated on things they've done, correct?

21        A.   Correct.

22        Q.   And also predicated on things that other gang

23   members believe they have done?

24        A.   I believe in that question you're asking me if

25   they're admitting to doing something, they get checked

1    to verify that information.

2        Q.   One of the things -- you -- I think you talked

3    about El Salvador being sort of like a base of control

4    for the gang, correct?

5        A.   I referred to it as the motherland.

6        Q.   The motherland.

7             And there are a lot of members in MS who

8    immigrate from El Salvador, the motherland, to the

9    United States, correct?

10       A.   Correct.

11       Q.   And, when they get here, to an area like Northern

12   Virginia, and they affiliate with a local clique, they

13   often come with a reputation, correct?

14       A.   Yes.

15       Q.   And, that reputation is based on what the members

16   here in the United States have been told by that

17   individual about what they did back in El Salvador,

18   correct?

19       A.   Yes.

20            And they check on that.

21       Q.   And they check on that by talking to other MS

22   people, correct?

23       A.   Usually the leadership.

24       Q.   Other untrustworthy individuals, correct?

25       A.   Maybe untrusted to them, yes.

1    Q.   Other criminals, correct?

2    A.   Correct.

3    Q.   Other people who lie, correct?

4    A.   Correct.

5    Q.   That's their source of verification, correct?

6    A.   Correct.

7    Q.   Now, those individuals, by telling stories about

8    what they've done back in El Salvador, that gives them

9    greater status here in the United States, correct?

10   A.   If it's validated, yes.

11   Q.   For example, if I come to the United States and

12   I'm an MS member, and I brag about committing 12

13   homicides, if, if believed, that gives me higher status,

14   correct?

15   A.   If believed and verified, yes.

16   Q.   If believed, it gives me higher status, correct?

17   A.   If verified.  I can't say if believed.  If

18   verified.

19   Q.   Now, these -- these individuals who you have had

20   the occasion to interview, the 100 or so, how many of

21   them have ever lied to you?

22   A.   A handful or more.

23   Q.   When you say a handful, can you give me --

24   A.   When you talk about lying, it could be something

25   unrelated to the case.  It could be something unrelated

1    to what I've asked.  I mean, everybody lies to some

2    extent.  When you ask me when they lie, yeah, have they

3    lied?  Yes.

4        Q.   And they lie about a variety of things, correct?

5        A.   Yes.

6        Q.   Sometimes they lie about their names, correct?

7        A.   Yes.

8        Q.   They lie about their identity, correct?

9        A.   That's correct.

10       Q.   They lie about where they're from, correct?

11       A.   Correct.

12       Q.   They lie about their citizenship, correct?

13       A.   Correct.

14       Q.   They lie about whether or not they actually are

15   affiliated with the gang, correct?

16       A.   Well, if I'm interviewing an MS gang member and

17   he's saying he's not, yes.

18       Q.   They lie about crimes that they've committed,

19   correct?

20       A.   Yes.

21       Q.   They -- sometimes, they claim they haven't

22   committed a crime when you have clear evidence that

23   they, in fact, have, correct?

24       A.   Yes.

25       Q.   So, they're not what you would consider to be the

1    most credible sources of information --

2        A.   Yeah, they're --

3        Q.   -- correct?

4        A.   -- not standup citizens.

5        Q.   They're not, correct?

6        A.   Correct.

7        Q.   And one of the things about this gang, about this

8    culture, is that they like to brag, don't they?

9        A.   Depending on the rule.  Because, right now, a lot

10   has changed with MS, and silence is golden.

11       Q.   Well, let's talk about the first five years of

12   your experience with the gang.

13       A.   Okay.

14       Q.   Would you agree with me that during that time,

15   you learned in your first five years, that MS members

16   like to brag?

17       A.   But, who are they bragging to?

18       Q.   Well, I'm just asking you a very simple question,

19   sir.  In your first five years of experience, is it true

20   that you learned that MS members like to brag?

