1    IN THE UNITED STATES DISTRICT COURT FOR THE
     EASTERN DISTRICT OF VIRGINIA
2              Alexandria Division

3    UNITED STATES OF AMERICA,              )
                                            )
4                    Plaintiff,             )
                                            ) Crim. No. 1:14cr306
5         vs.                               )
                                            )
6    JOSE LOPEZ TORRES, ALVIN GAITAN        ) March 31, 2016
     BENITEZ, CHRISTIAN LEMUS CERNA,        )
7    OMAR DEJESUS CASTILLO, DOUGLAS         )
     DURAN CERRITOS, MANUEL ERNESTO         )
8    PAIZ GUEVARA, and JESUS ALEJANDRO      )
     CHAVEZ,                                )
9                                           )
                     Defendants.            )
10   _____)

11

12                        JURY TRIAL

13

14   BEFORE:      THE HONORABLE GERALD BRUCE LEE
                  UNITED STATES DISTRICT JUDGE
15

16
     APPEARANCES:
17

18   FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                 BY:   JULIA MARTINEZ, AUSA
19                     STEPHEN M. CAMPBELL, AUSA
                       TOBIAS TOBLER, AUSA

20
                            ---
21

22   OFFICIAL COURT REPORTER:

23               RENECIA A. SMITH-WILSON, RMR, CRR
                 U.S. District Court
24               401 Courthouse Square, 5th Floor
                 Alexandria, VA 22314
25               (703)501-1580

1    APPEARANCES (Continued)

2    FOR DEFENDANT JOSE LOPEZ TORRES

3            BYNUM & JENKINS, PLLC
             BY:  ROBERT L. JENKINS, JR., ESQ.
4            THE LEIVA LAW FIRM, PLC
             BY:  MANUEL E. LEIVA, ESQ.
5
     FOR DEFENDANT ALVIN GAITAN BENITEZ
6
             LAW OFFICE OF AMY LEIGH AUSTIN
7            BY:  AMY LEIGH AUSTIN, ESQ.
             SMITH & ZIMMERMAN, PLLC
8            BY:  JEFFREY D. ZIMMERMAN, ESQ.

9    FOR DEFENDANT CHRISTIAN LEMUS CERNA

10           LAW OFFICE OF CHRISTOPHER AMOLSCH
             BY:  CHRISTOPHER AMOLSCH, ESQ.
11           FRANK SALVATO, ESQ.

12   FOR DEFENDANT OMAR DEJESUS CASTILLO

13           FIRSTPOINT LAW GROUP, PC
             BY:  KATHERINE MARTELL, ESQ.
14           OLD TOWN ADVOCATES, PC
             BY:  MEREDITH M. RALLS, ESQ.
15
     FOR DEFENDANT DOUGLAS DURAN CERRITOS
16
             LAW OFFICE OF J.R. CONTE, PLLC
17           BY:  JOSEPH R. CONTE, ESQ.
             LAW OFFICE OF DWIGHT CRAWLEY
18           BY:  DWIGHT E. CRAWLEY, ESQ.

19   FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

20           LAW OFFICE OF W. MICHAEL CHICK, JR.
             BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
21
     FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
22
             JEROME P. AQUINO, ESQ.
23           ELITA C. AMATO, ESQ.

24
                             ---
25

INDEX

PRELIMINARY MATTERS                                          4

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Claudio Saa (Cont.) | --- | 10 | 50 | --- |
| Osmin Alfaro Fuentes | 59 | 80 | 144 | --- |
| Jay Choi | 149 | --- | --- | --- |
| Frances Field | 154 | 160 | --- | --- |
| Robert C. Hicks | 162 | 189 | 223 | --- |
| Liliana Portwine | 231 | (Witness not completed) | | |

(Court recessed)

---

<u>PROCEEDINGS</u>

1

2

3          (Thereupon, the following was heard in open
4   court at 10:15 a.m.)
5              (Jury not present.)
6              THE CLERK:  1:14 Criminal 306, United States
7   versus Jose Lopez Torres, Alvin Gaitan Benitez,
8   Christian Lemus Cerna, Omar Dejesus Castillo, Douglas
9   Duran Cerritos, Manuel Ernesto Paiz Guevara, and Jesus
10  Alejandro Chavez.
11             THE COURT:  Everybody okay now?
12             THE INTERPRETER:  Yes.
13             THE COURT:  Good morning, ladies and
14  gentlemen.
15             Good morning, Mr. Jose Lopez Torres,
16  Mr. Alvin Gaitan Benitez, Mr. Douglas Duran Cerritos,
17  Mr. Christian Lemus Cerna, Mr. Omar Dejesus Castillo,
18  Mr. Manuel Ernesto Paiz Guevara, and Mr. Jesus Alejandro
19  Chavez, and counsel.
20                  PRELIMINARY MATTERS
21             THE COURT:  There's a note received from the
22  jury and I want to know if you all had any comment about
23  what I should say or not say about it at all.
24             MS. MARTINEZ:  Your Honor, the government's
25  position would be that there's no need to respond to it

unless Your Honor feels necessary to tell the juror that you're not going to respond to it.

There will certainly be ample testimony in this case about Pedro Romero Cruz, whose gang name is Payaso.  He may have been mentioned -- he certainly was mentioned as Payaso in the opening.  I can't recall if his full name was mentioned.

But there will be witnesses who will discuss him, so, I imagine that question will be answered at some point during trial.  I don't see any reason to answer it now.

MR. JENKINS:  May it please the Court. Robert Jenkins on behalf of Mr. Torres, Your Honor.  On behalf of Mr. Torres, we concur with the government's suggestion.

THE COURT:  All right.

MR. SALVATO:  I think we all agree, Your Honor.  Frank Salvato for Mr. Cerna.

THE COURT:  All right.

I want to let you all know one thing I'm doing that's a little bit different, and that is, during jury selection, I think there were one or two jurors, and now it looks like there's seven or eight, who want to be able to use their laptop or tablet to keep -- check with their office in terms of e-mails and things

1  like that, which I want to allow in the jury room before
2  court starts, at lunchtime, and during the trial, but
3  they will not be able to take notes on them.  They're
4  not going to bring any cellphones in.
5          And I think it will police itself, just like
6  there are two phones in the jury room now, that have
7  been back there for years.  You can't really do
8  something privately back there because there's so many
9  people and the table is so small.  So that's my plan.
10         You can bring our jury out.
11         (Jury present at 10:19 a.m.)
12         THE COURT:  You may be seated.
13         Good morning, ladies and gentlemen.
14         THE JURORS:  Good morning, Your Honor.
15         THE COURT:  Good morning, Mr. Jose Lopez
16  Torres.
17         Good morning, Mr. Alvin Gaitan Benitez.
18         Good morning, Mr. Douglas Duran Cerritos.
19         Good morning, Mr. Christian Lemus Cerna.
20         Good morning, Mr. Omar Dejesus Castillo.
21         Good morning, Mr. Manuel Ernesto Paiz
22  Guevara.
23         And good morning, Mr. Jesus Alejandro
24  Chavez.
25         Ladies and gentlemen, as we begin the trial,

1    first, I received a note from one juror about a name

2    that was referred to during argument.

3            Be patient.  The whole case will be

4    presented to you and everything you need to see and hear

5    will be presented to you during the trial.  So there's

6    no need to focus on any particular questions just yet.

7            Remember I said at the beginning of this

8    that the lawyers will bring out anything they think is

9    important.  Any names, any activities, they'll bring it

10   out for you.

11           I am going to be doing something that's a

12   bit unprecedented I wanted to bring to your attention,

13   and the reason I've had you sign a court order is, I

14   remember during jury selection that there were several

15   individuals who are self-employed and who also are in

16   jobs where they have to follow through with individuals

17   during the day.

18           And, I mentioned to you that I would allow

19   you to bring in laptops and tablets.  We don't have

20   wi-fi in the courthouse.  You're going to have to bring

21   in your own hot spot.  And maybe you all can share a hot

22   spot.  That's what it has to be.

23           But it can't be a cellphone.  And that is

24   because our court has a no cellphone policy.

25           Now, of course, there are people who bring

cellphones in the area of the courthouse, and then there are a couple stores that will actually store a cellphone if that's what you need to do.  But you can't bring them in the building because our court has a no cellphone policy.

The only exception to that would be the lawyers who are in trial, with a court ordered approval.

So I'm trying to strike a balance by allowing you to have access to a laptop and a tablet in the jury room.

But bear in mind there are already two phones back there.  So if somebody needs to make a phone call, the phone is back there so you can make brief phone calls to family, children, and work as time permits.

But don't, obviously, become so consumed with that that you're losing track of why you're here. You're here for jury duty, which is a very important responsibility.

So I wanted to say that out loud.  And I have a court order that you all signed.  And all the people who have signed the order, I believe, understand the importance of adhering to it.

And rule number one, as always, is, even if you're using your laptop or a tablet, you're not to do

1    any research on the case.  You're not to discuss the

2    case.

3                    And, I'm expecting other jurors to let me

4    know if there would be any violation of that.  If that

5    were to happen, then we would stop it altogether.

6                    Because what I'm trying to do here is strike

7    a balance, so you can continue to keep in touch with

8    your office, if you think you need to, Monday through

9    Thursday, and also pay attention to the trial.

10                   Does everybody understand what I'm trying to

11   do?

12                   (Jurors indicating.)

13                   THE COURT:  Okay.  Well, I hope you work

14   with me.  What I'm doing is something different, but I'm

15   trying to accommodate you and also trying to make sure I

16   have a fair, representative jury who can sit six weeks

17   and not be distracted by needing to call their office or

18   follow up with an e-mail.

19                   Thank you very much.

20                   Ready to bring the witness back?

21                   MS. MARTINEZ:  Yes, Your Honor.

22                   THE COURT:  Thank you.

23                   I believe the next examiner will be counsel

24   for Mr. Alvin Gaitan Benitez.

25                   MR. JENKINS:  Yes, Your Honor.

1              THE COURT:  Is that right.

2              No?

3              MR. JENKINS:  Yes, Your Honor.

4              Your Honor, for the record, at the

5     beginning -- at the conclusion of his direct I reserved

6     on the issue of his qualifications as an expert.

7              THE COURT:  Yes.

8              MR. JENKINS:  But now that I've had ample

9     opportunity to cross-examine him on behalf of

10    Mr. Torres, we will withdraw any objection, and we

11    believe that the witness is qualified as a gang expert.

12             THE COURT:  All right.

13             MR. SALVATO:  And we concur with that, Your

14    Honor.

15             THE COURT:  All right.

16             THEREUPON, CLAUDIO SAA, previously duly

17    sworn, testified further as follows:

18                    CROSS-EXAMINATION

19    BY MR. ZIMMERMAN:

20      Q.   Good morning, Sergeant.

21      A.   Good morning, sir.

22      Q.   My name is Jeff Zimmerman and I represent

23    Mr. Gaitan Benitez.

24             What was the name -- you had

25    testified yesterday -- what was the name of the meeting

1    of just the leadership of regional cliques?

2        A.   Universal *misa*.

3        Q.   A universal *misa*.  Is that also sometimes called

4    a general meeting?

5        A.   Yes.

6        Q.   And that's just the leadership?

7        A.   Yes.

8        Q.   And those are the only people in attendance at

9    such a meeting?

10       A.   There may be situations where they may make an

11   exception for somebody.

12       Q.   But generally.

13       A.   Generally, it's the leadership.

14       Q.   Okay.  And, it's only the leadership of MS-13

15   that decides that a death sentence, a green light, can

16   be imposed on an MS-13 member, correct?

17       A.   They approve it, yes.

18       Q.   And they must approve it?

19       A.   Well, there have been cases where a --

20       Q.   For --

21       A.   Generally, yes.

22       Q.   And, this is done at such leadership meetings,

23   correct?

24       A.   For the most part.

25                MR. ZIMMERMAN:  I have no further questions,

1    Your Honor.

2              MR. CONTE:  Your Honor, just two questions.

3              THE COURT:  Counsel for Mr. Cerritos.

4                    CROSS-EXAMINATION

5    BY MR. CONTE:

6       Q.  Good morning.

7       A.  Good morning, sir.

8       Q.  Sir, how many members did you say that are in

9    MS-13?

10             THE REPORTER:  I'm sorry?

11   BY MR. CONTE:

12      Q.  How many members are there in MS-13, in the area?

13      A.  Where, exactly?

14      Q.  In Northern -- or the Washington, DC,

15   Metropolitan area?

16      A.  It fluctuates anywhere from 2,000 to 3,000, more

17   or less.

18      Q.  And, is their membership declining?

19      A.  I can't say that for certain.

20      Q.  Well, do you recall testifying in 2006 that there

21   were approximately 3,500, to 5,000 --

22      A.  If that's what --

23      Q.  -- members?

24      A.  -- I testified to, yes.

25      Q.  Pardon me?

1       A.   If that's what I testified to, yes.

2       Q.   All right.  So, that would mean that the

3    membership is declining, right?

4       A.   Yes.  But like I also said, it fluctuates.

5            MR. CONTE:  All right.

6            Nothing further, Your Honor.

7            THE COURT:  Counsel for Mr. Lemus Cerna?

8            (Pause.)

9            THE COURT:  I'm only calling your names.

10   You're not required to speak if you don't want to.  I'm

11   just following the order you gave me.

12            State your name, please.

13                 CROSS-EXAMINATION

14   BY MR. SALVATO:

15      Q.   Good morning, Sergeant Saa.  This is Frank

16   Salvato and I represent Christian Lemus Cerna.

17      A.   Good morning.

18      Q.   I'm going to ask you a few questions about

19   tattoos.  You remember you talked to Mr. Campbell about

20   that during --

21      A.   Yes, sir.

22      Q.   -- your testimony?

23            And is it fair to say that there are certain ways

24   in which MS-13 members recognize each other?

25      A.   Yes.

C. Saa - Cross                                                     14

1    Q.   And, one of those ways is to get tattoos,
2    correct?
3    A.   Correct.  That's one way.
4    Q.   And at one point, tattoos were considered
5    mandatory.
6    A.   At one point, yes.
7    Q.   And that seems to be changing; but at one point,
8    they were mandatory; is that correct?
9    A.   Correct.  When they first started that was a
10   mandatory situation.
11   Q.   Okay.  And, basically, part of getting a tattoo
12   is the result of having work done or getting work done,
13   correct?
14   A.   Well, it depends on what specific tattoo and each
15   specific clique, like I said.  The tattooing situation
16   has changed over the years.  Previously, when they first
17   began, once the member became part -- once that *paro*
18   associate became a full-fledged member, he was given a
19   tattoo.
20   Q.   And you can also get a tattoo for getting work
21   done, correct?
22   A.   Yes.
23   Q.   In other words, for committing an act of violence
24   you can get a tattoo; is that --
25   A.   Yes.

1     Q.   -- correct?

2          And, MS-13 often uses different types of tattoos,

3     correct?

4     A.   Yes.

5     Q.   Dots, correct?

6     A.   Well, dots are not an MS-13-specific tattoo.

7     Q.   Area Codes?

8     A.   That's not a specific to MS-13.

9     Q.   I thought you said in your direct testimony that

10    503 -- what was the Area Code you mentioned?

11    A.   I don't remember saying 503.

12    Q.   Do, often, MS-13 members have 503 or an Area

13    Code?

14    A.   Some, yes, for the southern Area Code.

15    Q.   And, it's the leader that decides whether a

16    member, an associate, gets a tattoo, correct?

17    A.   Not necessarily, no.

18              MR. SALVATO:  Court's indulgence.

19              (Pause.)

20    BY MR. SALVATO:

21    Q.   Mr. Saa, it's fair to say that a leader would

22    decide whether or not a particular member of the gang

23    had earned a tattoo; is that true?

24    A.   If he earns it, yes.

25    Q.   A leader makes that decision?

1    A.   For the most part, yes.

2    Q.   And, do you have any specific knowledge about my

3    client in this case, Christian Lemus Cerna, having any

4    tattoos?

5    A.   No.

6    Q.   Does he have any tattoos?

7    A.   I don't know your client.

8    Q.   You don't know one way or another?

9    A.   No.

10   Q.   Can you identify my client at all?

11   A.   No, I don't know who your client is.

12   Q.   Sergeant Saa, I think you said during your

13   examination with Mr. Jenkins that there are ranges of

14   punishment --

15   A.   Yes.

16   Q.   -- for a violation, correct?

17   A.   Yes.

18   Q.   And cooperating with the police is a significant

19   punishment that results in a green light --

20   A.   Correct.

21   Q.   -- correct?

22        Or trying to leave the gang, that's a

23   significant rule violation that can result in a green

24   light, correct?

25   A.   If leaving the gang wasn't approved.

1    Q.   But, generally, green lights are provided for

2    these major violations such as cooperating with the

3    police?

4    A.   Yes.

5    Q.   And, the type of violation of a rule that would

6    warrant a *calentón*, or a beating, would be not paying

7    your dues, letting a homeboy down during a

8    confrontation, or not following some of the rules, true?

9    A.   Correct.

10   Q.   And, fair to say, as you just indicated, I think,

11   to Mr. Zimmerman, that the leader decides whether a

12   green light should be authorized, true?

13   A.   For the most part, yes.

14   Q.   And, that's done at a general meeting, true?

15   A.   For the most part, yes.

16   Q.   And, I believe you said during your direct

17   testimony that once somebody is in MS-13 as a homeboy,

18   they're in for life?

19   A.   Correct.

20   Q.   So, once a homeboy, always a homeboy?

21   A.   That is correct.

22   Q.   Mr. Saa, would it be fair to say that not in your

23   16 and a half years of law enforcement experience, that

24   not every criminal act done by an MS-13 member is in

25   furtherance or in support of the gang?

1      A.   That's correct.  Because there could be something

2  that the individual member did on his own.

3      Q.   Sure.  So, there are such things as personal

4  criminal acts, true?

5      A.   Yes.

6      Q.   For example, in the Town of Herndon or elsewhere,

7  where you pulled over an MS-13 member who didn't have a

8  license, was driving drunk, that's not a criminal act?

9      A.   Well, it is a criminal act.

10     Q.   In furtherance of MS-13?

11     A.   That's correct.

12     Q.   That is a personal situation, true?

13     A.   Yes.

14     Q.   And you've investigated cases in your experience

15  over these 16 and a half years where, even an assault or

16  a violent act was a personal beef, not an act in

17  furtherance of MS-13, true?

18     A.   An example being a domestic, domestic assault.

19     Q.   Or in a bar, where -- you've investigated cases

20  where in a bar, an MS-13 member's girlfriend was

21  approached by somebody else, and the guy punched him in

22  the face, true?

23     A.   Yes.

24     Q.   And that's a personal beef, a personal action,

25  not in furtherance of the gang, true?

1     A.   I could say that.

2     Q.   And I know you covered in some detail with
3  Mr. Jenkins about braggadocio, bragging, that's part of
4  the culture?

5     A.   Correct.

6     Q.   And have you seen cases where different MS-13
7  members or associates bragged about doing something that
8  only one person had actually done; in other words,
9  multiple people taking credit for something that
10 somebody else did?

11    A.   I can't speak on the totality of how many people
12 are doing that, but have I personally seen that?  Yes.

13    Q.   So you've seen cases where three guys are taking
14 credit for something that one guy actually did, in
15 reality?

16    A.   Or they may have had minimal participation and
17 boast themselves up.

18    Q.   A situation where they were just there, but they
19 said they did something that was more active than just
20 being there, true?

21    A.   No.  Because I've had cases that they were there
22 and participated, but in a minimal fashion, but boasted
23 about doing more.

24    Q.   All right.  And you've had cases where they
25 weren't even there, and one person bragged, or three

1    other people, and all of a sudden it's like who attended

2    Super Bowl I; all of a sudden 300,000 people attended

3    that event.  Fair to say?

4        A.   You say who wasn't there?  That I wasn't there?

5        Q.   Let's say an MS-13 member wasn't even there, but

6    he heard about it through somebody that was there.

7        A.   Right.

8        Q.   And he starts bragging about it.  You've had

9    those types of situations.

10       A.   Well, I can't say, because, if -- I wasn't there,

11   and if he's telling me, then I'm investigating the case,

12   that shows that he was involved, I go based on that.

13       Q.   But, through your investigation it later turned

14   out that only one person perpetrated that crime versus

15   the ten people that are bragging about it; you've had

16   that, haven't you?

17       A.   I can't really say I have.

18       Q.   Have you ever had a situation where -- so you've

19   never had a situation where multiple people take credit

20   for a criminal act that was only perpetrated by one

21   other person?

22              MR. CAMPBELL:  Objection, Your Honor.  Asked

23   and answered.

24              THE COURT:  Overruled.

25              THE WITNESS:  Sir?

1    BY MR. SALVATO:

2        Q.   Have you ever had a --

3               THE COURT:  Answer the question.

4               THE WITNESS:  Ask again, please.

5    BY MR. SALVATO:

6        Q.   Sure.  Have you ever had a situation where

7    multiple people are bragging about an act that only one

8    single person actually did?

9        A.   I mean, I've had cases where it was a mob assault

10   and I said they -- I say they bragged to me about it,

11   but they actually minimized it to some degree, but they

12   were an active participant.

13       Q.   But sometimes they maximize their involvement in

14   order to pump themselves up, true?

15       A.   Maybe to their fellow gang members, but for the

16   most part they minimize to me.

17       Q.   To fellow gang members, though, they're bragging

18   and --

19       A.   Yes.

20       Q.   -- putting themselves in a higher role in the

21   situation than they actually did?

22       A.   Yeah.

23               And, of course, where if I have ten defendants

24   and each one is giving me a different story, but they're

25   all putting themselves there.  One would say one did

1   more, and one would say one did less.

2       Q.   Okay.  But the fellow gang members, often they

3   brag about things that they even didn't do, true?

4       A.   Well, when you say did or didn't, yes, in the

5   totality of the situation, yes.

6       Q.   And Mr. Jenkins, I think, asked you about the

7   impact of cooperation on MS-13 members.  Do you remember

8   that line of questioning by Mr. Jenkins?

9       A.   Yes.

10      Q.   And, fair to say, if you cooperate with the

11  police or with the government, that has a significant

12  impact on your potential safety, correct?

13      A.   Yes.

14      Q.   All right.  And, that safety concern, if you

15  cooperate with the government and you're ultimately

16  deported to El Salvador, that safety concern is still

17  present, correct?

18      A.   That concern in there.

19      Q.   In fact, I think you used the words "confirmed

20  and verified" that you cooperated with the police, then

21  there's a greater risk of safety issues if you get

22  deported back to El Salvador.

23      A.   Yeah.  When they confirm and verify that they did

24  participate or cooperate, that is a chance that that can

25  happen.

1    Q.   Right.  And in fact, the greater chance, I think

2    you responded to Mr. Jenkins, a greater chance in El

3    Salvador than here.

4    A.   Yes.

5            MR. SALVATO:  That's all the questions I

6    have.

7            Thank you, Your Honor.

8            THE COURT:  All right.  You may inquire.

9                    CROSS-EXAMINATION

10   BY MS. RALLS:

11   Q.   Good morning, Sergeant Saa.  My name is Meredith

12   Ralls.

13   A.   Good morning.

14   Q.   Mr. Salvato asked you about his client.  In fact,

15   you haven't investigated any of these guys in this case,

16   right?

17   A.   Not any of them.

18   Q.   You earlier described the cliques as NFL teams.

19   But they don't necessarily compete against each other

20   the same way that NFL teams do.

21   A.   No, I just used as an example, as far as the

22   structure.

23   Q.   So, they might hang out together sometimes?

24   A.   Clique members?  Other clique members?

25   Q.   Right.

1    A.   Yes.

2    Q.   And, there might be someone with the same

3    nickname as another person when they hang out together?

4    A.   Yes.

5    Q.   You earlier said that gang members pay dues,

6    right?

7    A.   Yes.

8    Q.   Now, if somebody wasn't paying dues, that would

9    be some evidence that he maybe wasn't part of the gang,

10   right?

11   A.   He may be also -- well, if he's -- if he's a

12   member who is supposed to be paying dues, he's part of

13   the gang.

14   Q.   But, if he's not paying dues, if there's somebody

15   not paying dues to the gang, that would be some evidence

16   that he's not part of the gang, right?

17   A.   No.   That's some evidence that he's not paying

18   dues and that he has to step up and pay the dues.

19   Q.   So, gang members pay dues, then?

20   A.   Yes.

21   Q.   And, people who are not in the gang don't pay

22   dues?

23   A.   Yeah.   Non-gang members --

24   Q.   Okay.

25   A.   No.

1              MS. RALLS:  Thank you.

2              (Pause.)

3              THE COURT:  You may proceed.

4                    CROSS-EXAMINATION

5    BY MR. CHICK:

6       Q.  Good morning, Detective Saa.  My name is Mike

7    Chick, and I'm the attorney for Manuel Ernesto Paiz

8    Guevara.

9       A.  Good morning.

10      Q.  How are you holding up?  All right?

11      A.  Good to go.

12      Q.  Okay.  So, you talked a little bit, more

13   yesterday, a little bit today, but about a *calentón*?

14      A.  Yes.

15      Q.  A *calentón* is a -- it's a discipline, right?

16      A.  Punishment.

17      Q.  Punishment, discipline?

18      A.  Yes.

19      Q.  Okay.  And, you said it was at 13-second beating,

20   right?

21      A.  Yes.

22      Q.  Okay.  And, um, I think you also said that

23   it's -- that a *calentón* is more severe than a typical

24   13-second jump in; is that right?

25      A.  Yes.

1    Q.   Okay.  Um, are there parameters to -- or rules in

2    a *calentón* at all, in terms of -- I don't know, like

3    where, where you can hit or where you cannot hit or

4    anything like that?

5         Like, can you hit the head?

6         Can you hit the face?

7         Is there -- are there rules to it?

8    A.   What the *calentón*, basically, it's punishment, so

9    you take whatever beating is given to you.  What you're

10   referring to are far as not being kicked in the head,

11   that's more so for the jump in.

12   Q.   Okay.  There's a slight difference between the

13   two in terms of -- so, in a jump in, there might --

14   there are rules in terms of where you can hit, where you

15   cannot hit?

16   A.   Yes.  A jump in is the indoctrination to bring

17   the member in, an associate into the gang.  The *calentón*

18   is a punishment, i.e., you're being punished --

19   Q.   Okay.

20   A.   -- so --

21   Q.   And that's why you say it's a little bit

22   severe --

23   A.   Yes.

24   Q.   -- because it's more sort of a --

25   A.   Punishment.

1    Q.   No rules in term of that kind of a thing?

2    A.   Yes.

3    Q.   Okay.  Have you ever -- I don't think you've ever

4    actually been in a gang, right?

5         I mean, I'm not trying to be sarcastic or

6    anything.  I'm just -- it's a -- I'm -- genuinely

7    curious.

8    A.   I have not been in a gang, but I did undercover

9    work as a gang member.

10   Q.   Okay.  So, I'm guessing that you've -- that

11   you've seen a *calentón* with your own eyes?

12   A.   Yes, I have.

13   Q.   Okay.  And you've seen a jump in with your own

14   eyes, too?

15   A.   Yes, I have.

16   Q.   Did you participate in those?

17   A.   No.

18   Q.   Okay.  And you said earlier that the purpose of a

19   gang is to instill fear and intimidation in the

20   community?

21   A.   Instill fear and intimidation in the community,

22   yes.

23   Q.   Gang members threaten people?

24   A.   All the time.

25   Q.   Okay.  Do they ever threaten each other?

1    A.   Yes.

2    Q.   Okay.  What about a homeboy?  Would a -- is it

3    consistent with the culture of the gang and the practice

4    of the gang for a homeboy to threaten a *chequeo* or a

5    recruit?

6    A.   Yes.

7    Q.   Okay.  Why would they threaten them?

8    A.   Maybe he's not stepping up to what he was ordered

9    to do or asked to do.

10   Q.   Okay.  You talked about the fact that there are a

11   bunch of different types of cliques in MS-13, and you

12   talked about the fact -- one of the cliques that you

13   described is one of the cliques at issue here, which is

14   the clique that is at -- at issue here, which is PVLS,

15   right?

16   A.   Yes.

17   Q.   Okay.  Are you -- what kind of familiarity do you

18   have specifically with that clique?

19   A.   PVLS, which stands for Park View Locos

20   Salvatrucha, which originated in Los Angeles in the

21   early '80s when the gang first started, named after Park

22   View Street, in the Pico-Union area of Grand Park.

23        It was one of the originating cliques.  And once

24   the gang established themselves in the U.S. and through

25   deportation, those members who were in that clique

1    brought that to El Salvador.

2        Q.   Okay.  So you're familiar with sort of the

3    history of the clique?

4        A.   Yes.

5        Q.   I guess what I'm getting at is, what familiarity

6    do you have in terms of what the clique is doing today

7    and in the past, you know year, or so.  Intimate -- what

8    kind of intimate familiarity do you have with the

9    clique?

10       A.   This clique is in our region.  Through the

11   history they've established themselves as a -- as a

12   clique of MS that's grown in the United States and in

13   the Northern Virginia region.

14       Q.   Okay.

15       A.   It's one of the larger cliques in the region.

16       Q.   Are you up to date in terms of knowledge of

17   what's going on in the clique, who's been in charge,

18   who's not been in charge, who the members are, all that

19   kind of stuff?

20       A.   Not as much as I should be.

21       Q.   Okay.

22            You don't know who any of these people are in

23   this courtroom?

24       A.   I don't know any of the clients here.

25       Q.   Okay.

1     A.   The defendants, excuse me.

2     Q.   Can you name anybody in the PVLS clique?

3     A.   No.

4     Q.   You can't, because you don't know?

5     A.   I don't know.

6     Q.   Okay.  And you're based in Herndon, in Fairfax

7  County, right?

8     A.   Yes.

9     Q.   Okay.  And that's where that -- one of the areas

10 where that clique is located, right?

11    A.   In which area?  Fairfax County?

12    Q.   Correct.

13    A.   Yes.

14    Q.   Okay.  I think you -- you mentioned that you

15 also -- you -- not only do you go and you go to

16 trainings for yourself to learn about the gang and the

17 history and all that kind of stuff, but you also -- you

18 also participate in training other people about the gang

19 and about gang prevention and awareness and that sort of

20 thing, right?

21    A.   Yes.

22    Q.   Okay.  Um, I assume part of that training also

23 includes educating people on -- on what kind of kids are

24 at risk or vulnerable to being lured into a gang; is

25 that right?

1      A.   Yes.  And in the training I do, and how in-depth
2   I go into, which, who is my audience, because it could
3   be law enforcement, it could be parent/teacher
4   conferences.
5      Q.   Okay.  And, there's also quite -- there's quite a
6   bit of academic studies and literature on the type of
7   kids who are vulnerable and who the gang would prey on
8   to try to pull in and indoctrinate, right?
9      A.   There's a lot of studies, done, yes.
10      Q.   Okay.  Young teenage males?
11      A.   Yes.
12      Q.   Poor?
13      A.   Poor to middle class.
14      Q.   Okay.  Teenagers who -- young teenage poor males
15   who are immigrants are a higher risk, right?
16      A.   That's their target audience, yes.
17      Q.   Okay.  And probably especially young immigrant
18   poor teenage boys who are -- who only speak Spanish,
19   right?
20           Or may be newer to the country, even?
21      A.   I mean, I can't -- I don't want to paint a broad
22   brush on that, but, yes, because there are exceptions.
23      Q.   But that's what the literature says, they are the
24   at-risk kids.
25      A.   That's -- yes, they are the at-risk.

1      Q.   Okay.  Kids who live in high -- high crime or
2  high gang activity neighborhoods are even higher risk,
3  right?
4      A.   That's the target audience, yes.
5      Q.   Okay.  You're familiar with the Culmore
6  neighborhood?
7      A.   Yes, I am.
8      Q.   Okay.  That's in Fairfax County, right?
9      A.   Yes, it is.
10     Q.   You would call that a high-risk neighborhood,
11  wouldn't you?
12     A.   I can't say.  I mean, defining it in your terms,
13  what you just said, you have to --
14     Q.   It means --
15     A.   Poor middle-class immigrants, that are in that
16  area, yes.
17     Q.   You can check all those boxes off when you look
18  at the Culmore neighborhood, right?
19     A.   Yeah, but I wouldn't -- I personally wouldn't
20  define it as a high-risk area, because you're defining
21  it by, like you said, the check-off list --
22     Q.   Right.
23     A.   -- the studies.  Somebody growing up in that area
24  would say different.
25     Q.   Sure.  Yeah.  But setting aside our subjective

1   views of what's high risk and what's not high risk, the

2   objective factors, the check marks that they use, would

3   categorize Culmore as a high-risk neighborhood for

4   somebody who would be vulnerable to gang recruitment,

5   right?

6       A.   I would define it as an area that is vulnerable

7   to it.

8       Q.   Okay.

9            Kids with single parents, right?

10      A.   Correct.

11      Q.   Kids who don't have a father figure?

12      A.   Correct.

13      Q.   Okay.  Those are the kids that the gang preys on,

14   correct?

15      A.   They target that, yes.

16      Q.   Okay.  And I heard you used the word a couple of

17   different times, the word "indoctrinate," right?

