```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                      EASTERN DISTRICT OF VIRGINIA
 2                         Alexandria Division

 3    UNITED STATES OF AMERICA,         )
                                        )
 4                         Plaintiff,   )
                                        ) Crim. No. 1:14cr306
 5         vs.                          )
                                        )
 6    JOSE LOPEZ TORRES, ALVIN GAITAN   ) April 4, 2016
      BENITEZ, CHRISTIAN LEMUS CERNA,   )
 7    OMAR DEJESUS CASTILLO, DOUGLAS    )
      DURAN CERRITOS, MANUEL ERNESTO    )
 8    PAIZ GUEVARA, and JESUS ALEJANDRO )
      CHAVEZ,                           )
 9                                      )
                           Defendants.  )
10    _____)

11                      REPORTER'S TRANSCRIPT

12                           JURY TRIAL

13

14    BEFORE:        THE HONORABLE GERALD BRUCE LEE
                     UNITED STATES DISTRICT JUDGE
15

16
      APPEARANCES:
17
      FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
18                      BY:  JULIA MARTINEZ, AUSA
                             STEPHEN M. CAMPBELL, AUSA
19                           TOBIAS TOBLER, AUSA

20
                               ---
21

22    OFFICIAL COURT REPORTER:

23                      RENECIA A. SMITH-WILSON, RMR, CRR
                        U.S. District Court
24                      401 Courthouse Square, 5th Floor
                        Alexandria, VA 22314
25                      (703)501-1580
```

1    APPEARANCES (Continued)

2    FOR DEFENDANT JOSE LOPEZ TORRES

3            BYNUM & JENKINS, PLLC
             BY:  ROBERT L. JENKINS, JR., ESQ.
4            THE LEIVA LAW FIRM, PLC
             BY:  MANUEL E. LEIVA, ESQ.
5
     FOR DEFENDANT ALVIN GAITAN BENITEZ
6
             LAW OFFICE OF AMY LEIGH AUSTIN
7            BY:  AMY LEIGH AUSTIN, ESQ.
             SMITH & ZIMMERMAN, PLLC
8            BY:  JEFFREY D. ZIMMERMAN, ESQ.

9    FOR DEFENDANT CHRISTIAN LEMUS CERNA

10           LAW OFFICE OF CHRISTOPHER AMOLSCH
             BY:  CHRISTOPHER AMOLSCH, ESQ.
11           FRANK SALVATO, ESQ.

12   FOR DEFENDANT OMAR DEJESUS CASTILLO

13           FIRSTPOINT LAW GROUP, PC
             BY:  KATHERINE MARTELL, ESQ.
14           OLD TOWN ADVOCATES, PC
             BY:  MEREDITH M. RALLS, ESQ.
15
     FOR DEFENDANT DOUGLAS DURAN CERRITOS
16
             LAW OFFICE OF J.R. CONTE, PLLC
17           BY:  JOSEPH R. CONTE, ESQ.
             LAW OFFICE OF DWIGHT CRAWLEY
18           BY:  DWIGHT E. CRAWLEY, ESQ.

19   FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

20           LAW OFFICE OF W. MICHAEL CHICK, JR.
             BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
21
     FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
22
             JEROME P. AQUINO, ESQ.
23           ELITA C. AMATO, ESQ.

24
                         ---
25

INDEX

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Liliana Portwine | --- | 5 | 34 | --- |
| Sandra M. D'Sa | 56 | 86 | 105 | --- |
| Ramon Aguilar | 114 | 130 | 154 | --- |
| Leonel Gonzalez | 156 | 167 | 200 | --- |
| Matthew Armstrong | 205 | 232 | 240 | --- |
| John Webb | 241 | 255 | --- | --- |
| Claudia Dubravetz | 256 | 260 | --- | --- |
| Jaime Rosales Villegas 263 (Not completed) | | | | |

(Court recessed)

---

<u>PROCEEDINGS</u>

1
2
3          (Thereupon, the following was heard in open
4  court at 10:07 a.m.)
5          (Jury not present.)
6          THE CLERK:  1:14 Criminal 306, United States
7  versus Jose Lopez Torres, Alvin Gaitan Benitez,
8  Christian Lemus Cerna, Omar DeJesus Castillo, Douglas
9  Duran Cerritos, Manuel Ernesto Paiz Guevara, and Jesus
10  Alejandro Chavez.
11          THE COURT:  Good morning.
12          Good morning, Counsel.
13          Good morning, defendants.
14          Ready to proceed?
15          MR. LEIVA:  Your Honor, if I may, my client
16  is having difficulty.
17          THE COURT:  Okay.  Let's see if it's
18  working.
19          THE INTERPRETER:  It's okay.  Try it again.
20          THE COURT:  Is that better?
21          THE INTERPRETER:  Yes.
22          MR. LEIVA:  Thank you.
23          THE COURT:  You can bring the witness back.
24          Oh, okay.  The record should reflect, the
25  six interpreters are present, being previously sworn.

```
 1              You can bring the witness back, Mr. Toliver;
 2   Ms. Portwine.
 3              You can bring the jury out.
 4              (Jury present.)
 5              (Witness resumed stand.)
 6              THE COURT:  You may be seated.
 7              Good morning, ladies and gentlemen.
 8              Good morning, Mr. Jose Lopez Torres.
 9              Good morning, Mr. Alvin Gaitan Benitez.
10              Good morning, Mr. Douglas Duran Cerritos.
11              Good morning, Mr. Christian Lemus Cerna.
12              Good morning, Mr. Omar DeJesus Castillo.
13              Good morning, Mr. Manuel Ernesto Paiz
14   Guevara.
15              And good morning, Mr. Jesus Alejandro
16   Chavez.
17              Counsel ready to proceed?
18              Good morning, Ms. Portwine.
19              THE WITNESS:  Good morning.
20              THE COURT:  You may proceed.
21              MR. LEIVA:  I apologize, Your Honor.
22              THE COURT:  No problem.
23              THEREUPON, LILIANA PORTWINE, previously duly
24   sworn, testified further as follows:
25                       CROSS-EXAMINATION
```

L. Portwine - Cross                                    6

BY MR. LEIVA:

Q.   Good morning, Ms. Portwine.

A.   Good morning.

Q.   Ms. Portwine, why don't we start first with your
work experience and also your qualifications.  Can we do
that?

A.   Yes.

Q.   Yes.

So, right now, are you currently employed by the
FBI or are you a contractor with the FBI?

A.   I'm a contractor.

Q.   You're a contractor.

A.   Yes.

Q.   So, which company do you work for?  Or do you
have your own private company?

A.   I'm an independent contractor.

Q.   Independent --

A.   -- I don't have --

Q.   -- contractor.  Very well.

I was reviewing your resumé and I see that you
are not a member of the American Translators
Association; is that correct?

A.   That's correct.

Q.   Okay.  And, you have not taken the American
Translators Association's certified test, have you?

1    A.   I have not.

2    Q.   Okay.  You are also not a member of the

3    International Association of Professional Translators

4    and Interpreters, are you?

5    A.   I am not.

6    Q.   You are not a member of the National Capital Area

7    Translators Association.

8    A.   I am not.

9    Q.   And, you are also not a member of the National

10   Association for Interpretation, are you?

11   A.   I am not.

12   Q.   Okay.  So, in other words, you are -- you are not

13   certified to be an interpreter or translator, are you?

14   A.   That's correct, I'm not.

15   Q.   Okay.  So, for example, the gentlemen and ladies

16   who have been helping us in this court proceedings are

17   certified to be federal court interpreters.  You have

18   not taken that test or been certified to be able to

19   translate in a federal court.

20   A.   Correct.

21   Q.   Now, on direct examination, Ms. Martinez asked

22   you about Spanish and how it's spoken differently in

23   Latin America.  If we can go into a little more of that,

24   if you wouldn't mind.

25   A.   No.

1    Q.   So, Latin American is a pretty big place, isn't

2    it?

3    A.   Correct.

4    Q.   All right.  And, the Spanish that's spoken across

5    Latin America is not the same country to country, is it?

6    A.   It -- it's not the same.

7    Q.   It varies by -- there's different dialects?

8    A.   Correct.

9    Q.   Different accents?

10   A.   Correct.

11   Q.   All right.  And even within close proximate

12   neighbors, let's say, for example, Mexico and Nicaragua,

13   you have different colloquialisms that you use, right?

14   A.   Correct.

15   Q.   One word can mean one thing in Nicaragua and can

16   mean another thing in Mexico.

17   A.   Yes.

18   Q.   All right.  And someone who speaks Spanish in

19   Argentina will not necessarily be able to understand

20   someone who speaks Spanish in El Salvador.

21        I mean, there may be some difficulty.  Let me put

22   it that way.

23   A.   I'm not sure.  I -- I don't think that would be

24   correct.  I think they could communicate.

25   Q.   So you think they can communicate.  So, for

L. Portwine - Cross                                    9

1    example, someone from Boston would be able to
2    communicate without any problems with someone from out
3    in the country in Mississippi.
4        A.  Sure.  Yeah.
5        Q.  And, you had mentioned earlier about some of the
6    dialect or slang that's used in El Salvador.  Let's
7    focus on that.
8            You would agree with me that Salvadorans for the
9    most part respect their own dialect, right?
10       A.  Yes.
11       Q.  Okay.  And, they use a lot of slang when they
12   speak?
13       A.  Yes.
14       Q.  In other words, it's not proper or formal
15   Spanish, is it?
16       A.  A lot of it is not proper formal Spanish, yes.
17       Q.  Okay.  And, in cases where you believe you are
18   listening to phone conversations that are between gang
19   members, you have gang slang thrown into the slang
20   that's spoken among Salvadorans.
21       A.  Correct.
22       Q.  And, I believe you testified that you weren't
23   raised in Mexico; you were actually born in Mexico and
24   immigrated to the United States when you were ten.
25       A.  Correct.

1    Q.   So, most of your formal education was in this

2    country, I assume?

3    A.   Yes.

4    Q.   It was in English, right?

5    A.   It was in English.

6    Q.   In other words, you didn't attend an emergent

7    school or bilingual school?

8    A.   No.

9    Q.   And, if you don't mind telling me, where in the

10   United States were you raised?

11   A.   Los Angeles; in Montebello, specifically.

12   Q.   So, I would -- well, let me not assume anything.

13   Let me ask you this question, Ms. Portwine.  I'm

14   assuming the Spanish that you learned was initially in

15   Mexico?

16   A.   Correct.

17   Q.   All right.  Then, I'm assuming, also, that you

18   continued with your Spanish because that's what was

19   spoken at home?

20   A.   Correct.

21   Q.   And, I'm assuming since you were born in Mexico,

22   your parents were not Salvadoran.

23   A.   They're not.

24   Q.   Okay.  So, your formative years of learning

25   Spanish were in the household where Salvadoran slang

1    wasn't spoken?

2        A.   Correct.

3        Q.   And I'm also going to assume that Salvadoran gang

4    slack wasn't spoken.

5        A.   It was not.

6        Q.   So, when you started working for the FBI and you

7    started hearing this form of Salvadoran slang -- I'm not

8    referring to the gang slang, but El Salvadoran slang --

9    who did you go to for assistance with that?

10       A.   When we first began, like I said, as -- when I

11   started working for the FBI, we -- we started working

12   with some -- I started working with the agents and we

13   started working a case that was specific to El

14   Salvadorans.

15            So, we were -- the agent brought us dictionaries,

16   glossaries from other previous linguists and stuff like

17   that.  So --

18       Q.   Okay.  So, I'm assuming that you requested these

19   dictionaries and glossaries because these were words

20   that you had never heard before?

21       A.   Yeah.

22       Q.   Okay.  Well, let's go back a little -- and let me

23   be fair to you -- in chronological order, so we can kind

24   of develop your work history here.

25            So, it's listed on your resumé that you served as

L. Portwine - Cross                                    12

1    a teacher/parent aid, right?

2        A.   As a teacher what?

3        Q.   I would say a teacher's aid, to help facilitate

4    communication with parents of school children?

5        A.   That was -- it was for teacher/parent

6    conferences, or teacher/parent administrators

7    conferences, not -- I was a substitute teacher and I was

8    a translator.

9        Q.   Okay.  But let's focus on the translator portion

10   of your duties.

11       A.   Okay.

12       Q.   So you would assist parents who were not fluent

13   in English when it came to parent/teacher conferences,

14   right?

15       A.   Correct.

16       Q.   And that happened, what, two times a year?

17       A.   Um, let's say, yes, twice a year.

18       Q.   And, the length of the parent/teacher conference

19   for a student lasted what, maybe five, ten minutes?

20       A.   Approximately, yes.

21       Q.   And, that's where you came into contact with

22   people who were Salvadoran?

23       A.   Correct.

24       Q.   And, I'm assuming that given the subject matter,

25   the conversations that they you were translating dealt

1    with school work?

2        A.   Correct.

3        Q.   And, even though Salvadorans speak in slang --

4    and correct me if I'm wrong -- I'm assuming that when

5    they went to meet their children's teachers, they

6    attempted to formalize their Spanish and not speak in so

7    much slang?

8        A.   Um -- I don't know.

9        Q.   Do you recall ever having an occasion during

10   these teacher/parent conferences, when you were a

11   translator for Salvadoran parents, where you had to ask

12   them to define a certain term or word that they were

13   using?

14       A.   No.

15       Q.   So, you also have listed in your work history

16   that -- and I believe that you had mentioned on direct

17   that you worked for a trucking company?

18       A.   Correct.

19       Q.   All right.  And, here's where I lost a little bit

20   about what you said.  You said you called for

21   directories?

22       A.   No.  I -- I called the CEOs of companies, Mexican

23   trucking companies, and I got detailed information about

24   their -- their product or their trucks, their --

25       Q.   Was it a sales call that you were performing?

1    A.   It was not a sales call.

2    Q.   Okay.  But it was information that you were
3  obtaining, I'm assuming, for the company salesmen, for
4  the company you worked for, their sales people?

5    A.   Not for the sales people.  The information was
6  gathered to be put into a directory, and then the
7  directory is sold.  When a different company would make
8  use of the directory, that's because they wanted to hire
9  a truck, a refrigerated truck, perhaps.

10   Q.   So, let me ask you this question, which may seem
11  silly, but I need to ask it nonetheless:  So, when you
12  spoke to the CEOs of trucking companies, they spoke to
13  you in proper Spanish, correct?

14   A.   Correct.

15   Q.   Not in slang?

16   A.   Correct.

17   Q.   Not in gang slang?

18   A.   Correct.

19   Q.   All right.  And, then you also worked for an
20  airliner?

21   A.   Correct.

22   Q.   And, it sounds like you were more of a customer
23  service rep.

24   A.   That's correct.

25   Q.   So, the subject matter that you dealt with when

1    dealing with airline clients was just about connecting

2    flights or missed flights or lost luggage?

3        A.   Yes.

4        Q.   So, you were working at a call center, much like

5    when we call now, we get someone from India who speaks

6    English.  Is that -- was that your -- is that where you

7    were employed, at a call center for the airline?

8        A.   For one airline, yes.  For the other one, I was

9    at the airport.

10       Q.   At the airport.

11       A.   Uh-huh.

12       Q.   Okay.  And again, when you were dealing with

13   people who may not have been fluent in English, when you

14   spoke to them, they were speaking to you in proper

15   formal Spanish, for the most part?

16       A.   For the most part.

17       Q.   So, let's get back, now, to when you started

18   dealing with gang cases.  So, you said that you had --

19   you were unfamiliar with certain terms and you had to

20   ask that someone provide you -- or a glossary or a

21   dictionary was provided to you, right?

22       A.   Correct.

23       Q.   And, this was -- from what you know, it was

24   compiled by agents?

25       A.   Agents, linguists, yes.

1    Q.   Well, did you -- what, if any, independent
2  research did you do yourself to make sure that it was
3  compiled by linguists or people who should know what
4  they're doing?
5    A.   Um --
6    Q.   Did you do anything, or you just took it at face
7  value?
8    A.   Normally, the glossaries or the dictionaries,
9  they have a name that you can verify, and usually has
10 the linguist or whoever compiled its name on there.
11 But, yeah, I basically, I just took it for face value,
12 yeah.
13   Q.   All right.  Now, let's talk about this particular
14 assignment, this particular case.
15   A.   Okay.
16   Q.   Were you told what type of case this was?
17   A.   No.
18   Q.   So, were you told what nationality you believed
19 that the people who were on those phone calls -- where
20 they were from?
21   A.   I was told where they were from, yes.
22   Q.   Who told you that?
23   A.   The agent.
24   Q.   Which agent?
25   A.   I believe it was Greg Horner.

L. Portwine - Cross                                                17

1     Q.   All right.  And so he -- is that something that
2   you needed to know or is it standard practice just to go
3   in there and you independently listen to these phone
4   calls and do the translation?
5          Or is it the practice that you find out where
6   these people are from, or maybe get some more
7   information?
8               MS. MARTINEZ:  Objection, Your Honor.
9   Compound question.
10               THE COURT:  Sustained.
11               One question, Mr. Leiva.
12               MR. LEIVA:  Yes, Your Honor.  I apologize.
13               THE COURT:  No problem.
14   BY MR. LEIVA:
15     Q.   So, Ms. Portwine, is it your standard practice
16   that you ask where the individuals are from?
17     A.   I don't -- I don't ask.  It's not a standard
18   practice that I ask.
19     Q.   Okay.  So, then, someone just volunteered that
20   information to you?
21          This particular agent just came in and
22   volunteered it to you?
23     A.   Correct.
24     Q.   Is it standard practice within -- and I'm going
25   to call what you do, let's say, your industry, okay --

1    within the translation world, that you should not

2    receive information other than what's -- what you're

3    hearing in order to transcribe?

4         Does that make sense?

5    A.   No, it doesn't.

6    Q.   Okay.  I -- um, you believe the standard practice

7    within your industry is to just listen to the calls, and

8    then you translate what is being heard, or that you

9    gather as much information as possible in order to

10   understand what's being heard?

11   A.   I -- I don't understand the question.  I'm not

12   sure what you're asking.

13   Q.   Okay.  So, you weren't told that this was an

14   MS-13 related investigation, were you?

15   A.   I was not told it was MS-13.

16   Q.   But, you were told that there were Salvadorans

17   who were speaking with each other?

18   A.   Correct.

19   Q.   And, I believe you also testified on direct --

20   and correct me if I'm wrong -- that your translations

21   were verbatim?

22   A.   That's correct.

23   Q.   Okay.  What does "verbatim" mean to you,

24   Ms. Portwine?

25   A.   It means to translate exactly what is said, word

1    for word.

2        Q.   So, in other words, it's to translate exactly

3    what is said, not what you think is being said.

4        A.   Correct.

5        Q.   So, if someone is using a term like "*loco*," what

6    does "*loco*" mean?

7                MR. LEIVA:  That's l-o-c-o, Madam Court

8    Reporter.

9                THE WITNESS:  It could mean -- it could have

10   very many different meanings, even.

11   BY MR. LEIVA:

12       Q.   Okay.  What's the generally accepted term within

13   Latin American or Spanish when someone says "*loco*"?

14       A.   A dude.

15       Q.   A dude, right?

16       A.   Uh-huh.

17       Q.   But, in these particular translations, you

18   interpreted "dude" to "homeboy" or "homie."  Do you

19   recall that?

20       A.   Yes.

21       Q.   Okay.  And, the reason I'm asking you is because

22   the members of the jury and Judge Lee heard from a gang

23   expert and a former gang member of how one achieves the

24   certain ranks of homie, homeboy, and *chequeo*.

25       A.   Uh-huh.

1    Q.   So, what prompted you, then, to give the
2    designation of someone, who you're listening to, the
3    status of homeboy or homie when all they did was use the
4    word "*loco*"?
5    A.   Well, I did -- I did grow up in Los Angeles, so,
6    I do know a little bit more about gangs than -- than,
7    maybe just anybody.
8    Q.   Yeah, but you told me you didn't know that this
9    was a gang case.
10   A.   Okay.  So, I've been working in this case for a
11   lot longer than just a verbatim.  I mean, I talked to
12   the prosecutor as well.  Like, I had worked this case
13   from the very beginning --
14   Q.   Okay.
15   A.   -- that, when I was just only told it's El
16   Salvadoran.
17             THE COURT:  Do you recall his question?
18             THE WITNESS:  Yeah.
19             THE COURT:  His question was:  Can you
20   describe why you chose "homeboy" for the word "*loco*"?
21             Can you answer that question?
22             THE WITNESS:  Yeah.  So, because I was using
23   the gang-specific language to translate the word "*loco*."
24   BY MR. LEIVA:
25   Q.   Okay.  So, how is that verbatim, then,

1    Ms. Portwine?

2          If the term "*loco*" means dude, how do you jump

3    from that, when you're saying you're translating

4    verbatim, to designating someone as homeboy or homie,

5    since you said that you've been working on this case and

6    you know about gangs, know that that's a specific

7    designation that someone has to earn?

8    A.   Um --

9    Q.   Were you making a judgment call?

10   A.   No.

11   Q.   You, yourself, deeming that someone reached that

12   level?

13   A.   No, no.

14         Can you ask the question again, please.

15   Q.   All right.  So, how do you make that jump, then,

16   to designate someone a homie or homeboy, when the word

17   that was used during any particular conversation was

18   "*loco*"?

19   A.   Well, like I said, "*loco*" is dude for the most

20   part.  But since I did -- I did ask, once I started

21   doing the verbatim, I asked -- I knew it was already a

22   gang case.

23   Q.   Okay.  So --

24   A.   That's why I made the assuming to use "homie,"

25   because "dude" doesn't apply any more.

1    Q.   Well, let me stop you there.  You said you asked.
2  Who did you ask and what did you ask?
3    A.   Um, I would ask the agent.
4    Q.   Which agents?
5    A.   At the time, Fernando Uribe.
6    Q.   And what would you ask Agent Uribe?
7    A.   I just asked him, are they gang members?
8    Q.   That's it?  Nothing more?
9    A.   Yeah, I mean -- no, not really.
10    Q.   So, then, am I correct to assume, then, that when
11  you were doing this verbatim, as you call it,
12  translation, you were now doing it through the filter
13  of, this is the FBI going after MS-13?
14    A.   No.
15    Q.   Well, you said that you were involved in this
16  case from the beginning.  What does that mean?
17         What was your involvement with this case from the
18  beginning?
19    A.   I was doing the summaries.  I was listening to
20  the consensual recorded conversations and doing,
21  translating the summaries, translating into summaries.
22    Q.   So it would be fair to say, then, Ms. Portwine,
23  that you weren't a neutral party, right?
24         You're not walking in here as a neutral
25  translator.

1    A.   Yes, I am.

2    Q.   Okay.  So, you were employed with the FBI.

3  You've been involved in this case since the beginning.

4  You were told that this is a gang case.  You were told

5  they were Salvadorans.  And certain words that have

6  certain common meanings, you were skewing them more to

7  fit this narrative that this is a gang case.

8          MS. MARTINEZ:  Objection, Your Honor.

9  Compound question.

10         THE COURT:  Overruled.

11  BY MR. LEIVA:

12   Q.   Isn't that what you were doing?

13   A.   That's -- that's what is necessary when you

14  translate.  That's what you do.

15   Q.   So, when you're translating, like you say,

16  verbatim, you're saying it's necessary to skew it to one

17  way or the other?

18   A.   You know -- yeah, to -- to -- to what you're

19  listening.

20   Q.   Now, I see that there are names that were

21  associated in these transcripts.  Did you put those

22  names in your -- your transcripts, or did someone else

23  do them?

24         And by that -- I'm sorry.  What I mean by "name,"

25  I don't mean the names in the actual context of the

1    conversations, but who they are attributed to, who made
2    what as far as statements.  Did you decipher those names
3    or did someone give you those names to put in there?
4        A.   Someone gave me the names.
5        Q.   Okay.  Who is the person that gave you the names?
6        A.   Fernando Uribe.
7        Q.   Okay.  The same agent who told you that this was
8    an MS case?
9        A.   Yes.
10       Q.   What does *caen que caen* mean to you?
11            THE COURT:  Spell that, please.
12   BY MR. LEIVA:
13       Q.   C-a-e-n, space, separate word is q-u-e, separate
14   worth is c-a-e-n.
15       A.   *Caen que caen*?
16            You're asking me what it means?
17       Q.   Yes, I'm asking you what it means.  What is the
18   verbatim translation of that?
19       A.   I'm sorry -- put me on the spot.  Um, whoever
20   falls, falls.
21       Q.   Okay.  Now, do you recall translating a call
22   where you assert that the person was saying:  We get
23   them, we get them, or do you mean here?
24       A.   I would need to hear it.
25       Q.   Okay.

1    A.   I don't recall.

2    Q.   That's fine.

3         MR. LEIVA:  Your Honor, I think for -- what

4  I can do to make this a little more expeditious is let

5  me finish my questions, and I can go back and -- and

6  play that.

7         THE COURT:  Okay.

8  BY MR. LEIVA:

9    Q.   Now, you also talked about how your work is

10 reviewed by your supervisor.  Is it a supervisor or is

11 it just a colleague?

12   A.   It's a colleague.

13   Q.   It's a colleague.

14   A.   Uh-huh.

15   Q.   And, how is it that your colleague goes about

16 reviewing what you just translated?

17        Does your colleague listen to the audio portion

18 and then they come up with their own transcript and

19 compare it to yours, or how is it done?

20   A.   Um, the -- I don't know how they do it, but the

21 way I do it, the way we're supposed to do it in the

22 office, is that they listen and they make -- they track

23 changes on the Word document, make suggestions, and the

24 changes are tracked.

25   Q.   Now, I noticed that your transcripts are

1    different from what I've seen before, and let me -- let

2    me give you a little background.  I've seen some where

3    there's two columns --

4        A.   Uh-huh.

5        Q.   -- what's written out in Spanish, transcribed,

6    what they've heard -- what the translator has heard, and

7    then next to it is what it is in English, so that person

8    can see line from line what's being said and what's

9    being translated to English.

10       A.   Right.

11       Q.   You didn't do that in this case, right?

12       A.   I did not.

13       Q.   Okay.  So, are you telling us, then, when your

14   colleague reviews your work, they don't have something

15   like that right next to each other to compare, to see

16   whether your translation is accurate or not?

17       A.   They do not have anything like that, no.

18       Q.   Okay.  They just listen to it?

19       A.   They listen to it, yes.

20       Q.   So, the colleague who was reviewing your work,

21   when it came to this issue of home boys and homies, did

22   the same thing that you did, right?

23            They heard the word "*loco*" and determined that

24   that is the equivalent of a homeboy or a homie?

25       A.   I -- I imagine so, yeah.

1    Q.   And how many times do you think your colleague

2  reviewed the work that you did?

3         Now, when I mean (sic) how many times, I mean for

4  each transcript.  Do they just review it once or do they

5  review it several times?

6    A.   Um, I would -- if -- when I'm doing it, I do it

7  several times.  I don't know how many times they would

8  do it.

9    Q.   And, if they believe that you made a mistake --

10   A.   Uh-huh.

11   Q.   -- how is that brought to your attention?

12        How is that dealt with?

13   A.   Like I said, it's underlined or it's in red.  It

14 track changes on Word software.  So, it turns red and

15 there's a line through it.

16   Q.   All right.  And how ultimately is it revolved?

17        Who gets the last call on this --

18   A.   That --

19   Q.   -- as far as who is right?

20   A.   That would be the original linguist.

21   Q.   I'm sorry?

22   A.   The original person, the original linguist.

23   Q.   So then, when you see your colleagues review it,

24 it's more just a suggestion.  If they think that

25 something may have a different meaning, they just

1    suggest that you, but ultimately it's your decision

2    whether you make the change or not?

3        A.   Yes.

4        Q.   And, I believe the -- the woman who reviewed your

5    work is a Ms. LaSalle?

6        A.   Correct.

7        Q.   Okay.  Where is she from?

8        A.   She's from Mexico.

9        Q.   Mexico as well.

10       A.   Uh-huh.

11       Q.   Okay.  Ms. Portwine, I'm going to see if this

12   works, okay?  I've got a speaker here, and I'm --

13   hopefully you'll be able to hear it.

14            MR. LEIVA:  Let me see if I can find this.

15            MS. MARTINEZ:  Your Honor, I would ask

16   that -- that Mr. Leiva identify the exhibit number, and

17   also allow Ms. Portwine to look at the transcript while

18   she's listening.

19            MR. LEIVA:  I will.

20            Ms. Portwine, Counsel, it will be

21   Exhibit 7-A, page nine, the eighth sentence on page

22   nine.

23            THE COURT:  I want to make sure I

24   understand.  I thought you said this transcript was not

25   in Spanish.  It's just English, right?

```
 1              MR. LEIVA:  It is in English.
 2              THE COURT:  Well, doesn't she speak Spanish?
 3              MR. LEIVA:  Yes.
 4              THE COURT:  So why does she need to look at
 5    the transcript, if she wrote it?
 6              MR. LEIVA:  The government is the one who
 7    has asked that I reference the transcript, Your Honor.
 8    I mean -- so, there's going to be some contention as to
 9    what she translated in English.
10              THE COURT:  Well, let's let her hear what
11    she heard first, and then she can translate it.
12              MR. LEIVA:  I will, Your Honor.
13              THE COURT:  She doesn't need to look at it
14    yet.
15              Just listen.  We want to know how you did
16    it.  Just listen.  Okay?
17              THE WITNESS:  Okay.
18              (Pause.)
19              MR. LEIVA:  I apologize, Your Honor.  I had
20    to cue it up.
21              THE COURT:  Take your time.
22              MR. LEIVA:  Your Honor, may I do it this
23    way?  May I let my co-counsel go forward, because
24    apparently --
25              THE COURT:  Sure.  Go ahead.
```

1         MR. LEIVA:  And then I'll just find the

2    actual CD?  Because I have a backup system and I can't

3    find it.  So --

4         THE COURT:  Okay.

5         MR. LEIVA:  -- if I could reserve?

6         THE COURT:  Sure.

7         MR. LEIVA:  Yes.

8             CROSS-EXAMINATION

9    BY MR. AQUINO:

10   Q.  Good morning.  Jerry Aquino on behalf of Jesus

11   Chavez, along with my co-counsel, Ms. Amato.

12   A.  Good morning.

13   Q.  I just have a few questions for you.

14   A.  Yes, sir.

15   Q.  You indicated, as to the speakers, that you got

16   the information as to who the speakers were from the

17   FBI; is that correct?

18   A.  Correct.

19   Q.  And specifically, Agent Uribe; is that accurate?

20   A.  That's correct.

21   Q.  So you're relying upon information that Mr. Uribe

22   provides you to be accurate; is that correct?

23   A.  Yes.

24   Q.  Okay.  And do you know where the agent got his

25   information as to who the speakers were?

1    A.   I don't know where.

2    Q.   Okay.  Now, did you ever meet, in this case, with

3    any gang members themselves?

4    A.   Never did.

5    Q.   Okay.  So, you never got, for example, an actual

6    El Salvadoran gang member's assistance in going through

7    some of the information that you have in this case?

8    A.   We -- we actually did, but it wasn't -- it wasn't

9    a gang member for this particular.  But we had, through

10   the agent, we would ask questions for meanings and stuff

11   like that --

12   Q.   Okay.  And so --

13   A.   -- with other people that the agent knows.

14   Q.   And again, you're making the assuming that the

15   gang member who was providing the information to the

16   agent was being truthful; is that correct?

17   A.   Correct.

18        MR. AQUINO:  That's all the questions I

19   have.

20        THE COURT:  Anyone else?

21        (No response.)

22        THE COURT:  Okay.

23        Mr. Leiva, are you done?

24        MR. LEIVA:  Your Honor, no.  Someone else?

25        I just need five minutes, Your Honor.

1          THE COURT:  Okay.

2          MR. LEIVA:  I just don't know where I got

3   it -- where it went.

4          (Pause).

5          MR. LEIVA:  Your Honor, may I speak to

6   counsel real quick?

7          THE COURT:  Sure.

8          (Pause.)

9          MR. CRAWLEY:  Your Honor?

10          THE COURT:  Yes.

11          MR. CRAWLEY:  My client needs to use the

12   restroom.  So while he's waiting on this --

13          THE COURT:  All right.  We'll take a brief

14   recess.  Thank you.  Let's make it 15 minutes.

15          (Court recessed at 10:45 a.m. and reconvened

16          at 11:02 a.m.)

17          THE COURT:  Bring our jury out, please.

18          You may be seated.

19          Ready to proceed?

20          MR. LEIVA:  Yes, Your Honor.  Again I

21   apologize.  Thank you for your patience.

22                  FURTHER CROSS-EXAMINATION

23   BY MR. LEIVA:

24     Q.   Ms. Portwine, let me ask you -- have you listen

25   to the little segment, and let me know if you can hear

1  it.
2         (Audio played.)
3         MR. LEIVA:  Just rewind it back just a
4  little bit.
5         (Audio played.)
6  BY MR. LEIVA:
7     Q.  What did you hear?
8     A.  (Spanish spoken).
9     Q.  Well, can you say *hijos*?
10        Did you hear the word *hijos* in there?
11    A.  Play it again.
12    Q.  Yes, ma'am.
13        THE COURT:  You will have to interpret this
14 for us English-speaking people.
15        MR. LEIVA:  Yes.
16        (Audio played.)
17 BY MR. LEIVA:
18    Q.  So, I'd like you to focus on *caen que caen*.  What
19 is the verbatim translation of *caen que caen*?
20    A.  Fall that they fall.
21    Q.  Okay.  Good.  All right.
22        And if you could look at page nine -- do you
23 still have that in front of you, Ms. Portwine?
24        (Pause.)
25    A.  Yes.

1    Q.  All right.  You just said that the verbatim

2    translation of that was, if they fall, they fall.

3    A.  Yes.

4    Q.  What you transcribed is:  We get them, we get

5    them.

6        That's completely different from if they fall,

7    they fall.  Would you agree?

8    A.  Yes.

9    Q.  So, you -- would you agree that the --

10           MR. LEIVA:  Well, that's all I have, Your

11   Honor.

12           Excuse me.

13           (Off the record with counsel.)

14           MR. LEIVA:  That's all I have, Your Honor.

15           Thank you, Ms. Portwine.

16           THE COURT:  Redirect.

17                    REDIRECT EXAMINATION

18   BY MS. MARTINEZ:

19   Q.  Good morning, Ms. Portwine.

20   A.  Good morning.

21   Q.  Defense counsel asked you a lot about different

22   dialects of Spanish, right?

