```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                       EASTERN DISTRICT OF VIRGINIA
 2                          Alexandria Division

 3    UNITED STATES OF AMERICA,        )
                                       )
 4                        Plaintiff,   )
                                       ) Crim. No. 1:14cr306
 5         vs.                         )
                                       )
 6    JOSE LOPEZ TORRES, ALVIN GAITAN  ) April 5, 2016
      BENITEZ, CHRISTIAN LEMUS CERNA,  )
 7    OMAR DEJESUS CASTILLO, DOUGLAS    )
      DURAN CERRITOS, MANUEL ERNESTO    )
 8    PAIZ GUEVARA, and JESUS ALEJANDRO )
      CHAVEZ,                          )
 9                                     )
                          Defendants.  )
10    _____)

11

12                              JURY TRIAL

13

14
      BEFORE:      THE HONORABLE GERALD BRUCE LEE
15                 UNITED STATES DISTRICT JUDGE

16

17    APPEARANCES:

18    FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                        BY:  JULIA MARTINEZ, AUSA
19                           TOBIAS TOBLER, AUSA

20
                              ---
21

22    OFFICIAL COURT REPORTER:

23                      RENECIA A. SMITH-WILSON, RMR, CRR
                        U.S. District Court
24                      401 Courthouse Square, 5th Floor
                        Alexandria, VA 22314
25                      (703)501-1580
```

APPEARANCES (Continued)

FOR DEFENDANT JOSE LOPEZ TORRES

        BYNUM & JENKINS, PLLC
        BY:  ROBERT L. JENKINS, JR., ESQ.
        THE LEIVA LAW FIRM, PLC
        BY:  MANUEL E. LEIVA, ESQ.

FOR DEFENDANT ALVIN GAITAN BENITEZ

        LAW OFFICE OF AMY LEIGH AUSTIN
        BY:  AMY LEIGH AUSTIN, ESQ.
        SMITH & ZIMMERMAN, PLLC
        BY:  JEFFREY D. ZIMMERMAN, ESQ.

FOR DEFENDANT CHRISTIAN LEMUS CERNA

        LAW OFFICE OF CHRISTOPHER AMOLSCH
        BY:  CHRISTOPHER AMOLSCH, ESQ.
        FRANK SALVATO, ESQ.

FOR DEFENDANT OMAR DEJESUS CASTILLO

        FIRSTPOINT LAW GROUP, PC
        BY:  KATHERINE MARTELL, ESQ.
        OLD TOWN ADVOCATES, PC
        BY:  MEREDITH M. RALLS, ESQ.

FOR DEFENDANT DOUGLAS DURAN CERRITOS

        LAW OFFICE OF J.R. CONTE, PLLC
        BY:  JOSEPH R. CONTE, ESQ.
        LAW OFFICE OF DWIGHT CRAWLEY
        BY:  DWIGHT E. CRAWLEY, ESQ.

FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

        LAW OFFICE OF W. MICHAEL CHICK, JR.
        BY:  WILLIAM MICHAEL CHICK, JR., ESQ.

FOR DEFENDANT JESUS ALEJANDRO CHAVEZ

        JEROME P. AQUINO, ESQ.
        ELITA C. AMATO, ESQ.


                        ---



1                              <u>INDEX</u>

2

3    PRELIMINARY MATTERS                                        4

4    <u>WITNESS (Government)</u> <u>DIRECT</u>   <u>CROSS</u>     <u>REDIRECT</u>     <u>RECROSS</u>

5    Jaime Rosales Villegas (Continued)
                           15    139 (Not completed)
6

7       (Court recessed)

8                              ---

9

1                    <u>PROCEEDINGS</u>

2                    (Thereupon, the following was heard in open

3    court at 10:01 a.m.)

4                    (Jury not present.)

5                    THE CLERK:  1:14 criminal 306, United States

6    versus Jose Lopez Torres, Alvin Gaitan Benitez,

7    Christian Lemus Cerna, Omar Dejesus Castillo, Douglas

8    Duran Cerritos, Manuel Ernesto Paiz Guevara, and Jesus

9    Alejandro Chavez.

10                   THE COURT:  Good morning.

11                        PRELIMINARY MATTERS

12                   THE COURT:  Would you like to come to

13   sidebar, or do it here in open court?

14                   MS. MARTINEZ:  Your Honor, if we could,

15   could we come to sidebar --

16                   THE COURT:  Sure.

17                   MS. MARTINEZ:  -- with defense counsel,

18   please?

19                   THE COURT:  Sure.  I understand.

20                   (Thereupon, the following side-bar

21   conference was had:)

22                   MS. MARTINEZ:  Good morning, Your Honor.

23                   THE COURT:  Good morning.

24                   MS. MARTINEZ:  Julia Martinez for the

25   United States, with Tobias Tobler.

1              Your Honor and counsel, I was informed this

2    morning, at about 8:30 this morning, that my trial

3    partner, Stephen Campbell, is unable to continue with

4    trial.  He is not here today.  He will not be here for

5    the reminder of the trial.

6              I can tell Your Honor that he has been

7    having a number of health problems, and I was informed

8    by our U.S. Attorney -- I have not spoken to him

9    directly, I don't know the details to provide Your

10   Honor, but I was informed by our U.S. Attorney this

11   morning that he is unable to continue with trial.

12             The government is prepared to proceed.

13   Mr. Tobler and I will continue as the two AUSAs in the

14   case.

15             We're in the course -- in the middle of the

16   witnesses.  We have several witnesses lined up today,

17   which Mr. Tobler and I were already planning on

18   handling.

19             Your Honor, I would ask -- if the defense

20   counsel has the position -- I would ask for one of two

21   things.  If Your Honor is at all unwilling to indulge

22   this -- we have two witnesses coming towards the end of

23   the day, or possibly tomorrow, that were Mr. Campbell's.

24   One is a very significant witness in this case.

25             I'm certainly capable of handling that

1    witness, and I will, but I would ask the Court for a

2    24-hour continuance to allow me to get prepared to

3    handle this witness, and to handle the other things that

4    Mr. Campbell has been handling.  We have had no

5    transition period.  It is an emergency situation.

6                If Your Honor is not inclined to give us

7    24 hours to regroup, the second thing that I would ask

8    is if we do get to those witnesses today -- and I don't

9    know that we will, but if we do, what I would ask is if

10   we could recess early at that point, and pick up with

11   those witnesses tomorrow morning.

12               So, I'm asking, first, for a 24-hour

13   continuance, which would start after we get through

14   several witnesses today.  So, in other words, I would be

15   asking to have -- to not have court tomorrow.

16               If Your Honor is not inclined to grant that,

17   the second thing I'd be asking is that we be able to

18   recess early today, if we do get to those witnesses, and

19   start those witnesses tomorrow morning.

20               MR. ZIMMERMAN:  Your Honor --

21               MR. SALVATO:  Frank Salvato for Christian

22   Lemus Cerna.

23               I've briefly spoken to all of co-counsel.

24   We don't have any objection to that 24-hour delay.

25               We hope Mr. Campbell is okay.  He's always

1   been a professional, decent person to all of us, so I
2   just extend my wishes to him.
3         But as far as the case, we don't have any
4   objection to a 24-hour delay, Your Honor.
5         THE COURT:  Well, I appreciate your dilemma,
6   and we always have more than one lawyer on a case like
7   this for very good reason.
8         Convey my concern to Mr. Campbell.
9         My suggestion is to continue calling the
10  other witnesses that you're prepared on, that's all, and
11  just restructure your case.
12        MS. MARTINEZ:  Your Honor, because of
13  witness travel and because some of the witnesses are
14  professionals, I will tell you we do not have another
15  witness prepared to come on today after these witnesses.
16        I really would ask for -- and especially
17  with defense counsel's consent -- for 24 hours, which
18  allows us to regroup.
19        This is -- Your Honor may know, prior to
20  beginning trial he was lead counsel on this case.  I've
21  been sitting in first chair since the case started
22  because of the health problems.  But it was completely
23  unexpected and -- completely unexpected to me.  I
24  learned it at 8:30 this morning.  I have not even spoken
25  to him directly.

1          Twenty-four hours would make a significant

2     difference, both in making sure that these witnesses are

3     prepared -- this is an important case, Your Honor.  This

4     is a significant case.  I don't want to see something

5     dropped because of a very unexpected event that has

6     occurred here.

7          And, the witness that we're talking about --

8     and I know defense counsel knows, this is Junior.  He is

9     perhaps the most significant witness.

10          THE COURT:  I'm not having -- the concern

11     that I have is recessing the case with all the people

12     here.  And, how much time do you have today, do you

13     think?

14          MS. MARTINEZ:  I think that we will get

15     through most of the day today.  I think we have either a

16     full or mostly a full trial day.  It's a little

17     difficult to judge, based on cross-examination.  We have

18     much more to go with this witness.  We have several

19     witnesses lined up after that.  So we're talking about a

20     full day today.

21          And then I would be simply asking to take

22     tomorrow as a recess, and begin Thursday morning with a

23     fresh start.

24          THE COURT:  Let me think about it some more,

25     but let's start today.

1          MR. SALVATO:  The only other thing I would

2     add, Your Honor, is that the Court does have under

3     consideration certain transcripts involving this

4     witness, Junior.

5          We filed some additional pleadings

6     yesterday, with a significant amount of exhibits.  The

7     Court has reserved ruling on some of our requests for

8     redacts.

9          THE COURT:  But you just filed that on

10    Saturday.  The government hasn't had a chance to respond

11    to it yet.

12         MR. SALVATO:  They have not.  But this is a

13    series of pleading back and forth, so I think the

14    government filed at least two responses.

15         So, if Junior is going to be called fairly

16    soon in the case, that might give the Court an

17    opportunity to look at those and make a ruling one way

18    or another.

19         THE COURT:  All right.

20         MR. SALVATO:  And so, we don't -- for all

21    those reasons, we don't -- I think we will get through

22    most of today with the government's witnesses, and we

23    don't object to the 24-hour continuance.

24         MS. MARTINEZ:  Your Honor, if I may add --

25         THE COURT:  Mr. Aquino wants to say

something.

            MR. AQUINO:  And I'm totally fine, totally
fine with what counsel is suggesting.  But, just to
buttress what Mr. Salvato is saying, I see this as --
the transcript issue is a significant issue.  And so --

            THE COURT:  It could have been briefed weeks
in advance.

            To have two sets of briefs, motions on this
thing now, while I'm in trial, is not going to get the
same kind of consideration you would have gotten at
pretrial.

            I'm going to read your brief.  But if you
file them at 12:00 o'clock, file them on Saturday and
Sunday, the government hasn't had a chance to respond.
I'm not sure what you expect me to do.

            MR. AQUINO:  I submitted mine a few weeks
ago.

            THE COURT:  I ruled on yours.

            MR. AQUINO:  Based upon what we heard on the
stand has caused additional facts to come to light that
were not in front of the Court at the time we filed that
motion.

            The reason I'm addressing this is, is that
the Court has reserved ruling on that issue.  And we
would like to have argument on that issue before those

1  come in.

2              So, I'm just making you aware that we

3  consider that to be something that needs to be addressed

4  by the Court.  That's all.

5              THE COURT:  Okay.  Well, I appreciate that

6  very much.  But what she's asking for is 24 hours.

7              MR. AQUINO:  I'm good -- I'm good with that.

8              THE COURT:  I would not be able to take up

9  your motion, in any event, while she is out preparing

10  for the witness --

11             MR. AQUINO:  That's fine.

12             THE COURT:  -- so, I'm sorry.

13             MS. MARTINEZ:  Just one second, Your Honor.

14             Mr. Salvato makes a very good point.  He

15  actually filed the motion yesterday while we were in the

16  Court at about 2:30, so we have not had a chance to look

17  at it.

18             However, what Mr. Salvato is asking for,

19  several redactions, it is possible, with a little bit of

20  time -- although, obviously, we have not had any time --

21  it's valuable to come to some agreement on some of the

22  additional redactions which would -- which I think would

23  help resolve the issue.

24             I don't know if we will be able to agree on

25  everything, but agree on many things, with the 24 hours

1    recess, perhaps we would be in the position to start

2    with Junior, with transcripts in which the redactions

3    are agreed upon.

4              THE COURT:  Well, one thing at a time.

5              MS. MARTINEZ:  Yes, Your Honor.

6              THE COURT:  Concerning your request, I'll

7    let you know whether you get a 24-hour continuance.

8              As it relates to the motions, motions filed

9    during trial, I gave you all ample time well before

10   trial to file motions.

11             And now you're saying the government -- you

12   filed a motion yesterday.  The government is requesting

13   24 hours continuance to prepare for witnesses further.

14   There's no time to file a response.

15             I'm not sure when you expect me to consider

16   it.  The reason I structured the case as I did was to

17   take care of all that before trial.  We don't do motion

18   practice during trial.

19             So you should not contemplate oral argument

20   unless I decide we will have some.  And all I have is a

21   one-sided brief, so I'll not be able to take that up

22   until I have the other side's response.

23             I'll let you know by lunchtime what I'm

24   going to do.  Thank you.

25             (Thereupon, the sidebar conference was

1   concluded.)

2   MS. MARTINEZ:  Your Honor, we have one

3   additional small matter that can be taken up in open

4   court, Your Honor, with this witness who is currently on

5   the stand.

6   We do expect to get to a couple of the

7   transcripts, some of the transcripts for which the

8   linguists have already testified.

9   We have prepared -- our paralegal has

10   prepared transcript binders for each of the jurors, to

11   allow them to more easily follow along.

12   Once a transcript has actually been

13   admitted, we would ask permission to distribute those,

14   and ask Your Honor to instruct the jurors that they're

15   only to look at transcripts that are being discussed in

16   open court, once Your Honor has admitted them and

17   permitted publication to the jury.

18   It's simply for the ease of the jurors, to

19   be able to read something in their lap instead of

20   looking at the screen.

21   THE COURT:  All right.  And these are just

22   the transcripts that are going to be referred to this

23   one witness; is that right?

24   MS. MARTINEZ:  We put all the transcripts in

25   one binder, Your Honor.  It's difficult --

```
1              THE COURT:  All right.  Okay.
2              MS. MARTINEZ:  -- to take them out per
3    witness.  But if Your Honor instructs them not to flip
4    to other transcripts, I think that would be --
5              THE COURT:  Okay.
6              MS. MARTINEZ:  -- that would be doable.
7              THE COURT:  And we will collect the
8    transcripts at each break or recess.  All right.
9              MS. MARTINEZ:  Yes, Your Honor.
10             Should we distribute them before the jury
11   comes out, put them under each chair, or how would Your
12   Honor like to do that, logistically?
13             THE COURT:  I think it might be better to --
14             MS. MARTINEZ:  They are bulky.
15             THE COURT:  They are bulky?
16             MS. MARTINEZ:  They are.
17             THE COURT:  If you can put them under the
18   chair, do it now and save time.
19             MS. MARTINEZ:  Thank you, Your Honor.
20             (Pause.)
21             THE COURT:  Are you ready to bring the jury
22   out now?
23             MS. MARTINEZ:  Yes, Your Honor.
24             THE COURT:  All right.  You can bring our
25   jury out, Mr. Toliver.  Thank you.
```

```
 1                    (Jury present at 10:14 a.m.)
 2                    THE COURT:  You may be seated.
 3                    Good morning, ladies and gentlemen.
 4                    THE JURORS:  Good morning.
 5                    THE COURT:  Good morning, Mr. Jose Lopez
 6      Torres.
 7                    Good morning, Mr. Alvin Gaitan Benitez.
 8                    Good morning, Mr. Douglas Duran Cerritos.
 9                    Good morning, Mr. Christian Lemus Cerna.
10                    Good morning, Mr. Omar Dejesus Castillo.
11                    Good morning, Mr. Manuel Ernesto Paiz
12      Guevara.
13                    Good morning, Mr. Jesus Alejandro Chavez.
14                    Are counsel ready to proceed?
15                    MS. MARTINEZ:  Yes, Your Honor.
16                    THE COURT:  All right.  You can bring our
17      witness back.
18                    (Witness resumed stand.)
19                    THEREUPON, JAIME ROSALES VILLEGAS,
20      previously sworn, testified further as follows:
21                       DIRECT EXAMINATION (Continued)
22      BY MS. MARTINEZ:
23         Q.  Good morning.
24         A.  Good morning.
25         Q.  When we broke yesterday, we were talking about
```

1    the two MS-13 members that you initially found when you

2    began walking the area in Culmore, Lagrima and

3    Peligroso.

4        A.   Yes.

5        Q.   How did you meet Peligroso?

6        A.   I met Peligroso through some *chequeos* who were

7    walking in the area.

8        Q.   What was your initial interaction with him like?

9        A.   So, when I saw him, I told him that I was a

10   member of Park View, and he said he also was a member of

11   the Park View.

12       Q.   What did you do after Peligroso told you he was a

13   member of Park View?

14       A.   At that moment, I called Peligroso (sic), and I

15   told him there was another member that was also a member

16   of the Park View gang.

17       Q.   Who did you call?

18       A.   Payaso.

19       Q.   How did Payaso react?

20       A.   So, he told me to ask him who -- made him join

21   the Park View gang.

22       Q.   What did you do?

23       A.   So, I asked Peligroso who had jumped him into the

24   Mara.  And he made me -- gave me a few names.

25       Q.   Once you learned that information, what did you

1   do?

2       A.   I called Payaso and I let him know.

3       Q.   What was his reaction?

4       A.   Well, he told me he was going to find out about

5   those persons who had jumped in Peligroso.  And then he

6   learned that those people were no longer members of the

7   gang.

8       Q.   What did you and Payaso do in response to that

9   information?

10      A.   Then, I told Peligroso if he was firm within the

11  gang, that he could continue working with us.

12      Q.   How did Peligroso respond?

13      A.   Well, he said yes, that he was firm in the

14  neighborhood and that he would continue walking with us.

15      Q.   At this point, who were the members of Park View?

16      A.   Lagrima, Peligroso, and there was another homie

17  that we call Greñas.

18      Q.   Who is Greñas?

19      A.   He's a member of the Park View.

20      Q.   Do you know him by any other name other than

21  Greñas?

22      A.   Manuel.

23      Q.   Do you know him by any other name other than

24  Manuel and Greñas?

25      A.   No, only those two.

1     Q.   How did you meet Greñas?

2     A.   Well, he was walking through that area, and so I

3   talked to the other guys, and I met him in a soccer

4   field.

5     Q.   What happened when you met him?

6     A.   Well, when we met him, we told him we were

7   members of the Park View.

8          And then he said he also was a member of the Park

9   View and that he would be walking along with us.

10    Q.   What did you do after Greñas told you that he was

11  a member of Park View and would walk with you?

12    A.   Then I called Payaso and I told him that there

13  was another member, and that he was going to be walking

14  with us.

15    Q.   How did Payaso respond?

16    A.   Well, he said that it was all right, and that if

17  we agreed that, then he could continue walking with us

18  in the Park View gang.

19    Q.   What did you do?

20    A.   Well, since we were already four, we decided to

21  see if we could recruit some more guys, some more

22  *chequeos* to be walking together with us.

23    Q.   And just to recap, who were the four?

24         MR. CONTE:   Objection.   That's been asked

25  and answered.

1              THE COURT:  Objection overruled.

2

3   BY MS. MARTINEZ:

4       Q.  At this point, who were the four homeboys?

5       A.  Peligroso, Lagrima, Greñas and myself.

6       Q.  Do you see Greñas in court today?

7       A.  Yes.

8       Q.  Would you please identify him for the jury,

9   describing where he's sitting and something that he's

10  wearing.

11      A.  Well, he's here up front, with a long-sleeve

12  shirt with little squares.

13              MS. MARTINEZ:  Your Honor, may the record

14  reflect that he has identified Jose Lopez Torres?

15              THE COURT:  So noted.

16  BY MS. MARTINEZ:

17      Q.  You said that at this point you wanted to recruit

18  new *chequeos*.

19      A.  Yes.

20      Q.  Were you able to recruit *chequeos*?

21      A.  Yes.

22      Q.  What is a *chequeo*?

23      A.  Well, this is a person who would like to be a

24  member of the clique, and so he does some jobs for the

25  clique.

1   Q.   Who was the first *chequeo* that you recruited?

2   A.   It was Silencio.

3   Q.   Who was the second *chequeo* that you recruited?

4   A.   The second was a guy we called Guasón.

5   Q.   Do you know Guasón by any other names?

6   A.   Well, Lil Poison.

7   Q.   Do you know his real name?

8   A.   The only thing I know, I think they call him

9   Douglas.

10   Q.   How did you meet Guasón, Lil Poison, Douglas?

11   A.   I met Lil Poison through Silencio.

12   Q.   Where did you meet him?

13   A.   On the sector that we were walking.

14   Q.   Describe that meeting.

15   A.   Well, at this time, I spoke with Silencio and he

16   told me there was another homie who wanted to be a

17   member of the Park View.

18   Q.   Who was the other person?

19   A.   Guasón.

20   Q.   At some point, did you speak with Guasón?

21   A.   Yes.

22   Q.   What, if anything, did he say to you about the

23   gang?

24   A.   Well, he said that he would like to join.  He

25   would like to become a member.

1            So, I called Payaso and I told him.

2    Q.   What did you tell Payaso?

3    A.   Well, I told him that there was another person

4    who wanted to be a member of the Park View, and that he

5    was walking with us.

6    Q.   How did Payaso respond?

7    A.   Well, he said it was all right and that I should

8    make him work for the clique.

9    Q.   What, if anything, did Guasón, Lil Poison, tell

10   you about why he wanted to walk with you?

11   A.   Well, he said -- he just only wanted to become a

12   member.  He did not give me any reason.

13   Q.   What was his position in the gang at that point?

14   A.   He was like a *chequeo*.

15   Q.   How long did he remain a *chequeo*?

16   A.   Well, about three months as a *chequeo*.

17   Q.   What happened after three months?

18   A.   Well, then, Payaso told me that it was about time

19   to make him a homeboy.

20   Q.   What does that mean?

21   A.   Well, to jump him into the neighborhood.

22   Q.   What does it mean to jump him in?

23   A.   Well, that means that we count 13 seconds and we

24   beat him up, in order for him to become a member.

25   Q.   What is the purpose of beating a prospective

1    member up for 13 seconds?

2       A.   Well, to gain courage, so he would not be scared

3    when we have to confront our enemies.

4       Q.   Was Guasón, Lil Poison jumped in?

5       A.   Yes.

6       Q.   What year was that?

7       A.   This was in 2012.

8       Q.   Do you see Guasón or Lil Poison in court today?

9       A.   Um, yes.

10      Q.   Would you please point him out to the jury by

11   describing where he's sitting and an item of clothing

12   that he's wearing?

13      A.   Yes.  He's the young man here in front who has a

14   black shirt on, and glasses.

