```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                      EASTERN DISTRICT OF VIRGINIA
 2                         Alexandria Division

 3    UNITED STATES OF AMERICA,        )
                                       )
 4                     Plaintiff,      )
                                       ) Crim. No. 1:14cr306
 5         vs.                         )
                                       )
 6    JOSE LOPEZ TORRES, ALVIN GAITAN  ) April 7, 2016
      BENITEZ, CHRISTIAN LEMUS CERNA,  )
 7    OMAR DEJESUS CASTILLO, DOUGLAS    )
      DURAN CERRITOS, MANUEL ERNESTO   )
 8    PAIZ GUEVARA, and JESUS ALEJANDRO )
      CHAVEZ,                          )
 9                                     )
                       Defendants.     )
10    _____)

11

12                            JURY TRIAL

13

14
      BEFORE:      THE HONORABLE GERALD BRUCE LEE
15                 UNITED STATES DISTRICT JUDGE

16

17    APPEARANCES:

18    FOR GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
                       BY:  JULIA MARTINEZ, AUSA
19                          TOBIAS TOBLER, AUSA

20
                            ---
21

22    OFFICIAL COURT REPORTER:

23                      RENECIA A. SMITH-WILSON, RMR, CRR
                        U.S. District Court
24                      401 Courthouse Square, 5th Floor
                        Alexandria, VA 22314
25                      (703)501-1580
```

1    APPEARANCES (Continued)

2    FOR DEFENDANT JOSE LOPEZ TORRES

3            BYNUM & JENKINS, PLLC
             BY:  ROBERT L. JENKINS, JR., ESQ.
4            THE LEIVA LAW FIRM, PLC
             BY:  MANUEL E. LEIVA, ESQ.
5
     FOR DEFENDANT ALVIN GAITAN BENITEZ
6
             LAW OFFICE OF AMY LEIGH AUSTIN
7            BY:  AMY LEIGH AUSTIN, ESQ.
             SMITH & ZIMMERMAN, PLLC
8            BY:  JEFFREY D. ZIMMERMAN, ESQ.

9    FOR DEFENDANT CHRISTIAN LEMUS CERNA

10           LAW OFFICE OF CHRISTOPHER AMOLSCH
             BY:  CHRISTOPHER AMOLSCH, ESQ.
11           FRANK SALVATO, ESQ.

12   FOR DEFENDANT OMAR DEJESUS CASTILLO

13           FIRSTPOINT LAW GROUP, PC
             BY:  KATHERINE MARTELL, ESQ.
14           OLD TOWN ADVOCATES, PC
             BY:  MEREDITH M. RALLS, ESQ.
15
     FOR DEFENDANT DOUGLAS DURAN CERRITOS
16
             LAW OFFICE OF J.R. CONTE, PLLC
17           BY:  JOSEPH R. CONTE, ESQ.
             LAW OFFICE OF DWIGHT CRAWLEY
18           BY:  DWIGHT E. CRAWLEY, ESQ.

19   FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

20           LAW OFFICE OF W. MICHAEL CHICK, JR.
             BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
21
     FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
22
             JEROME P. AQUINO, ESQ.
23           ELITA C. AMATO, ESQ.

24
                         ---
25

INDEX

PRELIMINARY MATTERS                                              5

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jaime Rosales Villegas | --- | 38 | 73, 79 | 77 |
| Miguel Serrano | 80 | 86 | 95 | --- |
| Gregory Hermanson | 97 | 113 | --- | --- |
| Vania Vargas | 148 | 164 | --- | --- |
| Agustin Lopez | 237 | 249 | 264 | --- |
| FURTHER PROCEEDINGS |  |  |  | 265 |

(Court recessed)

---

<u>PROCEEDINGS</u>

(Thereupon, the following was heard in open court at 9:33 a.m.)

(Jury not present.)

THE CLERK:  1:14 criminal 306, United States versus Jose Lopez Torres, et al.

With a Spanish interpreter to be sworn in, replacing Ms. Blumberg.

THE COURT:  Mr. Benjamin Engelsberg?

THE INTERPRETER:  Yes, Your Honor.

THE COURT:  Have you acted as an interpreter in our court before?

THE INTERPRETER:  Not in this courtroom, but in this courthouse, yes.

THE COURT:  All right.  We'll have you take the oath from the clerk, please.

(Interpreter duly sworn.)

THE INTERPRETER:  I do.

THE CLERK:  Thank you.

THE COURT:  Good morning, Counsel.

Good morning, Mr. Lopez Torres, Mr. Gaitan Benitez, Douglas Duran Cerritos, Mr. Omar Dejesus Castillo, Paiz Guevara, and Mr. Alejandro Chavez.

And good morning, Counsel.

1          Ready to proceed?

2          MR. ZIMMERMAN:  Yes, Your Honor.

3          THE COURT:  I'm ready.

4          MR. ZIMMERMAN:  Okay.  Good morning, Your

5   Honor.

6          THE COURT:  Good morning.

7                   PRELIMINARY MATTERS

8          MR. ZIMMERMAN:  This comes on the motion of

9   Mr. Gaitan Benitez for severance based on antagonistic

10  defenses.  We filed a pleading.  The government has

11  responded.

12          The government concedes on page one of their

13  opposition that severance is required where, quote, "the

14  jury is presented with the proposition that to believe

15  the core of one defense it must believe" -- "it must

16  disbelieve the core of the other."

17          This is in their introduction.  It's

18  actually a quote from a number of cases cited by both

19  the defense and the government, including *United States*

20  *versus Najjar*, that would be N-a-j-j-a-r, 300 Fed 3d

21  466, 473, Fourth Circuit, 2002.

22          This Fourth Circuit case actually cites with

23  approval this very proposition on our lead case.  That

24  would be *United States versus Romanello*, 726 Fed 2d 173,

25  177, Fifth Circuit 1994.

1          And we cited *Romanello* in our severance

2    motion.  Briefly, Judge, in the *Romanello* case, several

3    defendants were joined for a trial.  They were accused

4    of gold theft.  And one of them, Vertucci, argued that

5    the other two, Mendez and Romanello, had robbed him of

6    the gold.

7          Mendez and Romanello went to trial and they

8    said they had innocently accepted a job to transport the

9    gold, and that the story that Vertucci told of the

10   robbery was a lie.

11         The Court of Appeals found that if the jury

12   believed Vertucci was robbed by Mendez and Romanello,

13   they would have to disbelieve Mendez and Romanello.

14         Moreover, just the accusation by Vertucci's

15   counsel in opening statement was sufficient to create

16   this antagonistic defense.  And it was -- it was after

17   this opening statement; there wasn't any actual

18   evidence.

19         But this triggered the severance motion.

20   And the Court of Appeals -- this was a Fifth Circuit,

21   but cited with approval by the Fourth Circuit --

22   reversed the District Court's denial of a severance in

23   that case.

24         THE COURT:  But, is the opening statement

25   evidence, Mr. Zimmerman?

```
 1            MR. ZIMMERMAN:  The opening statement is
 2  sufficient to make it clear that there is an
 3  antagonistic that makes -- that -- that makes it
 4  appropriate for the severance motion and that one of the
 5  defendants is going to be denied a fair trial,
 6  because -- essentially because they're blamed, and that
 7  to believe one defendant, um, the defendant moving for
 8  the severance would have to be convicted and --
 9            THE COURT:  So, describe the antagonism that
10  you see.
11            MR. ZIMMERMAN:  Okay.  So in this case, the
12  opening statements of pretty much all of the
13  defendants -- some were more detailed than others, but
14  it was clear that the defenses -- and Mr. Guevara's
15  counsel went last, but prior to that, the defenses were
16  essentially that the government witnesses were not to be
17  trusted, that the -- there was not going to be
18  sufficient evidence; in fact, that the co-defendants
19  were not present -- I'm talking about Count 6 now, which
20  is a count that -- the only count Mr. Guevara is also
21  charged with -- that in Count 6, the Aguilar murder, the
22  Guason Aguilar murder, that the defendants were not
23  present, and that the recordings of the defendants, that
24  we all anticipate and the government previewed in their
25  opening, was blustering, it was false blustering.
```

 1              And, in fact, through the witnesses, the

 2   defense has consistently elicited testimony that the

 3   government witnesses are not to be trusted, the

 4   government witnesses are trying to buy their freedom,

 5   they constantly lie, they're inconsistent, and that

 6   falsely bragging about being involved in these murders

 7   is common in MS-13.  In fact, it's sort of more common

 8   now that they don't really have the tattoos, they have

 9   the false bravado.

10              Guevara's counsel got up in opening, and

11   also -- the part of the opening was that -- that -- and

12   Mr. Amolsch focused on this -- that these weren't --

13   this wasn't really planned murder, and that, in any

14   event, it was outside the racketeering.  It wasn't in

15   furtherance of racketeering.

16              Guevara's counsel got up and he said:  The

17   defendants were all present at the murder.  They planned

18   this murder.  They were present at the murder, and that

19   they duped or forced his client to participate in the

20   murder.

21              And this is really exactly the situation

22   that we're seeing in our cited cases, *Romanello* and

23   *Johnson*, and very much different than what we're seeing

24   in the government's cases, *Najjar* and *Smith,* they

25   chiefly rely on, which is very distinguishable.

So, in the government cases what you
typically have are fraud cases.  *Najjar* is an auto theft
ring, and *Smith* is a misappropriation of loan proceeds,
wire fraud cases.  So you have a bunch of people in a
fraud case.

And the conflicting defenses in those cases,
which are found not to warrant a severance, is that
they're sort of pointing the finger at each other.  And
like in a loan fraud case, one defendant says, "The
other defendant conceived of it and I was kind of
following along, I didn't really have the specific
intent to defraud.  He might have had the specific
intent to defraud.  I didn't."

So it's really -- they're all kind of,
they're doing it, but the dispute is, um, their relative
role and specific intent.

And the courts have consistently held -- and
these are the cases cited by the government -- that,
look, there's going to be a little finger pointing in
any multi-defendant case and they're going to argue
about this.

But the distinguishing feature of this case,
in *Romanello* and the *Johnson* case, is that, again, the
core, to believe the core of one defense, they have to
believe the core of the other.

1          THE COURT:  But at the moment, I mean, what
2    we're dealing with is opening statement in a
3    multi-defendant trial, where the jury going to have to
4    evaluate the evidence against each individual.  And as I
5    see it, there will probably be arguments that, "I was
6    merely present and was not involved," or "I was
7    unaware," and the fact that others might have been aware
8    does not necessarily create antagonism, does it?
9          MR. ZIMMERMAN:  I think it does, actually.
10   And it's not just opening statement.  This also -- this
11   contrast was very strong in the different
12   cross-examinations of gang expert Claudio Saa.
13          So again, Mr. Benitez and similarly
14   situated -- and the other co-defendants in Count 6, the
15   testimony was elicited and the evidence that was laid
16   was that the government witnesses can't be trusted, and
17   the defendants, those that are caught on tape saying
18   incriminating things, are falsely blustering.  "That's
19   what we do."
20          But then, again, the cross by Guevara's
21   counsel is to elicit that -- that, um, his client is
22   forced by everybody else to do this.  It -- it -- the
23   core is that in order for Guevara to be acquitted on his
24   defense, our clients -- my client -- I'm sorry --
25   Mr. Benitez has to be convicted, that is, Mr. Benitez

1  participated in the Aguilar murder and duped or forced,

2  however Guevara's counsel wants to characterize it, him

3  to participate.

4           Of course, Mr. Guevara is --

5           THE COURT:  These are all arguments, and I

6  told the jury that opening statements are not evidence.

7  And we know that there are going to be, what, four or

8  five cooperators testifying, and the jury's going to

9  have to ultimately make a decision about who they

10 believe.

11          And I don't know what's going to happen in

12 terms of whether an individual defendant will testify at

13 all.  So, these arguments that they're making through

14 cross-examination all deal with their individual

15 defense.

16          And we have seven defendants, who each have

17 the right to have a separate verdict, don't they?

18          MR. ZIMMERMAN:  They do.  We all have a

19 right to separate verdict.  And, of course, Mr. Guevara

20 has an absolute right to the defense he deems most

21 appropriate.

22          But, Mr. Benitez has a right to a trial in

23 which -- and this is language that comes from

24 *Romanello* -- in which there aren't prosecutors on both

25 sides of the podium.  Essentially, the government's

argument is that Mr. Benitez participated in the Aguilar murder.  It was planned.  It was part of racketeering. We participated in the Aguilar murder.

        Mr. Benitez's defense is that he didn't participate in the murder.  It wasn't planned.  It wasn't part of racketeering.

        THE COURT:  That's called --

        MR. ZIMMERMAN:  After he does that --

        THE COURT:  That's called the "I did not do it," defense, right?  The five point defense, "I did not do it."

        MR. ZIMMERMAN:  I understand.  I didn't do it.  Not -- right.  Not relative roles, say, in the fraud scheme, like in the government's case.

        But then, at the end of opening statement, at the end of any witness examination, Mr. Guevara's counsel gets up and basically reiterates the government's theory:  Mr. Benitez was present at the scene of the murder.  He participated in the murder. This was planned.

        This -- Mr. Guevara's argument --

        THE COURT:  Are you suggesting that his defense is that he participated in the murder, but he was not responsible for it?

        That's the defense?

```
 1                    MR. ZIMMERMAN:  His defense.
 2                    THE COURT:  Okay.  I understand your
 3     position.  Thank you.
 4                    MR. ZIMMERMAN:  Yeah.  I just -- okay, Your
 5     Honor.
 6                    And, just again to emphasize, what
 7     distinguishes this case is that -- finger pointing at
 8     Mr. Benitez from both sides.
 9                    We are entitled to a trial in which there's
10     only one side prosecuting Mr. Benitez, and that for a
11     defendant to be acquitted, Mr. Benitez doesn't have to
12     be convicted, if found guilty.  And that is Guevara's
13     defense, and that is what justifies the severance.
14                    THE COURT:  Thank you.
15                    MR. CHICK:  Your Honor, if I may, briefly.
16                    THE COURT:  I'm listening.
17                    (Pause.)
18                    Mr. Chick, you didn't file anything, did
19     you?
20                    MR. CHICK:  I didn't, Your Honor.  I didn't
21     file a motion, but I just --
22                    THE COURT:  So, is this your motion or are
23     you just adding on because --
24                    MR. CHICK:  It's not --
25                    THE COURT:  -- it impacts your client?
```

1          MR. CHICK:  It's not my motion.  I just feel
2    like I need to at least respond, because we were sort of
3    the subject of the motion.
4          THE COURT:  Go ahead.
5          MR. CHICK:  So, I'll be really brief.
6          My client has a right to be defended, to be
7    zealously defended.  I'm trying to do what I can do to
8    do that.
9          THE COURT:  So is it your theory your guy
10   was there and participated in the murder, but he's not
11   guilty?  Is that your theory?
12         MR. CHICK:  Your Honor, my theory is that
13   there was a planned murder, that he was -- that he was
14   brought to the murder scene, that he didn't know that
15   there was going to be a murder.  A murder happened, and
16   that at some point he was ordered to participate.
17   And --
18         THE COURT:  Okay.  So, duress and mere
19   presence.
20         MR. CHICK:  Your Honor, it's -- duress is
21   not a defense to murder.
22         THE COURT:  I just want to make sure I
23   understood what your defense was.
24         MR. CHICK:  Malice is an element of murder,
25   and --

1    THE COURT:  So, lack of intent and mere

2    presence; is that it?

3    MR. CHICK:  Lack of malice.

4    THE COURT:  All right.  I got it.

5    MR. CHICK:  And, quite frankly, you know,

6    there have been rulings made by the Court that have --

7    that I believe have interfered with my ability to fully

8    zealously represent him; for example, rulings about my

9    ability to -- to point out that there are other

10   defendants here who did, who did, in fact, participate

11   in another murder that was almost exactly similar to the

12   way this murder happened.

13   And, that bolsters my argument that these --

14   all these guys did know about it, they did plan it,

15   because they did it before.

16   And now I can't do that.  So, I do want to

17   point that fact out.  You know, I'm going to keep doing

18   what I'm doing --

19   THE COURT:  Have you made a renewed motion

20   for severance?

21   You have not, have you?

22   MR. CHICK:  I've not filed any papers on

23   that, no, sir.

24   THE COURT:  All right.

25   MR. CHICK:  And I'm not -- I'm not asking

1    for that now.  But I'm just -- I'm laying this out, that
2    that's -- I'm doing what I'm -- I think is best for my
3    client, and I'm going to keep doing it and I'm going to
4    keep pursuing that defense as -- as hard as I can.
5              And, right now, there are certain things
6    that I -- that my hands are tied from doing because of
7    rulings that the Court has made.  So...
8              THE COURT:  You have a right to appeal those
9    rulings.
10             MR. CHICK:  Yes, sir.
11             THE COURT:  Uh-huh.
12             Government counsel?
13             MS. MARTELL:  Your Honor, if I may?
14             THE COURT:  Well, wait a minute.  This is
15   not all add-on -- what's going on here?
16             I mean, I have one motion for severance --
17             MS. MARTELL:  And we join that motion.
18             THE COURT:  Come on up.  Come up on.
19             MS. MARTELL:  Thank you, Your Honor.
20             May it please the Court.  Katherine Martell
21   on behalf of Mr. --
22             THE COURT:  You didn't file anything, did
23   you, Ms. Martell?
24             MS. MARTELL:  Your Honor --
25             THE COURT:  This is just a motion to join,

1  right?

2          MS. MARTELL:  Your Honor, we filed a motion

3  to join.

4          THE COURT:  All right.

5          MS. MARTELL:  Your Honor -- and we agree

6  with Mr. Zimmerman and his pleadings and the case law.

7  And I think this -- like it's spelled out in the

8  government's opposition, this is -- this has to be more

9  than mere finger pointing, which this is.  This has to

10 be that if you -- if you believe Paiz Guevara's defense,

11 and -- then you have to disbelieve the co-defendants on

12 Count 6.

13          Here, the co-defendants have laid out, at

14 least through cross-examination, that their defense is

15 that, well, some of them will argue, they weren't there.

16          I think that Mr. Amolsch, when he -- he came

17 up and through some of the cross-examination it's been

18 clear that it's -- there was no plan; that if there was

19 a murder that took place regarding Count 6 of Little

20 Guason, that there was no plan to kill Little Guason, by

21 some of these co-defendants.

22          And, Mr. Paiz Guevara's defense is that

23 there was, in fact, a plan, that there was a plan to

24 kill, except his client was the only one -- because of

25 his status as a *chequeo*, that his client was the only

one that wasn't part of that plan.

So, if you believe Paiz Guevara's defense, that there was, in fact, a plan, you must disbelieve the co-defendants, who are saying that: Well, hey, there was no plan.

And, I think that, as Mr. Chick says, he has a right, and he will continue to pursue that theme throughout the trial. And from the case law, we don't have to wait until the defense's case-in-chief until the defense presents their witnesses and -- to see whether or not Mr. Paiz Guevara takes the stand and says just that, that there was, in fact, a plan that night, but he was the only one left out of the plan.

That's a mutually exclusive defense, Your Honor. That is the basis for severance in a case like this.

On Count 6, which is the one that my client is charged with along with Paiz Guevara, there is no way that my client can build a defense at this point. There's no -- there's no case that we can present that would not be mutually exclusive of Paiz Guevara.

THE COURT: What is your client's defense, Ms. Martell?

MS. MARTELL: Well, one, we will argue that he wasn't there; however, that there was no plan to

1    murder -- that there was no plan that evening and -- to

2    kill Lil Guasón.

3                     And, I think that at the root of that,

4    that -- that is the opposite of what Mr. Paiz Guevara is

5    saying.

6                     THE COURT:  Okay.  Well, this is a

7    conspiracy case where I infer that each of you will

8    argue that there was no agreement, no common plan, no

9    concerted action.  And I think that is going to be one

10   of the key factors that the jury will have to consider

11   as well.

12                    Don't you agree?

13                    MS. MARTELL:  I agree, Your Honor.  And I

14   think --

15                    THE COURT:  So the fact that there's -- you

16   would not want to create the impression that all the

17   defendants had an agreement in any respect, would you,

18   as a defense attorney in a conspiracy case?

19                    MS. MARTELL:  And that's -- that's exactly

20   right, Your Honor.  But that is what Mr. Paiz Guevara's

21   defense is.  His defense is not that there was no plan,

22   there's no conspiracy, because there was no plan to

23   kill.  His defense is just the opposite, that there was

24   a plan.

25                    THE COURT:  The defense has to be supported

by evidence.

Thank you.

MS. MARTELL:  Thank you, Your Honor.

MS. MARTINEZ:  Your Honor, the government submits that there are not sufficient grounds to sever here, for the core reason that the two defenses that have been described in the pleading and in court today, while inconsistent, are not mutually antagonist- -- are not irreconcilable.

And the core proposition from the Fourth Circuit case law is that defenses are not mutually antagonistic where one defendant's guilt is not dictated by the asserted -- asserted innocence of his co-defendants.

Here, we have one defendant who is apparently going to have the defense that the murder happened, and that he was present, but that he does not have legal guilt, legal culpability, for the murder that happened.

We have one or more other defendants who, as I understand, won't say that the murder didn't happen, will simply say that they weren't there.

Your Honor, the government's evidence will prove, through recordings and through the testimony of cooperators, that seven gang members were involved in

this murder.

So, the idea that one defendant saying, "I wasn't there" is somehow completely disproven by another defendant saying, "I was there and other people duped me" or "tricked me" or "forced me into doing this," they're inconsistent, perhaps, maybe, but they are not irreconcilable.

And for that core reason and all the case law that we cited in -- in our brief, there is simply no ground to sever here.

Mr. Zimmerman talks about a Fourth -- a Fifth Circuit case.  Of course, that's not binding on this Court.  The Fourth Circuit precedent is binding. But that Fifth Circuit case that Mr. Zimmerman so heavily relies on is completely distinguishable here.

In the Fifth Circuit case, the issue there was that you couldn't believe one defense and also believe the other defense.  That was the issue in the Fifth Circuit case.

That is distinguishable here.  Here, you can believe both defenses.  You could acquit both defendants.  The jury could find that Mr. Paiz Guevara was there, but that he didn't intend to commit murder, and could find that Mr. Gaitan Benitez wasn't at the murder.

1          And that would not be inconsistent.  It

2    wouldn't be inconsistent with the murder even happening

3    or with the conviction of some other defendant.

4          For that reason, there's no grounds here.

5    And this case is much more similar to the Fourth Circuit

6    case of *U.S. versus Smith,* where in fact one defendant

7    said, "I didn't do it," and the other defendant had a

8    different kind of defense, but at the end of the day the

9    two defenses weren't irreconcilable.

10          Your Honor, we've briefed this -- this

11   motion extensively.  I would cite the cases of *U.S.*

12   *versus Lightly*, and the quote:  "The presence of

13   conflicting or antagonistic defenses alone does not

14   require severance.  The mere presence of hostility among

15   defendants or the desire of one to exculpate himself by

16   inculpating another are insufficient grounds to require

17   separate trials."

18          As the Court goes on to explain, "There must

19   be such a stark contrast presented by the defenses that

20   the jury is presented with the proposition that to

21   believe the core of one" -- "of one defense it must

22   disbelieve the core of the other."

23          That is not the case that we have here.  And

24   I'll go -- I'll point out further that in *U.S. versus*

25   *Smith*, the Fourth Circuit observed, in denying a very

1  similar motion to sever, a motion where one defendant
2  said he didn't do it and the other defendant had a
3  different kind of defense -- in denying that motion to
4  sever the Fourth Circuit observed:  "Joint participants
5  in a scheme often will point the finger at each other to
6  deflect guilt from themselves or will attempt to lessen
7  the importance of their role."
8          The Court noted that there's a certain
9  amount of conflict among the defendants, and that that's
10 inherent in most multi-defendant trials.  That's all we
11 have here, Your Honor, and there is no grounds to sever.
12          THE COURT:  All right.
13          MR. ZIMMERMAN:  Brief rebuttal, Your Honor?
14          THE COURT:  Sure.
15          MR. ZIMMERMAN:  Thank you.
16          Your Honor, in some sense, I think
17 Ms. Martinez has made our argument, because what she's
18 done is, in order to argue that a severance isn't
19 appropriate, she has really downplayed and
20 mischaracterized Paiz Guevara's defense.
21          Paiz Guevara's defense is that Mr. Benitez
22 and others -- but, my client -- duped or forced him to
23 commit the murder.  He was there, Mr. Benitez was there,
24 and the reason why Guevara is not guilty -- his theory
25 of -- of acquittal is that my client forced him to

1    commit the murder.

2                That's the core of the defenses.  That's

3    what the --

4                THE COURT:  You said it was not duress.  I

5    just asked.  You said it was not going to be duress.

6                MR. ZIMMERMAN:  Well, I understand that,

7    Judge.

8                But -- but the testimony -- the opening that

9    we heard and the cross that we heard -- and again, I

10   mean, what I'm seeking here to do is to make this motion

11   which I filed, you know, after the testimony last week

12   as early as practicable, when this came up in opening

13   and cross, and not waiting for Guevara to point the

14   finger.

15               In all the cases the government cites -- the

16   government cited *United States versus Smith.*  And again,

17   as I noted, what we have in this case is you've got --

18   you've got a bunch of individuals involved in the

19   misappropriation of loan proceeds, and they -- it's

20   relative roles.

21               They say, "Look, he was the architect of the

22   fraud scheme.  I was kind of following his direction."

23   Each side says, "I didn't have specific intent."

24               So, the jury can look at those relative

25   roles, as the Court has commented during its motions

1    hearing.

2                    But in the case I cited --

3                    THE COURT:  Mr. Zimmerman --

4                    MR. ZIMMERMAN:  -- in *Romanello* --

5                    THE COURT:  Mr. Zimmerman?

6                    MR. ZIMMERMAN:  Yes.

7                    THE COURT:  You're repeating yourself.

8                    MR. ZIMMERMAN:  I'm sorry, Judge.

9                    Here's the bottom line.  The bottom line is

10   that the language consistent in all of these cases, that

11   the jury is presented with the proposition that to

12   believe the core of one defense, it must disbelieve the

13   core of the other, this isn't a fight about relative

14   roles in a fraud scheme.  This is Paiz Guevara stating,

15   through opening and cross -- and I'm -- and we're

16   obviously previewing, as Ms. Martell said, and we don't

17   have to wait for that, and shouldn't -- his examination

18   that, um, Mr. Benitez was participating in this, and as

19   a result of his participation and the duping or however

20   his counsel wants to characterize it -- because of

21   Mr. Benitez's presence and duping of his client, his

22   client is not guilty.

23                   In order to find his guilty not guilty, the

24   jury would have to find my client guilty.

25                   He's absolutely entitled to that defense.

He's entitled to aggressively pursue it.  But what
Mr. Benitez is entitled to is to not have prosecutors on
both sides of me here.  It's to not have the government
have a theory and then Guevara have the same theory,
that requires my client to be convicted for his to be
acquitted.

That was the scenario in the cases I cited,
and it's very different.  And -- and the government
characterizes Guevara's defense as much less than it
actually is, to fit around this requirement of
severance.

And it just isn't -- I don't think it's a
fair characterization.  I think when the defense
continues to develop, we're going to see that -- this
real blame, the core of the defense.  And so, we would
submit that severance is warranted.

THE COURT:  All right.

Let the record reflect this matter is before
the Court on the Defendant Alvin Gaitan Benitez's motion
for severance of the trial.

Defendant contends that there are
antagonistic defenses which are denying him his right to
fair trial, and that the co-defendant, Mr. -- that his
client, Mr. Gaitan Benitez, faces the risk of being
prejudiced by the defense being put forth by Manuel

Ernesto Paiz Guevara concerning his role in the offense.

This is a conspiracy case.  There are seven defendants.  The jury has been instructed multiple times to consider the evidence separately for each individual defendant.

And here, I do not find the defenses are conflicting or antagonistic, such as would require severance under Rule 14.

The *Lightly* case talks about -- I don't even believe it's hostility.  I actually think that in any conspiracy case, each of the defendants would want to deny that there was an agreement and would offer evidence that there was no concerted action.

And what we have here is, apparently, Mr. Paiz Guevara is going to claim that he was present at the scene of the murder, but he was duped into coming to the scene.  He didn't know it was -- even though he participated, he was somehow coerced to participate, but it was not duress.

And, this is the defense he's presenting at a trial where there will be five co-defendants to testify, and there are recordings of a variety of gang member discussions of events.

It may well be that that defense has to be measured separately from the defense being offered by

counsel here for Mr. Gaitan Benitez, who claims that he was not involved, was not present, and, in other words, the "I did not do it" defense.

Well, as I see it here, the difference in the defenses being asserted does not present any stark contrast that the jury has to accept one theory and reject the other.  There's no indication here of who is going to testify or not.

But we do know that each individual is entitled to present their own defense.  And in a conspiracy case, the mere presence is a defense, not being a part of the conspiracy is a defense, not having any mutual intent to act in concert is a defense, And all these defenses can be presented coherently in a trial such as this, and I do not think that there's a sufficient basis shown for a severance.

I think the *Lightly* case in the Fourth Circuit, and *Najjar* and the *Smith* cases all support the Court's judgment that the motion for severance will be denied.

Thank you.

I'm not sure what Mr. Cerritos wanted me to do about this notice of filing.  Is that something you want me to take up now, or not?

MR. CONTE:  Your Honor, the Court invited an

1   argument for another motion, the defense counsel to

2   provide to the Court any indication -- any examples of

3   where we -- we were being unfairly treated in the

4   discovery in this case.

5           THE COURT:  Well, to be clear, as I

6   understand it, what you have is a lot of information

7   about the whole investigation, and you've been told and

8   identified documents that they thought were associated

9   with the case.

10          Your concern, as I understand it, is to ask

11  for every single thing in the investigation, including

12  the identity of all the witnesses interviewed by the FBI

13  be disclosed.  Is that right?

14          MR. CONTE:  Correct, Your Honor.

15          THE COURT:  And what would be the purpose of

16  that?

17          MR. CONTE:  Pardon me?

18          THE COURT:  What would be the purpose of

19  that, if they're not related to this case?

20          MR. CONTE:  Judge, if I can't -- if I don't

21  know who is talking, I have no way to investigate.

22  There's documents in there that somebody says that --

23  well, one, in particular, and probably the most

24  apparent, is one person identifies herself as my

25  client's girlfriend.

```
1            I don't know that.  I mean, how do I figure
2    that out, if I don't know who -- who the name is?
3            And, likewise --
4            THE COURT:  If the person is being called as
5    a witness, you'll certainly know who that person is --
6            MR. CONTE:  But Rule --
7            THE COURT:  -- if that's his girlfriend, if
8    that's what you're talking about.
9            MR. CONTE:  But Rule 16(a)(1)(E)(i) says I'm
10   entitled to any document that -- to help me build my
11   defense.
12           And, if I'm denied a document that may be
13   pertinent -- and it's not the government -- it can't be
14   the government that decides what's important or what's
15   relevant or what's necessary for a defense.
16           THE COURT:  If you're talking about
17   exculpatory evidence, that's something different.
18           MR. CONTE:  I'm not talking about
19   exculpatory evidence.
20           THE COURT:  So you're talking about
21   disclosure of every witness interviewed in the gang
22   investigation, which is still ongoing and is much
23   broader in this case.  I want to make sure, that's the
24   record you want to make, right?
25           MR. CONTE:  Correct.
```

1          THE COURT:  Okay.

2          MR. CONTE:  But how do I know what's in

3    there?  It could be exculpatory or it could help me

4    build my defense.

5          THE COURT:  We had the 302.  All you don't

6    have is the name.  If there was something exculpatory

7    you could point me to, that's one thing.  But you're not

8    pointing to anything exculpatory, are you?

9          MR. CONTE:  Judge, unless I know who's

10   speaking, I can't know whether they're telling the truth

11   or not.  I --

12         THE COURT:  Are you saying --

13         MR. CONTE:  Somebody could say my client was

14   present at the murder.

15         Well, who is it?

16         It may be -- and they redact the name, and

17   it's somebody who I can prove wasn't there.

18         THE COURT:  Mr. Conte, I want to make sure

19   that you and I understand each other.  If you pointed me

20   to a document where there's some information about your

21   client and this case that you think is exculpatory,

22   that's one thing.

23         If it is information that is incriminating,

24   that only relates to the investigation as a whole and

25   not this case, I don't see a basis to disclose it.  Do

1  you?
2          MR. CONTE:  Yes, I do.
3          THE COURT:  Okay.
4          MR. CONTE:  I believe the rule --
5          THE COURT:  All right.
6          MR. CONTE:  -- requires that they provide us
7  the information.  And if they can't provide us the
8  information, the rule says they need to -- they need to
9  file a motion for a protective order with the Court so
10 that the Court can decide what is pertinent and what is
11 not.
12         And the government --
13         THE COURT:  And the reason you want these
14 names is so you can show your client everybody who have
15 been interviewed about the MS-13 case, right?
16         MR. CONTE:  How do I know whether that
17 person is telling the truth, unless I know who it is?
18         THE COURT:  All right.  I think I understand
19 your position.
20         Thank you.
21         MS. MARTINEZ:  Your Honor, just briefly for
22 the record, we made our position clear in the filing.
23 We see nothing under Rule 16 or any other discovery
24 obligation that requires the government to tell a
25 defendant the name of every single person who was

interviewed by him in the scope of a broad
investigation.

To be clear for the record, where the --
where the individual who was interviewed is going to
testify in this case, that name has not been redacted.
So, defense counsel have been provided with 302s, with
the names unredacted, for witnesses who will actually
testify for the government's case.

In the instances in which the names have
been redacted, the substance of the information has been
provided and made available to defense counsel.

And, Your Honor, the government agrees with
Your Honor that if it were exculpatory information, that
would be a very different kind of scenario.  And we've
worked with defense counsel when they've identified
something that -- that they believe is exculpatory.  The
government has tried very hard to identify exculpatory
information.

But sometimes we're not privy to the
defense.  And when there has been a request for
information that a particular defendant believes is
exculpatory, we have done our best to try to accommodate
that.

But here, this defendant is not claiming
anything exculpatory, and he's not claiming that he's

1    been denied the substance of the information.

2            I would -- I would submit that the

3    government has, in fact, provided even more than is

4    required under Rule 16 already.  But, that's appropriate

5    in a case of this magnitude and of this importance and

6    with the type of consequences these defendants are

7    facing.

8            But we simply cannot give the defendant --

9    not just defense counsel, but the defendant -- the list

10   of all of the names of the individuals who agreed to

11   talk to law enforcement during this case.

12           It's not required, and it would put those

13   people and their families in undue jeopardy.

14           Thank you.

15           THE COURT:  All right.

16           MR. CONTE:  Your Honor, I understand

17   security is an issue.  However, the government in their

18   argument said they're not providing it because they

19   don't want to give the names to the defendants.

20           And, the response that I make is that the

21   government can provide us the information with a motion

22   for a protective order, or whatever it wants to do; but

23   we're entitled to it.

24           I think the government is conceding that

25   we're entitled to it, but under the guise of,

"Well, we're not going to give it to them because the defendant will learn their names" -- unless we have the names, we can't investigate what these people are saying, whether they're telling the truth or were telling a lie.

And the government's position that we -- we can't have it because the defendants will get their names is not appropriate.  That's not what Rule 16 says.

THE COURT:  Thank you.

Let the record reflect this matter is before the Court on the defendant's notice of filing.  It's not exactly a motion, but it is an attempt to, under Rule 16(a)(1)(E)(i), obtain the names of all the witnesses who have been interviewed in the investigation.

And as I understand it, the government has provided defense counsel with the 302s from FBI interviews of a number of individuals who will not be witnesses in the case, and identified in those 302s witnesses who will be called and disclosed that information.

So the substance of the motion is to require the government to identify every single person interviewed in the broad investigation, which is not -- is beyond just this case, into MS-13 and other matters.

Defendant is not claiming that this

information is exculpatory.  He does not claim that he is entitled to full disclosure of all the incriminating evidence that the government has.

Maybe in a civil case that would be the rule, but as far as I understand under Rule 16, the scope of discovery in a criminal case is quite limited, and it does not include every single person interviewed by the government, except as required under Rule 16, with a statement made by the defendant or exculpatory evidence.

