```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                  EASTERN DISTRICT OF VIRGINIA
 2                     Alexandria Division

 3   UNITED STATES OF AMERICA,           )
                                         )
 4                      Plaintiff,       )
                                         ) Crim. No. 1:14cr306
 5        vs.                            )
                                         )
 6   JOSE LOPEZ TORRES, ALVIN GAITAN     ) April 11, 2016
     BENITEZ, CHRISTIAN LEMUS CERNA,     )
 7   OMAR DEJESUS CASTILLO, DOUGLAS      )
     DURAN CERRITOS, MANUEL ERNESTO      )
 8   PAIZ GUEVARA, and JESUS ALEJANDRO   )
     CHAVEZ,                             )
 9                                       )
                        Defendants.      )
10   _____)

11

12                          JURY TRIAL

13

14
     BEFORE:      THE HONORABLE GERALD BRUCE LEE
15                UNITED STATES DISTRICT JUDGE

16

17   APPEARANCES:

18   FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                   BY:  JULIA MARTINEZ, AUSA
19                      TOBIAS TOBLER, AUSA

20                          ---

21

22   OFFICIAL COURT REPORTER:

23                   RENECIA A. SMITH-WILSON, RMR, CRR
                     U.S. District Court
24                   401 Courthouse Square, 5th Floor
                     Alexandria, VA 22314
25                   (703)501-1580
```

<u>APPEARANCES</u> (Continued)

FOR DEFENDANT JOSE LOPEZ TORRES

       BYNUM & JENKINS, PLLC
       BY:  ROBERT L. JENKINS, JR., ESQ.
       THE LEIVA LAW FIRM, PLC
       BY:  MANUEL E. LEIVA, ESQ.

FOR DEFENDANT ALVIN GAITAN BENITEZ

       LAW OFFICE OF AMY LEIGH AUSTIN
       BY:  AMY LEIGH AUSTIN, ESQ.
       SMITH & ZIMMERMAN, PLLC
       BY:  JEFFREY D. ZIMMERMAN, ESQ.

FOR DEFENDANT CHRISTIAN LEMUS CERNA

       LAW OFFICE OF CHRISTOPHER AMOLSCH
       BY:  CHRISTOPHER AMOLSCH, ESQ.
       FRANK SALVATO, ESQ.

FOR DEFENDANT OMAR DEJESUS CASTILLO

       FIRSTPOINT LAW GROUP, PC
       BY:  KATHERINE MARTELL, ESQ.
       OLD TOWN ADVOCATES, PC
       BY:  MEREDITH M. RALLS, ESQ.

FOR DEFENDANT DOUGLAS DURAN CERRITOS

       LAW OFFICE OF J.R. CONTE, PLLC
       BY:  JOSEPH R. CONTE, ESQ.
       LAW OFFICE OF DWIGHT CRAWLEY
       BY:  DWIGHT E. CRAWLEY, ESQ.

FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

       LAW OFFICE OF W. MICHAEL CHICK, JR.
       BY:  WILLIAM MICHAEL CHICK, JR., ESQ.

FOR DEFENDANT JESUS ALEJANDRO CHAVEZ

       JEROME P. AQUINO, ESQ.
       ELITA C. AMATO, ESQ.

---

INDEX

PRELIMINARY MATTERS                                            4

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Brenda K. Born | 6 | 26 | 90 | --- |
| Jose Garcia | 117 (Not completed) | | | |

(Court recessed)

---

<u>PROCEEDINGS</u>

(Thereupon, the following was heard in open court at 10:03 a.m.)

(Jury not present.)

THE CLERK:  1:14 criminal 306, United States versus Jose Lopez Torres, Alvin Gaitan Benitez, Christian Lemus Cerna, Omar Dejesus Castillo, Douglas Duran Cerritos, Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez.

Excuse me, with Spanish interpreters, six previously sworn.

THE COURT:  All right.  Good morning, everyone.

Ready to bring the jury out?

PRELIMINARY MATTERS

MS. MARTINEZ:  Your Honor, before we bring the jury out, we request permission to distribute the transcript binders for the jurors, under the juror chairs.  We wanted to address that with you on the record before doing so.

THE COURT:  Okay.  You can do that.

MS. MARTINEZ:  We can do that right now?

THE COURT:  Yes.

MS. MARTINEZ:  Thank you, Your Honor.

1          (Pause.)

2          MR. ZIMMERMAN:  Your Honor.

3          THE COURT:  Yes.

4          MR. ZIMMERMAN:  Just -- Jeffrey Zimmerman

5   for Mr. Gaitan Benitez.

6          I had a discussion with Ms. Martinez at the

7   end of last week.  Just for the record, my understanding

8   is that the word "verbatim" has been taken off of every

9   single transcript, not simply the ones that we had gone

10  over at the time that argument was made, but, that she

11  had -- the government had agreed to do that, and that

12  has been done.

13         THE COURT:  That's my understanding.  And

14  the transcripts I have, the replacement transcripts all

15  say "Transcript."  They don't say "verbatim."

16         MR. ZIMMERMAN:  Thank you, Judge.

17         THE COURT:  Ready to bring the jury out?

18         MS. MARTINEZ:  Yes, Your Honor.

19         THE COURT:  All right.

20         You can bring the jurors out, Mr. Toliver.

21  Thank you.

22         (Jury present at 10:05 a.m.)

23         THE COURT:  You may be seated.

24         Good morning, ladies and gentlemen.

25         THE JURORS:  Good morning.

1          THE COURT:  Good morning, Mr. Manuel Ernesto
2     Paiz Guevara.
3          Good morning, Mr. Christian Lemus Cerna.
4          Good morning, Mr. Omar Dejesus Castillo.
5          Good morning, Ms. Jesus Alejandro Chavez.
6          Good morning, Mr. Alvin Gaitan Benitez.
7          Good morning, Mr. Douglas Duran Cerritos.
8          And good morning, Mr. Jose Lopez Torres.
9          Counsel ready to proceed?
10         MS. MARTINEZ:  Yes, Your Honor.
11         THE COURT:  All right.
12         MS. MARTINEZ:  The government calls Brenda
13    Born.
14         THE CLERK:  Please raise your right hand.
15         (Witness sworn.)
16         THE WITNESS:  Yes, I do.
17         THEREUPON, BRENDA K. BORN, having been duly
18    sworn, testified as follows:
19                    DIRECT EXAMINATION
20    BY MS. MARTINEZ:
21      Q.  Good morning.
22      A.  Good morning.
23      Q.  Would you please state and spell your full name
24    for the record.
25      A.  Yes.  My name is Brenda K. Born, B- -- as in

1   boy -- -o-r-n.

2       Q.   Where are you employed?

3       A.   I am a supervisory special agent with the Federal

4   Bureau of Investigation.

5       Q.   How long have you worked for the FBI?

6       A.   Since October of 2015.

7       Q.   How long have you been a supervisory special

8   agent?

9       A.   Since September of 2014.

10      Q.   What position did you have before September of

11  2015 (sic)?

12      A.   I was a special agent at the Washington Field

13  Office, violence crimes against children squad.

14      Q.   Are you acquainted with an individual who goes by

15  the nickname Junior?

16      A.   Yes, I am.

17      Q.   How do you know Junior?

18      A.   I was his case handling agent.

19      Q.   What is Junior's relationship with the FBI?

20      A.   He is a confidential human source.

21      Q.   What is a confidential human source?

22      A.   A confidential human source is an individual that

23  the FBI recruits and operates to obtain intelligence,

24  intelligence associated to advance investigative

25  priorities, or intelligence associated with FBI national

1   intelligence requirements.

2       Q.   You said you were his handling agent?

3       A.   Correct.

4       Q.   What is that?

5       A.   That's his main point of contact for the FBI.

6       Q.   How long were you his handling agent?

7       A.   From approximately October of 2009 until I went

8   to the cyber division in September of 2014.

9       Q.   Prior to becoming his handling agent, had you any

10  contact or experience with him?

11      A.   Yes, I did.

12      Q.   What -- in what manner?

13      A.   His original case handling agent, I assisted him

14  with some gang operations that involved Junior, and so I

15  had contact with him prior.

16      Q.   Based on your experience with him, both before

17  and during the time that you were his handling agent,

18  are you familiar with his history with the FBI as a

19  confidential human source?

20      A.   Yes, I am.

21      Q.   How long has Junior been an FBI confidential

22  human source?

23      A.   Since approximately November of 2005.

24      Q.   Briefly, what kinds of cases has he assisted the

25  FBI with?

1     A.   He has --

2               MR. CONTE:  Objection on relevance grounds.

3               MS. MARTINEZ:  Your Honor, this is --

4               MR. CONTE:  Bolstering, also, Your Honor.

5               MS. MARTINEZ:  This is foundational.  What

6     kinds of cases is hardly bolstering.

7               THE COURT:  All right.  Let's focus just on

8     this case.  Objection sustained.

9     BY MS. MARTINEZ:

10     Q.   Are you familiar with the nature of this case?

11     A.   Yes, I am.

12     Q.   Are you familiar with Junior's involvement in

13     this case?

14     A.   Yes, I am.

15     Q.   Generally speaking, what procedures are in place

16     for an FBI CHS like Junior?

17     A.   We administer admonishments on a yearly basis.

18     There's database checks, criminal history checks.  And

19     we are also required to interact with them on a minimum

20     of at least once every 90 days.

21     Q.   What do you mean by interact a minimum of every

22     90 days?

23     A.   Reach out and have contact with them.

24     Q.   For what purpose?

25     A.   Just to engage with them, since they're a

1    confidential human source.  Do they have any updates?

2    Have they moved?  If they're involved in any tasking,

3    have they provided any information, have they been able

4    to conduct the task.

5        Q.   When you were Junior's handling agent, what type

6    of contact would you have with him?

7             What form did that contact take place?

8        A.   We would meet face to face.  Junior also had my

9    desk number that he could call.  He also had my

10   FBI-issued cellphone number that he could call.  And he

11   also had my FBI e-mail address.  And we engaged in all

12   those methods of communication.

13       Q.   When Junior provided information to you, as his

14   handling agent, what procedures did you follow?

15       A.   Depending on the information that he would

16   provide -- there's a couple types of information.  It

17   can be administrative or it can be substantive.

18            If it was administrative, for example, a new

19   e-mail address or change of employment or moved, then I

20   would update the CHS case file to reflect those

21   administrative changes.

22            If it was substantive, an investigative related,

23   then I would update the case file, his confidential

24   human source case file, but then also update and

25   associate that information with the investigative case

1  file.

2      Q.  You mentioned something about yearly

3  admonishments.  Can you explain that to the jury?

4      A.  Every CHS gets admonished every year.  We go

5  through -- there's a series of questions that you inform

6  the confidential human source, questions like:  Their

7  participation is voluntary.  The information they

8  provide has to be truthful.  We cannot guarantee any

9  rewards or payments, cannot guarantee any immigration

10 benefits.

11     And then, depending on if they're associated with

12 unions or other employment, then there's separate

13 questions that you ask.  And that's done on a yearly

14 basis.

15     Q.  Does the FBI pay confidential human sources?

16     A.  Yes, we do.

17     Q.  For what?

18     A.  We pay them for services, as well as

19 reimbursement for expenses incurred.

20     Q.  What do you mean, "expenses incurred"?

21     A.  For example, if I were to ask a source to go out

22 and purchase a prepaid phone card to give to a subject,

23 they would incur an expense to get that prepaid phone

24 card.  They would provide me a receipt and we would

25 reimburse them for the expenses.

1    Q.   What do you mean by "services"?

2    A.   Services, if they participated in an event for us

3    or provided valuable intelligence, then we have the

4    opportunity to pay them for those types of activities.

5    Q.   What sort of approval, if any, is necessary to

6    pay an FBI confidential human source for services?

7    A.   You request the payment, and then depending on

8    the amounts of the payments, there's different

9    thresholds that require higher-up approvals, depending

10   on the amounts of it.

11   Q.   Who requests the payment?

12   A.   The case handling agent requests it.

13   Q.   What procedures, if any, are followed when a

14   confidential human source is given a payment?

15   A.   Well, when you do give them the payment -- you

16   get the payment, and then once you do give them the

17   payment, you have them sign that they did receive the

18   payment.  That is witnessed by another agent or task

19   force officer, and then that gets reconciled back into

20   their case file.

21   Q.   Has Junior been paid during the course of his

22   11 years as an FBI confidential human source?

23   A.   Yes, he has.

24   Q.   Has he been reimbursed for expenses?

25   A.   Yes, he has.

1    Q.  Has he also been paid for services?

2    A.  Yes, he has.

3    Q.  Do you know approximately how much he has been

4    paid, total, expenses and services, over his history

5    with the FBI as a confidential human source?

6    A.  I believe it's approximately $30,000.

7    Q.  Do you know how much he has been paid

8    specifically for services, over the 11 years as a

9    confidential human source?

10   A.  For services, I'm not sure exactly for services.

11   Q.  Has he received any immigration benefits as a

12   result of his work for the FBI?

13   A.  Yes, he has.

14   Q.  Can you elaborate?

15   A.  He has received significant benefit of parole,

16   deferred action.  And, then I was working on an S Visa

17   application request, but I did not submit that prior to

18   leaving the Washington Field Office.  I handed that off

19   to the violent gang squad.

20   Q.  Now, you stated that you're familiar with the

21   work that Junior did on this case.

22   A.  Correct.

23   Q.  Are you aware of the general nature of this case?

24   A.  Yes, I am.

25   Q.  What is that?

1       A.   It's a case involving MS-13 gang members.

2       Q.   Do you personally have any specialty in gang

3   investigations?

4       A.   No, I do not.

5       Q.   Is a confidential human source permitted to

6   perform illegal acts when he is working as a

7   confidential human source for the FBI?

8       A.   Only if you get proper authorization.

9       Q.   What does that mean?

10      A.   We have a process called "otherwise illegal

11  activity" that allows the FBI to obtain approval to

12  conduct an illegal act.

13      Q.   What kinds of illegal acts were authorized, if

14  any, for Junior, during the course of this

15  investigation?

16      A.   He had authorization to discuss and be involved

17  in MS-13 gang activities, to include drugs,

18  prostitution, purchasing of weapons, and wiring of

19  funds.

20      Q.   Are you aware of how it was that he was able to

21  engage in gang activity, how he had that access?

22      A.   His previous association with the gang.

23      Q.   In addition to general gang activities, were

24  there any specific legal activities that were authorized

25  during the course of this investigation?

1     A.   He had authority to obtain a weapon.  He had

2 authority for consensual monitoring.  He had authority

3 for a consensual wire.

4     Q.   Let's talk first about the weapon.  What do you

5 mean by that?

6     A.   He purchased a weapon from an -- I can't remember

7 if the individual was a MS-13 gang associate or an

8 actual gang member.  I'm not -- not exactly sure on

9 that.

10    Q.   Was the authority for that activity obtained

11 before or after the purchase of the weapon?

12    A.   Prior to the purchase of the weapon.

13    Q.   Why is it done prior to the purchase?

14    A.   We request authority by executive management at

15 your local field office, that -- inform them this is

16 what we would like to do, the illegal act, and get the

17 authorization to conduct the illegal act.

18         And then prior to conducting the illegal act, we

19 admonish the individual that will actually be performing

20 the illegal act, to let them know what authorizations

21 they actually have.  And it's for a limited period of

22 time.

23    Q.   What's the purpose of those procedures?

24    A.   Just admonishment, so they know that they are

25 only allowed to engage in a specific illegal act, that

1    it's not an open-ended, you can conduct any illegal

2    activity; it's for a specific purpose.

3        Q.   What sort of activity, if any -- illegal

4    activity, was Junior not permitted to engage in during

5    the course of this investigation?

6        A.   He was not authorized to engage in anything

7    involving bodily harm.  He was not authorized to engage

8    in providing drugs to anybody.

9        Q.   Are you aware of any instances in which he

10   violated the admonishment not to engage in any sort of

11   acts of violence?

12       A.   Yes.  He did on one instance bring a joint to a

13   meet.

14       Q.   Just to be clear, my question said "acts of

15   violence."

16       A.   Oh.

17       Q.   Was he individually involved in acts of violence?

18       A.   No, he did not.  I apologize.

19       Q.   Okay.  Let's clarify about the joint.  Tell the

20   jury what you're talking about.

21       A.   On May 15th, in 2014, we were conducting an

22   operation involving Junior, where Junior was going to be

23   meeting with Leopardo, and Leopardo was going to be

24   showing Junior the possible locations of where two

25   individuals were buried.

1          And upon arrival, Junior informed me that he had

2   brought a joint to the meet.  And he did not have

3   authorization to bring or provide that joint.

4      Q.  What did you do when he informed you that he had

5   this joint?

6      A.  I tried to obtain verbal emergency authorization

7   to allow him to conduct that activity.  I contacted

8   multiple executives at the Washington Field Office, but

9   I was unable to reach anybody.  So he was not allowed to

10  conduct that activity.

11     Q.  Do you remember the date of that incident?

12     A.  It was May 15th of 2014.

13     Q.  What was the -- what was going on on that date,

14  when he arrived with the joint?

15     A.  He was meeting with Leopardo, and Leopardo was

16  going to show him where they buried two bodies.

17     Q.  Going back for a moment to the authorization

18  involving the firearm that Junior was involved in, after

19  the purchase of the firearm, what procedures were

20  followed?

21     A.  Um, upon purchase, then once Junior obtained the

22  weapon, we met Junior at a secured location, and then

23  the FBI took possession of the firearm.

24     Q.  Now, you mentioned the firearm.  You also

25  mentioned consensual monitoring.  What is consensual

1    monitoring?

2        A.   Consensual monitoring is where the individuals

3    allow the FBI to record their conversations.  The

4    recordings can be audio and/or video.

5        Q.   When you say "audio or video," can you elaborate?

6        A.   Audio could just be involving telephonic

7    communications.  Video could be where we're actually

8    video recording and audio at the same time, the meet

9    with the individual.

10       Q.   For what purposes did the FBI approval consensual

11   monitoring for Junior during this investigation?

12       A.   For the purpose of gaining intelligence and the

13   actual conversations between Junior and the individuals

14   that he was interacting with.

15       Q.   You also mentioned something called a wire.  Can

16   you tell the jury what that is?

17       A.   That is where -- for the wires, where we, with

18   the proper authorization, go up on an actual telephone

19   and we record the actual conversations on the telephone.

20   It could be any text messages or any actual telephonic

21   communications.

22       Q.   All right.  In this instance, what phone was the

23   wire on?

24       A.   This was an FBI phone that we had provided to

25   Junior.

1      Q.   When a wire is on a phone, are all of the calls

2   recorded?

3      A.   Yes, on that phone.

4      Q.   Are all of the text messages recorded on that

5   phone?

6      A.   Yes.

7      Q.   In addition to actually recording the

8   conversations, the phone calls themselves, is there

9   other information about the calls that's collected by

10   the wire?

11      A.   Date and time, the telephone number.

12      Q.   When did the consensual wire for Junior begin?

13      A.   That began in approximately the end of October of

14   2013.

15      Q.   What precipitated the decision to put the

16   consensual wire in place?

17      A.   At the beginning of October, I think it was

18   approximately October 9th, Junior had contacted me and

19   informed me that he --

20           MR. CONTE:  Objection, Your Honor.  That's

21   hearsay.

22           THE COURT:  Sustained.

23   BY MS. MARTINEZ:

24      Q.   Without stating what Junior said, generally

25   speaking, what precipitated the decision to put the wire

1    in place?

2        A.   A conversation Junior had told me he had had.

3        Q.   With who?

4        A.   With Payaso.

5        Q.   Now, going back to -- you mentioned that there

6    may be consensual recordings of video for meetings.

7    What's -- what procedures are put in place when a

8    confidential human source like Junior is recording a

9    meeting with another individual?

10       A.   We -- prior to the meet, we would, in a secured

11   location, would meet up with Junior, and we would have

12   him fill out the appropriate paperwork to conduct the

13   consensual monitoring.

14            We would then, using FBI technology, we would

15   place the equipment somewhere on Junior to record the

16   meet.

17            And then afterwards we would, again at a secure

18   location, meet up with Junior and then obtain the

19   equipment.

20            And then that equipment then would be, depending

21   on what it was, proper procedures followed to obtain the

22   data off of the equipment.

23       Q.   Now, earlier when you mentioned the marijuana

24   joint that Junior wasn't supposed to have, you said the

25   date was May 15, 2014.  Were you involved in an

1    operation with Junior on May 15, 2014?

2        A.   Yes, I was, for part of it.  I wasn't there for

3    the whole thing, but for part of it, yes, I was.

4        Q.   And was there a body wire used during that

5    operation?

6        A.   Yes, there was.

7        Q.   And were -- you said you weren't there for the

8    entire time.  Were you there at the beginning, the

9    middle or the end?

10       A.   The beginning.

11       Q.   Were procedures followed at the beginning?

12       A.   Yes, they were.

13       Q.   All right.  Now, circling back one more time to

14   the questions about whether Junior was allowed to --

15   permit to engage in certain activity, illegal activity

16   or others, you stated -- and correct me if I'm wrong --

17   that he was not allowed to engage in any violent

18   activity.

19       A.   That's correct.

20       Q.   To your knowledge, did he ever violate that rule

21   of the FBI?

22       A.   To my knowledge, no, he did not.

23            MS. MARTINEZ:  No further questions, Your

24   Honor.

25            MR. AMOLSCH:  Your Honor, Christopher

1   Amolsch for Mr. Cerna.  May we approach, Judge?

2                    THE COURT:  Yes.

3                    (Thereupon, the following side-bar

4   conference was had:)

5                    MR. AMOLSCH:  Thank you, Your Honor.  Chris

6   Amolsch for Mr. Cerna.

7                    In the government's allocution with this

8   Junior regarding -- with the witness regarding the

9   telephone conversations and why she was meeting with

10  Junior, her testimony was that she met with Junior to

11  discuss with Leopardo, who is Mr. Cerna, the burial of

12  the bodies.

13                   She didn't say "reburial."  She said

14  "burial."  She said "bodies," relating to Trujillo and

15  Aguilar.

16                   The only way he could have been part of the

17  burial of Mr. Trujillo was if he participated in the

18  murder.

19                   I understand the Court's order regarding the

20  government is allowed to elicit testimony that 15 days

21  greater, or thereabouts, Mr. Cerna went and dug up the

22  body of Mr. Trujillo and reburied it.

23                   I understand the Court's order, that it's

24  not permissible, given the Court's order regarding any

25  evidence that Mr. Cerna participated in the murder of

Trujillo.

But in this case, she did say burial of the two bodies which is not reburial.  And the only way he could have been part of the burial is if he participated in the murder.

I'll remind the Court at this point, the government's evidence is that there's only about five or six people in this gang at this point.  We heard the testimony about the recruiting process and that it was going slow.

The government is going to present evidence that, who was there at the murder, which -- I assume which included Mr. Cerna, homeboy one and homeboy two. There is only five of them, Judge.

The government had an opportunity to meet with this witness and talk about the limitations on the Court's order regarding evidence that he participated in the murder.

I believe they violated that, Judge.  This isn't about the reburial 15 days later.  This is about the burial after the murder.

I ask for a mistrial, Judge, or at least an instruction to the jury regarding that.  Because that's outside what the Court has allowed the government to bring.

1    MS. MARTINEZ:  May I respond, Your Honor?

2    THE COURT:  Sure.

3    MS. MARTINEZ:  Your Honor, I heard the

4    witness say the burial locations of the bodies.  But

5    even if Mr. Amolsch is correct, and she said the burial

6    of the bodies, when his client dug up moved the body and

7    then buried it in a new location, he did, in fact, bury

8    the body.

9        I don't think the jury is going to play

10   anything into reburial versus burial.  There were no

11   further details elicited from this witness.

12       And, as the government's case will prove,

13   the body of Lagrima was, in fact, found in the second

14   location, the location where Mr. Amolsch's client buried

15   him, albeit the second time -- which the jury won't hear

16   about the first time.  But he did, in fact, bury the

17   victim in the location in which it was found.

18       The purpose of this operation, that this

19   witness testified about, was so that Mr. Amolsch's

20   client could show Junior where the bodies were located.

21   The body of Lagrima was located in the second location,

22   where, in fact, Mr. Amolsch's client did bury him.

23   There's no grounds for mistrial.

24       MR. AMOLSCH:  Judge, I would say we

25   understand the Court's ruling on the reburial.  We note

1    our objection to that.  But that's not what she said.

2    She said -- the witness said, where the two bodies were

3    buried.

4            This is the -- I understand, Judge, you

5    know, there's some nuance here, but given how few

6    members there are of this clique at this time, the

7    government's insistence on using the instructions,

8    homeboy one and homeboy two, who I assume is Del Cid or

9    whoever else is going to testify to, and now the FBI

10   agent's testimony about their taking him to where the

11   bodies were buried, it is impossible for them not to

12   conclude -- because they can count to six -- who is on

13   trial here and who was -- must have been present at the

14   burial.  Again, Judge, this is in violation of what we

15   talked about.  This is inadmissible evidence regarding

16   the murder of Trujillo.

17           And I would ask for a mistrial, Judge, or we

18   need some sort of instruction at the very minimum

19   regarding what they are allowed to consider this

20   evidence for.

21           THE COURT:  All right.  I don't see it the

22   way you see it.  I appreciate your bringing it to my

23   attention.  This witness is not going to be the main

24   witness on what happened.  It's going to be Junior.

25   You'll have a chance to cross-examine.

```
 1              And I don't think that she's made any
 2    judgment about who was involved in the murder by using
 3    the word "burial."  The bodies were buried.
 4    Theoretically, the word "bury" means in the past,
 5    doesn't mean presently.
 6              And, also, we're talking about a person who
 7    is on the site where two bodies were buried.  So I don't
 8    think there's anything violating the rules.  I don't
 9    think there's any grounds for mistrial.  So motion will
10    be denied.
11              Thank you.
12              (Thereupon, the side-bar conference was
13    concluded.)
14              THE COURT:  You may proceed.
15              MR. LEIVA:  Thank you.
16                    CROSS-EXAMINATION
17    BY MR. LEIVA:
18       Q.  Good morning, Agent Born.
19       A.  Good morning.
20       Q.  Agent Born, you've been Junior's handler for
21    about five years; is that correct?
22              Or you were his handler for about five years?
23       A.  That is correct.
24       Q.  And when you first started using Junior -- and
25    I'm going to use the term "confidential informant" or
```

1   "confidential human source" interchangeably, if that's

2   okay with you.

3         When you first started using Junior as a

4   confidential informant, was he in MS-13?

5   A.   At the time I -- I think he still was, yes.

6   Q.   Okay.  And, do you recall what, if any, rank he

7   had achieved when you first started working with Junior

8   back in 2009?

9   A.   I think at that point he was just one of the

10  members, if I remember correctly.

11  Q.   Just a regular homeboy?

12  A.   I think so, yes.

13  Q.   Okay.  And I understand that you said that you

14  were not a specialist when it came to MS-13, but you

15  know enough about them, right, working with Junior?

16  A.   From him, yes.

17  Q.   Okay.  And, you know that one rises in position

18  or rank based on deeds that they do on behalf of MS-13.

19  A.   Correct.

20  Q.   Okay.  So, you start working with him in 2009.

21  I'm assuming that when you started working with him, you

22  did not advise him to leave the gang.

23  A.   That is correct.

24  Q.   Right?

25        Would it be fair to say that you instructed him

1   to stay in the gang?

2      A.  I wouldn't say that I instructed him to stay in

3   the gang.  I allowed him to continue the activities that

4   he was currently doing --

5      Q.  All right.

6      A.  -- with the proper approvals.

7      Q.  And, when you did that, you, of course,

8   understood that he would have to commit criminal acts in

9   order to gain rank and move up in the gang.

10     A.  I don't know what acts were needed to move up,

11  but I do understand that you do move up in the ranks of

12  a gang.

13     Q.  All right.  And did you and Junior have a

14  discussion about that?

15        Well, let me go back.

16        I'm assuming that when you recruited Junior as an

17  asset, you envisioned that he would be working for you

18  or for the Federal Bureau of Investigation for -- for

19  some time?

20     A.  I wasn't involved in his original recruitment

21  back in 2005.

22     Q.  But, once you got involved, would it be fair to

23  say that you knew that he would be working for the

24  Bureau for some time?

25     A.  Yes.

1    Q.   Okay.

2    A.   Yes.

3    Q.   So, this wasn't an asset that you were just going

4    to use in 2009 and just get rid of afterwards; you

5    needed him in there, right?

6    A.   Correct.

7    Q.   Okay.  All right.  So, going back to three

8    questions before that one, so you -- it would be fair to

9    say that you knew that he would be committing criminal

10   acts in the future --

11   A.   Well, I don't --

12   Q.   -- on behalf of the gang?

13   A.   -- know that he was going to be committing

14   criminal acts in the future.  And at the time that I did

15   take over Junior, he was also assisting with other types

16   of investigations besides gang.

17   Q.   So, no one -- you were never privy to a

18   conversation where there was a discussion with Junior

19   that, "Listen.  We know you're involved in this gang.

20   We know this gang commits criminal offenses.  We know

21   you're going to be put in a position where you,

22   yourself, have to commit criminal offenses."  You were

23   never privy to a discussion like that with Junior?

24   A.   I know we had discussed gang activities and stuff

25   that's involved with gangs.  But the criminal activity,

1    I know that we had talked about there were some drugs
2    and prostitution stuff and some weapons that he had
3    knowledge of.  I do remember those conversations.
4        Q.   All right.  So, those conversations that you do
5    recall, do you remember being -- or Junior being told,
6    "As long as you tell us ahead of time that you're going
7    to commit these criminal offenses, you'll be okay, you
8    won't be charged with anything"?
9        A.   I don't remember telling him anything like that.
10       Q.   What, if any, conversation was there with Junior
11   that would lead him to believe that it was okay for him
12   to participate in criminal activity and not be punished
13   for it?
14       A.   I'm sorry.  Can you repeat that?
15       Q.   What, if any, conversation did you, or were you
16   present with your colleagues, where Junior was told that
17   he would not get in trouble for any criminal activity
18   that he did while he was this asset for you guys?
19       A.   I was never involved in anything to tell him that
20   he would not be in trouble for committing --
21       Q.   Do you know --
22       A.   -- crimes.
23       Q.   -- of any reason why Junior would believe that he
24   would not get in trouble, as long as he was working as
25   an asset for the Federal Bureau of Investigation?

1    A.  I do not know of anything as to why he would

2    believe that.

3    Q.  Okay.  Now, you testified that he has been given

4    a parole or deferment action, right?

5    A.  There was a significant benefit of parole and a

6    deferred action.  And then I had started another process

7    that I did not complete.

8    Q.  By "parole and deferred action," that means that

9    the U.S. Government has told Junior they're not going to

10   deport him back to El Salvador.

11   A.  The significant benefit of parole was to allow

12   him to legally remain here to work on an investigation

13   for a limited period of time.

14        And then the deferred action allowed us to have

15   him remain here legally.  So that was for anybody who

16   was going through deportation or removal proceedings,

17   for a limited period of time.

18   Q.  And he was also told that you guys would try to

19   get him an S Visa, right?

20   A.  He knew that I was working on the application,

21   but he also knew that there was no guarantees.  Because

22   S Visas, there is a limited number of applications that

23   are allowed.

24   Q.  I understand that you used the word "guarantee,"

25   okay?  And I understand that you are never in a position

 1   where you can guarantee someone --

 2      A.   Right.

 3      Q.   -- something, okay?

 4           But you guys made it abundantly clear that you

 5   would lobby for Junior to get this special S Visa.

 6      A.   He knew that I was filling out the application,

 7   yes.  But he also knew the limitation on the number and

 8   that it was not an FBI decision.

 9      Q.   I understand that.

10      A.   Uh-huh.

11      Q.   Okay?  But correct me if I'm wrong:  When you

12   have a conversation with someone like Junior --

13      A.   Yes.

14      Q.   -- you say to him, "Junior, we can't guarantee

15   you this visa, but we're going to do everything we can

16   to see if we can get you one."

