```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                      EASTERN DISTRICT OF VIRGINIA
 2                         Alexandria Division

 3    UNITED STATES OF AMERICA,          )
                                         )
 4                         Plaintiff,    )
                                         ) Crim. No. 1:14cr306
 5         vs.                           )
                                         )
 6    JOSE LOPEZ TORRES, ALVIN GAITAN    ) April 13, 2016
      BENITEZ, CHRISTIAN LEMUS CERNA,    )
 7    OMAR DEJESUS CASTILLO, MANUEL      )
      ERNESTO PAIZ GUEVARA, and          )
 8    JESUS ALEJANDRO CHAVEZ,            )
                                         )
 9                         Defendants.   )
      _____)

10

11

12                          JURY TRIAL

13

14    BEFORE:      THE HONORABLE GERALD BRUCE LEE
                   UNITED STATES DISTRICT JUDGE
15

16
      APPEARANCES:
17
      FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
18                      BY:  JULIA MARTINEZ, AUSA
                             TOBIAS TOBLER, AUSA
19

20                            ---

21

22    OFFICIAL COURT REPORTER:

23                   RENECIA A. SMITH-WILSON, RMR, CRR
                     U.S. District Court
24                   401 Courthouse Square, 5th Floor
                     Alexandria, VA 22314
25                   (703)501-1580
```

1  APPEARANCES (Continued)

2  FOR DEFENDANT JOSE LOPEZ TORRES

3         BYNUM & JENKINS, PLLC
          BY:  ROBERT L. JENKINS, JR., ESQ.
4         THE LEIVA LAW FIRM, PLC
          BY:  MANUEL E. LEIVA, ESQ.
5
   FOR DEFENDANT ALVIN GAITAN BENITEZ
6
          LAW OFFICE OF AMY LEIGH AUSTIN
7         BY:  AMY LEIGH AUSTIN, ESQ.
          SMITH & ZIMMERMAN, PLLC
8         BY:  JEFFREY D. ZIMMERMAN, ESQ.

9  FOR DEFENDANT CHRISTIAN LEMUS CERNA

10        LAW OFFICE OF CHRISTOPHER AMOLSCH
          BY:  CHRISTOPHER AMOLSCH, ESQ.
11        FRANK SALVATO, ESQ.

12 FOR DEFENDANT OMAR DEJESUS CASTILLO

13        FIRSTPOINT LAW GROUP, PC
          BY:  KATHERINE MARTELL, ESQ.
14        OLD TOWN ADVOCATES, PC
          BY:  MEREDITH M. RALLS, ESQ.
15

16 FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

17        LAW OFFICE OF W. MICHAEL CHICK, JR.
          BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
18
   FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
19
          JEROME P. AQUINO, ESQ.
20        ELITA C. AMATO, ESQ.

21
                        ---
22

23

24

25

1                            INDEX

2

3    WITNESS (Government) DIRECT   CROSS   REDIRECT   RECROSS

4    Jose Garcia (Cont.)    ---      6      258

5    FURTHER PROCEEDINGS                                 282

6
        (Court recessed)
7

8                          ---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2

3          (Thereupon, the following was heard in open

4    court at 10:05 a.m.)

5               (Jury not present.)

6               THE CLERK:  1:14 criminal 306, United States

7    versus Jose Lopez Torres, Alvin Gaitan Benitez,

8    Christian Lemus Cerna, Omar Dejesus Castillo, Manuel

9    Ernesto Paiz Guevara, and Jesus Alejandro Chavez; with

10   Spanish interpreters previously sworn.

11              THE COURT:  Good morning, everyone.

12              Anything I need to take up before we bring

13   the jury out?

14              (No response.)

15              THE COURT:  Okay.  You can bring our jury

16   out, Mr. Toliver.  Thank you.

17              (Jury present at 10:06 a.m.)

18              THE COURT:  You may be seated.

19              Good morning, ladies and gentlemen.

20              THE JURORS:  Good morning.

21              THE COURT:  Good morning, Mr. Omar Dejesus

22   Castillo.

23              Good morning, Mr. Manuel Ernesto Paiz

24   Guevara.

25              Good morning, Mr. Jesus Alejandro Chavez.

1           Good morning, Mr. Alvin Gaitan Benitez.

2           Good morning, Mr. Jose Lopez Torres.

3           And good morning, Mr. Christian Lemus Cerna.

4           Good morning, ladies and gentlemen.

5           Good morning, Counsel.

6           ALL COUNSEL:  Good morning.

7           THE COURT:  Now, before we begin and bring

8 the witness out, ladies and gentlemen, I want to alert

9 you of something.

10           So, last night I was at the gym and I may

11 have overdone it with the bike.  So I may just stand up.

12 So if I stand up, it has nothing to do with the witness.

13 It is not intended to punctuate anything.  It's just

14 that I'm getting ready to have a cramp and I need to

15 walk it out.  And I will try to stay on this side of the

16 room so I don't interfere with the witness' testimony.

17           Can everybody agree with that?  Okay.  Thank

18 you very much.

19           You can bring the witness out.  Thank you.

20           When you're getting old, you have to take

21 care of yourself.  Exercise is very important.

22           (Witness resumed stand.)

23           THE COURT:  Good morning, Mr. Garcia.

24           You may proceed, Counsel.

25           MR. LEIVA:  Thank you.

1              THEREUPON, JOSE GARCIA, previously duly

2    sworn, testified further as follows:

3                   CROSS-EXAMINATION (Continued)

4    BY MR. LEIVA:

5        Q.   Good morning, Mr. Garcia.

6        A.   Good morning.

7        Q.   Mr. Garcia, I believe when we left off, I was

8    asking the question about you possibly being ordered to

9    go on a mission.  But, let me go back a little bit, just

10   in case you forgot what my initial question was.

11       A.   Okay.

12       Q.   And again, if at any time I ask you a question

13   that you don't understand, please let me know, and I'll

14   either rephrase the question or just reask it.

15   Understood?

16       A.   Okay.

17       Q.   All right.  So, we established that in 2006, you

18   had testified in open court.

19       A.   Yes.

20       Q.   And you testified in a murder case.

21       A.   Yes.

22       Q.   And, we also established that after you

23   testified, that several members of MS-13 had asked you

24   if you were a snitch.

25       A.   Yes.

J. Garcia - Cross                                                    7

1    Q.   Okay.  And, from your experience with MS-13,
2    when an MS-13 member's loyalty is questioned --
3    A.   Yes.
4    Q.   -- is it correct that MS-13 has that member
5    commit some type of act to prove their loyalty?
6    A.   Yes.
7    Q.   Okay.  So, in your case, since you were accused
8    of being a snitch, what act did they require you to do
9    to prove your loyalty to the gang?
10   A.   It wasn't my clique.  They didn't ask me to prove
11   any loyalty.
12   Q.   So -- I know you said they didn't provide -- they
13   didn't ask you to provide (sic) any loyalty.  My
14   question was:  Did they ask you to go on a mission to
15   prove your loyalty, or to commit an act to prove your
16   loyalty?
17   A.   No.
18   Q.   No.
19        So, your testimony today is that even though they
20   suspected that you were a snitch, they took you at your
21   word that you were not a snitch?
22   A.   Um, let me get -- get it clear to you.
23        There are cliques.  If I'm Silvas, and they're
24   Park View, they cannot just come and say, "You need to
25   do a mission," because it's not from my clique.  So,

1  they need to -- my clique has to decide if I need to do

2  a mission or not.  It's not just an MS-13 member.  It

3  has to be, always, discussed within the clique.

4      Q.  I understand that.

5          But, you would agree with me that word got to

6  your clique that you may be a snitch?

7      A.  Yes.

8      Q.  Okay.  So, with that, then, am I to understand

9  that your clique knew that there were rumors about you

10 being a snitch?

11     A.  Yes.

12     Q.  Okay.  And, even after your clique hearing the

13 rumors, your testimony is that you did not have to prove

14 your loyalty to the gang?

15     A.  Yes.

16     Q.  So then, Mr. Garcia, you also testified that you

17 were eventually elevated to the first word of the

18 Silvas.

19     A.  Yes.

20     Q.  Right?

21         And I believe in response to Ms. Martinez's

22 question, you said that you were elevated because of

23 your experience.

24     A.  Yes.

25     Q.  Okay.  Up to this point, we've established that

1    for the 12 years that you were in MS-13, you were not

2    involved in any crime of violence?

3        A.   Um, I was, on my clique.

4        Q.   You were involved in crimes of violence with your

5    clique?

6        A.   Yes, minor -- I would say, we were involved --

7    really, I was driving a car for another guy for my

8    clique, and he got some stolen stuff, and I was driving

9    the car, so we got arrested for it.

10            Another time -- just, minor offenses, I would

11   say.

12       Q.   All right.  And, was this -- did you convey all

13   this information to your handler?

14       A.   Yes.

15       Q.   So, Agent Born knew about all this stuff?

16       A.   Yes.

17       Q.   Okay.  And, these offenses that you conveyed to

18   Agent Born, were you charged with these offenses?

19       A.   Yes.

20       Q.   In which courts were you charged with these --

21       A.   Fairfax.

22       Q.   Fairfax.

23            How many times were you charged in Fairfax?

24       A.   I believe it was two times.

25       Q.   Two times.  Okay.

1       Prior to testifying, what, if any, documents did

2   you review?

3       You reviewed the transcripts, right?

4   A.   Which transcript?

5   Q.   Well, the transcript that you testified to the

6   past couple of days.  I'm assuming --

7   A.   Yes.

8   Q.   -- you reviewed those.

9   A.   I did, yes.

10  Q.   All right.  Did you review any of the FBI notes

11  or reports?

12  A.   I review all the transcripts.

13  Q.   Okay.

14  A.   That, all the recorded calls.

15  Q.   Okay.  My question is:  Did you review any

16  documents titled "FBI notes" or --

17  A.   Yes.

18  Q.   -- incident reports?

19  A.   Yes.

20  Q.   Okay.  And who gave you those FBI reports and

21  incident reports to review?

22  A.   It was different agents, when we were reviewing

23  it.

24  Q.   Okay.  And when you were reviewing those reports,

25  the reports basically laid out what the government's

J. Garcia - Cross                                                              11

1   theory of the case was, right?

2       A.   Um, I read what -- what was on the paper, what

3   the FBI agents -- we were reviewing it, the calls.

4       Q.   I'm sorry.  I think I'm -- you said you agreed

5   with what you reviewed?

6       A.   Yes, I agreed with what I was reviewing.

7       Q.   Okay.  Did you also review what we call the grand

8   jury testimony?

9       A.   Um, I don't know what you mean by "grand jury

10  testimony."

11      Q.   Did you review a document where Agent Uribe

12  testified?

13      A.   No, I haven't reviewed that one.

14      Q.   Okay.  Did you review any, any pictures, autopsy

15  pictures?

16      A.   No.

17      Q.   Did you review any autopsy reports?

18      A.   No.

19      Q.   Okay.  So -- and I'm sorry, I kind of took you

20  off course.  Let's go back to your status as first word.

21          So, you said you were -- it sounds like you were

22  involved in only two incidents that may be deemed crimes

23  of violence?

24      A.   Fairfax, yes.

25      Q.   Fairfax.

J. Garcia - Cross                                                    12

1          And what were you charged with in Fairfax?

2     A.   It was grand larceny.

3     Q.   Grand larceny.

4          You also testified earlier that you were not

5     involved in any type of prostitution?

6     A.   No.

7     Q.   Okay.  You were not involved in any type of

8     extortion?

9     A.   No.

10    Q.   Okay.  And, you had limited involvement in drug

11    distribution?

12    A.   No drug distribution.

13    Q.   No distribution.  Okay.

14         So, when you testified that you were elevated

15    based on your experience, what experience are you

16    referring to?

17    A.   Well, since 2002, I knew a lot of guys, I knew a

18    lot of people that they got deported to El Salvador.  So

19    I was pretty much, I would say, one of the few that stay

20    in Virginia and knew a lot of people that were in

21    Virginia.  And someone had got killed, someone had got

22    deported.

23    Q.   So, would you agree with me that when you say

24    "experience," you also mean your reputation within the

25    gang --

J. Garcia - Cross                                                          13

1    A.   Yes.

2    Q.   -- helped you get elevated --

3    A.   Yes.

4    Q.   -- right?

5         So, since -- I'm assuming, based on what you're

6    just testifying today, that you really didn't commit

7    many criminal acts --

8    A.   Huh-un.

9    Q.   -- would it be fair to say that you bolstered

10   about your reputation?

11   A.   Not bluster.  It's just -- I would say I was

12   not -- I always got into the fight within the gang,

13   because I kind of -- I always have issue with the

14   different cliques, always.  So, that's kind of was my

15   reputation.

16   Q.   When you say you had issue with different

17   cliques, you mean that you would get in fights with

18   different cliques?

19   A.   Yes.

20   Q.   Okay.  So, then the reputation you had was as a

21   tough guy?

22   A.   Kind of, yes.

23   Q.   All right.  A guy who would throw it down on

24   behalf of your clique?

25   A.   Yes.

1   Q.   And, I'm assuming that you would brag to members

2   of your clique about what you would do or say to these

3   other gang members, right?

4   A.   No.

5   Q.   No?

6   A.   Huh-un.

7   Q.   All right.  So, you're testifying that just other

8   people were present and were able to see your conduct?

9   A.   Yes.  I wasn't bragging about it.  It was nothing

10  to brag about, to tell you the truth.

11  Q.   Do you have tattoos, Mr. Garcia?

12  A.   I don't feel comfortable with answering that

13  question.

14  Q.   You have MS-13 tattoos, do you not?

15  A.   No.

16  Q.   You don't have an MS-13 tattoo on your back?

17  A.   No.

18  Q.   You don't have an MS-13 tattoo on your shoulder?

19  A.   No.

20  Q.   All right.  Well, other than the name of

21  people -- if that's what's making you uncomfortable, I'm

22  not going to ask you that -- what kind of tattoos do you

23  have?

24  A.   I just have SLS.

25  Q.   SLS.

1    A.   Yes.

2    Q.   Okay.  And where do you have the SLS tattoos?

3    A.   My back.

4    Q.   On your back.

5         And correct me if I'm wrong, but one of the MS-13

6    rules, right -- there are rules about what kind of

7    tattoos you can get?

8    A.   There is rules.

9    Q.   And, there is rules where you can get these

10   tattoos placed on your body.

11   A.   Yes.

12   Q.   Okay.  And, please explain to the members of the

13   jury what the significance is of getting a tattoo in the

14   location that you have?

15   A.   It's just you're getting a tattoo on your back.

16   There is no meaning at all.

17   Q.   So you didn't earn that location --

18   A.   No.

19   Q.   -- within your clique?

20   A.   No.  And one of the rules would be that you had

21   to have the "MS" first, you have to earn the MS first in

22   order for you to have tattoos of MS.

23   Q.   All right.  So, Mr. Garcia, you're a first word

24   of the Silvas clique, right?

25        What were your duties as the first word of Silvas

1    clique?

2        A.   Just listen to what my members or my clique, they

3    wanted to do.  Sometimes I ask them for money from El

4    Salvador, from within the clique here in Virginia.

5        Q.   All right.  So, one of your duties was to send

6    money to El Salvador?

7        A.   Yes.

8        Q.   Okay.  So, that means, then, you had to collect

9    money?

10       A.   Yes.

11       Q.   Okay.  So, were you responsible for collecting

12   money from the extortion that your homeboys committed?

13       A.   As far as I know, we didn't -- I -- we -- we paid

14   dues every month, and sometimes that money we used to

15   send to El Salvador.

16       Q.   My question was:  Was one of your duties to

17   collect extortion money that your soldiers or homeboys

18   from Silvas collected from people?

19       A.   No.

20       Q.   Did your duties include collecting money from the

21   drug sales that your homeboys would be involved in?

22       A.   No.

23       Q.   Did your duties include collecting money from any

24   prostitution that your homeboys were involved in?

25       A.   No.

J. Garcia - Cross                                                    17

1    Q.   Okay.  So, it sounds like, at least when you were

2    the leader of your clique, there wasn't really much

3    criminal activity going on.

4    A.   No.  I was always talk to my handle for any --

5    any situation, the -- any criminal activity that I

6    thought that could have happen, I always talk to them

7    first and see what we could do, in order not to do

8    anything that I was not able to do.

9    Q.   Well, was your clique involved in criminal

10   activities while you were running the clique?

11   A.   Yes.

12   Q.   Okay.  What type of criminal activities was your

13   clique involved in while you were running the clique?

14   A.   Yes.  Some of them were buying drugs.  Some of

15   them -- they were looking for money, or stealing money,

16   I would say.

17   Q.   And, you, as the leader of the clique, would have

18   to okay that conduct, right?

19   A.   Not really, not all the time.  I -- pretty much I

20   always told them, like, come up with excuses and try to

21   buy time.

22   Q.   Well, you said that word several times, that

23   term, "buying time."  It looks like you bought time for

24   12 years.

25   A.   Like I said, 12 years doesn't mean that I was on

J. Garcia - Cross                                                    18

1     the street 24/7.

2         Q.   All right.  So, it sounds like -- and excuse me

3     for using this term, but I believe you used it before,

4     that you were kind of like a useless member to the Silva

5     clique, because you really didn't do anything?

6         A.   At some point, yeah, I --

7         Q.   Okay.  Well, help me understand this.  Because I

8     believe that in response to one of Ms. Martinez's

9     questions, you said that if a homeboy was useless to the

10    clique, he would be killed.

11        A.   Yes.

12        Q.   But you're still here, right?

13        A.   Yes.

14        Q.   As the first word of Silvas, you were also

15    responsible for recruits, right?

16        A.   Yes.

17        Q.   All right.  Not only recruiting them, but also, I

18    guess, walking with them and teaching them the way of

19    the Mara?

20        A.   Not recruiting them, going myself and ask if he

21    wants to be a part of that clique.  I never did that.

22        Q.   So -- but, once someone said that they wanted to

23    be a recruit, in other words, once someone was a

24    *chequeo* --

25        A.   Yes.

1    Q.   -- with the Silva crew, you would be responsible

2    for them, right?

3    A.   I would be responsible for whoever brought that

4    *chequeo* to the clique.

5    Q.   All right.  And, you had about, what, about five

6    *chequeos* when you were the leader of the Silvas clique?

7    A.   It was -- it was only two.

8    Q.   Two *chequeos*.  All right.

9         And, did you order any of the *chequeos* to commit

10   a murder in order to reach homeboy status?

11   A.   No.

12   Q.   So, you didn't do that, either?

13   A.   No.

14   Q.   Now, at some point, Mr. Garcia, you were given

15   the responsibility of running East Coast program, right?

16   A.   Yes.  But I didn't -- I didn't took it.

17   Q.   All right.  Let's start first with the East Coast

18   program.  Explain to the Judge Lee and the members of

19   the jury, the East Coast program included most of the

20   states on the East Coast, right?

21   A.   Yes.

22   Q.   Including North Carolina?

23   A.   Yes.

24   Q.   Virginia?

25   A.   Yes.

J. Garcia - Cross                                                    20

1    Q.   Maryland?

2    A.   Yes.

3    Q.   DC?

4    A.   Yes.

5    Q.   New York?

6    A.   Yes.

7    Q.   New Jersey?

8    A.   I don't know about New Jersey.

9    Q.   All right.  Pennsylvania?

10   A.   I don't know.  I cannot --

11   Q.   All right.

12   A.   -- I don't know about.

13   Q.   So, being asked to run the East Coast program of

14   MS-13 was a big deal, right?

15   A.   Yes.

16   Q.   All right.  And, you were asked to run the East

17   Coast program?

18   A.   At some point, but not from -- it was from a gang

19   member from Park View.

20   Q.   All right.  So, at some point, someone deemed

21   that you were good enough that you should be given this

22   responsibility of running a multistate gang, right?

23   A.   Yes.

24   Q.   Okay.  And, the way you achieve that is you've

25   got impress the leaders, right?

J. Garcia - Cross                                                21

1    A.   Um, I -- I didn't have to impress nobody.  I
2    just, like I say, I just knew how to talk to them.
3    Q.   All right.  And when you say you knew how to talk
4    to them, you meant you knew how to talk a big game,
5    right?
6    A.   Yes.
7    Q.   All right.  You knew how to brag about things,
8    right?
9    A.   I didn't brag about anything.
10   Q.   Well, when I say you talked a big game, you put
11   yourself out there as a big shot, right?
12   A.   No, I didn't put myself as a big shot.
13   Q.   All right.  So, just help me understand this.
14   So, you -- you don't really do much, and then you're
15   elevated to the head of the SLS clique, right?
16   A.   Yes.
17   Q.   And, you still don't do much, and then you're
18   asked to run the East Coast program for the MS-13.
19   A.   Yeah, that's --
20             MS. MARTINEZ:  Compound question.
21             THE WITNESS:  Like I say, they --
22             THE COURT:  Just a second.  Just a second.
23             MR. LEIVA:  Your Honor, he said yes -- he
24   nodded yes to the first part, and that's when I went to
25   the second part.

1           THE COURT:  But it's not clear what part he
2   was answering.  If you would ask one question at a time.
3   Thank you.
4           Objection stained.
5           MR. LEIVA:  Yes, Your Honor.
6   BY MR. LEIVA:
7     Q.  Let me go back, Mr. Garcia.
8         So, your testimony was that you didn't really do
9   much in the way of criminal activity, right?
10    A.  Yes.
11    Q.  Yet you were elevated to the head of the clique,
12  SLS clique?
13    A.  Yes.
14    Q.  Okay.  And then while head of the SLS clique, you
15  didn't really get involved in too much criminal activity
16  as well?
17    A.  Yes.
18    Q.  And then you were eventually asked to head the
19  East Coast program of MS-13?
20    A.  I was asked for a -- a Park View gang member.
21    Q.  Okay.  All right.  And, you also attended
22  leadership meetings?
23    A.  Yes.
24    Q.  And, you also were involved in conference calls
25  with the *mesa* or would otherwise be like the board of

J. Garcia - Cross                                                        23

 1   directors of MS-13?

 2       A.   Yes.

 3       Q.   And, you were invited to sit in on those

 4   conference calls with the *mesa*, right?

 5       A.   Not really.  I -- I wasn't invited.  There was a

 6   gang member from Park View that he was invited to the

 7   *mesa*, and he sometimes usually call me, chose for me to

 8   listen to what they had to say.

 9       Q.   Well, you -- there was a -- there was question

10   from Ms. Martinez about you and Big Payaso (sic) having

11   conversations, right?

12       A.   Yes.

13       Q.   And Big Payaso is a big deal, isn't it?

14       A.   Yes.

15       Q.   All right.  And, Big Payaso is in El Salvador,

16   right?

17       A.   I don't know if -- last thing I know he was in

18   jail.

19       Q.   In El Salvador?

20       A.   Yes -- no, no.  Over here.

21       Q.   Over here.

22            (Counsel conferring.)

23   BY MR. LEIVA:

24       Q.   I'm sorry.  Big Poison.  You had a -- a phone

25   conversation with Big Poison, right?

J. Garcia - Cross                                                24

1      A.   Yes.

2      Q.   And Big Poison is a big deal?

3      A.   Yes.

4      Q.   Okay.  Big Poison is in El Salvador?

5      A.   Yes.

6      Q.   And not everyone gets to talk to Big Poison?

7      A.   Actually, not -- not really.  Big Poison is the

8  type of person that he like to use whoever he can use to

9  get money.

10     Q.   And Big Poison just uses leaders.  He will only

11 talk to leaders of the clique?

12     A.   He will talk to whoever he wants in order to get

13 what he wants.

14     Q.   And, in these meetings that you would have with

15 the leadership -- and let's -- I'm sorry.  Maybe I'm

16 confusing things.  Let's make things clear.

17          You have meetings where you physically attend,

18 right?

19     A.   Yes.

20     Q.   And those meetings, it would be the head of the

21 cliques that would attend, right?

22     A.   Yes.

23     Q.   And you guys would discuss MS-13 business?

24     A.   Yes.

25     Q.   All right.  You guys would discuss drug

1   distribution, right?

2       A.   Yes.

3       Q.   You guys would discuss which clique would be

4   granted certain -- certain sectors to run, right?

5       A.   Yes.

6       Q.   Okay.  And you guys would also discuss other

7   illegal activities as well, other illegal businesses?

8       A.   Yes.

9       Q.   And you guys would also discuss if any punishment

10  needed to be handed down, right?

11      A.   Yes.

12      Q.   And you guys would also discuss any green lights

13  that needed to be decided to send to El Salvador, to see

14  if you could get approval?

15      A.   Yes.

16      Q.   And is it your testimony, Mr. Garcia, that

17  everything that was discussed in those meetings, all

18  those criminal activities that were discussed, you told

19  that to your handler?

20      A.   Yes.  Actually, I always have a device to record

21  those meetings.

22      Q.   But, before you started recording -- are you

23  telling us that for the last ten years you've always had

24  a recording device on you?

25      A.   Most of the time, yes.

J. Garcia - Cross                                                  26

1    Q.   So, I'm assuming, then, you had a whole treasure
2    trove of criminal activity that you reported back to
3    your handler?
4    A.   Yes, always.
5    Q.   All right.  And, of all that information that you
6    gave to your handler, not including this case, how many
7    charges were brought against people?
8    A.   I can't recall that.
9    Q.   This is only your second time testifying, isn't
10   it?
11   A.   Yes.
12   Q.   All right.  So, from '06 till today, you never
13   testified at all?
14   A.   No.
15   Q.   And, you never inquired with your handler, "Hey,
16   why is it that I'm giving all this information on
17   criminal activity, yet you're not charging anybody?"
18   A.   Um, I didn't ask that many questions, to tell you
19   the truth.
20   Q.   You recall attending a meeting in Arlington with
21   members of Park View, in a restaurant?
22   A.   With just Park View?
23   Q.   I think there were other -- other people there as
24   well, other members of MS-13.
25   A.   Yes.

1    Q.   Okay.  And, do you recall at that meeting that
2    another member of MS-13 pulled a knife on you?
3    A.   Yes.
4    Q.   Okay.  All right.  And, you instructed everyone
5    that he needed to be punished for breaking the rule and
6    pulling a knife out on you, right?
7    A.   I didn't instruct.  I said that was disrespect
8    for what I did.
9    Q.   And then you followed up with saying he has to
10   receive a *calentón*, right?
11   A.   Everybody has to decide if he gets a *calentón*.
12   That wasn't my decision.
13   Q.   A *calentón* is a beat down, right?
14   A.   Yes.
15   Q.   Okay.  And, you brought it to everyone's
16   attention that this homeboy had violated a rule by
17   pulling a knife out on you?
18   A.   I didn't bring it to their attention.  Everybody
19   saw -- everybody saw what he did.
20   Q.   All right.  And, you suggested to everyone that
21   he receive a 26 second *calentón*, right?
22   A.   Not that I recall.
23   Q.   You don't recall.
24        Did you do anything to stop this homeboy
25   receiving a beat down?

1    A.   No.

2    Q.   But you knew it was going to happen, right?

3    A.   Yes.

4    Q.   Did you know Scorpion, from your gang, from your

5  clique?

6    A.   Yes.

7    Q.   Eric Tusios Lazos (phonetics)?

8    A.   Yeah.

9    Q.   Okay.  And he was involved in the murder, was he

10 not, or in a plan to kill somebody?

11   A.   Not that I know of.

12   Q.   Okay.  So, you're not aware that Scorpion was

13 convicted --

14   A.   I know he --

15   Q.   -- of attempted murder?

16   A.   -- was convicted, but I didn't know the details.

17   Q.   All right.  So you don't know that he was

18 convicted in '07 for planning someone's murder, sometime

19 around '07, '08?

20   A.   No, I don't know the details.  I know he was

21 convicted, but I don't know the details.

22   Q.   So you didn't tell Agent Born that you had

23 information about an attempted murder, about one of your

24 homeboys?

25   A.   Yes, I did, but, I say, I don't know the details,

1    actually, what happened on the -- if he got convicted or

2    how long he's going to be in jail.  I don't have the

3    details.

4        Q.  So you're telling us that you did tell Agent Born

5    about that?

6        A.  Yes, yes, I did.

7        Q.  So you told Agent Born about that?

8        A.  Yes.

9        Q.  He went to trial, but you weren't required to

10   testify?

11       A.  No.

12       Q.  Okay.  And, after Scorpion gets convicted, and

13   there were already rumors about you being a snitch, did

14   anybody come up to you and say, "Hey, we think you

15   snitched on Scorpion"?

16       A.  Nobody said that.

17       Q.  No?

18       A.  No.

19       Q.  Now, let's go over a little bit -- over the

20   transcripts that you testified to.  And I'm just going

21   to ask you just general questions, rather than going

22   line by line, if that's okay with you.

23            So, in your conversations with the different

24   defendants, they use code words a lot, right?

25       A.  Yes.

1    Q.    I think you said that a chicken represented

2    Lagrima --

3    A.    Yeah.

4    Q.    -- right?

5          Little chicken represented Little Guasón?

6    A.    Yes.

7    Q.    Gerson Martinez?

8    A.    Yes.

9    Q.    Okay.  That "cooking" meant to kill somebody,

10   right?

11         Or, I'm sorry, "eating at a restaurant" or

12   "eating" meant -- was code for killing someone?

13   A.    Yes.

14   Q.    And so, there was a lot of code that was used

15   when they were talking about bad things?

16   A.    Yes.

17   Q.    Okay.  We also, yesterday, went through a list of

18   other words that members use to signify green light.  Do

19   you remember that?

20   A.    Yes.

21   Q.    Please tell us what *pega* means, what -- it's a

22   verb in Spanish, isn't it?

23   A.    Yes.

24   Q.    P-e-g-a.

25   A.    Say that again?

J. Garcia - Cross                                                    31

1    Q.   *Pega*?

2    A.   *Bega*?

3    Q.   *Pega,* with a P.

4    A.   Okay.

5    Q.   All right?  And, *pega* is a verb.  Do you agree

6    with that?

7    A.   Um, but, I'm not following the question, *pega*, of

8    what you trying to -- to ask.

9    Q.   Let me ask you this --

10   A.   Is it *pegar*?

11   Q.   *Pega* is a verb that means to hit, right?

12   A.   You mean *pegar*?  *Pegar* is the -- that's the word

13   that you use, *pegar*.

14   Q.   Okay.  *Pegar*.

15          MS. MARTINEZ:  Can we get the spelling, for

16   the record, both of these words that counsel and what

17   the witness are using?

18          MR. LEIVA:  *Pegar* is p-e-g-a-r.  And I

19   believe I already spelled *pega.*

20   BY MR. LEIVA:

21   Q.   And, when *pegar* is used among MS-13 members, it

22   can mean a variety of things, right?

23   A.   *Pegar* means -- it means kill.

24   Q.   Okay.  Well, let's start this way:  *Pegar* means

25   hit.  You would agree with that?

1    A.   Yes.

2    Q.   Okay.  All right.  And your testimony is that

3    when MS-13 members use the word "hit," they literally

4    mean a hit, to kill somebody?

5    A.   Yes.

6    Q.   Okay.  So, would you agree with me, that *pegar*

7    also means to beat up somebody, to attack somebody?

8    A.   Not in, in gang terms.

9    Q.   Okay.  Well, here's where I'm a little confused

10   then, Mr. Garcia.

11   A.   Yes.

12   Q.   We have all this code being used, right, to

13   describe bad things?

14   A.   Yes.

15   Q.   But, when there's someone talking about an actual

16   hit, they use the actual word "hit"; is that what your

17   testimony is?

18   A.   Yes.  They use hit, they use *pegar*, *pegar*, in

19   gang terms.  I can't talk to a regular person and say

20   *pegar* means, like you say, hit.  But in gangs, it means

21   one thing.

22   Q.   But there is no -- that's not even code, is it?

23   *Pegar* --

24   A.   No, no.

25   Q.   -- if it means hit?

1    A.   It's a word.

2    Q.   It's a word.

3    A.   Yes.

4    Q.   And it's a word that's clear to everyone, right?

5    A.   Yes.

6    Q.   So, it seems kind of ridiculous that these guys

7    would use all this code, but on the one -- on an

8    incriminating word they don't even use code, they just

9    say hit.

10   A.   Yeah.

11   Q.   That's why I'm asking you:  Hit can also mean to

12   beat up someone, can't it?

13   A.   No.

14   Q.   Now, you were involved with the particular

15   group -- and when I say "this particular group," I mean

16   Park View -- starting in July 2013?

17   A.   Somewhere around there.

18   Q.   And you were asked by a high -- someone high up

19   in Park View to help organize these guys, right?

20   A.   Just to -- because, Payaso knew that I knew a lot

21   of people back in the days, and, at that time, old Park

22   View, they didn't know anything about who was in

23   Virginia before.

24   Q.   Right.  And when you say that "Payaso knew that I

25   knew a whole lot of people," you mean that you knew a

1    lot of important people?

2        A.   Yes.

3        Q.   A lot of people in high leadership positions in

4    MS-13?

5        A.   Yes.

6        Q.   People who were here in the United States, right?

7        A.   Yes.

8        Q.   And, people who were also in El Salvador?

9        A.   Yes.

10       Q.   Okay.  So, Payaso asked you, I'm assuming --

11   well, correct me if I'm wrong -- based on your

12   experience, to come over here and help organize these

13   guys?

14       A.   No.  No.

15       Q.   No to what?

16       A.   He didn't ask me that.

17       Q.   He asked you to help run this particular crew,

18   right?

19       A.   No.

20       Q.   So what did he do, just ask you to kind of

21   baby-sit them and watch what they're doing?

22       A.   No.  He just -- he just asked me to back them up

23   on anything when they have those big meetings, and

24   sometimes they didn't know how to talk, and someone --

25   if they see, they see them as they're -- they're not

1   capable of -- of running things how they want it run.

2   That's all.

3       Q.   All right.  And, would it be fair for me to

4   assume that the reason Payaso asked you was because you

5   had a proven record of being able to run things?

6       A.   Um, no, not -- not that I know that he knows.

7       Q.   All right.  And when he asked you, you agreed,

8   right?

9       A.   Yes.

10      Q.   Okay.  So, this was back sometime in July of

11  2013?

12      A.   Yes.

13      Q.   All right.  And, when you introduced yourself to

14  the members of Park View, you told them that you were

15  there with the blessing of either Payaso or some other

16  members --

17      A.   Actually, Payaso was the one who introduced me to

18  them.

19      Q.   All right.  And Payaso told them that they needed

20  to listen to you, right?

21      A.   Yeah, in case, if any question or anything, they

22  can call me, or they actually pretty much they -- he

23  told them that --

24      Q.   Anything they --

25      A.   -- anything that --

1    Q.   Any questions?

2    A.   -- any questions they have.

3         MS. MARTINEZ:  Objection.  He should be

4    allowed to complete his answer.

