1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,                )
                                         )
                         Plaintiff,      )
                                         )   Crim. No. 1:14cr306
         vs.                             )
                                         )
JOSE LOPEZ TORRES, ALVIN GAITAN          )   April 14, 2016
BENITEZ, CHRISTIAN LEMUS CERNA,          )
OMAR DEJESUS CASTILLO, MANUEL            )
ERNESTO PAIZ GUEVARA, and                )
JESUS ALEJANDRO CHAVEZ,                  )
                                         )
                         Defendants.     )
_____ )

JURY TRIAL

BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                  BY:   JULIA MARTINEZ, AUSA
                        TOBIAS TOBLER, AUSA

---

OFFICIAL COURT REPORTER:

                  RENECIA A. SMITH-WILSON, RMR, CRR
                  U.S. District Court
                  401 Courthouse Square, 5th Floor
                  Alexandria, VA 22314
                  (703)501-1580

APPEARANCES (Continued)

FOR DEFENDANT JOSE LOPEZ TORRES

      BYNUM & JENKINS, PLLC
      BY:  ROBERT L. JENKINS, JR., ESQ.
      THE LEIVA LAW FIRM, PLC
      BY:  MANUEL E. LEIVA, ESQ.

FOR DEFENDANT ALVIN GAITAN BENITEZ

      LAW OFFICE OF AMY LEIGH AUSTIN
      BY:  AMY LEIGH AUSTIN, ESQ.
      SMITH & ZIMMERMAN, PLLC
      BY:  JEFFREY D. ZIMMERMAN, ESQ.

FOR DEFENDANT CHRISTIAN LEMUS CERNA

      LAW OFFICE OF CHRISTOPHER AMOLSCH
      BY:  CHRISTOPHER AMOLSCH, ESQ.
      FRANK SALVATO, ESQ.

FOR DEFENDANT OMAR DEJESUS CASTILLO

      FIRSTPOINT LAW GROUP, PC
      BY:  KATHERINE MARTELL, ESQ.
      OLD TOWN ADVOCATES, PC
      BY:  MEREDITH M. RALLS, ESQ.

FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

      LAW OFFICE OF W. MICHAEL CHICK, JR.
      BY:  WILLIAM MICHAEL CHICK, JR., ESQ.

FOR DEFENDANT JESUS ALEJANDRO CHAVEZ

      JEROME P. AQUINO, ESQ.
      ELITA C. AMATO, ESQ.

---

1 INDEX

2

3 <u>WITNESS (Government)</u> <u>DIRECT</u>  <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

4 Jose Garcia (Cont.)    ---      ---        5          29

5 Michelle L. Miller     32       89        ---        ---

6 Juan Carlos Ayala
  Marquez              124 (Not completed)

7

8      (Court recessed)

9                          ---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1
2
3          (Thereupon, the following was heard in open
4 court at 10:13 a.m.)
5          THE CLERK:  1:14-306, United States versus
6 Jose Lopez Torres, Alvin Gaitan Benitez, Christian Lemus
7 Cerna, Omar Dejesus Castillo, Manuel Ernesto Paiz
8 Guevara, and Jesus Alejandro Chavez.
9          THE COURT:  Good morning, everyone.  Ready
10 to bring the jury out?
11          Bring the jury out, Mr. Burns.  Thank you.
12          (Jury present.)
13          THE COURT:  You may be seated.
14          Good morning, ladies and gentlemen.
15          THE JURORS:  Good morning.
16          THE COURT:  Good morning, Counsel.
17          Good morning, Mr. Omar Dejesus Castillo.
18          Good morning, Mr. Manuel Ernesto Paiz
19 Guevara.  Good morning.
20          Good morning, Mr. Jesus Alejandro Chavez.
21 Good morning.
22          Good morning, Mr. Alvin Gaitan Benitez.
23          Good morning, Mr. Jose Lopez Torres.
24          And good morning, Mr. Christian Lemus Cerna.
25          Good morning, Counsel.  Ready to proceed?

1    Bring the witness back, please.

2    (Witness resumed stand.)

3    THE COURT:  Good morning, Mr. Garcia.

4    THE WITNESS:  Good morning.

5    THE COURT:  Counsel, you may proceed.

6    THEREUPON, JOSE GARCIA, previously duly

7    sworn, testified further as follows:

8    REDIRECT EXAMINATION (Continued)

9    BY MS. MARTINEZ:

10   Q.  Good morning, Mr. Garcia.

11   A.  Good morning.

12   Q.  When we left off yesterday, we were in

13   Government's Exhibit 10-A-1.  Go to the cover page

14   first.  Just -- and you can actually just use the

15   screen.  That would be easier than the binder there.

16   Just to refresh your recollection, this is the

17   3-31-2014 recording with Pesadilla and Lil Poison,

18   right?

19   A.  Yes.

20   Q.  Okay.  We were on page seven.  When we left off

21   before the break, I had asked you to review this page

22   and told you I was going to ask you about just that last

23   paragraph by Pesadilla at the bottom.

24   My question is going to be, what event is he

25   talking about is being discussed in the call?

1          And then we will move on to the next page.  Take

2    your time to review however much you need.

3      A.   Okay.

4      Q.   In that paragraph, Mr. Pesadilla said, "I held

5    his coconut down on the ground and I stuck him with the

6    blade with everything," what is he talking about?

7      A.   He's talking about the murder of Lil Guasón.

8      Q.   Please turn to page eight.  And I'll ask you a

9    couple questions about this page.  If you need to,

10   please review it.

11     A.   Okay.

12     Q.   Okay.  Now, this recording with Pesadilla

13   discussing the murder of Lil Guasón, was the recording

14   before or after the murder?

15     A.   After the murder.

16     Q.   On this page here, there's references to

17   Solitario.  Pesadilla talks about Solitario.  Do you see

18   that?

19     A.   Yes.

20     Q.   Solitario's lawyer asked you on cross-examination

21   about what Pesadilla said about Solitario.  Do you

22   recall?

23     A.   Yes.

24     Q.   Now, in the middle of the page, in that longish

25   paragraph by Pesadilla that starts with, "Yeah, yes,

1    yes," he says, "The homie was already wet."  What homie
2    is he talking about?
3        A.   He's talking about Solitario From PVLS.
4        Q.   What does "wet" mean?
5        A.   Wet mean that he already kill someone.
6        Q.   Do you understand what murder he's talking about,
7    that Solitario committed?
8        A.   Yes.
9        Q.   What murder?
10       A.   Lil Guasón.
11       Q.   Thank you.
12            Let's go now to Government's Exhibit 8-A-1.
13   Starting with the cover page, What's the date on this
14   recording?
15       A.   It's January 26, 2014.
16       Q.   And, who are you speaking to?
17       A.   Lil Payaso from PVLS.
18       Q.   Lil Payaso's attorney asked you about this
19   recording as well.  Do you remember?
20       A.   Yes.
21       Q.   If we could go to page eight.  I'm going to ask
22   you primarily about that long paragraph in the middle.
23   Take your time to review as much as you need.
24       A.   Okay.
25       Q.   Lil Payaso's attorney asked you about this long

1   paragraph.  Do you remember that?

2       A.  Yes.

3       Q.  She asked you in the last sentence about the word

4   "restaurant."  Do you remember that?

5       A.  Yes.

6       Q.  That full sentence there, "So then we went there

7   to the restaurant where we cooked the chicken.  We gave

8   it to him."

9           What do you understand Lil Payaso to be saying?

10      A.  Pretty much that when Lagrima was killed, when --

11  at the park.

12      Q.  What the significance of the chicken?

13      A.  They were referring chicken as Lagrima.

14      Q.  What does "the restaurant" mean?

15      A.  It means when they kill Lagrima at the park.

16      Q.  Why does it mean that?

17      A.  Because that's when they say the chicken, they

18  cook the chicken, so they killed Lagrima at the park.

19      Q.  Why do gang members use the words like "cook" and

20  "restaurant"?

21      A.  Just as a code.

22      Q.  Is that a code you're familiar with?

23      A.  Yes.

24      Q.  Is that a code that's been used more than just by

25  Lil Payaso in this call?

1      A.   Yes.

2      Q.   At the very bottom of the page, you ask,

3 "Oh, that's the time when you eat?"  Do you see that?

4      A.   Yes.

5      Q.   What were you asking?

6      A.   Pretty much if that's the time when they killed

7 Lagrima.

8      Q.   Please turn to the next page.  How does Lil

9 Payaso respond to your question?

10      A.   Yes, that's when they kill Lagrima.

11      Q.   Now, he says in that response, "That was when we

12 went to eat."  Do you see that?

13      A.   Yes.

14      Q.   Do you recall that Lil Payaso's attorney asked

15 you about his use of the word "we"?

16      A.   Yes.

17      Q.   Continuing in that sentence, he says, "That's the

18 only time I saw him."  What do you understand Lil Payaso

19 to be saying about himself in that sentence?

20      A.   That's the only time he saw Lagrima.

21      Q.   When was the only time that Lil Payaso saw

22 Lagrima?

23      A.   When they killed him.

24      Q.   When who killed him?

25      A.   Lil Payaso, with the PVLS clique.

1    Q.   Please turn now -- let me ask this first:  At
2    another time, did Lil Payaso tell you what he
3    specifically did during the murder?
4    A.   Yes.
5    Q.   Please turn to Government's Exhibit 23-A-1.  Who
6    are you talking to in this recording?
7    A.   Lil Payaso and Lil Tuner from PVLS.
8    Q.   What's the date of the recording?
9    A.   It's July 27, 2014.
10   Q.   Do you remember this recording?
11   A.   Yes.
12   Q.   Where was it?
13   A.   It was at the park.
14   Q.   Please turn to page 33.  Take your time to
15   review.  I'm going to ask you about what Lil Payaso says
16   on this page.
17   A.   Okay.
18   Q.   What is Lil Payaso talking about here?
19   A.   When they kill Lagrima, what he did when he kill
20   Lagrima.
21   Q.   What did Lil Payaso say that he specifically did
22   when the gang killed Lagrima?
23   A.   He went after Lagrima's feet to knock him down.
24   Q.   Please turn now to Government's Exhibit 15-A-1.
25   Who is this recording with?

1      A.   Leopardo from PVLS, Gatito.

2      Q.   Let's turn to page 21.  Leopardo's attorney asked

3  you some questions about this recording.  Do you

4  remember?

5      A.   Yes.

6      Q.   He asked you some questions about this page

7  specifically.  Do you recall that?

8      A.   Yes.

9      Q.   I'm going to ask you some additional questions.

10  Please take your time to review as much as you need to.

11      A.   Okay.

12      Q.   All right.  In the middle of the page, towards

13  the bottom of the page, you say, "But did you even get a

14  chance?"  Do you see that?

15      A.   Yes.

16      Q.   Do you remember Leopardo's attorney asking you

17  about that?

18      A.   Yes.

19      Q.   What did you mean when you asked Leopardo, "But

20  did you even get a chance?"

21      A.   He want to be the first one to kill Lil Guasón.

22      Q.   In the paragraph immediately above that, Leopardo

23  says, "Anxious and waiting, wanting to get to go at him,

24  you know, before the time, you know, and eat him first

25  myself, you know."  What do you understand Leopardo to

1    mean when he says that?

2       A.   That he wanted to be the first one to kill Lil

3    Guasón.

4       Q.   And after you asked, "Did you even get a chance,"

5    how did he respond?

6       A.   No.

7       Q.   What's the rest of his response?

8       A.   But, that he was -- he was -- at least he cut his

9    head off.

10      Q.   What did you understand him to mean?

11      A.   Even though he -- I mean, he did something crazy

12   to Lil Guasón.

13           MR. SALVATO:  Objection.  That's pure

14   speculation.

15           THE COURT:  I'm sorry.  I can't hear.

16           MR. SALVATO:  That's speculation.

17           MS. MARTINEZ:  The question was:  What did

18   you understand him to mean?

19           THE COURT:  Objection overruled.

20   BY MS. MARTINEZ:

21      Q.   When Leopardo says, "No, man, at least I got to

22   cut the son of a bitch's head off," what did you

23   understand him to mean?

24      A.   That he killed Lil Guasón.  I don't know whether

25   Lil Guasón was alive or not.

J. Garcia - Redirect                                                13

1    Q.   Let's go to Government's Exhibit 18-A-1.  Who is
2    this recording with?
3    A.   Leopardo, Gatito, from PVLS.
4    Q.   Let's turn to page -- well, actually, what's the
5    date of this recording?  I'll blow it up so you can see
6    better.
7    A.   Okay.  It's May 15, 2014.
8    Q.   Do you remember this recording?
9    A.   Yes.
10   Q.   What's happening in this recording?
11        Where was the recording?
12   A.   That was the recording at the park.
13   Q.   Please turn to page 30.  And just to clarify,
14   when you said "the recording at the park," who were you
15   at the park with?
16   A.   With Leopardo.
17   Q.   For what purpose?
18   A.   To find the bodies of Lil Guasón and Lagrima.
19   Q.   Please turn to page 30.  Leopardo's defense
20   attorney asked you some questions about this page.  Do
21   you recall?
22   A.   Yes.
23   Q.   Please take a minute to review it, or as much
24   time as you need to review it, and then I have some
25   questions.

1    A.   Okay.

2    Q.   Do you recall where you were during this section

3  of the recording?

4    A.   We were still walking.

5    Q.   Where were you walking to?

6    A.   We were walking at the park.

7    Q.   Had you yet reached the location where he showed

8  you the bodies were buried?

9    A.   No.

10   Q.   Now, Leopardo's attorney asked you about one -- a

11 line from you, sort of in the middle of this page, that

12 says, "No, we'll also put that motherfucker next to

13 those two chickens, man."  Do you remember him asking

14 you about that?

15   A.   Yes.

16   Q.   What did Leopardo say right before you said that?

17   A.   That he was -- he would find a place bury another

18 body in the park.

19   Q.   Why did you respond to that by referencing the

20 two chickens?

21   A.   Can you repeat that?

22   Q.   Sure.  First of all, when you said "those two

23 chickens," who were you talking about?

24   A.   Lagrima and Lil Guasón.

25   Q.   When Leopardo showed other areas, why did you

1    respond by talking about the two chickens?

2        A.   Just to find out where -- where the bodies.

3        Q.   Why -- which bodies?

4        A.   Lagrima's and Lil Guasón.

5        Q.   Why were you trying to find those bodies?

6        A.   Because I need to find out where it was, to give

7    it to my handler.

8        Q.   In -- the next thing that Leopardo says, in

9    response to you, is, "But there are other areas that are

10   even better, man.  It's really nice over there.  You'll

11   see.  That's why we chose it, you know."  What is he

12   talking about?

13       A.   He's talking about the park.

14       Q.   And, in particular, what areas is he talking

15   about?

16       A.   He's talking about where Lagrima and Lil Guasón

17   was buried.

18       Q.   Now, both right before and right after the

19   section we're talking about, you reference hits and

20   children.  Do you see that?

21       A.   Yes.

22       Q.   What is that about?

23       A.   There was some kids.  I don't know if they were

24   not at school at that time or what they were doing, and

25   they were just walking by.

1    Q.   You addressed them.  You say, "Hey, your mother
2    is coming.  You guys should be in school."  Why did you
3    do that?
4    A.   Because, you know, they have no idea what they
5    were -- what they were doing over there, and, I know
6    that there were two dead bodies somewhere in that park,
7    so, I didn't want to see these kids around there.
8    Q.   Leopardo's attorney asked you about the marijuana
9    that you had on the day of this recording.
10   A.   Yes.
11   Q.   Why did you bring marijuana the day that you were
12   meeting Leopardo?
13   A.   Oh, just to make Leopardo comfortable.
14   Q.   What do you mean by that?
15   A.   Not to suspect anything about me.
16   Q.   Were you intending to smoke the marijuana?
17   A.   No.
18   Q.   What were you intending to do with it?
19   A.   Just give it to him, and it was up to him what he
20   wants to do.
21   Q.   Why did you want to give him marijuana?
22   A.   Because I know he always talk about it.  He likes
23   marijuana.  He -- some conversations that I have with
24   him, he says, "Oh, we should go and smoke a joint and
25   walk, and I show you at the park."

J. Garcia - Redirect                                              17

1      Q.   When did you alert your handler that you had the

2   marijuana?

3      A.   As soon as I, I got there.

4      Q.   Please turn to Government's Exhibit 21-A-1.

5           Who is this conversation with?

6      A.   With Duende from PVLS.

7      Q.   Please turn to page four.  One of the defense

8   attorneys ask you about this page.  Do you recall?

9      A.   Yes.

10     Q.   Please take a minute to review it, and then I

11  have a couple questions.

12     A.   Okay.

13     Q.   What was Duende telling you about in this

14  section?

15     A.   Um, he was pretty much telling me that Taliban

16  was -- was the one who kill the guy in Chirilagua.

17     Q.   The defense attorney asked you about this long

18  paragraph by Duende right in the middle of the page.  Do

19  you remember that?

20     A.   Yes.

21     Q.   At the end of that paragraph that she asked you

22  about, in the last two sentences, you say -- or he says,

23  excuse me, "You can tell the son of a bitch is solid

24  man, you know.  But, so, right, if they want to test him

25  again, well, the dude is there, dog."

1          Do you understand what he's talking about?

2    A.    Yes.

3    Q.    Who is he talking about?

4    A.    Talking about Taliban.

5    Q.    When he says that Taliban is solid, what does

6    that mean?

7    A.    That means that they -- they trust Taliban, that

8    he -- he's already -- that he kill someone, that he is

9    solid.

10   Q.    Now, you said they trust him and you said he

11   already killed someone.  Is there a connection for MS-13

12   between trusting someone and someone killing someone?

13   A.    Yes.  Because that's the rule of MS-13.  You need

14   to show them, you need to prove your loyalty to them.

15   Q.    What happens to -- someone who is associated with

16   MS-13, either as a *chequeo* or a homeboy, what happens to

17   their status or reputation in the gang after they kill

18   someone?

19   A.    Um, they become a full homeboy, a recruit, and,

20   you get pretty much a homeboy and your reputation goes

21   up.

22   Q.    At some point, did you talk to Taliban directly?

23   A.    Yes, on the phone.

24   Q.    Please turn to -- to Government's Exhibit 22-A-1.

25   Who were you talking to in this recording?

 1    A.    Duende from PVLS, and Taliban.

 2    Q.    And it says Lil Payaso, too.  Do you see that?

 3    A.    Yes.

 4    Q.    Were you also talking to Lil Payaso in this

 5  recording?

 6    A.    Yes.

 7    Q.    Please turn to page two.  You were also asked

 8  about this page.  Do you remember that?

 9    A.    Yes.

10    Q.    Please take a moment to review it and then I have

11  a couple questions.

12    A.    Okay.

13    Q.    Now, the defense attorney asked you, when you

14  were looking at this page, whether Taliban talks about

15  killing someone with Duende and with Gatuso.  Do you

16  remember that question?

17    A.    Yes.

18    Q.    Setting aside the "with Duende" and "with Gatuso"

19  part, does Taliban talk about a murder on this page?

20    A.    Yes.

21    Q.    Where does he talk about a murder?

22    A.    When he told Lil Payaso that he, pretty much

23  Duende already saw his photo, his picture.

24    Q.    What does photo or picture mean?

25    A.    That means in the gang code that he already kill

1    someone.

2        Q.  Can you explain further what that code means or

3    why that code means that?

4        A.  It means that when the gang member go and kill

5    someone, like, they can use a gun, and, when -- the

6    firearm goes off, you can't -- you don't see a flash,

7    but you see, kind, of something, on the gun.  So, they

8    call it -- that as a picture, or photo.  And they put a

9    photo, that means they -- they're the one who kill the

10   person, or they're the one -- the gang -- took a picture

11   means they kill someone.

12       Q.  The murder in Chirilagua that you're talking

13   about, were you able to learn from other gang members

14   what -- what type of weapon was used in the murder?

15       A.  Yes.

16       Q.  What weapon was used in that murder in

17   Chirilagua?

18       A.  I can't recall it, but I believe it was a nine

19   millimeters.

20       Q.  Was it a firearm?

21       A.  Firearms, yes.

22       Q.  Right before Taliban talks about his photo,

23   immediately before that, he says, "Because I'm

24   determined, you know."  What do you understand that to

25   mean?

1     A.   That he's determined to jumped into Park View,

2   PVLS clique.

3     Q.   Please turn to page three.  You were also asked

4   about this page.  Do you recall?

5     A.   Yes.

6     Q.   Take as much time as you need to review it.  I'm

7   going to ask you primarily about that first long

8   paragraph by you.

9     A.   Okay.

10         Okay.

11    Q.   You were asked about that paragraph in

12  cross-examination.  Do you recall?

13         MS. AMATO:  Objection, I did not ask the

14  witness about this page.

15         THE COURT:  Say again.

16         MS. AMATO:  It misstates what occurred in

17  cross-examination.  I did not ask the witness about this

18  question.

19         MS. MARTINEZ:  My mistake.  I can rephrase.

20         THE COURT:  All right.

21  BY MS. MARTINEZ:

22    Q.   You were asked about this page on

23  cross-examination, if you recall?

24    A.   Yes.

25    Q.   In that first long paragraph by you, towards the

1   end of it, you say, "Because of that -- because of the

2   crazy shit that you did, that you were good to go."  Do

3   you see that?

4      A.   Yes.

5      Q.   What were you talking about?

6               MS. AMATO:  Your Honor, I'm going to object.

7   It's beyond the scope of cross.

8               THE COURT:  Objection overruled.

9   BY MS. MARTINEZ:

10     Q.   When you said, "Because of the crazy shit you

11  did, that you were good to go," what were you talking

12  about?

13     A.   I was talking about the murder of Chirilagua,

14  that he -- that he already kill someone.

15     Q.   Who were you talking to?

16     A.   Taliban.

17     Q.   How did Taliban respond to you in the next line?

18     A.   He says, "Yeah, for sure."

19     Q.   All right.  Continuing now to page six, take as

20  much time as you need to review.  I'm going to ask you

21  primarily about the first part of that page.

22     A.   Okay.

23     Q.   That first thing that Taliban says there, that

24  first paragraph, he says, "Yeah, yeah.  Hey, whenever it

25  happens, right, you know, because, because I want this

1    thing to be done with already, you know, I want to do

2    that, that little dance."  Do you understand what he's

3    talking about?

4        A.   Yes.

5        Q.   What does he mean by, "I want to do that little

6    dance"?

7        A.   That he wants to be jumped in and get the beating

8    for 13 seconds.

9        Q.   In June of 2014, the time of this recording, what

10   did someone have to do in MS-13 in order to be jumped in

11   as a homeboy?

12       A.   Kill someone.

13       Q.   To your knowledge, based on what you learned from

14   other gang members and Taliban himself, had Taliban

15   killed someone by the time of this recording?

16       A.   Yes.

17       Q.   Please turn to page seven.  Take as much time as

18   you need to review.  I'm going to ask you primarily

19   about the last part of the page.

20       A.   Okay.

21       Q.   Okay.  At the very bottom of the page, Lil Payaso

22   says, "When it comes to that, there should be a notice,

23   you know, so that we can all be there, you know."  Do

24   you understand what he's talking about?

25       A.   Yes.  When they jump -- planning to jump in

1    Taliban.

2       Q.   And, why would -- what do you understand him to

3    mean, notice?

4       A.   They all should -- all should be -- be on the

5    same page, so, they talk to each other, and Taliban

6    should tell them when he wants to do it, or where.

7       Q.   Defense counsel also asked you about going with

8    Gatuso, Lil Gatuso, to look for the gun.  Do you recall

9    that?

10      A.   Yes.

11      Q.   Where did you go with Gatuso to look for the gun?

12      A.   I went to the place that Taliban went to get the

13   gun from.

14           MS. AMATO:  Objection, there's no

15   foundation.

16           MS. MARTINEZ:  I can draw that out, Your

17   Honor.

18           THE COURT:  Overruled.  Go ahead.  Draw it

19   out.

20   BY MS. MARTINEZ:

21      Q.   Were you able to learn from gang members where

22   Taliban got the gun?

23      A.   I was able to -- I learn it from, from Gatuso and

24   from Duende.

25      Q.   And, after you learned where he got the gun, what

1  did you do?

2     A.  We -- I meet up with Gatuso and we went to the

3  apartment that they got the gun from.

4     Q.  Where was the apartment?

5     A.  Somewhere in Chirilagua.

6     Q.  What happened when you got to the apartment?

7     A.  We knock on the door and the guy open the door.

8     Q.  And then what happened?

9     A.  And then he asked questions and I asked questions

10  as well.

11     Q.  Did you learn any information about the gun?

12     A.  Yes.

13           MR. AQUINO:  Objection, hearsay, Judge.

14           MS. MARTINEZ:  I'm not asking for what he

15  learned, just whether he learned any information, Your

16  Honor.

17           THE COURT:  The next step would be, if he

18  was to repeat it, would be hearsay.

