IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,                    )
                                             )
                        Plaintiff,           )
                                             )  Crim. No. 1:14cr306
            vs.                              )
                                             )
JOSE LOPEZ TORRES, ALVIN GAITAN              )  April 19, 2016
BENITEZ, CHRISTIAN LEMUS CERNA,              )
OMAR DEJESUS CASTILLO, MANUEL                )
ERNESTO PAIZ GUEVARA, and                    )
JESUS ALEJANDRO CHAVEZ,                       )
                                             )
                        Defendants.          )
_____          )


JURY TRIAL


BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                  BY:  JULIA MARTINEZ, AUSA
                       TOBIAS TOBLER, AUSA


                       ---


OFFICIAL COURT REPORTER:

                  RENECIA A. SMITH-WILSON, RMR, CRR
                  U.S. District Court
                  401 Courthouse Square, 5th Floor
                  Alexandria, VA 22314
                  (703)501-1580

1    APPEARANCES (Continued)

2    FOR DEFENDANT JOSE LOPEZ TORRES

3         BYNUM & JENKINS, PLLC
          BY:  ROBERT L. JENKINS, JR., ESQ.
4         THE LEIVA LAW FIRM, PLC
          BY:  MANUEL E. LEIVA, ESQ.
5
     FOR DEFENDANT ALVIN GAITAN BENITEZ
6
          LAW OFFICE OF AMY LEIGH AUSTIN
7         BY:  AMY LEIGH AUSTIN, ESQ.
          SMITH & ZIMMERMAN, PLLC
8         BY:  JEFFREY D. ZIMMERMAN, ESQ.

9    FOR DEFENDANT CHRISTIAN LEMUS CERNA

10        LAW OFFICE OF CHRISTOPHER AMOLSCH
          BY:  CHRISTOPHER AMOLSCH, ESQ.
11        FRANK SALVATO, ESQ.

12   FOR DEFENDANT OMAR DEJESUS CASTILLO

13        FIRSTPOINT LAW GROUP, PC
          BY:  KATHERINE MARTELL, ESQ.
14        OLD TOWN ADVOCATES, PC
          BY:  MEREDITH M. RALLS, ESQ.
15

16   FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

17        LAW OFFICE OF W. MICHAEL CHICK, JR.
          BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
18
     FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
19
          JEROME P. AQUINO, ESQ.
20        ELITA C. AMATO, ESQ.

21
                              ---
22

23

24

25

1

INDEX

2

3

WITNESS (Government) DIRECT   CROSS   REDIRECT   RECROSS

4

Araeli Santiago
Villanueva (Cont.)        6        17        103          ---

5

Jose Del Cid           150 (Not completed)

6

7

    (Court recessed)

8

                          ---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

        (Thereupon, the following was heard in open court at 10:03 a.m.)

            (Jury not present.)

            THE CLERK:  1:14 criminal 306, United States versus Jose Lopez Torres, Alvin Gaitan Benitez, Christian Lemus Cerna, Omar Dejesus Castillo, Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez; with six previously sworn Spanish interpreters.

            THE COURT:  Good morning.

            Good morning, Counsel.  Good morning, parties.

            Yes, Mr. Jenkins.

            MR. JENKINS:  Yes, good morning, Your Honor.  May it please the Court.

            Mr. Salvato, before the previous witness, had requested that we alter the order that cross-examination is done.  And not to delay, once the jury gets here, I wanted to at this time make the same request.  Once the government is finished with his direct, that after I conclude my examination, that we go in the same order we did with the previous cooperating witness.

            THE COURT:  That's fine.  I'm prepared to do

it in that order if that's what you all want.

MR. JENKINS:  Thank you.

THE COURT:  Ready to bring the jury out?

You can bring our jury out, Mr. Toliver.
Thank you.

(Jury present.)

THE COURT:  You may be seated.

Good morning, ladies and gentlemen.

THE JURORS:  Good morning.

THE COURT:  Good morning, Mr. Omar Dejesus
Castillo.

Good morning, Mr. Manuel Ernesto Paiz
Guevara; good morning.

Good morning, Mr. Jesus Alejandro Chavez;
good morning.

Good morning, Mr. Alvin Gaitan Benitez.

Good morning, Mr. Christian Lemus Cerna;
good morning.

Good morning, Mr. Jose Lopez Torres.

Let me say good morning to the interpreters,
Ms. Ana Lefèvre, Ms. Angeles Estrada, Ms. Erin
Gaskin-Owen -- I don't think Mr. DeCastellví is here --
Ms. Horvath and Ms. Blumberg.

Did I get everybody?  And Ms. Blumberg.

THE INTERPRETERS:  Good morning, Your Honor.

1          THE COURT:  Did I miss somebody?  I got him,

2     right.  I got Ms. Estrada?  I got everybody?  Okay.

3          Now, ready to proceed?

4          Good morning, Counsel.

5          Bring the witness out, please.  Thank you.

6          (Witness resumed stand.)

7          MS. MARTINEZ:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          THEREUPON, ARAELI SANTIAGO VILLANUEVA,

10    previously duly sworn, testified further as follows:

11               DIRECT EXAMINATION (Continued)

12    BY MS. MARTINEZ:

13      Q.   Good morning.

14      A.   Good morning.

15      Q.   When we left off at the end of the day yesterday,

16    we were talking about how the gang got Lil Wasón to go

17    to the park that night.  Do you recall?

18      A.   Yes.

19      Q.   You were talking about being in the apartment

20    before you went to the park.  Do you recall that?

21      A.   Yes.

22      Q.   You said something about a text message to Lil

23    Wasón?

24      A.   Yes.

25      Q.   Would you tell the jury about that.

A. Villanueva - Direct                                        7

1    A.   I sent a text to Solitario, to tell him that we

2    had a meeting and to go to the park.

3    Q.   Why did you send the text to Solitario?

4    A.   Because that's what Lil Poison told me to do.

5    Q.   Who brought Lil Wasón to the park that night?

6    A.   Solitario.

7    Q.   When you arrived at the park, who else was there?

8    A.   (Answer not interpreted.)

9    Q.   Was Lil Wasón there?  Sorry.

10   A.   Lil Payaso, Lil Poison, Guepardo, Pesadilla,

11   Duende, Solitario and I.

12   Q.   Was Lil Wasón there?

13   A.   Yes.

14   Q.   What happened when you first arrived?

15   A.   We all greeted each other.

16   Q.   How did you greet each other?

17   A.   Like this (indicating).

18   Q.   Are those the same hand signs that you showed to

19   the jury yesterday when you were talking about the

20   Lagrima murder?

21   A.   Yes.

22          MS. MARTINEZ:  Your Honor, may the record

23   reflect that he made the same hand signs that were

24   described on the record yesterday?

25          THE COURT:  The record will reflect that

1    he's repeated the signs he had given yesterday.  Thank

2    you.

3    BY MS. MARTINEZ:

4        Q.   What happened after everyone greeted each other

5    with those hand signs?

6        A.   We all got together and we told him that we were

7    going to give him a 13-second beating.

8        Q.   Told who?

9        A.   Lil Wasón.

10       Q.   How did he respond?

11       A.   He was okay.

12       Q.   What happened next?

13       A.   We cleaned up the area where we were going to

14   give him the beating, and then we began beating him.

15       Q.   Who counted for the *calentón*?

16       A.   Lil Poison.

17       Q.   In addition to counting, were you able to see Lil

18   Poison say anything else?

19       A.   Yes.  Before he started counting he said, *trucha,*

20   and then he started counting.

21       Q.   What does *trucha* mean?

22       A.   It's like, get ready, start.

23       Q.   And for the record, is *trucha* t-r-u-c-h-a?

24       A.   Yes.

25       Q.   Do you recall anyone saying *trucha* during the

1    murder of Lagrima?

2        A.   Yes.

3        Q.   Who said *trucha* during the murder of Lagrima?

4        A.   Greñas.

5        Q.   When did Greñas say *trucha* during the murder of

6    Lagrima?

7        A.   Before they started beating him.

8        Q.   And when you say "beating," do you mean with

9    hands -- at that moment, do you mean with hands and

10   fists or with knives and machetes?

11       A.   With hands and fists.

12       Q.   What happened after Lil Poison said *trucha* during

13   the murder of Lil Wasón?

14       A.   We began to hit him and kick him.

15       Q.   What was the position of Lil Wasón's body while

16   that was happening?

17       A.   Face down.

18       Q.   On the ground?

19       A.   Yes.

20       Q.   At some point, was he attacked with weapons?

21       A.   Yes.

22       Q.   Who was the first person to attack Lil Wasón with

23   a weapon?

24       A.   Pesadilla.

25       Q.   What did Pesadilla do?

1    A.   He stabbed him in the neck with a knife.

2    Q.   Who else stabbed Lil Wasón?

3    A.   Lil Payaso, Solitario, Guepardo, Duende, and I

4    did.

5    Q.   What did you do?

6    A.   I stabbed him in the throat.

7    Q.   With what?

8    A.   With a knife.

9    Q.   What did Lil Payaso do?

10   A.   He cut off his head.

11   Q.   What did Solitario do?

12   A.   He stabbed him in the back.

13   Q.   With what?

14   A.   With a knife.

15   Q.   Before or after you stabbed him?

16   A.   Before.

17   Q.   What did Guepardo do?

18   A.   He cut him on the neck as well.

19   Q.   What did Duende do?

20   A.   He stabbed him in the back.

21   Q.   How many times was Lil Wasón stabbed?

22   A.   I don't remember how many times, but it was a

23   lot.

24   Q.   What weapons were used?

25   A.   Knives.

1    Q.   How many?

2    A.   Two.

3    Q.   What happened to Lil Wasón's head?

4    A.   They cut it off.

5    Q.   Who cut it off?

6    A.   Lil Payaso.

7    Q.   What happened to the head after Lil Payaso cut it

8    off?

9    A.   It was handed to Guepardo, and Guepardo held it

10   up like this and said, "Look."

11   Q.   When you say "held it up like this," can you show

12   the jury what Guepardo did.

13   A.   (Indicating) He passed it over like this.  He was

14   holding it like this, "Look."

15   Q.   What was -- from what part was he holding the

16   head?

17   A.   Here.

18        MS. MARTINEZ:  Your Honor, may the record

19   reflect that the witness made a fist and grabbed his own

20   hair at the top of his head.

21        THE COURT:  So noted.

22   BY MS. MARTINEZ:

23   Q.   What happened to Lil Wasón's head after that?

24   A.   They put it in a bag.

25   Q.   What kind of bag?

1    A.   A big green bag.

2    Q.   What was it made out of?

3    A.   Nylon, thread.

4    Q.   What happened to Lil Wasón's body?

5              MS. MARTINEZ:  Court's indulgence, Your

6    Honor.

7              THE INTERPRETER:  May the interpreter ask

8    that the witness repeat?

9              THE COURT:  Yes.

10             THE WITNESS:  We put it in a bag.

11   BY MS. MARTINEZ:

12   Q.   What kind of bag?

13   A.   The same bag.

14   Q.   So are we talking now about his body?

15   A.   Yes.

16   Q.   What happened to his body after that?

17   A.   We pushed it towards the hole where we -- where

18   he was buried.

19   Q.   Where was the hole?

20   A.   Nearby, in the same park.

21   Q.   Was the hole already dug by the time that you and

22   the others killed Lil Wasón?

23   A.   Yes.

24   Q.   Do you know who dug the hole?

25   A.   Yes.

1    Q.   Who?

2    A.   Pesadilla and Guepardo.

3    Q.   When you got to the hole with the body, what did

4    you do?

5    A.   We put him inside.

6    Q.   Did he fit okay?

7    A.   No.

8    Q.   Why not?

9    A.   The length was too short.

10   Q.   So what happened?

11   A.   We broke his legs.

12   Q.   Who broke his legs?

13   A.   Duende and myself.

14   Q.   What was used to break his legs?

15   A.   A *piocha*.

16        THE INTERPRETER:  The interpreter needs to

17   inquire.

18   BY MS. MARTINEZ:

19   Q.   Might that mean a pickaxe?

20        MS. AUSTIN:  Your Honor, leading.

21        THE COURT:  Sustained.

22   BY MS. MARTINEZ:

23   Q.   Could you describe a *piocha* for the interpreter,

24   so she can interpret it.

25   A.   It's a stick that has a point at one end and a

A. Villanueva - Direct                                            14

1    handle at the other.

2        Q.   Is the -- what is the point made out of, what

3    kind of material?

4        A.   Metal.

5        Q.   And for the record, could we spell *piocha*.

6        A.   Yes.  P-i-o-c-h-a.

7        Q.   Where on Lil Wasón's legs did you and Duende

8    break them with the *piocha*?

9        A.   At the knees.

10       Q.   Once his legs were broken, was he able to fit in

11   the hole?

12       A.   No.  We flipped them forward.

13       Q.   What did you flip forward?

14       A.   The legs.

15       Q.   Onto what?

16       A.   Over his chest area.

17       Q.   What happened next?

18       A.   We all began to throw rocks on him.

19       Q.   What kind of rocks?

20       A.   Normal rocks, like --

21       Q.   What sizes?

22       A.   Like this (indicating).

23       Q.   Why did you put rocks on the body?

24       A.   It was the same rocks that we pulled out of the

25   riverbed in order to cover him.

1    Q.   And why did you get rocks out of the riverbed?

2    A.   It was the same as -- well, we wanted to

3    completely cover him.

4    Q.   After you put rocks on the body, what did you do?

5    A.   We put some dirt and branches on top of that.

6    Q.   Who else helped bury Lil Wasón in addition to

7    you?

8    A.   Lil Payaso, Duende, Solitario, Guepardo and

9    myself and Lil Poison.

10   Q.   After you and the others killed Lil Wasón and

11   buried him, how long was it before you were arrested?

12   A.   Three months.

13   Q.   Were you in Northern Virginia the whole time,

14   those three months?

15   A.   No.

16   Q.   Where did you go?

17   A.   Kansas City.

18   Q.   Why did you go to Kansas City?

19   A.   We were fleeing from the police.

20   Q.   Who did you go with?

21   A.   Lil Poison, Solitario, and Guepardo.

22   Q.   Whose idea was it to go to Kansas City to flee

23   the police?

24   A.   Lil Poison.

25   Q.   Who decided to go?

1        A.   We did.

2        Q.   How long did you stay?

3        A.   Four days.

4        Q.   Where did you go after that?

5        A.   I returned again to Virginia.

6        Q.   Why?

7        A.   We had to -- Guepardo and I had to pick up some

8    drugs.

9        Q.   Did you come back by yourself or with someone

10   else?

11       A.   I was with -- I did, Guepardo, and a person who

12   brought us back.

13       Q.   What did Lil Poison and Solitario do once you got

14   back here?

15       A.   Solitario and Lil Poison stayed with us, the

16   other homeboys.

17       Q.   Where?

18       A.   Kansas City.

19       Q.   What were the four of you planning on doing in

20   Kansas City?

21       A.   Form, form a clique there.

22       Q.   Was that something you discussed with the other

23   three?

24       A.   Yes.

25       Q.   Why did you want to form a clique in Kansas City?

1    A.   To -- to grow our gang.

2         MS. MARTINEZ:  No further questions,

3    Your Honor.

4         THE COURT:  You may proceed.

5         MR. JENKINS:  Thank you, Your Honor.

6              CROSS-EXAMINATION

7    BY MR. JENKINS:

8    Q.   Good morning, sir.

9    A.   Good morning.

10   Q.   Sir, you pled guilty to murder in this case,

11   correct?

12   A.   Yes.

13   Q.   And, you pled guilty back in February of 2015,

14   correct?

15   A.   Yes.

16   Q.   And, when you pled guilty, you came into a

17   courtroom like this, correct?

18   A.   Yes.

19   Q.   And, before you pled guilty, did the judge ask

20   you some questions?

21   A.   Yes.

22   Q.   Before the judge asked you those questions, did

23   you swear to tell the truth?

24   A.   Yes.

25   Q.   As you did on yesterday in this case?

A. Villanueva - Cross                                    18

1      A.   Yes.

2      Q.   Did you understand, when you were answering the

3    judge's questions, that he expected you to tell the

4    truth?

5      A.   Yes.

6      Q.   Is that also fair to say, that today you

7    understand, sir, that this jury expects you to tell the

8    truth?

9      A.   Yes.

10     Q.   And, after you pled guilty, sir, did you not meet

11   with -- have a series -- a number of meetings with

12   government agents?

13     A.   Yes.

14     Q.   And, when you were meeting with these agents, was

15   Ms. Martinez present?

16     A.   Yes.

17     Q.   Was it your understanding that during these

18   meetings they expected you to tell the truth?

19     A.   Yes.

20     Q.   And when you met with the agents and

21   Ms. Martinez, did you tell them the truth?

22     A.   Yes.

23     Q.   Now, sir, you are -- you became a member of the

24   gang in 2012, correct?

25     A.   No.

1    Q.   You did not?

2    A.   No.

3    Q.   Sir, do you remember meeting with the FBI agents

4    and Ms. Martinez on February the 13th, 2015?

5    A.   Yes.

6    Q.   Do you remember at that time telling the agents

7    that you joined MS at the age of 17, following your

8    arrival in Virginia in 2012?

9    A.   No.

10   Q.   No, you did not say it, or no, you do not recall

11   saying it?

12   A.   I didn't say it.

13   Q.   You did not say it?

14   A.   No.

15   Q.   Sir, you -- when you were in the gang, you often

16   consumed illegal drugs, correct?

17   A.   Yes.

18   Q.   You smoked marijuana, correct?

19   A.   Yes.

20   Q.   And, you smoked marijuana very often?

21   A.   Yes.

22   Q.   And sometimes you would lace your marijuana with

23   PCP, correct?

24   A.   No.

25   Q.   You would lace your marijuana with crystal meth?

A. Villanueva - Cross                                      20

1    A.   Yes.

2    Q.   And, you would also use heroin, correct?

3    A.   Yes.

4    Q.   And, at times you even used cocaine?

5    A.   Yes.

6    Q.   And, in fact, during some of the events that you

7    testified to here today and yesterday, on those very

8    days you were using narcotics, correct?

9    A.   No.

10   Q.   Sir, on the day in which you went with others to

11   kill Lagrima, did you not smoke marijuana on that day?

12   A.   I did.

13   Q.   You did smoke marijuana on that day, correct?

14   A.   Yes.

15   Q.   You smoked marijuana before the murder, correct?

16   A.   Yes.

17   Q.   You smoked marijuana laced with crystal meth just

18   before the murder, correct?

19   A.   Yes.

20   Q.   And, because you have used drugs so often in your

21   life, is it fair to say that it has affected your

22   ability to accurately recall things?

23   A.   No.

24   Q.   Your testimony is that despite consuming

25   marijuana, crystal meth, heroin, and cocaine on a

1    regular basis, it has not impacted your ability to

2    recall?

3                MS. MARTINEZ:  Objection, Your Honor, asked

4    and answered.

5                MR. JENKINS:  I'm asking, is that his

6    testimony.

7                THE COURT:  Overruled.

8    BY MR. JENKINS:

9       Q.   Is that your testimony, sir?

10      A.   No.

11      Q.   Sir, would you agree with me that the events that

12   you testified to in this case happened quite some time

13   ago?  Correct?

14      A.   Yes.

15      Q.   In fact, it happened more than three years ago,

16   correct?

17      A.   Yes.

18      Q.   And, would you agree with me that your memory, as

19   time has gone on, has not improved with respect to these

20   events?

21      A.   What was that again?  Could you repeat it?

22      Q.   Well, let me rephrase it this way.

23           The murder of Lagrima occurred in October of

24   2013, correct?

25      A.   Yes.

1    Q.   Is it fair to say that your recollection of

2    everything that transpired with respect to that murder

3    was better in October of 2013 than what it is as you sit

4    here before this jury today?

5    A.   It's the same.

6    Q.   And, when you met with agents, FBI agents, and

7    Ms. Martinez in February 2015, unlike your testimony

8    here today, there were several facts you simply could

9    not recall, correct?

10   A.   No.

11   Q.   Yesterday, you told us what Duende did, correct?

12   A.   Yes.

13   Q.   You also told us what Lil Evil did, on yesterday,

14   correct?

15   A.   Yes.

16   Q.   And, you also told us what Lil Payaso did during

17   the Lagrima murder, also, correct?

18   A.   Yes.

19   Q.   But, when you met with agents one year ago, is it

20   not true that you told Ms. Martinez and the FBI agents

21   that you could not recall what Duende's actions were

22   during the murder?

23   A.   No.

24   Q.   No, you didn't -- you don't recall, or no, you

25   did not tell Ms. Martinez and agents that you did not

1    recall what Duende did?

2        A.   I did not tell them that.

3        Q.   You did not tell them that?

4        A.   No.

5        Q.   Is it not true that when you met with

6    Ms. Martinez on February the 3rd of 2015, you told them

7    that you had no recollection of what Little Evil's

8    actions were during the murder?

9        A.   I don't remember having said that.

10       Q.   With respect to Lil Evil, your testimony here now

11   is that you don't remember whether you told the agents

12   that, correct?

13       A.   No.

14       Q.   And, is that because of the amount of drugs

15   you've used?

16       A.   I remember everything perfectly.

17       Q.   You remember -- your testimony is you remember

18   everything perfectly?

19       A.   Yes.

20       Q.   Do you recall just one year ago meeting with

21   Ms. Martinez and the FBI agents, and telling them that

22   you had no recollection of what Lil Payaso did during

23   the murder?

24       A.   Can you repeat that?

25       Q.   Do you recall meeting with Ms. Martinez and the

1    FBI agents, approximately one week after you pled

2    guilty, and you told them during that meeting that you

3    had no recollection of what Lil Payaso did during the

4    murder?

5        A.    I did not say that.

6        Q.    You did not say that?  That's your testimony?

7        A.    Yes.

8        Q.    Now, sir, you -- precedent to your decision to

9    plead guilty, you signed a written plea agreement,

10   correct?

11       A.    Yes.

12       Q.    And before you signed that plea agreement, you

13   went over it with your attorneys, correct?

14       A.    Yes.

15       Q.    Did someone translate the agreement into Spanish

16   for you?

17       A.    Yes.

18       Q.    Did you understand it?

19       A.    Yes.

20       Q.    Did you understand it completely?

21       A.    Yes.

22       Q.    Is it not true that according to your plea

23   agreement, only the United States Attorney's Office can

24   make a request of the judge to reduce your sentence in

25   light of your cooperation?

