IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　　　)　Crim. No. 1:14cr306
　　　vs.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
JOSE LOPEZ TORRES, ALVIN GAITAN　)　April 21, 2016
BENITEZ, CHRISTIAN LEMUS CERNA,　)
OMAR DEJESUS CASTILLO, MANUEL　　 )
ERNESTO PAIZ GUEVARA, and　　　　　)
JESUS ALEJANDRO CHAVEZ,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendants.　　　　)
_____)

JURY TRIAL

BEFORE:　　　THE HONORABLE GERALD BRUCE LEE
　　　　　　　UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR GOVERNMENT:　UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　BY:　JULIA MARTINEZ, AUSA
　　　　　　　　　　　TOBIAS TOBLER, AUSA

---

OFFICIAL COURT REPORTER:

　　　　　　　　　RENECIA A. SMITH-WILSON, RMR, CRR
　　　　　　　　　U.S. District Court
　　　　　　　　　401 Courthouse Square, 5th Floor
　　　　　　　　　Alexandria, VA 22314
　　　　　　　　　(703)501-1580

1  APPEARANCES (Continued)

2  FOR DEFENDANT JOSE LOPEZ TORRES

3          BYNUM & JENKINS, PLLC
           BY:  ROBERT L. JENKINS, JR., ESQ.
4          THE LEIVA LAW FIRM, PLC
           BY:  MANUEL E. LEIVA, ESQ.
5
   FOR DEFENDANT ALVIN GAITAN BENITEZ
6
           LAW OFFICE OF AMY LEIGH AUSTIN
7          BY:  AMY LEIGH AUSTIN, ESQ.
           SMITH & ZIMMERMAN, PLLC
8          BY:  JEFFREY D. ZIMMERMAN, ESQ.

9  FOR DEFENDANT CHRISTIAN LEMUS CERNA

10         LAW OFFICE OF CHRISTOPHER AMOLSCH
           BY:  CHRISTOPHER AMOLSCH, ESQ.
11         FRANK SALVATO, ESQ.

12 FOR DEFENDANT OMAR DEJESUS CASTILLO

13         FIRSTPOINT LAW GROUP, PC
           BY:  KATHERINE MARTELL, ESQ.
14         OLD TOWN ADVOCATES, PC
           BY:  MEREDITH M. RALLS, ESQ.
15

16 FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

17         LAW OFFICE OF W. MICHAEL CHICK, JR.
           BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
18
   FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
19
           JEROME P. AQUINO, ESQ.
20         ELITA C. AMATO, ESQ.

21
                              ---
22

23

24

25

<u>INDEX</u>

PRELIMINARY MATTERS                                          4

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jose Del Cid (Cont.) | --- | 7 | 53 | --- |
| Constance DiAngelo | 68 | 102 | --- | --- |
| David R. Hunt | 113 | --- | --- | --- |
| Eric DiGravio | 153 | --- | --- | --- |
| Michael Garcia | 159 | 168 | --- | --- |
| Genaro Sen Garcia | 172 (Not completed) | | | |

(Court recessed)

---

<u>PROCEEDINGS</u>

(Thereupon, the following was heard in open court at 10:03 a.m.)

(Jury not present.)

THE CLERK:  1:14 criminal 306 United States versus Jose Lopez Torres, Alvin Gaitan Benitez, Christian Lemus Cerna, Omar Dejesus Castillo, Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez; with interpreters previously sworn.

And I think we're just waiting for Eva Desrosiers later today, and --

THE COURT:  That's fine.

PRELIMINARY MATTERS

THE COURT:  Good morning.  Before we bring the jury out, anything I need to take up?

MS. AUSTIN:  Yes, Your Honor.  Good morning.

THE COURT:  Good morning.

MS. AUSTIN:  Just briefly.

If this door could be closed so the witness doesn't hear?  Thank you.

Your Honor --

THE COURT:  Thank you.

MS. AUSTIN:  I'm sorry.

I would like to just ask the Court to

1    reassure -- first of all, I wanted to say this is not a
2    criticism in any way.  I applaud the efforts and MMAs
3    every day at what is going on here with the translations
4    and the interpretations.
5              But I would just like to have the Court
6    encourage the interpreters that when vulgar or offensive
7    language is used by a witness, that it be translated
8    exactly how it's said.
9              Because it's the jury's duty to weigh the
10   testimony and, more importantly, the manner in which
11   that testimony is given.  And if there is curse words,
12   swear words, vulgar phrases, we would like the jury to
13   hear that exactly as the witness is conveying that.
14             And I know maybe it might be against the --
15   the moral fiber of some people to speak like that in
16   court.  It doesn't feel natural at all.  We would just
17   request that that be done.
18             THE COURT:  Okay.  I have the impression
19   that we have some very seasoned and experienced
20   interpreters who are very accustomed to interpreting in
21   criminal cases where all manner of profanity and vulgar
22   expressions and despicable words are used regularly.  We
23   have no soft people here, I don't think.
24             But if you or someone who speaks Spanish
25   observes some improper interpretation, call it to the

1    Court's attention.

2              And remember, given the status of this trial

3    and the issues involving the translations of the

4    transcripts -- and we've seen interpreters correct

5    themselves -- I think it's a question of fact for the

6    jury to decide whether or not the interpretations are

7    right on everything.  Okay?

8              MS. AUSTIN:  Thank you.

9              THE COURT:  Anything else?

10             MS. AUSTIN:  No.

11             THE COURT:  Okay.

12             Ready to bring the jury out?  Thank you.

13             You can bring the witness out.

14             (Witness resumed stand.)

15             (Jury present.)

16             THE COURT:  You may be seated.

17             Good morning, ladies and gentlemen.

18             THE JURORS:  Good morning.

19             THE COURT:  Good morning.

20             Good morning, Mr. Omar Dejesus Castillo.

21             Good morning, Mr. Manuel Ernesto Paiz

22    Guevara; good morning.

23             Good morning, Mr. Jesus Alejandro Chavez;

24    good morning.

25             Good morning, Mr. Alvin Gaitan Benitez; good

1    morning.

2              Good morning, Mr. Jose Lopez Torres; good

3    morning.

4              And good morning, Mr. Christian Lemus Cerna.

5              Good morning, Counsel.  Ready to proceed?

6              And good morning, Mr. Del Cid.

7              THE WITNESS:  Good morning.

8              THE COURT:  Good morning.

9              You may proceed, Counsel.

10             MR. SALVATO:  Good morning, Your Honor.

11             THEREUPON, JOSE DEL CID, previously duly

12   sworn, testified further as follows:

13                  CROSS-EXAMINATION (Continued)

14   BY MR. SALVATO:

15     Q.  Mr. Del Cid, we left off last night talking about

16   drug use.  Do you remember those questions?

17     A.  Yes, sir.

18     Q.  I believe you said yesterday you used marijuana

19   about 200 times over a two-year period?

20     A.  Yes, sir.

21     Q.  And, you did not, according to your testimony,

22   use marijuana on the night Lil Guasón was killed,

23   correct?

24     A.  Of course not.

25     Q.  And, the reason why is that you wanted to be

J. Del Cid - Cross                                          8

1   prepared, correct?

2       A.   Well, as I told you, and I repeat it, I never

3   like to use drugs while doing things like this.

4       Q.   Right.  And I appreciate that answer; and if you

5   could answer me yes or no, I would appreciate it.  Okay?

6       A.   Okay.

7       Q.   So, you did not use marijuana that night,

8   according to your testimony, because you wanted to be

9   prepared, correct?

10      A.   Yes.

11      Q.   You wanted to be focused, correct?

12      A.   That's right.

13      Q.   And, clear-headed, correct?

14      A.   Exactly.  Right.

15      Q.   And you knew -- what you told this jury yesterday

16  is you knew that this was going to happen, correct?

17      A.   That's right.

18      Q.   And, you were -- with regard to your past acts of

19  violence or murder, you had been prepared, correct?

20      A.   Yes, sir.

21      Q.   The gentleman that you dismembered, you were

22  prepared with a sharp machete, correct?

23      A.   Yes, sir.

24      Q.   And, you were prepared when you attempted to

25  shoot your own mother, correct?

1              THE INTERPRETER:  "Shoot"?  Excuse me?

2    BY MR. SALVATO:

3         Q.   To shoot your own mother.

4         A.   Yes, sir.

5         Q.   And, you raised the shotgun to your mother's

6    face, correct?

7         A.   Yes, sir.

8         Q.   And, you pulled the trigger, correct?

9         A.   Yes.

10        Q.   And, the gun did not go off, correct?

11        A.   Yes.

12        Q.   And your mother fell to the ground?

13        A.   Yes, sir.

14        Q.   So, all of these prior crimes of violence or

15   murder, you have been very prepared, true?

16        A.   That's right.

17        Q.   However, sir, you told this jury yesterday that

18   you appeared at the scene of Lil Guasón's murder with a

19   dull knife, right?

20        A.   That's right.

21        Q.   So, you appeared at the scene of a murder you

22   knew was going to happen, with a weapon that would do no

23   damage; is that what you're telling us?

24        A.   Correct.  Because that was the weapon that was

25   given to me.

1    Q.   The weapon was given to you?

2    A.   Yes, sir.

3    Q.   So, for all of these other crimes of violence,

4    you brought your own weapon, correct?

5    A.   Well, the weapons were already there when

6    something was going to happen.  The weapons were there.

7    Q.   Okay.  Did you bring your own weapons to the

8    other crimes of violence?

9    A.   Yes.

10   Q.   So, they weren't already there.  You brought

11   them, true?

12   A.   Well, in one instance I brought the machete.  But

13   in the other ones, the weapons were there already.

14   Q.   When you stabbed the 12-year-old boy in the

15   chest, was the weapon there already?

16   A.   Well, the homeboys had it in the car, and that

17   was what was given to me, the knife.

18   Q.   So, you did not, with respect to the 12-year-old

19   boy, bring your own weapon?  That was just given to you?

20   A.   That's right.

21   Q.   You brought a shotgun to your mother's house,

22   correct?

23   A.   Yes.

24   Q.   And, was that another weapon that was simply

25   given to you?

1      A.   Well, that was the one that was given to me, and

2   I was told go and do it.

3      Q.   It seems, sir, that you're shifting

4   responsibility onto other people.  Is that fair to say?

5           MS. MARTINEZ:  Objection, Your Honor,

6   argumentative.

7           THE COURT:  I'll give you a chance to argue

8   the case at the end.  Objection sustained.

9   BY MR. SALVATO:

10     Q.   The machete that you brought, where you

11  dismembered the man, that one you brought yourself.  Is

12  that what you're telling us?

13     A.   Yes.

14     Q.   Sir, I want to back up and ask you a few

15  questions about your cooperation agreement.

16     A.   Okay.

17     Q.   I think Mr. Aquino asked you some questions about

18  the benefits that you've received.  Do you remember

19  those questions?

20     A.   Yes.

21     Q.   And, I just want to ask you a few questions.  If

22  you could answer yes or no, I would appreciate it.

23     A.   Okay.

24     Q.   You understood before you pled guilty in federal

25  court regarding Lil Guasón's murder, that you faced

1    possible federal charges, correct?

2       A.   Yes.

3       Q.   And, you also understood for that same murder,

4    that you could also face state charges, correct?

5       A.   No, I didn't know that.

6       Q.   Well, you received letters from the Commonwealth

7    attorney of Fairfax, correct?

8       A.   No, sir.

9       Q.   You didn't answer Mr. Aquino's questions, that

10   you got assurances that you would not be prosecuted in

11   Fairfax County, correct?

12      A.   Yes, that's right.  But it was through my

13   attorney.

14      Q.   I'm sorry.  It was through your attorney?

15      A.   Yes, sir.

16      Q.   So, through your attorney, your attorney was able

17   to negotiate that you wouldn't be charged in state

18   court?

19      A.   I suppose so.

20      Q.   And that applied to Gerson, correct?

21      A.   I don't -- I don't know what it had to do with

22   Gerson.

23      Q.   And, you received assurances from the

24   Commonwealth attorney of Fairfax that you would not be

25   prosecuted in state court, correct?

1    A.   Yes, sir.

2    Q.   And, you haven't been prosecuted in Fairfax,

3  right?

4    A.   No.

5    Q.   You've only been prosecuted here in federal court

6  for a RICO murder, correct?

7    A.   I suppose so.

8    Q.   Well, you looked at your plea agreement

9  yesterday, correct?

10   A.   Yes, that's right.

11   Q.   And, you pled guilty in this court to two counts

12  of RICO murder?

13   A.   Well, as I told you, I assumed responsibility for

14  the four charges that they gave me.  But, they sentenced

15  me for only two.

16   Q.   And, those two were RICO murders in this federal

17  court, correct?

18   A.   Yes.

19   Q.   You were not prosecuted for the shooting in

20  Alexandria in state court either, correct?

21   A.   No.

22   Q.   That is correct, you have not been prosecuted in

23  the city of Alexandria?

24   A.   Well, as I told you, I was sentenced for that

25  charge, but it was federal.

1    Q.   The state authorities agreed not to prosecute you

2    for that shooting, correct?

3    A.   That's right.

4    Q.   And, similarly, sir, Prince William County, the

5    Commonwealth attorney there agreed not to prosecute you

6    in state court for the Garfield High School incident,

7    true?

8    A.   That's right.

9    Q.   Sir, I want to turn your attention to the meeting

10   before Lil Guasón's killing that you spoke about.  Okay?

11   A.   Okay.

12   Q.   I think you indicated yesterday that you were in

13   and out of that meeting, correct?

14   A.   That's right.

15   Q.   Because you were selling marijuana that night?

16   A.   Well, yes.  We received a call.  Somebody wanted

17   a 20.  Nobody wanted to go.  They sent me.

18   Q.   Okay.  You were selling marijuana that night,

19   correct?

20   A.   That's right.

21   Q.   And, how many sales of marijuana did you do that

22   night?

23   A.   Well, that night, I did only that one, because

24   that was the one we received a call.  Because in that

25   sector I hardly sold drugs.  Where I sold was in

1   Chirilagua.

2       Q.   All right.  So, you weren't there during the

3   entire meeting, correct?

4       A.   Yes, sir.

5       Q.   However, I think you testified on direct that

6   Mr. Villanueva or Lil Slow was there, correct?

7       A.   Yes.

8       Q.   And, as far as you know, Lil Slow was there for

9   the entire meeting, correct?

10      A.   If I remember right, yes.

11      Q.   And you told this jury that you believed that

12  Leopardo was there, correct?

13      A.   He was there.

14      Q.   So, Lil Slow and Leopardo, it's your testimony,

15  were together, present at that meeting, correct?

16      A.   Yes.

17      Q.   How far away was Lil Slow from Leopardo during

18  that purported meeting?

19      A.   Like from here to that table (indicating).

20      Q.   Here to the government's table?

21      A.   This one here (indicating).

22      Q.   About eight feet; is that right?

23      A.   Yes.  I'm not too good with measurements.

24      Q.   So, your testimony is, Lil Slow was about eight

25  feet from Leopardo during that meeting, correct?

1    A.   Yes, sir.

2    Q.   And, they were both together for the entire

3  meeting, correct?

4    A.   That's right.

5    Q.   So, Lil Slow would have had no problem seeing

6  Leopardo from eight feet away, true?

7    A.   I suppose not.

8    Q.   Sir, isn't it fact that Leopardo was not at that

9  meeting?

10   A.   He was present.

11   Q.   So, if Lil Slow told us that he was not at that

12 meeting, that was a lie?

13        MS. MARTINEZ:  Objection, Your Honor, beyond

14 the scope of this witness's knowledge.

15        THE COURT:  Sustained.

16 BY MR. SALVATO:

17   Q.   You're certain he was -- Leopardo was at that

18 meeting?

19        MS. MARTINEZ:  Objection, Your Honor, asked

20 and answered.

21        THE COURT:  Overruled.

22        THE WITNESS:  Yes, I am sure, because he

23 also requested that it be done that night.

24 BY MR. SALVATO:

25   Q.   Are you as sure about that fact that you are

1   about everything else that you've testified to?

2       A.   Yes, sir.

3            MR. SALVATO:  Court's indulgence for just

4   ten seconds.

5            With Mr. Toliver's assistance, Your Honor,

6   I'd like Mr. Del Cid to take a look at what I've marked

7   for identification as what I believe is Cerna Number 5.

8   BY MR. SALVATO:

9       Q.   Sir, along with your plea agreement, it was filed

10  with the Court a statement of facts about your case; is

11  that correct?

12      A.   Yes, sir.

13      Q.   And, on the last page of that document, page

14  seven, is that your signature on page seven?

15      A.   Yes, sir.

16      Q.   So, you could identify that as the statement of

17  facts in your case, correct?

18      A.   Yes, that's right.

19      Q.   And that was translated to you from English to

20  Spanish, correct?

21      A.   That's right.

22      Q.   And, that statement of facts contains a lot of

23  details, doesn't it?

24      A.   That's right.

25           MR. SALVATO:  Your Honor, may I ask

1    Ms. Horvath to translate paragraph two -- it's three

2    sentences -- to Mr. Del Cid.

3                    (Interpreter complies.)

4                    THE INTERPRETER:  Done.

5                    MR. SALVATO:  Thank you.

6    BY MR. SALVATO:

7        Q.   Sir, in that paragraph in your statement of

8    facts, paragraph number two, there's a lot of details

9    about MS-13, correct?

10       A.   That's right.

11       Q.   Where MS-13 is located?

12       A.   Right.  It's all over the States.

13       Q.   And, what other countries, correct?

14       A.   Guatemala, El Salvador, Honduras, Mexico.

15       Q.   And those details were included in your statement

16   of facts, correct?

17       A.   That's right.

18                   MR. SALVATO:  If I could ask Ms. Horvath to

19   read paragraph nine to the witness.

20                   We're switching, so not Ms. Horvath.

21                   THE INTERPRETER:  Nine?

22                   MR. SALVATO:  Nine, please.

23                   (Interpreter complies.)

24   BY MR. SALVATO:

25       Q.   Did you understand that paragraph?

1     A.   Yes, sir.

2     Q.   And that's a lot of detail about MS-13, correct?

3     A.   Yes.

4     Q.   There's details about clothing colors, correct?

5     A.   Yes.

6     Q.   Numbers that add up to 13, correct?

7     A.   Yes.

8     Q.   Information and details about tattoos, correct?

9     A.   Yes.

10    Q.   How MS-13 marks their territory, correct?

11    A.   Yes, sir.

12    Q.   How MS-13 marks their territory with graffiti,

13    correct?

14    A.   Yes.

15              MS. MARTINEZ:   Your Honor, for clarity, has

16    this exhibit actually been entered into evidence?  So --

17              THE COURT:   No.   It's being presented to him

18    for review.

19              MS. MARTINEZ:   Well, at this point details

20    are being read in front of the jury.  So we would object

21    to further information from the document, unless it can

22    be entered into evidence.

23              THE COURT:   All right.   Sustained.

24              MR. SALVATO:   I would enter at this time,

25    Your Honor, Cerna Exhibit Number 5.

1           MS. MARTINEZ:  No objection.

2           THE COURT:  All right.  Exhibit 5 will be

3   received.

4           MR. SALVATO:  Now that the document is into

5   evidence, may we display paragraph nine?

6           THE COURT:  Sure.  Help yourself.

7   BY MR. SALVATO:

8       Q.  I just want to ask you, obviously, you can't read

9   the screen, correct?

10          Can you read English?

11      A.  A little bit.

12      Q.  So, I'm just going to ask you questions through

13  the translator, okay?

14      A.  Okay.

15      Q.  So, paragraph nine indicates details about

16  graffiti, correct?

17      A.  Yes.

18      Q.  And, how MS-13 members display names, correct?

19      A.  *Sí*.

20      Q.  And symbols?

21      A.  That's correct.

22      Q.  All right.  And hand signs, correct?

23      A.  Yes.

24      Q.  So, there's fair amount of detail in paragraph

25  nine, true?

1      A.   Correct.

2      Q.   And, if you look at paragraph ten --

3           MR. SALVATO:  Can I have the translator read

4  paragraph ten?

5           (Interpreter complies.)

6  BY MR. SALVATO:

7      Q.   There's a lot of detail in paragraph ten,

8  correct?

9      A.   Yes.

10     Q.   And, you didn't write this statement of facts,

11 did you?

12     A.   No, but I notified the prosecutor how the gang

13 worked.

14     Q.   Okay.  But, you didn't write this statement of

15 facts, correct?

16     A.   Are you asking me if I word it, or I sign it?

17     Q.   Did you write these words?

18          You didn't write these words, did you?

19          You didn't write paragraph ten, did you?

20     A.   Oh, no, no, sir.

21     Q.   But you signed off on it as true, correct?

22     A.   That's correct.

23     Q.   And, the government wrote this document, correct?

24     A.   Yes.

25     Q.   And, your attorney presented it to you, correct?

1    A.   Yes.

2    Q.   And, you reviewed it, correct?

3    A.   Yes.

4         MR. SALVATO:   Court's indulgence.

5  BY MR. SALVATO:

6    Q.   I'm going to ask you about one more paragraph in

7  this statement of facts, okay?

8    A.   Okay.

9         MR. SALVATO:   If I could ask the translator

10  to read paragraph 17 to this witness.

11         (Interpreter complies.)

12  BY MR. SALVATO:

13    Q.   Have you reviewed that paragraph?

14    A.   Yes.

15    Q.   And, that paragraph, along with the other

16  paragraphs, you swore were completely accurate, correct?

17    A.   Yes.

18    Q.   Sir, during your direct testimony, you stated,

19  all individuals there started to stab him, correct?

20    A.   Yes.

21    Q.   And, you understand "all" means everybody,

22  correct?

23    A.   Yes.

24    Q.   Now, isn't it true, sir, that your statement of

25  facts says several of the gang members were involved in

1    beating or stabbing the victim?

2       A.   Yes.

3       Q.   So, not all people that were there stabbed him,

4    correct?

5              MS. MARTINEZ:  Objection, Your Honor.  It

6    misstates facts in evidence.

7              MR. SALVATO:  Let me reask the question,

8    Your Honor.

9              THE COURT:  I sustain the objection to the

10   question that was asked.

11   BY MR. SALVATO:

12      Q.   My client, Leopardo, did not stab Gerson,

13   correct?

14      A.   Yes, he did, sir.

15      Q.   In fact, the only thing that he did, according to

16   you in your own statement of facts, is he --

17             MS. MARTINEZ:  Objection, Your Honor.

18   Misstates facts in evidence.

19             MR. SALVATO:  I haven't stated a question,

20   Your Honor.

21             THE COURT:  Premature, Ms. Martinez.

22   Premature.

23             MS. MARTINEZ:  I apologize, Your Honor.

24   BY MR. SALVATO:

25      Q.   Do you see the first part of that sentence on

1    that page?

2        A.   Yes.

3        Q.   And it says, "Member pulled out a knife and

4    stabbed him in the neck"?

5        A.   Yes.

6        Q.   That was not Leopardo, correct?

7        A.   It was Tuner.

8        Q.   And, in fact, that's what you told Detective

9    Ignacio when you first spoke to him, that actually Tuner

10   was the one who killed Lil Guasón?

11       A.   Well, it was that way.  Tuner began hitting him

12   on the neck.

13       Q.   So the question I have, sir, very specifically,

14   is that:  Did you tell Detective Ignacio of the

15   Alexandria Police Department that Tuner was the

16   individual who killed Lil Guasón?

17       A.   Yes.

18       Q.   So, Leopardo, to be clear, did not stab Lil

19   Guasón in the neck or kill him, correct?

20            MS. MARTINEZ:  Objection, Your Honor,

21   compound question.

22            MR. SALVATO:  I'll break it down.

23   BY MR. SALVATO:

24       Q.   So, to be clear, sir, Leopardo did not stab Lil

25   Guasón in the neck, correct?

1     A.   He was the one that cut his head off.

2     Q.   The question was very specific.  Leopardo was not

3  the person who killed Lil Guasón, correct?

4     A.   That's right.

5     Q.   Now, I want you to look at that next sentence,

6  the first full sentence on that page.

7              THE INTERPRETER:  Beginning with "After"?

8              MR. SALVATO:  Beginning with "After."

9              THE INTERPRETER:  Would you like the

10  interpreter to read that again?

11             MR. SALVATO:  Just that portion.

12             (Interpreter complies.)

13             THE WITNESS:  Yes.

14  BY MR. SALVATO:

15    Q.   And, that sentence is true, correct?

16    A.   Yes.

17    Q.   So, you told this jury, "Well, Leopardo, um, went

18  to his neck," correct?

19    A.   Yes.

20    Q.   However, anything that you're saying that

21  Leopardo did was after Lil Guasón had already died,

22  correct?

23    A.   Well, whether he was dead then, I could not tell

24  you, because I didn't go and put my fingers on his

25  throat to see whether or not he was alive.

1    Q.   Let me ask you about that.  That says, "After

2    concluding that he was dead," correct?

3    A.   That is what it says there, yes.

4    Q.   So, Leopardo only made any contact with Lil

5    Guasón, according to even your testimony, after you

6    concluded Lil Guasón was dead, correct?

7             MS. MARTINEZ:  Objection, Your Honor,

8    misstates facts in evidence.

9             MR. SALVATO:  I don't think it does, Your

10   Honor.  That's a very --

11            THE COURT:  That's not a proper objection.

12   Please don't do that again.

13            Objection overruled.

14            THE WITNESS:  Well, you have to understand

15   that once Tuner moved away, we all began hitting him

16   with knives.

