IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,     )
                      )
            Plaintiff,   )
                      ) Crim. No. 1:14cr306
    vs.                )
                      )
JOSE LOPEZ TORRES, ALVIN GAITAN  ) April 25, 2016
BENITEZ, CHRISTIAN LEMUS CERNA,  )
OMAR DEJESUS CASTILLO, MANUEL   )
ERNESTO PAIZ GUEVARA, and       )
JESUS ALEJANDRO CHAVEZ,       )
                      )
           Defendants.  )

JURY TRIAL

<u>BEFORE</u>:    THE HONORABLE GERALD BRUCE LEE
              UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
               BY:  JULIA MARTINEZ, AUSA
                   TOBIAS TOBLER, AUSA

---

OFFICIAL COURT REPORTER:

          RENECIA A. SMITH-WILSON, RMR, CRR
          U.S. District Court
          401 Courthouse Square, 5th Floor
          Alexandria, VA 22314
          (703)501-1580

1   APPEARANCES (Continued)

2   FOR DEFENDANT JOSE LOPEZ TORRES

3           BYNUM & JENKINS, PLLC
            BY:  ROBERT L. JENKINS, JR., ESQ.
4           THE LEIVA LAW FIRM, PLC
            BY:  MANUEL E. LEIVA, ESQ.
5
    FOR DEFENDANT ALVIN GAITAN BENITEZ
6
            LAW OFFICE OF AMY LEIGH AUSTIN
7           BY:  AMY LEIGH AUSTIN, ESQ.
            SMITH & ZIMMERMAN, PLLC
8           BY:  JEFFREY D. ZIMMERMAN, ESQ.

9   FOR DEFENDANT CHRISTIAN LEMUS CERNA

10          LAW OFFICE OF CHRISTOPHER AMOLSCH
            BY:  CHRISTOPHER AMOLSCH, ESQ.
11          FRANK SALVATO, ESQ.

12  FOR DEFENDANT OMAR DEJESUS CASTILLO

13          FIRSTPOINT LAW GROUP, PC
            BY:  KATHERINE MARTELL, ESQ.
14          OLD TOWN ADVOCATES, PC
            BY:  MEREDITH M. RALLS, ESQ.
15

16  FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

17          LAW OFFICE OF W. MICHAEL CHICK, JR.
            BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
18
    FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
19
            JEROME P. AQUINO, ESQ.
20          ELITA C. AMATO, ESQ.

21
                            ---
22

23

24

25

1                              INDEX

2

3       WITNESS (Government) DIRECT  CROSS   REDIRECT   RECROSS

4       Genaro Sen Garcia        7      10       86       ---

5       Victor Ignacio          91     104      121       ---

6       Vidal Jiménez Sedillo  123     133      144       ---

7       Thomas Buckley         145     156      ---       ---

8       Aundrea Speede         161     ---      ---       ---

9       Ronald Witt            163     ---      ---       ---

10      Kevin Horan            171     191      ---       ---

11      Brian W. Bayliss       201     211      ---       ---

12      Raymond E. Betts       212 (Not completed)

13          (Court recessed)

14

15                          ---

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

(Thereupon, the following was heard in open court at 10:04 a.m.)

(Jury not present.)

THE CLERK:  1:14 criminal 306, United States versus Jose Lopez Torres, Alvin Gaitan Benitez, Christian Lemus Cerna, Omar Dejesus Castillo, Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez; with Spanish interpreters previously sworn.

THE COURT:  Good morning.  Good morning, everyone.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  Are we ready to proceed?

Ms. Blumberg apparently wants to make an adjustment to the record about a translation, so you all could take note of that.

But we should do it in the presence of the jury.

THE INTERPRETER:  Yes, sir.

THE COURT:  All right.

Ready to bring the jury out?

Yes.

MR. LEIVA:  Your Honor, I didn't raise this last time.  Would the Court allow her to tell us what it

1  is, just in case we may have a problem with her edited
2  version of what her translation is, rather than doing it
3  in front of the jury?
4          THE COURT:  Well, I don't want to edit her.
5  I want the jury to hear whatever she tells us, because
6  it seems to me the interpretation is a question of fact
7  for the jury.
8          MR. LEIVA:  I understand, Your Honor.
9          THE COURT:  All right.
10          You can bring our jury out, thank you.
11          (Jury present.)
12          THE COURT:  You may be seated.
13          Good morning, ladies and gentlemen.
14          THE JURORS:  Good morning.
15          THE COURT:  Good morning, Mr. Omar Dejesus
16  Castillo.
17          Good morning, Mr. Alvin Gaitan Benitez; good
18  morning.
19          Good morning, Mr. Manuel Ernesto Paiz
20  Guevara; good morning.
21          Good morning, Mr. Jesus Alejandro Chavez.
22          Good morning, Mr. Alvin Gaitan Benitez.
23          Good morning, Mr. Christian Lemus Cerna.
24          Good morning, Mr. Jose Lopez Torres.
25          And good morning, Counsel.

```
 1              Before we begin, what I'd like to do is to
 2   notify the jurors that the ninth floor conference room
 3   will not be available today for lunch.  Apparently
 4   they're using that room for the Clerk's Office for some
 5   training.
 6              It's come to my attention Ms. Blumberg wants
 7   to make an observation about her interpretation.
 8              If you would come forward, Ms. Blumberg, and
 9   tell us what changes you want to make, and why.
10              THE INTERPRETER:  Thank you.  The
11   interpreter wishes to correct the record.
12              At the end of the day on Friday, the witness
13   said, están haciendo las cosas mal, and I interpreted
14   that as, "They are doing bad things."  And this is
15   incorrect.  It should have been, "They are doing things
16   wrong," or "doing things badly."
17              THE COURT:  And what made you later change
18   your mind?
19              THE INTERPRETER:  Two of my colleagues
20   pointed this error out to me, and I agreed that they
21   were correct, and I felt that -- we agreed that it was
22   best that this be changed on the record, because it's a
23   change of meaning.
24              THE COURT:  And this testimony was whose
25   testimony?
```

1          THE INTERPRETER:  The witness who is
2    testifying again today, Mr. Sen Garcia.
3          THE COURT:  Okay.
4          THE INTERPRETER:  At the very end of the day
5    Friday.
6          THE COURT:  All right.
7          THE INTERPRETER:  Thursday.  Thank you.
8          THE COURT:  Thank you very much.
9          Any observations from counsel?
10          (No response.)
11          THE COURT:  All right.
12          Can you bring our witness out?  Thank you.
13          (Witness resumed stand.)
14          THE COURT:  Good morning, Mr. Garcia.  Good
15    morning.
16          THE WITNESS:  Good morning.
17          THEREUPON, GENARO SEN GARCIA, previously
18    duly sworn, testified further as follows:
19                DIRECT EXAMINATION (Continued)
20    BY MS. MARTINEZ:
21       Q.  Good morning.
22       A.  Good morning.
23       Q.  At the end of the day on Thursday, we were
24    talking about you going with Junior to try to recover
25    the gun.  Do you remember that?

```
 1              THE INTERPRETER:  "Going with Junior"?
 2              MS. MARTINEZ:  With Junior.
 3              THE WITNESS:  Yes.
 4   BY MS. MARTINEZ:
 5      Q.   Where did you go with Junior to try to recover
 6   the gun?
 7      A.   To the place where the owner of the weapon lived.
 8      Q.   Were you able to recover the gun?
 9      A.   No.
10      Q.   At some point after that, were you arrested?
11      A.   No.
12      Q.   Well, at some point in the future from that time,
13   did you come to be arrested?
14      A.   No.  I handed myself in.
15      Q.   What do you mean you handed -- you turned
16   yourself in?
17      A.   I turned myself to the police.
18      Q.   Please describe that to the jury.
19      A.   How do you want me to describe it?  I do not
20   understand.
21      Q.   Tell the jury what happened.
22      A.   So, I did not have contact with the gang members,
23   and then I went to a church, and one of the sisters
24   began --
25              MR. AQUINO:  Objection as to hearsay.
```

G. Garcia - Direct                                                    9

1      MS. MARTINEZ:  Your Honor, I don't think
2  we're eliciting hearsay here.
3      THE COURT:  I'm not sure that he said
4  anything else someone else was saying.  Let him complete
5  the answer.  He can complete the answer.
6      THE WITNESS:  So I went to a church, and one
7  of the sisters began talking to me about Christ, and she
8  told me that it was better to face my --
9      MR. AQUINO:  Objection again, Judge.
10      THE COURT:  All right.  Objection to what
11  the nun said to the witness.
12  BY MS. MARTINEZ:
13  Q.  Would you please tell us what happened, without
14  saying what the nun said to you.
15  A.  So, after that, I contacted the detective that
16  was in charge of the case, and told him that I wanted to
17  turn myself in.  But I didn't want it to be near the
18  place where the events took place, because I didn't want
19  the other gang members to realize that I was turning
20  myself in.
21  Q.  Did you, in fact, turn yourself in?
22  A.  Yes.  But before that, I went to Arlington and I
23  told a policeman, a patrolman who was there, kind of
24  take -- looking out to the place that I wanted to hand
25  myself in.

1          And he said that --
2                MR. AQUINO:  Objection, Judge.
3                THE COURT:  Sustained.
4    BY MS. MARTINEZ:
5        Q.  What happened after you approached the police
6    officer?  Without telling me what anyone said.
7        A.  So, since he would not accept my turning myself
8    in, then I had to call the detective that I ended up
9    speaking with.
10       Q.  And, after that, did you turn yourself in?
11       A.  Yes.
12       Q.  Who were you with?
13       A.  With a sister, member of the church.
14       Q.  After you turned yourself in, were you taken into
15   custody?
16       A.  That's correct.
17       Q.  Have you been in custody continuously since that
18   time?
19       A.  Yes.
20               MS. MARTINEZ:  No further questions, Your
21   Honor.
22                      CROSS-EXAMINATION
23   BY MS. AMATO:
24       Q.  Good morning.
25       A.  Good morning.

1    Q.   My name is Elita Amato and I, along with Jerry

2    Aquino, represent Mr. Jesus Chavez.

3         Now, Mr. Sen Garcia, you've been connected with

4    MS-13 since you were 14 years old, correct?

5    A.   Yes, correct.

6    Q.   And, you are now 21 years old?

7    A.   That's correct.

8    Q.   And, at the time of the shooting of June 2014,

9    you were 19 years old?

10             THE INTERPRETER:  Say again.  "You were..."

11             MS. AMATO:  Nineteen years old.

12             THE WITNESS:  That's correct.

13   BY MS. AMATO:

14   Q.   So, at that point, you had been an MS member for

15   five years?

16   A.   Yes.

17   Q.   You started with MS-13 as a gang member when you

18   were living in Guatemala?

19   A.   Yes.

20   Q.   And, that's where you're from?

21   A.   Yes.

22   Q.   And, at that time, you had already dropped out of

23   school?

24   A.   Yes.

25   Q.   And, at 14 years old, you decided that the gang

1    life was the life for you?

2       A.   Yes.

3       Q.   The life of running after 18th Street members,

4    correct?

5       A.   The 18th Street and other gangs.

6       Q.   Other *chavalas*?

7       A.   Yes.

8       Q.   Because, as you told us on direct on Thursday,

9    that you joined the gang for revenge, correct?

10      A.   Yes.

11      Q.   Now, you first entered as a *paro*?

12      A.   Yes.

13      Q.   And, as a *paro*, you did the favors, correct?

14      A.   That's correct.

15      Q.   Buy cocaine?

16      A.   I didn't say which drug specifically, but I said

17   drugs.

18      Q.   All right.  Well, did you buy cocaine for the

19   gang?

20      A.   I did.

21      Q.   Crack?

22      A.   I don't remember which drugs, but yes, I did.

23      Q.   And you would deliver the drugs for the gang,

24   correct?

25      A.   I would buy the drugs for them.  They gave me the

1    money.  I would go to the person that sold them and then
2    give the drugs to them.
3        Q.   Correct.
4             So you were going to get the drugs and delivering
5    it to them, correct?
6        A.   Yes.
7        Q.   And then you became a *chequeo*?
8        A.   Uh-huh, that's correct.
9        Q.   Yes.  Okay.  And, as a *chequeo*, you helped to
10   keep the neighborhood an MS territory?
11       A.   Yes.
12       Q.   And, to do that, that meant fighting others,
13   correct?
14       A.   Sometimes.
15       Q.   Right.  Doing whatever you needed to do to keep
16   the territory safe, correct?
17       A.   Yes, to warn the homeboys if there was something
18   that was not correct.
19       Q.   And, when we say "not correct," we're talking
20   about other -- *chavalas*, gang members of other gangs?
21       A.   Yes.
22       Q.   And, you were then jumped into the gang?
23       A.   Yes.
24       Q.   And, you were jumped into the clique called Las
25   Delicias clique, correct?

1     A.   Yes.

2     Q.   And, to spell that for the court reporter, that's

3   spelled -- the first word is L-a-s, and the second word

4   is D-e-l-i-c-i-a-s, correct?

5     A.   Yes.

6     Q.   And, at no time were you ever a member of the

7   clique called Via Satélite?

8     A.   No, no.  That's a Salvadorian clique.

9     Q.   And just so we can spell that for the court

10  reporter, the first word is V-i-a, the second word,

11  S-a-t-e-l-i-t-e, correct?

12    A.   Yes.

13    Q.   So, even though at some later point when you came

14  to the United States -- you had never been a member of

15  the Via Satélite clique, correct?

16    A.   No, I would get together with others who were

17  from that clique, but I was never jumped into the

18  clique.

19    Q.   So, when you told other people, other homies in

20  the DC -- excuse me -- in the U.S. that you were a

21  member of Via Satélite, that was incorrect?

22    A.   Yes.

23    Q.   It was a lie?

24    A.   That was a lie that I told, so that they wouldn't

25  know where I was from.

G. Garcia - Cross                                                15

1    Q.   Now, when you were jumped in, you were given the

2    name Gatuso?

3    A.   I always had the nickname Gatuso.  That's what I

4    would be called.  But, yes, that's what they would call

5    me there.

6    Q.   But when you were asked on direct examination on

7    Thursday if you were given the name Gatuso when you were

8    jumped in, you told us yes?

9    A.   No, well, I had said that I always had that name.

10   That's a name that I've had from the time that I was

11   little from my neighborhood.

12        And I didn't really want to say what the name

13   meant, but it's a nickname that I got because of my

14   name.  My name is Genaro.  There's a player that has

15   that name, so that's why I got that nickname.

16   Q.   There is an Italian football, soccer player with

17   that name, correct?

18   A.   Yes, that's correct.

19   Q.   His name is Gennaro Gattuso, correct?

20   A.   Yes, that's correct.

21   Q.   And, but he spells his first name differently

22   than yours?

23   A.   I don't know.  Honestly, I don't know.  I just

24   know that his name is Gennaro, and so is mine.  And I

25   didn't want to explain it when I came here.  There were

1   a lot of gang members, and when they would ask me what

2   my name was, I would say that, because I didn't want to

3   say my name.

4       Q.   All right.  So you're telling me that you don't

5   know much about Gennaro Gattuso?

6       A.   No.

7       Q.   You're telling us that you were named after him?

8       A.   Well, they gave me that name.  They gave it to

9   me.  I didn't give it to myself.

10      Q.   Who are you talking about?  Your parents?

11      A.   No, no, people on the street.

12      Q.   Well, you don't look like Mr. Gennaro Gattuso.

13      A.   No, but, I imagine because of my name, I got the

14  nickname.  It's not my fault that they gave me that

15  nickname.

16      Q.   Well, *gatuso*, the word *gatuso* also comes from the

17  word "cat," correct?

18      A.   Well, honestly, I don't know.  You all can give

19  it whatever meaning you want.

20      Q.   Well, you told us on Thursday that your name has

21  many different meanings, correct?

22      A.   Yes, that's right.

23      Q.   All right.  So one is, as you said, there's a

24  soccer player with the name Gennaro Gattuso, correct?

25      A.   Yes, that's right.

1      Q.   But it also comes from the word "cat" --
2   g-a-t-u-s-o, Gatuso, is how you spell your name,
3   correct?
4      A.   Yes, that's right.
5      Q.   And, you live up to that name, correct?
6      A.   No.  From the time I was little, I was called
7   that.  I don't know why.
8      Q.   Well, cats are known to have nine lives, right?
9   That's what they say.
10     A.   I guess, but I don't think so.
11     Q.   Well, let me -- you recall speaking with law
12  enforcement the day that you turned yourself in.
13  Remember that?
14     A.   Yes.
15     Q.   And, at the end of that meeting, it was just you
16  and one of the other -- one law enforcement officer, and
17  you guys were talking about names.  Remember that?
18     A.   I don't remember very well, honestly.
19     Q.   He told you his name was -- he told you his
20  nickname was Bear.
21          MS. MARTINEZ:  Objection, Your Honor,
22  hearsay.
23          MS. AMATO:  It goes to the conversation that
24  the law enforcement told him about his nickname --
25          THE COURT:  Would that be hearsay?  You're

1    reciting what the law enforcement officer said --

2                MS. AMATO:  No, I --

3                THE COURT:  -- for the truth of the matter

4    asserted.

5                MS. AMATO:  It's to show his response, which

6    is --

7                THE COURT:  All right.  Well, you can ask

8    him the question without calling for hearsay.  Objection

9    sustained.

10   BY MS. AMATO:

11      Q.  At the end of that interview, you told the

12   officer that your name, Gatuso, means -- comes from a

13   cat, someone who survives?

14      A.  You could say that it has many meanings.  You

15   could ask any gang member what their nickname means, and

16   they could tell you that means this, this, or that.  But

17   really the only person who would know what it means is

18   the person who gave that name.

19      Q.  Right.

20      A.  (Speaking, not translated.)

21      Q.  Excuse me.  There's no question.

22          But when you spoke with that officer, you

23   actually told him at that time that that's what your

24   name meant, it's like a cat, cats constantly survive,

25   they're always surviving?

1    A.   Maybe I did tell him that.  I don't remember that
2    well.
3    Q.   And that's what you're trying to do here today,
4    is trying to survive, correct?
5         It's a yes or no, sir.
6    A.   Well, honestly, we all try to survive.  But I was
7    told that I had to tell the truth, and what I'm saying
8    is the truth.
9    Q.   And you're here to save yourself from spending
10   the rest of your life in jail, correct?
11   A.   Honestly, I'm not trying to save myself.  All
12   they gave me was a little hope, and I'm just trying to
13   say what really, what happened.  I'm just trying to say
14   the truth, and I'm trying to not hide anything and to
15   just tell the truth.
16   Q.   All right.  Well, we'll get into that a little
17   bit more later.
18        While you were a member of the gang in Guatemala,
19   you did violent things, correct?
20   A.   Yes, that's right.
21   Q.   You've already told us that you stabbed an 18th
22   Street member, correct?
23   A.   Yes.
24   Q.   And, he may have died for all you know, correct?
25   A.   Maybe he did, maybe he didn't.

1    Q.   But maybe he did?

2    A.   Maybe.

3    Q.   And, the whole reason for joining gang -- for you

4    to join a gang was because you wanted to kill rivals,

5    correct?

6    A.   Yes, that's right.

7    Q.   And, you also were involved in extortions?

8    A.   Yes.

9    Q.   And, you used violence sometimes to enforce those

10   extortions?

11   A.   Not necessarily with violence, because it was a

12   fee that the stores had to pay us.

13   Q.   The stores had to pay you a fee; is that what

14   you're saying?

15   A.   (Speaking, not translated.)

16   Q.   These are yes or no questions.  Yes or no?

17   A.   Yes, yes, it's true.

18   Q.   And, these were -- excuse me -- these were stores

19   that didn't belong to MS-13, correct?

20   A.   No.

21   Q.   These were stores that were owned by moms and

22   pops, correct, small stores?

23   A.   Yes.

24   Q.   Family-owned stores?

25   A.   Large stores.

1   Q.   Only large stores?

2   A.   Whatever size.  There was a variety.

3   Q.   Some were small stores, correct?

4   A.   Yes.

5   Q.   Some were large stores?

6   A.   Yes.

7   Q.   It didn't really matter, right?

8   A.   No.

9   Q.   The point was, MS-13 wanted money from these

10  stores, right?

11  A.   Yes, that's right.

12  Q.   And, if the stores didn't pay up, then there were

13  consequences?

14  A.   Yes.

15  Q.   Now, at some point, you decided to come to the

16  United States?

17  A.   Yes, that's right.

18  Q.   And, the first time you tried to come over, you

19  were caught at the border, right?

20  A.   In Belize.

21  Q.   You were caught in Belize?

22  A.   Yes.

23  Q.   You were not caught in the United States?

24  A.   No.

25  Q.   You did not tell police officers, when you were

1    arrested, that you were deported from the United States

2    at the border to Belize?

3        A.   No.  I was caught at the Belizean border.

4        Q.   So, do you remember -- well, you remember telling

5    law enforcement that you were deported at the border

6    from the United States to Belize.  Do you remember that?

7        A.   No, no, no.  I didn't say that.

8        Q.   But you tried, anyway.  The first time it didn't

9    work, correct?

10       A.   Yes, that's right.

11       Q.   And when you went back to Guatemala, the gang

12   wasn't happy with you, were they?

13       A.   I didn't go all the way back to the place where I

14   lived.  I just went back from the Belizean border to the

15   Guatemalan border, and then I tried again.

16       Q.   Well, the question was:  The gang wasn't happy

17   when they heard that you had tried to leave Guatemala

18   without their permission, correct?

19            MS. MARTINEZ:  Objection, Your Honor, lack

20   of foundation.

21            THE COURT:  Sustained.

22   BY MS. AMATO:

23       Q.   Did you receive permission from the gang to leave

24   Guatemala?

25       A.   No.

1   Q.   Do you believe that was going to make them angry?

2   A.   Yes, of course.

3   Q.   Now, you did finally come successfully into the

4   United States, correct?

5   A.   Yes.

6   Q.   And, that was illegally, correct?

7   A.   That's right.

8   Q.   And, you've been here ever since, correct, in the

9   United States?

10  A.   Yes.

11  Q.   Now, you arrived in the United States in March of

12  2011?

13  A.   Yes.

14  Q.   And, you were 16 years old?

15  A.   Yes.

16  Q.   And, you first lived with your mother, correct,

17  in Maryland?

18          THE INTERPRETER:  Could you please repeat

19  the question.

20  BY MS. AMATO:

21  Q.   You first lived with your mother in Maryland?

22  A.   Yes.

23  Q.   And then you moved to Chirilagua?

24  A.   Yes.

25  Q.   And, just like in Guatemala, you didn't go to

1    school here, correct?

2        A.   No.

3        Q.   So, you were hanging out all day, correct?

4        A.   Working.

5        Q.   All right.  And, you maintained your gang

6    allegiance?

7        A.   I didn't communicate with them any more.  I would

8    just communicate with them once in a while.  It wasn't

9    every day.

10       Q.   Right.  But you did communicate with them?

11       A.   Yes, for a while, I did.

12       Q.   And, when you first came here, you wanted to set

13   up your own clique?

14       A.   Yes, that was my purpose.

15       Q.   But it didn't work?

16       A.   After I talked to them, after my daughter was

17   born, I just stopped thinking about that.

18       Q.   Well, when you say "talked to them," you're

19   talking about the gang back in Guatemala, correct?

20       A.   Yes.

21       Q.   And, you ended up deciding that you wanted to

22   join another clique instead, correct?  Another clique?

23       A.   Yes.

24       Q.   Okay.  You wanted to join the PVLS clique,

25   correct?

G. Garcia - Cross                                                    25

1    A.   I didn't want to join that clique.  I just walked
2    with that clique.
3    Q.   Well, that was Duende's clique, right?
4    A.   Yes.  I was walking with them.  I hadn't joined
5    that clique.  I hadn't been jumped.
6    Q.   Right.  You hadn't been jumped in, but you were
7    interested in joining that clique, correct?
8    A.   Well, it's not that I was interested, but it's
9    simply that I talked down, and I said that I wanted
10   to -- I simply just -- I talked down to them.  I said
11   that I wanted to walk with them.  I talked to the clique
12   that was down there.  And they told me that I should
13   just walk with one of them.  But I wasn't trying to be
14   jumped in.
15   Q.   So, you actually talked with -- you talked with
16   the clique members here, locally, correct?
17   A.   Yes.
18   Q.   And, you talked with members in El Salvador,
19   correct?
20   A.   Yes, that's right.
21   Q.   And, you let the people, the clique know here
22   that you were -- that you were looking for another
23   clique to join, correct?
24   A.   Well, Duende told me that I should join the
25   clique.  It's not that I wanted to join the clique.  He

1    just said, "Why don't you walk with us?"

2         And then the clique down there told me that I

3    should try to get my clique ahead, to move my clique up.

4         And he said, "Why don't you walk with us?"

5    Q.   And you did walk with them, right?

6    A.   I did walk with them, but I didn't get jumped in

7    by them.

8    Q.   Well, you didn't have a chance to get jumped in,

9    did you?

10   A.   Because there was no time, because this issue

11   came up.

12   Q.   Okay.  Now, on Thursday, you told us that you met

13   Duende on Facebook.

14   A.   Yes.

15   Q.   So, it wasn't when you were on a bus going to

16   work?

17   A.   That was with another gang member.  It was not

18   Duende specifically.

19   Q.   Okay.  So, when you told law enforcement that you

20   met Duende on a bus when you were going to your work in

21   Shirlington, that was not correct?

22   A.   I did not say Duende.  I said members of the

23   MS-13.  They were other members of the MS-13.  I did not

24   say Duende.

25            MS. AMATO:  Court's indulgence.

BY MS. AMATO:

Q.   So, it's your testimony here today that you did not tell Detective Ignacio that you met Duende when you worked in Shirlington and you took the bus?

A.   No.

Q.   You did work in Shirlington, right?

A.   I did work at a cinema in Shirlington.

Q.   And did you also work at the Hoffiman (sic) cinema theater as well?

THE INTERPRETER:   Hoffiman?

MS. AMATO:   Hoffman.   Hoffman.

THE WITNESS:   In Tysons?

BY MS. AMATO:

Q.   I'm asking you.   Do you recall working at another theater besides Shirlington?

(Question not translated; witness answering.)

THE INTERPRETER:   The interpreter would like to indicate that the witness is not waiting for the interpretation.

MS. AMATO:   I'm aware of that.

THE WITNESS:   I don't remember the name of the cinema specifically, but I did work for another one in Tysons Corner.

BY MS. AMATO:

Q.   All right.   So, you do admit that you worked at a

1  movie theater in Shirlington, correct?

2      A.  Yes.

3      Q.  And, that you also worked at another movie

4  theater at Tysons Corner.

5      A.  Yes.

6      Q.  And, but it's your testimony that you did not

7  meet Duende when you took a bus to Shirlington?

8      A.  No.

9      Q.  But, you do admit that you saw him at McDonald's,

10 and that was the first time you met him, correct?

11     A.  Yes.

12     Q.  And on Thursday, you told us that you ran into

13 him just by chance, correct?

14     A.  Yes.

15     Q.  But, that's not what really happened.

16     A.  So, what happened?

17     Q.  Well, didn't you and he, on Facebook, plan a

18 meeting?

19     A.  Yes, we did get in touch, but we did not plan to

20 meet each other there.

21     Q.  Weren't you both planning to meet there to have a

22 fight?

23             THE INTERPRETER:  "Have a fight"?

24             MS. AMATO:  Have a fight, to fight each

25 other.

1              THE WITNESS:  It was not at the McDonald's.

2    It was behind a laundromat.

3    BY MS. AMATO:

4        Q.   Right.  It was supposed to be behind a

5    laundromat, but then you ended up going to McDonald's.

6        A.   No, that was not -- when I met with him was about

7    three days later or a week later, and it was by chance.

8        Q.   Okay.  All right.  So you're telling us now that

9    you did meet with him at a laundromat to fight, correct?

10       A.   Yes.

11       Q.   But he thought you were an 18th Street member?

12       A.   Yes.

13       Q.   You didn't know what he was?

14       A.   No.

15       Q.   So, when you two of you got together, you both

16   realized that you were actually MS members, correct?

17       A.   Yes.

18       Q.   And so there was no fight?

19       A.   No.

20       Q.   Because you were members?

21       A.   Yes.

22       Q.   Both homies?

23       A.   Yes.

24       Q.   And that's when you began hanging out with him?

25       A.   Yes.

1    Q.   Now, you ended up hanging out with him every day,
2    correct?
3    A.   Not initially.
4    Q.   But, later you did, correct?
5    A.   In the last two weeks.
6    Q.   Two weeks after that, correct?
7    A.   The last two weeks before this issue came up.
8    Q.   So, you're saying that after you met him and that
9    you both realized you were homeboys, that you didn't
10   hang out with him?
11   A.   No, I would just get in touch with him, but I did
12   not go to where he was every day, on a daily basis.  We
13   just got in touch on Facebook.
14   Q.   Okay.  Not on a daily basis, but you would keep
15   contact with him, correct?
16   A.   Yes, but not every day.
17   Q.   And, at some point, you ended up leaving the area
18   for a bit, correct?
19   A.   Yes.
20   Q.   And, you left with some -- some woman, correct?
21   A.   Yes.
22   Q.   And, that was after the time you had punched in
23   the face the mother of your child, correct?
24   A.   I did not punch her in the face.
25   Q.   Well, that's what you say, correct?

1       A.   And what ended up being clarified.

2       Q.   Well, when you say what ended up being verified,

3   you went to court for that, correct?

4       A.   Yes.  And that's why I went to trial, because I

5   knew that I had not done, and she just got angry because

6   I separated from her.

7       Q.   Now, when you moved back to the area -- well,

8   even before you moved back to the area, you kept in

9   contact with Duende, correct?

10      A.   Yes.

11      Q.   And, then when you came back, you had daily

12  contact with him?

13      A.   When I came back, I had daily contact with him,

14  yes.

15      Q.   And, you were living in Chirilagua?

16      A.   Yes.

17      Q.   And, he was living in Chirilagua, more or less?

18      A.   Yes, or he was there all the time.

19      Q.   And, you looked up to him, correct?

20      A.   I did not look up to him.  I just respected him

21  as a gang member, like I would anybody.

22      Q.   But, you thought he was a big shot in his clique,

23  right?

24      A.   Well, not a big shot.  They're all the same.

25      Q.   Well, some people are leaders, correct?

1    A.   Some.

2    Q.   And, you thought he was one of the leaders?

3    A.   Being a leader doesn't mean that you are more

4  than the rest.  It is a responsibility.  And at the end

5  of the game, we are all the same.

6    Q.   But, you thought he was a leader?

7    A.   I did never thought that.  There was always

8  somebody above him.

9    Q.   Right.  But, leaders can have -- a person can be

10  a leader and have someone above him, correct?

11   A.   Yes.

12   Q.   All right.  Let's talk about the June 19th

13  shooting.  Now, back at that point, you were living in

14  Chirilagua.

15   A.   Yes.

16   Q.   And, the day of the shooting you went over to

17  Christopher's that day.

18   A.   Yes.

19   Q.   He lived in another building in the same

20  apartment complex as you, correct?

21   A.   Yes, that's correct.

22   Q.   And, when you went over there, you and

23  Christopher basically smoked marijuana all day, correct?

24   A.   Yes, but not only the two of us; everybody that

25  was there.

G. Garcia - Cross                                                    33

1     Q.   Okay.  But I'm asking about you.  All right?

2     A.   That's correct.

3     Q.   So, you and Christopher and whoever else was

4  there smoked marijuana all day, correct?

5     A.   Yes.

6     Q.   And, after going to Christopher's, you don't

7  remember well what happened, because of the drugs that

8  you used that day?

9     A.   Yes, I do remember what happened.

10    Q.   Well, when you turned yourself in, you spoke with

11 Detective Ignacio.  You remember that?

12    A.   Yes.

13    Q.   And, before you turned yourself in, you spoke to

14 the pastor that had helped you to turn yourself in,

15 correct?

16    A.   Yes.

17    Q.   And, Detective Ignacio told you, you had no

18 reason to lie?

19    A.   Yes.

20    Q.   And, he told you to tell the truth?

21    A.   Yes.

22    Q.   And, you told Detective Ignacio that after going

23 to Christopher's, you don't remember well what happened

24 because of the drugs you used that day?

