IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,                )
                                         )
                        Plaintiff,       )
                                         ) Crim. No. 1:14cr306
        vs.                              )
                                         )
JOSE LOPEZ TORRES, ALVIN GAITAN          ) April 26, 2016
BENITEZ, CHRISTIAN LEMUS CERNA,          )
OMAR DEJESUS CASTILLO, MANUEL            )
ERNESTO PAIZ GUEVARA, and                )
JESUS ALEJANDRO CHAVEZ,                   )
                                         )
                        Defendants.      )
_____ )


JURY TRIAL


BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                  BY:  JULIA MARTINEZ, AUSA
                       TOBIAS TOBLER, AUSA


                        ---


OFFICIAL COURT REPORTER:

                  RENECIA A. SMITH-WILSON, RMR, CRR
                  U.S. District Court
                  401 Courthouse Square, 5th Floor
                  Alexandria, VA 22314
                  (703)501-1580

1    APPEARANCES (Continued)

2    FOR DEFENDANT JOSE LOPEZ TORRES

3         BYNUM & JENKINS, PLLC
          BY:  ROBERT L. JENKINS, JR., ESQ.
4         THE LEIVA LAW FIRM, PLC
          BY:  MANUEL E. LEIVA, ESQ.
5
     FOR DEFENDANT ALVIN GAITAN BENITEZ
6
          LAW OFFICE OF AMY LEIGH AUSTIN
7         BY:  AMY LEIGH AUSTIN, ESQ.
          SMITH & ZIMMERMAN, PLLC
8         BY:  JEFFREY D. ZIMMERMAN, ESQ.

9    FOR DEFENDANT CHRISTIAN LEMUS CERNA

10        LAW OFFICE OF CHRISTOPHER AMOLSCH
          BY:  CHRISTOPHER AMOLSCH, ESQ.
11        FRANK SALVATO, ESQ.

12   FOR DEFENDANT OMAR DEJESUS CASTILLO

13        FIRSTPOINT LAW GROUP, PC
          BY:  KATHERINE MARTELL, ESQ.
14        OLD TOWN ADVOCATES, PC
          BY:  MEREDITH M. RALLS, ESQ.
15

16   FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

17        LAW OFFICE OF W. MICHAEL CHICK, JR.
          BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
18
     FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
19
          JEROME P. AQUINO, ESQ.
20        ELITA C. AMATO, ESQ.

21
                              ---
22

23

24

25

INDEX

PRELIMINARY MATTERS                                              4

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Raymond E. Betts | 9 | 29 | 111 | --- |

(Rule 29 motions not part of transcript)

| WITNESS (Defendants) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael Garcia | 128 | --- | --- | --- |
| Brenda K. Born | 137 | 151 | --- | --- |
| Victor Ignacio | 154 | --- | --- | --- |

(Court recessed)

---

<u>PROCEEDINGS</u>

(Thereupon, the following was heard in open court at 10:07 a.m.)

(Jury not present.)

THE CLERK:  1:14 criminal 306, United States versus Jose Lopez Torres, Alvin Gaitan Benitez, Christian Lemus Cerna, Omar Dejesus Castillo, Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez; with Spanish interpreters previously sworn.

THE COURT:  Good morning.

PRELIMINARY MATTERS

MR. SALVATO:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. SALVATO:  Quickly, Frank Salvato for Mr. Cerna.

Your Honor, when we left off yesterday, Detective Betts, I think, was about to launch into a description of the recovery of bodies, once again from Holmes Run Park.

We would object to any evidence as to the actual recovery as cumulative at this point, Your Honor. I think the jury has heard an enormous amount of information about that situation.

If he wants to talk about any forensic

1    testing or anything new, I think that would be
2    appropriate.  But, I would ask the Court to limit this
3    witness from going through, once again, the body
4    recovery mission.  I think the jury has already heard it
5    from at least one or two agents, as well as Mr. Garcia.
6    So we would object to it as cumulative.
7            It seems like it's almost a summary
8    witness -- I think that's Rule 1006 -- which is only
9    permitted in cases of voluminous material.
10           So, we would object if the government is
11   going in that direction, to go through that and rehash
12   that again.  We would object to that testimony.
13           THE COURT:  All right.
14           MS. MARTINEZ:  Your Honor, we're not going
15   to go in detail to repeat all the details of the
16   recovery of these bodies.  Detective Betts will be
17   testifying only about his own direct involvement in the
18   scope of this case.
19           He's not a summary witness.  He's testifying
20   about what his role in the investigation was.  He has
21   very little testimony about the recovery of the bodies,
22   including location and that sort of thing.
23           But, we're not planning on going back over
24   in detail all of the facts that have already been
25   established with respect to how the bodies were

1  recovered; but to establish his role in the

2  investigation, very brief testimony, for example, of his

3  knowledge and what led, from his perspective, without

4  getting any hearsay, what led them to the park.

5          He actually was about to testify, I believe,

6  about looking in the park prior to Junior being led to

7  those bodies, and that is not cumulative and not

8  repetitive of what we have already heard about the

9  actual recovery.

10          But we are not going back into the pictures

11  of the recovery of the bodies.  We're not going back

12  into a step-by-step description of how those bodies were

13  recovered, or the sort of thing that we have already

14  heard testimony about.

15          So, this is supplemental and different, and

16  not repetitive of what we've already heard.  But I think

17  Your Honor would be satisfied, there's very little about

18  the actual recovery of the bodies in Detective Betts's

19  direct examination.

20          THE COURT:  Was he engaged in surveillance

21  of Junior when Junior went back to the grave site with

22  an individual?  Was he personally there for

23  surveillance?

24          MS. MARTINEZ:  Your Honor, I --

25          THE COURT:  You're not planning to go

through that.

MS. MARTINEZ:  I'm not planning on going into surveillance of Junior going back with Leopardo to the park.

THE COURT:  Okay.  I think that matter is resolved.

Is there something else, Mr. Salvato, that you wanted to bring to my attention?

MR. SALVATO:  No, Your Honor.

THE COURT:  Okay.

MR. SALVATO:  But there is one issue as to some government exhibit, but we don't need to hold up the jury on that.

THE COURT:  Okay.  All right.

MS. AUSTIN:  Your Honor, in that regard, this prompts a request that -- that Officer Betts -- Detective Betts limit his answers to the questions as to the facts that he knows them.

Yesterday, in his testimony, a few of his answers included phrases, "as you have heard from others at this trial," and, "as you have heard."  It's as though he is being presented as a summary witness.  He has been able to sit and listen to all the testimony.

But I don't believe his wrapping it up and trying to corroborate other testimony that's been

1    presented with his testimony is proper.

2              He has questions presented to him.  He needs

3    to answer them and not bolster his testimony with

4    phrases that make it seem that his testimony

5    corroborates the testimony of others.

6              THE COURT:  All right.  And I'm sure you

7    will object if he does it.

8              MS. AUSTIN:  Thank you.

9              THE COURT:  Ready to bring the jury out now?

10             All right.  You can bring the jury out,

11   Mr. Toliver.  Thank you.

12             Can you bring the witness back.

13             (Witness resumed stand.)

14             (Jury present.)

15             THE COURT:  You may be seated.

16             Good morning, ladies and gentlemen.

17             THE JURORS:  Good morning, Your Honor.

18             THE COURT:  Good morning, Mr. Manuel Ernesto

19   Paiz Guevara; good morning.

20             Good morning, Mr. Omar Dejesus Castillo;

21   good morning.

22             Good morning, Mr. Jesus Alejandro Chavez;

23   good morning.

24             Good morning, Mr. Alvin Gaitan Benitez; good

25   morning.

1          Good morning, Mr. Jose Lopez Torres; good
2  morning.
3          Good morning, Mr. Christian Lemus Cerna.
4          Good morning, Detective Betts.
5          Counsel, are you ready to proceed?
6          Good morning, Counsel.
7          MS. MARTINEZ:  Good morning Your Honor.
8          THE COURT:  You may proceed.
9          THEREUPON, RAYMOND E. BETTS, previously duly
10 sworn, testified further as follows:
11            DIRECT EXAMINATION (Continued)
12 BY MS. MARTINEZ:
13   Q.  Good morning, Detective Betts.
14   A.  Good morning, ma'am.
15   Q.  When we left off yesterday afternoon, I believe
16 we were talking about attempts that you made to locate
17 the scene of the murders, or the burial of the bodies,
18 prior to Junior being led to those graves.  Would you
19 please tell the jury about that?
20   A.  Yes, ma'am.  So, as I said yesterday, myself and
21 Agent Uribe and another agent, Agent Pixton, had
22 utilized some of Junior's phone calls that had come in.
23 There was one specific call that actually gave walking
24 distance -- or walking directions to where the bodies
25 might have been, or was, or were.

1          So, we attempted to locate the crime scene of

2     sorts by using the call.  And, at the time, on that day

3     we didn't find anything that was obvious to us, where it

4     occurred or where the bodies were.

5          Q.   Where were you looking?

6          A.   We were in Holmes Run Park.  It's also -- I think

7     there's actually two parks there, Lillian Carey Park, I

8     think it's called, but Holmes Run Park is the larger

9     park of the two.

10         Q.   Where are these parks?

11         A.   They're in Fairfax County, in Falls Church,

12    behind Barcroft View Apartments.

13              BY MS. MARTINEZ:  Your Honor, may we publish

14    what has already been admitted as Government's

15    Exhibit 96-B?

16              THE COURT:  Yes.

17    BY MS. MARTINEZ:

18         Q.   Detective, do you recognize this photograph?

19         A.   I do.

20         Q.   What is it?  What does it show?

21         A.   So, this is the park, Holmes Run Park.  And on

22    the far right, I don't remember the name of the school.

23    I think someone has referred to it as a school.  But,

24    this is a large school here.  And, the park that we were

25    inside is essentially the section here.

1    Q.   And when you say the park that you were inside,

2    do you mean when you and Agent Uribe were looking for

3    the burial scenes?

4    A.   That's correct, ma'am.

5    Q.   And do you have an understanding of where the

6    bodies were ultimately found, generally speaking?

7    A.   To be honest with you, looking at this, I

8    can't -- I wouldn't be able to point exactly where the

9    bodies were from this aerial view.

10   Q.   Do you know whether it's on the picture that's

11   shown here?

12   A.   Yes.  Within the circle, I believe both bodies

13   were found.

14          MS. MARTINEZ:  Your Honor, may we show the

15   witness, with the help of the court security officer,

16   Government's Exhibit 96-D?

17          THE COURT:  Yes.

18          THE WITNESS:  Okay.

19   BY MS. MARTINEZ:

20   Q.   Do you recognize Government's Exhibit 96-D?

21   A.   I do.

22   Q.   What is it?

23   A.   This is another aerial photo.  Within the photo,

24   I can see Barcroft View Apartments, and I can also see a

25   portion of Culmore.

 1          MS. MARTINEZ:  Your Honor, the government

 2   would offer Government's Exhibit 96-D into evidence.

 3          THE COURT:  Received without objection.

 4          MS. MARTINEZ:  May we publish?

 5          THE COURT:  Yes.

 6   BY MS. MARTINEZ:

 7     Q.   All right.  You mentioned -- well, first of all,

 8   is the park that we saw in the last photograph visible

 9   in this photograph?

10     A.   It is, ma'am.  It's going to be -- the park's

11   right there.  Just above that red line is the school I

12   mentioned earlier.

13     Q.   All right.  And just to orient the jury here, I

14   see a large street, basically in the middle of that

15   picture, horizontal to the horizon.  What is that street

16   there?

17     A.   Okay, ma'am.  I assume you're talking about this

18   road here, and that's going to be Columbia Pike.

19     Q.   All right.  And again to orient the jury, how

20   about Route 7; are you familiar with Route 7 in this

21   area?

22     A.   I am ma'am.

23     Q.   Where is Route 7?

24          First of all, is Route 7 shown in the photograph?

25     A.   No, it is not.

1    Q.   Where is Route 7 in -- in relationship to what is
2    shown in the photograph here?
3    A.   Okay.   If you were to continue down Columbia Pike
4    in this direction, you would continue on and eventually
5    you would run into Route 7, which essentially would run
6    this way.
7              MS. MARTINEZ:   Your Honor, may the record
8    reflect that the witness has drawn a horizontal line,
9    continuing off the left side of the photograph, and then
10   indicated that Route 7 would intersect with that
11   horizontal line outside the left area of photograph.
12             THE COURT:   So noted.
13   BY MS. MARTINEZ:
14   Q.   All right.   Now, you mentioned Barcroft.   First
15   of all, what is Barcroft?
16   A.   Simply an apartment complex.
17   Q.   And, where is Barcroft in this photograph?
18   A.   It's going to be this section here.
19             MS. MARTINEZ:   Your Honor, may the record
20   reflect that the witness has drawn a circle just south
21   of where he indicated, or just -- sorry -- just below in
22   the picture of where he indicated the park is.
23             THE COURT:   So noted.
24   BY MS. MARTINEZ:
25   Q.   You also mentioned Culmore.   First of all, what

1    is Culmore?

2        A.   Culmore also is an apartment complex.  And, it's

3    going to be closer to Route 7 than closer to -- Barcroft

4    is obviously closer to Columbia Pike.  Culmore is closer

5    to Route 7.

6        Q.   Where is Culmore on this photograph?

7        A.   Only a small portion of Culmore is shown here,

8    but it's going to be through here.

9             MS. MARTINEZ:  Your Honor, may the record

10   reflect that the witness has indicated the lower section

11   of the photograph?

12            THE WITNESS:  I actually believe this may

13   also be a portion of Culmore.

14   BY MS. MARTINEZ:

15       Q.   And you said that only part of it is shown.

16   Where -- in what direction from the photograph does

17   Culmore continue?

18       A.   So, as you're looking at the photo here, if you

19   go bottom left, so it continues up kind of at an angle,

20   and further off the bottom of the screen.

21       Q.   Detective, is this area that we're looking at

22   here in Fairfax County, within the Eastern District of

23   Virginia.

24       A.   It is, ma'am.

25       Q.   And in particular, the parks -- the park in which

1    the bodies were found, is that in the Eastern District

2    of Virginia.

3        A.   Yes, ma'am.

4        Q.   And as long as we're talking about location, I

5    want to return for a moment to your involvement in the

6    murder plot on Peligroso.

7        A.   Uh-huh.

8        Q.   Are you familiar with Garfield High School in

9    Woodbridge, Virginia?

10       A.   Yes.  I don't think I've ever actually been

11   there, but I am familiar with it.

12       Q.   You're familiar with its location?

13       A.   Yes.

14       Q.   Is it within the Eastern District of Virginia?

15       A.   It is, ma'am.

16       Q.   Continuing past your attempts to find these

17   bodies, once they were actually located within the park,

18   I believe you testified earlier that at that point, from

19   your perspective, the investigation became a homicide

20   investigation?

21       A.   Yes, ma'am.

22       Q.   What steps, if any, did you take to attempt to

23   determine the date of death of the first murder victim,

24   Nelson Omar Quintanilla Trujillo, Lagrima?

25       A.   It was kind of, as I mentioned yesterday, you

1  know, we -- we interviewed a lot of people.  There's a

2  lot of interviews that were done.  We checked

3  immigration records, checked jail records.  We utilized

4  Junior's source reporting, and also his phone calls.

5      Q.   And, were you able to determine a possible phone

6  number that Lagrima, Nelson Omar Quintanilla Trujillo,

7  was using at the time of his death?

8      A.   Yes, ma'am.

9           MS. MARTINEZ:  Your Honor, may we show the

10  witness what has been previously entered as Government's

11  Exhibit 101-B.

12           THE COURT:  Yes.

13  BY MS. MARTINEZ:

14      Q.   Detective, what is Government's Exhibit 101-B?

15      A.   Okay.  So, this is a -- essentially, a phone dump

16  report that you get when you pull all the information

17  off of a phone.  And specifically on this page, it's

18  showing the phone context -- contacts of -- that's the

19  phone number there, Demente's phone number.

20      Q.   If we could go to page three.

21           What, if any, phone number here in Demente's

22  contacts is significant to you, with respect to the

23  murder of Nelson Omar Quintanilla Trujillo?

24      A.   So, the phone contact number 20, he has it

25  labeled as "Lagri."

1     Q.   What is that phone number?

2     A.   It's 703-474-3558.

3     Q.   After learning this phone number associated with

4  Lagrima, were you -- what were you able to do to help

5  determine the date of the murder?

6     A.   We requested for a toll records.

7          MS. MARTINEZ:   Your Honor, may we show the

8  witness what has been already admitted as Government's

9  Exhibit 106?

10         THE COURT:   Yes.

11 BY MS. MARTINEZ:

12    Q.   What is this, Detective?

13    A.   These are the toll records that we obtained.

14    Q.   For that same phone number?

15    A.   Yes, ma'am.

16    Q.   If we could go to page 32.

17         About a third of the way down the page there,

18 what is the last entry that appears for the call data?

19         What is the date and time?

20    A.   Okay.   So, it appears right here, right next to

21 the 655, October 8th, 2013.

22    Q.   What is the time on that call?

23    A.   9:06 p.m.

24    Q.   And if we could continue to page 37.

25         What is the date of the last entry of this SMS or

1    text data?

2        A.   So, right here next to 178, you have the date of

3    October 8th, 2013.

4        Q.   And what is the time of that entry?

5        A.   That time is 9:07 p.m.

6        Q.   Moving now to the murder of Gerson Adoni Martinez

7    Aguilar, Lil Wasón, what methods did you use during the

8    course of the investigation to determine the date of the

9    murder of Lil Wasón?

10       A.   The same methods were utilized.  Obviously, we

11   still and had been conducting a lot of interviews, used

12   source reporting, Junior's phone calls, et cetera.

13       Q.   Were you able to determine a phone number that

14   Lil Wasón was using near the time of his death?

15       A.   If I remember, we actually obtained a couple

16   different numbers, but we weren't able to drill down

17   with the same precision as we were with Lagrima.  So,

18   that was unsuccessful.

19       Q.   Were you involved in any of the arrests that

20   were -- arrests that were conducted during the course of

21   this investigation?

22       A.   I was, ma'am.

23       Q.   Were you involved in the arrest of Ernesto Paiz

24   Guevara, Solitario?

25       A.   Yes.

1      Q.   Please tell the jury about that arrest?

2      A.   I have to go back April 23rd, the incident that I

3  discussed yesterday, when I seized the marijuana from

4  him.  On that day, I provided him with my phone number

5  and told him that I'd like to talk to him later.  But I

6  didn't want to talk to him further on that date, because

7  I knew he was with his associates, and I didn't want to

8  put him in any kind of danger.  So I let him walk that

9  day, and I gave him two days to call me.

10          Two days later I didn't hear from him, so I

11  obtained a possession with intent to distribute

12  marijuana within a school zone warrant, which was a

13  felony.

14     Q.   When were you able to execute that warrant?

15     A.   I was contacted by Kansas City, I believe it was

16  May 3rd, 2014, and they advised that they had him in

17  custody out that way.

18     Q.   What did you do at that point?

19     A.   May 15th, myself, a fugitive detective with

20  Fairfax, and another gang detective, we flew out to

21  Kansas City, took possession of Mr. Paiz Guevara and his

22  property.

23     Q.   What property did you take possession of at that

24  time?

25     A.   I don't recall everything that was in his

1    property, but one of the things that I did take and
2    seize was his cellphone.
3        Q.   In addition to Solitario, was there anyone else
4    you took into custody on that same day?
5        A.   Yes, ma'am.  Douglas Cerritos, Lil Poison.
6        Q.   And where was he?
7        A.   He was also in Kansas City.
8             And just to explain, briefly, he was also picked
9    up, and they determined that he had an outstanding
10   warrant, also by me, for possession intent to distribute
11   heroin, which goes back to the discussion -- the thing
12   that I discussed yesterday that occurred on April 25th,
13   2014, where we found the heroin in his room.
14             MS. MARTINEZ:  Your Honor, may we show --
15   BY MS. MARTINEZ:
16       Q.   You said you seized a phone from Solitario; is
17   that right?
18       A.   I did, ma'am.
19             MS. MARTINEZ:  Your Honor, may we show the
20   witness what has already been admitted as Government's
21   Exhibit 39?
22             THE COURT:  Yes.
23   BY MS. MARTINEZ:
24       Q.   Do you recognize Government's Exhibit 39?
25       A.   I do, ma'am.

1    Q.   What it is?

2    A.   It's the cellphone that I seized from Mr. Paiz

3    Guevara.

4    Q.   When did you seize that cellphone?

5    A.   It was on May 15th, 2014.

6    Q.   After seizing it, did you obtain a warrant to

7    search it?

