1     IN THE UNITED STATES DISTRICT COURT FOR THE
            EASTERN DISTRICT OF VIRGINIA
2                 Alexandria Division

3    UNITED STATES OF AMERICA,            )
                                          )
4                      Plaintiff,         )
                                          )  Crim. No. 1:14cr306
5         vs.                             )
                                          )
6    JOSE LOPEZ TORRES, ALVIN GAITAN      )  April 27, 2016
     BENITEZ, CHRISTIAN LEMUS CERNA,      )
7    OMAR DEJESUS CASTILLO, MANUEL        )
     ERNESTO PAIZ GUEVARA, and            )
8    JESUS ALEJANDRO CHAVEZ,              )
                                          )
9                      Defendants.        )
     _____)

10

11

12                        JURY TRIAL

13

14   BEFORE:      THE HONORABLE GERALD BRUCE LEE
                  UNITED STATES DISTRICT JUDGE
15

16
     APPEARANCES:
17
     FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
18                     BY:  JULIA MARTINEZ, AUSA
                            TOBIAS TOBLER, AUSA
19

20                          ---

21

22   OFFICIAL COURT REPORTER:

23                   RENECIA A. SMITH-WILSON, RMR, CRR
                     U.S. District Court
24                   401 Courthouse Square, 5th Floor
                     Alexandria, VA 22314
25                   (703)501-1580

APPEARANCES (Continued)

FOR DEFENDANT JOSE LOPEZ TORRES

  BYNUM & JENKINS, PLLC
  BY:  ROBERT L. JENKINS, JR., ESQ.
  THE LEIVA LAW FIRM, PLC
  BY:  MANUEL E. LEIVA, ESQ.

FOR DEFENDANT ALVIN GAITAN BENITEZ

  LAW OFFICE OF AMY LEIGH AUSTIN
  BY:  AMY LEIGH AUSTIN, ESQ.
  SMITH & ZIMMERMAN, PLLC
  BY:  JEFFREY D. ZIMMERMAN, ESQ.

FOR DEFENDANT CHRISTIAN LEMUS CERNA

  LAW OFFICE OF CHRISTOPHER AMOLSCH
  BY:  CHRISTOPHER AMOLSCH, ESQ.
  FRANK SALVATO, ESQ.

FOR DEFENDANT OMAR DEJESUS CASTILLO

  FIRSTPOINT LAW GROUP, PC
  BY:  KATHERINE MARTELL, ESQ.
  OLD TOWN ADVOCATES, PC
  BY:  MEREDITH M. RALLS, ESQ.

FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

  LAW OFFICE OF W. MICHAEL CHICK, JR.
  BY:  WILLIAM MICHAEL CHICK, JR., ESQ.

FOR DEFENDANT JESUS ALEJANDRO CHAVEZ

  JEROME P. AQUINO, ESQ.
  ELITA C. AMATO, ESQ.

---

1

<u>INDEX</u>

2

3

| <u>WITNESS (Defendants)</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| Terri Shaw | 5 | 42 | 98 | --- |
| Cosmo Gonzalez<br>(Via Video Deposition) | 105 | | | |
| Hector Molina<br>Chavarria | 107 | 109 | --- | --- |
| Jose Lopez Torres | 121 | 155 | (Not completed) | |

4

5

6

7

8

9

   (Court recessed)

10

11                           ---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

       (Thereupon, the following was heard in open court at 10:17 a.m.)

       (Jury not present.)

       THE CLERK:  1:14 criminal 306, United States versus Jose Lopez Torres, Alvin Gaitan Benitez, Christian Lemus Cerna, Omar Dejesus Castillo, Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez; with Spanish interpreters previously sworn.

       THE COURT:  Good morning.

       Good morning, Counsel.  Ready to proceed?

       MS. RALLS:  Yes, Your Honor.

       THE COURT:  Ready to bring the jury out?

       MS. RALLS:  Yes, Your Honor.

       THE COURT:  Okay.  You can bring our jury out, Mr. Toliver.  Thank you.

       (Jury present.)

       THE COURT:  You may be seated.

       Good morning, ladies and gentlemen.

       THE JURORS:  Good morning.

       THE COURT:  Good morning, Mr. Omar Dejesus Castillo.  Good morning.

       Good morning, Mr. Manuel Ernesto Paiz Guevara.  Good morning.

```
 1               Good morning, Mr. Jesus Alejandro Chavez.
 2   Good morning.
 3               Good morning, Mr. Alvin Gaitan Benitez.
 4   Good morning.
 5               Good morning, Mr. Christian Lemus Cerna.
 6   Good morning.
 7               And good morning, Mr. Jesus Alejandro
 8   Chavez.
 9               Good morning, Counsel.  Ready to proceed?
10               MS. RALLS:  Yes, Your Honor.
11               Meredith Ralls on behalf of Mr. Omar Dejesus
12   Castillo.
13               We call Terri Shaw to the stand.
14               (Witness sworn.)
15               THE WITNESS:  I do.
16               THE COURT:  You may proceed.
17               THEREUPON, TERRI SHAW, having been duly
18   sworn, testified as follows:
19                     DIRECT EXAMINATION
20   BY MS. RALLS:
21      Q.  Good morning, ma'am.  Could you please state your
22   name and spell it for the court reporter.
23      A.  Good morning.  Terri Shaw, T-e-r-r-i, S-h-a-w.
24      Q.  And, Ms. Shaw, what do you do for a living?
25      A.  I'm an interpreter.
```

1        MS. RALLS:  One moment.  I think we need to

2   adjust the microphone.

3   BY MS. RALLS:

4        Q.   Okay.  You're an interpreter.  And what languages

5   do you primarily work with?

6        A.   Spanish and English.

7        Q.   And how long have been worked as an interpreter?

8        A.   Approximately since the late '90s, early 2000s;

9   almost 20 years.

10       Q.   And, what experience, if any, do you have in

11  translating, in interpretation?

12       A.   Originally I was a translator.  I obtained two

13  translation certificates from Georgetown University,

14  Spanish into English and French into English.

15       Q.   And what's your native language?

16       A.   English.

17       Q.   How long have you been speaking Spanish?

18       A.   Since I was 12 years old.

19       Q.   And how did you learn Spanish?

20       A.   My family lived in Guatemala, and I lived in many

21  other Latin American countries.

22       Q.   And you mentioned some of your certificates.

23  What's your level of formal education?

24       A.   I have a master's.

25       Q.   And what's the focus of that master's?

1      A.   In journalism.

2      Q.   And what institution was that earned from?

3      A.   Columbia University.

4      Q.   Do you have any other formal degrees?

5      A.   Um, I have certificates in interpretation.  I

6  took a course at the University of Arizona, a three-week

7  course, and I -- I believe I obtained a certificate from

8  that.

9      Q.   What was the focus of that three-week course in

10 Arizona?

11     A.   That was court interpreting, Spanish, English.

12     Q.   Do you hold any certifications in translating

13 from courts?

14     A.   Yes.  I have certification from the Consortium of

15 State Courts, and from the federal courts.

16     Q.   And what are those certifications in?

17     A.   I'm sorry?

18     Q.   What are those certifications for?

19     A.   For court -- Spanish/English court interpreting.

20     Q.   Are you a member of any professional

21 associations?

22     A.   Yes, of the American Translators Association.

23 I'm certified to translate from Spanish into English,

24 the National Capital Area Translators Association, and

25 the National Association of Judiciary Interpreters and

1    Translators.

2        Q.   And, what experience do you have in interpreting

3    for individuals from El Salvador?

4        A.   In the many years I've been interpreting in the

5    courts and outside the courts, a large majority of the

6    people I interpreted for were from El Salvador.

7        Q.   Were any of those individuals from or particular

8    social group from El Salvador?

9        A.   People -- highly educated El Salvadorans do not

10   need interpreters, because they speak English.  So most

11   of the people were relatively low-educated.

12       Q.   Do you have any specialized training, other than

13   what you've already mentioned, in translating Salvadoran

14   slang?

15       A.   I've taken a number of workshops.  The University

16   of Arizona had particular workshops in slang and bad

17   language, and I've taken a number of workshops in the --

18   the topic of gangs, for example.

19       Q.   And, have you ever been to El Salvador?

20       A.   Yes.

21       Q.   How many times?

22       A.   I went once for about a week as a journalist, and

23   another time about a week as a translator at a meeting.

24       Q.   Can you tell us about any differences about the

25   way people from El Salvador speak versus people from

1   other Spanish speaking countries?

2       A.   I think the differences are mainly vocabulary.

3   They use different words.  The syntax and grammar is

4   pretty much the same.

5       Q.   And how many hours a week do you spend, on

6   average, interpreting or translating between Spanish and

7   English?

8       A.   Well, because of my disability, I've cut back

9   quite a bit.  I usually only take one or two onsite jobs

10  in a given week.  I do interpret by telephone quite a

11  bit.

12      Q.   Do you have any other jobs, other than

13  translating and interpreting?

14      A.   No.

15      Q.   Other than the courts that you mentioned, have

16  you provided interpretation or translation services for

17  defense attorneys?

18      A.   Yes.

19      Q.   In which settings?

20      A.   Um, both in their offices, in jails, frequently.

21      Q.   Have you provided those services for the

22  prosecution?

23      A.   Not as much.  I can't recall any cases where I've

24  worked for the prosecution.  There may have been some.

25      Q.   Have you provided any services for the

1   Department of Justice?

2       A.   Yes.  I interpreted at a good number of proffers,

3   and I went to Mexico with a Department of Justice

4   delegation at one point.  I've also worked in their

5   offices, interpreting for Mexican prosecutors who are

6   visiting.

7       Q.   Can you tell the jury what a proffer is?

8       A.   I call it a debriefing.  It's when a -- a

9   defendant has pleaded guilty and has promised to

10  cooperate with the prosecution, and usually he sits down

11  with prosecutors and agents and they ask him questions

12  about the case.

13      Q.   Okay.  And just to be clear, have you done any of

14  that kind of work for this case?

15      A.   No.

16      Q.   Ms. Shaw, I'd like to direct your attention to

17  the white binder in front of you, with the assistance of

18  the court security officer.  He's going to hand it to

19  you.

20      A.   Oh, good.

21      Q.   If you look at the first tab there.

22      A.   Yes.

23      Q.   Do you recognize this document?

24      A.   Yes, I do.

25      Q.   Can you tell us what it is?

1     A.   It's my resumé.

2              MS. RALLS:  Your Honor, I'd like to admit

3     what has been identi- -- what has been marked as

4     Castillo 7 into evidence.

5              THE COURT:  Received.

6              MS. RALLS:  Your Honor, at this time we

7     would move to recognize Ms. Shaw as an expert translator

8     and interpreter, both in Spanish in general and in the

9     Salvadoran dialect in particular.

10             THE COURT:  She will be qualified based upon

11    her experience, certification and training, as an expert

12    to translate between Spanish to English, and to appear

13    in court and to offer interpretation.

14    BY MS. RALLS:

15    Q.   All right.  Ms. Shaw, were you asked to review

16    certain materials for this case?

17    A.   Yes, I was.

18    Q.   All right.  Were you asked to review

19    qualifications of contract language monitors who had

20    previously testified?

21    A.   Yes.

22    Q.   What opinions, if any, do you have about their

23    qualifications?

24             MS. MARTINEZ:  Objection, Your Honor.

25             THE COURT:  What's the objection?

1           MS. MARTINEZ:  Her opinions about someone

2    else's qualifications are not within the scope of her

3    expertise.

4           THE COURT:  Overruled.

5           THE WITNESS:  Please repeat the question.

6    BY MS. RALLS:

7      Q.  What opinions, if any, do you have about the

8    qualifications of the contract language monitors who

9    previously testified?

10     A.  I noticed that they've had very little, if any,

11   training in the techniques of translation and

12   interpreting.  However, they had a lot of on-the-job

13   experience.

14     Q.  Are you aware of any FBI regulations regarding

15   the qualifications of these translators?

16          MS. MARTINEZ:  Objection, Your Honor, calls

17   for hearsay, beyond the scope of her expertise.

18          MS. RALLS:  Your Honor --

19          THE COURT:  Did you plan to qualify her to

20   comment on the qualifications of translators, Ms. Ralls?

21          MS. RALLS:  Yes, Your Honor.

22          THE COURT:  All right.  Are you making such

23   a motion now?

24          MS. RALLS:  Yes.

25          THE COURT:  Objections?

1          MS. MARTINEZ:  Yes, we object to that.

2    There's been no foundation as to her knowledge of any

3    sort of FBI policy or qualifications with respect to

4    FBI.  Your Honor, if you'd like to hear more, could the

5    prosecution approach the sidebar?

6          THE COURT:  All right.  Lay a foundation.

7    BY MS. RALLS:

8    Q.   Ms. Shaw, are you aware of any FBI regulations

9    regarding qualifications of the translators that

10   previously testified?

11   A.   I believe you sent me some documents concerning

12   that.

13         MS. MARTINEZ:  Your Honor, at this point, we

14   renew the objection.  If her knowledge is based on

15   something that counsel provided as opposed to her

16   expertise otherwise.

17         THE COURT:  All right.

18         MS. RALLS:  Your Honor --

19         THE COURT:  Yes.

20         MS. RALLS:  I think it might be best to

21   approach on this.

22         THE COURT:  All right.  Come to sidebar.

23         (Thereupon, the following side-bar

24   conference was had:)

25         MS. MARTINEZ:  Your Honor, we have no

1    objection to qualifying Ms. Shaw as an expert
2    interpreter in Spanish language or in El Salvadoran
3    dialect.  We have no objection to that.
4           If there's a foundation laid about her
5    understanding, generally speaking, of qualifications for
6    court-certified interpreters, for example -- which I'm
7    not sure I see the foundation -- we may not have
8    objection on that.
9           However, I believe what defense counsel is
10   attempting to do is have her comment on FBI policies.
11   Unless she has some sort of experience with respect to
12   FBI policies, I don't think that there is really any way
13   to lay a foundation.  And certainly, as of yet, none has
14   been laid about her expertise with respect to FBI
15   policy.
16          And based on her last answer, it seems to me
17   that, likely, her only knowledge of FBI policy is having
18   received an FBI policy, and I suspect not actually a
19   policy, but the audit report that was offered to Your
20   Honor earlier, which does not contain the FBI policy.
21   It was sent to defense counsel for purposes of this
22   litigation.
23          So, again, if there's foundation about her
24   general knowledge or expertise about what makes a
25   court-certified interpreter, as long as foundation has

 1     been laid, we likely will not object to that.  But if
 2     counsel is attempting to elicit opinions about FBI
 3     policy, particularly if those opinions are based on a
 4     several-year-old audit report and not based on other
 5     information, including sworn declarations that were
 6     submitted to Your Honor in response to Your Honor's
 7     order, we do strongly object to her offering expert
 8     opinion about FBI policy.
 9                MS. RALLS:  Your Honor, my intent was solely
10     to have her identify the audit report and admit it, and
11     move on from there.
12                MS. MARTINEZ:  Then we would object to
13     hearsay on the audit report.
14                MS. RALLS:  Your Honor, it's a public
15     document.  I have the citations -- citations to the
16     rules, if we want to get into that.
17                MS. MARTINEZ:  I have case law that says
18     audit reports are inadmissible hearsay.  I have to grab
19     it from the desk.
20                MS. RALLS:  As an expert, she's allowed to
21     testify on hearsay.
22                MR. JENKINS:  Your Honor, I want to add that
23     I think that, while I understand the government
24     counsel's objection, I think that if the witness is
25     qualified as an expert, then the witness not only can

1    rely on hearsay, whether or not it was provided by

2    defense counsel or government counsel, that she relied

3    in forming her opinion about whether or not the

4    previously testified language experts rise up to a

5    certain standard, she's free to offer that opinion.

6              I think government counsel, certainly, on

7    cross-examination can explore her basis for arriving at

8    that conclusion.  And if her basis was audit reports

9    that she received from Ms. Ralls, then government

10   counsel on cross-examination can put that before the

11   jury, as to whether or not that was a reliable basis in

12   order to use, to reach those conclusions or not.

13             But I don't think that stops it from being

14   admissible -- I mean, for her to ask her the question.

15             I fall short of agreeing with Ms. Ralls that

16   the actual audit report can come in.

17             But I think the witness can testify that she

18   reviewed that, or she reviewed the American

19   Encyclopedia, whatever she wants to say that she used as

20   her bases in arriving at her opinion, because she's now

21   been qualified as an expert.

22             THE COURT:  Okay.  My judgment is that you

23   can have her identify the report, anything else that she

24   relied upon in forming her opinion.

25             I believe she is qualified to testify about

1  her opinion about the quality of interpretations and by

2  contract linguists.

3         The inspector general's report is admissible

4  as a public record under the hearsay rule.  I admitted

5  such a document in another trial I just had three months

6  ago, regarding to a general healthcare fraud case.  So

7  the documents will come into evidence and her opinions

8  will come into evidence.

9         Objection overruled.

10         (Thereupon, the side-bar conference was

11  concluded.)

12  BY MS. RALLS:

13     Q.   All right, Ms. Shaw.  So, I had asked you about

14  your opinion of the qualifications of the contract

15  language monitors.  Did you review any documents to help

16  you form that opinion?

17     A.   Yes.

18     Q.   And what documents did you review?

19     A.   You sent me their testimony.

20     Q.   So, you reviewed their testimony; is that what I

21  hear you saying?

22     A.   Yes.

23     Q.   Did you review any other documents?

24     A.   I believe you sent me an FBI report.  I don't --

25  it's --

1    Q.  Let me help you out, Ms. Shaw.  If you look at

2    the second tab in that white binder.

3    A.  Actually, it was another report.  It was a

4    declaration that described the language program, and --

5    the training and the language program.

6    Q.  Okay.

7    A.  As well as the OIG report.

8    Q.  Okay.  If you turn to the second tab in the white

9    binder in front of you.

10   A.  Yes.  I have it.

11   Q.  Okay.  Is this the OIG report you were talking

12   about?

13   A.  Yes.

14        MS. RALLS:  All right.  Your Honor, I would

15   move to admit what is marked as Defendant's Exhibit

16   Castillo 8.

17        THE COURT:  For the reasons stated at

18   sidebar, it will be received over objection.

19   BY MS. RALLS:

20   Q.  Now, Ms. Shaw, we talked about some of your

21   certifications.  I believe you said you received some

22   certifications from Georgetown University?

23   A.  Yes.

24   Q.  What did you have to do to get those

25   certifications?

1    A.   I got two.  Each one was a one-year course in
2    translation.
3    Q.   Okay.  And, I believe you also said you had a
4    certification from something with the state courts.
5    What was that again?
6    A.   That's correct.  It's the Association of State
7    Courts.  I took my training in Maryland.
8    Q.   Okay.  What kind of training was -- did you have
9    to go through to get that certification?
10   A.   There was a one-day session every month for eight
11   months.
12   Q.   And, I believe you also said you had a
13   certification from a professional association?
14   A.   Oh, the American Translators Association.
15   Q.   Okay.  What did you have to do to get that
16   certification?
17   A.   I had to take a test.
18   Q.   How long was the test?
19   A.   It was a one-day test.
20   Q.   When you were reviewing the qualifications of the
21   contract language monitors who had previously testified,
22   did you see any similar certifications that they had?
23   A.   No.
24   Q.   I believe you also said that you're certified to
25   interpret in federal court.

1     A.   That's correct.

2     Q.   In which federal courts are you certified to

3  interpret?

4     A.   All of them.

5     Q.   All of them across the nation?

6     A.   That's correct.

7     Q.   How did you get that certification?

8     A.   There's a national testing procedure.  You take a

9  written test the first year, and if you pass the written

10  test, a year later you can take the oral test.

11    Q.   So, could you do what these other interpreters

12  are doing here today?

13    A.   Yes, I can.

14    Q.   Have you done that in this courthouse in the

15  past?

16    A.   I have.

17    Q.   Did you review any Spanish language recordings

18  that were admitted into evidence in this case?

19    A.   Yes, I did.

20    Q.   Can you tell us which recordings you reviewed?

21    A.   There were three, Government Exhibit 23-A-1,

22  Government's Exhibit 9-A-1 and 8-A-1.

23    Q.   Did you review the transcripts that -- well, so

24  you said you reviewed the recordings.  Did you also

25  review the transcripts for those recordings?

1    A.   Yes.

2    Q.   And, who were those transcripts prepared by?

3    A.   Um, I'm looking at the Exhibit, um, 23-A-1 was

4  translated by Sandra D'Sa and reviewed by Ramon Aguilar.

5  And, 9-A-1 was translated by Vania Vargas and reviewed

6  by Ramon Aguilar.  And 8-A-1 was also translated by

7  Vania Vargas and reviewed by Ramon Aguilar.

8    Q.   First, I'd like to ask you about the format of

9  these transcripts.  What problems, if any, did you find

10  with the format of the transcripts themselves?

11    A.   Usually transcripts have three columns, one

12  column with the initials of the speaker, the second one

13  is the Spanish transcription, and the third one is the

14  English translation.  This one does not have the

15  Spanish.

16    Q.   Why is it important to have that three-column

17  format?

18    A.   It's important so that you can follow along and

19  compare the Spanish to the English.

20    Q.   Are you aware of any papers from industry

21  associations that discuss this?

22    A.   Yes.  NAJIT has a position paper.

23    Q.   And what is NAJIT?

24    A.   National Association of Judiciary Interpreters

25  and Translators.

1    Q.   So NAJIT is N-A-J-I-T?

2    A.   Correct.

3    Q.   The acronym for that, so the court reporter can

4    get that right.

