<pre>
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                     EASTERN DISTRICT OF VIRGINIA
 2                        Alexandria Division

 3   UNITED STATES OF AMERICA,        )
                                      )
 4                    Plaintiff,      )
                                      )  Crim. No. 1:14cr306
 5        vs.                         )
                                      )
 6   JOSE LOPEZ TORRES, ALVIN GAITAN  )  April 28, 2016
     BENITEZ, CHRISTIAN LEMUS CERNA,  )
 7   OMAR DEJESUS CASTILLO, MANUEL    )
     ERNESTO PAIZ GUEVARA, and        )
 8   JESUS ALEJANDRO CHAVEZ,          )
                                      )
 9                    Defendants.     )
     _____)

10

11

12                          JURY TRIAL

13

14   BEFORE:      THE HONORABLE GERALD BRUCE LEE
                  UNITED STATES DISTRICT JUDGE
15

16
     APPEARANCES:
17
     FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
18                     BY:  JULIA MARTINEZ, AUSA
                            TOBIAS TOBLER, AUSA
19

20                          ---

21

22   OFFICIAL COURT REPORTER:

23                     RENECIA A. SMITH-WILSON, RMR, CRR
                       U.S. District Court
24                     401 Courthouse Square, 5th Floor
                       Alexandria, VA 22314
25                     (703)501-1580
</pre>

1  <u>APPEARANCES (Continued)</u>

2  FOR DEFENDANT JOSE LOPEZ TORRES

3      BYNUM & JENKINS, PLLC
       BY:  ROBERT L. JENKINS, JR., ESQ.
4      THE LEIVA LAW FIRM, PLC
       BY:  MANUEL E. LEIVA, ESQ.
5
   FOR DEFENDANT ALVIN GAITAN BENITEZ
6
       LAW OFFICE OF AMY LEIGH AUSTIN
7      BY:  AMY LEIGH AUSTIN, ESQ.
       SMITH & ZIMMERMAN, PLLC
8      BY:  JEFFREY D. ZIMMERMAN, ESQ.

9  FOR DEFENDANT CHRISTIAN LEMUS CERNA

10     LAW OFFICE OF CHRISTOPHER AMOLSCH
       BY:  CHRISTOPHER AMOLSCH, ESQ.
11     FRANK SALVATO, ESQ.

12 FOR DEFENDANT OMAR DEJESUS CASTILLO

13     FIRSTPOINT LAW GROUP, PC
       BY:  KATHERINE MARTELL, ESQ.
14     OLD TOWN ADVOCATES, PC
       BY:  MEREDITH M. RALLS, ESQ.
15

16 FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

17     LAW OFFICE OF W. MICHAEL CHICK, JR.
       BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
18
   FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
19
       JEROME P. AQUINO, ESQ.
20     ELITA C. AMATO, ESQ.

21
                      ---
22

23

24

25

1                              INDEX

2

3    PRELIMINARY MATTERS                                    4

4    <u>WITNESS (Defendants)</u> <u>DIRECT</u>   <u>CROSS</u>    <u>REDIRECT</u>    <u>RECROSS</u>

5    Jose Lopez Torres       ---      15       84         ---

6
        (Instructions conference not part of transcript)
7
        (Court recessed)
8

9                             ---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

    (Thereupon, the following was heard in open court at 10:17 a.m.)

        (Jury not present.)

        THE CLERK:  1:14 criminal 306, United States versus Jose Lopez Torres, Alvin Gaitan Benitez, Christian Lemus Cerna, Omar Dejesus Castillo, Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez; with Spanish interpreters previously sworn.

        THE COURT:  Good morning.

        Please turn the computer on.  Turn the computer on and sign in.

        Good morning, ladies and gentlemen.  Are we ready to proceed?

                    PRELMINARY MATTERS

        MS. MARTINEZ:  Your Honor, briefly, before we begin, in Government's Exhibit 7-A-1, which is a transcript of a recorded call between Junior and Defendant Lopez Torres, Greñas, who is currently testifying, there is a page where previously the parties agreed to redact the name Wasón, which is one of the nicknames that Duran Cerritos, or Lil Poison, goes by. It's in the context of talking about the Lagrima murder.

        And prior to Douglas Cerritos being severed

1   from this matter, it was appropriate to redact that name

2   because of the homeboy one, homeboy two, homeboy three

3   issue.  Now that Douglas Cerritos is no longer in the

4   case, there's no real reason for that to be redacted.

5               And this defendant's testimony yesterday

6   has --

7               THE INTERPRETER:  Excuse me.  The

8   interpretation -- there is a problem with the --

9               (Counsel conferring.)

10              MS. MARTINEZ:  Your Honor, defense counsel

11  has asked me to start again, because the defendant was

12  unable to hear.  So I'm going to start at the beginning.

13              Is it working?  Okay.

14              Your Honor, in Government's Exhibit 7-A-1,

15  which is a transcript of a recorded call between

16  Defendant Lopez Torres, Greñas, who is currently

17  testifying, and Junior, there is a page where the

18  parties previously agreed to redact the name Wasón,

19  which is a nickname for Douglas Cerritos, or Lil Poison.

20  It's in the context of talking about the Lagrima murder.

21              And the reason it was redacted previously

22  was because of Your Honor's rulings with respect to

23  Defendant Duran Cerritos and Lemus Cerna, and it

24  certainly was appropriate to redact that name.  Of

25  course, those redactions were made prior to Duran

1    Cerritos being severed from this trial.  And, at this
2    point, there's no real reason for that redaction to stay
3    on the page any longer.  Of course, multiple witnesses
4    now, once the severance happened, have testified that
5    Duran Cerritos indeed was involved in the Lagrima
6    murder.

7            This witness, this defendant, during his
8    testimony yesterday, he raised -- he made this issue
9    directly relevant by saying that in fact, Lil Poison,
10   Wasón, Duran Cerritos, was not involved in the Lagrima
11   murder.  And in a recorded call, he says that he was.

12           The jurors currently have a redacted version
13   of that page.  Because there's no reason for a redaction
14   any longer, what we're asking for is that that one page,
15   unredacted, the only -- all that was redacted before was
16   the word Wasón, I think three or four -- five times --
17   six times, just the name was redacted on that page.

18           So I'm asking that the unredacted page be
19   added to the jurors' exhibits, added to exhibit binder,
20   the official exhibit binder, and provided to -- to all
21   parties.

22           THE COURT:  Page number?

23           MS. MARTINEZ:  It is page 19, Your Honor.

24           THE COURT:  All right.

25           MS. MARTINEZ:  And I have about 29 copies

1    here that I can pass out.

2                    THE COURT:  Let me hear from defense first.

3                    MS. MARTINEZ:  Thank you.

4                    MR. JENKINS:  No objection.

5                    THE COURT:  No objection.

6                    MS. AUSTIN:  I object, Your Honor.  May I be

7    heard?

8                    THE COURT:  Sure, uh-huh.

9                    MS. AUSTIN:  I have a couple grounds, Your

10   Honor, to object to this.

11                   First of all, when Your Honor granted the

12   mistrial motion and Mr. Cerritos was excused from the

13   trial, I brought this very issue up about the redactions

14   and Cerritos -- references to him in the transcripts,

15   and why don't we go and take the -- remove the

16   redactions.

17                   And counsel for the government refused to

18   agree to that.  She said:  We're going, let's just --

19   and there was a refusal on her part to change it, so

20   that we could argue about Mr. Cerritos' presence at the

21   Lagrima murder and other matters that were redacted out.

22                   So, I don't think it's proper now, when it's

23   in the government's interest, to ask for an exhibit that

24   has been admitted and argued about and people have based

25   their arguments on that, to be changed while the last

witness testifies in this case.

The exhibit has been admitted as is, and to change it now is improper, and I object on those grounds.

THE COURT:  All right.

MS. MARTELL:  Your Honor, I would also object -- I would also object, Your Honor, on behalf of Mr. Omar Dejesus Castillo.

Your Honor, we're charged in Count 4, which is the Lagrima murder.  And this issue directly affects our case.  We were not able to question any of the witnesses with these redactions.  The government didn't seek to unredact these.

And when we -- after Mr. Douglas Cerritos was removed -- his mistrial was granted, when we went to visit -- revisit the issue of the transcripts, there was no opportunity, as Ms. Austin said.  We were moving forward with these transcripts that were redacted, and we weren't given the opportunity during this trial to question the witnesses on the stand about this fact, and about the fact that in this transcript, and specifically in this page 19, it says that Douglas Cerritos is the one who took certain actions against -- in the Lagrima murder.

And so, now, to have this unredacted when it

1   benefits the government and our case is now closed,

2   presents an unfair situation to our client,

3   Mr. Castillo, who can't question any witnesses and who

4   can't present any evidence and argue this point from

5   this -- because our case is now closed.

6          And, to have this new evidence that we could

7   have somehow used to question the witnesses at this

8   stage would be unfairly prejudicial to him.

9          MR. JENKINS:  Your Honor, maybe -- if I may,

10  Your Honor, may it please the Court.  Maybe the solution

11  is to simply have Mr. Lopez Torres refer to him as a

12  pseudonym.

13         And the government counsel, if their point

14  is to put before the jury that, contrary to what they

15  believe he said in this recording about this other

16  individual being involved, in comparison to what his

17  testimony was yesterday, I don't think it's that

18  important to have his proper name.

19         The point I think the government wants to

20  raise before the jury is that Mr. Lopez Torres

21  specifically said that this individual was not there,

22  and in the recording they believe he said that the

23  individual was there.

24         THE COURT:  Can I see a copy of the page,

25  please?

1           MS. MARTINEZ:  Yes, Your Honor.

2           And may I briefly respond to what counsel

3    said?

4           THE COURT:  Absolutely.

5           MS. MARTINEZ:  Your Honor, Mr. Jenkins --

6    that's only a part of the point, what Mr. Jenkins said.

7    First of all, three different cooperating defendants

8    have all testified that Lil Poison was involved in the

9    Lagrima murder.

10          Defense counsel all had opportunities to

11   question all three of those cooperators.  All three of

12   them described Lil Poison as the initial aggressor in

13   the Lagrima murder, the defendant who stabbed Lagrima in

14   the chest and slashed him across the face with a

15   machete.  That's what three of the government's

16   witnesses have testified to.

17          That is consistent with what this defendant

18   said in this recorded call.  It's not a mere fact that

19   he didn't list someone and he listed someone in this

20   call.  He didn't list someone who is still pending

21   trial, which we would submit is the reason that he is

22   trying to deny that this person was involved.

23          He acknowledged Lil Poison's, Wasón's

24   involvement during this recorded call before he was

25   arrested.  He testified yesterday that Lil Poison was

1    not involved.  And three of the government's cooperating
2    witnesses have testified that he was involved.
3                As for Ms. Austin's argument, Your Honor, I
4    have no recollection of refusing to put in unredacted
5    pages with information about Lil Poison.  I don't -- I
6    could be wrong.  It's been a long trial.  But I have no
7    recollection of that.
8                I don't think that the government would have
9    objected if defense counsel had said, "I want to ask
10   about this page with this part unredacted," and then
11   asked to swap those pages out.  I don't recall that ever
12   happening, Your Honor.
13               But irregardless, there were three different
14   witnesses who testified to Lil Poison's involvement.
15   They testified consistently about that, and defense
16   counsel had an opportunity to question every single one
17   of them.
18               THE COURT:  All right.
19               My judgment is to sustain the objection.
20   We're staying with what we have.  You have ample -- you
21   have the right to argue those three witnesses saying
22   what they said to the jury.  The jury will recall the
23   testimony of all the witnesses.
24               And, if you want to impeach him by using a
25   pseudonym, you may, but that's as far as I'm going to

1    go.  The reason I'm doing that is because the defense

2    case is closed.  They did not have a chance to examine

3    any of those cooperators on this issue.  It is a

4    material issue about who was present.  And I think to do

5    that now in the defense case, last witness in the trial,

6    would be unfair to them.

7              So, objection is sustained.

8              MS. MARTINEZ:  Thank you.

9              THE COURT:  Can we bring the jury out now?

10             Let's have the defendant come back to the

11   stand, please.

12             MR. JENKINS:  Your Honor, just so my client

13   is clear, the pseudonym that you just referenced that

14   the government could cross-examine him about, if you

15   could refresh my recollection, is it homeboy one or

16   three?