21       A.   I really can't answer that.

22       Q.   You're the gang expert, correct?

23       A.   When you're talking about bragging, I mean, what

24   are they bragging about?  Their status?  Their violence?

25       Q.   Let's take each one of those.

1    A.   Okay.

2    Q.   Do they brag about their status?

3    A.   No.  Because the rules with MS have changed, that

4    they don't -- the ones who -- if you're referring to the

5    ones that are just encountered on the street during

6    consensual encounters, yeah, they don't admit they're

7    gang members.  They're not going to brag about it.

8    Q.   Do they brag about crimes that they have

9    committed?

10   A.   I can't speak on the gang itself, but some do,

11   yes.

12   Q.   Some do?

13   A.   Yes.

14   Q.   And did you learn that in your first five years,

15   or more recently?

16   A.   Throughout my career.

17   Q.   Just throughout your career?

18   A.   Yes.

19   Q.   So you've had occasions in which you have

20   encountered gang members who have bragged about doing

21   certain things, certain crimes, correct?

22   A.   I guess when you say "brag," I mean, they're not

23   being boastful about it.

24   Q.   They're not?

25   A.   No.  I mean, when you -- when I'm interviewing

C. Saa - Cross                                                    40

1    these gang members, yes, some do lie, that they didn't

2    commit the crime that I'm investigating, and some do

3    admit to it.

4         But as far as being boastful about it, there have

5    been some, but for the most part, they don't boast about

6    it.

7    Q.   When MS -- are you telling me that when MS

8    members are discussing their criminal activities with

9    one another, they don't boast about it?

10   A.   I'm pretty sure they talk about it, yes.

11   Q.   I didn't ask you about talk, Detective.  Do they

12   boast about it?

13   A.   I'm not right there to hear them boast about it.

14   Q.   During your 16 and a half years of experience,

15   have you ever encountered a situation in which one

16   boasted about it?

17   A.   You are right, because we've done surveillance,

18   video.  Yes, they do.

19   Q.   So, through your investigative technique, you

20   have encountered situations where members are boasting

21   about what they have done?

22   A.   During my investigative techniques, yes.

23   Q.   And the reason why you know from your 16 and a

24   half years of experience in being a gang expert, is that

25   they're doing this because they want to, again, improve

1   their reputation and status within the gang, correct?

2       A.   Yes.

3       Q.   Now, let's talk about these rules.  There are

4   different levels of rules in MS-13, correct?

5       A.   I don't understand.

6       Q.   Well, sort of like in -- you're in law

7   enforcement.  There are misdemeanors and then there are

8   felonies, correct?

9       A.   Yes.

10      Q.   Felonies being more serious than misdemeanors,

11  correct?

12      A.   Yes.

13      Q.   Misdemeanors warranting certain levels of

14  punishment, while felonies warranting a much higher

15  level of punishment, correct?

16      A.   Correct.

17      Q.   And the same is true about MS-13, correct?

18      A.   Yes.

19      Q.   There are small, insignificant rules that get you

20  punished, correct?

21      A.   Correct.

22      Q.   And then there are more significant rules that

23  warrant more serious, grave consequences, correct?

24      A.   That is correct.

25      Q.   And as a member of MS-13, all members are charged

1  with knowing those rules, correct?

2      A.  They're supposed to, yes.

3      Q.  For example, there is something called a 13,

4  correct?

5      A.  Yes.

6      Q.  And then there is something else called a 26,

7  correct?

8      A.  Yes.

9      Q.  Now, tell the ladies and gentlemen of the jury

10  what a 26 is.

11      A.  Well, 26 is just 13 times 2, and you get beat for

12  26 seconds instead of 13.

13      Q.  Who decides who gets a 26?

14      A.  The leader of the clique.

15      Q.  Does the recipient have any say-so in that?

16      A.  The individual receiving it?

17      Q.  Yeah.

18      A.  No.

19      Q.  Do they vote on it as a clique?

20      A.  Depends on the violation.

21      Q.  They may vote on whether or not to administer the

22  26 or not?