18      A.   Yes.

19      Q.   And you said -- I think in direct, you said that

20   *chequeo*s, recruits, they are those -- and I think this

21   is a direct quote -- they are those in the process of

22   being indoctrinated into the gang.  Right?

23      A.   Yeah, I used it when the -- the different stages

24   of the membership.  It starts with the *paro*.  And once

25   they reach that high status as *paro* or *paisa*, and if

1    they've proven themselves to some degree as to loyalty

2    to the gang, then they go to the *chequeo* stage, which is

3    the final stage before they become a member.

4        Q.   Okay.

5        A.   Or homeboy.

6        Q.   And they pull these kids in, in a very alluring

7    way, right?

8             They lure them in, right?

9        A.   They lure them.  They threaten them in.  There's

10   a variety of things they use to get these recruits.

11       Q.   And they -- once they start to pull them in, they

12   groom them, right?

13       A.   Yeah, as part of the stage, the staging of

14   getting them to be homeboys.

15       Q.   And once they are sufficiently indoctrinated,

16   then they become -- they call them soldiers, right?

17       A.   When you say "sufficiently indoctrinated" --

18       Q.   Once they have met the level of -- once they have

19   satisfied the people in the gang that they are

20   sufficiently indoctrinated what they need to be

21   indoctrinated with, they become soldiers in the gang,

22   right?

23       A.   Once they do the *paisa* stage, *paro*, they're

24   interchangeable.  Or the *chequeo*, they are given the

25   mission to commit a violent act or homicide.  Then

1    they're considered a homeboy or a soldier.

2        Q.   And the way you go from *chequeo*, from recruit, to

3    homeboy or soldier is by acts of violence, right?

4        A.   Acts of violence, homicides.

5        Q.   Okay.  You kill somebody, you're moving up?

6        A.   Correct.

7        Q.   Okay.  And, let's say -- let's say a *chequeo*

8    is -- is -- well, actually, let me ask the question this

9    way:  Let me ask you some things and you can tell me

10   whether these things are consistent with the practice of

11   MS-13.  Okay?

12       A.   Okay.

13       Q.   Is it consistent with the practices of MS-13 to

14   keep a *chequeo* in the dark about things that they're

15   doing, about certain plans that they have, to not tell a

16   *chequeo* certain things?

17       A.   I think that would be a case-by-case situation.

18       Q.   Okay.  That's -- that happens?

19       A.   Case-by-case situation.

20       Q.   Okay.  So, for example, if there's a plan to

21   murder somebody, they wouldn't tell -- they wouldn't

22   necessarily tell the *chequeo* about that plan, would

23   they?

24       A.   They probably wouldn't provide all the details to

25   it.

1    Q.   Okay.

2    A.   But they would probably give him -- say the heads

3    up on it, that he will be involved in this, but not

4    provide all the details to it.

5    Q.   Would they -- would they ever draw, lure a

6    *chequeo* to a meeting when there is going to be a

7    homicide, where there's a plan to be a homicide, but not

8    tell the *chequeo* that somebody is going to be killed?

9    A.   That could happen.  But when the -- that recruit

10   member at that stage already, he pretty much knows that

11   that's going to be the next step.

12   Q.   I'm confused.  It could -- you're saying it can

13   happen?

14   A.   That -- the scenario you gave me?

15   Q.   Yes.

16   A.   Yeah, it's possible.  But like I said, for the

17   most part, when that individual *paro* is already in that

18   *chequeo* stage, he knows the rules.  He knows that when

19   you're in that stage, you're going to be called upon to

20   do an act of violence, i.e, a homicide.

21   Q.   But it's consistent with the gang for somebody to

22   actually be brought to a planned murder scene, but them

23   not to be told that there is going to be a murder,

24   right?

25   A.   You say "consistent.  I can't say it's

1    consistent.  It's case by case.

2        Q.   Okay.  Is it inconsistent with the gang?

3        A.   It's case by case.

4        Q.   Okay.  So it can happen?

5        A.   Yes.

6        Q.   I guess in my -- my definition of "consistent"

7    is, if -- if it's case by case, then that -- that's

8    consistent.  I'll just put that out there.  Okay?  Just

9    for future --

10       A.   I'm going to leave it at case by case.

11       Q.   Okay.  All right.

12           Let's say -- let's say a *chequeo* --

13   hypothetically, a *chequeo* is at a -- at a meeting where

14   there's a planned murder, okay?  And, people start --

15   people start murdering the person who they are planning

16   to murder, and then the *chequeo* is told -- after the

17   person is stabbed and laying there, the *chequeo* is given

18   a knife and told to stab the deceased, and -- and

19   threatened to stab them or -- or, you know -- well, they

20   are threatened.  What if a *chequeo* doesn't follow that

21   order?

22           What would happen?

23           MR. CAMPBELL:  Objection, Your Honor.  It

24   calls for speculation.

25           MR. CHICK:  He's an expert in the gang and

1     its practices and its culture.

2              THE COURT:  Hypothetical questions are

3     permitted.  Objection overruled.

4              THE WITNESS:  Hypothetically, harm would

5     probably come to him if he doesn't follow through.

6     BY MR. CHICK:

7        Q.  Okay.  Possible death?

8        A.  Hypothetically, yes.

9        Q.  He just witnessed -- he would have just witnessed

10    a murder, right?

11       A.  In the hypothetical situation you gave, yes.

12       Q.  Okay.  Does the gang like to keep witnesses of

13    murders around?

14       A.  Well, they're all witnesses to the murder.

15       Q.  Okay.  You said that -- like, top rule, top rule

16    in the gang is the Mara, which means gang, Mara comes

17    number one, right?

18       A.  Yes.

19       Q.  Over mother, I think that's what you said?

20       A.  Over mother, over God.

21       Q.  Okay.  Over mother --

22       A.  Over God.

23       Q.  -- over God.

24              So, if you're told -- if you're ordered -- in a

25    situation like I just described, if you're ordered to do

1    something and you don't do it, um, the rest of the gang

2    would consider that you're breaking rule number one,

3    right?

4        A.   Yes.

5        Q.   Okay.

6             I guess right up there with that rule, almost --

7    almost equally with that rule, is the rule that you

8    don't talk to law enforcement, right?

9        A.   Yeah.  The thing about what -- with these members

10   or these associates going around -- up on the stages to

11   the soldier, they know all of this going in.

12       Q.   Got you.

13            Let me go back to my hypothetical of that murder,

14   murder scene.

15       A.   Yes, sir.

16       Q.   Okay?

17            Would it be consistent with the gang's practices,

18   after that murder goes down, would it be consistent with

19   the gang's practices for that *chequeo* to be jumped in to

20   the gang at that point?

21       A.   No.  Because if he's a *chequeo*, he already had

22   been -- going through the stage, he would have to -- the

23   *chequeo* stage, he would have to commit that crime that

24   he's being -- would it have happened right there in that

25   instant?

1    Q.   Uh-huh.

2    A.   Could, could not.

3    Q.   So, in other words, if the *chequeo* does what's

4    expected of him -- if he does what's expected of him, he

5    could be jumped in?

6    A.   In that instant or in the future?

7    Q.   Well, we'll go one by one.  He could definitely

8    be jumped in, in the future.

9    A.   Yes.

10    Q.   Okay.  And, you're saying, case by case, he could

11    be jumped in in that instant?

12    A.   It wouldn't happen right then and there at that

13    scene.

14    Q.   It would not happen right then and there at that

15    scene?

16    A.   If the -- if this hypothetical homicide just

17    happened --

18    Q.   Yes.

19    A.   -- they're not going to wait around to jump a

20    member in when they just committed a murder.

21    Q.   And as the gang expert, as the gang expert,

22    you're saying that right after a murder scene, where a

23    *chequeo* is present, the gang would never jump in that

24    *chequeo* right after the murder at the scene?

25    A.   No.  As a gang expert I'm saying it's a case by

1    case.

2        Q.   Okay.  So it's case by case?

3        A.   Yes.

4        Q.   Okay.

5             You have participated in searches at gang

6    members' homes?

7        A.   Yes.

8        Q.   You guys go to their -- you show up at their

9    homes, their apartments or, you know, the mother's home

10   or wherever it is, with a search warrant and you kind of

11   surprise them, right?

12            I mean, you don't tell them you're coming with a

13   search warrant?

14       A.   No.

15       Q.   Okay.  So, nobody -- nobody knows you're coming.

16            What do you find when you search -- search their

17   homes and their apartments and their bedrooms and that

18   kind of stuff?

19       A.   I mean, that's a very open-ended question.  We

20   could find anything.  I mean, it hasn't -- specific to a

21   case, what we're looking for, what we put on the search

22   warrant we're looking for.

23       Q.   Well, what kind of stuff do you put on the search

24   warrant that you're looking for?

25       A.   You're talking about hundreds of cases.  I mean,

1   what specifically are you --

2              THE COURT:  Mr. Chick, I gave you some

3   leeway with hypotheticals.  This is a case -- if you

4   would focus on this case, it would help me now.  Thank

5   you.

6              MR. CHICK:  Yes, sir.

7   BY MR. CHICK:

8      Q.   When you search somebody's house, you're looking

9   for gang-related things, right?

10     A.   Depends upon the crime that I'm investigating.

11     Q.   Okay.  You have worked with the federal

12  government in gang cases before?

13     A.   Yes.

14     Q.   And you assist them, you help them?

15     A.   Yes.

16     Q.   Okay.  Um -- and you know that gang members

17  who -- as an expert in this whole thing, you know that

18  gang members who participate and who help the federal

19  government, they get certain special treatment from the

20  federal government, don't they?

21     A.   They are recommended.  As far as special

22  treatment, I don't know what you're saying as far as

23  special treatment.

24     Q.   Okay.  They're given visas to stay in the

25  country?

1    A.    That's all between the federal government and

2    that -- I know they can put in for a request for it.

3    But whether they give one, I can't say that.

4         Q.    Have you ever heard of people getting visas from

5    the federal government for helping the federal

6    government?

7         A.    For cooperating, yes.

8         Q.    Okay.  And they get protection, right?

9         A.    Yes.

10        Q.    They get to go to a -- they get to be put in the

11   Witness Protection Program, right?

12        A.    They have, yes.

13        Q.    They also get to -- and when they go to prison,

14   they actually get to go to a special prison that keeps

15   them protected, too, right?

16        A.    Like a secured special prison for them?

17        Q.    Like a prison for government cooperators.

18        A.    Yes.

19        Q.    And in your experience, do defendants who go to

20   trial, do they get any of those protections?

21             Do they get to go to the special prison?

22        A.    Like the defendants, you're talking about?

23        Q.    Right.

24        A.    Not that I'm aware of, no.

25        Q.    Okay.  Do they get visas to stay in the country?

1    A.   Not that I'm aware of, no.

2    Q.   Do their families get special protections?

3    A.   Not that I'm aware of.

4         MR. CHICK:   I have no further questions,

5    Your Honor.

6         Thanks very much.

7         THE WITNESS:   Yes, sir.

8         THE COURT:   Counsel for Mr. Jesus Alejandro

9    Chavez.

10              CROSS-EXAMINATION

11   BY MR. AQUINO:

12   Q.   Good morning, Sergeant.

13   A.   Good morning, sir.

14   Q.   I represent Jesus Chavez.  My co-counsel is

15   Ms. Elita Amato.

16   A.   Yes, sir.

17   Q.   I have a few questions for you.

18        Is there a specific tattoo as to MS?

19        In other words, specifically an M and an S?

20   A.   Yes.

21   Q.   Okay.  And, to get that specific tag of M and S,

22   do you have to earn it?

23   A.   Yes.

24   Q.   Okay.  Could you give, quickly, an example of

25   what would it take to earn that tattoo?

1    A.   But I must preface that with the fact that

2    they're going away from tattooing.

3    Q.   I understand that.

4    A.   Okay.  I mean, historically speaking, when the

5    gang first started up --

6    Q.   Uh-huh.

7    A.   -- you had to go through the whole indoctrination

8    stage, commit an act of violence.  Then you earned your

9    tattoo.

10   Q.   So a murder would be an example?

11   A.   Yes.

12   Q.   Okay.

13   A.   But like I said, the whole tattooing thing has

14   kind of gone --

15   Q.   Shifted.

16   A.   -- shifted to, like I say, we encounter MS-13

17   gang members with no tattoos, and have been involved in

18   acts of violence such as homicide.

19   Q.   But do some gang members currently receive that

20   M and S?

21   A.   Some do, yes.

22   Q.   Okay.  Now, just to go back to, very quickly,

23   through some vocabulary.  You have the gang itself,

24   right?  Like this (indicating).  And the gang operates

25   then through cliques, correct?

1    A.   Yeah.  You have the MS, then you have the -- I

2    would say spider webbing of cliques.

3    Q.   And each clique has a clique leader?

4    A.   Yes, or two.

5    Q.   Or two.

6         And then each clique has soldiers that work for

7    the clique leader, correct?

8    A.   Soldiers or homeboys, as they're referred to.

9    Q.   Okay.  Now, pretend, just for the sake of

10   argument that I'm a soldier in PVLS, okay?

11   A.   Okay.

12   Q.   And, I kill -- shoot and kill somebody without --

13   I want to emphasize "without" -- the approval of the

14   clique leader.  Could I get myself into trouble?

15   A.   Depends on who the victim was.

16   Q.   Okay.  And, if I could get myself into trouble,

17   is it possible a punishment that I might receive would

18   be a green light against me?

19   A.   Well, it kind of -- like I say, it encompasses on

20   who the victim was.

21   Q.   Understood.

22        So it's a possibility that I could be subject to

23   a death penalty?

24   A.   That's kind of hard to say, like I said, because

25   if it's -- the intended target is a rival, you're

1    praised, even though you didn't get the green light, you

2    did -- you didn't do it by the book, but you're praised

3    because it's a rival.

4        Q.   What if it's not a rival?

5        A.   Like I say, it all depends.  It could be -- if

6    it's a citizen, like -- the thing with the gang, they

7    thrive on that violence.  I really can't say if that has

8    to be -- I always I keep saying it's a case-by-case

9    situation.

10       Q.   Understood.

11       A.   It depends on what it is --

12       Q.   And --

13       A.   -- then you receive a green light.

14       Q.   -- if such a murder occurred, a shooting like

15   that, it could cause the gang to receive unwanted police

16   attention; is that correct?

17       A.   Yes.

18       Q.   From somebody like you, correct?

19       A.   That's correct.

20       Q.   Okay.  If I was the subject of a green light --

21   in other words, as a soldier, because of the murder I

22   committed, to stay alive I might want to shift the

23   blame; is that accurate?

24       A.   You're the target of --

25       Q.   No, no.

C. Saa - Cross                                                    48

1    A.   -- the green light?

2    Q.   Let me --

3    A.   Can you --

4    Q.   I'm the one that committed the shooting.

5    A.   Okay.

6    Q.   Okay.  Killed someone, and because of that it

7   resulted in a green light against me by the gang

8   membership.  You with me?

9    A.   I'm with you.

10    Q.   Okay.  To stay alive, I might want to shift the

11   blame, for example, to Mr. Campbell; is that accurate?

12    A.   Yeah, to stay alive, yes.  That could happen.

13    Q.   Now, yesterday, there was some discussion about

14   gangs that are rivals to MS-13.  Okay?

15    A.   Okay.

16    Q.   And, would it be correct that a minor rival

17   Hispanic gang is called the Latin Homies?

18    A.   Yes, it could be.

19    Q.   And their initials are LH; is that correct?

20    A.   Yes.

21    Q.   And you would not describe Latin Homies as

22   honest, upstanding, good people, would you?

23    A.   I can't speak on that, but, if they're a gang

24   member and they're committing criminal acts, I will say

25   they're not upstanding people.

1      Q.   Okay.  But based upon your knowledge of Latin

2   Homies, do they distribute marijuana?

3      A.   Some do.

4      Q.   Okay.  Do they steal?

5      A.   Some do.

6      Q.   Do they engage in acts of violence?

7      A.   Some do.

8      Q.   Okay.  Now, when a Latin Homie sees a member of

9   MS-13, does -- first, does the MS-13 member consider the

10  Latin Homie, based upon your knowledge of the gangs, a

11  *chavala*?

12     A.   Yes.

13     Q.   And a *chavala* again means a rival gang member?

14     A.   Yeah.  A *chavala* is a -- interchangeable as a

15  rival, yes.

16     Q.   Okay.

17     A.   Because you can have another gang say that MSes

18  are *chavalas*.

19     Q.   Understood.

20     A.   Yes.

21     Q.   So, for example, an MS-13 member, if he saw

22  someone he knew to be a Latin Homie, would want bad

23  things to happen to the Latin Homie.

24     A.   Yes.

25     Q.   Okay.  And the reverse is true, correct?

1        If the Latin Homie saw the MS-13 member, he would

2   want bad things to happen to the MS-13 member, correct?

3      A.   Correct.

4           MR. AQUINO:   Judge, that's all the questions

5   I have.  Thank you.

6           THE COURT:  Mr. Campbell.

7                    REDIRECT EXAMINATION

8   BY MR. CAMPBELL:

9      Q.   Good morning, Sergeant.

10     A.   Good morning, sir.

11     Q.   With respect to your current duties as a sergeant

12  in charge of the criminal investigation section, do you

13  actually conduct investigations now of gangs?

14     A.   Very minimal.

15     Q.   With respect to this case, were you ever an

16  investigator involved in investigation of this case?

17     A.   No, I was never an investigator in this case.

18     Q.   Following up to what you said earlier, you said,

19  generally, leadership has to approve of a green light.

20  Generally, leadership has to approve of a green light.

21  Can you elaborate on that?

22     A.   Generally, when I say as far as a green light, it

23  kind of all depends on who the intended target may be.

24  And we've had situations where a green light was

25  conducted without an approval of a leader.  And like I

1  was, like I say once again, I apologize, it's a

2  case-by-case situation.

3      Q.   By the time someone advances to the position of

4  *chequeo* within the gang, does he know the gang engages

5  in violence?

6      A.   Oh, yeah.  Even, in my expert opinion, they know

7  going in about the violence.

8      Q.   And does that *chequeo* know the gang engages in

9  murders?

10     A.   Yes.

11     Q.   With respect to one of the questions that

12 Mr. Chick asked you on cross-examination, with respect

13 to the possibility that the government may provide

14 cooperating defendants or witnesses with witness

15 protection or may transfer or move their families, why

16 would the government do that?

17     A.   Because the individual cooperator provided

18 information on a case.

19     Q.   And what are the possible consequences with -- in

20 terms of protection, of providing cooperation?

21     A.   The consequences to the individual cooperating is

22 death.

23     Q.   Do all members of MS-13 have "MS" tattooed on

24 their bodies?

25     A.   No.

1          MR. CAMPBELL:  No further questions, Your

2   Honor.

3          THE COURT:  May the witness be excused?

4          MR. CAMPBELL:  Yes, Your Honor.

5          THE COURT:  You're free to leave, sir.

6   Thank you for coming.

7          THE WITNESS:  Thank you, sir.

8          (Thereupon, the witness withdrew from the

9   stand.)

10          THE COURT:  Ladies and gentlemen, I want to

11   take up a matter with counsel, and I'll have you come

12   back in just a moment.  If you would go with Mr. Toliver

13   now.  Thank you.

14          (Proceedings held outside the presence of

15   the jury as follows:)

16          THE COURT:  You may be seated.

17          Counsel, my understanding is I need to do an

18   inquiry with the next witness?

19          MR. JENKINS:  Yes, Your Honor.

20          As the Court is aware, the next witness is a

21   client of mine.  And I know that Mr. Alfaro Fuentes has

22   endorsed a written waiver, as Mr. Torres has done, also,

23   addressing any potential conflicts.

24          The Court did, last March, place Mr. Torres

25   under oath and inquired of him, notwithstanding the fact

1   that he had signed a written waiver, and the parties
2   believe that it would be a good idea for the Court to do
3   the same with Mr. Alfaro Fuentes before he begins his
4   testimony.
5           I would state for the record that,
6   consistent with the Court's direction, I have not shared
7   with Mr. Leiva, my co-counsel in this matter, any
8   confidential information that I've learned during the
9   course of my representation of Mr. Alfaro Fuentes, and
10  Mr. Leiva will be handling the cross-examination of
11  Mr. Alfaro Fuentes.
12          THE COURT:  All right.
13          MR. TOBLER:  No objection from the
14  government, Your Honor.
15          THE COURT:  Can the witness be brought up?
16          MR. TOBLER:  Yes.  The witness -- the
17  witness is here.
18          THE COURT:  Okay.  It will be just a few
19  minutes.  Thank you.
20          I think you filed a written waiver, didn't
21  you, Mr. Jenkins?
22          MR. JENKINS:  I did, Your Honor.
23          THE COURT:  Okay.
24          MR. JENKINS:  I did.
25          MR. TOBLER:  The government calls Osmin

Alfaro Fuentes, Your Honor.

THE COURT:  All right.  Just a moment.  It's going to take a little bit of time.  Be patient.  Thank you.

(Pause.)

THE COURT:  If you like, what we can do is take the morning recess now, and then we can come back when the witness is available.

How about that?

MS. MARTINEZ:  Good idea, Your Honor.

THE COURT:  Let's take a 15-minute recess. Thank you.

MS. MARTINEZ:  Your Honor, the witness is here, just so Your Honor --

THE COURT:  Oh.

MS. MARTINEZ:  -- is aware.

THE COURT:  Oh.  Well, then let's do this now.  All right.

Ms. Bull, can you administer the oath.

Would you stand up, please.  Raise your right hand, please.

(Witness sworn.)

THE WITNESS:  Yes, I do.

THEREUPON, OSMIN ALFARO FUENTES, having been duly sworn, testified as follows:

```
1            THE COURT:  Good morning.  Can you tell me
2    your name, please.
3            THE WITNESS:  (Inaudible.)
4            THE REPORTER:  I'm sorry.
5            THE COURT:  Can you pull the microphone
6    closer?
7            THE WITNESS:  Osmin Alfaro Fuentes.
8            THE COURT:  Mr. Fuentes, good morning.
9            THE WITNESS:  Good morning, sir.
10           THE COURT:  Mr. Fuentes, I've asked you to
11   come into court for just a moment because I wanted to
12   talk to you about your right to conflict-free counsel,
13   and the right you have concerning your representation,
14   formal representation, by Mr. Jenkins.
15           THE WITNESS:  Yes.
16           THE COURT:  Mr. Jenkins is in the courtroom
17   now.  Do you see him here?
18           THE WITNESS:  Yes.
19           THE COURT:  He is representing an individual
20   in this case, and, my understanding is you're going to
21   be a witness in this case.
22           THE WITNESS:  Yes, sir.
23           THE COURT:  Now, Mr. Jenkins probably has
24   interviewed you and gathered information from you that
25   is secret, that he has to keep secret.
```

And, what I wanted to talk to you about was waiving your right to have Mr. Jenkins be a counsel in a case where you were a witness.  That is to say that Mr. Jenkins will not use information you've given him. Do you understand?

THE WITNESS:  Yes, sir.

THE COURT:  And he will also not question you.  You will be questioned by co-counsel.  And Mr. Jenkins just told me he has not told co-counsel anything about the secrets you told him.  Do you understand?

THE WITNESS:  Yes, sir.

THE COURT:  Now, you have the right to waive the conflict, meaning to allow Mr. Jenkins to continue to represent Mr. Torres, or not to.  Are you -- what is your -- are you willing to let Mr. Jenkins represent Mr. Torres?

THE WITNESS:  Yes, sir.

THE COURT:  And, are you willing to waive any potential interest of conflict with Mr. Jenkins concerning your testimony?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  I think that makes a sufficient record under Rule 44.

We'll have you back in just a moment.  We

will take a break and have you come back in about

15 minutes.  Thank you very much.

            THE WITNESS:  Yes, sir.

            (Court recessed at 11:13 a.m. and reconvened

            at 11:31 a.m.)

            (Jury not present.)

            MR. JENKINS:  Good morning, Your Honor.

Robert Jenkins on behalf of Mr. Torres.

            I anticipate that the government is going to

offer Government's Exhibit Number 125.  For the Court's

benefits, Your Honor, that is a copy of Mr. Alfaro

Fuentes' plea agreement.  On the final page of that

agreement, Your Honor, as the Court is well aware, my

name and signature appears as Mr. Alfaro Fuentes'

counsel.

            Your Honor, it's the view of the parties,

Mr. Torres as well as the government, that while that

may be admissible, the contents of 125, that it would be

more prudent to redact my name from it, so that when it

goes back into the jury room the jury need not concern

themselves with the fact that I represent Mr. Torres as

well as representing Mr. Alfaro Fuentes.

            I suspect that there will be a fair amount

of discussion about benefits that Mr. Alfaro Fuentes

derived from that agreement, which I negotiated on his

behalf.

I further would ask the Court, as a motion in limine, to instruct all counsel -- I don't see the relevance of it -- to be barred from mentioning the fact during their examination that I represent Mr. Alfaro Fuentes, in the presence of the jury.

THE COURT:  All right.

Any objection?

(No audible response.)

THE COURT:  So the order is that we'll first -- I don't have a Sharpie here with me.  You all make sure you redact Mr. Jenkins' name from 125.

MR. TOBLER:  Your Honor, the government will bring up a copy for the exhibit binder as well, with that information redacted.

THE COURT:  Excellent.  All right.

And then, also, all counsel refrain from referring to Mr. Jenkins as counsel for Mr. Fuentes.

Ready to bring the jury out?

MR. TOBLER:  We're ready.

THE COURT:  Let's bring our jury out, please.  Thank you.

(Jury present at 11:34 a.m.)

You may be seated.

All right, Counsel, you may proceed.

1          MR. TOBLER:  Your Honor, the United States

2    calls Osmin Alfaro Fuentes.

3          (Witness previously sworn.)

4          THE COURT:  Mr. Fuentes has previously been

5    sworn.

6          You may proceed, Counsel.

7          THEREUPON, OSMIN ALFARO FUENTES, having been

8    duly sworn, testified as follows:

9                    DIRECT EXAMINATION

10   BY MR. TOBLER:

11   Q.  Good morning, Mr. Fuentes.

12   A.  Good morning.

13   Q.  Please state your name and spell it for the jury.

14   A.  Osmin Alfaro Fuentes.  O-s-m-i-n, Osmin;

15   A-l-f-a-r-o, Alfaro; F-u-e-n-t-e-s, Fuentes.

16   Q.  What is your native language, sir?

17   A.  Spanish.

18   Q.  Do you also speak English?

19   A.  Yes.

20   Q.  If at any point you would like to use the

21   services of the Spanish interpreter, either to hear my

22   questions or to respond, please feel free to do so.  Do

23   you understand?

24   A.  Yes, sir.

25   Q.  How old are you, sir?

1    A.   37.

2    Q.   Where were you born?

3    A.   In El Salvador.

4    Q.   How far in school did you go in El Salvador?

5    A.   Ten, ten grade.

6    Q.   When did you come to the United States?

7    A.   1996.

8    Q.   How did you get to the United States?

9    A.   I crossed the border through Yuma, Arizona,

10   illegally.

11   Q.   Where did you first go after crossing the border

12   at Yuma, Arizona?

13   A.   I went to Los Angeles.

14   Q.   How long were you in Los Angeles?

15   A.   A month.

16        Then I moved to Herndon, Virginia.

17   Q.   Why did you move to Herndon, Virginia?

18   A.   I had a brother over here.

19   Q.   Have you ever been in a gang?

20   A.   Yes.

21   Q.   What gang?

22   A.   MS-13.

23   Q.   Were you in a particular clique in MS-13?

24   A.   Yes.  In the Western.

25   Q.   How did the Western clique get its name?

1    A.   It's a street from Los Angeles.

2    Q.   When did you join MS-13?

3    A.   The same year, 1996.

4    Q.   How old were you at the time you joined MS-13?

5    A.   Seventeen years old.

6    Q.   Where were you living at that time?

7    A.   Herndon, Virginia.

8    Q.   When a person joins MS-13, are they given a

9    nickname?

10   A.   Yes, sir.

11   Q.   Were you?

12   A.   Yes.  Buso.

13   Q.   What does Buso mean?

14   A.   Buso is a person who is always in a lookout,

15   ready for anything.

16   Q.   Are you currently in prison?

17   A.   Yes, sir.

18   Q.   Are you in prison for having pled guilty to

19   murder in aid of racketeering?

20   A.   Yes, sir.

21   Q.   What year did you plead guilty to that crime?

22   A.   2005.

23   Q.   Was that for a murder you committed with another

24   member of MS-13?

25   A.   Yes, sir.

1    Q.   Who was that other member?

2    A.   His name was Alirio Reyes.  They call him Psycho.

3    Q.   Where did you plead guilty to the crime?

4    A.   In Alexandria courtroom.

5    Q.   Did you -- were you sentenced at that time?

6    A.   Yes.

7    Q.   What sentence did you receive at the time you

8    pled guilty?

9    A.   Life.

10    Q.   With the assistance of the courtroom security

11    officer, I'd like you to look at a document that's been

12    marked for identification as Government's Exhibit 125.

13         Do you recognize that document, sir?

14    A.   Yes, sir.  It's the plea agreement.

15    Q.   Please turn to the last page.  Is that your

16    signature on this plea agreement?

17    A.   Yes, sir.

18    Q.   What are your obligations under this plea

19    agreement?

20    A.   Obligation is to tell the truth and testify at

21    any time the government wishes me to.

22    Q.   How many times have you testified?

23    A.   This would be my eighth time.

24    Q.   Have you received a sentencing reduction in

25    exchange for your testimony?

1    A.   Yes, sir.

2    Q.   What reduction did you receive?

3    A.   Fifteen years.

4    Q.   Has anyone made any promises to you other than

5    what's in that plea?

6    A.   No, sir.

7         MR. TOBLER:  Your Honor, we move for

8    admission of Government's Exhibit 125.

9         THE COURT:  125 will be received.

10   BY MR. TOBLER:

11   Q.   Are you familiar with the term "homeboy"?

12   A.   Yes.

13   Q.   What is a homeboy in MS-13?

14   A.   Homeboy is like you call a -- it's like a

15   brother.  You -- you want to -- a partner within the

16   gang.

17   Q.   Did you -- I'm sorry.  Did you say you're a

18   partner within the gang?

19   A.   Yeah.  It's like your brother, brotherhood,

20   thing.

21   Q.   Is everybody who is associated with MS-13 a

22   homeboy?

23   A.   If it's not a member, no.

24   Q.   At some point, did you become a homeboy in MS-13?

25   A.   Yes, sir.

O. Fuentes - Direct                                                   64

1    Q.   When?

2    A.   In 1996, when I was jumped in to the gang.

3    Q.   What does it mean to be jumped in to the gang?

4    A.   That's when you been initiated to get into the

5    gang.

6    Q.   What happens during a jumping in?

7    A.   Well, you will be beat up by three or four guys

8    for thirteen seconds.

9    Q.   Once you joined the gang, did you ever attend

10   clique meetings?

11   A.   Yes, sir.

12   Q.   How frequently?

13   A.   We have a weekly meetings, and there are general

14   meetings, too; but, mostly weekly.

15   Q.   Where did the clique meetings occur?

16   A.   Sometimes we had -- we held them in the hotel

17   parties, or parks.

18   Q.   What happened at those meetings?

19   A.   In those meetings, you know, we talk about

20   what's -- what has been going on throughout the week,

21   and collect money.

22   Q.   Who paid the money when you collected it?

23   A.   Everybody within the clique.

24   Q.   Were members of the clique required to pay money?

25   A.   Yes.

1    Q.   How much money were they required to pay?

2    A.   It all depends, what -- what amount of money you

3    are required to bring, 20, 25, $50.

4    Q.   Per week?

5    A.   Yes, sir.

6    Q.   What was that money used for?

7    A.   That money used for sending to the homies in

8    prison, jail, or to bail out anybody.

9    Q.   Where did you send the money?

10   A.   Jails or -- or we used the money to send it to

11   El Salvador, too.

12   Q.   How did you send money to El Salvador?

13   A.   Wire.

14   Q.   When you were in MS-13, did your clique contact

15   MS-13 members in El Salvador as well?

16   A.   Yes, sir.

17   Q.   How did you do that?

18   A.   By telephone.

19   Q.   Are you familiar with the term, "first word"?

20   A.   Yes, sir.  First word is the leader of the

21   clique, first.  And then there is the second word, which

22   is the second one.

23   Q.   When you were in MS-13, did you ever hold a

24   leadership position?

25   A.   Yes, sir.  I had the second word.

1    Q.   Were you active in MS-13 up until the time of
2    your arrest for murder?
3    A.   Yes, sir.
4    Q.   Were you still the second word at the time of
5    your arrest for murder?
6    A.   Yes, sir.
7    Q.   You mentioned before a general meeting.  What is
8    a general meeting?
9    A.   A general meetings is when all the cliques come
10   together to discuss major issues among the gang.
11   Q.   Have you ever attended a general meeting?
12   A.   Yes.
13   Q.   Does MS-13 have rules?
14   A.   Yes.
15   Q.   When did you learn the rules of MS-13?
16   A.   Right after I was jumped.
17   Q.   What rules does the gang have regarding
18   cooperating with law enforcement?
19   A.   Well, if you cooperate with law enforcement, you
20   would be a -- put a green light on you.
21   Q.   What does -- what do you mean when you use the
22   word "green light"?
23   A.   A green light is when you been marked to be
24   killed for a snitch.
25   Q.   What other reasons might a person get a green

1  light?