23   A.  Right.

24   Q.  Where in LA did you grow up?

25   A.  Los Angeles, in Montebello.

1    Q.   What's significant about Montebello?

2    A.   It's right in the middle of gang territory.

3    Q.   What is it known for?

4    A.   Um, not much.

5    Q.   Are you familiar with the history of MS-13?

6    A.   I am.

7              MR. AQUINO:  Objection, Judge.  I think

8    she's altering now this person's scope of ability that

9    has been noticed.

10             THE COURT:  Sustained.

11   BY MS. MARTINEZ:

12   Q.   What is -- the neighborhood where you grew up,

13   was --

14             MR. AQUINO:  Same objection, Judge.

15             THE COURT:  Are you focusing on her

16   testimony or --

17             MS. MARTINEZ:  Her Spanish language

18   abilities, Your Honor.

19             THE COURT:  All right.  Well, what was your

20   question?  What is the neighborhood known for?

21             MS. MARTINEZ:  I was actually going to ask

22   about her -- was asking -- I first asked what was the

23   neighborhood known for, which Your Honor sustained.

24             I was moving on to a question about her

25   experience in her neighborhood.

1          THE COURT:  Experience with the language?

2          MS. MARTINEZ:  Yes, Your Honor.

3          THE COURT:  Well, focus the question on

4     experience with the language.  Let me hear the question

5     first.  Go ahead.

6     BY MS. MARTINEZ:

7        Q.  You said that you grew up in the Montebello

8     neighborhood in Los Angeles; is that right?

9        A.  That's correct.

10       Q.  And you also said that Montebello is the middle

11    of gang territory; is that correct?

12       A.  That's correct.

13       Q.  Growing up, did you have experience listening to

14    people whom you believed were gang members?

15          MR. AQUINO:  I renew the objection.  Same

16    objection.

17          THE COURT:  Sustained.

18    BY MS. MARTINEZ:

19       Q.  When was the first time you heard Salvadoran

20    Spanish?

21       A.  A long time ago, in high school.

22       Q.  Where were you in high school?

23       A.  In Montebello.

24       Q.  And how was it that you heard Salvadoran Spanish

25    in Montebello?

1    A.   There were other Salvadorians in the area.

2    Q.   Were you able to understand them?

3    A.   Yes.

4    Q.   In high school when you heard Salvadorans

5  speaking Spanish, was there times when they spoke in

6  slang?

7    A.   Yes.

8    Q.   And were you able to understand them?

9    A.   Yes.

10   Q.   Now, moving forward to your experience with the

11 FBI, you were asked a number of questions about how you

12 became familiar with MS-13 slang and dialect.

13   A.   Yes.

14   Q.   During your time with the FBI, have you ever

15 worked with or consulted law enforcement officers from

16 El Salvador?

17   A.   Yes.

18        MR. AQUINO:   Judge, I note the objection is

19 the same objection, starting to morph here from what's

20 been noticed.

21        THE COURT:  Sustained.

22        MS. MARTINEZ:  Your Honor, may we approach

23 on that issue?

24        THE COURT:  No.  Go ahead.

25 BY MS. MARTINEZ:

1    Q.   How have you become familiar with dialects spoken
2    by those from El Salvador?
3    A.   Again, we have glossaries.  I have done research
4    on the Internet --
5                    MR. AQUINO:  Same objection, Judge, again.
6                    THE COURT:  Well, the answer demonstrates.
7    The objection IS  sustained.
8                    MS. MARTINEZ:  Your Honor, if I may, Your
9    Honor, we had moved previously to recognize Ms. Portwine
10   as an expert in Spanish language, with additional
11   expertise on El Salvadoran dialect and MS-13 dialect.
12   At this point we would ask the Court to recognize her as
13   such.
14                   MR. AQUINO:  I object, to the extent that
15   they're attempting to morph the designation to something
16   more than what's been provided.
17                   THE COURT:  She's qualified as a Spanish
18   language linguist, not for an expert in El Salvadoran or
19   MS-13 dialect, is that right, Ms. Martinez?
20                   MS. MARTINEZ:  Your Honor --
21                   THE COURT:  She was never qualified as an
22   MS-13 expert on language, was she?
23                   MS. MARTINEZ:  Not on MS-13, Your Honor, but
24   on dialects.  And as she has established and as defense
25   counsel has established, in different countries, natives

1   from different countries speak different dialects.  And

2   I believe, Your Honor, during direct examination on

3   Thursday, we moved to have her acknowledged as an expert

4   in the Spanish language, as well as dialects,

5   specifically from El Salvador and MS-13.  And we would

6   renew that at this time, Your Honor.

7            THE COURT:  I don't recall that.  I don't

8   recall her being qualified as an -- to testify about El

9   Salvadoran -- MS-13 or El Salvador.  I recall her being

10  a linguist.

11           MS. MARTINEZ:  Not -- not about El Salvador

12  or about MS-13, Your Honor.  I want to make sure I'm

13  very clear and very clear for the record.  I'm talking

14  about her linguist abilities.

15           And so based on the foundation that she's

16  established about different dialects being spoken by

17  individuals from different countries, Your Honor, we had

18  asked that she be recognized as an expert Spanish

19  linguist with expertise in the El Salvadoran dialects,

20  the spoken Spanish language by those who are native El

21  Salvadorans, as well as those who are associated with

22  MS-13, based on the foundation she laid that there are

23  different dialects spoken.

24           MR. AQUINO:  Objection --

25           MS. MARTINEZ:  Only as to the Spanish

language, Your Honor, not as to culture or anything like that.

          MR. AQUINO:  I think they are morphing her, essentially, into a gang expert, and she has not been notified for that.

          THE COURT:  All right.  The clerk's notes says Spanish language translation and El Salvadoran.  It says MS-13, but I don't remember saying anything about MS-13, because I don't have any evidence that she's expert on MS-13.

          So she can testify as to El Salvadoran dialects, but not necessarily MS-13.  As far as we know, she just gathered information from the police.

          MS. MARTINEZ:  And just to be clear, the request is not that she be able to testify about MS-13, Your Honor, but about dialects spoken by gang members.

          If Your Honor would like, I can walk through that foundation again, but --

          THE COURT:  No, I just want to make sure we're saying the same thing.

          MS. MARTINEZ:  Yes, Your Honor.

          THE COURT:  She can testify about Salvadoran dialects, but she cannot testify about what MS-13 gang parlance is, except to the extent she testified about what she received from glossaries from the police.  She

1    has already testified about that, right?

2              MS. MARTINEZ:  She -- she has also testified

3    about other ways in which she's familiar with gang

4    slang, not just from glossaries, Your Honor, and that

5    includes her experience growing up on the streets of Los

6    Angeles in -- right -- right in the middle of gang

7    territory.

8              THE COURT:  She never said anything about

9    MS-13 about where she grew up, having -- I don't want

10   to -- I don't want to prolong this any more than

11   necessary.

12             MS. MARTINEZ:  Yes, Your Honor.

13             THE COURT:  If you want to focus on

14   Salvadoran dialect.  Go ahead.

15             MS. MARTINEZ:  Thank you.

16             THE COURT:  But as far as we can tell, her

17   information about MS-13 slang came from the police.

18             MS. MARTINEZ:  Your Honor, I would like to

19   have permission on redirect to explore that further,

20   because --

21             THE COURT:  If you have glossaries here and

22   the dictionaries here, let me see them.

23             MS. MARTINEZ:  Your Honor --

24             THE COURT:  Go ahead.

25             MS. MARTINEZ:  -- if I may, I just want to

 1   ask questions beyond the -- about how she learned this
 2   slang in addition to glossaries.  May I?
 3             THE COURT:  If you can lay a foundation, go
 4   ahead.
 5             MS. MARTINEZ:  Yes, Your Honor.
 6   BY MS. MARTINEZ:
 7     Q.   During your time working with the FBI, have you
 8   worked with law enforcement officials from El Salvador?
 9     A.   Yes.
10     Q.   What was the purpose of working with law
11   enforcement officials from El Salvador?
12     A.   It was to learn the language and the way they --
13   the way they speak.
14     Q.   And when you say "they," who are you talking
15   about?
16     A.   Um, gang members, Salvadorians, gang members.
17             MR. AQUINO:  Judge, I renew the objection.
18   I think she is morphing into a gang expert.
19             THE COURT:  An expert can rely upon hearsay
20   from others.  But I think it will be necessary for her
21   to give some more information about who were the police
22   officers she spoke to, and when all that occurred.
23             And a policeman is not a gang member, right?
24             MS. MARTINEZ:  Correct, Your Honor.
25             THE COURT:  All right.

L. Portwine - Redirect                                          43

BY MS. MARTINEZ:

Q.   Now, you said a -- we talked about law
enforcement from El Salvador.  What kind of law
enforcement?

A.   Um, I believe it's the Anti-gang Unit.

Q.   And, how many of these law enforcement officials
have you worked with or learned from during your
experience at the FBI?

A.   At least two.

Q.   When was that?

A.   The first one was five years ago, when -- with my
very first case, and the last one was just recently.
And there was a couple in between, but, I don't recall
exactly when.

Q.   Prior to your experience at FBI, have you ever
listened to, been exposed to, gang slang?

A.   Yes.

Q.   MS-13 specifically?

A.   Yes.

Q.   When?

A.   Um, when I worked for --

         MR. AQUINO:  Objection, Judge.  Again, I
think she is essentially getting into MS-13 parlance, as
some type of expert, apparently.  The government is
trying to elicit that from her.

1          THE COURT:  That isn't what you're trying to

2    do?  That isn't what you're trying to do.

3          MS. MARTINEZ:  Not necessarily parlance,

4    Your Honor, but dialect, and the fact that different

5    people from different cultures and different countries

6    speak slightly differently.

7          Defense counsel drew this out, and she

8    answered on cross- -- direct -- excuse me --

9    cross-examination, that there are words in Spanish that

10   may have many different meanings, depending on context

11   or depending on the origin of the person who is

12   speaking.

13         I'm laying the foundation that she is able

14   to understand these different dialects and translate

15   them properly.  She must be able to do so in order to

16   translate the calls that she's heard.

17         I have other foundation to lay as well.  We

18   believe we laid foundation on direct examination, but

19   she has ample experience, both listening to and

20   translating El Salvadoran Spanish as well as Spanish

21   generally.

22         She also has significant experience, both

23   within the FBI and outside of the FBI, of listening to

24   and understanding Spanish spoken by gang members.

25         MR. LEIVA:  Yes, Your Honor.  What came out

1    on cross-examination was that she was unfamiliar with
2    the MS-13 gang slang; therefore, she relied on police
3    officers and/or glossaries.
4              That's what came out.  There was nothing
5    came out that she knew what these terms were used by
6    MS-13 before that.  She wasn't familiar with it.  And
7    she was given these -- this dictionary or the glossary
8    that was compiled by the police.
9              MS. MARTINEZ:  Your Honor, I think that's an
10   exaggeration of what --
11             THE COURT:  Well, let me do this --
12             MS. MARTINEZ:  -- defense counsel
13   established.
14             THE COURT:  Let me do this -- I'll be the
15   judge of that.
16             I'll sustain the objection.
17             MS. MARTINEZ:  Thank you.
18   BY MS. MARTINEZ:
19   Q.   I would like to talk about the list of terms or
20   the dictionaries that you were referencing on
21   cross-examination.
22   A.   Yes.
23   Q.   When you are listening to Spanish language
24   recordings, in addition to consulting dictionaries, how
25   do you go about understanding what's being said in the

1   Spanish language recordings?

2        A.   Well, when you listen to it, you have to put

3   everything in context.  So --

4        Q.   Tell us what that means.  What do you mean by

5   "put it in context"?

6        A.   Well, when you -- when you're listening to

7   something, um, you -- you have to listen to it, and you

8   cannot just translate it word for word, because

9   sometimes it's not going to make sense.

10            It's -- it's -- some things just don't translate

11   directly.  There's no direct word-for-word translation.

12   Even in English words have more than one meaning, so,

13   the same thing with Spanish and the same thing when I

14   translate.

15            And -- (pause) --

16        Q.   You also testified that you listened to thousands

17   of hours of recordings in this case specifically; is

18   that right?

19        A.   That's right.

20        Q.   Can you estimate approximately how many hours of

21   recordings you've listened to in this case?

22        A.   Um, in this particular case, it was about 3,000

23   or more hours.

24        Q.   And, in the -- while listening to those

25   3,000 hours of recordings, how, if at all, did that

1    inform your ability to understand what was being spoken

2    in the recordings?

3        A.   Well, again, by the context of the conversation,

4    and context clues, sentence clues, the way they speak,

5    the way they talk, the way they talk to each other.

6             Um, like he said, like for homie, I mean, you

7    can't just put "dude" on there because they don't say

8    homie -- they don't say "dude" to just about anybody.

9    They only say it to certain people, *loco*, you know.

10            So, you just have to put it in context.  You

11   cannot just say, oh *loco* -- well, "*loco*" means crazy,

12   too, but is that the context?  It doesn't fit.

13            And that's what we're taught in school, too,

14   like, look at sentence clues, look at other things, to

15   make sure that it makes sense to the whole conversation.

16            And that's part of the reason why I also -- I

17   also read it without the audio.  Does it make sense in

18   the whole conversation?

19       Q.   Well, you keep talking about context.  Is context

20   something that someone else is telling you, or is that

21   coming from your own observations?

22       A.   That's my own observations.

23       Q.   And your own observations doing what?

24       A.   Listening, knowing, learning every day, listening

25   to what's going on, and -- just -- (pause).

1    Q.    After listening to approximately 3,000 hours of

2    Spanish language recordings in this case, was it

3    apparent to you what country of origin most of the

4    speakers were from?

5    A.    Absolutely.

6    Q.    And, setting aside this case, but just generally

7    speaking, when you listen to lengthy Spanish recordings,

8    are you able to tell what country of origin, what

9    dialect they're using?

10   A.    Yes.

11   Q.    So, in other words, do you need someone to tell

12   you what dialect it is?

13   A.    No.

14   Q.    What country of origin were most of the speakers

15   in these 3,000 hours of recordings you listened to from?

16   A.    El Salvador.

17   Q.    All right.  And in addition to -- setting aside

18   what anyone may or may not have told you, were you able

19   to tell, by listening to these 3,000 hours of

20   recordings, whether or not some of the speakers spoke

21   like gang members?

22   A.    Yes.

23   Q.    And did they?

24   A.    They did.

25   Q.    And, did -- how, if at all, did that inform the

1    way --

2              MR. LEIVA:  Objection.

3    BY MS. MARTINEZ:

4        Q.  -- that you translated these calls?

5              MR. LEIVA:  Objection.

6              THE COURT:  The objection?

7              MR. LEIVA:  The last comment.  She's asked

8    for an opinion now.  She's basically testifying as a

9    gang expert.

10             She's now asked the jury for her to make the

11   decision on ultimate fact that's an issue of one of

12   these counts, is whether someone is a gang member or

13   not.

14             THE COURT:  Objection sustained.

15   BY MS. MARTINEZ:

16       Q.  When you're listening to a Spanish language

17   recording and you come to your own conclusion about what

18   dialog they're speaking -- dialect they're speaking,

19   how, if at all, does that affect your ability -- the way

20   that you translate that recording?

21       A.  Well, it affects it because that's -- those are

22   the kinds of words I'm going to look for to translate

23   it, and I'm going to go to that specific dialect, those

24   meanings, the way they -- the way they make up -- the

25   way they speak.

1    Q.   But you used the word "*loco*," l-o-c-o, as an

2    example.

3    A.   Right.

4    Q.   What are some of the meanings that "*loco*" can

5    have, setting aside context?

6    A.   Crazy, dude, um, man, um -- I mean, those are

7    just three that I can think of right now.

8    Q.   And, homeboy, too, right?

9              MR. AQUINO:  Objection.

10   BY MS. MARTINEZ:

11   Q.   That's what defense counsel --

12             MR. AQUINO:  Objection.

13             THE COURT:  Sustained.  Sustained.

14   BY MS. MARTINEZ:

15   Q.   When you hear the word "*loco*" in a Spanish

16   language recording, how do you tell what to translate it

17   as?

18   A.   Again, by what was said before, by what they're

19   talking about, by what's said afterwards.  You don't

20   just look at each word and that's it.  You look at the

21   whole thing, the whole sentence.

22   Q.   Now, defense counsel also asked you about the

23   names, the identities of the speakers in these

24   recordings.

25   A.   Yes.

1    Q.    Okay.  Now, you weren't responsible for
2    identifying who was speaking in the recordings; is that
3    right?
4    A.    That's correct.
5    Q.    When you initially prepared your verbatim, did
6    you include the names of the people who were speaking?
7    A.    Initially, no, I did not.
8    Q.    And, in the versions that we looked at on
9    Thursday, the exhibits for this court case, were there
10   names included to identify the speakers?
11   A.    Yes, they were.
12   Q.    Do you know who was responsible for identifying
13   those names?
14   A.    I -- I believe -- it's an assumption, but
15   Fernando Uribe, the agent.
16   Q.    Do you know, from your personal knowledge, who
17   was responsible for identifying the speakers in these
18   many calls?
19   A.    No.
20   Q.    And just to be clear about what your work product
21   is in these transcripts --
22   A.    Uh-huh.
23   Q.    -- the cover page of these transcripts includes
24   date, time, phone numbers, that sort of thing; is that
25   right?

1     A.   That's correct.

2     Q.   Where does that information come from?

3     A.   It comes from the recordings.

4     Q.   Defense counsel also asked about the review

5   process for some of these -- these verbatim

6   recordings --

7              MR. AQUINO:  Objection, Judge.  It's

8   implicit in that question that these are verbatim

9   recordings.  That subject is in dispute.  I submit that

10  the testimony has been they're not verbatim.

11             THE COURT:  Well, this is her witness.  I'm

12  going to allow her to use the word.

13             Go ahead.

14  BY MS. MARTINEZ:

15    Q.   Defense counsel asked you about the review

16  process for these verbatim translations that you

17  prepared for this case.

18    A.   Yes.

19    Q.   Setting this case aside, in your standard work

20  within the FBI, is your work reviewed from time to time?

21    A.   Yes, it is.

22    Q.   And, why is it reviewed from time to time?

23    A.   To make sure that I'm accurate and I'm doing a

24  good job.

25    Q.   How often is your work reviewed?

1    A.   At least once a year.

2    Q.   And what happens after the review?

3         Are you informed of any sort of conclusion?

4    A.   Yes.

5    Q.   And, what is the nature of how you're -- of what

6    you're informed?

7              MR. AQUINO:  Objection as to hearsay, Judge.

8              THE COURT:  You asked her to report the

9    report of a review of her work.  That would be hearsay,

10   wouldn't it?

11             MS. MARTINEZ:  Your Honor, perhaps it was a

12   bad question, but I was asking, in other words, what

13   were the options of the responses.

14             MR. AQUINO:  Objection.  Again, I think it's

15   attempting to elicit hearsay.

16             THE COURT:  It is.

17             MS. MARTINEZ:  In other words, is it

18   pass/fail?  Is there a grade?  Is there a score?  The

19   way that she gets feedback.

20             THE COURT:  Ask that question.  That was not

21   the question you asked.

22             MS. MARTINEZ:  It was perhaps a bad

23   question.  I apologize.

24   BY MS. MARTINEZ:

25   Q.   When your work is reviewed and you get feedback,

1    what is the nature of that feedback?

2         In other words, is it a pass/fail?

3         Do you get a score?

4              MR. AQUINO:  Same objection, Judge.

5              THE COURT:  It doesn't call for hearsay.

6    She didn't ask what score she received.  That would be

7    hearsay.

8              You can ask her.

9    BY MS. MARTINEZ:

10     Q.  What is the nature of the response that you get

11   when your work is reviewed?

12        Not a specific review; what is the nature of that

13   response?

14     A.  It's just a pass/fail.

15     Q.  And, over the course of your experience as a

16   contractor linguist with the FBI, approximately how many

17   times has your work been reviewed?

18     A.  At least six times.

19     Q.  Are you currently in good standing as a contract

20   linguist with the FBI?

21             MR. AQUINO:  She's asking for hearsay, Your

22   Honor.

23             THE COURT:  Overruled.

24   BY MS. MARTINEZ:

25     Q.  Are you currently in good standing as a contract

1   linguist with the FBI?

2       A.  Yes, I am.

3       Q.  Now, you also testified about the review of the

4   transcripts that you prepared for this case.

5       A.  Yes.

6       Q.  And, you testified that you are the final arbiter

7   of any disputes.

8       A.  That's correct.

9       Q.  Were there significant disputes?

10      A.  Not really, no.

11              MS. MARTINEZ:  Thank you, Your Honor.

12              THE COURT:  All right.

13              May the witness be excused?

14              MS. MARTINEZ:  Yes, Your Honor.

15              THE COURT:  You're free to leave.  Thank you

16   for coming.

17              (Thereupon, the witness withdrew from the

18   stand)

19   THE COURT:  Next witness.

20              MS. MARTINEZ:  The government calls Sandra

21   D'Sa.

22              MR. CONTE:  Excuse me, Your Honor.  I would

23   make a request for a copy of the glossary of the

24   dictionary that she used to interpret the recordings.

25              THE COURT:  We will take that up after the

1    recess.

2                    (Witness sworn.)

3                    THEREUPON, SANDRA M. D'SA, having been duly

4    sworn, testified as follows:

5                           DIRECT EXAMINATION

6    BY MS. MARTINEZ:

7        Q.   Good morning.

8             Would you please state and spell your full name

9    for the record.

10       A.   My name is Sandra Martha D'Sa, D-S-a.

11       Q.   Where do you work, Ms. D'Sa?

12       A.   I'm a contract language monitor for the FBI.

13       Q.   How long have you been a contract language

14   monitor for the FBI?

15       A.   Eight years, going into nine.

16       Q.   What languages are you a contract language

17   monitor for?

18       A.   Spanish.

19       Q.   How long have you spoken Spanish?

20       A.   My whole life.  When I -- when --

21       Q.   If you could just lean into the microphone there.

22   Sorry.

23            How long have you spoken Spanish?

24       A.   My whole life.  I'm a native speaker.

25       Q.   What country are you from?

1   A.   Mexico.

2   Q.   When did you come to the United States?

3   A.   When I was 17.

4   Q.   Seventeen?

5   A.   Uh-huh.

6   Q.   How old were you when you learned English?

7   A.   Seventeen.

8   Q.   Where did you work prior to the FBI?

9   A.   I was a teacher.

10  Q.   What kind of teacher?

11  A.   Preschool teacher.

12  Q.   In that capacity, were you able to use your

13  Spanish language skills?

14  A.   Yes.

15  Q.   How so?

16  A.   I was teaching Spanish to the children.

17  Q.   What school is this?

18       Or where was this school, perhaps is a better

19  question.

20  A.   In Herndon.

21  Q.   And when you were teaching Spanish to the

22  children, were you speaking in Spanish?

23  A.   Yes.

24  Q.   And were you also being spoken to in Spanish?

25  A.   They tried, yes.

1    Q.   You're from Mexico?

2    A.   Yes.

3    Q.   Would you agree that Spanish speakers from

4    different countries that speak Spanish use different

5    kinds of dialects?

6              MR. AQUINO:  Objection as to leading.

7              THE COURT:  Overruled.

8              THE WITNESS:  I do agree.

9    BY MS. MARTINEZ:

10   Q.   In addition to a dialect spoken by a native of

11   Mexico, such as yourself, are you familiar with dialects

12   by Spanish speakers from any other countries?

13   A.   I am.

14   Q.   What countries?

15   A.   Every -- countries from South America, like Peru,

16   Argentina, Peru -- I'm sorry -- Bolivia, Colombia,

17   Central America:  El Salvador, Honduras, Guatemala,

18   Nicaragua.

19   Q.   How have you become familiar with all of these

20   dialects?

21   A.   Well, I -- at work, I come across all kinds of

22   material from different countries; and just by speaking

23   to other native speakers, native from the countries.

24   Q.   I'll focus specifically on El Salvador.  How long

25   have you been able to speak with, communicate with,

1    natives of El Salvador in Spanish?

2        A.   Oh, for about over 20 years.  I've spoken to

3    people from El Salvador from the time I went to school,

4    grew up here.

5        Q.   You say when you went to school.  Where did you

6    go to school?

7        A.   Um, I went to school in Herndon, high school.

8        Q.   And, at school, did you have opportunities to

9    speak with other native speakers?

10       A.   Yes.

11       Q.   From what countries?

12       A.   Mainly El Salvador, and some were Peruvian,

13   Guatemalan, Honduran.

14       Q.   Focusing on your experience with the FBI, what

15   are your duties as a contract language monitor with the

16   FBI?

17       A.   I translate material, usually from Spanish into

18   English.

19       Q.   What kind of material?

20       A.   Audio, documents.  I also do interpreting, yep.

21       Q.   When you were hired by the FBI nearly nine years

22   ago, was there a test or qualification that you had to

23   satisfy in order to become a contract language monitor?

24       A.   Yes.

25       Q.   Were you able to satisfy that test or

1    qualification?

2        A.    Yes.

3        Q.    You talked about translating recordings.  What

4    kind of recordings?

5        A.    Um, it varies.  We -- it could be a -- like a

6    body wire or a telephone conversation, or -- it depends.

7        Q.    When you say "a telephone conversation," can you

8    tell us a little bit more about your work translating

9    telephone conversations?

10       A.    Yes.  It could be from wire intercept, or it

11   could be just a conversation that it's been recorded by

12   the agents.

13       Q.    What is a wire intercept?

14       A.    A wire intercept is when we listen to the

15   conversations of a telephone, of somebody's telephone.

16       Q.    Have you worked on wire intercepts during your

17   experience with the FBI?

18       A.    Yes, I have.

19       Q.    When you're working on one particular wire

20   intercept, how long do you work on that same wire

21   intercept?

22       A.    About 40 hours a week.

23       Q.    And for how long?

24       A.    Oh, it varies.  It could be one, two months, up

25   to a year, two years, perhaps.

1    Q.   Over your nearly nine years, how many wire

2    intercepts have you worked on that included Spanish

3    language phone calls?

4    A.   Over 15.

5    Q.   And, of these over 15 wire intercepts, what

6    countries -- what dialects were spoken in these Spanish

7    language recordings?

8    A.   Um, mostly Mexican, Salvadoran, Puerto Rican, a

9    little bit of Peruvian.

10   Q.   About what percentage would you say was

11   Salvadoran?

12   A.   About 50 percent.

13   Q.   I think you mentioned body wire recordings.  What

14   is that?

15   A.   A body wire is when the agents have a cooperating

16   witness, and they put a recording device, and they go

17   in -- they could go to a meeting.  They could go to,

18   whatever their tasks.

19   Q.   What is your role?

20   A.   I have to listen to the -- the recording and

21   translate it.

22   Q.   What language is -- do you translate?

23   A.   Spanish.

24   Q.   You also said that you do in-person translation.

25   Can you tell the jury a little bit more about that?

S. D'Sa - Direct                                                    62

1     A.   Yes.  I interpret for, like, if I -- if they need
2  me to go to interview a victim or to interpret in court
3  or to interpret in any -- any given situation where
4  the -- the agents need help interpreting for a person
5  who doesn't speak English.
6     Q.   In these contexts, in-person interpretations, are
7  you interpreting from Spanish into English?
8     A.   Yes.
9     Q.   Are you --
10    A.   Mostly.
11    Q.   Are you also interpreting from English into
12 Spanish?
13    A.   Sometimes -- yes, all the times.
14    Q.   Do you have any problem communicating with these
15 native Spanish speakers?
16    A.   No.
17    Q.   And, what countries are these native Spanish
18 speakers from?
19    A.   It varies.  Mostly Central American; Honduran,
20 Salvadoran, Mexican.
21    Q.   Now, going back to what you talked about, about
22 translating for wire intercepts, when you're working on
23 a wire, what is it that you're actually doing on a
24 day-to-day basis for 40 hours a week?
25    A.   I come in.  I log into the system.  And then we

1   just wait for the calls to come.  And when the call

2   comes, we do a summary of the calls.  Usually, it's in

3   Spanish, and -- and, we sign it, and that's it.

4       Q.   And, when you say you do a summary, how is it

5   that you're preparing the summary?

6            What are you doing in order to prepare the

7   summary?

8       A.   I listen to the conversation.

9       Q.   What language is the conversation in?

10      A.   In Spanish.

11      Q.   During your nearly nine years of experience with

12  the FBI, in all of these types of translating that

13  you've done, approximately what percentage would you say

14  has been Salvadoran dialect?

15      A.   About 50, 50 percent.

16      Q.   And, how many hours -- could you estimate how

17  many hours of recorded Spanish language material you've

18  heard during the course of your experience with the FBI

19  that was in Salvadoran dialect?

20      A.   Thousands.  It's been a lot.

21           MS. MARTINEZ:  Your Honor, at this time we

22  move the Court to recognize Ms. D'Sa as an expert

23  Spanish language linguist, both in the Spanish language

24  and in the Salvadoran dialect.

25           MR. LEIVA:  Subject to cross, Your Honor.

1      THE COURT:  All right.  She'll be qualified

2  as an expert in the Spanish language as a linguist and

3  Salvadoran dialect.

4      You may proceed.

5  BY MS. MARTINEZ:

6      Q.  As part of this case, were you asked to prepare

7  Spanish -- I'm sorry -- were you asked to translate

8  Spanish language recordings and prepare English

9  transcripts of those recordings?

10     A.  Yes.

11     Q.  What process do you use when you're

12  preparing a -- well, let me ask you this:  Were they

13  verbatim translations?

14     A.  Yes.

15     Q.  What process do you use when you're preparing a

16  verbatim English translation of a Spanish language

17  recording?

18     A.  So, I get the CD -- usually it comes in a CD --

19  and I follow the format, I listen to it and I just start

20  typing what I hear, and I translate it into Spanish.

21     Q.  What kind of equipment do you use when you do

22  this?

23     A.  I use, um, a transcription, um, system called,

24  um, Omniversal (sic) Start-Stop.  And it just has a, um,

25  pedal that controls -- allows me to pause and go as I

1   hear, and then I just type.

2       Q.   What's the -- what's the purpose of the pedal?

3       A.   Just so I can pause or go back without having to

4   use my hands.  So I just have a pedal and I just type,

5   but, pause or continue, and then I just hear and type

6   and translate.

7       Q.   Why is it helpful to not have to use your hands

8   to start and stop or rewind?

9       A.   Because I can go fast and I can just focus on

10  what I'm doing.

11      Q.   Does that software, Omniversal Start-Stop, make

12  any changes to the recordings itself?

13      A.   No.

14      Q.   Does it make any changes to the data contained

15  within the recording?

16      A.   No.

17      Q.   Now, as you're listening to the Spanish language

18  recording, what is it that you're preparing?

19      A.   Translation of the recording.

20      Q.   And, about how many times do you listen to one

21  Spanish language recording in order to prepare a

22  verbatim translation?

23      A.   Many, many, many.

24           For instance, just to get one phrase, I could

25  listen to it for over an hour, just to -- to get that

1    one -- not even a minute, just ten seconds, can take me

2    20 minutes, just because I want to make sure I'm getting

3    what I'm -- what I'm translating is correct.

4        Q.   And, how is it that you make sure that the

5    translation is correct?

6        A.   Um, I'm sorry?

7        Q.   You said you want to make sure -- you're

8    listening to make sure that what you're getting is

9    correct.  Can you explain to the jury what you mean by

10   that?

11       A.   Yes.  Because, I want to know that what I'm

12   producing is accurate, and, I'm not hearing what I think

13   I'm hearing, versus what they're really actually saying.

14       So, I -- I'm very meticulous about that.  I have

15   to make sure that what I'm translating is accurate and

16   it's -- um, and I'm conveying the meaning.

17       Q.   When you prepare one of these translations, do

18   you listen to the recording from beginning to end?

19       A.   Yes.

20       Q.   Do you do that multiple times?

21       A.   Yes.  I usually listen to it the first -- when I

22   first get the CD or the source of the -- or the audio, I

23   listen to it once, all the way and, just so I know what

24   the conversation is all about, what's going on, how many

25   participants.

S. D'Sa - Direct                                              67

1        And then after that is when I start the actual
2    translation.  And, you know, sometimes I have to go back
3    a little bit and make sure I know exactly what they're
4    saying.
5        Q.  So, you listen to it once all the way through,
6    then you begin listening and translating?
7        A.  Yes.
8        Q.  How many times from the very beginning -- from
9    the first time you listen to the time that you've
10   prepared the translation, how many times have you
11   listened to the recording from beginning to end, on
12   average?
13       A.  About five, five times.
14       Q.  Why so many?
15       A.  Because I have to make sure I get the correct
16   translation.  I want to make sure that I'm getting
17   exactly what they're saying.
18       Q.  Once you've prepared the translation and you
19   actually have the document in front of you, what's the
20   next thing that you do?
21       A.  Um, I turn it in to my supervisor, and then she
22   sends it somewhere else for -- to another colleague for
23   quality control.
24       Q.  Are you ever someone who does quality control for
25   your own colleagues?

S. D'Sa - Direct                                                    68

1      A.   Yes.

2      Q.   Tell the jury about that process.

3      A.   Okay.  So, we have a linguist and he translates

4  the product.  So the quality controller gets that

5  product, so we have to follow the audio and the

6  translation and make sure the -- make sure the linguist

7  accurately translated the document.

8           Um, if there are mistakes or omissions, then we

9  make suggestions and we track the changes.  Um, and it

10  goes back to the linguist.

11     Q.   So, we're returning to an example where you're

12  the linguist.  Do you receive the translation back after

13  the review?

14     A.   Yes.

15     Q.   What do you do then?

16     A.   Um, then I look at the changes they suggested,

17  and if I agree, and if it didn't -- if I agree with the

18  changes, I make the changes.  If I don't agree with the

19  changes, I don't.  I reject the changes and I keep my

20  original translation.

21     Q.   When you're reviewing any suggested changes, are

22  you doing that just based on the translation or does

23  that involve the recording as well?

24     A.   It involves the recording, always.

25     Q.   How so?

1    A.   You have -- when you're going back to a

2 translation, you cannot just read it and say, "Oh, yeah,

3 that sounds good."  You have to make sure you go back to

4 that same exact point of the translation and then you

5 listen to it and make sure it matches with whatever you

6 wrote or the suggestion of the quality reviewer.

7    Q.   During the course of your trial preparation, did

8 you review some of the translations that you prepared?

9    A.   Yes, I did.

10    Q.   Did you review them along with the Spanish

11 language recordings that you translated?

12    A.   Yes, I did.

13         MS. MARTINEZ:  Your Honor, with the help of

14 the court security officer, if we could show the witness

15 what has been marked as Government's Exhibit 1-A and

16 1-A-1.