15              MS. MARTINEZ:  Your Honor, may the record

16   reflect that the witness has identified Douglas Duran

17   Cerritos?

18              THE COURT:  So noted.

19   BY MS. MARTINEZ:

20      Q.   After Guasón, Lil Poison, who was the next

21   *chequeo* that the gang --

22              THE INTERPRETER:  I'm sorry?

23   BY MS. MARTINEZ:

24      Q.   Who was the next *chequeo* that the gang recruited?

25      A.   It was a guy we called el Bago.

1    Q.   Do you know Bago by any other name?

2    A.   Yes.

3    Q.   What name is that?

4    A.   Leopardo.

5    Q.   Do you know his real name?

6    A.   No.  I just know that his name is Christian.

7    Q.   When was Bago, Leopardo, Christian, recruited?

8    A.   The same year, in 2012.

9    Q.   How long did he remain a *chequeo*?

10   A.   Same thing, three months.

11   Q.   What happened after the three months?

12   A.   Again, after the three months, we jumped him in

13   so that he would be part of the Park View.

14   Q.   Who was jumped in first, Guasón, Lil Poison, or

15   Bago, Leopardo?

16   A.   Um, Guasón.

17   Q.   How much time apart were those two jump-ins,

18   approximately?

19   A.   It was a period of around three weeks.

20   Q.   What was Leopardo's status after he was jumped

21   in?

22   A.   He was a homeboy at that point, for the clique.

23   Q.   Do you see Leopardo in court today?

24   A.   I don't know.  Could they move around so I could

25   see better?

1          MS. MARTINEZ:  Your Honor, is there a way

2     that witness could get a view of all of the defendants?

3               THE COURT:  Can he stand up?

4               Can he stand up right there?

5     BY MS. MARTINEZ:

6       Q.  Are you able to see all the individuals sitting

7     at the seats in the courtroom?

8               MR. JENKINS:  Objection, Your Honor.  Your

9     Honor, the question is whether or not he's in the

10    courtroom, not whether -- a particular location in the

11    courtroom.

12              THE COURT:  Okay.  Sustained.

13              Are you able to see the person?

14              THE WITNESS:  No, I can't see him.

15    BY MS. MARTINEZ:

16      Q.  Are you able to see everyone in the courtroom?

17      A.  Yes, I can see them.

18      Q.  Do you need to stand up to be able to see better

19    at all?

20      A.  Yes, because I can't see people behind that

21    (indicating).

22              MS. MARTINEZ:  Your Honor, is there some way

23    we could make it so that this witness can see, without

24    describing any particular location, all of the

25    individuals in the courtroom?

1        THE COURT:  Okay.  What we'll do is we will

2    start with the back row first, just stand up, including

3    counsel.

4        Yes, back row, in the side, the well of the

5    court, just stand up.

6        THE WITNESS:  Okay, yeah, I got it.

7        THE COURT:  You may be seated.

8        Next row stand up.

9        THE WITNESS:  Yes -- yeah.  I've identified

10    him.

11        THE COURT:  Can you see the front row okay?

12        THE WITNESS:  No, I already identified the

13    person.

14        THE COURT:  Okay.

15    BY MS. MARTINEZ:

16      Q.  Would you please identify Leopardo, based on

17    where he is sitting and an item of clothing that he is

18    wearing?

19      A.  Yeah.  He's the young guy in the back row, and he

20    has a bluish shirt on.

21        MS. MARTINEZ:  Your Honor, may the record

22    reflect that this witness has identified Christian Lemus

23    Cerna?

24        THE COURT:  So noted.

25    BY MS. MARTINEZ:

1    Q.   With the help of the court security officer, I

2    would like you to look at a couple of exhibits.  We'll

3    start with what has been marked for Government's

4    Exhibit 66-A.

5         Do you see that exhibit?

6    A.   Yes.

7    Q.   Do you recognize the individual in that picture?

8    A.   Yes.

9    Q.   Who is the individual?

10   A.   That's Greñas.

11   Q.   Is that a fair and accurate depiction of Greñas

12   when you knew him?

13   A.   Yes.

14        MS. MARTINEZ:  Your Honor, we move to admit

15   Government's Exhibit 66-A, and to publish for the jury.

16        THE COURT:  Received without objection.  You

17   may publish.

18        (Exhibit published.)

19   BY MS. MARTINEZ:

20   Q.   Are you familiar with those tattoos shown in the

21   picture?

22   A.   Yes.

23   Q.   What do the tattoos say?

24   A.   They say Park View.

25   Q.   Could you take a look now at Exhibit 69-A.

1          Do you recognize the individual in that
2    photograph?
3       A.   Yes.
4       Q.   Who is it?
5       A.   Guasón.
6       Q.   Is that a fair and accurate depiction of what
7    Guasón looked like when you knew him?
8       A.   Yes.
9            MS. MARTINEZ:  Your Honor, the government
10   moves to admit Exhibit 69-A and to publish it for the
11   jury.
12           THE COURT:  Received without objection.  You
13   may publish.
14           (Exhibit published.)
15   BY MS. MARTINEZ:
16      Q.   Please take a look now at Government's
17   Exhibit 70-A.  Do you recognize the individual in that
18   photograph?
19      A.   Yes.
20      Q.   Who is it?
21      A.   It's Bago.
22           MS. MARTINEZ:  Your Honor, the government
23   moves to -- oh.
24   BY MS. MARTINEZ:
25      Q.   Is that a fair and accurate depiction of what

1    Bago, Leopardo, looked like when you knew him?

2       A.   Yes.

3            MS. MARTINEZ:  Your Honor, the government

4    moves to admit Government's Exhibit 70-A, and publish

5    for the jury.

6            THE COURT:  Received.  It may be published.

7            (Exhibit published.)

8    BY MS. MARTINEZ:

9       Q.   After Guasón, Lil Poison and Bago, Leopardo, were

10   jumped into the clique in 2012, who were the homeboys in

11   the clique?

12      A.   At the time it was Lagrima, Peligroso, Greñas,

13   and myself.

14      Q.   After Leopardo and Guasón were jumped in, what

15   was their status in the clique?

16            THE INTERPRETER:  I'm sorry.  Could you

17   repeat that?

18   BY MS. MARTINEZ:

19      Q.   After Guasón and Leopardo, after they were jumped

20   in, what was their status or their level within the

21   clique?

22      A.   They were homeboys.

23      Q.   At this point, once Guasón and Leopardo were

24   homeboys, were there meetings for the clique?

25      A.   Yes.

1   Q.   How often did the clique meet?

2   A.   Every two weeks.

3   Q.   Where were the meetings?

4   A.   We did it near the area or sector that was

5   pertained to our clique.

6   Q.   What area or sector is that?

7   A.   It was in Culmore.

8   Q.   Who attended the clique meetings in Culmore?

9   A.   It was all of us who were homeboys in Park View.

10  Q.   What was the purpose of the meetings?

11  A.   The purpose was to talk about the clique, and the

12  jobs that we were doing for the clique.

13  Q.   What do you mean by "jobs"?

14  A.   That is, work that was being done in order to

15  earn money for the clique.

16  Q.   What kind of work?

17  A.   Like drug business.

18  Q.   What kind of drugs?

19  A.   Um, marijuana.

20  Q.   Who was involved in the drug business?

21          MR. CONTE:  I'm objecting on foundation

22  grounds, Your Honor.

23          THE COURT:  I'm sorry, I didn't hear what

24  you said.

25          MR. CONTE:  I think we need a better

foundation.

THE COURT:  All right.  Personal knowledge.
If you could lay a foundation, please.

BY MS. MARTINEZ:

Q.   As the second word of the clique, were you aware
of who within the clique was involved in the clique's
drug business?

A.   Yes.

Q.   Who in the clique was involved in the clique's
drug business?

A.   It was Greñas, Bago, Guasón, myself and Lagrima.

Q.   In addition to discussing the clique's drug
business, what else happened at the clique meetings?

A.   We also talked about issues like other homeboys
that were now on the outside of the clique, and to look
for them and have them return to the clique.

Q.   What was the purpose of that?

A.   The purpose was to make Park View larger than it
had been in the past.

Q.   You've mentioned several times walking the sector
or walking the territory.  What does that mean?

A.   Well, we would walk around, that is, all of us
who were the homeboys in the Park View, we walk around
our area in order to keep an eye out for rival gang
members.

1    Q.   Why would you need to keep an eye out for rival
2    gang members?
3    A.   It was to protect our territory, so that other
4    gangs wouldn't come in and try and take it over.
5    Q.   What does your gang call members of other gangs?
6    A.   We call them *chavala*s.
7    Q.   What are members of La Mara supposed to do if
8    they see a *chavala*?
9    A.   Well, if we find an enemy, logically, we're
10   supposed to attack them with what we have at our
11   disposal, with whatever we have in our hand, and even
12   our fist.
13   Q.   Were members of the clique required to pay dues?
14   A.   Yes.
15   Q.   How much?
16   A.   We gave $10.
17   Q.   How often?
18   A.   Every 15 days or 2 weeks.
19   Q.   Where were the dues collected?
20   A.   When we had the meetings, when all of us had the
21   meetings.
22   Q.   Was there a person within the clique whose job it
23   was to keep track of the membership dues?
24   A.   Yes, there was.
25   Q.   Who?

1    A.   It was Bago.

2    Q.   How did Bago, Leopardo, keep track of the

3    membership dues?

4    A.   It was because Payaso told me that he should be

5    the one in charge of keeping track of the dues for the

6    clique.

7    Q.   Do you know in what way Bago kept track of the

8    dues?

9    A.   Um, I'm not sure exactly how he kept that record,

10   but I think he wrote it down somewhere.

11   Q.   You mentioned the drug business of the clique.

12   What did the clique do with the money that it made from

13   selling drugs?

14   A.   Well, part of the money went to help the homeboys

15   who were in prison, and also to continue to be able to

16   buy whatever the clique needed.

17   Q.   Let's start with the homeboys in prison.  Who are

18   you talking about?

19   A.   Well, I was referring on that occasion to the

20   little home boy, Silencio, who was in prison at the

21   time, and also homeboys who were in prison in El

22   Salvador.

23   Q.   Why were you using money from the clique's drug

24   business to help homeboys who were in prison in El

25   Salvador?

J. Villegas - Direct                                                     33

1    A.   I'm sorry.  Could you repeat the question?

2    Q.   Why were you using money from the clique's drug

3  business to help homeboys in prison in El Salvador?

4    A.   Well, because sometimes there would be homeboys

5  in El Salvador who would be the ones actually in control

6  of the Park View clique here in Virginia, and they would

7  give us a call and they would say that their homeboys

8  there in El Salvador needed a hand.

9    Q.   Who were these homeboys in El Salvador?

10   A.   Big Poison.

11   Q.   Anyone else?

12   A.   And the other one was Viejo Tigre.

13   Q.   How did you send money to Big Poison and Viejo

14  Tigre in El Salvador?

15   A.   We sent it through Western Union.

16   Q.   And for the record, can we spell Viejo?

17        Do you know how to spell it in Spanish?

18   A.   Yes.

19   Q.   Can you spell the word Viejo in Spanish?

20   A.   V-i-e-j-o.

21   Q.   Thank you.

22        You said you sent the money by Western Union.

23  Who were you sending the money through Western Union to?

24   A.   Well, on occasions, to the wife of Poison.

25   Q.   And to clarify, are you talking about Big Poison

1  down in El Salvador?

2      A.  Yes.

3      Q.  How much money did you send to the wife of Big

4  Poison in El Salvador?

5      A.  Well, there was one occasion I deposited $900.

6      Q.  Were there other occasions?

7      A.  Yes, there was another.

8      Q.  How much did you send on that occasion?

9      A.  I am not sure how much they send, because it was

10  done by another homeboy.

11      Q.  Do you know what other homeboy sent the money?

12      A.  I don't remember who he was.

13      Q.  What country was the wife of Big Poison in?

14      A.  In El Salvador.

15      Q.  Do you know, more or less, what Big Poison or

16  Viejo Tigre did with this money from the clique that you

17  sent?

18      A.  Yes.

19      Q.  What?

20      A.  It was to benefit the clique in El Salvador, to

21  help them.

22      Q.  How did the clique communicate with Big Poison?

23      A.  Through cellphones.

24      Q.  Where in El Salvador was -- do you know where in

25  El Salvador Big Poison was?

1    A.   Yes.

2    Q.   Where?

3    A.   In a city that is called San Miguel.

4    Q.   Where in the city?

5    A.   In the prison of San Miguel.

6    Q.   Now, you said earlier that in addition to sending

7    the proceeds from the drug business to El Salvador, the

8    clique also used it to buy what the clique needed.  What

9    does that mean?

10   A.   Well, to purchase more drugs so we would continue

11   making money for the clique.

12   Q.   Does the gang have rules?

13   A.   Yes.

14   Q.   What is the most important rule for La Mara?

15   A.   The first one is respect and loyalty towards the

16   gang.

17   Q.   Are there additional rules?

18   A.   Yes, there are several.

19   Q.   In your experience with the gang, did members of

20   the gang communicate with each other about these rules?

21   A.   Yes.

22   Q.   With the help of the court security officer,

23   would you please take a look at Government's

24   Exhibit 101-C.

25        Do you see that exhibit there, 101-C?

1    A.   Yes.

2    Q.   Do you know what it is?

3         You can look at the other pages, too, if you need

4    to.

5    A.   Yes, I know what this is.

6    Q.   What is it?

7    A.   These are text messages.

8    Q.   Do you know whose text messages they are?

9    A.   That this is -- this was in my telephone.

10   Q.   On your telephone with text messages, were you

11   communicating with other gang members?

12   A.   Yes.

13   Q.   Were you communicating with other gang members

14   about gang business?

15   A.   Yes.

16        MS. MARTINEZ:  Your Honor, the government

17   would move to admit Government's Exhibit 101-C, as well

18   as 101-D, which is the translation of this exhibit that

19   was previously discussed by one of the linguists.

20        THE COURT:  101-C and 101-D will be

21   received, subject to questioning concerning relevance

22   and verbatim transcripts.

23        MS. MARTINEZ:  Your Honor, may we publish

24   the --

25        THE COURT:  Yes.

J. Villegas - Direct                                                   37

1          MS. MARTINEZ:  -- the translations?

2          THE COURT:  Yes.

3          MS. MARTINEZ:  We're going to publish 101-D

4    for the record.  The witness will continue referring --

5          Please, sir, continue referring to the

6    exhibit in front of you, 101-C, which is in Spanish.

7          If we could go to the second page on the

8    translation.

9    BY MS. MARTINEZ:

10     Q.   If you look at that exhibit in front of you, do

11   you see the left-hand column has numbers?

12     A.   Yes.

13     Q.   Would you please go to number 48.  In the

14   translation it will be page 6, line 48.

15          Are you at line 48?

16     A.   Yes.

17     Q.   Do you know whose phone number that is there in

18   the second-from-the-last column?

19     A.   Yes, I know.

20     Q.   Who?

21     A.   Poison's.

22     Q.   Which Poison?

23     A.   Big Poison.

24     Q.   How do you recognize Big Poison's phone number?

25     A.   Because it shows the Area of El Salvador.

1   Q.   In that line on -- in 48, what is Big Poison
2   talking about?
3   A.   This is a rule he sent me, a rule of the
4   neighborhood.
5   Q.   And, do you see that in the -- in the far right
6   column, it starts with a number, "1"?
7   A.   Yes.
8   Q.   What is this rule that's labeled "1"?
9   A.   Respect, loyalty, discipline, and love to the
10  neighborhood.
11  Q.   What is the meaning of this rule?
12  A.   Well, this means that each member has to show
13  respect and loyalty to the neighborhood.
14  Q.   What's an example of breaking that rule?
15  A.   Well, one example would be to lose one of the
16  members after we send him to do a mission.
17  Q.   What would be another example of breaking this
18  rule?
19  A.   To show disrespect towards the neighborhood.
20  Q.   You keep using the word *barrio.*  Can you spell
21  that?
22  A.   Yes.  B-a-r-r-i-o.
23  Q.   What does the word *barrio* mean to you?
24  A.   Well, it is the area where the members of the
25  gang belong to.

1    Q.   What area is that?

2    A.   Well, we were in the area of Culmore.

3    Q.   Moving on to the next line in these text

4  messages, do you see where it says "3" in the middle of

5  the next box?

6    A.   Yes.

7    Q.   What is that rule that starts with "3"?

8    A.   Well, this is a rule to have respect to the

9  family and to the homeboys.

10   Q.   Who is the family?

11   A.   Well, it is our parents, our relatives, but, in

12 general, it's all the homeboys, because we are a family.

13   Q.   What would be an example of breaking this rule

14 about respecting the family and the homeboys?

15   A.   Well, let's say one homeboy has his wife, and

16 another homeboy shows up and wants to take her away.

17   Q.   What would be the consequence for a homeboy who

18 tried to take the wife of another homeboy?

19   A.   Well, he would be disciplined, but to the point

20 that we could even murder him.

21   Q.   If you could look now at line 50, and that text

22 starts with "5."  What is that rule?

23   A.   Not to steal from any homeboy, not to steal from

24 the *barrio*, or from the clique.

25   Q.   What would be a consequence for a homeboy who

 1    steals from another homeboy or from the clique?

 2       A.   Consequence would be death.

 3       Q.   You've just named two rules for which the

 4    consequence would be death if a homeboy broke it.

 5            What other type of thing could lead to a homeboy

 6    being killed by the gang?

 7       A.   Well, the most important ones would be number

 8    one, number three, and number five.

 9       Q.   Does the gang have any rules about whether or not

10    gang members are permitted to cooperate with police?

11            MR. CONTE:  Objection, leading, Your Honor.

12            THE COURT:  Sustained.

13    BY MS. MARTINEZ:

14       Q.   If we could turn to line 340 of these text

15    messages.  On the translation that's page 31, but not in

16    the Spanish version.

17            Let me know when you get to line 340.

18       A.   Yes.

19       Q.   Who is the individual sending this text message?

20       A.   This is a homeboy that we used to call Pesadilla.

21       Q.   Do you know Pesadilla by any other names?

22       A.   Well, Tuner.

23       Q.   How do you know Pesadilla or Tuner?

24       A.   Well, I know him as Pesadilla, but I know he

25    changed his nickname.

1    Q.   When you knew him as Pesadilla, how did you know

2    him?

3    A.   Well, I met him when he arrived to our territory.

4    Q.   What happened when he arrived to your territory?

5    A.   Well, he showed up and he told us that he was

6    Park View, that he had been a member of Park View in El

7    Salvador.

8         And then I informed Payaso about this.

9    Q.   What did Payaso do when you informed him that

10   Pesadilla said he had been a member of Park View in El

11   Salvador?

12   A.   Well, he said it was okay to put him to work

13   together within our clique, to stay with us.

14   Q.   What did you do?

15   A.   Well, I put him to work for the clique.

16   Q.   When was this?

17   A.   That was in 2012.

18   Q.   What was his level in the clique at that time?

19   A.   Well, he showed up as a *chequeo* within the

20   clique.

21   Q.   How long was he a *chequeo*?

22   A.   It was a short time.  I don't remember how long,

23   but it was short.

24   Q.   What happened after that?

25   A.   Well, we made him a homeboy of Park View.

1    Q.   Do you see Pesadilla in court today?

2    A.   Yes.

3    Q.   Would you please identify -- identify him by

4    describing where he's sitting and an item of clothing he

5    is wearing.

6              THE WITNESS:  Can I stand up?

7              THE COURT:  Yes.

8              THE WITNESS:  He's the young man who is on

9    the second row.  I think he has a beige shirt.

10   BY MS. MARTINEZ:

11   Q.   Can you describe something else that he's

12   wearing, just so we make sure that the record is clear?

13   A.   Well, the under -- the other shirt under the

14   shirt is a light blue color.

15   Q.   And again, just to make sure that the record is

16   clear, you said the second row.  In the second row, how

17   many people over is he from the left side here?

18   A.   He's the third person.

19             MS. MARTINEZ:  Your Honor, may the record

20   please reflect that the witness has identified Defendant

21   Alvin Gaitan Benitez?

22             THE COURT:  So noted.

23   BY MS. MARTINEZ:

24   Q.   Returning your attention to this text message

25   from Pesadilla, in line 340, first of all, what is the

 1   date of this text message?
 2       A.  9-13 of 2013.
 3       Q.  What is the significance of this text message to
 4   you?
 5       A.  Well, "You have a good day, homie" --
 6           THE INTERPRETER:  I need to repeat.
 7           THE WITNESS:  "Have a good day, homie.  And
 8   the Mara Salvatrucha, the beast be with you in this
 9   Friday 13th."
10   BY MS. MARTINEZ:
11       Q.  What is the significance of Friday the 13th?
12       A.  Well, it's a day that we celebrate the devil.
13       Q.  Who is the beast?
14       A.  The devil.
15       Q.  If I could turn your attention now to what has
16   been marked for identification purposes as Government's
17   Exhibit 101-B.
18           Actually, I'm sorry.  Before we get to that,
19   let's look at Exhibit 68-A.
20           MS. MARTINEZ:  Apologies, Mr. Toliver.
21           THE COURT:  Would counsel approach, please.
22           Feel free to stand, if you'd like.  It won't
23   be long.
24
25           (Thereupon, the following side-bar

1   conference was had:)

2           THE COURT:  Yes.

3           MS. AUSTIN:  Your Honor, the government is

4   getting ready to show the witness, and probably admit --

5   try to admit 68-A.  That's the photograph that came up

6   of our client making the claw symbol with his hand, as a

7   means of, just to identify Mr. Gaitan Benitez.

8           Your Honor instructed the government not to

9   use that one, to use one more similar to all the other

10  pictures that have been presented to witnesses the ID

11  the defendants.

12          We have recently filed a motion in limine to

13  exclude the use of this, 68-A, as prejudicial.  My

14  co-counsel, Mr. Zimmerman, filed the motion.  So I'll

15  let him continue.

16          MR. ZIMMERMAN:  Your Honor, the case law --

17  and I cite a number of cases here -- is that the

18  government is not to use photographs just to leave the

19  impression of the bad character of the accused.  And

20  that is essentially what this photograph does.

21          You know, as we saw in the --

22          THE COURT:  The bad character being what?

23          MR. ZIMMERMAN:  The bad character of him --

24  he's putting -- I'm not going to put -- he's making the

25  claw hand, as you can see, on the forehead.

1           THE COURT:  Is that a gang sign,

2    Mr. Zimmerman?

3           MR. ZIMMERMAN:  I think the government is

4    arguing it's a gang sign.  I think the unfortunate thing

5    is, this photograph is, unfortunately, not like any

6    other photograph they've used.

7           They're entitled to whatever testimony they

8    want on gang signs and the like, but it's particularly

9    prejudicial, because they're admitting a lot of

10   photographs of the gang members, and none of the other

11   photographs have the gang member making the claw on

12   their forehead, sort of in this way.

13          And so, our concern is that when the jury

14   goes back at the end of the -- now or at the end of the

15   case with all of these photographs, this one of the claw

16   on the forehead very much stands out in a way that none

17   of the other photographs does.

18          I think that -- and that's one of our

19   concerns, is that it leaps off the page, and it leaps

20   off the set, as opposed to 68-B.