Additionally in this case, the concern that has been voiced throughout the trial, and pretrial as well, is the disclosure of names of individuals interviewed, and whether or not they are potential witnesses, or who may be cooperating defendants who are not testifying -- let me take that back, not cooperating witnesses, but identified individuals who have been interviewed, may pose some risk to those individuals, as there has been indication of threats of retaliation to potential witnesses and their families.

So it seems to me that, first of all, Rule 16, defense is not entitled to it.  The defendant is not claiming that it is exculpatory, nor is the government required to disclose every single bit of discriminating evidence to the defendant under Rule 16.

1          So the motion is denied.

2          We will take a five-minute recess and bring

3   the jury out.  Thank you.

4          (Court recessed at 10:09 a.m. and reconvened

5          at 10:21 a.m.)

6          THE COURT:  Ready to bring the jury out?

7          (Counsel indicating.)

8          THE COURT:  You can bring the jury out,

9   Mr. Toliver.  Thank you.

10         (Jury present at 10:22 a.m.)

11         THE COURT:  You may be seated.

12         Good morning, ladies and gentlemen.

13         THE JURORS:  Good morning.

14         THE COURT:  Good morning, Mr. Manuel Ernesto

15  Paiz Guevara.

16         Good morning, Mr. Christian Lemus Cerna.

17         Good morning, Mr. Omar Dejesus Castillo.

18         Good morning, Mr. Jesus Alejandro Chavez.

19         Good morning, Mr. Alvin Gaitan Benitez.

20         Good morning, Mr. Douglas Duran Cerritos.

21         And good morning, Mr. Jose Lopez Torres.

22         Good morning, Counsel.

23         Ready to proceed?

24         I didn't mean to leave out the interpreters.

25  Good morning, everyone.  I apologize.

```
 1                    (Witness resumed stand.)
 2               THE COURT:  Good morning, Mr. Villegas.
 3               THE WITNESS:  Good morning.
 4               THE COURT:  Counsel ready to proceed?
 5               MR. SALVATO:  Yes.
 6               THEREUPON, JAIME ROSALES VILLEGAS,
 7     previously sworn, testified further as follows:
 8                    CROSS-EXAMINATION (Continued)
 9     BY MR. SALVATO:
10        Q.   Good morning, sir.
11        A.   Good morning.
12        Q.   Sir, what year were you arrested in this case?
13        A.   In 2013.
14        Q.   And, how -- what year did you meet my client, the
15     person you've identified as Christian?
16        A.   In 2012.
17        Q.   And the notebook that we talked about last time
18     was found when you were arrested in 2013; is that right?
19        A.   Yes.
20        Q.   And, sir, as an MS member or associate, is it
21     true that you and others bragged a lot?
22        A.   Can you repeat the question?  I didn't
23     understand.
24        Q.   Sir, is it true that you and other people in
25     MS-13 brag a lot?
```

1   A.   Yes.

2   Q.   And, sir, is it true that oftentimes the younger

3   guys try to brag to the older guys to make themselves

4   look tougher?

5   A.   Yes.

6   Q.   Sir --

7            THE INTERPRETER:  (Speaking to witness.)

8            THE WITNESS:  I'm sorry, I didn't understand

9   the question.

10           MR. LEIVA:  Your Honor, if I may, he

11  answered the question.

12           I think when the translator added the second

13  part, that's confusing.  It made it sound like it was

14  two separate questions when, in fact, it was one

15  question.

16           MR. SALVATO:  I'll do it, Your Honor.

17           THE COURT:  All right.  Restate your

18  question, please.  Thank you.

19  BY MR. SALVATO:

20  Q.   Sir, would you say it's true that the younger

21  guys often brag to the older guys to make themselves

22  look tougher?

23  A.   Yes.

24  Q.   Sir, do you remember last time we were here,

25  there were some recordings that you listened to?

1     A.   Yes.

2     Q.   And, there were some discussions about

3 prostitutes from New York.  Do you remember those

4 statements?

5     A.   Yes.

6     Q.   And when did those discussions about prostitutes

7 take place?  What year?

8     A.   In 2013.

9     Q.   And, these were prostitutes that were talked

10 about that were going to come down from New York,

11 correct?

12     A.   Yes.

13     Q.   And, did any prostitutes ever arrive from New

14 York?

15     A.   No.

16     Q.   And, that is an example of bragging or talking

17 about plans that never happened?

18     A.   Yes.

19     Q.   You also talked about, last time we were here, I

20 guess Tuesday, about patrolling the sector.  Do you

21 remember that?

22     A.   Yes.

23     Q.   And, sir, were you one of the people that was

24 patrolling the sector?

25     A.   Yes.

1    Q.   And, did you participate in patrolling the sector
2    in any attacks on *chavala*s?
3    A.   No.
4    Q.   How long did you patrol the sector for?
5    A.   Can you repeat that?  I don't understand the
6    question.
7    Q.   Did you patrol the sector for months, a year?
8         How long did you patrol the sector for?
9    A.   For as long as I was out, around a year.
10   Q.   So, in a year of patrolling the sector, you never
11   attacked any *chavalas*, right?
12   A.   No.
13   Q.   You never attacked any *chavalas*, correct?
14   A.   No.
15   Q.   And, no *chavala*s ever appeared in the sector or
16   you would have attacked them, right?
17   A.   Yes.
18   Q.   And, by patrolling the sector, does that mean
19   you're just kind of walking around the neighborhood?
20   A.   No.
21   Q.   When you patrol somewhere, are you driving or
22   walking?
23   A.   Sometimes walking, sometimes driving.
24   Q.   And, how big is this sector we're talking about?
25   A.   I wouldn't be able to tell you the exact length

1    of the sector.

2        Q.   Is it a block?

3        A.   Could be, could be, or some blocks.

4        Q.   How many blocks are you telling us constitute the

5    sector?

6        A.   I don't know the length of the blocks.

7        Q.   Okay.  How many blocks are in a sector?

8        A.   The sector where we were was around four blocks,

9    four blocks.

10       Q.   And, what you're telling the jury is, you would

11   drive around these four blocks?

12       A.   Sometimes, yes, sometimes I would drive around

13   the blocks.

14       Q.   And, sometimes you would walk around these four

15   blocks?

16       A.   Yes.

17       Q.   At the time you're patrolling this sector, did

18   you know my client, Christian?

19       A.   Yes.

20       Q.   Did he have a car to help patrol the sector?

21       A.   No.

22       Q.   Did anybody have a car, besides yourself, to

23   patrol these four blocks?

24       A.   No.  Just me.

25       Q.   So, you would really be the only one driving

1    around this sector, true?

2        A.   Yes.

3        Q.   And nothing ever happened, right?

4        A.   Yes.

5        Q.   So, this whole idea about patrolling the sector

6    is kind of another example of you bragging about

7    something to make it seem more important, true?

8        A.   No.

9        Q.   Sir, I believe you said that the drug that PVLS

10   sold was marijuana; is that right?

11       A.   Yes.

12       Q.   And, did you sell marijuana?

13       A.   Sometimes.

14       Q.   How many times did you sell marijuana?

15       A.   Like on two occasions.

16       Q.   So, over the course of a year, you sold marijuana

17   twice as part of the clique?

18       A.   Yes.

19       Q.   And, is it true that on these two occasions over

20   this year, the amount of marijuana you sold was very

21   small?

22       A.   Yes.

23       Q.   And, sir, I think you said two days ago that all

24   the money that was made on these marijuana sales went

25   back to the clique, correct?

1    A.   Yes.

2    Q.   And that was to pay the clique dues, correct?

3    A.   Yes.

4    Q.   How much money did you profit on those two sales,

5    over a year, of the marijuana?

6    A.   My earnings were quite small.

7    Q.   How much -- well, what amounts did you sell those

8    two times?

9    A.   On those two occasions, it was like around $60.

10   Q.   $60 in profit?

11   A.   Yes.

12   Q.   How much did you purchase the marijuana for?

13   A.   (Answer not interpreted.)

14         THE INTERPRETER:  The interpreter needs --

15   the interpreter needs to ask for repetition.

16         MR. SALVATO:  I can repeat the question.

17   It's okay.

18         THE INTERPRETER:  Your Honor, the

19   interpreter needs a repetition of the response.

20         MR. SALVATO:  I'm sorry.

21         THE COURT:  Okay.  You can ask him to

22   repeat.

23         THE INTERPRETER:  (Complies.)

24         THE WITNESS:  It was around $400, that is,

25   what it cost the clique to purchase that marijuana.

1    BY MR. SALVATO:

2        Q.   On the two occasions that you sold marijuana, you

3    sold it -- you bought it for $400, correct?

4        A.   I hadn't purchased it.  Other members of the gang

5    had.

6        Q.   So, when the marijuana came to you, you sold it,

7    correct?

8        A.   Yes.

9        Q.   And, the profit that you made was $60?

10       A.   60.

11       Q.   You would agree with me, sir, that that's a very

12   small amount of profit over a year, correct?

13       A.   Yes.

14       Q.   And, sir, you were never obviously prosecuted for

15   your sales of marijuana, correct?

16       A.   Yes.

17       Q.   And, the dues that were paid were about $10,

18   right?

19       A.   Yes.

20       Q.   Sir, let me move to another area, if I can.

21            You remember you testifying about the rules of

22   MS-13?

23       A.   Yes.

24       Q.   And, one of the rules you talked about is that

25   individuals have to have respect for family.

1    A.   Yes.

2    Q.   And you said that that was the most important

3    rule?

4    A.   No.

5    Q.   The most important rule is to not cooperate with

6    the police, true?

7    A.   The most important rule is to have respect and

8    fidelity to the gang.

9    Q.   And, the second most important rule would be that

10   you do not cooperate with the police, true?

11   A.   No.

12   Q.   So, you're telling us that that is the third most

13   important rule?

14   A.   I think so, but I really didn't learn much of the

15   rules of the gang.

16   Q.   Well, I think you told us all that you were

17   familiar with these rules, correct?

18   A.   Some of them, yes.

19   Q.   Well, the government asked you what the most

20   important rules were, and you said, one, three and five;

21   is that correct?

22   A.   Those are the ones that we have to correct in the

23   clique.  Those are the ones that we work for.

24   Q.   But you really didn't learn any of the rules; is

25   that what you're telling us?

1    A.   Yes, I did not learn them.  I did not learn them.

2    Q.   Sir, when the government asked you questions

3    about respecting family, you were able to answer those

4    questions, right?

5    A.   Yes.

6    Q.   And, was that -- and you gave an example about

7    somebody's wife.  Do you remember that?

8    A.   Yes.

9    Q.   And, sir, was that a question and answer that you

10   had previously spoken to the government about before

11   your testimony?

12   A.   I don't understand that.  Can you repeat it?

13   Q.   You practiced your answers with the government,

14   true?

15   A.   No.

16   Q.   I thought Mr. Jenkins asked you whether you had

17   gone over these questions with the government.

18   A.   I don't understand.

19   Q.   Didn't you testify earlier that you had practiced

20   these questions and answers with the government?

21   A.   Yes.

22   Q.   And, one of those questions was an example about

23   somebody's wife being respected, correct?

24   A.   Yes.

25   Q.   And, you know the difference between, obviously,

 1   a wife and somebody's girlfriend, correct?

 2       A.   Yes.

 3       Q.   So, family could be mother, father, wife, true?

 4       A.   Yes.

 5       Q.   But not -- girlfriend is not family?

 6       A.   No.

 7       Q.   And, sir, you mentioned an individual named

 8   Skinny.  Do you know Skinny?

 9       A.   Yes.

10       Q.   Was Skinny married?  Did he have a wife?

11       A.   I don't know whether they were married, but he

12   had a -- somebody -- a partner.

13       Q.   But Skinny wasn't married, was he?

14       A.   I think that he was not.

15       Q.   Sir, you also mentioned an individual you knew as

16   Duende.

17       A.   Yes.

18       Q.   When did you meet Duende?

19       A.   I also met him in 2012.

20       Q.   And where did you meet him?

21       A.   In the sector in Culmore.

22            MR. SALVATO:  May I have the Court's

23   indulgence for ten seconds.

24            THE COURT:  Sure.

25            MR. SALVATO:  I appreciate it.

1          (Pause.)

2          MR. SALVATO:  I'm inquiring whether the

3  picture of Duende was introduced into evidence.  It was

4  used in opening, But I'm not sure whether it was

5  introduced into evidence.

6          THE COURT:  I think it was.  That's my

7  recollection.

8          MR. SALVATO:  I didn't want to --

9          THE COURT:  I don't know the number.  It's

10 around the 60s, I think.  I think it's around the 60s,

11 but I don't remember the number.

12         MR. SALVATO:  I apologize, Your Honor.

13         THE COURT:  That's all right.

14         MR. SALVATO:  I think it's Exhibit 73.  It

15 has not been admitted, but I believe it was used in

16 opening.

17         I would ask permission to --

18         THE COURT:  Ask him to identify it first and

19 lay the foundation.

20 BY MR. SALVATO:

21   Q.  Can you take a look at Exhibit 73?

22         MR. SALVATO:  Mr. Toliver?

23 BY MR. SALVATO:

24   Q.  Can you look at that exhibit?  Is that -- who is

25 that?

1    A.   This is Duende.

2         MR. SALVATO:  Your Honor, can I move that

3    in -- or ask that it be published at this time?  I guess

4    that's probably the better way to do it.

5         THE COURT:  So you want to move it in

6    evidence in the government's case-in-chief?

7         MR. SALVATO:  No, Your Honor.  I'd just like

8    to publish it to the jury.

9         THE COURT:  You can't publish what's not

10   admitted.

11        MR. SALVATO:  I'll ask him questions about

12   it.

13        THE COURT:  Okay.  You can put it back.

14   BY MR. SALVATO:

15   Q.   That's Duende, correct?

16   A.   Yes.

17   Q.   Does Duende have any tattoos?

18   A.   Yes.

19   Q.   And, what types of tattoos does he have?

20   A.   He had the MS letters on his leg, and he had some

21   other tattoos on his body, but I do not remember what

22   were those.

23   Q.   And tattoos are a way you represent what you've

24   done in the gang, true?

25   A.   No.

1      Q.   Tattoos do not represent doing an act of violence
2   or something strong for the gang?
3      A.   No.
4      Q.   And, I believe you said that you knew Duende --
5   how long did you know Duende for?
6      A.   Nearly a year.
7      Q.   And, I think you said previously on Tuesday that
8   you believed he was a good person, correct?
9      A.   I don't understand the question.
10      Q.   I think you said just two days ago that you
11   thought that Duende was a good person.
12      A.   Yes.
13      Q.   And you never knew Duende to do anything violent?
14      A.   No -- could you repeat that?
15      Q.   You never saw Duende do anything violent?
16      A.   No.
17      Q.   And I think you identified a sign of the devil
18   last time you were in court; is that right?
19      A.   Yes.
20      Q.   And, Duende was familiar with that sign, correct?
21      A.   Yes.
22      Q.   Sir, did you know Duende to be a worshipper of
23   the devil?
24      A.   No.
25           MR. SALVATO:  Your Honor, I'd ask, with

 1    Mr. Toliver's assistance, if this witness could look at

 2    Government's Exhibit 65-B, which I believe has already

 3    been admitted into evidence, Your Honor.

 4              THE COURT:  Go ahead.

 5    BY MR. SALVATO:

 6         Q.  Who is that in 65-B?

 7         A.  Payaso.

 8              MR. SALVATO:  Your Honor, I think I'm going

 9    to be one for two here, but can I ask for this picture

10    to be published to the jury?

11              THE COURT:  Yes.

12    BY MR. SALVATO:

13         Q.  Sir, that's Payaso, correct?  Your cousin?

14         A.  Yes.

15         Q.  And, obviously, he has a lot of tattoos on him?

16         A.  Yes.

17         Q.  And, that's a representation of the gang, true?

18         A.  Yes.

19         Q.  And, the sign he's giving is an MS-13 sign or the

20    devil sign?

21         A.  It's an MS.

22         Q.  And, what significance do any of those tattoos

23    have?

24         A.  Well, the "MS" represents the clique.

25         Q.  What else?

1    A.   503 is the Area Code for our country.

2         The other ones, I don't know.  They are -- it's a

3    clown, a woman clown that he has there.

4    Q.   Is there any other tattoos that, in your opinion,

5    have any significance in the gang?

6    A.   No.

7         MR. SALVATO:  Thank you.  You can take that

8    down.

9    BY MR. SALVATO:

10   Q.   And, sir, you knew -- is it fair to say that my

11   client, Christian, who you pointed out in the back, has

12   no tattoos?  Correct?

13   A.   No.

14   Q.   Okay.  Does -- does he have tattoos or not?

15   That's my question.

16   A.   No, he doesn't.

17   Q.   Sir, the transcripts are -- or the tape

18   recordings that you listened to, fair to say that it's

19   difficult to hear what's being said?

20   A.   Yes.

21   Q.   And I think on one of the tapes, you said you

22   could understand only a little, correct?

23   A.   Yes.

24   Q.   So, while you might be able to identify the

25   voices on the tapes, it is very difficult to understand

1  what exactly is being said, true?

2  A.  No.

3  Q.  I thought you just told us that it was difficult

4  to understand what was being said?

5  A.  Well, there are some recordings that you can

6  understand, and others, no.

7  Q.  Okay.  How many could you not understand?

8  A.  I don't remember.

9  Q.  Okay.  How many did you listen to?

10  A.  I don't remember how many.

11  Q.  Was it more than 20?

12  A.  No.

13  Q.  Was it more than ten?

14  A.  No, but I -- I don't know really.

15  Q.  More than five?

16  A.  No.

17  Q.  Less than five?

18  A.  Yes.

19  Q.  So, out of the less than five, would you say half

20  were difficult to understand what was being said?

21  A.  No.

22  Q.  None of them were difficult to understand?

23  A.  Those were easy to understand.

24  Q.  How many did you listen to that were not easy to

25  understand?

J. Villegas - Cross                                                55

1     A.   The ones that I listened to were easy to
2 understand, but there were parts in the conversation
3 that you could not understand.
4     Q.   Sir, you entered into a plea agreement with the
5 government; is that correct?
6     A.   Yes.
7     Q.   And you decided to plead guilty before this trial
8 took place, correct?
9     A.   Yes.
10     Q.   And, you decided to cooperate with the government
11 before the trial started, true?
12     A.   Yes.
13     Q.   Because, it was your understanding that if you
14 went to trial, it would be too late to cooperate, true?
15     A.   Yes.
16     Q.   You needed to enter a plea agreement with the
17 government before the trial started?
18     A.   Yes.
19     Q.   Could I have you take a look at Government's
20 Exhibit 120, which is your plea agreement.
21          Is that your plea agreement?
22     A.   Yes.
23     Q.   And, on the last page of the plea agreement,
24 could you --
25               MR. SALVATO:  Can he take it out of those

1    sleeves, Your Honor?

2              THE COURT:  Sure.

3    BY MR. SALVATO:

4        Q.  Is your signature at the end of the plea

5    agreement?

6        A.  Yes.

7        Q.  Okay.  And, you had an attorney or two attorneys

8    help you with this plea agreement, true?

9        A.  Just one.

10       Q.  And so you had one attorney help you with this

11   plea agreement, true?

12       A.  Yes.

13       Q.  And, you had a -- the plea agreement is in

14   English, correct?

15       A.  Yes.

16       Q.  But, you had the help of a translator or an

17   interpreter, or both, to review the plea agreement with

18   you?

19       A.  Yes.

20       Q.  And, at the end of the plea agreement you signed

21   your name, true?

22       A.  Yes.

23       Q.  And, you told the judge -- and it's in the

24   papers -- that you had read and understand everything in

25   the plea agreement, true?

1      A.   Yes.

2           MR. SALVATO:  Your Honor, this has been

3   admitted.  I would ask, with the assistance of

4   Ms. Bishop, if we could look at Government's

5   Exhibit 120, paragraph 14.

6           THE COURT:  All right.

7           MR. SALVATO:  And publish that to the jury.

8           THE COURT:  Okay.

9           MR. SALVATO:  It's on page nine.

10  BY MR. SALVATO:

11     Q.   Do you have that paragraph in front of you?

12     A.   Yes.

13     Q.   And that was translated to you, correct?

14     A.   Yes.

15          MR. SALVATO:  Your Honor, can I have the

16  interpreter just read that paragraph to him in Spanish?

17  And then I would like to ask him a question --

18          THE COURT:  Yes.

19          MR. SALVATO:  -- on that.

20          THE INTERPRETER:  (Complies.)

21  BY MR. SALVATO:

22     Q.   Did you have that paragraph translated to you?

23     A.   Yes.

24     Q.   And, sir, it's fair to say that it's up to the

25  government's sole discretion, sole decision, to ask the

1    judge to reduce your sentence, true?

2       A.   Yes.

3       Q.   Sir, is it your understanding that the government

4    then decides whether you've told the truth, to then

5    reduce your sentence?

6       A.   Yes.

7       Q.   So, your future really rests in the hands of the

8    government deciding whether or not you've told the

9    truth, correct?

10      A.   Yes.

11            MR. SALVATO:   That's all the questions I

12   have.

13            Thank you, sir.

14                     CROSS-EXAMINATION

15   BY MR. CRAWLEY:

16      Q.   Good morning, sir.

17      A.   Good morning.

18      Q.   Yesterday, you talked a little bit about the gang

19   and the organization as a whole, MS-13.  Do you recall

20   that testimony?

21      A.   Yes.

22      Q.   And, it would be fair to say that MS-13 is a

23   large organization, correct?

24      A.   Yes.

25      Q.   It's a large brotherhood, correct?

1    A.   Yes.

2    Q.   And, essentially, the head of the organization

3    now resides in El Salvador, correct?

4    A.   Yes.

5    Q.   And, in fact, when you talked about green

6    lighting and how green lights are approved, you

7    indicated that a green light can only be approved if

8    someone were given permission by those in El Salvador to

9    carry the green light out, correct?

10   A.   Yes.

11   Q.   And, green light, to be clear, so we can speak in

12   layman's terms, is murder?

13   A.   Yes.

14   Q.   And specifically, in its context in this case,

15   it's murder of another MS-13 member, correct?

16   A.   Yes.

17   Q.   And, the word *calentón* -- and I may not be

18   pronouncing it correctly -- are you familiar with that

19   term?

20   A.   Yes.

21   Q.   Now, *calentón* is a type of discipline for MS-13

22   members, correct?

23   A.   Yes.

24   Q.   And, the *calentón* is something that a first word

25   or a second word can order, correct?

1    A.  Yes.

2    Q.  And, in order to get a *calentón*, the first word

3  or the second word does not need to contact El Salvador,

4  correct?

5    A.  Yes, sir.

6    Q.  Because, in essence, a *calentón* is essentially a

7  disciplinary action of an MS-13 member within a clique,

8  correct?

9    A.  Yes.

10   Q.  Now, we talked a little bit yesterday about the

11 levels of membership.  Do you recall that testimony?

12   A.  Yes.

13   Q.  And, in order to become a full member, you have

14 to first walk with the clique; is that correct?

15   A.  Yes.

16   Q.  My memory isn't that great and my ability to use

17 these words isn't that great, so, tell me, what is that

18 person called that walks with the clique prior to

19 becoming a member?

20   A.  *Chequeo*.

21   Q.  And, so, in essence, that person is walking with

22 the clique in hopes of becoming a member of the gang,

23 correct?

24   A.  Yes.

25   Q.  And one thing that that person understands, as

1    well as all of the members, allegedly, of the gang is

2    that they must follow the rules of MS-13?

3        A.   Yes.

4        Q.   Now, hear me closely on this one.  Now --

5             THE INTERPRETER:  I'm sorry?

6             MR. CRAWLEY:  Oh, I just wanted him to pay

7    close attention.

8                  (Interpreter translates.)

9    BY MR. CRAWLEY:

10       Q.   In order -- in order to gain entrance to and

11   maintain and increase your position in MS-13, you must

12   follow the rules.

13       A.   Yes.

14       Q.   And there are certain rules that have particular

15   importance, correct?

16       A.   Yes.

17       Q.   And there are rules that carry with them a

18   certain level of, how shall I say it, retribution if you

19   don't follow those rules, correct?

20       A.   I didn't understand the question.

21       Q.   Well, there are certain rules that if you don't

22   follow them correctly, the head of MS-13 in El Salvador

23   may actually ask that a green light be placed on you,

24   correct?

25       A.   Yes.

1    Q.   So, in essence, one of the main rules is that you
2  have to get permission to carry out a green light, and
3  if you don't get that permission to carry out a green
4  light, you may be putting yourself -- well, I rephrase
5  that -- you would be putting yourself at risk of
6  receiving a green light, correct?

7    A.   I didn't understand the question.

8    Q.   Okay.  You testified that in order to carry out a
9  green light, the gang must seek the approval of the
10  leadership in El Salvador.  Is that correct?

11    A.   Yes.

12    Q.   And, you testified that these rules are
13  particularly important, correct?

14    A.   Yes.

15    Q.   My question to you is:  One of the ramifications
16  or the effects of not getting a green -- not getting
17  approval for a green light is that you, the person who
18  executed the green light without permission, could be
19  killed yourself for violating the gang's rule?

20    A.   Yes.

21    Q.   And the reason for that is because the gang has
22  these strict rules as to how they would like to maintain
23  the gang, correct?

24    A.   Yes.

25    Q.   And they believe that if you follow these rules,

1  that you will essentially increase the gang's influence,

2  correct?

3      A.   Yes.

4      Q.   And, those who follow the gang's rules are those

5  that tend to ascend to the top of the gang, correct?

6      A.   Yes.

7      Q.   And since you've been in custody for this case,

8  your opinion of MS-13 has changed dramatically, correct?

9      A.   Yes.

10     Q.   Since you've been in custody, you've come to

11 realize that MS-13 isn't all that it was cracked up to

12 be; is that right?

13     A.   Yes.

14     Q.   In fact, MS-13 is comprised of a bunch of

15 disloyal individuals, correct?

16     A.   Yes.

17     Q.   A bunch of dishonest individuals, correct?

18     A.   Yes.

19     Q.   A bunch of people that don't know how to follow

20 rules, correct?

21     A.   Yes.

22          MR. CRAWLEY:  Next witness (sic).

23                    CROSS-EXAMINATION

24 BY MR. CHICK:

25     Q.   Good morning, sir.

1    A.   Good morning.

2    Q.   My name is Mike Chick and I am the attorney for

3  Manuel Ernesto Paiz Guevara.

4         He -- my client is the guy sitting back here with

5  the white shirt.  Can you see him?

6    A.   Yes.

7    Q.   Okay.  You talked about a lot of stuff over the

8  last several days.  You talked about gang meetings,

9  right?

10   A.   Yes.

11   Q.   You talked about walking the streets?

12   A.   Yes.

13   Q.   About patrolling the sector?

14   A.   Yes.

15   Q.   You talked about throwing gang signs?

16   A.   Yes.

17   Q.   You talked about jumping people into the gang?

18   A.   Yes.

19   Q.   You talked about phone calls that you made to

20  Payaso to -- to keep him up to date and get his insight

21  on all those things, too, right?

22   A.   Yes.

23   Q.   Okay.  Um, let me ask you about -- about my

24  client, then.  He was never at those gang meetings with

25  you, was he?

 1    A.   No.

 2    Q.   Okay.  He never walked the streets with you?

 3    A.   No.

 4    Q.   He never patrolled the sector with you?

 5    A.   No.

 6    Q.   And, what we're talking about, the sector and the

 7  streets, we're talking about the Culmore neighborhood,

 8  right?

 9    A.   Yes.

10    Q.   Okay.  He never threw gang signs with you?

11    A.   No.

12    Q.   You never called Payaso about him to say, "Hey,

13  he wants to be in the gang," right?

14            THE INTERPRETER:  "You never called Payaso?"

15            MR. CHICK:  Right.

16            THE WITNESS:  No.

17  BY MR. CHICK:

18    Q.   Because, you don't know my client, right?

19    A.   No.

20    Q.   You do not know my client?

21    A.   No.

22    Q.   Let me ask you about Government's Exhibit 101-D.

23  That was -- you looked at it the other day.  It was a

24  bunch of text messages from your phone.  Do you remember

25  that?

1     A.   Yes.

2     Q.   There were a bunch of text messages to your phone

3  and maybe some text messages from your phone; is that

4  right?

5     A.   Yes.

6     Q.   Okay.  And, there were 490 different text

7  messages.

8     A.   I think so.

9     Q.   Okay.  None of those 490 text messages were to my

10 client, were they?

11    A.   No.

12    Q.   None of them mentioned my client?

13    A.   No.

14    Q.   You also talked about Government's Exhibit 101-B,

15 which was -- it was admitted.  It was a list of all the

16 contacts that the government took out of your phone.

17    A.   Yes.

18    Q.   And, there were a bunch of names in there, right?

19    A.   Yes.

20    Q.   And, most of the names in there were nicknames

21 for people, right?

22    A.   Yes.

23    Q.   My client's name or nickname is not in your

24 phone, is it?

25    A.   No.

1   Q.   His phone number is not in your phone, is it?

2   A.   No.

3   Q.   And, I think that you said on the first day that

4   you testified, you said that you were the second word,

5   right?

6   A.   Yes.

7   Q.   And that means that you're one of the top leaders

8   in PVLS, right?

9   A.   No.

10  Q.   The second word is not one of the top leaders in

11  the clique?

12  A.   Well, the most important is the first.

13  Q.   Most important is the first word.  The second

14  most important is the second word.

15  A.   Yes.

16  Q.   And, you were the second word?

17  A.   Yes.

18  Q.   Okay.  And, when you're the second word, things

19  don't happen with the clique and people don't get into

20  the clique without you knowing about it, right?

21  A.   I do not understand that.

22  Q.   Okay.  The second word knows what's going on

23  inside the clique, right?

24  A.   Yes.

25  Q.   Okay.  And, specifically, in the Culmore

1  neighborhood, the second word is going to know what's

2  going on in the Culmore neighborhood, right?

3      A.   Yes.

4      Q.   Okay.  Um, let's -- let's talk just really

5  briefly about Government's Exhibit Number 35.  That was

6  a notebook that you were shown.

7           Do you remember that?

8      A.   Yes.

9      Q.   And they showed you a couple different pages.  A

10 few of the pages were pages 57 and 58.

11     A.   Yes.

12     Q.   And, there were a list of names or nicknames on

13 those pages.  Do you remember that?

14     A.   Yes.

15     Q.   And, those were -- those were people who were

16 members or involved in PVLS, right?

17     A.   Yes.

18     Q.   Those names included Demente or Lil Demente.

19 That's you, right?

20     A.   Yes.

21     Q.   Bago?  Bago?

22     A.   Yes.

23     Q.   The name Silencio?

24     A.   Yes.

25     Q.   And Silencio is one of your friends.  He is not

 1   charged in this case, right?

 2        A.   Yes.

 3        Q.   Okay, there was Lil Pesadilla?

 4        A.   Yes.

 5        Q.   Guasón?

 6        A.   Yes.

 7        Q.   Lagrima?

 8        A.   Yes.

 9        Q.   Greñas?

10        A.   Yes, sir.

11        Q.   Little Thunder?

12        A.   Yes.

13        Q.   Blacky?

14        A.   Yes.

15        Q.   Skinny?

16        A.   Yes.

17        Q.   Duende?

18        A.   Yes.

19        Q.   And then there was Little One, right?

20        A.   Yes.

21        Q.   Okay.

22             My client's name was not in that notebook, was

23   it?

24        A.   No.

25        Q.   Okay.  But the names of the people who were in

1  the notebook are the names of the people who were -- who

2  were part of PVLS, right?

3      A.   Yes, sir.

4      Q.   Those are the people that were walking the

5  sector?

6      A.   Yes.

7      Q.   Those were the people who were committing acts of

8  violence on behalf of PVLS, right?

9      A.   Yes.

10     Q.   You said that -- I think you said that if

11 somebody sleeps with a homeboy's girl, that is something

12 that could get them green lighted, right?

13     A.   Yes.

14     Q.   And so the person who would be responsible within

15 the clique, the person who would be responsible to give

16 that green light, would be the first word, right?

17     A.   Yes.

18     Q.   So, if that happened and a green light was issued

19 for the clique -- Payaso was the first word, right?

20     A.   Yes.

21     Q.   Okay.  So, if Payaso didn't order the green

22 light, then something that was done wasn't done for the

23 clique, right?

24     A.   Yes.

25     Q.   When you were stopped, there was a guy in the car

1   named Marciano, correct?

2       A.   Yes.

3       Q.   Okay.  He was one of the guys that was in on the

4   plan to go hit Peligroso?

5       A.   Yes.

6       Q.   "Peligroso" means dangerous, right?

7       A.   Yes.

8       Q.   And, everybody has a nickname?

9       A.   Yes.

10      Q.   In fact, Marciano, that was a nickname.  It means

11  Martian or alien, right?

12      A.   Yes.

13      Q.   And that guy, he was -- he was a *chequeo*, right?

14      A.   He wanted to be a *chequeo*.

15      Q.   He wanted to be a *chequeo*.

16           So, he wasn't even at *chequeo* status?

17      A.   No.

18      Q.   Okay.  But he knew about the plan and he was in

19  on the plan, right?

20      A.   Yes.

21      Q.   Okay.  Marciano, he's not here in this courtroom

22  today, is he?

23      A.   No.

24      Q.   Okay.  You said, also, I think, that you -- when

25  you wanted to join the gang, you said that Payaso just

1    made you the second word, right?

2        A.   Well, not immediately.

3        Q.   What do you mean by that?

4        A.   (Answer not translated.)

5             THE INTERPRETER:  I'm sorry.  The

6    interpreter is going to ask for a repetition of that.

7             THE WITNESS:  When I began with them, there

8    was not a person named as the second word yet.

9    BY MR. CHICK:

10       Q.   Okay.  But, you got to be the second word without

11   getting jumped in, is your testimony?

12       A.   Yes.

13       Q.   Okay.  And, your testimony here today and the

14   other day is that you were never jumped in the gang in

15   El Salvador?

16       A.   No.

17       Q.   And, that you were never part of MS-13 in El

18   Salvador before you came here?

19       A.   No.

20       Q.   Okay.  So, you would have never told Duende that

21   you were, right?

22       A.   No.

23       Q.   Okay.

24            MR. CHICK:  No further questions.

25            THE COURT:  Let's take the morning recess

1    now for 15 minutes.

2              Thank you.

3              (Court recessed at 11:29 a.m. and reconvened

4              at 11:50 a.m.)

5              THE COURT:  I apologize for the delay,

6    apologize for being late.

7              You can bring our jury back out, please.

8              (Jury present.)

9              THE COURT:  You may be seated.

10             Ladies and gentlemen, I apologize for the

11   delay.  I have reasons but no excuses.

12             Any other counsel?

13             (No response.)

14             THE COURT:  Redirect.

15             MS. MARTINEZ:  Thank you, Your Honor.

16                      REDIRECT EXAMINATION

17   BY MS. MARTINEZ:

18     Q.  Good morning.

19     A.  Good morning.

20     Q.  When you testified a couple days ago, Ms. Austin

21   asked you about a Claudia who helped you review the

22   transcripts during trial preparation.  Do you remember

23   that?

24     A.  Yes.

25     Q.  Do you remember a Claudia who helped you during

1   trial preparation listen to the recordings?

2      A.   Yes.

3      Q.   And, was Claudia, was she -- was that person --

4   excuse me -- female or male?

5      A.   Woman.  Female.

6            MS. MARTINEZ:  Your Honor, for the record,

7   the name Claudio, Claudio Saa, which Ms. Austin used, if

8   Your Honor could simply note for the record that Claudio

9   Saa, the government's gang expert, is male.

10           THE COURT:  All right.

11           MS. MARTINEZ:  And I'll further add for the

12  record that there was a Claudia Dubravetz, who did

13  testify for the government and is female.  Just to

14  clarify the record.

15           THE COURT:  All right.  So noted.

16  BY MS. MARTINEZ:

17     Q.   Greñas's attorney asked you about when you talked

18  to the police right after you were arrested.  Do you

19  remember those questions?

20     A.   Yes.

21     Q.   Greñas's attorney asked you about how you

22  initially told the police that the shotgun was yours.

23  Do you remember that?

24     A.   Yes.

25     Q.   Why did you initially tell the police that the

1   shotgun was yours?

2       A.   Well, because I pled guilty so that they could

3   get out.