17      A.   I didn't use those particular words, but yes, he

18   knew that --

19      Q.   But something --

20      A.   -- I was working on it.

21      Q.   -- similar to it?

22      A.   Yes.

23      Q.   Yes.

24           Because, otherwise, who --

25      A.   Yes.

1   Q.   -- would put their life in danger, if all you
2   guys said was, "Hey, come work for us, but we're not
3   going to guarantee you anything," right?
4        It would be hard to recruit people that way,
5   wouldn't it?
6   A.   He did know I was working on that application,
7   and that if it was denied that there were other means
8   that the FBI could follow to try and get an S Visa for
9   him.
10  Q.   And this S Visa, as we -- it's commonly referred
11  to as a snitch visa, right?
12  A.   That, I -- it's an S Visa.
13  Q.   Well, it's an S Visa, and he would be allowed to
14  remain here in this country legally, right, if he
15  obtained that S Visa?
16  A.   For a limited period of time --
17  Q.   All right.
18  A.   -- and then --
19  Q.   And so -- and so would his family.
20  A.   If you get the visa -- if he had family members
21  that required it, there are processes to get those.
22  Q.   What about his family members; what, if any,
23  benefit are they receiving?
24       Are they receiving any parole or deferred action?
25  A.   Not that I'm aware of.

1    Q.   So, am I to understand correctly, for the last

2    five -- or for the five years that you were handling

3    Junior, you met with him once every 90 days?

4    A.   You're required to meet with him once every

5    90 days.

6    Q.   That's a minimum --

7    A.   Correct.

8    Q.   -- right?

9         So you met him more than once every 90 days?

10   A.   If it warranted, yes.

11   Q.   Okay.  And every time that you met with Junior,

12   can I assume that he told you, yes, he was still in

13   MS-13?

14   A.   We didn't always have those types of

15   conversations, no.

16   Q.   Well, wasn't that the reason why he was working

17   for you guys, is to gather information, intel, about

18   MS-13?

19   A.   That was not the sole reason, no, for me.  As his

20   handling agent, he was working other violations and

21   providing intel.

22   Q.   Other violations, you mean narcotics?

23   A.   No.

24   Q.   What other violations are you referring to?

25   A.   Violent crimes against children.

1    Q.   Okay.  All right.  And, so, what you're saying is

2    that Junior had -- well, let me go back.

3         So, Junior had this MS-13 part of him that you

4    guys would work on him, but not all those five years,

5    right?

6    A.   Correct.

7    Q.   And then you had the crimes against children, he

8    also had information or contacts with, that had nothing

9    to do with MS-13?

10   A.   Correct.

11   Q.   Okay.  So, let's focus on 2013.

12   A.   Okay.

13   Q.   All right.  At that point, did you receive

14   information that Junior did obtain a rank higher than

15   just a homeboy?

16   A.   In 2013, I don't think he had achieved the rank

17   higher yet.  I don't think that was in 2013.  I would

18   have to go back to the case file to look, but I don't

19   think it was 2013 yet.

20   Q.   So, your testimony is that he was still a homeboy

21   back in 2013?

22   A.   I -- I don't know what level it was, but I don't

23   think he had achieved the one higher, that I thought was

24   in 2014.

25   Q.   Well, you were monitoring him during 2013, were

1  you not?

2      A.  Yes I was.

3      Q.  Okay.  And were you made aware that he was

4  meeting with leaders of other cliques?

5      A.  Yes.

6      Q.  Okay.  And, given your limited knowledge of

7  MS-13, did you know that a homeboy can't be present when

8  it's a leadership meeting?  Did you know that much?

9      A.  No, I do not.

10     Q.  You didn't.

11     A.  Uh-huh.

12     Q.  Did he tell you, or did anyone tell you, that he

13 had achieved the rank of a leadership role in MS-13, and

14 that's why he was being invited to these leadership

15 meetings?

16     A.  Not in 2013.  I don't recall that.

17     Q.  What about 2014?

18     A.  I thought it was 2014 where he had achieved the

19 leadership.

20     Q.  Okay.  And, what position of leadership did he

21 obtain?

22         Was he first word?

23         Was he the -- the -- are you familiar with that

24 term, "first word"?

25     A.  No.

1    Q.   All right.  So, you've been working with Junior

2    for five years, and you've never heard the term

3    "first word"?

4    A.   I've heard the term "first word," but I believe

5    he was, I believe, a clique leader, but I don't know if

6    that means the same as first word.

7    Q.   Okay.  What does a clique leader means to you?

8    A.   That he had kind of oversight and -- of the --

9    that particular clique.

10   Q.   And do you know what, if any, term is given to a

11   person that has that kind of oversight over a clique?

12   A.   Clique leader.

13   Q.   Okay.  So, that's -- you know -- you don't know

14   it as a first word or the *palavreado* or the *corredor*?

15        No?

16   A.   I have heard "first word."  I don't know if

17   that's equivalent to it.

18   Q.   Okay.  And you believe he made first word status,

19   or the leader -- I'm sorry -- the leader of the clique

20   sometime in 2014?

21   A.   I believe that he did, yes, in approximately

22   2014.

23   Q.   And, did you bother to ask him how is it that he

24   obtained the leadership role of a clique?

25   A.   No.  I know there had been conversations that he

1    had with individuals, and that -- I thought it was

2    requested that he become the clique leader and take over

3    that role because of -- I can't remember exactly what

4    happened to the previous clique leader.

5        Q.   As his handler, were you not concerned that

6    Junior had to commit some serious criminal offenses in

7    order to obtain that position of clique leader?

8        A.   I was not aware at the time that he needed to

9    conduct any serious crimes at that time.  I know from my

10   experience with him, was that he needed to have kind of

11   oversight of members, be involved in conversations and

12   attend meetings, whether they were clique meetings or

13   general MS-13 meetings.

14       Q.   Did you ask him how is it that he obtained this

15   status of clique leader?

16       A.   No, I did not.

17       Q.   You just -- to you, it wasn't important --

18       A.   No, I know --

19       Q.   -- how he came about --

20       A.   -- at that --

21       Q.   -- achieving such a -- such a status as clique

22   leader?

23       A.   At that point in time, the telephone that he was

24   using to do all the communications, we were recording

25   it, and I had direct connections with the MS-13 gang --

1     the violent gang squad out of the Washington Field

2     Office, and they were involved in the investigation as

3     well.

4          So, as the information came up I would provide it

5     to them, and then they would offer their expertise and

6     guidance in terms of what activities were important for

7     us to be involved in.

8          Q.   And I believe you testified on direct that Junior

9     got approval for you to engage in narcotics activity and

10    prostitution activity?

11         A.   It was activities involving the MS-13 gang

12    activities, was the -- was the otherwise illegal

13    activity --

14         Q.   But you --

15         A.   -- approval that he had.

16         Q.   -- certainly referenced narcotics and

17    prostitution.

18         A.   There was drugs, prostitution, others.

19         Q.   And when did he seek permission from you or any

20    other member of your agency to engage in -- in that kind

21    of conduct, the narcotics and prostitution?

22         A.   When did we do that?

23         Q.   Yes.  Was it in 2013, 2014?  When was it?

24         A.   I think it was both.

25         Q.   Okay.

1     A.   And then it's for a limited period of time.  So
2  we would -- we would need to renew it.
3     Q.   And, when he told you that he was engaged in
4  prostitution, did he tell you that he was actually
5  coordinating --
6     A.   No, he did not.
7     Q.   -- the possible transfer of people to work as
8  prostitutes?
9     A.   No, he did not.
10    Q.   All right.  What about the narcotics; did he tell
11  you that he was setting up deals?
12    A.   No, he did not.
13         He had told me he had information about deals,
14  but not anything where he was setting up deals.
15    Q.   So, in other words, then, he just comes up to you
16  and said, "Hey, I just have information about deals."
17         And you guys say, "Okay.  You got permission to
18  engage in narcotics."
19         Is it that simple?
20    A.   No, it's -- no, it's not that simple.
21    Q.   No, it is.  Because he told you that he was
22  involved with a guy name Smiley, right?
23    A.   Smiley sounds familiar, but I don't -- I don't
24  remember what --
25    Q.   You don't recall --

1      A.   -- you're talking about.

2      Q.   -- being told that Smiley was the narcotics guy

3  for MS-13, and that Junior was partnering up with him?

4      A.   No, I do not recall that.

5           The name -- I do recognize the name Smiley, but I

6  would have to refresh my memory on the case file to see

7  what Junior's involvement was with Smiley.

8      Q.   You also testified that he sought permission from

9  you to buy a weapon, right?

10     A.   Correct.

11     Q.   Okay.  And, did he tell you why he needed a

12  weapon?

13     A.   He was -- he had the opportunity -- an MS-13

14  individual -- I don't remember his name -- was selling a

15  weapon, and we did not want that weapon to be sold to

16  somebody else.  We wanted it to be a controlled buy.

17  So, we got the authorization to have Junior make the

18  purchase.

19     Q.   You also testified that as far as your

20  recollection goes, your knowledge, Junior was never

21  involved in acts of violence.

22     A.   Correct.

23     Q.   All right.

24     A.   To my knowledge, he has not been.

25     Q.   Do you recall Junior being at a meeting at a

1    restaurant with other MS-13 members?

2       A.   He attended different meetings at restaurants.

3    I'm not exactly sure which one you're talking --

4       Q.   All right.

5       A.   -- you're referencing.

6       Q.   Do you recall the meeting where he claimed that a

7    homeboy pulled a knife on him?

8       A.   I vaguely remember that.

9       Q.   Okay.  And do you recall that at that meeting,

10   Junior told the other homeboys that this guy needed to

11   receive a beating for pulling a knife out on him?

12      A.   I do not remember that or recall that.

13      Q.   You don't recall that?

14      A.   No, I do not, sir.

15      Q.   You don't recall observing that, as Junior was

16   leaving the restaurant, some other homeboys took the

17   homeboy around the corner, who pulled the knife out on

18   Junior, and gave him a beat down?

19      A.   No, I do not recall that.

20      Q.   So, sometime in 2014, Junior is the leader of a

21   clique.  Did he tell you which clique he was running?

22      A.   I believe it was the Silvas.

23      Q.   Okay.  And, the Silvas is one of the bigger

24   cliques in the area?

25      A.   I'm not sure.

1   Q.  You're not sure?

2   A.  No, I'm not.

3   Q.  You don't ask him these kinds of questions?

4   A.  No, I do not.

5   Q.  And, did he tell you what, if anything, he had

6   planned for the clique as far as what direction he was

7   going to take it, or take them?

8   A.  No, he did not.

9   Q.  Whether he was going to focus more on narcotics,

10  prostitution, violence, any of that?

11  A.  No, we did not have a discussion like that.

12  Q.  And, did he tell you that as a leader of the

13  clique, everything had to go through him?

14  A.  I believe that was true, that stuff did need to

15  go through the clique leader.

16  Q.  All right.  And that he would be the one that

17  would make the decisions for this particular clique?

18  A.  Yes, I believe that is true.

19  Q.  And, was there a meeting that he would not be

20  prosecuted -- was there any discussion that he would not

21  be prosecuted for any decision he made as leader of the

22  clique?

23  A.  No, there was no discussions like that.

24  Q.  Did you give him any instructions at all, what he

25  could or could not do as the leader of this clique?

1     A.   Oh, he had -- the only thing we had discussed was

2  his otherwise illegal activity approval, that allowed

3  him to be -- to have discussions and be involved in the

4  gang activities, and that in no instance was he allowed

5  to participate in any violence.

6     Q.   Do you recall a meeting that occurred here in

7  Northern Virginia on September 15, 2013, at a hotel

8  room, where Junior was present?

9     A.   I don't recall that one.

10     Q.   You don't recall on that date, that there was a

11  meeting of all the leaders of the local clique and this

12  drug guy named Smiley?

13     A.   I don't recall.  I would have to look back into

14  the case file to refresh my memory.

15     Q.   Well, you guys have video surveillance of it.  Do

16  you recall having video surveillance in these hotel

17  rooms -- or in the particular hotel room?

18     A.   I don't recall if we utilized that equipment that

19  day or not.  I would have to look into the case file.

20     Q.   Well, did you read your case file before you came

21  here and testified today?

22     A.   I did not read all of it.  I do not have access

23  to the system any more since I switched positions.

24     Q.   So, when is the last time that you read the case

25  file about this case, or Junior's role in this case?

1      A.   The entire case file?

2           I have my notes of stuff that I read related to

3    the murders, but I have not looked at everything since I

4    left back in September 2014.

5      Q.   Okay.  So, it's been about more than a year and a

6    half, then?

7      A.   Correct.

8                MR. LEIVA:  That's all the questions I have.

9    Thank you, Agent Born.

10               THE WITNESS:  Yes, sir.

11                    CROSS-EXAMINATION

12   BY MS. AUSTIN:

13     Q.   Good morning, Agent Born.

14     A.   Good morning, ma'am.

15     Q.   My name is Amy Austin and --

16               (Noise interruption.)

17               MS. AUSTIN:  Excuse me.  This just broke, I

18   think.

19               THE COURT:  Is it broken?

20               MS. AUSTIN:  Well, it just fell down on the

21   podium.

22               Okay.  I think I fixed it.  I'm sorry.

23     Q.   Good morning.

24     A.   Good morning, ma'am.

25     Q.   I represent Mr. Alvin Gaitan Benitez, and I have

1    a few more questions for you this morning.

2          I believe you testified that you put a wiretap on

3    Junior's phone.  When did you say that -- that happened?

4    A.    That was approximately the end of October 2013.

5    Q.    And so, prior to that, were you recording any of

6    his phone calls?

7    A.    We had done some consensual recordings prior to

8    that.

9    Q.    But, there was not a recording of every phone

10   call he had?

11   A.    No, there was not a recording of every phone call

12   he had.

13   Q.    And did you testify that you provided him with a

14   cellphone?

15   A.    The FBI did, yes.

16   Q.    And --

17   A.    But -- I apologize.  I wasn't the one that

18   actually had done the paperwork to get it.

19   Q.    Okay.  And, so when he communicated with you, he

20   used the cellphone; is that correct?

21   A.    He used his personal phone when he communicated

22   with me.

23   Q.    Not the FBI cellphone?

24   A.    No.

25   Q.    So, he had more than one cellphone?

1    A.   Correct.

2    Q.   And, when the wiretap was put in place, it was on

3    the FBI cellphone; is that correct?

4    A.   Correct.

5    Q.   And so, any phone call he made on his personal

6    cellphone would not have been included in that wiretap;

7    is that correct?

8    A.   Correct.

9    Q.   You stated that you communicated with him -- he

10   called your office phone, your cellphone, and e-mail; is

11   that correct?

12   A.   Correct.

13   Q.   Did he text you?

14   A.   Yes.

15   Q.   Did he text you from his personal phone or the

16   FBI phone?

17   A.   I believe the majority of it was his personal

18   phone.  He may have once or twice on the FBI phone to do

19   a test, to make sure it was working, but the majority of

20   it was his personal phone.

21   Q.   And, did you text him back?

22   A.   Yes.

23   Q.   And, did you e-mail with him?

24   A.   Yes.

25   Q.   Did you ever go into his home and search it

1    during the time that you were working as his handler?

2        A.   No, I did not.

3        Q.   And, you didn't know whether he had two or three

4    other cellphones, in addition to the two you were aware

5    of, do you?

6        A.   Correct.

7        Q.   And you certainly didn't have 24-hour

8    surveillance on Junior, did you?

9        A.   No.

10       Q.   The consensual recorded phone calls that you

11   talked about before the wiretap was put in place, would

12   those be recorded because Junior alerted you that he

13   wanted to record a phone call or think you should record

14   a phone call?

15       A.   Those would have been, he was providing some

16   information, and then the investigation that was

17   associated with the case agents made the call that it

18   would be beneficial to regard those, if he was going to

19   be having those types of conversations.

20       Q.   So, before the wiretap, what sort of recording of

21   phone conversations occurred -- conversations that

22   Junior had with other members of the MS-13.

23       A.   Correct.

24       Q.   No, I'm asking you.

25       A.   Oh, I'm sorry.

1    Q.   What sort of recordings were made?

2         How did that work?

3    A.   There was -- if he attended any meetings, then

4    there would be a recording.

5    Q.   Well, okay.  A recording -- a video recording or

6    audio recording; is --

7    A.   For the meetings, I don't remember if it was both

8    audio and video for those, or if it was just audio.  I'd

9    have to look back in --

10   Q.   Would he make that recording on a phone?

11   A.   No.  We would have the FBI specialized equipment

12   for the meetings.

13   Q.   Okay.  So, let me concentrate on telephone

14   calls --

15   A.   Okay.

16   Q.   -- before the wiretap was put in place in late

17   October 2013.

18   A.   Yes.

19   Q.   Were -- were there any phone calls he had with

20   MS-13 members that were recorded?

21   A.   I believe so, yes.  I think -- if he had them on

22   that phone when we had the consensual, then they would

23   have been recorded.

24   Q.   You say "when we had the consensual."  Is that a

25   matter of Junior hitting a record button when he's

1    having a phone call, or are agents involved in that?

2       A.   I believe in some instances early on, we actually

3    gave him equipment where he had to initiate the

4    recording of it.  But then I think we changed and it

5    went to where we were up on his phone.

6       Q.   When you say "we were up on his phone" --

7       A.   The FBI -- I apologize -- the FBI had done a

8    consensual on his personal phone.

9       Q.   Okay.  "Had done a consensual"; is that a wiretap

10   where everything is recorded?

11      A.   Yes.

12      Q.   Okay.  So, prior to the wiretap where everything

13   was recorded on the FBI cellphone, were you aware of

14   Junior recording phone conversations prior to that

15   wiretap?

16      A.   Yes.

17      Q.   And, it was up to him which phone calls to record

18   or not to record; is that correct?

19      A.   In -- when he was utilizing the specific devices

20   where we were not up totally on the phone where

21   everything was recorded, then he was the person making

22   the decision on what to record and what not to record.

23      Q.   Isn't it true, prior to the wiretap in late

24   October 2013, that if Junior had communication with an

25   MS-13 member on any topic, the only way you would know

1    about it is if he informed you?

2         A.   Correct.  Unless -- I apologize.  Unless it was a

3    time where we were doing the recordings.

4         Q.   But, you weren't doing those until late October,

5    correct?

6         A.   On the FBI phone, correct.

7         Q.   Okay.  So, prior to that --

8         A.   Correct.  He would notify me when he was having

9    conversations.

10        Q.   And it was -- let's talk about once he did notify

11   you of a conversation he had with an MS-13 member.

12   Would he call you and tell you he had this conversation,

13   or would he text you and let you know this information?

14        A.   Both.

15        Q.   Okay.  And, once you received that information,

16   if it -- let's say it was a telephone call, and you took

17   the information from him through a conversation, did you

18   simultaneously log that in, take notes of everything he

19   was telling you?

20        A.   Yes.

21        Q.   And, how would you do that?

22        A.   I would then summarize my telephone call or my

23   telephone conversation with him in an e-mail, and I

24   would provide that information to my contacts on the

25   Washington Field Office gang squad, and I would provide

1    that information to them, and then it would also be

2    entered into his confidential human source case file.

3        Q.   And if he texted you information, would you just

4    forward that text to the other agents involved?

5        A.   I wouldn't forward the text, no, but I would copy

6    the information and summarize it in an e-mail and send

7    it via e-mail to them, and then, again, enter it into

8    his case file, his confidential human source case file.

9        Q.   Now, you state that you gave -- the FBI gave

10   permission to Junior to engage in -- and your testimony

11   was, be involved in prostitution and narcotics?

12       A.   His otherwise illegal activity was for him to

13   discuss and be involved in MS-13 gang activities, to

14   include drugs, prostitution, there was the purchase of a

15   weapon, and then wiring of funds.

16       Q.   So, he was told that he was -- in addition to

17   being allowed to discuss gang activities, he could be

18   involved in gang activities?

19       A.   It would -- he was allowed to discuss, go to

20   meets, and then if there was ever any type of activity

21   that his presence was requested or he thought it would

22   be important for him to attend, then, I would -- we

23   would have the discussion with the -- the gang

24   investigators to see if that was some type of activity

25   we would want him to be involved with.

1     Q.   And, you would know of those activities only if
2     Junior told you about them, correct?
3     A.   Correct.
4     Q.   And, you would seek approval of those activities
5     that Junior had asked you approval for, correct?
6     A.   Correct.
7     Q.   And, he was not -- you did not have surveillance
8     on him.
9     A.   No.
10         And, then, if it was after the consensual
11    wiretap, then, obviously, if it had been discussed on
12    the -- via telephone conversation, on that wire, then,
13    individuals doing the translation would have documented
14    it as well.
15    Q.   But, they wouldn't have heard any conversations
16    he had on his personal cellphone, would they?
17    A.   Correct.
18              MS. AUSTIN:  I have no further questions,
19    Your Honor.  Thank you.
20              MR. CONTE:  Your Honor, may we approach?
21              THE COURT:  Yes.
22              (Thereupon, the following side-bar
23    conference was had:)
24              MR. CONTE:  I'm waiting for my entourage.
25              Your Honor, I think I had a Rule 16 on the

1    Jencks, we were entitled to the text messages between

2    Junior and this agents.

3              MS. MARTINEZ:  They've been provided, Your

4    Honor.

5              MR. CONTE:  I'm looking.

6              What format?

7              MS. MARTINEZ:  The source file that you had,

8    the verbatim -- the source file, and you've been

9    provided with them.

10             MR. CONTE:  Source file, what?  You mean the

11   302s?

12             MS. MARTINEZ:  No, I mean the source reports

13   of which you have the huge number.

14             Your Honor, we have been very conscientious

15   about this issue.  They have been provided.

16             MR. CONTE:  I have -- obviously, I'm in the

17   case late.  I don't recall seeing them.

18             MS. AUSTIN:  Are you talking about the

19   Brenda Born e-mails?

20             MS. MARTINEZ:  There are e-mails from

21   Brenda, what she -- what she -- writes verbatim what

22   text messages are.

23             There are also source reports, which are in

24   the binder at your table, that go on for many, many,

25   many, many pages, in which she types in exactly what was

1  said.

2           MR. CONTE:  I have those 302s.

3           MS. MARTINEZ:  That's the way -- they're not

4  302s.  The way the text messages were preserved were

5  typing verbatim.  That's the way they're preserved.

6           And they were provided to you through the

7  source file, which is the FBI's policy, the way that

8  they document these communications.

9           MR. LEIVA:  In the e-mail -- because there

10 is e-mails by Agent Born.  The only text messages we

11 received from -- were to Junior, which were Spanish.

12          MS. MARTINEZ:  With respect to

13 communications between Junior and Special Agent Born,

14 there are two sources for that.  One are the e-mails,

15 which clearly they are aware of, which also have

16 included verbatim text messages in the e-mails.

17          So, as she just testified what she would do,

18 they would put the information in the e-mail.  That was

19 the first thing she did.  Then, following FBI procedure,

20 she documents everything in his source file.  They are

21 source reports.

22          They're not 302s, but they're source

23 reports, sometimes one at a time -- I can see defense

24 counsel nodding with familiarity about these --

25 sometimes they go on, an entire month of reports.

1   They're in the binder sitting on your desk.

2              And they've been identified by us as

3   relating to Junior.  They say simply "CHS."  They don't

4   identify who the CHS is, but we identify by letter.

5   Those are source reports related to Junior.

6              MR. CONTE:  We have no guarantee that all

7   the text messages were in the source reports.

8              THE COURT:  Why don't you look at what's

9   there?

10             MR. CONTE:  Judge, I can't say what's not

11  there if I don't know.

12             THE COURT:  Well, it sounds like you haven't

13  looked at them.

14             MR. CONTE:  I looked at them.  Some of those

15  records are in there.  But I don't know that all the

16  texts this agent got from Junior are in those reports.

17  I have no way of knowing that, unless --

18             THE COURT:  Have you looked at them,

19  Mr. Conte?

20             MR. CONTE:  Yes, I have.

21             THE COURT:  Why did you ask where the text

22  messages are, if you looked at them, you know the text

23  messages are in the binder?

24             MR. CONTE:  I would think they would be

25  preserved in some other format than the source report.

1    THE COURT:  Did you hear what the witness

2    said?

3    She typed them into e-mails.  Are you -- I'm

4    not sure what you want me to do.  What do you want me to

5    do?

6    MR. CONTE:  If the government has a database

7    of text messages from this agent's phone, I think it

8    should be produced.

9    MS. MARTINEZ:  We don't, Your Honor.  What

10   we have is what was produced, which is the text

11   messages.

12   THE COURT:  All right.

13   I think you have what you're entitled to.

14   You're entitled to cross-examine this witness, and you

15   will have your chance.

16   Thank you very much.  Motion denied.

17   (Thereupon, the side-bar conference was

18   concluded.)

19   THE COURT:  You may proceed, Counsel.

20                   CROSS-EXAMINATION

21   BY MR. AQUINO:

22   Q.   Ms. Born, good morning.  My name is Jerry Aquino.

23   Along with Elita Amato, we represent Jesus Chavez.

24   A.   Good morning, sir.

25   Q.   Just a few questions for you.

1          Correct me if I'm wrong, but Junior, for example,

2    could go to CVS -- just get in the car and you would not

3    know about it, correct?

4         A.   That is correct.

5         Q.   And there were periods of time, as long as a

6    week, when you did not have communication with Junior.

7         A.   There were periods where I did not, yes, that is

8    correct.

9         Q.   Is it possible that it was more than a week?

10        A.   There are some times, yes.

11        Q.   Okay.  Now, during those period of times, he was

12   not supposed to engage in -- harm people; is that

13   correct?

14        A.   He was never authorized to engage in any harmful

15   activities with others.

16        Q.   And insofar as drug sales that were concerned, he

17   was only allowed to engage in narcotics sales when you

18   gave permission; is that accurate?

19        A.   That would be accurate, yes.

20        Q.   Okay.  So, you would agree that there were period

21   of times when you had no idea what he was doing,

22   correct?

23        A.   Yes.  I did not monitor him 24/7.

24        Q.   Okay.  And during that period of time, for

25   example -- or there was a period of time when he rose

1    from just a soldier or homeboy to clique leader,

2    correct?

3        A.   That is true, correct.

4        Q.   And he could have engaged in crimes of violence

5    as well as narcotics sales that you had no idea about,

6    correct?

7        A.   To the best of my knowledge, he has never engaged

8    in those activities.

9        Q.   Well, that was not the question I asked.  He

10   could have engaged in those acts and you would have no

11   idea, correct?

12       A.   That is correct.

13       Q.   Now, there was some discussion of an S Visa,

14   correct?

15       A.   Correct.

16       Q.   And, that is a nonimmigrant visa; is that

17   accurate?

18       A.   Um, I'm not an expert on our visas.  I know it's

19   the one that's a limited period of time, and somebody

20   has provided information to the government.

21       Q.   Okay.  Was there further discussions, beyond the

22   question of an S Visa, concerning his allowed -- to be

23   allowed to stay in the United States permanently?

24       A.   There -- I'm sorry.  What was that?

25       Q.   Sure.  Did you have any discussions with Junior

1   that might make a short-term period of time to stay in

2   the United States a longer period of time, that is,

3   something on a permanent bases?

4       A.   The only discussions I had with him was, I had

5   done the deferred action to allow him to stay here, and

6   that's for a specific period of time.  And then I was

7   working on the S Visa with it.

8       Q.   And can you give us a sense of how long you

9   expected the S Visa to last?

10      A.   The S -- from my understanding of how S Visas

11  work -- and that's assuming he would have been approved

12  for it, because my other understanding is that there's a

13  limited that are allowed to even be issued -- is that

14  it's three years, and then after three years they may be

15  eligible for a legal permanent resident.

16      Q.   Okay.  And legal permanent resident means he

17  could stay here for the rest of his life, assuming he

18  did not engage in some type of criminal behavior,

19  correct?

20      A.   Whatever their requirements are, yes.  I believe

21  that's pretty accurate.

22      Q.   And that was the goal; is that accurate?

23      A.   Yes, I did.  My intentions were to get him an

24  S Visa prior to leaving.

25      Q.   But, my point is, is that there were discussions

1    in which he could stay here as a permanent resident,

2    correct?

3         A.   If we got the -- there were -- there were some

4    things that would obviously have to take place; one,

5    that the S Visa would get approved, and I had no

6    guarantees that that would even be approved for the FBI.

7    And then, his -- obviously, his behavior in that three

8    years, there were specific guidelines that -- like you

9    said, if there were criminal acts created, then they

10   would not be allowed.  And then they have to go through

11   the legal permanent resident process.

12        Q.   Okay.  Assuming you knew about his criminal

13   behavior, correct?

14        A.   Correct.

15        Q.   Okay.  And again, there were periods of time

16   where you had no idea what he was doing, correct?

17        A.   Correct.

18             MR. AQUINO:  That's all the questions I

19   have.

20                     CROSS-EXAMINATION

21   BY MR. CONTE:

22        Q.   Good morning, Agent Born.  My name is Joseph

23   Conte.  Mr. Dwight Crawley and myself represent Douglas

24   Duran Cerritos.

25        A.   Good morning, sir.

1    Q.   I want to talk to you about the SMS, the text
2    messages, and the e-mails that you received from Junior.
3    Did every contact that you had with Junior go into the
4    source file?
5    A.   Yes, sir.
6    Q.   All right.  And, is there a permanent record
7    otherwise kept of any text message or SMS message or
8    e-mail message that's received by you or sent by you to
9    a source?
10   A.   No.  Those are -- we have limited space in our
11   system, so I would clear my inbox out.
12   Q.   And, there's no backup?
13   A.   I -- I'd have to defer to our computer experts.
14   Not that I'm aware of.
15   Q.   All right.  And, besides your desk phone and your
16   cellphone and your e-mail, did he ever communicate with
17   you in any other method?
18   A.   Face to face.
19   Q.   All right.  And, was each one of those documented
20   in the source file?
21   A.   Yes, they were, sir.
22   Q.   All right.  And the text messages, were they put
23   verbatim into the source file?
24   A.   Into the source file, I don't think so.  I think
25   I summarized what he was saying to me.

1    Q.   So, if he sent you a text or an e-mail, you would

2    only summarize it for the source file; is that correct?

3    A.   I believe I summarized -- I think some of them I

4    did do verbatim if I wasn't exactly sure what he was

5    saying.  But I think I did both, actually.

6              MR. CONTE:  All right.  I have nothing

7    further, Your Honor.  Thank you.

8                     CROSS-EXAMINATION

9    BY MS. RALLS:

10   Q.   Good morning, Agent Born.  My name --

11   A.   Good morning.

12   Q.   -- is Meredith Ralls, and I represent Omar

13   Dejesus Castillo.

14   A.   Good morning, ma'am.

15   Q.   I wanted to talk a little bit about the benefits

16   that you had discussed that Junior received.  With the

17   parole or deferred action, is it your understanding that

18   Junior would receive a work authorization with that?

19   A.   Yes.

20   Q.   And, he would receive a Social Security number as

21   part of that?

22   A.   I don't know if you get a Social Security number

23   for that.  But, we did request the work authorization

24   when we requested those types of benefits.

25   Q.   And when -- you talked about some of the payments

B. Born - Cross                                                      64

 1    that Junior received.  Were those given to him in cash
 2    or check?
 3        A.   Cash.
 4        Q.   And, to the best of your recollection, did he
 5    receive at least one payment in each year that you were
 6    working with him?
 7        A.   That, I'm not sure of, if he did in every year or
 8    not.
 9        Q.   And, Junior wasn't allowed to engage in criminal
10    activity without your prior authorization; is that
11    correct?
12        A.   Correct.
13        Q.   So, was he allowed to run a brothel?
14        A.   No, he was not.
15        Q.   Was he allowed to collect rent from a brothel,
16    like cash payments from a brothel that someone else was
17    running?
18        A.   I thought there was one instance where he did --
19    we did get authorization for him to collect rent.
20        Q.   Was that authorization for a specific period of
21    time or just for one instance?
22        A.   For one instance.
23        Q.   Do you remember where that brothel was located?
24        A.   If I remember correctly, I thought somewhere in
25    Maryland.

1    Q.   Did he ever receive authorization to conduct --
2    when I say "rent," I'm talking about extortion from that
3    brothel.
4    A.   Correct.
5    Q.   Okay.  So, to your knowledge, he received one
6    authorization to extort a brothel in Maryland?
7    A.   I believe.  And I'd have to confirm in my notes,
8    but -- in the paperwork that was done for that
9    operation.  But I thought he was meeting somebody and he
10   was -- the price and everything had already been
11   discussed, and he was going there to assist in the
12   collection of it.
13   Q.   Do you remember the approximate time period that
14   that was?
15   A.   I don't remember.
16   Q.   Was he ever allowed to authorize attacks on other
17   gang members?
18   A.   No, he was not authorized to do that.
19   Q.   Did you ever ask if he had committed criminal
20   acts outside of your authorization?
21   A.   No, I never asked that specific question.
22   Q.   But, it's very important to you that he not
23   commit criminal activity without your authorization;
24   isn't that correct?
25   A.   Correct.