5         THE COURT:  Let him answer, Mr. Leiva.

6    BY MR. LEIVA:

7    Q.   You said any questions?

8    A.   Any questions that they have.

9    Q.   So, when you say any questions that they had, to

10   you that meant any questions they had about things that

11   they should be doing or not doing?

12   A.   No.

13   Q.   Questions -- well, what kind of questions did you

14   envision you would be assisting them with?

15   A.   There were questions because they didn't know who

16   was in Culmore before.  So at that time they have a big

17   problem.  Nobody wanted probably to be in Culmore.  They

18   wanted to be somewhere else.  So, they have a lot of

19   back and forth about the sectors.

20   Q.   And, and, at some point, Payaso got locked up,

21   right?

22   A.   Big Payaso or --

23   Q.   Payaso, who introduced you to the members of Park

24   View?

25   A.   He was locked up -- he been before the meeting,

J. Garcia - Cross                                              37

 1    introduce me.

 2        Q.   He did what?  I'm sorry.

 3        A.   He was locked up before he introduced me to these

 4    guys.

 5        Q.   Okay.  So, would it be fair to say then that

 6    Payaso, since he was locked up --

 7        A.   Yes.

 8        Q.   -- asked you for a favor just to watch over these

 9    guys?

10        A.   Yes.

11        Q.   And he also asked that they run all decisions

12    through you as well?

13        A.   No.

14        Q.   He asked, then, that they at least consult with

15    you for some of the decisions that needed to be made?

16        A.   If they have a question, if they feel like it.

17    No reason.  It wasn't a must.

18        Q.   All right.  So, you were involved with this gang

19    starting in July 2013?

20        A.   Yes.

21        Q.   So, I'm assuming, then, Mr. Garcia, since you

22    were involved with them since July of 2013, you started

23    hearing rumors about a possible punishment on Lagrima.

24        A.   Yes.

25        Q.   And, when did you hear about a possible

1    punishment on Lagrima?

2        A.   Around 2013.  I cannot recall the exact --

3        Q.   Sometime in July --

4        A.   I can't --

5        Q.   -- August, September?

6        A.   I don't remember the exact date.

7        Q.   And, if there was a decision that needed to be

8    made as far as killing Lagrima, that's something that

9    you would have been consulted with?

10       A.   Nope.

11       Q.   So, Payaso is in jail, right?  We established

12   that?

13       A.   Yes.

14       Q.   Payaso asked, you because he was in jail, to

15   watch over these guys, right?

16       A.   Yes.

17       Q.   Payaso asked you to help them with any questions

18   they had, right?

19       A.   Yeah.  If they feel like asking a question, yes.

20       Q.   And, it's your testimony that such a big decision

21   as killing one of their own members, that wasn't asked

22   of you for your opinion?

23       A.   No.  Those decisions they made within the clique,

24   and I was not a part of this clique.

25       Q.   What about the punishment that was going to be

J. Garcia - Cross                                          39

1    given to Peligroso?

2        A.   I didn't know --

3        Q.   You didn't know that either?

4        A.   No.

5        Q.   No one reached out to you about that?

6        A.   No.

7        Q.   Now, it was clear from the transcripts that --

8    that these guys, they would talk to you with no problem,

9    right?

10       A.   Yes.

11       Q.   And, it wasn't because you were really a nice guy

12   to them; it was because of your position within the gang

13   that they would come to you?

14       A.   Like I said, they -- Payaso introduced --

15   introduced me to them.  So, Payaso was the one who run

16   the clique from inside at that point.

17       Q.   So you were given a position of trust with these

18   guys?

19       A.   Pretty much, yes.

20       Q.   And that -- and I'm assuming they also knew about

21   your reputation, right?

22       A.   Yes.

23       Q.   And they also knew of the people that you knew

24   who were high up in the organization?

25       A.   Yes.

J. Garcia - Cross                                                    40

1    Q.   And, going back to your days when you were a

2    homeboy, you would want to earn the respect of your

3    first word and the second word of your clique, right?

4    A.   Nope.  To tell you the truth, we -- Silvas clique

5    pretty much they started in Virginia, so we all started

6    pretty much at the same age.  We didn't have anybody in

7    El Salvador that we can say, oh, he was higher than, or

8    bigger than us.

9         So, we all started pretty much at the same age,

10   so, I didn't have to impress anybody and, or try to earn

11   the respect of anybody.

12   Q.   But, it sounds, given the different positions

13   that you were offered, that you were well respected

14   within MS-13.

15   A.   I'm sorry.  Repeat that again.

16   Q.   It sounds, given the different leadership

17   positions that you were offered --

18   A.   Yes.

19   Q.   -- that you were well respected within MS-13.

20   A.   Yes.

21   Q.   All right.  And, would you agree with me that

22   your experience is that the homeboys want to win the

23   respect of the leaders?

24   A.   Yes.

25   Q.   And so, when you were talking to several of these

1   young men, didn't it seem to you that they were trying

2   to get your respect by telling you what they had done?

3       A.   Um, they were bragging about it.  I'm not sure if

4   they were trying to earn my respect or what, but they

5   were -- just want to start bragging about it.

6       Q.   But you would agree with me, they were talking

7   too much, right?

8       A.   Sometimes they talk, and sometimes you can assume

9   that they talk too much, but, not all the time.

10      Q.   But I'm assuming, given your 12 years of

11  experience within MS-13, something inside you must have

12  said:  These guys are talking way too much.  They really

13  want me to respect them.

14      A.   Yeah, sometimes, yes.

15      Q.   Mr. Garcia, if I could have you look at

16  Government's Exhibit -- if I can find it real quick.

17           Actually, before I do that, I think -- you've

18  agreed, and it's come out, that you've been paid by the

19  FBI to work as an informant, right?

20      A.   Yes.

21      Q.   Okay.  And, when you were applying for your --

22  was it a permanent resident status?  Is that what you

23  were applying for?

24      A.   Yes.

25      Q.   Okay.  Did the government tell you that they

1    would not report certain things about you that would

2    prevent you from getting this legal permanent residency

3    status?

4        A.   No.

5        Q.   Well, do you recall filling out the application

6    for your permanent residency status?

7        A.   Um, you mean -- to who?

8        Q.   With the U.S. Government.

9        A.   Yes.

10       Q.   You recall filling out an application from

11   Homeland Security?

12       A.   Yes.

13       Q.   Okay.  And, do you recall being asked on the

14   application:  "Have you ever, in or outside the United

15   States, knowingly committed any crime of moral turpitude

16   for a drug related offense for which you have not been

17   arrested?"

18            Do you remember being asked that question?

19       A.   My lawyer fill out all the application.  I had a

20   lawyer, so --

21       Q.   I understand you may have had a lawyer.

22       A.   Yes.

23       Q.   But the lawyer, I'm assuming, asked you --

24       A.   Yeah.  With the paperwork, I gave all the

25   paperwork to my lawyer.

1    Q.  I'm assuming that when -- well, your lawyer was

2    helping you fill out this application --

3    A.  Yes.

4    Q.  -- your lawyer asked you what the answer was to

5    that question?

6    A.  Yes.

7    Q.  Okay.  And, you wrote down what?

8    A.  I -- I tell the truth.  What was --

9    Q.  So, you wrote down that you did --

10   A.  Yes.

11   Q.  -- commit crimes of moral turpitude or drug

12   related offenses?

13   A.  No drug related offenses.

14   Q.  Okay.  Question also -- another question on the

15   application is:  "Have you ever, in or outside the

16   United States, been arrested, cited, charged, indicted,

17   convicted, fined or imprisoned for breaking or violating

18   any law or ordinance, excluding traffic violations?"

19        Do you recall how you answered that?

20   A.  Yes.

21   Q.  You answered by telling the truth, yes?

22   A.  Yes.

23   Q.  All right.  Do you recall in the application

24   being asked:  "Have you ever engaged in any unlawful

25   commercialized vice, including, but not limited to,

1   illegal gambling?"

2      A.   No.

3      Q.   Okay.  No, you don't remember that question --

4      A.   I don't --

5      Q.   -- or no, you didn't participate in that

6   activity?

7      A.   I don't remember that question.

8      Q.   Okay.  What about this question:  "Have you ever

9   illicitly trafficked in any controlled substances or

10  knowingly assisted, abetted or colluded in the illicit

11  trafficking of any controlled substances?"

12     A.   No.

13     Q.   No, you don't recall that question, or no, you

14  did not participate?

15     A.   I did not participate.

16     Q.   You wrote no?

17     A.   Yes.

18     Q.   Okay.  So, let me ask you about that, since you

19  responded no.

20          I believe on -- in response to Ms. Martinez's

21  question, you said that there were times when you

22  received drugs and gave that to your handler.

23     A.   Yes.

24     Q.   Okay.  And, you also testified that there were

25  times when you received cash payments and you gave that

1     to your handler.

2          A.   Yes.

3          Q.   Okay.  How many times would you say that you gave

4     drugs to your handler?

5          A.   Just the time that I was allowed, through them.

6          Q.   So, about five times?

7          A.   I can't recall how many times.

8          Q.   Okay.  It's enough that you just don't remember

9     how many times?

10         A.   I just don't remember exactly how many times.

11         Q.   Okay.  What about cash; how many times do you

12    recall giving your handler cash?

13         A.   Cash, giving -- I don't recall giving my handler

14    cash.

15         Q.   I thought you said that on direct.  Maybe I'm

16    mistaken.

17         A.   I'm sorry.  Say that again.

18         Q.   At some time, when you would receive money, you

19    would just give it to your handler.

20         A.   No, no, I don't -- I never gave money to my

21    handler.

22         Q.   When I mean money, I don't mean to pay off, but I

23    mean, you received money from the gang, and rather than

24    hold on to it or send it to someone in El Salvador, you

25    just gave it to her so you wouldn't get in trouble?

1     A.   No, not that I remember.

2     Q.   Okay.  Other than drugs, what else did you give

3  your handler?

4     A.   All the information.

5     Q.   No weapons?

6     A.   Weapons, yes.

7     Q.   Okay.  How many times did you give your handler

8  weapons?

9     A.   I remember one, one or two -- actually, it was

10  two times.

11    Q.   Two times.

12         So you gave your handler weapons on at least two

13  occasions, and you don't remember how many times you

14  gave her drugs?

15    A.   Yes.  I mean, give her drugs, you said?

16    Q.   Yeah.  You gave -- I don't mean for her to use

17  it.

18    A.   Okay.

19    Q.   But, you had -- you were given drugs in your

20  capacity as a member of SLS, and you just gave it to her

21  rather than hold on to it?

22    A.   I was allowed through them to probably purchase

23  amount of drug, but always was through them.  So, it's

24  not like I go myself and buy the drug and give the money

25  or the drugs.

1        Q.   I understand.  So what you're saying is that you

2   would purchase drugs on behalf of SLS, right?

3             And then you would give it to your handler?

4                 MS. MARTINEZ:  Objection, compound question.

5                 THE COURT:  Sustained.

6   BY MR. LEIVA:

7        Q.   You would buy drugs through SLS?

8        A.   Um, I would buy drugs when I was approved through

9   FBI.

10       Q.   Okay.  I understand that.  So, the FBI would

11  approve for you to buy drugs as a member of SLS?

12       A.   Yes.

13       Q.   On behalf of SLS?

14       A.   Yes.

15       Q.   Okay.  And, once you obtained those drugs, you

16  then gave it to your handler?

17       A.   I did give it to the handler.

18       Q.   Okay.  And you just don't recall how many times

19  you did that?

20       A.   I don't.  I didn't do it that many times.

21       Q.   Okay.  Now, another rule that you testified to,

22  that a member of MS-13 could receive death as punishment

23  is if you steal from the gang, right?

24       A.   Yes.

25       Q.   Okay.  So, then, on several different occasions,

1    on behalf of SLS, you bought drugs --

2        A.   Yes.

3        Q.   -- right?

4             Gave it to your handler, right?

5        A.   Yes.

6        Q.   So, those drugs must have been missing, right?

7        A.   Yes -- I mean, but those drugs or the money has

8    nothing to do with the SLS clique.

9        Q.   All right.  But you just said that you bought

10   drugs on behalf of SLS.

11       A.   On behalf.  If there was a guy who was selling,

12   obviously, that person knew that you were from a gang.

13       Q.   Yes.  And --

14       A.   But I wasn't on behalf of SLS.

15       Q.   What I mean by "on behalf," I mean that you were

16   buying it, right --

17       A.   Uh-huh.

18       Q.   -- under the guise -- do you know what the word

19   "guise" means?

20       A.   Yes, I know.

21       Q.   -- under the guise that you were buying it for

22   your own crew, for your own --

23       A.   Oh, I wasn't buying it -- I wasn't buying it

24   to -- for my own clique.  I wasn't buying it like,

25   personal, so, that has nothing to do with the clique.

1    Q.  So, here's where I'm confused.  You're saying you

2    bought it for your personal --

3    A.  No, when I was doing it through FBI, and this

4    person tried to sell drugs, so I buy -- I bought them,

5    but not to make a business within the clique.  It was,

6    as soon as I buy them, give it to my handler.

7    Q.  So, just to clear things up, your testimony is

8    that you never purchased drugs on behalf of SLS?

9    A.  No.

10   Q.  Another question on the immigration application,

11   you were asked to list your present and past memberships

12   "in, or affiliation with, every organization,

13   association, party, club, society or similar group in

14   the United States."

15       Do you recall listing MS-13?

16   A.  Yeah, I remember that.

17   Q.  Okay.  So we're clear, you listed MS-13 on your

18   immigration application?

19   A.  I talked to my lawyer and he was doing the

20   paperwork.  So we talked.

21   Q.  All right.  So you listed MS-13 on your

22   immigration application, right?

23   A.  Not myself.  Like I say, I have a lawyer and he

24   knew what I had to do.

25   Q.  I understand.

1      A.   I could have said -- he knew that I was part of

2    it.  I don't know how he list it or what he says.

3      Q.   You reviewed this application before it was sent

4    in to Homeland Security.

5      A.   Um, the first time, yes.

6      Q.   You signed an application?

7      A.   Yes, I did sign.

8      Q.   All right.  And I'm assuming that before you

9    signed the application, you just looked over it?

10     A.   Yes.

11     Q.   All right.  And, you saw that on that question,

12   you did list, or your lawyer listed, MS-13?

13     A.   Um, not that I can recall.

14     Q.   Okay.  And, you also testified that you answered

15   yes to committing crimes in this country?

16     A.   Yes.

17     Q.   Okay.  And, after disclosing that, you were still

18   granted legal permanent residency status?

19     A.   Nope.

20     Q.   I thought you said you were --

21     A.   Yes.

22     Q.   Yes.

23     A.   But it wasn't just because I sent application and

24   was granted.

25     Q.   What other reason do you know of why you were

1   granted that?

2       A.   I wasn't granted.  I was pending and they put me

3   on removal proceeding.

4       Q.   Okay.  But, right now you have work

5   authorization?

6       A.   I am a green card holder.

7       Q.   You're a green card holder --

8       A.   Yes.

9       Q.   -- right?

10           So, at some point it was approved?

11      A.   Yes, at some point.

12      Q.   All right.  And your testimony is that even with

13  those disclosures on an application, you did receive a

14  green card?

15      A.   Yes.

16      Q.   Okay.  And, your testimony is that the government

17  did not assist you in any way in getting that, even with

18  those disclosures?

19      A.   No.

20           MR. LEIVA:  Court's indulgence.

21  BY MR. LEIVA:

22      Q.   Just one -- a couple last questions, Mr. Garcia.

23           The conversations -- you had several

24  conversations regarding the murder of Gerson Martinez,

25  right?

J. Garcia - Cross

1    A.   Yes.

2    Q.   Okay.  And from your recollection, there's about

3    three people, right, that took credit for chopping his

4    head off, right?  You can recall?

5    A.   It was one, it was -- it was one or two.  I can't

6    recall that right now.

7    Q.   All right.  So, it was Solitario?

8    A.   No.

9    Q.   All right.  So, it was at least two people that

10   took credit for chopping his head off?

11   A.   Yes.

12        MR. LEIVA:  Your Honor, that's all the

13   questions I think I have.

14        Thank you for your patience, Mr. Garcia.

15             CROSS-EXAMINATION

16   BY MS. AUSTIN:

17   Q.   Good morning, Mr. Garcia.

18   A.   Good morning.

19   Q.   My name is Amy Austin.  I represent Alvin Gaitan

20   Benitez.

21        I have some questions for you.  I'll start where

22   Mr. Leiva left off.

23        When were you granted your green card?

24        When did you get it?

25   A.   I'm sorry.  Repeat that question again.

J. Garcia - Cross                                              53

1    Q.   When did you get your green card?

2    A.   Last year.

3    Q.   Last year?

4    A.   Yes.

5    Q.   So, in 2014?

6    A.   '15.

7    Q.   '15, I'm sorry.  When in 2015?

8    A.   Around November.

9    Q.   When did you apply for it?

10   A.   2007.

11   Q.   2007?

12   A.   Yes, ma'am.

13   Q.   So, you've been denied --

14   A.   Twice.

15   Q.   Excuse me?

16   A.   Twice.

17   Q.   Twice.  Okay.

18        And so, as late as January 26, 2015, you were

19   still asking the U.S. Government to help you get your

20   S Visa, weren't you?

21   A.   They were still trying to process the S Visa.

22   Q.   Because you had been denied your green card?

23   A.   I was -- I wasn't denied it, but I was on the

24   process of -- of going in front of the judge.

25   Q.   You were trying to appeal that?

1    A.   No.  They send it to a judge, and the judge

2    decide.

3    Q.   But, in January of 2015, you were in

4    communication with Agent Uribe of the FBI, and you were

5    asking him, has your S Visa been submitted.  "Are you

6    doing this for me?"  And he responded; is that correct?

7             MS. MARTINEZ:  Objection, Your Honor,

8    compound question.

9             THE COURT:  It is.  Sustained.

10   BY MS. AUSTIN:

11   Q.   Were you in contact with Agent Uribe in January

12   of 2015?

13   A.   I was always in contact with Agent Uribe all the

14   time.

15   Q.   Were you in contact with him regarding your

16   status here in the United States?

17   A.   Sometimes, yes, I asked him.

18   Q.   And, do you remember text messages between you

19   and Agent Uribe discussing your S Visa?

20   A.   Sometimes.

21   Q.   Do you remember texting him in January of 2015

22   regarding your S Visa?

23   A.   I can't recall the date, but I always text him

24   and ask questions.

25   Q.   Do you remember asking him in January 2015,

1   through a text, "Is everything okay?  Just asking if S

2   Visa has been submitted"?

3       A.   Like I said, I can't recall the date, but I

4   ask -- I ask questions about the S Visa.

5       Q.   And do you remember him responding to you,

6   saying, "We are on it, this week, documentation has been

7   submitted"?

8       A.   Yes.

9       Q.   And then he also informed you --

10               MS. MARTINEZ:  Objection, Your Honor.

11   That's hearsay.

12               MS. AUSTIN:  I'll withdraw that.

13               THE COURT:  Okay.

14   BY MS. AUSTIN:

15       Q.   Did you then meet up with him to sign papers that

16   were required for that S Visa?

17       A.   Yes.

18       Q.   And is it your testimony that all the payments

19   you received from the FBI for your work performed and

20   for services -- excuse me -- for your work performed and

21   for expenses, those payments were made in cash to you?

22       A.   Yes.

23       Q.   No checks?

24       A.   No checks.

25       Q.   And, I understand that prior to Agent Born being

1   your handler, you had a different handler; is that

2   correct?

3       A.   Yes.

4       Q.   Who was that?

5       A.   Um, the first one was David Solis.

6       Q.   David Bliss?

7       A.   Solis, S-o-l-i-s.

8       Q.   Thank you.

9            That was your first handler.  Who was your second

10  handler?

11      A.   I can't remember his name.

12      Q.   Okay.  And then was Agent Born your third?

13      A.   I can't recall what -- what number she was.

14      Q.   When did you begin working with Agent Born?

15      A.   I can't recall.  I would say probably around

16  2007.

17      Q.   And, was it when you began working with Agent

18  Born, around that time, the same time that you began

19  providing information to her regarding the different

20  MS-13 cliques in Virginia?

21      A.   Um, you mean when I started?  I started with

22  David Solis, giving information.

23      Q.   On MS-13?

24      A.   Yes.

25      Q.   Okay.  So, when you started being handled by

J. Garcia - Cross                                              57

1  Agent Born, you had already been giving him -- you had
2  already been giving information on MS-13 in the Virginia
3  area?
4      A.   Yes.
5      Q.   Okay.  And so, you just sort of picked up with
6  Agent Born --
7      A.   Yes.
8      Q.   -- is that correct?
9      A.   Yes.
10     Q.   You e-mailed her or texted her the same
11 information you had been texting your prior handlers?
12     A.   Yes.
13     Q.   And, you had been doing this for quite a while?
14     A.   Yes.
15     Q.   And, did she just then -- withdraw that.
16          At what point did you start concentrating on PVLS
17 clique and providing information on them?
18     A.   When I learned what -- what they -- what they
19 trying to do in Virginia, and also when I learned about
20 the murders that they have committed.
21     Q.   So, prior to learning about the murders, you
22 didn't provide information on PVLS?
23     A.   Yes.
24     Q.   Okay.  So, around what time did you start
25 providing information on PVLS?

J. Garcia - Cross                                                    58

1      A.   2013.

2      Q.   2013.  Okay.

3           Is that when you --

4      A.   2013, 2012.  I don't recall the exact same date,

5   or the same --

6      Q.   Year?

7      A.   Year, yeah.

8      Q.   Is it fair to say, sometime around August,

9   September, 2013, you started concentrating on PVLS?

10     A.   No, it's not.

11     Q.   Okay.  When did you?

12     A.   Like I say, I don't have the date.  I can't

13  recall the date specifically.

14     Q.   When did you start talking to members of PVLS on

15  the phone?

16     A.   Could be 2012, 2013.

17     Q.   And so, all during, perhaps, 2012, 2013, you were

18  talking to them on a cellphone; is that correct?

19     A.   Cellphones, yes.

20     Q.   Cellphones?

21     A.   Yes.

22     Q.   How many cellphones did you have, Mr. Garcia?

23     A.   Um, I have two.

24     Q.   Two?

25     A.   Yes.

J. Garcia - Cross                                                    59

1    Q.   And, at some point, the FBI provided you with the

2    cellphone that --

3    A.   That's the second one.

4    Q.   But you had a personal one?

5    A.   I had a personal one.

6    Q.   You didn't always have that second FBI --

7    A.   No.

8    Q.   -- issued phone?

9         Do you know when you got that phone?

10   A.   No, I can't recall the date.

11   Q.   At some point you met Demente; is that correct?

12   A.   Yes.

13   Q.   And, you -- did you meet him in person?

14   A.   Yes.

15   Q.   So, you saw him?

16   A.   Yes.

17   Q.   You could recognize him?

18   A.   Yes.

19   Q.   And, you talked with him on the phone?

20   A.   Yes.

21   Q.   And, you knew him to be the second word for the

22   PVLS clique?

23   A.   I knew at that time he was the first word.

24   Q.   At that time he was the first word?

25   A.   Yes.

1    Q.   Did you know Payaso at that time?

2    A.   Yes.

3    Q.   Who -- what position did he have in the PVLS

4    clique?

5    A.   He was the one, pretty much the shot caller, from

6    jail to outside.

7    Q.   So, you wouldn't consider him the first word?

8    A.   Also would consider the first word, too.

9    Q.   So, he and Demente shared that position of first

10   word?

11   A.   Whatever they share is within the clique, however

12   they work it out --

13   Q.   I'm asking you --

14   A.   Yes.

15   Q.   -- Mr. Garcia.  You seem to have a lot of

16   information about these PVLS members.

17   A.   Yes.

18   Q.   What did you perceive Payaso's -- Payaso's

19   position to be?

20   A.   He was the first word, as well, from in jail.

21   Q.   From jail?

22   A.   Yes.

23   Q.   He conducted business over a cellphone from jail?

24   A.   Yes.

25   Q.   And, you talked to him several times while he was

J. Garcia - Cross                                                    61

1   in jail?

2       A.   Yes.

3       Q.   And, you also knew Demente, as the first word or

4   second word of PVLS, you knew him to deal in narcotics;

5   isn't that correct?

6       A.   Yes.

7       Q.   And, what drugs did you know him to deal in?

8       A.   Um, the only thing I can recall talk to him, he

9   was dealing with cocaine.

10      Q.   Cocaine?

11           Did you also know him to deal in methamphetamine?

12      A.   No, not that I can remember.

13      Q.   Do you remember telling your agent -- or your

14  handler, Agent Born, that Demente made a trip to LA to

15  buy a pound of crystal meth for $6,000?

16      A.   Yeah, I remember that.

17      Q.   Okay.  So, you knew Demente to deal in cocaine as

18  well as methamphetamine?

19      A.   Um, is that the same, crystal meth?  I don't know

20  if that's the same.

21      Q.   Crystal meth, yes.  I'm sorry.

22      A.   I don't know if it's the same --

23      Q.   Well, let me rephrase that, then.

24           You knew Demente to deal in cocaine as well as

25  crystal meth?

1    A.   Yes.

2    Q.   Okay.  And crystal meth is an illegal drug,

3    correct?

4    A.   Yes.

5    Q.   Okay.  And you knew that he had gone to LA to buy

6    $6,000 worth of --

7    A.   Yes.

8    Q.   And you knew that he drove out there to get it?

9    A.   Yes.

10   Q.   And he drove back to Virginia with it?

11   A.   Yes.

12   Q.   And he sold it in Virginia?

13   A.   Yes.

14   Q.   And when you found it out, you told your handler

15   about it, correct?

16   A.   Yes.

17   Q.   Because you felt that was important?

18   A.   Yes.

19   Q.   And, at some point, Demente was arrested,

20   correct?

21   A.   Yes.

22   Q.   And, do you remember around what time that was --

23   I'm not going to hold you to an exact date, but, if you

24   put --

25   A.   No, I don't remember the exact date, but I

J. Garcia - Cross                                    63

1    remember that he was --

2        Q.   Was it around the Peligroso incident?

3        A.   Yes.

4        Q.   Okay.  So, October 2013 -- October 1st, 2013,

5    we've heard through testimony, is that incident,

6    correct?

7        A.   Okay.  Like I said --

8        Q.   If I -- that's when he was arrested, correct?

9        A.   Okay.

10       Q.   No, not "okay."  Do you know that Demente was

11   arrested --

12       A.   I know Demente was arrested, but I don't know the

13   date specifically.

14       Q.   At the Peligroso incident?

15       A.   On the Peligroso incident, yes.

16       Q.   That's what you know?

17       A.   Yes.  I know he was --

18       Q.   Okay.

19       A.   -- arrested for Peligroso incident.

20       Q.   And, sometime after that you were asked by your

21   handler, Agent Born, to provide a roster of the members

22   of the different cliques that you knew of?

23       A.   Yes.

24       Q.   And, you provided that information to her?

25       A.   Yes.

1    Q.   And, you provided to her October 30th, 2013?

2    A.   Like I said, I don't recall the dates, but, I

3    remember I did provide whatever she asked.

4    Q.   Was it fairly -- within a short period of time

5    after Demente was arrested?

6    A.   Like I say, I can't recall the date.

7    Q.   Now, did you text that information to her or

8    e-mail it to her?

9    A.   I just wrote all the time.

10   Q.   You wrote out the names of those clique

11   members --

12   A.   Names, cliques, yes.

13   Q.   Yes.  And one of the cliques was Park View?

14   A.   Yes.

15   Q.   PVLS?

16   A.   Yes.

17   Q.   And isn't it true on that day, that when you

18   listed the members of the PVLS clique, you did not

19   mention Pesadilla, or Lil Tuner?

20   A.   Not that I remember.

21   Q.   You don't remember listing him?

22   A.   No, I don't remember.

23   Q.   Now, in addition to the phone calls that you had

24   with Demente -- and it's been discussed already -- but

25   you had phone calls with Big Poison in El Salvador,

1    correct?

2        A.   Yes.

3        Q.   And, you asked him at some point whether he

4    approved the hit or the green light on Little Guasón,

5    correct?

6        A.   Yes.

7        Q.   And he told you no, he did not --

8        A.   Yes.

9        Q.   -- correct?

10       A.   Yes.

11       Q.   I'm sorry.  I spoke over you.  And you also asked

12   Payaso, who is in jail, if he had approved the hit or

13   the green light on Little Guasón?

14       A.   Yes.

15       Q.   And, you spoke to him on the telephone about

16   this --

17       A.   Yes.

18       Q.   -- correct?

19           And, he said he did not approve it, correct?

20       A.   I don't remember what he says, to tell you the

21   truth.

22       Q.   You asked him specifically, didn't you,

23   Mr. Garcia, in an effort to glean information about

24   this --

25       A.   Like I say, I ask many questions, some questions,

1     probably, like listen the conversation, I will recall
2     that.
3         Q.   Did you review the transcripts?
4         A.   I did review the transcripts.
5         Q.   Do you remember that conversation?
6         A.   I don't remember that conversation with Payaso.
7         Q.   I'll come back to that.
8              Now, let's turn to Mr. Gaitan Benitez.  You
9     testified that you knew him as Pesadilla; is that
10    correct?
11        A.   Yes.
12        Q.   At some point, you stated, I believe on direct,
13    you had a conversation with someone you believed was
14    Pesadilla; isn't that correct?
15        A.   Yes, I spoke to Pesadilla.
16        Q.   On the telephone?
17        A.   Yes.
18        Q.   Not in person?
19        A.   Not in person.
20        Q.   And do you remember the first time you spoke to
21    this person who identified himself as Pesadilla?
22        A.   I remember it was the first time I talk to him,
23    but I don't remember the date.
24        Q.   But at that time, you had never meet him, had
25    you?

1    A.   No.

2    Q.   And, were you reporting your conversations with

3    Lil Pesadilla, Pesadilla, Lil Tuner, to Agent Born?

4    A.   Yes.

5    Q.   And, when you were talking to Pesadilla in 2013,

6    into 2014, how were you known to members of the PVLS

7    clique?

8    A.   What do you mean?  Know them all?

9    Q.   How were you known to them?  Who were you?

10   A.   I was a member of SLS clique.

11   Q.   A member?

12   A.   Yes.

13   Q.   You didn't have a ranking?

14   A.   I was at that time the first -- the first word of

15   Silvas.

16   Q.   You were first word of Silvas, like known as --

17   what was your nickname?

18   A.   Junior.

19   Q.   And, you recall in those conversations that you

20   had with Pesadilla, that in -- sometime in 2014, he told

21   you that he stabbed Lagrima three times during Lagrima's

22   murder.  Do you recall that conversation?

23   A.   I don't recall that conversation.

24   Q.   Do you recall sending information to your

25   handler, Agent Born, about a conversation you had with

J. Garcia - Cross                                                    68

1    Pesadilla in February of 2014?

2        A.   I send -- I send information all the time.

3        Q.   Right.  You sent it via text; is that correct?

4        A.   Yes.  I also had a phone that was, recorded the

5    conversation as well.

6        Q.   Okay.  And -- and so, they were recorded, and you

7    also sent that information to your handler?

8        A.   Yes.

9        Q.   And, so if your handler had written down that you

10   told her that Pesadilla said he stabbed Lagrima three

11   times during Lagrima's murder, does that refresh your

12   recollection at all of you telling her that?

13       A.   No, I can't recall that conversation.

14       Q.   Are you saying you didn't have that conversation?

15       A.   I said I cannot recall that conversation.

16       Q.   Could it have happened?

17       A.   Could it have happened?  Yes.

18       Q.   And in those conversations -- well, strike that.

19            Throughout your continued conversations with

20   members of the PVLS and working with the agents in this

21   case, you found out that Little Pesadilla, in fact, was

22   not involved in Lagrima's murder, didn't you?

23       A.   Yes.

24       Q.   In fact, he wasn't even present, was he?

25       A.   No.  He wasn't.

1    Q.   Sometime in April of 2014, did you find out

2    certain members of the PVLS clique had left the State of

3    Virginia?

4    A.   Yes, I believe so, yes.

5    Q.   What did you find out about that?

6    A.   That they had left to different states.

7    Q.   And why?

8    A.   Because they thought the police was looking for

9    them.

10   Q.   I'm sorry?

11   A.   They thought the police was looking for them.

12   Q.   Looking for them for what?

13   A.   Um, I can't -- I don't remember what they were

14   looking for them.

15   Q.   For Little Guasón's murder?

16   A.   Um, I can't recall that, if that was the reason

17   that they left.

18             MS. AUSTIN:   If the witness could look at

19   Exhibit 16-A-1-1.

20   BY MS. AUSTIN:

21   Q.   If you can look at page one.  If you could review

22   page one, please, Mr. Garcia.

23             Have you reviewed page one?

24   A.   I am.

25   Q.   Are you having a conversation with a member of

 1    PVLS in that transcript?

 2            MS. MARTINEZ:  Objection, Your Honor.  He's

 3    still reading.  He said, "Yes, I am," and he's still

 4    looking down and reading.

 5            THE WITNESS:  Okay.

 6            MS. AUSTIN:  Thank you.

 7    BY MS. AUSTIN:

 8       Q.   Have you reviewed page one?

 9       A.   Yes.

10       Q.   Does that refresh your recollection of the

11    conversation you had?

12       A.   Yes.

13       Q.   And the conversation was, certain members of PVLS

14    had left the State of Virginia --

15       A.   Yes.

16       Q.   -- is that correct?  I'm sorry?

17       A.   Yes.

18       Q.   Yes?

19            And Pesadilla did not go; is that correct?

20       A.   Yes.

21       Q.   In fact, he was going to get in trouble for not

22    going; is that correct?

23       A.   Yes.

24       Q.   And that was after Lil Guasón's murder; is that

25    correct?

1      A.   I don't have the exact same dates of Lil Guasón's
2   murder.
3      Q.   Well, the conversation you just looked at
4   occurred on May 10th, 2014?
5      A.   Yes.
6      Q.   Lil Guasón had been killed prior to that?
7      A.   Say that again.
8      Q.   Lil Guasón had been killed prior to that date;
9   isn't that correct?
10      A.   Like I said, I don't -- I don't recall the
11   date -- the day of Lil Guasón murder.  I don't have it
12   with me.
13      Q.   Mr. Garcia, I understand you can't recall certain
14   dates --
15      A.   Yes.
16      Q.   -- but we're talking about May 2014.
17      A.   Yes.
18      Q.   You went for hours yesterday on the stand talking
19   about --
20      A.   Yes.
21      Q.   -- certain events that happened in 2014.
22      A.   Yes.
23      Q.   Was Lil Guasón murdered by May 2014?
24      A.   I --
25      Q.   What happened in May 2014, that you testified to

1   extensively on direct?