19           MS. MARTINEZ:  Yes.

20           THE COURT:  Go ahead.

21  BY MS. MARTINEZ:

22     Q.  Without saying what the person you spoke to said,

23  from that conversation were you able to learn

24  information about the gun?

25     A.  Yes.

1        MR. AQUINO:  Objection, Judge, hearsay.

2        THE COURT:  He's not reciting what he

3   learned.  Objection overruled.

4   BY MS. MARTINEZ:

5     Q.   And based on what that person told you, was there

6   something you did?

7     A.   Yes.  I gave the information to my handler.

8     Q.   Was there anyone else you spoke to about the gun

9   after that point?

10    A.   No, just my handlers.

11    Q.   Why did you try to go find the gun?

12    A.   Because that's -- that was the first thing they

13  need to find, the gun that was used to kill the guy in

14  Chirilagua, and I want to know who was the one who gave

15  the gun to him.

16    Q.   Were you able to find the gun?

17    A.   No.

18        MS. MARTINEZ:  No further questions, Your

19  Honor.

20        THE COURT:  You can step down, sir.  Thank

21  you.

22        MR. SALVATO:  Your Honor, I had just a few

23  questions, if I could, on recross.

24        THE COURT:  No, there's no recross.  There's

25  no recross.

1        You can step down.

2        MR. SALVATO:  Could we approach just

3   briefly, Your Honor?

4        (Thereupon, the witness withdrew from the

5   stand.)

6        THE COURT:  Yeah, you can approach sidebar.

7   Come to sidebar.

8        (Thereupon, the following side-bar

9   conference was had.)

10        MR. SALVATO:  Thank you, Your Honor.  Your

11  Honor, on the government's redirect, they elicited

12  testimony from this witness that he brought a marijuana

13  cigarette to the park because my client, Christian Lemus

14  Cerna, needed a joint or wanted a joint.

15        In the transcript, it indicates that -- and

16  I can show the Court -- and this was all I was going to

17  ask him -- is that it was actually Junior who said, "I

18  need a weed eater."

19        And my client said, "A joint?"

20        And then Junior says, "I need a joint."

21        And then my client said, "Go ahead."

22        That's directly contradictory to what he

23  just told the jury on redirect.  And I don't -- I think

24  it would be appropriate for me to just ask him those

25  questions.

1          THE COURT:  Okay.  I'm sorry.  What were you
2    going to say?
3          MS. MARTINEZ:  Your Honor, I was going to
4    respond to any -- we can go get him back, if Your Honor
5    rules, certainly, but Mr. Salvato asked 30 or 40
6    questions about this marijuana joint on
7    cross-examination.
8          This transcript is in evidence.  He can make
9    argument to the jury.  He had ample opportunity to ask
10   whatever he wanted about the marijuana joint, and he
11   did, and we went on for 10 or 15 minutes about that
12   marijuana joint on cross-examination.  I don't think I
13   opened any new door on redirect.
14         Certainly we can get the witness, but we
15   have to move quickly, unless they're taking him out of
16   the building.
17         THE COURT:  Ask them to bring him back.
18         But generally, there's not recross.
19         MR. SALVATO:  I understand.
20         THE COURT:  All right.
21         MR. SALVATO:  I wouldn't have ask for it
22   other than that.
23         THE COURT:  All right.
24         MS. MARTINEZ:  I have to leave the courtroom
25   to make sure they can go get him.

1              THE COURT:  Sure.

2              (Thereupon, the side-bar conference was

3    concluded.)

4              MS. MARTINEZ:  Just a moment, Your Honor.

5              (Witness resumed stand.)

6                   RECROSS-EXAMINATION

7    BY MR. SALVATO:

8        Q.  Good morning, Mr. Garcia.

9        A.  Good morning.

10       Q.  You just told the jury in redirect that you went

11   and got this marijuana cigarette because Christian would

12   have wanted the joint, correct?

13       A.  Yes.

14       Q.  Can I ask you to take a look at what's already

15   been introduced Government's Exhibit 18-A-1, page 19.

16   Can you read that page to yourself, please.  You can

17   read it with the notebook or on the screen, whatever

18   works.

19             THE COURT:  It's not on the screen any more.

20             MR. SALVATO:  Are you looking at the

21   notebook or -- I'll put it back on the screen.

22             THE WITNESS:  So, what page?

23   BY MR. SALVATO:

24       Q.  Page 19 in the right-hand corner.

25             THE COURT:  Is this what you're trying to

1  show, Mr. Salvato?  Can you look at the screen and see

2  if that's what you're trying to show?

3           MR. SALVATO:  Right there, Your Honor.

4           THE WITNESS:  Page 11 or page 19 from the

5  right side?

6  BY MR. SALVATO:

7    Q.  Page 19 on the right side.

8    A.  The far right side?

9    Q.  Far right side, page 11, where it says

10 unclassified page 11.  Far right side, page 19.

11   A.  Okay.

12   Q.  So, in that exchange, you said, "I need a weed

13 eater," is that right?

14   A.  Yes.

15   Q.  And the word is "I need," correct?

16   A.  Yes.

17   Q.  And then, Christian responds, "A joint?"

18       And then right there, sir, Mr. Garcia, you said,

19 "I need a joint," correct?

20   A.  Yes.

21   Q.  And, but you just told the jury that you got the

22 joint for Christian.

23   A.  Yes, but --

24   Q.  Okay.

25   A.  -- at that time we were walking at the park there

1    was a lot of grass, and that's what I meant, a weed

2    eater to cut the grass.  It would be easy for us.  And

3    then he, he didn't understand what was a weed eater, and

4    he said, "A joint?"

5         So I just follow what he was saying.  I was not

6    saying no, I just -- I was just, you know, agree with

7    him even though I know what he meant, but I was just,

8    agree what he saying.

9    Q.   But you said, "I need a joint."

10   A.   Yes.

11   Q.   Because, the joint was for you?

12   A.   I said, yeah.

13             MR. SALVATO:  That's all the questions.

14   Thank you, Your Honor.  I appreciate it.

15             Thank you, Mr. Garcia.

16             MS. MARTINEZ:  May the witness be excused,

17   Your Honor.

18             THE COURT:  Yeah.  You're excused.  Thank

19   you.

20             (Thereupon, the witness withdrew from the

21   stand.)

22             MS. MARTINEZ:  The government calls Special

23   Agent Michelle Miller.

24             (Witness sworn.)

25             THE WITNESS:  Yes.

1          THE COURT:  You may proceed.

2          THEREUPON, MICHELLE L. MILLER, having been

3     duly sworn, testified as follows:

4                    DIRECT EXAMINATION

5     BY MS. MARTINEZ:

6      Q.  Good morning.

7      A.  Good morning.

8      Q.  Would you please state and spell your full name

9     for the record.

10     A.  Michelle Lee Miller; M-i-c-h-e-l-l-e, L-e-e,

11    M-i-l-l-e-r.

12     Q.  Where are you employed?

13     A.  The Federal Bureau of Investigation.

14     Q.  What's your current position with the FBI?

15     A.  I'm a supervisory special agent of the Mutual

16    Legal Assistance Unit, under International Operations

17    Division.

18     Q.  How long have you been a supervisory special

19    agent?

20     A.  Since April of last year, 2015.

21     Q.  Prior to 2015, what was your position?

22     A.  I was a special agent at the Washington Field

23    Office.

24     Q.  How long have you worked for the FBI?

25     A.  Since January of 2005.

1    Q.   Were you involved in the excavation of two bodies

2    in May of 2014?

3    A.   Yes, I was.

4    Q.   Where was the excavation?

5    A.   It was at Holmes Run Park in Falls Church,

6    Virginia.

7    Q.   How did you come to be involved?

8    A.   I was actually -- I'm actually -- I was a member

9    of the evidence response team at the Washington Field

10   Office.  And the team leader, Tom -- Special Agent Tom

11   O'Connor, contacted me to advise that there was a

12   potential for a human remains recovery in the park, and

13   asked me if I was available to assist.

14   Q.   You said the evidence response team.  What is

15   that?

16   A.   The evidence response team or ERT, as it's

17   referred to, is a subspecialty or an ancillary duty of

18   agents that either have a specialized background or an

19   interest in helping assist with crime scene management

20   and recovery.

21   Q.   Once you were alerted to this potential crime

22   scene, what steps did you take?  What initial steps did

23   you take?

24   A.   That was actually on May 16th, which was a Friday

25   afternoon when I received the telephone call.  I

1  actually met Tom and a couple other agents, case agents,

2  and police officers at the Mason District Fairfax County

3  Police Department to discuss the case.

4          At that time they gave me a short briefing,

5  outline of the case, and then we went to the site to

6  conduct a site survey.

7      Q.  Where was the site?

8      A.  It was -- it was in Holmes Run Park.  We accessed

9  it through a back -- kind of a back trail or a hiking

10  trail, or what I refer to as a billy goat trail, from a

11  nearby school.  And I couldn't tell you what the name of

12  the school is.

13              MS. MARTINEZ:  Your Honor, may we publish

14  what has been already admitted as Government's

15  Exhibit 96-B.

16              THE COURT:  Yes.

17  BY MS. MARTINEZ:

18      Q.  Do you recognize what's depicted here?

19      A.  Yes.  To the -- on the right-hand side of the

20  photograph is actually the school I was discussing.  And

21  then the -- this creek bed is part of the -- basically

22  went through one of -- the middle of this, the scene

23  that we excavated.

24      Q.  All right.  You said a creek.  I think if you

25  touch that screen you might be able to make a mark on

1    it.  Can you mark the creek that you see there?

2       A.   Yeah.  This is actually a creek bed all the way

3    through here.

4              MS. MARTINEZ:  Your Honor, for the record,

5    the witness has drawn an S-shaped mark on the screen,

6    basically in the middle of the picture.

7              THE COURT:  So noted.

8    BY MS. MARTINEZ:

9       Q.   And could you point to -- on the screen again,

10   make a mark, the school that you were talking about?

11      A.   This is the school here.  We actually parked our

12   vehicles -- this is a tennis court back behind the

13   school.  We actually parked our vehicles here and

14   entered a billy goat trail and worked our way down

15   through here.

16             MS. MARTINEZ:  Your Honor, for the record,

17   the witness has identified the school as the large

18   building on the right of the picture, the tennis courts

19   as a spot above the school, the way that the picture is

20   situated, and has drawn a line indicating a trail from

21   the tennis courts.

22             THE COURT:  So noted.

23   BY MS. MARTINEZ:

24      Q.   Once you entered on that billy goat trail, where

25   did you go?

1    A.   We worked -- I mean, I don't have GPS

2  coordinates, so I couldn't tell you exactly.  We kind of

3  worked our way down.  We had a couple of individuals

4  that had a general idea of where the sites of interest

5  were.  We basically worked our way down into -- and

6  again, I couldn't tell you exactly where, but it was in

7  this general area.

8    Q.   What did you do when you first arrived to the

9  site, to that general area?

10    A.   I started -- I looked around it, again, conducted

11  a basic site survey, which is just a visual survey,

12  looking for any evidentiary -- what we would call grave

13  markers or -- in the general area of interest.

14    Q.   What did you notice?

15    A.   A couple different things.  The -- there's always

16  a -- some of the indicators of a grave or a clandestine

17  burial, sometimes you have a primary, what they refer to

18  as a primary and/or a secondary depression.  And a lot

19  of -- the primary depression is basically a demarcation

20  of the initial grave outline.  A secondary depression

21  sometimes results once a body starts to decompose, and

22  the soil will actually start to sink within the primary

23  depression.

24    A couple other things is I noticed that there was

25  dirt on top of leaves, that it was actually a different

1  color.  You could actually see the -- the changes of

2  color of the soil.

3       And, to explain the significance of this --

4            THE COURT:  Excuse me.

5            I would prefer you ask one question at a

6  time, as opposed to long narrative response.

7            MS. MARTINEZ:  Yes, Your Honor.  I just

8  didn't want to interrupt her, but I'll make sure to

9  break it up.

10  BY MS. MARTINEZ:

11    Q.  You're talking about dirt on top of leaves.

12  Please explain the significance of you observing dirt on

13  top of leaves at the site.

14    A.  So, when somebody digs a hole in the ground,

15  basically, I mean, as you know, you dig the dirt and it

16  gets piled onto, you know, on a -- in an area next to

17  the hole.

18       As you go deeper into the earth, the color and

19  striations of the soil change.  Anybody who's a gardener

20  or likes to work in their yard knows that a lot of times

21  you have a nice dark rich soil on top, and as you get

22  further down sometimes the soil gets lighter.

23       This actually changes, depending on where you are

24  in the, you know, geography.  I mean, it changes among

25  states, it changes within the United States, and it

1  changes across the world.  But you can definitely see

2  stratification changes and dirt color changes.

3        When you dig a hole in the ground, you're

4  basically turning everything upside down.  You're

5  basically turning -- taking everything out of that grave

6  and throwing it outside the grave.  So the dark soil

7  always ends up on the bottom, and the lighter soils that

8  are in the base of the hole end up on top.

9        Well, then, most people, when they throw dirt

10 back into a hole, they don't always take the dirt from

11 the top again.  They just kind of scoop it from the

12 bottom and it cascades down.

13        So when a -- when the dirt goes back in the hole,

14 the majority of the time it ends up upside down, so you

15 end up with darker colors on the bottom, with lighter

16 colors on top.

17        And in addition to that --

18            THE COURT:  Next question, please.

19 BY MS. MARTINEZ:

20    Q.  Okay.  What did your observations indicate to

21 you, briefly?

22    A.  So, you could actually see the dirt halo of where

23 the dirt had actually been pulled out of the hole, and

24 then there was actually what they call manual

25 bioturbation, or the mixing of the leaves and the dirt,

1    where you're seeing lighter soil on top of leaves,

2    which, if you think about the seasons, you know, there

3    shouldn't be dirt on top --

4                    THE COURT:  Excuse me.

5                    THE WITNESS:  -- of leaves that just left

6    within the last season.

7                    THE COURT:  Excuse me.  I know that you have

8    a lot of information.  We need a laser focus here.

9                    Next question.

10                   MS. MARTINEZ:  Yes, Your Honor.

11   BY MS. MARTINEZ:

12       Q.  I'm going to walk you through question by

13   question.  Just stick with shorter answers and I'll just

14   ask a follow-up if necessary.  Okay?

15           So, you've described observing lighter colored

16   dirt and dirt on leaves.  Briefly, what did that suggest

17   to you?

18       A.  It definitely suggested that there was a -- some

19   type of manmade disturbance to the ground.

20       Q.  Was that site where you observed the lighter

21   colored dirt and the dirt on top of leaves, was that

22   site eventually excavated?

23       A.  Yes, it was.

24       Q.  Were you involved in the excavation?

25       A.  Yes, I was.

1    Q.   Was the excavation that same day when you did
2    this initial site survey?
3    A.   No, it was not.
4    Q.   Why not?
5    A.   The creek bed -- the way that we actually entered
6    was through like this billy goat trail.  There's a lot
7    of equipment that is used during an excavation, and it
8    would not only be safe, but very laborious, to try and
9    get all the equipment in through this back trail.
10        And the only other way, actually, would be to
11   come in -- there's a -- I believe there's a road that
12   actually enters the site right through here
13   (indicating).  And the road that actually crossed this
14   creek bed, there had just been a lot of rain.  The creek
15   bed was extremely high.
16        It would have been extremely -- impossible for
17   somebody to walk across it carrying equipment and it
18   would be very -- semi-dangerous for a vehicle to try to
19   cross.  So we suggested --
20   Q.   Okay.  Let me --
21   A.   -- waiting a day.
22   Q.   -- ask another question so we can stay on track
23   here.
24        MS. MARTINEZ:  And, Your Honor, for the
25   record, let me just say that when she was talking about

1    the street that crosses the creek, she drew a line in

2    the middle of the picture, across the line she

3    previously indicated, the creek.

4                THE COURT:  All right.  Thank you.

5    BY MS. MARTINEZ:

6        Q.   When was this, the site excavated?

7        A.   It would have been on the Sunday, so the 18th.

8        Q.   How did you access the site on Sunday, the 18th?

9        A.   We actually brought all the vehicles down across,

10   through the road and across the creek bed.

11       Q.   Would you please take a look at Government's

12   Exhibit 87-A through L, inclusive.  Can you look through

13   all of them, 87-A through L.

14       A.   Is it possible for me to take them out --

15       Q.   Absolutely.

16       A.   -- so they're easier to maneuver?

17       Q.   Do you recognize these photos?

18       A.   Yes.  They're all photos taken from the first

19   site that we excavated.

20                MS. MARTINEZ:  Your Honor, government moves

21   into evidence 87-A, alpha, through L, Leo, inclusive.

22                MR. AMOLSCH:  Your Honor, can we approach?

23                THE COURT:  Yes.

24                (Thereupon, the following side-bar

25   conference was had.)

1           MR. AMOLSCH:  Your Honor, as it relates to

2   the government moving in Exhibits, the photographs, 87-A

3   through K, we don't have any objection to it at this

4   point, but, just pictures of the grave site and the

5   body.

6           87-L, we think is -- there's other ones we

7   want to get to as well -- is highly problematic and

8   prejudicial and really unnecessary, as it relates to the

9   government's proof.

10           They're going to have autopsy reports.

11   They're going to describe the manner of death.  And so,

12   this one, we would object to.

13           Once we are done with this one --

14           THE COURT:  What's your objection?

15           MR. AMOLSCH:  It's highly prejudicial.  It's

16   inflammatory.  No reason -- 403, there's really no

17   reason to introduce this particular photo with the

18   government's proof, other than to inflame the jury about

19   the nature of the death and how grotesque it is.

20           THE COURT:  Do you question if this was dug

21   up, and it looked like that when it was dug up?

22           MR. AMOLSCH:  No.  I'm not questioning the

23   veracity of the photo.  I'm saying the probative value

24   is outweighed by the prejudice to the jury of seeing

25   this, not necessarily inflaming them as it relates to

M. Miller - Direct                                                          43

the body.

The government has a right to prove what happened, and there are other photos that illustrate that.

They're going to have testimony about the burial and about what happened, which we've already heard.  They're going to have, I understand, the autopsy doctor talk about the manner of death.  They're going to have the witness from Smithsonian, Hunt, talk about the wounds.

The photos are unnecessary, Judge, for the government's proof.  And especially whatever probative value they have is outweighed by the inflammatory and prejudicial nature of it.

MS. MARTINEZ:  Your Honor, as far as gruesome pictures go, this is hardly the most gruesome picture, in a gruesome murder place.  The picture shows a body, somewhat decayed.  There are no open wounds or blood or oozing or gore.  And, it's highly probative to the government's case, the way that this body appeared when it was dug out of the grave, the way that this individual looks.

There's been testimony about his size and about the way that he was buried, and the way that he was killed.  The picture is showing things that are

highly probative.

And again, the picture that the defense counsel is objecting to, 87-L, there's no blood. There's no guts.  There's no gore.  There is no slash from a machete showing open, exposed bone.  It's highly probative.

And, frankly, as far as the kind of evidence that's going to be -- that's going to get into testimony, this is -- this is minimal compared to that. And it has a high probative value.

THE COURT:  All right.

MR. AMOLSCH:  Your Honor, I would say I agree with the government that of the pictures they're going to try to introduce, this is on the lower end of the objectionable scale.  And I don't know when the appropriate time would be to discuss those pictures, maybe now, maybe at lunch when we get back.

THE COURT:  Do you have a whole stack of them to object to?

MR. AMOLSCH:  Assuming the government -- they haven't tried to move them in yet.

THE COURT:  But they're in the notebooks.

MR. AMOLSCH:  I understand.  So -- and I don't want to presume to take the government's case, but they are like -- something like this, Judge, that are

1    just out of control in terms of what the government

2    needs to prove.

3              THE COURT:  Whatever discussion -- if

4    somebody is holding the head up on their shoulders, I

5    mean, I can't sanitize what the facts are, if those are

6    the facts.  The jury is going to have to see them.

7              Let me do this.  I don't want to waste the

8    jury's time.  I'm generally going to let all the

9    pictures -- I'm generally going to let them all in.

10             If there are four or five you want to show

11   that you think I ought to put out, I'll send the jury

12   out for the morning break or would you want to do it

13   later?  Because I don't want to keep on the sidebar.

14             MR. AMOLSCH:  If you anticipate moving in

15   the Government's Exhibit 90 during this witness --

16             MS. MARTINEZ:  All the pictures in the

17   government exhibits at the site we anticipate moving in

18   at this point in time.

19             MR. AMOLSCH:  If we do it with this witness,

20   do it now and not waste the jury's time.

21             MS. MARTINEZ:  I don't have 90 in front of

22   me.

23             MR. AMOLSCH:  This one.  It's the picture of

24   the body.

25             MS. MARTINEZ:  Your Honor, I think it would

1   be prudent to deal with all the pictures at once.  I

2   don't, off the top of my head, remember if this comes

3   in, without seeing the series, with this witness or not.

4   So there's no reason to do it with multiple witnesses if

5   we can deal with everything all at once.

6              THE COURT:  All right.  I'll send the jury

7   out on the break.

8              MR. AMOLSCH:  Thank you, Judge.

9              THE COURT:  Ladies and gentlemen, I need to

10  take up matters with counsel, and it may be 20 minutes,

11  and so we will give you a break now.  Take the morning

12  recess.  You should take your break now.  We will let

13  you know how much time it takes up before we start our

14  break.  I have to take up matters with counsel.  Thank

15  you very much.

16             (Jury not present.)

17             MS. MARTINEZ:  Your Honor, may the witness

18  step down?

19             THE COURT:  You can step down.  We'll have

20  you come back.  Thank you.

21             (Witness withdrew from stand.)

22             (Thereupon, the side-bar conference was

23  concluded.)

24             THE COURT:  You may be seated.

25             Mr. Amolsch, give me your list.

```
 1              MR. AMOLSCH:  Thank you, Judge.  I'm asking
 2    Ms. Bishop to put them up for the Court.
 3              THE COURT:  I have them right here in front
 4    of me.
 5              MR. AMOLSCH:  Thank you, Judge.
 6              If we can look at Exhibits 90-A through
 7    90-F, Judge.  We could begin with 90-A.  And I'll
 8    preface this by saying, Judge, in the colloquy at the
 9    sidebar, the government, in arguing for the
10    admissibility of the 87-A-1, said this isn't one that's
11    blood and guts and machete wounds and all of those
12    things.  And I do appreciate the government's
13    distinction.
14              THE COURT:  Her point was that there will be
15    much more gruesome ones coming.  That's what her point
16    was.
17              MR. AMOLSCH:  I agree.  And so as it relates
18    to that distinction, we agree with the government that
19    that's on the lower end of the objectability scale.
20              But as it relates to 97-A, 97-B, which --
21    97-A is a head --
22              THE COURT:  90?
23              MR. AMOLSCH:  I'm sorry, 90-A, I apologize,
24    Judge.  90-A is a half face of a head.
25              90-B is, it looks to be the neck without a
```

1    head, with blood and guts and all the things the
2    government described.
3               90-C is probably -- is obviously less severe
4    than 90-A and B.
5               90-D doesn't appear to be problematic.
6               90-E, I think, is also inflammatory and
7    unnecessary; and 90-F.
8               So, as it relates to the government -- to
9    the judge saying point out the four or five that we
10   would submit are unnecessary, it would be 90-A, 90-B,
11   90-E, and 90-F, which at this point are the four that we
12   think are really unnecessary.
13              And as the Court pointed out, there has been
14   testimony about the murders.  There has been
15   testimony --
16              THE COURT:  But there's been graphic
17   testimony about heads cut off --
18              MR. AMOLSCH:  I agree.
19              THE COURT:  Let me finish.
20              There has been graphic testimony about
21   holding the head over the shoulders and holding the body
22   over the shoulder.
23              I don't -- I can't take something that's
24   been offered in testimony and then somehow remove from
25   the jury evidence that corroborates the testimony.

```
 1              So, I mean, if your idea is it's gruesome,
 2    it is gruesome.  But the case is gruesome.
 3              MR. AMOLSCH:  We're not -- and I don't want
 4    to -- please correct me if I'm wrong with defense
 5    counsel.  We're not objecting at all to the government's
 6    proof as to the manner in which they were killed.  So,
 7    there hasn't been any cross-examination about, no, the
 8    head wasn't cut off, or, no, his face wasn't sliced in
 9    half, or whatever gruesome testimony we heard.
10              We agree that -- the manner of death, Judge,
11    isn't in dispute.  The dispute rests elsewhere, not in
12    the way in which this happened.
13              So, the government's testimony, the autopsy
14    reports, there -- it's all covered, and nobody's arguing
15    about it.  They don't need it to bolster their case or
16    to overwhelm -- overcome an objection we're making as to
17    the cause of death.
18              This is -- there's really, in my opinion,
19    Judge, no reason to introduce this evidence except to
20    shock the conscience of the jury.
21              We're not arguing about how this happened.
22    So, I don't know why the government -- the Court
23    shouldn't let the government rely on testimony, autopsy
24    reports, expert testimony from the Smithsonian as it
25    relates to -- and the manner in which the body was
```

1    discovered.