1    A.    What was that again?

2    Q.    Is it not true, sir, that according to the terms

3    of your plea agreement, only the United States

4    Attorney's Office can make a request that the judge

5    reduce your sentence in light of your cooperation?

6    A.    That's correct.

7    Q.    Mr. Lopez Torres can't make that request on your

8    behalf, correct?

9    A.    No.

10   Q.    And, you and I have never meet, correct?

11   A.    No.

12   Q.    I can't make that request on your behalf,

13   correct?

14   A.    No.

15   Q.    Now, according to your testimony here today, you

16   did not know that Lagrima was going to be killed,

17   correct?

18   A.    I did not know.

19   Q.    What is a green light?

20   A.    When they are going to kill you.

21   Q.    Is it not true that you knew before Lagrima's

22   murder that he had a green light?

23   A.    No.

24   Q.    Do you recall meeting with Ms. Martinez and the

25   FBI agents on February the 13th, 2015, in which, during

1    that meeting, you told them that you knew that Lagrima

2    had a green light before he was murdered?

3       A.   I did not say that.

4       Q.   You did not tell Special Agent Uribe and

5    Assistant United States Attorney Martinez that you knew

6    before the murder that Lagrima had a green light?

7       A.   No.

8       Q.   Is it true, sir, that prior to Lagrima's murder,

9    you did not participate in any gang meetings in which

10   his murder, intended murder, was discussed?

11              THE INTERPRETER:   Could you repeat?

12   BY MR. JENKINS:

13      Q.   Prior to Lagrima's murder, is it true that you

14   did not participate in any gang meetings in which the

15   intended murder was discussed?

16      A.   No.

17      Q.   No, you did not?

18      A.   No.

19      Q.   In fact, the only person who you discussed what

20   was going to happen to Lagrima with was Mr. Douglas

21   Cerritos, correct?

22      A.   Yes.

23      Q.   Prior to the murder, you thought Lagrima was

24   simply going to receive a *calentón*, correct?

25      A.   Yes.

1    Q.   And, prior to the murder, you heard
2    Mr. Lopez Torres tell Lagrima that he was to receive a
3    *calentón*, correct?
4    A.   Yes.
5    Q.   Now, you testified here today, in response to
6    Ms. Martinez's questions, that Mr. Lopez Torres was
7    counting, correct?
8    A.   Yes.
9    Q.   You also testified in response to Ms. Martinez's
10   question that Mr. Lopez Torres was the person who you
11   heard say, *trucha*?
12   A.   Yes.
13   Q.   Do you recall, however, telling Ms. Martinez and
14   the FBI agents in February of 2015 that you couldn't
15   recall who was counting?
16   A.   I did not say that.
17   Q.   Did you also -- do you also recall telling
18   Ms. Martinez and the FBI agents in February of 2015 that
19   you couldn't recall who said *trucha*?
20   A.   I did not say that.
21   Q.   You did not say that?
22   A.   No.
23   Q.   Now, sir, since you've been -- at one point in
24   time, you were charged as a defendant in this case,
25   correct?

1      A.   Can you repeat that?

2      Q.   At one point in time, you were charged in this

3   case as a defendant, correct?

4      A.   Yes.

5      Q.   And at that point in time, you received a copy of

6   the indictment, correct?

7      A.   Yes.

8      Q.   In fact, you were brought to court on one

9   occasion and the Court asked you whether you had

10  received a copy of it.  Do you remember that?

11     A.   Yes.

12     Q.   And the judge -- and your lawyer told the judge

13  that you had received it and had reviewed it, correct?

14     A.   Yes.

15     Q.   Was that true at that time?

16     A.   Yes.

17     Q.   And, after that time, sir, is it not true that

18  your lawyers discussed with you what the government's

19  allegations were against you?

20     A.   I don't understand that.  Can you repeat it?

21     Q.   Did your lawyers share information with you

22  concerning the government's allegations against you?

23     A.   Yes.

24     Q.   Did they not also share information with you

25  concerning the government's allegations against

1    Mr. Lopez Torres?

2        A.   Yes.

3        Q.   And, sir, you've been in jail for how long now?

4        A.   Since June of 2014.

5        Q.   And, is it fair to say, it's not a very nice

6    place?

7        A.   No.

8        Q.   There're pretty -- there are limitations on

9    things you can do while you're in jail, correct?

10       A.   Yes.

11       Q.   There're even limitations on who you can

12   communicate with, correct?

13       A.   Yes.

14       Q.   But, those limitations, sir, on your ability to

15   communicate with people, did not stop you from

16   communicating with other people charged in this case,

17   correct?

18       A.   I've never had communication with them.

19       Q.   You've never had communications with any of the

20   other defendants charged in this case?

21       A.   No.

22       Q.   And I'm specifically drawing your attention to

23   since you've been arrested and in jail.

24       A.   Yes.

25       Q.   Sir, do you remember meeting with Ms. Martinez,

1   your defense attorneys and agents of the FBI, in which

2   you explained to them that since you had been charged in

3   this case, you had spoken to Payaso while you were in

4   jail?

5       A.   No.

6       Q.   No, you did not tell them that?

7       A.   No.

8       Q.   Sir, let me ask you this:  Payaso was not in the

9   courtroom today, correct?

10      A.   No.

11      Q.   Sir, do you remember telling the agents in May of

12  2015 that you were in the block of the jail in which you

13  spoke with Payaso?

14              THE INTERPRETER:  The what?

15  BY MR. JENKINS:

16      Q.   That you were in the block in the jail when you

17  spoke with Payaso?

18      A.   Yes.

19      Q.   So, you do recall speaking with Payaso since

20  you've been in jail, correct?

21      A.   Yeah, but in person, not by phone.

22      Q.   I'm sorry, sir.  I should have been clear.

23           First, let me ask you:  Do you now recall having

24  any in-person conversations with any of the defendants

25  charged in this case since the time you were charged?

1    A.   Yes.

2    Q.   And, one of those individuals that was charged in

3  this case along with you, who you had conversations with

4  in the jail, in person, was someone you know as Payaso,

5  correct?

6    A.   Yes.

7    Q.   And, one of the things that you and Payaso talked

8  about were the allegations against you being made by the

9  government, correct?

10   A.   Yes.

11   Q.   In fact, you and Payaso talked about all of the

12 allegations against all of the defendants, correct?

13   A.   Yes.

14   Q.   In fact, Payaso told you a lot of information

15 about what certain people allegedly did, correct?

16   A.   Yes.

17   Q.   And, in fact, Payaso told you that he was angry

18 at Mr. Lopez Torres, correct?

19   A.   No.

20   Q.   He didn't tell you that he was angry with

21 Mr. Lopez Torres?

22   A.   No.

23   Q.   Sir, do you recall meeting with Ms. Martinez, the

24 FBI agents, on May 13, 2015, at the United States

25 Attorney's Office?

1          THE INTERPRETER:  I'm sorry, could you

2    repeat the date?

3    BY MR. JENKINS:

4      Q.   May 13, 2015.

5          THE INTERPRETER:  The witness is asking for

6    a repetition.

7          MR. JENKINS:  I'm sorry?

8          THE INTERPRETER:  The witness is asking for

9    a repetition.

10   BY MR. JENKINS:

11     Q.   Sir, approximately three months after you pled

12   guilty, do you recall having a meeting with Ms. Martinez

13   and investigators in this case?

14     A.   Yes.

15     Q.   And during that meeting, is it not true that you

16   recounted for them your conversations with Payaso?

17     A.   Yes.

18     Q.   And, one of the things you told them was that

19   Payaso told you that he was angry with Mr. Lopez Torres?

20     A.   No.

21     Q.   And that Mr. -- and that Payaso was angry with

22   Mr. Lopez Torres, according to you, because Mr. Lopez

23   Torres had not been following the rules of the gang,

24   correct?

25     A.   No.

 1     Q.   No, you did not say it, or no, it did not happen?

 2     A.   I did not say that.

 3     Q.   Yesterday you testified -- well, let me -- why

 4   did you join the gang?

 5     A.   I didn't want to join them.

 6     Q.   Sir, do you remember meeting with the agents and

 7   Ms. Martinez on April the 20th, 2015, in which you told

 8   them that you wanted to join the gang because you wanted

 9   to kill *chavalas*?

10     A.   No.

11     Q.   Is it that you don't recall it, sir?  Is that

12   what you mean by "no"?

13     A.   I did not say that.

14     Q.   You did not say that.  That's your testimony?

15     A.   Yes.

16     Q.   Do you recall telling the agent on that same day

17   that you joined the gang also because you wanted a

18   family?

19            THE INTERPRETER:  A family?

20            MR. JENKINS:  Yes.

21            THE WITNESS:  Yes.

22   BY MR. JENKINS:

23     Q.   Is that true, that that's what you told them?

24     A.   Yes.

25     Q.   Because it's true you wanted to have a family,

1    correct?

2        A.   Yes.

3        Q.   But you're saying you didn't tell them you wanted

4    to kill *chavalas*?

5        A.   Yes.

6        Q.   Sir, is it not true that much of what you

7    testified to in response to Ms. Martinez's questions

8    were based on information that you learned from Payaso?

9        A.   Can you ask again, please?

10       Q.   I'm sorry?

11            THE INTERPRETER:   The witness is asking for

12   a repetition.

13   BY MR. JENKINS:

14       Q.   The testimony you gave in response to

15   Ms. Martinez's questions was, in part, based on what you

16   learned during your jail conversations with Payaso,

17   correct?

18       A.   Yes.

19       Q.   And it is also based in part on what you learned

20   when you received your copy of the indictment in this

21   case?

22       A.   Yes.

23       Q.   It is also based in part on the discussions you

24   had with your lawyers concerning the discovery provided

25   to you in this case?

1    A.   Yes.

2    Q.   Because the truth of the matter is, sir, it's

3 been so long, you can't remember all the details,

4 correct?

5    A.   No.

6    Q.   And because you were using drugs during some of

7 these events, you can't recall accurately who did what?

8    A.   I do remember everything.

9    Q.   And because you consumed so much cocaine, you

10 can't recall who said what?

11    A.   Yes, yes, I do remember.

12    Q.   Your testimony is designed for you to get out of

13 jail because you don't want to spend the rest of your

14 life in prison, correct?

15    A.   No.

16    Q.   You're prepared to do anything you need to do to

17 avoid spending the rest of your life in jail?

18    A.   No.

19    Q.   And you're also prepared to say anything you need

20 to say in order to avoid spending the rest of your life

21 in jail?

22    A.   No.

23         MR. JENKINS:   Thank you, sir.   I have no

24 further questions.

25         THE COURT:   You may proceed.

CROSS-EXAMINATION

BY MR. CHICK:

1

2

3    Q.   Good morning, sir.  How are you?

4    A.   Good morning.

5    Q.   My name is Mike Chick and I'm the lawyer for

6  Manuel Ernesto Paiz Guevara.

7        You referred to him -- I'm going to call him

8  Solitario, because that's what you know him as.  Is that

9  okay?

10   A.   Yes.

11   Q.   Okay.  And, you also said you know him by another

12  nickname.  I think you said Colita, right?

13   A.   Yes.

14   Q.   And, somebody started calling him that because he

15  had like longer hair, right?

16   A.   Yes.

17   Q.   Okay.  Because when you -- when you guys give

18  people nicknames, the nicknames mean something about the

19  person, right?

20   A.   Yes.

21   Q.   Okay.  And, I don't mean this at all to be

22  offensive, but I do want to ask you, because I don't

23  know.  Why do they call you Slow?

24   A.   They -- another homie gave me that name.

25   Q.   Okay.  Do you know why they call you that?

1    A.   No.  They just wanted to call me that.

2    Q.   Okay.  You were talking about hand signals

3    earlier.  You said that when you guys showed up to the

4    park for the killing of Lil Guasón, you said that

5    everybody greeted each other with hand signs?

6    A.   Yes.

7    Q.   Did Solitario greet everybody with a hand sign?

8    A.   Yes.

9    Q.   Okay.  So, *chequeos* are allowed to do the hand

10   signs?

11             THE INTERPRETER:  May the interpreter ask

12   for repetition?

13             MR. CHICK:  Sure.

14             THE WITNESS:  He had a passing -- our clique

15   had given him a pass to use the hand sign.

16   BY MR. CHICK:

17   Q.   Okay.  He had to get a special pass to do it?

18   A.   Yes.

19   Q.   Okay.  Did Lil Guasón do the same, I guess?

20   A.   Yes.

21   Q.   And, you said that there was a plan that was

22   arranged to do the murder of Lil Guasón, right?

23   A.   Yes.

24   Q.   And, the people who participated in this plan,

25   according to you, were Lil Poison?

A. Villanueva - Cross                                          38

1    A.   Yes.

2    Q.   Leopardo?

3    A.   Yes.

4    Q.   Lil Payaso?

5    A.   Yes.

6    Q.   Duende?

7    A.   Yes.

8    Q.   Pesadilla?

9    A.   Yes.

10   Q.   And you?

11   A.   Yes.

12   Q.   Okay.  And, Solitario was not part of the

13   planning, was he?

14   A.   No.

15   Q.   He was not part of the meetings when you guys got

16   together to plan this out?

17   A.   No.

18   Q.   And, in fact, part of the plan was to not tell

19   Solitario about the plan, right?

20   A.   Yes.

21   Q.   The plan was to keep him in the dark?

22   A.   Yes.

23   Q.   And also, obviously, to keep Lil Guasón in the

24   dark?

25   A.   Yes.

1   Q.   And, part of the reason that the plan was to not

2   tell Solitario was because -- because he was a *chequeo*,

3   right?

4   A.   Yes.

5   Q.   And the other part of the reason for the plan not

6   to tell him was because you all knew that he was very

7   good friends with Lil Guasón, right?

8   A.   Yes.

9   Q.   And, you were -- you didn't want him to warn Lil

10  Guasón about what would happen?

11  A.   Yes.

12  Q.   Okay.  And, let me jump to -- let me just jump

13  right into the -- the stabbing of Lil Guasón.  I just

14  want to make sure that I get the order correct, because

15  you went through the names a little bit quickly on

16  direct.

17       The first person --

18            THE INTERPRETER:  One moment.

19            MR. CHICK:  Okay.

20  BY MR. CHICK:

21  Q.   The first person to stab him was Pesadilla,

22  correct?

23  A.   Yes.

24  Q.   And, he stabbed him multiple times, right?

25  A.   Yes.

1    Q.   And, Pesadilla actually said, during the

2    planning, that he wanted to be the one to do that,

3    because he wanted to kill Lil Guasón because he didn't

4    get to kill Lagrima, right?

5              THE INTERPRETER:  May the interpreter ask

6    for a repetition?

7              MR. CHICK:  Sure.  I was very wordy.

8    BY MR. CHICK:

9    Q.   And Pesadilla said that he wanted to be the one

10   to kill Lil Guasón because he didn't get to kill

11   Lagrima, right?

12   A.   Yes.

13   Q.   And, that's why he went first?

14   A.   Yes.

15   Q.   And then you said Lil Payaso?

16   A.   Yes.

17   Q.   Okay.  And then you said Leopardo was next,

18   right?

19   A.   Yes.

20   Q.   Okay.  And all these guys stabbed him -- stabbed

21   Lil Guasón multiple times, right?

22   A.   Yes.

23   Q.   And then after Leopardo, that's when Solitario

24   was ordered to stab Lil Guasón, right?

25   A.   Yes.

1    Q.   And then, according to you, you went last,

2    correct?

3    A.   Yes.

4    Q.   Okay.  You talked about the murder of Lagrima.

5    You participated in that murder, right?

6    A.   Yes.

7    Q.   And, you were never charged with that murder,

8    were you?

9         (Pause.)

10        Were you ever charged with Lagrima's murder?

11   A.   Yes.

12   Q.   You were charged with it?

13   A.   Yes.

14   Q.   Okay.  When were you charged with Lagrima's

15   murder?

16   A.   I had two murders against me.

17   Q.   Okay.  So, in the --

18   A.   But, I pled guilty to one.

19   Q.   Okay.  So, you -- so, you're saying that in this

20   case, you were indicted for Lagrima's murder and you

21   were indicted for Lil Guasón's murder?

22   A.   Can you repeat that?

23   Q.   You're saying that in this case, you were

24   indicted for Lagrima's murder and you were indicted for

25   Lil Guasón's murder?

1    A.   Yes.

2    Q.   Okay, thanks very much.

3              MR. CHICK:   Those are my questions.

4                    CROSS-EXAMINATION

5    BY MR. AMOLSCH:

6    Q.   Good morning, Mr. Villanueva.

7    A.   Good morning.

8    Q.   I want to start by asking you some questions --

9    followup questions to the questions Mr. Jenkins asked

10   you.

11   A.   That's fine.

12   Q.   Mr. Jenkins asked you some questions about why

13   you wanted to join MS-13.  Do you remember that?

14   A.   Yes.

15   Q.   And, I believe you said that you actually didn't

16   want to join MS-13; is that correct?

17   A.   Yes.

18   Q.   Are you required to join MS-13?

19   A.   No.

20   Q.   So, you joined MS-13 because you wanted to join

21   MS-13, correct?

22   A.   No.

23   Q.   Nobody made you join, correct?

24   A.   No.

25   Q.   So, you joined because you chose to join,

1    correct?

2       A.   No.

3       Q.   Who made you join?

4       A.   No one.  But sometimes you get messed up in that,

5    and -- and you're just in before you know it.

6       Q.   You told the agents that you joined MS-13 because

7    you wanted to kill *chavalas*, correct?

8       A.   No.

9       Q.   And, you know what a *chavala* is, right?

10      A.   Yes.

11      Q.   *Chavala* is a member of another gang, correct?

12      A.   Yes.

13      Q.   And, on February 3rd, 2016, in an interview with

14   the United States Attorney's Office and the FBI agents,

15   you told them you wanted to join MS-13 so you could kill

16   *chavalas*?

17              THE INTERPRETER:  Did the attorney say

18   February 3rd?

19              MR. AMOLSCH:  Yes, ma'am.

20              THE WITNESS:  No.

21   BY MR. AMOLSCH:

22      Q.   You didn't say that, or you don't remember saying

23   it?

24      A.   I didn't say it.

25      Q.   In fact, you told them that in September of 2013,

1    you went to Alexandria with a machete to kill some
2    *chavalas*, didn't you?
3        A.    Yes.
4        Q.    Have you been charged with that crime?
5        A.    No.
6        Q.    I want to talk about the drugs that you say you
7    were involved with.  Heroin?
8        A.    Yes.
9        Q.    Crystal meth?
10       A.    Yes.
11       Q.    Cocaine?
12       A.    Yes.
13       Q.    And marijuana?
14       A.    Yes.
15       Q.    Now, did you sell those drugs, sir, or just use
16   them?
17       A.    I sold them.
18       Q.    Have you been charged with any of those crimes?
19       A.    Yes.
20       Q.    Have you been charged by the U.S. Attorney's
21   Office for any of those crimes?
22       A.    Could you repeat that?
23       Q.    Have you been charged by the United States
24   Attorney's Office with any of those crimes?
25       A.    Yes.

1    Q.   Which drug dealing crimes have you been charged
2  with?
3    A.   Marijuana and crystal meth.
4    Q.   And you're trying to escape going to jail for
5  those sentences as well, correct?
6    A.   Yes.
7    Q.   How much drugs were you selling, sir?
8    A.   A lot.
9    Q.   A lot.
10        Are we talking ounces of cocaine?
11   A.   More marijuana and crystal meth.
12   Q.   A lot of crystal meth; is that what you said?
13   A.   Yes.
14   Q.   Let me ask you some questions about Demente.  Do
15  you know who Demente is?
16   A.   Yes.
17   Q.   How do you know Demente?
18   A.   I met him on the street, and I hung around three
19  times.
20   Q.   Did you know him to be a member of MS-13?
21   A.   Yes.
22   Q.   Did you know him to be a drug dealer?
23   A.   No.
24   Q.   He wasn't much of a drug dealer?
25   A.   No.

1    Q.  And, you would know that because you were a drug
2  dealer with MS-13, correct?
3    A.  No, when I met him, he wasn't very involved in
4  the gang.
5    Q.  When did you meet him?
6    A.  2013.
7    Q.  Sir, you're telling this jury Demente was out of
8  the drug dealing business by 2013?
9    A.  No, I said I didn't know a lot about him, because
10  I was a *paro* for the gang, so I didn't know much about
11  him.
12    Q.  When did you meet -- let me ask it this way.
13  When did you meet Demente?
14    A.  In 2013.
15    Q.  Do you remember when in 2013?
16    A.  I don't remember the month, but I'm sure of the
17  year.
18    Q.  Sir, you just answered questions for Mr. Jenkins
19  about how your memory is perfect.
20    A.  Yes.
21    Q.  But, you can't remember when you met Demente?
22    A.  Yes.
23    Q.  So your memory isn't perfect.  We agree on that?
24    A.  No.
25    Q.  Can we agree on that?

1    A.   No.

2    Q.   How long did you know Demente for?

3    A.   I saw him quickly on three occasions.  I never

4    had a conversation with him.

5    Q.   Do you know Duende?

6    A.   Yes.

7    Q.   How long have you known Duende?

8    A.   Since 2013?

9    Q.   How long -- have you known him since 2013?

10   A.   Yes.

11   Q.   You got locked up in 2014?

12   A.   Yes.

13   Q.   When in 2014?

14   A.   June.

15   Q.   Is it fair to say, Duende had a big reputation in

16   MS-13?

17   A.   Can you repeat that?

18   Q.   Is it fair to say that Duende had a big

19   reputation in MS-13?

20   A.   No.

21   Q.   He wasn't a big deal at all?

22   A.   No.

23   Q.   Did you know he was known to be a devil

24   worshipper?

25   A.   Yes.

1    Q.   Are you a devil worshipper as well, sir?

2    A.   Yes.

3    Q.   Have you sworn your allegiance to the beast?

4    A.   Yes.

5    Q.   Did you burn your own hands, as well as Duende

6    did?

7    A.   No.

8    Q.   You've never burned your own hands as a sacrifice

9    to the beast?

10   A.   No.

11   Q.   Do you know how many people Duende has killed?

12   A.   I only know about the killing of Lagrima and Lil

13   Wasón.  Beyond that, I don't know.

14   Q.   Do you know Duende to use drugs?

15   A.   No.

16   Q.   You did not know that, or you do not know if --

17   let me ask the question this way.  Do you know if Duende

18   used drugs?

19   A.   I don't know.  In front of me, I never saw him

20   smoking drugs.