17   BY MR. SALVATO:

18   Q.   That's not my question, sir.

19        According to your testimony, Leopardo was

20   involved in having the person's head cut off, correct?

21   A.   That's correct.

22   Q.   That was after he was dead, correct?

23   A.   As I said, sir, I didn't go to put my fingers on

24   his throat to check whether he was dead or alive,

25   because he was still moving.

1          MR. SALVATO:  Say that again.

2          THE INTERPRETER:  "As I told you, sir, I

3  didn't go and put my fingers on his throat to check

4  whether he was dead or alive, because he was still

5  moving.

6  BY MR. SALVATO:

7     Q.  Well, you remember speaking to Agent Uribe and

8  Detective Betts about this very issue, correct?

9          THE INTERPRETER:  Detective Betts?

10         MR. SALVATO:  Detective Betts.

11         THE WITNESS:  Yes.

12  BY MR. SALVATO:

13    Q.  And, you told them the same thing as is in your

14  statement of facts, that the gentleman was already dead,

15  correct?

16    A.  Yeah, because that was what I assumed, that was

17  what I thought, that he was already dead.

18    Q.  And that's consistent with, "After concluding the

19  victim was dead," correct?

20    A.  Well, I repeat, I assume that he was dead,

21  because he was not fighting us off.  He was moving, but

22  he was like choking on his own blood.

23    Q.  But that statement of facts doesn't say that,

24  correct?

25    A.  Well, I repeat, what it says here, that he was

1    already dead, although he was still moving.

2        Q.   Okay.

3             MR. SALVATO:  Thank you.  You can...

4    BY MR. SALVATO:

5        Q.   We'll move on to a couple more subjects.  All

6    right?

7        A.   Okay.

8        Q.   You know Skinny, right?

9        A.   Yes.

10       Q.   And, what types of drugs was Skinny using at this

11   point?

12       A.   Marijuana only.

13       Q.   And, you knew him pretty well?

14       A.   Well, you could say that.

15       Q.   And, you saw him a lot, right?

16       A.   Yes.

17       Q.   You're telling this jury --

18             (Noise interruption.)

19             THE REPORTER:  I'm sorry?

20   BY MR. SALVATO:

21       Q.   You're telling this jury that Skinny only used

22   marijuana?

23       A.   That was what I saw him using, marijuana.  And

24   every once in a while he would have a beer with us.

25       Q.   All right.  Did Skinny use crystal meth?

1    A.   I couldn't tell you, but I never saw him using
2    it.
3    Q.   And, Skinny had a girlfriend named Rosie,
4    correct?
5    A.   I saw him texting to her, but, his wife was
6    somebody else.
7    Q.   Skinny wasn't married, was he?
8    A.   I don't know whether he was married or not, but I
9    know that he was living with a woman.
10   Q.   All right.  And that was a woman named Belén; is
11   that right?
12   A.   Yes.
13   Q.   And, Belén was actually with -- had slept with
14   other members of the gang, correct?
15   A.   Yes.
16   Q.   Besides Skinny, correct?
17   A.   Yes.
18   Q.   But, Skinny's main girl, his real girlfriend, was
19   a girl named Rosie, correct?
20   A.   Well, I repeat, I only saw him texting this girl.
21   But, I never knew whether that was his real girlfriend
22   or not.  Because as far as I knew, his woman was Belén.
23   Q.   Belén who had, however, been with other members
24   of the gang, true?
25   A.   Yes.

1    Q.   And, Skinny didn't really care about Belén, as
2  she had been sleeping with multiple members of the
3  group, so to speak, right?
4    A.   Well, I don't know about several.  As far as I
5  knew, she was only with Lil Guasón.
6         And, he must have been upset about that, because
7  he also asked -- -- he asked and he suggested that we
8  give him a green light.
9    Q.   And, but Skinny didn't -- I thought you told us
10  Payaso ordered this green light.
11    A.   Yeah, that's correct, because the homeboys asked
12  for it.  The other homeboys asked for it.
13    Q.   So, Payaso -- you're telling this jury that
14  Payaso ordered the green light on Lil Guasón?
15    A.   Well, we suggested it to him, and he authorized
16  it.
17    Q.   Right.  That's my question.  So, you're telling
18  this jury Little -- that Payaso ordered this green
19  light.
20    A.   Yeah, well, the ones that asked for it were
21  Skinny, Lil Poison and Tuner.  But the one who
22  authorized it was Payaso.
23    Q.   That's my question, sir.  You're telling this
24  jury that Payaso authorized this green light?
25         MS. MARTINEZ:  Objection, Your Honor.  It's

1  been asked and answered now.

2            THE COURT:  Sustained.

3  BY MR. SALVATO:

4     Q.   Now, Belén worked, correct?

5     A.   Yes.

6     Q.   And, she had her own money, correct?

7     A.   I assume so.

8     Q.   She made money at her job, correct?

9     A.   Yes.

10    Q.   Legitimate money, correct?

11    A.   Of course.

12    Q.   And, is it fair to say that the money that was

13 involved with Lil Guasón, that was Belén's money,

14 correct?

15    A.   Yes.

16            MR. SALVATO:  Court's indulgence for just

17 one second, Your Honor.

18            I don't have anything else.  Thank you, sir.

19                 CROSS-EXAMINATION

20 BY MR. ZIMMERMAN:

21    Q.   Good morning, Mr. Del Cid.

22    A.   Good morning.

23    Q.   My name is Jeff Zimmerman and I represent Alvin

24 Gaitan Benitez.

25            About how many times would you say you met with

1   the government to discuss this case, before your

2   testimony today?

3       A.   I would say about seven times, from five to seven

4   times.

5       Q.   Okay.  It was actually over ten times over a

6   period of almost two years; is that correct?

7            I'm talking about the entire time since you were

8   arrested and began talking to the government.

9       A.   Yes.

10      Q.   Okay.  And so you -- in 2014, you recall you met

11  with them on or about July 3rd, about?

12      A.   Yes.

13      Q.   And, four times -- about four times in October of

14  2014?

15      A.   I could not tell you exactly, because it was many

16  times, as I said.  And, I don't remember the months.

17      Q.   Okay.  But, it was -- it was over ten times since

18  2014, correct?

19      A.   Yes.

20      Q.   Okay.  And, how long would you say each meeting

21  was, on average?

22      A.   Two hours, three and a half hours.

23      Q.   Possibly four hours, some of them?

24      A.   Yeah, that's what I remember.  Three hours, three

25  and a half hours.

1     Q.   Okay.  So, if -- so at least ten times, at

2     least -- three and a half hours would be at least

3     35 hours talking to the government, correct?

4     A.   Yes.

5     Q.   And in a number of those meetings you talked

6     about the murder of Lil Guasón, correct?

7     A.   Yes.

8     Q.   And, at a meeting in October of 2014, one of the

9     ones you referred to, you had told agents that a number

10    of individuals were stabbing Lil Guasón, correct?

11    A.   Yes.

12    Q.   Okay.  You had said Lil Tuner was stabbing him,

13    correct?

14         THE INTERPRETER:  Lil Tuner, you said?

15    Tuner or Lil Tuner?

16    BY MR. ZIMMERMAN:

17    Q.   Tuner -- Lil Tuner?

18    A.   Yes.

19    Q.   And you told them Lil Payaso was stabbing Lil

20    Guasón, correct?

21    A.   Yes.

22    Q.   And Lil Slow was stabbing Lil Guasón?

23    A.   Yes.

24    Q.   Okay.  And you, you were one of the individuals

25    stabbing Lil Guasón to death; is that correct?

1    A.   Yes.

2    Q.   Okay.  There was a time before Lil Guasón's

3  murder that Skinny was incarcerated; is that correct?

4  Before Lil Guasón's murder?

5    A.   Yes.

6    Q.   Okay.  And, he would call you from the Fairfax

7  Jail -- he was in the Fairfax Jail, correct?

8    A.   Yes.

9    Q.   Okay.  And he would call you from the Fairfax

10  Jail?

11    A.   Yeah.  He sometimes would call Lil Payaso's

12  phone.

13    Q.   Okay.  And you would talk to him on Lil Payaso's

14  phone?

15    A.   Yes.

16    Q.   And when he called you, he would express a strong

17  dislike of Lil Guasón.  He did not like Lil Guasón.

18    A.   Yes.

19    Q.   And, at one point, he even told you something to

20  the effect of, "I want that crazy guy to disappear"?

21    A.   Yes.

22    Q.   Okay.  On cross-examination you told Mr. Leiva

23  that you participated in three murders in El Salvador

24  before you came to the United States, correct?

25    A.   Yes.

1    Q.   You also testified during that cross that you
2    assisted in the planning of two additional murders in
3    El Salvador; is that correct?
4    A.   Well, within those same thing ones, two of those
5    I participated in, in the planning.
6    Q.   Oh, okay.  And in this case that we're here today
7    for, you participated in the murder of Lagrima, correct?
8    A.   Yes.
9    Q.   And, the murder of Lil Guasón?
10            THE INTERPRETER:  In preparing or in the
11   murder itself?
12            MR. ZIMMERMAN:  He participated in the
13   murder of Lil Guasón.
14            THE WITNESS:  Yes.
15   BY MR. ZIMMERMAN:
16   Q.   In fact, you just testified you were one of the
17   individuals stabbing Lil Guasón.
18   A.   Yes.
19   Q.   And, you participated in the murder of Julio
20   Urrutia?
21   A.   Yes.
22   Q.   Okay.  So, you participated in three murders in
23   El Salvador and three murders here, for six murders,
24   correct?
25   A.   Yes.

1    Q.   And, you were involved in the planning of the
2    murder of Peligroso, correct?
3    A.   Yes.
4    Q.   And, if it hadn't been foiled by law enforcement,
5    you would have killed Peligroso as well?
6    A.   Well, not myself, because, I did not accompany
7    them to Woodbridge.
8    Q.   But you were involved in the planning?
9    A.   Yes, of course.
10   Q.   Okay.  So, that would be six completed murders,
11   and you assisted in the planning of an additional
12   murder, correct?
13   A.   Yes.
14   Q.   Okay.  Regarding stabbings, you, Lagrima and
15   Silencio stabbed a *chavala* in Alexandria?
16   A.   It was Lagrima who stabbed.
17   Q.   But you participated in that attack in which
18   Lagrima stabbed a *chavala* in Alexandria?
19   A.   As I repeat, I was the one that put my bicycle in
20   the path across him.
21   Q.   So, you -- you blocked the victim so that Lagrima
22   could stab him?
23   A.   You could say that.
24   Q.   Okay.  That's actually similar to the murder of
25   the Coca-Cola driver where -- in El Salvador, where you

1    blocked the truck and distracted him so that other gang

2    members could murder him, correct?

3        A.   That's correct.

4        Q.   Okay.  And, regarding stabbings, you also plunged

5    the knife into the chest of a 12-year-old in Fairfax,

6    correct?

7             THE INTERPRETER:  "You also punched a

8    knife"?

9             MR. ZIMMERMAN:  Plunged.  Stabbed.

10            THE WITNESS:  Yes.

11   BY MR. ZIMMERMAN:

12       Q.   Okay.  So, this was involvement in this country

13   in two stabbings, correct?

14       A.   Yes.

15       Q.   Okay.  Moving on to assault, you testified you

16   assaulted a one-armed man with a hammer, correct?

17       A.   Yes.

18       Q.   And you believed him to be a *chavala*?

19       A.   Well, that was what the company from Virginia

20   told me.

21       Q.   And that's why you assaulted him with a hammer?

22       A.   Yes.  We wanted him to leave that sector.

23       Q.   Okay.  In fact, you were chased away from that

24   assault by other individuals who came to the aid of the

25   victim you were beating; isn't that correct?

1    A.   That's right.

2    Q.   And, otherwise, you would have killed him,

3    because one of the rules is to kill *chavalas*?

4    A.   No, we were not going to kill him.

5    Q.   But, you understood he was a *chavala*?

6    A.   Yes, sir.

7    Q.   So, you were going to give him a severe beating?

8    A.   Yes.

9    Q.   But, you got chased away by people who came to

10   his aid?

11   A.   Yes.

12   Q.   Okay.  Also, somewhere in and around 2013, you

13   and Bandito robbed a drug dealer; is that correct?

14   A.   Yes.

15   Q.   And you assaulted him with a bat during a

16   robbery; you hit the drug dealer with a bat?

17   A.   Yes.

18   Q.   Okay.  So, that's two assaults, the one-armed man

19   with the harmer, and the individual you and Bandito --

20   you hit with the bat, correct?

21   A.   Yes.

22   Q.   And you also pulled a gun on a kid in Alexandria,

23   correct?  Stuck the gun in his face?

24   A.   Yes.

25   Q.   Okay.  So that's a total of six completed

1    murders, the attempted -- planning the attempted murder
2    of Peligroso, two stabbings including a 12-year-old, two
3    assaults with either a hammer or a bat, and sticking a
4    gun in a child's face.
5            MS. MARTINEZ:  Compound question.
6            MR. ZIMMERMAN:  It's not a compound
7    question.  I'm simply asking, yes or no, is that what we
8    just discussed.
9            THE COURT:  It sounds like a multiple choice
10   question to me.  Break it down, if you would.  You broke
11   down everything else.  I don't see why you can't break
12   this one down.  Go ahead.
13           MR. ZIMMERMAN:  Thank you, Judge.
14   BY MR. ZIMMERMAN:
15   Q.  So you testified to a total of six murders,
16   completed murders you participated in, correct?
17   A.  Yes.
18   Q.  You also were involved in the planning of the
19   murder of Peligroso.
20   A.  Yes.
21   Q.  A stabbing of a 12-year-old.
22   A.  Yes.
23   Q.  Blocking somebody so another individual, so
24   Lagrima could stab him?
25           MS. MARTINEZ:  Objection.  These questions

1    have all been asked and answered.

2              MR. ZIMMERMAN:  Your Honor, I'm simply

3    responding to -- I had one summary question of all this,

4    and the government objected and the Court asked me to

5    break it down.  And that's what I'm doing, Your Honor.

6              THE COURT:  So you're reiterating what he

7    said a moment ago, to reinforce what he said a moment

8    ago?

9              MR. ZIMMERMAN:  Exactly.

10             THE COURT:  All right.  Objection sustained.

11             MR. ZIMMERMAN:  Thank you, Judge.

12   BY MR. ZIMMERMAN:

13     Q.  You -- you entered the United States in 2012,

14   correct?

15     A.  Yes.

16     Q.  And, when were you initially arrested, taken into

17   custody?

18     A.  Well, that was while I was at Lala's place.

19     Q.  Okay.  That was in 2014?

20     A.  Yes.

21     Q.  Okay.  What month?

22     A.  To tell you the truth, I don't remember the

23   month.

24     Q.  Okay.  You think it was -- it was earlier in the

25   year?

1    A.   Yes, I remember it was in the beginning, but I
2    couldn't tell you what.
3    Q.   So it was around the beginning of 2014?
4    A.   Yes.
5    Q.   And, you've been in continuous custody since
6    then?
7    A.   Well, they let me go that time, because I gave
8    them another name.
9    Q.   Okay.  What name did you give them?
10   A.   Gabriel Dejesus.
11   Q.   Oh.  So you gave them a fake name for yourself,
12   and they let you go?
13   A.   That's right.
14   Q.   When was the next time you were rearrested?
15   A.   July 2nd.
16   Q.   July 2nd, 2014?
17   A.   Yes.
18   Q.   Okay.  Have you been in continuous custody since
19   July 2nd, 2014?
20   A.   Yes.
21   Q.   Okay.  And, have you committed any crimes since
22   then, that is, while in custody?
23              THE INTERPRETER:  Excuse me?
24   BY MR. ZIMMERMAN:
25   Q.   Have you committed any crimes since that time,

1    that is, while in custody?

2        A.   No.

3        Q.   Okay.  So all of the violence, all of the

4    murders, all of the stabbing, all the assaults we just

5    discussed, were just in this two-year period -- the

6    killings here were just in the two-year period from 2012

7    to 2014; is that correct?

8        A.   Yes.

9        Q.   Okay.  And you now, as you understand it, have

10   immunity from any further prosecution from -- by the

11   United States for all of this; is that correct?

12            MS. MARTINEZ:  Your Honor, I object to vague

13   as "to all of this."

14            MR. ZIMMERMAN:  As -- okay.  I can rephrase,

15   Your Honor.

16            THE COURT:  All right.

17   BY MR. ZIMMERMAN:

18       Q.   You now have immunity from prosecution from the

19   United States Government for the three murders you

20   completed here, your planning the attempted murder of

21   Peligroso, the two stabbings, including a 12-year-old,

22   and the two assaults with either a hammer and a bat, and

23   sticking a gun in a child's face; you now have immunity

24   from prosecution for all of that, correct?

25            THE INTERPRETER:  This is long.  I'll try

1   to --

2                   MR. ZIMMERMAN:   I can break it down.

3   BY MR. ZIMMERMAN:

4       Q.   The three completed murders in the United States.

5       A.   Well, I do not understand the word "immunity."

6       Q.   Okay.   Your understanding, pursuant to your plea

7   agreement, is that you are not going to be further

8   prosecuted or sentenced for these crimes, correct?

9       A.   That is right.

10      Q.   Okay.   In fact, you said you were sentenced for

11  two of the murders, and you do not expect to be

12  prosecuted or sentenced for any of the other things we

13  discussed this morning; is that correct?

14      A.   That's what I think.

15      Q.   Okay.   And you also --

16                  MR. ZIMMERMAN:   Well, could we -- I'm sorry

17  to drop this on you, guys.   Could we put up -- this

18  would be Government's Exhibit 123.   This is, with the

19  Court's permission, Mr. Del Cid's plea agreement.   If we

20  could put up page 8, paragraph 12.

21                  Ms. Horvath, if you could please translate

22  that, with the Court's permission, both the heading and

23  the one sentence of paragraph 12.

24                  (Interpreter complies.)

25  BY MR. ZIMMERMAN:

1     Q.   Do you understand what that says, Mr. Del Cid?

2     A.   Yes.

3     Q.   It says that the United States Attorney's Office,

4  sitting on my left here, has contacted prosecutors in

5  Fairfax County, Prince William County, and the city of

6  Alexandria, and that those jurisdictions have agreed to

7  abide by the terms of this agreement.  That's what it

8  says, correct?

9     A.   Yes.

10    Q.   And, you understand that the offenses that you

11 committed, murder, stabbing, assault, are also state

12 crimes; is that correct?

13    A.   That's right.

14    Q.   The state prosecutes people for murder, correct?

15    A.   Yes.

16    Q.   And, the jurisdictions in this area could

17 prosecute you for the murders that you've committed in

18 their jurisdictions, the state could.  You understand

19 that, correct?

20    A.   Yes, I understand.

21    Q.   But you, you understand that they're not going

22 to; is that correct?

23    A.   That's right.

24    Q.   And that you understand, and as reflected in this

25 paragraph you went over, that all of that immunity was

1    arranged by the United States Attorney's Office; is that

2    correct?

3         A.   Yes.

4         Q.   So, nobody, not the United States Attorney's

5    Office and not any of the jurisdictions in the area

6    where you committed a crime, is ever going to prosecute

7    you for these offenses; is that correct?

8         A.   Yes.

9         Q.   And as you testified, both on direct and during

10   various cross-examinations, you're hoping for a

11   significant sentence reduction as well?

12        A.   Yes.

13        Q.   And, you are hoping and anticipating that once

14   you get out of jail, you will live in witness protection

15   here in the United States, arranged for by the United

16   States Attorney's Office?

17        A.   Yes, that's what I understand.

18             MR. ZIMMERMAN:  Court's indulgence a moment,

19   Your Honor.

20             THE COURT:  Sure.

21             MR. ZIMMERMAN:  I have no further questions.

22   Thank you, Your Honor.

23             THE COURT:  You may proceed.

24             MS. MARTELL:  Thank you.

25

CROSS-EXAMINATION

BY MS. MARTELL:

Q.  Good afternoon, Mr. Del Cid.

A.  Good afternoon.

Q.  You would agree with me that you know how to look out for yourself, correct?

A.  Yes.

Q.  And, you've been looking out for yourself pretty much since you were nine years old, right?

A.  That's right.

Q.  And, part of looking out for yourself is doing whatever is necessary to survive, right?

A.  That's right.  That's what anybody would do.

Q.  I'm asking you about what you would do.

A.  Yes, yes.

Q.  You would lie, if necessary?

A.  It depends.

Q.  Okay.  In the past, you've lied when you thought it was necessary, correct?

A.  Yes, ma'am.

Q.  And, when you thought it was necessary, you've committed murder?

A.  That's right.

Q.  And, you've also committed other crimes, correct?

1    A.   Yes.

2    Q.   And, part of those times when you were committing

3    murder, assault, you believed that those things were

4    being done to feed the beast, correct?

5    A.   That's right.

6    Q.   And, you also believed that if you were to do

7    those things, like committing murder, assault, that the

8    beast would protect you, correct?

9    A.   Yes.

10   Q.   Like, having you get out of prison, correct?

11   A.   Yes.

12   Q.   And, with your testimony here, you're hoping that

13   that's going to get you out of prison one day, correct?

14   A.   That's right.

15   Q.   And, we can agree that getting out of prison one

16   day is something that's going to be in your best

17   interest, right?

18   A.   Yes, that's right.

19   Q.   And testifying here against all of these

20   individuals is for you to be able to survive, correct?

21   A.   You could say that, yes.

22   Q.   During -- after you became -- after you were

23   under arrest in July of 2014, you spoke with city of

24   Alexandria detectives, correct?

25   A.   Yes.

1      Q.   And, after that, you met with both FBI agents and
2   you also met with Ms. Martinez and people from the U.S.
3   Attorney's Office, correct?
4      A.   That's right.
5      Q.   And, I think you testified that you met with them
6   somewhere around ten times, correct?
7      A.   Well, I remember about ten, but you could say --
8   I mean, I remember about seven, but you could say that
9   we had ten visits.
10     Q.   Okay.  Let's agree with you.  Seven times,
11  correct?
12     A.   Okay.
13     Q.   And, from that first time that you spoke to
14  Alexandria detectives, and then the time when you were
15  meeting with the government, you would agree with me
16  that your story got more detailed, correct?
17     A.   That's correct.
18     Q.   And, you would also agree with me, from the time
19  you met with the Alexandria detectives and you began
20  meeting with the U.S. Attorney's Office, you also
21  learned more about evidence that the government had
22  against you, correct?
23     A.   Yes.
24     Q.   I want to ask you about some of the questions
25  that you've answered during cross-examination these two

1    days.

2        A.   Okay.

3        Q.   First, earlier this morning when Mr. Salvato over

4    here was asking you questions about who ordered the

5    green light on Lil Guasón, do you recall that, those

6    questions?

7        A.   Yes, I remember.

8        Q.   And, it's your testimony that that was something

9    that was -- that green light was something that was

10   ordered by Payaso, correct?

11       A.   Yes.

12       Q.   And just --

13       A.   He was the one who authorized it.

14       Q.   Correct.

15            And, just to be clear, that Payaso, that's not my

16   client, Omar Dejesus Castillo, correct?

17       A.   No.

18       Q.   Also, yesterday, if you recall, Mr. Leiva asked

19   you about some of the people that were present at the

20   meeting to plan the hit on Peligroso.  Do you remember

21   those questions?

22            THE INTERPRETER:  "Of who was present in the

23   meeting."

24            THE WITNESS:  Are you asking me?

25   BY MS. MARTELL:

1    Q.   No.  I'm asking you if you remember the
2    testimony.
3    A.   Yes, I do remember.
4    Q.   And, you testified that you were present at those
5    meetings, correct?
6    A.   Yes.
7    Q.   You also testified that Lil Payaso was at those
8    meetings, correct?
9    A.   Well, he was not at the Peligroso, because he was
10   in jail at that time.
11   Q.   So, if I heard you yesterday testify when
12   Mr. Leiva asked you questions, that Lil Payaso was
13   present, that would be a mistake, correct?
14   A.   Well, practically he was present, because he was
15   on the phone.
16   Q.   So, it's your testimony that my client, Omar
17   Dejesus Castillo, was present on the phone during the
18   meeting to plan the hit on Peligroso?
19   A.   Yes.
20   Q.   And, you've told that to law enforcement before?
21   A.   If I remember right, yes.
22   Q.   And, other people were there too as well,
23   correct?
24   A.   Yes.
25   Q.   So, if -- and you testified that someone by the

1   name of Lil Demente was there, correct?

2       A.   Yes.

3       Q.   So, if Lil Demente was there, he would be able to

4   testify that Lil Payaso was also present at those

5   meetings, wouldn't he?

6               MS. MARTINEZ:   Objection, Your Honor, beyond

7   the scope of this witness's knowledge.

8               THE COURT:   He can't make a comment on

9   another witness's testimony.   Objection sustained.

10  BY MS. MARTELL:

11      Q.   At that time, you had never meet my client,

12  Mr. Castillo, correct?

13      A.   No.

14      Q.   In fact, you didn't meet him until October of

15  2014, correct?

16      A.   Well, after he got out of the prison, that's when

17  I met him, and he arrived to where we were.

18      Q.   So, you'd never meet my client until

19  October 2014, correct?

20      A.   Well, I cannot tell you about the date, but I can

21  tell you that I met him once he was out.

22      Q.   I want to go back to something that you spoke

23  about with police, regarding your opinions of MS-13 in

24  the United States.