25    A.   I said that because I was afraid, because I knew

G. Garcia - Cross                                                34

1    that they were going to put me together where they all
2    were, and if I had said anything, then something could
3    have happened either to me or to my family.  So that's
4    the truth.
5        Q.   Well, you told them that, though, right?
6                THE INTERPRETER:  Say again.
7    BY MS. AMATO:
8        Q.   You made that statement to Detective Ignacio,
9    right?
10       A.   Yes, that's what I said.
11       Q.   And, in that same interview with Detective
12   Ignacio, yes or no, you told him that you have periods
13   of 20 to 30 minutes when you cannot recall what
14   happened?
15       A.   I do not remember, to tell the truth, whether
16   that was what I said or not.
17       Q.   And not only did you say that, but you said that
18   the pastor was a witness to that.
19       A.   Of what?
20       Q.   Of your 20 to 30 minutes loss of memory.
21       A.   I actually do not understand your question.  I
22   don't know whether you can rephrase it or something.
23       Q.   I can most definitely rephrase it.
24           When you told Detective Ignacio that there were
25   periods of up to 20 to 30 minutes when you can't

1   remember what happened during that time period, you said

2   the pastor is even a witness to that.

3       A.   What I need for you to explain to me is, when was

4   the time when I lost the 20 to 30 minutes of memory,

5   whether you're talking about the time of events.

6       Q.   When you spoke with Detective Ignacio, he was

7   asking you questions about what happened that night.

8       A.   Yes.

9       Q.   And, you answered him that you don't remember,

10  because there were periods of up to 20 to 30 minutes

11  when you can't remember things that happened, and that

12  the pastor is even a witness to that.

13          Now, do you remember making that statement?

14      A.   The pastor was not there the day of the homicide,

15  for her to testify.

16      Q.   Right.  But, you said that the pastor could be a

17  witness to your inability to remember things that

18  happened?

19      A.   I don't remember -- never said that -- well, I

20  don't remember that I have ever said that, or maybe they

21  just misunderstood me.

22      Q.   Okay.  Now, so the night of the fight, you

23  were -- you were ready to fight that night?

24      A.   Yes.

25      Q.   You were ready to fight a *chavala*?

G. Garcia - Cross

1    A.   Yes.

2    Q.   You were ready to fight an 18th Street member?

3    A.   That is the same thing, the *chavalas* and the

4    18th Street.

5    Q.   But you were interested not just in any *chavala*;

6    You were interested in 18th Street, correct?

7    A.   Yes.

8    Q.   And, you were ready to kill?

9    A.   Yes.

10   Q.   Now, the first thing that you agreed to do that

11   night is to go with Christopher to a fight that

12   Christopher was supposed to have, correct?

13   A.   Yes.

14   Q.   And, he was supposed to fight a guy named Herlin.

15            THE INTERPRETER:  Herlin?

16            MS. AMATO:  Herlin, H-e-r-l-i-n.

17            THE WITNESS:  I don't know the name, but he

18   just told me to go with him to a fight that he was going

19   to have.

20   BY MS. AMATO:

21   Q.   Okay.  And you went because you wanted to be

22   there to back him up, correct?

23   A.   Yes.

24   Q.   Because there was concern that the other guy

25   would come with his own people, too, correct?

1    A.   Yes.

2    Q.   All right.  And, but this guy never showed up,

3  right, the guy that was supposed to fight Christopher?

4    A.   That's correct.

5    Q.   And, then while you were waiting for this guy,

6  you saw some people who you thought were 18th Street

7  members, correct?

8    A.   Yes, that's correct.

9    Q.   And you were getting ready to fight them?

10    A.   Yes.

11    Q.   But the police showed up?

12    A.   At that time, nobody arrived.

13    Q.   You don't remember seeing police show up at all,

14  or drive through?

15    A.   That was later.

16    Q.   All right.  So, then there was another group of

17  people that you saw that you were interested in

18  fighting, correct?

19    A.   What do you mean?  I don't --

20    Q.   Okay.  All right.  Well, I'm going to move on.

21       At some point, you saw two guys.

22    A.   Yes, two young guys.

23    Q.   And one of the guys you recognized?

24    A.   Not recognize -- well, I knew both of them by

25  sight.

1    Q.   Right.  Okay.  So you recognized them by sight,

2    correct?

3    A.   Yes.

4    Q.   And, you recognized one of them as someone who

5    lived in the apartment complex at that time.

6    A.   Yes.

7    Q.   One of the other apartment buildings of the same

8    complex that you lived in, correct?

9    A.   On the other side, not in the same building.

10   Q.   Not in the same building, correct?

11   A.   He lived on the other street, by the name of

12   Russell.  I lived on Executive.

13   Q.   Right.  And those buildings are all the same --

14   of the same complex, right?

15   A.   I think.

16   Q.   All right.  And, you knew that this guy sold

17   drugs, correct?

18   A.   I did not actually know that he sold drugs, or

19   specifically that he sold drugs.

20   Q.   All right.  Well, you knew he had brothers,

21   correct?

22   A.   I did not know.

23   Q.   But, you told us on Thursday that you saw him

24   selling drugs?

25   A.   I saw them selling drugs, but I didn't know from

G. Garcia - Cross                                                    39

1    before that he sold drugs.

2        Q.   Okay.  But, at least on that day, you saw him

3    selling drugs?

4        A.   Yes.

5        Q.   And, you wanted to teach him a lesson for selling

6    drugs in your area, correct?

7        A.   Not my area, but the area where I was walking on.

8    And if I had -- I was doing that, then I had to be

9    responsible for the area.

10       Q.   Right.  So, the area that you walked, which was

11   the area where you saw him selling drugs, correct?

12       A.   Yes.

13       Q.   And that was the area you walked as a gang

14   member, correct?

15       A.   Yes.

16       Q.   And, because he was selling drugs in your area,

17   you believed he needed to pay you?

18       A.   Pay -- not me, but pay to the members of that

19   specific clique, not me.

20       Q.   Okay.  So, not you, but he needed to pay MS,

21   correct?

22       A.   Yes.

23       Q.   Just like back in Guatemala, the stores that you

24   would used to extort, correct?

25       A.   Yes.

1    Q.   The same thing is going on, right?  The same
2    theory that...
3    A.   Yes.
4    Q.   So, you ran after him?
5    A.   We ran after him.
6    Q.   Well, you ran after him?
7    A.   Yes, me and two others.
8    Q.   Right.  And I'm asking you, specifically.
9    A.   Yes, that's correct.
10   Q.   Now, according to you -- well, strike that.
11        The one that you saw sell drugs, he ran into his
12   apartment?
13   A.   Yes.
14   Q.   And the other one just ran away?
15   A.   He went down the other street.
16   Q.   Okay.  Now, after that, according to you, Talibán
17   went in to some apartment.
18   A.   Yes.
19   Q.   But, it was Detective Ignacio, during your first
20   interview with him when you turned yourself in, who told
21   you to say that, correct?
22   A.   No.  I just told the truth.
23   Q.   Well, on August the 13th, 2014, the day that you
24   turned yourself in, Ignacio told you, "I do not want to
25   tell you" --

1              MS. MARTINEZ:  Objection, Your Honor.

2              THE COURT:  Sustained.

3     BY MS. AMATO:

4        Q.  You did not tell Detective Ignacio, until he said

5     something to you, that Talibán went into an apartment.

6        A.  Could you repeat the question?

7        Q.  Initially, you did not tell Detective Ignacio

8     that you saw Talibán go into an apartment, in your

9     meeting with him on August the 13th of 2014.

10       A.  I don't remember if I told him or not.  It's been

11    more than two years now.

12       Q.  Well, it's only after he told you that, "I do not

13    want to tell you what" --

14             MS. MARTINEZ:  Objection, Your Honor.

15             MS. AMATO:  Your Honor, may we approach?

16             THE COURT:  Well, hearsay is not in -- there

17    are 24 exceptions.  Pick one.

18             MS. AMATO:  Your Honor --

19             THE COURT:  There are 24 exceptions.  Pick

20    one.

21             MS. AMATO:  It's not hearsay.  It's not for

22    the truth of the matter.

23             THE COURT:  I'll be the judge of that.

24    Objection sustained.

25             MS. AMATO:  Your Honor, I'd ask that we

 1    approach, please.

 2              THE COURT:  Come to sidebar.

 3              (Thereupon, the following side-bar

 4    conference was had:)

 5              THE COURT:  Tell me what you're doing.

 6              MS. AMATO:  Your Honor, what I'm doing, I'm

 7    trying to show that Chris- -- first of all, the

 8    statement that Detective Ignacio said to him, Detective

 9    Ignacio wasn't there.  So he doesn't know, in terms of

10    the shooting, what happened, whether Talibán went into

11    the apartment or not.

12              What I'm trying to show is that this witness

13    first did not acknowledge or say that Talibán went into

14    the apartment.  It was after Detective Ignacio said to

15    him, that, "We have" -- I don't remember the exact

16    statement, but that Detective Ignacio told him that, "We

17    know that some one of you went into the apartment, not

18    you, but someone else."

19              And it is based on that, that then this

20    witness changed his testimony.  So it's the effect on

21    the listener, this witness, to then change his story.

22              So that's why I don't believe it's hearsay,

23    because it's -- I'm not saying that it's truthful, what

24    Detective Ignacio said.

25              THE COURT:  Aren't you?

1          MS. AMATO:  Well, no.

2          THE COURT:  You're saying that

3    Detective Ignacio told him something, and that he

4    repeated it.

5          MS. AMATO:  Right.

6          THE COURT:  That's the classic definition of

7    hearsay.  If you have an exception, tell me.  You can

8    ask Detective Ignacio that question, if you'd like, but

9    he's not on the stand yet.

10          MS. AMATO:  Right.  I understand that.  I'm

11   seeing it as -- it doesn't really matter if what

12   Detective Ignacio is saying is truthful or not, because

13   we don't care.

14          We just -- Detective Ignacio wouldn't know

15   who went in the apartment, or if anybody did or didn't.

16   It's the effect that it has on this witness, that after

17   he hears that statement, then he says, "Oh yes, Talibán

18   went in the apartment."

19          So, that's -- it's not the truth of the

20   matter of -- of the content of Detective Ignacio's

21   statement.  It's the effect it has on the listener.  So,

22   it -- that's -- that's what I'm saying.  Maybe I'm

23   not --

24          MR. AQUINO:  If I can add?

25          THE COURT:  Go ahead.

1          MR. AQUINO:  If I could add, it's the

2    reaction that it generated.  So it's not being offered

3    for the truthfulness of the statement.  It's being

4    offered for the action, of an action that was generated

5    from that statement.

6          THE COURT:  So then, the statement is

7    necessary to identify the reactions; is that right?

8          MR. AQUINO:  Necessary, but we're not

9    offering it for its truthfulness.  We're offering it --

10         THE COURT:  Okay.

11         MS. MARTINEZ:  Your Honor, it sounds to me

12   like they are offering it for the truthfulness.  Their

13   theory seems to be that Detective Ignacio represented to

14   this witness what he knew, and that then the witness

15   apparently said something different in response to that.

16         It sounds like they're offering it for two

17   things, for the truth -- the substance of two things,

18   what Ignacio said he knew, and what the witness said he

19   knew.

20         And Detective Ignacio is going to testify.

21   He certainly can be asked himself about what he said,

22   but --

23         (Simultaneous speaking.)

24         THE COURT:  The way this works is, only one

25   person speaking at a time.  Be very patient.  Let the

G. Garcia - Cross                                                    45

1    court reporter be able to take it all down.

2              MS. MARTINEZ:  To me it sounds like hearsay

3    with respect to what Detective Ignacio said.

4              THE COURT:  All right.  Objection sustained.

5              (Thereupon, the side-bar conference was

6    concluded.)

7    BY MS. AMATO:

8        Q.  When you first spoke with Detective Ignacio on

9    August the 13th of 2014, you did not tell him that

10   Talibán went into some apartment, not initially, did

11   you?

12       A.  I didn't tell him that.

13       Q.  It was only after he said something to you that

14   then you changed your story?

15       A.  Well, he just told me to tell the truth.

16       Q.  He said more than just that, didn't he?

17       A.  To tell the truth, that it was the truth.  He

18   knew anyway.

19       Q.  But, he -- go ahead.

20       A.  That was, the truth was already known anyway.

21       Q.  But, he told you what to say?

22       A.  No, just, he told me that.

23       Q.  Okay.  And, then you told him that you and Duende

24   went into an apartment and Talibán went into an

25   apartment, but you do not know what he took, because you

1    were under the influence of drugs.

2              MS. MARTINEZ:  Objection, Your Honor,

3    compound.

4              THE COURT:  It is.  If you could break it

5    into parts, please.

6              MS. AMATO:  Certainly.

7    BY MS. AMATO:

8        Q.  Then you told police that you and Duende went

9    into an apartment?

10       A.  We hid outside of the apartments.

11       Q.  So, you're saying here that you never told him

12   that you went into an apartment with Duende?

13       A.  We went into the apartment, but not inside the

14   apartment.  We were outside of the apartments there,

15   because the police were patrolling the area.

16       Q.  So, while the police were patrolling the area,

17   you went inside the apartments, you're saying?

18       A.  Yes, yes.

19       Q.  And, you also told Detective Ignacio that

20   Duende -- excuse me -- that Talibán went into another

21   apartment, separate from you and Duende.

22             THE INTERPRETER:  Counsel, when you said

23   "you went into an apartment," rather than "you went into

24   apartments," because, it was trans- -- we translated it

25   as went into apartments.  That could be understood into

1  the apartment building, rather than a particular

2  apartment.  If you could please repeat the question.

3            MS. AMATO:  Okay.

4            THE INTERPRETER:  Thank you.

5  BY MS. AMATO:

6     Q.   You told Detective -- well, you went into an

7  apartment building?

8     A.   A building, not the apartment.

9     Q.   And, the building had a door?

10    A.   Yes.

11    Q.   So, you opened the door, correct?

12    A.   Yes.

13    Q.   And went in the apartment building?

14    A.   Yes, yes.

15    Q.   And the door closed?

16    A.   Yes.

17    Q.   And, Talibán at that point went into another

18 apartment building?

19    A.   Yes, that's right.

20    Q.   And, you told Detective Ignacio that you don't

21 know what Talibán took, because you were under the

22 influence of drugs?

23    A.   Well, like I said before, and --

24            MS. AMATO:  Your Honor, I'm going to move to

25 strike.  The answer is a yes or no question, whether he

1    said that to Detective Ignacio or not.

2              THE COURT:  Well, he started answering.  We

3    need to hear the answer.

4              MS. AMATO:  But I haven't heard -- Your

5    Honor --

6              THE COURT:  Are you going to interpret your

7    own questions to the witness, and all the rest of us

8    don't speak Spanish?  I don't know what he was about to

9    say.

10             MS. AMATO:  I'm not, Your Honor.  And the

11   only thing is --

12             THE COURT:  But that's what you're doing,

13   aren't you?

14             MS. AMATO:  No, but the first -- no, I heard

15   English.  And the first words I heard were not "yes" or

16   "no."

17             THE COURT:  All right.  Here's what we will

18   do.

19             Sir, can you hear me okay?  If the question

20   can be answered yes or no, just answer yes or no.  Thank

21   you.

22             MS. AMATO:  Thank you.

23             THE COURT:  Go ahead.

24             THE WITNESS:  Okay.

25   BY MS. AMATO:

1    Q.   So, getting back to the question:  And you told

2    Detective Ignacio that you do not know what Talibán

3    took, because you were under the influence of drugs

4    effect -- of the effects of drugs.  Yes or no?

5    A.   Yes, that's right.

6    Q.   But, on Thursday you claimed that you heard the

7    loading of a weapon, correct?

8    A.   Yes, yes.

9    Q.   And, when you spoke with police the day you

10   turned yourself in, you never told police anything about

11   hearing the loading of a weapon, correct?

12   A.   Yes, that's right.

13   Q.   And you spoke with them, it was about two months

14   after the shooting, correct?

15   A.   I don't remember how much time, but I talked to

16   them.

17   Q.   No, I'm not -- not about how much time you talked

18   with him; but it was about two months after the

19   shooting, that you turned yourself in, correct?

20   A.   Yes.

21   Q.   And on Thursday, you told us that after Talibán

22   went to the apartment, he had a weapon, correct?

23   A.   Yes.

24   Q.   But, that's not what you told police when you

25   turned yourself in on August the 13th of 2014, correct?

G. Garcia - Cross

1    A.   Yes.

2    Q.   And, that's not what you told Ms. Martinez and

3  Mr. Campbell when you spoke with them on January 15th of

4  2015?

5    A.   I don't really remember if I told her that.  But

6  it's the truth.

7    Q.   And, when you were asked by Detective Ignacio

8  whether -- what did Talibán have in his hands, you

9  answered, "Nothing."  Remember?

10   A.   I don't remember.

11   Q.   And, you told Detective Ignacio you did not see

12 Talibán with a gun when he came out of the apartment?

13   A.   Yes, that's right.

14   Q.   And, when you spoke with Ms. Martinez and

15 Mr. Campbell on January 15th of 2015, Detective Ignacio

16 was present at that time as well, correct?

17   A.   Well, I don't really know him by -- I don't

18 really know who he is.  I just know him by name.  That's

19 the detective.

20   Q.   And you know him by what?

21   A.   I know him by name -- I don't know him by name.

22 I know him when I see him, but I don't know him by name.

23   Q.   Is that correct --

24       MS. AMATO:  Excuse me, Ms. Angeles.

25 BY MS. AMATO:

1    Q.   Well, the detective that was with you speaking in

2  Spanish the day you turned yourself in, he was present

3  with Ms. Martinez and Mr. Campbell on January 15th of

4  2015.

5    A.   Yes, I had a meeting with them.

6    Q.   And at that time you were asked whether --

7  whether you saw Talibán with a gun when he came out of

8  the apartment?

9    A.   Yes, they asked me for the truth and I told them

10  the truth.

11    Q.   Right.  And, you told them that you didn't see

12  Talibán with a gun.  He had his hands in his pockets.

13    A.   I didn't see a weapon in his hands, but he was

14  wearing gloves.

15    Q.   So you never saw a weapon in his hands, correct?

16    A.   (Speaking, not translated.)

17    Q.   Yes or no, sir?

18    A.   No, no.

19    Q.   Now, on Thursday, you told us that Talibán made a

20  statement after he came out of the apartment.

21    A.   Yes.

22    Q.   But, again, when you spoke with Detective Ignacio

23  when you turned yourself in on August the 13th, you said

24  Talibán said nothing.

25    A.   I don't really remember that date, if I said that

1  or if I didn't say it.  But that's the truth.

2      Q.  But --

3      A.  But I said the truth.

4      Q.  On that day, correct?

5      A.  What do you mean?

6      Q.  On the day when you turned yourself in and spoke

7  with police officers.

8      A.  That day, I didn't tell the truth.  In some

9  parts, I didn't tell the truth.

10     Q.  Even though you told them you were telling them

11 the truth?

12     A.  Yes.  In some places, in some areas I told them

13 the truth, and others I didn't.

14     Q.  The question is:  On that day, you told police

15 officers that you were telling them the truth?

16     A.  Yes, that's right.

17     Q.  And when you spoke with Ms. Martinez and Steve

18 Campbell on January 15th, you did not tell them at that

19 point that you heard Talibán make any statement when he

20 came out of the apartment building.

21     A.  Yes, I said.  I said it.

22     Q.  Now, according to you, Duende told you and Sixto

23 to go back to the apartment after you and Talibán and

24 Duende and Sixto reconnected.

25              THE INTERPRETER:  Could you repeat the

1    question for the interpreter?

2                  MS. AMATO:  Certainly.

3                  THE INTERPRETER:  And the name is Sixto?

4                  MS. AMATO:  Sixto.

5    BY MS. AMATO:

6       Q.   According to you, after you, Duende, Talibán and

7    Sixto reconnected, Duende told you and Sixto to go back

8    to the apartment?

9       A.   Yes.

10      Q.   And that was -- and that was because -- excuse

11   me -- Sixto was only a *paro*, correct?

12      A.   Yes.

13      Q.   The rest of you all were homeboys, right?

14      A.   Yes.

15      Q.   Now, when you initially encountered the guy,

16   Julio who was shot, you told us that he said to you,

17   "You know the rules of the gang" -- excuse me -- "you do

18   not know the rules of the gang."

19      A.   That we didn't know anything.

20      Q.   Right.  To include the rules of the gang?

21      A.   Yes.

22      Q.   And, he got in your face about this, correct?

23      A.   Yes.

24      Q.   And he told you, you weren't MS members, right?

25   You weren't the real deal?

1    A.   He didn't say that.  He said that we were some

2    boys who didn't know anything.

3    Q.   Okay.  And, he said he knew the rules?

4    A.   Yes.

5    Q.   And, the only way he's going to know MS rules is

6    if he's a homeboy, right?

7    A.   Yes.

8    Q.   Because even a *paro* doesn't know all the rules,

9    correct?

10   A.   Well, yeah, when you are a *paro*, you begin

11   learning the rules.  Nobody tells you what they are, all

12   of them, but you begin learning them in the company of

13   others.

14   Q.   Right.  So you begin to learn the rules as a

15   *paro*, correct?

16   A.   Yes.

17   Q.   And, you learn them better as a *chequeo*?

18   A.   Yes.

19   Q.   But, as a homeboy, then you really know the

20   rules?

21   A.   Yes.

22   Q.   And certainly, an 18th Street member is not going

23   to know the rules of MS-13, are they?

24   A.   I wouldn't think so.

25   Q.   Okay.

1      A.   I have no interest in knowing the rules of the

2  18th Street gang.

3      Q.   Now, when you met with Detective Ignacio when you

4  turned yourself in, you recall he showed you some -- a

5  group of photos, correct?

6      A.   Yes.

7      Q.   And, he first -- so, he showed you some photos

8  and he asked you to ID anybody that you recognized who

9  was involved.

10     A.   Yes, that's correct.

11     Q.   And he showed you a first group of photos, and

12  you identified Duende, correct?

13     A.   Yes.

14     Q.   And then he was showing you a second group of

15  photos?

16     A.   Yes.

17     Q.   And, the first time around, when he showed you

18  those photos, you -- after he showed you each photo,

19  you, with your head, you indicated you didn't recognize

20  the person, correct?

21     A.   Yes.

22     Q.   And, you indicated that, you know, no, that

23  person was not involved, correct?

24     A.   That's correct.

25     Q.   And when you came to -- there was a fourth photo

1    that you came to, where you did the same thing, you

2    shook your head, that the person wasn't involved?

3        A.   That's correct.

4        Q.   And, Detective Ignacio didn't say anything,

5    but -- well, strike that.

6             He made a comment?

7        A.   I don't remember whether he made a comment or

8    not.

9        Q.   But, he looked -- this time he looked at other

10   officers.

11       A.   Yes, yes.  I remember that.

12       Q.   This time, he looked differently -- he acted

13   differently.  Excuse me.  He acted differently.

14       A.   He just turned to look at other officers, as if

15   suggesting that I was lying.

16       Q.   All right.  So then, you asked him to show you

17   the photos again, correct?

18       A.   Yes.

19       Q.   And this time around, when he came to that same

20   photo, you said, "Oh, yeah, that's Talibán"?

21       A.   Yes.

22       Q.   And, after that, he told you what to explain,

23   about why you didn't --

24             MS. MARTINEZ:   Objection, Your Honor,

25   hearsay.

G. Garcia - Cross                                                    57

1              MS. AMATO:  I'm not asking - I'm not saying
2    what it was.
3              THE COURT:  But you're saying what someone
4    else said.  Objection sustained.
5    BY MS. AMATO:
6        Q.  Mr. Sen Garcia, you have tattoos, correct?
7        A.  Yes.
8        Q.  Both hands, tattoos?
9        A.  Just the one.
10       Q.  Right arm, right hand?
11       A.  Yes.
12       Q.  You have MS-13 gang tattoos?
13       A.  No.
14       Q.  You have a 503 on your hand, correct?
15       A.  Yes.
16       Q.  503 is a gang tattoo.
17       A.  No.
18       Q.  Not a gang tattoo for you?
19       A.  No.
20       Q.  503 is the Area Code of El Salvador, correct?
21       A.  Yes.
22       Q.  And, it has a meaning for MS members, right?
23       A.  No.
24       Q.  No.  So, you're not familiar with MS members
25   wearing that just to show that -- their allegiance to

1    the gang in El Salvador?

2        A.    That can be shown by, I can wear the Area Code of

3    my country.  That doesn't mean that I have a loyalty to

4    a particular gang.

5        Q.    Right.  But you would agree with me that the Area

6    Code for Guatemala is not 503.

7            (Simultaneous speaking.)

8                 THE INTERPRETER:  I'm sorry.  The witness is

9    not waiting for the interpreter.  Should just -- should

10   the interpreter just interpret his answers, rather than

11   the questions?

12                MS. AMATO:  Interpret -- well, I'm not --

13   that's up to Your Honor.

14                THE COURT:  Well, I think it's important to

15   interpret the question as well as the answer, because he

16   may be answering something that's not the question.

17                THE INTERPRETER:  The witness is talking

18   over the interpreter.  The interpreter cannot catch up,

19   because the interpreter is trying to do both the

20   question and the answer.  And when the interpreter is

21   interpreting the question, the witness is already saying

22   the answer over the interpreter, so there's no way the

23   interpreter can catch up.

24                So, maybe we can instruct the witness to

25   wait until the interpreter finishes.

1              May I do that?

2              THE COURT:  Certainly.

3              (Interpreter speaking to witness.)

4              THE WITNESS:  Okay.  Yes.

5   BY MS. AMATO:

6   Q.  You speak English, correct?

7   A.  A little bit.

8   Q.  Well, you're understanding what I'm saying, some

9   of it at least, correct?

10  A.  Yes.

11             THE INTERPRETER:  The interpreter did not

12  understand the question about the Area Code of

13  Guatemala -- I'm sorry, did not interpret the question

14  about the Area Code for Guatemala.

15             MS. AMATO:  All right.  So I will ask that

16  question again.

17  BY MS. AMATO:

18  Q.  We will agree that the Area Code of Guatemala is

19  not 503.

20  A.  Yes.

21  Q.  It's 502.

22  A.  Correct.

23  Q.  You don't have 502 on your arm, do you?

24  A.  No.

25  Q.  You have 503, correct?

1    A.   Yes.

2    Q.   Now, before the shooting on June 19th, you had

3    told other people you wanted to do a mission.

4    A.   No.

5    Q.   No?

6         You didn't tell Duende you wanted to do something

7    big?

8    A.   We wanted to kill an 18th.

9    Q.   Right.  And you said you wanted to kill someone

10   because you wanted to earn an MS tattoo on your legs,

11   correct?

12   A.   That is false.

13   Q.   On your back?

14   A.   No.

15   Q.   That's not what you told people?

16   A.   No.

17   Q.   You didn't burn MS on your leg?

18   A.   I did.

19   Q.   So, you did burn the letters MS on your body,

20   correct?

21   A.   I burned over the tattoo that I had.  I did not

22   burn the letters.  I basically wanted to erase

23   something.

24   Q.   So, you did not tell people that that was an MS

25   that you had burned on your leg?

1    A.   No.  That is incorrect.

2    Q.   And, you did not have a discussion with Duende,

3  who told you, you have to earn the letters MS before you

4  can get a tattoo of it on your body?

5    A.   No.

6    Q.   And, he did not get angry with you for burning MS

7  on your body?

8    A.   I never told him I did.

9    Q.   He didn't tell you that you had to earn it?

10   A.   No.

11   Q.   Well, back in --

12   A.   That is neither -- he did not say that.

13   Q.   Back in June of 2014, you were ready to earn it,

14  correct?

15   A.   No, I had already earned it.  It's something else

16  that I did not have it, that I had not put it on.

17            THE COURT:  Counsel.

18            MS. AMATO:  Certainly.  Break?

19            THE COURT:  We'll take the morning recess

20  now for 15 minutes.

21            (Court recessed at 11:30 a.m. and reconvened

22            at 11:47 a.m.)

23            THE COURT:  You can bring our jury out,

24  Mr. Toliver.  Thank you.

25            (Jury present.)

```
 1                    THE COURT:  You may be seated.

 2                    All right, Counsel, you may proceed.

 3                    MS. AMATO:  Thank you, Your Honor.

 4                     CROSS-EXAMINATION (Continued)

 5   BY MS. AMATO:

 6      Q.  Good morning again, Mr. Sen Garcia.

 7      A.  Good morning.

 8      Q.  When we left off, we were talking about burning.

 9      A.  Yes.

10      Q.  And, you told us you admitted that you did

11   purposely burn your leg, correct?

12      A.  Yes.

13      Q.  But, you're saying it wasn't to burn the letters

14   MS on your leg, correct?

15      A.  No.

16      Q.  And, you burned your leg with a cigarette,

17   correct?

18      A.  Yes.

19      Q.  And, burning of the body is actually part of your

20   worship of the Santa Muerte, correct?

21      A.  No, it's not to do with it.

22      Q.  Not for you?

23      A.  Not for me.

24      Q.  But, you do believe in Santa Muerte?

25      A.  I used to.
```

G. Garcia - Cross                                               63

1      Q.   You used to.  Right.

2           You used to pray to Santa Muerte, correct?

3                THE INTERPRETER:  Should the interpreter

4      translate into English, "Santa Muerte"?

5                MS. AMATO:  No, not the "Santa Muerte."

6                THE WITNESS:  Yes.

7      BY MS. AMATO:

8      Q.   And the Santa Muerte is basically the saint of

9      the devil, correct?

10     A.   No.  Santa Muerte is just death.

11     Q.   Is death.

12          And death is connected to the devil?

13     A.   Yes.

14     Q.   And to the beast, as you call him?

15     A.   Yes.

16     Q.   And, you used to carry a prayer of Santa Muerte

17     in your wallet next to your daughter's -- excuse me --

18     the mother of your daughter's photograph?

19     A.   No.

20     Q.   Well, you used to keep a prayer in your wallet,

21     correct?

22     A.   I used to have a prayer, but never a photograph

23     of anybody in my wallet.

24     Q.   But, you had it in your wallet.  The Santa Muerte

25     prayer was in your wallet, correct?

G. Garcia - Cross                                                    64

1    A.   Yes.

2    Q.   And, you would keep your wallet with you,

3    correct?

4    A.   Yes.

5    Q.   And, let's go back just a moment.  You never did

6    see who shot the gun off that hit Julio Urrutia, did

7    you?

8         THE INTERPRETER:  Could counsel repeat that,

9    please.

10        MS. AMATO:  Certainly.

11   BY MS. AMATO:

12   Q.   You never did see who was the shooter to Julio

13   Urrutia, correct?

14   A.   No, I did not see it.

15   Q.   And, after the shooting on Thursday, you told us

16   you went to Christopher's, correct?

17   A.   Yes.

18   Q.   But, when you turned yourself in on August

19   the 13th, after Detective Ignacio told you to tell the

20   truth, you told him you went to the mountains directly

21   after the shooting, correct?

22   A.   Not exactly that day.

23   Q.   Well, you told him you went to the mountains,

24   right?

25   A.   Yes.

G. Garcia - Cross                                                    65

1    Q.   And, you never went to the mountains?

2    A.   Yes, I did.

3    Q.   But, you told him you went to the mountains right

4    after the shooting.

5    A.   Not that day.

6    Q.   Right.

7         But I'm asking you what you -- what you told

8    Detective Ignacio when you were -- when you turned

9    yourself in.

10   A.   I did say that to him, yes.

11   Q.   And, that's after you told him you were telling

12   him the truth?

13   A.   Yes.

14   Q.   And, that's after you had spoken to the pastor?

15   A.   Yes.

16   Q.   And, the pastor had found you under a bridge

17   under the influence of drugs, correct?

18   A.   No.

19   Q.   So, that's also another lie, correct?

20   A.   That's a lie.

21   Q.   Another lie that you told police?

22   A.   Yes.

23   Q.   After they told you to tell them the truth?

24   A.   That's correct.

25   Q.   After you told them you were telling them the

1    truth?