8    A.   I did, ma'am.

9    Q.   Who actually conducted the search?

10   A.   Detective Bayliss.

11   Q.   Have you reviewed the results from that search?

12   A.   I did, ma'am.

13        MS. MARTINEZ:   Your Honor, may we show the

14   witness what has been already admitted as Government's

15   Exhibit 104-D?

16        THE COURT:   Yes.

17   BY MS. MARTINEZ:

18   Q.   First of all, do you recognize this photograph?

19   A.   I do.

20   Q.   And, do you know where it came from?

21   A.   From Mr. Paiz Guevara's cellphone.

22   Q.   Do you personally recognize any of the

23   individuals in this photograph?

24   A.   I do.

25   Q.   Would you start -- by describing where they're

1    located, would you please identify anyone whom you

2    recognize in this photograph?

3        A.   Okay.  We will start with the far left, and go

4    across the back row.  I don't recognize -- I don't know

5    this individual.  This is Lil Evil.  This is Skinny, Lil

6    Slow, Duende, Pesadilla --

7        Q.   All right.  Let me stop you for just a minute.

8        A.   Uh-huh.

9        Q.   Just for the record, am I correct that you have

10   gone from left to right, as we're viewing the

11   photograph, in the back row?  Is that right?

12       A.   That is correct.

13       Q.   And am I also correct that you skipped the two

14   individuals who appear to be children?

15       A.   I did.

16       Q.   Do you know either of those individuals?

17       A.   I do not know this child, but I do know her.

18       Q.   And, without giving a name, who -- how do you

19   know -- who do you know the female child to be?

20       A.   I don't remember her name, but she is Skinny's

21   child.

22       Q.   Continuing to the front row, starting at the left

23   and moving over to the right, do you recognize any of

24   those individuals?

25       A.   Yes, ma'am.  This is Greñas.  This is Lil Poison.

1  And this is Lil Wasón.

2          MS. MARTINEZ:  Your Honor, may we show the

3  witness what has already been moved into evidence as

4  104-E?

5          THE COURT:  Yes.

6  BY MS. MARTINEZ:

7     Q.  I won't ask you to identify these people again,

8  but do you know where this picture came from?

9     A.  It also came from the same cellphone.

10    Q.  Which cellphone?  Whose cellphone?

11    A.  I'm sorry.  Mr. Paiz Guevara's.

12          MS. MARTINEZ:  Your Honor, may we show the

13  witness what has already been moved into evidence as

14  104-F?

15          THE COURT:  Yes.

16  BY MS. MARTINEZ:

17    Q.  Do you know where this photograph -- or this

18  picture came from?

19    A.  It was also pulled off of Mr. Paiz Guevara's

20  cellphone.

21    Q.  Moving on from the arrest of Solitario, were you

22  also involved in the arrest of Alvin Gaitan Benitez?

23    A.  I was.

24    Q.  What was the approximate date of that arrest?

25    A.  I believe it was August 5th, and it was in

1    Maryland.

2        Q.   Where in Maryland?

3        A.   Gaithersburg.

4        Q.   Could you describe the circumstances of the

5    arrest?

6        A.   Sure.  Again, going back to July 27th, 2014, the

7    operation I discussed yesterday where the two *chequeos*

8    were supposed to be jumped into MS-13, Prince William

9    County had obtained warrants, I believe they obtained

10   gang participation and gang recruitment warrants.

11            So, prior -- prior to that date, myself and other

12   FBI agents and gang investigation detectives had done a

13   surveillance operation on Pesadilla from the Fairfax

14   County courthouse to Maryland, because we had developed

15   information that he fled to Maryland once people started

16   getting arrested.  So, we already a good idea as to

17   where he was.

18            So, on August 5th, we needed to utilize the help

19   of, I think it was Montgomery County police, to arrest

20   him in Maryland on the outstanding Prince William County

21   warrants.

22       Q.   Were you also involved in the federal

23   investigation relating to the shooting murder of Julio

24   Urrutia?

25       A.   I was.

1          MS. MARTINEZ:  Your Honor, may we show the

2     witness what has already been moved into evidence as

3     Government's Exhibit 95-C?

4          THE COURT:  All right.

5     BY MS. MARTINEZ:

6     Q.   Do you know what 95-C is, Detectives Betts?

7     A.   I've seen it once before, and it is appears to be

8     an aerial of very near where the actual murder scene

9     occurred.

10    Q.   Are you generally familiar with the Chirilagua

11    neighborhood of Alexandria, Virginia?

12    A.   Very generally.

13    Q.   Are you familiar with its location?

14    A.   Yes.

15    Q.   And is it within the Eastern District of

16    Virginia?

17    A.   It is, ma'am.

18    Q.   Detective Betts, what involvement, if any, did

19    you have with respect to Defendant Jesus Chavez?

20    A.   I only ever interacted with him one time.  It was

21    when we brought him to FBI Headquarters for processing

22    on the federal charges.

23    Q.   Where did you pick him up when you brought him to

24    FBI Headquarters?

25    A.   I thought it was Arlington Jail, but I can't

1   remember if it was Arlington or Alexandria, to be honest
2   with you.
3       Q.   What was the approximate date of that processing
4   that you conducted?
5       A.   It was September 2014.
6       Q.   And when you say "processing," what did you
7   actually do?
8       A.   So, he was brought to the FBI Headquarters, and
9   he had to be fingerprinted, pictures had to be taken of
10  him, and personal information obtained.
11      Q.   When you say "pictures," what is the purpose of
12  the photographs?
13      A.   It just goes in with his fingerprints, and to
14  obviously document him on that day.
15      Q.   And what part of his body were photographs taken
16  of on that day?
17      A.   I believe there was a face shot, and then I think
18  we had -- we asked him to turn sideways, left side,
19  right side; and then any distinguishing marks, scars,
20  tattoos, et cetera.
21      Q.   And does he have any tattoos?
22      A.   I remember two, specifically.
23           MS. MARTINEZ:  Your Honor, may we show the
24  witness what has already been moved into evidence as
25  Government's Exhibit 72-A?

1          THE COURT:  Yes.

2   BY MS. MARTINEZ:

3      Q.  Who is this, Detective?

4      A.  Mr. Chavez.

5          MS. MARTINEZ:  Your Honor, may we show the

6   witness what has been moved into -- oh.

7   BY MS. MARTINEZ:

8      Q.  Let me ask you:  Is this picture of Mr. Chavez a

9   true and accurate depiction of what he looked like on

10  the day that you processed him in September of 2014?

11     A.  Yes, ma'am.

12         MS. MARTINEZ:  May we show the witness what

13  has been moved into evidence as 72-B?

14         THE COURT:  Yes.

15  BY MS. MARTINEZ:

16     Q.  Again, who is this individual?

17     A.  Mr. Chavez.

18     Q.  And is it a true and accurate depiction of what

19  Mr. Chavez looked like when you processed him in

20  September of 2014?

21     A.  Yes, ma'am.

22         MS. MARTINEZ:  May we show the witness what

23  has been moved into evidence as 72-C?

24         THE COURT:  Yes.

25  BY MS. MARTINEZ:

1    Q.   Again, Detective, who is this individual?

2    A.   Mr. Chavez.

3    Q.   And, is this picture, including the tattoo that's

4    visible in the picture, a true and accurate depiction of

5    what Mr. Chavez looked like when you processed him in

6    September of 2014?

7    A.   Yes, ma'am.

8              MS. MARTINEZ:  And, finally, Your Honor, may

9    we show him Government's Exhibit 72-D?

10             THE COURT:  Yes.

11   BY MS. MARTINEZ:

12   Q.   Who is the individual shown in this photograph?

13   A.   Mr. Chavez.

14   Q.   And, is the portion of Mr. Chavez that is

15   visible, and in particular the tattoo, a true and

16   accurate depiction of Mr. Chavez the day that you

17   processed him in September 2014?

18   A.   Yes, ma'am.

19   Q.   And, Detective Betts, do you see Mr. Chavez in

20   court today?

21   A.   I do, ma'am.  He's seated in between his counsel.

22   It looks like he's wearing a yellowish orange shirt

23   today.

24             MS. MARTINEZ:  Your Honor, may the record

25   reflect that Detective Betts has identified Defendant

1    Jesus Chavez?

2              THE COURT:  So noted.

3              MS. MARTINEZ:  No further questions.

4              THE COURT:  You may proceed.

5              MR. JENKINS:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7    BY MR. JENKINS:

8    Q.   Good morning, Detective Betts.

9    A.   Good morning, Mr. Jenkins.

10   Q.   Detective Betts, please remind me, how long have

11   you been a detective?

12   A.   A detective for over nine years.

13   Q.   And, how long have you been in law enforcement,

14   period?

15   A.   Over 17.

16   Q.   And, how long have you been working with the FBI?

17   A.   Over seven.

18   Q.   Over seven years?

19   A.   Yes, sir.

20   Q.   This -- is this your first MS-13 gang case?

21   A.   No.

22   Q.   Is this your first gang related case?

23   A.   No, sir.

24   Q.   Is this your first racketeering case?

25   A.   No, sir.

1    Q.   How many MS-13 investigations have you been

2    involved with?

3    A.   This is going to be a guesstimate, sir, but I

4    could easily say well over 50.

5    Q.   And, is this the first case in which you've made

6    use of confidential human sources?

7    A.   No, sir.

8    Q.   And, is it fair to say that based on your

9    training and experience as a law enforcement officer,

10   that when you work with confidential human sources,

11   there are certain precautions you need to take?

12   A.   I would agree with that, sir.

13   Q.   And, one of the reasons why you need to take

14   these precautions is that oftentimes, like in this case,

15   the confidential human source, himself, may be someone

16   that otherwise might be deemed untrustworthy, correct?

17   A.   Well, there's a lot of different precautions that

18   we take.  Could you be a little -- if you wouldn't mind,

19   just be a little bit more precise with your question?

20   Q.   Well, Detective Betts, sometimes, in your

21   experience, you've encountered situations where your

22   confidential human source that you want to use is a

23   criminal, correct?

24   A.   Yes, sir.

25   Q.   Is a convicted felon, correct?

1    A.   Yes, sir.

2    Q.   And that's somebody who, right out the gate, you

3  may have some questions about their trustworthiness,

4  correct?

5    A.   Yes, sir.

6    Q.   So, a lot of the techniques that you employ are

7  designed to limit the ability for someone like myself to

8  question whether or not the information provided to you

9  by the -- excuse me -- confidential human source is

10 accurate, correct?

11   A.   If I understand your question correctly, we

12 always corroborate the information, or at least attempt

13 to corroborate the information, that we've gotten from

14 the source.

15   Q.   And that's because you want to give a jury or a

16 judge additional reason to believe that the information

17 that was provided by this confidential human source is

18 reliable, correct?

19   A.   The main reason is initially we want to build a

20 strong case and make sure that the CI or the source is

21 reliable, yes.

22   Q.   And, in doing that, Detective Betts, there are a

23 number of law enforcement techniques that you employ,

24 correct?

25   A.   Yes, sir.

1    Q.   Some of which you've discussed here this morning

2    as well as yesterday, correct?

3    A.   Yes, sir.

4    Q.   For example, you've talked about consensually

5    monitored phone calls, correct?

6    A.   Yes, sir.

7    Q.   You've talked about executing search warrants,

8    correct?

9    A.   Yes, sir.

10   Q.   And, these, again, are law enforcement techniques

11   that you use to help corroborate what -- what

12   confidential human sources may be telling you, correct?

13   A.   They are.

14   Q.   And, there are other techniques, some of which

15   you haven't told the jury about, for example, DNA

16   testing, correct?

17   A.   That is more of an evidence side of things for

18   the case, but it could be used to corroborate

19   information we've gotten from the informant, yes.

20   Q.   As well as fingerprint testing?

21   A.   Yes, sir.

22   Q.   And, like in a case like this, where you seized

23   materials, items where there is handwritten script, you

24   also might take handwriting exemplars, correct?

25   A.   I guess you could.  I never have in 17 years.

1    Q.   Well, you've talked about acquiring cellphone

2    records.  And that's one of your techniques, correct?

3    A.   That is correct, sir.

4    Q.   And, again, this helps you in being able to

5    corroborate what individuals may have been having

6    communication with one another, correct?

7    A.   Yes, sir.

8    Q.   Again, you wouldn't want to just rely on what the

9    confidential human source has told you, correct?

10   A.   Initially, that's what you're going to rely on,

11   and then you have to corroborate or attempt to

12   corroborate after that, yes, sir.

13   Q.   So the point is, again, my question is, you

14   wouldn't want to just rely on the confidential human

15   source, correct?

16   A.   At times I have.

17   Q.   I know.  I'm asking you, based on your 17-plus

18   years of experience, Detective Betts, is it not true

19   that you would not want to just rely on a confidential

20   human source?

21   A.   When other options are available, that's when I

22   would.

23   Q.   You also, as part of your training, have learned

24   to prepare interview reports, correct?

25   A.   Yes, sir.

R. Betts - Cross                                                        34

1   Q.   Tell the ladies and gentlemen of the jury, what's
2   the purpose of preparing interview reports?
3   A.   If I understand Mr. Jenkins' question correctly,
4   it might be easier just to explain how we do it.  And
5   essentially, when we're interviewing someone, write down
6   the notes, and then we take our notes and we put it into
7   a report form.
8   Q.   And, is it fair to say that when you're going
9   through this process of creating these reports, it's
10  your goal to memorialize the important substan- --
11  substantive information that's been shared with you?
12  Correct?
13  A.   The goal of the report-taking is to document
14  everything that is said to us.
15  Q.   But, is it fair to say that you don't include
16  everything that was said to you in an interview in a
17  report, correct?
18  A.   If it's related to the investigation, then it's
19  going to be in the report.
20  Q.   Certainly if it's something that you find to be
21  material, correct?
22  A.   Yes, uh-huh.
23  Q.   For example, you don't include in the report what
24  the weather was like outside, correct?
25  A.   Only when it has bearing on the investigation.

1    But, most interviews, there's probably no reason to do

2    that.

3        Q.   And, you're taking these notes down as the

4    information is being shared with you, correct?

5        A.   That is correct, sir.

6        Q.   And, you understand that when you're doing that,

7    that these reports may be relied on by prosecutors,

8    correct?

9        A.   I know that when we're taking reports, it's going

10   to be relied on by prosecutors and defense, yes.

11       Q.   It may also be relied on by your fellow law

12   enforcement officers, correct?

13       A.   Yes, sir.

14       Q.   They might even come into possession and review

15   by judges, correct?

16       A.   Yes, sir.

17       Q.   And the same is true about jurors, correct?

18       A.   That is correct.

19       Q.   So, it's fair to say that you make every effort

20   to make sure that the interview reports are accurate,

21   correct?

22       A.   Yes, sir.

23       Q.   And contain all the material information you

24   learned during the course of the interview, correct?

25       A.   That is correct, sir.

1    Q.    Now, let's talk about some of these techniques in
2    which you did in this specific case.
3    A.    All right.
4    Q.    You testified about surveillance, correct?
5    A.    Yes.
6    Q.    You remember that?
7    A.    Yes, sir.
8    Q.    Now, you heard testimony earlier in this trial
9    about Drowsy and meetings that he had.  Do you remember
10   that?
11   A.    Yes, sir.
12   Q.    Remind the ladies and gentlemen of jury who
13   Drowsy was.
14   A.    So, Drowsy was the -- he technically wasn't a
15   signed up confidential informant or confidential human
16   source, but he approached Prince William County police
17   with information on the intended murder plot on
18   Peligroso.
19   Q.    And when someone like Drowsy notifies law
20   enforcement that is he going to be participating in a
21   meeting in which criminal activity may take place, is
22   that something that you would have an interest in
23   monitoring?
24   A.    Yes, sir.
25   Q.    And surveilling it, correct?

1      A.   Yes, sir.

2      Q.   And taking photographs to capture what went on,

3   correct?

4      A.   When it's -- when you're able to.  The specific

5   meeting was at night, so.

6      Q.   And one of the things that you hope to accomplish

7   by doing that is to be able to identify who attended

8   this meeting, correct?

9      A.   Yes, sir.

10      Q.   And, to be in a position to, again, corroborate

11   what your source of information is telling you about who

12   was at the meeting, correct?

13      A.   Yes, sir.

14      Q.   And, it may even help you in being able to

15   identify who said what at the meetings, correct?

16      A.   The photographs?

17      Q.   Yes.

18      A.   I don't think that's going to tell us who said

19   what, but it's -- it usually tells us or shows us who is

20   there at the meeting.

21      Q.   Now, prior to the planned hit, I believe you've

22   testified, or murder of Peligroso --

23      A.   Yes, sir.

24      Q.   -- there was a meeting between Drowsy and others,

25   correct?

1    A.   Yes, sir.  Uh-huh.

2    Q.   Now, was that meeting monitored?

3    A.   It was.

4    Q.   Were photographs taken of that meeting?

5    A.   I don't recall seeing any photographs.

6    Q.   So, you -- are you familiar with the state of the

7  evidence that has been presented here by the United

8  States Attorney's Office?

9    A.   I am.

10   Q.   And is it your testimony that you don't recall

11  seeing any photographs of that meeting?  Correct?

12   A.   That is correct.

13   Q.   Now, what you are relying on in terms of being

14  able to identify who attended that meeting where the

15  murder of Peligroso was discussed, you're relying in

16  part on what Drowsy told you, correct?

17   A.   That is correct.

18   Q.   But you're not relying on photographs, correct?

19   A.   Yes, sir.

20   Q.   Yes, you're not?

21   A.   You're right in what you said.  We're not relying

22  on photographs.

23   Q.   Now, let's go to the phone calls.  I believe

24  you've testified that the individual you called

25  Junior --

R. Betts - Cross                                                    39

1       A.   Uh-huh.

2       Q.   -- he agreed to allow his phone to be monitored

3    by law enforcement, correct?

4       A.   Yes, sir.

5       Q.   Now, you were aware that Junior had more than one

6    phone call -- more than one phone, correct?

7       A.   Yes.

8       Q.   In fact, he has as many as three that you know

9    of, correct?

10      A.   I only personally know of two.

11      Q.   But you wouldn't be able to tell this jury

12   whether or not he had three, four, five, or six,

13   correct?

14      A.   That's correct.

15      Q.   You only know about the one that the FBI gave

16   him, correct?

17      A.   Yes, sir.

18      Q.   And, you can't tell this jury whether or not he

19   had communications with any of these defendants on any

20   phone other than the one provided to him by the FBI,

21   correct?

22      A.   Sorry, sir.  I need to go back to your last

23   question.

24           You said I only know about the one.  I knew about

25   the two.  I knew he had a personal phone and then the

1    one the FBI gave him.

2        Q.   The one in which the monitored phone calls were

3    recorded --

4        A.   Yes, sir.

5        Q.   -- those are the only calls that you can testify

6    about, correct?

7        A.   That is correct.

8        Q.   You don't know any of the conversations he may

9    have had with any of these defendants, correct?

10       A.   That's correct.

11       Q.   Now, you were also -- in terms of relying on

12   whether or not Junior had other conversations with any

13   of these defendants, you're relying on what Junior told

14   you, correct?

15       A.   I was technically relying on what Agent Born was

16   telling me, because he was only being handled by her.

17   So any information that I had gotten came through her.

18       Q.   Now, on these phone calls, when -- and again,

19   this wasn't your first case in which you participated

20   where phone call conversations were captured, correct?

21       A.   That is correct.

22       Q.   You participated in what we generally in the

23   field called Title III warrants, correct?

24       A.   That is correct, sir.

25       Q.   And tell the ladies and gentlemen of the jury

1    what a Title III warrant is.

2        A.   In the simplest form, as we talked about Junior's

3    phone being consensual monitored, Title III is

4    un-consensual -- not consensual, and essentially, we

5    would have developed probable cause, gotten what they

6    call a dirty call on a suspect's phone, and then went

7    through the process of getting on that phone and

8    recording all calls coming in and out of that phone,

9    without them knowing.

10       Q.   Now, when you -- in order to make use of these

11   type of recorded phone calls, it would be helpful to law

12   enforcement to be able to reliably identify the

13   participants of the phone call.  Would you agree?

14       A.   Yes, sir.

15       Q.   And, one of the ways you do that is that, when

16   you have someone who has agreed to allow his phone to be

17   monitored, like Junior, I guess that makes it fairly

18   simple to identify him as a participant, correct?

19       A.   As Junior as a participant?

20       Q.   Yes.

21       A.   Yes, sir.

22       Q.   Because it's the phone that you gave him,

23   correct?