5    A.   Yes.

6    Q.   Now, turning again to the white binder that we've

7    looked at twice, if you go to the third tab, do you

8    recognize that document?

9    A.   I do.

10   Q.   And, what is it?

11   A.   That is NAJIT's position paper titled "General

12   Guidelines and Minimum Requirements for Transcript

13   Translation in any Legal Setting."

14   Q.   Is this publication something that you relied

15   upon in making your opinions for this case?

16   A.   Yes.

17   Q.   And, what's your opinion of the reliability of

18   publications from NAJIT?

19   A.   Well, in general, they're very good, and the

20   people who put this one together are -- they're a large

21   group of very good interpreters.

22            MS. RALLS:  Your Honor, at the time I'd like

23   to read into the record a portion of that NAJIT report.

24            MS. MARTINEZ:  Objection, Your Honor.  We

25   object to hearsay.  She certainly can rely on hearsay,

1    but the admissibility -- hearsay is not admissible even

2    if the expert relied on it.

3              MS. RALLS:  She has laid a foundation for a

4    learned treatise.  I have a citation to the rule that

5    states that this may be read into the record.

6              THE COURT:  Let me see it.  My view is --

7    let me see what you have.

8              MS. RALLS:  I just have the notation in my

9    notes.

10             THE COURT:  All right.  Then we'll put this

11   aside for the recess, because I need to read what you

12   have.

13             MS. RALLS:  All right.

14             THE COURT:  My inclination is to the sustain

15   the objection.  She can testify to what her opinions are

16   and she can rely on whatever she wants, that is reliable

17   in the field.  But she can't just read into the record

18   things written by others.

19             MS. RALLS:  All right.  Your Honor, may I --

20             THE COURT:  The FBI report is different, but

21   this is not the same as the FBI report.

22             MS. RALLS:  May I put the citation on the

23   record, to the rule I'm referring to?

24             THE COURT:  Yes, you can, but it doesn't

25   help me unless I have a copy of the case to read.  Go

 1    ahead.

 2                    MS. RALLS:  It's Federal Rule of Evidence

 3    803, subsection 18.

 4                    THE COURT:  I thought you said you had a

 5    case.

 6                    MS. RALLS:  No, Your Honor.  I have a

 7    citation to the rule.

 8                    THE COURT:  Oh.  I know the rules.  Okay.

 9    Thank you.

10                    The objection is sustained.

11    BY MS. RALLS:

12       Q.   Ms. Shaw, upon your review of the NAJIT report,

13    what are some of the reasons for the importance of

14    having a three-columned transcript in a court

15    proceeding?

16       A.   I'd like to refer to --

17                    THE COURT:  No, you can't read the report,

18    ma'am.  You can tell us what your opinion is, but you

19    can't read the report.  I'm assuming you read it before

20    you came to court today.

21                    THE WITNESS:  I have read it.

22                    THE COURT:  All right.

23                    THE WITNESS:  It's important to have a

24    record, a written record of both the Spanish and the

25    English for the court case, for the lawyers, for the

1   defendant who might be looking at this.  So it's very

2   important to have both of them on the same page so that

3   you can compare them.

4   BY MS. RALLS:

5       Q.   How does having the three-column report assist

6   with determining the accuracy of the transcript?

7       A.   Because a trained translator, interpreter, can

8   compare the two versions side by side.  It's much easier

9   to see if there are any gaps or any errors of

10  vocabulary.  Listening to the tape is much more --

11  it's -- you would also have to listen to the tape, of

12  course.

13          But, it's a lot easier to follow along and to --

14  to review -- to analyze the translation if you have the

15  written Spanish right in front of you.

16      Q.   Right.

17          Now, moving on to the substance of the

18  transcripts, what problems, if any, did you notice when

19  reviewing the substance of the transcripts themselves?

20      A.   I noticed -- in listening to the tapes and

21  reviewing the transcripts, I noticed there were some

22  mistranslations, some things that were dropped, and some

23  things that -- that were added that I did not hear.

24      Q.   Can you give us any examples of the

25  mistranslations or the dropped or added vocabulary?

1       A.   Okay.  Let me look at my notes.  I need to
2  consult my notes, which you have.  Most of the notes I
3  took were on 23-A-1.  For example --
4              MS. MARTINEZ:  Your Honor, we need to
5  approach on an issue with respect to the notes.
6              THE COURT:  All right.  Thank you.
7              (Thereupon, the following side-bar
8  conference was had:)
9              MS. MARTINEZ:  Your Honor, we have received
10  from defense counsel a copy of notes of critiques of
11  Exhibit 23-A-1.  Until this morning, listening to
12  Ms. Shaw testify, the government was not informed that
13  she reviewed 8-A-1 and 9-A-1.
14              And if she had no notes -- maybe defense
15  counsel needs to ask her.  She said most of her notes
16  are on 23-A-1, which suggests she also has notes on
17  8-A-1 and 9-A-1.  We have not received these from
18  defense counsel.
19              We did make a specific request by e-mail to
20  make sure that we received all discovery appropriately
21  related to this expert.  And, of course, Your Honor's
22  previous order with respect to expert witnesses covers
23  that as well, as would *Jencks*, if she's taking notes on
24  what she intends to testify to.
25              So, at this time, we would ask that we be

1    permitted to -- be given a copy of any notes that she

2    prepared, that she's going to testify to, because

3    they're discoverable to the government as reverse

4    *Jencks*, and also related to the expert testimony, and

5    that we be given a chance to review it in order to be

6    able to examine.

7            We're prepared with 23-A-1, because that was

8    provided to us in advance.  But apparently there's more

9    discovery here that was not provided in advance of her

10   testimony.

11           MS. RALLS:  Your Honor, I'm not aware of any

12   notes regarding 8-A-1 and 9-A-1.  I requested Ms. Shaw

13   to send me any notes that -- related to her testimony

14   that she would be providing.

15           The only thing I got was what I sent to the

16   government.  And I believe that's what I saw Ms. Shaw

17   pull out, that she was going to refer to.

18           THE COURT:  All right.  So long as there's

19   no testimony about 8-A-1 and 9-A-1 and notes, that we

20   don't have a problem.  But if she has notes, they have

21   to be produced.

22           MS. RALLS:  Yes, Your Honor.

23           While we're here, I would also like to renew

24   my request, for the record, the portion of the NAJIT

25   report, Your Honor.  She has laid the foundation for it

1    being a learned treatise, and Federal Rule of Evidence

2    803.18 states that if the statement is relied upon by

3    the expert on direct examination, and the publication is

4    established as a reliable authority, then the statement

5    may be read into evidence, but the publication itself

6    may not be actually admitted.

7                 That's why I was requesting to be able to

8    read a portion of that report into the record.

9                 THE COURT:  Okay.

10                MS. MARTINEZ:  Your Honor, we disagree that

11   there has been proper foundation to establish this

12   report as a learned treatise.

13                THE COURT:  I sustain the objection.

14                She can testify about her opinions, whatever

15   they are.  They can be based upon reliable material that

16   an expert relied upon.  But they just can't come into

17   court and read it into the record.

18                Thank you.

19                (Thereupon, the side-bar conference was

20   concluded.)

21   BY MS. RALLS:

22   Q.   All right, Ms. Shaw.  I had asked you about

23   examples of the issues that you had stated which were

24   mistranslations or deletions or additions to vocabulary.

25                Can you give us some examples?

1    A.   Okay.  In Government's Exhibit 23-A, on page 11,
2  JR says, "Did the homie ask you for permission?"
3         I hear, "Did the homie give you permission?"
4         On page 16, when JR is giving directions, he
5  said, "You take 123," but he left out the words, "to
6  Woodbridge."
7         On page 17, OC is quoted as saying, "They are
8  going to give me probation."  I heard him say, "Tomorrow
9  I am going to probation."
10        There are more, but -- do you want them all?
11             THE COURT:  Uh-huh.
12  BY MS. RALLS:
13    Q.   Approximately how many examples of these kinds of
14  errors did you find?
15             THE COURT:  I want to hear them.  What are
16  they?  What examples do you have?  Go ahead.
17             THE WITNESS:  These are the ones I wrote
18  down.
19             THE COURT:  All right.
20             THE WITNESS:  There were others.  But the
21  most problems I found were in that one, Exhibit 23-A.
22  There were other, smaller problems, in the other two.
23             Okay.  Back to 23-A.  Page 14 and 15, OC
24  uses the word *paros*.  It's translated as "doggies" and
25  "friendlies."  I think it means someone who owes you

1    money or a favor.

2             On page 17 -- I'm sorry.  It's three lines

3    down from the one about probation, JR said something

4    which the translation said --

5    BY MS. RALLS:

6        Q.   Ms. Shaw, can you slow down for a minute?  We're

7    going to try to put the transcripts up on the screen

8    so --

9        A.   Oh, wow.

10       Q.   -- everyone else can follow along.

11       A.   Okay.  Are the page numbers the same?  Okay.

12            THE INTERPRETER:  May the interpreter have a

13   copy to follow along?  We don't have a screen.

14            THE COURT:  Yes.  Hold on.

15   BY MS. RALLS:

16       Q.   I believe you said page 17 was the last one you

17   were talking about?

18       A.   Right.

19            MS. RALLS:  If we could pull up page 17.

20            THE WITNESS:  Oh, I think the page numbers

21   are different.  I guess I need to look at mine.

22            I guess the way it was sent to me, the way I

23   printed it out, the page numbers are different.  Oh boy.

24   What -- my page 17 was quite a bit earlier than that.

25   Um -- oh, no, I -- um, I guess it would be your 18.  Let

 1   me see 18, because -- hmm.

 2           THE COURT:  Can you let Ms. Ralls see what

 3   you have, and that way she can help you figure it out?

 4           THE WITNESS:  Um --

 5           THE COURT:  Do you have a copy of the

 6   transcript?

 7           THE WITNESS:  Let's go back to 17.  Part of

 8   it -- I do have this part:  "I had to take off time for

 9   almost a week" --

10   BY MS. RALLS:

11   Q.  Ms. Shaw?

12   A.  Yes.

13   Q.  If you don't see it on the screen, then, let's

14   just skip over that one.

15   A.  Okay.  It's funny, because the beginning is

16   there.

17   Q.  A portion --

18           MS. MARTINEZ:  Your Honor?

19           THE COURT:  Yes.

20           MS. MARTINEZ:  We might want to approach on

21   this issue before we go too much further into this.

22           THE COURT:  Okay.

23           MS. MARTINEZ:  Just so Your Honor is aware

24   of what's --

25           THE COURT:  All right.  Thank you.

1              (Thereupon, the following side-bar

2    conference was had:)

3              MS. MARTINEZ:  Your Honor, I believe what's

4    going on is that what's on the screen is, of course,

5    what's admitted into evidence and what the jury is

6    permitted to see, which includes redactions.

7              And I imagine Ms. Shaw was provided with the

8    unredacted copy, which she would need to have so she can

9    follow along and read.  I understand why defense counsel

10   did that.

11             But before she started reading from redacted

12   portions, I wanted to stop, unless we have a "homeboy

13   two" type problem.

14             THE COURT:  Right.

15             MS. RALLS:  She was provided with the

16   unredacted copy so that she could have a complete

17   opinion of the quality.  I -- that was the only copy of

18   the transcript that I had electronically, that I could

19   send her.

20             I think we can just instruct her to -- that

21   if what she has contains portions that are not in the

22   redacted exhibits, then just skip those portions.

23             THE COURT:  Isn't that risky?

24             Because I don't know what she has and what

25   she's reading from.  If she's reading from a portion

1    that was redacted, then I have a problem.  And I've

2    tried to avoid this whole issue.

3              Is it possible to have her testify about her

4    opinion without showing the transcript and people and

5    page?

6              Because the jury has seen the transcripts a

7    number of times now, and they're not adding anything.

8              If she has a specific criticism, she should

9    tell us what it is.  But the screen thing is not working

10   for me, because it doesn't seem to be that she has what

11   we have.  And I can't fix this now.  I don't have time.

12             MS. RALLS:  I'll move on from that, Your

13   Honor.

14             THE COURT:  All right.

15             MS. RALLS:  There's one area that I intend

16   to question her on, that I know is not redacted.

17             THE COURT:  Well, do you know if it has

18   "homeboy" in it, or should have "homeboy" in it?

19             Has Ms. Martinez seen it?

20             MS. RALLS:  It does not have the homeboy

21   issue in it.  I can --

22             THE COURT:  How would we know that?

23             MS. RALLS:  23-A-1, it's the top of page 30.

24             MR. SALVATO:  Your Honor, maybe we could

25   just have about a five-minute break so Ms. Ralls can --

```
 1                THE COURT:  I understand -- you had all
 2   afternoon, you had all morning.  I just can't, you know,
 3   I've got to --
 4                MS. RALLS:  There's a particular phrase I'm
 5   going to ask her about.
 6                THE COURT:  Can you show us the original
 7   transcript, the redacted transcript, and make sure it's
 8   right before you ask her the question?
 9                Can you get that?  Can somebody get it?
10                MS. MARTELL:  We can get it.
11                THE COURT:  This is the third bench
12   conference in ten minutes.  It's not working for me.
13                I'm going to send the jury out.
14                (Proceedings in open court:)
15                THE COURT:  Ladies and gentlemen, I need to
16   take up a matter with counsel.  I'll have you go out.
17   Thank you.
18                (Jury not present.)
19                (Continuing at sidebar as follows:)
20                MS. RALLS:  Your Honor, this is the portion.
21                THE COURT:  Let the government see it.
22                MS. RALLS:  Julia, page 30 at the very, very
23   top.  There's no redaction.
24                MS. MARTINEZ:  Let me just read it to make
25   sure.
```

```
1              THE COURT:  Yeah, sure.
2              Are there any others, others you're planning
3    to show her?
4              MS. RALLS:  No, sir.  That's the last one.
5              THE COURT:  Okay.
6              MS. MARTINEZ:  Your Honor, to be prudent, I
7    think I compared the page to what's actually been
8    admitted, but I believe that this should be unredacted
9    and in the admitted exhibit.
10             THE COURT:  Go take a look.  Uh-huh.
11             MS. MARTINEZ:  Your Honor, the government
12   and, I believe, counsel for Lemus Cerna are both
13   satisfied this can come in fully unredacted and, in
14   fact, is in evidence unredacted, page 30 of Government's
15   Exhibit 23-A-1.
16             THE COURT:  I want to save us one more bench
17   conference.  Mr. Aquino gave me this document with tabs
18   on it.  Is this what you plan to call and have the
19   witness look at?
20             MS. RALLS:  No sir.  What I will have her
21   look at is the second tab in the binder, she's looking
22   at.  And I believe it was provided to Your Honor.  It's
23   160 pages.  I'm going to ask her some questions about
24   page 7 and 8.
25             THE COURT:  I don't think you heard what I
```

1  just asked you.  Look at this.  This is what Mr. Aquino

2  gave me.  And, see if that is what you're planning to

3  present to the witness and put on the screen and call

4  out.  If it's not, just tell me.  I just don't want to

5  have another bench conference over this.

6              MS. RALLS:  This is not the full report.  It

7  does contain the page 7 and 8 that I was going to talk

8  to her about.

9              THE COURT:  I understand.  But do you

10  understand what I was asking you?

11              MS. RALLS:  Your Honor, I produced --

12              THE COURT:  All the witnesses have been

13  presented documents, and there was a call-out of a

14  certain part of the document.  Are you planning to do

15  that?

16              And if you aren't, just tell me.  I just

17  want to know what you're going to do.  That's all I'm

18  asking.

19              MS. RALLS:  Yes, sir.  On pages 7 and 8.

20              THE COURT:  Okay.  Is that it?

21              MS. RALLS:  Yes, sir.

22              MR. AQUINO:  You have those there, Judge.

23              THE COURT:  I was trying to get her to look

24  at what you gave me, and -- so you're planning to use

25  these two pages.

1          MS. RALLS:  Yes, sir.

2          THE COURT:  Okay.  And do you know what

3     those two pages are?

4          MS. MARTINEZ:  I don't.

5          THE COURT:  I want no more bench

6     conferences.  I want to get on with this case.

7          That's seven and eight, those two pages.

8          MS. MARTINEZ:  We're getting close, Your

9     Honor.

10         THE COURT:  That's seven, and the next page

11    is eight.

12         MS. MARTINEZ:  Yes, Your Honor.

13         THE COURT:  Okay.  So we will not have a

14    bench conference about it.  We're done with this.

15         All right.  We'll bring the jury out.  Thank

16    you.

17         (Thereupon, the side-bar conference was

18    concluded.)

19         THE COURT:  Are we ready to bring the jury

20    out?

21         Are we ready to bring the jury out?

22         MS. MARTINEZ:  Yes.

23         MS. RALLS:  Yes, Your Honor.

24         THE COURT:  All right.

25         You can bring the jury out, Mr. Toliver.

```
 1                    (Jury present.)
 2                    THE COURT:  You may be seated.  Thank you.
 3               All right, Counsel, you may proceed.
 4                    MS. RALLS:  Thank you, Your Honor.
 5    BY MS. RALLS:
 6       Q.   All right, Ms. Shaw, we were talking about
 7    Government's Exhibit 23-A-1.  I'd like to direct your
 8    attention to the top of page 30.  And we're going to
 9    pull that up on the screen for you.
10               Ms. Shaw, did you have an opportunity to review
11    the portion of the recording that corresponds to this
12    block of text?
13       A.   I think I looked at that about -- I listened to
14    it about 20 times.
15       Q.   Do you have any opinion about how this portion of
16    the text relates to the source recording?
17       A.   The source recording was extremely hard to hear
18    at that time.  I think I made a note.  There were
19    scratching noises and, also, he dropped his voice, so it
20    was almost impossible to hear him.
21               So, I heard the first part, "I told them right
22    there."
23               And then they said something about Hoya or Soya,
24    which is somebody's name.  I didn't get that.
25               And then when it said, "We took him there to rip
```

1   his coconut off," all I heard was, "We took him there,"

2   and then mumbling, garbling and a word that sounded more

3   like *locos* than *coco*.  And --

4       Q.   And what is -- what are those words in English,

5   *locos* and *coco*?

6       A.   Well, *loco* literally means crazy, but it's a word

7   they use to refer to each other or to any guy, actually.

8   So, they say *locos* all the time.  It's a word they use

9   constantly.

10      Q.   And the other word you said was *coco*.  How does

11  that translate?

12      A.   Theoretically, it could mean head, but I didn't

13  hear that.

14      Q.   And, what kind of equipment were you using to

15  listen to these recording?

16      A.   I have pretty good headphones, noise cancelling

17  headphones, and I used the -- the software you

18  recommended to play the tape.

19      Q.   What software was that?

20      A.   I can't remember the name of it.  You sent me the

21  name of it.

22      Q.   Did the software do anything to change the

23  recordings?

24      A.   It was a little clearer than the one I was -- I

25  started out using, the software in my equipment, which

1   was some Microsoft thing.  Then you sent me the name of

2   the other software, and it was -- it was somewhat

3   better, yes.

4       Q.  Now, we talked a bit about the -- what you called

5   the OIG report.

6       A.  Yes.

7       Q.  If you could turn to page seven of that.  At the

8   bottom it will say seven.

9              THE INTERPRETER:  Could the interpreter

10  please have that?

11             MS. RALLS:  I'm sorry.

12             THE WITNESS:  I found it.

13  BY MS. RALLS:

14      Q.  Have you reviewed these pages, seven and eight?

15      A.  Yes.

16      Q.  All right.  Did you rely on this in forming your

17  opinion about the qualifications of the contract

18  language monitors?

19      A.  Somewhat, yes.

20      Q.  And, how did this affect your opinion of the

21  qualifications of the contract language monitors?

22      A.  Well, as I said before, I can't really say,

23  because I don't know how difficult the test is.  They

24  took a test.  I don't know what the test is like.

25             MS. RALLS:  Your Honor, may we publish page

1  eight of the report to the jury?

2           THE COURT:  Yes.

3           MS. RALLS:  Your Honor, I have no further

4  questions for this witness -- oh, wait.

5           THE COURT:  What is this that you put on the

6  screen?

7           Have you had the witness identify it?  What

8  is it?  Ask the witness what it is.

9           MS. RALLS:  Yes, Your Honor.

10 BY MS. RALLS:

11    Q.   Ms. Shaw, can you identify what this is?

12    A.   This is a report by the Office of the Inspector

13 General, an audit of the FBI's language program.  And

14 page eight describes the different types of linguists,

15 of language specialists employed by the FBI, either as

16 employees or contract employees.  And it describes the

17 testing they have to undergo in order to do translation

18 and interpretation for the FBI.

19    Q.   Do you know anything about the test that they had

20 to take?

21    A.   I do not.

22           MS. RALLS:  Court's indulgence, Your Honor.

23 BY MS. RALLS:

24    Q.   Did you -- so, we talked about 23-A and 23-A-1,

25 and I believe you also said you reviewed a couple of

1    other recordings.  Did you have an opportunity to review

2    all of the recordings in this case?

3        A.    I did.

4        Q.    How many recordings did you review?

5        A.    Three.

6        Q.    Did you review any recordings other than the

7    three that you talked about?

8        A.    No.

9        Q.    And, why is that?

10       A.    Those are the only ones I had.

11             MS. RALLS:  No further questions, Your

12   Honor.

13             MR. SALVATO:  Your Honor, can I ask just a

14   few questions?

15             THE COURT:  Sure.  Uh-huh.

16             MR. SALVATO:  Thanks.

17                      CROSS-EXAMINATION

18   BY MR. SALVATO:

19       Q.    Good morning.

20       A.    Good morning.

21       Q.    My name is Frank Salvato.  I represent Mr. Cerna.

22   I want to ask you just a few questions about the

23   document you were just looking at.