17             THE COURT:  I don't want to say it.

18             MR. JENKIKNS:  I just want to make sure

19   Mr. Lopez Torres knows.

20             MS. MARTINEZ:  Your Honor, I don't intend to

21   introduce any other -- any new pseudonym.  We're going

22   to stick with homeboy two for Lemus Cerna in the murder

23   of Lagrima.  And I'm probably going to stay pretty far

24   away from that anyway.  I really don't want to get

25   into --

```
1              THE COURT:  It's not necessary.  Just focus
2    on -- there's plenty here for you to focus on without
3    going down that path.
4              MS. MARTINEZ:  I don't want to create
5    another complication at this stage.
6              THE COURT:  All right.
7              So you're not going to ask him anything that
8    calls for a homeboy response, right?
9              MS. MARTINEZ:  Your Honor, there's some
10   small chance --
11             THE COURT:  Okay.
12             MS. MARTINEZ:  -- with respect to the
13   Lagrima murder --
14             THE COURT:  Well, then lead.
15             MS. MARTINEZ:  I will.  It's cross.  I will.
16             But with respect to the issue we just spoke
17   about, I don't want to introduce a new pseudonym --
18             THE COURT:  Okay.
19             MS. MARTINEZ:  -- that he needs to remember
20   at this point.
21             THE COURT:  Thank you.
22             Are the interpreters ready?
23             THE INTERPRETER:  Yes, Your Honor.
24             THE COURT:  All right.
25             Everyone ready?
```

1          You can bring our jury out, Mr. Toliver.
2   Thank you.
3          (Witness resumed stand.)
4          (Jury present.)
5          THE COURT:  You may be seated.
6          Good morning, ladies and gentlemen.
7          THE JURORS:  Good morning, Your Honor.
8          THE COURT:  We're all very accustomed to
9   Northern Virginia traffic.  I have discovered a new way
10  to work.  It's called Waze, W-a-z-e.  No matter --
11  somehow it takes me on side streets and around traffic,
12  and it tells me when there's accidents ahead.  And so if
13  you haven't tried it -- I don't get any fee for that
14  either, by the way.
15         Good morning, Mr. Manuel Ernesto Paiz
16  Guevara; good morning.
17         Good morning, Mr. Omar Dejesus Castillo.
18         Good morning, Mr. Alvin Gaitan Benitez.
19         Good morning, Mr. Jesus Alejandro Chavez.
20         Good morning, Mr. Christian Lemus Cerna.
21         And good morning, Mr. Jose Lopez Torres.
22         THE WITNESS:  Good morning.
23         THE COURT:  Good morning, Counsel.  Ready to
24  proceed?  You may proceed.  Thank you.
25         THEREUPON, JOSE LOPEZ TORRES, previously

duly sworn, testified further as follows:

                    CROSS-EXAMINATION (Continued)

BY MS. MARTINEZ:

Q.   When we left off yesterday, the question posed
was the following:  The reason that Lagrima was unable
to tell you what he wanted to tell you was because you
killed him, right?

A.   We killed him.

Q.   And, that's why he was unable to tell you, right?

A.   Correct.

Q.   When you murdered Lagrima, you were second word
of your clique.

A.   No.

Q.   You became the second word after Demente was
arrested, right?

A.   No; the *portavos*, or the spokesperson.

Q.   You were the spokesperson?

A.   Correct.

Q.   That's a leader, right?

A.   No, because we don't make decisions.  A person
alone doesn't make the decision.

Q.   You were a leader on the night that Lagrima was
murdered, right?

A.   No.

                    MS. MARTINEZ:  Your Honor, I'd like to

1    publish a page from Government's Exhibit 7-A-1.

2             THE COURT:  All right.

3    BY MS. MARTINEZ:

4        Q.  In a recorded call -- page 13, please.

5             In a recorded call with Junior on December 6th of

6    2013, in the bottom third of the page, when you

7    described the Lagrima murder to Junior, you said, "I was

8    the one in charge," didn't you?

9        A.  Correct.

10       Q.  And you were the one in charge, weren't you?

11       A.  They gave me the word.

12       Q.  Exactly.  You had the word.

13       A.  Exactly.

14       Q.  On the day that you killed Lagrima, you had the

15   word?

16       A.  That's what they told me I had to do.

17       Q.  And that's what you wanted to do, wasn't it?

18       A.  No, it's not that I wanted to.  You have to do

19   it.  That was the rule in the neighborhood.

20       Q.  Let's talk about some of the things that you did

21   when you had the word of PVLS.  When you had the word,

22   that meant that you ran the clique on the outside,

23   right?

24       A.  No.  I was the spokesperson.

25       Q.  You had the word.  That's what you just

1    testified, wasn't it?

2        A.   The spokesperson mean you have to pass the

3    messages on to others.

4              (Witness answering further.)

5              THE INTERPRETER:  The interpreter asks for a

6    repetition, Your Honor.

7              THE COURT:  All right.

8              THE WITNESS:  Being a spokesperson means

9    that you can't make decisions.  You communicate those

10   with the people in El Salvador, and they tell you what

11   must be done, and you communicate that to the homeboys.

12   BY MS. MARTINEZ:

13       Q.   And when you say you communicate that to the

14   homeboys, that means you give orders to the homeboys

15   here, right?

16       A.   What I'm aware of, yes.

17       Q.   Because that's what it means to have the word,

18   doesn't it?

19       A.   *La palabra*, "the word" is something different.

20   It has a different meaning.

21       Q.   You testified, about four questions ago, that you

22   had the word.  Do you want to change your testimony?

23              MR. JENKINS:  Objection, Your Honor.

24              MR. LEIVA:  Objection, Your Honor.

25              THE COURT:  Overruled.  This is

1    cross-examination.

2              THE INTERPRETER:  The interpreter would like

3    to interject, Your Honor.

4              THE COURT:  Yes.

5              THE INTERPRETER:  "The word" can be *la*

6    *palabra*, l-a, p-a-l-a-b-r-a.  It could also be, in

7    certain contexts, *la voz*, l-a, v-o-z.  The interpreter

8    perhaps may have inadvertently interchanged *voz*, voice

9    or word, and *palabra*, word.

10             THE COURT:  Would you ask the witness?  And

11   "the word" in this case means something.  It's a term of

12   art relating to a gang.  If you would ask him that

13   question, please.

14             (Interpreter complies.)

15             THE WITNESS:  *Vocero*, spokesperson, is

16   different from being *palabrero*, shot caller.

17   BY MS. MARTINEZ:

18     Q.   Your testimony is that you were a mere

19   spokesperson on the night that you murdered Lagrima; is

20   that correct?

21     A.   Exactly.  I was the one who communicated with the

22   five homeboys for us to kill him.

23     Q.   And yet, when you talked to Junior, the way you

24   described it was, "I was in charge."

25     A.   You always have to change things, because that's

1    how it is in the gang.

2        Q.   Let's talk about who did have the word.  First

3    word was Payaso, right?

4        A.   As far as I know, no.

5        Q.   You communicated with Payaso by calling his

6    contraband cellphone, right?

7        A.   I spoke with Payaso.

8        Q.   You spoke with Payaso on a daily basis, right?

9        A.   Exactly.

10       Q.   Payaso was in prison, right?

11       A.   When I began to speak with them, I didn't know

12   that he was in prison.

13       Q.   And, by the time you killed Lagrima, you

14   certainly knew he was in prison, didn't you?

15                THE INTERPRETER:  Just a second.

16                (Interpreter conferring.)

17                THE INTERPRETER:  Interpreter corrects:

18   "When I began walking with him, I -- with them, I didn't

19   know he was in prison."

20   BY MS. MARTINEZ:

21       Q.   I'm not asking about when you began.  I'm asking

22   about the night that you killed Lagrima.  The night that

23   you killed Lagrima, you certainly knew that Payaso was

24   in prison, right?

25       A.   Yes.

1    Q.   And, by that time, you were communicating with
2    him on a daily basis?
3    A.   Correct.
4    Q.   On the -- by calling his contraband cellphone
5    that he had in prison, right?
6    A.   Correct.
7    Q.   Payaso was running the clique from inside the
8    prison.
9    A.   As I understood, no.
10   Q.   Payaso gave instructions, right?
11   A.   He wasn't running things.  He was kind of
12   speaking for the gang.  I don't know if he was running
13   things like a --
14           THE INTERPRETER:  May the interpreter ask
15   for repetition?
16           THE COURT:  Yes.
17           THE WITNESS:  I didn't know, because when I
18   came here to Virginia, they told me it was someone else
19   who was locked up, in Los Angeles.
20   BY MS. MARTINEZ:
21   Q.   You spoke to Payaso on a daily basis; is that
22   right?
23           MR. JENKINS:  Objection, Your Honor, asked
24   and answered.
25           THE COURT:  Overruled.

```
 1              THE WITNESS:  I'm sorry.  What did you say?
 2   I didn't hear.
 3   BY MS. MARTINEZ:
 4       Q.  You spoke to Payaso on a daily basis?
 5       A.  I talked about all sorts of things, what he was
 6   eating, what he was seeing.
 7       Q.  So, the answer to my question is, yes, you spoke
 8   to Payaso on a daily basis?
 9       A.  Exactly.
10       Q.  When you had clique meetings, you called Payaso
11   on the phone?
12       A.  Like all homeboys.
13       Q.  And during the clique meetings, Payaso ran the
14   meetings on the phone?
15       A.  I only know that he was present there.  That's
16   all.  Because he was locked up.
17       Q.  He gave orders when you called him, didn't he?
18       A.  Every now and then, but he would have to dial up
19   El Salvador.
20       Q.  Do you remember -- you were here for all of
21   trial, right?
22       A.  Correct.
23       Q.  Do you remember the recordings that we listened
24   to and the transcripts we read that involved Payaso?
25       A.  Correct.
```

1    Q.   Do you remember that Payaso said that he was in

2    charge on the inside and Demente was in charge on the

3    outside, in late September of 2013?

4    A.   Could be that he said that, but what I understood

5    was -- what I understood was something different.

6    Q.   I'm not asking whether it could be.  I'm asking

7    if you remember that he said that in the evidence that

8    we've seen in this trial.

9    A.   I'll say yes.

10   Q.   And, that was true, wasn't it?  In late September

11   of 2013, Payaso was running things from inside the

12   prison?

13   A.   As far as I know, no.

14   Q.   And, in late September of 2013, Demente was

15   running the clique on the outside, right?

16   A.   That is true.

17   Q.   Demente got arrested on October 1st, 2013, right?

18   A.   Correct.

19   Q.   And he never got out?

20   A.   Supposedly, he had a bond to get out, but he

21   never got out.

22   Q.   He never got out?

23   A.   Never.

24   Q.   So, after October 1st, 2013, Demente certainly

25   wasn't running the clique on the outside.

```
 1       A.  No, but he had part of the word --
 2            THE INTERPRETER:  Voz, the voice, the word,
 3   voz, v-o-z.
 4            THE WITNESS:  -- at the time.
 5   BY MS. MARTINEZ:
 6       Q.  But the clique has to have someone on the outside
 7   running it, right?
 8       A.  Not necessarily.
 9       Q.  You heard numerous witnesses testify during this
10   trial that after Demente was arrested, you became the
11   leader on the outside, didn't you?  That you ran the
12   clique on the outside?
13       A.  Witnesses will say whatever is in their best
14   interest.
15       Q.  What the witnesses said is consistent with what
16   you said on December 6th, 2013, isn't it?
17       A.  What do you mean?  Explain that.
18       Q.  The witnesses said you were in charge, and you
19   said you were in charge, right?
20       A.  (Answering, not translated.)
21            MS. MARTINEZ:  Your Honor, I'm going to
22   object to nonresponsive.  It was a yes or no question,
23   and he has started to list all kinds of people.
24            MR. LEIVA:  Your Honor, it was responsive.
25   She didn't let him finish.  He gave the exact answer to
```

1    her question.

2             MS. MARTINEZ:  There was -- the question

3    called for a date, Your Honor.  It was a yes or no

4    question.

5             MR. LEIVA:  Your Honor, she's asking for a

6    term of art, when he became the first word.

7             THE COURT:  No, the question she asked was:

8    The witnesses said you were in charge, and you say you

9    were in charge."  And he didn't answer.  Objection

10   sustained.

11   BY MS. MARTINEZ:

12     Q.  Yes or no -- no, no.  The objection was

13   sustained.  We're going to try again.

14        Yes or no --

15             MR. JENKINS:  Your Honor -- Your Honor, if

16   the objection was sustained, does that mean that the

17   witness can now finish his answer?  He was --

18             MS. MARTINEZ:  I objected.

19             MR. JENKINS:  I'm sorry.

20             THE COURT:  Restate your question.  Let me

21   hear the answer.

22   BY MS. MARTINEZ:

23     Q.  Yes or no:  The witnesses said you were in

24   charge, and you said you were in charge, right?

25     A.  Spokesperson.

1    Q.  Listen to my question.  The witnesses said --

2    A.  (Answering, not translated.)

3    Q.  Listen to my question.

4    A.  If you want me to just say yes.

5    Q.  I want you to answer the question honestly, under

6    oath.

7              THE COURT:  Excuse me.  I think he's

8    answered the question.  Move on to something else.

9    BY MS. MARTINEZ:

10   Q.  Let's use your word, "spokesperson."  You say you

11   were a spokesperson of the clique; is that right?

12   A.  Correct.

13   Q.  When did you become a spokesperson of the clique?

14   A.  When Demente got locked up.

15   Q.  Let me make sure I understand.  Before Demente

16   got locked up, he had the voice?

17   A.  The word, *la palabra*.

18   Q.  And after he got locked up, you were just a

19   spokesperson?

20   A.  Correct.

21   Q.  Who had the word?

22   A.  On the outside, no one.

23   Q.  So, the clique was just without leadership on the

24   outside?

25   A.  When a person knows the rules, they know how to

1    walk.  We're not children here.

2        Q.   Let's talk about what happened with the clique

3    after Demente was arrested.  The clique still continued

4    to function, right?

5        A.   Correct.

6        Q.   The clique continued to have meetings?

7        A.   Not many.

8        Q.   You attended the meetings?

9        A.   Correct.

10       Q.   The other homeboys attended the meetings?

11       A.   Some of them, when they could.

12       Q.   And I'm talking now about clique meetings.

13       A.   And that's what I am answering to.

14       Q.   Clique meetings are attended by clique members,

15   right?

16       A.   That's correct.

17       Q.   The homeboys in PVLS.

18       A.   Not exactly, not necessarily.  If we are running

19   a program, other homeboys can participate.

20       Q.   That's a general meeting, right, where other

21   homeboys come?

22       A.   No.

23       Q.   You've heard probably seven witnesses in the

24   course of this case testify that clique meetings are

25   only attended by clique members.  Would you agree with

1    that?