23      A.  Yes.

24      Q.  And, if you are not in the majority, that is, you

25  didn't vote to have the 26, does that mean you don't get

C. Saa - Cross                                                    43

1    involved?

2       A.   No -- as far as the person actually giving the

3    26, you mean?

4       Q.   Right.

5       A.   No.  The clique leader determines -- even though

6    you get a vote and you break it down to a democracy, if

7    you want to say, at the end of the day the leader says

8    what needs to be done.

9       Q.   Have you ever, in your 16 and a half years

10   experience, encountered a situation where a member of

11   MS-13 agreed, by word of mouth, that he would

12   participate in a 13 or a 26, but for one reason or

13   another failed to do so?

14      A.   Yes.

15      Q.   That means they said that they were going to do

16   something, administer punishment, but for some reason

17   they just didn't, correct?

18      A.   Correct.

19      Q.   Now, that's not something to brag about in MS,

20   correct?

21      A.   No.  That actually -- then he will get a 13 or a

22   26.

23      Q.   That's right.

24           You get punished if you agree to do something but

25   fail to follow through with it, correct?

C. Saa - Cross                                                              44

1     A.   Breaking rules.

2     Q.   And, generally, that's not something that you

3 want to tell people about, correct?

4     A.   About -- bragging about breaking rules?

5     Q.   That's right.

6     A.   No, you don't.

7     Q.   Because that could get you hurt, correct?

8     A.   Correct.

9     Q.   It could even get you killed, correct?

10    A.   Correct.

11    Q.   So in those situations, your experience is that

12 the MS member may take steps to conceal the fact that

13 he, in fact, did not go forward, go through with the

14 discipline, correct?

15    A.   That's kind of hard to conceal when you have

16 other individuals there.

17    Q.   Well, let me just ask you -- not how difficult it

18 is.  Have you ever experienced that in your 16 and a

19 half years of experience?

20    A.   That, I can't say I have.

21    Q.   You can't say that you have?

22    A.   With the question you're asking me, that they try

23 to conceal they're not participating in a 26, while

24 other members are there, no, I can't say that I have.

25    Q.   Let me -- le me frame it a different way.  If a

1   leader gives a homeboy a mission --

2       A.   Okay.

3       Q.   You understand what a mission is, when I say

4   that?

5       A.   Yes, I do.

6       Q.   Can you explain to the ladies and gentlemen of

7   the jury what I mean by "mission"?

8       A.   A mission is an order to conduct whatever the

9   leader is telling them to do.

10      Q.   (Continuing) -- and the homeboy fails to complete

11  the mission --

12      A.   Yes, sir.

13      Q.   You're still with me?

14      A.   Yes.

15      Q.   That's something that he would not want the

16  leader to know, correct?

17      A.   That's correct.

18      Q.   Because, if the leader found out that this

19  homeboy did not follow through with the mission, it can

20  subject that homeboy to punishment, correct?

21      A.   Correct.

22      Q.   He could get a 13, correct?

23      A.   Correct.

24      Q.   He could get a 26, correct?

25      A.   Correct.

1    Q.   He could even be killed, correct?

2    A.   Depending on the mission, yes.

3    Q.   So you would agree with me, it would be in his

4    interest to conceal the fact that he did not go through

5    with the mission, correct?

6    A.   Yeah, being with -- the punishment he would

7    receive with the mission given, yeah, he would try to

8    conceal it.

9    Q.   And when we talk about these rules and its

10   enforcement, it's not just limited to the members,

11   correct?

12   A.   No.

13   Q.   MS will reach out and touch friends and family,

14   correct?

15   A.   That is correct.

16   Q.   And, all members know that, correct?

17   A.   Correct.

18   Q.   That if you break one of these rules, such as not

19   following through with a mission, you not only can

20   subject yourself to physical harm, you also might

21   subject your mamma to physical harm.