2      A.   One other reason could be that you keep breaking

3  small rules, you eventually will be given a green light,

4  too.

5      Q.   What if you attempt to leave the gang?

6      A.   Oh, you can't leave the gang.  Everybody knows

7  that.

8      Q.   Who can order a green light?

9      A.   Well, a green light could be anybody will get in

10 a green light, you know, there would be a meetings to be

11 held and everybody would come together and agree.

12 But -- (pause).

13     Q.   If someone has a green light, are members of

14 MS-13 expected to carry out that green light?

15     A.   Yes, sir.

16     Q.   What does it do for a member's reputation if they

17 carry out a green light?

18     A.   They will gain a lot of respect.

19     Q.   Is respect important in MS-13?

20     A.   Yes, sir, it is.

21     Q.   Are you familiar with the term *calentón*?

22     A.   *Calentón*, yes.

23     Q.   What is a *calentón*?

24     A.   *Calentón* is when you get beat up, punished for

25 breaking the -- any small rule.

1      Q.   Who delivers a *calentón*?

2      A.   Members within the clique.

3      Q.   Are you familiar with the term *chavala*?

4      A.   Yes.

5      Q.   What is a *chavala*?

6      A.   We use that word for a -- to describe a rival

7  gang member.

8      Q.   What gangs are considered chavalas, by MS-13?

9      A.   All gangs that are not MS.  Everybody that is not

10  an MS is considered to be a *chavala*.

11     Q.   What are MS-13 members supposed to do if they see

12  a *chavala*?

13     A.   Every time you come across a *chavala*, your duty

14  is to beat them up, confront them, stab them, kill them.

15     Q.   And what happens to MS-13 members who attack

16  *chavalas*?

17     A.   Well, they respect a lot.

18     Q.   What if an MS-13 member kills a *chavala*?

19     A.   It's even better for them.

20     Q.   When you were in MS-13, did you learn any MS-13

21  hand signs?

22     A.   Yes, sir.

23     Q.   Would you please demonstrate them for the jury.

24     A.   This is what we use for representing gang sign

25  (indicating), which means, if I go like this to anybody

1    on the street, it means, I'm telling them that I am an

2    MS-13.  We call this the claw, also.

3                THE COURT:  Just a second.  You called it

4    the claw?

5                THE WITNESS:  Yeah.

6                THE COURT:  The record should reflect that

7    he is holding his index finger and baby finger up, and

8    his two fingers are folded over the thumb.

9    BY MR. TOBLER:

10      Q.   Please describe your tattoo on your forehead for

11   the jury.

12      A.   Ah, the tattoo above your neck means that you

13   must have done something serious.

14      Q.   Why did you get that tattoo?

15      A.   I was drunk.

16      Q.   Do you have any other tattoos?

17      A.   Yes, sir.

18      Q.   Please describe them.

19      A.   I have an "M" on my right arm, an "S" over here

20   on my left one.  A "1" on my right arm, and "3" on my

21   left.  And a claw on my chest.

22      Q.   Please describe the tattoos on your hands.

23      A.   I got the three dots over here, and "Su Trece,"

24   which means south -- south side -- south -- southerner.

25   We're under the Eme kind of rules, you know, the Mexican

1  mafia.

2      Q.   What do the three dots mean to you?

3      A.   Three dots is a crazy life, or three rules where

4  we eventually will end up, which is the hospital,

5  cemetery or prison.

6      Q.   When did you get these tattoos?

7      A.   This one, I got it in 2003.  And the rest of them

8  I got it like in -- late '90s.

9      Q.   Before you went to prison?

10     A.   Yes, sir.

11     Q.   You mentioned before that you moved from Los

12  Angeles to Virginia.  Where did you move after Virginia?

13     A.   I moved to Maryland.

14     Q.   When did you move to Maryland?

15     A.   1997.

16     Q.   Were you convicted of robbery in Maryland?

17     A.   Yes, sir.

18     Q.   What year?

19     A.   2001.

20     Q.   How long did you serve on that robbery?

21     A.   A year.

22     Q.   When you got out, did you meet any members of

23  MS-13 in Maryland?

24     A.   Yes, sir.

25     Q.   From what clique?

1    A.   Um, there were all kinds of cliques in there at

2    that time.  It was like I would call like a salad, you

3    know it was like, one member from Sailors and one member

4    from Normandies.

5    Q.   Did you ever have any conflicts with these

6    members?

7    A.   Yes.

8    Q.   Please describe that conflict.

9    A.   I was at a party that was held by the Sailors

10   clique.  The leader of that clique begun disrespecting

11   me.  And then I called him out to fight.  Then I left

12   the party and he came after me.  And when they catch up

13   to me, they stab me.

14   Q.   How many people caught up with you?

15   A.   Like eight people.

16   Q.   Do I understand correctly that these were members

17   of MS-13?

18   A.   Yes, sir.

19   Q.   From another clique?

20   A.   Yes, sir.  Sailors clique.

21   Q.   How many times did they stab you?

22   A.   Sixteen.

23   Q.   Were you hospitalized afterwards?

24   A.   Yes.  I went to the hospital for six days.

25   Q.   Where did you go after you got out of the

1    hospital?

2       A.   I went to stay with my sister, and then I moved

3    back to Virginia.

4       Q.   Was a meeting ever held to resolve this conflict

5    between you and members of the Sailors clique?

6       A.   Yes, it was.

7       Q.   What decision was made about how that would be

8    resolved?

9       A.   Well, after the Sailors and I finished each side

10   of the story, everybody in the meeting requested for us

11   to carry on a mission to go kill a *chavala*.

12      Q.   Why were you -- why did you receive that mission?

13      A.   Because there were -- there was blood shed

14   between us.

15      Q.   Were you and the other member of Sailors ever

16   able to carry out your mission together to kill a

17   *chavala*?

18      A.   No.  Because the Sailors were living in Virginia,

19   they were staying in -- I mean in Maryland, excuse me,

20   and I was over here in Virginia.

21           But then, we had another meeting, and there was

22   another conclusion that, you know, we shouldn't wait for

23   each other, and that I should carry on my mission here

24   and they would carry their own mission over there.

25      Q.   And when you say carry on your mission, you mean

1    to kill a *chavala*?

2        A.   Yes, sir.

3        Q.   After your mission changed, when did you first

4    attempt to carry it out?

5        A.   In the beginning of 2004.

6        Q.   Where?

7        A.   I was in a hotel party with some ULS members,

8    when one of them received a phone call from another ULS

9    member saying that he was in another party, and in this

10   party there were chavalas attending, too.

11       So, you know, I say, you know, this is my --

12   great opportunity for me to go over there and carry on

13   my mission.

14       Q.   You used the term "ULS."  What does ULS means?

15       A.   That's another clique.

16       Q.   Did you go to that other party where you heard

17   there were chavalas?

18       A.   Yes.  I went first to pick up a gun with another

19   ULS members, and then we headed to this party.

20       Q.   What kind of gun did you pick up?

21       A.   A 38.

22       Q.   Whose gun was that?

23       A.   Mine.

24       Q.   Were others allowed to use that gun?

25       A.   Yes, sir.

1    Q.   Once you got to the party, did you see anyone you
2    thought was a *chavala*?

3    A.   Yes.  When we got to this party, we hopped out of
4    the car, spot -- and this guy Sparky and I.  And Sparky
5    seems to know some *chavala*s, he was pointing at me a
6    *chavala.*  But there was a lot of people walking on the
7    sidewalk, so it was kind of difficult for me to just --
8    to see who he was pointing at.

9         So, we were doing that, while -- then a car was
10   passing by, and this guy caught my attention, a guy that
11   was in this car, because he was yelling out of the
12   window.  He was the passenger guy.  He was insulting me,
13   cursing me.

14        And so when I looked around and I noticed this
15   guy, he was wearing a red bandana across his forehead.
16   So, I automatically knew that he was a *chavala*, and I
17   say, you know, I say, "La Mara," and then I start
18   shooting.

19   Q.   What did -- why, when you saw the red bandana,
20   did you think that he was a *chavala*?

21   A.   Red is the color of a rival gang member.

22   Q.   How far away were you when you started shooting?

23   A.   Like from here to that table.

24   Q.   How many shots did you fire?

25   A.   Five.

1    Q.   What did you do after you got done firing?

2    A.   I took off running.  And, then I thought a car

3    was following me, so I fired another shot, hopped into

4    the car and left the area.

5    Q.   Did you ever learn whether you killed anyone that

6    night?

7    A.   Yes.  Later I was told that I didn't hit anybody,

8    thanks God.

9    Q.   Was your mission accomplished at that point?

10   A.   No, sir.

11   Q.   After that night, what's the next time you

12   attempted to carry out your mission to kill a *chavala*?

13   A.   On -- like a month later, Seco and I went to

14   visit these two girls --

15   Q.   Do you remember the date, sir?

16   A.   It's May 16, 2004.

17   Q.   Where did you go that day?

18   A.   We went to -- to check on these girls we were

19   dating.  But when -- but when we got to this parking lot

20   of this townhouse, we noticed that this guy, Negro, was

21   there, so -- Negro is another guy that was from my

22   clique.

23        So we decided to go to where he was at.  So, a

24   little bit while after we were talking with Negro, we

25   noticed that these two person was walking across were --

1    from where we were at, and Seco and I decided to go

2    check on them to see if they were any chavalas.

3        Q.   The person you were with that day when you went

4    to see Negro, who was that person?

5        A.   Seco.

6        Q.   What neighborhood were you in at that time?

7        A.   Somewhere around Herndon.

8        Q.   Why did you think the two people walking, that

9    you saw, were chavalas?

10       A.   Because that neighborhood right there was

11   known that a lot of chavalas live there.

12       Q.   What did you do after you saw the chavalas?

13       A.   Well, we -- we were -- followed them, and then

14   when we catch up to them, I crossed the path.  I stood

15   in front of the -- the people, and I -- I started

16   talking to the guy and to make sure that he was a

17   *chavala*.

18            I told him that I was an 18th Street, that I

19   was -- that I just had moved over there to that

20   neighborhood and that I was looking for homies to kick

21   with.

22            So as soon as I said that, he said, "I am an 18th

23   Street, too."  And, so that's when I saw Seco shot him.

24       Q.   Was that tattoo on your head at the time?

25       A.   Yes, sir.

1    Q.   How did you expect them to believe you were
2    members of a 18th Street gang?
3    A.   I was wearing a visor.
4    Q.   Is 18th Street gang considered a *chavala* gang?
5    A.   Yes, sir.
6    Q.   What -- what were you and Seco intending to do
7    when you followed those two people you thought might be
8    chavalas?
9    A.   Like, what we do, you know, when we confront a
10   *chavala*, to hit them, kill them.
11   Q.   Was Seco armed when you went to follow those
12   chavalas?
13   A.   Yes, sir.
14   Q.   What happened after the -- what question did you
15   ask the young man in the street?
16   A.   Oh, I was telling him that I was an 18th Street,
17   that I was looking for homies to kick it, because I just
18   had moved to the area.
19   Q.   Where was Seco standing at that time?
20   A.   He was behind the guy, to his right.
21   Q.   And what happened next?
22   A.   He shot him, as soon as the -- as soon as the guy
23   say that he was an 18th Street.
24   Q.   How many times did Seco shoot him?
25   A.   Three times.

1    Q.   You mentioned before, there was another person

2    with him?

3    A.   Yes.

4    Q.   Who was with him?

5    A.   A girl.

6    Q.   What happened to her?

7    A.   Well, after we left, we got to the house, to my

8    house, Seco -- Seco told me that he had shot the girl.

9              MR. CONTE:  Objection.  Hearsay.

10             THE COURT:  Excuse me?

11             MR. CONTE:  It's hearsay.

12             MR. TOBLER:  It's offered for the effect on

13   the listener.

14             THE COURT:  Offered for the effect of the

15   listener?

16             MR. TOBLER:  Offered for the effect on the

17   witness.

18             THE COURT:  Objection sustained.

19             MR. TOBLER:  You can answer -- excuse me.

20   BY MR. TOBLER:

21   Q.   What -- what did you -- where did you go right

22   after the shooting?

23   A.   We went to my house.

24   Q.   And why did you go to your house?

25   A.   Because we want to change into new clothes and,

1   you know, we want to get away from -- from the scene.
2   And that's when we talk a little bit about what
3   happened.
4       Q.   Where did you go after that?
5       A.   After that, we -- the next day, um, we went to
6   Fredericksburg.
7       Q.   Why?
8       A.   So -- was trying to get away from Herndon.
9       Q.   Who did you stay with in Fredericksburg?
10      A.   With another homie of my clique.
11      Q.   Where were you ultimately arrested?
12      A.   In Los Angeles.
13      Q.   How did you pay to get to Los Angeles?
14      A.   From money from my clique, the homies brought us
15  to -- to go over there.
16      Q.   After your arrest, were you extradited back to
17  Virginia?
18      A.   Yes, sir.
19      Q.   Is that where you were charged with murder in aid
20  of racketeering?
21      A.   Yes, sir.
22      Q.   And you pled guilty to that charge?
23      A.   Yes, sir.
24           MR. TOBLER:  No further questions, Your
25  Honor.

1          THE COURT:  You may proceed.

2

3                      CROSS-EXAMINATION

4   BY MR. LEIVA:

5      Q.  Good afternoon, Mr. Fuentes.

6      A.  Good afternoon, sir.

7      Q.  Mr. Fuentes, I'm going to ask you some questions.

8   And if you don't understand my questions, please let me

9   know and I'll do my best to either rephrase the question

10  or repeat it.  Understood?

11     A.  Yes, sir.

12     Q.  And these same accommodations can be made for

13  you.  If you need to go through an interpreter, please

14  let me know.

15     A.  Thank you.

16     Q.  All right.

17         So your name, Buso, means -- what was the

18  definition of that?

19         What was your understanding of why you were given

20  that name?

21         The quick one, right?

22     A.  Yes.

23     Q.  In other words, someone who reacts very fast,

24  right?

25     A.  Someone who is ready for anything.

1    Q.   Ready for anything, right?

2         It also means someone that's sharp, right?

3         Someone that's smart, astute?

4    A.   I wouldn't say that.

5    Q.   But, that is the definition of it, is it not?

6    A.   Buso is like somebody that's ready for anything.

7    Q.   *Listo*?

8    A.   Lookout.

9    Q.   Now, let's talk about -- you were asked about

10   gang rules, Mr. Fuentes, and you talked about, of

11   course, one of the prominent rules is that you cannot

12   cooperate with the police or with -- or with the

13   government; is that right?

14   A.   Yes, sir.

15   Q.   So, something as simple, for example, as walking

16   up to a patrol officer and saying, "Officer, I just saw

17   that guy steal a bike," you can't do if you're MS-13?

18   A.   No, you can't cooperate with them at all.

19   Q.   Even if it has nothing to do with you or your

20   boys or your case, you just can't cooperate with them,

21   period.

22   A.   No, sir.

23   Q.   And, that, also, of course, includes testifying

24   in court.  You can't testify in court, can you?

25   A.   No, sir.

1    Q.   Under no circumstances are you allowed to testify
2    in court?
3    A.   Not to cooperate at all.
4    Q.   Okay.  It's better as a homeboy to remain quiet
5    and go to jail than to testify in court, right?
6    A.   Well, if you're in the gang, that's the rules.
7    Q.   That's the rules.
8         And, as a homeboy, you're worried about your own
9    life being at risk, right, if you cooperate or if you
10   testify?
11   A.   Yes.
12   Q.   And, you're also concerned about placing your
13   family's life at risk if you cooperate or testify.
14   A.   Yes, sir.
15   Q.   And, of course, that's something that every
16   homeboy knows going into MS-13.
17   A.   Yes, sir.
18   Q.   And let's talk about another rule about the Mara.
19   You're not required to identify yourself when you're
20   asked if you're part of MS-13, are you?
21   A.   What do you mean?
22   Q.   Well, if a police officer walks up to you and
23   say, "Are you MS-13," are you required to say, "Yes, I'm
24   MS-13"?
25   A.   No, you -- you don't say that.

1    Q.   And, I apologize, I know these sound like silly

2    questions and a lot of it is common sense, but I still

3    need to ask you.

4    A.   All right.

5    Q.   All right?

6         And, for example, if you're walking with your mom

7    out of the grocery store and some *chavala* approached you

8    and they say, "Hey, you're MS-13," you're not required

9    to divulge that right then and there, are you?

10   A.   No.  You got to -- you got to answer that, yeah,

11   you are.

12   Q.   Oh.  So, when you're with your mom, even in the

13   grocery store, and you've got four 18th Street guys

14   around you, and they ask you, "Are you MS-13," you're

15   supposed to say, "Yeah"?

16   A.   Of course.  It doesn't matter.  You can't never

17   deny your gang.

18   Q.   But, you can deny it when the police ask you,

19   right?

20   A.   Yeah, because you never -- you can't tell the

21   police what -- who you are or what you're doing.

22   Q.   Yeah, but, the worst that happens if you admit

23   something to the police is they arrest you, right?

24        That's the worst that happens --

25   A.   Right.

O. Fuentes - Cross                                              84

1    Q.   -- right?

2         You admit to four or five 18th Street gang

3    members, while you're with your mom leaving the grocery

4    store, that you're MS-13, what's the worst that's going

5    to happen to you?

6    A.   Well, because like I say before --

7    Q.   What is the worst that can happen to you?

8    A.   Like what?

9    Q.   You would be killed, right?

10        Isn't that the worst that could happen to you?

11   A.   Yes.  But when you're in the gang -- in the gang,

12   your job is to confront, like I said before, confront

13   and do whatever it takes with any *chavala*.  It doesn't

14   matter who is around.  But, the rule is not to ever

15   cooperate with the police.

16   Q.   So, the rule is you confront chavalas no matter

17   who is around.  So, if you're walking back from your day

18   job, right, you're walking through an 18th Street

19   neighborhood, you see 20 18th Street members, the rule

20   is you go and throw yourself in there, right?

21   A.   Yeah.  Why not?

22   Q.   Eighteen guys.

23   A.   Yeah.  Why not?

24   Q.   Why not?

25   A.   Yeah.

1     Q.   So, what's the whole reason, then, to have secret
2  hand shakes, signs, tattoos on your forehead, if all
3  anyone has to do is ask you, "Are you MS-13?"
4          Is it really that simple?
5     A.   Well, you know, you got to represent to the --
6  either way.  Let them know that, that you're for real.
7  Because, any -- I mean --
8     Q.   But you guys have secret hand shakes, do you not?
9     A.   Well, we just go like this (indicates).
10    Q.   You guys have secret signs that you send to each
11 other, right?
12         Isn't that what you said, to let someone else
13 know that you're MS-13?
14    A.   Right.
15    Q.   All right.  That's why I'm a little confused,
16 because you're making it sound like it's so simple, that
17 it's, "Hey, just come up and ask me who I am or who I
18 rep with, as long as I'm not the police."
19         It's not that simple, is it, Mr. Fuentes?
20    A.   With the police?
21    Q.   No, no.  The way you're making it sound is, all
22 you need to do is ask me if I'm MS-13, and I will tell
23 you, unless you are the police.
24    A.   Look, I'm -- I'm not just going to approach to
25 anybody, I mean, I'm an MS-13, I'm regular person.  You

1    could tell right away who is a *chavala* and who is not.

2        Q.   All right.  Let's talk about that.  You could

3    tell right away who a *chavala* is.  And by that you mean

4    the color they wear, right?

5        A.   Nah, the way they dress, and, also the colors.

6        Q.   Right.

7             And you testified that one of the colors that one

8    of the rival gangs, 18th Street, is they wear red.

9        A.   Yes, sir.

10       Q.   Okay.  And, so, when you're out there looking for

11   *chavalas,* that's what you look for, to see, hey, who

12   fits that role, right?

13       A.   Right.

14       Q.   Who is walking like a gang banger, who is dressed

15   like a gang banger, who may be throwing up signs, right?

16       A.   Right.

17       Q.   Okay.  And, you mentioned also about gaining

18   respect within the gang.

19       A.   Yes, sir.

20       Q.   And let's talk about that.  Respect is very big

21   in MS-13, is it not?

22       A.   Yes, sir.

23       Q.   All right.  And your reputation is based on the

24   respect that you get from the homies and the things that

25   the homies think that you have done, right?

1    A.   Yes, sir.

2    Q.   And, you were in the gang for how long before you

3    pled guilty and agreed to cooperate with the government?

4    A.   Around eight years and a half.

5    Q.   Eight years and a half.  All right.

6         And, during that time period, you would agree

7    with me, Mr. Fuentes, that you heard a lot of homies

8    brag about their past deeds on behalf of the gang,

9    right?

10   A.   Yeah.

11   Q.   Yes?

12   A.   On their past what?

13   Q.   Their past deeds, their past actions that they

14   did --

15   A.   Okay.

16   Q.   -- on behalf of the gang, right?

17   A.   Right.

18   Q.   All right.  And, you would agree with me that

19   some homies tended to exaggerate about what they did on

20   behalf of the gang?

21   A.   I can't agree with you with that, because they

22   are just telling me the story what they did.  I was

23   never there.

24   Q.   Okay.  But, you would agree with me that when you

25   guys would get together, get high and drink, they would

1    tell you stories about some of the violent stuff that

2    they did, right?

3        A.   Right.

4        Q.   Right.  Because, they wanted to get respect from

5    you, right?

6        A.   Yes.

7        Q.   They wanted to show what you were made -- what

8    they were made of.

9        A.   Yes, but, that -- that -- that could be true.

10       Q.   That's all I'm asking.

11            Now, you were asked on direct examination about

12   the charge that you were facing and the fact that you

13   pled guilty to it, right?  So, let's focus on that.

14            You testified that you pled guilty, and the

15   punishment that you were to receive was life in prison.

16       A.   Yes, sir.

17       Q.   But, before you entered that plea of guilty, you

18   already knew that you were going to cooperate with the

19   government, right?

20       A.   I didn't know that.

21       Q.   Oh.  So, you walked into a life sentence; is that

22   what you're telling us?

23       A.   What are you talking about?  You got to give me a

24   time period.  You sound like -- what was -- I need to

25   know, are you talking about before, before right before

1    the -- I plead out, or --

2         Q.   The day --

3         A.   -- when I got arrested?

4         Q.   The day that you were in court and you agreed to

5    plead guilty to murder in aid of racketeering --

6         A.   Okay.

7         Q.   -- that day that you stood before Judge Ellis,

8    you knew that you were going to cooperate?

9         A.   Yes, sir.

10        Q.   Okay.  So, it wasn't one of these things that,

11   hey, you were a soldier and you were going to do what's

12   right and you were going to go ahead and plead guilty to

13   life and serve life.  You already knew that you were

14   going to start ratting people out, right?

15        A.   Yes, sir.

16        Q.   All right.  And you already knew that that was

17   your way out of getting a life sentence, was to

18   cooperate?

19        A.   That's what I was hoping.  But at the end of the

20   days it's up to the judge.

21        Q.   Yeah, but you were given an idea, weren't you?

22        A.   Yeah, but I didn't know.  I mean, what I'm saying

23   is they could tell me, "Yeah, we're going to submit a

24   motion for a reduction of sentence," but at the end of

25   the days it's up to the judge.  If the judge is going to

1   go along or not, it's up to the judge.

2       Q.   And I understand that.

3            And you were told -- and I'm not referring to

4   what your attorney told you.  You probably talked to a

5   lot of people.  But you knew that the level of reduction

6   that you would receive from that life sentence depended

7   on the amount and the quality of cooperation that you

8   gave the government.

9       A.   As long as I was truthful and honest.

10      Q.   Okay.  So, you knew going in there that when you

11  were pleading guilty that day in front of Judge Ellis,

12  you were going to get something that's less than life?

13      A.   Yes.  But I also didn't know what -- how much it

14  was going to be.

15      Q.   All right.  But, you were told as long as you

16  were a soldier on behalf of the government, they would

17  take care of you, right?

18      A.   Soldier?

19      Q.   I'm trying to talk the language that you would

20  understand.

21           As long as you were a soldier for the government,

22  right, they would take care of you?

23      A.   That's what I was hoping.  But like I say, you

24  know, it would have been at the end of the judge -- at

25  the end of the day --

1    Q.  Well --

2    A.  -- with the judge.

3    Q.  -- let's get around -- get away from what you

4    were hoping.  Tell the members of the jury what sentence

5    you actually did receive.

6    A.  Fifteen years.

7    Q.  So you went from life to 15 years?

8    A.  Yes, sir.

9    Q.  What about your immigration status before you

10   pled guilty, or the day that you pled guilty.  What was

11   it?

12   A.  Illegal.

13   Q.  Were you illegal?

14   A.  Yes.

15   Q.  All right.  And, what did the government promise

16   you as far as helping you with your immigration status?

17   A.  They haven't promised me anything.

18   Q.  All right.  So, the government has told you

19   they're going to deport you after those 15 years?

20   A.  I mean, they will recommend for me to stay here,

21   but that's not a promise.

22   Q.  No, no.  But that's an inquiry that you made,

23   right?

24       Because you know --

25   A.  Well, I hope so.

1      Q.   Hold on a minute.

2           Because you know that you've testified, and that

3      if you get deported back to El Salvador, something bad's

4      going to happen to you, right?

5      A.   Yes, sir.

6      Q.   All right.  So, you're smart enough to make

7      inquiries, or you made inquiries that they needed to

8      help you out with your immigration status in this

9      country.

10     A.   That's what I'm hoping.

11     Q.   You made inquiries, right?

12     A.   That's what I'm hoping.

13     Q.   And, you have no reason to believe that they

14     won't follow through on that, that they're actually

15     going to allow you to stay in this country.

16     A.   Would you repeat that question?

17     Q.   You keep saying you hope that that's what they're

18     going to do.

19     A.   Okay.

20     Q.   But, really, you've met with multiple FBI agents,

21     right, during this time that you agreed to be a

22     cooperating witness, right?

23     A.   Right.

24     Q.   Right.  You met with multiple assistant U.S.

25     attorneys --

1     A.   Right.

2     Q.   -- right?

3          You've testified in eight different trials on

4     behalf of the government --

5     A.   Right.

6     Q.   -- right?

7          And, you have reason to believe that they're

8     going to help you out with your immigration status,

9     given everything that you've done for them?

10    A.   Listen.  That's what I'm hoping, but either --

11    even though there is a -- there is an INS law that will

12    protect me from that, too, because, for who I am now, a

13    snitch -- um --

14    Q.   Are you talking about your snitch visa, or are

15    you talking about you're going to now claim political

16    asylum?

17    A.   Either one, hopefully.

18    Q.   All right.  And political asylum, of course, you

19    knew about that before you testified here today, right?

20    A.   Yes, sir.

21    Q.   All right.  And political asylum basically means

22    you're going to tell the U.S. Government, "Hey, I can't

23    go back to El Salvador because I fear that if I go back

24    there, I'm going to be persecuted, tortured or killed."

25    A.   Well, if I go, yeah.

1    Q.   And, let's see if you can help me out here with
2    the calculation.  It's been what, about 11 years since
3    you've been an active member of MS-13?
4    A.   An acting member?
5    Q.   Active.
6    A.   I told you, eight and a half --
7    Q.   No, no, no.
8    A.   -- before I got arrested.
9    Q.   I know you were an active member for eight and a
10   half years.  But, you pled guilty in 2005, right?
11   A.   Right.
12   Q.   Okay.  So, it's been about 10 or 11 years since
13   you've been active in MS-13?
14        Or are you active in the prison in MS-13?  I may
15   be mistaken.
16   A.   I'm not MS-13 any more.  I would say I'm a
17   former.
18   Q.   Okay.  So you've been a former MS-13 member for
19   well over ten years now, right?
20   A.   Yes, sir.
21   Q.   All right.  So, some of the things that you're
22   testifying here today is based on your knowledge of what
23   you knew of MS-13 ten years ago, right?
24   A.   Yes, sir.
25   Q.   Right.

1       Let me ask you about one thing that you were

2   talking about, going back to the rules.  And I apologize

3   to be going back and forth with you, Mr. Fuentes, but,

4   one thing caught my attention.  You said that you can

5   get a green light for breaking small rules.  Is that

6   what you meant?

7       A.   Yes, sir.

8       Q.   Small rules.

9       A.   If you keep repeating, breaking small rules,

10  eventually they will green light you.  It will be easier

11  for them than be dealing with you for a -- with the

12  petty stuff you doing.

13      Q.   Okay.  So then, a *calentón*, what you said it was

14  a beat down, right?

15      A.   Right.

16      Q.   And a green light can be used for the same kind

17  of offenses?

18      A.   Well, a *calentón* is when you readily break a

19  small rule.  But if you keep breaking the small rule

20  over and over and over, of course, they're going to --

21  it's going to be easy for them to get rid of you.

22      Q.   So, my question again is, that a green light is

23  not only reserved for the serious charges, it can also

24  be a small charge, a small offense?

25      A.   Yes, sir.

1     Q.   And a *calentón* can also be for a small offense?

2     A.   Yes, sir.

3     Q.   And a *calentón* can also be for a serious offense,

4     right?

5     A.   Nah.

6     Q.   Nah.

7          So, let's assume that you're the -- you're the

8     money man for your particular clique.  You're making the

9     clique money, and you commit a big offense, not

10    snitching, okay, but you commit a big offense.

11         You're telling me that the clique is ready to

12    kill you, even though you're the money man for the

13    clique?  Or they're going to give you a *calentón*?

14    A.   Nah, they're going to kill you, because there's

15    always somebody in line to -- to take over the spot.

16    Q.   You also mentioned these green light meetings.

17    And your testimony here today was, is that everyone is

18    there?

19    A.   Yes, sir.

20    Q.   All right.  So, it's not that it's reserved for a

21    first *palabra* or the first word or the second word?

22    A.   When I say "everyone is," I'm talking about every

23    clique.

24    Q.   Okay.  So you're not saying that everyone in the

25    clique is involved in this meeting where there's a

1   discussion of who's going to be green-lighted?

2       A.   No, just the first and second.

3       Q.   The first and the second word?

4       A.   Yes, sir.

5       Q.   Okay.

6            Now, let's talk about the murder that you were

7   involved in, you and Seco, right?  So your testimony is,

8   is that you were told that you had to kill a *chavala*,

9   right?

10      A.   Yes, sir.

11      Q.   Right.  And the reason why you had to kill a

12  *chavala* was because of this altercation that you had

13  with some MS-13 members in Maryland, right?

14      A.   Yes, sir.

15      Q.   All right.  And so the altercation that you had

16  in Maryland with MS-13 members resulted in you being

17  stabbed 16 times?

18      A.   Yes, sir.

19      Q.   I'm assuming you were running your mouth at this

20  party.  Is that what happened?

21      A.   No, sir.

22      Q.   No.

23      A.   It was the other guy.

24      Q.   It was the other -- so the other guy was at

25  fault?

1    A.   Was -- was disrespecting me, and I called him out

2   and, you know, they -- they begun to beating me up, and

3   then once they stopped, then I left, I decided to left.

4    Q.   But isn't that a violation of MS-13, beating up

5   another homeboy like that?

6         It isn't, isn't it?

7    A.   It is.

8    Q.   Okay.  So, you are the victim of a nonauthorized

9   beat down by homeboys --

10   A.   Right.

11   Q.   -- right?

12        And, the way you are telling Judge Lee and this

13  jury, all of us, is the way that MS-13 resolved it was

14  that you had to go out and kill somebody.

15   A.   Well --

16   Q.   That's what your story is, right?

17   A.   Right.

18   Q.   Okay.

19   A.   Well, the reason for that was because once I left

20  the party, one of them said that I would -- I swung a

21  knife at him, and they gave that reason in the meeting.

22  That was their story, for they to come up clean.

23   Q.   Buso, your name is -- you're Mr. ready for

24  anything, right?

25   A.   Right.

1    Q.   And you're not going to let somebody disrespect
2    you.
3    A.   Right.
4    Q.   Right?
5         So, at that party, you were drinking?
6    A.   Yes, I was.
7    Q.   All right.  You were getting high?
8    A.   Drinking.
9    Q.   Probably running your mouth?
10   A.   No, sir.
11   Q.   Oh, no?
12   A.   No.
13   Q.   Let's talk about this tattoo that's on your
14   forehead.  MS has rules about what kind of tattoos you
15   can get, right?
16   A.   Right.
17   Q.   And, where on your body you can get them?
18   A.   Right.
19   Q.   Because, certain tattoos have to be earned?
20   A.   Right.
21   Q.   And, the tattoo that you have on your forehead is
22   pretty prevalent and obvious to anyone, right?
23   A.   Yes.
24   Q.   Right.
25        So, it holds special status within MS-13, does it

1    not?

2         A.   Excuse me?

3         Q.   It holds a special status, right?

4         A.   Right.

5         Q.   Right?

6              Not any homeboy can just go out there and get the

7    M and the S put on their forehead, can they?

8         A.   No, sir.

9         Q.   And if any homeboy goes out and gets the M and

10   the S on their forehead, they can get in trouble for

11   that, right?

12        A.   But at that time, they knew --

13        Q.   My question is:  Can they get in trouble for

14   that?