17 BY MS. MARTINEZ:

18    Q.   Let's start with 1-A.  Do you have that in front

19 of you there?

20    A.   Yes, I do.

21    Q.   What is it?

22    A.   It's a CD.  It's the recording in Spanish.

23    Q.   When you say "the recording in Spanish," what do

24 you mean?

25    A.   It's a CD that contains a recording in Spanish.

1    I translate it.

2         Q.   Have you reviewed this particular CD?

3         A.   Yes, I have.

4         Q.   How do you know that?

5         A.   Because I signed it and I reviewed it.

6         Q.   When you reviewed it, what did you do?

7         A.   I listen to the audio and make sure it was -- um,

8    it matched the translation.

9         Q.   Turning your attention to what should be in front

10   of you there, Exhibit 1-A-1, what is that?

11        A.   That is the translation of the audio.

12        Q.   Which audio?

13        A.   The 1 -- 1-A?  1-A, yes.

14        Q.   All right.  If you could pull that translation

15   out of the sleeve there, so you have a chance to look at

16   it.

17        A.   Yes.

18        Q.   Within the translation, are there speakers who

19   are identified?

20        A.   Yes.

21        Q.   Were you responsible for identifying the

22   speakers?

23        A.   No.

24        Q.   On the front page of the -- the exhibit there,

25   there's information about time and date, that sort of

1    thing.

2        A.   Uh-huh.

3        Q.   Where does that information come from?

4        A.   It comes from the -- the recording.

5        Q.   Now, with the exception of the identities of the

6    speakers, is all of the translation contained -- all the

7    text contained within that translation your work -- your

8    work product?

9        A.   Yes.

10       Q.   Excuse me.

11       A.   Yes.

12       Q.   And, is Government's Exhibit 1-A-1, that

13   translation, a true and accurate English translation of

14   the Spanish language recording, Government's

15   Exhibit 1-A, to the best of your abilities as a Spanish

16   language monitor?

17       A.   Yes, it is.

18            MS. MARTINEZ:   Your Honor, we would move to

19   conditionally admit Government's Exhibit -- Government's

20   Exhibit 1-A-1, subject to establishing relevance and the

21   identities of the speakers.

22            I'll note for the record that Government's

23   Exhibit 1-A, the recording, has already been admitted.

24            MR. AQUINO:   Judge, I object as to the

25   verbatim aspect as being listed on the face of that

1    exhibit, and I ask that you reserve judgment on that
2    until we argue later about it.
3              THE COURT:  Is that it?
4              MR. AQUINO:  Yes, sir.
5              THE COURT:  All right.  Well, I will
6    conditionally admit 1-A-1, subject to relevance and
7    identification of the speakers.  And we will deal with
8    that.
9    BY MS. MARTINEZ:
10   Q.   Ms. D'Sa, could I turn your attention in the same
11   binder to Exhibits 4-A, and 4-A-1?
12   A.   Yes.  I have it.
13   Q.   What is Government's Exhibit 4-A?
14   A.   It's a CD containing recording in Spanish.
15   Q.   At any point, did you review that recording?
16   A.   Yes, I did.
17   Q.   How do you know that?
18   A.   Because I signed it.  It has my initials on it.
19   Q.   What is Government's Exhibit 4-A-1?
20   A.   It's the translation of the recording.
21   Q.   Which recording?
22   A.   Of the 1-A -- I'm sorry -- 4-A.
23   Q.   How do you know that the translation in 4-A-1 is
24   a translation of 4-A?
25   A.   Because I reviewed it.  I listened to the

S. D'Sa - Direct                                                    73

recording and matched it to the translation.

Q.   Who prepared the translation?

A.   I did.

Q.   Okay.  And again, with the exception of the
identity of the speakers, is that translation your work
product?

A.   Yes, it is.

Q.   And, is Government's Exhibit 4-A-1 a true and
accurate English translation of the recording contained
in 4-A, to the best of your abilities as a Spanish
language linguist?

A.   Yes, it is.

        MS. MARTINEZ:  Your Honor, we would
conditionally move to admit Government's Exhibits 4-A
and 4-A-1, subject to establishing relevance and
identity of speakers.

        MR. AQUINO:  Same objection, Judge.

        In addition to that, to the extent that the
testimony would morph into gang expert, we would ask
that as an additional objection.

        And finally, we believe that there may be,
and are, *Crawford* issues related to that.  So when we
get to some point, we would like to argue that to the
Court.

        THE COURT:  All right.  Then we'll

1    conditionally admit 4-1, 4-A-1, transcript, subject to

2    relevance, identity of speakers, information about

3    whether or not gang parlance has been properly

4    interpreted.

5                   Go ahead.

6    BY MS. MARTINEZ:

7       Q.   Turning your attention to Government's

8    Exhibits 4-B and 4-B-1 --

9       A.   Yes.

10      Q.   -- what is Government's Exhibit 4-B?

11      A.   It is a -- it is a smaller part of 4-A -- of

12   the -- of 4-A.

13      Q.   What do you mean, "a smaller part"?

14      A.   It is -- whatever is on this disk on Exhibit 4-B

15   is contained on 4-A.  It's a smaller clip of the -- of

16   4-A.

17      Q.   Did you review that clip?

18      A.   Yes, I did.

19      Q.   How do you know?

20      A.   I signed it and I listened to it.

21      Q.   If you could look at Government's Exhibit 4-B-1.

22   What is 4-B-1?

23      A.   It's the translation of 4-B, Exhibit 4-B.

24      Q.   Is Government's Exhibit 4-B-1 also a clip of some

25   sort?

1    A.   Yes, it is.  It's a clip from a 4-A.

2    Q.   And, is that clip transcript, 4-B-1, a true and

3    accurate translation of the clip recording from

4    Government's Exhibit 4-B, to the best of your abilities

5    as a Spanish language linguist?

6    A.   Yes, it is.

7         MS. MARTINEZ:  Your Honor, we move to

8    conditionally admit Government's Exhibit 4-B and 4-B-1

9    subject to relevance and identity of speakers.

10        MR. AQUINO:  Judge, same objection.

11        To speed matters along, every time they

12   admit or attempt to admit an exhibit, I ask that you

13   treat it as a standing objection.

14        THE COURT:  I think that's very efficient.

15   So if there's a question, we will admit the transcripts

16   conditionally with issues of verbatim -- whether or not

17   it's verbatim or not, subject to relevance, identity of

18   speakers, and limited on whether or not there's evidence

19   to support gang parlance.

20        Go ahead.

21   BY MS. MARTINEZ:

22   Q.   Moving now to Government's Exhibit 4-C and 4-C-1.

23   What is Government's Exhibit 4-C?

24   A.   It is also a clip from Exhibit 4-A.

25   Q.   Did you review that clip?

1    A.   I did.

2    Q.   How do you know that?

3    A.   I signed the disk and I reviewed it.  I listened

4  to it.

5    Q.   What is Government's Exhibit 4-C-1?

6    A.   It's the translation of 4-C, Exhibit 4-C.

7    Q.   Is that translation of in Exhibit 4-C a true and

8  accurate English language translation of the Spanish

9  language clip in 4-C?

10    A.   It is.

11    Q.   Moving now to Government's Exhibit 12-A and

12  12-A-1.

13    A.   Okay.

14    Q.   What is Government's Exhibit 12-A?

15    A.   It's a CD containing a recording in Spanish.

16    Q.   Is that a recording that you reviewed?

17    A.   Yes.

18    Q.   How do you know that?

19    A.   Because I signed the CD and I listened to it.

20    Q.   And Government's Exhibit 12-A-1, what is that?

21    A.   It's the translation of Exhibit 12-A.

22    Q.   Who prepared that translation?

23    A.   I did.

24    Q.   Is Government's Exhibit 12-A-1 a true and

25  accurate English translation of Government's

1   Exhibit 12-A, to the best of your abilities as a Spanish

2   language linguist?

3       A.   It is.

4       Q.   And just for an example for just a moment, on the

5   cover page of Exhibit 12-A-1 -- forgive me if we've

6   covered this before, but I don't recall -- there's

7   information concerning date, time, duration, phone

8   numbers, that sort of thing on the cover page.  Where

9   does that information come from?

10      A.   It comes from the recording.

11      Q.   Moving on to Government's Exhibit 19-A and

12  19-A-1, what is Government's Exhibit 19-A?

13      A.   A CD containing a recording.

14      Q.   Is that a recording that you reviewed?

15      A.   Yes, it is.

16      Q.   How do you know that?

17      A.   Because I signed the CD, and I listened to it.

18      Q.   What is Government's Exhibit 19-A-1?

19      A.   It is the translation of Exhibit 19-A.

20      Q.   Who prepared that translation?

21      A.   I did.

22      Q.   Is the translation in Government's Exhibit 19-A-1

23  a true and accurate English translation of the Spanish

24  language recording in 19-A, to the best of your

25  abilities as a Spanish language linguist?

S. D'Sa - Direct                                                    78

1     A.   It is.

2     Q.   Turning now, please, to Government's Exhibit 21-A

3   and 21-A-1.

4     A.   Okay.

5     Q.   What is 21-A?

6     A.   A CD containing a recording.

7     Q.   A recording that you reviewed?

8     A.   Yes.

9     Q.   How do you know that?

10    A.   Because I signed the CD, and I listened to it.

11    Q.   What is Government's Exhibit 21-A-1?

12    A.   It's the translation of Exhibit 21-A.

13    Q.   Who prepared that translation?

14    A.   I did.

15    Q.   Is the translation contained in

16  Government's Exhibit 21-A-1 a true and accurate English

17  translation of the Spanish language recording in

18  Government's Exhibit 21-A, to the best of your abilities

19  as a Spanish language linguist?

20    A.   Yes.

21    Q.   And now, Government's Exhibits 23-A and 23-A-1.

22    A.   Okay.

23    Q.   What is Government's Exhibit 23-A?

24    A.   It's a CD containing a recording.

25    Q.   Is that a recording that you reviewed?

1    A.   Yes.

2    Q.   How do you know that?

3    A.   Because I signed the CD and I listened to it.

4    Q.   What is Government's Exhibit 23-A-1?

5    A.   It is the translation that goes with 23-A.

6    Q.   Who prepared the translation?

7    A.   I did.

8    Q.   Is the translation contained in Government's

9    Exhibit 23-A-1 a true and accurate English translation

10   of the Spanish language recording in 23-A, to the best

11   of your abilities as a Spanish language linguist?

12   A.   Yes.

13   Q.   And again, to cover all of these translations

14   that we've covered, were you responsible for identifying

15   the speakers?

16   A.   No.

17   Q.   Other than identifying the speakers contained in

18   these translations, is all of the -- all of the

19   translation your work product?

20   A.   Yes.

21        MS. MARTINEZ:  Your Honor, just for the

22   record, we would move to conditionally admit all of the

23   exhibits -- conditionally admit the following exhibits,

24   subject to establishing relevance and the identity of

25   the speakers -- other than the ones I've already said --

1    4-C, 4-C-1, 12-A, 12-A-1, 19-A, 19-A-1, 21-A, 21-A-1,

2    23-A, 23-A-1.

3              THE COURT:  Received, subject to the

4    previous ruling concerning verbatim and all the other

5    matters I mentioned earlier.

6    BY MS. MARTINEZ:

7       Q.  Ms. D'Sa, in addition to these recordings that we

8    just looked at today or that we talked about today, did

9    you listen to other Spanish recordings related to this

10   case?

11      A.  I did.

12      Q.  For what purpose?

13      A.  To translate them.

14      Q.  About how many recordings did you listen to

15   during the course of this case?

16      A.  Many.  Many.

17      Q.  How long have you been working on Spanish

18   language recordings for this case?

19      A.  Over a year.

20      Q.  And in addition to preparing these verbatims,

21   what roles have you played?

22      A.  I was one of the linguists assigned to do the

23   verbatim translations.

24      Q.  Approximately how many hours have you spent

25   listening to recordings and preparing translations

1    related to this case?

2        A.   Over a thousand hours.  It's been a long -- many,

3    many.

4        Q.   And, what country of -- well, let me ask you

5    this:  As a Spanish language linguist, when you listen

6    to someone speaking in Spanish, are you typically able,

7    after a period of time, to determine what country of

8    origin dialect they're using?

9        A.   Yes, I am.

10       Q.   How can you determine that?

11       A.   Um, experience, and just knowing that I know.

12       Q.   And, in this case, listening to these Spanish

13   language recordings, both the ones that we've covered

14   and the others -- the many others that you listened to,

15   were you able to determine what type of dialect was

16   being used?

17       A.   Absolutely.

18       Q.   And what type of dialect was that?

19       A.   Um, Salvadoran, El Salvadoran.

20       Q.   During the course of your experience with the

21   FBI, what kinds of cases have you worked on?

22       A.   Oh, I have worked drug cases, gang, gang cases,

23   counterterrorism, counterintelligence, human

24   trafficking, white-collar crime, blue-collar crime,

25   um -- (pause) --

1    Q.   About what percentage of your -- I'm sorry.  Did

2    I interrupt you?

3    A.   No.

4    Q.   About what percentage of your cases during your

5    nearly nine years of experience with the FBI have been

6    gang cases?

7    A.   About 30 percent of the cases.

8    Q.   And, have you been able to prepare translations,

9    both summary and verbatim, in gang cases?

10   A.   Yes.

11   Q.   What -- do you know what gangs were involved in

12   the gang cases that you worked on?

13   A.   Mostly MS-13 and 18th Street.

14   Q.   How, if at all, have you educated yourself and

15   learned the different dialects that are spoken by gang

16   members?

17   A.   I have done extensive research, particularly to

18   MS-13.  I have been working on MS-13 cases for nine

19   years, and I have prepared by -- I do research, number

20   one.

21        I do -- I have a lot of interaction with police

22   officers from El Salvador.  And they come from a task

23   force in El Salvador that deals with gangs.  And I have

24   been lucky enough to work with them, at least five of

25   them.  And, they have helped me understand how they --

1    how they speak.

2        Q.   How have you they helped you?

3        A.   I -- I ask them questions, a lot of questions.

4    When I don't understand something they say, I typically

5    have an idea, and if I'm not a hundred percent sure and

6    I have not confirmed it, I -- I consult with these

7    gentlemen who are experts, and they -- they're down

8    there, they talk to them, they deal with them, and

9    they -- they know how they talk.

10         And I ask them, "What does this mean," and they

11   explain it to me.  I take notes, and I have my own

12   glossary.  It's -- pretty big.

13       Q.   And these gentlemen that you just mentioned, who

14   are the gentlemen?

15       A.   They are police officers from the TAG.  The TAG

16   is a transnational gang unit task force in El Salvador,

17   something like that.  So, their main job is to deal with

18   gangs, gang members.

19       Q.   Now, you said that when you consult these law

20   enforcement officials, you said, "Usually I have an idea

21   but then I go to them for clarification."  Can you tell

22   the jury what that means?

23       A.   Yes.  I do my own research.  I read books.  I --

24   just from experience, listening and, um, I watch

25   documentaries, and, you know, gang documentaries, and I

S. D'Sa - Direct                                                    84

do my own research.

And if I am not clear about a term or a word, or if I come across a part of the recording that I don't understand -- and sometimes it's not even about, um -- the Spanish is not very clear, or what -- like, if I understand the words, but not when you put them together, you're not sure of what they mean, I do consult with the officers.  And they clarify, "Oh, yeah, you know, you were pretty close," or, "No, that was not really" -- "that's really not what they're saying in this case."

Because, you know, one phrase can mean many different things, so, it depends.

Q.   In instances when you've consulted with others for assistance, do you rely solely on what someone else says, or do you rely on the recording as well?

A.   On the recording as well.

Q.   What does that mean?

A.   Um, I have to make sure I understand what they're saying -- what the recording says, and I have -- and I have a clear understanding of the words that are being said.

Putting them together and understanding the meaning could get a little challenging at times.

Q.   How, if at all, does context affect the way that

1    you're able to translate a word or a phrase during a

2    recording?

3        A.   Context -- how does it affect the recording?

4        Q.   No.  How does it affect your ability to translate

5    a particular word or phrase?

6        A.   Well, it depends.  A word can mean many different

7    things.

8            So, I have to have a -- a big -- the whole idea.

9    That's why I listen to the whole thing from beginning to

10   end.  Because if you -- if I hear a word there that

11   in -- and you just throw it out there, and you're

12   telling me, "Well, that means this, not that," well,

13   within the context -- within the context of the

14   conversation, it means that, and I know, because I -- I

15   put it all together.

16       Q.   So, in other words, if someone else tells you

17   that word A means B, do you rely solely on what that

18   other individual told you or do you do something else?

19       A.   No, I don't.

20       Q.   What do you do?

21       A.   I put -- I put everything together.  It's my --

22   my expertise and my knowledge of the language and of

23   the -- that specific -- that lingo or that slang.  And,

24   if I'm not satisfied with -- with that, then I just kind

25   of ask other people that have been -- other linguists or

1   even other agents that might have -- know a little bit,

2   other Spanish speaking agents.

3          It is never -- translating is never black or

4   white.  You know, there's -- there's always a little bit

5   of a gray area that, you know, it's never this or that.

6   No way.

7                  MS. MARTINEZ:  Thank you.

8                  No further questions, Your Honor.

9                  THE COURT:  You may proceed.

10                 MR. LEIVA:  Thank you.

11                        CROSS-EXAMINATION

12  BY MR. LEIVA:

13    Q.   Good afternoon, Ms. D'Sa.

14    A.   Good afternoon.

15    Q.   Ms. D'Sa, let's go through some preliminary stuff

16  before we get into your translation that was done in

17  this case.

18    A.   Yes.

19    Q.   Looking over your resumé, you're not a member of

20  the American Translator Association, are you?

21    A.   No, I'm not.

22    Q.   You've never gone through the American Translator

23  Association certified program, have you?

24    A.   No.

25    Q.   Okay.  You're not a member of the International

1   Association of Professional Translators and
2   Interpreters?
3       A.   I'm not.
4       Q.   Okay.  You're not a member of the National
5   Capital Area Translators Association?
6       A.   No, I'm not.
7       Q.   All right.  And, you're also not a member of the
8   National Association for Interpretation?
9       A.   No, I'm not.
10      Q.   Okay.  So, other -- well, in -- let me ask you,
11  you've never been court-certified to testify as a
12  translator in federal court, have you?
13      A.   No, I've not.
14      Q.   Okay.  And, you said that you work for the FBI.
15  I'm assuming that you're an independent contractor that
16  works for the FBI?
17      A.   I am.
18      Q.   You also were asked about your work history.
19      A.   Yes.
20      Q.   I see that you graduated from college, but that
21  was with a major in psychology?
22      A.   Yes.
23      Q.   Okay.  Now, you lived in your native country of
24  Mexico until you were 17 or 18 years old?
25      A.   Seventeen.

1    Q.   Seventeen.  And for at least a good 17 years of

2    your life, you didn't speak with any Salvadorans while

3    you lived in Mexico, for the most part.  Would you agree

4    with that?

5    A.   I agree with that.

6    Q.   And you would agree that your country of Mexico

7    has its own distinct dialect, does it not?

8    A.   Yes.

9    Q.   You guys have your own words that people

10   throughout Latin America are not familiar with?

11   A.   Absolutely, uh-huh.

12   Q.   You guys have your own distinct dialect as well?

13   A.   Yes.

14   Q.   And, even within Mexico the meaning of a word

15   changes from region to region?

16   A.   Yes.

17   Q.   And, you would agree that throughout Latin

18   America, Spanish is spoken differently?

19   A.   Yes.

20   Q.   For example, someone from Argentina may have no

21   clue what someone from El Salvador is speaking.

22   A.   Yes.

23   Q.   And someone from Nicaragua may have no clue to

24   what someone from Uruguay is speaking or saying --

25   A.   Correct.

S. D'Sa - Cross                                                            89

1    Q.   -- right?
2         Even though the mother language is Spanish.
3    A.   Yes.
4    Q.   So, would it be fair to say that when you first
5    started having contact with Salvadorans, you had some
6    difficulty understanding them?
7    A.   No, not really.
8    Q.   I'm not saying you didn't understand them; but it
9    was different, the way they were speaking?
10   A.   Yes.
11   Q.   And, you would agree that Salvadorans for the
12   most part tend to speak informal Spanish?  In other
13   words, they tend to speak slang?
14   A.   No.  Depends on, you know, the level of education
15   or depends on who you're talking to.  I wouldn't
16   generalize that all Salvadorans speak slang.
17   Q.   Well, that's -- that's a fair statement.
18        And, I'm not asking you to generalize, but would
19   you agree with me that most of the Salvadorans that you
20   have encountered -- and I don't mean to offend anyone,
21   I'm half Salvadoran myself -- but most of the
22   Salvadorans that you've encountered don't have a high
23   level of education?
24   A.   No, that's not correct.
25   Q.   So you first started having contact with

1  Salvadorans once you came to this country?

2      A.   Yes.

3      Q.   And, as far as your employment history goes,

4  you -- it appears that once you graduated from college,

5  and maybe while you were in college, you worked at a

6  gift shop for the Ritz-Carlton, correct?

7      A.   Correct.

8      Q.   And from there you moved on to the Federal

9  Children's Center --

10     A.   Correct.

11     Q.   -- right?

12          And is that where you taught toddlers how to

13  speak Spanish?

14     A.   Yes.

15     Q.   And given their ages, I'm assuming it was just

16  very rudimentary Spanish that you were teaching them?

17     A.   Yes, like little words and colors and -- yes.

18     Q.   So, let's talk about this particular assignment.

19  I believe you said that you have been working in this

20  particular case -- was it more than a year or about a

21  year?

22     A.   Um, over a -- a little bit over a year.

23     Q.   A little bit over a year.

24     A.   Uh-huh.

25     Q.   So, you said on direct that you would provide

S. D'Sa - Cross                                                    91

1    summaries.

2        A.   Correct.

3        Q.   I'm assuming you provided summaries to the case

4    agents?

5        A.   Yes.

6        Q.   So, just so I can understand what you mean by

7    "provide summaries," so, they would get a wire intercept

8    and they would immediately give it to you for you to

9    transcribe or to translate?

10       A.   Correct.

11       Q.   Okay.  And, would you agree that Exhibits 1-A and

12   all the other exhibits that you referenced were

13   initially summaries that you gave to case agents?

14       A.   Um, not necessarily myself.  It could have been

15   somebody else.

16       Q.   Okay.  But the ones that you worked on,

17   basically, what we see in 1-A, which is attributed to

18   you as the person that was, for lack of a better term,

19   the leading linguist, that's something that you try to

20   produce for the case agents almost in realtime?

21       A.   No.  That was a verbatim translation of a summary

22   that was previously submitted.

23       Q.   Okay.  And who -- the -- the translations that

24   you have submitted in court or that Ms. Martinez has

25   submitted in court, you're saying that you looked at

 1    summaries first.  They were based off of summaries?

 2       A.   Yes, exactly.

 3       Q.   Okay.  And, those were summaries prepared by

 4    somebody else?

 5       A.   It could have been somebody else, yes, not

 6    necessarily myself.

 7       Q.   Okay.  So, you don't know -- you have no way of

 8    knowing which summaries you prepared or which summaries

 9    someone else prepared?

10       A.   No.

11       Q.   That you then later relied on when providing

12    these transcripts, these translations?

13       A.   Correct.

14       Q.   Okay.  So, let's assume now that you provided

15    some of the summaries, all right?

16            So, at this point, you're working with agents

17    because it's an ongoing investigation.

18       A.   Correct.

19       Q.   Let's start with that premise, right?

20       A.   Uh-huh.

21       Q.   So, you're not going to wait months to prepare

22    these summaries or these transcripts.  They need it in

23    their hands as soon as possible --

24       A.   Yes.

25       Q.   -- right?

S. D'Sa - Cross                                               93

1          So, then, some terms which may be very generic in

2    Spanish, you assign certain gang, um, definitions to

3    them because you knew the agents needed these summaries

4    right away?

5        A.   No, I didn't assign anything.  I -- I didn't -- I

6    don't assign meaning to words.  I know the meaning of

7    the words, or the phrases or the words.

8        Q.   But at the time that you're preparing these

9    summaries, your target audience is the agents, right?

10       A.   Correct.

11       Q.   All right.  And your agents have told you, I'm

12   assuming, by this point that this is an MS-13

13   investigation.

14       A.   Yes.

15       Q.   All right.  So, of course, if you get a

16   Virginia -- a generic word like "*loco*," for example --

17       A.   Yes.

18       Q.   -- what does "*loco*" mean to you?

19       A.   In general, it's crazy.

20       Q.   Okay.  Can it also mean a dude, a guy?

21       A.   A homie.

22       Q.   Okay.  Well, let's focus on that term "homie,"

23   because I see that you used "homie" for every time

24   someone said "*loco*."

25       A.   Uh-huh.

1    Q.   You agree with that?

2    A.   Yes.

3    Q.   Okay.  So, then, um, if -- if you had case agents

4    that were investigating a white-collar crime between

5    some Argentineans, all right -- and I'm sure you're

6    familiar that Argentineans use the word "*loco*."

7    A.   Yes, they do.

8    Q.   You would assign the term "homie," then --

9    A.   No.

10   Q.   -- between Argentineans?

11   A.   No.

12   Q.   Right.  Because that's not your target audience,

13   right?

14   A.   Exactly.

15   Q.   All right.  So going back to my question then, at

16   some point -- well, not at some point.  Let's go back.

17        So, you would take generic terms in Spanish and

18   give them MS or gang meaning, because you knew that your

19   agents were working on an MS-13 gang case?

20   A.   No.  I would assign the term because I know that

21   the way they're speaking, I -- when I hear the

22   conversation, I can tell right away that they're MS-13

23   members.

24   Q.   Okay.  But, if an MS-13 member -- and, during

25   these conversations, you've actually heard MS-13 use the

1    word "homeboy," right?

2        A.   Yes.

3        Q.   They actually said, "homeboy"?

4        A.   Correct.

5        Q.   All right.  And in their conversations, where

6    they use the word "*loco*"?

7        A.   Correct.

8        Q.   So, clearly, they know the distinction between

9    "homeboy" and "*loco*," if they choose to use "homeboy"

10   and choose not to use "homeboy"?

11       A.   Correct.

12       Q.   But you saw it fit, that where they did not use

13   the word "homeboy," you were going to assign the meaning

14   homeboy when they used "*loco*"?

15       A.   I assigned the -- the use of that word because

16   based on my experience, when they talk to each other and

17   they call each other *locos*, they're usually talking

18   about another gang member.  That is why I know -- they

19   don't refer -- they don't refer to any other person as a

20   *loco* if they're not their -- associated with them,

21   they're not one of their associates.

22       Q.   I understand --

23       A.   Based on my experience.

24       Q.   I understand, Ms. D'Sa.

25            But you were here as a translator.

1    A.   Yes.

2    Q.   And what you're telling me is that you did not

3    translate "*loco*" as it's commonly used; you're using

4    your experience with talking to police officers, talking

5    to police officers here in the United States and in

6    El Salvador, to attach another meaning to what is

7    otherwise a generally accepted definition of "*loco*."

8    A.   No, I don't attach other meaning to it.  I use

9    the -- the meaning that it needs to go with it.

10   Q.   All right.  And you say that -- that meaning that

11   needs to go with it, is that because, again, you're

12   providing the summaries to these agents, and you know

13   that they are targeting MS-13, so, whatever translation

14   you provide to them has to be skewed toward that gang

15   lingo so they can understand what they're dealing with?

16   A.   I'm not the one saying the words.  They are

17   saying the words.

18   Q.   Yeah, but --

19   A.   I just translate them.

20   Q.   But they're saying the word like "*loco*."  And I'm

21   sorry to pick on such a simple word, but, it's simple,

22   "*loco*."

23   A.   Uh-huh.

24   Q.   Most people in Latin America, when you say

25   "*loco*," they don't think homeboy or homie; would you

1    agree with that?

2        A.    I would agree with it, yes.

3        Q.    Do you recall coming across another term, "*trompa*

4    *de hoyo*"?

5             And it's spelled t-r-o-m-p-a, separate word d-e,

6    separate word, h-o-y-o.

7        A.    Yes, I do remember that.

8        Q.    Okay.  And what is the translation of that?

9        A.    It is a -- it is a weapon of some sort.

10       Q.    "Of some sort."

11       A.    Uh-huh.

12       Q.    But in the translation that you provided, you

13   actually put down the caliber of weapon and the type of

14   weapon.

15       A.    Yes.

16       Q.    And nowhere -- well, I'll leave it at that.

17            So, let's talk about your interaction with --

18   with members of law enforcement, both here and in El

19   Salvador.

20            So, you testified that -- that you would have a

21   lot of questions and you would do your own research and,

22   um -- I'm assuming it's because you would hear certain

23   terms that you've never heard before?

24       A.    Yes.

25       Q.    And, specifically this case, how many times did

1    you consult with other people about certain words that

2    you heard?

3        A.   Quite a few.

4        Q.   Okay.  And, those people would consist of law

5    enforcement?

6        A.   No, not everybody.

7        Q.   I'm not saying everybody.

8        A.   Uh-huh.

9        Q.   You said a few.  So --

10       A.   A few.

11       Q.   -- a few of them would be law enforcement?

12       A.   A few, yes.

13       Q.   Okay.  Which -- which law enforcement in this

14   country did you consult with for certain definitions?

15       A.   In this country.  I -- I wouldn't -- no.

16       Q.   Do you remember exactly who?

17       A.   No, I -- not in this country, not -- not any of

18   the agents.

19       Q.   Okay.  So, based on that answer, then, is it fair

20   for me to assume that you consulted law enforcement

21   outside this country for certain terms that you heard in

22   these conversations?

23       A.   Yes.

24       Q.   Okay.  Do you recall who you consulted with?

25       A.   Yes.  I -- I asked -- do you want the names?

1    I -- what --

2       Q.   Yes, if you remember.

3       A.   Well, one is -- he goes by Junior.  One of them

4    is Paco, Amiga (phonetics) --

5       Q.   Let me stop you right there.

6            Junior?

7       A.   Yes.

8       Q.   Junior is a law enforcement officer?

9       A.   Yes.

10      Q.   Okay.  From El Salvador?

11      A.   Yes.

12      Q.   Okay.  And, who is the other one?

13      A.   Paco, Amiga, and --

14              MS. MARTINEZ:  Your Honor, may we approach

15   briefly on this?

16              THE COURT:  Okay.

17              MS. MARTINEZ:  Briefly, Your Honor.

18              THE COURT:  Sure.

19              MR. LEIVA:  Your Honor, I understand what

20   the concern is.

21              THE COURT:  Okay.

22              MR. LEIVA:  I'll instruct the witness, just

23   give me the first names.

24              THE COURT:  All right.

25              THE WITNESS:  Yeah, that's right.

1           MR. LEIVA:  First names.

2   BY MR. LEIVA:

3       Q.   And, Paco, he's from El Salvador?

4       A.   Yes.

5       Q.   Okay.  Who else?

6       A.   Amiga.  There was another gentleman, I just -- I

7   could never remember his name.  But I've -- I've spoken

8   to five of them.

9       Q.   Five.

10           And, do you recall or do you have notes which

11  words, specifically, you asked them to help you

12  translate?

13      A.   Um --

14      Q.   And I know you said you've listened to several

15  thousands hours, right?

16      A.   Yes.

17      Q.   So, is that a question that you can ask or -- I

18  mean that you can answer, or is it difficult?

19      A.   I'm trying to think of an example.  *Chumpe*, I had

20  no idea what that was.  I had an idea -- I had an idea,

21  and, I asked one of the officers who was here over the

22  summer, and he told me it was a turkey.

23           And I had no idea that it was a turkey.  But then

24  when you put -- when you use that word in a context,

25  in -- if you attach it to a phrase, it just means

S. D'Sa - Cross

1    something different.

2        Q.  All right.  That's one word.  But I'm assuming,

3    since you've spoken to five different officers -- I'm

4    assuming on five different occasions?

5        A.  Yes.

6        Q.  Right?

7        A.  Yes.

8        Q.  -- that you had a number of words that you were

9    unfamiliar with and you sought their advice on.

10       A.  Yes.

11       Q.  You also testified that you, as part of your

12   research, would view gang documentaries?

13       A.  I have watched a few, yes.

14       Q.  Okay.  And, you -- you derived some meaning to

15   some of the words based on those gang documentaries?

16       A.  No -- no -- well, it's not just MS-13

17   documentaries.  It's just all sorts of gang, gang

18   documentaries, not just MS-13.

19       Q.  So, you're not familiar with which words, then,

20   that you assigned meaning are either 18th Street lingo,

21   MS-13 lingo, Latin Kings lingo, La Eme lingo?

22       A.  I'm sorry.  What was the question?

23       Q.  Well, you said that you --

24              THE COURT:  It was a compound question.

25              MR. LEIVA:  All right.  I'll go through each

1  name, Your Honor.

2  BY MR. LEIVA:

3    Q.   So, you testified that you would watch these gang

4  documentaries and they would tend to be on gangs in

5  addition to MS-13, right?

6    A.   Yes.

7    Q.   And these documentaries would be part of your

8  research --

9    A.   Yes.

10   Q.   -- right?

11       So, do you know which words you derived meaning

12  from watching documentary -- whether it was a

13  documentary regarding La Eme?

14   A.   I have never watched one regarding La Eme.

15   Q.   18th Street?

16   A.   No.

17   Q.   The Latin Kings?

18   A.   No, I've not watched one.

19   Q.   All right.  So, which gangs documentaries or

20  which gangs are you referring to when you say it's not

21  only MS-13?

22       Which other Latino gangs are you referring to?

23   A.   No Latino gangs.  Like, I've watched

24  documentaries on the Cripps and the Hell's Angels --

25   Q.   Right.

1    A.   -- Angels.

2    Q.   Well, going back to my original question, then:

3    So then, when -- as part of your research for giving

4    meaning to certain words, the gang documentaries you did

5    use, then, dealt with MS-13?

6    A.   Yes.

7    Q.   You said an interesting phrase I would like to

8    focus on.  You said you like to put things all together,

9    right?

10   A.   Uh-huh.

11   Q.   So, you're almost like an investigator, right?

12   A.   Yes.

13   Q.   And, I'm assuming that working with all these

14   agents, and in this particular case over a year, you

15   felt that you were part of this team, right, that was

16   putting this case together?