21          I can grab the photo -- I think the Court is

22   familiar with that -- which does not.

23          And so in that sense, we think there's a

24   strong 403(b), because the photo doesn't serve any other

25   purpose -- they have numerous other photos -- except to

1    leap out of the photo, to draw attention to our client

2    as the only one making the sign on his forehead, with

3    what's somewhat of a menacing look.

4           It's an unfairly prejudicial photo and it

5    just says, you know, this is a scary bad guy.  It isn't

6    evidence of anything else, except there's some scary bad

7    character that really stands out.  And we ask that to be

8    excluded under 403.

9           MS. MARTINEZ:  Your Honor, no way is this

10   presenting anything unfairly prejudicial.  One of the

11   things the government must prove during the case is that

12   each defendant is a member or associate of the gang.

13          This witness has testified that

14   Mr. Zimmerman's client was a member, in fact a homeboy

15   of the gang, someone that he knew.  This witness has

16   testified about gang activity.

17          I would proffer that this witness, I expect,

18   will recognize this photograph, and also be able to

19   describe the hand sign that is being shown in the

20   photograph.

21          The government's ability to show defendants

22   engaged in gang activity, including flashing gang signs,

23   is direct evidence in the case.

24          I'll also add, Your Honor, there are other

25   photographs that the government does intend to admit

1  with other gang members flashing gang signs.

2          Now, this is direct evidence of the

3  indictment, it's direct evidence for the charges in this

4  case, and it's hardly unfavorably prejudicial.

5          All of the government's evidence against

6  each defendant will be prejudicial.  It is prejudicial

7  against them because we have a burden of proof to prove

8  that they committed these horrendous crimes.

9          This is in no way unfavorably prejudicial.

10 There will be ample evidence that this defendant engaged

11 in a variety of gang activity and, that he participated

12 in a murder and in digging up and reburying another

13 murder victim's body.

14          In light of that, I think the jury can put

15 aside any bad taste that a gang sign might leave in

16 their mouth, even if it weren't actually direct proof of

17 the crimes that's being charged, which is the first

18 reason that the objection should be overruled, Your

19 Honor.

20          MR. ZIMMERMAN:  Your Honor, the last phrase

21 of Rule 403 is that in addition to the "unfavorably

22 prejudicial," needlessly presenting cumulative evidence.

23 They have other evidence of this.  What we have is an

24 image, against all the other images, that very much

25 stands out.  It is unfavorably prejudicial and it is

1    needlessly cumulative, and we ask that this particular

2    image not be admitted.

3              MS. MARTINEZ:  May I respond to that part,

4    Your Honor?

5              THE COURT:  Yes.

6              MS. MARTINEZ:  Your Honor, we will have

7    cooperators who will show the jury the gang signs that

8    were used in the gang.  That's important for the jury to

9    see the way in which these gang members greeted each

10   other.

11             All of the cooperators will show them live

12   in court.  I believe that it is important, in fact

13   crucial, for the government to be able to show evidence

14   of the defendants using these same gang signs.

15             THE COURT:  All right.

16             Let the record reflect this matter is before

17   the Court on the defendant's motion to exclude

18   Government's Exhibit 68-A.

19             Previously a motion was made concerning the

20   exhibit, concerning opening statement, where the

21   government presented composite photographs of each of

22   the individual defendants, and this photograph, which

23   depicted the defendant allegedly -- depicts the

24   defendant displaying a gang sign, was distinct from the

25   others in the composite.  The composite was used in

1    opening statement and was not admitted into evidence.

2              Here, the government is attempting to offer

3    evidence of this defendant's participation in the gang,

4    and that this photograph demonstrates evidence that is

5    highly probative and relevant on whether or not he was

6    with the gang, signals that were -- were displayed at

7    the time.

8              It is prejudicial, but it's not unfavorably

9    prejudicial.  So I deny the motion and the government

10   may admit the exhibit.

11             Thank you.

12             (Thereupon, the side-bar conference was

13   concluded.)

14   BY MS. MARTINEZ:

15   Q.   Please look at Government's Exhibit 68-A.  Do you

16   recognize the individual in that photograph?

17   A.   Yes.

18   Q.   Who is it?

19   A.   Pesadilla.

20   Q.   Is that a fair and accurate depiction of what

21   Pesadilla looked like when you knew him?

22   A.   Yes.

23             MS. MARTINEZ:  Your Honor, permission to

24   admit Government's Exhibit 68-A and publish to the jury.

25             THE COURT:  Received, and you may publish.

```
 1                    (Exhibit published.)
 2    BY MS. MARTINEZ:
 3        Q.   Do you know what Pesadilla is doing with his hand
 4    in that picture?
 5        A.   Yes.
 6        Q.   What?
 7        A.   That's the sign that we, the members of the gang
 8    use.
 9        Q.   How do you use that gang sign?
10        A.   I'm sorry, can you repeat?  I didn't --
11        Q.   For what purpose do you use this -- this gang
12    sign?
13        A.   It's a way of identifying ourselves with other
14    gangs.
15        Q.   Identifying yourselves as what?
16        A.   Well, like, you know, that sign represents the
17    MS.
18        Q.   What is the MS?
19        A.   Mara Salvatrucha.
20        Q.   Can you show the jury this gang sign?
21        A.   Yes.
22        Q.   Please do.
23        A.   (Indicating.)
24             MS. MARTINEZ:  Your Honor, may the record
25    reflect --
```

```
 1              Please continue holding that sign up.
 2              THE WITNESS:  (Complies.)
 3              MS. MARTINEZ:  May the record reflect that
 4   the witness is holding up his index and pinky fingers.
 5   He has his thumb over his two middle fingers.
 6              THE COURT:  So noted.
 7              MS. MARTINEZ:  Thank you.
 8   BY MS. MARTINEZ:
 9      Q.  Let's turn now to Government's Exhibit 101-B.
10   You can take it out, if you want to see the full exhibit
11   there.
12         Do you know what that exhibit is, 101-B?
13         You can take it out of the sleeve so you can see
14   the other pages.
15      A.  Yes.  I think that pertains to what this -- well,
16   what was on my telephone.
17      Q.  And if you could take it out so you can see more
18   than just the first page.  Go ahead and review the other
19   pages.
20         What is this exhibit that pertains to your
21   telephone?
22      A.  Those are contacts in my phone.
23      Q.  And within your phone contacts, were there other
24   gang members?
25      A.  Yes.
```

J. Villegas - Direct                                        52

```
 1              MS. MARTINEZ:  Your Honor, government moves
 2    to admit Government's Exhibit 101-B.
 3              THE COURT:  Received.
 4              MS. MARTINEZ:  May we publish to the jury,
 5    Your Honor?
 6              THE COURT:  Yes.
 7              (Exhibit published.)
 8    BY MS. MARTINEZ:
 9       Q.  Starting with the first page --
10              MS. MARTINEZ:  Court's indulgence.
11    BY MS. MARTINEZ:
12       Q.  Beginning with the first page, who is number
13    three?
14       A.  Payaso.
15       Q.  What is the Area Code of that phone number there?
16       A.  540.
17       Q.  What was the Area Code of the cellphone that you
18    talked to Payaso -- that you called Payaso on?
19       A.  540.
20       Q.  Turning to page two.  Who is number seven?
21       A.  Pesadilla.
22       Q.  Who is Pesadilla?
23       A.  A member of Park View.
24       Q.  The same member you discussed earlier named
25    Pesadilla?
```

1     A.   Yes.

2     Q.   Please look at number 14.  Who is number 14?

3     A.   Guasón.

4     Q.   What other name is Guasón known by?

5     A.   Lil Poison.

6     Q.   Is that the same Guasón, Lil Poison, you

7   discussed earlier?

8     A.   (Answer not translated.)

9          MR. CONTE:  Objection, leading, Your Honor.

10         THE COURT:  Overruled.

11   BY MS. MARTINEZ:

12    Q.   I'm sorry, I didn't hear your answer.  Is that

13   the same Guasón, Lil Poison, that you mentioned earlier?

14    A.   Yes.

15    Q.   On the next page, please turn to number -- or

16   look at number 20.  Who is number 20?

17    A.   Lagrima.

18    Q.   The same Lagrima that you mentioned earlier?

19    A.   Yes, the same.

20    Q.   Who is number 21?

21    A.   Bago.

22    Q.   What other names is Bago known by?

23    A.   Leopardo.

24    Q.   Is this the same Leopardo, Bago, that you

25   mentioned earlier?

1    A.   Yes.

2    Q.   Please turn to the next page, and look at number

3    31.  Do you know who that is?

4    A.   Yes.

5    Q.   Who is it?

6    A.   Drowsy.

7    Q.   Who is Drowsy?

8    A.   He was a Park View member as well.

9    Q.   We'll talk more about him in a minute.

10        Within the clique, did different members of the

11   clique have different jobs for the clique?

12   A.   Yes.

13   Q.   What was your job?

14   A.   My job was to supervise the work of the clique,

15   you know, to be aware of everything that was being done

16   and all that, and to report back to Payaso and the

17   homies in El Salvador.

18   Q.   What was Payaso's job?

19   A.   The same as mine, only that Payaso was higher up.

20   Q.   What was Greñas's job?

21   A.   He was in charge of, you know, being on the

22   outside, walking or hanging with the homies in our

23   sector, our hood.

24   Q.   What do you mean by walking or hanging with the

25   homies in your sector or hood?

1    A.   Well, he would walk the area and ensure, you

2    know -- he would look around and make sure that

3    everything was controlled by us.

4    Q.   What do you mean, controlled by us?

5    A.   That there were no other members of other gangs

6    in the area that pertained to us, Park View.

7    Q.   You also --

8              THE COURT:  All right, Counsel.  We're going

9    to take the morning recess now for 15 minutes.

10             You all remain in place.

11             You can go, ladies and gentlemen.

12             (Jury not present.)

13             THE COURT:  Sidebar, please.

14             Fifteen-minute recess.

15             (Thereupon, the following side-bar

16   conference was had:)

17             THE COURT:  I'm going to grant the

18   government's motion for a 24-hour recess.

19             MS. MARTINEZ:  I appreciate that, Your

20   Honor.

21             THE COURT:  Recess for 15 minutes.  Thank

22   you.  I'm not going to tell the jury until after lunch.

23             MS. MARTINEZ:  Yes, Your Honor.  We will be

24   going for quite some time.  We have a couple witnesses

25   after this one.

```
1              THE COURT:  Okay.
2              (Thereupon, the side-bar conference was
3   concluded.)
4              (Thereupon, court was recessed at 11:31 a.m.
5              and reconvened at 11:48 a.m.)
6              THE COURT:  You can bring our jury out,
7   thank you, Mr. Toliver.
8              (Jury present at 11:49 a.m.)
9              THE COURT:  You may be seated.
10             All right, Counsel, you may proceed.
11             DIRECT EXAMINATION (Continued)
12  BY MS. MARTINEZ:
13    Q.  Before the break, we were talking about the
14  various things or jobs that each of the members did for
15  the clique.  Do you recall?
16    A.  Yes.
17    Q.  We were talking about Greñas.  In addition to
18  what you already testified to, was there anything else
19  you wanted to add about what Greñas did for the clique?
20    A.  I think this would be all.
21    Q.  Moving on to Leopardo, or Bago, what types of
22  jobs did Leopardo do for the clique?
23    A.  Well, he kept the bills, the accounts, the money
24  that was coming in, into the clique, what we
25  contributed.
```

1      Q.   When you say what you contributed, what do you

2  mean?

3      A.   Can you repeat the question, please?

4      Q.   Your answer was that he kept track of the money.

5  Is that right?

6      A.   Yes.

7      Q.   What money?

8      A.   That was the money we made selling drugs.

9      Q.   How about Guasón, or Lil Poison; what did Lil

10 Poison do for the clique?

11     A.   Well, he sometimes would try to get marijuana so

12 that we could sell it within the clique.

13     Q.   How about Pesadilla; what types of job did he do

14 for the clique?

15     A.   He cooperated in the distribution of the drug.

16     Q.   Distribution of what?  I'm sorry?

17     A.   Of the drug.

18     Q.   What drug?

19     A.   The one that we purchased so that we could sell

20 it within the clique.

21     Q.   What types of drugs?

22          MR. CONTE:  Objection, Your Honor.  The

23 question has been asked and answered.

24          MS. MARTINEZ:  The question is what types of

25 drugs, Your Honor.

1              THE COURT:  Overruled.

2   BY MS. MARTINEZ:

3      Q.   What types of drugs or type?

4      A.   Marijuana.

5      Q.   Now, you testified earlier, yesterday, that

6   you're incarcerated.

7      A.   Yes.

8      Q.   When were you arrested?

9      A.   October 1st, 2013.

10     Q.   I would like to talk about the circumstances of

11  your arrest.  Where were you when you were arrested?

12     A.   We were going towards Woodbridge.

13     Q.   Who were -- who were you with when you were

14  arrested?

15     A.   Well, a little homie we call Drowsy, Greñas, and

16  a *chequeo* that we used to call Marciano.

17     Q.   Starting with Greñas, is that the same Greñas

18  that you've mentioned and identified today?

19     A.   Yes.

20     Q.   Then, you mentioned a *chequeo* named Marciano.

21  Who is Marciano?

22     A.   He was someone who wanted to become a member of

23  Park View.

24     Q.   You also mentioned Drowsy.  Who is Drowsy?

25     A.   He was a homeboy in Park View.

1    Q.   How did you first meet Drowsy?

2    A.   Well, he showed up at the sector -- well, he came

3    with other homies, and the other homies told me about

4    him.

5    Q.   When did he show up at the sector?

6    A.   I'm not too sure about the date, but it must have

7    been around September.

8    Q.   Of what year?

9         The year you were arrested, or another year?

10   A.   2013, yes.

11   Q.   What happened after Drowsy showed up in September

12   of 2013?

13   A.   Well, he showed up saying he was a member of Park

14   View.  Then the homies called me and told me that there

15   was somebody who said he was a member of Park View.  So,

16   I came over and I met him.

17   Q.   What did you do?

18   A.   Well, I talk to him, and he said he was a member

19   of Park View.

20        So, I called Payaso and I told him that another

21   member of the clique had shown up.

22   Q.   How did Payaso respond?

23   A.   Well, Payaso told us to talk to him and make sure

24   whether he was firm with the clique, and who had jumped

25   him into the clique.

1    Q.   So, what did you do?

2    A.   Well, we talked to Drowsy and we asked him about

3    the persons who had jumped him in.

4    Q.   What happened after that?

5    A.   Well, he gave me the names of the persons who had

6    jumped him in.

7         So, I called Payaso, and I told him the names of

8    these persons.

9    Q.   How did Payaso respond?

10   A.   Well, Payaso told me that those persons no longer

11   belonged in Park View, that they were considered dirty

12   for the Park View.

13   Q.   So, what happened after you and Payaso learned

14   that the people who had jumped in Drowsy were dirty for

15   Park View?

16   A.   So, we asked Drowsy whether he was willing to be

17   firm within the Park View, and then, therefore, we would

18   jump him in again, because we were all new Park View.

19   We were a new generation.

20   Q.   Why did you need to jump Drowsy in again?

21   A.   Well, to make sure that he would be firm with us,

22   and that he would not have the record that the other

23   persons had.

24   Q.   Was he, in fact, jumped in again?

25   A.   Yes.

1   Q.   Was there anything else that Drowsy had to do to
2   show that he was firm with you and the rest of the
3   clique?
4   A.   Yes.
5   Q.   What?
6   A.   Well, Payaso and myself, we asked him to murder
7   Peligroso.
8   Q.   Is this the same Peligroso that you've mentioned
9   earlier today?
10   A.   Yes.
11   Q.   Why did you and Payaso decide that Peligroso
12   should be murdered?
13   A.   Well, because Peligroso had vanished from the
14   clique.  He did not report any more.  And as time went
15   by, we learned that he was recruiting other members for
16   the clique.
17   Q.   Why was this a problem?
18   A.   Well, because, he did not show up and did not
19   report to us.  So, he could not be doing that, to be
20   recruiting other people without notifying us from Park
21   View.
22   Q.   Why not?
23   A.   Because, he's not allowed to jump in other
24   persons without the knowledge of his runners.
25   Q.   Was he allowed to disappear and not report in to

1    you and Payaso?

2        A.   Can you repeat?

3        Q.   Was he allowed to disappear like he did, and not

4    report in?

5        A.   Well, it was allowed, but, if we met him, then we

6    would discipline him.

7        Q.   Who decided that he should die for these things

8    that he did?

9        A.   Payaso and myself.

10       Q.   Was there a plan about how the murder was to take

11   place?

12       A.   Yes.

13       Q.   Who, if anyone, did you discuss the plan with?

14       A.   Well, we discussed among all of us in Park View,

15   all the homeboys.

16       Q.   Please name who you remember discussing the plan,

17   to kill Peligroso, with.

18       A.   Greñas, Duende, Guasón, Little Thunder, Payaso

19   and myself.

20       Q.   What was the plan?

21       A.   The plan was to drive to Woodbridge and murder

22   Peligroso there.

23       Q.   Where in Woodbridge?

24       A.   Well, Peligroso was studying in a school, I

25   believe it's called Garfield.

1    Q.  Was there a discussion of what weapons should be

2  used?

3    A.  Yes.

4    Q.  What weapons were discussed?

5    A.  To use machetes.

6    Q.  Were there any other weapons discussed at any

7  point?

8    A.  Yes, so, a firearm.

9    Q.  What kind of firearm?

10         THE INTERPRETER:  A shar-gun (phonetics)?

11  Two and two?

12  BY MS. MARTINEZ:

13    Q.  A shotgun?

14    A.  (In English)  Yes.

15         THE INTERPRETER:  Oh.  "A shotgun."

16  BY MS. MARTINEZ:

17    Q.  What kind of shotgun?

18    A.  A 12.

19    Q.  Who was supposed to go to kill Peligroso at the

20  high school?

21    A.  Drowsy and the boy who -- the *chequeo* who wanted

22  to be a member, Marciano.

23    Q.  Who else was supposed to go?

24    A.  There was another homie --

25         THE INTERPRETER:  And I need to ask him the

1   name.

2          THE WITNESS:  -- called Nocturno, but he did

3   not show up to do the -- to carry out this mission.

4   BY MS. MARTINEZ:

5      Q.   Who is Nocturno?

6      A.   He's a member of Park View.

7      Q.   When he didn't show up, who went instead?

8      A.   I went.

9      Q.   What were you supposed to be doing that night,

10  before it was decided that you would go to kill

11  Peligroso?

12     A.   I was supposed to travel to New York for another

13  business of the clique.

14     Q.   What business?

15     A.   Well, we were trying to get into another

16  business, to bring down prostitutes from New York.

17     Q.   Why were you supposed to go to New York at that

18  time?

19     A.   Well, it was supposed -- I would go to New York

20  for that business, and these other men would go to

21  Woodbridge to carry out the other mission.

22     Q.   Why did the clique want to bring prostitutes down

23  from New York?

24     A.   So we could make more money for the clique.

25     Q.   Who else was involved in discussions or plans

1    about making money through prostitution for the clique?

2        A.   Payaso.

3        Q.   During your trial preparation, were you asked to

4    listen to some recordings?

5        A.   Yes.

6        Q.   What were you asked to do while you were

7    listening to the recordings?

8        A.   Identify the voices of the persons who were

9    talking.

10       Q.   How long did it take you to listen to all these

11   recordings and identify the voices?

12       A.   It was a while, like two days.

13       Q.   When you were arrested on October -- in October

14   of 2013, at that time, how often were you talking to

15   Payaso?

16       A.   No.  I lost communications with him.

17       Q.   You lost communication when you were arrested?

18       A.   Yes.

19       Q.   So, prior to your arrest, during the time period

20   before you were arrested, how often were you talking to

21   Payaso?

22       A.   Well, we talked almost every day.

23       Q.   On the phone?

24       A.   Yes.

25       Q.   Were you able to readily identify his voice on

1    the phone?

2        A.   Yes.

3        Q.   At the time that you were arrested, how long had

4    you known Greñas?

5        A.   It was about like a year.

6        Q.   How often did you see him?

7        A.   Every 15 days, when we gather together.

8        Q.   In addition to seeing him in person, did you also

9    speak with him on the phone?

10       A.   Yes.

11       Q.   How often?

12       A.   Almost every day.

13       Q.   Were you able to easily and readily recognize his

14   voice on the phone?

15       A.   Yes.

16       Q.   And in person?

17       A.   Yes.

18       Q.   By the time that you were arrested, how long had

19   you known Guasón, or Lil Poison?

20       A.   Lil Poison was like about a year and some days.

21       Q.   How often did you see him in that year and some

22   days?

23       A.   Well, almost the same, every two weeks.

24       Q.   Did you also speak with him on the phone?

25       A.   Yes.

1    Q.   How often?

2    A.   Almost every day.

3    Q.   Were you able to recognize his voice?

4    A.   Yes.

5    Q.   And by the time that you were arrested, how long

6    had you known Drowsy?

7    A.   Well, it been a short time, two or three weeks.

8    Q.   In that time, how many times did you see him?

9    A.   About two or three times.

10   Q.   Did you also speak to him on the phone?

11   A.   Yes.

12   Q.   About how many times?

13   A.   Well, not very frequently, but there were several

14   occasions I spoke with him.

15   Q.   During these several occasions, were you able to

16   recognize his voice?

17   A.   Yes.

18   Q.   And you also mentioned the *chequeo*, Marciano.

19   How long had you known him when you were arrested?

20   A.   A short time, not too much.

21   Q.   How many times did you see him?

22   A.   Four occasions, on four occasions.

23   Q.   Were there times when you spoke with him on the

24   phone?

25   A.   No, I did not communicate with him.

1    Q.   Were you able to recognize Marciano's voice based
2  on your in-person interactions?
3    A.   Yes.
4    Q.   At some point, you mentioned someone named
5  Duende.  Who is Duende?
6    A.   He's another homeboy of Park View.
7    Q.   How long had you known Duende when you were
8  arrested?
9    A.   Well, yes, the same, about one year.
10   Q.   How often did you see him during that one year or
11 so?
12   A.   Every two weeks.
13   Q.   Did you also speak to him on the phone?
14   A.   Yes.
15   Q.   How often?
16   A.   Almost every day.
17   Q.   Were you able to readily recognize his voice?
18   A.   Yes.
19   Q.   Now, you mentioned that when you listened to
20 these recordings for a long time during trial
21 preparation, you were asked to identify voices.
22   A.   Yes.
23   Q.   Were you, in fact, able to recognize voices?
24   A.   Yes, most of the voices, yes.
25   Q.   What did you do when you recognized the voice?

1       A.   Could you repeat the question?

2       Q.   When you were listening to the recordings, each

3    time you recognized the voice, what did you do?

4       A.   Well, I let the people know, the people who were

5    with me.

6       Q.   Were you able to recognize every single voice on

7    the recordings?

8       A.   Yes.

9       Q.   Every single one?

10             MR. JENKINS:  Objection, Your Honor.  Asked

11   and answered.