4       Q.   Who is they?

5       A.   That was Greñas, Drowsy and Marciano.

6       Q.   Why did you want them to get out?

7       A.   Well, because, I didn't want them to get locked

8   up.  So, I pled guilty to all of the weapons that were

9   in the car.

10      Q.   Who put the shotgun in your car the night that

11  you were arrested?

12      A.   Greñas did.

13      Q.   How was it that you became a leader within PVLS?

14      A.   Well -- well, it was through Payaso that I

15  started walking with them, and, you know, like around

16  three months later, he, Payaso, said that I should be

17  the leader.

18           And then, well, he confirmed it with Poison, that

19  is Big Poison, and he said that I should be the second

20  word.

21      Q.   Who was the bigger leader, you or Payaso?

22      A.   Payaso.

23      Q.   Who instructed you what to do for the clique?

24      A.   Payaso.

25      Q.   You were asked a lot of questions about the rules

1    of La Mara.  Do you remember that?

2        A.   Yes.

3        Q.   Were you instructed about the rules of La Mara?

4        A.   No.

5        Q.   Were you ever told the rules of La Mara?

6        A.   Yes.

7        Q.   By who?

8        A.   By Payaso and Big Poison.

9        Q.   Were you ever able to memorize all of the rules

10   of the Mara?

11       A.   No.

12       Q.   Why not?

13       A.   Because I just -- I never learned them.

14       Q.   Now, Mr. Chick asked you some questions about his

15   client.  Since your arrest in October of 2013, have you

16   been incarcerated the whole time?

17       A.   Yes.

18       Q.   Have you been running the clique from within

19   jail?

20       A.   No.

21       Q.   You were also asked some questions about your

22   sentence, or your possible sentence.  Do you remember

23   those questions?

24       A.   Yes.

25       Q.   Who do you understand is responsible for deciding

1    your sentence?

2        A.   The judge.

3        Q.   Who do you understand is responsible for deciding

4    whether or not you get a reduction for your sentence?

5        A.   The judge.

6        Q.   What do you understand will happen if the judge

7    believes you lie in court?

8        A.   I would get a high sentence.

9              MS. MARTINEZ:  Thank you.

10             No further questions, Your Honor.

11             MR. AQUINO:  Judge, in light of that

12   redirect, may I ask just a couple short questions?

13             THE COURT:  Yes.

14                  RECROSS-EXAMINATION

15   BY MR. AQUINO:

16       Q.   Good morning, sir.

17       A.   Good morning.

18       Q.   Just a couple quick questions.

19             Can you tell me if I misunderstood?  Did you just

20   testify that you pled guilty to a crime that you did not

21   commit?

22       A.   Yes.

23       Q.   So, you lied to a judge, is that what you're

24   saying?

25       A.   Yes.

1          MR. AQUINO:  That's all the questions I

2   have.

3          MS. MARTINEZ:  Your Honor, may I respond to

4   that?

5          THE COURT:  No.  Wait a minute.

6          MR. JENKINS:  Your Honor, before Mr. Aquino

7   stood up, I had some questions concerning the

8   government's last redirect, concerning the Court's role.

9          THE COURT:  All right.  And then I'll let

10  Ms. Martinez respond.

11          Recross is not typically allowed.

12          MR. JENKINS:  Understood, Your Honor.

13                    RECROSS-EXAMINATION

14  BY MR. JENKINS:

15    Q.   Sir, did I understand that you just, in response

16  to Ms. Martinez's question, indicated that it's your

17  understanding that the judge would determine whether or

18  not you've told the truth, correct?

19    A.   Yes.

20    Q.   But, you do understand that the judge doesn't,

21  according to your plea agreement, file a reduction

22  motion on your behalf, correct?

23    A.   I didn't understand the question.

24    Q.   You understand that you need the United States

25  Attorney's Office to file a motion to reduce your

1    sentence, correct?

2        A.   Yes.

3        Q.   And, according to your plea agreement, the only

4    person who has the sole discretion to determine whether

5    or not to file that motion is the United States

6    Attorney's Office, correct?

7        A.   I didn't understand.

8                 MR. JENKINS:  I have no further questions,

9    Your Honor.

10                THE COURT:  Now, Ms. Martinez.

11                     RE-REDIRECT EXAMINATION

12   BY MS. MARTINEZ:

13       Q.   What did you plead guilty to in Prince William

14   County?

15       A.   Of carrying a weapon.

16       Q.   What weapon?

17       A.   The weapon we were going to use to kill

18   Peligroso.

19       Q.   And, on the night that you were arrested, did you

20   know that that weapon was in your car?

21       A.   Yes.

22       Q.   And, were you guilty of having that weapon that

23   night?

24       A.   Yes.

25                MS. MARTINEZ:  Thank you.

 1                  THE COURT:  You can step down, sir.  Thank

 2    you.

 3                  (Thereupon, the witness withdrew from the

 4    stand.)

 5                  MR. TOBLER:  May the government call its

 6    next witness, Your Honor?

 7                  THE COURT:  Yes.

 8                  MR. TOBLER:  United States calls Miguel

 9    Serrano.

10                  THE INTERPRETER:  Does this witness need an

11    interpreter?

12                  MR. TOBLER:  No, ma'am.

13                  THE INTERPRETER:  Thank you.

14                  (Witness sworn.)

15                  THE WITNESS:  I do.

16                  THEREUPON, MIGUEL SERRANO, having been duly

17    sworn, was examined and testified as follows:

18                        DIRECT EXAMINATION

19    BY MR. TOBLER:

20       Q.  Good afternoon, Mr. Serrano.

21           Could you please state your name and spell it for

22    the record.

23       A.  Miguel Serrano, M-i-g-u-e-l, S-e-r-r-a-n-o.

24       Q.  Where do you work, Mr. Serrano?

25       A.  USCIS, United States Citizen Immigration

1    Services.

2        Q.   How long have you worked there, sir?

3        A.   One year.

4        Q.   What is your current position with Citizenship

5    and Immigration Services?

6        A.   Immigration services officer.

7        Q.   What are your duties in that position?

8        A.   Processing naturalization paperwork for people

9    going through the immigration process.

10       Q.   Where did you work prior to that time?

11       A.   Virginia Department of Corrections.

12       Q.   How long were with the Virginia Department of

13   Corrections?

14       A.   Nine years.

15       Q.   And, why did you leave the Virginia Department of

16   Corrections to work for USCIS?

17       A.   More growth.

18       Q.   When you say "more growth," you're referring

19   to -- please explain to the jury what you mean.

20       A.   Career-wise, more growth, more money, better

21   opportunity for advancement.

22       Q.   What was your position when you were with the

23   Virginia Department of Corrections?

24       A.   Intelligence officer.

25       Q.   What were your duties as an intelligence officer?

1      A.   Interviewing newly arriving inmates to the
2  Virginia Department of Corrections systems for gang
3  affiliation.
4      Q.   As an intelligence officer, did you also have any
5  investigative duties?
6      A.   Yes, sir, I did; anything involving drug
7  activity, contraband, assaults, things of that nature.
8      Q.   Let me direct your attention to the morning of
9  December 30th, 2013.  Were you working for the Virginia
10  Department of Corrections at that time?
11     A.   Yes, sir.
12     Q.   At what facility?
13     A.   Powhatan Correctional Center, Reception Center.
14     Q.   What were your duties on December 30th, 2013?
15     A.   That morning we had gotten up into the facility
16  early, to conduct a cell search of an inmate.
17     Q.   And what inmate?
18          Whose cell were you going to search?
19     A.   Romero Cruz.  Pedro Romero Cruz.
20          MR. TOBLER:  Your Honor, at this time may I
21  publish Government's Exhibit 102-D, which was previously
22  admitted into evidence.
23          THE COURT:  Yes.
24  BY MR. TOBLER:
25     Q.   Mr. Serrano, do you recognize this person?

1    A.   Yes, sir, I do.

2    Q.   Who is that?

3    A.   Romero Cruz.

4    Q.   Is Government's Exhibit 102-D a fair and accurate

5    depiction of Mr. Romero Cruz?

6    A.   Yes, it is.

7    Q.   Why did you intend to search Mr. Romero Cruz's

8    cell on the morning of December 30th, 2013?

9    A.   We had gotten information that he --

10        MR. CONTE:  Objection.  Calls for a hearsay

11   response.

12        THE COURT:  Sustained.

13        What action did he take?

14   BY MR. TOBLER:

15   Q.   What actions did you take that morning to search

16   Mr. Romero Cruz's cell?

17   A.   As far as what we did, we entered the cell block,

18   4:00 in the morning, maybe, entered his cell in order to

19   search for contraband, cigarettes, tobacco, cellphones.

20   Q.   What did you do first when you entered the cell?

21   A.   Upon entering the cell, his cell mate was up.  We

22   handcuffed the cell mate, brought him out.  He was in

23   the bed, bottom bunk, sleeping.  We woke him, put the

24   handcuffs on him, escorted him out the cell.

25   Q.   What did you do with Mr. Romero Cruz?

1    A.   We took him down the cell block into a shower

2  area, where there was no accessible areas to flush

3  items.

4    Q.   What did?

5    A.   Does that make sense?

6    Q.   What did you do once Mr. Romero Cruz was in the

7  shower area?

8    A.   We uncuffed him and we started to give him the

9  orders to strip down, piece by piece, of clothing.

10   Q.   What happened next?

11   A.   As he was giving us the clothing items, we were

12 searching them, we were handing it off to my partner.

13 When he gets down to -- he had two sets of boxers on.

14 He pulls both boxers on -- pulls them both off, hands me

15 the boxers.  As he hands me the boxers, the cellphone

16 drops out.

17   Q.   What -- what happened after the cellphone dropped

18 out?

19   A.   Romero Cruz picked up the cellphone, held it to

20 his chest.

21        I instructed him to hand over the cellphone.

22        At that time, he turned around, headed towards

23 the door.  There were two officers there.  He barreled

24 through the both of them.  And me and my other partner

25 jumped on -- on his back and started to struggle with

1    him until we got the handcuffs on him.

2         Q.   What happened to the phone during all of that?

3         A.   He attempted to slide it across the cell -- the

4    floor into another cell.

5         Q.   What else did you find that day, in addition to

6    the cellphone?

7         A.   He had a homemade cellphone charger with him,

8    Altered.

9         Q.   Were you able to recover the cellphone that he

10   slid away?

11        A.   Yes, sir, we were.

12        Q.   What did you do with the cellphone next?

13        A.   I placed it in the evidence bag, put my

14   information on the evidence bag, put it into our

15   evidence locker.

16        Q.   Was the evidence bag sealed?

17        A.   Yes, sir.

18        Q.   What else did you put into the evidence bag

19   before you sealed it?

20        A.   The homemade phone charger.

21        Q.   At this time, I would like -- with the assistance

22   of the courtroom security officer, I'd like to show you

23   what has been marked for identification as Government's

24   Exhibit 37.

25             If you could, please, open the envelope and

1    examine its contents.

2         Do you recognize that bag that you have in your

3    hand right now?

4    A.   Yes, sir.

5    Q.   What is that bag?

6    A.   This is the evidence bag we used to put all of

7    our contraband, illegal cellphones, illegal narcotics.

8    Q.   Where have you seen that particular bag before?

9    A.   This particular bag is the one I used the day

10   that we confiscated the cellphone from Romero Cruz.

11   Q.   Was that the bag in which you put the cellphone

12   you confiscated from Mr. Romero Cruz?

13   A.   Yes, sir.

14   Q.   If you hold up that bag, is there -- are there

15   any items inside that bag now?

16   A.   The homemade phone charger.

17         MR. TOBLER:  No further questions, Your

18   Honor.

19                    CROSS-EXAMINATION

20   BY MR. AQUINO:

21   Q.   Good afternoon, sir.

22   A.   Good afternoon.

23   Q.   My name is Jerry Aquino.  Along with Elita Amato,

24   we represent Jesus Chavez.  Just a couple questions.

25         Did I understand you work for USCIS?

1    A.   Yes, sir.

2    Q.   And that's otherwise known as the

3    Immigration Service, correct?

4    A.   Correct.

5    Q.   From time to time, does the government grant

6    legal status to people who help prosecutors?

7    A.   Say that again.

8    Q.   Sure.  From time to time, does Immigration grant

9    legal status in the United States to people who help

10   prosecutors?

11   A.   Yes.

12   Q.   And, normally, what precedes that is a request by

13   the Prosecutor's Office, such as the U.S. Attorney's

14   Office to say, "This person helped us."

15             MR. TOBLER:  Your Honor, we would object.

16   This goes beyond the scope of the direct examination.

17             THE COURT:  Sustained.

18             MR. AQUINO:  That's all the questions I

19   have.  Thank you.

20                   CROSS-EXAMINATION

21   BY MR. AMOLSCH:

22   Q.   Good morning.

23   A.   Good morning.  How are you?

24   Q.   I'm well, thank you.

25             So, can you explain to me again, how is it that

M. Serrano - Cross                                          88

1   you came to do the search of Mr. Romero Cruz?

2       A.   We had gotten anonymous sources saying that he

3   and his cellmate had tobacco products and cellphones in

4   the cell.

5       Q.   When you say "anonymous source," how did that tip

6   come to you?

7       A.   Usually, in a prison environment, someone writes

8   a note to me, puts it in inmate mail, and it gets to me.

9       Q.   Is that how it happened in this case?

10      A.   For some of it yes.

11      Q.   When you say "for some of it," what does that

12   mean?

13      A.   When we received the notes, we start to

14   investigate.  So, in his particular case we searched the

15   inmate phone system.  He had not made any phone calls in

16   over a year --

17      Q.   Let me stop you for a second.  I'm sorry.

18      A.   Uh-huh.

19      Q.   Did I understand that what you said is, you got a

20   note, an internal note from an anonymous tipster at the

21   prison, informing you about possible contraband in his

22   cell?  Is --

23      A.   Correct.

24      Q.   -- that correct?

25           Okay.  I'm trying to make sure I understand the

1    process.

2        A.   Yes.

3        Q.   Did that note contain anything more than,

4    "There's contraband," or did it contain any specific

5    items that might be there?

6        A.   It's been two years.  I don't remember what the

7    note said.

8        Q.   Do you remember, when you went to search

9    Mr. Cruz's cell, were you looking for anything in

10   particular or were you just looking for contraband?

11       A.   Tobacco and cellphone.

12       Q.   Do you remember how it is you focused on the

13   tobacco or the cellphone?

14       A.   Well, the cellphone, like I said, once we started

15   looking into the inmate phone calls, he hadn't made any.

16           The tobacco --

17       Q.   Okay.  So, there's other kinds of contraband at

18   the jail, right?

19       A.   Correct.

20       Q.   Drugs --

21       A.   Uh-huh.

22       Q.   -- pornography, whatever, correct?

23       A.   (No audible response.)

24       Q.   You keep going back to --

25           THE COURT:  You have to answer yes or no.

1    You have to answer yes or no.

2                THE WITNESS:  Sorry.  Yes.

3    BY MR. AMOLSCH:

4        Q.   You keep going back to the -- and I'm trying to

5    understand this -- to the part where you were checking

6    his outgoing phone calls at the jail, at the prison.

7        A.   Correct.  Yes.

8        Q.   Did you do that before you found the cellphone or

9    after you found the cellphone?

10       A.   Before.

11       Q.   Okay.  So, what made you do that?

12            Do you --

13       A.   Check the phone calls?

14       Q.   Yes.

15       A.   It's part of what we did when someone was thought

16   of having a cellphone, we checked their inmate phone

17   calls.  If they want communication with the family,

18   they're going to call.

19       Q.   So the reason you did that before you searched

20   Mr. Romero Cruz's cell for the cellphone is because part

21   of the tip was that he had a cellphone?

22       A.   Correct.

23       Q.   Did the tip indicate how long he had had a

24   cellphone?

25       A.   No, sir.

1    Q.   Did the tip indicate how frequently he used the

2    cellphone?

3    A.   No, sir.

4    Q.   Did the tip indicate how he knew that Mr. Romero

5    Cruz had a cellphone?

6    A.   No, sir.

7    Q.   After you got the cellphone as part of your

8    search from Mr. Cruz, I believe your testimony was that

9    you took it and put it in an evidence bag?

10   A.   Correct.

11   Q.   Before you did that, did you look to see when --

12   the most recent time Mr. Cruz had used the cellphone?

13   A.   No, sir.

14   Q.   Did you look to see if he had used it at all?

15   A.   No, sir, not at that time.

16   Q.   Do you know if any investigation was done, after

17   the seizure of the cellphone, indicating Mr. Romero

18   Cruz's use of the cellphone?

19   A.   I want to say no.  I think the phone was locked,

20   as far as the code being put in, so we couldn't search

21   the phone.

22   Q.   All right.  Were you able to identify the phone

23   number associated with that phone?

24   A.   No, sir.

25   Q.   Do you remember what kind of cellphone it was?

1    A.   No, sir.

2    Q.   Did it appear to you to be old or new?

3    A.   Just a cellphone.

4    Q.   I do have one question.  Was -- did you receive a

5    notice of substandard performance or on about April 3rd,

6    2014?

7    A.   Yes, sir.

8    Q.   What was that about?

9    A.   I allowed one piece of contraband to enter

10   another building, instead of stopping it where the

11   source started.

12   Q.   And why did you do that?

13   A.   In order to get the owner of the contraband.

14   Q.   Were you disciplined because of that?

15   A.   Yes, sir.

16   Q.   And, what was your discipline?

17   A.   I was removed from my position for three months.

18   Q.   And, that happened in 2014?

19   A.   Yes, sir.

20   Q.   And when did you join USCIS?

21   A.   2015.

22   Q.   Was your leaving for CIS at all related to the

23   discipline procedure?

24   A.   No, sir.

25            MR. AMOLSCH:  Thank you, Judge.  I have no

1   further questions.

2              MR. LEIVA:  I have two brief questions.

3              THE COURT:  All right.

4                   CROSS-EXAMINATION

5   BY MR. LEIVA:

6   Q.  Good afternoon, Mr. Serrano.

7   A.  Good afternoon.  How are you?

8   Q.  I'm fine, thank you.

9        Let me ask you this question about the facility

10  where Mr. Romero Cruz was housed.  Are there no jamming

11  mechanisms in that facility?

12  A.  No, sir.

13  Q.  So you don't have anything up there that would

14  prevent inmates from receiving text messages or

15  cellphone calls or making cellphone calls or sending out

16  text messages?

17  A.  No, sir.

18  Q.  Okay.  Now, correct me if I'm wrong, but the

19  culture in these facilities is that when someone has a

20  product, they sell it to the other inmates in order to

21  make some kind of profit, right?

22       Like, for example, tobacco?

23  A.  In some cases, not all.

24  Q.  Drugs?

25  A.  Some cases, not all.

1    Q.   And when people manage to sneak cellphones in,

2    they also sell the time on the cellphone, do they not?

3    A.   In some cases, not all.

4    Q.   I'm not asking you that.  You're here as someone

5    who worked there, right?

6    A.   Correct.

7    Q.   Okay.  My question to you was:  Do some of the

8    inmates in the past, who snuck cellphones in, also share

9    their air time with other inmates as --

10   A.   Yes.

11   Q.   -- contraband?  Yeah.

12        And they let others use the cellphone and they

13   get paid for it, I'm assuming.

14   A.   Yes.

15   Q.   Okay.  And, this anonymous tip that you received

16   told you that Mr. Romero Cruz was also selling air time

17   on his cellphone, right?

18   A.   I didn't say that.

19   Q.   Okay.  Well, I'm asking you.

20   A.   I don't remember.

21   Q.   Okay.  So, you're not saying it did not; you're

22   saying you do not remember because it happened several

23   years ago?

24   A.   Correct.

25   Q.   Did this anonymous tip indicate that he was also

1  telling tobacco to other inmates?

2      A.   I don't remember.

3      Q.   Did this anonymous tip indicate to you at all

4  what, if any, reliability they had?  In other words, how

5  they knew this?

6      A.   No.

7      Q.   No, it did not, or you just don't remember?

8      A.   I don't remember.  But, usually it doesn't come

9  with, "My reliability is..."

10      Q.   No, but reliability, I mean that they say, "Hey,

11  I know Romero Cruz is selling air time on his

12  cellphone," or "selling tobacco out of his cell."

13      A.   I don't remember if the note said that.

14           MR. LEIVA:  That's all the questions I have,

15  Your Honor.  Thank you.

16           THE COURT:  Redirect?

17           MR. TOBLER:  Very briefly, Your Honor.

18                    REDIRECT EXAMINATION

19  BY MR. TOBLER:

20      Q.   You were asked a question about a disciplinary

21  proceeding in April 2014, I believe, on

22  cross-examination.  Is that correct?

23      A.   Yes, sir.

24      Q.   After that disciplinary proceeding, were you

25  eventually returned to full duties?

1      A.   Full duties.

2      Q.   And have you had any other notices of substandard

3   performance since that time?

4      A.   No, sir.

5      Q.   You were asked questions about -- about the

6   cellphone that you -- that you seized that day in

7   December of 2013.

8      A.   Yes.

9      Q.   What else is in the envelope in Government's

10   Exhibit 37?

11      A.   Cellphone charger.

12      Q.   In addition to that?

13      A.   Sir?

14      Q.   In addition to that, what else is in that

15   envelope?

16      A.   In this bag, nothing.

17      Q.   Is there a separate bag within the envelope, sir?

18      A.   Yes, sir.

19      Q.   What's in that bag?

20      A.   Cellphone.

21            MR. TOBLER:  No further questions, Your

22   Honor.

23            THE COURT:  May the witness be excused?

24            MR. TOBLER:  Yes, sir.

25            THE COURT:  You're free to leave, sir.

1    Thank you.

2                    (Thereupon, the witness withdrew from the

3    stand.)

4                    MR. TOBLER:  Your Honor, the government

5    calls Gregory Hermanson.

6                    (Witness sworn.)

7                    THE WITNESS:  I do.

8                    THE COURT:  You may proceed.

9                    THEREUPON, GREGORY HERMANSON, having been

10   duly sworn, testified as follows:

11                        DIRECT EXAMINATION

12   BY MR. TOBLER:

13       Q.   Good afternoon, Mr. Hermanson.

14       A.   Good afternoon.

15       Q.   Would you please state your name and spell it for

16   the record.

17       A.   Gregory Hermanson, H-e-r-m-a-n-s-o-n.

18       Q.   Where do you work, sir?

19       A.   I work for the Federal Bureau of Investigation.

20       Q.   How long have you worked for the Federal Bureau

21   of Investigation?

22       A.   I have worked there since 1998.

23       Q.   What is your current position with the FBI?

24       A.   I am a computer forensic examiner.

25       Q.   What are your duties in that position?

1    A.   In that position, I examine computer evidence

2   that's submitted to our laboratory from case agents in

3   support of federal investigations.

4    Q.   In your position, do you also examine other types

5   of electronic evidence?

6    A.   Yes, I do.

7    Q.   What other types of electronic evidence?

8    A.   Typically, we'll investigate or examine cellular

9   phones and other types of digital media, like computer

10   disks, thumb drives.

11    Q.   What training did you receive before you became a

12   forensic examiner with the Federal Bureau of

13   Investigation?

14    A.   When I was hired, I went through approximately a

15   two-year training period, where we had -- at the

16   beginning of that period had a two-week training session

17   taught by our currently certified examiners.

18         And then the rest of that two-year period, I was

19   doing -- performing a certain amount of cases under the

20   guidance of certified examiners, and also assisting with

21   search warrants under the guidance of the certified

22   examiners.

23    Q.   Have you received any certification in forensic

24   examination?

25    A.   Yes.  In addition to the basic certification,

1    I've also been certified in advanced areas, such as Unix

2    and Apple McIntosh devices and cellular mobile devices.

3        Q.    Are there any requirements associated with

4    maintaining those certifications?

5        A.    Yes.  We have to do a certain amount of

6    examinations per year to maintain our currency, and we

7    also are required to take certain amounts of training in

8    each of those advanced certification areas, and take a

9    proficiency test every year.

10       Q.    Have you completed those examinations and tests?

11       A.    Yes.  Every year, I have.

12       Q.    Have you maintained your certification as a

13   forensic examiner?

14       A.    Yes, I have.

15       Q.    Over your career, how many cellular phones have

16   you examined?

17       A.    Roughly, probably close to a hundred cellular

18   devices.

19       Q.    Have you previously testified in federal court

20   regarding the forensic examination of electronic

21   evidence?

22       A.    Yes, I have.

23       Q.    How many times?

24       A.    Approximately four times, and one time in

25   military court as well.

1    Q.   Could you please describe for the jury your

2  educational background?

3    A.   I have a bachelor's degree in math and computer

4  science, and a master's in forensic science.

5    Q.   Please briefly describe for the jury the steps

6  you take when examining a cellular phone.

7    A.   When we get a cellular device in, typically we

8  will try one of two or three commercially available

9  software packages that are used to analyze cellular

10  devices.

11       And if those devices are unable, for various

12  reasons, to examine the devices, then we will proceed to

13  more lengthy and more difficult methods to extract the

14  data from the devices.

15    Q.   When you say -- you said before that you used the

16  utilities to analyze the devices.  Please explain to the

17  jury what you mean by that.

18    A.   What that typically entails is the -- connecting

19  the device to an examination station that runs the

20  software package.  And that will either obtain a logical

21  or a physical image of the device, typically.

22       And then either that software or another software

23  is used to interpret the data was obtained during the

24  physical or logical --

25    Q.   What do you mean by "physical image" versus

1   "logical image" of a cellular telephone?

2       A.   A physical image would be where we dump all data

3   from beginning to the end of the memory, and a logical

4   device already does the interpretation of files that are

5   present in that storage area.  So, that would be similar

6   to the actual items that are viewed on the cellular

7   phone.

8       Q.   I think I have heard you say a couple of times

9   that you used these utilities to interpret data on a

10  cellular phone.  Can you please explain what you mean by

11  that?

12      A.   In the case of a physical, physical image,

13  interpreting that data would be, the data is stored in a

14  method that wouldn't be viewable to the -- to the human

15  eye.  This software will go ahead and interpret that

16  data, similar to the way that it was designed to be

17  stored by that device.

18          So it is basically taking the data and looking at

19  it like a file.  An example would be contacts or your

20  call history.  That's something that you would probably

21  be familiar with.

22      Q.   Are you familiar with the term "report" in the

23  context of a forensic examination of a cellular

24  telephone?

25      A.   Yes, I am.

1    Q.   What is a report?

2    A.   The report that I generate from the results; is

3    that what you're meaning?

4    Q.   Yes.

5    A.   That report is typically the -- an HTML report,

6    which is -- it looks like any web page that you would

7    see using your browser on a computer.  So it organizes

8    the data into categories of data, as I mentioned

9    earlier, contacts, call history, your text messages, and

10   then other physical types of files, such as pictures and

11   audio files or movies.

12        So, it groups it into those categories, puts it

13   in a very nice web page.  And then I -- that's

14   reviewable by the case agent.  They can do further

15   analysis on it.

16   Q.   As part of this case, were you asked to

17   examination a cellular telephone?

18   A.   Yes, I was.

19   Q.   When you received that cellular telephone, how

20   was it packaged?

21   A.   It was packaged in a brown envelope, and then

22   inside the brown envelope the items were in two plastic

23   bags that were sealed.

24   Q.   When you say "items" plural, what were the items

25   that were in the two separate plastic bags?

1      A.    The items that were submitted were one Huawei

2    cellular phone, and it was also -- the other bag had a

3    device labeled as a, I believe, a battery or a charging

4    cable, and it was a device that -- that I did not

5    examine.

6      Q.    Were those bags sealed when you received them?

7      A.    Yes, they were.

8      Q.    Did you break the seal to remove the phone?

9      A.    Yes, I did.

10     Q.    After your examination, what did you do with the

11   phone?

12     A.    I sealed the phone back up into the evidence bag

13   and date and initialed it.

14     Q.    Did you make any markings on the other bag that

15   you described, with the smaller item in it?

16     A.    Yes, I did.

17     Q.    At this time, with the assistance of the

18   courtroom security officer, I'd like to show you what's

19   been marked for identification as Government's

20   Exhibit 37.

21          Before you open up that envelope, let me first

22   ask you whether you recognize the envelope.

23     A.    Yes, I do.

24     Q.    How do you recognize the envelope?

25     A.    I recognize the envelope by the case ID, and it's

G. Hermanson - Direct                                          104

1  labeled with a 1B number, which is typically the way the
2  field offices label evidence items.  And it's also
3  labeled with a field office bar code.
4      Q.  Please open up the envelope and look at the
5  contents of the envelope, if you would.
6      A.  (Complies.)
7      Q.  I'd like to direct your attention first to the
8  larger bag, holding the smaller item.
9      A.  Yes.
10     Q.  Do you recognized that bag?
11     A.  Yes, I do.
12     Q.  What is it?
13     A.  This is the evidence bag that the -- the cable
14  device was sealed in when I received it.
15     Q.  How do you recognize it?
16     A.  I recognize it because the -- I resealed the back
17  of it after I opened it to inventory it, and I have my
18  initials and a date on it, on the evidence tape.
19     Q.  Please direct your attention to the other bag.
20  Do you recognize that bag and its contents?
21     A.  Yes, I do.
22     Q.  How do you recognize it?
23     A.  This bag also is resealed with evidence tape, and
24  I initialed and dated the evidence tape when I resealed
25  it.

1    Q.   When did you receive the evidence that's in that
2    second bag you were holding?
3    A.   I received this from my evidence control on
4    April 14th, 2014.
5    Q.   Please describe, if you would, the steps that you
6    took to examine that phone in the second bag.
7    A.   I opened the bag and inventoried the items.  I
8    labeled them myself.  And then I -- I knew by previous
9    communications with -- with the case agent that this
10   item had been --
11             MR. CONTE:  Objection.  That's going to be a
12   hearsay response.
13   BY MR. TOBLER:
14   Q.   Please continue with your -- without going into
15   what the agent told you, please continue with telling us
16   the steps that you took in your examination of that --
17   that device.
18   A.   We previously discussed -- you asked my steps
19   earlier, And I typically try a commercial software
20   utility on these devices.
21             I was under the understanding that the field
22   office had attempted to do that already, and it was
23   submitted to our lab because they were unable to use
24   that software on it because it was -- had a lock on it.
25   So, I knew in advance that I was going to have to use a

1    more -- a more difficult method to examine it.

2          So, what I did was I had to open the case of the

3    phone and remove the main board from inside the phone.

4    And I needed to solder cables to that main board and

5    then connect it, using that cable, to my examination

6    system, and use a hardware and software utility to

7    obtain a physical image of the -- the memory on the

8    device.

9      Q.   What did you do after you obtained a physical

10   image of the phone?

11     A.   After obtaining the physical image of the phone,

12   I used a first utility to extract partitions from the

13   memory.  And, then I used a second utility to interpret

14   the data from those partitions and export it to an HTML

15   report that we were discussing earlier.

16     Q.   Based on your training and experience, is this a

17   standard means of data extraction from a cellular

18   telephone?

19     A.   Yes, it is.

20     Q.   And when you extract data this way, are the files

21   on the device altered?

22     A.   No, they are not.

23     Q.   As part of your participation in this case, have

24   you reviewed any photographs from that report you just

25   described?

1    A.   Yes, I have.

2              MR. TOBLER:   Your Honor, at this time the

3    government would like to publish Government's

4    Exhibit 102-B, which has been previously admitted into

5    evidence.

6              THE COURT:   All right.

7    BY MR. TOBLER:

8    Q.   Do you recognize Government's Exhibit 102-B, sir?

9    A.   Yes, I do.

10   Q.   What is it?

11   A.   This is one of the pictures that were extracted

12   by the utility that I used in my examination.

13   Q.   How do you recognize it?

14   A.   I recognize it because during pretrial we

15   reviewed the exhibits that you were going to use, and I

16   compared them to the results that I exported to a DVD,

17   and this was one of the pictures that was in the report

18   on my DVD, my results DVD.

19             MR. TOBLER:   Your Honor, if we may, we would

20   like to publish Government's Exhibit 102-D, which is

21   previously admitted into evidence.

22             THE COURT:   All right.

23             MR. TOBLER:   I'm sorry, Your Honor.  I would

24   like to published 102-B, which was also previously

25   admitted into evidence.

1          THE COURT:  I thought you just put up 102-B.

2          MR. TOBLER:  That last picture was 102-D,

3   which was also previously admitted into evidence.  I'm

4   sorry for the confusion, Your Honor.

5          THE COURT:  102-D, David.

6          MR. TOBLER:  102-D, as in David, has been

7   published for the jury and was previously admitted into

8   evidence.

9          THE COURT:  And now you want to offer what

10  exhibit?

11         MR. TOBLER:  102-B, as in bravo, Your Honor.

12         THE COURT:  All right.  Thank you.  Go

13  ahead.

14  BY MR. TOBLER:

15     Q.   Do you recognize that picture, sir?

16     A.   Yes, I do.

17     Q.   What is it?

18     A.   This is also one of the pictures that were

19  present on my results DVD.

20     Q.   How do you recognize it?

21     A.   Once again, we -- we reviewed your exhibits, this

22  was one of the exhibits, and I compared it to the

23  results report on my DVD.

24         MR. TOBLER:  Your Honor, at this time the

25  government would move Government's Exhibit 37 into

1   evidence, and we would request permission to show it to

2   the jury with the assistance of the courtroom security

3   officer.

4                    MR. CONTE:  Court's indulgence.

5                    Nothing, Your Honor.  Thank you.

6                    THE COURT:  All right.  37 will be received.

7   You may publish.

8                    MR. TOBLER:  If you won't mind taking the

9   bags out, Mr. Toliver, just to show the jury.  Thank

10  you.

11                   (Exhibit published.)

12  BY MR. TOBLER:

13    Q.   With the assistance of the courtroom security

14  officer, I would now like to show you what has been

15  marked for Government's Exhibit as 102-F.

16                   THE COURT:  F, as in Frank.

17                   MR. TOBLER:  F, as in Frank.

18                   Actually, sir, before you show him that

19  exhibit, let me ask this question.

20  BY MR. TOBLER:

21    Q.   As part of your participation in this case, did

22  you review a list of contacts included in the report

23  that you generated from Government's Exhibit 37?

24    A.   Yes, I did.

25    Q.   Okay.

1          MR. TOBLER:  Mr. Toliver, if you could now

2    show him what's been marked for identification as

3    Government's Exhibit 102-F.

4    BY MR. TOBLER:

5       Q.   Do you recognize Government's Exhibit 102-F?

6       A.   Yes, I do.  This was exported with the utility

7    that I used onto the report that was on my results DVD.

8       Q.   And what is it, sir, that you're looking at in

9    front of you?

10      A.   This is a list of contacts that was exported from

11   this -- from the device that was submitted.

12      Q.   And how do you recognize it?

13      A.   I recognize it because during review, you made

14   this available to me and I compared it to my -- the

15   actual DVD, which -- which was already here, and I

16   compared it, and this was on my results DVD.

17         MR. TOBLER:  Your Honor, the government

18   moves for admission of Government's Exhibit 102-F into

19   evidence, F as in foxtrot.

20         THE COURT:  Received.

21         MR. TOBLER:  May we publish the exhibit for

22   the jury, Your Honor?

23         THE COURT:  Yes.

24         (Exhibit published.)

25   BY MR. TOBLER:

 1    Q.   Mr. Hermanson, are you able to see that exhibit
 2   from where you're sitting?
 3    A.   Yes, I am.
 4    Q.   Could you please read the name that appears
 5   multiple times at the bottom of the first page of the
 6   list of contacts?
 7    A.   I believe it is Garias (phonetics).  Is that --
 8    Q.   Could you spell it?
 9    A.   It's -- I'm having difficulty reading it.
10    Q.   We'll just call it up for you in a larger box.
11    A.   I apologize.  My -- I'm having a tough time
12   reading it.
13    Q.   If you can't read it, we'll continue.
14            MR. TOBLER:  Could you --
15            THE WITNESS:  Grenas?  Is that how you say
16   it?  G-r-e-n-a-s.
17            MR. TOBLER:  Can we now go to the second
18   page of this exhibit, please.
19   BY MR. TOBLER:
20    Q.   If you could, sir, please read the first name
21   that appears multiple times at the top of the page.
22            MR. TOBLER:  Ms. Greigo, could you please
23   call it out and make it larger for me?  Thank you.
24            THE WITNESS:  The multiple -- multiple time
25   one?