1     Q.   But even though that's very important to you, you
2   didn't ask him if he had been doing that, correct?
3     A.   That is correct.
4     Q.   Now, you referenced one incident where Junior was
5   found to have been possessing marijuana.  To the best of
6   your knowledge, was he ever charged with possession of
7   marijuana for -- in a criminal case?
8     A.   For that particular instance, or --
9     Q.   For that instance.
10    A.   No, he was not.
11    Q.   Is Junior the only confidential human source that
12  you worked with during your tenure in that position?
13    A.   In the position of --
14    Q.   Of being a source handler.
15    A.   No.  I've worked with other sources.
16    Q.   All right.  Approximately how many?
17    A.   Over the years, or --
18    Q.   Sure.
19    A.   Maybe a dozen or so.
20    Q.   And --
21    A.   Approximately.
22    Q.   Okay.  And, you know that confidential human
23  sources are not always truthful to you, correct?
24    A.   That is correct.
25         But just -- I'm sorry.  Just to clarify, Junior

B. Born - Cross

1   was my only source of operative that was gang

2   associated.

3       Q.   Okay.  And, Junior was checking in with you by

4   text; isn't that correct?

5       A.   It was sometimes face to face, telephone calls,

6   whether it was at my desk, on my phone, e-mail and text

7   messages, yes.

8       Q.   To the best of your knowledge, he was also

9   checking in with other FBI agents; is that correct?

10      A.   To my knowledge, he was not.

11      Q.   Okay.  So, you wouldn't know if he was also

12  checking in with Special Agent Fernando Uribe?

13      A.   Not unless somebody else informed me.

14           MS. RALLS:  Thank you.

15           THE WITNESS:  You're welcome.

16                 CROSS-EXAMINATION

17  BY MR. SALVATO:

18      Q.   Good morning, Agent.  My name is Frank Salvato

19  and I represent Christian Lemus Cerna.

20      A.   Good morning, sir.

21      Q.   This gentleman, Junior, has been a source with

22  the FBI from 2005 until the present time; is that

23  correct?

24      A.   That is correct.

25      Q.   And, during this time period, he's been told --

1    he's been paid a total of about $44,000; is that right?

2       A.   Um, I thought it was approximately 30,000.

3       Q.   Is it -- $30,000 was for his services, and he has

4    also received close to $14,000 in expenses; is that

5    correct?

6       A.   Okay.  That could be correct.

7       Q.   Okay.  And, also, he's had -- other family

8    members have received money; is that true?

9       A.   I did not provide anything for other family

10   members.  Unless that happened after my -- I had left

11   the Washington Field Office.

12      Q.   And, is it your testimony that all the

13   information provided by Junior has been truthful?

14      A.   I'm sorry.  What was that?

15      Q.   Has he ever lied to you?

16      A.   I'm not aware of him ever lying to me.

17      Q.   Has he ever lied to any agent within the FBI?

18      A.   I'm not aware of him -- (pause) --

19      Q.   Has he ever lied in court, to a federal court?

20      A.   I am not aware of -- of him ever lying in court.

21      Q.   And, he's received all of these payments,

22   approximately $44,000 or so, in cash; is that correct?

23      A.   That would be correct.

24      Q.   And --

25      A.   At least, I can speak for sure for the times that

1   I paid him, that it was all in -- all in cash.

2       Q.   And, is he paid per transaction, per piece of

3   information?

4            How is his pay scale?

5       A.   There's no such thing as a pay scale.  It's up to

6   the case handling agent on conducting the payments with

7   it.

8            For certain things for Junior, if it was

9   expenses, I wouldn't always do the paperwork to pay

10  right away.  I might let a month or so go and then give

11  him the sum to cover multiple expenses he incurred.

12           And the same thing with the services:  it would

13  just depend on the information provided and --

14  (pause) --

15      Q.   Okay.  Is there a range of payment for the

16  services?

17      A.   There are different thresholds in terms of

18  getting approvals to make the payments.  But, that is

19  the life of a source.  We have, like, ranges, if it's

20  from zero to, for example, a hundred thousand, then this

21  executive can make the approval.

22           If it's going go a hundred thousand to 200, then

23  a higher level executive approves the threshold with it.

24  But it always goes through your field office, the

25  executive in your local field office, to give the

```
 1   approval for the payment.
 2       Q.  It's fair to say the more information, the more
 3   you get paid, true?
 4       A.  Well, it depends on the information.
 5       Q.  Well, if you --
 6       A.  If the information is valuable, then, it does
 7   warrant.  You have to justify your payments with it.
 8   You can't just go out and say, "I have this source.  I
 9   want to pay them."
10       Q.  Well --
11       A.  You have to have a reason and justification.
12       Q.  But the -- and I appreciate that information.
13           But the payment scale depends on what you feel is
14   the importance of the information, true?
15       A.  Correct.
16       Q.  And, Junior is here illegally, true?
17       A.  I would have to -- I'm not sure if his deferred
18   action had gone through prior to leaving, as well as the
19   status of the S Visa.  I'm not exactly sure on that.
20       Q.  Before his deferred action -- because I'm going
21   to ask you about that -- but before his deferred action,
22   he is here illegally, true?
23       A.  He -- I had done deferred actions for him, so he
24   was here legally.
25       Q.  Prior to your filing deferred actions for him, he
```

1  was illegal, true?

2     A.   That, I'm not sure.  By the time I was operating

3  him, he was here legally.  I don't know prior to my

4  operating him.

5     Q.   You're saying he's here legally because the FBI

6  filed deferred actions for him, true?

7     A.   Correct.

8     Q.   Right.  So, prior to that time period he was here

9  illegally, true?

10    A.   He must have been.

11    Q.   Or there would be --

12    A.   No deferred --

13    Q.   -- no need for a deferred action, true?

14    A.   Right.

15    Q.   All right.  And the FBI or the United States

16  Attorney's Office hasn't tried to deport him, correct?

17    A.   I thought he was in some deportation proceedings

18  in Fairfax County.

19    Q.   When was that?

20    A.   I'm not exactly sure.  It was right around, I

21  think, the time that I was going through my transition

22  over to headquarters.  I know he was having court

23  appointments in Fairfax County for his --

24    Q.   So, that would be Two Thousand- --

25    A.   Fourteen.

1    Q.   So, in 2014, it's your testimony that he was
2    going through some type of deportation proceedings?
3    A.   I know he was going through some type of legal
4    proceedings with Fairfax County.   I thought it was
5    Fairfax County.
6    Q.   Legal proceedings with regard to his immigration,
7    or criminal proceedings?
8    A.   I thought it was related to his immigration
9    proceedings.
10   Q.   All right.   But he was under a deferred action
11   situation, correct?
12   A.   Correct.
13   Q.   In fact, the FBI, every year since 2005, has
14   filed a deferred action, significant public benefit,
15   parole each year, correct?
16   A.   Correct.
17        And I had --
18   Q.   And that's renewable each year --
19   A.   Correct.
20   Q.   -- is that right?
21   A.   Correct.
22        And I had submitted one prior to leaving, but as
23   soon as I left, it had not quite been approved yet.   So,
24   I know there was a period of time that it was in
25   transition from when the paperwork was submitted, and

1    I'm not exactly sure then, because I was no longer in

2    the Washington Field Office --

3        Q.   You haven't followed --

4        A.   -- when that got --

5        Q.   You haven't followed up --

6        A.   I --

7        Q.   -- to see whether he got the deferred action?

8        A.   I was no longer his case handling agent.

9        Q.   Do you have any knowledge that the deferred

10   action was granted?

11       A.   I have not asked that question.

12       Q.   I mean, he's still here in --

13       A.   Yes.

14       Q.   -- in the community, correct?

15       A.   Correct.  Uh-huh.

16       Q.   And these deferred actions, is this what's called

17   a U Visa?

18       A.   I don't know anything about a U Visa.

19       Q.   These deferred actions, that's something that you

20   prepared while you were handling him?

21       A.   Correct.

22       Q.   Okay.  So, there would be a statement from you

23   indicating that you wanted this individual kept under a

24   deferred action, true?

25       A.   Correct.

1    Q.   And, how many of those statements did you fill
2    out -- and did you sign these?
3    A.   Yes, I believe I am a signature on it.
4    Q.   Okay.  And how many of these did you prepare?
5    A.   I think approximately three or four of them.
6    Q.   Okay.  And each year they were granted?
7    A.   Yes -- well, except for the last one I had done
8    prior to leaving.  I'm not -- I'm not sure of the status
9    of that one.
10   Q.   And, now, you are assisting him -- or had
11   assisted him in trying to get an S Visa; is that
12   correct?
13   A.   I had created the paperwork, correct.
14   Q.   And, again, that's something that you would
15   prepare and you would sign off on?
16   A.   I don't think I am an S Visa signature.  I think
17   that's higher up in the field office.  I'd have to go
18   back and look at the paperwork.
19   Q.   So, you would prepare the S Visa and then
20   somebody else would sign off on it?
21   A.   Correct.  There's just levels of management
22   within your local field office, as well as the U.S.
23   Attorney's Office, that sign off on the S Visa
24   application.
25   Q.   And, Agent, I believe it was your testimony that

1    Junior moved up from homeboy to clique leader in 2013;
2    is that correct?
3        A.   I thought it was 2014.
4        Q.   Okay.  2014.
5             And -- but, I think what you're telling the jury
6    is that you have no idea what criminal act he committed
7    to make that move.  Is that what you're telling us?
8        A.   I do not believe he committed any criminal act,
9    not to my knowledge.
10       Q.   So, he was able to move up from homeboy to clique
11   leader without any criminal act; is that what you're
12   saying?
13       A.   To my knowledge.
14       Q.   Ma'am, isn't it true that individuals within
15   MS-13 move up through acts of violence?
16       A.   I'm not exactly sure how members move up.
17       Q.   And, you have no knowledge of Junior committing
18   any criminal offense, other than this possession of
19   marijuana?
20       A.   Just the ones that we authorized him to engage
21   in, as well.
22       Q.   Collection of rents from a brothel?
23       A.   I believe that was one that we authorized.
24       Q.   How much money did he receive based upon that?
25       A.   I don't remember, sir.

Q.   How much money did he extort?

A.   To my knowledge, he wasn't the one that had done the extortion.  I thought that transaction had already been set up, and he was just assisting somebody in the collection.

Q.   How much was collected?

A.   I don't remember, sir.

Q.   You only have direct contact with him about every 90 days; is that fair to say?

A.   Well, that's the requirement, is at a minimum of 90 days.  During --

Q.   There's some --

A.   I'm sorry.

Q.   There's some time periods where, obviously, you don't have any contact with him, correct?

A.   There were some time periods that I did not, that is correct.

Q.   And you're relying on him to be truthful when he speaks to you about what's going on in his life, true?

A.   That is correct.

Q.   This operation that you talked about involving Leopardo, fair to say that Junior knew that this was going to be recorded, true?

A.   Correct, yes, he did know.  He had to consent to it.

1    Q.   And, he also knew that this was going to be

2    videotaped in some regard, true?

3    A.   I'm not exactly sure if he knew that the device

4    we were using was both audio and video.  I think he did,

5    yes, on that one.

6    Q.   So, he knew that the FBI was watching, correct?

7    A.   Correct.

8    Q.   All right.  And, even while the FBI is watching,

9    he still broke the law and possessed marijuana, true?

10   A.   At the time that he showed up with the marijuana,

11   He was not being recorded.

12   Q.   During the operation he possessed marijuana,

13   correct?

14   A.   No, not during the operation.  When he arrived --

15   when he arrived at our meet to --

16   Q.   So, Junior is meeting with the FBI --

17   A.   Correct.

18   Q.   -- knowing that the FBI is going to be there and

19   observe the operation, and he is breaking the law, true?

20   A.   Correct.

21   Q.   Did that give you any concern, that when he

22   wasn't being watched he was out committing crimes of

23   violence?

24   A.   No, it did not.

25   Q.   What was the penalty for his breaking the law

1    that day while you guys were watching?

2       A.  We removed the -- we took the joint from him,

3    and -- because I could not get authorization for him,

4    and that was disposed.

5       Q.  So, removing the -- removing the marijuana was

6    his penalty?

7       A.  And then, there's other procedures we go through

8    when we have unauthorized illegal activity, and I

9    followed those processes.

10      Q.  Was his deferred action visa taken from him?

11      A.  No, it was not.

12      Q.  Okay.  Was his application for an S Visa

13   infringed or slowed down in any way?

14      A.  No, it was not.

15      Q.  All right.  So, the only real penalty was that

16   you took away the illegal narcotic, true?

17      A.  Correct.

18      Q.  Ma'am, did you have any knowledge that Junior had

19   committed a robbery during the time period that you were

20   working with him?

21      A.  No, I did not.

22      Q.  Did you have any idea that he committed a robbery

23   of rings, chains and jewelry?

24      A.  No, I'm not aware of any of that.

25      Q.  Did he ever tell you about anything like that?

1      A.    No, he did not.

2      Q.    Did he ever tell you that he threatened, during

3   this robbery, to cut somebody's finger off?

4      A.    No, I never heard any of that.

5      Q.    And that the victim was crying and begging for

6   his finger not to be cut off?

7      A.    I did not hear any of that.

8      Q.    Did he ever tell you that he had -- to my client,

9   Leopardo, as you've identified him, that he, Junior,

10  wanted to kill another person?

11     A.    I'm not aware of any of that.

12     Q.    Nothing like that?

13     A.    No.

14     Q.    Are you aware that Junior told my client, during

15  this operation, that he wanted to kill another person

16  and bury that person?

17     A.    I'm not aware of any of that, to the best of my

18  memory, no.  I don't remember that.

19     Q.    Nothing like that?

20     A.    No, sir.

21     Q.    When you gave Junior these admonishments before

22  an operation like that, are you asking him to ask

23  questions in a certain way of the person that he's

24  dealing with?

25     A.    No.

1    Q.   All right.  Do you ask him to ask open-ended
2    questions or --
3    A.   No, I do not.
4    Q.   -- something like that?
5    A.   No, sir.
6            MR. SALVATO:  That's all the questions I
7    have, Your Honor.  Thank you.
8                        CROSS-EXAMINATION
9    BY MR. CHICK:
10   Q.   Good morning, Agent Born.  How are you?
11   A.   Good morning, sir.
12   Q.   My name is Mike Chick.  I'm the attorney for
13   Mr. Manuel Ernesto Paiz Guevara.
14   A.   Yes, sir.
15   Q.   So, you said that -- that Junior had started
16   working since 2005, right?
17   A.   Correct.
18   Q.   But, you -- you weren't working with him during
19   that initial period?
20   A.   I assisted on some operations where he was a part
21   of it, but I had -- I was not his case handling agent
22   during that timeframe.
23   Q.   Okay.  And then -- but in 2009 you started
24   working with him, and that was on cases other than this
25   case, right?

1    A.   Correct.

2    Q.   Okay.  And, then at some point, you started -- he

3    started working with you on this particular case?

4    A.   Correct.

5    Q.   Okay.  And, then, so you're -- and it sounds like

6    from your direct testimony and some of the

7    cross-examination that you're familiar -- familiar with

8    this case?

9    A.   I am, yes.  But I don't have, you know, intricate

10   details -- know the intricate details of this

11   investigation.

12   Q.   Okay.  Do you give him specific assignments for

13   this case?

14   A.   For this one, I did not give him specific

15   assignments.  He would have his conversations and report

16   to me the conversations, and let me know what types of

17   activities that were being requested.

18        And then, in consulting with the violent gang

19   squad, would determine which ones we would want him to

20   participate in.

21   Q.   So, what about conversations -- you said telling

22   him to have conversations with people.  Do you say,

23   "Hey, you know, go have a conversation with" this person

24   or that person, or "have a call with" so and so?

25   A.   No, I would not.

1    Q.   Okay.  He just -- he just sort of does that based

2    on his understanding of who's -- who are the people to

3    talk to?

4    A.   Correct.

5    Q.   Okay.  And, you guys trust his knowledge of who

6    are the important people to talk to?

7    A.   Correct.

8    Q.   Okay.  And, as -- as his handler, you're familiar

9    with the people he's talking to, right?

10   A.   The names would sound familiar, yes.

11   Q.   Okay.  Um -- and you've referred to some of the

12   names here today already.  You referred to the name

13   Leopardo.

14   A.   Correct.

15   Q.   You referred to Payaso.

16   A.   Correct.

17   Q.   And he talked with a bunch of other people whose

18   names you would remember, too, right?

19   A.   Yes.

20   Q.   Could I just get you a little bit more --

21   A.   Oh, I'm sorry.

22   Q.   -- in the microphone.

23   A.   Yes, sir.

24   Q.   Just so it helps her out a little bit, and

25   everybody.

1          So, let me ask you about the name Solitario.  Do

2    you remember him talking over the phone with anybody

3    named Solitario?

4          A.   That name does sound familiar.

5          Q.   Okay.  What specifically do you remember about

6    any conversations he had with that person?

7          A.   I don't remember the exact conversations, but I

8    know he did engage in conversations with somebody with

9    that name.  I don't know if that's their real name or

10   their nickname.

11         Q.   Okay.  You don't remember any specifics of any

12   conversations he had with that person?

13         A.   Not with that one, no.

14         Q.   Okay.  So -- but you're saying you know he had

15   recorded conversations with that person?

16         A.   I don't know if they were recorded at the time,

17   but I know he -- that name does sound familiar.

18         Q.   Okay.  Fair to say that the juicy stuff, you

19   remember those names, right?

20         A.   I know the ones involved with like the murders,

21   correct.

22         Q.   Okay.  But, you don't recall anything specific

23   with his name?

24         A.   The name sounds familiar, but I don't recall any

25   of the exact conversations.

1    Q.   Okay.  He was never specifically told to have

2    phone conversations with Solitario, or anything like

3    that?

4    A.   Not that I can remember.

5    Q.   Okay.  And, he was doing these calls for ten

6    months, right?

7    A.   For --

8    Q.   For --

9    A.   On the -- yes -- for the wire?

10   Q.   Correct?

11   A.   I'm sorry.  Pardon me?

12   Q.   He was -- he was having these phone calls and

13   meeting up with these guys and getting that information

14   on this case for -- for ten months, right?

15   A.   Correct.

16   Q.   Okay.

17            THE COURT:  Counsel, we'll take the morning

18   recess now for 15 minutes.  Thank you.

19            MR. CHICK:  Yes, sir.

20            (Court recessed at 11:31 a.m. and reconvened

21            at 11:46 a.m.)

22            (Jury not present.)

23            MR. AMOLSCH:  Your Honor, I have -- before

24   you bring the jury out, I would just like to make

25   another objection.

 1            The government, and Mr. Chick's

 2   cross-examination of the witness -- I'm sorry, Judge.

 3   Could we excuse the witness before I make my objection?

 4   I'm sorry.

 5            THE COURT:  If you could step outside for

 6   just a moment, please.  Thank you.

 7            (Thereupon, the witness withdrew from the

 8   stand.)

 9            MR. AMOLSCH:  Thank you, Judge.

10            Just for the record, when Mr. Chick was

11   cross-examining the government agent, they were talking

12   about the phone calls that were made and who they

13   recorded.  And her testimony was that they only recorded

14   the people who participated in the murders.

15            And we're going to hear extensive testimony

16   from the government and from Junior about his recordings

17   of Mr. Cerna, regarding taking to the grave sites.  We

18   have now heard twice, from the same witness, my memory,

19   regarding the burial of the body, not the reburial --

20   which Your Honor has already ruled on -- and again, that

21   the only people she -- that Junior recorded were the

22   people who participated in the murders.

23            Again, we're talking plural, not singular.

24   I just want to make objection again for the record,

25   Judge.

| | |
|---|---|
| 1 | THE COURT:  All right.  So noted. |
| 2 | MR. AMOLSCH:  Thank you, Judge. |
| 3 | THE COURT:  Bring the witness back now. |
| 4 | (Witness resumed stand.) |
| 5 | THE COURT:  You can bring our jury out, |
| 6 | Mr. Toliver.  Thank you. |
| 7 | (Jury present at 11:48 a.m.) |
| 8 | THE COURT:  You may be seated.  Thank you. |
| 9 | All right, Counsel, you may proceed. |
| 10 | MR. CHICK:  Thank you, Your Honor. |
| 11 | CROSS-EXAMINATION (Continued) |
| 12 | BY MR. CHICK: |
| 13 | Q.  Agent Born, you said that the names that you |
| 14 | remember are the names that came up during -- during |
| 15 | discussions about one murder or the other, right? |
| 16 | A.  Correct. |
| 17 | Q.  Okay.  And, I just want to make sure, you learned |
| 18 | about the murder of Little -- Lil Guasón, correct? |
| 19 | A.  Correct. |
| 20 | Q.  That's Gerson Aguilar Martinez? |
| 21 | A.  That's his real -- I'm not sure.  I know him by |
| 22 | Little Guasón. |
| 23 | Q.  Okay.  But, you got information about that |
| 24 | murder, correct? |
| 25 | A.  Correct. |

B. Born - Cross                                                    87

1    Q.   Okay.  And, you didn't hear anything about

2    Solitario with respect to that murder.

3    A.   I -- I don't remember.

4    Q.   Okay.  But, you said you would remember the names

5    that were --

6    A.   I remember the name being familiar as

7    communicating with my source, Junior, yes.

8    Q.   Okay.  The name -- just to follow up on that, you

9    say you remember your source, Junior, you know that he

10   had conversations with Solitario.

11   A.   I believe so, yes.

12   Q.   Are you able right now, since you don't have your

13   notes and you haven't looked at them in a while -- are

14   you able to tell whether your memory of that is about

15   him having conversations about Solitario, or about him

16   having conversations with Solitario?

17   A.   I'd have to reference my notes.

18   Q.   Okay.  Not quite sure?

19   A.   Not quite sure.

20   Q.   Okay.  That's fair.  And, you also talked to

21   Junior.  He would recount to you multiple times about

22   different -- different acts of violence that he heard

23   about, right?

24   A.   Correct.

25   Q.   Not just -- not just these murders, but all kinds

1    of other stuff, right?

2        A.   Correct.

3        Q.   And, what do you remember about Solitario with

4    respect to that stuff?

5        A.   I don't remember -- I don't remember.

6        Q.   Okay.  You talked to him about a guy named

7    Skinny, right?

8        A.   Skinny sounds familiar.

9        Q.   Okay.

10       A.   But I can't place the context of it.

11       Q.   Okay.  Do you remember a conversation you had

12   with him about a guy named Skinny and a shooting that

13   would have happened in late December of 2013,

14   December 21, 2013?

15       A.   I remember a shooting, but I don't remember if

16   Skinny's name was associated with that one or not.  I

17   don't --

18       Q.   Okay.

19       A.   I'd have to check my notes.

20       Q.   If you saw an e-mail that you sent, would that

21   refresh your recollection?

22       A.   If I had wrote an e-mail, yes.

23            MR. CHICK:  Your Honor, permission to show a

24   writing to -- to the witness.

25            THE COURT:  All right.

1          (Document tendered.)

2          THE WITNESS:  Yes, that's from me.

3     BY MR. CHICK:

4       Q.   Okay.  Now, I'm going to ask you -- I'm not

5     asking you what the writing says --

6       A.   Okay.

7       Q.   -- but I'm asking you, does that refresh your

8     recollection about whether you heard about a person

9     named Skinny who was involved in a shooting from

10    December 21st of 2013?

11      A.   I'm not exactly sure if December 21st would have

12    been the date of the shooting.  That's the day before

13    this e-mail.  I guess -- "last night," I guess that

14    would be correct, then.

15      Q.   Okay.  Do you ever recall Junior telling you

16    whether he -- Junior told you that he heard Skinny was

17    part of that shooting, right?

18      A.   Correct.

19      Q.   Did he ever tell you that Solitario was part of

20    that?

21      A.   I don't -- it's -- it does not -- according this

22    e-mail, there is nothing in there about Solitario.

23      Q.   Okay.

24          MR. CHICK:  I'll take that back.

25

BY MR. CHICK:

Q.   Agent Born, do you -- when did you stop working on this case, again?

A.   Um, well, I stop handling Junior.  I wasn't the case agent on the actual investigation file.  I was the handling case agent for Junior.  And, I moved to headquarters in September of 2014.

Q.   Okay.  And, who -- who handles Junior now?  Do you know?

A.   I believe Special Agent Fernando Uribe.

Q.   Okay.  He's -- he's the person that took over for you?

A.   Correct.  I believe so, yes.  I'd have to defer to the squad, to see who they assigned him to, but I believe that's correct.

Q.   Gotcha.

MR. CHICK:  I don't have any further questions.  Thank you very much.

THE WITNESS:  You're welcome.

THE COURT:  Redirect.

MS. MARTINEZ:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. MARTINEZ:

Q.   There were a lot of questions on cross-examination about authorizations given to Junior

1   related to illegal activity.

2       A.   Correct.

3       Q.   When Junior was authorized to conduct illegal

4   activity, was that a blanket authorization or specific

5   to a particular act?

6       A.   His authorization was to be involved in gang

7   discussions.  So, that was -- was -- I'd consider that

8   blanket.

9       Q.   And the blanket authorization for gang

10  discussions, did that go beyond discussions?

11      A.   And to be -- to be involved in; so he could

12  attend meetings.

13      Q.   And so, in addition to discussions and meetings,

14  was there a blanket authorization?

15      A.   I would say -- I'm sorry.  What was that?

16      Q.   Let's talk specifically about -- there were

17  questions about narcotics activities, for example.

18      A.   Right.

19      Q.   Did Junior have a blanket authorization to engage

20  in illegal narcotics activities?

21      A.   No, he did not.

22      Q.   Was there ever a specific authorization for

23  specific conduct related to narcotics?

24      A.   Specifically related to narcotics?  Not that I'm

25  aware of.  The only time, I think, involving narcotics

1   was when he brought that joint and we didn't have

2   authorization for that.

3       Q.   There was also a question about, something about

4   rent and a brothel.  Did Junior have a blanket

5   authorization to engage -- let's start with

6   prostitution -- to engage in prostitution?

7       A.   No, he did not.

8       Q.   Was he given a blanket authorization to run a

9   brothel?

10      A.   No, he was not.

11      Q.   How about a blanket authorization to collect rent

12  from a brothel?

13      A.   No, he was not.

14      Q.   Tell the jury about the specific instance that

15  was asked about on cross-examination involving a brothel

16  and rent.

17      A.   That one, he would have -- we would have got

18  specific authorization for him to participate in that

19  event.

20      Q.   In advance or after the event?

21      A.   In advance.

22      Q.   Why?

23      A.   Because we knew -- we knew about it.  So, I

24  always got authorization prior to any of the activities.

25  Before they were -- before any illegal activity was

1   conducted, I always got authorization.

2       Q.   What's the -- what's the purpose of getting the

3   authorization prior to the actual illegal activity?

4       A.   Getting -- obtaining the proper approvals.

5       Q.   In the instance with the rent and the brothel,

6   Mr. Salvato asked:  How much money did Junior receive?

7   Was Junior allowed to profit from this particular

8   illegal activity?

9       A.   No, he was not.

10      Q.   What happened to the money?

11      A.   If I remember correctly -- and I'd to refresh

12  my -- from my notes -- but I believe he, with the person

13  he assisted, they then took it to another separate

14  location.

15      Q.   In instances in which Junior had any involvement

16  with money and any gang or illegal activity, what was

17  the policy and procedure with respect to that money?

18      A.   With anything that he got for money, he would

19  have been required to turn it in to the FBI.

20      Q.   To your knowledge, is that what he did?

21      A.   To my knowledge, yes.  I don't recall any of the

22  times that he obtained any money, that he, like, was --

23  took home with him.  He -- I don't recall any of those

24  events.

25      Q.   When he obtained money and provided it to the

1    FBI, when would he provide it to the FBI?

2        A.   Usually, after -- after every operation that we

3    conducted with him, we would do a debrief in a secure

4    location, where he would provide whatever items he would

5    have obtained at that particular operation.

6            Like, for example, when he got the gun, then he

7    provided the gun, then, immediately afterwards.

8        Q.   You were asked questions about communicating with

9    Junior on his personal cellphone as opposed to the FBI

10   phone on which there was a consensual wire.  What was

11   the purpose of permitting Junior to communicate with you

12   on the personal cellphone?

13       A.   I allowed him to communicate with me on his

14   personal phone because I knew I was documenting

15   everything and putting it into the case file as to what

16   he was telling me, and then the -- the Washington Field

17   Office violent gang squad would be able to look at what

18   he was telling me and compare it to whatever was

19   appearing on the FBI recorded phone call.

20       Q.   Speaking of the FBI recorded phone call, on the

21   FBI phone with the consensual wire, was every single

22   phone call recorded?

23       A.   If it was made on that phone, it was recorded.

24       Q.   And on that phone, did Junior have any ability to

25   pick and choose which call was recorded or not recorded?

1    A.   On the FBI phone, he did not.

2    Q.   During the time period of this investigation,

3    when the consensual wire was on that FBI phone, were

4    there lengthy periods of time in which you had no

5    contact with Junior?

6    A.   No, there were not.

7    Q.   How often were you talking to Junior during the

8    period of time that he was using that phone with the

9    consensual wire?

10   A.   During that timeframe, probably almost every day.

11   Q.   You've talked about operations in which Junior

12   went in with a body wire to record audio or video.  Were

13   you involved in every single operation that Junior was

14   involved in?

15   A.   No, I was not.  I was aware of them but I was not

16   involved.

17   Q.   In operations in which you were involved, were

18   you the only FBI agent or were other FBI agents involved

19   as well?

20   A.   There were multiple FBI agents involved.

21   Q.   And in operations in which you were aware, but

22   you weren't involved, were there FBI agents involved?

23   A.   There would have been multiple FBI agents

24   involved.

25   Q.   And in those operations, was Junior permitted to

1    have contact with the other FBI agents?

2        A.   Yes, he was, during those operations.

3        Q.   Now, you were asked a lot of questions about the

4    marijuana that Junior had on May 15, 2014.  First of

5    all, how much marijuana was it?

6        A.   It was one joint.

7        Q.   How did you find out that he had a joint?

8        A.   He told me.

9        Q.   When did he tell you?

10       A.   When he arrived at our meet location.

11       Q.   What happened to the marijuana after he told you

12   that he had the one joint when he arrived?

13       A.   I tried to get authorization to allow him to

14   provide it to Leopardo, but, I was not able to reach

15   anybody that could give me authorization.  So, the joint

16   was seized and disposed of.

17       Q.   Once this one joint was seized and disposed of,

18   why didn't you stop the entire operation?

19       A.   To be honest, I didn't even think about it.  It

20   didn't seem like it warranted -- we were there for a

21   specific operation where Junior was meeting Leopardo to

22   locate the possible burial locations of two young men.

23   It didn't cross my mind for one joint to halt the

24   operation or suggest it.

25           But I did follow proper procedures, according to

1    FBI guidelines, on recording the unlawful illegal

2    activity, unauthorized illegal activity.

3              MS. MARTINEZ:  Thank you.  No further

4    questions.

5              THE COURT:  May the witness be excused?

6              (No audible response.)

7              THE COURT:  You're free to leave.  Thank you

8    very much.

9              (Thereupon, the witness withdrew from the

10   stand.)

11             MS. AUSTIN:  Your Honor, if we could request

12   on Agent Born, please.

13             THE COURT:  Reserve recall?

14             MS. AUSTIN:  Yes.

15             THE COURT:  Okay.  We will make her

16   available for recall, if necessary.  Thank you.

17             MS. MARTINEZ:  Your Honor, I apologize for

18   not doing this at the break, but prior to the next

19   witness, may we take up one very short issue outside the

20   presence of the jury?

21             THE COURT:  All right.

22             Ladies and gentlemen, we will have you go

23   out for just a moment.  Recess for just a moment.  Thank

24   you.

25             (Jury not present.)

1      THE COURT:  You may be seated.

2      MS. MARTINEZ:  Your Honor, during the next

3  witness, the next witness will use the two pseudonyms,

4  homeboy two and homeboy three.  We would ask that you

5  instruct the jury, at the Court's -- whenever the Court

6  wishes, either before the testimony or perhaps when the

7  witness gets to that point in the testimony, simply that

8  the use of those two pseudonyms is permitted and

9  authorized by the Court.  I don't think any further

10  instruction is necessary.

11      In addition, Your Honor, the next witness

12  will involve transcripts, which have been redacted

13  according to Your Honor's orders, and also some

14  agreement with -- with defense counsel.

15      Those redactions include, of course, the

16  "verbatim" on the front.  But more importantly, there

17  are substantive reductions throughout the transcripts,

18  either in compliance with Your Honor's orders or, in

19  some instances, where defense counsel and the government

20  have agreed that -- that there is no reason that

21  particular things need to be in the transcripts -- the

22  government has agreed to redact.