2             THE COURT:  Would you like to ask --

3             MS. MARTINEZ:  Objection, Your Honor.

4             THE COURT:  You want to ask one of the

5   questions you asked?

6             MS. AUSTIN:  Yes.

7             THE COURT:  Ask him one question at a time,

8   if you would.

9   BY MS. AUSTIN:

10     Q.   Do you remember your testimony on direct?

11     A.   Yes, I do remember.

12     Q.   Okay.  Do you remember the question about going

13   to Holmes Run Park?

14     A.   Yes.

15     Q.   Do you know when that was?

16     A.   Yes.  It was around the summer of 2014.

17     Q.   May, June 2014?

18     A.   It could be May, June, but I could not give you a

19   specific date if you ask me that.

20     Q.   Okay.  I'm not asking for specific dates,

21   Mr. Garcia.  I'm just asking for answers to the

22   question.

23     A.   Okay.

24             MS. MARTINEZ:  Objection, Your Honor.  She's

25   badgering the witness at this point.  He's doing his

1    best to answer these questions, and her tone of voice

2    and her, "I'm just asking for answers," is

3    inappropriate.

4              THE COURT:  The jury can see what you're

5    doing.  One question at a time, please.

6    BY MS. AUSTIN:

7        Q.   May, June, you were at Holmes Run Park; is that

8    correct?

9        A.   Yes.

10       Q.   So, do you think prior to May, Lil Guasón had

11   been murdered?

12       A.   Yes.

13       Q.   Thank you.

14            Now, you say you have to earn the MS tattoo; is

15   that correct?

16       A.   Yes.

17       Q.   How do you earn that?

18       A.   MS tattoo, by killing someone.

19       Q.   Get drunk one night and get MS tattooed across

20   your forehead, without having done anything to earn it,

21   is there going to be some trouble?

22       A.   Yes.

23            MS. AUSTIN:  Thank you.  I have no further

24   questions.

25            THE COURT:  You may proceed.

1           MR. SALVATO:  Thank you.

2                      CROSS-EXAMINATION

3    BY MR. SALVATO:

4       Q.  Good morning, Mr. Garcia.

5       A.  Good morning.

6       Q.  My name is Frank Salvato.  I represent Christian

7    Lemus Cerna.  I want to ask you some questions about --

8    in general, and then also about Gerson, Mr. Martinez,

9    okay?

10      A.  Okay.

11      Q.  All right.  Sir, I think you testified from

12   Mr. Leiva's questions that you filed an application for

13   a green card; is that correct?

14      A.  Yes.

15      Q.  All right.  And on that green card application

16   you represented that you were a member of MS-13; is that

17   right?

18      A.  Yes.

19      Q.  And you also put on that green card application

20   that you had committed certain crimes; is that correct?

21      A.  Yes.

22      Q.  And, that you had a criminal record; is that

23   correct?

24      A.  Yes.

25      Q.  All right.  And, you were successful in getting

J. Garcia - Cross                                                    75

1    that green card; is that right?

2        A.   Yes.

3        Q.   And you are telling us and the ladies and

4    gentlemen of the jury that the government had no

5    assistance in getting you that green card?

6        A.   My understanding, they sent a letter, but it was

7    sent back to them.

8        Q.   All right.  So, a letter was sent, but sent

9    back --

10       A.   Yes.

11       Q.   -- is that right?  All right.

12            So the government had no role in you getting a

13   green card, despite telling our government you're in

14   MS-13 and you have a criminal record.

15       A.   Yes.

16       Q.   Is that what you're telling us?

17       A.   Yes.  But I also had show a letter to the judge

18   when I was in front of the judge.

19       Q.   All right.  I thought you said to Mr. Leiva that

20   the government did not assist you in getting that green

21   card.

22       A.   Yes.  They personally didn't -- they send it, but

23   it was not to them.  I showed them -- I -- well, you go

24   to trial, trial means, they going to go -- you going to

25   go in details with them.

J. Garcia - Cross                                                    76

1    Q.   So, when you said the government didn't assist
2    you, you meant to say that the letter didn't get
3    delivered?
4    A.   Yes.
5    Q.   But, the letter did get delivered, true?
6    A.   It get delivered --
7    Q.   By you?
8    A.   -- by me.  Yes.
9    Q.   So, the letter did get delivered, true?
10   A.   Yes.
11   Q.   So, I'm going to ask you again.  The government
12   did assist you in staying in this country and getting a
13   green card, true?
14   A.   By the letter, that was provide to the judge.
15   Like I said, I was on trial.  I cannot go in details on
16   the trial.  It's a trial.  You present the proof and
17   it's a trial.
18   Q.   But part of that proof was the letter from the
19   United States, correct?
20   A.   Yes.
21   Q.   And, that was an important part of the trial,
22   correct?
23   A.   Yes.
24   Q.   And you didn't leave the letter at home,
25   undeliverable.  You brought it to the trial?

J. Garcia - Cross

1    A.   I have a copy of the letter.

2    Q.   You brought the letter?

3    A.   Yes.

4    Q.   So, when you told Mr. Leiva that the government

5    didn't assist you in getting that green card, despite

6    what you represented on the application --

7    A.   Yes.

8    Q.   -- that was a lie, true?

9    A.   He asked me a specific question was, through

10   them.  It was sent, but they didn't -- they just didn't

11   receive it through the government.  They receive it

12   through me, which is the difference.

13   Q.   That's the difference?

14   A.   Yes.  I would lie to you if I say they did

15   receive the letter through the government.

16   Q.   Let me ask you a couple questions about Demente.

17   Do you know who Demente is?

18   A.   Yes.

19   Q.   And, how long did you know Demente?

20   A.   Um, I knew him, probably, part of 2013.

21   Q.   Until he got locked up?

22   A.   Yes.

23   Q.   And, sir, isn't it true, Mr. Garcia, that

24   Demente, all he did was sell marijuana?

25   A.   I don't know.  I cannot answer that question.  I

J. Garcia - Cross                                              78

1    don't know what exactly he did.  I wasn't with them --
2    with him all the time.
3        Q.   Well, you told the agents that he was selling
4    cocaine?
5        A.   Yes.  That's what -- when we had conversation,
6    that's what he said.
7        Q.   So Demente told you he was selling cocaine?
8        A.   They were buying cocaine.
9        Q.   Buying cocaine?
10       A.   Buying cocaine, crystal meth.
11       Q.   What kind of amounts of cocaine did Demente tell
12   you about?
13       A.   He just say cocaine.  He said that he was going
14   to pay like 6,000.  The price sometimes they --
15   sometimes when we talk, it was -- it was a price, it was
16   they sell it for this price, or the prices were kind of
17   different.
18       Q.   How many times did Demente say that he purchased
19   cocaine?
20       A.   Um, I can't recall how many times that he told
21   me.
22       Q.   But it was up to $6,000 worth of cocaine?
23       A.   Yes.
24       Q.   And, Demente also told you that he was involved
25   in crystal meth?

1      A.   Yes.

2      Q.   And, how much crystal meth was Demente involved

3  in?

4      A.   I don't know.

5      Q.   I think you just told Ms. Austin that you did

6  know --

7      A.   Yeah, he was buying.  But the amounts, for 6,000,

8  I don't know how much, how much amount you're going to

9  get.

10     Q.   So, $6,000 for the cocaine, $6,000 for crystal

11  meth, that's a fair amount of drugs.

12     A.   Yes, but I'm not in the drug business, so, I

13  don't know -- I don't do drugs.  I cannot tell you

14  what's the amount.

15     Q.   Well, you showed up to Holmes Run Park with a

16  marijuana joint, right?

17     A.   Yes.

18     Q.   And, you smoked that marijuana joint?

19     A.   No.

20     Q.   So, it just ended up in your pocket?

21     A.   What do you mean, it ended up in my pocket?

22     Q.   How did the marijuana cigarette end up in your

23  pocket?

24     A.   I -- I purchased it.

25     Q.   Okay.  But you're not involved in drugs?

J. Garcia - Cross

1    A.   No.

2    Q.   Okay.  Who did you purchase the marijuana from

3  that day?

4    A.   It was a guy on the street.

5    Q.   A guy?

6    A.   Yes.

7    Q.   What's the guy's name?

8    A.   I can't remember.  I just met him that day.

9    Q.   You just met him that day and what?

10        You just rolled up on him and said, "Can I have

11 some marijuana?"

12   A.   No, no.  I just asked around, that's all.

13   Q.   Where did you ask around?

14   A.   If anybody who sold marijuana.

15   Q.   Where?  Where did you ask?

16   A.   Oh, what do you mean?  Where I ask?

17   Q.   The neighborhood?

18   A.   Yes.

19   Q.   So, how did this happen?

20        You just walk out of your house and ask around?

21   A.   Yes, pretty much.

22   Q.   So, you walk out the front door of your house?

23   A.   No, no, not my house.  I went to places that

24 probably I know they might sell drugs.

25   Q.   How would you know that they might sell drugs if

J. Garcia - Cross                                          81

1    you're not involved in the drug business?

2        A.   Just by rumors, probably, you can ask.

3        Q.   Rumors from who?

4        A.   On the street.

5        Q.   Who told you on the street?

6        A.   Remember, I was involved with these guys, and,

7    they always mention DC, DC.  If you go to DC, probably I

8    would be able to -- they would probably sell me drugs,

9    because, probably, they would assume that I'm not -- I'm

10   not a cop.

11       Q.   Where did you go in DC?

12       A.   I can't recall where it was.  I never been there.

13   I was just asking around.

14       Q.   You've never been to DC?

15       A.   Yes, I have been to DC.

16       Q.   Where in DC did you go to purchase the marijuana?

17       A.   Probably was in the south -- Southeast, or close

18   to it.

19       Q.   So, you just roll into Southeast and just start

20   asking around?

21       A.   Not start asking.  You have to be smart.  It's

22   not you're just going to ask and they're going to give

23   it to you.

24       Q.   So, you, what, rolled into the Southeast with

25   some cash on you?

1     A.   Nope.  I just asked.  I just asked a person.

2     Q.   What person?

3     A.   I didn't know that person.  I just ask the

4     person.  I don't know the name.  I don't ask for names.

5     Q.   Was it a person just on the street?

6          Was it a person inside a shop?

7     A.   It was on the street.  It was on the street.

8     Q.   Just walking down the street?

9     A.   Yes.

10    Q.   And you rolled up to him and said, "Hey, man, can

11    I have a joint?"

12    A.   No, I just ask him if he knew anybody that sells

13    weed.

14    Q.   And what did he say?

15    A.   Yes.

16    Q.   And, then, he gave you the weed?

17    A.   Yes.

18    Q.   How much did you buy it for?

19    A.   Twenty bucks.

20    Q.   And, you can't tell the ladies and gentlemen of

21    the jury where in Southeast DC --

22    A.   No.

23    Q.   -- this was?

24    A.   No.

25    Q.   No street?

1       A.  I wasn't paying attention to the street.

2       Q.  Okay.  How did you get there?

3       A.  Driving.

4       Q.  How did you get -- so you weren't paying

5  attention while you were driving.  You just showed up

6  in --

7       A.  I was paying attention, but, if you -- if you go

8  up the street, if you ask me what street is passing two

9  streets, I still won't remember which streets I passed.

10      Q.  So you just rolled up, what, 395 or so, you head

11 into Southeast DC, and -- is that right?

12      A.  Yes.

13      Q.  And then you just come up to somebody on the

14 street and get the marijuana?

15      A.  Yes.

16      Q.  Okay.

17              THE COURT:  Counsel, Counsel, we'll take the

18 morning recess.

19              MR. SALVATO:  Thank you, Your Honor.

20              THE COURT:  Fifteen minutes.

21              You all remain in place, please.

22              Fifteen-minute recess.  Please don't discuss

23 the case.  We will be back, hopefully about 15 minutes,

24 maybe a little bit more.

25              (Jury not present.)

1          THE COURT:  Please remain in place.

2          You can step down, sir.  You can step down.

3          (Witness stood aside.)

4          THE COURT:  Good morning.  Can you hear me

5    okay?

6          FAMILY MEMBERS:  Yes.

7          THE COURT:  I appreciate you coming to

8    court.  This is a public trial, and having family

9    members in court is a good thing.

10          But I want you to know that because of the

11   nature of this trial, we're paying attention to everyone

12   in the courtroom.

13          Can you hear me okay?

14          FAMILY MEMBERS:  Yes, sir.

15          THE COURT:  I am concerned about whether or

16   not there has been some verbal, or nonverbal, looking at

17   this witness, or signs being made to this witness while

18   he was testifying.

19          So, what I want you to know is that while I

20   wear this robe, I have to control this courtroom, and

21   there can be no verbal or nonverbal at any witness here.

22          The marshals, who work for the court, their

23   job is to ensure the courtroom is secure and safe.

24   While it's a public place, if they alert me that you or

25   anyone is doing such a thing, then I will put you out.

1    Do you understand?

2              FAMILY MEMBERS:  (Indicating.)

3              THE COURT:  And you won't be able to come

4    back at all.  Okay.

5              We want you to be present.  I think it's a

6    good thing to have family members in court.  But you

7    have to understand that where you are is a courtroom,

8    the most formal place in America, and so we want you to

9    conduct yourselves accordingly, to represent your family

10   well.  Okay?

11             FAMILY MEMBER:  Absolutely.

12             THE COURT:  Okay.

13             FAMILY MEMBER:  Thank you, Your Honor.

14             THE COURT:  We're in recess, 15 minutes.

15   Thank you.

16             (Court recessed at 11:36 a.m. and reconvened

17             at 11:52 a.m.)

18             (Jury not present.)

19             MS. MARTINEZ:  Your Honor, may we approach?

20             THE COURT:  Yes.

21             (Thereupon, the following side-bar

22   conference was had under seal:)

23   ████████████████████████████████

24   ██████████████████████████████████

25   █████████████







1

2

3          (Thereupon, the side-bar conference was
4  concluded.)
5          THE COURT:  You can bring our jury back, and
6  bring the witness out, please.
7          (Jury present at 11:59 a.m.)
8          THE COURT:  You may be seated.
9          (Witness resumed stand.)
10          THE COURT:  Counsel, you may proceed.
11          CROSS-EXAMINATION (Continued)
12  BY MR. SALVATO:
13     Q.  Mr. Garcia, you first indicated that you bought
14  the marijuana in your neighborhood.
15     A.  I did not say my neighborhood.
16     Q.  Then you said that you bought the marijuana in
17  Washington, DC.
18     A.  Yes.
19     Q.  But, you don't remember where; is that --
20     A.  No.  I mean, it's -- cannot give you an address
21  for it.
22     Q.  But it would be fair to say, sir, that you can
23  remember in excruciating detail what other people meant
24  in all of these transcripts?
25     A.  Yes.

1    Q.   On Demente, sir, isn't it true that Demente
2    simply sold marijuana on two occasions and made about 60
3    bucks?
4    A.   I don't know.  I just know what I talk to him.
5    Q.   So, he was telling you something much bigger --
6    A.   Yes.
7    Q.   -- than marijuana, true?
8    A.   Yes.
9    Q.   He told you $6,000 for cocaine, $6,000 for
10   crystal meth; is that right?
11   A.   Yes.
12   Q.   And, being a senior member of MS-13, it would be
13   fair to say that Demente may have been bragging a lot to
14   you, correct?
15   A.   How do I know?
16   Q.   That's the point, isn't it?
17   A.   Yes.
18   Q.   How do you know?
19   A.   Yes.
20   Q.   So, he could have been bragging to you to make
21   himself look bigger, true?
22   A.   He could have, yes.
23   Q.   And that's what happens sometimes in MS-13 --
24   A.   Yes.
25   Q.   -- correct?

1    A.   Yes.

2    Q.   Because, blowing up something from twice selling

3  marijuana for $60 to $6,000 of crystal meth from

4  California, that's a pretty big leap, true?

5    A.   Yes.

6    Q.   I want to ask you some questions about my client,

7  Christian Lemus Cerna, if I can.  Okay?

8    A.   Okay.

9    Q.   When you met Mr. Cerna, how old were you?

10   A.   I was probably 32, 33.

11   Q.   And Mr. Cerna, at that time, was about 16, 17,

12  18, true?

13   A.   I don't know them by name, to -- I need --

14   Q.   My client, Christian.

15   A.   Yes, I know him.

16   Q.   Okay.

17        Could we call him Christian from now on?

18   A.   Okay.

19   Q.   Okay.  So Christian was how old when you met him?

20   A.   I never ask him.  I never ask for his age, that I

21  can recall.

22   Q.   Did you know he was in high school?

23   A.   When I met him, he wasn't in high school at that

24  time, when I met him personally.

25   Q.   Did you ever see him in possession of like a

1    school notebook?

2        A.   Nope.

3        Q.   You never saw him in possession of a notebook to

4    collect dues?

5        A.   Nope.

6        Q.   Did you ever see him in possession of a notebook

7    which had some very low level, like shapes and

8    containers and those types of things?

9        A.   No.

10       Q.   So, you can't tell this jury in any way, shape,

11   or form, how old Christian was when you first met him?

12       A.   No.

13       Q.   Fair to say, however, he was much younger than

14   you, true?

15       A.   Yes.

16       Q.   And fair to say that he trusted you?

17       A.   Yes.

18       Q.   And he looked up to you?

19       A.   I don't know if he did.

20       Q.   Well, you were a senior member of MS-13.

21       A.   Yes.

22       Q.   He was trying to gain your respect, true?

23       A.   I don't know if he -- well, he was trying to gain

24   my respect.

25       Q.   And younger members of MS-13 often try to gain

J. Garcia - Cross                                                    93

1    the respect of older members, true?

2        A.   Yes.  It's just, they give the respect.

3        Q.   Because you want to give the respect to the older

4    members, correct?

5        A.   Yes.

6        Q.   And you were a clique leader in Silvas, correct?

7        A.   Yes.

8        Q.   And you were nominated even to be the East Coast

9    leader at some point?

10       A.   I'm sorry?

11       Q.   You were nominated to be the East Coast leader?

12       A.   I was not nominated.  I was asked for one of --

13       Q.   You were asked.

14       A.   -- one of the PVLS members.

15       Q.   Who asked you?

16       A.   Payaso.

17       Q.   All right.  And, your conversations with

18   Mr. Cerna, or Christian, you were trying to get him to

19   say things about Gerson Aguilar, correct?

20       A.   I wasn't trying to get him to say things.  I was

21   trying to find out what happened to him.

22       Q.   You were trying to find out, from his point of

23   view, what happened --

24       A.   Yes.

25       Q.   -- true?

J. Garcia - Cross                                                    94

1       You were trying to get familiar with him?

2   A.   Yes.

3   Q.   Trying to know him a little bit?

4   A.   Yes.

5   Q.   Manipulate him a little bit?

6   A.   I was asking the questions.  I don't know if that

7   can call it manipulating.  Because I didn't --

8   manipulating is to do something that he didn't want to

9   do.

10   Q.   And the point of these conversations was to find

11   out what happened, right?

12   A.   To find out what happened to -- and where were

13   the bodies.

14   Q.   Part of the purpose was to find out what happened

15   the night that this individual was killed, Mr. Gerson.

16   We'll call him Gerson, okay?

17   A.   Yes.

18   Q.   That was the point of your conversation -- one of

19   the points of your conversation, was it true?

20   A.   It always was a point to find out that they --

21   Q.   I'm talking about Christian, not they, okay?

22   A.   Yes.

23   Q.   So I want to be real focused with you.

24   A.   Okay.

25   Q.   All right.

J. Garcia - Cross                                                        95

1    A.   My point with Christian was always to find out
2  what happened, that they did, that --
3    Q.   Okay.  Let me -- let me ask.
4    A.   Okay.
5    Q.   I want to be real focused.  You were trying to
6  find out what -- in part, what Christian did, if
7  anything, true?
8    A.   Yes.
9    Q.   Okay.  And, you were trying to find out, real
10 focused, on whether Christian participated in Gerson,
11 true?
12   A.   Yes.
13   Q.   Sir, it's fair to say that Christian, in speaking
14 to you, told you he was present, correct?
15   A.   Yes.
16   Q.   And, he also told you he even had knowledge of
17 what happened, true?
18   A.   Yes.
19   Q.   To Gerson.
20   A.   Yes.
21   Q.   And, sir, he also told you, specifically, that he
22 did not participate in the death of Gerson.
23   A.   I'm sorry.  Say that again.
24   Q.   Didn't Christian tell you that he did not
25 participate in the death of Gerson?

1    A.   No, he -- he did not say that.

2    Q.   Didn't he tell you that he never had the chance

3    to participate in the death of Gerson?

4    A.   No, he did not say that.

5    Q.   He never told you that?

6    A.   No.

7         MR. SALVATO:  Mr. Toliver, could I ask the

8    witness to be shown Exhibit 15-A-1.

9         This has already been admitted, Your Honor.

10        THE COURT:  All right.

11        MR. SALVATO:  And I'm going to ask to

12   publish specifically page 21.

13   BY MR. SALVATO:

14   Q.   And I'm not going to ask -- you remember this

15   page, right?

16        Ms. Martinez ask you about this page?

17   A.   Yes.

18   Q.   All right.

19        MS. MARTINEZ:  Objection, Your Honor.  He

20   should be given a chance to review the page before he is

21   asked specific questions about it, just like he did

22   during direct.

23        MR. SALVATO:  Well, he's a -- that's fine,

24   Your Honor.

25        THE COURT:  He does need to have a chance to

```
 1    read it if you don't mind, Mr. Salvato.

 2              MR. SALVATO:  I don't mind.

 3              MS. MARTINEZ:  Your Honor, on the screen

 4    there is only part of the page.  May he be allowed to

 5    review the entire page?

 6              MR. SALVATO:  He can review --

 7              THE COURT:  Give him the notebook.  Does he

 8    have the notebook?

 9              MR. SALVATO:  He has the notebook.  He can

10    review the entire page.

11              THE COURT:  Read page 21 to yourself, sir.

12              MR. SALVATO:  Take all the time you want.

13    BY MR. SALVATO:

14       Q.   Okay.  Have you looked at the entire page?

15       A.   Yes.

16       Q.   Do you need any more time to look at it?

17       A.   No.

18       Q.   And you've already looked at this page before,

19    correct?

20       A.   Yes.

21       Q.   Ms. Martinez had asked you about this page in

22    your pretrial preparation --

23       A.   Yes.

24       Q.   -- correct?

25            And she asked you about it the other day,
```

1  correct?

2     A.  Yes.

3     Q.  Okay.  I want to draw your attention to the

4  portion of the page that I believe is up on the screen.

5  Can you look at the screen?  Can you see the screen?

6     A.  Yes.

7     Q.  Okay.  You see where -- and you are JR, right?

8     A.  Yes.

9     Q.  You see where it says, "JR, OV, mm"?

10    A.  Yes.

11    Q.  All right.  Now, under that, Mr. Cerna is telling

12 you that he was anxious; is that correct?

13    A.  Yes.

14    Q.  And, he was anxious before that time, correct?

15    A.  Yes.

16    Q.  And, "eat him first," correct?

17    A.  Yes.

18    Q.  And, you testified two days ago, or a day ago,

19 that your next question to Christian, "But did you even

20 get a chance?"  You testified two days ago that you were

21 asking him:  Did you ever get the chance to kill him?

22 True?

23    A.  No.  I ask him if he -- if he ever get the chance

24 to do what he wanted to do first.

25    Q.  Okay.  So, did he ever get the chance -- I think

 1   you testified, though, specifically --

 2       A.  Yes.

 3       Q.  -- I want to be real specific, that you testified

 4   that question was:  Did you ever get the chance to kill

 5   him?  To do what he wanted to do, correct?

 6       A.  Yes.

 7             MS. MARTINEZ:  Objection, Your Honor, asked

 8   and answered.

 9             MR. SALVATO:  I've asked it.  He haven't

10   answered it.

11             THE COURT:  He has.

12             MS. MARTINEZ:  He answered what he said on

13   direct.

14             THE COURT:  He has, but I'll let you ask him

15   one more time.

16   BY MR. SALVATO:

17       Q.  That's what you said on direct?

18       A.  Yes.

19             MS. MARTINEZ:  Objection, Your Honor.

20   That's completely unclear.  He was vague about "that's

21   what you said" --

22             MR. SALVATO:  Your Honor --

23             MS. MARTINEZ:  -- "on direct."

24             MR. SALVATO:  -- speaking objection.

25             THE COURT:  I'll sustain the objection.  If

```
 1   you would ask a specific question, Mr. Salvato --
 2              MR. SALVATO:  I did.  That's what I'm really
 3   trying to --
 4              THE COURT:  I know.  I'm asking you to do it
 5   again, so everybody can hear what you're trying to ask.
 6   Go ahead.
 7              MR. SALVATO:  I appreciate it.
 8   BY MR. SALVATO:
 9      Q.  On direct testimony from Ms. Martinez, what you
10   told this jury is when you asked him, "But did you even
11   get a chance," you were asking him, did you ever get a
12   chance to do what you wanted to do, correct?
13      A.  Yes.
14      Q.  And, Mr. Cerna told you in the next sentence, he
15   said, "No, man."  True?
16      A.  Yes.
17      Q.  And, he didn't say "yes" to that question, right?
18      A.  Yes.
19      Q.  He didn't say, "Yeah, I knocked him to the
20   ground," did he?
21      A.  No.
22      Q.  He didn't say, "Yeah, I used my toy on him,"
23   correct?
24      A.  Yes.
25      Q.  He didn't say, "Yeah, I stabbed him," true?
```

J. Garcia - Cross                                        101

1    A.  Yes.

2    Q.  He didn't say, "Yeah, I cut his head off while he

3    was still alive," correct?

4    A.  Repeat that question again.

5    Q.  He didn't say, "Yeah, I cut his head off while he

6    was still alive."

7        As horrible as these questions are, okay, he

8    didn't say, "I cut his head off while he was still

9    alive," did he?

10   A.  No.

11   Q.  Okay.  What he said was, "No, man.  At least I

12   got to cut the son of a bitch's head off."  Is that

13   right?

14   A.  Yes.

15   Q.  Okay.  And, obviously, you weren't there, true?

16   A.  Yes.

17   Q.  And, only the people that were there would know

18   whether Gerson was dead before his head was cut off,

19   true?

20   A.  Yes.

21   Q.  And one of the people that was there who would

22   know that, that you had spoken to, is Duende, correct?

23   A.  Yes.

24   Q.  And, that person is Jose Del Cid.  Do you know

25   his name?

J. Garcia - Cross

1    A.   I don't recall talking to Duende about a
2    specific -- about Little -- I mean --
3    Q.   I appreciate --
4    A.   -- Gerson.
5    Q.   -- that answer, but my question is --
6         MS. MARTINEZ:   Objection, Your Honor.   He's
7    cutting off the answer.
8         MR. SALVATO:   I asked -- it was
9    nonresponsive, Your Honor.   I'll rephrase it.
10        THE COURT:   Well, the way this has to work
11   is, you ask one question, one answer.   Thank you.
12   BY MR. SALVATO:
13   Q.   Do you know Duende's real name?
14   A.   No, I don't know them by name.
15   Q.   Now, sir, you testified before this jury under
16   penalty of perjury.   Do you remember that?
17   A.   Yes.
18   Q.   You came in and took an oath?
19   A.   Yes.
20   Q.   And you told this jury that you had -- that,
21   "This wasn't me," that you wanted to turn your life
22   around, true?
23   A.   Yes.
24   Q.   And part of turning your life around, and this
25   wasn't you, you told the jury, no more lies, correct?

J. Garcia - Cross

1    A.   Yes.

2    Q.   That you were going to come in and tell the

3    truth?

4    A.   Yes.

5    Q.   Sir, outside of what we've already spoken about,

6    have you been untruthful in any of your answers to the

7    government's questions?

8    A.   No.

9    Q.   Under penalty of perjury, have you answered every

10   one of questions from the government truthfully?

11   A.   Yes.

12   Q.   Sir, Mr. Garcia, is it true that in 2015, under

13   penalty of perjury, you filed a petition in Federal

14   Bankruptcy Court stating that you were unemployed, you

15   had no income, and you had no money?

16   A.   Yes, that was true.

17   Q.   In response to Ms. Martinez's questions, two days

18   ago, you said you were always employed, didn't you?

19   A.   Yes.

20   Q.   You would agree with me that there's a big

21   difference between filing bankruptcy, saying that you're

22   unemployed and have no money, versus telling this jury

23   that you've always been employed, true?

24   A.   Yeah, it's true.  If you were -- if you work two

25   or three days, if you work every week, you work.  So,

J. Garcia - Cross                                                    104

1    I'm not lying saying that I didn't work.

2        Q.   Now, Ms. Martinez asked you as a follow-up --

3        A.   Yes.

4        Q.   -- "Full time?"  Do you remember her asking you

5    that?

6        A.   Yes.

7        Q.   Okay.  And what was your response?

8        A.   Yes.

9        Q.   Okay.  So, now you're telling us there's a big

10   difference between two or three days and full time,

11   correct?

12       A.   Yes.

13            MR. SALVATO:  Your Honor, can I grab an

14   exhibit sticker?  I think we're at Cerna 4 for

15   identification.

16            MS. MARTINEZ:  Your Honor, we request to see

17   a copy of the exhibit before it's --

18            THE COURT:  Of course.

19            MR. SALVATO:  I'm just going to have him

20   identify it, Your Honor, but I have a copy for the

21   government.

22            MS. MARTINEZ:  Your Honor, we object to this

23   being admitted in evidence and ask to approach.

24            THE COURT:  Okay.  Come to sidebar.

25            (Thereupon, the following side-bar

 1    conference was had:)

 2              MS. MARTINEZ:  Your Honor, the security --

 3              THE COURT:  Can I see it?  What is it?

 4              MS. MARTINEZ:  Your Honor, I have a security

 5    concern about this document, and I would ask, for the

 6    reason I have a security concern, that the remainder of

 7    what I have to say not be translated for the defendant.

 8              THE COURT:  Okay.  You can step away, and

 9    don't translate.

10              (Under seal side-bar)







J. Garcia - Cross







J. Garcia - Cross





                (Thereupon, the side-bar conference was

concluded.)

                THE COURT:  You may proceed, Counsel.

                MR. SALVATO:  Thank you, Your Honor.

BY MR. SALVATO:

    Q.   Mr. Garcia, is it still your testimony that you

were truthful when Ms. Martinez asked you whether you

had always been employed full time, and you answered

yes?

    A.   Yes.

    Q.   But you haven't always been employed full time,

have you?

    A.   Um, not all the time.

    Q.   But, you answered her question untruthfully; is

that right?

    A.   Yes.

J. Garcia - Cross                                                    114

1      Q.   So, you lied about your employment situation,
2  true?
3      A.   Yes.
4      Q.   What else, if anything, have you lied about to
5  this jury?
6      A.   Nothing else.  I don't see that I lied, saying
7  two times two days is still a full time job.
8      Q.   You just said that you lied?
9      A.   You asked me a question, and the way you say it
10  is that I lie.
11      Q.   And, you did lie, correct?
12          You lied about whether you were always employed
13  full time?
14      A.   Let me ask you a question.  If I have three days,
15  and I work 12 or 15 hours a day, isn't that would be
16  three days full time?
17      Q.   I don't want you to talk to anything other than
18  my question, okay?  I don't want to talk about your
19  kids, family or anything like that.
20          My question, very specifically, is if you told
21  this jury that you were always employed full time, that
22  was a lie, true?
23      A.   Yes.
24      Q.   What else, if anything, have you lied about?
25      A.   Nothing else.

1    Q.   So, that's the only lie that you've told to this

2    jury, was when you were confronted with proof that you

3    lied, true?

4    A.   Yes.

5    Q.   And, sir, isn't it a fact that you were paid

6    $44,000 over about -- over the time period that you were

7    an informant or a confidential human source with the

8    FBI?

9    A.   You mean ten years?

10   Q.   Yeah.

11   A.   Yes.

12   Q.   And, you were always paid in cash?

13   A.   Yes.

14   Q.   And, you needed that money, correct?

15   A.   Yes.

16   Q.   You were desperate for that money?

17   A.   No.

18   Q.   Well, you and others in your family had run up a

19   lot of debt, true?

20   A.   Yes.

21   Q.   So, you really needed that money.  You were

22   desperate for that money?

23   A.   No.

24   Q.   Sir, you and your family -- I'm just going to use

25   "family," I'm not going to use any names or anything

1    like that.

2        A.   I don't feel comfortable talking about my family,

3    to tell you the truth.

4        Q.   You had run up a lot of debt, true?

5        A.   Yes.

6        Q.   Capital One, correct?

7        A.   Yes.

8        Q.   Dress Barn, correct?

9        A.   Yes.

10       Q.   Ford Motor Company, correct?

11       A.   Yes.

12       Q.   GE --

13            MS. MARTINEZ:   Objection, Your Honor,

14   cumulative.   He's answered the question about debt.

15            THE COURT:   Objection sustained.

16   BY MR. SALVATO:

17       Q.   Did you have a timeshare, sir?

18       A.   Yes.

19       Q.   Sir, I think you said in your direct testimony

20   something along the lines of, you can't brag about

21   something you did not do.   Do you remember that

22   testimony?

23       A.   Yes.

24       Q.   And the reason being, if you brag about something

25   you didn't do, the gang is going to figure it out, that

1    you didn't do it, right?

2        A.   Yes.

3        Q.   Sir, if you could take a look at Government's

4    Exhibit 18-A-1.

5            MR. SALVATO:   And, Your Honor, I apologize,

6    but we're going to have to switch to the Elmo for this

7    because of the page numbers and how many -- how many

8    versions.

9    BY MR. SALVATO:

10       Q.   Sir, can you look at Government's Exhibit 18-A-1,

11   which has already been admitted, page eight, eight on

12   the bottom, or 16, bigger numbers on the right.

13           On the top, it says, "In the garages there's a

14   shit load of stuff."  Are we looking at the same piece

15   of paper?

16       A.   What page?  You haven't said what page.

17       Q.   Page eight on the bottom, page 16 to the far

18   right.  It's on the screen.