2              None of that, Judge, is at issue.  So from a

3    probative point of view, these pictures actually add

4    almost nothing, because we haven't argued about it at

5    all.  So that would be our objection, Judge.

6              THE COURT:  All right.  Thank you.

7              MS. MARTELL:  Your Honor, we would join the

8    motion.  I --

9              THE COURT:  I assume that everybody joins

10   every motion, unless you tell me otherwise.

11             MS. MARTELL:  I understand, Your Honor.  But

12   we like to add on that, that we think these photos

13   should be excluded.  This is only to inflame the

14   passions of this jury.

15             Further, this is not -- this doesn't depict

16   the killing.  This depicts a decomposed body.  Yeah,

17   there may be a head that -- that's off the body, or

18   bones sticking out consistent with some of the

19   testimony.

20             But, what inflames the passion of the jury

21   is that this does not look like someone who was just

22   murdered.  This is a body in its -- in a decomposed

23   state, that has been in the ground, which intensifies

24   these photos and makes them highly -- overly

25   prejudicial.

1          And the government put on the record what
2     they -- what they deem probative value.
3          Well, with all the pictures that we're not
4     objecting to that will come into evidence, and with the
5     testimony, that will meet their goals and the probative
6     value which they seek to -- to put forward with these
7     photos.
8          These pictures don't add to the government's
9     theory of the case.  In fact, that's what makes them
10    highly prejudicial.  And it's the -- the decomposed
11    state of these bodies, not the depiction of how these
12    murders occurred.
13         And there's going to be plenty of other
14    photos that show slash marks into the bones, and there's
15    going to be testimony about those slash marks into the
16    bones that's going to be consistent with --
17         THE COURT:  Would you agree that this
18    evidence is relevant to Count 5, accessory after the
19    fact, having to do with the reburial of Nelson Omar
20    Quintanilla Trujillo?  Would you agree that that would
21    be relevant?
22         MS. MARTINEZ:  Your Honor, these pictures
23    are of the second victim, the 90-A through F pictures --
24         THE COURT:  Which charge does that relate
25    to?

1          MS. MARTINEZ:  They relate to Count 6, Your

2    Honor, the murder of Gerson Adoni Martinez Aguilar, Lil

3    Guasón.  That's the victim whose head was severed, as

4    we've heard testimony.

5          THE COURT:  This is Lil Guasón's body?

6          MS. MARTINEZ:  The first --

7          THE COURT:  The first set of pictures in 80,

8    what are those?

9          MS. MARTINEZ:  The pictures that we were

10   putting in to this witness were of Lagrima --

11         THE COURT:  Lagrima.

12         MS. MARTINEZ:  -- of Nelson Omar Quintanilla

13   Trujillo.

14         THE COURT:  Okay.

15         MS. MARTINEZ:  These pictures that

16   Mr. Amolsch has now raised are of the second murder,

17   Your Honor, of Lil Guasón, Gerson Adoni Martinez

18   Aguilar.

19         Lagrima was the victim who the gang thought

20   was snitching.  Lil Guasón was a victim who was a

21   *chequeo*, and who the testimony has established, and more

22   testimony will establish, that they severed his head

23   before burying him.

24         THE COURT:  So, I want to be clear.  You

25   just said that 80 deals with Lagrima.  Is that right?

1  And Lagrima is -- is that right?

2          MS. MARTINEZ:  Let me just, before I --

3          THE COURT:  Just trying to make sure.

4          MS. MARTINEZ:  Me, too.

5          We were on -- the ones that I had offered

6  through the witness who was on the stand were the 87

7  series.

8          THE COURT:  Yes.  Okay.

9          MS. MARTINEZ:  And so the 87 series is of

10 Lagrima, Quintanilla Trujillo.  And that's of the site

11 excavation of that first murder.

12         THE COURT:  So, that's Count 5.

13         MS. MARTINEZ:  That's -- well, Count 5 and

14 Count 4.  So --

15         THE COURT:  Okay.

16         MS. MARTINEZ:  It relates obviously to the

17 murder, and then also to the reburial.  He was excavated

18 from the place where he was reburied, of course.

19         THE COURT:  And then the objections are

20 to -- now to number series 90, and 90 relates to which

21 victim?

22         MS. MARTINEZ:  90 relates to the second

23 victim, Lil Guasón, Gerson Adoni Martinez Aguilar.

24 That's Count 6 of the indictment, Your Honor.

25         And that's the victim who the testimony has

1   established, and I'll proffer there will be additional

2   cooperators who will also testify, that the gang cut off

3   Lil Guasón's head.

4             THE COURT:  All right.

5             MS. MARTELL:  Your Honor, in response to

6   your question -- I'm sorry.

7             MR. AMOLSCH:  And just for clarification,

8   Judge, there is no -- there is no reburial of Mr. --

9   Guasón.  The reburial only took place as it relates to

10   Lagrima, not to the second one.

11             THE COURT:  Okay.  But both bodies were

12   buried, though.  There's no question about that.

13             MR. AMOLSCH:  But as it relates to the

14   Court's question --

15             THE COURT:  Yes, okay.  All right.  Thank

16   you.

17             MS. MARTELL:  Your Honor, so, to answer your

18   question, we don't believe it's relevant because there's

19   no -- none of the charged -- none of the charged crimes

20   relate to digging up and reburying the body of Lil

21   Guasón, which is the individual that they -- that they

22   say is depicted in these photographs.

23             And so, a decomposed body of, of the victim

24   of Count 6, Lil Guasón, is not relevant and is -- it is

25   more prejudicial than probative at this time.

```
1         MR. ZIMMERMAN:  Briefly, Judge, I think, if
2   I'm hearing the Court correctly -- and, of course, this
3   isn't a dispute with the accuracy of those, as proposed
4   in the government's theory, and, in fact, that these
5   events happened, that there was decapitations and
6   murders, is not in dispute at all.
7         The fact that the government --
8         THE COURT:  I don't remember anybody
9   admitting that.  Did anybody admit that to the jury yet?
10        I don't think anybody has.  Do you?  I don't
11  think anybody --
12        MR. ZIMMERMAN:  Judge, the defenses have all
13  been identity defenses.  They have been that the murders
14  haven't --
15        THE COURT:  My question is precise.
16        MR. ZIMMERMAN:  Okay.
17        THE COURT:  No defendant has admitted these
18  individuals were killed, have they?
19        MR. ZIMMERMAN:  No defendant has contested
20  that these individuals were killed.
21        THE COURT:  You're answering a different
22  question than mine, but I appreciate why you did that.
23        MR. ZIMMERMAN:  I do, Judge.  But I think,
24  in fairness, the defenses that we've heard -- well, I do
25  think -- um, I think, Paiz Guevara's defense has been
```

1    that all of the defendants -- that Gerson, was killed

2    and he was there and he was under duress.  So I think he

3    has.

4              Moreover, I think the defense of the other

5    defendants have been that -- have been identity

6    defenses.  I really don't think this has been contested.

7              Moreover, the government is eliciting and

8    there has been no objection to that, very graphic

9    evidence, and they're going to continue to do so, no

10   doubt, with this witness, which will not be

11   objectionable, I mean, just on that, of the gruesome --

12             THE COURT:  Is this related now to the

13   photographs?

14             MR. ZIMMERMAN:  What?

15             THE COURT:  Is your statement now relating

16   to the photographs?  I'm about to rule on photographs.

17             MR. ZIMMERMAN:  It relates to the

18   photographs.

19             THE COURT:  All right.  Go ahead.

20             MR. ZIMMERMAN:  It is that in light of all

21   the evidence that the government has elicited, and that

22   we anticipate that they will be eliciting, and the fact

23   that there were these murders and decapitations -- let's

24   go specifically to Gerson, because that's the 90

25   series -- that these photos have zero real relevance or

1    probative value.  That is, they're establishing it

2    through other evidence.  It's not being contested by the

3    defense.

4            The only purpose of the photos -- and we all

5    know this, we know this, when we step back and look at

6    this -- and, playing with legalism -- the purpose of

7    these is to shock the jury.  The purpose of these

8    photos --

9            THE COURT:  Let's --

10           MR. ZIMMERMAN:  -- is to be horrified.

11           THE COURT:  Let's be real here.

12           MR. ZIMMERMAN:  Okay.

13           THE COURT:  If these bodies were buried in

14   the ground like this, and somebody was murdered in the

15   park, it is evidence of what the crime was.  It is not

16   sanitized.  It is not manufactured.  It is what

17   happened.  The jury should see it.

18           So, unless you have something further to

19   say, I'm prepared to rule -- I'm going to let the

20   government respond, but I'm prepared to rule.

21           If there something else that hasn't been

22   said, go ahead.  I'm listening.

23           MR. ZIMMERMAN:  Just this, Judge, that as a

24   legal basis, the whole purpose -- one of the main

25   purposes of 403 is -- is essentially to keep out

evidence that -- that is -- may have some arguable
relevance.

    But, it's unfairly prejudicial, outweighs
the probative value.  That is, since the fact that the
murders occurred, even the fact that they were gruesome
murders and exactly what occurred, it has come in and
will continue to come in through other evidence.

    This -- this evidence only service to
unfairly prejudice the jury, to put aside what -- our
identity defenses, to put aside what our racketeering --
it wasn't racketeering activity defenses.  And to have
the jury look at these and go back and say, "That is so
disgusting and horrifying," that it just clouds the
judgment, and that's just unfair to the defendants.

    THE COURT:  Thank you, Mr. Zimmerman.

    MR. ZIMMERMAN:  Thank you, Judge.

    THE COURT:  Ms. Martinez, anything further?

    MS. MARTELL:  Your Honor, if we could add
one more thing.  We would also add --

    THE COURT:  Ms. Martell, I don't think you
can see which way this train is headed.

    MS. MARTELL:  No, I do.

    THE COURT:  You do?  Okay.

    Well, then, let me do this, because I'm not
going to spend three hours on photographs of a crime

scene.  All right?  They come in in every single case.
The fact that this one is gruesome has nothing to do
with -- I don't make the facts.  Neither do you.  These
are the facts.

The photographs -- Ms. Martinez, anything
further you want to say about series 87 and 90?

MS. MARTINEZ:  No, Your Honor.  I would just
state for the record --

THE COURT:  Are there others that you plan
to --

MS. MARTINEZ:  -- the 90 series does show
the injuries that have been described in testimony and
that will further be described in testimony.

We submit that they are highly relevant,
that although certainly they're prejudicial, so is the
rest of the government's case to these defendants.  The
question is whether it's unfairly prejudicial.  And we
submit that it certainly is not.

Your Honor, I'll add that we have scores of
pictures like this.  We don't intend to introduce 20 or
30 --

THE COURT:  Which ones --

MS. MARTINEZ:  -- pictures of this victim;
the ones that we marked as exhibits.

The defense has been provided with all of

1    the pictures that were taken of these bodies.  We have

2    selected ones, only ones that are necessary to show the

3    specific wounds that are described.  We have actually

4    been very precise in what we picked.  We're not going to

5    overwhelm the jury with 30 different pictures of the

6    body, pictures that show the severed head, that show the

7    stab wounds, that show the neck where the head was

8    severed.

9              These are highly relevant and they show the

10   jury what the testimony describes.  That's necessary for

11   corroboration and the jury should get to see it.

12             THE COURT:  Now, I'm looking at the 87

13   series.

14             MS. MARTINEZ:  Yes, Your Honor.

15             THE COURT:  And then there's 88.  They

16   haven't objected to 88, but I think they have the same

17   objections.  But I understand why you're offering them.

18             MS. MARTINEZ:  Yes, Your Honor.

19             THE COURT:  89, it looks like more

20   excavation photographs.  90, we just talked about.

21             MS. MARTINEZ:  If Your Honor would like, I

22   can put for the record what these different series are,

23   just so Your Honor is --

24             THE COURT:  That would save me time.

25   Please.

MS. MARTINEZ:  Okay.  So if we start with
87 -- and the 87 series was the series that this witness
was asked to identify -- that's the site where the body
of Nelson Omar Quintanilla Trujillo was excavated.  So
this is the -- the site survey and the excavation of
that body relates directly to Count 4 and Count 5 of the
indictment.

Turning to the 88 series, the 88 series also
relates to Nelson Omar Quintanilla Trujillo.  That's
pictures taken at the medical examiner's office showing
the body and the wounds at the medical examiner's
office.  Again, that relates to Count 4 and Count 5.

Turning to the 89 -- sorry -- yes, the 89
series, Your Honor, that's back in the park.  That's the
excavation of the second site.

And just for -- this won't -- I don't think
this will mean anything to Your Honor or to the
witness's testimony, but for defense counsels' purposes,
there was ample discovery on this, and the sites were
given different numbers.  So, this is actually site
four, I believe.  Because they looked at different sites
in the park.

But in any event, this is the site -- these
pictures show the excavation of the second murder
victim, Gerson Adoni Martinez Aguilar.  That relates to

Count 6.

           And then turning to the 90 series, which is
where we started, that, those are pictures taken at the
medical examiner's office of the second murder victim,
Gerson Adoni Martinez Aguilar, again, relating to Count
6.

           THE COURT:  This is number -- section 90?

           MS. MARTINEZ:  Yes, Your Honor.

           THE COURT:  All right.

           MS. MARTINEZ:  And for the Court's
convenience, on the exhibit list, which we certainly
don't intend the jury to have, but for Your Honor's
convenience, those series are described based on which
body it is, as well, which victim.

           THE COURT:  All right.  Okay.

           The record should reflect that the defense
has objected to --

           MS. MARTINEZ:  Your Honor, may I just add?

           THE COURT:  Yes.

           MS. MARTINEZ:  There is -- this is -- of
course, there's three murders in this case, and there
are pictures, as well, related to the third murder.  I
don't know -- no one has objected to those, but if Your
Honor wants to take up all pictures at the same time --

           THE COURT:  Is this witness going to testify

about all?

MS. MARTINEZ:  No, Your Honor.

THE COURT:  Well, I think we should see those when that witness comes up.

MS. MARTINEZ:  Just wanted to raise it so that Your Honor is not surprised when there are more pictures of another victim.

THE COURT:  Okay.  Thank you.

MS. MARTINEZ:  Thank you, Your Honor.

THE COURT:  The record should reflect this matter is before the Court on the defense's objection of photographs of excavation of grave sites and bodies retrieved from grave sites, that have been referred to in testimony relating to Counts 4, 5 and 6 of the indictment.

There has been testimony of recordings of discussion of cutting off heads and stabbing and cutting up legs to put a body into the ground.

And, these photographs show the area in which the informant witness, Garcia, Junior, testified that he went to the scene with one of the defendants, and these areas were identified to him as where the bodies were buried.

These photographs depict the decomposed bodies and the state in which they were found by the FBI

1    in the excavation.  And they are what they are; that is
2    to say, they are evidence that corroborates the charges
3    in Counts 4, 5, and 6, and they are highly relevant
4    under 401.
5            I do not think that from the standpoint of
6    403, that I should somehow sanitize the case or deprive
7    the jury of an opportunity to see just what happened to
8    these individuals.  If they're depicted, as stated,
9    there's no objection to that.  And, what they -- what
10   their bodies looked like when they were being removed
11   from the scene.
12           And nobody has stipulated that they agree
13   that they -- that a murder was committed.  And I
14   understand why you wouldn't do that.
15           But it seems to me that under 403, these
16   photographs are no more gruesome than others that have
17   been admitted in murder trials in the past.
18           For those reasons, those exhibits will be
19   admitted.
20           We will now take a 15-minute break and then
21   we will come back and start the trial.  Thank you.
22           (Court recessed at 11:30 a.m. and reconvened
23            at 11:46 a.m.)
24           THE COURT:  You can bring our jury out.
25           And bring the witness back, please.

1              (Witness resumed stand.)

2              (Jury present.)

3              THE COURT:  You may be seated.

4              All right, Counsel, you may proceed.

5    BY MS. MARTINEZ:

6       Q.  Welcome back.

7              When we left off, we were on Government's

8    Exhibits 87-A through L, the pictures of the site

9    excavation; is that right?

10      A.  That is correct.

11             MS. MARTINEZ:  Your Honor, the government

12   moves into evidence Government's Exhibits 87-A through

13   L.

14             THE COURT:  Received, over the objections.

15             MS. MARTINEZ:  Your Honor, may we publish?

16             THE COURT:  Yes.

17   BY MS. MARTINEZ:

18      Q.  We'll go through these one by one.  Let's start

19   with Government's Exhibit 87-A.  And we're going to put

20   them up on the screen, so you can use the paper or the

21   screen, whatever is easiest for you from the stand

22   there.

23             What is Government's Exhibit 87-A?

24      A.  It's actually an overall photograph that shows

25   the dirt halo, the primary and secondary depression, the

1  crime scene tape that we marked off, and the -- where we

2  set up the grid system or the Cartesian grid system to

3  take measurements.

4      Q.  At the time that this picture was taken, had any

5  excavation begun?

6      A.  No.

7      Q.  I observe in the middle of the picture what looks

8  to be a hole.  Do you see that?

9      A.  Yes.

10     Q.  Can you elaborate on what that is?

11     A.  This is actually what we would consider a

12 secondary depression.  It often results when there is

13 something buried and decomposes, or is changing, and the

14 earth slowly falls in.  That is happening from beneath.

15 And on top sometimes it's a result of carnivore

16 activity.

17     Q.  You mentioned the crime scene tape.  Can you just

18 show the jury where that crime scene tape is?

19     A.  Crime scene tape is all along the back side.

20         MS. MARTINEZ:  Let the record reflect that

21 the witness has drawn a horizontal line towards the top

22 of this picture.

23         THE COURT:  So noted.

24 BY MS. MARTINEZ:

25     Q.  Below that line, I see what looks like string,

1    maybe green string.  Do you see that?

2        A.   There's one right here, goes here to here, and

3    then from here over to here.

4        Q.   What is that string?

5        A.   Those are -- actually we use a Cartesian grid

6    system to take all our measurements.  Most people learn

7    in school, the X, Y and Z measurements, and those are

8    the lines that are drawn in order for us to take those

9    measurements throughout the excavation.

10       Q.   What is the purpose of the Cartesian

11   measurements?

12       A.   It's actually to document and basically to

13   recreate maps, exactly where the different -- like the

14   dirt halo and the primary and the secondary depression.

15   And then as we excavate, we can actually take depth

16   measurements, also, to be able to recreate the scene on

17   paper.

18       Q.   After this picture, what were the first steps

19   taken?

20       A.   There would be photography.  This is the initial

21   mapping of taking the outline of the, again, the dirt

22   halo, the primary and the secondary depression.  Then we

23   would actually start removing the dirt halo to try and

24   find the perimeters of the true grave.

25       Q.   How would you remove the dirt?

M. Miller - Direct                                          68

A.   We actually use small --

Q.   How did you remove the dirt?

A.   We actually use small hand trowels, or a small masonry trowel, which is usually about two or three inches long, in a methodical, slow method of basically just scraping one -- or anywhere from a half to one inch layers until you actually get down to the true ground.

And then, as you're removing the dirt it actually goes in buckets and is taken to another site, where it's actually sifted.  So there's no actual digging.  It's actually scraping.

Q.   What's the purpose of scraping rather than digging?

A.   To ensure that you don't compromise any evidence, or compromise the integrity of the actual true grave.

Q.   Please turn now, on the screen, to Government's Exhibit 87-C.  What does this picture show?

A.   This actually is a close-up of what you saw previously.  However, the -- all of the leaf litter or the, kind of the -- the debris, first layer of the ground was actually removed.  But you can actually see the -- again, here's the secondary depression that I discussed earlier.

You actually can start seeing the primary depression or the outline of the grave, just from the

1   variation in color.  You can also again see the two

2   lines for the Cartesian grid system.

3              MS. MARTINEZ:  And, Your Honor, may the

4   record reflect that with respect to --

5              Well, let me ask you, so I make sure I don't

6   get it wrong.

7   BY MS. MARTINEZ:

8        Q.   What was the first thing that you noted in this

9   picture?

10       A.   The secondary depression.

11       Q.   And can you just point to the secondary

12  depression again?

13       A.   The secondary depression.

14             MS. MARTINEZ:  Your Honor, may the record

15  reflect that the secondary depression has been

16  identified by this witness as the visible hole at the

17  center of the picture.

18             THE COURT:  So noted.

19  BY MS. MARTINEZ:

20       Q.   And the second thing that you noted, what is

21  that?

22       A.   The primary depression.  It's a little bit

23  difficult to see, but you can definitely see the

24  definitions of two colors of dirt that I discussed

25  earlier, where the darker dirt -- this is the true --

1    the dirt over here, and the dirt over here, and up in

2    these areas, that dark soil is a topsoil that I

3    discussed previously.

4         The lighter color of dirt that you see here and

5    all through this entire area is the lighter dirt that is

6    indicative of a clandestine burial where there is --

7    it's from a lower level of dirt that has now been

8    basically turned upside down.

9              MS. MARTINEZ:  Your Honor, may the record

10   reflect that in talking about the lighter colored dirt,

11   she has indicated an area at the center of screen larger

12   than the visible hole.

13             THE COURT:  So noted.

14   BY MS. MARTINEZ:

15   Q.   In the hole there that you can see, there appear

16   to be -- well, let me ask you what they are -- but lines

17   that sort of go through the hole.  What are those?

18   A.   The -- like the little twigs and stuff that are

19   sticking out right here?  Is that what you're talking

20   about?

21   Q.   Yes.

22   A.   Those are actually where -- since you've got a

23   very large tree and we're in a wooded area, the entire

24   network of the root system, basically, that are

25   basically coming off of this tree, which, I mean, they

1  look like lines, or almost like tentacles, coming out of

2  the earth.

3      Q.   Let's turn now to Government's Exhibit 87-D.

4           MS. MARTINEZ:  If we could flip that

5  90 degrees to the right.

6  BY MS. MARTINEZ:

7      Q.   What does this picture show?

8      A.   Again, it's actually after the, probably the

9  first two layers were removed.  It shows the outline of

10  the primary depression, which is going to be this area

11  right here.  And this is the true outline of the grave,

12  which has been preserved.

13          And, there's actually some large roots that

14  were -- we were able to tell, because you could see

15  shovel marks around the edge up on this end.  When they

16  hit these roots they basically stopped and continued --

17  I mean, they weren't going to go any deeper, so they

18  continued to go deep starting right about here.

19          MS. MARTINEZ:  Your Honor, may the record

20  reflect that when she --

21          THE COURT:  Well, the photograph actually

22  shows the indentation.

23          MS. MARTINEZ:  Thank you, Your Honor.

24  BY MS. MARTINEZ:

25      Q.   Now, in the -- across the screen there's some

1    sort of string and some sort of device.  What is that?

2        A.   That is the shame thing.  It's the Cartesian grid

3    system we use in order to take our D measurement or

4    depth measurement.  We actually attach a line level.

5    So, from our data point, which is basically zero, we're

6    able to attach the string using a line level, and then

7    use a plumb bob from any position to be able to take an

8    accurate depth measurement throughout the excavation.

9        Q.   At the lower right-hand side, I see what looks

10   like more roots.  Is that what we're looking at there?

11       A.   That is correct.  This is a major root right

12   here, which define one edge of grave as well.

13       Q.   And the smaller roots, some of them look like

14   they're broken or cut.  Is that a result of the

15   excavation?

16       A.   No.  We actually go to great lengths to make sure

17   that we do not alter any feature that we encounter.

18   Hence, the reason that we use small devices and

19   implements to excavate.  And we never cut anything, for

20   that exact reason, we want to make sure that roots are

21   left in the condition, so, if need be, we can actually

22   try and match tools that were used or implements used to

23   cut them during the initial digging.

24       Q.   Please go to Government's Exhibit 87-G.  What

25   does this picture show?

1       A.   Again, it's the same, same hole, a little bit

2   deeper.  You can actually see all of the different

3   roots.  These are large roots that actually have cut

4   from the initial, initial digging, with -- they actually

5   have very, very sharp edges.  So you can tell that it

6   was a sharp object that cut them, be it a saw, a shovel,

7   or a large knife.

8            And also, you can start seeing large, large rocks

9   that were laid in a layer about two and a half to three

10  feet down.

11      Q.   What's the significance of the rocks?

12      A.   These rocks were not -- it's not a natural layer

13  in the earth in that general region.  They were

14  obviously brought from another site and placed there.

15      Q.   When you were at this site, in the immediate

16  area, did you observe any similar rocks?

17      A.   There were no rocks like this, you know, in 20,

18  30 feet around the grave, looking on the ground surface.

19  However, they were -- they were very smooth, non-jagged

20  rocks, which were actually consistent with the ones that

21  were down in the creek bed.

22      Q.   About how far away from the creek bed was this

23  site?