21   Q.   Did you ever know him to sell drugs?

22   A.   Yes.

23   Q.   What drugs did he sell?

24   A.   Marijuana and crystal meth.

25   Q.   And, it's your experience in MS-13 that if you

1    sell marijuana and crystal meth, you also use marijuana

2    and crystal meth, correct?

3        A.   No.

4        Q.   Are you the only one who sells marijuana and

5    crystal meth and uses it?

6        A.   No.

7        Q.   So, other people in MS-13 sell crystal meth,

8    marijuana, and use those drugs?

9        A.   Yes.

10       Q.   Do you know Junior?

11       A.   Yes.

12       Q.   When did you meet Junior?

13       A.   2014.

14       Q.   How did you meet Junior?

15       A.   Through Guepardo.

16       Q.   Did you know Junior's reputation?

17       A.   No.

18       Q.   He never bragged to you about being the East

19   Coast leader of the Silvas clique?

20       A.   Yes, he said he was the leader of the Silvas.

21       Q.   Do you know Junior to be a violent person?

22       A.   Yes.

23       Q.   Very violent?

24       A.   Yes.

25       Q.   You knew him to be an enforcer?

1    A.   Yes.

2    Q.   In fact, you can't get to be the East Coast

3  leader of MS-13 without being a violent person, correct?

4    A.   I didn't understand.

5    Q.   Can you rise in the ranks of MS-13 to the

6  position of East Coast leader without being a violent

7  person?

8    A.   No.

9    Q.   Let me talk to you a little bit about your

10 understanding of the rules of MS-13.  Okay?

11   A.   Yes.

12   Q.   You know the rules of MS-13, correct?

13   A.   Yes.

14   Q.   In fact, everybody in MS-13 knows the rules?

15   A.   Yes.

16   Q.   It's part of your initiation, correct?

17   A.   Yes.

18   Q.   And there's different levels of punishment within

19 MS-13, correct?

20   A.   Yes.

21   Q.   There's green lights, which is authorization to

22 kill somebody.

23   A.   Yes.

24   Q.   And there's various -- and there's beatings of

25 either 13 or 26 seconds?

1    A.  Yes.

2    Q.  And, you can't decide on your own, sir, who to --

3   you can't decide for yourself who gets a green light or

4   who doesn't get a green light, correct?

5    A.  No, one yourself can't.

6    Q.  You have to get authorization, correct?

7    A.  Sí.  (Answer not translated.)

8    Q.  Now, other than the crimes that you have been

9   charged with in this case, have you ever committed other

10  robberies?

11   A.  Yes.

12   Q.  Ever gotten in a fight in a bar?

13   A.  Yes.

14   Q.  Ever steal something from 7-Eleven?

15   A.  Yes.

16   Q.  Is it fair to say, sir, that every time you

17  committed a crime, it wasn't necessarily as part of the

18  MS-13 gang.

19   A.  Can you repeat that?

20   Q.  Is it fair to say, sir, that in some of the

21  crimes you've committed have not been related to be

22  being an MS-13 gang member?

23   A.  Yes.

24        MR. AMOLSCH:  Your Honor, it is -- I'm about

25  to go into another area, if you want to take a break.

1              THE COURT:  Keep going to 11:30.

2              MR. AMOLSCH:  Court's indulgence.

3    BY MR. AMOLSCH:

4       Q.  Mr. Jenkins asked you some questions about some

5    people you met in the jail who are also associated with

6    this case.

7       A.  Yes.

8       Q.  Do you remember those questions?

9       A.  Yes.

10      Q.  He asked you about Payaso.  Do you remember that?

11      A.  Yes.

12      Q.  Who else have you met in the jail, associated

13   with this case, besides Payaso?

14      A.  Just him.

15      Q.  Just him.

16          So, you've spoken to no one else?

17      A.  No.

18      Q.  Sir, I'm going to ask you some questions now

19   about Skinny.  Do you know who Skinny is?

20      A.  Yes.

21      Q.  How do you know Skinny?

22      A.  He's a member of the clique.

23      Q.  How long have you known him?

24      A.  Since 2013.

25      Q.  How did you meet him?

1        A.    Through Douglas and Leopardo.

2        Q.    Was Skinny somebody who had authority in the

3    gang?

4        A.    For a time, yes.

5        Q.    Was he somebody who is able to give orders and

6    commands?

7        A.    Yes, for a time.

8        Q.    And, he was somebody whose word counted?

9        A.    Yes, for a time.

10       Q.    And what time period was that?

11       A.    In 2014.

12       Q.    In 2014.  All right.

13            MR. AMOLSCH:  Court's indulgence.

14    BY MR. AMOLSCH:

15       Q.    Did there come a time when you knew Skinny to be

16    locked up in jail?

17       A.    Yes.

18       Q.    Do you know what he was locked up for?

19       A.    No.

20       Q.    Nobody ever told you?

21       A.    No.

22       Q.    And how do you know he was locked up?

23            THE COURT:  All right, Counsel.  Now we'll

24    take the morning recess.  I have a schedule and I adhere

25    to the schedule rigidly.

```
 1                    MR. AMOLSCH:  I'm sorry, Judge.  Thank you.
 2                    THE COURT:  Fifteen-minute recess.  Thank
 3  you.
 4                    (Jury not present.)
 5                    THE COURT:  You can have him step down.
 6  Fifteen-minute recess.  Thank you.
 7                    (Court recessed at 11:31 a.m. and reconvened
 8                    at 11:50 a.m.)
 9                    THE COURT:  Ready to bring the jury back?
10                    MR. AMOLSCH:  Yes, sir.
11                    THE COURT:  All right.  Bring the jury back.
12                    (Jury present.)
13                    THE COURT:  You may be seated.
14                    Bring the witness in.
15                    MR. AMOLSCH:  Court's indulgence.
16                    May it please the Court.  If I can ask the
17  court reporter -- I can't remember the last question I
18  asked, that there was an answer.
19                    THE COURT:  We don't do read-backs.  But you
20  asked him, did he know that Skinny was locked up in
21  jail.
22                    MR. AMOLSCH:  Thank you, Judge.
23                    THE COURT:  Do you know why he was locked
24  up?
25                        CROSS-EXAMINATION (Continued)
```

BY MR. AMOLSCH:

Q.   Do you remember that question?

A.   No.  Can you say it?

Q.   Did you know what Skinny was locked up for?

A.   No.

Q.   You testified at length, questions from
Ms. Martinez regarding the reason that Mr. Aguilar was
killed.  Do you remember those questions?

A.   Yes.

Q.   And your testimony was that Skinny is the one who
ordered this hit, correct?

A.   No.

Q.   You didn't say that the reason that this happened
is because Gerson was having sex with Belén?

A.   What was that again?

Q.   You didn't testify that the reason Gerson was
killed was because Skinny was upset that Gerson was
sleeping with Belén?

A.   I did say that, but I did not say that Skinny
said that.

Q.   And, I believe you testified that Gerson had also
stolen money from the gang?

A.   Yes.

Q.   And that these were the reasons that Gerson was
killed, correct?

1     A.   Yes.

2     Q.   Now, I had ask you earlier, sir, if you're

3   familiar with the rules of MS-13.  Do you remember that

4   question?

5     A.   Yes.

6     Q.   And, you don't get green lighted for stealing

7   money or owing money to the gang, do you?

8     A.   No.

9     Q.   And, you don't get green lighted for having a

10  sexual relationship with a woman who used to have a

11  relationship with a homeboy, correct?

12    A.   Can you repeat that?

13    Q.   Certainly.

14         You don't get a green light for having sex with a

15  woman who used to have a relationship with a homeboy,

16  correct?

17    A.   Yes, they do that.

18    Q.   Do you know who Solitario is?

19    A.   Yes.

20    Q.   He also had sex with Belén, correct?

21    A.   No.

22    Q.   And he wasn't green lighted, was he?

23         THE INTERPRETER:  The answer to the first

24  question was "No."

25         MR. AMOLSCH:  I understand.

1    BY MR. AMOLSCH:

2    Q.   And he wasn't green lighted, was he?

3    A.   No.

4    Q.   In fact, other people have had sex with Belén and

5    they weren't green lighted either, correct?

6    A.   Yes.

7    Q.   Because Skinny didn't care about Belén any more,

8    correct?

9    A.   Yes.

10   Q.   In fact, he had another woman named Rosie,

11   correct?

12   A.   Yes.

13   Q.   And that was his real girl, correct?

14   A.   Yes.

15   Q.   And the truth is, sir, that all Skinny wanted was

16   his money back that he gave to Belén to pay the rent

17   while he was in jail, correct?

18        MS. MARTINEZ:  Objection, Your Honor, lack

19   of foundation as to what Skinny wanted.

20        THE COURT:  Sustained.

21   BY MR. AMOLSCH:

22   Q.   Sir, you have money that belongs to you and only

23   to you and not the gang, correct?

24   A.   No.

25   Q.   Your testimony is that everything you own belongs

1  to the gang?

2     A.  No.

3     Q.  So, you have possessions that are your

4  possessions that don't belong to the gang, correct?

5     A.  Yes.

6     Q.  So, the truth is, sir, that this was about

7  getting back the money that Gerson had taken from Belén,

8  correct?

9           MS. MARTINEZ:  Objection, Your Honor, lack

10  of foundation.

11           THE COURT:  Foundation, Mr. Amolsch --

12  sustained.

13           MR. AMOLSCH:  Thank you.

14  BY MR. AMOLSCH:

15     Q.  You mentioned there was some reason Gerson was

16  killed, was because of money.  Do you recall that

17  testimony?

18     A.  Yes.

19     Q.  That wasn't the gang's money; that was Belén's

20  money, correct?

21           MS. MARTINEZ:  Objection, Your Honor, lack

22  of foundation.

23  BY MR. AMOLSCH:

24     Q.  Do you know whose money that was?

25           THE COURT:  Sustained.

1          MR. AMOLSCH:  I'm sorry, Judge.  I'll

2     rephrase.

3     BY MR. AMOLSCH:

4          Q.  Do you know whose money that was?

5          A.  Yes.

6          Q.  Who's money was it?

7          A.  Belén.

8          Q.  Belén's, not the gang's money, correct?

9          A.  Yes.

10         Q.  Correct.

11              So, the truth is, sir, that there was no meeting

12    ahead of time about killing Gerson for having sex with

13    Belén and stealing her money, correct?

14         A.  Yes --

15         Q.  Correct.

16              So, let's talk about the night of the --

17         A.  Yes, there was.

18         Q.  -- murder -- let's talk about the night of the

19    murder.

20              MS. MARTINEZ:  Objection, Your Honor.  The

21    witness's answer should be able to be heard by the jury.

22              MR. AMOLSCH:  My memory is that he answered,

23    Judge.

24              THE COURT:  Well, if you don't mind, I would

25    like to hear what the interpreter said.

```
 1              MR. AMOLSCH:  Oh, I'm sorry.
 2              THE WITNESS:  Could you ask the question
 3    again?
 4              MR. AMOLSCH:  Sure.
 5    BY MR. AMOLSCH:
 6       Q.  The truth is, sir --
 7              MS. MARTINEZ:  Your Honor, before we do
 8    that, the interpreter gave an answer that Mr. Amolsch
 9    cut off.  I'd like to hear the answer that the
10    interpreter gave.  If Mr. Amolsch wants to ask the
11    question again, I suppose we can see how that goes.
12              MR. AMOLSCH:  Yes, I'm happy to let him
13    answer again, Judge, or whatever --
14              MS. MARTINEZ:  Can the interpreter --
15              THE COURT:  Just a second.  Just a second.
16              Do you recall the question and the answer?
17              THE INTERPRETER:  Yes, Your Honor.
18              THE COURT:  All right.
19              THE INTERPRETER:  The witness answered,
20    "Yes," and then when counsel began asking the second
21    question, the witness said, "Yes, there was."  In other
22    words, that there was a meeting.
23              THE COURT:  All right.
24    BY MR. AMOLSCH:
25       Q.  And you mentioned certain people being in that
```

 1   meeting, correct?

 2        A.   Yes.

 3        Q.   Correct.

 4             Mr. Chick asked you about who was at that

 5   meeting, correct?

 6        A.   Yes.

 7        Q.   And, you testified that Christian wasn't at that

 8   meeting, correct?

 9        A.   Yes.

10        Q.   Let's talk about the night of Gerson's murder.

11   It took place at night, correct?

12        A.   Pardon?

13        Q.   It took place at night, correct?

14        A.   Yes.

15        Q.   Midnight, about?

16        A.   Yes.

17        Q.   In a dark park?

18        A.   Yes.

19        Q.   Were there any lights?

20        A.   No.

21        Q.   You were asked some questions about who was

22   involved in the actual stabbing.  Do you remember that?

23        A.   Yes.

24        Q.   Yesterday, you were asked about Duende, and you

25   said that he wasn't involved, correct?

1     A.   No.

2     Q.   You didn't say that yesterday?

3     A.   No.  He was there with us.

4     Q.   I know that -- my question isn't was he there

5   with you.  Let me rephrase the question to make sure you

6   understand.

7        You testified yesterday that Duende was not part

8   of killing Gerson.  Do you remember that?

9              MS. MARTINEZ:  Objection, Your Honor.  That

10  question has been asked and answered, and the jury's

11  memory for what -- what was testified to earlier should

12  be what's --

13             MR. AMOLSCH:  Your Honor, I believe he

14  asked (sic) a question that I didn't ask, so I was

15  rephrasing the question to make sure he understood the

16  question.

17             And I believe we're speaking objections

18  here, Your Honor.

19             THE COURT:  We are back to speaking

20  objections.

21             MR. JENKINS:  Thank you, Your Honor.

22             THE COURT:  We want to refrain from that.

23             Well, here's the thing:  I think that when

24  you ask a question with a double negative in it, what is

25  interpreted really becomes a big mess for the person to

1    understand if they don't speak English.  So if you would

2    strive to ask a question that is not a double negative,

3    that might help.

4            MR. AMOLSCH:  Yes, Your Honor.  Thank you.

5    BY MR. AMOLSCH:

6    Q.  Do you remember testifying yesterday about who

7    took part in Gerson's murder?

8    A.  Uh-huh.

9    Q.  And, yesterday, you testified that Duende did not

10   take part in the stabbing.  Do you remember that?

11   A.  No.

12   Q.  You don't remember that, or that's not what you

13   testified to?

14   A.  I did not say that.

15   Q.  You testified on direct from Ms. Martinez that --

16   in terms of the order of the stabbing.  Do you remember

17   those questions?

18   A.  Yes.

19   Q.  And, when you were answering questions from

20   Ms. Martinez, you said that Solitario stabbed first, and

21   then Christian stabbed first (sic).  Do you remember

22   saying that?

23           MS. MARTINEZ:  Your Honor, objection to

24   compound question.

25           THE COURT:  It is, sustained.

1    BY MR. AMOLSCH:

2       Q.  Do you remember testifying about the order of the

3    people who stabbed Gerson?

4       A.  Yes.

5       Q.  Do you remember yesterday saying that Solitario

6    stabbed first, and then Christian stabbed second?

7              MS. MARTINEZ:  Objection, Your Honor, to

8    compound question.

9              MR. AMOLSCH:  I don't know how to ask

10   that --

11             THE COURT:  You can ask one question at a

12   time.  That would be good.  Sustained.

13   BY MR. AMOLSCH:

14      Q.  Do you remember saying that Solitario stabbed

15   before Christian?

16             THE COURT:  Sustained.  Ask one question at

17   a time if you would, please.

18             MR. AMOLSCH:  I'm trying.

19             THE COURT:  If you ask one question at a

20   time, you'll work fine.  Thank you.

21   BY MR. AMOLSCH:

22      Q.  Do you remember saying that Solitario stabbed

23   Gerson?

24      A.  Yes.

25      Q.  Do you remember saying that Christian stabbed

1    after Solitario?

2        A.   Yes.

3        Q.   Do you remember testifying to questions that

4    Mr. Chick asked you before we took the break?

5        A.   Yes.

6        Q.   And, do you remember testifying from questions

7    from Mr. Chick that Christian stabbed first?

8        A.   No.

9        Q.   You're saying you don't remember that, or that's

10   not what you testified to?

11       A.   It wasn't that.

12       Q.   The truth is, sir, you don't remember what

13   happened that night, do you?

14       A.   Yes, I do remember.

15       Q.   You were asked questions by Ms. Martinez about

16   who was present at the stabbing.  Do you remember those

17   questions?

18       A.   Yes.

19       Q.   And, do you remember her asking you to list the

20   people that were involved?

21       A.   Yes.

22       Q.   And do you remember hesitating for about five

23   second trying to remember who was involved?

24       A.   Yes.

25       Q.   And, that's because you can't remember who was

1    involved?

2        A.   No.

3             MR. AMOLSCH:  Court's indulgence.  I need to

4    get something.

5    BY MR. AMOLSCH:

6        Q.   Sir, do you remember the questions Mr. Jenkins

7    asked you about your plea agreement with the government?

8        A.   Yes.

9        Q.   Now, along with that plea agreement, you signed a

10   statement of facts, correct?

11       A.   Yes.

12       Q.   And, you reviewed the statement of facts with

13   your lawyer, correct?

14       A.   Yes.

15       Q.   And, this was translated from English into

16   Spanish for you?

17       A.   Yes.

18       Q.   And, you put in the statement of facts your

19   memory of what happened that night?

20       A.   Yes.

21       Q.   And, do you remember agreeing that the most that

22   you could say is that the defendant, you, and other

23   MS-13 gang members and associates killed the victim with

24   knives?

25             MS. MARTINEZ:  Objection, Your Honor.  Facts

1    not in evidence.  And may we approach on this?

2              THE COURT:  Okay.

3              (Thereupon, the following side-bar

4    conference was had:)

5              THE COURT:  Okay.

6              MS. MARTINEZ:  Mr. Amolsch's representation

7    of what the statement of facts said is completely

8    outrageous.  Like every other statement of facts that's

9    put before this Court during a plea agreement, the

10   statement of facts makes very clear that the statement

11   of facts does not contain every fact known to the

12   government, that it does not contain every fact known to

13   the defendant, or to the defense counsel.

14             And so to take a statement of facts that

15   does not contain all details known to this defendant and

16   to try to represent that the most he could say is what's

17   said in the statement of facts, is beyond the pale.

18             We don't have this statement of facts

19   translated into Spanish in a written document so that we

20   can put it in front of the witness and ask him about it.

21             More importantly, we all know, as lawyers

22   here, that that's what the statement of facts says.  We

23   don't sit down and write a hundred page statement of

24   facts with every single detail that the defendant knows.

25             That's why that language is in there, so

 1    that everyone, the judge, prosecutor, defense counsel

 2    for the defense, and, so that everyone involved at the

 3    time of the plea, and later, understands that this

 4    document is not meant to represent every single thing

 5    that this witness knows about the crimes that he's pled

 6    guilty to.

 7              Mr. Amolsch is completely misrepresenting

 8    that before the jury.  And with the witness, with his

 9    level of sophistication, who can't read English, who's

10    confused by questions with double negatives, this is --

11    it's misrepresenting the facts that this Court knows,

12    it's misrepresenting a legal document, and Mr. Amolsch

13    knows that.

14              THE COURT:  Can I see it?

15              MR. AMOLSCH:  Here's the language, Judge.

16              THE COURT:  Just a second.  I've done this

17    before.

18              MR. AMOLSCH:  I'm sorry, Judge.

19              THE COURT:  I've done pleas before.

20              You're referring to paragraph 18?

21              MR. AMOLSCH:  My plan was to introduce the

22    entire document into evidence as my exhibit on

23    cross-examination, something that he submitted and he

24    signed.

25              And the government can redirect him as they

1    want, in terms of what was included and what wasn't.

2              I'm certainly not misrepresenting the

3    statement that's in the statement of facts.  I read

4    directly from it.

5              And if they want to clarify that and say

6    exactly what she just said, I don't understand why that

7    would be not within their purview of something to do.

8              MS. MARTINEZ:  His question, Your Honor --

9              THE COURT:  Hold on.  Hold on.  I'm here

10   with all the hands -- we're not in class.  You have

11   something to say?  Is this your objection, too?  You

12   want to help him out?

13             MR. JENKINS:  I do, Your Honor.

14             THE COURT:  Okay.

15             MR. JENKINS:  I think that the witness has

16   already testified that he reviewed it.  He claimed that

17   he understood it, that someone translated it for him

18   into Spanish, and he had the benefit of going over it

19   with his lawyer.

20             I think Mr. Amolsch's question is fair.  But

21   at the same time, as I've seen many members of

22   Ms. Martinez's office do over my two dozen years of

23   doing this, she simply, on redirect, can point the

24   witness to that particular provision and ask him, "Does

25   it contain everything you know?"

1              And he can answer it truthfully, hopefully.

2              MS. MARTINEZ:  May I respond, Your Honor?

3              THE COURT:  Yes.

4              MS. MARTINEZ:  My objection is not to

5     Mr. Amolsch asking about a quote from the statement of

6     facts.  If he wants to quote and say, "You agreed to

7     this," that's one thing.

8              But his question was, "All you could say

9     about that murder was..."

10             That misrepresents a legal document.

11    Mr. Amolsch knows that all he could say was not that one

12    quote, because the document that the witness signed

13    makes very clear that this is not all he could say about

14    this crime.

15             THE COURT:  All right.

16             MR. AMOLSCH:  He can say, "No, I didn't" --

17             MS. MARTINEZ:  He's attempting --

18             THE COURT:  I'm going to do this --

19             MR. AMOLSCH:  There's actually not --

20    There's way more information that he gave them, but they

21    didn't put it in there.  In fact, Christian stabbed

22    him -- I mean, he can say whatever he wants to, but --

23             THE COURT:  I'm prepared to make a ruling.

24             MR. AMOLSCH:  Yes.

25             THE COURT:  The ruling is you can question

him about the statements in the statement of facts.  If
you rephrase your question and take out the word "all,"
that's fine.

           And, of course, the government's entitled to
redirect.  They can blow it up, put it on the screen.

           MR. AMOLSCH:  One hundred percent.

           THE COURT:  Thank you.

           MR. AMOLSCH:  I absolutely agree.

           THE COURT:  Just take the word "all" out of
your question.

           And the government can respond by doing what
they need to say in the statement of facts, if you want
to offer -- do you want to offer it in the government's
case-in-chief?  Go ahead.  Do you want to do that?

           MR. AMOLSCH:  I spoke to Mr. Salvato, and we
anticipate entering this, and he may talk me out of it,
Judge.

           THE COURT:  I'll leave it up to defense
counsel, offering evidence in the government's
case-in-chief.