25      A.   It's okay.

1    Q.   You told law enforcement that you were
2  disappointed with the way that the cliques were run here
3  in the U.S., correct?
4    A.   Yes.
5    Q.   And, back home in El Salvador the cliques are run
6  differently, correct?
7    A.   Yes, I would say yes, there are many differences.
8    Q.   And one of the differences that you didn't like
9  was that here in the U.S., the cliques would allow
10 *chavala*s to become homeboys, correct?
11   A.   That is right.
12   Q.   And that -- you told police that would never
13 happen in El Salvador, correct?
14   A.   Exactly.
15   Q.   Because what you learned is that your job is to
16 kill *chavalas*, correct?
17   A.   That's right.
18   Q.   And giving --
19        THE COURT:  Counsel, we're going to take the
20 morning recess now for 15 minutes.  Thank you.
21        (Court recessed at 11:31 a.m. and reconvened
22        at 11:53 a.m.)
23        THE COURT:  Ready to bring the jury out?
24        MS. MARTELL:  Yes, Your Honor.
25        THE COURT:  You can bring our jury out,

1    Mr. Toliver.

2              You can bring the witness back, please.

3              (Witness resumed stand.)

4              (Jury present.)

5              THE COURT:  You may be seated.

6              Ms. Martell, you may proceed.

7              MS. MARTELL:  Thank you, Your Honor.

8              No further questions, Mr. Del Cid.  Thank

9    you.

10             THE COURT:  Redirect.

11             MS. MARTINEZ:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13   BY MS. MARTINEZ:

14     Q.  Mr. Del Cid, I'd like you to take a look at, I

15   think what we called Cerna Exhibit 5, your statement of

16   facts.

17             MS. MARTINEZ:  We can put it on the screen,

18   too.  Start with the first page, right below "Statement

19   of facts."

20             Would the interpreter mind reading those

21   first few lines, right below "Statement of facts," up to

22   paragraph one?

23             (Interpreter complies.)

24   BY MS. MARTINEZ:

25     Q.  Do you understand that, Mr. Del Cid?

1     A.   Yes.

2     Q.   Do you agree with that, that you signed this

3  document saying that these are the things the government

4  would have proven if we had gone to trial against you?

5     A.   Yes.

6     Q.   Could we turn now to page five.  Take a look at

7  paragraph 20.

8              MS. MARTINEZ:  Would the interpreter mind

9  reading paragraph 20 to the witness, please.

10             (Interpreter complies.)

11 BY MS. MARTINEZ:

12    Q.   Do you agree with that, Mr. Del Cid, that this

13 document does not contain every single detail about the

14 crimes that you committed?

15    A.   Yes.

16    Q.   Now, defense counsel on cross-examination asked

17 you a number of questions about various violent crimes

18 that you committed here in the United States.  Do you

19 remember that?

20    A.   Yes.

21    Q.   Do you understand that the statement of facts is

22 part of your plea agreement?

23    A.   Yes.

24    Q.   As part of your plea agreement, did you take

25 responsibility for a number of violent crimes you

1   committed?

2           MR. SALVATO:  Objection, Your Honor,

3   leading.

4           THE COURT:  Sustained.

5           MS. MARTINEZ:  That's fine.

6   BY MS. MARTINEZ:

7     Q.  Let's go to page four.  Start with paragraph 13.

8           MS. MARTINEZ:  Would the interpreter please

9   interpret paragraph 13 for the witness.

10          (Interpreter complies.)

11  BY MS. MARTINEZ:

12    Q.  Do you agree with that, Mr. Del Cid?

13    A.  Yes.

14    Q.  Is that a violent crime you committed?

15    A.  Yes.

16    Q.  And, admitted in your statement of facts?

17    A.  That's correct.

18          MS. MARTINEZ:  Continuing to paragraph 14,

19  would the interpreter read, I think just the first

20  sentence of paragraph 14 will suffice.

21          (Interpreter complies.)

22  BY MS. MARTINEZ:

23    Q.  What does that paragraph refer to?

24    A.  That was the attempt against Peligroso's life in

25  Woodbridge.

1    Q.   How old were you during that planned attempt?

2    A.   Seventeen.

3         MS. MARTINEZ:   Turning to paragraph 15,

4    would the interpreter read the first sentence of

5    paragraph 15 in Spanish to the witness.

6         (Interpreter complies.)

7    BY MS. MARTINEZ:

8    Q.   What does that refer to, Mr. Del Cid?

9    A.   As we referred to the murder we perpetrated

10   against Lagrima.

11   Q.   How old were you during the murder of Lagrima?

12   A.   Seventeen.

13   Q.   How old were you for the murder of Lil Guasón?

14   A.   Eighteen.

15   Q.   How old were you for the murder of Julio Urrutia?

16   A.   Eighteen.

17   Q.   Have you, in fact, been prosecuted in this case?

18   A.   Yes.

19   Q.   Have you been sentenced?

20   A.   Yes.

21   Q.   What sentence did you receive?

22   A.   Two life sentences.

23   Q.   You were also asked on cross-examination a number

24   of questions about the planning of the murder of

25   Lagrima.  Do you recall that?

1    A.   I do.

2    Q.   You were asked a question about a statement you

3    made, that you didn't know the murder would happen until

4    that night.  Do you remember that?

5    A.   It was there that I realized, fully realized what

6    was going to happen.  But, as I said, I was suspecting

7    it.

8    Q.   Were you aware of the green light prior to that

9    night?

10   A.   I knew that they were considering green lighting

11   somebody, but I didn't know specifically that it was

12   Lagrima.

13   Q.   Were you involved in discussions about how the

14   murder would take place?

15   A.   Yes.

16   Q.   Now, during the murder, you stated that Greñas

17   counted; is that right?

18            MR. AQUINO:  Objection, leading.

19            THE COURT:  Overruled.

20            THE WITNESS:  Yes.

21   BY MS. MARTINEZ:

22   Q.   What did Greñas say when he completed counting?

23   A.   He said *trucha*.  And then he said to Lagrima that

24   we were going to kill him because he was a snitch.

25   Q.   What does *trucha* mean?

1    A.   That was the word spelled t-r-u-c-h-a, that was

2  the word that we were going to use to indicate that we

3  were ready to do what we were meant to do.

4    Q.   And when you say to do what you were meant to do,

5  what do you mean?

6    A.   To grab Lagrima so that the other homeboys, Lil

7  Poison could come and stab him.

8    Q.   Moving on past the murder to the reburial of

9  Lagrima.

10    A.   Okay.

11    Q.   What did Leopardo do during the reburial of

12  Lagrima?

13         MR. SALVATO:  Objection, Your Honor.  This

14  is beyond the scope of my cross-examination.  I did

15  not --

16         MS. MARTINEZ:  May we approach, Your Honor?

17         THE COURT:  Objection overruled.

18  BY MS. MARTINEZ:

19    Q.   What did Leopardo do during the murder -- I'm

20  sorry.  I'm completely mistaken.  I got myself confused

21  now.  We're talking about the reburial.

22         What did Leopardo do during the reburial of

23  Lagrima?

24    A.   He helped me and Tuner to get the body out of the

25  ditch and -- and we carried it to the other ditch.

1    Q.   How -- to the other what?

2              THE INTERPRETER:  Ditch, d-i-t-c-h.

3              THE WITNESS:  The other hole.

4    BY MS. MARTINEZ:

5    Q.   When you say "hole," what do you mean?

6    A.   Basically, the -- the -- that we had made, that

7    had been made to put his body inside.

8    Q.   How far did you and Leopardo and Tuner have to

9    carry Lagrima's body from the first hole to the second

10   hole?

11   A.   It was far away.

12             MR. AMOLSCH:  Your Honor -- I'm sorry.  The

13   witness --

14             THE COURT:  I couldn't hear you.

15             MR. AMOLSCH:  I thought the witness was -- I

16   didn't want to interrupt the answer.  I just wanted to

17   approach when the answer was completed.

18             THE COURT:  You want to come to sidebar?

19             MR. AMOLSCH:  Yes, sir.

20             THE COURT:  All right.

21             MR. AMOLSCH:  I didn't mean to cut his

22   answer off.

23   BY MS. MARTINEZ:

24   Q.   Were you done with your answer?

25   A.   What I was saying is that I could not tell you

1    how far, but it was quite far.

2                   MS. MARTINEZ:  Thank you.

3                   THE WITNESS:  Considerable distance.

4                   THE COURT:  Do you still need to come to

5    sidebar?

6                   MR. AMOLSCH:  Yes.

7                   THE COURT:  All right.

8                   (Thereupon, the following side-bar

9    conference was had:)

10                  MR. SALVATO:  Thank you, Your Honor.

11                  Your Honor, on behalf of Christian Lemus

12   Cerna, we make another motion for mistrial at this

13   point.

14                  Ms. Martinez, during her redirect

15   examination asked this witness specifically, what did

16   Leopardo do during the murder of Lagrima.

17                  She then apologized and said that she had

18   misstated.  But in combination with our other factors,

19   Your Honor, we believe that that -- there's simply no

20   way the jury can't put two and two together, to figure

21   out that the government believes that he was involved in

22   the murder of Lagrima.

23                  I would also point out, you know, to the

24   Court, that mentioning this witness's age during the

25   murder of Lagrima is a veiled attempt, in my humble

opinion, to show, because Mr. Cerna is under the age of
18, that must be the reason why he's not charged
formally in the murder of Lagrima.  There's no other
reason to ask this witness, how old you were during the
murder of Lagrima.

So, we would ask the Court for a mistrial.
There's just -- we've gone this far.  There's no reason
to keep pressing this issue as to who was involved in
the Lagrima murder.

Ms. Martinez's question certainly explicitly
and implicitly told the jury that Mr. Cerna was involved
in the murder of Lagrima.  We would make another motion
for mistrial on that basis.

MS. MARTINEZ:  Your Honor, I certainly did
misspeak, I have to admit -- I have to see the
transcript to be sure -- but what I think I was about to
say was the murder of Lil Guasón.  I don't think I got
to the end of that sentence, and I stopped myself when I
said "murder."  But again, I'd have to see the
transcript.

THE COURT:  The transcript says that you
mentioned "the murder of Lagrima -- I'm sorry, I'm
completely mistaken.  I want to talk about the burial of
Lagrima."

MS. MARTINEZ:  Thank you, because I

J. Del Cid - Redirect                                      62

1    appreciate that.

2              THE COURT:  That's what the transcript says.

3              MS. MARTINEZ:  But I did completely

4    misspeak.  And the question which was objected to by the

5    defense counsel is the question we all agreed to at

6    sidebar, was asked solely for the purpose of cleaning up

7    the record.

8              I apologize for misspeaking after that.  It

9    was just misspeak.  We've all misspoken from time to

10   time.

11             With respect to the age of this witness, to

12   be perfectly clear, the reason I had asked the age was

13   because on cross-examination, defense counsel, many

14   defense counsel have repeatedly implied or outright

15   stated that he's not being held responsible for these

16   crimes.

17             He's -- he has put in a statement of facts

18   all four of the events that were charged in this case,

19   that he was a part of, and he did, in fact, plead guilty

20   to the two that he committed as an adult.

21             There's no veiled tempt to try to link it to

22   Mr. Cerna's age.  And I don't think, although, again,

23   I'd have to review the whole transcript, I don't think

24   at any point during this case anyone has asked, or at

25   least the government has asked, about Mr. Cerna's age at

the time of the murder of Lil Guasón, or implied

anything about his age at the time of the murder of

Lagrima.

We all know what the age was, but I don't

think it's on the record.  I don't think it's before the

jury.  There's no veiled attempt to make that

comparison.  It's in response to the accusation by

defense counsel that the government has not held the

witness responsible for the crimes that he has

committed.

And I apologize for misspeaking.  I

absolutely was misspeaking.  But I don't think that it

was -- I don't think that warrants a mistrial.

MR. SALVATO:  I think it does, Your Honor.

We're at the third point where this has happened.

Homeboy two has been linked as my client.

The government said:  We apologize, we're

going to try to clear it up.

And they said:  Well, what did Leopardo do?

So hopefully to confuse the jury that it's two different

people versus the same person.

And now, again, we're at the point where it

should just be left alone, but government counsel said:

What did Leopardo do during the murder of Lagrima?

That, standing in combination with the other

1   circumstances, Your Honor, I think a mistrial is

2   compelled at this point.

3           THE COURT:  All right.  I reviewed the

4   transcript, and I heard the statement the prosecutor did

5   say:  What did you do during -- the part with "during

6   the murder of Lagrima," she said, "I'm sorry, I'm

7   completely mistaken.  I want to talk about the reburial

8   of Lagrima."

9           She said it in all the same paragraph, all

10  the same sentence in the record.  I don't think it's a

11  big deal.  Lawyers have frequently misstated questions

12  and rephrased question.  I don't think anyone has drawn

13  any particular attention to it.

14          I don't think, with the millions of words

15  transcribed in this trial, that that one sentence is

16  going to stand out before the jury, given all the

17  powerful testimony that we've heard of facts from a

18  variety of witnesses.

19          So the motion for a mistrial is denied.

20  Thank you.

21          MR. SALVATO:  Thank you, Your Honor.

22          (Thereupon, the side-bar conference was

23  concluded.)

24  BY MS. MARTINEZ:

25    Q.  Mr. Del Cid, let's now talk about the murder of

1   Lil Wasón.

2       A.   Okay.

3       Q.   You were asked a number of questions about the

4   planning of murder of Lil Wasón.  Do you remember that?

5       A.   Yes, I do.

6       Q.   Were you involved in only one, or more than one,

7   discussion with other gang members about the plan to

8   kill Lil Wasón?

9       A.   Only that one night, when we were there listening

10  to the plan.

11      Q.   Was that the night of the murder or a night

12  before the murder?

13      A.   The night of.

14      Q.   One of the people that you mentioned related to

15  the murder of Lil Wasón was Solitario; is that right?

16      A.   Yes.

17      Q.   And, during cross-examination by Solitario's

18  attorney, you also referred to him by another name, I

19  believe it was Misionero; is that right?

20      A.   That's correct.

21      Q.   For the court reporter, can we spell Misionero?

22      A.   M-i-s-i-o-n-e-r-o.

23      Q.   Was does Misionero mean?

24      A.   A person that carries out missions.

25      Q.   What does "missions" mean in the context of

1    MS-13?

2        A.   Work, work that the homeboys ask you to do.

3        Q.   What kind of work?

4        A.   It depends, it could be that they send you to

5    commit a murder, or to carry weapons from one place to

6    another, or to look out so that -- to make sure that the

7    police doesn't come.  Things like that.

8        Q.   You were asked a number of questions about who

9    did what during the murder of Lil Wasón.  Do you recall

10   that?

11       A.   Yes.

12       Q.   You were also asked exactly when it was that he

13   died.  Do you remember that?

14       A.   Yes.

15       Q.   Do you know who was the person who struck the

16   blow that actually killed him?  Do you know that?

17       A.   Well, it would be beginning with Tuner.  And then

18   he would have died from the other stabbings that we gave

19   him.

20       Q.   Do you know at what moment he died?

21       A.   When his head was cut off.

22       Q.   Who cut off his head?

23       A.   Leopardo and Solitario.

24       Q.   Did you cut off his head?

25       A.   No.

1    Q.  Are you guilty of his murder?

2           THE INTERPRETER:  Say again?

3    BY MS. MARTINEZ:

4    Q.  Are you guilty of his murder?

5           MR. JENKINS:  Objection, Your Honor.  That

6    calls for a legal conclusion.

7           THE COURT:  I don't think so.  It's a

8    factual question.  Objection overruled.

9    BY MS. MARTINEZ:

10   Q.  Are you guilty of the murder of Lil Wasón?

11   A.  Yes, I do feel that I am.

12   Q.  You were also asked -- and I'm sorry to bring

13   this up again, but you were asked about the time that

14   you tried to shoot your mother.

15   A.  I remember.

16   Q.  How old were you?

17   A.  If I am not mistaken, I was between nine and ten.

18   Q.  And why did you do that?

19   A.  Because that was what the *locos* asked me to do,

20   and at that time, I felt that I wanted to do it as well,

21   because at that time I felt like hatred towards my

22   mother.

23   Q.  Why?

24   A.  Because of the way she treated me, and the way

25   that she loved my other siblings better than loved me.

1    Q.   Where did you get the gun?

2    A.   Another homeboy gave it to me.

3              MS. MARTINEZ:  No further questions, Your

4    Honor.

5              THE COURT:  You can step down, sir.  Thank

6    you.

7              MS. MARTINEZ:  Your Honor, is the witness

8    excused?

9              THE COURT:  Yes.

10             (Thereupon, the witness withdrew from the

11   stand.)

12             MR. TOBLER:  Your Honor, the government

13   calls Dr. Constance DiAngelo.

14             THE INTERPRETER:  This witness does not

15   require --

16             THE COURT:  No.

17             MR. TOBLER:  No need for an interpreter

18   ma'am.  Thank you.

19             (Witness sworn.)

20             THE WITNESS:  I do.

21             THEREUPON, CONSTANCE R. DIANGELO, having

22   been duly sworn, testified as follows:

23                       DIRECT EXAMINATION

24   BY MR. TOBLER:

25    Q.   Good afternoon, ma'am.

1    A.   Good afternoon.

2    Q.   Would you please state your name and spell it for

3    the record?

4    A.   Constance R. DiAngelo, D-i- capital -A-n-g-e-l-o.

5    Q.   Where do you work, ma'am?

6    A.   Right now, I work at the District of Columbia

7    office of the chief medical examiner.

8    Q.   Where did you work prior to that?

9    A.   Prior to that, I worked at the Virginia

10   Department of Health, Office of the Chief Medical

11   Examiner, northern regional office.

12   Q.   Please describe your education and professional

13   training.

14   A.   I have a bachelor of science from George

15   Washington University.  I hold a master's of science

16   from Virginia Tech.  My medical degree is from the

17   Medical College of Wisconsin.

18        Following that, I did a five-year anatomic and

19   clinical pathology residency, and became board-certified

20   in anatomic and clinical pathology.

21        I stayed on for a one-year hospital autopsy

22   fellowship.  And following that, I did my one-year

23   forensic pathology fellowship at the medical examiner's

24   office in the city of Philadelphia, and became

25   board-certified in forensic pathology.

1    Q.   What is your specialty, Doctor?

2    A.   Forensic pathology.

3    Q.   What do you mean by "forensic pathology"?

4    A.   Forensic pathology is a subspecialty of

5    anatomical pathology, and it deals with determining

6    cause and manner of death, also injury identification

7    and characterization.

8    Q.   How long have you been with the DC Medical

9    Examiner's Office?

10   A.   About two months.

11   Q.   And how long were you in your prior job in the

12   Northern Virginia Medical Examiner's Office?

13   A.   About ten and a half years.

14   Q.   What is your current position?

15   A.   My current position is deputy medical examiner.

16   Q.   What are your primary duties in that position as

17   deputy medical examiner?

18   A.   The primary duties are to determine cause and

19   manner of death for decedents who die suddenly,

20   unexpectedly or unattended in the District of Columbia.

21   Q.   Were those also your duties when you were in your

22   prior position in Northern Virginia?

23   A.   Yes, they were.

24   Q.   Do your duties include conducting autopsies?

25   A.   Yes.

C. DiAngelo - Direct

1    Q.   How many autopsies have you performed over your
2    career?
3    A.   Over 4,500.
4    Q.   Of those, in approximately how many did you
5    determine that the manner of death was homicide?
6    A.   Um, probably over 500.
7    Q.   Have you ever testified in court before as a
8    forensic pathologist?
9    A.   I have.
10   Q.   Approximately how many times, ma'am?
11   A.   About 85.
12        MR. TOBLER:  Your Honor, at this time, the
13   government would move that Dr. DiAngelo be recognized
14   and be allowed to testify as an expert in the field of
15   forensic pathology.
16        THE COURT:  She will be qualified to testify
17   to a reasonable degree of certainty in her field as a
18   forensic pathologist.  Thank you.
19        You may proceed.
20   BY MR. TOBLER:
21   Q.   In your capacity as an assistant chief medical
22   examiner, Northern Virginia, were you asked in May 2014
23   to conduct autopsies on the remains of two bodies found
24   in Holmes Run Park?
25   A.   Which date again?

1    Q.   In May 2014?

2    A.   Yes.

3              MR. TOBLER:  With Your Honor's permission,

4    the government would now like to read into the record a

5    stipulation agreed to by the parties, which has been

6    marked for identification as Government's Exhibit 172.

7              THE COURT:  All right.

8              A stipulation, ladies and gentlemen, is

9    evidence that you are to consider as evidence in the

10   case.

11             Go ahead.

12             MR. TOBLER:  "The United States of America

13   and the defendants, through their counsel, hereby

14   stipulate and agree as follows:

15             "The body recovered from site one in Holmes

16   Run Park, on or about May 19, 2014, and the subject of

17   the report of autopsy number 325-14, Government

18   Exhibit 51, was that of Nelson Omar Quintanilla

19   Trujillo.

20             "The body recovered from site four in Holmes

21   Run Park, on or about May 20, 2014, and the subject of

22   the report of autopsy 326-14, Government Exhibit 53, was

23   that of Gerson Adoni Martinez Aguilar."

24             Your Honor, at this time we move

25   Government's Exhibit 172 into evidence.

 1                  THE COURT:  Received.

 2   BY MR. TOBLER:

 3      Q.  With the assistance of Mr. Toliver, I would now

 4   like to show you what has been marked for identification

 5   as Government's Exhibit 51.

 6                  MR. TOBERL:  This should be in the binder

 7   there, sir.

 8   BY MR. TOBLER:

 9      Q.  Ma'am, could you please examine that document?

10   And feel free to take it out of the sleeve.

11          Do you recognize this document?

12      A.  Yes.

13      Q.  What is it?

14      A.  It's a report of autopsy for our case number

15   325-14, including the autopsy diagrams.

16      Q.  Who is the deceased subject of the report?

17      A.  Nelson Omar Quintanilla Trujillo.

18      Q.  Is that your signature on the bottom of page one?

19      A.  It is.

20      Q.  When did you perform this autopsy?

21      A.  This autopsy was performed on May 20th, 2014.

22      Q.  What did you determine was the manner of death?

23      A.  The manner of death was homicide.

24      Q.  And the cause of death?

25      A.  Choppings of head and sharp wounds of neck, chest

1    and extremities.

2             MR. TOBLER:  Your Honor, at this time the

3    government would move to admit Government's Exhibit 51.

4             THE COURT:  Received without objection.

5    BY MR. TOBLER:

6    Q.  What was the condition of Mr. Trujillo's body

7    when you first observed it?

8    A.  Um, the -- well, the body was received in a body

9    bag.  And on opening the bag, portions of the head and

10   anterior portion of the body were covered in black

11   plastic.  The upper body and lower body also had some

12   clothing on it.

13        The body and clothing were covered in dirt and

14   mud.  And with cleaning up the remains, then, the body

15   was in an advanced stage of decomposition, with areas of

16   skeletonization --

17   Q.  What do you mean by "skeletonization," Doctor?

18   A.  Meaning that there's loss of the soft tissue, so

19   that the bones are exposed.

20        And then other areas where the tissue is

21   discolored, very soft, sort of falling apart.  And then,

22   when the actual autopsy was performed, that there was

23   loss of organs and tissues internally.

24   Q.  What is the significance of that in terms of

25   determining the level of decomposition?

1    A.   It's just something we note and, you know, could
2  help in determining how long the remains were in the
3  area.
4    Q.   Was there evidence of injury to the body of
5  Mr. Trujillo?
6    A.   There was.
7    Q.   Let's begin with the head.  Were there injuries
8  to Mr. Trujillo's head?
9    A.   There were.
10    Q.   Could you please describe these injuries?
11    A.   Um, there were at least five chop wounds to the
12  head, one to the right side of the head, one sort of to
13  the right and top of the head, one to the, um, sort of
14  left, um, eye area, going down to the right side of the
15  mouth.  There was one involving the left side of the
16  chin.  And then there was another, sort of in the right
17  side of the forehead.
18    Q.   Do you have an opinion as to what caused these
19  wounds?
20    A.   Um, again, it's a heavy sharp object, um, could
21  be a machete, could possibly be something like an ax.
22  But it has sort of a longer blade and, again, it's a
23  heavy instrument.
24    Q.   In addition to the injuries to the head, were
25  there injuries as well to the neck?

1        A.   There were, on the left side of the neck, and

2   there were three stab wounds to the left side of the

3   neck.

4             MR. TOBLER:   Your Honor, may we publish from

5   Government's Exhibit 51, which has been admitted into

6   evidence?

7             THE COURT:   What is it you want to publish?

8             MR. TOBLER:   I wanted to publish diagrams

9   that are included in the autopsy report.

10            THE COURT:   Yes.

11            MR. TOBLER:   Could you publish page four,

12  please.

13  BY MR. TOBLER:

14       Q.   Ma'am, could you please explain to the jury the

15  purpose of the diagrams on this page.

16       A.   Um, the purpose of the diagrams are basically,

17  they're my notes that I take during the autopsy.  Um, so

18  they, um, are the basis of the written report.  And,

19  basically, I'm transcribing my notes from the diagram

20  into written paragraph form in the autopsy report.

21       Q.   Would you please explain for the jury the

22  notations that you've made on the skull graphic, on the

23  top left?

24       A.   Um, in that diagram I'm just making measurements

25  of the length of the wound, um, that's at the top of the

1   skull.  I'm just, again, making notes of sort of how the

2   wound looked, the shape of it, the length.  Um, there

3   was a depressed portion of that wound.