2        A.   Yes.

3        Q.   And, after you spoke with the pastor?

4        A.   Yes.

5        Q.   So, the pastor did take you in?

6        A.   She found me, but it was not under the bridge.

7    It was at a store, and I was smoking.

8        Q.   Marijuana?

9        A.   Yes.

10       Q.   And, she wanted to help you?

11       A.   Yes.  She just invited me to go to the church,

12   that's all.

13       Q.   But, the church did help you?

14       A.   Yes.

15       Q.   And, they told you to turn yourself in?

16       A.   They just counselled me.  They had no idea what

17   problem I was in.

18       Q.   But, eventually they found out.

19       A.   Yes.  I told the pastor.

20       Q.   And, you've told us here that you've become --

21   or, you're no longer a Santa Muerte follower, correct?

22       A.   No.

23       Q.   Did you tell the pastor that you were a Santa

24   Muerte follower?

25       A.   Yes.

1    Q.   Did you tell the pastor about how you used to
2    pray to Santa Muerte?
3    A.   Yes.
4    Q.   Did you tell the pastor how, even after the
5    shooting, you were ready to get violent to anybody at
6    any time?
7    A.   No.
8    Q.   Because you were, weren't you?
9    A.   I don't understand that question clearly.
10   Q.   Well, after the shooting, at some point you heard
11   that someone was following your girlfriend, right?
12   A.   Oh, yes, that's true.
13   Q.   That was one of the friends of the decedent,
14   Julio, correct?
15   A.   I don't know whether it was their friends or not.
16   I just found out.
17   Q.   But, that's what you told other people.
18   A.   I am assuming that it was his gang.  That was
19   what I assumed.
20   Q.   You told JR that you thought it was his gang or
21   one of his people, right, of Julio's?
22   A.   Yes.
23   Q.   And you asked Junior to go with you to scare the
24   guy, right?
25            THE INTERPRETER:  I'm sorry.

```
1              THE WITNESS:  No, I never told him that.
2    BY MS. AMATO:
3       Q.   You didn't tell Junior that you planned to take
4    the guy out, if necessary?
5       A.   I told him that, but I didn't say -- it was just
6    in passing, that comment.  I didn't tell him to come
7    with me.
8       Q.   Right.  But you had a phone call with Junior and
9    you talked about it in that phone call.  Remember that?
10      A.   Yes.
11      Q.   And, at that time, you told him you were planning
12   to take the guy out, if necessary.
13      A.   Yes.
14      Q.   And, that wasn't the only person you were ready
15   to get violent with after the shooting, correct?
16              THE INTERPRETER:  "That was not"?
17              MS. AMATO:  Not the only person.
18              THE WITNESS:  Yes.
19   BY MS. AMATO:
20      Q.   Because you remember when you were hiding out in
21   Maryland, you decided to come back to Chirilagua.
22      A.   Yes.
23      Q.   And, you were so concerned about the person who
24   had the gun that was used in the shooting, that you
25   decided to make your way back out of hiding?
```

1              THE INTERPRETER:  "After the shooting" --
2      "that had the gun after the shooting"?
3                  (Interpreter continuing.)
4                  THE WITNESS:  Yes.
5      BY MS. AMATO:
6         Q.  So, you decided to risk everything and come back
7      to Chirilagua?
8         A.  That's correct.
9         Q.  And at that time you knew the police had come
10     back to Chirilagua looking for you, correct?
11        A.  Yes.
12        Q.  And, you even knew the police had come to the
13     mother of your little daughter's house, looking for you?
14        A.  Yes.
15        Q.  You went into Chirilagua and you met with JR?
16        A.  Yes.
17        Q.  And, you and JR went to the apartment of the guy
18     with the gun?
19        A.  That's correct.
20        Q.  The guy wasn't there?
21        A.  Uh-huh, yes.
22        Q.  His brother was there?
23        A.  Yes.
24        Q.  And, you both were able to convince him to give
25     you the phone number of the guy with the gun?

1      A.   Yes.

2      Q.   And, you both called the guy with the gun?

3      A.   Yes.

4      Q.   And, you didn't get the gun back that day?

5      A.   No.

6      Q.   But, you were prepared to use violence again, if

7    necessary?

8      A.   Yes.

9      Q.   To get the gun?

10     A.   Yes.

11     Q.   And to shut the guy up.  To shut the guy up?

12     A.   Yes.

13     Q.   Now, you told us that you decided to turn

14   yourself in, right?

15     A.   Yes.

16     Q.   And, again, you knew police were looking for you?

17     A.   Yes, that's right.

18     Q.   You knew there was a reward out for you?

19     A.   Yes.

20     Q.   You heard that your mother had been extorted of

21   money?

22     A.   Yes.

23     Q.   You were concerned about the mother of your

24   child?

25     A.   Yes.

1    Q.   And your child?

2    A.   That as well.

3    Q.   Because as we talked about, you knew that Julio's

4    people were following her?

5    A.   Yes.

6    Q.   And, you thought you were being followed?

7    A.   Yes.

8    Q.   And, you also learned that a green light had been

9    put out on you?

10   A.   Yes.

11   Q.   So, the only option for you at that point was to

12   turn yourself in?

13   A.   I could have gone somewhere else.

14   Q.   Could have.

15        Didn't have money, did you?

16   A.   I could have gotten money.

17   Q.   You didn't, did you?

18   A.   I didn't do it.

19   Q.   When you turned yourself in, you knew you were

20   going to talk to police?

21   A.   Yes.

22   Q.   You were going to tell them your story about what

23   happened, right?

24   A.   Yes.

25   Q.   And, you had about two months to think about your

G. Garcia - Cross

1    story, right?

2        A.   No.

3        Q.   Well, the shooting occurred on June the 19th,

4    right?

5        A.   Yes, that's right.

6        Q.   You turned yourself in on August the 13th?

7        A.   Yes.

8        Q.   Almost two months?

9        A.   But I wasn't planning on turning myself in.

10       Q.   Not initially?

11       A.   At the beginning.  It happened from one day to

12   the next.

13       Q.   Because initially you were just surviving on the

14   street?

15       A.   No, at the beginning, I was just staying in

16   another place.  I went to another gang member's house to

17   stay there, of other relatives.

18       Q.   Right.  You were going from one place to another?

19       A.   Yes.

20       Q.   And, you did communicate with el Duende during

21   that time period that you were on the run?

22       A.   One time, that's all.

23       Q.   Well, you certainly communicated with him,

24   correct?

25       A.   On Facebook.

1    Q.   And, you communicated and he responded?

2    A.   Yes.

3    Q.   You asked him for money?

4    A.   Yes.

5    Q.   He put you in contact with JR?

6    A.   No.  It was another contact whom he said wanted

7    to speak with me.

8    Q.   So, it's your testimony that Duende was not the

9    go-between between you and JR?

10   A.   No.

11   Q.   And, JR gave you money?

12   A.   No.  He sent me some money, but he didn't give it

13   to me in person.

14   Q.   But you received money through JR?

15   A.   Yes.

16   Q.   You did not communicate with Talibán after the

17   shooting?

18   A.   Not with anybody else.

19   Q.   Now, when you turned yourself in, you knew you

20   were facing a lot of jail time?

21   A.   Yes.

22   Q.   You knew you had a lot at stake?

23   A.   Yes.

24   Q.   You knew you had to do what was ever necessary to

25   help yourself out?

1      A.   I didn't know that this protected witness thing

2    existed.

3             MS. AMATO:  Move to strike.  That's not

4    my -- that's unresponsive to my question.

5             THE COURT:  Sustained.

6    BY MS. AMATO:

7      Q.   You knew you had to do what was necessary to help

8    yourself out?

9      A.   No, no, I didn't know.

10     Q.   Well, you hoped to work something out for

11   yourself, right?

12     A.   I just --

13            THE INTERPRETER:  Could the interpreter

14   repeat the last question for the witness, about working

15   something out?

16            MS. AMATO:  Okay.

17            (Pause.)

18            I don't remember my last question.

19            THE COURT:  "Well, you hoped to work

20   something out for yourself, right?"

21            MS. AMATO:  Okay.  Thank you, Your Honor.

22            THE WITNESS:  No.

23   BY MS. AMATO:

24     Q.   You did work something out, correct?

25     A.   As I said before, they just gave me some hope of

1    what could happen if I told the truth.

2       Q.   All right, sir.  When you were appointed a

3    lawyer -- when you received your lawyer, you were able

4    to work out a plea agreement, correct?

5       A.   Yes.

6       Q.   A cooperation plea agreement?

7       A.   Yes.

8       Q.   A plea agreement where you agreed to plead to

9    murder in aid of racketeering?

10      A.   Yes.

11      Q.   A charge that carries a mandatory life sentence?

12              MS. MARTINEZ:  Objection.

13              MS. AMATO:  Excuse me.  Strike that.

14              THE COURT:  Sustained.

15   BY MS. AMATO:

16      Q.   You were sentenced in this case, correct?

17      A.   Yes.

18      Q.   And, you received a life sentence?

19      A.   Yes.

20      Q.   And, as part of the plea agreement, you agreed to

21   cooperate with the prosecution?

22      A.   Yes, that's right.

23      Q.   And, the plea agreement permits the prosecutor to

24   file a motion on your behalf for your cooperation.

25      A.   Yes.

G. Garcia - Cross

1    Q.   And, this motion permits the prosecutor to ask
2    the judge to sentence you to less than the mandatory
3    life sentence.
4              MS. MARTINEZ:  Objection, Your Honor.  May
5    we approach?
6              THE COURT:  Sustained.
7    BY MS. AMATO:
8    Q.   You're hoping that by cooperating, the
9    prosecutor --
10             THE COURT:  Do you still need to approach,
11   or no?
12             MS. MARTINEZ:  We can address it at a later
13   time, Your Honor.
14             THE COURT:  All right.
15             You know what the objection was, don't you?
16   Do you?
17             MS. AMATO:  The first objection.
18             MS. MARTINEZ:  Perhaps we should approach.
19             THE COURT:  Come to sidebar.  I want to make
20   sure you understand.
21             MS. AMATO:  Certainly, Your Honor.
22             (Thereupon, the following side-bar
23   conference was had:)
24             THE COURT:  I made a pretrial ruling that
25   you may question about the penalty, but not use the word

1  "mandatory life."  Okay?

2           MS. AMATO:  Understood.

3           THE COURT:  All right.  That's it.  That's

4  it.

5           MR. ZIMMERMAN:  I'm sorry, Judge.  I was

6  just referencing that.  Doesn't the -- doesn't the plea

7  agreement refer to it as "mandatory minimum" in the plea

8  agreement, and aren't the plea agreements in evidence?

9           Can't she show the plea agreement and show

10  the mandatory life?

11           THE COURT:  She can do that.  What she did

12  was recite evidence to suggest that every person in here

13  is facing a life sentence, which I'm trying to keep from

14  the jury.

15           If you want to give her coaching, you should

16  coach her at sidebar.

17           MR. ZIMMERMAN:  Okay.

18           (Thereupon, the side-bar conference was

19  concluded.)

20           THE COURT:  You may proceed.

21           MS. AMATO:  Thank you.

22  BY MS. AMATO:

23     Q.  As part of the plea agreement, the government has

24  agreed that if you provide substantial cooperation, they

25  may file a motion on your behalf?

1    A.   The same thing that I said before.  They just

2  gave me the hope of having a reduced sentence.  But they

3  didn't tell me how much.

4    Q.   All right.

5          MS. AMATO:  Your Honor, I would like to show

6  the Government's Exhibit 124 to the witness.

7          THE COURT:  All right.

8  BY MS. AMATO:

9    Q.   Do you --

10          MS. AMATO:  We will first at page one,

11  please.

12  BY MS. AMATO:

13    Q.   Now, Mr. Sen Garcia, I understand that you've

14  been able to understand some of what I've been saying in

15  English.  Can you read English as well?

16    A.   A little bit, that's all.  But I don't consider

17  myself capable of doing it.

18    Q.   You recognize this document as your plea

19  agreement, correct?

20    A.   Yes.

21    Q.   And, before signing this plea agreement, you were

22  given a translated copy of this plea agreement in

23  Spanish?

24    A.   Yes.

25    Q.   All right.  And, in paragraph one, the first

1    sentence says, "The defendant agrees to plead guilty to

2    Count VII of the indictment, which charges the defendant

3    with murder in aid of racketeering activity."

4        A.   Yes.

5        Q.   Do you see that?

6        A.   Yes.

7        Q.   And you understood that when you pled guilty,

8    correct?

9        A.   Yes.

10       Q.   And, the second sentence says, "The maximum

11   penalties for this offense are a mandatory" -- "a

12   mandatory term of life imprisonment."  Do you see that?

13       A.   Yes.

14       Q.   And, you understood that when you plead guilty,

15   correct?

16       A.   Yes.

17       Q.   All right.  Turning to page eight, paragraph 14,

18   and this is the paragraph that talks about what the

19   government may do for you, correct?

20       A.   Yes.

21       Q.   It says, "Motion for downward departure,"

22   correct?  Do you see that?

23       A.   Yes.

24       Q.   And, you're hoping that the prosecutors will file

25   that motion with the judge, so that you can ask for less

1    jail time, correct?

2        A.   I can't ask for it.  I just don't know if they're

3    going to reduce it for me or not.

4             MS. AMATO:  Your Honor, that's unresponsive.

5    I move to strike.

6             THE COURT:  Overruled.

7    BY MS. AMATO:

8        Q.   The question, sir, is:  You are hoping that

9    that's what they're going to do, correct?

10       A.   Yes.

11       Q.   Because that's why you're here today with us,

12   right?

13       A.   Yes.

14       Q.   And you understand it's only the prosecutor that

15   can go before the judge and ask the judge to reconsider

16   your sentence according to your plea, correct?

17       A.   Yes.

18       Q.   Now, sir, you're still here illegally, correct?

19       A.   That's true.

20       Q.   And, you're hoping that the prosecutors will help

21   you stay in this country?

22       A.   If that could be done, yes.

23       Q.   I mean, you told us you tried twice to come to

24   the United States, correct?

25       A.   Yes.

1    Q.   And, you don't want to leave?

2    A.   If I leave right now, I could be killed.

3    Q.   That's a reason not to want to leave, correct?

4    A.   Yes.

5    Q.   Plus, your daughter's here?

6    A.   Yes.

7    Q.   Your mother's here?

8    A.   Yes.

9    Q.   Your girlfriend's here?

10    A.   Yes.

11    Q.   You're used to life in the U.S.?

12    A.   Yes.

13    Q.   And, you've discussed with the government their

14 possibly helping you stay, correct?

15    A.   Yes.

16    Q.   And you've been placed in the Witness Protection

17 Program?

18    A.   Yes.

19    Q.   And, do you believe that that program will also

20 help you legalize your status?

21    A.   I don't know.

22    Q.   Now, sir, you told us that you did work at two

23 movie theaters.

24    A.   In several, in several movie theaters.

25    Q.   And those movie theaters would pay you in a

1   check, correct?

2        A.   No, cash.

3        Q.   Did they -- did your employers know that you were

4   here illegally?

5        A.   Yes.

6        Q.   And, they still hired you?

7        A.   Yes.

8        Q.   But you have tried to use fake documents before,

9   correct?

10       A.   One time.

11       Q.   And, you recall meeting with a presentence report

12   writer?

13       A.   Who?  I don't really remember.  I don't really

14   understand the question.  Could you repeat that to me?

15       Q.   After you pled guilty, you had a meeting with an

16   individual who asked you questions about your personal

17   life.

18       A.   Yes.

19       Q.   And, that person asked you about your work

20   history?

21       A.   Yes.

22       Q.   And, you were supposed to -- you knew that you

23   were supposed to tell the truth, correct?

24       A.   That's true.

25       Q.   You spoke with your attorney prior to this

1    meeting, correct?

2        A.   Yes.

3        Q.   And, were your attorneys present during the

4    meeting?

5        A.   Yes.

6        Q.   And, at that meeting when you were asked what

7    kind of work you've had in the United States since

8    arriving in, you told the presentence report writer that

9    you worked primarily as a house painter and a commercial

10   cleaner?

11              THE INTERPRETER:  "Primarily as a" --

12              MS. AMATO:  House painter and commercial

13   cleaner.

14              THE WITNESS:  Just a house painter.

15   BY MS. AMATO:

16       Q.   Just a house --

17              THE INTERPRETER:  "Just a house painter."

18              THE WITNESS:  Or houses, buildings.

19   BY MS. AMATO:

20       Q.   And, commercial cleaner as well?

21       A.   Yes, at night.

22       Q.   But, you did not tell your presentence report

23   writer that you had been working at movie theaters,

24   correct?

25       A.   Yes, I told her.

1    Q.   Well, you had a chance to review the report after
2    it was completed, right?
3    A.   Yes.
4    Q.   And, in the report, it doesn't say anything about
5    working at movie theaters, does it?
6    A.   She asked me what my last job was.  I told her,
7    painting.
8    Q.   Sir, you were asked, since arriving in the United
9    States, what your work was.
10   A.   From the time I arrived, several jobs,
11   remodeling, painting, movie theaters, carpentry.
12   Q.   But you did not correct the presentence report
13   after you reviewed it, did you?
14   A.   No.  I only saw it once.
15   Q.   But you saw it?
16   A.   I mean, the person that asked me questions, we
17   only met once.
18   Q.   Right.  But after you met with that individual,
19   you saw her report that she prepared based on what you
20   told her?
21   A.   No, I did not see it.
22   Q.   You never reviewed it with your attorney?
23   A.   We saw several papers.
24   Q.   And, when you went to your sentencing -- so, you
25   saw various papers.  That's what your testimony is?

1      A.   Yes.

2      Q.   And one of those papers was your presentence

3  report?

4      A.   Yes.

5      Q.   You're 21 years old now, correct?

6      A.   Yes.

7      Q.   You don't want to live the rest of your life in

8  jail, do you?

9      A.   Nobody will want to spend the rest of their life

10  in jail.

11      Q.   Jail is an awful place, isn't it?

12      A.   Yes.

13      Q.   There's no privacy?

14      A.   No.

15      Q.   You can't do what you want?

16      A.   No.

17      Q.   When you went to?

18      A.   That's correct.

19      Q.   You can't hold your child?

20      A.   That's correct.

21      Q.   You can't smoke your marijuana?

22      A.   That's correct.

23      Q.   You have to share a cell?

24      A.   That's correct.

25      Q.   You have no control over who your cellmate is?

```
 1      A.   That's correct.
 2      Q.   You can't watch the TV programs you want to all
 3   the time?
 4      A.   That's correct.
 5      Q.   It's noisy, noisy, noisy?
 6      A.   Sometimes.
 7      Q.   Inmates yelling?
 8      A.   No, I have never heard them.
 9      Q.   Never heard them scream?
10      A.   Maybe the ones that are just arriving.
11      Q.   You can't really make any money?
12      A.   No.
13      Q.   You basically -- you clearly want out, right?
14      A.   Everybody that is in jail wants to get out.
15      Q.   That's correct.
16           And you're one of those people, obviously?
17      A.   Yes, of course.
18               MS. AMATO:  Your Honor, thank you.  I have
19   no further questions.
20               THE COURT:  Redirect.
21                    REDIRECT EXAMINATION
22   BY MS. MARTINEZ:
23      Q.   Defense counsel asked you about your job cleaning
24   movie theaters -- excuse me.  Please don't translate
25   that.  I misspoke.
```

1          Defense counsel asked you about your job at movie
2    theaters.  What did you do at the movie theaters?
3        A.   Clean.  I was cleaning.
4        Q.   Defense counsel also asked you about the night of
5    the shooting.  She asked -- do you remember that?
6          She asked you whether or not you were able to see
7    the shot when it was fired.  Do you recall that?
8        A.   Yes.
9        Q.   Were you able to hear it?
10       A.   I did hear it.
11       Q.   What direction did it come from?
12       A.   From behind.
13       Q.   Who was behind you?
14       A.   Talibán.
15       Q.   Where was Duende?
16       A.   Right next to me.
17       Q.   What did you feel when you heard the shot?
18       A.   I felt a burning sensation on my shoulder, near
19   my shoulder.
20       Q.   Defense counsel also asked you about the
21   interview that you gave the day that you turned yourself
22   in.  Do you remember that?
23       A.   Yes.
24       Q.   And, she asked you about you saying that you
25   didn't remember everything because you'd been taking

G. Garcia - Redirect                                          88

1    drugs.  Do you recall that?

2        A.  Yes.

3        Q.  Why did you say that on the day that you turned

4    yourself in?

5        A.  Because I didn't want to burn them.  I just

6    wanted to -- to turn myself in without doing that.

7                MS. MARTINEZ:  I'm not sure if I understood

8    the word.  Was the word "burn them"?

9                The English word, I couldn't hear.

10               THE INTERPRETER:  Yes, the interpreter said

11   "to burn them."

12   BY MS. MARTINEZ:

13       Q.  What do you mean, you didn't want to burn them?

14       A.  I did not want to report on them.

15       Q.  On who?

16       A.  Talibán, Duende, the other ones that were in

17   jail.  I wanted to cover it up.  In other words, I

18   wanted to just keep quiet, so as not to reveal it.

19       Q.  Why?

20       A.  Because I did not want to burn them, initially,

21   was because I was -- didn't want them to hurt my family,

22   and also was because I was there with them.

23       Q.  What do you mean, it was also because you were

24   there with them?

25       A.  That they could do something to me if they

1  learned that I was cooperating.  They could do something

2  to me.

3      Q.   Defense counsel also asked you about a photo

4  array that you were shown by one of the detectives.  Do

5  you recall that?

6      A.   Yes.

7      Q.   When you were shown the photo array, did you

8  recognize anyone?

9      A.   Yes.

10     Q.   Who?

11     A.   Duende and Talibán.

12     Q.   With respect to the photo array including

13 Talibán, defense counsel asked you about not initially

14 identifying him.  Do you recall that?

15     A.   Yes.

16     Q.   Why did you not immediately identify him?

17     A.   I did identify him, but I didn't want to say that

18 I knew him.

19     Q.   Why did you not want to say that you knew

20 Talibán?

21     A.   Because nobody was supposed to know him in that

22 area, because he had just come out of prison, and I

23 didn't want him to get in further trouble.

24     Q.   In further trouble for what?

25     A.   Because he was the one that had fired the gun.

G. Garcia - Redirect                                              90

 1    Duende was right next to me.
 2              MS. AMATO:  Objection, lack of foundation.
 3              MS. MARTINEZ:  I think there has been plenty
 4    of foundation laid as to what the witness knew about
 5    what happened that night.  This particular question, he
 6    said -- Your Honor, I'm not sure --
 7              THE COURT:  Let me do this:  The objection
 8    is overruled.
 9              THE WITNESS:  Duende was right next to me,
10    and I knew that I hadn't done it myself.
11    BY MS. MARTINEZ:
12       Q.   Hadn't done what yourself?
13       A.   That neither Duende nor myself had fired the gun.
14       Q.   Who fired the gun?
15       A.   The one that was behind.
16       Q.   Who was that?
17       A.   Talibán.
18              MS. MARTINEZ:  No further questions, Your
19    Honor.
20              THE COURT:  May the witness be excused?
21              You're excused, sir.  Thank you.
22              (Thereupon, the witness withdrew from the
23    stand.)
24              MS. MARTINEZ:  United States calls Detective
25    Victor Ignacio.

```
 1                    (Witness sworn.)
 2                    THE WITNESS:  I do.
 3                    THEREUPON, VICTOR IGNACIO, having been duly
 4      sworn, testified as follows:
 5                         DIRECT EXAMINATION
 6      BY MS. MARTINEZ:
 7         Q.   Good afternoon.
 8         A.   Good afternoon.
 9         Q.   Would you please state and spell your full name
10      for the record.
11         A.   It's Victor, V-i-c-t-o-r, Ignacio, I-g-n-a-c-i-o.
12         Q.   Sir, where do you work?
13         A.   I'm a -- in the city of Alexandria.  I'm a police
14      officer with the city of Alexandria.
15         Q.   How long have you been with the city of
16      Alexandria police?
17         A.   Twenty-five years.
18         Q.   What is your current position?
19         A.   I'm a polygrapher.
20         Q.   What does that mean?
21         A.   I do polygraph.  I've been a detective for the
22      last 20 years.
23         Q.   How long have you been a polygrapher?
24         A.   Since 2012.
25         Q.   You said you're also a detective?
```

1     A.   The polygrapher -- I'm still a detective, yes,
2  but I started as a detective in '96.
3     Q.   What are your general duties as a detective for
4  the Alexandria City Police?
5     A.   Investigate mainly violent crimes and crimes
6  against persons.
7     Q.   I'd like to turn your attention to June 19th,
8  2014.  On that night, were there any calls that you
9  responded to?
10     A.   Yes.  I responded to a shooting in the 3800 block
11  of Russell Road.
12     Q.   Approximately what time did you respond?
13     A.   It was sometime around after 11:30 that night,
14  yes.
15     Q.   What did you observe upon arriving on the scene?
16     A.   Um, lots of patrol officers, commanders.  They
17  had crime scene tape around the area.  They showed me
18  the spot where the victim had last been.  There was
19  blood over there.
20     Q.   Was the victim present when you arrived?
21     A.   No.  He had been transported to the hospital.
22          MS. MARTINEZ:  Your Honor, may we publish
23  what has been already admitted as Government's
24  Exhibit 91-A and 91-B.
25          THE COURT:  Yes.

1            MS. MARTINEZ:  Start with 91-A.

2   BY MS. MARTINEZ:

3       Q.   Do you recognize this photograph?

4       A.   Yes.

5       Q.   What is it?

6       A.   It depicts the area where the victim landed.

7   That's the sidewalk in front of 3810 Russell Road.

8       Q.   And is this a true and accurate depiction of what

9   you saw around the time that you arrived on the scene

10  that night?

11      A.   Yes.

12      Q.   If we could go to 91-B.

13           What does that picture show?

14      A.   The same spot, a close-up of the same photo.

15      Q.   And again, does this accurately depict what you

16  saw around the time that you arrived?

17      A.   Yes.

18      Q.   What other detectives were on the scene the night

19  of the shooting?

20      A.   Eventually, Detective Buckley arrived, who is the

21  lead detective, Detective Michael Rodriguez, and we

22  called upon another detective who spoke Spanish, Cepeda,

23  and Richard Sandoval, and also Detective Sean Casey was

24  present.

25      Q.   Who was the first detective on the scene?

1    A.   I was.

2    Q.   What did you do after you arrived on the scene?

3    A.   We began to conduct canvass.  I spoke to

4    witnesses, and conducted canvass in the area.

5    Q.   What does "conduct canvass" mean?

6    A.   Knock on doors and attempt to find witnesses or

7    people that may have seen or heard or saw anything that

8    happened that night related to this incident.

9    Q.   Was a bullet ever recovered at the crime scene?

10   A.   No.

11   Q.   How about a shell casing?

12   A.   No.

13   Q.   With the help of the court security officer,

14   let's have you look at Government's Exhibit 95-C.

15        What is Government's Exhibit 95-C?

16   A.   It depicts the Arlandria area of Alexandria.  It

17   also has the area where the crime took place.

18            MS. MARTINEZ:  Your Honor, the government

19   offers into evidence Government's Exhibit 95-C.

20            THE COURT:  Received.

21            MS. MARTINEZ:  May we publish, Your Honor?

22            THE COURT:  Yes.

23   BY MS. MARTINEZ:

24   Q.   On the screen there, I think if you touch it, it

25   will be able to make a mark.

1      Can you identify the location where the crime
2    scene was?
3      A.   Like right here (indicates).  It can't -- it
4    doesn't allow me to do it.
5           MS. MARTINEZ:  Let's see if we can make it
6    work.  Just a second.
7           THE WITNESS:  Around this area.
8           MS. MARTINEZ:  And, Your Honor, may the
9    record reflect that there is a red dot, somewhat in the
10   middle of the screen.
11          THE COURT:  On which street, sir?  On what
12   street?
13          THE WITNESS:  That's Russell Road.
14          THE COURT:  Thank you.
15          THE WITNESS:  Right in front of 3810 Russell
16   Road.
17          THE COURT:  Thank you.
18   BY MS. MARTINEZ:
19     Q.   And to orient the jury, can you please show the
20   jury which street is Russell Road?
21     A.   This one here.  It leads onto Mount Vernon Avenue
22   on the north side and Glebe Road on the south side.
23     Q.   And is Russell Road labeled in that -- in that
24   map there?
25     A.   It is.

1    Q.   And Mount Vernon Avenue, can you show the jury
2    where Mount Vernon Avenue is?
3    A.   Right here.  It runs north and south.
4    Q.   Is that labeled as well on the map?
5    A.   It is.
6    Q.   How about Executive Avenue; where is Executive
7    Avenue on this map?
8    A.   It's this one here.  It runs parallel to Russell.
9    Q.   Is that labeled as well?
10   A.   Yes.
11   Q.   Are you familiar with a restaurant called
12   Lillian's in this vicinity?
13   A.   Yes.
14   Q.   Are you able to identify on the map where
15   Lillian's is?
16   A.   It's right here.
17   Q.   And is Lillian's also labeled on that map?
18   A.   It is.
19   Q.   How about something called in the neighborhood,
20   the 24.  Are you familiar -- do you know what that is?
21   A.   Yeah.  24-hour Express store is the correct name,
22   and it's -- it's right outside the map here, in this
23   area here.
24         MS. MARTINEZ:  Your Honor, may the record
25   reflect that he put a dot at the top end of the map,

1    roughly in the center, in response to the

2    24-hour Express.

3              THE COURT:  So noted.

4    BY MS. MARTINEZ:

5      Q.  And, how about the Waffle Shop; do you know where

6    that is?

7      A.  Yes.  It is right here.

8      Q.  And where is that in proximity to the scene of

9    the crime?

10     A.  It's across from the scene of the crime.

11     Q.  With the help of the court security officer, I'd

12   like to show you Government's Exhibits 94-D, F, G and I.

13             Do you recognize those exhibits?

14     A.  Yes.

15     Q.  And what are they, generally?

16     A.  This is the Exxon on Mount Vernon Avenue, near to

17   the 24-hour Express.

18             And this red vehicle is parked right at -- in

19   front of 3810 Russell.

20             This is 3810 Russell, the building where the

21   incident took place.

22             And this is a shot of the 3810 Russell, heading

23   south.

24             MS. MARTINEZ:  Your Honor, the government

25   offers into evidence Government's Exhibits 94-D, F, G,

1    and I.

2              THE COURT:  Received.

3              MS. MARTINEZ:  May we publish, Your Honor?

4              THE COURT:  Yes.

5    BY MS. MARTINEZ:

6       Q.   Let's start with 94-F?

7       A.   Okay.

8       Q.   What does 94-F show?

9       A.   It shows the -- the B and C building.

10      Q.   Of what?

11      A.   Of 3810 Russell.

12      Q.   And, where in proximity to this view was the

13   scene of the crime?

14      A.   It was right outside of the steps, right here,

15   like right in this area here on the sidewalk.

16      Q.   Now, close to the large bush on the bottom

17   left-hand corner?

18      A.   Yes, but it would be on the sidewalk here.

19      Q.   Please turn to 95 -- 94-G.

20           What does this show?

21      A.   It shows the, still the spot where the victim

22   landed in front of the A Building, 3810, and the view is

23   south.  You can see the side of the Waffle Shop here,

24   and the church.

25      Q.   On the screen, could you show the jury where

1    the -- where the scene of the crime was.

2        A.   Right here.

3        Q.   In this picture, what is the stain on the

4    sidewalk there?  Do you know?

5        A.   That was the blood.

6        Q.   94-I, what does this show?

7        A.   It's the same photo, facing north, shows the

8    shopping center, Lillian's.

9        Q.   Where is the scene of the crime?

10       A.   It would be right here.

11       Q.   And is that that same stain?

12       A.   Yes.

13       Q.   94-D.  Approximately where is this taken from?

14       A.   This is taken facing north, and it shows again --

15   the crime scene would have been on this side here,

16   farther out, out of the picture.  And this is showing

17   Exxon and the 24-hour Express right here.

18             MS. MARTINEZ:  And Your Honor, may the

19   record reflect that when he indicated the 24-hour

20   Express, he put a dot on a pinkish building on the

21   screen.

22             THE COURT:  So noted.

23   BY MS. MARTINEZ:

24       Q.   When did this investigation become a homicide

25   investigation?