24       A.   Yes, sir.

25       Q.   And, sometimes you may have even been around when

1    he was placing the phone call, correct?

2        A.    Maybe.   But I personally was not.

3        Q.    Now, one of the ways that law enforcement go

4    about verifying the other participant on the phone is

5    that they may have the subscriber number that has been

6    associated with that other individual to use, correct?

7        A.    Yes, sir.

8        Q.    For example, if you have my cellphone number and

9    a call was placed to Junior, then, that's one way you

10   identify that Mr. Jenkins was the other participant in

11   that phone call, correct?

12       A.    Well, the subscriber information isn't always who

13   actually has the phone.

14       Q.    But it's one way --

15       A.    It is one --

16       Q.    -- that you use --

17       A.    -- yes, sir.

18       Q.    -- correct?

19       A.    That is correct.

20       Q.    And then you can also take that same information

21   and go to AT&T or Verizon or whomever, the subscriber

22   provider, and find out whether or not that number is

23   assigned to Robert Jenkins, correct?

24       A.    Yes, sir.

25       Q.    And that would be useful, correct?

1    A.  Very helpful.

2    Q.  Because you want to be able to identify not just

3    Junior, but who he actually is speaking to, correct?

4    A.  Yes, sir.

5    Q.  And, you don't want to, ideally, just rely on

6    Junior telling you that he was speaking to Mr. Jenkins,

7    correct?

8    A.  When other options are available, we will go down

9    that road, yes, sir.

10   Q.  Now, another way that law enforcement goes about

11   identifying speakers on phone calls is that they may

12   look for what we call self-authenticating comments that

13   are made in the conversation, correct?

14   A.  I'm not sure I understand what you're

15   referencing.

16   Q.  Well, for example, you and I are on the phone and

17   I say, "Hey, Detective Betts, this is Rob.  How you

18   doing?"  That's -- that's your way of authenticating

19   that Rob was a participant in that phone call, correct?

20   A.  Yes, sir, an example, yes.

21   Q.  Because, without that, it may be a little bit

22   more difficult to identify who was speaking to Detective

23   Betts, correct?

24   A.  Yes, sir.

25   Q.  So, you would look for subscriber information,

1    correct?

2        A.   (Indicating.)

3        Q.   You would look to see -- could you say "yes"?

4        A.   Yes, sir.  I'm sorry.  Yes, sir.

5        Q.   You would look to see whether or not, anywhere in

6    the call, it is something that you would consider

7    self-authenticating, correct?  Like the person

8    mentioning their name?

9        A.   It is an option, yes.

10       Q.   Now, let me turn your attention to, again, this

11   case, focus you in on the conversations that have been

12   testified about Junior's consensual monitored phone

13   calls.  Have you reviewed those calls?

14       A.   I have reviewed some of them, yes.

15       Q.   Okay.  And, is it not true that in those calls,

16   Mr. Lopez Torres -- well, let me ask you this:  During

17   these calls, did you have subscriber information for

18   Mr. Lopez Torres?

19       A.   I do not remember if we have that information or

20   not.

21       Q.   Now, you've testified just this morning in

22   response to Ms. Martinez, about the number of cellphones

23   from other defendants that you seized.  Do you remember

24   that testimony?

25       A.   Yes, sir.

1    Q.   And you seized these other telephones at the time
2  of their arrest, correct?
3    A.   That is correct, sir.
4    Q.   And in one occasion you seized one or more phones
5  from a room that was associated with one of -- one of
6  the defendants, correct?
7    A.   Yes, sir.
8    Q.   Did you -- are you aware of any telephones
9  associated with Mr. Lopez Torres that were seized?
10   A.   January 9th, 2014, I believe three of them were
11 seized from his person at his arrest.
12   Q.   So, you had three phones that you believe were
13 associated with Mr. Lopez Torres, correct?
14   A.   I personally did not, but I think Agent Uribe
15 did.
16   Q.   Now, you testified this morning about, once you
17 obtained the cellphones from other defendants, not
18 Mr. Lopez Torres, that you went on to obtain toll
19 records for some of those defendants, correct?
20   A.   The toll records were specific to the -- one of
21 the victims.
22   Q.   Well, did you obtain subscriber information for
23 any of the phones that you seized?
24   A.   The phones that I seized, I do not remember if I
25 ever requested toll records for those.

1    Q.   Now, you're the case agent in this case, correct?

2    A.   I am one of two, yes, sir.

3    Q.   Can you tell the jury what your responsibility is

4    as a case agent?

5    A.   To facilitate and to, obviously, assist the other

6    case agents throughout the investigation, of which in

7    this case it was two and a half years.  So, there's a

8    lot of moving parts.  We weren't only investigating this

9    case.  We were actually investigating a lot of other

10   things outside of this case, so we're going in a lot of

11   different directions.

12   Q.   Is it fair to say that part of your

13   responsibilities as the case agent is to be reasonably

14   familiar with the evidence that has been collected?

15   A.   I would agree with that.

16   Q.   And can you tell the ladies and gentlemen of the

17   jury whether any toll records for Mr. Lopez Torres were

18   ever collected?

19   A.   I do not remember seeing any.

20   Q.   Can you tell the ladies and gentlemen of the jury

21   whether or not any subscriber information for these

22   three phones, that you testified were seized from

23   Mr. Lopez Torres, were ever obtained?

24   A.   Again, I do not remember seeing any.

25   Q.   Now, you testified about conducting searches of

1    places where you understood certain defendants resided.

2    Do you remember that testimony?

3         A.   Yes, sir.

4         Q.   Okay.  Did you do any -- what's the reason why

5    you would search an area that you suspected a suspect

6    resided?

7              Why would you do that?

8         A.   Well, there is multiple reasons, but obviously to

9    gather evidence.

10        Q.   Physical evidence?

11        A.   Physical, yes.

12        Q.   Would it be fair to say that you're looking for

13   evidence of their participation in criminal activity?

14        A.   Yes, sir.

15        Q.   You're looking for evidence, in a case like this,

16   of their affiliation with a gang, correct?

17        A.   Yes, sir.

18        Q.   You're looking for evidence, specifically in this

19   case, about whether or not they may be affiliated with

20   the clique, PVLS, correct?

21        A.   Yes, sir.

22        Q.   And, you conducted these searches on residences

23   that you believe were occupied by how many defendants

24   here?

25        A.   One was a consent search of his residence.

1    Another one was by a search warrant.  Another defendant

2    was via search warrant.  So, if memory serves me

3    correctly, I believe there were three.

4        Q.   And, am I correct that none of those three

5    searches were of residence that you believed were

6    associated with Mr. Lopez Torres?

7        A.   No.  We couldn't determine exactly where he

8    lived.

9        Q.   So, your answer is no?

10       A.   That is correct, sir.

11       Q.   Thank you.

12            Now, in this case, you being familiar with the

13   law enforcement techniques that were used, you are aware

14   of the fact that certain items were recovered from what

15   you understood to be the crime scenes in these matters,

16   correct?

17       A.   Yes, sir.

18       Q.   For example, there were a number of items that

19   were recovered from the park where you believe both

20   Guasón and Lagrima were murdered, correct?

21       A.   Yes, sir.

22       Q.   For example, there were trash and debris in the

23   park around the area where you found the bodies that

24   were collected, correct?

25       A.   Yes, sir.

1          I do -- I do want to explain it, so you know,

2     when the first body was found, I left the scene, so I

3     don't know everything that was collected.  But,

4     obviously, the answer to your question, I know there was

5     a lot of things that was collected.

6          Q.   And one of the reasons, you know from your

7     17 years of experience in law enforcement that that is

8     done, is because you're looking to see whether or not

9     any of the physical items that are found on the crime

10    scene can be connected to any particular suspect,

11    correct?

12         A.   Yes, sir.

13         Q.   You're looking for things like DNA, correct?

14         A.   Yes, sir.

15         Q.   You're looking for things like fingerprints,

16    correct?

17         A.   Yes, sir.

18         Q.   You're looking for things like hair and fibers,

19    correct?

20         A.   That's correct.

21         Q.   Because those are things that we human beings

22    tend to leave behind when we visit locations, correct?

23         A.   Sometimes, yes, sir.

24         Q.   And, that's why you use it as a valuable

25    technique, correct?

1    A.   That is correct.

2    Q.   And in this case, you're aware of the fact that

3    items were submitted for DNA testing, correct?

4    A.   I don't know what -- yes, yes, I do.

5    Q.   You're also aware of the fact that items were

6    submitted for fingerprint testing, correct?

7    A.   Yes, sir.

8    Q.   And, you're also aware that items were submitted

9    for hair and fiber testing, correct?

10   A.   I was not aware of that.  But the fingerprints

11   and DNA, I was aware.

12   Q.   You do know about the fingerprints and the DNA?

13   A.   That is correct, sir.

14   Q.   Do you -- are you aware of whether or not any of

15   the reports that you've reviewed as the case agent

16   indicated that Mr. Lopez Torres's fingerprints were

17   found on any of the items that were tested?

18   A.   I've not seen any reports related to the testing

19   of any of those items.

20   Q.   Have you seen any of the reports of the testing

21   of the DNA items?

22   A.   I have not, sir.

23   Q.   Now, you're the case agent, correct?

24   A.   That is correct.

25   Q.   And, you don't know about whether or not hair and

1    fiber was done, correct, testing?

2        A.   That is correct, sir.

3        Q.   You haven't seen the DNA testing results?

4        A.   That is correct.

5        Q.   And, as a case agent, you haven't seen a

6    fingerprint analysis report, correct?

7        A.   Yes, sir.

8        Q.   Would you agree with me that as a case agent,

9    that information which would be contained in any of

10   those reports that would identify any of these

11   defendants as having been in contact with those items,

12   would be important?

13       A.   It would be important to the case.  But, I'm one

14   case agent, so I have my own obligations, as did the

15   other case agents.

16       Q.   But as the case agent, you not only are here to

17   tell us about what you did, but you're also familiar

18   about, as you told me, the overall state of all the

19   evidence in this case, correct?

20       A.   I am familiar with the overall investigation.  I

21   am not familiar with the overall evidence.

22       Q.   So, the items, for example, that were taken out

23   of Demente's vehicle, do you remember those items?

24       A.   I remember a couple things, which I'll be happy

25   to list for you, from what I remember.

R. Betts - Cross                                                    52

1 Q. Well, first of all, let's remind the jury, who is

2 Demente?

3 A. He was the individual driving the vehicle on the

4 day of October 1st, when they went down to Garfield High

5 School to kill Peligroso.

6 Q. And, there were certain items recovered from that

7 vehicle, correct?

8 A. Yes, sir.

9 Q. For example, there were two machetes, correct?

10 A. Yes, sir.

11 Q. There was a shotgun, correct?

12 A. Yes, sir.

13 Q. And, there were some shotgun shells, correct?

14 A. That is correct.

15 Q. And there was also a notebook, correct?

16 A. Yes, sir.

17 Q. Let's start with the weapons.  The weapons were

18 found in the trunk, correct?

19 A. They were.

20 And just -- just so you're aware, I was not on

21 scene.

22 Q. But as the case agent, you are aware of the fact

23 that --

24 A. That's correct.  I just wanted to make sure that

25 you knew that I wasn't there.

1    Q.   I understand.  Thank you.

2         And it would be important for you to know, as the

3    case agent, whether those weapons were tested for DNA,

4    correct?

5         Would that be important for you to know?

6    A.   As one of the case agents, as long as one of us

7    knew.

8    Q.   Would it be important for you to know whether or

9    not those items were tested for fingerprints?

10   A.   Again, it's the same answer:  As long as one of

11   us knew.  I did not know.  I do not know.

12   Q.   Now, we talked earlier in my cross-examination

13   about your desire to corroborate information that a

14   confidential human source might give you.  You remember

15   testifying about that?

16   A.   Yes, sir.

17   Q.   And, in -- in this specific case, you heard, when

18   you were seated here in the courtroom, that Demente

19   testified that my client, Mr. Lopez Torres, placed that

20   shotgun and one of the machetes in that vehicle,

21   correct?

22   A.   Yes, sir.

23   Q.   You heard him say that, correct?

24   A.   I did.

25   Q.   And, whether or not those items that he allegedly

1    placed in that car contained his DNA, that would be

2    important to you, correct?

3        A.   It was important to me on the local level, if you

4    want me to get into that.

5        Q.   Would it have been important for you, given

6    Mr. -- well, given Demente's testimony, about whether or

7    not those specific items had been tested for Mr. Lopez

8    Torres's fingerprints?

9        A.   I believe that Demente said that Mr. Lopez Torres

10   put them in the vehicle and they were wrapped in a

11   jacket.  So, I would assume there would be no

12   fingerprints and DNA.

13       Q.   Do you recall him saying "jacket" or a "spread"?

14       A.   I thought he said a jacket.

15       Q.   When the vehicle was stopped, it was subsequently

16   searched, correct?

17       A.   Yes.

18       Q.   And, an inventory of the contents of the vehicle

19   were made, correct?

20       A.   I would assume there was, yes.

21       Q.   And, as the case agent familiar with the state of

22   the evidence in this case, did you review that

23   inventory?

24       A.   I did not.

25       Q.   Is it not true -- well, you didn't review it?

1    A.   No, sir.

2    Q.   So, you also didn't review the inventory of the

3    items taken out of the car?

4    A.   No, sir.

5    Q.   So, the only way you know that there were two

6    machetes and a shotgun is because you heard somebody

7    testify about it during this trial?

8    A.   No, sir.  Prince William County police and FBI

9    Agent Hicks told me that.

10    Q.   Did they also tell you -- did you learn also from

11    law enforcement about the notebook being found?

12    A.   Yes, sir.

13    Q.   And, did you also learn from law enforcement

14    about the gun shell being found?

15    A.   Yes, sir.

16    Q.   You don't have any recollection that anybody is

17    telling you about any spread being found, correct?

18    A.   I don't.  The only other thing I remember being

19    found in that vehicle were, I think, two cellphones.

20    Q.   You don't have any other recollection about

21    anybody telling you that a jacket was found, correct?

22    A.   I don't, sir.

23    Q.   Now, but you do recall being told that there was

24    a notebook, Government's Exhibit 41-A.

25    A.   Yes, sir.

1          MR. JENKINS:  Could we pull 41-A up?

2    BY MR. JENKINS:

3      Q.   Now, this notebook was recovered from Demente's

4    vehicle, correct?

5      A.   Yes, sir.

6      Q.   And, this is the notebook, just to remind the

7    jury, that contains a fair amount of MS-13, gang related

8    graffiti, correct?

9      A.   This is not the notebook that was --

10     Q.   That's not the one from the vehicle?

11     A.   No, sir.

12          MR. JENKINS:  Court's indulgence.  35.  I

13   believe I'm told it's Government's Exhibit 35.  If we

14   can get 35 on the screen.  It's been previously

15   admitted, Your Honor.

16          THE COURT:  Yes.

17   BY MR. JENKINS:

18     Q.   Now, this is the notebook, again, it contains

19   some MS-13 graffiti, correct?

20     A.   Yes, sir.  I've only seen pictures of this.

21     Q.   And -- well, you were here in court when it was

22   being testified about, right?

23     A.   That was the second time that I saw pictures of

24   it, yes, sir.

25     Q.   It's fair to say you were paying attention during

1    the testimony, correct?

2         A.   Yes, sir.

3         Q.   Acutely, correct?

4         A.   Tried to, yes, sir.

5         Q.   All right.  So, you know that it also contained

6    some handwriting, correct?

7         A.   Yes, sir.

8         Q.   And, would it be fair to say that it would be

9    valuable for you to be able to identify who was the

10   author of some of this handwriting?  Correct?

11        A.   I guess if you're able to do that.

12        Q.   And, you heard testimony during the trial that

13   certain portions of what is written in this notebook,

14   Government's Exhibit 35, was written by Mr. Lopez

15   Torres, correct?

16        A.   I don't remember someone saying that, so I can't

17   testify to that.  I don't remember that.

18        Q.   Well, do you recall there being testimony about

19   anyone being the author of the writing that was

20   contained in that book?

21        A.   I do recall Mr. Lemus Cerna's counsel making

22   mention of some shapes of sorts in there, that was

23   related to him.

24        Q.   Now, one of the things that you know as a law

25   enforcement officer with 17 years of experience, is that

1    you know how to apply for all sorts of warrants,

2    correct?

3        A.   Yes, sir.

4        Q.   You know how to apply for an arrest warrant,

5    correct?

6        A.   Yes, sir.

7        Q.   Search warrants?

8        A.   Yes, sir.

9        Q.   Things of that nature, correct?

10       A.   Yes, sir.

11       Q.   And, even how to go about getting a DNA sample

12   from a suspect, correct?

13       A.   Yes, sir.

14       Q.   You also know how to go about getting a

15   handwriting sample from a suspect, correct?

16       A.   I do not, sir.

17       Q.   You don't know about that?

18       A.   I've never done it.

19       Q.   Never heard of it?

20            Have you ever heard of it in your 17 years of

21   experience?

22       A.   I have.

23       Q.   Would it be fair to say that you are aware of the

24   fact that that's one of the techniques that law

25   enforcement imply -- excuse me -- employ in cases like

1    this?

2        A.   It is fair to say that.

3        Q.   Can you tell the ladies and gentlemen of the jury

4    whether or not any handwriting comparison was done with

5    respect to Government's Exhibit 35?

6        A.   Not to my knowledge.

7        Q.   So, the contributor, or the person who authored

8    any of the writing contained in Government's Exhibit 35,

9    that is -- you know that, as the case agent, based on

10   what one of your confidential human sources hold you,

11   correct?

12       A.   I'm sorry.  I may have missed the first part of

13   your question.  I know which -- I know what?

14       Q.   That the person who wrote in what is Government's

15   Exhibit 35-A --

16       A.   Uh-huh.

17       Q.   -- you are relying on what one of your

18   confidential human sources told you, correct?

19       A.   Again, no one has talked to me specifically about

20   that book.  So, no confidential informant has told me

21   who was writing in that book.

22       Q.   Was the book ever submitted for DNA analysis?

23       A.   Not to my knowledge, no.

24       Q.   Was the book ever submitted for fingerprint

25   analysis?

R. Betts - Cross                                                60

1      A.   Not to my knowledge.

2      Q.   Other than what Demente told you about the book,

3  you don't know much other about the book, correct?

4      A.   That is correct, sir.

5      Q.   Just as with respect to these phone calls, other

6  than who Junior told you was on the phone, you don't

7  really know who was on the phone, correct?

8      A.   I don't speak Spanish, so I couldn't identify

9  them, no, sir.

10     Q.   Not only do you not speak Spanish, but it's also

11  fair to say you -- you aren't familiar with my client's

12  voice?

13     A.   I am not.  I've only ever actually talked to him

14  once.

15     Q.   You wouldn't be able to identify him in

16  Government's Exhibit 7-A at all, could you?

17     A.   What is 7-A?

18          MR. JENKINS:  Could you put up 7-A?

19          And this is Government's Exhibit 7-A-1, I'm

20  sorry.  It has been previously admitted, Your Honor.

21          Could we put up the first page?

22  BY MR. JENKINS:

23     Q.   Now, on the first page of Government's

24  Exhibit 7-A-1, you see at the bottom where it lists

25  participants, Junior and Jose Lopez Torres?

1        A.   Yes, sir.

2        Q.   That was -- the identity of these participants

3    was done by Junior, correct?

4        A.   I don't know if it was only Junior or not.

5        Q.   But it wasn't done by law enforcement, correct?

6        A.   I don't know that, either.

7        Q.   And, did you hear the testimony from the

8    translators, that they were not responsible for

9    identifying the participants?

10       A.   That is true.

11       Q.   And, have you had a chance to review this

12   transcript?

13       A.   I'd have to see more of it.

14       Q.   Please.

15            MR. JENKINS:  Your Honor, if I can have the

16   witness take a look at a physical copy, maybe that would

17   be quicker.

18            THE COURT:  All right.

19            MR. JENKINS:  With the help of the courtroom

20   security officer, If he can turn to Government's

21   Exhibit 7-A-1.

22   BY MR. JENKINS:

23       Q.   And, I want you to look through it, Detective

24   Betts.  And while you do it, tell me if it refreshes

25   your recollection that this was the conversation in

which, allegedly, Mr. Lopez Torres is speaking to Junior
about the Peligroso hit.  And I'll direct your attention
to pages seven and eight.

    A.   Would you like me to go straight to those pages
or --

    Q.   I think that would be helpful.

    A.   All right.

    Q.   Starting on page seven.

    A.   All right, sir.  I'm there.

    Q.   Does that refresh your recollection about whether
or not this was a conversation that, according to
Junior, he had with Mr. Lopez Torres about the Peligroso
hit?