24       A.    Yes.

25       Q.    Okay.

1          MR. SALVATO:  For the record, this is page

2     eight.

3     BY MR. SALVATO:

4          Q.   Do you have that on the screen?

5          A.   I do.

6          Q.   Okay.  It says "contract language monitor,"

7     says -- the first entry there is -- and this is prepared

8     by the FBI, correct?

9          A.   Yes.

10         Q.   All right.  The first sentence there says,

11    "Independent contractor."  What does that mean?

12         A.   It means they're not full-time employees.  They

13    get a 1099.

14         Q.   And so, they're contracted with the FBI?

15         A.   As I understand it, yes.

16         Q.   All right.  Now, the second entry there, it says,

17    "Can perform only summary translation of audio and

18    documents."  Can you explain your understanding of

19    what -- what does that mean?

20         A.   I've never worked for the FBI.  I'm assuming it

21    means that they can only do summaries and not complete

22    translations.

23         Q.   Okay.  And what's the difference between

24    summaries and complete translations?

25         A.   Um, a complete translation would translate

1    every -- every idea, every sentence, not necessarily
2    word for word, but the -- by the meaning.
3         Q.   Okay.  And, the same reasoning for, "can perform
4    summary translations of live monitoring"?
5         A.   I'm not sure what live monitoring is; I guess
6    listening to the phone calls as they are conducted.
7         Q.   Or perhaps a wire tap or something like that?
8         A.   Right.  In realtime, I guess.
9         Q.   Now, the second-to-last entry says, "Cannot do
10   verbatim translations."
11        A.   I guess that means that the contract language
12   monitors cannot --
13             THE COURT:  Are you guessing or is that what
14   you think?
15             THE WITNESS:  Oh.
16   BY MR. SALVATO:
17        Q.   Through your experience, what is a verbatim
18   translation?
19        A.   As I understand it, a verbatim translation is a
20   complete translation.
21        Q.   Like the documents that you've been --
22        A.   Yes, correct.
23        Q.   The transcripts?
24        A.   Exactly.
25        Q.   Those would be considered, by some, verbatim

1   translations?

2       A.   Yes.

3       Q.   All right.  And what's the difference between a

4   verbatim translation and just a summary?

5       A.   A summary would be, um, where the translator

6   would just, um, summarize the most important ideas in a

7   document or in a tape.  And in a verbatim translation,

8   the translator would have to translate every sentence,

9   as I said, not necessarily word by word, but for the

10  meaning.

11      Q.   Right.  And, you were certified to testify in

12  court; is that right?

13      A.   Oh --

14      Q.   All federal courts?

15      A.   Interpret, not testify.

16      Q.   I'm sorry.  Interpret and testify about those

17  translations; is that right?

18           You can do what these interpreters are doing?

19      A.   Yeah.  I'm certified to interpret in federal

20  court, yes.

21      Q.   All right.  And you've testified before in court?

22      A.   No.

23      Q.   And, these contract language monitors, the last

24  entry there is, "cannot testify in court."  Can you give

25  the court or the jury any reasoning behind the fact that

1    they cannot -- are not qualified to even testify in

2    court?

3        A.   I do not know.

4        Q.   Okay.

5             MR. SALVATO:   That's all the questions I

6    have, Your Honor.   Thank you -- oh, I had a couple more,

7    sorry.

8    BY MR. SALVATO:

9        Q.   You said there were other circumstances in the

10   transcripts where you thought things were added.   Is

11   that right?

12       A.   Um, I said that.   Now, I'm wondering.   Mostly,

13   things were dropped.

14       Q.   All right.   Can you explain what you mean by

15   "dropped"?   That's what I was going to ask about, add or

16   drop.

17       A.   Well, for example, when he said -- most often, if

18   the translator wrote "UI," which means unintelligible,

19   meaning they couldn't understand the words, in some

20   cases I did understand the words.

21       Q.   Okay.   So, that would be an example of how things

22   were dropped?

23       A.   Yes.   That's what I meant.

24       Q.   So, the language monitors would write "UI"?

25       A.   Uh-huh.

1    Q.   And tell me again what that means.
2    Unintelligible?
3    A.   Unintelligible.
4    Q.   All right.  But you were able to hear what was
5    being said?
6    A.   In some cases.
7    Q.   Okay.  In some case.
8         And that would be a case of something being
9    dropped?
10   A.   That's what I meant by "dropped," yes.
11   Q.   And then, were there other circumstances where
12   they heard something and put something in writing that
13   you didn't hear at all?
14   A.   For example, the example being the thing about
15   the coconut.
16   Q.   All right.  A lot of these are -- you've listened
17   to three of the transcripts.  Is it fair to say that
18   what you heard, portions of the transcripts were garbled
19   or just difficult to hear?
20   A.   That's correct.
21   Q.   Okay.  And you listened to that one paragraph 20
22   times or so?
23   A.   I think so, yes.
24            MR. SALVATO:  That's all the questions.  I
25   apologize.

1          Thank you, Your Honor.

2          MR. LEIVA:  Your Honor, I can go after the

3   government goes?

4          MS. MARTINEZ:  We'll go last, Your Honor.

5          THE COURT:  I don't think so.  I think you

6   have to go now.

7          MR. LEIVA:  I just have a couple questions,

8   Your Honor.

9                    CROSS-EXAMINATION

10  BY MR. LEIVA:

11     Q.  Good morning, ma'am.

12     A.  Good morning.

13     Q.  Let's talk about verbatim translations.  You

14  testified on direct that the best practice within your

15  field is to have three columns when translating; is that

16  correct?

17     A.  The transcription and translation should have

18  three columns, yes.

19     Q.  Okay.  And is that what is done within your field

20  when someone does a verbatim translation?

21     A.  Yes, I think so.

22     Q.  Okay.  And the reason for that is so someone can

23  compare what the context or word is in Spanish that's

24  being translated into English, correct?

25     A.  Correct.

 1    Q.   Otherwise, then, when you just have a transcript
 2  as the government has submitted, whoever is reading that
 3  transcript would actually need to listen to the actual
 4  audio and try to track what's being translated, correct?
 5    A.   Exactly.
 6    Q.   All right.  And so that's the reason behind
 7  having the three columns?
 8    A.   Yes.
 9    Q.   Okay.  Now, when a translator who is certified,
10  such as yourself, comes upon a word that has different
11  meanings, what is the standard industry practice?
12         Is it to give the different meanings in the
13  parentheses, or do you as a translator just pick what
14  that meaning should be?
15    A.   Context is everything.
16    Q.   Okay.
17    A.   You have to understand the context, how the word
18  was used in the -- you know, earlier, later.
19    Q.   Okay.  So, for example, let's take a simple word
20  like *loco*.  Okay?  And, I believe you testified on
21  direct that they used the word *loco* a lot.
22    A.   Yes.
23    Q.   When you refer to "they," you're talking about
24  Salvadorans?
25    A.   Actually, I was talking about the people who were

1    being -- whose conversation was being listened to.

2        Q.   Okay.  Would you agree with me that the term

3    "they" is used quite often within Latin American -- I'm

4    sorry -- I mean the term *loco* is used quite often within

5    certain Latin American countries?

6        A.   Yes.

7        Q.   Okay.  And, would you agree with me that the term

8    *loco,* other than the literal translation of meaning

9    someone who is crazy, refers to someone like a dude, as

10   we would use "dude" here in the United States?

11       A.   Yes.

12       Q.   Okay.  And would you agree with me that that is

13   the more general acceptance of the translation of *loco*

14   when it's used when guys are talking among each other,

15   they refer to each other as *loco*?

16       A.   Well, specifically these guys.  I can't say

17   everybody.

18       Q.   Okay.  And, I believe you were asked to look over

19   the credentials or the resumés of the contract linguist

20   monitors that were used by the government in this case.

21       A.   I read their testimony.

22       Q.   Their testimony.

23            Did you look at their CVs or their resumés?

24       A.   I think I did.

25       Q.   Okay.  I believe you testified that you have a

1   degree from Columbia University?

2       A.   That's correct.

3       Q.   Okay.  And, then you have a more advanced degree

4   from Georgetown?

5       A.   It's a certificate.  There are two translation

6   certificates from Georgetown.

7       Q.   Okay.  Did you notice, when reviewing the

8   credentials of the contract language monitors, whether

9   they had, one, any college degrees or, two, any advanced

10  certificates that you have?

11      A.   I think not.

12           MS. MARTINEZ:  Compound question, Your

13  Honor.

14           THE COURT:  One at a time.

15           MR. LEIVA:  Yes, sir.

16  BY MR. LEIVA:

17      Q.   When reviewing the credentials of the contract

18  language monitors, did you notice whether they had any

19  certifications?

20      A.   What kind of certifications?

21      Q.   Well, the kind that you have.

22      A.   No, not the interpretation or translation

23  certification.

24      Q.   Okay.  And would you agree with me that within

25  your field of -- or within your industry -- and by

1    "industry," of course, I mean, translation

2    interpreters -- that receiving a certification to

3    testify or to translate in federal court is one of the

4    more rigorous processes?

5        A.   The federal court interpretation certification is

6    very difficult, yes.

7        Q.   Very difficult.

8        A.   Yes.

9        Q.   And it sounds like it was a two-year process?

10       A.   Yes.

11       Q.   And, did you -- when reviewing the credentials of

12   the contract language monitors, did you notice whether

13   any of them were certified by a federal court?

14       A.   No, they were not.

15            MR. LEIVA:  That's all the questions I have.

16   Thank you, ma'am.

17                    CROSS-EXAMINATION

18   BY MS. MARTINEZ:

19       Q.   Good morning, Ms. Shaw.

20       A.   Good morning.

21       Q.   How are you doing?

22       A.   Okay.

23       Q.   I just have a few questions for you; won't keep

24   you much longer.

25            I want to ask you about your court certification.

1    I want to make sure I understand.  That's a

2    certification to do what the linguists who are here in

3    court today are doing; is that right?

4        A.   Yes, that's right.

5        Q.   Okay.  So, that's to interpret live, in court,

6    when people are speaking in one language?

7        A.   The certification is for really three things:

8    interpreting simultaneously in court, interpreting

9    consecutively in court, and doing something called a

10   sight translation.  In that case, you're given a

11   document in Spanish or English, you read the document

12   carefully and then you interpret -- you translate it

13   orally.

14       Q.   Okay.  So let me make sure I understand each of

15   those three things.  I'll take them one by one.

16            So, simultaneous interpretation, am I right that

17   that's what some of the linguists are doing right now,

18   as I'm talking?

19       A.   That --

20       Q.   They're translating what I'm saying into Spanish,

21   so that the defendants can hear with the earpieces; is

22   that right?

23       A.   That is correct.  That's simultaneous.

24       Q.   And then, the consecutive interpretation, I think

25   we've seen some examples of that in court, but that

1    would be, for example, if you were a Spanish speaking

2    witness, and after I finish this question that I'm

3    asking, someone were to interpret it to you for Spanish,

4    that would be the consecutive translation?

5         A.   That is consecutive.

6         Q.   And then what -- the third, you called it -- was

7    spot --

8         A.   Sight translation.

9         Q.   Sight translation.

10             And am I correct that that would be, for example,

11   if, again, you were a Spanish speaking witness, and I

12   offered you an English document and wanted to ask

13   questions, then the interpreter would, on the spot, by

14   sight, translate it into Spanish for you so I could ask

15   the question?

16        A.   Yes.  Or in some cases, if a judge issues an

17   order, a written order, and whoever it is needs to read

18   the order, the interpreter has to read the order, first

19   in English and then translate it into Spanish.

20        Q.   I see.

21             So, for example, if right now Judge Lee were to,

22   instead of orally enter an order, he were to hand all of

23   the lawyers a piece of paper with English on it, one of

24   the interpreters would want to read it in Spanish to one

25   of these defendants; is that right?

1    A.   Yes.

2    Q.   Okay.  All right.  Now, the documents that you

3  were asked to review in this case were written

4  transcripts; is that right?

5    A.   Yes.

6    Q.   And, the certification that we were just talking

7  about, that doesn't relate to preparing exhibits for

8  court like -- like these that you reviewed; is that

9  right?

10   A.   I don't think I understand the question.

11   Q.   Oh, I'm sorry.  Well, so my question is, your --

12  the certification, the very difficult certification that

13  you had to undergo, has to do with interpretation live

14  in court, right?

15   A.   And translation.

16   Q.   And translation.

17        And does it relate to preparing verbatim

18  transcripts?

19   A.   Many of my colleagues who are federally certified

20  do this work, prepare transcripts and translations.

21   Q.   Absolutely.  I'm sure they do.

22        But my question was much more specific, which

23  was:  Is the certification that you're required to have

24  in order to do what the very skilled interpreters are

25  doing here in court today, is that certification

1    required to prepare verbatim English transcripts of a

2    Spanish audio for use as an exhibit in a trial like

3    this?

4        A.   I guess not.

5        Q.   Now, let's -- I want to talk a little bit about

6    your particular experience.  You clearly have experience

7    with Central American dialects; is that right?  Of

8    Spanish?

9        A.   Yes.

10       Q.   And I guess I should step back, but would you

11   agree with me that Spanish speakers from different

12   countries speak in different dialects?

13       A.   The vocabularies are different.  The grammar and

14   syntax is not that different, usually.

15       Q.   So one word, in, for example, El Salvador might

16   mean something different in Mexico?

17       A.   That's correct.

18       Q.   And so -- I said "dialect," but that's -- we can

19   call it vocabulary, if that makes sense.

20            And also, there's slang that differs from country

21   to country; is that right?

22       A.   Yes.

23       Q.   And, you are familiar with slang in El Salvador;

24   is that what you testified to?

25       A.   Somewhat.

Q.   Somewhat.

How is it that you're familiar with El Salvadoran slang?

A.   Well, I work a great deal in DC Superior Court, and the interpreter coordinator there once told me that 95 percent of the people we interpret for are Salvadorans.

And I just interpret for Salvadorans in many other contexts, in depositions and jails, and lawyers' offices and medical appointments, as well. So I've -- in addition, I have been in El Salvador a couple times, and I have Salvadoran friends.

Q.   So, would it be fair to say that all that experience you've described would be someone speaking -- a native Salvadoran speaking to someone else who is not a native Salvadoran?

A.   Hmm.  Well, I mean, I've been in events and parties where Salvadorans were talking to each other.

Q.   Events and parties?

A.   Sure.

Q.   So, highly educated Salvadorans?

A.   Not necessarily.

Q.   Have you ever -- other than in preparing for your testimony today, have you ever been asked to translate calls, phone calls, between low-educated Salvadorans

1    speaking to each other?

2        A.   I don't think so.

3        Q.   Have you ever listened to, for example, a wire

4    tap and provided summary translations of that?

5        A.   I think once before I had to review a transcript

6    of a wire tap -- oh.  It was a phone conversation.

7        Q.   Was that for court today, or another time?

8        A.   It was another time, quite a long time ago.

9        Q.   So, in addition to what you did for court today,

10   and the one recall -- one call you reviewed -- well, how

11   long was that?  How many years?

12       A.   It was several years ago.  I can't remember the

13   exact date.

14       Q.   So, in addition to what you reviewed for court

15   and that one call, have you ever been asked to translate

16   when two native, low-educated Salvadorans are speaking

17   to each other?

18       A.   I don't think so.

19       Q.   Would you agree that that's what was happening in

20   the recordings that you listened to in court today?

21       A.   Yes.

22       Q.   And so that was a new experience for you?

23       A.   Yes.

24       Q.   Now, setting aside -- or moving on more

25   specifically within El Salvador, what experience do you

1   have translating for members of MS-13 when they are

2   speaking to other members of MS-13?

3       A.   I would not have to translate for them.

4       Q.   Fair enough.

5            What experience do you have preparing

6   translations while listening to two -- two or more

7   members of MS-13 speaking to each other?

8       A.   I generally do not do transcriptions and

9   translations.

10      Q.   Do you have any experience at all, other than

11  what you did for this case, that's directly related to

12  MS-13?

13      A.   Yes.  There have been other cases in court,

14  primarily, possibly in jail interviews.  I've done so

15  many jail interviews, I can't remember how many were

16  Colombians, how many were Salvadorans.  But I'm sure

17  some of them must have been Salvadorans.

18      Q.   So, would it be fair to say that all of that

19  experience involves someone -- the experience you just

20  mentioned would involve someone who is part of MS-13

21  speaking to lawyers and judges?

22      A.   Please repeat the question.  I was distracted.

23      Q.   I was, too.

24           Would it be fair to say that that experience that

25  you just described, translating in jails and translating

1    in court, involves -- to the extent that it did --
2    members of MS-13 speaking to professionals like lawyers
3    and judges and juries?
4         A.   Yes.  Yes.
5         Q.   So, do you have any experience translating
6    members of MS-13 speaking to each other, either live or
7    in recordings?
8         A.   I find your question difficult.  I would not be
9    translating for members of MS-13 when they're talking to
10   each other.  Please rephrase the question.
11        Q.   Sure.  How about interpreting, for either live or
12   in audio, two members of MS-13 speaking to each other,
13   interpreting that into English for whoever needs to know
14   what they're saying?
15        A.   Oh, okay.  So, I can't think of an occasion where
16   that would be necessary.
17        Q.   Well, for example, the transcripts that have been
18   entered into evidence in this case, they all involve
19   English translations of members of MS-13 speaking to
20   each other.  Would you agree with that?  Or at least the
21   ones you've reviewed?
22        A.   Right.  They're transcriptions and translations,
23   yes.
24        Q.   Okay.  And, would you agree, based on your
25   review -- well, let me go back to what you reviewed.

1   You reviewed the testimony of some of the linguists who

2   testified in this court; is that right?

3       A.   Yes.

4       Q.   You also reviewed their qualifications?

5       A.   Their CVs, yes.

6       Q.   And you reviewed this inspector general's report

7   from the FBI?

8       A.   Parts of it, yes.

9       Q.   Parts of it.

10          You didn't read the whole thing?

11      A.   No.  It's 130 pages long.

12      Q.   I see.

13          Did you read the sworn declarations submitted by

14   the FBI related to the linguist's testimony in this

15   case?

16      A.   That's the document I was referring to before.

17   I'm pretty sure --

18      Q.   I thought it was.

19          Can you just tell me the name of the declarant on

20   that?  Don't read from it otherwise, but just the name

21   of the declarant.

22      A.   Oh.  Would it be at the end?

23          Oh, here it is.  Gerald Roberts.

24      Q.   Does he have a title?

25      A.   Special agent in charge, Federal Bureau of

1    Investigation.

2        Q.   All right.  And based your review of all those

3    documents, is it your understanding that the linguists

4    whose testimony you reviewed do have experience working

5    on MS-13 cases?

6        A.   They do.

7        Q.   Is it also your -- do you also agree that those

8    linguists have experience interpreting, preparing

9    English transcripts of members of MS-13 speaking to each

10   other?

11       A.   Yes, they do.

12       Q.   Would you agree they have substantial more

13   experience than you do with respect to interpreting into

14   English, MS-13 slang?

15       A.   Translating, yes.

16       Q.   Translating.  I'm sorry.  I'm using those words

17   interchangeably, and I've been admonished before that

18   they're different.  I apologize for that.

19            Let me just make sure I got that right.

20   Translating is audio into written form?

21       A.   Translating is written.

22       Q.   Written.

23       A.   Anything that you write down is translation.

24       Q.   Written into written or audio into written, but

25   where the product is writing, correct?

1    A.   Yes.

2    Q.   I apologize.

3         Interpreting would be what the linguists in court

4    are doing?

5    A.   That is correct.

6    Q.   All right.  So, would you agree that the

7    linguists who testified have much more experience than

8    you do translating into English, MS-13 members who are

9    speaking in Spanish?

10   A.   Yes.

11   Q.   Do you have any particular knowledge of the

12   different vocabulary that MS-13 members use?

13   A.   I have, yes.  I have studied and attended

14   workshops and done a lot of research online, and there

15   are dictionaries.

16   Q.   So, you're aware, for example, that people who

17   are associated with or members of MS-13, they often

18   switch the word -- order of words in sentences?

19   A.   Yes.

20        THE COURT:  Counsel, let's take the morning

21   recess now for 15 minutes.  Thank you.

22        (Court recessed at 11:31 a.m. and reconvened

23        at 11:49 a.m.)

24        THE COURT:  Ready to bring the jury out?

25        Bring the jurors out, Mr. Toliver.  Thank

1     you.

2                     (Jury present.)

3                     THE COURT:  You may be seated.

4                     All right, Counsel, you may proceed.

5                      CROSS-EXAMINATION (Continued)

6     BY MS. MARTINEZ:

7        Q.   So, Ms. Shaw, we were talking about some of the

8     idiosyncrasies of people who are in MS-13, the way that

9     they speak Spanish.  So, we just talked about switching

10    word order.  You would agree with that, right?  People

11    in MS-13 sometimes switch the orders of words in their

12    sentences?

13       A.   It seemed to me that that was more just normal

14    Salvadoran way of talking.  Salvadorans tend to do that.

15       Q.   And would -- do you know whether that's actually

16    even more true with people who are in MS-13, or you just

17    don't know?

18       A.   I don't know.

19       Q.   Again, focusing on MS-13 in particular, do you

20    know that one of the things that MS-13 members do when

21    they speak to each other is they make up words by taking

22    an existing Spanish word --

23                     MS. AUSTIN:  Objection.  I think this is

24    more testimony than it is a question.

25                     THE COURT:  I don't think anything lawyers

1    say is testimony, Ms. Austin.