2        A.   I have heard something, not here.  I was the one

3    that was going, attending the meetings, not you.  That's

4    what I am explaining to you.

5        Q.   The witnesses who testified attended the

6    meetings, didn't they?  Duende, Skinny, Demente, Lil

7    Slow?

8        A.   Correct.

9        Q.   They all attended the meetings?

10       A.   Correct.

11       Q.   Do you hear them all say that clique meetings are

12   only attended by clique members?

13       A.   Oh, that's a lie.

14       Q.   Was it a lie when Buso said it, too?

15       A.   Remember, that they want to earn your graces so

16   that the sentence will be reduced.

17       Q.   Was it a lie when Claudio Saa, recognized as an

18   expert in MS-13, testified to it?

19            MR. SALVATO:  Your Honor, can I just lodge

20   an objection?  I don't think he can comment on another

21   witness's testimony.  I think this issue came up during

22   one of my witnesses.

23            THE COURT:  Sustained.

24   BY MS. MARTINEZ:

25       Q.   So, your testimony is that clique meetings are

1    attended by whoever wants to go?

2        A.   I have seen that.

3        Q.   Let's talk about what happened at those meetings.

4    You collected dues?

5        A.   People's dues, yes, personal dues.

6        Q.   You collected money that were made by the

7    homeboys and the *chequeos* from selling drugs?

8        A.   Yes.

9        Q.   And, in fact, until you were arrested, you were

10   responsible for making sure the clique's drug business

11   ran smoothly.

12       A.   Skinny and myself.

13       Q.   You made drug connections with homeboys in other

14   states?

15       A.   Skinny and myself.

16       Q.   You traveled outside of state to get the drugs.

17       A.   Once.

18       Q.   And, your status in PVLS was always pretty high,

19   wasn't it?

20       A.   Well, I have always been -- it's not that I have

21   had a high status.  It's that I have been with the gang

22   since I was a little boy, and it is a kind of respect

23   that you have earned with the gang.

24            MS. MARTINEZ:  Your Honor, may we publish

25   Government's Exhibit 66-A?

```
 1                    THE COURT:  Yes.
 2    BY MS. MARTINEZ:
 3        Q.   That's you, right?
 4        A.   That's correct.
 5        Q.   What do your tattoos say?
 6        A.   Park View.
 7        Q.   When did you get those tattoos?
 8        A.   I do not remember the date.
 9        Q.   More than five years ago?
10        A.   No -- well, maybe -- I don't know.  I don't
11    remember.
12        Q.   What year was it?
13        A.   Before I was arrested.
14        Q.   Do you still have those tattoos?
15        A.   Of course.
16        Q.   Show the jury.
17        A.   Is it necessary?
18                    THE COURT:  I'm sorry.  What's the point of
19    this?
20                    MS. MARTINEZ:  So they can see the tattoos.
21                    THE COURT:  What does the picture show?
22                    MS. MARTINEZ:  That he still -- the picture
23    is from some time ago.
24                    THE WITNESS:  You are seeing --
25                    THE COURT:  Do you really question whether
```

J. Torres - Cross                                                    30

1   or not he has tattoos, Ms. Martinez?  You don't, do you?

2               MS. MARTINEZ:  I can move on, Your Honor.

3               THE COURT:  Ask another question, please.

4   BY MS. MARTINEZ:

5       Q.  Who did you have to get permission from to show

6   these tattoos -- to get these tattoos?

7               (Interpreter conferring with witness.)

8               THE WITNESS:  So, part of that, from El

9   Salvador, because that's where I was jumped in.  And the

10  other part, I contacted Payaso and asked him to give me

11  the letters --

12              THE INTERPRETER:  That's when the

13  interpreter inquired.

14              THE WITNESS:  -- to tell me what will look

15  good on me, because he can draw well.

16  BY MS. MARTINEZ:

17      Q.  Did you get these tattoos in El Salvador or in

18  the United States?

19      A.  This one, I did it when I was up here.  Most of

20  the ones that I have, I did them when I was up here.

21  But, this is the only one that has to do with the gang.

22      Q.  And, am I understanding you correctly that you

23  got permission from both El Salvador and Payaso to get

24  these tattoos?

25      A.  Not from Payaso.  I only asked him for the

1    design, because he can draw well.

2        Q.   Did Payaso give you these tattoos?

3        A.   He just told me to go and see what I liked.

4        Q.   What did you have to do to earn these tattoos?

5        A.   Well, there you can do them -- I had been in the

6    neighborhood for a whole bunch of years, and you -- when

7    it is necessary to do something, well, it depends on

8    what you want to do.

9        Q.   My question was, what did you -- I'm sorry.

10       A.   You don't have to do anything especially.  It

11   depends on the type of tattoos that you want.

12   BY MS. MARTINEZ:

13       Q.   So, your testimony is you didn't have to do

14   anything to earn these tattoos?

15       A.   I have already earned them well enough.  I have

16   been with the gang since I was a little boy.

17       Q.   How did you earn them?

18       A.   Since I was in El Salvador, I was running things,

19   transporting things --

20            THE INTERPRETER:  Interpreter correction.

21            THE WITNESS:  Since I was a little boy.

22   BY MS. MARTINEZ:

23       Q.   And your testimony is that you earned these for

24   something that you did as a little boy?

25       A.   Because I never wanted to get the tattoo of the

1   MS.  I was told all the time that I should do it, that I
2   should do it.  But I never wanted to.
3               THE COURT:  Take the picture off the screen,
4   please.
5               THE WITNESS:  And then there came the time,
6   a day when I decided that I wanted the tattoo.  And I
7   told him I wanted to tattoo on myself the name of the
8   gang.  Because you really have that in your heart you
9   carry the name in your heart.
10  BY MS. MARTINEZ:
11      Q.   So, my question was:  Are you testifying that you
12  earned these tattoos based on your actions as a small
13  boy?
14      A.   Correct.
15      Q.   When you got these tattoos, did you get it all at
16  once?
17      A.   How is that?
18      Q.   Did you sit down one time and get those tattoos
19  in that picture, exactly like they're shown, or was it
20  over time?
21      A.   Well, little by little, because it hurts.
22      Q.   How many days did it take?
23      A.   I cannot tell you for sure, but it was not days.
24  It was about a month and a half, but I cannot tell you
25  for sure.

1    Q.   It says "Park" and "View" on one arm and the

2    other; is that right?

3    A.   That is how you see it on the photograph, yes.

4    Q.   Is that how it still is on you?

5    A.   No.  I have them painted over, but it couldn't be

6    done well, because it is very painful.

7    Q.   How did you paint over them?

8    A.   Well, it was done for me.  It was kind of shaded

9    in.

10   Q.   When you say "shaded in," do you mean you filled

11   in some of the letters, or do you mean you put another

12   tattoo on top of them?

13   A.   I'm never going to cover it up, no, never ever.

14   That it was filled in, that where you see it, that it

15   is -- that it is empty.  I filled that in, but I

16   couldn't do it well because it hurt.

17   Q.   So, in the picture, all of the letters except for

18   the "P" are just outlines; is that right?

19              MS. MARTINEZ:  Your Honor, may we put it

20   back up just for a moment?

21              THE COURT:  Yes.

22   BY MS. MARTINEZ:

23   Q.   Am I correct that in this picture, the "P" is the

24   only one filled in?

25   A.   Correct.  Because I was filling them in letter by

J. Torres - Cross                                          34

 1    letter.
 2        Q.    How many letters are filled in now?
 3        A.    Almost all of them, but they are not well filled
 4    in.
 5        Q.    When did you fill in the other letters?
 6        A.    With the passage of time.  I could not give you
 7    an exact date because I do not remember it.
 8        Q.    Have you done it since you were in jail?
 9        A.    No.
10        Q.    So, you filled them in before you were arrested?
11        A.    Correct; a long time before.
12        Q.    And, you testified earlier that you will never
13    cover up those tattoos.  Is that what you said?
14        A.    You cannot do that.
15        Q.    That's because of your loyalty to the clique,
16    right?
17        A.    Not because of loyalty, but because if you
18    decided to do it, now you have to put up with it.
19        Q.    It's because you always carry those letters in
20    your heart, right?
21        A.    The MS, that is because those are the people that
22    show me love.
23            THE INTERPRETER:  May the interpreter have a
24    second to consult?
25            (Interpreter conferring.)

1          THE INTERPRETER:  The interpreter indicated

2     earlier, "if you decide to do it, you should put up with

3     it."  The correction is, "you have to own up to it."

4     BY MS. MARTINEZ:

5          Q.   What do you mean by "own up to it"?

6          A.   Because, you know, you first take care not to

7     stain your body, and then -- and then you get the idea

8     that you want to do it and you become insistent.  And

9     people advise you against them, but you are just

10    hard-headed and you want to do it, and you know that

11    tattoos are for life.

12         Q.   And you are hard-headed, aren't you?

13         A.   A bit.  A little bit.

14         Q.   And you're still a proud member of Park View,

15    right?

16         A.   Well, it's not that there's pride, it's just that

17    when you do not have a family, this is your family.

18    They are my family.

19         Q.   Are you not proud to be a member of Park View?

20         A.   They're my family.

21         Q.   Are you proud to be a member of Park View?

22         A.   Anybody that has a family will be proud of their

23    family.

24         Q.   Are you proud to be a member of the Park View

25    Locos Salvatruchas clique of MS-13?

J. Torres - Cross                                      36

1    A.   I repeat to you that they are my family.

2    Q.   Let's talk about the other things that you did

3  as, what did you call it, a spokesperson for PVLS.

4    A.   Correct.

5    Q.   Another thing that you were in charge of was the

6  clique's firearms, right?

7    A.   No, not that.

8    Q.   One of the firearms you were in charge of was a

9  22-caliber firearm, wasn't it?

10   A.   No.  That was sent to me.

11   Q.   And you had it, right?

12   A.   I was never arrested with it.  I was never seen

13 with it.

14   Q.   And, yet you just told us that you had it?

15   A.   It was sent to me.  That is what I said.  One

16 thing is that they send it to you, and another thing is

17 for you to have it.

18   Q.   Once it was sent to you, it was in your

19 possession, right?

20   A.   I had to deliver it to somebody else.

21   Q.   Who sent it to you?

22   A.   A homeboy.

23   Q.   Who?

24   A.   I cannot give names.

25   Q.   Yes, you can.

J. Torres - Cross                                                    37

1      A.   That would be like snitching.

2      Q.   You are testifying under oath.  Who sent you the

3  22-caliber weapon?

4      A.   A homeboy.

5      Q.   Tell his name.

6      A.   I don't remember.

7      Q.   You just said you can't say it, and now you say

8  you don't remember.  Is that a lie?

9      A.   I do not want to say it.  One thing is that I am

10  under oath, and another thing is that I become a snitch.

11      Q.   You're not willing to be a snitch; is that what

12  you're saying?

13      A.   I am not a snitch, and that is why I'm here

14  accepting what I did.  That is what I did not ask for

15  the government's assistance, because I am accepting what

16  I did.

17      Q.   What you're also doing is not snitching on these

18  defendants, right?

19      A.   I am telling you what happened.

20      Q.   You're willing to say that the people who already

21  testified were involved in certain crimes, right?

22      A.   Well, that is why they pled guilty, because they

23  were given an option to get out.  And when they give you

24  that option, then, of course, you do -- you lie because

25  you have a hope.  However, I am here, and I'm sitting

1   here asking for nothing.

2       Q.   My question was:  You're willing to say that the

3   defendants who already testified were involved in the

4   crimes that they testified about, correct?

5       A.   It was five of us.

6       Q.   Is that a yes to my question?

7       A.   Correct.

8       Q.   You don't view that as snitching, right?

9       A.   What is -- how is that?

10      Q.   You just said you're not willing to be a snitch.

11      A.   And that is what I am here, telling you what I

12  did without asking anything in exchange.

13      Q.   When you say that Skinny was involved in killing

14  Lagrima, you don't view that to be snitching, right?

15      A.   He has an arrangement with the government.  I

16  have no arrangement with the government.

17      Q.   And, so, when you say that Skinny was involved in

18  murdering Lagrima, in your view, you are not snitching

19  because he already testified to that.  Am I correct?

20      A.   Well, he has accepted it in part.  But he didn't

21  tell you how things happened.

22      Q.   Your view is that you are not snitching when you

23  say that Skinny helped murder Lagrima; is that right or

24  wrong?

25      A.   I am not snitching on him, because he himself is

1    the snitch.  And if I am -- if I get killed because of

2    it, that's fine.  But I am not going to talk -- bringing

3    somebody that was never present.

4        Q.   So, in other words, you can't snitch on a snitch;

5    is that what you're saying?

6                   THE INTERPRETER:  "You can"?

7    BY MS. MARTINEZ:

8        Q.   You cannot snitch on a snitch?

9        A.   I am not snitching.  I'm only saying what

10   happened.

11       Q.   But, if you were to tell us the name of the

12   homeboy who sent you the 22, that would be snitching,

13   right?

14       A.   Exactly.

15       Q.   And, if you were to testify that another person

16   who helped murder Lagrima was Lil Poison, who is on

17   trial, that would be snitching, right?

18       A.   He was not there.

19       Q.   If you were to say that, it would be snitching,

20   wouldn't it?

21       A.   If I had an agreement with the government, yes.

22       Q.   But, you don't, so you're not willing to snitch,

23   right?

24       A.   Well, I am just telling you -- I'm just telling

25   you how things happened.  I was there.  You were not.