22   A.   Correct.

23   Q.   Your daddy to physical harm?

24   A.   Correct.

25   Q.   Your sister might be killed?

1     A.   Correct.

2     Q.   Your brother might be killed?

3     A.   Correct.

4     Q.   Your wife might even be raped, correct?

5     A.   Or killed.

6     Q.   And this is particularly sensitive to those MS

7   members who immigrated from El Salvador, correct?

8     A.   What part?

9     Q.   This fear of MS taking out retribution against

10  their family members?

11    A.   But they knew that going into the gang, though.

12    Q.   I know.

13         But isn't it particularly acute, among those

14  members who came from El Salvador and still have family

15  members back in El Salvador, who are operating here in

16  the United States?

17    A.   Both, and the family they have here.  But they

18  knew that going in.

19    Q.   But the risk to the families back in El Salvador

20  is much higher than here in the United States, correct?

21    A.   Why is that?

22    Q.   Well, I'm asking you.  You're the gang expert,

23  correct?

24    A.   It can be either or.

25    Q.   Are you telling me that the safety of the family

1   members in El Salvador is the same as what it is here in

2   the United States?

3       A.   If you're basing it down by security, no.  It's

4   much dangerous down in El Salvador.

5       Q.   It's much more dangerous in El Salvador, correct?

6       A.   Yes.

7       Q.   People get macheted and murdered, gang related

8   homicides, in El Salvador almost every day, correct?

9       A.   That's correct.

10      Q.   All the time, correct?

11      A.   Correct.

12      Q.   And your experience tells you that law

13  enforcement down there have virtually no chance of

14  stopping it, correct?

15      A.   I can't say that for a hundred percent.

16      Q.   In fact, down in El Salvador, the gang members,

17  they even run the jails, don't they?

18      A.   That, they do.

19      Q.   They do what they want when they want, correct?

20      A.   That, they do.

21      Q.   And gang members in MS in this country, they're

22  familiar with that fact, correct?

23      A.   Yes.

24      Q.   And that's a concern for them, correct?

25      A.   I guess so.

1    Q.   Their family's safety back in El Salvador,
2    correct?
3    A.   Yes.
4    Q.   Now, some of these rules, you said one of them
5    is, don't cooperate with law enforcement, correct?
6    A.   That's correct.
7    Q.   And, that's probably the number one rule, behind
8    loving the Mara, correct?
9    A.   Actually, Mara always comes first.
10   Q.   That's first.  That's putting the Mara number
11   one, correct?
12   A.   Correct.
13   Q.   Now, when they cooperate with law enforcement,
14   what we mean is by testifying in court, correct?
15   A.   Uh-huh.
16   Q.   Against the gang, correct?
17   A.   Correct.
18   Q.   And, that also means meeting with people like
19   yourself, detectives, to give interviews about the gang,
20   correct?
21   A.   Correct.
22   Q.   Those aren't the type of things that MS considers
23   cooperating, correct?
24   A.   They refer to them as *ratas*.
25   Q.   And, that is -- even in situations where a member

1   wishes to assist law enforcement to protect himself, if

2   in doing so he speaks ill of the gang, that could

3   subject him to discipline, correct?

4       A.   Yes.

5       Q.   That's a violation of the rule, too, correct?

6       A.   Yes.

7       Q.   So even if a gang member came into a courtroom

8   and said, "I didn't do it, but they did it, the rest of

9   the gang," that gets you punished, correct?

10      A.   I don't understand the question.

11      Q.   Well, I'm saying, when a -- if a gang member --

12  you said testifying in court is considered cooperation,

13  correct?

14      A.   Yes.

15      Q.   And even if a gang member -- because you're the

16  expert --

17      A.   Yes, I know that.

18      Q.   -- were to testify that they did not commit an

19  alleged crime, but that other MS members committed the

20  crime, that would subject them to punishment, correct?