15        A.   Okay.  Yes, sir.

16        Q.   Okay.  All right.  And, based on your testimony,

17   you did not ask permission to get the M and the S on

18   your forehead?

19        A.   No, sir.

20        Q.   You said that you just went out one day and got

21   drunk, and got this M and S on your forehead?

22        A.   Yes, sir.

23        Q.   And you would agree with me that having an M and

24   S on the forehead is reserved for only the special

25   homeboys who did something special for the Mara?

1    A.   Yes, sir.

2    Q.   Something special like murdering somebody, right?

3    A.   Yes, sir.

4    Q.   And, did you tell the government who you murdered

5    in order to get that M and that S on your forehead?

6    A.   I didn't murder anybody.

7    Q.   Well, you're still sticking to your story that

8    you just got drunk and you got the M and the S on your

9    forehead?

10   A.   Yes, sir.

11   Q.   So, as a result of this misunderstanding between

12   you and your homeboys up in Maryland, your testimony

13   today, and I'm assuming in the other court cases, has

14   been that to make things good, you had to kill a

15   *chavala*, right?

16   A.   Yes, sir.

17   Q.   Not that you would get a beat down for what you

18   did -- you and that homeboy did in Maryland?

19   A.   Yes.

20   Q.   Not that you would get green lighted for breaking

21   one of the rules of MS-13?

22   A.   No.

23   Q.   So, then, after you're given this assignment,

24   this mission as you called it, then, it sounds like for

25   some time you were on the hunt, you were on the prowl

1   for some chavalas?

2       A.   Yes, sir.

3       Q.   And again, a *chavala* is a rival gang member,

4   right?

5       A.   Yes.

6       Q.   And, I'm assuming -- and you correct me if I'm

7   wrong.  I'm assuming that the reason why you were tasked

8   with hunting down a *chavala* is because there's some

9   honor in killing your enemy, right?

10      A.   Yes, sir.

11      Q.   All right.  There's no fun in just walking up to

12  a normal civilian and shooting a civilian, right?

13           Anyone can do that.

14      A.   Not just any civilian.

15      Q.   That's what I'm saying.  The reason why you were

16  tasked with killing a *chavala* is because a *chavala* is in

17  the game, right?

18      A.   Yes.

19      Q.   A *chavala* is a gang member?

20      A.   Yes.

21      Q.   A *chavala* knows that if I see you, and you're

22  coming at me, I'm going to fight you.  I'm going to

23  square up with you.  I'm going to fight you and I may

24  kill you.

25      A.   Yes.

1    Q.   All right.  So that's part of the challenge about

2    when you have to go and find a *chavala* --

3    A.   Yes.

4    Q.   -- is that you're hunting someone who is just as

5    dangerous as you?

6    A.   Yes.

7    Q.   So, then, you testified that you were looking for

8    some chavalas, and you were at a -- a party, right?

9    A.   Yes.

10   Q.   Is that correct?

11   A.   Yes.

12   Q.   All right.  And, before you go to the party, you

13   get a gun?

14   A.   Yes, sir.

15   Q.   And when you get to this party, you do see a

16   group of chavalas, these 18th Street guys.  Did you know

17   they were 18th Street or did you just assume they were

18   *chavalas*?

19   A.   No.  When I got to this party, like I say, Sparky

20   was pointing at some *chavala*, but there was a lot of

21   people walking on the sidewalk.  I couldn't see who he

22   was pointing at.

23        That's when this car pulled over with these other

24   guys, and the guy on the passenger side had his head

25   stick out, cursing me.

1    Q.   What was he saying to you?

2    A.   He was telling me, "motherfuckers," and, you

3    know, all kind of bad words, because, the way I was

4    dressing.

5         And then when I look at him, that's when I

6    noticed that he had that red bandana across his

7    forehead.

8    Q.   How were you dressed?

9    A.   Like we usually do, with baggy pants, call them

10   bandalos, and very baggy clothes.

11   Q.   All right.  But you were in the car, so he

12   couldn't see your pants, could he?

13   A.   Who?

14   Q.   This guy who was yelling very bad things to you.

15   A.   He was right there, like in front of me.  He was

16   like talking directly to me.

17   Q.   So you were standing outside?

18   A.   Yes.

19   Q.   Okay.  You were standing outside.

20        And, this -- let's go back a little.

21        So you see this group who you believe is

22   chavalas, and there were a lot of people there, right?

23   A.   They were in a car.

24   Q.   Okay.  I'm confused.  Were there chavalas in the

25   car or were they out the car, or were there some in the

1   car or out the car?

2       A.   I say in the car.

3       Q.   In the car?

4       A.   Yes, sir.

5       Q.   And, you're just standing there, and then they

6   drive by, and they say something to you?

7       A.   Yes, sir.  They --

8       Q.   And they tell you that they're 18th Street?

9       A.   They didn't.  Because they was cursing me, and

10  when I look at them, and he had that bandana across his

11  forehead, I noticed right away that he must be a

12  *chavala*.  So I -- that's when I shout out, "La Mara,"

13  and I begun to shoot at him.

14      Q.   And, you missed, and so your mission was

15  unaccomplished, and you had to go out looking for some

16  more -- some other chavalas, right?

17      A.   Yes, sir.

18      Q.   All right.  So, let's talk about the murder that

19  you were -- you were involved in.  So, you say that you

20  were at a homeboy's home, who lived in a town home in

21  Herndon; is that correct?

22      A.   Yes.

23      Q.   All right.  And what time of day was it,

24  Mr. Fuentes?

25      A.   It was -- I can't recall really the time, but it

1    was light and dark, like light was fading away.

2        Q.   It was like 4:00 o'clock, 5:00 o'clock?

3        A.   I would say more like 6:00 and a half, 7:00.

4        Q.   And, you said that you saw -- well, you never

5    described this person who you saw, this male that you

6    saw.  He was a kid, right?

7        A.   He was a boy, but I don't -- he looked like he

8    was like, 18.

9        Q.   All right.  But since then, you found out what

10   his true age was, right?

11       A.   What do you mean?

12       Q.   I mean, now, sitting here today, you know how old

13   he was, right?

14       A.   No.  I -- I'm assuming that that's -- that's

15   what -- how old he was.

16       Q.   You mean to tell me that after all your court

17   proceedings when you pled guilty to murder, you don't

18   know how old the victim was?

19            MR. TOBLER:  Objection, Your Honor.  Asked

20   and answered.

21            MR. LEIVA:  I don't think he did, Your

22   Honor.

23            THE COURT:  Overruled.

24            THE WITNESS:  Say that again.

25   BY MR. LEIVA:

1       Q.   How old was the victim of the murder that you
2   were involved in?
3       A.   I say, it's maybe 18 years old.
4       Q.   So, what I'm asking you is, you never found out;
5   is that what you're telling us?  You never bothered --
6       A.   I don't remember, sir.
7       Q.   You never were told that he was 16 years old, 16
8   or 17 years old?
9       A.   I might.  I don't remember.
10      Q.   You don't remember.
11           I guess it didn't matter to you, right?  It
12  didn't matter how old he was.
13               MR. TOBLER:  Objection, Your Honor.
14  Argumentative.
15               THE COURT:  Sustained.
16  BY MR. LEIVA:
17      Q.   And he was with a young girl, right?
18      A.   Yes.
19      Q.   All right.  A little girl, someone under the age
20  of 18.
21      A.   I guess, I don't know.
22      Q.   And, was he holding a bike as he was walking?
23      A.   Holding a bike?
24      Q.   Was he on a bike, holding a bike?
25      A.   No.  I was on a bike.

1  Q.  You were on a bike?

2  A.  Yes.

3  Q.  All right.  And this area where you ran into this

4  kid and his sister, was it a park?  Was it a path?  Was

5  it a bike path?  Was it a running trail?

6      What was it?

7  A.  Street, regular street.

8  Q.  It was a regular street.

9      And, when you first saw him, you saw him walking

10 with this young girl, right?

11 A.  Yes.

12 Q.  All right.  And then, what?  You ran up to him,

13 you called him?

14     What did you do?

15 A.  I stopped right in front of him and I told him

16 that I was an 18th Street, that I just had moved over

17 there and that I was looking for homies to kick it.

18 Q.  But your experience, Mr. Fuentes, with any

19 *chavala* rival gang member, is that they're not going to

20 offer up who they belong to just because someone asked.

21 That's why you have secret hand shakes, that's why you

22 have signs, right?

23 A.  Well, I got to make sure he was an 18th Street.

24 Q.  Yeah, but what I'm getting at, if he's 18th

25 Street, he's that foolish enough, that just some

1    stranger coming up on the street, said, "Hey, are you

2    18th Street," you want us to believe that he responded,

3    "Yeah, I'm 18th Street"?

4        A.   Well, because, some of them tend to deny -- some

5    of them tend to get scared and denial when they really

6    are.

7        Q.   But what you're telling me --

8        A.   That's why I decided to approach it that way, to

9    make sure he was an 18th Street.

10       Q.   You were dressed in baggy clothes, right?

11       A.   Yeah.

12       Q.   So the same kind of style of clothing that you

13   wore that day when this young kid was shot, is the same

14   kind of style of clothing you wore when these people at

15   this party spotted you and knew that you were MS-13,

16   right?

17       A.   Yes, sir.

18       Q.   Because you dress that way, right?

19       A.   Yes, sir.

20       Q.   You represented that you're a Mara, right?

21       A.   Yes, sir.

22       Q.   And you got this big thing on your forehead

23   saying that you're MS?

24       A.   Yes, sir.

25       Q.   And you want Judge Lee, you want us, you want the

1    jury to believe that you are dressed like an MS-13 gang

2    banger, you've got this thing on your forehead, you walk

3    up to this kid and you say, "Hey, are you 18th Street,"

4    and this kid sees you and says, "You know what?  Yes, I

5    am 18th Street," to an MS-13 member?

6        A.   I was wearing a visor during that time, sir.

7    None of my tattoo were visible.

8        Q.   That's what you're saying.

9             If the government wants to believe that, they can

10   believe that.

11       A.   If you don't want to believe it, it's up to you.

12   I can't make you believe it, sir.

13       Q.   And --

14       A.   I'm just answering you what -- what it is.

15       Q.   Right.

16       A.   I can't go around telling you something that is

17   not.

18       Q.   And here -- and please don't be offended to my

19   question, but you --

20       A.   I'm not, sir.

21       Q.   -- you have a rather large forehead, right?

22            You've been told that before?

23       A.   Say what?

24       Q.   Your forehead is rather large, right?

25            Your boys have made fun of you because of your

1    forehead.

2              MR. TOBLER:  Objection, Your Honor.

3    Relevance.

4              THE WITNESS:  What relevance has that?

5              THE COURT:  Sustained.

6    BY MR. LEIVA:

7      Q.   And so, you're telling us that you somehow found

8    this cap or this visor that covered those enormous MS

9    letters on your forehead, that are right above your

10   eyebrow.

11     A.   Yes, it did.

12     Q.   And the cap that -- or visor that you were

13   wearing, they were MS-13 color, right?

14     A.   It was a white visor.

15     Q.   And you had MS-13 colors on you?

16     A.   Yes, sir.

17     Q.   And again, your testimony is that this 18th

18   Streeter sees a guy approaching him -- and it was you

19   and Seco, right?

20     A.   Yes, sir.

21     Q.   And Seco was also dressed like a homeboy, wasn't

22   he?

23     A.   Yes.

24     Q.   He was dressed in the MS-13 colors, right?

25     A.   Yes, sir.

1    Q.   All right.  So, this 18th Streeter -- well, let

2    me go back.

3         Have you found out who this young girl was that

4    was with him?

5         Has anyone ever told you that?

6    A.   I don't recall, sir.

7    Q.   You don't recalled being told it was his young

8    sister?

9    A.   I don't recall.

10   Q.   So, let's go back, then.  So, this young kid with

11   this -- with this young girl, sees two guys dressed in

12   MS-13 gear, approach them, and your testimony to us is

13   that he just openly said, "Yes, I'm 18th Street."

14   A.   Yes, sir.

15   Q.   Okay.  And, he did -- he did this knowing that

16   once he divulged to you that he was 18th Street, he

17   would either be beaten or killed, right?

18   A.   I think he believed me, sir.  Because he say that

19   right away, that he was an 18th Street.

20   Q.   And I understand.  I apologize if I confused you.

21        And, given the gang culture -- and the gang

22   culture is not that different between 18th Street and

23   MS-13, would you agree with that?

24   A.   Yeah.

25   Q.   All right.  And for the most part, 18th Street

1  members and MS-13 Street (sic) members are Salvadorian?

2  Not all of them; for the most part?

3      A.   Most of them, not all of them.

4      Q.   All right.  So, what my question to you was --

5  and I apologize if I confused you -- was that you're

6  telling us that this 18th Street member, who you say was

7  18th Street, sees two men approach him wearing MS-13

8  colors, and he tells you that he's MS-13 (sic) and

9  responds to your question, knowing that once he divulged

10  to you that he was 18th Street, that you guys were

11  either going to kill him or beat him, right?

12      Because that's what you guys do to each other,

13  right?

14      A.   Right.

15      Q.   And he had no backup, right?

16      He had no one around him to back him up.  It was

17  him against you.

18      A.   He never thought that we were MS.  That's why.

19      Q.   Hold on.

20      A.   In his mind --

21      Q.   You guys are trained to spot *chavalas*, right,

22  based on the colors?

23      A.   Right.

24      Q.   And, the 18th Street gang members are trained to

25  spot you guys, based on your colors?

1      A.   I was not an 18th Street member, sir.

2      Q.   But that's why you wear your colors, right, so

3   people can know that you're a member of the Mara, that

4   you're an MS-13 member?

5      A.   We do, because we're not afraid to represent.

6   But I can't speak on behalf of the other gang.

7      Q.   All right.  So, let me go back to my question.

8   And so, he didn't have anyone around him to back him up.

9   It was just his -- that girl who was with him?

10      A.   No.

11      Q.   And, of course, once Seco shot him, right, he

12   then turns around and shoots the girl?

13      A.   That's what he told me when we got to the house.

14      Q.   But you were there, weren't you?

15      A.   Yes.

16      Q.   Right?

17      A.   I was focusing on the -- on the guy.

18      Q.   And, you were going to take credit for it, right?

19           You were going to go back to your homeboys and

20   say, "Hey, mission accomplished.  We got a *chavala.*

21   Maybe we even got two *chavalas.*"

22      A.   I wasn't going to get anything, because it wasn't

23   me who shot it, but --

24      Q.   Yeah, but that's what you were hoping for, right?

25      A.   Yes.

1    Q.   Right?

2    A.   Yes, but, the mission was for me to kill a

3    *chavala*, not somebody else to kill it for me.

4    Q.   Yeah, but, you just said that that's what you

5    were hoping for, you were going to get credit for that

6    killing, right?

7    A.   Not for the mission.  You still going to get

8    credit for it, but not for the --

9    Q.   You're still going to get credit for it.

10        So you can go back to your homeboys and say,

11   "Hey, I participated in the murder of a *chavala*" --

12   A.   Right.

13   Q.   -- and your reputation would rise even further,

14   right?

15   A.   Right.

16   Q.   Because, if you told them the truth, which is,

17   "You know what?  Me and my homeboy just rolled up on a

18   16-year-old boy and his little sister and shot them,"

19   you wouldn't be getting the credit, right?

20        You wouldn't get any credit for that.

21   A.   If the -- if the guy was a *chavala*, yeah.

22   Q.   No.  I'm saying if the truth was that he was not

23   a *chavala* --

24   A.   All right.

25   Q.   -- and that you just rolled up on some young kid

1   and his sister walking, you wouldn't get any credit for

2   that.

3        A.    You still would get a credit for it.  You still

4   get a respect.

5        Q.    You get respect from the Mara for shooting a

6   young kid and his sister; that's what you're telling us?

7        A.    Yes, sir.  That's how savage, unfortunately, we

8   were.

9        Q.    But that's not what you were hoping for.  You

10  threw out -- you were -- you made up this whole story

11  about this young man just opening up to you and telling

12  you that he's 18th Street, because you wanted the

13  credit, because you wanted the mission accomplished, and

14  you wanted your reputation within the Mara to rise.

15       A.    Yeah, but my mission wasn't going to be completed

16  because I was not the guy who had the gun.

17       Q.    And, of course, since you've gone through these

18  court proceedings, you've since found out that that

19  young man was not 18th Street, right?

20       A.    I don't know if he was.  He told me he was, but,

21  I don't know if they --

22       Q.    So --

23       A.    -- if he was or not.  I'm just tell you what he

24  told me.

25       Q.    So, through all these court proceedings that

1    you've testified to, all these meetings with FBI agents,

2    all these meetings with these assistant U.S.

3    attorneys -- not these, but others as well -- no one

4    ever sat you down and told you how old these victims

5    were, no one ever told you whether they were 18th Street

6    or not.  That's what you're telling us, right?

7         You're still as clueless today as when you shot

8    that kid -- or participated in that murder some years

9    ago.

10        A.   I told you before, sir, I don't remember.

11        Q.   Let me go back and ask you a question about a

12   tattoo.  What does a teardrop tattoo signify within

13   MS-13?

14        A.   If you had a full tattoo, a teardrop, it means

15   you had killed somebody.  And if it's not -- and if it's

16   only line -- line without filling inside, means that you

17   had lost somebody --

18             MR. LEIVA:  That's all the questions --

19             THE WITNESS:  -- a loved one.

20             MR. LEIVA:  That's all the questions I have,

21   Your Honor.

22             THE COURT:  Say your name.

23                      CROSS-EXAMINATION

24   BY MS. AUSTIN:

25        Q.   Good afternoon.

1     A.   Good afternoon.

2     Q.   My name is Amy Austin and I represent

3  Mr. Gaitan Benitez.

4          Mr. Fuentes, I'm going to have to go back to the

5  tattoo and talk a little bit about that.  Do you

6  remember what year it was when you got the MS tattooed

7  on your forehead?

8     A.   2003.

9     Q.   And, you said you got drunk one night and got

10  that tattoo; is that correct?

11    A.   Yes.

12    Q.   After you woke up the next morning and realized

13  you had that tattoo on your forehead -- what did your

14  fellow homeboys say when they saw you?

15    A.   Well, they were -- they were kind of mad.  But at

16  that time, we just had barely fixed the problem between

17  us and -- between me and the Sailors clique, so they

18  kind of left it like that, because they knew that I was

19  going to carry this mission anyway, and, that's going to

20  make up for it.

21    Q.   So, you got that tattoo right after you had that

22  problem with the Sailors clique?

23    A.   Yes.

24    Q.   After you were stabbed several times?

25    A.   Yes, ma'am.

1   Q.   And so, you -- you endured quite a violent attack

2   when you were attacked by the Sailors clique, right?

3   A.   Yes, ma'am.

4   Q.   And -- and you lived through that, even though

5   you were stabbed 16 times.  Did that earn you respect

6   among the gang members?

7   A.   It did.

8   Q.   And so, they let you keep that tattoo?

9   A.   Not because of that.  It was because, like I say,

10  we just had finished fixing this problem between us and,

11  um, we didn't want to start another war among us.  And

12  they knew that I was going to carry this mission to kill

13  a *chavala*, and that was going to cover for that.

14  Q.   So -- so, was your mission to kill a *chavala*

15  based not only on this incident with the Sailors, but

16  because you got the MS tattooed on your forehead?

17  A.   No, just to kill a *chavala* for the incident.

18  Q.   And, they were just going to overlook the fact

19  that you got that MS tattooed on your head, that's

20  usually reserved for those who kill someone?

21  A.   Right.  But like I say before, you know, I was

22  going to have to carry this mission to, and they kind of

23  let it slide like that.

24  Q.   Now, I think you testified -- I'm not sure if it

25  was either on direct or during the cross-examination --

1  that MS-13 thrives on violence, is what you said; is

2  that correct?

3      A.   Right.

4      Q.   And that -- you talked about how respect is

5  important in MS-13.

6      A.   Yes, ma'am.

7      Q.   And so, when -- you also stated that when members

8  of MS-13 are talking, if they're drinking or -- or not

9  drinking, but talking about things they've done in the

10  past, maybe murders they've committed or other crimes

11  they've committed, I think you said you take them at

12  their word, that if they say they did it, you believe

13  they did it.

14      A.   Yeah.

15      Q.   And, because you -- somebody tells you something,

16  that they killed somebody, you believe it, and in the

17  gang world their status goes up just a little bit,

18  doesn't it?

19      A.   Well, you know, eventually we will find out if

20  he's telling the truth or not.

21      Q.   What if it was something that happened in El

22  Salvador before they came to the United States?

23      A.   Like I say, we will find out.  We -- this gang

24  communicates throughout this country and other countries

25  outside this country.  It's nothing you can say within

1    this gang that --

2        Q.  Do you have fact checkers in MS-13, that go out

3    and interview people to see if crimes were committed two

4    and three years ago?

5        A.  We communicate to each other.

6        Q.  Right.  You communicate via telephone?

7        A.  Yes, ma'am.

8        Q.  And -- but, you just stated that if somebody

9    tells you something, you assume it's true?

10       A.  Yes, I mean, because who am I to tell them right

11   there, "Hey, you lying"?  I don't know at that moment.

12   That's why we -- we have to find out.  And once we find

13   out, hey, this guy is telling the truth, yeah.

14       Q.  When all the homeboys get together, not for the

15   general meetings when just the runners are around, but

16   the other clique meetings --

17       A.  Okay.

18       Q.  -- is there a lot of talk, or is it all business?

19       A.  Nah; it is all business.

20       Q.  About the money and the --

21       A.  And about what's going on throughout the gang,

22   who needs to be -- who is admitted, who hasn't been

23   showed up, who hasn't bring the money, who -- or who had

24   been arrested, who needs to be sent the money to jail,

25   things like that.

1   Q.   When you were in MS-13 -- and I think the last

2   time you were an active member was in 2005; is that

3   correct?

4   A.   Yes, ma'am.

5   Q.   Did everybody have cellphones?

6   A.   Not really at that time, no.

7   Q.   So, homeboys weren't calling each other five

8   times a day, talking about this, that?

9   A.   Um -- well, usually the first word and the second

10  word, they -- they did have --

11  Q.   They had the phones?

12  A.   Yes.

13  Q.   But all the homeboys didn't have them?

14  A.   But it didn't take a -- once a -- there was

15  anything that we need to gather to or let anybody know

16  about it, we just call one person.  That's it.  And,

17  that person will let know the -- his people.

18  Q.   Now, let me go to 2004, when you and Seco were

19  involved in the murder of the person you said you

20  thought was the 18th Street gang member.

21       After that murder occurred, you said you got in

22  your car and you went back to your house; is that

23  correct?

24  A.   No.  We were --

25  Q.   I'm sorry, you were on bikes.  Where did you go

1   after that -- after the shooting?

2       A.   We went to dump the bikes and hid the gun, and

3   then we went to my house.

4       Q.   And then, when you -- how long did you stay at

5   your house?

6       A.   We spend the night over there in my house.

7       Q.   Were you and Seco together?

8       A.   Yes, ma'am.

9       Q.   Okay.  And then after you spent the night at your

10  house, what did you do?

11      A.   Well, that's when we left.  The next day we went

12  to stay with a homie in Fredericksburg.

13      Q.   So you left the area?

14      A.   Yes, ma'am.

15      Q.   And, this homie in Fredericksburg, was he in your

16  clique?

17      A.   Yes, ma'am.

18      Q.   And how long did you stay -- before you left --

19  no, I'll withdraw that.

20           How long did you stay with the homeboy or homie

21  in Fredericksburg?

22      A.   A week.

23      Q.   And after that week there, what happened?

24           Where did you go?

25      A.   We left.  We went to Tennessee.

1    Q.   Who did you stay with in Tennessee?

2    A.   With Seco's cousin.

3    Q.   Seco's cousin?

4    A.   Yes, ma'am.

5    Q.   And the fact that -- well, how long did you stay

6 in Tennessee?

7    A.   A week, too.

8    Q.   And, was Seco's cousin in the gang?

9    A.   No, he was not.

10    Q.   And, after you stayed in Tennessee, did you go

11 somewhere else?

12    A.   And while we were staying in there, we got this

13 job, moves around a lot, so we end up in North Carolina.

14    Q.   Okay.  And how long were you in North Carolina?

15    A.   A week.

16    Q.   And, are you and Seco still together?

17    A.   Yes, ma'am.

18    Q.   Okay.  And, after you stayed a week in North

19 Carolina, where did you go?

20    A.   That's when we decided to go to Los Angeles.

21    Q.   To California?

22    A.   Yes.

23    Q.   So, you quit your jobs and you went to

24 California?

25    A.   Yes, ma'am.

1    Q.   How did you get there?

2    A.   By land.

3    Q.   Car?

4    A.   Yes.

5    Q.   Who drove you?

6    A.   We -- our homies connected us with this company

7    that travel around the world, picking up here and there,

8    and that's how we end up going over there.

9    Q.   And who did you stay with in California?

10   A.   We stayed in a hotel over there, waiting for this

11   leader of MS in Los Angeles.  We waited for him to come

12   pick us up.

13   Q.   So, you were in contact with gang members in

14   California?

15   A.   Yes, ma'am.

16   Q.   And did that gang member come pick you up?

17   A.   No, because the police came and got us.

18   Q.   You were arrested?

19   A.   Yes.

20   Q.   And brought back to Virginia?

21   A.   Yes, ma'am.

22   Q.   Did you get in trouble with the gang for taking

23   off after shooting -- you and Seco being involved in the

24   shooting?

25   A.   With the gang?

1    Q.   Yes.

2    A.   No.  They were helping us, as a matter of fact,

3    to get away.

4    Q.   Okay.  What is your release date, Mr. Fuentes,

5    from the Bureau of Prisons?

6    A.   I'm afraid I can't answer you that, due to the

7    fact that I am afraid that these guys will know and they

8    put -- might put the word out that I am about to go

9    home.  But I still doing time.

10   Q.   You're still doing time?

11   A.   Yes, ma'am.

12   Q.   You said you can't leave the gang; is that

13   correct?

14   A.   Yeah.  Once you're in the gang, you can't leave.

15   Q.   And, there aren't any exceptions?

16   A.   Not really, I mean, unless you become a snitch,

17   like I am right now.  I'm glad that --

18   Q.   So -- now, if tattoos as part of MS-13 gang

19   culture go out of style, so to speak, let's assume, and,

20   you know, you haven't been an active gang member for a

21   while -- but let's assume for now MS-13 members don't

22   get tattoos, such as the one you have --

23   A.   Right.

24   Q.   -- because they don't want it to be so evident to

25   police that they're members.

1          The only way they can relate to people in the
2    gang that they may have done something violent or to
3    boast would be to tell the story; isn't that correct?
4        A.   Yes, ma'am, but -- you're assuming -- I assume
5    that there had to be someone with them to corroborate
6    the story.
7        Q.   Maybe they all corroborate a story.
8        A.   Well --
9        Q.   But that "MS" was an indication that you had been
10   involved in something violent, correct?
11       A.   Right.
12       Q.   And, if you're not allowed to get those tattoos
13   any more, word of mouth is really the only way you can
14   spread around the fact that you've been involved in
15   something, by telling the story.  You can't plaster it
16   on your body any more.
17       A.   Right.  But like I said, since you're assuming, I
18   assume that somebody had to be there to tell -- to tell
19   the -- to back him up and say, "Yes, he did," or, "I was
20   there."
21       Q.   You assume they're telling the truth?
22       A.   Right.
23            MS. AUSTIN:   Thank you.
24                     CROSS-EXAMINATION
25   BY MR. CRAWLEY:

1   Q.   I think it's almost afternoon, but I'm going to
2   say good morning -- well, good afternoon.  I'm sorry.
3   A.   Good afternoon.
4   Q.   How do you pronounce your last name?
5        Is it Alfaro?
6   A.   Yes, sir.
7   Q.   Mr. Alfaro, back to that incident concerning you
8   and the other gang -- the other MS clique, the incident
9   you talked about where there was an altercation.  You
10  recall that?
11  A.   Oh, yeah.  Yeah.
12  Q.   I think --
13  A.   Involved with the Sailors.
14  Q.   The Sailors.
15  A.   Okay.  Yes.
16  Q.   Okay.  So, in that particular incident, is it my
17  understanding that the gentleman from the Sailors
18  indicated that you had pulled a knife on him?
19       That's what he said?
20  A.   Yes.
21  Q.   You don't agree with that, correct?
22  A.   Nah.  I had a knife on me, but, it's the story in
23  a general meeting.
24  Q.   Well, I don't want to hear the whole story.  I
25  just want to know:  Did you pull a knife on him?

1    A.   No, I didn't.

2    Q.   You did not pull a knife?

3    A.   No.

4    Q.   Okay.  So it's fair to say that MS-13 is a

5    family, correct?

6         It's a brotherhood.  Is that a safe statement?

7         Like, MS-13, as Mara, that's a brotherhood of

8    individuals, correct?

9    A.   Right.

10   Q.   Okay.  And, by your own testimony, on this

11   particular night there was a -- a problem between you

12   and one of your brothers, correct?

13        Because the Sailor indicated that you had pulled

14   a knife on him, correct?

15   A.   Yeah, but we also got a --

16   Q.   It's just --

17   A.   -- got a war between us.

18   Q.   -- a yes or no question.

19   A.   Sir, I can't answer a --

20   Q.   Okay.  Let me rephrase.  Maybe I didn't do a good

21   job.

22        So, you admit that this is a brotherhood.  You

23   acknowledge that.

24   A.   Yes, sir.

25   Q.   And you admit that on this particular night, you

1    had an altercation, allegedly, with one of your

2    brothers, correct?

3        A.    With his clique, yes.

4        Q.    Correct.

5            And, you admit that this gentleman told a story

6    that was not true.  He told a lie, correct?

7        A.    We also go to war together among the cliques,

8    sir, so --

9        Q.    I didn't ask you what you had to do together

10   after the fact.  I'm asking you, as it relates to what

11   he said about the incident, he said something that you

12   said wasn't true, correct?

13       A.    Well, that was his story.

14       Q.    I know.  But you didn't agree with that story,

15   correct?

16       A.    Because it wasn't true.

17       Q.    Exactly.

18           So, you, by your own statement -- well, let me

19   put it this way:  Pulling a knife on someone is a very

20   dangerous act, correct?

21       A.    Right.  We're not allowed to do that in the gang.

22       Q.    Exactly.

23           And pulling a knife on someone, if you're going

24   to do it, you probably should have the intent to do

25   bodily harm to that individual, correct?

1    A.  We don't do it because we already know that we

2    shouldn't be doing that to another homie.

3    Q.  I understand.

4        Knives cause serious injuries, correct?

5    A.  Yes.

6    Q.  Okay.  And knives can be used to commit murder,

7    correct?

8    A.  Yes.

9    Q.  And pulling a knife on someone would be

10   consistent with the intent to cause serious injury to

11   that person, correct?

12   A.  It is.  But it's also that -- it's also about

13   the --

14          MR. CRAWLEY:  Your Honor --

15          THE WITNESS:  -- the respect --

16          MR. CRAWLEY:  Your Honor --

17          MR. TOBLER:  Objection, Your Honor.  He

18   should be allowed to answer the question.

19          THE WITNESS:  Yes, sir.  Are you going to

20   let me answer the question or --

21          THE COURT:  Just a second.

22          If the question asks for a yes or no, you

23   have to answer yes or no.

24          THE WITNESS:  Okay.  I'm sorry.

25          THE COURT:  The other lawyer will give you a

1    chance to answer the question.

2              THE WITNESS:  I'm sorry.

3              THE COURT:  Just focus on the question, if

4    you would.

5    BY MR. CRAWLEY:

6      Q.  So you would agree with my statement that it's

7    consistent with intending to cause serious bodily harm

8    to someone, correct?

9      A.  Yes, sir.

10     Q.  Okay.  So, in your statement, you've admitted,

11   under oath, that this individual that's in your

12   brotherhood lied on you about pulling a knife, correct?

13     A.  Yes, sir.

14     Q.  And, he did that to other gang members.  He told

15   other gang members a lie about you, correct?

16     A.  Yes, sir.

17             MR. CRAWLEY:  No further questions.

18                     CROSS-EXAMINATION

19   BY MR. SALVATO:

20     Q.  Good afternoon, sir.  My name is Frank Salvato

21   and I represent Christian Lemus Cerna.

22     A.  Good afternoon, sir.

23     Q.  Sir, you received a life sentence from Judge

24   Ellis, correct?

25     A.  Yes, sir.

1    Q.   And when did you receive that life sentence?

2    A.   By the end of 2005.

3    Q.   And then you've received a reduction in your

4    sentence, true?

5    A.   Yes.

6    Q.   When did you receive the reduction in your

7    sentence?

8    A.   2011.

9    Q.   And, in 2011, Judge Ellis reduced your sentence

10   from life in prison -- and there's no parole, right?

11   A.   Yes.

12   Q.   You were facing life in prison without parole,

13   true?

14   A.   Yes, sir.

15   Q.   And, Judge Ellis reduced your sentence from life

16   without parole to 15 years; is that true?

17   A.   Yes, sir.

18   Q.   And he did that pursuant to what's called a Rule

19   35?