17   A.   Yes.

18        MR. LEIVA:  That's all the questions I have,

19   Your Honor.

20                      CROSS-EXAMINATION

21   BY MR. AQUINO:

22   Q.   Good afternoon, ma'am.

23   A.   Good afternoon.

24   Q.   My name is Jerry Aquino.  Along with my

25   co-counsel, Ms. Amato, we represent Mr. Jesus Chavez.  I

S. D'Sa - Cross

1    just have a few questions for you.

2         And I thought -- you correct me if I'm wrong --

3    during the direct examination by Ms. Martinez, you

4    indicated that translating is not really black or white.

5    Is that accurate?

6    A.   Yes.

7    Q.   At its heart, you really give your opinion as to

8    the meaning of words, correct?

9    A.   Um, no, I wouldn't say it's my opinion.  It's

10   just based on my experience, like, some things are --

11   yes, this is always what this means, but when you apply

12   it in context, it changes.

13   Q.   So, you give your opinion at that point?

14   A.   You could say that, but, it's not my -- yeah.

15   Q.   Now, ma'am, earlier you testified, I believe,

16   that you rely, at least in part, on police officers for

17   their opinions as to what certain words mean; is that

18   correct?

19   A.   Correct.

20   Q.   And, principally, those police officers are

21   located in El Salvador; is that accurate?

22   A.   Yes.

23   Q.   Now, you don't know any hidden biases that those

24   police officers might have, do you?

25   A.   I don't know.

1    Q.   Okay.  Do you also rely upon gang members to

2    provide meanings for you?

3    A.   Yes, I do.

4    Q.   And, in this case, did you rely upon gang members

5    to provide meanings for you?

6    A.   Yes, I did.

7    Q.   Okay.  Now, you're making a certain assumption

8    about that, right?

9    A.   Am I making an assumption?

10   Q.   Sure.  And the assumption is that those gang

11   members, A, know the true meaning of those terms, and B,

12   are being truthful with you, correct?

13   A.   Correct.

14            MR. AQUINO:  That's all the questions I

15   have.

16            THE COURT:  Redirect.

17            MS. MARTINEZ:  Briefly, Your Honor.

18                   REDIRECT EXAMINATION

19   BY MS. MARTINEZ:

20   Q.   Ms. D'Sa, when you're preparing these

21   translations, the ones that we looked at in court today,

22   what are you basing the translation on?

23        Is it the summaries that were referenced in

24   cross-examination, the Spanish language recordings, or

25   something else?

1    A.   The translations?

2    Q.   Yes.

3    A.   I started from scratch.

4    Q.   What do -- what do you mean by "started from

5    scratch"?

6    A.   Yes.  I did not have any previous experience with

7    the recording.  Like, I -- I was asked if I had listened

8    to it before.  And, I have not.  When I was given these

9    translations, that was the first time I heard them.

10   Q.   When you were preparing the translations, were

11   you looking at a summary prepared by another linguist to

12   help you prepare the translation?

13   A.   No.

14   Q.   What did you base the translation on?

15   A.   What I heard on the recording.

16   Q.   The word "verbatim" has been thrown around a lot

17   during questioning.

18        Can you tell the jury what your understanding of

19   a verbatim translation is?

20   A.   A verbatim translation is all the -- it's a

21   meaning for meaning translation, that you don't

22   translate word per word.  It will never make sense if

23   you translate word per word.

24        So we translate meaning for meaning, and you

25   translate every single phrase, every single cough and

1    "um" and "ah" and noise, and everything has to be

2    included; and any pause, any -- someone sneezes, you

3    note it in the body of the translation.  That's a

4    verbatim translation.

5         Q.   Now, you said it would be meaning per meaning,

6    not word per word; is that right?

7         A.   Correct.

8         Q.   I want to explore that just a little bit more to

9    make sure that we're communicating the same thing.  When

10   you say -- well, let's start with "word per word."  If

11   you were to look at a sentence in Spanish and you

12   translated each single word into English and put those

13   English words in the same order as the Spanish words,

14   would that be the way that you would prepare a

15   translation?

16        A.   No.

17        Q.   Why not?

18        A.   Because, it wouldn't make sense.

19        Q.   Why not?

20        A.   Because we -- the English language and the

21   Spanish language are different, and, we don't say -- we

22   don't speak in the same way.  Like, we don't have -- the

23   sentences are not arranged in the same manner.

24             So, if you're trying to translate, for instance,

25   the white house, in Spanish it would be the other way,

1   the house white, and it wouldn't make sense.  So, we

2   have to -- it's meaning for meaning.

3       Q.   So, in other words, nouns and adjectives, are

4   they in the same order that they would be in English

5   when you see them in Spanish?

6       A.   No.

7       Q.   How about phrases; if you're looking at a whole

8   phrase in Spanish, would you translate that by

9   translating each word in the phrase into English and

10  keeping it in the same order?

11      A.   No.

12      Q.   Why not?

13      A.   It wouldn't make sense.

14      Q.   Why not?

15      A.   Because we -- we don't follow the same order.

16  Even like idioms, you don't -- like sayings, you

17  don't -- sometimes when you try to translate a saying,

18  like it's easier -- we will kill a bird with -- two

19  birds with one stone, sometimes, if you're trying to

20  translate that into Spanish, or vice versa, it doesn't

21  make sense.

22       So we have to find the equivalent in English for

23  that particular instance.  Sometimes, we do have the

24  exact same term, but, sometimes we don't.  Most of the

25  time we don't.

1    Q.   And, how about context?  If you have one phrase

2    or sentence in Spanish, does it matter, the context of

3    what's being said before and after that?

4    A.   Yes, it does.

5    Q.   How so?

6    A.   Um, if -- if they're talking about a certain, um,

7    word, um -- let me see if I think of an example.  If --

8    we have to look at the context for that word to be

9    assigned to the correct -- assigned the correct meaning.

10   Um, otherwise it won't -- it might not fit into the

11   context.

12   Q.   You were also asked about different dialects.

13   When you're translating, preparing a verbatim

14   translation, how does dialect inform the way that you

15   prepare the translation?

16   A.   It just -- I just have to, um, understand that --

17   I have to think about, okay, am I listening to a

18   Peruvian talking?  That word for them might mean

19   something different than it means to a Mexican or to a

20   Salvadoran.

21        So I sort of have to adapt to that and make sure

22   that I'm assigning the correct meaning to the word or

23   the phrase they're saying.

24   Q.   And when you're deciding whether you're list

25   ening to a Peruvian or a Salvadoran or something else,

1    how are you making that decision?

2       A.   Based on their accent and what they say.  They

3    have a -- Mexicans have a way of speaking, um, there are

4    certain words that are used more often by a certain

5    nationality, um -- depends where you're from.

6       Q.   Defense counsel also asked you about your ability

7    to understand MS-13 gang slang.  You said that when

8    you're listening to a recording, you can tell whether

9    you're listening to someone who is speaking MS-13 gang

10   slang.  Can you tell the jury a little bit more about

11   that?

12            MR. AQUINO:  Objection, Judge.  Again, I

13   think we're morphing into a gang expert.

14            MS. MARTINEZ:  She was asked the question on

15   cross.  I'm simply asking her to explain both the answer

16   and -- the question and the answer.

17            THE COURT:  Objection sustained.

18   BY MS. MARTINEZ:

19      Q.   You were asked about a particular phrase within

20   one of these recordings and, how you were able to tell

21   the caliber and type of weapon from that phrase.

22            Can you explain to the jury how you're able to

23   tell the caliber and type of weapon in that context?

24            MR. LEIVA:  Excuse me.  I believe that

25   mischaracterized what I asked.  I asked her to translate

1   that phrase, and from that, I asked her:  You did more

2   than that.  You just basically identified the caliber of

3   the weapon.

4                I didn't ask her how she went about doing

5   it.

6                THE COURT:  If you would rephrase the

7   question.

8   BY MS. MARTINEZ:

9     Q.   You were asked about a particular section of a

10  transcript.  Do you recall that -- on cross-examination?

11    A.   Yes, I do.

12    Q.   And you were asked about how you were able to

13  translate that particular section of the call; is that

14  right?

15    A.   Yes.

16    Q.   And, Mr. Leiva pointed out that in the

17  transcript, there's a discussion or there's a

18  translation about caliber and type.  Do you recall those

19  questions?

20    A.   I do.

21                MR. LEIVA:  Your Honor --

22  BY MS. MARTINEZ:

23    Q.   Do you know --

24                MR. LEIVA:  -- I object to mischaracterizing

25  my question.

1          THE COURT:  Overruled.

2    BY MS. MARTINEZ:

3      Q.  Do you recall what transcript we're talking

4    about?

5      A.  I do recall it.  I don't know exactly which one

6    it is.

7      Q.  That's okay.  But, you recall the general

8    context?

9      A.  Yes.

10     Q.  In that specific context, how was it that you

11   were able to -- to create a translation that included

12   caliber and type of weapon?

13     A.  They were talking about different weapons, and

14   they have different names for them.  And I consulted

15   with one of the -- actually, with two of the police

16   officers, and I asked, "What do you think that is?"

17          And they said, "That's a weapon."

18     Q.  But, more specifically, with respect to caliber

19   or type, how are you able to translate that?

20          MR. AQUINO:  Objection.  Asked and answered.

21          THE COURT:  Sustained.

22   BY MS. MARTINEZ:

23     Q.  When you're listening to Spanish language

24   recordings and you ask someone the meaning of one word,

25   do you rely solely on what that person tells you?

1    A.   No.

2    Q.   Why not?

3    A.   Because I have to satisfy myself.  I have to make

4 sure that I am -- I agree.  I have encountered times

5 where the -- I know the answer and I'm given different

6 answers.  So, I have to -- I have to agree with it.

7    Q.   In addition to just that one word, what are you

8 looking at to help determine the meaning of that word in

9 that particular instance?

10    A.   Um, the entire context of the conversation.

11         MS. MARTINEZ:  Thank you, Your Honor.  No

12 further questions.

13         THE COURT:  May the witness be excused?

14         (No audible response.)

15         THE COURT:  You're free to leave.  Thank you

16 for coming.

17         THE WITNESS:  Thank you.

18         (Thereupon, the witness withdrew from the

19 stand.)

20         MR. TOBLER:  May we call the next witness,

21 Your Honor?

22         THE COURT:  Yes.

23         MR. TOBLER:  United States calls Ramon

24 Aguilar.

25         (Witness sworn.)

1           THE WITNESS:  I do.

2           THEREUPON, RAMON AGUILAR, having been duly

3    sworn, testified as follows:

4                     DIRECT EXAMINATION

5    BY MR. TOBLER:

6       Q.   Good afternoon, sir.  Would you please state your

7    name and spell it for the record.

8       A.   My name is Ramon Aguilar, R-a-m-o-n,

9    A-g-u-i-l-a-r.

10      Q.   Where do you work, Mr. Aguilar?

11      A.   I am an independent or a freelance contractor

12   under contract for the FBI.

13      Q.   How long have you been in that position?

14      A.   I have worked with them for five and a half

15   years.

16      Q.   What languages do you speak, sir?

17      A.   Spanish and English.

18      Q.   How long have you spoken Spanish?

19      A.   Spanish, all my life.

20      Q.   Where did you learn Spanish?

21      A.   In Venezuela.

22      Q.   What is your level of proficiency in Spanish?

23      A.   I'd say about 90 percent.

24      Q.   How long have you spoken English?

25      A.   Since about 42 years.

1    Q.   Where did you work prior to working with the FBI?

2    A.   I worked for a major U.S. airline, still do.  I

3    also do, like I said earlier, freelance translation and

4    interpreting.

5    Q.   In your role with the airline, did you use your

6    Spanish skills?

7    A.   Yes.  That's why I was hired.

8    Q.   How did you use your Spanish skills in that job?

9    A.   Um, translate for customers, translate manuals,

10   interpret for, um -- with customers for customs,

11   immigrations, the local police, the airport police.

12   Q.   Just taking a step back, when you said you were

13   90 percent fluent, could you just explain to the jury

14   what you meant by that?

15   A.   Nobody is perfect at their language.  There is

16   always more to learn.

17   Q.   Based on your experience, would you agree that

18   Spanish speakers from different Spanish speaking

19   countries have different manners of speaking the

20   language?

21   A.   Would you repeat the question again, please.

22   Q.   Based on your experience, would you agree that

23   Spanish speakers from different countries speak Spanish

24   differently?

25   A.   Yes, they do.

R. Aguilar - Direct                                    116

1    Q.   What dialects are you familiar with?

2    A.   Um, all of them.

3    Q.   When you say "all of them," do you mean all

4    Spanish speaking countries?

5    A.   Yes.

6    Q.   Does that include Central American countries?

7    A.   Yes.

8    Q.   Does that include El Salvador?

9    A.   Yes.

10   Q.   How did you become familiar with the Salvadorian

11   dialect?

12   A.   Through -- through the local community and

13   through translating for the Salvadoran community and the

14   authorities, I guess.

15   Q.   When you say "the local community," to which

16   local community are you referring?

17   A.   Northern Virginia.

18   Q.   When you were hired by the FBI, were you required

19   to take any language proficiency exams?

20   A.   Yes, I was.

21   Q.   Were you able to successfully qualify to be a

22   contract linguist?

23   A.   Yes, I did.

24   Q.   What do you do as a contract linguist?

25   A.   I translate and interpret both from Spanish into

1    English and English into Spanish.  I -- do you want me
2    to go through, basically, what I -- general?
3        Q.   Please do.
4        A.   Okay.  I do both simultaneous interpretation.  I
5    do document translation, both from English into Spanish
6    and Spanish into English.  I do presentations.  I --
7    that's pretty much it, yeah.
8        Q.   Do you translate recordings?
9        A.   Yes, I do.
10       Q.   From English into Spanish?
11       A.   And Spanish into English.
12       Q.   What experience do you have translating Spanish
13   in the Salvadorian dialect?
14       A.   Probably about seven years.
15       Q.   Have you performed translations on wire taps
16   involving the Salvadorian dialect?
17       A.   Yes, I have.
18       Q.   How many times?
19       A.   Regularly.  I would say that's probably my bread
20   and butter.
21       Q.   Approximately how many times a year?
22       A.   Eighty percent of my time with the Bureau.
23       Q.   When you're translating for a wire tap, what are
24   your day-to-day duties?
25       A.   I will sit in a room and I will wait for a live

1    phone call, and I will listen to the call and I will

2    summarize it for the agent, from Spanish into English.

3        Q.   Do you ever create verbatim translations of these

4    calls?

5        A.   After the -- the agent in charge will determine

6    whether the call is pertinent, because of our summaries,

7    they will turn around and give them back to us and say,

8    "Now we need a verbatim translation."

9        Q.   Approximately how many hours a week do you

10   perform these duties when you're working on a wire tap?

11       A.   Besides working on a wire tap, I would probably

12   say most of my work is doing verbatim translations.

13       Q.   When you're working on a wire tap, what sort of

14   time commitment is that for you in a given week?

15       A.   Um, normally, our shifts are eight hours long,

16   and depending on how many people are working as monitors

17   for the wire, it would be three, four days, three, four

18   shifts a week, of eight hours each.

19       Q.   And how long does a wire tap typically last?

20       A.   Um, they could go for six months, a year.

21       Q.   What percentage of wires that you've worked on

22   that are in Spanish with the Salvadorian dialect involve

23   MS-13?

24       A.   Just about all of them.

25       Q.   So, what -- approximately what percentage of your

1    work for the FBI involves translating Spanish involving

2    MS-13?

3        A.  MS-13?  I would say probably about 80 percent of

4    my job.

5             MR. TOBLER:  Your Honor, we would move at

6    this time that the witness be recognized as a Spanish

7    linguist, with expertise in the Salvadorian dialect.

8             MR. AQUINO:  Subject to cross-examination,

9    Judge.

10            THE COURT:  He will be qualified as a

11   linguist in Spanish and the Salvadorian dialect.  Thank

12   you.

13   BY MR. TOBLER:

14       Q.  You mentioned before that one of the things you

15   translate was recordings.  Please describe the process

16   by which you prepare a verbatim translation of a Spanish

17   language recording.

18       A.  Normally, we are given -- for the verbatim, you

19   mean?

20       Q.  Yes.

21       A.  Normally, we're given the recording.  The first

22   thing I do is I will listen to the whole recording,

23   familiarize myself with the voices.  And then after I

24   listen to it, I'll just go back and translate verbatim,

25   word by word, what is being said.

1    Q.   What equipment do you use when you're translating

2    something verbatim?

3    A.   We have a commercially available software called

4    Start-Stop.  It comes with pedals that are attached to

5    the computer, and as we listen to the recording, we can

6    stop and start, and it just basically goes back and

7    forth.

8    Q.   What are you doing with your hands when you're --

9    A.   Oh, I'm typing -- I'm sorry -- or writing.

10   Q.   Do you also wear headphones?

11   A.   Yes, I do.

12   Q.   What kind of headphones?

13   A.   They're noise reduction headphones.

14   Q.   Does any of the equipment we just discussed alter

15   the recording you're listening to in any way?

16   A.   No, it does not.

17   Q.   What do you do after you've prepared a draft

18   translation?

19   A.   Um, normally, when that happens, it's returned to

20   whomever requested it.  And if it is an internal

21   document, it stays with us, and it normally doesn't get

22   reviewed.

23        But, if it -- it needs to be -- if it needs to go

24   out of the office for a third party, it is reviewed by

25   someone else.

R. Aguilar - Direct                                          121

1    Q.   Would something be reviewed if it was going to be
2    used for a case that was in court?
3    A.   Yes.
4    Q.   Have you ever served as a reviewer for another
5    linguist's translations?
6    A.   Yes, I have.
7    Q.   What do you do when you are in the position of
8    being the reviewer of another linguist's translations?
9    A.   Normally, when we review a -- a job, let's call
10   it that, I -- I will get both the translation from the
11   original translator and I will get also the audio, and,
12   I will listen to the audio while reading the
13   translation.
14        And if there is any doubt as to what was said, I
15   will compare it with the original translator.  We'll
16   discuss it, and, we will decide as to whether -- what
17   was said on the translation.
18   Q.   When you're the original linguist, rather than
19   the reviewer, what do you do once the reviewing process
20   is complete?
21   A.   I will -- please repeat the question one more
22   time.
23   Q.   What's the next step after the review step is
24   complete?
25   A.   Normally, each document that we translate, we

1    have what we put -- what is called a draft mark on it.

2    The document will continue having that draft mark until

3    it's reviewed.  And at that time, the draft mark will be

4    taken off and the document accepted as translated, and

5    then given to whomever requested it.

6        Q.   As part of this case, were you asked to perform

7    Spanish-to-English translations services?

8        A.   Yes, I was.

9        Q.   Were you also asked to review Spanish-to-English

10   translations performed by other linguists?

11       A.   Yes, I was.

12            MR. TOBLER:  Your Honor, at this time, with

13   the Court's permission, may the government publish page

14   56 of Government's Exhibit 35, which has previously been

15   admitted into evidence?

16            THE COURT:  Yes.

17   BY MR. TOBLER:

18       Q.   Do you recognize that, sir?

19       A.   Yes, I do.

20       Q.   What is it?

21       A.   It is a ledger that was in a book that we were

22   asked to translate.

23       Q.   And how do you recognize it?

24       A.   I recognize it because I did the review on the

25   original translation.

1          MR. TOBLER:  Your Honor, with the Court's

2    permission, may the government now publish page 57 of

3    the Government's Exhibit 35, which has previously been

4    admitted into evidence?

5          THE COURT:  Yes.

6    BY MR. TOBLER:

7       Q.   Do you recognize this, sir?

8       A.   Yes, sir, I do.

9       Q.   And, what is this?

10      A.   That is also a couple pages from a notebook that

11   I was asked to review, the translation.

12      Q.   With the assistance of the courtroom security

13   officer, could you now please direct your attention to

14   Government's Exhibit 35-A, which is in the exhibit

15   binder.

16          MR. TOBLER:  Thank you, Mr. Toliver.

17   BY MR. TOBLER:

18      Q.   Do you recognize Government's Exhibit 35-A, sir?

19      A.   Um, it's the cover sheet of one of our

20   translations.

21      Q.   You can take it out.

22      A.   Okay.  Okay.

23      Q.   Do you recognize that exhibit, sir?

24      A.   Yes.  That is the final product of our

25   translation.

1    Q.  How do you recognize it?

2    A.  Because I reviewed it.

3    Q.  Is Government's Exhibit 35-A a true and accurate

4  English translation of the contents of pages 56 and 57

5  of the Government's Exhibit 35, to the best of your

6  knowledge and ability as a linguist?

7    A.  Yes, they are.

8             MR. TOBLER:  Your Honor, the government

9  moves for the admission of Government's Exhibit 35-A

10  into evidence.

11            THE COURT:  Received.

12  BY MR. TOBLER:

13    Q.  Sir, please next direct your attention to

14  Government's Exhibit 101-C, which is also in the exhibit

15  binder.

16    A.  Okay.

17    Q.  Do you recognize Government's Exhibit 101-C?

18    A.  Um, yes.

19    Q.  What is it?

20    A.  It is a, um -- it's a number of texts that were

21  given to us for translation.

22    Q.  And in what language are those texts?

23    A.  They were in Spanish.

24    Q.  How do you recognize that exhibit?

25    A.  Because I reviewed it from the other linguist.

R. Aguilar - Direct                                          125

1    Q.   Were all of the texts in Government's
2    Exhibit 101-C translated?
3    A.   No.
4    Q.   Please next direct your attention to Government's
5    Exhibit 101-D, please.
6         Do you recognize that exhibit, sir?
7    A.   Yes, I do.
8    Q.   What is it?
9    A.   It is our final product for the translation.
10   Q.   And of what is the translation?
11   A.   Of the texts that were on the previous.
12   Q.   How do you recognize it?
13   A.   Um, mostly because of the highlights on it, or
14   the -- yeah, the highlights on it.
15   Q.   Okay.  You mentioned some highlighting.  What is
16   the significance of the highlighting that you see on
17   Government's Exhibit 101-D?
18   A.   When we receive the request for the translation
19   of texts, we received the request but we only translate
20   the highlighted text messages.  And that's what we did.
21   Q.   Is the highlighted language in Government's
22   Exhibit 101-D a true and accurate English translation of
23   excerpts from Government's Exhibit 101-C --
24   A.   Yes.
25   Q.   -- to the best of your knowledge and ability?

1    A.   Yes.

2         MR. TOBLER:  Your Honor, at this time the

3    government moves for admission of Government's

4    Exhibits 101-C and 101-D, conditional upon the

5    government establishing the evidence's relevance.

6         THE COURT:  Received subject to relevance.

7    BY MR. TOBLER:

8    Q.   Mr. Aguilar, please next direct your attention to

9    Government's Exhibit 104-A.

10   A.   Okay.

11   Q.   Do you recognize Government's Exhibit 104-A?

12   A.   You're talking about the CDs?  Yes.

13   Q.   What is it?

14   A.   Um, two audio CDs.

15   Q.   Please direct your attention to 104-A, in

16   particular.

17   A.   Sorry.  Okay.  I'm sorry.

18   Q.   What is Government's Exhibit -- no need to

19   apologize.

20        What is Government's Exhibit 104-A?

21   A.   It is a CD of an audio that we translated.

22   Q.   How do you recognize it?

23   A.   I initialed it.

24   Q.   When did you initial it?

25   A.   When I was asked to verify that it was the actual

1    recording that I translated.

2        Q.   Would you listen to the recording before you

3    signed this?

4        A.   Absolutely.

5        Q.   Please turn next to Government's Exhibit 104-A-1.

6        A.   Okay.

7        Q.   Do you recognize Government's Exhibit 104-A-1?

8        A.   Yes, I do.

9        Q.   What is it?

10       A.   It's another audio CD.

11       Q.   How do you recognize it?

12       A.   I initialed it.

13       Q.   What did you do before you initialed it?

14       A.   I listened to it and compared it to the other one

15   that we just showed.

16       Q.   When you say you compared it to the other one, do

17   you mean you compared it to another exhibit?

18       A.   Yes, to 10- -- yeah, the previous one.

19       Q.   Is that Government's Exhibit 104-A?

20       A.   104-A.

21       Q.   How do the contents of those two disks compare?

22       A.   They're the same.

23       Q.   Please turn next to Government's Exhibit 104-B.

24       A.   Okay.

25       Q.   Do you recognize Government's Exhibit 104-B?

1   A.   Yes.

2   Q.   What is it?

3   A.   It is my translation of the audio on the CDs.

4   Q.   Is it a -- of which exhibit, just for the record?

5   A.   104-1 and 104 ---104-A and 104-B, sorry.

6   Q.   Okay.  Just to be clear, if you look back at

7   those disks, is it 104-A it's a translation of -- I'll

8   rephrase.

9        Is 104-B a translation of 104-A?

10  A.   Yes, it is.

11  Q.   When you translated Government Exhibit 104-A to

12  create 104-B, did you follow the process you described

13  previously in your testimony?

14  A.   Yes, I did.

15  Q.   And as preparation for your testimony, have you

16  reviewed Government's Exhibit 104-B and compared its

17  contents against Government's Exhibit 104-A?

18  A.   Yes, I did.

19  Q.   Is Government's Exhibit 104-B a true and accurate

20  English translation of the contents of Government's

21  Exhibit 104-A, to the best of your knowledge and ability

22  as a linguist?

23  A.   Yes, it is.

24       MR. TOBLER:  Your Honor, at this time the

25  government moves for admission of Government's Exhibits

1    104-A and 104-B, conditional upon the government

2    establishing the evidence as relevant.

3              MR. AQUINO:  Just to be clear for the

4    record, our standing objection.

5              THE COURT:  As it relates to relevance,

6    verbatim, whether or not there is gang parlance in them,

7    that objection is preserved.

8    BY MR. TOBLER:

9    Q.  Mr. Aguilar, can you turn next, please, to

10   Government's Exhibit 104-C.  Do you recognize

11   Government's Exhibit 104-C?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  It is a number of subtitles.

15   Q.  How do you recognize it?

16   A.  It was given to me to translate.

17   Q.  Please turn to Government's Exhibit 104-C-1.

18        Real quickly, let me ask, while you have that

19   exhibit, what language are the subtitles, sir?

20   A.  They were in Spanish.

21   Q.  Please turn next to Government's Exhibit 104-C-1.

22   Do you recognize Government's Exhibit 104-C-1?

23   A.  Yes, I do.

24   Q.  What is it?

25   A.  That is my translation of the subtitles into

1  English.

2      Q.  How do you recognize Government's Exhibit

3  104-C-1?

4      A.  Because I did it.

5      Q.  Is Government's Exhibit 104-C-1 a true and

6  accurate English translation of the contents of

7  Government's Exhibit 104-C, to the best of your

8  knowledge and ability as a linguist?

9      A.  Yes.

10          MR. TOBLER:  Your Honor, at this time the

11  government moves for admission of Government's Exhibits

12  104-C and 104-C-1, conditional upon the government

13  establishing the relevance of the evidence.

14          THE COURT:  Received.

15          MR. TOBLER:  Thank you.

16          No further questions.

17          MR. CONTE:  Your Honor, would now be a

18  convenient time to --

19          THE COURT:  Well, we actually have five

20  minutes left.

21                    CROSS-EXAMINATION

22  BY MR. LEIVA:

23      Q.  Good afternoon, Mr. Aguilar.

24      A.  Good afternoon.

25      Q.  Mr. Aguilar, you testified that you're originally

1    from Venezuela, right?

2        A.   Actually, I was raised in Venezuela.  I was born

3    here.

4        Q.   I apologize.  I missed that.

5             And, you've been working for the FBI as an

6    independent contractor since 2010?

7        A.   Correct.

8        Q.   I'd like to just go through some preliminary

9    questions, Mr. Aguilar.

10            I'm looking at your resumé.  There are certain

11   things that I don't see there, so I'm going to give you

12   an opportunity to answer.

13            Are you a member of the American Translators

14   Association?

15       A.   No, I'm not.

16       Q.   Okay.  And, are you certified by the American

17   Translators Association?

18       A.   No, I'm not.

19       Q.   Are you a member of the International Association

20   for Professional Translators and Interpreters?

21       A.   No, I'm not.

22       Q.   Are you a member of the National Capital Area

23   Translators Association?

24       A.   No, I'm not.

25       Q.   Are you a member of the National Association for

1    Interpretation?

2        A.   No, I'm not.

3        Q.   And, you've never been certified as a federal

4    court interpreter or translator; is that correct?

5        A.   That is not true.

6        Q.   Okay.  So you have been?

7        A.   I didn't say that.  I've been -- I've been

8    certified by the FBI.  And as far as I understand, I am

9    certified to translate into federal court.  Whether that

10   is actual true or not, I'm not aware.

11             THE COURT:  It's not true.  It's not true.

12   It's not true.  You have to be certified by the Court --

13             THE WITNESS:  Okay.

14             THE COURT:  -- to translate.

15             Go ahead.

16   BY MR. LEIVA:

17       Q.   So, your work history seems to be similar to

18   other people that we've heard from today.  So, you work

19   at a airline, right?

20       A.   Uh-huh.

21       Q.   And --

22             THE COURT:  You have to say "yes" or "no."

23   You can't say "uh-huh."

24             THE WITNESS:  Oh, I'm sorry.

25             Yes.

1    BY MR. LEIVA:

2        Q.    Mostly as a customer service representative?

3        A.    Yeah.

4        Q.    And, before that, you -- and you are still

5    currently employed with an -- with United Airlines,

6    right?

7        A.    Correct.

8        Q.    And before then, you worked at a bank as an

9    assistant bank manager?

10       A.    Correct.

11       Q.    So, you don't -- it looks like in your -- your

12   prior work employment, you've never taught Spanish as a

13   course?

14       A.    Taught Spanish?  No, I never did.

15       Q.    And, you would agree, as you did on direct, that

16   Spanish is spoken differently all over Latin America.

17       A.    That is correct.

18       Q.    All right.  For example, your home country -- not

19   your home country, I apologize.  But the country where

20   you were raised, Venezuela, the way they speak Spanish

21   is distinct from the way Salvadorans speak Spanish.

22       A.    Just in the accent.

23       Q.    Just in the accent.

24       A.    It's still -- still the same Spanish.

25       Q.    Well, at it's -- its root, it's still the same

1   Spanish.

2       A.   Correct.

3       Q.   But you would agree with me that the Salvadoran

4   dialect tends to use more slang?

5       A.   Everyone uses different slang, depending on where

6   they are.  Even different neighbors use different slang.

7       Q.   All right.

8       A.   Different schools will use different slang.

9       Q.   All right.  And, of course, by that you mean that

10  if I say, if I use a particular word, depending on my

11  neighborhood or the region in my country, it could have

12  a totally different meaning?

13      A.   Correct.

14      Q.   All right.  And you just blow that up to the

15  entire Spanish speaking countries, and you have

16  multitude of different definitions and meanings for

17  certain words.

18      A.   Correct.

19      Q.   Even words that are simple and basic?

20      A.   Correct.

21           MR. LEIVA:  Your Honor, just so I can have a

22  point of reference, are we going to stop at 1:00, or --

23           THE COURT:  Yes.  1:00 o'clock is normally

24  the time we stop.

25           MR. LEIVA:  Okay.

1            THE COURT:  My clock still says 12:58.

2            MR. LEIVA:  Yes, sir.

3    BY MR. LEIVA:

4      Q.   So, as far as -- what have you done to educate

5    yourself as far as certain terms and meanings that are

6    used by Salvadorans?

7      A.   Talk to them, listen to them, read about them.

8      Q.   And --

9      A.   About as much as I could do.

10     Q.   And how long have you been assigned to this

11   particular case?

12     A.   Since the very beginning.

13     Q.   So --

14     A.   Two years ago.

15     Q.   Two years ago?

16     A.   Uh-huh.

17     Q.   And, for the last two years, I'm assuming that as

18   wire taps came in, you were tasked with interpreting

19   those wire taps?

20     A.   Correct.

21     Q.   Translating for the agents?

22     A.   Correct.

23     Q.   And you would do so in real time; in other words,

24   they would get it to you and they would need it within

25   24, 48 hours?

1    A.   Not all the time, no.

2    Q.   All right.  But, you would do initial summaries

3    for the case agents?

4    A.   Correct.

5    Q.   And, since the case agents were your target

6    audience, then you would -- you would add meaning to

7    certain words that you thought was appropriate, given

8    the context of this case?

9    A.   That's not true.

10   Q.   It's not true?

11   A.   No.

12   Q.   Okay.  So, we have been using the word "*loco*"

13   today.  What does "*loco*" mean?

14   A.   Dude.

15   Q.   Dude.

16        So, if --

17   A.   And, I'm sorry, that would be in Salvadoran

18   slang.  "*Loco*" literally means crazy.

19   Q.   And that's what it means in Salvadoran slang,

20   right?

21   A.   In my knowledge, yes.

22   Q.   And if --

23        THE COURT:  All right.  We'll pick up right

24   there at 2:00 o'clock.

25        MR. LEIVA:  Yes, sir.

1          THE COURT:  Ladies and gentlemen, please do

2    not discuss the case.  Don't permit the case to be

3    discussed in your presence.  Leave your notes in the

4    jury deliberation room.  We will resume at 2:00 o'clock.

5          Thank you.

6          (Court recessed at 1:00 p.m. and reconvened

7          at 2:02 p.m.)

8          (Jury not present.)

9          THE COURT:  Mr. Aguilar, could you step

10   outside for just a moment.

11         THE WITNESS:  Yes.

12         THE COURT:  Thank you.

13         (Witness stood aside.)

14         THE COURT:  Counsel, Ms. Martinez, Mr. Conte

15   asked for the glossaries that Ms. D'Sa referred to.  Are

16   there glossaries?

17         MS. MARTINEZ:  I don't have glossaries, Your

18   Honor.  We certainly can ask Ms. Portwine.  I'm frankly

19   not sure if this is something that's been formally

20   prepared, or these are notes that she has.  But we can

21   look into it, if Your Honor would like.

22         I don't -- I have not seen them myself, and

23   I don't have them here in court or in the U.S.

24   Attorney's Office.  But if Your Honor orders me,

25   certainly, we'll -- I will follow up on it.

1          THE COURT:  Well, Mr. Conte made a motion to

2    produce these documents that he called glossaries that

3    she referred to.  Under 705, he's entitled to them for

4    cross-examination.

5          So if you would see if there are glossaries,

6    produce them, and then if the defense wants to call her

7    back, that means she has to come back to court.

8          MS. MARTINEZ:  Okay, Your Honor.  So should

9    we inform her that she has not been --

10          THE COURT:  Excused.

11          MS. MARTINEZ:  -- excused?

12          THE COURT:  Well, find out first if there

13    really is a document called glossaries.  And if there is

14    a document called glossaries, then produce it to

15    Mr. Conte, and they can decide if they want to bring her

16    back or not.