12             THE COURT:  Overruled.

13   BY MS. MARTINEZ:

14      Q.   Every single voice -- you were able to recognize

15   every single one, or there were ones you did not

16   recognize?

17             MR. JENKINS:  Objection, Your Honor.

18             THE COURT:  Leading.  Sustained.

19             MS. MARTINEZ:  I apologize.

20   BY MS. MARTINEZ:

21      Q.   Were you able to recognize every single voice

22   that you heard on these recordings?

23      A.   The majority, most of them, yes.

24      Q.   If there was a voice you did not recognize, what

25   did you do?

1    A.   I would let the people know the guys who were

2    with me.

3    Q.   Are you confident in the voices that you did

4    recognize?

5    A.   Yes.

6    Q.   With the help of the court security officer, I

7    would like you to look at Government's Exhibits 1-A,

8    2-A, 3-A, 4-A, and 5-A.

9         You can go ahead and take those discs out of the

10   plastic sleeve so you can see them.  1-A, 2-A, 3-A, 4-A,

11   and 5-A.

12        Do you know what these are?

13   A.   Yes.

14   Q.   What are they?

15   A.   These contain the record of the plans that we

16   were making to kill Peligroso.

17   Q.   Have you listened to those discs, to those

18   recordings?

19   A.   Yes.

20   Q.   How do you know that you listened to those

21   recordings?

22   A.   Because my initials are on them.

23   Q.   When did you initial them?

24   A.   That -- that was when I had the interview with

25   them, but I don't remember the date.

1      Q.   What were you doing while you were listening to

2   these recordings?

3      A.   Identifying the voices of the people.

4           MS. MARTINEZ:  Your Honor, at this point the

5   government would move to admit Government's Exhibit's

6   1-A, 2-A, 3-A, 4-A, and 5-A, which are the recordings.

7           In addition, we would move to admit the

8   translations of these recordings, which were previously

9   identified by the linguists.  Those are Government's

10  Exhibit's 1-A-1, 2-A-1, 3-A-1, 4-A-1, and 5-A-1.

11          THE COURT:  Received without objection.

12          MS. MARTINEZ:  Your Honor, we would also

13  move to admit the clips that the linguist testified to,

14  that -- they testified that they were contained wholly

15  within the larger exhibits.  Those exhibits are 2-B and

16  2-B-1, 3-B and 3-B-1, 3-C, 3-C-1, 4-B, 4-B-1, 4-C, and

17  4-C-1.

18          And for the record, those are clips of the

19  recordings, and then translations that the linguist

20  testified go with those clips.

21          MR. AQUINO:  Judge, we renew the objection

22  that we previously made.

23          THE COURT:  Having to do with verbatim,

24  relevance -- and what was the third thing?

25          MR. AQUINO:  Yes, sir.

1           THE COURT:  Verbatim, relevance, and what

2    was the third thing?

3           Gang membership?  I think it was --

4           MS. MARTINEZ:  I believe it was identifying

5    the voices.

6           THE COURT:  Identifying the voices was one

7    of them.

8           MR. AQUINO:  Also it was in addition to

9    outside the scope of the expertise.

10          THE COURT:  Outside the scope of expertise.

11   Outside the scope of expertise.

12          So, for the record, 1-A, 2-A, 30A, 4-A, 5-A,

13   are received.  1-A-1, 2-A-1, 3-A-1, 4-A-1, 5-A-1; the

14   clips, 2-B, 2-B-1, 3-B, 3-B-1, 3-C, 3-C-1, 4-B, 4-B-1,

15   4-C, and 4-C-1, received.

16          MS. MARTINEZ:  Your Honor, at this time we

17   would ask the Court's permission to publish some of

18   these clips.  They're only a couple minutes long.  We

19   would like to play them in court and also put up the

20   transcripts that corresponds with them.

21          THE COURT:  All right.  You may -- you may

22   proceed.

23          MS. MARTINEZ:  We'll start with Government's

24   Exhibits 2-B and 2-B-1.

25          And, Your Honor, may we direct the jurors to

1  the exhibit -- or the transcript binders which are under

2  their chairs?

3              THE COURT:  Ladies and gentlemen, before

4  you -- before you move, the binders have transcripts

5  that we're going to refer to in court.  There will be

6  other transcripts in the binder which you're not to

7  refer to.  Just refer to the one that you're being

8  instructed to refer to for purposes of this proceeding.

9              So we're going to look at 2-B and 2-B-1; is

10 that right?

11             MS. MARTINEZ:  Yes, Your Honor.  2-B is the

12 recording.  2-B-1 is the transcript that should be in

13 each of the juror's binder.

14             We will put it on the screen as well;

15 whatever is most convenient.

16             THE COURT:  All right.

17 BY MS. MARTINEZ:

18    Q.  Mr. Rosales, we're going to play a recording now.

19 You don't need to look at -- let me ask this:  Can you

20 read English?

21    A.  A little.

22    Q.  Are you -- can you fluently read in English?

23    A.  Yes.

24    Q.  Can you speak fluent English?

25    A.  No.

1    Q.   What I'm going to ask you to do is if you could

2    just listen to the Spanish recording.  You don't need to

3    look at the transcript, which is in English.  Okay?

4              MS. MARTINEZ:  So, if we could, we'll just

5    take the transcript away from him.

6    BY MS. MARTINEZ:

7    Q.   I'd like you to respond just based on what you

8    hear in the Spanish language recording.  Okay?

9    A.   Okay.

10   Q.   For the record, do you have the transcript in

11   front of you?

12   A.   I'm sorry.  Could you repeat?

13   Q.   Do you have the transcript in front of you right

14   now?

15   A.   No.

16   Q.   Good.

17        Just listen to the recording.  Okay?

18              MS. MARTINEZ:  All right.  We'll now publish

19   Government's Exhibit 2-B.

20              (Audio played.)

21   BY MS. MARTINEZ:

22   Q.   Were you able to recognize the voices in that

23   recording?

24   A.   Yes.

25   Q.   What voices did you hear?

1    A.   Those are the voices of Payaso, Drowsy, and
2  Greñas.
3    Q.   Were you also involved in this discussion?
4    A.   Yes.
5    Q.   How were you involved in the discussion?
6    A.   By cellphone.
7    Q.   During this clip, did you hear your own voice?
8    A.   No.
9    Q.   Do you have a memory of this conversation?
10   A.   Yes.
11   Q.   Do you have a memory of you being involved on the
12  cellphone?
13   A.   Yes.
14   Q.   In this short clip, there's a voice that's much
15  quieter than the others.  Who is that?
16   A.   That's Payaso.
17   Q.   What were you and -- well, not you in this clip,
18  but Greñas and Payaso and Drowsy discussing?
19   A.   We were talking about what we were going to do
20  that night, that we were going to assassinate Peligroso,
21  and which weapons we were going to use.
22   Q.   Which weapons were discussed in this
23  conversation?
24   A.   We were talking about machetes.
25   Q.   Did you hear someone talk about a 22 and a 12?

1           MR. CONTE:  Objection, leading, Your Honor.

2           THE COURT:  Sustained.

3           MS. MARTINEZ:  Your Honor, if I could have

4    Court's indulgence.  It's in the transcript.  He can't

5    read the transcript.  I'm basically directing his

6    attention to something that's in the transcript.  But --

7           THE COURT:  You can ask him about another

8    question.  You can ask him another question, not about

9    the transcript, but ask him another question.

10          MS. MARTINEZ:  Well --

11   BY MS. MARTINEZ:

12     Q.  Within the recording, was there any mention of

13   weapons other than machetes?

14     A.  Yes.

15     Q.  What -- what weapon -- what weapons other than

16   machetes?

17     A.  Use a 12- or a 22-gauge.

18     Q.  What is a 22-gauge?

19     A.  It's a pistol.

20     Q.  What is a 12?

21     A.  It's a, how do you say it, a shotgun.

22     Q.  Within this conversation, were there people who

23   advocated for one weapon over the other?

24     A.  Yes.

25     Q.  Who advocated for the machete?

1    A.   Marciano and Drowsy.

2    Q.   Who advocated for a firearm?

3    A.   That was Greñas.

4    Q.   Were you able to obtain a machete?

5    A.   Yes.

6    Q.   From where?

7    A.   I took it off a friend who I lived with.

8    Q.   How many machetes were with you and the others

9  that night?

10   A.   We had two machetes on us.

11   Q.   Who brought the other machete?

12   A.   The other machete was kept in the area -- the

13 area pertaining to those of us in Park View.

14   Q.   That night when you were arrested, where were the

15 machetes?

16   A.   They were in my car.

17   Q.   Who put the first one in your car?

18   A.   I did.

19   Q.   Who put the second one in your car?

20   A.   The second one was brought by Greñas and Guasón.

21   Q.   Was there also a firearm with you that night when

22 you were arrested?

23   A.   Yes.

24   Q.   What firearm?

25   A.   The 12.

1    Q.   Where was the firearm when you were arrested?

2    A.   I had it in my car.

3    Q.   Who put it in your car?

4    A.   That one, Greñas had, along with the machete.

5    And it was in the sector when I picked him up.

6    Q.   Where in your car did Greñas put the shotgun and

7    the second machete?

8    A.   In the trunk of the car.

9         MS. MARTINEZ:  Your Honor, now I'd like to

10   publish Government's Exhibit 3-B, which is another clip,

11   with Your Honor's permission.

12        THE COURT:  All right.

13        MS. MARTINEZ:  And I would direct the jury

14   to the transcript, Government's Exhibit 3-B-1.

15        MR. AQUINO:  Judge, may we approach for just

16   one thing?

17        THE COURT:  Yes.

18        (Thereupon, the following side-bar

19   conference was had:)

20        MR. AQUINO:  Judge, in all these transcripts

21   and translations, it was my understanding that we were

22   treating this as a standing objection, and that we at

23   some point would address the issue in full.

24        And, I'd like to -- in other words, the

25   admissibility.  And so --

1          THE COURT:  Of the tapes or the transcripts
2    themselves?
3          MR. AQUINO:  Yes, sir.  And so, I don't know
4    if we're going to do that later, but at some point -- I
5    can do it now -- but at some point, I would like to
6    address the Court in full as to the basis for my
7    objection.
8          THE COURT:  Well, since we're admitting them
9    now, why don't we do it right now?
10          MR. AQUINO:  Sure.
11          THE COURT:  Do you need to take the jury
12    out?
13          MR. AQUINO:  That would be great.  I would
14    like that.
15          (In open court as follows:)
16          THE COURT:  Ladies and gentlemen, we're
17    going to take a brief recess and have you come back in
18    just a moment.
19          Thank you very much.
20          (Jury not present.)
21          (Thereupon, the side-bar conference was
22    concluded.)
23          THE COURT:  The witness can step down and
24    step out for a moment.
25          (Thereupon, the witness withdrew from the

1    stand.)

2              MR. AQUINO:  Yes, sir.  The basis of our

3    objection is in several respects.  The first deals with

4    the issue of verbatim translations.

5              It became crystal clear during the

6    questioning of the linguists that these were not

7    verbatim translations, and by that I mean word for word.

8    Rather, it became evident in the questioning of the

9    linguists that these were interpretations.

10             I believe, for example, specifically

11   Ms. D'Sa indicated that this is not black and white, in

12   other words, implying that there's an awful lot of gray

13   here which requires interpretation by the linguists.

14             The face of each exhibit -- excuse me.  The

15   face of each translation proposed by the government

16   indicates on the top, "verbatim translation."

17             And so, I submit that that is misleading the

18   jury if those go back, because I believe it was clear to

19   us and clear to the Court -- and I even believe it's

20   clear to the government -- that those are not verbatim

21   translations.

22             And so, for that reason, I would ask that

23   those transcripts not be admitted into evidence.

24             In addition, Rule 16 talks about expert

25   witness disclosure.  The Court, I submit, is very highly

familiar with expert witness disclosures from your
practice of law when handling personal injury cases.

In this situation, the expert witness
disclosure rule, Rule 16(g) requires, "The summary
provided under this subparagraph must describe the
witness's opinions, the basis and reasons for those
opinions, and the witness's qualifications."

Now, what do we know from the -- the
disclosures made by the government as to their expert
witness disclosure?

This was the expert witness disclosure for
each, to each linguist.  It's the same one --

THE COURT:  Do you have a docket number for
it?

MR. AQUINO:  I do.

THE COURT:  What docket number is it?

MR. AQUINO:  I'm sorry.  I just have it as
an expert witness disclosure --

THE COURT:  Okay.  That's fine.

MR. AQUINO:  -- that was sent.  And I'll
read it to you and I'll hand it up to you.

THE COURT:  Okay.

MR. AQUINO:  And this, for example, is used
to apply to Ms. D'Sa.

"Ms. D'Sa will be called as an expert

witness regarding her English transcription of
recordings during which defendants conversed in Spanish.
Ms. D'Sa has served as a contract Spanish linguist
monitor with the FBI since 2007.  She has provided
language related services to include translation,
interpreting, monitoring and quality control compliance
review.  Ms. D'Sa will testify that the process by which
she prepared and reviewed her transcription of the
recordings" -- and if I could hand that up so that you
have it right in front of you.

                THE COURT:  All right.

                MR. AQUINO:  And I highlighted it for you.

                Now, it became evident in the
cross-examination yesterday of Ms. D'Sa and other
linguists, that they relied upon gang members.  They
relied upon police officers from El Salvador.

                In other words, what I'm driving at is, is
that the expert witness disclosure was insufficient,
insufficient, and the Court, for that reason, should
strike the government transcripts, because their
description of what's contained in their disclosure is
different than the actual testimony offered by the
translators.  In other words, it exceeds what's
described in the expert witness disclosure.

                And to go further and underline that point,

if we were talking about just a garden variety personal injury case, in which we had *Geico* here, we had *State Farm*, and the defense lawyers were off- -- offering a expert witness disclosure like that, and there was such a difference between what was contained in their expert witness disclosure and the actual testimony, and the basis for that opinion that was offered yesterday, I submit the Court would strike the testimony of those experts propounded by the insurance company.

But what's important -- and the reason why that's -- I emphasize that is, that's a case for money damages.  But here we are in a case where someone's liberty is at issue.

And the Court knows the rules, as all of us do, on the issue about penal statutes, which we submit would be applicable to this situation, meaning that there's more gravity to the actual meaning of the rule than in just a money damage situation, where someone's liberty is at issue.

And what I'm getting at is, is that the strict language of the rule should be enforced in this case, where there be a summary of the reasons and the basis for the expert opinion.

None of this -- none of what we heard yesterday about the reliance -- reliance upon gang

testimony -- or gang members, nor police officers from
El Salvador, is contained in the government disclosure
of the basis for the witness's opinions.  There's a big
disparity in those two.

And so, for that reason I would ask that the
Court strike the testimony, as well as the witnesses.

In addition to that, Rule 703 talks about --
and you've raised this on your own in pleadings that
I've filed and others have filed, about the issue about
expert witness disclosure and reliance upon hearsay.
And I would like to read the first two sentences of
Rule 703.

"An expert may base an opinion on facts or
data in the case that experts" -- "that the expert has
been made aware of or personally observed."

And the second sentence is particularly
relevant.  "If experts in the particular field would
reasonably rely on those kinds of facts or data in
forming an opinion on the subject, they need not be
admissible for the opinion to be admitted."

Now what I'm driving at is, is that it
requires a foundation to be laid that the expert
reasonably relies on those facts or data.

For example, again in a personal injury
case, you might say to Dr. Jones, "Do you reasonably

rely upon the facts and opinions of other healthcare providers in forming your opinion?"

Okay.  That's a foundation that's laid in a personal injury case that a court would often see.

We had none of that yesterday offered by the government, establishing a foundation -- a foundation for the reliance upon hearsay testimony of their expert.

That's an additional reason I would ask.

And finally, the last -- the last point that I would draw the Court's attention to is that *Crawford* issue, namely, that we had a significant amount -- a significant amount of what I would submit to be unsworn testimony or statements that came in -- that came in from former gang members.

Essentially, this is a Confrontation Clause issue, meaning we had a -- linguists on the stand who are relating directly what gang members had told them to the -- the meaning of certain terms.

And I asked one in particular, Ms. D'Sa: You're making two assumptions.  One, that the gang member knows that you're talking about.

She admitted that was true.

And two, that the gang member was truthful.

And she admitted:  Yeah, that's true, too.

Now, what we have that's important about

1    that position is, is evidence in this case from

2    Detective Saa -- excuse me -- Sergeant Saa, who

3    indicated that gang members are unreliable.  Unreliable.

4              And so, what I'm driving at is, and the

5    point of the Confrontation Clause is to address

6    reliability.  In other words, confrontation or

7    cross-examination, at its heart, really is a tool used

8    to get at truthfulness.

9              And by allowing all this information to

10   spill in into evidence about what other gang members are

11   saying, I submit is a violation of the Confrontation

12   Clause and, effectively, what those witnesses were doing

13   was kind of spewing back information that -- that they

14   had heard from gang members, as well as other police

15   officers in El Salvador, which is not subject at all to

16   cross-examination, so as to test their reliability.

17             And so for these reasons, I ask that the

18   transcripts be struck from the case, Judge.

19             THE COURT:  All right.

20             MS. MARTINEZ:  Your Honor, I believe

21   Mr. Aquino has raised four issues.  Two of them have

22   already been dealt with in extensive briefing with this

23   Court and this Court has already ruled on them.

24             The first of the issues that the Court has

25   already ruled on are the expert disclosures.  There was

1   a motion to strike these experts, these linguists, based
2   on inadequate disclosure.
3               Your Honor denied that motion.  Your Honor
4   actually denied the motion before the government
5   responded to it -- and we would be happy to submit a
6   written response.  We have case law to cite.  But the
7   essence of it is that the disclosures were more than
8   adequate.
9               Your Honor, the rule about disclosing expert
10  witnesses -- the purpose of the rule is to give defense
11  counsel adequate time to understand what expert will be
12  testifying and to prepare effective cross-examination.
13              There's case law in the Fourth Circuit that
14  makes clear -- and I apologize, I don't have those cases
15  in front of us; I was not aware we were going to do this
16  right now, but I could submit them later -- there's case
17  law in the Fourth Circuit that makes it clear that this
18  rule, this rule for disclosure, is not a technical
19  requirement.  It's a requirement to allow defense
20  counsel adequate time to prepare cross-examination.
21              Your Honor, I submit that our disclosures
22  were more than adequate to allow defense counsel to
23  prepare adequate -- to prepare cross-examination.
24              In addition to the written disclosure which
25  was passed up to the bench, the government also provided

CVs for each of the experts it disclosed.  Those CVs have been marked just for identification purposes in the government's exhibit binder.  They are Government's Exhibits 130 through 148.

Specifically to the three -- the three linguists who have already testified, Ramon Aguilar's CV is Exhibit 130.  Sandra D'Sa resumé is Exhibit 134.  And Liliana Portwine's CV is Government's Exhibit 144.

Your Honor, in addition to written disclosure and the CVs, the government also provided the transcripts about which these witnesses would testify. We provided the transcripts well before -- before the expert disclosure deadline.

I believe, Your Honor, that we provided them all in the form that they are in the exhibit binders, to defense counsel, on March 3rdrd.

And of course, the government had provided the recordings themselves long before that, well over a year before that.  If I'm not mistaken, every single one of the recordings being presented in evidence in this case were provided to defense counsel in the year 2014.

So, in other words, in order to prepare to cross-examine these linguists, defense counsel had Spanish language recordings, which they've been able to listen to and obtain their own linguist to translate or

to summarize or whatever they find appropriate for, in some cases, I think a year and a half, but certainly well over a year in every single instance.

They've had the verbatim -- and I'll address that complaint in a moment -- the verbatim English translations prepared by these linguists since March 3rd.

Your Honor, as Your Honor has seen with these exhibits, every single English translation has a cover page that lists the linguist who prepared them. So they've had notice of what linguist prepared these translations since March 3rd.

And then on the date that Your Honor -- Your Honor provided for the government to make expert disclosures, we also made the expert disclosure, which is in front of Your Honor, and provided CVs or resumés for each of the linguists expected to testify.

All of this is more than adequate for defense counsel to prepare their cross-examinations. And I'd submit, Your Honor, that based on the cross-examinations we've seen, I think it's been quite clear that they've had adequate information and time and resources and ability to prepare effective cross-examinations.

We would submit that the -- on this issue,

that the expert disclosure was more than adequate.

Turning, Your Honor, to the complaint about verbatim.  I disagree with defense counsel, with Mr. Aquino's characterization.  I think that what was established through the three different linguists who testified is that translation is an art, not an exact science; that if you translate literally each word -- and there was testimony, I believe it was from Mr. D'Sa -- but I admit the three linguists are running together a little bit for me, but there was testimony that if you were to take each Spanish word in a sentence and just translate each word into one English word and put those in the same order, it wouldn't make sense.

That's not a verbatim translation, because the English would not make sense.  The testimony is that "verbatim" is meaning to meaning, Taking a whole phrase or a whole sentence or a whole explanation, and translating that into the meaning that it has in English.  That was the testimony that was established by the linguists.

And I would submit that the linguists did lay more than enough foundations that these are proper verbatim English translations of these Spanish language recordings, prepared by these FBI linguists, with ample experience and expertise in both Spanish and in

1   Salvadoran dialect.

2          Your Honor, Mr. Aquino also complained about

3   Rule 703 and the expert's reliance on hearsay.

4          There certainly was some testimony that

5   linguists would sometimes consult each other or consult

6   other individuals whom they felt might give them

7   information to help understand words or phrases.  There

8   was testimony about consulting online resources.

9          Your Honor, I submit that this is natural,

10  this is a standard part of a linguist's duties.  And

11  importantly, what was established on redirect is that

12  the linguists did not simply ask someone else for the

13  answer and then plug it into the transcript and rely on

14  it.

15         They asked for input, but then they made

16  their own decisions based on their knowledge, their

17  expertise of knowledge and the Salvadoran dialect, based

18  on listening to the Spanish language recordings, context

19  of the recordings, to some extent their familiarity with

20  these same speakers whom they heard over and over again,

21  particularly Ms. Portwine and Ms. D'Sa, who testified

22  that they heard thousands of recordings in this case

23  alone, involving the same players in this case; and that

24  they made these determinations based, as well, on the

25  dialect that they were hearing, on the Salvadoran

dialect with which they were familiar.

So, yes, they relied on input from external sources, but it was input.  It was not having an external source do the translations for them.  I think the testified made that quite clear.

Your Honor, with respect to Mr. Aquino's last issue, the *Crawford* issue, I believe, at least in part, this is the second issue that has already been litigated with Your Honor.

Your Honor, *Crawford* is for testimonial statements.  Testimony -- the -- the individuals who are contained in these recordings were making -- were making statements to whom they believed were other gang members.

And there's clear Fourth Circuit case law -- and again, this is something else that we've already briefed for Your Honor, that Your Honor has already ruled on.