BY MR. TOBLER:

Q.   Yes, please.

A.   J-r, Junior.

Q.   Okay.  Could you now please read the name that next appears multiple times on that page?

A.   Lil Payaso.

Q.   What's the name directly below that, if you can read it?

A.   Lil Pesadilla.

Q.   And now reading up from the bottom of the same page, what is the name that appears near the bottom, multiple times?

A.   Skinny.

Q.   With the assistance of the courtroom security officer, I would next like to hand you what has been marked for identification as Government's Exhibit 102-A.

Do you recognize Government's Exhibit 102-A?

A.   Yes, I do.

Q.   What is it, sir?

A.   This is a picture that was also present on my results media in the report that was exported from this device.

Q.   How do you recognize it?

A.   These exhibits, we went over them and it was -- I

 1    compared it to my results, and I found it on my results

 2    report.

 3              MR. TOBLER:  Your Honor, at this time the

 4    government moves for admission of Government's

 5    Exhibit 102-A into evidence.

 6              THE COURT:  Received.

 7              MR. TOBLER:  May we publish it to the jury,

 8    Your Honor?

 9              THE COURT:  Yes.

10              (Exhibit published.)

11              MR. TOBLER:  No further questions, Your

12    Honor.

13              MR. AMOLSCH:  I have questions, if nobody

14    else does.

15              THE COURT:  First come, first served.

16              MR. AMOLSCH:  Thank you, Judge.

17                      CROSS-EXAMINATION

18    BY MR. AMOLSCH:

19       Q.   Good afternoon, Agent.

20       A.   Good afternoon.

21       Q.   Can you tell me a little bit, again, how it is

22    you came to be examining this phone?

23       A.   This phone was submitted to our division from the

24    field -- Washington Field Office.  They submitted it

25    with a request, and -- and we were asked to -- to assist

G. Hermanson - Cross

1    them, because it was locked.

2        Q.   And, so the initial request you got was to assist

3    them in getting into the phone?

4        A.   Yes.

5        Q.   And, were you able to do that?

6        A.   Using the method that I -- I described earlier,

7    yes, I was.

8        Q.   Once you got into the phone, were you given

9    additional instructions?

10       A.   No.  Basically, the request was to -- as I

11   recall, the request was to get any and all information

12   that I could from the phone.

13       Q.   Okay.  So, is it -- was it a generally open-ended

14   request to get into the phone and then get whatever

15   information is on it?

16       A.   Yes.  As I recall, that was the request.

17       Q.   And how long did it take you to do that?

18       A.   The -- the image portion or the entire

19   examination?

20       Q.   We'll start with the entire examination.

21       A.   The entire examination took about eight days.

22       Q.   From -- is that eight hours a day, or periodic?

23       A.   No, it isn't.  I have -- I have multiple cases

24   that I'm working on, so, it -- I did the image portion

25   in one day, and then the additional steps that I took

1    were on other days, and, it was not the entire day.

2       Q.   How long do you remember it taking you to get

3    into the phone initially?

4       A.   Um, from taking the phone apart to removing the

5    board, probably, the -- a morning, to then solder the

6    cables to the device.  And then the image portion

7    itself, it was about four -- four gigabytes in size.

8    That -- I just let that run, and it probably took maybe

9    that afternoon.

10      Q.   Did you do the physical dismantling and the

11   soldering yourself?

12      A.   Yes, I did.

13      Q.   After you got the information, what did you do

14   with it?

15      A.   That image that's obtained during that first

16   portion that I described is then examined with a -- one

17   utility to interpret the partitions on the -- in the

18   memory, and then a second utility interprets that.

19   Those partitions are fed into a second utility.  That

20   utility is able to interpret the file systems that are

21   in those various partitions.  That is the information

22   that the utility -- the second utility exports into a

23   report.

24      Q.   And what's the name of that utility?

25      A.   That utility is called the CEAU android tool.

G. Hermanson - Cross                                          116

1   The CEAU stands for -- is the initials of a unit in my

2   division.

3       Q.   Once you got that information, you then passed it

4   on to the U.S. Attorney's Office; is that the next step?

5       A.   No.  That is -- that is put onto a DVD disk, and

6   I returned that disk, results disk, with the original

7   evidence back to the field office.

8       Q.   And do you know what happened to it after that?

9       A.   I do not.

10      Q.   Did you ever receive a request to re-look at the

11  phone to gather additional information?

12      A.   Not the phone itself; but in trial prep I

13  reviewed the results that I created.

14      Q.   So, once you had turned over -- once you had made

15  your DVDs and had passed on the information, nobody came

16  back to you and said, "Could you look for this

17  additional piece of information?"

18      A.   No.

19          And are you -- are you asking from the results or

20  from the phone, the evidence item?

21      Q.   From the results.

22          My question, I guess, is:  Once you had completed

23  your examination and you turn over the information, does

24  anybody -- did anybody look at that information and say,

25  "We're actually looking for information X that wasn't

1    included.  Can you find that?"

2        A.   In this case, no.  I did not do any further

3    analysis of my results.  That was done -- I don't know

4    who did that.  That was done at the field office or here

5    at the attorney's office.

6        Q.   Have you been asked that question in the past, to

7    go back and --

8        A.   We are.  Sometimes we are asked to do further

9    analysis.  But, typically, we are -- we are back-logged

10   enough that we do our portion of it, and it's then

11   usually transferred to people that are specialized in

12   analysis.

13       Q.   Do you remember what kind of phone it was?

14       A.   It was a Huawei, and I believe the model number

15   was a U8665.

16       Q.   Do you remember how old the phone was?

17       A.   I received it in 2014, and I don't think it was a

18   new phone at that time.  I don't -- I probably have that

19   information in my notes, but I don't know off the top of

20   my head.

21       Q.   One of the exhibits that you -- the government

22   previously talked about is Exhibit 102-F.

23            MR. AMOLSCH:  Can we bring that up?

24   BY MR. AMOLSCH:

25       Q.   Do you see that?  Do you see that exhibit in

1    front of you?

2       A.   Yes.

3       Q.   The -- is that the entire list of contacts that

4    were on the phone?

5       A.   No.   This is a portion of it.   It is not the

6    entire list right here, at least this page that I'm

7    looking at.   There's more than that.

8            MR. AMOLSCH:   Can you -- I'm sorry.   I

9    apologize.

10           Can you scroll through the document?

11           She's going to show you the list, the

12   incomplete page list.

13   BY MR. AMOLSCH:

14      Q.   I believe the government asked you questions

15   about the names that appear on this page and also a

16   different page.

17      A.   Yes.

18      Q.   Do you remember that?

19      A.   Yes.

20      Q.   Taking those entire two pages, not just what you

21   see on the screen, is that the entire list of contacts

22   that was taken from the phone?

23      A.   I believe what I'm seeing at the top of this

24   page, in particular, it says there's a total of 77

25   contacts, I believe.   Is that -- I'm -- it's very small

1    for me.

2        Q.   Is that your -- we can make it bigger.

3        A.   So, this is saying that there's 77 contacts.

4    That's the total amount that I extracted.

5        Q.   And that's the total universe of contacts that

6    was on Mr. Romero Cruz's phone?

7        A.   Yes.

8        Q.   The -- did the government ask you for any

9    additional information relating to the names, Greñas?

10       A.   No.

11       Q.   Junior?

12       A.   No.

13       Q.   Payaso?

14       A.   No.

15       Q.   Pesadilla?

16       A.   No.

17       Q.   Or Skinny?

18       A.   No.

19       Q.   On the second page, right above Skinny's name,

20   there is also another name that I -- that appears

21   multiple times.  I believe it's Pollo, P-o-l-l-o.

22            MR. AMOLSCH:  On the second page.  We will

23   bring it up in a second.

24   BY MR. AMOLSCH:

25       Q.   Do you see the name Pollo?  I think it's at the

1    bottom.

2        A.   Yes.

3        Q.   Okay.  And it looks like it appears five

4    different times?

5        A.   Yes.

6        Q.   Okay.  Did the government ask you any additional

7    information about that name?

8        A.   No, they did not.

9        Q.   Were you -- as part of your analysis, were you

10   able to determine how frequently the phone was used?

11       A.   I did not.

12       Q.   Were you asked to find out how frequently the

13   phone was used?

14       A.   No, I was not.

15       Q.   Is that something you would have been able to do

16   had you been asked to do it?

17       A.   Possibly.  I mean, it's -- like I could -- I

18   could -- there is a timeline feature of this utility

19   that -- that shows -- especially the call history, I

20   could go through the call history and tell what -- dates

21   and times and lengths of calls.  I can do it that --

22   that method.

23       Q.   So, there was a way to tell -- when you say "call

24   history," when outgoing calls were made?

25       A.   Yes.

1    Q.   When outgoing (sic) calls were received?

2    A.   Yes.

3    Q.   Would it tell you -- would it identify the

4    numbers that were made --

5    A.   Yes.

6    Q.   -- outgoing, and the numbers that were received?

7    A.   Yes.

8    Q.   Would it tell you the length of the phone call?

9    A.   Yes.

10   Q.   Would it give you the date of the phone call?

11   A.   Yes, it does.

12        MR. AMOLSCH:  I believe that's all the

13   questions I have, Your Honor.  Thank you.

14                   CROSS-EXAMINATION

15   BY MR. CHICK:

16   Q.   Hi, sir.  My name is Mike Chick and I represent

17   Manuel Ernesto Paiz Guevara.  I just have a couple

18   questions.

19        You were just talking about Exhibit 102-F, which

20   was the contact list, right?

21   A.   Yes.

22   Q.   Are -- why are there some lines that are pink and

23   some lines that are white?

24   A.   The white lines are active contacts that were

25   logically available to be seen on the phone, and the red

1    ones are recovered deleted ones.

2        Q.   Okay.  And then why do some contacts show up

3    multiple times?

4        A.   I -- I can't be positive on that, but that --

5    this is -- since this is done physically and the

6    files -- the contacts are stored in a -- an SQL

7    database, a database, and sometimes contacts are moved,

8    and that -- the contents of that contact may be stored

9    at a different location.

10            So, that data stays there, and any time that this

11   utility encounters that, it reports it.  So it may not

12   be the active contact that you're seeing on the phone,

13   but it still may be there, and in the SQL database.

14   That is my estimation on why that happens.

15       Q.   And then on the -- kind of towards the right-hand

16   side, there's a columns that says something like "number

17   of times contacted" or something like that, right?

18       A.   Yes.

19       Q.   Okay.  And that tells -- there's a specific value

20   that has a number of how many times -- presumably how

21   many times the phone contacted that person or was

22   contacted by that person, right?

23       A.   That's my understanding, yes.

24       Q.   Okay.  So do you know, when a name shows up more

25   than one time, there's a number there, there's a value

1    there, for each row for that name, is that a cumulative

2    things?

3          Do we -- do we add those up or do we not add

4    those up?

5     A.   I believe that would be the time of contact- --

6    the number of times contacted at the time that that

7    individual entry --

8     Q.   Okay.

9     A.   -- was encountered.  So, if, in other words, that

10   was moved to another portion of the database, that would

11   continue counting later, I believe.

12    Q.   Okay.  And then you said when you extract the

13   information from the phone, it comes up in kind of an

14   HTML format so you can see it?

15    A.   Yes.

16    Q.   And then it's all categorized into different --

17   different headings, I guess, right?

18    A.   Yes.

19    Q.   There's photographs, there's audio, that sort of

20   thing, right?

21    A.   That's correct.

22    Q.   Okay.  And you were shown an Exhibit 102-A, which

23   is -- which is a photograph, right?

24    A.   Yes.

25    Q.   Okay.  Um, do you -- are you able to tell, based

G. Hermanson - Cross                                                    124

1  on the analysis that you did, how that photograph got

2  into that phone?

3      A.   Not specifically from these results.  There --

4  there are ways you can determine that, but, the way that

5  this is output into the report, our designers decided to

6  put it this way.

7           So, there is a -- inside the database for where

8  the images are kept track of, it does keep a path, and

9  you could more than likely determine where that picture

10 came from, from where it was located.  But, that -- that

11 is not displayed in this report.

12     Q.   Okay.  So you had the ability to find out where

13 the photo came from or how the photo got into the phone,

14 but that wasn't done, right?

15     A.   It was -- it's not reported.

16     Q.   Okay.  And then, so, with respect to this photo,

17 for example, you -- you can't say whether it was a photo

18 that that phone took, right?

19     A.   Looking at this report, I can't, but --

20     Q.   Okay.

21     A.   -- yeah, that information could be obtained.

22     Q.   Or whether it was sent to the phone from another

23 phone, for example, right?

24     A.   Correct.  I can't tell from this report.

25     Q.   Or whether they downloaded it from Facebook or

1   something like that?

2   A.   No, not from the report.

3   Q.   Okay.

4           MR. CHICK:  I don't have any further

5   questions.  Thanks very much.

6                     CROSS-EXAMINATION

7   BY MS. AUSTIN:

8   Q.   Good afternoon, Agent.

9   A.   Good afternoon.

10   Q.   On the second page of this exhibit, 102-F, that

11   lists the contacts, down about midway after the pink

12   line, the third pink line, it says "Lil Pesadilla,"

13   correct?

14           Oh, I'm sorry.

15   A.   I'm waiting for it to come up.

16   Q.   Okay.

17           Is it easier for you to look at the paper copy in

18   the book?

19   A.   They're both hard to see for me.

20   Q.   Okay.  Okay.  It just got blown up.  Do you see

21   that?

22   A.   Yes.

23   Q.   Okay.  And across -- if you go across from where

24   it says "Lil Pesadilla" to the column where it says

25   "times contacted," isn't it true that after "Lil

1    Pesadilla" there is a "0" regarding the times contacted,

2    all three times that name is listed?

3        A.   Could you repeat the question?

4        Q.   Is it true that on all three lines where Lil

5    Pesadilla is listed, under the column "times contacted,"

6    there's a "0"?

7        A.   There's nothing there, yes.

8        Q.   Okay.  Correct.  Thank you.

9             And then at the top of that page, that same page,

10   where "Junior" is listed as the contact, one, two,

11   three, four, five times --

12       A.   Yes.

13       Q.   Okay.  After -- in the very next column it has

14   "android phone" and a phone number, correct?

15       A.   Yes.

16       Q.   And then under that it has "com.whatsapp."  Do

17   you know what that is?

18       A.   Those are most likely the app that was used --

19   that that's a contact for.

20       Q.   And -- and, if two people are communicating on

21   that app, that's not a recorded telephone call, is it?

22            It's -- it's -- text going back and forth,

23   correct?

24       A.   I am not sure.  I don't know.  I don't know the

25   answer to that.  But, WhatsApp is a texting utility.

1    I'm not sure --

2        Q.   Okay.  Okay, so, WhatsAPp is a texting

3    application on cellphones, correct?

4        A.   Yes.

5        Q.   It's not a speaking application?

6        A.   Once again, I'll just -- I don't want to say

7    something I'm not sure of.  I don't know the

8    capabilities of the app.  I've heard of it, But I have

9    not done any research on it.  I don't know.  I don't use

10   it, so --

11       Q.   Have you --

12       A.   -- I cannot answer definitely.

13       Q.   Okay.  But, you're a forensic expert, correct?

14       A.   I am.

15       Q.   Okay.  And, is it your understanding, as far as

16   you know, that the only way two people can communicate

17   on that app is through texts?

18       A.   I believe.

19               MS. AUSTIN:  Thank you.

20                     CROSS-EXAMINATION

21   BY MR. CONTE:

22       Q.   Good afternoon, Mr. Hermanson.

23       A.   Good afternoon.

24       Q.   My name is Joseph Conte, and with Mr. Dwight

25   Crawley we represent Douglas Duran Cerritos.

1          With the court -- the aid of the court security

2    officer, I'd like to refer you to Government's

3    Exhibit 102-F.

4          I'd like to ask you if you see the name Cerritos

5    in Government's Exhibit 102-F.

6    A.   And, can you repeat the contact name?

7    Q.   Cerritos, C-e-r-r-i-t-o-s.

8    A.   I do not.

9    Q.   And, do you see the name Lil Poison?  And I'll

10   spell out for you.  It's two words.  L-i-l, first word,

11   P-o-i-s-o-n, second word.

12   A.   I do not.

13   Q.   And, finally, the word -- name, Geason,

14   G-e-a-s-o-n.

15   A.   Man Geason?  Is that --

16   Q.   G-e-a-s-o-n.

17   A.   I do not.

18          MR. CONTE:  Thank you.  Nothing further,

19   Your Honor.  Thank you.

20          THE COURT:  You may proceed.

21                  CROSS-EXAMINATION

22   BY MR. LEIVA:

23   Q.   Good afternoon, Agent Hermanson.

24   A.   Good afternoon.

25   Q.   So, is my understanding correct, that you

1    received this cellphone from the field office?  Right?

2        A.   Yes, correct.

3        Q.   Okay.

4        A.   Through our evidence control.

5        Q.   Through evidence control?

6        A.   We don't receive it directly.

7        Q.   Walk me through what the idea and proper protocol

8    would be for you to receive this cellphone.

9            And, starting with that premise, would you prefer

10   that if an -- if a cellphone is confiscated, that it is

11   secured and go directly to you?

12            MR. TOBLER:  Objection, Your Honor.

13   Compound question.

14            THE COURT:  Sustained.

15   BY MR. LEIVA:

16       Q.   All right.  Well, let me break it up.

17            My premise was, in the ideal world, in the ideal

18   forensic world, within your expertise, all right?

19   That's not a question.  That's just a premise.

20            Would you want a cellphone to be sent directly to

21   you, rather than to someone else, let's say someone in

22   the field office, ideally?

23       A.   It's tough to answer that question.  I mean --

24       Q.   That's why I'm asking.  You're the expert.

25       A.   It's just the way -- the way things are done,

1    because they are the ones that are running the cases,

2    They are the ones executing the search warrants.  The

3    field office is -- very few cases are generated by the

4    headquarters division, which is where our laboratory is.

5         So, the cases are run and search warrants are

6    executed by the field offices.  They seize the evidence.

7    So, really, there isn't a case, there isn't an evidence

8    to be examined without the field office doing that.

9       Q.   And I understand that.  That's why --

10                THE COURT:  Mr. Leiva, we will give you a

11   chance to --

12                MR. LEIVA:  Thank you, sir.

13                THE COURT:  -- continue after lunch.

14                Ladies and gentlemen, please do not discuss

15   the case.  Don't permit the case to be discussed in your

16   presence.  Leave your notes in the jury deliberation

17   room.

18                We'll resume at 2:00 o'clock.  Thank you.

19                (Court recessed at 1:00 p.m. and reconvened

20                at 2:05 p.m.)

21                THE COURT:  Ready to bring the jury out?

22   Okay.

23                You can bring our jury out, Mr. Toliver.

24   Thank you.

25                (Jury present at 2:06 p.m.)

1           THE COURT:  You may be seated.

2           All right, Counsel, you may proceed.

3           MR. LEIVA:  Thank you, sir.

4              CROSS-EXAMINATION (Continued)

5    BY MR. LEIVA:

6       Q.   Agent Hermanson, when we left off, you were

7    explaining the procedures of the FBI are such that you

8    don't get the cellphones first, correct?

9       A.   Yes, that's correct.

10      Q.   Now, notwithstanding the FBI procedures, as a

11   computer forensic examiner, would you prefer that the

12   cellphones go directly to you -- or come directly to

13   you?

14      A.   I could see advantages to doing that.

15      Q.   And what are the concerns that you have, if any,

16   if they are first touched or manipulated or -- or

17   someone tries to access them before they come to you?

18      A.   Just the modification of original evidence.

19      Q.   And please, in layman's terms, what does that

20   mean, "the modification of original evidence"?

21      A.   That previous examinations would touch and change

22   the actual content of the device.

23      Q.   All right.  And, that is a concern even with the

24   software that the FBI employs at the field office?

25      A.   It's something that we test and validate the

G. Hermanson - Cross

1   utilities, to make sure that they don't do, yes,
2   correct.
3       Q.   My question was:  That is a concern even with the
4   software that the FBI uses at its field office to access
5   content on a cellphone, this modification that could
6   happen?
7       A.   It's -- yes, it's something we're concerned
8   about, yes.
9       Q.   Okay.  So, you -- you receive this cellphone and
10  you do not use the software that was used at the field
11  office?  Is that my understanding?
12      A.   Correct.  The -- the commercial off-the-shelf
13  software packages that we typically try first could not,
14  in this case, get to the data because there was a PIN
15  lock or Gesture Lock in this case.
16      Q.   Let me take you back one step.  And I apologize
17  for doing this for you.  But when you said modification
18  of certain content, that could be the date, for example,
19  like a timestamp or a date stamp on anything that you
20  may retrieve from the phone?
21      A.   Any data that's -- yes, user data, that's
22  associated with user data, yes, anything.
23      Q.   So, at some point, sir, you were able to
24  access -- well, maybe "access" is the wrong term within
25  your field, but, it sounds that you were able to

G. Hermanson - Cross                                    133

1    replicate whatever was in that phone when you received

2    it.

3        A.   Yes.

4        Q.   So, your testimony is based on what you -- you

5    were able to retrieve from the moment that you had

6    access to that device, the cellphone.

7        A.   Yes, correct.

8        Q.   Okay.  So, any corruption that may have happened

9    before then, you are not able to attribute to who may

10   have corrupted it or how it was corrupted?

11       A.   I can't say that there is was corruption, but the

12   data that I examined was the data the -- the way that it

13   was when I got it, yes.

14       Q.   All right.  Well, the reason I'm using the word

15   "corrupted" is if you look at -- if you could please

16   look at Exhibit 102-F.

17            MR. LEIVA:  If we could publish that,

18   please.

19   BY MR. LEIVA:

20       Q.   On the top left-hand corner where it says,

21   "Notes," "Unlinked records have been deleted and may

22   contain partially overwritten data, causing them to

23   appear corrupted."

24            Are those notes that you inputted?

25       A.   No.  That's -- that was done by the utility.

1    Q.  The utility?

2    A.  Yes.

3    Q.  The utility that you used to retrieve data --

4    A.  Yes.

5    Q.  -- right?

6        And that utility that you used to retrieve data

7    is telling you that certain files may be corrupted?

8    A.  What they're referring to when they say

9    "corruption" is that -- and this is trying to explain

10   what -- the meaning of "unlinked records."  It's

11   basically that there is something in that -- that field,

12   the descriptor field, that is unlinked.  In other words,

13   it's -- "linked" means it's pointed to the storage area

14   of the data.

15       That is meaning that somewhere along the line, in

16   the actual, everyday use of this system, this device,

17   that that data, that link, the pointer to where the data

18   was has been overwritten, So it can no longer point to

19   that data.

20   Q.  Okay.

21   A.  Unlinked data.

22   Q.  And when you say "everyday," that also includes

23   if someone had tried to access the cellphone and

24   something happened or something went wrong, right?

25   A.  I'm not positive what happened.

1    Q.   And I know you're not.  I'm not trying to put you

2    on the spot by asking you a hundred percent what

3    happened.  I guess I'm asking you to educate me, in that

4    that is a possibility, right?

5    A.   If something -- if this -- if this activity of

6    the phone could -- could have happened before I got it?

7    It is a possibility.  I can't speak to that.

8    Q.   And it's also a possibility that perhaps when the

9    agents at the field office tried to access information

10   from this phone, that also may have caused this type of

11   corruption?

12   A.   I'll clarify.  I know what you're asking and I'll

13   clarify it.  What you're saying is a possibility, but

14   once again, I'd like to point out that this is trying to

15   describe what -- the meaning of what different things

16   are in this report.

17        It's trying to describe -- the corruption that

18   it's referring to is something that happens in the

19   everyday use of this device.  It's normal.  It's

20   different than what -- the corruption you're talking

21   about.

22   Q.   Now, if -- if you look at 102-F, again -- and I

23   think one of my colleagues had asked you about the

24   significance of the pink in that particular record.

25   That is letting you know that, at least the data that's

1    highlighted in pink is corrupted, right?  Or appears

2    corrupted?

3        A.   It's a recovered deleted entry, and it -- it

4    can't specify why it was deleted.  But it's recovered

5    for -- it's not an active contact.  It at one point most

6    likely was.  It no longer is.  It's deleted for some

7    reason, and it's recovered by this utility.

8        Q.   Is there any way for you to know what, if any,

9    data on this particular cellphone has been manipulated

10   prior to you receiving it?

11       A.   Manipulated how?

12       Q.   Well --

13       A.   In what way?

14       Q.   -- what different versions of manipulation are

15   there when it comes to cellphone data?

16           I think we touched on one, maybe a timestamp,

17   right?

18       A.   Modification?

19       Q.   I'm sorry.  Maybe I'm just using -- I'm using the

20   wrong lingo.

21       A.   Just clarifying.  I'm sorry.

22       Q.   So modification of a timestamp, right?

23       A.   Sure.

24       Q.   A date stamp?

25       A.   So, yeah, those things -- those things could

1   happen with just use, the everyday use of the phone.

2   It's any time that that individual data field is

3   accessed, if it's an accessed time, for instance.

4       Q.   Right.

5            So, let me narrow my question then.  Do you have

6   any software which would assist you in determining what,

7   if any, modifications were made on the data on this

8   cellphone prior to you accessing the data?

9       A.   Like for a specific time range, just any -- or

10  any time before I got it?  Just modification of --

11      Q.   Well, I'm assuming that you can only testify as

12  to the data that you retrieved once it was in your

13  hands, right?

14      A.   Yes.

15      Q.   Not what happened when some field agent tried to

16  access it.

17      A.   Correct.  There is no method for me to do that,

18  no.

19      Q.   So, my question then is:  Is there any program or

20  software that you use, or any information -- well, I

21  don't want to compound this question.  So let me go

22  back.

23           So, is there any software that you use which

24  assists you in determining whether any data has been

25  modified at all?

1           Or do you guys even check for that?

2      A.   No, I don't check for that.

3               THE COURT:  Excuse me, Counsel.  We need to

4      take a brief recess.

5               MR. LEIVA:  Yes, sir.

6               (Thereupon, court recessed at 2:15 p.m. and

7               was reconvened at 2:18 p.m.)

8               (Jury not present.)

9               MR. CONTE:  Your Honor, may we approach?

10              THE COURT:  Yes.

11              (Thereupon, the following side-bar

12     conference was had:)

13              MR. CONTE:  Your Honor.

14              THE COURT:  Yes.

15              MR. CONTE:  Your Honor, they brought my

16     client, Mr. Cerritos, out in shackles.  I was over near

17     the jury box, and I think it would have been visible to

18     the jurors sitting in seats 2, 8, and 14.  It's highly

19     prejudicial and we would ask for a mistrial.

20              THE COURT:  Tell me what exactly happened.

21              MR. CONTE:  We were sitting, during -- we

22     found out our clients were wearing leg shackles, leg

23     irons.

24              THE COURT:  Your client sits at the end of

25     the table, all the way at the end, right?

```
 1                    MR. CONTE:  The gentleman with the glasses.
 2                    THE COURT:  He is about 40 feet away from
 3   the jury.  You think they're looking under the table to
 4   see what's on his feet?
 5                    MR. CONTE:  I don't know what they saw,
 6   Judge.  And I have no explanation as to why he was
 7   brought out in shackles, either.
 8                    And I would ask the Court to inquire of the
 9   marshals, or whoever did it, made a decision why my
10   client was brought out in shackles.
11                    THE COURT:  Well, I'm not sure that's going
12   to help us understand what the situation is.  I have
13   instructed the marshals not to have anybody in handcuffs
14   or shackles at all, ever.
15                    And you'll note when I come on the bench, I
16   try to wait until everybody's seated before I bring the
17   jury in, to avoid any risk of that.
18                    In this instance, I don't have any
19   indication that the jury would have seen it from their
20   sight lines.
21                    And we can take a picture of the courtroom,
22   if you'd like.  I'm happy to do that.  Maybe we should,
23   so that that part of the record, you can all agree where
24   your guy was sitting and where the jury is seated.
25                    But I don't think that it's -- it's likely
```

1    they would have been looking under the table all the way

2    at the end of the room, to see his feet.

3              MR. CRAWLEY:  Your Honor, when we went over

4    to the jury box, we both sat down in those seats.  It's

5    a clear sight line.  And it's at eye level.  So it's not

6    like they had to do a lot of work to look under that

7    table.

8              Because of the distances Your Honor has

9    touched upon, that distance allows for that angle of

10   sight, such that it's not a difficult thing for them to

11   see.

12             If Your Honor wishes to sit over there and

13   look for himself, he can see clearly under the table.

14             MS. MARTINEZ:  Your Honor --

15             THE COURT:  Well, the witness was on the

16   stand just a moment ago.

17             MS. MARTINEZ:  Yes, he was.

18             THE COURT:  And there was cross-examination

19   taking place, so I can't speak to what the jury was

20   doing.  I really can't, I mean, honestly, I don't know

21   what they were looking.  I was looking at the witness.

22   I'm assuming -- when I was looking at the jury, the jury

23   was looking at the witness, and I don't really have any

24   indication any juror saw anything.

25             I'm afraid to ask them if they saw anything,

 1    because that --

 2              MR. CONTE:  You can't do that.

 3              THE COURT:  -- would just create a bigger

 4    problem.

 5              MS. MARTINEZ:  Your Honor, we wouldn't

 6    object to a picture being taken, or a multiple pictures,

 7    from the jury box.

 8              I just now, walking up here, stood in front

 9    of the jury box and looked to where Mr. Douglas Cerritos

10    was seated at the time.  From where I stood, at least, I

11    could not see under the table.

12              Of course, for the record as well, counsel

13    was sitting next to him on either side, and then there

14    were other -- another defendant and another counsel

15    seated closer.  So, there were a number of things

16    blocking the view from the jury.

17              I -- from my perspective, it does not seem

18    like it would be have been visible.

19              THE COURT:  Okay.

20              MR. CONTE:  The trouble is, it's all

21    conjecture whether they did or didn't.

22              THE COURT:  I'm happy --

23              MR. CONTE:  In this case, I think we have to

24    err on the side of safety that they did.  As soon as

25    somebody assumes that somebody didn't see something --

1          THE COURT:  I don't want to make assumptions
2    about something as powerful as that.
3          What I'm prepared to do, if you want, I can
4    take a picture from the jury's seat, everybody sit down
5    where they were seated, and that would become a part of
6    the record.  I'm willing to do that, if you want.  If
7    you don't want that, tell me.
8          MR. CONTE:  I'd request that.
9          THE COURT:  Okay.
10         MR. CONTE:  Juror seat number two.
11         (Thereupon, the side-bar conference was
12    concluded.)
13         THE COURT:  Counsel, you all have a seat,
14    please.  Everyone have a seat.
15         MR. CONTE:  Number two.
16         THE COURT:  Seated.
17         MS. MARTINEZ:  Seated.
18         THE COURT:  Come back over here, too.
19         Remain seated.  Remain seated.
20         Take a picture from this angle.
21         Go up on the bench and take a picture from
22    this angle.
23         THE CLERK:  Seated?
24         THE COURT:  Yes.  Uh-huh.
25         Counsel, was your bag right there?

1          MR. CONTE:  It hasn't been moved.

2          THE COURT:  So it was in front of his feet.

3          MR. CONTE:  In front of my feet.

4          THE COURT:  It's in front of his feet, too,

5   from where I'm seated.

6          Take a seat.  Have a seat, Mr. Crawley.

7   Okay.

8          (Pause.)

9          THE COURT:  Come back up, Counsel, see the

10  pictures.

11         (Thereupon, the following side-bar

12  conference was had:)

13         THE COURT:  I want you all to see the

14  photographs that were taken.

15         Okay, can you see?

16         MR. CRAWLEY:  Yes, sir.

17         THE COURT:  That's the first one, From seat

18  two, that you asked.

19         The law clerk was sitting there taking that

20  picture; is that right?

21         MR. CRAWLEY:  Yes, sir.

22         THE COURT:  That's the second one.  We will

23  call that B.

24         That's the third one, and that's from the

25  perspective of the Court.

1           But what I see is screens.  I can't really
2     see his feet.
3           And this fourth one, you can't really see
4     his feet, either.  But when you pull it up, you can see
5     there's darkness, really.
6           So, I will make this a part of the record.
7           MR. CONTE:  Your Honor, I hate to delay the
8     trial, but I ask that a picture be taken while -- while
9     he's wearing the leg irons, because they're silver and
10    the bag is dark red.
11          MR. CRAWLEY:  May I use the restroom quick?
12          THE COURT:  You have one lawyer here.
13    That's fine.
14          Even with blowing that up, you could see
15    your bag is in front of his feet.
16          MR. CONTE:  I see my feet --
17          THE COURT:  This is as much as I can do,
18    sir.  I'm sorry.  I can't really do any more.
19          I will --
20          MS. MARTELL:  I think --
21          THE COURT:  Yes?
22          MS. MARTELL:  My client heard the shackles
23    when he stood up, and asked me about the handcuffs.  And
24    I didn't --
25          THE COURT:  They're not handcuffs.

G. Hermanson - Cross

1          MS. MARTELL:  Yeah, but he used the word

2   "handcuffs," and I didn't understand him.  And then you

3   took the recess, and then I saw him.  But --

4          THE COURT:  A concern has been raised that

5   Douglas Cerritos was in the courtroom -- and I know

6   we're doing all we can to avoid that issue presenting

7   itself.

8          THE MARSHAL:  Absolutely.

9          THE COURT:  So, just -- I don't know if you

10  recall it or not.  It doesn't matter.  I'm not trying to

11  put you on the spot.  I have the lawyers who told me

12  what they saw, and I wanted to bring it to your

13  attention.

14         THE MARSHAL:  Understood.  I'll get to the

15  bottom of that issue.  It definitely wasn't intentional.

16  The defendant was sitting down before the jury was in.

17         I have a very difficult time believing

18  anyone could have seen it, but --

19         THE COURT:  Well, your credibility is not at

20  issue.  I'm the one making the judgment.  I'm trying to

21  avoid that.

22         THE MARSHAL:  Understood.  We'll address it.

23         THE COURT:  So the motion for mistrial is

24  denied.

25         Let's bring the jury back.  Thank you.

1

2                  (Thereupon, the side-bar conference was

3      concluded.)

4                  THE COURT:  Counsel, I'm responsible for the

5      courtroom, and, what I'm hoping to do each time you

6      have -- I'll ask, are we ready to bring the jury out,

7      I'm trying to make sure everybody's seated before they

8      come in.

9                  But if you all see anything amiss, just let

10     me know.   Thank you very much.

11                 You can bring our jury back.   Thank you.

12                 (Jury present at 2:29 p.m.)

13                 (Witness resumed stand.)

14                 THE COURT:  You may be seated, thank you.

15                 Thank you for your patience, ladies and

16     gentlemen.

17                 Thank you, Counsel.   You may proceed.

18                  CROSS-EXAMINATION (Continued)

19     BY MR. LEIVA:

20       Q.   Agent, just a couple more questions.

21            When did you conduct the analysis on -- let me

22     ask, not the analysis, but when did you physically

23     receive the phone?

24       A.   I received it on April 14th, 2014.

25       Q.   Okay.  And when was the phone collected by an

1   agent in your department?

2       A.   I don't know that.

3       Q.   The -- the evidence bags that you have before

4   you, or that you reviewed, does that have any date when

5   it was collected?

6       A.   I believe so.

7       Q.   If you wouldn't mind looking at that.

8       A.   The date on the evidence bag is December 30th,

9   2013.

10      Q.   And, based on that date, that's when you believe

11  an agent in your department took physical custody of

12  that phone, right?

13      A.   This is when the case agent received it from

14  Sergeant John Bendrick (phonetics).

15      Q.   December.

16           And you didn't actually physically get the phone

17  yourself until April?

18      A.   Correct.

19           MR. LEIVA:  That's all the questions I have,

20  Your Honor.  Thank you.

21           MR. TOBLER:  No redirect, Your Honor.

22           THE COURT:  May the witness be excused?

23           (No audible response.)

24           THE COURT:  You're free to leave, sir.

25  Thank you for coming.

1           THE WITNESS:  Thank you, Your Honor.

2           (Thereupon, the witness withdrew from the

3    stand.)

4           MR. TOBLER:  United States calls Vania

5    Vargas.

6           THE COURT:  Ms. Martinez, were you able to

7    locate the glossary?