23      So, when we get to the transcripts or at the

24  beginning of the witness, as Your Honor prefers, we

25  would ask that the jury be instructed that they should

simply -- they should take -- make no inference from the fact that there are redactions in the transcripts.

THE COURT:  All right.

MR. CRAWLEY:  Court's indulgence, Your Honor.

THE COURT:  Same motion, now or later?

MR. AMOLSCH:  Regarding --

THE COURT:  The instruction.

MR. AMOLSCH:  Whatever the Court desires.

THE COURT:  Let's do it now, so we can keep going.

MR. AMOLSCH:  Thank you, Judge.

MR. CRAWLEY:  May I approach the government for one second, Your Honor?

THE COURT:  Yes, uh-huh.

MR. AMOLSCH:  Your Honor --

THE COURT:  Mr. Amolsch, tell me the purpose of instructing the jury now.  What would be the purpose of it?

MR. AMOLSCH:  The purpose of the timing or the purpose of the instructions?

THE COURT:  Both.

MR. AMOLSCH:  Okay.  This is similar, I think, Judge, to a 404(b) issue, where the government is going to present evidence that Mr. Cerna participated in

1   the reburial of Trujillo, after his murder.

2           And we believe, Judge, that, one, that is,

3   one, a criminal act, one of the other co-defendants was

4   charged with moving the body afterwards.  It's another

5   bad act.

6           I believe -- I'm not sure -- maybe it was --

7   I'm not sure who was indicted on that, but one of the

8   co-defendants is charged with that particular crime.

9   Mr. Benitez, actually, ha been indicted with that

10  particular charge, Judge.  So, that is technically a bad

11  act as well.

12          And our -- our entire concern regarding the

13  Court allowing the testimony as it relates to

14  Mr. Cerna's participation in the Trujillo incident is

15  that that will necessarily bleed over into the

16  government's evidence as it relates to his participation

17  in the murder of Mr. Aguilar.

18          So, it is very akin to, if not identical to,

19  a 404(b) issue from a bad acts point of view.  And while

20  Your Honor has ruled that there's nothing impermissible

21  about the government introducing evidence relating to

22  the reburial, our position is that while the Court has

23  allowed that -- and we don't think it should be allowed

24  at all -- that to prevent any bleed-over effect from the

25  jury taking that evidence that he participated in the

reburial of Trujillo only days after his murder, that if
he -- that he had some connection with the Trujillo
murder, that he -- that they shouldn't consider that as
evidence that he also participated in the Aguilar
murder, especially given the similarity of the conduct.

In the case there is a reburial.  He is
taken to the grave -- to the two grave sites.  This
witness -- I have already objected twice, Judge,
regarding how I think they are mixing and matching the
two murders.

I think -- I've made mistrial motions, which
Your Honor has denied.  I think this is a real concern.
And so, at a minimum, I believe Your Honor should
instruct the jury that when they're hearing evidence
about Mr. Cerna's alleged participation in the reburial
of Trujillo, that is not at all evidence that he
participated in the murder of Trujillo, nor should it be
considered as evidence that he participated in any other
crime, especially given that Mr. Benitez has been
indicted and charged with the reburying Mr. Trujillo,
and Mr. Cerna has not.

It's a productive instruction, Judge.  I
think it keeps the record as clean as it can be right
now regarding the charge for which Mr. Cerna is charged,
the evidence that he will be facing relating to that

1   particular charge.

2            But, it's in- -- inflammatory stuff, Judge.

3   I mean, you know, you're going to hear about, I would

4   imagine, I don't know all the government's proof, but

5   we're going to hear about the state of the body when it

6   was removed from the grave.

7            We're going to hear about how Mr. Cerna, I

8   think, was able to identify how he was killed, which we

9   believe indicates that he actually participated in the

10  murder.  How else could he know that.

11           But even --

12           THE COURT:  He can know that because he's a

13  gang member.

14           MR. AMOLSCH:  Exactly.  I understand.  But

15  this is -- I'm just articulating my concern.

16           THE COURT:  I understand.

17           MR. AMOLSCH:  I'm not -- I'm not asking Your

18  Honor to reconsider that.

19           But, given the inflammatory nature of that,

20  and -- I believe there's a real concern the jury will

21  just hear that and automatically assume the similarity

22  of conduct, in and of itself, will say that Mr. Cerna is

23  a bad guy, he is participating in the reburial.  He

24  seems to be enjoying it or laughing or however it is

25  they characterize his behavior during that, that they're

going to assume, unfairly, that if he was doing this and part of this, that it is a foregone conclusion, or at least more likely than not, or evidence, that he also participated in the Aguilar murder.

So, what I'm asking the Court to do is simply instruct them that that's the reason that the evidence is being introduced.

Your Honor articulated those reasons in your order.  I took that language right from your order.  Your Honor again repeated it.  It's a standard 404(b) instruction, Judge.  I took it right from either the Fifth Circuit or the Fourth Circuit or the Third Circuit pattern instructions, and I modified it a little bit to the terms of this -- of this case.

But I think it's important, Judge.  I mean, the witnesses are, again, already messing this up.  We had the issue with Mr. Cerritos on homeboy one.  Now we're on homeboy two and three.  The jury needs to be instructed on why this evidence is being admitted, and the permissible purposes for which it can consider that evidence.

THE COURT:  Should I do it now or should I do it at the end of the trial, when they are going to be given an instruction to consider the evidence separately as to each individual, and they are going to be given a

1   verdict form that only has one offense, and they're not
2   to be charged with looking at any other offenses that
3   there might be, except those in the indictment?  What
4   about that?
5            MR. AMOLSCH:  If I have to choose one or the
6   other, I would prefer it now.  But I would suggest that
7   there is no harm in giving it twice; instruct the jury
8   as they hear this witness that that's the reason they
9   can consider it, and that's it.
10           And then you can again instruct the jury at
11  the end, when they're looking at a verdict form, that --
12  I don't think there's any harm, quite honestly, in doing
13  it twice.  But if Your Honor is making me choose one,
14  then I would -- I would suggest we do it now.
15           THE COURT:  All right.
16           Government counsel.
17           MS. MARTINEZ:  Your Honor, unlike defense
18  counsel, we're not actively checking our e-mails during
19  trial, and apparently this is something that was
20  provided by e-mail to us while we've been sitting here
21  in the courtroom, so, we haven't seen it.
22           THE COURT:  I see.  Well, we'll take it up
23  later then.
24           MR. AMOLSCH:  I have a copy that I can show
25  to her right now.

1          THE COURT:  Well, I mean, I want to give her

2   a chance to look -- and co-counsel to look it over.

3          MS. MARTINEZ:  I can -- I'm not sure I can

4   respond to the instruction, Your Honor, because I'd like

5   to look at that closely.

6          But I can respond to -- very briefly to the

7   rest of what Mr. Salvato said, if it would be helpful.

8   Otherwise, we can take it up later, however Your

9   Honor prefers.

10          THE COURT:  Take it up later.  I don't want

11   to complicate things more than they need to be.

12          MR. CRAWLEY:  I still need a moment, Your

13   Honor, because I haven't had a chance to talk to them

14   about my situation.

15          MS. MARTINEZ:  Your Honor, for the record,

16   Mr. Salvato -- there's no -- no ill will here.

17   Mr. Salvato wasn't trying to pull --

18          THE COURT:  I didn't think that.

19          MS. MARTINEZ:  -- a fast one on us.

20          THE COURT:  I didn't think that at all.

21          MS. MARTINEZ:  Thank you, Your Honor.

22          (Pause.)

23          MS. MARTINEZ:  Your Honor, I believe that

24   Mr. Crawley wants me to put on the record that our

25   understanding is that this witness will use the

1  pseudonyms, homeboy two and homeboy three, to reference

2  Lemus Cerna and Duran Cerritos, to the extent that this

3  witness talks about the involvement of those two

4  defendants in the murder of Nelson Omar Quintanilla

5  Trujillo, AKA Lagrima.

6         The government's understanding is that the

7  witness will not use a pseudonym for Mr. Crawley's

8  client, other than in the context of that murder.

9         And, Your Honor, in an abundance of

10 caution -- Mr. Crawley seems very concerned about this.

11 This is not a cooperating defendant.  This individual is

12 not in custody.

13         But, perhaps, as we had suggested with the

14 cooperating defendants who are in custody, perhaps we

15 should recess briefly so that we can go over just that

16 instruction with this witness, and be as sure as we can

17 be before he gets on the stand that he understands the

18 scope of the pseudonyms.

19         We've done that previously --

20         THE COURT:  Okay.

21         MS. MARTINEZ:  -- but Mr. Crawley is

22 concerned, and we have no objection to that if Your

23 Honor will permit it.

24         THE COURT:  All right.  Okay.  We will take

25 a brief recess.  Let me know when you're ready.

1            (Court recessed at 12:11 p.m. and reconvened

2            at 12:30 p.m.)

3            (Jury not present.)

4            MR. AMOLSCH:  Judge, I'm sorry.  One

5  quick -- for the record.  When Your Honor ruled on the

6  motion for -- Mr. Zimmerman's motion for severance, the

7  other defense counsel informed Your Honor, and Your

8  Honor allowed them to, basically, on cross-examination

9  of Junior, or whoever, say, "My client is not homeboy

10  two," "My client is not homeboy three," or "My client is

11  not homeboy two."

12            I expect all of them will do that at some

13  point, at which point, again, it will be overwhelmingly

14  obvious who the other homeboys are.  So, again, I'm just

15  going to object to that instruction, Judge.

16            The "homeboy," as you have now heard,

17  carries with it special significance.  It's someone who

18  is a gang member, not somebody who just happened to be

19  present at the murder.

20            The evidence will be that PVLS committed the

21  murder.  There is only six or five members of PVLS at

22  this point.

23            I understand your Court's ruling.  Again, I

24  would just ask for the Court to instruct them, "Others,"

25  not "homeboy two," "homeboy three."  I just wanted to

1   put that on the record, Judge.

2          THE COURT:  All right.  Motion denied.

3          MS. MARTINEZ:  Your Honor, may I respond

4   briefly to that?

5          I didn't understand that all of the other

6   defense attorneys were going to stand up and say, "My

7   client is not homeboy two," "My client is not homeboy

8   three," "My client is not homeboy two," "My client is

9   not homeboy three."

10         Your Honor, I would suggest that that's not

11   necessary, and that Your Honor not permit those

12   cross-examination questions, which may essentially

13   involve one defense counsel trying to imply to the jury

14   that -- Mr. Crawley's -- or Mr. Salvato's client is

15   homeboy two or homeboy three.

16         I don't think it's necessary to ask those

17   questions, and I do think that that could introduce some

18   confusion or some prejudice because, of course,

19   Mr. Crawley, Mr. Conte, Mr. Salvato, won't stand up and

20   ask that exact same question.

21         MR. JENKINS:  Your Honor, it won't be an

22   issue for Mr. Lopez Torres.  I suspect that the witness

23   is going to identify him by name --

24         THE COURT:  Okay.

25         MR. JENKINS:  -- as being a participant.

1           THE COURT:  All right.

2           MR. CONTE:  Your Honor, Mr. Cerritos joins

3   the motion of Mr. Amolsch, for the record.

4           THE COURT:  You join the motion of what?

5           MR. CONTE:  Of Mr. Christopher Amolsch.

6           THE COURT:  Of Mr. Amolsch?  Okay.  Thank

7   you.

8           MR. ZIMMERMAN:  Your Honor, if I might be

9   heard.

10          Mr. Amolsch was referring to my motion for

11  severance.  This was the motion for severance I made

12  after the Fourth Circuit ruling came down and the Court

13  dismissed, I believe it was Count 4 as to Mr. Cerritos,

14  that I said -- that I thought at that point separate

15  trials would be necessary, because of all the possible

16  prejudice.  Mr. Benitez is not charged with the Lagrima

17  murder, but he is charged with the reburial.

18          And in order to make this clear, in order to

19  elicit that he wasn't there and to avoid all of the

20  prejudice and the smearing and, frankly, a lot of stuff

21  that Mr. Amolsch talked about, from negatively impacting

22  Mr. Benitez, that separate trials would be -- would be

23  necessary.

24          And the Court ruled that they wouldn't be

25  because there wouldn't be any issue with us eliciting

from the witnesses that Mr. Gaitan Benitez is not homeboy three and is not homeboy four.

Again, because of the similarities and because of the, um, possible prejudice, that's an issue.

And, there's actually a further important exculpatory issue, in that there is -- there is evidence that Mr. Benitez actually falsely implicated himself in the Lagrima murder, which is critical to the defense, that they are blustering.

So, it is critical for us to establish, as a good example of blustering, that he is not homeboy two and homeboy three.

And again, it was my understanding, from the denial of that motion for severance that was made orally, that we wouldn't have any difficulty in eliciting this testimony, that the Court's rulings with regard to these redactions and everything going off with -- going on with Cerritos and Cerna would not impact our ability to ask those questions.

And, it's critical for us -- we don't have any objection to, um, to the designation of -- instead of "homeboy two" or "homeboy three" as "others" or "persons."  I think that could possibly provide less prejudice to, um, to Cerna and Cerritos.

But regardless of whatever the moniker is,

we believe it's critical to the defense that we be
allowed to elicit that testimony.

THE COURT:  I don't think I made any ruling
that you couldn't ask that question, did I?

MR. ZIMMERMAN:  No, you didn't.

THE COURT:  All right.

MR. ZIMMERMAN:  You specifically ruled that
we could ask that question --

THE COURT:  All right.

MR. ZIMMERMAN:  -- in denying the motion for
severance.

THE COURT:  Okay.

MR. ZIMMERMAN:  Thank you, Judge.

THE COURT:  Is there something you need from
me?  Is that it?

MR. ZIMMERMAN:  I just wanted to make that
record and clarify that, in --

THE COURT:  I think that -- you know, I
don't want to say "over-thinking it."  I mean, it seems
to me that, ultimately, the jury is going to be
instructed to look at each individual separately, look
at what they're charged with, look at the evidence
against them.

And if your client is not charged with some
uncharged offense, I don't see it being a problem.

1           MR. ZIMMERMAN:  So, we can elicit that
2      testimony.
3           THE COURT:  I never said you could not.
4      Unless you're telling me I did.
5           MR. ZIMMERMAN:  No.
6           THE COURT:  I don't remember saying that.
7           MR. ZIMMERMAN:  No.
8           THE COURT:  The government just asked me to
9      put that restriction on cross-examination.  I'm not
10     willing to do it.  I don't think it's necessary to do
11     it.
12          MR. ZIMMERMAN:  That's correct, Your Honor.
13     That was my understanding of the ruling.
14          THE COURT:  Okay.  All right.  Do you need
15     something else?
16          MR. ZIMMERMAN:  That's it.  Thank you.
17          THE COURT:  Okay.  All right.
18          Yes.
19          MS. MARTINEZ:  One completely unrelated and
20     minor thing.  We've conferred with Ms. Austin and
21     Mr. Zimmerman regarding their desire to potentially
22     recall SA Born.
23          She is outside of the courtroom now, and
24     certainly will follow Your Honor's orders.  But our
25     understanding -- defense counsel -- the government, is

that she would not be recalled today.

So I would ask the Court for permission to have an agent instruct her that she does not need to remain in the courthouse all day, and go back to her normal duties.  We will coordinate with the defense counsel if there is a need for her to come back and testify.

THE COURT:  Mr. Zimmerman is standing.

MR. ZIMMERMAN:  Your Honor, we have no objection to that.

Again, since we imagine calling her in the defense case, obviously, we will not need her until the government's case-in-chief is over.

There is one issue that, as a matter of policy, the United States Attorney's Office insists that we comply with the *Touhy* regulations in making requests.

And while this is certainly understandable, if we wanted to reach out and grab a governmental employee as a defense witness who isn't currently a witness, we would submit that -- that FBI Agent Brenda Born and any of the other government agents that we specifically ask to reserve, us or any co-counsel, that they're reserved.  They're already witnesses.  We would simply be bringing them back, and that we don't need to comply with *Touhy*.

I don't have any problem sending a letter to the U.S. Attorney's Office.  I just think it would be -- it's not really necessary, and I don't want to be in a situation where the government says, you know, "We" -- "under *Touhy*, we don't think you get to call her as a witness," because we think she already is a witness, and that the *Touhy* regulations are unnecessary.

I'm willing to go through the motions of it, but, frankly, you know, I would like the Court to rule that she's a witness and we can recall her in the defense case.

THE COURT:  Okay.

MR. ZIMMERMAN:  Thank you, Judge.

THE COURT:  Any problem with that?  Save us all a lot of time.

MS. MARTINEZ:  Your Honor, I am required by department policy to state that the *Touhy* regulations apply any time that defense counsel wishes to call a federal employee as a witness.

And, Your Honor, it would be our position, consistent with that departmental policy, which I am obliged to follow, that *Touhy* would have to be complied with.

Other defense counsel in this case have followed those procedures.  To my knowledge, there has

1    been no problem whatsoever and no issue with anyone not

2    getting authority to call someone that they want to.

3                So -- I certainly understand Your Honor's

4    point about --

5                THE COURT:  It seems to be a waste of time.

6    I mean, if I enter an order, would that help you from

7    the standpoint of policy?

8                Because I can do that very easily, and keep

9    things moving.  I really don't have time --

10               MS. MARTINEZ:  Your Honor, I will leave it

11   up to Your Honor.  I don't think --

12               THE COURT:  I'll issue an order that she is

13   to come back.  That simple.  All right.

14               MS. MARTINEZ:  Thank you, Your Honor.

15               May I simply ask an FBI agent --

16               THE COURT:  She can be excused.

17               And just let the government know when you

18   want to call her back.

19               MS. MARTINEZ:  Thank you very much, Your

20   Honor.

21               THE COURT:  Thank you.

22               Ready to bring the witness out?

23               You want me to instruct the witness or

24   instruct the jury?

25               You want me to talk to the jury about

homeboy two and three, and the transcripts and

redactions?  Those are the three things that --

MS. MARTINEZ:  Yes, Your Honor.  I don't

think this witness needs Your Honor's instruction, but

certainly we defer to Your Honor if Your Honor wishes to

address the witness.

THE COURT:  No.  Okay.  I will not instruct

the witness.

You can bring the jury out, Mr. Toliver.

Thank you.

(Jury present at 12:38 p.m.)

THE COURT:  You may be seated.

All right, Counsel, you may proceed.

MS. MARTINEZ:  The government calls Jose

Garcia.

THE COURT:  Ladies and gentlemen, during

some of the testimony you may hear reference to the term

"homeboy two" or "homeboy three."

That's on my instruction.  I told the

witness to use those terms.

And there will also be transcripts that you

will have during the course of the witness' testimony.

Some of them are redacted.  That's based on my rulings

that they be redacted.

You can bring him out.

```
 1                    (Witness sworn.)
 2                    THE WITNESS:  I do.
 3                    THE COURT:  You may proceed.
 4                    THEREUPON, JOSE GARCIA, having been duly
 5    sworn, testified as follows:
 6                         DIRECT EXAMINATION
 7    BY MS. MARTINEZ:
 8        Q.  Good afternoon.
 9        A.  Good afternoon.
10        Q.  Would you state your name and spell it for the
11    record, please.
12        A.  Jose Garcia, J-o-s-e, G-a-r-c-i-a.
13        Q.  Mr. Garcia, how old are you?
14        A.  Thirty-three.
15        Q.  Where were you born?
16        A.  El Salvador.
17        Q.  When did you come to the United States?
18        A.  Around 2000.
19        Q.  How old were you when you came to the United
20    States from El Salvador?
21        A.  About 17, 18.
22        Q.  Can you speak right into that microphone?
23        A.  Seventeen, eighteen.
24        Q.  You can actually move it a little closer to you.
25    That way you don't have to lean.
```

1    A.   Okay.

2    Q.   Perfect.  Thanks.

3         How did you get to the United States?

4    A.   I crossed the border.

5    Q.   Was that legally or illegally?

6    A.   Illegally.

7    Q.   When you first came here to the United States,

8    where did you go?

9    A.   I came to Virginia, State of Virginia.

10   Q.   How far did you go in school in El Salvador

11   before you came to the U.S.?

12   A.   Almost high school.

13   Q.   Did you complete the equivalent of high school?

14   A.   No.

15   Q.   When you came here to the U.S., did you continue

16   with your schooling?

17   A.   Yes.

18   Q.   What did you -- what school did you go to -- or

19   how far did you go in school here in the U.S.?

20   A.   About 12 grade.

21   Q.   Did you complete 12th grade?

22   A.   No.

23   Q.   Did you continue with schooling after that?

24   A.   No.

25   Q.   What languages do you speak?

J. Garcia - Direct                                    119

1      A.   Spanish, and English.  I learned English.

2      Q.   Are you proficient in speaking both Spanish and

3   English?

4      A.   Yes.

5      Q.   What languages can you read?

6      A.   Spanish and English.

7      Q.   What languages can you write?

8      A.   Both.

9      Q.   Are you proficient in both, in reading and

10  writing?

11     A.   Yes.

12     Q.   Have you ever been a member of a gang?

13     A.   Yes.

14     Q.   What gang?

15     A.   MS-13.

16     Q.   When did you join MS-13?

17     A.   Around 2002, 2002.

18     Q.   How old were you?

19     A.   Probably around 18, 19, probably.  I can't

20  recall.

21     Q.   Within MS-13, did you belong to a particular

22  clique?

23     A.   Yes.

24     Q.   What clique was that?

25     A.   Silvas.

J. Garcia - Direct                                    120

1    Q.   What's the full name of that clique?

2    A.   Silvas Locos Salvatruchos.

3    Q.   Is it also abbreviated in any way?

4    A.   I'm sorry?

5    Q.   Is it abbreviated in any way?

6    A.   Yes.

7    Q.   How is a abbreviated?

8    A.   SLS.

9    Q.   Why did you join MS-13?

10   A.   First, I came to know kids from school.  They

11   were used to hanging around the gang members, obviously.

12   So there was -- some of the guys were my friends, and, I

13   used to get to know them, all the time.  And little by

14   little, I was getting more involved with them, to the

15   point I find out they were belong to a gang.

16   Q.   How were you initiated into the gang?

17   A.   They beat -- beat you up for 13 seconds.

18   Q.   What is that called?

19   A.   Jumped in.

20   Q.   How old were you when you were jumped in?

21   A.   Around 18, 19.

22   Q.   What's the purpose of beating someone for

23   13 seconds to have them join the gang?

24   A.   It just the rule of the gang, that you have to --

25   they have to beat you up for 13 seconds.

J. Garcia - Direct                                        121

1    Q.   Once you joined the gang, were you given a
2  nickname or a gang name?
3    A.   I wasn't given a nickname.  I didn't like no
4  nicknames.
5    Q.   Were you later given a nickname?
6    A.   It was -- yeah.  It was Junior.
7    Q.   When were you given the nickname Junior?
8    A.   When I was jumped in.
9    Q.   Once you were jumped in, what was your status in
10  the gang?
11       What were you called?
12    A.   Um, it was a -- I would say like soldier, you
13  start.
14    Q.   What is a soldier?
15       What does it mean to be a soldier?
16    A.   You just follow what -- whoever has the first
17  word, or run the clique tell you to do, and just follow
18  the rules.
19    Q.   What is the first word?
20    A.   He's the one who controls the clique at that
21  point.
22    Q.   What are some other terms for a soldier in MS-13?
23    A.   Homeboy, regular homeboy.
24    Q.   Now, what does someone have to do in MS-13 in
25  order to become a homeboy?

1    A.   Um, at that time, or right now?

2    Q.   Well, let's start with at that time.

3    A.   At that time, they just -- they had to know you,

4    probably chill with them a couple of times, and just

5    hang out with them, pretty much.

6    Q.   And now you said, "or right now."  Did that

7    change at some point?

8    A.   Yes.

9    Q.   How did it change?

10   A.   Right now, in order for you to become part of

11   that gang, you have to kill someone.

12   Q.   Do you know when that changed?

13   A.   It changed, I will say, around Two Thousand --

14           MR. CONTE:  Objection, foundation.

15           THE WITNESS:  -- Seven, 'Eight.

16           THE COURT:  I'm sorry.  I can't hear you.

17           MR. CONTE:  I don't think there's any

18   foundation for the question.

19           THE COURT:  Foundation for what?

20           MR. CONTE:  To answer this question.

21           THE COURT:  Okay.

22           MS. MARTINEZ:  Your Honor, he has testified

23   that he was involved in the gang.  He testified about

24   knowledge of the gang.  I think there has been

25   foundation, but --

1          THE COURT:  All right.

2          You can save that for cross.  Objection

3    overruled.

4    BY MS. MARTINEZ:

5       Q.  I'm sorry.  Did you say that there was a specific

6    point in time that it changed, or did it change

7    gradually?

8       A.  It just changed gradually.

9       Q.  Now, did you have to commit an act of violence in

10   order to become a homeboy?

11      A.  No.

12      Q.  Through your experience in MS-13, have you

13   come -- become familiar with the rules of MS-13?

14      A.  Yes.

15      Q.  And, how is it that you've become familiar with

16   the rules of MS-13?

17      A.  Um, I was learning little by little, with the

18   time, how the gang has changed rules, and how they --

19   they act, in order to influence people or try to, um, I

20   will say, persuade kids to become gang members.

21      Q.  What are the core rules of MS-13?

22      A.  Never snitch.  Never cooperate with the police.

23   Never turn your back on your homeboy.  And, you have to

24   commit crimes to rival gang members, kill -- they call

25   it kill *chavala*s.

1     Q.   What is a *chavala*?

2     A.   It's a rival gang member, whoever is a not part

3  of MS-13.

4     Q.   And what are the rules with respect to *chavalas*?

5     A.   Kill them.  Just go there, fight and kill them,

6  do whatever they can.

7     Q.   Now, you said there's a rule about respecting

8  fellow homeboys.  Is that right?

9     A.   Yes.

10     Q.   What does that mean?

11     A.   The rules that you have to not be disrespectful

12  for any homeboy, don't get involved with a homeboy's

13  girlfriend, and never let the -- never let the homeboy

14  down in anything.

15     Q.   When you say not get involved with a homeboy's

16  girlfriend, what does that mean?

17     A.   That you don't have to get involved, having sex

18  with -- that you know that the girl is somebody else's

19  girlfriend.

20     Q.   What are the possible consequences if a gang

21  member gets involved with another gang member's

22  girlfriend?

23     A.   They will kill you.

24     Q.   The first rule that you mentioned was about

25  cooperating with law enforcement.

1    A.   Yes.

2    Q.   What are the consequences for a gang member who

3    cooperates with law enforcement?

4    A.   They will kill you.

5    Q.   What is it called when the gang decides to kill

6    someone, for example, for cooperating with law

7    enforcement?

8    A.   A rat.

9    Q.   Are you currently a confidential human source for

10   the FBI?

11   A.   Yes.

12   Q.   When did you start being a confidential human

13   source for the FBI?

14   A.   Back in 2005.

15   Q.   How long had you been in the gang by the time you

16   began working with the FBI?

17   A.   About two years.

18   Q.   Why did you decide to begin cooperating with law

19   enforcement?

20   A.   That wasn't -- that wasn't me.  That was not the

21   life that I want to live.

22   Q.   What do you mean?

23   A.   I didn't like it, how it become so -- it was

24   pointless.  That was not me, doing violent stuff for

25   something makes no sense.

1    Q.   Have you been a confidential human source

2    consistently since 2005?

3    A.   Yes.

4    Q.   And, during your over ten years of being a

5    confidential human source, how have you provided

6    information to the FBI?

7    A.   Um, by phone, electronic devices, and recordings.

8    Q.   Who do you provide information to?

9    A.   To FBI.

10   Q.   Specifically within FBI, is there someone who's

11   assigned for you to provide information?

12   A.   Yes.  It was my handler at that time.

13   Q.   And what would you report on to your handler?

14   A.   Anything.  Anything has to do with the gang, even

15   if it is so small or big, that was my first thing, to

16   let them know.

17   Q.   Have you testified in court before?

18   A.   Yes.

19   Q.   When?

20   A.   2006 or '7, I believe.

21   Q.   What court?

22   A.   Right here.

23   Q.   What did you testify about?

24   A.   About a murder.

25   Q.   Was it a gang murder?

J. Garcia - Direct                                        127

1    A.   Yes.

2    Q.   In this case, during the course of this

3    investigation, in addition to providing information to

4    FBI, what else did you do?

5    A.   Um, I was infiltrated with the -- with the gang,

6    and go to meetings, find out more what their, pretty

7    much, criminal activities were.

8    Q.   What was the purpose of going to meetings?

9    A.   To find out what they were trying to do around

10   Virginia or any other place.

11   Q.   Have you been paid money as a confidential human

12   source?

13   A.   Yes.

14   Q.   Over the past, over ten years, how much money,

15   approximately, have you been paid?

16   A.   About 42,000.

17   Q.   What was that money for?

18   A.   It was expenses and -- and -- it was just

19   expenses and just payment that they did.  That's pretty

20   much.  I can't recall it right now.

21   Q.   Let's start with expenses.  What kind of

22   expenses?

23   A.   Um, buying phone cards, sending money to El

24   Salvador, giving money right here to any other homeboy

25   that needs money, send money here, send money there,

1   any -- any -- pay dues to the clique, and also pay dues

2   to the general meeting as well.

3       Q.   We'll talk more about some of those activities in

4   a minute.  But focusing for a moment on the money that

5   you were paid, in addition to that reimbursement for

6   expenses, were you also paid for services, for

7   information?

8       A.   Yes.

9       Q.   Of the approximately 42,000 over the past

10  ten-plus years, how much of that was for services as

11  opposed to for expenses?

12      A.   It was 15,000 on expenses, and about -- I would

13  say, 27, 28,000 on service.

14      Q.   So, under 30,000, is --

15      A.   Yeah.

16      Q.   -- your testimony?

17      A.   Yeah, under 30,000.

18      Q.   So in addition to $30,000 over the past ten

19  years, how else have you supported yourself?

20      A.   Oh, with work.

21      Q.   Sorry?

22      A.   I always have my job.

23      Q.   Full-time?

24      A.   Yes.

25      Q.   During the course of your involvement with the

J. Garcia - Direct                                                      129

1   FBI, have you received any immigration benefits from

2   FBI?

3       A.   Yes.

4       Q.   Tell the jury about that.

5       A.   Deferred action.

6       Q.   What is -- what is deferred action?

7       A.   Deferred action is a temporary protection, they

8   allow you to be in the country legally.

9       Q.   For how long?

10      A.   Just for the time that they provide.  It could be

11  a year, could be six months; just the time that they

12  provide.

13      Q.   What's your current immigration status?

14      A.   I'm a green card holder.

15      Q.   How did you get your green card?

16      A.   Through regular immigration proceedings.

17      Q.   When you say "regular immigration proceedings,"

18  is that something that the FBI sponsored you for, or

19  not?

20      A.   No.

21      Q.   So, in other words, you got a green card without

22  the FBI sponsoring you?

23      A.   Yes.

24      Q.   Did the FBI have any involvement in your attempt

25  to get the green card?

1    A.   They -- they did a letter, but, the letter was

2  returned, when they send the letter to the person that

3  needs to be sent.  And they didn't get the letter.

4    Q.   What do you mean by, it was returned?

5    A.   It was some mistake on the -- I believe on the

6  alien number, and it was returned.

7    Q.   We heard some testimony earlier about an S Visa

8  for you.

9    A.   Yes.

10   Q.   Did you ever receive an S Visa?

11   A.   No.

12   Q.   Have you recently been involved in any

13 deportation proceedings?

14   A.   Yes.

15   Q.   Very briefly, tell the jury about that.

16   A.   It was -- they put in the petition, the

17 proceeding, you need to go to court, and in front of a

18 judge.  And the judge decide whether you stay or you go.

19 If you got -- if you have ground.  What they -- they put

20 you in a trial, and see if you're being a good citizen

21 or not good citizen, and they decide.

22   Q.   And, was it before or after those proceedings

23 that you actually obtained your green card?

24   A.   After.

25   Q.   Has the government also sent money to move some

1  of your family members for safety reasons?

2    A.   Yes.

3          MR. CONTE:  Objection, leading, Your Honor.

4          THE COURT:  Sustained.

5  BY MS. MARTINEZ:

6    Q.   In addition to your expenses and services, do you

7  know whether the FBI has spent money for other things

8  related to you, as an FBI confidential human source?

9    A.   Just to move my family.

10   Q.   What is your understanding of the terms of your

11 agreement with the FBI?

12   A.   Um, I can never be part of any violence at all,

13 and always, I need to notify if anything, any criminal

14 activities to them.