19           Do you have it?

20       A.   Yes.

21       Q.   Do you need a moment to look at it?

22       A.   Yes.

23           Okay.

24       Q.   You read the whole page?

25       A.   Yes.

1    Q.   Okay.  If I could ask, at the bottom where it
2    says, "That dude," do you see that paragraph?
3    A.   Yes.
4    Q.   Okay.  And on the screen it says -- and I believe
5    in front of you --
6    A.   Uh-huh.
7    Q.   -- you said, "That dude that's giving me
8    bullshit, he already pissed me off, dude."  Who are you
9    speaking to in this transcript?
10   A.   It was -- it was a guy, um --
11   Q.   And I apologize.  Maybe I asked that wrong.
12   You're talking to Christian --
13   A.   Yes.
14   Q.   -- as part of this conversation?
15   A.   Yes.
16   Q.   Okay.  And, you said, "That dude that's giving me
17   bullshit, he already pissed me off, dude.  The dude was
18   bullshitting Stone."  Do you see that?
19   A.   Yes.
20   Q.   Okay.  And that's you talking right?
21   A.   Yes.
22   Q.   And, you said, "So, we dropped in on him."  Do
23   you see that?
24   A.   Yes.
25   Q.   Okay.  And "dropping in on him" is a phrase where

J. Garcia - Cross

1   you --

2       A.  Yes.

3       Q.  -- or MS-13 members attack somebody, you drop in

4   on them, correct?

5       A.  I was -- I was talking of the clique, what --

6   what we were saying, and I was explaining about the

7   clique, what happened with this guy.

8       Q.  I appreciate what you said there, but my answer

9   was very -- my question was very specific.

10      A.  Okay.

11      Q.  You're saying, "so we dropped in on him."

12  "Dropped in on him" is a phrase that you are going to

13  attack somebody, correct?

14      A.  Yes.

15      Q.  That you're going to rob them, true?

16      A.  Yes.

17      Q.  And it says, "we dropped in on him."  And the

18  "we" included you, correct?

19      A.  Yes.

20      Q.  And when did this dropping in take place?

21      A.  I wasn't part of it.  Actually, I record -- I

22  record that situation with the phone.

23      Q.  So, "we" doesn't include you?

24      A.  It does, because I was on the phone, so it

25  includes me.  I can explain it to you so you understand

1    better, why we use "we."

2        Q.   I'll ask you a couple more questions.

3             And you said, "and the motherfucker was crying,

4    you know, 'the rings, the chains, leave me those, they

5    belong to my wife.'"  Do you recall saying that?

6        A.   Yes.

7        Q.   And if you could take a look at the very next

8    page, page nine at the bottom, page 17 on the right-hand

9    corner.  Do you need some time to read through that?

10       A.   You want me to read the whole page?

11       Q.   Read as much or as little as you want.

12       A.   I need to know, so I can answer your question.

13       Q.   Okay.  You read the whole page.

14       A.   Okay.

15            Okay.

16       Q.   You read the whole page?

17       A.   Yes.

18       Q.   And on your first quote, where it says "JR," you

19   said, "We took his money and everything."

20       A.   Yes.

21       Q.   Is that right?

22       A.   Yes.

23       Q.   And, who -- who were you robbing here?

24       A.   I wasn't robbing nobody.

25       Q.   Who is -- who is the victim here?

J. Garcia - Cross

1    A.   I don't know that guy.

2    Q.   "All right, cool, we told him, all right, 250, I

3    told him, you know."  Do you see that?

4    A.   Yes.

5    Q.   Okay.  It no longer says "we," does it?

6    A.   No.

7    Q.   It says, "I told him."

8    A.   Yes.

9    Q.   And, you're the one speaking, correct?

10   A.   Yes.

11   Q.   And you're telling this jury that you,

12   Mr. Garcia, was not involved in that robbery?

13   A.   No, I wasn't.

14   Q.   "I told him, you know, 'no for sure.'"  Then it

15   says, "Stone told him, 'I'm going to cut your finger

16   off, you son of a bitch.'

17           "'No, no, no, said the motherfucker.'"

18           "'We're going to cut your finger off.'"

19           "'No, no, no.'  And the son of a bitch would

20   start crying, you know."

21           And then you say, "Where I can leave the car

22   around here, dude?"

23           You --

24   A.   Yes.

25   Q.   -- threatened to cut the man's finger off,

J. Garcia - Cross                                              122

 1   correct?

 2       A.  I wasn't, because I wasn't there.  I didn't have

 3   him in front of me.

 4       Q.  But it says right there, sir, "I told him, you

 5   know, 'no, for sure.'"  You told him --

 6       A.  Yes.

 7       Q.  -- true?

 8       A.  No, I didn't --

 9       Q.  So you were there?

10       A.  No, I wasn't there.  I was there when they were

11   doing it on the phone.  They called me, and I was just

12   listening to it, recording the whole conversation.

13       Q.  And where were they?

14       A.  I don't know where were they, when they called

15   me.

16       Q.  You didn't say, "Guys, where are you?"

17       A.  No.  The -- my handler knew about what they

18   wanted to do.

19       Q.  And you told your handler when, right away?

20       A.  I told her way before it happens, and I told her

21   after it happens, and I told -- I told her when -- when

22   it happens.

23       Q.  So, you knew this robbery was going to take

24   place?

25       A.  I -- I was aware, so I let my handler know the

J. Garcia - Cross                                                    123

1   situation.

2       Q.   Okay.  So you told your handler --

3       A.   Yes.

4       Q.   -- who is the FBI --

5       A.   Yes.

6       Q.   -- that this robbery was going to take place?

7       A.   Yes.  It was going to take place at some point,

8   but I just didn't know when.

9       Q.   And, you told the FBI who was going to be

10  involved in the robbery?

11      A.   Yes.

12      Q.   And you told the FBI who the victim of the

13  robbery was going to be?

14      A.   I have an idea.  That's what I told her.

15      Q.   Okay.  What was your idea?

16      A.   What they told me, the --

17      Q.   What did they tell you?

18      A.   They tell you that they were planning to rob a

19  guy.  They gave me the description, the best that they

20  could, that I asked, and that's the same information I

21  gave to my handler.

22      Q.   Who was the guy?

23      A.   I don't know the guy.

24      Q.   Where did the guy live?

25      A.   I don't know where he lives.

1    Q.   So, Stone, who is lower than you in the gang --

2    A.   Yes.

3    Q.   -- is telling you that he plans to rob some

4    unknown guy?

5    A.   He says that -- at that time, it was the second

6    word as well in Silvas, which was another gang member,

7    so, they -- they always were in the street.

8    Q.   Okay.  So, Stone was below you in the gang,

9    correct?

10   A.   Yes.

11   Q.   Right.  And, he told you that there was going to

12   be a robbery?

13   A.   Yes.

14   Q.   And, you had an idea who was going to be robbed?

15   A.   Yes.

16   Q.   And, you knew that Stone -- apparently not you,

17   but Stone was going to be involved in the robbery?

18   A.   Yes.

19   Q.   Okay.  And, you told the FBI?

20   A.   Uh-huh.

21   Q.   Is that right?

22   A.   Yes.

23   Q.   Okay.  And, did the robbery get prevented?

24   A.   No.

25   Q.   Did anyone get arrested?

J. Garcia - Cross

1    A.   I believe so.

2    Q.   For this robbery?

3    A.   Yes.

4    Q.   Who got arrested?

5    A.   I believe Stone.

6    Q.   What's Stone's name?

7    A.   I don't know him by name.

8    Q.   And did Stone get prosecuted?

9    A.   Yes.

10   Q.   Did you testify against Stone?

11   A.   No.

12   Q.   So, according to your testimony, you were

13   bragging about something that you did not participate in

14   it, true?

15   A.   Yes.

16   Q.   But you just told us, I think ten minutes ago,

17   that MS-13 members don't brag about things that they

18   didn't participate in.

19   A.   Yes.

20   Q.   So, what you told us ten minutes ago is not true?

21   A.   It is true.  It is true.

22             MR. SALVATO:  Court's indulgence, Your

23   Honor.

24   BY MR. SALVATO:

25   Q.   Look at page -- I believe it's in that same big

1   exhibit, page 30, the big one on the right, page 30.

2   Can you read through that entire page?  Take your time.

3       A.   Okay.

4       Q.   Okay.  And, in about two-thirds down the page

5   where you speak, it says, "No, we'll also put..."  Do

6   you see that?

7       A.   Which one?

8       Q.   About two-thirds down the page where it says:

9   "JR:  No, we'll also put..."  Do you see that sentence?

10      A.   No.

11      Q.   On the screen.  See it, right in the middle of

12  the screen?

13      A.   Okay.  Yes.

14      Q.   Okay.  So, here you're saying, "No, we'll also

15  put that motherfucker next to those two chickens, man.

16  We'll put him over there next to those pair of dudes,

17  you'll see."  Okay?  You're talking about having someone

18  else killed, correct?

19      A.   Yes.

20      Q.   All right.  And you're -- you didn't kill

21  anybody --

22      A.   No.

23      Q.   -- right?

24           But you're bragging about something that you

25  didn't do, and that you weren't going to do, correct?

1    A.   Yes.

2    Q.   And you're talking about killing somebody, right?

3    A.   Yes.

4    Q.   All right.  And, I thought you just told us

5   15 minutes ago that you don't brag about something you

6   didn't do, right?

7    A.   Yes, but that's a different situation.  The point

8   here was me trying to find the bodies of Lagrima and the

9   other person.

10   Q.   I understand.  But you're bragging about

11  something you didn't do.

12   A.   Yes, I was bragging, of course.

13   Q.   And, bragging is -- another word for bragging in

14  this situation is lying, correct?

15   A.   Yes.

16   Q.   Okay.  So you're trying to lie and manipulate

17  Christian, correct?

18   A.   No.

19   Q.   Well, you're lying to him, right?

20   A.   Yes.

21   Q.   So, you're trying to manipulate him, correct?

22   A.   No.  Because that's -- I'm not making him do

23  anything that he don't want to, or putting word in his

24  mouth.

25   Q.   If you could look at page -- big page 54 of that

J. Garcia - Cross

1    same long exhibit.  Do you have page 54 there?

2    A.  Yes.

3    Q.  Can you read that for me?

4    A.  Yes.  Okay.

5    Q.  And, this is talking, in essence, about a

6    confrontation, right?

7    A.  Yes.

8    Q.  And, when you say -- do you see about a third of

9    the way down the page, when it says, "And the shot

10   caller from South Side shows up."

11   A.  Yes.

12   Q.  Okay.  So, this is a situation where a rival gang

13   member showed up and confronted you, correct?

14   A.  Confront me and the other guys that were with me.

15   Q.  Who were the other guys that were there?

16   A.  Two other members from Silvas.

17   Q.  Who?

18   A.  Was Pelucho and Corky.

19   Q.  And when did this happen?

20   A.  Back in 2003 -- 2003, I believe.

21   Q.  Okay.  So you're talking about something with my

22   client, Christian, that happened back in 2003?

23   A.  Yes.

24   Q.  So this actually happened, correct?

25   A.  Yes.

J. Garcia - Cross                                              129

1    Q.   And then it says later on, the second-to-the-last

2    time that you speak, the long paragraph, you say at the

3    second sentence of that, "So, he gets them on the second

4    floor, fool, bam, motherfucker, they come falling down."

5    That's what you said, right?

6    A.   Yes.

7    Q.   "And the four of us took off running"; is that

8    right?

9    A.   Yes.

10   Q.   And, "All the security guards were coming down";

11   is that right?

12   A.   Yes.

13   Q.   All right.  And that all happened, right?

14   A.   It did.

15   Q.   Okay.  Did you disclose any of that information

16   on your application for green card?

17   A.   Yes.

18   Q.   You -- you noted that incident?

19   A.   Yes.

20   Q.   You said that you were confronted by some South

21   Side guys, big commotion, and the four of you took off

22   running --

23   A.   Yes.

24   Q.   -- and the security guards were all running after

25   you?

J. Garcia - Cross                                                130

```
1              MS. MARTINEZ:  Objection, compound question.
2              THE WITNESS:  I submit all my disposition
3   court order to Immigration --
4              THE COURT:  Just a second.  Just a second.
5              MR. SALVATO:  I'll rephrase it, Your Honor.
6              THE COURT:  Sustained.
7   BY MR. SALVATO:
8     Q.  You told the United States Government, Homeland
9   Security --
10    A.  Yes.
11    Q.  -- that -- about this fucking commotion -- about
12   this commotion?
13    A.  Say that again.
14    Q.  On your application --
15    A.  Yes.
16    Q.  -- for the green card, did you tell the United
17   States Government about this incident?
18    A.  Yes.
19    Q.  And, you told them about, that it was a
20   commotion, and that you ran from the police?
21              MS. MARTINEZ:  Objection, compound question,
22   Your Honor.
23   BY MR. SALVATO:
24    Q.  Did you tell them about --
25              MS. MARTINEZ:  Objection, compound question.
```

1              THE COURT:  Sustained.

2    BY MR. SALVATO:

3       Q.   Did you tell them about the commotion?

4       A.   I told them how the court has my financial

5    disposition order.  I tell them how it was, how it

6    happened.

7       Q.   Were you arrested?

8       A.   Yes.

9       Q.   What were you charged with?

10      A.   Disorderly conduct.

11      Q.   Can you take a look at the next page, please,

12   sir?

13      A.   Which page, 55?

14      Q.   Yes, the very next page.  If you can read through

15   that.

16      A.   Okay.

17      Q.   Right in the middle of the page -- are you still

18   talking about this same incident, by the way?

19      A.   Yes.

20      Q.   All right.  And right in the middle of the page

21   you say, "And the fools were already there for murder."

22   Do you see that?

23      A.   Yes.

24      Q.   Okay.  Who are the fools?

25      A.   The -- the guys from South Side.

1    Q.   They were there for murder when?  What do you

2    mean?

3    A.   I don't know.  That's what they told us.  I don't

4    know the details.

5    Q.   Who told you that?

6    A.   In the court.

7    Q.   At what court?

8    A.   Arlington.

9    Q.   So, Arlington court told you that the South Side

10   guys were there for murder?

11   A.   No, not the court.  Well, we have a lawyer, a

12   public defender, I believe, and he's the one who told

13   us.

14   Q.   That the --

15   A.   Whether it --

16   Q.   -- South Side guys --

17   A.   Whether it was true or not, that's what I was

18   told.

19   Q.   By the lawyer?

20   A.   Yes.

21   Q.   And then you say, "So the judge tells us no.  He

22   says, 'You can get out on probation'"; is that right?

23   A.   Yes.

24   Q.   And, you got probation for that?

25   A.   Yes.  I believe I have 90, or -- 90 days.  I

 1    can't recall that.

 2       Q.   And, somebody else got five years probation?

 3       A.   Yes.

 4       Q.   And somebody else got sent down, meaning sent to

 5    prison --

 6       A.   Yes.

 7       Q.   -- for that?  Okay.

 8            But what you're telling us is that you got a

 9    90-day probationary period for this commotion?

10       A.   Yes.

11       Q.   And others got five years or sent to prison?

12       A.   Yes.

13            MR. SALVATO:  Court's indulgence, Your

14    Honor.

15    BY MR. SALVATO:

16       Q.   Take a look at page 69.  You want to read that

17    page?

18       A.   Okay.

19            Okay.

20       Q.   All right.  And in the middle where it says --

21    where you're talking, you're JR, saying, "I went blank,

22    dude."  Do you see that?

23       A.   Yes.

24       Q.   And, you said, "I hit him, right, like this,

25    look, like this."  So, you hit him?

J. Garcia - Cross

1   A.   No.  I hit him with this look.  I hit him with

2   the look.

3   Q.   You hit him with the look?

4   A.   Like I was mad at him.

5   Q.   So, you didn't actually hit him?

6   A.   No.

7   Q.   You hit him with your look?

8   A.   Yes.

9   Q.   And then after this look, dude from Coronados

10  grabbed you, right?

11  A.   Yes.

12  Q.   And then you went for a knife, correct?

13  A.   No.

14  Q.   It says, "I went like this to the knife" -- "to

15  the knive (sic), you know."  Do you see that sentence?

16  A.   Yes.

17  Q.   "I went like this to the knive, you know."  So

18  you went for a knife?

19  A.   No.  I wasn't -- probably it means that I was

20  looking at his knife.  He had a knife.  I didn't go to

21  no -- for no knife.

22  Q.   He had a knife.

23  A.   Yes.

24  Q.   It doesn't say that in there, does it?

25       Does it say he had a knife?

1     A.   Well, if you read the whole conversation, you

2  will see that he had a knife at some point.

3     Q.   Okay.  And then you said in the last line,

4  "You're going to take a beating, dude"; is that right?

5     A.   Yes.

6     Q.   Okay.  When did that happen?  When did this

7  incident happen?

8     A.   It happened in the general meeting.

9     Q.   When?

10    A.   I can't recall when, but it was in a general

11  meeting.

12    Q.   What year?

13    A.   It was around 2013, 2014.

14    Q.   Okay.  And did you tell your handlers, the FBI,

15  that --

16    A.   Yes.  I have a recording device.  There were

17  cameras in the restroom.  So they knew everything.

18    Q.   Was anybody arrested for that?

19    A.   Um, I don't remember.

20    Q.   You don't know whether the guy Coronados who

21  pulled a knife on you was arrested?

22    A.   No, I don't remember.

23    Q.   Did you ever testify against this guy?

24    A.   Nope.

25    Q.   So, as far as you know, the FBI, or your handlers

1    let this guy with a knife from Coronados just back into

2    the community?

3        A.   I don't know.  I don't know if he was arrested.

4    I know the police got there.  They got many people.  I

5    don't know if he was one of them.

6        Q.   Okay.  What's his name?

7        A.   He was Lil Payaso from Guanacos.

8             MR. SALVATO:  Just a couple more questions,

9    Your Honor.

10   BY MR. SALVATO:

11       Q.   Sir, it's fair to say that you want to stay in

12   this country, correct?

13       A.   Yes.

14       Q.   And, being an informant and returning to El

15   Salvador, you don't want to do that, correct?

16       A.   No.

17       Q.   All right.  And you want to help the government

18   in whatever way possible in order to stay in the

19   country, true?

20       A.   Um, I want to help -- I want to do what's right.

21   And if that apply to helping the government, that's

22   what -- that's what I'm going to do.

23       Q.   Okay.  So, you're trying to help the government

24   to stay in this country, correct?

25       A.   No.

J. Garcia - Cross

1    Q.   You're hoping the government will help you stay
2    in this country, correct?
3    A.   That is up to them, not to me.
4    Q.   That's not my question.
5    A.   Okay.
6    Q.   You are hoping that the government will help you,
7    because of your testimony and other things, to stay in
8    the country?
9    A.   You're asking me if I'm hoping, but, I cannot
10   hope.  I cannot decide -- like I respond, it's up to
11   them.
12   Q.   But, you're hoping that they help you.  That's
13   the reason why you're here today, right?
14   A.   No.
15            MR. SALVATO:  That's all the questions I
16   have, Your Honor.
17            I think we're at our lunch break.
18            THE COURT:  All right.
19            You can step down, sir.
20            We'll let the jury go out first.  Remain in
21   place, please.
22            (Jury not present.)
23            THE COURT:  You can step down, sir.
24            (Witness stood aside.)
25            THE COURT:  You may be seated.

1              I wanted to make one other observation to

2      family members who might be present in the courtroom,

3      and that is, because there are so many people involved

4      in the case, the attorneys, particularly the government

5      attorneys and law enforcement are not to be approached;

6      and no contact with them.

7              If you get on the elevator and you see them

8      there, get off.  And likewise, if they see you on the

9      elevator, they're going to get off.

10             And we want everything to go smoothly.  And

11     you're welcome to be here, but you've got to respect my

12     rules.  Thank you.

13             We're in recess until 2:00 o'clock.  Thank

14     you.

15             (Court recessed at 1:01 p.m. and reconvened

16             at 2:02 p.m.)

17             THE COURT:  You can bring our jury out,

18     Mr. Toliver.  Thank you.

19             We need the witness back.

20             (Jury present at 2:03 p.m.)

21             THE COURT:  You may be seated.

22             All right, Counsel.  You may proceed.

23             (Witness resumed stand.)

24

25

                          CROSS-EXAMINATION

1

2    BY MS. RALLS:

3       Q.   Good afternoon.  My name is Meredith Ralls and I

4    represent Mr. Omar Dejesus Castillo.

5            Mr. Garcia, you met Mr. Castillo at the end of

6    2013; is that correct?

7       A.   Yes.

8       Q.   I want to ask you some questions about your

9    contacts with the FBI.  Have you ever talked to anybody

10   named Sandra D'Sa?

11      A.   I can't recall that name.

12      Q.   Have you talked to anybody that you thought was a

13   translator for the FBI?

14      A.   No.

15      Q.   And, you met with the prosecutors in this case to

16   prepare for your testimony today; is that correct?

17      A.   Yes.

18      Q.   Did you also meet with agents from the FBI to

19   prepare for testifying?

20      A.   To review the transcripts, yes.

21      Q.   And, you're testifying here today in English,

22   correct?

23      A.   Yes.

24      Q.   But you're not an expert in the English language;

25   is that correct?

1    A.  Yes.

2    Q.  And, you're not an expert in translating from

3    Spanish into English either; is that correct?

4    A.  No, I'm not an expert.

5    Q.  And, you early said that -- earlier said that

6    Agent Uribe is your handler at this moment; is that

7    correct?

8    A.  I did not say that.

9    Q.  Okay.  Well, is Agent Uribe your handler?

10   A.  We haven't talked if he's my handler.  I still --

11   anything, I talk to Brenda first.  I talk more with him

12   right now, but it hasn't been saying that Brenda Born is

13   not the handler any more.  I still have contact with

14   Brenda if I need to.

15   Q.  So, who is your designated handler?

16   A.  As of right now, it's Fernando.

17   Q.  Fernando Uribe?

18   A.  Yes.

19   Q.  Okay.  And when did he become your designated

20   handler?

21   A.  Oh -- I can't recall.  I will say probably a year

22   ago, or a year and a half ago.

23   Q.  Okay.  And, have you communicated with him by

24   text message?

25   A.  Text message, e-mail, and phone.

1    Q.   So, that's a yes?

2    A.   Yes.

3    Q.   Okay.  And you communicated him -- communicated

4    with him by text message before January 2015; is that

5    fair to say?

6    A.   Yes.

7    Q.   And, you did that on your personal cellphone,

8    correct?

9    A.   I do on the -- my personal phone and also on the

10   phone that was provided for the FBI sometimes.

11   Q.   All right.  Now, the government already admitted

12   Exhibit 23-A and 23-A-1, so I'd like you to turn your

13   attention to that.

14        But first, I'm going to play a clip from that

15   recording for you.  And I don't want you to look at the

16   transcript at this moment.

17            MS. RALLS:  And I'm going to play at time

18   stamp 1 hour, 14 minutes and 9 seconds, for anybody that

19   wants to follow along.

20            THE COURT:  I'm not sure how we follow

21   along.

22            MS. RALLS:  No.  Some of the other counsel

23   are taking notes about the sections that I'm referring

24   to, and I believe the government is, too.  So I'm just

25   letting everybody know where I'm going to play from.

BY MS. RALLS:

Q.   All right.  Now, Mr. Garcia, let me know if you can hear this.  I'm going to play about 41 seconds.

(Audio played.)

BY MS. RALLS:

Q.   Mr. Garcia, are you able to hear that?

A.   It's not clear.

Q.   Let's try again.

MS. MARTINEZ:  Your Honor, for the record, I'm sitting right next to her and I can't hear it.

MS. RALLS:  Let's see.  Let's try again.

(Audio played.)

BY MS. RALLS:

Q.   Can you hear it now?

A.   Still can't hear it that well.

Q.   You can't hear it that well.

Let's see.  Put it by the speaker.  Let's try one more time.  If it doesn't work, then I'll move on.

(Audio played.)

Q.   Are you able to hear it?

A.   Hear it, but still, you don't hear it clear.

Q.   Okay.

THE COURT:  If you want to use it -- you don't want to use it in English?  Is this a -- you don't want to use it in English?

J. Garcia - Cross

1              If you don't want to use it in English, you
2    don't have to.
3              MS. RALLS:  I don't want to use the English.
4              THE COURT:  All right.
5    BY MS. RALLS:
6    Q.   Well, now, we'll refer to the transcript.  With
7    the assistance of the court security officer, could we
8    turn to Government's Exhibit 23-A-1.
9         And if you could turn to page 29.  Up to --
10   well --
11   A.   What page?
12   Q.   Page 29.  Let me know when you've turned to that
13   page and had a chance to review it.
14   A.   Okay.
15        Okay.
16   Q.   All right.  And this is Mr. Castillo speaking; is
17   that correct?
18   A.   Yes.
19   Q.   And, the 10th entry down, about halfway,
20   Mr. Castillo says, "But just like this homie told me,
21   dude, since I wasn't, I wasn't over there, you know.
22   The ones that were there were them, you know."
23   A.   What part is --
24   Q.   In the middle.  Do you see where it says that?
25   Where OC is speaking, it starts with "No, he was," and

1    then halfway through that little paragraph.

2        A.   Sorry.  I wasn't reading the right page.

3        Q.   Okay.  We're on page 29.

4        A.   Yes.  I was on page 20, I'm sorry.

5        Q.   You're on page 29 now?

6        A.   I'm going to review.

7        Q.   Okay.  Go ahead.

8        A.   Okay.

9        Q.   Have you finished reviewing that page?

10       A.   Yes.

11       Q.   If I --

12            MS. RALLS:  Court's indulgence, one moment.

13   BY MS. RALLS:

14       Q.   And this is the part of the conversation where

15   you're asking about Lil Guasón; is that correct?

16       A.   Yes.

17       Q.   And then during that portion of the conversation,

18   Mr. Castillo says, "I wasn't over there, you know.  The

19   ones that were there were them, you know."  Is that

20   correct?

21       A.   Yes.

22       Q.   All right.  Now, I'd like to direct your

23   attention to Exhibit 8-A -- 8-A-1, actually, excuse me.

24   And I'd like to direct your attention to page three.

25       A.   You want me to review the whole page?

J. Garcia - Cross

1    Q.   If you would, please.

2    A.   Okay.

3    Q.   In this section of the conversation -- well, let

4    me back up.

5         This conversation takes place on January 26,

6    2014, correct?

7    A.   Yes.

8    Q.   And, in this section on page three, and a little

9    bit before, you and Mr. Castillo are talking about a

10   general meeting that happened a few days before,

11   correct?

12   A.   Yes.

13   Q.   And, it was at that meeting that somebody pulled

14   a knife on you, correct?

15   A.   Yes.

16   Q.   And it was another person named Lil Payaso,

17   correct?

18   A.   Yes.

19   Q.   So, there's two Lil Payasos?

20   A.   Yes.

21   Q.   And, in fact, you were feuding with that other

22   Lil Payaso at that time; isn't that correct?

23   A.   Yes.

24   Q.   Because he had disrespected you?

25   A.   Let me make it clear.  He pulled a knife because

1  he was arguing with me.  He was -- it was more a guy

2  that he didn't want to -- he didn't want him to be in

3  that meeting.  So, either he pulled the knife on me or

4  for the other guy, I'm not sure.  But he did pull a

5  knife in front of the two of us.

6      Q.  And before that meeting, the other Lil Payaso had

7  been disrespecting you, correct?

8      A.  Yes.

9      Q.  And, at that time, you were one of the leaders of

10 the East Coast program, correct?

11     A.  No.

12     Q.  And, it was a knife, correct, that he pulled out,

13 not a gun?

14     A.  A knife.

15     Q.  All right.  But in the middle here, you say,

16 "Fuck, but they took out a gun, man."  So that's an

17 error on that entry; isn't that correct?

18     A.  Um, where?

19     Q.  It's one, two, three, four -- it's the sixth

20 entry.  It's also highlighted on the screen.

21     A.  Yes.

22              THE COURT:  Are you on page three?

23              MS. RALLS:  I'm on page -- I'm on the third

24 page of the transcript.  I think the copy that I'm

25 referring to might be paginated differently.  I believe

```
 1      it would be the fifth page of the overall document.
 2                  THE COURT:  Oh, I see.  Mine are numbered at
 3      the bottom right.  You say it's page five?
 4                  MS. RALLS:  Yes, sir.
 5                  THE COURT:  Okay.  I was looking at the
 6      wrong page.  Okay.
 7                  THE WITNESS:  So what page is it?
 8                  THE COURT:  It's page number five.
 9                  MS. RALLS:  Page number five of your
10      document.
11                  THE COURT:  At the bottom right corner it
12      says five.
13                  THE WITNESS:  I'm reading there.
14      BY MS. RALLS:
15      Q.   Okay.  Take your time.
16      A.   Okay.
17      Q.   So, where it says, "but they took out a gun,
18      man," that's incorrect, isn't it?
19      A.   Yes.
20      Q.   Because it was actually a knife?
21      A.   Yes.
22      Q.   And you had a chance to look over these
23      transcripts, but you missed that, right?
24      A.   Yes.
25      Q.   Okay.  So, this person, this other Lil Payaso, he
```

1    broke a gang rule by bringing a weapon to the meeting,

2    right?

3        A.   Yes.

4        Q.   And that's a very serious rule that he broke?

5        A.   Yes.

6        Q.   So, you stated in that meeting that that person

7    would have to receive a *calentón*; isn't that correct?

8        A.   Yes.

9        Q.   And you left, though, before it happened?

10       A.   Yes.

11       Q.   But the *calentón* was carried out that day?

12       A.   Yes.

13       Q.   And it's -- in this exhibit, it's after you're

14   talking about that *calentón* that you and Mr. Castillo

15   start talking about someone named Lloron, L-l-o-r-o-n.

16       A.   On what page?

17       Q.   It's the bottom of that page, continuing on to

18   the next.

19       A.   Okay.

20       Q.   And, in this conversation, Mr. Castillo is

21   telling you things that you had already heard from other

22   people --

23       A.   Yes.

24       Q.   -- isn't that correct?

25            He didn't tell you anything new that you hadn't

1    heard before, right?

2        A.   Not that I -- that I can recall.

3        Q.   Okay.  And if you go to page seven, and the third

4    entry down, OC says --

5        A.   I haven't finished reading it.

6        Q.   Oh, go ahead.  Sure.

7        A.   Okay.

8        Q.   Right.  The third part down, OC says, "So, then

9    the dude, the dude was never willing to give the papers,

10   you know what I mean?  I think it is because he was --

11   he had already screwed Peluca, the homie, you know."

12       That's an instance where Mr. Castillo was telling

13   you things that you had already heard from other people,

14   right?

15       A.   Yes.

16       Q.   And, this person that you're talking about,

17   Lloron, Mr. Castillo says he had only seen this person

18   once, right?

19       A.   Yes.

20       Q.   And that he had seen him at a restaurant?

21       A.   No.

22       Q.   On page eight, that big chunk of text where OC is

23   speaking --

24       A.   I'm reviewing the page.

25       Q.   Okay.

1    A.   Okay.

2    Q.   Mr. Castillo says, "So then we went there to the

3  restaurant," correct?

4    A.   Yes.

5    Q.   And in this portion of the conversation,

6  Mr. Castillo is using the plural word "we," right?

7    A.   Yes.

8    Q.   And that's something you said that you had done

9  earlier when talking about things that other people in

10 your clique had done, right?

11   A.   Yes.

12   Q.   You sometimes refer to your clique as "we" --

13   A.   Yes.

14   Q.   -- even if you weren't there, right?

15   A.   Yes.

16   Q.   And this Lloron, he's not in your clique, right?

17   A.   No.

18   Q.   And, Mr. Castillo was not associated with your

19 clique at all, right?

20   A.   No.

21   Q.   All right.  And again, also on page six -- excuse

22 me -- page eight, where Mr. Castillo says, "They were

23 really suspicious," in that same chunk of text, he's

24 talking about other people within his clique, correct?

25   A.   Yes.

1    Q.   And when he says, "they were asking for papers,"

2    again that's other people in his clique, right?

3    A.   Yes.

4    Q.   And when he says, "What I understood from that

5    homie," that's other people in his clique, right?

6    A.   Yes.

7    Q.   Now, if you go to page nine, take a moment to

8    review that and let me know when you're ready.

9    A.   Okay.

10   Q.   All right.  And, in this portion of the

11   conversation, Mr. Castillo says, "There were a lot of

12   rumors going around about Lloron"; is that correct?

13   A.   Yes.

14   Q.   Because this conversation happened in January,

15   right?

16   A.   Let me make sure.  Yes.

17   Q.   And that's about four months after Lloron went

18   missing, right?

19   A.   Yes.

20   Q.   So, there had been a lot of rumors spread about

21   in that four months, right?

22   A.   Right.

23   Q.   And even you had heard the rumors, right?

24   A.   Yes.

25   Q.   And, again, when Mr. Castillo talked to you in

J. Garcia - Cross

1    January, he didn't tell you anything other than what you

2    had already heard in those rumors, right?

3        A.   Yes.

4        Q.   All right.  Now, I'd like to direct your

5    attention to Government's Exhibit 9-A-1.  If you go to

6    your page four, which starts with, "Coughs.  Yeah, man."

7        A.   Which page again?

8        Q.   Page four.

9             THE COURT:  It's actually page two.

10            MS. RALLS:  I'm sorry.

11            THE COURT:  Page two.  You said "Coughs.

12   Yeah man," if that's what you're looking for.

13            THE WITNESS:  Okay.

14   BY MS. RALLS:

15       Q.   Do you recall having this conversation with

16   Mr. Castillo?

17       A.   Yes.

18       Q.   And this conversation took place January 29th,

19   2014?

20       A.   Yes.

21       Q.   In this conversation, you and Mr. Castillo are

22   talking about rumors about what gang members had done,

23   correct?

24       A.   Yes.

25       Q.   And about whether Lil Thunder had been released

J. Garcia - Cross                                                  153

1   from jail, right?

2       A.   Yes.

3       Q.   And whether Silencio had been released from jail?

4       A.   Yes.

5       Q.   Because the news about what's going on with other

6   cliques is not always clear, right?

7       A.   Yes.

8       Q.   So you're telling Mr. Castillo what people in

9   your clique have done, right?

10      A.   I don't see anything saying about my clique here.

11      Q.   Was Silencio someone who was associated with your

12  clique?

13      A.   No.

14      Q.   Do you know which clique he was associated with?

15      A.   PVLS.

16      Q.   And this was around the same time, I believe --

17  it was a couple days after the conversation depicted in

18  Exhibit 8-A-1, correct?

19      A.   Yes.

20      Q.   So that's the time there were a lot of rumors

21  going around, right?

22      A.   Yes.

23      Q.   All right.  And, you had also heard about the

24  killing of Lagrima from another person named Greñas,

25  right?

J. Garcia - Cross

1    A.   Yes.

2    Q.   And, when he described the incident to you, he

3    omitted any reference to Lil Payaso; isn't that correct?

4    A.   Yes.

5    Q.   Now, you heard about a time when the body of

6    Lagrima was reburied, right?

7    A.   Yes.

8    Q.   And, it was your understanding that the people

9    who were -- well, strike that.

10        Mr. Castillo was not at the reburial; isn't that

11   correct?