24      A.   If it was straight down, it was probably maybe a

25  hundred feet.  But it was very steep, so it was

1   probably -- I should say a hundred yards, I'm sorry.

2   It's more like anywhere from 150 to 200 yards, because

3   you kind of had to zigzag to get down.  It's an

4   extremely steep embankment.

5       Q.   Please go to Government's Exhibit 87-H.  What

6   does this picture show?

7           Or let me ask you, is this the same grave?

8       A.   Yes, it is.

9       Q.   On the right-hand side, there's some sort of

10  measuring device.  What is that?

11      A.   It's another implement that we use that we're

12  trying to take general -- an estimate of -- we're

13  actually trying to get the depth of what rocks, the

14  layer of rocks were.

15      Q.   Do you recall what the depth measurement was

16  here?

17      A.   It was -- the rocks were all different sizes, but

18  they ranged -- it was right around three feet.

19      Q.   How big were the rocks?

20      A.   They ranged in sizes.  They're fairly large.  The

21  average size was probably about this big.

22      Q.   Would you say that was, what, maybe 18 to 24

23  inches you were holding your hands apart?

24      A.   Yes.

25          And then there were a couple very large ones,

1    that they were so large it actually took two of us to

2    lift them.

3        Q.   Please go to 87-E.  What does this picture show?

4        A.   This is the photo -- the graph that was actually

5    taken right after the layer of rocks that was actually

6    removed.  And immediately I was able to identify that

7    there -- they were human remains.

8        Q.   How were you able to identify that?

9        A.   The -- there's actually -- if you pay attention,

10   there's, right here, it's the left leg, and the right

11   leg is actually adjacent to it.

12        The -- the decomposition on this leg was very

13   extensive, and I was actually able to feel around --

14   it's not working.  There's a -- to the top area, where

15   it's -- there it is.  I was able to feel around and

16   palpate that general area and identify it as the lower

17   end of the human femur and the top end of the human

18   tibia.

19             MS. MARTINEZ:  Your Honor, may the record

20   reflect she has indicated areas on the left side of the

21   hole visible on the picture.

22             THE COURT:  So noted.

23   BY MS. MARTINEZ:

24        Q.   What steps were taken after the excavation got to

25   this level?

1    A.   As soon as we are able to confirm that it is

2  human remains, we are obligated to contact the medical

3  examiner office.  And I actually talked to them, and

4  provided them the exact same information I had just told

5  you, and the reasoning that I believed that it was human

6  remains.

7    Q.   How did the excavation proceed after that point?

8    A.   Since it was very late in the day, I think it was

9  close to 6:00 o'clock, we -- an excavation like this,

10  and to make sure that we don't miss any evidence, it's

11  very critical that we have great light.  And because it

12  was a wooded area, we were losing light quickly, we

13  decided it was a good time to actually take a break for

14  the evening and secure the site and come back the next

15  morning.

16    Q.   What steps were taken to secure the site?

17    A.   The photographs, final measurements were taken.

18  Photographs were taken.  We actually brought in a large

19  sheet of plywood that was actually laid over the top.

20  And then there were two police officers that remained

21  with the site until we returned in the morning, to make

22  sure that it wasn't compromised in any way.

23    Q.   What happened when you returned in the morning?

24    A.   It's kind of the reverse.  We removed the

25  plywood.  Again we take photos and we take more

1    measurements, just to make sure there was no variation

2    from the previous evening, and then we progress with the

3    excavation.

4        Q.   How did the excavation progress that next day?

5        A.   Once you get to this level, you actually have to

6    slow down, because once we've reached the level of the

7    body, the levels actually have to get smaller and you

8    have to be a lot more methodical to make sure that we

9    don't, A, compromise the integrity and further damage

10   the human remains, and we want to make sure that we

11   don't miss any evidence as well.  So it was pretty much

12   an entire day excavating.

13       Q.   Please turn to Government's Exhibit 87-K.  What

14   does this picture show?

15       A.   This is actually further down.  We have almost

16   reached the -- or we've gotten to a point where it's

17   called pedestaling, where you've gotten down to the body

18   and we're exposing as much as we can, using -- we're now

19   using pottery tools, small dowel tools and paint

20   brushes, basically, to clean up all the dirt that we

21   possibly can, and slowly let the -- the remains emerge

22   without compromising their positioning whatsoever.

23       Q.   Are you able to tell the position of the body in

24   this photograph?

25       A.   Yes.  Again, this is the same -- this is the same

1    left leg, bent right here.  This is the right leg

2    sitting right next to it.  The hips or the pelvic girdle

3    would be right through here.  This would be the main

4    torso.  And the head is going to be up in this region.

5              MS. MARTINEZ:  Your Honor, may the record

6    reflect that the witness has indicated that the legs are

7    on the right side of the hole, visible, and the head is

8    on the left side.

9              THE COURT:  So noted.  But the photograph

10   shows what it shows.  Next question.

11   BY MS. MARTINEZ:

12     Q.  What did you do at this point?

13     A.  Again, you just continue the excavation until

14   there's no -- we go down around all sides of the

15   remains, to try and get -- basically break the body free

16   of anything that's holding it in the grave.

17     Q.  Please turn to Government's Exhibit 87-J.  What

18   does this picture show?

19     A.  This is going to be one of the last photographs

20   that was probably taken before the individual was

21   removed from the grave.  It's in a position -- or we

22   call it pedestaling, where we've remove as much as dirt

23   as possible and exposed everything.

24              After this, we would take photographs, final

25   measurements of all the major joints, to be able to

1    measure his exact positioning within the grave.

2       Q.   What was the position of the body in the grave?

3       A.   As I said before, it was a semi-fetal position.

4    Again, you've got your head on this end, and then these

5    are the two knees.

6       Q.   Please turn to Government's Exhibit 87-I.  What's

7    happening in this picture?

8       A.   Similar to what we did with the rocks, we were

9    taking final depth measurements on the -- of the

10   individual.

11      Q.   Do you recall the final depth measurement?

12      A.   The top of his knees were like, just below three

13   feet.  His hips were around four and a half feet deep.

14      Q.   Please turn to Government's Exhibit 87-F.  What

15   does this picture show?

16      A.   After the body was removed, we took -- we

17   actually go in and remove and try and find the true

18   bottom of the grave, to make sure that there's no human

19   remains left, and there's no evidence remaining at the

20   base of the grave.  So once we take that out, sift it,

21   we take final measurement of the true, true bottom.

22      Q.   How was the body removed?

23      A.   There was actually two of us that had to work in

24   the grave.  And what we ended up doing is pulling up his

25   upper body and sliding a sheet underneath of him,

1    similar to like a sling.  And then we did the same thing

2    with the lower portion of the body and slid a second

3    sheet underneath, and then got out of the grave and

4    basically pulled him up in a sling-like fashion.

5        Q.    What was the measurement of the true depth of the

6    grave, if you recall?

7        A.    It was about four and a half -- it ranged,

8    obviously, from four and a half almost close to five

9    feet deep at its deepest.

10       Q.    Please turn to Government's Exhibit 87-B.  What

11   is this?

12       A.    This is actually a picture of all the rocks that

13   was -- were taken out of the grave.  The reason that we

14   photographed them is because to show how many were

15   there.  Also, we made sure that when we pulled them out,

16   when we set them, we set them upside down, because they

17   were in direct contact with the human remains, and we

18   wanted to make sure that there was no evidence that was

19   left behind.

20       Q.    One of the rocks on the right side appears to me

21   to be bigger than the others.  Do you recall where that

22   rock was located?

23       A.    This large rock was basically in the stomach

24   area.  And that was the one that took two, and almost

25   three people for us to lift it out.

1    Q.   Please turn to Government's Exhibit 87-L.  What
2    does this picture show?
3    A.   It's the human remains as we placed them in the
4    body bag.  And you can still see the two sheets laying
5    underneath of him that we used as the sling to pull him
6    out.
7    Q.   And what is the material on top of the body?
8    A.   Those were all materials that he was -- that were
9    encased that -- it was manmade material.  Again, I --
10   it's not my position to state what it is.  That falls
11   under the realm of the medical examiner.  But it was --
12   it was materials that he was -- that was attached to him
13   and, therefore, we kept its -- maintained its integrity
14   as we pulled him out of the grave.
15   Q.   When was the second body excavated?
16   A.   The following day, so, it would have been on the
17   20th.
18   Q.   All right.  And, if we could go back to that
19   aerial photograph, Government's Exhibit 96-B,
20   approximately where was the second excavation site.
21   A.   It was on the other side of the creek bed.  So,
22   if the first body was on this side, the second body
23   would have been on the hill side, on this side.
24   Q.   All right.  And just for the record, you're
25   saying the first body is -- the way this picture is

1    depicted, the first body is on the right side and the

2    second body was on the left side?

3        A.    That is correct.

4        Q.    How far apart were the two sites, approximately?

5        A.    You could -- you could see them.  And again, they

6    were probably -- if you drew a straight line, probably

7    150, 200 yards.  But the fact that you actually had to

8    walk in a zigzag motion, it took you 20 minutes to get

9    from one site to the other.

10       Q.    And when you say "walk in a zigzag motion," what

11   are you referring to?

12       A.    The, the terrain was so steep it would be

13   dangerous just to walk straight down.  So the hiking

14   trails -- some of the trails that existed was almost

15   like a switchback path down.

16       Q.    The second site, how far was that site from the

17   creek bed?

18       A.    Probably 100, 150 feet.

19       Q.    Please take a look at Government's Exhibits 89-A

20   through Q, inclusive.  And feel free to remove them as

21   you did with the others.

22            Do you recognize these photographs?

23       A.    I do.

24       Q.    What do they show?

25       A.    They're all consistent with the second grave that

1    we excavated.

2              MS. MARTINEZ:  Your Honor, the government

3    move into evidence 89-A through Q, inclusive.

4              THE COURT:  Received over objections.

5    BY MS. MARTINEZ:

6         Q.  Let's start with Government's Exhibit 89-B.  What

7    does this photo show?

8         A.  It's actually the -- in the forefront is the

9    location of the site with, the ground debris is still

10   present, and you can actually see the creek bed in the

11   background, and the crime scene tape to the left.

12        Q.  When you first arrived on the scene, what did you

13   observe?

14        A.  Very similar to the first site.  I was able to

15   see a dirt halo, bioturbation, the, the ground scatter,

16   the dirt scatter, and the primary and secondary

17   depressions.

18        Q.  What were the first steps taken with respect to

19   this excavation?

20        A.  The exact same as previously.  We took initial

21   photography.  We took initial measurements.  Then we

22   cleared the ground debris and took measurements of the

23   dirt halo, removed the dirt halo, and took the

24   measurements of the grave outline.

25        Q.  Please turn to Government's Exhibit 89-A.  And

1    what does this show?

2       A.   This is the -- again, it's showing the perimeter

3    that we've set up with crime scene tape, and we're

4    taking -- we have cleared the ground debris or the leaf

5    litter, and we are taking the -- setting up the

6    Cartesian grid system to take the grave measurements.

7       Q.   89-I.   What does this photograph show?

8       A.   It's a close-up of the primary depression or the

9    grave outline.   Again, you can see the variation in soil

10   color, and -- that allows you to depict the outline of

11   the grave.

12      Q.   Please turn to Government's Exhibit 89-J.   What

13   does this photograph show?

14      A.   It's very similar to the previous one, just a

15   different view, again showing the full outline of the

16   grave, and the soil color and the primary depression.

17      Q.   What steps were taken during the excavation after

18   this point?

19      A.   Again, you've got the -- once we've been able to

20   determine what the primary depression, we started

21   excavate that depression.

22      Q.   How did the excavation proceed?

23      A.   I was -- again, I was the team lead, and we very

24   methodically started removing layers using a small hand

25   trowel, and sifting the dirt as we went, looking for

 1    evidence.

 2        Q.   Please look at Government's Exhibit 89-L.  What

 3    does this picture show?

 4        A.   Again, at a much -- almost less than a foot, foot

 5    and a half down, we encountered another layer of large

 6    rocks.

 7        Q.   Were there large rocks like these in the

 8    immediate area of this site?

 9        A.   There was one that was actually right on top or

10    at the foot of the grave, but, there were none anywhere

11    else that we could see on the hill.

12        Q.   Where were the closest rocks of this size that

13    you were able to observe in the general area?

14        A.   Down in the creek bed.

15        Q.   Please turn to Government's Exhibit 89-M.  What

16    does this picture show?

17        A.   This is actually a large -- as we excavated, we

18    quickly encountered a very large rock on one end of the

19    grave, and we realized it's -- actually it was a

20    boulder, which the individuals that actually dug the

21    hole probably encountered the same thing, where they had

22    actually started with a hole that was this large, and

23    this entire portion here is a boulder that is part of

24    the earth.  So once they hit that, they basically moved

25    forward before they continued to go downward, taking

1   measurements of the depth of that boulder.

2       Q.   What's the dark area in the bottom right-hand of

3   the screen?

4       A.   This is actually part of the human remains.

5       Q.   What are the dark dots on top of that?

6       A.   Those would probably be flies, maggots and

7   beetles.

8       Q.   Please turn to Government's Exhibit 89-P.  What

9   does this show?

10      A.   This is after we have removed all the rocks, and

11  we took -- and were able to definitively say that it was

12  human remains, they took an overall photo of the

13  entire -- what now is the primary depression or the

14  grave circumference.

15      Q.   How were you able to determine at this stage

16  definitively that this was human remains?

17      A.   Again, it was palpation of the leg bones in this

18  general area, or this general area, that it was, in

19  fact, human remains.

20      Q.   What was the approximate depth of the human

21  remains in this grave?

22      A.   It was -- it was actually very shallow.  It was

23  less than two feet.

24      Q.   To the right-hand side of that picture, there

25  appears to be some sort of black material.  What is

1  that?

2      A.  It's not really -- the black material is actually

3  volatile fatty acids that are a result of decomposition

4  of everything in the human body, kind of turns

5  everything a really dark color.  It's often confused as

6  possibly being burned.  It isn't.  It's actually the

7  volatile fatty acids.

8      Q.  Please turn to Government's Exhibit 89-P --

9  pardon me -- 89-N.  What does this show?

10     A.  This is actually after we've pedestaled the body,

11 as I explained previously, and it shows the orientation

12 of the individual in the grave.

13     Q.  What was the orientation?

14     A.  Initially, we thought since the legs were bent

15 right here, we actually thought that he was face down.

16 Once we were able to excavate the shoulders and the

17 elbow, I could actually tell that he's in fact, face up,

18 and therefore his legs were broken at some point or

19 forced forward.

20     Q.  Where is his head?

21     A.  Um, at this point we had not actually located his

22 head.  His shoulders are right here.  And, this is

23 actually the big rock that I was telling you about

24 before.

25     Q.  Please turn to Government's Exhibit 89-O.

1          MS. MARTINEZ:  Court's indulgence, Your

2     Honor.

3          Just a moment, Your Honor.  Technical

4     difficulties.

5     BY MS. MARTINEZ:

6     Q.   What does Government's Exhibit 89-O show?

7     A.   It's actually a close-up of the individual in the

8     grave.  This is actually a very large rock that was

9     placed on his chest and his hands, replaced over him.

10    And at this point, I was able to palpate the neck region

11    determine that his head was not attached.

12    Q.   Please turn to Government's Exhibit 89-K.  What

13    does this picture show?

14    A.   This was another overall picture showing all the

15    rocks that we actually pulled out of the grave during

16    our excavation.  The ones on the left are the ones

17    that -- these here are the ones that were in direct

18    contact with the body.  Again, you can see that same

19    black material that's consistent with the previous

20    photos.

21    Q.   Please turn to Government's Exhibit 89-Q.  What

22    does this photograph show?

23    A.   It's actually the remains.  Again, we used the

24    exact same method, using a sheet or a sling to remove

25    the individual and placed him in a body bag, and at

1   that -- at which time we were able to locate the head,

2   or the calvarium, which was underneath the body.

3         So we just put it -- we orientated it in the

4   correct position.  It was a final photograph taken

5   before the medical examiner took custody of the body.

6   Q.   Where is the head in this picture?

7   A.   It's actually in a, some type of material.  I did

8   not actually remove it myself.  I could not tell you

9   what the material was.

10  Q.   Was it manmade material?

11  A.   Yes.

12         MS. MARTINEZ:  No further questions, Your

13  Honor.

14         MR. JENKINS:  Yes, Your Honor.

15                CROSS-EXAMINATION

16  BY MR. JENKINS:

17  Q.   Good morning, Special Agent.

18  A.   Good morning.

19  Q.   Special Agent, you participated in the excavation

20  of both bodies, correct?

21  A.   That is correct.

22  Q.   Did you participate in the collection of any

23  other physical evidence at the scene?

24  A.   No, I did not.

25         MR. JENKINS:  No further questions, Your

1    Honor.

2                THE COURT:  Any redirect?

3                MS. MARTINEZ:  No, Your Honor.  May the

4    witness be excused?

5                THE COURT:  You're excused.  Thank you for

6    coming.

7                THE WITNESS:  Thank you.

8                (Thereupon, the witness withdrew from the

9    stand.)

10               MS. MARTINEZ:  Your Honor, the government

11   calls Juan Ramos.

12               (Witness sworn.)

13               THE WITNESS:  I do.

14               THE COURT:  You may proceed.

15               THEREUPON, JUAN RAMOS, having been duly

16   sworn, testified as follows:

17                       DIRECT EXAMINATION

18   BY MS. MARTINEZ:

19      Q.   Good afternoon.

20      A.   Good afternoon.

21      Q.   Please state and spell your full name for the

22   record.

23      A.   It's Juan Ramos.  J-u-a-n, R-a-m-o-s.

24      Q.   Mr. Ramos, where do you work?

25      A.   The FBI.

1      Q.   What do you for the FBI?

2      A.   I'm a language specialist.

3      Q.   What is a language specialist?

4      A.   I provide language support during FBI

5   investigations.

6      Q.   How long have you been a language specialist for

7   the FBI?

8      A.   Twenty-four years.

9      Q.   What languages do you provide support for to the

10  FBI?

11     A.   Spanish.

12     Q.   What languages do you speak?

13     A.   Spanish and English.

14     Q.   How long have you spoken Spanish?

15     A.   Fifty-three years.

16     Q.   Where did you learn Spanish?

17     A.   I'm a native speaker.

18     Q.   How long have you spoken English?

19     A.   Most of my life.  I learned it in school as a

20  second language.

21     Q.   When you were hired by the FBI, were you required

22  to take any language proficiency exams?

23     A.   Yes.

24     Q.   And were you -- did you -- based on those exams,

25  did you successfully qualify to be a language

J. Ramos - Direct                                                     92

1   specialist?

2       A.   Yes, I did.

3       Q.   What are your duties as a language specialist?

4       A.   I translate a variety of materials, audio, and

5   documents from English to Spanish, and Spanish into

6   English.

7       Q.   Let's start with audio.  What kind of audio do

8   you translate?

9       A.   Um, anywhere from monitoring live Title III

10  investigations, to body wires and consensual telephone

11  conversations, for example.

12      Q.   When you mentioned Title III investigations, what

13  is that?

14      A.   That is live monitoring of electronic

15  communications by court order.

16      Q.   And when you're monitoring these electronic

17  communications, what are your duties?

18      A.   To listen to the conversation and make a synopsis

19  of the conversation.

20      Q.   You also mentioned body wires.  What is your duty

21  with respect to body wires?

22      A.   Um, that's also a type of audio that I'm tasked

23  with translating, sometimes summarizing, sometimes doing

24  a verbatim translation of the body wire.

25      Q.   In your 24 years of experience with the FBI in

J. Ramos - Direct                                              93

1    translating Spanish, what countries have the Spanish

2    speakers been from?

3        A.   A variety of countries, from the Caribbean,

4    Mexico, Central America, Dominican Republic,

5    Puerto Rico.

6        Q.   Focusing particularly on Central America, what

7    experience do you have translating people speaking

8    Spanish from Central America?

9        A.   I have experience with Spanish from Honduras and

10   from El Salvador.

11       Q.   Based on your experience, would you agree that

12   Spanish speakers from different Spanish speaking

13   countries have different manners of speaking?

14       A.   Yes.

15       Q.   How long have you personally been translating

16   persons from Central America, particularly El Salvador?

17       A.   I would say most of my career.

18       Q.   And with what dialects of Spanish are you

19   familiar?

20       A.   With the dialects from the Caribbean, Puerto

21   Rican Spanish, Dominican, Mexican Spanish, Honduran

22   Spanish, from El Salvador.

23       Q.   You mentioned before summaries and verbatim

24   translation.  Let's start with summaries.  What are

25   summaries?

1    A.   It's just basically listening to a whole

2    conversation and providing a synopsis of the most

3    important parts of that conversation.

4    Q.   Are there times when you also translate

5    conversations and prepare the full translation?

6    A.   Yes.  That, it's called a verbatim translation.

7    Q.   What steps do you take when you're assigned that

8    task?

9    A.   Well, the very first step that I take is I

10   identify the speaker or the author, the message, and the

11   audience.

12   Q.   What's the purpose of identifying the -- what's

13   the purpose of those steps?

14   A.   Well, the -- basically, I mean, the more you know

15   about the speaker, you know, you could -- you could

16   immediately be able to tell the nationality, the variety

17   or regional kind of Spanish the person is speaking.

18       With the message, identifying the message is the

19   content of the conversation.  It could be a conversation

20   about narcotics or mortgage fraud, you know.  So you

21   identify what you're translating.

22       And the audience, of course, is who is going to

23   be reading these translations.

24   Q.   During your experience with the FBI, have you had

25   any experience translating on gang related cases?

J. Ramos - Direct                                                    95

1    A.   Yes, I have.

2    Q.   How much experience do you have translating on

3    gang related cases?

4    A.   Most of my career, about 24 years.

5    Q.   Continuing with the steps when you're preparing a

6    full translation, after you have identified those

7    features that you mentioned, what's the next step that

8    you take?

9    A.   I become familiar with the task, I mean, whether

10   it's a document, we're talking about verbatim

11   translations of audio.  I would begin by becoming very

12   familiar with what I'm about to translate.

13          So, I may listen to the full audio several times

14   before I translate the first word of that transcript,

15   you know, five, six, seven, maybe ten times, before I

16   even begin to translate.

17   Q.   What's the purpose of listening to it before you

18   begin to translate?

19   A.   Becoming familiar, and preparing a strategy for

20   the product I'm about to start working on.

21   Q.   Once you actually begin to translate, how do you

22   go about doing that?

23   A.   Um, the mechanics, I use a computer with a

24   digital media player that allows me to use a foot pedal

25   to manipulate the recording.  I use headphones, and

1    Microsoft Word to produce the transcript.

2         Q.   What's the purpose of the foot pedal?

3         A.   So that I can type as I'm listening to the

4    recording.  I can, you know, play, pause, fast-forward

5    and rewind.

6         Q.   Once you begin this translation process, how do

7    you proceed?

8         A.   I -- you know, sometimes I have to listen to the

9    same section, you know, just to make sure that there's

10   no background noises, that there's -- that I'm familiar

11   with the -- with the terms that are being used, that

12   there are no -- that I find specific equivalency for

13   certain things, because there's -- sometimes there are

14   no lexical or direct translations for words from Spanish

15   into English, or from one variety of Spanish into

16   English.  There might -- you know, you may have the same

17   term in -- in Spanish, two different countries, that

18   mean two different things.

19        Q.   Let's focus on that in particular.  You said you

20   have experience on gang cases?

21        A.   Yes, I do.

22        Q.   Have you had experience on gang cases involving

23   MS-13?

24        A.   Yes.

25        Q.   And, in your experience, do individuals

1    associated with MS-13 speak Spanish in a particular kind
2    of way?

3        A.   Well, yes.  There's Spanish, you know, basic
4    Spanish, and there's what, you know, most people will
5    call slang or *caliche*, which is, you know, slang from El
6    Salvador; and also, you know, slang which is
7    specifically for that, you know, community, for gang
8    related Spanish, or *caliche*.

9        Q.   How have you educated yourself about that type of
10   slang and dialect?

11       A.   Over the years, you know, by talking to experts,
12   you know, subject matter experts, and by researching
13   myself, reading scholarly papers about, about the
14   subject matter, and by many, many hours of -- hundreds,
15   maybe thousands of hours of listening to conversations.

16       Q.   Continuing to your translation product of audio,
17   of an audio product, you said that you use a foot pedal
18   and you begin actually typing in Microsoft Word; is that
19   right?

20       A.   Yes.

21       Q.   Now, that foot pedal, does it alter the recording
22   in any way?

23       A.   Oh, no.  It's just simply the -- the way that you
24   would use a regular recorder, you use your fingers to
25   fast-forward, rewind.