           Go ahead.

           MR. SALVATO:  I think we're dancing around,
offering evidence in the defendant's case-in-chief -- in
the government's case-in-chief -- I'm getting ahead of
myself -- precludes us from making a Rule 29 motion.

```
 1              THE COURT:  I can't give you legal advice.
 2              MR. SALVATO:  I don't believe that it does,
 3   but --
 4              MR. AQUINO:  I second that.  That's not the
 5   law.
 6              MR. AMOLSCH:  So, just so I'm clear, I'm
 7   going to reask the question, is --
 8              THE COURT:  With taking the word "all" out.
 9              MR. AMOLSCH:  To make sure I'm clear, I'm
10   going to -- how should I say that?  You -- can you --
11   can you -- I know the judge --
12              THE COURT:  We don't do read-backs.
13              MR. AMOLSCH:  I don't remember what my
14   question is, so I can take "all" out.
15              So, what you put in your statement of
16   facts -- what you put in your statement of facts is that
17   the defendant and other MS-13 gang members and
18   associates killed using the knives.
19              Can I say that?
20              THE COURT:  Yeah, that's the exact quote
21   from that document.
22              MR. AMOLSCH:  So what you said in your
23   statement, what you agreed to in the statement of facts,
24   is that the defendant and other MS-13 gang members and
25   associates killed the victim using knives.  That's
```

1  acceptable?

2           THE COURT:  Keep your voice down.

3           That's fine.  You can do that.

4           MR. AMOLSCH:  Sorry.

5           THE COURT:  Let's go.

6           MS. MARTINEZ:  As long as you don't imply

7  that's the only thing he said.

8           THE COURT:  Don't worry about that.  You'll

9  have a chance to respond.

10          (Thereupon, the side-bar conference was

11 concluded.)

12 BY MR. AMOLSCH:

13   Q.  Mr. Villanueva, my question to you is this:  In

14 your statement of facts, you agreed the defendant and

15 other MS-13 gang members and associates killed the

16 victim using knives, correct?

17   A.  Yes.

18   Q.  And, you signed this statement of facts in

19 March -- on March 2nd, 2015, correct?

20   A.  I'm sorry, can you repeat that?

21   Q.  And, you signed this on March 2nd, 2015, correct?

22 Sorry.

23       You signed it on February 27th, 2015, correct?

24       (Pause.)

25       That's a question.  I'm sorry.  You signed this

1   on February 27th, 2015, correct?

2       A.   Yes.

3       Q.   And, you didn't write that Mr. Cerna stabbed the

4   victim, correct?

5       A.   No, I didn't say that.

6       Q.   Would you agree with me, sir, that your memory

7   was better a year ago than it is now?

8       A.   No.

9       Q.   You also testified about who held up the head of

10  Mr. Aguilar, after it was -- after it was taken off.  Do

11  you remember that?

12      A.   Yes.

13      Q.   And, that wasn't Mr. Cerna, correct?

14      A.   Can you repeat the question?

15      Q.   And, that wasn't Mr. Cerna, correct?

16      A.   He passed it to me.

17      Q.   Do you remember testifying on direct that Payaso

18  cut off the head?

19      A.   Yes, Lil Payaso.

20      Q.   And that's not Mr. Cerna, correct?

21      A.   Yes.

22      Q.   I'm going to ask you a couple more questions,

23  sir, about your meeting with Payaso in the jail.  Do you

24  remember the questions you got about Payaso, meeting

25  Payaso in the jail?

1    A.   Yes.

2    Q.   And, during that conversation with Payaso, as

3  Mr. Jenkins asked you, Payaso was angry, correct?

4         THE INTERPRETER:  The interpreter corrects.

5         THE WITNESS:  Yes.

6  BY MR. AMOLSCH:

7    Q.   And, do you remember telling the FBI that he was

8  angry because he wanted to know who gave the order to

9  kill Gerson?

10   A.   Yes.

11   Q.   And, do you remember telling the FBI that Payaso

12 was angry because it went against the rules of the gang

13 and the clique?

14   A.   Yes.

15   Q.   And, that this was not an MS-13 gang hit?

16   A.   Yes.

17        MR. AMOLSCH:  Thank you.

18        Court's indulgence.  Thank you, Judge.  I

19 have no further questions.

20        Thank you, Mr. Villanueva.

21                CROSS-EXAMINATION

22 BY MS. AUSTIN:

23   Q.   Good afternoon.

24   A.   Good afternoon.

25   Q.   My name is Amy Austin.  I represent Alvin Gaitan

1    Benitez.  I have some questions for you.

2         Before I begin, though, you referred to

3    Mr. Gaitan Benitez as Pesadilla, correct?

4       A.  Yes.

5       Q.  So, if I refer to my client as Alvin or

6    Mr. Benitez, we're all talking about the same person,

7    Pesadilla?

8       A.  Yes.

9       Q.  Okay.  Mr. Villanueva, do you know -- well,

10   you've testified that you know Junior, correct?

11      A.  Yes.

12      Q.  In fact, you've had phone calls with Junior;

13   isn't that correct?

14      A.  Yes.

15      Q.  And, um, you've met him in person, correct?

16      A.  Yes.

17      Q.  Um, when did you meet him in person for the first

18   time?

19           THE INTERPRETER:  The first time or the last

20   time?

21   BY MS. AUSTIN:

22      Q.  For the first time.  I'm sorry.

23      A.  It was May.

24      Q.  May of what year?

25      A.  2014.

A. Villanueva - Cross

1    Q.   Where did you meet him?

2    A.   Near where I lived.

3    Q.   Where is that?

4    A.   In Seven Corners, Virginia.

5    Q.   Where exactly in Seven Corners did you meet him?

6         Did you meet him on the street?

7         Did you meet him at an apartment?

8    A.   On the street.  I met up with him on the street.

9    Q.   In Seven Corners?

10   A.   Yes.

11   Q.   And, when you met up with him, what occurred?

12   A.   He gave me some money.

13   Q.   Why did he give you money?

14   A.   It was some money he was loaning to us.

15   Q.   When you say "us," you mean you and who else?

16   A.   To the clique.

17   Q.   And that's the first time you had ever seen him

18   in person?

19   A.   Yes.

20   Q.   But, you had spoken to him on the phone before

21   that; isn't that correct?

22   A.   Yes.

23   Q.   And, how did you -- um, how did you know Junior?

24   A.   Through Leopardo.

25   Q.   And, um, as far as you knew, what was Junior's

1    position in MS-13?

2        A.   Yes.

3        Q.   I'm sorry.  Okay.  What position did Junior hold

4    in the gang?

5        A.   He was the head of his clique.

6        Q.   And, his clique was the what clique?

7        A.   Silvas.

8        Q.   How long had he been the leader of his clique?

9        A.   I don't know.  I just know he was the leader of

10   his clique.

11       Q.   Now, were you ever involved in, um, jumping or

12   attacking a guy in Seven Corners with Junior?

13       A.   No.  We didn't jump in anyone, but we did beat up

14   on some dude.

15       Q.   Okay.  I'm sorry.  I shouldn't have used the word

16   "jump."  You said you beat up on some dude.  When you

17   say "we," who participated in that beat up?

18            THE INTERPRETER:  May the attorney re- --

19            MS. AUSTIN:  Yes, let me rephrase that.  It

20   was poorly phrased.  I apologize.

21   BY MS. AUSTIN:

22       Q.   When you say "we beat up some dude," who do you

23   mean by "we"?

24       A.   He and I.

25       Q.   Junior and you?

1     A.   Uh-huh.

2     Q.   And, the person you beat up, who was that?

3     A.   He said he was a *chequeo* with Normandy.

4     Q.   When you said he said he was a *chequeo* with

5  Normandy, did Junior say that or did the dude that you

6  beat up say that?

7     A.   The other person.

8     Q.   And, you and Junior beat this guy up, the *chequeo*

9  with Normandy, as -- was it a punishment, a *calentón*?

10    A.   No, no.

11    Q.   What was the purpose of beating this *chequeo* from

12  Normandy up?

13    A.   We -- we didn't know if he was lying to us, and

14  he told me that I wasn't a homeboy, so, it was like he

15  was disrespecting me.  So Junior hit him.

16    Q.   After Junior hit him, what happened?

17    A.   We left.

18    Q.   Did he hit him with his fist or with a weapon?

19    A.   Yeah, he hit him with his fist in the face.

20    Q.   Did the person fall down?

21    A.   No.

22    Q.   Did the person fight back?

23    A.   No.

24    Q.   And, after Junior hit him in the face, where did

25  you go?

1     A.   He went -- I don't know where he went.  I went
2   home.
3     Q.   Had Junior asked you to join him there?
4     A.   No.
5     Q.   You just happened to be hanging out with Junior?
6     A.   You're -- can you repeat?
7     Q.   Why were you there with Junior?
8     A.   Because he was going to hand over some money to
9   me.
10    Q.   Did Junior take money from the *chequeo*?
11    A.   No.
12    Q.   So, you showed up, met Junior on that day,
13   correct?
14    A.   Yes.
15    Q.   And, you're in Seven Corners?
16    A.   Yes.
17    Q.   Are you walking around?
18         Are you on the street?
19         Where were you when you meet the *chequeo* from
20   Normandy?
21    A.   We were walking, and he just passed by there.
22    Q.   The *chequeo* passed by?
23    A.   Yes.
24    Q.   And, did Junior ask him a question?
25    A.   Yes.

1    Q.   What did he ask him?

2    A.   He asked him who he was.

3    Q.   And the -- the person answered he was a *chequeo*

4    from Normandy?

5    A.   Yes.

6    Q.   Is that when Junior hit him in the face?

7    A.   No.

8    Q.   What happened next then?

9    A.   He told him -- he asked him why he was

10   disrespecting me.

11   Q.   How had he disrespected you?

12   A.   Because a few days before, I had met him, and he

13   told me that I was making believe that I was part of the

14   gang and that I was a nobody.

15   Q.   So, you had met this *chequeo* prior to you and

16   Junior seeing him on the street that day?

17   A.   Yes.

18   Q.   And so, you met Junior that day in the same area

19   you had seen the *chequeo* previously?

20   A.   Yes.

21   Q.   So, you were looking for this *chequeo*?

22   A.   No.  He just passed by.  I was not looking for

23   him.  And I told Junior -- I told Junior, "This is the

24   guy -- look, this is the guy that I talked to you about

25   before."

1    Q.   And, Junior then asked him a question; is that
2    correct?
3    A.   Yes.
4    Q.   And hit him in the face?
5    A.   No.   He spoke to him and he asked him why was it
6    that he was disrespecting me, and it was after that he
7    hit him.
8    Q.   After that, he hit him in the face?
9    A.   Yes.
10   Q.   When you met Junior in Seven Corners that day,
11   were you also going to get drugs from him?
12   A.   No.
13   Q.   Was -- were drugs involved at all that day with
14   anyone?
15   A.   No.
16   Q.   You hesitated when I asked that question.   Did
17   you have to think about that for a minute?
18   A.   No.
19        MS. AUSTIN:   Court's indulgence.
20   BY MS. AUSTIN:
21   Q.   Now, we've talked already -- or you've been asked
22   questions already about you -- your involvement in
23   Gerson -- Lil Guasón's murder.
24   A.   Yes.
25   Q.   And, we've -- you've been asked about, um,

1  sitting down with the United States Government,

2  specifically Agent Uribe, and discussing your

3  involvement in that murder; isn't that correct?

4      A.   Yes.

5      Q.   And, while we're on this topic, how many times

6  have you sat down and discussed your involvement in this

7  case with the agents or the U.S. attorneys involved in

8  this case?

9      A.   Three times.

10     Q.   And, is it true that when you sat down with the

11 agents and Ms. Martinez in February of 2015, you

12 described the events leading up to Gerson's murder; is

13 that correct?

14     A.   Yes.

15     Q.   And you knew they wanted to know who had directed

16 this murder to take place; isn't that correct?

17     A.   Yes.

18     Q.   And, is it true that on that day when you sat

19 down and spoke to them, you told them that the plan to

20 murder Gerson was mentioned for the first time by

21 Mr. Cerritos, who is also known as Lil Poison?

22     A.   Yes.

23     Q.   And, that you also told them that Cerritos

24 announced that it was to be done on a Saturday?

25              THE INTERPRETER:  "On a Saturday," Counsel?

1          THE WITNESS:  Yes.

2    BY MS. AUSTIN:

3        Q.   And, that Cerritos instructed the clique members

4    where to go?

5        A.   Yes.

6        Q.   And, that Douglas or Cerritos instructed you to

7    send Solitario a text message?

8        A.   Yes.

9        Q.   And that Douglas instructed you to inform

10   Solitario that they were -- and Gerson, that there was

11   going to be a clique meeting?

12       A.   Yes.

13       Q.   And that you also told the government that it was

14   Douglas Cerritos who instructed you to tell Gerson at

15   midnight that Solitario and Gerson was to think there

16   was a meeting?

17       A.   Yes.

18       Q.   So, it was Cerritos, Lil Poison, who is giving

19   the instructions that night, correct?

20       A.   Yes.

21       Q.   And, you took his instructions and did what he

22   told you to do; isn't that correct?

23       A.   Yes.

24       Q.   Now, after Lil Guasón was murdered -- and I

25   believe you mentioned this on questioning earlier -- you

1   stated you fled the police and went to Kansas City; is

2   that correct?

3       A.   Yes.

4       Q.   When did you leave Virginia to go to Kansas?

5       A.   June 2014.

6       Q.   June 2014?

7       A.   Yes.

8       Q.   Who did you leave the area with?

9       A.   Solitario, Guepardo and Lil Poison.

10      Q.   Mr. Gaitan Benitez did not flee the area with

11  you, did he?

12      A.   No.

13      Q.   And, how did you travel from Virginia to Kansas

14  City?

15      A.   Pesadilla made contact with a homeboy from

16  another clique, so that he could take us to Kansas City.

17      Q.   So, Pesadilla arranged for you to have a ride?

18      A.   Yes.

19      Q.   But Pesadilla did not go with you, did he?

20      A.   No.

21      Q.   And, did you make it to Kansas City?

22      A.   Yes.

23      Q.   And, how long were you there?

24      A.   I was four days.

25      Q.   And, you say you fled the area because the police

1    were looking for you because of Gerson's murder; is that

2    correct?

3        A.   Yes.

4        Q.   Now, once you were arrested and put in a jail,

5    you were housed at one time with Payaso; is that

6    correct?

7        A.   Yes.

8        Q.   And, at what jail was that?

9        A.   Northern Neck.

10       Q.   Okay.

11            And, if I could show the witness what's

12   labeled Exhibit 65-C, please.

13            I'm sorry.  We'll show him 65-B.

14   BY MS. AUSTIN:

15       Q.   Do you recognize who this is in the photograph?

16       A.   Yes.

17       Q.   Who is it?

18       A.   Payaso.

19            MS. AUSTIN:  If we can publish that to the

20   jury.  It's been admitted, Your Honor.

21            THE COURT:  All right.

22            MS. AUSTIN:  65-B -- I believe 65-B.

23

24   BY MS. AUSTIN:

25       Q.   Now, this is Payaso in the picture, correct?

1    A.   Yes.

2    Q.   And, at some point, you were locked up with him

3  at the Northern Neck Regional Jail, correct?

4    A.   Yes.

5    Q.   And, is it true that you knew Payaso as being the

6  first word of the Park View clique?

7    A.   Can you repeat that?

8    Q.   What position did Payaso -- Payaso hold in the

9  Park View clique?

10    A.   First word.

11    Q.   And, when you sat down with the agents and the

12  assistant U.S. attorneys to talk about this case, is it

13  true that you told them that he was angry about the

14  murder of Lil Guasón?

15    A.   Yes.

16    Q.   And that he had told you, while you were

17  incarcerated together, that there would be a little

18  something for everyone involved in that murder?

19    A.   Yes.

20    Q.   What does "little something" mean to you, when

21  you heard that?

22    A.   A *calentón*.

23    Q.   And, in fact, through your conversations with

24  Payaso, as well as others while incarcerated, you

25  learned that anyone involved in the murder of Gerson

A. Villanueva - Cross                                                88

 1   were going to be green lighted -- green lit or -- a
 2   green light put on you, correct?
 3              MS. MARTINEZ:  Objection, Your Honor,
 4   compound question.
 5              THE COURT:  It is.
 6              MS. AUSTIN:  Okay.  Let me rephrase it.  It
 7   was poorly phrased.
 8   BY MS. AUSTIN:
 9     Q.   During your incarceration with Payaso, as well as
10   others, did you learn about a green light being issued
11   for anyone involved in Gerson's murder?
12              MS. MARTINEZ:  Objection, Your Honor, still
13   compound question.
14              THE COURT:  Sustained.
15   BY MS. AUSTIN:
16     Q.   Was there talk of a green light while you were
17   incarcerated with Payaso as well as others?
18              MS. MARTINEZ:  Objection, Your Honor.  It's
19   still compound, involving multiple people.
20              MS. AUSTIN:  Your Honor, at some point, you
21   have to ask a question that involves a little bit
22   more -- you know, I can break it up and then -- in
23   pieces, if that's what I need to do.  I -- I asked about
24   a green light, did he hear about a green light while he
25   was incarcerated with people.

1          THE COURT:  And you asked about others, as

2    well.  So that's very ambiguous.  If you would like to

3    ask a specific question, now is your chance to do that.

4          MS. AUSTIN:  Okay.

5          THE COURT:  Objection sustained.

6          MS. AUSTIN:  Thank you.

7          THE COURT:  Thank you.

8    BY MS. AUSTIN:

9    Q.  Okay.  While you're incarcerated, did you hear

10   about a green light?

11   A.  No.

12   Q.  You were never told about a green light being

13   issued for those involved in Gerson's murder?

14   A.  No.

15   Q.  But, you were told about possible punishments for

16   those involved in Gerson's murder?

17   A.  Yes.

18   Q.  And, you were told that even in prison, the

19   gang -- were you told that the gang would find

20   individuals gang members in prison?

21         MS. MARTINEZ:  Objection, Your Honor, lack

22   of foundation as to who is saying this.  It could be

23   hearsay depending on where the source is.

24         THE COURT:  Sustained.

25   BY MS. AUSTIN:

```
1        Q.   Were you told by either Payaso or other clique
2    members that --
3        A.   What was that again?
4             THE COURT:  It's a multiple choice
5    questions.  When you ask multiple choice questions, I'm
6    going to sustain the objection.
7             MS. AUSTIN:  If I use "and," is it multiple
8    choice?
9             THE COURT:  When you say "and others," it
10   is.
11            MS. AUSTIN:  Okay.
12            THE COURT:  It's ambiguous.
13            MS. AUSTIN:  I just want to make sure.
14            THE COURT:  Free legal advice.
15   BY MS. AUSTIN:
16       Q.   Now -- I think I might move on and come back to
17   that.
18            When you were incarcerated -- strike that.
19            At some point during your incarceration, you
20   decided that you were going to cooperate with the
21   government, correct?
22       A.   Yes.
23       Q.   And, that was after you had been locked up with
24   Payaso; isn't that correct?
25       A.   No.  It was before.
```

1    Q.   It was before.

2         And, you had decided to cooperate with the

3    government prior to having this conversation with Payaso

4    in jail?

5    A.   Yes.

6    Q.   And, is it true that you were also incarcerated

7    at one time with Mr. Jose Lopez Torres, also known as

8    Greñas?

9    A.   I was with him, yes.

10   Q.   And that you admitted to him that on the night of

11   Gerson's murder, you were high on marijuana, correct?

12   A.   Yes.

13   Q.   But you neglected to tell him that you were also

14   high on crystal meth that night; isn't that correct?

15   A.   No.

16   Q.   So, if -- do you remember sitting down with the

17   agents and the U.S. Attorney in February of 2015,

18   Mr. Villanueva?

19   A.   Yes.

20   Q.   And, do you remember being asked about -- strike

21   that.

22        Do you remember explaining to the agents and the

23   assistant United States attorney that you told Greñas

24   that you were high on marijuana the night of Gerson's

25   murder?

1    A.   I told them that night I had consumed both

2    marijuana and crystal.

3    Q.   Okay.  So, you did tell the government that that

4    night you were high on both marijuana and crystal meth?

5    A.   Yes.

6    Q.   And, that in your conversations with the U.S.

7    attorney and the agents, you also revealed to them that

8    you were a very heavy marijuana user, using it almost

9    daily?

10   A.   Yes.

11   Q.   And, during your incarceration, after you were

12   arrested in June of 2014, you had many conversations

13   with members of the Park View clique, correct?

14   A.   Yes.

15   Q.   And, in fact, you had different conversations at

16   different times with members of the clique, depending on

17   where you were incarcerated; is that correct?

18   A.   Yes.

19   Q.   And, for instance, if you were locked up with

20   Mr. Lopez Torres and had a conversation with him --

21   A.   Yes.

22   Q.   -- is it true that any information you received

23   from him, you relayed to the U.S. Attorney's Office?

24   A.   Yes.

25   Q.   And, if you had a conversation with Payaso --

```
 1                  THE COURT:  Excuse me.  Excuse me.
 2                  MS. AUSTIN:  I'm sorry.
 3                  THE COURT:  Are these hypothetical questions
 4      or questions about things that happened?
 5                  MS. AUSTIN:  Things that happened.  He had
 6      conversations.
 7                  THE COURT:  Well, if you would ask him that.
 8      You keep saying "if" --
 9                  MS. AUSTIN:  Okay.
10                  THE COURT:  -- and that suggests a
11      hypothetical.
12                  MS. AUSTIN:  I'm sorry.
13      BY MS. AUSTIN:
14         Q.  Who else did you have conversations with while
15      you were incarcerated?
16         A.  With the entire clique.
17         Q.  With the entire clique?
18         A.  Yes.
19         Q.  Okay.  And, every time you had a conversation
20      with one of these clique members, you then told the U.S.
21      attorney and the agents about the conversation; is that
22      correct?
23         A.  Yes.
24         Q.  And, did some of these --
25                  MS. AUSTIN:  Excuse me for one minute, Your
```

1    Honor.

2                   Did a lot of these conversations happen in

3    2014 and 2015?

4        A.   Yes.

5        Q.   And, you had already been charged at that time

6    with the murder of Lil Guasón; is that correct?

7        A.   Yes.

8        Q.   And, you had met with your attorneys that were

9    representing you on that; is that correct?

10       A.   Yes.

11       Q.   And, you understood what the charges were against

12   you and the other members of the clique; is that

13   correct?