4          Then if we go towards the, um, middle of the

5   diagram toward, um, the forehead and above the nose,

6   there's another injury there.  Again, I'm sort of noting

7   the shape, um, and area that was depressed on the wound.

8   And then the lighter line for me represented a fracture

9   that was extending from the wound.  Um, that's letter B.

10         Letter D, I'm again showing -- it seems to be

11  going from the top of the left, um, eye socket, sort of

12  down through the nose, and then to the right side of the

13  jaw.

14         Again, I'm just noting some teeth are absent,

15  some are sheared, and then some of the dimensions of the

16  wound.

17    Q.   Doctor, if I could direct your attention now to

18  the diagram on the top right-hand side of the page.

19  Could you please explain the notation you've made on the

20  jaw on that graphic?

21    A.   Um, for the left side of the jaw, again, when I

22  was looking at the body, portion of skin and underlying

23  soft tissue was absent, and I could see the actual

24  underlying jawbone exposed.  And so, I noted that on the

25  diagram.

1       Q.   Could we please turn to page five.

2            Could you please explain the notations made on

3       the top left portion of this diagram?

4       A.   Um, so, again this is showing the skin portion of

5       the head.  This is the right side of the head.  And so

6       I'm showing the cut to the skin on the right side of the

7       head, and, again, locating it so many inches down from

8       the top of the head and to the right of midline, um, and

9       again, just noting the measurements and characteristics

10      of the wound.

11      Q.   And lastly, ma'am, could you explain the

12      notations that you made on the graphic on the bottom

13      right-hand side of the page, on the neck region of that

14      diagram?

15      A.   So, again on the left side of the neck, I

16      identified, um, three, um, sharp defects that were, um,

17      stab wounds.  And so, they are measured and sort of

18      located on the left side of the neck.

19            MR. TOBLER:  With the assistance of the

20      courtroom security officer, I would now like to show the

21      witness what has been marked for identification as

22      Government's Exhibit -- Government's Exhibits 88-B --

23      88-A, 88-B, 88-C, 88-D, 88-E, and 88-F.  So that's 88-A

24      through 88-F, inclusive.

25

BY MR. TOBLER:

Q.   Do you recognize these documents, Doctor?

A.   I do.

Q.   What are they?

A.   Um, they're photographs of the different portions of the body of the decedent.

Q.   Do Exhibits 88-A through 88-F fairly and accurately depict the remains of Nelson Omar Quintanilla Trujillo at the time that you performed the autopsy?

A.   They do.

        MR. TOBLER:  Your Honor, at this time we move into evidence Government's Exhibit 88-A through 88-F, inclusive.

        THE COURT:  Received.

        MR. TOBLER:  May we publish for the jury, Your Honor?

        THE COURT:  Yes.

        MR. TOBLER:  Let's publish Government's Exhibit 88-A, please.

BY MR. TOBLER:

Q.   Doctor, can you please explain for the jury what Government's Exhibit 88-A depicts?

A.   Um, 88-A is depicting the anterior portion of the face and neck and upper chest of the decedent.

Q.   What evidence of injury is depicted in

1  Government's Exhibit 88-A?

2     A.  Um, 88-A is showing many of the chop wounds to

3  the right side of the head, as well as the front of the

4  face.  Um, the stab wounds to the left side of the neck

5  can be seen.  And then there were also injuries on the

6  top of the right chest that can be seen.

7     Q.  If you could, ma'am, I believe if you touch the

8  screen it should make a mark.  Can you just please point

9  to the wound that you described on the top of the head?

10     A.  Um.

11         (Witness complies.)

12     Q.  And, could you please point to the wound that you

13  described on the jaw.

14     A.  Um, so this is the left side of the jaw here.

15         (Witness complies).

16             MR. TOBLER:  Could we please publish

17  Government's Exhibit 88-D.

18  BY MR. TOBLER:

19     Q.  Ma'am, could you please explain what's depicted

20  in this exhibit.

21     A.  Um, this is the head of the decedent.  It's

22  showing more the top of the head and it's, um, showing

23  one of the chop injuries to the head.

24             MR. TOBLER:  Could we please now publish

25  Government's Exhibit 88-E.

BY MR. TOBLER:

Q.   What's depicted here, Doctor?

A.   Um, 88-E is showing, um, the outer surface of the skull.  This is after we've reflected the scalp and, um, soft tissue of the skull so that we can see the injury to the bone, as well as the radiating fracture, and then the depressed area associated with the sharp injury to the bone.

Q.   And what evidence of injury, just to be clear, Doctor, is visible to you in that picture?

A.   So, this is one of the chop wounds to the skull.

Q.   And, can you just circle on the screen the chop wound?

A.   (Witness complies).

MR. TOBLER:  Can we please now publish Government's Exhibit 88-F.

BY MR. TOBLER:

Q.   Can you please explain what's depicted in this exhibit?

A.   Um, this is showing the mandible or lower jaw of the decedent.  Um, this is showing predominantly the right side of the jaw, um, so it is showing that there was injury to, um, one of the -- to the teeth on the right side of the jaw.  And it also shows that there's absence of, um, the articulation with the skull on the

1  left side.

2      Q.   What do you mean by "articulation with the

3  skull"?

4      A.   Um, a portion of the -- of the mandible is not on

5  this specimen when we took it out, because of the injury

6  to the left side of the jaw.

7      Q.   In addition to these -- in addition to these

8  injuries on the head and neck, were there also injuries

9  to the decedent's torso?

10     A.   Yes.

11     Q.   Can you please describe these injuries for the

12 jury?

13     A.   So, there were stab wounds to the, um, chest, um,

14 there were some to the right upper chest, One to the

15 midportion of the chest, and then about three to the

16 left side of the chest.

17         There was also a depressed area on the left side

18 of the chest, which internal examination showed that,

19 um, portions of two of the ribs on the left side were

20 missing.

21             MR. TOBLER:  Could we please publish page

22 six of Government's Exhibit 51.

23 BY MR. TOBLER:

24     Q.   Can you please explain for the jury the notations

25 that you've made on the chest area of the body diagram

1    on the left-hand side of the page.

2        A.   All right.  So, again we're looking at the -- the

3    anterior portion of the body diagram.  So, by the right

4    clavicle or shoulder bone -- collarbone, excuse me,

5    there are two vertical lines, which represent two stab

6    wounds.

7             In the midportion of the diagram, I have

8    notations for two other stab wounds.

9             And then on the left side of the chest, I've

10   indicated where there were stab wounds, as well as this

11   depressed area on the left side of the chest.

12       Q.   Just to be clear for the record, when you say

13   "the left side of the chest," you are referring to

14   Mr. Trujillo's left side; is that correct?

15       A.   That is correct.

16       Q.   And it appears on the right side on the diagram

17   to someone who is looking at it?

18       A.   Yes.

19       Q.   In addition to the injuries we have discussed so

20   far, were there injuries to the decedent's legs?

21       A.   Yes.

22       Q.   Can you please describe these injuries for the

23   jury?

24       A.   Um, there were -- I'm sorry.  There were some

25   abrasions and lacerations, as well as cut wounds, to the

1   lower extremities.

2           MR. TOBLER:  Would you please publish page

3   seven of Government's Exhibit 51, please.

4   BY MR. TOBLER:

5     Q.  Would you please explain for the jury the

6   notation that you've made on the skeletal body diagram

7   on the left-hand side of the page?

8     A.  Um, yeah.  So, um, on this diagram, um, if we

9   focus around the knee areas, both of the kneecaps on the

10  decedent could be seen.  There was no tissue covering

11  them.  And then also on the left leg, the upper portion

12  of the leg bones, the -- were also exposed.

13          MR. TOBLER:  Let's publish Government's

14  Exhibit 88-B, please.

15  BY MR. TOBLER:

16    Q.  Please explain what's depicted in this exhibit,

17  Doctor.

18    A.  Um, so, this is showing the, um, left leg and

19  portion of the knee and, um, it's -- sort of towards the

20  top of the screen we're seeing the, um, cut end of the

21  shin bone or tibia.  I think it's harder to see the cut

22  on the, um, on the fibula, which is the smaller bone of

23  the lower -- of the leg.

24    Q.  Could you please circle the cut bone that you

25  described, the one that's visible to you.

1    A.    (Witness complies).

2    Q.    And for the record, it appears to me that you've

3    circled something that appears in the top middle of the

4    page; is that correct?

5    A.    That's correct.

6    Q.    In addition to the injuries that you've just

7    described, were there injuries as well to the decedent's

8    arms and hands?

9    A.    There were.

10   Q.    Could you please describe these injuries for the

11   jury?

12   A.    Um, so, on the, um, shoulder areas, there was

13   exposure of the portions of body.  I could not identify

14   actual injury to the bone.  Um, and then on the, um,

15   right hand, near the wrist, there was either a cut or a

16   laceration.  So there was disruption of the skin and

17   underlying soft tissues.  And then on the left hand

18   there were, um, area that appeared cut on the thumb and

19   some of the fingers.

20          MR. TOBLER:  Let's publish Government's

21   Exhibit 88-C, please.

22   BY MR. TOBLER:

23   Q.    Please explain what is depicted in this exhibit.

24   A.    Um, this is the, um -- should be the left hand of

25   the decedent.  Um, and so, again we're seeing injury to

1    the thumb and, um, some of the fingers.

2        Q.   Were any tattoos found on the decedent?

3        A.   Yes.

4        Q.   Could you please describe the tattoos?

5        A.   There was a tattoo on the chest, um, right upper

6    chest that said "Jose."

7             And then there was a tattoo on the anterior left

8    forearm, um, I'm not quite sure what it said.  There

9    were -- appeared to be three letters.

10            And then on the right anterior thigh, there was

11   another tattoo, where I can make out at least a cross

12   and some wings.

13       Q.   After you completed this autopsy, what was next

14   on the remains?

15       A.   Um, so, for this case then, um, some of the

16   portions of the remains were then processed for forensic

17   anthropology, meaning that the soft tissue was removed

18   from the bones so that -- and the bones were cleaned so

19   that we could get a look at the injuries on the bones.

20       Q.   Was a report ultimately completed by a forensic

21   anthropologist in this case?

22       A.   It was.

23       Q.   With the assistance of the courtroom security

24   officer -- it may actually be in front of you.  I'd like

25   you to look at Government's Exhibit 52.

1          Do you recognize this, Doctor?

2     A.   I do.

3     Q.   What is it?

4     A.   Um, it's the report that was prepared by

5   Dr. Hunt, the forensic anthropologist.  So it includes

6   his examination, as well as photographs.

7     Q.   How do you recognize Government's Exhibit 52?

8     A.   Well, I -- my initials are at the bottom of the

9   document, on the first page.

10     Q.   Please turn, if you would, to Government's --

11   what has been marked for identification as Government's

12   Exhibit 53.

13          Do you recognize this document, ma'am?

14     A.   I do.

15     Q.   What is it?

16     A.   Um, it's the autopsy report that was prepared for

17   our case number 326-14.

18     Q.   Who is the deceased subject of that autopsy

19   report?

20     A.   Gerson Adoni Martinez Aguilar.

21     Q.   Is that your signature at the bottom of page one?

22     A.   It is.

23     Q.   When did you perform this autopsy?

24     A.   This was performed on May 21st, 2014.

25     Q.   What did you determine as the manner of death?

1     A.   Homicide.

2     Q.   And what was the cause of death?

3     A.   Sharp wounds of neck, back and lower extremities.

4          MR. TOBLER:  At this time the government

5     would move to admit Government's Exhibit 53, Your Honor.

6          THE COURT:  Received.

7     BY MR. TOBLER:

8     Q.   What was the condition of this body when you

9     first observed it, Doctor?

10    A.   Um, again, this body was received initially in a

11    sealed body bag.  And upon opening the bag, um, the head

12    of the decedent was actually within a green canvas or

13    cloth bag.  And then, the remainder of the body, again,

14    the upper portion was clothed and there were a pair of

15    underwear on the lower portion.

16         This body was also in a moderate to advanced

17    state of decomposition, with, again, areas of skin

18    discoloration, skin slippage, some tissue decomposition,

19    and organ decomposition and loss.

20    Q.   Let me direct your attention, ma'am, to

21    Government's Exhibits 90-A, 90-B, 90-C, 90-D, 90-E, and

22    90-F.  That's Government's Exhibit 90-A through 90-F.

23         Do you recognize those exhibits, Doctor?

24    A.   I do.

25    Q.   What are they?

1    A.   They're photographs taken of the decedent, um,

2    and includes some of the clothing.

3    Q.   Do Exhibits 90-A through 90-F fairly and

4    accurately depict the remains and personal effects of

5    Gerson Adoni Martinez Aguilar at the time you performed

6    the autopsy?

7    A.   They do.

8         MR. TOBLER:   We would move for admission of

9    Government's Exhibit 90-A through 90-F inclusive, Your

10   Honor.

11        THE COURT:   Received.

12        MR. TOBLER:   May we publish for the jury,

13   Your Honor?

14        THE COURT:   Yes.

15        MR. TOBLER:   Could we please publish

16   Government's Exhibit 90-A?

17   BY MR. TOBLER:

18   Q.   Doctor, what's depicted in this photograph?

19   A.   This photograph is depicting the head of the

20   decedent within the green canvas or cloth bag.

21        MR. TOBLER:   Can we please publish

22   Government's Exhibit 90-B?

23   BY MR. TOBLER:

24   Q.   What's depicted here, Doctor?

25   A.   Um, here we're looking at basically the top

1    portion of the remainder of the body, um, including the

2    corresponding area of the neck, um, and then the

3    shoulders and chest.

4        Q.   Would you simply point to the area that is the

5    neck area on the body.

6        A.   So, it's this area (witness complies).

7        Q.   For the record, you've circled the area more or

8    less in the middle of the screen; is that correct,

9    Doctor?

10       A.   That's correct.

11       Q.   What -- the last photograph, 90-B, was that the

12   condition that the body arrived in, or had you removed

13   the head?

14       A.   No.  The head was separate from the body.

15       Q.   Was there evidence of injury to the decedent's

16   body, apart from the severing of the decedent's head?

17       A.   Yes.

18       Q.   What injuries did you observe to the decedent's

19   neck area?

20       A.   There were sharp wounds or -- of the neck.

21       Q.   When you say "sharp wounds," what do you mean by

22   "sharp wounds"?

23       A.   They appeared likely to be from knife wounds,

24   stab wounds.

25       Q.   What injuries did you observe to the decedent's

1    back?

2       A.   Again, there were sharp wounds of the back.  They

3    seemed most consistent with knife wounds.

4            MR. TOBLER:  Can we please publish page

5    three of Government's Exhibit 53, entered into evidence?

6            Your Honor, this is a diagram from within

7    the autopsy report.

8            THE COURT:  Yes.

9    BY MR. TOBLER:

10      Q.   Would you please explain to the jury the purpose

11   of the diagrams on this page.

12      A.   Um, so, again, um, this -- the -- this diagram is

13   produced, um, at the time the autopsy.  So, again, I'm

14   just making notes as to, um, where these sharp wounds

15   are on the back of the neck and on the upper back of the

16   body; and just some measurements related to the length

17   of some of the wounds, as well as their placement, um,

18   from the top of -- the stump of the neck, and then also

19   to the right and left of the midline of the back.

20      Q.   And to be clear, when you say notations of stab

21   wounds to the back, are you referring to the notations

22   on the diagram on the right side of the page?

23      A.   Yes, I am.

24      Q.   And how many stab wounds, approximately, did you

25   count?

1      A.  I counted approximately 18 stab wounds to the

2  back.

3              MR. TOBLER:  Could we please publish page

4  five of Government's Exhibit 53?

5  BY MR. TOBLER:

6      Q.  Could you please explain the notations that

7  you've made on the body diagram on the top right-hand

8  side of this page?

9      A.  Um, so, again, we're looking at the diagram of

10  the back.  Um, I've made notes regarding, um, I guess,

11  looks like four additional stab wounds a little bit

12  lower down on the back, as well as, um, some abrasions

13  and contusions that were on the left side of the back.

14              MR. TOBLER:  Can we publish Government's

15  Exhibit 90-C, please?

16  BY MR. TOBLER:

17      Q.  What's depicted here, ma'am?

18      A.  This is the upper body clothing that was on the

19  body, um, so, to the -- I guess left would be, um, the

20  sleeveless undershirt.  Then in the middle is the

21  T-shirt, and then to the right is a longer-sleeved

22  shirt.

23      Q.  There appear to be holes in those T-shirts.  Is

24  that your finding, that those are holes that are

25  depicted in those T-shirts, on the far left and in the

1   middle?

2      A.  Um, yes.

3      Q.  Do you have an opinion as to what caused those

4   holes to be formed?

5      A.  Um, many of them are consistent with basically

6   stab wounds through the shirts.

7           MR. TOBLER:  Could we please publish

8   Government's Exhibit 90-D.

9   BY MR. TOBLER:

10     Q.  What's depicted here?

11     A.  Um, so, this is the T-shirt, um, and again it's

12  depicting sharp defects of the T-shirt.

13          MR. TOBLER:  And, let's publish Government's

14  Exhibit 90-F, please.

15  BY MR. TOBLER:

16     Q.  What's depicted in this exhibit, Doctor?

17     A.  Um, this is showing the back of the decedent, um,

18  the upper portion.  And so it's depicting the area of

19  decapitation, as well as stab wounds to the neck and

20  back.

21     Q.  How many stab wounds did you count to the neck

22  area?

23     A.  To the neck, there were approximately eight stab

24  wounds.

25     Q.  In addition to the injuries we have already

1    discussed, were there injuries to the decedent's legs?

2        A.   Yes, there were injuries to the lower

3    extremities.

4        Q.   Can you please describe those injuries for the

5    jury?

6        A.   Um, so, on the right thigh and knee, on the front

7    portion, there were approximately six incised wounds,

8    meaning they're sharp wounds; they're longer than they

9    are deep.

10            And then looking at the backs of the lower

11   extremities, in the area behind the knee, the popliteal

12   areas, there were sharp injuries involving the joint, as

13   well as areas on the thigh and the legs.

14                MR. TOBLER:  Could we please publish

15   Government's Exhibit 90-E?

16   BY MR. TOBLER:

17       Q.   What's depicted in this exhibit, Doctor?

18       A.   Um, so this is depicting the back or posterior

19   portion of the lower extremities.  Um, so, that would be

20   the thigh, the popliteal area or the areas behind the

21   knees, the legs and the feet.

22       Q.   What evidence of injury do you see in this

23   photograph?

24       A.   Um, this is depicting the sharp injuries

25   involving the back of the knee joints, as well as

1   injuries to the back of the thighs and the legs.

2       Q.   After you completed this autopsy, what was done

3   next with the remains?

4       A.   Um, again, as with the other case, certain

5   portions of the remains were then, um, defleshed and

6   processed for forensic anthropology analysis.

7       Q.   Was that analysis of forensic anthropology

8   completed?

9       A.   It was.

10      Q.   Could you please look at Government's Exhibit 54

11  in the exhibit binder, ma'am.

12           Do you recognize this?

13      A.   I do.

14      Q.   What is it, Doctor?

15      A.   This is a report that was prepared by the

16  forensic anthropologist, Dr. Hunt, and it includes his

17  written report and photographs.

18      Q.   Have you signed that document, Doctor?

19      A.   I initialed it, yes.

20      Q.   In your capacity as assistant chief medical

21  examiner, were you asked in June of 2014 to conduct an

22  autopsy on the remains of the victim of a shooting that

23  month in Alexandria?

24      A.   Yes.

25      Q.   Please look at Government's Exhibit 55, ma'am.

1              THE COURT:  Counsel, we can start here after

2      the luncheon recess.

3              Ladies and gentlemen, please do not discuss

4      the case with anyone.  Do not discuss -- let the case be

5      discussed in your presence.  Leave your notes in the

6      jury deliberation room.  We'll resume at 2:00 o'clock.

7      Thank you.

8              (Court recessed at 1:00 p.m. and reconvened

9              at 2:10 p.m.)

10             THE COURT:  Can you bring the witness back?

11             (Witness resumed stand.)

12             THE COURT:  Are you ready to bring the jury

13     out?

14             You can bring our jury out, Mr. Toliver.

15     Thank you.

16             (Jury present.)

17             THE COURT:  You may be seated.

18             All right, Counsel, you may proceed.

19             DIRECT EXAMINATION (Continued)

20     BY MR. TOBLER:

21       Q.  Doctor, before we broke for lunch, I asked you to

22     review a document that has been marked for

23     identification as Government's Exhibit 55.  Have you had

24     an opportunity to review that document?

25       A.  Yes.

1    Q.  Do you recognize it?

2    A.  I do.

3    Q.  What is it?

4    A.  It's the autopsy for case number 385-14.

5            MR. TOBLER:  With Your Honor's permission,

6    the government would now like to read into the record a

7    stipulation agreed to by the parties, marked for

8    identification as Government's Exhibit 173.

9            THE COURT:  All right.

10           Ladies and gentlemen, the stipulation is an

11   agreement about the evidence you're to consider.

12           Go ahead.

13           MR. TOBLER:  "The United States of America

14   and the defendants, through their counsel, hereby

15   stipulate and agree as follows:

16           The victim of the shooting that occurred on

17   or about June 19, 2014, in the vicinity of 3810 Russell

18   Road, Alexandria, Virginia, and the subject of the

19   report of autopsy number 385-14, Government Exhibit 55,

20   was Julio Urrutia."

21           Your Honor, at this time we would move to

22   admit Government's Exhibit 73.

23           THE COURT:  Received.

24   BY MR. TOBLER:

25   Q.  Turning back to the document in front of you,

1    Doctor, is that your signature on the bottom of page

2    one?

3        A.   It is.

4        Q.   When did you perform this autopsy?

5        A.   June 23rd, 2014.

6        Q.   What did you determine as the manner of death?

7        A.   Homicide.

8        Q.   And the cause of death?

9        A.   Gunshot wound of head.

10              MR. TOBLER:  The government moves to admit

11   Government's Exhibit 55.

12              THE COURT:  Received.

13   BY MR. TOBLER:

14       Q.   What was the condition of the body when you first

15   observed it?

16       A.   Again, the decedent was brought in in a body bag.

17   He was received from one of the area hospitals and was

18   brought to our office.  He was unclad and had no

19   personal effects, but did have evidence of medical

20   intervention.

21       Q.   What level of decomposition did you observe on

22   the body?

23       A.   He had none.

24       Q.   I would like you to now look at what has been

25   marked for identification as Government's Exhibits 92-A

1    and 92-B.

2            Do you recognize these exhibits?

3        A.   I do.

4        Q.   And what are they?

5        A.   Um, the photographs of the decedent, one with

6    sort of the medical intervention in place, and the 92-B

7    with some of the bandages removed.

8        Q.   Do Exhibits 92-A and 92-B fairly and accurately

9    depict the remains of Julio Urrutia at the time you

10   performed the autopsy?

11       A.   They do.

12           MR. TOBLER:  Your Honor, the government

13   would move in Exhibits 92-A and 92-B.

14           THE COURT:  Received.

15           MR. TOBLER:  May we publish to the jury,

16   Your Honor?

17           THE COURT:  Yes.

18           MR. TOBLER:  Would you please publish

19   Government's Exhibit 92-A.

20   BY MR. TOBLER:

21       Q.   Doctor, what is depicted in this photograph?

22       A.   This is the decedent basically prior to the

23   autopsy, with the medical intervention in place,

24   basically showing more of the left side of his body, um,

25   head and chest.

C. DiAngelo - Direct                                    100

1    Q.   When you say evidence of medical intervention,
2    can you be more specific as to what you're referring to
3    in that photograph?
4    A.   In this case, he has an endotracheal tube or
5    breathing tube that is held in place with sort of a
6    larger guard, with tape and band.  He has a nasogastric
7    tube.  And then on the left side of his face and neck he
8    has a large pressure dressing.
9    Q.   When you performed the autopsy on this
10   individual, was there evidence of injury to the
11   decedent?
12   A.   Yes.
13   Q.   What injury?
14   A.   There was a gunshot wound to the left side of the
15   jaw.  And then, internal examination revealed injury to
16   the jaw, the left side of the neck, including major
17   blood vessels, and then to the muscles at the back of
18   the neck.
19   Q.   To be clear, were you able to determine where the
20   bullet entered?
21   A.   I was.
22   Q.   Where did the bullet enter?
23   A.   The bullet entered on the left lateral jaw.
24   Q.   Was there an exit wound?
25   A.   There was.  That was on the right back of the

1    neck.

2         Q.   What was the bullet's path?

3         A.   Again, it's going through the skin and tissues of

4    the left side of the jaw, through the bone itself, left

5    side of the neck, and then through the soft tissues, out

6    the back of the neck.

7         Q.   What damage did the bullet cause?

8         A.   Um, the bullet went through what's called the

9    common carotid artery, which is a large blood vessel

10   which takes oxygenated blood to the neck, face and

11   brain; and also to the jugular vein on the left side,

12   and that is draining blood from the brain and head back

13   to the heart.

14             MR. TOBLER:  Would you please publish

15   Government's Exhibit 92-B.

16   BY MR. TOBLER:

17        Q.   What's depicted in this photograph, Doctor?

18        A.   Um, so this photograph, sort of towards the top

19   of the photograph is showing the entrance gunshot wound.

20   And then more towards the ruler is the surgical incision

21   and staples where medical intervention was done

22   internally.

23        Q.   Was that medical intervention performed by you?

24        A.   It was not.

25             MR. TOBLER:  No further questions,

1    Your Honor.

2              MR. JENKINS:  No questions.

3              MR. AMOLSCH:  I have some questions, Your

4    Honor.  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6    BY MR. AMOLSCH:

7        Q.  Good afternoon.

8        A.  Good afternoon.

9        Q.  I'm going to ask you a few questions about your

10   general medical background, so I can understand your

11   level of expertise.