1    A.   It would have been on the 21st.

2    Q.   What happened on the 21st?

3    A.   Um, the victim was pronounced dead at the

4    hospital.

5    Q.   After the night of the shooting, prior to making

6    any arrests, did you conduct interviews?

7    A.   Yes.

8    Q.   Without telling us what anyone said during the

9    interviews, were you able to develop any suspects?

10   A.   At that time, no.

11   Q.   Were you eventually able to develop suspects to

12   this homicide?

13   A.   Yes.

14   Q.   Who were the suspects?

15   A.   It was Genaro Sen Garcia, Jose Del Cid and Jesus

16   Chavez.

17   Q.   Were photo arrays of any of the suspects shown to

18   any of the people you interviewed?

19   A.   Yes.

20        MS. MARTINEZ:   Your Honor, with the help of

21   the court security officer, may we show him Government's

22   Exhibit 93-A?

23        THE COURT:   Yes.

24   BY MS. MARTINEZ:

25   Q.   Do you recognize Government's Exhibit 93-A?

V. Ignacio - Direct                                   101

1    A.   Yes.

2    Q.   Does your signature appear on that document?

3    A.   Um, not my signature, but it's definitely my

4    handwriting and my name on it.

5    Q.   Without going into details, what is it,

6    generally?

7    A.   It is the -- basically the form that we use to

8    explain to the witnesses on how the photo spread is

9    going to go, the way we tell them, you know.  We read

10   this one completely to them, make sure they understand

11   them before we actually show them the photos.

12   Q.   What is attached to that form?

13   A.   Um --

14   Q.   You can take it out of the sleeve.

15   A.   The photos that were shown.

16   Q.   Who prepared this particular photo array?

17   A.   The lead detective, Buckley.

18   Q.   And who was this particular one shown to?

19   A.   Mr. Vidal Jiménez.

20   Q.   Who showed it to Vidal Jiménez?

21   A.   I was present, Detective Rodriguez was present,

22   and Agent Rich Baer was present.

23   Q.   What suspect was in the photo array?

24   A.   Jesus Chavez.

25   Q.   Do you know Jesus Chavez by any other name?

1    A.   Chuy.

2    Q.   Were you eventually able to arrest any of the

3    suspects?

4    A.   All three of them were arrested, yes.

5    Q.   When was the first arrest?

6    A.   The first arrest was July 2nd.

7    Q.   What other law enforcement were present on

8    July 2nd with you?

9    A.   U.S. marshals and the FBI.

10   Q.   Where did the arrest take place?

11   A.   In the 42, 4300 block of Duke Street, an

12   apartment complex.

13   Q.   Who was arrested that day?

14   A.   It was Jose Del Cid, Jesus Chavez, and Lala --

15   Mr. Chavez's sister, but I can't recall her name right

16   now.

17   Q.   Who lived at the 4200 block of Duke Street?

18   A.   It was Mr. Chavez's mother and family.

19   Q.   What happened when you arrived?

20   A.   When we arrived, the marshals arrested Jose Del

21   Cid and Lala outside the apartment -- inside -- in the

22   apartment complex, outside the apartment.  And they told

23   us that Mr. Chavez was inside the apartment, watching

24   TV.

25   Q.   And who is Lala?

1    A.   It would be Jesus Chavez's sister.

2    Q.   After you arrested Jose Del Cid and Lala, what

3  happened?

4    A.   We proceeded to go to the apartment, knocked on

5  the patio door.  Mr. Chavez came out.

6    Q.   What happened after that?

7    A.   We spoke to him, asked him that we were

8  interested in speaking to him, if he will come to the

9  office voluntarily.

10        And he denied.  He said that he would not go.

11        So, at that point, Detective Rodriguez contacted

12  a probation officer, his probation officer, and alerted

13  him that he was in -- around in the presence of gang

14  members.  And that was one of the -- he should not be

15  allowed gang members, for his probation.

16        We left -- we were waiting for transport to

17  transport Mr. Del Cid and Lala.  At the time when we

18  waited for transport, Mr. Chavez came out.  He was about

19  to get into a car.

20        Detective Rodriguez advised us that his probation

21  officer had issued a warrant for probation violation.

22  At that point he was taken into custody.

23    Q.   And where was he taken?

24    A.   To the Alexandria Police Department.

25        MS. MARTINEZ:  Thank you.  No further

1    questions, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. AQUINO:

4        Q.   Detective Ignacio, my name is Jerry Aquino.

5    Along with Elita Amato, we represent Jesus Chavez.

6        A.   Yes, sir.

7        Q.   Now, you said you were the first detective at the

8    scene; is that accurate?

9        A.   Yes, sir.

10       Q.   And, so far as Ms. Martinez is concerned a few

11   seconds ago, you talked about the results of your

12   investigation; is that correct?

13       A.   Yes, sir.

14       Q.   Okay.  Now, you indicated that you arrested Jose

15   Del Cid on July 2nd; is that correct?

16       A.   The 2nd, yes.

17       Q.   Of 2014, correct?

18       A.   Yes, sir.

19       Q.   And, you interrogated Mr. Del Cid; is that

20   accurate?

21       A.   Yes, sir.

22       Q.   Okay.  And, he told you that Gatuso was the one

23   that pulled the gun on Mr. Urrutia; is that correct?

24       A.   He said that once, yes.

25       Q.   And he told you that he was the one, that is,

1    Gatuso -- let me rephrase it -- Duende, that is,

2    Mr. Del Cid, told you that Gatuso was the one that shot

3    Mr. Urrutia; is that correct?

4        A.   He said that once.

5        Q.   Okay.  And, he told -- Duende, again, Del Cid,

6    told you that following the shooting, that Gatuso, that

7    is, Sen Genaro Garcia, left the area with the gun; is

8    that correct?

9        A.   Correct.

10       Q.   Now, Mr. Del Cid has tattoos on his arms; is that

11   correct?

12       A.   I don't recall, but he had tattoos, yes.

13            MR. AQUINO:  Can we put up 7 -- 73, please.

14            THE WITNESS:  I'm not sure where the tattoos

15   were.

16            THE COURT:  This is Government's 73?

17            MR. AQUINO:  Yes, sir.

18            THE COURT:  Just a second.

19   BY MR. AQUINO:

20       Q.   Would you agree, on his upper left arm he appears

21   to have tattoos?

22       A.   Yes, sir.

23       Q.   And, the tattoos appear towards the downward area

24   of his left arm of his; is that accurate?

25       A.   Yes.

1    Q.   And would you also agree that he had tattoos on

2    his right arm?

3         I realize you can't see them there, but would you

4    agree with me that he has tattoos on his right arm?

5    A.   I know he has several.  I would have to see the

6    photos.

7    Q.   Okay.  Now, you met Gatuso or Sen Genaro Garcia;

8    is that accurate?

9    A.   Yes, sir.

10   Q.   And he has tattoos in the hand area; is that

11   accurate?

12   A.   Yes.

13   Q.   Now, you also were involved in the arrest of

14   Jesus Chavez on July 2nd of 2014, correct?

15   A.   Yes, sir.

16   Q.   You were present when he was arrested?

17   A.   Yes.

18   Q.   Okay.  Have you examined his arms?

19   A.   We looked at him.

20   Q.   No tattoos on his arms?

21   A.   I'm not sure.

22   Q.   No tattoos on his hands, are there?

23   A.   Like I said, if you show me photos I'll be able

24   to tell you whether he did or not.

25   Q.   Now, you talked about meeting Gatuso; is that

1   correct?

2       Is that correct?  You interrogated Gatuso; is

3   that accurate?

4       A.  Yes.

5       Q.  And when you initially interrogated Gatuso, he

6   told you that he really didn't remember much about what

7   happened on the night of the July 19th -- excuse me --

8   June 19th of 2014, correct?

9       A.  He said that at first, yes.

10      Q.  And he also told you that there were periods of

11  time that he went 20 to 30 minutes without remembering

12  things; is that accurate?

13      A.  Yes, sir.

14      Q.  Now, you presented a photo array to Mr. Garcia;

15  is that correct?

16      A.  Yes.  The interview was conducted with Detective

17  Buckley, so, yes, photos were shown to him, yes.

18      Q.  And, you would agree that from time to time, that

19  when you've interviewed people, that is, people that you

20  arrest in the past, from time to time, you lie to them;

21  is that correct?

22      A.  Yes, sir.

23      Q.  And, would you agree that the more you lie, the

24  easier it becomes?

25      A.  Not really.  I mean --

1     Q.   Okay.  Now, would it be correct to say that you

2  were present when a photo array was presented to

3  Mr. Gatuso, that is, Sen Genaro Garcia, that included

4  the picture of Jesus Chavez; is that accurate?

5     A.   Yes.

6     Q.   And you wanted Mr. Gatuso, Sen Genaro Garcia, to

7  identify the shooter; is that correct?

8     A.   Yes.

9     Q.   And there was a picture of Mr. Chavez included

10  within that photo array, correct?

11     A.   Yes, sir.

12     Q.   And, Gatuso looked at all the pictures and passed

13  the picture of Mr. Chavez; is that accurate?

14     A.   Yes, sir.

15     Q.   And when he passed that picture of Mr. Chavez,

16  you made a noise like, "Huh," or something out loud to

17  him, right?

18     A.   Which is the reason why I put it on the -- my

19  write-up, because it was something that we don't

20  normally do --

21     Q.   The question is --

22     A.   Yes, I did.  Yes.

23     Q.   -- you made a noise to him --

24     A.   Yes.

25     Q.   -- isn't that accurate?

1      A.   I said, "Huh," yes, sir.

2      Q.   And the purpose of that was to direct him towards

3    Mr. Chavez, wasn't it?

4      A.   Yes, sir.

5      Q.   That's what I thought.  All right.

6           Now, you also interrogated Vidal Jiménez in this

7    case; is that correct?

8      A.   No.  We interviewed Mr. Jiménez.  He was never --

9      Q.   Okay.  You interviewed Mr. Jiménez.

10          And you talked a few minutes ago about showing

11   him a photo array of -- is that correct?

12     A.   Yes, sir.

13     Q.   And that included a picture of Mr. Chavez; is

14   that accurate?

15     A.   Yes, sir.

16     Q.   And, like what you did with Gatuso, you directed

17   him as to who to pick out of that photo spread; isn't

18   that correct?

19     A.   No, sir.

20     Q.   Sir, have you ever been convicted of a crime of

21   moral turpitude, that is, lying, cheating or stealing?

22     A.   A tag violation 20 years ago.  I paid a $100

23   fine.

24     Q.   And that occurred while you were a police

25   officer; is that correct?

1    A.   Yes.

2    Q.   In fact, another police officer turned you in; is

3    that accurate?

4    A.   No.

5    Q.   Another police officer reported you committing

6    that crime.

7    A.   The car was parked in front of the office.

8    Q.   My question was:  Another police officer reported

9    you committing that crime; is that correct?

10   A.   A parking enforcement did; a parking enforcement

11   officer.

12   Q.   Okay.  So it wasn't a police officer, it was a

13   parking enforcement officer?

14   A.   It was a parking enforcement officer.  They

15   didn't turn him (sic) in.  They didn't even know who the

16   car belonged to, sir.

17   Q.   Now, you indicated earlier that you had a

18   conversation with Gatuso, and you took a statement on or

19   about January 15th, or one of his statements on or about

20   January 15th of 2015; is that correct?

21   A.   I --

22   Q.   You don't remember?

23   A.   I mean, if you have any paper, I don't remember

24   that, yeah.

25   Q.   That's okay.  We'll come back to that later.

1        Now, I want to be clear, then.  You have
2   interviewed Sen Genaro Garcia, that is, Gatuso?
3       A.   Yes, sir.
4       Q.   You've interviewed Vidal Jiménez; is that
5   correct?
6       A.   Yes, sir.
7       Q.   And you've interviewed Jose Del Cid; is that
8   accurate?
9       A.   Yes, sir.
10             MR. AQUINO:  Judge, that's all the questions
11  I have.  Thank you.
12             MR. CHICK:  I have questions.
13                   CROSS-EXAMINATION
14  BY MR. CHICK:
15      Q.   Hi, Detective.  My name is Mike Chick.  I'm the
16  attorney for Manuel Ernesto Paiz Guevara.
17      A.   Hello.
18      Q.   I want to ask you some questions to follow up
19  about your interview with Jose Del Cid, Duende.
20      A.   Yes.
21      Q.   You interviewed him about not just the crime that
22  happened in Chirilagua, but some other murders as well,
23  right?
24      A.   Yeah.  That was Rich Baer kind of took the lead
25  on that.  He was present.

1    Q.   Okay.  You participated in that interview?

2    A.   Yes, sir.

3    Q.   Okay.  And during that interview, he told you

4    about a murder of somebody named Gerson or Gerson,

5    right?

6    A.   Yes.

7    Q.   Okay.  And he said in that interview that -- and

8    if you need to see a report or anything to refresh any

9    recollection, just let me know.  Okay?

10        He told you that the people who participated in

11   that murder were somebody by the name of Leopardo --

12            MS. AUSTIN:  Objection.  May we approach,

13   Your Honor?

14            THE COURT:  All right.

15            (Pause.)

16            THE COURT:  Ladies and gentlemen, we're

17   going to recess for lunch now.  Please do not discuss

18   the case.  Don't permit the case to be discussed in your

19   presence.  Leave your notes in the jury deliberation

20   room.

21            Mr. Toliver will tell you where you can have

22   lunch in the jury room.  And we'll recess until

23   2:00 o'clock.

24            Thank you.

25            (Jury not present.)

1          THE COURT:  If you can step outside.

2          (Thereupon, the witness withdrew from the

3  stand.)

4          (Thereupon, the following sidebar conference

5  was had:)

6          THE COURT:  Yes.

7          MS. AUSTIN:  Thank you, Your Honor.  I'm

8  objecting to the line of questioning by Mr. Chick.  It's

9  outside the scope of direct examination.

10          And if he needs to call this person as his

11  own witness to establish things, I would request that he

12  do that, instead of going --

13          MR. CHICK:  Two responses --

14          (Simultaneous speaking.)

15          THE COURT:  I thought -- he was examining

16  the witness.

17          MR. AMOLSCH:  I apologize.

18          MR. CHICK:  Two responses, Your Honor.

19  First, I believe that he was asked about whether he

20  interviewed Mr. Del Cid and arrested Mr. Del Cid.  And

21  so it is within the scope.

22          Secondly, it's being offered for purposes of

23  impeachment of things that Mr. Del Cid said during his

24  testimony.

25          And if we need to call him -- if I need to

1  call him, I'll call him.  But it seems it's within the

2  scope, based on the fact he was questioned of his

3  interview with Mr. Del Cid.

4          MR. AMOLSCH:  This is Mr. Amolsch for

5  Mr. Cerna.

6          It's revealing, the government didn't object

7  to it being beyond the scope.  If Mr. Chick wants to

8  call him as a witness in his own case, that would give

9  us an opportunity to cross-examine this witness on

10 anything Mr. Chick might have elicited regarding his --

11 his testimony, and his questions regarding the guilt of

12 the other defendants in this case.

13         We don't have an opportunity, at this point,

14 to cross-examine this witness on anything Mr. Chick

15 might ask the detective, given that it wasn't in the

16 scope of the government's examination.

17         MR. CHICK:  I think that's why the defense,

18 why the other defense counsel asked for me to go earlier

19 in the cross-examination order, so that they can

20 respond.

21         THE COURT:  Just a minute.

22         Does the government want to be heard?

23         MS. MARTINEZ:  Your Honor, defense counsel

24 made the objection before the government did.

25         I agree that during the direct examination

1     of the witness, he testified that he interviewed Mr. Del

2     Cid.  I don't think the questioning had gone very far.

3     It perhaps would go beyond the scope of the direct.

4     But, as of yesterday, I don't know that it had.

5                   We don't have any objection to any defendant

6     calling a detective in their own case-in-chief, if

7     that's appropriate, for whatever defense any defendant

8     wants to assert.

9                   I don't think we would have a position on

10    this particular objection, Your Honor.  I think it's

11    between defense counsel.  We might take a position if it

12    goes any further, but at this point I don't know that

13    the government really has a position.

14                  MR. SALVATO:  Your Honor, I would just add,

15    Detective Ignacio was not questioned at all about Lil

16    Guasón.  His only questions during direct examination

17    were about Chuy and the murder of Julio Urrutia, not

18    anything about Lil Guasón.

19                  So I think it's plainly outside the scope,

20    and I just join in with my colleague, indicating he

21    wasn't asked anything about Lil Guasón at all.

22                  MS. AUSTIN:  That's exactly what I was about

23    to say, Your Honor, that --

24                  THE COURT:  You don't have to say it then.

25                  MS. AUSTIN:  Okay.

1          THE COURT:  Objection sustained.  If you
2   want to call him, call him.
3          MR. CHICK:  Yes, sir.
4          THE COURT:  Thank you.
5          (Thereupon, the side-bar conference was
6   concluded.)
7          THE COURT:  Well, would you look at the
8   time.  It's time for the luncheon recess.
9          We will recess to 2:00 o'clock.  Thank you.
10          (Court recessed at 1:00 p.m. and reconvened
11          at 2:04 p.m.)
12          (Jury not present.)
13          MR. AMOLSCH:  Thank you.  May it please --
14          THE COURT:  Let the court reporter get set
15   up.
16          MR. AMOLSCH:  I'm so conscious of the time,
17   Judge.
18          THE COURT:  That's all right.
19          You may proceed now.
20          MR. AMOLSCH:  Thank you, Judge.
21          Following up on the last objection, Judge,
22   I'm not sure if the witness answered the question.  I
23   don't think that he did.  But in the event --
24          THE COURT:  He did.
25          MR. AMOLSCH:  He did or did not?

1           THE COURT:  He did.

2           MR. AMOLSCH:  Judge, in addition to

3    sustaining the objection, I would also make a motion to

4    strike the question.  Your Honor's ruling is it's

5    outside the scope.  The question is out there.  Again,

6    if Mr. Chick wants to call him as his own witness, that

7    would be fine.

8                But we've discussed that we would like an --

9    instruct the jury to disregard the question as well, in

10   addition to sustaining the objection, so it's not

11   hanging out there.

12           THE COURT:  Well, I think what I'm going to

13   do is nothing.  Because -- I know you all think the

14   jurors have like a photographic memory and that they're

15   taking detailed notes of everything that's being said in

16   the courtroom.  I don't think that they are.  So I'm not

17   going to do anything more.

18                If Mr. Chick wants to call that witness as a

19   witness, he can.  But there was no -- I'm looking at the

20   transcript, and there was no answer given.

21           MR. AMOLSCH:  So, there was an objection --

22   just so I understand.  So there was an objection.  Is

23   Your Honor just not even going to rule on the objection

24   in open court, and just --

25                THE COURT:  I ruled at sidebar.  You

1    remember when I was sitting over there?

2              MR. AMOLSCH:  No, I remember.

3              THE COURT:  The court reporter was right

4    there when I was speaking.  You do remember that?

5              MR. AMOLSCH:  All right.  So -- all right.

6    Thank you, Judge.

7              THE COURT:  Uh-huh.  All right.  Thank you.

8              Ms. Martell is coming up.

9              MS. MARTINEZ:  Your Honor, we have a very

10   short matter, if --

11             THE COURT:  Oh --

12             MS. MARTINEZ:  Oh, I'm sorry.

13             THE COURT:  Ms. Martell was coming next.

14   I'll give you a chance.

15             MS. MARTELL:  Your Honor, very quickly, we

16   would like to put on the record that during the lunch

17   break, myself and Ms. Ralls went to the fourth floor

18   attorney work room.

19             I entered the room.  And upon entering,

20   there were two jurors present having a conversation.

21             At that moment, kind of taken by surprise, I

22   said, "Sorry, excuse me," and I walked out of the room.

23             Just -- I let your clerk know, and just

24   wanted to put that on the record.  I let Ms. Martinez

25   know.

1           THE COURT:  Thank you for bringing that to
2   my attention.  You did the right thing.
3           What happened had nothing to do with you.
4   It was all the fault of my court security officer, who I
5   asked to take the jury down there, and he didn't do
6   that.  He had someone else do it, and they took him to
7   the wrong room.  He has promised me he will not do that
8   again.
9           MS. MARTELL:  Thank you, Your Honor.  And I
10  apologize.
11          THE COURT:  I try to make sure that
12  everybody understands, we're at a very critical point at
13  the trial.  I cannot have mistakes like that made again.
14          MS. MARTELL:  I understand.
15          THE COURT:  Thank you.
16          MS. MARTELL:  Thank you.
17          THE COURT:  Ms. Martinez.
18          MS. MARTINEZ:  Your Honor, as long as we
19  have a minute while the jury is not here, to inform the
20  Court of timing, the government does anticipate resting
21  potentially today or perhaps early tomorrow, to apprise
22  everyone of the schedule.
23          And we would make a short oral motion.  We
24  have been -- the government has been providing defense
25  counsel, each day at the close of court, with a list of

1  witnesses for at least for the next day, sometimes for a
2  couple days in advance.
3              I would like to make a motion and ask the
4  Court to order defense counsel to do the same.  Some
5  have already represented they would be happy to do so,
6  to let us know at least a day in advance of any
7  witnesses they intend to call, with the exception, of
8  course, of any defendant.  They have no obligation to
9  tell us whether or not a defendant will testify, of
10 course.
11             THE COURT:  All right.
12             Hearing no objection, I'll enter an order
13 that directs counsel to give the government 24-hours
14 notice of any witness you're going to call.
15             Mr. Chick, is there something you wanted to
16 say before I brought the jury out?
17             MR. CHICK:  No, sir.  I was just going to go
18 back to the table.
19             THE COURT:  All right.  Ready to bring the
20 jury out?
21             We'll have the witness brought out.
22             (Witness resumed stand.)
23             (Jury present.)
24             THE COURT:  You can have a seat.  You may be
25 seated.

1           All right, Counsel, you may proceed.

2           MR. CHICK:  Thank you, Your Honor.

3           I have no further questions.  I would just

4    ask that the witness be subject to recall.

5           THE COURT:  All right, subject to recall.

6           Sir, you're subject to being recalled by the

7    defense.  And you will be notified when to come back to

8    court.  So do not discuss your testimony with anyone.

9    Thank you.

10          MS. MARTINEZ:  May I redirect?

11          THE COURT:  Yes.  Sure.

12                 REDIRECT EXAMINATION

13   BY MS. MARTINEZ:

14   Q.  Detective Ignacio, you were asked by defense

15   counsel about some violation that occurred 20 years ago.

16   A.  Yes.

17   Q.  Could you explain that to the jury?

18   A.  It was the temporary tag that was -- that I

19   altered, basically.  I was given a citation and paid a

20   hundred dollar fine, and that's it.

21   Q.  When was that?

22   A.  It was November '96.

23   Q.  Turning your attention to this case, you were

24   asked by defense counsel about a number of interviews

25   that you conducted.  He mentioned Jose Del Cid, Genaro

1    Sen Garcia and Vidal Jiménez.  Do you recall that?

2         A.   Yes.

3         Q.   In addition to those three persons, during the

4    course of your investigation were there also other

5    people you interviewed?

6         A.   Yes.

7         Q.   In addition, defense counsel asked you about Jose

8    Del Cid's interview, his initial interview on the day of

9    his arrest.  Do you recall that?

10        A.   Yes.

11        Q.   And, you stated that Del Cid said once that

12   Gatuso was the shooter; is that right?

13        A.   Yes.

14        Q.   What did he say about the shooter after that?

15        A.   Um, let me think back.  First, he didn't know who

16   the shooter was, because the shooter was behind him, he

17   said.  Then eventually he said that it was Mr. Chavez.

18             MS. MARTINEZ:  No further questions, Your

19   Honor.

20             THE COURT:  You can step down, sir.

21             (Thereupon, the witness withdrew from the

22   stand.)

23             MS. MARTINEZ:  United States calls Vidal

24   Jiménez.

25             (Witness sworn.)

1                     THE WITNESS:  Yes.

2                     THEREUPON, VIDAL JIMÉNEZ SEDILLO, having

3      been duly sworn, testified as follows:

4                          DIRECT EXAMINATION

5      BY MS. MARTINEZ:

6          Q.   Good afternoon.

7          A.   Good afternoon.

8          Q.   Would you please state your name and spell it for

9      the record.

10         A.   My name is Vidal Jiménez Sedillo; V-i-d-a-l,

11     J-i-m-e-n-e-z, Sedillo is S-e-d-i-l-l-o.

12         Q.   How old are you?

13         A.   Twenty-three.

14         Q.   Where were you born?

15         A.   Arlington, Virginia.

16         Q.   What languages do you speak?

17         A.   I speak both English and Spanish.

18         Q.   Which language are you most comfortable with?

19         A.   English.

20         Q.   Are you fluent in Spanish?

21         A.   No.

22         Q.   Are you familiar with a gang called MS-13?

23         A.   Yes.

24         Q.   How are you familiar with them?

25         A.   Just growing up.

1     Q.   Growing up where?

2     A.   In Virginia, see them everywhere.

3     Q.   What neighborhoods did you grow up in in

4  Virginia?

5     A.   I grew up in Fairfax, Arlington, Alexandria.

6     Q.   Have you personally ever affiliated with a street

7  gang?

8     A.   Yes.

9     Q.   What gang was that?

10    A.   LH.

11    Q.   What is LH?

12    A.   Latin Homies.

13    Q.   When did you affiliate with Latin Homies?

14    A.   Around the age of 14.

15    Q.   Do you still affiliate with them?

16    A.   No.

17    Q.   How old were you when you stopped?

18    A.   Seventeen.

19    Q.   I'd like to turn your attention to the night of

20  June 19th, 2014.  Do you recall a shooting that occurred

21  that night?

22    A.   Yes.

23    Q.   Where did the shooting occur?

24    A.   Near the Waffle Shop in Alexandria.

25    Q.   What neighborhood in Alexandria?

1    A.   It's called Chirilagua.

2    Q.   Do you know who the victim of the shooting was?

3    A.   Yes.

4    Q.   Who was it?

5    A.   Julio.

6    Q.   Was Julio someone you knew?

7    A.   Yes.

8    Q.   How did you know Julio?

9    A.   I knew him by friends that knew him as well.

10           MS. MARTINEZ:   Your Honor, may we show the

11   witness what has already admitted as Government's

12   Exhibit 63-A?

13           THE COURT:   Yes.

14   BY MS. MARTINEZ:

15   Q.   Do you know who that is?

16   A.   Yes.

17   Q.   Who is it?

18   A.   That's Julio.

19   Q.   Where were you when the shooting happened?

20   A.   I was standing in the middle of Julio, David and

21   Jose.

22   Q.   Who is David?

23   A.   It's my sibling.

24   Q.   Who is Jose?

25   A.   It's also my other sibling.

1    Q.   Do you recall approximately what time the
2  shooting happened?
3    A.   Around 10:00.
4    Q.   Turning your attention to a short while before
5  the shooting, where were you perhaps 15 minutes before
6  the shooting happened?
7    A.   I was just finishing dinner, arriving home.
8    Q.   When you say "home," where was home?
9         Please don't provide an address, but more general
10  location?
11    A.   In Alexandria.
12    Q.   Who were you with?
13    A.   I was with my brothers.
14    Q.   What was happening when you were with your
15  brothers shortly before the shooting?
16    A.   They were chasing my youngest sibling, and,
17  that's what led us to be outside.
18    Q.   You said "they were chasing."  Who were you
19  referring to as they?
20    A.   I'm assuming it's members of MS.
21         MS. AMATO:  Objection.
22         THE COURT:  I'll sustain the objection to
23  "assume."  No assumptions.
24  BY MS. MARTINEZ:
25    Q.   After -- you said that your brother was chased;

1   is that right?

2       A.   Yes.

3       Q.   What happened, from your perspective, after that?

4       A.   Well, after that, we just -- we were just

5   outside, talking about him being chased.

6       Q.   When you were outside, who were you with?

7       A.   David and Jose.

8       Q.   And what happened after that?

9       A.   Afterwards, we run into Julio and his cousin.

10  And they were also approached by similar group.

11      Q.   After you ran into Julio and his cousin, what was

12  the next thing you recall happening?

13      A.   Um, we spoke about the situation, and then three

14  gentlemen approached us.

15      Q.   You say "three gentlemen approached."  What

16  direction did they approach from?

17      A.   They came from behind the building.

18      Q.   What happened as they approached?

19      A.   They confronted us.  We exchanged words, and one

20  thing led to another.

21      Q.   What sort of words were exchanged?

22      A.   They were asking us to speak in Spanish.  They

23  were, in a sense, demanding respect and acknowledgment.

24      Q.   What language were the three individuals who

25  approached your group speaking in?

1     A.   Spanish.

2     Q.   What were their mannerisms like?

3     A.   You could tell that they were up to no --

4           MR. AQUINO:  Objection, calls for opinion.

5           THE COURT:  It does.  He can describe.

6  Sustained.

7  BY MS. MARTINEZ:

8     Q.   How did you describe their behavior as they

9  approached you?

10    A.   Very intense.

11    Q.   What was their tone of voice?

12    A.   Very direct.

13    Q.   You said there were three individuals?

14    A.   Yes.

15    Q.   How would you describe them physically, as

16  compared to each other?

17    A.   Two of them were fairly small.  I mean, they were

18  probably somewhere around five, six.  The last gentleman

19  was the tallest, bigger than both of them.

20    Q.   Focus -- sorry?

21    A.   Stocky.  I don't know.

22    Q.   Focusing on that individual, what was that

23  individual wearing?

24    A.   He had a gray shirt on, blue jeans.

25    Q.   What happened after the verbal confrontation?

1   A.   The attention sort of shifted to Julio.  One of
2   the guys threw a punch.  And afterwards, I just seen the
3   muzzle flash.

4   Q.   Which guy threw a punch?

5   A.   I believe he had a --

6        MR. AQUINO:  Objection, opinion.

7        THE COURT:  Overruled.

8   BY MS. MARTINEZ:

9   Q.   Which guy threw a punch?

10  A.   It was the -- it was a gentleman that had a
11  piercing on his eye.

12  Q.   Was he one of the smaller guys or was he the
13  bigger guy?

14  A.   He was one of the smaller gentlemen.

15  Q.   And where did the flash come from?

16  A.   The gentleman standing in the middle.

17  Q.   Was he one of the smaller guys or one of -- or
18  the bigger guy?

19  A.   He was the bigger guy.

20  Q.   What did you notice about the bigger guy, just
21  prior to the flash?

22  A.   He was very quiet, and he was just fumbling with
23  his belt.

24  Q.   When you mean, he was fumbling with his belt?

25  A.   As in it seemed like he was trying to reach for

V. Jiménez - Direct                                          130

something.

Q.   What was he wearing at that moment?

A.   Gray shirt, blue pants.

Q.   What else, if anything, did you observe about him?

A.   He spoke English.

Q.   What happened after the shooting?

A.   So, after the shooting occurred, as instinct, I ran.  But, unfortunately, two of my siblings were there, And so, I turned back, because that's family.

And, it sends a chilling feeling.  I seen David holding Julio, and you just -- we're just trying to do everything we can to suppress his bleeding.

Q.   You said that you saw David holding Julio?

A.   Yeah.  He was trying to suppress the gunshot wound he took.

Q.   Where were they?

A.   I'm assuming it was in his chest.

Q.   No, no, no.  Where were David and Julio?

A.   On the floor.

Q.   Inside or outside?

A.   Outside.

Q.   Had you ever seen the shooter before that day?

A.   Yes.

Q.   When, approximately?

V. Jiménez - Direct                                               131

1      A.   About two weeks before the shooting.

2      Q.   What did you see or observe about the shooter two

3  weeks before the shooting?

4      A.   I mean, he's a calm, casual guy.  He -- we

5  actually had a casual conversation before the event,

6  and -- I didn't see anything much.

7      Q.   After the day of the shooting, did you ever see

8  him again?

9      A.   Yes.

10     Q.   When?

11     A.   I was walking through a local park, and he was

12  with another person, a gentleman and a female.

13     Q.   Did you recognize the gentleman or the female

14  whom he was with?

15     A.   I believe the gentleman that was with him was

16  also the gentleman that was at the crime scene.