    A.   To answer your earlier question, I cannot recall
if I read this before.

        But to answer your second question, it does
appear that they are discussing the Peligroso hit.

    Q.   And, go to page one.

    A.   Okay, sir.

    Q.   Now, was this call initiated by Junior or by the
other participant?

    A.   So, it shows direction, outgoing.  So, that would
lead me to believe that Junior called Mr. Lopez Torres.

    Q.   Junior called someone, correct?

    A.   Yes, sir.

1    Q.   And, Junior was speaking to someone, correct?

2    A.   Yes, sir.

3    Q.   And, the only way that we know that that someone

4    was Mr. Lopez Torres is because Junior told you that it

5    was Mr. Lopez Torres, correct?

6    A.   Again, sir, I'm not trying to be difficult, but I

7    don't -- I don't know how it was determined if it was

8    Mr. Lopez Torres or not.  Junior didn't tell me

9    anything.

10   Q.   But, the call went out.  It was an outgoing call

11   from Junior to a number, correct?

12   A.   That is correct.

13   Q.   Now, as the case agent responsible for this case,

14   do you know what number Junior dialed?

15   A.   I only know from being here, and the page.

16   Q.   Yes.

17   A.   Okay.  The line, "target," it looks

18   like 703-855-2796.

19   Q.   Do you know whose telephone number that is?

20   A.   I have no personal knowledge as to whose number

21   that is.

22   Q.   To your knowledge, did anyone in law enforcement

23   attempt to identify who was the subscriber assigned to

24   that phone number?

25   A.   I don't know if they did or not.

1    Q.   For all you know as you sit here today, that

2    could be my cellphone number?

3    A.   Yes, sir.

4    Q.   For all you know as you sit here today -- well,

5    back -- the point is, you don't know who is on this

6    call, correct?

7    A.   That is correct.

8    Q.   You only know what Junior told you, correct?

9    A.   Again, Junior didn't tell me anything.

10   Q.   You only know what Junior told law enforcement,

11   correct?

12   A.   That is correct, sir.

13            MR. JENKINS:   I have no further questions,

14   Your Honor.

15            THE COURT:   Mr. Aquino, are we changing the

16   order again?

17            MR. AQUINO:   I'm sorry.   I didn't think

18   anyone was -- if you want me to wait.

19            THE COURT:   Mr. Chick, are you going to go?

20            MR. CHICK:   I'll go, Your Honor.

21            THE COURT:   All right.   Change the order.

22                  CROSS-EXAMINATION

23   BY MR. CHICK:

24   Q.   Good morning, Detective.   How are you?

25   A.   Good, sir.   Thank you.

1      Q.   Um, I want to try to keep this brief.

2           You -- during the course of your investigation,

3      you came across a lot of information, right?

4      A.   Yes, sir.

5      Q.   And, fair to say that your investigation revealed

6      that Manuel Ernesto Paiz Guevara, the person we're

7      calling Solitario, that he did not know about any murder

8      plan?

9      A.   I can't say that with a hundred percent

10     certainty.  To answer your question, there was

11     information that is believed that.  There is also

12     information made us believe that he did know, so.

13     Q.   Okay.  Your investigation revealed evidence that

14     he did not know about the plan?

15     A.   There were some people talking on the phone that

16     said he didn't know.

17     Q.   Okay.

18     A.   I think that was the only evidence, if you would

19     consider it evidence.

20     Q.   Okay.  Multiple people talking on the phone.

21     A.   I remember one in particular.

22     Q.   Okay.  You heard Junior testify in here, right?

23     A.   I did hear Junior testify.

24     Q.   And, he said multiple phone calls where that

25     happened, correct?

1    A.   Yeah, but I only remembered one, personally.

2    Q.   Okay.  And, fair to say that your investigation

3    also led you to substantial -- or I don't want to use

4    the word "substantial."  I don't want to get into

5    arguments over what is or what isn't substantial.

6         Your investigation revealed evidence that he was

7    surprised when it happened?

8    A.   Again, the phone calls, some people said that,

9    yes.

10   Q.   Okay.  That he was afraid, that he froze up?

11   A.   Yeah.  That's phone calls, yes, sir.

12   Q.   Okay.  Information that he was threatened?

13   A.   Yes, sir.

14   Q.   Okay.  And when I say "threatened," I mean he was

15   told, "If you don't" -- something along the lines, "If

16   you don't get down there and do that, you're going to be

17   down there with him," right?

18   A.   Yes, sir.

19   Q.   Okay.  Let me just ask you about the photographs

20   that were put up from -- that you said you got from the

21   phone that you took from his property.  Is that right?

22   A.   Yes, sir.

23   Q.   You got the phone from -- you didn't get the

24   phone from him; you got it from property, correct?

25   A.   That's correct.  When he was -- when I took

1   custody of him in Kansas City, his property was handed

2   over to me, and the phone that they handed over to me

3   was on his person at his arrest.

4        Q.   Gotcha.

5        A.   Uh-huh.

6        Q.   And I want to make sure that we're all clear.

7   You said that the information that came from his phone,

8   you're talking about photograph, the photograph of the

9   guys, I think we heard that it was on December 24th of

10  2013?

11       A.   Yes, sir.

12       Q.   Okay.  You're not saying that that information

13  originated on his phone, right?

14       A.   Yeah, I can't -- I can't tell you if it did or

15  didn't.

16       Q.   In fact, you heard Detective Bayliss -- is

17  that --

18       A.   Bayliss, yes, sir.

19       Q.   -- he actually said that it did not come from

20  that phone, right?

21       A.   If I remember correctly, he said that the

22  photograph originated on December 24th, and ended up on

23  that SD card on January 2nd.

24       Q.   Right.  It came to that sometime later?

25       A.   Yes, sir.

1    Q.   Okay.  And, you don't have any -- any information

2    suggesting that Solitario was with these guys on

3    December 24th of that year, right?

4    A.   I do not, no.

5    Q.   Okay.  For all you know, he was with his family

6    on that day; fair to say?

7    A.   I have no knowledge where he was.

8    Q.   Okay.

9             MR. CHICK:  No further questions.

10                      CROSS-EXAMINATION

11   BY MR. AQUINO:

12   Q.   Good morning, Detective Betts.

13   A.   Good morning, Mr. Aquino.

14   Q.   As you know, Ms. Amato and I represent

15   Mr. Chavez.

16   A.   Yes, sir.

17   Q.   Mr. Chavez has no tattoos on his arms, correct?

18   A.   That is correct.  I don't remember seeing any.

19   Q.   So, you don't remember.

20             MR. AQUINO:  Stand up for a second.

21             (Defendant complies.)

22   BY MR. AQUINO:

23   Q.   Look at his arms right now.  Do you see any

24   tattoos?

25   A.   No tattoos, sir.

1        MR. AQUINO:  That's all.

2               CROSS-EXAMINATION

3    BY MR. SALVATO:

4        Q.  Good morning, Detective Betts.

5        A.  Good morning, sir.

6        Q.  Just a few questions about a couple of things you

7    said about Mr. Cerna, okay?

8        A.  Sure.

9        Q.  You said you had an interaction with him,

10   January 10th of 2014; is that correct?

11       A.  That is correct, sir.

12       Q.  And I think you said there were about four

13   individuals outside?

14       A.  Originally, as I was watching the group, there

15   were four.  By the time we got to them, it was only two

16   males and a female.

17       Q.  And Mr. Cerna was one of the males?

18       A.  That is correct.

19       Q.  And you approached him and he consented to a

20   search of his person; is that correct?

21       A.  Yes.

22           And just -- just so we're all on the same page,

23   myself and Detective Diffley approached, and Detective

24   Diffley asked for the consent search.

25       Q.  So you were there, right?

1    A.   I was, yes.

2    Q.   And Mr. Cerna consented to the search of his

3    person, true?

4    A.   That is true, sir.

5    Q.   And, I think you testified that the total weight

6    of cocaine that was found on his person was 1.6 grams;

7    is that correct?

8    A.   I don't remember what the weight was, but if that

9    is what I read off the sheet, then that is correct, sir.

10   Q.   All right.  And it was eight bags?

11   A.   It was eight small baggies of, yes, cocaine, yes.

12   Q.   And that would be .3 grams or so per bag?

13   A.   Yes, sir.

14   Q.   And there was also a small amount of marijuana

15   found; is that correct?

16   A.   Two small baggies, yes, sir.

17   Q.   And, the charge in that case was eventually

18   reduced to just mere possession, correct?

19   A.   I can't speak on that, only simply because

20   Detective Diffley took the case to court, and I don't

21   know what the outcome was.

22            MR. SALVATO:  May I have the Court's

23   indulgence for one moment, Your Honor.

24            THE COURT:  All right.

25            MR. SALVATO:  Mr. Toliver, could I ask you

1    to give this to the witness.

2    BY MR. SALVATO:

3        Q.   Detective Betts, could you take a quick look at

4    this, see if it refreshes your recollection as to the

5    previous question.  Just read it to yourself.

6        A.   Okay, sir.

7        Q.   Does that refresh your recollection about what

8    happened in the case?

9        A.   It -- yes, sir.  It's a supplement that Detective

10   Diffley wrote.

11            MR. SALVATO:  Could I retrieve that document

12   back?

13   BY MR. SALVATO:

14       Q.   So the case was resolved on a possession scale,

15   correct?

16       A.   Yes, sir.

17       Q.   And then I think you --

18            MR. SALVATO:  Thank you, Mr. Toliver.

19   BY MR. SALVATO:

20       Q.   I think you also indicated you had an interaction

21   with Mr. Cerna on April 23rd of 2014?

22       A.   That is correct, sir.

23       Q.   All right.  And, fair to say, in that

24   circumstance he consented to a patdown search; is that

25   correct?

R. Betts - Cross                                                    72

1    A.   Yes, sir, he did.

2    Q.   And, you didn't find any weapons on him at that

3    time?

4    A.   I did not.

5    Q.   No knife, no gun, no weapon at all, correct?

6    A.   No, sir.

7    Q.   And, you didn't find any drugs on him at that

8    point, correct?

9    A.   No, sir.

10   Q.   Detective Betts, you mentioned an individual

11   named Mr. Hector Chavarria.  Do you remember that,

12   during your direct testimony?

13   A.   Yes, sir.

14   Q.   And I think you indicated you surveilled him at

15   one point, Mr. Chavarria, he had a green vehicle; am I

16   correct?

17   A.   It was a tan Hyundai with a green hood.

18   Q.   And, when was that surveillance of Mr. Chavarria?

19   A.   And just to be clear, we weren't surveilling him.

20   We were surveilling a meeting at a hotel, and his

21   vehicle pulled into the parking lot.

22   Q.   Okay.  Was he driving?

23   A.   I remember seeing him, but I -- I cannot remember

24   if I saw him actually driving.

25   Q.   Okay.  How do you know the vehicle belonged to

1   him?

2       A.   Interactions with him.

3       Q.   He basically admitted that that was his vehicle?

4       A.   Oh, yes, yes.

5       Q.   And, are you aware of any searches that have been

6   done on Mr. Chavarria's vehicle?

7       A.   Yes, sir.

8       Q.   And, is it fair to say that there was no blood

9   evidence or DNA evidence connected to this case found in

10  Mr. Chavarria's vehicle?

11      A.   The answer is still yes to your previous

12  question.  When you asked the previous question, I was

13  thinking that you were asking for like consent searches

14  or traffic stop.  I understand now what you mean, and

15  the answer to your last question is, to my knowledge,

16  no.

17      Q.   There was no physical evidence, no DNA evidence,

18  no blood evidence, found in Mr. Chavarria's vehicle,

19  correct?

20      A.   That is correct, sir.

21      Q.   And, I assume both the front and the back seats

22  were tested.

23      A.   So, I wasn't there when the actual testing was

24  occurring.  The vehicle was turned over to an FBI crime

25  scene dude, and they did their testing on it -- on the

1    vehicle.

2        Q.   Right.  And I'm assuming, as the co-case agent,

3    that the entire interior of the vehicle was tested,

4    correct?

5        A.   I would assume so, yes, sir.

6        Q.   Sir, fair to say that with regard to

7    Mr. Christian Lemus Cerna, there was no weapon recovered

8    from him that was connected to this case, correct?

9    Through DNA evidence?

10       A.   That is correct, sir.

11       Q.   Last question.  And also, no clothing of

12   Mr. Cerna's with blood on it, or DNA evidence or

13   anything that has a connection to this case, correct?

14       A.   Not to my knowledge, no.

15            MR. SALVATO:  Thanks, Detective.

16            THE WITNESS:  Yes, sir.

17            MR. SALVATO:  Thank you, Your Honor.  I

18   don't have anything further.

19                    CROSS-EXAMINATION

20   BY MS. MARTELL:

21       Q.   Good morning, Detective.

22       A.   Good morning, ma'am.

23       Q.   Detective, we've heard this morning about some of

24   the investigative tools that you used in this case.  I

25   want to talk to you about interviews that you conducted.

1    Is it correct that in your investigation of this case,

2    you conducted numerous interviews?

3        A.    Yes, ma'am.

4        Q.    And, one of the interviews that you conducted was

5    of an individual who goes by the name of Lil Evil,

6    correct?

7        A.    Yes.

8        Q.    And, we've heard Lil Evil's name throughout this

9    case.  It's your belief that Lil Evil participated in

10   the murder of Lagrima, correct?

11       A.    Yes, ma'am.

12       Q.    And, when you interviewed him, you asked him

13   questions about the murder of Lagrima, correct?

14       A.    Yes.

15             And again, I want to be clear.  If I recall, that

16   interview, that was actually done in Spanish, and there

17   were two other agents there that spoke Spanish.

18       Q.    And, it was translated to you in English, what

19   was going on during that interview?

20       A.    Yes, ma'am.  Uh-huh.

21       Q.    And, you don't have any basis to believe that

22   that translation that was going on was incorrect in any

23   way?

24       A.    I assume you're talking about -- specifically

25   about the agent's translating it to me, and --

1    Q.   Correct.

2    A.   -- no.

3    Q.   And during that interview, you recall showing Lil

4    Evil photographs of individuals, correct?

5    A.   I would have to see the report.  As you can

6    imagine, there were a lot of interviews and a lot of

7    people we showed photographs to.  If you have the

8    report, I would be happy to take a look at it.

9    Q.   Yes.

10   A.   Okay.

11        MS. MARTELL:  Court's indulgence.

12   BY MS. MARTELL:

13   Q.   Detective, we're locating that report and I'm

14   going to come back to that while they pull it up.

15        In addition to interviewing Lil Evil, you

16   interviewed other individuals that weren't directly

17   involved with this case, correct?

18   A.   Did you say that were not?

19   Q.   That were not directly involved with this case,

20   correct?

21   A.   That is correct, yes.

22   Q.   And, some of those individuals were individuals

23   that occasionally provided information to law

24   enforcement, correct?

25   A.   Yes.

1    Q.   Those individuals provide information to law

2    enforcement in hopes that you would be able to help them

3    with their cases, correct?

4    A.   Some of them, yes, but --

5    Q.   Okay.  I mean, during this case, you received

6    information from an individual who was incarcerated in

7    Fairfax Adult Detention Center, correct?

8    A.   That is correct.

9    Q.   And that individual was not incarcerated in

10   regards to this case, correct?

11   A.   That's correct, ma'am.

12   Q.   But, he was incarcerated with Lil Slow, or

13   Mr. Villanueva, who testified, right?

14   A.   I believe they were there at the same time, yes.

15   Q.   And Lil Slow was talking to this individual,

16   correct?

17            MS. MARTINEZ:  Objection, Your Honor, calls

18   for hearsay.

19            THE COURT:  She hasn't asked what the person

20   has said.  Objection overruled.

21   BY MS. MARTELL:

22   Q.   Lil Slow was talking to this individual, correct?

23            MS. MARTINEZ:  In that case, Your Honor,

24   lack of personal knowledge.  The person wasn't there.

25            MS. MARTELL:  I can lay a foundation.

1            THE COURT:  All right.
2    BY MS. MARTELL:
3       Q.  This individual, we call -- can we call him a
4    jailhouse snitch?
5       A.  Okay.
6       Q.  Okay.  And this individual, he contacted you,
7    correct?
8       A.  Yes, ma'am.
9       Q.  He wrote letters to you?
10      A.  Yes, ma'am.
11      Q.  And, in those letters to you, you learned that he
12   had --
13            MS. MARTINEZ:  Objection, Your Honor, calls
14   for hearsay.
15            THE COURT:  Do you have an exception?
16            MS. MARTELL:  Your Honor, we're not asking
17   for what the letters said.  It's just part of his
18   investigation, not hearsay.
19            MS. MARTINEZ:  The question was what he
20   learned from the letters.
21            THE COURT:  That's what you just asked,
22   Ms. Martell.  Objection sustained.
23   BY MS. MARTELL:
24      Q.  Based on the letters that you received, you went
25   and spoke to this individual, correct?

1    A.   I did, ma'am.

2    Q.   And, this individual -- you learned that this

3  individual --

4         MS. MARTINEZ:   Objection again, Your Honor,

5  calls for hearsay.   Questions based on his interview.

6         MS. MARTELL:   Not what he learned from

7  this -- I'm not asking about what he learned from the

8  individual.

9         THE COURT:   You are.   You said:   You

10 learned, from this individual, information.

11        Objection sustained.

12 BY MS. MARTELL:

13   Q.   After you spoke to this individual, what did you

14 do as a result of your conversation with him?

15   A.   There was -- I believe I -- I can't remember if I

16 spoke to him more than once.   I know I spoke to him at

17 least once with reference to the information provided,

18 and I believe there was a report written on that day.

19 And, basically, we utilized that information to

20 corroborate what we had already learned.

21   Q.   And, if this individual had given you information

22 that was not consistent with what you would have

23 learned, did you investigate that further?

24        MS. MARTINEZ:   Objection, Your Honor, calls

25 for hearsay and also hypothetical.

1              THE COURT:  Sustained.

2              Let's take the morning recess now for

3    15 minutes.  Thank you.

4              (Court recessed at 11:31 a.m. and reconvened

5              at 11:49 a.m.)

6              (Jury not present.)

7              MS. MARTINEZ:  May I make an objection

8    before the jury comes out?

9              THE COURT:  Yes.

10             MS. MARTINEZ:  Your Honor, I would object to

11   any continued questioning along the lines of what has

12   already been presented to Detective Betts about this

13   jailhouse snitch.  Any additional questioning is only

14   going to attempt to elicit hearsay, either from an

15   in-person interview or from letters.

16             I would like to advise the Court, also, that

17   one of the requests that defense counsel made with

18   respect to discovery was the identity of this individual

19   that she's talking about.  Identity and the ability to

20   contact the individual has been provided to defense

21   counsel.  And if defense counsel thinks that there's

22   admissible evidence that can come in from that

23   individual, they can and should subpoena that

24   individual.

25             And so, rather than standing up every other

1    question and objecting to hearsay, I want to make that

2    objection known, and ask that -- that Ms. Martell be

3    asked to move on from this line of questioning, unless

4    it's about what Detective Betts himself did, as opposed

5    to what he's learned from some other individual.

6                    THE COURT:  All right.

7                    MS. MARTELL:  Your Honor, I don't think

8    Detective Betts should be here when we -- while this

9    questioning --

10                   THE COURT:  Can you step out for a moment?

11                   THE WITNESS:  Yes, sir.

12                   THE COURT:  Ms. Martell, let Mr. Jenkins get

13   back to his seat.

14                   MS. MARTELL:  I apologize.

15                   THE COURT:  Okay.

16                   MS. MARTELL:  Your Honor, my testimony (sic)

17   is not intended to elicit any further hearsay.  It's

18   going to be based on -- Detective Betts has already

19   testified, without objection, that he interviewed an

20   individual at the jail that provided him with

21   information, and I'm only going to ask him that, based

22   on that interview, what -- the further actions that he

23   took from that.

24                   And, based on what he learned from the

25   interview of that individual, we believe he took further

1    steps, and we're going to question him about those.

2              Further, Your Honor, about Ms. Martinez's

3    point that we had the identity of this individual, well,

4    you know, the government and defense sit at a very

5    different position when they receive the identity of

6    someone that the government has interviewed and has --

7    does not have under subpoena or under a writ.

8              We attempted to locate this individual.  We

9    did not have an address for him.  We had a phone number.

10   We attempted to call him several times, and we were

11   unable to arrange a meeting with him.  And so,

12   unfortunately, we could not serve him with a subpoena.