2              MS. AUSTIN:  Well --

3              THE COURT:  This is cross-examination.  This

4    is cross-examination.  Leading questions are permitted.

5    Objection overruled.

6    BY MS. MARTINEZ:

7      Q.   Do you know that MS-13 members, one of the things

8    they do is they take an existing Spanish word and they

9    make up a word by changing the letters around in that

10   word?

11             Are you familiar with that?

12     A.   Actually, that's a very common kind of pig Latin

13   that a lot of people do in many different Spanish

14   speaking countries.

15     Q.   We do it in English, too, right?

16     A.   Right.

17     Q.   Pig Latin?

18     A.   Right.

19     Q.   Are you aware that MS-13 members actually do it

20   much more than other folks in Spanish speaking

21   countries?

22     A.   I did not know that.

23             THE COURT:  She just asking you questions.

24   She's not asking you to agree with her.

25             THE WITNESS:  Thank you.

BY MS. MARTINEZ:

    Q.   That's right.  I'm asking whether or not you know.  Certainly you don't have to agree with me.

       So, going back to your experience with -- well, with interpreting in particular, would you agree that Spanish speakers, when they speak in a more formal setting, sometimes adjust the way that they speak?

    A.   But we all do.

    Q.   Sure.

       So let's start with English speakers.  Would you agree that when -- when English speakers speak in a formal setting, we adjust the way that we speak?

    A.   I'm adjusting the way I speak right now.  I'm in a formal setting.

    Q.   So you would agree?

    A.   Yes.

    Q.   And would you agree that applies to Spanish speakers as well?

    A.   Sure.

    Q.   And would you agree that those with higher levels of education do that more adeptly than those with lower levels of education?

    A.   Yes.

    Q.   Would you agree that, even among those with lower levels of education, some people do that more adeptly

1   than others?

2       A.   Yes.

3       Q.   And, then, focusing on your experience

4   interpreting for gang members, would you agree that the

5   way that gang members speak when they're speaking, for

6   example, to their lawyer is different than the way that

7   they speak to one another?

8       A.   Possibly.

9       Q.   What do you mean by "possibly"?

10      A.   I guess I don't know.  I mean --

11      Q.   Would it be fair -- I mean, do you not know

12  because you don't have a lot of experience listening to

13  two gang members talk to each other, or for some other

14  reason?

15      A.   No.  I spent the past few days listening to gang

16  members talk to each other, so I -- possibly, when they

17  speak to the lawyer, they try to be a little more

18  formal, yes.

19      Q.   So, let's use that as an example.  In the past

20  few days you've spent a lot of time listening to gang

21  members talk to each other in the recordings that are in

22  evidence in this case; is that right?

23      A.   Yes.

24      Q.   Would you agree that the way that these -- that

25  these individuals spoke on the phone is different than

1    the way you've heard defendants speak, for example, to a

2    government lawyer during a debrief?

3        A.   Yes.

4        Q.   Now, let's talk about the linguists whose

5    testimony you reviewed in particular.  I think that you

6    said, based on your review of their qualifications, that

7    they had lots of on-the-job experience?

8        A.   Yes.

9        Q.   What do you mean by that?

10       A.   One of them said she had done 3,000 hours,

11   listened to 3,000 hours, if I remember correctly.

12       Q.   Do you think that's important?

13       A.   Sure.

14       Q.   How come?

15       A.   The more you listen, the better you can

16   understand, to a certain point.

17       Q.   So, let's talk about that a little bit.  Would

18   you agree that the more someone listens to people in

19   MS-13 talking to each other, the better that person is

20   able to understand those types of recordings?

21       A.   Yes.

22       Q.   How many hours did you spend listening to these

23   three recordings?

24       A.   Well, five days, approximately six hours a day;

25   maybe 30 hours.

1    Q.   From hour one to hour 30, was it easier to

2    understand what they were saying?

3    A.   Yes.

4    Q.   And, would you agree that one -- well, not

5    generally speaking.  In this particular instance, was

6    context important to you, to understanding what they

7    meant?

8    A.   Yes.

9    Q.   Would you also agree that as you became more

10   familiar with their voices, it was easier to understand

11   what they were saying?

12   A.   A little bit.

13   Q.   Would you think that if you listened to another

14   few hundred calls involving the same individuals for a

15   series of weeks or months, that may make it even easier

16   for you to understand what they were saying?

17   A.   Yes.

18   Q.   Now, defense counsel in direct examination asked

19   you some questions about the specific qualifications of

20   the individuals who testified in court, whose testimony

21   you reviewed.  You were asked about the difference for

22   FBI between contract language monitors and language

23   monitors; is that right?

24   A.   Yes.

25   Q.   Now, prior to being asked to review this

1    inspector general's report, had you any experience with

2    respect to FBI policies?

3         A.   I once attended a workshop on working for the

4    government and heard a presentation by a representative

5    of the FBI.

6         Q.   And did that include any information about who is

7    or is not permitted to prepare English transcripts of

8    Spanish language recordings?

9         A.   No.  It was more general.

10        Q.   Did it include any information about who is or is

11   not permitted to testify as a witness in court to

12   transcripts?

13        A.   No, I don't think so.

14        Q.   Now, based on your review of the inspector

15   general's report, but also that sworn declaration, do

16   you have an understanding that the linguists who

17   testified were, in fact, permitted to do so?

18        A.   I don't understand the question.

19        Q.   Well, defense counsel asked about whether the

20   witnesses who have testified in court were acting within

21   or outside of their scope of responsibilities.

22             Do you have an understanding, based on that

23   declaration, of whether the linguists were permitted to

24   prepare these transcripts that have been entered into

25   evidence in this case?  Permitted by the FBI?

1      A.   To prepare or to testify?

2      Q.   Well, I'll start -- let's start with prepare the

3    transcripts.

4      A.   Yeah.  Sure.

5      Q.   So you agree, they were permitted to prepare

6    these transcripts by the FBI?

7      A.   Now I'm confused.  I think the -- the OIG report

8    we reviewed said that they were not permitted to make a

9    verbatim translation.

10     Q.   And I'm asking you, based on your review of the

11   sworn declaration, do you have a different

12   understanding?

13     A.   What I remember from the sworn declaration is it

14   said they had a waiver permitting them to testify.  I

15   don't remember what it said about preparing translations

16   and transcriptions.

17     Q.   Okay.  So we'll focus on testifying.  Do you have

18   an understanding that the witnesses whose testimony you

19   reviewed were permitted to testify?

20     A.   The declaration said that they had a waiver

21   permitting them to testify, yes.

22     Q.   All right.  Now, let's talk about the transcripts

23   in particular.

24              MS. MARTINEZ:  And actually, if we could

25   just put up the one that you reviewed most closely,

1   Government's Exhibit 23-A-1, on the screen, the cover

2   page.

3   BY MS. MARTINEZ:

4       Q.   All right.  If we look at the linguists and

5   reviewers listed there, do you have an understanding of

6   what "CLM" means in front of Sandra D'Sa?

7       A.   Yes.  Contract language monitor, I think.

8       Q.   How about "CL" in front of Ramon Aguilar?

9       A.   Contract linguist, I think.

10      Q.   Do you have an understanding of whether contract

11  linguists are permitted, even under the IG report, to

12  prepare English transcripts?

13      A.   I can't recall.

14      Q.   Okay.  Um, you didn't review that whole report;

15  is that right?

16      A.   No.  It was very long.

17      Q.   Did you review the testimony of Ramon Aguilar, or

18  only -- or between the two that are on this page, did

19  you review the testimony of Ramon Aguilar, or only

20  Sandra D'Sa?

21      A.   Just Ms. D'Sa.

22      Q.   Now, would it be fair to say you're not sure what

23  FBI policy dictates with respect to who can and cannot

24  prepare an exhibit such as like -- such as this?

25      A.   I'm not sure.

1      Q.   Let me ask you a question about --

2           MS. MARTINEZ:  We can leave this up.

3  Actually, let's go to -- we can go a couple pages in,

4  just to see the typical text.  Page three, maybe.

5  BY MS. MARTINEZ:

6      Q.   You testified that the distinction between this

7  and what you typically see in transcripts is that this

8  has two columns --

9           (Witness bumps microphone.)

10     A.   I'm sorry.  Yes.

11     Q.   -- and in your experience, three columns are

12  used; is that right?

13     A.   Yes.

14     Q.   And the column that's not here would be a column

15  in Spanish of what these speakers are saying; is that

16  right?

17     A.   Yes.

18     Q.   And, am I correct that that's useful for someone

19  who can hear both Spanish -- can understand Spanish, so

20  that they can follow along as they listen to the

21  recording?

22     A.   Correct.

23     Q.   And is that the purpose of that third column

24  that's missing?

25     A.   One of many purposes.

1    Q.  Well, is one of the other purposes so that
2    someone could more quickly review the written work of a
3    translator like this?

4    A.  Yes.  And more quickly find the quote, because if
5    you have to listen over and over to the tape, it's hard
6    to find out where you are in the English translation.

7    Q.  So, it would have made your job easier, right?

8    A.  Yes.

9    Q.  And, it would have made it easier for someone who
10   understands Spanish, when they're listening to the audio
11   recording, to follow along in the transcript; is that
12   right?

13   A.  Yes.  Yes.

14   Q.  Would you agree that it would make no difference
15   to someone who does not have the ability to review --
16   review the written Spanish?

17   A.  I've seen lawyers use it, even though they don't
18   understand Spanish very well, that you can see a proper
19   name or some other clue in the Spanish that connects to
20   the English.

21   Q.  Would you agree that a jury should be looking
22   only at the English, at least in a U.S. court?

23   A.  No.

24   Q.  Why not?

25   A.  Because there are other indications in the

1    Spanish to link it to the English.  As I said, there are

2    proper names, there are things like the noises and the

3    telephone ringing, that all of these, I think it would

4    be helpful to jurors as well, to connect the Spanish to

5    the English, even if they did not speak Spanish.

6        Q.   Well, so the proper name appears in the English,

7    right?

8        A.   If it appears in the Spanish, you can see -- you

9    can connect the English and the Spanish.  For example,

10   if it says, the engine -- a car engine is running, and

11   you see that in English and in Spanish, then you know

12   you're in the right spot.  Especially if someone is

13   testifying, then the jurors could see both languages and

14   connect the two -- what's being said in each language to

15   the other language.

16       Q.   Well, what if the -- the person testifying is

17   testifying in English; would it matter to be able to see

18   the Spanish?

19       A.   I think it would be helpful.

20       Q.   Okay.  Fair enough.

21           The things that you said would be in both

22   languages, first was proper name; is that right?

23       A.   Yes.

24       Q.   Proper names do appear in this English

25   transcript; is that right?

1    A.   Right.

2    Q.   And, also sounds, like car engine starting?

3    A.   Yes.

4    Q.   And in your review of these English transcripts,

5    did you see places where there were brackets and then a

6    description of noises?

7    A.   Oh, yes.

8    Q.   Okay.  Have you ever prepared a transcript, an

9    English transcript like this, for use as an exhibit

10   during a jury trial?

11   A.   No.

12   Q.   You also reviewed the testimony of Ms. D'Sa and a

13   couple other linguists; is that right?

14   A.   Yes.

15   Q.   Do you recall during that testimony, a couple of

16   the linguists were asked questions about the word *locos*?

17   A.   Yes.

18   Q.   Do you recall them being asked about why they

19   translated, on occasion, *locos* as homies?

20   A.   I do recall that discussion, yes.

21   Q.   And, you agree, don't you, that *locos* and homies

22   are more or less synonyms in this context?

23   A.   I believe "homies" refers specifically to a

24   member of the gang, but the word *locos* is used so

25   vaguely by these people that it can be -- it can be

1    confused.

2        Q.  Did you write an e-mail to defense counsel on

3    this topic?

4        A.  Yes.

5        Q.  And, did you write to defense counsel on

6    April 24th, quote, "I have to say I agree with the

7    linguists that, quote, *loco* and, quote, homie are

8    basically synonyms"?

9            Is it you that wrote that?

10       A.  I wrote that, and then I reconsidered it.

11       Q.  Did you reconsider it because defense counsel

12   asked you to?

13       A.  Yes.

14       Q.  All right.  The three recordings that you

15   reviewed, who picked them for you?

16       A.  Defense counsel.

17       Q.  And, that section of this Exhibit 23-A-1 that you

18   said you listened to many times --

19       A.  Uh-huh.

20       Q.  -- did defense counsel ask you to focus on that

21   section?

22       A.  Yes.  Yes.

23       Q.  I think I have an understanding of the -- the

24   corrections that you would make to this transcript, but

25   I want to go over them and make sure I'm correct, okay?

1    A.   Uh-huh.

2    Q.   So, this -- first of all, this exhibit, this

3    transcript, is 48 pages long; is that right?

4    A.   Yes.

5    Q.   Did you review the entire recording and the

6    entire transcript, all 48 pages?

7    A.   The defense counsel told me that the first hour

8    was mainly just riding in a car.  I actually started

9    listening carefully after about 45 minutes, because

10   I couldn't --

11   Q.   What page of the transcript was that?

12   A.   That's a good question.  I -- actually, I did

13   make notes on page 11.  So, I was listening at that

14   point from -- yeah.  I think I started listening at

15   about -- that's right -- 44:48, 44 minutes and

16   48 seconds in.

17   Q.   Could it be 45:48?

18   A.   Well, when -- I did start where they were talking

19   about, "The air is not working."  And then I got down to

20   45:48, and that's where I -- I thought I understood -- I

21   heard something different from what she wrote.

22   Q.   So, just to be clear, you skipped the first

23   nearly 45 minutes --

24   A.   I did.

25   Q.   -- of this recording?

1      A.   I did.

2      Q.   And that's the first, about, 10 to 11 pages of

3    this transcript?

4      A.   The first ten pages.

5      Q.   Okay.  And that was at defense counsel's

6    direction?

7      A.   Yes.

8      Q.   Now, I've counted, I think, the number of

9    corrections that you would make to this entire

10   transcript.  I got to 18.  Am I right about that?

11     A.   Well, there were others.  I just sent her the

12   ones that I considered most important.

13     Q.   The ones that you considered most important?

14     A.   Yes.  I think so, yeah.

15     Q.   So, one of them, the first one -- correct me if

16   I'm wrong -- the transcript says, "Did the homie ask you

17   for permission?"

18     A.   Yes.

19     Q.   And, you heard, "Did the homie give you

20   permission?"

21     A.   Correct.

22     Q.   And that's one of the most important ones that

23   you heard?

24     A.   No, not -- I don't think it's the most important.

25   I really didn't rate them as important.

1      Q.    The ones that you didn't note in your written

2    comments were less important than the ones you did note?

3      A.    Yes.  They -- (pause).

4      Q.    One of the other ones that you testified about on

5    direct was about the interpretation of the word *paros*,

6    p-a-r-o-s.

7      A.    Yes.

8      Q.    Are you familiar with that word?

9      A.    I've looked it up and I've inquired to people

10   about it.  Yes.

11     Q.    Who did you inquire?

12     A.    Salvadorans.

13     Q.    Did you inquire to anyone who has any expertise

14   in MS-13?

15     A.    I looked in a glossary of words related to MS-13.

16     Q.    Did you learn that *paro* -- from that glossary,

17   did you learn that a *paro* is a term for a particular

18   level of association with MS-13?

19     A.    That was not in that glossary.

20     Q.    What glossary did you look in?

21     A.    It was a glossary of Salvadoran terms.

22     Q.    Was it specific about MS-13, or it just was about

23   Salvadoran terms?

24     A.    No, it was just Salvadoran terms.

25     Q.    If you were to begin working on MS-13 cases full

1  time, would it be helpful to you to have a glossary

2  prepared by people who have been interpreting MS-13 for

3  many years?

4      A.   Of course.

5      Q.   And would you rely on a glossary like that?

6      A.   I would.

7      Q.   Do you know, now, what *paro* means in the context

8  of MS-13?

9      A.   You have told me.

10     Q.   I meant, do you know from anyone else?

11     A.   No.

12     Q.   Did defense counsel provide you any information

13  about MS-13 before you began reviewing these recordings?

14     A.   No.

15     Q.   Did you consult any experts related to MS-13

16  before reviewing these recordings?

17     A.   Only Internet sources and Salvadorans who were

18  not members of MS-13.

19     Q.   Going back to the corrections that you had, we

20  had 18 that you listed as the most important; is that

21  right?

22     A.   Yes.

23     Q.   And, of those 18, I counted -- correct me if I'm

24  wrong -- 8 of those 18 are places where the transcript

25  says "U/I," and you heard something; is that right?

1    A.   Yes.

2    Q.   And, you understood that -- do you agree that

3    "U/I" means unintelligible?

4    A.   Yes.

5    Q.   So, there were places where it was apparently

6    difficult for the person who wrote this transcript to

7    hear, but you were able to hear; is that right?

8    A.   That's correct.

9    Q.   And, then there was also a place where it was

10   difficult for you to hear, and apparently the person who

11   wrote the transcript was able to hear; is that right?

12   A.   Which one was that?

13   Q.   Well, let's actually go to it.  It's page 30 of

14   the transcript.

15        So, at the top of the page there, the transcript

16   says, "I told them right there, go right now, take these

17   homies over there" unintelligible "you know.  We took

18   him there to rip his coconut off.  And there, that's it,

19   then" unintelligible.  "So later I told Tuner"

20   unintelligible "that was homie, Leopardo, they went

21   there.  We went there to do another thing with this

22   homie, and then we called him" -- unintelligible.  And

23   it continues.

24        That's the section that you had difficulty

25   understanding?

1    A.   Yes.

2    Q.   You also -- I think you said on direct

3    examination that in that section there was a name that

4    you couldn't understand; is that right?

5    A.   Either Soya or Hoya.  And I don't see that in the

6    translation, either.

7    Q.   There is places in the translation that say

8    "unintelligible," right?

9    A.   Yes.

10   Q.   Could it be in one of those places?

11   A.   I think so.

12   Q.   Did you hear the word, *soyapa*?

13   A.   No.

14        Actually, I think it was the first

15   unintelligible, where it says, "Take those homies over

16   there," I heard something that sounded like Hoya or

17   Soya, and I didn't know what it was.

18        And then it became garbled -- well, I heard, "We

19   took him there," and then it became garbled.  And I

20   listened over and over again, and all I could hear was

21   something that sounded like *locos*.

22   Q.   Would you agree that *cocos* and *locos* sound

23   similar?

24   A.   Of course.

25   Q.   *Cocos* means coconut?

1    A.   It could mean coconut.  It could mean head.

2    Q.   So, it could be that this means, "We took him

3  there to rip his head off"?

4    A.   To me, it did not mean that.  I did not hear

5  that.

6    Q.   Because you couldn't hear it or because it meant

7  something different?

8    A.   I could not hear it.

9    Q.   And defense counsel asked you to listen to this

10 part in particular?

11   A.   Yes.

12   Q.   Going back to the testimony that you reviewed, of

13 the linguists, do you also recall reviewing a section

14 where one of the attorneys asked one of the linguists

15 about the word *fierro*, f-i-e-r-r-o?

16   A.   Yes, I do.

17   Q.   You agree -- do you agree that *fierro*

18 traditionally translates to knife or blade?

19   A.   Yes.

20   Q.   And, you also agree, don't you, that in context

21 it could mean gun?

22   A.   There is not enough context to say.  Because it

23 just said, "He had a *fierro*."  That's not enough

24 context.

25   Q.   Would you agree that, in that context, it may

1    have meant gun?

2        A.   No.

3        Q.   Did you write an e-mail to defense counsel on

4    April 24th, in which you said, "However, I think *fierro*

5    generally refers to a knife or blade, although it is not

6    impossible that, by extension, they may have meant a

7    gun"?

8        A.   But, I -- you could not say it meant gun unless

9    it was in a sentence that said something like, "He shot

10   four bullets from the *fierro.*"  If you just said, "He

11   had a *fierro*," you would have to choose the most common

12   meaning because there's no context.  When you just say,

13   "He had a *fierro*," there is no context, so you choose

14   the most common meaning, which is knife.

15       Q.   First of all, is that what you said in an e-mail

16   to defense counsel?

17       A.   Yes.  But I'm elaborating on it now.

18       Q.   Sure.

19            Did she ask you to reconsider that?

20       A.   No, she did not.

21       Q.   Just the part about homies?

22       A.   Yes.  I did some additional research to confirm

23   my belief that it was knife, and I found multiple

24   examples where it is, indeed, knife.

25       Q.   Setting aside that context, which you are not

1    sure you can determine, would you agree that in the
2    right context, the word *fierro* may, in fact, mean gun?
3        A.   If it said, "He fired four bullets from the
4    *fierro*," I would think it meant gun.  But I've never
5    seen it used in that way.
6        Q.   But when you were reviewing it for defense
7    counsel, you thought that it was not impossible that, by
8    extension, they may have meant a gun; is that right?
9        A.   It's not impossible if the context made that
10   clear, but the context did not make that clear.
11       Q.   How long was this recording, Exhibit 23, or at
12   least the portion that you were asked to review after
13   minute 44?
14       A.   It was very long.  Let's see.  I got down to an
15   hour and a half, an hour -- okay.  I -- I was still
16   listening at an hour 32:45.  And then I continued to
17   listen, but -- maybe I shouldn't have made a judgment.
18   It seemed to me it was not at important at this point,
19   when they were just leaving the place where they had
20   been, and then the police were following them.  And
21   apparently it stopped at about two hours.
22       Q.   So, in total, how long was the part that you
23   listened to?
24       A.   Well, I listened to the whole thing after 45
25   minutes.