1    Q.   Let's go back to talking about firearms.

2    A.   Okay.

3    Q.   Another firearm that you were in charge of for

4  PVLS was a 32-caliber weapon.

5    A.   Those things were no good.  They did not work,

6  and they were taken away.  But I --

7              (Interpreter conferring with witness.)

8              THE WITNESS:  But it was -- I never had

9  that.  It was just taken away.

10 BY MS. MARTINEZ:

11   Q.   So, you were aware of the 32-caliber weapon?

12   A.   But it didn't work.

13   Q.   Where did it come from?

14   A.   Demente brought it.

15   Q.   It worked the night that Lil Poison used it in

16 the shooting in Culmore on December 21st, 2013, didn't

17 it?

18   A.   I do not know if it was the same one.  And to

19 begin with, I don't know who it was that fired it, fired

20 the gun.

21   Q.   You were there on December 21st, 2013, weren't

22 you?

23   A.   I was passing by when I was there.  I was there,

24 but I was passing through.  And I didn't know why --

25 what the situation was, what happened.

1    Q.   Lil Evil was there that night, right?

2    A.   Correct.

3    Q.   Pesadilla was there that night, right?

4    A.   I don't recall.

5    Q.   Leopardo was there that night, right?

6    A.   I don't remember.

7    Q.   Solitario was there that night, right?

8    A.   I'd be lying -- I have so many things in mind, I

9  can't remember who was there.  I don't want to say yes

10  or no, because I honestly can't remember very well.

11    Q.   You remember Lil Evil, who is not here in court.

12    A.   Because we realized later that it was because of

13  him that the problem happened.  And when the shots went

14  off, couldn't find a place to run off to.

15    Q.   Let's talk about the shots that went off.  Lil

16  Poison fired that gun, right?

17    A.   I don't know.  We were arguing and then just, a

18  shot went off.

19    Q.   So, you were there for the argument?

20    A.   Yes, because those guys were there with the other

21  guys, and somebody took out a machete.

22    Q.   And you were there when the shot went off?

23    A.   Yeah.  All of a sudden, we heard it.  I was like,

24  no, and then there was no place to run off to.

25    Q.   But your testimony is that you do not know --

1           THE INTERPRETER:  One second, please.

2           THE WITNESS:  We didn't know where to run

3    off to.

4           THE INTERPRETER:  Interpreter corrects.

5    BY MS. MARTINEZ:

6      Q.  But your testimony is that you don't know who

7    fired that shot?

8      A.  I don't know who did it.

9      Q.  Other than Lil Evil, who do you remember being

10   there?

11     A.  Skinny, it seems, me, some *paros*, I don't

12   remember well their names, and, some other guys who

13   liked to smoke marijuana.

14     Q.  Do you remember their names?

15     A.  There was another one that they said, that they

16   called Medio Trago, another one, Pampas.  I don't know.

17     Q.  Do you remember anyone else?

18     A.  No.

19     Q.  Which gun was used that night?

20     A.  As far as I know, not one.

21     Q.  You said a shot went off.

22           (Interpreter conferring.)

23           THE WITNESS:  I didn't use any one.

24           THE INTERPRETER:  Interpreter correction.

25   BY MS. MARTINEZ:

J. Torres - Cross                                             43

1    Q.   I didn't ask you what gun you used.  I asked what
2  gun was used that night.
3    A.   I suppose it was a handgun, because I heard some
4  shots go off.
5    Q.   Which one?
6         THE INTERPRETER:  The interpreter inquire --
7  BY MS. MARTINEZ:
8    Q.   Which gun?
9    A.   How could I know?
10   Q.   You were there, right?
11   A.   Correct.
12   Q.   At that time, in December of 2013, what guns did
13  the clique have?
14   A.   I don't know what caliber they were, because
15  there was a revolver that didn't work.  There was a
16  40 -- 40-caliber one that Demente had also purchased,
17  but it didn't have the magazine.
18   Q.   What else?
19   A.   That's all I recall.  And then the one that had
20  been given to Skinny -- that I --
21         THE INTERPRETER:  The interpreter requests a
22  repetition.
23         THE WITNESS:  The one that I --
24         THE INTERPRETER:  Interpreter corrects.
25         THE WITNESS:  -- I had given to Skinny.

BY MS. MARTINEZ:

Q.   Which gun did you give to Skinny?

A.   I honestly don't know what caliber it was.

Q.   Where did you get it?

A.   It's one they sent to me.

Q.   From the homeboy whose name you're not willing to say?

A.   The homeboy who sent it to me.

Q.   Whose name you're not willing to say in court?

A.   I already said what I had to say.

Q.   And, you're not willing to say his name; is that right?

A.   The homeboy.

Q.   What clique is he in?

A.   I think he's with our clique.  I think, I'm not real sure.

Q.   What state does he live in?

A.   In Los Angeles.

Q.   What state did he send you the gun from?

A.   That I sent to him?

Q.   No, that he sent to you?

A.   I don't know.  It was just sent from Los Angeles. I don't know.

Q.   How was it sent?  By mail, UPS, FedEx?

A.   I just know they sent it in the mail.

1    Q.   They sent it to you?

2    A.   Correct.

3    Q.   To your house?

4    A.   No one else wanted it.

5    Q.   So, they sent it to your house?

6    A.   Not exactly my house, house.

7    Q.   Where did they send it to?

8    A.   An address we got that somebody gave us as a

9    favor.

10   Q.   Who gave you the favor?

11   A.   A *paro*.

12   Q.   Was the address the *paro*'s address?

13   A.   Correct.

14   Q.   Who is the *paro*?

15   A.   A *paro*.

16   Q.   Are you not willing to say his name?

17   A.   No.

18   Q.   Because that would make you a snitch?

19   A.   Yes.

20   Q.   When was that gun sent to you or to the *paro*?

21   A.   I don't remember.

22   Q.   Let's go back to the green light on Lagrima.

23   A.   Correct.

24   Q.   The green light was because the gang thought that

25   Lagrima was a snitch?

1     A.   For several reasons.

2     Q.   We talked about all those reasons yesterday.   One

3    of those reasons is because the gang thought that

4    Lagrima was a snitch, right?

5     A.   They thought, because there was a homeboy who had

6    been deported because of him; something that Duende

7    didn't say.

8     Q.   So, is it correct that one of the reasons that

9    Lagrima was green lit was because the gang believed that

10   he was a snitch?

11    A.   It was for several reasons.   It wasn't one.   It

12   was for several reasons.   I can't say specifically that

13   they killed him for being a snitch, because there were

14   several.

15    Q.   One of those reasons was because the gang thought

16   he was a snitch; yes or no?

17              MR. JENKINS:  Objection.

18              THE COURT:  What's your objection?

19              MR. JENKINS:  Asked and answered.

20              THE COURT:  Sustained.

21   BY MS. MARTINEZ:

22    Q.   When the green light was put on Lagrima, the gang

23   had to get permission from El Salvador; is that right?

24    A.   That's where the word came from.   That's where it

25   came from.

1    Q.   And when you say "it," you mean the green light
2    on Lagrima?
3    A.   Correct.
4         I'm not calling it a green light because it
5    wasn't like he was looking for it.
6    Q.   What do you want to call it?
7         How about an order to kill?
8              THE INTERPRETER:  One moment, please.
9    BY MS. MARTINEZ:
10   Q.   What do you want to call it, if not a green
11   light?
12        How about an order to kill?
13   A.   When someone -- when the decision is made in El
14   Salvador and they say, like, you have two days to kill
15   someone, you know, you do it.  You have to do it.  It
16   doesn't matter whether it's called *luz verde*, they're
17   telling you to do it.  You have to do it.
18   Q.   And is that what happened with Lagrima?
19   A.   I've already said that several times to you.
20   Q.   The order to kill Lagrima came from El Salvador?
21   A.   Exactly.
22   Q.   Who gave the order?
23   A.   A homeboy.
24   Q.   Who?
25   A.   Can I say?

1    Q.   I'm asking you --

2             THE INTERPRETER:   No.   The interpreter asks

3    for repetition.

4             THE WITNESS:   I cannot say.

5             THE INTERPRETER:   Interpreter correction.

6             MS. MARTINEZ:   Your Honor, may we publish a

7    page from one of the transcripts, Government's

8    Exhibit 7-A-1?   Page 13.

9             THE COURT:   Yes.

10            MS. MARTINEZ:   The bottom of the page.

11   BY MS. MARTINEZ:

12   Q.   It's the same page we looked at earlier when you

13   told Junior that you were in charge.   Do you remember

14   that?

15   A.   Correct.

16   Q.   And, after telling him that you were in charge,

17   you said, quote, "I called down there, and I told them,

18   quote, 'Look,' end quote, I told them, quote, 'we

19   suspect a rat,' end quote.   Everyone was at the meeting

20   there.   Quote, 'Prove it,' end quote, he said to me,

21   right?   So I proved it."

22        You said that, right?

23   A.   That's where I was just talking big.   That's what

24   most of us do in order to survive.

25   Q.   So, this is what you said to Junior; is that

1    right?

2       A.   It's written there that way.

3       Q.   And that's what you said in the recording, right?

4       A.   I heard it.  That's what I think you heard,

5    correct?

6       Q.   When you said, "I called down there," what you

7    meant was El Salvador, right?

8       A.   Correct.

9       Q.   And when you said, "We suspect a rat," you were

10   talking about Lagrima, right?

11      A.   Correct.

12      Q.   And, after this quote here, Junior asked you,

13   "Poison?"

14           And you responded, "Yes," right?

15      A.   If that's what's in the call.  But I say, "It's a

16   homeboy."

17      Q.   Who is Poison?

18      A.   I don't know.

19      Q.   Is that a lie?

20      A.   He's a homeboy.

21      Q.   Where is Poison?

22      A.   It seems that he's in El Salvador.

23      Q.   Where in El Salvador?

24      A.   In jail.

25      Q.   Which one?

1    A.   He's in jail, a jail.

2    Q.   Which one?

3    A.   He's in jail.

4    Q.   Do you know which jail he's in?

5    A.   No.

6    Q.   Is that a lie?

7         THE COURT:  Take it off the screen, please.

8         MS. MARTINEZ:  Your Honor, actually, I was

9    going to flip to the next page, if you don't mind.

10        THE COURT:  Well, flip to the next page.

11        MS. MARTINEZ:  If we could go to page 14.

12   BY MS. MARTINEZ:

13   Q.   The next thing that you said was, "All of the

14   shot callers were there"; is that right?

15   A.   That is what it says there.

16   Q.   That's what you said, right?

17   A.   That is what it says there.

18   Q.   Is that also what you said?

19   A.   That is what it says there.

20   Q.   Who were all the shot callers?

21   A.   Homeboys.

22   Q.   Who?

23   A.   Homeboys.

24   Q.   Are you not willing to say their names because

25   that would make you a snitch?

1    A.   You're asking me who was there, and I'm telling

2  you that it was the homeboys.

3    Q.   And I'm asking you for their names.  What are

4  their names?

5    A.   And I am answering, homeboys.

6    Q.   Are you not willing to say their names because

7  that would make you a snitch?

8    A.   I don't know what you're looking for.  What do

9  you want?

10           THE COURT:  Next question.

11  BY MS. MARTINEZ:

12    Q.   Who is El Tigre?

13    A.   A homeboy.

14    Q.   Where is El Tigre?

15    A.   I don't know.

16    Q.   What position does El Tigre have in the gang?

17    A.   I don't know.

18    Q.   What position does Poison down in El Salvador

19  have in the gang?

20    A.   I don't know.

21    Q.   Poison is the one who gave the order to kill

22  Lagrima, right?

23    A.   I don't know.

24    Q.   That's what you told Junior, isn't it?

25    A.   That is what is written there.

1    Q.   Is it what you told Junior?

2    A.   That is what is written there.

3    Q.   Have you been over these calls with your lawyers?

4    A.   What do you mean?

5    Q.   Have you listened to them?

6    A.   As -- with time, yes, I have.  But I told you

7    that I have many things in my mind and there are things

8    that I don't remember.

9    Q.   This particular call on December 6th of 2013,

10   have you listened to that phone call?

11   A.   Maybe I have, but I do not remember it.

12   Q.   Do you remember the testimony about it?

13   A.   You would have to explain that to me so that I

14   can remember.

15   Q.   Do you remember testimony that you had a recorded

16   phone call with Junior on December 6th, 2013?

17   A.   You have to explain that more for me to remember.

18   Q.   We just looked at a part of the transcript of

19   that call.  That call involved you, right?

20   A.   That is what it says there.

21   Q.   Yesterday, your lawyer asked you about things

22   that you said in calls.  Do you remember that?

23   A.   Yes.

24   Q.   When your lawyer asked you questions, you

25   remembered things that you said in calls; is that right?

J. Torres - Cross                                                    53

1      A.   Correct.

2      Q.   And, you do remember things that you said in

3   calls, right?

4      A.   What is that?  Explain that to me.

5      Q.   You remember telling Junior all about the murder

6   of Lagrima, right?

7      A.   Junior already knew that he was going to be

8   killed.

9      Q.   You remember having a recorded call with Junior

10   in which you told him all about the murder, right?

11      A.   He already knew about it.  And that is why -- why

12   I told him.

13            MS. MARTINEZ:  Your Honor, may we publish

14   page 11 of Government's Exhibit 7-A-1?

15            THE COURT:  All right.

16   BY MS. MARTINEZ:

17      Q.   At the top of the page, you told Junior, "If one

18   of these sons of bitches decides to talk, I told them,

19   these are the consequences."  Didn't you?