21      A.   His mere talking to law enforcement would --

22      Q.   Again, that could get him killed, correct?

23      A.   Yes.

24      Q.   That could get his mamma killed?

25      A.   Yes.

C. Saa - Cross                                                          51

1    Q.   His daddy killed?

2    A.   Yes.

3    Q.   His brothers and his sisters, correct?

4    A.   Correct.

5    Q.   Now, different people in MS have different levels

6    of authority, correct?

7    A.   Yes.

8    Q.   There's a certain hierarchy, I think how you

9    describe it, correct?

10   A.   Correct.

11   Q.   Not everyone can order a green light, correct?

12   A.   Correct.

13   Q.   Certain ones require somebody above your chain of

14   command, if you -- if you will, correct?

15   A.   Correct.

16   Q.   And, when these meetings are held, the *misa* --

17   that's the mass, is that correct?

18   A.   Church mass.

19   Q.   Church mass.

20        And "mass" is another word for *misa* that's often

21   used, correct?

22   A.   Yes.

23   Q.   Now, not everybody is invited to these mass,

24   correct?

25   A.   No.

1    Q.    Only the higher-ups, correct?

2    A.    Leadership.

3    Q.    The leadership.

4          And then they filter down what has happened at

5    the *misa* to the homeboys, correct?

6    A.    Correct.

7    Q.    And, these are the leaders of MS who are at the

8    *misa*, correct?

9    A.    Correct.

10   Q.    These are the same criminals we talked about

11   earlier, correct?

12   A.    Yes.

13   Q.    The same untrustworthy individuals, correct?

14   A.    As you refer to them, yes.

15   Q.    I think that was a word you adopted.  Am I

16   incorrect?

17   A.    Yes, go ahead.

18   Q.    And the same liars that we're talking about,

19   correct?

20   A.    Yes.

21   Q.    They go back and they relay messages to the

22   homeboys, correct?

23   A.    Correct.

24   Q.    And the homeboys, they weren't at this *misa*,

25   correct?

1      A.   That is correct.

2      Q.   They are relying on the same liars, correct?

3      A.   Correct.

4      Q.   The same criminals, correct?

5      A.   Correct.

6      Q.   The same untrustworthy individuals, correct?

7      A.   Correct.

8      Q.   To reliably tell them what happened at the *misa*,

9   correct?

10     A.   Correct.

11     Q.   And there's no -- I mean, let's be honest here.

12  This isn't a standard business meeting, correct?

13     A.   No.

14     Q.   I mean, there's nobody there like a court

15  reporter taking down what's being said, correct?

16     A.   No.

17     Q.   There's not even anyone down there scribbling

18  down handwritten notes, correct?

19     A.   In some cases, they have.

20     Q.   Everybody is just going off word of mouth,

21  correct?

22     A.   For the most part.

23     Q.   Now, you have testified, I believe, you said, 13

24  times, correct?

25     A.   Yes.

1    Q.   And, five of those occasions were in federal

2    court, correct?

3    A.   Here in EDVA, yes.

4    Q.   Right here in the Eastern District of Virginia?

5    A.   Yes.

6    Q.   Is it fair to say that you've testified on all

7    five of those occasions for the U.S. Attorney's Office?

8    A.   Yes.

9    Q.   And how many times did you meet with the U.S.

10   Attorney's Office before you came in here today about

11   this particular case?

12   A.   I met with them once.

13   Q.   Let me draw your attention to Government's

14   Exhibit 137-A.  And turn to page four, for me.  Let me

15   know when you've found it.

16   A.   Okay.

17   Q.   You got page four?

18   A.   Yes.

19   Q.   Now, in relation to the first case, do you recall

20   how many times you met with the U.S. Attorney's Office?