20   A.   Yes, sir.

21   Q.   And you understand what a Rule 35 is?

22   A.   Yes, sir.

23   Q.   Okay.  And a Rule 35, sir, is the government's

24   motion to reduce your sentence, correct?

25   A.   Yes, sir.

1    Q.   And, without the government's motion to bring
2    it -- your case back before the Court, your sentence
3    cannot be reduced, true?
4    A.   Yes.  But it was -- be up to the judge at the
5    end.
6    Q.   The government has to initiate or start the
7    process --
8    A.   Oh, yes, yes.
9    Q.   The judge doesn't have the power on his own to
10   reduce your sentence, true?
11   A.   Right.  That's correct.
12   Q.   It is only if the government is satisfied with
13   your cooperation, can they file a motion.
14   A.   That's correct.
15   Q.   Then it's up to the judge.
16   A.   That's correct.
17   Q.   And so without the government's motion and
18   consent and their endorsement, you would be facing a
19   life without parole sentence still, true?
20   A.   Yes.
21   Q.   And I think you said during your direct
22   examination that it's your hope that the government will
23   allow you to stay in the country, yes?
24   A.   Yes.
25   Q.   And, has anyone from the government -- that's not

1    part of your plea agreement, true?

2        A.   Yes, it's not.

3        Q.   All right.  Has anyone from the government, the

4    FBI, law enforcement, represented to you that they will

5    help you with that endeavor, with that effort to stay in

6    the country?

7        A.   They haven't promised me anything.

8        Q.   Has anyone offered to you that they would assist

9    you in that effort?

10       A.   Well, I was told that I would be put in this

11   Witness Protection Program outside, but it's -- it will

12   be up to the -- I got to be accepted in this witness

13   protection.  It's up to them to at the end.

14       Q.   So, witness protection here in the United States?

15       A.   Yes, sir.

16       Q.   Okay.  And who told you that they would assist in

17   your efforts to stay in the United States in the Witness

18   Protection Program?

19       A.   The government would recommend that.

20       Q.   Okay.  Who in the government told you that?

21       A.   I don't remember if it was -- -- they never

22   promised me anything.  They will recommend it,

23   Mr. Parker, Mr. Parker, Morris Parker.

24       Q.   And he's the prosecutor in your case?

25       A.   Yes.

1    Q.   Right.

2         And, he was the one that prosecuted you for the

3    RICO murder, true?

4    A.   Yes.

5    Q.   All right.  And your representation is that the

6    United States Attorney's Office, through Morris Parker,

7    indicated to you that they would attempt to have you

8    stay in the country, true?

9    A.   Yes.

10   Q.   And help you with your immigration status?

11   A.   Yes.

12   Q.   Sir, fair to say, once you're in the gang, you're

13   in the gang, true?

14   A.   Yes, sir.

15   Q.   Homeboy once, homeboy forever?

16   A.   Yes, sir.

17   Q.   Okay.  So your position in the gang is maintained

18   as a homeboy once you're in the gang, true?

19   A.   Yes, sir.

20   Q.   Sir, is it fair to say that oftentimes MS-13

21   members commit a crime that's not part of the gang,

22   that's a personal crime?

23   A.   Yes.

24   Q.   So, somebody can go off and assault somebody

25   personally, that's not part of MS-13, true?

1       A.   Yes.

2              MR. SALVATO:   That's all the questions I

3    have, Your Honor.

4              I do have one brief motion we can take up,

5    either at the bench or at the break.

6              THE COURT:   At the break is fine.   Thank

7    you.

8              Close enough.   Ladies and gentlemen, we'll

9    take the luncheon recess now.

10             Please remember my instructions.   Do not

11   discuss the case.   Don't permit the case to be discussed

12   in your presence.   Leave your notes in the jury

13   deliberation room.   Don't do any research on the case.

14             And, of course, if you see individuals on

15   the elevator and they don't speak to you, they're not

16   being rude, it's only because they've been told not to

17   do so.

18             We will return at 2:00 o'clock.   Thank you.

19   You all can leave.

20             We're going to stay in session.

21             And the witness can go.

22             (Jury not present.)

23             THE COURT:   You may be seated.

24             You can step down, sir.

25             (Thereupon, the witness withdrew from the

```
 1  stand.)
 2              MR. SALVATO:  Court's indulgence.
 3              THE COURT:  All right.
 4              MR. SALVATO:  Your Honor, I don't want to
 5  hold everyone up.  Let me talk to co-counsel about the
 6  propriety of the motion --
 7              THE COURT:  All right.
 8              MR. SALVATO:  -- and whether I should bring
 9  it up, and I'll let the Court staff know that.
10              THE COURT:  Thank you.
11              We recess until 2:00 o'clock.  Thank you
12  very much.
13              Thereupon, court recessed at 1:00 p.m. and
14  reconvened at 2:04 p.m.).
15              THE COURT:  Ready to bring the jury out?
16              You can bring our jury out, Mr. Toliver.
17              (Jury present.)
18              THE COURT:  You may be seated.
19              I'll have the witness brought out in just a
20  second.
21              (Previous witness resumed stand.)
22              THE COURT:  All right, Counsel.  You may
23  proceed.
24              MR. SALVATO:  Thank you.
25
```

1

2

3              THEREUPON, OSMIN ALFARO FUENTES, previously

4   sworn, resumed the stand and testified as follows:

5          FURTHER CROSS-EXAMINATION (Continued)

6   BY MR. SALVATO:

7      Q.   Mr. Alfaro Fuentes, I just have a couple more

8   questions for you.

9      A.   All right.

10     Q.   In 2008, you were in prison; is that correct?

11     A.   Yes, sir.

12     Q.   And, you received a discipline for -- while you

13  were in prison for committing an assault without a

14  serious injury; is that correct?

15     A.   Yes, sir.

16     Q.   And that was during an altercation with another

17  inmate?

18     A.   Yes, sir.

19     Q.   Okay.  And that other inmate suffered abrasions

20  to the chest and back; is that correct?

21     A.   Operations?

22     Q.   Bruises, abrasions.

23     A.   Not to my knowledge.

24     Q.   Okay.  There was no bruising involved?

25     A.   Nah.  I think I end up with one, only.

1    Q.   But you were disciplined for committing the
2  assault, correct?
3    A.   Yes.
4    Q.   And, that was in a disagreement over a kitchen
5  job, and your feeling that the other inmate did not
6  respect you?
7    A.   That's fine.  That's correct.
8    Q.   And, you served time in the segregated housing
9  unit?
10    A.   Yes.
11    Q.   Okay.  And then three years later, the government
12  still made a motion to reduce your sentence, correct?
13  2011?
14    A.   Yes.
15         MR. SALVATO:  That's all the questions I
16  have.  Thank you.
17         THE COURT:  May the witness be excused?
18         MR. LEIVA:  Your Honor, we would like to
19  reserve him.
20         MR. TOBLER:  Your Honor, we would like to do
21  brief redirect.
22         MR. AQUINO:  No, no.  I needed to cross.
23         THE COURT:  Okay.  Are you going to cross,
24  Mr. Aquino?
25         MR. AQUINO:  Yes, sir.

1        THE COURT:  Okay.  I didn't see anybody

2   moving, so I thought maybe --

3        MR. AQUINO:  I wasn't sure if others were --

4        THE COURT:  No.  You know, you can say "No

5   questions" if you'd like.  There's no requirement that

6   everybody question every single witness, unless you want

7   to.

8                      CROSS-EXAMINATION

9   BY MR. AQUINO:

10    Q.   Good afternoon, sir.  My name is Jerry Aquino.  I

11   represent Mr. Chavez, along with Ms. Amato.

12    A.   Good afternoon.

13    Q.   I just have a few questions for you.

14         Is it correct that the clique leader -- the

15   clique leader is the one that issues a green light?

16    A.   We all have to come to an agreement to do so.

17    Q.   Okay.  But, he's the final word on that; is that

18   correct?

19    A.   Yes, sir.

20    Q.   Okay.  Now, in that regard, it's important that

21   the clique leader like you if you're a soldier in his

22   clique, right?

23    A.   What you mean, like me?

24    Q.   Sure.  If, for example, someone like you either

25   murdered the wrong person or didn't carry out a murder

1    properly, that could result in the clique leader being

2    upset at you, right?

3        A.   Not really.

4        Q.   He wouldn't be upset if you murdered the wrong

5    person?

6        A.   No.

7        Q.   Okay.  And he wouldn't be upset if you didn't

8    carry out a murder correctly?

9        A.   Well, if -- as long as the murder has been done,

10   it doesn't matter.

11       Q.   If the clique leader felt that a mistake was

12   made, he could order a green light on you, correct?

13       A.   Yes.

14       Q.   Okay.  Now, I thought you testified -- and you

15   correct me if I'm wrong -- that the tattoos on your

16   forehead are a mistake, correct?

17       A.   I was drunk.

18       Q.   Right.

19            But I thought you testified that you had tattoos

20   on your arms and elbows.  Am I wrong or right?

21       A.   Yes, on my arms.

22       Q.   Each one?

23       A.   Yes, sir.

24       Q.   Okay.  And, is the point of that, those tattoos

25   on your arms, each arm, is that kind of an advertisement

1    to the world that you're a gang member?

2        A.   Yes, back in the days.

3        Q.   Right.  Okay.  Now, there's a lot of discussion

4    that you had about the issue of *chavalas*, correct?

5        A.   Yes.

6        Q.   And, would the gang Latin Homies, Latin Homies,

7    would those constitute *chavalas*?

8        A.   What kind of Latin homies are you talking about?

9        Q.   Is there a gang called Latin Homies?

10       A.   La Rasa, one that I knew.

11       Q.   You say "no"?  I couldn't hear you.

12       A.   La Rasa, that's the only one I remember.

13       Q.   Okay.

14            And if you're in a gang that's not a member, part

15   of MS, that's considered being a *chavala*, correct?

16       A.   Yes, sir.

17       Q.   Now, you also testified that, I believe, phone

18   calls were made that you were involved with, either with

19   the clique leader or among gang members.  Is that

20   accurate?

21       A.   Yes, sir.

22       Q.   And often when you make these calls, is it

23   accurate that you speak in coded language?

24       A.   Yes, sir.

25       Q.   And that's done for the purpose of making sure

1    that law enforcement doesn't really know what you're

2    talking about; is that correct?

3        A.   Yes, sir.

4        Q.   Okay.  And so, the person at the other end of the

5    phone would have to know the code, right, so to speak --

6        A.   Yes.

7        Q.   -- to be able to translate what you're saying,

8    correct?

9        A.   Yes.

10       Q.   Okay.  And, is it correct -- you're from El

11   Salvador; is that accurate?

12       A.   Yes, sir.

13       Q.   And often the expressions that you use in these

14   coded telephone calls are often Salvadorian expressions

15   particular to El Salvador; is that right?

16       A.   Yes.

17            MR. AQUINO:  That's all the questions I

18   have.  Thank you.

19                  REDIRECT EXAMINATION

20   BY MR. TOBLER:

21       Q.   Mr. Alfaro Fuentes, you were asked many questions

22   by defense counsel about your plea agreement and your

23   understanding of the plea agreement.  What is your

24   understanding of the consequences with respect to your

25   plea agreement with the government, if you lie?

1    A.   That my plea agreement won't be good for me any

2    more.

3    Q.   You testified on cross-examination that when a

4    homeboy tells you that they committed a crime for the

5    gang, you try to corroborate what they tell you.

6         What would happen to a gang member who tells his

7    homeboys that he committed a crime, but then the gang

8    finds out that he was lying about that?

9    A.   Nothing.

10   Q.   Several attorneys asked you questions about why

11   you have a tattoo on your head.  Your testimony is that

12   you were drunk?

13   A.   Yes, sir.

14   Q.   How drunk were you?

15   A.   Very drunk, to a point that I passed out when --

16   when I woke up and they woke me up and told me they were

17   finished.

18             MR. TOBLER:  No further questions, Your

19   Honor.

20             May this witness be excused?

21             MR. LEIVA:  Your Honor, if we could have a

22   reserve, Your Honor.

23             MR. TOBLER:  Your Honor, may we approach?

24             THE COURT:  We will take this up at the end

25   of the day.  For right now, I'll have him leave and at

1    the end of the day we will take it up.  Is that

2    satisfactory?

3                MS. MARTINEZ:  May we approach, Your Honor?

4                MR. TOBLER:  We need to approach, Your

5    Honor.

6                THE COURT:  Okay.  All right.

7                (Sidebar conference held as follows:)

8                THE COURT:  Is this a sidebar under seal or

9    what?

10               MS. MARTINEZ:  I think --

11               MR. CRAWLEY:  Your Honor --

12               THE COURT:  I just asked the question.

13               MS. MARTINEZ:  I think, based on what I

14   intend to say, it's fine for the defendants to hear it.

15   If it goes into any more detail, we may have to make a

16   different hearing on that.  We're fine not being under

17   seal.

18               THE COURT:  All right.  I'm listening.

19               MS. MARTINEZ:  Your Honor, the -- as we've

20   heard in open court today, this witness is in the

21   Witness Protection Program.  There are serious --

22               THE COURT:  Wait for the reporter.

23               MS. MARTINEZ:  Your Honor, as we've heard in

24   open court, this witness is in the Witness Protection

25   Program.  There are obvious reasons, very serious

1   concerns, related to him.

2          The marshals who were escorting him here are

3   prepared to take him elsewhere, essentially, immediately

4   when Your Honor excuses him.

5          So, if there's a motion to have him held

6   longer, we would like that heard immediately, and we

7   would like a ruling on that immediately, so that he is

8   not here where he could be in greater jeopardy for any

9   longer than he absolutely needs to be.

10          MR. LEIVA:  Manuel Leiva, Your Honor.  I

11   understand the security concerns, and, I'm not

12   requesting he be held here.

13          I mean, if the government needs a week or

14   two weeks advance notice of when we may call him, we can

15   provide that.

16          THE COURT:  Why don't we do this:  Ask him

17   the questions now.

18          MR. LEIVA:  It's -- because we need to look

19   into some things that were disclosed today, Your Honor.

20   That's not -- why we're not ready to do so today.  There

21   were some things, for example, that the government

22   didn't provide us, that he admitted to, such as the

23   immigration assistance that he was receiving.

24          Now, I know that was already dealt with, but

25   other stuff that came out as well that we would like an

1    opportunity to look into.

2              And again, I understand their security

3    concerns, and we can work with the government, giving

4    them, you know, enough advance warning as they need.

5              MS. MARTINEZ:  May I respond, Your Honor?

6              THE COURT:  Sure.

7              MS. MARTINEZ:  Your Honor, I think we need

8    much more of a proffer on the record in order to be

9    holding this witness, especially in light of the

10   security concerns, for any longer.

11             This witness has testified, as he said,

12   seven or eight times.  Those transcripts have been

13   provided to the defense counsel.  Ample disclosures have

14   been made, including the fact that he is in the Witness

15   Protection Program.

16             If counsel wants to claim that something

17   came out on direct that was entirely a surprise to them,

18   when this witness has testified in open court numerous

19   times, and they've read the transcripts, I think there

20   needs to be more of a proffer on the record before we

21   hold this witness further to recall on this case.

22             MR. LEIVA:  Your Honor, the only concern

23   with that is -- and of course we're tipping our hand on

24   what we expect to do with this witness, and I don't

25   think I should have to do that.

| | |
|---|---|
| 1 | THE COURT:  Did you subpoena him? |
| 2 | MR. LEIVA:  No, Your Honor, we did not. |
| 3 | THE COURT:  Are you finished? |
| 4 | MR. LEIVA:  Yes, sir. |
| 5 | THE COURT:  I'm going to let the witness go. |
| 6 | If you have a motion to file, file it.  But I'm not |
| 7 | going to have him held here. |
| 8 | MR. LEIVA:  Thank you. |
| 9 | (Thereupon, the side-bar conference was |
| 10 | concluded.) |
| 11 | THE COURT:  He's excused. |
| 12 | Did you have any questions for him? |
| 13 | (No response.) |
| 14 | (Thereupon, the witness withdrew from the |
| 15 | stand.) |
| 16 | THE COURT:  Okay.  Next witness. |
| 17 | MR. TOBLER:  Your Honor, the government |
| 18 | calls Jay Choi. |
| 19 | (Witness sworn.) |
| 20 | THE WITNESS:  I do. |
| 21 | THE COURT:  You may proceed. |
| 22 | THEREUPON, JAY CHOI, having been duly sworn, |
| 23 | testified as follows: |
| 24 | DIRECT EXAMINATION |
| 25 | BY MR. TOBLER: |

1    Q.   Good afternoon, Mr. Choi.

2    A.   Good afternoon.

3  BY MR. TOBLER:

4    Q.   Could you please state your name and spell it for

5  the record?

6    A.   Jay Choi; J-a-y, last name, C-h-o-i.

7    Q.   Where do you work, Mr. Choi?

8    A.   Herndon Police Department.

9    Q.   How long have you worked at the Herndon Police

10 Department?

11   A.   Over 13 years.

12   Q.   What is your current position in the police

13 department?

14   A.   Senior police officer.

15   Q.   I would like to direct your attention to May 16,

16 2004.  What was your position at that time?

17   A.   Private first class, working patrol.

18   Q.   Were you working that night?

19   A.   I was.

20   Q.   What were your duties that night?

21   A.   I was working as part of the patrol, midnight

22 shift.  We work from 8:00 p.m. to 7:00 a.m., and respond

23 to dispatch calls for service as well as conduct traffic

24 enforcement.

25   Q.   What dispatch calls did you receive that night?

1    A.   That night, a little after 9:40 p.m., received a

2    report of a shots fired from Park Avenue.

3    Q.   What city was that in?

4    A.   That's Town of Herndon, Virginia.

5    Q.   How far away were you from the reported scene of

6    the shooting at the time you received that dispatch

7    call?

8    A.   I was about seven blocks, about point --

9    0.6 miles.

10   Q.   How long did it take you to arrive on the scene?

11   A.   Less than a minute.

12   Q.   Please describe the neighborhood in which the

13   reported shooting occurred.

14   A.   Primarily townhouses.  It's all residential.  And

15   Park Avenue is just a -- one lane each direction, with a

16   double yellow line in the middle.

17   Q.   What did you observe upon arriving at the scene?

18   A.   I pulled up.  I saw a male subject laying on his

19   back in the roadway, motionless.  Approached.  He wasn't

20   breathing, no pulse.  And my attention went to a second

21   subject nearby on the sidewalk.

22   Q.   Please describe what you observed about the

23   second subject nearby on the sidewalk.

24   A.   The second subject was a female, not in the

25   roadway, on the sidewalk, just a -- feet away.  She was

1    frantic, was coughing, started spitting up blood, and

2    told me that she and her brother had been shot.

3        Q.   Was she able to describe the people that were

4    responsible for the shooting?

5        A.   She was able to provide a description for one of

6    the subjects, yes.

7        Q.   How did she describe that subject?

8        A.   Described the subject as a Hispanic male, had a

9    tattoo on his forehead, the letters "MS."

10       Q.   Did she identify the other person who was with

11   her, who had been shot?

12       A.   Yes, she did.  She stated that it was her

13   brother, Jose.

14       Q.   Were you able to identify her as well?

15       A.   Yes, I was.

16       Q.   What is her identity?

17       A.   She told me her name is Lorena Sandoval.

18       Q.   What happened to Ms. Sandoval after you spoke

19   with her?

20       A.   Well, I noticed that she had a gunshot wound to

21   her shoulder, left side, and also a gunshot wound to the

22   center of her back.  Called for rescue to have her

23   transported over to Fairfax Hospital.

24            She provided a description of what had happened

25   right before the shots had been fired, as we waited for

J. Choi - Direct

1    the ambulance.

2        Q.   Who did law enforcement seek in connection with

3    this crime?

4        A.   A Roberto Alfaro Fuentes.

5        Q.   Do you know him by any other names?

6        A.   Yes.  He has -- goes by the gang monicker of

7    Buso.

8        Q.   Did any law enforcement seek anyone else in

9    connection with the crime?

10       A.   Yes, one other subject.

11       Q.   Was Mr. Alfaro Fuentes ultimately arrested?

12       A.   He was.

13       Q.   Where?

14       A.   Los Angeles, California.

15              MR. CONTE:  This calls for a hearsay

16   response, Your Honor.

17              THE COURT:  Sir, I can't hear you.

18              MR. CONTE:  I said that calls for a hearsay

19   response.

20              THE COURT:  Sustained.  Sustained.

21   BY MR. TOBLER:

22       Q.   Where did you next see Mr. Alfaro Fuentes?

23       A.   I saw him in Los Angeles, where I was part of the

24   extradition team, and bought him back here to Fairfax

25   County, Virginia.

1          MR. TOBLER:  No further questions, Your

2    Honor.

3          MR. LEIVA:  No cross-examination, Your

4    Honor.

5          THE COURT:  All right.

6          May the witness be excused?

7          (No audible response.)

8          THE COURT:  All right.

9          You're free to leave, sir.  Thank you for

10   coming.

11         THE WITNESS:  Thank you, sir.

12         (Thereupon, the witness withdrew from the

13   stand.)

14         THE COURT:  Next witness.

15         MR. TOBLER:  Your Honor, the government

16   calls Dr. Frances Field.

17         (Witness sworn.)

18         THE WITNESS:  I do.

19         THEREUPON, FRANCES FIELD, having been duly

20   sworn, testified as follows:

21                    DIRECT EXAMINATION

22   BY MR. TOBLER:

23     Q.  Good afternoon, Dr. Field.

24     A.  (Bumps microphone)  Oops.  Sorry.

25     Q.  Good afternoon, Dr. Field.

1     A.   Good afternoon.

2     Q.   Could you please state your name and spell it for

3   the record.

4     A.   Frances Field, F-r-a-n-c-e-s, F-i-e-l-d.

5     Q.   Where do you work, Dr. Field?

6     A.   At the Office of the Chief Medical Examiner in

7   Manassas.

8     Q.   Would you please describe for the jury your

9   education and professional training?

10     A.   After medical school, I did a four years of

11   training in anatomic and clinical pathology.  I then did

12   an extra year of training in diseases of the lungs, and

13   then a year of training in forensic pathology.  I am

14   board certified in anatomic and clinical pathology and

15   in forensic pathology.

16     Q.   What is your specialty, Dr. Field?

17     A.   Forensic pathology.

18     Q.   What is forensic pathology?

19     A.   Forensic pathology is the performance of post

20   mortem examinations or autopsies on people who die

21   suddenly and unexpectedly, including people who die as a

22   result of homicides, suicides, accidents as well as a

23   number of natural deaths where there's no physician to

24   account for why the person died.

25          These autopsies are done to either rule out or

1    rule in the legal or illegal nature of the death and for

2    possible presentation in court.

3        Q.   As part of being a forensic pathologist, do you

4    offer an opinion as to a cause and manner of death?

5        A.   Yes, I do.

6        Q.   How long have you been with the Office of the

7    Chief Medical Examiner?

8        A.   Since 1985, with -- I actually retired for about

9    a year, and then have been back since that time.

10       Q.   What is your current position in that office?

11       A.   I'm a part-time assistant chief medical examiner.

12       Q.   What are your duties in the position of assistant

13   chief medical examiner?

14       A.   The main duty is to perform autopsies or external

15   examinations on sudden deaths, to establish a cause and

16   assist in establishing a manner of death, and for court

17   presentations.

18       Q.   How many autopsies have you performed in your

19   career?

20       A.   Several thousand.

21       Q.   Have you ever testified in court as a forensic

22   pathologist?

23       A.   Yes.

24       Q.   How many times, approximately?

25       A.   Several hundred times.

1    Q.   Please describe briefly for the jury the steps
2    you take when you're performing an autopsy.
3    A.   First, the body is received at the Medical
4    Examiner's Office.  And, it is examined as received, so
5    it may come clothed or not, or may have hospital
6    intervention about it.
7         We describe on -- in paper and a diagram all the
8    injuries that are present, all the different medical
9    paraphernalia that might be about the body.
10        After that, we unclothe the body and again
11   describe what we see, clean the body, and describe,
12   taking photographs along the way.
13        And after that, we perform the internal
14   examination, where we remove the chest organs and the
15   abdominal organs and the brain, and examine each organ
16   individually.
17        We also take samples, depending on the type of
18   case.  Most cases get drug testing.  Other cases get
19   other types of laboratory procedures performed on them.
20   Q.   Are there any special procedures used for the
21   victims of shootings?
22   A.   The -- the main procedures are examining the
23   wound carefully to look for evidence of range of fire.
24   We also take microscopic sections to either confirm that
25   powder is present or to show that gun powder isn't

1    present.  And we always remove the bullet, if a bullet

2    is present in the body.

3        Q.   Were you asked, in May 2004, to perform an

4    autopsy on a shooting victim?

5        A.   Yes.

6        Q.   Who requested that you perform that autopsy?

7        A.   I believe it was the Herndon Police Department.

8        Q.   With the assistance --

9             THE WITNESS:  Thank you.

10   BY MR. TOBLER:

11       Q.   With the assistance of the courtroom security

12   officer, I'd like you to take a look at what's been

13   marked for government identification as Government's

14   Exhibit 50.

15       A.   May I take it out?

16       Q.   Yes, you may.

17            Do you recognize this document, ma'am?

18       A.   Yes.  It's a copy of my autopsy report on Jose

19   Sandoval.

20       Q.   Is that your signature on the bottom of page one?

21       A.   Yes.

22       Q.   When did you perform this autopsy on Jose

23   Sandoval?

24       A.   May 17th of 2004, at 7:45 in the morning.

25       Q.   What evidence of injury did you find to the

1   decedent?

2      A.   He had a gunshot wound on his right arm that

3   entered and exited the arm and reentered the chest.

4   That wound injured both lungs, the stomach and the

5   spleen, and caused internal bleeding into the chest

6   cavities and into the abdominal cavity.  And I recovered

7   a bullet from the left side of the body.

8      Q.   Were you able to reach an opin- --

9      A.   He had another wound on the right upper back that

10  bruised the right lung and entered the spinal canal,

11  cutting the spinal cord completely apart at that place.

12  And the bullet was recovered from inside the spinal

13  canal.

14          And he also had a gunshot wound to his right

15  thigh, that entered and exited the thigh.

16     Q.   Were you able to reach an opinion as to the cause

17  of Mr. Sandoval's death?

18     A.   Yes.

19     Q.   What is that opinion?

20     A.   He died from penetrating gunshot wounds of the

21  thorax and abdomen.

22          MR. TOBLER:  Your Honor, at this time we

23  would move for the admission of Government's Exhibit 50

24  into evidence.

25          MR. JENKINS:  No objection, Your Honor.

1          THE COURT:  Received without objection.

2          MR. TOBLER:  No further questions,

3   Your Honor.

4          MR. JENKINS:  No questions, Your Honor, on

5   behalf of Mr. Torres.

6          MR. LEIVA:  Sorry, Your Honor.  A couple

7   questions.

8                    CROSS-EXAMINATION

9   BY MR. LEIVA:

10    Q.  Good afternoon, Dr. Fields (sic).

11    A.  Good afternoon.

12    Q.  Doctor, when you conducted the autopsy, did you

13   do a review of the external portion of Mr. Sandoval's

14   body?

15    A.  Yes.

16    Q.  All right.  And did you note whether he had any

17   tattoos or not?

18    A.  May I refer to my report?

19    Q.  Yes, Doctor.

20    A.  No, he had none.

21    Q.  None.

22          And were you able to determine his age, or were

23   you told his age?

24    A.  We were told the age.

25    Q.  And what was his age?

1    A.   His age was 17.

2    Q.   All right.  And, how much did he weigh?

3    A.   135 pounds.

4    Q.   And how tall was he?

5    A.   64 inches.

6    Q.   He was a petite individual?

7    A.   Yes.

8              MR. LEIVA:  That's all the questions I have,

9    Your Honor.  Thank you.

10             MR. TOBLER:  Your Honor, may the witness be

11   excused?

12             THE COURT:  Yes.

13             Thank you for coming, Doctor.  Good to see

14   you.

15             THE WITNESS:  Thank you.

16             (Thereupon, the witness withdrew from the

17   stand.)

18             THE COURT:  Next witness.

19             MR. CAMPBELL:  Your Honor, the government

20   calls Special Agent Clay Hicks.

21             (Witness sworn.)

22             THE WITNESS:  I do.

23             THE COURT:  You may proceed.

24

25

1          THEREUPON, ROBERT CLAYTON HICKS, having been

2   duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4   BY MR. CAMPBELL:

5       Q.   Good afternoon, sir.

6       A.   Good afternoon.

7       Q.   Please state your full name and spell it for the

8   record.

9       A.   Robert Clayton Hicks, H-i-c-k-s.

10      Q.   Where do you work?

11      A.   I'm a special agent with the FBI.

12      Q.   How long have you served with the FBI?

13      A.   Approximately 14 years now.

14      Q.   What assignments have you held within the FBI?

15      A.   I was initially assigned in the Omaha Division to

16  work counterterrorism, counterintelligence and

17  eventually criminal matters.

18          Transferred to the Washington Field Office, and,

19  worked various positions there, to include five years on

20  a Northern Virginia gang and drug task force.

21          Currently assigned to a headquarters element near

22  Quantico, Virginia, responsible for rendering safe

23  weapons of mass destruction.

24      Q.   Are you a supervisor at that headquarters?

25      A.   I am, indeed.

1    Q.   Have you received any specialized training during
2    your service?
3    A.   Yes, sir.
4    Q.   In what field?
5    A.   Numerous fields, but, specific to -- to this
6    case, I've attended several different classes, both
7    within the FBI Academy, as well as externally, on gang
8    participation, gang violence, international gangs,
9    street gangs, and the methods and processes by which
10   government entities, both state and federal, investigate
11   those criminal matters.
12   Q.   You mentioned that you served with the gang task
13   force.  What is the gang task force?
14   A.   The gang task force is a collection of
15   individuals representing different agencies, both
16   federal, state, and local, primarily in the Northern
17   Virginia area.
18   Q.   What are the agencies?
19        Can you identify some of the agencies that are on
20   that task force?
21   A.   The FBI, Fairfax County Police department, Prince
22   William Police Department, Herndon PD, Arlington,
23   Alexandria, various -- numerous agencies in the Northern
24   Virginia area.
25   Q.   Sir, if I can direct your attention to late

1   September of 2013, do you recall participating in an
2   investigation around that time period?
3       A.   I do.
4       Q.   And what was the nature of that investigation?
5       A.   It was a conspiracy to commit murder by various
6   gang members from the MS-13 street gang.
7       Q.   What triggered the investigation?
8       A.   An individual who decided to cooperate with law
9   enforcement called the Prince William County Police
10  Department and informed them of the nature of a
11  conspiracy to murder an individual who had left the
12  gang.
13          And that individual, after having been entered --
14  or, excuse me -- after having been turned over to Prince
15  William County Police Department, Detective Armstrong
16  from the gang -- their gang task force called my
17  supervisor, who then gave it to me.
18      Q.   What was the date that the Prince William County
19  Police Department was contacted by the cooperating
20  witness?
21      A.   The Prince William Police Department was
22  contacted on September 30th of 2013.
23      Q.   What did you do in response to that call?
24      A.   Detective Armstrong and I went and interviewed
25  the cooperator.

1    Q.   Please look at Government's Exhibit 86-A.

2    A.   Yes, sir.

3    Q.   Do you recognize the person in that photograph?

4    A.   I do.

5    Q.   Is that a fair and accurate depiction of how he

6    appeared?

7    A.   Yes, sir, it is.

8    Q.   What is that person's gang name?

9    A.   He went by the name Drowsy.

10   Q.   What was the gang name of the individual who was

11   targeted for the murder?

12   A.   Peligroso.

13   Q.   What were the initials of Peligroso's real name?

14   A.   DF.

15   Q.   When you met with Drowsy in person, what did he

16   tell you about the gang's plan to kill another gang

17   member?

18             MR. CONTE:  Objection, hearsay.

19             MR. CAMPBELL:  Your Honor, this is offered

20   not for the truth of the matter asserted, but as

21   background and context to law enforcement's response.

22             THE COURT:  All right.  Objection's

23   sustained.

24   BY MR. CAMPBELL:

25   Q.   What did this cooperator, Drowsy, agree to do

1    with law enforcement after you met with him?

2       A.   He agreed to perform several different monitored

3    phone calls and meetings for law enforcement.

4             MR. CAMPBELL:   If I may go back to the

5    Exhibit 86-A, Your Honor, I would move 86-A into

6    evidence at this time.

7             THE COURT:   Received without objection.

8    BY MR. CAMPBELL:

9       Q.   What did the cooperator agree to do for the FBI

10   at that point?

11      A.   He agreed to perform several different monitored

12   phone calls and meetings for us.

13      Q.   What was the purpose of such recordings?

14      A.   Those recordings were utilized to gather evidence

15   of the impending conspiracy to commit murder, and in

16   order to also corroborate what he had told us.

17      Q.   How did you enable him to secretly record these

18   conversations?

19      A.   The FBI and various law enforcement agencies

20   utilize recording devices that are embedded into objects

21   that are innocuous.  And, he was -- on each of those

22   occasions, he was provided with one by me in order to

23   record either the phone call or the meeting.

24      Q.   And, how does that device work, in fundamental

25   terms?