17          And if there are not any glossaries, then

18    she definitely needs to come back, because she told us

19    there were glossaries.  Do you see what I'm saying?

20          MS. MARTINEZ:  I do, Your Honor.  Yes.

21          THE COURT:  All right.

22          MS. MARTINEZ:  So, we will inform her that

23    she needs to not discuss the case with anyone, she needs

24    to not be in court.  She needs to be on standby in case

25    she is recalled.

```
 1            And we will look into that.  Your Honor, it
 2   may take -- we're not going to be able to do that until
 3   after court today --
 4            THE COURT:  I understand.
 5            MS. MARTINEZ:  -- and she may not be in the
 6   office, so it may take a couple days to --
 7            THE COURT:  That's fine.
 8            MS. MARTINEZ:  -- to track that down.
 9            THE COURT:  Okay.  Thank you.
10            MS. MARTINEZ:  Thank you, Your Honor.
11            THE COURT:  So I'm clear, I'm just asking
12   you to tell her she's not excused.   If there are
13   glossaries, produce them to Mr. Conte, and he can let
14   you know if he wants to bring her back or not.
15            And if you need to bring her back, you can
16   bring her back in your case.  You should be able to do
17   that while she was here, under 705.
18            MS. MARTINEZ:  Yes, Your Honor.
19            THE COURT:  All right.
20            You can bring the witness back now, thank
21   you.
22            You can bring the jury back out,
23   Mr. Toliver.
24            (Witness resumed stand.)
25            THE COURT:  Thank you, Mr. Aguilar.
```

```
 1              (Jury present at 2:06 p.m.)
 2              THE COURT:  You may be seated.  Thank you.
 3         All right, Counsel, you may proceed.
 4              MR. LEIVA:  Thank you, Your Honor.
 5                CROSS-EXAMINATION (Continued)
 6   BY MR. LEIVA:
 7    Q.   Mr. Aguilar, you were asked by the government to
 8   review text messages, correct?
 9    A.   Yes, sir.
10    Q.   And, you don't need to give me any personal
11   information, but do you have any children who are
12   teenagers or young adults?
13    A.   No.
14    Q.   So, you're not used to this deciphering text
15   messages that are used -- that use abbreviations or
16   acronyms like most of the young people do now?
17    A.   Actually, I am.
18    Q.   You are.
19    A.   Yeah.
20    Q.   Okay.  How is that you are familiar, then, with
21   deciphering acronyms or abbreviations used --
22    A.   Because --
23    Q.   -- in text messages?
24    A.   -- in the last five years doing my job, I have
25   done that.
```

1    Q.   You've done that?

2    A.   Yes, sir.

3    Q.   In English and in Spanish?

4    A.   Yes, sir.

5    Q.   Okay.  And, you would agree with me that the text

6    messages that you received or you reviewed in this case,

7    they're shortened, right?

8    A.   Yes.

9    Q.   They don't follow any particular rules of

10   grammar?

11   A.   Correct.

12   Q.   They are often -- there are often misspelled

13   words?

14   A.   Correct.

15   Q.   There are acronyms?

16   A.   Correct.

17   Q.   There are abbreviations?

18   A.   Yes.

19   Q.   Okay.  So, how do you go about determining what

20   meaning to give to an abbreviation or an acronym that

21   you see?

22   A.   The easiest way that I do it, I say them out

23   loud.

24   Q.   You say it out loud?

25   A.   Uh-huh.

1    Q.   Okay.  And for the --

2    A.   It works for the most part.

3    Q.   And for the acronyms or abbreviations that

4    phonetically don't sound right, how do you go about

5    investigating what, if any, meaning you attribute to

6    that?

7    A.   Internet or whatever assets I can get my hands

8    on.

9    Q.   All right.  So, let's talk about your Internet

10   searches, then.  You just do a general -- you just type

11   in whatever letters you see and see what the Internet

12   says?

13   A.   That's how I start, yes.

14   Q.   Okay.  And, for the words that come back having

15   different meanings, how do you dwindle it down as to

16   which one you're going to use when you produce these

17   transcripts?

18   A.   Um, it's difficult at the beginning of a job

19   assignment because you don't get to know the person that

20   you're translating.  But, as you start working the case,

21   you get -- become familiar with what they use.

22   Q.   All right.  So, when you're listening -- I'm

23   sorry.  When you're reviewing these text messages, are

24   you given the names of the individuals who are texting

25   each other back and forth?

1    A.   Sometimes you are, sometimes you're not.  Just
2  the phone number.
3    Q.   All right.  Are you given the gender of the
4  individual who is texting back and forth?
5    A.   Sometimes you are, sometimes you're not.
6    Q.   So in the cases where you do not know the
7  person's identity or gender or age, for that matter --
8    A.   Correct.
9    Q.   -- how is it that, as you put it, you get to know
10  the person?
11    A.   As you keep reading, as in the -- the translation
12  that we have on file, um, there are a number of them,
13  and as the conversation between the parties go, you get
14  to know them.
15    Q.   And so, again, for a word that comes back with
16  several different meanings when you do this Internet
17  search, you're basically relying, what, on your gut,
18  based on what you think you know about this person who
19  is involved in these text conversations?
20    A.   Not the gut; on the experience of what I know of
21  the person.
22    Q.   When you started this investigation, were you
23  told who the identities were of the people involved --
24    A.   No.
25    Q.   -- who was the target of the investigation?

1     A.   No.

2     Q.   Were you told what kind of case this was?

3          In other words, was it a white collar, was it a

4     bank fraud, mortgage fraud?

5     A.   I don't remember, but it was probably gang case.

6     They usually go that far, to tell us.  We normally know

7     according to the unit that is working it.

8     Q.   And since it appears -- and correct me if I'm

9     wrong -- that you make an attempt to get to know these

10    people, would it be fair for me to assume that you ask,

11    "What kind of case are we dealing with?  What kind of

12    individuals are we dealing with?"

13    A.   Yeah, we normally will be briefed.

14    Q.   And who were you briefed by?

15    A.   Specifically in this case, I couldn't tell you.

16    I don't remember because it's been a while and there are

17    so many cases that we worked.

18    Q.   But you were briefed; you remembered that?

19    A.   Yes.

20    Q.   And you were briefed early on in the

21    investigation?

22    A.   I'm sure.

23    Q.   Otherwise, it would be difficult for you to kind

24    of get to know who you were dealing with in --

25    A.   Not necessarily, no.

1    Q.   All right.  Do you recall what web sites you

2    relied on when determining what abbreviations --

3    A.   There are several.  I would go -- I would even go

4    into the -- depending on the country that I'm

5    translating or the background of the person, I might

6    even go into the country's press.  There are several

7    sites that are gang-related, that they have lingoes.  We

8    have dictionaries --

9    Q.   If I could stop you there --

10   A.   Yes.

11   Q.   -- Mr. Aguilar.

12        Which website did you go to that dealt with -- or

13   provided you with reference material for gang lingo?

14   A.   Right off the top of my head, one of the ones

15   that I can think of tubabel.com.

16   Q.   How do you spell that?

17   A.   T-u-b-a-b-e-l.

18   Q.   Tubabel.  Okay.

19        Which is the other one?

20   A.   Right off the top of my head, I can't think of

21   any.  But there are several.

22   Q.   Okay.  And, how often do you recall consulting

23   with these websites?

24   A.   Not as often as I used to.  As I've gotten to

25   know the lingo, I have used it less and less.

1    Q.   You also mentioned -- and correct me if I'm

2  wrong -- that you would refer to a dictionary?

3    A.   Dictionary?

4    Q.   Did you refer to a dictionary?

5         What other sources, other than the Internet, did

6  you refer to or rely on that --

7    A.   I have --

8    Q.   Hold on.  Let me finish.

9    A.   Okay.

10   Q.   -- in order to determine what certain

11  abbreviations stood for or what certain acronyms stood

12  for?

13   A.   Sometimes I just put them in, and they come right

14  out.  Google it, the abbreviation.

15   Q.   And, as far as the results that came back on

16  Google, I'm assuming, based on your answer, that it

17  would just pop up, and you wouldn't do any further

18  digging as far as the source, who the credited source

19  was, where it was coming from?

20   A.   It depends on what I'm translating.  Okay?  On a

21  text, which has one line and one abbreviation, I might

22  just leave it in there and say, "Don't know what it is,"

23  put "untranslatable."

24        I mean, if I get to know the person and I have

25  long texts or long texts that I'm translating, yeah,

1    I'll go back and dig a little further.

2        Q.   And when you say that you will say -- when you

3    come across a text where you're not sure of, you say

4    it's untranslatable, what do you use -- what do you use

5    as a measuring stick or a gauge?

6            If it's 51 percent, you think you're right, then

7    you go ahead and provide it -- provide a translation for

8    it?

9        A.   No.  I would probably say more like 95 percent.

10       Q.   Do you recall in these translations at all

11   writing down that something was not translatable?

12       A.   Not right off the top of my head, but there's

13   usually some, somewhere.

14       Q.   You also were asked to translate some music

15   files, correct?

16       A.   Correct.

17       Q.   And, those music files, in what format were they

18   provided to you?

19       A.   CD.

20       Q.   CD?

21       A.   Uh-huh.

22       Q.   Did you attempt to find these songs on the

23   Internet?

24       A.   Yes, I did, actually.

25       Q.   And, the reason why you went on the Internet to

1   find these songs is because you wanted to see if there
2   was someone who translated it for you?
3       A.   Correct.
4       Q.   And how many of those songs -- well, let me just
5   go back.
6            Did you do that for every song that you came
7   across?
8       A.   No, just the one that I was asked to translate.
9       Q.   And I'm assuming that you found the translation
10  for that song?
11      A.   No, I did not.
12      Q.   Did you go on YouTube at all to see if you could
13  find it?
14      A.   Yes, I did.  The video is there.
15      Q.   And did you read the comment sections on YouTube
16  to help you do some researches as to what certain
17  meaning of that song meant or stood for?
18      A.   I read some of the comments out of curiosity, but
19  no, not to try to find meanings for it.
20      Q.   On any of these translations, sir, did you use
21  Google Translate?
22      A.   For that specific song?
23      Q.   For either the song or anything that you found in
24  the text messages, did you use that program called
25  Google Translate?

1    A.   That -- that's part of the tools that I use.

2    Q.   And just so the jury know, Google Translate

3    basically serves as a translator, right?

4         It's a program, right?

5    A.   Machine translate.

6    Q.   Machine translate.

7         You put in the term of whatever language you

8    want, and you have Google translate it to you in

9    whatever language you are seeking.

10   A.   Correct.

11   Q.   All right.  And you did -- you said you did use

12   that for the text messages and maybe for the song?

13   A.   That's one of the tools I've used.  I can't tell

14   you specifically that I used it for this case.

15   Q.   Well, when you're -- when you're going through

16   your translations, do you keep a note or a diary of what

17   other tools you use?

18   A.   No.

19   Q.   So that -- I guess the previous answer is, you're

20   not going to say you didn't use or did use it; you just

21   don't know?

22   A.   I don't recall.

23   Q.   How many other cases have you been working on

24   simultaneously to this one?

25   A.   Right now, I'm working ten cases.  At that time,

1    it depends on the time.  As we're getting to the end,

2    that was the only case we were working on.  But

3    throughout the year, I can be working --

4        Q.  Well --

5        A.  -- ten cases.

6        Q.  That's what I'm getting at, sir.  This was, it

7    appears, your only case during this time period, right?

8        A.  Not during the whole two years, no.

9        Q.  But for the bulk, would it be 90 percent of your

10   time was spent on this case?

11       A.  No.

12       Q.  Eighty percent of your time?

13       A.  Probably about 80.

14       Q.  And what you're telling us today is that you have

15   no recollection as to whether you used Google Translate

16   at all?

17       A.  That's not what I said, sir.  What I said was, I

18   don't have recollection of using Google Translate

19   specifically for the translations that are on file.  I

20   did use Google Translate.

21       Q.  While you were translating material for this

22   case; you're just not sure --

23       A.  Correct.

24       Q.  -- if it was the specific exhibit --

25       A.  Correct.

1    Q.   -- that the government introduced.

2    A.   Uh-huh.

3    Q.   Did you consult with any law enforcement

4    officials to help you in assigning certain meaning or

5    definitions to words that you found on these text

6    messages or the song that you translated?

7    A.   Just once.

8    Q.   Just once?

9    A.   Uh-huh.

10   Q.   Who did you consult with?

11   A.   There was a visiting Salvadorian gang officer,

12   and I just happened to meet him, and I said, "Would you

13   happen to know what this means?"

14        And he told me what it was.

15   Q.   Was it one word or was it a series of words

16   that --

17   A.   Or two words, specifically.

18   Q.   Do you recall what those two words were?

19   A.   Yes, I do.  The "blue."

20   Q.   Blue?

21   A.   Blue, and frog, on the song, which meant, cops

22   and soldiers.

23   Q.   Frog, f-r-o-g?

24   A.   Correct.

25   Q.   All right.

1    A.   "*Rana*" is what the song said.

2    Q.   All right.  So -- so the lyrics were in Spanish?

3    A.   Correct.

4    Q.   Any other law enforcement official, other than

5    that?

6    A.   No.

7    Q.   Did you consult with any of your colleagues when

8    you were translating either the text messages or the

9    song?

10   A.   Constantly.

11   Q.   Who were those colleagues that you consulted

12   with?

13   A.   Ms. Sandra D'Sa, Lily Portwine, Raphael Diaz.

14   We're always trying to improve our translation skills by

15   consulting with each other.

16   Q.   And when you sought advice from those

17   individuals, I'm assuming you did so because maybe you

18   were stuck on a word or unsure of its meaning?

19   A.   Yeah.

20   Q.   And, it would be fair to say that those

21   individuals who you just named, you did consult with

22   while translating or interpreting material that the

23   government gave you on this case?

24   A.   Yes.

25            MR. LEIVA:  That's all the questions I have,

1    Your Honor.

2              (Pause.)

3              THE COURT:  Redirect?

4              MR. ZIMMERMAN:  Your Honor, I have one

5    question.

6              THE COURT:  Oh, all right.  I looked over.

7    I didn't see anybody move, so I thought there were no

8    questions.

9              MR. ZIMMERMAN:  I need to move faster, Your

10   Honor.

11             THE COURT:  No, if you had stood up, I could

12   see.  You're a tall man.

13                    CROSS-EXAMINATION

14   BY MR. ZIMMERMAN:

15     Q.  Good afternoon.

16     A.  Good afternoon.

17     Q.  In the transcripts that were referenced, there

18   are the names of those supposedly on call, correct?

19     A.  Refresh my memory.  I'm sorry.

20     Q.  In the --

21             MR. ZIMMERMAN:  Pull up the Government's

22   Exhibits 10-A-1.

23             THE WITNESS:  10-A-1.  I don't think I

24   addressed any of those.

25

BY MR. ZIMMERMAN:

Q.   Did you translate any of the calls?

A.   Not for -- not that are on -- on file here.

Q.   Just the text messages?

A.   I reviewed the text messages from my colleague.
I translated the song and the song titles.

          MR. ZIMMERMAN:  Okay.  I have no further
questions.

                    REDIRECT EXAMINATION

BY MR. TOBLER:

Q.   Very briefly.

     You were asked a question about understanding
acronyms and abbreviations, and you mentioned that --
you testified that you help translate acronyms and
abbreviations by getting to know the person.

A.   Yes.

Q.   What did you mean by that?

     Could you please explain for the jury?

A.   As probably everybody know, every person has
their own mannerisms, their own language, their own
vocabulary.  You know, like, one kid might say "you
know" all the time, or somebody greets somebody by
saying, "What's up, dude," or, "How are you?"

     So, as time passes and you hear these people
repeatedly using these kind of words, you get to know

1    what they're using it for, and you get to know what the
2    meaning is.
3        Q.   When you search the Internet and you come across
4    different possible definitions of a word -- first, let
5    me ask:  Does that ever happen, that you search the
6    Internet for words?
7        A.   All the time.
8        Q.   When that happens, how do you decide which
9    translation should apply to whatever's in front of you?
10       A.   The -- the most common answer to that would be,
11   depending on the conversation, okay?  If they're talking
12   about something that is brown, brown, brown, brown, and
13   then you say, well, they're talking about the car that
14   is brown, because he has a brown car.  I don't know if I
15   explained myself well.
16            But, you get to know the person and you get to
17   know what they talk about, and you get to know the --
18   the meaning of what they're saying, I guess.
19       Q.   Okay.
20            MR. TOBLER:  No further questions, Your
21   Honor.
22            May this witness be excused?
23            THE COURT:  Yes.
24            You're free to leave.  Thank you for coming
25   today.

1           THE WITNESS:  Thank you.

2           (Thereupon, the witness withdrew from the

3    stand.)

4           MS. MARTINEZ:  May we call the next witness?

5           THE COURT:  Yes.

6           MS. MARTINEZ:  The government calls Leonel

7    Gonzalez.

8           THE INTERPRETER:  Excuse me.  Does the

9    witness need interpretation?

10           MS. MARTINEZ:  I'll ask him, but I don't

11   think so.

12           (Witness sworn.)

13           THE WITNESS:  Yes.

14           THE COURT:  You may proceed.

15           THEREUPON, LEONEL GONZALEZ, having been duly

16   sworn, testified as follows:

17                    DIRECT EXAMINATION

18   BY MS. MARTINEZ:

19      Q.  Good afternoon.

20      A.  Good afternoon.

21      Q.  Would you please state your full name and spell

22   it for the record.

23      A.  Leonel Gonzalez, spelled L-e-o-n-e-l, Gonzalez,

24   G-o-n-z-a-l-e-z.

25      Q.  Make sure to speak right into that microphone,

1  okay?

2      A.   Sure.

3      Q.   What language are you comfortable testifying in?

4      A.   English.

5      Q.   How old are you?

6      A.   Twenty-four.

7      Q.   Have you ever been a member of a gang?

8      A.   Yes.

9      Q.   What gang?

10     A.   MS-13.

11     Q.   How old were you when you joined MS-13?

12     A.   Eighteen.

13     Q.   What clique?

14     A.   PVLS.

15     Q.   What's the full name of the clique, PVLS?

16     A.   Park View Locos Salvatruchos.

17     Q.   When you joined MS-13, were you given a gang

18  name?

19     A.   Yes.

20     Q.   What gang name were you given?

21     A.   Drowsy.

22     Q.   How do you spell "Drowsy"?

23     A.   D-r-o-w-s-y.

24     Q.   Mr. Gonzalez, have you ever been convicted for

25  any gang crimes?

1    A.   Yes.

2    Q.   What crimes?

3    A.   Malicious wounding, gang participation, armed

4  robbery, unlawful wounding and weapon possessions.

5    Q.   Did you serve time for these convictions?

6    A.   Yes, I did.

7    Q.   When were you convicted?

8    A.   I was convicted in the year 2011.

9    Q.   How much time were you given?

10   A.   Twenty-five years, with twenty-two years

11 suspended.

12   Q.   When -- are you currently incarcerated?

13   A.   No.

14   Q.   When were you released?

15   A.   September of 2013.

16   Q.   When you were released in September of 2013, were

17 you still an active member of MS-13?

18   A.   No.

19   Q.   At any point after your release, did you again

20 become an active member of MS-13?

21   A.   I was contacted by gang members.  They attempted

22 to bring me in, to be active again.

23   Q.   Who contacted you?

24   A.   An associate I know as only Scrappy.

25   Q.   Scrappy?

1    A.   Yes.

2    Q.   When you say that they contacted you and

3  attempted to bring you back in, can you tell the jury

4  what that means?

5    A.   Basically, they were in the process of finding

6  lost gang members, if you will, and bringing them back

7  to where they belonged.

8    Q.   After you were initially contacted by Scrappy,

9  what happened?

10   A.   I was taken to a meeting with several gang

11  members.

12   Q.   Do you know the gang names of the gang members

13  who were at this meeting?

14   A.   I can't remember all of them, but I can name

15  some.

16   Q.   Could you names the one that you do recall?

17   A.   I remember individuals known as Low -- Little

18  One, Duende, Greñas, Flacco, and Joker.

19   Q.   What happened at this meeting?

20   A.   Um, I gave them a little bit of my background

21  story, told them who I was, where I was from, and they

22  beat me in again.

23   Q.   To give a context in time, how long,

24  approximately, was this after your release in September

25  of 2013?

1    A.   Within weeks.

2    Q.   You said that they beat you in again.  What does

3    that mean?

4    A.   It's a beating, 13 count.

5    Q.   What's the purpose of the beating for a 13 count?

6    A.   Just to establish yourself with the gang again.

7    Q.   Once you were beat back into the gang,

8    established with the gang again, what was your

9    interaction with the gang members?

10   A.   Had to report daily; other than that, nothing

11   serious.

12   Q.   Who did you have to report to?

13   A.   Not anyone specifically, just one person, mainly

14   an individual, and it was Payaso.

15   Q.   Payaso?

16   A.   Yes.

17   Q.   What did you know about Payaso?

18   A.   Not much.  He was incarcerated.

19   Q.   How do you know that he was incarcerated?

20   A.   He told me so.

21   Q.   Who else did you communicate with in the gang

22   after you were beat back in?

23   A.   The members that I named earlier, among other

24   members that I can't remember their names.

25   Q.   After you were jumped back in, was there anything

L. Gonzalez - Direct

1    else that you had to do to prove your loyalty to the
2    gang?
3        A.    Shortly afterwards, another associate of mine, a
4    former associate that I -- I do know, we were tasked
5    with carrying out a murder.
6        Q.    Who tasked you with carrying out a murder?
7        A.    Payaso.
8        Q.    Anyone else?
9        A.    No.
10       Q.    Who was the intended target of the murder?
11       A.    My associate, Peligroso.
12       Q.    You say your associate.  What do you mean by
13   that?
14       A.    He's also a member of MS-13, someone I associated
15   with before.
16       Q.    Before you were in jail?
17       A.    Yes.
18       Q.    Do you know why the gang wanted to kill
19   Peligroso?
20       A.    I didn't get a clear reason; just basically, he
21   had left them.
22       Q.    What do you mean, he had left them?
23       A.    I guess he had cut all ties.
24            MR.  JENKINS:  Objection, Your Honor.  Calls
25   for speculation.

1        THE COURT:  Sustained.

2   BY MS. MARTINEZ:

3      Q.   What, if anything, did the other gang members who

4   were involved in beating you back in tell you about why

5   they wanted to kill Peligroso?

6      A.   They hadn't heard from him.  They thought he was

7   a runaway.

8      Q.   At some point, was there a plan about how this

9   murder was to be conducted?

10     A.   Yes.

11     Q.   Were you aware of the plan?

12     A.   Yes.

13     Q.   How did you become aware of the plan?

14     A.   I was at -- I was present at the meetings.

15     Q.   When you learned of the plan, what did you do?

16     A.   Contacted authorities.

17     Q.   You contacted authorities.  What authorities?

18     A.   Prince William County police.

19     Q.   How did you contact the Prince William County

20   police?

21     A.   I called the station.

22     Q.   Who did you ask to speak to when you called the

23   station?

24     A.   The gang unit.

25     Q.   Were you able to speak with someone?

1    A.    Yes.

2    Q.    What did you tell this individual?

3    A.    I told them about the plan.

4    Q.    Was this on the phone or in person, or some other

5    way?

6    A.    In person.

7    Q.    How did you meet with -- do you recall who it was

8    you met?

9    A.    Detective Armstrong.

10   Q.    How did you meet with Detective Armstrong in

11   person?

12   A.    We met at a shopping center that I -- I

13   frequented often in Woodbridge, Virginia.

14   Q.    What information did you convey to Detective

15   Armstrong during this meeting?

16   A.    The whole plan, basically from the beginning,

17   everything I just told you.

18   Q.    What was the plan?

19   A.    The plan was to catch -- catch him leaving night

20   classes.  We would wait for him to come out and we would

21   assault him with machetes.

22   Q.    Once you conveyed this information to Detective

23   Armstrong, what happened?

24   A.    Um, I agreed to wear a wire, and I wore it the

25   whole time that we went to the school and we were

1    intercepted by police.

2        Q.   When you say "a wire," what do you mean by that?

3        A.   A surveillance device.

4        Q.   Were you also able to record phone calls?

5        A.   Yes.

6        Q.   As part of your trial preparation, did you listen

7    to the recordings that you obtained of the gang members?

8        A.   Yes.

9             MS. MARTINEZ:   Your Honor, with the help of

10   the court security officer, I would like to show this

11   witness Government's Exhibits 1-A, 2-A, 3-A, 4-A, and

12   5-A.

13   BY MS. MARTINEZ:

14       Q.   You can take those out of the sleeve, if you need

15   to.  I'm going to ask you if you recognize each of

16   those.

17       A.   I see them and I recognize them.  I know what

18   they are.

19       Q.   What are they?

20       A.   They are the disks containing the recordings that

21   I was able to obtain.

22       Q.   How is it that you know that these particular

23   disks contain the recordings that you obtained?

24       A.   I initialed them.

25       Q.   Did you also listen to them?

L. Gonzalez - Direct                                          165

1       A.   Yes, ma'am.

2       Q.   You mentioned that you were able to obtain a

3   recording of a meeting during which gang members

4   discussed the murder.  Is that right?

5       A.   Right.

6       Q.   Where did this meeting take place?

7       A.   In the Culmore area of Falls Church.

8       Q.   Who was at the meeting?

9       A.   The gang members I stated earlier, among others.

10      Q.   Could you give the gang names of the members whom

11  you recall from the meeting?

12      A.   I know Duende was there.  Little One was there.

13  Greñas was there.  I know Wasón was there.  Other than

14  that, I can't be too clear.

15           MS. MARTINEZ:  Your Honor, at this time we

16  move to admit Government's Exhibits 2-A, 4-A -- 2-A and

17  4-A, your Honor.  1-A, 3-A and 5-A have been previously

18  admitted.

19           MR. AQUINO:  Same objection.

20           THE COURT:  2-A and 4-A, subject to the

21  previous objection made about verbatim, gang parlance

22  and relevance.

23           Go ahead.

24  BY MS. MARTINEZ:

25      Q.   What happened at this meeting?

1    A.   We discussed the plot that we would carry out the
2    following day.
3    Q.   And what was the nature of those discussions?
4    A.   Weapons, times that we would meet.
5    Q.   What weapons were discussed?
6    A.   Machetes and a sawed-off shotgun.
7    Q.   What happened the day that the murder was
8    supposed to take place?
9    A.   Um, I met with the three individuals that were to
10   go with me, and we went to the school and we were
11   intercepted.
12   Q.   Who were the three individuals who were to go
13   with you?
14   A.   An individual I know as Demente, another younger
15   individual, I can't remember his name, and another
16   individual, and it was Greñas.
17   Q.   You said that you met with these three
18   individuals.  Where did you meet them?
19   A.   I met them at a 7-Eleven in Woodbridge, Virginia.
20   Q.   Were -- were they on foot, in a vehicle or
21   otherwise?
22   A.   They were in a vehicle.
23   Q.   Do you know whose vehicle it was?
24   A.   I'm not sure.
25   Q.   Who was driving the vehicle?

1   A.   An individual I know as Demente.

2   Q.   Did you get into the vehicle?

3   A.   Yes, I did.

4   Q.   Where were you seated in the vehicle?

5   A.   The back seat.

6   Q.   Where was Greñas seated in the vehicle?

7   A.   Front seat.

8   Q.   Where did you go after they picked you up at the

9   7-Eleven?

10   A.   We drove to Garfield Senior High School.

11   Q.   What happened when you got the Garfield High

12   School?

13   A.   We were intercepted by police.

14   Q.   About what time of night was this?

15   A.   I would say between 7:00 and 8:00 p.m.

16   Q.   What happened when you were intercepted by the

17   police?

18   A.   We were taken into custody.

19           MS. MARTINEZ:  No further questions at this

20   time, Your Honor.

21           THE COURT:  You may proceed.

22           MR. JENKINS:  Thank you, Your Honor.

23                   CROSS-EXAMINATION

24   BY MR. JENKINS:

25   Q.   Good afternoon, sir.

1      A.   Good afternoon.

2      Q.   You are -- or were a member of MS-13?

3      A.   Correct.

4      Q.   How long were you a member of MS-13?

5      A.   Between 2010 and 2013.

6      Q.   So, for three years?

7      A.   Yes.

8      Q.   And, during that time, you were convicted of

9  several felonies, correct?

10     A.   Yes.

11     Q.   You were speaking a little bit too fast for me,

12 sir.  Could you state those convictions once again?

13     A.   Malicious wounding, unlawful wounding, gang

14 participation, armed robbery, and several weapon

15 offenses.

16     Q.   And you were given a 25-year sentence?

17     A.   Yes.

18     Q.   And, all but 20- -- but three years were

19 suspended; am I correct?

20     A.   Yes.

21     Q.   So you had 22 years that were suspended over your

22 head?

23     A.   Yes.

24     Q.   Meaning that if you violated your terms of

25 probation, you could be returned back to prison,

1    correct?

2        A.   Yes.

3        Q.   And, you could be returned back to prison for as

4    much as 22 years, correct?

5        A.   Yes.

6        Q.   And, that's something that you weren't interested

7    in doing, correct?

8        A.   Correct.

9        Q.   You didn't want to go back to jail in 2013,

10   correct?

11       A.   Yes, sir.

12       Q.   Now, when you were placed on probation, that was

13   in Fairfax County, correct?

14       A.   Correct.

15       Q.   Fairfax County Circuit Court?

16       A.   Correct.

17       Q.   And, that was -- the judge who gave you -- it was

18   a judge who gave you that sentence, correct?

19       A.   Yes.

20       Q.   And the judge placed you on probation, correct?

21       A.   Yes.

22       Q.   And, one of the things that the judge told you

23   was that you were to abide by certain conditions,

24   correct?

25       A.   Right.

L. Gonzalez - Cross                                              170

1    Q.   Probation conditions, correct?

2    A.   Correct.

3    Q.   And you were given a probation officer, am I

4    correct?

5    A.   Correct.

6    Q.   One of the things that you were told that you

7    couldn't do any more was commit crimes, correct?

8    A.   Correct.

9    Q.   You had to stay out of trouble, correct?

10   A.   Yes.

11   Q.   You were supposed to be of uniform good behavior,

12   correct?

13   A.   Correct.

14   Q.   Had some other conditions also, correct?

15   A.   Yes.

16   Q.   And, hanging out with gang members wasn't

17   consistent with those conditions, correct?

18   A.   Correct.

19   Q.   And, in September of 2013, at that point in time,

20   you reaffiliated with the gang, correct?

21   A.   Yes.

22   Q.   And, did you tell your probation officer that you

23   had reaffiliated with the gang?

24   A.   I informed my probation officer as soon as the

25   situation was going on.

L. Gonzalez - Cross                                                  171

1    Q.   That you had reaffiliated with the gang?

2    A.   Yes.

3    Q.   And, at that point in time -- well, did you tell

4    your probation officer at the time you contacted

5    Detective Armstrong?

6    A.   Yes.

7    Q.   Had you told your probation officer before that?

8    A.   No.

9    Q.   So, when the gang member first reached out to you

10   to try to get you back into the gang, at that point in

11   time you didn't report that, correct?

12   A.   No.

13   Q.   And, at the point in time in which you came to

14   this meeting in which you were jumped in, again, you

15   didn't report that, correct?

16   A.   No.

17   Q.   Now, at some point in time, this individual who

18   you described as Peligroso -- how long had you known

19   Peligroso?

20   A.   A few years, I would say, two, three.

21   Q.   You referred to him on direct examination as your

22   associate.  Was he a particular friend of yours?

23   A.   No.  Back when I was more active with the gang,

24   when I was active, a hundred percent with the gang, he

25   was one of the gang members that was by my side.

1    Q.   And, in MS-13, the gang that you formerly
2    affiliated with, am I correct that it has certain rules?
3    A.   Correct.
4    Q.   And, a certain way of maintaining order within
5    the gang?
6    A.   Correct.
7    Q.   Like if you break certain rules, you receive
8    certain -- you can subject yourself to certain
9    punishment, correct?
10   A.   Correct.
11   Q.   For example, there's a 13-second beating,
12   correct?
13   A.   Correct.
14   Q.   A 26-second beating?
15   A.   Correct.
16   Q.   And it can go right on up to being green lighted,
17   correct?
18   A.   Correct.
19   Q.   And what's a green light?
20   A.   A -- an order to murder.
21   Q.   And, that's something that is decided by whom?
22   A.   Gang leaders.
23   Q.   Did someone like yourself have the ability to
24   weigh in on that?
25   A.   No.

1    Q.   Not something that you would decide yourself?

2    A.   No.

3    Q.   Now, Peligroso, you had known him for a number of

4    years, correct?

5    A.   Correct.

6    Q.   And, you had -- is it fair to say that during the

7    time that you knew him, when both of you were members of

8    the gang, that you had committed crimes together?

9    Correct?

10   A.   Yes.

11   Q.   You had done certain things that you didn't want

12   law enforcement to know about, correct?

13   A.   Correct.

14   Q.   And, is it true, also, that there became a time

15   in September of 2013 that you believed that Peligroso

16   was a snitch?

17   A.   No.

18   Q.   Isn't it true that at some point in time in

19   September of 2013, you told other gang members that

20   Peligroso was a rat?

21   A.   No.

22   Q.   Isn't it true that in September 2013,

23   specifically, you told Demente that Peligroso was a

24   snitch?

25   A.   No.

L. Gonzalez - Cross

1    Q.  Isn't it true that you told Demente that

2  Peligroso needed to be killed?

3    A.  No.

4    Q.  Isn't it true that you told Demente that he

5  needed to be killed because he was a snitch?

6    A.  No.

7    Q.  Now, when you first met with the -- first

8  contacted law enforcement concerning this Peligroso

9  matter, you explained to them that this was a plot to

10  kill Peligroso, correct?

11    A.  Yes.

12    Q.  Now, during these meetings that you had

13  previously had or the one meeting that you had attended

14  with gang members, was the word "kill" ever used?

15    A.  Yes.

16    Q.  And you're sure that it was the word "kill"?

17    A.  Yes.

18    Q.  And you listened to the recordings, correct?

19    A.  Yes.

20    Q.  Before you came in here today?

21    A.  Yes.

22    Q.  Now, isn't it also true that the Spanish word for

23  "hit" was used also?  Correct?

24    A.  Correct.

25    Q.  And, when you say you're going to hit someone in

1    MS-13, that can mean kill them, correct?

2        A.   Correct.

3        Q.   And it also can mean literally to hit them,

4    correct?