There is clear Fourth Circuit case law that when a defendant or another individual makes a statement that happens to be recorded, but believes he's making the statements to other individuals on the street, to co-defendants, to co-conspirators, to other gang members, these are not testimonial statements.

The fact that they were, in fact,

surreptitiously recorded by someone working with the government does not make them testimonial statements. *Crawford* simply does not apply under clearly established Fourth Circuit case law.

THE COURT:  Thank you.

MR. AQUINO:  Brief response, Judge.

I think she's misunderstanding the nature of my objection as to the expert witness disclosure.  You have in front of you the exact expert witness disclosure.

THE COURT:  But she also submitted the CVs; is that right?

MR. AQUINO:  Well, she did, but the --

THE COURT:  And she submitted the transcripts, right?

MR. AQUINO:  She did.

THE COURT:  Okay.  Go ahead.

MR. AQUINO:  But in none of those transcripts or the CVs does it explain the reliance upon gang member testimony or police testimony that we heard from that witness stand.

In other words, the basis for the opinion was never disclosed.  You have it right there.  And it's not contained in the transcripts nor is it contained in the CVs.

1          And so, the point I'm getting at is, is you
2    have the expert witness disclosure, and there's a large
3    disparity between the basis for the expert witness
4    disclosure that's contained in your report versus the
5    testimony that we heard on the stand.  That's my
6    objection on the expert witness disclosure.
7          In addition, about the verbatim transcripts,
8    counsel summed it up well.  She said, more art than
9    science.  In other words, two plus two might equal five.
10   Two plus two might equal eight.  And so that exactly is
11   the point I'm trying to make, which is, it's not
12   verbatim.  It's not verbatim, and we're misleading the
13   jury on that issue.
14         And then the last issue is -- goes to the
15   question about *Crawford*.  The point I'm making -- again,
16   I think there's a misunderstanding here.  The point I'm
17   making on the *Crawford* issue is, is that we have
18   information that comes, essentially unfiltered, from
19   gang members themselves, as well as police officers in
20   El Salvador, not subject to cross-examination about
21   motivations or reliability.
22         And at the heart of *Crawford*, that's what
23   this is about.  It's the Confrontation Clause, the
24   ability through the use of cross-examination to test
25   truthfulness or reliability.

1          In this instance, we have an awful lot of
2   information that they relied upon from other gang
3   members, which they interpret or believe to be truthful,
4   and they're making a big assumption based upon the
5   testimony we heard from Sergeant Saa of the Herndon
6   police, that gang members are notoriously unreliable.
7          And so, for these reasons, I would ask that
8   the Court strike those transcripts.
9          MR. CONTE:  Your Honor --
10          MS. MARTINEZ:  Your Honor, may I respond
11   briefly to that second *Crawford* argument that was just
12   made?
13          THE COURT:  No.  That's okay.
14          Yes?
15          MR. CONTE:  Your Honor, I think this would
16   be a good time for me to inquire whether the government
17   found any information on those glossaries that the Court
18   ordered them to look into yesterday.
19          THE COURT:  You can ask her that separate
20   from this.  Let me take this up right now.
21          MR. ZIMMERMAN:  If I might, Judge.
22          Briefly, in addition to explicitly joining
23   this -- and I know the Court has us all joined in
24   these -- and agreeing that the transcripts in total have
25   to be struck.

1              It's also -- we would submit that,
2    alternatively -- although, again, we join with that --
3    that the "verbatim transcript," that that phrase has to
4    be struck.
5              And I think that we're talking about a lot
6    more than grammar.  In other words, certainly, if it was
7    translated word for word, white house would be house
8    white and stuff like that.  But on Mr. Leiva's cross of
9    Ms. Portwine, he elicited testimony that she been in
10   this case from the beginning, and she said when
11   translating, it is necessary to skew it one way or the
12   other.
13             And this was within the context of the
14   discussion of *loco*, which literately means crazy, which
15   generally translates in the slang as dude, which would
16   be a more value neutral, which she translated often as
17   homeboy, which is very value laden, it's very
18   incriminating and it's very much skewed towards the
19   government and against the defense.
20             And again, Ms. Portwine testified that it
21   isn't simply a matter of switching the nouns and the
22   adjectives so that it sounds grammatically correct, but
23   it's necessary to skew it when making these calls.  And
24   that's -- that's how she explained *loco* not being crazy
25   and not being dude, but being homeboy.

And so when arguing to the jury about these -- because we'll argue about everything -- it's really unfair that they say "verbatim transcription."

Because I can imagine the government coming back and saying, "You have the transcripts and they're a verbatim transcription."  And, they're not.  They're not even close.

And so, we would join, for all of the reasons stated by Mr. Aquino, these have to be struck.  In the alternative, that language has to come off the cover page.

THE COURT:  Go ahead.

MS. MARTINEZ:  Your Honor, just briefly with respect to Mr. Aquino's other *Crawford* argument.  Your Honor, essentially, his argument is that if an expert talks to anyone else and that informs the expert's opinion, it would be impermissible under *Crawford* for that expert to testimony unless every other single person the expert ever spoke to or consulted testified.

Your Honor, I would submit that that would be -- that's far more than the Supreme Court or the Fourth Circuit has ever countenanced under Sixth Amendment Confrontation Clause or under *Crawford* or any of the progeny.  It's simply not allowed.

Mr. Aquino characterized it as unfiltered,

the information that these -- these linguists got from
other sources.

Again, I disagree with that
characterization.  I think the linguists all made it
very clear that, although they consulted other sources,
they made their own determinations about meanings based
on context, dialog, dialect, the extent of their
familiarity with individual recordings, and the
recordings as a whole.

There was no testimony that the linguists
simply asked someone else and relied on that other
person to perform their translation purposes.

With respect to -- well, Your Honor, we'll
rest at that point unless Your Honor has further
questions.

THE COURT:  I don't have any questions.
Thank you.

Let the record reflect this matter is before
the Court on the defendants' motion to exclude the
transcripts prepared by the linguists in connection with
the case.  And there have been several transcriptions
made of recordings that the government consensually
recorded from an individual connected with the case, a
co-defendant, as well as with a confidential source.

The question presented is whether the term

"verbatim transcript" should be stricken, and whether or
not the transcripts themselves should be stricken
because they fail to comply with Rule 16(g) as it
relates to disclosure of expert opinion.

The record should reflect that, in my view,
preparing a transcript for -- from a recording requires
someone who is competent in the language, who has some
expertise, which can be shown through certification, and
can also be shown through experience under 702, and from
a foundation.

And, my judgment is that each of the
witnesses who testified -- Mr. Aguilar, Ms. Portwine and
Ms. D'Sa -- there was sufficient foundation laid for
them to testify that they are fluent in the Spanish
language, they are familiar with the dialect from El
Salvador, and, because they have work with the FBI for
several years, they have worked on cases involving MS-13
and have developed a degree of familiarity with gang
parlance through the work they've done in the past, and
in this case, because they were apparently 3,000 hours
or some large number of hours of recordings.

As it relates to the disclosures, I think
there are two things that are very important.  The first
is the purposes of disclosure is to give the defendants
notice that a person is going to be called as an expert,

is going to testify, the basis for their opinion, and to
see their opinion.

In this case, they were given not only the
summary -- which has been provided to me -- they were
given the CV for each of the individuals, and they were
given the proposed transcripts.

It seems to me that under those
circumstances, there can be no surprise, as there might
be in a civil case, where an expert comes into court and
testifies to something that was unanticipated about a
substantive opinion.

The issue of what they consulted, which has
to do with whether an expert may rely upon or consider
hearsay testimony, is very well settled, that is, that
experts can consider anything that is reasonably relied
upon by experts in that field.

And it seems to me the testimony --
foundation has been laid for Mr. Aguilar, about him
consulting not only law enforcement officer, something
called Google Translate on the Internet, and Ms. D'Sa --
Ms. Portwine saying that she spoke to officers from El
Salvador who worked with gang cases.  And she mentioned
a glossary, which counsel has requested to be produced
and I'm expecting them to produce it, if there is such a
document, and, if not, to bring Ms. Portwine back to

explain what she meant by "glossary."

I think that that -- there's nothing impermissible about experts relying upon hearsay.

And the key point here is whether Ms. Portwine adopted what was told to her or whether she made her own judgment about what these words meant, or Ms. D'Sa made her own judgment about what these words meant.

In my view, their consultation with law enforcement members who have had cases involving MS-13, her speaking with policemen from El Salvador, or even former gang members, in and of itself does not suggest that she just imported what they said into the opinion without considering the context.

And she made a great point -- Ms. Portwine made a great point about context, and so did Ms. D'Sa, and that is that interpretation of words from one language to another is not a literal translation, it is an interpretation of words, the word's interpretation is distinct from literally transcribed.

And here, there's not a literal transcription being presented.  It is an interpretation of the words in the -- on the recording.

I don't think there's anything wrong with that.  I don't think -- I think that both sides had an

opportunity -- the defendant had an opportunity to bring out the fact that there was reliance upon gang members consultation, reliance upon law enforcement members consultation, for words.  And that certainly goes to weight and not to admissibility.

And as it relates to the issue of *Crawford* and whether or not there is some *Crawford* violation here, first of all, *Crawford* requires, I think, custody, and also requires that you're offering words that are testimonial.

I don't think there's anything testimonial about the consultation between the linguist and gang members, such that you have gang members testifying. The gang members are not here subject to cross-examination.  That is true.

However, the witness who is offering an opinion based upon her familiarity with the Spanish language or familiarity with MS-13 cases, besides this case, and other cases involving gang members, and their experience, is not the same as wholesale reporting that gang member Drowsy said so and so, and that is the gospel in this case.

It's not what she said.  What she did was she drew upon law enforcement, she drew upon gang members, she grew upon her knowledge and she drew upon

1    reliance -- consultation with other linguists to

2    formulate an opinion about the meaning of words.

3              That does not implicate *Crawford* one bit in

4    my mind, and I remain to be persuaded otherwise.  But I

5    do not see any basis for any *Crawford* issue, where the

6    expert draws an opinion on their own that they're

7    prepared to testify to in court to a reasonable degree

8    of certainty in their field; and this interpretation is

9    one that is relied upon by the expert giving her

10   opinions here in court.

11             So to be clear, my judgment is that, first,

12   that the transcriptions that have been offered are the

13   government's interpretation of the words on the

14   recording.

15             I'm prepared to strike the word "verbatim."

16   It's Latin, and we can take that off.  But the bottom

17   line, they're transcripts, and I will grant it to remove

18   the word "verbatim."

19             But, I think that the evidence already shown

20   that they're not word-for-word interpretations.  Word

21   for word would not make any sense, just as Mr. Zimmerman

22   pointed out, about using the word white house.  It would

23   have to be an interpretation.  That's what has been

24   offered.

25             The disclosures are more than sufficient,

particularly when you consider the summary, the
transcript, as well as the CVs we have been provided,
And I do not find any violations.

So, for those reasons, the motion to exclude
the transcripts and to strike transcripts will be
denied.

And I note, also, with respect to the
so-called *Crawford* issue, that what we're talking about
here is whether the tapes themselves, which have words
from different co-defendants, somehow would be
excludable because they are being offered against these
individuals.

But co-conspirator's declarations are
admissible.  Admissions are admissible.  In this case,
the statements on the tapes themselves would fall within
both categories.

So the motion is denied.

And, also, I think I said this before in the
order, in the written order, and I'll say it again, if
the defense has some witness that you want to call who
is a linguist who wants to testify that these
interpretations are wrong, call them, as long as you
provide the proper information to the government.

That, to me, is a question of fact for the
jury in any event.

1          Let's bring the jury back and we'll break
2     for lunch.
3          And let me give -- Ms. Bull, can you mark
4     this for the record?
5          I need to give it back to Mr. Aquino.  Mark
6     it as Exhibit A in connection with his motion to strike.
7          (Jury present at 1:04 p.m.)
8          THE COURT:  You may be seated.
9          All right, ladies and gentlemen, I've
10    addressed a matter with counsel.  So what I'm going to
11    do now is recess for lunch for one hour.
12         I remind you not to discuss the case.  Don't
13    permit the case to be discussed in your presence.  And
14    leave your notes in the jury deliberation room.  Leave
15    the notebooks here in the courtroom.
16         We'll resume at 2:05.  Thank you.
17         (Jury not present.)
18         THE COURT:  So, before the exhibits go back,
19    take the word "verbatim" off of them.
20         MS. MARTINEZ:  We will, Your Honor.
21         May I just address that point?
22         THE COURT:  Yes.
23         MS. MARTINEZ:  With respect to the
24    transcripts that the jurors are looking at, would Your
25    Honor like us to also redact the word "verbatim" from

1    all the books that the jurors have?

2                THE COURT:  You have an hour to do it.  That

3    would be great.  Just use a black marker to do that.

4                MS. MARTINEZ:  I wasn't actually suggesting

5    we do it right this moment, Your Honor.  I just --

6                THE COURT:  Oh.  What are you suggesting?

7                MS. MARTINEZ:  What I was going to suggest

8    is that we be allowed to collect them at the end of the

9    day and take them and redact them appropriately.

10               But what I wanted to note is, I have not

11   seen any jurors writing in them.  But if we were going

12   to do that, the last thing we would want would be to be

13   taking any sort of juror notes.

14               THE COURT:  I don't know if they wrote in

15   them or not.  I don't think I told them to write in them

16   or not.

17               MS. MARTINEZ:  I haven't seen anyone doing

18   that.  And we've only gone through just the one

19   transcript.  But I just want to raise that as an issue.

20               THE COURT:  Well, I could ask them when they

21   come back --

22               MS. MARTINEZ:  Yes, Your Honor.

23               THE COURT:  -- if anyone has taken notes.

24               MS. MARTINEZ:  And then, perhaps Your Honor

25   could suggest that they not take notes today, and then

1    we can take them back tonight and bring them back fresh

2    Thursday morning, with all the appropriate redactions.

3              THE COURT:  Well, why don't I just tell them

4    not to take any notes in the notebook themselves?

5              MS. MARTINEZ:  Yes, Your Honor.

6              THE COURT:  Okay.  Thank you.  2:05.

7              (Court recessed at 1:07 p.m. and reconvened

8              at 2:10 p.m.)

9              THE COURT:  You can bring our jury out,

10   Mr. Toliver.  Thank you.

11             (Jury present.)

12             THE COURT:  You may be seated.

13             Ladies and gentlemen, before we go back to

14   the notebooks, I want to make sure, you should not write

15   in the notebooks.  Do not write in the notebooks.  You

16   can take notes on your pads.

17             We need the witness back.

18             (Witness resumed stand.)

19             THE COURT:  You may proceed.

20              DIRECT EXAMINATION (Continued)

21   BY MS. MARTINEZ:

22    Q.   Before the lunch break, we were about to play

23   another clip.

24             MS. MARTINEZ:  Your Honor, with the Court's

25   permission, may we publish Government's Exhibit 3-B, and

1    also refer the -- the jurors to Government's

2    Exhibit 3-B-1?

3              THE COURT:  Yes.

4    BY MS. MARTINEZ:

5      Q.   Mr. Rosales, I would like you to listen to this

6    recording.

7              (Audio played.)

8              THE COURT:  I don't want you to go through

9    that again.  That was so garbled I couldn't tell what

10   was -- I couldn't hear anything except garble.  Maybe if

11   you turn the speaker down or something.  It was just so

12   loud that you could barely even make out -- it was more

13   than one person speaking.

14             MS. MARTINEZ:  Yes, Your Honor.  We can

15   adjust the speaker and hopefully that will be a little

16   bit better.

17             THE COURT:  All right.  I'm not asking you

18   to play it again, because there will be a chance to read

19   it.

20   BY MS. MARTINEZ:

21     Q.   Mr. Rosales, were you able to understand that?

22     A.   A little bit.

23     Q.   Were you able to hear the voices?

24     A.   Yes.

25     Q.   Were you able to identify the voices?

1    A.   Yes.

2    Q.   What voices did you hear?

3    A.   Those of Payaso and Poison.

4    Q.   Were you involved in this conversation at all?

5    A.   No.  At that time, I wasn't there.

6    Q.   And you said in -- "at that time," what do you

7    mean by that?

8    A.   Well, what I mean is when Payaso and Poison were

9    talking, I was not involved in that conversation.

10   Q.   And for the record, to clarify, which Poison are

11   we talking about?  Big Poison or Lil Poison?

12   A.   Big Poison.

13   Q.   In El Salvador?

14   A.   Yes.

15   Q.   What were they talking about?

16   A.   They were talking about some business that Payaso

17   had carried out with Poison.

18   Q.   What business?

19   A.   Having to do with drugs.

20   Q.   Was there discussion of money?

21   A.   Yes.

22   Q.   What was that about?

23   A.   That was about sending some money to some homies

24   in Los Angeles.

25   Q.   For what purpose?

1           MR. LEIVA:  Your Honor, if I may, I object.

2    This gentleman said that he wasn't in on the

3    conversation.  He could barely hear, or understood just

4    a little bit of it.  So I guess it would be a lack of

5    foundation.  He's also speculating at this point.

6           MS. MARTINEZ:  Your Honor, I can lay a

7    foundation that I'm asking based on either his personal

8    knowledge or his understanding of this recording.  But,

9    he -- he was actually able to hear the recording, I

10   believe he said.

11          THE COURT:  I guess my question is:  Are you

12   proffering this witness as the interpreter of this

13   conversation, or are you proffering him as a person who

14   identified the speakers on the tape?

15          MS. MARTINEZ:  I'm proffering him as a

16   person who identified the speakers on the tape.  But in

17   addition of that, he had personal knowledge of the

18   speakers and of the subject matter which they are

19   discussing, so he's in a position to be able to explain

20   that subject matter.

21          The speakers are, of course, other gang

22   members, other members of his clique with whom he was

23   involved, and he was involved in this business they were

24   discussing.

25          THE COURT:  All right.  Objection sustained.

BY MS. MARTINEZ:

Q.   We'll move on to --

          MS. MARTINEZ:  Your Honor, with the Court's permission, we would like to publish another clip.  I hope it will be --

          THE COURT:  All right.

          MS. MARTINEZ:  -- audible for this witness and for the Court as well.

          The clip is Government's Exhibit 3-C.  And I would direct the jurors in their transcript binders to 3-C-1.

          (Audio played.)

BY MS. MARTINEZ:

Q.   Were you able to hear that recording?

A.   Yes.

Q.   What voices did you hear in that recording?

A.   Those which spoke were Payaso, Drowsy, Nocturno, and I.

Q.   What were you talking about?

A.   It was about getting an apartment.  We were going to be bringing some prostitutes from New York, so we could set them up there.

Q.   What was the purpose of the apartment?

A.   The purpose was to have them there and to be able to carry business with them through the cellphone.

1    Q.   What kind of business?

2    A.   Well, practically, to sell, to sell the

3    prostitutes.

4    Q.   What were you going to do with the money from

5    selling the prostitutes?

6    A.   We were going to use it for the clique.

7              MS. MARTINEZ:   Your Honor, with the Court's

8    permission, I'd like to publish now Government's

9    Exhibit 4-B.

10             And I direct the jury's attention to the

11   transcript at 4-B-1.

12             THE COURT:   All right.

13             (Audio played.)

14   BY MS. MARTINEZ:

15   Q.   Were you able to understand that recording?

16   A.   Yes.

17   Q.   Who was speaking in that recording?

18   A.   Payaso and I.

19   Q.   What were you talking about?

20   A.   We were talking about how to get a fine edge on

21   the machete.

22   Q.   What machete?

23   A.   The machete we're going to use in order to

24   kill -- to murder Peligroso.

25             MS. MARTINEZ:   Your Honor, we'd now like to

1    publish Government's Exhibit 4-C.

2              And direct the jurors' attention to the

3    transcript at 4-C-1.

4              THE COURT:  All right.

5              (Audio played.)

6    BY MS. MARTINEZ:

7       Q.   Were you able to hear that recording?

8       A.   Yes.

9       Q.   Whose voices did you hear?

10      A.   The first voice that was heard was that of

11   Greñas.  Then the second person who spoke was Payaso.

12   And the third person who spoke was a person you wanted

13   me to refer to as homeboy number one.

14             MS. MARTINEZ:  Your Honor, may we approach

15   briefly?

16             THE COURT:  Yes.

17             (Thereupon, the following side-bar

18   conference was had:)

19             THE COURT:  Yes.

20             MS. MARTINEZ:  Your Honor, this witness has

21   an excellent memory.  We discussed Your Honor's ruling

22   about referring to Lil Poison as homeboy one.  We would

23   actually -- I had decided to -- he's talking now about

24   the attempted murder, which is actually related to Your

25   Honor's ruling.  He knows a little bit about the first

1    murder.

2              And I -- I didn't actually think it was

3    going to be necessary for him to use the pseudonyms, but

4    his memory is very good and he recalled that we asked

5    him to do that.

6              I don't see any harm here, but I would ask

7    that Your Honor simply instruct the jury that it was

8    appropriate for him to use the pseudonym in that

9    instance, or something along those lines.

10             MR. CRAWLEY:  My concern, Your Honor, on

11   behalf of Mr. Cerritos, is that at this point, going

12   forward, they have to refer to him as homeboy number one

13   to identify him.

14             When you used the context of that call, as

15   Lil Poison, it jeopardizes everything that we had

16   discussed, because going forward, if they're going to

17   talk about the Lagrima murder, and they link homeboy

18   number one from this call -- this particular witness --

19   and the Lagrima murder, they're going to show the

20   connection between him and Lil Poison as being the same

21   person.

22             So --

23             THE COURT:  I'm not understanding.

24             MR. CRAWLEY:  Okay.

25             THE COURT:  Is homeboy number one Lil

1   Poison?

2           MR. CRAWLEY:  Exactly.  So that's going to

3   be the issue here.

4           THE COURT:  Okay.

5           MR. CRAWLEY:  Cerritos, Lil Poison, AKA

6   Guasón, those are the three nicknames.

7           THE COURT:  Okay.

8           MR. CRAWLEY:  So, our concern is that going

9   forward, each witness, in particular this witness, has

10  to now refer to him as homeboy number one, than to refer

11  to him as Lil Poison.

12          Going forward, the jury, in looking at those

13  transcripts, can again go back and see a connection and

14  assume that that's the same person.  That's going to be

15  the problem we're facing.

16          THE COURT:  So your suggestion is what --

17          MR. CRAWLEY:  That he has to, going

18  forward --

19          THE COURT:  Refer to him as homeboy number

20  one.

21          MR. CRAWLEY:  And if he calls him anything

22  else, we would move for a mistrial.

23          MS. MARTINEZ:  Your Honor, I'm not sure I

24  entirely understand the suggestion.

25          Certainly, this witness should be able to

1    name their client in different contexts, when he -- as

2    he did earlier in his testimony, when he said he knew

3    him as a *chequeo*, he knew that he was jumped in as a

4    homeboy.  None of that is related -- is related to Your

5    Honor's ruling.

6             If -- I think that the concern is -- I

7    didn't expect him to use the pseudonym right now, and he

8    did.  And, the transcript does identify to Mr. Crawley's

9    client.  So I do think that there is some concern that

10   Mr. Crawley justifiably raises, that the jury may

11   connect homeboy one to the name in the transcript.