8           MS. MARTINEZ:  We have, Your Honor, and it

9    has been provided --

10          THE COURT:  Thank you.

11          MS. MARTINEZ:  -- to defense counsel.  We

12   also have copies for other defense counsel, if they

13   would like copies.

14          THE COURT:  All right.  Thank you.

15          (Witness sworn.)

16          THE WITNESS:  Yes.

17          THE COURT:  You may proceed.

18          THEREUPON, VANIA VARGAS, having been duly

19   sworn, testified as follows:

20                    DIRECT EXAMINATION

21   BY MR. TOBLER:

22   Q.   Good afternoon, ma'am.

23   A.   Hello.

24   Q.   Could you please state your name and spell it for

25   the record.

1    A.   Vania Vargas, V-a-n-i-a, V-a-r-g-a-s.

2    Q.   Where do you work, ma'am?

3    A.   At Washington Field Office.

4    Q.   For what organization?

5    A.   The FBI.

6    Q.   What is your position with the FBI?

7    A.   I'm a contract linguist.

8    Q.   How long have you been in that position?

9    A.   Almost ten years.

10   Q.   What languages do you speak?

11   A.   Spanish and English.

12   Q.   How long have you spoken Spanish?

13   A.   It's my first language.

14   Q.   Where did you learn Spanish?

15   A.   In Bolivia.

16   Q.   Are you from Bolivia?

17   A.   Yes.

18   Q.   How long have you spoken English?

19   A.   I -- since I was four.

20   Q.   Where did you work prior to the FBI?

21   A.   Bank of America.

22   Q.   How long did you work at the Bank of America?

23   A.   About seven years.

24   Q.   Where was the bank branch in which you worked?

25   A.   I worked in different ones:  Woodley Park,

1  Wheaton and Gaithersburg.

2     Q.  What was your position at the bank?

3     A.  A banker.

4     Q.  In your role as a banker, did you use your

5  Spanish skills?

6     A.  I did.

7     Q.  How so?

8     A.  I interacted with Spanish-speaking customers.

9     Q.  From what countries were the people you spoke to

10 in Spanish?

11    A.  Most of them, Central Americans.

12    Q.  What countries within Central America?

13    A.  El Salvador, Honduras, Guatemala.

14    Q.  And what would you -- when you spoke to these

15 folks from Central America, what would you speak to them

16 about?

17    A.  I would help them with their banking, their

18 mortgage, their investment.

19    Q.  Were you able to communicate with those

20 individuals from Central America?

21    A.  Yes.

22    Q.  Based on your experience, would you agree that

23 Spanish speakers from different Spanish speaking

24 countries have different manners of speaking the

25 language?

1    A.   Yes.

2    Q.   With what dialects of Spanish are you familiar?

3    A.   Central Americans, Mexicans, Dominicans, Puerto

4  Ricans.

5    Q.   When you say Central American, does that include

6  Salvadoran?

7    A.   Yes.

8    Q.   How are you familiar with the Salvadoran dialect?

9    A.   They have -- -- can you rephrase the question for

10 me?

11   Q.   What experiences have you had in which you have

12 become familiar with the Salvadoran dialect?

13   A.   By working at the bank, I help with the customers

14 with their banking needs, their mortgage needs.  And

15 then when I transferred to the FBI, I started working

16 with a lot of Central Americans and -- and different

17 other countries.

18             THE COURT:  Can you rephrase the question?

19 I don't think she understood your question.

20 BY MR. TOBLER:

21   Q.   Um --

22             THE COURT:  His question had to do with your

23 familiarity with the Salvadorian dialect.  Can you

24 explain that?

25             THE WITNESS:  Yes.  I started learning and

1  getting acquaintance with the language, with Salvadorian

2  slang, when I worked at Bank of America, because I had

3  many customers who were from El Salvador.  And in order

4  for me to understand their needs, I had to get used to

5  the different type of Spanish they spoke to the one I

6  was used to.

7  BY MR. TOBLER:

8      Q.   When you were hired by the FBI, were you required

9  to take any language proficiency exams?

10     A.   I was.

11     Q.   Did you successfully qualify to be a contract

12 language monitor?

13     A.   Yes.

14     Q.   What do you do as a -- as a contract language

15 monitor?

16     A.   I do interpreting.  I do summaries verbatim.  I

17 do wiretaps.

18     Q.   What types of materials do you interpret?

19     A.   CDs, audios, any type of audio, video.

20     Q.   Do you interpret documents?

21     A.   I do.

22     Q.   Do you also conduct in-person interpretation?

23     A.   Yes.

24     Q.   And I believe you mentioned that you interpret

25 recordings as well.

V. Vargas - Direct                                          153

1    A.   I'm sorry?

2    Q.   I believe you mentioned you interpret recordings

3  as well.

4    A.   I translate recordings.

5    Q.   When you translate, do you translate from Spanish

6  to English?

7    A.   Yes.

8    Q.   Do you also translate from English to Spanish?

9    A.   Sometimes.

10   Q.   What experience do you have translating Spanish

11 in the Salvadorian dialect?

12   A.   Um, about seven years.  I started with

13 Salvadorian Title III drug cases, MS-13 cases.

14   Q.   When you were working on a wiretap, what were

15 your duties?

16   A.   To listen to the call and to do a summary of the

17 call.

18   Q.   Did you ever complete verbatim transcripts?

19   A.   Not from T-IIIs.

20   Q.   When you're working on a wiretap, approximately

21 how many hours per week are you listening to recordings?

22   A.   At least 30.

23   Q.   And just so we're clear, when you're listening to

24 the recordings, what language are the recordings in?

25   A.   Spanish.

1    Q.   And you are translating them into what English --
2    excuse me -- into what language?
3    A.   English.
4    Q.   And, how long -- how long does a wiretap
5    typically last?
6    A.   It can go from 30 days up to six months or a
7    year, or even more.
8    Q.   Approximately what percentage of your work
9    translating Spanish involves MS-13?
10   A.   Fifty percent.
11   Q.   In your experience, do people involved with MS-13
12   speak Spanish in a distinctive manner?
13   A.   I'm sorry?
14   Q.   In your experience, do people involved with MS-13
15   speak Spanish in a distinctive way?
16   A.   Yes.
17   Q.   How so?
18   A.   Slang, different slang.
19   Q.   How have you educated yourself to understand
20   Spanish as spoken by MS-13 members?
21   A.   On the job.
22   Q.   Could you please describe what you mean by "on
23   the job"?
24   A.   On the job, just by listening to their
25   conversations and, just talking to other people who have

1    more experience.

2        Q.   Who have you talked to, to help you understand

3    MS-13 slang?

4        A.   I started with senior linguists at work.  And, on

5    the first case I worked I actually spoke to somebody who

6    came from El Salvador to help us out.

7        Q.   Who was that person who came from --

8        A.   He was a task force officer from -- a gang task

9    force officer from El Salvador.

10       Q.   Do you know what his position was in El Salvador?

11       A.   I don't recall.

12       Q.   Was he a member of Salvadoran law enforcement?

13       A.   Yes.

14            MR. TOBLER:  Your Honor, we would move that

15   the witness be recognized as an expert Spanish linguist,

16   with expertise in the Salvadorian dialect.

17            MR. LEIVA:  Subject to cross-examination.

18            THE COURT:  Subject to cross-examination,

19   she will be allowed to testify to a reasonable degree of

20   certainty in her field, as an expert in the Spanish

21   language with expertise in the Salvadorian dialect.

22   BY MR. TOBLER:

23       Q.   Ma'am, please describe the process by which you

24   prepare a verbatim translation of a Spanish language

25   recording.

1    A.    Sure.  I'm given the recording.  I will listen to

2    the recording from beginning to end the first time.  The

3    second time around I'll take notes on the recording.

4    And then I'll start translating into English after --

5    after my notes.

6    Q.    What do you do after -- well, let me ask you this

7    question first:  What equipment do you use during that

8    process?

9    A.    Start-Stop.

10   Q.    What is Start-Stop?

11   A.    Start-Stop is a system that allows me to pause

12   the recording with my foot.  It makes -- leaves my hands

13   free so I'm able to type.

14   Q.    Does that equipment alter the recording in any

15   way?

16   A.    Not at all.

17   Q.    Do you wear headphones when you're performing

18   translations?

19   A.    I do.

20   Q.    Do the headphones you wear alter the recordings

21   in any way?

22   A.    Not at all.

23   Q.    When you're translating, what do you do when you

24   come across a word that you do not understand?

25   A.    I talk to my fellow colleagues, and I have them

1  listen to the recording to see if they could understand

2  it.  If not, I try to, like, slow down the recording to

3  see if I can hear it better.

4      Q.  What if you can hear the word but you don't

5  necessarily understand the meaning, or you have

6  questions about the meaning?

7      A.  I will once again approach my colleagues, the

8  senior linguists who I work with, and sometimes I will

9  use the Internet.

10      Q.  And, after you consult -- what role, if any, does

11  context play in helping you understand the meaning of a

12  word?

13      A.  It depends on the type of conversation the

14  subject is having, like, what are they talking about.

15  Like the whole conversation has a lot to do with the

16  meaning of the word.

17      Q.  When you're making an assessment of the meaning

18  of a word, who -- upon whose judgment do you ultimately

19  rely?

20      A.  Mine.

21      Q.  And in your experience, is it common practice for

22  a contract language monitor to rely on the resources you

23  just described when translating words or phrases?

24      A.  Yes.

25      Q.  What do you do after you've prepared a draft

1    translation?

2       A.   I review it a couple more times to make sure I --

3    I'm happy with the results that I have.

4       Q.   And what about after that?

5            Is there a -- is there a review process in place

6    for these --

7       A.   Yes.

8       Q.   -- translations?

9       A.   Somebody else will review my work as well.

10      Q.   Have you ever served as a reviewer for another

11   linguist's translations?

12      A.   Yes.

13      Q.   What do you do when you conduct a review of

14   another linguist's translations?

15      A.   I review -- I listen to the conversation from

16   beginning to end.  Then I get the document and I review

17   with the audio.  I go with the audio.

18      Q.   What do you do after that, as a reviewer?

19      A.   Then I give it back to the linguist.

20      Q.   What do you include with what you give back to

21   the linguist?

22      A.   Suggestions.  I help fill out the blanks, or

23   things that I understood better.  I'll make suggestions

24   of what I hear and what I understand.

25      Q.   When you're the original linguist, what do you do

1   when the review is complete?

2       A.   I go over the -- the audio as well again, and I

3   review the corrections that have been made.  And if I

4   agree with the corrections, I will take them.  If I

5   don't agree with the corrections, I will keep what I

6   have written.

7       Q.   By the time you complete the entire process,

8   approximately how many times have you listened to the

9   recording that you are translating?

10      A.   About ten.

11      Q.   As part of this case, were you asked to perform

12  Spanish to English translation services?

13      A.   Yes.

14           MR. TAYLOR:  With the assistance of

15  Mr. Toliver, I would like to show you what has been

16  marked in the exhibit binders for identification as

17  Government's Exhibit 8-A, 9-A and 22-A.

18  BY MR. TOBLER:

19      Q.   Do you recognize these exhibits, ma'am?

20      A.   Yes, I do.

21      Q.   What are they?

22      A.   They are the recordings.

23      Q.   Recordings of what?

24      A.   Of conversations.

25      Q.   Were these recordings -- were these conversations

1   translated?

2   A.   Yes.

3   Q.   By whom?

4   A.   By me.

5   Q.   How do you recognize these exhibits?

6   A.   I have my initials on the CDs.

7   Q.   What did you do before initialing those CDs?

8   A.   I sat down and I listened to the recording and I

9   read the document.

10  Q.   When you say "the document," what document are

11  you referring to?

12  A.   The translations.

13  Q.   Please turn, if you would, in the binder to

14  Government's Exhibits 8-A-1, 9-A-1, and 22-A-1.

15      Did you have an opportunity to see all of them?

16  A.   Yes.

17  Q.   Do you recognize these exhibits?

18  A.   Yes.

19  Q.   What are they?

20  A.   They're CDs.

21  Q.   I'm actually asking you to look at Government's

22  Exhibit 8-A-1, so the dash-1 afterwards.

23  A.   Oh, I'm sorry.

24  Q.   No problem.

25      It should be behind the disks, I believe.

1       A.  Oh, I see.  Sorry.  Thank you.  Got it.  Thanks.

2       Q.  Feel free to take them out.

3       A.  Okay.  Thank you.

4       Q.  Is that 8-A-1?

5       A.  Yes.

6       Q.  Please also review 9-A-1.

7           And then, lastly, please review 22-A-1.

8       A.  Sorry.

9       Q.  No need to apologize.  Thank you.

10      A.  Thank you, sir.

11          Okay.  Yes.

12      Q.  Do you recognize Government's Exhibits 8-A-1,

13  9-A-1 and 22-A-1?

14      A.  I do.

15      Q.  What are they?

16      A.  These are my translations.

17      Q.  What is Government's Exhibit 8-A-1 a translation

18  of?

19      A.  Conversations.

20      Q.  And, where are those conversations located?

21          Are those the conversations that are in

22  Government's Exhibit 8-A?

23      A.  Yes.

24      Q.  What is Government's Exhibit 9-A-1 a translation

25  of?

1    A.   Conversations.

2    Q.   The conversations in Government's Exhibit 9-A?

3    A.   Yes.

4    Q.   What is Government's Exhibit -- well, is

5  Government's Exhibit 22-A-1 a translation of

6  Government's Exhibit 22-A?

7    A.   Yes.

8    Q.   When you created these translations, did you

9  follow the process you described previously in your

10  testimony?

11   A.   I did.

12   Q.   Do these translations identify the speakers in

13  the recordings?

14   A.   Some.

15   Q.   Was it part of your translation responsibility to

16  identify the actual speakers in these recordings?

17   A.   No.

18   Q.   What was the source of that information?

19   A.   It was given to me.

20   Q.   Do you have personal knowledge -- who gave it to

21  you?

22   A.   The case agent.

23   Q.   Do you have personal knowledge of where the case

24  agent got that information?

25   A.   No.

1    Q.   On the first page of each translation, is there

2    information about the time and date of the call?

3    A.   Yes.

4    Q.   Where does that information come from?

5    A.   The CD.

6    Q.   Other than the information we just discussed,

7    including the identity of the speakers, are these

8    translations your own work product?

9    A.   Yes.

10   Q.   As preparation for your testimony, have you

11   reviewed Government's Exhibit 8-A-1, 9-A-1, and 22-A-1,

12   and compared their contents against Government's

13   Exhibits 8-A, 9-A and 22-A?

14   A.   Yes.

15   Q.   Based on your training and experience, is

16   Government's Exhibit 8-A-1 a true and accurate

17   translation of the contents of 8-A?

18   A.   Yes.

19   Q.   Based on your training and experience, is

20   Government's Exhibit 9-A-1 a true and accurate

21   translation of the contents of 9-A?

22   A.   Yes.

23   Q.   Based on your training and experience, is

24   Government's Exhibit 22A-1 a true and accurate

25   translation of the contents of 22-A?

1    A.   Yes.

2         MR. TOBLER:  Your Honor, at this time the

3    government moves for admission of Government's

4    Exhibits 8-A, 8-A-1, 9-A, 9-A-1, 22-A, and 22-A-1,

5    conditional upon the government establishing the

6    evidence as relevant.

7         MR. AQUINO:  Judge, renew the same

8    objection.

9         THE COURT:  All right.  Subject to the

10   objection, the standing objection concerning these

11   transcripts, concerning whether or not they are verbatim

12   whether or not -- whether they're relevant, and whether

13   or not the translation as related to gang dialect are

14   accurate, they will be received.

15        MR. TOBLER:  No further questions, Your

16   Honor.

17                    CROSS-EXAMINATION

18   BY MR. LEIVA:

19   Q.   Good afternoon, Ms. Vargas.

20   A.   How are you?

21   Q.   So, you're Bolivian?

22   A.   Yes.

23   Q.   *Pacena*?

24   A.   I'm sorry?

25   Q.   *Pacena*?

```
 1    A.   Yes.
 2              MR. LEIVA:  That's p-a-c-e-n-a.
 3    BY MR. LEIVA:
 4    Q.   Am I correct, then, to infer that you were raised
 5    in Bolivia?
 6    A.   Yes.
 7    Q.   Okay.  How old were you when you came to the
 8    United States?
 9    A.   Eleven.
10    Q.   Eleven years old.  All right.
11         Okay.  So you were mostly raised here in the
12    States, then, not Bolivia?
13    A.   Well --
14    Q.   Or half-half?
15    A.   Half.
16    Q.   Half-half; I'll take that.
17         And, Ms. Vargas, the Spanish -- and I know this
18    is going to sound like a silly question, but I need to
19    ask it.  The Spanish that you learned was in Bolivia.
20    A.   Yes.
21    Q.   All right.  And, just so you know, I'm half
22    Salvadoran and half Bolivian.
23    A.   Okay.
24    Q.   So, the -- the Spanish that you learned, I think
25    we established was in Bolivia, right?
```

V. Vargas - Cross

1    A.   Yes.

2    Q.   And, within Latin America, would you agree that
the Spanish spoken in Bolivia tends to have the
reputation of being the truest form of Spanish, in the
sense that it follows all the correct grammatical rules
in Spanish?

7         You've never heard that before?

8    A.   No.

9    Q.   Okay.  All right.  Would you agree with me that
the Spanish spoken in Bolivia tends to have very little
slang?

12   A.   No.

13   Q.   All right.  Would you agree with me that the
Spanish spoken by Salvadorians is laden with slang?

15        (Pause.)

16        Well, let me ask it this way:  You testified on
direct --

18        THE COURT:  I'm sorry.  I didn't hear an
answer.  Did you answer?

20        THE WITNESS:  No, Your Honor, I didn't.
He's going to --

22        MR. LEIVA:  Well, let me rephrase it then.

23   BY MR. LEIVA:

24   Q.   Salvadorian Spanish -- the way Salvadorians speak
Spanish, they use a lot of slang, do they not?

1    A.   Not all of them.

2    Q.   That's not what I asked you.  I didn't ask you,

3    all of them.  I asked you if -- if the Spanish spoken by

4    Salvadorians, if they tend to use a lot of slang?

5    A.   Yes.

6    Q.   Okay.  And, the reason I'm asking that, because

7    when you testified on direct, when counsel was eliciting

8    your experience with Salvadorians, you used the phrase

9    "it took some getting used to."

10   A.   Correct.

11   Q.   All right.  So, if your position today is that

12   they don't really use a lot of slangs, what were you

13   getting used to?

14   A.   May I answer?

15   Q.   Yes.

16   A.   Okay.  So, they speak -- for -- for my Spanish,

17   it was just they used different words for different

18   things that I would use a different word for.

19   Q.   All right.  So you're saying that the dialect is

20   different?

21   A.   The dialect is different.

22   Q.   All right.  And the words that they used, they

23   tended to be slang words; would you agree with that?

24   A.   Yes.

25   Q.   Okay.  And so, even in the setting as simple as

 1   you dealing with someone's banking issues, initially you

 2   had difficulty understanding them?

 3       A.   Yes.

 4       Q.   And I'm assuming that when people came to you

 5   seeking assistance for banking issues, they weren't

 6   talking in gang slang, right?

 7       A.   No.

 8       Q.   Right.

 9            And, you would think that someone that's coming

10   to seek assistance for banking issues would try to use

11   little slang when dealing with someone professional, as

12   yourself?

13       A.   Yes.

14       Q.   All right.  But, what you found is, even that the

15   Spanish that they used -- they were using -- let's --

16   let me characterize it as they cleaned up their Spanish,

17   was still difficult initially for you to understand?

18       A.   Initially.

19       Q.   And, you would agree that throughout Latin

20   America there are differences in dialect, right?

21       A.   Yes.

22       Q.   And, words have different meanings?

23       A.   Yes.

24       Q.   Okay.  Now, if you would indulge me here.  I tend

25   to be more of a hands-on type of learner.  Either I need

1    to see things or hear things.  And if I may play a clip

2    for you, all right, and if you can tell the members,

3    ladies and gentlemen of the jury and Judge Lee whether

4    this is a correct analogy of someone from Bolivia

5    listening to someone from El Salvador speak, all right?

6    If I may.

7        A.   Okay.

8        Q.   What I'm going to play to you is someone from

9    Liverpool, England, speaking English.  And you let me

10   know if you think that's an appropriate analogy.

11             MR. TOBLER:  Your Honor, we would object to

12   the relevance of the analogy.

13             MR. LEIVA:  I think it's an example, because

14   right now we're talking abstract.

15             MR. TOBLER:  We would also object to it

16   being published to the jury without her having a chance

17   to listen.

18             THE COURT:  I think he's going to let her

19   listen to something now.

20             MR. LEIVA:  Yeah, I was going to play it

21   right now.

22             THE COURT:  Well, she's an expert, so

23   experts can be asked that type of question.  Objection

24   overruled.

25             (Audio played.)

BY MR. LEIVA:

Q.   Would you say that's a fair analogy?

MR. TOBLER:  Your Honor, we would again renew our objection.  This isn't English language.  And it's being published before the jury without her having --

MR. LEIVA:  Well, she --

THE COURT:  I'm sorry.  I'm sorry.

What's your objection?

MR. TOBLER:  It's being published without -- before the jury without her having an opportunity to hear it first.

We would object to the relevance.  He's playing something, from, I believe he said it was from Liverpool.  I don't see why that is relevant, given the fact that we're talking about Spanish, Spanish language testimony.

MR. LEIVA:  Your Honor, it's a simple yes or no answer.  She can say yes, it is analogous to what someone from Bolivia would -- would -- when listening to someone speaking Salvadorian sounds like, in English terms, or she can just say no, it's not a proper analogy.

THE COURT:  Objection overruled.

THE WITNESS:  I'm sorry?

BY MR. LEIVA:

Q.   So, you are an English speaker, right?

A.   Yes.

Q.   And I just played a clip of someone from Liverpool speaking English as they do in Liverpool.

A.   Yes.

Q.   All right.  Now, someone who is Bolivian, South American, speaking -- or hearing someone from El Salvador speak, would you say that the analogies are kind of the same, that initially you don't catch things and you kind of have to listen hard to understand what's being said by a Salvadorian, someone with your background, initially from Bolivia?

A.   Yes.  And if I may give an example, it's -- well, it's like if you take somebody from Boston and send them to the deep South, you know, he gets in his car and he goes to the South, within a week, within a few days, he'll be able to understand.

        So, yes, I'm Bolivian, but if you give me a recording and I'm working on this for so many years, I will be able to understand.

Q.   All right.  So, you're saying at some point you start to hear and fine-tune certain things?

A.   Yeah.  I have the ear for it.

Q.   Okay.  So, let's go to -- before we get to the

1    actual translations, let me jus ask you some very basic

2    questions about your background.

3        A.    Sure.

4        Q.    Are you a member of the American Translators

5    Association?

6        A.    No.

7        Q.    Are you a member of the International Association

8    of Professional Translators and Interpreters?

9        A.    No.

10       Q.    Are you a member of the National Capital Area

11   Translators Association?

12       A.    No.

13       Q.    Are you member of the National Association for

14   Interpretation?

15       A.    No.

16       Q.    Are you certified to provide interpretation or

17   translating services in federal court?

18       A.    No.

19       Q.    Before testifying here today, did you talk to any

20   of your colleagues who testified here previously?

21       A.    Yes.

22       Q.    Okay.  Who did you speak with?

23       A.    My colleagues.

24       Q.    No, who?

25             Ms. D'Sa --

1    A.   Ms. D'Sa.

2    Q.   Ms. D'Sa.  And, she told you about what she

3    testified here today?

4    A.   No.

5    Q.   Okay.  Did she tell you about what kind of

6    questions were asked of her?

7    A.   No.

8    Q.   All right.  What, if anything, did she say about

9    her experience here in court?

10   A.   She was nervous.

11   Q.   She was nervous.  All right.

12        And how did that topic come up between you and

13   Ms. D'Sa?

14   A.   We are colleagues.  We have -- we do a lot of

15   work together, so we have to talk at least once a day.

16   Q.   I understand that.

17        But did you approach her and say, "Hey, how did

18   it go in court," or did she just volunteer that

19   information to you?

20   A.   It just came out, out of the conversation.

21   Q.   And she didn't expand on why she was nervous?

22   A.   No.

23   Q.   She just left it at that, "I was nervous."

24   A.   Yeah.

25   Q.   How many times did you testify that you reviewed

V. Vargas - Cross

1    these recordings before you were okay with the final

2    product?

3        A.   About ten.

4        Q.   Ten times.  Okay.

5             If I could have you look at Government's

6    Exhibit 8-A-1.

7             Do you have that in front of you?

8        A.   I do.

9        Q.   Okay.  And, this is a -- a recording that you

10   reviewed, correct?

11       A.   Yes.

12       Q.   All right.  And it's a recording that you

13   reviewed at least ten times?

14       A.   Yes.

15       Q.   Okay.  All right.  Now, we've -- the jury has

16   heard some -- some questions about this word "*loco*,"

17   right?

18            What does the word "*loco*" mean to you?

19       A.   I'm sorry?

20       Q.   What does the word "*loco*" mean to you?

21       A.   Homeboy.

22       Q.   "*Loco*" --

23       A.   Like a buddy.

24       Q.   "Loco" means homeboy?

25       A.   Like a buddy.

1    Q.   All right.  So, when someone says to you, "Hey, I

2    don't speak Spanish, but my buddy just said hey -- he

3    used the term '*loco*' on me," your first response is that

4    it means homeboy?

5    A.   Buddy, yeah, my friend, my buddy.

6    Q.   Well, hold on.  Buddy and homeboy are two

7    different things.

8    A.   Depends on the context.

9    Q.   All right.  Does it -- so you say it depends on

10   the context.  So when you were reviewing this audio

11   recording, were you told that this was an MS-13 case?

12   A.   No, not at first.

13   Q.   Not at first.

14       When did you get involved with listening to

15   recordings about this case?

16   A.   When?

17   Q.   Yeah, when.

18   A.   I think September.

19   Q.   September of 2014?

20   A.   No, last year, 2015.

21   Q.   2015?

22   A.   Yeah.

23   Q.   Okay.  And so when you initially started

24   listening to these audio recordings, you were not told

25   that it was an MS-13 case?

1     A.   I knew -- when did I --
2               THE COURT:  I'm sorry?  You didn't complete
3     your answer.  I couldn't hear you.
4               THE WITNESS:  I'm sorry, Your Honor.  I'm
5     thinking, because I do a lot of cases --
6               THE COURT:  Okay.  All right.
7               THE WITNESS:  -- at the same time, so --
8     yeah, I work a lot of cases at the same time.
9               Um, I think when I started was September --
10    August, September.
11    BY MR. LEIVA:
12    Q.   Okay.  All right.
13              THE COURT:  Of what year?
14              THE WITNESS:  Last year.
15              THE COURT:  Thank you.  2015.
16              THE WITNESS:  2015.
17    BY MR. LEIVA:
18    Q.   All right.  If I could draw your attention to
19    page two of that exhibit, Government's 8-A-1.  And if we
20    could go down to the fourth line with "OC," do you see
21    that?
22    A.   On page two?
23    Q.   Page two, yes, ma'am.
24    A.   And what did you say again?  "OC"?
25    Q.   I guess your -- your page is probably different

1    than -- it may appear to be -- it would be, I guess,

2    your page four.

3        A.   Okay.

4        Q.   It would be the sixth line down, starting with

5    "OC," with, "Yeah, man."

6             Do you see that?

7        A.   I see it.

8        Q.   Okay.  If I could play you the recording of that

9    section.

10            MR. LEIVA:  If I may, Your Honor?

11            THE COURT:  Go ahead.

12   BY MR. LEIVA:

13       Q.   And what I'm specifically asking you to look for

14   is -- or to listen for is the word "*loco*"?

15       A.   Okay.

16       Q.   Okay?

17            (Audio played.)

18            Did you hear that?

19       A.   No, I'm sorry.  Could you play it again.

20       Q.   Yes.

21            I'll go back a little further for you.

22       A.   Thank you.

23            (Audio played.)

24       Q.   Did you hear the word "*loco*"?

25       A.   I'm sorry.  Could you play it one more time,

1    please?

2        Q.   Yes.

3             (Audio played.)

4        Q.   Did you hear the word "*locos*"?

5        A.   I did.

6        Q.   And, you transcribed "*locos*" in that context as

7    dudes, right?

8        A.   Yes.

9        Q.   Okay.  Let me have you go down to the bottom, the

10   last statement that's made, that starts with "homie."

11       A.   Okay.

12            (Audio played.)

13       Q.   All right.  And you heard the actual word "homie"

14   being said, right?

15       A.   Yes.

16       Q.   Okay.

17            (Pause.)

18            Let me play another section -- another -- well,

19   let me do this, Let me do this, rather than go through

20   every single "*loco*" that's there.  So just on that page

21   alone --

22       A.   Uh-huh.

23       Q.   -- all right, on a transcript that you claim that

24   you reviewed ten different times -- right?

25       A.   Yes.

1    Q.   Well, sorry.  Strike that.

2         Let me have you just listen to one more, okay?

3    The word "*loco*."

4         (Audio played.)

5    Q.   Did you hear the word "*loco*"?

6    A.   I did.  But what page are you on?

7    Q.   Excuse me?

8    A.   What page were you on?

9    Q.   I'm sorry.  It's the same page that we were on --

10   I'm sorry.  It's -- it's -- let me look at yours,

11   because ours are different.

12        It would be your page six -- actually, go back.

13   It's the beginning of your page five.  I don't know why

14   our -- what you have and what I have are misnumbered.

15   So it would be your page number five.

16   A.   Okay.

17   Q.   Okay?  So, if you go down to your page number

18   five, down one, two, three, four, five, six, seven,

19   eight, nine, ten, the tenth person that's speaking,

20   "OC".

21   A.   Okay.

22   Q.   Which starts, "Imagine the big..."

23   A.   Okay.

24   Q.   That's what I'm going to play for you.

25        (Audio played.)

V. Vargas - Cross                                          180

1    Q.  Do you hear the word "locos"?

2    A.  I did.

3    Q.  Okay.  So, here's my question, Ms. Vargas:  So,

4    you heard what was on your page number four and number

5    five.  On page number four, they initially use "locos"

6    and you translate that as dudes, right?

7    A.  Yes.

8    Q.  Okay.  Then at the bottom of that page, they use

9    the word "homie," and you translate that correctly to

10   homie?

11   A.  Yes.

12   Q.  And then on the next page they use "locos" again,

13   and you translate that to homies.

14   A.  Yes.

15   Q.  All right.  Why the inconsistencies, if you

16   reviewed this ten times?

17   A.  Because they're talking about their buddies,

18   they're talking about their friends.

19   Q.  But, listening to these MS-13 tapes, as you've

20   claimed that you have experience, you know that a

21   homeboy and a homie has special status within the gang?

22   A.  Yes.

23   Q.  Okay.  And, you correctly noted that when someone

24   used the word "homie," you attribute that in your

25   transcript, that they used the word "homie"?

1    A.   Yes.

2    Q.   But, then when someone uses a term other than

3    "homie," like "*loco*," you assign the definition of homie

4    to that, or homeboy to that?

5    A.   Yes.

6    Q.   Right.  That's my question:  Why the

7    inconsistency?

8    A.   Because I use them both as homie and as a buddy,

9    my buddy, my pal.

10           THE REPORTER:  Can you repeat that?

11           THE WITNESS:  I'm sorry?

12           THE COURT:  Can you repeat your answer,

13   please?

14           THE WITNESS:  Yes, sir.

15           I used it both as my homie, my buddy, my

16   friend, my buddy, my pal.

17   BY MR. LEIVA:

18   Q.   And, are you familiar with the word "*vato*"?

19   A.   Yes.

20   Q.   And what does "*vato*" mean?

21   A.   It's similar, like my buddy, my homeboy.

22   Q.   Okay.  My friend, my dude, right?

23   A.   Yes.

24   Q.   But, in this case, when someone use the word

25   "*vato*," you assigned homeboy to that.

1          (Pause.)

2          You want me to play it for you?

3     A.   Sure.

4     Q.   Okay.  Same page, the next line, underneath the

5    one that we just listened to.

6     A.   I'm sorry, what page was that again?

7     Q.   The same page, that would be your --

8     A.   Five?

9     Q.   Your five, right.

10         So I'll play it for you.  I'll start a little

11   back.

12    A.   Okay.

13         (Audio played.)

14    Q.   All right.  So, did you hear the word "*vato*"

15   being used, two times?

16    A.   I did, but, let me --

17    Q.   And in one of them, you translated "*vato*" as

18   being man, and in the other one, you translated it as

19   homeboy.

20              THE COURT:  Is that a question?

21              MR. LEIVA:  Yes.  Well, no, that's not a

22   question.

23   BY MR. LEIVA:

24    Q.   My question is, again, there seems to be

25   inconsistency here.  Did someone else review this and

1    make changes without -- without your permission?

2        A.   Well, somebody else did review it, and I reviewed

3    with the changes and I'm the one that made the final

4    decisions on it.

5        Q.   So, can you explain to us, then, why two people

6    reviewed this, and within just that one segment

7    attribute different meaning to the word "*vato*"?

8            (Pause.)

9            Do you have an explanation or --

10               THE COURT:  Let her answer.

11               THE WITNESS:  I'm sorry?

12               THE COURT:  We're waiting for your answer.

13               THE WITNESS:  Yes.  Thank you, sir.

14               To me, they're talking to their friends, so

15   therefore, "*vato*" is my homeboy, my buddy.  And, I used

16   different words for it, but at the end it's the same

17   meaning, because they're talking about their friends.

18   BY MR. LEIVA:

19       Q.   But, there's no concern about keeping things

20   consistent, so if someone who is not a native Spanish

21   speaker, just doesn't speak Spanish at all, just reads

22   that one page, and you've given one, two -- two to three

23   definitions for the same word.

24       A.   I did.

25       Q.   When you said you consulted with your colleagues,

1   did you ever consult with someone by the name of Junior?

2       A.   No.

3       Q.   All right.  Or someone that said that they were

4   Officer Junior?

5       A.   No.

6       Q.   Did you ever consult with anyone by the name of

7   Osman Alfaro Fuentes?

8       A.   No.

9       Q.   Anyone by the name of Jose Del Cid?

10      A.   No.

11      Q.   Or by the moniker, Duende?

12      A.   No.

13      Q.   Anyone named Genaro Sen Garcia?

14      A.   No.

15      Q.   Anyone with the last name Santiago Villanueva?

16      A.   No.

17      Q.   Did you consult with any gang members at all --

18      A.   No.

19      Q.   -- or who you were told were gang members?

20      A.   No.

21      Q.   What about a gentleman named Jose Aparicio

22   Garcia?

23      A.   No.

24      Q.   So as far as outside references go, you mentioned

25   that you went on the Internet, right?

1    A.   Yes.

2    Q.   Okay.  And, the people who you also consulted who

3    you say were your colleagues, who were they?

4    A.   Senior linguists.

5    Q.   Who?  Which linguists?

6    A.   The ones that work with me at my office.

7    Q.   Well, I'm asking.  I don't know who works with

8    you.

9    A.   Oh.  You need names?

10   Q.   That would be fine.

11   A.   America Leister.

12   Q.   She's the only one?

13   A.   Basically.

14   Q.   Okay.  So, in this case, how many times do you

15   believe you consulted with Ms. Leister?

16   A.   A couple of times.  I wouldn't be able to tell

17   you an exact number.

18   Q.   All right.  So, in other words, even though

19   you've been listening to some MS-13 recordings, you

20   still sometimes would hit a point where certain words

21   were not recognizable to you?

22   A.   Or I just wanted to make sure I was listening to

23   the right thing.

24   Q.   Now, you testified on direct that you would

25   listen to these audio recordings and that you would

1    provide summaries of these audio recordings.

2       A.   Not from this.

3       Q.   Excuse me?

4       A.   From what audio recordings?

5       Q.   Well, from the wiretaps that you testified to,

6    you would provide summaries.

7       A.   Yes.

8       Q.   Okay.  And you would provide summaries to the

9    agents working the case?

10      A.   Yes.

11      Q.   And, so, it would be fair to say that the bulk of

12   your work as a contractor for the FBI as a linguist is

13   to provide the agents with -- with translations as soon

14   as humanly possible?

15      A.   Yes.

16      Q.   Right?

17           Because, they're listening to wiretaps, they may

18   not know what's being said and they need somebody to

19   tell them right away what's being said.