15   Q.   Before or after the criminal activity?

16   A.   Before and after, both.

17   Q.   When you hear about possible criminal activity,

18 what are the procedures you're supposed to follow?

19   A.   Um, I need to talk to my handler first.

20   Q.   For what purpose?

21   A.   To -- to find a better way to approach the

22 situation without me getting involved with any violent

23 crimes.

24   Q.   Were there times when you were authorized to

25 engage in nonviolent illegal activity?

1    A.   Yes.

2    Q.   What kind of illegal activity did the FBI

3    authorize you to engage in?

4    A.   It was buying drugs and buying guns.

5    Q.   How many times were you authorized to purchase a

6    firearm?

7    A.   Um, I would say once.

8    Q.   Were you given a general authorization to

9    purchase a firearm at any time, or was it specific to a

10   particular conduct?

11   A.   It was a specific -- it was in a specific time.

12   Q.   In that specific time, did you get authority

13   before or after the transaction?

14   A.   Before.

15   Q.   And, how did that transaction proceed?

16   A.   Um, talked to my handle.  They decide what -- how

17   they're going to do it, when they're going to do it,

18   provide the money, and I set up the meeting to purchase

19   the gun.

20   Q.   You mentioned narcotics activities.

21   A.   Yes.

22   Q.   Were you given general authorization to engage in

23   any sort of narcotics activity?

24   A.   No.  Just in a specific times.

25   Q.   In the specific times, were you given

J. Garcia - Direct                                          133

1    authorization before or after the specific conduct?

2       A.   It was before.

3       Q.   And what was your instruction with respect to

4    engaging in specific conduct related to narcotics?

5       A.   Just, I was allowed to purchase that time, just

6    for that reason.

7       Q.   If you purchased narcotic activity with the

8    authority of -- a narcotics with the authority of FBI,

9    what did you then do with the narcotics?

10      A.   Give it to my handler.

11      Q.   When?

12      A.   Pretty much right away.

13      Q.   What type of illegal activity did the FBI not

14   permit you to engage in?

15      A.   Has to do with any -- any violent crime.

16      Q.   Mr. Garcia, we've heard a lot of testimony in

17   this trial about MS-13 and violent activities.  How is

18   it that you were able to be a homeboy in MS-13 and not

19   commit violent activity?

20      A.   You choose -- has to be smart and always talk to

21   your handler.  And, we always come up with a good -- I

22   will say a good way to avoid or to buy time in order not

23   to -- to be involved in any criminal activities.

24      Q.   What do you mean, "a good way to avoid or buy

25   time"?

J. Garcia - Direct

1    A.   Know how to talk to them, know how to say no, and
2    put excuses, and always buying time.
3    Q.   Can you give an example?
4    A.   I will say, if -- let's say they say, we need to
5    do something, and we need to go and rob someone.
6         You can come up and tell them, "Look, if we're
7    going to rob someone and we get caught, then, who's
8    going to be outside helping the homeboys inside?"  Which
9    would be a little bit smart, and that's buying time.
10   Q.   And if you bought time in relation to illegal
11   activity like robbing someone, what would then happen?
12   A.   Um, can you repeat that again, please?
13   Q.   Well, you just gave an example about buying
14   time --
15   A.   Uh-huh.
16   Q.   -- related to a robbery.
17   A.   Uh-huh.
18   Q.   What would happen with respect to that planned
19   robbery if you bought time like that?
20   A.   Well, then you buy time, then you come up with
21   another excuse, another excuse, and you get involved
22   with something else that has nothing to do with
23   violence.
24   Q.   Were you involved in violent activity --
25   A.   Nope.

J. Garcia - Direct                                             135

1    Q.   -- with MS-13?

2    A.   Nope.

3    Q.   Why not?

4    A.   Because, I was not allowed to, and, that was not

5    me.

6    Q.   What do you mean, it wasn't you?

7    A.   I'm not -- I'm not a -- I don't consider myself a

8    gang member that goes for violence.

9    Q.   Since 2005, have you associated with MS-13?

10   A.   Yes.

11   Q.   Why?

12   A.   Just to find out and try to prevent crimes.

13   Q.   How did you try to prevent crimes?

14   A.   Infiltrate, go to meetings, find out what they're

15   up to and what they have done, and always, like I say,

16   report it to my handler right away.

17   Q.   During this investigation, what was your position

18   within the Silvas clique?

19   A.   I was the first word.

20   Q.   When did you become the first word?

21   A.   Around 2012.

22   Q.   How long had you been cooperating with the FBI

23   when you became the first word?

24   A.   About -- about ten years.

25   Q.   Did you consult with the FBI before becoming the

1   first word?

2       A.   Yes, always.

3       Q.   Why?

4       A.   Because they need to instruct me what should I

5   do.  I cannot take -- I cannot make decisions on my own.

6       Q.   How were you able to gain confidence and trust of

7   gang members, to rise up to the level of first word?

8       A.   Just know how to talk to them and also, um, they

9   thought that because I been in -- in the clique since

10  2002, they think that, you know, everything, and they --

11  you gain respect sometimes that way.

12           And, just pretty much, like I said, know how to

13  talk to them and I study them, how they are, because not

14  everybody is the same.

15      Q.   Were you required to conduct any particular act

16  in order to become first word?

17      A.   Nope.

18      Q.   Were you required to commit an act of violence to

19  become first word?

20      A.   No.

21      Q.   How is it that you became first word?

22      A.   Actually, the clique -- the clique choose you,

23  and who they think is active at that time, and they had

24  know about the gang, and that's how -- well, that's how

25  Silvas clique choose.

1               THE COURT:  Counsel, we're going to break

2      for lunch now.  1:00 o'clock.

3               Ladies and gentlemen, please don't discuss

4      the case.  Don't permit the case to be discussed in your

5      presence.  Leave your notes in the jury deliberation

6      room.

7               Resume at 2:00 o'clock.  Thank you.

8               (Court recessed at 12:59 p.m. and reconvened

9               at 2:05 p.m.)

10              (Jury not present.)

11              MR. AQUINO:  Judge, just a few seconds.

12              There was some testimony from the FBI agent,

13     as well as Junior, that the government was involved in

14     some -- in -- provided assistance concerning his

15     immigration status.

16              Now, it's unclear to me at this point the

17     full extent or the extent of the government's assistance

18     to him.  And I know the FBI agent said that they

19     provided deferred action assistance on his case.

20              But, the witness testified, Junior

21     specifically, that he has received a green card.

22              Now, to enter the United States and to

23     obtain a green card, there's only two ways.  It's either

24     family based or employment based.

25              And we don't need to get into the weeds on

1    all that, but the point I'm making is, in either of

2    those applications you have to make a bunch of factual

3    assertions.

4              Now, we don't have his green card

5    application.  I mentioned this to Ms. Martinez.

6              She indicates that they did not provide him

7    assistance in his green card application.

8              But, I'm concerned that that is a document

9    that should be produced to us, in light of the fact that

10   we know for sure it's in Immigration's possession.  He's

11   testified that he has a green card.

12             And so, I would ask the Court to make some

13   inquiries on that to the government and, if it is

14   available, that you order it be produced.

15             THE COURT:  Well, did he testify that the

16   government helped him get a green card, Mr. Aquino?

17             MR. AQUINO:  I don't think he -- I don't

18   think he commented on that.  I think he testified that a

19   letter was written, but it came back.

20             THE COURT:  Right.

21             MR. AQUINO:  And, it is unclear to me the

22   extent of the government's assistance.

23             We know for sure, through the FBI agent,

24   that they were involved in some manner in his remaining

25   in the United States.  As to whether that went further,

1    I'm uncertain.

2              THE COURT:  Well, I'm not sure that I

3    understand your request.  The inconsistency is one that

4    could be cleared up on cross-examination, it seems to

5    me.

6              Ms. Born was here and she testified she sent

7    an application to get an S Visa, and he didn't get it.

8    And this witness has said he has a green card.

9              If you want to inquire how he got it, go

10   ahead.  But I don't have any indication the government

11   got it for him.  Do you?

12             I don't have any indication the government

13   got it for him.

14             MR. AQUINO:  Okay.

15             THE COURT:  All right?

16             MR. AQUINO:  Well, we'll see.  All right.

17   Thank you.

18             THE COURT:  Ready to bring the jury out?

19             Bring the witness back, yes.

20             (Court and clerk conferring.)

21             THE COURT:  I understand.

22             Ms. Martinez?

23             MS. MARTINEZ:  Yes, Your Honor?

24             THE COURT:  The clerk and I have been

25   working with the original exhibit list --

1           MS. MARTINEZ:  Yes, Your Honor.

2           THE COURT:  -- so to try to change now is

3    just too complicated.

4           MS. MARTINEZ:  The only -- and that's fine,

5    Your Honor.

6           The only thing that we added -- I want to

7    make sure the witness doesn't walk in while I'm

8    talking -- was in response to motions and Your Honor's

9    inquiries and defense counsel inquiries, we provided

10   on -- over the weekend to defense counsel copies of

11   translations where there are notations --

12          THE COURT:  Okay.

13          MS. MARTINEZ:  -- inserted by the CHS.  And

14   we added them in an abundance to caution, to make sure

15   that everyone has them.

16          That's the only change that has been made to

17   the exhibit list.  We provided those -- those new

18   exhibits --

19          THE COURT:  Okay.

20          MS. MARTINEZ:  -- to the Court this morning.

21   That's the only change.

22          THE COURT:  So the numbers are the same,

23   pretty much.

24          MS. MARTINEZ:  All the numbers are the same.

25          THE COURT:  All right.

1          MS. MARTINEZ:  There's no change to anything

2    that was already on there.  We just added those new

3    exhibits, and they all have Zs at the end of them.

4          THE COURT:  Okay.

5          MS. MARTINEZ:  And that's just to make sure

6    that everyone's clear on what this individual's

7    involvement was --

8          THE COURT:  Okay.  Thank you.

9          MS. MARTINEZ:  -- with respect to the

10   translations.

11         THE COURT:  Thank you.

12         You can bring the witness back now.  Thank

13   you.

14         (Witness resumed stand.)

15         THE COURT:  You can bring our jury out now,

16   thank you.

17         (Jury present at 2:10 p.m.)

18         You may be seated.

19         Counsel, you may proceed.

20          DIRECT EXAMINATION (Continued)

21   BY MS. MARTINEZ:

22   Q.  Before the break, we were discussing your

23   position in the Silvas clique.  How long were you first

24   word in the Silvas clique?

25   A.  About two years.

1    Q.   How was it that you were able to be a leader in

2  the clique, in MS-13, and also at the same time work for

3  the FBI?

4    A.   Like I say, I always -- I always talk to my

5  handler about any situation on anything that had to do

6  with the gang.  I would approach, how can we -- there is

7  anything criminal that can -- I can be involved, with

8  also with my handlers, see what was the best way to come

9  up with.

10   Q.   And when you say "what was the best way to come

11  up with" it, what do you mean by that?

12   A.   My goal was know how to talk to them, and buying

13  time all the time.

14   Q.   Talk to who?

15   A.   To -- to the gang members.

16   Q.   What do you mean by "how to talk to the gang

17  members"?

18   A.   I would persuade them, you know, be kind of

19  friend of them, and, you know, sometimes you even agree,

20  even though you know they're wrong, you kind of have to

21  agree what they saying, just to, you know, get along

22  with them.

23   Q.   What do you mean by "persuade them"?

24        What would you try to persuade them of?

25   A.   For anything.  So I always try to talk to them,

J. Garcia - Direct                                    143

1   try to call them, to find out anything, anything like --

2   like I say, anything that they have done, or any thing

3   that is about to happen.

4       Q.   What was the purpose of finding out about what

5   they've done?

6       A.   To give information to my handler.

7       Q.   What was the purpose of finding out about

8   something that might be about to happen?

9       A.   To prevent any crime, to see if they had commit

10  anything big, or most of the time, like prevent any

11  crime.

12      Q.   Were there instances where you heard in advance

13  about crimes?

14      A.   Yeah.  I would say yes.

15      Q.   What would you do about if you heard in advance

16  about a possible crime?

17      A.   Talk to my handler right away.

18      Q.   Now, as the clique leader, during the two years

19  that you were a leader of the Silvas, what relationship,

20  if any, did you have with other cliques in MS-13?

21      A.   We talk to them, pretty much through all the

22  first words of the other cliques and all their homeboys.

23      Q.   During that time period, what were the other

24  cliques in the Northern Virginia area?

25      A.   It were -- it was PVLS, PLS, ULS, GLS, CGLS, and

J. Garcia - Direct                                    144

1   other cliques.  I can't recall the rest of them.

2       Q.  Were there ever meetings that involved members of

3   the different cliques?

4       A.  Yes.

5       Q.  Were there times when you went to meetings

6   involving members of cliques other than your own?

7       A.  Yes.

8       Q.  Who would attend these meetings involving

9   multiple cliques?

10      A.  The first words of each clique.

11      Q.  How often were these meetings held?

12      A.  Just depend.  It could be few hours, could be an

13  hour, could be more.

14      Q.  And how often did they happen?

15      A.  It happened, could be every -- every month, every

16  couple months.  It just depend how safe they felt to go

17  to the place.

18      Q.  Where did the meetings occur?

19      A.  In -- always happen, most of the meetings, in

20  hotels.

21      Q.  At hotels?

22      A.  Yes.

23      Q.  What kinds of hotels?

24      A.  Regular hotels.

25      Q.  Where?

1      A.   Woodbridge.

2      Q.   At meetings that you attended with members of the

3   other cliques --

4      A.   Yes.

5      Q.   -- were there ever meetings with members of the

6   PVLS clique?

7      A.   Yes.

8      Q.   And what is the full name of PVLS?

9      A.   Park View Locos Salvatruchos.

10     Q.   Who were the members of PVLS that attended

11  meetings that you attended as well?

12     A.   It was Peluca from PVLS, Lil Poison from PVLS,

13  Lil Payaso from PVLS, Demente from PVLS.

14     Q.   Anyone else?

15     A.   No, I can't -- not that I remember.

16     Q.   Let's start with Peluca.

17     A.   Yes.

18     Q.   How long have you known the individual called

19  Peluca?

20     A.   I know him by phone, and personally I saw him

21  couple of times.

22     Q.   Do you know him by any other names other than

23  Peluca?

24     A.   Peluca, Peluguin, Greñas.

25     Q.   Have you met him in person?

1    A.   Yes.

2    Q.   How many times?

3    A.   I would say more than four times, five times.

4    Q.   Have you ever spoken to Peluca, Greñas, on the

5    phone?

6    A.   Yes.

7    Q.   How many times?

8    A.   Many times.

9    Q.   Over the course of what period?

10   A.   Over the course of, probably, 2012 until 2014.

11   Q.   Do you see Greñas, Peluca, here in court today?

12   A.   Yes.

13   Q.   Would you please identify him by describing where

14   he's sitting and an item of clothing that he is wearing.

15   A.   He's wearing kind of blue shirt, right in the

16   middle, right in front of me.

17   Q.   Would you describe which row of the these tables

18   he's sitting in.

19   A.   First row.

20   Q.   And, just to make sure that the record is clear,

21   starting from where I am, how many people over is he,

22   not including myself?

23   A.   Just one.

24        MS. MARTINEZ:   Your Honor, may the record

25   reflect that the witness has properly identified Jose

1  Lopez Torres.

2              THE COURT:  So noted.

3  BY MS. MARTINEZ:

4      Q.  You also mentioned someone named Lil Payaso; is

5  that right?

6      A.  Yes.

7      Q.  Do you know Lil Payaso by any other names?

8      A.  Just by Lil Paya, kind of that word, the same

9  name.

10     Q.  How long have you known Lil Payaso?

11     A.  The same, almost the same time as Peluca.

12     Q.  How many times -- did you ever meet Lil Payaso in

13  person?

14     A.  Yes.

15     Q.  How many times?

16     A.  More than five, six times.

17     Q.  Have you spoken to Lil Payaso on the phone?

18     A.  Yes.

19     Q.  How many times?

20     A.  I would say more than 15 times.

21     Q.  Over what time period?

22     A.  2012, 2014.

23     Q.  Do you see Lil Payaso here in court today?

24     A.  Yes.

25     Q.  Would you please identify him by describing

J. Garcia - Direct                                              148

1    specifically where he's sitting and an item of clothing
2    that he's wearing.
3         A.   She's right -- he's right behind.  He's wearing a
4    yellow shirt.
5              MS. MARTINEZ:  Your Honor, may the record
6    reflect that the witness has identified Omar Dejesus
7    Castillo.
8              THE COURT:  So noted.
9    BY MS. MARTINEZ:
10        Q.   You mentioned someone named Lil Poison.
11        A.   Yes.
12        Q.   Do you know Lil Poison by any other names?
13        A.   Um, just Lil Poison; not that I remember another
14   name.
15        Q.   How long have you known Lil Poison?
16        A.   About the same time.
17        Q.   How many times have you met him in person?
18        A.   Like four, four or six times.
19        Q.   Have you spoken to him on the phone?
20        A.   Yes.
21        Q.   How often?
22        A.   Every -- every week.  Almost, I would say every
23   few days at a time.
24        Q.   Over what time period?
25        A.   2014 to -- I mean, 2012 to 2014.

1    Q.   Do you see Lil Poison in court today?

2    A.   No, I can't see -- I don't -- I can't see right

3    now.  This is --

4              THE WITNESS:  Can I stand?

5              THE COURT:  Yes, you can stand up.

6              THE WITNESS:  I can't see him.

7              MS. MARTINEZ:  That's fine.

8    BY MS. MARTINEZ:

9    Q.   You mentioned someone named Demente.

10   A.   Yes.

11   Q.   How long have you known Demente?

12   A.   I know him since 2012.

13   Q.   Have you met him in person?

14   A.   Yes.

15   Q.   How often?

16   A.   Probably couple of times, I saw him.

17   Q.   Have you also spoken to him on the phone?

18   A.   Yes.

19   Q.   How often?  How many times?

20   A.   Probably ten times.

21   Q.   Over what time period?

22   A.   2012 to -- 2012, I would say.

23             MS. MARTINEZ:  Your Honor, with the help of

24   the court security officer, I'd like to show the witness

25   what has been marked for identification purposes as

1    Government's Exhibit 75.

2              THE COURT:  All right.

3              MR. CONTE:  Your Honor, may we approach?

4              Court's indulgence.

5              (Pause.)

6              MR. CONTE:  I will withdraw my objection,

7    then.

8              THE WITNESS:  Yes, that's him.  That's

9    Demente.

10             MS. MARTINEZ:  Your Honor, permission to

11   move Government's Exhibit 75 into evidence.

12             THE COURT:  Received.

13   BY MS. MARTINEZ:

14     Q.  When you attended these meetings that you

15   referenced with other clique members, would you inform

16   the FBI of the meetings?

17     A.  Yes.

18     Q.  What would the FBI do to protect you during these

19   meetings?

20     A.  Um, I was always -- they were always around the

21   meetings, and tell me what I can do and what I cannot

22   do.

23     Q.  When you say around during the meetings, were

24   they in the meetings with you?

25     A.  No.

1    Q.   Where were they?

2    A.   They were outside in the parking lots.

3    Q.   Were there times when you also were able to

4    record meetings?

5    A.   Yes.

6    Q.   How did you do that?

7    A.   With the device, electronic device.

8    Q.   And what was the purpose of recording meetings?

9    A.   To record what they saying.

10            MS. MARTINEZ:  Your Honor, with the help of

11   the court security officer, I'd like to show the witness

12   what has been previously marked for identification

13   purposes as Government's Exhibit 80-A and 80-B.

14   BY MS. MARTINEZ:

15   Q.   Do you recognize those pictures?

16   A.   No, I cannot recall that one.

17   Q.   Okay.  That's 80-A?

18   A.   Yes, that's 80-A.

19   Q.   How about 80-B?

20   A.   Yes, that's, um, Leopardo from PVLS.

21   Q.   Do you know what was happening in that picture?

22   A.   Nope.

23   Q.   Let's talk about Leopardo --

24            MS. MARTINEZ:  Well, Your Honor, permission

25   to move in Government's Exhibit 80-B, is the one that he

 1   did recognize.

 2              THE COURT:  Received.

 3              MS. MARTINEZ:  May we publish for the jury?

 4              THE COURT:  Yes.

 5              MS. MARTINEZ:  Wait -- well, may we publish

 6   for the jury.

 7   BY MS. MARTINEZ:

 8      Q.  I'd like to turn your attention now to

 9   Government's Exhibits 81-A, B, and C.  Do you recognize

10   these pictures?

11      A.  Yes.

12      Q.  What was happening in these pictures?

13      A.  It was a meeting, general meeting.

14      Q.  What do you mean by a "general meeting"?

15      A.  All the first words of the clique attend to the

16   meeting.

17      Q.  Where was this general meeting?

18      A.  Woodbridge.

19      Q.  Do you remember approximately when?

20      A.  I would say around January.

21      Q.  Where in Woodbridge was the meeting?

22      A.  In a hotel room; hotel in Woodbridge.

23              MS. MARTINEZ:  Your Honor, we would move in

24   Government's Exhibits 81-A, 81-B and 81-C.

25              THE COURT:  Received.

J. Garcia - Direct                                                    153

```
1              MS. MARTINEZ:  May we publish for the jury?
2              THE COURT:  Yes.  81-A, B and C.
3              MS. MARTINEZ:  Starting with 81-A.
4    BY MS. MARTINEZ:
5        Q.  Who is this individual?
6        A.  That's Hansel, a chequeo from Silvas.
7        Q.  What do you mean by "chequeo"?
8        A.  He's not a full gang member.
9        Q.  You testified earlier that at general meetings,
10   only the leaders would go to the meetings.
11       A.  Yes.
12       Q.  Do you know why a chequeo was there at the
13   meeting?
14       A.  He was there just to look out.
15       Q.  What do you mean by "look out"?
16       A.  See if there is any police around the place.
17       Q.  Was he inside the meeting?
18       A.  No.
19       Q.  Was that something that happened commonly?
20       A.  Nope.
21       Q.  What was the role of chequeos with respect to
22   meetings?
23       A.  Just be outside and look out and let us know if
24   they see a police around.
25       Q.  What's the purpose of looking out for police?
```

J. Garcia - Direct                                          154

1    A.   Just to let us know if the police is there, so we
2    can pretty much leave.
3    Q.   Moving on to 81-B.
4         Starting with the individual on the far left, who
5    is that?
6    A.   That would be Estone from Silvas, a full gang
7    member.
8    Q.   How about the individual in the middle, in the
9    white shirt?
10   A.   That's Peluca from PVLS.
11   Q.   Is that the same Peluca, Greñas, you identified
12   in court?
13   A.   Yes, he is.
14   Q.   How about the individual on the far right?
15   A.   That would be Skinny from PVLS.
16   Q.   Who is Skinny?
17   A.   He's a member of PVLS clique.
18   Q.   How long -- do you know Skinny?
19   A.   Yes.
20   Q.   How long have you known Skinny?
21   A.   Probably 2012 to 2013.
22   Q.   Have you seen him in person?
23   A.   Yes.
24   Q.   Have you spoken to him on the phone?
25   A.   Yes.

1    Q.   How often?

2    A.   I spoke to him about four or five times.

3    Q.   If you could take a look at Government's

4   Exhibit 77.

5    A.   That's Skinny from PVLS.

6         MS. MARTINEZ:   Your Honor, move to admit

7   Government's Exhibit 77 into evidence.

8         THE COURT:   Received.

9         MS. MARTINEZ:   May we publish for the jury?

10         THE COURT:   Yes.

11   BY MS. MARTINEZ:

12    Q.   I'll return your attention now to back to 81-C,

13   which was already admitted.

14         MS. MARTINEZ:   May we publish, Your Honor?

15         THE COURT:   Yes.

16   BY MS. MARTINEZ:

17    Q.   Who were the individuals in this picture?

18    A.   That would be me, and Gato from ULS.  I cannot

19   recall the rest -- the other two.

20    Q.   Who is Gato?

21    A.   He's a gang member from ULS clique.

22    Q.   If you could take a look now at what's been

23   marked for identification purposes as

24   Government's Exhibit 82-A, all the way through 82-G.

25    A.   That would be me, Joker from --

1    Q.   Before you say that, if you could look at

2    Government's Exhibit 82-A through 82-G and see if you

3    recognize the pictures.

4    A.   82-A and what else?

5    Q.   82-A, 82-B, 82-C, 82-D, 82-E, 82-F, and 82-G.

6    A.   Okay.

7    Q.   Do you recognize these pictures?

8    A.   Yes.

9    Q.   What was going on in these pictures?

10   A.   It was a general meeting.

11   Q.   Just like the other general meeting?

12   A.   Yes.

13   Q.   Was this a different general meeting?

14   A.   No, it was regular general meeting.

15   Q.   Was it a --

16   A.   It was a different one.

17   Q.   Different from the picture we saw before?

18   A.   Yes.

19   Q.   Where was this general meeting?

20   A.   Woodbridge.

21   Q.   Where in Woodbridge?

22   A.   A regular hotel in Woodbridge.

23        MS. MARTINEZ:   Your Honor, the government

24   moves in Government's Exhibits 82-A through 82-G,

25   inclusive of the letters in between.

1          THE COURT:  Received.

2          MS. MARTINEZ:  May we publish?

3          THE COURT:  Yes.

4   BY MS. MARTINEZ:

5     Q.   Starting with 82-C, please.  Who are the

6   individuals in this picture?

7     A.   That would be me, Little -- Lil Payaso from PVLS;

8   Uzi, a *chequeo* from Silvas; Hansel, a *chequeo* from

9   Silvas; and Estone, a full gang member from Silvas.

10    Q.   Which individual in the picture is Lil Payaso

11  from PVLS?

12    A.   The one with the stripes, pretty much.

13    Q.   There are two individuals with striped shirts.

14  Is it the individual --

15    A.   The gray --

16    Q.   -- to the left or the --

17    A.   The guy who has the gray stripe, the gray shirt

18  with stripes.

19    Q.   And, just to make sure that the record's clear,

20  there are two individuals with stripes.  Is Lil Payaso

21  the one on the left or the one on the right?

22    A.   On the left.

23    Q.   Now, you mentioned that there were some *chequeos*

24  in this picture.  What was the role of the *chequeos* at

25  this general meeting?

1    A.   The same, just looking for if there's any cops

2  around.

3    Q.   What was the role of Lil Payaso at this meeting?

4    A.   He was one of the first word of PVLS.

5    Q.   Was he inside the meeting?

6    A.   Yes.

7         MS. MARTINEZ:  May we publish 82-D, Your

8  Honor?

9         THE COURT:  Yes.

10 BY MS. MARTINEZ:

11   Q.   Do you know who this individual is?

12   A.   Yes.

13   Q.   Who?

14   A.   Lil Poison from PVLS.

15   Q.   What was Little Poison's role at this general

16 meeting?

17   A.   Um, he was a second word of PVLS.

18   Q.   Did he attend the meeting?

19   A.   Yes, he did.

20   Q.   82-E.  Who are these individuals?

21   A.   Um, it's Lil Poison from PVLS.

22        The one with wide stripe and blue stripes, that

23 would be Uzi, a *chequeo* from Silvas.  Next to him is

24 Hansel, a *chequeo* from Silva.  Next to Hansel is Estone,

25 a homeboy from Silvas.  And that would be me.

1    Q.   Let's start with you.  Where in this picture do
2    you appear?
3    A.   I'm pretty much wearing a black jacket.  You
4    can't see my face.
5    Q.   The individual all the way to the right of the
6    picture?
7    A.   Yes.
8    Q.   Now, Lil Poison, starting from the left of
9    picture, can you count how many over he is?
10   A.   Two.
11   Q.   What is he wearing?
12   A.   He's wearing a black shirt and a hat, backwards.
13   Q.   Moving to 82-F.  Who are these individuals?
14   A.   That would be Lil Payaso from PVLS, Lil Poison
15   from PVLS.  I can't recall the other two.
16   Q.   Starting with Lil Payaso, where in the picture is
17   Lil Payaso?
18   A.   In the far left, wearing a gray shirt with
19   stripes.
20   Q.   The person all the way to the far left of the
21   picture does not have a gray shirt with stripes.  Is
22   that Lil Payaso, or is he somewhere else in the picture?
23   A.   No.  That's Lil Payaso.
24   Q.   Can you point to where Lil Payaso is in this
25   picture?

1    A.   It's right here.

2         MS. MARTINEZ:   Your Honor, for the record,

3    in this picture there are four individuals, and the

4    individual that the witness just pointed to and made a

5    note on the screen is the second individual from the

6    left.

7         THE COURT:   So noted.

8    BY MS. MARTINEZ:

9    Q.   Would you point to Lil Poison, please.

10   A.   (Indicating.)

11        MS. MARTINEZ:   Your Honor, for the record,

12   the witness has pointed to an individual who -- who

13   appears to be the second from the right, and in front of

14   two individuals, wearing a hat.

15        THE COURT:   All right.

16   BY MS. MARTINEZ:

17   Q.   82-G.  Is this from that same meeting?

18   A.   Yes.

19   Q.   Who do you recognize in this picture?

20   A.   Lil Poison from PVLS.  Lil Payaso from PVLS.

21   Q.   Would you please point to Lil Poison on the

22   screen?

23   A.   (Indicating.)

24        MS. MARTINEZ:   Your Honor, for the record,

25   the witness has pointed and made a mark on the screen to

1    the individual furthest to the right in the picture.

2              THE COURT:  All right.  So noted.

3    BY MS. MARTINEZ:

4       Q.  Would you please point to Lil Payaso?

5       A.  (Indicating.)

6              MS. MARTINEZ:  For the record, Your Honor,

7    the witness has pointed and made a mark on the screen to

8    the individual four from the right side of the picture.

9              THE COURT:  So noted.

10   BY MS. MARTINEZ:

11      Q.  Would you please turn your attention to what's

12   been marked for identification purposes as Government's

13   Exhibits 83-A, 83-B, 83-C, 83-D, and 83-E.

14      A.  Okay.

15      Q.  Do you recognize these pictures?

16      A.  Yes.

17      Q.  What's happening in these pictures?

18      A.  This is a different general meeting.

19      Q.  Same general meeting as the other one, or a

20   different one?

21      A.  Different one.

22      Q.  Is it the same meeting within all these pictures,

23   the 83 series?

24      A.  What do you mean, like --

25      Q.  Do all of the 83 series depict the same meeting?

1     A.   Yes.

2          MS. MARTINEZ:  Your Honor, permission to

3     move into evidence Government's Exhibit 83-A through

4     83-E, inclusive.

5          THE COURT:  Received.

6          MS. MARTINEZ:  May we publish?

7          THE COURT:  Yes.

8     BY MS. MARTINEZ:

9     Q.   Let's start with 83-C.  Who are these

10    individuals?

11    A.   That's Lil Poison from PVLS and Lil Payaso from

12    PVLS.

13    Q.   Where was this gang meeting?

14    A.   It was in Lorton, Virginia.

15    Q.   What were the role -- what was the role of Lil

16    Payaso at this meeting?

17    A.   He was also the first word to attend the general

18    meeting, representing his clique.

19    Q.   What was the role of Lil Poison at the meeting?

20    A.   He was also second -- he was the second word on

21    the meeting -- on the clique.

22    Q.   Which individual in the picture is Lil Payaso?

23    A.   He's in the left side, wearing a, um, with the

24    white shirt and stripes.

25    Q.   And there are only two pictures -- two

1    individuals in this picture, correct?

2        A.  Yes.

3        Q.  83-D.  Who is this?

4        A.  That's Lil Payaso from PVLS.

5        Q.  83-E.  Who are these individuals?

6        A.  That's Lil Poison from PVLS, and that was -- the

7    other guy is a *chequeo*, is actually a *paro* from PVLS.

8        Q.  Which individual is Lil Poison?

9        A.  The one who's wearing a black shirt and a hat

10   backwards.

11       Q.  Is he to the left or to the right of the two

12   individuals?

13       A.  To the left.

14       Q.  And, you said that the other individual is a

15   *paro*?

16       A.  Yes.

17       Q.  What is a *paro*?

18       A.  A *paro* means they're -- they're just helping the

19   gang member around, for rides; or if anything happen,

20   they will let them know.  They're not full -- they're

21   not one to be a part of the gang in full capacity.  They

22   just want to, you know, get along with them.

23       Q.  What was the role of a *paro* like this individual

24   at a general meeting?

25       A.  Giving a ride to Lil Poison.

1    Q.  Was that what happened in this case, in this

2    instance?

3    A.  I'm assuming, yes.

4              MR. CONTE:  Objection.

5              THE COURT:  Sustained to assumptions.

6    BY MS. MARTINEZ:

7    Q.  In addition to the individuals we've already

8    discussed, were you acquainted with someone whose gang

9    name was Lil Tuner?