12   A.   Not that I know of.

13   Q.   Okay.  And, you were not there when Lagrima died;

14   isn't that correct?

15   A.   No.

16   Q.   It's not correct, or you were not there?

17   A.   I was not there.

18   Q.   And, you were not there when Lil Guasón died?

19   A.   I was not there.

20   Q.   You only heard about it from other people, right?

21   A.   Yes.

22   Q.   And that's because the -- those people want to

23   increase their reputation in the gang, right?

24   A.   Um, well, the conversation that I have doesn't

25   sound to me that they want to increase their reputation.

1    Q.   Well, you were a leader in the gang, right?

2    A.   Yes.

3    Q.   And, you had been in the gang for a long time,

4    right?

5    A.   I was Silvas clique, not -- I wasn't leader of

6    the gang.  The gang could be MS.  I wasn't leader of MS.

7    At that point I was the leader of the clique.

8    Q.   Okay.  So you were a leader of the clique.  And

9    had you been in the gang for a long time, right?

10   A.   Yes.

11   Q.   You had weekly meetings for the Silvas; is that

12   correct?

13   A.   I'm sorry?

14   Q.   You had weekly meetings for the Silvas clique?

15   A.   No.

16   Q.   How often did you have meetings for the Silvas

17   clique?

18   A.   It changed since 2002 to -- to 2012, it could be

19   once a month.  And since 2002 it was probably once a

20   week, twice a week.

21   Q.   I want to focus on the time that you were the

22   first word of Silvas.

23   A.   Probably was once a month or every three months,

24   probably.

25   Q.   And you were the one that set up those meetings,

J. Garcia - Cross

1    right?

2       A.   We all set up the meetings, because sometimes I

3    didn't have time for it, and the other guys pick out the

4    day.  But, I was the -- the one that tell them what time

5    I was available.  So I had coordinate with my handler

6    first.

7       Q.   Did you tell your handler about each and every

8    time that you had a Silvas clique meeting?

9       A.   Yes.

10      Q.   Now, I believe you testified earlier that you

11   sent money to gang members in El Salvador; is that

12   correct?

13      A.   Yes.

14      Q.   You sent that money to Silvas members in El

15   Salvador?

16      A.   Yes.

17      Q.   All right.  And to the best of your knowledge,

18   they were using that money to purchase weapons in El

19   Salvador; isn't that correct?

20      A.   Some of them, they were using -- well, what they

21   told me, they use it for food, clothes, and I'm not sure

22   if they had use it for guns.

23      Q.   But some of them stated to you that their

24   purpose, whether or not they actually did it, their

25   purpose was to buy weapons?

1    A.   Yes.

2    Q.   Now, you got a good reputation in the gang,

3    right?

4    A.   Yes.

5    Q.   You were first word in Silvas clique, right?

6    A.   Yes.

7    Q.   You -- other people respected you, right?

8    A.   Yes.

9    Q.   We heard someone named Payaso, who was the leader

10   of another clique, he respected you, right?

11   A.   Yes.

12   Q.   And someone named Big Poison in El Salvador, he

13   respected you, right?

14   A.   Yes.

15   Q.   And these people were leaders of other cliques --

16   A.   Yes.

17   Q.   -- right?

18        Now, when people suspected that you were a

19   snitch, you told Payaso that they need to cut it out,

20   right?

21   A.   Yes.

22   Q.   And, Payaso believed that you were not a snitch,

23   right?

24   A.   Yes.

25   Q.   So, he told those other people, cut it out,

J. Garcia - Cross

1    right?

2        A.   Yes.

3        Q.   Because you have such a good reputation with the

4    gang, they wouldn't believe it, right?

5        A.   Yes.

6        Q.   And, this Payaso, he was the first word of PVLS?

7        A.   Yes, from the inside, from jail.

8        Q.   And that was from about 2012 to 2015, right?

9        A.   Yes.

10       Q.   And, it could even be true today?

11       A.   I don't know.

12       Q.   Now, to get a good reputation in the gang, you

13   have to tell other people that you've committed acts of

14   violence, right?

15       A.   Not really.

16       Q.   Okay.  But you did tell other people that you

17   committed acts of violence, right?

18       A.   Yes.

19       Q.   You told them that you beat up rival gang

20   members, *chavalas*?

21       A.   Yes.

22       Q.   And, you told other gang members that you made

23   money by selling drugs, right?

24       A.   Not that I recall, that one.

25       Q.   And, you told other people that you had even

J. Garcia - Cross                                          159

1    killed somebody in about 2005, right?

2        A.   No.

3        Q.   Didn't you tell people that you were the one that

4    killed Snoopy, from the trial that you testified in?

5        A.   No.

6        Q.   Isn't it true that -- strike that.

7             Now, you told Mr. Salvato, who was before me,

8    that you were not trying to manipulate his client,

9    Christian.

10       A.   Yes.

11       Q.   Is that correct?

12            But you've been manipulating gang members for

13   years, right?

14       A.   I was -- just know how to talk to them.

15       Q.   You know how to talk to them to increase your

16   reputation, right?

17       A.   Not to increase, because they already knew me.

18       Q.   Okay.  Your -- you know how to talk to them to

19   gain their trust?

20       A.   Yes.

21       Q.   All right.  You're manipulating them to gain

22   their loyalty, right?

23       A.   I don't manipulate nobody.

24       Q.   Okay.  But you talk to them in such a way that

25   you try to gain their respect, right?

J. Garcia - Cross

1    A.   I just trying to find out some information to
2    help -- could be a victim or prevent a crime.
3    Q.   So, I'm not asking about the information that
4    you're trying to get from other people.
5    A.   Okay.
6    Q.   I'm asking about the information that you're
7    giving to other people.
8    A.   Okay.
9    Q.   Okay?  So the information that you're giving to
10   other people, you're doing that to try to gain respect
11   in the gang, right?
12   A.   No.
13   Q.   So, when you tell other people that you beat up
14   *chavalas* --
15   A.   Yes.
16   Q.   -- you're not doing that to try to gain respect
17   in the gang?
18   A.   No, just to try to have a conversation, that they
19   feel comfortable and they're able to trust me.
20   Q.   Okay.  So you're trying to gain their trust,
21   then?
22   A.   Not gain their trust; just make them feel
23   comfortable.
24   Q.   Okay.
25   A.   Because they already trust me.  They wouldn't be

1    talking to me if they didn't trust me.  So I'm not

2    trying to --

3        Q.  So it's necessary to lie to them about things you

4    had done; isn't that correct?

5        A.  Up to some point.

6        Q.  Now, we talked about -- you've been cooperating

7    with the government for about ten years, correct?

8        A.  Yes.

9        Q.  And during that time they gave you cash payments,

10   right?

11       A.  Yes.

12       Q.  And, they paid for some of your expenses, right?

13       A.  Yes.

14       Q.  But you've also been working a little?

15       A.  Yes.

16       Q.  Were you working at least a little between

17   September 26, 2014, and March 26, 2015?

18       A.  Say that again.

19       Q.  Were you working, even a little, between

20   September 26, 2014, and March 26, 2015?

21       A.  Yes.

22       Q.  Did you receive any cash from FBI during that

23   period?

24       A.  Yes.

25       Q.  Because it was during this time -- well, it

 1    was -- excuse me.  September 2014 was a few months after

 2    you had led the FBI to some bodies; isn't that correct?

 3        A.   Yes.

 4        Q.   Now, we talked about your bankruptcy petition

 5    earlier.

 6        A.   Yes.

 7        Q.   After you filed that petition, you had to go to a

 8    meeting with somebody from -- well, with the trustee

 9    from the Bankruptcy Court; isn't that correct?

10        A.   I have a lawyer at that time.

11        Q.   So, you had a lawyer?

12        A.   Yes.

13        Q.   Okay.  Did you go with your lawyer to a meeting

14    with the trustee?

15        A.   Yes.

16        Q.   Okay.  And the trustee is something that works

17    with the court, right?

18        A.   Yes.

19        Q.   And the trustee puts you under oath, right?

20        A.   Yes.

21        Q.   And they ask you to state that everything in your

22    bankruptcy petition is true, right?

23        A.   Yes.

24        Q.   And did you say yes, that everything in your

25    petition was true?

J. Garcia - Cross

1    A.   Yeah.

2    Q.   Did you tell them that you had not been working

3    for the six months prior to the date that you filed your

4    petition?

5    A.   I talked to my lawyer about the details, that

6    sometimes --

7    Q.   You have to answer questions to somebody other

8    than your lawyer, right?

9    A.   No, not really.  I just talk to my lawyer, and

10   any questions, my lawyer -- my lawyer was the one who

11   answer.

12   Q.   But, didn't you just testify that you went to a

13   meeting with the trustee?

14   A.   Yeah, I mean, we went to a meeting, but like I

15   said, it was my lawyer there.

16   Q.   But, didn't the trustee put you under oath?

17   A.   Yes.

18   Q.   The trustee didn't put your lawyer under oath.

19   A.   Yes.

20   Q.   So you were the one answering questions, right?

21   A.   Yes.

22   Q.   And you answered that you had no income for the

23   six months before you filed your bankruptcy petition,

24   right?

25   A.   Yes.

1    Q.  But that wasn't true, was it?

2    A.  No, it wasn't.

3    Q.  Now, some of these expenses that we talked about,

4    they included dues paid to the gang, right?

5    A.  Yes.

6    Q.  And, you got reimbursed for that money from the

7    FBI?

8    A.  Yes.

9    Q.  And, you also got some money to send to other

10   gang members in El Salvador, correct?

11   A.  Yes.

12   Q.  And those were part of your expenses?

13   A.  Yes.

14   Q.  Now, you stated that you received some money, or

15   some people related to you, received some money to help

16   relocate.  I don't know -- want to know where they

17   relocated to, but before they were relocated, were they

18   in this country?

19            MS. MARTINEZ:  Objection, Your Honor.  May

20   we approach?

21            THE COURT:  All right.

22            (Thereupon, the following side-bar

23   conference was had:)

24            THE COURT:  Tell me why you ask that

25   question.

1          MS. RALLS:  Your Honor, the information that

2     we have is that the government paid for relocation

3     expenses.  If they relocated from outside the country,

4     into the country, I would like to know if they received

5     immigration assistance to get a visa, because, that

6     would be a benefit that came to them from this witness's

7     cooperation with the government.

8          THE COURT:  Do you have any facts for this

9     question, or you're just shooting in the dark?

10         MS. RALLS:  Well, Your Honor, he testified

11    that he immigrated illegally, and that he received

12    benefits from the FBI to relocate them.  All I want to

13    know is, were they outside the country, were they

14    relocated within the country, from one state to another,

15    whatever, or were they in another country and brought to

16    the United States.

17         He received --

18         THE COURT:  Hold on.  I don't recall him

19    saying anything about his family being relocated while

20    he was doing law enforcement work, do you?  Is that what

21    he said?

22         MS. RALLS:  Your Honor, I believe that he

23    did testify that he received benefits.  I believe he

24    testified on direct that the government paid for his

25    family to relocate.

1          MR. AMOLSCH:  The government may have also
2    provided a letter, Judge, disclosing that.
3          THE COURT:  I'm just trying to find out the
4    factual evidence.
5          Yes.
6          MS. MARTINEZ:  Your Honor, we have provided
7    ample *Giglio* disclosures for this witness, including
8    everything that's been asked about on cross-examination
9    and direct.
10         We did disclose that the money was spent to
11   aid in relocation of family members.  And that is the
12   only factual basis.  I will tell you that visas were not
13   obtained.  If they were, that would be something we
14   would have to disclose.  So, she has no factual basis
15   for that.
16         But getting into where family members are
17   located, or were located or will be located, even
18   broadly speaking by states or countries, is completely
19   inappropriate.
20         MS. RALLS:  Your Honor, if this witness
21   believed that his family had received government
22   benefits in the form of immigration assistance, that
23   would be entirely relevant.
24         And I just want to know what this -- if this
25   witness either knows or believes what has been provided

J. Garcia - Cross

1    to his family.  Was it just the relocation expenses?

2              THE COURT:  So your question really is:  To

3    your knowledge, did the government assist your family

4    members in obtaining a visa?

5              MS. RALLS:  That's correct.

6              THE COURT:  You want to ask about how much

7    money they gave his family?  Do you want to ask that

8    question?

9              MS. RALLS:  I believe that was covered on

10   direct, so I wasn't intending to.

11             THE COURT:  I'll sustain the objection to

12   where they were located from.  That doesn't matter.

13   What you really want to know is whether or not they got

14   visa assistance from the government.

15             MS. RALLS:  I'll rephrase.

16             (Thereupon, the side-bar conference was

17   concluded.)

18             THE COURT:  Now, you can proceed.

19   BY MS. RALLS:

20     Q.  Let me rephrase my question.

21         To your knowledge, did your family receive any

22   immigration assistance from the government when they

23   relocated?

24             MS. MARTINEZ:  Objection, Your Honor.  May

25   we approach?

1          THE COURT:  Yes.

2          (Thereupon, the following side-bar

3   conference was had:)

4          MS. MARTINEZ:  If Ms. Ralls wants to ask

5   whether the U.S. Government procured U.S. immigration

6   status or benefits for family member, that's one thing.

7   But to go into, was any immigration assistance received

8   when they relocated, this is broadly insinuating --

9   that's a broad question, and it's going to terrify this

10  witness.

11         MS. RALLS:  Your Honor, any benefits that

12  have been provided to him and his family, we believe are

13  fair game.  And I tried to tailor the question in such a

14  way that it would not frighten the witness, as the

15  government stated.

16         THE COURT:  Let's make sure.  I think that

17  your concern is -- about the issue of relocation.  Is

18  that what you're concerned about?

19         MS. MARTINEZ:  Yes, Your Honor.

20         THE COURT:  Well, what is the question that

21  you think she asked?

22         I thought she asked the question, if they

23  received any visa assistance.

24         MS. MARTINEZ:  Well, she didn't say "visa

25  assistance."  She said:  Immigration assistance when

J. Garcia - Cross

1   they were relocating."

2           That's a very broad question that could mean

3   this country, that could mean other countries.

4           THE COURT:  Okay.

5           MS. MARTINEZ:  That can mean a number of

6   things.  And "immigration assistance" could mean helping

7   get from one border to another, that could mean a lot of

8   things.

9           And I don't want to say anything on the

10  record because the defendants are listening, but,

11  certainly, if a -- if a U.S. visa was provided to a

12  family member, that would be a benefit, and, certainly

13  that would be something that would be disclosed in

14  *Giglio*.

15          To my knowledge, that has not occurred,

16  which is why it was not disclosed in *Giglio*, to my

17  knowledge.

18          If she wants to ask that to see if this

19  witness contradicts that, I think that question is fair.

20  But, any questions about his family, where his family

21  is, whether his family has been relocated, he is very

22  concerned about his family's safety, he's terrified

23  about these defendants getting information about his

24  family.  He's much more concerned about his family's

25  safety.  And this is really walking close to the line,

1   for no reason.

2                  THE COURT:  Okay.

3                  Yes?

4                  MS. RALLS:  Your Honor, any assistance --

5   and I think my question was even broader than what the

6   Court had intimated -- any immigration assistance,

7   whether it's into the country, out of this country,

8   between countries, any assistance that's been given by

9   the United States Government is relevant.

10                 THE COURT:  If you had a factual basis for

11  that question, I would allow it.  But I've asked you to

12  tell me the factual basis, and do you have anything that

13  you can point to that says the government gave his

14  family a visa.

15                 Or are you just shooting in the dark?  Can

16  you tell me.

17                 MS. RALLS:  Your Honor, I believe it -- it

18  could be reasonably likely, because this witness has

19  stated that he did receive immigration assistance from

20  the United States Government, and, the government stated

21  that they paid him and they paid for expenses for his

22  family, and I'm -- I would like to know if they also

23  received immigration benefits.

24                 THE COURT:  Okay.  What I'm going to do is

25  sustain the objection.  If you want to ask if the

1    government sponsored a visa for any family member, you

2    may ask that question, but nothing else.  Clear?

3              MS. RALLS:  Yes.  I will write it down.

4              THE COURT:  That is acceptable?

5              MS. MARTINEZ:  Yes.

6              THE COURT:  You may ask whether the

7    government obtained a U.S. visa for a family member --

8              MS. MARTINEZ:  U.S. visa.

9              THE COURT:  -- as a part of your cooperation

10   with the government.

11             MS. RALLS:  Your Honor -- right, Your Honor.

12   Any visa is relevant, we believe.  And even -- I think

13   the government is expressing a concern for the safety of

14   this witness, but my question was even broader than the

15   United States.

16             THE COURT:  I understand that, and that's

17   the exact reason I'm not going to let you do it, is

18   because Brenda Paz was murdered because she testified in

19   an MS-13 trial.

20             I don't think you understood.  I'm trying to

21   make clear, I'm not trying to have a situation where

22   this record becomes a basis for retaliation.  I want to

23   handle this one case, not another.

24             I'll write down the question you're going to

25   ask.  Or did you write it down?

```
 1            MS. RALLS:  Yes, I did.

 2            THE COURT:  Just ask that question and not

 3   another.  Thank you.

 4            (Thereupon, the side-bar conference was

 5   concluded.)

 6   BY MS. RALLS:

 7     Q.   Mr. Garcia, to the best of your knowledge, did

 8   the United States Government sponsor a visa for any of

 9   your family members?

10            MS. MARTINEZ:  Objection, Your Honor.  May

11   we approach?

12            THE COURT:  Yes.

13            MS. RALLS:  Your Honor, I'll rephrase.

14            THE COURT:  Thank you.

15   BY MS. RALLS:

16     Q.   Mr. Garcia, to the best of your knowledge, did

17   the United States Government sponsor a U.S. visa for any

18   of your family members?

19     A.   Yes.

20     Q.   And, was that sponsorship in -- in relationship

21   to your assistance for the FBI?

22     A.   Yes.

23     Q.   I know you don't want to answer too many

24   questions about your family, so I'll move on from that.

25            Mr. Garcia, while you're cooperating with the
```

J. Garcia - Cross

1   government, you're not -- excuse me.

2        When we were talking about things you had told

3   other gang members, You also told Mr. Lemus Cerna,

4   Christian, that you had attacked a gang member named

5   Conejo, C-o-n-e-j-o?

6   A.   Yes, I was in a fight with Conejo once.

7   Q.   Okay.  And, that individual was associated with

8   the Centrales clique?

9   A.   No, he was a Big Gangster, I believe.  The clique

10  was a Big Gangsters.

11  Q.   Big Gangsters, that's the name of a clique?

12  A.   Yes.

13  Q.   And, isn't it also true that you authorized a

14  beating for one of the *chequeos* in your clique, Uzi?

15  A.   Not that I can recall.  I know he got a beating,

16  but I can't recall if it was me that authorized it.

17  Q.   Okay.  So, you know that Uzi did get a beating?

18  A.   Yes.

19  Q.   But you don't remember if you authorized it not?

20  A.   No, I didn't authorize it.  But I wasn't allowed

21  to authorize that.  If he has an issue with the people

22  that were -- was there, of course, they're going to call

23  me that, you know, they're going to do a beating.

24        But, it was -- I always make sure on the phone,

25  that, "Well, it's up to you.  It's your decision, not

J. Garcia - Cross

1   mine."  And it's always been on the phone recordings.

2       Q.  So, now you do remember that you did not

3   authorize that, correct?

4       A.  Yes.

5       Q.  And, you made that call on your recorded FBI

6   phone?

7       A.  Yes, that's where they call me.

8       Q.  Okay.  And, you ended up excluding Uzi from your

9   clique; is that correct?

10      A.  Yes.

11      Q.  And there was another *chequeo* named Hansel; is

12  that correct?

13      A.  Yes.

14      Q.  And, you also -- well, you authorized a beating

15  on Hansel because he wanted to switch cliques; is that

16  correct?

17      A.  No, he actually -- he made the decision to switch

18  clique, and he knows the rules that he has to -- to --

19  in order for him to become for a different -- *chequeo*

20  from a different clique, he has to get a beating.  It's

21  not actually from us, give it to him, it just was his

22  decision.

23      Q.  So, he got a beating from the Silvas?

24      A.  Yes.

25      Q.  And then, did he also get a beating from his new

J. Garcia - Cross

1   clique?

2        A.   Yes.

3        Q.   And you authorized the beating for -- from the

4   Silvas?

5        A.   I did not authorize it.

6        Q.   But, you're the first word, right?

7        A.   Yes.

8        Q.   And isn't it also true -- well, is it -- it's

9   true that you ordered a hit on a *chavala* near Loehmann's

10  Plaza in 2014?

11       A.   No.

12       Q.   And, a gang member in your clique was convicted

13  of that killing, correct?

14       A.   Not that I remember.

15       Q.   Okay.  You sent somebody to hit a *chavala* at the

16  El Palenque restaurant; isn't that correct?

17       A.   No.

18       Q.   And, you beat up somebody with Lil Slow; isn't

19  that correct?

20       A.   No, I didn't beat up anybody.  We had an

21  altercation with this guy that -- he approached me and,

22  you know, he tried to kind of swing at me.  So I just

23  defend myself, I just push him back.  But we didn't beat

24  him, me and Slow.

25       Q.   So, you pushed him and that's it, altercation?

J. Garcia - Cross

1    A.   Yes.  Then, because he was -- he said that he was

2    a *chequeo*, or part of a different clique in Maryland.

3    Q.   And, you were collecting extortion rents from a

4    brothel in the Culmore area, correct?

5    A.   Yes, once I was authorized by the -- by the FBI.

6    Q.   And that was in Culmore in Virginia?

7    A.   Yes.

8    Q.   Isn't it true that Lagrima told you not to

9    collect that rent because it wasn't your clique's

10   sector?

11   A.   Yes.

12   Q.   And, you didn't like it when Lagrima told you to

13   stop collecting rent from that brothel?

14   A.   Yes.

15   Q.   And, you were mad at him for telling you to stop

16   doing that, right?

17   A.   We were always arguing.  He was always like, I

18   mean, a person like to argue back and forth, and we were

19   back and forth all the time.

20   Q.   Isn't it true that you had heard that Lagrima was

21   going to get punished before October 2013?

22   A.   No, I can't recall that one.

23   Q.   Okay.  Now, we talked about the clique meetings,

24   and I want to talk about the general meetings as well.

25        You set the schedule for the general meetings on

1    occasion; isn't that correct?

2       A.   Yes.

3       Q.   And, you decided at which hotel they would be

4    held?

5       A.   First I would talk to always with my handlers,

6    how we're going to -- which was the safety place for us

7    to -- to do a meeting.

8       Q.   Okay.  And then you would pick a hotel, right?

9       A.   Yes, close by.

10      Q.   And you would tell others to reserve that hotel

11   room, right?

12      A.   Yes.

13              MS. RALLS:  Court's indulgence, Your Honor.

14              No further questions.  Thank you.

15                    CROSS-EXAMINATION

16   BY MR. CHICK:

17      Q.   Good afternoon, sir.  How are you?

18      A.   Good.

19      Q.   My name is Mike Chick.  I'm the attorney for

20   Manuel Ernesto Paiz Guevara.  Okay?

21      A.   Okay.

22      Q.   You were asked on direct testimony by

23   Ms. Martinez about attending all kinds of different gang

24   meetings, right?

25      A.   Yes.

J. Garcia - Cross

1    Q.   And, you were shown a bunch of photographs of
2    people who were at these meetings, right?
3    A.   Yes.
4    Q.   Okay.  And, Ms. Martinez had you identify a bunch
5    of people, right?
6    A.   Yes.
7    Q.   She had you identify people in photographs?
8    A.   Yes.
9    Q.   And, she had you identify people, actually a
10   bunch of people here in court, right?
11   A.   Yes.
12   Q.   Okay.  Um, and, Ms. Martinez never asked you to
13   identify anybody named Solitario, right?
14   A.   No.
15   Q.   Solitario.
16   A.   No.
17   Q.   Okay.  Um, because, as you said, you don't -- you
18   don't know Solitario, right?
19   A.   No.
20   Q.   I'm right, that you do not know Solitario?
21   A.   I saw him once, but that was about it.  So, I --
22   Q.   Okay.
23   A.   -- I cannot -- he was sleeping.  He was -- I
24   wasn't even -- I didn't see his complete face.
25   Q.   You saw him once and you said he was asleep when

J. Garcia - Cross                                                  179

1    you saw him?

2        A.   Yes, he was sleeping.

3        Q.   Okay.  So you've never spoken to him, right?

4        A.   No.

5        Q.   Okay.  And, you saw him once when he was asleep.

6    But you also -- you've heard about him in conversations

7    that you've had, right?

8        A.   Yes.

9        Q.   Okay.  Um -- and I'm going to keep calling him

10   Solitario.  His name is Manuel Ernesto Paiz Guevara, but

11   I'm going to call him Solitario because that's the name

12   you that know of when you heard of him, right?

13       A.   Okay.

14       Q.   Okay.  When you talked about those -- the gang

15   meetings that you went to, like the general meetings,

16   for example, you identified people who were there, who

17   went, who were *chequeos*, right?

18       A.   Yes.

19       Q.   They were recruits?

20       A.   Yes.

21       Q.   Low level guys?

22       A.   Yes.

23       Q.   And, you saw those *chequeos* in the photographs at

24   the general meetings and you identified those *chequeos*,

25   right?

1    A.   Yes.

2    Q.   And, you even identified a *chequeo* who was from

3    PVLS, right?

4    A.   Yes.

5    Q.   Okay.  And, you also identified at least one

6    *paro*, right?

7    A.   Yes.

8    Q.   That's like kind the next level down under

9    *chequeo*?

10   A.   Yes.

11   Q.   And that *paro* that you identified, who went to

12   this general meeting, was also from PVLS, right?

13   A.   Yes.

14   Q.   Okay.  But, Solitario never, right?

15   A.   No.

16   Q.   Okay.  But, *chequeos*, it's not uncommon for a

17   *chequeo* to go to that general meeting in the context

18   that we saw it, right?

19   A.   They're not allowed to go inside the meeting, but

20   they're allowed to, if they feel like it, just be

21   outside.

22   Q.   Right.  Sometimes they're asked to go and to be

23   there and to look out and that kind of stuff.

24   A.   Yes.

25   Q.   That's normal, right?

1    A.   Yes.

2    Q.   Okay.  And, your -- your -- I'm going to call it

3    your assignment.  Your assignment on this case, your job

4    on this case was, it was about at least ten months,

5    right?

6    A.   Yes.

7    Q.   Almost a whole year, right?

8    A.   I would say more than that.

9    Q.   It was even longer than that?

10   A.   Yes, it was longer.

11   Q.   Okay.  And during -- during that time, part of

12   your -- in order to do your job, and to do it well, you

13   had to -- you had to kind of be -- you had to hang out

14   with these guys, right?

15   A.   Yes.

16   Q.   You had to put in the time, right?

17   A.   Yes.

18   Q.   Because, the only way to really build trust with

19   people is to put in the time with them, right?

20   A.   Yes, but the time I was putting in was by phone.

21   Q.   Okay.  But you also had to put in some face time,

22   right?

23   A.   Yes.

24   Q.   Okay.  Because one of the things that you wanted

25   to do, you're -- you're good at what you do.  You think

1    that, right?

2        A.   Um, I just do what is right, but I'm not saying

3    that I'm good, nothing is going to happen to me.

4        Q.   Okay.  Well, one of the things that you do in

5    order to be good at what you do is, you try to learn as

6    much as possible, right?

7        A.   Yes.

8        Q.   You try to get as much information as possible,

9    right?

10       A.   Yes.

11       Q.   And, you really try to get that information, not

12   just general information, but you want to get specific

13   information, right?

14       A.   Yes.

15       Q.   Okay.  Information about what's going on?

16       A.   Yes.

17       Q.   Information about things that have already

18   happened?

19       A.   Yes.

20       Q.   Information about things that are going to happen

21   in the future?

22       A.   Yes.

23       Q.   Okay.  Information about who is doing what?

24       A.   Yes.

25       Q.   Information about who did what back in the past?

1   A.   Yes.

2   Q.   And about who's talking about doing what in the

3   future, right?

4   A.   Yes.

5   Q.   Okay.  Um, and during that time that you had been

6   working on this case, you said over a year, you were

7   parts of thousands and thousands of hours of recorded

8   conversations, right?

9   A.   Yes.

10  Q.   And, you -- you said like with some of the people

11  it was -- you talked to these people well over 50 times,

12  right?

13  A.   Yes.

14  Q.   Multiple people, you talked with over the phone,

15  in recorded conversations, well over 50 times?

16  A.   Yeah.

17  Q.   To get that information?

18  A.   Yes.

19  Q.   And to get those specifics, right?

20  A.   Yes.

21  Q.   Right?

22  A.   Yes.

23  Q.   Okay.  Um, because it's really important when

24  you're doing this, I mean, this is serious stuff.  You

25  would agree with that, right?

1    A.   Yes.

2    Q.   And it's really important when you're doing this,

3    um, you want to get the information directly from the

4    people who were there, right?

5    A.   Yes.

6    Q.   You're not trying to get secondhand information?

7    A.   Yes.

8    Q.   And you also want to get information directly

9    from -- when you're getting information about what a

10   certain person did, you want to get information from

11   that person about their perspective, right?

12   A.   Yes.

13   Q.   Not just what other people were saying about

14   them, right?

15   A.   Yes.

16   Q.   You want to go to that person?

17   A.   Yes.

18   Q.   Because that's the most credible source, right?

19   A.   Yes.

20   Q.   You want to hear it from their own mouth?

21   A.   Yes.

22   Q.   And, in this case, it's fair to say that you

23   really went out of your way to do just that, right?

24   A.   Yes.

25   Q.   So -- so, for example, even though Leopardo would

J. Garcia - Cross

1    tell you something --

2        A.   Yes.

3        Q.   -- about who did what, you didn't just take what

4    he said.  You then tried to follow up on that and go to

5    whoever that was and hear their perspective, right?

6        A.   Yes.

7        Q.   And, you tried to do that in a recorded

8    conversation, right?

9        A.   Yes.

10       Q.   And, you kept doing that and you kept pushing to

11   try to get more information, right?

12       A.   Yes.

13       Q.   Um, so, for example, if Leopardo -- I'll use him

14   again because you had a lot of phone calls with him --

15   if he would talk about somebody, like if he would

16   mention Pesadilla and what Pesadilla did, or Duende, or

17   Lil Poison --

18       A.   Yes.

19       Q.   -- you would go to Pesadilla, right?

20       A.   Yes.

21       Q.   Or you would go to Duende?

22       A.   Yes.

23       Q.   You would go to Poison --

24       A.   Yes.

25       Q.   -- or Lil Poison.

```
1              Sometimes Lil Poison is called Poison, right?

2      A.   Sometimes.

3      Q.   Okay.  And then you would get it from them,

4  right?

5      A.   Yes.

6      Q.   Okay.  And so, just kind of going down, not --

7  not the complete list, but a short list of some of the

8  people whose own mouths that you went to and who told

9  you from themselves what they did, okay?  Leopardo?

10     A.   Yes.

11     Q.   And these are all recorded things that they told

12  you what they did, right?

13     A.   Yes.

14     Q.   Pesadilla?

15     A.   Yes.

16     Q.   Taliban, over the telephone?

17     A.   Yes.

18     Q.   Yes?

19          Lil Payaso?

20     A.   Yes.

21     Q.   Payaso?

22     A.   Yes.

23     Q.   Greñas?

24     A.   Yes.

25     Q.   Lil Poison?
```

1    A.   Yes.

2    Q.   And a bunch of other people?

3    A.   Yes.

4    Q.   And, it's true that you heard directly from every

5    defendant in this courtroom about what they did, except

6    for Solitario, right?

7    A.   Yes.

8    Q.   You never talked to him, to hear from him about

9    his perspective about anything, did you?

10   A.   No.

11   Q.   And so, for everybody else you did it one way,

12   but when it comes down to this one specific person,

13   Solitario, with him, it's true, you're just relying on

14   what other people say, right?

15   A.   Yes.

16   Q.   And, you did have some phone calls where you

17   talked about Solitario, right?

18   A.   Some phone -- can you repeat that question?

19   Q.   You had some telephone calls where you were

20   talking about somebody else, where you were talking

21   about Solitario?

22   A.   Yes.

23   Q.   Okay.  And you asked other people about him?

24   A.   Yes.

25   Q.   Because, it was important to you to try to find

out what his -- what his role was in -- in this stuff,
right?

     A.   Yes.

     Q.   But, it wasn't important to you to find out what
his role was from him, right?

     A.   I'm sorry.  Say that again.

     Q.   It wasn't important to you to find out from him
what his role was?

     A.   I wanted to find information as best I can from
whoever was involved.

     Q.   Okay.  So my question -- I'm going to ask it
again.  Was it important to you to find out from him --

     A.   Yes.

     Q.   -- what his role was?

     A.   Yes.

     Q.   But you didn't do that?

     A.   No.

     Q.   Okay.  And specifically, it was important to you
to find out what his role was with respect to the death
of Lil Guasón?

     A.   Yes.

     Q.   Who sometimes I'll call Gerson or Gerson, okay?

     A.   Okay.

     Q.   We're on the same page, right?

     A.   Yes.

J. Garcia - Cross

1    Q.   Okay.  And, you -- you did talk with -- with
2    multiple people about -- about his role, right?
3    A.   Yes.
4    Q.   You said that?  Okay.
5         And, so, I know the government yesterday,
6    Ms. Martinez, she asked you some questions and she
7    showed you some transcripts about a few things that were
8    said --
9    A.   Yes.
10   Q.   -- about him, right?
11   A.   Yes.
12   Q.   Okay.  Um, but you had other calls where you
13   talked about him, too, right?
14   A.   Yes.
15   Q.   Okay.  Um, so, for example, you had a call with
16   Leopardo on May 9th, which was one of the same days that
17   the government played for you yesterday, right?
18   A.   Yes.
19   Q.   And in that call, um, Leopardo told you that
20   Solitario was -- he was Gerson's best friend?
21   A.   Yes.
22   Q.   He told you that Solitario did not know about the
23   plan to kill Gerson, right?
24   A.   Yes.
25   Q.   He told you that Solitario panicked when Gerson

J. Garcia - Cross

1    started to get stabbed, right?

2        A.   Yes.

3        Q.   And he actually told you that multiple times in

4    that conversation, right?

5        A.   Yes.

6        Q.   And, just to take a specific line translated to

7    English about what he said, he said, "I called him, and

8    he just stayed there looking panicked," right?

9        A.   Yes.

10       Q.   And then he told you after all the others stabbed

11   him, that Solitario was ordered to stab Gerson, right?

12       A.   Yes.

13       Q.   And, what he told you, what Leopardo told you,

14   was it was at that -- it was at that moment when

15   Solitario used the knife on Gerson's expired body,

16   right?