1    Q.   While you're actually translating, using and
2    typing in Microsoft Word, approximately how many times,
3    on average, do you listen to the recording?
4    A.   To give you an average, it would -- it would be
5    fair to say that it would take about an hour of work, of
6    translation work, to produce -- to go over one minute of
7    audio.
8    Q.   Once you've prepared the full translation, what
9    do you do with it?
10   A.   I submit it to my supervisor.
11   Q.   What's the purpose of submitting it?
12   A.   That the supervisor routes that translation, that
13   product, to whomever the person is that it's supposed to
14   be routed to.
15   Q.   Is there a review process in place?
16   A.   Yes, there is.
17   Q.   Are you ever an individual who reviews other
18   linguists' written product?
19   A.   Yes, I am.
20   Q.   Switching gears for a moment to an instance where
21   you're the reviewer, what steps do you take to review a
22   full transcript prepared by another linguist?
23   A.   I listen to the full recording and I read the
24   full transcript.
25   Q.   What's the purpose of that?

1       A.   To make -- to make sure that the -- that the

2    translation is accurate.

3       Q.   And once you've -- once you've reviewed that

4    translation, what do you do with it?

5       A.   I resubmit it to my supervisor.

6            MS. MARTINEZ:   Your Honor, at this point, we

7    move to qualify Mr. Ramos as an expert in translating

8    Spanish into English from audio equipment, including

9    particularly in the El Salvadoran dialect.

10           THE COURT:   Based upon his experience and

11   testimony, I'll qualify him as an expert in

12   Spanish-English translation, with experience with the

13   El Salvadorian dialect, to prepare summaries and

14   transcripts.

15   BY MS. MARTINEZ:

16      Q.   Mr. Ramos, I would like to direct your attention,

17   with the help of the court security officer, to

18   Government's Exhibits 18-A and 18-A-1.  Do you have 18-A

19   in front of you there, the disc?

20      A.   Yes, ma'am.

21      Q.   What is Government's Exhibit 18-A?

22      A.   18-A is the disc containing the full recording.

23      Q.   Is that a recording that you have previously

24   reviewed?

25      A.   Yes, I have.

1    Q.  Have you also reviewed it during your trial
2    preparation?
3    A.  Yes, I did.
4    Q.  How do you know that disc contains the recording
5    you reviewed?
6    A.  Because after I reviewed the disc, I put my
7    initials on the disc.
8    Q.  Please turn to Government's Exhibit 18-A-1.  What
9    is Government's Exhibit 18-A-1?
10   A.  18-A-1 is a transcript of the contents of 18-A.
11   Q.  Who prepared that transcript?
12   A.  I did.
13   Q.  Now, there are speakers identified in that
14   transcript; is that right?
15   A.  Yes, there are.
16   Q.  Was it your responsibility to identify the
17   speakers?
18   A.  No.
19   Q.  Wtih the exception of the identity of the
20   speakers, can you attest to the written product in
21   18-A-1?
22   A.  Yes, I can.
23   Q.  And based on your experience, your knowledge, as
24   a linguist, is the translation in Government's
25   Exhibit 18-A-1 a true and accurate translation of the

1   audio in 18-A?

2       A.   Yes, it is.

3            MS. MARTINEZ:   Your Honor, to the extent

4   that it's not already in, the government moves in

5   Government's Exhibit 18-A and 18-A-1.

6            THE COURT:   Received.

7   BY MS. MARTINEZ:

8       Q.   Could you turn now to Government's Exhibit 18-B

9   and 18-B-1, as well as 18-C, 18-C-1, and 18-D and

10  18-D-1 -- and actually, I misspoke.  There is no 18-C-1,

11  I believe.  So, 18-B, 18-B-1, 18-C, 18-D, and 18-D-1.

12           Do you have those documents -- those exhibits

13  there?

14      A.   Yes, I have.

15      Q.   All right.  18-B, 18-C, and 18-D, what are those?

16      A.   Those are excerpts from the disc containing the

17  full recording.

18      Q.   Just to be clear, they are excerpts of

19  Government's Exhibit 18-A?

20      A.   Yes, they are.

21      Q.   Have you reviewed these excerpts?

22      A.   Yes, I have.

23      Q.   How do you know you've reviewed those particular

24  excerpts?

25      A.   After reviewing every one of the excerpts, I put

1    my initials on the discs.

2        Q.   If you could look at 18-B-1, and 18-D-1.

3        A.   Okay.

4        Q.   What are those?

5        A.   Those are transcripts of the excerpts.

6        Q.   Which excerpts?

7        A.   18-A -- I mean, 18-B and 18-D.

8        Q.   Did you review those excerpted transcripts when

9    you reviewed the excerpt of the audio?

10       A.   Yes, I did.

11       Q.   And, do those transcripts correspond with the

12   audio?

13       A.   Yes, they do.

14       Q.   Are they true and accurate translations of the

15   audio, to the best of your abilities as a linguist?

16       A.   Yes, they are.

17            MS. MARTINEZ:  No further questions, Your

18   Honor -- oh, actually, the government moves in, to the

19   extent they're not in, Government's Exhibits 18-B,

20   18-B-1, 18-C, 18-D, and 18-D-1, Your Honor.

21            No further questions.

22            THE COURT:  18-B, bravo, 18-B, bravo, 1,

23   18-C, 18-D, David, 18-D-1, received.

24            MS. MARTINEZ:  Thank you, Your Honor.

25            THE COURT:  You may proceed.

CROSS-EXAMINATION

BY MR. LEIVA:

Q.   Good afternoon, Mr. Ramos.

A.   Good afternoon, sir.

Q.   Just a couple quick questions for you.

A.   Okay.

Q.   All right.  You asked -- you were asked about your Spanish proficiency, I believe, and you said that you were a native speaker?

A.   Yes, I am.

Q.   Okay.  What do you mean by that?

A.   I was born in Puerto Rico, and my first language is Spanish.

Q.   Okay.  All right.  You testified that you are a language specialist, correct?

A.   Yes, sir.

Q.   And that you took a test or an exam to qualify as a language specialist?

A.   Yes, sir.

Q.   All right.  And, I'm assuming that a language specialist is different from a contract language monitor?

A.   Yes, it is.

Q.   All right.  And, it's different in what sense? That you have a higher, let's say -- let me just

J. Ramos - Cross

 1    use this term -- you have a higher level than a contract
 2    language monitor?
 3        A.    I don't know that.  I don't know how that
 4    decision by my employer is made.  I -- I cannot answer
 5    that.
 6        Q.    All right.  Do you work around contract language
 7    monitors?
 8        A.    Sometimes I do.
 9        Q.    Okay.  And, would you agree with me there are
10    certain duties that you can perform that a contract
11    language monitor cannot perform?
12        A.    I --
13        Q.    You've been with the bureau about 20-something
14    years, have you not?
15        A.    Twenty-four years.
16        Q.    Twenty-four years.
17              And, correct me if I'm wrong, but I'm assuming
18    that in those 24 years you've worked next to contract
19    language monitors.
20        A.    Yes.  And they perform the same duties that I
21    perform.
22        Q.    All right.  So, what's the distinction, then?
23              Why have the distinction of a language specialist
24    and a contract language monitor, if you guys do the same
25    thing?

1    A.   Um, I'm a full-time employee, and they're

2   contractors.  But, I mean, I'm not -- I mean, that's

3   for the person that does the hiring to answer.  I

4   don't --

5    Q.   So I guess the short answer is, you don't know?

6    A.   I don't know, sir.

7    Q.   I appreciate that.  Thank you.

8         You also said something interesting, that, you

9   said you talked to experts.  When you said you talked to

10  experts, were you referring to experts in Salvadoran

11  gang slang, or were you just referring to experts in

12  general, Spanish language?

13   A.   In general, but I have, yes.

14   Q.   Okay, in general.

15        So, you have not consulted with any experts

16  regarding Salvadoran -- first let's start with

17  Salvadoran slang.

18   A.   In 24 years?

19   Q.   Yes.

20   A.   Of course.  I mean, sometimes I have worked with

21  people that are -- who are experts on different types

22  of -- of slang.  In this case, you're mentioning, you

23  know, Salvadorian slang.

24   Q.   Okay.  When was the last time that you consulted

25  with an expert on Salvadoran slang?

J. Ramos - Cross

1    A.   We're talking many years ago.

2    Q.   Ten, fifteen years ago?

3    A.   Maybe, during, you know -- yes.  I mean --

4    Q.   That was -- I'm sorry.

5    A.   Yes.  I mean, it's -- you're talking that I work

6    with somebody considered an expert, I mean, in a

7    particular slang, that's what you're asking?

8    Q.   I'm asking when was the last time that you worked

9    with an -- or you consulted with an expert concerning

10   Salvadoran gang slang?

11   A.   A long time ago.

12   Q.   About 10, 15 years?

13   A.   You're saying 10, 15 years, but for me, I mean,

14   it's just a long time ago.

15   Q.   That's what I'm asking you.  A long time for me

16   could be something different than --

17   A.   Exactly.

18   Q.   -- a long time for you.  That's why I'm giving

19   you the opportunity to tell me what a long time means.

20   A.   You're asking me to guess.  Maybe 15 years ago,

21   10, 15 years ago.

22   Q.   And, you would agree with me, based on your

23   experience in dealing with MS-13 cases, that Salvadoran

24   gang slang, particularly MS-13 slang, is constantly

25   changing?

J. Ramos - Cross

1      A.   Yes, sir.

2      Q.   All right.  And it's constantly changing to avoid

3  detection from law enforcement?

4      A.   Yes, sir.

5      Q.   Another interesting point that you brought up,

6  you said you reviewed scholarly papers?

7      A.   Yes.

8      Q.   The scholarly papers that you reviewed, was it

9  just on the issue of -- I'm sorry -- just on the topic

10  of translations?

11      A.   Um -- well, not necessarily.  Sometimes when I'm,

12  when I'm preparing to do -- prepare a translation, and

13  it's from an area that I don't know, there is, you know,

14  somebody somewhere did a -- a Ph.D. dissertation on

15  Puerto Rican, you know, gang Spanish.  So you have a lot

16  of research in one paper that prepares you, if you have

17  no experience, to, you know, to handle that task.

18      Q.   I understand.

19           Let's focus on MS-13 gang slang.  That's why I

20  became curious when I heard you say "scholarly papers."

21  Are you telling us that you reviewed a scholarly paper

22  that dealt with MS-13 gang slang?

23      A.   Over -- over 24 years?

24      Q.   Whatever time.  You said that you --

25      A.   Yes, at some point in time, yes, I probably

J. Ramos - Cross

1    Google, you know, something to -- that brought me to a
2    paper on MS-13 gang slang, *caliche*, yes.
3        Q.   Okay.  So, just so I'm straight, you Googled
4    something, and you believe it led you to a paper that
5    dealt with Salvadoran gang -- or MS-13 gang slang?
6        A.   That's not very hard to do, yes.
7        Q.   I understand that.  I understand there are a lot
8    of sites out there.
9            But you used the word "scholarly."  That's why I
10   became interested.
11       A.   The sources you use are very important, too.
12       Q.   I understand.  That's why I'm asking these
13   questions.
14           So, the sources that you found on the Internet,
15   were they just sources of glossaries of, of different
16   definitions of what people thought Salvadoran gang slang
17   was?
18       A.   Not what people thought.  I mean, I don't just,
19   you know, review one source.  I review a variety of
20   sources.  And, meaning, when you're looking through a
21   translation to produce a translation, the objective is
22   translating, meaning to meaning, as the author, as the
23   speaker intended, not as a definition you pull out of a
24   dictionary.  Because it could mean, you know, one thing
25   for one person and another thing from another person.

1    You're --

2        Q.   And I understand that, sir.

3        A.   And you could be referring to semantic change and

4    things of that nature.  So that's another aspect that

5    can be considered.

6        Q.   I understand that, and I understand on the

7    Internet you can find a lot of those.

8            But the scholarly work that you're referring to,

9    do you recall who the author of that scholarly work was

10   or what the title of that scholarly work was?

11       A.   No, sir.

12       Q.   Okay.  Now, when I asked you -- initially asked

13   you that question, you said -- you gave the example of

14   someone with a Ph.D. writing a paper on Puerto Rican

15   gang slang.

16       A.   An example, yes.

17       Q.   Okay.  As an example.

18           So, this scholarly work that you're referring to,

19   was it your recollection that someone who had a Ph.D.

20   wrote a scholarly piece of work on Salvadoran -- or

21   MS-13 --

22       A.   It could have been a dissertation of somebody,

23   yes.

24       Q.   And do you recall how long ago it was that you

25   reviewed that scholarly work on MS-13 gang slang?

1    A.   No, sir.

2    Q.   You also said that as part of your process, you

3    identify the speakers, correct?

4    A.   The speaker, the message and the audience.

5    Q.   The message and the audience.

6         When you're going through that process, do you

7    speak to the agents to kind of get an idea -- the FBI

8    agents to kind of get an idea of what the kind of case

9    this is?

10   A.   I get an assignment from my supervisor.  There

11   might be a brief description of the task on the cover

12   page of my assignment.

13   Q.   And, given that you -- your title is language

14   specialist, who is -- who are the individuals or the

15   person that reviews your work?

16   A.   That's a process that I am not -- I mean, that's

17   my supervisor's job.

18   Q.   And, what is the title that your supervisor

19   holds?

20   A.   It is language services supervisor.

21   Q.   As far as you know, has anyone who is a native --

22   who is Salvadoran ever reviewed your transcripts?

23   A.   No, sir.

24   Q.   Okay.

25        MR. LEIVA:  That's all I have.  Thank you,

1    sir.

2              THE WITNESS:  Thank you.

3              MS. MARTINEZ:  May the witness be excused,

4    Your Honor?

5              THE COURT:  Yes.

6              (Thereupon, the witness withdrew from the

7    stand.)

8              MS. MARTINEZ:  The government calls Juan

9    Carlos Marquez Ayala.

10             And Mr. Toliver, he's going to come from the

11   other side.

12             Your Honor, while we're waiting, there is a

13   short issue we should probably take up outside the

14   presence of the jury before the witness testifies.

15             THE COURT:  All right.

16             Ladies and gentlemen, we'll have you step

17   out for a moment.  It may be that we will send you to

18   lunch, but I'm not sure yet.

19             So, if I do, let me give you the instruction

20   now, which is do not discuss the case.  Don't permit the

21   case to be discussed in your presence.  Leave your notes

22   in the jury deliberation room.

23             And, I'll let you know in just a second if

24   I'm releasing you for lunch yet.  Thank you.

25             (Jury not present.)

```
 1              THE COURT:  You may be seated.
 2              MS. MARTINEZ:  Your Honor, my agent reminded
 3   me, fortunately, that this is one of the witnesses where
 4   it would be prudent for us to speak with him right
 5   before he testifies --
 6              THE COURT:  Oh, I see.
 7              MS. MARTINEZ:  -- to make sure he
 8   understands that he should not name the defendant who
 9   should not be named with respect to the first murder.
10              THE COURT:  Well, why don't we do that after
11   lunch, then?  Don't you think?  I'm just kind of --
12              MS. MARTINEZ:  That would be great.
13              THE COURT:  I think if you take 15 minutes
14   now, we're going to be at the lunch hour.  So we will
15   recess until 2:00 o'clock.  And why don't you instruct
16   him right before he comes in and, you know.
17              MS. MARTINEZ:  I'll have to consult with the
18   marshals about where we can instruct him.
19              THE COURT:  Yes.
20              MS. MARTINEZ:  It may be that we have to do
21   it --
22              THE COURT:  That's fine.
23              MS. MARTINEZ:  -- in the corner of the
24   courtroom, but we'll make those arrangements.
25              Do you want him to be instructed by 2:00, or
```

1    may we come back at 2:00 and instruct him at that time?

2            THE COURT:  I think you should instruct him

3    right before 2:00, so right before he comes to the

4    courtroom, he will know.

5            MS. MARTINEZ:  Okay.  Just to be clear, Your

6    Honor, I was going to ask for about 20 minutes to talk

7    to him, just because the last thing I want is for

8    another problem, and another mistrial.

9            THE COURT:  I understand.

10           MS. MARTINEZ:  I want to make sure he is

11   well prepped.

12           THE COURT:  What are you asking ask me to

13   do?

14           I was going to give you until 2:00 o'clock.

15   What would you like me to do?

16           MS. MARTINEZ:  Just, you know, the hour goes

17   by very fast, Your Honor, with respect to getting food

18   and making sure we have everything in order.  If,

19   perhaps, we could -- if we could start at 2:10, we will

20   be up here at 10 till 2:00, and we will get him prepped

21   during that time.

22           THE COURT:  Recess to 2:10.

23           You can tell the jury.

24           (Court recessed at 12:47 p.m. and reconvened

25           at 2:13 p.m.)

1          (Jury not present.)

2          THE COURT:  The government's ready now?

3          MS. MARTINEZ:  We're ready, but may I

4    address the Court briefly?

5          THE COURT:  Yes.

6          MS. MARTINEZ:  Two things, Your Honor.

7          One, if we could bring the witness out

8    before the jury, I'd ask Your Honor to instruct this

9    witness that you understand that he may use a pseudonym

10   for a particular individual, and that that is with your

11   instruction and your blessing, that he understands he's

12   not being untruthful when he does so.

13         THE COURT:  Okay.

14         MS. MARTINEZ:  Second, Your Honor, in light

15   of the previous problems we've had with these

16   pseudonyms, I'd like to make a request and a suggestion,

17   if the -- if Your Honor is willing to --

18         THE COURT:  All right.

19         MS. MARTINEZ:  -- willing to grant this.

20         What I'd like to do is very lightly lead

21   this witness through the questions that are most likely

22   to elicit the information that no one in this courtroom

23   wants to actually hear on the record, so that we don't

24   have another motion for a mistrial, another reason for a

25   mistrial.  I'll give an example of what I'm thinking.

1          Rather than saying, you know, "Who was
2  involved in the murder of Lagrima?"  With laying
3  foundation about the witness's knowledge and that other
4  gang members were there, generally speaking, then to
5  say, "Were other gang members there?  Were other gang
6  members we've already discussed today there?"
7          And then to just:  Was so and so there?  Was
8  so and so there?  Was so and so there?  Was so and so
9  there?
10         So that the list can be elicited from this
11  witness without an open-ended question, where he may
12  forget and not use the pseudonym.
13         We have prepped him thoroughly.  I think he
14  understands, but this would be an additional precaution
15  that I propose.
16         THE COURT:  I'm listening.
17         MS. AUSTIN:  I would object, Your Honor, at
18  this point, that that's not lightly leading, and it's
19  completely implicating, name by name, possibly everybody
20  here in the courtroom.
21         He has to testify based on his recollection.
22  And I -- you know, I understand the concerns about the
23  pseudonyms, but that's just, I think, going too far in a
24  trial where these gentlemen's lives are at stake, to
25  name them by name on direct examination.  And that is --

1    he's got to answer the question.  It's one name, he
2    can't say now we're down to one.
3              THE COURT:  Well, another way to do it is to
4    have each person, each defendant stand, and ask,
5    "Was that person involved," and have him identify him
6    from the stand.  I could do that, too.
7              MS. AUSTIN:  I don't think that's
8    appropriate, either, Your Honor, in all due.  He has got
9    to answer questions about what he knows, and based on
10   his knowledge and his recollection of events, and not
11   have it fed to him.
12             At a trial, where -- I -- I'm sorry --
13             THE COURT:  Is misidentification the issue
14   in this case, Ms. Austin?
15             MS. AUSTIN:  This person hasn't identified
16   anybody, coming onto the stand.
17             THE COURT:  Okay.  All right.
18             Anyone else?
19             MR. JENKINS:  Yes, Your Honor.  Your Honor,
20   my concern for the Court -- I certainly understand the
21   thrust behind the Court's suggestion, but one of the
22   useful things we get out of cross-examination is testing
23   whether or not a witness will be consistent.  That is, a
24   witness may say something on direct examination, but
25   then under the pressures of cross-examination may modify

their answer.  And that's something that a jury or any fact-finder should take into account in evaluating their credibility.

So, while I appreciate and understand why the Court suggested if the witness were just permitted to have, for example, my client stand up, identify him as being a participant in the activities charged in Count 4, I still, even if that were done, would feel as though that Mr. Torres is entitled on cross-examination to reexamine that area and see whether or not the witness, on cross-examination, would remain consistent.

THE COURT:  I wouldn't prohibit anyone from cross-examining about the in-court identification of their client.  It would just be avoiding mentioning individuals who are not present.

MR. JENKINS:  I certainly understand that, and --

THE COURT:  I'm trying to keep out the name that I'm trying to keep out.

MR. JENKINS:  Right.  And I certainly understand that concern.  I think that's a legitimate one.  But as the Court and I have exchanged in some dialogue early on in this case, while certainly as a defense counsel I take pride in my ability to control witnesses through leading questions, there are times,

1  strategically, where I believe that an open-ended
2  question would actually serve greater value.
3           Asking a witness for, example, "Well, tell
4  me who all was there," without necessarily leading them,
5  may, at times, actually be very valuable, because he may
6  list three names and leave out two that he may have
7  mentioned on direct examination.  And, again, that's
8  another way.
9           If I tried to achieve the same purpose
10 through a leading series of questions, then I would
11 essentially be suggesting the answer to him for each
12 particular defendant, when I really want to test his
13 consistency and his recall based on the answers he gave
14 on direct.
15          So, I -- you know, while I understand what
16 the Court is trying to do, and I think it's, again,
17 legitimate, I think defense counsel should not be barred
18 from simply asking the -- asking the witness, "Well, you
19 answered questions about who all participated in Count
20 4."
21          "Yes, I did."
22          "Can you tell me who all participated in
23 Count 4?"
24          And, just leave it at that.  I think that's
25 a legitimate question.

1          THE COURT:  Well, they are legitimate
2     questions.  I don't doubt that at all.
3          MS. MARTINEZ:  Your Honor, two things.
4          First, with respect to Mr. Jenkins'
5     argument -- and I certainly -- I certainly think
6     Mr. Jenkins is a very skilled -- very skilled at
7     cross-examination, and there are different strategies to
8     take at different times.
9          I do want to put on the record, I have a
10    concern that if this witness or other witnesses are
11    repeatedly asked open-ended questions, who was there,
12    who was there, who was there, at some point we may see a
13    slip up.
14          And I would not like to see defense counsel
15    inviting a mistrial by encouraging a witness to list
16    over and over and over everyone who was there, and wait
17    for him to slip up and say the name he's not allowed to
18    say.
19          So, I do think that there needs to be, in
20    light of what's already happened, in light of Your
21    Honor's ruling, there needs to be a little bit of
22    direction from the Court about how far the parties can
23    go with respect to this.
24          With respect to the government's proposal
25    about leading, I do think it would be appropriate.

1    However, if Your Honor disagrees, and defense counsel

2    obviously disagrees, another way that we could handle

3    that is I could lead with respect to homeboy two.

4              For example, after laying appropriate

5    foundation, going through all of that, "Was homeboy two

6    there for the murder?"

7              "Yes" -- presumably the witness will say,

8    "Yes, he was."

9              "Other than homeboy two, who else was

10   there?"

11             That may remind him, encourage him, not to

12   say the name that he knows is associated with homeboy

13   two.  That would be my backup suggestion, other than be

14   able to lead with the names.

15             Again, all I'm attempting to do here, I'm

16   confident that this witness, if there is no issue with

17   pseudonyms, will list the people who were involved.  And

18   we've prepped him thoroughly on the pseudonym.  We're

19   now only down to one.  I think that he understands it.

20             But people get nervous on the stand.  He has

21   never testified before.  English isn't his first

22   language.  He will be testifying through an interpreter.

23   And the stakes for him are high.

24             So, put on the record that we've seen a

25   slip-up before, and I'm attempting to do everything I

1  can, everything in the government's power, to avoid an

2  additional slip-up.

3  　　　　　THE COURT:  All right.  Well, I like your

4  second suggestion of leading as to what homeboy two did,

5  and who is homeboy two.  So I will permit you to do that

6  over the objections of defense counsel.

7  　　　　　And, defense counsel, I'm not going to

8  restrict you on cross-examination of the witness.  I

9  think you have the right to cross-examine.  And I also

10  think that the government has the right to do what it's

11  done in the past in terms of in-court identification.

12  　　　　　We'll do what we can.  But if the result is

13  that cross-examination goes into a mistrial motion, it's

14  going to be denied.  All right.

15  　　　　　You can bring the jury out first.

16  　　　　　(Jury present at 2:22 p.m.)

17  　　　　　THE COURT:  You may be seated.

18  　　　　　MS. MARTINEZ:  Your Honor, may I approach

19  briefly?  May we approach briefly?

20  　　　　　THE COURT:  Yes.  Sure.

21  　　　　　(Thereupon, the following side-bar

22  conference was had:)

23  　　　　　MS. MARTINEZ:  My apologize, Your Honor.  We

24  all got excited about the -- the issues of how the

25  direct was going to go; but the first request, whether

the witness could be instructed by Your Honor outside
the presence of the jury, I apologize, I think we all
forgot.

THE COURT:  You did ask me that.