14       A.   Yes.

15       Q.   And so, you knew that as much information as you

16   could give to the U.S. attorney, it would benefit you;

17   is that correct?

18       A.   Yes.

19       Q.   And, in fact, you told them everything you had

20   heard; is that correct?

21       A.   Yes.

22       Q.   So, much of your information was based on what

23   others told you; is that correct?

24       A.   No.

25                   MS. AUSTIN:   I have no further questions,

1    Your Honor.

2              THE COURT:  You may proceed.

3                     CROSS-EXAMINATION

4    BY MS. RALLS:

5      Q.   Mr. Villanueva, you pleaded guilty to one murder;

6    is that correct?

7      A.   Yes.

8      Q.   But, you testified here today that you were

9    involved in two, correct?

10     A.   Yes.

11     Q.   But, it's your understanding that you're not

12   going to get charged for killing Lagrima; is that

13   correct?

14     A.   Yes.

15     Q.   You're not going to get charged in this

16   courthouse, right?

17     A.   No.

18     Q.   And you're not going to get charged in State

19   Court down the road in Fairfax, correct?

20     A.   No.

21     Q.   And, you took part in an armed robbery in

22   Fairfax; is that correct?

23     A.   Yes.

24     Q.   And, you're not going to get charged for that

25   either?

1      A.   No.

2      Q.   And, you took part in a stabbing with another

3   individual or two other people in Fairfax, correct?

4      A.   No.

5      Q.   You were with somebody you know as Jose Gavidia

6   when he stabbed somebody 15 times, correct?

7      A.   No.

8      Q.   And, he got charged for that?

9           MS. MARTINEZ:  Objection, Your Honor, lack

10   of knowledge, lack of foundation.

11          THE COURT:  Foundation.  Objection

12   sustained.

13   BY MS. RALLS:

14     Q.   You told other people in jail that you were a

15   part of that; wasn't that correct?

16     A.   No.

17     Q.   Now, you told Mr. Amolsch that you had gone to

18   Alexandria with a machete at one point to try to kill a

19   *chavala*.  Do you remember that?

20          THE INTERPRETER:  Mr. Amolsch?

21          MS. RALLS:  Amolsch.

22          THE WITNESS:  Yes.

23          THE COURT:  Counsel, we'll start right there

24   at 2:00 o'clock.

25          Ladies and gentlemen, please do not discuss

1     the case.  Do not permit the case to be discussed in

2     your presence.  Leave your notes in the jury

3     deliberation room.  We'll resume at 2:00 o'clock.  Thank

4     you.

5                    (Court recessed at 1:00 p.m. and reconvened

6                    at 2:06 p.m.)

7                    (Jury not present.)

8                    MR. AQUINO:  Judge, I noticed some of the

9     lawyers are running late.  It's hard to get through

10    security.

11                   THE COURT:  I appreciate that.  You don't

12    get to go through the side door like I do, so that means

13    you have to come back earlier.

14                   Is everybody here now?

15                   MR. AMOLSCH:  Mr. Jenkins, Mr. Leiva.

16                   THE COURT:  Oh, okay.  Well, I guess we'll

17    give them a few more minutes.

18                   MR. AMOLSCH:  They were in line.

19                   THE COURT:  I'm sure they're coming back.

20    I'm never worried about that.

21                   I think we have everyone now.  Can you bring

22    the witness out?

23                   (Witness resumed stand.)

24                   THE COURT:  Bring our jury out, Mr. Toliver.

25    Thank you.

1                    (Jury present.)

2                    THE COURT:  You may be seated.

3                    Ms. Ralls, your last question had to do with

4     going to Alexandria with a machete.

5                    MS. RALLS:  Thank you, Your Honor.  May I

6     proceed?

7                    THE COURT:  Yes.

8                        CROSS-EXAMINATION (Continued)

9     BY MS. RALLS:

10       Q.   Mr. Villanueva, we were talking about some of the

11    things you had done in the past.  It's true that you

12    were with a group of people that attacked a young man

13    with a machete; isn't that correct?

14       A.   Yes.

15       Q.   And, they almost cut his hand off; isn't that

16    right?

17       A.   Yes.

18       Q.   And, you're not going to be prosecuted for that

19    either, correct?

20       A.   No.

21       Q.   And, you took part in another assault in Fairfax

22    in August 2013, correct?

23       A.   Yes.

24       Q.   And, that was where you and some other people

25    attacked a homeless black man in an abandoned house,

1    correct?

2        A.   Yes.

3        Q.   And, you beat him with a two-by-four?

4        A.   Yes.

5        Q.   And, you're not going to be prosecuted for that

6    either, correct?

7        A.   No.

8        Q.   And, for all of that, you're not going to be

9    prosecuted because you're testifying here today,

10   correct?

11       A.   Yes.

12       Q.   And, you told all of that to the government,

13   correct?

14       A.   Yes.

15       Q.   And, that's because they asked you about things

16   you had done in the past, right?

17       A.   Could you repeat that?

18       Q.   The AUSA, Ms. Martinez, wanted to know about

19   things you had done in the past, right?

20       A.   Yes.

21       Q.   And, they wanted you to be truthful about those

22   things, right?

23       A.   Yes.

24       Q.   And they told you that because you had pleaded

25   guilty, they wouldn't prosecute those crimes against

1    you, right?

2        A.    Yes.

3        Q.    And, so, you also told them about this incident

4    where you were with someone named Junior, when Junior

5    punched that person in the face, right?

6        A.    Yes.

7        Q.    And, I don't know if you mentioned this, did that

8    *chequeo*, did he have a cut or a bruise or anything after

9    the punch?

10       A.    Well, he -- he had bleeding lips.

11       Q.    And, you told the government about this, right?

12             (Question not translated.)

13       A.    Sí.

14             THE INTERPRETER:   Interpreter corrects

15   himself.   "Split lips."

16   BY MS. RALLS:

17       Q.    And when you told the government about this, the

18   agents were taking notes, right?

19       A.    Yes.

20       Q.    And, how did the government agents react when you

21   told them about this incident with Junior?

22       A.    Normal.   He just took notes of it.

23       Q.    And when you were talking to the government, they

24   were asking about things that other people had done,

25   correct?

1    A.  Yes.

2    Q.  And, when you were telling them about the murder

3  of Lagrima, you couldn't remember anything that Lil

4  Payaso did; is that correct?

5    A.  No.

6    Q.  There were several people that you couldn't

7  recall their actions; isn't that correct?

8    A.  No.

9    Q.  And, you also told -- you talked about when you

10  killed Lagrima with people that you were in jail with,

11  correct?

12    A.  Yes.

13    Q.  And, you told them that Junior from Silvas was

14  there when Lagrima was killed, right?

15    A.  No.

16    Q.  And, you did not tell them that Lil Payaso was

17  there, correct?

18    A.  No.

19    Q.  Do you remember what you told people in the jail

20  about what had happened?

21    A.  To what people?

22    Q.  Anybody in the jail, any other inmates.

23    A.  No, I didn't mention that to any other inmate.

24    Q.  Now, you pleaded guilty to killing Lil Guasón

25  after you were charged, correct?

1  A.  What did you say?

2  Q.  Well, I'll rephrase.

3  You pleaded guilty, after you had a chance to

4  review the charge against you from the government?

5  A.  Yes, I pled guilty.

6  Q.  And, you knew that the government had accused my

7  client, Mr. Castillo, of committing similar crimes,

8  correct?

9  A.  Yes.

10  Q.  And, you knew that when you pleaded guilty, the

11  government wanted you to tell them about what other

12  people had done to Lagrima and Lil Guasón?

13  A.  Yes.

14  Q.  And, you knew that the crime that you were

15  charged with carried a mandatory life sentence?

16  A.  Yes.

17  Q.  And, the only way for you to avoid having that

18  life sentence was to testify against the other people

19  charged in this case?

20  A.  Yes.

21          MS. RALLS:  No further questions.

22          THE COURT:  Redirect.

23          MS. MARTINEZ:  Thank you, Your Honor.

24              REDIRECT EXAMINATION

25  BY MS. MARTINEZ:

1      Q.   You were asked some questions about the statement

2    of facts submitted with your plea agreement.  Do you

3    remember that?

4      A.   Yes.

5           MS. MARTINEZ:  Your Honor, with the help of

6    the court security officer, I would like to hand the

7    witness what we have now marked -- and I have in my

8    hands -- as Government's Exhibit 122-A.  I have a Court

9    copy, a copy for the witness, and a copy for Your Honor,

10   as well as one for defense counsel, although defense

11   counsel has all seen this.

12           Mr. Toliver, it's here in my hand.

13           THE COURT:  I believe I have it in this

14   notebook.  Thank you.

15   BY MS. MARTINEZ:

16     Q.   Do you see that document in front of you?

17     A.   Yes.

18     Q.   Please turn to the last page.  Is that your

19   signature?

20     A.   Yes.

21     Q.   Does this appear to be your statement of facts

22   submitted with your plea agreement?

23     A.   Yes.

24           MS. MARTINEZ:  Your Honor, government moves

25   into evidence Government's Exhibit 122-A.

1                    THE COURT:  Received.

2                    MS. MARTINEZ:  Court's indulgence one

3    moment.

4                    Your Honor, may we publish?

5                    THE COURT:  Yes.

6    BY MS. MARTINEZ:

7       Q.   Now, this statement of facts is part of your plea

8    agreement; is that right?

9       A.   Yes.

10      Q.   Defense counsel asked you about paragraph 16.

11           Do you remember defense counsel asking you about

12   a line in your plea agreement related to the murder of

13   Lil Wasón?

14      A.   Yes.

15                   MS. MARTINEZ:  With the help of the

16   interpreter, could we interpret for the witness just the

17   first sentence of paragraph 16.

18                   THE INTERPRETER:  That is, Counsel, there is

19   one that starts, "On or about March 29?"

20                   MS. MARTINEZ:  Yes.

21                   (Interpreter complies.)

22   BY MS. MARTINEZ:

23      Q.   Do you remember being asked about that sentence?

24      A.   Yes.

25                   MS. MARTINEZ:  Could we go to paragraph 18,

1    please.  And would the court interpreter be so kind,

2    would you please translate paragraph 18 for the witness.

3               (Interpreter complies.)

4    BY MS. MARTINEZ:

5       Q.   Do you understand that paragraph?

6       A.   Yes.

7       Q.   This statement of facts is written in English.

8    Did you, yourself, write this English document?

9       A.   Yes.

10      Q.   You wrote it in English?

11      A.   No.

12      Q.   Someone else wrote it?

13      A.   Yes.

14      Q.   When you signed it, was it interpreted into

15   Spanish for you?

16      A.   Yes.

17      Q.   Now, you've testified to a lot of details today

18   about the murders that you and others committed; is that

19   right?

20      A.   Yes.

21      Q.   During interviews with the government, have you

22   provided details about the murders?

23      A.   Yes.

24      Q.   Does that include details that aren't contained

25   in this short statement of facts?

1      A.   Like, how -- would you -- could you repeat the
2  question?
3      Q.   I know it's difficult because the document is
4  there in English in front of you.  I don't want to ask
5  the interpreter to interpret out loud every single word,
6  but if you need it, we can do that.
7           But my question is, essentially, do you
8  understand or agree that this statement of facts doesn't
9  include every detail you know about the murders?
10              MR. JENKINS:  Objection, Your Honor, to the
11  leading nature.
12              THE COURT:  Sustained.
13  BY MS. MARTINEZ:
14      Q.   Do you understand paragraph 18 there?
15      A.   Yes.
16      Q.   Do you agree with it?
17      A.   Yes.
18      Q.   Now, if you would please take a look at paragraph
19  12.
20              MS. MARTINEZ:  Would the court interpreter
21  please interpret paragraph 12 for the witness.
22              THE INTERPRETER:  Certainly, counsel.
23              (Interpreter complies.)
24  BY MS. MARTINEZ:
25      Q.   Do you understand that paragraph?

1    A.  Yes.

2    Q.  Does that describe one of the violent events

3 counsel asked you about in cross-examination?

4    A.  Yes.

5    Q.  Do you understand that the statement of facts is

6 part of your plea agreement?

7    A.  Yes.

8    Q.  Please turn to paragraph 15.

9         MS. MARTINEZ:  Would the court interpreter

10 interpret the first sentence of paragraph 15.

11         (Interpreter complies.)

12 BY MS. MARTINEZ:

13   Q.  Do you understand that sentence?

14   A.  Yes.

15   Q.  Do you agree with it?

16   A.  Yes.

17   Q.  Now, you were also asked on cross-examination

18 about being charged for the murder of Lagrima.  Do you

19 recall that?

20   A.  Yes.

21   Q.  How old were you at the murder of Lagrima?

22   A.  Seventeen.

23         MS. MARTINEZ:  Your Honor, may we publish

24 Government's Exhibit 122, which has been admitted into

25 evidence?  It's his plea agreement, Your Honor.

```
1              THE COURT:  Yes, uh-huh.
2              MS. MARTINEZ:  If we could go to paragraph
3    ten.
4    BY MS. MARTINEZ:
5       Q.  Now, this is your plea agreement, right, on the
6    screen?
7              MS. MARTINEZ:  Go back to the first page.
8    BY MS. MARTINEZ:
9       Q.  You saw this before.  This is your plea
10   agreement?
11      A.  Yes.
12      Q.  If we could go to paragraph ten.
13             THE INTERPRETER:  There is some confusion,
14   because the witness seems to be looking at the paper
15   document of the prior exhibit.
16             MS. MARTINEZ:  Okay.
17             On the screen, let's go back to page one so
18   the witness sees what we're talking about.
19   BY MS. MARTINEZ:
20      Q.  Do you recognize this as your plea agreement?
21      A.  Yes.
22      Q.  If we could go to paragraph ten, please.
23             MS. MARTINEZ:  Would the court interpreter
24   please interpret paragraph ten for the witness.
25             THE INTERPRETER:  Yes, certainly.
```

1              (Interpreter complies.)

2     BY MS. MARTINEZ:

3         Q.   Do you understand that?

4         A.   Yes.

5         Q.   Do you recall being charged as a juvenile with

6     the murder of Lagrima?

7         A.   Yes.

8         Q.   If you go to the last page of this plea

9     agreement -- second-to-the-last page, sir.

10             What is the date by your signature, or the date

11    by those other signatures, if it's easier to read?

12        A.   February 3rd, 2015.

13        Q.   You testified that you were arrested in June of

14    2014; is that right?

15        A.   Yes.

16        Q.   Defense counsel asked you on cross-examination

17    about a conversation that you had with Payaso.  Do you

18    recall that?

19        A.   Yes.

20        Q.   Where were you for that conversation?  What jail?

21        A.   Northern Neck Regional Jail.

22        Q.   You were also asked about conversations with

23    other defendants.  Do you recall that?

24        A.   Yes.

25        Q.   Where did those conversations take place?

1    A.   Northern Neck.

2    Q.   You were asked a lot of questions about your

3  memory of what happened during the murders.  Do you

4  remember that?

5    A.   Yes.

6    Q.   Specifically about the murders, the details that

7  you've testified to, do you remember them?

8    A.   Yes.

9    Q.   And when I say "remember," do you personally have

10 a memory of the events that happened?

11   A.   Yes.  I don't think I'll ever forget that.

12   Q.   During cross-examination, were there times when

13 you were having trouble understanding defense counsel's

14 questions?

15          MR. JENKINS:  Objection, Your Honor.

16          MR. AMOLSCH:  Objection, Judge.

17          THE COURT:  What's the objection?

18          MR. JENKINS:  Your Honor, it's leading.

19          THE COURT:  Sustained.

20 BY MS. MARTINEZ:

21   Q.   During defense counsel's questioning, did you

22 understand every question, or were there times when

23 you --

24          MS. AUSTIN:  Objection, compound question.

25          MR. JENKINS:  Objection.

1          THE COURT:  Sustained.

2    BY MS. MARTINEZ:

3      Q.   How well did you understand defense counsel's

4    questions?

5               MR. JENKINS:  Objection.

6               THE COURT:  That's not leading.  Objection

7    overruled.

8               THE WITNESS:  Well.

9    BY MS. MARTINEZ:

10     Q.   Were there any questions that you had any trouble

11   with?

12     A.   No.

13     Q.   When you asked defense counsel to repeat

14   questions, why did you do that?

15     A.   To be sure about what I was going to answer.

16     Q.   You were asked a question about when you joined

17   MS-13.  Do you remember that?

18     A.   Yes.

19     Q.   When were you jumped in to MS-13 as a homeboy?

20     A.   October 8, 2013.

21     Q.   Why are you so certain of the date?

22     A.   Because it was the night that we killed Lagrima.

23     Q.   Before you were jumped in as a full homeboy, were

24   you hanging out with the gang?

25     A.   Yes.

1    Q.   How old were you when you first started hanging
2    out with them?
3    A.   Seventeen.
4    Q.   How long had you been hanging out with them, more
5    or less, before you were fully jumped in as a homeboy?
6    A.   Six months.
7    Q.   You were asked some questions about Skinny.  Do
8    you remember that?
9    A.   Yes.
10   Q.   Do you recall that he was arrested?
11   A.   Yes.
12   Q.   After Skinny was arrested, who was in charge of
13   the clique?
14   A.   Lil Poison.
15   Q.   You were also asked some questions about Junior.
16   A.   Yes.
17   Q.   You were asked questions about talking to Junior
18   on the phone.  Do you remember that?
19   A.   Yes.
20   Q.   Do you remember what you talked about to Junior
21   on the phone?
22   A.   Yes.
23   Q.   What do you remember?
24   A.   We talked about money, drugs, and the deaths that
25   we caused.

1    Q.   What deaths?

2    A.   Lagrima and Gerson.

3         MS. MARTINEZ:  Your Honor, may we approach

4    quickly?

5         THE COURT:  All right.

6         (Thereupon, the following side-bar

7    conference was had:)

8         MS. MARTINEZ:  Your Honor, we have in

9    evidence a recorded call and a transcript where Junior

10   has identified the speaker as being this witness, and

11   where he provides a list of all the defendants involved

12   in each of the two murders.

13        Because of questioning on cross-examination,

14   and implying that he learned all the information about

15   the murders from the indictment and other sources, what

16   I would like to do is I'd like to have this witness talk

17   about that phone call.

18        Now, we have the transcript, and the

19   witness, of course, can't read English and can't read

20   the transcript, so what I'd like to do is I'd like to

21   play it for him, so he can testify both on hearing it in

22   Spanish.

23        But I want to raise with everyone before I

24   do, that the transcript, of course, has Leopardo's name

25   redacted when it comes to the Lagrima murder.

1          Now, the call can't be redacted, so,

2    whatever the witness says and whatever Junior and this

3    witness said in that call will be audible.

4          I would submit that because it's in Spanish,

5    because it's spoken very rapidly, because there's slang,

6    the jury won't be able to tell or hear that anyone is

7    saying that Leopardo is involved in the murder.

8          But before I publish that and ask to do so,

9    I want to make sure what everybody is aware what I'm

10   doing and what I'm asking for, and give defense counsel

11   an opportunity to comment on it.

12         I'm not sure how else we can have him

13   testify about the audio without hearing it.  We could

14   explore options for him listening without the jury being

15   able to hear it.

16         Again, I don't think the jury -- and if I

17   remember correctly from looking at my notes on voir

18   dire, I don't believe any of the jurors -- although

19   defense counsel will correct me if I'm wrong -- I'm not

20   sure any of them is native Spanish speakers.

21         So it seems unlikely to me that they'll be

22   able to follow the audio.  And the transcript, of

23   course, the transcript has the name that can't be

24   included redacted, so --

25         THE COURT:  How long does it take?

1          MS. MARTINEZ:  Just a few minutes to get to

2    the point where we want to, maybe five or six minutes at

3    most.

4          MR. AMOLSCH:  No way.  I mean, the name

5    Leopardo is -- is easily identified.  She's had him

6    identify the name Leopardo several times.  Everybody

7    identifies him as Leopardo.

8          Your Honor's order on this is very specific

9    as it relates to the introduction of evidence to the

10   Lagrima murder.  While I'm sympathetic to the

11   government's evidentiary issue, that's not the

12   concern --

13         THE COURT:  We don't need to --

14         MR. AMOLSCH:  I know.

15         THE COURT:  Okay.

16         MR. AMOLSCH:  So --

17         THE COURT:  What I'm considering doing is

18   allowing this witness to hear the videotape outside the

19   presence of the jury.

20         And then, when the jury comes back, he can

21   say, "I've listened to the videotape, and this

22   transcripts seems to be what I said," and use the

23   transcript that's redacted, and everybody can follow it.

24         MR. AMOLSCH:  Your Honor --

25         THE COURT:  I'm not asking for approval.  If

1   you have an objection, tell me.

2            MR. AMOLSCH:  This is my objection, and I'll

3   put this on the record.  You know, everybody has gone

4   out of their way to make sure that nobody has said his

5   name as it relates to this murder.  We are five weeks in

6   to maybe a seven-week trial.

7            If the government does this, and he messes

8   up, we would be asking for a mistrial with prejudice,

9   because this is their witness, and they will have done

10  this, not somebody on this side.

11           That would be my position, Judge, as it

12  relates to this is unnecessary, I think, in terms of

13  their re- -- I mean redirect.  So, we have avoided,

14  subject to the other objections we've already made so

15  far, of not messing up with the homeboy two.

16           So, that would be my position.

17           THE COURT:  Okay.

18           MS. AUSTIN:  Your Honor --

19           MS. MARTINEZ:  Your Honor, my intention is

20  to ask questions that do not cause him to list names,

21  because the names are very clearly listed in the

22  transcript.  And the jury can read that, with the

23  appropriate redactions.

24           My intention is to ask him to confirm the

25  voice, to confirm that it's him, and ask him to talk --

1    to testify generally about what was -- what he was

2    telling Junior.  In other words, I'm asking him to

3    confirm what's in the transcript, which is that he was

4    telling Junior, long before he was arrested, who the

5    other people were at the murders.

6                I'm not going to ask him to list everyone.

7    He's made it through that.  He's done that already on

8    direct, and we had no problems with homeboy two.  The

9    list is clearly in the transcript.  The transcript

10   reflects what -- the audio that he'll hear as was

11   testified to by the linguist and by Junior.

12               I'm asking him to authenticate his own voice

13   and to confirm that he talked about the conversation.

14               THE COURT:  You would go back to the

15   transcript, just to that page where there's a list of

16   names.