12             So, you -- you are at the Virginia Department --

13   Department of Health, or you are no longer there?

14       A.  I am no longer there.

15       Q.  So you were there before?

16       A.  Yes.

17       Q.  And how long were you there for?

18       A.  I was there for about ten and a half years.

19       Q.  Ten and a half years.

20             And where do you work now?

21       A.  At the District of Columbia Office of the Chief

22   Medical Examiner.

23       Q.  The same kind of organization, just in a

24   different spot?

25       A.  Basically, yes.

1    Q.   So, in order to -- and I apologize if these

2    questions seem basic, but -- I've never meet you before,

3    correct?

4    A.   Correct.

5    Q.   We have never had a conversation before --

6    A.   No.

7    Q.   -- correct?  Okay.

8         Is -- what is your specialty?  What's it called?

9    A.   Forensic pathology.

10    Q.   Okay.  Forensic pathology.

11        So that's something you complete after general

12    medical school?

13    A.   Um, no.  After medical school, I did my anatomic

14    and clinical pathology residency, and then following

15    that I did not fellowship in forensic pathology.

16    Q.   Okay.  So, you have a basic -- and again, this is

17    going to sound silly, but a basic understanding of like

18    human anatomy, as part of -- in addition to your

19    forensic understanding of causes of death?

20    A.   Yeah.

21    Q.   Okay.  Talk to you a little bit, how does it work

22    when you are assigned a case?

23        Like, does it -- are you presented with a body to

24    examine, or do you meet with anybody beforehand?

25        How does that work?

1      A.   Basically, a death would be reported to the
2  Medical Examiner's Office.  And then the first
3  determination is whether the death actually falls under
4  the jurisdiction of the medical examiner.
5           And then if it does, in Virginia, then it's
6  determined whether, um, the body will come into a
7  district office or whether it would be left out in the
8  community for a local medical examiner to complete an
9  examination.
10     Q.   So, there's an initial determination about the
11 nature of the cause of death before you ever see it?
12     A.   Well, basically, there's a, um, a call about the
13 circumstances surrounding the death, and whether the
14 circumstances leading up to the person's death would
15 cause it to fall under medical examiner jurisdiction.
16     Q.   And before you begin your analysis, your
17 examination, do you meet with the detectives to talk
18 about their theory of the manner of death?
19     A.   No.
20     Q.   There is, in Exhibit 54, which I believe the
21 government admitted into evidence.
22          MR. AMOLSCH:  Oh, I'm sorry.  If you could
23 pull it up.  I'm sorry.  Exhibit 54.
24          Before I publish -- I'm not sure I'm going
25 to admit the exhibit, Judge.  I'm going to ask her some

1    questions about it before I do.

2              THE COURT:  You just want her to look at it.

3    You don't want to publish it; is that right?

4              MR. AMOLSCH:  Correct, not at this point.

5              THE COURT:  All right.

6              MR. AMOLSCH:  Not until I understand what it

7    is, Judge.

8              THE COURT:  All right.

9              Do you have it in front of you now?

10             Does she have --

11             THE WITNESS:  I do.

12             THE COURT:  All right.

13   BY MR. AMOLSCH:

14      Q.  So, this is -- so, just so I understand what this

15   is, this is a letter that's addressed to you, dated

16   January 15th, right?  On this --

17      A.  It's a report, yes.

18      Q.  You did not write this letter?

19      A.  I did not write this report.

20      Q.  You received this letter?

21      A.  It's a report.

22      Q.  It's a report.

23          And where does the report comes from?

24      A.  It comes from -- well, Dr. David Hunt generated

25   the report.

1     Q.   And who is Dr. Hunt?

2     A.   He is the forensic anthropologist that we used in

3     the office in Virginia.

4     Q.   Okay.  So --

5               MR. AMOLSCH:  Your Honor, I'd like to ask

6     her some questions about this, so I guess I'd like to

7     admit it as Cerna 6.

8               THE COURT:  Okay.

9               MR. AMOLSCH:  If the government doesn't have

10    any objections.

11              (Pause.)

12              Is that all right, Judge?  I don't believe

13    the government has an objection.

14              MS. MARTINEZ:  No objection to its

15    admission.

16              THE COURT:  All right.

17              MS. MARTINEZ:  We can admit it as the

18    government's exhibit that it's stamped as.  I think that

19    might be simpler.  We intend to offer it with the next

20    witness.

21              THE COURT:  Okay.  So, who's going to offer

22    it?

23              MR. AMOLSCH:  The government can offer it,

24    Judge, early, and I don't have any objection to their

25    offering.

1              THE COURT:  That's fine.

2              MS. MARTINEZ:  Your Honor, we offer the

3    admission of Government's Exhibit 54.

4              THE COURT:  Received.

5    BY MR. AMOLSCH:

6       Q.  Okay.  So, there is a third paragraph --

7              MR. AMOLSCH:  If you could pull that up.  If

8    you could put that on the screen.

9    BY MR. AMOLSCH:

10      Q.  It says -- in the third paragraph, do you see

11   where it says, "The attending agents relayed information

12   concerning possible pre-mortem activities of the

13   decedent."

14          So it sounds to me -- to me, what that means is,

15   but tell me if I'm wrong, that agents, investigative

16   agents are communicating information regarding what they

17   believe to be the cause of death, at least in this

18   instance; is that correct?

19      A.  Um, that's not how I read it.

20      Q.  Okay.  How do you read it, then?

21      A.  That they're talking about some of the --

22   whatever pre-mortem activities that the decedent may

23   have had.

24      Q.  And what do they mean by "pre-mortem"?

25          I believe that means before death, correct?

1    A.   Yes.  And around the time of death, or, I guess,

2  perimortem.

3    Q.   And when they say "attending agents," who does

4  that mean?

5    A.   I guess Dr. Hunt is talking about the officers

6  that he named in the report.

7    Q.   And that would be detective -- or Agent Uribe?

8         Do you see that second line, Uribe, officers in

9  attendance?

10   A.   Yes.

11   Q.   Okay.  And it says, Kevin M. McKeener.  Do you

12 see that name?

13   A.   Yes.

14   Q.   Do you know that name?

15   A.   Um, I -- I'm not sure.

16   Q.   It's okay if you don't know.

17   A.   I don't.

18   Q.   Okay.

19         MR. AMOLSCH:  Thank you, Judge.

20 BY MR. AMOLSCH:

21   Q.   The autopsy -- sorry.  Before we get to that.

22        You testified -- the last questions the

23 government asked you was about the gunshot wound to

24 Mr. Urrutia.  Do you remember that question?

25   A.   Yes.

C. DiAngelo - Cross                                              109

1    Q.   And -- I thought I heard you say something about
2    his jugular vein.
3    A.   Yes.
4    Q.   Okay.  Could you repeat what you said about that?
5         Actually, let me strike that.
6         Did you have any comment on the damage, if any,
7    was done to his carotid artery?
8    A.   I did.
9    Q.   Can you tell me what that was again?
10   A.   I said that there was injury to the common
11   carotid artery.
12   Q.   Do you remember how much damage?
13   A.   Not specifically, but there were sutures in place
14   and there was basically a stroke of the left side of the
15   brain.
16   Q.   "Sutures in place," meaning that before it came
17   to you, that had been surgically taken care of?
18   A.   Yes.
19   Q.   Okay.  Were you able to tell how long afterwards
20   that had happened?
21        From the injury to the sutures, were you able to
22   determine how long the gap was?
23   A.   Um, no, I would have had to review medical
24   records.  I don't recall.
25   Q.   Do you take notes for all of your autopsies?

C. DiAngelo - Cross                                            110

1    A.   On the diagrams, yes.

2    Q.   Okay.  Do you keep those notes?

3    A.   It's the diagrams.

4    Q.   Other than what you -- so, there are no other

5    notes that you have for any of these --

6    A.   I don't keep any additional notes.

7    Q.   Are you required to, or is that a personal

8    preference for the doctors?

9    A.   That would be a personal preference.  I do not.

10            MR. AMOLSCH:  Can I have the Court's

11   indulgence one second?

12            THE COURT:  Yes.

13            MR. AMOLSCH:  Thank you, Judge.  I'm sorry.

14            Judge, I believe that's all I have, I'm

15   sorry.  Based on her answers to the questions, I think I

16   have my questions answered.  If I could have two seconds

17   to make sure.

18            THE COURT:  All right.  You don't have to be

19   sorry.

20            MR. AMOLSCH:  I'm just cognizant of the

21   Court's time, Judge.

22            A few more questions.

23   BY MR. AMOLSCH:

24   Q.   The carotid artery carries blood from the heart

25   to the brain; is that correct?

C. DiAngelo - Cross                                          111

1      A.   To the neck, face, and brain, yes.

2      Q.   Okay.  And it is one of the -- if not the largest

3   artery in the body, or close to it?

4      A.   No.  It's a branch off of the aorta, which is the

5   largest artery.

6      Q.   Okay.  So it comes from here (indicating) and

7   goes up the side of the neck to the brain, correct?

8      A.   The left one does, yes.

9      Q.   Okay.  Is there one on the right-hand side as

10  well?

11     A.   There is.

12     Q.   And does that also feed the brain?

13     A.   Yes.

14     Q.   Okay.  And the blood is then -- once the blood

15  leaves the brain, it's then taken away from the

16  body (sic) with the jugular vane?

17     A.   Yes.

18     Q.   The difference being, arteries carrying blood,

19  and jugular removes the blood, once it's been

20  deoxygenized?

21     A.   Right.  Arteries carry oxygenated blood and veins

22  carry deoxygenated blood.

23     Q.   The stab wounds to -- on Exhibit 53, which I

24  believe has been admitted -- do you have that exhibit in

25  front of you?

1    A.   I do.

2    Q.   Okay.  If you could look at page five of that

3    exhibit.

4         Do you have that in front of you?

5    A.   I believe so.

6    Q.   It's the diagram where you said you made notes?

7    A.   Yes.

8    Q.   And those notes are your notes?

9    A.   They are.

10   Q.   And at the very top, it says, "right carotid cut

11   and left carotid cut," correct?

12   A.   Yes.

13   Q.   Okay.  And there is two cuts on each side,

14   meaning that there were two cuts -- two carotid -- the

15   artery was cut in two separate places on the right-hand

16   side, correct?

17   A.   From reading my description, it sounds like it's,

18   the artery is only cut once on each side.

19   Q.   And the depth of the cut, I believe you said, was

20   three-quarters of an inch?

21   A.   I did not give a depth.  I say that it's -- it

22   should be "transected," or cut.

23   Q.   I'm going to --

24   A.   Transection.

25   Q.   -- point you to something in your report.  Okay.

1    It says -- so the report says, "There are cuts to the

2    right and left common carotid artery."  Is that what

3    that says?

4        A.  Yes.

5             MR. AMOLSCH:  I believe that is all my

6    questions, Judge.  Thank you.

7             MR. TOBLER:  No redirect, Your Honor.

8             THE COURT:  May the witness be excused?

9             You're free to leave.  Thank you very much.

10   Thank you for coming.

11            (Thereupon, the witness withdrew from the

12   stand.)

13            MS. MARTINEZ:  United States calls Dr. David

14   Hunt.

15            (Witness sworn.)

16            THE WITNESS:  I do.

17            THEREUPON, DAVID R. HUNT, having been duly

18   sworn, testified as follows:

19                     DIRECT EXAMINATION

20   BY MS. MARTINEZ:

21       Q.  Good afternoon.

22       A.  Hello.

23       Q.  Would you please state your full name and spell

24   it for the record.

25       A.  David Roehm Hunt; D-a-v-i-d, R-o-e-h-m, H-u-n-t.

1    Q.   What is your professional?

2    A.   I'm a physical anthropologist.

3    Q.   What does that mean?

4    A.   That means that I study human remains, and human

5    variation and skeletal biology is my areas of particular

6    specialty.

7    Q.   What -- tell the jury a little bit more about

8    what that entails.

9    A.   Um, well, in our physical anthropology section we

10   are interested in humans, but often we're interested in

11   humans in a sense of we find them as skeletons in

12   archaeological settings.

13        And so we are learning from our archaeological

14   excavations about human beings from the biological

15   aspects, to integrate with archaeologists.  But then we

16   also work with cultural anthropologists in biological

17   health and changes in humans during their lifetime, et

18   cetera.

19        But, the specialty that I'm here at this location

20   is that, applied physical anthropology, in the sense of

21   using skeletons to be able to determine the -- how

22   people lived and how they died, and in this particular

23   instance, in a medical legal setting, which then becomes

24   forensic anthropology.

25   Q.   Where do you work, sir?

1     A.   I work at the Smithsonian Institution, at the

2  Museum of Natural History, downtown.

3     Q.   How long have you worked there?

4     A.   I've been there for 26 years.

5     Q.   What is your position?

6     A.   I am the collections manager for physical --

7  physical anthropology for all the human remains and all

8  of the other things that are associated with human

9  remains in our collections.

10     Q.   What are your duties in that position?

11     A.   I take care of those collections, administer new

12  collections coming into the museum, and I also provide

13  assistance and advice to researchers, of which I have

14  probably 50 to a hundred a year that come in to use the

15  collections for various different types of research, and

16  everything from anthropology to medical research to

17  forensic anthropology.

18     Q.   With the help of the court security officer, I'd

19  like to show you what has been marked as Government's

20  Exhibit 135.

21     What is that document, sir?

22     A.   That's my curriculum vitae.

23     Q.   Please describe for the jury your educational

24  background.

25     A.   I have a Ph.D. in physical anthropology, which

1    specializes in human variation, skeletal biology and

2    forensic anthropology from the University of Tennessee,

3    that I received in 1989.

4          And, I've been -- I have a master's in physical

5    anthropology, also from the University of Tennessee, and

6    a bachelor's in physical anthropology and also a

7    bachelor's in classics -- classical archeology from the

8    University of Illinois.

9    Q.   Are you board-certified?

10   A.   Yes.  Board-certified since 2001, so 15 years.

11   Q.   What are you board-certified in?

12   A.   Forensic anthropology.

13   Q.   Have you taught at any universities or academic

14   institutions in your area of specialty?

15   A.   I teach a fall course in advanced skeletal

16   biology at George Washington University, and I -- I

17   teach with the -- other specialist with the Armed Forces

18   Institute of Pathology for medical examiners, coroners,

19   and death investigators.  That's yearly.  And then I

20   usually give training to police forces and other law

21   enforcement agents as -- as they come up.

22   Q.   Have you published any papers?

23   A.   I have numerous publications in the journal,

24   American Journal of Physical Anthropology, General

25   Forensic Sciences, International Journal of Dental

1    Anthropology.  I have been coauthor on three books,

2    mostly on skeletal biology and pathology, and five

3    chapters in various different --

4                THE COURT:  Is there an objection to the

5    witness being qualified as a forensic pathologist?

6                MR. JENKINS:  No objection.

7                THE COURT:  All right.  Thank you.

8                So, Doctor, you will be permitted to testify

9    to a reasonable degree of certainty in your field of

10   forensic pathology.

11               THE WITNESS:  Thank you.

12   BY MS. MARTINEZ:

13   Q.   Within your field, have you provided any

14   professional consulting services?

15   A.   Yes.  Since my inception at the Smithsonian

16   Institution, I worked with the district medical

17   examiner's office from approximately 1993, but then

18   actually had an actual understanding with them since

19   1997, until they hired a full-time forensic

20   anthropologist a year and a half ago.

21        And I'm still a consultant for the Virginia OCME,

22   that's the northern district that's out in Manassas.

23   And I'm also the consultant for the National Center for

24   Missing and Exploited Children, in forensic

25   anthropology.

1     Q.   As a consultant for the medical examiner's

2  offices in either DC or Virginia, what type of analysis

3  do you provide?

4     A.   Um, as a forensic anthropologist, what is

5  requested from me as, as I'm brought in, when a body has

6  reached a point that's past the point of doing a normal

7  autopsy for the pathologist, I am often called in to

8  identify the remains or help identify the remains by

9  providing a demographic profile of the skeleton; so,

10  things for the sex of the individual, the ancestry of

11  the individual, the age of individual, evidence for

12  trauma, personal -- personal traits that could be

13  identified from radiographs, or other features that

14  might be identifiable.

15     Q.   When you're asked by the medical examiner's

16  office to consult determining the nature and cause of

17  traumatic injury, briefly and in layman's terms, could

18  you describe to the jury what you do.

19             THE COURT:  Better yet, could he tell us

20  what he did in this case?

21             MS. MARTINEZ:  Sure, Your Honor.  We can

22  jump right to that if you'd like.

23             THE WITNESS:  Okay.  So --

24  BY MS. MARTINEZ:

25     Q.   I'll direct your attention immediately to this

1    case.

2         A.   Okay.

3         Q.   In May of 2014, were you asked to examine two

4    sets of remains to determine the nature and cause of

5    traumatic injury?

6         A.   Yes, I --

7         Q.   How --

8         A.   Okay.

9         Q.   How did you come to be involved in this case?

10        A.   I was contacted by one of the death

11   investigators, informing me that the first body had been

12   found from excavating out a clandestine grave, and would

13   I attend the autopsy so that Dr. DiAngelo and I could

14   confer about what was observed in the soft tissue

15   from -- from that autopsy, even though the body was

16   decomposed.

17        Q.   You referenced the first body.  Was there a

18   second body as well?

19        A.   The very next day, another body was exhumed, so I

20   was asked to come for that autopsy as well, the next

21   day.

22        Q.   What initial steps did you take with respect to

23   the review you were asked to conduct?

24        A.   I was there at the autopsy, and Dr. DiAngelo was

25   doing -- doing the autopsy, and we were reviewing the

1    traumatic injuries that were observable in the soft

2    tissue.  And then we identified those areas that were of

3    most diagnostic and most interest.

4         And then the death investigator staff then took

5    those parts from the body and macerated them down to the

6    skeleton.  I came back a couple weeks later and then did

7    the skeletal analysis to those remains.

8         Since they were soft tissue remains that were

9    present there, that the identification of the sex of the

10   individual was not in question, but I still would look

11   at the skeletal remains to be able to identify sex, just

12   to follow consistency in our normal reports that we do.

13        So we always want to report the sex of the

14   individual, the approximate age of the individual,

15   the -- the ancestry of the individual, if there are

16   evidence of trauma, and then those personal traits that

17   you might identify, such as dental traits or other

18   skeletal traits that could be used for personal

19   identification.

20   Q.   Doctor, you used the word "macerate."  What does

21   that mean?

22   A.   Macerate means boiling the tissue off of the

23   bone.

24   Q.   And what is the purpose of that, for your -- for

25   your job?

D. Hunt - Direct                                              121

1      A.    So that we can see the skeletal remains.  Because
2  the soft tissue gives some evidence, but Dr. DiAngelo,
3  one of the things she was particularly interested in or
4  concerned about in the first individual were that there
5  were some cut -- cuts -- defects that were in the soft
6  tissue around the neck, that she wasn't sure exactly
7  where they were positioned or how far they had been or
8  whether they really were cuts or part of decomposition.
9  And she -- so we were to look at those particular areas
10  to see whether there was any skeletal evidence for
11  damage.
12      Q.    When you completed your examinations of the two
13  sets of remains, did you prepare reports?
14      A.    Yes.  I have reports for both individuals.
15      Q.    All right.  Turning your attention now to what
16  has been marked as Government's Exhibit 52.
17          Do you recognize Government's Exhibit 52?
18      A.    Yes.  This is my report for the Virginia
19  Department of Health number N 325-14.
20      Q.    Who is the subject of this report?
21      A.    It was the first individual that had been exhumed
22  by the FBI team.
23      Q.    Do you know the name of the individual?
24      A.    The individual was identified, and at the end of
25  the report I have here -- I'll make sure that I read it

 1   right -- was tentatively identified as Nelson Omar

 2   Quintanilla Trujillo.

 3              MS. MARTINEZ:  Your Honor, the government

 4   would move into evidence Government's Exhibit 52.

 5              THE COURT:  Received.

 6   BY MS. MARTINEZ:

 7     Q.   Now, a moment ago you described the initial

 8   determinations that you attempt to make when you conduct

 9   this review.  What are the initial determinations that

10   you go through?

11     A.   You want to identify the sex of the individual,

12   which the pelvis is the most diagnostic for that; but

13   also, the features of the skull, the cranium, are also

14   somewhat diagnostic for sex of the individual.

15          Age of the individual are primarily related to

16   either growth and development of the skeleton or the

17   arthritic changes that take place after -- after you've

18   reached maturity.  And so, that was what we -- I did on

19   the age of the individual.

20          And the age of this individual was consistent

21   with the identified or tentatively identified individual

22   of being in their late twenties, from growth and --

23   final growth and development of the clavicles and of the

24   cranium.

25     Q.   What did you determine the sex of this individual

1   to be?

2       A.   The sex of the individual was male.

3       Q.   Were you able to make any determinations

4   concerning the individual's height?

5       A.   Yes.  We have standard measurements that we can

6   take on the skeleton, that then we have regression

7   values that we can do for numerous other -- numerous

8   types of ancestry, which this individual fell within 5-7

9   to 6 feet, 5 foot, 9 inches, approximately, plus or

10  minus 2 inches.

11      Q.   You've mentioned already that you observed

12  injuries during the autopsy.  Once you did your review

13  of the skeletal remains, on what areas of the body did

14  you observe injuries?

15      A.   Well, we were primarily focused on the injuries

16  that had taken place to the cranium, mandible, throat,

17  and around the knees.

18      Q.   All right.  Let's start first with the head.

19           MS. MARTINEZ:  And, Your Honor, may we

20  publish -- appended to this report are photographs,

21  pictures.  May we publish those pictures as we discuss

22  the doctor's findings?

23           THE COURT:  Yes.

24  BY MS. MARTINEZ:

25      Q.   Beginning first with figure seven.

1        First of all, what -- what does this figure
2   depict?
3        A.   That is the right three-quarter view of the
4   skull.
5        Q.   What injuries or defects did you observe on the
6   skull?
7        A.   You can see in this -- in this image here, the
8   left orbit has a defect on the upper portion of the
9   orbit, that then actually passes down through the nose,
10  and over to the upper portion of the maxilla.
11       Q.   And if I could interrupt you there for just a
12  moment.  The image on the screen, if you want to, if you
13  touch it, you'll be able to make a mark on it.  So as
14  you're describing, if you want, for the jury, to show
15  them where you're talking about, that would be very
16  helpful.
17       A.   (Complies) Going down through like that.  That's
18  one injury.
19       Q.   What additional injuries did you observe?
20       A.   Then there's the second one that's fairly
21  obvious, that comes down through here.  And the third
22  one that's over here, and a fourth one that's over here.
23       We cannot see the -- the damage to the mandible
24  in this picture, but you can see how the mandible is a
25  little bit foreshortened there.  And in another image

1    you'll see that.

2       Q.   Let's turn to page -- or figures 9 and 10.

3    Please describe the injuries that are visible in these

4    figures of the skull.

5       A.   Okay.  This is the anterior aspect of the -- of

6    the cranium, and then the top -- the superior view of

7    the cranium.  So, you can see that those injuries,

8    again, across here, across here.

9            You can't really see the other ones on the top,

10   but you can see a very severe one that goes across here,

11   with cracking from once the injury -- once the defect

12   was formed from -- from the sharp implement, it has

13   actually split the bone.

14           And then this one is the other one that you see

15   over here.  And that, again, was one in which the

16   implement, once it entered, when it was pulled back out,

17   a portion of the bone actually sectioned off, so you see

18   that kind of edge that's popped off.

19      Q.   Please turn to figures 11 and 12.

20           What do these figures depict?

21      A.   Well, I've still got the -- the other -- oh,

22   wait.

23      Q.   Just a moment.

24      A.   Okay.

25      Q.   There you go.

1          What do figures 11 and 12 depict?

2     A.   Okay.  Figure 11 is the inside of the cranium, so

3 that you can see that it actually passed all the way

4 through the cranium into -- into where the brain is.

5 And so you can see that it's a -- that one, that

6 largest, longest one that you saw on the top of the

7 cranium, has actually gone through, is approximately

8 50 millimeters long, and has broken off portions of the

9 skull -- of the bone on the inside, that have been

10 embedded -- would have been embedded into the brain.

11         And then the lower figure, image number 12, is

12 showing the amount of severity that this -- the damage

13 that this also caused.  Because if you look right --

14 well, it's kind of hard to see, but right in here and

15 right in here, those are the two areas where your ear

16 bones go into the base of the cranium.

17         And this individual had sustained a hard enough

18 blow to the top of the head, those two blows to the

19 head, that it actually caused the cranium to -- to be

20 crushed on the spine, and so it broke and separated

21 those areas right there at the ear.

22     Q.   What kind of force would have been necessary to

23 cause this extent of injuries to the skull?

24     A.   Well, I don't know what the actual -- because

25 it's very hard, if not almost impossible, to identify a

1    particular type or a particular instrument.  But, this

2    would be a heavy instrument that -- or -- that would be

3    long, like -- and the best I can use is like a machete

4    or a bush hog -- a bush ax, or maybe like a saber or a

5    sword, something that has had lot of weight to it, has a

6    long thin blade, and could -- you know, and instill a

7    very strong, you know, blow as you, you know, as you

8    welded that instrument.

9       Q.   Were you able to draw any conclusions about the

10   number of blows that were delivered to this individual's

11   head, based on your -- based on your examination?