17     Q.   One of the three, or someone else?

18     A.   One of the three.

19     Q.   What was that interaction like, after the

20  shooting -- well, first of all, let me ask, how long

21  after the shooting was that incident?

22     A.   About four days.

23     Q.   And what happened?

24     A.   They were walking.  And so, I didn't acknowledge

25  them.  I continued to walk.

1    Q.  Where was it?

2    A.  At a local park in Alexandria.

3    Q.  Do you recall meeting with some police detectives

4    and looking at some pictures?

5    A.  Yes.

6    Q.  Do you recall being asked if you were able to

7    identify the shooter?

8    A.  Yes.

9    Q.  Were you able to identify the shooter from the

10   photo array?

11   A.  Yes.

12         MS. MARTINEZ:  Your Honor, may we show the

13   witness what has been marked as Government's

14   Exhibit 93-A?

15         THE COURT:  Yes.

16   BY MS. MARTINEZ:

17   Q.  Take a look at that document.  And you can take

18   it out of the sleeve so you can see the whole thing.

19         Is that your signature on the first page?

20   A.  Yes.

21   Q.  And if you could look through it, is this the

22   array that you were shown when you were asked to

23   identify the shooter?

24   A.  Yes.

25   Q.  Are you able to tell us which picture you

1    identified?

2        A.   Yes.

3        Q.   Would you hold it up for the jury.

4             MS. MARTINEZ:  Your Honor, I apologize.  We

5    move to admit Government's Exhibit 93-A.  I should have

6    said that before I asked him to hold it up.

7             THE COURT:  93-A will be received.

8    BY MS. MARTINEZ:

9        Q.   I'm sorry.  Would you hold that up for the jury.

10       A.   (Complies.)

11            MS. MARTINEZ:  And, Your Honor, may we

12   publish that on the screen so the jury can see it

13   better?

14            THE COURT:  Yes.

15   BY MS. MARTINEZ:

16       Q.   What date did you identify the shooter from this

17   photo array?

18       A.   7-7-14.

19            MS. MARTINEZ:  I have no further questions,

20   Your Honor.

21                    CROSS-EXAMINATION

22   BY MR. AQUINO:

23       Q.   Good afternoon, sir.

24       A.   Good afternoon.

25       Q.   My name is Jerry Aquino.  Along with Elita Amato,

1    we represent Jesus Chavez.

2         You indicated earlier you used to be a member of

3    LH; is that correct?

4    A.   Yes.

5    Q.   And that is Latin Homies; is that accurate?

6    A.   Yes.

7    Q.   And the gang sold drugs; is that correct?

8    A.   No.

9    Q.   The gang didn't -- the gang stole, right?

10   A.   No.

11   Q.   The gang hurt people, right?

12   A.   Yes.

13   Q.   Now, is a rival -- or was a rival gang of LH,

14   Latin Homies, MS-13?

15   A.   You can say so.

16   Q.   I'm asking, what do you say?

17   A.   Yes.

18   Q.   Now, you were a member of Latin Homies for three

19   years; is that correct?

20   A.   Yes.

21   Q.   You know what a *chavala* is?

22   A.   That's a term -- I'm familiar with it, but, no.

23   Q.   Okay.  Now, were you or your friends ever in a

24   fight with MS-13?

25   A.   Not that I can recall.

1    Q.   Okay.  You perceive my client, Mr. Chavez, to be
2  a member of MS-13; is that an accurate statement?
3    A.   Yes.
4    Q.   Okay.  That would not influence your testimony
5  here today, would it?
6    A.   Not at all.
7    Q.   Now, you say the shooting occurred on June 19th
8  of 2014, correct?
9    A.   Yes.
10   Q.   And your brother, David, was present at the
11 shooting scene; is that accurate?
12   A.   Yes.
13   Q.   And did he have a shirt on?
14   A.   I believe so, yes.
15   Q.   How about after the shooting; did he have a shirt
16 on?
17   A.   Yes, sir.
18   Q.   Okay.  And again, your brother's name is David
19 Jiménez, correct?
20   A.   Yes, sir.
21   Q.   And your other brother there, Jose Molina, was
22 also present; is that accurate?
23   A.   Yes, sir.
24   Q.   So both brothers were there when Mr. Urrutia was
25 shot, correct?

V. Jiménez - Cross

1    A.   Yes.

2    Q.   And would you describe the shooter as being 5

3  foot 11, 180 pounds?

4    A.   Yes.

5    Q.   And, on June 20th, 2014, you gave a statement to

6  the police about the shooter's description; is that

7  accurate?

8    A.   Yes.

9    Q.   And isn't it true on June 20th, within hours

10 after the shooting, June 20th of 2014, you described the

11 shooter as five eight to five nine, 165 pounds?

12   A.   I don't remember, to be honest with you.

13   Q.   You were very close to the shooter; is that

14 correct?

15   A.   Standing in front of him.

16   Q.   Ten feet or less, right?

17   A.   About so, yes.

18   Q.   You know what tattoos look like; is that

19 accurate?

20   A.   Yes, sir.

21   Q.   Friends have tattoos, correct?

22   A.   Yes, sir.

23   Q.   Okay.  When you went to high school you saw

24 people with tattoos, correct?

25   A.   Yes, sir.

1      Q.   When you went to junior high school or middle
2   school, you saw other people with tattoos?
3      A.   Yes.
4      Q.   You used to be a member of LH.  I'm sure you saw
5   members who had tattoos; is that correct?
6      A.   Yes, sir.
7      Q.   You have tattoos; is that accurate?
8      A.   Yes, sir.
9      Q.   You've seen hundreds of tattoos in your lifetime;
10  is that correct?
11     A.   Yes, sir.
12     Q.   Okay.  Now, would you agree that at the time of
13  the shooting, the lighting conditions were good?
14     A.   They were fair.
15     Q.   Fair.
16          I believe we were in this courtroom -- another
17  courtroom -- another courtroom in this building on
18  October 20th of 2015; is that correct?
19     A.   Yes, sir.
20     Q.   And you were under oath at that time; is that
21  accurate?
22     A.   Yes, sir.
23     Q.   You remember being asked and answered in the
24  following manner:
25          "Question:  Describe the lighting conditions for

1   us.

2        "Answer:  The lighting conditions were pretty

3   good, actually."

4        A little bit farther:

5        "No trouble observing what happened?

6        "Answer:  No, sir."

7        Do you remember being asked and answering in that

8   manner?

9   A.   Yes, sir.

10  Q.   Now, you told Detective Buckley within hours

11  after the shooting that the shooter had tattoos on both

12  forearms; isn't that correct?

13  A.   I don't remember.

14  Q.   You don't remember what you said to the police

15  officer?

16  A.   I don't remember specifying whether he had

17  tattoos or not.

18  Q.   Okay.  On July 7th, 2014, isn't it correct that

19  your story began to change as to tattoos on the shooter?

20  A.   Do you mind --

21  Q.   Sure.  On July 7th of 2014, your description of

22  the shooter moved from tattoos on both forearms to

23  tattoos on just the right arm; is that correct?

24  A.   To be honest with you, I don't remember.

25  Q.   Isn't it true that on July 7th, 2014, you told

1   Detective Victor Ignacio that the shooter had tattoos on

2   his right arm?

3       A.   I don't remember.

4       Q.   And then your story changed again on

5   December 17th of 2014:  Isn't that correct?

6       A.   I don't remember.

7       Q.   And at that time, you indicated that the

8   tattoos -- the shooter did not have any tattoos on his

9   arm; is that correct?

10      A.   Yes.

11      Q.   By any chance, did someone from the police, such

12  as Victor Ignacio, tell you that Mr. Chavez had no

13  tattoos on his arm?

14      A.   I don't remember.

15      Q.   When you met Detective Ignacio on July 7th of

16  2014, July 7th of 2014, did Detective Ignacio help you

17  make an identification of Mr. Chavez as the shooter?

18      A.   No.

19      Q.   Isn't it true that you want the police on your

20  side?  Is that an accurate statement?

21      A.   I just want -- I just want what's done to be

22  right.

23      Q.   At the time of the shooting, June 19th, 2014, you

24  were involved with your brother in the sale of marijuana

25  in the Chirilagua area to poor people; isn't that

1   correct?

2      A.   No.

3      Q.   Isn't it accurate that on June 19th, 2014, in the

4   early morning hours of June 19th of 2014, you were

5   arrested for marijuana possession?

6      A.   No.

7      Q.   Let me show you a document and ask if you can

8   identify it.

9           Would you look at that?

10          Is your name, Vidal Jiménez Sedillo, in the

11  right-hand corner?

12     A.   That is my name.

13     Q.   And, is the date of birth accurate, 11-19-92?

14     A.   Yes.

15     Q.   Okay.  And, that indicates that on June 19th, at

16  2014, Thursday, slightly after midnight, that is

17  18 minutes after midnight, you were arrested for

18  possession of marijuana, correct?

19     A.   This states June 26th.

20     Q.   Oh, no.  Look at "date of offense" in the middle

21  of the page, on the right, "date of offense."

22     A.   Okay.

23     Q.   See it?

24     A.   I do.

25     Q.   What's the date of that offense?

1      A.   6-19-14.

2      Q.   So, it's accurate that on June 19th, 2014, day of

3   the week Thursday -- excuse me -- at 18 minutes after

4   12:00, you were arrested for marijuana possession; is

5   that correct?

6      A.   Yes.

7      Q.   Now, you and your brother had been running a

8   marijuana business out of that apartment, correct?

9      A.   That's not true.

10      Q.   He had access, your brother, to a gun; is that

11   correct?

12      A.   I don't know.

13      Q.   You stored weapons in that apartment, right?

14      A.   I don't know.

15      Q.   That apartment was within a hundred to a hundred

16   and fifty feet or less of the shooting scene; is that

17   correct?

18      A.   Yes.

19      Q.   Now, the shooter spoke; is that accurate?

20      A.   Yes.

21      Q.   Okay.  But, you can't recall what he said; is

22   that correct?

23      A.   No.

24      Q.   And you can't recall whether the shooter spoke in

25   English or Spanish; is that accurate?

1    A.   I knew that he spoke both languages.

2    Q.   My question is, you can't recall whether he spoke

3    in English or Spanish?

4    A.   He spoke in English.

5    Q.   You said he spoke in English?

6    A.   Yes, sir.

7    Q.   Do you remember taking the deposition, again, on

8    October 20th of 2015, in front of Judge Lee?

9    A.   Yes.

10   Q.   And you were under oath at that time; is that

11   accurate?

12   A.   Yes.

13   Q.   Do you remember being asked and answering in the

14   following manner:

15       "When the shooter spoke, did he speak in English

16   or Spanish, if you recall?

17       "Answer:  I don't really remember, to be honest

18   with you."

19       Do you remember being asked and answering in that

20   manner?

21   A.   Yes.

22   Q.   Now, you indicated that you saw the shooter a

23   week or so prior to the shooting on June 19th of 2014;

24   is that correct?

25   A.   Yes.

1    Q.   And, again, you met Detective Buckley on
2    June 20th of 2014, right?
3    A.   Yes.
4    Q.   You never told Detective Buckley anything about
5    seeing the shooter one week prior to the shooting
6    incident, correct?
7    A.   Do you mind repeating that again?
8    Q.   Sure.  When you met with Detective Buckley on
9    June 20th of 2014, you never said one word about seeing
10   the shooter prior to that time, correct?
11   A.   Yes.
12   Q.   You did or --
13   A.   I did not.
14   Q.   And, you claim you saw the shooter two or three
15   days after the shooting, right?
16   A.   Yes.
17   Q.   And, I believe you claimed to be scared and ran
18   from the park; is that accurate?
19   A.   Yes.
20   Q.   Okay.  And, you -- you told the police that on --
21   in December of 2014; is that correct?
22   A.   Yes.
23   Q.   But, you met with the police earlier, on
24   July 7th, 2014, correct?
25   A.   I don't remember.

1     Q.   You never told Detective Ignacio anything about

2   that meeting, three or four days after the shooting,

3   that occurred in the park, correct?

4     A.   No.

5     Q.   Between December 7th, 2014, and December --

6   excuse me -- July 7th of 2014 and December 14th of 2014,

7   how many times did you meet Detective Ignacio?

8     A.   To be honest with you, I don't remember.

9     Q.   He can get kind of aggressive, you would agree?

10    A.   No.

11         MR. AQUINO:   That's all the questions I

12   have, Judge.

13                   REDIRECT EXAMINATION

14   BY MS. MARTINEZ:

15    Q.   Defense counsel asked you about the shooter's

16   arms.  Sitting here today, what, if anything, do you

17   recall about the shooter's arms?

18    A.   To be honest with you, I don't remember.

19         MS. MARTINEZ:   No further questions, Your

20   Honor.

21         THE COURT:   May the witness be excused?

22         MR. AQUINO:   We would ask that he be held.

23   We may recall him.

24         THE COURT:   You may recall him?

25         MR. AQUINO:   Yes, sir.

1                THE COURT:  Okay.

2                Can you hear me okay, sir?

3                THE WITNESS:  Excuse me?

4                THE COURT:  Can you hear me okay?

5                THE WITNESS:  Yes.

6                THE COURT:  Please do not discuss your

7    testimony with anyone.  You may be recalled.  And

8    defense counsel will notify you when to come back to

9    court.

10               THE WITNESS:  Yes.

11               THE COURT:  Thank you.

12               (Thereupon, the witness withdrew from the

13   stand.)

14               MR. TOBLER:  United States calls Detective

15   Thomas Buckley.

16               (Witness sworn.)

17               THE WITNESS:  I do.

18               THEREUPON, THOMAS BUCKLEY, having been duly

19   sworn, testified as follows:

20                    DIRECT EXAMINATION

21   BY MR. TOBLER:

22   Q.   Good afternoon, sir.

23   A.   Good afternoon.

24   Q.   Could you please state your name and spell it for

25   the record.

1     A.   Thomas Buckley; T-h-o-m-a-s, B-u-c-k-l-e-y.

2     Q.   Where were you working in June of 2014?

3     A.   Alexandria Virginia Police Department.

4     Q.   What was your position in the Alexandria Police

5   Department?

6     A.   Homicide detective.

7     Q.   How long were you with the Alexandria Police

8   Department?

9     A.   Over 25 years.

10     Q.   How long were you a homicide detective?

11     A.   Two and a half years.

12     Q.   Let me direct your attention to June 19th, 2014.

13   What were you doing that night?

14     A.   I received a call for a shooting at 3810 Russell

15   Road and responded to the scene.

16     Q.   Approximately what time did you respond to the

17   scene?

18     A.   Approximately 1:05 a.m.

19     Q.   When you --

20     A.   It was actually on June 20th when I responded.

21     Q.   So in the early hours of June 20th was when you

22   responded?

23     A.   That's correct.

24     Q.   What other detectives were on the scene when you

25   arrived?

1      A.   Detective Ignacio was already on the scene,

2   interviewing somebody.  I arrived, and then Detective

3   Rodriguez arrived a short time later.

4      Q.   What did you observe upon arriving at the scene?

5      A.   There was a large pool of suspected blood on the

6   sidewalk in front of apartment building.  There was some

7   cars parked at the curb, and there was suspected spray

8   of blood that transferred from -- or onto the cars.

9      Q.   What did you -- what did you do first upon

10  arriving at the scene of the shooting?

11     A.   I interviewed two separate people that were in

12  the courtyard in front of 3810 Russell Road.

13     Q.   Who did you interview?

14     A.   Jose Molina and Vidal Jiménez.

15     Q.   What other investigative steps did you take at

16  the scene?

17     A.   I did a canvass with the other detectives,

18  knocking on doors.

19     Q.   Was the shell casing ever recovered from the

20  scene of the shooting?

21     A.   No, it was not.

22     Q.   Was the bullet ever recovered?

23     A.   No.

24     Q.   After the night of the shooting, but prior to

25  conducting any arrest in connection with the crime, did

1    you conduct further interviews?

2        A.   Yes.

3        Q.   Were photographic lineups shown to any of the

4    individuals that you interviewed?

5        A.   Yes.

6        Q.   Who prepared the photographic lineups?

7        A.   I did.

8        Q.   How did you prepare the photographic lineups?

9        A.   We used what is called the Alexandria Police

10   Department's photo spread worksheet.  And we used six

11   photos.  I take the photos out of a mug shot system,

12   which has thousands of photographs.  And they're labeled

13   from A-1 all the way to A-6.

14       Q.   How did you select the photographs that are

15   included in the lineup?

16       A.   I included persons of similar appearance as to

17   the suspect.

18       Q.   Are suspects included in the lineups?

19       A.   Yes.

20       Q.   Were suspects included in the lineups that you

21   prepared in this case?

22       A.   Yes.

23            MR. TOBLER:  At this time, the government

24   would like to publish Government's Exhibit 93-A, which

25   has already in evidence, Your Honor.

1          THE COURT:  All right.
2     BY MR. TOBLER:
3        Q.   Do you recognize this exhibit, sir?
4        A.   Yes, sir.
5        Q.   What is it?
6        A.   That is the photo spread lineup worksheet.
7        Q.   Were any suspects in this shooting included in
8     the lineup?
9        A.   Yes.
10       Q.   Who?
11       A.   Jesus Chavez.
12            MR. TOBLER:  Could we please publish page
13    ten.
14    BY MR. TOBLER:
15       Q.   Who is depicted in this photograph?
16       A.   Jesus Chavez.
17       Q.   Do you know him by any other names, sir?
18       A.   Yes.  Chuy and Talibán.
19       Q.   Following the interviews to which you just
20    referred, did you develop any other suspects in addition
21    to Jesus Chavez?
22       A.   Yes.
23       Q.   Who?
24       A.   Gabriel Cabrera, also known as Duende.
25       Q.   Anyone else?

1   A.   Yes.  Genaro Sen Garcia.

2   Q.   Following the interviews, did you arrest any

3   individuals in connection with the shooting on June --

4   on June 19th, 2014?

5   A.   Yes.

6   Q.   Approximately when was the first arrest?

7   A.   July 2nd of 2014.

8   Q.   Where did that arrest occur?

9   A.   In the 4200 block of Duke Street, at the Fields

10  apartment complex.

11  Q.   Who lived at that address?

12  A.   Sonia Chavez, and I believe her mother.

13  Q.   Who is Sonia Chavez?

14  A.   That is Jesus Chavez's sister.

15  Q.   Do you know her by any other names?

16  A.   Lala.

17  Q.   When you arrived at the 4200 block of Duke Street

18  on July 2nd, 2014, what did you observe?

19  A.   I was with Detective Rodriguez and Detective

20  Ignacio.  We had received information that Duende may be

21  in that vicinity.  We drove to the rear of the complex

22  and we located a female and a male who we suspected was

23  Duende, kneeling down, and they appeared to be talking.

24  Q.   Who was the female?

25  A.   Sonia Chavez.

1    Q.   Did you later confirm who the male was that you

2  saw?

3    A.   Yes.

4    Q.   Who was it?

5    A.   Duende.

6    Q.   Where were these two in relation to one another

7  when you saw them?

8    A.   They were talking to each other.

9    Q.   What did you do after observing those two

10  individuals together?

11    A.   We set up in the immediate area.  We called the

12  United States Marshal's violent crimes task force,

13  advised them of who Duende was, and that he was wanted.

14  And they moved in and effected an arrest.

15    Q.   What did you do next?

16    A.   Detective Rodriguez, Ignacio and myself were

17  about to leave, and Detective Ignacio received a phone

18  call from Chris Cahill, advising that we should arrest

19  Jesus Chavez.

20    Q.   Why?

21    A.   For probation violation.

22    Q.   What did you do after speaking with the probation

23  officer for Jesus Chavez?

24    A.   Detective Ignacio and I ran up to Jesus Chavez.

25  He was talking with another male in the parking lot.  As

1  we got closer, he took a cellphone and tried to hand it

2  to the male.  I then grabbed it, took custody of it.

3      Q.  What kind of cellphone was it?

4      A.  It was a Samsung Galaxy Note.

5      Q.  With the assistance of the courtroom security

6  officer, I would like to have you look at what has been

7  marked for identification as Government's Exhibit 40.

8          MR. TOBLER:  It should be over here,

9  Mr. Toliver.

10 BY MR. TOBLER:

11     Q.  Do you recognize this exhibit?

12     A.  Yes, sir.

13     Q.  What is it, sir?

14     A.  This is the packaging for the Alexandria Police

15 Department, and this appears to be the Galaxy Note that

16 I seized from Jose Chavez.

17     Q.  How do you recognize it?

18     A.  By its appearance and size.

19     Q.  You mentioned that it's in packaging from

20 Alexandria Police Department?

21     A.  Yes.

22     Q.  Do your initials appear anywhere on that

23 packaging?

24     A.  Yes, they do.

25         MR. TOBLER:  At this time, we move

1   Government's Exhibit 40 into evidence, Your Honor.

2              THE COURT:  40 will be received.

3   BY MR. TOBLER:

4      Q.  Sir, are you familiar with the term, IMEI?

5      A.  Yes, I am.

6      Q.  What is an IMEI?

7      A.  It's similar to the O number for the iPhone or

8   for a phone.

9      Q.  Does Government's Exhibit 40 include an IMEI?

10     A.  Yes, it does.

11     Q.  Where is that located?

12     A.  It's on the back of the phone, behind the

13  battery.

14     Q.  Could you please read the IMEI in Government's

15  Exhibit 40 for the record?

16     A.  Yes.  It's 352013/05/004541.

17     Q.  Was anything else seized from Mr. Chavez in

18  addition to the phone you just described?

19     A.  Yes.  He had a -- upon search incident to arrest,

20  he had an Apple iPhone in his pocket.

21     Q.  What legal process did you obtain with regard to

22  the seized phone?

23     A.  I executed -- or secured two search warrants and

24  then executed them on the phones.

25     Q.  Were you subsequently able to review contact

1    names and numbers saved on the iPhone?

2        A.   Yes.

3        Q.   What contacts did you find relevant to this

4    investigation?

5        A.   There was one contact with a nickname of Chuy,

6    with a phone number attached to it.

7        Q.   What was that phone number?

8        A.   It was 571-388-9343.

9        Q.   What legal process did you obtain related to that

10   number associated with Chuy?

11       A.   I obtained a court order.

12       Q.   And what did that court order allow you to seek?

13       A.   Subscriber information, cellphone -- cell site

14   information and call detail record.

15       Q.   What was the purpose of seeking cell site

16   information for that number?

17       A.   Cell site information allows you to determine a

18   person's physical location -- or the phone's physical

19   location when it's turned on.

20       Q.   Were any other individuals arrested in connection

21   with the shooting that occurred on June 19th, 2014?

22       A.   Yes.

23       Q.   Who?

24       A.   Genaro Sen Garcia.

25       Q.   When was Mr. Sen Garcia arrested?

1      A.   He turned himself in on August 13th of 2014.

2      Q.   Where did that occur?

3      A.   At the Dunkin Donuts at 2325 Jefferson Davis

4   Highway, Alexandria.

5      Q.   Who was there at the time that he surrendered to

6   the police?

7      A.   His pastor.

8      Q.   With the assistance of the courtroom security

9   officer, I'd now like you to take a look at what has

10  been marked for identification as Government's

11  Exhibit 74-B.

12     A.   Yes, sir.

13     Q.   Do you recognize that, sir?

14     A.   Yes.

15     Q.   What is it?

16     A.   That is the -- a photo that we took of Genaro Sen

17  Garcia after his arrest, in the interview room.

18     Q.   Why did you take that photo?

19     A.   Because we noticed what appeared to be a small,

20  fainted burn mark on his back.

21     Q.   Is Government's Exhibit 74-B a fair and accurate

22  depiction of Mr. Sen Garcia's back at the time of his

23  arrest?

24     A.   Yes.

25               MR. TOBLER:  Your Honor, at this time we

1    move Government's Exhibit 74-B into evidence.

2              THE COURT:  Received.

3              MR. TOBLER:  May we publish, Your Honor?

4              THE COURT:  Yes.

5    BY MR. TOBLER:

6      Q.  Could you please point out the mark on Mr. Sen

7    Garcia's back for the jury?

8      A.  Yes.  Right here.

9              MR. TOBLER:  For the record, he's pointed --

10   he's indicated to a spot more or less at the center of

11   the screen, Your Honor.

12             THE COURT:  So noted.

13             MR. TOBLER:  No further questions.

14                    CROSS-EXAMINATION

15   BY MR. AQUINO:

16     Q.  Good afternoon, Detective Buckley.  My name is

17   Jerry Aquino.  My co-counsel is Elita Amato, and we

18   represent Jesus Chavez.  We just have a few questions

19   for you.

20     A.  Yes, sir.

21     Q.  Would you agree that soon after the shooting on

22   June 19th, you met with Vidal Jiménez?

23     A.  Yes.

24     Q.  And that meeting took place within about two

25   hours from the time of the shooting; is that a correct

1    statement?

2        A.   That appears -- that sounds right.

3        Q.   And you took a physical description from Vidal

4    Jiménez of the shooter; is that accurate?

5        A.   Yes.

6        Q.   Have you had a chance before today to review your

7    police incident report of that?

8        A.   Yes.

9        Q.   Okay.  And, would you agree that Vidal Jiménez

10   told you that the shooter was five foot eight, to five

11   foot nine?  Is that correct?

12       A.   That sound correct.

13       Q.   Would you agree that he told you that the shooter

14   was 165 pounds?  Is that correct?

15       A.   Approximately, I believe he said, yes.

16       Q.   And would you agree that he told you that the

17   shooter had tattoos on both forearms, described as

18   semi-sleeves?  Is that correct?

19       A.   That's correct.

20       Q.   Okay.  Now, do you know what semi-sleeves are?

21       A.   Yes.

22       Q.   Okay.  They're like on the skin; is that correct?

23       A.   Well, the forearm.

24       Q.   Right.  In other words -- I don't want there to

25   be misunderstanding.  They're not a piece of cloth,

1   right?

2       A.   Right.

3       Q.   They're actually tattoos on the forearm area,

4   correct?

5       A.   Correct.

6       Q.   And they were on -- indicated they were on both

7   forearms; is that correct?

8       A.   Yes.

9            THE COURT:   The record should reflect that

10  Mr. Aquino was pointing to his forearm as he stated

11  those questions.

12  BY MR. AQUINO:

13      Q.   Now, did you broadcast that description that you

14  received from Vidal Jiménez to the Alexandria Police

15  Department?

16      A.   I don't recall.

17      Q.   Okay.  Is that something that you would expect

18  that you would have shared with other police officers?

19      A.   I may or may not have.

20      Q.   Okay.  Now, you testified, I believe, about Lala;

21  is that correct?

22      A.   That's correct.

23      Q.   Okay.  Isn't it accurate that she was living in

24  the area where the shooting occurred?

25      A.   I don't recall where she was living at the time.

159

1    Q.   Okay.  Now, you indicated -- and I believe you
2    testified about Gatuso, was that correct?
3         A few minutes ago, you testified about Gatuso,
4    correct?
5    A.   If you're referring to Genaro Sen Garcia?
6    Q.   I am.
7    A.   Yes, sir.
8    Q.   Okay.  And there was a photo that was exhibited
9    to you; is that correct?
10   A.   That's correct.
11   Q.   And, you -- and, tell me if I'm wrong, but I
12   thought you indicated that there may have appeared to
13   have been burn marks; is that correct?
14   A.   A burn, just one mark.
15   Q.   Just one mark.
16        You don't know when that burn mark took place,
17   from your own knowledge, do you?
18   A.   I do not.
19   Q.   Okay.  And do you know that Mr. Sen Genaro Garcia
20   used to worship the devil?
21   A.   No.
22   Q.   Now, were you present when Vidal Jiménez met with
23   Detective Ignacio on July 7th of 2014; is that correct?
24   A.   I don't recall the date.  I believe there were --
25   we had two meetings.

1    Q.   But the second meeting in July of 2014, when

2    there was a photo spread, I believe.  Okay?  Were you

3    present when the photo spread took place?

4    A.   I don't recall if I was.

5    Q.   Okay.

6              MR. AQUINO:  Judge, that's all the questions

7    I have for him.  Thank you.

8              THE COURT:  All right.

9              MR. AQUINO:  Judge, also, if we could hold

10   him subject to recall.

11             THE COURT:  Sir, you may be recalled by

12   defense counsel.  Please do not discuss your testimony

13   with anyone.  And counsel will contact you and have you

14   come back to court if they need you.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Thank you.

17             MR. TOBLER:  No redirect.

18             (Thereupon, the witness withdrew from the

19   stand.)

20             MR. TOBLER:  United States calls Aundrea

21   Speede.

22             (Witness sworn.)

23             THE WITNESS:  I do.

24

25

1        THEREUPON, AUNDREA SPEEDE, having been duly

2    sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. TOBLER:

5        Q.   Good afternoon, ma'am.

6        A.   Hello.

7        Q.   Would you please state your name and spell it for

8    the record?

9        A.   Aundrea Speede, A-u-n-d-r-e-a, S-p-e-e-d-e.

10        Q.   Where do you currently work?

11        A.   Operations logistics unit.

12        Q.   And for how long have you locked as an

13    operational logistics unit?

14        A.   Since September 21st, 2015.

15        Q.   And where did you work before you worked at the

16    operations logistical unit?

17        A.   Nottoway Correctional Center.

18        Q.   How long did you work at Nottoway Correctional

19    Center?

20        A.   Fourteen years.

21        Q.   What was your position when you left Nottoway

22    Correctional Center?

23        A.   Sergeant.

24        Q.   When did you become a sergeant, ma'am?

25        A.   July 2013.

1    Q.   What was your position at Nottoway Correctional
2    Center prior to that?
3    A.   Intelligence officer.
4    Q.   What were your duties as intelligence officer?
5    A.   To interview all incoming offenders.
6    Q.   As part of those duties, did you interview
7    incoming offenders regarding gang membership?
8    A.   I did.
9    Q.   Have you interviewed members of MS-13?
10   A.   I did.
11   Q.   I would like to direct your attention to the date
12   of June 28th, 2014.  Were you working that day at
13   Nottoway Correctional Center?
14   A.   Yes.
15   Q.   What were your duties that day?
16   A.   To interview all incoming offenders.
17   Q.   And did you interview any incoming offenders?
18   A.   Yes.
19   Q.   Who?
20   A.   I don't know all the names.
21   Q.   Were you -- did you interview Jesus Chavez?
22   A.   I did.
23   Q.   And during the interview, what questions did you
24   ask regarding gang affiliations?
25   A.   I asked him, was he affiliated with any gangs or

1    terrorist groups, sovereign citizen.

2        Q.   What did he say in response?

3        A.   He self-admit to MS-13.

4        Q.   What, if anything, did Mr. Chavez do when he said

5    he was in MS-13?

6        A.   He did something with his hands, but I wasn't

7    sure.  But my partner later on told me what it was.

8              MR. AQUINO:  Objection, Judge.

9              THE COURT:  Sustained to what a partner told

10   her.

11             MR. TOBLER:  No further questions.

12             THE COURT:  You're free to leave.  Thank

13   you.

14             (Thereupon, the witness withdrew from the

15   stand.)

16             MR. TOBLER:  United States calls Ron Witt.

17             (Witness sworn.)

18             THE WITNESS:  Yes, I do.

19             THEREUPON, RONALD WITT, having been duly

20   sworn, testified as follows:

21                       DIRECT EXAMINATION

22   BY MR. TOBLER:

23       Q.   Good afternoon, sir.

24       A.   Good afternoon.

25       Q.   Could you please state your name and spell it for

1    the record?

2        A.   Ronald Witt, R-o-n-a-l-d, W-i-t-t.

3        Q.   Where do you work, sir?

4        A.   I work for T-Mobile Metro.

5        Q.   How long have you worked for T-Mobile Metro?

6        A.   I'm in my twelfth year.

7        Q.   What is your position with T-Mobile Metro?

8        A.   I'm sorry?

9        Q.   What is your position?

10       A.   I'm a senior trial specialist in the law

11   enforcement relations group.

12       Q.   What are your duties in that position?

13       A.   In our group, primarily it's production of

14   records, when we receive an appropriate legal demand.

15   We also provide assistance to 911 centers and law

16   enforcement with emergency situations.  And as a member

17   of the trial team, I appear in court to testify and

18   attest to T-Mobile records.

19       Q.   Are you familiar with the term "cell site

20   information"?