13             But, it does not mean that we can't question

14   Detective Betts on something that occurred during this

15   investigation, which was that he interviewed this

16   individual, and based on that interview, he took certain

17   steps.  And we're going to question him about those

18   steps.

19             THE COURT:  Relevance?

20             MS. MARTELL:  The relevance is that this

21   individual, we believe that Detective -- well, we know

22   that Detective Betts learned from this individual that

23   there were inconsistencies in what Lil Slow had told the

24   detectives in this case, and the agents.

25             And so, we're going to question him about

 1    whether -- and that Lil Slow gave information which is

 2    inconsistent with his testimony here and with

 3    information that he had given to them.

 4                And we're going to question him about

 5    whether he investigated --

 6                THE COURT:  So, are you going to question

 7    the agent about statements Lil Slow made to him?

 8                MS. MARTELL:  Correct.

 9                THE COURT:  All right.  And, you're going to

10    question him about statements -- actions he took after

11    he talked to the person in jail?

12                MS. MARTELL:  Correct.

13                THE COURT:  But not asking him what the

14    person in jail told him.

15                MS. MARTELL:  I'm not going to ask him what

16    the person in jail told him.

17                THE COURT:  Okay.  All right.

18                MS. MARTINEZ:  Your Honor, just for the

19    record, I'm also going to object that this does go

20    beyond the scope of direct examination.  We allowed it

21    to go somewhat into general investigative steps, but

22    going into all these details about this particular

23    source of information, I do think is beyond the scope of

24    the direct examination.

25                THE COURT:  Well, I don't recall you

1    objecting when Mr. Jenkins was asking about DNA,

2    fingerprint, and other kind of testing, investigative

3    techniques.  So the objection is overruled.

4                 Let's bring our jury out, please.

5                 You can bring the witness back now.

6                 (Witness resumed stand.)

7                 (Jury present.)

8                 THE COURT:  You may be seated.

9                  CROSS-EXAMINATION (Continued)

10   BY MS. MARTELL:

11      Q.   Detective Betts --

12      A.   Yes, ma'am.

13      Q.   -- after you received the letters from this

14   individual at Fairfax County Adult Detention Center, you

15   had an interview with him, correct?

16      A.   I do recall at least one interview, yes.

17      Q.   And based on that interview and what you learned

18   from that interview, did you question Lil Slow?

19      A.   No, I wasn't permitted to.  I wasn't allowed to.

20      Q.   Later on, you did, in fact, though, interview Lil

21   Slow, correct?

22      A.   The only -- I believe the only time I ever had

23   interaction with Lil Slow after that was during the

24   meetings with the U.S. attorneys, that I was present at.

25      Q.   And at that time you conducted an interview of

1    Lil Slow, correct?

2        A.   Actually, at that point, I don't actually conduct

3    the interview.  The United States Attorney's Office

4    does.

5        Q.   You were present during that interview?

6        A.   I was.

7        Q.   And, you were permitted to ask questions during

8    that interview, correct?

9        A.   Some, yes.

10       Q.   And, during that interview of Lil Slow, did you

11   question him about the information that you had received

12   from this individual at the jail?

13       A.   I don't recall specifically asking him anything

14   that was directly related to the letters or information

15   from my source, no.

16       Q.   And, you did, however, ask him -- or it was asked

17   of him about, um, the Lagrima murder, correct?

18       A.   Yes.

19       Q.   And, during that questioning of Lil Slow, Lil

20   Slow stated that he had no recollection of Lil Payaso's

21   actions during the murder; isn't that correct?

22       A.   Ma'am, I hate to do this to you, but I would have

23   to see the report again, because --

24       Q.   Not a problem.

25            MS. MARTELL:  I'm going to ask for what's

 1    been Bates marked as EDVA 584.  Thank you.

 2              And with the help of Mr. Toliver, if we

 3    could pass this up to --

 4              THE COURT:  What's the purpose for which

 5    you're handing this document to him?

 6              MS. MARTELL:  He's asking further -- to

 7    refresh his recollection, Your Honor.

 8              THE COURT:  All right.  Okay.

 9              It might be helpful if you highlight and put

10    a tab where you want him to read.  It would save us a

11    lot of time.

12              MS. MARTELL:  I've highlighted the portion.

13    BY MS. MARTELL:

14       Q.  Go ahead and read that to yourself.

15           And if you can hand the document back to

16    Mr. Toliver.

17       A.  Okay, ma'am.  Thank you.

18           Okay, ma'am.

19       Q.  If you could give that document back to

20    Mr. Toliver.

21       A.  (Witness complies.)

22       Q.  Thank you.

23           That was the report that you prepared after the

24    interview of Lil Slow, correct?

25       A.  Um, my apologies, ma'am.  I actually didn't look

1    at the first page to see if it was myself or Agent Uribe

2    that prepared it, but I do believe I was present.

3        Q.   And did that refresh your recollection about

4    statements made by Lil Slow during that interview?

5        A.   It did.

6        Q.   And Lil Slow, during that interview, stated that

7    he had no recollection of Lil Payaso's actions during

8    the murder, correct?

9        A.   That is correct, ma'am.

10       Q.   Detective, earlier you asked me to -- that you

11   could not recall regarding information provided to you

12   by Lil Evil, and you asked for your report.

13       A.   Yes, ma'am.

14            MS. MARTELL:  I'm going to have the --

15   Mr. Toliver hand this to you.

16            THE WITNESS:  Okay.

17   BY MS. MARTELL:

18       Q.   Lil Evil talked to you during his interview

19   about --

20            MS. MARTINEZ:  Objection, Your Honor.  Calls

21   for hearsay.

22            MS. MARTELL:  These are statements,

23   co-conspirator statements.

24            THE COURT:  Co-conspirator in furtherance of

25   the conspiracy?  Was the conspiracy over when the

1    statements were made?

2              MS. MARTELL:  Yes, Your Honor.

3              THE COURT:  They were.  Okay.  Do you have

4    another theory?

5              MS. MARTELL:  No.

6              THE COURT:  Okay.

7    BY MS. MARTELL:

8      Q.   Detective Betts, you recall showing Lil Evil

9    pictures of individuals that you believed were involved

10   in the Lagrima murder, correct?

11     A.   I'm going through the report now.

12          Yes, we did show photos.

13     Q.   And, Lil Evil was not able to identify --

14             MS. MARTINEZ:  Objection, Your Honor,

15   hearsay.

16             MS. MARTELL:  Your Honor, may we approach on

17   this?

18             THE COURT:  Yes, uh-huh.

19             (Thereupon, the following side-bar

20   conference was had:)

21             MS. MARTELL:  Your Honor, we don't believe

22   that this is hearsay.  This is based on the actions that

23   occurred.  This is Lil Evil's actions, not his

24   statements.

25             THE COURT:  So, the question is whether his

1    prior identification of photographs is hearsay?

2            MS. MARTELL:  Correct.  Those --

3            THE COURT:  Okay.

4            MS. MARTELL:  Those are the issues raised.

5    We're saying that it was not --

6            MS. MARTINEZ:  Your Honor, when a witness,

7    during an interview with law enforcement, is asked

8    whether or not he recognizes someone in the picture, and

9    the witness provides an answer, be it yes or no, or a

10   name, or any other information related to an identity to

11   a person's photograph, that is a statement.  That is a

12   statement that counsel is attempting to offer for the

13   truth of the matter asserted.

14           And, there's no exception that I'm aware of,

15   certainly not a co-conspirator statement, that was made

16   to law enforcement, was not made in furtherance of the

17   conspiracy.  It was made during an interview to law

18   enforcement, and it was made after the conclusion of the

19   conspiracy.

20           And, after -- I believe after the arrest was

21   made in this case, they're offering the statement made

22   by a third party, who is not here, to law enforcement,

23   and they're trying to offer it for the truth of the

24   matter asserted.

25           THE COURT:  Actually, I think Ms. Martell is

1   right.  Objection overruled.

2                (Thereupon, side-bar conference was

3   concluded.)

4   BY MS. MARTELL:

5      Q.   Detective Betts, do you need me to repeat the

6   question?

7      A.   No.  I think your question was:  Was a photo

8   shown to Lil Evil?  Correct?

9      Q.   Correct.

10     A.   There was a photo shown to Lil Evil of your

11  client, yes.

12     Q.   And he was not able to identify -- of the photos

13  he was shown, he was not able to point -- to identify my

14  client, Mr. Castillo, correct?

15     A.   May I read what I wrote?

16     Q.   No, you -- no, you can't.

17     A.   Um, well, I can't say that he didn't, with a

18  hundred percent certainty, not identify your client.

19     Q.   Okay.  During your --

20              THE COURT:  The request was to read it to

21  refresh your recollection, or to read it out loud?

22              THE WITNESS:  Well, I needed this to

23  recollect, my memory.

24              THE COURT:  All right.

25              Do you want to refresh his recollection or

1  not?

2          MS. MARTELL:  I believe his recollection was

3  refreshed.  He wanted to read directly what he wrote in

4  the report.

5          THE COURT:  All right.

6          MS. MARTELL:  I didn't think that was

7  proper.

8          THE COURT:  All right.  Next question.

9  BY MS. MARTELL:

10   Q.  Also, during this investigation, you learned of

11  other individuals who had bragged about being involved

12  in the murder of Gerson Aguilar Martinez, correct?

13   A.  Bragged about?

14   Q.  Yes.

15   A.  I learned about other individuals that had

16  admitted to being there, or -- to other gang members.

17   Q.  Correct.

18      There were other individuals who, at times,

19  stated that they killed Lil Guasón, Mr. Aguilar

20  Martinez, correct?

21          MS. MARTINEZ:  Objection, Your Honor,

22  hearsay.

23          MS. MARTELL:  This is not for the truth of

24  the matter asserted, Your Honor.

25          THE COURT:  Oh, yes, it is.  Yes, it is.

1    Yes, it is.

2              What's your theory for admissibility?

3              MS. MARTELL:  Your Honor, we're not

4    presenting it for the truth of the matter.  I don't --

5              THE COURT:  Yes, you are.

6              MS. MARTELL:  This is based -- what -- it's

7    only being offered to show what the detective did with

8    those statements.

9              THE COURT:  No, you were asking him to

10   identify others who made statements.  Objection

11   sustained.

12   BY MS. MARTELL:

13     Q.  You learned that there were individuals that were

14   bragging --

15             MS. MARTINEZ:  Objection, Your Honor.

16             THE COURT:  Overruled.

17             You can ask the question.

18   BY MS. MARTELL:

19     Q.  You learned that there were individuals that were

20   bragging about being involved in the murder of Lil

21   Guasón, correct?

22             MS. MARTINEZ:  Objection, Your Honor,

23   hearsay.

24             THE COURT:  It doesn't call for any hearsay

25   yet.  Objection overruled.

1            MS. MARTINEZ:  Your Honor, if I may, she's
2   stated --
3            MS. MARTELL:  Your Honor, may we approach?
4            THE COURT:  No.  I've overruled the
5   objection.  Ask the question.
6   BY MS. MARTELL:
7      Q.  During your investigation, you learned that there
8   were individuals that were bragging about being involved
9   in the murder of Lil Guasón, correct?
10     A.  I'm really trying to think as to what you're
11  referencing.
12     Q.  Would it refresh your recollection if I showed
13  you a report?
14     A.  Yes.  That would be awesome.
15           MS. MARTELL:  If we could pull up EDVA 503.
16           MS. MARTINEZ:  Your Honor, may we approach?
17           THE COURT:  Yes.
18           (Thereupon, the following side-bar
19  conference was had.)
20           THE COURT:  First, tell me what you're
21  doing.
22           MS. MARTELL:  Your Honor, it is our theory
23  of the case that there is a braggadocios nature to
24  MS-13.  During the investigation, this detective learned
25  of individuals who were bragging about being involved in

```
1   the murder, specifically someone by the name of Lil One.
2   That person is not charged in the murder of Lil Guasón.
3               However, he was telling other individuals
4   that -- and this detective interviewed more than one
5   person -- that told him that Lil One was saying that he
6   killed Gerson Aguilar Martinez.
7               THE COURT:  So, would that be hearsay?
8               MS. MARTELL:  No, Your Honor.
9               THE COURT:  Why not?
10              MS. MARTELL:  It's not for the truth --
11  again, this isn't -- well, this is about not what
12  this -- and I'm not asking him that Lil One -- I'm only
13  telling Your Honor for background, but I'm not asking
14  this detective to state that Lil One said that he killed
15  Gerson Aguilar, but there were people bragging about the
16  murder.
17              And I'm asking him if he recalls, about
18  people, and he stated that he doesn't recall people who
19  were bragging about being involved in the murder.  And
20  this is only to refresh his recollection.
21              He will say that, yes, there were people
22  bragging about the murder.
23              And what I'm going to ask him is, if the
24  individuals were bragging about the murder were all
25  charged in this case.
```

```
 1                   And I believe his answer would be no.
 2                   THE COURT:  I'm sorry.  There are 24 hearsay
 3      exceptions.  Which one is that?
 4                   MS. MARTELL:  We're not asking for
 5      statements that anyone gave.
 6                   THE COURT:  Yes, you are.  You're asking him
 7      to tell us that what other people told him about their
 8      involvement in the murder.  That's hearsay, isn't it?
 9                   MS. MARTELL:  No.  We're only asking him
10      that there were people bragging about it, people were
11      talking about it.
12                   THE COURT:  You're asking him to report what
13      other people told him, which is hearsay.  And I've now
14      given you two times to tell me which one of the 24
15      exceptions apply.
16                   Do you have something, Ms. Martinez?
17                   MS. MARTINEZ:  Your Honor, we would simply
18      like to add, it is hearsay within hearsay.  Ms. Martell
19      is attempting to elicit from the detective statements
20      made by a third party, not a witness, not a defendant,
21      about what yet another third party says.
22                   In other words, she wants Detective Betts to
23      say, "I interviewed X person.  X person told me that Y
24      person was bragging about committing a murder," that
25      Ms. Martell is trying to prove her client did not
```

1   commit.  She's offering actually both statements for the

2   truth, attempting to have the jury hear that some person

3   who is not in court today reported something that

4   someone else said to him.

5              And she's also attempting to elicit the idea

6   that what that other person said, which relates to one

7   of the charged crimes, was true, and somehow exculpates

8   her client.  And so, it's -- it is hearsay offered for

9   the truth on two levels.

10             MS. MARTELL:  Your Honor, this is not being

11  offered to prove that this individual killed anyone.

12  It's being offered not for the truth, but to show that

13  people -- that people lie, people brag about MS-13 --

14  MS-13.

15             No one believes that this individual killed

16  Gerson.  The police don't believe it.  And we're not

17  presenting him an alternative theory in this case.

18             We're only stating that people brag in

19  MS-13.  It's not for the truth.  It's just that people

20  say things that aren't true.  Statements are made by

21  people that they were involved in this murder, that may

22  or may not be true.

23             And we're not even asking for the particular

24  statement, just that people brag about it that weren't

25  involved.

1             THE COURT:  I gave you three chances to tell

2    me which one of the 24 exceptions apply.  Objection

3    sustained.  This is hearsay.

4             (Thereupon, the side-bar conference was

5    concluded.)

6    BY MS. MARTELL:

7       Q.  Detective, Mr. Salvato asked you some questions

8    regarding a vehicle that at one point the FBI searched

9    for evidence related to one of these murders, correct?

10      A.  Yes, ma'am.

11      Q.  And, that search was of a vehicle that belonged

12   to someone by the name of Hector Chavarria, correct?

13      A.  Yes, ma'am.

14      Q.  And, you searched Hector Chavarria's vehicle

15   looking for both DNA evidence or anything that could

16   link that vehicle to the murder of Gerson Aguilar

17   Martinez, correct?

18      A.  Yes, ma'am.

19          Just to be clear, I said -- I know what you

20   meant, but just so the jury is aware, the FBI crime

21   scene guy -- and it was for physical evidence, yes.

22      Q.  And, you're aware of what the FBI crime lab did,

23   because you were one of the lead investigators on this

24   case, correct?

25      A.  I was there when the vehicle was brought to the

1    FBI RA, and it was dropped off while we went with

2    Hector.  But, to be honest, I have no idea what they --

3    what steps they took in order to process the vehicle.

4        Q.   And, you would agree with me that if there had

5    been DNA evidence found in that vehicle, you, as one of

6    the lead detectives on this case, would have been

7    notified, correct?

8        A.   In that situation, yes, I think I would have.

9        Q.   And, to your knowledge, no one has notified you

10   about any DNA recovered from that vehicle, correct?

11       A.   That's correct, ma'am.

12       Q.   You interviewed the individual who owns that

13   vehicle, correct?

14       A.   Yes, ma'am.

15       Q.   And, it was based on that interview that you

16   obtained a warrant to search the vehicle, correct?

17       A.   There's been multiple interviews with him, but

18   yes, the information he was providing led us to believe

19   that we should search the vehicle.

20       Q.   Detective Betts, during your investigation, you

21   did not have any information that my client,

22   Mr. Castillo, ever went to Kansas City after the murder

23   of Gerson Aguilar Martinez, correct?

24       A.   That's correct.

25       Q.   You also did not seize any other drugs that were

1   presented as evidence in this case from Mr. Castillo,

2   correct?

3        A.   I did not, no.

4        Q.   But, the drugs that we've seen in evidence, those

5   were not seized from Mr. Castillo, correct?

6        A.   That's correct.

7        Q.   And, you also were not able to recover any

8   weapons from Mr. Castillo that were involved in any of

9   the murders in this case, correct?

10       A.   That's correct, ma'am.

11            MS. MARTELL:  Thank you, Detective.  No

12   further questions.

13            THE WITNESS:  You're welcome, ma'am.

14            THE COURT:  You may proceed.

15            MS. AUSTIN:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17   BY MS. AUSTIN:

18       Q.   Good afternoon, Detective Betts.

19       A.   Hello, ma'am.

20       Q.   My name is Amy Austin and, with Mr. Zimmerman, we

21   represent Mr. Alvin Gaitan Benitez.  I know you're aware

22   of that, but for the record.

23       A.   Yes, ma'am.

24       Q.   You stated, I believe on direct examination, when

25   you were being asked questions about Junior, that you

1  received your information regarding Junior from Brenda
2  Born.  Is that correct?
3     A.   Brenda Born and also Agent Uribe; but for a
4  majority of the beginning of the case it was coming from
5  Brenda Born, yes.
6     Q.   When you say "the beginning of the case," what --
7  when did you start receiving information from Brenda
8  Born?
9          And just for the record, who is Brenda Born?
10    A.   She's the special agent that testified earlier in
11 the trial.
12    Q.   FBI agent?
13    A.   Yes, ma'am.
14    Q.   And, was she known as Junior's handler?
15    A.   She was.
16    Q.   Okay.
17    A.   Or she is, yes.
18    Q.   And when did you start receiving information from
19 Brenda Born?
20    A.   I can't be specific with the date, but it would
21 be towards the end of September, early October.
22    Q.   And, the year?
23    A.   Oh, I'm sorry.  2013.
24    Q.   Okay.  And, did you receive e-mails from her
25 regarding information Junior had provided?

1    A.   No.  Maybe it was a misspeak on my part.  I don't

2    recall actually getting an e-mail from her.  Usually

3    what would happen is she would send it to her FBI

4    counterparts, and then they would relay the information

5    to me via e-mail.

6    Q.   Would they -- via e-mail?  I'm sorry.

7    A.   Via e-mail, that's correct.

8    Q.   So, her e-mails were forwarded to you?

9    A.   Yes.  Some of them, yes.

10   Q.   And were some texts forwarded to you?

11   A.   I don't recall ever getting any text messages

12   forwarded to me that came from her or Junior.

13   Q.   Okay.  So, it was mostly e-mails?

14   A.   Yes, ma'am.

15   Q.   Okay.  And were those timely e-mails that you

16   received about the information Junior had provided?

17   A.   When you say "timely," I assume you mean within

18   hours or within a day of -- of the information coming

19   in, or --

20   Q.   Timely to you, so that you could utilize that

21   information.

22   A.   Um, yes, some of the information, yes.

23   Q.   And, so, FBI Agent Born sent information to FBI

24   Agent Uribe, who then distributed it to others,

25   including yourself; is that correct?

R. Betts - Cross

1    A.   Yes, at times, yes, ma'am.

2    Q.   Now, I want to review with you a little bit about

3    what you stated -- just give me one minute here to go

4    through my notes.

5         You -- on April 25th, 2014, you testified, that

6    Douglas Cerritos, also known as Lil Poison, was stopped

7    in the Culmore area?