1    Q.   So, did you listen to two hours, or the whole
2    thing is two hours and you skipped the first 44?
3    A.   I skipped the first 45.
4         (Pause.)
5    Q.   I'm sorry.  I was waiting --
6    A.   I skipped the first 45 minutes.  I listened to
7    the rest.
8    Q.   And my question was:  How long was the section
9    that you listened to?
10        Was it two hours, or was it two hours minus
11   45 minutes?
12   A.   It was -- it must have been -- well, I stopped
13   noting the times after an hour and a half, but there was
14   quite a bit after that.  So it may have been two hours
15   minus 45 minutes.
16   Q.   Well, so, let's say that it was.  In an hour and
17   15 minutes, of the most important corrections that you
18   noted, you found 18; is that right?
19   A.   I found more.  I did not write them all down.
20   Q.   Well, I just want to make sure I understand your
21   testimony.  Is your testimony that you wrote down the
22   most important ones?
23   A.   The ones that were most obvious to me.  I don't
24   think I'm in a position to decide what's most important.
25   Q.   Okay.  But, so the ones that were most obvious --

1    A.   Yes.

2    Q.   -- in an hour and 15 minutes you had 18 to note;

3    is that right?

4    A.   The most obvious.  I could have written down many

5    more.

6    Q.   Did you write down any others?

7    A.   I have notes here with many others.

8              MS. MARTINEZ:  Your Honor, may we approach?

9              THE COURT:  Yes.

10             (Thereupon, the following side-bar

11   conference was had:)

12             THE COURT:  Did you hear that?

13             MS. RALLS:  Yes, Your Honor.

14             THE COURT:  The witness says she has more

15   notes.  She's your expert.

16             MS. RALLS:  Your Honor, I requested that she

17   turn over any notes that she had.  And -- everything I

18   had, I gave to the government.  I -- I instructed the

19   witness to turn over any additional notes.  I mean, I'm

20   certainly happy for her to have the government look at

21   them.

22             THE COURT:  No, I don't think we can make it

23   up on the stand.  We can only focus on what you have

24   notes about.

25             MS. MARTINEZ:  I agree with that, Your

1    Honor, although I think an adverse inference should be
2    drawn here.
3                THE COURT:  Well, I'm not going to do that.
4    If there's something else you want me to do, tell me
5    what it is.
6                MS. MARTINEZ:  Your Honor, I suppose we
7    would request a jury instruction that the witness's
8    testimony about writing many more things down is not
9    something that was provided either to the government or,
10   apparently, to the defense counsel, and they should
11   disregard any testimony about any alleged corrections
12   that no one in this court has had a chance to look at.
13               THE COURT:  Well, I think you can ask her
14   that question.  Objection sustained.
15               So we're talking about things that she has
16   in her notes, but defense -- the government can ask
17   questions about:  You have things that you have not
18   given to the lawyer who hired you.
19               (Thereupon, the side-bar conference was
20   concluded.)
21   BY MS. MARTINEZ:
22    Q.   Ma'am, the additional notes that you have there,
23   did you ever provide them to defense counsel?
24    A.   No.  I have copies of -- I brought copies of some
25   of them.

1    Q.   Did you ever provide them to government counsel?

2    A.   No.  I asked if I could consult them while I'm

3    here, and she said yes, but I should have copies of

4    them.  So I did make copies of them, most of them.

5    Q.   Am I understanding correctly that you told

6    defense counsel that you had additional notes beyond

7    what was provided to the lawyers in this case?

8    A.   I said I had scribbled all over the text, and

9    asked if I could refer to these scribblings.

10        And she said yes, but that I should have copies

11   of them.  So I brought copies of them.

12   Q.   When was that communication?

13   A.   Yesterday or the day before.

14   Q.   So a day or two ago you told defense counsel that

15   you had notes beyond what the lawyers have here to ask

16   you questions about?

17   A.   It's just --

18   Q.   Am I understanding that correctly?

19   A.   I wrote all over these transcripts, and I asked

20   her if I could refer to these notes.

21   Q.   And she told you to bring copies when you came to

22   court?

23   A.   Right.  And the copies are here.

24   Q.   Did she ask you to send them to her in advance?

25   A.   No.

1     Q.   Did she ask you to get them to government counsel
2  in advance?
3     A.   You know, I didn't know what I should have done,
4  so --
5     Q.   Oh, no.  I'm asking you what defense counsel told
6  you to do.
7     A.   Yes.  She said it would be good to have copies,
8  she said.
9     Q.   Did she tell you it would be good to have copies
10 before lawyers are standing up asking questions?
11    A.   I guess not.
12    Q.   Okay.  So, I'm going to focus only on the things
13 that you actually provided, at defense counsel's
14 instruction, to the lawyers in this case; is that fair?
15    A.   Good.  Yes.
16    Q.   Okay.  So, of the things that -- that you saw fit
17 to write up and provide to defense counsel, there were
18 18 corrections; is that right?
19    A.   Yes.
20    Q.   All right.  And of those 18 corrections, eight of
21 them were instances where the person preparing the
22 transcript was unable to hear a few words and you did
23 hear a few words; is that right?
24    A.   Yes.
25    Q.   And, one of them was the -- the part on page 30

1  we just looked at, that defense counsel asked you to

2  focus on --

3     A.   Yes.

4     Q.   -- where you couldn't hear, but the person

5  preparing the transcript could; is that fair?

6     A.   Yes.

7     Q.   Are you aware whether or not multiple people have

8  listened to and reviewed this transcript?

9     A.   I think it said that the one person reviewed --

10  one person did it and the other person reviewed it.

11    Q.   Were you provided, by defense counsel, testimony

12  by someone who goes by the name Junior?

13    A.   All his testimony?

14    Q.   Were you provided any testimony by a witness who

15  goes by the name --

16    A.   No.

17    Q.   -- Junior?

18         No?

19    A.   No.

20    Q.   Were you informed by defense counsel that Junior

21  had reviewed the audio recording and the transcript?

22    A.   No.

23    Q.   All right.  Of these corrections that you've made

24  here that you -- that you noted down, am I correct that

25  one of them, the quote was, "locked up the" -- the quote

1     in the transcript was, "locked up for screwing his

2     woman," and you heard, "screwing his woman when he was

3     locked up."

4         A.   Yes.

5         Q.   And that was one of the important corrections

6     that you wanted to note; is that right?

7         A.   Yes.

8         Q.   Of the unintelligible translations, am I correct

9     that one of them, the linguist put "unintelligible" and

10    you heard, "is that all?"

11        A.   Yes.

12        Q.   Am I also correct that one of the other places

13    where the transcript said "unintelligible," you heard,

14    "they told me"?

15        A.   Yes.

16        Q.   Are those typical examples of the kinds of

17    corrections that you found in this transcript?

18        A.   I don't know what you mean by "typical."  There

19    were many kinds of -- many things that I noted that I

20    thought should have been done differently.

21        Q.   Well, I'm talking just about the translation.

22    We've already talked about the three columns.  I

23    understand you think that should have been done

24    differently.

25             But talking specifically about translating the

1    spoken Spanish by MS-13 member into written English, you
2    wrote down and provided to counsel, 18; is that right?
3        A.   Yes.
4        Q.   And, I just went over more than half of them; is
5    that correct?
6        A.   I think so.
7        Q.   Okay.  And so, the examples I gave are the
8    majority of what you saw; is that right?
9        A.   The majority?
10       Q.   I went over more than half of your 18
11   corrections; am I correct?
12       A.   I'd have to look at it.  I think -- I thought you
13   said eight.
14       Q.   All right.  Well, let's start again.  There's 18
15   total, right?
16       A.   1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,
17   15, 16, 17 -- yes.
18       Q.   Eight of them are instances where you heard a
19   couple words, and the transcripts says "unintelligible,"
20   right?
21       A.   Well, not always "unintelligible."  There's some
22   where words were left out, like the word, "to
23   Woodbridge."
24       Q.   Well, I'm focusing on the ones where you say --
25       A.   Unintelligible.

1   Q.   -- translation says something unintelligible, I
2   heard.  There's eight of those examples, right?
3   A.   1, 2, 3, 4, 5, 6, 7, 8, yes.
4   Q.   And, there's one where you weren't able to hear,
5   the thing about ripping off the coconut or the head?
6   A.   Yes.
7   Q.   There's also, we talked about an example earlier,
8   the word *paros*?
9   A.   Yes.
10  Q.   Which you weren't familiar with, right?
11  A.   Not that meaning.
12  Q.   Right.  So that's nine.
13       We talked about the one where the translation
14  says, "Did the homie ask you for permission," and your
15  correction is, "Did the homie give you permission?"
16  A.   Correct.
17  Q.   That's ten.
18       We also talked about where the transcript said,
19  "locked up for screwing his woman," and you heard,
20  "screwing his woman when he was locked up" --
21  A.   Correct.
22  Q.   -- is that right?
23  A.   Yes.
24  Q.   Okay.  So, are we at over half now?
25  A.   You tell me.

1    Q.  Well, you're the witness.

2    A.  But, you did the math.  I --

3    Q.  Okay.  Well, let's see if we can do the math

4    again.

5        There's eight where the transcripts says

6    "unintelligible," right?

7        We agreed on that?

8    A.  Yes.

9    Q.  And there's one where you couldn't hear the thing

10   about knocking the coconut or the head off, right?

11   A.  Yes.

12   Q.  That puts us at nine.  Am I -- are you with me on

13   the math?

14   A.  Yes.

15   Q.  Okay.  Then, we talked about, "Did the homie ask

16   you for permission?"  Now we're at ten; is that right?

17   A.  "Did the homie ask for permission?"  Yeah.

18       I'm not sure I understand the point of this

19   exercise, but go ahead.

20   Q.  My question is just:  Did we go over half of the

21   corrections that you provided to counsel?

22   A.  Yes.

23   Q.  Did we go over more than half of them; that's my

24   only question.

25   A.  I guess I'm getting tired.

1          So, the one about "locked up for screwing his

2     woman" was not an unintelligible one, correct?

3          You're just counting all of them now?

4      Q.   I'm just trying to cover the basis of all 18 that

5     you -- that you noted and thought significant enough to

6     provide to counsel.  Am I correct?

7      A.   I guess so.  I just -- (pause).

8      Q.   There's another one here where the transcript

9     says that the translation, quote, "was the dude a thug?"

10    And am I understanding correctly that the Spanish word

11    you heard was *pelón*, p-e-l- with an accent -- -n?

12     A.   O-n, yes.

13     Q.   Oh, sorry.  P-e-l-o, with an accent, -n; is that

14    right?

15         Am I correct?

16     A.   Yes.

17     Q.   That that's the word you heard?

18     A.   Yes.

19     Q.   And *pelón*, I understand you to -- am I correct

20    that you believe *pelón* sometimes means asleep?

21     A.   Sometimes.

22     Q.   Do you know what it means in MS-13 slang?

23     A.   Well, it also means that someone is bald.  But,

24    no, I don't know.

25     Q.   So, the word *pelón* in one context might mean

1    bald; is that right?

2        A.   Yes.

3        Q.   In another context it might mean asleep, right?

4        A.   Yes.

5        Q.   And you're not sure what it would mean to someone

6    who is speaking to another MS-13 member --

7        A.   Correct.

8        Q.   -- is that right?

9        A.   Yes.

10            MS. MARTINEZ:   Your Honor, I have no further

11   questions.

12            THE COURT:   All right.

13                   REDIRECT EXAMINATION

14   BY MS. RALLS:

15       Q.   Hi, Ms. Shaw.

16       A.   Yes.

17       Q.   I have a few more questions for you.

18            You were asked about your certification to

19   interpret in federal court.  How does the difficulty and

20   the skills required for interpreting in court compare to

21   the skills required to translate audio recordings?

22       A.   Well, they're similar.  The court -- the federal

23   test, when I took it, also involved listening, although

24   not transcribing, but just listening to recordings.

25       Q.   Have you interpreted for alleged gang members in

1    the past?

2        A.   Yes.

3        Q.   How many times?

4        A.   I don't know.

5        Q.   More than ten?

6        A.   I really don't know.

7        Q.   Okay.  Do you recall how many cases you've

8    interpreted for in court that involved alleged gang

9    members?

10       A.   Several.  I can't say how many.

11       Q.   And, when you're interpreting in court or for

12   attorneys, do the people -- or how much slang, if any,

13   do the people you're interpreting for use?

14       A.   A lot of slang.

15       Q.   In your opinion, does the amount of slang that

16   they use change base on the setting?

17       A.   It depends on the person.  Some people who have

18   not had the benefit of a formal education use slang all

19   the time.

20       Q.   Have you interpreted for people like that?

21       A.   Yes.

22       Q.   How many hours do you estimate that you

23   personally have spent listening to Salvadorans speak?

24       A.   Oh, I've been listening to Salvadorans speak

25   since I was a teenager, or younger.

1    Q.   What about listening to alleged gang members
2    speak?
3    A.   That would be many fewer hours.  Um, in a --
4    aside from all this, I've heard a few when they were
5    interviewed by their lawyers.  That's mostly when I
6    heard them, was when they were talking to their lawyers.
7    And I can't give a number of hours.
8    Q.   Now, I wanted to ask you some questions about the
9    three-column format and the word *loco* that government
10   counsel asked you about.
11        How would the three-column format assist a
12   non-Spanish speaker, if at all, to determine the meaning
13   of *loco*?
14             MS. MARTINEZ:  Objection, Your Honor,
15   leading.
16             THE COURT:  Overruled.
17             THE WITNESS:  Um, I'm not sure if the
18   three-column format would really help the non-Spanish
19   speaking person understand the term *loco* any better.
20   BY MS. RALLS:
21   Q.   Let me rephrase that.  You talked about the word
22   *loco*.  And how many different meanings can the word *loco*
23   have?
24   A.   Well, I think it would be translated a lot of
25   different ways.  If you want to vary the language, dude,

1    guy, fellow, buddy.

2        Q.   Without the three-column format, would you be

3    able -- would a non-Spanish speaker be able to tell if

4    that's the same Spanish word, *loco*, that's being

5    translated those different ways?

6        A.   It might be helpful to have the three columns,

7    yes.

8        Q.   Does the lack of the three-column format have any

9    effect on the chance for confusion and error in the

10   transcription?

11       A.   A trans- -- a chance for confusion or error by

12   whom?

13       Q.   Well, by people that are reading the transcript.

14   Let's start with that.

15       A.   It would be helpful to have the three columns,

16   yes.

17       Q.   Would it be helpful for people that didn't speak

18   Spanish?

19       A.   I think it would, in the sense that when I've

20   worked with lawyers in jail interviews and they have

21   transcriptions with three columns, they are non- -- they

22   don't speak Spanish, but they do refer back and forth to

23   the Spanish and the English columns.  They're able to

24   place a quote -- an English quote with reference to the

25   Spanish quote.  And I think they find it helpful.  They

1   seem to use all three columns when they're talking to

2   their client.

3       Q.   When you reviewed the testimony of the contract

4   language monitors, did you see anything about what they

5   had done with the notes that they made?

6       A.   No.

7       Q.   Did you review the process that they took to make

8   their translations?

9       A.   I recall the part about listening to the tape

10  over and over again, as you have to do.  I recall the

11  part about how they had the foot pedal so they were able

12  to go back to a specific spot and listen again, because

13  I know I wish I had a foot pedal.

14          And I do remember the part about consulting

15  glossaries, consulting other people, sometimes agents,

16  sometimes their supervisors.

17          That's what I remember about their testimony.

18      Q.   Do you remember anything they said about what

19  they did with notes that they made?

20      A.   No.

21      Q.   To a reasonable degree of certainty in your

22  profession, were there mistakes in these transcripts

23  that you reviewed?

24      A.   There were some mistakes, yes.

25      Q.   Were -- were there mistranslations?

1    A.   There were some.

2    Q.   And, were there omissions or additions?

3    A.   There were omissions.

4    Q.   Were there any additions?

5    A.   I'm not sure about that.

6    Q.   Okay.

7              MS. RALLS:  No further questions.

8              THE COURT:  May the witness be excused?

9              MR. SALVATO:  Your Honor, could I have a

10   follow-up?  Can I ask a few follow-up?

11             MS. MARTINEZ:  Your Honor, recross is

12   typically not permitted.

13             THE COURT:  No, no recross.  Thank you.

14             MR. SALVATO:  Thank you, Your Honor.

15             MS. RALLS:  Yes, Your Honor.  This witness

16   may be excused.

17             THE COURT:  All right.  You're free to

18   leave.  Thank you for coming.

19             (Thereupon, the witness withdrew from the

20   stand.)

21             MS. RALLS:  Court's indulgence, Your Honor.

22             Your Honor, at this time, I'd like to read a

23   stipulation that the parties have agreed to --

24             THE COURT:  All right.

25             MS. RALLS:  -- about some evidence that I

1    would like to admit.

2              THE COURT:  A stipulation is an agreement by

3    the parties that you're to consider, ladies and

4    gentlemen.

5              MS. RALLS:  "The defendants and the United

6    States of America, by and through their undersigned

7    counsel, hereby stipulation and agree as follows:

8              "The pictures labeled as Castillo Exhibits 1

9    through 5 are true and accurate depictions of Omar

10   Dejesus Castillo.

11             "The parties further stipulate that the

12   'WWJD' in Mr. Castillo's tattoo stands for 'what would

13   Jesus do'; And that Imelda is the name of Omar Dejesus

14   Castillo's mother."

15             And, Your Honor, that has been marked as

16   Defendants' Exhibit Castillo 6.

17             At this time, we move to admit the

18   stipulation and the five pictures.

19             THE COURT:  All right.  Received.

20             MS. RALLS:  Thank you, Your Honor.

21             MS. AMATO:  Your Honor?

22             THE COURT:  You may proceed.

23             MS. AMATO:  Thank you.

24             At this time we would like to play the

25   recording of Cosmo Gonzalez.  I would just ask the

1    Court's permission for Ms. Bishop to place, as she is

2    doing right now, two speakers on the rail in front of

3    the jury.

4              We are hopeful that this time the recording

5    will be heard better.  And Ms. Bishop will also be

6    sitting at the table behind government counsel.

7              THE COURT:  I think we need to have an

8    interpreter sit over there, so they can hear.  Don't you

9    think?

10             MS. AMATO:  It -- it doesn't need to be

11   interpreted.

12             THE COURT:  It doesn't need to be

13   interpreted?

14             MS. AMATO:  It's interpreted while --

15             THE COURT:  Okay.  All right.

16             MS. AMATO:  And, of course, if the jury

17   cannot, for whatever reason, hear again, we would ask

18   that they let us know.

19             Thank you.

20             (Thereupon, the video deposition of Cosmo

21   Gonzalez was played to the jury.)

22             (Video stopped.)

23             THE COURT:  All right.  Ladies and

24   gentlemen, we're going to recess for lunch until

25   2:00 o'clock.

1          Please do not discuss the case.  Don't

2   permit the case to be discussed in your presence.  And

3   leave your notes in the jury deliberation room.

4               We will resume at 2:00 o'clock.  Thank you.

5               (Court recessed at 1:05 p.m. and reconvened

6               at 2:05 p.m.)

7               THE COURT:  Ready to bring the jury out?

8               MS. AMATO:  Yes, Your Honor.

9               THE COURT:  All right.

10              You can bring our jurors out.  Thank you.

11              (Jury present.)

12              THE COURT:  You may be seated.

13              MS. AMATO:  Your Honor, may we proceed?

14              THE COURT:  I was waiting for Mr. Toliver to

15   come back.  Okay.

16              Are you done?  You're coming out?  Are you

17   going to come across the TV screen, or are you going to

18   stay in the corner?  Okay.

19              All right.  Now you may proceed.

20              MS. AMATO:  Thank you, Your Honor.  At this

21   time we will continue.

22              (Video deposition of Cosmo Gonzalez

23   continued to be played.)

24              MS. AMATO:  Thank you, Your Honor.

25              THE COURT:  All right.  Are you done?

1           MS. AMATO:  Yes, we are done.  Thank you.

2           THE COURT:  So, defense rests?

3           MS. AMATO:  Yes, we do rest.  On behalf of

4    Jesus Chavez, we rest.

5           THE COURT:  Okay.

6           MS. MARTELL:  Your Honor, at this time we

7    call Hector Chavarria.

8           THE CLERK:  Please raise your right hand.

9           (Witness sworn.)

10          THE WITNESS:  Yes.

11          THE COURT:  You can have a seat, sir.  Thank

12   you.

13          THEREUPON, HECTOR MOLINA CHAVARRIA, having

14   been duly sworn, testified as follows:

15                   DIRECT EXAMINATION

16   BY MS. MARTELL:

17   Q.   Good afternoon.

18   A.   Good afternoon.

19   Q.   If you can pull the mike close to you.

20   A.   (Complies.)

21   Q.   I'm going to have you please state your name for

22   the record; and if you could spell your last name for

23   the benefit of the court reporter.

24   A.   My name is Hector Molina Chavarria.  You want me

25   to just spell my whole name?

1    Q.   Please.  That would be helpful for her.

2    A.   Hector is H-e-c-t-o-r, Jocue, J-o-c-u-e, Molina,

3    M-o-l-i-n-a, and Chavarria is C-h-a-v-a-r-r-i-a.

4    Q.   Thank you.

5         Do you know someone that goes by the name of Lil

6    Payaso?

7    A.   Yes.

8         MS. MARTELL:  Your Honor, with your

9    permission, I'd like to show the witness what has been

10   introduced into evidence as Government's Exhibit 67-C.