20            THE INTERPRETER:  I'm sorry.  The

21   interpreter cannot see that.  What is that?

22            THE COURT:  I'm not sure you have the page

23   that we're referring to.

24            THE INTERPRETER:  I cannot see it.

25            MS. MARTINEZ:  Sorry.

1          THE COURT:  I don't see it.

2          MS. MARTINEZ:  It's right in the top of the

3    cutout on the screen.

4          THE INTERPRETER:  But, you added --

5    Ms. Martinez, you added something after that.  What was

6    that you added?

7    BY MS. MARTINEZ:

8      Q.  You said to Junior, "If one of these sons of

9    bitches decides to talk, I told them, these are the

10   consequences."

11     A.  I told Lil One.  I told Slow, to the five of us

12   that were there present.

13     Q.  And the consequences that you're talking about is

14   murder, right?

15     A.  We all run that risk.  I do, too.

16     Q.  And then a little ways down the screen in that

17   same cutout, you said, "Dismembered son of a bitch, we

18   hacked him all up in pieces."  Right.

19          THE INTERPRETER:  Could you indicate for the

20   interpreter where that is?  Okay.

21          THE WITNESS:  That it shows what you do when

22   you brag.

23   BY MS. MARTINEZ:

24     Q.  This is something you told Junior, right?

25     A.  Correct.

1      Q.   Now, your testimony is Junior already knew about

2   it because he was there for the plan; is that right?

3      A.   Not that he was present; that the first

4   disagreement that he had with -- that we had with

5   Lagrima was on July 25th, and it had to do with some

6   rent money.  And he surprises me that not all the calls

7   got recorded.

8      Q.   So, let me understand.  Your testimony is that by

9   the time you had this phone call with Junior, he knew

10  about the murder, because he was present when you

11  planned it; is that right?

12     A.   No.  He knew what was going to happen with

13  Lagrima.

14     Q.   Your testimony is he knew before the murder that

15  Lagrima was going to be murdered; is that right?

16     A.   He had known for a while.

17     Q.   Let's go three lines down from what we just

18  highlighted.  After you told Junior that you hacked

19  Lagrima up in pieces, he said, "I thought that asshole

20  was kidding when he told me about that, dude."  That's

21  how he responded to you, wasn't it?

22     A.   Well, yeah, but he's a snitch.  He's not going to

23  point a finger to himself.  You are paying him so that

24  he can point the finger against others.

25     Q.   But, in this call, he's talking to you, right?

J. Torres - Cross                                                    56

1    A.   Yes.

2    Q.   And, after he said that, you said, "No man.  We

3    dismembered that son of a bitch," right?

4    A.   (Answer not translated.)

5         THE INTERPRETER:  I'm sorry, the interpreter

6    did not quite get that.  May the interpreter ask again

7    for repetition?

8         THE WITNESS:  I was bragging about it

9    myself.  But, he knew in part.  He had a higher rank, a

10   much higher rank in the gang.  And we do our best to

11   look good to others.

12   BY MS. MARTINEZ:

13   Q.   So, back to my --

14        THE COURT:  Counsel, we'll take the morning

15   recess now for 15 minutes.

16        Let the jury leave first.  Everybody else

17   remain in place, please.

18        (Jury not present.)

19        THE COURT:  Be seated.

20        Mr. Jenkins, since you asked your client if

21   he was in custody even now, does it really matter for

22   the jury to know that he's in custody?  Because he

23   testified to that on the stand yesterday.

24        MR. JENKINS:  Yes, Your Honor.  From my

25   perspective, I think the concern is whether or not --

1          THE COURT:  The other defendants.

2          MR. JENKINS:  Yes.

3          THE COURT:  All right.  Okay.  We'll recess

4     now for about 15 minutes.  Thank you.

5              (Court recessed at 11:32 a.m. and reconvened

6              at 11:51 a.m.)

7          THE COURT:  Ready to bring the jury out?

8          MS. MARTINEZ:  Yes, Your Honor.

9          THE COURT:  You can bring the jury out,

10    Mr. Toliver.  Thank you.

11             (Jury present.)

12         THE COURT:  You may be seated.

13             Counsel, you may proceed.

14              CROSS-EXAMINATION (Continued)

15    BY MS. MARTINEZ:

16     Q.  Let's talk about the attempted murder of

17    Peligroso.

18     A.  Okay.

19     Q.  Do I understand your testimony from yesterday

20    correct, that although you admit you're guilty of the

21    murder of Lagrima, you deny that you're guilty of the

22    attempted murder of Peligroso?

23     A.  That's correct.

24     Q.  You claim that you did not know that there was a

25    green light on Peligroso?

J. Torres - Cross

1   A.   Exactly.  No green light.

2   Q.   You claim that when you went out on October 1st,

3   2013, you thought that you were just going to beat up

4   Peligroso?

5   A.   That is what had been agreed.

6   Q.   You thought it was just going to be a *calentón*?

7   A.   Well, exactly.  The two times that I was there,

8   we spoke about other things, but I never thought that it

9   was going to take place.  I thought that they were just

10  kidding around, because we didn't have a position from

11  El Salvador or any papers at hand.

12  Q.   So, your testimony is that you thought it was

13  just a -- going to be a *calentón*; is that right?

14  A.   Exactly.

15  Q.   And we agreed yesterday that you don't use

16  weapons during a *calentón*, right?

17  A.   No.

18  Q.   But the day before you went out looking for

19  Peligroso, on September 30th, 2013, you talked about a

20  machete in connection to Peligroso, right?

21  A.   Well, the machete wasn't -- actually, I didn't

22  know that those things were in the car.  They had asked

23  me, I don't know if it was that same day or the day

24  before, to sharpen a machete.  I thought they were

25  kidding around, and I did not do it.  I did not sharpen

1    a machete.

2       Q.   You talked about a machete?

3       A.   Yes.

4       Q.   And you talked about a firearm?

5       A.   Yes.

6       Q.   And, you don't beat someone up with a machete,

7    right?

8       A.   Yeah.  As I am telling you, the conversation was

9    like a joke:  I promise to do this, I promise to do

10   that.  But we didn't have any papers, so I thought that

11   it was just -- they were just kidding around.  It was

12   just what Drowsy said.

13      Q.   My question was:  You don't beat someone up with

14   a machete, right?

15           THE INTERPRETER:  May the interpreter

16   inquire?

17           (Interpreter conferring with witness.)

18           THE WITNESS:  It was just what he said.

19   BY MS. MARTINEZ:

20      Q.   My question was:  You don't beat someone up with

21   a machete, right?

22      A.   No.

23      Q.   And, you don't beat someone up with a gun, right?

24      A.   No.

25      Q.   You wanted to use the firearm on Peligroso,

1    right?

2        A.   Well, there were -- no.  I mean, there were two

3    conversations, one that was five minutes long, and the

4    other one is where, that length, that talk about me

5    sharpening a machete.  But as I said, no, at no time at

6    all.

7             And, they were talking about, said again and

8    again and again, the 12, the 12, the 12, and I myself

9    said, the 12; but I never thought that it was in the

10   car.

11       Q.   You said "the 12," right?

12       A.   Yes.

13       Q.   And, Payaso said "the 12," right?

14       A.   I don't remember.

15             MS. MARTINEZ:  Your Honor, may we publish

16   page four of Government's Exhibit 2-B-1?

17             THE COURT:  Yes.

18   BY MS. MARTINEZ:

19       Q.   Now, this recording was on September 30th, 2013,

20   right?

21       A.   That is what it says there.

22       Q.   And, I'm going to be looking at the top of the

23   page.  Payaso says, "The beans for the -- of the 22,

24   they were able to get them.  But, there, you know, I

25   don't know how you feel about taking a machete or it's

J. Torres - Cross                                                    61

1    going to be the 12."

2         Does that refresh your recollection of Payaso

3    talking about the 12?

4    A.   I don't remember that.

5    Q.   At the bottom of the page, Payaso says, "That

6    dude wants to take the machete or a piece?"  By "piece,"

7    he means a gun, right?

8    A.   No.

9    Q.   What do you think he means?

10   A.   It can be a knife.  It can be a pickaxe or a

11   pick, different things.  "A piece" can mean other

12   things.

13   Q.   Your response at the very bottom of the page is,

14   "That's right, the machete."  Do you see that?

15   A.   Yes.

16   Q.   And, if we go to page five, the next thing you

17   say is, "The crazy thing is that if he sees you with

18   that machete, the son of a bitch is going to run off.

19   Remember, with -- that with the 12, you just have to --"

20        That's what you said, right?

21   A.   Yes, yes.  And as I told you, there was talk

22   about the 12, and there was kidding around.  Sometimes

23   it seems like there was serious, but it was -- I never

24   took it seriously.  Because I don't think that you have

25   all the conversations that I believe that were held.

J. Torres - Cross                                          62

1      Q.  "The 12" is the 12-gauge shotgun, right?

2      A.  It could be.

3      Q.  And, that's what you and Demente got caught with,

4  right?

5      A.  It was found in Demente's car.

6      Q.  The very day after that recording, right?

7      A.  Correct.

8      Q.  The truth is, it was supposed to be a hit on

9  Peligroso, right?

10     A.  What's that?  No, not as far as I know.

11     Q.  A hit is a murder, right?

12     A.  No.

13     Q.  What's a hit?

14     A.  It could be that they hit you.  It has different

15  meanings.

16     Q.  You don't strike someone with a 12-gauge shotgun,

17  do you?

18     A.  You might.  What if it doesn't work?

19     Q.  You don't strike someone with a machete, do you?

20     A.  As what I've seen from the photographs, is that

21  that machete has not been sharpened; unless you're going

22  to use it with the rusted blade.

23         MS. MARTINEZ:  Your Honor, may we publish

24  page seven of Government's Exhibit 7-A-1?

25         THE COURT:  Yes.

BY MS. MARTINEZ:

Q.   Looking at the top half of the page.  This is that same December 6th, 2013, call with Junior that you were involved in.  Remember?

A.   What I'm reading.

Q.   About a third of the way down the page, you tell Junior, "We were going to go do a hit and they caught him with a 12 and a machete."  Do you see that?

A.   Yeah.  But if I was talking with Junior, how wouldn't I brag to him?  I was going to brag to Junior.  You know, a person wants respect.

Q.   And, here, when you said "hit," you meant murder, right?

A.   Yeah, at that time, perhaps, yes, because I wanted to impress Junior.

Q.   And then a couple lines down, Junior asked you, "Who were you going to hit?  That one kid Peligroso?"

A.   Well, from what I'm seeing there, it seems like he knew about it, too.

Q.   Your response was, "Yes, that fucking son of a bitch."  Do you see that?

A.   Again, to impress him.

Q.   And then you said, "I have even told Payaso, Payaso, that, this and that, we should hit that kid, son of a fucking.  I think he's a rat."

1          Did you tell Payaso that?

2     A.   Yes, but, we weren't talking about Peligroso.

3     Q.   Who were you talking about?

4     A.   I don't remember very well.  I may have mixed it

5    up.  I don't remember well.

6     Q.   Well, it's in front of you now.  Does that

7    refresh your recollection?

8     A.   Yes, exactly.

9     Q.   So, when Junior asked, "Peligroso," and you

10   responded, "Yes," you were talking about Peligroso,

11   right?

12    A.   Yes.  But from what I can see, that question --

13   that response is responding to a question, and perhaps

14   it's referring to something else.

15    Q.   Now, you claimed on direct examination that you

16   didn't learn that there was going to be a murder until

17   you were in the car that night; is that right?

18    A.   Supposedly, yeah, about the supposed plot that we

19   were headed to.  Because, there's one thing, one thing,

20   to start at a school, there could have been children.

21   That's prohibited.  You can't do anything in front of

22   them.  If I had known, I would have gone to examine how,

23   when it would be done.

24    Q.   Your testimony is that you learned in the car on

25   the way to the school?

J. Torres - Cross                                                    65

1   A.   I mean, that I realized the thing was serious.
2   That's what I mean.
3   Q.   By "serious," you mean it was going to be a
4   murder?
5   A.   But, that I wasn't going to do it.
6   Q.   You learned that Peligroso was going to be
7   murdered that night.  Your testimony is, you learned
8   that in the car on the way to the school.
9   A.   When we went to pick up Demente.
10  (Witness answering further.)
11  THE INTERPRETER:  May the interpreter
12  inquire?
13  THE COURT:  Yes.
14  THE INTERPRETER:  The interpreter corrects.
15  THE WITNESS:  When Demente went to pick him
16  up, we went somewhere else.  And then that's when
17  Demente explained what was going to be done with Drowsy.
18  BY MS. MARTINEZ:
19  Q.   So, your testimony is that you learned in the car
20  that night that Peligroso was going to be killed?
21  A.   I repeat:  They were going to kill him.  I
22  thought it was a joke.  If you're going to kill
23  somebody, why are you going to do it with a pizza?  You
24  know, when they caught me, I had a large pizza on my
25  lap.  That's stupid.  So -- so, I am taking

1   responsibility for a killing.  It wouldn't be hard to

2   take responsibility for that, because I know that I did

3   that one.

4       Q.   Now, you testified on direct that the murder of

5   Peligroso was Drowsy's idea; is that right?

6       A.   Exactly.

7       Q.   But Drowsy reported the plan to the police.  You

8   know that, right?

9       A.   I don't know what it was he wanted to get.

10  There's a lot of people who use the police.  I don't

11  know what motives he had to do it.

12      Q.   But, you know that he reported the plan to the

13  police.