21   A.   For the February 13th one?

22   Q.   Yes.

23   A.   No, I don't.

24   Q.   Was it more than once?

25   A.   Yes.

C. Saa - Cross                                                55

1    Q.   What about the second case, the February 15th
2    case; did you meet with the U.S. Attorney's Office more
3    than once?
4    A.   Yes.
5    Q.   Was it more than five times?
6    A.   That, I can't say for certain.
7    Q.   What about the -- the July 2009 case; how many
8    times did you meet with the U.S. Attorney's Office?
9    A.   More than once.
10   Q.   More than once.
11        Let me turn -- turn to page five.
12   A.   Okay.
13   Q.   You see the case, listed February 19, 2010?
14   A.   Yes.
15   Q.   Did you meet with the U.S. Attorney's Office on
16   that occasion?
17   A.   Yes.
18   Q.   How many times?
19   A.   Actually, that one was once.
20   Q.   Once?
21   A.   Yes.
22   Q.   Turn to page six.
23        The May 13, 2013, case, how many times did you
24   meet with the U.S. Attorney's Office?
25   A.   Once.

1    Q.   How many times have you met with me?

2    A.   None.

3    Q.   How many times have you met with my client,

4    Mr. Torres?

5    A.   None.

6    Q.   Now, are you -- you're here today and this is a

7    part of your job, correct?

8    A.   Correct.

9    Q.   You get paid, correct?

10   A.   For being a police sergeant, yes.

11   Q.   That's right.

12        And, do I understand it correctly, in all the

13   times -- other than those five times, the other eight

14   times you testified, have you ever testified on behalf

15   of the defense?

16   A.   No.

17   Q.   You always testify on behalf of the government?

18   A.   Yeah, for my job, yes.

19        MR. JENKINS:  I have no further questions,

20   Your Honor.

21        THE COURT:  We've reached the recess hour,

22   5:00 p.m.

23        Ladies and gentlemen, please do not discuss

24   the case.  Don't permit the case to be discussed in your

25   presence.

1           Don't do any research on the case.  Leave
2    your notes in the jury deliberation room.
3           We will resume tomorrow at 10:00 a.m.
4    You're free to leave.
5           Remain on the stand, please.
6           Jurors, I'm sorry.  My law clerk has
7    reminded me, was there anyone on the jury who wanted to
8    bring a laptop in tomorrow?  Does anyone want to do that
9    for work?
10          (Jurors indicating.)
11          THE COURT:  Okay.  Give your names to
12   Mr. Toliver.  We will issue a letter for you to bring
13   them in.  Three?
14          Just give your name to Mr. Toliver on your
15   way out.  You have to bring your own hot spot.  We don't
16   have wireless in the courthouse.  Okay.
17          (Jury not present.)
18          THE COURT:  You may be seated.
19          Sir, can you hear me okay?
20          THE WITNESS:  Yes, sir.
21          THE COURT:  Obviously, we need you back
22   tomorrow.  Please do not discuss this case with anyone,
23   and no more talking to any lawyers until you come back
24   to court.  Okay?
25          THE WITNESS:  Yes, sir.

1            THE COURT:   Including the government

2    attorneys.   Thank you.   You're excused to leave.   You're

3    excused.

4            (Witness stood aside.)

5            THE COURT:   Is there anything else I need to

6    take up before we leave today?

7            (No response.)

8            THE COURT:   No?

9            We're in recess until tomorrow at

10    10:00 o'clock.   Thank you.

11            (Thereupon, the proceedings were concluded

12    at 5:01 p.m.)

13                              ---

```
1

2                    CERTIFICATE OF REPORTER

3

4              I, Renecia Wilson, an official court

5    reporter for the United States District Court of

6    Virginia, Alexandria Division, do hereby certify that I

7    reported by machine shorthand, in my official capacity,

8    the proceedings had upon the jury trial in the case of

9    UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

10             I further certify that I was authorized and

11   did report by stenotype the proceedings in said jury

12   trial, and that the foregoing pages, numbered 1 to 58,

13   inclusive, constitute the official transcript of said

14   proceedings as taken from my shorthand notes.

15

16             IN WITNESS WHEREOF, I have hereto

17   subscribed my name this  27th  day of  April, 2016.

18

19                       /s/
                         _____
20                       Renecia Wilson, RMR, CRR
                         Official Court Reporter
21

22

23

24

25
```