1    A.   The recording device itself, as I said, is

2    embedded into various different innocuous devices --

3    objects, I should say.  And, the way that they were

4    utilized in this particular instance was each of the

5    devices is turned on prior to being given to the

6    cooperator.

7         It is utilized -- being turned on, meaning the

8    recording has begun.

9         It's given to the cooperator, and throughout the

10   time that he utilizes it, he doesn't touch it until such

11   time that I retrieve it from him.

12        And prior to that, in preparation for giving him

13   the recording device, I took all the different recording

14   devices that were given to him at different times,

15   tested them, conducted a practice recording, download

16   that recording on our computers utilizing our software,

17   test the recording, ensure that it's functioning

18   properly and as designed; charged the device and ensure

19   that it's charged appropriately.

20        And then once tested and it meets my satisfaction

21   for its performance, then, empty or delete all the test

22   recordings so that you have maximum recording

23   capability.  Again, ensure it's charged to its fullest

24   extent, and then go utilize it.

25    Q.   And what do you do as an FBI agent before you

1  actually equip the operator with your recording device?

2       A.   Generally a, what's called a preamble is recorded

3  prior to providing the cooperator with the recording

4  device.  And the preamble consists primarily of my name,

5  the date and time, and then just a short description of

6  what the cooperator is about to do with the recording.

7       Q.   Why do you record the preamble?

8       A.   The preamble is utilized in order to be able to

9  separate out different events that were recorded, but

10 also specifically for the date, time stamp, in case the

11 electronic date time stamp that's embedded or that's

12 utilized in the recorder fails for some reason, or isn't

13 set properly, you have that on the audio recording

14 itself.

15      Q.   How many times did this cooperating witness,

16 Drowsy, use that recording device secretly to record

17 conversations?

18      A.   Three times over the course of two days.

19      Q.   When was the first secret recording conducted?

20      A.   The evening of September 30th, 2013,

21 approximately 9:30 p.m., I believe.

22      Q.   And where was that first secret recording

23 conducted?

24      A.   In the Park View apartments -- or near them,

25 around them, in the Culmore area of Fairfax, Virginia.

1    Q.   And, what was the purpose for that particular
2    recording?
3    A.   The purpose for that recording was, he had been
4    summoned to a meeting to discuss the --
5            MR. CONTE:  Objection, Your Honor.  Again,
6    it calls for hearsay response.
7            MR. CAMPBELL:  Your Honor, this is context
8    to explain why they are responding the way they are.
9    It's very limited.
10           THE COURT:  All right.  Well, I sustain the
11   objection.  He can say that he directed him to go some
12   place, if he did that.
13   BY MR. CAMPBELL:
14   Q.   What did you do with Drowsy before he went to
15   this gang meeting?
16   A.   Prior to dropping him off, we briefed him on
17   several safety measures, how we would respond, how he
18   needed to respond if he found himself in trouble, if he
19   was threatened in any way.
20        Provided him with the recording.  Gave him
21   directions as far as when and where we were going to
22   drop him off, when and where to meet us after the fact.
23        And then, upon briefing him to our satisfaction,
24   we dropped him off near the neighborhood and he went to
25   the meeting after that.

1    Q.   And, what did you do while he was at that

2  meeting?

3    A.   I, along with several other detectives from

4  Fairfax County Police Department and others, conducted

5  surveillance in the area, both near and more as an area

6  surveillance.

7    Q.   And why do you conduct that surveillance?

8    A.   A couple reasons.  Initially and primarily for

9  the safety of the cooperator, should he find himself in

10  trouble, you know, with respect to the people that he's

11  going to go meet with, to provide us, you know, ample

12  time to come help him.

13       And secondarily, to gather evidence of whatever

14  kind, visually, that we could see, people coming and

15  going from the meetings, things of that nature.

16    Q.   When Drowsy returned from the gang meeting, what

17  did you do with him?

18    A.   Initially retrieved the recording device from him

19  and secured it, turned it off, and then debriefed him on

20  what happened during the meeting, and ensured he was

21  safe, and then moved him away from the area.

22    Q.   When was the second secret recording conducted?

23    A.   The second recording was the following day, on

24  October 1st, approximately 5:00 p.m.

25    Q.   And where was that secret recording conducted?

1    A.   It was conducted in a par- -- on top of a parking

2    garage in Woodbridge, Virginia.

3    Q.   And what was the purpose of that?

4    A.   The purpose for that particular recording was to

5    record the phone call to several different higher level

6    PVLS clique members, in order to get details of when and

7    where they were to pick him up in order to go conduct

8    the murder.

9    Q.   Where were you when that recording occurred?

10   A.   Right beside the cooperator, in a vehicle.

11   Q.   What did you do with the recording at the

12   conclusion of that phone call?

13   A.   I stopped the recording, secured it, ensured that

14   it functioned properly, and then maintained the recorder

15   in my possession until further use.

16   Q.   When was the last of the three secret recordings

17   conducted?

18   A.   Later that same evening on October 1st, at

19   approximately 7:40 or so in the evening.

20   Q.   Where was that recording conducted?

21   A.   That recording, again, was on the cooperator's

22   person at the time, and, that was conducted in a vehicle

23   with three other MS members, and, along the drive to go

24   conduct the murder and then shortly thereafter.

25   Q.   What did you do while Drowsy was being driven in

1    that vehicle?

2        A.   Again, conducted surveillance, this time

3    primarily with Prince William County Police Department

4    individuals -- or at least that's who I was with.

5            And upon the group of individuals leaving the

6    parking lot, a traffic stop was conducted, and then I

7    came to the -- came upon the traffic stop and secured

8    the recorder later on once the cooperator was at the

9    Garfield -- Prince William County Police Department at

10   Garfield Station.

11       Q.   At the conclusion of your investigation over

12   those two days, what did you do with those three

13   recordings?

14       A.   Excuse me.  I took the recordings back to the

15   office, downloaded them onto our computer via -- via our

16   software, and then saved them to DVDs, to be included

17   into electronic evidence for the FBI, to be maintained.

18       Q.   With the assistance of Mr. Toliver, will you

19   please look at Government's Exhibits 1-A, 3-A and 5-A.

20   Again, sir, that's Government's Exhibits 1-A, 3-A, and

21   5-A.

22       A.   Okay.

23       Q.   Sir, do you recognize those items?

24       A.   I do.

25       Q.   And what are they?

A.   Those are copies of the original recordings that I made with the cooperator for the three different events.

Q.   What did you do with those recordings that you're looking at?

A.   So, a couple weeks ago, I listened to these particular copies of the recordings and noted that they were the same as the originals -- or copies of the originals that I had made, and then placed my initials on each of the CDs.

Q.   In response to the information you received that the gang planned to commit a murder, what did the FBI and the gang task force do at that point?

A.   So, because of the obvious dangerous nature of the allegations that were being made and what appeared to be corroborated through the recordings that we received, we formulated an operations plan.  It was approved through our management, as well as that of the police departments that were involved, in order to, like I said, equip Drowsy with a recorder -- a recording device.

And once we knew from the meetings and from the information received from these recordings where the murder was supposed to take place, we then formulated a plan to have Drowsy in the vehicle with them, as they

1    desired.  They had told him that they wanted him to come

2    commit the murder as well.  So, he was going to be the

3    individual that carried the recorder for us.

4            And, in order to limit their potential actions at

5    the site, which was Garfield High School, right behind

6    Potomac Mills Mall, we placed a marked police unit in

7    the parking lot in order to spook them a little bit once

8    they finally made their drive into the parking lot.

9            We set up a surveillance plan, as I mentioned

10   earlier, in order to keep watch over them, both, again,

11   for the safety of our cooperator, but also for the

12   safety of the public, because during the meetings they

13   had indicated that they were going to conduct a murder

14   with a shotgun, and then potentially two machetes.

15            MR. LEIVA:  Excuse me.  I object to hearsay.

16            THE COURT:  Sustained.

17   BY MR. CAMPBELL:

18     Q.  What was the nature of the operations plan, the

19   essence of it, with respect to interdicting the

20   attempted murder?

21     A.  The basic plan was, as soon as the vehicle drove

22   into the parking lot -- after having picked up the

23   cooperator, drove into the parking lot of Garfield High

24   School, upon it departing, which we fully expected it to

25   do once they saw the police cruiser -- the detective,

1   Dale Young, from Prince William County Police

2   Department, was driving another marked Prince William

3   County police cruiser, and would conduct a traffic stop

4   of the individuals, and we would be in the area to

5   support Officer Young as needed.

6       Q.   Why did you want to make it appear to be a

7   traffic stop?

8       A.   At the time, we did not want to alert those in

9   the vehicle, those involved in the plan, the murder

10  plan, to realize that we had a cooperator and that we

11  knew of their plan ahead of time.  So, we conducted a

12  traffic stop in order to make it look a little less

13  conspicuous on our part.

14      Q.   After Detective Young conducted that traffic stop

15  with his cruiser, what did you do?

16      A.   Shortly after Detective Young stopped the

17  vehicle, I and Detective Armstrong drove up to where he

18  had stopped them, just on the outskirts of the Potomac

19  Mills Mall, and got out of the vehicle, walked over to

20  where the individuals had been pulled out of the vehicle

21  and were seated on the ground.

22      Q.   Please look at Government's Exhibit 86-C.

23      A.   Okay.

24      Q.   Sir, do you recognize the person in that

25  photograph?

1    A.   I do.

2    Q.   Who is that?

3    A.   An individual who went by the name of Demente.

4    Q.   Does the photograph fairly and accurately reflect

5    his appearance --

6    A.   It does.

7    Q.   -- on that night?

8    A.   It does.

9         MR. CAMPBELL:  Your Honor, I move

10   Government's Exhibit 86-C into evidence and request that

11   it be published for the jury.

12        MR. JENKINS:  No objection, Your Honor.

13        THE COURT:  Received.

14        It may be published.

15   BY MR. CAMPBELL:

16   Q.   Sir, please look at Government's Exhibit's 86-B.

17   A.   Okay.

18   Q.   Do you recognize the person in that photograph?

19   A.   I do.

20   Q.   Who is that person?

21   A.   It's an individual who went by the gang name

22   Greñas.

23   Q.   And does that photograph fairly and accurately

24   reflect how he appeared on the evening of that traffic

25   stop?

1    A.   It does.

2            MR. CAMPBELL:   Your Honor, I move

3    Government's Exhibit 86-B into evidence and request that

4    it be published for the jury.

5            MR. JENKINS:   No objection, Your Honor.

6            THE COURT:   86-B will be received.

7            You may publish.

8    BY MR. CAMPBELL:

9    Q.   In addition to those two gang members, who else

10   was in the car when it was stopped that evening?

11   A.   Obviously, as I've stated, Drowsy, the

12   cooperator, and another individual by the name of

13   Marciano.

14   Q.   What was the age of Marciano, generally?

15   A.   He's a juvenile.

16   Q.   What did you do after conducting the car stop and

17   identifying those individuals?

18   A.   So, when I approached the individuals, they -- as

19   I said, they were seated on the ground, having been

20   removed from the vehicle by the time I got there.

21           Upon Detective Armstrong's receiving permission

22   to search the vehicle, we began to search the vehicle to

23   look for the weapons that we believed were in the

24   vehicle.

25   Q.   And what weapons did you discover during the

1    search of that car?

2        A.   We found a sawed off shotgun and two machetes.

3        Q.   Sir, please look at Government's Exhibit 86-E.

4        A.   Yes, sir.

5        Q.   Do you recognize that photograph?

6        A.   I do.

7        Q.   What is that a photograph of?

8        A.   That is a photograph of the 12-gauge shotgun that

9    we found, or that I -- that we located in the vehicle,

10   as well as one of the machetes.

11       Q.   And when was that photograph taken?

12       A.   During the search.

13       Q.   Does the photograph fairly and accurately reflect

14   how the weapons appeared on that night?

15       A.   It does, indeed.

16            MR. CAMPBELL:  Your Honor, I move

17   Government's Exhibit 86-E into evidence and request that

18   it be published for the jury.

19            THE COURT:  Received.

20   BY MR. CAMPBELL:

21       Q.   Special Agent Hicks, where in the car were those

22   weapons located?

23       A.   They were located in the trunk of the vehicle,

24   hidden up under the lining of the trunk, as far forward

25   as you can get in the trunk, up against the back side of

1    the rear passenger seat.

2        Q.   Sir, please look at Government's Exhibit 86-D.

3        A.   Yes, sir.

4        Q.   Do you recognize the items in that photograph?

5        A.   I do.

6        Q.   What's in that photograph?

7        A.   That photograph depicts the location where I and

8    Detective Young found the shotgun and --

9        Q.   Does that fairly --

10       A.   -- the shotgun and the machete.

11       Q.   And does that photograph fairly and accurately

12   reflect the location of those weapons the night you

13   received them?

14       A.   It does.

15            MR. CAMPBELL:  Your Honor, I move

16   Government's Exhibit 86-D into evidence and request that

17   it be published for the jury.

18            MR. JENKINS:  No objection, Your Honor.

19            THE COURT:  Received.

20   BY MR. CAMPBELL:

21       Q.   Sir, please look at Government's Exhibit 86-F.

22       A.   Yes, sir.

23       Q.   Do you recognize the item in that photograph?

24       A.   I do.  That is the underside of the shotgun,

25   located that same night.

1    Q.   And what does it show on that picture?

2    A.   It shows a serial number as well as another model

3    number.

4    Q.   Does that photograph fairly and accurately

5    reflect that numerical identifier as it appeared that

6    night?

7    A.   It does.

8             MR. CAMPBELL:  Your Honor, I move

9    Government's Exhibit 86-F into evidence and request that

10   it be published for the jury.

11            MR. JENKINS:  No objection, Your Honor.

12            THE COURT:  Received.

13   BY MR. CAMPBELL:

14   Q.   Special Agent Hicks, with the assistance of the

15   court security officer, Mr. Toliver, please look at

16   Government's Exhibit 32.

17   A.   Yes.

18   Q.   Sir, do you recognize that weapon?

19   A.   I do.

20   Q.   What is it?

21   A.   That is the same weapon located the night in

22   question, as well as the -- in the photographs that have

23   been displayed.

24   Q.   How do you know that's the same shotgun that you

25   seized on that night?

1     A.   The serial number found on the bottom of the

2   weapon matches that in the photo that we took that

3   evening.

4         Additionally, I recognize the condition in which

5   I found the weapon in.

6     Q.   You said --

7     A.   There are several different engravings on the

8   side that are familiar to me as well.

9     Q.   And, you said, sir, that it's in substantially

10  the same condition as you seized it that evening?

11    A.   It is.

12         MR. CAMPBELL:  Your Honor, I move

13  Government's Exhibit 32 into evidence and request that

14  it be presented before the jury.

15         THE COURT:  We will admit it.  It won't go

16  back, but they can see it.  Let the jury -- publish, let

17  them see it.

18         You can let them see it, Mr. Toliver.

19         (Exhibit published to jury.)

20  BY MR. CAMPBELL:

21    Q.   Special Agent Hicks, please look at what has been

22  marked as Government's Exhibit 30.

23    A.   Okay.

24    Q.   Sir, do you recognize that weapon?

25    A.   I do.

1    Q.   And, how do you know that's the same weapon that
2    you seized from this car that night?
3    A.   Because it has some of the same exact coloring,
4    same rust pattern on the blade, as well as I recall some
5    of the, for lack of a better term, dings into the blade,
6    some of the damage to the blade.
7    Q.   And what is that weapon?
8    A.   That is the machete that was depicted in the
9    photograph earlier with the shotgun.
10   Q.   And, is it in the same or substantially the same
11   condition as when you seized it?
12   A.   Yes, sir, it is.
13            MR. CAMPBELL:  Your Honor, I move
14   Government's Exhibit 30 into evidence, and request that
15   it be presented before the jury.
16            THE COURT:  Received.  But again, it won't
17   go back.  They can just see it now.
18            MR. CAMPBELL:  Yes, Your Honor.
19            (Exhibit published to jury.)
20   BY MR. CAMPBELL:
21   Q.   Sir, please look at what has been marked as
22   Government's Exhibit 31.
23   A.   Yes, sir.
24   Q.   What is that?
25   A.   That is the other machete that was located in the

1   vehicle that evening.  It's a machete from Harbour

2   Freight.

3      Q.   How do you know it's the same machete that you

4   seized that evening?

5      A.   Again, because I seized it, I recall its nature

6   and what it appears like.  I also have one at home,

7   so --

8               MR. CAMPBELL:  Your Honor --

9               THE WITNESS:  -- it's very similar.

10              MR. CAMPBELL:  Your Honor, I move

11  Government's Exhibit 31 into evidence and request that

12  it be presented before the jury.

13              MR. JENKINS:  No objection, Your Honor.

14              THE COURT:  Exhibit 31 will be received and

15  presented, but not going back for deliberations.

16              (Exhibit published to jury.)

17  BY MR. CAMPBELL:

18     Q.   Special Agent Hicks, please look at Government's

19  Exhibit 34.

20     A.   Yes, sir.

21     Q.   You recognize those items?

22     A.   I do.

23     Q.   What are they?

24     A.   These are the glove in which -- or this is the

25  glove and these are the three 40-caliber rounds that we

1   located and that I seized in the trunk of the vehicle

2   that night.

3       Q.   How do you know that they're the same bullets and

4   the glove you seized that evening?

5       A.   Well, I bagged it, and we put it into evidence --

6   I put it into evidence shortly thereafter.  I also

7   recognize the glove from that evening.

8            The rounds appear to be the same.  There's no

9   serial number, per se, but they appear to be the same

10  rounds.

11      Q.   What did you mark on that bag?

12      A.   In addition to the date and case file number,

13  evidence number, I wrote, "Seized by" and then my name,

14  locate -- where it was located in the -- in the trunk of

15  the vehicle, and then provided a description:  "Three

16  40-caliber rounds, along with a black and silver glove."

17           MR. CAMPBELL:  Your Honor, I move

18  Government's Exhibit 34 into evidence and ask that it be

19  presented to the jury.

20           MR. JENKINS:  No objection, Your Honor.

21           THE COURT:  Received.

22           (Exhibit published to jury.)

23  BY MR. CAMPBELL:

24      Q.   Sir, in addition to a search of the trunk, where

25  else did you search in that car?

1    A.    The entire vehicles were -- vehicle was searched,

2    to include the personnel space, front and back seat

3    areas.

4    Q.    And what was discovered in that compartment, the

5    passenger compartment?

6    A.    In addition to, again, what we've already

7    discussed in the trunk, we discovered a -- two 12-gauge

8    shotgun shells, as well as a notebook with MS-13

9    graffiti, names of members of the PVLS clique, and

10   whether they had paid their dues or not, things of that

11   nature.

12   Q.    Sir --

13   A.    So forth.

14   Q.    -- please look at Government's Exhibit 33.

15   A.    Yes, sir.

16   Q.    Do you recognize those items?

17   A.    I do.

18   Q.    What are they?

19   A.    These are the two shotgun shells that were

20   located in the front of the vehicle.

21   Q.    Sir, how do you know those are the same shotguns

22   shells that you seized that night?

23   A.    Because, again, I recognized my handwriting on

24   the bag, and they look materially the same as when we

25   located them that evening.

1          MR. CAMPBELL:  Your Honor, I move

2   Government's Exhibit 33 into evidence and ask that it be

3   presented before the jury.

4          MR. JENKINS:  No objection, Your Honor.

5          THE COURT:  33 will be received and

6   presented to the jury.  It will not go back.

7              (Exhibit published to jury.)

8   BY MR. CAMPBELL:

9      Q.  Please look at what has been marked as

10  Government's Exhibit 35.

11     A.  May I remove it?

12     Q.  Yes, you may.

13     A.  Yes, sir.

14     Q.  And what is that?

15     A.  This is the notebook that we located in the back

16  floor board of the vehicle.

17     Q.  And how do you know it's the same notebook that

18  you seized that evening?

19     A.  In reviewing it, I recognized all the different

20  things that were in here, to include the list of the

21  members of PVLS clique and whether they had paid their

22  dues, and how much they had paid; in addition to that,

23  numerous pages of graffiti -- known, very, very common

24  graffiti for the MS-13 gang.

25          MR. CAMPBELL:  Your Honor, I move

Government's Exhibit 35 into evidence.

And with the assistance of the court
security officer -- and Special Agent Hicks, if you can
flag the page that you just looked at with the
membership list, I ask that the court security officer
present that to the jury.

THE COURT:  Received without objection.

(Exhibit published to jury.)

MR. ZIMMERMAN:  I'm sorry, Your Honor.  What
page is being shown to the jury?

THE COURT:  The page he tabbed.  I don't
have the page number in front of me.  I don't know.

MR. CAMPBELL:  Your Honor, we will ask the
witness to identify the page when Mr. Toliver has
returned it.

THE COURT:  All right.

Let defense counsel see the page, please.

MR. CAMPBELL:  Your Honor, for the record,
there's another copy of this that's been marked with
page numbers.  The original evidence has not been
marked, for obvious reasons.

THE COURT:  Okay.  If, by chance, you have
the exhibit number of the one that you think is marked,
that might help us, if you know it.

MR. CAMPBELL:  Your Honor, it's the same

1   number as this exhibit is marked; it's just a Redwell

2   that I believe was attached to the exhibit.

3            THE COURT:  Oh, I see.

4            Thank you very much.

5            MR. CAMPBELL:  Your Honor, may we at this

6   time bring up a photocopy of that document and publish

7   it to the jury?  Directly identifying page number 56.

8            MR. SALVATO:  Is 56 what we're looking at

9   now, Mr. Campbell?

10            MR. CAMPBELL:  Yes.

11            THE COURT:  Yes, you may.  Go ahead.

12            It looks like it's sideways.

13            There you go.

14            It's illegible to me.

15            I have a piece of paper here that -- let

16   counsel see it's the same one, I guess, but at least it

17   appears to be legible.

18            MR. CAMPBELL:  Counsel just advised, by

19   looking at the actual document, they're content with

20   that view.

21            THE COURT:  I thought you were trying to

22   show it to the jury.

23            MR. CAMPBELL:  They've already seen it, Your

24   Honor.

25            THE COURT:  Oh, okay.  Thank you.

1            Go ahead.

2            MR. CAMPBELL:  Your Honor, finally, earlier

3   Special Agent Hicks testified about the recordings that

4   were made and that he reviewed -- this is Government's

5   Exhibits 1-A, 3-A and 5-A -- and testified that he

6   confirmed that, by the preamble, those were the

7   recordings where he was present and equipped the

8   cooperating witness, Drowsy.

9            We would move, 1-A, 3-A and 5-A into

10  evidence at this time.

11           THE COURT:  Received without objection.

12           MR. CAMPBELL:  Your Honor, we have no

13  further questions of this witness.

14           THE COURT:  All right.

15           MR. JENKINS:  May counsel proceed, Your

16  Honor?

17           THE COURT:  Yes, please.

18                   CROSS-EXAMINATION

19  BY MR. JENKINS:

20    Q.   Good evening -- good afternoon, Special Agent

21  Hicks.

22        How long have you been an FBI agent?

23    A.   Approximately 14 years now.

24    Q.   Fourteen years.

25        And that 14 years, I believe you testified that

1  you've received a fair amount of training, correct?

2      A.   Yes, sir.

3      Q.   Training on law enforcement techniques?

4      A.   Yes, sir.

5      Q.   Training about gangs?

6      A.   Yes, sir.

7      Q.   And this is not the first time you've testified

8  in court, is it?

9      A.   No, sir.

10     Q.   You've also received training on how to testify

11 in court, correct?

12     A.   From the FBI Academy, yes, sir.

13     Q.   And at the academy they taught you that when

14 you're testifying, that you should only relay on the

15 facts, correct?

16     A.   Always.

17     Q.   Just what you know, correct?

18     A.   Yes, sir.

19     Q.   And not to speculate, correct?

20     A.   Sure.

21     Q.   And how many times have you testified?

22     A.   Anywhere, five to ten.  I couldn't put an exact

23 number on it.

24     Q.   About five to ten times?

25     A.   In trials; numerous other times in pretrial

1    motions, things of that nature.

2        Q.   Well, give the jury a sense of how many -- the

3    total times, approximately, that you've testified in

4    court.

5        A.   Fifteen times.

6        Q.   How many of those were MS-13 related matters?

7        A.   I believe just one before this.

8        Q.   One before this?

9        A.   I believe so.

10       Q.   And, have you had the occasion to arrest members

11   of MS-13 before?

12       A.   In various capacities.  I have been one of the

13   members of the Washington Field Office, as well as the

14   Omaha Field Office, SWAT team for probably ten years.

15   So, I've arrested MS-13 members in various different

16   places from other different -- or from different cases

17   as well.

18       Q.   In fact, you were even a member of the gang task

19   force, correct?

20       A.   Not directly.  I was part of the squad that

21   participated with the gang task force, but I, myself,

22   was not directly assigned to the gang task force.

23       Q.   How long did you participate with that squad?

24       A.   From approximately January of 2010 through

25   September of 2014.

1    Q.   So, for about four years?

2    A.   Almost five.

3    Q.   Almost five years.

4         And, during that time, is it fair to say that you

5    gained a fair amount of knowledge about MS-13?

6    A.   To an extent, yes, sir.

7    Q.   And about gangs in general, correct?

8    A.   Yes, sir.  I wouldn't consider myself an expert

9    by any stretch, but knowledgeable.  Yes, sir.

10   Q.   Knowledgeable about their manner and means, ways

11   of committing crimes?

12   A.   In a general sense.  Each clique seems to do it a

13   little differently, at times, but in a general sense,

14   yes, sir.

15   Q.   And when you first came in contact with this

16   individual that you described as Drowsy, shown in

17   Government's Exhibit 86-A --

18        MR. JENKINS:  If I could have that put up.

19   BY MR. JENKINS:

20   Q.   This is Drowsy, correct?

21   A.   Yes, sir.

22   Q.   And this is the individual who you understood

23   contacted law enforcement about a tip concerning a

24   murder plot, correct?

25   A.   Yes, sir.

1    Q.   Okay.

2              MR. JENKINS:  You can take it down now.

3    BY MR. JENKINS:

4    Q.   Now, from your experience as an FBI agent, you

5    know that when you are dealing with cooperating gang

6    members, that you have to take certain precautions,

7    correct?

8    A.   Specifically, what?

9    Q.   Well, when an individual who is a self-identified

10   gang member comes to law enforcement and wants to

11   provide information, you know that it's a good idea,

12   from an investigative standpoint, to take steps to

13   corroborate the information that that individual would

14   be providing, correct?

15   A.   Certainly.

16   Q.   And, the reason for that is that you know through

17   your experience that these aren't often the most

18   trustworthy individuals, correct?

19   A.   At times, certainly.

20   Q.   I mean, these are the types of individuals, I

21   mean, out committing crimes in our communities, correct?

22   A.   They're seated at the table for a reason.

23   Q.   Yeah.

24        These are the type of individuals -- speaking

25   about individuals like Drowsy, right?

1          Because Drowsy is not in this courtroom right
2     now, correct?
3      A.   Right.
4      Q.   So we're talking about Drowsy, right?
5      A.   Sure.
6      Q.   Okay.
7      A.   Sure.
8      Q.   Now, and Drowsy is the type of individual that
9     you have to take precautions with, because you know
10    through your experience that he's not the type of person
11    you would consider trustworthy, correct?
12     A.   Sir, I work for the FBI.  No one is trustworthy.
13     Q.   But particularly when you're dealing with people
14    like Drowsy -- because I think you testified on direct
15    that you made efforts to corroborate what he was saying,
16    correct?
17     A.   Always.  Do that with every person who gives us
18    information.
19     Q.   You want to make sure he's not spinning tales,
20    correct?
21     A.   Certainly.
22     Q.   So you take steps to verify what he is saying,
23    correct?
24     A.   Yes, sir.
25     Q.   And that's one of the reasons why you wanted to

1    make these recordings, correct?

2        A.   One of the reasons, yes, sir.

3        Q.   You weren't prepared just to take Drowsy's word,

4    correct?

5        A.   No.

6        Q.   So -- and when you made these recordings -- the

7    first recording was made on September the 30th, correct?

8        A.   Yes, sir.

9        Q.   And that was a meeting -- well, you understood it

10   to be a meeting between Drowsy and some other

11   individuals, correct?

12       A.   Right; other gang members, yes, sir.

13       Q.   Well, at that point in time did you know they

14   were gang members that he was meeting with?

15       A.   Based on the names that he provided, as well --

16   of the people he believed were going to be -- people who

17   were going to be there, yes, we --

18       Q.   So, is it fair to say that on September 30th,

19   when you gave him this recording device, you were

20   relying exclusively on what Drowsy told you about the

21   identity of these individuals?  Correct?

22       A.   The identity of the people at the meeting?

23       Q.   Yes.

24       A.   I wouldn't say exclusively, simply because the

25   names he provided were known to law enforcement.  So,

1    that was a -- that was a semblance of corroboration

2    right there.

3         In addition to that, law enforcement approached

4    the intended victim of this murder, and he indicated he

5    was well aware --

6    Q.   I don't --

7    A.   -- of the green light.

8    Q.   -- want you to tell us what he said, because that

9    would be impermissible; but I think I understand your

10   answer.

11        You had a source, other than just Drowsy, about

12   the identity of these individuals who were going to be

13   at the meeting, correct?

14   A.   Yes, sir.

15   Q.   So you were able to confirm that these other

16   participants in this meeting, in fact, were gang

17   members, correct?

18   A.   Yes, sir.

19   Q.   Or at least you believed that on September

20   the 30th, correct?

21   A.   Yes, sir.

22   Q.   And, you were not in the room during this

23   meeting, correct?

24   A.   Correct.

25   Q.   And, no one else from law enforcement was in the

R. Hicks - Cross                                                      197

1    room during this meeting, correct?

2        A.   Correct.

3        Q.   Before that time, before September 30th, had you

4    ever heard the voices of any of the participants in this

5    meeting, other than Drowsy?  You, yourself?

6        A.   I had not, no.

7        Q.   So, is it fair to say that when you listened to

8    the recordings on September the 30th, you, yourself,

9    just based on your own personal knowledge, could not

10   identify who those participants were?

11       A.   That's correct.

12       Q.   And, by the way, do you speak Spanish?

13       A.   I do not.

14       Q.   And, this meeting was among a group of

15   individuals who were speaking in Spanish, correct?

16       A.   Yes, sir.

17       Q.   A language that is unknown to you, correct?

18       A.   Correct.

19       Q.   So, after you met with Drowsy on September

20   the 30th, correct, it was Drowsy who identified those

21   voices for you, correct?

22       A.   Yes, sir.

23       Q.   And, if Drowsy mistakenly identified any of those

24   voices, you would have no way to contradict that,

25   correct?

1    A.   Unless he made such a mistake that it was obvious

2    it was two different voices, I would say that's correct.

3    Q.   Other than that, you would have to just rely on

4    what Drowsy is saying, correct?

5    A.   At that moment, yes.

6    Q.   And, you would --

7    A.   For me, personally.  I can't speak to what other

8    law enforcement officers did later, but for me

9    personally that day, yes, that's correct.

10    Q.   Well, Agent, for the rest of your testimony here

11    today, I want you to rely on that experience that you

12    told us that you received training at the FBI Academy.

13    Remember you told the jury that you were trained to just

14    speak to what you know, correct?

15    A.   Yes, sir.

16    Q.   So I'm not asking about what any other agent may

17    have known, correct?

18         You understand that?

19    A.   I understand that.

20    Q.   You understand I'm only asking you about what you

21    know, correct?

22    A.   Always.

23    Q.   All right.

24         So, on September 30th, when you listened to these

25    recordings, you were relying on what Drowsy told you

1   about who was speaking at the meeting, correct?

2       A.   Yes, sir.

3       Q.   And, I think you've already said that if Drowsy

4   mistakenly identified any of the voices, you would not

5   be in a position to challenge that, correct?

6       A.   I would not, no.

7       Q.   And if Drowsy purposely misidentified any of the

8   voices, again, you would not be in a position, yourself,

9   to challenge it, correct?

10      A.   Not that night, no, sir.

11      Q.   And if Drowsy told you what the other speakers

12  were saying, again, since you don't know Spanish, you

13  couldn't be able to confirm or deny what he was saying,

14  correct?

15      A.   Me, myself?  No, sir.

16      Q.   You would just be relying on what Drowsy told

17  you, correct?

18      A.   No, sir -- well, that particular night?  Yes,

19  sir.

20      Q.   September 30th.

21      A.   September 30th, yes, sir.

22      Q.   Now, at -- on September 30th, at this point in

23  time, did you know Drowsy, the individual you identified

24  in Government's Exhibit 86-A, was a convicted felon?

25      A.   Yes, sir.

1     Q.   Did you know he was a professed gang member?

2     A.   Yes, sir.

3     Q.   Did you know how many times he had been convicted

4  of felonies?

5     A.   At the time I believe so, yes, sir.

6     Q.   Now, turning your attention to October 1st, that

7  recording, the one that was done earlier in that day, do

8  you remember that recording?

9     A.   I do.

10    Q.   Now, was that a phone conversation or was that a

11  physical meeting?