5        A.   Right.

6        Q.   It can be either one, correct?

7        A.   Correct.

8        Q.   But, you understood that when "hit" was being

9    used in this meeting, you interpreted it as kill,

10   correct?

11       A.   Yes.

12       Q.   Now, one of the things that Peligroso or a member

13   of gang -- of the gang can subject themselves to a green

14   light is if they are a snitch, correct?

15       A.   Correct.

16       Q.   And your testimony here today is that you never

17   told anyone that Peligroso was a snitch, correct?

18       A.   Correct.

19       Q.   And it's your testimony here today that that

20   wasn't the reason why you understood that he was subject

21   to discipline, correct?

22       A.   Correct.

23       Q.   And, also, in speaking of discipline, there's

24   something called a court in MS-13, also, correct?

25       A.   Correct.

1    Q.   What is a court?

2    A.   Basically, a gang member will -- will go ahead

3    and explain himself, someone will question him.  At that

4    point, the proper discipline is decided.

5    Q.   So if -- for example, if someone is suspected of

6    violating a rule, a gang member or the gang can decide

7    that a court should be held, correct?

8    A.   Correct.

9    Q.   And that's not a 13-second beating, correct?

10   A.   Correct.

11   Q.   But that is a form of the whole discipline system

12   that you have in MS-13, correct?

13   A.   Correct.

14   Q.   And, isn't it true that in September 2013, I

15   believe you testified on direct examination, that the

16   gang thought that Peligroso had walked away from the

17   gang?  Correct?

18   A.   Correct.

19   Q.   There wasn't any definitive proof, correct?

20   A.   Correct.

21   Q.   It was just something that you believed, correct?

22   A.   Correct.

23   Q.   And that's the type of situation where you often

24   would have a court, correct?

25   A.   Correct.

1    Q.   That's the type of situation where you actually
2    want to find out whether or not the gang member truly is
3    guilty of that offense, correct?
4    A.   Correct.
5    Q.   Not the type of situation where you would
6    immediately go to green light, correct?
7    A.   Correct.
8    Q.   Because green light is the most severe form of
9    punishment, correct?
10   A.   Correct.
11   Q.   It's reserved for the most severe transgressions,
12   correct?
13   A.   Correct.
14   Q.   You don't get a green light just for -- I don't
15   know, bumping into a gang member, correct?
16   A.   Correct.
17   Q.   You don't get a green light for simply failing to
18   pay dues on time, correct?
19   A.   Correct.
20   Q.   You don't get a green light for not showing up at
21   one meeting, correct?
22   A.   Correct.
23   Q.   Those are things in which you would have a court
24   for, correct?
25   A.   Correct.

1    Q.   And, in fact, in this meeting that you attended,

2    there was discussion about having a court for Peligroso,

3    correct?

4    A.   I don't recall that.

5    Q.   In fact, Greñas, the individual you described as

6    Greñas, discussed having a court for Peligroso, correct?

7    A.   I don't recall that.

8    Q.   And, isn't it true that the plan was to go to

9    Garfield High School in order to conduct a court?  Is

10   that not true?

11   A.   No.

12   Q.   Is it not true that the plan was to confront

13   Peligroso, to find out whether or not he had, in fact,

14   walked away from the gang?  Correct?

15   A.   No.

16   Q.   Because you didn't have any evidence, again, that

17   he was a snitch, correct?

18   A.   No, I did not.

19   Q.   What does it mean in MS-13 to have papers on

20   someone?

21   A.   Basically, you know their knowledge, you know

22   their story, and it's not just -- it's not just words

23   from their mouth.  It's documented.

24   Q.   For example, when someone wants to confirm

25   whether or not someone is a snitch, i.e., working with

1   law enforcement, you might ask for their papers,

2   correct?

3       A.   Correct.

4       Q.   This other gang member who's accusing one gang

5   member of being a snitch may be asked to produce

6   documentation that shows that he is a snitch, correct?

7       A.   Correct.

8       Q.   And without that, again, you may want to have a

9   court, correct?

10      A.   Correct.

11      Q.   And, in September 2013, no one had produced any

12  documentation or papers with respect to Peligroso,

13  correct?

14      A.   Correct.

15      Q.   There was no confirmed -- confirmation that

16  Peligroso was a snitch, correct?

17      A.   Correct.

18      Q.   Only the suspicion that he may have walked away

19  from his gang obligations, correct?

20      A.   Correct.

21      Q.   And I believe you already testified that that's

22  the type of situation that generally a court is held,

23  correct?

24      A.   Correct.

25      Q.   Now, sir, are you -- are you from the United

L. Gonzalez - Cross

1    States?

2        A.   Yes.

3        Q.   Is your family here in the United States?

4        A.   Yes.

5        Q.   When you met with Detective -- Armstrong?

6        A.   Yes.

7        Q.   -- is he the one who gave you the recording

8    device?

9        A.   Yes.

10       Q.   After you recorded the first conversation -- was

11   that by phone or was that the in-person meeting?

12       A.   It was by phone first.

13       Q.   It was by phone first.

14            Did you meet with Detective Armstrong after you

15   completed the first recording?

16       A.   I can't recall.

17       Q.   Do you recall whether or not, after making that

18   first recording, you ever met with Detective Armstrong

19   again?

20       A.   I'm not -- I'm not sure I met with -- I met with

21   a number of law enforcement officers.

22       Q.   Who's the first law enforcement you met with

23   after you made the first recording?

24       A.   I -- I can't recall.

25       Q.   When you met with that first officer who you

1   can't recall, do you know whether or not he was a member

2   of the FBI?

3       A.   No.

4       Q.   Do you know whether or not he was a member of

5   Fairfax County Police Department?

6       A.   No.

7       Q.   But, whoever this individual is that you met

8   with, did the subject matter of the content of that

9   recording come up?

10      A.   Yes.

11      Q.   You talked about what was on it, correct?

12      A.   Yes.

13      Q.   And, this law enforcement officer that you were

14  meeting with was not a Spanish speaking officer,

15  correct?

16      A.   Correct.

17      Q.   And, he wanted to know from you what was on the

18  recording, correct?

19      A.   Correct.

20      Q.   And, you're the one that told him what was on the

21  recording, correct?

22      A.   Correct.

23      Q.   You're the one that told him that the word "kill"

24  was on the recording, correct?

25      A.   Correct.

1    Q.    Because you could speak Spanish and he couldn't,
2    correct?
3    A.    Correct.
4    Q.    So, as far as you know, he was relying on what
5    you said was on the recording, correct?
6    A.    Correct.
7    Q.    And, the same is true for the word "hit,"
8    correct?
9    A.    Correct.
10   Q.    You're the one that told that officer how "hit"
11   was being used, correct?
12   A.    Correct.
13   Q.    You're the one that assured that officer that the
14   "hit" meant kill and not simply beat up, correct?
15   A.    Correct.
16   Q.    Even though you concede that the word "hit" in
17   gang parlance could mean beat up or kill, correct?
18   A.    Correct.
19   Q.    Now, the second recording you made was the
20   meeting, correct?
21   A.    Correct.
22   Q.    And, is -- did you also, after making that second
23   recording, meet with someone in law enforcement?
24   A.    Yes.
25   Q.    Was it the same individual who you had met with

L. Gonzalez - Cross                                              183

1    the first time?

2        A.   Yes.

3        Q.   And, again, that individual couldn't speak

4    Spanish, correct?

5        A.   Correct.

6        Q.   That individual themselves couldn't tell what was

7    on that recording, correct?

8        A.   Correct.

9        Q.   And, it -- but you could tell what was on the

10   recording, correct?

11       A.   Correct.

12       Q.   Because you speak Spanish fluently, correct?

13       A.   Yes.

14       Q.   You also speak MS-13 slang, correct?

15       A.   Correct.

16       Q.   And, you listened to the recording, correct?

17       A.   Correct.

18       Q.   And, you told the officer what was on the

19   recording, correct?

20       A.   Yes.

21       Q.   Again, you told the officer how the word "hit"

22   was being used, correct?

23       A.   Yes.

24       Q.   You told the officer where the word "kill" was to

25   be found, correct?

1    A.    Yes.

2    Q.    He was relying on you, correct?

3    A.    Yes.

4    Q.    Now, the third meeting that you had, third

5  recording, let me say, that's the recording where you're

6  in the car going to Garfield, correct?

7    A.    Correct.

8    Q.    And, I believe you told us that Demente was in

9  the car, correct?

10   A.    Correct.

11   Q.    Demente was the driver of the car, correct?

12   A.    Yes.

13   Q.    And it was Demente's car, correct?

14   A.    I don't know.

15   Q.    You don't know whose car it was?

16   A.    No.

17   Q.    Now, the weapons, were there any weapons in the

18  car?

19   A.    Yes.

20   Q.    Where were the weapons?

21   A.    Trunk.

22   Q.    Who put the weapons in the trunk?

23   A.    I don't know.

24   Q.    You don't know how they got there?

25   A.    No.

1   Q.  How do you know the weapons were in the trunk?

2   A.  They told me.

3   Q.  Who told you?

4   A.  Gang members.

5   Q.  Which gang members?

6   A.  I can't recall.

7   Q.  You don't know if it was Demente?

8   A.  No.

9   Q.  You don't know if it was Drowsy?

10      I mean, excuse me, you're Drowsy.

11      You don't know if it was Demente, correct?

12  A.  Correct.

13  Q.  And you don't know if it was Greñas?

14  A.  Correct.

15  Q.  Where were you when you were first told that?

16  A.  I was in the vehicle.

17  Q.  You were already in the car?

18  A.  Yeah.

19  Q.  And, how did the conversation go?

20  A.  I can't recall off the top of my head.

21  Q.  You can't recall.

22      It's been, what, three years since you had these

23  conversations?

24  A.  Yes.

25  Q.  Has it been three years since you listened to

1    these recordings?

2         A.   No.

3         Q.   It's been three years since you made them,

4    correct?

5         A.   Yes.

6         Q.   And, during that time period, have you met with

7    members of the United States Attorney's Office?

8         A.   Yes.

9         Q.   How many times?

10        A.   I would say three to four times.

11        Q.   Three to four.

12             When you met with the members of the United

13   States Attorney's Office, was there anyone from law

14   enforcement there?

15        A.   Yes.

16        Q.   Who?

17        A.   FBI agents, a couple of times, and the Fairfax

18   County detective.

19        Q.   Let's talk about the FBI agents.  Which FBI

20   agents were there?

21        A.   I can't remember their names.

22        Q.   You can't remember that?

23             Let's talk about the Fairfax County officers.

24   Who were there?  Who was there?

25        A.   Detective Hyden.

1    Q.   Detective --

2    A.   Detective Hyden.

3    Q.   Anyone else from Fairfax?

4    A.   No.

5    Q.   Where did these meetings occur?

6    A.   At the United States Attorney's Office.

7    Q.   Have you and I met?

8    A.   No.

9    Q.   Okay.

10   Q.   Are you still on probation?

11   A.   Yes.

12   Q.   You still are subject to those same 22 years?

13   A.   Yes.

14   Q.   If you're found in violation, you could be sent

15   back to jail for 22 years?

16   A.   Yes.

17           MR. JENKINS:  Court's indulgence.

18           (Pause.)

19   BY MR. JENKINS:

20   Q.   Now, sir, in MS-13, at one point in time when you

21   were a member, it was quite popular to have tattoos,

22   correct?

23   A.   Yes.

24   Q.   And what is the significance of the tattoos?

25   A.   The tattoos can tell your story, what you've done

1    before.

2        Q.   And, when you -- returning you to your meetings

3    with the members of the U.S. Attorney's Office, during

4    these meetings, am I correct that they asked you a lot

5    of questions about your background?

6        A.   Yes.

7        Q.   They asked you questions about where you're from?

8        A.   Yes.

9        Q.   Where's your family from, correct?

10       A.   (No audible response.)

11       Q.   But they also had a lot of questions about your

12   criminal history, correct?

13       A.   Correct.

14       Q.   Crimes that you may have committed, correct?

15       A.   Correct.

16       Q.   And your involvement in the gang, correct?

17       A.   Correct.

18       Q.   Did they explain to you that it was important for

19   them -- for you to be completely truthful with them when

20   you discussed your background?

21       A.   Of course.

22       Q.   They explained to you that it was very important

23   for you to tell them everything that you've done in

24   relation to MS-13, correct?

25       A.   Yes.

1    Q.    And, what relationship you had with various

2  members of the gang, correct?

3    A.    Yes.

4    Q.    And, I noticed that you have a teardrop, what

5  appears to be a tattoo below -- is that your left eye?

6    A.    Yes.

7    Q.    Does that have any particular significance?

8    A.    It can mean different things in gang culture.  To

9  me it was basically my dedication to the lifestyle.

10    Q.    And it wouldn't have anything to do with you

11  committing any murders on behalf of the gang, correct?

12    A.    Not in my case.

13    Q.    And in your case, it's just something that you

14  just thought was a good idea for you to have, correct?

15    A.    Yeah.

16    Q.    And, the gang members saw no problem with that,

17  correct?

18    A.    Correct.

19    Q.    Are there any rules about getting tattoos in

20  MS-13?

21    A.    Certain rules when it comes to getting the two

22  letters.

23    Q.    There also are rules about where you get tattoos

24  on your body, correct?

25    A.    Correct.

1   Q.   The higher up on your body, the more significant
2   the tattoo, correct?
3   A.   Correct.
4   Q.   It generally means that you've put in work for
5   the gang, correct?
6   A.   Correct.
7   Q.   Tell the ladies and gentlemen of the jury what we
8   mean by "put in work for the gang."
9   A.   All right.  Committing violent acts, bringing in
10  money for the gang, things of that sort.
11  Q.   And, when you were a member of MS-13, you know
12  these rules surrounding where and when and who can get a
13  tattoo were pretty serious rules, correct?
14  A.   Yes.
15  Q.   They're the types of rules that if you violate,
16  you can subject yourself to discipline, correct?
17  A.   Correct.
18  Q.   You could receive a 13, correct?
19  A.   Correct.
20  Q.   But before a 13 it might be a court, correct?
21  A.   Correct.
22  Q.   Then a 13, correct?
23  A.   Correct.
24  Q.   And it moves right on up to that 26, correct?
25  A.   Correct.

L. Gonzalez - Cross                                              191

1     Q.   These aren't the type of things that members can

2    just willy-nilly decide on their own whether or not to

3    do, correct?

4     A.   Correct.

5     Q.   To get a tattoo, correct?

6     A.   Correct.

7     Q.   Like the one you have on your face, correct?

8     A.   Correct.

9     Q.   But your testimony to this jury is that you just

10   decided it was a good idea, correct?

11    A.   No.  I did it as a dedication.  I was dedicating

12   myself to the lifestyle, and putting it on my face was,

13   to me at the time, a perfect example of my dedication to

14   it.

15    Q.   But it wasn't consistent with the rules

16   surrounding tattoos in MS-13, correct?

17    A.   I was given approval.

18    Q.   You were given approval by who?

19    A.   Gang leaders at the time.

20    Q.   Who?

21    A.   They're all gone now.  I would say that there's

22   individuals that I can name to you, but they're --

23   they're long gone.  One individual, the one that gave me

24   explicit permission to do it, was an individual I know

25   as Demon.

1    Q.   Who?

2    A.   Demon.

3    Q.   Do you know -- is that his gang name?

4    A.   Yes.

5    Q.   Now, when was that?

6    A.   It was in 2010.

7    Q.   Now, as a member of MS-13, is it also true that

8    members worship the devil?

9    A.   Some members.

10   Q.   Were you one of those type of members?

11   A.   No.

12   Q.   When you were convicted of malicious wounding and

13   unlawful wounding, is that in relation to the same

14   incident?

15   A.   No.

16   Q.   That was separate and distinct?

17   A.   Yes.

18   Q.   And when you were convicted of gang

19   participation, was that in relation to the malicious

20   wounding?

21   A.   There was one attached to a malicious wounding

22   and another attached to unlawful wounding.

23   Q.   So you have been convicted on gang participation

24   on more than one occasion?

25   A.   Correct.

1    Q.   When was your first conviction, felony

2    conviction?

3    A.   It was 2009.

4    Q.   And, were you placed on probation after that

5    conviction?

6    A.   Yes.

7    Q.   And, how much time was suspended over your head

8    at that point?

9    A.   I was just sentenced to a little over a year, so

10   it was about six months that I had suspended.

11   Q.   When was your second conviction after the 2009?

12   A.   2011.

13   Q.   So you successfully completed probation?

14   A.   No.  I was incarcerated.

15   Q.   You violated the terms of your probation?

16   A.   Yes.

17   Q.   So, after you had promised to uphold the law, you

18   broke that promise, correct?

19   A.   Correct.

20   Q.   After you had promised the judge that you weren't

21   going to commit any more crimes, you went out and

22   committed more crimes, correct?

23   A.   Correct.

24   Q.   When you made that promise in 2009 to -- was that

25   a Fairfax County Circuit Court judge?

L. Gonzalez - Cross

1   A.   Prince William County.

2   Q.   Prince William.

3        When you promised that judge in 2009 that you

4   weren't going to convict -- I mean commit any more

5   crimes, were you under oath at that time?

6   A.   No.

7   Q.   Were you in a courtroom much like you are right

8   now?

9   A.   Yes.

10  Q.   And you promised that judge that you weren't

11  going to commit any more crimes, correct?

12  A.   Yes.

13  Q.   But, yet you went out in 2011 and committed more

14  crimes, correct?

15  A.   Yes.

16  Q.   Now, when you were convicted in 2011, were you

17  placed on probation?

18  A.   Yes.

19  Q.   What was your sentence in 2011?

20  A.   It was the sentence that -- the 25 years.

21  Q.   That was the 25 years one?

22  A.   Yeah.

23  Q.   And you haven't been convicted of any more crimes

24  since that time, correct?

25  A.   I have a driving without a license.  That's it.

1    Q.   Were you violated for doing that?

2    A.   No.

3    Q.   When did that occur?

4    A.   I would say six to nine months ago.

5         MR. JENKINS:  No further questions, Your

6    Honor.

7                    CROSS-EXAMINATION

8    BY MR. AQUINO:

9    Q.   Good afternoon, sir.  My name is Jerry Aquino.

10   Along with my co-counsel, Ms. Amato, we represent

11   Jose -- Jesus Chavez, I'm sorry.

12        I just have a few questions for you.

13        Tattoos were popular in 2013; is that correct?

14   A.   Correct.

15   Q.   2014, too; is that correct?

16   A.   Correct.

17   Q.   Now, people wear tattoos on their arms, correct?

18   A.   Correct.

19   Q.   And the purpose of that is to advertise to the

20   world that you're a member in good standing of the gang;

21   is that correct?

22   A.   Right.

23   Q.   And they're visible to people in the -- outside

24   of the gang, correct?

25   A.   Correct.

1    Q.  You want people to see those tattoos, correct?

2    A.  Right.

3    Q.  Okay.  You mentioned earlier about Duende.  His

4 real name is Jose Del Cid; is that correct?

5    A.  I don't know.

6    Q.  You don't know?

7    Did you know Duende to be a very violent guy?

8    A.  No.

9    Q.  No.

10    He was involved in the decision to commit a

11 murder; is that accurate?

12    A.  Yes.

13    Q.  Okay.  And, was he insistent upon it?

14    A.  No.

15    Q.  He didn't want the murder?

16    A.  It seemed to me like it wasn't his choice.  He

17 was just following what was decided.

18    Q.  He just kind of went with the flow?

19    A.  Yeah.

20    Q.  Okay.

21      MR. AQUINO:  That's all the questions I

22 have.  Thank you.

23               CROSS-EXAMINATION

24 BY MR. CHICK:

25    Q.  Good afternoon, Mr. Gonzalez.

1    A.  Good afternoon.

2    Q.  My name is Mike Chick.  I'm the attorney for

3    Manuel Ernesto Paiz Guevara.

4        Let me ask you, the guy back here in the gray

5    sweater sitting in the corner at the table there

6    (indicating) --

7    A.  Sure.

8    Q.  -- do you know him?

9    A.  I can't say that I do.

10   Q.  Okay.  You said that you were -- you were

11   recruited into the gang at age 18; is that right?

12   A.  Yeah.

13   Q.  And how old are you right now?

14   A.  Twenty-four.

15   Q.  Okay.  And when they recruited you, at first you

16   were just befriended, right?

17   A.  Yes.

18   Q.  Okay.  Guys befriended you.  So then you started

19   hanging out?

20   A.  That was actually years before that.  I became an

21   official member at 18, but I was associated with the

22   gang since 16.

23   Q.  Okay.  So for a couple years the recruitment

24   process take place, right?

25   A.  Right.

1    Q.   I'm just going to ask you to speak a little bit
2    more into the microphone.
3    A.   Correct.
4    Q.   Okay.  And, while the recruitment process was
5    going out, it started out slow, right?
6    A.   Yes.
7    Q.   It was gradual?
8    A.   Yes.
9    Q.   And it goes from hanging out with the guys to
10   smoking marijuana with people, right?
11   A.   Correct.
12   Q.   And then eventually -- it sort of builds from
13   there, right?
14   A.   Yes.
15   Q.   Until they start to get you or make you, actually
16   sell marijuana for them, right?
17   A.   Correct.
18   Q.   Okay.  And, they slowly indoctrinate you into the
19   gang, right?
20   A.   Yes.
21   Q.   Okay.  They even have you listen to music related
22   to MS-13, right?
23   A.   Correct.
24   Q.   Okay.  They make you download music files, right?
25   A.   They don't force you to.  It comes with it.

1    Q.   Okay.   Sometimes, do they download the files for
2    you?
3    A.   No.
4    Q.   Okay.   And, you said that the tattoo, it was your
5    dedication to the gang lifestyle, right?
6    A.   Correct.
7    Q.   And you said that was -- at the time, that's what
8    it was?
9    A.   Correct.
10   Q.   Because you were so indoctrinated into this gang
11   culture that it felt like that was -- that felt
12   appropriate to do, right?
13   A.   Yes.
14   Q.   Okay.
15        You said that you got jumped into the gang at
16   some point, right?
17   A.   Correct.
18   Q.   You actually got jumped into the gang twice,
19   right?
20   A.   Yes.
21   Q.   Okay.   And the way that you sort of earned that
22   status of getting jumped into the gang is by committing
23   acts of violence, right?
24   A.   Yes.
25   Q.   If you don't commit acts of violence, you're not

1    getting jumped into the gang, right?

2        A.   Correct.

3        Q.   Okay.  And, some of your acts of violence include

4    things like malicious wounding, unlawful wounding, gang

5    participation, weapon offenses, right?

6        A.   Yes.

7        Q.   And there's other acts of violence that you

8    haven't been convicted for that helped support you get

9    jumped into the gang, right?

10       A.   Yes.

11       Q.   Okay.  Stuff that we're not talking about here in

12   court, right?

13       A.   Yes.

14       Q.   Okay.

15              MR. CHICK:  I don't have any further

16   questions.  Thanks.

17              THE COURT:  Redirect?

18                    REDIRECT EXAMINATION

19   BY MS. MARTINEZ:

20       Q.   Mr. Jenkins here, he asked you about some of the

21   recorded conversations you had with the gang members

22   about the murder.

23          In addition -- prior to going to the Prince

24   William County police, had you already had conversations

25   with the gang members about the attempted murder?

1    A.   Yes.

2    Q.   Were the conversations that you had prior to

3    going to the police recorded?

4    A.   No.

5    Q.   Why not?

6    A.   I was just being informed of the plot.  I didn't

7    think that it would go that far.

8    Q.   When you were being informed of the plot, did you

9    have any recording equipment with you?

10   A.   No.

11   Q.   Where did you get the recording equipment that

12   you used to record the conversations that occurred

13   later?

14   A.   Law enforcement.

15   Q.   Approximately how much time passed between when

16   you official- -- when you originally notified law

17   enforcement of the plot and the day that you were --

18   that you went to the high school with the other gang

19   members?

20   A.   It was within 24 hours.

21   Q.   Mr. Jenkins also asked you about some of the

22   words used by gang members while discussing this murder

23   plot.

24        First of all, what language were you talking to

25   the other gang members in?

1    A.   Spanish.

2    Q.   Are you fluent in Spanish?

3    A.   Yes.

4    Q.   Mr. Jenkins asked you about the word "hit," and

5    he asked you if that meant to kill.  Did you interpret

6    it in that context as meaning to kill?

7    A.   Yes.

8    Q.   Why?

9    A.   It was explicitly stated that he should not be

10   left alive.  Someone else had been assaulted recently

11   and he was left alive, and, no one was happy about it.

12   Q.   In these same conversations, were there

13   discussions about what weapons may be used to hit

14   Peligroso?

15   A.   Yes.

16   Q.   What weapons?

17   A.   Machetes or the shotgun.

18   Q.   In your experience as a gang member, do gang

19   members use shotguns to hit, as in slap or strike, other

20   people?

21   A.   No.

22   Q.   In your experience as a gang member, what do gang

23   members do with firearms?

24   A.   Shoot to kill.

25   Q.   You testified that your understanding of the

1  motivation behind the murder plot on Peligroso's life

2  was that he had walked away from the gang; is that

3  right?

4      A.   Yes.

5      Q.   What's wrong with walking away from MS-13?

6      A.   Well, when you join the gang you're in for life.

7  Your responsibility is yours for life.

8      Q.   What can happen if you try to not be in for life?

9      A.   Death.

10     Q.   When you got out of prison, why did you agree to

11 be jumped back into the gang?

12     A.   It wasn't much of a choice.

13     Q.   What do you mean by that?

14     A.   I wasn't given the option to walk away.

15     Q.   What would have happened if you tried to walk

16 away?

17     A.   Who knows?  It was up to their -- it would be up

18 to their discretion.

19     Q.   What are some of the possibilities for walking

20 away from the gang?

21     A.   On the low end, a beating; high end, death.

22     Q.   Mr. Jenkins asked you about what is called a

23 green light.  Is snitching the only way to get a green

24 light put on you?

25     A.   No.

1    Q.   What are some other ways that a gang member can
2    have a green light put on him?
3    A.   Depends on the situation.  It's up to the
4    leader's discretion.
5    Q.   Can you give an example other than snitching?
6    A.   I would say leaving a fellow gang member behind.
7    Covering -- covering -- covering up.  For example, it
8    could be -- it could be something that's stolen from the
9    gang, something that the gang has in possession, a
10   weapon, a vehicle, if a gang member uses it for the
11   wrong reasons, or lies to the gang as a whole, it could
12   be punishable by death.
13   Q.   There's been a lot of conversation about
14   snitching.  What does that mean?
15   A.   Working with law enforcement.
16   Q.   Does that include testifying?
17   A.   Yes.
18   Q.   What's the penalty for an MS-13 member who
19   snitches?
20   A.   Death.
21   Q.   Are you still an active MS-13 member?
22   A.   No.
23   Q.   Why not?
24   A.   I -- when the situation came up, I really wanted
25   a way out, and, this was my way out.

1          MS. MARTINEZ:  No further questions,

2    Your Honor.

3          THE COURT:  May the witness be excused?

4          (No audible response.)

5          THE COURT:  You're free to leave, sir.

6          (Thereupon, the witness withdrew from the

7    stand.)

8          MS. MARTINEZ:  The government calls

9    Detective Matthew Armstrong.

10         (Witness sworn.)

11         THE WITNESS:  I do.

12         THEREUPON, MATTHEW ARMSTRONG, having been

13   duly sworn, testified as follows:

14                    DIRECT EXAMINATION

15   BY MS. MARTINEZ:

16     Q.  Good afternoon.

17     A.  Good afternoon.

18     Q.  Would you please state your full name and spell

19   it for the record.

20     A.  Matthew Armstrong, M-a-t-t-h-e-w,

21   A-r-m-s-t-r-o-n-g.

22     Q.  Where do you work?

23     A.  Prince William County Police Department.

24     Q.  What is your current position with the Prince

25   William County Police Department?

1     A.   I'm currently assigned as a school resource
2   officer.
3     Q.   How long have you worked for the Prince William
4   County Police Department?
5     A.   Going on 12 years.
6     Q.   What was your position in September and October
7   of 2013?
8     A.   I was assigned as a detective to the gang unit.
9     Q.   Why did you change -- at what point did you
10  change from detective in the gang unit to school
11  resource officer?
12    A.   I left the gang unit in April of 2015.
13    Q.   What was the reason for the change in position?
14    A.   It's the policy of our department to limit the
15  amount of time that officers are assigned to special
16  units.  Routinely, that is four years.  If you're -- if
17  you're rather good at it and the department feels the
18  need for it, they can extend you an additional year.
19    Q.   How long were you a detective in the gang unit?
20    A.   For five years.
21    Q.   As a detective in the gang unit, what were your
22  duties?
23    A.   To investigate gang related crimes and also to
24  keep tabs on gang activity in the county.
25    Q.   Over the course of your five years of experience

1    as a detective within the gang unit, approximately how

2    many gang cases did you work?

3        A.   I'd say between 50 or 60 as primary detective, as

4    well as assisting other detectives.

5        Q.   And in the course of the investigations, what

6    gangs were you investigating?

7        A.   My primary responsibility was the MS-13 street

8    gang.

9        Q.   About what percentage of the cases you worked on

10   involved MS-13 while you were in the gang unit?

11       A.   I'd estimate about 80 percent.

12       Q.   How many gang members did you arrest during your

13   experience as a detective in the gang unit?

14            MR. CONTE:  Objection, relevance, Your

15   Honor.

16            MS. MARTINEZ:  Foundational, Your Honor, to

17   establish his knowledge and experience as a detective

18   investigating gang crimes and knowledge.

19            THE COURT:  Well, is he going to be an

20   expert or is he going to be a fact witness,

21   Ms. Martinez?

22            MS. MARTINEZ:  He's a fact witness, Your

23   Honor.

24            THE COURT:  All right.  Well, let's focus on

25   what he did in this case.  Thank you.

```
1              Objection sustained.
2    BY MS. MARTINEZ:
3       Q.   Do you recall conducting an investigation related
4    to MS-13 in late September 2013?
5       A.   I do.
6       Q.   What was the nature of that investigation?
7       A.   Our department received information regarding an
8    intended assassination of an MS-13 gang member.
9       Q.   What was the source of that information?
10      A.   It was an individual known by the gang moniker as
11   Drowsy.
12      Q.   How did you respond when that information came
13   in?
14      A.   I received that information in an e-mail
15   regarding the subject had contacted law enforcement.  I
16   was then directed by my supervisor to make contact with
17   that individual, interview him, and verify the validity
18   of his information.
19      Q.   And after you received that instruction, did you,
20   in fact, make contact with the individual?
21      A.   I did.
22      Q.   What was the individual's gang name?
23      A.   Drowsy.
24      Q.   What was the date of the contact that you made
25   with Drowsy?
```

1    A.   September 30th, I believe.

2    Q.   Where did you make this contact?

3    A.   I met with him in north Woodbridge.

4    Q.   And, what was the nature of that meeting?

5    A.   I, along with FBI Agent Clay Hicks, interviewed

6    him face to face and obtained information from him,

7    where he laid out that there was a planned

8    assassination --

9            MR. CONTE:  Objection to what he laid out,

10   Your Honor.  It's hearsay.

11           MS. MARTINEZ:  Your Honor, he's giving a

12   broad view of what was laid out, not specifics.  And

13   it's necessary to establish the reason for the steps he

14   took in act -- in other words, it's not being offered

15   through this witness for the truth of the matter

16   asserted, but to explain the steps that were taken in

17   the investigation.

18           THE COURT:  Okay.  Well, we understand he

19   had a meeting.  What's the next thing?

20           Objection sustained.

21   BY MS. MARTINEZ:

22   Q.   Without giving the specific details of what was

23   relayed during the meeting, what was the general nature

24   of the information conveyed to you?

25           MR. CONTE:  Same objection, Your Honor.

1          MS. MARTINEZ:  Your Honor, we can't possibly

2    explain why he took the steps he did if the jury can't

3    hear that he was given --

4          THE COURT:  Well, the thing is --

5          MS. MARTINEZ:  -- generally speaking --

6          THE COURT:  -- Ms. Martinez, the rules of

7    evidence apply to both sides.  You can ask him what

8    action he took as a result of the meeting.

9          MS. MARTINEZ:  Pardon me, Your Honor?

10         THE COURT:  You can ask him what action he

11   took as a result of the meeting.

12         MS. MARTINEZ:  Yes, Your Honor.  I was

13   laying foundation why he took that action.

14         THE COURT:  Well, we just heard from Drowsy.

15   We have an idea what he talked about.

16         MS. MARTINEZ:  Thank you, Your Honor.

17   BY MS. MARTINEZ:

18     Q.  What was the purpose of having this meeting with

19   Drowsy?

20     A.  To verify the information that was provided, and

21   also to establish a baseline in order to verify

22   additional items of intel.

23     Q.  Without describing any of the information that

24   was provided, did Drowsy, in fact, provide you with

25   information that led you to take additional steps in

1    your investigation?

2       A.   He did.

3       Q.   What additional steps did you take after meeting

4    with Drowsy?

5       A.   I contacted a subject believed to be involved,

6    whose gang nickname was Peligroso, verified with him the

7    existence of what is called a green light --

8                MR. CONTE:  Objection to what Mr. Peligroso

9    said, also, Your Honor.

10               THE COURT:  All right.

11   BY MS. MARTINEZ:

12      Q.   If you could proceed without stating what anyone

13   told you, and simply take -- simply describe the steps

14   of investigation that you took.  We'll start with this

15   individual Peligroso.

16           Were you familiar with the individual, Peligroso?

17      A.   I was.

18      Q.   How was it that you were familiar with this

19   individual, Peligroso?

20      A.   I knew him from previous gang investigations in

21   the county.

22      Q.   Without giving his full name, could you provide

23   his initials of his true name, if you know them?

24      A.   DF.

25      Q.   Thank you.

1       What was the purpose of you meeting with
2  Peligroso after you met with Drowsy?
3       A.   To verify his status as a student attending night
4  classes at Garfield High School, located in Woodbridge,
5  Virginia, and also to verify his -- his residency in the
6  county.
7       Q.   During this meeting, was there any information
8  that you provided to Peligroso?
9       A.   There was.
10      Q.   What was that?
11      A.   I advised him that I had received information --
12           MR. CONTE:  Objection to what --
13           THE COURT:  He's saying what he said.
14 That's not hearsay.  Objection overruled.
15 BY MS. MARTINEZ:
16      Q.   Please continue.
17      A.   I advised of information I had received regarding
18 imminent dangers to himself and instructed him to take
19 safety precautions.
20      Q.   What instructions did you give to Peligroso?
21      A.   To leave the area and have no contact with anyone
22 from MS-13.
23      Q.   In addition to contacting Peligroso, what other
24 steps did you take during the course of your
25 investigation in response to the information relayed by

1    Drowsy?

2       A.   I verified with the school that he was an active

3    student, attending the night classes there.