12            If I may make -- if I may make a suggestion,

13   we haven't used pseudonyms yesterday, and only used them

14   among ourselves.  None of our other witnesses have

15   testified yet, who are going to use that.  That would

16   be -- we could instruct our witnesses to use different

17   pseudonyms to avoid this issue altogether.

18            This is -- in this current context, where

19   this pseudonym was used, we're not talking about the

20   Lagrima murder.  The witness just came out with it.

21            I think we could go to homeboy, homeboy two

22   or three, and some type of pseudonym instead of homeboy

23   one, including the homeboy one, as an isolated incident

24   where Mr. Crawley's client is identified in the

25   transcript, because he can be identified in the

1    transcript.  The transcript is not about Lagrima.

2                MR. CRAWLEY:  That's the problem, Your

3    Honor.  I've been looking over at the jury.  They're

4    clearly looking at the handbook that the Court gave them

5    to review the transcript.

6                My concern is, in speaking with co-counsel,

7    that they've already established that Lil Poison is the

8    person, because each individual lead sheet -- meaning

9    every time you get to a transcript, there's a lead sheet

10   that basically identifies the speakers.  It gives an

11   initials and, his case, it's DC, for Douglas Cerritos, I

12   would assume.

13               Once you do that, you draw the connection,

14   Douglas Cerritos, then it says Lil Poison, Poison,

15   Payaso, gives the other names of the other individuals.

16   Now they're going to assume, and they're going to

17   basically draw a conclusion that is correct, that that

18   person, homeboy number one, is, in fact, Lil Poison, is

19   in fact, Douglas Cerritos.

20               So, at this point, they're going to be

21   confused as to why, now, are they calling him something

22   else.  That was never the nickname.  And why would the

23   government instruct them to call him by another --

24   another name?

25               MS. MARTINEZ:  So, Your Honor, the

1    suggestion would be that we scrap "homeboy one" as the

2    pseudonym for Mr. Crawley's client.  It was used only in

3    the one instance.

4           With respect to all other witnesses, with

5    respect to Mr. Crawley's client's involvement in the

6    Lagrima murder, we would use a new pseudonym, so there

7    is no taint with respect to the use of the pseudonym in

8    this instance.

9           MR. CRAWLEY:  Your Honor, we also -- not to

10   go back in time, but as the Court is aware, on the first

11   day when the jury was impaneled and the Court read the

12   instructions, the Court mistakenly -- and I acknowledged

13   that and the Court accepted that -- the Court mistakenly

14   indicated that our client was charged in that count,

15   Count 4.

16          Now, we add this on top of it, it will

17   destroy any ability, in our opinion, for this jury to be

18   impartial and unbiased as it relates to Mr. Cerritos.

19   They will draw the conclusion that he is, in fact, an

20   uncharged person in another crime, and that is going to

21   be prejudicial to him.

22          So, therefore, we're asking the Court to

23   declare a mistrial as it relates to Mr. Cerritos.

24          THE COURT:  All right.

25          Well, first, I'm going to deny the motion

1    for mistrial.

2              I will adopt the suggestion that we change

3    the name from homeboy one to homeboy three or four,

4    whatever, three or four, I think it is probably going to

5    be.

6              And with respect to the issue about my only

7    mistake in the instructions, bear in mind, it's a

8    six-week trial.  I did give the jury some overview of

9    what the charges were, and the instructions, so that

10   they would know what they were listening for four to six

11   weeks, and they will receive a separate instruction at

12   the end of the case, along with the verdict form.

13             And I told the jury, they have to consider

14   the evidence against each individual individually.

15   Under those circumstances, the issue of prejudice to Mr.

16   Cerritos is minimal, and so the motion for mistrial will

17   be denied.

18             And we will change the pseudonym to homeboy

19   four.

20             MS. MARTINEZ:  Three, I think, Your Honor,

21   would be appropriate.  Because it's two of them.  So it

22   would be two and three.

23             If Your Honor would simply instruct the jury

24   that it should draw no inference by the use of the

25   pseudonym in the previous --

1              THE COURT:  I can do that.

2              MR. AMOLSCH:  I'm sorry.  This isn't my

3    motion, but we attached to the homeboy one, homeboy two,

4    issue.  Mr. Cerna is homeboy two.  And during her

5    opening, government's opening, they didn't use any of

6    the pseudonyms.  They said "others."  Okay?

7              So I would suggest -- we weren't able to

8    deal with that in opening -- as opposed to adopting, you

9    know, homeboy three, six, seven, whatever number we're

10   going to get to, that they just don't use the words

11   "homeboy," that they can say "others."  That's what they

12   referenced in the opening.  It's how they presented the

13   case to the jury.

14             We weren't able to respond in any kind of

15   meaningful way, because we didn't know what the opening

16   was going to be.  But they already laid the groundwork

17   for that.  This is already how they presented their case

18   to the government, without the use of any pseudonyms one

19   way or the other.

20             And as I understand, the homeboy two issue,

21   we're going to, you know -- I don't know what number

22   we're going to get to, if they make a mistake again.

23             THE COURT:  It's called a trial -- it's

24   called practice for a reason.  Opening statements are

25   not evidence.

```
 1              Motion denied.  Thank you.
 2              (Thereupon, the side-bar conference was
 3   concluded.)
 4              THE COURT:  Ladies and gentlemen, during the
 5   trial from time to time, you may have witnesses referred
 6   to as homeboy one, two, or three.  That is based on my
 7   instruction to the witnesses to use those pseudonyms.
 8              It's not necessary for you to focus on that
 9   as much as it is to focus on the information being
10   conveyed, and that is based on my instructions to the
11   witnesses.
12              Thank you.
13   BY MS. MARTINEZ:
14      Q.   Mr. Rosales, we had a bit of break there, but do
15   you remember the recording that you just listened to?
16      A.   Yes.
17      Q.   What was being discussed in that recording?
18      A.   They were talking -- we were talking about how to
19   sharpen the machete.
20      Q.   What machete?
21      A.   The one we were going to use to kill Peligroso.
22      Q.   On the night that you went out with the others to
23   kill Peligroso, you said that you drove to Woodbridge;
24   is that right?
25      A.   Yes.
```

J. Villegas - Direct

1    Q.   Who drove?

2    A.   I was.

3    Q.   What car?

4    A.   My car.

5    Q.   Who else was in the car with you that night?

6    A.   Greñas was there, Drowsy, and Marciano and I.

7    Q.   Who was in the front passenger seat?

8    A.   Greñas.

9    Q.   Of the three of the passengers you had that

10   night, who did you pick up first?

11   A.   I picked up first Greñas and Marciano.

12   Q.   Where did you pick up Greñas and Marciano?

13   A.   I picked them up in the clique area, Culmore.

14   Q.   What happened when you arrived in the clique area

15   in Culmore that night?

16   A.   Well, I went to that place to pick them up, and

17   with them was the other machete that was put in my car.

18   Q.   You mentioned earlier that Greñas also put a

19   firearm in your car; is that right?

20   A.   Yes.

21   Q.   When did that happen?

22   A.   When the machete was put in.

23   Q.   Did you -- were you able to see where he got the

24   machete and the firearm before -- immediately before

25   putting them in your car?

1      A.   He had them hidden there in the bushes near the

2  apartment.

3      Q.   What did they look like when you first saw them?

4      A.   Repeat the question, please.

5      Q.   What did the weapons look like when you saw them

6  that night?

7      A.   The weapons could not be seen.  They were wrapped

8  in something.

9      Q.   What, if anything, did Greñas say about the

10 weapons that were wrapped in something?

11     A.   That the machete was there, and that we would

12 hide it in the trunk.

13     Q.   What, if anything, did he say about the firearm?

14     A.   That he had the -- we referred to the weapon

15 sometimes as the toy.

16     Q.   Where did he put the firearm and the machete?

17          Where in your car did he put them?

18     A.   Well, as far as the weapon, in my car, the back

19 seat can be put forward, and there's a space there.  And

20 that's where it was put.

21     Q.   Were there any other gang members around when you

22 picked up Greñas and Marciano?

23     A.   There were -- there was some around there --

24 well, Skinny was there, but not together with us.

25     Q.   Who is Skinny?

1     A.   He's another member of Park View.

2     Q.   Do you know him by any other name?

3     A.   No, just Skinny.

4     Q.   After you picked up Greñas and Marciano and the

5  weapons, where did you go next?

6     A.   After that, I went towards Woodbridge to pick up

7  Drowsy.

8     Q.   Where did you pick up Drowsy?

9     A.   I picked up Drowsy at 7-Eleven in Woodbridge.

10    Q.   After you picked up Drowsy at the 7-Eleven, where

11  did you go?

12    A.   After that, Drowsy told me how to get to the

13  school where Peligroso was.

14    Q.   And where did you go?

15    A.   We went towards the school.

16    Q.   What happened after you arrived at the school?

17    A.   Well, we went into the school, into the parking

18  area of the school, and we parked there about five

19  minutes.

20    Q.   What did you do after those five minutes?

21    A.   At that point, when we saw there was a patrol

22  car, we went back.

23    Q.   What happened next?

24    A.   Well, after that, the patrol car followed us and

25  put on the lights for us to stop.

1    Q.   What happened next?

2    A.   At that point, we parked at a Taco Bell parking

3    area and we were arrested.

4    Q.   With the help of the court security officer, I'd

5    like to show you what has been previously admitted as

6    Government's Exhibit 86-C.

7              MS. MARTINEZ:   Your Honor, since it's been

8    admitted, may we publish for the jury?

9              THE COURT:   Yes.

10             (Exhibit published.)

11   BY MS. MARTINEZ:

12   Q.   Do you recognize the person in this picture?

13   A.   Yes.

14   Q.   Who is it?

15   A.   That's me.

16   Q.   Do you recognize the car?

17   A.   That car belonged to someone who was there in the

18   parking lot.

19   Q.   What parking lot?

20   A.   The Taco Bell parking lot.

21   Q.   Do you know when this picture was taken?

22   A.   No -- I think it was when I was arrested.

23             MS. MARTINEZ:   Can we go now to

24   Government's Exhibit 86-B, please, that has been

25   previously admitted.

1          May we publish, Your Honor?

2          THE COURT:  Yes.

3          (Exhibit published.)

4    BY MS. MARTINEZ:

5      Q.  Do you recognize this person?

6      A.  Yes.

7      Q.  Who is this?

8      A.  That's Greñas.

9          MS. MARTINEZ:  Could we please show the

10   witness Government's Exhibit 35?  It has been previously

11   admitted.  We will show him the original version of

12   that.  It's the notebook.

13   BY MS. MARTINEZ:

14     Q.  You can go ahead and take that exhibit out of

15   there so you can see it.

16         Do you recognize that?

17     A.  Yes.

18     Q.  What is it?

19     A.  It's a notebook.

20     Q.  Have you seen it before?

21     A.  Yes.

22     Q.  Where have you seen it before?

23     A.  When we -- it was in my car.

24     Q.  Had you seen it before the night that it was in

25   your car?

1    A.   Yes.

2    Q.   Where had you seen it before that night?

3    A.   A member of my gang had it.

4    Q.   What member?

5    A.   Bago.

6    Q.   That's Leopardo, who we talked about earlier?

7    A.   Yes.

8              MS. MARTINEZ:  Your Honor, may we publish

9    various pages from this notebook as I refer to them?

10   The notebook has previously been admitted.

11             THE COURT:  Yes.  Lay a foundation for this

12   witness when you do that, though.

13             MS. MARTINEZ:  Yes.

14   BY MS. MARTINEZ:

15   Q.   We're going to start with just the cover page.

16        Have you seen the outside of this notebook

17   before?

18   A.   Yes.

19   Q.   Can you read the name on the outside of it?

20   A.   Yes.

21   Q.   What is the name?

22   A.   It says Christian Jose -- Josue Lemus.

23             MS. MARTINEZ:  And, Mr. Toliver, could we

24   hand him the photocopy that has the page numbers.

25             What I'll do is ask him to look at a page

1   and lay that foundation before we publish that page to

2   the jury, if that's acceptable, Your Honor.

3           THE COURT:  It is.

4   BY MS. MARTINEZ:

5       Q.  Do you have in front of you a photocopy of that

6   notebook?

7       A.  Yes.

8       Q.  Do you see that there are page numbers on your

9   photocopy, off on the side?

10          (No response.)

11          Do you see where the page numbers are?

12          (No response.)

13          If you're looking at it right side up, on the

14   right side of the pages there's a number.  Do you see

15   that?

16      A.  I don't see any numbers.

17      Q.  Okay.  Let's start with the first page, the very

18   cover page.

19          Can you look at the cover page, please, with the

20   exhibit sticker on it.  Do you see that page?

21          (No response.)

22          Do you see the very small number on the right

23   side of the page?

24          Do you see that?

25      A.  Yes.

1    Q.   What's the number on that first page?

2    A.   35.

3    Q.   That's the exhibit number, yes.  You're right.

4         Much smaller, and way on the side of the page, it

5    says "001."  Do you see that?

6    A.   It says here, 306.

7    Q.   Not on the yellow sticker.  On the side of the

8    piece of paper, the right side, the right edge, in the

9    middle.

10   A.   Would it this be one?

11   Q.   Does it say 001?

12   A.   It just has the number "1."

13   Q.   Okay.  Good.  So that's the number "1" for page

14   one.

15        If you look at the other pages, do you see that

16   there's a number on the other pages in the same

17   location?

18   A.   Yes.

19   Q.   When I talk about a page, I'm going to say that

20   number, and I want you to flip to that page so you can

21   see that page, okay?

22   A.   Okay.

23   Q.   Now, first of all, have you seen inside of this

24   notebook before?

25   A.   No, I hadn't seen inside the notebook before.

1    Q.   Have you seen any of the inside?

2         Let's go to one page and see if you've seen that

3    before; page 57, please.

4              MR. JENKINS:  Objection, Your Honor.  I

5    believe the witness has already answered he hasn't seen

6    the inside of the notebook.

7              MS. MARTINEZ:  I believe he's referring to

8    whatever page he was looking at, Your Honor.

9              THE COURT:  Overruled.

10   BY MS. MARTINEZ:

11   Q.   Let me know when you get to page 57.

12   A.   Yes, I'm here.

13   Q.   Have you seen that page before?

14   A.   Yes.

15   Q.   Where have you seen it before?

16   A.   I saw this when I was shown the evidence that

17   they had against me.

18             MR. JENKINS:  Same, objection, Your Honor.

19   BY MS. MARTINEZ:

20   Q.   Prior to seeing it -- are you talking about your

21   attorney?

22   A.   Yes.

23   Q.   Had you seen this page before your attorney

24   showed it to you?

25   A.   Not before.

1      Q.   I see.

2               THE COURT:  Objection sustained.

3  BY MS. MARTINEZ:

4      Q.   Are you able to tell what you're looking at on

5  that page?

6               MR. JENKINS:  Objection, Your Honor.

7  Objection, Your Honor.

8               MS. MARTINEZ:  Laying a foundation, Your

9  Honor.  I think we can probably still talk about it.

10  But I'm not going to ask what's in there until I lay a

11  foundation.

12               THE COURT:  No, you can't do that.

13  Objection sustained.

14               MS. MARTINEZ:  No problem.

15  BY MS. MARTINEZ:

16      Q.   Other than -- so, you said that you saw this on

17  the night that you were arrested; is that right?

18      A.   Yes.

19      Q.   You said that you saw it before the night that

20  you were arrested; is that right?

21      A.   Yes.

22      Q.   With Leopardo?

23      A.   Yes.

24      Q.   Where do you recall seeing Leopardo with this

25  notebook?

1    A.   I saw it at one point in the territory of Park

2    View.

3    Q.   Where in the territory of Park View?

4    A.   In Culmore.

5    Q.   What was he doing with the notebook?

6    A.   He -- he had it, I think, when the members --

7    when he was writing down when the members had their rent

8    that we were turning in.

9    Q.   Were you able to see him writing down --

10            MR. JENKINS:   He said "I think," Your Honor.

11   It calls for speculation.

12            THE COURT:   Foundation.

13   BY MS. MARTINEZ:

14   Q.   Were you able to see him writing in this

15   notebook?

16   A.   Yes.

17   Q.   What was happening when he was writing in the

18   notebook?

19   A.   He was writing down every member who was giving

20   him money.

21            MS. MARTINEZ:   Your Honor, may we publish a

22   page based on that foundation?

23            THE COURT:   Yes.

24            MS. MARTINEZ:   Permission to publish page

25   57.

```
 1                   THE COURT:  You may.
 2                   (Exhibit published.)
 3    BY MS. MARTINEZ:
 4       Q.  Can you look at page 57, either in your notebook
 5    or on the screen there.
 6            Do you know what this is on the right-hand side
 7    of the page?
 8       A.  Yes.
 9       Q.  What is it?
10       A.  These are the names of each of the members of the
11    gang, and the accounting of the person who is giving the
12    money.
13       Q.  Who is the first member listed?
14       A.  Me.
15       Q.  Who is the second member listed?
16       A.  Bago.
17       Q.  Is that the same Bago, Leopardo, we talked about
18    today?
19       A.  Yes.
20       Q.  Who is the third member?
21       A.  Silencio.
22       Q.  Who is the next member after Silencio?
23       A.  Little Pesadilla.
24       Q.  And looking at --
25                   MS. MARTINEZ:  And we won't go through every
```

1    single one for the record.

2    BY MS. MARTINEZ:

3       Q.   But looking at those names, is anyone on that

4    list not a homeboy at that time?

5       A.   No.  Here, everyone who is in this list was a

6    homeboy.

7            MS. MARTINEZ:  Your Honor, may we publish

8    page 58, the next page?

9            THE COURT:  Foundation?

10           MS. MARTINEZ:  The same foundation that we

11   laid previously, Your Honor, that he saw the defendant

12   writing in this notebook while dues were being collected

13   and noting who paid dues.

14           THE COURT:  All right.  You may publish.

15           (Exhibit published.)

16   BY MS. MARTINEZ:

17      Q.   Do you see page 58?

18      A.   Yes.

19      Q.   Do you know what that is on the top left-hand

20   side of the screen?

21      A.   Yes.

22      Q.   What is it?

23      A.   These are the names of the homeboys and the

24   accounting for the money that was being given.

25      Q.   Do you know what it is that appears below the

1    list of the homeboys and the accounting of the money?

2       A.   Yes.

3       Q.   What is it?

4       A.   It is the M and the S.

5       Q.   What is the significance of the M and the S?

6              MR. LEIVA:  Excuse me, sir.  I'm going to

7    object, Your Honor.  He's not the author of this ledger.

8              THE COURT:  I couldn't hear you.

9              MR. LEIVA:  I'm going to object.  He's not

10   the author of this ledger.  She asked the significance

11   of those two letters.

12             THE COURT:  Okay.

13             MS. MARTINEZ:  He's testified that he's a

14   gang member.  He's testified the name of the gang.  He's

15   testified about how the gang represents himself --

16   itself.  He's basing this on his own experience as a

17   gang member, Your Honor.

18             THE COURT:  Objection overruled.

19   BY MS. MARTINEZ:

20      Q.   What is the significance of the two letters, the

21   M and the S?

22      A.   The meaning is -- it means Mara Salvatrucha,

23   La Mara Salvatrucha.

24             MS. MARTINEZ:  Your Honor, may we publish

25   the next page, 59, on the same foundation?

1              THE COURT:  Yes.

2                  (Exhibit published.)

3    BY MS. MARTINEZ:

4       Q.  Do you recognize -- do you understand what this

5    signifies?

6       A.  Yes.

7       Q.  Let's start with the right-hand side.  Do you

8    know what the letters signify?

9       A.  Yes.  The M and the S and the other ones are the

10   initials for the clique.

11      Q.  What are the initials for the clique?

12      A.  It's PVLS.

13      Q.  Do you know what the drawing signifies?

14      A.  Yes.

15      Q.  What do they signify?

16      A.  It's the sign that we use for -- I mean, for our

17   gang.

18      Q.  Can you show the jurors that sign?

19      A.  Yes.

20      Q.  Please do.

21      A.  (Indicating.)

22              MS. MARTINEZ:  Your Honor, for the record,

23   the witness is holding up his index and pinky fingers.

24   His middle fingers are being held by his thumb, bent

25   down.

```
 1                   THE COURT:  So noted.
 2                   MS. MARTINEZ:  Your Honor, may we publish
 3     one more page, page 60, on the same foundation that's
 4     been laid previously?
 5                   THE COURT:  Yes.
 6                   (Exhibit published.)
 7     BY MS. MARTINEZ:
 8     Q.   Do you see page 60?
 9     A.   Yes.
10     Q.   Do you know what the things on this page signify?
11     A.   Yes.
12     Q.   Let's start with the left-hand side.  What does
13     that signify?
14     A.   These are the M and the S and the "1" and the
15     "3."
16     Q.   What does that signify?
17     A.   It's Mara Salvatrucha.
18     Q.   On the right side, what is that?
19     A.   It is the same as the M and the S.
20     Q.   What is the drawing?
21     A.   Represents the beast.
22     Q.   What is the beast?
23     A.   The devil.
24     Q.   Why is that significant to MS?
25     A.   I'm sorry.  Could you repeat the question.
```

1    Q.   Why is the beast or the devil significant to the

2    gang?

3    A.   The devil has the meaning for us in that we go

4    around doing the bad things.

5    Q.   You've mentioned Lagrima several times during

6    your testimony.  With just a "yes" or a "no," do you

7    know what happened to Lagrima?

8    A.   Yes.

9    Q.   How do you know what happened to Lagrima?

10   A.   Because a member of my clique told me.

11   Q.   What member?

12   A.   Greñas.

13   Q.   When did Greñas tell you?

14   A.   At one time when they transported us over here to

15   Alexandria.

16   Q.   When you say "Alexandria," are you referring to a

17   jail?

18   A.   Yes.

19   Q.   Was this conversation with Greñas before or after

20   you began cooperating with the government?

21   A.   It was before -- before I started to cooperate

22   with the -- with the -- I mean with the government.

23   Q.   What did Greñas tell you happened to Lagrima?

24   A.   That they had killed him.

25            MS. MARTINEZ:  No further questions, Your

1    Honor.

2                MR. JENKINS:  May counsel proceed?

3                THE COURT:  You may proceed.

4                        CROSS-EXAMINATION

5    BY MR. JENKINS:

6        Q.   Good afternoon, sir.

7        A.   Good afternoon.

8        Q.   You have -- before yesterday, when you came into

9    court, you had previously met with the assistant United

10   States attorney, Ms. Martinez, who was just asking you

11   questions, correct?

12       A.   Yes.

13       Q.   In fact, you had several meetings with her,

14   correct?

15       A.   Yes.

16       Q.   How many meetings would you say you had with her?

17       A.   I think it was like, like two, two or three

18   instances.  I don't remember very well.