20      A.   Yes.

21      Q.   Okay.  So when you're compiling these

22   transcripts, your target audience is the FBI agents.

23      A.   Yes.

24      Q.   All right.  It's not necessarily that it's going

25   to be used in court.  It's to have the agents have them

1   at their disposal?

2       A.   Yes.

3       Q.   Okay.  And so, when you're preparing these, for

4   example, the words that we just covered, the words

5   "*vato*" and "*loco*," you put that MS-13 spin on them

6   because it's for the agents to review?

7       A.   I'm sorry.  Can you repeat that again?

8       Q.   Yes.  So, given that the bulk of your work is to

9   provide these agents with realtime translations of the

10  wiretaps that they're listening to, or recording, right,

11  and not so much that you're concerned about being -- it

12  being used in court, when certain words come up like

13  "*vato*" and "*loco*," you're putting that MS-13 spin on

14  them just so you keep somewhat consistent -- keep it

15  somewhat consistent for the agents.  Does that make

16  sense or not?

17              MR. TOBLER:  Objection, Your Honor.

18  Compound question.

19              THE COURT:  It is.  If you would do them one

20  at a time, Mr. Leiva.

21              MR. LEIVA:  Yes, Your Honor.

22  BY MR. LEIVA:

23      Q.   We've established that you prepare summaries for

24  the case agents when they give you these wiretaps.

25      A.   Yes.

1    Q.   And we've established that the target audience of

2    your summaries are the case agents.

3    A.   Yes.

4    Q.   And, at some point during this case you realized

5    that this was an MS-13 case?

6    A.   But --

7    Q.   Upon listening to these wiretaps, you realized it

8    was an MS-13 case, or someone told you it was an MS-13

9    case?

10   A.   Yes.

11   Q.   Okay.  So then, to keep things consistent, any

12   terms that you heard which may be neutral in nature, you

13   put an MS-13 spin on them.  Would that be fair to say?

14   A.   No.

15   Q.   Okay.  So, when we went over these terms of

16   "*vato*" and "*loco*," which you agree means buddy -- or you

17   used the word "buddy," I used the word "dude" --

18   A.   Uh-huh.

19   Q.   -- you translated that as homeboys, right?

20   A.   Yes.

21   Q.   For the most part.

22   A.   Yes.

23   Q.   All right.  And, that was done because you

24   thought that was the correct and accurate translation of

25   that word, or did you do it because you knew the agents

1    were dealing with an MS-13 case?

2        A.   Because I thought it was a more closely related

3    word to the Spanish word --

4        Q.   So --

5        A.   -- based on the conversation.

6        Q.   Between MS-13 members?

7        A.   Between my -- the two people that were speaking.

8        Q.   Okay.  But here's where -- and I'm not going to

9    keep beating a dead horse, but here is where I'm getting

10   confused.  Is that your testimony under oath is that the

11   word "*loco*" in Spanish means homeboy, and the word

12   "*vato*" in Spanish means homeboy.  That's what I'm

13   getting from what you're just telling me.

14            THE COURT:  If you could ask one question at

15   a time, that might help.

16            MR. LEIVA:  Yes, Your Honor.  I apologize.

17            THE COURT:  Ask one question.

18            MR. LEIVA:  Yes.

19   BY MR. LEIVA:

20       Q.   So your testimony is that the correct and

21   accurate translation of "loco" is homeboy?

22       A.   Yes.

23       Q.   Okay.  And the correct and accurate translation

24   of "*vato*" is homeboy?

25       A.   Depends on the context.

1          MR. LEIVA:  That's all the questions I have,

2    Your Honor.

3               Thank you, Ms. Vargas.

4                    CROSS-EXAMINATION

5    BY MR. AQUINO:

6     Q.   Good afternoon, ma'am.

7     A.   Hello.

8     Q.   My name is Jerry Aquino.  Along with my

9    co-counsel, Ms. Amato, we represent Jesus Chavez.  I

10   just have a few questions for you.

11    A.   Sure.

12    Q.   Would you agree that translating is neither black

13   nor white?

14    A.   Can you repeat that again, please?

15    Q.   Sure.  Would you agree that translating is

16   neither black nor white?

17    A.   Yes.

18    Q.   And it requires your opinion to give meaning; is

19   that accurate?

20    A.   No.

21    Q.   Explain.

22    A.   Because when you're translating, you're

23   translating on what you're listening to, not -- you're

24   not trying to make a meaning out of it.  So, you

25   translate what they're saying.

1      Q.   But, you get meaning from different sources,
2    correct?
3      A.   Explain, please.
4      Q.   For example, I believe you testified that you
5    consulted a law enforcement officer from El Salvador; is
6    that correct?
7      A.   Many, many years ago, yes.
8      Q.   Do you remember his name?
9             MR. TOBLER:  Objection.
10   BY MR. AQUINO:
11     Q.   I'm not asking that you repeat it.  Do you
12   remember his name?
13     A.   It was years ago.  I'm sorry.
14     Q.   And he provided you assistance in forming
15   opinions; is that accurate?
16     A.   No.  He provided me assistance on vocabulary
17   terms.
18     Q.   Vocabulary terms.
19          And you don't know anything about any biases that
20   officer might have had before -- in discussing his
21   vocabulary with you, do you?
22     A.   No.
23     Q.   Okay.  And he works -- he worked for law
24   enforcement, right?
25     A.   Yes.

V. Vargas - Cross                                          192

1    Q.   And, you work for law enforcement; is that
2  accurate?
3    A.   Yes.
4    Q.   Now, is there a difference in language and
5  pronunciation between San Salvador, the capital of El
6  Salvador, and San Miguel?
7    A.   I don't know.
8    Q.   Have you spent an extended period of time in El
9  Salvador?
10   A.   No.
11   Q.   Have you spent a day in El Salvador?
12   A.   No.
13   Q.   Now, earlier you testified that there was a
14 review process --
15   A.   Yes.
16   Q.   -- correct?
17   A.   Yes.
18   Q.   Okay.  Did you make notes along the way?
19   A.   If I -- from --
20   Q.   Notes in the course of your review process, for
21 example, like a rough draft?
22   A.   On the computer.
23   Q.   Okay.  And, did you keep any of the rough drafts
24 that --
25   A.   No.

V. Vargas - Cross                                    193

1    Q.  -- you went through?

2    A.  No.

3    Q.  Those were all erased?

4    A.  It's on the computer, same paper.

5    Q.  But, I mean, they no longer exist?

6    A.  They don't.

7    Q.  Okay.  And in terms of guidance you received, you

8    said you get some guidance through the Internet.  Is

9    that accurate?

10   A.  Yes.

11   Q.  Okay.  How often, for example, in an average week

12   do you go on the Internet?

13   A.  For what purpose?

14   Q.  To help you with your job.

15   A.  Five times a day.

16   Q.  Five times a day.

17        And, do you use any translation service provided

18   over the Internet to assist you?

19   A.  No.

20   Q.  Is it normal for someone in your office to use a

21   translation service provided over the Internet?

22   A.  Yeah.

23   Q.  Okay.  You don't use it?

24   A.  What type of service do you mean?  Like if I type

25   in a word in Spanish and use the English?

V. Vargas - Cross

1    Q.   Yes.

2    A.   Of course I do.

3    Q.   So you use that, too.

4         And in terms of seeking guidance, you -- I

5    believe you got some guidance from Ms. Leister; is that

6    accurate?

7    A.   Yes.

8    Q.   Do you speak to her daily?

9    A.   Yes.

10   Q.   Do you solicit her advice daily?

11   A.   Yes.

12        MR. AQUINO:   That's all the questions I

13   have.

14        Thank you, Judge.

15        THE WITNESS:   Thank you.

16                   CROSS-EXAMINATION

17   BY MS. MARTELL:

18   Q.   Good afternoon, Ms. Vargas.

19   A.   Hello.

20   Q.   How are you?

21   A.   Good.   How are you?

22   Q.   You testified that your job at the FBI is

23   contract language monitor; is that correct?

24   A.   Yes.

25   Q.   And, that's different than being a contract

1   linguist, correct?

2      A.   Yes.

3      Q.   And if you were to take a look at that

4   Exhibit 8-A that you have in front of you -- do you

5   still have that?

6      A.   Yes, I do.

7      Q.   If you look at the first page, the one with the

8   exhibit sticker --

9      A.   Yes.

10     Q.   -- it says, middle of the page, "Name and office

11  of linguist:  CLM Vania Vargas."  CLM, that stands for

12  contract language monitor, correct?

13     A.   Linguist monitor.

14     Q.   And, that's different, also, than a language

15  analyst, an LA, correct?

16     A.   It's the same thing.

17     Q.   A language analyst is a full-time employee with

18  the FBI?

19     A.   Yes, a contractor.

20     Q.   You're an independent contractor, correct?

21     A.   Yes.

22     Q.   And, you're aware of FBI regulations and rules

23  concerning your position?

24     A.   Yes.

25     Q.   Are you also aware, then, a contract language

1   monitor differs from a contract linguist in their job

2   description, correct?

3       A.   Yes.

4       Q.   And that's because a contract language monitor,

5   as yourself, they're to perform only summary

6   translations, correct?

7       A.   Yes.

8       Q.   Not verbatim translations?

9       A.   Yes.

10      Q.   And they're not supposed to testify in court,

11  either, right?

12      A.   Yes.

13      Q.   To follow up on what Mr. Leiva asked you

14  regarding the word "*loco*," l-o-c-o, the word "*loco*"

15  means, literally, crazy, correct?

16      A.   Correct.

17      Q.   However, like many words, it's also used as a

18  slang term, correct?

19      A.   Yes.

20      Q.   And in slang terminology, "*loco*" can mean dude,

21  correct?

22      A.   Yes.

23      Q.   However, during the portion that Mr. Leiva showed

24  you of your -- of the transcript that you prepared, you

25  translated the word "*loco*" both as dude in one part and

1    homie in another, correct?

2        A.   Yes, correct.

3        Q.   Am I correct, then, as well, that -- but you

4    didn't mean anything different by that.  You meant it as

5    just dude, or, my buddy, as you testified, correct?

6        A.   Yes.

7        Q.   There was no MS-13 connection, correct?

8        A.   I translate whatever they say.  I put it in

9    Spanish.  So, it doesn't matter if they're MS-13 --

10   bless you, sorry.  If they're MS-13, drug deals,

11   whatever it is, I'm not looking to make up something.

12   I'm just doing a translation of what they're saying, not

13   what they're meaning.

14       Q.   Correct.

15            Because you don't know if the speakers -- you

16   don't know the speakers of this audio.

17       A.   No.

18       Q.   And you don't know if they're MS-13 members,

19   homeboys, correct?

20       A.   Correct.

21       Q.   I also -- I want to play for you another part of

22   this.  And if you can turn your attention to that page

23   five that you were looking at earlier.

24       A.   Sure.

25       Q.   Middle of the page, seventh th speaker, JR.

1    A.   Okay.

2    Q.   Go ahead and take a listen.

3         (Pause.)

4              MS. MARTELL:  Court's indulgence.  Try not

5    to get the microphone so you can hear this.

6              (Audio played.)

7              THE WITNESS:  I can't hear it.

8              (Audio played.)

9              THE WITNESS:  I could barely hear it.

10             MS. MARTELL:  Let's play it one more time.

11             (Audio played.)

12   BY MS. MARTELL:

13   Q.   Did you hear that?

14   A.   I did.

15   Q.   Okay.  Did you hear the word "*fierro*?

16   A.   I did.

17   Q.   F-i-e-r-r-o?

18   A.   I did.

19   Q.   What is "*fierro*"?

20   A.   A gun.

21   Q.   Isn't it true that "*fierro*" means knife in slang?

22   A.   Could be.

23   Q.   Do you ever consult glossaries?

24   A.   Yes, I do.

25   Q.   And, have you ever consulted a glossary that the

1    FBI has regarding MS-13 -- an MS-13 glossary with

2    different words and their meanings?

3        A.   Not one from -- I consulted a glossary made by my

4    colleague, but --

5        Q.   And which colleague was that?

6        A.   Sandy D'Sa.

7        Q.   And Ms. D'Sa's glossary, isn't it true that the

8    word "*fierro*" is defined as a weapon, knife or machete?

9        A.   I don't recall.

10       Q.   Have you ever heard the word "*fierro*" used as

11   weapon?

12       A.   Just as -- as a translation, *fierro* to weapon?

13       Q.   Yes.

14       A.   No.

15       Q.   There's another term that we heard in that, and

16   it was "*sale barba*," first word s-a-l-e, second word

17   b-a-r-b-a.

18            What does that term mean to you?

19       A.   Depending on the -- once again, depends on the

20   context, how it will translate into English.

21            So, you would have to play it for me again so I

22   can hear it.

23            (Audio played.)

24       A.   It will catch up to you.

25       Q.   In this translation you translated it, however,

 1    as, "it will backfire," correct?

 2        A.   Okay.  I can't -- I can't -- I'm not being able

 3    to follow my writing right now, but, yeah.

 4        Q.   You also translated it in the same page as

 5    consequences, correct?

 6        A.   Can you tell me exactly what you are reviewing?

 7        Q.   We're looking at page five --

 8        A.   Uh-huh.

 9        Q.   -- the 13th speaker.

10        A.   Yes.

11        Q.   Do you see that translation there?

12        A.   I see it.

13        Q.   Okay.  And then again, the following page, third

14    speaker?

15        A.   Okay.

16        Q.   Translated there again as, where it says third

17    speaker in the middle, "You know what I mean about the

18    entire problem."

19             MR. TOBLER:  Objection, Your Honor.  I don't

20    think she was allowed to hear it.

21             MS. MARTELL:  I'll play it again if you

22    want.  She just heard it.

23             THE COURT:  Play it again.

24             (Audio played.)

25

1    BY MS. MARTELL:

2        Q.  Did you hear that?

3        A.  No.  You would have to replay it for me.  I'm

4    sorry.  It's -- the audio is just --

5              THE COURT:  We'll play it right after the

6    recess.

7              Fifteen minutes.  Thank you.

8              (Court recessed at 3:30 p.m. and reconvened

9              at 3:46 p.m.)

10             (Witness resumed stand.)

11             THE COURT:  Ready to bring the jury out?

12             You can bring the jury out, Mr. Toliver.

13   Thank you.

14             You may be seated.

15             Counsel, you may proceed.

16             MS. MARTELL:  Thank you, Your Honor.

17               CROSS-EXAMINATION (Continued)

18   BY MS. MARTELL:

19       Q.  Ms. Vargas, if you can bear with me, I'm going to

20   play a recording.

21       A.  Okay.

22       Q.  And then I'm actually going to direct you on that

23   page five that you have, about 13 lines down, JR,

24   starting with, "Then that's another problem."  Do you

25   see that?

1      A.   I see it.

2      Q.   Okay.  That's the section that I'm going to focus

3  on.  So just if you could follow along with me.

4           (Audio played.)

5           Did you hear that?

6      A.   I did.

7      Q.   Okay.  And, were you able to follow along with

8  your translation?

9      A.   I did.

10     Q.   Okay.  Now, I'm going to play another section.

11 If you could turn your attention -- and I believe it's

12 going to be your page nine, at the top, it says, "OC:

13 Uh-huh."

14     A.   Okay.

15     Q.   And then, okay, I'm actually going to be

16 referring to about, again, 11, 12 lines down, JR

17 starting with, "No, I'm only saying..."

18          Do you see that part?

19     A.   I do.

20     Q.   Okay.  That's the part I'm going to play.

21          (Audio played.)

22          Okay.  In those two sections that I referred you

23 to --

24     A.   Yes.

25     Q.   -- we have the same speaker use the same phrase,

1    correct?

2       A.   Yes.

3       Q.   However, you translated it in each instance

4    differently, correct?

5       A.   Yes.

6       Q.   Why the lack of consistency, Ms. Vargas?

7       A.   Because of the context of the conversation, of

8    the sentence.

9       Q.   In both sections, the context is pretty much the

10   same, that this is something that's going to grow legs,

11   correct?

12          Would you agree that "*sale barba*," s-a-l-e,

13   second word b-a-r-b-a, is the same as in the English way

14   of saying, that's something that can grow legs, correct?

15      A.   Yes.

16      Q.   So why would the same speaker, if the context is

17   the same, that this is something that could become a

18   problem, why would you translate it differently?

19          Why not use the same, either consequences, as you

20   said that that means?

21          Why not use the same phrase -- word in both

22   instances?

23      A.   I just chose something different.

24      Q.   I want to talk to you about the review process

25   that you discussed earlier.  You testified, when

1    Ms. Martinez [sic] asked you that sometimes you take

2    notes, correct?

3        A.   Correct.

4        Q.   Why -- where are those notes?

5             What happens to them?

6        A.   They are basically underneath this, so they get

7    deleted.

8        Q.   Is that the process that all contract linguists

9    use?

10       A.   No.

11       Q.   They go over their notes?

12       A.   What do you mean, go over them?

13       Q.   Meaning that they write over their notes or

14   delete them?

15       A.   That's my process.

16       Q.   Okay.  So, some other linguists, they keep their

17   notes?

18       A.   Could be.

19       Q.   And if you were to keep your notes, we would see

20   places where perhaps another linguist suggested another

21   word or a different meaning?

22       A.   No.

23            THE COURT:  Excuse me.

24            Tell me how you keep your notes.

25            THE WITNESS:  When I'm listening to a

recording, and if I need to take notes, I take it on the
Word Perfect document I'm writing on.  So once I know
what I want to translate, I just delete the Spanish or
whatever I wrote, and I wrote -- I write what I'm
writing, basically.

            THE COURT:  Come to sidebar, please.

            (Thereupon, the following side-bar
conference was had.)

            THE COURT:  I don't know how Word Perfect
works, but I know in Word, that when you make
modifications, it's not deleted, it's just there.  You
just accept the final version.

            Now I'm not sure about Word Perfect, but in
my experience with some sort of computer, it's not
deleted.  It's still there.

            So, I just want to make that point.  And I
don't know if you all use Word Perfect.  I'm sure how it
is in Word, in Word you can't erase.  You can see all
the modifications.

            MS. MARTELL:  Your Honor, that's my
understanding of Word Perfect as well, That there is --
the program code or the metatags, as you would say,
maintain those different versions.

            When she saves this, they're -- these other
formats that she had or these notes are still there.

1   They could be retrieved.  That's what the metatags or

2   the coding of the documents would be.

3            So, at the -- based on that, we would be

4   making -- we would ask the government to provide those

5   file formats, because that data can be extracted, if we

6   were provided the actual Word Perfect documents.

7            THE COURT:  Well, you've got to lay a

8   foundation for that.

9            MS. MARTINEZ:  Your Honor, may I respond?

10           THE COURT:  Sure, you can respond.

11           MS. MARTINEZ:  The response -- I'm not sure

12  that there's any basis for discovery request of drafts

13  and work product from one linguist.  A linguist is

14  sitting there making notes, making changes, creating a

15  draft, revising the draft.  I'm not sure there's any

16  basis in the rules of discovery for the production of

17  that kind of work product.

18           THE COURT:  I'll let you all brief that.

19  Thank you.

20           MS. AUSTIN:  Your Honor, I didn't come up to

21  the bench and I sat and watched the witness look at --

22  the witness look at the jurors, smile, make eye contact,

23  roll her eyes like this (indicating), "It's just

24  terrible."

25           And I think it's completely inappropriate,

1    what she's doing with the members of the jury.  And I

2    wanted to alert the Court to it, because nobody was up

3    there to see it.  But I sat there and watched it.

4             THE COURT:  You've got a chance to question

5    her.  You can bring that up.  Go ahead.

6             MR. AMOLSCH:  What's the question?

7             THE COURT:  Did you understand?

8             MR. AMOLSCH:  I didn't hear.

9             MR. SALVATO:  I'll let him know.

10            MS. AUSTIN:  I mean, she should be

11   instructed that she's not to communicate in any way with

12   the jury, especially during a sidebar when we're here

13   and she's making eyes, she's rolling her eyes, like,

14   "Oh, this is just awful," and then smiling at all the

15   members of the jury.  It's completely out of line.

16            THE COURT:  Ms. Austin, do you think that

17   reflects bias?

18            MS. AUSTIN:  Yes, I do.

19            THE COURT:  Then you should question her

20   about it.

21            (Thereupon, the side-bar conference was

22   concluded.)

23   BY MS. MARTELL:

24   Q.   Ms. Vargas, is it correct, then, that the version

25   when you -- when you start to translate an audio such as

1    this, you open a Word Perfect document; is that correct?

2        A.   Yes.

3        Q.   And, that document you start typing and making

4    notes, correct?

5        A.   Yes.

6        Q.   And then, ultimately, you delete some of those

7    notes as you create your final product?

8        A.   Yes.

9        Q.   But those notes, those were notes that you used

10   in arriving at this final product, correct?

11       A.   I go by sessions.  So -- can I -- do you need an

12   explanation?

13           This is my personal way of doing it.  Let's say

14   I've listened to the CD for, you know, the first time I

15   listen throughout the whole thing, and, you know, I'll

16   make a note or two, but, I'm actually listening to begin

17   with.

18           And then I keep listening to it again, like a

19   second time, and then I start writing.

20           So, whenever I hear a speaker, I will write what

21   the speaker says, in Spanish.  And then I will go back,

22   listen to it again, listen to it again, and I will write

23   it in English.  But, therefore, I'm writing on top of

24   what I wrote in Spanish, so the Spanish part gets

25   deleted.

V. Vargas - Cross

1    And then I keep going and going and going until

2    I'm done with the recording.  And then once again, if I

3    have certain parts that I'm not sure about, I'll go back

4    to the recording and I'll listen to it again, I'll type

5    what I think it is or what it is.

6    And then if I'm not satisfied with what I wrote,

7    then I'll go over it again and again until I'm

8    satisfied.

9    But, I'm basically typing on top of what I

10   already typed, so there is no paper, there is no --

11   Q.   I understand.

12   And you save -- ultimately, you save that

13   document in the same Word Perfect format?

14   A.   Yes.

15   Q.   And so there exists a saved copy somewhere of

16   that document, correct?

17   A.   A final one, yes.

18   Q.   And that file would be in a Word Perfect document

19   format?

20   A.   Yeah.  It's here.

21   Q.   Well, this is the printout.  This isn't the

22   document in that Word Perfect format.

23   A.   I have the same thing you do.

24   Q.   So you do have the same product saved as a Word

25   Perfect document somewhere?

1    A.   Yes.

2    Q.   Ms. Vargas, in addition to that process that you

3    go through, someone then reviews the translation that

4    you've prepared, and they use that with track changes,

5    correct?

6    A.   Yes.

7    Q.   When they make their suggestions?

8    A.   Yes.

9    Q.   And, that's in that same Word Perfect document

10   that you -- that you have saved?

11   A.   That I submitted, yes.

12   Q.   And, then, you decide whether you're going to

13   keep those changes or reject them, correct?

14   A.   Correct.

15   Q.   And ultimately, that decision is up to you?

16   A.   Yes.

17   Q.   You reviewed these about ten times, you

18   testified?

19   A.   Yes.

20   Q.   So, did there come a time that the inconsistency

21   stood out to you when you were reviewing it?

22   A.   No.

23        MS. MARTELL:  I don't have any further

24   questions.  Thank you.

25

CROSS-EXAMINATION

BY MR. CONTE:

Q.   Good afternoon, Ms. Vargas.

A.   Good afternoon.

Q.   My name is Joseph Conte.  Mr. Dwight Crawley and
I represent Douglas Duran Cerritos.

     Do you ever do translations where you list the
Spanish on one side of the paper and then the English
translation on the other?

A.   No.

Q.   That's never done in the FBI?

A.   It is.

Q.   It is?

A.   But I personally have not.

Q.   Do you know under what occasions they would do
a -- a translation like that?

A.   It's up to the case agent, whatever their needs
are.

Q.   So, the possibility exists to put the Spanish and
English on one page.  It's up to the case agent to make
that decision?

A.   Yes.

Q.   And is that -- to your knowledge, is that
dictated by the time necessary to prepare for trial?

A.   I don't know.

1          MR. CONTE:  All right.  I have nothing

2   further.

3               Thank you, Your Honor.

4                    CROSS-EXAMINATION

5   BY MR. AMOLSCH:

6    Q.   Good afternoon, Ms. Vargas.

7    A.   Hello.

8    Q.   I understand that you've been a contract linguist

9   with the FBI for ten years?

10   A.   Yes.

11   Q.   And you're a contract language -- what's the "M"

12   stand for?

13   A.   Monitor.

14   Q.   Monitor.

15        How does your contract with the FBI -- does that

16   work?

17        Is it a year-long contract, job by job?

18   A.   It's yearly.

19   Q.   It's yearly.  So you sign a year contract every

20   year.

21        And, are you paid based on the number of hours

22   you work, the amount of pages of transcription you

23   produce?

24   A.   Hourly.

25   Q.   Okay.  When you sign your contract, do you know

 1   what jobs you're going to be assigned to?

 2       A.  Yes.

 3       Q.  Okay.  How does that work?

 4           Do you request it?

 5           Do they tell you where you're going to be?

 6       A.  I'm sorry.

 7       Q.  Do you request to be on a particular assignment?

 8       A.  No, I don't.

 9       Q.  Okay.  So, when you say at the beginning -- at

10   the beginning of this year, is that when you signed your

11   new contract?

12       A.  Fiscal year.

13       Q.  Sorry?

14       A.  Fiscal year, yes.

15       Q.  At the end of the fiscal year.

16           When is the fiscal year?

17       A.  September, I think.

18       Q.  I'm sorry.  I need you to speak into the

19   microphone.

20       A.  I'm sorry.  I don't recall.  September?

21       Q.  September.

22           So in September, we will say, you signed your

23   contract for the following year, to expire at the end of

24   August?

25       A.  Yes.

V. Vargas - Cross

1    Q.   At that time, were you told where you would be
2  contracted to?
3    A.   Meaning what office?
4    Q.   Were you told you would be contracted to the FBI?
5    A.   I'm my own contractor, so, I think that's what
6  it's called.  So I contract my services to the FBI, just
7  the FBI.
8    Q.   Just the FBI.
9         Do you do work with any other --
10   A.   I do not.
11   Q.   On a Monday when you come in, do you say, "I want
12 to work in that department," or do they tell you where
13 you're going to work on a particular day?
14   A.   When I come in on Monday, my supervisor gives me
15 an assignment and I work on the assignment.
16   Q.   All right.  The job application process, I think
17 you have to renew every year.  How is it determined
18 whether your contract is renewed?
19   A.   On my work.
20   Q.   Okay.  And how is that -- based on what?
21   A.   Every year, my work gets pulled, depending on how
22 many cases and different things I've worked.  My
23 supervisor pulls my works and sends it out for review.
24 And either I -- and I've passed every single review.
25 That's why I'm still here.

V. Vargas - Cross

1    Q.   When you say it's sent out for review, what does
2    that mean?
3    A.   It means that somebody else in some other state
4    will get an audio, and let's say my summaries or
5    anything else that I've worked on, and they will review
6    my quality of work.
7    Q.   So I understand, an independent auditor listens
8    to an audio recording and compares that audio recording
9    to your translation?
10   A.   Correct.
11   Q.   Do you choose what audio recording gets sent?
12   A.   I do not.
13   Q.   Do you know if this independent auditor is also a
14   contract attorney -- a contract linguist with law
15   enforcement?
16   A.   It's in the language department.  It's with
17   somebody within the language department of the FBI.
18   Q.   At the FBI.
19        Have you ever not had your contract renewed?
20   A.   No.
21   Q.   Okay.  And do you know anybody that you work with
22   who has ever not had their contract renewed?
23   A.   Not that I'm aware of.
24   Q.   You spoke about taking a language proficiency
25   exam and having passed that.

1    A.   Yes.

2    Q.   Okay.  What is a language proficiency exam?

3    A.   It's basically when you speak Spanish or test,

4    you have to write from English to Spanish, Spanish to

5    English, in various forms, be able to speak in Spanish,

6    be able to speak in English.

7    Q.   Are you -- is it a pass/fail, or do you get a

8    numerical?

9    A.   You get a numerical assignment to your -- your

10   score.

11   Q.   Is it a scale of one to a hundred?

12   A.   I don't know.

13   Q.   Do you remember what your score was?

14   A.   I do not.

15   Q.   Do you remember if the exam had, as part of it,

16   your understanding of regional Central American

17   dialects?

18   A.   I don't recall.

19   Q.   How many times have you taken this language

20   proficiency exam?

21   A.   Once.

22   Q.   And when did you do that?

23   A.   Almost ten -- oh, more than ten years ago.

24   Q.   So, since -- so, ten years ago, you were

25   proficient, but nobody has given you an exam in ten

1    years to see if you're still proficient?

2        A.   Yes.

3             MR. AMOLSCH:   Court's indulgence.

4             (Pause.)

5    BY MR. AMOLSCH:

6        Q.   My understanding from your testimony was that you

7    have not received any specialized training in the El

8    Salvadorian dialect of Spanish.   Is that correct?

9        A.   Correct.

10       Q.   My understanding from -- is also that you have

11   not spent any time -- any time at all in El Salvador.

12   Is that correct?

13       A.   Correct.

14       Q.   That means you have not spent time there as a

15   vacation?

16       A.   No.

17       Q.   As a day visitor?

18       A.   No.

19       Q.   Never been to the capital?

20       A.   No.

21       Q.   MS-13 cases largely involve people from El

22   Salvador, correct?

23       A.   Yes.

24       Q.   And your testimony is you have no experience,

25   professional experience -- you've never been trained to

1    interpret El Salvadorian Spanish?

2              MR. TOBLER:  Objection, Your Honor.

3    Compound.

4              THE COURT:  Sustained.  One question at a

5    time, please.

6              MR. AMOLSCH:  My apologies, Your Honor.

7              THE COURT:  No problem.

8    BY MR. AMOLSCH:

9        Q.   You would agree with me that MS-13 gang members

10   largely communicate in the El Salvadorian dialect of

11   Spanish.

12       A.   Yes.

13       Q.   And your testimony is that you have not received

14   any specialized training in understanding El Salvadorian

15   dialect of Spanish.

16       A.   I train on the job.

17       Q.   That wasn't my question.

18       A.   I'm sorry.

19       Q.   My question wasn't whether you learned from on

20   the job, because we're going to get to that.  My

21   question was whether you received any specialized

22   training.

23       A.   No.

24       Q.   Has anybody from the FBI asked you to get that

25   training?

1    A.   No.

2    Q.   Do you know if anybody in your office has that

3 training?

4    A.   I don't know.

5    Q.   Have you inquired whether that training is

6 available?

7    A.   No.

8    Q.   What does the word "verbatim" mean to you?

9    A.   Word by word.

10   Q.   Do we agree, then, that if I were to tell you the

11 definition of "verbatim" is in exactly the same words as

12 were used originally --

13   A.   Yes.

14   Q.   -- you would agree with me, that is what

15 "verbatim" means?

16   A.   Yes.

17   Q.   Based on the questions you received from other

18 lawyers here, you would agree with me that your

19 translations are not verbatim, correct?

20   A.   No.

21   Q.   You would not agree with me?

22   A.   No.

23   Q.   You would agree with me -- and I don't mean to

24 beat a dead horse, but I can't understand your answers

25 on the question as relates to the word "*loco*."  You

1   heard questions that "*loco*" can be translated as dude,

2   correct?

3       A.   Yes.

4       Q.   Yet, you sometimes wrote it down as homeboy,

5   correct?

6       A.   Yes.

7       Q.   You would agree with me that "dude" and "homeboy"

8   are not the same words, correct?

9       A.   It is the same.

10      Q.   Dude is spelled d-u-d-e --

11      A.   I know --

12      Q.   -- correct?

13      A.   -- how it's spelled, thank you.

14      Q.   Okay.  So you agree with me that the word "dude"

15  is not the exact same word as the word "homeboy"?

16      A.   Yes.

17      Q.   Can we agree on this?

18      A.   Yes.

19      Q.   If a verbatim translation, which we just agreed

20  is exactly the same words as they were used

21  originally --

22      A.   Yes.

23      Q.   -- would you agree with me that your translations

24  are not verbatim?

25      A.   No.

1    Q.   So, your testimony is that even though "dude" and

2    "homeboy" are different words, they are nevertheless the

3    same words?

4    A.   Not the same words, but it's got the same meaning

5    of they're talking to a friend.

6    Q.   But I didn't ask you about meaning.  I asked you

7    if we agreed on the definition of the word --

8    A.   Yes.

9    Q.   -- "verbatim."

10   A.   Yes.

11   Q.   Do you remember what the definition was?

12   A.   Yes.

13   Q.   Exactly the same words; not your impression of

14   the same meaning, correct?

15   A.   Yes.

16   Q.   But exactly the same words.

17        So, again --

18   A.   Yes.

19   Q.   -- would you agree with me that these are not

20   exactly the same words?

21   A.   Yes.

22   Q.   So, this -- these are not verbatim translations.

23   Can you agree with me on this?

24   A.   No.

25   Q.   Is that because you work for the FBI?

1    A.   No.  It's because it's my work.

2    Q.   What is the difference, again, between somebody

3  who is a contract linguist moderator -- is that the

4  right word?

5    A.   Monitor.

6    Q.   -- monitor and a contract linguist analyst?

7       You answered some questions earlier, and I missed

8  the answer.

9    A.   Because I'm contractor, I'm not an analyst.  But

10  people who are not contractors are analysts.

11    Q.   Did you testify earlier that you are not supposed

12  to be testifying about translations?

13    A.   Correct.

14    Q.   So, you should not even be in the courtroom

15  testifying?

16    A.   I was given permission by Language Services to

17  work on this case, and --

18    Q.   But --

19    A.   -- to work on this.

20    Q.   But according to your designation in your level,

21  which I assume is what a contract linguist monitor is,

22  you should not be testifying in this court?

23            MR. TOBLER:  Objection, Your Honor.  Asked

24  and answered.

25            THE COURT:  Overruled.

1              THE WITNESS:  I was allowed by Language

2     Services to do it, so --

3     BY MR. AMOLSCH:

4        Q.   That wasn't my question.  I didn't ask you if you

5     were allowed to do it.  I ask you, based on you being a

6     contract language monitor, you should not even be

7     testifying in this court?

8        A.   If we go to the way you're --

9        Q.   Yes or no?

10       A.   Yes.

11       Q.   Are you supposed to be creating -- I'm going to

12    use the word -- are you supposed to be creating anything

13    other than summary translations?

14       A.   No.

15       Q.   Yet, what the government has asked you to do is

16    create full translations, not summaries, correct?

17       A.   Yes.

18       Q.   So, you should not have done that, either?

19       A.   No, I should.

20       Q.   I understand someone gave you permission to do

21    so.  But based on your being a contract language

22    monitor, you shouldn't have done that, either?

23       A.   I'm --

24       Q.   Yes or no?

25       A.   No, I should have.  Yes.

1    Q.   Earlier in your testimony you referenced a

2    conversation you had, I believe, with a Ms. D'Sa.

3    A.   Correct.

4    Q.   And I believe she talked to you, or you talked to

5    her, about her testimony here in court.  Is that

6    correct?

7    A.   We talked -- I asked her how she was doing.

8         She said she was stressed.

9    Q.   Okay.  Let's talk about how that conversation

10   happened.  Does Ms. D'Sa work in your office?

11   A.   No.

12   Q.   Where did you see her?

13   A.   I haven't.

14   Q.   I'm sorry?

15   A.   I have not seen her.

16   Q.   This conversation happened on the telephone?

17   A.   Correct.

18   Q.   Okay.  Did you call her or did she call you?

19   A.   She called me.

20   Q.   Okay.  And what did she -- what did she tell you

21   was the reason for her phone call?

22   A.   D'Sa and I are actually co-workers and we're

23   friends, and we talk at least once a day.

24   Q.   That's great.

25        What did she tell you was the reason for her

1    phone call?

2        A.   I didn't know there had to be a reason for her to

3    call me.

4        Q.   Did she not give you one?

5        A.   She said she was stressed because she had to go

6    pick up Adrienne, her daughter.

7        Q.   So your testimony earlier today was about the

8    fact that you had a conversation with Ms. D'Sa about

9    your testimony here -- about her testimony here in

10   court, and she said she was stressed.

11       A.   Yes.

12       Q.   Now, you're telling me the testimony -- she said

13   she was stressed, not about her testimony here, but

14   about picking up her daughter?