10   A.  Yes.

11   Q.  Who was Lil Tuner?

12   A.  He was a member of PVLS.

13   Q.  How long did you know Lil Tuner?

14   A.  About the same time, from 2012 to 2014.

15   Q.  Were there occasions when you met him in person?

16   A.  Yes.

17   Q.  About how many times?

18   A.  One time.

19   Q.  Did you know Lil Tuner by any name other than Lil

20   Tuner?

21   A.  Lil Pesadilla.

22   Q.  In addition to meeting him in person, did you

23   ever speak to him on the phone?

24   A.  Yes.

25   Q.  About how many times?

J. Garcia - Direct                                              165

1      A.   More than 50, I would say.

2      Q.   During what period of time?

3      A.   2012, 2014.

4      Q.   Do you see Lil Tuner, Lil Pesadilla, here in

5   court today?

6      A.   Yes.

7      Q.   Would you identify him based on where he's

8   sitting, specifically, and something that he's wearing.

9      A.   He's wearing kind of a purple -- a purple shirt.

10     Q.   Which row of tables is he seated at?

11     A.   The second one.

12          MS. MARTINEZ:  Your Honor, may the record

13   reflect that the witness has identified Defendant Alvin

14   Gaitan Benitez?

15          THE COURT:  So noted.

16   BY MS. MARTINEZ:

17     Q.   Were you also acquainted with someone whose gang

18   name was Leopardo?

19     A.   Yes.

20     Q.   How did you know Leopardo?

21     A.   I know him by phone.

22     Q.   And who was Leopardo?

23     A.   He was a member of from PVLS clique.

24     Q.   Were there times that you met Leopardo in person?

25     A.   Yes.

1    Q.   How many times?

2    A.   Um, I'd say, one -- a couple of times.

3    Q.   How many times did you speak to Leopardo on the

4    phone?

5    A.   Um, more than 50, 40 times.

6    Q.   Over what time period?

7    A.   2012 to 2014.

8    Q.   Do you see Leopardo in court today?

9    A.   Yes.

10   Q.   Would you identify him based on where he's

11   sitting, specifically, and an item of clothing that he's

12   wearing?

13   A.   He's on the third row, wearing a white shirt.

14           MS. MARTINEZ:  Your Honor, may the record

15   reflect that the defendant has identified -- excuse

16   me -- the witness has identified Defendant Christian

17   Lemus Cerna.

18           THE COURT:  So noted.

19   BY MS. MARTINEZ:

20   Q.   Did you know Leopardo by any other name, other

21   than Leopardo?

22   A.   Leopardo, Gatito.  That's pretty much it.

23   Q.   In addition to these meetings that we've

24   discussed, how did you keep in touch with other gang

25   members?

J. Garcia - Direct                                    167

1    A.   By phone.

2    Q.   During the course of this investigation, what

3    phone did you use?

4    A.   A phone the FBI provide.

5    Q.   Why did the FBI provide you a phone?

6    A.   So, that way I cannot use my personal phone, and

7    record -- and also have that phone specific just for the

8    gangs.

9    Q.   What was the purpose of having a phone specific

10   for the gangs?

11   A.   To record every in and out call.

12   Q.   How were the conversations recorded?

13   A.   On the phone, a device.

14   Q.   Were you able to control whether or not it

15   recorded?

16   A.   No.

17   Q.   How were you instructed to use that phone?

18   A.   Just to gang -- just to record the gang

19   activities.  That's all.

20   Q.   Other than that phone, did you use any other

21   phones during that time period to talk to gang members?

22   A.   No.

23   Q.   What was your strategy to get gang members to

24   talk to you about criminal activity?

25   A.   Like I said, just know how to talk to them, like,

1   persuade them, agree with them, even though, you know,

2   they're completely wrong, just, you know, take sides

3   with them, and, that's how, little by little, you earn

4   their -- their trust.

5       Q.   What do you mean by you would agree with them

6   even though they're completely wrong?

7       A.   Let's say, like, they -- they talking crazy

8   stuff, that you know they're wrong.  I mean, you cannot

9   say anything to them.  You say, "Oh yeah, that's, that's

10  good, that's" -- or just agree with them, pretty much

11  whatever they say.

12      Q.   What kind of crazy stuff?

13      A.   Like, they say, they -- say, they talk about,

14  let's say, a murder, and, you know, you just hear them,

15  but you don't say anything, "You shouldn't do that," or,

16  you -- you know, "Why you did that?"  Stop asking

17  questions that you shouldn't.

18      Q.   Why didn't you ask questions like that?

19      A.   Because, I mean, they're -- they're also smart.

20  They will -- they will know why you asking so many

21  questions that way.  So, that mean that, you -- they

22  will think there's something -- something fishy with

23  you.

24      Q.   From the fall of 2013 through the summer of 2014,

25  how many recordings of PVLS gang members do you estimate

1    you made for the FBI?

2        A.   Hundreds.

3        Q.   How long were these recorded calls?

4        A.   Just depend.  Could be seconds, minutes, hours.

5        Q.   What language did you generally speak to these

6    gang members in?

7        A.   Spanish.

8        Q.   What, if anything, is different about the way

9    that MS-13 gang members speak in Spanish?

10       A.   The only difference will be, they use a word and

11   they use it as a backwards, but it means the same thing.

12   It's just like a code for them.

13       Q.   Were you able to understand code when it was

14   used?

15       A.   Yes.

16       Q.   How?

17       A.   Because, like I said, they use it as a backwards,

18   and then you know what they mean.

19       Q.   How long have you had experience listening to

20   that kind of code?

21       A.   Since I was -- since I been providing all the

22   information to the FBI.

23       Q.   Over ten years?

24       A.   Yes.

25               MS. MARTINEZ:  Your Honor, with the help of

1    the court security officer, I'd like to show the witness

2    Government's Exhibits 7-A through 12-A, and 14-A through

3    23-A.

4              Mr. Toliver, these should be discs.

5    BY MS. MARTINEZ:

6    Q.   Do you recognize Government's Exhibit 7-A through

7    12-A and 14-A through 23-A?

8    A.   Yes.

9    Q.   What are they?

10   A.   They are CDs.

11   Q.   Have you listened to these CDs?

12   A.   Yes.

13   Q.   What do they contain?

14   A.   All the calls -- most of the calls that I record

15   with the gangs.

16   Q.   Do they contain every single call that you

17   recorded, or just some?

18   A.   Some.

19   Q.   Did you listen to these particular CDs?

20   A.   Yes.

21   Q.   How do you know that?

22   A.   Because I listen to them over and over, many

23   weeks ago.

24   Q.   Do you see anything on the discs that allows you

25   to identify these discs as the ones that you listened

1    to?

2        A.   Yes, my initials.

3        Q.   On each disc?

4        A.   Yes.

5        Q.   Do you recall -- when you listen to these

6    recordings, do you recall participating in the

7    conversations?

8        A.   Yes.

9        Q.   Were you able to identify the voices of the other

10   people participating in the conversations?

11       A.   Yes, some of them.

12       Q.   How were you able to identify voices?

13       A.   Because I came to know them face to face, and I

14   used to talk to them every other day, I would say, or

15   every day.

16       Q.   Were there instances, in these recordings or

17   others, where individuals would identify themselves by

18   name?

19       A.   Yes.

20            MS. MARTINEZ:  Your Honor, government would

21   move into evidence Government's Exhibit 7-A through

22   12-A, inclusive, and 14-A through 23-A, inclusive.

23            THE COURT:  7-A through 12-A?

24            MS. MARTINEZ:  Yes, Your Honor.

25            THE COURT:  And 23-A, inclusive?

1          MS. MARTINEZ:  Just for the record, Your

2    Honor, 7-A through 12-A, inclusive, so, 7-A, 8-A --

3          THE COURT:  Right, right.

4          MS. MARTINEZ:  Right.  And then also 14-A

5    through 23-A, inclusive.

6          THE COURT:  All right.  So, 7-A to 12-A, and

7    14-A to 23-A will be received.

8          MS. MARTINEZ:  Yes, Your Honor.  There is no

9    13-A, for the record.

10          THE COURT:  All right.

11   BY MS. MARTINEZ:

12     Q.  When you listened to these recordings on these

13   discs, were you able to review English translations?

14     A.  Yes.

15     Q.  When was that review?

16     A.  When I was listening to the conversations.

17     Q.  Approximately how long ago was it?

18     A.  Three or four weeks ago.

19     Q.  How long did it take you to review all of these

20   recordings?

21     A.  Just depends, because some of the calls are

22   really long, some of them are short.  But I would say

23   all day.

24     Q.  How many days did you spend working on that?

25     A.  A lot of days.

J. Garcia - Direct                                          173

1      Q.   With the help of the court security officer, I
2  would like to show you Government's Exhibits 7-A-1
3  through 12-A-1, inclusive, And 14-A-1 through 23-A-1,
4  inclusive.
5           You may need to flip through the binder just to
6  see all of the exhibits there.
7      A.   7-A to what?
8      Q.   7-A-1, 8-A-1, all the way up through 12.
9      A.   Okay.
10     Q.   And then starting with 14 -- there's no 13.
11  Starting with 14-A-1, all the way up to 23-A-1.
12  Basically, 7 through 23, because there's no 13.
13     A.   Okay.
14     Q.   Do you recognize these exhibits?
15     A.   Yes.
16     Q.   What are they?
17     A.   It's DVDs, phone calls that I record.
18     Q.   So, I actually wanted you to look at the A-1s,
19  which should be paper.  Were you able to do that?
20     A.   A-1.
21     Q.   So 7-A-1, 8-A-1, all the way up through 23-A-1.
22  Sorry for the confusion.
23     A.   7-A-1, right?
24     Q.   Yes.
25          Is 7-A-1 paper?  Is it a paper exhibit?

1          You can take them out of the sleeves, too, so you

2   can see them if you need to.

3      A.   To what number?

4      Q.   Starting with 7-A-1 --

5      A.   Uh-huh.

6      Q.   -- all the way through 23-A-1, each one.  There's

7   no 13.

8      A.   Okay.

9      Q.   Do you recognize these exhibits?

10     A.   Yes.

11     Q.   What are they?

12     A.   That's a -- CDs that contain all the record that

13   I did.

14     Q.   So, one more time.  I wanted you to look at the

15   paper, not the disc.

16     A.   Okay.

17     Q.   Were you able to do that when you were flipping

18   through, or were you looking at the discs?

19     A.   I was looking at the discs.

20     Q.   Okay.  Would you please look at -- so the discs

21   are the As?

22     A.   Yes.

23     Q.   And then there's paper, and the paper are A-1; so

24   starting with 7-A-1.

25     A.   Yes.

1    Q.   And then continuing to 8-A-1 -- and they should

2    all be paper -- all the way through 23-A-1.  Could you

3    look at each of those paper exhibits?

4        Sorry to make you keep flipping through that

5    binder.

6        And just so you know, sir, I think the way that

7    they're packaged up there for you is there's a plastic

8    sleeve.  The disc is on top and the paper is behind it.

9    So it's the paper that I actually want you to review.

10       And if you need to, you can take it out of the

11   plastic sleeve.  So, it's coupled right there with the

12   disc, but I'm talking about the paper.

13   A.   So, I have to remove all of them, or one by one?

14   Q.   My question is going to be, after you've had a

15   chance to look at each of these, whether you recognize

16   them.

17   A.   Yes.

18   Q.   Have you had a chance to -- I know you flipped

19   through there several times, but do you recognize

20   Government's Exhibit 7-A-1, through 12-A-1, inclusive,

21   and 14-A-1 through 23-A-1, inclusive?

22   A.   Yes.

23   Q.   What are they?

24   A.   They are conversations that I had with gang

25   members.

1    Q.   And, the A-1s, what type of exhibit is it?

2    A.   7-A-1?

3    Q.   What is it that you're looking at?

4         Is it a disc or is it paper?

5    A.   It's a paper.

6    Q.   All right.  What is that paper?

7    A.   It's -- contains my name and the name of the gang

8    members that I talked to that day.

9    Q.   Go ahead and look through the paper.  Is it

10   something that you've seen before?

11   A.   Yes, it's the conversation.

12   Q.   What language is that paper in?

13   A.   English.

14   Q.   Have you reviewed that paper?

15   A.   Yes.

16   Q.   Is it a translation of something?

17   A.   Yes.

18   Q.   When did you review it?

19   A.   Three, four weeks ago.

20   Q.   What were you doing when you were reviewing that

21   English translation?

22   A.   I was listening to the Spanish, and at the same

23   time reading in English.

24   Q.   Were you able to review each one of those English

25   translations, 7-A-1 through 12-A 1, and 14-A 1 through

1  23-A-1?

2     A.  Yes, I did.

3     Q.  What were you doing as you reviewed each and

4  every one of those English translations?

5     A.  Listen to the Spanish conversation that I had

6  with the gang members, and also at the same time reading

7  the exhibit.

8     Q.  Now, those exhibits that you have there, do they

9  identify speakers?

10        Are there --

11    A.  Yes.

12    Q.  And, do those identities of speakers match what

13 you were able to determine, based on voice

14 identifications or the ways that the speaker identified

15 themselves?

16    A.  Yes.

17        MS. MARTINEZ:  We would move now, in,

18 Government's Exhibit 7-A11 through 12-A-1, inclusive,

19 and 14-A-1 through 23-A-1, inclusive.

20        THE COURT:  7-A-1 through 12-A 1, and 14-A-1

21 to 23-A-1, will be received.

22 BY MS. MARTINEZ:

23    Q.  When you were reviewing the Spanish language

24 recordings and the English translations, did you

25 generally agree or disagree with the translations?

1    A.  Most of the time, I agree.  There were minors

2  that I disagree, really minor translation.

3    Q.  When you disagreed with a minor translation, what

4  did you do?

5    A.  I talked to the FBI agent and I told them what --

6  what that -- what they trying to mean by that.

7    Q.  And what did you observe happen when you informed

8  an agent that you disagreed with a particular piece of

9  the translation?

10    A.  He, just to type it at the side of the word that

11  was translate, what I think it might be.

12    Q.  Have you had an opportunity to review some

13  translations that contain these corrections that you're

14  referencing?

15    A.  Yes.

16         MS. MARTINEZ:  With the help of the court

17  security officer, I'd like to show the witness what has

18  been marked as Government's Exhibit 7-Z, 8-Z, 10-Z,

19  11-Z, 12-Z, 15-Z, and 18-Z.

20  BY MS. MARTINEZ:

21    Q.  What are these exhibits?

22    A.  Conversations that I have with the gang.

23    Q.  Do these versions include notes about your

24  corrections?

25    A.  Yes.

1    Q.   Were there many corrections?

2    A.   Not that many.

3    Q.   Were these the only corrections?

4    A.   Yes.

5    Q.   Were there also translations where you had no

6    corrections to make?

7    A.   Yes.

8             MS. MARTINEZ:   Your Honor, we would move in

9    now Government's Exhibits 7-Z, 8-Z, 10-Z, 11-Z, 12-Z,

10   15-Z, and 18-Z.

11            THE COURT:   7-Z, 8-Z, 10-Z, 11-Z, 12-Z,

12   15-Z, 18-Z will be received.

13            MS. MARTINEZ:   Your Honor, may we publish

14   Government's Exhibit 12-Z?

15            THE COURT:   Yes.

16            MS. MARTINEZ:   We will go to page 25.

17   BY MS. MARTINEZ:

18   Q.   On page 25, do you see towards the bottom of the

19   screen where "melon" is crossed out and it says "onion,"

20   and that's in red?

21   A.   Yes.

22   Q.   Is that an example of a correction that you made?

23   A.   Yes.

24   Q.   Is that a typical example of the type of

25   corrections you suggested in these translations?

1    A.   Yes.

2    Q.   Are there any other corrections on this page of

3  this translation?

4    A.   No.

5    Q.   In this entire multipage translation, were there

6  any other corrections that you offered?

7    A.   Not on this page.

8    Q.   How about on the other pages?

9    A.   Not that I see.

10            MS. MARTINEZ:  Your Honor, permission to

11  publish Government's Exhibit 7-A-1.

12            THE COURT:  You may publish it.

13  BY MS. MARTINEZ:

14    Q.   What was the date of this recorded conversation?

15            MS. AUSTIN:  Your Honor, may we approach?

16            THE COURT:  Okay.

17            THE WITNESS:  It was January 1st.

18            THE COURT:  Just a second.  Just a second.

19            You wanted to come to sidebar; is that

20  right?

21            MS. AUSTIN:  Yes.

22            THE COURT:  All right.

23            (Thereupon, sidebar conference held as

24  follows:)

25            MS. AUSTIN:  Your Honor, I looked up at the

1    screen and what's being shown has "verbatim translation"

2    written on it.

3            MS. MARTINEZ:  Your Honor, it's possible

4    that our paralegal, although she redacted it from all

5    the versions that the witness currently has, they may

6    have not have redacted it from the system.  I didn't

7    notice it myself.

8            Might we have a brief recess and redact that

9    so we can proceed?

10           I apologize.  I -- I know we redacted it

11   from every single binder, but I think that perhaps our

12   paralegal forgot that the system also needs redactions.

13           THE COURT:  Okay.

14           MS. AUSTIN:  Your Honor, I'm not going to do

15   anything else, but just notify the Court we're going to

16   ask for an instruction at some point regarding these

17   translations, and how the jury should perceive them.

18   That should hopefully clear this up.

19           But at this --

20           THE COURT:  I expect to give an instruction

21   about the question of fact concerning the

22   translations --

23           MS. AUSTIN:  Thank you.

24           THE COURT:  -- of the transcripts.  The

25   instruction I gave to the jury was about the interpreter

1    interpreting testimony, not about the transcripts.

2    Okay?  That's fine.

3              MS. AUSTIN:  Thank you.

4              THE COURT:  So, let me know how much time

5    you need.  I'll send the jury back so they're not

6    waiting in court.

7              MS. MARTINEZ:  May I confer with the

8    paralegal?  I don't want to put her under time pressure

9    that she can't meet.

10             THE COURT:  I'll wait right here.

11             (Pause.)

12             MS. MARTINEZ:  Your Honor, Ms. Griego

13   apologizes.  She needs about 20 minutes and will be able

14   to take care of the problem.

15             She also informed me that while she was

16   sitting there, she just went through and made sure that

17   the other redactions that were agreed over the past few

18   days have already been included on the system.  So,

19   knock on wood, we shouldn't have any problems with any

20   other redactions.  But she did miss the "verbatim" on

21   the cover page.

22             THE COURT:  You want to take a 20-minute

23   recess?

24             MS. MARTINEZ:  Is that okay, Your Honor?

25             THE COURT:  Yes, we have to take a break.

1    Okay.  All right.

2             You all can stay here, and let the jury go

3    back.

4             (Thereupon, the sidebar conference was

5    concluded.

6             THE COURT:  Ladies and gentlemen, we have

7    some technical difficulties.  We'll give you a 20-minute

8    recess.  20-minute recess.

9             (Court recessed at 3:03 p.m. and reconvened

10            at 3:28 p.m.)

11            THE COURT:  You want to bring the witness

12   back?

13            (Witness resumed stand.)

14            THE COURT:  You can bring our jury out,

15   Mr. Toliver.  Thank you.

16            (Jury present at 3:30 p.m.)

17            You may be seated.

18            Counsel, you may proceed.

19            MS. MARTINEZ:  Thank you, Your Honor.

20            All right.  So, we were on Government's

21   Exhibit 7-A-1.  If we could bring up the cover page.

22   BY MS. MARTINEZ:

23      Q.   According to that cover page, what was the date

24   of this recording?

25            Oh, and you know what, sir?  To make it easier

J. Garcia - Direct                                           184

1   for you, everything is going to come up on the screen
2   right there.
3         You can take that paper, get it out of your way
4   so you have some space at the stand.  If for some reason
5   we need it back, we will take it back.  But we can use
6   the screen from here on.
7         So, looking at the screen and at the cover page
8   of Government's Exhibit 7-A-1, what was the date of this
9   recording?
10  A.   It's December 12th -- I mean December 6th, 2013.
11  Q.   Who was involved in this recording with you?
12  A.   It was Peluca, or Greñas, from PVLS.
13  Q.   Turning to page six of this translation, I'm
14  going to start towards the bottom of page six, about
15  three lines up.  If you could review the last few lines
16  of that translation just to refresh your memory, and
17  then I'm going to ask you a couple questions.
18  A.   Can you repeat that again, which lines?
19  Q.   Absolutely.  The last three speakers at the
20  bottom of the page, review that for a moment, and then
21  I'm going to ask you questions.
22  A.   Okay.
23  Q.   All right.  Who is JR speaking here?
24  A.   That's me, Junior.
25  Q.   And JL is?

1    A.   Peluca.

2    Q.   So, starting with where you say, "Hey, and what's

3    up with Demente," who is Demente?

4    A.   He was a member -- he's a member of PVLS clique.

5    Q.   All right.  And what were you asking in relation

6    to Demente?

7    A.   Because he originally got arrested.

8    Q.   All right.  And who were you speaking to here?

9    A.   Peluca, or Greñas, from PVLS.

10   Q.   What was Greñas's response?

11   A.   That he was going to go to court and find out

12   what -- what's going on with Demente.  But, Payaso --

13   Q.   What -- what did you understand "court" to mean

14   in this -- in this instance?

15   A.   That he's -- he's in jail, and he has a hearing.

16   Q.   So, a normal court?

17   A.   Yes.

18        MS. MARTINEZ:  May we show the witness what

19   has been actually already admitted as Government's

20   Exhibit 66-A.

21        We can just put it on the screen if Your

22   Honor doesn't mind.

23        THE COURT:  That's fine.

24        MS. MARTINEZ:  It's been admitted already.

25        Sorry, Mr. Toliver.

BY MS. MARTINEZ:

Q.   Do you recognize this person?

A.   Yes.

Q.   Who is that?

A.   Peluca from PVLS.

Q.   Is that the individual you're speaking to in this transcript we're looking at?

A.   Yes.

Q.   All right.  Let's go back to the call, Government's Exhibit 7-A-1.  All right.  We were on page six.

Now, when Greñas responds about court, he mentioned Payaso.  Who is Payaso?

A.   He was the first word from jail, to PVLS clique outside.

Q.   What do you mean, "from jail"?

A.   He was in jail, but, he was -- he was giving the orders from jail to the clique outside.

Q.   Turning to page --

MR. CONTE:  Objection, Your Honor.  There's no foundation for that.

THE COURT:  If you'd lay a foundation.

BY MS. MARTINEZ:

Q.   How long have you -- how do you know about Payaso?

1    A.   By phone, and, I met him back in 2002.

2    Q.   What do you mean when you say you know him by

3    phone?

4    A.   We talked on the phone a lot of times.

5    Q.   What do you know about his position within PVLS?

6    A.   He was -- that he was the first word.

7    Q.   And, what, if anything, did he tell you about his

8    location when you were speaking to him on the phone?

9    A.   That he was in jail.

10   Q.   Moving on to page seven.

11        I have a number of questions I'm going to ask you

12   about this page.  If you could start reviewing the page,

13   and we'll start from the top, down.  But take a moment

14   to refresh your memory.

15             MS. MARTINEZ:  And, Your Honor, perhaps this

16   would be a good time to note for the record that, for

17   the jurors, there are transcript binders under

18   everyone's chairs, to the extent to jurors want to

19   follow on paper in addition to the screen, if Your Honor

20   would permit that.

21             THE COURT:  You can if you'd like.

22             MS. MARTINEZ:  For any jurors who are

23   opening their exhibit book, we are on Government's

24   Exhibit 7-A-1, and we're on page seven.

25             THE WITNESS:  Okay.

1    BY MS. MARTINEZ:

2        Q.   Starting at the top of the page, Greñas

3    references bail.  What did you understand "bail" to mean

4    in this context?

5        A.   He was -- he's referring to bail of Demente,

6    because he's in jail.  He is trying to find out how much

7    is the bail.

8        Q.   And why were you discussing -- or why was Greñas

9    discussing Demente's bail with you?

10       A.   Because I asked him --

11               MR. LEIVA:  Your Honor, I object.  Calls for

12   speculation.

13               THE COURT:  Overruled.

14   BY MS. MARTINEZ:

15       Q.   You can go ahead and answer.  Why was Greñas

16   discussing Demente's bail with you?

17       A.   Because he was arrested.

18       Q.   Do you know what he was arrested for?

19               MR. CONTE:  Objection.

20               THE WITNESS:  Yes.

21               MR. CONTE:  Calls for hearsay response.

22               MS. MARTINEZ:  Your Honor, I can lay the

23   foundation, but, the -- the foundation will be that

24   other gang members told him, which, of course, is

25   permissible.

1         MR. CONTE:  If she lays a foundation, Your

2    Honor.

3         THE COURT:  All right.

4    BY MS. MARTINEZ:

5    Q.  You said that you do know what he was arrested

6    for; is that right?

7    A.  Yes.

8    Q.  How do you know what he was arrested for?

9    A.  Because they told me -- the gang members from

10   PVLS told me what he was arrested for.

11   Q.  What was Demente arrested for?

12   A.  For the 12 shotgun.

13   Q.  What do you mean by "the 12 shotgun"?

14   A.  He got arrested for a gun.

15   Q.  What kind of gun?

16   A.  A 12 shotgun.

17   Q.  Further down the page, the fifth speaker, there's

18   a reference to a 12 and a machete.  Do you understand

19   what that reference is about?

20   A.  Yes.

21   Q.  Can you tell the jury?

22   A.  They don't -- they don't speak the full terms of

23   what is it.  They will say, probably, 12.  But we know

24   what 12 means, a 12 shotgun.  And, of course, a machete

25   is a machete.

 1    Q.   Further down the page, you ask, "Who were you
 2  going to hit?"
 3         What did you mean by, "Who were you going to
 4  hit?"
 5    A.   They were -- they were going to kill someone.
 6    Q.   Who was the intended victim?
 7    A.   Peligroso from PVLS.
 8    Q.   Do you know who was planning to kill Peligroso?
 9    A.   Yes.  It was Peluca, Demente --
10         MR. LEIVA:  Your Honor, excuse me.  I would
11  object to foundation, lack of foundation.
12         THE COURT:  Foundation.
13  BY MS. MARTINEZ:
14    Q.   Going forward, sir, if I ask you, "Do you know,"
15  just answer "yes" or "no," and then I'll ask a follow-up
16  question.  Okay?
17         All right.  Do you know who was going to go kill
18  Peligroso?
19    A.   Yes.
20    Q.   How do you know?
21    A.   Because they told me.
22    Q.   Who is they?
23    A.   Peluca from PVLS.
24    Q.   Who was going to go kill Peligroso?
25    A.   Peluca from PVLS, Demente from PVLS, and some

J. Garcia - Direct                                                      191

1    other *chequeo* that I don't know.

2        Q.   All right.  Now, continuing towards the bottom of

3    the page, the last thing that Greñas says there, he

4    says, "We're going to do the hit.  What a coincidence."

5    Do you understand what he meant by "coincidence" there?

6        A.   Yes.

7        Q.   What did he mean?

8        A.   He explaining to me that there was some cops

9    already on the place that they were going to hit

10   Peligroso, and what a coincidence the police was already

11   there, without them turning to anybody.

12       Q.   What was the significance of him calling it a

13   coincidence?

14       A.   He thinks somebody -- somebody rat them out.

15       Q.   Continuing to page eight, I have a few questions

16   about this page.  If you could review briefly, and then

17   I'll ask you questions.

18       A.   Okay.

19       Q.   Okay.  In the first few exchanges in the top of

20   the page, what are you and Greñas talking about?

21       A.   He's -- he's talking about, um, they got stop by

22   the police, and they find out what they were up to that

23   night.

24       Q.   Where did they get stopped by the police?

25       A.   They went to Taco Bell, and after Taco Bell, he

1   says, they got stopped.

2       Q.   Greñas says that it was strange.  Do you

3   understand what he meant by that?

4       A.   Yes.  That he -- he thinks somebody say

5   something -- somebody rat him out.

6       Q.   Did he tell you who he thought had ratted him

7   out?

8       A.   He said, he think it's Drowsy.

9       Q.   Now, if you continue to the long paragraph in the

10  center of the page, Greñas says, "We have to

11  investigate."  Do you understand what he means by

12  "investigate"?

13      A.   He now -- he think that it's definite somebody

14  rat him out.  They need to find out who it is.

15      Q.   What do you mean, he has to find out who it is?

16      A.   They need to check -- they need to check within

17  his clique or whoever they talk to, who might be the

18  rat.

19      Q.   What do you mean by "rat"?

20      A.   That somebody is talking to the police.

21      Q.   What's the problem with talking to the police,

22  within MS-13?

23      A.   That's a rule.  You're going to get killed.

24      Q.   Later in that same paragraph, Greñas says, "He

25  showed me a paper."

J. Garcia - Direct                                          193

1              Do you understand what that means?

2         A.   Yes.

3         Q.   What is a paper?

4         A.   Give me a second.

5              Pretty much, he -- what I understand, the police

6    show him what he was saying.

7         Q.   What do you mean, "the police showed what he was

8    saying?"

9         A.   That, what he was talking to the other gang

10   members without him.  He been talking to the police.

11        Q.   Who?

12        A.   Greñas.

13        Q.   All right.  Continuing on to page nine.  If you

14   could review the first half of this page, then I'll ask

15   you questions.

16        A.   Okay.

17        Q.   What did you understand Greñas to mean when he

18   said, "We're just like the FBI"?

19        A.   They will -- they will find you and they will

20   kill you for being a rat.  It don't matter how long it

21   takes.

22        Q.   What did you understand when he says, "We always

23   hit"?

24        A.   That they always kill.

25        Q.   A second time he says, "We're just like the FBI,"

1    he says, "the Mara."  What is the Mara?

2        A.   It's the MS-13.  It's the gang.

3        Q.   And then continuing to the next thing he says,

4    "Investigating, but that we get them, we get them."

5    What do you understand that to mean?

6        A.   Until they find out who's the rat, they --

7    they're not going to -- they're not going to stop.

8    They're going to find who it is and they're going to

9    kill him.

10       Q.   Let's turn now to page 11.  Please review this

11   page, and look up when you're done and I'll ask you

12   questions.

13       A.   Okay.

14       Q.   Starting with the first paragraph at the top of

15   the page, when Greñas says, "These are the

16   consequences," what do you understand that to mean?

17       A.   He's trying to make a point that if you rat or

18   something, you're going to die, by killing someone.

19       Q.   The next paragraph, he says, "Sometimes when

20   they're rats, you understand, we cut their heads off."

21            What did you understand him to mean there?

22            MR. AQUINO:  Judge, I will note an

23   objection.  I think it calls for speculation on the part

24   of the speaker.  This person has not been identified as

25   a gang expert.

1          THE COURT:  No, he hasn't, but he is a gang

2    member.  Objection overruled.

3    BY MS. MARTINEZ:

4      Q.   What did you understand Greñas to mean when he

5    says, "Sometimes when they're rats, you understand, we

6    cut their heads off"?

7      A.   When they find a rat within the gang, they're

8    going to take -- going to cut your head off.

9      Q.   What is a rat to MS-13?

10     A.   A rat is someone that talk to the police.

11     Q.   The next line that Greñas says, "Dismembered, son

12   of a bitch, we hacked him all up in pieces."  Do you

13   understand who he is talking about there?

14     A.   Yes.

15     Q.   Who was he talking about?

16     A.   Lagrima.

17     Q.   Who was Lagrima?

18     A.   He was a member of PVLS clique.

19     Q.   What did you understand him to mean when he says,

20   "We hacked him all up in pieces"?

21     A.   That they cut him up with a machete in pieces.

22     Q.   What was Greñas's tone of voice when he

23   referenced cutting up Lagrima with a machete?

24     A.   He was heartless.

25          MR. CONTE:  Objection, Your Honor.

1          THE COURT:  What's the objection?

2          MR. CONTE:  He doesn't -- I don't think this

3    witness can say whether he was heartless or not.

4          THE COURT:  I'll give you a chance to

5    cross-examine.  Objection overruled.

6    BY MS. MARTINEZ:

7    Q.   Now, continuing a couple lines down, you say to

8    Greñas, "I thought that asshole was kidding me when he

9    told me about that."  Who are you talking about?

10   A.   Because I remember somebody else told me -- I

11   can't recall it right now -- about Lagrima's murder.

12   Q.   How does Greñas respond to you saying you thought

13   someone else was kidding?

14   A.   No, he was -- he says, they did, they dismembered

15   Lagrima.

16   Q.   Now, the next line down for Greñas, he says, "We

17   dismembered him, two -- two times, we dismembered him."