17       A.   Yes.

18       Q.   And -- and I just want to be clear:  And it was

19   before that that Solitario was panicked, right?

20       A.   Yes.

21       Q.   And he also told you that after that, he still

22   seemed very panicked, right?

23       A.   Yes.

24       Q.   Long after that, right?

25       A.   Yes.

J. Garcia - Cross

1    Q.  Okay.  But you never observed Solitario yourself,

2  right?

3    A.  No.

4    Q.  Okay.  And at one point in your discussion, you

5  were talking to Leopardo, and you used -- you said this

6  about Solitario and the whole situation and him being

7  ordered.  You said, "Yeah, man.  If -- if he had cut up

8  right there, it would have been his turn, right?  You

9  would have hit him if he had cut up."

10   A.  Yes.

11   Q.  What does that mean?

12   A.  They would see that he wouldn't be part of the

13  murder, probably he would have end up dead as well.

14   Q.  Okay.  Did -- did the government ever give you a

15  transcript of that call to review?

16   A.  Yes.

17   Q.  They did?

18   A.  I have the calls, all the calls they have review.

19   Q.  Okay.  And that wasn't just the only call.  You

20  had other calls where he said that he froze up and that

21  he panicked, right?

22   A.  Yes.

23   Q.  And that he was afraid?

24   A.  Yes.

25   Q.  Let me ask you, did you say you got into MS-13

J. Garcia - Cross

1   back in like 2002?  Is that what it was?

2       A.   Yeah, around 2002.

3       Q.   Why did you -- why did you join MS-13?

4       A.   At the beginning, it was, you -- it was like kind

5   of friendship.  It was after school.  They used to get

6   together, probably go to a club.  It was nothing major

7   in that specifically happened at that time.  So, it just

8   pretty much was kind of friends.

9       Q.   It starts out kind of innocent?

10      A.   I would say that, yes.

11      Q.   Like they're buddying up with you, you're talking

12  about --

13      A.   Yes.

14      Q.   -- normal stuff, playing soccer, girls --

15      A.   Yes.

16      Q.   -- maybe some marijuana little stuff like that,

17  right?

18      A.   Some of that they did, yes.

19      Q.   And it kind of gradually goes from there, right?

20      A.   Yes.

21      Q.   And they sort of groom you into getting into this

22  culture?

23      A.   Yes.

24      Q.   Okay.  And then before you know it, you're --

25  you're in way deeper than you want to be, right?

1    A.   That's right.

2    Q.   And you feel trapped?

3    A.   That's true.

4    Q.   And, it's not weird for somebody to be trapped in

5    a situation like we're talking about with Solitario,

6    right?

7    A.   Yes.

8    Q.   Um, I want to go back -- I want to go back to

9    something that I think you said in one of the

10   transcripts yesterday, and I don't have the specific

11   transcript exhibit number in front of me.  But, I

12   think in one of the transcripts you had mentioned that

13   you were talking to somebody about Solitario, and

14   somebody told you that he was, quote, "already wet."  Do

15   you remember that?

16   A.   Yes.

17   Q.   Okay.  And, you said that "already wet" means

18   that he already has a murder to his name.

19   A.   Yes.

20   Q.   Okay.  Is there any other way to interpret that?

21   A.   No.  That's the only one.

22   Q.   Okay.  If he had another murder, why would he

23   still be a *chequeo*?

24   A.   He was waiting to -- -- he pick a date to be

25   jumped in, which was June the -- June the -- Friday the

J. Garcia - Cross

1    13th.

2        Q.   Okay.  He told you that?

3        A.   No, he did not.

4        Q.   Okay.  Somebody else said that that was the date?

5        A.   Yes.

6        Q.   And they said that he's the one that picked it,

7    right?

8        A.   Yes.

9        Q.   They didn't say that they picked it for him?

10       A.   No.

11       Q.   Okay.  So, but you don't know what the truth is?

12       A.   No.

13       Q.   Okay.  Well -- all right.  Can you tell me,

14   because I know following up on the details is really

15   important, what was that murder, what was that prior

16   murder all about?

17       A.   Which one?

18       Q.   The prior murder that he was already -- that he

19   was already wet from?

20       A.   Oh, he was a *chequeo* from PVLS.

21       Q.   Okay.  What -- who did he murder?

22       A.   Um, Lil Guasón.

23       Q.   But, before that, who did he murder?

24       A.   I don't know.  As far as I know -- I don't know

25   that he kill anybody before.

J. Garcia - Cross

1    Q.   Okay.  If -- that's an important thing, if you
2  heard somebody say that he was already wet --
3    A.   Yes.
4    Q.   -- before Lil Guasón --
5    A.   Yes.
6    Q.   -- you'd follow -- you'd want to follow up on
7  that, right?
8    A.   Yes.
9    Q.   Um, and you don't know of anybody that he
10  supposedly murdered?
11    A.   No.
12    Q.   Okay.  Not even a hint of anybody that he
13  supposedly murdered?
14    A.   No.
15    Q.   Okay.  And there's no rumors about anybody
16  specific that he supposedly murdered, are there?
17    A.   No, no one besides Lil Guasón.
18    Q.   There are no rumors or there is no information
19  about when he supposedly murdered somebody?
20    A.   No.
21    Q.   Okay.  Um, and, we don't have any details about
22  how he supposedly would have murdered somebody in the
23  past?
24    A.   No.
25    Q.   Okay.  And you didn't ask about any details like

J. Garcia - Cross

1   that?

2       A.   No.

3       Q.   Okay.  Um, you've been working for the FBI for

4   ten years?

5       A.   Yes.

6       Q.   That's -- like when you hear about a murder, when

7   murder comes up, I mean, in your mind, I'm guessing

8   that's -- you want to follow up on those details, right?

9       A.   Yes.

10      Q.   Okay.  But you didn't?

11      A.   Didn't what?  Follow what details?

12      Q.   When somebody told you that Solitario was already

13  wet --

14      A.   Yes.

15      Q.   -- you didn't follow up on that -- on those

16  details at all?

17      A.   I already knew that he -- that he was part of

18  killing Lil Guasón.  I already knew --

19      Q.   Okay.

20      A.   -- kind of -- kind of the details of what

21  happened.

22      Q.   Okay.  I think maybe we're not on the same page,

23  so, I'll just -- because yesterday it sounded like you

24  were saying, you interpreted "already wet" as he

25  murdered somebody else before Lil Guasón.  You're saying

1    "already wet" was referring to him being part of Lil

2    Guasón?

3        A.   Yes.

4        Q.   Okay.  The one that we just talked about?

5        A.   Yes.

6        Q.   Where he was panicked?

7        A.   Yes.

8        Q.   Okay.

9             And, you know that prior to the Lil Guasón

10   killing --

11       A.   Yes.

12       Q.   -- that he was a *chequeo*, right?

13       A.   Yes.

14       Q.   Okay.  And, do you know why he wasn't told about

15   the plan to murder Lil Guasón?

16       A.   No, I wasn't told.  They didn't tell me why, they

17   didn't tell anything.

18       Q.   Okay.  And then you know that after Gerson was

19   killed, that he was still a *chequeo*, right?

20       A.   Yes.

21       Q.   That he wasn't jumped in that night?

22       A.   No.

23       Q.   And he hadn't been jumped in since then, right?

24       A.   No.

25       Q.   And you talked about a lot of calls yesterday, a

1   lot of phone calls that you have.  I know it wasn't all

2   the calls that you had, but you talked about a lot of

3   them, right?

4       A.  Yes.

5       Q.  It's fair to say that -- well, let me start with

6   this.  You mentioned Solitario's name in some of the

7   calls, right?

8       A.  Yes.

9       Q.  But it's fair to say that in most of the calls,

10  his name was never brought up?

11      A.  Yes.

12      Q.  Okay.  Including most of the calls that you

13  talked about yesterday?

14      A.  Yes.

15      Q.  Okay.  And, in many of the calls there was talk

16  about the killing of Lil Guasón -- right?

17      A.  Yes.

18      Q.  -- that didn't even involve -- where his name

19  didn't come up even when that killing was talked about,

20  right?

21      A.  Yes.

22      Q.  Um, you talked a little bit about like devil

23  worship kind of stuff.

24      A.  Yes.

25      Q.  It sounds like that's like fairly common in MS.

J. Garcia - Cross                                                    199

1    A.   Yes.

2    Q.   Or at least fairly common with some people?

3    A.   Yes.

4    Q.   Fair to say that everybody in MS doesn't worship

5    the devil?

6    A.   Most of them.

7    Q.   Most of them do?

8    A.   Yes.

9    Q.   Do you?

10   A.   No.

11   Q.   Okay.  Well, how about when you got into MS in

12   2002; did you worship the devil then?

13   A.   No.

14   Q.   Okay.  So there are people who are in MS-13 who

15   don't worship the devil, right?

16   A.   Yes.

17   Q.   Okay.  And, you'd never heard any talk about

18   Solitario worshipping the devil?

19   A.   No.

20   Q.   Or that he does worship the devil?

21   A.   No.

22   Q.   Or that he talks about the beast or feeding the

23   beast or anything like that, have you?

24   A.   No.

25   Q.   Okay.

J. Garcia - Cross

1          MR. CHICK:  Court's indulgence.

2          THE COURT:  Yes.

3          MR. CHICK:  No further questions, Your

4    Honor.  Thank you very much.

5                    CROSS-EXAMINATION

6    BY MS. AMATO:

7      Q.   Good afternoon, Mr. Garcia.

8      A.   Good afternoon.

9      Q.   My name is Elita Amato and I, along with Jerry

10   Aquino, represent Mr. Chavez.

11     A.   Okay.

12     Q.   I'm going to talk to you first about Duende, all

13   right?  You've told us that you know a guy named Duende,

14   correct?

15     A.   Yes.

16     Q.   And Duende goes by the -- another nickname as

17   well, correct?

18     A.   Yes.

19     Q.   And that nickname you know as Enanito, correct?

20     A.   Yes.

21     Q.   And Duende is a person that you've never meet in

22   person?

23     A.   Yes.

24     Q.   All right.  But you've talked to him over the

25   telephone at least ten times, correct?

1    A.   Yes.

2    Q.   And, you're also Facebook friends with him,

3  correct?

4    A.   I'm sorry?

5    Q.   You are also Facebook friends with him, correct?

6    A.   No.

7    Q.   No.  All right.

8         So, your contact with Duende was merely by

9  telephone, correct?

10    A.   Yes.

11    Q.   So if Duende walked through the doors today, you

12  wouldn't even know what he looked like, correct?

13    A.   No.

14    Q.   And, Duende was an MS member, correct?

15    A.   Yes.

16    Q.   All right.  And Duende belonged to the PVLC

17  clique, right?

18    A.   PVLS.

19    Q.   PVLS, excuse me.  PVLS clique, all right.  Which

20  you've been talking about and telling us about, correct?

21    A.   Yes.

22    Q.   All right.  And, you talked to us about two phone

23  calls that you had with Duende.

24    A.   Yes.

25    Q.   All right.  And one of those phone calls, it was

1    just you and Duende on the phone, correct?

2        A.   Yes.

3        Q.   And, you called him.  You initiated the called,

4    correct?

5        A.   Yes.

6        Q.   All right.  And you initiated the call because

7    you had wanted -- you had heard about a shooting that

8    took place on June 19th of 2014, correct?

9        A.   Yes.

10       Q.   And so you wanted to find out more information,

11   correct?

12       A.   Yes.

13       Q.   Because as your job as someone who was trying to

14   get information for the FBI, this was one of the things

15   you needed to find out about, correct?

16       A.   Yes.

17       Q.   All right.  And you reached out to Duende because

18   you knew that he lived or he -- he hung out in the area

19   where the shooting occurred.

20       A.   Yes.

21       Q.   All right.  And you knew that area as the

22   Chirilagua area, correct?

23       A.   Yes.

24       Q.   And so you called him, and then you spoke with

25   him about what happened, correct?

1    A.   Yes.

2    Q.   And, in that phone call, it was just you and

3  Duende, correct?

4    A.   Yes.

5    Q.   So you were relying just on what he was telling

6  you?

7    A.   Yes.

8    Q.   And, he was the one who told you what happened,

9  according to him, correct?

10   A.   Yes.

11   Q.   He's the one who told you that supposedly Taliban

12  was the shooter, correct?

13   A.   Yes.

14   Q.   All right.  And again, that was in the

15  conversation with just you and Duende, correct?

16   A.   Yes.

17   Q.   And you relied on him, correct?

18   A.   Yes.

19   Q.   And, then you provided that information to the

20  FBI, correct?

21   A.   Yes.

22   Q.   And they relied on Duende then as well, correct?

23   A.   Yes.

24   Q.   And, in that phone call -- why don't you turn --

25  it's Government's Exhibit 21-A-1.  Do you have that in

1    front of you?

2       A.   No.

3       Q.   Okay.  Why don't you just get it so you have it.

4            So, in this phone call --

5            THE COURT:  Just a second.  He doesn't have

6    it in front of him.

7            MS. AMATO:  I'm sorry.  And I'm not going to

8    refer to it just yet, but just so long as he has it.  It

9    should be 21-A-1, is the transcript.

10   BY MS. AMATO:

11      Q.   All right.  So you see the transcript now,

12   correct?

13      A.   Yes.

14      Q.   All right.  And this is a call that occurred on

15   June 27th of 2014, correct?

16      A.   Yes.

17      Q.   And it's just you and Duende?

18      A.   Yes.

19      Q.   All right.  And, Duende, again, is the one who

20   puts Taliban in the mix, correct?

21      A.   Yes.

22      Q.   All right.  He says the name Taliban.  You had

23   never meet Taliban?

24      A.   No.

25      Q.   All right.  And, you had never met him at this

J. Garcia - Cross

1    time, correct?

2        A.    No.

3        Q.    And, you never met him after that, correct?

4        A.    No.

5        Q.    Never in person seen him?

6        A.    No.

7        Q.    Okay.  Now, you were aware that this guy,

8    Taliban, was referred to MS through a guy named Blacky,

9    correct?

10       A.    Yes.

11       Q.    All right.  And in fact, in this phone call, you

12   and Duende discussed that, correct?

13       A.    Yes.

14       Q.    All right.  And, there was a problem with that,

15   right?

16       A.    Um, I need to read what are you referring to.

17       Q.    Okay.  Well, I'm going to -- if you don't

18   remember, you can just say you don't remember at this

19   point.

20       A.    Okay.

21       Q.    All right?  So, the problem was that Blacky --

22   was thought that Blacky was a rat, correct?

23       A.    I don't remember this.  I would like to read it.

24       Q.    All right.  So let's -- why don't you turn to

25   page four.

1          MS. AMATO:  And if we can also put that on
2    the screen for -- and I will -- they can't see.
3    BY MS. AMATO:
4      Q.  And page four is -- I'm looking at the bottom
5    numbers on page four.
6      A.  You want me to read a specific part or the whole
7    page?
8      Q.  Well, let me direct you, all right?  I'm going to
9    direct you -- first of all, on the top of the page it
10   says JC, correct?
11     A.  Yes.
12     Q.  There is an initial JC.  And that's Duende,
13   correct?
14         JC is -- stands for Duende?
15     A.  Let me -- I don't -- like I say, I don't know
16   them by name.
17     Q.  All right.  Why don't you go to the very first
18   page.
19     A.  Yes.
20     Q.  All right.  And on that first page it indicates
21   who the initials are.
22     A.  Yes.
23     Q.  And you've got a JC, and that's for Duende,
24   correct?
25     A.  Yes.

J. Garcia - Cross

1    Q.  All right.  Now, go back to page four.

2    A.  Okay.

3    Q.  All right.  And so the first speaker we've got is

4  JC.  That's Duende, correct?

5    A.  Yes.

6    Q.  All right.  So if you count down speakers, we go

7  to the eighth, I believe -- one, two, three, four, five,

8  six, seven, eight.  And in this conversation -- this

9  portion, it's you, speaking, correct?  You're the eighth

10  speaker there?

11    A.  Yes.

12    Q.  And, you say, "It's not anyone else's word then,

13  right?  That's why, that's why when -- right, we hear

14  that Blacky had sent the dude, you know, what was the

15  first reactions are, you know?"

16      And then Duende's response is, "Nah, yeah, I

17  thought the same thing, too, man, you know?  Hey, hey, I

18  thought the same thing, too, dog, right?  You tell me

19  this, right?  He comes with the word from a son of a

20  bitch that supposedly is ratting, you know?"

21    A.  Yes.

22    Q.  Okay.  So you -- so, Blacky was thought was

23  ratting, correct?

24    A.  Yes, they thought that Blacky was.

25    Q.  Right.  They thought that Blacky was a rat?

```
 1        A.   Yes.
 2        Q.   MS -- the MS gang thought Blacky was a rat,
 3   correct?
 4        A.   Yes.
 5        Q.   All right.  And we've heard a lot about the
 6   problem with rats in the gang, right?
 7        A.   Yes.
 8        Q.   And, of course, ratting means -- rat is someone
 9   who is ratting on others to the police, correct?
10        A.   Correct.
11        Q.   Cooperating, correct?
12        A.   Yes.
13        Q.   Basically what you're doing, correct?
14        A.   Yes.
15        Q.   You are a rat?
16        A.   I don't consider myself a rat.
17        Q.   Sorry?
18        A.   I don't consider myself a rat.
19        Q.   You may not consider yourself a rat, but, MS
20   would think you're a rat, right?
21        A.   They will, yes.
22        Q.   Okay.  And here -- but here they're not talking
23   about you as a rat, they're talking about Blacky as a
24   rat.
25        A.   Okay.
```

J. Garcia - Cross

1    Q.   Right?

2    A.   Yes.

3    Q.   And so, there was a problem with that, and Duende

4    is saying, basically, to you that because he thought

5    that Taliban was a rat, that he didn't trust him,

6    correct?

7    A.   Yes.

8    Q.   All right.  Because you don't trust rats, right?

9         Well, MS-13 does not trust rats, correct?

10   A.   Yes.

11   Q.   And rats are people that they don't like,

12   correct?

13   A.   Yes.

14   Q.   That they don't -- that they hurt, right?

15   A.   Yes.

16   Q.   There's no problem hurting a rat, correct?

17   A.   That's what they do.

18   Q.   Right.  And, they lie on rats, right?

19   A.   They what?

20   Q.   Lie on rats?

21   A.   What do you mean, "lie on"?

22   Q.   I mean, they'll do anything they need to do to a

23   rat, right?

24   A.   Yes.

25   Q.   They lie to get them to come to parks, right?

J. Garcia - Cross

1    A.  Yes.

2    Q.  Okay.  So they lie on rats all the time.

3    And it doesn't matter if they hurt them, because

4  it's a rat?

5    A.  Yes.

6    Q.  They green light rats, correct?

7    A.  Yes.

8    Q.  Although you never meet Taliban, you knew that

9  Taliban, this Taliban, was not a homeboy, correct?

10    A.  Yes.

11    Q.  All right.  He was not even a *chequeo*, correct?

12    A.  Yes.

13    Q.  He wasn't even a *paro*, correct?

14    A.  Yes.

15    Q.  So when you're saying yes, you're agreeing with

16  me, correct?

17    A.  Yes.

18    Q.  All right.  So basically, this Taliban was a

19  nobody, correct?

20    A.  Yes.

21    Q.  Connected to a rat?

22    A.  Yes.

23    Q.  Now, besides Taliban, in this conversation that

24  you had with Duende, he talked about another person

25  called Gatuso, correct?

1    A.   Yes.

2    Q.   All right.  And you told us on direct that not

3  only did you speak to Gatuso, but you actually met him

4  in person several times.

5    A.   Yes.

6    Q.   All right.  And Gatuso was an MS member, like

7  Duende, correct?

8    A.   Yes.

9    Q.   All right.  So he was a homie, correct?

10   A.   Yes.

11   Q.   All right.  But Gatuso was a kid looking for a

12  clique?

13   A.   Yes.

14   Q.   All right.  And, in fact, there's discussion

15  about that in this same phone call, on page 11.  I'd

16  like you to turn to page 11?

17             THE COURT:  We'll start at page 11 right

18  after the break.

19             MS. AMATO:  Oh, okay.  Thank you.

20             THE COURT:  Thank you.

21             Fifteen minutes.

22             (Jury not present.)

23             THE COURT:  You can step down, sir.

24             (Witness stood aside.)

25             THE COURT:  All right, 15 minutes.

1              (Court recessed at 3:30 p.m. and reconvened

2              at 3:48 p.m.)

3              (Jury not present.)

4              THE COURT:  Before you start, Ms. Amato, I

5    understand that Ms. Ralls wants to say something.

6              MS. AMATO:  Certainly.

7              MS. RALLS:  Your Honor, I'm asking for a

8    jury instruction about benefits that have been provided

9    to this witness that have not been disclosed.

10             I'm also asking for the government's

11   redirect to be limited to this witness, to not discuss

12   any immigration benefits.

13             And also, for the record, I'm asking that

14   the case against my client be dismissed, and I'll tell

15   you why.

16             There has been a pattern of failure to

17   disclose on behalf of the government.  And, that is a --

18   a *Jencks* and *Giglio*, Your Honor.

19             THE COURT:  If you want to take up a motion,

20   we can take it up at 5:00 o'clock.  I thought you had

21   something to do with this witness.  I'm not trying to do

22   motion during trial.

23             MS. RALLS:  I understand, Your Honor.

24             THE COURT:  So, I'm not going to restrict

25   the government's redirect.  Since you asked the question

 1    about immigration, she's entitled to immigration about
 2    it.  And I'll take up jury instructions at the end of
 3    the trial.
 4              MS. RALLS:  I understand, Your Honor.
 5              I would like to take up the issue, at least
 6    of the government's redirect of the witness, of course,
 7    before they're able to get to the redirect.
 8              THE COURT:  What is it -- how am I to
 9    restrict their redirect?
10              MS. RALLS:  Your Honor, the government has
11    not disclosed certain immigration benefits that have
12    been provided to this witness's family.  The government
13    has attempted to limit defense counsel's questioning, my
14    questioning of the witness about the immigration
15    benefits provided to his family.  And I believe that's
16    in an effort to cover up the fact that they have not
17    disclosed these benefits.
18              THE COURT:  Okay.  Well, again, I'm going to
19    take up jury instructions at the end of the case.
20              I'm not going to restrict redirect, since
21    you opened it up on direct, as you were entitled to do,
22    and I guess there was a factual basis for your question
23    about whether or not the family was receiving
24    immigration status.  But I would like for my trial to
25    proceed now.

J. Garcia - Cross

1        MS. RALLS:  Yes, Your Honor.

2        THE COURT:  Thank you.

3        MS. RALLS:  I will --

4        THE COURT:  Five o'clock, have at it.

5        MS. RALLS:  Yes, sir.

6        THE COURT:  Bring our jury out, please.

7        (Jury present at 3:51 p.m.)

8        THE COURT:  You may be seated.

9        You can bring our witness back, please.

10        (Witness resumed stand.)

11        THE COURT:  You may proceed.

12        MS. AMATO:  Thank you, Your Honor.

13          CROSS-EXAMINATION (Continued)

14   BY MS. AMATO:

15   Q.  Good afternoon, again, Mr. Garcia.

16   A.  Uh-huh.

17   Q.  All right.  I'd like to bring us back to where we

18   were before we stopped.

19   A.  Okay.

20   Q.  You had Government's Exhibit 21-A-1 in front of

21   you.

22   A.  Yes.

23   Q.  Okay.  You still have it, correct?

24   A.  Yes.

25   Q.  All right.  And, before we stopped, we had

J. Garcia - Cross

1   started talking about a person with the -- the nickname

2   Gatuso.

3       A.   Yes.

4       Q.   Do you recall that?

5       A.   Yes.

6       Q.   Okay.  And, Gatuso, as you had mentioned, that

7   you had -- you had actually met Gatuso on several

8   occasions, correct?

9       A.   Yes.

10      Q.   All right.  But those meetings occurred after

11  this conversation, correct?

12      A.   Yes.

13      Q.   All right.  And, in fact, the first -- strike

14  that.

15          Now, Duende is the one who brings up the name

16  Gatuso, correct?

17      A.   Yes.

18      Q.   Because he's again telling you his version,

19  supposedly, of what occurred on the shooting of June

20  the 19th, correct?

21      A.   Yes.

22      Q.   And, he tells you that Gatuso is a kid looking

23  for a clique, correct?

24      A.   Yes.

25      Q.   And, you knew -- you understood that to mean that

J. Garcia - Cross

1  Gatuso already was a homeboy, correct?

2      A.  Yes.

3      Q.  But he was looking for a new clique to join,

4  correct?

5      A.  Yes.

6      Q.  All right.  And, let's just turn to page 11,

7  what's marked as 11 on the bottom of Government's

8  Exhibit's 21-A-1.

9              MS. AMATO:  And I'm going to ask that it be

10 put on the screen, Ms. Bishop.  And highlight the

11 portion.  And --

12             THE COURT:  Do you want him to read the

13 page?

14             MS. AMATO:  Excuse me?

15             THE COURT:  Do you want him --

16             MS. AMATO:  No, I'm going --

17             THE COURT:  -- to read the page?

18             MS. AMATO:  -- to have it highlighted,

19 actually.

20             THE COURT:  I'm asking if you want him to

21 read it.

22             MS. AMATO:  I'm going to, but I just first

23 am waiting for it to be highlighted, Your Honor, if

24 that's okay.

25 BY MS. AMATO:

1    Q.   Can you see the highlighted portion?

2         Mr. Garcia, can you see the highlighted portion?

3    A.   Yes.

4    Q.   Okay.  And the speaker here again, JC, is Duende,

5    correct?

6    A.   Yes.

7    Q.   All right.

8         MS. MARTINEZ:  Your Honor, I'm going to

9    object.  I'd like the witness to be able to read the

10   page so that he understands the context before he begins

11   asking questions -- answering questions about specific

12   quotes.

13        MS. AMATO:  Your Honor, I'm not doing

14   anything different than what the government counsel had

15   done at various times as well, which is to highlight

16   certain portions.  He can certainly read --

17        THE COURT:  Just a second.  Just a second.

18        What I'd like to do is let him read it

19   first, then you can ask every specific question you

20   have.  Let him read it first.  Thank you.

21        MS. AMATO:  Fine.

22   BY MS. AMATO:

23   Q.   Mr. Garcia, why don't you read the full page.

24   A.   Okay.

25   Q.   All right.  Now, I'd like to direct you to the

J. Garcia - Cross

1    portion that we have highlighted for you.  Do you see
2    that?
3        A.   Yes.
4        Q.   All right.  And, the person who's speaking there
5    is Duende, correct?
6        A.   Yes.
7        Q.   All right.  And Duende says -- he's talking about
8    this guy named Gatuso.  He says, "This kid that was
9    looking for a clique, too, doggy, you know, this kid
10   Gatuso from Via Satélite," correct?
11       A.   Yes.
12       Q.   All right.  And, so this is information, again,
13   you're relying on from Duende, correct?
14       A.   Yes.
15       Q.   All right.  And, it's Duende who believes that
16   Gatuso is a member of the Via Satélite clique, correct?
17       A.   Yes.
18       Q.   And he wanted to join another clique, correct?
19       A.   Yes.
20       Q.   Now, you were then introduced to Gatuso through
21   Duende, correct?
22       A.   Yes.
23       Q.   All right.  And, Duende actually asked you to go
24   and give this guy, Gatuso, money, right?
25       A.   Not that I remember.

J. Garcia - Cross                                          219

1    Q.   All right.  Well, you end up giving him money,
2    correct?
3    A.   Yes.
4    Q.   All right.  And it's because -- and it's based on
5    Duende asking you to reach out to Gatuso, correct?
6    A.   Yes.
7    Q.   All right.  And you learned that Gatuso was on
8    the run in Maryland, correct?
9    A.   Yes.
10   Q.   All right.  And he was on the run in Maryland
11   after the June 19th shooting in Chirilagua, correct?
12   A.   Yes.
13   Q.   All right.  And, you -- you actually speak with
14   him by telephone first, correct?
15   A.   Yes.
16   Q.   All right.  And in these phone calls with him, he
17   tells you how he's out in -- he's out hiding in
18   Maryland, correct?
19   A.   Yes.
20   Q.   And, he tells you that he knows the police are
21   looking for him, correct?
22   A.   Yes.
23   Q.   And, he tells you he knows the police are going
24   to all the places that he's known to live in, in
25   Virginia, correct?

1    A.   Yes.

2    Q.   Including his baby's mother's house, correct?

3    A.   Yes.

4    Q.   But he's out in Maryland, correct?

5    A.   Yes.

6    Q.   And his hope is to find a job in Maryland, right?

7    A.   Yes.

8    Q.   So he can support himself?

9    A.   Yes.

10   Q.   And start a new life, correct?

11   A.   I don't know about that.  He just --

12   Q.   Well, he wants --

13   A.   -- looking for a job.

14   Q.   Okay.  Well, he informed you that he wanted to

15   find work in Maryland, correct?

16   A.   Yes.

17   Q.   And then he was going to find an apartment,

18   correct?

19   A.   Not that I can recall --

20   Q.   You don't recall.

21   A.   -- mentioning an apartment.

22   Q.   That's fine.

23        But, you offer to help him out, correct?

24   A.   About what?

25   Q.   With money?

1    A.   Yes.

2    Q.   All right.  And you even offer to give him shoes

3    and clothes and things like that, correct?

4    A.   Yes.

5    Q.   And so you meet him, right?

6    A.   Yes.

7    Q.   In person?

8    A.   Yes.

9    Q.   All right.  And, in one of these meetings, you do

10   give him some money, right?

11   A.   Yes.

12   Q.   And you give him some clothes?

13   A.   Yes.

14   Q.   All right.  And, at some point, though, he

15   actually comes back to Chirilagua, correct?

16   A.   Yes.

17   Q.   All right.  And, he does that because he's really

18   concerned about the gun that was used in the shooting,

19   correct?

20   A.   Yes.

21   Q.   All right.  And so, he's -- he's willing to leave

22   his hiding place in Maryland to go get that gun,

23   correct?

24   A.   Yes.

25   Q.   And you go with him, correct?

1    A.   Yes.

2    Q.   And you go with him because you want to get that

3    gun as well, right?

4    A.   Yes.

5    Q.   Because you're working for the police, correct?

6    A.   Yes.

7    Q.   And you want that -- and we've heard that in the

8    past you've already given two guns to police, correct?

9    A.   Yes.

10   Q.   And so, you wanted to do the same thing here,

11   correct?

12   A.   Yes.

13   Q.   But Gatuso, he wanted to get that gun for just

14   the opposite reason, correct?

15   A.   Yes.

16   Q.   He wanted to get that gun so police wouldn't get

17   that gun, right?

18   A.   Yes.

19   Q.   And so, the two of you meet, and you go to the

20   apartment of the guy that supposedly had the gun,

21   correct?

22   A.   Yes.

23   Q.   And, when you get there, the guy is not there,

24   correct?

25   A.   Yes.

J. Garcia - Cross

1    Q.   But his brother's there, right?

2    A.   Yes.

3    Q.   And you go to the apartment, right?

4    A.   Yes.

5    Q.   And, the brother basically gives you the phone

6    number of the guy who supposedly has the gun, correct?

7    A.   Yes.

8    Q.   So that you and Gatuso and call him, correct?

9    A.   Yes.

10   Q.   And, the guy who supposedly has the gun, on the

11   telephone basically says, "I already got rid of it,"

12   correct?

13   A.   Yes.

14   Q.   All right.  Now, Gatuso is still concerned about

15   that guy, right?

16   A.   Yes.

17   Q.   He's concerned that the guy is not telling the

18   truth --

19   A.   Yes.

20   Q.   -- correct?

21        That the guy still has the gun, correct?

22   A.   Yes.

23   Q.   And he is also concerned that the guy is going to

24   turn into a rat as well?

25   A.   Yes.

J. Garcia - Cross

1    Q.   Gatuso's word, the guy is going to rat on him,

2  correct?

3    A.   Yes.

4    Q.   And you guys talk about that.

5    A.   Yes.

6    Q.   And you talk about how the first time, when you

7  and Gatuso went to speak with the guy who supposedly had

8  the gun, that you were soft with him, right?

9    A.   Yes.

10   Q.   And you just spoke to him, correct?

11   A.   Yes.

12   Q.   But next time, Gatuso says, "You guys got to get

13  rough on him," right?

14   A.   Rough on who?

15   Q.   Well, Gatuso wanted to get violent on the guy who

16  supposedly had the gun, correct?

17   A.   Yes.

18   Q.   And even -- and not only the guy who had the gun,

19  but his brother, correct?

20   A.   Yes.

21   Q.   The brother who didn't know anything about

22  anything, correct?

23   A.   He knew about the gun.

24   Q.   Oh, he did know about it?

25   A.   Yes.

J. Garcia - Cross

1    Q.   Okay.  All right.  So, but the point was that
2    Gatuso wanted to get violent on both of them, correct?
3    A.   Yes.
4    Q.   Because he was afraid they were going to rat on
5    him --
6    A.   Yes.
7    Q.   -- about the gun.
8    A.   Yes.
9    Q.   And you were going to --
10           MS. AMATO:  Oh, I'm sorry.  Going too fast?
11           THE COURT:  I've been advised, too.  I've
12   been admonished, too.  I know I've been talking fast.
13   Hopefully, the jurors could understand.  I know the
14   interpreters could not understand me.  I apologize.
15           MS. AMATO:  I'm sorry, Your Honor.  I will
16   slow down.
17   BY MS. AMATO:
18   Q.   Now, the second meeting with the guy who
19   supposedly had the gun never occurred, correct?
20   A.   No.
21   Q.   Because the guy disappeared, right?
22   A.   Yes.
23   Q.   He and his brother, right?
24   A.   I don't know what happened after that.
25   Q.   Okay.

J. Garcia - Cross

1    A.   If they disappeared or they still there.  I don't

2    know.

3    Q.   They both disappeared, correct?

4    A.   I don't know.

5    Q.   All right.  Well, they're no longer living there,

6    correct?

7    A.   I don't know.

8    Q.   You don't know.  Okay.

9         All right.  Now, I want to direct your attention

10   to the second phone call that you have with Duende,

11   which is Government's Exhibit 22-A-1.  Let me know when

12   you have it.

13   A.   I do have it.

14   Q.   Thank you.

15        Now, in this phone conversation, it's not just

16   you and Duende, correct?

17   A.   Yes.  That's correct.

18   Q.   There's more than, than the just of two of you

19   speaking, correct?

20   A.   Yes.

21   Q.   All right.  And, in this phone call, there is

22   supposedly an individual by the name of Taliban who is

23   speaking, correct?