MS. MARTINEZ:  And you brought the jury out.

THE COURT:  I'll take the jury out.

(Thereupon, the side-bar conference was
concluded.)

THE COURT:  Let the jury go back out a
minute.

(Jury not present.)

THE COURT:  You can bring the witness out.

Is the pseudonym homeboy number two, *dos?*
Okay.  Homeboy two.

(Witness sworn.)

THE WITNESS:  I swear.

THE COURT:  You can have a seat.

Can you tell us your name?

THE WITNESS:  Juan Carlos Ayala Marquez.

THE COURT:  Mr. Ayala Marquez, I've
instructed the government to have you refer to one
individual as homeboy two.  You remember hearing that
term, homeboy two?

THE WITNESS:  Yes.

THE COURT:  Don't use that person's real

1   name.  Just use homeboy two, on the Court's

2   instructions.  I have a reason why I want that done.

3   So, even if you're asked questions, don't bring out the

4   name.  Just say homeboy two.  Okay?

5            THE WITNESS:  Okay.

6            THE COURT:  All right.  Thank you.

7            MS. MARTINEZ:  Your Honor, I need to address

8   you --

9            THE COURT:  Yes.

10            MS. MARTINEZ:  -- either from here or at the

11   bench on that issue.

12            THE COURT:  Okay.

13            MS. MARTINEZ:  On your instruction.  The

14   issue is that that individual's name actually should be

15   used for everything other than the issue that we

16   discussed.  So, I've instructed this witness on that,

17   but I want to make sure he doesn't think you're giving

18   him different instructions.

19            THE COURT:  Ms. Martinez has given you the

20   right instruction.  I have not.

21            Whatever Ms. Martinez told you earlier, you

22   follow that, okay?  Okay?  All right.

23            Okay.  You got it?

24            MS. MARTINEZ:  Yes.

25            THE COURT:  All right.  You can bring the

```
 1    jury out.  Thank you.
 2                (Jury present.)
 3                THE COURT:  You may be seated.
 4                All right, Counsel, you may proceed.
 5                THEREUPON, JUAN CARLOS AYALA MARQUEZ, having
 6    been duly sworn, testified as follows:
 7                        DIRECT EXAMINATION
 8    BY MS. MARTINEZ:
 9       Q.   Good afternoon.
10       A.   Good afternoon.
11       Q.   Make sure to speak a little bit closer to the
12    microphone, so everyone can hear you.
13            Would you please state your full name and spell
14    it for the record.
15       A.   Juan Carlos Ayala Marquez.  J-u-a-n, C-a-r-l-o-s,
16    space, A-y-a-l-a, space, M-a-r-q-u-e-z.
17       Q.   Mr. Ayala, how old are you?
18       A.   Twenty-two.
19       Q.   Where were you born?
20       A.   El Salvador.
21       Q.   When did you come here to the United States?
22       A.   In 2010.
23       Q.   How old were you at that time?
24       A.   Fifteen, sixteen years.
25       Q.   How did you get here to the United States?
```

1    A.    Illegally.

2    Q.    When you first came to the United States, where

3  did you go?

4    A.    New York, where my dad was.

5    Q.    How long did you stay in New York with your

6  father?

7    A.    Like about a year.

8    Q.    Where did you go after that?

9    A.    I came to Virginia.

10   Q.    Where in Virginia?

11   A.    Culmore, Falls Church.

12   Q.    How far did you go in school before you came to

13  the United States?

14   A.    Ninth grade.

15   Q.    After you came to the United States, did you

16  continue with school?

17   A.    Yes.

18   Q.    In New York?

19   A.    Yes.

20   Q.    When you came to Virginia, did you also continue

21  with school here?

22   A.    Yes.

23   Q.    What school did you go to?

24   A.    JEB Stuart High School.

25   Q.    How long did you attend JEB Stuart High School?

J. Ayala - Direct                                          126

1     A.   A few months, six months, maybe.

2     Q.   What grade were you in?

3     A.   Tenth.

4     Q.   Mr. Ayala, are you a member of a gang?

5     A.   Yes.

6     Q.   What gang?

7     A.   MS-13.

8     Q.   What's the full name of MS-13?

9     A.   Mara Salvatrucha.

10    Q.   When did you first start hanging out with MS-13?

11    A.   When I was like about 18 years old.

12    Q.   Within MS-13, is there a particular clique that

13   you joined?

14    A.   Yes.

15    Q.   What clique is that?

16    A.   PVLS.

17    Q.   What's the full name of PVLS?

18    A.   Parque de Vista Locotes Salvatruchas.

19    Q.   For the court reporter, can we spell Parque --

20   can we spell that?

21    A.   First word, P-a-r-q-u-e, space, d-e, space,

22   V-i-s-t-a, space, L-o-c-o-t-e-s, space,

23   S-a-l-v-a-t-r-u-c-h-a-s.

24    Q.   Thank you.

25         Are you currently incarcerated?

1    A.  Uh-huh.  Yes.

2    Q.  For what?

3    A.  Murder charge.

4    Q.  How did you plead to that murder charge?

5    A.  Guilty.

6    Q.  Where was that?  Where did you plead?

7    A.  In this court, in Alexandria.

8    Q.  Was that for a murder you committed with other

9    gang members?

10   A.  Yes.

11   Q.  Have you been sentenced for your crime?

12   A.  No.

13         MS. MARTINEZ:  Could we show, please, the

14   witness what has been marked as Government's

15   Exhibit 121.

16   BY MS. MARTINEZ:

17   Q.  Please look at the document that was handed to

18   you.  Does that appear to be a copy of your plea

19   agreement?

20   A.  Yes.

21   Q.  If you could look at the last page of the plea

22   agreement, is that your signature?

23   A.  Yes.

24   Q.  What are your obligations under this plea

25   agreement?

J. Ayala - Direct                                                    128

1      A.   To say the truth.

2      Q.   What benefit do you hope to get from entering

3   into a plea agreement with the government?

4      A.   A review of my sentence.

5      Q.   Who do you understand will determine your

6   sentence?

7      A.   The judge.

8      Q.   Who do you understand will determine any

9   reduction you later get to your sentence?

10     A.   The judge.

11     Q.   What do you understand will be the consequences

12   if you lie during this case?

13     A.   I would not receive a reduction in my sentence.

14     Q.   Mr. Ayala, you indicated that you joined the

15   gang, PVLS, MS-13, at age 18.  Why did you join the

16   gang?

17     A.   Because there were a lot of guys from the Mara

18   over at where I lived.  I just wanted to be cool with

19   them.  That's all.

20     Q.   What is a member of MS-13 called?

21     A.   Homeboy.

22     Q.   Were you a homeboy?

23     A.   Yes.

24     Q.   When you became a homeboy, were you given a

25   nickname?

1     A.   Yes.

2     Q.   What nickname?

3     A.   Skin.

4     Q.   Skinny?

5     A.   Skinny.

6     Q.   Are you known by any nicknames other than Skinny?

7     A.   Yes.

8     Q.   What nickname?

9     A.   Flaco, Escalera.

10    Q.   Any others?

11         THE INTERPRETER:   The interpreter is going

12   to request a repetition, Your Honor.

13         THE WITNESS:   Some friends call me

14   Camalarga, as well.

15   BY MS. MARTINEZ:

16    Q.   For the court reporter, can we spell Camalarga?

17    A.   C-a-m-a-l-a-r-g-a.

18    Q.   Before you became a homeboy, was there another

19   level in the gang that you had?

20    A.   *Chequeo*.

21    Q.   What is a *chequeo*?

22    A.   It's like before getting to be a homeboy, you got

23   a foot inside the Mara so that they can jump you.

24    Q.   Before you were a *chequeo*, was there another

25   level that you had?

1     A.   (Not translated.)

2          THE INTERPRETER:   The interpreter doesn't

3  quite understood what he said.   May the interpreter --

4          THE COURT:   Yes.

5          THE WITNESS:   I was doing errands as a *paro*

6  for the Mara.

7  BY MS. MARTINEZ:

8     Q.   Was the word you used *paro*, p-a-r-o?

9     A.   Yes.

10    Q.   What is a *paro*?

11    A.   Somebody who does little favors for the Mara,

12 like, little favors, without getting to give one a lot

13 of trust yet.

14    Q.   What kind of little favors did you do for the

15 gang as a *paro*?

16    A.   To sell drugs, to collect rent.

17    Q.   What do you mean by rent?

18    A.   It's like a collection that you do to people who

19 have some sort of illegal business.

20    Q.   What kind of illegal business?

21    A.   Like drugs, prostitution.

22    Q.   How long were you a *paro* for MS-13?

23    A.   Some like, five months, six months.

24    Q.   What happened after that?

25    A.   I got in to be with them a little more fully, to

1    be closer to them, to go out with them.

2        Q.   What was your status then?

3        A.   I'm sorry.  Could you repeat the question?

4        Q.   What was your level in the gang after the five or

5    so months that you were the *paro*?

6        A.   Once I get jumped, I was just one more soldier.

7        Q.   Before you became a homeboy, what was your level?

8        A.   I was just a soldier, that all.  I didn't have a

9    position or anything.

10       Q.   You mentioned the position *chequeo* previously.

11       A.   Yes.

12       Q.   When did you become a *chequeo*?

13            Was that before or after you were a homeboy?

14       A.   Before.

15       Q.   And, was -- were you a *chequeo* before or after

16   you were a *paro*?

17       A.   After being a *paro*.

18       Q.   How long were you a *chequeo*?

19       A.   Like about two months, one month.

20       Q.   As a *chequeo*, what did you do for the gang?

21       A.   To sell drugs, to steal.

22       Q.   What did you steal?

23       A.   Money.  We would buy -- steal money from cars.

24   We would mug people.

25       Q.   What happened after the approximately two months

J. Ayala - Direct                                    132

1    when you were a *chequeo*?  What happened at the end of

2    those two months?

3        A.   They jumped me in.

4        Q.   What do you mean when you say, "They jumped me

5    in"?

6        A.   They jumped me in for 13 seconds, so that I would

7    be a part, finally, from the Mara.

8        Q.   What happens during those 13 seconds when someone

9    is jumped in?

10       A.   Three persons are beating me, and then someone is

11   counting the 13 seconds.

12       Q.   What do they beat you with?

13       A.   With the hands, the feet.

14       Q.   Are weapons involved?

15       A.   No.

16       Q.   How old were you when you were jumped in?

17       A.   Nineteen, almost nineteen.

18       Q.   What does someone have to do to earn sufficient

19   respect in the gang to be jumped in as a homeboy?

20       A.   To earn the trust of the other homeboys, the

21   homeboys who have been longer -- who are more better on

22   in the clique.

23       Q.   How did you earn the trust of the older homeboys

24   in the clique?

25       A.   The majority of them already knew me, because I

1    had been there living in Culmore for a while.  Some of

2    them knew what I used to do or what I was in, also.

3        Q.   When you say what I used to do, what are you

4    talking about?

5        A.   I mean, just in the street, selling drugs and all

6    of that stuff.

7        Q.   When you said "what I was into," what did you

8    mean?

9        A.   I didn't care.  I was in the street, and

10   sometimes I was also walking about with people who also

11   might have been gang members.  So, I mean, they saw me,

12   and that's how I also earned their trust.

13       Q.   When you joined the clique, PVLS, was there a

14   leader of the clique?

15       A.   Yes.

16       Q.   Who was the leader?

17       A.   El Payaso.

18       Q.   Who is Payaso?

19       A.   He's the clique's runner, and he's in prison.

20       Q.   How do you know he's in prison?

21       A.   I used to speak with him.

22       Q.   How would you speak with him?

23       A.   Through the cellphone.

24       Q.   What was Payaso's position called?

25       A.   The runner, the *ranflero*.

J. Ayala - Direct                                                    134

1    Q.   The Spanish word that was just used, so that was

2    translated to runner, and then there was a Spanish word.

3    Can we spell the Spanish word -- I believe it was

4    *ranflero*, for the court reporter.

5    A.   R-a-n-f-l-e-r-o.

6    Q.   Other than Payaso, who was the runner from inside

7    a prison, was there a leader of the clique who was not

8    in prison?

9    A.   Yes.

10   Q.   Who was that?

11        THE INTERPRETER:  The interpreter didn't

12   catch the first word.

13        THE WITNESS:  A Lil Demente.

14   BY MS. MARTINEZ:

15   Q.   Lil Demente?

16   A.   Yes.

17   Q.   Through your experience with MS-13, were you

18   taught the rules of MS-13?

19   A.   Yes, some of them.

20   Q.   Who taught you?

21   A.   The homeboys in my clique.

22   Q.   What, if any, rules does MS-13 have about

23   cooperating with the police?

24   A.   That cannot be done.  You cannot cooperate with

25   the police.  That would be a rat.

J. Ayala - Direct

1    Q.   What is supposed to happen to a gang member who
2    violates this rule?
3    A.   They give him a green light.
4    Q.   What is a green light?
5    A.   That they're going to kill him.
6    Q.   Who can issue a green light?
7    A.   The clique, all of them talking it out, the
8    runner and the clique.
9    Q.   If a homeboy helps kill someone who has been
10   green lighted, what does that do to the status or
11   reputation of the homeboy who helped kill?
12   A.   He could raise in -- he could go up in rank.
13   Q.   I'm sorry.  I didn't hear the answer.
14           THE INTERPRETER:  "He could go up in rank."
15   BY MS. MARTINEZ:
16   Q.   How about a *chequeo*?  What happens to a *chequeo*'s
17   status or reputation within the gang if the *chequeo*
18   helps kill someone who has been green lighted?
19   A.   The homeboys could deem that he has like the
20   courage to do, like stuff like that for the Mara, and
21   jump him in as a homeboy.
22   Q.   What does MS-13 call rival gangs?
23   A.   *Chavalas*.
24   Q.   What, if any, rules does MS-13 have with respect
25   to *chavalas*?

J. Ayala - Direct                                          136

1    A.   There's no respect for them.  You have to kill
2    them.
3    Q.   When you say you have to kill them, what do you
4    mean?
5    A.   That if you run into one in the street or
6    whatever, then you have to kill them.
7    Q.   If a gang member does that, runs into a *chavala*
8    on the street, and kills him, what happens to that gang
9    member's status or reputation within the gang?
10   A.   He would lose some -- he would lose some
11   reputation, and he could receive a *calentón* or he could
12   even be killed.
13   Q.   Why would a gang member lose reputation for
14   killing a *chavala*?
15   A.   I'm sorry.  Could you repeat the question?
16   Q.   Maybe I didn't understand you correctly.  Did you
17   say that if a gang member kills a *chavala*, he loses his
18   reputation?
19   A.   Yes.
20   Q.   Why does a gang member lose his reputation for
21   killing a *chavala*?
22   A.   Oh.  The way I understood her question is that if
23   he were not to kill him, he would lose in reputation; or
24   if he would kill him.
25   Q.   Okay.  Let's clarify.  Let's start with a

1    scenario where a gang member sees a *chavala* and does not

2    kill him.  In the instance where the gang member does

3    not kill the *chavala*, what would happen to his

4    reputation?

5        A.   He would -- his reputation would be lowered.

6    They could give him a *calentón* or even kill him.

7        Q.   Now, how about the scenario, the opposite, where

8    a gang member sees a *chavala* and does kill him.  What

9    happens to the gang member's reputation?

10       A.   He could go up in rank, depending on how many

11   *chavalas* has he killed.

12       Q.   Let's talk a little bit more about the membership

13   of your clique, PVLS.  You've already mentioned the

14   leader is Payaso and Demente.  When you joined PVLS, who

15   were the other homeboys?

16       A.   There was Silencio.  There was Lil Poison.  There

17   was Lil Pardo.  There was Lil Pesadilla.  There was Lil

18   Payaso.  There was Duende.  There was Greñas.  There was

19   Lil Thunder.  And there was Blacky.

20       Q.   When were you arrested?

21       A.   January 2014.

22       Q.   By the time you were arrested, were there other

23   homeboys, too?

24       A.   Yes.

25       Q.   Who?

J. Ayala - Direct                                                    138

1    A.   Lil Slow, Lil Evil.

2    Q.   Was the first one Lil Slow?

3    A.   Yes.

4    Q.   Were there other leaders, too, by the time that

5    you were arrested, in addition to Payaso and Demente?

6    A.   Yes.

7    Q.   Who?

8    A.   Lil Greñas, Lil Payaso.

9    Q.   Were you ever a leader?

10   A.   I took a position, not like a leader, but like in

11   charge of some things.

12   Q.   What does that mean?

13   A.   Like to hand over the money for the drugs.

14   Q.   When did you take that position?

15   A.   That was a little before I ended up in jail.

16   Q.   And we've mentioned a lot of names, so I'd like

17   to go through some of them one by one.  Okay?

18   A.   Okay.

19   Q.   Let's start with Demente.  Do you know Demente by

20   any other names?

21   A.   No.  I just know him as Demente when I was

22   outside.

23   Q.   By the time that you were arrested, how long had

24   you known Lil Demente?

25   A.   Couple of months.

1          MS. MARTINEZ:  Your Honor, may we show the

2     witness what has already been admitted as Government's

3     Exhibit 75?

4          THE COURT:  Yes.

5          MS. MARTINEZ:  May we publish to make it

6     easier for Mr. Toliver?

7          THE COURT:  Yes.

8     BY MS. MARTINEZ:

9     Q.   Do you know who that is?

10    A.   Yes.

11    Q.   Who is it?

12    A.   Lil Demente.

13    Q.   You mentioned someone named Greñas.

14    A.   Yes.

15    Q.   Do you know Greñas by any other names?

16    A.   Yes.

17    Q.   What names?

18    A.   El Gatito, Mediometro, Rambito.

19    Q.   Any others?

20    A.   El Peluca.

21    Q.   For the court reporter's purposes, can we spell

22    these names?

23         Let's start with Peluca.

24    A.   P-u-l-u-c-a (sic).

25    Q.   Was another one you said Mediometro?

```
1          Would you spell that for the court reporter?

2     A.   Yes.  M-e-d-i-o-m-e-t-r-o.

3     Q.   And forgive me, but I don't remember if you said

4  another name.  You said Peluca, Mediometro.  Was there

5  another name or now?

6     A.   Rambito.

7     Q.   Would you spell Rambito, please.

8     A.   R-a-m-b-i-t-o.

9     Q.   Were there any others for Greñas?

10    A.   I don't think so.

11    Q.   By the time that you were arrested, how long had

12 you known Greñas?

13    A.   I met him before joining the Mara.  I saw him a

14 couple of times.

15    Q.   You mentioned that at some point Greñas was a

16 leader in the clique; is that right?

17    A.   Yes.

18    Q.   When did he become a leader?

19    A.   When Lil Demente was arrested.  Payaso gave him

20 more trust, so --

21         MR. LEIVA:  Your Honor, just a second.  And

22 I apologize.  I can understand what he's said before

23 it's translated.  I would object for the lack of

24 foundation, Your Honor, and hearsay.

25         MS. MARTINEZ:  The question is about his
```

1  knowledge of the gang structure.  He's testified

2  extensively, Your Honor.  I can lay more foundation.

3             THE COURT:  "When did he become a leader,"

4  was the question that she asked.

5             MR. LEIVA:  He was responding, how he knew

6  when my client allegedly became a leader.

7             THE COURT:  He's asking for a foundation

8  for --

9             MS. MARTINEZ:  I'll lay some foundation,

10  Your Honor.

11             THE COURT:  -- when the change took place.

12  Sustained.

13  BY MS. MARTINEZ:

14     Q.  Was Greñas a leader during a period of time

15  before you were arrested?

16     A.  Yes, on the streets.

17     Q.  As a member of PVLS, were you familiar with who

18  the leaders of PVLS were?

19     A.  Yes.

20     Q.  Were there times when leaders would change, when

21  a new person would become a leader?

22     A.  Yes.

23     Q.  When a new person became a leader, while you were

24  on the street, were you aware of the reasons that the

25  new person became a leader?

1    A.   Yes.

2    Q.   Why did Greñas become a leader in PVLS?

3    A.   Because, Lil Demente was arrested.

4    Q.   Do you remember approximately when that was?

5    A.   I don't remember the exact date.

6    Q.   Do you know what Demente was arrested for?

7    A.   Yes.

8    Q.   What?

9    A.   For attempted murder.

10   Q.   Do you know who the victim of the attempted

11   murder was?

12   A.   Yes.

13   Q.   Who?

14   A.   Peligroso.

15   Q.   Do you see Greñas in court today?

16   A.   Yes.

17   Q.   Would you please identify him by describing where

18   he's sitting and an item of clothing that he's wearing?

19   A.   He has a striped checkered shirt, and he's about

20   two meters from where she is standing.

21           MS. MARTINEZ:  Your Honor, may the record

22   reflect that the witness has properly identified

23   Defendant Jose Lopez Torres as Greñas.

24           THE COURT:  So noted.

25   BY MS. MARTINEZ:

1    Q.   You also mentioned someone named Lil Payaso.

2    A.   Yes.

3    Q.   Do you know Lil Payaso by any other name?

4    A.   Yes.

5    Q.   What names?

6    A.   Omar, and before becoming Lil Payaso, he was Lil

7    Slow.

8    Q.   Do you know why he changed his name from Lil Slow

9    to Lil Payaso?

10   A.   I only know that he was arrested together with

11   Payaso, and Payaso gave him the nickname.

12   Q.   Gave him which --

13        THE INTERPRETER:  Correction, "the gang

14   nickname."

15   BY MS. MARTINEZ:

16   Q.   Which gang nickname?

17   A.   Lil Payaso.

18   Q.   When you said he was arrested and with Payaso, is

19   that Payaso the runner whom you mentioned earlier?

20   A.   Yes.

21   Q.   By the time that you were arrested, how long had

22   you known Lil Payaso?

23   A.   Couple of months.

24   Q.   You mentioned that Lil Payaso at some point had a

25   leadership role in the clique; is that right?

1    A.   Yes.

2    Q.   Was that before you were arrested?

3    A.   Yes.

4    Q.   When was Lil Payaso a leader of the clique?

5    A.   When he was released from prison, Payaso gave him

6    the second word.

7    Q.   What do you mean by second word?

8    A.   Like the one after the runner.

9    Q.   Do you see Lil Payaso in court today?

10   A.   Yes.

11   Q.   Would you please identify him by describing

12   something he's wearing and where he's seated.

13   A.   He is wearing a white shirt with a black and gray

14   striped tie, and he's sitting behind you.

15           MS. MARTINEZ:   Your Honor, may the record

16   reflect that the witness has identified Defendant Omar

17   Dejesus Castillo, as Lil Payaso.

18           THE COURT:   So noted.

19   BY MS. MARTINEZ:

20   Q.   You mentioned someone named Lil Slow --

21   A.   Yes.

22   Q.   -- when you mentioned -- when you initially

23   mentioned Lil Slow, Were you talking about Lil Payaso or

24   someone else?

25   A.   Someone else.

1    Q.   Who is Lil Slow?

2    A.   Another clique member.

3    Q.   Do you know Lil Slow by any other names?

4    A.   Yes.

5    Q.   What names?

6    A.   Spider.

7    Q.   How long had you known Lil Slow by the time that

8    you were arrested?

9    A.   Couple of months, also.

10        MS. MARTINEZ:   Your Honor, may we show the

11   witness what has already been admitted as Government's

12   Exhibit 76.

13        THE COURT:   Yes.

14   BY MS. MARTINEZ:

15   Q.   Do you know who that is on the screen?

16   A.   Yes.

17   Q.   Who is it?

18   A.   Lil Slow.

19   Q.   You mentioned also someone named Leopardo.

20   A.   Yes.

21   Q.   Do you know Leopardo by any other names?

22   A.   Yes.

23   Q.   What names?

24   A.   Kanavi, Bago, Lil Hueso.

25   Q.   For the court reporter, let's spell each of

1    those, starting with Kanavi?

2        A.   K-a-n-a-v-i.

3        Q.   How about Bago?

4        A.   B-a-g-o.

5        Q.   And Lil Hueso?

6        A.   L-i-l, H-u-e-s-o.

7        Q.   Who was Leopardo?

8        A.   He was a clique member.

9        Q.   What was his level?

10       A.   A soldier.

11       Q.   You've used the word "soldier."  You've also used

12   the word "homeboy."  Is there any difference between

13   soldier and homeboy within MS-13?

14       A.   No.

15       Q.   Do you see Leopardo in court today?

16       A.   Yes.

17            MR. SALVATO:  Your Honor, just to eliminate

18   any issue, we would stipulate that Leopardo is here, and

19   this person would identify him as this person is

20   Leopardo.

21            THE COURT:  So noted.

22            MS. MARTINEZ:  Your Honor, I would still

23   like to have the witness identify him so the jury sees

24   him identifies him.

25            THE COURT:  Okay.

BY MS. MARTINEZ:

Q.   Would you identify Leopardo based on where he's seating and an item of clothing that he's wearing.

A.   He's wearing a light blue shirt, a light blue shirt with a tie, and he's sitting four people from where you're standing.