17               MS. MARTINEZ:  It's a couple pages, but yes,

18   Your Honor.

19               Just to be clear, to round it out -- I'm not

20   objecting to him listening outside of the presence of

21   the jury.  But to round out the issue with the name, in

22   this call, he talks about both murders, so he absolutely

23   uses the name.  And the name is unredacted in the

24   transcript with respect to the second murder.  So,

25   Judge, I have no objection --

A. Villanueva - Redirect                                    118

1          THE COURT:  The murder he's charged with.

2          MS. MARTINEZ:  The one he's charged with

3     that can't be redacted.  Even if the jury were to hear

4     the name in the transcript, the name appears because he

5     lists everyone for both murders.

6          THE COURT:  Okay.

7          MR. AMOLSCH:  Your Honor, I want to say, we

8     spent a lot of time going over the transcripts.  I need

9     to make sure can I look at that before we do this.

10         THE COURT:  She'll give you the page.

11         MR. AMOLSCH:  Thank you, Judge.

12         MR. JENKINS:  Yes, Your Honor.  I have two

13    objections.  The first is, it would be beyond the scope.

14    While I questioned whether or not his ability to recall

15    specific details and suggested to the jury, by way of my

16    cross-examination, that perhaps he got some of these

17    details from other sources, I did not ask him about

18    these phone calls at all on cross-examination, nor do I

19    believe any of my fellow defense attorneys did.

20         The government had a fair opportunity on

21    direct examination to put these calls in or have this

22    witness testify about these calls, and they did not.

23         And the Court has been fairly consistent

24    with advising defense counsel that there would be no

25    recross.

1           Now they're about to open a door into calls,

2    into what he said on calls.  And if the government were

3    going to present that on direct, I certainly would have

4    availed myself of the opportunity to cross-examine him

5    on the authen- -- whether or not the calls were

6    accurately transcribed, whether or not the words that

7    are attributed to him or Junior were accurately done.

8           So -- so to give the government an

9    opportunity to do this and then deny us the opportunity

10   to have addressed this on cross-examination, I think, is

11   unfair.  It is beyond the scope.

12          I think it is also cumulative in that the

13   transcripts are already in.  If the government simply

14   wants him to authenticate his voice and saying that

15   "government exhibit" whatever "is actually a recording

16   of me," they've already gotten the recording in.

17   They're now free to argue it in those.

18          So the first ground for my objection, Your

19   Honor, would be that it is beyond the scope, and

20   secondly, it is cumulative.

21          THE COURT:  Okay.  Well, I appreciate what

22   you just said.  The difficulty that you --

23   cross-examination presented is it suggested that the

24   witness's memory is inaccurate, that he's been

25   influenced by other prisoners in jail, what the

1    statements are, who was involved.

2              And since that was an attempt to create

3    prior inconsistent statements, prior consistent

4    statements are admissible.  So prior consistent

5    statements made before cross-examination was admissible.

6              So I'll allow the witness to listen to the

7    tape outside the presence of jury.  You pull up the two

8    or three pages you think you want to use.

9              Let me see -- let me see them before we

10   bring the jury out, and we will be able to focus on

11   those pages, and that's it.

12             MR. AMOLSCH:  Can I have one more thing?

13             THE COURT:  Certainly.

14             MR. AMOLSCH:  Is the audio-recording going

15   back as an exhibit, or just the transcript?

16             THE COURT:  Nothing is going back just yet.

17   What's going to happen in court is the witness is going

18   to listen -- see the transcript, but he's going to

19   listen to the tape outside the presence of the jury now.

20             MR. AMOLSCH:  And my --

21             THE COURT:  Does that answer your question?

22             MR. AMOLSCH:  That's fine, Judge.  Yes, sir.

23   Understood.

24             THE COURT:  You can stand right here for a

25   second.

1

2                    (In open court:)

3                    THE COURT:  Ladies and gentlemen, I'm going

4    to send you out for just a moment, send you out.

5                    The witness can remain.

6                    (Jury not present at 2:46 p.m.)

7                    THE COURT:  All right, the bench conference

8    is over now.  Thank you.

9                    (Thereupon, the side-bar conference was

10   concluded.)

11                   THE INTERPRETER:  Your Honor, do we need to

12   interpret this for the witness?

13                   THE COURT:  Not yet.  Just interpret

14   everything that's being said until I tell you not to.

15   Okay?  Thank you.

16                   MS. MARTINEZ:  The exhibit that we're

17   referring to is Exhibit 19.  It's -- 19-A is the

18   recording and 19-A-1 is the transcript.  For everyone's

19   purposes here, I'll start with the pages of the

20   transcript.

21                   The easiest way to do this for this witness,

22   I would submit, Your Honor, would be to start at the

23   beginning, because he starts talking about these things

24   very soon in the recording.

25                   Sorry.  I'll wait for everyone to actually

1    get to the transcript.

2              19-A-1, on page one of the transcript, about

3    halfway down, the relevant conversation starts, it says,

4    "CHS," and then in the middle of that he says, "We're

5    going to ask him these questions, right, about, about

6    how many homeboys were there when they hit Lagrima."

7              And then AS is -- the testimony is -- what

8    the testimony has shown as to who AS is, which I won't

9    say in front of the witness right now --

10             THE COURT:  All right.  Thank you.

11             MS. MARTINEZ:  -- and it continues.

12             And then what I would ask to do is to

13   continue through to page two, they're still talking

14   about this.  And page three, page four, we've now

15   switched from one to the other, page five, and then it

16   ends on page six, when they're talking, towards the very

17   end of the page, about Solitario and Lil Payaso.

18             And what I would suggest doing is playing

19   the audio, and I have -- our agent in the back will stop

20   it when we get to about the end of page six.

21             THE COURT:  All right.

22             Explain to the witness that you want him to

23   just listen to this first, and then you can ask him

24   questions about the -- whether or not he recalls the

25   conversation, is that his voice.  If you would do that

1    first.

2    BY MS. MARTINEZ:

3       Q.   Mr. Santiago, we're going to play a recording in

4    Spanish for you.  What I'm going to ask you to do is to

5    listen to that recording from the beginning until when

6    we stop it.  And then once you've listened to it, I

7    believe what the judge will do is ask the jury to come

8    back out.

9            After the jury comes out, I'm going to ask you a

10   couple questions about this Spanish recording.  I'm

11   going to ask you who's talking and, generally speaking,

12   what you're talking about?

13           Okay?

14      A.   That's fine.

15           MR. AMOLSCH:  Court's indulgence, Your

16   Honor.  I didn't hear the transcript number.

17           MS. MARTINEZ:  I apologize.  It's

18   Exhibit 19-A-1, and then we're going to start right at

19   the beginning, page one, and it continues through to the

20   end of page six.

21           THE COURT:  Just a second.

22           MR. JENKINS:  Yes, Your Honor.

23           THE COURT:  Ms. Martinez, I had the

24   impression that when the jury comes back, you'll direct

25   him to a particular page and ask him if that testimony

1    is what he heard on the call.

2            MS. MARTINEZ:  Yes, Your Honor.  If Your

3    Honor would allow me to read from the transcript in

4    small pieces, that may be the easiest way to avoid the

5    issue that Mr. Amolsch has raised.

6            In other words, once he's heard it, saying

7    something like, "Did you say," and then I can make sure

8    that I control the redaction issue.

9            THE COURT:  Okay.

10           Mr. Jenkins, you had an objection?

11           MR. JENKINS:  I do, Your Honor.  It's

12   something that I want to inquire about the Court's

13   ruling, on a matter outside the presence of this

14   witness.

15           THE COURT:  Okay.  Could you all take him

16   out for just a moment, please.

17           (Thereupon, the witness withdrew from the

18   stand.)

19           MR. JENKINS:  Yes, Your Honor.  Thank you,

20   Your Honor.

21           Your Honor, having reviewed -- or refreshed

22   my recollection of this conversation, the first six

23   pages, I would renew or make a request, Your Honor, that

24   if the government is going to be permitted to do this

25   under the theory that it is a prior consistent

1    statement, which I still think there's a significant

2    question about, given the cross-examination, that the

3    defendants would be allowed to recross; and

4    specifically, as it relates to my client.

5              In this call, Your Honor, while I believe

6    that if the transcript is to be believed, that the

7    witness will say that my client was there.

8              My cross, Your Honor, was designed to raise

9    questions as to the details of what he testified on

10   direct that my client actually did during the murder was

11   highly questionable.

12             And there's nothing in this call, in this

13   transcript, where he talks about what my client said,

14   i.e, *trucha*, or that my client was counting for the

15   *calentón*, or that my client stabbed the victim, held the

16   victim down.

17             And those were the specific, very narrow

18   points.  I didn't ask him any questions challenging

19   whether or not Mr. Lopez Torres, in fact, was at the

20   scene when it occurred.

21             In fact, what I said to him, Your Honor, if

22   the Court recalls, I asked him whether or not it was

23   true that at the scene, Mr. Lopez Torres told Lagrima

24   that he was to receive a *calentón*, that he was there.

25             Now, for it to be a prior consistent

A. Villanueva - Redirect

1    statement, my understanding of the law is that the

2    government has to adduce evidence to establish that he

3    said something consistent, which I challenged on

4    cross-examination.

5            I never challenged my client's presence.  I

6    challenged him on the details, which this call does not

7    address at all.

8            So, if the Court is going to permit it, then

9    I would be -- I would ask to be given leave of Court to

10   recross this witness on why he did not provide any of

11   these chocked full of details about Mr. Lopez Torres's

12   participation in the actual murder on recross.

13           THE COURT:  I appreciate your motion.  It's

14   denied.

15           You can bring the jury out.

16           MS. MARTINEZ:  Your Honor?

17           THE COURT:  Yes.

18           MS. MARTINEZ:  Did you want to bring the

19   witness out?

20           THE COURT:  I'm sorry.  Bring the witness

21   back out, the witness back out first.  Play the tape

22   first.

23           (Witness resumed stand.)

24           MS. MARTINEZ:  And, Your Honor, for the

25   record, as we hit "play" here, not in front of the

1   presence of the jury, we're going to have a split screen

2   of the audio and the transcript for anyone to follow

3   along, but also for the agent to follow along and stop

4   us when we get to the end of page six, if that's okay

5   with Your Honor.

6              THE COURT:  Okay.

7              MS. MARTINEZ:  And when the jury comes out,

8   we'll obviously take the audio down and just go to the

9   transcript.

10             THE COURT:  That's all I want.  Thank you.

11  BY MS. MARTINEZ:

12    Q.   So, Mr. Santiago, just like we discussed before,

13  what we're going to do is play a Spanish language

14  recording.  There is an English transcript up on the

15  page there.  Ignore that.  Just listen to the audio,

16  please.  Okay?  You don't need to look at the screen.

17  The screen is for everyone else.

18        Once the audio is complete, the jury is going to

19  come back out and I'll ask you questions about what you

20  heard in this audio.  Okay?

21    A.   Okay.

22        (Audio played).

23             MS. MARTINEZ:  Your Honor, I believe that

24  that got us to just past the end of page six.

25             THE COURT:  Ask him the foundational

1    questions.

2               MS. MARTINEZ:  Yes, Your Honor.  In front of

3    the jury or not in front of the jury?

4               THE COURT:  Well, let's do it out here first

5    before we bring the jury out, to make sure.

6               MS. MARTINEZ:  Yes, Your Honor.

7    BY MS. MARTINEZ:

8        Q.   Were you able to hear that recording?

9        A.   Yes.

10       Q.   Whose voices did you hear?

11       A.   Junior's and mine.

12       Q.   Generally speaking, without providing any

13   details, what were the -- what was the topic of

14   conversation?

15       A.   About the deaths of Lagrima and Lil Wasón.

16              MS. MARTINEZ:  Your Honor, may we ask those

17   same questions in front of the jury and --

18              THE COURT:  Yes.

19              MS. MARTINEZ:  -- ask additional details?

20              THE COURT:  Yes.

21              You can bring our jury out now.  Thank you.

22              (Jury present at 3:03 p.m.)

23              THE COURT:  You may be seated.

24              Thank you for your patience, ladies and

25   gentlemen.

1        You may proceed, Counsel.

2            REDIRECT EXAMINATION (Continued)

3   BY MS. MARTINEZ:

4   Q.  Mr. Santiago, while the jury was outside in the

5   other room, were you asked to listen to a Spanish

6   language recording?

7   A.  Yes.

8            MS. MARTINEZ:  And Your Honor, for the

9   record and for the jury's purposes, the exhibit played

10  was Government's Exhibit 19-A.

11           Your Honor, may we publish the transcript

12  for the jury, Government's Exhibit 19-A-1?

13           THE COURT:  Yes, certain pages of it.  Go

14  ahead.

15           MS. MARTINEZ:  Yes, Your Honor, the pages

16  that we talked about while the jury was out.

17           But first, just the cover page, so everyone

18  can get up to speed.

19  BY MS. MARTINEZ:

20  Q.  Now, Mr. Santiago, when you listened to that

21  recording just now, whose voices did you hear?

22  A.  Junior's and mine.

23  Q.  And generally speaking, what was the topic of the

24  conversation in the recording that you listened to?

25  A.  Who was at the deaths of Lagrima and Lil Wasón.

A. Villanueva - Redirect                                   130

1     Q.   All right.  Let's turn to page one of the

2  transcript.

3         Mr. Santiago, everyone is going to look at the

4  transcript, but I'm going to ask you based upon

5  listening to the Spanish language recording, okay?

6     A.   Yes.

7              MS. MARTINEZ:  For the record, on page one,

8  I'm focusing on the last half of the page.

9  BY MS. MARTINEZ:

10    Q.   Did you hear Junior ask you about who was there

11  for the murder of Lagrima?

12    A.   Yes.

13    Q.   And, without listing the names, did you respond

14  with some names?

15    A.   Yes.

16    Q.   Peluquín?

17    A.   Yes.

18    Q.   Who is Peluquín?

19    A.   Greñas.

20    Q.   Lil Payaso?

21    A.   Yes.

22    Q.   Is that the same Lil Payaso you ID'd in court?

23    A.   Yes.

24    Q.   And, with respect to the previous name, Greñas,

25  is that the same Greñas you ID'd in court?

1    A.  Yes.

2    Q.  La Evil?

3    A.  Yes.

4    Q.  Is that Lil Evil?  Who is La Evil?

5    A.  Lil Evil.

6    Q.  The same Lil Evil we talked about during your

7    testimony?

8    A.  Yes.

9    Q.  Duende?

10   A.  Yes.

11   Q.  The same Duende we talked about during your

12   testimony?

13   A.  Yes.

14   Q.  Skinny?

15   A.  Yes.

16   Q.  During this conversation, at the bottom of page

17   two, do you also talk about moving Lagrima's body -- I'm

18   sorry, the bottom of page one -- I apologize for the

19   record -- the bottom of page one, did you also talk

20   about moving Lagrima's body?

21   A.  Yes.

22   Q.  And, did you tell Junior who was involved in

23   moving Lagrima's body?

24   A.  Yes.

25   Q.  Did you say that Pesadilla moved him?

A. Villanueva - Redirect

1    A.   Yes.

2    Q.   Is that the same Pesadilla that you identified in

3  court?

4    A.   Yes.

5    Q.   Turning to page two.

6         Did you talk about the "girl Evil," with respect

7  to moving Lagrima's body?

8    A.   Yes.

9         MS. AUSTIN:  Objection, Your Honor.  I don't

10  want to speak this objection, but, if we could approach.

11         THE COURT:  All right, sure.

12         (Thereupon, the following side-bar

13  conference was had:)

14         MS. AUSTIN:  Your Honor, I'm going to object

15  to this on two grounds.  One, I think it's beyond what

16  counsel for the government explained that she was going

17  to try to do.

18         And she's asking this witness, did you

19  mention Gatito, did you mention -- and in the transcript

20  it is Junior that's mentioning these names and giving

21  information to this witness, and he's not the one

22  stating the names in this phone call.  It's Junior.

23  And, it's --

24         THE COURT:  At the bottom of page one,

25  that's him speaking, isn't it?  Isn't that him speaking?

1          MS. AUSTIN:  Well, yeah, for the one.  But

2     then she went to page two, did you -- did you mention

3     Gatito.  It's the confidential source mentioning --

4          MS. MARTINEZ:  I don't think I said Gatito.

5          MS. AUSTIN:  Evil.

6          MR. ZIMMERMAN:  And the point is, that's

7     Junior saying that.

8          THE COURT:  Okay.

9          MS. AUSTIN:  Your Honor, if -- the objection

10    mirrors what Mr. Jenkins was objecting to.  If this

11    witness has a recollection, or has made a -- a statement

12    prior, she should ask him about this.

13          Instead of going through this and

14    summarizing what she wants the transcript to say and

15    have this witness agree to it, ask him specific

16    questions, like we have to ask him specific questions:

17    Does he remember it or does he not remember it, and then

18    follow up.  But -- it's beyond what she said and it's --

19    beyond the scope of cross-examination.

20          MS. MARTINEZ:  Your Honor, I'm -- I'm

21    attempting to be very careful in asking about what he

22    said.  I'll note that on page one, the first several

23    questions, there's a long paragraph, says AS.  That's

24    Slow.  That's been identified both by Junior, and that's

25    who that speaker was.  He says Peluquín, he says Lil

1    Payaso, he says La Evil, he said Duende.

2              CHS follows up with Skinny.

3              He agrees with that, and Little Slow,

4    Gatito, Pesadilla.  Now we're talking about moving the

5    body, to be clear --

6              THE COURT:  Hold on.  Stop right there.

7              I had the impression the reason you're doing

8    this was to address cross-examination questions, that

9    names were placed in the witness's head in jail about

10   who was involved, and he didn't know the details.

11             MS. MARTINEZ:  Yes, Your Honor.

12             THE COURT:  I let you respond to that aspect

13   of the testimony by showing a prior consistent

14   statement, what he said in the past, who was involved

15   and did what.  But I didn't plan for you to read the

16   whole transcript to him.  You see what I'm saying?  It

17   was more or less what he told somebody before.

18             MS. MARTINEZ:  I'm happy to do it as quickly

19   and briefly as I can.  The issue is that the names

20   continue for multiple pages.

21             Now, you can see, Your Honor, from my

22   highlighting, there's plenty that we don't need to go

23   over.  But when they list -- Slow says the names of who

24   was involved, I think that goes exactly to his prior

25   consistent statements.

1          And, most of the time he's volunteering

2    these names.  I acknowledge -- and the transcript, of

3    course, can, you know, show us this -- there are

4    certainly times Junior asks him, was so and so there,

5    was a particular person there.

6          But then he gives a response, and that's

7    agreeing or disagreeing with what's being said at that

8    point.

9          So, we would submit that the fact that in

10   this call, which is dated May 26, 2014, this witness

11   lists everyone involved in both murders, consistent with

12   the testimony he gave today.  And this call was made

13   before he was arrested, before the charges were filed in

14   this case, before he had any discovery or advice of

15   lawyers, or any information from other sources.  That

16   shows prior consistent statement.

17         And defense counsel, on multiple

18   cross-examination, not just Mr. Jenkins, have questioned

19   whether he's being accurate about who was there, and

20   have questioned where he got that information, and

21   whether he got it from the indictment or from his

22   defense attorneys or from talking to the defendants well

23   after this phone call.

24         This phone call shows knowledge, direct

25   personal knowledge of this witness, prior to all of the

1    things suggested by the defense counsel; the prior

2    consistent statement.

3              Now, the call is in.  He's listened to it.

4    But I do think that it is compelling and relevant to go

5    through the names that he lists and have him confirm who

6    these people are --

7              MR. JENKINS:  Your Honor.

8              MS. MARTINEZ:  -- whether they're the people

9    named during the direct examination.

10             MR. JENKINS:  Your Honor, and here's --

11   again, I just want to restate my problem with not being

12   allowed to cross-examine this witness on this.  He now

13   for the first time is attributing a moniker to my name

14   that -- to my client that up until this point has not

15   been -- this Peluquín has not been used to refer to my

16   client.

17             He didn't refer to my client that way on

18   direct examination.  On direct examination, he referred

19   to my client as Greñas.  Others have referred to my

20   client as Peluca.  This is new.  And this is not an area

21   that I have had an opportunity to examine him on at all.

22             And I would just, again, remind the Court

23   for the record, I never challenged on cross-examination

24   whether or not my client was there.  And all this does

25   on page one, in the light most favorable to the

1    government, concedes that he was there.  The questioning

2    was designed to challenge this witness on the details of

3    who did what.  As the Court will instruct this jury,

4    mere presence alone is not enough.

5            I didn't question him on whether or not

6    Mr. Lopez Torres was present.  And that's why I believe

7    it is not a prior consistent statement.

8            MS. AUSTIN:  And, Your Honor, I would just

9    add very briefly that the objection goes to this, as

10   well, because we can't recross on it is -- statements in

11   this phone conversation that aren't being covered by --

12   on redirect is, he says, when Junior is telling him,

13   "What about Skinny," and, "You were forgetting that,

14   man, and so."

15           Then Santiago says, "Oh, I don't remember,

16   you know, that I -- I don't know why the fuck I didn't

17   go."

18           And then he makes another statement,

19   "Serious shit, I couldn't remember, I didn't know, look,

20   I didn't even know that," after Junior is testifying

21   about who was there, and who did -- so, this isn't -- we

22   should be able to say that on this date, he's making

23   statements that he doesn't even remember what happened

24   in here.

25           THE COURT:  I appreciate you're making a

1    record.  My judgment stands.

2              Just focus on pages 1 through 6 on identity,

3    who was present, just the names who were present.

4    That's all we're going to do.

5              And that's not only because it's you in

6    cross-examination, Mr. Jenkins.  Several raised the

7    inference that he doesn't remember, he talked to the

8    police, he's talked to other persons, Payaso told him

9    not to say, his memory is not good.

10             This shows what he knew before prior

11   inconsistent statement.  Objection overruled.

12             I'm sorry.  You have to speak up before I

13   leave.  When I rule, I'm done.

14             MS. MARTELL:  Now that we're beyond, my

15   next -- I was going to object next.  Now that we're

16   beyond the Lagrima murder, that we ask that she not

17   continue to question in the leading manner.  She's been

18   leading the witness through because of the issue with

19   homeboy two.  Now that she's beyond that, and they're on

20   to the reburial and going on to Gerson, we'd ask that

21   she go back to nonleading questions.

22             MR. ZIMMERMAN:  As in who was there, as

23   opposed to so and so was there.

24             THE COURT:  Objection overruled.  Thank you.

25             (Thereupon, the side-bar conference was

1    concluded.)