12      A.   Well, the other -- there are two -- two injuries

13   also to the mandible, of which one -- I don't know -- do

14   we have a photograph of that?

15      Q.   Sure.  Let's go to figure 13.

16      A.   Okay.  This is -- this is the left side here, and

17   you can see the mandible down there, the teeth and the

18   mandible.  And you can see this large cut that goes

19   across here like this.  And this has actually, has

20   severed the lower portion of the mandible as this large

21   implement has been used to cut.  And so, something like

22   a sword or a -- or a machete or something like that.

23           And then a second one has been -- on the bottom

24   part here, has been -- is cut off, another section

25   that's right there as well.

1      So, if you combine all of those, you had the one,

2  two, three, four, and then fifth, with a sixth one on

3  that bottom portion of the mandible.

4      Q.  Were you able to draw any conclusions about the

5  relative position of the victim and the assailant or

6  assailants during these blows?

7      A.  Well, if you think about yourself, if you're

8  holding a machete -- let's use that as the example.  If

9  you're going to pass that machete going from the forward

10  part of the chin back, and those injuries that are on

11  the forehead that make sort of a fan shape, most likely

12  the person, the individual here, the victim, was down on

13  the ground, or laying back, and the machete or the

14  person was standing more or less behind the person, over

15  their left shoulder, to have put those -- the injury to

16  the mandible, and then those that fan out, the

17  successive blows to the head, the face, and then on the

18  forehead as it went around.  Because it makes an arc as

19  it goes across the head.

20      Q.  You used the term "successive blows."  Were you

21  able to make any determinations about the sequence of

22  these injuries that you've described to the mandible and

23  to the head?

24      A.  Most individuals are more likely to act, on a

25  situation such as this, more -- some people do it more

1    tentatively, initially, but others will first do the

2    strongest action first.  And this mandible, cutting

3    through that mandible would have taken a large and a

4    heavy thrust to be able to make that fracture and cut

5    that portion of the mandible off.

6          So, I'm -- I'm going to go with, it first started

7    here and then moved its way across as it went in the

8    blows that you see there.

9      Q.  Please turn to figure 14.

10         What does figure 14 show?

11     A.  This is the front of your chest, the manubrium.

12   And the sternum and the manubrium, you can feel the top

13   part right here.  And so you can see that in this little

14   portion right there.

15         And then these are the wings that are on the side

16   there, that the clavicle is attached to.  And then your

17   sternum comes down here, and the ribs, through

18   cartilage, attach to that sternum on either side of the

19   sternum.

20         And in this particular -- this photograph here is

21   to show this cut that goes through here, and then

22   there's a defect that's right here.  I guess I didn't

23   hit it very well, did I?  But down in the lower portion

24   of the sternum.

25         And the manubrium, that cut is also most likely

1    something that may have happened, may have happened at

2    the same time as those other blows to the face.  And it

3    would have hit there and caused that split that you see

4    there.

5          However, the one that's down on the lower portion

6    of the sternum is a puncture wound.  So it would have

7    been most likely something like a sharp implement, like

8    a knife, that would have a sharp point on the end of it,

9    because this is a puncture-type wound that goes -- hits

10   inside.

11         And then the next --

12   Q.   If you could turn to figure 15.

13         What is figure 15?

14   A.   Figure 15 is the interior ventral -- dorsal side,

15   the inside of it.  And then you can see down here on the

16   lower portion where you saw that, now there's an open,

17   more large defect that's there.  As the knife has gone

18   through, it has taken the plate of the bone and pushed

19   it out, and so you have this large section there.

20         But, both of those are still indicative of some

21   sort of a pointed instrument, probably not like a --

22   like a pickaxe -- or, I mean, an ice pick or anything

23   like that.  It had some shape to it, as we would term

24   often as a signature wound that would identify a type of

25   instrument that was used.

1    Q.   And generally speaking, what type of instrument

2    would have caused a defect like that?

3    A.   This would be a sharp -- you can see how it's --

4    how it's vertical, and one side is larger on the top

5    side, and then it narrows down.  So think of any -- most

6    knives that you're familiar with that are single bladed

7    knives, that have a blunt side and then the blade side

8    on the other.

9    Q.   Please turn to figures 16 and 17.

10   A.   These just show, again, the anterior, the

11   sternum, the anterior side and then the dorsal side, so

12   that you can see them a little more closely, of the

13   entrance wound of this pointed instrument, knife, and

14   then the exit wound.

15   Q.   Which is the entrance and which is the exit?

16   A.   The top one would be the entrance, and it's --

17   you know, it's essentially pushed in as the knife would

18   have gone, so the bone itself is actually pushed in

19   itself.  And then the exit is going to be pushed out.

20   And that's what you see on that lower -- that lower

21   image.

22   Q.   How thick is this bone?

23   A.   Um, the bone itself, totally, is maybe about

24   seven, eight millimeters thick.  But it has that spongy

25   bone, that trabecular bone that's on the inside, and it

1   has two cortical layers.  So the external bone that

2   you're seeing there is actually quite thin, so it will

3   break like an egg shell, sort of, in a way, and then

4   there is that soft bone in between.

5       Q.   Please turn to figure 18.

6            What does figure 18 depict?

7       A.   Figure 18 is the -- the neck vertebra, the

8   cervical vertebra, and it has the second cervical

9   through the seventh cervical vertebra present.

10      Q.   Where on the body is that?

11           Can you show on yourself?

12      A.   (Indicating) Here -- here to here.  You're

13  looking at it from the anterior aspect.

14      Q.   So, in other words, from the very base of your

15  skull -- I'm just describing what you showed with your

16  hands -- from the base of your skull down to basically

17  your sternum?  I mean, except in the back?

18      A.   Well, when you feel on your own back, you know,

19  right before you get to where your ribs are between your

20  shoulder blades, would be that seventh cervical

21  vertebra, down there.

22           And the second cervical vertebra -- the first

23  cervical vertebra, your skull actually rides on.  And so

24  the second then is what that rotates on.  And so you're

25  seeing the second through the seventh there.

1          And again, this is coming -- this picture would

2     be as if you're looking at it directly from -- from the

3     front.

4          Q.   If you could turn to figures 19 and 20.

5               What do these figures show?

6          A.   These are separate vertebrae that are -- that

7     were in that cervical vertebra part of the spine.  And

8     as Dr. DiAngelo was interested and wanting to know, were

9     there any defects on the -- from those injuries that she

10    saw in the soft tissue.  And yes, you can see a cut

11    here, or a defect, which would probably be a, you know,

12    again, point of a knife going in.

13         Q.   And you've drawn a line in figure 19 towards the

14    top; is that right?

15         A.   At the top, uh-huh.  And then right here, there

16    is another one right there.  There's another one right

17    here.  And there's a cut that goes right there.

18         Q.   Those are all on figure 19; is that right?

19         A.   Those are all on figure 19, uh-huh.

20              And then there is injuries to the support facet

21    right -- and you see this one right there, which if, as

22    this injury is --

23         Q.   And that line is on figure 20; is that correct?

24         A.   That's on figure 20, yes.

25              As the knife would have been inserted through the

1    neck, this would have had to gone all through the

2    vertebra and hit the spinous process that's on the back

3    side -- the facet on the back side of the neck.  So it

4    has to also be a long blade that would do this.

5        Q.   Please turn to figure 21.

6             What is figure 21?

7        A.   Figure 21 is the seventh cervical, that lowest of

8    the cervical vertebrae.  And you can see the defect

9    right there.  And again, this would be the end of a

10   knife or, you know, a single bladed implement or

11   instrument.

12            And you can see that pattern again, where it's

13   thicker and flatter on one side, and very narrow and

14   sharp on the other side.  So you can get an idea of the

15   position of the knife itself as it went into the bone.

16       Q.   Now, you've indicated that the knife would have

17   gone in through the front of the neck and injured the

18   bone at the back of the neck; is that right?

19       A.   On that previous -- on figure 20, yes.

20       Q.   Let's go back to figure 20.

21            And what are you basing that conclusion on, that

22   the knife went into the front of neck and injured the

23   back of the neck?

24       A.   Because it's only -- the injury is only on this

25   anterior aspect that's there.  And so if it had been

1  something where it had come from the back, through, the

2  other way, then you would see, you know, injury on both

3  sides.

4       But you only see it on that -- on that side where

5  it would be on the anterior.  Plus, it's consistent with

6  the others that you see on the rest of the neck.

7     Q.   Turning to figures 23 and 24.

8          Let's start with figure 23.  What is figure 23?

9     A.   Figure 23 is the distal end of the left femur,

10  and so that would be the knee end, but the femur side.

11  And you can see the --

12    Q.   And just for those of us who maybe didn't go to

13  medical school, which one is the femur?

14    A.   The femur is the upper leg bone.  Okay.

15         So, you can see this long defect that's right

16  there.  And that long defect is longer than what would

17  have been something that would have been done by a

18  knife.  So, we're back to likely a machete or a brush ax

19  or something like that, that was used around the knee,

20  which the femur has this one, and then figure 24 you can

21  see this great amount of trauma that's around that --

22  that portion of the upper proximal portion of the tibia.

23    Q.   In figure 24, were you able to determine whether

24  this shows one injury or multiple injuries?

25    A.   Um, this is -- this has been hit numerous

1   times -- in this area -- in that particular area it's

2   been hit numerous times with, again, this long-bladed

3   instrument.

4          Figure 25 and 26, the next ones, actually are --

5     Q.   Let's turn to figures 25 and 26.

6     A.   So you can see, I have rearticulated the upper

7   and lower portion of the tibia, because it is actually

8   separate from one another.  And --

9     Q.   What do you mean "rearticulated"?

10    A.   Put it back together again, from where it had

11  been fractured.

12         And, you can see there's a large linear cut that

13  goes here, and then one, two, three -- and we don't know

14  because there's no evidence because the bone isn't

15  present any longer, but certainly a fourth, that went at

16  this angle here, and most likely probably a fifth that

17  may have struck through there and actually caused that

18  fracture.

19    Q.   What does figure -- and just for the record,

20  those lines that you have drawn are on figure 25; is

21  that right?

22    A.   Uh-huh.

23    Q.   And which leg is this?

24    A.   This is the left.

25    Q.   Figure 26, what does that show?

1    A.   It just shows the different positioning of -- so

2    that you can again see those -- those numerous defects

3    that go across here, one, two, three, this one here, the

4    fourth one, and that one there on the top, the fifth one

5    there.

6    Q.   What type of weapon caused these wounds to the

7    leg?

8    A.   Again, I would think that this would be a long,

9    thin-bladed implement like a machete or a brush ax or

10   something like that.

11   Q.   Overall, based on all of the injuries you

12   observed to the skeletal remains of this individual,

13   what conclusions were you able to draw about the number

14   of types of weapons that were used?

15   A.   In this particular individual, I think there's --

16   there's a minimum of two types of implements that were

17   used:  one, this long, thin-bladed, heavy, thin-bladed

18   instrument like a machete; and the other being like a

19   knife, but it would have to be a fairly long knife.

20        It does not appear to be a real thick-bladed

21   knife, because those injuries which we could see in the

22   soft tissue were not very long, probably about 25 to

23   30 millimeters in length.  So it wasn't like a large,

24   thick blade -- a large, wide blade, but probably a

25   thinner blade, but it had to be fairly long to be able

1    to reach through the distance that it would go through

2    to go through the neck.

3        Q.    You said a minimum of two types.  Can you

4    elaborate on that?

5        A.    Through the knife and the machete, if you want to

6    use those as the terms.

7        Q.    Turning now please, to Government's Exhibit 54.

8              MS. MARTINEZ:  And Your Honor, 54 was --

9    during the last witness was admitted into evidence.

10             THE COURT:  All right.

11   BY MS. MARTINEZ:

12       Q.    Do you recognize Government's Exhibit 54?

13       A.    Yes.  This is my report for the Virginia

14   Department of Health, number N326-14.

15   BY MS. MARTINEZ:

16       Q.    And, who is the individual whose remains you

17   examined in this report?

18       A.    This individual was identified as -- and I want

19   to read it right -- identified as Gerson Martinez

20   Aguilar -- Aguilar.

21       Q.    Starting with your initial steps, your initial

22   determinations on this review, what was the sex of this

23   individual?

24       A.    Again, the soft tissue identified it, but I

25   checked and looked at the other features such as the

1    cranium and the x-rays of the pelvis, which identified
2    the individual as male.
3        Q.   What conclusions, if any, were you able to draw
4    about this individual's age?
5        A.   This individual was a younger individual.  Some
6    of the apotheoses and epithoses (phonetic) that close at
7    the later teens and early twenties, some of them were in
8    their last state of closure.
9             Also, the bone was in -- was still in a growth
10   and development portion of the time period, nose,
11   arthritic changes.  So, this individual fell
12   approximately into 20 to 22, 23 years of age.  And the
13   individual was a 21-year-old.
14       Q.   What observations were you able to make, or
15   conclusions were you able to make about his height?
16       A.   Again, using the regression and -- regression
17   values and regression formula that we have for Hispanic
18   males, this individual would be approximately five feet,
19   eight inches, plus or minus two and a half inches.
20       Q.   On what areas of the body did you observe
21   injuries or defects?
22       A.   This individual had injuries to the neck, the
23   dorsal side of the back, the upper back, and in the
24   knees.
25       Q.   What in particular did you observe about the

 1   individual's neck?

 2       A.   There was numerous injuries and defects to the

 3   vertebra.

 4       Q.   Let's turn to figure 14.

 5            MS. MARTINEZ:  Your Honor, may we publish?

 6            THE COURT:  Yes.

 7   BY MS. MARTINEZ:

 8       Q.   Turn to figure 14.

 9            What does this show?

10       A.   This is the cervical vertebrae as you saw in the

11   previous individual.  This is, again, the same -- same

12   neck vertebrae, except in this particular instance,

13   this -- this image is if you were looking at it from the

14   back -- back right side of the neck.

15            And in this, you can see that there are numerous

16   injuries that are multiple, even on one vertebra going

17   through here, going through there, a -- kind of puncture

18   defect that's there, cuts that go across here, and I

19   think there's another one up here.

20       Q.   Please turn to figure 15.

21            What does this show?

22       A.   This would be the left aspect, looking at it from

23   the back -- back left side of the neck.  So, you can see

24   that in these injuries, all the -- in the previous

25   individual you saw all of the punctures and injuries to

1    the anterior portion of the vertebrae, in this

2    individual there are numerous cuts that go across the

3    back side of the head.

4         And so you can see ones there, there, here, here,

5    and here, and a portion of this end of the vertebra

6    being cut off.  So, there are -- this, you know -- these

7    are numerous cuts and stabs that are going on, on the

8    back side of the neck.

9    Q.   Please turn to figure 18.

10        What does figure 18 show?

11   A.   Figure 18 shows these cuts, the cut that I was

12   talking about just earlier, going through that one

13   spinous process here.  But then you see another one

14   here, and you see these other cuts that go across here.

15   All of these are -- are actual cuts that would have gone

16   from being either -- coming probably from standing in

17   front of the individual, and they're cutting to try to

18   remove -- remove the head; and then, from the back side,

19   running the instrument into these -- into the vertebra,

20   and what you're doing is you are actually splitting the

21   vertebra as that knife goes through it.

22   Q.   Please turn to figure 21.

23        What does figure 21 show?

24   A.   These show specific -- specific vertebra.  The

25   first one, the upper one in figure 21 is the second

1    cervical vertebra.  And this is, again, the left dorsal

2    or the back aspect of that vertebra.

3           And you can see the two -- the puncture wound

4    here and the puncture wound going here, and then a cut

5    that goes up there.

6           And, this is getting a knife all the way through.

7    And this is the second cervical vertebra.  So it's up,

8    essentially underneath the head.  So they have actually

9    run this knife up here, and up, going -- going at an

10   ankle up underneath the head itself.  That's very hard

11   to get to, in any medical and surgical work.

12      Q.   Why do you say that?

13      A.   Because it's -- it's -- there's a lot of muscle

14   tissue here.  There's a lot of -- a lot of energy has to

15   be expended to get to that point.  And so to run a knife

16   up through there, it would have to be a very thin, sharp

17   knife and a lot of thrust that would have had to been

18   done to get it to that -- to the bone.

19      Q.   Please turn to figures 23 and 24.

20           What does figure 23 show?

21      A.   Figure 23 shows, again, this left dorsal aspect

22   of the third cervical vertebra, which you can see this

23   one cut that goes through, all the way through the bone

24   into the neural canal.  So it actually went into where

25   your spinal column is.

1    Q.   What's the significance of that?

2    A.   That would have -- it's -- one, it takes a lot of

3    force to be able to do that.  And two, it would go and

4    it would actually sever the spinal column.  Now, if the

5    individual is already dead, this would not have had much

6    other effect, but --

7    Q.   If the individual was alive, what effect would it

8    have had?

9    A.   It would have been fortunate for them, because it

10   would have been as if they were, you know, severing the

11   spinal column, and all your nerves would then no longer

12   be functioning below that point.

13   Q.   What would that mean for the victim?

14   A.   Well, hopefully, they wouldn't have much further

15   pain.  But, I think this individual would have had to

16   have been already, hopefully, unconscious at this point,

17   if not dead.

18   Q.   Looking at figure 24, what -- first of all, what

19   is figure 24?

20   A.   Figure 24 is the next cervical vertebra below the

21   fourth cervical.  And you see this major cuts that goes

22   through here and the loss of that spinous process by --

23   by the knife or the implement actually cutting that

24   section off.

25        And if you look real carefully, you can see just

1    inside there, there's a puncture, a little puncture

2    defect.  So that knife has gone all the way through

3    that -- the bridge or the spinous process there, and

4    gone all the way through and has punctured the back side

5    of the body of the vertebra.

6        Q.   Turning -- turning your attention back to what

7    you said a moment ago, that hopefully by the time this

8    individual's spinal cord was cut, he was hopefully

9    unconscious, why do you say that?

10       A.   I'd like to believe that he was not feeling these

11   injuries as they were -- it's maybe just a personal

12   feeling.

13       Q.   Please turn to figure 26.

14       A.   Figure 26 just shows, again, this -- these

15   aspects on the vertebrae.  I have -- the vertebrae are

16   now imaged upside down, in the sense that you're seeing

17   the underside of them.  And you can see the cut that

18   goes across here, that one that I was talking about that

19   goes all the way through there, and then this one that

20   cut the lower portion of the neural arch, there.

21            And you can see this also up here on the -- on

22   figure 25, that one that goes through there, and this

23   one that goes through here.

24            And then in figure 27 you can see this -- this

25   puncture defect that's right there, and then the cut

1    going along the side where there was -- where the knife

2    was going across the bone as they're cutting tissue

3    along that area there.

4        Q.   Based on your examination of the injuries to this

5    individual's -- the bones in this individual's neck,

6    what conclusions, if any, were you able to draw about

7    the number of injuries the individual sustained to his

8    neck?

9        A.   To be honest, I didn't count the number of

10   injuries that were present there, because some of

11   them -- the person probably sustained further ones that

12   may not have actually shown up on the bone itself.  But

13   you can see that you're looking at, you know in the

14   excess of 10 to 12 that are actually showing up on the

15   bone itself.  And they're deep and they're -- and

16   they're working towards, somehow or another, getting rid

17   of -- or cutting through the tissue in the back side of

18   the head.

19       Q.   What, if any, conclusions were you able to draw

20   about the type of instrument used to cause these

21   injuries?

22       A.   Um, this is, again, going to be something like a

23   knife, a long, thin, sharp -- with a sharp point,

24   nonserrated blade.  And it had to be fairly long to be

25   able to make these -- the depth that -- the length that,

1   you know, the depth of it, that it had to go through the

2   through the neck, and then the size and length on the

3   side that you see the cuts that go along either side of

4   the neck.

5        Q.   Please turn now to figures 30 and 31.

6             Starting with figure 30, what does figure 30

7   show?

8        A.   Um, figure 30 shows that in this -- there's these

9   two facets that the vertebrae ride on, on either side,

10  on the right side and the left side.  And on the left

11  side here, you can see this one here is lost.  It's been

12  severed off.  So the knife cut that went through there

13  actually severed that portion of the -- of that facet

14  off.  And you can also see a cut on the spinous process

15  on the back side right there, too.

16       Q.   What is the spinous process?

17       A.   You can feel them on your -- on your own back,

18  you know, those things that stick out there.  Each one

19  of the spines or vertebra have a spine that comes out, a

20  spinous process that comes out.

21       Q.   What does figure 31 show?

22       A.   Figure 31 shows some of the others that we

23  processed without the rest of body, but these are the

24  spinous processes of the -- if you were to think of this

25  as being the spinous process, these ones here that you

1   see right here are ones from the thoracic vertebrae, so

2   in the upper midback.  And these have all been severed

3   by -- by some, you know, blows, probably by a knife, not

4   probably by like a machete or anything like that.

5        And then you --

6   Q.   For the record, you're indicating the pieces of

7   bone shown in the right portion of figure 31?

8   A.   The lower right portion.

9        And then the -- the mid- -- upper left portion,

10  those are two rib pieces.  And, that one piece that you

11  can see here has a -- has a cut that goes through it, so

12  a knife wound that would have gone through and actually

13  gone and cut, as the knife went through it, cut the rib

14  as it went through.

15  Q.   What, if any, conclusions were you able to draw

16  about the type of instrument used to cause these

17  injuries to this individual's back?

18  A.   This may have been either the same or a similar

19  type of long, thin knifelike blade that had a sharp

20  point on the end.

21  Q.   Please turn now to figures 33 and 34.

22       What do figures three -- starting with 33, what

23  does figure 33 show?

24  A.   Figure 33 is the bottom part of the femur, the

25  upper leg, and the top portion of the tibia, the lower

1  leg bone.  And, both in figure 33 and 34, what's

2  illustrated here -- this is -- this aspect is the dorsal

3  aspect, so the back side of the knee.

4          And you can see that there's this section here of

5  which both of the condyles, those bulbous parts of

6  this -- of the articulation, are actually been split

7  by -- and this would have been a long blade, like a

8  machete, because it had to have a lot of force behind

9  it, and it has actually sheared off the two condyles off

10  of the distal end of the femur.

11     Q.  What is the condyle?

12     A.  The condyle is the back side of the articulation

13  of the femur with the tibia.

14     Q.  What kind -- what type of blow would have been

15  necessary to actually severe these condyles?

16     A.  This would have taken a, you know, a very extreme

17  blow, bringing something down and, you know, giving it a

18  good solid blow to it.  Because I don't know how many of

19  you ever had a machete or bush ax or cutting something

20  like that, and cutting sections, you know, little

21  branches off of trees.  But it is not, you know, if it

22  gets big enough, it stops, instead of actually going

23  through.

24          So if you have something that goes through

25  bone -- and this is living bone, so living bone is kind

1    of like wood, you know, living wood.  It's tough.  So,

2    if you can actually cut something like that, you're

3    giving it a really strong thrust, a strong whack.

4        Q.   Please turn to figures 35 and 36.

5        A.   Okay.

6        Q.   Take a look --

7        A.   35 just shows that the femur, again, showing

8    those two condyles.

9             And 36 actually shows the two sections, the

10   sheared off sections now laying side by -- aside of each

11   side of the femur, so you can see that they're actually

12   separated off.

13            And the way you can identify the angle at which

14   this went in, that it was coming from the back side and

15   going down through the femur, because it's wider on the

16   top part and it, like other things that you would have,

17   it splits.  And so you can see that split as it hit here

18   and then split down on both of those -- both of those

19   areas there.

20            Interestingly enough, when you look at the top of

21   the tibia, you would think that if you did that, then

22   you should hit the tibia.  But in -- but on the left

23   tibia, you do not see that.  So, most likely, the tibia

24   was flexed back, so that when the leg was hit, the blade

25   did not actually hit the tibia at all.

1    Q.   Please turn to figures 37 and 38.

2    A.   37 and 38 are images of the right knee, so, the

3    femur here and the tibia there, and the fibula, the

4    other bone that's on the external side or the lateral

5    side of the leg.

6         And you can see that there's defects here on the

7    femur that are then also illustrated here in a different

8    angle, so that you can see that anterior -- that angle

9    on the inside -- it would be essentially the inside of

10   the right leg.

11        And this one here, you're seeing it from the back

12   side, so you're seeing the side there.

13        These injuries, as you see there in that lower,

14   in figure 38, they're a more crushed edge.  It's still

15   an edge, but it's a more crushed edge, where the bone

16   itself has been crushed by something -- whatever

17   implement was hitting it.

18        This is not something that you would see in a

19   normal machete or a bush ax or something like that,

20   because you've seen in those previous pictures how thin

21   and sharp that edge is.

22        This one here looks more of a crushing blow.  And

23   this is most likely from something that would be -- have

24   a blunter edge.  Best thought would be something like an

25   ax, except if this leg was hit with an ax, most likely

1    it would have split on the other side.  So it may be

2    something more like a blunt edge of like a shovel or

3    something that would be less sharp, not have quite as

4    much weight to wield a strong pressure.

5        Q.   Based on your examination of the leg bones of

6    this individual, what conclusions were you able to draw

7    about the number of weapons used on the individual's

8    legs?

9        A.   On this, as you see right here, this one and then

10   the left knee showed thin, sharp blades.  So you have

11   two different types of instruments that were being used

12   on the right versus the left knee.

13       Q.   And based on your overall examination of the

14   skeletal remains of this individual, what conclusions

15   were you able to make about the number of weapons used

16   overall?