21       A.   Yes.

22       Q.   What is cell site information?

23       A.   Part of some of the records that we produce, it

24   will show -- for voice calls, it will show the beginning

25   and ending cell site for that particular call.

1    Q.   And when you say "cell site," to what are you

2    referring?

3    A.   The actual antenna that is providing the

4    information for that radio -- cellphone calls.

5    Q.   Through your duties, are you familiar with the

6    way that T-Mobile records this information?

7    A.   Yes.

8    Q.   How so?

9    A.   It's part of our day-to-day responsibilities, not

10   only to provide the records, but as part of our

11   responsibilities, to assist with 911 centers and law

12   enforcement, we have to have an understanding of how our

13   system works.

14   Q.   What cell site information does T-Mobile record?

15   A.   It records the initiation of the call, either

16   when the subscriber hits "send" on the phone or when

17   they answer the phone.  It records the beginning of that

18   call.  And then when the call is terminated, at the end

19   of the call, then it records the ending cell site

20   information as well.

21   Q.   How does T-Mobile record this information?

22   A.   It's recorded automatically through the cell site

23   and switch information.  That information is recorded

24   and then downloaded and then available for retrieval at

25   a later time through our mainframe computer.

1    Q.   Does T-Mobile record this information at or near
2    the time that it is received, or generated?
3    A.   Yes.
4    Q.   Is it the regular practice of T-Mobile to record
5    this information?
6    A.   Yes.
7    Q.   How does T-Mobile maintain these records?
8    A.   Again, it's maintained in a mainframe computer
9    that we have access to.
10   Q.   At T-Mobile, is cell site information recorded
11   for texts, as well?
12   A.   Now, yes.  Depending on when the records were
13   requested, order records, no, it was only for voice
14   calls.
15   Q.   As part of this case, was T-Mobile asked to
16   provide subscriber information associated with a
17   particular phone number?
18   A.   Yes.
19   Q.   With the assistance of the courtroom security
20   officer, I would like to show you what has been marked
21   for identification as Government's Exhibit 105-A.
22        Do you recognize this exhibit, sir?
23   A.   Yes.
24   Q.   What is it?
25   A.   It's call detail records, including cell site,

1    for a particular number.

2        Q.  And, what is that number?

3        A.  It's 571-388-9343.

4        Q.  To be clear, are these T-Mobile call detail

5    records?

6        A.  Yes.

7        Q.  And how do you recognize those records?

8        A.  I recognize them.  They're in a format that we

9    provide, and also reviewed our historical copy

10   previously before coming to testify.

11             MR. TOBLER:  Your Honor, at this time the

12   government would move Government's Exhibit 105-A into

13   evidence.

14             THE COURT:  Received.

15             MR. TOBLER:  May we publish, Your Honor?

16             THE COURT:  Yes.

17             How can we tell the page numbers on this?

18             MR. TOBLER:  I would just like to cover an

19   entry on the first page of that document.

20             THE COURT:  Okay.  All right.

21             MR. TOBLER:  Would you please blow up just

22   the first third of the page there, if possible.

23   BY MR. TOBLER:

24       Q.  Are you able to read that, sir?

25       A.  On the screen, no; but I can read the printed

1    copy.

2       Q.   Okay.  Well, I'd like to briefly walk through an

3    entry with you.  I believe it's marked as entry 23.  It

4    should be the first entry for which there's cell site

5    information.  Do you see that?

6       A.   Yes.

7       Q.   If you look at the table at the very top, there's

8    a reference to MSIDN; is that correct?

9       A.   Yes.

10      Q.   What is that a reference to?

11      A.   That abbreviation stands for mobile station

12   international subscriber directory number.  It's what we

13   refer to as the target number, or the number that the

14   records are dealing with.

15      Q.   If you move to the next column -- or there's a

16   column that reads, "IMEI"; is that correct?

17      A.   Yes.

18      Q.   What is that a reference to?

19      A.   That's the third column.  IMEI stands for

20   international mobile equipment identity number.  It's a

21   type of electronic serial number.  It's associated with

22   the handset for this particular number.

23      Q.   And what is that -- what is that IME number

24   associated with the handset for this number?

25      A.   Again, if you have the particular handset that

1    the -- if you open up, generally underneath the battery

2    you'll see a number.  The first few digits identify the

3    manufacturer.  The next few digits will identify a

4    particular model.  And then the last digits are unique

5    to that particular handset.

6        Q.   And what is the IME number in this case?

7        A.   It's 35201305004541.

8        Q.   There's a column here that reads "event type."

9    Do you see that?

10       A.   Yes.

11       Q.   What does that refer to?

12       A.   That will tell you -- if it says "voice" it's a

13   voice call.  If you see "SMS," SMS stands for short

14   message service, more commonly referred to as a text

15   message.  You may also see "MMS," which stands for

16   multimedia service, more commonly referred to as a

17   picture message.

18       Q.   And what about "start time"; what does that refer

19   to?

20       A.   "Start time" will have the date and time of the

21   event, whether it's a voice call or a text.

22       Q.   And "TAC"?

23       A.   I'm sorry.

24       Q.   There's a reference to "TAC" on the table.  Can

25   you tell me what that means?

1    A.    On a voice call, for the IMEI number, it actually

2  deciphers and tells you the particular phone model.

3    Q.    And what is the phone model here?

4    A.    It's a Samsung, it has an underscore, I believe,

5  i717 Galaxy Note LTE.

6    Q.    Now, I notice there are also several columns that

7  refer to the first tower on the actual table.  Do you

8  see that?

9    A.    Yes.

10    Q.    What is significance of that?

11    A.    Again, as I mentioned previously, at the

12  initiation of a call, whether the caller hits send or he

13  answers the call, it will record that particular cell

14  site for the beginning of the call, and it will provide

15  the information associated with that cell tower.

16    Q.    And lastly, there are several columns referring

17  to the last tower.  Can you please explain to the jury

18  what that means?

19    A.    Again, when they end the call, conversation, it

20  will record the ending cell site information.  It may or

21  may not be the same as the beginning, depending where

22  the handset -- if it moves or not.

23         MR. TOBLER:  No further questions, Your

24  Honor.

25         THE COURT:  You can step down, sir.  You're

1    excused.
2                   (Thereupon, the witness withdrew from the
3    stand.)
4                   MR. TOBLER:  United States calls Special
5    Agent Kevin Horan.
6                   (Witness sworn.)
7                   THE WITNESS:  I do.
8                   THEREUPON, KEVIN HORAN, having been duly
9    sworn, testified as follows:
10                        DIRECT EXAMINATION
11   BY MR. TOBLER:
12       Q.   Good afternoon, sir.
13       A.   Good afternoon.
14       Q.   Would you please state your name and spell it for
15   the record.
16       A.   It's Kevin Horan, H-o-r-a-n.
17       Q.   Where do you work, Mr. Horan?
18       A.   I work for the FBI.
19       Q.   How long have you worked for the FBI?
20       A.   Twenty years.
21       Q.   What's your position at the FBI?
22       A.   I'm a special agent.
23       Q.   Would you please briefly describe your
24   educational background for the jury.
25       A.   I have a bachelor's degree from Syracuse

1   University and a law degree from the University of

2   Dayton.

3       Q.   What did you do prior to working for the FBI?

4       A.   I was a prosecuting attorney for four and a half

5   years.

6       Q.   Could you please describe your background in the

7   FBI?

8       A.   When I left the FBI Academy, I was transferred to

9   the Cincinnati Field Office, Columbus Resident Agency,

10  which is where I've been for the last 20 years.  When I

11  was in Columbus, I was assigned to a violent crime task

12  force.  So, my entire career has basically been devoted

13  to investigating violent crime cases, like bank

14  robberies, fugitives, criminal enterprises.

15           About 2007, I was asked to join a new unit that

16  was formed at FBI headquarters, called the cellular

17  analysis survey team or CAST team, which is, we're

18  subject matter experts in the field of cellphones.

19      Q.   And when you say "subject matter experts in the

20  field of cellphones," can you please tell us a little

21  bit more about what that details?

22      A.   Essentially, we do a number of different things.

23  But the primary thing we do is what's called historical

24  record analysis; that is, all the records that are

25  produced by our cellphones, we analyze those and we

1   create investigative tools that can be utilized in our

2   investigations or in a setting such as this, in court,

3   or for prosecutions.

4         We also do some forensic analysis of cellphones,

5   and we also do tracking, live tracking of cellphones.

6      Q.   What training did you receive to become a CAST

7   agent?

8      A.   Various schools, but the primary school what was

9   we call the CAST School, which is a month-long school.

10  It's about 3- to 400 hours.  It is broken up into four

11  different parts, the first part being what we call radio

12  frequency theory.  So, that is all the science and

13  engineering behind phones and how they work, how they

14  communicate.

15        The second week is we work with the -- all the

16  service providers, the major service providers, that is

17  Verizon, Sprint, AT&T, T-Mobile.  They all come to us.

18  We learn from them.  We learn their networks.  We learn

19  their records.  We learn how they do things.

20        Our third week is devoted to what we call drive

21  testing.  And that is all the major service providers

22  utilize scientific gear that tests their network.  And

23  what we use that same gear for is to take it out on the

24  street and drive it around in vehicles.  And what it

25  does is it measures the radio frequencies that are

1    coming off the cell towers, and it gives us the actual

2    footprint or coverage area of those cell towers.  So we

3    get certified in the use of that gear.

4        And then the last week is an actual practical

5    exercises, moot court, and a final exam.

6        That's our -- that's the CAST School, the primary

7    school that we go to.

8    Q.   Is there any associated certification with the

9    CAST primary school?

10   A.   As far as?

11   Q.   Do you receive any certification at the end of

12   this?

13   A.   Yes.  The school is actually taught by a

14   government contractor, so that contractor actually

15   certifies us.  And then, in addition to that, we have

16   yearly retrainers and additional schools that we are

17   required to go to.

18   Q.   Do you provide any training in this area of

19   cellular phone analysis?

20   A.   Yes.

21   Q.   Would you please describe that, briefly?

22   A.   Basically, the technique that I'm going to talk

23   about here in court is called historical record

24   analysis.  So it's heavy relied upon by law enforcement

25   all over the world.  This is how most agencies, when

1   they get a set of records from a provider, this is how

2   they jump into it, if you will, how they analyze it,

3   what kind of information they can get from it, and how

4   it will benefit their investigation.

5          So, our schools that we teach are designed to

6   help the investigator, whether state, local or federal,

7   take this information, understand it, know what to ask

8   for, know what it means, how to analyze it.

9   Q.   When you say "historical record analysis," what

10  kind of records do you use when you're conducting that

11  kind of analysis?

12  A.   We call them call detail records.  And the reason

13  why they're called call detail records, or CDRs, is

14  because it's everything that happens on your cellphone

15  over a period of time.

16         By law, the service providers must maintain an

17  accurate record of what you do on your cellphone.  So,

18  whether you make a call, a text, or a data session, all

19  of that is maintained in a database by the provider

20  that, if we need it in law enforcement, and with the

21  right legal justification, we can get it and actually

22  analyze it.

23  Q.   How many times have you performed analysis on

24  historical call records?

25  A.   I was trying to add this up the other day, and

1    it's -- it's -- between 1- and 2,000.

2        Q.   Have you testified in court before as an expert?

3        A.   I have, yes.

4        Q.   Approximately how many times?

5        A.   Sixty-two times.

6              MR. TOBLER:  At this time, we would offer

7    Special Agent Horan as an expert in cellular telephone

8    record analysis.

9              THE COURT:  He will be permitted to testify

10   as an expert in cellphone -- cellular telephone record

11   analysis.

12   BY MR. TOBLER:

13       Q.   Sir, were you asked to perform a cellular

14   telephone analysis in this case, in connection with the

15   shooting on June 19th, 2014?

16       A.   I was, yes.

17       Q.   And what types of records did you analyze?

18       A.   I received the set of call detail records that

19   were for a T-Mobile cellphone.

20             MR. TOBLER:  At this time, with the

21   assistance of the courtroom security officer, I would

22   like to show you what has already been put into

23   evidence.  It's Government's Exhibit 105-A.

24   BY MR. TOBLER:

25       Q.   Do you recognize this, sir?

1    A.   Yes, I do.

2    Q.   What it is?

3    A.   These are the call detail records for the

4  T-Mobile cellphone that I analyzed in this case.

5  They're -- they're actual hard copies.  We typically --

6  when I do my analysis, it's always an electronic copy.

7  So it's in an Excel spreadsheet.

8    Q.   What is the number for the phone upon which you

9  performed your analysis?

10    A.   It's 571-388-9343.

11    Q.   And what type of information is included in those

12  records?

13    A.   There's various types of information here, but

14  the primary information that appears on these sheets are

15  the number that was either called or being called, the

16  date and the time that the call started and also ended,

17  what type of event was it, was it a text message, was it

18  a voice call.

19         We have cell site information, in other words,

20  which cell tower and which part of that cell tower did

21  the phone communicate when this event occurred.  There's

22  also duration that appears in here, and what we call

23  switch information, which tells us generally what part

24  of the world the phone is in when these events are

25  occurring.

1    Q.   What is the total timeframe covered by these call

2    detail records?

3    A.   These start on -- I apologize, I didn't bring my

4    glasses in here -- but June 18th, 2014, and I believe

5    the last entry on here is July 2nd of 2014.

6    Q.   Before getting into the analysis you conducted

7    with this data, I'd like to cover a few basics with you.

8    Can you please explain the purpose of a cellphone tower?

9    A.   Basically, cellphone towers are the devices that

10   our cellphones communicate with.  So, despite some

11   misnomers about how phones works or what they actually

12   do, they actually don't talk to one another.  So, my

13   cellphone doesn't talk to your cellphone.  It must talk

14   to a cell tower.

15       And those cell towers are essentially receivers.

16   They're constantly on and they're constantly beaming a

17   signal out that has a defined radius or a defined area

18   of coverage.

19       And so what your phones do is that the phones are

20   actually the brains of the entire operation.  They

21   determine which tower to select.  They determine which

22   sector to select.  It's all based inside the cellphone.

23   Q.   Have you prepared a presentation in anticipation

24   of your testimony today?

25   A.   Yes.

K. Horan - Direct                                                179

```
 1      Q.  With the assistance of the courtroom security
 2   officer, I'd like to show you what has been marked for
 3   identification as Government's Exhibit 105, please.
 4         Do you recognize that?
 5      A.  Yes.
 6      Q.  What is it?
 7      A.  This is the PowerPoint that I prepared to
 8   essentially demonstrate my conclusions in this case.
 9              MR. TOBLER:  At this time the government
10   would move Government's Exhibit 105 into evidence, Your
11   Honor.
12              THE COURT:  Received.
13              MR. TOBLER:  May we publish page five?
14              THE COURT:  Yes.
15              MR. TOBLER:  Thank you.
16   BY MR. TOBLER:
17      Q.  Could you please tell me what's depicted by the
18   diagram in the center of this picture?
19      A.  Yes.  As we were talking earlier about cell
20   towers or cell sites, this is just a typical
21   illustration of a cell site.  In this case, it's just
22   downtown Columbus, Ohio.
23         The red dot in the center of the map is actually
24   the cell tower.  And then you see this triangle-shaped
25   structure on top of it.  And what that is that's the,
```

1    what we call the antenna array.  That's where the actual

2    antennas will hang off of the cell tower.  And those are

3    what your phone actually communicates with.

4         Those antenna arrays are all pointing in

5    different directions, And they're designed to be pointed

6    in different directions because they have a defined area

7    of coverage.

8         These cell towers typically are designed to cover

9    a 360-degree radius, so a circle.  But rather than just

10   have one big antenna that blobs -- puts out a blob of

11   energy 360 degrees, what the providers do is they break

12   it up into three equal parts, generally, and those are

13   called sectors.

14   Q.   How do you determine the area covered by a

15   sector, the actual area?

16   A.   The actual area.  Well, typically, when we -- if

17   we cannot do a drive test, which I had mentioned earlier

18   about taking measurement gear out in the street, we have

19   to do an estimate.  But, the best way, and the only way,

20   really, that you can do the actual -- the true coverage

21   area of a cell site is to perform a drive test.

22        So we bring measurement gear out in the street

23   and we're driving around our target cell tower in

24   essentially like a grid search pattern, and it's

25   measuring the radio frequencies that are coming off all

1    the sectors and all the towers in the area.

2        Q.   Can a cellphone communicate with a tower if it's

3    not within the tower's coverage area?

4        A.   It cannot.

5             So, if this were the only cell tower, let's say

6    in all of Columbus, Ohio, this tower has a defined area

7    of coverage.  In other words, it reaches a certain point

8    where the signal strength is no longer viable, it can no

9    longer be used by the cellphone.  So, in order for the

10   phone to communicate with the tower, it has to be inside

11   what we call its footprint.  It has to be within that

12   area.

13            And, also, just because you're in a footprint

14   doesn't mean that's the tower your phone will talk to,

15   because it has to be the strongest footprint.  It only

16   talks to the strongest, best quality signal, which is

17   typically, many times, the tower that you're closest to;

18   Not always, but it makes sense that it would be that

19   way.

20       Q.   You mentioned before, cell site information that

21   came from T-Mobile.

22       A.   Yes.

23       Q.   What can that information tell you about a

24   person's location -- or the location of a device, I

25   should say?

1    A.   Well, what -- the main thing it does is it
2  narrows down for us, on the Earth, where a phone could
3  be.  So, when the call detail records show a certain
4  cell tower, what it does is it gives us a number, and
5  also gives us a sector, of which part of that -- which
6  side of that tower the phone is communicating with.
7       There is no other tower and no other sector on
8  Earth that has the same number combination.  So, I can
9  infer from looking at that, looking at the tower
10  information that appear in the call detail records, that
11  the phone had to be communicating with a certain side of
12  that tower.  So, based on that, and also it may be a
13  drive test or something else, we can narrow down where
14  the phone could have been during a given period of time.
15       The best thing I can tell you is that I can show
16  you where the phone was not.  So, if it was, let's say,
17  here in Columbus, I can say, by looking at the
18  information here, that it was not five miles away or two
19  miles to the south or here in Washington, DC, or
20  somewhere else.  It -- it narrows it down to one
21  specific area.
22    Q.   And just to be clear, the tower information that
23  you're provided as part of call detail records, that
24  tower information is linked to date information?
25    A.   Yes, it is.

1    Q.   And is it linked to information regarding a
2    specific time, as well?
3    A.   Yes.  These lines in the call detail record
4    will -- every time that you hit the little green button
5    on your phone to either make a call or receive a call, a
6    time stamp occurs, real time, at the, what we call the
7    switch.
8          So, a time stamp, a date and time and direction
9    and all this other information is then filled in at that
10   moment in time, so that we have records of it.  We know
11   exactly where that -- what happened and, generally,
12   because of the cell site information, where the phone
13   is.
14   Q.   Let's discuss what you did with the information
15   you received in this case.  After you obtained call
16   detail records from the T-Mobile number we discussed,
17   what did you do first?
18   A.   The first thing I do is I look at the records and
19   make sure that the records I got are the correct
20   records.  In other words, do they contain cell site
21   information.  Because sometimes we get these records
22   that are sent to us by the providers, and they don't
23   have the right information that's been asked for.
24         The next thing I do is I make sure I have, from
25   whoever is asking us to do the analysis, a set of facts.

1    So I have to have at least a basic understanding of what
2    happened, where did it happen, what time did it happen,
3    that kind of thing.

4           I'm not actually part of the investigation; that
5    is, I'm not out on the street interviewing witnesses or
6    anything.  I'm just getting basic information on what
7    happened.

8           I take that information, and these records are
9    loaded into a software program that was designed for us
10   in CAST, which is basically an automated program.  It
11   takes this information and it automatically plots it for
12   us in -- using mapping software, and it shows us exactly
13   what cell towers, what sectors, were utilized by the
14   phone that are actually in these records.

15          As you can tell, if you look at these records,
16   it's just a bunch of numbers.  It doesn't say anything
17   unless you do something with it.  So the way I like to
18   describe it is, it's like these things tell a story.
19   They tell us a lot of things, like who's talking to who,
20   how long, and most importantly, where was that phone
21   when these events occurred.

22          So, the software program then gives us this, I
23   like to call it like a hundred-mile view of what's going
24   on with the phone during a specific period of time.

25          And then all I do is I narrow it down to the

1    specific incident, and then I start looking at some of

2    the more detailed information to make sure that it's

3    correct.

4         Q.   Using this data, were you able to identify the

5    specific towers that were used to make or receive calls

6    by the telephone we've been discussing, during the

7    relevant time and date?

8         A.   Yes.

9         Q.   How so?

10        A.   Essentially, by looking at the relevant time and

11   date, it was determined from the records that the

12   target -- we call it the target cellphone, because this

13   is the target phone that I'm looking at -- was

14   communicating with only one tower and one sector of a

15   tower during a block of time.  So, what I -- what I was

16   looking at, at that point, was only one cell site, one

17   sector.

18        I next made a determination that this would be a

19   good candidate for a drive test.  So, I did actually

20   conduct a drive test in this case, and have a footprint

21   of this cell site sector.

22        Q.   Based on the cellular record analysis you

23   performed, including the drive test, did you draw any

24   conclusions about the location of the, what you referred

25   to as the target telephone, the cellular phone with the

1    number 571-388-9343, between 6:38 p.m. and 10:23 p.m. --

2       A.   I did.

3       Q.   -- on June 19th, 2014?

4       A.   Yes.

5       Q.   What is that conclusion, sir?

6       A.   Again, it was only in one specific area of town.

7    It communicated with one specific T-Mobile cell site and

8    sector.  And I made an illustration of actually where

9    that is.

10              MR. TOBLER:  Could we please publish page 16

11   of this presentation.

12   BY MR. TOBLER:

13      Q.   I'd like to walk you through this graphic, if I

14   could.  First of all, could you tell me broadly what

15   this depicts?

16      A.   So, this is the timeframe that I had actually

17   narrowed my analysis down to, which is June 19th, 2014,

18   from 6:38 to 10:23 p.m.

19              During that time, I believe there were eight

20   events that occurred on the cellphone.  So these were

21   all voice calls.

22              MR. TOBLER:  Could you please blow up that

23   table while he's talking about the events?

24   BY MR. TOBLER:

25      Q.   And what's depicted in this table, sir?

1    A.   These are the actual call times.  So we have one

2    at 6:38, one at 6:39, then one at 9:20, 9:26, 9:27,

3    9:28, and then also one at 10:23.

4         So, those come actually from the call detail

5    records.  And what that's saying is, is that for each

6    one of these particular times, the phone selected this

7    tower in this sector during this timeframe.

8         And at the top of that, you can see what says

9    "CID37542."  That's actually the, the cell site

10   identifier for this particular T-Mobile tower, and also

11   the sector identifier.  So, based on that, I know that's

12   the tower, that's the singular tower and singular sector

13   that the phone communicated with during this period of

14   time.

15   Q.   Let me just ask you maybe to answer an obvious

16   question.  What is the red -- the red dot in the middle

17   with the blue -- with the purple arc coming out of it?

18        Can we blow that up?  Thank you.

19   A.   So what our software does is it -- without the

20   benefit of a drive test, it will put in what we call an

21   open wedge, which is this thing that kinds of looks like

22   a flying wedge, or almost like a, I like to look at as

23   like a B-2 bomber or something.

24        But anyway, it's got two -- two wings that are

25   coming out.  And in the center there's this arc.  And

1    what that is, is that that's actually the orientation of

2    the sector.  So that's showing you where that antenna

3    array is pointing on the tower.

4         The lines actually illustrate, again without --

5    without a drive test, the 120-degree arc of that

6    particular sector, the approximate coverage area of the

7    cell site.

8         And that, that center arch that you see, it's

9    colored in with purple, all that's there for is to

10   illustrate that the radio frequency starts where the

11   number "1" is, and it pushes out in that bubble fashion.

12   So it comes out and it moves out over the land as it

13   spreads out away from the tower.  It's just a way to

14   attempt to illustrate that.

15        What I've done is I put this in to show you

16   the -- what the orientation of the actual antenna array

17   is, and then I've overlaid over the top of that the

18   results of the drive test that I did.

19   Q.   How is that depicted, the results of the drive

20   test?

21   A.   Did measurement gear that I used in this

22   particular case measured the entire radio frequency

23   spectrum of this particular antenna structure.  The dark

24   area is the strongest, best quality signal coming off of

25   the tower.

Q.   Just for the record, when you say "the dark
area," what color are you referring to?

A.   That's blue, the darker blue.

     As you can see, it kinds of looks like -- it's
kind of chunky, and almost like an amoeba shape.  And
that would be typical for the way radio frequency
behaves as it comes off of a tower.  And the reason is,
it has everything to do with the terrain in the area,
buildings and things like that.  But, this is the
coverage area, the dark blue, of that particular sector.

     What that means is, is that if the records show
that your phone communicated with this tower, you had to
be in the blue, the dark blue.  Because that's the
strongest, best quality signal, that's what your phone
will talk to.  It will only talk to that, no other
tower, no other sector, only that.

     The other, light blue area that has a red line
around it, that's the actual terminating signal strength
of that entire radio frequency spectrum coming off that
tower.  In other words, if this was the only cell tower
in town, that's the furthest those frequencies reach
before they're gone, before the device can no longer
measure it.

     And we put this in here when we do an analysis
just to show you the entire coverage area, even though

1  those areas are weaker and the phone wouldn't

2  communicate in the lighter blue or greenish area here

3  with the red.

4      Q.  What is the star?

5      A.  The star is the actual homicide scene.

6      Q.  From the call detail records, was it possible to

7  determine the location of this phone later that night of

8  June 19th, to the morning of June 20th?

9      A.  No.

10     Q.  Why is that?

11     A.  After this particular event, the last call

12  activity on this phone was at 2223 or 10:23.  After

13  that, there was a series of voice calls that were

14  incoming calls to the phone, as well as some text

15  message.  But the ones I pay attention to are the voice

16  calls, because those actually record cell tower

17  information.

18         The phone, in my opinion, was either

19  unavailable -- in other words, it was -- it could not

20  get a signal, such as being underwater or in a subway or

21  something like that -- or it was powered off.  Because,

22  whenever we see in call detail records -- just because

23  your phone is off doesn't mean the records stop.  Any

24  time anybody calls you, there's still a record of that.

25  It's still maintained by the provider, even text

1    messages or data sections.

2         So in this case, there was -- the records still

3    continued to roll, but there was no cell site activity

4    in relation to that.  So the phone was not communicating

5    with the network.

6              MR. TOBLER:  No further questions for this

7    witness, Your Honor.

8              THE COURT:  We'll take the afternoon recess

9    now for 15 minutes.  Thank you.

10              (Court recessed at 3:30 p.m. and reconvened

11              at 3:47 p.m.)

12              THE COURT:  Ready to bring the jury back?

13              (Pause.)

14              That calls for an audible response.  Ready

15    to bring the jury back?

16              ALL COUNSEL:  Yes, Your Honor.

17              THE COURT:  Thank you.

18              Bring the jury back, please.

19              (Jury present.)

20              THE COURT:  You may be seated.

21              MS. AMATO:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23    BY MS. AMATO:

24    Q.  Good afternoon.

25    A.  Good afternoon.

1    Q.   I just have a few questions for you.

2         Now, if I understood correctly, you explained to

3    us that when a cellphone is being used, it gives out a

4    signal, correct?

5         Let me put it this way:  It's being read by a

6    tower, correct?

7    A.   Yes.

8    Q.   And that tower is what, then you're able to

9    extrapolate, more or less, where the location of that

10   cellphone is emanating its signal from, correct?

11   A.   Correct.

12   Q.   Okay.  All right.  And, now, there are certain

13   things that may cause a tower that, under normal

14   circumstances, would communicate with that cellphone.

15   Am I --

16   A.   You're talking about an overload?

17   Q.   Right, such as an overload.

18   A.   A rare event, but I'm familiar with that, yes.

19   Q.   Okay.  And just so we're all clear what I'm

20   trying to express, an overload, as you mentioned, is

21   when the tower that should receive the signal from the

22   phone is overloaded with other signals coming in, so it

23   cannot read it, correct?

24   A.   Well, there's a -- there's kind of a long

25   explanation for what an overload is and what actually

K. Horan - Cross

1   occurs.  Essentially, the best way for me to describe it
2   to you that a tower overload, it is extremely rare, and
3   represents a failure on the part of the, the provider to
4   properly engineer their towers and their networks.
5         But if it did occur, what happens is, is the
6   footprint, which is always there, it's always
7   constant -- it's like a light when you turn it on, it's
8   always beaming, it's always coming out -- the footprint
9   shrinks, so it gets smaller, because there's too many
10  people on the tower for the -- for the tower to handle
11  it.  So, the -- the energy starts to pulling back
12  towards the cell site.
13        What happens is, is that if you were in the
14  peripheral edges of that, you would lose service from
15  that tower, and you now would be on a new tower or a new
16  stronger signal, which has now been taking over by
17  another footprint.
18        So, you don't actually -- the misnomer is, is
19  that somehow your phone is communicating with the tower,
20  and the tower redirects you or something or says, "Hey,
21  I'm too busy," or something.  That doesn't happen.  What
22  happens is, is the footprint shrinks and you're
23  somewhere else, on a different tower.
24  Q.  On a different tower.  Exactly.
25              MS. AMATO:  And so, if we can look at 16 --

1    no, this one.

2    BY MS. AMATO:

3        Q.   And, this is -- we've seen this before.  You were

4    testifying about this earlier, correct?

5        A.   Yes.

6        Q.   Okay.  And, this is the diagram which

7    basically --

8            (Microphone falls.)

9               THE COURT:  Did you break my microphone?

10   This is government property, Ms. Amato.

11              MS. MARTINEZ:  It's gone, Your Honor.

12              THE COURT:  It's gone?

13              This is taxpayer equipment, Ms. Amato.

14              MS. AMATO:  Excuse me.

15              MR. TOLIVER:  It's down --

16              THE COURT:  You might have broken it.

17              There's no way -- is it down inside there?

18   Okay.

19              How many more questions do you have?

20              MS. AMATO:  Someone's telling me to sit

21   down.

22              THE COURT:  Can you use the hand-held mike

23   for a few minutes?

24              MS. AMATO:  Yes, I can.

25              THE COURT:  Please don't drop it.  Okay?

1            MS. AMATO:  Is it working?

2            All right.  We'll try this again.

3    BY MS. AMATO:

4       Q.   Getting back to Government's Exhibit 105, this is

5    a diagram that you showed us and you talked about

6    earlier, correct?

7       A.   Yes.

8       Q.   All right.  And this is where you're showing,

9    based on the tower that you say that this phone

10   communicated with, that the area in dark blue is the

11   strong area where it would have been receiving signals

12   from; is that correct?

13      A.   Yes.

14      Q.   And again, that is if everything is working

15   correctly with the tower, correct?

16      A.   That's correct.

17      Q.   And now, this is not like a GPS system, though,

18   correct?

19      A.   It is not.  It does not tell us exactly where in

20   the blue, the dark blue, that the phone was, that --

21   just that it was somewhere within that area.

22      Q.   Right.  Okay.  So, again, so we don't know

23   specifically where that cellphone was, if it was in that

24   blue area, but the assumption is it's somewhere within

25   that blue area?

```
1     A.   That's correct.
2     Q.   Now, you also -- looking at exhibit --
3   Government's Exhibit 105-A --
4          MS. AMATO:  Crystal -- thank you.
5   BY MS. AMATO:
6     Q.   And you had mentioned -- let's see.  I believe
7   that you were able to look at entries until 10:23 p.m.;
8   is that correct?
9     A.   Yes.
10    Q.   That you found coming from that specific area
11  that we just looked at in 105, correct?
12    A.   Yes.
13    Q.   All right.  And, then you said after that, if I
14  heard correctly, you said you did not believe that there
15  was any more activity from that phone?
16    A.   There -- there was activity.  There was incoming
17  activity to the phone.  There was also some text
18  messaging that was going on.  But the incoming activity
19  did not have an associated cell site, which means that
20  the network never found the cellphone.
21    Q.   Okay.  But, now I'm reading the reports, these
22  notations, to indicate that there were also two outgoing
23  activities from that phone.  And, if you look at
24  entry -- and we can put it up on the screen.
25          It's 107, and 109.
```

1    A.   Is there any way you could blow that up?

2    Q.   Well, let's hope.

3         No, she cannot.  Okay.  Sorry?

4              One moment, Your Honor.

5              We're going to try to blow this up so you

6    can see it and everybody can see it.