8    A.   Yes, ma'am.

9    Q.   Area.

10   A.   Uh-huh.

11   Q.   And, at that time, he possessed a large butcher

12   knife; is that correct?

13   A.   That is correct.

14   Q.   And, his room was searched and there was heroin

15   found in there, correct?

16   A.   Yes, ma'am.

17   Q.   And, did you find anything during that search

18   that belonged to Mr. Gaitan Benitez?

19   A.   Nothing that belonged to him that I knew of, no.

20   Q.   And, you also stated that during your

21   investigation, you were attempting to arrest Mr. Paiz

22   Guevara, and you were contacted by Kansas City, I

23   believe, on May 3rd, 2015; is that correct?

24   A.   That's correct.

25   Q.   And --

1    A.   No, I'm sorry.  It was 2014, May 3rd, 2014.

2    Q.   I'm sorry.  You're right.  My mistake.  2014?

3    A.   Yes, ma'am.

4    Q.   And, based on the information you received, you

5    flew to Kansas City very soon thereafter; is that

6    correct?

7    A.   Yes, ma'am.  It was May 15th.

8    Q.   And, out in Kansas City, who did you arrest in

9    relation to this case?

10   A.   Douglas Cerritos and Manuel Paiz Guevara.

11   Q.   You did not arrest Mr. Gaitan Benitez, did you?

12   A.   I did not, ma'am.

13   Q.   And, you also testified that you were -- in

14   August 5, 2014, you arrested Mr. Gaitan Benitez; is that

15   correct?

16   A.   I was present for the arrest operation.  I

17   believe it was -- I believe it was Montgomery County or

18   it was Maryland -- police in Maryland that actually took

19   him into custody.  I believe that was the date that our

20   operation occurred.

21   Q.   So, Maryland police officers took him into

22   custody?

23   A.   Yes.  We had an FBI operation, surveillance

24   operation, waiting for him to come out of the apartment

25   and to arrest him on the Prince William charges.

1     Q.  Okay.  So, you were present?

2     A.  I was present, ma'am.

3     Q.  And you say you were waiting for him to come out

4  of an apartment?

5     A.  We had previously -- if I have the dates correct,

6  we had previously surveilled your client from Fairfax to

7  Maryland, when he came to Fairfax for, I think it was a

8  traffic court case or something.  So, we thought we knew

9  where he lived.  So, on this date we had set up a

10  surveillance operation waiting for him to come out, to

11  take him into custody, yes.

12     Q.  Okay.  So you set up around the place where you

13  had determined Mr. Gaitan Benitez lived, correct?

14     A.  Yes, ma'am.

15     Q.  And he came out of the apartment, correct?

16     A.  Yes.

17     Q.  And he was arrested, correct?

18     A.  Yes, ma'am, yes.

19     Q.  Did he have any weapons on him?

20     A.  I do not remember him being armed, no.

21     Q.  And so, when you testified earlier that he fled

22  to Maryland, your investigation revealed that he was

23  actually living in Maryland in August of 20- -- 2014,

24  correct?

25     A.  By the time -- yes, by August, yes.

1    Q.   Now, during the course of your investigation of

2    the murder of Gerson Martinez, would you venture a guess

3    to how many interviews you've conducted?

4    A.   Are you talking specific to that murder, or our

5    entire investigation?

6    Q.   To that murder.

7    A.   I think I could easily say 30 different people,

8    and some of them were multiple interviews.

9    Q.   Okay.

10   A.   A lot.

11   Q.   Right.  And, you made reports of all those

12   interviews, correct?

13   A.   Myself or other agents or detectives that were

14   present.  Somebody had made a report.

15   Q.   And, those are usually referred to as FBI 302s;

16   is that correct?

17   A.   Yes, ma'am.  Uh-huh.

18   Q.   Okay.  And, during the course of all these

19   interviews of this murder of Mr. Martinez, isn't it true

20   that you learned that an individual named Skyper --

21              MS. MARTINEZ:  Objection, Your Honor, calls

22   for hearsay.

23              THE COURT:  It does.  Sustained.

24   BY MS. AUSTIN:

25   Q.   Have you ever heard of anyone that goes by the

1    name, Skyper?

2        A.   There's two individuals that I know -- referred

3    to as Skyper.

4        Q.   Are they MS-13 members?

5        A.   One is a MS-13 member and one is a MS-13

6    associate.

7        Q.   And, do you know anyone who goes by the name Lil

8    Crazy?

9        A.   Yes.

10       Q.   Do you know whether that person is also known as

11   Lil Mejia?

12       A.   Lil Mejia.

13       Q.   Mejia?

14       A.   Yes.

15       Q.   Sorry.

16       A.   Uh-huh.

17       Q.   So, this is the same person, Lil Crazy, Lil

18   Mejia?

19       A.   Yes, ma'am.  Uh-huh.

20       Q.   Is this person an MS-13 member?

21       A.   I can't recall if we ever established that he was

22   actually jumped in, but I can testify to the fact he is

23   an MS-13 associate.

24       Q.   And, how about Malandro?

25               MS. MARTINEZ:  Your Honor, I'm object to

 1    relevance.

 2              THE COURT:  Relevance?

 3              MS. AUSTIN:  Your Honor, if I can -- they're

 4    MS-13 members.  I'm going to ask questions about his

 5    investigation regarding these individuals who were known

 6    MS-13 members, whether they're located in the area --

 7              MS. MARTINEZ:  Object to --

 8              (Simultaneous speaking.)

 9              THE COURT:  Come to sidebar.  Come to

10    sidebar.

11              MS. AUSTIN:  I'm sorry.  I don't mean to --

12              THE COURT:  That's all right.

13              (Thereupon, the following side-bar

14    conference was had:)

15              THE COURT:  Can you tell me what you're

16    doing?

17              MS. AUSTIN:  Yes.  I'm going through names

18    of individuals who were provided to the government

19    during interviews, FBI interviews, that were alleged to

20    have been involved in the murder of Lil Guasón, but who

21    are not charged with the murder.

22              We haven't --

23              THE COURT:  So, how would you be able to

24    establish that without eliciting hearsay?

25              MS. AUSTIN:  Well, I'm not going to ask the

1    agent what anybody told him in the interviews, but I'm

2    going to ask if they were MS-13 members, and, as a

3    result of his investigation, did he ever attempt to

4    contact them.

5              Your Honor, we've heard about one of these

6    already by the -- person by the name of VA, or Virginia.

7    He's been testified about extensively in the case as

8    being an MS-13 member.  There are --

9              THE COURT:  You remember my question was

10   about hearsay.

11             MS. AUSTIN:  Okay.  I do not intend to

12   elicit from him anything anybody told him.

13             THE COURT:  You're going to ask him --

14             MS. AUSTIN:  As a result of his

15   investigation, what did he do next, what -- did he

16   attempt to locate these people?  Did he locate them?

17   What did he learn as a result of that?  What did he do

18   next?

19             I'm not --

20             THE COURT:  What did he learn as a result?

21             MS. AUSTIN:  No, no, not what did he learn.

22   What steps did he take after he located or didn't locate

23   them.

24             MS. MARTINEZ:  Your Honor, I don't think

25   that counsel can establish any relevance to the

1    detective interviewing random MS-13 members, unless

2    she's going to elicit some hearsay statement from

3    someone that that person was involved.

4              I mean, her theory is that someone -- or

5    someone said that other people were involved, and the

6    detectives did not arrest those people.  So, the link,

7    the missing link there is that hearsay statement.

8              If all she's going to do is run through a

9    list of names and say, "Did you arrest them for the

10   murder of Lil Guasón," there is no relevance there.  We

11   can go through -- we could take out a phone book and

12   start listing names, "Did you arrest this person for the

13   murder of Lil Guasón?  Did you arrest this person for

14   the Lil Guasón?"

15             If she wants to ask anyone else arrested for

16   the murder of Lil Guasón, one question like that is

17   relevant.  But going through names without establishing

18   any other relevance or context, which she can't do

19   without hearsay, I think is objectionable.

20             MR. ZIMMERMAN:  Your Honor, I submit that

21   the formulation, "As a result of your investigation, did

22   you come across these names that were associated with

23   the murder of Guasón," and then, "Ultimately, what

24   happened," is a formulation the government uses all the

25   time in these hearsay situations.

1           She's not eliciting particular testimony of

2   who said what.  She's -- he's the case agent who sat

3   here the whole time.  Typically the government asked,

4   "As a result of your investigation, did you learn of

5   other people who were allegedly involved?  Yes or no.

6   Were these people allegedly involved?  Did you follow up

7   with that?"

8           THE COURT:  I don't recall -- this is not

9   about what the government said.  This is about

10  Ms. Austin's question and where it's going.

11          So from the standpoint --

12          MS. AUSTIN:  I'm not --

13          THE COURT:  Let me finish.

14          From the standpoint of relevance, I don't

15  see how it's relevant, unless you can tie to a witness

16  in this case who was not charged, that you have evidence

17  was at the scene, and you have a witness who can offer

18  that testimony.

19          Without that, this is just, let's make a

20  list of our team members, which does not tend to prove

21  or disprove any facts in issue.

22          Do you have anything about how it ties in?

23          MS. AUSTIN:  I'm not going down the phone

24  book, Your Honor, and asking about 20 random MS-13

25  members.  It was four individuals who were listed in the

1    302 by this agent as people involved in the murder, but

2    they haven't been charged in the case.

3              So, I was asking if there are MS-13

4    members -- we may be able to present testimony, when we

5    present our case, from someone that will tie into what

6    I'm asking Agent Betts.  But I'm not getting into

7    asking -- I'm not asking him what anybody told him.

8              THE COURT:  All right.  Well if you have a

9    witness who can offer some testimony, I'll consider it

10   right then.  The objection is sustained.

11             (Thereupon, the side-bar conference was

12   concluded.)

13             MS. AUSTIN:  Detective Betts, thank you.  I

14   don't have any further questions.

15             THE WITNESS:  You're welcome, ma'am.

16             THE COURT:  Redirect.

17             MS. MARTINEZ:  Thank you, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MS. MARTINEZ:

20     Q.  Detective Betts, why are there two case agents on

21   this case?

22     A.  Because of the complexity of the investigation.

23     Q.  Can you elaborate?

24     A.  Well, initially, when the investigation started

25   it wasn't just targeting three murders and one attempted

1    murder.  We were -- as I mentioned yesterday, we were

2    looking at prostitution, narcotics trafficking, and,

3    like I said, an all-encompassing MS-13 investigation.

4          And then it specifically got to the murders, and

5    we were still trying to investigate outside of that, but

6    we just kept getting pulled back into the murders.

7    There is just a lot to do in these types of

8    investigation, so one case agent could not handle that.

9       Q.   Mr. Jenkins asked you about various investigative

10   techniques, some of which you did take, some of which

11   you did not take.  Do you recall those questions?

12      A.   I do.

13      Q.   All right.  Focusing first on his questions about

14   DNA, based on your experience as a detective, are you

15   aware of whether or not DNA is always transferred when

16   someone touches an item?

17      A.   I have no way I knowing that.

18      Q.   And based on your experience as a detective, are

19   you aware of whether or not, when an individual touches

20   something, that individual's fingerprints always appear

21   on that item?

22      A.   Always?  I wouldn't know that, either.

23      Q.   All right.  You were asked about Government's

24   Exhibit 35, the notebook that was seized from Demente's

25   car during the stop for the Peligroso attempted murder.

R. Betts - Redirect                                       113

1    Do you recall that?

2        A.   Yes, ma'am.

3        Q.   And, you were asked about whether you conducted

4    any handwriting analysis on the pages, the handwriting

5    within the notebook.  Do you recall that?

6        A.   Yes, ma'am.

7        Q.   All right.  Separate and apart from handwriting

8    analysis, were you able to, from your investigation,

9    recognize any of the names written inside of the

10   notebook?

11       A.   Yes, ma'am.

12           MS. MARTINEZ:  Your Honor, may we publish

13   pages from Government's Exhibits -- Exhibit 35, which is

14   in evidence?

15           THE COURT:  Yes.

16           MS. MARTINEZ:  May we publish page 56?

17           THE COURT:  Yes.

18           MS. MARTINEZ:  Oh -- and actually, let's

19   start with this page that's up.

20           Can we flip that so we can see it?  Can you

21   turn it.

22   BY MS. MARTINEZ:

23       Q.   Do you recognize the name on the front cover of

24   the notebook?

25       A.   Yes.

1    Q.   And, what name is that?

2         How do you recognize it?

3    A.   Christian Jose Lemus Cerna.  Christian Lemus

4    Cerna is seated in the front row, next to his counsel.

5    Q.   If you could turn to page 56.

6         MS. MARTINEZ:  And can we zoom in on the

7    page on the right there?

8    BY MS. MARTINEZ:

9    Q.   Based on your investigation, are there any names

10   on this page that you recognize?

11   A.   I recognize all of them.

12   Q.   Well, let's start at the top.

13   A.   So, at the time that this was seized, which was

14   October 1st, Guasón at that point was Douglas

15   Cerritos --

16        MS. AUSTIN:  Objection, Your Honor.  This is

17   well beyond the scope of cross.  He was asked if he

18   conducted any testing of this document.  The document

19   was -- I don't want to do a speaking objection.  It's

20   beyond the scope.

21        THE COURT:  All right.  Thank you.

22   Overruled.

23        MR. SALVATO:  Your Honor, can I add to that?

24   I think it calls for hearsay as well.  He is explaining

25   what he documented of the sources --

1        THE COURT:  You're asking him to identify
2  names on a page --
3        MS. MARTINEZ:  Yes, Your Honor.
4        THE COURT:  -- based on the investigation?
5        MS. MARTINEZ:  Yes, Your Honor.
6        THE COURT:  All right.  The page speaks for
7  itself.  Objection sustained.
8        MS. MARTINEZ:  If we could go to page 57.
9        And zoom in on the right-hand page there.
10  BY MS. MARTINEZ:
11     Q.  Without identifying any particular names, my
12  question is only:  Based on your investigation, do you
13  recognize any of the names on this page?
14     A.  I recognize all of them.
15     Q.  And, without going into any particular
16  individuals, how is it that you recognized these names?
17     A.  Through this investigation.
18        MR. SALVATO:  Objection, Your Honor, it's
19  hearsay and beyond the scope.
20        THE COURT:  Sustained.
21  BY MS. MARTINEZ:
22     Q.  Let's talk about questions that Leopardo's
23  attorneys asked you.
24     A.  Okay.
25     Q.  They asked you about your arrest of Leopardo.  Do

R. Betts - Redirect                                       116

1    you remember that?

2        A.   Yes.

3        Q.   And, you were asked about whether there was any

4    forensic testing done on the clothing he was wearing the

5    day that he was arrested.

6        A.   On --

7             MR. SALVATO:  Objection.  I didn't ask that.

8    Beyond the scope.

9             MS. MARTINEZ:  I apologize, Your Honor.  I

10   thought I heard that question.

11            THE COURT:  All right.  Sustained.

12   BY MS. MARTINEZ:

13       Q.   You were asked about what items -- whether

14   Leopardo had any weapons on him the day that you

15   arrested him.  Were you asked about that?

16       A.   Um, I believe what counsel had asked me was the

17   day that I patted him down.  I didn't arrest him that

18   day.  But he had no weapons on him that day.

19       Q.   And what day was that?

20       A.   April 23rd, 2014.

21       Q.   And how long was that after the murder of Lil

22   Wasón?

23       A.   Approximately 23, 24 days.

24       Q.   Pesadilla's attorney asked you about your arrest

25   of Pesadilla in Gaithersburg, Maryland.

1    A.    Yes, ma'am.

2    Q.    You said that that was where he was living at the

3    time.

4    A.    Yes.

5    Q.    First of all, what was the date of that arrest?

6    A.    I believe that was August 5th, was when we did

7    the operation, and then he was subsequently arrested.

8    Q.    And when you said he was living at the time,

9    where was he living prior to that time?

10         MS. AUSTIN:  Objection, Your Honor, calls

11   for hearsay.

12         THE COURT:  Sustained.

13   BY MS. MARTINEZ:

14   Q.    Do you have knowledge, based on your

15   observations, as opposed to what someone told you, about

16   what location or neighborhood Pesadilla was living in at

17   other times?

18   A.    I do not remember ever observing him at another

19   location.

20   Q.    Had you ever observed him in other locations at

21   all, setting aside where he lives?

22   A.    I observed him in Prince William at the -- the

23   operation on July 27th.  I don't remember any other than

24   that.

25   Q.    Mr. Jenkins, Greñas's attorney, asked you about

1    conversations that Junior had with various defendants.

2    Do you recall those questions?

3        A.   Yes.

4        Q.   And, he asked you -- he asked you specifically

5    about the recorded calls from Junior's consensual wire.

6    Are you aware of that?

7        A.   Yes.

8        Q.   Are you aware of any conversations that Junior

9    had in person with defendants in this case?

10       A.   I know that he did meet with some, yes.

11       Q.   And, did you observe some of those meetings?

12       A.   I did.

13       Q.   Who did you observe Junior meeting with?

14            Which defendants in this case have you personally

15   observed Junior meeting with?

16       A.   Um, again, to be clear, when they -- the meetings

17   that are occurring at the hotels, they go inside the

18   hotels, so I don't actually see him -- who he is

19   technically talking to.  But I do see him in the parking

20   lot with other persons, prior to going in or when they

21   come out.

22       Q.   Have you reviewed transcripts of conversations

23   between -- in-person conversations between Junior and

24   other defendants in this case?

25       A.   I have.

1    Q.   Now, focusing on your surveillance, you were just

2    talking about what you're able to see when you're

3    observing these meetings.  First of all, is it always

4    possible to take surveillance pictures when you're

5    conducting surveillance?

6    A.   No, it is not.

7    Q.   Why not?

8    A.   Multiple reasons, but, sometimes if it's -- if

9    it's at night, unless you have a high-speed camera with

10   night vision, you're not going to get pictures.

11        Obviously, during these meetings at hotels, if

12   they're inside the hotel, we're not going to get

13   pictures of what's going on inside the hotel.

14        And also, as I stated yesterday, MS-13 has

15   started doing countersurveillance, so as their

16   countersurveillance is walking around the parking lot,

17   we can't really be seen throwing up our cameras, taking

18   pictures.

19   Q.   Of the surveillances that you conducted in the

20   scope of this investigation, were you able to take

21   pictures during every single encounter?

22   A.   No.

23   Q.   Mr. Jenkins also asked you about phone calls with

24   defendants.  Do you recall that?

25   A.   Yes.

1    Q.  And, specifically phone calls with Junior?

2    A.  Yes, ma'am.

3    Q.  He also asked you extensive questions about your

4    experience investigating gang cases.

5    A.  Yes, ma'am.

6    Q.  Based on your experience investigating gang

7    cases, what do you know about gang members changing

8    their phone numbers?

9            MR. JENKINS:  Objection, Your Honor,

10   leading.

11           THE COURT:  Sustained.

12   BY MS. MARTINEZ:

13   Q.  Based on your experience investigating gang

14   cases, are you always able to determine what phone

15   number is associated with a particular individual?

16           MR. JENKINS:  Objection, Your Honor.

17           THE COURT:  Questions that suggest the

18   answer are leading.  Objection sustained.

19   BY MS. MARTINEZ:

20   Q.  Please tell the jury what steps you take when you

21   are investigating phone numbers and suspected gang

22   members?

23   A.  Um, so, some of which has already been discussed,

24   when we're doing phone dumps of other people's phones,

25   You will have their monikers, their gang names, on the

1    phone number -- the phone contact sheet.  That is one

2    way how we determine --

3              MS. AUSTIN:  Your Honor, I'm going to object

4    to this.  This is a general question about his

5    investigation.  It should relate to this case.

6              THE COURT:  Sustained.  Focus on this case.

7    BY MS. MARTINEZ:

8    Q.  Focusing on this case, what steps, if any, were

9    attempted to connect particular individuals, subjects of

10   the investigation to particular phone numbers?

11   A.  So, again, specific to this case, the same --

12   same scenario, with -- you've got phone dumps, and we

13   dumped phones, Demente's phone being one of them.

14   That's how we establish who's -- which gang or

15   associates are using certain numbers.

16        We also do subpoena for subscriber information,

17   as was previously brought up by Mr. Jenkins.

18        And then, also, we just -- we go to the street

19   and talk to people on the street, the associates to the

20   gang, and sometimes they'll tell whose number is whose.

21   Q.  And what challenges, if any, have you faced with

22   respect to these steps?

23              MR. JENKINS:  It's leading, "what

24   challenges."