11        THE COURT:  All right.

12   BY MS. MARTELL:

13   Q.   Mr. Chavarria, if you could look at the screen.

14   Do you recognize the individual in that photograph?

15   A.   Yes.

16   Q.   Who is that individual?

17   A.   Lil Payaso.

18   Q.   Thank you.  Thank you.

19        I want to direct your attention to the evening of

20   March 29th, 2014, the night Gerson Aguilar Martinez was

21   killed.  Do you remember being near the area of

22   Holmes Run Park that evening?

23   A.   Yes.

24   Q.   Is it correct that you were in that area at two

25   different points near Holmes Run Park that evening?

1    A.   Yes.

2    Q.   During those times, did you see individuals that

3    you believed were associated with MS-13, PVLS?

4    A.   Yes.

5    Q.   At any point that evening, did you see my client,

6    who was in the picture on 67-C, Omar Dejesus Castillo --

7    A.   No.

8    Q.   -- known to you as Lil Payaso?

9    A.   No.

10            MS. MARTELL:   Thank you.

11            Your Honor, no further questions for this

12   witness.

13            MR. AMOLSCH:   I have two brief questions.

14                     CROSS-EXAMINATION

15   BY MR. AMOLSCH:

16   Q.   Good afternoon, sir.

17   A.   Hello.

18   Q.   I'm the lawyer for Mr. Cerna.

19        How are you today?

20   A.   Good.

21   Q.   I'm going to ask you some very specific questions

22   regarding the questions that the other attorney just

23   asked you.  Okay?

24        So, my understanding is that at some point you

25   returned to the park to pick up some people who had --

1   you had previously dropped off regarding Mr. Aguilar's

2   murder, that the government -- defense lawyer just asked

3   you about.  Do you remember that?

4       A.   Yes.

5       Q.   Okay.  Now, specifically, what I'm asking you is:

6   You gave some people a ride home after that evening; is

7   that correct?

8       A.   Yes.

9       Q.   And, I believe you saw that one of the people in

10  that car had blood on them.  Do you remember that?

11      A.   Yes.

12      Q.   All I'm going to ask you, sir, is:  Mr. Cerna was

13  not the one who had the blood on him; is that correct?

14      A.   Yes.

15      Q.   Mr. Cerna was sitting right next to you in the

16  passenger's seat; is that correct?

17      A.   I guess, yeah.

18      Q.   Okay.  So you had an opportunity to view him?

19      A.   Huh?

20      Q.   So you had an opportunity to see him, correct?

21      A.   Yes.

22      Q.   And he drove all the way back with you in the

23  car?

24      A.   Yeah.

25      Q.   All right.  And you saw him walk towards you

 1   prior to him getting into the car?

 2       A.   Yes.

 3            MR. AMOLSCH:  That's all I have, Judge.

 4   Thank you.

 5                    CROSS-EXAMINATION

 6   BY MS. MARTINEZ:

 7       Q.   Sir, you weren't there for the murder, right?

 8       A.   Sorry?

 9       Q.   You were not there for the murder, right?

10       A.   No.

11            MS. MARTINEZ:  No further questions, Your

12   Honor.

13            May the witness be excused?

14            THE COURT:  Yes.

15            (Thereupon, the witness withdrew from the

16   stand.)

17            MS. MARTELL:  Your Honor, on behalf of

18   Mr. Castillo, we rest.

19            MR. JENKINS:  Your Honor, there is a matter

20   before Mr. Lopez Torres proceeds that I do believe needs

21   to be addressed by the Court outside the presence of the

22   jury.

23            THE COURT:  Should I send the jury out or do

24   I need to have a sidebar?

25            MR. JENKINS:  No, Your Honor, I think this

1    is one that would require the jury to be excused.

2                    THE COURT:  All right.

3                    If you all would step out for a moment,

4    please.  Thank you.

5                    (Jury not present.)

6                    THE COURT:  You may be seated.

7                    MR. JENKINS:  Thank you, Your Honor.

8                    May it please the Court.  Your Honor,

9    Mr. Lopez Torres wishes to exercise his Fifth Amendment

10   right to offer testimony on his own behalf.

11                   Before he does so, Your Honor, I think it

12   would be prudent for the Court to make a limited inquiry

13   of Mr. Lopez Torres as to whether or not he appreciates

14   and understands his Fifth Amendment rights to remain

15   silent during the course of this trial.

16                   THE COURT:  All right.

17                   Stand up, Mr. Lopez Torres.

18                   Can you hear me okay?

19                   Mr. Lopez Torres, under our law, you have

20   the absolute right not to testify.  Do you understand?

21                   DEFENDANT LOPEZ TORRES:  Correct.

22                   THE COURT:  The judge and the jury cannot

23   consider if you decide not to defend.  Do you

24   understand?

25                   DEFENDANT LOPEZ TORRES:  Yes.

|   |   |
|---|---|
| 1 | THE COURT:  If you take the stand and |
| 2 | testify, then you'll be open to any question that the |
| 3 | lawyers want to ask of you about your alleged |
| 4 | involvement in this case.  Do you understand that? |
| 5 | DEFENDANT LOPEZ TORRES:  I do. |
| 6 | THE COURT:  All right.  If you are convicted |
| 7 | and I have to decide whether or not you lied on the |
| 8 | stand, I am permitted under law to consider that.  Do |
| 9 | you understand that? |
| 10 | DEFENDANT LOPEZ TORRES:  Okay. |
| 11 | THE COURT:  Okay.  And, have you made your |
| 12 | own informed choice that you want to testify? |
| 13 | DEFENDANT LOPEZ TORRES:  (Indicating.) |
| 14 | THE COURT:  I need you to speak out loud. |
| 15 | Did you say yes? |
| 16 | DEFENDANT LOPEZ TORRES:  Yes. |
| 17 | THE COURT:  Okay. |
| 18 | Yes, Mr. Amolsch. |
| 19 | MR. AMOLSCH:  Thank you, Judge. |
| 20 | We have the issue with homeboy two and |
| 21 | Mr. Cerna -- |
| 22 | THE REPORTER:  I'm sorry? |
| 23 | THE COURT:  There's a microphone right |
| 24 | there. |
| 25 | MR. AMOLSCH:  Your Honor, Mr. Amolsch, |

1  Christopher Amolsch, for Mr. Cerna.

2           We have the homeboy two, homeboy three,

3  Christian Cerna issue as it relates to the Lagrima

4  murder that Mr. Lopez Torres was present at.

5           THE COURT:  Allegedly present at.

6           MR. AMOLSCH:  Allegedly -- I'm sorry,

7  allegedly present at, at least according to the

8  government's proof.

9           So, I'm not certain how to handle that.  I

10  know that your Court has instructed the government's

11  witnesses and --

12           THE COURT:  I'm happy to instruct Mr. Lopez

13  Torres of the same right now.

14           MR. AMOLSCH:  Thank you, Judge.  I'm not

15  sure how --

16           THE COURT:  If he's going to cover that.

17  I'm assuming that he probably is.

18           MR. AMOLSCH:  That's my point, Judge.

19           THE COURT:  All right.

20           MR. AMOLSCH:  Thank you.

21           THE COURT:  Mr. Jenkins, have you spoken to

22  your client about that issue?

23           MR. JENKINS:  I have not, Your Honor.

24           THE COURT:  Okay.

25           MR. JENKINS:  But I certainly, Your Honor,

am prepared to ask a leading question, if I am going to
be permitted to do so, when I cover that area concerning
homeboy two.

THE COURT:  Mr. Lopez Torres, I've made a
judgment, a rule, that no one may testify that Mr. Cerna
may have been present at the Lagrima incident.  Do you
understand?

DEFENDANT LOPEZ TORRES:  Correct.

THE COURT:  Which means you may not use his
name if you decide to talk about what happened at the
Lagrima murder.  Do you understand?

DEFENDANT LOPEZ TORRES:  Correct.

THE COURT:  And, if you feel the need to
give a name --

Did we decide --

MR. JENKINS:  Homeboy two.

THE COURT:  Homeboy two.

DEFENDANT LOPEZ TORRES:  Correct.

THE COURT:  -- you're to use the word
homeboy two.  Do you understand?

DEFENDANT LOPEZ TORRES:  Correct.

THE COURT:  All right.  Now, tell me what I
just asked you to do.

DEFENDANT LOPEZ TORRES:  You said if I give
testimony, I should not use the name of Christian Lemus.

Rather, you use the synonym homeboy two.

THE COURT:  Only as to the Lagrima murder; not to the reburial, just to the murder.

DEFENDANT LOPEZ TORRES:  Correct.

THE COURT:  Say it again.  Tell me what I asked you to do.

DEFENDANT LOPEZ TORRES:  I should only not mention Christian Lemus with regard to the Lagrima murder as homeboy two, and not the other case.

THE INTERPRETER:  The witness said, "I should only mention Christian Lemus in Lagrima case and not in the other cases."  I think that's --

THE COURT:  No, only in the murder of Lagrima.

DEFENDANT LOPEZ TORRES:  Correct.

THE COURT:  You're going to say something, Ms. Martinez?

MS. MARTINEZ:  Yes, Your Honor.  Your Honor, trust me when I say that no one wants this to be complete more than -- than the government at this point. But, we have to protect the record here.  This is, I believe, the last witness in this case.  This is the last opportunity for this to go wrong.  We do not want to see a mistrial here.

Your Honor, from our experience in preparing

1  witnesses who committed these crimes and have similar

2  level of language skills and probably educational

3  background and cultural background as this individual, I

4  would suggest that it takes more time than that very

5  short colloquy in open court to explain this concept.

6          And, as Your Honor saw during trial, despite

7  a lot of explanation, at least from the government, to

8  some witnesses, there were a couple slip-ups.  So at a

9  minimum, Your Honor, I think it would be prudent to

10  recess here and to allow Mr. Jenkins and Mr. Leiva to

11  talk to their client and make as certain as they

12  possibly can that this is crystal clear.

13          Mr. Jenkins leading, I think, on this narrow

14  issue is completely appropriate.  We won't object to

15  that.  But, I am concerned that because he should be

16  using the actual name in other contexts, not just the

17  reburial, but membership, other -- I mean, anything

18  other than the murder, that's the part that I think the

19  witnesses have had a lot of confusion with.

20          And I think it's less likely that we'll have

21  him say the name in the context of the murder than that

22  he will use the term "homeboy two" in another context,

23  which would potentially make it clear to the jury

24  exactly what we have tried so hard during this case to

25  keep out of the trial.

1          So, I think we do need a little more
2   explanation than the colloquy that was just given.
3          MR. JENKINS:  Your Honor, I respectfully
4   disagree.  Mr. Lopez Torres has been paying acute
5   attention throughout this entire trial.  And while
6   Mr. Lopez Torres and I did not specifically talk about
7   the homeboy two, him using it during his testimony here
8   today before he arrived at his decision that he wished
9   to exercise his Fifth Amendment right, based on all of
10  my other conversations with him during the course of
11  this trial and before this trial, in discussing the
12  Court's rulings on how to deal with this issue, I am
13  confident that Mr. Lopez Torres is going to do his best
14  to abide by the Court's instructions.
15         And I do not believe that by taking
16  additional time to discuss the matter with Mr. Lopez
17  Torres any further, is going to enhance our position at
18  all.
19         I believe that Mr. Torres understands the
20  Court's order and will make every opportunity to -- take
21  every effort to abide by it.
22         MR. AMOLSCH:  Your Honor, if I could --
23         THE COURT:  The microphone is right there.
24         MR. AMOLSCH:  I'm used to my voice carrying,
25  Judge.

1        I think Mr. Jenkins is completely right,

2   Judge.

3        But if you could just include one more

4   admonition to the witness:  not any nicknames either,

5   like Bago, or Leopardo, or Guepardo or Gatito.

6        He is nodding his head, so he understands,

7   but --

8        THE COURT:  He's not to use them; is that

9   what you're saying?

10       MR. AMOLSCH:  Yes, Your Honor.  Not just to

11  use his name, but also any of the nicknames that the

12  government has introduced through their witnesses.

13       THE COURT:  I don't understand that aspect

14  of it.  What are you trying to say?

15       MR. AMOLSCH:  Well, the government has

16  introduced evidence that Mr. Cerna has nicknames:

17  Leopardo, Gepardo, Gatito, Bago.

18       You instructed him about not using

19  Mr. Cerna's name, and I just want to make sure he

20  understands not to use any of the nicknames as well.

21       THE COURT:  The government is entitled to

22  ask him that question if he takes the stand, what

23  nicknames he knew --

24       MR. AMOLSCH:  I understand.  But as -- I'm

25  not against that rule; but just as it relates to the

1    Lagrima situation, Judge.

2              THE COURT:  Okay.  All right.

3              I'm going to take a recess, because I'm not

4    going to take any chances.  I want you to take whatever

5    time you need to put him through his paces about this

6    area, what's going to happen as it relates to the

7    Lagrima murder, and to make sure he understands that

8    with respect to all other things, he can use Mr. Cerna's

9    name.

10             And so I'm going to be counting on you to do

11   that.  And you let me know when you're ready, and we'll

12   bring the jury out.

13             But don't do it -- don't do it

14   perfunctorily, Mr. Manuel Leiva and Mr. Jenkins.  This

15   is a very critical moment in the trial, and I want

16   Mr. Lopez Torres to have his right to testify

17   unfettered, without a bunch of bench conferences every

18   five minutes.

19             Thank you.  Take as much time as you need.

20             (Court recessed at 2:52 p.m. and reconvened

21             at 3:03 p.m.)

22             THE COURT:  Ready to bring the jury out?

23             MR. JENKINS:  I am, Your Honor.

24             THE COURT:  All right.

25             You can bring the jury out, Mr. Toliver.

1    Thank you.

2                    (Jury present.)

3                    THE COURT:  You may be seated.

4                    All right.  Let the clerk administer the

5    oath.

6                    (Witness sworn.)

7                    THE WITNESS:  I swear.

8                    THE COURT:  You may proceed.

9                    MR. JENKINS:  Yes, Your Honor.

10                   Your Honor, for the record, at this time,

11   the defense calls Mr. Jose Lopez Torres.

12                   THEREUPON, JOSE LOPEZ TORRES, having been

13   duly sworn, testified as follows:

14                        DIRECT EXAMINATION

15   BY MR. JENKINS:

16       Q.  Good afternoon, Mr. Lopez Torres.

17       A.  Good afternoon.

18       Q.  Mr. Lopez Torres, are you the same individual

19   who's charged in the superseding indictment in this

20   manner?

21       A.  Right.

22       Q.  Other than the name Jose Lopez Torres, have you

23   used any other names?

24       A.  My nickname.

25       Q.  What is your nickname?

1      A.   Greñas.

2      Q.   Mr. Lopez Torres, do -- what is your native

3    language?

4      A.   Spanish.

5      Q.   Do you speak any other languages?

6      A.   Just Spanish.

7      Q.   Mr. Lopez Torres, where are you from?

8      A.   From El Salvador.

9      Q.   And how old are you, Mr. Lopez Torres?

10     A.   Twenty-eight.

11     Q.   Now, Mr. Lopez Torres, you've decided to testify

12   here today?

13     A.   Right.

14     Q.   Do you have any agreements with the government

15   with respect to your testimony here today?

16     A.   None.

17     Q.   In other words, do you expect to receive any

18   benefits from the United States Attorney's Office in

19   exchange for your testimony?

20     A.   None.

21     Q.   Mr. Lopez Torres, are you a member of a gang?

22     A.   Right.

23     Q.   What is the name of your gang?

24     A.   Mara Salvatrucha.

25     Q.   When did you become a member of the Mara

1   Salvatrucha?

2       A.   In '96.

3       Q.   How old were you when you became a member?

4       A.   Eight years.

5       Q.   Were you eight years old, or was it eight years

6   ago?

7       A.   I was eight years old.

8       Q.   Where were you living when you became a member of

9   the Mara Salvatrucha?

10      A.   In El Salvador.

11      Q.   Is the Mara Salvatrucha also known as MS-13?

12      A.   Right.

13      Q.   Is it also known as MS?

14      A.   Right.

15      Q.   And, MS, were you a member of a clique?

16      A.   Right.

17      Q.   What is a clique?

18      A.   The name of the clique is Parque Vista.  It's

19   like a group.

20      Q.   Is that the clique that you originally were --

21   became a member of?

22      A.   Right.

23      Q.   Does the MS have rules?

24      A.   Right.

25      Q.   Does it have a rule concerning testifying in

L. Torres - Direct                                           124

1   court?

2      A.   I don't understand well.

3      Q.   Is there -- are there any rules in MS-13 with

4   respect to testifying -- members testifying in court?

5      A.   Depends on how the person testifies.

6      Q.   Are there any punishments for those who break

7   that rule?

8      A.   Right.

9      Q.   Do you know someone who has testified here in --

10  during your trial who goes by the name Junior?

11     A.   Right.

12     Q.   How do you know Junior?

13     A.   Through Salvadorian people.

14     Q.   Was Junior a member of your gang?

15     A.   No.

16     Q.   How long have you known Junior?

17     A.   Probably a year and a half.

18     Q.   Do you know someone who's testified here during

19  your trial who goes by the name of Drowsy?

20     A.   I don't know him very well.

21     Q.   How long have you known him?

22     A.   I saw him only two days.

23     Q.   Was -- is Drowsy a member of your gang?

24     A.   According to what I was told, I think so.

25     Q.   Was he a member of the PVLS clique?

1    A.   According to what I was told, I think so.

2    Q.   Do you know someone who has testified during your

3   trial who goes by the name Demente?

4    A.   Right.

5    Q.   How long have you known Demente?

6    A.   A year and a half.

7    Q.   Was Demente a member of your gang?

8    A.   Right.

9    Q.   Was Demente a member of the PVLS clique?

10   A.   Previously, he wasn't.

11   Q.   Do you know someone who goes by the name Slow?

12   A.   Right.

13   Q.   Do you recall Slow testifying during your trial?

14   A.   Right.

15   Q.   Was Slow a member of your gang?

16   A.   Right.

17   Q.   Was Slow a member of the PVLS clique?

18   A.   Previously, when you made a -- asked a question

19   about Demente, he belonged to another clique, but then

20   he transferred to Park View.

21   Q.   Now, let's talk about Slow.  Was Slow a member of

22   the PVLS clique?

23   A.   Right.

24   Q.   Did you know someone who went by the name

25   Peligroso?

1     A.   Not much.  I think I saw him twice.

2     Q.   But you know who he was, correct?

3     A.   Right.

4     Q.   Do you recall listening to testimony during this

5     trial concerning Peligroso?

6     A.   Right.

7     Q.   Did you know the individual Peligroso by any

8     other name?

9     A.   No.

10    Q.   Was Peligroso a member of your clique?

11    A.   Right.

12    Q.   Did there come a time in which you became

13    convinced that Peligroso had violated certain rules of

14    MS-13?

15    A.   I'm not very well aware of that.  Things I had

16    heard, but I can -- can't state things precisely.

17    Q.   The things that you said you had heard with

18    respect to Peligroso's violation of rules, did you learn

19    those things from other gang members?

20    A.   Right.

21    Q.   What did those other gang members tell you with

22    respect to Peligroso's violation of MS gang rules?

23    A.   That he was raising, starting a clique without

24    authorization, and doing things that he was not supposed

25    to do.

1    Q.   What are some of those things he was doing that
2    he was not supposed to do?

3    A.   Jumping people without the gang's authorization,
4    doing illegal deals without the gang authorization, and
5    presumably, one thing I heard from Drowsy that, was that
6    presumably he had snitched on him when he was arrested.

7    Q.   Did you learn that -- excuse me -- information
8    that you just referenced concerning him snitching, from
9    Drowsy?

10   A.   Right.

11   Q.   Did you, yourself, ever accuse Peligroso of being
12   a snitch?

13   A.   Never.

14   Q.   Did you personally have any information that
15   Peligroso was a snitch?

16   A.   Never.

17   Q.   When you used the term "snitch," what do you
18   mean?

19   A.   Being a cooperator with the police.

20   Q.   Did the gang discuss a way to deal with
21   Peligroso's rule violations?

22   A.   Drowsy spoke about that with some other people.

23   Q.   Were you present when Drowsy was speaking about
24   it to other people?

25   A.   On two occasions; the first one over the phone,

1    and the second one for about five minutes, because then

2    I had to do some things I had to do.

3        Q.   During these two discussions, did you occupy a

4    position of leadership in the clique?

5        A.   No.

6        Q.   Who was the leader of the clique at that time?

7        A.   Demente.

8        Q.   Was Demente the first word?

9        A.   Right.

10       Q.   Who was the second word?

11       A.   That was -- that was coming from El Salvador.

12       Q.   With respect to Demente, what role did he play in

13   the discussions concerning Peligroso?

14       A.   About making -- taking measures to green light

15   him because Drowsy said he had snitched.

16       Q.   Was there a plan put in action to deal with

17   Peligroso?

18       A.   Can you repeat that?

19       Q.   Was a plan developed to deal with Peligroso?

20       A.   I think so.

21       Q.   What was the plan -- or what -- strike that.

22            What was your understanding of the plan to deal

23   with Peligroso?

24       A.   I only know there was a plan, but when someone

25   doesn't have the word in a clique, you're not supposed

1    to be hearing things that you're not supposed to.  And,

2    Drowsy had been a runner before he was arrested.

3         Q.   Do you recall being arrested in October of 2013

4    in Woodbridge, Virginia?

5         A.   Right.

6         Q.   Where were you?

7         A.   In the car.

8         Q.   Who was in the car with you?

9         A.   Drowsy, Marciano, and Demente, and I.

10        Q.   Who is Marciano?

11        A.   It seems that he was one person who was going to

12   become a *chequeo* that day.

13        Q.   He was to become a *chequeo* that day?

14        A.   According to what I've heard, I think so.

15        Q.   What does one need to do in order to become a

16   *chequeo* in MS-13?