14      A.   That's what they told me.  In time, they told me.

15      Q.   Which means that Drowsy saved Peligroso's life,

16  right?

17      A.   He himself had sentenced him, and now it seems

18  like he's eaten up with regret.

19      Q.   He saved Peligroso's life, right?

20      A.   He, the same one who was going to kill him?  He

21  saved him.

22      Q.   You've heard the evidence in this case, right?

23      A.   Correct.

24      Q.   You knew that you were going to get convicted,

25  right?

1     A.   What do you mean, convicted?

2     Q.   That the jury was going to find you guilty.

3     A.   Like I say, I decided to come here and testify

4  because that thing about Peligroso, they're accusing me

5  of having put everything in the car.  There are other --

6  there's other testimony that says I planned everything.

7  And, I'm going to assume responsibility for what I did.

8     Q.   Before you decided to testify, you were looking

9  at a near certainty of spending the foreseeable future

10 in prison, right?

11          THE INTERPRETER:  I'm sorry.  The

12 interpreter requests a repetition.

13 BY MS. MARTINEZ:

14    Q.   Before you decided to testify, you were looking

15 at a near certainty of spending the foreseeable future

16 in prison.

17    A.   Perhaps yes, perhaps no.

18    Q.   Before you were arrested, out on the street, you

19 were a big shot?

20    A.   What do you mean, a big shot?

21    Q.   You had status in the gang?

22    A.   It's not like I had a lot of status or that I was

23 a big shot.  As I repeat, we all want to survive in this

24 life.  She's never going to understand me, because

25 she -- she's not in the MS.  She doesn't live that life.

1   She doesn't sleep with what we sleep with.

2       Q.   You had respect within the gang.

3       A.   Sometimes you don't have respect.  Everyone can

4   say they respect you, but sometimes, it's a lie.

5       Q.   You had soldiers to take your orders?

6       A.   What do you mean, I had soldiers?

7       Q.   Soldiers is another name for homeboys, isn't it?

8       A.   Yes, but only if the runner or the shot caller

9   gives them an order.  I was just the spokesperson.

10      Q.   You had soldiers to take your orders, right?

11      A.   My personal soldiers, no.

12      Q.   You're not a spokesperson any more, are you?

13      A.   No.

14      Q.   It's not the same for you locked up in jail in

15  Alexandria, is it?

16      A.   What do you mean?

17      Q.   You don't have the same status that you used to,

18  now that you're in jail.

19      A.   I don't know.  I am locked up.  What good am I

20  for?

21      Q.   If the jury finds you guilty, you'll go to prison

22  after you're sentenced, right?

23      A.   Of course.

24      Q.   Big Payaso ran the clique from inside a prison?

25      A.   What do you mean, Big Payaso?

J. Torres - Cross

1    Q.   Payaso ran the clique from inside Powhatan
2    Prison, right?
3    A.   No.
4    Q.   Poison is a shot caller down in El Salvador?
5    A.   No.
6    Q.   Poison is in prison in El Salvador?
7    A.   Yes.
8    Q.   El Tigre is another shot caller down in El
9    Salvador?
10   A.   Shot caller, I don't know about that.  He's
11   locked up.  I just know he's locked up.
12   Q.   He's in prison in El Salvador?
13   A.   Of course.
14   Q.   And that's what you want, isn't it?
15   A.   What do you mean?
16   Q.   You know you're getting locked up, so, you want
17   status inside.
18   A.   Nobody wants status in this life.  But when you
19   make a mistake and you feel guilty, you have to face it.
20   It's not like those other people who come in and swear
21   by the Bible and lie to God and lie to the jury and they
22   lie to you, but you give them a prize because you give
23   them the hope of getting out.  Me, on the other hand,
24   no.
25   Q.   You're looking for a prize, too, aren't you?

1    A.   I'm not looking for any prize.

2    Q.   Your plan is to pretend to sacrifice yourself to

3 save some of your co-defendants, right?

4    A.   I -- I'm not helping anybody.  Nobody helps me.

5    Q.   Your hope is that if you tell part of the truth,

6 maybe this jury will believe your lies.

7    A.   It's not a lie because I swore on the Bible.  I

8 was present at that killing.

9    Q.   Your hope is that if you say it was only the

10 people who already testified, plus you, maybe this jury

11 will ignore all the other evidence?

12    A.   I don't know if I can respond well to your

13 question.  But the snitches are doing it for money.

14 They could be doing it for their freedom.  They could

15 lie and the jury could believe them.  I have a mother.

16 I'll never see her again.

17    Q.   You're not doing this out of loyalty to your

18 co-defendants, are you?

19    A.   I swear before God.

20    Q.   When -- I'm sorry.  You swear before God; is that

21 what you're saying?

22    A.   That's why I'm seated here.

23    Q.   And yet, you worship the devil?

24    A.   Unfortunately, yes.

25    Q.   The beast?

1    A.   No.

2    Q.   Oh, just the devil?

3    A.   Well, there's only one; just people give it

4    different meanings.

5    Q.   You worship the devil?

6    A.   It's not so much that I worship it.  When you are

7    young, you want to impress people.  You're not going to

8    understand it, because you don't live in this world

9    where you have to survive.  Only we know, those of us

10   who live on the streets.

11   Q.   When Payaso ran the clique from inside Powhatan

12   Prison, he had homeboys on the outside like you, right?

13   A.   How many times do I have to say that I didn't

14   know whether he was in charge or not?  My understanding

15   was different.

16   Q.   He had homeboys to smuggle him contraband?

17   A.   As far as I know, no.

18   Q.   He had homeboys to send him money?

19   A.   That is a responsibility that one has.

20   Q.   Poison down in El Salvador has homeboys on the

21   outside, too, right?

22   A.   It might be.  Maybe not.  I don't know.

23   Q.   He relies on homeboys here in the United States

24   to send him money.

25   A.   We are a family.

J. Torres - Cross

1    Q.   He gives his orders to the homeboys on the

2    streets.

3    A.   I don't know.

4    Q.   El Tigre gives his orders to the homeboys on the

5    street?

6              THE INTERPRETER:  Ms. Martinez, when counsel

7    says "his orders," it's his own orders?

8    BY MS. MARTINEZ:

9    Q.   El Tigre's orders.

10   A.   I don't know.

11   Q.   Your homeboys are here, right?

12   A.   What do you mean, my homeboys?

13   Q.   Your fellow homeboys are sitting here in court,

14   right?

15   A.   Some of them, the ones that I knew, the ones that

16   I thought were like my brothers, no.  Because there's a

17   person here that is not even a member of the gang.

18   Q.   If everyone here gets convicted, you won't have

19   anyone to carry out your orders, right?

20   A.   What do you want with that question?  Explain it

21   to me, because I don't understand it.

22   Q.   If everyone here gets convicted, you won't have

23   homeboys out on the street to carry out your orders for

24   the clique.

25   A.   When I was outside, I survived on my own.  When

1   I'm inside, I will survive on my own.  If I had needed

2   help, I would have asked you for it, just like the

3   people that I thought were my brothers did.

4       Q.   If everyone here gets convicted, there'll be no

5   one to smuggle in a contraband cellphone, right?

6       A.   I think I might not have understood the word

7   correctly, or maybe you are trying to confuse me, or

8   maybe -- I don't know what you're looking for.  Perhaps

9   I didn't understand correctly.  What is it that you

10  want?

11      Q.   If everyone here gets convicted, there will be no

12  one on the outside to smuggle a contraband cellphone

13  into you in prison, right?

14      A.   I have lived on my own for almost 20 years out on

15  the streets.  I don't need help from anyone.  I will

16  find a way to get ahead.  I have never needed them.

17      Q.   If everyone here gets convicted, there will be no

18  one to send you money from their drug sales, right?

19      A.   I don't know whether you want to get me confused,

20  but I -- but I think that there is a lot more people

21  belonging to the MS-13 than the ones that are here

22  present.  The MS-13 is a whole bunch of people, not just

23  the people that are here.  The police itself could bring

24  me drugs into the prison.

25      Q.   And that's your plan, isn't it?

1    A.   No.

2    Q.   To gain status, so that you'll have respect when

3    you're in prison?

4    A.   It would be a different world, and it would be

5    not the same world of lies that we have on the streets.

6    Q.   This --

7    A.   When you are there, there is no place to run.

8    Q.   This is just a power play, isn't it?

9    A.   I don't have any game plan for to gain power.  If

10   you think that I'm just doing this for power, I think

11   that I would get some support from the homeboys on the

12   outside, some help.  And you can ask my attorneys how my

13   family is living now.  I have to be looking out for

14   them, week after week.  And you consider that respect?

15   Q.   If your testimony helps one or more of these

16   defendants get acquitted, that would help your family,

17   wouldn't it?

18   A.   I'm not trying to help anyone.  I don't know

19   whether you have understood correctly, or I don't know

20   what it is that you're looking for.  Had I wanted to

21   help my family, I would have had approached you.  Don't

22   you think?  I didn't get any prize as you gave *ratas* --

23             THE INTERPRETER:  I'm sorry.

24             THE WITNESS:  -- the rats.

25             Instead of carrying out justice, you are

1    using the law to give them prizes, and they are not

2    going to spend their life in prison like I will.

3    BY MS. MARTINEZ:

4        Q.   You're looking for your prize from MS-13, aren't

5    you?

6        A.   I'm not looking for no prize.  Had I been looking

7    for a prize, I would have got it already.  I have been a

8    member of the gang since 1996.  Don't you think that I

9    would be living a cushy life?  I would have money in my

10   cell.  I would have food in my cell.  I wouldn't even

11   have to worry about my family.  As it is, I have to call

12   them week after week.

13          If you have earned respect, if you have earned a

14   position, you wouldn't have to worry like that.  I'm

15   going to have to worry all my life.

16       Q.   You're still a proud member of MS-13, aren't you?

17       A.   It is my family.

18       Q.   And you're not willing to snitch, right?

19       A.   Why?  To just spread lies like the snitches have

20   done, to spread lies or tell lies to the jury?

21       Q.   Are you willing to snitch?

22       A.   At no time at all.  Because I don't think that

23   the Prosecutor's Office wants somebody that tells the

24   truth.  Because how many interviews you have in this

25   case?  I don't think it was just one.  I think it was

J. Torres - Cross

1     about five.  What about Slow?  I think you have over
2     five with him.
3         Q.   If you snitch, you will lose all respect of the
4     gang; is that right?
5         A.   Don't you understand that I have no respect from
6     them?  Don't you understand that what is in jail --
7         Q.   My question was --
8         A.   -- and even when --
9         Q.   -- if you snitch, you will lose all respect of
10    the gang; is that right?
11        A.   But, I will be saved the benefit of your
12    assistance, and I wouldn't have to worry about anything.
13        Q.   Your hope is that your testimony will gain you
14    back the respect that you feel you've lost, isn't it?
15        A.   I don't want to recover anything.  I'm
16    not earning anything by doing this.  You think that my
17    family is going to survive with my respect, just by
18    sitting here, that they're going to get food?  I don't
19    think so.
20        Q.   If the gang helps you, that will help your
21    family, won't it?
22        A.   You don't know how the gang works.  You don't
23    live this life.  I have been in the gang since '96.
24        Q.   If the gang helps you, that will help your
25    family, right?

J. Torres - Cross                                                    77

1    A.   If they help me.  But I have not received help
2    during the entire time that I have been here in jail.
3         Q.   And that's why you decided to testify, right?
4         A.   At no time at all.  If I had wanted that, I would
5    have sought your assistance to retaliate.  What I didn't
6    like is that the five of us made the promise, and now
7    the family of the deceased are looking for justice.  And
8    tell me, are you going to give justice to the five?  I
9    don't think so.
10        Q.   You understand that --
11        A.   I don't think --
12             MR. LEIVA:  Your Honor, I object.
13             THE INTERPRETER:  I'm sorry.  The
14   interpreter missed something.
15             MR. LEIVA:  The interpreter should be
16   permitted to finish his answer, Your Honor.
17             MS. MARTINEZ:  Your Honor, his answers are
18   completely nonresponsive.
19             THE COURT:  That's been going on for several
20   minutes.  If you would like to have -- ask a question
21   that calls for a narrative response, which is what
22   you're getting, we have to let her complete the
23   interpretation.
24             THE INTERPRETER:  The interpreter wants to
25   ask for repetition, because she missed something right

J. Torres - Cross                                                    78

1    at the end.

2              THE WITNESS:  She doesn't want me to finish

3    talking.  She's just upset, and she just continues

4    harping on the same thing.

5              MS. MARTINEZ:  Objection, Your Honor.

6              THE COURT:  Her question -- sustained.

7              Her question had to do with help for his

8    family, if he would get help from his family if he

9    testified for the government.

10             MS. MARTINEZ:  Your Honor, that was not my

11   question.

12             THE COURT:  All right.  Well, you ask your

13   question then, Ms. Martinez.

14   BY MS. MARTINEZ:

15      Q.  If the gang helps you, that will help your

16   family, right?

17      A.  Lady, I don't know how many times I have to

18   repeat it --

19             MS. MARTINEZ:  Your Honor, would you direct

20   the witness to answer the question.

21             THE COURT:  I think that we've heard it.

22   Move on to something else.  You have plenty more to

23   question him about.  We've heard this for about five

24   minutes now.  Go ahead.