12    A.   Phone conversation.

13    Q.   That was a phone conversation.

14    A.   Uh-huh.

15    Q.   Were you listening in on that phone conversation?

16    A.   I was.

17    Q.   And, again, was that phone conversation in

18  Spanish?

19    A.   It was.

20    Q.   Was Drowsy a participant in that phone

21  conversation?

22    A.   He was.

23    Q.   Were there other voices you heard on that phone

24  conversation?

25    A.   Multiple.

1    Q.   Had you heard any of those other voices before

2    October 1st?

3    A.   I had not, no, sir.

4    Q.   Is it fair to say that when you were listening to

5    those -- that phone conversation on October 1st, you had

6    no independent way, yourself, to identify who the

7    participants were?

8    A.   Myself?  No.

9    Q.   At that point in time, is it not true that you

10   were relying -- on October 1st -- on what Drowsy told

11   you as to who the participants were?

12   A.   Not completely, in that -- and my -- my answer to

13   you a minute ago with respect to independently verifying

14   the voices, I couldn't do that.  However, I knew the

15   phone number of the individual who he called on that --

16   Q.   Well --

17   A.   -- call.

18   Q.   -- isn't it more accurate to say that you knew

19   the phone call that was known to be used by this other

20   individual?  Correct?

21   A.   While he was in jail, yes.

22   Q.   Because, you didn't actually -- at that point in

23   time, had you researched that phone number to describe

24   who the -- who it was assigned to, what subscriber?

25   A.   No, not from the telephone company, no.

1    Q.   Right.

2         You --

3    A.   Generally, they're in a fake name anyway.

4    Q.   Well, I understand that, right.  But again, I

5    want to remind you about the training that you received

6    at the academy, okay?

7    A.   Well, I'm also sworn to tell the whole truth,

8    sir, which is what I'm doing.

9    Q.   I understand.

10        But I want you to answer my questions relative to

11   what you know.  Okay?

12   A.   I do know they use fake names.

13   Q.   I don't --

14             THE COURT:  We will resume in 15 minutes.

15   We will --

16             MR. JENKINS:  Thank you.

17             THE COURT:  -- take the afternoon recess at

18   this time.

19             Please do not discuss the case, ladies and

20   gentlemen.

21             (Court recessed at 3:32 p.m. and reconvened

22        at 3:47 p.m.)

23             THE COURT:  You can bring our jury out,

24   please.  Thank you.

25             (Jury present.)

1        THE COURT:  You may be seated.

2        All right, Counsel, you may proceed.

3        MR. JENKINS:  Thank you, Your Honor.

4           CROSS-EXAMINATION (Continued)

5    BY MR. JENKINS:

6     Q.   Special Agent Hicks, the -- the recording that

7    was done on October the 1st, earlier in the day, the

8    first recording of that day, I believe you -- when we

9    left off, you were telling the jury that that was a

10   telephone call, correct?

11    A.   Yes, sir.

12    Q.   And, you were listening in as that call was being

13   made, correct?

14    A.   Uh-huh.

15    Q.   And, that call was in Spanish, correct?

16    A.   It was.

17    Q.   And, one of the sources of information you had

18   concerning who was on that call with Drowsy was, in

19   fact, Drowsy, correct?

20    A.   Correct.

21    Q.   And, again, you don't speak Spanish, correct?

22    A.   I do not.

23    Q.   And when you got off -- when that call concluded,

24   did you have conversations with Drowsy about the

25   contents of that conversation?  Correct?

1     A.   I did.

2     Q.   And, Drowsy explained to you what was said,

3    correct?

4     A.   He did.

5     Q.   And it was Drowsy who explained to you at that

6    point in time -- well, let me ask you this:  Was there

7    anyone else in law enforcement with you and Drowsy at

8    that point?

9     A.   During the phone call?  No.  They were standing

10   outside the vehicle, but not in the vehicle.

11    Q.   And, so, at that point in time, it was Drowsy who

12   also told you who was on the phone, correct?

13    A.   Correct.

14    Q.   Now, on --

15    A.   As much as he knew.

16    Q.   -- the third conversation, the third recording,

17   that occurred later on in the evening of October 1st --

18    A.   Right.

19    Q.   -- was this a telephone call or an in-person

20   meeting?

21    A.   In-person meeting.

22    Q.   And, where did this occur?

23    A.   He was picked up by vehicle with three other

24   individuals in it.

25    Q.   That's the one that led to -- or terminated at

1   the time of the traffic stop, correct?

2       A.   Correct.  That's right.

3       Q.   And, that car that -- it was being driven by

4   someone that you came to know by the street name of

5   Demente, correct?

6       A.   I didn't observe him driving, but that was my

7   understanding, yes.

8       Q.   And, in fact, the car was registered to that same

9   individual.  It was his car, correct?  Demente?

10      A.   Yes.

11      Q.   It wasn't Greñas' car, correct?

12      A.   Not to my knowledge, no.

13      Q.   And you -- there was a search done of the

14  vehicle, correct?

15      A.   Yes.

16      Q.   And, there was certain items that were discovered

17  in the vehicle.  I believe you've identified them as

18  Government's Exhibits 30 through 35, correct?

19      A.   I don't recall the exact numbers, but, I believe

20  that's correct.

21      Q.   And, in your training, did you receive any

22  training at the FBI Academy or in any of your experience

23  as a law enforcement officer on the collection of

24  physical evidence?

25      A.   Yes.

1    Q.    And, as part of your training, you learned that

2    it's very important that you take steps to preserve the

3    physical evidence in the manner in which it is

4    discovered, correct?

5    A.    Yes.

6    Q.    And, you take precautions by using gloves and

7    things of that nature, correct?

8    A.    Yes.

9    Q.    And you have nice little plastic bags that you

10   put the evidence in and seal it up real quick, correct?

11   A.    Yes.

12   Q.    Or as soon as practically possible, correct?

13   A.    Right.

14   Q.    And, that's because you've learned that one of

15   the things that law enforcement may want to do with

16   those items is to perform certain examinations on those

17   items, correct?

18   A.    At times, yes, sir.

19   Q.    For example, they may want to examine to see

20   whether or not DNA is found on the item, correct?

21   A.    Certainly.

22   Q.    Because that could be very important to law

23   enforcement, to identify who may have came in contact

24   with a particular item, correct?

25   A.    Yes, sir.

1    Q.   So, if you, in law enforcement, want to know, for

2    example, who may have handled what is depicted in

3    Government's Exhibit 86-D --

4              MR. JENKIKNS:   If I can have that shown for

5    the jury, 86-D.

6    BY MR. JENKINS:

7    Q.   -- this shotgun, here, if you wanted to know --

8    or gain some evidence as to who may have handled that,

9    one of the things you may do is submit it to the FBI

10   Forensic Lab for DNA testing, correct?

11   A.   Possibly.

12   Q.   You also possibly could even have it examined for

13   fingerprints, correct?

14   A.   Sure.

15   Q.   Because sometimes you find fingerprints on guns,

16   correct?

17   A.   You do.

18   Q.   And you also might submit it for hair, fiber

19   analysis, correct?

20   A.   Any number of examinations.

21   Q.   All with the driven goal to try to gain

22   information as to who may have been in physical

23   possession of that shotgun, correct?

24   A.   If that's what you're looking for, yes, sir.

25   Q.   Because, again, we don't want to just rely on

1    Drowsy, correct?

2        A.   Correct.

3        Q.   You want corroboration for what Drowsy has told

4    you, correct?

5        A.   Sure.

6        Q.   Because he's the convicted felon, correct?

7        A.   Right.

8        Q.   He's the admitted gang member, correct?

9        A.   Yes.

10       Q.   Now -- and the questions I asked you about those

11   forensic examinations, that also would apply to the

12   first machete that was discovered, correct?

13       A.   Yes.

14       Q.   And, it would also apply to the second machete

15   that was discovered, also, correct?

16       A.   Certainly.

17       Q.   It would also apply to those shell casings that

18   you found, correct?

19       A.   Yes.

20       Q.   And, even that notebook that you found, you can

21   do examinations on those, also, correct?

22       A.   Certain pieces, certain types of -- of

23   examinations, yes, sir.

24       Q.   And, for the results of those examinations, would

25   it be fair to say that you don't have to worry about

1  whether or not they're untrustworthy?  Would that be

2  fair to say?

3      A.   I don't understand your question.

4      Q.   Let me ask you this:  Fingerprints don't lie,

5  correct?

6      A.   Not to my knowledge, no, sir.

7      Q.   DNA test results don't lie, correct?

8      A.   No, sir.

9      Q.   Hair and fiber analysis, they don't lie, correct?

10     A.   That's not a hundred percent true, but --

11     Q.   Well, in your training, you've learned they are

12  what they are, correct?

13     A.   They are.

14     Q.   Because they don't have felonies, correct?

15     A.   No.

16     Q.   They don't have motives, correct?

17     A.   No motives.

18     Q.   They don't have incentives to lie, correct?

19     A.   Last time I checked, no, sir.

20     Q.   They don't have plea agreements with the United

21  States Attorney Office?

22     A.   No, sir.

23     Q.   And they don't get any benefits by giving any

24  particular results, correct?

25     A.   No, sir.

1    Q.   They are what they are, correct?

2    A.   Yes, sir.

3    Q.   Let me ask you, as it relates to what's depicted

4    in Government's Exhibit 86-D --

5              MR. JENKINS:  If we could have that back up

6    on the screen.

7    BY MR. JENKINS:

8    Q.   Let me focus your attention on the shotgun.  Do

9    you know if any forensic analysis was done on that

10   shotgun?

11   A.   I do not, because I transferred responsibility of

12   the investigation to another individual not long after

13   this evening, because I was involved in another large

14   gang investigation.

15   Q.   One of the things that they taught you at the

16   academy, in terms of testifying, is to answer the

17   question that's asked, right?

18   A.   Answer it as a whole, yes, sir.

19   Q.   And, the question I posed to you is whether or

20   not you know whether this --

21   A.   I have no idea.

22   Q.   The answer is you have no idea, correct?

23        Now, is that also true about this machete that's

24   depicted in Government's Exhibit 86-D?

25   A.   True.  It may or may not have been submitted.  I

1   don't know.

2       Q.   Is that also true about the second machete that

3   was recovered?

4       A.   Yes, sir.

5       Q.   Is that also true about the bullets that you

6   testified in Government's Exhibit 34?

7       A.   Yes, sir.

8       Q.   Is that also true about the notebook that was

9   identified as Government's Exhibit 35?

10      A.   Yes, sir.

11      Q.   Now, you testified with respect to Government's

12  Exhibit 35 --

13              MR. JENKINS:  Can we get that notebook?

14  BY MR. JENKINS:

15      Q.   Do you have the notebook with you, Special Agent?

16      A.   I have nothing, sir.

17      Q.   Let's see if we can go through that page that you

18  identified, that I believe you testified shows dues that

19  are being paid and owed.

20          While you're doing that, Special Agent, let me

21  ask you this:  You testified that you don't speak

22  Spanish, correct?

23      A.   I do not.

24      Q.   Do you read it?

25      A.   No, sir; other than just very common words that

many people know, no, sir.

Q.    And what's written in that book that you identified as a tally of dues owed and to be paid, that's all written in Spanish, correct?

A.    Certain pieces, yes, sir.

Q.    And, there's nothing on there in English that says that this is a membership dues list, correct?

A.    No, sir.  But the Spanish that I do know, certainly appears to be dues, month to month, name by name of the --

Q.    You see month to month and you see name by name.

Do you see the Spanish equivalent for the word "dues"?

A.    No, sir.

Q.    Do you see the Spanish word for the equivalent, "members"?

A.    Not to my knowledge.

Q.    Do you see the Spanish equivalent for the word "homeboys"?

A.    No, sir.

Q.    You believe that this is a listing of gang members, based in part on what Drowsy told you, correct?

A.    In part.

Q.    You believe that this is a list of dues, based on what Drowsy told you, correct?

1    A.   I don't believe I ever spoke to him about this.

2    Q.   About it being --

3    A.   About this notebook.

4    Q.   About that notebook?

5    A.   I don't believe that I did.

6    Q.   Your own personal knowledge, Agent, you don't

7  know whether or not that's a listing of gang members,

8  based on your own personal knowledge.

9    A.   Yes, sir, actually I do.

10   Q.   How do you know that?

11   A.   Because during this investigation and prior to

12 this investigation, law enforcement keeps databases of

13 reports from various different agencies --

14        MR. CONTE:  We would object, Your Honor.  I

15 think it's not a --

16        THE COURT:  Well, personal knowledge and

17 what you read are two different things.  Objection

18 sustained.

19 BY MR. JENKINS:

20   Q.   Your personal knowledge.

21   A.   Could I have you rephrase the question, in

22 that --

23   Q.   Let me ask you this --

24   A.   Do I know them personally?

25        No, I don't know these individuals personally.

1    Is that what you're driving at?

2        Q.   Agent, the -- the machete that's depicted in

3    Government's Exhibit 86-D, I think you identified that

4    as one that you recognize because you describe it as

5    having rust on the blade, correct?

6        A.   Along with other items, yes, sir.

7        Q.   And, also the fact that it has certain dings in

8    it, correct?

9        A.   Yes, sir.

10       Q.   It certainly wasn't, in your opinion, sharpened,

11   correct?

12       A.   I don't know.  I didn't feel the blade.

13       Q.   You didn't feel the blade.

14            But when you examined it up here on the witness

15   stand, was it in the same condition that it was on the

16   night in which you discovered it?

17       A.   It appeared to be.

18       Q.   As you examined it on the witness stand when you

19   were being questioned by Assistant U.S. Attorney

20   Campbell, did it appear to be sharpened to you at that

21   time?

22       A.   It appears to be sharp enough.  I can't really

23   qualify -- quantify.

24       Q.   Agent Hicks, the items were found not in any one

25   individual's physical possession, correct?

1    A.   The weapons weren't.  They were in the trunk.

2  The notebook was in one particular spot within the

3  vehicle nearest to one of the individuals in the

4  vehicle.  But, as far as the weapons, no, sir.

5    Q.   That notebook that you mentioned, the handwriting

6  contained in that notebook, you, yourself, you don't

7  know who wrote in that notebook, correct?

8    A.   I didn't watch them do it, no.

9    Q.   You didn't have any handwriting exams done,

10 either, did you?

11   A.   I can't answer that.

12   Q.   The item that was -- the items that were found in

13 the trunk, they weren't -- as soon as you opened up the

14 trunk, is it fair to say you could not see those items?

15   A.   Initially, that's correct.

16   Q.   In fact, the items were concealed, correct?

17   A.   Correct.

18   Q.   They were underneath some clothing, cloths?

19        What were they underneath?

20   A.   Are you talking about the weapons?

21   Q.   Yes.

22   A.   They were under the lining of the trunk,

23 concealed up under the lining, all the way into the

24 trunk, up against the back seat, basically, under the

25 rear deck of the vehicle.

1              MR. JENKINS:  Court's indulgence.

2              (Pause.)

3              Your Honor, I believe that's all the

4    questions I have.

5              THE COURT:  All right.

6                    CROSS-EXAMINATION

7    BY MR. SALVATO:

8       Q.   Good afternoon, Special Agent.  My name is Frank

9    Salvato and I represent Christian Lemus Cerna.

10      A.   How you doing, sir?

11      Q.   I'm doing okay.

12             Sir, you made a comment during Rob- --

13   Mr. Jenkins' cross-examination that I want to explore

14   for a second.  You said in an offhand manner that

15   they're sitting at the table for a reason.  Do you

16   recall saying that?

17      A.   I do.

18      Q.   Okay.  You understand that the indictment is not

19   evidence in this case.  You understand that, right?

20      A.   The indictment?  No, sir, that's right.

21      Q.   All right.  And, you understand that there have

22   been cases, even FBI investigations, where people have

23   sat at the table for no good reason.  In fact, they've

24   been found guilty and later on exonerated, true?

25      A.   I'm aware of things like that, yes, sir.

1    Q.   All right.  So, just the mere fact of where a

2    person is sitting or they're sitting at a -- where

3    they're sitting in the courtroom, that's -- that's not a

4    reason, right?

5         It's not a reason that they're guilty; is that

6    what you're trying to say?

7    A.   No, sir.  If I made that statement as a general

8    sense, that everyone sits -- who sits at the table is

9    guilty, then that may be something to take umbrage with.

10   But my specific thing was knowledge that I specifically

11   have about some of these individuals.

12   Q.   You said they're sitting at the table for a

13   reason.  But sometimes there's no good reason.  And, in

14   fact, sometimes people are not guilty or later on are

15   even exonerated, true?

16   A.   I have heard of those instances yes, sir.

17   Q.   And in fact, FBI cases, correct?

18   A.   I would assume so.

19   Q.   I want to back up to the beginning of a couple of

20   things you said, just about the procedure of using an

21   informant.

22   A.   I'm sorry, using what?

23   Q.   An informant.

24   A.   Understood.

25   Q.   All right.  When you radio somebody up or put a

1   wire on them to record a meeting or an event, I think

2   you mentioned in your direct that you give them certain

3   instructions, correct?

4       A.   Yes, sir.

5       Q.   All right.  And, what are those instructions that

6   you give your source, your informant?

7       A.   They vary with every instance.  In general, the

8   ones that are sort of utilized across the board are

9   safety instructions.  We typically give them some code

10  word that, if we are utilizing a transmitter with that

11  individual, that we can hear the transmitter, whatever

12  the code word is, means:  Danger, please come help me.

13          And that's different for each person.

14      Q.   Do you give your source or your informant

15  instructions about using illegal narcotics?

16          In other words, are your sources or the person

17  that's wearing a wire for the FBI allowed to use

18  narcotics?

19      A.   No.

20      Q.   Is that part of the instructions?

21      A.   Again, it -- not across the board.  If we have a

22  reason to believe that they are -- there's going to be a

23  drug transaction, then, certainly, that may be one of

24  the instructions.

25      Q.   Okay.  And you're familiar with that, in your

1    training?

2        A.   I've done it many times.

3        Q.   So, you've given somebody an instruction that,

4    "Hey, don't use narcotics during this encounter,"

5    correct?

6        A.   I have.

7        Q.   All right.  And the reason being that the use of

8    the narcotic may make your informant unreliable, true?

9        A.   Primarily because it's illegal.

10       Q.   Right.

11            So, your informant shouldn't be doing illegal

12   things like using narcotics, true?

13       A.   True.

14       Q.   And that may also impair their ability to recall

15   the events, true?

16       A.   Possibly, yes.  It certainly depends on which

17   narcotic you're talking about.

18       Q.   All right.  Well, you don't want your informant

19   at a meeting or something like that, sitting around

20   smoking a marijuana joint, true?

21       A.   I would prefer him not to, yes.

22       Q.   And, in fact, that's against the -- against the

23   rules, true?

24       A.   It is.

25       Q.   For good reason, yes?

1    A.   True.

2    Q.   The rule exists for a good reason?

3    A.   True.

4         MR. SALVATO:  Mr. Toliver, can I grab that

5    notebook, Exhibit 35, please?

6         May I retrieve the exhibit so I can ask

7    questions from the exhibit, Your Honor?

8         THE COURT:  Here, take my copy of it.

9         MS. MARTINEZ:  Your Honor, I have a copy.

10   Your Honor can keep your own copy.

11        THE COURT:  Okay.

12        MR. SALVATO:  It doesn't matter.

13   BY MR. SALVATO:

14   Q.   Sir, you indicated on what, page 56, this is

15   where what you allege were some names and some numbers

16   with dues; is that right?

17   A.   I don't have page numbers in -- in the original

18   copy, but, I -- I mean, as a matter of general sense,

19   yes.

20   Q.   And, there is also a number of other items in

21   that notebook, correct?

22   A.   Yes, there's --

23   Q.   Looking at the beginning pages, there's shapes,

24   containers, vocabulary words, true?  Just looking

25   through the first ten pages or so.

 1     A.   Yes, sir.

 2     Q.   Okay.  There's words about vocabulary for

 3   different seasons, correct?

 4     A.   Correct.

 5     Q.   Information about prepositions, correct?

 6     A.   Appears to be.

 7     Q.   Pictures of the different seasons:  winter,

 8   summer, fall, spring, true?

 9     A.   I believe so, yes, sir.

10     Q.   There's also other information about plants and

11   other very innocuous information, true?

12     A.   Yes, sir.  It appears to be utilized for school

13   work, in addition.

14     Q.   And, I think you responded to Mr. Jenkins'

15   questions that you don't know who wrote that chart on

16   that page, 56, that the jury has seen.  I hope I have

17   the page number right, but I believe it was 56.

18     A.   I don't -- I mean, I wasn't there when it was

19   written, so can I swear to it?  No, sir.

20     Q.   And, you can't tell the jury that the same person

21   who may have written the notations about the schoolwork

22   is the same person that may have written the notations

23   about page 56, true?

24     A.   I have no testimony one way or the other on that.

25     Q.   Okay.  And you haven't, to your knowledge, sent

1    that notebook for any type of examination or comparison

2    or anything along those lines, true?

3        A.    I did not.  I can't testify to what anyone else

4    may or may not have done.

5        Q.    Are you aware of any law enforcement officer that

6    may have sent that notebook out for comparison?

7        A.    I have no knowledge of it, no, sir.

8        Q.    And there's some pictures, I think you said, in

9    the back, that are separated from the school information

10   that I think you identified in your direct as common

11   graffiti, true?

12       A.    For MS-13, yes, sir.

13       Q.    And, you can't tell the ladies and gentlemen of

14   this jury whether that, again, the same person who may

15   have drawn those -- that common graffiti, is the same

16   person that did the chart or even the same person that

17   did the schoolwork, true?

18       A.    No, sir.

19       Q.    And there's no name attached to the common

20   graffiti, right?

21            There's no "Picture by" -- X, Y, Z, or anything

22   like that?

23       A.    I don't believe the artist signed his work, no,

24   sir.

25       Q.    All right.

1          And you indicated the notebook was found in the

2    body of the car, not in the trunk, true?

3      A.   Correct.

4      Q.   Front seat or back seat?

5      A.   Back seat.

6      Q.   And, when you stopped the vehicle, my client,

7    Mr. Cerna, was not in the vehicle, correct?

8      A.   No, sir.

9      Q.   Okay.

10          MR. SALVATO:  Thank you, Your Honor.  That's

11   all I have.

12          (Pause.)

13          THE COURT:  Redirect?

14          MR. CAMPBELL:  Briefly, Your Honor.

15                REDIRECT EXAMINATION

16   BY MR. CAMPBELL:

17     Q.   Special Agent Hicks, has Drowsy ever operated as

18   a confidential informant or a CHS, a confidential human

19   source, by the FBI?

20     A.   No, sir.

21          MR. CONTE:  Objection, outside the scope.

22          THE COURT:  Overruled.

23          THE WITNESS:  No, sir, he was not.

24   BY MR. CAMPBELL:

25     Q.   Did he ever receive any benefits from the FBI or

1    law enforcement?

2        A.   To my knowledge, no, sir.

3        Q.   Earlier, one of the defense counsel, I believe it

4    was Mr. Jenkins, focused his questions on suggesting

5    that you relied solely on Drowsy's reporting.  What, if

6    anything, did you do to corroborate his reporting?

7        A.   One of the things we did was we went and

8    approached the intended victim, in order to ensure that

9    he did not go to class that night.  He was scheduled to

10   be at a night class at the high school, along with

11   the -- the lacrosse game that was going on there.  So we

12   wanted to remove him from the situation, have him not

13   show up that night.

14           He indicated to us that he was very well aware --

15                MR. JENKINS:  Objection.

16                THE COURT:  Excuse me.  Excuse me.

17                THE WITNESS:  I'm sorry.

18                THE COURT:  You can't tell us what he said.

19   That would be hearsay.  Objection sustained.

20                THE WITNESS:  Understood.

21   BY MR. CAMPBELL:

22       Q.   What else did you do to corroborate his

23   reporting?

24       A.   In addition to utilizing -- so for all of the

25   names and all of the information that he gave us with

1    respect to the gang and members and things of that

2    nature, we corroborated the names, as well as any phone

3    numbers that were given --

4              MR. JENKINS:  Objection, Your Honor,

5    nonresponsive.  He's talking about what "we" did.  I

6    believe the question was what he did.

7              THE COURT:  Correct.

8              Personal knowledge, please.

9              THE WITNESS:  Understood.  Sorry, sir.

10             Either I searched those names and/or phone

11   numbers in the FBI database, and/or other databases --

12             MR. JENKINS:  Objection, Your Honor.  That

13   calls for hearsay.  He would only know that based on

14   someone telling him.

15             THE COURT:  Exactly, but he --

16             If you recall what names you searched for,

17   if you can tell us that.

18             THE WITNESS:  Yes, sir.  The names that were

19   provided were Demente, along with his real name, Pedro

20   Romero Cruz, AKA Payaso, who was supposedly in prison.

21   I verified through the state prison system that he was,

22   in fact, incarcerated in prison, and the prison that was

23   reported to me.

24             The phone number that was given to us, we

25   verified --

1            MR. JENKINS:  Objection, again, Your Honor.

2            THE WITNESS:  -- I verified that the phone

3    number was, in fact, a working phone number utilized by

4    a particular phone company, by calling the phone company

5    and verifying that.

6    BY MR. CAMPBELL:

7       Q.   What was your role in the investigation after

8    October 1st?

9       A.   Shortly thereafter, because I was involved in

10   another large gang case -- the case appeared that it was

11   going to take off into various directions, the decision

12   was made by myself, as well as my supervisor, that I

13   could not manage both potentially large cases.  So, the

14   case was then assigned shortly thereafter to Special

15   Agent Fernando Uribe.

16      Q.   I believe it was defense counsel who earlier on

17   cross-examination focused on the recovery of the

18   physical evidence, the weapons, the sawed-off shotgun,

19   the two machetes, the shotgun shells, the 40-caliber

20   ammunition that was recovered by you and other law

21   enforcement officers that evening.

22           I think he asked you whether or not that was

23   submitted, if you had specific knowledge that it was

24   submitted to the lab.

25           You just testified that you moved on from this

1    investigation.  As standard procedure, what does the FBI

2    do with physical evidence such as that?

3        A.   Once the evidence is packaged and included into

4    the FBI's --

5              MR. JENKINS:  Objection, Your Honor.  Can we

6    approach, Your Honor?

7              THE COURT:  Well --

8              MR. JENKINS:  I don't want to get into a

9    speaking objection.

10              THE COURT:  Okay.  All right.

11              (Thereupon the following side-bar conference

12    was had:)

13              MR. JENKINS:  Your Honor, I would object.

14    Your Honor, throughout the course of this trial, the

15    Court has admonished all attorneys to direct their

16    questions to focus in on this case.

17              This witness has already testified that

18    after October 1st, he wasn't involved and that he

19    doesn't know what was done with those -- with those

20    items.

21              For the government counsel now to be able to

22    solicit from him about what some general FBI practice

23    is, I find to be irrelevant to this case.

24              MR. CAMPBELL:  Your Honor, Mr. Jenkins on

25    cross-examination focused on his experiences as an

1   agent, and asked him specifically about whether or not,

2   in his experience, these types of weapons were

3   fingerprinted or analyzed for DNA.

4           I should be able to ask him on redirect

5   whether or not, from his experience, these types of

6   weapons were submitted to the FBI Lab.

7           THE COURT:  My recollection is he asked:

8   Were they processed for those things.

9           And he asked -- and he didn't know.

10          So I'm going to sustain the objection.

11          I understand why you want to ask about

12  standard practices, but I want to focus just on what he

13  did in this case, personal knowledge only.

14          Objection sustained.

15          MR. CAMPBELL:  Very well.

16          (Thereupon, the sidebar conference was

17  concluded.)

18          THE COURT:  Ready?

19          You may proceed.

20  BY MR. CAMPBELL:

21     Q.  Agent Hicks, in addition to the recovery of the

22  shotgun and the machete and the shotgun shells from the

23  car, you testified about the recovery of that notebook.

24  With the assistance of the court security officer, can I

25  ask you to look at that notebook one more time?

1    A.   Is the copy sufficient, or is the original

2    necessary?

3    Q.   We will have you look at the original --

4    A.   Okay.

5    Q.   -- please.

6         Please direct your attention to the cover of that

7    notebook.

8    A.   Yes, sir.

9    Q.   Can you read what the name on the cover of that

10   notebook is?

11   A.   "Christian" -- sorry.  The bag's in the way.

12   "Christian Jesus Lemus Cerna."

13             MR. CAMPBELL:  No further questions, Your

14   Honor.

15             THE COURT:  Come back up just for a second.

16   Come back up just for a second.

17             (Thereupon, the following side-bar

18   conference was had:)

19             THE COURT:  I was bothered by this agent's

20   comment that there's a reason that's why they're sitting

21   here.  And I'm intending to say something about it, to

22   say what I said at the beginning of the case, that

23   they're presumed to be innocent, and to say that -- the

24   fact is, I've had MS-13 cases where two defendants were

25   acquitted in a capital case.  So, the fact that they're

1    sitting here means nothing.  I want to say that they are

2    presumed to be innocent.  The fact that they are here

3    does not mean one thing until the government proves them

4    guilty.

5                MR. CAMPBELL:  Your Honor, may I be heard on

6    this briefly?

7                THE COURT:  Yes.

8                MR. CAMPBELL:  I certainly understand Your

9    Honor's point, and I don't objection to the instructions

10   or the Court's commentary.

11               This is a very experienced agent, and he, on

12   redirect, clearly, he explained that the distinction, he

13   wasn't focused on indicting them.  He was focused, that

14   he knew certain of these individuals in the court, and

15   that's why he said they were at the table.

16               THE COURT:  That's fine.  But I'm going to

17   say what I said.  Thank you.

18               (Thereupon, the side-bar conference was

19   concluded.)

20               THE COURT:  Ladies and gentlemen, during the

21   course of this witness's testimony he made an

22   observation about there's a reason why these individuals

23   are here.

24               You've heard me say many times, in the jury

25   selection and the beginning of this trial, each

1    individual is presumed to be innocent.

2              The fact they're here does not mean one

3    thing until the end of the case and you've heard all the

4    evidence.

5              And he doesn't have any ability to tell you

6    why they're here at all.

7              And, yes, there have been individuals who

8    have been tried in this court for MS-13 offenses who

9    have been acquitted in front of me.

10             So the fact that they're here means nothing

11   at all until you hear the evidence.  Thank you.

12             You can step down, sir.

13             THE WITNESS:  Yes, sir.

14             (Thereupon, the witness withdrew from the

15   stand.)

16             THE COURT:  Next witness.

17             MS. MARTINEZ:  Government calls Liliana

18   Portwine.

19             (Witness sworn.)

20             THE WITNESS:  I do.

21             THEREUPON, LILIANA PORTWINE, having been

22   duly sworn, testified as follows:

23                        DIRECT EXAMINATION

24   BY MS. MARTINEZ:

25     Q.   Good afternoon.

1      A.   Good afternoon.

2      Q.   Could you please state your full name and spell

3  your name for the record.

4      A.   Sure.  My name is Liliana Portwine,

5  L-i-l-i-a-n-a, P-o-r-t-w-i-n-e.

6      Q.   Ms. Portwine, where do you work?

7      A.   I work at the FBI.

8      Q.   What do you do at the FBI?

9      A.   I am a contract language monitor.

10      Q.   How long have you been a contract language

11  monitor for the FBI?

12      A.   For six years.

13      Q.   What languages do you speak?

14      A.   I speak Spanish and English.

15      Q.   How long have you been speaking Spanish?

16      A.   For my whole life.

17      Q.   Where were you born?

18      A.   I was born in Mexico.

19      Q.   When did you come to the United States?

20      A.   In 19- -- in 1975.

21      Q.   How old were you when you came to the United

22  States?

23      A.   I was ten years old.

24      Q.   And, how long have you been speaking English?

25      A.   Since I was ten years old.

1    Q.   Where did you work before you came to work for
2    the FBI?
3    A.   I worked at Stafford County Public Schools.
4    Q.   And then, what did you do for Stafford County
5    Public Schools?
6    A.   I was a substitute teacher and I also a
7    translator/interpreter.
8    Q.   In that position, as a teacher and as a
9    translator/interpreter, did you use your Spanish skills?
10   A.   I did.
11   Q.   Can you tell the jury a little bit about that?
12   A.   I would -- I would translate for the
13   administrators and the parents regarding any issues or
14   anything to do with a child's educational plans.
15        I would go to teacher/parent conferences.
16   Sometimes I would -- there would be student testing, so
17   I would do that to assess what their language in English
18   was, what their skill was, what the skill level was.
19   Q.   What countries were the students and the parents
20   whom you translated for originally from?
21             MR. CONTE:  Objection, relevance.
22             THE COURT:  Relevance?
23             MS. MARTINEZ:  It establishes her knowledge
24   of Spanish generally and also Spanish spoken by people
25   from certain countries.