4       Q.   Were you involved in the operation that was

5    conducted on October 1st, 2013?

6       A.   I was.

7       Q.   What was the nature of that operation?

8       A.   To interdict and prevent the planned

9    assassination of an MS-13 member.

10      Q.   What MS-13 member?

11      A.   Peligroso.

12      Q.   What was your role in the operation?

13      A.   I assisted with surveillance during the

14   operation.

15      Q.   What were you surveilling?

16      A.   The movement of the -- of the vehicle as it

17   traveled through Woodbridge to Garfield High School.

18      Q.   What was the purpose of surveilling the vehicle

19   as it traveled through Woodbridge to Garfield High

20   School?

21      A.   To verify that it was part of the plan that had

22   been provided previously.

23      Q.   What did you do after the vehicle -- did you --

24   did the vehicle, in fact, arrive at Garfield High

25   School?

1    A.    It did.

2    Q.    What did you do after the vehicle arrived at

3    Garfield High School?

4    A.    I was in the area, listening to the radio.

5    Q.    And, what happened next, from your perspective?

6    A.    Another detective with our department, who was in

7    a marked cruiser sitting in the parking lot, observed

8    the vehicle pull in, park in the parking lot for a few

9    minutes.

10          After about three to five minutes, the vehicle

11   left out onto the roadway.  The detective in the marked

12   cruiser then conducted a traffic stop on that car.

13   Q.    What did you do?

14          MR. CONTE:  Objection, Your Honor.

15   Foundation.  (Inaudible).

16          THE REPORTER:  I'm sorry?

17          THE COURT:  I'm sorry?

18          MR. CONTE:  There's no foundation that --

19   his knowledge of the stop of the car.

20          MS. MARTINEZ:  The question was from his

21   perspective, what happened next, Your Honor.

22          THE COURT:  I had the impression that he was

23   personally present.  Objection overruled.

24   BY MS. MARTINEZ:

25   Q.    After the vehicle was pulled over, what did you

M. Armstrong - Direct

1  do?

2     A.   I arrived on scene to assist the detective.

3     Q.   What did you observe when you arrived on the

4  scene?

5     A.   I observed that detective speaking with the

6  driver, outside the vehicle.

7     Q.   Who was the detective?

8     A.   Detective Dale Young.

9     Q.   After you observed Detective Young speaking with

10 the driver of the vehicle, what steps did you take?

11    A.   I approached the vehicle on the passenger side,

12 observed the individual, Drowsy, in the right rear

13 passenger seat, removed him from the vehicle, patted him

14 down for weapons, secured him and placed him on the

15 pavement besides the car.

16    Q.   When you say you secured him, why did you secure

17 Drowsy?

18    A.   Members of MS-13 are known to engage in acts of

19 violence, as well as to carry weapons.  So, when dealing

20 with known gang members, it's routine to secure them or

21 place them in a position of disadvantage.

22    Q.   What did you do after you secured Drowsy?

23    A.   I spoke with the driver in the front -- front

24 driver -- I'm sorry -- passenger side front.

25    Q.   Did that individual identify himself?

1    A.   He identified himself at that time as
2 Manuel Lopez Torres.
3    Q.   What, if anything, did Manuel Lopez Torres say to
4 you at that time?
5    A.   He denied the presence of any weapons, although
6 when asked, he admitted he was aware that the individual
7 in the back seat, Drowsy, was a member of MS-13.
8    Q.   What did you do -- did he -- was there anything
9 else that he advised you at that time?
10   A.   He stated that they were down in the area to play
11 soccer.
12   Q.   What did you do after you spoke with Manuel Lopez
13 Torres?
14   A.   I placed him, sitting -- sitting beside the MS-13
15 subject, Drowsy.
16   Q.   And, I apologize, I think I just misstated the
17 name.  What was the name of the individual you spoke to?
18   A.   At the time he identified himself as Manuel Lopez
19 Torres.
20   Q.   I didn't misstate it then.
21       What did you find when you -- when you searched
22 the vehicle?
23   A.   During the search of the vehicle, I found a white
24 knit cap that was in the map pocket, the pocket on the
25 inside of the door.  And the white cap, upon picking it

1    up, two red shotgun shells fell out onto the ground.

2         Also in the vehicle was recovered a sawed-off

3    shotgun, as well as two machetes, both from the trunk.

4         Q.   What else did you find in the vehicle?

5         A.   I recovered a blue Samsung cellphone that was up

6    on the front dash, as well as a composition-style

7    notebook from the passenger side rear floor board.

8              MS. MARTINEZ:  With the help of the court

9    security officer, Your Honor, I'd like to show this

10   witness what has already been admitted, Government's

11   Exhibit 35.

12             Mr. Toliver, there should be a photocopy,

13   too, of that notebook.  Can we give the witness both

14   versions for his convenience?

15   BY MS. MARTINEZ:

16        Q.   Starting with the original there in your hand,

17   could you open that up and see if you recognize that?

18        A.   I do.

19        Q.   What is it?

20        A.   This is the composition notebook that was found

21   inside the vehicle, the passenger side on the rear

22   floorboard.

23        Q.   And how do you recognize it?

24        A.   Based on the name on the front of it, it is --

25   appearance.

1    Q.   Do you have that photocopy there in front of you
2    as well?
3         You can keep that there, just in case you need
4    it.
5         Have you reviewed the photocopy previously?
6    A.   I have.
7    Q.   Is it, in fact, a photocopy of the notebook?
8    A.   It is.
9    Q.   Do you see there are page numbers on those pages?
10   A.   I do.
11   Q.   Are those page numbers included in the original?
12   A.   No, they're not.
13   Q.   For everyone's convenience, so that we can make
14   sure we're all on the same page, I'm going to ask you to
15   use the photocopy so that you can talk about the page
16   numbers.  Is that all right?
17   A.   Yes, ma'am.
18   Q.   If at any point you want to refer to the
19   original, please do so.  The original, of course, is the
20   original evidence, but this will make it easier for
21   everyone.
22   A.   Okay.
23        MS. MARTINEZ:  Your Honor, with the Court's
24   permission, when Detective Armstrong names a page
25   number, I would like the Court's permission to publish

1  the page so that everyone in the courtroom can see what

2  page he's talking about.

3             THE COURT:  That's fine.

4  BY MS. MARTINEZ:

5    Q.  You said you seized the notebook from the

6  vehicle; is that right?

7    A.  Yes, ma'am.

8    Q.  Why did you seize this notebook?

9    A.  Originally, I was looking through the notebook to

10  look for items of assault.  As I said before, routinely

11  when we work with MS-13, it's very common for them to

12  have weapons, including knives, pocket knives, razor

13  blades, all the way up to firearms.  By fanning through

14  the notebook, I was making sure there were no weapons

15  inside.

16   Q.  What did you find while fanning through the

17  notebook?  What, if anything, did you find?

18   A.  I came across numerous pages of writings,

19  graffiti, consistent with MS-13 --

20             MR. CONTE:  Objection, no foundation.

21             MS. MARTINEZ:  Your Honor, Mr. Conte

22  objected to the foundation I attempted to lay

23  previously.  I'd be happy to do that now.

24             MR. CONTE:  Your Honor, this isn't an expert

25  witness.  We don't need his opinion.

1          MS. MARTINEZ:  He's a gang expert,

2    Your Honor.  He --

3          THE COURT:  He's not a gang expert.  You

4    said --

5          MS. MARTINEZ:  I mean -- I'm sorry, I

6    misspoke.  A gang detective.  I misspoke.  He's a gang

7    detective.

8          THE COURT:  He's a gang detective.  That's

9    fine.  He can identify items in the pages that you want

10   him to refer to, but we'll let the jury be the judge of

11   whether or not they relate to a gang or not.

12          Go ahead. Ask your next question.

13   BY MS. MARTINEZ:

14    Q.   In your experience as a gang detective, do you

15   conduct searches?

16          Did you conduct searches in your experience as a

17   gang detective?

18    A.   I did.

19    Q.   And what kind of things did you look for when you

20   were doing a search in a gang related case?

21    A.   It was -- excuse me.  It was fairly routine when

22   you're working gangs to find the items of graffiti,

23   doodling, drawings, monikers and names are routinely put

24   down on paper.

25    Q.   What was it that you found in this notebook that

1    was significant?

2        A.   Numerous items that based on my previous training

3    and experience, education, I took to be --

4              THE COURT:  This is what I don't want.  If

5    he wants to identify items that -- the page numbers, he

6    can do that.  But he cannot testify without a page.  He

7    is a fact witness.

8              MS. MARTINEZ:  Yes, Your Honor.

9              THE COURT:  All right.

10   BY MS. MARTINEZ:

11       Q.   Could you give us an example of a page that you

12   found at the time to be significant and led you to seize

13   this notebook?

14       A.   On page 58.

15             MS. MARTINEZ:  Could we publish page 58,

16   please.

17   BY MS. MARTINEZ:

18       Q.   What was significant about this page, to you?

19       A.   The letters M and S.

20       Q.   In your experience, what does M and S stand for?

21       A.   It's part of the letters used for the MS-13

22   criminal street gang.

23       Q.   Were there other pages that you found significant

24   upon your initial review?

25       A.   There were.

1    Q.   Could you please draw the jury's attention to

2    those pages?

3    A.   Page 59.

4    Q.   What about this page was significant to you?

5    A.   The stylized claw hand displayed in part of the

6    MS-13 hand sign, the letters M and S, as well as the

7    four letters, PVLS.

8    Q.   In your experience, what did the letters PVLS

9    signify?

10   A.   It's the letters for a clique of MS-13, Park View

11   Locos Salvatruchos.

12   Q.   Were there any other pages that you found

13   significant upon this initial review?

14   A.   There were.

15   Q.   What page?

16   A.   Page 60.

17   Q.   What was significant about this page?

18   A.   Again, a combination of the stylized hand

19   displaying the hand sign, the letters M and S, numbers 1

20   and 3.

21   Q.   What was the significance, in your experience, of

22   the numbers 1 and 3?

23   A.   Part of their nomenclature for the gang, MS-13.

24   Q.   In addition to these three pages, were there any

25   other pages that you found significant during this

1   initial cursory review?

2       A.   There were.

3       Q.   What page?

4       A.   Page 61.  That's a stylized drawing of the hand

5   sign for MS-13.

6       Q.   After this initial review and you found these

7   pages which were significant to you in your experience,

8   what did you do with the notebook?

9       A.   I inspected it for additional pages.

10      Q.   What was the purpose of the inspecting it for

11  additional pages?

12      A.   Looking for sources of gang intel, things that

13  would be of use to us on the street in our

14  investigation.

15      Q.   Can you tell the jury a little bit more about

16  what you mean by that?

17      A.   Based on what I saw in the -- in a notebook like

18  this, makes me suspect there will be additional items

19  that would be on other pages.  A lot of times there will

20  be a roll call, names of gang members that are in good

21  standing.  Sometimes there will be a tracking of

22  finances.  Those were the items --

23              MR. CONTE:  Objection, Your Honor.  Can we

24  approach?

25              THE COURT:  Yes.

1

2              (Thereupon, the following side-bar

3    conference was had:)

4              MR. CONTE:  Your Honor, I think -- I think

5    this individual -- the detective, Armstrong, is about to

6    identify that page as a tally sheet or a dues statement

7    for MS gang members.

8              And I'm objecting.  I think that's his

9    opinion.  I think it's -- it's improper.  It would be

10   improper testimony for a fact witness to try to identify

11   the tally sheet or dues sheet, if that's what it is.

12             MS. MARTINEZ:  Your Honor, we are not

13   qualifying Detective Armstrong as a gang expert.  That

14   is absolutely true.

15             However, he does have significant experience

16   as a gang detective.  And based on his experience, I

17   believe that he can testify as a fact -- as a fact

18   witness -- not under 702, not as expert witness, but as

19   fact witness -- about what he does during the course of

20   the investigations, the steps that he took here, why he

21   took the steps that he did, and what he observed, which

22   was consistent with his investigation of a gang case,

23   and a gang related attempted murder.

24             THE COURT:  Okay.  The objection is

25   sustained.

1          MR. CONTE:  Would this be a good time for a
2    break, so we don't have --
3          THE COURT:  I was planning to take the break
4    in five minutes, but we'll take it now.  That's fine.
5          MR. CONTE:  So we don't have to go crawl
6    over everybody.
7          THE COURT:  Okay.
8          (Thereupon, the side-bar conference was
9    concluded.)
10         THE COURT:  We'll take the afternoon recess
11   now for 15 minutes.  Thank you very much.
12         (Proceedings outside the presence of the
13   jury:)
14         THE COURT:  Detective Armstrong, if you
15   would step outside for just a minute.
16         (Witness stood aside.)
17         THE COURT:  You can have a seat.
18         Ms. Martinez?
19         MS. MARTINEZ:  Yes, Your Honor.
20         THE COURT:  You gave me the foundation for
21   why you wanted him to identify that sheet; is that
22   right?
23         MS. MARTINEZ:  Yes, Your Honor.
24         THE COURT:  All right.  The objection is
25   still sustained.

1              All right.  Fifteen minutes.

2              (Court recessed at 3:28 p.m. and reconvened

3         at 3:48 p.m.)

4              THE COURT:  You can bring our jury out,

5    Mr. Toliver, thank you.

6              (Jury present.)

7              You may be seated.

8              DIRECT EXAMINATION (Continued)

9    BY MS. MARTINEZ:

10     Q.  Detective, turning your attention back to

11   Government's Exhibit 35, the notebook, what does the

12   cover of the notebook say?

13             MS. MARTINEZ:  And if we could publish that

14   for the jury, Your Honor.

15             THE COURT:  Sure.

16             THE WITNESS:  It's the name Christian Jose

17   Lemus, and then the second part of the name is difficult

18   to read, but it appears to start C-e-r.

19             MS. MARTINEZ:  Thank you.

20   BY MS. MARTINEZ:

21     Q.  You mentioned, in addition to the notebook, you

22   seized a cellular phone from the vehicle on the night of

23   October 1st, 2013; is that right?

24     A.  Yes, it is.

25     Q.  All right.  With the help of the court security

1    officer --

2              MS. MARTINEZ:  Could you please show the

3    witness what has been marked for identification purposes

4    as Government's Exhibit 36.

5    BY MS. MARTINEZ:

6         Q.   Do you recognize Government's Exhibit 36?

7         A.   I do.

8         Q.   What is it?

9         A.   It's the blue -- blue phone that was taken from

10   the interior of the vehicle.

11        Q.   How do -- how do you recognize it?

12        A.   It is packaged and sealed both with my

13   handwriting on the seals, as well as our department's

14   inventory control tag.

15        Q.   At some point, did you perform a search on this

16   phone?

17        A.   I did.

18        Q.   Over the course of your career, how many cellular

19   devices have you examined or searched?

20        A.   Between 50 and 60.

21        Q.   Have you received any particularized training in

22   how to search a cellphone, a cellular device?

23        A.   I've been instructed by my department in the

24   order in which to conduct an examination.

25        Q.   Have you testified in court before about

1    searching cellular phones?

2        A.   I have.

3        Q.   How many times?

4        A.   Approximately four times.

5        Q.   In what court, or courts?

6        A.   In General District Court in Prince William

7    County, as well as Juvenile Domestic Relations Court in

8    Prince William County.

9        Q.   Please tell the jury the typical steps you take

10   when you're performing a search on a cellular device

11   like a cellphone.

12       A.   The machine we use is called a Cellebrite.  It's

13   a cube-shaped, has an LCD screen on top of it.  You

14   select the type of examination you want to perform,

15   whether it's to withdraw information from the SIM -- SIM

16   card, extract from the phone, or to just obtain just

17   like a phone -- like the contacts from the phone.

18       Q.   You mentioned Cellebrite; is that right?

19       A.   Yes, ma'am.

20       Q.   What is Cellebrite?

21       A.   It's a manufacturer of the type of machine that

22   our department uses.

23       Q.   And does that machine alter the data on the -- on

24   the device -- on the cellular device in any way.

25               MR. CONTE:  I'm going to object.  He's not

1   an expert on this machine.  He may know how to operate

2   it, but he doesn't know the parameters.

3                MS. MARTINEZ:  Your Honor, at this point we

4   would move to have Court recognize Detective Armstrong

5   as capable of testifying under Rule 702 about the

6   methods and process used to search a cellular device.

7                MR. CONTE:  Your Honor, we didn't receive

8   any notice under Rule 161(e).

9                MS. MARTINEZ:  I believe that we did, Your

10  Honor.  I believe he was included in our expert notices.

11               We can approach if necessary, Your Honor.

12               THE COURT:  Well, he's testified he used

13  some software; is that right?

14               MS. MARTINEZ:  The --

15               THE COURT  Yes.

16               MS. MARTINEZ:  -- the method that he uses in

17  order to search the cellphone.

18               THE COURT:  Okay.

19               MS. MARTINEZ:  The purpose of the testimony

20  is simply to testify to what was on the cellphone, Your

21  Honor.

22               THE COURT:  I understand.

23               I will overrule the objection as to the

24  software.  He can identify the software, but he can't

25  tell us what it does.  He can tell us what he got out of

M. Armstrong - Direct                                    230

1    it.  All right.
2                MS. MARTINEZ:  All right.
3    BY MS. MARTINEZ:
4       Q.  So, the software you used was Cellebrite; is that
5    right?  Or that you typically use is Cellebrite; is that
6    right?
7       A.  The hardware manufacturer is the Cellebrite
8    machine.
9       Q.  Cellebrite machine.  So it's hardware, not
10   software?
11      A.  Correct.
12      Q.  What do you do with this hardware, typically,
13   when you're searching a cellular device?
14      A.  You start by selecting the type of examination
15   you want to perform.  You -- in this instance, it was
16   to conduct an examination on the phone.  You select
17   "extract from cellphone."
18           You then proceed through a list of -- to get, you
19   know, options, to get down to the -- specifically what
20   type of model the phone you're extracting.
21      Q.  Based on your training and experience, is that a
22   standard way to search a cellphone, a cellular device?
23      A.  It is.
24      Q.  Did you perform those same steps on the device in
25   Government's Exhibit 36?

M. Armstrong - Direct                                    231

1      A.   I did.

2      Q.   What data were you able to obtain from that

3   phone?

4      A.   Call logs, photos, text messages, and some

5   application data.

6      Q.   Could I turn your attention in the exhibit binder

7   to what has been marked as Government's Exhibit 101-A.

8      Q.   Do you recognize Government's Exhibit 101-A?

9      A.   I do.

10      Q.   What is it?

11      A.   It is the incoming call list from the examination

12   that was conducted on the phone.

13      Q.   Could you take a look, please, at Government's

14   Exhibit 101-B.

15           What is Government's Exhibit 101-B?

16      A.   It is the phone contacts from the examination of

17   the cellphone.

18      Q.   How about 101-C?  Do you recognize Government's

19   Exhibit 101-C?

20      A.   It is the SMS text messages from the examination

21   of the -- of the phone.

22      Q.   And just so the record is clear, when you say

23   "the examination of the phone," what phone are you

24   talking about?

25      A.   The blue Samsung phone that was taken from the

 1    interior of the vehicle.

 2            MS. MARTINEZ:  Your Honor, at this time we'd

 3    move into evidence Government's Exhibit 36, 101-A,

 4    101-B, and 101-C.

 5            THE COURT:  Received.

 6            MS. MARTINEZ:  At this time, as well, Your

 7    Honor, we would move in the translations of the text

 8    messages which were previously offered, conditionally.

 9    And those are Government's Exhibit 104-C-1.

10            THE COURT:  Received, subject to the

11    previous objection.

12            MS. MARTINEZ:  Your Honor, I apologize.  I

13    misspoke about the exhibit number, about the

14    translation.  We are not at this time moving in 104-C-1.

15    That relates to a different piece of evidence.

16            The number that I meant to say was 101-D.

17    101-D is the translation of Government's Exhibit 101-C.

18    It was conditionally admitted previously, Your Honor.

19            THE COURT:  Received subject to

20    cross-examination, 101-D.

21            MS. MARTINEZ:  No further questions at this

22    time.

23                      CROSS-EXAMINATION

24    BY MR. JENKINS:

25       Q.   Good afternoon, Detective.

1    A.   Good afternoon.

2    Q.   Detective, did I understand you correctly on
3    direct examination that MS-13 members, from your
4    experience, routinely are found to be in possession of
5    weapons?

6    A.   Yes, sir.

7    Q.   That's knives, correct?

8    A.   Yes, sir.

9    Q.   Firearms, also, correct?

10   A.   They have been, yes.

11   Q.   Would you include machetes in that, also?

12   A.   Yes, sir.

13   Q.   And that's true for them whether or not they're
14   going to play soccer, correct?

15   A.   I don't understand your question.

16   Q.   Well, you said they routinely or often are found
17   to be in possession of weapons, correct?

18   A.   Yes, sir.

19   Q.   They just ride -- are you saying that they just
20   ride around in cars with weapons?

21   A.   I'm not sure if it's routine for them to ride
22   around in vehicles with weapons.  I know that on
23   numerous stops that I've conducted, we have found
24   members of MS-13 to have weapons with them.

25   Q.   And on these previous stops, have you ever

1    stopped them while, for example, they were on their way

2    to a soccer game?

3        A.   I don't know where they were going to at the time

4    I stopped them.

5        Q.   Or on their way to get something to eat?

6        A.   Again, I don't know where they were planning to

7    go to, other than their statements of saying so.

8        Q.   But based on your experience, just because they

9    were in possession of weapons on a particular date and

10   time, doesn't necessarily mean that the intention was to

11   commit a crime at that time, correct?

12       A.   I'm sorry.  Could you ask that one more time?

13   I'm just --

14              MR. JENKINS:  I'll withdraw the question.

15   BY MR. JENKINS:

16       Q.   Let me ask you this:  On that evening, you

17   conducted -- or certain individuals were arrested,

18   correct?

19       A.   Yes, sir.

20       Q.   In fact, the driver of the vehicle was arrested,

21   correct?

22       A.   Yes, sir.

23       Q.   That's the individual that you testified you knew

24   as Demente, correct?

25       A.   I don't believe I testified to that directly,

but, that is the individual that was in the vehicle.

Q.   What -- what was the name of the driver?

A.   Jaime Villegas -- I'm drawing a blank at this time.  He told me his gang nickname was Demente.

Q.   But he was the driver, correct?

A.   Yes, sir, he was.

Q.   It wasn't the passenger in the front seat.  You didn't arrest him that night, correct?

A.   No, sir.

Q.   And the person who was arrested that night, the driver, he was charged with a number of criminal violations, correct?

A.   Yes, sir.

Q.   He was charged with being in possession of that firearm -- that shotgun that you found in the trunk, correct?

A.   Yes, sir.

Q.   And, he was charged with being -- with gang participation, correct?

A.   Yes, sir.

Q.   Was he charged with anything else?

A.   If memory serves, he was charged with weapons at the school, trespass at a school at night, possession of a short-barrel shotgun or rifle, as well as numerous counts of gang participation.

1    Q.  Was he charged with murder?

2    A.  No, sir.

3    Q.  Was he charged with attempted murder?

4    A.  No, sir.

5    Q.  Was he charged with conspiracy to commit murder?

6    A.  No, sir.

7    Q.  Was anyone else on that night charged with

8  murder?

9    A.  No, sir.

10   Q.  Was anyone else that night charged with attempted

11 murder?

12   A.  No, sir.

13   Q.  Was anyone else that night charged with

14 conspiracy to commit murder?

15   A.  No, sir.

16            MR. JENKINS:  I have no further questions.

17            I'm sorry, I do have one more.

18 BY MR. JENKINS:

19   Q.  The car, you learned, was registered to the

20 driver, correct?

21   A.  I believe so, yes.

22   Q.  And that's the person who was charged with being

23 in possession of that firearm, correct?

24   A.  That is correct.

25            MR. JENKINS:  No further questions.

1           (Pause.)

2           THE COURT:  Redirect?

3           MS. MARTINEZ:  No, Your Honor.

4           THE COURT:  May the witness be excused?

5           (No audible response.)

6           THE COURT:  You're free to leave, sir.

7    Thank you.

8           THE WITNESS:  Thank you, Your Honor.

9           Excuse me, Your Honor.  Am I excused --

10          THE COURT:  Yes.

11          THE WITNESS:  -- for the day?

12          THE COURT:  You're excused from the case.

13   Thank you.  You're free to go.

14          (Thereupon, the witness withdrew from the

15   stand.)

16          MR. JENKINS:  Excuse me, Your Honor.  I'm --

17   I'm -- well, can I confer with counsel before he leaves?

18          THE COURT:  Yes.

19          Hold on -- Mr. Armstrong, hold on just one

20   second.

21          (Counsel conferring.)

22          MR. JENKINS:  Your Honor, I do have a couple

23   more questions.  I believe government counsel would not

24   object.  It will be beyond the scope --

25          THE COURT:  Okay.

1          MR. JENKINS:  -- of her direct.

2          THE COURT:  You can come back.

3          (Witness resumed stand.)

4             CROSS-EXAMINATION (Continued)

5    BY MR. JENKINS:

6       Q.   Detective Armstrong, can you please remind me,

7    how long have you been a cop?

8       A.   Going on -- excuse me.  Going on 11 -- almost

9    12 years now.

10      Q.   And I believe you testified that you have

11   participated in investigations related to MS-13,

12   correct?

13      A.   Yes, sir.

14      Q.   And you've conducted numerous arrests, correct?

15      A.   Yes, sir.

16      Q.   Now, is it true that in the course of your

17   investigations, oftentimes you've participated in the

18   collection of forensic evidence?  Correct?

19      A.   Yes, sir.

20      Q.   For example, you've participated in the

21   collection of DNA samples, correct?

22      A.   I don't recall collecting DNA evidence.

23      Q.   Well, in this particular case, didn't you get a

24   warrant in order to -- obtain a warrant to take a DNA

25   sample from my client, Mr. Lopez Torres?

1      A.  I don't recall getting a DNA search warrant for

2  your client.

3      Q.  Well, let me ask you this:  Do you know whether

4  or not during the course of this investigation any DNA

5  analysis was done?

6      A.  I'm not aware.

7      Q.  Do you know if the shotgun that was found in the

8  vehicle that night, if it was tested for the presence of

9  DNA?

10      A.  I don't have any direct knowledge of that.

11      Q.  Do you know if that item was tested for

12  fingerprints?

13      A.  Again, I don't know.

14      Q.  Do you know why, based on your experience in law

15  enforcement, an item such as a firearm would be

16  submitted for DNA testing?

17      Is there any value to doing that?

18      A.  To have DNA on a -- tested for DNA on a weapon or

19  a gun would be to check to see who had touched the

20  implement.

21      Q.  Would that be helpful in your investigation, in

22  identifying who may have possessed that firearm?

23      A.  It may.

24      Q.  Would it also may be helpful if DNA testing was

25  done on the machetes that you found in that car for the

1   same purpose?

2       A.   It may.

3            MR. JENKINS:  I have no further questions,

4   Your Honor.

5            MS. MARTINEZ:  Briefly, Your Honor.

6            THE COURT:  All right.

7                    REDIRECT EXAMINATION

8   BY MS. MARTINEZ:

9       Q.   You said that DNA testing may be helpful to

10  determine who possessed a weapon.  Can you elaborate on

11  that?

12      A.   Referred to as touch DNA, if -- if an implement

13  is handled by someone, there may be a transfer of DNA

14  from -- from that person to the item.

15      Q.   You say that there may be.  Is there always a

16  transfer?

17      A.   No, not that I'm aware of.

18           MS. MARTINEZ:  No further questions, Your

19  Honor.

20           THE COURT:  Now is the witness excused?

21           MR. JENKINS:  Yes, Your Honor.

22           MS. MARTINEZ:  Yes, Your Honor.

23           THE COURT:  You're free to leave.  Thank

24  you, sir.

25           (Thereupon, the witness withdrew from the

1    stand.)

2              MR. TOBLER:  May we call the next witness,

3    Your Honor?

4              THE COURT:  Yes.

5              MR. TOBLER:  United States calls John Webb.

6              (Witness sworn.)

7              THE WITNESS:  I do.

8              THEREUPON, JOHN WEBB, having been duly

9    sworn, testified as follows:

10                    DIRECT EXAMINATION

11   BY MR. TOBLER:

12     Q.   Good afternoon, sir.

13     A.   Good afternoon.

14     Q.   Would you please state your name and spell it for

15   the record?

16     A.   My name is John Webb.  Last name is spelled

17   W-e-b-b.

18     Q.   Where do you work, Mr. Webb?

19     A.   I work at the FBI Laboratory in Quantico,

20   Virginia.

21     Q.   For how long have you worked for the FBI?

22     A.   I started with the FBI in 1998.

23     Q.   What is your current position?

24     A.   I'm a supervisory forensic examiner in the

25   firearms tool marks unit.

1    Q.    What are your duties in that position?

2    A.    In that position, I supervised six employees,

3    basically just mentoring them for successful and happy

4    careers.  But the majority of my work is as a firearms

5    examiner.

6    Q.    What kinds of firearms examinations do you

7    conduct?

8    A.    In our laboratory, we're responsible for

9    receiving and examining all types of firearms --

10   handguns, rifles, shotguns -- examining for their

11   operability, comparison with other evidence, writing

12   reports and then testifying to those conclusions.

13   Q.    As part of your firearms examinations, do you

14   ever test fire weapons?

15   A.    Yes.  We test fire every weapon that comes

16   through the laboratory.

17   Q.    Do you ever measure weapons?

18   A.    We measure every weapon that also comes through

19   the laboratory.

20   Q.    As part your examinations, do you identify the

21   makes and models of weapons?

22   A.    Yes, we do.

23   Q.    What previous positions have you held within the

24   FBI?

25   A.    Within I started in 1998, I was a technician in

the firearms tool marks unit.  In 2000, I was promoted
to an examiner trainee, and in 2002 was qualified as a
firearms examiner.

Q.   What are -- what were your duties as a firearms
examiner?

A.   As a firearm examiner, I received the evidence,
the firearms, bullets from a victim, cartridge cases
from a scene, make notations on those, test fire the
weapons, and then compare those test-fired specimens to
the evidence, bullets and cartridge cases.

      If there's an association, I'll make note of
that, again, draft a report, and then testify to my
findings, if necessary.

Q.   Were you also conducting the same types of
firearms examinations that you conduct now?

A.   Yes.

Q.   And that includes test firing weapons, for
instance?

A.   That's correct.

Q.   Measuring weapons; is that correct?

A.   That's correct.

Q.   And identifying weapons?

A.   Yes, sir.

Q.   What -- what training did you receive when you
started with the FBI?

1      A.   The training to become a firearm examiner is

2   almost exclusively on the job.  I spent two years in

3   essentially an apprenticeship, working side by side with

4   qualified examiners, working dozens of dozens of real

5   and mock cases, examining hundreds of firearms and

6   conducting thousands upon thousands of comparisons of

7   bullets and cartridge cases.

8          At the end of that two-year period, I

9   successfully completed a series of oral examinations,

10  and, at that point was recognized by the FBI Laboratory

11  as a qualified examiner.

12     Q.   Over your career, how many firearms have you

13  examined?

14     A.   About hundreds, if not thousands.

15     Q.   How many have you test fired?

16     A.   The same, hundreds and thousands -- hundreds, if

17  not thousands.  Sorry.

18     Q.   How many have you measured?

19     A.   The same as well.

20     Q.   Have you previously testified in court regarding

21  firearms examinations?

22     A.   Yes, I have.

23     Q.   Approximately how many times?

24     A.   Approximately 50 times.

25     Q.   And, how many out of that 50 were in federal

1    court?

2        A.   I'd say probably about two-thirds of those are

3    federal trials.

4        Q.   Please tell the jury about your educational

5    background, sir.

6        A.   Well, I received a bachelor of science from the

7    University of North Carolina at Chapel Hill, and then a

8    master's degree in criminal justice, forensic science,

9    from Virginia Commonwealth University.

10       Q.   Are you required in your job to undergo any

11   periodic proficiency training?

12       A.   Yes, we are.

13       Q.   How often?

14       A.   We take proficiency tests twice a year.

15       Q.   What does that testing consist of?

16       A.   The test is offered in whatever discipline we're

17   qualified in.  As a firearms tool marks examiner, I take

18   one firearms and one tool mark proficiency test a year.

19   That test is essentially sent to us as a blind case, and

20   we report -- work the evidence as an individual, and

21   then record our findings.

22       Q.   Have you successfully completed the testing?

23       A.   Yes, I have.

24       Q.   As part of this --

25                MR. TOBLER:  Your Honor, at this time we

 1   would move that this witness be recognized as an expert

 2   in firearms examination under Rule 702.

 3              THE COURT:  He will be permitted to

 4   testified to a reasonable degree of certainty in this

 5   field as a firearms examiner.

 6              Go ahead.

 7   BY MR. TOBLER:

 8   Q.   As part of this case, were you asked to examine a

 9   firearm?

10   A.   Yes, I was.

11   Q.   With the assistance of Mr. Toliver, I'd like to

12   hand you what was previously admitted into evidence as

13   Government's Exhibit 32.

14        Do you recognize Government's Exhibit 32, sir?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   Government's Exhibit 32 is a 12-gauge Browning

18   shotgun that was submitted to me for examination.

19   Q.   How do you recognize it?

20   A.   I recognize this shotgun because it has -- see if

21   I can hold this up for you.

22        On the trigger guard, right here (indicating)

23   where my thumb is pointing, it has my identifiers, the

24   laboratory number, as well as my initials on it.  It

25   also has the serial number that I recognize on the lower

1    part of the receiver.

2              MR. TOBLER:  For the record, Your Honor, the

3    witness, when he was signifying to that tag, I believe

4    it was near the trigger.

5    BY MR. TOBLER:

6        Q.   Is that correct?

7        A.   That's correct.  It's on the trigger guard.

8        Q.   And I believe you mentioned that there's a

9    laboratory number on the trigger guard.

10       A.   Yes, there is.

11       Q.   What is the laboratory number?

12       A.   The laboratory number is -- generally or

13   specifically?

14       A.   Generally speaking, what is a laboratory number?

15       A.   A laboratory number is just a number that is

16   assigned to a group of evidence that's submitted under a

17   single case.  It helps to organize that evidence under a

18   single laboratory number.