19       Q.   Did you have any other meetings with members of

20   the United States Attorney's Office other than

21   Ms. Martinez?

22       A.   Yes.

23       Q.   How many of those meetings did you have?

24       A.   There were like four instances.  I don't remember

25   very well; like about four.  I don't remember quite

J. Villegas - Cross

1    exactly.
2        Q.   Is that four total, or is that four without
3    Ms. Martinez being present?
4        A.   Without Ms. Martinez being present.
5        Q.   I'm sorry, with or without?
6        A.   Without.
7        Q.   Without.
8             And, you had three with her, correct?
9        A.   Yes.
10       Q.   So based on what you recall, you had about seven
11   meetings, seven of these meetings, correct?
12       A.   Yes.
13       Q.   And am I correct that the first of these meetings
14   occurred back in November of 2015?
15       A.   Um, I don't remember the date, the first date in
16   which I met with them.
17       Q.   Would I be correct in saying that the first
18   meeting occurred before Christmas of 2015?
19       A.   No, it was afterwards.
20       Q.   It was after Christmas?
21       A.   Yes.
22       Q.   Between that first meeting -- when is the last
23   time before yesterday you met with Ms. Martinez?
24       A.   That was in -- the last time that I met with her,
25   that was this month of March.

J. Villegas - Cross                                         141

1    Q.   And, during all of these meetings that you had

2  with Ms. Martinez and other members of the United States

3  Attorney's Office, am I correct that members of the

4  United States Attorney's Office asked you a series of

5  questions, much as she did today?

6    A.   Yes.

7    Q.   They asked you questions about your involvement

8  with the gang, correct?

9    A.   Yes.

10    Q.   They asked you about your knowledge of what you

11  call the Peligroso assassination?

12    A.   Yes.

13    Q.   They asked you about my client, Mr. Lopez Torres,

14  correct?

15    A.   Yes, correct.

16    Q.   And they asked you about a number of other

17  members of the gang, correct?

18    A.   Yes.

19    Q.   And, you provided them answers to those

20  questions, correct?

21    A.   Yes.

22    Q.   And, in fact, during these series of meetings,

23  you were asked the same question more than once,

24  correct?

25    A.   Yes.

J. Villegas - Cross

1    Q.   And, in fact, many of the questions that

2    Ms. Martinez asked you today, she had previously asked

3    you during those meetings, correct?

4    A.   Yes.

5    Q.   And the same is true concerning the questions she

6    asked you on yesterday, correct?

7    A.   Yes.

8    Q.   So, is it fair to say that when you came in here

9    on yesterday, the questions that Ms. Martinez had for

10   you were not surprising to you?  Correct?

11   A.   Yes, correct.

12   Q.   You knew what she was going to ask, and you also

13   had an understanding as to what she expected you to say,

14   correct?

15   A.   Yes.

16   Q.   Now, you've never meet with me, correct?

17   A.   Yes, correct.

18   Q.   Prior to this day, I've never asked you any

19   questions, correct?

20   A.   Yes.

21   Q.   Now, sir, you pled guilty in this case, correct?

22   A.   Yes.

23   Q.   Back in October of 2014, you were charged along

24   with a number of other individuals in this courtroom, in

25   this case, correct?

1    A.   It was not in October 2014.  It was 2013.

2    Q.   Okay.  And there came a time, after you were

3  originally charged in this case, that you made a

4  decision to plead guilty, correct?

5    A.   Yes.

6    Q.   And at that point in time, you agreed to

7  cooperate with the government, correct?

8    A.   Yes, of course.

9    Q.   And you signed an agreement with the government

10 to do just that, correct?

11   A.   Yes.

12   Q.   And that was in February of 2016 that occurred,

13 correct?

14   A.   Yes.

15   Q.   And, by your account, that was about two and a

16 half years after you had actually originally been

17 charged in this case, correct?

18   A.   Yes.

19   Q.   Now, you would agree with me that -- well, let me

20 ask you this --

21        MR. JENKINS:  Can you get Government -- can

22 the witness be shown Government's Exhibit Number 120?

23 BY MR. JENKINS:

24   Q.   Now, sir, what you have before you is a copy of

25 your plea agreement, correct?

1     A.   Yes.

2     Q.   Do you remember the day in which you signed this

3   agreement?

4     A.   It was the 27th, it seems it was February.

5     Q.   Would January the 27th, 2016, this year -- does

6   that sound familiar?

7     A.   Yes.

8     Q.   And, prior to you signing this agreement, you had

9   some discussions with your attorney about the agreement,

10  correct?

11    A.   Yes.

12    Q.   When you came into court to enter your guilty

13  plea, did you tell the judge you had read this

14  agreement?

15    A.   Yes.

16    Q.   Did you tell the judge that you understood

17  everything that was in the agreement?

18    A.   Yes.

19    Q.   Prior to you telling the judge that you had read

20  the agreement and understood the agreement, were you

21  placed under oath?

22    A.   Yes.

23    Q.   In response to taking that oath, did you not

24  assure the judge that you were going to tell the truth?

25    A.   Yes.

1 Q. You promised the judge that you would tell the

2 whole truth, correct?

3 A. Yes.

4 Q. And you promised that you would tell to the judge

5 nothing but the truth, correct?

6 A. Yes.

7 Q. Now, according to your plea agreement, sir, you

8 agreed to plead guilty to three counts, correct?

9 A. Yes.

10 Q. And, Count I for which you pled guilty to, you

11 were exposed to a maximum sentence of ten years in

12 prison, correct?

13 A. Yes.

14 Q. In Count II that you pled to, you also were

15 exposed to a maximum of ten years in prison, correct?

16 A. Yes.

17 Q. And, for the third count, you were exposed to a

18 maximum sentence of life without the possibility of

19 parole, correct?

20 A. Yes.

21 Q. So, before you entered your plea agreement with

22 the government, you understood that by being charged in

23 this case, you were exposed to a maximum sentence of

24 life plus 20 years, correct?

25 A. Yes.

1    Q.   And, you understood, sir, that that meant that if

2    you were found guilty on all three of these charges, you

3    would never get out of prison, correct?

4    A.   Yes.

5    Q.   And, how long have you been in jail now?

6    A.   I've been there two years -- like two and a half

7    years.

8    Q.   It's been hard, hasn't it?

9    A.   Yes.

10   Q.   Do you have children?

11   A.   Yes, I do.

12   Q.   You don't get to have any physical contact with

13   your children?

14   A.   No.

15   Q.   You miss your children, don't you?

16   A.   Yes.

17   Q.   You want to get back to them, correct?

18   A.   Yes.

19   Q.   Probably the most important thing to you,

20   correct?

21   A.   Yes.

22   Q.   Now, when you were -- you testified on direct

23   examination that you understand now that only the judge

24   can reduce your sentence, correct?

25   A.   Yes.

1    Q.   But it does require some action by the United

2    States Attorney's Office, correct?

3    A.   Repeat, please.  I did not understand the

4    question.

5    Q.   I will rephrase.

6         In order for the judge to reduce your sentence,

7    it first requires the United States Attorney's Office to

8    file a motion for a reduction of sentence, correct?

9    A.   Yes, I think so.

10   Q.   And, in fact, without the United States

11   Attorney's Office filing that motion to reduce your

12   sentence, the judge would not be able to reduce your

13   sentence in light of your cooperation, correct?

14   A.   I think so -- right?

15   Q.   Well, you testified in response to my questions

16   that you went over this plea agreement, correct?

17   A.   Yes.

18   Q.   And you had the benefit of an attorney to assist

19   you, correct?

20   A.   Yes.

21   Q.   And you and that attorney met on multiple

22   occasions to discuss this plea agreement, correct?

23   A.   Yes.

24   Q.   And, isn't it true that according to your plea

25   agreement, it is in the sole discretion of the United

1    States Attorney's Office as to whether or not to file a

2    substantial assistance motion on your behalf?

3        A.   Yes.

4        Q.   Mr. Lopez Torres can't file that motion for you,

5    correct?

6        A.   No, I don't think so.

7        Q.   In fact, none of the defendants who are on trial

8    today can file that motion for you, correct?

9        A.   No.

10       Q.   And without that motion, it's your understanding

11   you will remain in prison for the rest of your life?

12       A.   Yes.

13       Q.   In fact, it's your understanding that the only

14   way you can avoid spending the rest of your life in

15   prison is to cooperate with the government, correct?

16       A.   No.

17       Q.   Now, sir, when you were first charged in this

18   case about two and a half years ago, you came to court

19   frequently with the other defendants, correct?

20       A.   Yes.

21            THE COURT:  Excuse me.  Excuse me.  Would

22   you go to another area, please?

23            MR. JENKINS:  Yes, Your Honor.

24   BY MR. JENKINS:

25       Q.   You -- on direct examination, you testified that

J. Villegas - Cross

1  when you came to court, that Greñas made certain

2  statements to you, correct?

3      A.   Yes.

4      Q.   Prior to you signing your agreement or agreeing

5  to cooperate with the government, would you agree with

6  me that the story you told here today concerning your

7  involvement in the Peligroso matter was different?

8      A.   I don't understand the question.

9      Q.   Do you remember being interviewed on the night

10  you were arrested, on October the 1st, 2013?

11      A.   No, I don't remember that.

12      Q.   You don't recall on the night that you were

13  arrested that you were -- that you had a conversation

14  with any of the law enforcement?

15      A.   Yes, I remember that.

16      Q.   And, do you remember -- isn't it true that on

17  that night, in response to law enforcement's

18  questioning, you explained that the firearm that was

19  found in your car belonged to you?

20      A.   Yes.

21      Q.   And, that was before you had a plea agreement

22  with the government, correct?

23      A.   Yes.

24      Q.   At the time that the officer was interviewing

25  you, did you understand he expected you to answer his

1    questions truthfully?

2        A.   Yes.

3        Q.   Is it also true that you told the officers that

4    night that the machetes that were found in your car

5    belonged to you?

6        A.   No.

7        Q.   Isn't it true that you never told the officers

8    that night that Greñas had placed that firearm in your

9    car?

10       A.   The night that I was arrested, no.

11       Q.   Now, sir --

12              THE COURT:  Counsel, let's take the

13   afternoon recess now for 15 minutes.  Thank you.

14              (Court recessed at 3:30 p.m. and reconvened

15              at 3:48 p.m.)

16              THE COURT:  You may be seated.

17              I was waiting for Ms. Horvath to be seated.

18   I didn't want her to struggle in front of the jury.

19              You're fine, Ms. Horvath.  Have a seat.

20              You can bring the jury out.

21              (Jury present.)

22              THE COURT:  You may be seated.

23              All right, Counsel, you may proceed.

24              MR. JENKINS:  Thank you, Your Honor.

25                CROSS-EXAMINATION (Continued)

BY MR. JENKINS:

Q.   Sir, do you recall being asked a number of questions by Ms. Martinez this afternoon, concerning some text messages that were found on your phone?

A.   Yes.

Q.   In particular, you -- found on your found were some text messages from someone in El Salvador you referred to as Poison.

A.   Yes.

Q.   And Poison was a leader of the gang back in El Salvador, correct?

A.   Yes, he's a leader of the Mara.

Q.   And one of the things that Poison sent to you via text messages were some rules for the gang, correct?

A.   Yes.

Q.   And when he sent you these rules, you were a leader in your clique, correct?

A.   Yes.

Q.   Were you the first word then, or the second word?

A.   The second.

Q.   And your cousin, Payaso, was the first word, correct?

A.   Yes.

Q.   These were rules that Poison wanted you to share with all the members of your clique, correct?

J. Villegas - Cross

1    A.   Yes.

2    Q.   And, one of the rules that Poison shared in the

3    text messages was that only the leaders or shot callers

4    of a clique were supposed to in possession of weapons in

5    their homes, correct?

6    A.   I don't remember that.

7    Q.   And, you --

8         MR. JENKINS:  Can the witness be shown

9    Government's Exhibit 101-D?

10        For the Court, there's an English and a

11   Spanish version.  I would assume it would be appropriate

12   to show him the Spanish version, Your Honor.

13        THE COURT:  All right.

14        MR. JENKINS:  101-C is the Spanish version.

15   If you can go to page seven of 101-C.

16        THE COURT:  Is there a block number,

17   Mr. Jenkins?  A block number?

18        MR. JENKINS:  Yes, Your Honor.  It's page,

19   one, two --

20        THE COURT:  To the left side there appears

21   to be a block number.  Far left.

22        MR. JENKINS:  Oh, I'm sorry, Your Honor.

23   It's 56 through 58.

24   BY MR. JENKINS:

25   Q.   Can you look at those blocks, sir, and tell me

1      when you're done?

2      A.   56?

3      Q.   Yes; 57 and 58.

4      A.   Okay.

5      Q.   Have you reviewed it?

6      A.   Yes.

7      Q.   Does it refresh your recollection as to whether

8      or not Poison sent you a text message, with a rule that

9      only the shot callers were supposed to keep weapons in

10     their homes?

11     A.   Yes.

12     Q.   And, at the time of the Peligroso, what you call

13     assassination, Mr. Lopez Torres, who you referred to as

14     Greñas, he was not a shot caller, correct?

15     A.   No.

16     Q.   But your testimony in response to Ms. Martinez's

17     question is that on the night in -- of the Peligroso

18     assassination, it was Greñas who brought the weapons,

19     correct?

20     A.   Yes.

21     Q.   Here today in response to Ms. Martinez's

22     questions, you testified, am I correct, that it was you

23     and Payaso who wanted to kill Peligroso?  Correct?

24     A.   Yes.

25     Q.   But, is it not true that when you first met with

1    Ms. Martinez, other members of the U.S. Attorney's

2    Office, and the special agent from the FBI, you told

3    them that Drowsy was the person who wanted to kill

4    Peligroso?

5        A.   Yes.

6        Q.   When you told the FBI agent and Ms. Martinez that

7    during this first meeting, did you understand at that

8    time that they expected you to tell the truth?

9        A.   Yes.

10       Q.   Prior to that first meeting, did you not sign an

11   agreement with Ms. Martinez's office in which you

12   promised to tell the truth?

13       A.   No, I don't remember.

14       Q.   During that same meeting, did you not explain to

15   Ms. Martinez, the other members of the U.S. Attorney's

16   Office and the FBI agent, that the plan was for Drowsy

17   and Nocturno to kill Peligroso?

18       A.   Yes.

19       Q.   And, you were to drop them off -- the plan was

20   for you to drop them off and return at a later point to

21   pick them up, correct?

22       A.   Yes.

23       Q.   And, that Greñas, Mr. Lopez Torres, was to be at

24   another location watching what was to happen to

25   Peligroso, correct?

J. Villegas - Cross

1    A.   Yes.

2    Q.   So, in -- the version that you told the FBI agent

and Ms. Martinez during your first meeting did not have

Greñas actually participating in the murder, correct?

5    A.   Could you repeat the question, please.

6    Q.   In the version that you first told Ms. Martinez

and the FBI agent during that first meeting, it did not

have Greñas actually participating in the murder,

correct?

10            MS. MARTINEZ:  Objection, Your Honor, lack

of foundation.  There was no testimony about a murder.

12            THE COURT:  Sustained.

13            MR. JENKINS:  I'm sorry.  I'll rephrase.

14   BY MR. JENKINS:

15   Q.   The attempt -- the planned murder.

16       Is it not true that in your first interview with

Martinez -- Ms. Martinez and the FBI agent, you

explained to them that the plan in the attempted murder

was for Greñas to be off at a different location,

observing what was to happen to Peligroso?  Correct?

21   A.   Yes.

22   Q.   And, in that version, there were only to be two

individuals who were going to attack Peligroso, correct?

24   A.   Yes, correct.

25   Q.   But, I believe you testified here today that

J. Villegas - Cross                                        156

1   there were three weapons found in your car, correct?

2       A.   Yes.

3       Q.   There were two machetes and a shotgun, correct?

4       A.   Yes, yes.

5       Q.   Now, during the conversations, you testified,

6   concerning the planning of the Peligroso attempted

7   murder -- do you recall listening to those recordings

8   today?

9       A.   Yes.

10      Q.   There were several discussions about what to do

11  with Peligroso, correct?

12      A.   Yes.

13      Q.   Not all of the same gang members participated in

14  each and every one of those discussions, correct?

15      A.   Could you repeat the question?

16      Q.   During the several conversations about what to do

17  with Peligroso, not all of the same gang members

18  participated in each of those conversations, correct?

19      A.   Yes.

20      Q.   Sometimes you were there, correct?

21      A.   Yes.

22      Q.   And sometimes you did not participate in the

23  conversations, correct?

24      A.   Yes.

25      Q.   Sometimes the individual you referred to as

1    Greñas was there, correct?

2        A.   Yes.

3        Q.   And sometimes Greñas was not there, correct?

4        A.   Yes.

5        Q.   And, the same is true for the *chequeo* who was

6    found in the car with you on the night of your arrest,

7    that is, sometimes he was not there for the

8    conversations, correct?

9        A.   Yes.

10       Q.   And, during these conversations, there were

11   several forms of discipline that were discussed about

12   meting out against Peligroso, correct?

13       A.   I don't understand.

14       Q.   Were there discussions about holding a court for

15   Peligroso?

16       A.   Yes.

17       Q.   And, there were also conversations about

18   administering a *calentón*, correct?

19       A.   Yes.

20       Q.   And, during your interview with the FBI agent and

21   Ms. Martinez, the first one you had, you explained that

22   it was Drowsy who kept pushing for more, correct?

23       A.   Yes.

24       Q.   Because, according to you, Drowsy wanted to kill

25   Peligroso or have Peligroso disciplined, because he

1    believed that Peligroso had snitched on him, correct?

2        A.   Yes.

3        Q.   Now, after you went to jail in October of 2013,

4    you were no longer a leader of the gang, correct?

5        A.   No.

6        Q.   Someone else took your position, correct?

7        A.   Yes.

8        Q.   Who was that?

9        A.   Frankly, I don't know who it was.

10       Q.   When you went to jail as a member of MS-13, you

11   had certain expectations of the gang, correct?

12       A.   Could you repeat the question?  I don't

13   understand the question.

14       Q.   When you went to jail, you expected the gang to

15   help you out, correct?

16       A.   Yes.

17       Q.   You expected the gang to give you money to assist

18   with your legal problems, correct?

19       A.   Yes.

20       Q.   You expected the gang to do certain things to

21   help take care of your family while you were in jail,

22   correct?

23       A.   No.

24       Q.   And, you were in jail as a consequence of you

25   being arrested for being in possession of that firearm

1   that was found in your car, correct?  That shotgun?

2       A.  Yes.

3       Q.  And, at that point in time, the person who you

4   identified as Greñas was a member of your clique,

5   correct?

6       A.  Yes.

7       Q.  And, he was not in jail at that time, correct?

8       A.  Yes, correct.

9       Q.  And, he's one of those gang members who you

10  expected to help you out, correct?

11      A.  No.

12      Q.  And, is it true that when you went to jail in

13  October of 2013, the gang did not help you out?

14      A.  No.

15      Q.  They didn't give you money for a lawyer?

16      A.  No.

17      Q.  They didn't help you bail out?

18      A.  No.

19      Q.  Do you remember telling the FBI agent and

20  Ms. Martinez that that made you upset?

21      A.  No, no, I don't remember.

22      Q.  At some point in time while you were in jail on

23  that charge, you were visited by someone from

24  Immigration, correct?

25      A.  No.

J. Villegas - Cross                                      160

1    Q.   You don't remember being interviewed by someone

2    about -- from Immigration, concerning your country of

3    origin?

4    A.   Yes.

5    Q.   And, at the time that you agreed to submit to

6    this interview, did you understand that the person

7    interviewing you expected you to tell the truth?

8    A.   Yes.

9    Q.   And, you told that person that you were a member

10   of MS-13 in Virginia, correct?

11   A.   I don't remember.

12   Q.   Do you remember telling that person that you did

13   not hold a position in the gang, that you were not a

14   leader?

15   A.   No, I don't remember having said that I was a

16   leader.

17   Q.   Do you remember telling that person that you had

18   left the gang because you wanted out?

19   A.   No, I don't remember having said that.

20   Q.   Did you tell -- did you respond to that person's

21   questions truthfully?

22   A.   Yes.

23   Q.   Sorry, sir.  Can you remind me, how long have you

24   been a member of the gang?

25   A.   I went in -- when I started becoming a member in

1    2012.

2      Q.   And, you testified in response to Ms. Martinez's

3    questions that when you first met Drowsy, he indicated

4    to you that he was a member of the gang, correct?

5      A.   Yes.

6      Q.   And, you took steps to verify that, correct?

7      A.   Yes.

8      Q.   For example, you contacted your cousin, Payaso,

9    to see if Drowsy really was a member of the gang,

10   correct?

11     A.   Yes, correct.

12     Q.   And, your understanding is that Payaso checked

13   with Poison back in El Salvador to determine whether

14   Drowsy was, in fact, a member of the gang, correct?

15     A.   I think so.

16     Q.   And the reason why you took these steps to verify

17   what Drowsy was saying, is because you know from your

18   experience of being a gang member that members of MS-13

19   don't always tell the truth, correct?

20     A.   Could you repeat the question, please.

21     Q.   The reason why you took those steps to verify

22   what Drowsy had said to you is because through your

23   experience as a MS-13 gang member, you know that gang

24   members often lie, correct?

25     A.   Yes, that's true.

1      Q.   In fact, you're taught by the gang to lie to law
2   enforcement, correct?
3      A.   Yes.
4      Q.   And, you're taught by the gang to lie to
5   prosecutors, correct?
6      A.   No.
7      Q.   You're taught by the gang to lie to judges,
8   correct?
9      A.   No.
10     Q.   And, you also know as a gang member that one of
11  the reasons why you verify what people say to you in the
12  gang is because members of MS-13 often are quite
13  braggadocios about their activities, correct?
14     A.   I don't understand the question.
15     Q.   You -- you know that gang members sometimes take
16  credit for doing things that they, in fact, have not
17  done?
18     A.   Yes.
19     Q.   And, that is because, in MS-13, a member's
20  reputation is very, very important, correct?
21     A.   Yes.
22     Q.   Members of MS-13 want other members of MS-13 to
23  believe that they are very violent, correct?
24     A.   Yes.
25     Q.   And, when you testified in response to

J. Villegas - Cross

1   Ms. Martinez's question that you had this conversation

2   with Greñas before you decided to plead guilty -- you

3   remember giving that testimony?

4       A.  Yes.

5       Q.  This conversation occurred at the Alexandria

6   Adult Detention Center?

7       A.  Yes.

8       Q.  And, as far as you know, this conversation was

9   not recorded, correct?

10      A.  No.

11      Q.  There were no FBI agents around when this

12  conversation occurred, correct?

13      A.  No.

14      Q.  And, there were no members from the United States

15  Attorney's Office around at that time, correct?

16      A.  No.

17      Q.  And, your testimony is that Greñas at that time

18  told you what happened to Lagrima, correct?

19      A.  Yes.

20      Q.  At that time, had you received a copy of the

21  indictment charging you in this case?