15       A.   Well, the person -- the other lawyer rephrased

16   the question differently.  She said:  Why did she say?

17            I said:  She was stressed.

18       Q.   The question that you got from the other lawyer

19   was about your testimony in court.

20            And your response, if I remember correctly, was

21   that you had a conversation with her about her testimony

22   in court, and that she said she was stressed.  Is that

23   correct?

24       A.   I don't recall.

25       Q.   Well, let's talk about it again now.

1    A.    Please, go ahead.

2    Q.    Have you had a conversation with Ms. D'Sa about

3    her testimony here in court, even if that testimony

4    included the phrase, "I'm stressed"?

5    A.    No.

6    Q.    Have you had a conversation with Ms. D'Sa at all

7    about her testimony here in court?

8    A.    No.

9    Q.    Have you had a conversation with anybody about

10   their testimony here in court?

11   A.    No.

12   Q.    You mentioned that you referred to glossaries

13   when you were doing these translations.  Is that

14   correct?

15   A.    Yes.

16   Q.    Where did you get those glossaries from?

17   A.    Google.

18   Q.    I'm sorry?

19   A.    Internet.

20   Q.    You downloaded your own glossaries?

21   A.    No, I didn't.

22   Q.    Well, let's take them one by one.  I'm going to

23   show you some glossaries --

24               THE COURT:  No, no.  Follow up with the

25   first question.

1          MR. AMOLSCH:  I'm sorry?

2          THE COURT:  She said she went on Google.

3   There's a followup question to that, isn't there?

4          MR. AMOLSCH:  Okay.

5   BY MR. AMOLSCH:

6     Q.   You went -- explain that to me.  You went on

7   Google?

8     A.   Urban Dictionary.

9     Q.   That's where you got your translations, Urban

10  Dictionary?

11    A.   I get ideas of what certain -- of -- when you go

12  to Google, you know, you can put in a word and it will

13  give you different definition of a specific word.

14         So based on the context of the conversation and

15  what I'm looking for, I pick the word that I understand

16  fits my needs.

17    Q.   So, just to summarize where we are so far, before

18  I move on, you're here testifying when you shouldn't be,

19  correct?

20    A.   No.

21    Q.   You have provided -- you have completed trans- --

22  translations that you should not have, because they're

23  not summaries, correct?

24         (Pause.)

25         You need to answer.

1          THE COURT:  She didn't answer.

2          THE WITNESS:  Oh, I need to answer?

3          THE COURT:  Yeah.  When he asks you a

4     question, he expects you to answer.

5          THE WITNESS:  I'm sorry.  I thought he was

6     going to keep on going.

7          MR. AMOLSCH:  That's why we're here.

8     BY MR. AMOLSCH:

9     Q.   So, yes?

10    A.   No.

11    Q.   And, you are using Urban Dictionary --

12    A.   Yes.

13    Q.   -- as one of your sources --

14    A.   Yes.

15    Q.   -- for your translations here?

16    A.   Yes.

17    Q.   These are some glossaries that were provided to

18    us by the government.

19    A.   Okay.

20    Q.   I'm going to ask you to take a look at these and

21    see if these are some that you've used or not.

22    A.   Okay.

23    Q.   The first one is called Dirty Spanish.  Have you

24    ever seen this?

25    A.   Never.

1     Q.   Do you know anybody in your office who has used
2  this?
3     A.   No.
4     Q.   Talk Dirty Spanish.
5     A.   No.
6     Q.   Have you ever seen this?
7     A.   No.
8     Q.   Have you ever used it?
9     A.   Nope.
10     Q.   Dictionary of Spanish Slang.  Do you recognize
11  this?
12     A.   I don't own one.
13     Q.   Have you ever seen anybody in your office use it?
14     A.   I don't know.
15     Q.   Have you ever seen Ms. D'Sa use these?
16     A.   No.
17     Q.   Ms. D'Sa is your good friend, correct?
18     A.   Yeah.
19     Q.   Streetwise Spanish; ever seen this?
20     A.   No.
21     Q.   Ever used this?
22     A.   No.
23     Q.   Ever seen anybody else use it?
24     A.   No.
25     Q.   Ever seen Ms. D'Sa use it?

1      A.   No.

2      Q.   Oops.

3           There's another glossary of words, handwritten

4      and typed.  I'm going to ask you to look at these and

5      tell me if you recognize them or have any idea where

6      they came from.

7                MR. AMOLSCH:  I'll ask Mr. Toliver to show

8      you this.

9                THE COURT:  We'll mark that for

10     identification.

11               MR. AMOLSCH:  Yes.

12               THE COURT:  Not offered into evidence, but

13     just marked for identification.

14               MR. AMOLSCH:  Yes, Your Honor.  We'll mark

15     it as -- I'm for Mr. Cerna, Judge, so, Cerna 1?

16               THE COURT:  All right.  Just for

17     identification.

18               MR. AMOLSCH:  It's been marked Cerna 1, Your

19     Honor, for identification purposes.

20               THE COURT:  All right.

21               THE WITNESS:  Thank you.

22     BY MR. AMOLSCH:

23     Q.   Have you had a look at that?

24     A.   Uh-huh.

25     Q.   Do you recognize it?

1   A.   I've seen something similar.

2   Q.   Have you ever used that?

3   A.   Yes.

4   Q.   Do you have any idea where it came from?

5   A.   I got a copy like -- similar to this from Sandy.

6   Q.   Who is Sandy?

7   A.   Sandra D'Sa.

8   Q.   Sandra D'Sa.

9        Do you know where she got it?

10  A.   No.

11  Q.   Do you know if that's reliable in any way?

12  A.   Yes.

13  Q.   How do you know that it's reliable?

14  A.   Because she's had it for a long time.

15  Q.   I understand Sandy's had it for a long time.  My

16  question is:  How do you know that the information

17  contained in that document is reliable?

18  A.   Because whenever I have a question on a word, I

19  also talk to my colleagues regarding the word, even

20  though if it's in the glossary and I find the word on

21  Google, I find the word in the glossary, I will go to my

22  senior linguist and be like, "This is where I am.  This

23  is what I have.  I need your input on this."  And then I

24  will make my own final decision.

25  Q.   Other than Sandy, have you ever seen anybody else

V. Vargas - Cross                                              232

1    use this?

2        A.    No.

3        Q.    So, you and Sandy use this.

4              Do you know if Sandy has had this approved by

5    anybody at the FBI?

6        A.    We work in different offices.

7        Q.    Do you know if Sandy has had --

8        A.    I don't know.

9        Q.    -- this approved by anybody at the FBI?

10       A.    I don't know.

11       Q.    May I have that back?

12             This document is an 11-page document, "Mara

13   Salvatrucha Gang Terminology," prepared by the Criminal

14   Investigative Division, from 2008.

15             Have you seen this document?

16       A.    If I could see a little bit closer, I would be

17   able to see it.

18             MR. AMOLSCH:  I'm going to mark this one as

19   well, Judge.

20             THE COURT:  Yes.

21             MR. AMOLSCH:  It's marked for identification

22   purposes as Cerna 2, Your Honor.

23             THE WITNESS:  Thank you.

24   BY MR. AMOLSCH:

25       Q.    Do you recognize that document?

1    A.   Yes.

2    Q.   Have you seen it?

3    A.   I have.

4    Q.   Have you used it?

5    A.   Yes.

6    Q.   When was the last time you used it?

7    A.   About six months ago.

8    Q.   So, your -- and that document is dated 2008; is

9    that correct?

10   A.   Yes.

11   Q.   Okay.  Can you look in that document and point to

12   me the definition of the word "*loco*"?

13   A.   It's not here.

14   Q.   Not in there?

15   A.   No.

16       MR. AMOLSCH:  Can I have that back?

17       THE WITNESS:  Sure.  Thank you.

18       MR. AMOLSCH:  Thank you, Mr. Toliver.

19       Court's indulgence.  I'm sorry.

20   BY MR. AMOLSCH:

21   Q.   I'm going to hand these to you.  I'm going to ask

22   you to identify which of any of these documents you

23   recognize as having -- you having used them during your

24   translations.

25   A.   Okay.

 1                THE COURT:  Translations in this case or
 2     translations in general?
 3                MR. AMOLSCH:  Translations in this case.
 4                THE COURT:  Okay.  All right.
 5                MR. AMOLSCH:  Thank you.
 6                And when you've identified them, hand them
 7     back to me and we'll go through them.
 8                THE WITNESS:  Okay.
 9                THE COURT:  This is Cerna 3?
10                MR. AMOLSCH:  Yes, sir, Cerna 3, the entire
11     lot of them.
12     BY MR. AMOLSCH:
13         Q.  Are you finished?
14         A.  Yes.
15         Q.  Do you recognize any of those documents?
16         A.  Some.
17         Q.  Can you identify for me the ones -- pull out the
18     ones that you recognize as you having used in your
19     translations.
20                MR. TOBLER:  Your Honor, just to be clear,
21     she's transferring to translations in --
22                MR. AMOLSCH:  In this case.  I apologize.
23     Always in this case, Judge.  I apologize.  In this case.
24                Thank you, Mr. Tobler.
25     BY MR. AMOLSCH:

1 Q. That's it?

2 A. Uh-huh.

3   MR. AMOLSCH:  Mr. Toliver, thank you, sir.

4   THE WITNESS:  You want the stack?

5 BY MR. AMOLSCH:

6 Q. So, my understanding, you had all of this at your

7 disposal, and never once referred to it?

8 A. No, I -- (pause) --

9 Q. And, what you've identified is something put

10 together by Ms. America Lester, right?

11 A. Leister.

12 Q. Leister.  That's who we spoke about before,

13 right?

14 A. Yes.

15 Q. Last name, L-e-i-s-t-e-r?

16 A. Yes.

17 Q. This was prepared -- there's a date on top of

18 here that says June 4th, 2004.

19 A. I saw it.

20 Q. Twelve years ago?

21  And this is what you used?

22 A. May I be a little specific?

23 Q. Sure.

24 A. Ms. Leister updates her glossary.

25 Q. Do you know that?

1    A.   Uh-huh.

2    Q.   Have you seen her do that?

3    A.   Yes.

4    Q.   When did -- when was it most -- when did she most

5    recently update it?

6    A.   I don't recall, but she does it.

7    Q.   Can you point to me -- I'm going to hand this

8    back to Mr. Toliver -- where the word "*loco*" is on any

9    of this?

10   A.   Thank you.

11        It's not on this one.

12             MR. AMOLSCH:  Thank you.

13             No further questions, Judge.

14             THE COURT:  Is that it from the defense?

15             (No audible response.)

16             THE COURT:  Redirect.

17             MR. TOBLER:  No, Your Honor, no redirect.

18             THE COURT:  All right.

19             May the witness be excused?

20             (No audible response.)

21             THE COURT:  You're free to leave.  Thank you

22   very much.

23             THE WITNESS:  Thank you.

24             MR. AQUINO:  Judge, may we approach?

25             THE COURT:  Let's do it at the end of the

1    day.

2              MR. AQUINO:  Sure.

3              THE COURT:  Next witness.

4              MS. MARTINEZ:  United States calls Agustin

5    Lopez.

6              (Witness sworn.)

7              THE WITNESS:  I do.

8              THEREUPON, AGUSTIN LOPEZ, having been duly

9    sworn, testified as follows:

10                    DIRECT EXAMINATION

11   BY MS. MARTINEZ:

12       Q.   Good afternoon.

13       A.   Good afternoon.

14       Q.   Would you please state your full name and spell

15   it for the record.

16       A.   Sure.  My name is Agustin Lopez.  It's spelled

17   A -- g-u-s-t-i-n, Lopez, L-o-p-e-z.

18       Q.   Where do you work?

19       A.   I work at the Federal Bureau of Investigation,

20   FBI.

21       Q.   What is your current position?

22       A.   I'm the assistant legal attaché for the FBI down

23   in Bogotá, Colombia, at the embassy.

24       Q.   How long have you been down in Bogotá?

25       A.   For about three months now.

1    Q.   How long have you been with the FBI?

2    A.   Ten years.

3    Q.   Where did you work within the FBI before you were

4    stationed in Bogotá?

5    A.   The majority of my time was spent up here in the

6    Washington Field Office, on the gang drug squad that

7    worked out of Northern Virginia.

8    Q.   What was your position in May of 2014?

9    A.   I was an agent on the gang drug squad.

10   Q.   Do you recall participating in an operation

11   involving an FBI confidential human source on May 15th,

12   2014?

13   A.   I do.

14   Q.   What is a confidential human source?

15   A.   Somebody who works with or under the direction of

16   the FBI, or any law enforcement agency that collects

17   information for us.

18   Q.   In this particular operation, who was the

19   confidential human source?

20   A.   I knew him as Junior.

21   Q.   Had you had any previous experience with Junior

22   prior to May 15, 2014?

23   A.   Yes, ma'am.  I -- I had been working on and off

24   with him for probably almost my whole time in the Bureau

25   up to that point, so for about eight years, on and off,

A. Lopez - Direct                                    239

1    on different cases.

2        Q.   What was the operation on May 15th, 2014?

3        A.   The CHS, confidential human source, was to meet

4    with some suspected MS-13 members.  They were -- they

5    were going to discuss a -- a murder that had taken

6    place.  The objective was to find the location of -- but

7    mostly just to discuss.

8        Q.   Where did this operation take place?

9        A.   In the park off of Columbia Pike, Holmes Run, I

10   think it was called.

11       Q.   What is FBI standard procedure related to an

12   operation like this?

13       A.   We meet with the source at what we call a staging

14   location.  Usually it's an area that we pick ahead of

15   time.  It's close to wherever the operation is going to

16   go, close enough where getting there won't be a problem

17   but far enough away where we won't be discovered or

18   stumbled upon, or somebody driving to that location

19   won't drive right past us and see us; so usually a

20   little off the way, but still close enough to get to the

21   operation site pretty quickly.

22       Q.   What happens at the staging location?

23       A.   The informant meets us, the agents there, or any

24   other law enforcement.  Standard procedure is we search

25   the CHS --

1          THE COURT:  Excuse me.

2          Focus on this case, not what happens in

3    general.

4          MS. MARTINEZ:  Yes, Your Honor.

5    BY MS. MARTINEZ:

6    Q.   In this operation in general, was there a staging

7    area?

8    A.   Yes, there was.

9    Q.   In this operation in particular, what happened at

10   the staging area?

11   A.   We searched the vehicle, we searched the source,

12   and we made sure his recording devices were in place and

13   working.

14   Q.   And when you say "source," are you referring to

15   the confidential human source --

16   A.   Yes, ma'am.

17   Q.   -- we discussed?

18        You said something about recording equipment.

19   Can you elaborate?

20   A.   Sure.  In this case, as in most -- we try to do,

21   but in this case in particular, we set up an audiovisual

22   recording device on the source's person.

23   Q.   What was the purpose of that audiovisual

24   recording device?

25   A.   To collect evidence, um, any statements.

1     Q.   What safety measures were taken to ensure the

2   safety of the confidential human source?

3     A.   We followed him to the site in separate vehicles.

4   We had live transmitting audio equipment so we could

5   hear what was going on realtime.

6          And, we stayed as close as we could without being

7   discovered, and still allow for receiving the

8   transmission.  And, so we could hear what was going on

9   throughout the -- throughout the whole meeting.

10    Q.   Were you able to see the confidential human

11  source at times during the meeting?

12    A.   At times, yes.  Um -- yes.

13    Q.   Were you able to see the individual with whom he

14  was meeting?

15    A.   I -- I -- I was not.

16    Q.   What happened at the end of the operation?

17    A.   I'm sorry.  Can I go back to that last question?

18    Q.   Yes.

19    A.   I was able to see the source and the individual

20  he met with, now that I recall the -- more of the

21  movements.  Because it was -- a lot of it was on foot

22  and they were moving all the time.  But, yes, I was able

23  to see both of them.

24    Q.   Perhaps we could elaborate a little bit.  Without

25  saying anything that anyone said, what was -- first of

1    all, how long did the operation take place?

2           How long was the source with the subject?

3    A.    Over an hour.  They were out on foot, in the

4    park.  It was on and off raining.  A storm was moving

5    in.  We -- we followed them as much as we could without,

6    like I said, being discovered.  We were in vehicles.

7    They were on foot.  They were walking through the park.

8    We were driving through the neighborhoods, on and off,

9    seeing them on and off, listening to them, And then

10   meeting -- designing a meet location afterwards.

11   Q.    At the time that you were able to see, to have

12   visual contract with the source and the subject he was

13   meeting with, were surveillance pictures taken?

14   A.    Yes, ma'am.

15   Q.    With the help of the court security officer, I'd

16   like to direct your attention to what's been marked for

17   identification purposes as Government's Exhibit 70-B.

18          Do you recognize that picture?

19   A.    I do.

20   Q.    What does it depict?

21   A.    The informant and the subject he was meeting with

22   at the time of our surveillance.

23          MS. MARTINEZ:  Your Honor, permission to

24   admit Government's Exhibit 70-B.

25          THE COURT:  Received.

1          MS. MARTINEZ:  Court's indulgence for just

2    one moment.

3          (Pause.)

4          MS. MARTINEZ:  Permission to publish to the

5    jury, Your Honor.

6          THE COURT:  Go ahead.

7          (Exhibit published.)

8    BY MS. MARTINEZ:

9    Q.   In this picture, which -- which individual was

10   the suspected MS-13 gang member with whom the source was

11   meeting?

12   A.   The gentleman to the -- on the left, but he's in

13   the checkered shorts, smaller frame, Polo type shirt

14   with the white trim on the collar and the white trim on

15   the sleeves.

16   Q.   Thank you.

17         What happened at the conclusion of the operation?

18   A.   The CHS came back, as directed, to meet us, Agent

19   Uribe and myself, on the south end of the park.  We

20   found the location.  We met up.

21         Agent Uribe and I were there, met him, collected

22   the recording devices.  And then it was decided that we

23   were going to go back to the location that was pointed

24   out to the -- to the CHS, as to the -- where they

25   suspected the bodies -- he suspected the bodies had been

1  buried.

2      Q.   What was the purpose of the collecting the

3  recording equipment when you met back up with the

4  source?

5      A.   To ensure that I -- what we call a chain of

6  custody, to ensure that it gets into our possession

7  immediately, and that we can then enter it into evidence

8  and download it and do everything we need to do.

9      Q.   All right.  You said that there was a decision

10  made to go back into the park and try to locate the

11  place that the source found --

12      A.   Correct.

13      Q.   -- or that the source was directed to.

14      A.   Correct.

15      Q.   Did that, in fact, happen?

16      A.   Yes.  So, all three of us, the source, myself,

17  and Agent Uribe, walked back into the park in an attempt

18  to go back to the location, while it was still fresh in

19  the CHS's mind.

20          And, like I said, there was a storm coming in.

21  It was starting to rain pretty good, and the concern was

22  that the creek was getting higher and higher.  And I

23  knew we would have to cross the creek to get to that

24  location.

25          And then there was also the concern, we were --

1   had been informed -- I had been informed that this was a

2   regular meeting place for MS-13, so we were in a hurry

3   to get back to the location before more suspected gang

4   members came to the location.  So, there was a little

5   sense of urgency with the weather.

6           So, yeah, we walked up through the park, and

7   ended up having to cross the creek, which was -- the

8   trail, unfortunately, was submerged underwater at

9   certain parts, but fortunate for us they were putting in

10  newer sewer pipes in the -- in the park, so they had

11  very large conduit piping placed across the creek.

12          So, the original path was submerged and

13  underwater, but the very large pipe was exposed.  So, we

14  were able to cross through -- over the pipe.

15          Agent Uribe had to -- we decided the best course

16  of action would be for Agent Uribe to go back to the

17  car, to bring the car to the north part of the park,

18  because we knew we wouldn't be able to get back the way

19  we came.

20          THE COURT:  Next question.

21  BY MS. MARTINEZ:

22  Q.  Would you take a look at Government's

23  Exhibit 96-B, please.

24  A.  Yes, ma'am.

25  Q.  Do you know what that exhibit is?

1      A.   Yes, ma'am.  It's an aerial view of the park.

2           MS. MARTINEZ:  Your Honor, permission to

3      move into evidence Government's Exhibit 96-B.

4           THE COURT:  Received.

5           MS. MARTINEZ:  May we publish?

6           THE COURT:  Yes.

7           (Exhibit published.)

8  BY MS. MARTINEZ:

9      Q.   Which park is this?

10     A.   Holmes Run Park.

11     Q.   If you could just orient the jury and explain

12     what we're looking at here, maybe starting with the

13     right side of the page.

14     A.   So, on the right side of the page would be -- the

15     large structure is the high school.  If you -- and,

16     right through the middle of the picture is the creek,

17     the creek that I was talking about where we had to

18     cross.

19          Directly in between the creek and the high

20     school, on one of the higher ridges, is where we found

21     the burial site.

22     Q.   Where did you enter the park in this picture?

23     A.   It's not even on this picture.  We -- we entered

24     so far to the south, and probably walked almost a mile

25     or so to get to this part through the forest, through

1   the woods.

2   Q.   What direction in this picture did you enter

3   from?

4   A.   The south.

5   Q.   The bottom of the page?

6   A.   Correct.  Sorry.  Yes.

7   Q.   Just for the record, is this -- based on your

8   knowledge, is this oriented with north towards the top

9   of the page and south towards the bottom?

10        Was that your -- was that your testimony?

11   A.   Actually, you know what?

12        I wouldn't be able to tell.  It's been a while.

13   Because I would have -- I wouldn't be able to tell.

14   Q.   That's fine.

15        Are you able to tell approximately where the

16   source brought you, the location that you finally ended

17   up?

18   A.   Yes.

19   Q.   Could you show that to the jury, either by

20   describing -- or it's possible if you touch that screen

21   you might be able to --

22   A.   Oh, okay.

23   Q.   -- make a mark on there.

24   A.   Great.

25        So -- yeah.  So, right about --

1    Q.  Maybe not.

2    A.  Well, you can see, there's a white path that

3    leads up to the creek.  The side of the creek that has

4    the high school, the white path is on the opposite side.

5    Right about where that white path reaches the creek on

6    the high school side, would be there, around where the

7    burial site was.

8    Q.  For the record, are you describing a point

9    approximately in the middle of that photograph?

10   A.  Pretty much in the center, correct.

11   Q.  After you located that site on that day, what

12   further involvement, if any, did you have in these

13   matters?

14   A.  Um, the next day we brought a canine, a Fairfax

15   County rescue cadaver dog, out to the site.

16   Q.  And what was the purpose of that?

17   A.  To give him a general starting area, to see if he

18   could confirm that, in fact -- if he marked or indicated

19   a burial -- a dead body may be buried there.

20   Q.  And after that day with the cadaver dog, what, if

21   any, further involvement did you have?

22   A.  That was it.

23        MS. MARTINEZ:  Thank you.  No further

24   questions.

25        THE COURT:  You may proceed.

CROSS-EXAMINATION

BY MR. LEIVA:

Q.   Good afternoon, Agent Lopez.

A.   Good afternoon.

Q.   Agent Lopez, you testified that you've been working with this confidential informant, Junior, for about eight years?

A.   Yes, sir.

Q.   Okay.  It wasn't eight continuous years, right?  It was off and on?

A.   Off and on, correct.

Q.   All right.  So, when you first started working with Junior eight years ago, what was his rank or position within MS-13?

     Was he just a homeboy?

A.   I couldn't tell you.  I know when I worked with him it was mostly on the drug stuff that he would be an informant for, drug cases, not -- and he would report to other handlers for MS-13 stuff.

Q.   But he was an MS-13 member, as far as you recall, when you first stated dealing with him?

A.   I know he was associated --

Q.   Okay.

A.   -- with MS-13.  He knew --

Q.   All right.

1    A.   -- MS-13 members.

2    Q.   Okay.  So, he either wasn't -- well, you're not

3  saying he wasn't MS-13.  You're saying he may not --

4  well, he may not have officially joined MS-13?

5    A.   Correct.  I know -- I know he associated with

6  them.  I don't know if he actually joined or not.

7    Q.   And this last go-around on this particular case

8  when you started working with Junior, he had obtained a

9  high-ranking position within MS-13, right?

10   A.   I don't know if it was high-ranking, but

11 obviously it was a position of trust.

12   Q.   All right.  Was he a -- was he a *corredor*?

13   A.   I'm sorry?

14   Q.   A *corredor*, a run -- well, the head guy, as far

15 as you knew?

16   A.   I do not know.

17   Q.   All right.

18   A.   Sorry.

19   Q.   Would it be fair to say that he held -- other

20 than being in a position of trust, that he held a

21 position of authority within the group?

22   A.   I'm sorry.  I don't know.  I --

23   Q.   When did you get involved with this particular

24 case?

25   A.   Um, the day that Agent Uribe asked me to come out

1   and assist with the surveillance.

2       Q.  So, just this May day?

3       A.  Correct.

4       Q.  Okay.  All right.  So, you weren't involved

5   before then?

6       A.  Correct.

7       Q.  Okay.  So, in the brief period that you were

8   working with -- with Junior, did you know how long he

9   had been involved in this investigation?

10      A.  I do not, unfortunately.

11      Q.  All right.  So, you're just basically here just

12  to testify as to you and Agent Uribe and --

13      A.  That day.

14      Q.  -- you walked into the park.  That's about the

15  extent of your knowledge?

16      A.  Yes, sir.

17              MR. LEIVA:  That's all the questions I have.

18  Thank you, sir.

19              THE WITNESS:  Thank you.

20                     CROSS-EXAMINATION

21  BY MS. AUSTIN:

22      Q.  Good afternoon --

23      A.  Good afternoon.

24      Q.  -- Agent Lopez.

25          On May 15th, 2014, you stated prior to Junior

1  meeting the subject, he was taken to a staging area and

2  searched?

3      A.   Correct.  Yes, ma'am.

4      Q.   Did you perform the search or did --

5      A.   I performed the search on the vehicle, not on

6  him.

7      Q.   Were you the one who found the marijuana

8  cigarette on Junior?

9      A.   I did not.

10         My understanding is he turned it in voluntarily.

11 I don't know if the other agents found it or if he

12 turned it, but --

13     Q.   You don't --

14     A.   -- I wasn't --

15     Q.   -- know the answer to -- you don't know how it

16 was found?

17     A.   Correct.

18     Q.   But it was found that day?

19     A.   Correct.

20     Q.   In his possession?

21     A.   Yes, ma'am.

22              MS. AUSTIN:  Thank you.

23              THE COURT:  You may proceed.

24              MR. SALVATO:  Thank you, Your Honor.

25

CROSS-EXAMINATION

BY MR. SALVATO:

Q.   Good afternoon, Mr. Lopez.

A.   Good afternoon.

Q.   You indicated you had been working with Junior for almost eight years?

A.   Yes, sir.

Q.   Okay.  Had he ever lied to you during those eight years?

A.   No, sir, not to me.

Q.   How about in the screening or the staging area; was he instructed not to use marijuana?

A.   That's one of the standing instructions, is always, you know, stay within the law.

Q.   All right.  And, he did use marijuana, correct?

A.   I don't know if he used it.  I don't know.

Q.   You're not aware that Junior used marijuana during this operation?

A.   No, I'm not.

Q.   And if he had used marijuana, that would have been against the rules, correct?

A.   Correct.  Absolutely.

Q.   And if he told an agent that he wasn't going to do it and he did do it, that would be a lie, correct?

A.   I would imagine so, yes.

1    Q.  Did Junior ever tell you that he was -- in the

2   eight years that you dealt with him, that he was in

3   MS-13?

4    A.  Nope.  I mean, he never told me, but we all

5   assumed that he was affiliated with them.  I mean, I

6   wasn't his handler, so I didn't have very much direct

7   conversations with him.

8    Q.  Did he --

9    A.  So I couldn't tell you his history --

10   Q.  Did he ever --

11   A.  -- on that respect.

12   Q.  Did he ever tell you he confronted other rival

13   gang members with knives and guns?

14   A.  No.

15   Q.  Did he ever tell you he threatened to cut

16   somebody's finger off?

17   A.  No.

18   Q.  Did he ever tell you about any of his bragging or

19   his past deeds?

20   A.  No.  Again, I was not his handler.  If he had

21   stuff like that to say, he would say those things in

22   confidence to his handler.

23   Q.  Who was his handler?

24   A.  At the time, eight years ago, an agent by the

25   name of David Solis, who is now in the Miami office.

1    Q.   And Junior is a paid informant; is that correct?

2    A.   To my knowledge, yes.

3    Q.   Okay.  And, fair to say, he's been paid about

4    $43,000 by the FBI?

5    A.   I have no idea.  Again --

6    Q.   Who paid him?

7    A.   Probably -- his handlers would pay him.

8    Q.   Okay.  And how would he be paid?

9    A.   I would imagine in cash, which is standard

10   procedure for the FBI.

11   Q.   In cash?

12   A.   Yes, sir.

13   Q.   And, is he paid per piece of information or per

14   operation, or how does that work?

15   A.   Depends on how he and his handler set it up.

16   Q.   Do you have any knowledge in this case --

17   A.   I do not, unfortunately.

18   Q.   So, you're not aware of whether or not Junior was

19   paid about $50,000 to provide information?

20   A.   I do not.

21   Q.   Did Junior ever speak to you about his

22   immigration situation?

23   A.   No, he did not.

24   Q.   Do you know whether Junior is legal or illegal in

25   this country?

1      A.   I have no idea.

2      Q.   Do you know whether the FBI or the government has

3  kept Junior in the country, even though he's here

4  illegally?

5      A.   I have no idea.  Sorry.

6      Q.   Sir, Government's Exhibit 70-B, that's the

7  picture of the two people.

8      A.   Sure.

9      Q.   Fair to say that one individual is a lot younger

10 than the other individual, true?

11     A.   I don't know their ages, and I --

12     Q.   How old is Junior at the time?

13     A.   I have no idea.  Sorry.

14     Q.   How old was he when he started working with you?

15     A.   I don't know.  I wasn't his handler.  I didn't

16 take his date of birth or -- I don't even know his real

17 name, if -- he was not my source.

18     Q.   So, you wouldn't know that he was about 30 years

19 old at the time of this operation?

20     A.   If you say so.  I don't know.

21     Q.   All right.  And do you have any idea how old

22 Christian Cerna was at the time of this operation?

23     A.   No, I don't.

24     Q.   Do you have any idea that he was 18 at this time?

25     A.   No, I didn't.

A. Lopez - Cross

1    Q.   And were you privy to any of the conversations

between Junior and Mr. Cerna leading up to this

operation?

4    A.   No.

5    Q.   So, you have no idea how this unfolded?

6    A.   Not really, no.

7    Q.   And, you have no personal knowledge about whether

Mr. Cerna participated in anything, correct?

9    A.   Nope.

10   Q.   And, is it your understanding that Junior, your

confidential human source, he wasn't present when any

actual crime took place?

13   A.   To my understanding, that would be correct.

14   Q.   So, Junior has no firsthand knowledge of what

actually happened, true?

16   A.   That -- I would not be able to make that

statement, because I don't know what his knowledge is.

18   Q.   But your understanding is he wasn't present when

any crime was committed, true?

20   A.   I don't know.

21   Q.   Were you able to hear the conversation between

the -- Junior and the other gentleman?

23   A.   On and off, yes.  Right now, I don't remember

most of it.  We were -- it was a long time ago and I

haven't --

1     Q.   You haven't reviewed it?

2     A.   I have not.

3     Q.   So, you couldn't tell the jury, really, any part

4   of that conversation with any certainty?

5     A.   Correct.

6              MR. SALVATO:   That's all the questions I

7   have, Your Honor.   Thank you.

8                    FURTHER CROSS-EXAMINATION

9   BY MS. RALLS:

10    Q.   Good afternoon, Mr. Lopez.   My name is Meredith

11  Ralls and I represent Omar Dejesus Castillo.

12         You testified that you're working in Bogotá?

13    A.   Yes, ma'am.

14    Q.   Okay.   And when did you start that job?

15    A.   December of last year, so, three, four months

16  ago.

17    Q.   So, you're -- and you're living down in Bogotá?

18    A.   Correct.

19    Q.   And your only involvement in this case was the

20  one, two days that you talked about walking in the park?

21    A.   Correct.

22    Q.   And, was Special Agent Uribe with you the whole

23  time during this walk in the park?

24    A.   No, he was not.

25    Q.   Okay.   When was he absent?

1    A.   We entered the park together, and we -- as we
2    approached the creek, probably for the first half mile,
3    and then we decided it would be a better course of
4    action if one of us went back to get the cars and move
5    one of the cars to the northern part of the park.  And
6    he knew the park better than I did, so, he moved -- he
7    drove the car, because he knew where we would probably
8    end up.
9    Q.   And then after that, he rejoined you?
10   A.   And then after that, he rejoined us.  He rejoined
11   us by the time we got to the spot.
12   Q.   Did the government pay for you to fly back for
13   this case?
14   A.   Yes, ma'am.
15   Q.   And, your visit to the United States is just for
16   you to testify in this case, right?
17   A.   Correct.  Yes, ma'am.
18        MS. RALLS:  That's all I have, Your Honor.
19   Thank you.
20                    CROSS-EXAMINATION
21   BY MR. CHICK:
22   Q.   Good afternoon, sir.
23   A.   Good afternoon, sir.
24   Q.   My name is Mike Chick, I'm the attorney for
25   Manuel Ernesto Paiz Guevara.  Just a -- just a couple

A. Lopez - Cross

1    questions.

2        So, why -- why is it necessary for you to be -- I

3    mean, it sounds like you're sort of like a middleman

4    with Uribe and Junior --

5    A.   Correct.

6    Q.   -- is that fair to say?

7    A.   Yes, sir.

8    Q.   So, why is it necessary to have the middleman

9    there?

10   A.   I was the -- probably the only one there during

11   that walk up through the park.  I was there when he was

12   searched.  I was there when he was -- when we collected

13   the recording devices.

14   Q.   But, my point is, Uribe was there, too, right?

15   A.   For most of it, not all of it.

16   Q.   Okay.

17   A.   Uh-huh.

18   Q.   Is that standard protocol within the FBI, to sort

19   of have a middleman there?

20   A.   We try to keep somebody with the informant at all

21   times, when we can.

22   Q.   Let me just make sure that --

23   A.   Sure.

24   Q.   -- that I get this.

25   A.   Uh-huh.

A. Lopez - Cross                                    261

```
 1      Q.   Junior goes out into the woods.  That's the
 2 picture that we have.  They're --
 3      A.   Right.
 4      Q.   -- walking out into the park, right?
 5      A.   Correct.
 6      Q.   Okay.  You're there when that's happening?
 7      A.   I'm in the area, correct.
 8      Q.   You're in the area.
 9      A.   Correct.
10      Q.   Uribe is or is not in the area --
11      A.   He is --
12      Q.   -- at that time?
13      A.   -- in the area.
14      Q.   Is in the area.
15      A.   Yes.
16      Q.   Okay.  Junior comes back.
17      A.   Correct.
18      Q.   Okay.  Then you guys talk with Junior, and then
19 you --
20      A.   Correct.
21      Q.   -- decide we're -- we're all going to -- us three
22 are going to go out there, right?
23      A.   Correct.
24      Q.   Okay.  So Uribe is there the whole time?
25      A.   Yes.  Yes, sir.
```

1    Q.   So, why is it necessary for you to be there if
2    Uribe is already there?
3    A.   Well, the two of us were on surveillance.
4    Obviously, two is better than one when you're trying to
5    protect somebody for safety.
6    Q.   Okay.
7    A.   And then when we walked back through the park
8    We're also concerned about safety, because we know MS-13
9    had just been there and they might come back.
10   Q.   So, you were brought -- you were brought there
11   just for this one limited occasion, right?
12   A.   Correct.
13   Q.   Okay.  And, is that standard protocol?
14        Is that how the FBI does it?
15        They bring somebody like you, who's just sort of
16   only -- your exposure, so to speak, is limited to that
17   one specific instance, right?
18   A.   Absolutely.  Yes.
19   Q.   Is there a reason that they do it that way?
20   A.   Yeah.  Because we have a -- a case agent
21   investigating the case, and when something that poses
22   potential danger or needed for evidentiary reasons,
23   whatever, will ask other agents within the area, in the
24   squad, "Hey, can you come help me for this surveillance?
25   Can you help me for this meeting?  Can you help me for

1    this debriefing?"