18   Do you understand what he meant when he says they

19   dismembered him two times?

20   A.   Yeah.  They -- they cut him in pieces twice.

21   Q.   Continuing, he says, "We reburied him, and then

22   we went and took him out and we dismembered him, and

23   then we buried him again."  Do you understand what he

24   meant there?

25   A.   Yes.

1   Q.   Please tell the jury.

2   A.   They kill him, they bury him.  Then they went

3   back to unbury him, and cut him and bury him again.

4   Q.   After that, you ask about someone's sister

5   calling the cops.

6   A.   Yes.

7   Q.   Whose sister?

8   A.   Lagrima's sister.

9   Q.   Why did you ask about Lagrima's sister?

10  A.   Because, if someone is missing, I mean, the first

11  thing that comes to my mind is family member, they were

12  going to look for them.

13  Q.   The very bottom of the page, the last thing you

14  say on this page is, "Didn't anyone chicken out, man?"

15  What do you mean by "chicken out"?

16  A.   They -- when they were killing Lagrima, if

17  anybody feel remorse or not to do it.

18  Q.   Why did you ask Greñas whether anyone chickened

19  out?

20  A.   Because -- I ask him, so that way I can approach

21  to that -- to that person, instead of the crazy ones.

22  Probably they can -- they can talk or they can say

23  something that can -- I can talk to the FBI about it, or

24  how to approach them.

25  Q.   Why would you want to talk to someone who had

1    chicken out during the murder?

2        A.   Because, that show you that at least, they --

3    they didn't want to do it at some point, but, they end

4    up doing it.  But there's not like -- like I would say,

5    crazy from the head.

6        Q.   What would be the purpose of talking to that

7    person about the murder?

8        A.   Just to find out how -- where was Lagrima, how

9    they kill him, who kill him.

10       Q.   What would you do with that information?

11       A.   I would give it to the handler right away.

12       Q.   Continuing to the next page, page 12, please

13   review that page, and then I'll -- and look up when

14   you're finished.

15       A.   Okay.

16       Q.   How did Greñas respond to your question about

17   whether anyone chickened out during the murder of

18   Lagrima?

19       A.   He said, "Yes, there was one."

20       Q.   Who did he say chickened out?

21       A.   He says it was Lil Slow.

22       Q.   Who was Lil Slow?

23            Do you know who Lil Slow is?

24       A.   Yes.

25       Q.   Who is Lil Slow?

1     A.   A homeboy from PVLS.

2     Q.   Have you met Lil Slow in person?

3     A.   Yes.

4     Q.   Have you spoken to him on the phone?

5     A.   Yes.

6     Q.   About how many times?

7     A.   Only 40 times, I would say.

8     Q.   When Greñas says, "Look, he grabbed the knife

9  from me, homie, and started to cut him up all over,

10  without mercy," who is he talking about?

11    A.   Lil Slow.

12    Q.   How did you reconcile that statement with Greñas

13  saying that Slow had chickened out?

14    A.   Can you repeat the question --

15    Q.   Sure.

16    A.   -- a different way, please?

17    Q.   You said that Greñas said Slow chickened out.

18  And then later Greñas talks about Slow cutting up

19  Lagrima.

20    A.   Yes.

21    Q.   What was your understanding of Greñas's

22  explanation about Slow?

23    A.   At the beginning -- the only -- what I understand

24  is, at the beginning Slow kind of didn't want to do it,

25  but then he just went crazy on Lagrima.

J. Garcia - Direct                          200

1    Q.   Towards the bottom, there's one long paragraph by
2    Greñas.  He says, at the -- towards the beginning,
3    "Respect for that son of a bitch, because that son of a
4    bitch has turned out to be solid for us."  Who is he
5    talking about?
6    A.   Lil Slow.
7    Q.   What does he mean by respect for Lil Slow?
8    A.   He think that by Lil Slow showing what he did to
9    Lagrima, he -- he earned his respect.
10   Q.   And what does he mean by "turned out to be solid
11   for us"?
12   A.   Like, he -- he's -- he's a -- he's a -- I would
13   say, he's hundred percent for the gang, and nothing else
14   but the gang.
15   Q.   Towards the ends of that paragraph, he talks
16   about dismembering, and then says "bury him at 15 days,
17   getting him out again."  What do you understand him to
18   be talking about there.
19   A.   It's about what they did to Lagrima.
20   Q.   What did they do to Lagrima?
21   A.   They bury him and then they unbury him after
22   15 days.
23   Q.   And then Greñas says, "You have to have some
24   balls on you."  What did you understand that to mean?
25   A.   That, you have to be -- you have to be crazy to

 1   do that.

 2        Q.   The very last thing you say on this page, you

 3   asked Greñas, "Why did you get him out again at

 4   15 days?"  Why did you ask him that?

 5        A.   Because, I wanted to know the reason why, why

 6   they did that for, you know, what was in their minds.

 7        Q.   Why did you want to know?

 8        A.   Because, it's only -- I can't even put words to

 9   somebody that crazy would do that, just for no reason.

10        Q.   Let's turn to page 13.  How did Greñas respond to

11   your question about why he would do that?

12        A.   You want me to read the whole page?

13        Q.   Let's just start with his response to your

14   question.

15        A.   He just -- his response is like, he just want to

16   know how mentally all of them are, his clique and

17   himself.

18        Q.   What do you mean by "how mentally all of them

19   are"?

20        A.   How crazy, how crazy they are.

21        Q.   What did you understand by "mental capacity" to

22   mean, in his response?

23        A.   The crazier, who is crazier gets in the whole

24   clique.

25        Q.   And who is Greñas referring -- who did you

J. Garcia - Direct                                        202

1    understand Greñas to be referring to when he's talking
2    about mental capacity?
3        A.   He's talking about himself.
4        Q.   Continuing down to the very bottom of the page,
5    the last three lines there, Greñas says, "Yes, no, man,
6    look, I" -- please review from there to the bottom, and
7    then I have a couple questions.
8        A.   Okay.
9        Q.   What do you understand Greñas to mean when he
10   says, "I was the one in charge"?
11       A.   That he was the one in charge of Lagrima's
12   murder.
13       Q.   He then says, "I called down there."  Do you
14   understand what he meant when he --
15       A.   Yes.
16       Q.   -- said he called down there?
17       A.   That means that he called El Salvador.
18       Q.   Why would he call El Salvador?
19       A.   Because, they need to get the okay from
20   El Salvador gang, or his clique, if they want to kill
21   somebody.
22       Q.   Why?
23       A.   Because their rules, they need to have proof.
24   They need to have -- the guys need to get the okay, and
25   they need to explain why they want to kill that person.

J. Garcia - Direct                                         203

1    Q.  What do you mean by "proof"?

2    A.  Proof, like, what he says they have seen, what

3    they say -- if there is any paper that says that he have

4    talk to a police, or anything that can implicate

5    Lagrima.

6    Q.  Continuing in that same section, he says,

7    "Everyone was at the meeting there.  Prove it, he said

8    to me.  So, I proved it."  What do you understand that

9    to mean?

10   A.  Means that he call El Salvador, and everybody was

11   there, all the -- the first words of the clique,

12   whoever, they have control, and they asked for proof,

13   and he has the proof.

14   Q.  You then ask, "Poison?"  Who is Poison here?

15   A.  Poison -- Poison was the -- was the, I would say,

16   the shot caller from El Salvador to his clique back up

17   here.

18   Q.  Which clique?

19   A.  PVLS clique.

20   Q.  Why did you ask about Poison here?

21   A.  Because they always go to Poison.  Anything, any

22   question, anything, any okay that they needed to, they

23   always go to Poison.

24   Q.  Turning to page 14, please review that page and

25   then I'll ask you a few questions.

1    A.   Okay.

2    Q.   The first thing Greñas says on that page is, "All

3   of the shot callers were there."  Who were the shot

4   callers?

5    A.   All of them in the gang in El Salvador, PVLS.

6    Q.   And when he says "there," what is he talking

7   about?

8    A.   In El Salvador.  "There" means he call El

9   Salvador.

10    Q.   And then you respond briefly, and then Greñas has

11   a lengthy paragraph.  What is he talking about in that

12   long paragraph?

13    A.   He's just saying that, like, 75 percent agree

14   with him, to give him the go-ahead to kill Lagrima.

15    Q.   75 percent of who?

16    A.   Of the gang in El Salvador.

17    Q.   He mentions the 7-Eleven in that paragraph, and

18   then again, "the 7."  Do you understand what he's

19   talking about?

20    A.   Yes.

21    Q.   What is he talking about?

22    A.   It just meant to meet -- he told Lagrima about a

23   deal, a drug deal that was going to happen.  He just

24   told him where, and what they were going to do about the

25   drug business.  And, for some reason, the police showed

J. Garcia - Direct                                                205

1    up.  They were there.  So, that's what he -- he
2    thought -- he think that Lagrima was a rat.
3        Q.  Why?
4        A.  Because he think that Lagrima snitch on them.
5        Q.  At the end of that paragraph, he says, "How
6    strange, homeboy, that the detectives showed up."  What
7    did you understand that to mean?
8        A.  Those are the key words.  When they use
9    "strange," that means that -- it's somebody -- they
10   think somebody's ratting -- somebody is a rat.
11       Q.  A few lines later, Greñas says, "So, you tell
12   me" -- "so" -- and then dot dot dot -- "so then I sent
13   the proof down there."  What do you understand him to
14   mean by "the proof"?
15       A.  The proof means that whatever they asking in El
16   Salvador, he send them to get the okay.
17       Q.  What do you understand the proof was in this
18   instance?
19       A.  Proof that -- he has any paper, or if he saw with
20   his own eyes.  That's what I would think of the proof.
21       Q.  And to be clear, here, it's proof of what?
22       A.  Of, he was a rat.
23       Q.  Who?
24       A.  Lagrima.
25       Q.  Moving on to page 15.  Please review that page,

 1   and look up when you're done.

 2       A.   Okay.

 3       Q.   In the middle of this page, Greñas says, "He --

 4   as he was dying, he told us, 'let me be,' he said, 'I

 5   swear I'll tell you everything that was said and who

 6   else,' he told me.  There's someone else involved."

 7            Who do you understand Greñas to be talking about

 8   here?

 9       A.   Lagrima.

10       Q.   What is he saying about Lagrima?

11       A.   Lagrima pretty much was begging for his life, and

12   he was going to tell them who was the rat.

13       Q.   Did Lagrima tell Greñas who the rat was?

14       A.   He just saying he mention it's really another

15   gang member.

16       Q.   What was Greñas's tone of voice when he said that

17   Lagrima was begging for his life?

18       A.   Like I said, he -- no remorse.

19       Q.   Down towards the bottom of the page, Greñas says,

20   "Yes, no man, and when -- when we got to him, I told

21   him, it was all of a sudden."  Who do you understand him

22   to be talking about there?

23       A.   About Lagrima.

24       Q.   He then says, "We had everything thought out."

25   What do you understand that to mean?

1    A.   That all his clique knew what was going to happen

2    to Lagrima.   They -- they knew how they were going to

3    kill him, where they were going to kill him.

4    Q.   He says, "We let him be seen with other people,

5    but not to be seen with us."   What do you understand

6    that to mean?

7    A.   It was just to make people feel -- think that

8    they were not with them, when probably Lagrima

9    disappear.   He was with somebody else.

10   Q.   Moving on to page 16.

11        I'm just going to ask about the first response

12   from Greñas there, so if you could review just the first

13   several lines.

14   A.   Okay.

15   Q.   When Greñas say, "The day that the son of a bitch

16   left us," what do you understand that to mean?

17   A.   Lagrima was dead.

18   Q.   Then he talks about something called the beast.

19   What is the beast?

20   A.   The devil.

21   Q.   He says, "The beast sang for joy."   What does

22   that mean?

23   A.   That means the devil was happy for what they had

24   done.

25   Q.   What had they done?

J. Garcia - Direct

1    A.   They killed Lagrima.

2    Q.   He then said, "Twice he sang for joy."  What did

3    you understand him to mean when he said that the beast

4    sang for joy twice?

5    A.   The devil was happy for what he had done, twice.

6    Like when you go to church, if you're a Christian, you

7    follow what God wants.  So if you're doing good stuff, I

8    mean, you're okay with God.  But, with the devil, the

9    worse, the crazier that you get, it's just pretty much

10   worship the devil.

11   Q.   What role does the devil or the beast play in the

12   culture of MS-13?

13   A.   It's a sign.  So, it's a sign they show, the two

14   horns of the devil.

15   Q.   After Greñas says, "Twice he sang for joy," he

16   says, "the time we hit him and the time we took him

17   out."  What did you understand him to mean by the time

18   we hit him?

19   A.   The time that Lagrima got kill, and the time that

20   they went back and bury him -- bury him back.

21   Q.   Continuing to page 17, please review this page,

22   starting with in the middle where Greñas says, "No,

23   well, we'll see what's going on," that long paragraph to

24   the end of the page.  And look up when you're done.

25   A.   Okay.

1    Q.   In the middle of that paragraph, in the middle of

2    the screen, Greñas says, "This is what will happen to us

3    if we rat."  What did you understand him to mean by

4    that?

5    A.   They going to kill you if you rat, if you talk to

6    the police.

7    Q.   Who is going to kill you?

8    A.   The MS-13, or the gang.

9    Q.   Then he continues and he says, "I told them this:

10   whoever rats will get dismembered."  Who did you

11   understand Greñas to be telling that whoever rats will

12   get dismembered?

13   A.   To his clique, the members of his clique, PVLS.

14   Q.   What did you understand him to mean by

15   "dismembered"?

16   A.   They -- they cut him in pieces.

17   Q.   Was that code or literal?

18   A.   That was literal.  They cut them in pieces.

19   Q.   And he says, "If we don't get him, then somebody

20   they care about will get dismembered."  What did you

21   understand that to mean?

22   A.   They -- they go after your family.  If they're

23   not able to get you, they going to go after your family

24   or somebody close to your family, or whoever they feel

25   that they can hurt, they hurt you at the same time.

1    Q.   And, do what to the family?

2    A.   Kill.  Just kill, nothing else.

3    Q.   The next thing Greñas says is, "Yes, and since

4   what I do is this, I bury him shallow and go back to

5   take him out at 15 days so I can dismember him again and

6   rebury him again."  Who do you understand him to be

7   talking about?

8    A.   What he did to Lagrima.

9    Q.   What do you understand him to be saying he did to

10  Lagrima?

11   A.   He kill him, bury him, went back after 15 days,

12  unbury him and bury him back.

13   Q.   Towards the bottom of the page, the

14  second-to-last thing that Greñas says is -- the second

15  half of it -- "So you've never dismembered people, man?"

16  What did you understand him to be asking you?

17   A.   That if I have -- I ever done that.

18   Q.   What did you say?

19   A.   I said, "No."

20   Q.   Why?

21   A.   Because, I never done that.

22   Q.   What was Greñas's reaction when you said you'd

23  never done something like that?

24   A.   Well, I thought that he was going to think

25  something of me, like, this guy, you know, he's

1   probably -- he's not that big what they say, or I

2   shouldn't be talking to him.  But he didn't say anything

3   else.

4       Q.   Please turn to page 18, just the first 13 -- or

5   the first -- excuse me -- the first three lines.  He

6   asks you again, "So you've never dismembered people?"

7       A.   Yes.

8       Q.   And what do you say?

9       A.   "No."

10      Q.   Why didn't you brag and pretend that you had done

11  things like Greñas had done?

12      A.   Because there's nothing, you cannot brag about

13  that.

14      Q.   Why not?

15      A.   Because there's a rules in the gang that, they

16  know me, they say I brag about it, and they know that I

17  hadn't done anything, then, I can -- they're going to

18  kill me, pretty much, or they're going to put you on a

19  mission to do it, to prove yourself to the gang.

20      Q.   What do you mean by "a mission"?

21      A.   A mission go and kill someone.  If you brag about

22  and you hadn't done it, then you -- you need to prove to

23  the gang.

24      Q.   After this conversation where you didn't brag to

25  Greñas --

1    A.   Uh-huh.

2    Q.   -- did Greñas continue speaking to you?

3    A.   Yes.

4    Q.   Please turn to page 19.  And I'm going to ask you

5    about that last paragraph by Greñas at the bottom.

6    A.   Okay.

7    Q.   What did you understand Greñas to be talking

8    about?

9    A.   He's talking about -- he's talking about Lagrima.

10   Q.   What is he saying about Lagrima?

11   A.   That, pretty much, Lagrima was begging for his

12   life.

13   Q.   When?

14   A.   When he was getting killed.

15   Q.   Please turn to page 20.  At the top of the page,

16   what did Greñas say about his response to Lagrima when

17   Lagrima was begging for his life?

18   A.   Pretty much he -- he didn't care.  Like I say, he

19   just say kill him.  He didn't pay attention what he was

20   saying.

21   Q.   In the transcript at the end of that it says,

22   bracket, laughs, bracket.  What does that mean?

23   A.   Say that again, please.

24   Q.   At the very end of that -- of that lines at the

25   top, where it says, "laughs"?

1    A.   Uh-huh.

2    Q.   Was he laughing on the call?

3    A.   Yes, he was laughing.

4    Q.   The next thing that Greñas says, the second half

5  of that paragraph, he says, "Look, we grabbed him by the

6  hands.  We knocked him down.  We machete him."  What do

7  you understand him to be describing?

8    A.   They used a machete to hurt Lagrima, to cut him

9  in pieces.

10   Q.   What else did Greñas say there about what he did

11 to Lagrima?

12   A.   They knocked him down with the machete.

13   Q.   When he continues and says, "The bone in that son

14 of a bitch's head was tough, because I wasn't able to

15 take it off," what did you understand that to mean?

16   A.   I understand that they were trying to cut his

17 head, and, they couldn't.

18   Q.   If we could turn now to Government's

19 Exhibit 8-A-1.  Beginning with the cover page here, what

20 was the date of this recording?

21   A.   It was January 26, 2014.

22   Q.   Who were you speaking to in this recording?

23   A.   I'm -- I'm talking to -- this is myself and Lil

24 Payaso from PVLS.

25            MS. MARTINEZ:  If you could show the witness

1    what has been marked for identification purposes as

2    Government's Exhibit 67-C.

3              Your Honor, while Mr. Toliver gets that

4    exhibit, can we approach briefly?

5              THE COURT:  Yes.

6              (Thereupon, the following side-bar

7    conference was had:)

8              MS. MARTINEZ:  Your Honor, as the jurors are

9    going to be reading transcripts, I noticed several

10   times, several of time pick up a pen and thought better

11   and put it down.  Are the jurors permitted to take notes

12   in the transcript binder, now that we resolved that?

13             THE COURT:  Are these going to be their

14   notebooks for --

15             MS. MARTINEZ:  I don't see why they can't

16   be.  They've all been admitted and all the redactions

17   have been resolved.  Everything in the binder has now

18   been admitted.  It seems to me it would be helpful for

19   deliberations, rather than taking notes in a little note

20   pad while they're looking at a big binder.

21             All these exhibits will go back for

22   deliberation.  I think the question is just whether Your

23   Honor permits them to take their own binder back, or

24   just the one court binder.

25             I submit for deliberation, if they're going

 1    to read the transcripts, it would probably be to

 2    everyone's benefit if they have their own copies, and

 3    don't have to share one copy among 12 jurors to try to

 4    read transcripts.

 5              THE COURT:  I'm all in favor of efficiency.

 6    So let everyone take notes.

 7              MR. CONTE:  I would object.  In this case,

 8    the Spanish language involved, they're never allowed to

 9    take transcripts back in, in many of these cases where

10    Spanish language is involved.

11              So I'm going to object to them taking the

12    transcripts back in the case.  Transcripts generally are

13    not evidence.  It's the recordings that are evidence.

14              But given the circumstances of Spanish

15    language, we're making do.  I just think this is

16    improper.  Counsel is going through line by line what

17    the people said.  And to permit the jurors to take the

18    transcripts back, we wouldn't do it in an English

19    speaking case, and I don't see why we would do it in

20    this case here.

21              THE COURT:  All right.  The reason we're

22    doing it in this case is because the transcripts -- all

23    the recordings would be in Spanish, right?

24              MR. CONTE:  Right.

25              THE COURT:  So it wouldn't be probative

evidence.

          I'm not asking you to agree.  I'm saying
that, given the situation, I think I'm going to let them
have the transcript back.  The question is whether they
have one or twelve copies of it.

          Your objection is they should not have any.

          MR. CONTE:  Correct.

          THE COURT:  Objection overruled.

          MS. MARTELL:  I am going to note an
objection.  The issue is not being 12 copies of
transcript, but, if they're going to be taking notes in
them, they're supposed to be guided by their own
memories and their own notes, not the other people's
notes.

          But do the binders have the names on them?
How are we going to keep track of whose binder is whose?
I think by putting -- I think they've been doing fine up
until now.  They can have the binder.  They can read the
transcripts, and have them for efficiency in the jury
deliberations.

          But I think that by allowing them to take
notes in those transcripts, we get into a situation,
perhaps, of some jurors -- some jurors are interchanging
binders and notes are becoming communal type notes.
That's my concern.

1          THE COURT:  Okay.  Thank you.

2          Objection is overruled.  I'll let them use

3     it.

4          (Thereupon, the sidebar conference was

5     concluded.)

6          THE COURT:  Ladies and gentlemen, the

7     transcripts you have are not transcripts prepared by

8     court-certified interpreters.  I want to make sure you

9     understand that.  There's a difference between my

10    instruction at the beginning of the trial about the

11    court interpreters from the witness stand and what you

12    have in these binders.

13          What's in these binders was prepared from

14    the witnesses you heard from, but they are not

15    court-certified.  Do you understand?

16          I'm going to let take notes in these.  And

17    there may be a contest about the accuracy of these

18    transcripts during the trial.  You can take notes in

19    them.  And put your name on the book, so that will be

20    your notebook for deliberations.  Okay?  Thank you.

21          You may proceed, Counsel.

22    BY MS. MARTINEZ:

23    Q.  Do you have in front of you Government's

24    Exhibit 67-C?

25    A.  Yes.

1    Q.   Do you recognize that individual in that picture?

2    A.   Yes.  That's Lil Payaso from PVLS.

3              MS. MARTINEZ:  Your Honor, the government

4    moves to admit Government's Exhibit 67-C.

5              THE COURT:  Received.

6              MS. MARTINEZ:  May we publish?

7              THE COURT:  Yes.

8    BY MS. MARTINEZ:

9    Q.   Returning now to the January 26th recording with

10   Lil Payaso, Government's Exhibit 8-A-1, let's go to page

11   five.

12        I'm going to ask you on this page only about that

13   last line -- well, actually, let me ask you first:  Who

14   are the speakers on this page?

15   A.   Myself and Lil Payaso from PVLS.

16   Q.   Who is JR?

17   A.   Junior.

18   Q.   Who is OC?

19   A.   He's Lil Payaso.

20             MS. MARTINEZ:  Just clarifying so everyone

21   can follow along with who is who.

22   BY MS. MARTINEZ:

23   Q.   The last line there by you, please review that

24   last line and then I'll ask you a question.

25   A.   Okay.

1    Q.   You used the word, *lloron*, l-l-o-r-o-n.

2    A.   Yes.

3    Q.   What does that mean?

4    A.   It's -- it's like a you're saying, cryer,

5    crybaby -- it's not a crybaby, but it's just a term that

6    we -- that they use and I use for Lagrima.

7    Q.   Why do you use that term, *lloron,* to refer to

8    Lagrima?

9    A.   He has a teardrops, two on his left -- left or

10   right cheek.  I can't recall that.

11   Q.   Why were you asking Lil Payaso about Lagrima?

12   A.   Because I want to know, what is -- what was he

13   say about it, and if he say something different about

14   what happened to Lagrima.

15   Q.   Why did you want to know if he would say

16   something different -- well, first of all, different

17   from whom?

18   A.   From Peluca, from Greñas.

19   Q.   Why did you want to know if Lil Payaso would say

20   something different than what Greñas said?

21   A.   Just to find out if whatever they saying is true,

22   or if they -- if he sees something else, action, no.

23   Q.   What was the purpose of you finding out this

24   information?

25   A.   Purpose was to find out -- was if they thought it

1  was somebody else is ratting, or if -- where was

2  Lagrima, all those -- pretty much that's all it was.

3       Q.   What did you do with the information that you

4  learned?

5       A.   I gave it to my handler right away.

6       Q.   Continuing in that same line, you asked Lil

7  Payaso, "Did you ask down there for the okay or what?"

8  What does that mean?

9       A.   That means they -- they got the okay from MS-13

10  down there in El Salvador.

11      Q.   If you could turn to page six, does Lil Payaso

12  answer your question about whether they got the okay

13  from El Salvador to kill Lagrima?

14      A.   Yes.

15      Q.   What was his answer?

16      A.   Yes, that he got the okay from El Salvador.

17      Q.   Now, right after that redacted text there, Lil

18  Payaso says, "That's when we took action."  What did you

19  understand "action" to mean?

20      A.   "Action" means that that's when they killed

21  Lagrima.

22      Q.   In the middle of the page, you say, "What

23  problems did you guys have, man."  What does that mean?

24      A.   I just -- I was asking him what is the reason

25  they kill Lagrima, if they have any -- anything, that

1   they think that he was a rat or something.  That's what

2   I was trying to find out.

3       Q.   If you could review the rest of that page and

4   then look up when you're done.

5       A.   Okay.

6       Q.   You used the word "papers."  You said, "Did you

7   have papers, or what?"  What did you mean by that?

8       A.   I mean, if they have court papers that

9   will incriminate Lagrima, that he was snitching or

10  ratting somebody.

11      Q.   What's the significance about asking about court

12  papers?

13      A.   They suspect that you're a rat, and, you need to

14  prove that you're not by showing if you ever been

15  arrested.

16      Q.   How would it help to show whether you'd ever been

17  arrested?

18      A.   It will show how you got out, or, if you had

19  attended court, or anything like that.

20      Q.   Why does the gang ask for paperwork from arrests

21  and court?

22      A.   Because they know anybody who doesn't have paper

23  got arrested for anything, they're not going to let them

24  out.  They're going to be in jail.  They're going to be

25  most likely deported.

1    Q.   What conclusion do gang members reach if someone

2    gets released quickly?

3    A.   They will -- that will be a red flag.  They would

4    think that he's talking to the police.

5    Q.   How --

6              MR. CONTE:  Your Honor, may we approach?

7              THE COURT:  Yes.

8              (Thereupon, the following side-bar

9    conference was had:)

10             MR. CONTE:  Judge, I apologize.  I may -- I

11   think I might be confused, but, the government is

12   referring to 8-A.  Is that not what -- you gave us last

13   night was 8-Z.

14             MS. MARTINEZ:  We're not doing 8-Z right

15   now.  We're doing 8-A-1.

16             MR. CONTE:  The 8-1 is redacted.

17             MS. MARTINEZ:  The A-1 is redacted.  You may

18   not have a printed redacted version, but they are

19   redacted.

20             MR. CONTE:  I'm looking at the book that you

21   gave us.

22             MS. MARTELL:  Crystal just gave us exhibits.

23   They haven't given it to everybody.

24             MR. CONTE:  That's why I'm confused.

25             MS. MARTINEZ:  You asked for exhibits early

1    before they were final, so we gave you the unredacted

2    version.  And as they were redacted, we gave you

3    redacted.

4               MR. CONTE:  I'm sorry.  I haven't received

5    it.

6               MS. MARTINEZ:  As you can see on the screen,

7    they are redacted and redacted in the juror's.

8               MR. CONTE:  I appreciate that.  But I'm

9    looking at my book, and I'm confused as to why I'm

10   seeing something in my book different on this screen.

11   And, I'm sorry, I should have it before you start

12   talking about it.

13              MS. MARTINEZ:  We also sent them by e-mail,

14   so --

15              MR. CONTE:  I got 8-Z by e-mail last night.

16   That's why I have it here.

17              MS. MARTELL:  We never got the redacted

18   8-A-1 by e-mail.

19              I think this is a good time -- Amy Austin

20   and myself got them, but I don't think the rest of

21   counsel got them.  So if we can distribute them to them,

22   I think that would -- might make a difference.

23              MS. AUSTIN:  It's confusing.

24              THE COURT:  Okay.  Well, let's uncomplicate

25   it.  Can we distribute them to everyone?  That would be

1    lovely.  Thank you.

2              MR. CONTE:  Thank you, Your Honor.

3              (Thereupon, the side-bar conference was

4    concluded.)

5              THE COURT:  Is everyone in accord now?  Is

6    everyone in accord now?

7              MR. CONTE:  Court's indulgence.

8              THE COURT:  Now is everyone in accord?

9              MR. CONTE:  Court's indulgence.

10             THE COURT:  We're looking at 8-A-1 right

11   now.

12             MS. MARTINEZ:  Page six.

13             THE COURT:  Page six.  8-A-1, page six.

14   You're with us, Mr. Conte?

15             MR. CONTE:  I am, Your Honor.

16             THE COURT:  All right.  Thank you.

17             You may proceed.

18   BY MS. MARTINEZ:

19      Q.  Continuing on this page, from the portion that's

20   up on the screen, at the bottom of this paragraph,

21   you -- Lil Payaso says, "They were really suspicious

22   about this dude."  First of all, who is "this dude" in

23   this context?

24      A.  Lagrima.

25      Q.  Who was really suspicious about Lagrima?

1    A.   All of them, all the PVLS clique.

2    Q.   And then -- and the next thing that Lil Payaso

3  says, he says, "The homie got caught."  Who got caught?

4    A.   Lagrima.

5    Q.   Who caught him?

6    A.   The police.

7    Q.   He continues, "And they were asking him for the

8  papers, and he was never willing to give them."  Are

9  these the same kind of papers we were talking about

10 earlier?

11   A.   Yes.

12   Q.   What is the significance of Lagrima being

13 unwilling to give gang members court papers?

14   A.   That was -- that was pretty much the sentence to

15 the gang -- to the clique that he has something to hide,

16 he has something to hide.

17   Q.   If you could continue to page seven.  Please

18 review page seven and look up when you're done.

19   A.   Okay.

20   Q.   The very top of the page, Lil Payaso says,

21 "He got caught and they let him out."  Who got caught?

22   A.   Lagrima.

23   Q.   By who?

24   A.   The police.

25   Q.   And next thing that he says, at the end he says,

1    "He had already screwed Peluca, the homie, you know."

2    What did you understand that to mean?

3        A.   He -- that means Lagrima, they think that Lagrima

4    rat Peluca out for any -- any business that probably

5    only they -- they know.

6        Q.   Do you understand what they thought Lagrima had

7    ratted out Peluca about?

8        A.   About the -- the job business in the 7-Eleven.

9        Q.   And then, you ask, "What homie?"

10        Lil Payaso says, "Peluca."

11        And you say, "Oh, Peluquín?"

12        What is that exchange about?

13        A.   It's the using the same -- we're using the same

14    name, Peluquín, Peluca, Greñas.  It means pretty much

15    the same.

16        Q.   Why would you repeat gang member's name in these

17    recording conversations?

18        A.   Just for -- just for pretty much when the handler

19    knows, he knows who we talking to and who are they.

20        Q.   Was that intentional?

21        A.   Yes.

22        Q.   You then say, "Oh, okay.  It's just that you were

23    locked up, dude.  You were locked up, right?"

24        What are you asking Lil Payaso there?

25        A.   He was locked up.  He was locked up -- as far as

1  I know, he was locked up.  And I asked him if -- why is

2  it that he knew, or he knew at that time.  But he -- he

3  just explain when he got out, he start pretty much

4  saying the same thing that everybody is saying about

5  Lagrima.

6      Q.  Obvious question, but when you say "locked up,"

7  what do you mean?

8      A.  He was in prison.

9      Q.  How -- how were you aware that Lil Payaso was in

10  prison?

11     A.  Because, one day I talked to Payaso, and then he

12  gave the phone to Lil Payaso, from prison.

13     Q.  So when you asked Lil Payaso if he was locked up,

14  how did Lil Payaso respond?

15     A.  He say, "Yes."

16     Q.  Then he continues, the next response down, and

17  says, "So, then it was around that time -- around that

18  time that I got out."  What time is he talking about?

19     A.  He's talking about when they were rumors and

20  gossip around that, why Lagrima can be a rat or he's not

21  a rat.

22     Q.  What did you understand him to mean that, it was

23  around the time that those rumors were going around,

24  that he got out?

25     A.  He got out of the prison during that time that

1    the clique was suspicious about Lagrima.