24   A.   Yes.

25   Q.   All right.  Now, again, you've never meet this

1    Taliban in person?

2        A.   No.

3        Q.   Not before this phone call, correct?

4        A.   No.

5        Q.   Not after this phone call?

6        A.   No.

7        Q.   And, you don't really know what his voice sounds

8    like, correct?

9        A.   No.

10       Q.   All right.  So, you're just relying on what

11   people are telling you, that this person you're speaking

12   to is Taliban, correct?

13       A.   Yes.

14       Q.   And Taliban's a kind of common name, right,

15   nickname?

16       A.   Taliban?

17       Q.   Taliban, yes?

18       A.   Not really.

19       Q.   No?  You've never heard of someone else with the

20   name Taliban before?

21       A.   No.  Except the news.

22       Q.   You've never heard of a Julio Estuardo Córdoba,

23   who uses the nickname Taliban?

24       A.   No.

25       Q.   Okay.  All right.  Now, in this call, there's

J. Garcia - Cross                                             228

1    actually three different phones that are being used,

2    correct?

3        A.   Yes.

4        Q.   Okay.  You're on one phone, right?

5        A.   Yes.

6        Q.   Then there's a person who's identified with the

7    initials OC on a second phone, correct?

8        A.   Yes.

9        Q.   And then there's a third phone, which is Duende

10   and a person who they identify as Taliban, correct?

11       A.   Yes.

12       Q.   All right.  And on this first page of 22-A-1 --

13   first of all, you didn't complete this transcript,

14   correct?

15       A.   I did complete the transcript.

16       Q.   You completed -- you prepared this transcript?

17       A.   No, I -- I reviewed the transcript.

18       Q.   Okay.  You reviewed the transcript, right.

19       A.   Yes.

20       Q.   But when you got this transcript, it was already

21   prepared, right?

22       A.   Yes.

23       Q.   And, the names of the speakers were already

24   identified as participants on this transcript, correct?

25       A.   Yes.

1     Q.   All right.  So you're not the one who put the

2     name on this first page, Chavez, Jesus, AKA Taliban,

3     correct?

4     A.   No.

5     Q.   All right.  That was -- it was given to you

6     already prepared, correct?

7     A.   Yes, it was.

8     Q.   All right.  Now, in this call, you introduce

9     yourself to this Taliban, correct?

10    A.   What page you want me to read?

11    Q.   Okay.  All right.  You know I'm going there

12    already.  Okay.

13         So, why don't you turn to page three, the top of

14    page three.

15              MS. AMATO:  And we can maybe highlight it.

16    It's the top of the page.

17    BY MS. AMATO:

18    Q.   Okay.  Do you see on the top where it says "JR"?

19    That's you, correct?

20    A.   Yes.

21    Q.   All right.  And you're basically --

22              MS. MARTINEZ:  Objection, Your Honor.  The

23    witness should be given a chance to read the page.

24              MS. AMATO:  It's the very first part of

25    the -- but that's fine.  If he wants to read the whole

J. Garcia - Cross

1   page, that's fine.

2         THE COURT:  You may not remember this, but

3   what will typically happen is, each witness is going to

4   be able to be read the page, and then there's a question

5   about it.

6         MS. AMATO:  That's fine.

7         THE COURT:  So I'd like to carry on that

8   same procedure with this witness.

9         MS. AMATO:  I understand.

10         THE COURT:  Thank you.

11   BY MS. AMATO:

12   Q.   Mr. Garcia, let me know when you finish reading

13   the page.

14   A.   Okay.

15        Okay.

16   Q.   All right.  Now, so, we're all on the same page

17   of this page --

18   A.   Yes.

19   Q.   -- I want you to look on the screen, to the

20   portion highlighted, which is the first paragraph, which

21   is you speaking, correct?

22   A.   Yes.

23   Q.   All right.  And you're introducing yourself to

24   this Taliban, right?

25   A.   Yes.

J. Garcia - Cross                                                    231

1    Q.   All right.  And you're saying, basically, you're

2    saying, I'm from Silva, I'm Junior.  I've been walking

3    along with the shot caller for these homeboys since I

4    was a kid from Park View, right?

5    A.   Yes.

6    Q.   Okay.  And, again, shot caller is basically the

7    leaders, right?

8    A.   Yes.

9    Q.   Okay.  So you're basically telling him that

10   you've been walking with the leaders, right?

11   A.   Yes.

12   Q.   All right.  You don't tell him you're a leader

13   here, do you?

14   A.   No.

15   Q.   Okay.  You just say you're walking with the

16   leaders?

17   A.   Yes.

18   Q.   But at that point you were already a -- a first

19   word, correct?

20   A.   At what point?

21   Q.   Well, this phone call is back in June of 2014.

22   A.   Yes, I was.

23   Q.   All right.  But you don't tell him that you're a

24   first word in this call.

25   A.   No.

1    Q.   All right.  And, let's be clear.  In this phone

2    conversation this Taliban never says that he was with

3    Duende and Gatuso during the shooting, correct?

4    A.   Yes.

5    Q.   And you're agreeing with me, correct?

6    A.   Yes.

7    Q.   In this phone call, in this conversation, this

8    Taliban never says he shot anyone?

9    A.   That's correct.

10   Q.   And in this phone conversation, this Taliban

11   never says --

12            MS. MARTINEZ:  Objection, Your Honor.  Can

13   we clarify whether she's talking about the page he has

14   been allowed to review or the entire phone call, which

15   he has not been permitted to review?

16            MS. AMATO:  I'm talking about the whole

17   conversation, Your Honor.

18            MS. MARTINEZ:  In that case, I request that

19   the witness be allowed to review the entire transcript

20   so that he can actually answer the question for the

21   entire thing, and not just the page he looked at.

22            MS. AMATO:  Absolutely, Your Honor.

23            THE COURT:  Sir, if you would take your time

24   and read the whole transcript, please.

25            MR. JENKINS:  Your Honor, while the witness

J. Garcia - Cross

1    is reviewing a transcript -- we want to afford him the

2    time as possible -- could we approach briefly?

3              THE COURT:  Okay.

4              (Thereupon, the following side-bar

5    conference was had:)

6              MR. JENKINS:  Your Honor, at the outset of

7    this trial, I thought the Court made it abundantly clear

8    that all counsel should avoid speaking objections.

9              And today, Your Honor, they have become

10   increasing -- as the day as gone on, both government

11   counsel and at times defense counsel, but, particularly

12   government counsel has been, in my view, making speaking

13   objections in such a manner that it is telegraphing to

14   the witness what his answer should be.

15             And at some point in time, Your Honor, I

16   think it would be appropriate for government counsel to

17   be reminded that the Court has already directed all

18   counsel to avoid speaking objections.

19             THE COURT:  Okay.  I think that's fair.

20   That's been something I've observed as well.  I think

21   what's happening as the trial goes on longer, and we see

22   some of the same witnesses, similar testimony, that

23   people become more animated.

24             But this is a trial, not the last trial

25   we're going to have together, and let's do your job for

1    this case.  But don't become too personally involved in

2    it.  Just do what you've got to do.

3              MR. JENKINS:  Yes, Your Honor.

4              THE COURT:  No speaking objections.  Stop.

5              (Thereupon, the side-bar conference was

6    concluded.)

7              THE WITNESS:  Okay.

8    BY MS. AMATO:

9        Q.   Okay.  All right.  So, now that you've had a

10   chance to review the whole transcript of this phone

11   call, which you were a participant of, I ask you again,

12   nowhere in this conversation does Taliban state that he

13   was with Duende and Gatuso the night of the shooting,

14   correct?

15       A.   No.

16       Q.   Nowhere in this conversation does Taliban, this

17   Taliban, even discuss that shooting, correct?

18       A.   No.

19       Q.   Nowhere in this conversation does this Taliban

20   say that he shot anybody when he was with Duende and

21   Gatuso, correct?

22       A.   He said -- he said a different way, a gang code,

23   but he didn't mention Gatuso.

24       Q.   Well, okay.  Where is that?

25       A.   Um, when he referred to the, Duende, "he already

1    seen my -- my photo, my picture."

2        Q.   Okay.  And we're going to get to that word in a

3    minute.  But besides that word, where he says, "he's

4    seen my photo," nowhere else in this conversation does

5    Taliban say anything, in code or un- code, about having

6    shot anybody in the presence of Duende and Gatuso,

7    correct?

8        A.   No.

9        Q.   Or having shot anybody at any time, correct?

10       A.   No.

11       Q.   All right.  Now, we've heard you at length talk

12   about the words that people use when they've shot

13   someone, correct?

14       A.   Yes.

15       Q.   You use the word "hit"?

16       A.   Yes.

17       Q.   And in Spanish that's *pegar*, correct?

18       A.   Yes.

19       Q.   P-e-g-a-r.

20           We don't see "hit" on this page or any other

21   page, correct?

22       A.   No.

23       Q.   All right.  Other words that are used are

24   *plomaso*, correct?

25       A.   Yes.

J. Garcia - Cross

1      MS. AMATO:  And that's spelled
2  p-l-o-m-a-s-o.
3  BY MS. AMATO:
4     Q.  That's another gang word for to hit, to shoot
5  someone, correct?
6     A.  Yes.
7     Q.  And that's not a word that this Taliban used,
8  correct?
9     A.  No.
10    Q.  And, also another word that the gang uses as code
11  is *frijolear*, correct?
12    A.  Yes.
13      MS. AMATO:  And that's f-r-i-j-o-l-e-a-r.
14      THE WITNESS:  Yes.
15  BY MS. AMATO:
16    Q.  Another gang word, to hit, is actually *cuetaso,*
17  correct?
18    A.  Yes.
19    Q.  C-u-e-t-a-s-o, correct?
20    A.  Yes.
21    Q.  And none of those words are in this transcript,
22  correct?
23    A.  Yes.
24    Q.  And, what -- what this Taliban was actually
25  saying by the word photo is, he's talking about his

J. Garcia - Cross

1    references, correct?

2        A.   He's talking about -- we talk about before, what

3    a gang member says, "I'm going to put my picture," that

4    means killing.  And, picture and photo is almost the

5    same when they use it as a code.

6        Q.   Well, he doesn't say "picture" here, correct?

7        A.   Yeah, but he says "photo."

8        Q.   He says "photo."  Okay.

9        A.   When you take a photo, eventually it's going to

10   be a picture.

11       Q.   And according to you, it's the same thing?

12       A.   Yes, in gang code, yes.

13       Q.   I see.  But he doesn't talk -- the rest of the

14   conversation is all about his references, correct?

15       A.   Yes.

16       Q.   Right.  That's all he talks about, correct?

17       A.   Yes.

18       Q.   All right.  So that's really what he's talking

19   about in this conversation, correct?

20       A.   Yes.

21       Q.   Now, one of those people that he references is,

22   back on page three, is Blacky, right?

23       A.   Yes.

24       Q.   And we've already talked about Blacky in the

25   first conversation --

J. Garcia - Cross

1       A.   Yes.

2       Q.   -- we talked about, right?

3            And he mentions -- and he doesn't use the word

4    "Blacky," but he uses the word Negrito, correct?

5       A.   Yes.

6       Q.   And Negrito basically is the same as Blacky,

7    correct?

8       A.   Yes.

9       Q.   It's the same person, correct?

10      A.   Yes.

11      Q.   Right.  Negrito comes from the word *negro*,

12   correct?

13      A.   Yes.

14      Q.   Which is the word "black" in Spanish, correct?

15      A.   Yes.

16      Q.   All right.  So's talking about the Blacky that

17   everybody in MS thinks is a rat, correct?

18      A.   Yes.

19      Q.   And he's putting that out there and he's using it

20   as a reference, correct?

21      A.   Yes.

22      Q.   All right.  And Blacky was a gang member,

23   correct?

24      A.   Yes.

25      Q.   As we talked about already.

1           And, clearly, this Taliban doesn't know that MS

2    thinks Blacky is a rat, correct?

3       A.   Yes.

4       Q.   Because otherwise, he wouldn't be throwing

5    Blacky's name out there, would he?

6       A.   Yes.

7       Q.   You're agreeing with me, correct?

8       A.   Yes.

9       Q.   All right.  And, let's go on to page three, to

10   the portion, it's the one, two, three -- fourth speaker

11   from the bottom of the page.

12           MS. AMATO:  If you could highlight that.

13   BY MS. AMATO:

14      Q.   Where it says, "Oh, yeah" -- this Taliban is

15   saying, "Oh, yeah, I watch."

16           It's highlighted.  Do you see that?  Yes?

17      A.   Yes.

18      Q.   Okay.  And so, this Taliban is saying, "Oh, yeah,

19   I watch, I, I was a talking with, with, with, with the

20   homie, Negrito," right?

21      A.   Yes.

22      Q.   Okay.  And that's his way of saying that he had

23   been speaking with this guy Blacky, and he was putting

24   Blacky out as his reference, correct?

25      A.   Yes.

J. Garcia - Cross

1    Q.   And he goes on further when he says, the next
2    portion that's highlighted, "It's been -- it's been
3    like -- it's been like, like, like five that I've
4    been -- I've been running around with the homie," right?
5    A.   Yes.
6    Q.   Okay.  So, what -- earlier on direct you said
7    that what he was saying -- what you understood him to
8    say was that he had been wanting to be an MS member
9    since he was five, correct?
10        That's what you --
11   A.   Yes.
12   Q.   -- told us earlier.
13        But that's not accurate, is it?
14   A.   That's the way I -- I -- I kind of understand
15   when I was talking to him.
16   Q.   Right.  But now that you've had a chance to read
17   all this in context, together, you realize that he's
18   talking about having been running around for five years
19   with this homie, Negrito, correct?
20   A.   Yes.
21   Q.   All right.  Okay.  And, you knew that -- you know
22   that Blacky had been locked up, correct?
23   A.   Yes.
24   Q.   And, you had heard that this Taliban had been
25   locked up, correct?

J. Garcia - Cross                                                     241

 1    A.   Yes.

 2    Q.   And knew that this Blacky had been locked up for

 3  at least five years, correct?

 4    A.   I don't know how long.

 5    Q.   You don't know how long.  Okay.

 6         And going on to the next page, page four, on the

 7  very top of page four, he continues to talk about this

 8  homie, Blacky, again, because he's using him as a

 9  reference, correct?

10    A.   Yes.

11    Q.   All right.  And then, he puts another MS member's

12  name out to use as a reference, and that's Tricky,

13  Tricky, the name Tricky, right?

14    A.   Yes.

15    Q.   And, that's in the very first paragraph again, he

16  mentions homeboy Tricky.  Do you see that?

17    A.   Yes.

18    Q.   Okay, and we've got that highlighted.

19         And so, again, here, this Taliban is -- as a

20  reference, is throwing out the name Tricky, who is an MS

21  member, to try to say:  Hey, I know people in MS and

22  they know me.  Correct?

23    A.   Yes.

24    Q.   All right.  But, it turns out that just like

25  Blacky, this guy Tricky had problems with the gang,

1  right?

2     A.   Yes.

3     Q.   In fact, this guy Tricky ended up getting green

4  lighted, correct?

5     A.   Yes.

6     Q.   By his own clique?

7     A.   That's what I learned.

8     Q.   Right.  And, again, this Taliban didn't know

9  that, right?

10    A.   No.

11    Q.   And, there's conversations about that on page

12 four.

13              MS. AMATO:  And if we can highlight that.

14 BY MS. AMATO:

15    Q.   In the middle of the paragraph, you tell him, you

16 say, "Ah, they killed that homeboy Tricky, man."  You

17 see that?

18    A.   Yes.

19    Q.   And that's you telling him, right?

20    A.   Yes.

21    Q.   And you say, "Yeah, that homeboy is dead,

22 homeboy."

23         And then at the very end of that page, the last

24 portion where you're speaking -- which we can

25 highlight -- and it says, "And, and -- well, as far as I

1    know, it was the same, right, the same Mara.  Because

2    the homeboy, right, did some stuff that he shouldn't

3    have done.  But that's going to be another problem."

4          So, there, you're telling him that it was his

5    same clique that actually killed him, right?

6    A.   The gang.

7    Q.   Right, the gang.  And -- well, let's go on to the

8    page five, the top of page five.

9          And on the top of page five, again, you're

10   talking to him, you're telling him that Tricky, who was

11   his -- "it was in the homeboy's own house that they

12   dropped him -- dropped in and took him out, homie,"

13   right?

14   A.   Not Taliban house.

15   Q.   Sorry?

16   A.   Not on Taliban house.  It was in El Salvador.

17   Q.   Right, right, right, no.  Exactly.  It was in Sal

18   Salvador -- it was in El Salvador that he was killed,

19   right?

20   A.   Yes.

21   Q.   But what you're telling him here is that it was

22   in his own -- it was in the homeboy's own house,

23   correct?

24   A.   Yes.

25   Q.   -- that they dropped him.  Right.

J. Garcia - Cross

244

1    So, again, both of the people that Taliban puts

2  out as references, both had problems with the MS gang,

3  correct?

4    A.  Yes.

5    Q.  Now, you talked a lot about the rules of MS.  And

6  I'm not going to go into all of them, but I do want to

7  point out a few things relative to that.

8    Now, El Salvador has become sort of the homeland

9  of MS, right?

10   A.  Yes.

11   Q.  Of the gang?

12   A.  Yes.

13   Q.  They've taken on the leadership role, correct?

14   A.  I'm sorry?

15   Q.  They've taken on a leadership role, correct?

16   A.  Yes.

17   Q.  All right.  And, so they're the ones who decide

18  the rules, correct?

19   A.  Yes.

20   Q.  And then they inform the first words and the

21  second words, correct?

22   A.  Yes.

23   Q.  And they -- they send texts from El Salvador to

24  the United States, with what the rules are, correct?

25   A.  They -- they use phones.

J. Garcia - Cross                                      245

 1    Q.   They use phones.  Okay.  Well --
 2    A.   They use text, they use anything they can get in
 3  touch with anybody they want to.
 4    Q.   Right.  So they use phones, they call, correct?
 5    A.   Yes.
 6    Q.   They text, correct?
 7    A.   Yes.
 8    Q.   Did you ever receive text messages of a reminder
 9  of the rules?
10    A.   Yes.
11    Q.   All right.  And, and that's also to remind the
12  cliques in the U.S. that, hey, El Salvador is watching
13  them, correct?
14    A.   Yes.
15    Q.   All right.  And, one of the rules, of course, is
16  to respect the homeboy, correct?
17    A.   Yes.
18    Q.   Respect the gang?
19    A.   Yes.
20    Q.   Love the gang?
21    A.   Yes.
22    Q.   And don't make the hood look bad, correct?
23    A.   Never heard of that one.
24    Q.   You've never heard of that one, don't make the
25  hood look bad?

1      A.   No.

2      Q.   Don't make the territory look bad?

3      A.   No.

4      Q.   Would you be surprised if that was a rule?

5      A.   Probably they -- they might say in a different

6  way, to protect your territory.

7      Q.   Protect your territory.  Okay.

8      A.   That would be --

9      Q.   But it's the same thing, right?

10      A.   Yes, but that's the rule that going to make sense

11  to a gang.

12      Q.   Right.  To protect your territory?

13      A.   Yes.

14      Q.   Okay.  And the territory is really the hood, the

15  same thing, right?

16      A.   Yes.

17      Q.   So, PVLS, the hood was Culmore, correct?

18      A.   Yes.

19      Q.   Okay.  Where was your hood?

20      A.   I didn't have one.

21      Q.   Silvas didn't have a hood?

22      A.   No.  They were -- they were pretty much

23  everywhere they wanted to go.

24      Q.   All right.  Now, another important rule, of

25  course, was that the homeboys needed to follow the

1    rules, right?

2        A.   Yes.

3        Q.   It was important for that?

4        A.   Yes.

5        Q.   And, the homeboys are the soldiers, right?

6        A.   Yes.

7        Q.   And, so, they're the ones who follow the rules,

8    not make the rules, correct?

9        A.   Yes.

10       Q.   Because, as we heard, it's El Salvador who makes

11   the rules, right?

12       A.   Yes.

13       Q.   And it's the first and the second word who make

14   decisions for the clique, right?

15       A.   Yes.

16       Q.   And it's the soldiers that follow them out?

17       A.   Yes.

18       Q.   And homeboys aren't supposed to go and go rogue.

19   Do you know what I mean?

20       A.   Yes.

21       Q.   Okay.  They're not supposed to do their own

22   things on behalf of the gang without authorization,

23   correct?

24       A.   Yes.

25       Q.   They can get in trouble for that, correct?

J. Garcia - Cross

1    A.   Yes.

2    Q.   They could get a *calentón*, correct?

3    A.   It just depend.  They don't have to -- they don't

4    have to ask permission, let's say, if there is a rival

5    gang or they think there is a guy that could be a rival

6    gang, they don't need permission for that, because

7    that's the gang rule.  You kill *chavalas*.

8    Q.   Right.  I understand.  But I'm not -- I was just

9    talking in general terms, that it can be a problem for a

10   gang member who acts on behalf of the gang without

11   permission, correct?

12   A.   Like I said, just depends.

13   Q.   It depends, exactly.  So we're in agreement.  It

14   depends, right?

15   A.   Yes.

16   Q.   It can end up in getting a *calentón* for that

17   person, right?

18   A.   Yes.

19   Q.   It could end up in getting a double *calentón*,

20   right?

21   A.   Yes.

22   Q.   Which is a 26-second beating, right?

23   A.   Yes.

24   Q.   It can even end up with a green light?

25   A.   Yes.

J. Garcia - Cross

1    Q.   Now, for the MS gang, this June 19th shooting had
2    problems, right?
3    A.   Yes.
4    Q.   There were problems with that shooting, right?
5    A.   Yes.
6    Q.   Okay.  First thing was, it wasn't authorized, was
7    it?
8    A.   But they didn't see it as a problem.
9    Q.   Well, okay.  Well --
10   A.   Like I said, they don't have a problem if it's a
11   rival gang member.
12   Q.   All right.
13   A.   That's one of the rule.
14   Q.   Well, you don't -- okay.  Well, let's talk about
15   this then.
16        So, you discussed this with -- on this phone
17   call, the 22-A-1, correct?
18   A.   Yes.
19   Q.   All right.  And, the discussion was specifically
20   that this shooting wasn't authorized.  Remember that?
21   Correct?
22   A.   Yes.
23   Q.   All right.  And, in fact, let's turn to page
24   seven.  And at this point in this conversation, before
25   we get to that specifically, the third speaker, one,

J. Garcia - Cross                                          250

 1   two, three -- the fourth speaker, excuse me, which is
 2   you, you say, "Put Duende on for us, homie," right?
 3   That's you, correct?
 4       A.  Yes.
 5       Q.  Okay.  And you had been talking to the Taliban at
 6   that point, correct?
 7       A.  Yes.
 8       Q.  And you're telling that Taliban at that point to
 9   put Duende on.
10       A.  Yes.
11       Q.  Because they were sharing a phone, correct?
12       A.  Yes.
13       Q.  All right.  So now, from here on out on this
14   conversation, you're talking to Duende, correct?
15       A.  Yes.
16       Q.  All right.  And, when you talking to Duende,
17   you're telling him that -- that this shooting -- you're
18   telling him:  Look, there is a problem, and that there
19   was -- because however it was, that you have to keep an
20   eye on what's going to be the benefit for the clique.
21           Right?  And I can point you to where you're
22   saying that.
23       A.  Yes, please.
24       Q.  Okay.  It's -- it's highlighted now.  It's the
25   large paragraph where it says "JR," in the middle of

J. Garcia - Cross                                                251

1    that paragraph, and it says -- you're saying, "Because

2    how will that benefit the clique, right?"  Do you see

3    that?

4        A.   I just see, "You didn't say anything."  That's

5    what you highlighted.

6        Q.   Say that again?

7        A.   Well, you start -- you highlighted where it says,

8    "You didn't say anything."

9        Q.   Okay.  Excuse me.  It should -- well, that's

10   fine.  We can start from there.  It says, "You didn't

11   say anything to the clique, that they were keeping an

12   eye on someone or anything, because how will that

13   benefit the clique, right?"

14           Do you see that?

15       A.   Yes.

16       Q.   Okay.  And then further on, OC is still part of

17   this conversation, too, correct?

18       A.   Yes.

19       Q.   And, the very last -- he's the very last speaker

20   on the page.  Do you see that?

21       A.   Yes.

22       Q.   And he's -- and he's pointing out that:  Hey,

23   there's got to be some notice, correct?

24           He says, "The homie, you know, was saying, you

25   know, right, that fuck, you know, that when it comes to

1   that, there should be a notice, you know, so we can all

2   be there, you know."

3        Do you see that?

4   A.  Yes.

5   Q.  Okay.

6           THE COURT:  Was that a question?  Were you

7   asking him did he see it in the transcript, or were you

8   asking him a question about it?

9           MS. AMATO:  Well, I was asking him both.  I

10  will be more clear.  I'll follow up.

11          THE COURT:  Ask two questions if you would,

12  thank you.

13          MS. AMATO:  All right.

14  BY MS. AMATO:

15  Q.  So you see that on the transcript, correct?

16  A.  Yes.

17  Q.  Say --

18  A.  Yes.

19  Q.  Okay.  And, so, this was all part of the problem

20  that the clique had with this shooting, right?

21  A.  Yes.

22  Q.  Because there was no notice, correct?

23  A.  Yes.

24  Q.  All right.  And, there was another problem, too,

25  correct?

J. Garcia - Cross                                          253

1      A.   I don't know what problem.

2      Q.   Okay.  All right.  The other problem was that the

3  El Salvador leadership wasn't happy with this shooting

4  either, correct?

5      A.   Not that I know of.

6      Q.   You're not -- know of it.  All right.

7           Well, you were aware -- you learned later that

8  the MS guy -- the guy had been shot was an MS member,

9  correct?

10     A.   Yes.

11     Q.   All right.  He was an inactive member at that

12  point, right?

13     A.   Yes.

14     Q.   He had been given a *paso de hermano*, right?

15     A.   Yes.

16     Q.   You're familiar with that term, right?

17     A.   Yes.

18          MS. AMATO:  *Paso* is spelled p-a-s-o, space,

19  d-e, space, *hermano*, h-e-r-m-a-n-o.

20  BY MS. AMATO:

21     Q.   And that's basically permission to leave the

22  gang, right?

23     A.   Yes.

24     Q.   Okay.  And so that was the guy that got killed on

25  the night of June the 19th, correct?

J. Garcia - Cross

1    A.  Yes.

2    Q.  And so, El Salvador wasn't happy about that, were

3    they?

4    A.  I wasn't for sure.  I just --

5    Q.  Okay.  You weren't for sure, but you had heard

6    about that, right?

7    A.  Yes.

8    Q.  Okay.  There were grumblings about it, right?

9    A.  Yes.

10   Q.  Okay.  And, in fact, on page eight -- we can turn

11   to page eight.  It's Duende speaking on the very top?

12   A.  Yes.

13   Q.  And, he's first trying to explain, according to

14   his version of what happened, that the whole thing was

15   all very sudden.

16          MS. AMATO:  And then let's highlight the

17   very last sentence.

18   BY MS. AMATO:

19   Q.  Which he states, which is, he says, "But I also

20   knows what's going on with those fucking sons of

21   bitches, that it wasn't just any recruit that we killed,

22   man, you know."

23          And OC responds, "All right.  Cool, you know.

24   No, well, yeah, you know, that's what the homie was

25   saying, you know, right?  That's, that's the problem.

J. Garcia - Cross                                          255

1   You know, right."

2          So, that's who they're talking about.  They're

3   talking about the guy who was shot, correct?

4      A.   Yes.

5      Q.   And then he wasn't just some recruit, he wasn't

6   just some *chavala,* he was an actual MS member?

7      A.   At this point they -- they just heard.  They are

8   not for sure he was a gang member.

9      Q.   Right.  But the point is, that's what was being

10  discussed?

11     A.   Yes.

12     Q.   And so they knew -- in their minds, they thought

13  it was a problem?

14     A.   Yes.

15     Q.   Okay.  Now, there was a third problem with

16  this -- with this shooting.  The shooting occurred in

17  the area of Chirilagua, right?

18     A.   Yes.

19     Q.   According to what you heard, correct?

20          And, that's not where Duende's clique's territory

21  was, was it?

22     A.   No.

23     Q.   Duende's clique's territory was in Culmore,

24  correct?

25     A.   Yes.

1    Q.   And, the territory where the shooting occurred

2   was actually another clique's territory, right?

3    A.   Yes.

4    Q.   Okay.  And, in fact, you discussed that in the

5   very first phone call that we talked about with Duende,

6   that it was the Pinos clique territory, right?

7    A.   Yes.

8    Q.   And it was the Pinos clique's territory, that if

9   anybody should have been doing the shooting, it was them

10   who should have been doing the shooting, correct?

11    A.   Yes.

12    Q.   All right.  And let's just turn, so that we're

13   all clear, back to the transcript 21-A-1, please.  And

14   let me know when you have it.

15    A.   Yes.

16    Q.   All right.  Thank you.

17         If you turn to page five.  And we're going to

18   highlight it for you as well on the screen.  And if

19   you'd like to read the whole page, you can.  That's

20   fine.

21    A.   Okay.

22    Q.   Okay.  And, let's just -- now, look at the

23   portion that I've highlighted.  And that's you

24   speaking --

25    A.   Yes.

J. Garcia - Cross

1    Q.   -- right?  JR.  And you're saying, "Man, they're

2    in Chirilagua, supposedly Pinos should be the one

3    cleaning, not you guys, right, man"?

4    A.   Yes.

5    Q.   And that's where you're telling Duende that:

6    Hey, that was the Pinos territory.  They're the ones who

7    should have been doing the cleaning up, correct?

8    A.   Yes.

9    Q.   All right.  And so, that was another problem?

10   A.   Yes.

11   Q.   So, this shooting, this murder of June 19, 2014,

12   had a lot of problems connected to it, right?

13   A.   Yes.

14   Q.   And, when there are problems, people sometimes

15   have to pay for it, correct?

16   A.   Yes.

17   Q.   And that could be either a *calentón*, correct?

18   A.   Yes.

19   Q.   It could be a green light?

20   A.   Yes.

21   Q.   It could their life?

22   A.   Yes.

23        MS. AMATO:  No further questions, Your

24   Honor.

25                    REDIRECT EXAMINATION

BY MS. MARTINEZ:

Q.   Good afternoon.

A.   Good afternoon.

Q.   All right.  You've been asked a lot of questions
on cross-examination.  I'm going to cover a few things
that -- that you were asked about.  Okay?

A.   Yes.

Q.   You were asked a number of questions about your
position as first word --

A.   Yes.

Q.   -- in your clique.  Why did your clique support
you to become first word?

A.   At that point, there were not that many, and I
was the, pretty much the oldest one, that I knew all the
guys when the clique start at the beginning.  And, they
were just asking me if I want to be the first -- the
first word.

     And of course, I first -- I get in contact with
my handler to see what they -- they want me to do.

Q.   When you say that you were the oldest guy around,
what do you mean by that?

A.   Most of the guys that since 2002, '3, they're
deported, dead, and they're not here any more.

Q.   How many gang members do you know in the area who
are -- who were there in 2002 and are still there today,

1   not arrested or deported or dead?

2       A.   I don't -- I don't -- probably none.

3            MR. LEIVA:  Your Honor, object, compound

4   question.

5            THE COURT:  It is.  Sustained.

6            THE WITNESS:  Not that I know --

7            THE COURT:  Just a second.  She's going to

8   ask one question at a time.

9   BY MS. MARTINEZ:

10      Q.   How many gang members do you know, who were there

11  in 2002, and are still on the streets active as gang

12  members today?

13      A.   Probably no one.

14      Q.   So, when your clique approached you as the oldest

15  member, and asked you about being first word, what did

16  you do?

17      A.   I talk to my handler first.

18      Q.   Why?

19      A.   Because I wasn't -- I wasn't sure what they want

20  me to do.  I wasn't out to be in any violence at all.

21  So, it was up to them what -- what was -- they want me

22  to do or come up with any excuse, so that way I was not

23  going to be the first word.

24      Q.   Why did you decide to accept your clique's

25  request for you to become first word?

1     A.   Because my handler, they agreed to it, and I
2   should take the first word.
3     Q.   Did it require you to commit any act of violence?
4     A.   No.
5     Q.   As first word, did you commit any act of
6   violence?
7     A.   No.
8     Q.   You were also questioned about the reaction by
9   other gang members after you testified many years ago.
10    A.   Yes.
11    Q.   You remember that?
12    A.   Yes.
13    Q.   You said that there were rumors about you as a
14  snitch after your testimony.
15    A.   Yes.
16    Q.   Were the people who were spreading the rumors
17  from your clique or from another clique?
18    A.   From my clique and other cliques as well.
19    Q.   Did your clique members challenge your loyalty at
20  that time?
21    A.   No.
22         MR. SALVATO:  Your Honor, leading question,
23  "did you."
24         THE COURT:  Sustained.  Questions that begin
25  "did you" are leading.

BY MS. MARTINEZ:

Q.   At that time, was there any challenge by your clique members to your loyalty?

A.   No.

Q.   What do you mean by that?

A.   They didn't ask me anything.  And, there was nobody back in El Salvador that we can say, oh, he was a Silva ten years before I was Silva.  So, there was nobody, I would say, putting pressure or saying anything.  In fact, if there was one, he was probably, I already knew that guy, so there was nothing he could tell them, pretty much.

Q.   You say you already knew the guy?

A.   Yes.

Q.   What does that mean?

A.   Means probably he was here and he was in jail in El Salvador.  And, I mean, he was here and he got deported and he was in jail in El Salvador.

Q.   What was the significance to you of the fact that your clique did not challenge your loyalty?

A.   Um, I mean, I was always on the lookout for anything, but they, they didn't come up with something specific to challenge any loyalty.

Q.   Generally speaking, within MS-13, if a clique specifically challenges a particular homeboy's loyalty,

1   what could happen?

2       A.   Um, they gonna -- they gonna ask you probably do

3   a hit or put a mission on you.

4       Q.   Was that something that happened to you?

5       A.   No.

6       Q.   Why not?

7       A.   Because nobody told me that.

8       Q.   You were asked by a number of defense counsel

9   about payments by the FBI.

10      A.   Yes.

11      Q.   Payments were -- how were the payments made?   In

12  cash, check, or some other way?

13      A.   Cash.

14      Q.   Do you know why payments were made to you in

15  cash?

16      A.   No.

17      Q.   If someone had given you a check that said "FBI"

18  on it, for you to have on your person, would that cause

19  you any security concerns?

20      A.   Yes.

21      Q.   Why?

22      A.   Who knows?   Um, probably they give me a check, if

23  for some reason I lost the check, it would say my name,

24  probably and who's paying.