MS. MARTINEZ:  Your Honor, may the record reflect that he has identified Defendant Lemus Cerna.

THE COURT:  So noted.

BY MS. MARTINEZ:

Q.   I believe you also mentioned someone by the name of Pesadilla?

A.   Yes.

Q.   Do you know Pesadilla by any other name?

A.   Yes.

Q.   What names?

A.   Black, and Lil Tuner.

Q.   The first one was El Black; is that right?

A.   Yes.

Q.   And then Lil Tuner.  For the court reporter, would you spell Lil Tuner?

A.   I'm not sure how to spell Tuner.

Q.   That's okay.

How long had you known Pesadilla by the time you were arrested?

1    A.   Couple of months, also.

2    Q.   What was his level in the gang?

3    A.   He was a soldier.

4    Q.   Do you see him in court today?

5    A.   Yes.

6    Q.   Would you identify him by describing a piece of

7  clothing he's wearing and where he's sitting in court?

8    A.   I'm sorry, I can't see him because there are

9  other people.

10             MS. MARTINEZ:   Your Honor, may he stand?

11             THE COURT:   Yes.

12             MS. MARTINEZ:   Please stand if that helps

13  you see.

14             THE WITNESS:   He's behind you, with a

15  greenish shirt.

16  BY MS. MARTINEZ:

17    Q.   Could you just describe which table he's sitting

18  at, if this table to my right is the first table, and

19  there are more tables behind it, which table is he at?

20    A.   He's in the table behind.

21    Q.   Behind the first table?

22    A.   *Sí*.   (Answer not translated.)

23    Q.   And to make sure that the record is clear, how

24  many seats over in that table he is, starting with the

25  lady with the gray hair, how many people over?

1          The lady with the glasses.

2      A.   Two.

3               MS. MARTINEZ:   Thank you.

4               Your Honor, may the record reflect that the

5   witness has identified Defendant Alvin Gaitan Benitez as

6   Pesadilla.

7               THE COURT:   So noted.

8               MS. MARTINEZ:   And may the record also

9   reflect that I meant it as a compliment.   I apologize.

10  BY MS. MARTINEZ:

11     Q.   Another gang member whom you mentioned was Lil

12  Poison?

13     A.   Yes.

14     Q.   Who was Lil Poison?

15     A.   Another gang soldier.

16     Q.   Do you know him by any other name?

17     A.   Lil Wasón, or Wasón.

18     Q.   Could we spell Wasón for the court reporter?

19     A.   W-a-s-o-n.

20     Q.   How long had you known Lil Poison when you were

21  arrested?

22     A.   Maybe one year.

23               MS. MARTINEZ:   Your Honor, could we show the

24  witness what has previously been admitted as

25  Government's Exhibit 69-D.

1              THE COURT:  Yes.

2    BY MS. MARTINEZ:

3        Q.   Do you recognize this person?

4        A.   Yes.

5        Q.   Who is it?

6        A.   Lil Poison.

7        Q.   You also mentioned someone named Duende?

8        A.   Yes.

9        Q.   Do you know Duende by any other name?

10       A.   No.

11       Q.   How long had you known Duende by the time you

12   were arrested?

13       A.   Couple of months.

14       Q.   What was his level in the gang?

15       A.   He was only just a soldier.

16            MS. MARTINEZ:  With the help of the court

17   security officer, may we show the witness what has been

18   previously marked for identification purposes as

19   Government's Exhibit 73?

20   BY MS. MARTINEZ:

21       Q.   Do you have Government's Exhibit 73 in front of

22   you?

23       A.   Yes.

24       Q.   Do you recognize the person in that picture?

25       A.   Yes.

1    Q.   Who is it?

2    A.   Duende.

3         MS. MARTINEZ:   Your Honor, the government

4    moves into evidence Government's Exhibit 73.

5         THE COURT:   Received into evidence.

6         MS. MARTINEZ:   May we publish?

7         THE COURT:   Yes.

8    BY MS. MARTINEZ:

9    Q.   You also mentioned someone named Lil Evil?

10   A.   Yes.

11   Q.   Who is Lil Evil?

12   A.   A soldier of the gang, of the clique.

13   Q.   And do you know him by any other names?

14   A.   Yes.

15   Q.   What?

16   A.   Cusuco.

17   Q.   Would you spell that for the court reporter,

18   please?

19   A.   C-u-s-u-c-o.

20   Q.   Any other names?

21   A.   No.

22   Q.   How long had you known Lil Evil by the time you

23   were arrested?

24   A.   A few months.

25   Q.   Once you joined the clique, PVLS, were there

1    meetings with other members of the clique?

2        A.   Yes.

3        Q.   How often did the clique meet?

4        A.   Every two weeks, every week.

5        Q.   Where were the meetings?

6        A.   Different places.

7        Q.   What kinds of places?

8        A.   The woods, a homeboy's house.

9        Q.   What city or neighborhood were the meetings in?

10       A.   Several times in Culmore, the forest behind

11   Barcroft View.

12       Q.   What is Barcroft View?

13       A.   Some -- an apartments.

14       Q.   Who attended the clique meetings?

15       A.   All the homeboys, most of the clique homeboys.

16       Q.   How about *chequeos*?

17       A.   No.

18       Q.   How about *paro*s?

19       A.   No.

20       Q.   What topics were covered at the meetings?

21       A.   Subjects that had to do with the clique, the

22   clique's money.

23       Q.   What subjects had to do with the clique?

24            THE INTERPRETER:  Interpreter needs to

25   ask --

J. Ayala - Direct

1          THE COURT:  All right.

2          THE WITNESS:  To start the clique, purchase

3   weapons, buy drugs, do hits.

4   BY MS. MARTINEZ:

5      Q.   What's a hit?

6      A.   *Pagadas* are murders, to kill *chavalas*.

7      Q.   What is the Spanish word that you used for that?

8      A.   *Pagadas*.

9      Q.   Could you spell that for the court reporter.

10     A.   P-a-g-a-d-a-s.

11     Q.   *Pagadas* means murders?

12     A.   Yes.

13     Q.   At these clique meetings, were dues collected?

14     A.   Sometimes.

15     Q.   How much?

16     A.   Whatever people had; $10.

17     Q.   What was the money used for?

18     A.   For the clique.

19     Q.   For what for the clique?

20     A.   To buy drugs.

21     Q.   You've mentioned drugs many times already.  Were

22   you involved in selling or buying drugs for the clique?

23     A.   Yes.

24     Q.   Selling, buying, or both?

25     A.   Both.

J. Ayala - Direct                                                      154

```
1    Q.   What kinds of drugs?
2    A.   Marijuana, cocaine, heroin, crystal meth.
3    Q.   Have you also used drugs?
4    A.   Yes.
5    Q.   What kind?
6    A.   All types of drugs that I had just mentioned,
7  except heroin.
8    Q.   How often?
9    A.   Every day.
10   Q.   When you say "every day," are you talking about
11 before you were arrested or also now in jail?
12   A.   Before I was arrested.
13   Q.   Before you were arrested, how often did you use
14 marijuana?
15   A.   Every day, maybe 10, 15 times a day.
16   Q.   How much did you use cocaine before you were
17 arrested?
18   A.   Well, I slowed down a bit after I was jumped into
19 the gang, but before I did, I did it quite often.
20   Q.   After you were jumped into the gang, how often
21 did you use cocaine?
22   A.   Maybe every two days.
23   Q.   How about crystal meth; how often did you use
24 crystal meth before you were arrested?
25   A.   I only used it twice.
```

J. Ayala - Direct                                                    155

1    Q.   The drugs that you sold for the gang, for the
2    clique, where did you get them?
3    A.   The first times we bought them from some guys who
4    were there around the neighborhood where we lived.
5    Q.   You said the first times.  How about after those
6    first times.
7    A.   Then, we got drugs from Los Angeles, from some
8    homeboys who were over there.
9    Q.   Who were the homeboys in Los Angeles?
10   A.   I can't remember their names.  I just remember
11   one, Tuner.
12   Q.   What clique did the homeboys in Los Angeles
13   belong to?
14   A.   From ours, some of them.
15   Q.   How did the drugs get from Los Angeles to
16   Virginia?
17   A.   On one occasion, some of the homeboys of the
18   clique went over there to pick them up.
19   Q.   What homeboys?
20   A.   I remember Lil Demente and Greñas.  And, at other
21   times, we would get it by mail.
22   Q.   When you got it by mail, who sent it to you?
23   A.   The homeboy that -- in Los Angeles, and we would
24   receive it at the house of some homeboy here.
25   Q.   What homeboy?

1    A.   I got it on some occasions, and Greñas and Lil
2    Pesadilla and Lil Poison.
3    Q.   The connection in Los Angeles, who in the clique
4    in Virginia had the connection with the guys in Los
5    Angeles.
6    A.   Greñas.
7    Q.   Where did the clique sell the drugs?
8    A.   Many places, in our area, in Culmore.
9    Q.   In addition to Culmore, where else did the
10   cliques sell the drugs?
11   A.   Other states.
12   Q.   What states?
13   A.   Maryland, New York.
14   Q.   How did the clique get the drugs to New York?
15   A.   Sometimes we would take them over in a car.
16   Sometimes we would send them by mail, also.
17   Q.   Who would take them by car?
18   A.   Sometimes Lil Poison with Greñas took it to New
19   York.
20   Q.   Who would send the drugs by mail to New York?
21   A.   I remember that I did it on one occasion.
22   Q.   Do you know of anyone else who did?
23   A.   No.
24   Q.   Who were you sending the drugs to in New York?
25   A.   Homeboy of the clique and homeboys of another

1    clique who wanted to raise it.

2        Q.   Raise what?

3        A.   Their clique.

4        Q.   The drugs that the clique received from Los

5    Angeles, how did the clique pay for those drugs?

6        A.   Well, we come with the drugs and we would send

7    back the money in -- in installments.

8        Q.   Who would you send the money to?

9        A.   To the homeboys in Los Angeles, and to other

10   people whose name we were given to deposit it in their

11   accounts.

12       Q.   Who gave you the names?

13       A.   The homeboys who got us the drugs in Los Angeles.

14       Q.   What kinds of drugs did the clique get from Los

15   Angeles?

16       A.   Crystal, heroin, marijuana, cocaine.

17       Q.   What kind of drugs did the clique sell in New

18   York, or sell to homeboys in New York?

19       A.   Crystal and cocaine.  On some occasions we also

20   sent marijuana.

21       Q.   What kinds of drugs did the clique sell in

22   Culmore?

23       A.   All the four I have mentioned to you.

24       Q.   How about in Maryland?

25       A.   Crystal and cocaine.

1    Q.   What did the clique do with the money that it
2    made from the sale of the drugs?
3    A.   Help some homeboys who are in jail in
4    El Salvador.  Help our *ranflero* who is in jail here.
5    Q.   Let's start -- sorry.  Please continue.
6    A.   Pay for the rent where we were living, food.
7    Q.   Let's start with the homeboys in El Salvador.
8    Who were the homeboys in El Salvador that the clique
9    helped?
10   A.   Poison and Tigre.
11   Q.   Where was Poison in El Salvador?
12   A.   He's in jail.  He's locked up.
13   Q.   Where is Tigre in El Salvador?
14   A.   He's also in jail.
15   Q.   How do you know that Poison and Tigre are in
16   jail?
17   A.   Because, I would speak with them.
18   Q.   How would you speak with them?
19   A.   By cellphone.
20   Q.   How would the clique send money to Poison and
21   Tigre in El Salvador?
22   A.   He would give us the names of some male or female
23   friends of his, and we would sent it to them, and they
24   would take them to the prison or buy food for them.  I
25   don't know.

1    Q.   In what country were these male or female friends
2    of Poison or Tigre?
3    A.   In El Salvador.
4    Q.   How did you get the money to El Salvador?
5    A.   Via Western Union.
6    Q.   Who sent the money via Western Union?
7    A.   I did it on some occasions.  The other homeboys
8    of the clique also did.
9    Q.   What other homeboys sent the money from Western
10   Union to El Salvador?
11   A.   The ones I remember, Greñas, Lil Poison and
12   Silencio.
13   Q.   Who in the clique was involved in the clique's
14   drug business, in addition to yourself?
15   A.   Can you repeat the question?
16   Q.   Who in the clique -- what homeboys in the clique
17   were involved in the clique's drug business?
18   A.   Primarily Greñas and myself.
19   Q.   What homeboys in the clique sold drugs for the
20   clique?
21   A.   All of them.
22   Q.   Were there *chequeos* who sold drugs for the
23   clique?
24           THE INTERPRETER:  Could you repeat the
25   question?

```
 1              MS. MARTINEZ:  Of course.
 2    BY MS. MARTINEZ:
 3        Q.   Were there chequeos would sold drugs for the
 4    clique?
 5        A.   Sometimes.
 6        Q.   What chequeos?
 7        A.   Solitario, Lil Guasón.  Those were the only two
 8    chequeos there were.  Afterwards, there were some paros
 9    who would also sell.
10        Q.   Let's talk about Solitario.  Do you know -- do
11    you know Solitario by any other name?
12        A.   Yes.
13        Q.   What name or names?
14        A.   El Colita.
15        Q.   Can we spell Colita for the court reporter.
16        A.   Yes.  C-o-l-i-t-a.
17        Q.   How long had you known Solitario before you were
18    arrested?
19        A.   Perhaps about a year.
20        Q.   Do you see Solitario in court today?
21        A.   Yes.
22        Q.   Would you please identify him by describing an
23    item of clothing he's wearing and the location in court
24    he is sitting.
25        A.   He's got like a light blue shirt.  He's on the
```

1   third row, the last one in the row.

2            MS. MARTINEZ:  Your Honor, may the record

3   reflect that the witness has identified

4   Manuel Ernesto Paiz Guevara.

5            THE COURT:  So noted.

6   BY MS. MARTINEZ:

7       Q.  Do you know when Solitario first started

8   associating with the clique?

9       A.  I don't remember the exact date, but yes, I do

10  remember how it started.

11      Q.  What do you remember about it?

12      A.  I just remember that he started walking with the

13  Lil Poison --

14      Q.  What do you mean --

15      A.  -- at school.

16      Q.  What do you mean by "walking with Lil Poison"?

17      A.  Well, he would always hang out with him.  He

18  would be doing his thing and they would be like,

19  smoking, were like friends at first, not walking.

20      Q.  What does it mean within MS-13 for someone to be

21  walking?

22      A.  It's like they were giving him schooling in La

23  Mara.  They're showing him how La Mara works.

24      Q.  What kind of schooling?

25      A.  Teach him about the *chavalas*, all about the rules

1   or how things are in La Mara, teach him how seriously.

2                   Ms. Martinez:  Your Honor, may we show the

3   witness what has been marked for identification purposes

4   as Government's Exhibits 71-A and 71-B.

5                   THE COURT:  Yes.

6   BY MS. MARTINEZ:

7       Q.   Do you have those pictures in front of you?

8       A.   Yes.

9       Q.   Who is in the pictures?

10      A.   Solitario.

11                  MS. MARTINEZ:  Government moves into

12  evidence Government's Exhibits 71-A and 71-B.

13                  THE COURT:  Received.

14                  MS. MARTINEZ:  May we publish?

15                  THE COURT:  Yes.

16  BY MS. MARTINEZ:

17      Q.   Starting with 71-A, And now 71-B, Solitario's

18  hair is different in those two pictures.  Do you know

19  when he changed his hair?

20      A.   When he started walking with us in La Mara.

21      Q.   Why?

22      A.   Because long hair doesn't go with La Mara.

23      Q.   What do you mean?

24      A.   Most of the *chavalas* have long hair.

25      Q.   Is it permitted within MS-13 to have long hair?

1    A.   No.

2    Q.   How did the clique keep track of money from dues

3    and from drug sales?

4    A.   Keeping accounting in notebooks.

5    Q.   Who had the notebooks?

6    A.   I remember I had them for a while.  Some other

7    homeboys had them, also.

8    Q.   What other homeboys?

9    A.   Greñas, Lil Poison, Leopardo.

10            THE COURT:  Counsel, let's take the

11   afternoon recess for about 15 minutes.

12            Take the afternoon recess, ladies and

13   gentlemen.  You may be excused.  Fifteen minutes.  Thank

14   you.

15            (Court recessed at 3:40 p.m. and reconvened

16            at 3:58 p.m.)

17            THE COURT:  I'm just having the witness

18   brought out.

19            (Witness resumed stand.)

20            THE COURT:  You can bring our jury out.

21            (Jury present.)

22            THE COURT:  You may be seated.

23            Counsel, you may proceed.

24             DIRECT EXAMINATION (Continued)

25   BY MS. MARTINEZ:

J. Ayala - Direct                                          164

1    Q.   Mr. Ayala, before the break, we were talking
2    about the notebooks in which the clique kept track of
3    its money from dues and from drug sales, right?
4    A.   Yes.
5    Q.   And I believe you said, but correct me if I'm
6    wrong, that various members of the cliques had these
7    notebooks at different times, including you, Greñas, Lil
8    Poison and Leopardo?
9    A.   Yes, that's correct.
10             MS. MARTINEZ:  Your Honor, may we show the
11   witness what has been marked for identification purposes
12   as Government's Exhibits 41-A and 41-B?
13             THE COURT:  Yes.
14             MS. MARTINEZ:  Mr. Toliver, those are
15   physical exhibits that are here -- that are right there.
16   Thank you.
17   BY MS. MARTINEZ:
18   Q.   Would you please look at Government's
19   Exhibits 41-A and 41-B.  Please feel free to take them
20   out of the bag and open them up to see what they are.
21             MS. MARTINEZ:  Court's indulgence.
22             I've been informed by my agent that the bags
23   are still sealed as evidence.  May we have Your Honor's
24   permission to break the seal and open this evidence?
25             THE COURT:  Yes.

1          MS. MARTINEZ:  I apologize, Your Honor.  I

2     didn't anticipate this, but it does make sense that

3     they're sealed.

4          THE COURT:  Hand the documents to

5     Mr. Toliver.

6          The record should reflect that the court

7     security officer is cutting the seal.

8          Thank you.

9     BY MS. MARTINEZ:

10       Q.   Mr. Ayala, please take those items out of the bag

11    and look through them to see if you know what they are.

12       A.   Yes, I know what it is.

13       Q.   What are they?

14       A.   There is the accounting and some notes from the

15    clique.

16          MS. MARTINEZ:  Your Honor, government moves

17    into evidence Government's Exhibit 41-A and 41-B.

18          THE COURT:  Has the defense seen these

19    exhibits?

20          MS. MARTINEZ:  Your Honor, the defense has

21    seen color photocopies of all of the pages of the

22    exhibits.

23          THE COURT:  All right.  41-A and 41-B will

24    be received.

25          MS. MARTINEZ:  Your Honor, we have also

1   color photocopies that have page numbers.  May we use

2   those with the witness for ease of referring to each

3   page?

4                    THE COURT:  Yes.  Does the defense have

5   copies of them?

6                    MS. MARTINEZ:  Yes, Your Honor.

7                    THE COURT:  Mr. Toliver, I think she has

8   them here.  Oh, there's one there.  And I'll take one.

9   Thank you.

10                   MS. MARTINEZ:  Your Honor, may we publish

11  the pages as I reference them, or would you like --

12  would Your Honor like him to look first before we

13  publish?

14                   THE COURT:  Well, he's identified the book.

15  I don't think we need to go through that.  Just have

16  him -- focus on whatever page you want him to look at.

17                   MS. MARTINEZ:  Thank you, Your Honor.

18                   May we please put up on the screen page two

19  of Exhibit 41-A.

20  BY MS. MARTINEZ:

21    Q.  You can just look on the screen, Mr. Ayala.  Do

22  you see that?

23    A.  Yes.

24    Q.  At the top of that page, can you read what it

25  says?

```
 1      A.   Church's debt --
 2      Q.   Could we --
 3               THE INTERPRETER:   Or "debt from the
 4    iglesia."
 5    BY MS. MARTINEZ:
 6      Q.   Could we do that in Spanish, since it's written
 7    in Spanish?
 8           For the record, what does it say in Spanish?
 9      A.   Deudas de la clica.
10      Q.   Would you read it verbatim, what it actually
11    says, sir?
12      A.   (Reading, not translated) --
13      Q.   Just a moment.   Just the first line.
14           Spell deudas.
15      A.   D-e-u-d-a-s.
16      Q.   What does deudas mean?
17      A.   Like, money that is owed by the clique.
18      Q.   And then you said, "of the clica."   What is
19    clica?
20      A.   It's a group, a group.
21      Q.   How do you spell clica?
22      A.   C-l-i-c-a.
23      Q.   On this page, what word are you reading to mean
24    clica?
25      A.   Iglesia.
```

J. Ayala - Direct

1   Q.   Could you spell *iglesia*?

2   A.   I-g-l-e-s-i-a.

3        MS. MARTINEZ:   Would the interpreter provide

4   the literal translation of *iglesia*.

5        THE INTERPRETER:   The interpreter translates

6   *iglesia* means church.

7   BY MS. MARTINEZ:

8   Q.   Why does church mean *clica* or clique to you?

9   A.   Because there's sometimes like code words or code

10  that we use in order to talk.

11  Q.   Below that first line it says "Tio Alejandro."

12  A.   Yes.

13  Q.   Do you know what that means?

14  A.   Not exactly.

15  Q.   Okay.  Let's go to page 17 of the same exhibit.

16       For the court reporter, we'll go back to page

17  two, and looking at page two, just to make it easier, I

18  will -- well, no.

19       Could you please spell -- have the witness do

20  it -- where it says, "Tio Alejandro."

21  A.   T-i-o, A-l-e-j-a-n-d-r-o.

22  Q.   Do you understand the significance of this page,

23  generally?

24  A.   Yes.

25  Q.   What is the general significance of this page?

1      A.   That some money is owed to some *clicas.*  The

2   amounts of money are written down.

3      Q.   When you said you don't know exactly what Tio

4   Alejandro means, what do you mean not exactly?

5      A.   Because it could be some clique and I don't know

6   exactly which clique.

7      Q.   Please turn to page 17.  What is the significance

8   of this page?

9      A.   It's the 13th.

10     Q.   What's the significance of the 13th to the gang?

11     A.   Well, the gang is called MS-13, so that is the

12  number the gang has.  That's the number they use to get

13  together the homeboys.

14     Q.   Please turn to page 24.  What does this say?

15     A.   MS.

16     Q.   What is the significance of those letters?

17     A.   Mara Salvatrucha.

18     Q.   Let's go now to Exhibit 41-B, page two.  Do you

19  understand the general significance of this page?

20     A.   Yes.

21     Q.   What is the significance of this page?

22     A.   They are -- here you have the initials for the

23  homeboys.

24     Q.   Where on the page are the initials of the

25  homeboys?

J. Ayala - Direct                                           170

1   A.   On the left side, at the beginning, where it
2   starts, the S, the M, the G and the C.
3   Q.   What are the numbers and the letters to the right
4   of those initials of the homeboys?
5   A.   Over there it says *niña ojos negros*.  That means
6   heroin.  Below that, it says, *en la calle*, and that
7   means what has been sold on the street.
8   Q.   Let's start with the line, *niña ojos negros*.  Can
9   you spell that for the court reporter, please?
10  A.   N-i-n- -- with the wavy line on top -- -a,
11  o-j-o-s, n-e-g-r-o-s.
12  Q.   Why do you understand *niña ojos negros* to mean
13  heroin?
14  A.   Because that's how we refer to heroin when I used
15  to be on the outside.  All of the homeboys, all of us,
16  we refer to it as -- that way, in order not to say
17  "heroin."
18  Q.   Why would you not want to say the word "heroin"?
19  A.   It was just between us, like a code word that we
20  use, so that the other people would perhaps not
21  understand what we were referring to.
22  Q.   Below that it says, *en la calle*.  Would you spell
23  that for the court reporter, please?
24  A.   E-n, l-a, c-a-l-l-e.
25  Q.   Why do you understand *en la calle* to mean what

1    was sold on the street?

2        A.   Because that's almost how we wrote things on the

3    book.  We always wrote "in the street," meaning that we

4    were in the streets selling the drugs.

5        Q.   And going back to the letters that you say are

6    initials of the homeboys on the left side, do you know

7    what the list of numbers to the right of those initials

8    refers to?

9        A.   Yes.  They're like amounts of money.

10       Q.   Money for what?

11       A.   For drugs.

12       Q.   Do you know whose initials are listed here?

13       A.   Perhaps some of them.

14       Q.   Let's go to page five.  What's the word at the

15   very top of the page on the farthest left?

16       A.   *Niña.*

17       Q.   What does that mean to you?

18       A.   It could be some type of drug, but it doesn't say

19   specifically which drug.

20       Q.   Below *niña* -- oh, and can we spell *niña* for the

21   court reporter, please.

22       A.   N-i-n- with the wavy character -- -a.

23       Q.   Below *niña*, there are letters going down each

24   line.  Do you see that?