2              THE COURT:  Let the court reporter set up,

3    please.  Let counsel get back to their seat.

4              Now, you may proceed.

5    BY MS. MARTINEZ:

6      Q.  We were on the bottom of page one.  You were

7    talking about moving Lagrima's body.  Those are the

8    questions we were asking about.  Do you recall?

9      A.  Yes.

10     Q.  And, did you say that Pesadilla helped move him

11   from where he was?

12     A.  Yes.

13     Q.  All right.

14             THE COURT:  Would you put the last sentence

15   in there, too?

16             MS. MARTINEZ:  Yes, Your Honor.

17   BY MS. MARTINEZ:

18     Q.  Did you also say, after saying, "Pesadilla moved

19   him from there where he was at first, and I don't

20   remember, you know, that I -- I don't know -- why the

21   fuck I didn't go, I couldn't go out that night, from,

22   from the house."

23         Did you hear that?

24     A.  Yes.

25     Q.  Continuing on to page two.

1       Was there a conversation between you and Junior
2   about Evil being involved in moving the body?
3   A.   Yes.
4   Q.   Is that the same Lil Evil that we talked about
5   earlier during the case?
6   A.   Yes.
7   Q.   Now, if we could turn to page three.
8       Did you also say that Pesadilla was not at the
9   murder of Lagrima because he had an accident?
10  A.   Yes.
11  Q.   Turn to page four.
12      Now, you said that you and Junior also talked
13  about who was at the murder of Lil Wasón; is that right?
14  A.   Yes.
15  Q.   Did you hear Junior ask about Gatito?
16  A.   Yes.
17  Q.   Do you know who Gatito is?
18  A.   Yes.
19  Q.   Who is Gatito?
20  A.   Guepardo.
21  Q.   And did you say that Gatito, Guepardo, was at the
22  murder of Lil Wasón?
23  A.   Yes.
24  Q.   Turning to page five.
25      And still on the same context of the murder of

1   Lil Wasón, did you hear Junior say the name Pesadilla?

2   A.   Yes.

3   Q.   And, did you respond affirmatively?

4   A.   Yes.

5   Q.   Did you also name Duende as being in the murder

6   of Lil Wasón?

7   A.   Yes.

8   Q.   And is that the same Duende that we've been

9   talking about?

10   A.   Yes.

11   Q.   And, the Pesadilla we just spoke about, is that

12   the Pesadilla you ID'd in court?

13   A.   Yes.

14   Q.   Did you also name Lil Payaso when listing the

15   names of people involved in the murder of Lil Wasón?

16   A.   Yes.

17   Q.   Is that the same Lil Payaso you identified in

18   court?

19   A.   Yes.

20   Q.   Did you also say that Skinny was not there,

21   talking about the murder of Lil Wasón?

22   A.   Yes.

23   Q.   And, again, about the murder of Lil Wasón, did

24   you say that Greñas was not there?

25   A.   Yes.

1    Q.   Turning to page six, still asking about the

2  murder of Lil Wasón, did Junior ask you about Lil

3  Poison?

4    A.   Yes.

5    Q.   Did you respond affirmatively?

6    A.   Yes.

7    Q.   Did Junior ask you about Solitario?

8    A.   Yes.

9    Q.   Did you respond affirmatively to that as well?

10   A.   Yes.

11        MS. MARTINEZ:   We can take that down now.

12  BY MS. MARTINEZ:

13   Q.   Pesadilla's attorney also asked you about when

14  you fled to Kansas City.  Do you remember that?

15   A.   Yes.

16   Q.   You said that Pesadilla made the arrangements?

17   A.   Yes.

18   Q.   What arrangements did Pesadilla make with respect

19  to you and the others fleeing to Kansas City?

20   A.   He obtained -- well, a homeboy from another

21  clique who had a car for us to move over there.

22   Q.   Do you know why he made those arrangements for

23  you?

24        MS. AUSTIN:   Objection, Your Honor.

25        THE COURT:   Sustained.

A. Villanueva - Redirect                                   143

1   BY MS. MARTINEZ:

2       Q.   Did Pesadilla say anything to you -- don't tell

3   me what he said, but did he say anything to you about

4   those arrangements?

5       A.   Yes.

6       Q.   And, generally speaking, was the content of what

7   he said related to gang activity?

8               MS. AUSTIN:  Objection.

9               MS. MARTINEZ:  Trying to lay a foundation,

10  Your Honor.  It should be admissible as a co-conspirator

11  statement.

12              THE COURT:  I sustain the objection.

13  BY MS. MARTINEZ:

14      Q.   Do you know what Pesadilla did while you and the

15  others were fleeing to Kansas City?

16              MS. AUSTIN:  Objection.  How would he know

17  that?

18              THE COURT:  Is your objection foundation?

19              MS. AUSTIN:  Yes.

20              THE COURT:  It is, thank you.  No speaking

21  objections.

22              MS. AUSTIN:  I'm sorry, Your Honor.

23              MS. MARTINEZ:  Your Honor, may I simply ask

24  a yes or no, does he know, and then I'll lay a

25  foundation if he answers yes?

1          THE COURT:  Lay a foundation first.

2   BY MS. MARTINEZ:

3      Q.   During the time that you -- before you fled to

4   Kansas City, were you in touch with Pesadilla?

5      A.   Yes.

6      Q.   Were you still a member of the gang?

7      A.   Yes.

8      Q.   Was Pesadilla still a member of the gang?

9      A.   Yes.

10     Q.   Were you in touch with Pesadilla about gang

11  activity?

12     A.   Yes.

13     Q.   You testified that the reason you went to Kansas

14  City was to flee from police who were looking for you;

15  is that right?

16     A.   Yes.

17     Q.   Was that something you discussed with Pesadilla?

18     A.   Yes.

19     Q.   What, if anything, did Pesadilla say to you with

20  respect to the arrangements for you and the others to

21  flee to Kansas City?

22     A.   That the homie from the other clique was going to

23  come by to pick us up on a certain date, and that we

24  were going to be okay there.

25     Q.   What do you mean by "okay there"?

1    A.   Safe; that the police was not going to nab us.

2    Q.   Without saying what was said, did you also

3  discuss with Pesadilla what Pesadilla planned to do?

4              MS. AUSTIN:  Objection, leading.

5              THE COURT:  Sustained.

6  BY MS. MARTINEZ:

7    Q.   Without saying what was said, in addition to what

8  you were going to do, were you involved in conversations

9  with Pesadilla about other topics at that time?

10   A.   No.

11   Q.   After you fled to Kansas City, were you at all in

12  touch with Pesadilla?

13   A.   Yes.

14   Q.   And, after you fled to Kansas City, were your

15  conversations -- were you still a member of the gang?

16   A.   Yes.

17   Q.   Was Pesadilla still a member of the gang?

18   A.   Yes.

19   Q.   Were you still discussing gang activity with

20  Pesadilla?

21   A.   Yes.

22   Q.   What, if anything, did you learn from Pesadilla

23  about what he was doing while you were fleeing in Kansas

24  City?

25              MS. AUSTIN:  Objection, compound question.

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  Could you repeat?
 3   BY MS. MARTINEZ:
 4      Q.  What, if anything, did you learn from Pesadilla
 5   about what Pesadilla was doing while you were fleeing in
 6   Kansas City?
 7      A.  We wanted to raise a clique in Kansas City.
 8      Q.  Who wanted to raise a clique in Kansas City?
 9      A.  All of the homies.
10      Q.  What, if any, conversation did you have with
11   Pesadilla about that?
12      A.  That we're going to go for however long it would
13   be necessary to that place and to raise the clique
14   there.
15      Q.  Based on your communications with Pesadilla
16   before you left and after you left, are you aware what
17   Pesadilla was doing while you were in Kansas City?
18              MS. AUSTIN:  Your Honor, I'm going to
19   object.  That was asked and answered.  She's -- about
20   two questions ago.
21              THE COURT:  Overruled.
22   BY MS. MARTINEZ:
23      Q.  Do you need me to repeat it?
24      A.  Yes.
25      Q.  Based on your conversations with Pesadilla, both
```

 1    before you left for Kansas City and after you left for

 2    Kansas City, are you aware of what Pesadilla was doing

 3    when you were in Kansas City?

 4        A.   Yes.

 5        Q.   What was Pesadilla doing when you were in Kansas

 6    City?

 7        A.   He was at his house, and he said he was working.

 8              MS. MARTINEZ:   No further -- I apologize.

 9    Did you have more to say?

10              THE WITNESS:   No.

11              MS. MARTINEZ:   No further questions, Your

12    Honor.

13              THE COURT:   You can step down, sir.

14              We're going to take a 15-minute recess,

15    maybe a little bit longer, but about 15 minutes.   Thank

16    you.

17              (Jury not present.)

18              THE COURT:   The witness is excused.   Thank

19    you.

20              (Thereupon, the witness withdrew from the

21    stand.)

22              (Court recessed at 3:31 p.m. and reconvened

23              at 3:54 p.m.)

24              (Jury not present.)

25              MR. ZIMMERMAN:   Your Honor, may we be heard

```
1    at the bench on a brief matter?
2                 THE COURT:  Yes.
3                 MR. ZIMMERMAN:  Thank you.
4                 (Thereupon, the following side-bar
5    conference was had:)
6                 MR. ZIMMERMAN:  That's true, we don't --
7                 (Discussion off the record.)
8                 MR. ZIMMERMAN:  There was an issue with the
9    Marshal's Service that's been resolved.
10                The second thing is a motion in limine, just
11   for the record, but the government doesn't object to
12   there -- there's some double hearsay alleged threats
13   made by my client towards the next witness.  And the
14   government has advised that they're not going to elicit
15   that.  I just wanted to make a record.
16                THE COURT:  Is that it?
17                MR. ZIMMERMAN:  That is it.
18                (Thereupon, the side-bar conference was
19   concluded.)
20                THE COURT:  Ready to bring the jury out?
21                MS. MARTINEZ:  Your Honor, before the jury
22   comes out, would you give the same very short
23   instruction you've given to the previous cooperators to
24   this witness?
25                THE COURT:  Yes.
```

1         MS. MARTINEZ:  He expects it.

2         THE COURT:  You can bring him out, please.

3  Thank you.

4         MS. MARTINEZ:  Your Honor, for the record,

5  the government calls Jose Del Cid.

6         (Witness sworn.)

7         THE WITNESS:  Yes.

8         THEREUPON, JOSE DEL CID, having been duly

9  sworn, testified as follows:

10        THE COURT:  You can have a seat, sir.

11        Mr. Del Cid, can you hear me okay?

12        THE WITNESS:  Yes.

13        THE COURT:  The government has asked you to

14  use the term "homeboy" in connection with one individual

15  in the case.  That was on my instruction.  And so, that

16  is what I want you to do when asked about that

17  individual as it relates to what you were told by the

18  government.  Okay?

19        THE WITNESS:  Okay.

20        THE COURT:  If you have a question about

21  that, ask government counsel to clarify.

22        THE WITNESS:  Yes.

23        THE COURT:  Okay.

24        You can bring our jury out, Mr. Toliver.

25  Thank you.

```
 1                    (Jury present.)
 2                    THE COURT:  You may be seated.
 3                    All right, Counsel, you may proceed.
 4                    MS. MARTINEZ:  Thank you, Your Honor.
 5                         DIRECT EXAMINATION
 6    BY MS. MARTINEZ:
 7       Q.   Good afternoon.
 8            Would you please state your full name and spell
 9    it for the record.
10       A.   Jose Leonardo Del Cid.
11                    THE COURT:  Ladies and gentlemen, this
12    witness was previously sworn outside your presence.
13    BY MS. MARTINEZ:
14       Q.   When you speak, when you answer my questions,
15    could you move that microphone a little closer and speak
16    into it so the jury can hear you?
17       A.   Yes.
18       Q.   Please spell your full name for the record.
19       A.   J-o-s-e, L-e-o-n-a-r-d-o, D-e-l, C-i-d.
20       Q.   How old are you?
21       A.   Twenty years.
22       Q.   Where were you born?
23       A.   In El Salvador.
24       Q.   When did you come to the United States?
25       A.   In 2012.
```

J. Del Cid - Direct                                                  151

1    Q.   How old were you?

2    A.   Sixteen years.

3    Q.   How did you get to the United States?

4    A.   Legally -- illegally.

5    Q.   When you came to the United States, where did you

6    go?

7    A.   There was a city of Alexandria.

8    Q.   Just to clarify for the record with that last

9    question, did you say you came to the United States

10   legally or illegally?

11   A.   Illegally.

12   Q.   When you came to Alexandria, what neighborhood

13   did you go to?

14   A.   Over there, the Hispanics call that place

15   Chirilagua, that place.

16   Q.   How far did you go in school in El Salvador?

17   A.   Grade eight.

18   Q.   When you came here to the United States, did you

19   continue with school?

20   A.   No.

21   Q.   Are you a member of a gang?

22   A.   Yes.

23   Q.   What gang?

24   A.   MS-13.

25   Q.   What is the full name of MS-13?