17       A.   Well, in this -- in this particular instance you

18   had the knife wounds that you saw, the sharp implement

19   in the neck; and then the sharp, long-bladed damage that

20   you saw in the left knee; and then this more crushing

21   damage that you saw in the right knee.

22            Although the right knee also had the upper

23   portion of the tibia is also severed off, or a portion

24   of it severed off, with a, likely with a thin long blade

25   like a machete, too.  So the right knee had two of these

1   larger, heavier implements damage to it, versus just the

2   left side was just that thin blade type.

3       Q.   And so, overall, how many types?

4       A.   Three, three instruments would have probably been

5   used on this -- on this individual --

6                MS. MARTINEZ:  Thank you --

7                THE WITNESS:  -- minimum.

8                MS. MARTINEZ:  Thank you, Doctor.

9                No further questions, Your Honor.

10               MR. JENKINS:  No questions.

11               MR. SALVATO:  No questions.

12               MR. AMOLSCH:  No questions, Your Honor.

13               THE COURT:  May the witness be excused?

14               MS. MARTINEZ:  Yes, Your Honor.

15               THE COURT:  You're free to leave, sir.

16  Thank you for coming.

17               THE WITNESS:  Thank you.

18               (Thereupon, the witness withdrew from the

19  stand.)

20               MR. TOBLER:  Would Your Honor like the

21  government to call its next witness?

22               THE COURT:  Yes.

23               MR. TOBLER:  The government calls Eric

24  DiGravio.

25               (Witness sworn.)

1           THE WITNESS:  I do.

2           THE COURT:  You may proceed.

3           THEREUPON, ERIC DIGRAVIO, having been duly

4  sworn, testified as follows:

5                      DIRECT EXAMINATION

6  BY MR. TOBLER:

7      Q.   Good afternoon, sir.

8      A.   Good afternoon.

9      Q.   Could you please state your name and spell it for

10  the record.

11     A.   Eric DiGravio; E-r-i-c, D-i-G-r-a-v- as in Victor

12  -i-o.

13     Q.   Where do you work?

14     A.   AT&T.

15     Q.   How long have you worked with AT&T?

16     A.   Eight and a half years.

17     Q.   What is your current position at AT&T?

18     A.   Retail sales manager.

19     Q.   What are your duties in that position?

20     A.   Manage the day-to-day sales within the store and

21  the employees.

22     Q.   Are you familiar with the term "call records"?

23     A.   Yes.

24     Q.   What are call records?

25     A.   It's a list of all calls and data over the

1    network.

2        Q.    And, what sort of information is included with

3    call records?

4        A.    Dates, times, the originating number, terminating

5    number.

6        Q.    Through your duties, are you familiar with the

7    way that AT&T creates and maintains these call records?

8        A.    Yes.

9        Q.    How are you familiar with the way at which AT&T

10   creates and maintains these records?

11       A.    Deal with them day to day, explaining billing,

12   usage questions.

13       Q.    What call records does AT&T create?

14       A.    Any network usage.

15       Q.    What does that include?

16       A.    Any phone call, text message is recorded by the

17   network automatically.

18       Q.    How does AT&T create these records?

19       A.    As a call is placed, made or received, the

20   network records that in a secured database.

21       Q.    Why does AT&T make these records?

22       A.    We use it for billing purposes.

23       Q.    Is it the regular practice of AT&T to make these

24   records?

25       A.    Yes.

1    Q.   Are the records made at or near the time the

2    actual calls are placed?

3    A.   Yes.

4    Q.   How does AT&T maintain these records once they're

5    made?

6    A.   They're secured in an online database.

7    Q.   Are these records maintained in the course of

8    AT&T's regularly conducted business activity?

9    A.   Yes, they are.

10   Q.   As part of this case, was AT&T asked to produce

11   call records associated with a particular phone number

12   for the month of October 2013?

13   A.   Yes, they were.

14   Q.   With the assistance of Mr. Toliver, I'd like to

15   show you what's been marked for identification as

16   Government's Exhibit 106.

17            THE COURT:  All right, Counsel, let's start

18   right there after the recess.

19            We'll take a 15-minute recess, ladies and

20   gentlemen.  Again, don't discuss the case.  We will

21   return in 15 minutes.  Thank you.

22            (Court recessed at 3:30 p.m. and reconvened

23            at 3:49 p.m.).

24            (Jury not present.)

25            THE COURT:  Mr. Tobler?

1              MR. TOBLER:  Yes, sir.

2              THE COURT:  Do you plan to go through every

3     single entry on every single page on this exhibit?

4              MR. TOBLER:  No, I do not, Your Honor.

5              THE COURT:  I just wanted to make sure.

6              MR. TOBLER:  No.  Two pages of the exhibit,

7     Your Honor.

8              THE COURT:  All right.

9              You can bring our jury out.

10             (Jury present.)

11             THE COURT:  You may be seated.

12             All right, Counsel, you're on Exhibit 106.

13    You may proceed.

14                 DIRECT EXAMINATION (Continued)

15    BY MR. TOBLER:

16      Q.   Mr. DiGravio, before the break, I asked you to

17    look at Government's Exhibit 106.  Have you had an

18    opportunity to review that exhibit?

19      A.   Yes.

20      Q.   Do you recognize it?

21      A.   Yes, I do.

22      Q.   What is it?

23      A.   It's a call log.

24      Q.   Is it associated with any particular phone

25    number?

1    A.   Phone number 703-474-3558.

2    Q.   And, from where is this call log?

3    A.   From AT&T Mobility.

4    Q.   How do you recognize the call log?

5    A.   It's a call log that I reviewed on Wednesday.

6         MR. TOBLER:  Your Honor, at this time, the

7    government would move Government's Exhibit 106 into

8    evidence.

9         THE COURT:  Received without objection.

10        MR. TOBLER:  May we publish, Your Honor?

11        THE COURT:  Yes.

12        MR. TOBLER:  Would you publish page one,

13   please?

14   BY MR. TOBLER:

15   Q.   At the top of that page, sir, there's a line that

16   reads "voice usage," and it has a number, 703-474-3558.

17   What does that mean?

18   A.   That's the telephone number the records are for.

19   Q.   Beneath that there appear to be entries with

20   dates followed by rows of numbers.  Can you explain

21   these entries to the jury.

22   A.   Each row and item number is a separate call.

23        MR. TOBLER:  Can we please publish page 32?

24   BY MR. TOBLER:

25   Q.   And if I could, I would like to direct your

1    attention to item number 655.

2         What is the date and time for entry 655?

3    A.   October 8th, 2013, at 9:06 p.m.

4    Q.   And is this the call -- is this a call record?

5    A.   Yes, it is.

6    Q.   Is it the final record, included?

7    A.   Yes, it is.

8    Q.   And what is the significance of the fact that

9    there are no more entries?

10   A.   There was no additional phone calls on the

11   network.

12             MR. TOBLER:  If I could -- I'd like to now

13   publish page 37 -- actually, could we go back to page 32

14   for a second?  I apologize.

15   BY MR. TOBLER:

16   Q.   Beneath that final entry there is additional

17   data, if I'm not mistaken.  Can you please explain to

18   the jury what that information is?

19   A.   These are text messages for the phone number

20   703-474-3558.

21             MR. TOBLER:  Could we now please publish

22   page 37?  Thank you.

23   BY MR. TOBLER:

24   Q.   If you look at the very bottom there, sir, what

25   is the date and the time for the final entry?

1     A.   October 8th, 2013, at 9:07 p.m.

2     Q.   And what is the significance of the fact that

3     that is the last entry?

4     A.   There was no additional text messages recorded by

5     the network.

6               MR. TOBLER:  No further questions, Your

7     Honor.

8               MR. JENKINS:  No questions, Your Honor.

9               THE COURT:  All right.  May the witness be

10    excused?

11              MR. TOBLER:  Yes, Your Honor.

12              THE COURT:  Thank you.

13              (Thereupon, the witness withdrew from the

14    stand.)

15              MR. TOBLER:  Your Honor, the government

16    calls Officer Michael Garcia.

17              (Witness sworn.)

18              THE WITNESS:  Yes.

19              THEREUPON, MICHAEL GARCIA, having been duly

20    sworn, testified as follows:

21                      DIRECT EXAMINATION

22    BY MR. TOBLER:

23    Q.   Good afternoon, sir.

24    A.   Good afternoon.

25    Q.   Would you please state your name and spell it for

M. Garcia - Direct                                         160

1    the record.

2        A.   My first name is Michael, M-i-c-h-a-e-l, last

3    name Garcia, G-a-r-c-i-a.

4        Q.   Where do you work, sir?

5        A.   With the city of Alexandria as a police officer.

6        Q.   How long have you worked with the city of

7    Alexandria Police Department?

8        A.   Three and a half years.

9        Q.   What is your current position?

10       A.   I'm a patrol officer.

11       Q.   What are your duties as a patrol officer?

12       A.   Patrol the area of Arlandria and respond to

13   calls.

14       Q.   When you say Arlandia (sic), what area are you

15   referring to?

16       A.   It's the Del Ray, Chirilagua area.

17       Q.   As part of your training as a law enforcement

18   officer, have you received any training in providing

19   medical assistance to injured persons?

20       A.   Yes.

21       Q.   Have you received any training in providing

22   medical assistance to gunshot victims?

23       A.   Yes.

24       Q.   What kind of training?

25       A.   Excuse me.  I'm a prior EMT, also received -- how

M. Garcia - Direct                                           161

1    to render aid for immediate wounds like that.

2       Q.   When you say an EMT, can you explain to the jury

3    what that means?

4       A.   Emergency medical technician.

5       Q.   Through your job, have you received training in

6    identifying gunshot wounds?

7       A.   Yes.

8       Q.   And where did you receive that training?

9       A.   At the academy, and also when I was taking

10   classes for first responder.

11      Q.   I would like to direct your attention to the

12   evening of June 19th, 2014.  Were you working that

13   night?

14      A.   Yes.

15      Q.   What were your duties that night?

16      A.   I was a patrol officer.  I respond to calls.

17      Q.   What calls did you respond to that night?

18      A.   A weapon violation call.

19      Q.   What was the location of the reported weapons

20   violation?

21      A.   Mount Vernon and Russell Road.

22      Q.   What was the time of day?

23      A.   It was around 11:40 in the evening.

24      Q.   How far away were you at the time you received

25   that call?

M. Garcia - Direct                                                      162

1    A.   About two miles.

2    Q.   How long did it take you, approximately, to

3    respond to the scene?

4    A.   Roughly, about a minute.

5    Q.   Could you please describe for the jury the

6    neighborhood in which the weapons violations occurred?

7    A.   It's residential, and some commercial across the

8    street.

9    Q.   What did you first observe upon arriving at the

10   scene?

11   A.   Upon arriving, I observed a female bystander,

12   pointing me to the direction of a male on the ground who

13   was on the sidewalk, bleeding.

14   Q.   What did you observe about the individual that

15   you saw on the sidewalk, bleeding?

16   A.   I observed that he had a -- he was bleeding from

17   the rear of his neck and also had an entrance wound, a

18   gunshot on his cheek.

19   Q.   What -- what medical assistance did you provide

20   to this individual?

21   A.   To apply pressure where his exit wound was on the

22   rear of his neck.

23   Q.   All right.  So you mentioned an exit wound on the

24   rear of the neck.  Were you able to find an entrance

25   wound as well?

1    A.   Yes.

2    Q.   And where was the entrance wound?

3    A.   As far as I recall, it was on the front, on his

4    cheek.

5    Q.   Which cheek?

6    A.   Left cheek, I believe it was.

7    Q.   Was the victim alive when you found him?

8    A.   Yes.

9    Q.   How do you know?

10   A.   He was gasping for air.

11   Q.   With the assistance of the courtroom security

12   officer, I'd like to show you what has been marked for

13   identification as Government's Exhibits 63-A and 63-B.

14        Do you recognize what's depicted in these

15   exhibits?

16   A.   Yes.

17   Q.   What is it?

18   A.   Photos of the victim.

19   Q.   Are Government's Exhibits 62-A (sic) and

20   62-B (sic) a fair and accurate depiction of the person

21   you found shot on the night of June 19th, 2014?

22   A.   Yes.

23   Q.   My apologies, 63-A and 63-B, the exhibits you

24   just reviewed.

25   A.   Yes.

1          MR. TOBLER:  Your Honor, at this time we

2     would move to admit Government's Exhibits 63-A and 63-B.

3          THE COURT:  Received.

4          MR. TOBLER:  May we publish for the jury,

5     Your Honor?

6          THE COURT:  Yes.

7     BY MR. TOBLER:

8      Q.  Was anyone with the victim when you first arrived

9     on the scene?

10     A.  Yes.

11     Q.  Please describe the appearance of the individual

12    who was with the victim?

13     A.  It was a Hispanic male without a shirt.

14     Q.  What was this shirtless individual doing when you

15    arrived on the scene?

16     A.  He was trying to apply pleasure on the wound.

17     Q.  Were you able to identify this person?

18     A.  Yes.

19     Q.  Who is he?

20     A.  David Jimenez.

21     Q.  Were you able to interview him?

22     A.  Yes.

23     Q.  What was his emotional state?

24     A.  He was very irate and aggravated.

25     Q.  Without telling me what Mr. Jimenez said, what,

1    if anything, did you do after speaking with him?

2        A.   I contacted for additional units to respond, and

3    also -- excuse me.  I contacted for -- I provided a

4    lookout for other additional units who were responding

5    to the area.

6        Q.   What do you mean when you say "a lookout"?

7        A.   As far as providing descriptions of the suspect.

8        Q.   Afterwards, did you interview any other

9    individuals?

10       A.   Yes.

11       Q.   How many?

12       A.   Two others.

13       Q.   What other law enforcement units did you observe

14   responding to the scene of the shooting?

15       A.   There was a CSI unit, detectives, as well as a

16   K-9 unit.

17       Q.   What did you observe the crime scene

18   investigators doing?

19       A.   They were taking photos and also placing

20   identifying markers on possible evidence.

21       Q.   With the assistance of the courtroom security

22   officer, I'd like to show you what has been marked for

23   identification as Government's Exhibits 91-A and 91-B.

24            Do you recognize these exhibits, sir?

25       A.   Yes.

1    Q.   What are they?

2    A.   It's the crime scene.

3    Q.   Are Government's Exhibits 91-A and 91-B a fair

4    and accurate depiction of the scene of the shooting --

5    A.   Yes, sir.

6    Q.   -- on the night of June 19th, 2014, in

7    Alexandria, Virginia?

8    A.   Yes, sir.

9         MR. TOBLER:  Your Honor, at this time we

10   move to admit Government's Exhibit 91-A and 91-B.

11        THE COURT:  Received without objection.

12        MR. TOBLER:  May we publish, Your Honor?

13        THE COURT:  Yes.

14   BY MR. TOBLER:

15   Q.   Sir, what's depicted in Government's Exhibit

16   91-A?

17   A.   It's where the victim was lying.  It's where he

18   was bleeding out.

19   Q.   And where in this image was the victim lying when

20   you arrived on the scene?

21   A.   Right in front of the red Corolla there.

22        MR. TOBLER:  Please publish Government's

23   Exhibit 91-B.

24   BY MR. TOBLER:

25   Q.   What's depicted in this photograph, sir?

1    A.    Same thing, the blood trail where he was lying.

2    Q.    After you completed the interviews on the scene,

3    what did you do next?

4    A.    After I completed the interviews, I was informed

5    to transport one of the witnesses to our headquarters.

6    Q.    Let me direct your attention to June 23rd, 2014.

7    On that night, did you return to the vicinity of the

8    shooting?

9    A.    Yes.

10   Q.    What were you doing that evening?

11   A.    I was marked out on special detail, just to

12   observe over a vigil that was occurring that night.

13   Q.    Who, if anyone, did you recognize at the vigil?

14   A.    I observed that David Jimenez was on scene.

15   Q.    What dispatch -- what dispatch calls did you

16   receive, if any, while you were at the vigil?

17   A.    It was a suspicious event.

18   Q.    Without telling me what the caller told dispatch,

19   were you able to identify any individuals referenced by

20   the caller who had reported the suspicious event?

21   A.    Yes.

22   Q.    Who?

23   A.    David Jimenez.

24   Q.    Who, if anyone, did you interview that night?

25   A.    I interviewed David Jimenez.

M. Garcia - Cross

1   Q.   Were there any additional interviews that you

2   conducted that evening?

3   A.   No.  That was it.

4   Q.   Did you speak to anyone on the phone?

5   A.   I did; the witness who contacted us.

6   Q.   When you say "the witness who contacted us," are

7   you referring to the caller?

8   A.   Yes.

9           MR. TOBLER:  No further questions, Your

10  Honor.

11                  CROSS-EXAMINATION

12  BY MR. AQUINO:

13  Q.   Good afternoon, Officer.

14  A.   Good afternoon.

15  Q.   Jerry Aquino and Elita Amato on behalf of Jesus

16  Chavez.  I just have a few questions for you.

17          You indicated that you saw -- when you arrived

18  you saw a shirtless man; is that correct?

19  A.   Yes.

20  Q.   And you determined that shirtless man to be David

21  Jimenez; is that accurate?

22  A.   Yes.

23  Q.   And would you characterize Mr. Jimenez as

24  combative with you?

25  A.   Not combative.

M. Garcia - Cross

1    Q.   Did he have his fist raised?

2    A.   No.

3    Q.   At any point, did he have his fist raised towards

4    you?

5    A.   No.

6    Q.   When you saw -- went back to the vigil the other

7    day -- excuse me -- a few days after the scene, why is

8    it that you noticed Mr. Jimenez?

9    A.   Because I saw him at the scene, and I saw him at

10   the scene the night the incident occurred, and I

11   recognized him that night.

12   Q.   All right.  And, did that create some type of

13   suspicion on your behalf as to why he was there?

14   A.   No.

15             MR. AQUINO:  That's all the questions I have

16   for him, Judge.

17             THE COURT:  All right.

18             MR. TOBLER:  No redirect, Your Honor.

19             THE COURT:  May the witness be excused?

20             MR. AQUINO:  No, sir.  We subpoenaed him,

21   too.  We ask that he be --

22             THE COURT:  Oh, okay.

23             You remain under subpoena.  You will need to

24   come back when called by defense counsel.  Thank you.

25             THE WITNESS:  Okay.

1     THE COURT:  And don't discuss your testimony

2  with anyone.

3     THE WITNESS:  Yes, sir.

4     THE COURT:  Thank you.

5     (Thereupon, the witness withdrew from the

6  stand.)

7     MS. MARTINEZ:  United States calls Genaro

8  Sen Garcia.

9     THE COURT:  All right.

10     THE INTERPRETER:  Ms. Martinez, does he need

11  an interpreter?

12     MS. MARTINEZ:  He does, thank you.

13     Your Honor, may we approach briefly?

14     THE COURT:  Yes.

15     Ladies and gentlemen, let me have you step

16  out for a moment.  Thank you.

17     (Jury not present.)

18     THE COURT:  You can have a seat.

19     Should the witness be --

20     MS. MARTINEZ:  Sure, perhaps in abundance of

21  caution.

22     THE COURT:  Would you step outside for just

23  a moment, please?

24     (Witness not present.)

25     THE COURT:  Is the door closed?

1          MS. MARTINEZ:  Your Honor, we anticipate

2    that this witness will be testifying about the shooting

3    incident that occurred on June 19th, 2014, in

4    Alexandria.

5          This witness, to my knowledge, has no

6    knowledge of the two murders that occurred where the

7    bodies were buried in the park.

8          So, as -- to the best of my knowledge and

9    based on my direct examination, there should be no

10   reason whatsoever for "homeboy two" to come up.  And, he

11   has not been briefed in any way on that.  I will not be

12   asking any questions about the murder of Nelson Omar

13   Quintanilla Trujillo.  And so, I see no reason that this

14   witness needs to be instructed.

15         THE COURT:  Okay.

16         You can bring our jury back.  And bring the

17   witness back.

18         Thank you very much.

19         (Witness resumed stand.)

20         (Jury present.)

21         THE COURT:  You may be seated.

22         (Witness sworn.)

23         THE WITNESS:  I so swear.

24

25         THEREUPON, GENARO SEN GARCIA, having been

1    duly sworn, testified as follows:

2                    DIRECT EXAMINATION

3    BY MS. MARTINEZ:

4        Q.   Good afternoon.

5        A.   Good afternoon.

6        Q.   Would you please state your full name and spell

7    your last name for the record.

8        A.   Genaro Estardo Sen Garcia.

9        Q.   And I think I may have said spell your last name,

10   but please spell your full name for the record.

11       A.   G-e-n-a-r-o, E-s-t-a-r-d-o, S-a-n, G-a-r-c-i-a.

12       Q.   Your last name is Sen Garcia; is that right?

13       A.   Yes.

14       Q.   Sen, S-e-n?

15       A.   Yes.

16       Q.   How old are you, Mr. Sen Garcia?

17       A.   Twenty-one.

18       Q.   Where were you born?

19       A.   Guatemala.

20       Q.   When did you come to the United States?

21       A.   In 2011.

22       Q.   How did you get to the United States?

23       A.   Illegal.

24       Q.   How old were you when you came here?

25       A.   Sixteen.

1    Q.   How far did you go in school before you came to
2    the United States?
3    A.   Till eighth.
4    Q.   When you came here, did you continue school?
5    A.   No.
6    Q.   Are you a member of a gang?
7    A.   Yes.
8    Q.   What gang?
9    A.   MS.
10   Q.   What is the full name of MS?
11   A.   Mara Salvatrucha.
12   Q.   How old were you when you joined MS?
13   A.   Fourteen.
14   Q.   Is there a particular clique that you joined?
15   A.   Yes.
16   Q.   What clique?
17   A.   Delicias Locotes.
18   Q.   Can we spell Delicias?
19   A.   D-e-l-i-c-i-a-s.
20   Q.   And the second word you said was Locotes?
21   A.   L-o-c-o-t-e-s.
22   Q.   Were you given a gang name when you joined MS?
23   A.   Gatuso.
24   Q.   What does that mean?
25   A.   A lot of meanings, yeah, yeah.

1      Q.   Like what?

2      A.   Sometimes you have this from the time when you're

3  very young, you grow up with a nickname.  But that's

4  what I've been called since I was little.

5      Q.   Are you known by any other nicknames?

6      A.   No.

7      Q.   Are you currently in prison?

8      A.   Yes.

9      Q.   For what?

10     A.   For being accomplice in -- being an accomplice in

11  a murder.

12     Q.   Did you plead guilty?

13     A.   Yes.

14     Q.   Where?

15     A.   In Alexandria.

16     Q.   Was that a murder that you committed with other

17  gang members?

18     A.   Yes.

19     Q.   Who was the victim?

20     A.   I don't know the name, last name, but I believe

21  he was a member of another gang, and his first name is

22  Julio.

23     Q.   Have you been sentenced for your crime?

24     A.   Yes.

25     Q.   What was your sentence?

1    A.   Life sentence.

2         MS. MARTINEZ:  And with the help of the

3    court security officer, may we please show the witness

4    what has been marked as Government's Exhibit 124.

5    BY MS. MARTINEZ:

6    Q.   Do you have that document in front of you?

7         Do you now have that document in front of you?

8    A.   Yes.

9    Q.   Does that appear to be a copy of your plea

10   agreement?

11   A.   Yes.

12   Q.   Please turn to the last page.

13        Is that your signature on the last page?

14   A.   Yes.

15   Q.   What are your obligations under this plea

16   agreement?

17   A.   Tell nothing but the truth.

18   Q.   What benefit do you hope to receive as a result

19   of your plea agreement?

20   A.   I was only given the hope of a reduction.

21   Q.   Who do you understand will determine what -- what

22   reduction, if any, you receive to your sentence?

23   A.   Your Honor, the judge.

24   Q.   What do you understand will be the consequences

25   if you lie to the government?

1     A.   I'll stay with the sentence.

2     Q.   What do you understand will be the consequences

3  if you lie in court?

4     A.   Well, there'll be no reduction in my sentence.

5     Q.   As a result of your cooperation, have you been

6  placed with -- in protective custody within the Bureau

7  of Prisons?

8             THE INTERPRETER:  Interpreter corrects.

9             THE WITNESS:  Yes, that's right.

10 BY MS. MARTINEZ:

11    Q.   Why did you join MS-13?

12    A.   Out of hate.

13    Q.   What do you mean by that?

14    A.   Because I saw how they killed my friend who I

15 grew up with.  That's all.

16    Q.   What about that made you join the gang?

17    A.   Well, several of my friend were killed, some

18 people who were my schoolmates.

19    Q.   Who were they killed by?

20    A.   The 18th Street people.

21    Q.   What is 18th Street?

22    A.   A rival gang.

23    Q.   When you first started associating with MS-13,

24 what was your level or position within the gang?

25    A.   In the beginning, I was just a *paro*.

G. Garcia - Direct                                        177

1    Q.   What is a *paro*?

2    A.   It's a person who does favors for others for the

3    rest of the gang members.

4    Q.   What kind of favors?

5    A.   For example, go and buy drugs for them in areas

6    where they can't enter because of the other gangs.

7    Q.   How long were you a *paro* for MS-13?

8    A.   Like, for a year, a year and a half, around

9    there.

10   Q.   What happened after that?

11   A.   Well, I asked the person in charge, the runner,

12   if I could be a member.  And he said, well, first, I

13   would have to run with them and then be a *chequeo*.

14   Q.   What is a *chequeo*?

15   A.   It's a person who patrols around the area of the

16   gang to make sure that there's no other person from

17   another gang there selling drugs in the place that they

18   shouldn't be.