7              THE COURT:  Do you have a hard copy there,

8    too?

9              THE WITNESS:  I do, Your Honor.

10             THE COURT:  Okay.

11             THE WITNESS:  But it's as small as what you

12   saw on the screen.

13             THE COURT:  All right.

14   BY MS. AMATO:

15   Q.   So -- okay.  So we can see it a little larger.

16        Now, let's follow 107 across the page, if we can.

17   And if I'm reading that correctly, I see it says an

18   outgoing call, or an outgoing.  Is that -- do you read

19   that?

20   A.   At which time are you talking about?

21   Q.   It's 11:05, 38 seconds, p.m.

22   A.   That's correct.

23   Q.   So that would indicate that there was activity on

24   that phone of an outgoing nature, correct?

25   A.   It says outgoing, but there's no cell site

1    captured during that period of time.

2        Q.   But, it's certainly not incoming; it says

3    outgoing?

4        A.   That's what it says, yes.

5        Q.   And would you agree with me, then, that that

6    would mean that it was something from that phone, that

7    is, putting out either a voice message -- a voice call

8    or a text or something?

9        A.   Can you scroll over to the left?

10            MS. AMATO:  To the -- to the left.

11            THE WITNESS:  The other way.

12            MS. AMATO:  The other way.  Oops, we've lost

13   it.

14            And it actually says "voice" -- woops.

15   There we go.

16            THE COURT:  Hold the microphone closer,

17   Ms. Amato.

18            MS. AMATO:  Thank you, Your Honor.

19   BY MS. AMATO:

20       Q.   So it says "voice," correct?

21       A.   It does.  But you also notice where it says "NA,"

22   it did not capture the, what we call the MZ of the

23   phone, which is actually the account information for

24   that particular device.  And when those are missing with

25   a voice associated voice call, again, the network did

1    not actually see this phone.

2        Q.   Okay.  And, when you're talking about the

3    network, though, you're talking about --

4        A.   T-Mobile.

5        Q.   Okay.  The tower, though, right?

6            I mean it's not that there was no -- that there

7    was not activity on that phone at that hour; it just

8    means that it wasn't contacted -- it was not read

9    through that particular tower?

10       A.   It's hard to -- it's hard to -- well, actually,

11   you see two.  You see 1:05:03 and 1 -- I'm sorry --

12   11:05:03 and 11:05:38.  If you scroll to the right,

13   there's incoming/outgoing.  Incoming -- outgoing.  So,

14   this was a call that was routed to voicemail.  That's

15   the voicemail server, 805.

16       Q.   I'm sorry, 80- --

17       A.   The 805 number is the voicemail server for this

18   particular area.

19       Q.   Okay.  So, this phone call, then, was --

20       A.   Was a routed call.

21       Q.   -- was being used to check its voicemail message,

22   correct?

23       A.   No.  It appears as -- it's actually an incoming

24   call, and an outgoing call to the voicemail server.

25   That's what appears in the call detail records.  But

1    again, there's no MZ that was captured, so that the

2    network never actually saw the phone.  And there's no

3    cell site information, as well, which is another

4    indicator it never actually contacted the network.

5          But, a call did occur, but it was a routed call

6    to voicemail.

7                MS. AMATO:  All right.  Thank you.  I have

8    no further questions, on this microphone or any other

9    microphone.

10               MR. TOBLER:  No redirect.

11               THE COURT:  You can step down, sir.  Thank

12   you for coming.

13               (Thereupon, the witness withdrew from the

14   stand.)

15               MR. TOBLER:  Your Honor, the United States

16   calls Detective Brian Bayliss.

17               (Witness sworn.)

18               THE WITNESS:  I do.

19               THEREUPON, BRIAN W. BAYLISS, having been

20   duly sworn, testified as follows:

21                         DIRECT EXAMINATION

22   BY MR. TOBLER:

23     Q.  Good afternoon, Detective.

24         Would you please state your name and spell it for

25   the record.

1          THE COURT:  You've got to hold the

2   microphone higher.  I'm sorry, we just have to do this.

3          MR. TOBLER:  No problem.

4   BY MR. TOBLER:

5      Q.  Could you state your name and spell it for the

6   record.

7      A.  Detective Brian W. Bayliss; B-r-i-a-n,

8   B-a-y-l-i-s- as in Sam, -s as in Sam.

9      Q.  Where do you work?

10     A.  I work for Fairfax Police Department's computer

11  forensic section.

12     Q.  How long have you worked for the Fairfax County

13  Police Department?

14     A.  A little over 23 years.

15     Q.  And how long have you worked for the computer

16  forensic division?

17     A.  I think I'm in my sixth year.

18     Q.  And what is your position?

19     A.  I am a -- one of the computer forensic

20  detectives.

21     Q.  What are your duties as a computer forensic

22  detective?

23     A.  To forensically seize electronic devices,

24  forensically remove the data from those devices,

25  interpret it, and then be prepared to present it in a

1    court of law.

2        Q.   Have you received any certifications in forensic

3    examination?

4        A.   I have a certification from the International

5    Association of Computer Investigative Specialists, the

6    certification being I'm a certified forensic computer

7    examiner.

8        Q.   What were the requirements for obtaining that

9    certification?

10       A.   To begin with, you have to take a two-week course

11   in Florida.  And then it's followed by a series of what

12   they call peer review.  During the peer review process,

13   there are four problems of varying grades of difficulty.

14   You have 90 days to complete each of those.  You have to

15   complete each of those.  And you do so with the help of

16   a coach, who helps you and guides you through the

17   training program.

18            When you've successfully completed that, you have

19   two -- two more problems -- it's the certification

20   phase -- one of them being to examine, basically, the

21   data contents of a hard drive, a computer hard drive.

22   You have to complete that successfully.  And then you

23   move on to a test.  You have 90 days to complete both of

24   those.

25       Q.   In addition to obtaining this certification, have

you taken any training courses related to cellular

device examination, specifically?

    A.   Yes.

    Q.   Would you please describe those courses?

    A.   I have a few hundred hours of training dedicated

to general cellphone forensics, cellular technology,

cellphone file systems, basically, and also the -- the

use of the various forensic devices and software

platforms that we use to forensically examine cellphones

and the data.

    Q.   Approximately how many cellular devices have you

examined over the course of your career?

    A.   I stopped counting at 400.

    Q.   Have you testified in court regarding the search

of cellphone devices?

    A.   Yes.

    Q.   Approximately how many times?

    A.   Somewhere between 12 and 20.

    Q.   Were you asked to search any cellular devices as

part of this case?

    A.   Yes.

    Q.   With the assistance of the courtroom security

officer, I would like to show you what's been marked for

identification as Government's Exhibit 39.

    A.   Yes.

1    Q.   Do you recognize this exhibit, sir?

2    A.   Yes, I do.

3    Q.   What is it?

4    A.   It is a ZTE model N8000 cellphone, which I

5    examined at Detective Betts's request, my examination

6    being complete on October 19th of 2014.

7            MR. TOBLER:  Your Honor, at this time we

8    would move to admit Government's Exhibit 39 into

9    evidence.

10           THE COURT:  Well, I don't have a copy of it

11   in my notebook, so I need to see it.

12           MR. TOBLER:  It's physical evidence, Your

13   Honor.  It's a phone.

14           THE COURT:  Can I see it?

15           Oh, okay.

16           Have you ever testified in federal court

17   before?

18           THE WITNESS:  Once, long ago, Your Honor.

19           THE COURT:  So, this is your first time

20   testifying as an expert in federal court?

21           THE WITNESS:  Yes, Your Honor.

22           THE COURT:  All right.

23           MR. TOBLER:  May we move Government's

24   Exhibit 39 into evidence, Your Honor?

25           THE COURT:  Yes.

1          MR. TOBLER:  At this time, I'd also like to

2    show you what's been marked as identification as

3    Government's Exhibit 151.

4          And, Your Honor, we would ask that

5    defendant -- Detective Bayliss be allowed to testify as

6    an expert in cellphone examination.

7          THE COURT:  All right.  He will be permitted

8    to testify as an expert in cellphone examination to a

9    reasonable degree of certainty.

10         Go ahead.

11   BY MR. TOBLER:

12     Q.   Sir, do you recognize Government's Exhibit 151?

13     A.   Yes, I do.

14     Q.   What is it?

15     A.   These are my examination notes from this

16   particular cellphone.

17     Q.   Going back to Government's Exhibit 39, the

18   cellphone, were you able to extract data that was stored

19   on that phone itself?

20     A.   On the phone itself, no.

21     Q.   Why not?

22     A.   It had a gesture code which prevented us from

23   accessing the data.

24     Q.   What do you mean when you say "gesture code"?

25     A.   It had one of those codes that you swipe it,

1    rather than punching in the number or letters.

2        Q.   Was data stored anywhere else in the device?

3        A.   Yes.

4        Q.   Where?

5        A.   The phone had a micro SD card installed in it.

6        Q.   What is a micro SD card?

7        A.    It's a little storage card that you see on

8    almost -- well, every non-Apple type of cellphone.  You

9    also see them in cameras and stuff.  It's just a little

10   piece of flash media that allows you to store data on it

11   instead of on the phone itself.

12       Q.   Were you able to extract data that was stored on

13   the phone's SD card?

14       A.   Yes.

15       Q.   What steps did you take to perform that

16   extraction?

17       A.    Removed the SD card.  I then attached it to a

18   large computer, a forensic evidence device, wrote --

19   write blocked it so that nothing would change.  And then

20   I made an exact duplicate of the data contents of the SD

21   card.

22            I then used another similar software platform to

23   convert all that data into a format that I could see and

24   read as a normal human being, and examined it for

25   photographs, messages, music, et cetera.

1   Q.   Did you find any of those sorts of data that you
2   just described?
3   A.   Yes, I did.
4   Q.   What sorts of data did you find?
5   A.   Music, photographs.
6   Q.   Based on your training and experience, are the
7   steps that you took a standard means of extracting
8   data -- I should say copying data from an SD card?
9   A.   Yes.   They're the industry standard.
10   Q.   When you copy data in this way, are there any
11   changes made to the type of data you mentioned finding
12   on the --
13   A.   None whatsoever.
14   Q.   Have you reviewed the images that you copied from
15   Government's Exhibit 39?
16   A.   I have.
17   Q.   With the assistance of the courtroom security
18   officer, I would now like to show you what has been
19   marked for identification as Government's
20   Exhibits 104-D, 104-E and 104-F.
21        Do you recognize these exhibits, sir?
22   A.   Yes, I do.
23   Q.   What are they?
24   A.   They are all three images that I took off of that
25   micro SD card.

B. Bayliss - Direct                                          208

1          MR. TOBLER:  Your Honor, at this time we

2   move to admit Government's Exhibits 104-E and 104-F.  I

3   believe Government's Exhibit 104-D has already been

4   admitted into evidence.

5          THE COURT:  104-E, 104-F will be received.

6          Can you stabilize that microphone?  I'm

7   really nervous that I'm going to lose it, and have to

8   end my trial.  I don't want to do that.

9          MR. TOBLER:  How's that?

10          THE COURT:  That looks better.  Thank you.

11          MR. TOBLER:  May we publish the exhibits,

12   Your Honor?

13          THE COURT:  Yes, 104-E, 104-F.

14          MR. TOBLER:  Could we publish Government's

15   Exhibit 104-D, which is already admitted into evidence?

16          THE COURT:  Yes.

17          MR. TOBLER:  And, now, let's please publish

18   Government's Exhibit 104-E, which has just been admitted

19   into evidence.

20   BY MR. TOBLER:

21      Q.  Sir, were you able to determine when these two

22   photographs were created?

23      A.  Yes, I was.

24      Q.  Were you able to determine when they were -- when

25   they first appeared on the SD card located in

1    Government's Exhibit 39?

2        A.   Yes, I did.

3        Q.   How were you able to make that determination?

4        A.   For most devices, most -- most of the artifacts,

5    pictures and stuff, that are stored on a phone, there

6    are two different times.  There's the time stored within

7    the image itself, within the photograph, which records

8    usually what time -- when it was made, the type of

9    camera, and -- it can be quite a bit of data.

10            And then there's a second time, which is what we

11   call the file system time.  That's when the phone's

12   operating system records that it actually wrote this

13   particular picture.  In other words, a picture could

14   come from one source and have one time, and then be

15   transferred on to something and have a completely

16   different time from the file system.

17       Q.   Are both of those dates available for review in

18   the file system, to your analysis?

19       A.   Yes.

20       Q.   When were these photographs created?

21       A.   Can I refer to my notes real quick?

22       Q.   Go ahead.

23       A.   These first two, the ones that show human beings,

24   were all created on December 24th, 2013.

25       Q.   And on what date were they copied or -- I should

1  say on what date did they appear on Government's

2  Exhibit 39's SD card?

3      A.   I'm sorry.  Actually -- yes.  On -- they were

4  actually copied onto it at December 24th, 20- -- I'm

5  sorry -- January 2nd, 2014.

6            MR. TOBLER:  May we publish Government's

7  Exhibit 104-F, please?

8            THE COURT:  Yes.

9  BY MR. TOBLER:

10     Q.   Detective Bayliss, what can you tell the jury

11 about how this image was created on Government's

12 Exhibit 39?

13     A.   This image is created during a process we call

14 screen shotting.  Basically, almost -- most cellphones,

15 most smart phones, have the ability that when you see a

16 picture that's on your display, on your screen, you have

17 the ability to compress a couple of buttons and actually

18 save a permanent copy of it.  So you can take a still

19 from a video or an album cover you're listening to, or

20 even a message somebody sends you.  It then stores it

21 permanently as a separate image.

22            MR. TOBLER:  No further questions, Your

23 Honor.

24                      CROSS-EXAMINATION

25 BY MR. CHICK:

1    Q.   Hi, Detective.  How are you?

2         My name is Mike Chick.  I'm the attorney for

3    Manuel Ernesto Paiz Guevara.  Sorry I'm standing on my

4    toes a little bit so I can get to the mike.  Just a

5    couple quick questions.

6         The images that you're talking about, you -- it

7    sounds like you were able to determine that those images

8    did not originate on that phone; is that right?

9    A.   The two images that had human beings in them were

10   taken with a Samsung SGH-I747 cellphone, a different

11   type of cellphone.

12   Q.   Okay.

13   A.   The screen shot, I can't tell one way or another.

14   Q.   Okay.  You can't tell where the screen shot

15   originated, correct?

16   A.   Correct.

17   Q.   And then the other two images, you can tell that

18   they originated on another phone, and they were

19   essentially sent to that phone; is that right?

20   A.   They were either sent to the phone, or that SD

21   card was originally in that phone; one of the two.

22              MR. CHICK:  Okay.  No further questions.

23              MR. TOBLER:  No redirect, Your Honor.

24              THE COURT:  You're excused, sir.  Thank you

25   for coming.

```
 1                 (Thereupon, the witness withdrew from the
 2      stand.)
 3                 MS. MARTINEZ:  The United States calls
 4      Detective Betts.
 5                 And, Your Honor, I'm going to hold this,
 6      because I'm pretty short.
 7                 THE COURT:  Okay.
 8                 (Witness sworn.)
 9                 THE WITNESS:  I do, ma'am.
10                 THEREUPON, RAYMOND E. BETTS, having been
11      duly sworn, testified as follows:
12                        DIRECT EXAMINATION
13      BY MS. MARTINEZ:
14         Q.  Good afternoon.
15         A.  Good afternoon.
16         Q.  Please state your full name and spell it for the
17      record.
18         A.  Sure.  Raymond Eugene Betts; R-a-y-m-o-n-d,
19      Eugene is E-u-g-e-n-e, Betts, B-e-t-t-s.
20         Q.  Where do you work?
21         A.  Fairfax Police Department.
22         Q.  How long have you worked for the Fairfax County
23      Police Department?
24         A.  For over 17 years now.
25         Q.  What's your position?
```

R. Betts - Direct                                                   213

1      A.   I'm a detective with the gang investigations

2 unit.  And I've been with the gang unit for over nine

3 years now.

4      Q.   Do you ever work with the FBI?

5      A.   I do.  I'm also a task force officer with the

6 FBI.  I've been working with the FBI for over seven

7 years.

8      Q.   What are your duties, first as a detective with

9 Fairfax County?

10      A.   So, there's obviously numerous duties that we

11 have.  Essentially gather and disseminate gang

12 information throughout the department, different

13 entities of the department, and work gang crime, violent

14 crimes.

15      Q.   How about as a task force officer with the FBI;

16 what are your duties?

17      A.   While working with the FBI for the last seven

18 years or so, most of our cases are long-term cases,

19 racketeering cases.  And for the last four or five

20 years, I've been a case agent or co-case agent on

21 racketeering cases.  Prior to that, I worked some sex

22 trafficking cases.

23      Q.   What training have you received relevant to this

24 investigation?

25      A.   So, I can easily say well over hundreds of hours

1    of training in gang investigations and violent crime.

2    And I've also provided training throughout the United

3    States and also in El Salvador, well over a hundred

4    hours.

5        Q.   What is your involvement in the case that brings

6    us to court today?

7        A.   So, it was towards the end of 2013 -- and when I

8    say the FBI, that also includes myself -- we initiated

9    a -- opened a case against MS-13.  It was pretty much an

10   all-encompassing case targeting MS-13.  We weren't

11   looking at any specific clique.  We were going after

12   MS-13 in the Washington Metropolitan Area.

13       Q.   What was your role or position with respect to

14   this investigation?

15       A.   Um, I am one of the two case agents on the case.

16       Q.   Who is the other case agent?

17       A.   Special Agent Fernando Uribe.

18       Q.   When the investigation was started, were you a

19   case agent on the case?

20       A.   I was.

21       Q.   And when the investigation first started, was

22   Special Agent Uribe a case agent?

23       A.   He was not.  He wasn't here in the area as of

24   yet.

25       Q.   Approximately when did the investigation

1  commence?
2      A.   We technically started, from what I remember,
3  August 2013, about when we started.
4      Q.   And when it commenced, what was the nature of the
5  investigation?
6               THE COURT:  Excuse me.
7               MS. MARTINEZ:  Yes, Your Honor.
8               THE COURT:  Do we want to go into every
9  investigation they've done here, or just focus on this
10  case?
11              MS. MARTINEZ:  Just this investigation,
12  particularly.
13              THE COURT:  All right.  Okay.
14              MS. MARTINEZ:  Your Honor --
15  BY MS. MARTINEZ:
16     Q.   Sir, so I'm focusing on this investigation.
17     A.   Right.
18     Q.   Just to make sure the record is clear, when did
19  this investigation commence?
20     A.   So -- and just to back up a little bit, so this
21  investigation did start in August 2013, but it got
22  narrow very quickly, and that was in September 2013.
23  September 29th is when we got the information that
24  Drowsy has already testified upon.  And, on
25  September 30th is when we had the meeting that he's also

1   testified on, that I was a part of.

2       Q.   Let's back up just a minute to the beginning of

3   the investigation.  When the investigation commenced,

4   what was the -- briefly, what was the nature of the

5   investigation?

6       A.   So, what we were targeting was prostitution, drug

7   trafficking and violent crime.

8       Q.   Of -- with respect to what?

9       A.   MS-13.

10      Q.   Was there any particular aspect of MS-13 that the

11  investigation was focused on?

12      A.   Initially it was just the Washington Metropolitan

13  Area, and up and down the East Coast.

14      Q.   And, then you said over time -- or actually you

15  said quickly it narrowed.  What do you mean by that?

16      A.   So, we got the information that there was a

17  planned murder attempt on Peligroso.  And, like I said,

18  that was towards the end of September.  And the very

19  first operation that I was involved in, the case

20  actually was involved in, was September 30th, where

21  MS-13 had planned to have the meeting to plan the murder

22  of Peligroso, and we wired up Drowsy to attend this

23  meeting.

24      Q.   We'll talk more about that in a minute.

25           But in addition to violent crimes, were there any

1    other sort of criminal activity that the investigation

2    focused on?

3         A.   The drug trafficking and the prostitution.

4         Q.   All right.  Let's start with drug trafficking.

5    During the course of this investigation, did you seize

6    any drugs?

7         A.   I did.

8         Q.   I would like to direct your attention to

9    January 10th, 2014.  What, if any, interaction did you

10   have with a defendant in this case on January 10th,

11   2014?

12        A.   Okay.  So I was in the Culmore area -- and that's

13   in Falls Church, Fairfax County -- and it was, like she

14   said, January 10th around 3:00 p.m.  I was observing, I

15   think it was roughly four individuals outside.  It was

16   raining, cold.  They were kind of hanging out,

17   congregating.  I found this odd because of the weather

18   and the temperature.

19            And when kids are coming off the school buses,

20   they would walk up to this group.  I saw one of the

21   subjects walk up to the kids, do what I believed to be a

22   hand-to-hand interaction or transaction.  This went on

23   for about 30 minutes or so.  I reached out to another

24   detective on our unit and asked them to come down to the

25   area.

1    Q.   Did that detective come to the area?

2    A.   He did.

3         And, basically, what I explained to him was that

4    I wanted to do a subject stop on these individuals to

5    see what they were up to.

6    Q.   Was there a subject stop completed?

7    A.   There was, ma'am.  We ended up stopping one

8    defendant, and a juvenile, and then a female.  I don't

9    recall really talking to the female.  But the one

10   defendant that we spoke to was Mr. Christian Lemus

11   Cerna, who is seated next to counsel.  It's looks like

12   today he's just wearing a white shirt.  He's in the

13   front row.

14   Q.   What happened when you spoke to Mr. Lemus Cerna?

15   A.   So, when I asked -- the other detective was

16   Detective Diffley.  So I asked him to come in on one

17   angle, and I was going to come in from the other side,

18   so if the guys took off running, they would run right to

19   me.

20        So, as we approached the group, or the two guys

21   and the girl, Diffley got to Mr. Lemus Cerna first, and

22   he started talking to him, asked him what he was doing

23   in the area, and then he asked him for a consent search.

24   Q.   Was a consent search conducted?

25   A.   It was, obviously after Mr. Lemus Cerna granted

1    the consent search.

2          And upon the search of his person, there were, I

3    believe it was eight baggies of suspected cocaine found

4    on his person, as was two small baggies of suspected

5    marijuana.

6    Q.   Detective, I'd like to show you, with the help of

7    the court security officer, what has been marked as

8    Government's Exhibits 115-A and 115-B.

9          Do you recognize those exhibits?

10   A.   I do, ma'am.

11   Q.   How do you recognize them?

12   A.   A couple different reasons.  One is, we have our

13   Fairfax County case number here.  I was also with

14   Detective Diffley when he actually packaged this

15   property, and I recognize his initials here on the

16   evidence tape, and his EIN or his employee number.

17   Q.   Are those evidence bags sealed?

18   A.   They are, ma'am.

19   Q.   What are they?

20   A.   So, these are property bags that we put our

21   narcotics in.

22          I also do want to note that there appears at the

23   bottom that they were cut open at some point and then

24   resealed.  And that is from the Department of Forensic

25   Science when they were tested.

1    Q.  What do Government's Exhibits -- well, let's

2    start with 115-A.  What is Government's Exhibit 115-A?

3    A.  So this is eight small blue baggies of white

4    powdery substance.

5    Q.  How about 115-B?

6    A.  And this is two baggies of suspected marijuana --

7    green leafy substance.

8    Q.  And to be clear, from whom were these items

9    seized?

10   A.  Mr. Lemus Cerna.

11          MS. MARTINEZ:  Your Honor, the government

12   would move into evidence Government's Exhibits 115-A and

13   115-B.

14          THE COURT:  Received.

15   BY MS. MARTINEZ:

16   Q.  With the help of the court security officer, can

17   I please direct your attention to Government's

18   Exhibit 111-E.

19          Do you recognize Government's Exhibit 111-E?

20   A.  I do.

21   Q.  What is it?

22   A.  So, just real quick, it's a certificate of

23   analysis from the Department of Forensic Science.  Just,

24   essentially what we do is once we seize the narcotics,

25   we package it like I showed you there, and then we take

1    it to the state lab.

2       Q.   And, without giving us the details in that

3    record, what does that certificate relate to?

4       A.   So, basically, once it's turned over to the state

5    lab, they test it for what we believe it to be.

6       Q.   What items does that -- does that certificate

7    relate to?

8       A.   Item one is the eight blue Ziplock baggies, and

9    item two are the two plant material, suspected

10   marijuana.

11              MS. MARTINEZ:  Your Honor, at this time I'd

12   ask permission to read a stipulation that's been agreed

13   to by the parties.  It's marked as Government's

14   Exhibit 174.

15              THE COURT:  All right.

16              Ladies and gentlemen, you may consider the

17   stipulation as evidence.

18              MS. MARTINEZ:  "The United States of America

19   and the defendants, by and through undersigned counsel,

20   hereby stipulate and agree that the following

21   certificates of analysis from the Virginia Department of

22   Forensic Science are authentic and admissible as proof

23   of the results of the forensic analyses contained

24   therein."

25              The first is:  Certificate of analysis dated

1    March 11th, 2014, signed by Jull A. Cruciotti, marked as

2    Government's Exhibit 111-E.

3              The second:  Certificate of analysis dated

4    September 2nd, 2014, signed by Stacey L. Desjardins,

5    marked as Government's Exhibit 112-C.

6              And third:  Certificate of analysis dated

7    September 17th, 2014, signed by Farolyn Young, marked as

8    Government's Exhibit 113-H.

9              Your Honor, I would offer Government's

10   Exhibit 174, the stipulation, into evidence, along with

11   the certificate that the detective has just identified,

12   111-E.

13             THE COURT:  Admitted.

14   BY MS. MARTINEZ:

15     Q.   Looking at that certificate of analysis, what

16   were the results of that drug testing?

17     A.   Okay.  So, for item one, I know that I told you

18   all that there were eight baggies.  Only five were

19   tested, which is normal.  And the five that were tested

20   were found to be positive for cocaine.

21             And then item two, which was the suspected

22   marijuana, that was also found to be positive results on

23   marijuana.

24     Q.   What were the quantities?

25     A.   The quantities -- it looks like it says, for the

1   cocaine, the gross weight of the -- I'm sorry.  Let me

2   back up.  The gross weight was 1.694, plus or minus

3   .013, grams of powder.  And the gross main of the

4   remainder was 1.3 grams.

5          And then for the marijuana, it was .66, plus or

6   minus .005 grams.

7                MS. MARTINEZ:  And, Your Honor, may we

8   publish 111-E?

9                THE COURT:  Yes.

10               MS. MARTINEZ:  I apologize for not putting

11  that up to begin with.

12  BY MS. MARTINEZ:

13    Q.  But can you just show the jury where the -- first

14  the quantities of the drugs are located on this exhibit

15  here?

16    A.  Okay.  So, it's going to be right in that area.

17  I don't want to cover it up, but --

18               MS. MARTINEZ:  Can we zoom in on that area

19  so the jury can see it better?

20               THE WITNESS:  Well, I just covered it up.

21  Awesome.

22               THE COURT:  Just hit the "clear" button.

23               THE WITNESS:  Oh, I can hit the "clear"

24  button here?  Is that that?  Oh, look at that.  It's

25  gone.  All right.  I can't -- it's -- yeah.

1        MS. MARTINEZ:  That's okay.  You don't need
2  to mark it.
3            If we could just clear that off.
4  BY MS. MARTINEZ:
5     Q.   Let's start with item one.  What is item one?
6     A.   That's the five analyzed baggies of cocaine.
7     Q.   Okay.  And what is the quantity of that cocaine?
8     A.   That -- that is the 1.69, plus or minus
9  .0136 grams of powder.
10    Q.   All right.  And what is item two?
11    A.   Item two is the .6653, plus or minus .0055 grams.
12    Q.   Of what?
13    A.   Of marijuana.
14    Q.   Thank you.
15         All right.  Directing your attention now to
16  April 25th, 2014 -- I'm sorry -- April 23rd, 2014, let's
17  start there.  On April 23rd, 2014, what, if any,
18  interaction did you have with any defendant in this
19  case?
20    A.   Okay.  So myself and my partner, Agent Uribe, and
21  an analyst, we were in Culmore.  On this day, we were
22  conducting interviews, and we went in, I believe it was
23  on Vista Drive, but we did an interview inside a
24  building, walked in the building.  No one was outside in
25  the immediate area.

R. Betts - Direct

1       When we walked back out, which we weren't inside
2   very long, we observed four individuals pretty much
3   right outside the door there.
4       As soon as I looked at them, I recognized them.
5   And one of them was Mr. Lemus Cerna, again, and then,
6   Mr. Paiz Guevara, which it's kind of hard to see him
7   from here, but he's in the back with the, the brownish
8   sweater on.
9       Mr. Paiz Guevara was with them, and then also
10  Mr. Villanueva, Lil Slow -- you all heard him testify.
11  And then there was a fourth individual, who was a
12  juvenile.
13  Q.  What did you observe about these four individuals
14  outside the building?
15  A.  So, when we first came outside, I actually -- the
16  first person I saw and recognized was Mr. Lemus Cerna.
17  And, you know having just dealt with him three months
18  prior, I went right to him, to talk to him.
19      I walked over towards them.  And I didn't ask him
20  for a consent search on this day.  I was more worried
21  about weapons.  At this point in our investigation --
22  and we had other things we were dealing with -- I just
23  wanted to make sure he didn't have any weapons.
24      So I asked him for a consent patdown, just to
25  make sure he wasn't armed.  He allowed that.  I patted

1    him down.  He had nothing, no weapons on him.

2         And told him, I said, "Hey, listen, dude, I can't

3    tell you you've got to leave, so if you want to leave,

4    you can.  If you want to chill here, that's cool, too, I

5    mean, whatever."

6         So he elected to walk away.  When he walked away,

7    it kind of made me nervous, because he looked back at

8    the guys that we were still with.  He actually looked

9    back twice.  And, I just -- I believed at that point

10   that they were holding something, which is why he kept

11   looking back at them.

12              MR. SALVATO:  Objection, Your Honor.  I

13   think that's speculation and irrelevant.

14              THE COURT:  Sustained.

15   BY MS. MARTINEZ:

16   Q.   After Mr. Lemus Cerna looked back at the three

17   individuals, what did -- twice, what did you do?

18   A.   So I looked down the row of the three

19   individuals, down once, and then came back, and Mr. Paiz

20   Guevara was who I focused in on, because I noticed that

21   he was wearing a sweatshirt, a zip-up sweatshirt.  And

22   his -- it has two pockets on the front for his hands.

23   And he didn't have his hands in his pockets, but there

24   was a bulge in the left side of his pocket.

25              And, as soon as I saw that, I immediately thought

1    that he was armed with a firearm.  So, I walked towards

2    him and asked him to come towards me.  I did not ask him

3    for a patdown, because it wasn't going to be a

4    consensual situation.  I wanted to pat it down and make

5    sure he was not armed.

6         He came towards me.  I asked him to turn around.

7    He put his hands behind his back.  I held his hands, and

8    I immediately patted the front left pocket.  And as soon

9    as I did, I felt hard lumpy objects, and heard the sound

10   of plastic, and I immediately knew that it was drugs,

11   reached in and pulled out a larger bag, a Ziploc baggie,

12   and inside that baggie was, I believe, seven smaller

13   baggies of marijuana, or suspected marijuana.

14   Q.   You said you immediately knew it was drugs.  Can

15   you explain to the jury how you would know that?

16   A.   Through training --

17   Q.   How you did know that?

18   A.   Sure.  Through officer training and experience,

19   and like I said I've been on for 17 years, something

20   that I did very early on in my career was trained myself

21   on the playing field doctrine.

22        And what I would do is when I, myself, would

23   seize narcotics or other officers would seize narcotics,

24   we would take it back to the station, we would -- I

25   would either have my partner put on his person

1  somewhere, in a sock, in a pocket, wherever, or on

2  myself or in a jacket, and I would train myself that,

3  you know, see what drugs or narcotics felt like as soon

4  as I patted it.