25              THE COURT:  "If any."  Overruled.

BY MS. MARTINEZ:

Q.   What challenges, if any, have you faced with respect to these types of investigative steps in this investigation?

A.   So, in this investigation, it's -- it's -- the gang members like to change their numbers to keep us off track, so we can't continue to follow them.  If they kept the same number for a length of time, we would be able to -- we would know that, and obviously be able to follow them via their number.  But they change often.

Q.   How often?

A.   It's a case-by-case basis.  I couldn't testify as to it's always the same.  It's just, they change often.

Q.   What are some examples of frequency with which, in this investigation, you saw phone numbers change?

A.   Um, there was -- I'm trying to -- if I remember, Lil Wasón, obviously, he was a victim, but his number -- his number changed a number of times.  And there were -- I recall there were others, but I just can't -- I don't recall which ones.

Q.   Mr. Jenkins also asked you about ways in which, during the course of your investigation, you attempted to -- or anyone attempted to identify speakers in the recorded calls with Junior.  Do you recall that?

A.   I do, ma'am.

 1      Q.   Now, one of the things Mr. Jenkins asked about --
 2   I want to use the words he used -- was
 3   self-authenticating information.  Do you recall that?
 4      A.   I do.
 5      Q.   And is content within a call itself sometimes
 6   used to help identify the speakers in the call?
 7      A.   Sometimes, yes.
 8      Q.   Mr. Jenkins asked specifically about Government's
 9   Exhibit 7-A-1.
10           MS. MARTINEZ:  Your Honor, may we publish
11   pages from that exhibit?
12           THE COURT:  Yes.
13   BY MS. MARTINEZ:
14      Q.   Let's start with the first page, first numbered
15   page.
16           MS. MARTINEZ:  And if we could zoom in on
17   the top third of the page there.
18   BY MS. MARTINEZ:
19      Q.   Detective, at the very beginning, above the
20   cutout there, do you see it says, "Phone rings"?
21      A.   Yes.
22      Q.   Is this the beginning of the phone call?
23      A.   Yes.
24      Q.   Do you see the second line there, where Junior
25   says, "No, man, for sure, the problem, it's your phone,

1    Greñas"?

2        A.   Yes, ma'am.

3        Q.   Who do you know Greñas to be?

4        A.   Jose Lopez Torres.

5             MS. MARTINEZ:  If we could go to page three.

6    And zoom in on the last third of that page there.

7    BY MS. MARTINEZ:

8        Q.   Do you see in the third-to-last line, Junior

9    says -- excuse my language -- "Fuck man, Peluca."  Do

10   you see that?

11       A.   I do, ma'am.

12       Q.   Who do you know Peluca to be?

13       A.   A second moniker or nickname that Jose Lopez

14   Torres uses.

15             MS. MARTINEZ:  Could you go to page eight?

16   And zoom -- zoom in on the large paragraph in the middle

17   of the screen, where Greñas is speaking.

18   BY MS. MARTINEZ:

19       Q.   Do you see in the middle of that text there,

20   where Greñas says, "When Demente calls me, we're going

21   to clear all this craziness, and how do the sons of

22   bitches know?  And listen to what they told me, quote,

23   'Well, yeah, Greñas,' end quote, they told me"?

24             Again, who do you know Greñas to be?

25       A.   Jose Lopez Torres.

1          MS. MARTINEZ:  If we could go to page 13,

2     and zoom in on the second half of page 13.

3     BY MS. MARTINEZ:

4        Q.   And do you see within this cutout, which is only

5     part of the page, the first, second, third, fourth

6     section down, Greñas says, "Yeah, that son of a bitch,

7     and Little -- and all of these sons of bitches would

8     tell me, quote, 'You're crazy, Greñas,'" end quote?

9          Again, who do you know Greñas to be?

10       A.   Jose Lopez Torres.

11         MS. MARTINEZ:  And if we could go to page

12    19.  And zoom in on the last paragraph at the bottom of

13    the page there.

14    BY MS. MARTINEZ:

15       Q.   And do you see there where it says, "Son of a

16    bitch was saying", quote, "No man, if I messed up, I

17    swear to you I will tell you, but don't kill me," end

18    quote, open quote, "Bullshit, son of a bitch, I told

19    him, for being a rat," end quote, open quote, "I will

20    tell you, he would tell me", open quote, "Grenitas, I

21    will tell you, but let me live," end quote?

22         Who do you know Grenitas to be?

23       A.   Another version or another way of saying Greñas,

24    for Jose Lopez Torres.

25              MS. MARTINEZ:  Court's indulgence, Your

1    Honor.

2              No further questions, Your Honor.

3              THE COURT:  You can step down, sir.

4              THE WITNESS:  Thank you, sir.

5              (Thereupon, the witness withdrew from the

6    stand.)

7              MS. MARTINEZ:  Your Honor, the government

8    rests.

9              THE COURT:  All right.

10             Ladies and gentlemen, we've heard all the

11   government's evidence in the case.  What I'd like to do

12   now is to recess until 2:00 o'clock.

13             Again, please don't discuss the case.  Don't

14   permit the case to be discussed in your presence.  Don't

15   do any research on the case.  And leave your notes in

16   the jury deliberation room.

17             We will resume at 2:00 o'clock.  Thank you.

18             (Jury not present.)

19             THE COURT:  Be seated.

20             Government rests.

21                           ---

22             (Rule 29 motions heard, not included as part

23   of transcript.)

24                           ---

25             (Court in session at 3:23 p.m.)

1          THE COURT:  All right.  Bring our jury out,
2    Mr. Toliver.  Thank you.
3          (Jury present.)
4          THE COURT:  You may be seated.
5          All right, ladies and gentlemen, we're in
6    the defense case now, and we're about to begin.
7          Mr. Jenkins is going to read some
8    stipulations that have been reached by the lawyers in
9    the case, and you're to treat these stipulations as
10   evidence in the case.
11         Go ahead, Mr. Jenkins.
12         MR. JENKINS:  Thank you, Your Honor.
13         "The United States of America and the
14   defendants, by and through undersigned counsel, hereby
15   stipulate and agree that the report of examination from
16   the Federal Bureau of Investigations dated January 29,
17   2015, and hereto attached as Defendant Lopez Torres
18   Exhibit 1, is admissible as a proof of the results of
19   the forensic analysis referenced therein.
20         "The parties further agree that if called to
21   testify, the lab technician would aver that failure to
22   recover DNA from an item does not foreclose the
23   possibility that an individual came into contact with
24   that item."
25         The second stipulation, Your Honor, reads as

1   follows:

2                   "The United States of America and the

3   defendants, by and through undersigned counsel, hereby

4   stipulate and agree that the report of examination from

5   the Federal Bureau of Investigations dated February 3rd,

6   2015, and hereto attached as Defendant Lopez Torres

7   Exhibit 2, is admissible as a proof of the results of

8   the forensic analysis referenced therein."

9                   And, Your Honor, we would offer both for

10  admission.

11                  THE COURT:  All right.  Received.

12                  MR. JENKINS:  Thank you, Your Honor.

13                  THE COURT:  Mr. Aquino.

14                  MR. AQUINO:  Judge, we call Officer Michael

15  Garcia, Michael Garcia.

16                  (Witness sworn.)

17                  THE WITNESS:  Yes.

18                  THEREUPON, MICHAEL GARCIA, having been duly

19  sworn, testified as follows:

20                       DIRECT EXAMINATION

21  BY MR. AQUINO:

22      Q.   Officer Garcia, good afternoon.

23      A.   Good afternoon.

24      Q.   Would you state your name for the record.

25      A.   Officer Michael Garcia.

1    Q.   And you work for?

2    A.   City of Alexandria.

3    Q.   Police, correct?

4    A.   Yes.

5    Q.   Would you spell your last name for the court

6    reporter?

7    A.   Last name is G-a-r-c-i-a.

8    Q.   Okay.  Officer Garcia, you were here last week on

9    a subpoena of the government; is that correct?

10   A.   Yes.

11   Q.   Okay.  And, just to get to the point, you arrived

12   at the scene of the shooting of Mr. Julio Urrutia in the

13   city of Alexandria on June 19th of 2014; is that

14   correct?

15   A.   Yes.

16   Q.   And it was at night; is that accurate?

17   A.   Yes.

18   Q.   Okay.  And, did you encounter a shirtless man?

19   A.   I did.

20   Q.   His name?

21   A.   David Jiménez.

22   Q.   Okay.  Now, when you approached Mr. Jiménez, was

23   he cooperative with you?

24   A.   No.

25   Q.   Okay.  Can you explain?

1    A.   He was very agitated -- well, initially, when I

2  arrived, he was actually trying to assist the victim.

3    Q.   Uh-huh.

4    A.   But then he was very uncooperative and agitated,

5  pacing back and forth.

6    Q.   I didn't hear the last part.

7    A.   And pacing back and forth.

8    Q.   Did you find him combative?

9    A.   He -- he got in a position where he got in a

10  stance, but he didn't raise his arms or anything at me

11  like that.  He was five inches away from my face.

12    Q.   How did you interpret that?

13    A.   As if he's trying to fight.

14          MR. AQUINO:  Judge, that's all the questions

15  I have.  Thank you.

16          MR. TOBLER:  No cross, Your Honor.

17          THE COURT:  All right.

18          You're excused, sir.  Thank you.

19          (Thereupon, the witness withdrew from the

20  stand.)

21          THE COURT:  I'm ready.

22          MS. AMATO:  Oh, thank you, Your Honor.

23          Your Honor, at this time on behalf of

24  Mr. Chavez, by myself as well Mr. Aquino, we would like

25  to introduce into evidence the deposition of a Mr. Cosmo

1    Gonzalez.  And we will -- like to play that deposition
2    at this time.
3              THE COURT:  Ladies and gentlemen,
4    Mr. Gonzalez is not present in court.  He is
5    unavailable.  But this testimony was taken here in open
6    court in front of me, with counsel for the defendant and
7    counsel for the government present, and videotaped.
8              So you're to consider it as substantive
9    evidence in the case.  You won't be able to go back to
10   it, but you're able to see it here in court.  Thank you.
11             MS. AMATO:  Your Honor, may I sit back at my
12   seat, or shall I stay at the podium?
13             THE COURT:  Well, I'm expecting no
14   objections, so, go ahead.
15             MS. AMATO:  Yes, thank you.
16             (Video deposition of Cosmo Gonzalez played
17   at 3:30 p.m.)
18             THE COURT:  Can you stop it?
19             (Video stopped at 3:36 p.m.)
20             THE COURT:  The audio is terrible.  Is that
21   all we have?
22             MS. AMATO:  It's the speakers in the
23   courtroom, Your Honor.  Yes, it is.
24             THE COURT:  They can't understand it.
25             MR. AQUINO:  Judge, what I was going to

suggest, maybe with the court reporter -- sorry -- the
interpreter can hear with the earphones, because she can
do the translation, so that it is audible for the jury.

THE INTERPRETER:  The interpreter cannot
hear enough to translate.  I mean, the interpreter
cannot hear the voice.  And this is -- it is this
interpreter who is on the video.

THE COURT:  How many lawyers does it take to
figure out how to put sounds on on --

MR. ZIMMERMAN:  This is why we became
lawyers.

THE COURT:  And they said there would be no
math.

MR. AQUINO:  If the interpreter said she
can't -- if we can read the transcript, if that would be
acceptable.

We can put the microphone by the --

MS. MARTINEZ:  It might take a few minutes
to figure out the technology, Your Honor.

THE COURT:  I see.  I guess it might be easy
to send the jury out, so they don't have to see you do
everything.

I'll let you all go out.  It's not easy to
fix something when somebody's looking at you.  I'll
leave, too.

1          (Jury not present, 3:40 p.m.)

2          THE COURT:  Ms. Amato and Mr. Aquino, my

3   rule is, with technology in court, you have duplicate

4   systems.  You have ten minutes to get this fixed or we

5   move on to something else.

6          MS. MARTINEZ:  Your Honor, may I quickly

7   address the Court?

8          Special Agent Born, at defense counsel's

9   request, has been here since 9:00 o'clock this morning.

10  I would ask that defense, if they're going to call her,

11  that they do call her today.  I was asked yesterday to

12  call her last night and get her here first thing in the

13  morning.

14         It's just -- you know, she's extremely busy,

15  and she has been here since 9:00.  It seems appropriate,

16  given that we still have an hour and 20 minutes, that

17  she be called today and that this -- I mean, this video

18  can be played tomorrow.  And perhaps that will give time

19  to figure out the technology as well.

20         MR. AQUINO:  I'm good with that, Judge.

21         THE COURT:  All right.  Ready to bring the

22  jury back?

23         MR. AQUINO:  Yes.

24         THE COURT:  All right.  Have a seat.  You

25  can do that after we leave court, as much as you want.

1       You can bring our jury back.  Thank you.

2       You can take that off the screen.

3       MR. ZIMMERMAN:  Your Honor --

4       (Jury present at 3:41 p.m.)

5       THE COURT:  You may be seated.

6       MR. ZIMMERMAN:  Your Honor, can we approach

7  briefly?

8       THE COURT:  No.

9       Call your witness.

10      MS. AUSTIN:  Your Honor, this has to do with

11  the order of presentation of evidence that was just

12  sprung on us in the last 20 seconds.  We have an issue.

13      THE COURT:  I wish you told me this before I

14  brought the jury back.  I just asked if you all were

15  ready.

16      MS. AUSTIN:  We stood up.

17      THE COURT:  Ladies and gentlemen, if you

18  would go back out again, please.

19      (Jury not present at 3:43 p.m.)

20      THE COURT:  You may be seated.

21      You want to come to the podium?

22      MR. ZIMMERMAN:  Yes, Your Honor.  Thank you.

23      Your Honor, a number of things.  As the

24  Court has advised us, to give the government advance

25  notice of our witnesses, what we simply did is we

1   advised the government immediately that we have this
2   witness, and we want them to be available.  We obviously
3   didn't know if, through all the presentation of
4   evidence, this would come up today.
5           You know, we -- there is an important order
6   of presentation of evidence, and, for example, we go
7   after Mr. Paiz Guevara, for various reasons that the
8   Court is aware of, and has ordered it.  And we would
9   like to maintain that order.
10          The one thing I can suggest is that Special
11  Agent Born be released today -- and we appreciate that
12  she was available -- and then is available tomorrow.  We
13  understand that there might be a time period tomorrow
14  afternoon that might be open as a result of an earlier
15  sidebar.  And so the -- we would submit that she can be
16  released today.
17          And this has to do with the order of
18  evidence.  We're certainly ready to go with this
19  witness, but we would prefer, as with everything else,
20  to go after Paiz Guevara.  And that was --
21          THE COURT:  I appreciate your request.
22          MR. ZIMMERMAN:  Thank you, Judge.
23          THE COURT:  What we're going to do now is
24  we're going to try this case.  You were notified on
25  Thursday that the government was going to rest on

1  Monday, and, now we're at Tuesday.  I'm ready to go

2  forward with the defense case, if you have one.  If you

3  call this witness, it will be now or maybe not at all.

4  So, are you ready to call the witness?

5            MR. ZIMMERMAN:  We are ready to call this

6  witness, Your Honor.

7            THE COURT:  All right.

8            Bring the jury back.

9            (Jury present at 3:45 p.m.)

10           THE COURT:  Thank you for your patience,

11 ladies and gentlemen.

12           You may be seated.

13           MR. ZIMMERMAN:  Your Honor, the defense

14 calls Special Agent Brenda Born.

15           THE COURT:  She remains under oath.

16           (Witness resumed stand.)

17           THE COURT:  You may be seated.

18           Agent Born, you remember the oath you took

19 other day?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  All right.  You're still under

22 oath.

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Go ahead.

25

1          THEREUPON, BRENDA K. BORN, previously duly

2    sworn, testified as follows:

3                     DIRECT EXAMINATION

4    BY MR. ZIMMERMAN:

5       Q.   Good afternoon, Agent Born.

6       A.   Good afternoon.

7       Q.   My name is Jeff Zimmerman, and along with Amy

8    Austin we represent Alvin Gaitan Benitez.

9          And although you have previously testified, just

10   so the record is clear, could you please state your name

11   for the record and spell it for the court reporter.

12      A.   Sure.  My name is Brenda K. Born, B- as in boy,

13   -o-r-n.

14      Q.   And, you testified on direct a little while ago

15   that you were Junior's handler; is that correct?

16      A.   Correct.

17      Q.   And, just for the record, could you state

18   Junior's full name, who we're talking about?

19      A.   Jose --

20          MS. MARTINEZ:  Objection, Your Honor,

21   relevance.

22          MR. ZIMMERMAN:  The relevance we typically

23   put the gang moniker with the individual's actual name.

24   This individual has testified as to his actual name, and

25   I want the record to be clear who we're talking about.

1        THE COURT:  I don't think there's any

2   ambiguity on he is, Mr. Zimmerman.  Objection sustained.

3        MR. ZIMMERMAN:  Thank you, Your Honor.

4        THE COURT:  Go ahead.

5   BY MR. ZIMMERMAN:

6   Q.   And, as -- since you were Junior's handler, he

7   reported what other gang members said to you, correct?

8   A.   He reported to me what the gang members said to

9   him.

10  Q.   Yes.

11  A.   Correct.

12  Q.   And, you memorialized these conversations in

13  e-mails; is that correct?

14       MS. MARTINEZ:  Your Honor, we object to

15  leading.  This is now direct examination.

16  BY MR. ZIMMERMAN:

17  Q.   Did you memorialize those conversations?

18  A.   Yes, I did.

19       MR. ZIMMERMAN:  I'm sorry, Judge.

20       THE COURT:  Questions that begin "Did you"

21  are leading.  Objection sustained.

22  BY MR. ZIMMERMAN:

23  Q.   What did you do after you -- how frequently did

24  you speak to Junior?

25  A.   It would depend kind of the timeframe.  We are

1    obligated to speak every 90 days as a requirement for

2    handling a confidential human source.  For this

3    investigation, sometimes it would be daily that I would

4    speak with Junior.

5        Q.  Okay.  And after you spoke to Junior, what would

6    you do?

7        A.  I would -- depending on what our conversations

8    were, if it was relevant to the investigation I would

9    document that information and provide it to the violent

10   gang squad of the Washington Field Office.

11       Q.  Okay.  And how would you document that

12   information?

13       A.  In e-mail.

14       Q.  And who would you send these e-mails to?

15       A.  The case agent and the supervisor at the time.

16       Q.  So, Special Agent Fernando Uribe would typically

17   be a recipient of these e-mails?

18       A.  Correct.

19       Q.  Okay.  And, you sent these e-mails to the agents

20   because they relied on them in their investigation; is

21   that correct?

22              MS. MARTINEZ:  Objection, Your Honor,

23   leading.

24              THE COURT:  Sustained.

25

BY MR. ZIMMERMAN:

Q.   Why did you send these e-mails to the agents?

A.   I provided them the intelligence as I thought --
as it related to gang activities.

Q.   Um, and, was it important to you that these
e-mails be accurate?

A.   Pardon me?

Q.   Was it important that these e-mails be accurate?

A.   Yes.  I mean, I provided the information that was
provided to me from Junior.

Q.   Okay.  And, um, at a certain point, during one of
these conversations, did Junior tell you that --

MS. MARTINEZ:  Objection, Your Honor,
leading, also, about to go into hearsay.

MR. ZIMMERMAN:  Well, this would fall
squarely within the co-conspirator exception.  This is
exactly the type --

MS. MARTINEZ:  Your Honor, may we approach
if we're going to --

THE COURT:  Okay.

MS. MARTINEZ:  -- have a speaking --

THE COURT:  All right.

(Thereupon, the following side-bar
conference was had:)

MS. MARTINEZ:  Your Honor --

1          THE COURT:  Yes.

2          MS. MARTINEZ:  -- the objection is to

3    hearsay, and, I imagine Mr. Zimmerman, because he just

4    started to say it, will say there's a co-conspirator

5    exception.

6              Junior was not a co-conspirator.  The

7    testimony at trial has conclusively established that he

8    was a confidential human source for the FBI.  He did not

9    conspire with any of these defendants or anyone else.

10   He is a government agent during the scope of his work on

11   this investigation.  It's very clear that the

12   confidential human source is not a co-conspirator.

13         MR. ZIMMERMAN:  Your Honor, the government

14   has elicited throughout this trial the statements that

15   were given by co-conspirators to Junior when Junior was

16   posing as a co-conspirator.

17         THE COURT:  So, what you just said is very

18   important, statements of defendants made to Junior, as

19   distinct from what Junior said to the police.