17        A.   I couldn't tell you, because -- well, it depends,

18   well, I mean, really, at that point, I didn't know what

19   we were going to do.  It wasn't until I got into the car

20   that I learned what we were going to do and what was

21   supposed to happen.  Because there's different ways you

22   can become a *chequeo*.  You don't have to kill somebody.

23   You can do different things.

24        Q.   Where was Marciano seated in the vehicle?

25        A.   In the rear.

1    Q.   Where was Demente?

2    A.   He was the one who was driving.

3    Q.   Whose car -- who did the car belong to?

4    A.   I think Demente.

5    Q.   Where was Drowsy in the vehicle?

6    A.   In the rear.

7    Q.   And where were you?

8    A.   In the front.

9    Q.   Were any weapons in the vehicle?

10   A.   I didn't see -- I mean, to that point, I hadn't

11   seen any.

12   Q.   Did you -- do you recall the testimony of Demente

13   concerning weapons in the vehicle?

14   A.   Could you explain it, please?

15   Q.   Let me ask you:  Did you place any weapons in

16   that vehicle?

17   A.   Never.

18   Q.   What was your understanding of the purpose of

19   you, Drowsy, Demente, and Marciano being in the vehicle

20   on that evening?

21   A.   Well, as far as I had been told, we were supposed

22   to go beat up Peligroso so he would understand the

23   warning, because he'd been warned before that.  But as I

24   understood things, on the way there, things changed.

25   Q.   How did they change?

1    A.   Seemed that we weren't going to beat him up any

2    more.   We were going to go kill.

3    Q.   Who decided that Peligroso would be killed?

4    A.   That was decided by Demente with Drowsy.

5    Q.   Did you agree with Demente and Drowsy to kill

6    Peligroso?

7    A.   At no point, because he hadn't shown papers, and

8    we cannot kill a homeboy if he hasn't shown papers,

9    because that is a commitment.

10   Q.   Is it your testimony that when you were in the

11   vehicle that night, you were going to beat up Peligroso?

12   A.   Right.   Because, had I known, I wouldn't have --

13   I mean, I would have brought what was necessary, like a

14   hood, like gloves, like, you know -- because then you go

15   with some other intention.   But since you don't know,

16   you just go as you normally would.

17   Q.   What is a *calentón*?

18   A.   They're going to hit you hard.   I mean, over

19   there, it's not going to be -- you're not going to do

20   26.   They're going to hit you like a crazy minute.

21   They're going to hit you, whatever.

22   Q.   Was it the plan that evening, when you got

23   arrested, to do a *calentón* on Peligroso?

24   A.   Correct.

25   Q.   Mr. Lopez Torres, did you discuss the planned

1    *calentón* on Peligroso with the person you knew as

2    Junior?

3        A.   Junior already knew from before.

4        Q.   Do you know how Junior knew from before?

5        A.   Because I think Junior had had a problem with

6    Peligroso.

7        Q.   Did you have these discussions with Junior

8    concerning Peligroso before you were arrested?

9        A.   Correct.

10       Q.   At some point in time, did you also have

11   discussions with Drowsy concerning Peligroso?

12       A.   No.  Well, I mean -- I mean, the thing is, there

13   was a confusion, because there's a recording in there in

14   which there was confusion, because there was a

15   conversation going on with Peligroso -- with Payaso --

16            THE INTERPRETER:  Interpreter corrects

17   himself.

18            THE WITNESS:  -- conversation with Payaso,

19   which is another homeboy, which is another person.  But

20   this thing is, there was a habit sometimes, when you're

21   on line talking with somebody, there's a *mana* or a habit

22   between homeboys, to tell somebody, "Don't say

23   anything."  But, in order to have somebody else on the

24   line listening, and -- and that was --

25       Q.   Okay.  Do you know someone who goes by the name

1   Duende?

2       A.   Correct.

3       Q.   How do you know him?

4       A.   From what I've heard and from what he has shown

5   about what the neighborhood was made of.

6       Q.   Was Duende a part of the discussions about what

7   to do concerning Peligroso?

8       A.   I came to realize that, too much.

9       Q.   Let's move on.  Did you know someone who went by

10  the name Lagrima?

11      A.   Correct.

12      Q.   How did you know him?

13      A.   Because he was a member of the Mara.

14      Q.   Was he also a member of your clique?

15      A.   Earlier on he used to be a member of another

16  clique.

17      Q.   Did there come a time in which the gang believed

18  that Lagrima had violated gang rules?

19      A.   Not that we had thought that he violated; and he

20  demonstrated that he had violated them.

21      Q.   What were his violations?  What rules did he

22  violate?

23      A.   Well, first of all, you cannot go about raping

24  people only for the sake of it, or to cause harm to

25  somebody without a reason.

1       (Witness answers further in Spanish.)

2           THE INTERPRETER:  Interpreter would like to

3   clarify.  The word used, "violated" before, in Spanish

4   could be mean rape and abusing somebody.  May this be

5   clarified as another thing that was said by the witness,

6   later statement was:  "You could" -- it was perhaps a

7   clarifying statement -- "you could not just go beating

8   around people without a reason."

9   BY MR. JENKINS:

10      Q.   Now, at the time in which the gang believed that

11  Lagrima had violated gang rules, did you have a position

12  of leadership?

13      A.   I had a voice.

14      Q.   When you say you had the voice, what do you mean?

15      A.   That I would have to pass the instructions, the

16  voice, to some people as to what the *palabredo*, the shot

17  caller, would tell me, or what I would be instructed to

18  do from El Salvador.

19      Q.   Do you mean that you would relate messages from

20  the shot caller to the other members of the gang?

21      A.   Depends on what authorization I got, as to who

22  could I pass those voices to.

23      Q.   Were there discussions by the gang concerning

24  what to do about Lagrima's rule violations?

25      A.   Yes.   Junior was present.

1    Q.   Were you present?

2    A.   Correct.

3    Q.   Was homeboy two present?

4    A.   Not for the meeting.

5    Q.   Do you recall any other gang members that were

6    present for the discussions?

7    A.   In the discussions, Skinny, I, Duende, Slow, and

8    Lil Evil.

9    Q.   Who is Skinny?

10   A.   He was -- he was almost like my right-hand man.

11   Q.   Was he also a member of the gang?

12   A.   Correct.

13   Q.   And, he was a member of PVLS?

14   A.   Correct.

15   Q.   Who was Lil Evil?

16   A.   He was another member of the gang.

17   Q.   Was he also a member of PVLS?

18   A.   Correct.

19   Q.   Was this discussion held over the phone or was it

20   in person?

21   A.   Well, they were telling us from El Salvador --

22   well, they were with me.

23   Q.   Were -- did anyone participate in these

24   discussions by phone?

25            THE INTERPRETER:  Can counsel repeat the

1    question, please.

2    BY MR. JENKINS:

3        Q.   Did anyone participate in these discussions by

4    phone?

5        A.   Yes.

6        Q.   Who participated in the discussions by phone?

7        A.   The five of us who were there.

8        Q.   What was the plan to deal with Lagrima?

9        A.   Well, the plan they gave us was for us to kill

10   him.

11       Q.   The plan was -- that was given to you was to kill

12   him?

13       A.   Correct.

14       Q.   Do you remember the details of the plan?

15       A.   There was not a specific plan.  We just told that

16   the five of us were in charge of assassinating him,

17   killing him, and that that should not get out from

18   beyond the five of us.

19       Q.   Was Lagrima killed?

20       A.   Correct.

21       Q.   Other than homeboy two, who participated in

22   Lagrima's killing?

23       A.   He didn't kill him.

24       Q.   Who killed him?

25       A.   I did, and Duende, and Slow, and Skinny, and Lil

1    Evil.

2        Q.   Where did the killing occur?

3        A.   Near where a little stream goes by, and there was

4    some stuff half in construction.

5        Q.   What did you do during the murder of Lagrima?

6        A.   I stabbed him.

7             (Witness answering further in Spanish.)

8             THE INTERPRETER:  Okay.  The interpreter is

9    going to request permission of the Court to clarify.

10            THE COURT:  All right.

11            THE WITNESS:  With a *corvo*, defined as a

12   large sword -- machete, and also with a knife, but it's

13   a special knife that's got like a point on the edge.

14   BY MR. JENKINS:

15       Q.   What did Skinny do?

16       A.   He stabbed him as well.  Skinny, but for a

17   reason, because the day when Lagrima recommended Skinny

18   as a *chequeo*, he told him that if he ever failed

19   Lagrima, that he was going to kill him; but likewise,

20   that if he ever should fail Skinny, to kill him as well,

21   because that was like a rule.

22       Q.   Mr. Lopez Torres, what, if anything, did Skinny

23   do during the murder of Lagrima?

24       A.   He and I, we dug up the first hole.  That was

25   like around 4:00 p.m.  He and Lil Slow and Duende and

1    Lil Evil and I, we all stabbed him all over -- well, we

2    didn't stab him all over.  We stabbed him in the part

3    over here (indicating) and over here, and here, and also

4    in the part of the legs and part of the head.

5        Q.   Mr. Lopez Torres, for the judge's benefit, can

6    you please show again on your body where you stabbed

7    Lagrima?

8        A.   (Indicating) Over here with the machete in this

9    part, this part, and this part.  Skinny stabbed him here

10   three times.  Duende and Slow were the ones that stabbed

11   him here and in the front.

12             THE COURT:  The record should reflect that

13   the witness identified a machete going down the center

14   of the top of the head, in between the eyes, and across

15   the left side of the head, and two stab wounds in the

16   chest, heart area.

17             You may proceed.

18   BY MR. JENKINS:

19       Q.   You testified that you and Skinny dug a hole; is

20   that correct?

21       A.   Right.

22       Q.   And, you indicated that you dug this hole at

23   about 4:00 p.m. on the day of the murder?

24       A.   Right.

25       Q.   Did you dig the hole before the murder?

1   A.   Right.

2   Q.   Who assisted you with digging the hole?

3   A.   The five of us who had gotten the order to kill

4   Lagrima got together, and at that time, I made sure,

5   because we were going to go by Barcroft, and homeboy two

6   lived there.  I called him and asked him where he was,

7   and he told me he was at home.  I told him not to go

8   out, because the area was very hot with the police.

9        It would be good if you put a photograph of the

10  Culmore area, so I can indicate our path that we walked,

11  and where we got the two shovels to dig.

12  Q.   Mr. Lopez Torres, we'll get to that.

13       Mr. Lopez Torres, after Lagrima was dead, what,

14  if anything, did you do?

15  A.   We buried him.

16       (Interpreters conferring.)

17            THE INTERPRETER:  Interpreter correction.

18            When the witness said that he told him not

19  to go out because it was hot with the police, he added,

20  "as an excuse."

21  BY MR. JENKINS:

22  Q.   Mr. Lopez Torres, do you know -- well, what does

23  it mean to dismember someone?

24  A.   We were exaggerating.

25  Q.   Did you dismember Lagrima?

1    A.   Never.

2    Q.   Have you listened to the recordings of

3    conversations between you and other gang members that

4    were produced during the course of this case?

5    A.   Right.

6    Q.   Did you ever tell any other gang member that you

7    had dismembered Lagrima?

8    A.   Right.

9    Q.   You testified that you exaggerated; is that

10   correct?

11   A.   Right.

12   Q.   Why did you exaggerate?

13   A.   Many of us exaggerate.  It's a way to survive in

14   the system of the gang.  I've been surviving like that

15   practically all my life by exaggerating and to be in a

16   good standing with other people, so they don't look down

17   on you, or that they don't think you're weak.  Because

18   if you're weak in the gang, you die.

19   Q.   Is it uncommon for gang members, in your

20   experience, to lie to one another?

21   A.   That's not uncommon.  Ever since the Mara was

22   formed, they teach you all my life that they teach you,

23   because, I grew up on the street, and they teach you to

24   lie, to lie to survive.

25   Q.   Does this lying include taking credit for

1  participating in crimes that a member may not have

2  participated in?

3      A.   Right.  It's always the cat and mouse.  It's --

4  it's -- you can't be weak.  It's always like that.  It's

5  like a cat and mouse.  And if you killed an ant, you

6  have to say you killed a --

7           THE INTERPRETER:  Excuse me.  Interpreter

8  needs a minute, please.

9           THE WITNESS:  Instead of saying you killed

10 an ant, you say you killed a *marabunta* ant.  So the --

11 or an army.

12 BY MR. JENKINS:

13     Q.   And, this exaggeration, does it also include

14 taking credit for being involved in crimes in which you

15 were not?

16          (Witness conferring with interpreter.)

17          THE INTERPRETER:  The previous answer the

18 witness says:

19          THE WITNESS:  And you do that.  You

20 exaggerate, and you say you killed, even though inside

21 you're crying.

22 BY MR. JENKINS:

23     Q.   Now, my next question was:  Does this

24 exaggeration include taking credit for participating in

25 crimes in which a member actually did not participate?

1    A.   It's always.  You want to get it.  I mean, only

2  us gang members will understand how the gang system

3  works.  We have a saying that says, "You have it, I have

4  it."  If I killed him, he also has the right to say that

5  he did, even though he hasn't.  Many of us do that.

6              THE COURT:  Next question.

7  BY MR. JENKINS:

8    Q.   Mr. Lopez Torres, at some point in time, was

9  there a need to dig up the body of Lagrima?

10   A.   Seems like it.

11   Q.   Were you a part of that plan?

12   A.   No.

13   Q.   How did you learn about the digging up of

14  Lagrima's body?

15   A.   Presumably, Skinny, Slow, Duende and Lil Evil

16  were going to do it, because what we had done was not

17  going to be known by any other -- anyone else.

18   Q.   Did you participate in the reburial of Lagrima?

19   A.   No.

20   Q.   Do I understand that the individuals who

21  participated in the reburial of Lagrima -- could you

22  please name them again?

23   A.   Before I go there, I dug the second hole.  That's

24  the only thing I did, with Skinny.  And I brought up

25  rocks and dirt -- sand with him.

1              THE COURT:  Excuse me.  We'll take the

2    afternoon recess for 15 minutes.

3              MR. JENKINS:  Yes, Your Honor.

4              THE COURT:  Let the jury go out first.

5    Remain seated.  Remain seated.

6              You all can go out.

7              (Jury not present.)

8              THE COURT:  Please be seated.

9              Counsel, I prefer that you remind him about

10   this part of what the instruction is, before -- and I

11   want you to lead --

12             MR. JENKINS:  Yes, Your Honor.

13             THE COURT:  -- with names.  All right?

14             MR. JENKINS:  Yes, Your Honor.

15             THE COURT:  Thank you.

16             All right, 15 minutes.

17             (Court recessed at 3:52 p.m. and reconvened

18             at 4:10 p.m.)

19             MR. JENKINS:  Your Honor, before the jury

20   comes out --

21             THE COURT:  Let's just wait for counsel to

22   be seated.

23             Yes, sir.

24             MR. JENKINS:  I conferred with Ms. Martinez,

25   and I just want to be absolutely clear in front of

1  Mr. Lopez Torres.

2            I am about to now solicit some testimony

3  concerning the reburial of Lagrima.  And it is our

4  understanding that it is permissible for the witness to

5  now use the actual given name for homeboy two.

6            THE COURT:  Well, Mr. Cerna.

7            MR. JENKINS:  Yes, Mr. Cerna -- and not use

8  homeboy two.

9            THE COURT:  Exactly.  So I want you to lead

10 by using the name --

11           MR. JENKINS:  Yes.

12           THE COURT:  -- If you don't mind.

13           MR. JENKINS:  Yes.  Yes.

14           THE COURT:  Ready to bring the jury out?

15           All right.  You can bring the jury out.

16           THE WITNESS:  Right now, I'm not supposed to

17 use the name --

18           THE COURT:  Hold on.

19           THE WITNESS:  -- for homeboy --

20           MR. JENKINS:  We are now going to discuss

21 the reburial of Lagrima.  During this portion of your

22 testimony, the Judge is permitting you to use

23 Mr. Cerna's name, if necessary.

24           THE COURT:  And not to use "homeboy two" at

25 all.

1          MR. JENKINS:  But do not use "homeboy two"
2   in discussing the reburial.
3          THE WITNESS:  Okay.
4          THE COURT:  Can you explain to us what
5   Mr. Jenkins just told you?
6          THE WITNESS:  I understood.
7          THE COURT:  I want you to tell me.
8          THE WITNESS:  Right now, we're not talking
9   about the murder.  We're talking about the unburial and
10  reburial.  So, right now, if there is a need to mention
11  Christian Lemus, it will be by the name or by the
12  nickname, but not by "homeboy two."
13         MR. JENKINS:  Not by "homeboy two" is what
14  he said, Your Honor.
15         THE COURT:  But we're only talking about
16  burial and the reburial now.
17         MR. JENKINS:  The reburial, Your Honor.
18         THE COURT:  All right.
19         THE WITNESS:  Correct.
20         THE COURT:  Thank you.
21         You can bring our jury out, Mr. Toliver.
22  Thank you.
23         (Jury present.)
24         THE COURT:  You may be seated.
25         Counsel, you may proceed.

1      MR. JENKINS:  Thank you, Your Honor.

2  BY MR. JENKINS:

3      Q.  Mr. Lopez Torres, prior to the break, you had, in

4  response to my question, indicated that you and Skinny

5  dug the second hole for the reburial of Lagrima.  Do you

6  recall that?

7      A.  Correct.  Right.

8      Q.  Where was this second hole dug?

9      A.  A little ways away from the first one.

10     Q.  How many days had -- how much time had passed

11 between when Lagrima was murdered and when you dug the

12 second hole?

13     A.  Twenty-five days, something like that.

14     Q.  How was he -- was he reburied?

15     A.  Once they got him out, yes.

16     Q.  Did you participate in the reburial?

17     A.  I just pulled out rocks and I dug out the second

18 hole with Skinny.

19     Q.  Did you carry the body to the second hole?

20     A.  No.

21     Q.  Mr. Lopez Torres, how long have you -- well, are

22 you in jail now?

23     A.  Right.

24     Q.  How long have you been in jail in connection with

25 this case?

1    A.   You could say something like two years, a year
2    and a half, something like that.  But actually being in
3    jail, I've almost -- I'm going to -- it's going to be
4    three years.  I mean, I don't count the months, what
5    goes with the -- I mean, I don't really keep track of
6    the months or the months that I'm here.  I don't care
7    about the months.
8    Q.   Since you have been in jail, have you had any
9    communications with any other gang members?
10   A.   Right.
11   Q.   Have these discussions with other gang members
12   included the charges in this case?
13   A.   With some of them, yes, with some of them, not.
14   Q.   With those in which you have, have you discussed
15   with other gang members the evidence in this case?
16   A.   With some other people, yes.
17   Q.   With those people, did you discuss what you
18   expected the government to prove in this case is?
19   A.   With some of them, yes.
20   Q.   Can you tell us the name of those individuals,
21   those gang members that you discussed this case with
22   while you were in jail?
23   A.   Well, with Duende, we have been in touch with
24   something sort of like through letters.  I mean he
25   already told me that he was cooperating, but he had lied

1    to me about a situation with Gerson, you know.  He -- I

2    mean, he was running out, but didn't say that it was

3    because of a situation with Lil Guasón, that they had

4    given him the green light.

5       Q.   With -- Mr. Lopez Torres, wait for the

6    interpreter.

7            THE INTERPRETER:  Interpreter corrects

8    himself, that:  "He had ratted about other things, not

9    about the ones why they gave him the green light."

10   BY MR. JENKINS:

11      Q.   With respect with Duende, let's take him first.

12   When did you have these discussions with Duende?

13      A.   When I had just barely been brought here to

14   Alexandria.

15      Q.   When you had these discussions with Duende

16   concerning this case, had you received a copy of the

17   indictment?

18      A.   Actually, I can't remember.  I can't remember

19   very well.

20      Q.   At the time you had these discussions with

21   Duende, do you -- were you aware of what you were

22   charged with?

23      A.   Yes.

24      Q.   At this time, when you had these discussions with

25   Duende, were you aware of what all of the defendants on

1    trial today were charged with?

2        A.   No, not at that time, until a moment arrived when

3    I got all the papers.  And then I was surprised because

4    I saw certain persons in cases they had nothing to do

5    with.

6        Q.   When you say -- when you got the papers, what

7    papers are you referring to?

8        A.   The ones with the charges and the names of the

9    persons.

10       Q.   Did these papers include investigative reports?

11       A.   I don't remember.

12       Q.   Did they include recorded conversations?

13       A.   No.

14       Q.   At some point in time, did you listen to the

15   recorded conversations?

16       A.   Only once.  My attorney came over to start

17   explaining the case to me real well.

18       Q.   And did you discuss with Duende the fact that you

19   had received these papers?

20       A.   Well, yeah, right.  I mean, we would send

21   messages to each other when we're over at the jail,

22   because he was like in protective custody.  So we would

23   do it through little wrapped up papers that somebody who

24   was there doing the cleaning stuff would carry over to

25   him.

1        But I had believed him, because he had given me a

2   version that was different than the one that was about

3   accusing certain people, not the ones that were.

4        Q.   Were you aware, or did you become aware, that

5   Duende was going to accuse other people of things?

6        A.   Well, the thing is, after he told me he had

7   reached an agreement with the prosecution -- because I

8   didn't know how that whole business worked of having

9   deals with the prosecution for people who snitched, but

10  he told me that he had gotten from them a good deal,

11  that he was going to get life times two, which in the

12  end would come out to 20 years, and that he was going to

13  bring in somebody in, and that he was going to be saying

14  the truth, because the prosecution had asked him to tell

15  the truth.