25   BY MS. MARTINEZ:

J. Torres - Cross                                                     79

1      Q.   Your hope is to continue to run the gang from
2   inside prison, right?
3      A.   Lady, I don't know whether you're watching a
4   video, but, don't you realize that I become a Sureño?   I
5   become a member of the opposite gang by being in prison?
6   Do you think that the gang is going to give me rank if I
7   am a Sureño?
8      Q.   What gang are you a member of now?
9      A.   I'm always going to say that I am of the MS.
10   But, once I am under federal care, I would become a
11   Sureño.
12      Q.   And you hope to have status.
13      A.   I think I've already answered that several times.
14      Q.   You hope to get respect while you're in prison.
15      A.   Prison is not the street.
16      Q.   You don't want respect in prison?
17      A.   Well, once there I'll see what the environment's
18   like.   I can't say yes or no, because I don't know how
19   it is up there.   It's not the streets.
20      Q.   Certainly, you would agree that MS-13 respects
21   homeboys who refuse to snitch.
22      A.   That's in the streets.   Remember, where am I
23   going to be living?
24      Q.   On the street, MS-13 respects homeboys who refuse
25   to snitch.

J. Torres - Cross                                                    80

1      A.   I don't know.  The homeboys that decide not to
2  snitch are in prison.
3      Q.   On the street, MS-13 respects homeboys who decide
4  not to snitch, right?
5      A.   I'm not going to answer that question.
6      Q.   The homeboys on the street who send money to the
7  homeboys in prison, right?
8      A.   If they can, when they can.
9      Q.   And you can use some money, couldn't you?
10     A.   I think it would be good for there to be a list
11 made of how long I've been in jail in Alexandria and how
12 much money I've received.
13     Q.   You could use some money, couldn't you?
14     A.   I'll see what I can do to have enough to eat.
15     Q.   You could use money, right?
16     A.   I already have some.  What do I need with more?
17     Q.   Your family is suffering, you said.
18     A.   Well, in my family, there's only four in the
19 family.
20     Q.   Did you say they're suffering?
21     A.   Every poor family suffers.
22     Q.   And it would be helpful if your homeboys would
23 send you money for you family, right?
24     A.   That would be -- it would be good if you could
25 communicate with my family and ask them that question

 1   and see how they respond.

 2        Q.   You're the one on the stand, and I'm asking you.

 3   It would be helpful to your family if your homeboys

 4   would send you money.

 5        A.   Listen.  I don't know if you're going to

 6   understand me or not --

 7                MS. MARTINEZ:  Your Honor, would you direct

 8   the witness --

 9                THE WITNESS:  -- I spent three years --

10                MS. MARTINEZ:  -- to respond to the

11   question?

12                THE COURT:  He already has.  Objection

13   sustained.

14   BY MS. MARTINEZ:

15        Q.   How much money have the homeboys sent you since

16   you've been in prison?

17        A.   It isn't like they've given it to me.  I have a

18   debt.

19        Q.   How much have they sent you since you've been in

20   jail?

21        A.   I don't know.  That was in Fairfax, but it's not

22   just homeboys.  It was some friends, through some

23   homeboys that sent the money.

24        Q.   How much?

25        A.   60, sometimes my uncle would send me a hundred,

1    60, what -- whatever they wished.  But, it wasn't always

2    the gang.

3        Q.  When it was the gang, who was it?

4        A.  I don't know.  It may have been 300, 200,

5    somewhere around there, for the months that I was in

6    Fairfax.

7        Q.  No, the question was:  When it was the gang, who

8    sent it?

9        A.  That, I don't know.  One time it may have been

10   Junior.

11              THE INTERPRETER:  May the interpreter

12   inquire as to the number of months?

13              MS. MARTINEZ:  That's not the question.

14              MR. LEIVA:  Your Honor, it was

15   misinterpreted.  It was interpreted as "months," when he

16   actually gave a figure, how many months he was in

17   Fairfax.

18              THE INTERPRETER:  The interpreter stands by

19   the rendition.  She believes that the witness said both

20   a number of months and numbers, as far as money.  She

21   stands by her rendition, Your Honor.

22

23   BY MS. MARTINEZ:

24       Q.  Have any of these defendants, sitting at these

25   tables here, sent you money since you've been in jail?

J. Torres - Cross                                            83

1     A.   I couldn't say one way or the other.  I couldn't
2  tell you if it was them or not.  So I couldn't give you
3  a concrete answer.
4     Q.   They can't send you money if they're in prison,
5  right?
6     A.   How many times am I going to have to repeat that
7  I don't need it?
8             MS. MARTINEZ:  Your Honor, I have no further
9  questions.
10            MR. JENKINS:  Good afternoon, Mr. Lopez
11 Torres.
12            May I proceed, Your Honor?
13            THE COURT:  Yes.
14            THE INTERPRETER:  Your Honor, may the
15 interpreter inquire if it was $300 in ten months, or
16 perhaps if the interpreter said $300 in one month?
17            THE COURT:  You may --
18            THE INTERPRETER:  May the interpreter --
19            THE COURT:  -- inquire, yes.
20            THE INTERPRETER:  -- inquire, Your Honor?
21            (Interpreter complies.)
22            THE WITNESS:  No, ten months.  The months I
23 was in -- 300, 200.
24            THE INTERPRETER:  The interpreter believes
25 he said, "the months I was in Fairfax."

REDIRECT EXAMINATION

BY MR. JENKINS:

1   Q.   Mr. Torres, I want to go over some of the
questions that Ms. Martinez asked you.  She ended her
examination by asking you a series of questions
concerning your motive to protect some of your
co-defendants.  Do you remember those questions?

A.   Yes.

Q.   Do you know -- are you aware that one of your
co-defendants goes by the name Talibán?

A.   That is what the -- that is what is being said.
I didn't.

Q.   And the shooting that Talibán has been charged
with, you were in prison when that happened -- you were
in jail when that happened, correct?

        MS. MARTINEZ:  Your Honor, I object to
beyond the scope.

        THE WITNESS:  Overruled.

BY MR. JENKINS:

Q.   You were in jail when that shooting occurred,
correct?

A.   That's correct.

Q.   So, you weren't there when that shooting
occurred, correct?

A.   No, but I know from what Duende told me.

J. Torres - Redirect                                                    85

1     Q.   Other than what Duende told you, do you have any

2  personal knowledge as to who was present during that

3  shooting?

4     A.   That's correct.

5     Q.   Other than what Duende told you, can you tell the

6  ladies and gentlemen of this jury who was present at

7  that shooting?

8     A.   Only -- I only know -- well, it is a long story

9  why Duende was asked to do -- Duende has always been a

10 person that is very wound up.  He gets very excited --

11          MS. MARTINEZ:  Your Honor, I object to

12 nonresponsive.

13          THE COURT:  Sustained.  It's not responsive.

14 BY MR. JENKINS:

15    Q.   Mr. Torres, I want you to focus your attention on

16 what I'm asking you.

17    A.   Okay.

18    Q.   Other than what Duende told you, can you tell the

19 ladies and gentlemen of the jury who was present at the

20 shooting that Talibán is accused of?

21    A.   I base myself on what Duende told me.

22    Q.   Because you weren't there, correct?

23    A.   Because I was not there.

24    Q.   You don't know if Talibán shot anyone, correct?

25    A.   I don't know.

1    Q.   Because you were in jail at that time, correct?

2    A.   Correct.

3    Q.   Let's talk about the murder of Lil Guasón.  That

4    was your friend, correct?

5    A.   My brother.

6    Q.   Remember Ms. Martinez asking you a series of

7    questions about your efforts to protect your

8    co-defendants with respect to his murder.

9              MS. MARTINEZ:  Your Honor, object on the

10   scope.  I didn't ask at all about that murder.

11             MR. JENKINS:  She asked questions, Your

12   Honor, concerning whether or not his motive was to

13   protect all of these defendants.

14             THE COURT:  Objection overruled.

15   BY MR. JENKINS:

16   Q.   Do you remember Ms. Martinez asking you those

17   questions?

18             THE INTERPRETER:  Could you -- the

19   interpreter did not finish interpreting the question.

20   Could you repeat it, sir.

21             MR. JENKINS:  Let me ask it another way.

22

23   BY MR. JENKINS:

24   Q.   Mr. Lopez Torres, when your friend Lil Guasón was

25   killed, where were you?

1    A.   In jail.

2    Q.   Were you present when Lil Guasón was killed?

3    A.   I was in jail.

4    Q.   Other than what people told you about his murder,

5  can you tell the ladies and gentlemen of the jury who

6  killed Lil Guasón?

7    A.   The one who called himself my brother.

8         THE COURT:   Rephrase your question, please,

9  to recite personal knowledge.

10 BY MR. JENKINS:

11   Q.   Just drawing your attention to your own personal

12 knowledge, were you present when Lil Guasón was killed?

13   A.   No.

14   Q.   Were you in jail when he was killed?

15   A.   That's correct.

16   Q.   Did you witness anyone kill Lil Guasón?

17   A.   No.

18   Q.   Let's talk about Lagrima.  Were you there when

19 Lagrima was killed?

20   A.   Yes.

21   Q.   Have you told the ladies and gentlemen of the

22 jury who helped you kill Lagrima?

23   A.   Many times.

24   Q.   Who is Lil Evil?

25   A.   He's a homeboy of the gang.

1    Q.   Has he testified in this trial?

2    A.   I have not seen him.

3    Q.   Do you see him seated among these defendants?

4    A.   No.

5    Q.   Have you told us about his involvement in

6    criminal activity?

7    A.   Yes.

8    Q.   But he's not one of your co-defendants, correct?

9    A.   He's not here, as he should be.

10   Q.   He's not one of the people who testified pursuant

11   to a plea agreement with Ms. Martinez, correct?

12   A.   He had a different prize.  His solution was to

13   get out.

14   Q.   Who is Marciano?

15   A.   The one who was going to kill Peligroso.

16   Q.   Is he one of the defendants that -- co-defendants

17   seated in this courtroom?

18   A.   That is another prize that the government gave

19   him, his freedom.

20   Q.   My question is:  Is Marciano among the

21   co-defendants here in this courtroom?

22   A.   No.  He should be.

23   Q.   Did I just understand you to say that Marciano

24   was there to help kill Peligroso?

25   A.   That he was going to kill him.

1    Q.   That he was going to kill him, correct?

2    A.   Together with Drowsy.

3    Q.   And Marciano was one of your gang members,

4    correct?

5    A.   He wanted to be.  He wanted to be.

6    Q.   He was one of your *chequeos*?

7              MS. MARTINEZ:  Your Honor, this is all

8    leading.

9    BY MR. JENKINS:

10   Q.   Was he a chequeo?

11             THE COURT:  It is.  Sustained.

12             THE WITNESS:  He wanted to be more than

13   that.

14   BY MR. JENKINS:

15   Q.   But you're not protecting him, are you?

16             MS. MARTINEZ:  Objection, Your Honor.

17             THE COURT:  Objection sustained.

18             MR. JENKINS:  I'll move on, Your Honor.

19   I'll move on, Your Honor.

20   BY MR. JENKINS:

21   Q.   Now, getting to the Peligroso kill -- plan to

22   kill, you remember the questions that Ms. Martinez asked

23   you with respect to that?

24   A.   Yes.

25   Q.   Remember the questions she asked you about your

1    conversation with Junior on September the 30th?

2        A.   Yes.

3              MR. JENKINS:  Can we have Government's

4    Exhibit 7-A-1 on the screen, page 11.

5              Can we get Government's Exhibit 7-A-1 on the

6    screen?

7    BY MR. JENKINS:

8        Q.   Do you remember being asked about this exhibit?

9        A.   Yes.

10       Q.   Remember being asked questions about your

11   conversation here with Junior?

12       A.   Yes.

13             MR. JENKINS:  Could I get page 11 up?

14   BY MR. JENKINS:

15       Q.   Was your testimony, in response to Ms. Martinez,

16   that during this conversation you were lying to Junior?

17       A.   Correct, like many of us do.

18       Q.   Was it your testimony that during this

19   conversation --

20             MS. MARTINEZ:  Your Honor, this is all

21   leading.

22             THE COURT:  It is leading.  This is your

23   witness.  You'll have to ask non-leading questions,

24   Mr. Jenkins.

25             MR. JENKINS:  Thank you, Your Honor.

```
 1  BY MR. JENKINS:
 2     Q.  Page 11, if you can draw your attention to the
 3  middle.
 4         Was Lagrima dismembered?
 5              MS. MARTINEZ:  Your Honor --
 6              THE COURT:  If you'd like to ask him
 7  non-leading questions, Mr. Jenkins, I'll permit you to
 8  do that.  But this is not cross-examination.  Objection
 9  sustained.  This is your witness.
10              MR. JENKINS:  Understood, Your Honor.
11  BY MR. JENKINS:
12     Q.  What happened to Lagrima?
13     A.  We killed him.
14     Q.  In this -- on page 11, does it indicate that you
15  said, "No man.  We dismembered that son of a bitch"?
16     A.  That is what I said.
17     Q.  Is that true?
18     A.  No.
19     Q.  Was it true at the time you said it?
20     A.  No.
21     Q.  Why did you say it?
22     A.  Because I wanted to look good to Junior.
23     Q.  Two lines down, is it true that you said, "We
24  dismembered him two -- two times, we dismembered him"?
25              THE INTERPRETER:  Would you expand it?  The
```

J. Torres - Redirect

1    interpreter cannot really read it.

2              MR. JENKINS:  Can you make it larger?

3    BY MR. JENKINS:

4      Q.  Do you see where it says, "We dismembered him

5    two -- two times, we dismembered him"?

6              THE INTERPRETER:  It's not on the screen.

7              MR. JENKINS:  Page 11.

8              THE COURT:  He's asking you to call it out,

9    so she can read it.