1           THE COURT:  Objection is overruled.
2    BY MS. MARTINEZ:
3       Q.  What countries were the students and parents whom
4    you translated for originally from?
5       A.  Guatemala and El Salvador.
6       Q.  How long did you work in that role?
7       A.  Three to four years.
8       Q.  Did you have -- prior to -- or other than your
9    role in the schools and your job currently with the FBI,
10   have you had other employment where you had opportunity
11   to use your Spanish skills?
12      A.  I did.  I did have other employment that I used
13   Spanish with.
14      Q.  What employment was that?
15      A.  It was a trucking company.  It was actually a
16   company that did a -- they wrote a directory for
17   trucking companies.  And I would have to call Mexican
18   trucking companies and get information, detailed
19   information so that the company would put it in the
20   directory.
21      Q.  And, what country -- I'm sorry.  Did you say what
22   country you were translating for?
23      A.  Mexico.
24      Q.  So, other than the jobs that you've already
25   listed, have you had any other jobs in your lifetime

1   that required you to use your Spanish skills?

2       A.   Yes, I did.

3       Q.   What job is that?

4       A.   There was another -- I used to work for the

5   airlines, Pan American Airlines.  I worked at the LA

6   Airport and I used my Spanish skills there.

7            I also worked for Continental Airlines, at the

8   international desk, and I used my Spanish skills there

9   as well.

10      Q.   Starting with Pan American, what did you do for

11  Pan American Airlines?

12      A.   I worked at the airport, at the terminal, and I

13  would do anything from checking in luggage to going up

14  to the gate and calling boarding gates; any -- any kind

15  of job at the airport.

16      Q.   And why did that require you to use your Spanish

17  skills?

18      A.   Many of our flights -- well some of our flights,

19  they were going to South America and Central America.

20  They wanted the announcements to be made in Spanish to

21  be able to help the customers.

22      Q.   What countries, specifically?

23      A.   Guatemala, El Salvador, Argentina, Peru.

24      Q.   And in your experience working for Pan American

25  Airlines and in talking to customers flying on Pan

1    American Airlines, were there customers who were from

2    those countries you just named?

3         A.   Yes.

4         Q.   Did you speak to them in Spanish?

5         A.   I did.

6         Q.   Were you able to effectively communicate?

7         A.   I did.

8         Q.   And understand them?

9         A.   Yes.

10        Q.   Okay.  You also said you worked for Continental

11   Airlines?

12        A.   I did.

13        Q.   What did you do for Continental Airlines?

14        A.   International reservation desk agent.  And

15   Spanish calls were rerouted as well -- even if they were

16   not international -- to my desk because I spoke Spanish.

17        Q.   What countries were the Spanish speakers you

18   would speak to from?

19        A.   Several countries:  Mexico, Guatemala, El

20   Salvador, Costa Rica, any of the areas that we served.

21        Q.   Were you able to understand these speakers in

22   Spanish regardless of which country they were from?

23        A.   I was able to, yes.

24        Q.   Able to effectively translate for them?

25        A.   Yes, I was.

1    Q.   How long did you work for Continental Airlines?

2    A.   Two years.

3    Q.   How long did you work for Pan American Airlines?

4    A.   Three years.

5    Q.   All right.  Now, going back to your current

6  position, you said that you're a contract language

7  monitor?

8    A.   Correct.

9    Q.   Have you been in that position your entire time

10 at the FBI?

11   A.   Correct.

12   Q.   Okay.  When the FBI hired you as a contract

13 language monitor, did you have to take any sort of

14 qualification in order to become a contract language

15 monitor?

16   A.   Yes.  I had to have a test, written and verbal.

17   Q.   And based on your written and verbal test, did

18 you in fact qualify to be a contract language monitor

19 for the FBI?

20   A.   Yes, I did.

21   Q.   And for what languages?

22   A.   For Spanish.

23   Q.   All right.  So, what do you do at the FBI as a

24 contract language monitor?

25        What are your duties?

1     A.   I get recordings, and from those recordings I do

2   translations.  I get documents, and from those documents

3   I translate the documents.

4          I also do -- go out with agents and do debriefs

5   or interviews.  Any type of communication between two

6   parties, you know, Spanish, English, I am able to do

7   that.

8     Q.   Let's start with -- you said that you translate

9   recordings; is that right?

10    A.   That's correct.

11    Q.   What kind of recordings?

12    A.   Any kind of recordings, wire taps, body wires,

13   any -- any -- any recording.

14    Q.   When you say "wire tap," what do you mean?

15    A.   That's where we -- where we listen on the phone,

16   listen to phone calls as they're coming in or after the

17   fact.

18    Q.   When you work on a wire tap, what does that

19   entail for you on a day-to-day basis?

20    A.   That means that I go there and I sit and I listen

21   and as I listen, I translate.

22    Q.   And how many hours a day do you do that?

23    A.   Eight hours a day.

24    Q.   How many hours -- how many days a week?

25    A.   Five days a week.

1    Q.   How many wire taps have you worked on in your

2    experience at the FBI where the primary language spoken

3    on the wire was Spanish?

4    A.   Many.  Over ten.

5    Q.   And, on a typical wire when you're assigned to a

6    wire tap, how long do you typically work on that wire?

7    A.   The -- most wires last about three months.

8    Q.   And if you're working on a wire tap for three

9    months, are you working 40 hours a week for three

10   months?

11   A.   Yes, that's correct.

12   Q.   Listening to the Spanish language recordings the

13   whole time?

14   A.   Correct.

15   Q.   During your time at the FBI and working on wire

16   taps and translating other recordings, what countries

17   have these speakers been from that you're listening to

18   and translating?

19   A.   They have been from Mexico.  They have been from

20   El Salvador, Guatemala, Cuba, Peru.

21   Q.   And, are you approved within the FBI as a

22   contract language monitor to translate Spanish to

23   English for all of those countries, for speakers from

24   all of those countries?

25   A.   I am, yes.

1    Q.   You also said that you translate in person.  Can
2    you tell us a little bit more about that?
3    A.   Yes.  Agents will call my supervisor and my
4    supervisor will send me out on assignments, and I will
5    either translate with the witness, family members,
6    any -- anyone that needs the -- that needs me to
7    translate.
8    Q.   Do you translate spoken Spanish into spoken
9    English?
10   A.   Yes.
11   Q.   Do you translate spoken English into spoken
12   Spanish?
13   A.   Yes.
14   Q.   What experience, if any, do you have working on
15   investigations that involve members or alleged members
16   of the gang MS-13?
17   A.   I have -- I have done a lot of work with MS-13.
18   Q.   Remind me again, how long have you been with the
19   FBI?
20   A.   Six years.
21   Q.   And how long have you been working on cases
22   involving MS-13?
23   A.   Six years.
24   Q.   What was the -- how long did you -- when -- the
25   first case you worked on that involved MS-13, what was

1    your -- what were your responsibilities?

2        A.   I was to sit and listen on a wire tap.

3        Q.   How long did that wire tap go for?

4        A.   Um, I believe three to four months.

5        Q.   And just to be clear, that wire tap wasn't

6    related to this current case, right?

7        A.   It was not.

8        Q.   And during those three to four months working on

9    that wire type, how many hours a week were you working

10   on it?

11       A.   Forty hours a week.

12       Q.   And what were you doing 40 hours a week?

13       A.   I would sit and listen as the calls came in and I

14   would translate.

15       Q.   When you say "translate," what would you do?

16       A.   I would write a summary of the conversation that

17   was spoken.

18       Q.   What languages would you write your summary in?

19       A.   In English.

20       Q.   In your experience, when -- with translating

21   Spanish, and Spanish from people from different

22   countries, do Spanish speakers from different countries

23   speak different dialects?

24       A.   Yes, they do.

25       Q.   Can you tell the jury just a little bit more

1   about that?

2      A.   So, people from different countries obviously

3   have different ways of speaking.  I would say one word

4   in Mexico that might mean something different in Cuba or

5   in Costa Rica or in Argentina.  So, yeah, we all have a

6   little bit of a different dialect.

7      Q.   And in your experience at the FBI in particular,

8   what percentage of the cases you've been assigned to

9   have involved Spanish speakers from Central America?

10     A.   About 80 percent.

11     Q.   And, more specifically, what percentage involves

12  Spanish speakers from El Salvador?

13     A.   It's very high, also, maybe 80 percent as well.

14     Q.   Now, you said that you have experience with

15  MS-13 cases; is that right?

16     A.   That's correct.

17     Q.   In your experience, do members and associates of

18  MS-13 speak in any particular kind of dialect?

19     A.   Yes, they do.

20     Q.   Could you tell the jury about that?

21     A.   They have their own way of talking.  Sometimes

22  they transpose the letters so that it's not clearly

23  understood.  Sometimes they transpose the sentences.

24  That would be an example of that.

25     Q.   Over the six years that you've been working at

1  the FBI, could you estimate how many hours you've spent

2  listening to recordings of members and associates of

3  MS-13 speaking in the dialect that you described?

4      A.  Over 3,000 hours.

5          MS. MARTINEZ:  Your Honor, at this time I

6  move the Court to recognize Ms. Portwine as an expert

7  Spanish language linguist, with expertise particularly

8  in El Salvadoran and MS-13 dialects of Spanish.

9          MR. LEIVA:  Subject to cross-examination.

10         THE COURT:  Subject to cross-examination.

11         Go ahead.

12 BY MS. MARTINEZ:

13     Q.  Ms. Portwine, as part of this case, were you

14 asked to translate some Spanish language recordings and

15 prepare verbatim English translations of those

16 recordings?

17     A.  Yes, I was.

18     Q.  What process do you use when you are listening to

19 a Spanish language recording and preparing a verbatim

20 English transcript?

21     A.  There are several steps, but my -- the way I do

22 things is, the very first thing that I do is to listen

23 to the whole recording.  And as I'm listening, I'm

24 taking a few notes in my head.

25         Then after that, then I go ahead and I begin

1    listening for a couple of minutes and then I start

2    typing.  So, then, that's the second step.

3         And then after I finish typing the whole thing,

4    going back and forth until I understand everything that

5    was said.

6         Then after that, then I just read it without any

7    audio.

8         And then after that, then I listen and read at

9    the same time.

10        And after I listen and read, then I wait a -- a

11   day or two, and then I listen and read again, and then I

12   turn it in to my supervisor.

13   Q.   Let's go through that just a little bit more.

14   A.   Okay.

15   Q.   When you're going through that process, where are

16   you?

17   A.   I am at my office, at my desk.

18   Q.   And what equipment do you use to listen to the

19   recordings while you're preparing the translation?

20   A.   Well, we have a computer software called

21   Universal Start-Stop.

22   Q.   What is Universal Start-Stop?

23   A.   That is just a software program that allows me to

24   bring the recordings, and I'm able to use a foot pedal

25   so that I can listen and type without having to stop and

1   use my hand to use the clicker and stuff.  So I'm using

2   a foot pedal.

3       Q.   What does the food pedal do?  Or what can you do

4   with the foot pedal?

5       A.   The foot pedal only allows me to go forward,

6   backward, slow it down, start-up, and -- yeah.  Forward

7   and backwards, and it allows me to slow it down, too, to

8   slow or fast, whichever way.

9       Q.   Does the software make any changes to the

10  recordings?

11      A.   Not at all.

12      Q.   Does it alter the data on the recording?

13      A.   Not at all.

14      Q.   Other than Start-Stop, is there any other

15  equipment that you use listening to the recordings?

16      A.   I use headphones.

17      Q.   What kind of headphones?

18      A.   Bose.

19      Q.   Are they noise cancelling headphones?

20      A.   Yes.

21      Q.   Why do you use those?

22      A.   I like to make sure that I am focusing on the

23  recording and not anything else.

24      Q.   Perhaps an obvious question, but do your

25  headphones make any alteration to the recordings in any

1    way?

2        A.   No, not at all.

3        Q.   All right.  Now, you said that you use Start-Stop

4    so that your hands are free; is that right?

5        A.   That's correct.

6        Q.   What are you doing with your hands while

7    listening to the recording?

8        A.   I'm usually type.

9        Q.   And what are you typing?

10       A.   On the translation.  Yeah, I'm translating

11   whatever I'm listening, too.

12       Q.   Skipping ahead a little bit in the process that

13   you already described, you said that once you've

14   prepared the full translation, you turn it in.

15       A.   That's correct.

16       Q.   What is the purpose of turning it in?

17       A.   That would be so that my supervisor will send it

18   out to have it reviewed, to -- to have what I have

19   written, to have everything reviewed by somebody else.

20       Q.   And, do you ever have occasion to be the person

21   who is reviewing a translation prepared by another

22   linguist?

23       A.   Yes.

24       Q.   So let's talk about the review process from your

25   perspective when you're the reviewer.  If you obtained a

translation from another linguist, what process do you undergo to review it?

A.   Um, again, I start with, I listen to the whole tape and make a few notes here and there.  And in the case of a review, I also go ahead and read it without the audio, because I got to check for grammar and things like that as well.  So that's why I like to read it.

And then I listen and read.  And as I'm listening, if I need -- if I suggest any changes, then I use -- I track the changes.

Q.   What kind of changes might you suggest?

A.   Again, grammar would be a -- or maybe a mistranslation, maybe a word, use a different word, maybe there's a better meaning or anything -- anything that will improve the translation.

Q.   Once you're done with your review, what do you do with that transcript that you've reviewed?

A.   Then I send it back to my supervisor so they can send it to the original linguist.

Q.   Okay.  So, let's go back to the times when you're the original linguist.

A.   Okay.

Q.   After you've submitted it to your supervisor for review --

A.   Uh-huh.

1    Q.    -- at some point do you get the transcript back?

2    A.    That's correct.

3    Q.    And what do you do then?

4    A.    Okay.  So as soon as I get my transcript, my

5    translation, I read it and I read all the changes.  I

6    want to make -- I want to check for grammar, if there

7    was any suggestion on that.  I want to change -- I want

8    to see what was -- what was suggested.

9          And then, and then after that, then I listen to

10   it and make the appropriate changes, if I agree with

11   them.

12   Q.    Are you the final decider, when you're the

13   linguist, about what the translation says?

14   A.    Yes, I am.

15   Q.    Now, you described this long process that you

16   take to translate a recording, and you've described a

17   lot of steps.  But from beginning to end, how many

18   times, on average, do you listen to a Spanish language

19   recording before your English translation is finalized?

20   A.    About eight or nine.

21   Q.    And, so just to give the jury a sense of time

22   that it takes you to do this, if we were talking about,

23   let's say, a 20-minute recording in Spanish, how

24   many minutes or hours would it take you from the

25   beginning of your product to the very end, to prepare

1    that final English translation?

2        A.   It would take a long time.  It's about a minute

3    and -- an hour per minute with the whole process and

4    everything, so...

5        Q.   So, in other words, an hour of your time for a

6    minute of recording?

7        A.   Correct.

8        Q.   And, how many recordings did you listen to,

9    approximately, in this case?

10       A.   Um, approximately 42 for this case.

11       Q.   For the verbatim, right?

12       A.   For the verbatim, correct.

13       Q.   Did you also listen to recordings where you

14   performed other work other than preparing verbatim

15   translations?

16       A.   Yes.

17       Q.   What else did you do in this case?

18       A.   Well, I was doing the summaries, listening to the

19   wire tap and -- for those summaries.

20       Q.   So overall, for the whole course of the

21   investigation, about how many recordings did you listen

22   to?

23       A.   Over 10,000.

24            MS. MARTINEZ:  With the help of the court

25   security officer, Your Honor, I would like to show this

1   witness what have been marked for identification

2   purposes as Exhibits 2-A and 2-A-1.

3              Big binder.  Sorry about that.  Feel free to

4   take them out of the binder, out of the sleeves, if you

5   need to.  Okay?

6              THE WITNESS:  Okay.

7   BY MS. MARTINEZ:

8       Q.  Let's start with 2-A.

9       A.  2-A, yes.

10      Q.  It should be a disk?

11      A.  It is a disk.

12      Q.  Do you recognize that disk?

13      A.  I do.

14      Q.  You do.  How do you recognize that disk?

15      A.  It has my signature on it.

16      Q.  And when did you put your signature on it?

17      A.  Um, right before I --

18      Q.  Let me ask it this way:  As part of your trial

19  preparation, were you asked to come and listen to some

20  disks and compare them to some translations?

21      A.  Yes.

22      Q.  And those translations, who prepared the

23  translations that you reviewed while you reviewed the

24  disks?

25      A.  I did.

1    Q.   So, if you could go back and look at 2-A, is 2-A

2    one of the disks that you listened to in preparation for

3    your trial testimony?

4    A.   Yes, it is.

5    Q.   And, how do you know that that particular disk is

6    one of the ones that you listened to?

7    A.   It has my signature on it.

8    Q.   Now, if you could look at Exhibit 2-A-1.

9    A.   Uh-huh.

10   Q.   What is 2-A-1?

11   A.   2-A-1 is the translation of the recording.

12   Q.   Which recording?

13   A.   2-A.

14   Q.   And is that a translation that you prepared?

15   A.   Yes, it is.

16   Q.   Using the process that you already described

17   here?

18   A.   Correct.

19   Q.   All right.  Now, within 2-A-1, there are some --

20   within the transcript there are people identified.  The

21   speakers of the -- the people are identified; is that

22   right?

23   A.   Correct.

24   Q.   All right.

25   A.   Yes.

1    Q.   Is it your responsibility, as the linguist, to

2  identify the names of the people who are speaking in the

3  translation?

4    A.   No, it's not.

5    Q.   When you prepare your translation, if you don't

6  know who's speaking, how do you indicate that?

7    A.   I put "unknown male," "UM."

8    Q.   And did you do that in this case?

9    A.   Sometimes I did, yes.

10   Q.   And, in these final versions of the translations

11 that you reviewed in your trial preparation, are many of

12 the names identified?

13   A.   Um --

14   Q.   Many of the speakers?

15   A.   Many of the speakers are identified.

16   Q.   And just to be clear, those identifications don't

17 come from you; is that right?

18   A.   Correct.

19   Q.   With the exception of the identities of the

20 speakers, are the trans- -- is the translation in 2-A-1

21 entirely your work product?

22   A.   Yes, it is.

23   Q.   And based on your experience and your knowledge

24 as a Spanish language linguist, is the translation in

25 Exhibit 2-A-1 a true and accurate English translation of

1    the Spanish language recording in 2-A, to the best of

2    your abilities as a Spanish language linguist?

3        A.   Yes, it is.

4             MS. MARTINEZ:  Your Honor, at this time we

5    would move -- conditionally move 2-A and 2-A-1 into

6    evidence, conditional on establishing the relevance, of

7    course, of the recording and the translation.

8             THE COURT:  All right.  And subject to

9    cross-examination on her expertise.  All right, 2-A and

10   2-A-1 will be received conditionally.

11   BY MS. MARTINEZ:

12       Q.   Now I would like you to look -- it should be in

13   that same binder there -- at Exhibit 2-B and 2-B-1.

14       A.   I see it.

15       Q.   Do you see 2-B and 2-B-1?

16       A.   Yes.

17       Q.   All right.  Starting with 2-B, what is 2-B?

18       A.   2-B is a recording of a translation --

19       Q.   And -- I didn't mean to interrupt.  Go ahead.

20       A.   2-B is a part of a recording of a translation.

21       Q.   What you do mean by, it's part of a recording?

22       A.   It's only part of it.  It's not the whole

23   recording.

24       Q.   Which one is the whole recording?

25       A.   2-A.

1    Q.   So, 2-B is a clip of 2-A?

2    A.   Correct.

3    Q.   All right.  And that disk there that you're

4    looking at, have you reviewed that particular disk?

5    A.   I did review it.

6    Q.   And how do you know -- how do you know that you

7    reviewed it?

8    A.   Because it has my signature.

9    Q.   How about 2-B-1; what is Government's

10   Exhibit 2-B-1?

11   A.   2-B-1 would be the translation of the clip of the

12   recording.

13   Q.   So, it's the translation of the smaller portion;

14   is that right?

15   A.   That's correct.

16   Q.   Did you review that translation or that portion

17   of the translation while you were also reviewed the clip

18   in 2-B?

19   A.   I did.

20   Q.   And does the translation match the clip, the

21   Spanish language clip?

22   A.   It does.

23   Q.   And is that a portion of a transcript that you

24   actually prepared?

25   A.   Correct.

1    Q.   And is 2-B-1 a true and accurate translation of

2    2-B, to the best of your abilities as a Spanish language

3    linguist?

4    A.   Correct.

5         MS. MARTINEZ:   Your Honor, we would

6    conditionally move to admit 2-B and 2-B-1, subject to

7    relevance.

8         THE COURT:   And cross-examination.

9         MS. MARTINEZ:   And cross-examination.

10         THE COURT:   2-B and 2-B-1 will be received.

11   BY MS. MARTINEZ:

12   Q.   Let's look now, if you will, at Government's

13   Exhibits 3-A and 3-A-1.  Do you see that?

14   A.   I see it.

15   Q.   All right.  Start with 3-A.

16   A.   Uh-huh.

17   Q.   What is 3-A?

18   A.   3-A is a recording that I reviewed.

19   Q.   Is --

20   A.   It's a -- it's a recording in Spanish that I

21   reviewed already.

22   Q.   Did you review it as part of your trial

23   preparation?

24   A.   Yes, I did.

25   Q.   Had you also reviewed it earlier as part of your

1    duties in this case?

2       A.   Yes.

3       Q.   What is 3-A-1?

4       A.   3-A-1 is the translation of the recording, 3-A.

5       Q.   All right.  And just in case I didn't ask you,

6    how do you know that Government's Exhibit 3-A is the

7    same recording that you previously reviewed?

8       A.   Um, because it has my signature.

9       Q.   Who prepared the translation in 3-A-1?

10      A.   I did.

11      Q.   And, did you review the translation while

12   listening to the recording in 3-A?

13      A.   I did.

14      Q.   And, once again, are -- are there names

15   identified in the translation?

16      A.   Yes, there are.

17      Q.   Were you responsible for identifying those names?

18      A.   No, I was not.

19      Q.   With the exception of the names, the identities

20   of the speakers, is all of the translation in 3-A-1 your

21   work product?

22      A.   Yes, it is.

23      Q.   And, is Government's Exhibit 3-A-1, the English

24   translation, a true and accurate English translation of

25   the Spanish language recording in Government's

1   Exhibit 3-A, to the best of your abilities as a Spanish

2   language linguist?

3        A.   Yes, it is.

4             MS. MARTINEZ:  Your Honor, again subject to

5   relevance and cross-examination, we conditionally move

6   to admit Government's Exhibit 3-A and 3-A-1.

7             THE COURT:  Admitted conditionally, subject

8   to cross-examination and qualification.

9             MS. MARTINEZ:  And, Your Honor, just for the

10  record, Government's Exhibit 3-A, the recording, has

11  already been admitted into evidence through a previous

12  witness.

13            THE COURT:  Okay.

14  BY MS. MARTINEZ:

15       Q.   Could you look now at Government's Exhibits

16  3-B --

17       A.   I see it.

18       Q.   -- and 3-B-1?

19       A.   I see it as well.

20       Q.   What is Government's Exhibit 3-B?

21       A.   3-B is a clip, a portion of a -- of a --

22  previously -- of a previous translation -- of a previous

23  recording.

24       Q.   Can you identify which recording it is a clip of?

25       A.   Yes.  3-A.

1    Q.   How do you know that 3-B is a clip of 3-A?

2    A.   That is because I reviewed it.  I reviewed it

3    along with 3-B-1, and it has my signature.

4    Q.   And what is 3-B-1?

5    A.   3-B-1 is a clip or a part, a portion of a

6    translation.

7    Q.   And, does the portion of the translation in 3-B-1

8    match the audio recording in 3-B?

9    A.   Yes, it does.

10   Q.   How do you know that?

11   A.   It has my signature.

12   Q.   And is 3-B-1 a portion of 3-A-1?

13   A.   Yes, it is.

14   Q.   And who prepared that translation?

15   A.   I did.

16   Q.   So, is 3-B-1 a true and accurate English

17   translation of the Spanish language recording clip in

18   3-B, to the best of your abilities as a Spanish language

19   monitor?

20   A.   Yes, it is.

21   Q.   Let's look at 3-C and 3-C-1.

22        What is 3-C?

23   A.   3-C is also a portion of a translation for 3-A.

24   This is the recording, the CD, with my signature on it.

25   And 3-C-1 is the translation.

1    Q.   And is 3-C-1 a portion of a translation?

2    A.   Yes, it is.

3    Q.   What is it a portion of?

4    A.   Of the translation for 3-A-1.

5    Q.   Thank you.

6         And, did you review Government's Exhibit 3-C?

7    A.   Yes, I did.

8    Q.   How do you know?

9    A.   It has my signature on it.

10   Q.   Is Government's Exhibit 3-C-1, the English

11   language translation, a true and accurate English

12   translation of Government's Exhibit 3-C, to the best of

13   your abilities as a Spanish language linguist?

14   A.   Yes, it is.

15        MS. MARTINEZ:  Your Honor, again subject to

16   relevance and cross-examination, we conditionally move

17   to admit Government's Exhibits 3-C and 3-C-1.

18        THE COURT:  3-C, 3-C-1 conditionally

19   admitted.

20   BY MS. MARTINEZ:

21   Q.   Ms. Portwine, we have a few more to go through

22   and in an attempt to go a little bit faster, I'm going

23   to try to do several at once.

24   A.   Okay.

25   Q.   You just let me know if it gets too confusing and

1   we will stop and go one by one.

2       A.   Okay.

3       Q.   Okay?

4            Can you go ahead and look at Government's

5   Exhibits 7-A and 7-A-1, 10-A and 10-A-1, 11-A, 11-A-1,

6   14-A, 14-A-1, 15-A, 15-A-1, 16-A, 16-A-1, 17-A, 17-A-1,

7   and 20-A and 20-A-1.

8            Let's start with all of those A's.  Do you

9   recognize those exhibits?

10      A.   I do.

11      Q.   What are they?

12      A.   The recordings.

13      Q.   Are they recordings that you've reviewed?

14      A.   They are recordings I have reviewed, yes.

15      Q.   How do you know that those disks are recordings

16  that you reviewed?

17      A.   All of them have my signature.

18      Q.   And let's go through the A-1s.  All of those A-1s

19  that you just looked at, what are they?

20      A.   They are translations of the recordings.

21      Q.   Who prepared those translations?

22      A.   I did.

23      Q.   And, did you also review the disks, the A's, and

24  compare them to the translations, the A-1s?

25      A.   I did.

1    Q.   And which translation goes with which disk?

2    A.   Um, so, translations for recording 4-A goes with

3    4-A-1.

4    Q.   Okay.  So if we were to go to -- I think we

5    started with 7-A and 7-A-1.

6    A.   Correct.

7    Q.   Do those two match?

8    A.   Yes.

9    Q.   And, do you know because you reviewed them?

10   A.   Correct.

11   Q.   All right.  Moving on to 10-A and 10-A-1, what's

12   the relationship between those exhibits?

13   A.   10-A is the recording, the CD, the recording, and

14   10-A-1 is the translation.

15   Q.   11-A, 11-A-1?

16   A.   11-A is the recording.  11-A-1 is the

17   translation.

18   Q.   14-A, 14-A-1?

19   A.   14-A is the recording.  14-A-1 is the

20   translation.

21   Q.   And just to be clear for the record, when you're

22   saying "the translation," do you mean the translation of

23   that disk?

24   A.   Correct.

25   Q.   15-A, 15-A-1?

1     A.   15-A is the recording and 15-A-1 is the

2   translation of the recording.

3     Q.   16-A, 16-A-1?

4     A.   16-A is the recording.   16-A-1 is the translation

5   of the recording.

6     Q.   17-A, 17-A-1?

7     A.   17-A is the recording.   17-A-1 is the translation

8   of the recording.

9     Q.   And 20-A and 20-A-1?

10    A.   20-A is the recording.   20-A-1 is the translation

11   of the recording.

12    Q.   And for all of these recordings and translations

13   that you prepared, are the translations true and

14   accurate English translations of the Spanish language

15   recordings to the best of your ability as a Spanish

16   language linguist?

17    A.   Yes, they are.

18         MS. MARTINEZ:   Your Honor, subject to

19   relevance and cross-examination, the government moves to

20   admit Government's Exhibits 7-A, 7-A-1, 10-A, 10-A-1,

21   11-A --

22         THE COURT:   Ms. --

23         MS. MARTINEZ:   -- 11-A-1 --

24         THE COURT:   -- Martinez, Ms. Martinez.

25         MS. MARTINEZ:   I'm so sorry, Your Honor.

1          THE COURT:  No, it's just that I can't write

2   as fast as you can speak, and I want to make sure I get

3   it right.  Okay.  Start over.

4          MS. MARTINEZ:  Absolutely, Your Honor.

5          THE COURT:  Take your time.  Hold on.

6          MS. MARTINEZ:  I'll begin with 7-A, 7-A-1.

7          THE COURT:  Okay.

8          MS. MARTINEZ:  10-A, 10-A-1, 11-A, 11-A-1,

9   14-A, 14-A-1, 15-A, 15-A 1, 16-A, 16-A 1, 17-A, 17-A 1,

10  20-A, and 20-A-1.

11         THE COURT:  Received.

12         MS. MARTINEZ:  Thank you, Your Honor.

13

14  BY MS. MARTINEZ:

15    Q.  And Ms. Portwine, if you could indulge me,

16  because we went through a lot of numbers and a lot of

17  exhibits and I just want to make sure we got them all.

18  Could you flip back to Government's Exhibits 3-B and

19  3-B-1.

20         MS. MARTINEZ:  Court's indulgence for just a

21  moment, Your Honor.

22         THE COURT:  Sure.  All right.

23         (Pause.)

24  BY MS. MARTINEZ:

25    Q.  All right.  And so, Government's Exhibit 3-B,

1    what is that?

2        A.   That is a part of a recording -- it's a

3    recording, but it's only a clip.  It's only a part of

4    another recording.

5        Q.   Okay.  And, is -- what recording is it a part of?

6        A.   It would be 3-A.

7        Q.   So, another clip like we've talked about before?

8        A.   Yes, correct.

9        Q.   How about 3-B-1?

10       A.   3-B-1 is again, a part, a portion of translation.

11   The translation would be 3 -- 3-1 -- 3-A-1.

12       Q.   And is 3-B-1 a true and accurate English

13   translation of Government's Exhibit 3-B, to the best of

14   your abilities as a Spanish language linguist?

15       A.   Yes, it is.

16       Q.   All right.  And indulge me, just in case I

17   skipped this one, can you look at Government's

18   Exhibits 5-A and 5-A-1.

19            Government's Exhibit 5-A, is that a disk that

20   you've reviewed before?

21       A.   Um, can I take it out?

22       Q.   Of course.

23       A.   Yes, it is.

24       Q.   How do you know?

25       A.   It has my signature on it.

1    Q.   You couldn't see it until you took it out?

2    A.   I couldn't see it until I take it out.

3    Q.   How about 5-A -- excuse me -- 5-A-1; what is

4    5-A-1?

5    A.   5-A-1 is the translation of the recording, 5-A.

6    Q.   Is that -- who prepared that translation?

7    A.   I did.

8    Q.   And, once again, just for the record, in all of

9    these translations, were you responsible for identifying

10   the names of the speakers?

11   A.   No, I wasn't.

12   Q.   And do all of these translations have

13   identities -- have names of speakers in the

14   translations?

15   A.   Yes, they do.

16   Q.   With the exceptions of the identities of the

17   speakers, are they all your work product?

18   A.   Yes, they are.

19   Q.   And is Government's Exhibit 5-A-1 a true and

20   accurate English translation of Government's

21   Exhibit 5-A, to the best of your abilities as a Spanish

22   language linguist?

23   A.   Yes, it is.

24            MS. MARTINEZ:   Your Honor, again

25   conditionally, the government would also move to admit

1    Government's Exhibits 3-B and 3-B-1 and 5-A and 5-A-1.

2               THE COURT:  Received.

3               MS. MARTINEZ:  No further questions, Your

4    Honor.

5               MR. JENKINS:  Your Honor, would now be an

6    appropriate time to stop for the day?

7               THE COURT:  Mr. Jenkins, I think it would be

8    an appropriate time to stop, because we don't have a

9    short witness.  And I don't mean short in stature.

10              (Laughter.)

11              MR. JENKINS:  Thank you, your Honor.  I

12   appreciate that.

13              THE COURT:  Ladies and gentlemen, again, we

14   appreciate your attention as responsibility as jurors.

15              I want to remind you of the instruction I

16   give every day, and that is not to discuss the case, not

17   to permit the case to be discussed in your presence.

18   Don't do any research on the case.

19              Leave your notes in the jury deliberation

20   room.

21              Don't visit any places that you've heard

22   discussed in trial.

23              We will resume on Monday, 10:00 a.m.  You're

24   free to leave now.  Thank you very much.  You can go.

25   And leave your notes in the jury deliberation room.

1    Thank you.
2                (Jury not present.)
3                THE COURT:  Anything else I need to take up
4    before we leave for the day?
5                (No response.)
6                THE COURT:  Okay.  Good.  We're in recess.
7    Thank you.
8                (Court recessed at 4:58 p.m.)
9                            ---
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF REPORTER

I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the jury trial in the case of UNITED STATES OF AMERICA v. PEDRO ANTHONY ROMERO CRUZ, et al.,

I further certify that I was authorized and did report by stenotype the proceedings in said jury trial, and that the foregoing pages, numbered 1 to 268, inclusive, constitute the official transcript of said proceedings as taken from my shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this  2nd  day of  May  , 2016.

                    /s/
                    Renecia Wilson, RMR, CRR
                    Official Court Reporter