19       Q.   And with respect to Government's Exhibit 32,

20   before you there, that laboratory number is something

21   that you put on the firearm; is that correct?

22       A.   That's correct.

23       Q.   And, did you also mention the item number?  I

24   believe you used the term "item number"?

25       A.   That's correct.

1    Q.   What is an item number, generally speaking?

2    A.   So, just as a laboratory number can be used to

3    group items of evidence, an item number would be a

4    specific item of evidence under that laboratory number.

5         Each item of evidence as received is assigned its

6    own unique item number, so it can be distinguished from

7    the other evidence.

8    Q.   When did you receive Government's Exhibit 32?

9    A.   I believe it was February 2015.

10   Q.   What examinations did you perform on Government's

11   Exhibit 32?

12   A.   This weapon was received, so it was examined for

13   safety.  It was -- had general examinations done on it,

14   the gauge, the make, the model.  It was test fired in

15   the laboratory.  And, that was -- and it was measured as

16   well.

17   Q.   What is the make and model of Government's

18   Exhibit 32?

19        I believe you mentioned before, but could you

20   mention again?

21   A.   This is a Browning, model 2000 shotgun.

22   Q.   How do you know that?

23   A.   The Browning, I recognize because it's actually

24   on the firearm itself, on the receiver.  And I

25   believe -- I can't flip it over because of the way it's

1    cable tied into the box, but the 2000 is the other side.

2        Q.   Does Government's Exhibit 32 also bear a serial

3    number?

4        A.   Yes, it does.

5        Q.   What is that serial number?

6        A.   That serial number on the lower part of the

7    receiver is 29986C, as in Charlie, 47.

8        Q.   Please explain for the jury how you measured the

9    barrel of Government's Exhibit 32.

10       A.   In order to conduct a barrel measurement for a

11   firearm, the action has to be closed.  The bolt is

12   forward, as if the firearm is ready to be fired.  Of

13   course, there's no ammunition in the firearm at that

14   time.

15            And then very simply -- if this is convenient --

16   a rod is placed down the muzzle end of the firearm,

17   until it stops at the breech block, or whatever is

18   closing the action of the firearm.

19            At that point -- that rod is graduated just like

20   a ruler, and you measure off exactly the length from the

21   muzzle end to the breech block here.

22       Q.   Based on your training and experience, sir, is

23   that a standard means of measuring a firearm?

24       A.   Yes, it is.

25       Q.   What was the length of the barrel of Government's

1    Exhibit 32?

2        A.   I measured this length to be 14 and 13/16 inches

3    long, plus or minus 9/100 of an inch.

4        Q.   You mentioned before, sir, that you also test

5    fired Government's Exhibit 32.  Please --

6        A.   That's correct.

7        Q.   Please explain for the jury how you test fired

8    Exhibit 32.

9        A.   We test fire every firearm that comes through the

10   laboratory.  In order to do that -- the firearm is

11   examined for function, dry-fired, basically, to make

12   sure that it's safe to fire.

13       Once we determine that it is safe to operate, we

14   will take the appropriate ammunition -- we actually have

15   a range in our facility.  We will load the firearm and

16   then test fire to see if it will function properly as

17   it's designed.

18       Q.   Based on your training and experience, is this a

19   standard means of test firing a weapon?

20       A.   Yes, it is.

21       Q.   What did you observe about Government's

22   Exhibit 32 during your test fire of that weapon?

23       A.   Although it did function, in that I could load

24   the firearm, press the trigger and it would discharge

25   that first shot shell, it did not operate as it's

1    designed to.

2        Q.   Why did the shotgun fail to operate as designed?

3        A.   If I can explain the operation of the firearm

4    first.

5        Q.   Please do.

6        A.   This is a semi-automatic shotgun.  That means

7    that one shot shell can be loaded into the chamber,

8    basically, the breech end of the barrel, and then

9    additional shot shells can be loaded into a magazine

10   tube below that barrel.

11       The semi-automatic, once there's a shot shell in

12   the chamber and it's in battery, the trigger is pressed,

13   the firearm discharges, the action automatically unloads

14   the empty shot shell, and as the bolt moves forward it

15   loads another shot shell, a live round, from the

16   magazine tube.  So each press of the finger fires one

17   shot shell.

18       This is a gas-operated shotgun.  What that means

19   is the gas forcing that shot shell, that projectile, the

20   credible pleasure of gas, as that moves down the barrel,

21   part of that gas is vented off in a little tube, a

22   little hole in the barrel up here (indicating), towards

23   your magazine.

24       There's an operating rod that that gas acts on,

25   and that pushes the bolt rearward, and that helps to

1    unlock it, to extract and eject the empty shot shell.

2    That bolt is under spring tension.  It moves forward,

3    loading the next round.

4            The reason this weapon didn't operate properly as

5    designed, although that gas came through the tube and

6    acted on the action, the barrel of this shotgun is

7    supposed to extend to about here (indicating) -- excuse

8    me -- so, that that gas can act on that operating rod

9    for a much longer time.

10           With the cut off barrel, the gas was not able to

11   operate on the rod as long as it needed to, so it

12   couldn't -- there wasn't enough force to cycle the

13   weapon.

14               MR. TOBLER:  Your Honor, for the record,

15   when he was indicating the size of a non-short barreled

16   rifle --

17   BY MR. TOBLER:

18       Q.  I believe your hand was about a foot or two above

19   the end of the barrel of the gun; is that correct?

20       A.  Approximately, yes.

21       Q.  Because the normal action didn't work with the

22   shotgun, how -- were you able to eject the shell from

23   the gun?

24       A.  I was.  This shotgun is equipped with a handle on

25   the side, so it can be manually operated, manually

1    manipulated, if the gas system fails.

2        Q.   Were you able to fire Government's Exhibit 32?

3        A.   Yes, I was.

4        Q.   Were you able to fire it repeatedly?

5        A.   Yes, I was.

6        Q.   And based on your examination of Government's

7    Exhibit 32, do you have an opinion as to whether it is a

8    weapon which will expel a projectile by action of

9    explosive?

10       A.   It is.

11       Q.   Approximately when was Government's Exhibit 32

12   made?

13       A.   According to the serial number, this firearm was

14   made in 1974.

15       Q.   Are you familiar with the term, "replica

16   firearm"?

17       A.   Yes, I am.

18       Q.   What is a replica firearm?

19       A.   "Replica firearm" refers to firearms that are

20   made currently, but represent antique firearms, often

21   firearms that were made before the 1900s, muzzle-loading

22   firearms that require a different type of ignition

23   system than modern firearms that use cartridges.

24       Q.   Is Exhibit 32 a replica firearm?

25       A.   No, it is not.

1    Q.   How do you know that?

2    A.   It's a modern firearm, created in 1974 by

3    Browning Firearms Company.

4    Q.   Are you familiar with the term "center fire"?

5    A.   Yes, I am.

6    Q.   To what does that refer?

7    A.   "Center fire" refers to an ignition system

8    utilized in most firearms, whereas the primer is in the

9    center of that unit of ammunition, whether it's a rifle

10   cartridge, a handgun cartridge or a shot shell.

11   Q.   You mentioned before a muzzle-loading shotgun.

12   Is Exhibit 32 a muzzle-loading shotgun?

13   A.   No, it's not.

14   Q.   What's the difference between a center fire

15   shotgun and a muzzle-loading shotgun?

16   A.   A center fire shotgun, such as Exhibit 32,

17   utilizes a single unit of ammunition, a shot shell, that

18   contains the primer, the gunpowder, as well as the

19   projectile.

20        A muzzle-loading shotgun would require the user

21   to hand load the gunpowder from the muzzle end of the

22   firearm, push that towards the breech end, and then the

23   projectile on top of that.

24        The ignition system, whether it's a flintlock or

25   a percussion cap or what have you, would you on the

1    outside of that receiver.  It's completely separate from

2    the other ammunition components.

3                    MR. TOBLER:  No further questions, Your

4    Honor.

5                            CROSS-EXAMINATION

6    BY MR. AQUINO:

7        Q.   Good afternoon, sir.

8        A.   Good afternoon.

9        Q.   My name is Jerry Aquino.  Along with Elita Amato,

10   I represent Jesus Chavez.  Just a few questions for you.

11       Are handguns manufactured in Virginia?

12       A.   I cannot think of any handgun manufacturers in

13   Virginia; dealers and distributors, but not actual

14   manufacturers.

15       Q.   Okay.  Does that include rifles, too?

16       A.   No.  There is a rifle manufacturer in Virginia.

17   Excuse me.

18       Q.   Now, based upon your experience, given the right

19   skill set, given the right tools, can a firearm such as

20   a handgun be manufactured within someone's home or

21   office?

22       A.   Yes.

23       Q.   Okay.  Have you encountered cases where you've

24   seen rudimentary handguns made that way, in other words,

25   not by a professional manufacturer?

1    A.   I have seen cases.  I have not worked any of

2    those myself, but I have seen cases of similar firearms

3    that you mentioned.

4    Q.   Made out of the home or someone's office or

5    somewhere like that?

6    A.   That's correct.

7              MR. AQUINO:  That's all the questions I

8    have.

9              (Pause.)

10             THE COURT:  May the witness be excused?

11             MR. TOBLER:  Yes, Your Honor.

12             THE COURT:  All right.  You can step down,

13   sir.  Thank you very much.

14             (Thereupon, the witness withdrew from the

15   stand.)

16             MS. MARTINEZ:  Government calls Special

17   Agent Claudia Dubravetz.

18             (Witness sworn.)

19             THE WITNESS:  I do.

20             THEREUPON, CLAUDIA DUBRAVETZ, having been

21   duly sworn, testified as follows:

22                       DIRECT EXAMINATION

23   BY MS. MARTINEZ :

24   Q.   Good afternoon.

25   A.   Good afternoon.

1    Q.   Please state and spell your full name for the

2    record.

3    A.   Claudia Dubravetz; C-l-a-u-d-i-a,

4    D-u-b-r-a-v-e-t-z.

5    Q.   How are you employed?

6    A.   I'm a special agent with the Federal Bureau of

7    Investigation.

8    Q.   How long have you been a special agent with the

9    FBI?

10   A.   Nine months.

11   Q.   Congratulations.

12   A.   Thank you.

13   Q.   Where did you work before that?

14   A.   I was an intelligence analyst with the Federal

15   Bureau of Investigation.

16   A.   How long were you an intelligence analyst.

17   A.   Four years.

18   Q.   What is your current assignment as a special

19   agent?

20   A.   I am currently assigned to work drug and gang

21   related matters, particularly MS-13.

22   Q.   What languages do you speak?

23   A.   English and Spanish.

24   Q.   How long have you spoken Spanish?

25   A.   My entire -- I'm a native Spanish speaker, so

1    it's my first language, so about 30 -- just under
2    30 years.
3        Q.   What's your level of proficiency in Spanish?
4        A.   Native Spanish speaker.
5        Q.   All right.
6             Are you acquainted with an individual named Jaime
7    Rosales Villegas?
8        A.   I am.
9        Q.   How so?
10       A.   I participated in a review of some recordings
11   that he did, and I also was present during his trial
12   preparation.
13       Q.   And, is this individual someone who is in
14   custody?
15       A.   Yes.
16       Q.   What was your role during -- you said you
17   assisted with review of recordings; is that right?
18       A.   Yes.
19       Q.   What was your role in assisting with his review
20   of recordings?
21       A.   So, my job was to play Mr. Rosales Villegas the
22   recording.  I had a copy of the English translation.
23   So, my job was to play him the recording, and he was
24   responsible for identifying line by line in the
25   translation who was speaking during that -- during that

1  time.  So, I would make note of who he identified in the

2  translation.

3      Q.   Where were you making these notes?

4      A.   In the actual English translation of the

5  recording.

6      Q.   While the recording was playing, what language

7  was it playing in?

8      A.   In Spanish.

9      Q.   Were you able to understand it?

10     A.   Yes.

11          MS. MARTINEZ:  With the help of the court

12  security officer, if we could hand the witness

13  Government's Exhibit 1-A-1, 2-A-1, 3-A-1, 4-A-1, and

14  5-A-1, please.

15  BY MS. MARTINEZ:

16     Q.   Are you familiar with those exhibits?

17     A.   I am.

18     Q.   What are they?

19     A.   These are the translations for the recordings

20  that Mr. Rosales Villegas reviewed during the review

21  process.

22     Q.   And is this the version that you actually took

23  the notes on, or is it another version?

24     A.   It's another version.

25     Q.   And, have you reviewed this version in

1    particular?

2        A.   Yes.

3        Q.   Are the identification of voices contained in the

4    versions there consistent with the notes that you made

5    based on your -- the review with Mr. Jaime Rosales

6    Villegas?

7        A.   Yes.

8        Q.   And is that true for Government's Exhibits 1-A 1,

9    2-A-1, 3-A-1, 4-A-1 and 5-A-1, throughout the exhibits?

10       A.   Yes.

11              MS. MARTINEZ:   No further questions, Your

12   Honor.

13                        CROSS-EXAMINATION

14   BY MR. JENKINS:

15       Q.   Good afternoon, Agent.

16       A.   Good afternoon.

17       Q.   My understanding is that you were in this meeting

18   or -- I think you called it a trial prep?

19       A.   Correct.

20       Q.   With Mr. Rosales?

21       A.   Yes.

22       Q.   Did I -- did I pronounce his last name correctly?

23       A.   Rosales Villegas.

24       Q.   Rosales.

25              And there were other government agents there,

 1    correct?

 2        A.   I believe -- when I went, I was the only federal

 3    agent that was present during the trial preparation, the

 4    review.

 5        Q.   How long -- how long ago was this?

 6        A.   The three sections that we did with him were

 7    about, I think it was early February.

 8        Q.   Now, let me draw your attention to the first

 9    session that you had with him.

10        A.   Uh-huh.

11        Q.   Were the identities of the speakers on the

12    recordings made at that time?

13        A.   Yes.

14        Q.   Prior to that day, had you ever heard any of the

15    voices on that recording, or any of those recordings?

16        A.   No.

17        Q.   Is it fair to say that you've never meet my

18    client, Mr. Lopez Torres?

19        A.   I have never meet him, no.

20        Q.   You're not familiar with his voice?

21        A.   No.

22        Q.   You could not, as you sit here today, tell us

23    whether or not his voice was on any of those recordings,

24    correct?

25        A.   Correct.

1    Q.   In fact, you are relying exclusively on what
2  Mr. Rosales told you?
3    A.   Correct.
4    Q.   And, but for him, you would not know who were on
5  those tapes, correct?
6    A.   So, can you -- can you -- so, "for him," can you
7  repeat that?  I'm sorry.
8    Q.   Were you relying exclusively on him to tell you
9  who the voices were?
10   A.   Yes.
11             MR. JENKINS:  I have no further questions.
12             THE COURT:  Redirect?
13             MS. MARTINEZ:  None, Your Honor.
14             THE COURT:  May the witness be excused?
15             (No audible response.)
16             THE COURT:  You're free to leave.  Thank you
17  very much.
18             THE WITNESS:  Thank you.
19             (Thereupon, the witness withdrew from the
20  stand.)
21             MS. MARTINEZ:  Your Honor, the government
22  calls Jaime Rosales Villegas.
23             (Witness sworn.)
24             (Through interpreter.)
25             THE WITNESS:  I do.

1          THEREUPON, JAIME ROSALES VILLEGAS, having

2     been duly sworn, testified as follows:

3                         DIRECT EXAMINATION

4     BY MS. MARTINEZ:

5          Q.   Good afternoon.

6          A.   Good afternoon.

7          Q.   When you answer the questions, if you could just

8     speak right into the microphone there.  Okay?

9          A.   Okay.

10         Q.   What language do you speak?

11         A.   Spanish.

12         Q.   We're going to use your testimony with the

13    Spanish language interpreter.  If at any point you don't

14    understand, just ask me to repeat.  Okay?

15         A.   Okay.

16         Q.   And even though you're speaking in Spanish, if

17    you could make sure you speak right into that microphone

18    so everyone can hear you, that would be very helpful,

19    thank you.

20         A.   Okay.

21         Q.   How old are you?

22         A.   Thirty years old.

23         Q.   Where were you born?

24         A.   El Salvador.

25         Q.   When did you come to the United States?

1    A.   January 20th, 2005.

2    Q.   How old were you when you came to the United

3    States?

4    A.   I was 20.

5    Q.   How did you get to the United States?

6    A.   Through my father.  He applied for my residence

7    permit.

8    Q.   How far did you go to school in El Salvador?

9    A.   High school.

10   Q.   Did you complete high school in El Salvador?

11   A.   Yes.

12   Q.   When you came to the United States, did you

13   continue at all with your schooling?

14   A.   No.

15   Q.   Are you a member of a gang?

16   A.   Yes.

17   Q.   What gang?

18   A.   Park View.

19   Q.   When you say "Park View," what's the full name

20   that you're referring to?

21   A.   It's part of the Mara Salvatrucha.

22   Q.   What else is La Mara Salvatrucha known as?

23   A.   La Mara.

24   Q.   Is it also known as MS-13?

25             MR. CONTE:  Objection, leading.

```
 1                THE COURT:  Sustained.
 2   BY MS. MARTINEZ:
 3      Q.  You said that Park View is part of La Mara, or La
 4   Mara Salvatrucha.  What do you mean it's part of it?
 5      A.  Park View is a part of the Mara Salvatrucha.
 6      Q.  When did you join La Mara Salvatrucha?
 7      A.  I joined them in the year 2012.
 8      Q.  How old were you?
 9      A.  Twenty-seven.
10      Q.  Was there a particular clique that you joined
11   when you joined La Mara Salvatrucha?
12                MR. CONTE:  Objection, asked and answered,
13   Your Honor.
14                MS. MARTINEZ:  I don't think I asked that
15   question.
16                THE COURT:  Overruled.  Overruled.
17   BY MS. MARTINEZ:
18      Q.  Was there a particular clique that you joined
19   when you joined the La Mara Salvatrucha?
20      A.  Yes.
21      Q.  What clique?
22      A.  Park View.
23      Q.  Do you know the full name of the Park View
24   clique?
25      A.  Yes.
```

1    Q.   What is the full name of the Park View clique?

2    A.   Park View Locos Salvatrucha.

3    Q.   Is there an abbreviation that's used for Park

4    View Locos Salvatrucha?

5    A.   Yes.

6    Q.   What's the abbreviation?

7    A.   PVLS.

8    Q.   When you joined the gang, were you given a

9    nickname?

10   A.   Yes.

11   Q.   What nickname?

12   A.   Satánico, Little Demente and Demente.

13   Q.   You just listed three nicknames.  Are you known

14   by all three of those nicknames?

15   A.   Yes.

16   Q.   Are you currently incarcerated?

17   A.   Yes.

18   Q.   For what?

19   A.   For attempt to commit a crime.

20   Q.   What crime?

21   A.   Intent to kill a person.

22   Q.   Was that crime gang related?

23   A.   Yes.

24   Q.   Did you plead guilty?

25   A.   Yes.

1    Q.   Who was the intended victim of your crime?

2    A.   He was an ex-member of our clique and we call him

3    Peligroso.

4    Q.   We'll talk more about Peligroso in a moment.

5         But at this time, would you please look, with the

6    help of the court security officer, at Government's

7    Exhibit 120.

8         Please go ahead and take that document out of the

9    sleeve so that you can fully see it.

10   A.   (Complied.)

11   Q.   Does that document appear to be a copy of your

12   plea agreement with the government?

13   A.   Yes.

14   Q.   On the last page of the plea agreement, is that

15   your signature?

16   A.   Yes.

17        MS. MARTINEZ:   Your Honor, the government

18   moves to admit Government's Exhibit 120 into evidence.

19        MR. JENKINS:   No objection, Your Honor.

20        THE COURT:   Received.

21   BY MS. MARTINEZ:

22   Q.   Does that plea agreement say that you pled guilty

23   to three counts?

24   A.   Yes.

25   Q.   And is that attempted murder in aid of

1    racketeering --

2                   MR. CONTE:  This is leading.

3                   THE COURT:  Overruled.

4    BY MS. MARTINEZ:

5        Q.   Are the three counts that you pled guilty to,

6    attempted murder in aid of racketeering, conspiracy to

7    commit murder in aid of racketeering, and the use of a

8    firearm in a crime of violence?

9        A.   Yes.

10       Q.   And were those offenses related to the attempted

11   murder you mentioned on Peligroso?

12       A.   Yes.

13       Q.   What are your obligations under that plea

14   agreement?

15       A.   To tell the truth about what was going to happen

16   that day.

17       Q.   What benefit do you hope to get?

18       A.   To get less time for my sentence.

19       Q.   Have you been sentenced yet for your crime?

20       A.   No.

21       Q.   Who do you understand is responsible for

22   determining your sentence?

23       A.   I think it's the judge.

24       Q.   Who do you understand is responsible for

25   determining any reduction in your sentence in response

1    to your cooperation?

2        A.   The judge.

3        Q.   What do you understand will be the consequences

4    under your plea agreement if you lie?

5        A.   That I will get a lot more time than I would

6    normally get.

7        Q.   Once you pled guilty, have you also had

8    conversations with the government about the possibility

9    of putting you in protective custody?

10       A.   Yes.

11       Q.   How did you first come to be involved with La

12   Mara Salvatrucha?

13       A.   I began getting involved through a cousin.

14            MS. MARTINEZ:  I'm sorry, I didn't

15   quite under- -- I didn't --

16            THE INTERPRETER:  "Through a cousin," "a

17   cousin of mine."

18   BY MS. MARTINEZ:

19       Q.   What cousin?

20            MR. CHICK:  Your Honor, my apologies.  Is

21   there any way we can get the interpreter a microphone?

22            THE INTERPRETER:  Thank you so much.

23            MS. MARTINEZ:  I was having trouble

24   understanding her as well, Your Honor.

25            THE INTERPRETER:  I apologize.  My voice

1    isn't high.

2              "I began getting involved through a cousin."

3    BY MS. MARTINEZ:

4        Q.   What cousin?

5        A.   Payaso.

6        Q.   Do you know Payaso by any other name?

7        A.   By his real name.

8        Q.   What is Payaso's real name?

9        A.   Pedro Antonio Romero Cruz.

10       Q.   How long have you known Pedro Antonio Romero

11   Cruz, or Payaso?

12       A.   Since we were kids.

13       Q.   In El Salvador?

14       A.   Yes.

15       Q.   Did the two of you live in the same area in El

16   Salvador?

17       A.   For a time, we lived together.

18       Q.   What is his age relative to yours?

19       A.   I am not sure, but I think he's 27.

20       Q.   Is that older or younger than you are?

21       A.   Younger.

22       Q.   By how many years?

23       A.   About three.

24       Q.   Do you know what country Payaso lives in now?

25       A.   Yes.  Here in the United States.

J. Villegas - Direct                                    271

1    Q.   Who came to the United States first, you or
2    Payaso?
3    A.   Payaso.
4    Q.   When you came to the United States in 2005, were
5    you in touch, at that time when you came to the United
6    States, with Payaso?
7    A.   No.
8    Q.   At some point after you arrived in the United
9    States, did you come to be in touch with him?
10   A.   Yes.
11   Q.   When was that?
12   A.   That was like in 2012.
13   Q.   How did you come to be in touch with him?
14   A.   I got in touch with him because at a point he
15   called my phone.
16   Q.   He called you?
17   A.   Yes, he did.
18   Q.   That first time he called you, did you
19   immediately recognize his voice?
20   A.   No.  That time that we spoke, I did not recognize
21   him.
22   Q.   How did you come to understand that it was your
23   cousin, Romero Cruz, Payaso, who was calling?
24   A.   Because, he told me that he was his cousin, that
25   I was speaking with his cousin.

1   Q.   Did he tell you where he was?

2   A.   Yes.  He told me he was in jail.

3   Q.   Did he tell you what jail or prison he was in?

4   A.   The jail is called something like Powhatan.

5   Q.   When he called you from Powhatan jail or prison,

6  was he calling on a prison phone, a line authorized for

7  inmate use within the prison?

8            MR. CONTE:  Objection, Your Honor.  There's

9  no basis for his knowledge of this.

10            THE COURT:  Foundation.  Objection

11  sustained.

12  BY MS. MARTINEZ:

13   Q.   Do you recall the Area Code of the phone number

14  he called you from?

15   A.   Yes.

16   Q.   What was the Area Code?

17   A.   540.

18   Q.   At any point, did Payaso tell you about the phone

19  on which he was calling you?

20   A.   He told me that it was a cellphone that he had.

21   Q.   Did he tell you how it was that he had a

22  cellphone in a prison?

23            MR. CONTE:  Objection, Your Honor.

24            THE COURT:  The objection is?

25            MR. CONTE:  It's leading.  She's giving the

1    gentleman the answer before he answers the question.

2                THE COURT:  All right.  Sustained.

3    Questions that begin "Did you" are leading.

4    BY MS. MARTINEZ:

5        Q.   At any point during your conversations with

6    Payaso, was there an opportunity for you to learn, from

7    Payaso, how it was that he had a cellphone in a prison?

8        A.   No, he never told me how was it that he obtained

9    that cellphone.

10       Q.   In addition to speaking to him on the phone, was

11   there ever a time that you visited him in person?

12       A.   Yes, I did.

13       Q.   Where did you visit him?

14       A.   In that prison in Powhatan.

15       Q.   After the first time you visited him, were there

16   additional times that you spoke to him on the phone?

17       A.   Yes.  We continued communicating by phone.

18       Q.   Were there times that he called you?

19       A.   Yes.

20       Q.   Were you also able to call him directly?

21       A.   Yes, I could.

22       Q.   What number did you use to call him?

23       A.   The one with the 540 Area Code.

24       Q.   Were you also able to send text messages to him?

25       A.   Yes, I could.

1    Q.   What number did you send him text messages on?

2    A.   The one with the 540 Area Code.

3    Q.   Were there times that he responded to you via

4    text message?

5    A.   Yes, many times.

6    Q.   From what phone number?

7    A.   The 540 number.

8    Q.   Approximately how many times, if you recall, did

9    you visit your cousin, Payaso, at Powhatan?

10   A.   It was about ten times, more or less.

11          MS. MARTINEZ:  With the help of the court

12   security officer, if we could show the witness what has

13   been previously marked for Government's Exhibit purposes

14   as 102-D, as in dog.

15   BY MS. MARTINEZ:

16   Q.   Do you have Government's Exhibit 102-D in front

17   of you there?

18   A.   Yes.

19   Q.   Do you recognize that picture?

20   A.   Yes.

21   Q.   What do you recognize it as?

22   A.   This is my cousin, Payaso.

23   Q.   Is that picture a fair and accurate

24   representation of what your cousin, Payaso, looked like

25   when you visited him?

1    A.   Yes.

2         MS. MARTINEZ:   Your Honor, the government

3    moves to admit Government's Exhibit 102-D into evidence.

4         THE COURT:   Received without objection.

5         MS. MARTINEZ:   May we publish to the jury,

6    Your Honor?

7         THE COURT:   Yes.

8    BY MS. MARTINEZ:

9    Q.   Could you now take a look at Government's

10   Exhibit 102-B, as in boy.

11        Do you recognize Government's Exhibit 102-B?

12   A.   Yes.

13   Q.   Do you recognize the person in that picture?

14   A.   Yes.

15   Q.   Who is the person depicted in that picture?

16   A.   Payaso.

17   Q.   And is that a fair and accurate representation of

18   your cousin, Payaso, at the time that you visited him?

19   A.   Yes.

20        MS. MARTINEZ:   Your Honor, government moves

21   to admit Government's Exhibit 102-B into evidence.

22        THE COURT:   Received.

23        MS. MARTINEZ:   May we publish to the jury?

24        THE COURT:   Yes.

25

1    BY MS. MARTINEZ:

2        Q.   Could you take a look now at Government's

3    Exhibit 65-B, as in boy.

4             Do you have Government's Exhibit 65-B?

5        A.   Yes.

6        Q.   Do you recognize the individual depicted in

7    Government's Exhibit 65-B?

8        A.   Yes.

9        Q.   Who is it?

10       A.   Payaso.

11       Q.   Your cousin?

12       A.   Yes.

13            MS. MARTINEZ:   Your Honor, the government

14   moves into evidence Government's Exhibit 65-B.

15            THE COURT:   Received without objection.

16            MS. MARTINEZ:   May we publish?

17            THE COURT:   Yes.

18   BY MS. MARTINEZ:

19       Q.   You said that your cousin, Payaso, was the one

20   who got you involved with La Mara Salvatrucha.  Do you

21   know whether Payaso was involved with the gang?

22       A.   Yes.

23       Q.   Was he?

24       A.   Yes, he was.

25       Q.   When did you decide that you wanted to join the

1    gang?

2        A.   I decided in the year 2012 to enter the gang.

3        Q.   You also testified that you first began speaking

4    to Payaso on that cellphone in 2012.  Did you decide you

5    wanted to join the gang before or after the first time

6    you spoke to Payaso on the cellphone?

7        A.   After the first phone call I had with him.

8        Q.   Why did you decide that you wanted to join the

9    gang?

10       A.   Excuse me?

11       Q.   Why did you decide that you wanted to join the

12   gang?

13       A.   I decided to involve myself because of some

14   problems I had at home, and I wanted to walk on the

15   streets.

16       Q.   Once you decided that you wanted to join the

17   gang, what did you do?

18       A.   On that occasion, I had to speak with Payaso and

19   tell him that I want to be part of the Park View.

20       Q.   Was Payaso part of the Park View clique?

21       A.   Yes.

22       Q.   When you told Payaso that you wanted to be part

23   of the gang and the Park View clique, what did he do?

24       A.   He told me that he was going to talk to certain

25   homeboys there, and then he would let me know.

1    Q.   After that, was there a time when he confirmed
2    whether or not he spoke to these certain homeboys?
3    A.   Yes.
4    Q.   What did he tell you?
5    A.   That he had already spoken with them and that I
6    could become a member of Park View.
7    Q.   Do you know who these homeboys were?
8    A.   Only one, that was known as Cabro.  I don't know
9    who the others were.
10   Q.   Do you know where Cabro was?
11   A.   He was also in prison.
12   Q.   For the record, can we spell Cabro?
13        Do you know how to spell Cabro in Spanish?
14   A.   Yes.
15   Q.   Could you spell it?
16   A.   C-a-b-r-o.
17   Q.   Do you know what country Cabro was in jail in?
18   A.   I'm not sure, but I think it's in Washington.
19             MR. CONTE:  Objection.
20             THE COURT:  Sustained, what he thinks.
21   BY MS. MARTINEZ:
22   Q.   Who talked to you about Cabro?
23   A.   Payaso.
24   Q.   Once Payaso told you that you were approved to
25   join the gang, what happened?

J. Villegas - Direct                                    279

1    A.   I started walking the sector that belonged to the
2    Park Views.

3    Q.   When you say "the sector that belonged to the
4    Park Views", what are you referring to?

5    A.   I mean the territory for Park View was.  It was
6    the area of Culmore.

7    Q.   How did you know where the territory of Park View
8    was?

9    A.   Because, Payaso told me that that was Park View
10   territory.

11   Q.   Where is Culmore?

12   A.   I think it belongs to Falls Church, but I'm not
13   sure.

14   Q.   Could you make sure to speak into that microphone
15   there.

16        In what state is Culmore?

17   A.   Virginia.

18   Q.   You said that you began to walk the sector.
19   Please tell the jury what you mean when you say "walk
20   the sector."

21   A.   What I mean is that I started looking around in
22   the sector for other clique members who were active, to
23   regroup them.

24   Q.   What was your position in the gang?

25   A.   I was like the second runner, the second word.

1    Q.   What is the second runner or a second word?

2    A.   Someone who carries the control of the clique.

3    Q.   Was there such a thing as a first word or first

4    runner?

5    A.   Yes.

6    Q.   What is the first word or the first runner?

7    A.   He's the leader of the clique.

8    Q.   Who was the first word of your clique?

9    A.   Payaso.

10   Q.   Once you began associating yourself with the gang

11   and with the clique, how often did you talk to Payaso?

12   A.   We spoke every day.

13   Q.   What phone number did you use to call him on?

14   A.   I used the 540 one.

15   Q.   At this point, when you had first joined the

16   clique, how many active members of Park View were there

17   in the area of Culmore?

18   A.   At that time, the only -- the active member,

19   there were only two.

20   Q.   Who were the two?

21   A.   Lagrima and Peligroso.

22   Q.   When you say two, do you mean in addition to you

23   and Payaso?

24   A.   Yes.  We were four in total.

25   Q.   Who was Lagrima?

1    A.   He was a Park View member.

2    Q.   How did you first meet Lagrima?

3    A.   I met him through a *chequeo* who hanged out with

4    us.

5    Q.   What happened when you first met Lagrima?

6         What did you do when you first met Lagrima?

7    A.   When I saw Lagrima, I told him that I was going

8    to be the one in control outside of the clique.

9    Q.   How did Lagrima respond?

10   A.   That he was fine with it, that he was steadfast

11   with us, and he was going to hang out with us.

12   Q.   You also mentioned Peligroso.  Who was Peligroso?

13   A.   He was another Park View member.

14   Q.   How did you come to meet Peligroso?

15   A.   I met him also through another -- other *chequeo*

16   who were with me.

17   Q.   How did you learn that Peligroso was an

18   active gang --

19        THE COURT:  We'll start right there

20   tomorrow.

21        MS. MARTINEZ:  Yes, sir.

22        THE COURT:  Ladies and gentlemen, please do

23   not discuss the case.  Don't permit the case to be

24   discussed in your presence.  Don't do any research on

25   the case.  Don't do any looking in the media about the

1  case.

2          We will resume tomorrow at 10:00 o'clock.

3  And please leave your notes in the jury deliberation

4  room.

5          You all can go.

6          (Jury excused.)

7          THE COURT:  You can step down.

8          (Thereupon, the witness withdrew from the

9  stand.)

10          THE COURT:  Is there anything else?

11          (No response.)

12          THE COURT:  We're in recess.

13          (Thereupon, the proceedings were concluded

14  at 5:01 p.m.)

15

16                          ---

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the jury trial in the case of UNITED STATES OF AMERICA v. PEDRO ANTHONY ROMERO CRUZ, et al.,

I further certify that I was authorized and did report by stenotype the proceedings in said jury trial, and that the foregoing pages, numbered 1 to 283, inclusive, constitute the official transcript of said proceedings as taken from my shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this  6th   day of  May , 2016.


                        /s/
                        Renecia Wilson, RMR, CRR
                        Official Court Reporter