22      A.  Yes.

23      Q.  Had it been translated to you in Spanish?

24      A.  I don't remember.

25      Q.  Isn't it true that contained in that indictment

J. Villegas - Cross

1   was allegations that Greñas had participated in the

2   murder of Lagrima?

3       A.   Yes.

4       Q.   Didn't that same indictment include the

5   allegations concerning Greñas's alleged participation in

6   the attempted murder of Peligroso?

7       A.   Could you repeat the question, please.

8       Q.   Did that same indictment also include allegations

9   against Greñas, alleging that he had been involved with

10  the attempted murder of Peligroso?

11      A.   I don't understand the question.

12      Q.   Prior to your decision to meet with agents of the

13  government the first time, is it not true that you had

14  discussed the discovery turned over to your attorney in

15  this case?

16      A.   Yes.

17      Q.   And, through those discussions, you learned

18  exactly what the government alleged that Greñas's role

19  was in the attempted Peligroso murder, correct?

20      A.   No.

21      Q.   And, you had that information before you ever

22  decided to meet with the government, correct?

23      A.   I honestly don't understand the question you're

24  asking.

25      Q.   You also had attended several hearings with

1  Greñas in which you heard the government explain what it
2  believed its evidence would be against Greñas, correct?
3      A.  No.
4      Q.  And, you had the benefit of knowing all of this
5  before you first sat down and told the government your
6  version of events, correct?
7      A.  No.
8      Q.  And when you sat down to identify the voices on
9  the recordings that Ms. Martinez played for you, is it
10  not true that it was your understanding that the United
11  States Attorney's Office needed you to identify those
12  voices?
13      A.  Repeat, please.
14          MR. JENKINS:  Your Honor, I have no further
15  questions.
16          THE COURT:  You may proceed.
17          MS. AUSTIN:  Thank you, Your Honor.
18                  CROSS-EXAMINATION
19  BY MS. AUSTIN:
20      Q.  Good afternoon.
21      A.  Good afternoon.
22      Q.  You stated in 2012 that you were in MS-13 here in
23  Virginia; is that correct?
24      A.  Yes.
25      Q.  And, you testified earlier that there were a few

1   *chequeos* at that time that wanted to become members of

2   PVLS; is that correct?

3       A.   Yes.

4       Q.   And, the only way those *chequeos* could become

5   members is if the gang agreed to jumped them in, isn't

6   that correct?

7       A.   Yes.

8       Q.   Now, if someone came from El Salvador, where in

9   El Salvador they were a member of MS-13, if they came to

10  the United States, would they have to be jumped in again

11  to be a member of the gang?

12      A.   No.

13      Q.   And, isn't that, in fact, what happened to you in

14  2012 when you came into the United States?

15           You weren't jumped into the gang, as you stated

16  on direct; isn't that correct?

17      A.   No.

18      Q.   You weren't -- I'm sorry?

19      A.   I don't understand.

20      Q.   Well, let me rephrase it.

21           Your testimony was that Payaso approved you

22  becoming a member of PVLS.  You remember testifying to

23  that?

24      A.   Yes.

25      Q.   And he approved you because you were already a

J. Villegas - Cross

1    member of MS-13 in El Salvador; isn't that correct?

2        A.   I wasn't a member of MS in El Salvador.

3        Q.   But, you became a member of MS-13 here in

4    Virginia without getting jumped in?

5        A.   Yes.

6        Q.   Is it true you were fleeing El Salvador because

7    you had committed a murder there?

8        A.   No.

9        Q.   You did not kill the *chavala* named Cabala

10   (phonetics), Cavala (phonetics), Cavula (phonetics)?

11       A.   No.

12       Q.   Why did you leave El Salvador?

13       A.   I came because my father got my papers for me,

14   and also to give a better life to my son, who is in El

15   Salvador.

16       Q.   How did you enter the United States?

17       A.   By an airplane, with a residence.

18            THE INTERPRETER:  Interpreter correction.

19   "Legal residence."

20   BY MS. AUSTIN:

21       Q.   So your status was a legal resident in the United

22   States?

23       A.   Yes.

24       Q.   Did it remain that way, but -- up until your

25   arrest?

J. Villegas - Cross

1       A.   Yes.

2       Q.   Now, once you indicated to the United States that

3   you were going to plead guilty, did you meet with any

4   individuals and discuss the recordings of these

5   telephone calls you've listened to here today?

6       A.   Yes.

7       Q.   And, who did you meet with?

8       A.   With Ms. Martinez, another prosecutor and some

9   detectives.

10      Q.   Did you ever meet with anyone by the name of Saa,

11  Claudia Saa (sic)?

12      A.   Yes.

13      Q.   And, did she (sic) ask you questions regarding

14  the meaning of certain words?

15      A.   Yes.

16      Q.   How many times did you meet with her (sic)?

17      A.   It was, um, two, three times.

18           MS. AUSTIN:   Court's indulgence, Your Honor.

19           (Pause.)

20  BY MS. AUSTIN:

21      Q.   Did you ever meet with anyone by the name of

22  Ms. Portwine?

23      A.   I don't remember that.

24      Q.   Did you meet with anyone else, other than

25  Ms. Saa (sic), regarding the telephone calls and the

1    meaning of words in those calls?

2        A.   I don't remember that.

3        Q.   Could you have met with someone else?

4        A.   No.

5        Q.   So, in 2012 when you entered the United States,

6    you say it was to make a better life for yourself; is

7    that correct?

8        A.   I came to the United States in 2005.

9        Q.   I'm sorry.

10            But, in 2012, you contacted your cousin, Payaso,

11   to see if you could enter the MS-13 gang; isn't that

12   correct?

13       A.   Yes.

14       Q.   And, you were just allowed to enter the gang?

15       A.   Yes.

16       Q.   And you're immediately made second word?

17       A.   Not immediately.

18       Q.   How long thereafter?

19       A.   Some three months later.

20            MS. AUSTIN:  I have no further questions.

21                    CROSS-EXAMINATION

22   BY MR. AQUINO:

23       Q.   Good afternoon.

24       A.   Good afternoon.

25       Q.   My name is Jerry Aquino.  My co-counsel, Elita

J. Villegas - Cross

1    Amato, and I represent Jesus Chavez.  I just have a few
2    questions for you.
3                MR. AQUINO:  Could the witness be shown
4    Exhibit 101-C, which is the Spanish version of 101-D,
5    specifically boxes 48 and 49.
6    BY MR. AQUINO:
7       Q.  Again, boxes 48 and 49.  And these deal with the
8    first couple rules of the gang; is that correct?
9       A.  Yes.
10      Q.  Okay.  And, one of the rules is not to make the
11   hood look bad; is that accurate?
12               THE INTERPRETER:  I'm sorry.  The
13   interpreter didn't hear you, Counsel.
14   BY MR. AQUINO:
15      Q.  One of the rules is not to make the hood look
16   bad; is that correct?
17      A.  You referred to the first one?  I don't
18   understand the question.
19      Q.  Okay.  Look at the first rule.  What does the
20   first rule say?
21      A.  The first law says, "Respect, loyalty, and love
22   to the hood."
23               MR. AQUINO:  I'm sorry.  I didn't hear.
24               THE INTERPRETER:  "Respect, loyalty, and
25   love to the hood."

1          MR. AQUINO:  Okay.

2     BY MR. AQUINO:

3          Q.   And, what does the second rule say?

4          A.   The second one means to say, in order to jump

5     somebody in, you need a past life.

6          Q.   Would you agree that if you were disloyal to your

7     neighborhood, that is, the area that you were involved

8     in patrolling somehow, that that would be a violation of

9     one of the rules?

10         A.   You mean rule number two?  I don't understand.

11         Q.   Okay.  Let's move on.

12              When you were second in command of the PVLS,

13    would it be correct to say that you were very conscious

14    of the police presence in the area?

15         A.   Yes.

16         Q.   You want to know when the police are around,

17    right?

18         A.   Could you repeat?  I have not understood.

19         Q.   Sure.  You would want to know when the police

20    were around, correct?

21         A.   Yes.

22         Q.   You'd want to stay away from them, correct?

23         A.   Yes.

24         Q.   You want to keep some distance between yourself

25    and the police, correct?

J. Villegas - Cross

1     A.   Yes.

2     Q.   They could damage your drug distribution

3  business, correct?

4     A.   Yes.

5     Q.   So, if someone in your clique, a homeboy in your

6  clique killed someone, shot and killed someone without

7  your permission, they could get themselves into trouble

8  from you, right?

9     A.   I don't understand the question.

10    Q.   Okay.  I'll ask it a different way.

11         If someone in your clique, okay, who's under

12  you --

13    A.   Uh-huh.

14    Q.   -- shot and killed somebody without your

15  permission, you could be upset with that gang member,

16  correct?  Because they did not get your permission in

17  advance to do such an action?

18    A.   No.

19    Q.   No?  So, you mean they could kill someone and you

20  would not be upset at all?

21    A.   No.

22    Q.   Wouldn't you be concerned that some gang member

23  killing someone without your permission might bring

24  unwanted police attention to your clique?

25    A.   No.

1    Q.   So, you don't worry about police attention at

2    all?

3    A.   Yes.

4    Q.   Now, Detective Victor Ignacio, have you ever met

5    him?

6    A.   No, I don't remember him.

7    Q.   Okay.  Now, there was also some discussion, I

8    believe, of Duende participating in the decision to have

9    Peligroso murdered.  Do you remember that?

10   A.   Could you repeat the question again, please.

11   Q.   There was some discussion, I believe, on direct

12   examination that Duende participated in the decision

13   that Peligroso should be killed by the clique.

14   A.   Yes.

15   Q.   Okay.  And Duende also goes by the name of Jose

16   Del Cid; is that correct?

17   A.   Yes, I think that is his name.

18   Q.   And he was a really violent guy; is that correct?

19   A.   No.

20   Q.   Not at all?

21   A.   Not at all.

22   Q.   You never saw him attack anybody?

23   A.   No.

24            MR. AQUINO:  That's all the questions I

25   have.  Thank you.

J. Villegas - Cross

1    THE COURT:  Right before you start, let's
2    take a brief stretch.
3              (Pause in proceedings.)
4              THE COURT:  Thank you.
5              You may proceed.
6              MR. SALVATO:  Thank you, Your Honor.
7                    CROSS-EXAMINATION
8    BY MR. SALVATO:
9    Q.  Good afternoon, sir.  My name is Frank Salvato
10   and I represent Christian Cerna, the individual you
11   identified as Christian.
12        You were responsible for attempting to recruit
13   Christian into the gang, true?
14   A.  Yes.
15   Q.  And, I think you identified him as the young man
16   in the blue shirt?
17   A.  Yes.
18   Q.  And, how old was he when you attempted to recruit
19   him?
20   A.  I don't know what his exact age was, but I think
21   he was 17 or 16.
22   Q.  And, he had just come to this country?
23   A.  No.
24   Q.  Was he just starting to learn to read and write
25   when you were trying to recruit him?

 1     A.   Yes, I think so.

 2     Q.   Was he just learning simple things like what the

 3   seasons are, what certain shapes are?

 4     A.   I don't understand the question.

 5     Q.   Was he just starting to learn simply ideas, such

 6   as fall, winter, spring, summer?

 7     A.   No.

 8     Q.   Sir, you testified about a notebook that was

 9   found in your car that had Christian's name on it.  Do

10   you recall that testimony?

11     A.   Yes.

12     Q.   And, when you -- and that notebook was discovered

13   when you were arrested; is that right?

14     A.   Yes.

15     Q.   And, fair to say, sir, that the notebook was in

16   the car, but Christian was not in the car, correct?

17     A.   Yes, correct.

18     Q.   But, sir, I think you answered Ms. Martinez's

19   question that you saw Christian write in certain pages

20   in that notebook, correct?

21     A.   Yes.

22          MR. SALVATO:  Your Honor, with that

23   foundation, which I think is the same as the

24   government's, I would ask to publish certain pages of

25   that notebook.

```
1              THE COURT:  All right.

2              MR. SALVATO:  This is Government's

3   Exhibit 35.

4              THE COURT:  Do you want to use the one with

5   the page numbers on it?

6              MR. SALVATO:  I have Ms. Bishop, Your Honor.

7   She can pull up the exact page.

8              THE COURT:  Oh, okay.  Go ahead.  That's

9   fine.

10             MR. SALVATO:  I have the pages.

11             Government's Exhibit 35, Ms. Bishop, could

12  you --

13             MS. MARTINEZ:  Your Honor, we object to

14  publishing before a foundation has been laid with this

15  witness.  I believe the way we did it with the

16  government was the foundation had to be laid before we

17  actually published that page.

18             THE COURT:  All right.

19             MR. SALVATO:  I think the notebook has been

20  introduced, Your Honor.  It's the same foundation, that

21  he had seen my client write into that notebook.  And

22  she --

23             THE COURT:  All right.

24             MR. SALVATO:  So I can direct him to the

25  other pages in the notebook.
```

1          THE COURT:  Fair enough.  The objection is

2   overruled.  Go ahead.

3          MR. SALVATO:  And I believe the whole

4   notebook is in evidence.

5          So, I ask Ms. Bishop to pull up Government's

6   Exhibit 35, page four.

7          (Exhibit published.)

8   BY MR. SALVATO:

9   Q.  Sir, is Government's Exhibit 35, page four, in

10   front of you?

11   A.  Yes.

12   Q.  Does that appear to be certain shapes?

13   A.  No.  These are some drawings that are there.

14   Q.  Well, are the drawings of certain shapes and

15   containers?

16   A.  Repeat.  I don't understand.

17   Q.  Are the drawings that you refer to, shapes and

18   containers?

19   A.  No.

20          THE COURT:  Counsel, if you look at page

21   four, you're referring to page three.

22          THE WITNESS:  I think you've made a mistake

23   with the page.

24          MR. SALVATO:  The screen, not the book.

25          If the plaintiff could look at the screen

J. Villegas - Cross

1    and not the book.

2              THE WITNESS:  I don't have the book.

3    BY MR. SALVATO:

4        Q.  I'm asking you to look at the screen.  Do you see

5    two pages there?

6        A.  Yes.

7        Q.  And, on -- the one on the left has certain shapes

8    and containers.

9        A.  Yes.

10       Q.  And, the page on the right has two other shapes?

11       A.  Yes.

12       Q.  So, both pages have certain shapes on them,

13   right?

14       A.  Yes.

15       Q.  And, sir, isn't it true that at the time you were

16   trying to recruit Christian into the gang, that he was

17   just starting to learn basic things, such as shapes and

18   containers?

19       A.  No.

20       Q.  Okay.

21             MR. SALVATO:  If I could ask that page 16 of

22   that same exhibit be published for the jury, Your Honor.

23   It's already been admitted.

24             (Exhibit published.)

25             THE COURT:  All right.

BY MR. SALVATO:

Q.   Do you see those two pages in front of you?

A.   Yes.

Q.   And, those are pages about the seasons, like winter and spring, summer.  Do you see those?

A.   Yes.

Q.   And, sir, is it still your testimony that when you tried to recruit Christian into the gang, that he wasn't still at the stage of learning such simple things as the seasons?

MS. MARTINEZ:  Objection, Your Honor.  Asked and answered.

MR. SALVATO:  It's a different issue, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MR. SALVATO:

Q.   Sir, you were in the gang in El Salvador, correct?

A.   No.

Q.   You were in Centrales in El Salvador, correct?

A.   No.

Q.   Sir, you changed your name at some point from Satánico to Demente, correct?

A.   Yes.

1    Q.  And why did you change your name from Satánico to
2  Demente?
3    A.  Because another person used that nickname.
4    Q.  Somebody else had the name Satánico already
5  taken?
6    A.  Yes.
7    Q.  And that was somebody in the gang in El Salvador?
8    A.  No.
9    Q.  That was somebody here in the United States?
10   A.  Yes.  It was someone in Los Angeles.
11   Q.  And how did you know there was a Satánico in Los
12  Angeles?
13   A.  Because that nickname was given to me by Payaso
14  in memory of that homie.
15   Q.  Payaso gave you the name Satánico?
16   A.  Yes.
17   Q.  And he was the clique leader, correct?
18   A.  Yes.
19   Q.  He told you what to do, correct?
20   A.  I don't understand the question.
21   Q.  Well, the clique leader, Payaso, told you what to
22  do?
23   A.  Yes.
24   Q.  And he told you that would be your name,
25  Satánico?

1  A.  Yes.

2  Q.  And, you decided for yourself to change it from

3  Satánico to Demente?

4  A.  No.

5  Q.  Sir, you testified on direct that Payaso was your

6  cousin, correct?

7  A.  Yes.

8  Q.  And he was the one in charge of Park View,

9  correct?

10 A.  Yes.

11 Q.  And he had a 540 Area Code when he was in jail?

12 A.  Yes.

13 Q.  And he called you a lot, correct?

14 A.  Yes.

15 Q.  And he was the one that was calling the shots for

16 the gang, correct?

17 A.  He had the first place.

18 Q.  So, he was the one ultimately in charge, correct?

19 A.  No.

20 Q.  He was the leader of the clique, right?

21 A.  No.

22 Q.  You were the leader of the clique?

23 A.  I was the second leader.

24 Q.  Okay.  And who was the first leader?

25 A.  Payaso.

J. Villegas - Cross

1    Q.  So, he was the clique leader, right?

2    A.  Yes, but not just him.  We were both leaders.

3    Q.  Okay.  So, you both call, as leaders, the shots,

4    the decisions, correct?

5    A.  Yes.

6    Q.  And, the clique leaders, you and Payaso, would

7    make the important decisions such as if someone was to

8    be green lighted, true?

9    A.  Not all the time.

10   Q.  Well, the clique leaders make the decision on

11   whether to green light somebody, true?

12   A.  But, we had to get permission from El Salvador

13   first.

14   Q.  So, the clique leaders, so I understand it, the

15   clique leaders in PVLS cannot make a decision to green

16   light someone without the authority of El Salvador?

17   A.  Yes.

18   Q.  And if a green light is put out on someone

19   without the leadership's agreement, and El Salvador's

20   approval, that would be outside the gang rules, true?

21   A.  Yes.

22   Q.  So, that could be a personal situation in which a

23   gang member has a problem with someone else?

24   A.  I don't understand.

25   Q.  Sir, the gang has to get formal permission from

1    the leaders in El Salvador for a green light, true?

2        A.   Yes.

3        Q.   And, if the gang members just go off and do

4    something on their own, that is not in furtherance of

5    the gang, true?

6        A.   I don't understand the question.

7        Q.   If a gang member doesn't get authorization from

8    the leaders in El Salvador, he's off on his own doing

9    his own crime, true?

10       A.   I honestly don't understand your question.

11       Q.   Okay.  Sir, not every crime that an MS-13 member

12   or associate commits is part of the gang, true?

13       A.   Repeat the question, please.

14       Q.   Not every crime committed by an MS-13 member or

15   someone associated with MS-13 is part of the gang, true?

16       A.   No.

17       Q.   Sometimes gang members go off and do their own

18   crime, true?

19       A.   Yes.

20                THE COURT:  Mr. Salvato.

21                MR. SALVATO:  I'll stop now.

22                THE COURT:  All right.

23                We will just recess for right now, that's

24   all.

25                Ladies and gentlemen, please listen to me

1    very carefully.  First, please do not discuss the case.

2    Do not do any research on the case.  Leave your notes in

3    the jury deliberation room.

4                We have had a lawyer become ill, so we will

5    not sit tomorrow, but we will resume on Thursday

6    morning.  So we will not sit tomorrow, all day, but

7    resume Thursday morning at 10:00 o'clock.  So we will

8    see you Thursday at 10:00 o'clock.

9                Thank you very much.

10               (Jury excused at 5:00 p.m.)

11               THE COURT:  You can have a seat, sir.

12               Please be seated.

13               Ms. Martinez, you wanted me to -- about the

14   witness, what was it you wanted me to do?

15               MS. MARTINEZ:  Yes, Your Honor.  With Your

16   Honor's permission -- we had briefed this earlier.  With

17   any witness, any cooperating defense who uses any of the

18   pseudonyms that have been discussed on the record -- and

19   this witness did use one pseudonym -- we would ask that

20   Your Honor simply relay to the witness that Your Honor

21   is aware of the decision about the pseudonyms and that

22   Your Honor does not view the use of the pseudonyms to be

23   a lie or dishonest, which would be a violation of the

24   witness's plea agreement.

25               THE COURT:  Sir?  Can you hear me okay?

1      THE WITNESS:  Yes.

2      THE COURT:  I made a ruling early on in the

3  trial, an order, directing you to use a pseudonym,

4  "homeboy," and, that is what I wanted you to do.  And

5  certain other witnesses will have the same instruction.

6      It is a part of your agreement with the

7  Court?  Do you understand?  With the government

8  attorneys.  Do you understand?

9      THE WITNESS:  Yes, what do you mean by using

10  a pseudonym?

11      THE COURT:  When you used the word "homeboy"

12  earlier on, without mentioning the name, that was what

13  we wanted you to do concerning one individual who might

14  be on trial now.

15      THE WITNESS:  Okay.

16      THE COURT:  So then that person's name

17  should not be used.  It should only be "homeboy number

18  one."  Do you understand?

19      THE WITNESS:  Yes.

20      THE COURT:  All right.  Thank you very much.

21  You're excused.

22      (Thereupon, the witness withdrew from the

23  stand.)

24      THE COURT:  Is there anything else I need to

25  take up before Thursday morning?

1          We have hearings on Thursday morning.
2  Anything else?
3          MR. AQUINO:  Just one last thing, that issue
4  about the transcript.  Again, I ask that it be treated
5  as continuing objection, so we don't have to renew it.
6          THE COURT:  All right.  For the record, a
7  continuing objection as stated multiple times by
8  Mr. Aquino and --
9          Mr. Zimmerman, you look like you're about to
10  stand.  Do you need to say something?
11          MR. ZIMMERMAN:  I might have missed this,
12  Judge.  We're all supposed to be here at 9:30 Thursday
13  morning?
14          THE COURT:  Yes, 9:30, Thursday morning.
15          MR. ZIMMERMAN:  Yes, Your Honor.  Thank you.
16          MS. MARTINEZ:  Your Honor, we're submitting
17  a come-up for all defendants for 9:30.  If anyone
18  doesn't want their -- their client here, they should
19  either alert us or the marshals about the timing.
20  Otherwise, the U.S. Attorney's Office will submit the
21  come-ups for everyone on 9:30 on Thursday.
22          THE COURT:  All right.
23          We're in recess.  Thank you.
24          (Thereupon, the proceedings were concluded
25  at 5:02 p.m.)

CERTIFICATE OF REPORTER

        I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the jury trial in the case of UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

        I further certify that I was authorized and did report by stenotype the proceedings in said jury trial, and that the foregoing pages, numbered 1 to 187, inclusive, constitute the official transcript of said proceedings as taken from my shorthand notes.


        IN WITNESS WHEREOF, I have hereto subscribed my name this __11th__ day of __May__, 2016.


                        ____/s/_____
                        Renecia Wilson, RMR, CRR
                        Official Court Reporter