2          And so, whatever agents are around, they'll say,

3    "Absolutely.  I can come help you for this afternoon,"

4    or whatever, "this evening."

5       Q.   But -- but, there's a specific intent to limit

6    your exposure to that one specific event, is what I'm

7    getting at, right?

8       A.   No, I don't think so.  I just happened to be

9    available that afternoon.  There was not an intent to

10   limit me.  It was just, "Hey, can you come out and help

11   me today?"

12         And I said, "Sure.  Absolutely."

13      Q.   But you didn't get involved in the case at after

14   that, right?

15      A.   No -- I mean, I came back the next day, because I

16   knew where the spot was, to help the dogs find it.  But

17   after that, no.  I was working my own cases and there

18   was no immediate danger posed once the spot had been

19   discovered, so...

20      Q.   Let me ask -- let me ask you this:  If Uribe had

21   been there with Junior, without you, Uribe would have to

22   be the one here testifying, right?

23      A.   Correct.  I would assume so.  I mean, I don't

24   know what the strategy is, but I would assume so.

25      Q.   All right.

1          MR. CHICK:  No further questions.

2          (Pause.)

3          THE COURT:  Redirect?

4                 REDIRECT EXAMINATION

5    BY MS. MARTINEZ:

6     Q.  What were the safety concerns the day of the

7    operation on May 15th, 2014?

8     A.  That other MS-13 members would be around during

9    the meet, first off; and the idea -- I knew enough to

10   know that it was about a murder that had happened.  So,

11   obviously, these are dangerous gang members, so, we

12   wanted agents available and around in case anything bad

13   happened.

14          And then, the idea of going back to the site to

15   confirm the location, the idea that MS-13 might come

16   back, because it was a regular meeting -- a known

17   regular meeting spot.

18    Q.  Whose safety were you concerned for?

19    A.  Junior's.

20    Q.  Is it standard procedure to involve more than one

21   agent in an operation such as the one that you

22   described?

23    A.  Yes, ma'am.

24          MS. MARTINEZ:  No further questions, Your

25   Honor.

THE COURT:  May the witness be excused?

MS. MARTINEZ:  Yes, Your Honor.

THE COURT:  All right.

(Thereupon, the witness withdrew from the stand.)

THE COURT:  Well, I won't make you start a short witness, because they're probably not short in stature.  So, what we will do is recess now until Monday.

So, ladies and gentlemen, please do not discuss the case.  Don't do any research on the case. Don't go near any of the areas we've heard talked about. Don't go onto Wikipedia or to social media of any kind.

And I will have you come back on Monday, 10:00 o'clock.  Leave your notes in the jury deliberation room.

Thank you.  You're free to leave.

(Jury excused at 4:57 p.m.)

FURTHER PROCEEDINGS

THE COURT:  You may be seated.

Mr. Aquino?

MR. AQUINO:  Yes, sir.

Judge, in light of the testimony of Ms. Vargas, I'd like to renew the previous motion that I made to strike testimony and exhibits.  And

specifically, I'm referring to the testimony of
Ms. D'Sa, Ms. Portwine, and Ms. Vargas.

We know from Ms. Vargas's testimony that she
is a Spanish linguist monitor.  What I did not fully
understand, until her testimony, was the significance of
that distinction as compared to a Spanish linguist.

Now, if you'll notice in the expert witness
disclosure -- and I'll pass it up in just a second --
Ms. D'Sa, Ms. Portwine, and Ms. Vargas were listed as
Spanish linguist monitor, as compared to Mr. Francisco
Diaz, who is listed as a Spanish linguist.

Now, the distinction, apparently, is
important based upon the testimony of Ms. Vargas; that
is, she was not supposed to be testifying in court as a
Spanish linguist monitor.  We did not know that when
Ms. D'Sa testified, nor did we know that when
Ms. Portwine testified.

Now, I realize that Ms. Vargas said, "Well,
I got the permission from people in my office that I
could testify."

But, up until then, she indicated that --
under cross-examination by both counsel before -- that
FBI regulations did not allow her to testify as a
Spanish linguist monitor.

And so the basis of my objection is to

1  strike their testimony, as well as the attendant

2  exhibits, as, one, unreliable; two, a violation of

3  Rule 16.  Because, the basis of their testimony and that

4  distinction was not fully disclosed as to the

5  significance between a linguist monitor and a linguist.

6          And, finally, we also believe, and ask that

7  the Court recognize, that that constitutes a *Brady*

8  violation, namely, that this information could have been

9  used to impeach the testimony of Ms. Portwine as well as

10  Ms. D'Sa, had we fully understood the distinction

11  between the two.

12          And we submit the government had an

13  obligation under Rule 16, as well as *Brady*, to make us

14  aware of that distinction, as well as the FBI

15  regulations that Ms. Vargas testified to, that she was

16  not to testify in court as a Spanish linguist monitor --

17  Spanish linguist monitor.

18          (Counsel conferring.)

19          MR. AQUINO:  Oh, I'm sorry, Spanish language

20  monitor.  I got that wrong.  Spanish language monitor.

21          So, again, to recap, that applies to

22  Ms. D'Sa, Ms. Portwine, and Ms. Vargas, who are Spanish

23  language monitors.

24          So, for these reasons, I would ask, A,

25  it be -- those -- their testimony, as well as the

1    attendant exhibits relating to those witnesses, A, be

2    stricken as unreliable, a Rule 16 violation, and a *Brady*

3    violation.

4            Thank you, Judge.

5            MS. MARTELL:  Your Honor, we would obviously

6    join Mr. Aquino's motion, and we would add that we also

7    believe this is a *Jencks* violation.

8            I mean, we were never informed, not in

9    expert disclosures, not in the disclosures of *Jencks* and

10   *Brady* materials -- we were never advised that these

11   contract language monitors, that they received special

12   permission, apparently, from the FBI, which would have

13   to be a process.

14           Because it's the FBI's own regulations that

15   would prohibit them not only from testifying, but also

16   from providing verbatim translations, as they did in

17   this case.

18           These transcripts that are verbatim -- that

19   they classify as verbatim transcripts, are not part of,

20   as Ms. Vargas testified, are not part of the duties.

21   That's something else she would have received special

22   permission for.

23           As a contract language monitor, she's only

24   able to provide summary translations, and not able to

25   testify in court.

1          So, somewhere, there's either a special

2    permission that she received and that these other

3    language monitors received, and we were never provided

4    with that information of this special permission.  We

5    were also never provided with that distinction and --

6    regarding their limitations.

7          And I would submit to Your Honor that it

8    seems that the difference here between a contract

9    linguist and a contract language monitor would go, as

10   Mr. Aquino stated, to the reliability of this evidence.

11          THE COURT:  Well, did --

12          MS. MARTELL:  We ask that they be stricken.

13          THE COURT:  Did the witness testify that she

14   used an -- Urban Dictionary on the Internet, on Google?

15          MS. MARTELL:  She also --

16          THE COURT:  Was that provided to you?  Was

17   that provided to you?

18          MS. MARTELL:  No.

19          THE COURT:  Is that like Wikipedia?

20          MS. MARTELL:  Your Honor, and -- I think

21   that --

22          THE COURT:  I'm asking a real question.  Is

23   that like Wikipedia?

24          MS. MARTELL:  No, Your Honor.

25          THE COURT:  So Urban Dictionary is not like

1 Wikipedia?

2         MS. MARTELL:  I would not categorize it as

3 Wikipedia.

4         MR. AMOLSCH:  Your Honor, it's the same open

5 source, anybody can add to it, document.  There is --

6 there's literally no reliability whatsoever.

7         MR. CRAWLEY:  I concur.

8         MS. MARTELL:  And, Your Honor, for the

9 record, I would add that the documents that we received

10 today that were designated by Ms. -- I believe Ms. D'Sa,

11 as a glossary, that these included four -- the cover

12 pages for four books, another document that was -- seems

13 to be self-prepared by Ms. D'Sa, which is self-titled as

14 a glossary.

15         It also includes a draft version of what

16 seems to be a Department of Justice gang terminology

17 packet.  But it also includes four dictionaries that are

18 printed out from the Internet, as well as Wikipedia

19 printouts.

20         And this is more -- much more than just a

21 glossary, but this is what was provided to us, that

22 Ms. D'Sa referred to as her glossary.

23         And then, in addition to that, we have

24 Ms. Vargas's testimony about using the Internet, and not

25 just random -- Urban Dictionary, which is what she

1    stated.

2              We didn't receive any of that information,

3    either in the expert disclosures or in any other

4    disclosures from the government.

5              MR. JENKINS:  Your Honor, on behalf of --

6    Robert Jenkins on behalf of Mr. Lopez Torres.

7              I also wanted to take the opportunity to

8    remind the Court, on behalf of Mr. Lopez Torres, before

9    each proffered expert witness testified, either myself

10   or Mr. Leiva indicated that we did not accept them as

11   being an expert, subject to cross-examination; Unlike

12   the gang expert, in which we notified the Court that we

13   had no objection after cross-examination.

14             We continued to reserve on their

15   qualifications, and after hearing the qualifications

16   that have been testified to, and what they rely on, we

17   would, again, object to them being accepted as experts,

18   and we would join in the request to have their testimony

19   stricken.

20             THE COURT:  All right.

21             MS. AUSTIN:  Obviously, Your Honor, we join

22   in this --

23             THE COURT:  Use the microphone, please.

24             MS. AUSTIN:  Yes.  Amy Austin for --

25             THE COURT:  Just use the microphone so the

1    court reporter can hear you, please.

2              MS. AUSTIN:  Amy Austin for Mr. Gaitan

3    Benitez.

4              I just want to note that we're joining this

5    motion, Your Honor.

6              THE COURT:  I think everybody joins unless

7    you stand up now and say you don't want to join.  Is

8    that right?

9              Okay.  You don't want to join?

10             MR. CRAWLEY:  No, no.  I wanted to grab the

11   mike so when she finishes, I can speak.

12             THE COURT:  Oh, okay.

13             I said, everyone would join the motion,

14   unless you don't want to joint, you can tell me you

15   don't want to join.

16             MR. CHICK:  Your Honor, I have one other

17   point I'd like to make.

18             THE COURT:  All right.  Everybody use the

19   microphone, please.  Make your record.

20             MR. CHICK:  I think just one other point

21   that should be made is that fact that during voir dire,

22   the jury selection process, the Court -- with all the

23   jurors, the Court specifically instructed the jurors to

24   make sure that they could commit to the fact that you

25   will defer to the -- to the interpretation that you get

 1   from -- in the transcripts or whatever else it is.

 2              And I think that that's an important thing

 3   to remember when this objection is raised in -- in

 4   consideration of the request to exclude these documents.

 5   Because they were already instructed:  Look -- I mean,

 6   we're attacking their credibility.  We're saying this,

 7   we're saying that.  I think all the lawyers here -- I

 8   haven't, but all the other lawyers here have done a

 9   really good job of bringing out those points.

10              But they've already been instructed:  You

11   will defer to the language in the transcripts that

12   you're given.

13              And it sort of cuts -- cuts into that a

14   little bit.  So it's just one of the points that I

15   thought was important to make.

16              THE COURT:  All right.

17              Mr. Crawley.

18              MR. CRAWLEY:  Yes, Your Honor.  Thank you.

19              I took it upon myself to go look up "Urban

20   Dictionary."  And when you look up Urban Dictionary,

21   it's quite amazing, because it says that in order to

22   make a submission to Urban Dictionary, in order to have

23   someone review it, use it as a source, all you need is a

24   Facebook or Gmail account.

25              Now, just imagine a ten-year-old or an

1   11-year-old with a Facebook or Gmail account submitting

2   information to Urban Dictionary regarding evidence that

3   an expert in federal court is using to convict,

4   essentially, these individuals on charges that carry

5   mandatory life.

6            I mean, this is beyond believable.

7            And, Your Honor even paused and asked

8   Mr. Amolsch, essentially, "Don't you have another

9   question?"

10           And I could only glean from that that Your

11  Honor was extremely disturbed.

12           So, we have an expert, their expert, using

13  something as laughable as Urban Dictionary as their

14  reference.  It has to be stricken, Your Honor.

15           MS. MARTINEZ:  Your Honor, it seems that

16  there are two issues here.  One is the reliability of

17  these experts, and second is complaints about

18  disclosure, discovery, *Brady*, *Giglio* violations.

19           I'll address first the reliability, and I'll

20  address --

21           THE COURT:  All right.  This is a *Daubert*

22  motion, as I see it.

23           MS. MARTINEZ:  I'm sorry, Your Honor?

24           THE COURT:  This is a *Daubert* motion, as I

25  see it --

MS. MARTINEZ:  Sure.

THE COURT:  -- as to whether or not this expert has been sufficiently qualified to render a reliable opinion, and has used reliable sources to render opinion.

MS. MARTINEZ:  Yes, Your Honor.

THE COURT:  All right.  I'm listening.

MS. MARTINEZ:  Your Honor, I believe that the testimony established by all of the linguists -- and I'm going to use that term colloquially, just to refer collectively to those who have testified that they translate Spanish into English and that they did so for this case -- the testimony from all the linguists has established ample experience in understanding, interpreting, and translating Spanish into English and, in particular, El Salvadoran dialect into English.

In terms of the disclosures that were made, the titles of these individuals were provided.  The CVs or resumes were provided.

And again, Your Honor, the Spanish language recordings were provided a year and a half ago, or more than a year ago, depending on the recording, and the transcripts were provided on March 3rd.

So, defense counsel has had more than ample opportunity to understand who is testifying and what it

1    is that they will testify to.

2                We would submit that their qualifications

3    and, in particular, their experience -- each of these

4    linguists testified to listening to hours and hours and

5    hours, some of them thousands of hours, of Spanish

6    language recordings in this case alone.

7                And then when you expand that experience

8    into the many years which these linguists -- again I'm

9    using it colloquially -- in which these linguists have

10   worked for the FBI as Spanish language interpreters and

11   linguists, or contract language monitors -- their

12   official titles in some instances -- each of them

13   testified, for example, about working on wiretaps, and

14   that when they work on wiretaps they work on a wiretap

15   generally for 40 hours a week, and that entire time they

16   are sitting, listening to the language, and they are

17   translating into English.  That's their entire job.

18   It's their bread and butter.

19                THE COURT:  Ms. Martinez.

20                MS. MARTINEZ:  Yes, Your Honor.

21                THE COURT:  I had the impression that what

22   each of these individuals did when they listened to a

23   wiretap was prepare summaries.  Is that your impression,

24   too?

25                MS. MARTINEZ:  During wiretaps, yes,

Your Honor, I would agree with that.

THE COURT:  Did you hear them say they prepared transcripts?

MS. MARTINEZ:  I heard them say that they prepared transcripts upon request.  Not for 40 hours a week while listening to wiretaps.  But yes, Your Honor, I did hear them say that they would prepare transcripts when requested to by the investigation.

THE COURT:  In this case, I don't recall anyone say that they testified in federal court as an expert where they gave transcripts.  Do you recall such testimony?  I don't recall.

MS. MARTINEZ:  No, Your Honor.  I don't recall anyone testifying --

THE COURT:  So then --

MS. MARTINEZ:  -- that they testified in federal court.

THE COURT:  So then I will be the first judge in America to qualify a language monitor to be an expert in interpretation; is that right?

MS. MARTINEZ:  I don't know the answer to that, Your Honor.

I believe that with respect to these particular witnesses, I think that's accurate.

A witness who has not testified in federal

court before, and an expert who has not testified in federal court before, of course, has to do so the first time somewhere.

THE COURT:  Well, the qualifications of an expert is committed to the discretion of the district judge in the *Daubert* case.

MS. MARTINEZ:  Yes, Your Honor.

THE COURT:  Help me with the issue of whether there is some restriction on their testifying in court and preparing transcripts.  Can you answer that question?

MS. MARTINEZ:  Your Honor, I can answer based on what my understanding of the testimony was.

My understanding of the testimony of Ms. Vargas is that based on her job description, her job description does not include, generally speaking, testifying in court; but that she was given permission by her employer -- she's a contract employer -- but by her employers and the entity which employed her to do so in this case.

That's my understanding of the testimony.

THE COURT:  So, in other words, the FBI contract linguist monitor's supervisor approved her becoming an expert witness in federal court, and I'm supposed to just accept that.

1      MS. MARTINEZ:  I'm not -- Your Honor, I
2  would not say that you would accept it based on what
3  someone -- on some decision that someone else made; but
4  I would suggest that you should accept her
5  qualifications based on the qualifications to which she
6  has testified, based on her ample experience, based on
7  her ability to listen to Spanish language recordings and
8  prepare English translations.
9      Your Honor, this case involves, as Your
10  Honor is aware, tens of thousands of Spanish language
11  recordings.  It has required great resources, both on
12  the government side and on the defense side.
13      THE COURT:  As they always do --
14      MS. MARTINEZ:  Yes, Your Honor.
15      THE COURT:  -- when we have trials where
16  there are Spanish speaking recordings of witnesses.
17      But, typically, there is presentation of
18  individuals who have some type of certification to
19  appear in federal court.
20      Now, I heard Ms. Vargas say that she used
21  Urban Dictionary, and it was only when she was presented
22  with those glossaries by Mr. Amolsch that she
23  acknowledged that she had seen Ms. D'Sa's glossary.
24      The concern I have is whether or not
25  linguists, or even our trained interpreters here, would

1   go to Urban Dictionary or Wikipedia to gather
2   information for words.  That's one concern.  Address
3   that.
4               MS. MARTINEZ:  Yes, Your Honor.
5               All of the linguists, again, colloquially
6   speaking, who have testified, have been asked about
7   various sources that they look to when they don't
8   understand a word.
9               And if I'm -- if I'm not mistaken, in every
10  single instance, the answer, either on cross or in
11  redirect, was that although they may look to another
12  source, they don't necessarily -- they don't ever rely
13  solely on that source.  They rely on their own judgment,
14  on the context of the recording, on the speakers who
15  were speaking, and on their own abilities and skills and
16  experience as Spanish language linguists.
17              In addition, Your Honor, I think that
18  several of these linguists have testified that they --
19  that this is standard procedure, to ask a colleague, to
20  refer to another source.
21              Your Honor, sitting here in court, watching
22  these very skilled, very talented court-certified
23  linguists, I watched on occasion as they ask each other
24  questions while there's a witness testifying, to clarify
25  a word.

            I don't see a distinction here.  That's
exactly what --
            THE COURT:  I didn't see them go to
Wikipedia.  Have you?
            MS. MARTINEZ:  Well, I can't --
            THE COURT:  No, I don't you have.
            MS. MARTINEZ:  -- see that, Your Honor.
            THE COURT:  I don't think you have.  I don't
think that that is how it operates.
            The other concern that I have is, the
cross-examination revealed several things that are
concerning.  And I'm not -- haven't decided whether they
go to weight or admissibility, but I'm concerned about
it from the standpoint of, at least Ms. Vargas's
testimony concerning the inconsistency of her use of
words, and the choices she made even in the same page or
paragraph.
            And, I have the impression that the
government believes the word "homeboy" suggests that the
person is a gang member and it's a gang distinction, and
apparently the word -- at least Ms. Vargas's testimony
and Ms. D'Sa's, I believe, there were multiple times
where the word *loco* was translated homeboy when the word
*loco* was being used.
            These things affect my judgment about the

reliability of the witness's testimony.  And I'm trying
to discern -- so, what I have, as I see it -- and I want
you to tell me what you think I have.

I have individuals who work for the FBI,
whose job it is to listen to wiretap tapes and prepare
written summaries.

You agree with that.  That's one of their
jobs, right?

MS. MARTINEZ:  One of their jobs.

THE COURT:  Yes.

MS. MARTINEZ:  Not their only job.

THE COURT:  Not their only job.

And on occasion they prepare transcripts; is
that right?  That's what I heard somebody say, prepare
transcript.  You said that.  I don't --

MS. MARTINEZ:  I believe that -- they
clearly did in this case --

THE COURT:  They did.

MS. MARTINEZ:  -- and I believe there was
testimony about doing so beyond the scope of the -- the
exhibits in this case.

THE COURT:  And, according to Ms. Vargas,
they're not supposed testify in court, but her boss gave
her permission to testify in court.  And -- (pause) --

MS. MARTINEZ:  May I add one point,

Your Honor?

THE COURT:  Yes, go ahead.

MS. MARTINEZ:  With respect to Ms. Vargas --
all of the linguists testified about the review process,
and the fact that each one of these translations was
reviewed by another linguist.

With respect to Ms. Vargas, I observed --

THE COURT:  Well, that becomes even more
troubling, because you have Mr. D'Sa prepare her own
dictionary.  And so, Ms. Vargas is looking at and
relying on Ms. D'Sa's dictionary, which she says is
based on her conversations with the police from El
Salvador and agents on the case.

And I don't recall her saying that she spoke
to gang members themselves to find out what terms they
used.  She has inferred what the words mean.

And I think that the inference of what the
words mean is very, very important here in this case,
where there are certain statements being made or being
offered that relate to whether or not someone is a
member, what they did.

I'm concerned about that.  Help me with your
view of -- of whether that goes to admissibility or
weight from the standpoint of *Daubert*.

MS. MARTINEZ:  Yes, Your Honor, I will

respond to that.  I just wanted to complete that thought, the thought I was starting to say, before I forget.

With respect to Ms. Vargas in particular, I just observed that the translations that have been offered into evidence that she prepared were reviewed by Aguilar Diaz, who testified in court, and he testified that he is actually a linguist.

So to the extent that it -- and I think that adds to the weight and to the credibility of the translations that Ms. Vargas prepared.  I simply wanted to --

THE COURT:  Aguilar --

MS. MARTINEZ:  -- make that point.

THE COURT:  Aguilar also said that he relied upon the Internet, as well.  I remember him saying that.

MS. MARTINEZ:  I agree, Your Honor.  I think they all testified that that's standard practice.

THE COURT:  Well, I'm not from the school where if it's on the Internet, that means it's gospel, and that was the concern I have is, is do I have that situation here.

I mean, I understand they are Spanish speakers, and, the evidence that I've heard suggests that there are distinctions in the dialects, and I have

a woman from Bolivia, a man who is also from Colombia, and Ms. D'Sa, I believe, is from -- is not from El Salvador, I believe she's from Mexico.

They're being presented to this jury as authorities on the language.  And so I'm trying to figure out, from the standpoint of the reliability aspect of it, how do I measure the reliability of their work?

And the fact that one reviewed the other, to me, in and of itself has its own problems.  How am I to determine that it's reliable?

MS. MARTINEZ:  Well, Your Honor, with respect to relying on the Internet and you believe -- and I would agree with you -- that not -- what's on the Internet is not necessarily, as you said, gospel, but I think that's exactly what each of these witnesses testified to.

They said they consult another source, but they would not rely wholeheartedly on that other source, whether it was a colleague of theirs or a glossary or the Internet.  They would consult it in order to get ideas about what something may mean.

The determinations that they made in these translations, when they actually performed their translation, was based on their own knowledge, their own

understanding, their own experience of the Spanish language.

With respect to the El Salvadoran dialect, the government laid ample foundation for every single one of these witnesses about the experience that each of the witnesses has in listening to, communicating in, understanding, and translating and, frankly, interpreting, which is different -- translating is written, interpreting is verbal -- the Salvadoran dialect.

Each one of them testified that they've been doing this for years.  Now, the foundation is a little different for all of them.  Ms. D'Sa, for example, if I'm remembering right -- and they are all blending together a little bit -- but testified that she has had friends who are native Salvadoran, who she ha spoken to in Spanish while they speak in Salvadoran dialect for, I think she said, over 15 years.

And, each of these witnesses has worked in the FBI for many years.  I would have to go back to my notes to get the exact number for each of them, but I believe all of them, more than several years.

And the entire time they've been working in the FBI, each of them testified that a significant percentage of their work involves persons from

1   Central America, involves persons from El Salvador,

2   involves people speaking Salvadoran dialect.

3            So, Your Honor, I think that there is on the

4   record more than enough foundation to establish their

5   expertise.

6            Now, defense counsel -- has with each of

7   these, and with many sets of cross-examinations, raised

8   very good points.  I submit that these go to the weight,

9   not to the admissibility, of this testimony as expert

10  testimony under 703.

11           They've raised every issue, the issues of

12  what they rely on, what their experience is, what their

13  technical job titles are, what that means, the

14  difference between that title and some other title.

15           All of these points have been made ad

16  nauseam to the jury.  The jury has had an opportunity to

17  hear all of it.

18           And I would submit that it goes to weight,

19  that it does not go to admissibility, that under Rule

20  703, under the case law from the Fourth Circuit, that --

21  that informs us as lawyers, and Your Honor as a court,

22  about what is permitted as expert testimony; that these

23  witnesses have the experience, the knowledge, the

24  understanding, and the ability to do exactly what they

25  did in this case, which is to listen to Spanish language

1  recordings, primarily in Salvadoran dialect, and to

2  translate it into English.

3          THE COURT:  The only person who says she had

4  contact with gang members was Ms. Portwine, I believe,

5  because she said she grew up in California.

6          I think that this witness said she worked at

7  a bank, Ms. Vargas worked at a bank.

8          Let me do this.  This is a very important

9  issue, and I should not just make a judgment about it

10 just based on oral argument.  I'll give you all a chance

11 to brief it.

12         But we're going to go forward with the

13 trial.  I'm not going to stop the trial and not going to

14 stop the presentation of the evidence; if we can go

15 forward without necessarily presenting the actual

16 transcripts as yet.

17         But I do want some briefing on this, because

18 I need to have a record of just what you have.  And, if

19 there is some regulation from the FBI that says a

20 contract linguist cannot testify, I want to see it.  If

21 there is some regulation concerning what contract

22 monitors can do with respect to transcripts, I want to

23 see it.

24         And, I want a list of the cases that they've

25 testified to as experts in federal court, in terms of if

1    they have ever testified in a federal court, about a

2    transcript.

3              So to be clear, I want to see the

4    regulations concerning the preparation of transcripts,

5    regulations concerning whether they can testify in

6    court, the number of times each has testified in a

7    federal court with respect to a transcript.

8              And, I think that you gave me a summary, or

9    at least the lawyers, everyone has given me a summary of

10   what they have done in terms of their experience, but I

11   think for purposes of the record, it would be useful for

12   you to -- each side to summarize what you think the

13   experience levels of each of these individuals are, and

14   the sources they relied upon.

15             The -- I'm thinking -- this is to me an

16   in-trial *Daubert* motion, and the question presented is

17   whether the Court would allow someone who is a Spanish

18   speaker, who -- as you testified (sic) -- an expert can

19   qualify based on experience.  And someone who has worked

20   for the FBI for ten years and has been exposed to cases

21   involving MS-13, certainly, over the course of that

22   time, through their training from the FBI or the police,

23   and their exposure to documents, can theoretically

24   become an expert by experience.

25             But, the aspect of reliability has to be

1  measured some way.  And these interpreters who are in

2  the courtroom now are all certified, which means they've

3  had to take a test and they've had to be certified to

4  come into court to testify at trial -- to translate at

5  trial.

6          And this, to me, is just the same thing.

7  Instead of translating testimony, these individuals are

8  being proffered as experts to translate recordings that

9  are in Spanish.  And the only way to challenge that

10 would be, as these lawyers have done, on cross, and to

11 perhaps offer their own expert, which I guess becomes a

12 question they will have to decide, or we'll find out

13 soon.

14         So, do you think we can do this by close of

15 business Monday, since we have all these days in

16 between?

17         MS. MARTINEZ:  Your Honor, for the record,

18 we -- we are at a point in our case where we did intend

19 to start presenting these transcripts in the very near

20 future.

21         THE COURT:  I understand, which is why I

22 asked for briefs by Monday.

23         MS. MARTINEZ:  Well --

24         THE COURT:  Yes?

25         MR. AQUINO:  Judge, I don't think we can

adequately brief the subject until they provide the
information that you requested, because I think that's
going to bear on our approach in our briefs.

THE COURT:  Okay.

MR. AQUINO:  So I would ask that that
material be produced first, and then we go ahead and
file.

THE COURT:  All right.

MR. JENKINS:  And, Your Honor, if I may, in
the interim, I think it would be prudent for the
government not to publish before the jury any additional
transcripts.

It would be one thing for a witness like
Junior to come in and say, "I made these recordings,"
and perhaps even be shown the transcripts and say, "Hey,
they match up to what I remember."

But what the government has sought
permission, and the Court has permitted, is for them to
prepare these transcripts so that the jurors can look at
them while recordings are being played.

I think, in order to have force behind the
Court's action that it may take sometime in the future,
and from Mr. Lopez's perspective, hopefully, to grant
the motion to exclude these transcripts, that would
certainly have a minimizing impact if the jury has

1    already had the opportunity to read the transcripts.

2              So, I would just ask the Court to, from this

3    point going forward, until the Court resolves this

4    issue, that the jurors not be permitted to take a look

5    at those written transcripts.

6              THE COURT:  All right.

7              MS. MARTINEZ:  Your Honor, if I may.

8              THE COURT:  Please.

9              MS. MARTINEZ:  When we have a witness who

10   testifies about recordings that he made and reviewed,

11   and our purpose -- our intention is to have, for

12   example, Junior talk about these recordings and talk

13   about the transcripts and talk about the meanings and

14   talk about the conversations that he engaged in, and,

15   Your Honor --

16             THE COURT:  Let me ask you this.  Hold on.

17             He can testify to all that without a

18   transcript.  He doesn't need a transcript to testify

19   what he did.

20             MS. MARTINEZ:  Your Honor, I --

21             THE COURT:  I'm not trying --

22             MS. MARTINEZ:  -- Junior made thousands of

23   Spanish language recordings.  Does Your Honor want us to

24   sit here and play an hour-long recording in Spanish and

25   ask him questions about it?

            THE COURT:  I don't think that -- I think
witnesses are perfectly capable of testifying without a
transcript or a recording.  But I said, right now, until
I get this issue resolved, he can testify.  He just
can't play the transcripts as yet.

            MS. MARTINEZ:  Your Honor, in that case we
are not going to be able to put him on the stand,
because the purpose of his testimony is to talk about
these recording that he made.

            And, Your Honor, no, he cannot testify about
thousands of recordings he made without being directed
to what those recordings were, what the dates were, who
was involved, either by looking at a transcript or by
listening to the recording.

            So, if we can't get the transcripts in, what
we will be in a position to do will be to sit here and
listen to Spanish, which most of us will not be able to
understand, so that Junior can then tell us what's going
on in these conversations and then talk about the
context and the purpose and all of the things that a
witness would traditionally testify to, in a case where
a CHS has made recorded calls and recorded in-person
meetings with defendants, talking about murders and
criminal activity.

            So, Your Honor, I submit that we will not be

1    able to put Junior on on Monday, if this case (sic) has

2    not been resolved.

3              THE COURT:  Well, that's fine.  I guess we

4    won't be able to put him on Monday until I get the issue

5    resolved.

6              I have not made a judgment to exclude it

7    yet.  I'm trying to decide if there's a reason to

8    exclude, and whether or not he qualifies -- whether the

9    people who have testified thus far about the

10   transcriptions qualify as experts under *Daubert*.  That's

11   what I'm trying to decide.

12             And I'm happy to do that as soon or later,

13   but I think perhaps there are other witnesses you can

14   call until we get to that point where I can make a

15   judgment.

16             But, I need to have those documents.  I

17   mean, I guess you, in preparation, relied upon the

18   transcripts and the CVs you received from the linguists,

19   without knowing that they had glossaries and other

20   things that they were using to prepare these

21   transcripts.  It was only when that came out on

22   cross-examination that they were produced.

23             And now, we hear today that there's a

24   witness who says, "Well, we're not even supposed to

25   testify in court because we're not qualified to do so,"

or, "We're not supposed to and my boss said I could."
So I want to see those things before I make a judgment
about reliability.

And, if that presents some problem in
slowing your case down, then so be it.  I didn't make
that up.  I don't make the facts.  I have to make the
judgment based upon the law, what's presented to me.

And the objection that is made, I think,
deserves serious consideration.  It's not something I
can just handle off the cuff in court.  I'm not going to
be stampeded into doing that.

So, my question to you is:  How much time do
you need to prepare, bring me those things from the FBI,
and prepare a written brief that tells me what you think
you have?

MS. MARTINEZ:  Your Honor, you're requesting
that the government submit a brief first, prior to a
brief by the defense, or --

THE COURT:  Yes.

MS. MARTINEZ:  -- you're requesting --

THE COURT:  Because they do need to see
whatever it is the FBI has, if there's anything.  Maybe
there's nothing.

MS. MARTINEZ:  Does Your Honor want first a
full brief, or does Your Honor want information provided

1     to defense?

2          THE COURT:  I would like a brief --

3          MS. MARTINEZ:  Yes, Your Honor.

4          THE COURT:  -- that includes the documents.

5          MS. MARTINEZ:  Which documents, Your Honor?

6          I'm sorry.  I just want to make sure we're

7     clear and we do what Your Honor wants.

8          THE COURT:  I want a job description from

9     the FBI.

10         I want, if there's a regulation or a rule

11    that says that a linguist is not to prepare a

12    transcript, that you bring me that.

13         If there is a rule or a policy statement

14    that a linguist is not to testify in court, I want to

15    see that.

16         If there is -- if each of these witnesses

17    have testified in federal court, I want to know what

18    cases they've testified in front of a district judge in

19    court, as experts in presenting a transcript, not a

20    summary, but a transcript.

21         And, I want to know, in your view, how I'm

22    to measure the reliability of their translations.  Is it

23    just because the FBI said so, and they worked there for

24    ten years?

25         What is it that allows me to assess the

accuracy and reliability of their translations?

I heard Ms. Vargas say she was tested about ten years ago, and she said she hasn't been tested in ten years.  I don't know if the others were tested at all, or what kind of test it was.  But, obviously, it was not the kind of test that our interpreters use to be certified to appear in federal court.

So those -- those are the key things that I want.

Then I want you to brief the issue.  I mean, it seems to me that, arguably, under 702, a witness can be qualified to offer testimony based on their experience, and their experience can lead to expertise, and testifying for -- preparing summaries for the FBI for ten years may be a basis to admit a summary.

The question I have is whether or not ten years of preparing summaries of wiretaps is the same as preparing transcripts.

I know in this case that we have invested a lot of resources in trying to get transcripts prepared by individuals who were qualified to come into court and testify.

And, I want to know if these individuals have -- have been qualified before.  Would I be the first judge in America to qualify these individuals to

1   testify in federal court?

2            Those are the things that I want in the

3   brief.

4            If you want to get a transcript from the

5   court reporter, you can.

6            And if the issue is really a straightforward

7   one under *Daubert* -- and you may be -- I haven't done

8   the research myself, but I will let you all do the

9   research.  There's got to be some cases on this issue.

10           MR. AQUINO:  If I could just add, could you

11  ask them to produce the distinction between a monitor,

12  which D'Sa, Portwine and Vargas are, as compared to a

13  linguist, which Mr. Diaz is?

14           THE COURT:  Not Diaz.  I think it's Aguilar.

15           MR. AQUINO:  Okay, maybe it's Aguilar.

16           THE COURT:  Yes.  That's important, too, to

17  know the difference between being a linguist and a

18  monitor, whatever the FBI's written materials are.

19           Do you understand?

20           MS. MARTINEZ:  We do, Your Honor, and we

21  would be happy to submit that by Monday.

22           THE COURT:  Okay.

23           MS. MARTINEZ:  And we do have a couple

24  witnesses who could testify without transcripts, but,

25  I'm not sure we will get through a full day of testimony

1  on Monday before we get to the point in the case where

2  it's simply necessary to be talking about these calls

3  and these transcripts.

4          THE COURT:  That's fine.  It will be what it

5  will be, and we will go forward in due course.  Thank

6  you.

7          MS. MARTINEZ:  Thank you.

8          THE COURT:  We're in recess.

9          (Proceedings concluded at 5:34 p.m.)

10                        ---

CERTIFICATE OF REPORTER


        I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the jury trial in the case of UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

        I further certify that I was authorized and did report by stenotype the proceedings in said jury trial, and that the foregoing pages, numbered 1 to 300, inclusive, constitute the official transcript of said proceedings as taken from my shorthand notes.


        IN WITNESS WHEREOF, I have hereto subscribed my name this __11th__ day of __May__, 2016.


                        __/s/_____
                        Renecia Wilson, RMR, CRR
                        Official Court Reporter