2        Q.   Was that before or after Lagrima was killed?

3        A.   No, it was before.

4        Q.   Down to the very bottom, the last thing that Lil

5    Payaso says on this page, he says, "The one who more or

6    less paid for the mess was that fucker, Peluquín."  What

7    did you understand that to mean?

8        A.   The -- the one that pretty much got screwed

9    because they think that Lagrima was a rat, was -- the

10   more affected was Peluca, Greñas or Peluquín, from PVLS.

11   He is the same person.

12       Q.   How was Greñas affected?

13       A.   Because they think that the police is after

14   Greñas.

15       Q.   Turn now to page eight.  Please review that page

16   and look up when you're done.

17       A.   Okay.

18       Q.   What is Lil Payaso talking about in this page?

19       A.   He's talking about when they get Lagrima killed.

20       Q.   Starting at the top in that first paragraph, the

21   second line, he says, "We would call him when we had

22   meetings, and the homie -- we would go and the dude

23   didn't want to show up."  What did you understand that

24   to mean?

25       A.   Every time they have meetings, Lagrima didn't

J. Garcia - Direct

1    show up.

2       Q.   Was it okay for a gang member to not show up when

3    there were gang meetings?

4       A.   No.

5       Q.   Why not?

6       A.   Because, you had to have a big excuse for not to

7    attend a meeting.

8       Q.   What would happen if a gang member didn't attend

9    meetings and did not have a good excuse?

10      A.   They're going to beat you for 13 seconds.

11      Q.   What is it called when gang members beat someone

12   for 13 seconds?

13      A.   Well, when they -- they call it *calentón*.

14      Q.   What is the purpose of a *calentón* or beating a

15   gang member for 13 seconds?

16      A.   It's pretty much a punishment.

17      Q.   Continuing down the page, you say, towards the

18   middle, right before that big paragraph, "When you gave

19   him the beating, did the dude not -- not tell you

20   anything when you beat him up?"  What are you referring

21   to?

22      A.   I'm referring to Lagrima said something when --

23   when they start -- they start killing him.

24      Q.   What did Lil Payaso say?

25      A.   He was explaining to me about he already got

1    caught couple of times drinking and not following the

2    rules, and that -- that was pretty much, also, one of

3    the big factors, that they think that Lagrima was not

4    following the rules as well.

5        Q.   In the middle of that long paragraph from Lil

6    Payaso, he says, "That dude had a 26."  What is a 26?

7        A.   A 26 is every -- every punishment is for

8    13 seconds.  So, if you disobey once then they give you

9    a 13 seconds.  If you do something else, that is another

10   13 seconds.  So, and add up to 26.

11       Q.   What happens during a 26?

12       A.   Lagrima got killed.

13       Q.   Right below that, in quotes, it says, "'Why is it

14   a 26?  It should only be a 13'" -- end quote -- "he told

15   me."  Who do you understand Lil Payaso to be quoting

16   there?

17       A.   Lagrima.

18       Q.   At the very end of that paragraph, Lil Payaso

19   says, "So, then we went to the restaurant where we

20   cooked the chicken.  We gave it to him."  What do you

21   understand Lil Payaso to mean by "the restaurant"?

22       A.   The restaurant -- it means the place where

23   Lagrima got killed.

24       Q.   What do you understand Lil Payaso to mean by "we

25   cooked the chicken"?

1    A.   That they killed Lagrima.

2    Q.   Why do you understand "restaurant" and "cook the

3 chicken" to be talking about a murder?

4    A.   Because that's kind of like code they use.  When

5 you already know what happened at some point, that then

6 they going to refer just to, like a code.  That's, you

7 know, that's, they use a code, we ate him or we cook

8 him, that means they kill him.

9    Q.   You say we ate him, we cook him, that means we

10 killed him, was this code used more than just in this

11 phone call?

12   A.   Yes.

13   Q.   Was it a code used by more than just Lil Payaso?

14   A.   Yes.

15   Q.   How is it you're familiar with this code,

16 these -- these words about cooking and eating and

17 restaurants referring to murder?

18   A.   Because when we're in conversation it come up,

19 and some of them, instead of use "kill," they say we

20 eating, we cooking.  And, they stay with that code.

21 And, I knew what -- what they were referring to.

22   Q.   Your response to Lil Payaso is, "But, there, he

23 didn't listen after you gave him the 26?  And he -- and

24 the dude fucked up again."  What is it that you're

25 trying to clarify there.

1    A.   I just trying to clarify, after the -- you know,

2    after he got the punishment, maybe he want to get in

3    line and follow the rules.  But, you know, that wasn't

4    the -- that wasn't the case.  They knew that they were

5    going to kill him that day.

6    Q.   Lil Payaso responds, "No.  That -- that was when

7    we were going to make the food."  What do you understand

8    "make the food" to mean?

9    A.   Means that when they were ready to kill Lagrima.

10   Q.   Your response at the bottom, "Oh, when -- oh,

11   the -- the -- oh, that's the time when you eat?"  What

12   were you asking?

13   A.   Asking, that's the time when they kill Lagrima.

14   Q.   Why were you asking this, this going back and

15   forth about punishment and murder?

16   A.   Because I want to know how -- how they did it and

17   how -- if they give him the 26 first, or -- and then --

18   or it wasn't that day.  I just trying to find out how it

19   happen.

20   Q.   Why were you trying to find out how it happened?

21   A.   To give to -- for the handler, to what happened

22   to Lagrima.

23   Q.   Continue to page nine.  Please review that page

24   and look up when you're done.

25   A.   Okay.

1   Q.   The first line there from Lil Payaso, he says,

2   "Uh-huh, that was when we went to eat."  What did you

3   understand him to be confirming?

4   A.   Confirming that's the time that they kill

5   Lagrima.

6   Q.   And, he continues and says, "That's the only time

7   I saw him.  That's the only time that -- that I've seen

8   him."  What did you understand that to mean?

9   A.   That's the only time he ever met Lagrima, that

10  day they -- they kill him.

11  Q.   Did Lil Payaso tell you whether or not he

12  participated in killing Lagrima?

13  A.   Yes.

14  Q.   Did he participate in killing Lagrima?

15  A.   Yes.

16  Q.   Two-thirds of the way down the page, Lil Payaso

17  has a slightly longer response.  He says, "Nah, yes,

18  that's why" -- do you see that there?

19  A.   Yes.

20  Q.   In the middle of that, he says, "Poison knows

21  about that problem.  You know what I mean?  It was with

22  him that -- that we dealt with these people, you know."

23  What do you understand him to mean when he says that "we

24  dealt with these people"?

25  A.   They get -- they call Poison to get the okay for

J. Garcia - Direct                                         234

1    them to kill someone.

2        Q.   Who is Poison?

3        A.   Poison is the shot caller from El Salvador, from

4    PVLS clique.

5        Q.   Continuing on to Government's Exhibit 9-A-1.

6    What date was this recording?

7        A.   It was January 29, 2014.

8        Q.   Who were you talking to in this recording?

9        A.   It was me and Lil Payaso from PVLS.

10       Q.   Let's go to page two.  At the bottom of page two,

11   the last thing that you say on that page, you say, "That

12   homie, Llorona, man."  Who are you talking about when

13   you say "that homie, Llorona."

14       A.   Can you say that again?  Where?

15       Q.   Sure.  At the bottom of the page, the last thing

16   that you say on the page, the very last sentence that

17   you say.

18       A.   Okay.

19       Q.   And actually, let me ask this first, just so that

20   we're clear.  JR refers to who in this call?

21       A.   Junior.

22       Q.   And, who does OC refer to?

23       A.   Lil Payaso.

24       Q.   All right.  So the very last thing you say on

25   this page is -- starts with, "That homie, Llorona."  Who

1   is Llorona?"

2       A.   Lagrima.

3           MS. MARTINEZ:   And for the record, Llorona

4   is L-l-o-r-o-n-a.

5   BY MS. MARTINEZ:

6       Q.   Why did you call Lagrima, Llorona?

7       A.   Because, it's a term that when you -- in Spanish,

8   means you cry, and, because the same thing, he has the

9   eye tear and tattoo on his left side or right side.  I

10  can't recall.

11      Q.   Why were you talking to Lil Payaso about Lagrima

12  again, just a few days later?

13      A.   Just trying to find out more.

14      Q.   After that, you say, "I didn't know that shit,

15  dude."  What are you referring to?

16      A.   That -- I asked -- I asked him if he referring to

17  why Lagrima, they think that he has ratting Peluca and

18  some other guy.  And that's why they -- I told him I

19  didn't know that.

20      Q.   Why were you trying to find out more about

21  Lagrima's murder?

22      A.   If -- just to give it to my handler, and see

23  if -- if each of the person that I talk to, says the

24  same thing.

25      Q.   Please turn to page three and review that page,

236

1    and look up when you're done.

2        A.    What page?

3        Q.    Just one more.  There you go.  Page three.

4        A.    Okay.

5        Q.    Starting at the top of the page, the first thing

6    you say, towards the end of that you say, "Why did these

7    homies notice that about that homie so late?"  What are

8    you asking Lil Payaso?

9        A.    I asking him why is it they find out that Lagrima

10   was a rat that late, and they didn't find out before.

11       Q.    What you mean by "that late"?

12       A.    Because, I -- I knew Lagrima by some other guys

13   that talk about Lagrima, and they never say anything

14   about him, until I -- I knew these guys that start

15   saying something about Lagrima.

16       Q.    What was your understanding of how long Lagrima

17   had been a homeboy with PVLS?

18       A.    It was a long time.

19       Q.    How did Lil Payaso respond to your question?

20       A.    He didn't know that.  He just knew what the other

21   gang member, PVLS, had told him that Lagrima have

22   been -- rat them out at some point.

23       Q.    In his response there, that long response, in the

24   middle he says, "Then the homies, you know what I mean,

25   started to ask him for the papers, and the homie didn't

1    want to let them go."  What did you understand that to

2    mean?

3        A.    He asked Lagrima for paper, because they already

4    suspect that Lagrima was a rat.  And he didn't turn

5    anything in.

6        Q.    Was that consistent with what you heard from

7    other gang members?

8        A.    Yes.

9        Q.    Continuing down, more than halfway down the page

10   to your long response, the last sentence of your long

11   response, you say, "You should have let the homie talk

12   so that he could tell you who the other homies were,

13   man."  What are you talking about?

14       A.    About when they kill Lagrima.

15       Q.    And what do you mean by, "tell you who the other

16   homies were"?

17       A.    If Lagrima knew that if somebody else was talking

18   to the police.

19       Q.    Why did you tell Lil Payaso that they should have

20   let Lagrima say who else was talking to the police?

21       A.    Because at that point, I want to know if there

22   was any other names, so I can give it to my handler,

23   also, if by any chance, come up, anything on my name.

24       Q.    Why would you want to give your handler names of

25   someone the gang thought was cooperating or snitching?

1    A.   To prevent that they -- they get kill.

2    Q.   And you also said you wanted to know if your name

3    came up?

4    A.   Yes.

5    Q.   Why did you want to know if your name came up?

6    A.   Because there was a lot of some gang members say

7    they -- they were -- they were not getting along with

8    me, so, I -- I heard some rumors that they were kind of

9    be thinking that -- not that I was talking to the police

10   at some point, but they were not sure.

11   Q.   Why would you want to know if the gang members

12   thought you were talking to the police?

13   A.   That way, any -- I mean, I need to be careful and

14   I need to talk to my handler.

15   Q.   Lil Payaso responds, and in his response he has a

16   quote.  He says, "'No, it's not me.  I swear that it

17   isn't me.'"  Who do you understand him to be quoting

18   there?

19   A.   Lagrima.

20   Q.   What do you understand him to be describing?

21   A.   That he was not a rat.  It wasn't him.

22   Q.   Do you understand at what moment Lil Payaso was

23   quoting him, when Lagrima said that?

24   A.   When they were killing Lagrima.

25   Q.   Then he says -- Lil Payaso says, "We just wanted

1    to finish that thing quickly, man."  What do you

2    understand that to mean?

3        A.   They just want to kill him and get it over with.

4        Q.   The next thing that Lil Payaso says is, "When we

5    got to thinking about that stuff he was, you know what I

6    mean, finished already."  What did you understand Lil

7    Payaso to be saying?

8        A.   Lagrima was already killed.

9        Q.   By when?

10       A.   By the time that he was saying that they already

11   kill Lagrima.  They didn't even let him talk.

12       Q.   The last thing on the page that Lil Payaso says

13   is, "He was already frozen stiff."  Who was frozen

14   stiff?

15       A.   Lagrima.

16       Q.   What does "frozen stiff" mean?

17       A.   That he's dead.  He's not moving any more.

18       Q.   Please turn -- we'll turn on the screen -- to

19   Government's Exhibit 10-A-1.  What is the date of this

20   recorded conversation?

21       A.   March 31st, 2014.

22       Q.   And, in this conversation, who were you talking

23   to?

24       A.   I'm talking to Lil Tuner from PVLS.

25                MS. MARTINEZ:  Can we leave that up on the

1   screen?

2   BY MS. MARTINEZ:

3       Q.   Who else are you talking to?

4       A.   Also, I'm talking to homeboy three, from PVLS.

5               MS. MARTINEZ:  Your Honor, may we approach?

6               THE COURT:  Okay.

7               (Thereupon, the following side-bar

8   conference was had:)

9               MR. CRAWLEY:  Well, Your Honor, we're back

10  at this point.  We're going to move for a mistrial

11  again, because it clearly says on that document, on the

12  lead page of Exhibit 10-A, that "DC" is Douglas Duran

13  Cerritos.  Once again, they've identified him, with the

14  pseudonym.

15              MR. CONTE:  Now they said he's homeboy

16  three.

17              MR. CRAWLEY:  So, on three separate

18  occasions they've identified him with the pseudonym.  In

19  turn, there's an easy connection between that pseudonym

20  and the actual person.

21              There's no way this jury at this point can

22  be impartial regarding our client as to Count 4.

23  Because if he's, one, he's Douglas Duran Cerritos, and

24  if he's homeboy number three, he's Douglas Duran

25  Cerritos.  And that is at the heart of what our

1    objection was earlier in this case.

2              And I hate to keep touching upon it, but

3    when you couple that with the earlier statement -- and I

4    understand the Court and I respect the Court -- but when

5    you couple that with the Court's reference to him in

6    Count 4, these jurors have all been taking notes.  The

7    Court instructed them that they could take notes on

8    these exact transcripts.

9              So, now, the jurors -- and I watched them

10   carefully when the Court instructed them that they could

11   grab the transcripts, they did, a lot of them grabbed

12   them, and a lot of them have been writing in there.

13             So, now we have it three times, where they

14   referenced our guy as not only the pseudonym, but

15   they're looking at the actual name.

16             I don't see how we can escape it.  It has to

17   be a mistrial, Your Honor.

18             MS. MARTINEZ:  May I respond, Your Honor?

19             THE COURT:  Yes.

20             MS. MARTINEZ:  Your Honor, we -- we

21   obviously disagree that there needs to be a mistrial,

22   but, I will apologize to counsel and apologize to Your

23   Honor.  We have done everything we can to prep these

24   witnesses.  As Your Honor knows, we met with this

25   witness immediately before he got on the stand.

1            It's -- I think it is a puzzling and

2    confusing thing to a lay person, who is not involved in

3    these court proceedings, about the importance and

4    significance of making sure -- although we have stressed

5    this in our prep sessions -- making sure that when they

6    use pseudonyms, to not link that to the actual person.

7            I have no idea why this witness just came

8    out with "homeboy three" in response to seeing Duran

9    Cerritos's name.  It was clearly a mistake, and

10   certainly not the way he was prepped.  We regret being

11   here, Your Honor.

12           I feel compelled to say for the record --

13   and I hope Your Honor takes absolutely no disrespect

14   from this, because I certainly mean none.  And I don't

15   mean to quibble with any of Your Honor's rulings, but in

16   order simply to protect the record and make this

17   position, we, of course, briefed why we believe that

18   evidence that Duran Cerritos and Lemus Cerna committed a

19   first murder of Lagrima before committing a second

20   murder, we briefed why we think that is admissible.

21           And I'm not asking Your Honor to revisit

22   that ruling, and I certainly respect that ruling, but I

23   do think that's relevant.  I do think that there is good

24   case law to support why that would be admissible in a

25   case like this.

1              And again, certainly, we're not going to try

2     to reopen that door, we're not asking Your Honor to

3     allow us to bring in that evidence.

4              However, when you look at that case law and

5     that argument, and that reasoning about why, in other

6     cases, in other similar cases, uncharged murder evidence

7     has come in against defendants who are not charged with

8     that murder, why that has been found to be admissible,

9     in a gang case, for example, in a racketeering case,

10    that's direct evidence of racketeering activity and gang

11    activity, and also admissible for, B, evidence.

12             There is case law and argument, we think, to

13    support that letting that evidence in simply mitigates

14    the harm that's done here, where there is a slip-up like

15    this.

16             And again, I'm certainly not asking to

17    introduce that kind of evidence, simply making that

18    record, because I do think it mitigates the harm that is

19    done when we have a slip-up like this.

20             And, Your Honor, the government will

21    continue to do everything possible to avoid that.  And I

22    apologize, that it should not have happened just now.  I

23    sincerely apologize.

24             But, I do think it's a sticky situation,

25    Your Honor, and, we're trying to get through this with

1   two defendants who have been, various times, charged

2   with these two murders that we're litigating, and

3   they're sitting in court here.

4           So, Your Honor, we -- we disagree that a

5   mistrial is warranted.  We oppose that motion, and, we

6   submit that we should be able to move forward with this

7   witness.

8           I also note that I think -- someone should

9   correct me if I'm wrong -- I think this is the first

10  time that "homeboy three" has been used.  I don't know

11  if we want to consider changing the pseudonyms once

12  again.  I know we did that already.  That could invite

13  other confusion.  But I don't think there's any

14  testimony on the record yet about homeboy three.

15          MR. CRAWLEY:  Your Honor, in order to give

16  weight -- in order to give weight to Your Honor's

17  rulings, they have to be enforced.  They have to be.

18          We -- my co-counsel and I made it a strong,

19  strong statement to the government.  We asked for a

20  recess.  The Court granted the recess because we feared

21  that something like this would happen.

22          This is on the record.  The government stood

23  up.  They acknowledged that this was a concern.  They

24  briefed this individual for at least 20 minutes prior to

25  coming back out here.

```
 1              There is nothing else we could have done to
 2   prevent this.  We asked specifically, he is charged in
 3   only one count.  He has been hit by "homeboy number
 4   one," "homeboy number three," and, with all due respect,
 5   Your Honor's reference to Count 4.
 6              Now, in particular, Exhibit 10-A, this is
 7   where it gets to be extremely troubling.  10-A deals
 8   with the count that he is actually charged with.  There
 9   is no reason he should not have mentioned him by his
10   name.  That is his charge.  That phone call occurred.
11              THE COURT:  I'm sorry.  Go back.  What
12   you're saying, this 10-A, is what?
13              MR. CRAWLEY:  Is March 31st, it references
14   the incident that occurred in Count 6.
15              THE COURT:  Okay.
16              MR. CRAWLEY:  That alleged murder occurred
17   on March 29th, of Mr. Guasón.  If you refer to him as
18   homeboy number three, when you should have just referred
19   to him as Douglas Duran Cerritos or Lil Poison, it has
20   totally confused the jury.  Why aren't you referencing
21   him in a count that speaks to him?
22              Now -- now, if you go back and think about
23   Count 4, the count that he's supposed to be -- the count
24   that we're not going to prejudice this jury with, he is
25   identified under the pseudonym, as the person that the
```

1    Court has referred to him as homeboy number three, for

2    Count 4 purposes.

3              So, they've identified him on two separate

4    occasions as a pseudonym.  So, anytime you bring -- the

5    government, and I think rightfully so, asked the Court

6    maybe to use the word "others."  But the Court rejected

7    that, with all due respect.

8              Now --

9              MR. AMOLSCH:  That was my suggestion.

10             MR. CRAWLEY:  Okay.  Let's give Mr. Amolsch

11   his credit.

12             The point being, the point being --

13             THE COURT:  Just a second.

14             I'll send the jury out.

15             (Thereupon, the side-bar conference was

16   concluded.)

17             THE COURT:  Ladies and gentlemen, why don't

18   you put your notes under the chair.  We will recess for

19   the evening.

20             Please do not discuss the case.  Don't

21   permit the case to be discussed in your presence.  Don't

22   do any research on the case.  And we'll resume tomorrow

23   morning at 10:00 o'clock.  Thank you.

24             (Jury excused at 5:02 p.m.)

25             THE COURT:  You may be seated.

1          MR. CRAWLEY:  You're going to excuse the

2    witness, Your Honor?

3          THE COURT:  Yes, sir.

4          Can you hear me okay?

5          THE WITNESS:  Yes.

6          THE COURT:  Please don't discuss your

7    testimony with anyone.  We need you to come back

8    tomorrow at 10:00 o'clock.  Okay?

9          THE WITNESS:  Yes.

10         (Thereupon, the witness withdrew from the

11   stand.)

12         THE COURT:  Mr. Crawley, you said there were

13   three times, including -- four times, including my

14   statement at the beginning of the trial.  Is that right?

15         MR. CRAWLEY:  I think three times total,

16   Your Honor.

17         THE COURT:  Three times total.  And this

18   last time, tell me exactly what this time was.

19         MR. CRAWLEY:  Okay.  So, as the Court -- and

20   does the Court have a copy of the transcript book?

21         THE COURT:  I do.

22         MR. CRAWLEY:  That may help the Court.

23         The exhibit that the government was

24   referencing --

25         THE COURT:  10-A-1.

1           MR. CRAWLEY:  -- 10-A-1, as the Court can

2    see, the lead-in sheet -- I refer to it as the lead

3    sheet, but --

4           THE COURT:  Right.

5           MR. CRAWLEY:  -- Your Honor may refer to it

6    as something else -- that document has on its cover, on

7    its face, the speakers.

8           THE COURT:  Right.

9           MR. CRAWLEY:  Where "verbatim" has been

10   removed and it says "translation," and then below

11   "translation," the Court will note that there are

12   several speakers, one being Junior, I believe -- and I

13   don't have it in front of me -- but one being Junior,

14   one being Mr. Gaitan Benitez, and one being my client,

15   Mr. Douglas Duran Cerritos.  I think all three of those

16   names appear on the lead sheet --

17          THE COURT:  Yes.

18          MR. CRAWLEY:  -- if my memory is correct.

19          So, as the Court is aware -- thank you.

20          As the Court is aware, prior to this witness

21   being brought out for his testimony, we asked the Court

22   for the Court's indulgence to speak with the government,

23   because we were concerned that this witness, on the

24   witness stand, would make the mistake of referring to

25   our client as the pseudonym, homeboy number three, in

reference to certain charges in this case that would confuse the jury based on what we believe to be two prior incidents in which, in one case, the Court spoke about my client being involved in Count 4, and then corrected itself by saying -- and these were the Court's words -- that he is no longer charged in Count 4, which was troubling to us because that gives the jury the, I guess, the assumption that he may have been at some point charged.

The Court said that it would -- or it felt that it had dealt with it by explaining to the jury that the defendant was no longer charged in that count, and that it would instruct the jury that it's not to consider that count.

So, during the trial as the government called other witnesses, at least one other witness, that witness, in discussing the attempted murder of what I would call alleged victim Peligroso, the witness indicated that homeboy number one, in reference to my client, was involved.

This was another example where the lead-in sheet had my client's name, Douglas Duran Cerritos.  We objected and moved for a mistrial at that time as well.

The Court attempted to remedy that mistake by indicating to us that we would change the pseudonym.

1   If "homeboy number one" has been used, we're going to

2   now refer to Mr. Cerritos at a later date, or when

3   another witness appears -- we're going to refer to him,

4   as it relates to Count 4, as "homeboy number three."

5           So, today, a few minutes ago, the government

6   called this witness, reconvened, and we dealt with

7   Exhibit 10-A.

8           Exhibit 10-A -- and the government can

9   correct me if I'm wrong, but I believe I'm correct --

10  Exhibit 10-A concerns a telephone call that occurred on

11  March 31st, 2014.

12          At that heart -- at the heart of that call,

13  what I expect the testimony will be, is that my client

14  made certain statements regarding Count 6 and the murder

15  of Mr. Guasón.  And I'm sorry, I apologize, I think his

16  last name is Mr. Martinez, but once again I'm not

17  looking --

18          THE COURT:  Right.

19          MR. CRAWLEY:  -- at my notes.

20          THE COURT:  Guasón Martinez.

21          MR. CRAWLEY:  Yes.

22          So, in reference to that particular call,

23  they're referring to my client not by his name in a

24  count for which he is charged; they're referring to him

25  as homeboy number three, once again adding to the

1    confusion of the jury.

2              Because now the jury is looking at this

3    sheet and, as I indicated, the Court had given them

4    permission to take notes.  And as they see the sheet,

5    they're wondering:  Okay, we see these names.  He's

6    identified the speaker.  Who now is this homeboy number

7    three?  Because we have these individuals listed here.

8              So, once again, if you take into

9    consideration that, as Mr. Zimmerman has touched upon,

10   the ability to cross-examine, and basically, through

11   commonsense reasoning, ask, "Well, is homeboy number one

12   my client, is homeboy number two my client, is homeboy

13   number three my client," you're left with only two

14   possible individuals.  You're left with, Mr. Cerna and

15   Mr. Duran Cerritos.

16             With my client having been, for our

17   purposes -- and I know the Court may not agree -- but

18   for our purposes identified on two occasions as homeboy

19   number one and now homeboy number three, it doesn't take

20   a rocket scientist to realize that's who they're talking

21   about (indicating).  And I'm pointing to my client.

22   That's who they're talking about in Count 4.

23             Because, Count 4 is the highly prejudicial

24   charge that the Court said it would limit the

25   government's ability to reference our client's names,

1    Mr. Cerna and myself -- and Mr. Cerritos.

2              So, by -- by limiting the government's

3    ability to call them by their name, the Court placed on

4    the government the burden -- and let me say it this way:

5    The Court basically ruled in favor of Mr. Amolsch and

6    Mr. Salvato, but it was the government who suggested

7    this remedy.

8              The government is the one that suggested,

9    before a decision was even made regarding my client,

10   that if the Court of Appeals ruled in our favor, or if

11   Your Honor ruled in our favor, that their remedy was to

12   refer to these two individuals as homeboy number one and

13   homeboy number two.

14             And I have a lot of respect for

15   Ms. Martinez, but, although she may think that, well,

16   the Court erroneously made that decision, it was her

17   suggestion to the Court that the Court adopt it.

18             And it was our fear -- and I think

19   Mr. Amolsch and Mr. Salvato supported me in this -- it

20   was our fear that this would ultimately lead us back to

21   this predicament.  And it has.  But it has despite every

22   attempt by the defense to avoid it.

23             When have you seen a defense attorney stop a

24   case, ask for a recess to remind the government to ask

25   its witness to not refer to our client by this pseudonym

1  in matters that -- that the Court has said are relevant
2  and the pseudonym should not be applied?
3          And their witness still did it.
4          So, I don't see how we can pull back what
5  has already been done.  We cannot close this door.  It
6  has been opened.  And it wasn't opened by us.  It wasn't
7  opened by any of these defendants or their attorneys.
8  It was opened by the government and the government's
9  witness.
10          THE COURT:  All right.
11          MR. CRAWLEY:  And for those reasons we ask
12  for the mistrial.
13          Thank you.
14          THE COURT:  All right.
15          Mr. Amolsch is standing up.  I'm not sure if
16  he's coming to the podium or not.
17          MR. AMOLSCH:  I am, Your Honor.
18          THE COURT:  All right.
19          MR. AMOLSCH:  I would just add that, what
20  Mr. Crawley jus said, that this witness again -- just
21  kind of piggybacking what we've talked about, is, when
22  they were talking about the PVLS -- PVLS clique, he
23  said, three different times, the whole clique knew they
24  were going to kill Lagrima, when they killed Lagrima,
25  and how they did it, again referring to the entire

 1   clique as a whole, meaning PVLS, which that -- which

 2   includes everybody that the government has identified as

 3   being in that clique.

 4          THE COURT:  All right.

 5          MS. MARTINEZ:  Your Honor, as I stated up at

 6   the bench conference, first of all, we have tried hard

 7   with our witnesses to prep them to use the pseudonyms

 8   appropriately, consistent with the suggestions made by

 9   the parties and Your Honor's ruling.

10          And I apologize to the Court, I apologize to

11   the defense counsel, that this witness misused the

12   pseudonym.  That's -- that was a mistake.  There is no

13   reason for him to use the pseudonym under these

14   circumstances with this transcript.

15          And certainly, there was no reason for him

16   to use the pseudonym when he's looking right at the name

17   that we're trying to redact, essentially, with the use

18   of the pseudonym.

19          As Mr. Crawley rightly observed, this

20   particular transcript has -- has to do with the second

21   murder, the murder which his client is charged with.

22   Why it came into this -- this witness's mind at that

23   moment, I'm not sure.

24          I can submit to the Court that I think

25   perhaps it is difficult for a lay person, such as this

1   witness and perhaps others, to understand the

2   significance and the importance, despite the

3   government's best ability to prep them and to explain

4   the significance and explain how important it is to

5   follow those instructions.

6           And so, we apologize that there is a slip-up

7   here.  We acknowledge that there was a slip-up.  That's

8   exactly why I asked to approach.

9           Your Honor, we -- there has been a motion

10   for a mistrial.  We obviously disagree with that.  We

11   oppose the motion for a mistrial.  We don't think it's

12   warranted here.

13           We think that the prejudice that's been

14   caused to -- to Mr. Crawley's client, and to the jury

15   having heard that and potentially having also seen the

16   name at the same time -- we can't know what they were

17   looking at or what they saw before we took it off of the

18   screen -- but we think the prejudice is minimal, for a

19   number of reasons.

20           And, Your Honor, as I stated at the bench,

21   I'm making these arguments about the prejudice caused by

22   this mistake here.  I'm not asking Your Honor to -- to

23   revisit any rulings, and I'm certainly not arguing with

24   Your Honor about Your Honor's rulings.  I have great

25   respect for the Court and for the Court's rulings.

1    However, I will state that, as we briefed

2 extensively with the Court during motions practice,

3 there is significant case law which we do believe

4 supports the admissibility of evidence of an uncharged

5 murder in a case such as this, evidence -- that it is

6 both direct evidence of racketeering activity, of the

7 racketeering enterprise, of the defendant's knowledge of

8 the enterprise, of their involvement in the enterprise,

9 things that the government must prove directly; and,

10 also, that it is admissible 404(b) evidence, for all of

11 the reasons that we stated in our pleadings.

12    Now, we're not trying to reopen that door.

13 We're not attempting to affirmatively bring in that kind

14 of evidence.  But I do think that that -- that that case

15 law and that argument warrants consideration under the

16 circumstances, given that other courts and the Fourth

17 Circuit has countenanced evidence of uncharged murders

18 coming in against defendants who are at trial for other

19 crimes.

20    I think that that shows that that level of

21 prejudice in a case like this, where the defendant --

22 where Mr. Crawley's client, Duran Cerritos, is charged

23 with a brutal murder, where the -- where the jury will

24 hear all of these details, these gory details, about the

25 murder with which he is charged.

1          We think that a slip-up, a reference that
2   perhaps the jury would infer to understand that he knew
3   about another murder, or even if -- even if the jury
4   understood it to mean that he was involved in another
5   murder, we think that that prejudice is extremely
6   small --
7          THE COURT:  All right.
8          MS. MARTINEZ:  -- such that it does not
9   warrant a mistrial.
10          THE COURT:  Thank you.
11          MS. MARTINEZ:  Thank you, Your Honor.
12          THE COURT:  All right.  I'll take the matter
13   under advisement.  We'll resume tomorrow at 9:30.  Thank
14   you.
15          (Proceedings concluded at 5:16 p.m.)
16                          ---
17
18
19
20
21
22
23
24
25

1

2                    CERTIFICATE OF REPORTER

3

4            I, Renecia Wilson, an official court

5    reporter for the United States District Court of

6    Virginia, Alexandria Division, do hereby certify that I

7    reported by machine shorthand, in my official capacity,

8    the proceedings had upon the jury trial in the case of

9    UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

10           I further certify that I was authorized and

11   did report by stenotype the proceedings in said jury

12   trial, and that the foregoing pages, numbered 1 to 258,

13   inclusive, constitute the official transcript of said

14   proceedings as taken from my shorthand notes.

15

16           IN WITNESS WHEREOF, I have hereto

17   subscribed my name this  12th  day of  May , 2016.

18

19                      /s/
                         Renecia Wilson, RMR, CRR
20                       Official Court Reporter

21

22

23

24

25