25      Q.   Why would that worry you?

J. Garcia - Redirect                                    263

1      A.   Because they will -- they will know that I was
2   working with the police.
3      Q.   What might happen to you if the gang knew you
4   were working with the police?
5      A.   They going to kill me.
6      Q.   When you were paid in cash, were you required to
7   sign any paperwork?
8      A.   Yes.
9      Q.   Every time?
10     A.   Yes.
11     Q.   Now, you were asked a number of questions about
12   various illegal acts that you observed or participated
13   in with the approval of FBI.
14     A.   Yes.
15     Q.   Let's talk about drugs in particular.
16     A.   Yes.
17     Q.   Were there instances in which you were involved
18   in drug transactions during your time as a CHS?
19     A.   Yes.
20     Q.   During those instances, what steps, if any, did
21   you take to inform the FBI?
22     A.   First, I always was instruction (sic) by the FBI
23   how we have to do the transaction.
24     Q.   Were those instructions given before or after the
25   transaction?

J. Garcia - Redirect                                    264

1        A.   Way before.

2        Q.   When did you seek approval for any drug

3    transactions that you engaged in?

4        A.   When I knew the gang members were trying to do a

5    drug transaction, I always reach to my handler and

6    explain it, what they were trying to do.  Sometimes we

7    were able to avoid it.  Sometimes we were not.

8        Q.   Why would you explain it to your handler in

9    advance?

10       A.   Because that's what I had to do.  I had to report

11   to my handler for any -- for anything, pretty much.

12       Q.   Why?

13       A.   Because that's -- that's what the agreement that

14   I have with them, report to them for anything.

15       Q.   When you were given instructions about these

16   specific transactions, would you follow the

17   instructions?

18       A.   Yes.

19       Q.   Were you given approval to engage in any drug

20   transaction that you wanted to?

21       A.   No.

22       Q.   When you were given approval, was it for a

23   particular transaction, or was it for weeks or months or

24   years at a time?

25       A.   No, just was for a particular transaction.

J. Garcia - Redirect

1  Q.  How about weapons?  You testified that there was
2  one or two occasions where you were involved in the
3  purchase of a weapon.
4  A.  Yes.
5  Q.  Is that right?
6  A.  Yes.
7  Q.  What, if any, steps did you take to notify the
8  FBI about those instances?
9  A.  I told them who was selling them, for how much,
10  and when, and how they were going to -- they want me to
11  do it.
12  Q.  Was that before or after the transaction took
13  place?
14  A.  Before.
15  Q.  When did you obtain approval to engage in that
16  transaction or transactions?
17  A.  Well, they let me know.  It wasn't right away.
18  They had to get the approval, I guess, first.
19  Q.  Who let you know?
20  A.  My handler.
21  Q.  Was -- and, when your handler let you know, was
22  that before or after the transaction with the weapon?
23  A.  Before.
24  Q.  When you obtained approval to engage in a weapon
25  transaction --

J. Garcia - Redirect

1    A.   Yes.

2    Q.   -- what did you do with the weapon?

3    A.   I give it -- they actually -- the agents were

4    always around the transaction, watching over.  And as

5    soon as I was done with the transaction, we would head

6    out to where we met at first, at the first place, and

7    they would -- they will take the gun.

8    Q.   You said the agents were always around.  Why were

9    the agents always around during transactions like this?

10   A.   Because they knew the -- the -- anything could

11   be -- could be a set-up or could be -- could -- I can

12   end up getting killed.

13   Q.   There were also questions about you being

14   involved in money being sent to El Salvador.

15   A.   Yes.

16   Q.   What steps, if any, did you take to inform the

17   FBI about any involvement you might have in sending

18   money to El Salvador?

19   A.   It's the same.  I was asking how much they were

20   asking, and if that was okay, to get the approval to

21   send the money.

22   Q.   What was the purpose of sending money to El

23   Salvador?

24   A.   Um, because that -- that's all they care in

25   El Salvador.  And that way you can keep them pretty much

1   happy, and that way they don't start bothering you,

2   trying to make stuff up.

3        Q.   What was the purpose of you, particularly, being

4   involved in sending money to El Salvador?

5             How did that benefit you?

6        A.   Um, I was -- they probably -- they -- I wasn't

7   hearing from them that much, like, if they want to do --

8   they want us to send -- let's say, because we didn't

9   send money, the first thing they're coming up with:  Why

10  you guys don't go and steal, or extortions.

11            So, by sending the money, that will, you know,

12  they have the money, there's no need for us, for myself,

13  to put me in that situation.

14       Q.   When did you obtain approval from FBI?  Before or

15  after sending --

16       A.   Before.

17       Q.   -- the money?

18            I'm sorry?

19       A.   Before.

20       Q.   Where did you get the money that you sent to El

21  Salvador?

22       A.   From an agent.  And sometimes -- well, I get it

23  from agent after, but sometimes from my own pocket.

24       Q.   When you got it from your own pocket, were you

25  reimbursed?

1    A.   Yes.

2    Q.   By who?

3    A.   By the FBI.

4    Q.   Is that part of the expenses that you were paid

5    for?

6    A.   Yes.

7    Q.   What was the purpose of the FBI providing you

8    with money so you could make these payments?

9    A.   Um, just to reimburse for the money I've been

10   spending from my pocket.

11   Q.   You were also asked about a particular drug

12   transaction where you made a purchase.  You were asked

13   questions about whether you did it on behalf of your

14   clique.  Do you remember that?

15   A.   Yes.

16   Q.   What do you -- you said you did not do it on

17   behalf of your clique.  Could you explain that answer?

18   A.   Um, it was -- "on behalf of the clique," it means

19   that you're going to purchase something and make sure

20   the clique knows, and what you're going to do with the

21   drugs.

22        But at this -- at this -- in this transaction, it

23   has nothing to do with the clique.  I had to just give

24   it to whoever I want.  In that case, we already know

25   that my handler knew about it, so I don't have

J. Garcia - Redirect

1    to explain the clique what I did with the drugs.

2        Q.   During that transaction, was your clique aware of

3    the transaction?

4        A.   Where?

5        Q.   Was your clique aware -- did they know about the

6    transaction?

7        A.   Not that I can remember.  I can't recall that.

8        Q.   In that particular transaction, were -- was it a

9    controlled purchase or a controlled sale?

10           Were you buying or selling?

11       A.   I was buying.

12       Q.   What did you do with the narcotics after you

13   bought them?

14       A.   Give it to my handler, the FBI agents.

15       Q.   Why?

16       A.   Because that's what I was -- that's what I was

17   supposed to do.

18       Q.   When did you obtain approval for that

19   transaction?  Before or after it occurred?

20       A.   Before.

21       Q.   You were asked questions about your employment.

22       A.   Yes.

23       Q.   Particularly, you were accused of lying about

24   saying that you were employed.

25       A.   Yes.

1    Q.   You gave some answers about working two to three

2    days a week or working full time.

3    A.   Yes.

4    Q.   Would you explain further what you mean to the

5    jury?

6    A.   Well, sometimes I had to work on different other

7    places.  I cannot go into details, but I always was in

8    one place.  Because I know it would be -- I know what I

9    was doing with the FBI.  It would be easy for any

10   investigator -- or easy to find me and know what I was

11   working, what I was doing, in case somebody was looking

12   for me from the gang, in case they find out that I was

13   working with the police.

14   Q.   Are you, in fact, employed?

15   A.   Yes.

16   Q.   You were asked about various things that you

17   reviewed in preparation for your testimony.

18   A.   Yes.

19   Q.   You were asked about the transcripts of the

20   calls.

21   A.   Yes.

22   Q.   And, is it, in fact, true that you reviewed many

23   transcripts of recordings?

24   A.   Yes.

25              MR. LEIVA:  Your Honor, I object.  Leading.

1          THE COURT:  Sustained.

2    BY MS. MARTINEZ:

3      Q.   What did you review before your testimony?

4      A.   The, the calls that I did.

5      Q.   In addition to transcripts of calls and the audio

6    of the calls, were there reports by the FBI stating what

7    other witnesses said?

8              MS. AUSTIN:  Objection, leading.

9              MS. MARTINEZ:  The answer could be yes or

10   no, Your Honor.

11             THE COURT:  But a question that suggests the

12   answer is leading.  Objection sustained.

13   BY MS. MARTINEZ:

14     Q.   Were there anything, in terms of reports or

15   otherwise, beyond these transcripts that you reviewed on

16   paper?

17     A.   I don't understand the question.  Can you --

18     Q.   Well, defense counsel asked you if you reviewed

19   FBI reports.  Do you understand what that means, an FBI

20   report?

21     A.   Um, I understand it is FBI report, that only they

22   know what the report.  I wasn't allowed to see what they

23   report.

24     Q.   You weren't allowed to see what?

25     A.   Any report of the FBI.

1    Q.  You testified both on direct and

2  cross-examination about your knowledge of the clique

3  PVLS.

4    A.  Yes.

5    Q.  When you first began talking to clique members,

6  PVLS clique members --

7    A.  Yes.

8    Q.  -- at the very beginning --

9    A.  Yes.

10   Q.  -- did you know all of the members of PVLS?

11         MR. SALVATO:  Leading, "did you," again.

12         THE COURT:  I know it's late in the day, but

13  questions that begin "did you" are leading.  Objection

14  sustained.

15  BY MS. MARTINEZ:

16   Q.  When you first began talking to members of PVLS

17  on the phone at that time --

18   A.  Yes.

19   Q.  -- were you acquainted -- had you met every

20  single member of PVLS?

21   A.  No.

22   Q.  Over time, were there more members you began to

23  talk to?

24   A.  Yes.

25   Q.  Over time, were there more members whom you met?

 1    A.   Yes.

 2    Q.   Was there ever a time where you met every single

 3  member of PVLS?

 4    A.   No.

 5         MR. LEIVA:   Your Honor, I object to

 6  foundation.   If he's claiming he doesn't know every

 7  member, how does he know if he met every member?

 8         THE COURT:   Objection overruled.

 9  BY MS. MARTINEZ:

10    Q.   What was your answer?

11         Was there a time when you met every member of

12  PVLS?

13    A.   No.

14    Q.   Now, one PVLS member in particular, his attorney

15  asked you a question, Pesadilla, do you know Pesadilla?

16    A.   Yes.

17    Q.   How else do you -- what other name do you know

18  Pesadilla by?

19    A.   Lil Tuner.

20    Q.   Have you ever met Lil Tuner, Pesadilla?

21    A.   Yes.

22    Q.   And is that the same Pesadilla you identified in

23  court during direct examination?

24    A.   Yes.

25    Q.   In addition to meeting Pesadilla -- and to be

1    clear, when I say "meeting," I mean face to face.  Have

2    you met Pesadilla face to face?

3        A.   Yes.

4        Q.   In addition to meeting Pesadilla face to face,

5    have you also spoken to him on the phone?

6        A.   Yes.

7        Q.   We looked at a transcript of a call between you

8    and Pesadilla.  Do you remember that?

9        A.   Yes.

10       Q.   Was that call the only call you ever had with

11   Pesadilla?

12       A.   No.

13       Q.   Approximately how many times did you speak to

14   Pesadilla on the phone?

15       A.   Say, probably more, more than 40, 50.

16       Q.   Over what period of time?

17       A.   Over, over 2013 to 2014.

18       Q.   On what phone?

19       A.   On the one that I have from the FBI.

20       Q.   Let's talk about the phone that the FBI gave you.

21   You were asked a lot of questions about that phone.

22       A.   Yes.

23       Q.   Do you remember off the top of your head the

24   phone number of that phone?

25       A.   No.

1    Q.   That phone that you had, did it only have one

2    phone number or did it have multiple phone numbers?

3    A.   Just one.

4    Q.   Is it common for gang members to change their

5    phone numbers at times?

6    A.   Yes.

7    Q.   Why?

8    A.   Because of some -- any gang member, the police,

9    either they get caught or they check their phone,

10   They -- they inform to the rest of the gang for

11   different clique, or their own clique, to change their

12   phone, that somebody might have seen the numbers.

13   Q.   Was there ever a time when you changed your phone

14   number?

15   A.   Yes.

16   Q.   What phone?

17   A.   The FBI phone.

18   Q.   How many times did you change your phone number

19   on the FBI phone?

20   A.   Probably twice.

21   Q.   When you changed your phone number on the FBI

22   phone, was it still the same physical phone?

23   A.   Yes.

24   Q.   Were the calls still recorded?

25   A.   Yes.

J. Garcia - Redirect

1    Q.   Was there ever a time when you could prevent the
2    calls on that FBI phone from being recorded?
3    A.   No.
4    Q.   You were asked a lot of questions about things
5    that other gang members said in these phone calls, in
6    these recorded phone calls.  Do you recall that?
7    A.   Yes.
8    Q.   And, in particular, you were asked a number of
9    questions about gang members reporting criminal activity
10   that they had engaged in in the past.
11   A.   Yes.
12   Q.   When you heard about a crime from a gang member,
13   that had already occurred, what steps, if any, did you
14   take to try to confirm the details of that crime?
15   A.   Um, I called them, try to follow up, and try to
16   find the best -- the most information that I could.
17   Q.   Why did you do that?
18   A.   Um, because sometimes when I learn that someone
19   was killed, and I always thought about the family first,
20   and, about the person, and I just -- I believe I was
21   doing the right thing.
22   Q.   When someone told you something that he said he
23   did that was a crime --
24   A.   Yes.
25   Q.   -- would you just take that person at his word

1   with no other confirmation?

2       A.   I will take it at his word and also I will

3   make -- I will follow up, see if that's true.

4       Q.   Why would you follow up?

5       A.   Just to make sure if that's true, if somebody got

6   killed, or somebody will be hurt, or try to prevent

7   somebody getting hurt.

8       Q.   What would you do with that information that you

9   would learn when you would follow up?

10      A.   Any information, I was going to talk to my

11  handler, always.

12      Q.   During the time when these recordings were being

13  made, how often were you communicating with your handler

14  in any form?

15      A.   All the time.  All the time by phone, by e-mail,

16  by text.

17      Q.   Why?

18      A.   Because that's -- that's -- that's one of the

19  things that they -- they need to know, in case they need

20  me to do something or how they want to approach the

21  situation.

22      Q.   And when you say need you to do something, what

23  do you mean?

24      A.   Probably find out more, something that they might

25  need me to find about the specific crime, or if they

1   already knew about the crime, but they didn't have an

2   idea who did it.

3       Q.   We focused in these recordings a lot on crimes

4   that had already occurred at the time of the recording,

5   right?

6       A.   Yes.

7       Q.   In other recordings, were there times where you

8   learned about crimes before they occurred?

9       A.   Yes.

10      Q.   What would you do when you learned about a crime

11  that hadn't yet occurred?

12      A.   I would always talk to my handler right away.

13      Q.   You were asked on cross-examination about gang

14  meetings.

15      A.   Yes.

16      Q.   And about you attending gang meetings.

17      A.   Yes.

18      Q.   One of the things you were asked about is whether

19  green lights or death threats were discussed at gang

20  meetings.

21      A.   Yes.

22      Q.   Were green lights discussed at gang meetings?

23      A.   Sometimes.

24      Q.   When you went to a gang meeting and heard a green

25  light being discussed, what did you do after the

J. Garcia - Redirect

1   meeting?

2   A.   Go to meet up with my handlers, FBI agents.

3   Q.   Why?

4   A.   Because to let them know -- it was already

5   recorded but I was -- talk to them, what I learned at

6   that meeting.

7   Q.   In this case, the three murders that you obtained

8   recordings on, of Lagrima, Lil Guasón, and Julio

9   Urrutia, were you able to find out before the murders

10  that they were going to happen?

11  A.   No.  It was after.

12  Q.   You were asked some questions about a meeting you

13  attended where someone pulled a knife.

14  A.   Yes.

15  Q.   What kind of meeting was that?

16  A.   That's a general meeting.

17  Q.   What's a general meeting?

18  A.   It's all the cliques from Virginia get together

19  to discuss gang business.

20  Q.   Is it allowed to have a knife at a general

21  meeting?

22  A.   No.  It's a rule that it's not allowed to have

23  any type of weapon at all.

24  Q.   What was your reaction when you saw the knife?

25  A.   Um, first, my first reaction was to defend

J. Garcia - Redirect

1    myself, because I don't know what he was going to do.

2        Q.   Why was that your reaction?

3        A.   Because, you know, these guys, they're going to

4    kill you in a heartbeat for no reason.

5        Q.   You were also asked about a beating that was

6    given to the guy who pulled the knife.

7        A.   Yes.

8        Q.   Were you present when the beating occurred?

9        A.   No.

10       Q.   Where were you?

11       A.   I was already on my way to meet with the FBI

12   agents.

13       Q.   Why had you left?

14       A.   Because I was not -- I was not to be part of any

15   violence.

16       Q.   What did you inform the FBI agents when you met

17   with them?

18       A.   Everything.  They went through what happened at

19   that meeting.

20       Q.   You mentioned that on occasion when you attended

21   meetings you would wear recording devices.

22       A.   Yes.

23       Q.   Were you wearing a recording device at this

24   meeting where the knife was pulled?

25       A.   Yes.

J. Garcia - Redirect                                   281

1    Q.  All right.  You were asked about a bunch of these

2    transcripts.

3    A.  Yes.

4    Q.  I want to go back over a few of them.  I hope it

5    won't take too long.

6    A.  Okay.

7    Q.  Okay.  If we could start with Government's

8    Exhibit 10-A-1.

9         MS. MARTINEZ:  And I think we can do it on

10   the screen, Mr. Toliver.  We will start with the cover

11   page, just so everyone is on the same page of where we

12   are.

13   BY MS. MARTINEZ:

14   Q.  Do you recall this March 31st call with Pesadilla

15   and Lil Poison?

16   A.  Yes.

17   Q.  Go to page seven, please.

18        If you would review -- the whole page if you

19   wish, but specifically that last paragraph by Pesadilla

20   there.  My question is just going to be:  What is the

21   general topic of conversation here?

22        MS. AUSTIN:  Your Honor.

23        THE COURT:  Yes.

24        MS. AUSTIN:  I'm going to object to this

25   question.  This is redirect.  The general topic of

1   conversation, I think at this point these questions need

2   to be directed to what was covered on cross.

3               MS. MARTINEZ:  This will be directed, Your

4   Honor.  I simply want to establish what --

5               THE COURT:  All right.

6               MS. MARTINEZ:  -- the topic of conversation

7   is before I do the specific question.

8               THE COURT:  Objection overruled.

9               (Pause.)

10              Why don't we start here tomorrow?

11              Ladies and gentlemen, please do not discuss

12  the case, nor permit the case to be discussed in your

13  presence.  Don't do any research on the case.  Don't go

14  on the Internet about the case.  Leave your notes in the

15  jury deliberation room.

16              We will resume tomorrow at 10:00 o'clock.

17  Thank you.

18              (Jury excused at 4:59 p.m.)

19              THE COURT:  We're in recess -- oh, was there

20  a motion?

21                    FURTHER PROCEEDINGS

22              THE COURT:  Ms. Ralls --

23              MS. RALLS:  Yes.

24              THE COURT:  Do you have a motion?

25              MS. RALLS:  Yes, Your Honor.

1          THE COURT:  All right.

2          MS. MARTINEZ:  Your Honor, could we

3   possibly take a five- -- oh.  First of all, the witness

4   should probably be excused.

5          THE COURT:  You can step down, sir.  Sorry.

6          (Thereupon, the witness withdrew from the

7   stand.)

8          MS. MARTINEZ:  Could we possibly take a

9   five-minute recess before we get into what I assume will

10  be a lengthy motion?

11         THE COURT:  Ten minutes; how about that?

12         MS. MARTINEZ:  That would be great.  Thank

13  you, Your Honor.

14         MR. CHICK:  Your Honor, if I may, before we

15  recess, too.  I have to leave to pick up my son.  I

16  can't stay for the motion.  I'm not trying --

17         THE COURT:  Does it affect your client?

18         MR. CHICK:  I don't think that it does.

19         THE COURT:  Good-bye.

20         MR. CHICK:  Thank you.

21         THE COURT:  All right.

22         MR. JENKINS:  Does that apply to all

23  counsel?

24         THE COURT:  Yes.  You're not required to

25  stay for every single motion.  If you would like to,

1    you're welcome to stay.  If you don't want to stay,
2    please feel free to leave.
3              MR. JENKINS:  Yes, sir.
4              THE COURT:  And have your client excused as
5    well.
6              MR. JENKINS:  Thank you.
7              THE COURT:  Thank you.
8              Ten-minute recess.
9              (Thereupon, court was recessed at 5:00 p.m.
10             and reconvened at 5:10 p.m.)
11             MS. RALLS:  Your Honor, I wanted to address
12   what we see as a pattern of failure to disclose on
13   behalf of the government.  It has continually come up
14   throughout this trial as the evidence has been
15   presented, and we would like some action to be taken in
16   reference to that.
17             The failures to disclose that I'm talking
18   about are failure to disclose the lack of
19   qualifications, and the need for special permission for
20   the contract language monitors to testify; the failure
21   to affirmatively disclose the texts between the witness,
22   Junior, and his former handler, Brenda Born; the failure
23   to disclose texts between the witness, Junior, and his
24   new handler that he testified is Fernando Uribe.
25             We have texts from January to June 2015, but

nothing before that.

Your Honor, again, the failure to disclose immigration benefits provided to the witness, Junior's family, We believe those benefits still have not been disclosed.

THE COURT:  Let me do this.

MS. RALLS:  Sure.

THE COURT:  There is a lot going on in this trial all in one day.  And if you have a substantive motion to make, I require you to make it in writing with a brief.

And I need to give the government a chance to respond to whatever it is you're doing.  And so I really can't -- I don't think it would be fair to me or to you, if you have a very serious motion, you should write a serious brief for me to read.

Because I heard you say "motion to dismiss" earlier.  And if that's what you're seeking, you actually have to do something in writing to explain to me, how I would do that four weeks into trial.

And if you have a grounds for it, file a written motion and give the government time to respond, and I'll hear you after I've read both briefs.  But I can't do this orally.

MS. RALLS:  Yes, sir.  I --

1          THE COURT:  Okay.

2          MS. RALLS:  -- will act accordingly.

3          However, while this witness is on the stand,

4    we would -- or shortly after his testimony has

5    concluded, because of the government's failure to

6    disclose the immigration benefits provided to this

7    witness's family, we would like --

8          THE COURT:  When you say "benefits," be

9    specific.  What is it that you want that you feel has

10   not been disclosed?  What is it you want?

11         MS. RALLS:  Your Honor, we believe, based on

12   the government's objections and attempts to --

13         THE COURT:  Hold on.  Hold on.

14         Okay.

15         MR. ZIMMERMAN:  Thank you, Judge.

16         THE COURT:  Are you asking for monetary --

17   money given to this witness to pay a lawyer for a visa?

18   What are you asking for?

19         MS. RALLS:  Your Honor, based on the

20   government's attempts to limit defense counsel's

21   questioning, it appears to us that there has been some

22   affirmative action taken by the government to secure

23   some sort of immigration benefit for the witness's

24   family.

25         I don't know where or how that has happened,

because the government hasn't disclosed it, but
something has been done, something in addition to paying
money.

The amount of --

THE COURT:  I'm trying to make sure I
understand.  I heard him say that the government helped
his family, someone in his family get a visa, or his
family get a visa.

I don't know what that means except to infer
that somebody did something in an immigration proceeding
or at immigration court, and I don't know how it was
done.

So you want to know about that, right?
That's what you want to know?

MS. RALLS:  I would like to know that, and
if --

THE COURT:  You would like to know if they
were given money, right?

MS. RALLS:  Yes, I would also like to know
that.

THE COURT:  Okay.

MS. RALLS:  And if any sort of letters,
communication, facilitation of some sort, was given to
secure those visas.

I'm not sure if they were actions taken in

United States courts.  They may have been communications
to other immigration authorities.  But, the --

THE COURT:  Help me with -- help me with why
it would be important to know about some other
country --

MS. RALLS:  Your Honor, this --

THE COURT:  -- if he discloses that the
government helped with a U.S. visa.

MS. RALLS:  Your Honor, I'm not sure that
that is what actually happened, and I don't think that's
the -- if it is what happened, I don't think it's the
only benefit in the immigration realm that this witness
has received for his family --

THE COURT:  Well, let me say this --

MS. RALLS:  -- due to his cooperation.

THE COURT:  I don't know if this witness --
if this individual has been placed in the Witness
Protection Program or not.  I don't really know the
answer to that question.

But I do know that there are limits on what
I would have the government disclose to you for purposes
of impeachment.  It seems to me that *Giglio* material is,
did the government give him money or benefits that
relate to his testimony.

So, yes, if his wife or girlfriend got a

visa because the government intervened, that would be
*Giglio* material.  If his wife or girlfriend got money or
paid rent, that would be *Giglio* material.

But the fact that the person may have got a
visa to go to Mexico or Colombia may not be, because
we're only talking about a U.S. visa.  You see what I'm
saying?

So I don't want to -- I don't want to go
further than I need to go, and so, I was asking you to
give me a list.  I wrote down here:  Government
intervention on visa benefit, money, letters to the
service for a visa.  Is that it?

MS. RALLS:  Your Honor, again, I don't need
to know which third country may have been involved, but
if the government has been in contact with some
third-party country in order to encourage the granting
of a visa, I would also want to know that.

THE COURT:  I won't give you that.  I won't
give you that, if that's what the issue is.  I won't
give you that.

It will be enough to me that you have the
three things I just mentioned, which is government
intervention for a U.S. visa for him or girlfriend or
family, money that was paid to him or to others
associated with him, and letters to the service for a

1   visa.

2              And I would not want to, if there's some

3   reference in a letter to, they were relocated to

4   Colombia, that you would come in here and tell the jury

5   that.  You understand?

6              MS. RALLS:  I understand, Your Honor.

7              THE COURT:  Okay.  Does that -- can the

8   government do that?

9              MS. MARTINEZ:  Of course, Your Honor.

10             I'd like to briefly address the record --

11  address the Court, because I want to make sure that the

12  record is clear, I want to make sure that Your Honor

13  doesn't think that I intentionally misrepresented

14  anything to the Court.

15             What I would like to put on the record, Your

16  Honor, is I have our *Giglio* disclosures here in front of

17  me.  Naturally, in the course of a case like this,

18  senior AUSAs who were in charge of certain witnesses do

19  those *Giglio* disclosures themselves.

20             In this case, Mr. Campbell -- this was

21  Mr. Campbell's witness.  Mr. Campbell took unexpectedly

22  ill.  The *Giglio* disclosures were clearly made well

23  before that.  I've relied on those *Giglio* disclosures

24  and believe them to be true.

25             The *Giglio* disclosures do include specific

1  dollar amounts of money for services and for expenses to

2  this person -- to this witness.  It also includes

3  specific dollar amounts spent related to family members

4  relocated for -- for security reasons.

5           The letter does not say that family members

6  received any sort of U.S. immigration benefits.  And I

7  would agree, Your Honor, that if a family member

8  received from the -- from the FBI, from the -- the

9  investigators, a U.S. immigration benefit, that

10  certainly would be *Giglio*.

11           And I will look into that, and if that

12  additional disclosure needs to be made, I will do that.

13           I just want to be clear to the Court that

14  when I was addressing the Court at the bench, it was my

15  understanding that these disclosures were accurate and

16  that there was no U.S. visa provided to any family

17  member of this witness associated with his cooperation,

18  provided or assisted by the FBI.  That was my

19  understanding.

20           I'm going to clear that up and make sure

21  that that's true.  If it's not true, if there are

22  additional disclosures as Your Honor just laid out, we

23  will absolutely make those.

24           But I just want to assure the Court that I

25  was not attempting to avoid our *Giglio* obligations or to

1    misrepresent anything to Your Honor or on the record.

2             And, again, I think Your Honor appreciates

3    this, but I want to be clear for the record and for

4    defense counsel, our concerns are about safety and

5    security.

6             The vigorous objections about certain

7    questions are about putting information on the public

8    record, in front of the public, in front of these

9    defendants, about details about this witness and any

10   family he may or may not have, and any location they may

11   or may not be in, or information that could lead someone

12   to figure that information out.

13            That's the nature of the objections, that's

14   the reason for the objections, not to hide any

15   information that should be disclosed or that was

16   disclosed under the United States' *Giglio* obligations,

17   which I, and I know and my co-counsels, take very

18   seriously.

19            But I just want Your Honor to be aware that

20   I was not personally in charge of these *Giglio*

21   obligations, these *Giglio* disclosures, nor was

22   Mr. Tobler.  And I will look into it.  I am now senior

23   counsel on this case.  I will make sure that they

24   accurate.  In fact, I plan to look at all of them.

25            But I didn't review them, of Mr. Campbell's,

1    and if there's a mistake to be made, we will rectify --

2    if there was a mistake made, we will rectify it.

3             THE COURT:  Well, I appreciate what you just

4    said, but Special Agent Born, who was the witness's

5    handler, told us that she only did a letter for an

6    S Visa that was never received by the immigration

7    authorities.

8             MS. MARTINEZ:  Yes, Your Honor.

9             THE COURT:  The witness told us that he took

10   the letter to the immigration proceeding.  So I find it

11   interesting that she didn't know anything about that.

12   So I want you to talk specifically to her.

13             And Special Agent Uribe has been sitting in

14   this courtroom, and he's the handler -- is he the

15   handler now?

16             MS. MARTINEZ:  Yes.

17             THE COURT:  Then, you talk to him about what

18   the situation is concerning visas.  Because I would

19   expect the handler, who is representing the government

20   with this witness, would know the details of it.  And

21   you question them.

22             MS. MARTINEZ:  I fully will.

23             May I just request a clarification, Your

24   Honor?

25             THE COURT:  Yes.

1    MS. MARTINEZ:  Your Honor, some defense

2  counsel, I think it was Ms. Austin, asked that Agent

3  Born be -- be not excused and be able to be called back.

4    We would not typically talk to her while she

5  is still pending as a witness.  Would Your Honor

6  nonetheless like me to speak to her about this issue?

7    THE COURT:  Ms. Austin?

8    MS. AUSTIN:  Your Honor, we are going to

9  plan on recalling Agent Born.  If she wants to ask some

10  very specific questions to Agent Born about immigration

11  benefits --

12    THE COURT:  I want her to ask about *Giglio*,

13  period.

14    MS. AUSTIN:  Well, that's fine.

15    THE COURT:  That way we would know, you

16  know, what she knows about *Giglio*.

17    And I don't think I need to articulate

18  *Giglio* for you, Ms. Martinez.  But ask her --

19    MS. MARTINEZ:  Certainly not, Your Honor.

20    THE COURT:  -- about *Giglio*, to make sure we

21  have everything.

22    MS. AUSTIN:  That's fine, Your Honor.

23    THE COURT:  I don't want to do this twice.

24    MS. MARTINEZ:  Happy to do that, Your Honor.

25  I just wanted to make sure we weren't violating any

1   other issue.

2           THE COURT:  I appreciate you telling me

3   that.  I didn't know that you were relying on what

4   Mr. Campbell prepared.  But again, I appreciate your

5   representation, and I'll expect you will follow up with

6   that.

7           Is there anything further, Ms. Ralls?

8           MS. MARTINEZ:  We will follow up promptly,

9   Your Honor.

10           MS. RALLS:  Your Honor, I would just like to

11   note that I don't believe that that would fully disclose

12   all benefits that have been provided to this witness and

13   his family.

14           I wrote down the question that I was going

15   to ask the witness, which is:  Did the United States

16   Government sponsor a visa for family members?

17           When I asked that question, the government

18   objected and specifically requested that I modify my

19   question to state:  Did the United States Government

20   sponsor a U.S. visa for family members?

21           Therefore, we have reason to believe that

22   there has been some communication to secure some other

23   visa, and we ask that to be disclosed.

24           THE COURT:  All right.

25           MS. RALLS:  And with whatever protective

measures the Court wants to put in place, just, was an embassy contacted, any --

THE COURT:  Tell me how that would advance the inquiry of this witness's truthfulness, Ms. Ralls.

MS. RALLS:  Your Honor, he has a motivation to testify favorably to the government, and the government has a duty to disclose those motivations, that he's been paid money, that he has been reimbursed for expenses, that his family has been paid money for relocation expenses -- which the government did disclose.  They disclosed $6,880 in incidental expenses when relocated for security reasons.

But in addition to that, benefits that have been provided to him and his family in the form of forbearance from prosecution, whether informal or formal; and also, immigration benefits are highly relevant to his motivation to stretch the truth, to fabricate and outright lie in order to maintain those benefits for his family.

THE COURT:  Do you recall my question?

My question was:  How would it advance the inquiry to know if the United States sponsored a visa application for another country?  Can you answer that question?

MS. RALLS:  Yes, Your Honor.  It would show

1   further benefits that this witness indirectly, through

2   his family, has received as a result of his cooperation

3   with the government, and would show further motivation

4   for him to not be truthful.  Because, he's been

5   receiving not only immigration benefits for himself, but

6   also immigration benefits for his family.  I believe

7   that would show that.

8               THE COURT:  I'm not sure how, if you even

9   have the information, it would change the inquiry about

10  his truthfulness.  And so, that's my concern.

11              And that is, if the government wrote a

12  letter to a foreign country, if they did that, they

13  could disclose that without disclosing the name of the

14  country.  Do you agree with that?

15              MS. RALLS:  I do.

16              THE COURT:  Okay.

17              Then I want you to make a list, in a motion

18  that you give to the government, and the government will

19  use that list as a road map, and then they will respond

20  to it with whatever response they have.

21              Thank you.

22              Is there anything else?

23              MS. RALLS:  Nothing further, Your Honor.

24              THE COURT:  And again, I want to be clear

25  with counsel, I'm not going to have motions hearings

1    every day.  This is not Judge Ito.  This is Judge Lee.
2    We had motions all before trial, okay?  So right now I'm
3    in trial.  I stay in trial mode.
4                We're in recess.  Thank you.
5                (Proceedings concluded at 5:24 p.m.)
6                            ---
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2                     CERTIFICATE OF REPORTER

3

4              I, Renecia Wilson, an official court

5     reporter for the United States District Court of

6     Virginia, Alexandria Division, do hereby certify that I

7     reported by machine shorthand, in my official capacity,

8     the proceedings had upon the jury trial in the case of

9     UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

10             I further certify that I was authorized and

11    did report by stenotype the proceedings in said jury

12    trial, and that the foregoing pages, numbered 1 to 299,

13    inclusive, constitute the official transcript of said

14    proceedings as taken from my shorthand notes.

15

16             IN WITNESS WHEREOF, I have hereto

17    subscribed my name this  27th  day of  May, 2016.

18

19                       /s/
                         _____
20                       Renecia Wilson, RMR, CRR
                         Official Court Reporter

21

22

23

24

25