25       A.   Yes.

1    Q.   What do you understand these letters to mean or

2    signify?

3    A.   Yes, I can understand what it is.

4    Q.   What is it?

5    A.   It is the initials for the homeboys and the money

6    which they have turned over, or which they owe.

7    Q.   Money for what or from what?

8    A.   For drugs or the drugs that they were selling.

9    Q.   Do you know whose initials are listed?

10   A.   The L and the P is Lil Poison.  The V and the A

11   is Viejos Aparo (phonetic).  The L and the G is Lil

12   Guasón.  The L and the P, Lil Poison.  The S and the L,

13   Solitario.

14   Q.   Please turn to page 11.  Do you understand the

15   significance of this page?

16   A.   Yes, I'm able to read.  I understand.  There are

17   some words here that I'm not able to read.

18   Q.   Of the parts that you're able to read, what do

19   you understand it to mean?

20   A.   Well, the beginning you have the date, the month

21   and the date.

22   Q.   What is the date?

23   A.   The 13th of February -- February the 13th.

24   Q.   What else do you understand on the page?

25   A.   Well, on the left side, it says, debt, that

1    means, debt, like money that is owed.

2        Q.   How about below that?

3        A.   There's also the initials of some of the

4    homeboys, and some of the *paros*.

5        Q.   Before we go through the initials, the word *deve*,

6    can you spell that for the court reporter.

7        A.   D-e-v-e.

8        Q.   Do you understand whose initials are listed below

9    for the debts?

10       A.   Yes.

11       Q.   Please tell us.

12       A.   The L and the G, Lil Waso.  It could also be Lil

13   Guasón.  Afterwards, F beneath that, it says El Malo.

14   That is a *paro*.  After that, you get, Soli, which means

15   Solitario.  Afterwards, it says, *yo*, which means like,

16   I.

17            And, afterwards, you get L and S, which could be

18   Lil Song, or like Lil Wasón as well.  And then the V and

19   the A, which is how we call the *paro*, VA.

20            After, beneath that is L and the P, which could

21   be Lil Poison.

22            What is underneath, I cannot distinguish.  I

23   cannot read it.

24       Q.   How about the last line on the page.  Are you

25   able to read that?

1    A.   Yes.

2    Q.   What does it say?

3    A.   *Mañana*, Solis, go to the bank.

4    Q.   Let's start with *mañana.*  How is that spelled?

5    A.   M-a-n- -- with a wavy character on the top --

6    -n-a.

7    Q.   And Solis, how is that spelled there?

8    A.   S-o-l-i-s.

9    Q.   What do you understand, "*mañana* Solis go to the

10   bank" to mean?

11   A.   It means that tomorrow somebody is going to go to

12   the bank.  He's going to go to the bank.  It could be to

13   deposit some money.

14   Q.   Do you know who?

15   A.   Oh, it says Solis over here.  It could be

16   Solitario.

17   Q.   Please go to page 14.  Do you understand the

18   significance of this page?

19   A.   Yes.

20   Q.   What is the significance of this page?

21   A.   Money that's being collected from the clique.

22   Q.   For what?

23   A.   Well, there is always -- I mean there was a

24   program that we were in, several cliques, and there was

25   always money that was being collected to send it to El

J. Ayala - Direct

1   Salvador to some other cliques which needed it.

2       Q.   You said a program that the clique was in.

3   What's the program?

4       A.   It like the program -- program of the Virginia

5   cliques.

6       Q.   What cliques were involved?

7       A.   There were several.  There were the Silvas.

8   There were the Guanacos.  There was us, the Park Views.

9   There were the ULS.  I think that's all.  That's the

10  ones that I remember.

11      Q.   Are there cliques listed on this page?

12      A.   There is the PLS, which is the Pinos.  It means

13  the Pinos Locotes Salvatruchas.

14      Q.   Can you spell Pinos?

15      A.   P-i-n-o-s.

16      Q.   Which lines signifies the Pinos?

17      A.   The one where it says PLS.

18      Q.   Do you understand what the other line signifies?

19      A.   ULS means Uniones Locotes Salvatruchas.

20      Q.   Please spell Uniones.

21      A.   U-n-u -- no, sorry -- U-n-i-o-n-e-s.

22      Q.   How about the other lines?

23      A.   Well, over ULS, it says Delicia.

24      Q.   What is Delicia.

25      A.   It's another clique.

1    Q.   How do you spell Delicia?

2    A.   D-e-l-i-c-i-a.

3    Q.   How about the line above that?

4    A.   Park View, is a clique -- our clique, Parque de

5    la Vista Locotes Salvatrucha.

6    Q.   Can you spell Park View?

7    A.   P-a-r-k, V-i-e-w.

8    Q.   Please turn to page 15.

9         Do you understand what this is?

10   A.   That is -- that is a receipt.

11   Q.   Of what?

12   A.   That is a receipt served like the commissary,

13   that you buy stuff in jail, something like that.

14   Q.   What jail?

15   A.   I'm sure that it is Fairfax.

16   Q.   Let's turn to page 31.  Do you understand the

17   significance of page 31?

18   A.   Yes.

19   Q.   What is it?

20   A.   They're also homeboy debts.

21   Q.   What homeboys?

22   A.   Some clique homeboys and some *paro*s.

23   Q.   Can you list the ones that you're able to read?

24   A.   Well, the first one, it says Duende.  The second

25   one, I can't understand what it says.  The third one,

1   Lil Waso.  The one that follows, I can't understand that

2   one either.  The one after says Lil Tuner.  Then

3   Solitario.  Then Choky, then, VA, that's a *paro*, the

4   clique's *paro*.  Then it says Belén.  That's my son's

5   mother.  The other one, I can't understand what it says.

6        Q.   Please turn to page 54.  What is this?

7        A.   The clique's letters.

8        Q.   What's after the clique's letters?

9        A.   13.

10       Q.   What's above the clique's letters and the number

11   13?

12       A.   A marijuana leaf and like smoke.

13       Q.   Please turn to page 72.  Do you understand this

14   page?

15       A.   Yes.

16       Q.   What's the name in the box on the left side of

17   the page, about halfway down?

18       A.   Solitario.

19       Q.   What does it say right below Solitario?

20       A.   There is a 13.

21       Q.   Do you understand any other of the significance

22   of this page?

23       A.   Yes.  At the top it says, Payaso's woman.

24       Q.   Anything else?

25       A.   No.

J. Ayala - Direct

1    Q.  Now -- that's 72.  All right.

2        Mr. Ayala, does MS-13 have any particular music

3    that members listen to?

4    A.  There's a lot of music that we listen to.

5    Q.  Is there music that's particular to MS-13?

6    A.  Yes.

7    Q.  Have you listened to music that's particular to

8    MS-13?

9    A.  Yes.

10   Q.  During your trial preparation, were you asked to

11   listen to a song?

12   A.  Yes.

13   Q.  Were you able to recognize the song that you

14   listened to?

15   A.  Yes, I had heard it before.

16   Q.  Was it related at all to MS-13?

17   A.  Yes.

18       MS. MARTINEZ:  Your Honor, at this time the

19   government would ask to publish Government's

20   Exhibit 104-A, which is a recording that we would play.

21   It's in Spanish.  It's, I think, less than two minutes;

22   and also, Government's Exhibit 104-B, which is a

23   translation of that recording, which was previously

24   identified and admitted by one of the linguists.

25       THE COURT:  So, do you want us to have 104-B

1    handy as you play the song?

2              MS. MARTINEZ:  Yes, Your Honor.  And I think

3    Ms. Greigo can put them both on the screen, but I

4    believe that 104-B is in the jurors' binder.

5              MR. LEIVA:  Your Honor, note an objection

6    based on relevance.

7              THE COURT:  Relevance?

8              MR. LEIVA:  Yes, sir.

9              THE COURT:  Relevance?

10             MS. MARTINEZ:  Oh, I'm sorry, Your Honor.

11   The relevance is, as this witness has testified, there

12   are songs that are particular to MS-13 and that relate

13   to MS-13.  He's testified that he has listened to such

14   music and, in fact, that he has listened previously to

15   this precise song, and that it relates to MS-13.

16             THE COURT:  All right.  How does that relate

17   to this case?

18             MR. LEIVA:  Your Honor, may we --

19             THE COURT:  Have you laid a --

20             MS. MARTINEZ:  Perhaps we should approach.

21             THE COURT:  -- foundation?

22             MS. MARTINEZ:  I --

23             THE COURT:  Have you laid a foundation,

24   connection to this case?

25             MS. MARTINEZ:  Could we perhaps approach to

1      avoid the speaking objection?

2                    THE COURT:  All right.  Sure.

3                    (Thereupon, the following side-bar

4      conference was had:)

5                    MR. JENKINS:  Your Honor, on behalf of

6      Mr. Torres, we would object on relevance grounds, also.

7                    As I think the Court has already inquired of

8      the counsel for the government, I fail to see what the

9      relevance is in this particular case.  The mere fact

10     that members of the MS-13 might listen to country music

11     or prefer rock over rap music, I don't see where the

12     relevance is to this case.

13                    MR. LEIVA:  If I may add, Your Honor --

14     again on behalf of Mr. Lopez Torres -- they're not

15     singing about the exploits.  For example, the Mexican

16     mafia is known to have songs made based on the exploits

17     about people they killed, transactions that they've

18     done.  This is just a generic MS-13 song.  It's akin to,

19     if we have an African-American gang and they want to pay

20     NWAF, the police, there's no relevance to it.  That's

21     the kind of music they listen to.

22                    It's more prejudicial than anything else.

23     So unless this song was either made by one of these

24     members or specifically highlights or details --

25                    MS. MARTINEZ:  I'm sorry.  The jury is

J. Ayala - Direct

1    speaking very loudly right now.  Perhaps --

2              THE COURT:  I can hear.  Can you hear?

3              MS. MARTINEZ:  I just meant it's not

4    appropriate for the jury to be speaking in the courtroom

5    to each other.

6              THE COURT:  They can talk to each other.

7              MR. LEIVA:  (Continuing) -- or details, one

8    of the exploits, then I don't see how it's relevant at

9    all.

10             MS. MARTINEZ:  Your Honor, relevant in this

11   case is the racketeering enterprise, the existence of

12   the racketeering, the activities that the racketeering

13   enterprise, MS-13, engaged in, and also membership in

14   the racketeering enterprise.

15             Your Honor, I'll proffer that subsequent

16   witnesses -- I can only take so many witnesses at

17   once -- subsequent witnesses were telling from the

18   telephone, one of the defendants from which membership

19   in this enterprise in MS-13 will be contested.

20             It's Manuel Ernesto Paiz Guevara,

21   Mr. Chick's client, that we're obviously not going to

22   elicit that particular fact through the witness, but

23   because this witness has personal knowledge of this

24   song, we do think it's appropriate for him to be able to

25   testify about the song.

1              The government will shore up the relevance,

2    the very specific relevance to this case, in one of the

3    defendant's -- one of the defendant's testimony that the

4    song came from the cellphone of this defendant.

5              The order of witnesses -- we can't put every

6    witness before every other witness.

7              But in addition to the relevance to

8    Mr. Chick's client, we do submit that, generally

9    speaking, these lyrics about what -- and the lyrics are

10   about MS-13, Your Honor, and about what MS-13 is and

11   what MS-13 does, and we submit that that is relevant to

12   this case, and to the various elements we have to prove

13   to prove that MS-13 is a racketeering enterprise.

14             MR. LEIVA:  So --

15             MS. MARTINEZ:  So, in other words, we have

16   two bases of relevance, Your Honor, generally speaking

17   to the case at large and the racketeering enterprise,

18   and more specifically to the Defendant Paiz Guevara.

19             THE COURT:  You were going to say something?

20             MR. LEIVA:  Yes, I do, Your Honor.  Several

21   things.

22             It's one thing to ask this witness if he's

23   heard the song, and if it's about MS-13, and that's it.

24   I mean, if she wants to establish that Mr. Chick's

25   client had a song about MS-13 in his possession, that's

J. Ayala - Direct

 1   all that needs to be asked of this witness.

 2            And as far as the lyrics go, they're very

 3   highly prejudicial, Your Honor.  But, just -- I --

 4            THE COURT:  Is it against the law to possess

 5   a song?

 6            MS. MARTINEZ:  No, Your Honor.  But if part

 7   of the defense is arguing that he was not fully a

 8   enmeshed in the culture of MS-13, or not really a member

 9   of MS-13, we do see this as extremely relevant to show

10   his membership, to show he had been engaged in the

11   culture, to show him associating with gang members.

12            Again, if this were a different defendant, I

13   think that perhaps the relevance would be more limited,

14   if this were a defendant where we have ample testimony

15   about leadership, where it seems from the arguments of

16   counsel, you can seem to acknowledge that they're part

17   of the gang.

18            But Mr. Chick has strenuously argued about

19   his client not really being involved with the gang, his

20   client being a small player.  In the opening statement,

21   various arguments he made to the Court, and I imagine he

22   will argue in closing that his client had very little

23   involvement with the gang.

24            And, this type of evidence does demonstrate

25   his membership, his association, things that we must

1    prove in order to make our case against that defendant.

2              MR. LEIVA:  All it does is show his

3    preference for music.  That's all it shows.  Just

4    because I happen to listen to some music, a particular

5    type of genre, doesn't mean I'm a member of whatever

6    that music is detailing or singing about.

7              MS. MARTINEZ:  Although it --

8              THE COURT:  I don't want to make a federal

9    case out of this.

10             MR. ZIMMERMAN:  We already have that.

11             THE COURT:  I've heard enough.  If all

12   you've got is a record on a cellphone, then you have a

13   very weak case.

14             I sustain the objection.  I don't think we

15   need to have some fact -- to have the songs on the

16   cellphone means nothing.  It doesn't prove that the

17   person is a member of the gang.  They like to listen to

18   that song, just like the NWA song, so what.  Objection

19   sustained.

20             (Thereupon, the side-bar conference was

21   concluded.)

22             MS. MARTINEZ:  Thank you, Your Honor.

23             THE COURT:  Now you may proceed, Counsel.

24   BY MS. MARTINEZ:

25      Q.  Mr. Ayala, you mentioned earlier in your

 1    testimony someone named Peligroso.

 2        A.   Yes.

 3        Q.   Who is Peligroso?

 4        A.   A gang member, a member of the clique.

 5        Q.   What happened with Peligroso?

 6        A.   I only knew him for a couple of months and then

 7    he disappeared.

 8        Q.   What do you mean by "disappeared"?

 9        A.   Well, I only -- when -- before -- when I became

10    part of the clique -- before I became part of the

11    clique, he had already disappeared.  And when I became

12    part of the clique, I found out that he had tried to --

13             THE COURT:  Excuse me.  Excuse me.

14             Is he getting ready to tell us some hearsay

15    about what he found out, without any foundation?

16             MS. MARTINEZ:  I'm not sure, Your Honor.  I

17    asked what he meant by "disappeared."  That's the

18    question.

19             THE COURT:  Okay.  Well, he can testify that

20    he couldn't find him again.  Next question.

21    BY MS. MARTINEZ:

22        Q.   When you say -- without saying what anyone else

23    told you, before laying that foundation, when you use

24    the word "disappeared," what do you mean by that?

25        A.   He didn't come over to meet with the homeboys any

J. Ayala - Direct

1    more.

2        Q.   Within MS-13, what's the significance of a

3    homeboy disappearing or not coming to meet with the

4    homeboys?

5        A.   It means that he is *pesetiando* (phonetics), or

6    like a *peseta*.

7        Q.   What's a *peseta*?

8        A.   That he is distancing himself from the clique

9    without telling anyone that he doesn't want to be with

10   the clique any more.

11       Q.   Is that something that is permitted within MS-13?

12       A.   No.

13       Q.   Why not?

14       A.   Because once you're inside, you can't get out.

15       Q.   What can happen to a homeboy who tries to get

16   out?

17       A.   He can be killed if he does it without saying

18   anything.

19       Q.   How did the clique react to Peligroso

20   disappearing?

21       A.   Putting a green light on him.

22       Q.   What's a green light?

23       A.   He was going to be killed.

24       Q.   Were there times when you heard other homeboys

25   discuss the green light on Peligroso?

1   A.   I heard about going out to look for him and kill
2   him.
3   Q.   Were you aware of a plan to go out and kill him?
4   A.   Yes.
5   Q.   What was the plan?
6   A.   Go looking for him where he met at a school, and
7   hit him.
8   Q.   What do you mean by "hit"?
9   A.   Kill him.
10  Q.   Who was supposed to go?
11  A.   Lil Demente, Lagrima, Greñas, a homeboy we call
12  Drowsy, and a *paro* we call Marciano.
13  Q.   How were they going to kill him?
14  A.   With a machete and also a shotgun.
15  Q.   Was there a particular day when the plan was
16  supposed to be carried out?
17  A.   Yes, there was a day, but I can't remember that
18  day.
19  Q.   Were you around that day?
20  A.   Yes.
21  Q.   What did you see happen?
22  A.   I saw when they were getting together to leave in
23  Lil Demente's car.
24  Q.   Who was getting together to leave?
25  A.   There was Lil Demente.  There was Greñas.  There

1    was Drowsy.  Marciano was also there.  And the other

2    homeboys, we were there, also, waiting for them to

3    leave, and also waiting for Lagrima, because he was

4    supposed to go with them.

5        Q.   Were you there when they left?

6        A.   Yes, I was there.

7        Q.   Who was in the car when it left?

8        A.   Lil Demente, Greñas, Drowsy, and Marciano.

9        Q.   Was Lagrima there?

10       A.   No.

11       Q.   Who was Lagrima?

12       A.   He was a gang member, the one we killed.

13            MS. MARTINEZ:  Your Honor, may I show the

14   witness what has been marked as Government's Exhibit

15   61-A and B?

16            THE COURT:  Yes.

17   BY MS. MARTINEZ:

18       Q.   Do you recognize the person in those pictures?

19       A.   Yes.

20       Q.   Who is it?

21       A.   Lagrima.

22            MS. MARTINEZ:  Your Honor, the government

23   moves into evidence Government's Exhibit 61-A and 61-B.

24            THE COURT:  Received.

25            MS. MARTINEZ:  May we publish?

J. Ayala - Direct

1          THE COURT:  Yes.

2     BY MS. MARTINEZ:

3        Q.   Before the car left with Lil Demente, Greñas,

4     Drowsy and Marciano, at any point, did you see any

5     weapon?

6        A.   Yes.

7        Q.   What weapon?

8        A.   A machete and a shotgun.

9        Q.   Without telling me what you may have heard, at

10    any point did you hear what ended up happening that

11    night?

12       A.   Yes.

13       Q.   Who did you hear from?

14       A.   Who did I hear --

15       Q.   Who told you?

16       A.   Greñas.

17       Q.   What did Greñas tell you?

18       A.   He didn't only tell me, he told all the other

19    homeboys, too.

20       Q.   What did you hear Greñas tell the homeboys?

21       A.   That when they got to the place, the police was

22    waiting for them, that someone had turned them in.

23       Q.   What did Greñas say about someone turning them

24    in?

25       A.   That he -- he said Lagrima, that he had heard his

1  voice when he had been taken to a room, when he was

2  taken to the jail in Prince William.

3      Q.   What, if anything, did he say that that meant to

4  him?

5      A.   That he had turned them in.

6      Q.   How did the clique react to Greñas's accusations

7  about Lagrima?

8      A.   Well, that we were all going to find out if it

9  was the truth, that he had turned us in -- turned them

10  in, because he was supposed to go along with them, but

11  he didn't.

12      Q.   What do you mean by, find out if he was the one

13  who turned everyone in?

14      A.   We were going to find out if he was a snitch, and

15  we were going to prove it or something like that.

16      Q.   Prove it how?

17      A.   Taking him to another mission, and seeing if

18  something strange happened like it happened on that day.

19      Q.   What is a mission?

20      A.   It could be a hit.

21      Q.   Was there a time when Lagrima was taken to

22  another mission to see if something strange happened?

23      A.   Yes.

24      Q.   What was that mission?

25           THE INTERPRETER:  Interpreter needs --

1          THE WITNESS:  I was going to do a mission

2   with Greñas, to do a hit or something like that, and he

3   was supposed to be waiting for Greñas at a certain spot.

4   BY MS. MARTINEZ:

5       Q.   Who was supposed to be waiting?

6       A.   Lagrima.

7       Q.   What happened?

8       A.   Because Greñas said that he arrived there, but he

9   wasn't there, that there was a patrol car.

10      Q.   What did Greñas do after that?

11      A.   He spoke with us, and he told -- said that he was

12  already sure that he was a snitch.

13      Q.   What happened with Lagrima -- what happened with

14  respect to Lagrima after Greñas said he was sure Lagrima

15  was a snitch?

16      A.   Look for him and put a green light on him.

17      Q.   Who put a green light on him?

18      A.   Well, the clique decided.

19      Q.   Do you know who within the clique was in charge

20  of deciding, or do you mean the whole clique decided?

21      A.   Greñas made the call to get the okay.  He called

22  El Salvador, the homeboy down there.  He also spoke with

23  Payaso.

24      Q.   Starting with El Salvador, what homeboy in El

25  Salvador did Greñas call about the green light?

1      A.   Well, he spoke with Poison, because he was a

2  homeboy who was down there.  But, he also spoke to other

3  cliques who said that Lagrima was a snitch.

4      Q.   You know why he spoke with Poison in El Salvador?

5      A.   Because he has the word in El Salvador.

6      Q.   What do you mean by "the word"?

7      A.   Because he has a high rank and he can also make a

8  decision for the clique.

9      Q.   You said that Greñas also spoke with Payaso; is

10 that right?

11     A.   Yes.

12     Q.   That's the Payaso in prison in the U.S.?

13     A.   Yes.

14     Q.   Do you know why Greñas spoke with Payaso?

15     A.   Yes.  Because he was the clique's *ranflero*, he

16 was supposed to know.

17     Q.   After the green light was put on Lagrima, was

18 there a plan developed about how to carry out the green

19 light?

20     A.   Yes.

21     Q.   Were you present for conversations with other

22 gang members about the plan on how to kill Lagrima?

23     A.   Yes.

24     Q.   During conversations about the plan to kill

25 Lagrima, was the person we agreed to call homeboy two

J. Ayala - Direct

1    there?

2        A.   Yes.

3        Q.   Other than homeboy two, what other gang members

4    were present when you were involved in conversations

5    about how to kill Lagrima?

6        A.   Myself.  There was Greñas, Lil Poison, Pesadilla.

7    There was Lil Evil.  Duende was there, Lil Payaso, Lil

8    Slow -- he was Spider at that time.

9        Q.   Where did these conversations take place?

10       A.   Several places.

11       Q.   Where?

12       A.   Near the apartments where we lived, where we

13   sometimes met, sometimes over the phone when we spoke

14   with Payaso.

15       Q.   Let's start first with the apartments where you

16   lived.  What neighborhood were those apartments in?

17       A.   That's in Culmore.

18       Q.   You mentioned phone conversations.  Who did you

19   say you spoke to on the phone?

20       A.   With several homeboys, always our clique.

21       Q.   I believe I heard you say the name Payaso; is

22   that right?

23       A.   Yes.

24       Q.   Were there conversations with Payaso about the

25   murder?

J. Ayala - Direct

1    A.   Yes.

2    Q.   Based on the plan, where was the murder supposed

3    to take place?

4    A.   Where we met to have our meetings.

5    Q.   Where did you meet?

6              THE COURT:  Excuse me.  Excuse me.

7              THE WITNESS:  Behind the Barcroft View

8    Apartments, in the forest.

9              THE COURT:  We'll start right there on

10   Monday.

11             Ladies and gentlemen, please do not discuss

12   the case.  Don't do any research on the case.  Leave

13   your notes in the jury deliberation room.  We'll resume

14   Monday, 10:00 o'clock.  You're free to go.  Thank you.

15             The witness can step down.  Thank you.

16             (Jury excused.)

17             THE COURT:  We're in recess.

18             (Proceedings concluded at 5:01 p.m.)

19                        ---

20

21

22

23

24

25

1

2            CERTIFICATE OF REPORTER

3

4            I, Renecia Wilson, an official court

5    reporter for the United States District Court of

6    Virginia, Alexandria Division, do hereby certify that I

7    reported by machine shorthand, in my official capacity,

8    the proceedings had upon the jury trial in the case of

9    UNITED STATES OF AMERICA v. JOSE TORRES LOPEZ, et al.

10            I further certify that I was authorized and

11   did report by stenotype the proceedings in said jury

12   trial, and that the foregoing pages, numbered 1 to 195,

13   inclusive, constitute the official transcript of said

14   proceedings as taken from my shorthand notes.

15

16            IN WITNESS WHEREOF, I have hereto

17   subscribed my name this  18th  day of  May, 2016.

18

19                        /s/
                   _____
20                     Renecia Wilson, RMR, CRR
                       Official Court Reporter

21

22

23

24

25