```
1    A.   Mara Salvatrucha 13.
2    Q.   How old were you when you first started
3  associating with MS-13?
4          THE INTERPRETER:   The interpreter is going
5  to request a repetition.
6          THE WITNESS:   Nine years.
7  BY MS. MARTINEZ:
8    Q.   Why did you start associating with MS-13 when you
9  were nine years old?
10   A.   Well, first, reason why I got involved with that,
11 because due to the relationship that I had with my mom.
12 I was always home and she would kick me out because of a
13 relationship I had with her was not good so.  Then once
14 she came, had to kick me out of the house and told me
15 not to ever come again.  So, I went over to -- I slept
16 over at a river, by a river.
17   Q.   How old were you when your mom kicked you out of
18 the house and told you not to come back?
19   A.   Nine years.
20   Q.   You said you went to a river?
21   A.   Yes.  I headed over there, you know, to a river,
22 and I was sleeping next to it, when I heard some noise
23 of some people who were coming down.
24   Q.   Who were the people?
25   A.   There some members of the Mara.  And so, then
```

J. Del Cid - Direct

1    they came and they asked me whether I want to get up.

2          And I say, "No, because I have -- my back is

3    hurting."

4          They said, "Don't be an asshole.  We're asking,

5    do you want to get up and become a member of the Mara."

6          And I said, "Oh, yeah."

7    Q.   And then after that, did you, in fact, join

8    MS-13?

9    A.   Yes.  And that way I continued with them, acting

10   as a *paro* and moving things for them, doing things for

11   them, right.  And then that way I got more and more

12   involved with the things of the Mara.

13   Q.   What is a *paro*?

14   A.   (Answer not translated.)

15   Q.   And we'll talk more about that in a minute.

16   Within MS-13, was there a particular clique that you

17   joined?

18              THE INTERPRETER:  Permission to clarify a

19   term with the answer.

20              MS. MARTINEZ:  Of course.

21              THE WITNESS:  I mean, being a *paro* is like,

22   you know, doing things like doing errands that they send

23   you to, with money.

24   Q.   I see.

25              Within MS-13, was there a particular clique that

J. Del Cid - Direct

1   you joined?

2       A.   Park Views, PVLS.

3       Q.   Were you given a nickname once you joined?

4       A.   Yes.  They gave me the, Parky -- Sparky.

5       Q.   Can you -- just so the record is clear, would you

6   spell Sparky?

7       A.   S-p-a-r-k-y.

8       Q.   Are you known by any other gang names?

9       A.   Yes.  In the United States, they used to know me

10  as El Duende.

11      Q.   Are you currently in prison?

12      A.   Yes.

13      Q.   For what?

14      A.   For getting myself in the murder of some people.

15           THE INTERPRETER:  May the interpreter

16  request a repetition of the witness?

17           THE WITNESS:  Yeah, because I'm in prison,

18  because they accused me of having caused the murder of

19  three persons.

20  BY MS. MARTINEZ:

21      Q.   And did you plead guilty?

22      A.   Yes, I pled guilty.

23      Q.   Did you acknowledge your guilt of those three

24  murders?

25      A.   I accepted responsibility for three, and for an

J. Del Cid - Direct

1   attempt.  But, I mean, they sentenced me for two.

2       Q.   Were those three murders -- were those three

3   murders, murders you committed with other gang members?

4       A.   Yes.

5       Q.   You also mentioned an attempt.  An attempted

6   what?

7       A.   It was a murder attempt that was directed to --

8   there was another homeboy who was also belonging to the

9   clique PVLS.

10      Q.   Was that also a crime you committed with other

11  gang members?

12      A.   Yes, I was there when they were planning -- while

13  they were planning, I mean, how it was going to be done.

14      Q.   Which of those four events happened first, the

15  planning of the attempted murder, or the three

16  murders -- which of the three murders?

17      A.   Well, the first one was the murder attempt.

18      Q.   Who was the victim of that planned murder,

19  planned unsuccessful murder?

20      A.   El Peligroso.

21      Q.   Who is the victim of the first murder that was

22  part of your plea agreement?

23      A.   El Lagrimas.

24      Q.   Who was the second victim of the -- who was

25  the -- excuse me.

1            Who was the victim of the second murder that was

2    part of your plea agreement?

3        A.   Lil Guasón.

4        Q.   Who was the victim of the third murder that was

5    part of your plea agreement?

6        A.   Julio Urrutia.

7        Q.   How old were you during the planning of the

8    attempted murder of Peligroso?

9        A.   Seventeen years old.

10       Q.   How old were you for the murder of Lagrima?

11       A.   Seventeen years.

12       Q.   How old were you for the murder of Lil Wasón?

13       A.   Eighteen.

14       Q.   How old were you for the murder of Julio Urrutia?

15       A.   Eighteen.

16       Q.   Have you been sentenced?

17       A.   Yes.

18       Q.   What was your sentence?

19       A.   Life times two.

20       Q.   You mean two life sentences?

21       A.   Yes.

22            MS. MARTINEZ:  Your Honor, with the help of

23   the court security officer, may we show the witness what

24   has been marked as Government's Exhibit 123.

25            THE COURT:  Yes.

J. Del Cid - Direct                                             157

1   BY MS. MARTINEZ:

2       Q.   Do you have that document in front of you?

3       A.   Yes.

4       Q.   Does it appear to be a copy of your plea

5   agreement?

6       A.   Yes.

7       Q.   Is that your signature on the last -- or

8   second-to-last page?

9       A.   Yes.

10      Q.   What are your obligations under --

11           MS. MARTINEZ:  Your Honor, at this point,

12   the government moves into evidence Government's

13   Exhibit 123.

14           THE COURT:  123 will be received.

15   BY MS. MARTINEZ:

16      Q.   What are your obligations under this plea

17   agreement?

18      A.   Well, to tell the truth, and the truth about how

19   things happened.

20      Q.   What benefit do you hope to get?

21      A.   Well, I was hoping for a sentence reduction, I

22   hope.

23      Q.   Who do you understand is responsible for deciding

24   about any sentence reduction that you may or may not

25   get?

1    A.   As I understand, I understand that the only one

2    that can decide about my sentence is the judge.

3    Q.   What do you understand will be the consequences

4    if you lie to the government?

5    A.   I'll be left in prison for life.

6    Q.   What do you understand will be the consequences

7    if you lie in court?

8    A.   Also, I would stay in prison for life.

9    Q.   Have you been placed -- as a result of your

10   cooperation, have you been placed in protective custody

11   within the Bureau of Prisons?

12   A.   Yes.

13   Q.   Let's go back to when you first started

14   associating with MS-13.

15   A.   Okay.

16   Q.   You mentioned that you started as a *paro*?

17   A.   Yes.

18   Q.   As a *paro*, what sort of favors did you do for the

19   gang?

20   A.   Well, practically, as I repeat, moving weapons,

21   moving drugs, acting as a *paro* for La Mara whenever they

22   were doing something, assisting, and also going around

23   acting as a lookout, so that the police would not come.

24   Q.   How long did you stay a *paro*?

25   A.   If I remember well, about two years.

1    Q.   What happened after that?

2    A.   Then they raised me up to *chequeo*.

3    Q.   What is a *chequeo*?

4    A.   *Chequeo* is like a person that, well, you know, he

5   assumes for -- takes more responsibility in what the

6   Mara actually is, you know.

7    Q.   How old were you when you went from *paro* to

8  *chequeo*?

9    A.   Eleven years, if I'm not wrong.

10    Q.   What did you have to do in order to advance to

11  *chequeo*?

12    A.   I mean, to help -- well, to help the homeboys out

13  in the killing of an 18th.

14    Q.   When you say an 18th, what do you mean?

15    A.   A member of the opposite gang, of the enemy.

16    Q.   What did this rival gang member do for a job?

17    A.   He drove a Coca-Cola truck.

18    Q.   What was your role in the murder?

19    A.   Well, practically, I had to get the truck to

20  stop, right, and to start chatting with the dude, so

21  that -- that would distract him, and the other dudes

22  would go around and would do the hit on him.

23    Q.   When you say "hit," what do you mean?

24    A.   Shooting.

25    Q.   What happened to the driver?

1    A.   Well, he was left there in the truck, dead.

2    Q.   Once you became a *chequeo* after that incident,

3  what did you do for the gang?

4    A.   Well, there, more than anything else, I started

5  getting more information, per se, as to what the Mara

6  was about, and then also, still did work as a *paro*'s

7  duties, you know, moving drugs and all of that stuff.

8    Q.   How long were you a *chequeo*?

9    A.   If I remember right, a year, a year and a half.

10    Q.   What was your next level in the gang?

11    A.   Homeboy.

12    Q.   How old were you when you became a homeboy in

13  MS-13?

14    A.   Thirteen years.

15    Q.   What did you have to do to become a homeboy?

16    A.   There, I had to personally kill one from the

17  18th.

18    Q.   How did you locate the person from the 18th

19  Street gang that you had to kill?

20    A.   The homeboys had the dude tied up by a river,

21  also, and then what they did is they gave me a machete

22  and all I had to do was slash at him, cut him.

23    Q.   What did you do with the machete?

24    A.   Well, I started hitting the dude on the head, you

25  know, and on the chest and on the arms.  And then

1    afterwards, we cut him up and threw him into a bag and

2    into the river.

3        Q.   How old were you?

4        A.   There, I was 13.  I think I was about to become

5    14.

6        Q.   What ritual does the gang have to make someone a

7    homeboy after he commits a murder like you did?

8        A.   Well, they beat him for 13 seconds.  They give

9    him a 13-second beating.

10       Q.   What is it called when a *chequeo* is beat for

11   13 seconds to become a homeboy?

12       A.   Jump.

13       Q.   What's the purpose of beating a *chequeo* for

14   13 seconds when he becomes a homeboy?

15       A.   Well, I mean, the truth is that idea I never

16   quite got it right, but, the truth is that that was the

17   way they went about introducing dudes to become members

18   of La Mara.

19       Q.   During your association with the gang, did you

20   come to learn the rules of MS-13?

21       A.   Yes.

22       Q.   Did you learn those rules when you were still

23   down in El Salvador, or after you came to the United

24   States?

25       A.   I mean, the rules, they read them to you when you

J. Del Cid - Direct

1   get -- you're about to get jumped, right?  But you're

2   going to remember very little of that, so the rules,

3   really, you learn them as the time goes by.

4       Q.   And, are you familiar with at least some of the

5   rules of MS-13?

6       A.   Yes.

7       Q.   What are the most important rules of MS-13?

8       A.   Well, I mean, really, the most important is not

9   to snitch, you know.  And, also not to get, join other

10  rival gangs or stuff like that, or not to be passing

11  information to rival gangs.

12      Q.   What is supposed to happen to a member of MS-13

13  who, as you said, snitches?

14      A.   Well, they're going to kill him.

15      Q.   What is that called?

16      A.   A beating --

17           THE INTERPRETER:  No.  "A hit."  "A hit."

18  BY MS. MARTINEZ:

19      Q.   What are some of the other most important rules

20  of MS-13?

21      A.   Well, I mean, because, you know, well, I was

22  walking with the Mara, I had my mind on doing other

23  stuff.  I had little mind for the rules.  But I sort of

24  remember a lot with you, I mean, the thing is also, that

25  you know, the Mara got its rules, but the clique also

1    got its own rules.

2        Q.   Well, we can focus a little bit.  You've

3    mentioned several times rival gang members.  What does

4    MS-13 call rival gang members?

5        A.   *Chavala*s, *vichota*.

6        Q.   What are members of MS-13 supposed to do if they

7    encounter a *chavala*?

8        A.   To turn around, to kill them.

9        Q.   The second word that you used after *chavala*, what

10   was that word?

11       A.   *Vichota*.

12       Q.   For the court reporter, would you spell that

13   word.

14       A.   V-i-c-h-o-t-a.

15       Q.   What happens to the reputation of a homeboy who

16   encounters a *chavala* and kills him?

17       A.   He earns respect.

18       Q.   Going back to the rule about snitching, what

19   happens to a member of MS-13 who helps kill someone the

20   gang suspects of snitching?

21            What happens to the reputation of that gang

22   member?

23       A.   Well, I mean, like much the same thing, you know,

24   earns more respect on death.

25       Q.   What type of clothing are members of MS-13

J. Del Cid - Direct                                    164

1   supposed to wear?

2              THE INTERPRETER:  Permission to inquire.

3              THE WITNESS:  Well, before it used to be

4   blue and white, right?  But they're going easy on it

5   right now, you know, because that was too much giving

6   the police a clue with the colors.  So right now, all of

7   that stuff, the blue and white, the Cortez's Nikes shoes

8   and the belt all the way down, you know, in the pants,

9   and the -- the socks up to half leg, they're going easy

10  on all of that stuff.

11  BY MS. MARTINEZ:

12     Q.  Why do you say you're going easy on all of that

13  stuff?

14     A.  Because, well, because that was giving too much

15  of hint about the color to the police.  The people who

16  were going like that, the police would get the eye on

17  them, you know, and shortly thereafter they would

18  fall -- they would end up in jail, because they were

19  flashing their colors too much.

20     Q.  Do members of MS-13 sometimes have tattoos

21  related to MS-13?

22     A.  Yes.

23     Q.  Do you have any tattoos related to MS-13?

24     A.  Yes.

25     Q.  What tattoos that are related to the gang do you

J. Del Cid - Direct

1  have?

2   A.  I mean, the letters, the spider web, the two

3  faces, the 503 --

4          THE INTERPRETER:  The interpreter needs to.

5          THE COURT:  All right.

6          THE WITNESS:  And a "see, hear, and don't

7  say anything."

8  BY MS. MARTINEZ:

9   Q.  Let's go through those one by one.  You said "the

10  letters."  What letters are you talking about?

11   A.  MS.

12   Q.  What does that stand for?

13   A.  That mean the initials for the Mara, you know,

14  the Mara Salvatrucha.

15   Q.  You also said a spider web.  How does that relate

16  to the gang?

17   A.  I mean, many homeboys get it on, you know,

18  because they have already been in prison, and that

19  represents the many years they've been in prison.  I

20  mean, that's what I understand, what I was told that the

21  spider web represents.

22   Q.  What does it represent to you?

23      What does your tattoo represent for you?

24   A.  Well, the truth is that I get the tattoo over

25  there just to cover up another tattoo that I had there.

J. Del Cid - Direct                                          166

1    I didn't get it because I had been in prison or anything
2    like that.
3        Q.   You also said the two faces.  What are the two
4    faces?
5        A.   That means, to laugh now and to cry later.
6        Q.   How is that connected to the gang?
7        A.   Well, you understand that one point, we're
8    laughing with the homeboys, and the next thing you know,
9    we're crying.
10       Q.   What does that mean?
11       A.   Well, for example, we'll be laughing when we
12   finish a hit on somebody, turn around another rival gang
13   member.  But we cry when someone does that to one of
14   ours.
15       Q.   What when you say "a hit," what are you talking
16   about?
17       A.   That means to kill an opponent, another -- a gang
18   member from another rival gang.
19       Q.   Was the Spanish word that you used for hit,
20   *pegada*?
21       A.   Yes.
22       Q.   For the court reporter, would you spell *pegada*?
23       A.   P-e-g-a-d-a.
24       Q.   Is that related to the word, *pegar*?
25       A.   Yes.

Q.   What does *pegar* mean?

A.   To give a blow.

Q.   Would you spell *pegar* for the court reporter?

A.   P-e-g-a-r.

Q.   Returning to your tattoos, you also mentioned a tattoo of 503.  How does that relate to MS-13?

A.   Well, you understand, that's because that's the Area Code for El Salvador.  And because most of the homeboys, you know, come from El Salvador, that's why we use it, to represent that we come from El Salvador, or something like that.

Q.   The last tattoo that you mentioned, you called it "see, hear, and don't say anything."  What does that mean?

A.   Well, that's like another rule that has to do with the gang, because it means you see and you hear, but you have to be quiet.  You have to do that, too. Otherwise, they turn you around.  They kill you, or turn you over.

Q.   What does that tattoo look like?

     Is it words or something else?

A.   Well, many people put them in different ways. Like, for example, I have the letters.  Other people put them in the form of skulls.  And some use the wise monkeys, where you have your hands over -- or they have

1   their hands over the mouth, the eyes and the ears.

2       Q.   What does your tattoo look like?

3       A.   They're letters.  You understand me?

4       Q.   Let's turn now to when you came to Virginia.

5   What year was that?

6       A.   2012.

7       Q.   How old were you?

8       A.   Seventeen years old.

9       Q.   When you came here to Virginia, were there any

10  members of the PVLS clique here?

11      A.   (Answer not translated.)

12           THE INTERPRETER:  The interpreter requests

13  permission to verify the age.  My colleague is

14  suggesting that it was 16, not 17.

15           The interpreter corrects.  "I was 16 when I

16  came here in 2012."

17           MS. MARTINEZ:  Thank you.

18  BY MS. MARTINEZ:

19      Q.   I think we got off track there, but when you came

20  here to Virginia in 2012, were there any other members

21  of the PVLS clique here in Virginia?

22      A.   Yes.

23      Q.   Who were the first members of PVLS that you met

24  here in Virginia?

25      A.   The first one was Satánico or Lil Demente,

1   Lagrimas, Peligroso and Silencio.  There were two others
2   who were *chequeos*, and they were Wasón and Bago.
3        Q.   Who was the leader of clique when you got here?
4        A.   The one who had the word outside was Satánico.
5   But, there was another homeboy, too, Payaso.  He's the
6   general runner.
7        Q.   What's another name for general runner?
8        A.   First word.
9        Q.   Where was Payaso?
10       A.   Well, he was in prison.
11       Q.   How did the gang communicate with Payaso in
12  prison?
13       A.   By telephone.
14       Q.   Who was the second word when you first began
15  associating with the PVLS clique here in 2012?
16       A.   Well, here on the outside, Payaso said that the
17  one who had the first word was Satánico.  But, the one
18  who had the second word was Silencio.
19       Q.   When you joined the PVLS clique here in Virginia,
20  were you given a new gang name?
21       A.   Yes.  I was given Duende.
22       Q.   What does Duende mean?
23       A.   It's like an elf.  And for that, they had to give
24  me another beating for 13 seconds.
25       Q.   Why did they have to give you another 13-second

J. Del Cid - Direct                                          170

1    beating?
2        A.   Well, because in order to change my tag, and also
3    because we were reinitiating the clique as well.
4        Q.   Who gave you the new name?
5        A.   Satánico.
6        Q.   From the time that you joined the PVLS clique
7    here in Virginia through the time of your arrest, who
8    were the other members of the PVLS clique?
9        A.   Greñas was there, Lil Poison, Lil Payaso, Lil
10   Slow, Guepardo, or Bago, Blacky, Lil Evil, Tuner --
11   they're two different ones -- and Silencio, and
12   Satánico, and Peligroso, and Lagrima.
13       Q.   All right.  We've mentioned a lot of names.
14   Let's go over some of them one by one.
15            The first name you just said was Greñas?
16       A.   Yes.
17       Q.   Do you know Greñas by any other names?
18       A.   Well, his gang name is Greñas, his tag, but, he's
19   also called Polvo and Meadio Metro and Peluca as well.
20       Q.   Let's start with the first name that you said,
21   Polvo.  Would you --
22       A.   Medio Polvo, because he's short.
23       Q.   Could you spell that for the court reporter?
24       A.   M-e-d-i-o, P-o-l-v-a.
25       Q.   And how about Meadio Metro.  How do you spell

J. Del Cid - Direct                                    171

1    that?

2    A.   M-e-a-d-i-o, M-e-t-r-o.

3    Q.   And, Peluca?

4    A.   P-e-l-u-c-a.

5    Q.   What does Peluca mean?

6    A.   Well, for example, somebody who is bald puts on

7    false hair, like a toupee.  That's what it means -- or a

8    wig, or a wig.  Why they call him wig or Peluca, I don't

9    know.  I never found that out.

10   Q.   What was Greñas's, Peluca's role in the PVLS

11   clique?

12   A.   Well, over time, he began taking on the role of

13   first word, and he was first word on the outside as

14   well.  Well, more and more, as the homeboys were getting

15   locked up, then he was taking over, so he was more and

16   more in control of the drugs and stuff like that, you

17   know what I mean.

18   Q.   Do you see Greñas in court today?

19   A.   Yes.

20   Q.   Would you please identify him by describing an

21   item of clothing he's wearing and the location where he

22   is sitting.

23   A.   He has a blue long-sleeve shirt on, and he's to

24   your right.

25            MS. MARTINEZ:  Your Honor, may the record

J. Del Cid - Direct                                          172

1  reflect that the witness has identified Defendant Jose
2  Lopez Torres as Greñas?
3            THE COURT:  So noted.
4  BY MS. MARTINEZ:
5     Q.   You also mentioned someone named Tuner.
6     A.   Yes.
7     Q.   Do you know Tuner by any other name?
8     A.   Tunnel (sic), or Pesadilla.
9            THE INTERPRETER:  No, not Tunnel.
10           (Interpreter conferring with witness.)
11           THE WITNESS:  But Tuner and Pesadilla, Lil
12  Pesadilla, too.
13  BY MS. MARTINEZ:
14    Q.   When you say Tuner or Tunel, are you saying two
15  different words there?
16    A.   (Answer not translated.)
17    Q.   Let's spell the first one.
18    A.   T-u-n-e-r.
19    Q.   And the second?
20    A.   T-u-n-e-l.
21    Q.   What was Pesadilla's or Tuner's role in the PVLS
22  clique?
23    A.   Well, also, in the same way, over time he came to
24  have second word as well.
25    Q.   Do you see Pesadilla or Tuner in court today?

J. Del Cid - Direct

1    A.   No.

2    Q.   Are you able to see everyone in court?

3         Do you need to stand?

4    A.   Yes.

5    Q.   Yes, what?

6    A.   Yes, he is here present in court.  But I can't

7    see the clothing he has on.

8         He has a white shirt on, and he's behind you as

9    well.

10   Q.   So that the record's clear, if this table to my

11   right is the first row, and there's a second and a third

12   row, which row is he in?

13   A.   He's in the second.  I can't see him too well

14   from here.

15        MS. MARTINEZ:  Your Honor, may the record

16   reflect that the witness has identified Defendant Alvin

17   Gaitan Benitez as Pesadilla or Tuner?

18        THE COURT:  So noted.

19   BY MS. MARTINEZ:

20   Q.   You also mentioned someone, you said Guepardo or

21   Bago.

22   A.   Yes.

23   Q.   Is that the same person?

24   A.   Yes, that's the same person.

25   Q.   For the court reporter, let's spell Guepardo.

J. Del Cid - Direct                                           174

1     A.   G-e-p-a-r-d-o.

2     Q.   And Vago?

3     A.   V-a-g-o.

4     Q.   Do you know, Guepardo, Vago, by any other name?

5     A.   Weso, too.

6     Q.   What was -- what was his role in the gang?

7     A.   Well, he came to be the treasurer at one point in

8     the gang, and he was in charge of the petty cash of the

9     gang.

10    Q.   Do you see Guepardo, Vago, in court today?

11    A.   Yes.  He is to your right at the first table.

12    Q.   Would you describe an item of clothing that he's

13    wearing?

14    A.   It's a long-sleeved white shirt.

15         MS. MARTINEZ:  Your Honor, may the record

16    reflect that the witness has identified Defendant

17    Christian Lemus Cerna as Guepardo or Vago?

18         THE COURT:  So noted.

19    BY MS. MARTINEZ:

20    Q.   You also mentioned someone named Little -- no,

21    sorry -- Lil Payaso?

22    A.   Yes.

23    Q.   Do you know Lil Payaso by any other name?

24    A.   Slow.

25    Q.   What was Lil Payaso's role in the gang?

1      A.   He came to run the first word at a point in time,
2    outside.
3      Q.   Do you see Lil Payaso in court today?
4      A.   Yes.
5      Q.   Please identify him by describing an item of
6    clothing he's wearing and where he's sitting.
7      A.   He's sitting at the fourth table behind you, and
8    he's wearing a blue shirt with long sleeves as well.
9           MS. MARTINEZ:   Your Honor, may the record
10   reflect that the witness has identified the defendant,
11   Omar Dejesus Castillo, as Lil Payaso.
12          THE INTERPRETER:   The interpreter would add
13   he also indicated a tie.
14          THE COURT:   So noted.
15   BY MS. MARTINEZ:
16     Q.   You mentioned someone named Lil Poison.
17     A.   Yes.
18     Q.   Do you know Lil Poison by any other name?
19     A.   By Guasón.
20     Q.   What was his role in the gang?
21     A.   He at a certain time ended up running or doing --
22   holding the first word.
23          MS. MARTINEZ:   Your Honor, may we show the
24   witness what has already been admitted as Government's
25   Exhibit 69-A.

1          THE COURT:  Yes.

2          MS. MARTINEZ:  May we publish?

3   BY MS. MARTINEZ:

4     Q.   Do you recognize this person?

5     A.   Yes.

6     Q.   Who is it?

7     A.   That's Guasón, or Lil Poison.

8     Q.   Now, we've gone over some of the homeboys of the

9   PVLS clique.  Were there *chequeos* here in Virginia as

10  well?

11    A.   Yes.

12    Q.   Who were the *chequeos* of the PVLS clique?

13    A.   Well, first, the first two *chequeos* were Vago and

14  Guasón.  But then we jumped them in, and so the next

15  ones were Solitario and Lil Wasón.

16    Q.   Solitario, do you know him by any other names?

17    A.   Just Colita, which is another name they used for

18  him.

19    Q.   Do you know why they used that name?

20    A.   Because supposedly he had long hair.

21    Q.   Do you see Solitario in court today?

22    A.   Yes.

23    Q.   Would you please identify him by describing an

24  item of clothing he's wearing and where he's sitting?

25    A.   He's wearing a gray shirt, and he's at the fourth

1    table as well.

2        Q.   For the record, how far over is he from the

3    center of the room here?

4        A.   He's behind you, two tables.  I don't know the --

5    I wouldn't know how to tell you the distance.

6        Q.   Is he one of the people closest to me or one of

7    the people furthest from me?

8        A.   He's a little far from you.  He's a little far.

9             MS. MARTINEZ:  Your Honor, may the record

10   reflect that the witness has identified Manuel Ernesto

11   Paiz Guevara as Solitario.

12            THE COURT:  So noted.

13   BY MS. MARTINEZ:

14       Q.   Once the PVLS clique here in Virginia was

15   reconstituted, were there clique meetings?

16       A.   Yes.

17       Q.   How often were the meetings?

18       A.   First we did them every Saturday, and then we did

19   them every two weeks.

20       Q.   Who attended the meetings?

21       A.   Well, the majority of the homeboys had to attend,

22   all the homeboys, pretty much.

23       Q.   What topics were discussed at the clique

24   meetings?

25       A.   Talked about how we were going to get together

J. Del Cid - Direct

1   some money, how we were going to clean up the field,

2   and, the *cancha* or the field is an area where the clique

3   is established.

4        Well, also, if a homeboy, we would talk about if

5   a homeboy did something that wasn't allowed, we'd decide

6   whether he was going to get a *calentón*, or get beat for

7   13 seconds.

8        Q.   You mentioned making money for the clique.   How

9   did the clique make money?

10       A.   Well, selling drugs, establishing rents and also

11  robbing people.

12       Q.   When you say "rents," what do you mean?

13       A.   Well, we would set an amount of money to be paid

14  by someone who was doing something illegal as well, and

15  if they didn't pay, we would kill their family.   And,

16  anyone who's doing that in the area that is set for the

17  gang has to -- has to pay up.

18       Q.   What is the area that was set for the gang?

19       A.   Well, Park View, where Park View was, was in

20  Culmore, in Fairfax.

21       Q.   What type of drugs did the clique sell?

22       A.   Marijuana, cocaine, crystal meth, K2.

23       Q.   Where did the clique get the drugs?

24       A.   Well, I was never fully aware of the contacts

25  that they had, but --

1          (Further answer not translated.)

2     Q.   I'll go ahead and stop you there.  If you're not

3  sure, I won't ask you to guess.  Okay.

4          You mentioned, in addition -- in terms of topics

5  discussed at the meeting, in addition to money, cleaning

6  up the field.

7     A.   Well, that means to be patrolling around, one

8  goes and patrols around, and if there are any rivals of

9  our clique in the area, then, they have to leave.

10    Q.   When you say patrol around, where did the clique

11 patrol?

12    A.   In the Culmore area.

13    Q.   And what do you mean by "patrol"?

14    A.   Walking around the area in the city, on the

15 corners, making sure there are no rivals around.

16    Q.   You said that rivals would have to leave.  What

17 does that mean?

18    A.   In other words, we had to get them out of there,

19 you understand me?  Because they couldn't be living in

20 our area.

21    Q.   How would the clique get them out of there?

22    A.   Well, killing them.  Well, to be honest, in the

23 time that we were in Culmore, there weren't too many

24 other -- in the time that Park View was there, there

25 weren't too many other rival gang members around.

J. Del Cid - Direct                                                  180

1    Q.   At these gang meetings, these clique meetings,
2  were dues collected from the people who attended the
3  meetings?

4    A.   Yes.

5    Q.   How much?

6    A.   $15 was the rent that the homeboys had to pay, or
7  $10.

8    Q.   How often?

9    A.   That was every two weeks.

10       Well, we had to bring it every two weeks.  And if
11 we missed one month, that would be okay, one month.  The
12 second month would be okay.  And the third month, if we
13 didn't bring it, then we would have to get a *calentón*.

14   Q.   What did the clique do with the money that it
15 collected?

16   A.   Well, that would be kept in a petty cash in case
17 of some emergency that a homeboy had, like he had a
18 problem and we had to get a car and move him.

19   Q.   What kind of problem?

20   A.   For example, if the police were looking for him
21 there around the field, then we would have to move him.
22 You understand me?

23   Q.   Who was responsible for keeping track of the
24 clique's money?

25   A.   In the beginning, the person responsible for the

J. Del Cid - Direct

1    money was Leopardo, or Vago.  But later, as time went
2    on, as time was changing, Silencio took it over.  And
3    then, it would go changing from hand to hand, in time.
4        Q.   Where were these clique meetings?
5        A.   We would do them in different places, like in the
6    apartments, the homeboy's apartments, sometimes at the
7    river, or in a channel.
8        Q.   What do you mean by "channel"?
9        A.   It's a place -- it's a place where the water
10   pass.  It's kind of like a river, or like a pipe.
11       Q.   The apartments that you described, what area are
12   they in?
13       A.   That's also there in Culmore.  It's a place
14   called Barcroft.  It's a set of apartments that has
15   woods nearby.
16       Q.   How about the river.  What area is the river that
17   you talked about in?
18       A.   It's in the same place behind Barcroft, in the --
19   in the same woods.
20       Q.   And, the channel?
21       A.   That's also there near Culmore, by a gas station.
22       Q.   During this time when you were attending these
23   clique meetings in Culmore, where were you living?
24       A.   In the Chirilagua area.
25       Q.   What city is Chirilagua in?

1    A.   It's in Alexandria here, by Mount Vernon Avenue.

2    Q.   Now, among the other homeboys that you mentioned,

3    you mentioned someone named Peligroso.

4    A.   Yes.

5              THE COURT:  Counsel, we'll start right there

6    tomorrow.

7              Ladies and gentlemen, please do not discuss

8    the case with anyone.  Do not allow the case to be

9    discussed in your presence.  Don't do any research on

10   the case, do any posting on social media.  Don't read

11   any news media reports there might be about the case.

12             Leave your notes in the jury deliberation

13   room.  We will resume at 10:00 o'clock tomorrow.

14             Thank you.

15             (Proceedings concluded at 5:01 p.m.)

16                            ---

CERTIFICATE OF REPORTER

I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the jury trial in the case of UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

I further certify that I was authorized and did report by stenotype the proceedings in said jury trial, and that the foregoing pages, numbered 1 to 183, inclusive, constitute the official transcript of said proceedings as taken from my shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this  23rd  day of  May , 2016.


/s/
Renecia Wilson, RMR, CRR
Official Court Reporter