19   Q.   As a *chequeo,* what did you do for the gang?

20   A.   Patrol, and then I began with the assaults and

21   then extortion.

22   Q.   How long were you a *chequeo*?

23   A.   Some six to seven months, around top leaders.

24   Q.   What happened after that?

25   A.   I was jumped into the neighborhood.

1    Q.    What do you mean you were jumped in?

2    A.    Well, the way it's said is like I was baptized.

3    Q.    What is the process?

4    A.    Well, you get beat up for 13 seconds.

5    Q.    What does someone have to do in order to be

6  jumped into MS-13?

7    A.    Well, first, you just have to run along with them

8  and show that you love the gang.  And then to be a true

9  gang member, then to be jumped in, you have to go, be

10 sent on a mission.

11   Q.    What is a mission?

12   A.    Go kill an 18th Street, a guy from a rival gang.

13   Q.    What was your mission?

14   A.    The same.

15   Q.    Were you successful?

16   A.    I don't know.

17   Q.    How old were you when you were jumped into MS-13?

18   A.    Fourteen.

19   Q.    Through your experience with MS-13, did you come

20 to learn the rules of the gang?

21   A.    Yes.

22   Q.    What rules does the gang have about cooperating

23 with the police?

24   A.    Well, anybody who cooperates gets cut up in

25 pieces, and they kill -- they kill them.  They get cut

1    up in pieces they cut out his tongue.

2        Q.   What does the gang call it when someone

3    cooperates with the police?

4        A.   *Sapo*, *soplon*, many things.  Snitch, rat, things

5    like that.

6        Q.   Are you familiar with the term "green light"?

7        A.   Of course.

8        Q.   What is a green light?

9        A.   Well, it's when a person has, for example, now

10   that I'm talking, I have a green light, and if someone

11   sees me, they can kill me.

12       Q.   What rules does MS-13 have about rival gangs?

13       A.   Kill an 18th Street matter, no matter where you

14   see them.  Not get together with other gangs.  See, hear

15   and keep quiet.  You can't talk about anything.

16       Q.   What does MS-13 call members of rival gangs?

17       A.   *Chavala*.  A lot of ways to call them, but

18   specifically for 18th Street, *chavalas*.

19       Q.   If a member of MS-13 kills a *chavala*, what does

20   that do for the member's reputation or status within the

21   gang?

22       A.   Earns respect.

23       Q.   What happens if a *chequeo* kills a member of 18th

24   Street or a *chavala*?

25            What does it do for the *chequeo*'s reputation or

1    status?

2        A.   It goes up high.  He's practically a homeboy

3    then.

4        Q.   When you first came to the United States, where

5    did you go?

6        A.   To Maryland.

7        Q.   Why did you go to Maryland?

8        A.   That's where my mom lived.

9        Q.   And how old were you?

10       A.   Sixteen.

11       Q.   How long did you stay with your mom?

12       A.   Three months.

13       Q.   Where did you go next?

14       A.   Went to Virginia.

15       Q.   Where in Virginia?

16       A.   Alexandria.

17       Q.   What neighborhood in Alexandria.

18       A.   One that's called Chirilagua.

19       Q.   When you were in Maryland and then Virginia, were

20   you still an active member of MS-13?

21       A.   No.

22       Q.   When you came to Chirilagua, did you meet any

23   other members of the MS-13?

24       A.   Yes.

25       Q.   At some point, did you begin hanging out with

1    them?
2         A.   Not in the beginning.
3         Q.   At some point later?
4         A.   Yes, afterwards.
5         Q.   Who?
6         A.   With Duende and other people.
7         Q.   How did you initially meet Duende?
8         A.   For a message I got on Facebook.
9         Q.   After that, did there come a time when you met
10   him in person?
11        A.   Yes.
12        Q.   What was that meeting like?
13        A.   Well, we just ran into each other at a
14   McDonald's.
15        Q.   What clique did Duende belong to?
16        A.   The Park Views.
17        Q.   After you met Duende, did you continue
18   communicating with him?
19        A.   Yes.
20        Q.   At some point, did you move away from Chirilagua?
21        A.   Yes.
22        Q.   Was that before or after you met Duende?
23        A.   After.
24        Q.   How long -- where did you go when you left
25   Chirilagua?

1    A.   I went to a place called Williamsburg, here in
2    Virginia, too.
3    Q.   How long did you stay there?
4    A.   A month.
5    Q.   Where did you go next?
6    A.   I went to Florida.
7    Q.   How long were you in Florida?
8    A.   Like for three or four months, around there.
9    Q.   Where did you go after that?
10   A.   I came back again to Alexandria.
11   Q.   When did you return to Alexandria?
12   A.   Like, two weeks before the homicide.
13   Q.   When you came back, did you see Duende?
14   A.   Yes.
15   Q.   How often?
16   A.   Almost every day.
17        MS. MARTINEZ:   Your Honor, may we publish
18   what has already been admitted as Government's
19   Exhibit 73?
20        THE COURT:   Yes.
21   BY MS. MARTINEZ:
22   Q.   Take a look at the screen.  Do you recognize that
23   person?
24   A.   Yes.
25   Q.   Who is it?

G. Garcia - Direct

1    A.    Duende.

2    Q.    Turning your attention now to the homicide.  In

3    the week or two before the homicide, what gang members

4    were you spending time with?

5    A.    With Duende, with Talibán, with several others,

6    members of the gang.

7    Q.    Who is Talibán?

8    A.    The one who shot the weapon.

9    Q.    How did you meet him?

10   A.    What do you mean?

11   Q.    How did you first meet Talibán?

12   A.    When he got out of prison.

13   Q.    Do you know him by any other name?

14   A.    As Chuy.

15   Q.    You said after he got out of prison, you met him?

16   A.    Since after he got out of prison.

17   Q.    After he got out of prison, how much time did you

18   spend with him?

19   A.    Like about two weeks approximately, three.  I

20   don't remember exactly very well.

21   Q.    During that time, how often did you spend time

22   with him?

23   A.    Well, every two days he would come.  Like in the

24   beginning it was like every three days, but then in the

25   last weeks it was almost every day.

1    Q.   Do you see Talibán or Chuy here in court today?

2    A.   Yes.

3    Q.   Would you please identify him by describing a

4    piece of clothing he's wearing and the location where he

5    is sitting?

6    A.   It's behind the young lad, and he's got a -- he's

7    got a tie and he's behind there, behind that guy.

8    Q.   Would you please -- would you please describe the

9    color of --

10   A.   He's got like a beard.  I don't know how to

11   describe him.

12           MS. MARTINEZ:  Your Honor, the record should

13   reflect that the witness has identified another

14   individual.

15           MS. AMATO:  Objection to -- objection.

16           THE COURT:  Sustained.

17           MS. MARTINEZ:  I apologize, Your Honor.  I'm

18   simply trying to make sure the record is clear.

19           MR. AQUINO:  We object.

20           THE COURT:  Sustained, the objection.  No

21   speaking --

22           MR. AQUINO:  May we approach?

23           THE COURT:  -- objections.

24           Excuse me?

25           MR. AQUINO:  May we approach quickly?

1              THE COURT:  Okay.

2              (Thereupon, the following side-bar

3     conference was had.)

4              MS. MARTINEZ:  I apologize, Your Honor --

5              MR. AQUINO:  No, it's my objection.

6              Counsel was essentially instructing him what

7     to say.  And what I'm asking the Court to do is for some

8     relief, that is, I ask that you instruct the jury

9     specifically that what counsel did there was improper.

10    She knew what she was doing.  She was telegraphing him

11    what to say.  And I think that was really improper.

12             MS. MARTINEZ:  Your Honor, may I respond?

13             THE COURT:  Yes.

14             MS. MARTINEZ:  I apologize for phrasing it

15    the way that perhaps implied something different than

16    what I was doing.  But what I was trying to make clear

17    for the record was that the witness did not identify the

18    person he was being asked to identify, so that it can be

19    clear on the record there was a misidentification, and

20    not to instruct him to do anything further, but for aid

21    the defense, that, in fact, he did not ID the person who

22    has been referred to in Court as Talibán.

23             It was not trying to telegraph, and I

24    apologize for giving the impression I was.

25             The record should reflect, based on my

 1   understanding, now that we're here at the bench, of who

 2   the witness was identifying, that it was not

 3   Mr. Aquino's client.  I'm not going to ask him to move

 4   to another ID.  I'm simply going to move on with

 5   questions.

 6                THE COURT:  Well, you should not have done

 7   what you did.

 8                MS. MARTINEZ:  I apologize.

 9                THE COURT:  I will tell the jury that.

10                MS. AMATO:  Could I ask that it be done

11   outside the presence of the witness?  I don't want this

12   to be highlighted to the witness any further.

13                THE COURT:  Right.

14                But let's say this out loud.  The way the

15   courtroom set up, the sight lines are terrible.  I can

16   barely see the witness.  And I know that he can't see

17   the whole array of defendants on the left side of the

18   courtroom because of the way the podium is lined up.

19                And what other witnesses have done is stand

20   up and look around the courtroom, which is what has not

21   been done.  The witness is still in direct examination.

22   So, that is probably going to happen.

23                But what I'll do now is tell the jury that

24   Ms. Martinez does not decide what happens in court.  I

25   do that.  And, so, they are to just rely upon what

1    happens from the witness stand, what they observed for

2    themselves.  Okay?

3                MR. JENKINS:  Your Honor, I just want to

4    add -- and I think the Court is already aware of this --

5    the speaking objections are continuing, and they are

6    coming from one side of the courtroom far more often

7    than the other.

8                I have to echo Mr. Aquino's comment.  I'm

9    starting to question whether or not they're just honest

10   mistakes, or whether or not, because counsel's got so

11   caught up in this case, they just -- it's impairing

12   their ability to remember the Court's ruling on these

13   speaking objections.  We're now in the third week of

14   trial, and they're still going on.

15               THE COURT:  So noted.  And I'll be more

16   verbal.  And if you all will help me, stand up, and I'll

17   jump on it.  Thank you.

18               MR. JENKINS:  Thank you, Your Honor.

19               (Thereupon, the side-bar conference was

20   concluded.)

21               THE COURT:  Can you take the witness out

22   just a minute.

23               (Thereupon, the witness withdrew from the

24   stand.)

25               THE COURT:  Ladies and gentlemen, the

1   testimony of the witnesses and what they say and do not

2   say is something for you to decide because you're the

3   judges of the facts.

4            The government attorney should not be making

5   statements about what the record should reflect, unless

6   she's asking me to make a judgment about what the record

7   reflects.

8            And so, what she did a moment ago was

9   inappropriate, and she's been admonished not to do it

10  again.

11           And what we'll do now is bring the witness

12  back and she will ask additional questions.

13           Thank you.

14           You can bring the witness back now.

15           (Witness resumed stand.)

16  BY MS. MARTINEZ:

17   Q.   Mr. Sen Garcia, we were talking about Talibán.

18  At the time of the murder, who was -- of the three of

19  you, Duende, Talibán and yourself, who was bigger

20  physically?

21   A.   Talibán.

22   Q.   In the week or two before the murder, what sort

23  of things did you do with Talibán?

24   A.   To smoke, I mean, we didn't really chill out so

25  much with each other.  We smoke, sometimes we would

1  talk, but we didn't chill out as much.  I would chill

2  out mostly with the other ones.

3     Q.   Were you aware of whether or not Talibán had any

4  association with MS?

5     A.   Could you repeat the question, please.

6     Q.   Were you aware of whether Talibán had any sort of

7  association with the gang, with MS-13?

8     A.   I wouldn't speak with him so much, but his

9  sister, she was Duende's girlfriend.

10    Q.   Focusing on Talibán specifically, what sort of

11 things did you discuss with him?

12    A.   I mean, mostly he would speak about prison.  He

13 almost didn't speak about gangs at all, because we

14 didn't have a lot of trust yet.  We had just barely met

15 each other.

16    Q.   I'd like to direct your attention to the night of

17 the murder that you pled guilty to.  Where were you that

18 night?

19    A.   Well, at an apartment where we all used to get

20 together.

21    Q.   Whose apartment?

22    A.   From a *paro* whose name was Christopher.

23    Q.   What were you doing at Christopher's apartment?

24    A.   Smoking.

25    Q.   Smoking what?

1    A.   Marijuana.

2    Q.   At some point, did you leave Christopher's

3  apartment that night?

4    A.   Yes.

5    Q.   Around what time?

6    A.   It would have been like 10:00 at night.  I don't

7  remember the time exactly, but it would have been sort

8  of like 9:00 or 10:00.

9    Q.   Who was there when you left?

10   A.   Well, there was ten of us in total.

11   Q.   Please list the people that you remember.

12   A.   Talibán, Duende, I, Mogley, Lala, Sixto.  The

13  other ones I don't remember quite so well.

14   Q.   Were you armed that night?

15   A.   Yes.

16   Q.   With what?

17   A.   Just a knife.

18   Q.   Do you know if anyone else in the group had any

19  weapon?

20   A.   At that point, Talibán was carrying a knife.

21   Q.   What did you do when you left the apartment?

22   A.   We were going to go to a fight.  We were going to

23  go to a fight.

24   Q.   What kind of fight?

25   A.   Well, the *paro* was going to get into -- was going

1   to have a fight with some other young man.  He just

2   asked us to accompany him.

3       Q.   What happened after you left the apartment?

4       A.   We run into some members of the gang, the 18th

5   Street.

6       Q.   How do you know that these people you saw were

7   members of the 18th Street gang?

8       A.   Well, they were Latinos, they were wearing red

9   shirts with 18 on them.  We start flashing the Mara

10  signs to them, and then they just started to laugh and

11  they got into the car and they turn around.

12      Q.   What are the Mara signs?

13      A.   La Mara.

14      Q.   Let's start with the first one.  Could you hold

15  it up so the jury can see?

16      A.   (Complies.)

17           MS. MARTINEZ:  Your Honor, may the record

18  reflect that the witness is holding his pinky and index

19  fingers up, with -- extended, with his two middle

20  fingers bent and his thumb bent as well.

21           THE COURT:  So noted.

22  BY MS. MARTINEZ:

23      Q.   Please hold up the second sign you showed for the

24  jury.

25      A.   (Complies.)

1        MS. MARTINEZ:  Your Honor, may the record
2    reflect that the witness is holding his index and middle
3    finger together, with his two other fingers bent and his
4    thumb extended.
5        THE COURT:  So noted.
6        THE WITNESS:  It could also be like this.
7        MS. MARTINEZ:  Your Honor, may the record
8    reflect that the witness is holding his two hands
9    together, with his index fingers expended out, one to
10   each side, and his other fingers bent.
11       THE COURT:  So noted.
12   BY MS. MARTINEZ:
13   Q.  What do these signs mean?
14   A.  Well, this is the claw, the devil's claw.  That's
15   what you could call it.
16       This one is the 13th, the MS-13.  Everything's
17   got its meaning.
18   Q.  What does the one with two hands together mean?
19   A.  It's the same, the claw, but the two letters in
20   capital, the two letters in capitals.
21       THE INTERPRETER:  And, Your Honor, may the
22   witness be instructed -- the interpreter requests that
23   the witness be instructed to wait until the interpreter
24   finishes the interpretation before the witness answers,
25   so there's no overlap for the court reporter.

1          THE COURT:  Please.  Do that.

2               (Interpreter speaking to witness.)

3    BY MS. MARTINEZ:

4      Q.  What happened after these people you thought were

5    18th Street members left?

6      A.  I mean, we went back, because that person that

7    was supposed to fight did not come.  But on the way,

8    Talibán ran into a young lady, and he started chatting

9    with her.  Me and Duende and the others, we crossed the

10   street and we waited for him there, sitting down, for

11   him to finish talking.

12     Q.  What happened after that?

13     A.  Two persons went by that belong to the South Side

14   gang.  And then they ran into a person who supposedly

15   was from the 18th gang, but I don't know whether we got

16   them by mistake or not -- or we were mistaken or not.

17     Q.  Who were you with at the time?

18     A.  Well, I was there and Duende.  Talibán was still

19   talking with the girl, and the others were in groups of

20   two or three.

21     Q.  Where was Sixto?

22     A.  He was with the other group.  He was with Mogley

23   and Lala and another one who's called Puma.

24     Q.  What happened after these two individuals passed

25   by?

1   A.   Well, I just followed them with my eyes, and I
2   noticed when he gave drugs to the other person.
3   Q.   What happened after that?
4   A.   Well, when they came back again, I told Duende,
5   and he had seen it, too.  And so when they came back, we
6   started to throw the gang signs.
7   Q.   Why?
8   A.   Because they were selling drugs in the territory
9   that was controlled by the Mara.  It wasn't their
10  territory.
11  Q.   How did they react?
12  A.   We started exchanging insults, and then -- and
13  then we started following them.
14  Q.   Who followed them?
15  A.   I followed them, Duende did, and Sixto.
16  Q.   Did you catch up to them?
17  A.   No, no.  One took off to one -- in one direction
18  and the other one went into an apartment.
19  Q.   By that time, who were you with?
20  A.   When we ran them off, I was there, Duende and
21  Sixto, and Talibán came from where the girl was to where
22  we were.
23  Q.   What did the four of you do next?
24  A.   Well, when the guy entered the apartment, the
25  four of us kept walking up.  And then about seven or

1   eight people came out, who were from the gangs that we

2   had run off.

3       Q.   After the group went into the apartment -- I'm

4   sorry.  Did one of the two go into the apartment, or

5   both went into the apartment?

6       A.   When -- one went in one direction and the other

7   went into the apartment.

8       Q.   Where did the four of you go after that happened?

9       A.   Well, when the seven or eight of the other gang

10  came over, we took off running to another apartment on

11  Executive.

12      Q.   What is Executive?

13      A.   That's the name of the street.  It's Executive

14  Avenue.

15      Q.   What happened when the four of you got to the

16  other apartment on Executive?

17      A.   Talibán told us to wait outside, and he went in

18  the apartment.

19      Q.   Were you able to hear anything from inside the

20  apartment?

21      A.   Yes.

22      Q.   What?

23      A.   Loading a weapon was heard.

24      Q.   How long was Talibán in the apartment?

25      A.   Like three or four minutes.

G. Garcia - Direct                                    196

1    Q.   What, if anything, did he say when he returned?

2    A.   When he came back, he said, "Now those son of a

3    bitches are going to find out who we are."

4    Q.   What was Talibán wearing when he came out of the

5    apartment?

6    A.   He had on a black shirt, black shorts, black

7    socks, black shoes, and black gloves.

8              (Interpreter conferring with witness.)

9              THE WITNESS:  Black gloves.

10   BY MS. MARTINEZ:

11   Q.   Had he been wearing the black gloves before he

12   went into the apartment?

13   A.   No.

14   Q.   What did the four of you do after Talibán came

15   back down from that apartment?

16   A.   We followed them.

17   Q.   Followed who?

18             THE INTERPRETER:  Interpreter corrects.

19             THE WITNESS:  We followed him, because he

20   was going to where the group was.

21   BY MS. MARTINEZ:

22   Q.   Who was going to where the group was?

23   A.   Myself, Sixto, Duende and Talibán.

24   Q.   Who was in the lead?

25   A.   Well, the four of us were going, but he had the

 1    weapon.

 2        Q.   Who had the weapon?

 3        A.   Talibán.

 4        Q.   What happened next?

 5        A.   Duende told me and Sixto to go back, but Talibán

 6    said just Sixto should go back, and I should continue.

 7        Q.   Was Sixto part of MS-13?

 8        A.   I think he was a *paro*.  I didn't have much

 9    contact with him.

10        Q.   After Talibán told him to leave, did he, in fact,

11    leave?

12        A.   Yes, he left.  He went back.

13        Q.   After he left, what did the three of you -- you,

14    Duende and Talibán -- do?

15        A.   Duende and I went ahead.  Well, he stayed back

16    and we went forward.  And he was going to stay back, and

17    we went forward.  And then he was going to -- and he was

18    going to -- he was going to shoot the gun.

19        Q.   Where were you going?

20        A.   Where the group was.

21        Q.   And was the group still there?

22        A.   Yes, they were there.

23        Q.   How close did you get to the group?

24        A.   Like from here to where the Bible is.

25             THE COURT:  About six feet.

BY MS. MARTINEZ:

Q.   What happened as you approached?

A.   The others started to complain to us, asking why we had run off their brother, something like that.

     And we said to them, why were they going around selling drugs in an area that did not belong to them.

     Then, the guy who died came out and said that he knew the rules of the gang and that we were doing bad things.

     Well, then, when he pushed us, Duende hit him and I got down below, and then the shot fired.

Q.   Where did the shot come from?

A.   From behind.

Q.   Who was behind you?

A.   Talibán.

Q.   Where was Duende?

A.   Beside me.

Q.   What did you feel when you heard the shot?

A.   I felt like a burning on my shoulder.

Q.   Did you see what happened to the victim?

A.   Yes.

Q.   What?

A.   He fell and he was bleeding.

Q.   What did you do?

A.   Ran.

1    Q.   Where did you go?

2    A.   I went back to the apartment.

3    Q.   Where did Duende and Talibán go?

4    A.   I didn't see them.  And from then on, I didn't

5    see them again.

6    Q.   What did you do after you got to the apartment?

7    A.   Well, I arrived and I told the others what had

8    happened.  And we turned the lights off, because the

9    police were coming.

10   Q.   How long did you stay in the apartment?

11   A.   Just one night.

12   Q.   Where did you go after that?

13   A.   I called another contact for them to pick me up.

14   Q.   Where did you go?

15   A.   I was taken to Maryland in a car.

16   Q.   How long was it between then and when you were

17   arrested?

18   A.   Like a month and a half, around there.

19   Q.   Where were you during that time?

20   A.   I stayed in several places.

21   Q.   What were you doing?

22   A.   Nothing.  Nothing.  After that, I didn't keep

23   talking to them that much.  I spoke with the gang once

24   in a while.

25   Q.   Did you see Duende again?

G. Garcia - Direct                                      200

1    A.   No, I didn't see him again.

2    Q.   Did you see Talibán again?

3    A.   No.

4    Q.   Earlier, I asked you if you saw Talibán in court.

5  I would like you to stand up and make sure you can see

6  everyone, and let me know whether or not you see him.

7    A.   No, I can't recognize him real well.  But, if I

8  saw him in a photo, I would be able to recognize him

9  well.  It was almost two years ago that I saw him the

10 last time.

11   Q.   Do you know if Talibán has any tattoos?

12   A.   Yes, he has one.

13   Q.   What -- have you seen it before?

14   A.   Yes.  He has a tattoo on his stomach that is the

15 seal of El Salvador.

16         MS. MARTINEZ:  Your Honor, may -- -- Your

17 Honor, may we show -- I'm sorry.

18         Is the interpreter done?

19         THE INTERPRETER:  I'm sorry.  I'm just --

20 the word for *escudo* is not the seal, but the --

21         THE INTERPRETER:  The coat of arms.

22         THE INTERPRETER:  -- the coat of arms --

23 thank you -- for El Salvador.  That's teamwork.

24         MS. MARTINEZ:  Your Honor, may we show the

25 witness what has been admitted as Government's

1    Exhibit 72-A?

2              THE COURT:  Yes.

3              MS. MARTINEZ:  May we publish it?

4              THE COURT:  Yes.

5    BY MS. MARTINEZ:

6    Q.   Do you know who that is?

7    A.   That's Talibán.

8    Q.   Do you know someone named Junior?

9    A.   Yes.

10   Q.   Who's Junior?

11   A.   He's a guy who throws the gang, also.

12   Q.   Did you see him between the time of the murder

13   and the time that you were arrested?

14   A.   Yes, I saw him once.

15   Q.   For what reason?

16             THE COURT:  Excuse me.

17             THE WITNESS:  Because he told me that he

18   wanted to talk to me, as well as another member of the

19   Mara whom they named El Payaso.

20             THE COURT:  We've reached the end of the

21   day.  So, ladies and gentlemen, we're going to end for

22   today.

23             Please remember, do not discuss the case

24   with anyone.  Do not allow the case to be discussed in

25   your presence.  Don't do any research on the case.

1   Don't post anything on social media.  Do not review any
2   media reports.  There may be some media reports on
3   television, the Internet or in the newspaper.  Don't
4   read them.  Don't visit any of the areas mentioned in
5   the trial.  And leave your notes in the jury
6   deliberation room.
7               We'll resume on Monday, 10:00 o'clock.
8   Thank you.
9               (Jury excused.)
10              THE COURT:  He can be excused.
11              (Thereupon, the witness withdrew from the
12  stand.)
13              THE COURT:  We're in recess.
14              (Proceedings concluded at 5:02 p.m.)
15                          ---
16
17
18
19
20
21
22
23
24
25

1

2          CERTIFICATE OF REPORTER

3

4          I, Renecia Wilson, an official court

5   reporter for the United States District Court of

6   Virginia, Alexandria Division, do hereby certify that I

7   reported by machine shorthand, in my official capacity,

8   the proceedings had upon the jury trial in the case of

9   UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

10         I further certify that I was authorized and

11  did report by stenotype the proceedings in said jury

12  trial, and that the foregoing pages, numbered 1 to 203,

13  inclusive, constitute the official transcript of said

14  proceedings as taken from my shorthand notes.

15

16         IN WITNESS WHEREOF, I have hereto

17  subscribed my name this  25th  day of  May , 2016.

18

19                         /s/
                           _____
20                         Renecia Wilson, RMR, CRR
                           Official Court Reporter

21

22

23

24

25