5      Q.  What did you find as a result of that patdown?

6      A.  It was the seven baggies of suspected marijuana.

7      Q.  With the help of the court security officer, I'd

8  like to show you what has been marked as Government's

9  Exhibit 112-B.

10          MS. MARTINEZ:  Oh, I'm sorry.  Why don't we

11  grab 116 while you're there.  Perfect.

12          And then 112-B should be in the binder.  I

13  apologize, Mr. Toliver.

14  BY MS. MARTINEZ:

15      Q.  We'll start with 112-B, but I'll turn your

16  attention to 116 in a moment.

17      A.  Okay.

18      Q.  What is Government's Exhibit 112-B?

19      A.  So, these -- this is a picture that I took the

20  day of the seizure.

21      Q.  Of what?

22      A.  Of the suspected marijuana.

23          MS. MARTINEZ:  Your Honor, the government

24  would offer 112-B into evidence.

25          THE COURT:  Received.

1        MS. MARTINEZ:  May we publish?

2        THE COURT:  Yes.

3   BY MS. MARTINEZ:

4    Q.  Where did you take this photograph?

5    A.  That was at our office, my office.

6    Q.  When you seized this evidence, was this the exact

7   way that it appeared?

8    A.  No.  It was in a larger Ziploc baggie.

9    Q.  And what did you do at your office with the

10  larger Ziploc baggie?

11   A.  So, I packaged it, which we have the package

12  here.  I packaged it up, sealed it and initialed it,

13  which is how I know that no one else other than the

14  state lab has gone into this package.

15   Q.  All right.  And you skipped right ahead.  For the

16  record, you're looking at 116; is that right?

17   A.  116, yes.

18   Q.  And, what is Government's Exhibit 116?

19   A.  It is the seven small baggies of suspected

20  marijuana that I seized on that day.

21       MS. MARTINEZ:  Your Honor, the government

22  would offer 116 into evidence as well.

23       THE COURT:  116 will be received.

24  BY MS. MARTINEZ:

25   Q.  After you seized and packaged that evidence, what

1    did you do with it?

2        A.   So, eventually it was taken to the state lab to

3    be tested.

4        Q.   With the help of the court security officer, can

5    we take a look at 112-C from the binder.

6        A.   Okay.

7        Q.   Do you have 112-C?

8        A.   I do.

9        Q.   What is 112-C?

10       A.   So, the same as the last case, this is another

11   forensic certificate of analysis of the suspected plant

12   material.

13       Q.   Does that certificate relate to this seizure from

14   April 23rd, 2014?

15       A.   It does.  It's -- item one is the one sealed

16   Ziploc plastic bag containing the seven Ziploc baggies.

17            MS. MARTINEZ:  Your Honor, pursuant to the

18   previous stipulation, we would offer Government's

19   Exhibit 112-C into evidence.

20            THE COURT:  112-C will be received.

21            MS. MARTINEZ:  May we publish?

22            THE COURT:  Yes.

23            MS. MARTINEZ:  If you could zoom in on the

24   center there.

25   BY MS. MARTINEZ:

1    Q.   What were the results of this analysis?

2    A.   So, it says the contents of the five were

3    analyzed separately, and each one was found to contain

4    marijuana.  The total net weight of the five was 3.1924,

5    plus or minus .0136 grams.  And, the gross weight of the

6    remainder was .8093 grams.

7    Q.   Directing your attention to two days later,

8    April 25th, 2014, what, if any, interactions did you

9    have with any defendants in this case on April 25th,

10   2014?

11   A.   So, obviously, that was two days later.  We had

12   set up -- or I had set up an operation, a gang

13   suppression operation in the Culmore area, again Falls

14   Church.  Essentially, the plan was just to identify gang

15   members in and around the area, and update photographs,

16   et cetera.

17        While we were in the area, I was asked to come to

18   a stop, a subject stop that had just occurred, where

19   Mr. Douglas Cerritos, AKA Lil Poison, was stopped.  He

20   had -- officers pulled into Bellevue Drive, and as soon

21   as he saw the officers, he pulled a very large butcher

22   knife from his waistband and tossed it.  So they were

23   dealing with him because of that stop.

24   Q.   What did you do when you reported to that subject

25   stop?

A.    So, again, it was -- I remember Agent Uribe was with me as well.  We just essentially assisted the officers.  The officers elected to charge him with concealed weapon, which is only a Class 1 misdemeanor.

He gave us his correct information.  He told us where he lived.  So he was given a summons, a ticket, essentially, and he was let go.  He wasn't taken into custody.

Q.    What did you do with that information?

A.    So, a few hours later, myself, again, and Agent Uribe thought it might be a good idea just to verify his address.  So we decided to go to the address that he gave us on Bellevue Drive.  And we knocked on the door. We were allowed entry into the apartment, and we were directed to a back bedroom where he was staying.

Q.    What did you do with -- with respect to that back bedroom?

A.    So, we located a female in the room there, and she said that Mr. Cerritos had just left to go get dinner.  So, I verified that she was staying there, that she had control of the room, and that some of her things were there.

So I asked Agent Uribe to ask her if we could have consent to search the room, which was granted.  And upon a consent search of the room, I located heroin.

1    Q.   With the help of the court security officer, can
2    I show you what's been marked as -- in the binder --
3    Government's Exhibit 110-B, C, D, E, and F.
4    A.   All right.
5    Q.   Do you recognize these photographs?
6    A.   I do.
7    Q.   What are they, generally?
8    A.   They're photographs that I took on that night.
9    Q.   And, where were they taken?
10   A.   So, 110-B was actually --
11   Q.   Just generally speaking, in what room were they
12   taken?
13   A.   Three of them -- well, two of them were taken in
14   the room.  Two of them were taken at my office.
15           MS. MARTINEZ:  Your Honor, the government
16   would offer Government's Exhibits 110-B, C, D, E, and F
17   into evidence.
18           THE COURT:  Received without objection.
19           MS. MARTINEZ:  And, may we publish,
20   Your Honor?
21           THE COURT:  Yes.
22           MS. MARTINEZ:  Let's start with Government's
23   Exhibit 110-B.
24           THE WITNESS:  And did you say E as well?  Or
25   no.

1          MS. MARTINEZ:  I did; B, C, D, E, and F.

2          Do you have all of those there?

3          Your Honor, we would offer Government's

4    Exhibit 110-B through F, inclusive.

5          THE COURT:  Received.

6          MS. MARTINEZ:  Thank you.

7    BY MS. MARTINEZ:

8      Q.   Let's start with Government's Exhibit 110-B,

9    first of all.  Where was this photograph taken?

10     A.   This was inside his room on -- or inside the

11   room, the apartment that we had did the consent search

12   on that day.

13     Q.   Did you place these items here to be

14   photographed?

15     A.   No.  They were there, and I just took picture of

16   this to show that he had ties to the room.

17     Q.   Moving to 110-C.  What is 110-C?

18     A.   So, actually, earlier I misspoke.  Actually, the

19   only picture that I took that was inside the room was

20   the one we just discussed.  The rest of the photos were

21   all taken at my office.

22          But 110-C, these are items that were found inside

23   the bookbag, of which where also the heroin was found.

24     Q.   Where was the bookbag?

25     A.   It was inside of a closet inside the room.

1    Q.   Moving on to 110-D?

2    A.   And this was the suspected black tar heroin.

3    Q.   Where was that found?

4    A.   Inside the backpack, bookbag.

5    Q.   Moving to 110-E?

6    A.   This is how the back tar heroin was sealed.  It

7    was -- as you can see, it was rolled up in a plastic, a

8    plastic cellophane of sorts, and it was inside that

9    smaller Ziploc baggie, and it was down inside this

10   canister here.

11   Q.   110-F?

12   A.   So, this was a picture that I took back at the

13   office, just trying to get a weight on the suspected

14   heroin.

15   Q.   Was there anything else that you found during the

16   search of this room?

17   A.   Yes.  There was two notebooks that I had also

18   seized.

19   Q.   With the help of the court security officer, can

20   we show you Government's Exhibits 41-A and B, which are

21   already in evidence.

22        What are Government's Exhibit 41-A and B?

23   A.   So, these are the two notebooks that I had seized

24   on that night, same night.

25   Q.   Where were they seized from?

```
1        A.   From two bedroom.  And they were laying on the

2   bed, actually next to the summons -- a copy of his

3   summons from earlier in the night.

4              MS. MARTINEZ:  And, Your Honor, these are

5   already in evidence.  May we ask for the court security

6   officer to remove them from the bags and just show the

7   jury, so they're reminded of what exhibits these are?

8              THE COURT:  Yes.

9   BY MS. MARTINEZ:

10       Q.   And I apologize, you may have just said this, but

11  where were those seized from?

12             Where were they located in the room?

13       A.   On the bed.

14       Q.   I'd like to direct your attention now to

15  June 24th, 2014.  What steps did you take with respect

16  to this investigation on that day?

17       A.   Well, this investigation actually started on

18  June 5th, but it was a -- it was a robbery, assault

19  investigation that I assisted another officer,

20  Officer Sylvester on.

21       Q.   On June 24th, 2014, what steps did you take?

22       A.   There was a -- we developed a suspect, and, I

23  know that he was eventually arrested on June 23rd.  And

24  I believe that we had done a search warrant on, I

25  believe it was June 20th, at his location, at his
```

1    residence.

2        Q.   I apologize.  Perhaps I have the date wrong.

3             First of all, let's start with:  Who is the

4    subject of this search?

5        A.   Mr. Villanueva, Lil Slow.

6        Q.   And what was the date of the search?

7        A.   I believe it was on June 20th, 2014.

8        Q.   Where was the search conducted?

9        A.   At his residence, that we had determined.

10       Q.   And, what did you find, if anything, during the

11   course of the search?

12       A.   So, we were directed by his family that he was --

13   all his items were inside a hall closet.  And so they

14   directed us to the hall closet, and I actually started

15   searching there.

16       Q.   With the help of the court security officer, I'd

17   like to show you Government's Exhibits 113-A, B, C, and

18   D.

19            Do you recognize these exhibits?

20       A.   I do, ma'am.

21       Q.   What are they?

22       A.   Okay.  So, these are pictures that myself and

23   Officer Sylvester had taken of the narcotics.  Three of

24   them are from the drugs, narcotics that was seized, and

25   one of them is a picture of the package that the

1    marijuana was in.

2                MS. MARTINEZ:  Your Honor, government would

3    offer Government's Exhibits 113-A, B, C, and D into

4    evidence.

5                THE COURT:  113-A, B, C and D will be

6    received.

7                MS. MARTINEZ:  May we publish, Your Honor?

8                THE COURT:  Yes.

9                MS. MARTINEZ:  Let's start with 113-A.

10               THE WITNESS:  So, this was suspected

11   methamphetamine that was found inside that canister,

12   it's on the left there.  And it was inside a jacket or a

13   shirt that was inside the closet.

14   BY MS. MARTINEZ:

15       Q.   Where was this picture taken?

16       A.   This was taken back at the office, our office.

17       Q.   Turning to 113-B.

18       A.   So, this is the package that the marijuana, 113-C

19   and 113-D, was packaged in when it was inside the

20   closet.

21       Q.   Let's go to 113-C.  What is 113-C?

22       A.   The green leafy substance, suspected marijuana,

23   that was inside that envelope or that package I just

24   mentioned.

25       Q.   And 113-D?

1    A.   Same; just another picture of it.

2    Q.   With the help of the court security officer, can

3    I show you, please, Government's Exhibits 117-A, B and

4    C.

5    A.   Okay.

6    Q.   What are those exhibits?

7    A.   So, 117-A, 117-B, is the green leafy substance,

8    suspected marijuana.

9    Q.   Now, you said those exhibits numbers together.

10   Can you explain that to the jury?

11   A.   So, they were both found in the same package and

12   put in the package together.  And I believe that they

13   were tested individually, so that's why there would be

14   two different numbers.

15   Q.   And the other?

16   A.   The other one is the suspected methamphetamine

17   that was found inside the closet as well.

18   Q.   And what is that Government's Exhibit Number?

19   A.   117-C.

20        MS. MARTINEZ:  Your Honor, the government

21   would offer Government's Exhibits 117-A, B and C into

22   evidence.

23        THE COURT:  Received.

24   BY MS. MARTINEZ:

25   Q.   And, may I now show you, with the help of the

1    court security officer, 113-H.

2         And while he's getting that, could you hold those

3    items up so the jury can see them?

4    A.   Sure.

5    Q.   Let's start with 117-A and B.  What is that?

6    A.   That's the suspected marijuana that was inside

7    the package.

8    Q.   And, 117-C.

9    A.   Suspected methamphetamine, also found in the

10   closet.

11   Q.   Directing your attention to Government's

12   Exhibit 113-H, that Mr. Toliver has there, what is that

13   exhibit?

14   A.   Again, it's another certificate of analysis,

15   state lab, testing the materials that we turned over to

16   them.

17             MS. MARTINEZ:  Your Honor, pursuant to the

18   previous stipulation, the government would offer 113-H

19   into evidence.

20             THE COURT:  Received.

21             MS. MARTINEZ:  May we publish?

22             THE COURT:  Yes.

23             MS. MARTINEZ:  And if we could zoom in

24   there.

25   BY MS. MARTINEZ:

1    Q.   Let's start with item one.  What is item one --
2  or item 1A, I suppose.
3    A.   Yes.  So, item one is -- it actually contains
4  items 1A and 1B, and it is the suspected marijuana,
5  plant material.
6    Q.   What was the result of that testing?
7    A.   Well, for 1A, it was .3783, plus or minus .0027
8  grams --
9            THE REPORTER:  I'm sorry?
10           THE WITNESS:  Yes, ma'am?  Was that too
11  fast?
12           THE COURT:  That was really fast.
13           THE WITNESS:  Too fast.  Sorry.
14           THE COURT:  We can't think as fast as you
15  can speak.
16           THE WITNESS:  So, item 1A, it was tested
17  positive for marijuana, and it's .3783, plus or minus
18  .0027 grams.
19           And then for the 1B, also tested positive
20  for marijuana, and that's 4.8349, plus or minus
21  .0027 grams.
22  BY MS. MARTINEZ:
23    Q.   How about item two.  What is item two?
24    A.   Item two is the one sealed evidence bag
25  containing the two Ziploc baggies of suspected crystal

1    meth.

2        Q.   All right.  And are items, 1A and 1B and 2, there

3    with you and admitted into evidence?

4        A.   Yes.

5        Q.   All right.  Now, there's also an item three on

6    this certificate.  Do you know what item three is?

7        A.   I do.  It was another suspected baggie of meth,

8    that was found in the living room of this apartment.

9        Q.   And, why do you differentiate that item?

10       A.   Because, in my opinion, it wasn't -- it wasn't a

11   part of his property, so, I didn't feel that it was tied

12   to him.

13       Q.   But it was included on this certificate; is that

14   right?

15       A.   It was, because it had to be seized.  Obviously,

16   we can't leave illegal substances in an apartment.

17       Q.   All right.  In addition to the seizures of the

18   heroin and the marijuana, was there anything else seized

19   during that search?

20       A.   During that search, then a search warrant, there

21   were a number of things seized, yes.

22       Q.   Was there a cellphone seized?

23       A.   There was a cellphone seized.  But the cellphone

24   that was used in this case was actually seized from

25   Mr. Villanueva on June 23rd.

1      Q.   Your memory is better than mine.

2           Let me direct your attention to June 23, 2014.

3   What, if any, interaction did you have with a defendant

4   in this case on June 23rd, 2014?

5      A.   This is where my memory is not so great.  I do

6   not -- I do not remember if I actually interacted with

7   Mr. Villanueva on that day, but he was arrested in

8   Fairfax County.  His phone was seized by the officer,

9   and then it was turned over to Officer Sylvester and --

10  essentially myself, and then we -- I assisted Officer

11  Sylvester with running a search warrant for the phone.

12     Q.   Was the phone ultimately searched?

13     A.   It was.

14     Q.   And did you have an opportunity to review any

15  results of that search?

16     A.   I did.

17          MS. MARTINEZ:  Your Honor, may we show the

18  witness what is already admitted as Government's

19  Exhibit 113-E?

20          We can just publish it, if the Court's okay

21  with that, Mr. Toliver.

22          THE COURT:  Fine.

23          MS. MARTINEZ:  All right.  Government's

24  Exhibit 113-E.

25  BY MS. MARTINEZ:

1    Q.   Do you recognize this photograph?

2    A.   I do.

3    Q.   Where did it come from?

4    A.   It was one of the pictures that were on his

5    phone.

6    Q.   113-F.  Do you recognize this picture?

7    A.   Yes, ma'am.  Another picture on his phone.

8    Q.   And 113-G.  Do you recognize this?

9    A.   Yes, ma'am.  Another picture that was found on

10   his phone.

11   Q.   And just to be clear, whose phone?

12   A.   Villanueva.

13   Q.   All right.  Now, earlier, when you started

14   talking about the investigation, you mentioned the

15   information received by Drowsy in late September of

16   2013.  I'd like to direct your attention to that.

17   A.   Uh-huh.

18   Q.   All right.  What, if any, involvement did you

19   have with respect to that particular event in this

20   investigation?

21   A.   So, the information obviously came to us from

22   Prince William.  And on September 30th, I actually

23   arranged for an operation to occur in Fairfax County,

24   because the meeting was supposed to occur in Culmore.

25   So I met up with Special Agent Hicks, other FBI agents,

1   and I believe Prince William County Street Crimes might

2   have assisted as well, and we conducted an operation, a

3   surveillance operation.

4       Q.   What was the purpose of that surveillance

5   operation?

6       A.   To obtain information in regards to the attempt

7   murder on Peligroso.

8       Q.   Now, after the operation related to the attempted

9   murder on Peligroso, what was the next significant step

10  in this investigation?

11      A.   So, the attempt murder on Peligroso, coupled with

12  the information that we had developed referenced Lagrima

13  being killed, we decided that the best option for us to

14  do was to go up on a consensual wire on Junior's phone.

15      Q.   What is a consensual wire?

16      A.   Essentially, the informant or the confidential

17  human source has to agree that he will allow us to

18  monitor his phone calls.  And it's basically I fill out

19  paperwork that gives consent for us to listen to any and

20  all calls that come in on that phone.

21      Q.   And what was the purpose of putting a consensual

22  wire on his phone?

23      A.   To capture all the calls coming in and out to his

24  phone.  It's -- it's very difficult for -- if someone

25  were to call him and he's not ready for the call, for

1    the call to be recorded.

2         There are ways that you can do that, where if

3    someone calls in, he would say, "Hey, I have to call you

4    back," and then he calls the number, and then that

5    person -- then he calls that number back and it can be

6    recorded.

7         It's very difficult to do that.  So, obviously,

8    the easiest thing to do is to do the consensual

9    monitoring, so all the phone calls are recorded, coming

10   in and out.

11   Q.   In addition to the consensual wire on Junior's

12   phone, how else did you utilize Junior during the course

13   of this investigation?

14   A.   So, we also -- there were numerous surveillance

15   operations that occurred, a lot of clique meetings --

16   I'm sorry, not clique meetings -- program meetings and

17   general meetings that he attended.

18   Q.   All right.  You just talked about three different

19   kinds of meetings.  Let's clarify that.  You said clique

20   meetings first.  What do you mean by "clique meetings"?

21   A.   So, the reason I apologized for saying "clique

22   meeting" is because Junior is with the Silvas clique.

23   So, it's very -- I don't want to say it's impossible,

24   but it's very unlikely that Park View, the clique of

25   Park View, would invite him to a clique meeting.  Junior

1   would have his own clique meetings with Silvas.  Park

2   View is going to have their own clique meetings.  So,

3   that's a clique meeting.

4        Then you have your program meetings.  And, your

5   program meetings and your general meetings are usually

6   one and the same.  And, essentially what that is, is you

7   have programs, and it's essentially a -- an umbrella.

8   So under the program you have multiple cliques that can

9   fall under the program.

10       You could have Park View clique, you could have

11  Silvas clique, you could have Pinos clique, and all

12  these different cliques will fall under that program.

13  The first and second words of those cliques would attend

14  meetings, at hotels or wherever, parks, that they

15  decide.

16  Q.   How was Junior utilized with respect to these

17  program and general meetings?

18  A.   So, I believe every time, but if not every time,

19  most every time, he was wired up with a recorder, so

20  everything that was being discussed would be recorded.

21  And he was also provided with a transmitter, so we could

22  also hear what was going on.

23  Q.   What was your role during these operations?

24  A.   My main role was surveillance, obviously

25  gathering information, tags, anything going on, letting

1    everyone else on the perimeter know what's going on.

2    And also, if we ever had to do what they call a CI

3    rescue, where if he's in trouble we need to go in and

4    rescue him, that's another part that we be a part of.

5           And something that MS has stepped up within the

6    last few years is, they -- they have started doing

7    countersurveillance.  So while we're out there, they

8    actually have *paro*s and *chequeo*s looking for us.  So the

9    other aspect of our job is, hey, we see so and so

10   walking through the parking lot, the is

11   countersurveillance, and we would let other people know

12   that.

13     Q.   I'd like to direct your attention to

14   December 14th, 2013.  Were you involved in any

15   surveillance with respect to Junior on that date?

16     A.   Yes.  I believe that one is one of the -- one of

17   two that I was present at, that was at the Quality Inn

18   down in Woodbridge, on Horner Road.

19     Q.   What was the purpose of the operation on that

20   day?

21     A.   That was a program meeting, and essentially it

22   was just to gather intelligence, to listen what they

23   were going to talk about.  Usually, in these types of

24   meetings they make contact with El Salvador, the

25   leadership in El Salvador.

1    Q.   What was your role with respect to the operation

2  on December 14th, 2013?

3    A.   The same as I previously mentioned, you know,

4  surveillance, getting tags, seeing who is coming and

5  going.  I was getting familiarized, obviously, with the

6  people involved so I can let people know who so and so

7  is when we see them walking through the parking lot,

8  et cetera.

9    Q.   Why is it important to let people know who

10 particular people are?

11   A.   Just for documentation purposes more than

12 anything else.  And, obviously, we just -- you know, one

13 of our main jobs is to identify these individuals

14 involved in our investigation.

15             MS. MARTINEZ:  Your Honor, I'd like to show

16 the witness what has already been admitted as

17 Government's Exhibit 81-B.  May we publish it?

18             THE COURT:  Yes.

19 BY MS. MARTINEZ:

20   Q.   Do you recognize this photograph?

21   A.   I do.

22   Q.   And how do you recognize it?

23   A.   I remember seeing this from a while ago.

24 Obviously, this was -- this surveillance was a while

25 back.  But, I've seen it a while ago and I have seen it

1    recently as well.

2        Q.   And when was this surveillance?

3        A.   This was 12-14-2013.

4        Q.   Do you recognize any of the individuals in this

5    photograph here?

6        A.   I do not recognize the guy to the far left.  The

7    guy in the white shirt there, that's Greñas, and that's

8    Jose Lopez Torres, seated at the front row here next to

9    counsel, with the blue shirt on.

10            And then Skinny is next to Greñas, and he's --

11   yeah.

12       Q.   Who is Skinny?

13       A.   Juan Carlos Marquez, which he testified

14   previously.

15       Q.   I'd like to direct your attention now to

16   February 23rd, 2014.  Were you involved in any

17   surveillance related to Junior on that date?

18       A.   Yes.  I believe that -- that meeting was also at

19   this same hotel.

20       Q.   And where was that hotel?

21       A.   In Woodbridge.  Sorry.

22       Q.   What was the purpose of the operation on

23   February 23rd, 2014?

24       A.   Same as before.

25       Q.   What was your role?

1        A.   Same as previously mentioned.

2             MS. MARTINEZ:  Your Honor, I'd like to show

3   the witness photographs that are already in evidence.

4   May we publish them?

5             THE COURT:  Yes.

6             MS. MARTINEZ:  Starting with Government's

7   Exhibit 82-C.

8   Greñas

9        Q.   Do you recognize this photograph?

10       A.   I do.

11       Q.   And what is it from?

12       A.   This is from the -- the meeting we were just

13   discussing.

14       Q.   Do you recognize any of the individuals in this

15   photograph?

16       A.   I do.  I'll start with the far right side.  So,

17   first individual is Stone, with the Silvas clique.  The

18   second one is Hansel.  Third is Uzi.  He is also with

19   the Silvas.

20            And then Lil Payaso, who is seated in the back;

21   he's wearing a white shirt with stripes on his tie, Omar

22   Castillo.

23            And then this is Junior.  And I can't tell who is

24   to the left of Junior.

25       Q.   Turning to 82-D, When was this photograph from?

1     A.   It's from the same surveillance.

2     Q.   Do you recognize that individual?

3     A.   I do.  That's Douglas Cerritos.

4     Q.   How else do you know Douglas Cerritos?

5     A.   Lil Poison.

6     Q.   Moving to 82-G, When was this photograph from?

7     A.   It's from the same -- same surveillance.

8     Q.   Do you recognize any of the individuals in this

9     photograph?

10    A.   I do.  I'm going to start with the far right

11    again.  You've got Lil Poison here.

12         I'm not sure who that dude is.

13         The guy to his left, I believe that's Sambra, but

14    from GLCS clique, Guanacos, Lil Sycos, not the Sambra

15    from Silvas that I think has been discussed.

16         Next to him here, over here, is Lil Payaso again.

17         Far left, I don't know who this individual is.

18         And then this individual here is Chucky.  He was

19    the East Coast program leader.

20    Q.   Now, I'll direct your attention to March 30th,

21    2014.  Were you involved in any surveillance with

22    respect to Junior on March 30th, 2014?

23    A.   I was.  That -- that one was in Lorton.  That was

24    in Fairfax County.

25    Q.   What was the purpose of that operation?

1    A.   Same as before, again just gathering information,

2  see what El Salvador had to say, how they're directing

3  our MS guys up here.

4    Q.   And what was your role?

5    A.   Same as before, as I mentioned before.

6    Q.   What, if anything, did you observe during your

7  surveillance?

8    A.   I don't recall seeing pictures from this

9  surveillance, but I remember while I was there in the

10  parking lot there was a tan Hyundai with a green hood

11  that pulled into the parking lot.  And I knew that the

12  *paro*, Hector Chavarria, had -- he drives that vehicle

13  often, and it's his vehicle.

14       Later on in the surveillance, I had actually

15  moved out of the parking lot, went down the street to

16  watch vehicles drive -- leaving the parking lot.  And,

17  as the vehicle drove past me, I observed

18  Douglas Cerritos in the vehicle, Lil Poison.

19    Q.   Directing your attention now to July 27th, 2014,

20  were you involved in any surveillance with respect to

21  Junior on that day?

22    A.   Yes, ma'am.

23    Q.   Where was that surveillance?

24    A.   That one was in a park in Woodbridge, Prince

25  William County.

1    Q.   What was the purpose of the operation on
2    July 27th, 2014?
3    A.   Information was developed that two *chequeos* were
4    to be jumped into MS-13.
5    Q.   What was your role?
6    A.   Essentially, again -- I don't want to sound like
7    a broken record, but obviously to gather information --
8    actually, it's a little different, I guess, in this
9    case -- but, to gather information from the meeting that
10   was supposed to occur; and also, since we had
11   information that there was supposed to be a jump in,
12   which obviously is an assault, we also wanted to make
13   sure that we prevented that from occurring.
14   Q.   What was the plan to prevent that assault, that
15   jump in, from occurring?
16   A.   So, we had to verify that there was actually
17   going to be a meeting, or that the individuals showed
18   up.  They did, in fact, show up.  And, we had
19   coordinated with the police to do a drive-by, come --
20   bring the cruiser down into the park to kind of drive by
21   the individuals, to spook them, so they wouldn't carry
22   out the jump in.
23   Q.   What did you observe during the surveillance?
24   A.   I remember I was in the back of one of the
25   vehicles.  I don't recall who was driving the vehicle I

```
 1   was in.  But I remember seeing Pesadilla, who is -- I
 2   can't see him from here, but -- he's in the second --
 3   second table, with the yellow shirt on.  I remember
 4   seeing Pesadilla, Junior was there, and, I remember
 5   seeing Lil Payaso as well.
 6      Q.   How else do you know Pesadilla, by what other
 7   name?
 8      A.   Lil Tuner.
 9           MS. MARTINEZ:  Your Honor, may we show the
10   witness what has already been admitted as Government's
11   Exhibit 84-A?
12           THE COURT:  Yes.
13   BY MS. MARTINEZ:
14      Q.   When was this picture taken?
15      A.   July 27th, 2014.
16      Q.   Do you recognize these individuals?
17      A.   I do, ma'am.
18      Q.   Who are these individuals?
19      A.   Lil Payaso here, and then Junior here.
20      Q.   Is that the Lil Payaso we have talked about
21   during the course of this case?
22      A.   Yes, ma'am.
23      Q.   One of the defendants in this case?
24      A.   Yes, ma'am.
25      Q.   Where was this picture taken?
```

1     A.   It was in that same park in Prince William

2  County.

3          MS. MARTINEZ:  And, Your Honor, may we show

4  the witness what has already admitted as 84-B?

5          THE COURT:  Yes.

6  BY MS. MARTINEZ:

7     Q.   Where was this photograph taken?

8     A.   That's during the same surveillance, same

9  operation in the same park in Prince William County.

10  And that's Pesadilla.

11     Q.   And is that the same Pesadilla we've talked about

12  throughout this case?

13     A.   Yes, ma'am.

14     Q.   One of the defendants?

15     A.   Yes, ma'am.

16     Q.   Now, Detective Betts, at what point did this

17  investigation become a homicide investigation?

18     A.   For the longest time we actually treated it as a

19  missing persons.  The -- for me, and I feel that for

20  Uribe as well, it didn't become a homicide investigation

21  until the day that we found the first body.

22     Q.   Well, let's focus on the missing persons aspect

23  of the investigation.  Who were the missing persons,

24  when it was a missing persons investigation?

25     A.   For the longest time we only knew that Lagrima

was one.  And eventually we were able to determine that
his real name was Nelson Quintanilla.  And then the
second individual was Lil Guasón, or his given name is
Gerson Martinez.

Q.  And once the investigation became a missing
persons investigation, what steps did you take?

A.  We obviously conducted numerous interviews of
multiple people.  We checked ICE records, immigration
records, because we couldn't find either of the
individuals.  We wanted to make sure that they hadn't
been deported.  We checked jail records.  We obviously
utilized a lot of Junior's phone calls, the information
we were getting from Junior's phone calls.

Q.  Are you familiar with the operation where Junior
was actually led into the park where the bodies were
buried?

A.  I am familiar with it, yes.

Q.  Prior to the day of that operation, were there
any attempts to locate the murder scenes or the bodies?

A.  Yes.  So, like I mentioned, there was a number of
phone calls, of which already discussed in this trial.
And, during some of those phone calls, myself and Agent
Uribe and Agent Pixton (phonetics) went to the park in
Holmes Run Park and tried to find the locations via the
directions that were being given to Junior over the

1    phone.

2                    THE COURT:  Excuse me.

3                    MS. MARTINEZ:  Yes, Your Honor.

4                    THE COURT:  We've reached that hour.

5                    Ladies and gentlemen, please do not discuss

6    the case with anyone.  Do not permit the case to be

7    discussed in your presence.  Don't do any posting on

8    social media or reading anything on the Internet, news

9    media about the case.  And don't visit any of the

10   locations mentioned during the trial.  Leave your notes

11   in the jury deliberation room.

12                    We will resume tomorrow at 10:00 o'clock.

13   Thank you.

14                    (Proceedings concluded at 5:00 p.m.)

15                                      ---

16

17

18

19

20

21

22

23

24

25

```
 1
 2                   CERTIFICATE OF REPORTER
 3
 4            I, Renecia Wilson, an official court
 5   reporter for the United States District Court of
 6   Virginia, Alexandria Division, do hereby certify that I
 7   reported by machine shorthand, in my official capacity,
 8   the proceedings had upon the jury trial in the case of
 9   UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.
10            I further certify that I was authorized and
11   did report by stenotype the proceedings in said jury
12   trial, and that the foregoing pages, numbered 1 to 259,
13   inclusive, constitute the official transcript of said
14   proceedings as taken from my shorthand notes.
15
16            IN WITNESS WHEREOF, I have hereto
17   subscribed my name this  26th  day of  May , 2016.
18
19                       /s/
20                       Renecia Wilson, RMR, CRR
                         Official Court Reporter
21
22
23
24
25
```