20         MR. ZIMMERMAN:  Right.  And then Junior --

21   and then -- and then -- okay.  Okay.  I'm sorry, Your

22   Honor.  I'll take another shot at this.

23         THE COURT:  All right.  I'm listening.

24         MR. ZIMMERMAN:  When Junior was on the

25   stand, Amy asked him if my client, Pesadilla, had

1    bragged to him that he had stabbed Lagrima.  And there

2    is no evidence that -- he's not charged with the Lagrima

3    stabbing.  So this goes to the defense of blustering.

4              And Junior said that he didn't recall that.

5    He couldn't confirm that he recalled that.  So this is

6    actually impeachment testimony --

7              THE INTERPRETER:  One of the defendants is

8    asking the speakers to slow down, please, because the

9    Spanish is very --

10             THE COURT:  All right.

11             MR. ZIMMERMAN:  So, I'm impeaching him by

12   bringing out, in fact, Junior did say that name.  So

13   it's not hearsay.  That's coming in as impeachment.

14             THE COURT:  There are 24 exceptions to the

15   hearsay rule.  Which one do you rely on?

16             MR. ZIMMERMAN:  There's two, Your Honor.

17   One, we would say this is outside of hearsay because

18   what this does is impeach.  But it's, Junior says

19   that -- that when Junior was asked by my co-counsel

20   whether or not Lagrima told him -- sorry -- whether or

21   not Pesadilla told him that he, Pesadilla, had stabbed

22   Lagrima, he couldn't confirm that.  He didn't know.  And

23   in fact, he did tell that to Agent Born.  So, it's not

24   for the truth of the matter asserted.

25             THE COURT:  That's your first one.  What's

1    the second one?

2              MR. ZIMMERMAN:  The second one it is a

3    statement of a -- this is a statement of a defendant.

4    This is statement of my client.  But the fact --

5              THE COURT:  So, a statement of your client

6    that you're trying to offer through the witness; is that

7    what you're stating to me?

8              MR. ZIMMERMAN:  The statement of my client

9    to a co-conspirator.

10             THE COURT:  Okay.  You've had three tries.

11             MR. ZIMMERMAN:  This is impeachment

12   testimony.

13             THE COURT:  If Junior was on the stand, it

14   might be impeachment.

15             MR. ZIMMERMAN:  We did impeach him.  He was

16   on the stand.

17             THE COURT:  You're stuck with his answer.

18             MR. ZIMMERMAN:  No.  I get to impeach his

19   answer.

20             THE COURT:  Not with hearsay.  I'm not

21   debating or running a law school class.

22             MR. ZIMMERMAN:  Can I get one more sentence?

23   I think I muddled it a little bit.  It's my fault.

24             Judge, we get -- Junior was asked, did he

25   tell Brenda Born -- Junior was asked about whether the

1    statement was made to him.

2              He denied it.  He said he didn't know that

3    it was made.  He denied it.

4              So now we get to impeach him through the

5    person that he made the statement to.  And it's part of

6    our defense, that he is -- he's now denying those

7    statements, because those would help us.

8              So this is impeachment.  It's not hearsay.

9    Junior changes his story, and through this agent I get

10   to bring out that he --

11             THE COURT:  That he made a prior

12   inconsistent statement?

13             MR. ZIMMERMAN:  -- he claimed one thing, and

14   it's not true.

15             MS. MARTINEZ:  May I respond to that, Your

16   Honor?

17             THE COURT:  Then we shut this down, okay.

18             MS. MARTINEZ:  With respect to impeachment,

19   it's improper impeachment, if I understand the defense

20   counsel proper correctly.  Their understanding is Junior

21   said he couldn't remember.  They didn't attempt to

22   refresh his recollection.  They didn't play the

23   recording.

24             They've got the entire wire.  If there's a

25   recording of that, Mr. Zimmerman's client, that

1    Mr. Zimmerman wants the jury to hear, he can play it and
2    they can get a translation of it.
3                But what they're instead trying to do is to,
4    when Junior said I don't remember something, they're now
5    trying to get another witness to put in two little
6    cents --
7                THE COURT:  Objection sustained.
8                MR. SALVATO:  Your Honor, Your Honor --
9                THE COURT:  I don't have three --
10               MR. SALVATO:  I was going to make a
11   30-second observation.
12               THE COURT:  But it's not your motion.  It's
13   Mr. Zimmerman's motion.
14               MR. SALVATO:  It relates to the motion, Your
15   Honor.
16               The only thing -- the only -- I'm sorry.
17   Just for the record, the only thing I would state, Your
18   Honor, is that we previously made a motion, and we would
19   renew it here.  If Junior was a paid government agent,
20   basically a law enforcement officer, and these guys are
21   making statements to him, that not only are about
22   themselves but also about other people in the case,
23   because he's in a position as a law enforcement officer,
24   in our opinion, that those statements should only be
25   about the person making the statements, instead of

1   allowing that person to talk about other people.

2              We raised the issue before, and I'm raising

3   it again, just for the record.  The Court denied us.

4              THE COURT:  Thank you.  I denied it.  Thank

5   you.

6              (Thereupon, the side-bar conference was

7   concluded.)

8   BY MR. ZIMMERMAN:

9      Q.  As the confidential human source, Junior, was

10  subject to a lot of rules from the FBI; is that correct?

11     A.  Correct.

12     Q.  And one of the rules was that he not engage in

13  violence; is that correct?

14             MS. MARTINEZ:  Objection, Your Honor,

15  leading.

16             THE COURT:  Sustained.

17  BY MR. ZIMMERMAN:

18     Q.  What were those rules?

19     A.  He was not allowed to engage in -- engage in any

20  unauthorized illegal activity.  He was not allowed to

21  participate in violence.  He was -- part of the

22  agreement was to provide truthful information.  He was

23  not promised any payments or --

24     Q.  Okay.

25             If he violated any of those rules --

1          MS. MARTINEZ:  Your Honor, I object to

2    defense counsel --

3          THE COURT:  I'm not sure she was finished

4    answering the question, Mr. Zimmerman.

5          MR. ZIMMERMAN:  I'm sorry, Your Honor.

6          THE COURT:  You asked her what the rules

7    were.

8          MR. ZIMMERMAN:  I did.

9          THE WITNESS:  And then, in addition, there

10   was no promises of immigration benefits.

11   BY MR. ZIMMERMAN:

12     Q.   Okay.  And was Junior required to report any

13   violations of these rules to you?

14     A.   Yes.  I mean, if he violated them, yes.

15     Q.   Um, and did he report to you, um --

16         MS. MARTINEZ:  Objection, Your Honor,

17   leading.

18         MR. ZIMMERMAN:  I haven't even asked the

19   question, Your Honor.

20         THE COURT:  Questions that begin "Did you"

21   are leading.  Objection sustained.

22   BY MR. ZIMMERMAN:

23     Q.   Were there any reports from Junior about his

24   violations of any of these rules?

25     A.   No, not from him, no.

1    Q.  Um, so he didn't report any acts of violence to
2    you that he committed?
3    A.  No, he did not.
4    Q.  Okay.  Um, and he didn't report, um, that he
5    punched a young man in the face in retaliating --
6              MS. MARTINEZ:  Objection, Your Honor,
7    leading.
8              THE COURT:  Sustained.  Questions that begin
9    "did you" or that suggest the answer are leading,
10   Mr. Zimmerman.
11   BY MR. ZIMMERMAN:
12   Q.  Any acts of violence he committed would have
13   violated his agreement with the FBI, correct?
14   A.  Correct.
15   Q.  And then, he could have been denied any of the
16   potential benefits he gets from the FBI, correct?
17             MS. MARTINEZ:  Objection, Your Honor,
18   leading.  These questions are all leading.
19             THE COURT:  Sustained.
20   BY MR. ZIMMERMAN:
21   Q.  What would happen if he violated the rules?
22   A.  Well, if -- I guess it would depend on which
23   rules.  We would go back and talk about what it was,
24   what the violation was, and determine what course of
25   action needed to be followed.

1    Q.  What if the violation was that he committed an

2  act of violence?

3    A.  I would have to go back and see what the act of

4  violence was, and consult with the field office and

5  determine what we need to do to move forward.

6    Q.  What would be a potential sanction for that?

7            MS. MARTINEZ:  I object to the hypothetical

8  now.

9            THE COURT:  Sustained.

10            I want to ask the interpreter.  Are we

11  talking too fast here?

12            THE INTERPRETER:  Borderline, Your Honor.

13            THE COURT:  Borderline.  Okay.  Slow down

14  our pace.

15  BY MR. ZIMMERMAN:

16    Q.  What would be the sanction if he punched somebody

17  in the face?

18            MS. MARTINEZ:  Objection, Your Honor, to

19  hypothetical.

20            MR. ZIMMERMAN:  Your Honor, I mean, this is

21  tough, because we're objected to leading questions,

22  and -- and you know, at this point --

23            THE COURT:  Mr. Zimmerman --

24            MR. ZIMMERMAN:  Yes.

25            THE COURT:  -- I would prefer not to have

1   speaking objections --

2               MR. ZIMMERMAN:  That's fair enough, Judge.

3               THE COURT:  -- and the rules of evidence

4   apply to the government and defense counsel.

5               MR. ZIMMERMAN:  I appreciate that, Judge.

6   BY MR. ZIMMERMAN:

7      Q.  What is a sanction for a significant act of

8   violence?

9      A.  To be honest, I don't know.  I've never had one,

10  to determine what it would be.  I'd have to talk with

11  our office and determine what the course of action would

12  be.

13     Q.  Are one of the sanctions -- is a potential

14  sanction that he can -- that the individual can --

15              MS. MARTINEZ:  Objection, Your Honor,

16  leading.

17              THE COURT:  Sustained.

18  BY MR. ZIMMERMAN:

19     Q.  What are all the sanctions for violating the

20  rules?

21     A.  I've not exactly sure.  I've never had -- the

22  only violation I've had ever was an unauthorized illegal

23  activity.  I've never had violations of the other ones,

24  to know what that course of action would be.

25     Q.  What was the sanction for that?

1    A.   I needed to notify the U.S. Attorney's Office,

2   and I needed to notify the executive management within

3   our field office and get permission to continue

4   operating the source.

5    Q.   Okay.  Was Junior advised that he'd be sanctioned

6   if he violated the rules?

7    A.   He was advised that he was not to commit any of

8   those offenses.  I never went over, like, what any

9   punishments would be if he did violate them because I

10  don't know myself, like I said.

11   Q.   And was he advised he had to report any

12  violations?

13   A.   Yes.

14          MR. ZIMMERMAN:  No further questions, Your

15  Honor.

16          THE COURT:  You may proceed.

17                 CROSS-EXAMINATION

18  BY MR. LEIVA:

19   Q.   Good afternoon, Agent Born.

20   A.   Good afternoon, sir.

21   Q.   Just one or two quick questions.

22   A.   Sure.

23   Q.   You just testified on direct that you advised

24  Junior that he would receive no special immigration

25  benefits?

1    A.   I could not make any promises that he would
2    receive immigration benefits.
3    Q.   What about his family; did you make any promises
4    to any immigration benefits that his family would
5    receive?
6    A.   No, I did not.
7    Q.   Okay.  Are you telling us, then, Agent Born, that
8    as his handler, you did not receive any information that
9    his family received entrance and temporary immigration
10   status here in the U.S.?
11   A.   When I was his handling agent?  No, I did not.
12   Q.   Okay.  And you say when you were his handling
13   agent.  You were his handling agent for how long?
14   A.   From, I believe, approximately October of 2009
15   until September of 2014.
16   Q.   All right.  And, from that whole time period, you
17   were never instructed that Junior's family would benefit
18   from his cooperation --
19   A.   No, I did not --
20   Q.   -- is that what you're telling us?
21   A.   I'm sorry.  What was the question?
22   Q.   Are you telling us for that length of period of
23   time that you were Junior's handler, you were never told
24   that his family would receive immigration benefits for
25   his cooperation?

1    A.   No.

2              MR. LEIVA:  That's all the questions I have,

3    Your Honor.  Thank you.

4              MS. MARTINEZ:  Your Honor, we have no

5    cross-examination.

6              May Agent Born be excused?

7              THE COURT:  Yes.

8              You're excused.  Thank you.

9              THE WITNESS:  Thank you.

10             (Thereupon, the witness withdrew from the

11   stand.)

12             MR. ZIMMERMAN:  We have no further evidence.

13   Thank you, Your Honor.

14             THE COURT:  All right.

15             MR. CHICK:  Could I have the Court's brief

16   indulgence?

17             THE COURT:  Sure.

18             MR. CHICK:  Your Honor, we call Detective

19   Ignacio.

20             MS. MARTINEZ:  Your Honor, it's possible we

21   will have to approach on this.

22             Fortunately, I was mistaken.

23             THE COURT:  Okay.

24             You remain under oath.

25             (Witness previously sworn.)

1          THEREUPON, VICTOR IGNACIO, previously duly

2    sworn, testified as follows:

3                     DIRECT EXAMINATION

4    BY MR. CHICK:

5      Q.   Hi, Detective.  My name is Mike Chick.  I'm the

6    attorney for Manuel Ernesto Paiz Guevara.  Sorry to have

7    to have to bring you back, but I just have a couple

8    questions.  Okay?

9      A.   Yes, sir.

10     Q.   First, I guess just the formality, can you please

11   say and spell your name once again for the court

12   reporter.

13     A.   It's Victor, V-i-c-t-o-r, Ignacio, I-g-n-a-c-i-o.

14     Q.   Okay.  And Detective Ignacio, you testified a

15   couple -- a couple days ago, and I think also yesterday,

16   about your interviews with Jose Del Cid, otherwise known

17   as Duende; is that right?

18     A.   Yes.  That was yesterday.

19     Q.   Okay.  And what, if anything, did I ask you to

20   review with respect to your interviews with him?

21     A.   It was a portion of the video from his interview.

22     Q.   Okay.  And were you able to do that?

23     A.   I did.

24     Q.   Okay.  I'm going to ask you a little bit about

25   that interview, and particularly about anything that he

1  said about the killing of somebody named Gerson or

2  Gerson.  Okay?

3      A.   Okay.

4      Q.   Do you remember that being discussed in your

5  interview?

6      A.   Yes.

7      Q.   Okay.  Can you tell me what -- first of all, I

8  guess, what, if anything, he said about a person named

9  Solitario?

10     A.   He was *chequeo*, that he was -- he was there.

11     Q.   He said, a *chequeo* named Solitario was there, or

12  a *chequeo* named Misionero was there?

13     A.   Oh, no, Misionero, yes.

14     Q.   Okay.  Did he say anything about the name

15  Solitario?

16     A.   I don't remember him saying that, no.

17     Q.   Okay.  He did give other names, though?

18     A.   Yes, he did.

19     Q.   Okay.  And, what, if anything, did he say about

20  the person, the *chequeo* Misionero?

21     A.   That he was there.

22     Q.   Okay.  Did he say anything about that person

23  doing anything?

24     A.   He simply said that he was there.

25     Q.   Okay.  Um, when he was talking about other

1   individuals -- you don't have to name any names, but

2   when he was talking about other individuals aside from

3   that *chequeo*, what, if anything, did he say about those

4   people?

5       A.   During that initial interview, he only said that

6   one of them took part in the crime, and himself.  He

7   never said what the rest of the guys did.  He just say

8   that they were there, too.

9       Q.   Okay.  Did he say anything about anybody else

10  using knives to stab the victim?

11      A.   One of them, yes.

12              MS. MARTINEZ:  Objection, Your Honor,

13  leading.

14              THE COURT:  Sustained.

15  BY MR. CHICK:

16      Q.   What, if anything, did he say about people using

17  knives to stab the victim?

18              MS. MARTINEZ:  Objection, Your Honor,

19  leading.

20              MR. CHICK:  Your Honor, the question was

21  what, if anything, did he say about it?

22              THE COURT:  That would suggest the answer.

23  Objection sustained.

24  BY MR. CHICK:

25      Q.   What, if anything, did he say about the killing

1   of the victim?

2        A.   That they killed him.

3        Q.   Okay.  And when you say "they," can you expand on

4   that?

5        A.   The names that he mentioned.

6        Q.   Okay.  And I just want to make sure that we're

7   clear.  Are you saying that Misionero was one of the

8   people that he was referring to, when he said that?

9             Did I say that right?  Let me say it again.

10            When he said they killed him, are you saying that

11  he said Misionero was one of those people that killed

12  him?

13       A.   I'm saying that he would -- Misionero was there.

14  He said that.

15       Q.   Okay.

16       A.   He also mentioned three or four other names that

17  were there.

18       Q.   Okay.  And then, with respect to, um, Misionero,

19  what does -- what does that word mean?

20       A.   Misionero is a mission.

21       Q.   Missionary?

22       A.   Yeah, missionary, yeah.

23            MR. CHICK:  Court's brief indulgence.

24  BY MR. CHICK:

25       Q.   Just one last question, if you remember anything

 1   about this.  With respect to the person that he

 2   identified as Misionero, did he say -- what, if

 3   anything, was said about why Misionero was there?

 4                MS. MARTINEZ:  Objection, Your Honor.  This

 5   is improper impeachment at this point.  This is just

 6   hearsay.

 7                MR. JENKINS:  Objection, Your Honor,

 8   hearsay.

 9                THE COURT:  Sustained.

10                MR. CHICK:  I don't have any further

11   questions.

12                MS. MARTINEZ:  No cross-examination, Your

13   Honor.

14                May the detective be excused?

15                THE COURT:  You're excused, sir.  Thank you.

16                THE WITNESS:  Thank you.

17                (Thereupon, the witness withdrew from the

18   stand.)

19                THE COURT:  Mr. Paiz Guevara, do you rest?

20                I'm asking, do you rest?

21                MR. CHICK:  Yes, sir.

22                THE COURT:  Mr. Alvin Gaitan Benitez, do you

23   rest?

24                MS. AUSTIN:  We do, Your Honor.

25                THE COURT:  Jose Lopez Torres?

1          MR. JENKINS:  Your Honor, we do have one

2    witness who is not here today.  Our understanding was

3    that Mr. Aquino was going to go before us.

4          THE COURT:  Okay.

5          Mr. Cerna's counsel?

6          MR. SALVATO:  We rest at this point.  We may

7    have some questions for the remaining witnesses that

8    Mr. Jenkins may call.

9          THE COURT:  Okay.

10          MR. SALVATO:  But, we rest in terms of

11    affirmative evidence at this point.  We may have some

12    questions tomorrow.

13          THE COURT:  That's fine.

14          I'm just trying to see if we have any

15    witnesses.  Any more witnesses today?

16          No?  Okay.

17          Ladies and gentlemen, we're going to recess

18    now for the evening.  And remember, as I've said many

19    times, do not discuss this case with any one.  Do not

20    permit the case to be discussed in your presence.  Don't

21    do any research on the case.  Don't do any posting on

22    social media about the case.  And don't review any

23    reports that might be in the news media, television,

24    newspaper, anything like that.  And don't visit any of

25    the area of any scenes that have been testified to.

1    Leave your notes in the jury deliberation room.

2              We will resume tomorrow at 10:00 o'clock.

3    Thank you.

4              We're going to remain in session.

5              (Jury not present.)

6              THE COURT:  You may be seated.

7              Counsel, my plan is to let you all put on

8    witnesses tomorrow, whatever witnesses you have.  If you

9    have enough to go the whole day, that's fine.  If you

10   don't, then my thought is at midday, that we start the

11   instruction conference.

12             And I think that my law clerk sent you all a

13   memo about certain instructions that we want to have

14   some understanding of why the instructions are offered,

15   with authority that supports them.

16             But the way this is going, unless I'm

17   mistaken, we only have less than a day of testimony.  Is

18   that right?  Less than a day?  Does that sound right?

19             (Counsel indicating.)

20             THE COURT:  Okay.  Then we should be able to

21   do the instruction conference tomorrow, and go to the

22   jury on Thursday.

23             Okay.  We're in recess.  Thank you.

24             (Pause.)

25             THE COURT:  Mr. Aquino, you presented this

1    to me.  I don't know if you've abandoned it or you have
2    the -- you have the intention that you wanted to admit
3    it.
4                MR. AQUINO:  I've abandoned it.
5                THE COURT:  Thank you.
6                (Proceedings concluded at 4:13 p.m.)
7
8                             ---
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF REPORTER

I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the jury trial in the case of UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

I further certify that I was authorized and did report by stenotype the proceedings in said jury trial, and that the foregoing pages, numbered 1 to 162, inclusive, constitute the official transcript of said proceedings as taken from my shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this __26th__ day of __May__, 2016.


_____/s/_____
                Renecia Wilson, RMR, CRR
                Official Court Reporter