16       Q.   Was one of the individuals you spoke with in

17  jail, Slow?

18       A.   Right.

19       Q.   When you had these discussions with Slow, was it

20  after you had been charged in this case?

21       A.   Right.

22       Q.   Was -- did you have these discussions with Slow

23  after you had received what you called the papers?

24       A.   Well, I don't -- I can't remember exactly, I

25  cannot remember exactly about the date.  Slow told me

1   that he was going to be coming to trial with us.  And

2   the thing is -- Slow was going to be coming to trial

3   with us, because at the time he had already -- well,

4   Slow had already gotten the green light, but not for

5   being a rat, but for some other reason.

6               THE INTERPRETER:  And, Your Honor, the

7   interpreter would like to call the Court and counsel --

8   the interpreter believes there was a statement in

9   between those two that the interpreter could not recall.

10  I don't know if the other interpreter's colleagues

11  remember that.

12              THE COURT:  Why don't you ask your question

13  again.

14  BY MR. JENKINS:

15      Q.   At the time you had these discussions with Slow,

16  had you already received what you called the papers?

17      A.   I can't remember very well.

18      Q.   Do you remember discussing with Slow what the

19  allegations were against you?

20      A.   We talked for a pretty lengthy, length of time,

21  that:  Yeah, let's go to trial, as long as nobody ratted

22  anybody out, nobody was going to realize that we had

23  gone.

24           And, he said that, you know, we should get the

25  five of us and, then, you know, get other people -- I

1    mean, to rat out and to get other people involved.

2    Because he had already been talking to the prosecutors

3    and I don't know how he had been realizing, and that he

4    had been ratting out.

5        Q.   When he told you that you should get other people

6    involved, what did you understand that to mean?

7                (Question not yet translated.)

8                MR. JENKINS:  Court's indulgence.

9                (Off the record discussion with counsel.)

10               MR. JENKINS:  Your Honor, if I could

11   withdraw that last question based on --

12               THE COURT:  All right.

13   BY MR. JENKINS:

14       Q.   Mr. Lopez Torres, in response to my last

15   question, did you say in Spanish to the interpreter that

16   Lil Slow told you that you and him should rat out and

17   bring other people into the case?

18       A.   Right.

19       Q.   What did you understand him to mean by that,

20   "bring other people into the case"?

21       A.   Well, to save our skins.  Because the government

22   makes promises to you that no one's going to know, and

23   they're going to protect your family.  But when it comes

24   time down to it, I think that the -- I mean, the

25   detective sitting there knows very well, the one who is

1    a Mexican one -- well the times when the, you know --

2                    THE INTERPRETER:  Permission to clarify.

3                    (Interpreter conferring with witness.)

4                    THE WITNESS:  At times when they are not

5    straight with you, they, you know, get information out

6    of you, and then -- they didn't get anything out of me

7    because they didn't have any conversation with me, but

8    they did with some other people.

9    BY MR. JENKINS:

10       Q.   Did Little -- did Slow suggest to you that you

11   lie on others?

12       A.   Correct.

13                   MS. MARTINEZ:  Your Honor, objection,

14   leading.

15                   THE COURT:  It is.  Objection sustained.

16                   MR. JENKINS:  I'll withdraw the question.

17   BY MR. JENKINS:

18       Q.   After you had your conversations with Slow, what

19   was your understanding of what Slow wanted you to do?

20       A.   To cooperate.

21       Q.   Now, at some point -- well, did you know someone

22   in the gang or associate with the gang who went by the

23   name Lil Wasón?

24       A.   Right.

25       Q.   How did you know him?

1    A.   He came to live with me because his family had

2  kicked him out of the house.

3    Q.   How long did he live with you?

4    A.   Can't tell you for sure, because I really don't

5  remember very well.

6    Q.   Was he a friend?

7    A.   More than a friend.

8    Q.   Was he also a member of your gang?

9    A.   When I was on the streets, I don't remember.

10  Maybe, I think he was a *chequeo* or maybe even *paro*.  I'm

11  not sure.

12    Q.   Do you know what happened to him?

13    A.   He was killed by mistake.

14    Q.   How do you know what happened to him?

15    A.   Because Duende, Skinny, Slow, and another person

16  bragged about what they had done and why they had done

17  it.

18    Q.   When he was killed, Lil Wasón, where were you?

19    A.   In jail.

20         MR. JENKINS:  Court's indulgence.

21         Your Honor, I have no further questions at

22  this time.

23         THE COURT:  Cross-examination by the

24  government?  I don't see anybody moving.

25         MS. MARTINEZ:  I was waiting to see if

 1   defense counsel had any questions, Your Honor.

 2                        CROSS-EXAMINATION

 3   BY MS. MARTINEZ:

 4       Q.   Okay.  Let me see if I understand.  You're guilty

 5   of the murder of Lagrima?

 6       A.   That's why I'm sitting right here.

 7       Q.   You killed him?

 8       A.   Right.

 9       Q.   Because you thought he was a rat?

10       A.   Not because I thought.  We can say many things,

11   but only us within the gang know why we killed him.

12       Q.   Oh, you're testifying under oath, so you actually

13   have to say:  Why did you kill Nelson Omar Quintanilla

14   Trujillo?

15       A.   For many reasons.

16       Q.   List them.

17       A.   For rape.  For raping an underage girl, for going

18   around beating people without a reason.  And that's not

19   something I'm making up about the beating.  That's been

20   recorded by the police.  Stabbing people for no reason.

21   For using drugs as he was not supposed to be using.  And

22   primarily for not obeying -- respecting the rules.

23   Because when we get into the -- in this, we all know

24   what the rules are.  They are explained to you.  And

25   that's why you're first a *paro*, then you are a firm

L. Torres - Cross

1    *paro*, then *chequeo*.

2        Q.   Are you done listing the reasons why you killed

3    Lagrima?

4        A.   Many reasons.

5        Q.   You've listed four.  Do you have more?

6        A.   Using drugs, drinking, stealing.  He was no

7    angel.

8        Q.   Is that an excuse?

9        A.   No, it's not an excuse.

10       Q.   You killed him for violating rules of your gang,

11   MS-13; is that right?

12       A.   That's what I was told to do, to kill him.  I did

13   not make that decision myself.

14       Q.   You did not make that decision?

15       A.   No.  It was El Salvador.

16       Q.   But you're the one who asked El Salvador to put

17   the green light on Lagrima, aren't you?

18       A.   That's what is in the calls.

19       Q.   That's what you said in the calls?

20       A.   To brag about what I had not asked for.

21       Q.   So, let me see if I understand this.  In the

22   calls you say that you believed Lagrima was a snitch,

23   right?

24       A.   Right.

25       Q.   And that's grounds in MS-13 to kill someone,

L. Torres - Cross                                              157

1    right?

2        A.    There are many reasons to kill a person.

3        Q.    And, one of them, in fact one of the biggest

4    reasons to kill someone in MS-13, is if the gang

5    believes he's a snitch, correct?

6        A.    Right.

7        Q.    Before you were arrested, you said in these

8    recordings that you killed Lagrima because he was a

9    snitch, right?

10       A.    Right.

11       Q.    Now, you say it's because he broke other rules,

12   right?

13              MR. JENKINS:  Objection, Your Honor.  I

14   think that misstates his testimony.

15              THE COURT:  Is that a speaking objection,

16   Mr. Jenkins?

17              Objection overruled.  This is

18   cross-examination.

19   BY MS. MARTINEZ:

20       Q.    Now, today in court you claim that you had other

21   motives?

22       A.    I would have liked Junior to record all the

23   calls, a call on July 25th --

24              MS. MARTINEZ:  Objection, Your Honor.  The

25   witness is not being responsive to the question.

1          MR. JENKINS:  Your Honor, I don't know if we

2     know.

3          MS. MARTINEZ:  We do.  Some of it was

4     translated into English.

5          THE COURT:  If you would restate your

6     question.

7     BY MS. MARTINEZ:

8     Q.   Today in court, you have testified that you had

9     other motives to kill Lagrima; is that correct?

10    A.   I didn't have other motives.  The gang had other

11    motives.

12    Q.   You killed him, right?

13    A.   Right.

14    Q.   And, just a minute ago, I asked you why.  Do you

15    remember that?

16    A.   Right.

17    Q.   You gave me a list of reasons that you killed

18    Lagrima, correct?

19    A.   Right.

20    Q.   Do you want to change your testimony?

21    A.   At no time.

22    Q.   So, am I correct that today in court you are

23    testifying that you had other reasons, other than

24    believing that Lagrima was a snitch, to kill him?

25    A.   (Answering, not yet translated.)

1          MS. MARTINEZ:  Objection, Your Honor.  It
2    was a yes or no question.
3          THE COURT:  It was.  Sustained.
4    BY MS. MARTINEZ:
5      Q.  I'm going to ask you again.  Today in court, your
6    testimony, yes or no, is that you had motives other than
7    believing Lagrima was a snitch when you killed him.
8      A.  The reason I did not have, but he was killed for
9    being a rat, too.
10     Q.  You killed him?
11     A.  Right.
12     Q.  You had reasons?
13     A.  I didn't have any motives.  To begin with, I am
14   not the one who makes the decisions.  But, I did kill
15   him for being a snitch.
16     Q.  So, what you said in the calls was true?
17     A.  Right.
18     Q.  You believed he was a snitch?
19     A.  I did not think he was.  It was because he was.
20     Q.  Because of your belief that Lagrima was a snitch,
21   you killed him?
22         MR. JENKINS:  Asked and answered, Your
23   Honor.
24         THE COURT:  Sustained.
25   BY MS. MARTINEZ:

1    Q.   Snitching isn't allowed in MS-13, right?

2    A.   It is not allowed.

3    Q.   If someone snitches, they get a green light,

4    right?

5    A.   You can be green lighted for many reasons.

6    Q.   That wasn't my question.  Listen to my question.

7    If someone snitches in MS-13, they get a green light,

8    right?

9    A.   There have been times in that it hasn't.

10   Q.   This time, it happened.

11   A.   Correct.

12   Q.   A green light was put on Lagrima.

13   A.   For me, it wasn't a green light.  But, green

14   light means that you go out looking for the person.  The

15   order was to kill him.

16   Q.   Is it your testimony that a green light doesn't

17   mean to kill someone?

18   A.   Yes, it means that.  But what I'm trying to say

19   is that you have to go look for the person.  But, when

20   he's there and you're told you have to do it, you have

21   to go ahead and do it.

22   Q.   So, is your testimony that Lagrima wasn't green

23   lit because you didn't have to go look for him?

24   A.   Right.  He was right there.

25   Q.   You just lured him to the park, right?

1      A.   Correct.

2      Q.   Pretended there would be a normal gang meeting,

3   right?

4      A.   Five of us knew that we were going to kill him.

5   The rest didn't know.

6      Q.   I'm asking about what you did.  You pretended

7   that it would be a normal gang meeting, right?

8      A.   Right.

9      Q.   And, that was a lie?

10     A.   Right.

11     Q.   Because you knew that you had weapons?

12     A.   What do you mean?  I don't understand the

13   question.

14     Q.   You knew that the gang brought weapons to the

15   park the night that Lagrima was killed.

16     A.   Yes.

17     Q.   A machete, right?

18     A.   Machete, right.

19     Q.   And knives, right?

20     A.   One knife.

21     Q.   Weapons like that are not allowed at normal gang

22   meetings, right?

23     A.   No.

24     Q.   The only reason you had them that night was to

25   kill Lagrima?

1   A.   Right.

2   Q.   But, you didn't have to go look for him; is that

3   your testimony?

4   A.   No.

5   Q.   You just asked him to come to a meeting?

6   A.   Right.

7   Q.   And that was a lie?

8   A.   Right.

9   Q.   Once the meeting started, you told Lagrima that

10  he would get a *calentón*?

11  A.   That's what the five of us agreed on.

12  Q.   I'm asking about you.  You personally told

13  Lagrima that he would receive a *calentón* that night?

14  A.   Right.

15  Q.   That was a lie?

16  A.   Right.

17  Q.   Weapons are not permitted during a *calentón*?

18       MR. LEIVA:  Asked and answered already.

19       THE COURT:  Overruled.

20  BY MS. MARTINEZ:

21  Q.   Weapons are not permitted during a *calentón*,

22  right?

23  A.   Right.

24  Q.   But, you knew that weapons would be used, right?

25  A.   Right.

1    Q.   You knew that you would count to 13, right?

2    A.   26.

3    Q.   You knew that you would start counting to 26,

4    correct?

5    A.   Right.

6    Q.   And, you knew that at some point, you would yell,

7    *trucha*, right?

8    A.   The other four were going to jump on him.

9    Q.   When you yelled *trucha*, the other four would jump

10   on him; that's your testimony?

11   A.   To give it to him hard, to start counting.

12   Q.   *Trucha* was the signal that it was time to kill

13   him, wasn't it?

14   A.   No.

15   Q.   When did you yell *trucha* then?

16   A.   When I started counting.

17   Q.   When you finished counting, Lagrima was on the

18   ground, right?

19   A.   No.  When I was on 22, I told Skinny, *buso*, and

20   he already knew what he had to do.

21   Q.   *Buso*, b-u-s-o, what does that mean?

22   A.   Well, like ready, like ready to throw him down.

23   Q.   So, in other words, you gave the command for the

24   others to kill Lagrima?

25   A.   I was the one who killed him, with other four.

1    Q.   You were the one who gave the order, *buso*, right?

2    A.   For them to drop him, yes.

3    Q.   And, to begin killing him, yes?

4    A.   Right.

5    Q.   And, that's what happened, right?

6    A.   Right.

7    Q.   He was stabbed in the stomach with a knife,

8    right?

9    A.   We didn't stab him in the stomach.

10   Q.   He was stabbed in the chest with a knife, right?

11   A.   With both weapons.

12   Q.   He was slashed across the face with a machete,

13   correct?

14   A.   Right.

15   Q.   He was slashed in the jaw?

16   A.   Right.

17   Q.   He was slashed across the top of the head?

18   A.   Uh-huh.  I think so.

19   Q.   He was slashed across the face?

20   A.   Yes.

21   Q.   How many times was he slashed across the face

22   with the machete?

23   A.   In the head, approximately like about five times

24   or something like that, unless I'm wrong.

25   Q.   In addition to that, he was stabbed repeatedly,

1    right?

2        A.   Right.

3        Q.   And, in addition to that, he was attacked on the

4    legs, correct?

5        A.   Well, for that, I think it was not when we killed

6    him.

7        Q.   Was it later, when you buried him?

8        A.   I didn't bury him.

9        Q.   Were Lagrima's legs hacked with a weapon?

10       A.   I don't know.

11       Q.   What weapons were used on Lagrima?

12       A.   When I -- when we killed him, there was a machete

13   and the thing that looks like a knife.

14       Q.   Which weapon did you bring?

15       A.   The knife.

16       Q.   How big was the knife that you brought to kill

17   Lagrima?

18       A.   Like this (indicating).

19                THE COURT:   About eight, nine inches.

20                THE WITNESS:   With a point on top, curved

21   point.

22   BY MS. MARTINEZ:

23       Q.   Is that the length the blade, or the blade

24   including the handle?

25       A.   The whole thing.

1    Q.   Where did you stab Lagrima?

2    A.   On the chest.

3    Q.   Where else?

4    A.   On the chest, and from there, well, we went at it

5    one by one, so that we would all get our hands dirty.

6    Q.   Where else did you stab Lagrima?

7    A.   Just on the chest, and I hit him twice with the

8    machete.

9    Q.   How many times did you stab him with the knife?

10   A.   About five, in the same spot.

11        THE INTERPRETER:  Interpreter didn't quite

12   hear the last word, Your Honor.

13        THE COURT:  Okay.

14        THE WITNESS:  On the same spot.  It was

15   almost like all five of us struck him almost on the same

16   spot.

17   BY MS. MARTINEZ:

18   Q.   Where did you slash him with the machete?

19   A.   Like around the jaw and a little bit higher up.

20   Q.   Higher up where?

21   A.   Like about here (indicating), and about here.

22   Q.   Are you the one who broke his jaw?

23   A.   I think so.  But it was with -- I mean, it was

24   not my intention.

25   Q.   Your intention was to kill him?

1    A.   That was the mission that the five of us had.

2    Q.   That wasn't my question.  Your intention was to

3  kill him?

4    A.   Yeah, you could say that, yeah.  Because I

5  couldn't leave, because then I know what would be coming

6  my way.

7    Q.   Right before you started killing him, you told

8  him why you were killing him, didn't you?

9    A.   The first word was "rat," and then the other

10 things followed.

11   Q.   What you said was, "For being a rat, you're going

12 to die," wasn't it?

13   A.   Right.

14   Q.   And then he begged for his life?

15   A.   He didn't beg.  He was just saying that he was

16 going to turn over to us who it was.

17        And Duende was like, excited, and he was saying,

18 no, no, that we had to do it, we had to do it, and not

19 to believe him.

20   Q.   Lagrima asked you not to kill him, right?

21   A.   He asked us.

22   Q.   Repeatedly, right?

23   A.   Maybe about three.

24   Q.   Three times, he asked you not to kill him?

25   A.   Yes, yes, that he was going to tell the truth to

1    us.

2          But Duende was saying, "Don't believe him.  Don't

3    believe him."

4     Q.  He didn't have a chance to tell you whatever it

5    was he wanted to tell you, right?

6               THE INTERPRETER:  Sorry, Counsel.  Would you

7    repeat the question, please.

8    BY MS. MARTINEZ:

9     Q.  He did not have a chance to tell you whatever it

10   was that he wanted to tell you, right?

11    A.  No, because Duende hit him three hits with a

12   knife over, unless I'm mistaken, on this side, but he

13   hit him three times with the knife.

14    Q.  And, you hit him with the machete in the face:

15   Is that your testimony?

16    A.  Yes, yes; and that Duende was already so

17   exalted (sic) and -- yes, that's how it was.

18    Q.  So, he didn't have a chance -- Lagrima didn't

19   have a chance to say what he wanted to say because you

20   had killed him; is that right?

21    A.  Well, I wanted -- I wanted him to tell me who it

22   had been.  But as I -- as I will repeat again, Duende

23   was exalted.

24               THE INTERPRETER:  Permission to clarify the

25   term.

1          (Interpreter conferring with witness.)

2          THE WITNESS:  He was -- he was exalted.  He

3    wanted us to finish quickly.

4    BY MS. MARTINEZ:

5      Q.   So the answer to my question is yes, right?

6           Or do you not remember the question?

7      A.   Could you repeat it?

8           THE COURT:  We can start there tomorrow,

9    10:00 a.m.

10          Ladies and gentlemen, please do not discuss

11   the case.  Don't permit the case to be discussed in your

12   presence.  Don't do any research on the case or posting

13   on social media.  Don't review any media reports, and

14   there may be some in the paper or on the news.  And do

15   not visit any locations mentioned during the trial.

16   Leave your notes in the jury deliberation room.

17          We'll resume tomorrow at 10:00 o'clock.

18   Thank you.

19          (Jury not present.)

20          THE COURT:  You may be seated.

21          MR. JENKINS:  Your Honor, may it please the

22   Court, I just want to make sure I don't run afoul of the

23   Court's expectation.

24          My understanding of the law, Your Honor, is

25   that when a defendant testifies, during a brief recess

1   he is not permitted to confer with counsel.  However,
2   during an overnight recess, the defendant is free to
3   confer with counsel.
4           And I just want to assure that that's the
5   Court's understanding, also, that I don't run afoul of
6   any ethical issues here.
7           THE COURT:  That's a good question.
8           MR. JENKINS:  I believe that's what the law
9   is.
10          MS. MARTINEZ:  Your Honor, I had hoped that
11  you knew the answer to that.
12          Off the top of my head, I am not sure, and
13  I'm not willing to take a position without looking into
14  it.  Mr. Jenkins is often correct about the law, but to
15  be honest, I do not know.
16          THE COURT:  Well, I'm going to take
17  Mr. Jenkins' word as an officer of the court that that
18  is the law.  And, of course, if you speak to him
19  overnight, the prosecutor can ask him whatever questions
20  you asked him overnight.
21          MR. JENKINS:  Thank you.
22          THE COURT:  All right.
23          I want to remind my staff to leave your
24  computers on when you sign off.  They're going to be
25  updating our computers.

                In terms of jury instructions, make sure you
respond to my law clerk's e-mail about jury
instructions.  Because once we're done, my plan is to go
right into the instruction conference.

                And so you know, depending upon when we
finish, if we finish tomorrow, even if we finish at
1:00 o'clock, I don't think it would be prudent to try
to instruct and have arguments on Thursday.  And we
don't sit on Fridays.

                So that means that we get the instructions
done tomorrow afternoon, if possible, and give you a
chance to reflect on them, and then we argue and
instruct on Monday.

                My practice is to instruct first, then the
lawyers argue.  And I give the jurors copies of the
written instructions.

                Any questions?

                MR. AQUINO:  So Monday is the operative
date.

                THE COURT:  Monday looks like the operative
date.  But I don't know how long the examination will
go, so that's the plan for right now.

                Thank you.  We're in recess.

                (Proceedings concluded at 5:03 p.m.)

                         ---

CERTIFICATE OF REPORTER

I, Renecia Wilson, an official court reporter for the United States District Court of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the jury trial in the case of UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

I further certify that I was authorized and did report by stenotype the proceedings in said jury trial, and that the foregoing pages, numbered 1 to 172, inclusive, constitute the official transcript of said proceedings as taken from my shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this  27th   day of  May , 2016.


                          /s/
                          Renecia Wilson, RMR, CRR
                          Official Court Reporter