10             THE WITNESS:  That is a lie.

11   BY MR. JENKINS:

12     Q.  Why did you lie?

13     A.  Because I wanted to look good to Junior.

14     Q.  Do you see where it goes on to say, "We reburied

15   him, and then we went and took him out and we

16   dismembered him and we buried him again"?

17     A.  It says that.

18     Q.  Is that what you did?

19     A.  I did not dismember him, and we did not dismember

20   him the second time.  We did -- I did not take him out

21   of the grave.  We did -- we did take him out of the

22   grave, but it -- what it says there is not true.

23     Q.  Why did you lie to Junior?

24     A.  Because I wanted to look good to Junior, because

25   we knew that he had a high rank in the gang, and many

1   people supported him and showed him respect.

2       Q.   Was the killing of Lagrima authorized by the

3   gang?

4       A.   From El Salvador.

5       Q.   Was that order to kill Lagrima given to you?

6       A.   Correct.

7       Q.   What, if anything, did you do when you received

8   the order to kill Lagrima?

9       A.   Well, initially you think about it.  And they had

10  given us a set time, and if we would go beyond that

11  time, we knew what to expect, the five of us.  That is

12  why we dug that small hole, because we did it with our

13  fingers, with our nails, Skinny and I did.

14      Q.   What is your understanding -- what was your

15  understanding of what would have happened to you if you

16  had disobeyed that order?

17      A.   The same fate.

18      Q.   Have you told the ladies and gentlemen of the

19  jury what happened to Lagrima?

20      A.   Yes.

21      Q.   Have you told them who assisted you with killing

22  Lagrima?

23      A.   Yes.

24      Q.   Let's talk about the Peligroso planned killing.

25  Was that authorized by the gang?

1    A.   No.

2    Q.   Have you told the ladies and gentlemen of the

3    jury what you know about that plan?

4    A.   The little I know.  And, what I knew was from

5    what Drowsy said, that he wanted him killed.  There are

6    many other conversations that were not shown.

7              THE COURT:  Counsel, we can start here at

8    2:00 o'clock.

9              THE WITNESS:  I thought they were all

10   kidding.

11             MR. JENKINS:  Thank you, Your Honor.

12             THE COURT:  Ladies and gentlemen, please do

13   not discuss the case nor permit the case to be discussed

14   in your presence.  Don't do any research on the case.

15   And leave your notes in the jury deliberation room.

16             We'll resume at 2:00 o'clock.  Thank you.

17             (Court recessed at 1:00 p.m. and reconvened

18             at 2:03 p.m.)

19             THE COURT:  Are we ready to bring the jury

20   out?

21             You can bring our jury out, Mr. Toliver.

22   Thank you.

23             (Jury present.)

24             THE COURT:  You may be seated.  Thank you.

25             Counsel, you may proceed.

1          MR. JENKINS:  Thank you, Your Honor.

2          REDIRECT EXAMINATION (Continued)

3    BY MR. JENKINS:

4      Q.   Mr. Lopez Torres, do you recall when Ms. Martinez

5    asked you a series of questions concerning certain gang

6    members who continued to run the gang while in jail?

7      A.   Right.

8      Q.   And, do you remember her asking you a series of

9    questions suggesting that you were hoping to do the

10   same?

11     A.   Yes.

12     Q.   She also asked you a series of questions -- well,

13   tell me if you recall -- concerning the rules of the

14   gang.

15     A.   Right.

16     Q.   Does the gang have a rule about members

17   testifying in open court concerning gang activities?

18     A.   It depends on the system.

19     Q.   What is the rule with respect to gang members

20   testifying in open court concerning gang activities?

21     A.   You can be killed.

22     Q.   Do you gain respect from the gang by testifying

23   in open court about gang activities?

24     A.   No.  Probably death.

25     Q.   Do members of the gang provide money to those

1    gang members who testify in open court --
2                MS. MARTINEZ:  Objection, Your Honor,
3    leading.
4                THE COURT:  Sustained.
5    BY MR. JENKINS:
6        Q.   Mr. Lopez Torres, are you aware of any benefits
7    that gang members receive from other gang members in
8    exchange for testifying in court?
9        A.   No, man.
10       Q.   Based on your more than 15 years as a member of
11   MS-13, are you aware of any situation in which a member
12   who testified about gang activities in open court was
13   given money by the gang?
14       A.   As I repeat, maybe death.
15       Q.   Based on your 15 years of experience, do you
16   know -- as a MS gang member, do you know of any
17   situation where an incarcerated MS-13 member was
18   provided a contraband cellphone in exchange for him
19   testifying in open court about gang activities?
20       A.   No.
21       Q.   Who is El Tigre?
22       A.   A homeboy.
23       Q.   How long have you known him?
24       A.   I wouldn't be able to tell you.
25       Q.   Do you remember Ms. Martinez asking you questions

1   about him running a clique from the gang -- excuse me --

2   from the jail?

3       A.   That's what she asked.

4       Q.   Do you know if El Tigre has ever come into open

5   court and testified openly about gang activities?

6       A.   No.

7       Q.   Do you know who Big Poison is?

8       A.   I only know him by Poison.

9       Q.   Do you recall Ms. Martinez asking you about

10  Poison running gang activities from a prison in El

11  Salvador?

12      A.   That's what she asked.

13      Q.   Do you know if Poison has ever come into a

14  courtroom and testified openly about gang criminal

15  activities?

16      A.   Not to my knowledge.

17      Q.   Do you -- who is Big Payaso?

18      A.   I only know him by Payaso.

19      Q.   Do you recall Ms. Martinez asking you questions

20  about Payaso running a clique from the jail?

21      A.   That's what she asked.

22      Q.   Do you recall her asking you questions about

23  Payaso receiving benefits from the gang while in jail?

24      A.   That's what she asked.

25      Q.   Do you know whether or not Payaso has ever come

J. Torres - Redirect

1    into an open courtroom to testify about gang activities?

2        A.   Not to my knowledge.

3        Q.   Have you told this jury about Payaso's

4    involvement in the Peligroso plan?

5        A.   No.

6        Q.   Is Payaso here in the courtroom with us today?

7        A.   No.

8        Q.   Is Lil Evil in the courtroom with us today?

9              MS. MARTINEZ:  Asked and answered, Your

10   Honor.

11             THE COURT:  Sustained.

12             MR. JENKINS:  I'm not sure if I asked this,

13   so I'll go ahead and give it a try.

14   BY MR. JENKINS:

15       Q.   Is Marciano in the courtroom today?

16             MS. MARTINEZ:  Asked and answered, Your

17   Honor.

18             THE COURT:  You did.

19             MR. JENKINS:  I did?

20             THE COURT:  Yes.

21             MR. JENKINS:  Thank you, Your Honor.

22   BY MR. JENKINS:

23       Q.   Now, Mr. Lopez Torres, Ms. Martinez also asked

24   you about some recordings with Junior.  Do you remember

25   those questions?

1    A.   Right.

2    Q.   And during one of your responses, you had -- you

3    had referenced a conversation with Junior that took

4    place on July the 25th.  What was that conversation

5    about?

6    A.   About a threat that he made to us for wanting to

7    take a rent that he had from a whorehouse.

8    Q.   When you spoke with Junior on the phone, do you

9    remember the number that Junior would call you from?

10   A.   He would call from different numbers.

11   Q.   I'm sorry.  You said he would call from different

12   numbers?

13   A.   Right.

14   Q.   So, it wasn't always the same phone, correct?

15   A.   No.  Sometimes we were talking, and he would say

16   that his battery power was going to go off, so he would

17   call from a different phone.

18   Q.   Ms. Martinez asked you a number of questions

19   about what it's like to be in jail now.  Do you recall

20   those questions?

21   A.   Right.

22   Q.   She also asked you questions about what you

23   expect your future incarceration to look like.

24   A.   Right.

25   Q.   Tell the ladies and gentlemen of the jury what

1   you expect your future incarceration to look like.

2       A.   Can you explain to me?  I don't understand your

3   question.

4       Q.   What impact do you expect your testimony here

5   today to have on your incarceration in the future?

6       A.   A lot.

7       Q.   What do you mean by that?

8       A.   It changes your life.  You're going to spend the

9   rest of your life locked up in four walls.  You're not

10  going to see your family.  You won't have the same

11  options that the ones who decided to cooperate will

12  have.

13      Q.   What do you mean by that, the same options as the

14  ones who cooperated?

15      A.   What they explained to me was that they were

16  going to be released in 15 years.  And that is the -- an

17  option that the ones who are sitting in court don't

18  have.  We live differently than them, trying to survive

19  in prison.

20      Q.   What impact does your testimony here in court --

21  do you expect it to have on your family?

22      A.   A lot.

23      Q.   Mr. Lopez Torres, you've admitted your

24  involvement in the Lagrima murder, correct?

25      A.   Correct.

1    Q.  Do you deny your involvement in the plan to kill

2    Peligroso?

3    A.  That's right.

4    Q.  Why?

5    A.  Because I know I didn't do it.  I know what is in

6    the calls.  I know I was exaggerating.

7         How could I say that I'm guilty for something

8    that I'm not guilty for?  That is not logical.  That's

9    why I know what I did, that I killed Lagrima.  But the

10   rest, I didn't do.

11             MR. JENKINS:  No further questions, Your

12   Honor.

13             THE COURT:  We'll take a brief recess,

14   please.

15             (Jury not present.)

16             THE COURT:  You may be seated.

17             He can go back to his seat now.

18             (Thereupon, the witness withdrew from the

19   stand.)

20             THE COURT:  Your next witness?

21             MR. JENKINS:  Your Honor, Mr. Lopez Torres

22   would rest.

23             THE COURT:  All right.

24             I think what I'd like to do is bring the

25   jury back, release them, and tell them to call in -- I'm

1    sorry.

2              MS. MARTINEZ:  Just for the record, the

3    government does not have a rebuttal case.

4              THE COURT:  I didn't think you did, but I --

5              MS. MARTINEZ:  I just --

6              THE COURT:  -- appreciate you're making that

7    record.  I appreciate you're doing that.

8              MS. MARTINEZ:  Just for the record, Your

9    Honor.

10             THE COURT:  I didn't mean to be preemptive,

11   but I kind of think you would not have one.

12             MS. MARTINEZ:  I assumed that you believed

13   that, but I wanted it to be on the record, Your Honor.

14             THE COURT:  I appreciate that.  Attention to

15   the record is very important.

16             MR. JENKINS:  And, Your Honor, if it please

17   the Court, Mr. Torres would like to have the opportunity

18   to formally rest its case in front of the jury.

19             THE COURT:  I want to do that.  I also want

20   to think through out loud now, the jury instruction

21   conference, which we can start in maybe like 15 minutes,

22   and see if we -- where we are.

23             Tomorrow is Friday.  I would want the jury

24   to call Friday night, and give them instructions about

25   whether they are to come back on Monday or Tuesday,

depending upon where we are in the instructions.

So, we'll bring the jury back, and I'll tell them to call in on Friday night to find out what the plan is for Monday or Tuesday.

All right.  You can bring the jury back, Mr. Toliver.  I'm going to send them home now.

(Jury present.)

THE COURT:  You may be seated.

Mr. Jenkins.

MR. JENKINS:  Your Honor, on behalf of Mr. Jose Lopez Torres, the defense rests.

MS. MARTINEZ:  No rebuttal, Your Honor.

THE COURT:  Ladies and gentlemen, you've heard all the evidence you're going to hear in connection with this case.

Now it's my responsibility to meet with counsel and develop the jury instructions, which I'll give to you orally and in writing.

The lawyers will then be given a chance to argue the case, and the case will be submitted to you for deliberation.

We cannot do that this afternoon, and, I think the prudent course would be to instruct you to call the jury telephone line Friday evening, because then I can give you instruction about whether or not to

1    report on Monday or Tuesday.

2              Right now, I don't want to give you a

3    commitment.  But I want you to call Friday evening at

4    the close of business to see what the jury line tells

5    you to do about coming back to court, whether it's

6    Monday or Tuesday.

7              In the interim, as I've said to you many

8    times and repeat tonight, do not discuss this case with

9    anyone.  Do not permit the case to be discussed in your

10   presence.  Don't do any research on the Internet or

11   social media.

12             Don't post anything on social media.  Don't

13   review any media reports or newspaper reports or

14   television that might be about the case.  Do not visit

15   any areas or locations mentioned in the trial.  Don't

16   consult any dictionaries, anything like that.  And leave

17   your notes in the jury deliberation room.

18             We'll see you when we resume next week.

19   Leave your notes in the jury deliberation room.  Thank

20   you.

21             (Jury excused at 2:22 p.m.)

22             (Instructions conference not part of

23   transcript.)

24

25                       ---

```
 1
 2                    CERTIFICATE OF REPORTER
 3
 4            I, Renecia Wilson, an official court
 5   reporter for the United States District Court of
 6   Virginia, Alexandria Division, do hereby certify that I
 7   reported by machine shorthand, in my official capacity,
 8   the proceedings had upon the jury trial in the case of
 9   UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.
10            I further certify that I was authorized and
11   did report by stenotype the proceedings in said jury
12   trial, and that the foregoing pages, numbered 1 to 105,
13   inclusive, constitute the official transcript of said
14   proceedings as taken from my shorthand notes.
15
16            IN WITNESS WHEREOF, I have hereto
17   subscribed my name this  27th   day of  May , 2016.
18
19                         /s/
20                         Renecia Wilson, RMR, CRR
                           Official Court Reporter
21
22
23
24
25
```