1    IN THE UNITED STATES DISTRICT COURT FOR THE
                    EASTERN DISTRICT OF VIRGINIA
2                        Alexandria Division

3    UNITED STATES OF AMERICA,          )
                                        )
4                        Plaintiff,     )
                                        )  Crim. No. 1:14cr306
5         vs.                           )
                                        )
6    JOSE LOPEZ TORRES, ALVIN GAITAN    )  May 3, 2016
     BENITEZ, CHRISTIAN LEMUS CERNA,    )
7    OMAR DEJESUS CASTILLO, MANUEL      )
     ERNESTO PAIZ GUEVARA, and          )
8    JESUS ALEJANDRO CHAVEZ,            )
                                        )
9                        Defendants.    )
     _____)

10

11

12                          JURY TRIAL

13

14   BEFORE:      THE HONORABLE GERALD BRUCE LEE
                  UNITED STATES DISTRICT JUDGE
15

16
     APPEARANCES:
17
     FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
18                     BY:  JULIA MARTINEZ, AUSA
                            TOBIAS TOBLER, AUSA
19

20                          ---

21

22   OFFICIAL COURT REPORTER:

23                     RENECIA A. SMITH-WILSON, RMR, CRR
                       U.S. District Court
24                     401 Courthouse Square, 5th Floor
                       Alexandria, VA 22314
25                     (703)501-1580

APPEARANCES (Continued)

FOR DEFENDANT JOSE LOPEZ TORRES

       BYNUM & JENKINS, PLLC
       BY:  ROBERT L. JENKINS, JR., ESQ.

FOR DEFENDANT ALVIN GAITAN BENITEZ

       LAW OFFICE OF AMY LEIGH AUSTIN
       BY:  AMY LEIGH AUSTIN, ESQ.
       SMITH & ZIMMERMAN, PLLC
       BY:  JEFFREY D. ZIMMERMAN, ESQ.

FOR DEFENDANT CHRISTIAN LEMUS CERNA

       LAW OFFICE OF CHRISTOPHER AMOLSCH
       BY:  CHRISTOPHER AMOLSCH, ESQ.

FOR DEFENDANT OMAR DEJESUS CASTILLO
       OLD TOWN ADVOCATES, PC
       BY:  MEREDITH M. RALLS, ESQ.

FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

       LAW OFFICE OF W. MICHAEL CHICK, JR.
       BY:  WILLIAM MICHAEL CHICK, JR., ESQ.

FOR DEFENDANT JESUS ALEJANDRO CHAVEZ

       JEROME P. AQUINO, ESQ.
       ELITA C. AMATO, ESQ.

---

1          (Thereupon, the following was heard in open

2  court at 11:08 a.m.)

3          THE CLERK:  1:14 criminal 306, United States

4  versus Jose Lopez Torres, Alvin Gaitan Benitez,

5  Christian Lemus Cerna, Omar DeJesus Castillo, Manuel

6  Ernesto Paiz Guevara, and Jesus Alejandro Chavez, with

7  three Spanish interpreters.

8          THE COURT:  Good morning, Ms. Eva

9  Desrosiers, Ms. Maria Horvath and Ms. Anna Lefèvre.

10          Will each of you act as interpreters for us

11  today?

12          THE INTERPRETERS:  Yes, Your Honor.

13          THE COURT:  If you would take the oath from

14  the clerk, please.

15          (Interpreters duly sworn.)

16          THE INTERPRETER:  I do, for the record, Ana

17  Lorena Lefèvre, federally certified court interpreter.

18          THE INTERPRETER:  Maria Horvath, federally

19  certified interpreter.

20          THE INTERPRETER:  Eva Desrosiers, federally

21  certified Spanish interpreter.

22          THE COURT:  All right.

23          Counsel, if you would all enter your

24  appearances, please.

25          MS. MARTINEZ:  Good morning, Your Honor.

1   Julia Martinez and Tobias Tobler on behalf of the United

2   States.

3                    THE COURT:  Good morning.

4                    MS. MARTINEZ:  Good morning.

5                    MR. AQUINO:  Good morning, Your Honor.

6   Jerry Aquino and Elita Amato on behalf of Mr. Chavez.

7                    THE COURT:  Good morning.

8                    MS. AUSTIN:  Good morning, Your Honor.  Amy

9   Austin and Jeffrey Zimmerman on behalf of Alvin Gaitan

10  Benitez.

11                   THE COURT:  Good morning.

12                   MS. RALLS:  Good morning, Your Honor.

13  Meredith Ralls on behalf of Omar DeJesus Castillo.

14                   THE COURT:  Good morning.

15                   MR. CHICK:  Good morning, Your Honor.  Mike

16  Chick on behalf of Manuel Ernesto Paiz Guevara.

17                   THE COURT:  Good morning.

18                   MR. JENKINS:  Good morning, Your Honor.  May

19  it please the Court, Robert Jenkins on behalf of

20  Mr. Lopez Torres.

21                   THE COURT:  All right, good morning.

22                   MR. AMOLSCH:  Good morning, Your Honor.

23  Christopher Amolsch for Mr. Cerna who is present.

24                   THE COURT:  Good morning, Mr. Jose Lopez

25  Torres.

1           Good morning.
2           Good morning, Mr. Alvin Gaitan Benitez, good
3  morning.
4           Good morning, Mr. Christian Lemus Cerna,
5  good morning.
6           Mr. Manuel Ernesto Paiz Guevara, good
7  morning.
8           And Mr. Jesus Alejandro Chavez, good
9  morning.
10          All right, counsel, I'm ready to proceed.
11          MR. AQUINO:  Good morning, Judge.  We're
12  here on our Rule 33 motion.  Just as a preface to that
13  motion, a couple matters.
14          One, my sense is that in your life as a
15  federal and state judge you probably have not granted
16  this motion more than twice, maybe tops, maybe less.
17          The idea of granting a new trial to
18  Mr. Chavez is not something that causes you to jump for
19  joy.  We understand that, but we submit that you should
20  grant this motion of Mr. Chavez for reasons that we
21  cited in the papers independently, that is, standing
22  alone as well as jointly.
23          The law in this subject is crystal clear.
24  Pursuant to Rule 33, the Court has the power to review
25  the entire record that has taken place in the case, to

1    include examining the credibility of witnesses, or to
2    say this is a different way, this is not a renewed Rule
3    29 motion.  This is -- we're here under Rule 33.
4              So, the only question is, would you exercise
5    that power in this case, and we ask that you do so for a
6    number of reasons.
7              The first deals with the question of
8    spillover evidence, of which there was a significant
9    amount.  And in that regard, we'd like to cite two cases
10   to you, the *McRae* case from the Fifth Circuit in 2012
11   and Judge Brinkema's decision in this court in August of
12   2014 in *United States versus Aleem*.  Both of those cases
13   were cited in our pleadings.
14             *McRae*, we submit, is a highly significant
15   case for a couple reasons.  And I would just like to
16   read a few sentences from that decision.
17             THE COURT:  I hope that you won't read to
18   me, Mr. Aquino, because you should assume I've read your
19   brief.
20             MR. AQUINO:  Well --
21             THE COURT:  I have a couple questions,
22   though.
23             MR. AQUINO:  Sure.
24             THE COURT:  The first is, this is a
25   conspiracy case involving racketeering; is that right?

1           MR. AQUINO:  Understood.

2           THE COURT:  And so is there always spillover

3   when there're cases like that?  There is always

4   different levels of evidence against individuals, some

5   higher, some lower, some not at all; is that right?

6           MR. AQUINO:  Understood.  What separates

7   this case and what makes this more like the *McRae* case,

8   as well as the *Aleem* case -- *Aleem*, by the way, was a

9   racketeering conspiracy case.

10          THE COURT:  Was it MS-13?

11          MR. AQUINO:  It was African American gang.

12  Just substitute African American for Hispanic and it's

13  basically the same case.  There were not murders but

14  there was very serious attacks in that case, to include

15  face slashings, rapes, as well as an incredible amount

16  of sex trafficking and terrible telephone calls involved

17  in the *Aleem* case.

18          THE COURT:  So the *Aleem* case was Judge

19  Brinkema, not the Fourth Circuit?

20          MR. AQUINO:  Not the Fourth Circuit, Judge

21  Brinkema.

22          THE COURT:  Uh-huh.

23          MR. AQUINO:  In -- let's go from starting

24  with *McRae*.

25          *McRae*, really, cites the law in our circuit

1  on the issue of severance.  And that's why I wanted to
2  draw your attention to it.  It goes on to say very
3  briefly, "Our case law does not" -- they're talking
4  about the Fifth Circuit case law -- "reflect a liberal
5  attitude towards severance.  We will not reverse a
6  conviction based upon a denial of a motion to severe,
7  unless the defendant can demonstrate compelling
8  prejudice against which the trial court was unable to
9  afford protection, in that he was unable to obtain a
10  fair trial".  That's our law.  That's Fourth Circuit law
11  and any judge of the circuit -- of our circuit could
12  have written those words.
13        Now, the Court in that case, however, did
14  reverse, and they went on to make this finding which is
15  applicable to our facts.  "The most compelling prejudice
16  in our mind resulted from the evidence, testimony and
17  photographs presented in connection with the
18  government's case against *McRae* for the burning of
19  Glover's body".
20        Just as an aside, this was a Hurricane
21  Katrina case in which three police officers were charged
22  with shooting and -- one of them was charged with
23  shooting and killing a Mr. Glover.  And the other two
24  police officers for a coverup in that death.
25        The Court goes on to say "all of this

1    evidence had the effect of associating Warren" -- that's

2    one of the police officers -- "with the burning of

3    Glover's body and subsequent coverup.  Especially

4    troubling were the photographs of Glover's remains after

5    they had been burned and the emotional testimony of

6    Glover's family".

7              This case is well beyond that case, well

8    beyond it.  What do we have in this case that makes it

9    even worse than *McRae?*  In this case, the government

10   introduced a significant number of photos of bodies that

11   had been buried and reburied.

12             For example, in 88A, I believe, is the

13   picture of Lagrima's decomposed body.  In Exhibits 90A

14   and 90B are picture of Mr. Gerson's body.

15             Now all of us in this courtroom have been

16   around the block and we've seen some terrible pictures.

17   Sometimes in our business we see people at their worst.

18             And I have to tell you in all honesty,

19   pictures 90A and 90B were some of the most gruesome

20   pictures I've ever seen involving Mr. Gerson.

21             THE COURT:  Wasn't your client in jail when

22   all this happened?

23             MR. AQUINO:  Absolutely.  In fact, there was

24   a stipulation that he was in jail at the time all this

25   happened and that's my point.

1          THE COURT:  I had the impression that your

2   defense at trial was eyewitness identification.  Your

3   guy didn't do it.

4          MR. AQUINO:  That's right.  But the issue

5   I'm dealing with now is the spillover of having to sit

6   in court where all this evidence poured in on him that

7   was unrelated to him, that was totally unconnected to

8   Mr. Chavez.

9          And that's what the Court found in *McRae*.

10  And that's what I submit, bothered Judge Brinkema in

11  exactly the same issue in the *Aleem* case.

12          *Aleem*, like this, I cited a number of

13  factors in front of Judge Brinkema, but the predominant

14  factor was spillover as in *McRae*, the Fifth Circuit

15  decided upon.

16          In this case, we have it in spades.  Not

17  only do we have these horrible pictures that came into

18  evidence, we have a heavy dose of drug trafficking, sex

19  trafficking, as well as some really terrible telephone

20  calls that again were unconnected to Mr. Chavez.

21          THE COURT:  But this is not a state court

22  conspiracy case.  This is a RICO case.

23          MR. AQUINO:  I understand that --

24          THE COURT:  We both can't talk at the same

25  time.  I'll let you speak if you let me speak.

1          MR. AQUINO:  Yes, sir.

2          THE COURT:  My impression is that because

3   the government has to show predicate acts that a lot of

4   the evidence was offered for those reasons.  Do you

5   disagree with that?

6          MR. AQUINO:  I do not disagree with that,

7   but what I would say is this, that in a separate trial,

8   much of this evidence would be unlikely, unlikely to

9   come into evidence against Mr. Chavez.

10          For example, I don't dispute the

11   government's right to put on evidence of deaths, for

12   example.  But I submit to you that the gruesome

13   photographs that came into evidence would not be

14   admissible in a trial against him solely.  Or --

15          THE COURT:  Are you familiar with a single

16   defendant going to trial on a RICO case, Mr. Aquino?

17          MR. AQUINO:  I am not --

18          THE COURT:  So, if this were a state court

19   murder case, maybe what you're saying is true.  But this

20   is not a state court murder case, is it?

21          MR. AQUINO:  It is not a state court murder

22   case, but it doesn't separate the fact that evidence

23   that was against him that was unconnected to him, poured

24   into evidence that I submit was damaging to Mr. Chavez.

25          And, for example in this case that I cited

1    in *McRae*, *McRae* was cited with two other gentlemen, two

2    other police officers at the time.  And the Court went

3    on to make that finding.

4            Some of the evidence and testimony would

5    have been inadmissibility against Warren.  Again, that's

6    the police officer Warren, the moving party, had he been

7    tried alone.

8            And we are convinced that the severely

9    emotional testimony and photographs prejudiced Warren.

10   I submit that's exactly what Mr. -- prejudiced that

11   Mr. Chavez suffered in this case.

12           Keep in mind, the government also made a lot

13   of noise over telephone calls and recordings.  And they

14   cited these specific telephone -- recordings that they

15   made a big point about, the government.  This is, for

16   example, concerning Mr. Alvin Gaitan Benitez.  "I was

17   calm with a knife in my hand.  When he's through, they

18   knock him down, whomp, right then and there I ripped his

19   coconut off".

20           The government also put on evidence --

21           THE COURT:  Your guy was in jail when all

22   that happened, right?

23           MR. AQUINO:  Absolutely.

24           THE COURT:  So, I read your brief.  I get

25   that part.  I understand that.

1          MR. AQUINO:  And so, my point is, is that
2     none of this evidence is connected to Mr. Chavez.  For
3     example, as in the *Aleem* case, *Aleem* case, again was a
4     gang racketeering case in which Mr. Aleem was being
5     tried with a number of other people.  None of the
6     evidence concerning the rapes, concerning the severe
7     assaults, really horrible assaults -- there was a young
8     woman whose face was slashed from here to here.  The
9     government made a big point of that, put on pictures of
10    her as well as had her get off the jury -- excuse me,
11    the witness stand, and parade up and down in front of
12    the jury.
13          And the troubling aspect of that is that is
14    highly emotional testimony as were the photographs of
15    Lagrima and Gerson in this case.
16          THE COURT:  I agree with you that when hear
17    testimony that somebody's head was cut off and buried in
18    the ground, but that's what happened.  We can't sanitize
19    what happened.  That's what happened.
20          Now as it relates to your client, your
21    client was in jail.  So --
22          MR. AQUINO:  Well --
23          THE COURT:  -- he had an airtight alibi for
24    all those things.
25          MR. AQUINO:  In a technical sense, that's

1    true.  The problem is, is that the evidence spilled over

2    as in *McRae*, as in *Aleem*, onto him from which he could

3    not be protected by limiting instructions.

4             For example, in -- for example, in *McRae*,

5    the Court goes on to find --

6             THE COURT:  Please, please, don't read the

7    case to me.

8             MR. AQUINO:  I won't.

9             THE COURT:  Thank you.

10            MR. AQUINO:  The Court goes on to find in

11   that case, though, that limiting instructions were

12   insufficient, insufficient to protect Warren from the

13   spillover that took place.

14            THE COURT:  I see part of your argument

15   being that the Fourth Circuit law should change

16   concerning instructions in multi-defendant trials and

17   that empirical researches reveal that jurors don't

18   follow instructions.  And so, I understand you're making

19   a record for that, and I appreciate that.

20            MR. AQUINO:  I'll move on to my next point.

21            THE COURT:  Thank you.

22            MR. AQUINO:  I'm now dealing with the

23   question of Mr. Torres's mid trial plea which I

24   considered to be very significant, and I've not seen

25   such a set of facts that occurred in my 30 years of

1  practice.

2             THE COURT:  Was it a guilty plea?

3             MR. AQUINO:  I submit that it was.  He

4  acknowledged that he committed the crime charged, I

5  believe, in Count 4 which was one of the murders that

6  were alleged against him in this case.

7             THE COURT:  Now, was there a question of

8  fact for the jury to decide whether he was guilty or not

9  guilty, Mr. Aquino?

10            MR. AQUINO:  Sure, absolutely.

11            THE COURT:  Okay.

12            MR. AQUINO:  Here's the problem I have with

13 that issue, though, is, his counsel in this case,

14 started with a very, very strong opening statement

15 followed by supremely aggressive questioning by

16 Mr. Jenkins.  They were sincere in their presentation to

17 the jury.  But, that makes it worse for Mr. Chavez not

18 better.

19            We proceed then five weeks, and after five

20 weeks, they turn around and say to the jury -- and this

21 is not a criticism of Mr. Jenkins or Mr. Leiva.  They

22 did what their client asked them to do.  They turned

23 around and said, "we were wrong.  He's guilty of that

24 one count".

25            We submit this is kind of the reverse side

of the spillover issue that I just argued in front of
you which is that it diminishes our credibility and in
front of a jury, let's face it, credibility is
everything.  But it damaged us in that here we were
essentially making the exact same argument.  We didn't
do it.  We didn't do it.  And for five weeks, they
aggressively took that position, "we didn't do it".

And then all of a sudden they turned around
and said, "you know, we're just wrong.  We did do it".
We submit that that is harmful to Mr. Chavez to have to
endure that and be associated with that after they took
the exact same position that we took.  And we had no
reason to anticipate that that was going to occur.

The other issue, moving on to the next issue
in this case, which deals with the weight of the
evidence, which we submit bears strongly, strongly
against the jury verdict in this case.

Now, earlier you mentioned what our defense
was.  And in part, for sure, it dealt with the
identification issue.  There's no doubt about the
testimony that we heard, that Vidal Jimenez told
Detective Buckley that within two hours of the shooting
he gave this report, that the shooter had tattoos on
both of his forearms.  That testimony was unmistakable,
unimpeached.

1         In addition you heard from Detective Betts

2    that established that my client, Mr. Chavez, had no

3    tattoos on his forearms.

4         Beyond that, there was the whole issue about

5    the Gatuso identification.  Now, you heard testimony

6    from Sen Genaro Garcia whose nickname was Gatuso.  And

7    in court there were two attempted identifications that

8    took place in the court.  And on each of those

9    instances, he identified the wrong person.

10        The government tried to pass that off to the

11   jury and saying, "well, it's been two years, two years

12   from the shooting that occurred in this case".  That's

13   not entirely true and that was not the evidence.

14        Within 60 days of the shooting, Gatuso was

15   presented a photo spread by Detective Victor Ignacio.

16   He was unable to make the identification of Mr. Chavez

17   as being the shooter in that case.  And don't forget,

18   that's what's caused Ignacio to put his thumb on the

19   scale and try to steer Gatuso in his selection of who to

20   take out from that photo.

21        The point I'm making about these witnesses,

22   we have three potential or alleged eyewitnesses in this

23   case.  Vidal Jimenez who identified the shooter has

24   having tattoos on both forearms when my client clearly

25   does not; Gatuso who was up at the plate three times in

1    the identification process, the first within 60 days of

2    the shooting and twice in this courtroom, and on each

3    attempt of identification, struck out.

4            THE COURT:  This sounds like the argument

5    you made to the jury.

6            MR. AQUINO:  Well it may be, but the Court

7    has the power --

8            THE COURT:  It was a question of the fact

9    for the jury to decide about the accuracy of the

10    identification as well as the credibility of all the

11    witnesses who testified about the event; is that right?

12            MR. AQUINO:  That is right, but you -- under

13    Rule 33, the Fourth Circuit, empowers you, empowers you

14    to consider the issue of credibility.

15            No doubt about that.  Every circuit court in

16    our country does that.  Under Rule 33, the Court has the

17    power to consider credibility and if there is sufficient

18    facts that weigh heavily against the jury verdict, the

19    Court has a right to -- to issue a decision granting a

20    new trial.  And we submit that you should on this

21    standing alone as well as in combination with the other

22    factors that I've cited in this case.

23            THE COURT:  All right.

24            MR. AQUINO:  So again, of three people, of

25    three people, two gave evidence that really, I submit,

1   was inconsistent with my client's guilt.  And then we

2   have the third, and that is Jose Del Cid also known as

3   Duende.  Undoubtedly, he made an identification in court

4   of Mr. Chavez as the shooter.

5           But in that regard, again, the Court also

6   has the power again to consider credibility relative to

7   Del Cid.  We know -- what do we know about Del Cid?  Del

8   Cid has tattoos on his arms and he is an extremely, an

9   extremely violent man, such that he attempted to shoot

10  his mother when he was young.

11          What else do we know --

12          THE COURT:  That was very powerful for me as

13  well.

14          MR. AQUINO:  I'm sorry.

15          THE COURT:  That was very powerful to me,

16  that testimony, as I'm sure it was to the jury.

17          MR. AQUINO:  Understood.  But, I would go

18  further, which is, he had every reason in this case not

19  to tell the truth, not to tell the truth, and is not

20  worthy of belief in this case.

21          He had every reason in the world to want to

22  shift the blame.  For example, you heard Junior, the

23  government's described him as a hero, testify that there

24  was -- this was a problem shooting.  And that Del Cid

25  had some answering to do for the shooting.

1        My client, Mr. Chavez, according to Junior,
2  was not a gang member, a *paro* or a *chequeo.*  In other
3  words, he was an easy fall guy for Del Cid to push the
4  blame off for this unauthorized shooting of an MS-13
5  members -- of an MS-13 member, excuse me.  So again, I
6  want to focus on that.
7        There's only three people who claimed to be
8  present when the shooting took place, and two out of the
9  three, I submit, gave evidence that was inconsistent
10  with my client's guilt.  And a third, Del Cid, had a
11  reason to blame him for that shooting.  So I'm asking
12  the Court to consider that.
13        THE COURT:  All right.
14        MR. AQUINO:  In addition to that, is the
15  issue with a video testimony of Cosmo -- Cosmo Gonzales,
16  who had absolutely no motive, no reason to fabricate a
17  story.  His testimony was unimpeached.
18        THE COURT:  Mr. Aquino.
19        MR. AQUINO:  Yes, sir.
20        THE COURT:  If I were to pull up the
21  transcript of your closing argument to the juror, would
22  I hear everything you're saying right now?
23        MR. AQUINO:  Understood.  I'll move on,
24  Judge.
25        Then we go to the issue of Detective

1    Ignacio, who I submit in this case, in a word is

2    radioactive, radioactive.

3              THE COURT:  Tell me the issue as it relates

4    to Detective Ignacio that you're trying to raise, the

5    legal question.  What is the legal question?

6              MR. AQUINO:  Sure, that his testimony in

7    this case, as well as facts that we know about him, that

8    occurred, for example, after the trial in this case

9    about information that came to light, undermined

10   confidence in the jury verdict in this case.

11             So, what do we know about the detective?  We

12   know that he interviewed three highly relevant

13   witnesses:  Duende, Gatuso, and Vidal Jimenez.

14             We know that he attempted by his own

15   admission, by his own admission, attempted to steer

16   Gatuso into selecting Mr. Chavez from a photo spread

17   after Gatuso, that is Sen Genaro Garcia, was unable to

18   identify Chavez as the shooter of Mr. Urrutia.

19             Now, I consider this a pretty serious

20   matter.  But to underline the seriousness of the Court,

21   I ask the Court to consider the witness tampering

22   statute in this which is specifically 18 USC 1512.

23             My client was charged by criminal complaint

24   on or about August 6th of 2014.  So we have a pending

25   proceedings.  Within about a week of that time,

1  Detective Ignacio attempts to steer the identification
2  of Gatuso into getting him to select our man.  The
3  defendant admitted that on the witness stand.
4          The witness tampering statute says in part,
5  "whoever corruptly, otherwise obstructs, influences or"
6  apiece -- "impedes any official proceedings or attempts
7  to do so shall be fined under this title or imprisoned
8  not more than 20 years, or both".
9          Now, I'm not bringing this to your attention
10 with the hope that the government's going to do anything
11 about it, just the opposite.  I'm bringing it to your
12 attention to underline the seriousness of what that
13 police officer admitted on the witness stand that he
14 attempted to do, which was to steer the identification
15 of Mr. Chavez by Gatuso.
16          THE COURT:  But he didn't steer it, did it?
17          MR. AQUINO:  Say again.
18          THE COURT:  He didn't steer it, did he?  He
19 didn't change his identification, did he?
20          MR. AQUINO:  No.  There was no testimony as
21 to whether the identification changed.  I think in
22 actual life he did.
23          In other words, he was not able to identify
24 Mr. Chavez from the photo spread.
25          THE COURT:  Well --

1           MR. AQUINO:  I'm sorry, go ahead.

2           THE COURT:  I guess what my concern is,

3   you're asking me now post trial to look at things that

4   happened post trial, post verdict about Detective

5   Ignacio.  Is he still on the force?

6           MR. AQUINO:  He is.

7           THE COURT:  Has he been charged with any

8   offense?

9           MR. AQUINO:  He has not that I know of and I

10  don't expect that he will be.

11          THE COURT:  He's never been charged with

12  perjury, obstruction of justice; is that right?

13          MR. AQUINO:  He's been charged and pled

14  guilty to a crime involving moral turpitude that he

15  admitted in court that we know about that took place as

16  a police officer.

17          THE COURT:  So then that was before the

18  jury?

19          MR. AQUINO:  It was before the jury.

20          THE COURT:  All right.

21          MR. AQUINO:  On the issue about the steering

22  of the identification process, that likewise, was before

23  the jury, in which --

24          THE COURT:  There's nothing new here.  These

25  are the same things you told the jury.

1          MR. AQUINO:  That issue is right.  I was
2   simply trying to sum up the issue of what we know about
3   him.
4          THE COURT:  Okay.  If you would sum up your
5   arguments, that would be great for me.
6          MR. AQUINO:  Yes, sir.
7          What do we know that has taken place since
8   the jury verdict in this case?  I submit it as part of
9   our pleading, an issue that took place in the City of
10  Alexandria, a defense motion for a *Brady* violation was
11  filed in front of Judge Kemler on February 29th.  Keep
12  in mind, our trial started about three weeks later on
13  March 21st.
14         In that case -- and I attach the pleadings,
15  both the defense motions as well as the response by the
16  Commonwealth, as well as Judge Kemler's order, in which
17  the defense alleged that Detective Ignacio was at the
18  center of a *Brady* violation.  That is, specifically --
19  there was -- the case is *Commonwealth versus Garay*.
20         And in that case, the Commonwealth was
21  alleging that Mr. Garay shot an MS-13 member.  The
22  defense came after the trial into information to suggest
23  that Detective Ignacio had information that indicated
24  that Mr. Garay was not the shooter and that he was
25  pressuring a witness to testify.

1               The Commonwealth's response to that motion
2      was we, the Commonwealth, meaning the specific
3      prosecutors, did not have this information.  We did not
4      engage in bad faith.
5               Ultimately, Judge Kemler granted the defense
6      motion and ordered a new trial in that case.
7               And the point I'm getting at is, is that
8      Detective Ignacio was at the center of a *Brady* violation
9      that took place.  That information --
10              THE COURT:  One *Brady* violation doesn't
11     means that he's committed multiple *Brady* violations.
12              MR. AQUINO:  No, what I'm saying that is
13     information that should have been disclosed to us at the
14     time of trial or immediately prior to the trial
15     Detective Ignacio testified in our case.
16              THE COURT:  Do you have information that the
17     government had in its possession this information?
18              MR. AQUINO:  No, but I don't have to.  I
19     don't have to, and this is what I mean.  I cited to you
20     the Supreme Court case -- if I could find it one second.
21              THE COURT:  *Kyles versus Whitley?*
22              MR. AQUINO:  It's a cousin of that.  It is
23     *Youngblood versus West Virginia*, 2006 Supreme Court
24     case.
25              The Court goes on to say, "the individual

1   prosecutor has a duty to learn any favorable evidence
2   known to the others acting on the government's behalf in
3   the case, including the police".
4           And so, what I submit is, this is
5   information that should have been disclosed to us.  Am I
6   imputing bad faith to government lawyer in this case
7   about that issue?  I'm not.  But what I am submitting is
8   that she had a duty to learn of this information and to
9   question her witnesses that are called in her case in
10  chief, which included Detective Ignacio.
11          And ultimately, what we do know is that
12  Judge Kemler did grant a new trial in this case to Mr.
13  Garay as a result of a *Brady* violation.
14          Now, the last issue, again, deals with the
15  behavior of the government in this case.  And I cited
16  the issue about when the Court and the whole -- the dust
17  up over the Gatuso identification process, admonished
18  the prosecutor in front of the jury.
19          But, that did not occur in a vacuum.  That
20  occurred after frequent, frequent speaking objections in
21  which witnesses were basically suggested answers in the
22  course of speaking objections that took place by the
23  prosecutor in our case.
24          In addition to that, I made a big point in
25  front of the jury of arguing the issue about the

1   unimpeached testimony of Mr. Cosmo Gonzales.  In our
2   final closing, the government stood up and their
3   argument was, why would Duende, that is Del Cid, and
4   Gatuso Sen Genaro plead guilty if what they were saying
5   was not true?

6            That argument ran precisely counter to jury
7   instruction number 80.  Jury instruction number 80 in
8   this case reads as follows:  "You have heard testimony
9   from a government witness who pled guilty to charges
10  arising out of the same facts of this case.  You are
11  instructed that you are to draw no conclusions or
12  inferences of any kind about the guilt of the defendant
13  on trial from the fact that a prosecution witness pled
14  guilty to similar charges.  That witness's decision to
15  plead guilty was a personal decision about his own
16  guilt.  It may not be used by you in any way as evidence
17  against or unfavorable to the defendant on trial here."

18           In other words, the argument that counsel
19  engaged in ran contrary to the law of the case as
20  described -- as described in instruction number 80.

21           Finally, we're also dealing with that issue
22  about the *Brady* violation.  Again, I don't impute bad
23  faith on *Brady* violation to the government in this case,
24  but they did have a duty to learn of that from Detective
25  Ignacio.

1    And by the way, Detective Ignacio admitted
2 that he was a 20-year police veteran, meaning, he knows
3 what's *Brady* -- he knows what that's all about.
4    THE COURT:  All right.
5    MR. AQUINO:  And for these reasons, I would
6 ask the Court to order a new trial in this case.
7    Thank you, Judge.
8    THE COURT:  Thank you.
9    MS. MARTINEZ:  Good morning, Your Honor.
10    THE COURT:  Good morning.
11    MS. MARTINEZ:  Unless Your Honor has a
12 different preference, I'll take up the arguments in the
13 order Mr. Aquino has made them.
14    THE COURT:  That's fine.
15    MS. MARTINEZ:  Starting first with his
16 argument that his client should have been severed and
17 that there was prejudice spillover evidence, Your Honor,
18 we've litigated this motion a number of times.  It was
19 litigated before trial.  It's been briefed on a number
20 of occasions.  I don't want to sit here and read case
21 law to Your Honor or recite all of the exact same
22 arguments.
23    But to briefly sum up, this is -- Mr. Aquino
24 is complaining about evidence that was submitted,
25 presented to the jury, that was direct evidence that was

1  first of all, relevant for two reasons.  First it was

2  direct evidence of crimes that other defendants were

3  charged with and that the jury was asked to deliberate

4  on with respect to other defendants.

5        It also was relevant in this case, because

6  as Your Honor pointed out, this is a racketeering case.

7  It's a case where the government has the burden of

8  proof, not just to prove the individual violent acts of

9  which each individual defendant is accused, but also to

10  prove that MS-13 is a racketeering enterprise and all of

11  the elements that go along with that.  And it does

12  require the government to put on evidence of other

13  crimes, including violent acts such as murders and the

14  other crimes that Mr. Aquino has complained about today,

15  including drug distribution, and the limited evidence of

16  sex trafficking, et cetera.

17        So, all of that was proper.  In addition to

18  that, Your Honor, as the Fourth Circuit has made clear,

19  the jury is assumed, under Fourth Circuit law, to follow

20  Your Honor's instructions.  And in particular, to follow

21  curative instructions from Your Honor which Your Honor

22  properly issued at the close of the case, instructing

23  the jury that it should -- should not consider evidence

24  of violent crimes attributed to other defendants as

25  evidence of guilt against defendants who are not accused

1  of that crime.

2              Has Your Honor has pointed out, as Your

3  Honor's questions has aptly honed in on, there is no

4  question that the jury fully understood that defendant

5  Chavez was accused of only one violent act, that was the

6  murder of Julio Urrutia and that it was not to consider

7  the evidence of other violent crimes as evidence of

8  Mr. Chavez's guilt of killing Julio Urrutia.

9              THE COURT:  They were also instructed

10 multiple times to give separate consideration to all the

11 evidence of each of the individual defendants and that

12 government counsel or defense counsel did not state the

13 law but that my instructions orally and in writing state

14 the law.  Is that right?

15             MS. MARTINEZ:  I agree with that completely,

16 Your Honor.

17             THE COURT:  All right.  If you would go on

18 now to the issue of the exculpatory evidence.

19             MS. MARTINEZ:  Would you like the Detective

20 Ignacio issue -- is that the issue that --

21             THE COURT:  That's the issue I'm talking

22 about.

23             MS. MARTINEZ:  Okay.  We will skip right

24 over weight of evidence or do you want to hear argument

25 on that?

1    THE COURT:  I don't need weight of evidence.
2    Thank you.

3    MS. MARTINEZ:  With respect to Detective
4    Ignacio, I'd actually like to first address, if Your
5    Honor doesn't mind, the *Garay* issue.  That's --
6    everything else I think was argued to the jury and I can
7    certainly respond to all of that.

8    But, the issue that Mr. Aquino raised in his
9    reply to our response about the *Garay* case is a new one.
10   And that's not something that was argued to the jury nor
11   should it have been.  And it's not something that we
12   have argued about until just today in court.

13   Your Honor, first of all, as we put in our
14   pleadings, the U.S. Attorney's Office had no knowledge
15   of that case.  But I agree with Mr. Aquino if a
16   detective who was identifying a case or is testifying as
17   a witness did have knowledge of something that actually
18   was exculpatory or disclosable under *Brady* or *Giglio*,
19   that we did have a duty to discover that and to disclose
20   it if necessary.

21   That's not the situation here.  That
22   information was not disclosable.  Mr. Aquino has not
23   argued -- there was a *Brady* violation.  That's clear.
24   Judge Kemler found that caused reversal of a jury
25   verdict.  We take no issue with that.

1       But Mr. Aquino is not arguing that there is

2  *Brady* information that came out in the *Garay* case that

3  somehow is exculpatory as to his client.  What he's

4  arguing, actually, is that it's *Giglio* as to Detective

5  Ignacio.

6       He's arguing that what happened in the *Garay*

7  case makes Detective Ignacio untrustworthy or dishonest

8  and that that's information he was entitled to so that

9  he could cross-examine Detective Ignacio about it.  At

10  least that's how I understand his argument.

11       THE COURT:  It seems to be focused on

12  impeachment --

13       MS. MARTINEZ:  Exactly.

14       THE COURT:  -- whether or not his testimony

15  was credible.

16       MS. MARTINEZ:  So, the issue here is

17  whether -- Mr. Aquino is making a number of assumptions

18  that are nowhere present in the pleadings, in *Garay*, in

19  Judge Kemler's order in *Garay*, or even in the transcript

20  of the proceedings which the U.S. Attorney's Office took

21  pains to obtain in order to read and make sure that our

22  understanding of those proceedings was accurate.

23       And our understanding, and I believe this to

24  be true, is that Judge Kemler at no point made any

25  finding about Detective Ignacio, about misconduct by

1    Detective Ignacio.

2              To the best of our knowledge, Detective

3    Ignacio has not been disciplined or sanctioned in any

4    way.  There's been no finding that Detective Ignacio

5    acted dishonestly in any way, shape or form.

6              What the pleading and the outcome in *Garay*

7    showed was that there was lots of information that was

8    going on and the dots were not connected.

9              The issue in *Garay* that relates to Detective

10   Ignacio concerns interviews of witnesses in unrelated

11   murder investigations that occurred a few days or a

12   couple weeks before trial.  And it turned out that

13   information that came from those witnesses had relevance

14   to the *Garay* case.

15             Now, certainly, those dots should have been

16   connected.  Certainly that information should have been

17   disclosed and that's what led to the *Brady* violation

18   that Judge Kemler found.  But there was no finding that

19   someone committed misconduct.  And one doesn't need to

20   find that for a *Brady* violation.

21             If there was information and it didn't get

22   disclosed, even if that was an accident or a mistake, or

23   a completely innocent, that still violates the

24   defendant's rights.  And that's -- that's proper.

25   That's the law and that would be the law here as well,

1    Your Honor.

2            But there simply was nothing that came out

3    of the *Garay* case that impeaches Detective Ignacio.  And

4    so, even if we had had that information and had

5    disclosed it -- and I submit it wouldn't be something

6    that would need to be disclosed -- but if we had

7    disclosed it, Mr. Aquino wouldn't have been able to

8    cross-examine Detective Ignacio on it because it

9    wouldn't have been permissible impeachment evidence

10   under 608(b).  It's not evidence of his dishonesty.

11   It's not evidence of a felony.  So there's nothing there

12   that Mr. Aquino actually could have questioned Detective

13   Ignacio about.

14           But, Your Honor, in addition to all of those

15   arguments, there's one argument that we raised in our

16   pleadings that Mr. Aquino did not answer when he

17   responded to our pleading and that he did not answer in

18   argument before this Court, which is when Mr. Aquino

19   learned of this information, this information was all

20   publicly available, in public pleadings and it was all

21   available before this trial started.  It was available

22   before Detective Ignacio testified.

23           And, the law is clear, Supreme Court law and

24   Fourth Circuit law that when the defendant has the

25   ability to independently discover information, *Brady*

1   information, *Giglio* information, there can be no

2   violation when the government does not disclose it.

3             And he actually did independently discover

4   it.  It was brought to our attention by Mr. Aquino's

5   pleadings.  He independently discovered it.

6             If he independently discovered it before

7   Detective Ignacio testified, the entire argument is moot

8   because he actually had the information which he claims

9   to be impeachment information.

10            But even if he didn't actually have it, the

11  fact that he could have obtained it, because it was

12  publicly available, in a public state proceeding, and

13  the pleadings that Mr. Aquino attached they were

14  publicly available before the trial even started which

15  was, of course, weeks before Detective Ignacio

16  testified.

17            So, for both of those reasons, in addition

18  to our argument that it is not proper impeachment

19  evidence, that it was not disclosable as *Giglio* against

20  Detective Ignacio, we would submit that there's no cause

21  to reverse the verdict for the -- on that ground.

22            THE COURT:  All right.

23            MS. MARTINEZ:  Would Your Honor like

24  argument on any of Mr. Aquino's other issues?

25            THE COURT:  No, I think that the issue of

1  severance has been fully explored multiple times and

2  you've just addressed the issue of the *Brady* violation

3  if there was one.

4          From the standpoint of materiality, I think

5  that if Detective Ignacio had committed perjury or

6  suppressed witness testimony, that certainly would have

7  been *Brady* material that might have bared on his

8  credibility.  Do you agree with that?

9          MS. MARTINEZ:  Yes, Your Honor.  And we're

10  not aware of any evidence that he either testified

11  untruthfully or that he intentionally suppressed any

12  information.  We're not aware that any court or any

13  internal -- that there was sort of internal

14  investigation or anything like that, that there was any

15  finding that he committed any sort of misconduct.

16          THE COURT:  All right.  And I made an

17  observation that I thought Mr. Aquino's identification

18  arguments about the identification of the witnesses, it

19  sounded very much like closing argument, didn't it?

20          MS. MARTINEZ:  I would agree, Your Honor.

21  And we're happy to rest on our closing argument or

22  address any questions that the Court has.

23          THE COURT:  I was there for seven weeks.  I

24  think I remember the trial.  Thank you.

25          MS. MARTINEZ:  Thank you, Your Honor.

1         THE COURT:  Mr. Aquino, anything further?

2         MR. AQUINO:  Just a follow up on that issue.

3   I learned of this information concerning Detective

4   Ignacio well after our trial.  And actually, I submitted

5   it as part of our reply to the government's brief.

6         THE COURT:  Did Judge Kemler decide that

7   Detective Ignacio had lied?

8         MR. AQUINO:  I don't believe she made that

9   finding, Judge.

10         THE COURT:  Did she say he had suppressed

11   evidence?

12         MR. AQUINO:  No.

13         THE COURT:  All right, okay.  Thank you.

14         MR. AQUINO:  The significance, though, that

15   I see to it is that he had a duty to come forward and

16   make the defense counsel through the Commonwealth's

17   lawyers aware of this information since he was going to

18   be a witness in the trial that took place in front of

19   Judge Kemler that ultimately was reversed.  And so for

20   these reasons I renew our request.

21         THE COURT:  Thank you very much.

22         You want to take up Mr. Paiz Guevara's

23   motion, Mr. Chick?

24         MR. CHICK:  Good morning again, Your Honor.

25   Mike Chick on behalf Mr. Paiz Guevara.  I'll be very

1    brief.  The pleading is laid out.  I think it's pretty
2    straightforward.
3              From our perspective, what happened during
4    the -- during the government's rebuttal closing
5    arguments was unconstitutional burden-shifting argument.
6    It was pretty egregious and what takes it to the next
7    level is after the objections were made, curative
8    measures were requested, not only curative instruction
9    being requested, but then also, you know, request for
10   mistrial and so on and so forth.
11             And, the Court actually overruled the
12   objection.  And what happened after that is really
13   what -- from my perspective, takes this to the next
14   level of creating substantial prejudice to Mr. Paiz
15   Guevara and really to the other defendants as well, is
16   that the government came back.  The government stood up
17   and essentially now with the Court's blessing, very
18   incredulously and very, I would say indignantly and
19   boldly, rehashed all of those arguments and pounded them
20   even harder.  And we were essentially in a helpless
21   position at that point to the prejudice of Mr. Paiz
22   Guevara.
23             Certainly, the cases say that what the Court
24   should do in those circumstances is sustain the
25   objection, and that a Court should caution the

1  government not to conduct that type of argument.

2          And many of the cases that we cited in our

3  pleadings actually are cases where they're up on appeal

4  and the Court of Appeals -- the Court of Appeals rules

5  against the defendant in those cases.

6          And in each of those cases, what the Circuit

7  Court does is the Circuit Court relies on the curative

8  measures that the trial court took.  And in this case,

9  we just don't have those.

10          And for those reasons, we do ask that the

11  Court grant Mr. Paiz Guevara a new trial because of the

12  unconstitutional burden-shifting arguments that were

13  made.

14          If the Court has other questions for me, I'm

15  happy to answer them.

16          THE COURT:  Mr. Chick -- and maybe I did

17  this.  I believe I did.

18          From the very beginning, jury selection, I

19  told the jury about the presumption of innocence.  I

20  told the jury that what you lawyers say is not evidence.

21  That was done before trial.  That was done in the

22  written instructions.  That was done orally, wasn't it?

23          But of course, it was not done, as you say,

24  in response to your objection.  But you do agree I did

25  instruct them multiple times of those principles.  Do

1   you agree with that?

2           MR. CHICK:  Those instructions were made

3   sort of the typical times those types of instructions

4   were made by the Court.  They were.  And from our

5   perspective, the problem is that when the jury sees what

6   happened and when things play out the way that they did,

7   and then, in the moment when such an instruction is not

8   given, in the jury's mind, those things that happened

9   before are, you know, for lack of a better phrase, lip

10  service or something else.

11          That's the problem with -- with that type of

12  a situation or looking at it from that perspective.

13          THE COURT:  Well, because the jury has

14  written instructions, and I believe I gave them -- I

15  think each juror had a written copy of the instructions

16  even after all this took place.  I understand your

17  position.

18          Thank you.

19          MR. CHICK:  Thank you, Your Honor.

20          MR. TOBLER:  Thank you, Your Honor.  I'll be

21  brief.

22          The Court was entirely correct in the way it

23  dealt with the defendant's motion at the time the

24  defendant made it in court.

25          As Your Honor is --

1      THE COURT:  What led to this argument any
2  way?
3      MR. TOBLER:  The defense -- the defendant's
4  argument in closing was that the government had
5  possession of transcripts and recordings that were
6  exculpatory in nature that the government had not put in
7  front of the jury.
8      And the Fourth Circuit law is very clear
9  that under those circumstances the government is
10 perfectly justified in making a response, not in which
11 they shift the burden to the defendant and say the
12 defendant has any burden of proving his own innocence,
13 but simply in pointing out that the defendant had the
14 ability to present that evidence themselves.  And the
15 cases cited in the government's brief make that very
16 clear.
17     The standard for overturning a jury verdict
18 because the prosecutorial misconduct is very high.  It
19 requires not only that there be an improper statement
20 made, but that it be egregious and deprive the defendant
21 of a fair trial.
22     In this case, even that low bar is not met
23 because the comments that were made in rebuttal argument
24 by government counsel was entirely proper.  I will also
25 point out that in addition to the instructions that Your

1  Honor mentioned that were given to the Court, excuse me,
2  that were given to the jury multiple times about where
3  the burden lies, government counsel also made that point
4  multiple times in front of that jury.  So not only is
5  there no egregious conduct in this case, there is not
6  even improper conduct.
7              The steps that were taken, the argument that
8  was made in rebuttal by government counsel has been
9  fully blessed in the case law which is set forth in the
10 government's paper.  So unless there --
11             THE COURT:  I'm not sure the judges can
12 bless anything, but I appreciate what you just said.
13             MR. TOBLER:  Thank you, Your Honor.
14             THE COURT:  Anything further, Mr. Chick?
15             MR. CHICK:  No, sir.
16             THE COURT:  All right.  Thank you very much.
17 Let's take up Mr. -- the next motion.  That's you,
18 Ms. Amato.
19             MS. AUSTIN:  Your Honor, yes.
20             THE COURT:  Are you arguing for the joint
21 motion or is somebody else doing that?
22             MR. AQUINO:  Ms. Austin.
23             THE COURT:  I'm sorry.
24             MS. AUSTIN:  Your Honor, I'm going to argue
25 the motion regarding production of defendant's

1    statements.  Mr. Zimmerman's going to argue the other
2    motion that was filed.
3              THE COURT:  Okay, great.
4              MS. AUSTIN:  Your Honor, we move for a new
5    trial based on the government's failure to meaningfully
6    disclose statements by the defendants.  Particularly
7    Mr. Gaitan Benitez, but I believe all the defendants
8    have joined in this motion.
9              And specifically, as it became clear during
10   the trial, there were written statements of Mr. Gaitan
11   Benitez in the government's control that were not
12   produced to the defendant.
13             THE COURT:  Now, tell me about these
14   statements that you say the government had that he --
15   are these statements that Mr. Benitez wrote?
16             MS. AUSTIN:  I'm sorry.
17             THE COURT:  Are these statements that
18   Mr. Benitez wrote?
19             MS. AUSTIN:  No.
20             THE COURT:  Then what statements were they?
21             MS. AUSTIN:  They were statements that he
22   made to the government witness, Junior, who was working
23   with the FBI, so was an agent of the government at that
24   point, which were not only being recorded but were being
25   listened to by another government agent and

1  contemporaneously writing down what was being said.

2          And that is those summaries produced by the

3  contract language monitors of the phone conversations

4  that Junior was having with Mr. Alvin Gaitan Benitez as

5  well as the other defendants.

6          THE COURT:  So, then let's be clear.  So the

7  actual statements themselves were the recordings of

8  Mr. Benitez speaking himself; is that right?

9          MS. AUSTIN:  They are statements that

10  Mr. Benitez made.

11          THE COURT:  Himself speaking that were

12  recorded contemporaneous at the time he made them.  Is

13  that right?

14          MS. AUSTIN:  Yes.

15          THE COURT:  So then what you're asking for

16  is something I think we litigate at pretrial, and that

17  is, should the government be required to give you a

18  transcript that identifies the speaker and their

19  interpretation of it; is that right?

20          MS. AUSTIN:  No, no.

21          THE COURT:  Okay.

22          MS. AUSTIN:  This wasn't litigated prior to

23  trial because we did not know the existence of these

24  contemporaneous summaries before the trial started.  It

25  only became clear to us during the testimony of the

1  contract language monitors that they were listening to
2  the conversations and preparing summaries.
3           Now, Your Honor we did litigate the
4  transcript issue, and those transcripts were prepared
5  later.
6           So, they weren't contemporaneous written
7  versions of a defendant's statement.
8           THE COURT:  So what part of Rule 16 do you
9  say applies here?
10          MS. AUSTIN:  The part that says "any
11  relevant written or recorded statement made by the
12  defendant within the possession, custody or control of
13  the government, the existence of which is known".
14          THE COURT:  What written statement do you
15  say the government had that they should have produced?
16          MS. AUSTIN:  The summaries produced by the
17  contract language monitors as they were listening to the
18  defendants speaking.
19          THE COURT:  As I'm hearing what you said, it
20  sounds like the summary was written by the contract
21  monitor.  Is that right?  The summary was written by the
22  contract monitor?
23          MS. AUSTIN:  Right.
24          THE COURT:  So the summary would not be the
25  defendant's statement, would it?

1          MS. AUSTIN:  Yes, "a defendant's statement
2     is discoverable when it or an account thereof is written
3     or recorded promptly after the statement is made".
4          So, yes, it is.  It's just like being
5     interviewed by an FBI agent and the FBI agent taking
6     down the statement of a defendant.  It's a defendant's
7     statement that was written down at the time it was made.
8     And we didn't even know they existed.
9          So, we -- and the government had them, and
10    now -- I'll go ahead and argue this point.  The
11    government's going to say, hey, we gave all the
12    recordings, we gave them all to the defense counsel, and
13    we identified the ones that we were going to use.
14         That is irrelevant to this argument.  They
15    dumped over 178 hours of Spanish recordings on the
16    defense counsel.  Your Honor did give us funds to try to
17    translate these recordings.  We weren't told who was
18    speaking.  We weren't given any information.
19         THE COURT:  Well, I want to focus on they
20    were given to you how far in advance of trial,
21    Ms. Austin?
22         MS. AUSTIN:  Several months, they were given
23    to us several months.  It was an insurmountable task, as
24    it turns out, for us to do any meaningful translation of
25    those telephone calls.

1        THE COURT:  Well, I guess the question --
2   that becomes a matter of how you all allocated your time
3   and resources because you had them for not just several
4   months, I believe it was 12 to 14 months.  Is that
5   right?
6        MS. AUSTIN:  Yes, I don't know the exact
7   number, but I'm agreeing with Your Honor that we had
8   them for a while, yes.
9        THE COURT:  And then the issue of
10  identifying the speaker, would you agree with me that if
11  the government identified a speaker as Mr. Romero Cruz
12  and the defense had evidence it was actually Mr. Lopez
13  Torres, would that be a question of fact for the jury
14  about the accuracy of the transcript?
15       MS. AUSTIN:  See, Your Honor, yes, I will
16  answer your question "yes".  But, I am not saying we
17  should have gotten the transcripts -- because the --
18  there are two separate recordings of these phone
19  conversations.
20       We have the transcripts that were produced
21  in the binders right before trial and we were looking
22  over them during the trial and figure -- you know, we
23  saw, okay, these are the ones that are going to be used.
24       THE COURT:  No, they told you months earlier
25  which ones they were going to use.  They told you about

1   200 of them; is that right?

2            MS. AUSTIN:  Right, the ones they deemed

3   relevant.

4            THE COURT:  Right.

5            MS. AUSTIN:  But there were more statements

6   by my client that were written down at the time he made

7   them that were the summaries, not the transcripts, but

8   summaries that were not provided to us prior to trial in

9   violation of Rule 16.

10           And I just want to also state to the Court

11  that the cases the government cites about there's no

12  real obligation by the government to give transcripts to

13  the defendants just to provide the recordings, those are

14  excerpts of cases that were pulled out and cited by the

15  government in defense of its position that it didn't

16  have an obligation to turn those summaries over to us.

17           But, in the case of *United States versus*

18  *Bailey* that the government cited, 689 F.Supp. 1463, it's

19  Northern District of Illinois, that deals with -- a

20  defendant in that case, where there were many, many,

21  many recordings, as for tapes that the government

22  intended to use as impeachment evidence.  So the issue

23  in that case is different from this issue.

24           But, what did happen in that case is that

25  the Court ordered the government to produce all tapes

1    and transcripts of any tape recorded conversation
2    relating to the matters alleged in the indictment.
3          So, in that case, the District Court did
4    exactly what we're now saying the government should have
5    done at the beginning of this case.  When it handed us
6    the recordings of the phone calls, the summaries should
7    have come along with those recordings because they were
8    written versions of our clients' statements.
9          And, the Court ordered those transcripts to
10   be produced in that case, in the *Maze* case they cited
11   which is unpublished, but it's a 2011 West Law case of
12   5320976 saying, again, the issue in that case was --
13   let's see, whether a -- and, this is what's interesting
14   about this case.  The government agreed to provide the
15   defense in the *Maze* case what they call line sheets of
16   tape recorded phone calls of the defendants, which are
17   basically synonymous with what my argument is regarding
18   this summaries.  They were lined sheets.  They were
19   drafts, quick drafts of what the defendant said in the
20   recordings.
21         And the government said, we'll turn these
22   over to the defense, but we want a stipulation that when
23   it comes to trial, if there's some sort of typo or we
24   have since then corrected what we believe the phone call
25   actually says, the defense can't then come back and say,

1   oh, well, your summary says this.  And so they made a
2   stipulation, look, we're going to give you these because
3   we're giving you an enormous amount of phone calls and
4   these are line sheets statements made by your clients
5   and the government produced them.
6          And what comes up later in this case is an
7   issue completely different than what we are arguing
8   here.  But what's important is in both of those
9   district -- yes, District Court cases, the government
10  produced the writings, the summaries, those things that
11  were produced contemporaneously with what statements --
12  with the defendant's statements.
13         And, like I said, this all sort of -- it was
14  a rolling realization on our part of what was actually
15  out there.
16         For months, we struggled trying to figure
17  out what these -- who was even on the recordings, who
18  people were talking to.  They were of such poor quality,
19  our translator couldn't make sense of them.  And then it
20  became abundantly clear during trial that these contract
21  language monitors were listening to the phone calls as
22  they were being made and summarizing them and knew
23  exactly who was speaking.
24         And if -- Junior testified at trial that he
25  had 40 conversations with Mr. Alvin Gaitan Benitez on

1   his phone that were recorded -- where these phone calls

2   were being recorded.  Three phone calls involving

3   Mr. Alvin Gaitan Benitez were produced by the

4   government.  So, that leaves 37 statements by Mr. Alvin

5   Gaitan Benitez made to a government agent that were

6   written down that we did not receive in discovery.

7                    And, so, Your Honor --

8                    THE COURT:  All right.  Well, help me with

9   prejudice.  Is that a fact I should consider here?

10                    MS. AUSTIN:  Yes.

11                    THE COURT:  Can you describe prejudice for

12   me in this case as it relates to the recordings,

13   particularly when you all had all the tapes for many,

14   many months and then you had your own person or persons

15   to do -- and I don't really remember any defense witness

16   coming in and saying, well these transcripts are all

17   wrong.  I remember cross-examination about that.

18                    But I don't remember any defense witness

19   coming in and saying these transcripts were all God

20   awful.  They're not right and there are a lot of typos

21   and misstatements.  Do you remember any of that at

22   trial?

23                    MS. AUSTIN:  No, no, and I'm not arguing

24   that the transcripts --

25                    THE COURT:  Well, help me with prejudice

1  then.  What's the prejudice?

2          MS. AUSTIN:  Well, to be quite honest, I

3  don't know.  That's why alternatively we're asking for

4  you to order the government to provide those statements

5  under Rule 16 to us so we can see.  We don't even know

6  what is in those statements because we've never seen

7  them.  We've never been able to review the written

8  statements of our client that was made.

9          THE COURT:  But you have the original

10  recordings.  You just don't have what the government's

11  language monitor wrote down, correct?

12          MS. AUSTIN:  That's correct.

13          THE COURT:  All right, thank you.

14          MR. TOBLER:  Your Honor, from the Court's

15  questioning, I think it's fairly obvious that the Court

16  understands the government's position, so I'll be very

17  brief.

18          THE COURT:  I want you to address the issue

19  of summaries.  These contract language monitors, it

20  seems to me, I had real questions of all of their -- and

21  the defense questioned their qualifications and the

22  reliability of it.

23          Is the monitor summary the defendant's

24  statement?

25          MR. TOBLER:  It is not, Your Honor.  I think

the law makes very clear in the cases that have been
cited -- well, to start with the face of the rule
itself, the words of Rule 16, they are entitled to the
recorded or written statements of the witness.

They received recorded statements of the
witnesses.  They have received those recorded statements
approximately 16 months before trial began.

The government fully met its Rule 16
obligations at the time it provided those materials.

There were a number of cases cited in the
government's brief in which the Court adopted the
position that is before the Court here, which is that
Rule 16 does not entitle a defendant to anything other
than the recorded statements themselves.

And it's no answer to distinguish on the
grounds of what the government did or did not do in that
case.  As a legal matter, Rule 16 does not entitle them
to more than the recorded statement.

And I would point out, Your Honor, that --
take issue as defendants might with the authority that's
been cited by the government, there is no authority
cited in the defendant's paper for the -- for the
proposition that in addition to producing the recorded
statements themselves, the government must also produce
all work product in which a summary is made of those

1   recordings.

2           And I think Your Honor has recognized that

3   in its previous rulings in this case in which defendants

4   have sought in addition to the recorded statements

5   themselves, again, recorded statements that they've been

6   in possession of for a year and a half at the time the

7   trial began.  And, as Your Honor pointed out, we

8   directed them to 200 calls that were particularly

9   pertinent.  And the Court made money available for them

10  to use to translate these recordings.  The obligation

11  was fully met and then some under Rule 16.

12          THE COURT:  Thank you.

13          MR. TOBLER:  Are there any further

14  questions, Your Honor?

15          THE COURT:  No.

16          MR. TOBLER:  Then we would rest on our

17  papers.

18          THE COURT:  Anything further, Ms. Austin?

19          MS. AUSTIN:  Just briefly.

20          Discovery production has to be meaningful.

21  It just keeps getting repeated that you had the

22  recordings, the defense had the recordings, the

23  defendants had the recordings months.

24          Those recordings were such and of such

25  volume that it is not fair, and it does prejudice the

1    defendant for the government to be able to say "here you

2    go", and that's it.  They are in Spanish.  They are of

3    such poor quality.  The volume is such that even giving

4    us funds and starting completely from scratch in as much

5    as the contract language monitors were, as the

6    government said, very well versed in the El Salvadorian

7    dialect, knew stuff, knew gang slang and they had the

8    benefit of talking to Junior, talking to Agent Uribe,

9    and they were working the case in producing a written

10   statement of our defendant as he made a statement over

11   the telephone.

12          And so to say that we were on equal footing

13   or even close to it because they gave us the recordings

14   is -- is false.  And dumping that volume of recordings

15   on us in Spanish was not meaningful discovery and so,

16   that --

17          THE COURT:  But, your client speaks Spanish,

18   is that right, Ms. Austin?  Does your client speak

19   Spanish?  Okay, and do you speak Spanish, too?

20          MS. AUSTIN:  No.

21          THE COURT:  When you talk to your client, do

22   you have an interpreter present?

23          MS. AUSTIN:  Yes.

24          THE COURT:  I can't make the case something

25   that it's not.  The whole trial was in Spanish, and the

1   defendants speak Spanish.  That's their first language.
2   But we had six interpreters, and they were in court
3   every single day.  I don't know what to tell you.  I
4   guess I could give you five years to prepare for trial
5   and that still would not have made any difference
6   because the Court knew the quality of them was so poor
7   it wouldn't have made any difference any way.
8          I understand your position.  But I
9   understand, this is only a Rule 16 motion, and it seems
10  very similar to something I decided before, but I
11  appreciate your argument.  Thank you.
12         MS. AUSTIN:  Your Honor, I would just like
13  to point out that I don't think you -- you have decided
14  this before because until in the middle of trial, we
15  didn't know these summaries existed.
16         So, I'm not saying that you had this issue
17  before.  You ordered the production of the tapes.  You
18  said they don't have to give you the transcripts.  We
19  didn't argue over contract language monitors summaries,
20  because we didn't know they existed.
21         THE COURT:  I didn't know about them either.
22  But I don't think it changes whether under Rule 16, the
23  summaries prepared by a government contract monitor are
24  equivalent to your client's statement.  But I appreciate
25  your argument.  You're making your record as you are

1    supposed to do.  And I suspect that the Fourth Circuit
2    would have to give a decided judgment about that.
3                MS. AUSTIN:  Thank you.
4                THE COURT:  Mr. Zimmerman.
5                MR. ZIMMERMAN:  Thank you, Your Honor.
6                Your Honor, if I might just pick up at the
7    end of that last motion and the Court's comment about
8    the Fourth Circuit is that we would ask and Ms. Austin
9    references for possible evidentiary hearing, but in the
10   absence of that -- and there's going to be a similar
11   request with the other motion -- we would ask that the
12   summaries be produced for the purposes of appeal.  That
13   is that we are -- one of the difficulties that I'd like
14   to emphasize here is we don't know who is on any of
15   those recordings.  This was actually somewhat of a
16   contentious issue --
17               THE COURT:  That was a question of fact, who
18   was on the tapes; is that right, Mr. Zimmerman?
19               MR. ZIMMERMAN:  On all of the recordings.
20   Not -- Your Honor, I'm not talking about the recordings
21   that were introduced into evidence.
22               THE COURT:  Oh, okay.
23               MR. ZIMMERMAN:  Okay.  I'm talking about 170
24   plus hours of the recordings that we tried to slog
25   through.  And, Ms. Austin isn't going to toot her own

1   horn here, but she sort of took the lead on this and
2   found the best interpreters that we knew in the area and
3   was constantly working on this and constantly e-mailing
4   us translations, and I want to make a record of that.
5   But, we don't know who is even on those tapes.
6           And I remember this was a contentious issue.
7   I think it was Gretchen Karlson (sic) whose client
8   ultimately pled.  But this was a joint motion of all of
9   us, where we said, you know, at least identify for us
10  who this is because they're working with Junior, they're
11  working with Special Agent Uribe.
12          We not only have voices that are hard to
13  distinguish, but there's absolutely no way for us to
14  know who's on the tapes.
15          THE COURT:  There actually is a way for you
16  to know who was on the tapes.  It's called "play the
17  tape for your client".  And I suspect, good lawyers that
18  I know you to be, that at some point you did that.
19          Now, I'm not asking you to tell me what your
20  client said, but I mean there comes a point where you
21  have to draw upon what you have and the facts are what
22  you have.
23          Now, would you like to turn to your motion,
24  because as I understood it, the issue was whether the
25  government had an obligation to produce more than you

already received concerning immigration benefits that
they gave Junior, the bankruptcy petition, and monetary
benefits.  Is that it?

MR. ZIMMERMAN:  It is, Your Honor.  And we
have argued and actually, the government did not
produced the bankruptcy petition.

THE COURT:  You have that on your own.

MR. ZIMMERMAN:  Mr. Salvato obtained a copy
of that.  And the -- the issue is laid out in the
pleadings, Your Honor, is that as we pointed out,
Junior, who of course was the government's star witness,
his testimony was full of contradictions regarding his
own criminal activity.

For example, he testified that he didn't
commit any actions of violence and he testified that he
didn't brag about things he didn't do.

In the recordings that we did hear in
evidence, Junior bragged about his participation in the
robbery in which he threatened to cut a victim's fingers
off.  He bragged in another part of the same transcript,
this is Government's Exhibit 18A1 about attacking gang
members at the Ballston Mall.  He testified that he
didn't commit any crimes while working for the FBI but
he also testified that he collected extortion rent from
a brothel in Culmore.

1              We would submit and we'd ask for a *Brady*

2     material and extensive *Brady* pleading, I'm sure the

3     immigration materials, for his A file.

4              Now the government in their response suggest

5     that look, we're not responsible for what other

6     government agencies not involved in this prosecution

7     have, and so we don't have to go true the A file, for

8     example, for exculpatory or for *Brady* or *Giglio.*

9              In this case that doesn't really apply

10    because the government, the U.S. Attorney's Office was

11    very actively involved in seeking immigration benefits

12    for Junior.  They wrote a letter to the judge on his

13    behalf.  This, of course, was another lie that we caught

14    Junior on on direct.  Junior testified that the letter

15    from the U.S. Attorney's Office did not get delivered to

16    the immigration judge.

17              On cross-examination it was revealed that

18    while the letter was returned, that Junior himself

19    showed it to the immigration judge.

20              So, this was the kind of games that Junior

21    played.  When he says that judge didn't get the letter

22    it turns out he meant he didn't get it in the mail, but

23    he actually saw it, which of course was the basis of

24    question.

25              THE COURT:  He actually took the letter to

1    the immigration judge, he said.

2            MR. ZIMMERMAN:  He did, he did.  After

3    testifying on direct that the Court did not get the

4    letter on cross, he admitted that, in fact, he showed it

5    to the judge.

6            THE COURT:  So, I want to make sure we're

7    focused on what you're trying to do here.  These are all

8    things you covered in front of the jury as a part of

9    impeachment.  So what is it that you say the government

10   suppressed?

11           MR. ZIMMERMAN:  We did not get the A file

12   and we believe we are entitled to the A file.  And I

13   think that the A file certainly would contain examples

14   of additional lies and prevarications of the type that

15   we saw.

16           We'd be able to get much deeper, do much

17   more significant impeachment about that.  For example,

18   did Junior report his activities such as extortion, such

19   as threats to cut a victim's fingers off?  Did he report

20   them in the A file?  And if he did --

21           THE COURT:  But you asked him those

22   questions, didn't you?  But you're saying the file would

23   show if he reported it?

24           MR. ZIMMERMAN:  The file --

25           THE COURT:  We don't have the application to

1  know what he told the government.  Is that what you're
2  saying?
3            MR. ZIMMERMAN:  We don't know what the truth
4  is, right, Judge.  Sure we can ask Junior these things,
5  but we can't impeach him.  So, it -- if he reported all
6  of these crimes or other crimes that we don't know about
7  in the A file, and nonetheless, he's still here in the
8  country, then he's getting significant benefit from the
9  government with regard to immigration and that is bias
10  and impeachment.
11            If in fact he didn't report all of these
12  crimes in the A file, then he's lied on his forms and
13  that is also impeachment.
14            Of course, we can ask Junior this, but
15  Junior is a liar.  And to the extent we have recordings
16  and stuff, we can impeach him.
17            THE COURT:  Your view is the government had
18  obligation to go to ICE and obtain his A file and
19  produce it to the defendant.  I understand that
20  position.
21            MR. ZIMMERMAN:  Well, Judge, I think there's
22  no doubt that the government had reviewed or -- or
23  agents had reviewed the A file.  In other words, before
24  writing a letter to the immigration judge on behalf of
25  Junior, it's hard to imagine that they weren't familiar

1    with his A file in order to take seriously giving him

2    immigration benefits, which was a major part of the

3    inducement for him to be such a star witness for them.

4    It's hard to imagine that they didn't look at his A

5    file.

6              THE COURT:  Well, you relied upon your

7    imagination.  I can only rely on what is presented here

8    in court.  I understand what you're saying.

9              MR. ZIMMERMAN:  So, Judge, I think that's

10   one part of it.  The other part of it is as far as the

11   appeal goes, we need a copy -- we would ask the Court --

12   there's sort of three requests we make in the motion.

13   The motion is for a new trial under Rule 33 for the

14   failure to disclose that any reasonable look at the

15   evidence in a situation this would have to be

16   exculpatory.

17             Number two, we would ask for an evidentiary

18   hearing in which the A file is actually produced and we

19   can go through it and make a record of this.  And number

20   three, we would ask that the A file be produced for the

21   purposes of appeal so that we're not stuck in this catch

22   22 where the Fourth Circuit says to us, you know, you

23   can't point to anything in the A file that is

24   exculpatory.

25             Now the government is going to say that, you

1  know, we're trying to go on a fishing expedition here.
2  But again, Judge, there is no way -- if Junior loaded up
3  his A file with all his crimes and we can show that to
4  the jury and he still got a benefit, it shows massive
5  bias.  If he didn't load up the A files with all his
6  crimes, then he's a liar and it also impeaches --
7          THE COURT:  On the first point, the letter
8  was written because of his cooperation with the
9  government.  So, the government had some idea about the
10 nature and extent of what they had him do and the
11 information he reported to them when they wrote the
12 letter.  Is that right?
13         MR. ZIMMERMAN:  That's right, Judge, but --
14         THE COURT:  But the letter was supposed to
15 be given to an immigration judge and according to the --
16 Mr. Junior, the government's letter never got to the
17 judge but he took a copy of the letter to the judge.  Is
18 that right?
19         MR. ZIMMERMAN:  Right.  So, when he was
20 testifying on direct about the benefits he was
21 receiving, he testified that the judge didn't get the
22 letter from the United States Attorney's Office.  And
23 obviously the purpose and the implication of that
24 testimony to the jury is look, I'm not really getting a
25 benefit from the United States Attorney's Office, right,

1  because they drafted a letter that the judge didn't get.
2           And then on cross-examination when he's
3  pressed he says, okay, I showed it to the judge.  So,
4  it's this type of gamesmanship by Junior that, you know,
5  really emphasizes the need to have the A file.  With a
6  witness this slippery --
7           THE COURT:  All right.
8           MR. ZIMMERMAN:  -- it's not enough just to
9  ask him questions.  So we would ask for those forms of
10 relief.  And again related to the other motion we did on
11 behalf of Mr. Benitez, we would ask that the summaries
12 that the government has not produced also be produced
13 for the purposes of appeal so that the Fourth Circuit
14 doesn't say, look, you can't point to anything that
15 these discoveries would have revealed that you could
16 have actually identified information that you could have
17 used.
18          THE COURT:  All right.
19          MR. ZIMMERMAN:  Thank you, Your Honor.
20          THE COURT:  Thank you.
21          MS. MARTINEZ:  Your Honor, the FBI doesn't
22 have unfettered access to A files.  A files, immigration
23 files contain highly personal information.  They're
24 highly protected.  They're maintained by a separate
25 government organization.

1          The FBI hasn't reviewed Junior's A file, had
2    no obligation to do so, and defense counsel can't point
3    to any case law that would suggest otherwise.
4          THE COURT:  Well, while it might be tempting
5    to accept your word that the FBI didn't look at the
6    file, I'm not sure I can do that.  There's no evidence
7    before me I can say that.  And I'm not sure -- I'm
8    assuming maybe you had a -- questioned the FBI about the
9    A file.
10          MS. MARTINEZ:  Yes, Your Honor.
11          THE COURT:  But the issue for me is really
12   one of whether the A file is something that was in the
13   government's possession and should have been produced in
14   total to the defendant.  Can you answer that question?
15          MS. MARTINEZ:  Yes, Your Honor.  So, first
16   of all, it would be hard to imagine a circumstance under
17   which *Brady* would require an entire A file to be
18   produced to defense counsel.  And certainly those
19   circumstances are not present here.
20          Now, one could imagine a circumstance under
21   which particular information within an A file may need
22   to be produced if it were exculpatory and it were within
23   the possession of the prosecution team.  Both of those
24   things would need to be met.  But neither of those --
25   the first is that -- the A file was not within the

1   possession of the prosecution team, so that in and of
2   itself means we have no obligation to produce it.
3            Now, if I knew of something that was
4   exculpatory anywhere, whether it was in an A file or
5   otherwise, certainly.  And if someone's knowledge could
6   be imputed to me by another member of the prosecutor
7   team, certainly we would have an obligation to produce
8   that.  But that would never extend to an entire A file.
9   It is a fishing expedition.
10           What defense counsel is looking for is they
11  want to review the A file themselves so they can try to
12  find something that they think would contradict
13  something.
14           Now, Your Honor, I'm not going to parse
15  through every single characterization that Mr. Zimmerman
16  made just now and in his pleadings, but I do want to say
17  generally speaking that we disagree with many of the --
18  the ways in which Mr. Zimmerman has interpreted
19  testimony by Junior.
20           He's not sticking with just "these are the
21  exact words".  When he says, there was testimony -- he
22  said that he wasn't involved in the violent act, but
23  then there was this statement in the transcript.
24           Well, there was also explanations offered
25  both in testimony and in argument by both sides about

1    why those are or are not inconsistent.  But this is
2    getting into the nitty gritty details --
3              THE COURT:  I don't need to retry the case.
4    I'm just trying to focus on whether the government had
5    the obligation to produce the A file and whether the A
6    file had information that was exculpatory that might
7    have been relevant for impeachment or mitigation or
8    punishment that was suppressed by the government that
9    also caused prejudice to the defendant.
10             There are several steps in the process, and
11   I understand you to be saying that the government didn't
12   have the A file.  So I'll start there.  You didn't have
13   the A file.
14             MS. MARTINEZ:  We didn't have the A file,
15   Your Honor.
16             THE COURT:  Now, there was testimony about a
17   letter the government wrote to the immigration judge,
18   and it was odd to me about why the letter was just
19   written and there was no follow up, because Junior
20   ultimately testified he actually gave the letter to the
21   immigration judge.  Is that your recollection?
22             MS. MARTINEZ:  Your Honor, the letter itself
23   was disclosed to defense counsel.  Defense counsel had a
24   copy of that letter in our *Brady* disclosures and with a
25   letter from the U.S. Attorney's Office that went with

1  the letter.  We disclosed the fact that the U.S.
2  Attorney's Office wrote that letter and we disclosed the
3  letter itself.
4        We also disclosed that the U.S. Attorney's
5  Office mailed the letter to the immigration court and
6  that the -- it was returned in the mail.  Those were the
7  facts known to the government at that time and it was
8  all disclosed to defense counsel well in advance of
9  trial.  What came up at trial was that Junior testified
10  and that was not known, was not known to me, certainly,
11  that he hand delivered that letter after it was returned
12  to the U.S. Attorney's Office.
13        But again, this is information that was
14  presented in front of the jury and that defense counsel
15  had an opportunity, both to cross-examine Junior about
16  and to argue to the jury.  So there's no violation here.
17        THE COURT:  Now, ultimately, an immigration
18  judge made a judgment that Junior could remain in the
19  United States, correct?
20        MS. MARTINEZ:  Your Honor, off the top of my
21  head, I'm not actually sure of the status of his
22  proceedings and whether there's been a final
23  determination.  And I'm not sure that is necessarily
24  relevant here.  But I think it was clear testimony in
25  front of the jury that there were immigration

1    proceedings that involved Junior, yes.

2            THE COURT:  But he's still here, or at least

3    he was still here at the time of trial.

4            MS. MARTINEZ:  Yes, clearly.

5            THE COURT:  Okay, all right.  I think I

6    understand your position.

7            What's your position about evidentiary

8    hearing?

9            MS. MARTINEZ:  Your Honor, there's

10   absolutely no need for an evidentiary hearing.  I guess

11   Mr. Zimmerman is asking for two separate evidentiary

12   hearings; one on the summaries and a separate one on the

13   A file.

14           So starting first just with the summaries

15   and Mr. Tobler has already handled most of that

16   argument.  But to just respond to what Mr. Zimmerman

17   argued, which was that they don't even know who were on

18   these calls.  And they argued that these summaries from

19   the contract language monitors would help them see that.

20           I remind defense counsel and the Court that

21   the testimony from the contract language monitors which

22   was clear both in their direct and followed up

23   repeatedly on cross-examination was that these -- these

24   contract language monitors also did not know who was on

25   these calls.  That was very clear.  On the record in

1   front of the jury, they had no knowledge of who was
2   speaking, so those summaries can't possible help defense
3   counsel figure out who was speaking.
4           What could help defense counsel is what the
5   government gave defense counsel which is not just a mess
6   of recordings but an entire consensual wire including
7   metadata, metadata including in-going and out-going
8   phone numbers, metadata including date and time that the
9   call was made and duration of the call.
10          So defense counsel had more than just a dump
11  of recordings.  And although defense counsel has again
12  and again complained about us dumping all of these
13  recordings, it was a consensual wire between a star
14  government witness and most of these defendants and
15  other co-conspirators and other MS-13 gang members.
16          If we had not given them that entire wire,
17  they would have been complaining about that.  And
18  instead what we did, we gave them all of those
19  recordings in an organized fashion with metadata,
20  16 months before trial.
21          There is no need for evidentiary hearing on
22  that.
23          With respect to the A file again, defense
24  counsel has cited no case law that says that the
25  government has to go out and obtain A files for

1   government witnesses.  That's not -- there's no

2   obligation there to do that, there never has been,

3   there's no case law to support that.  Defense counsel

4   can't cite any.  And so there's no grounds here to

5   produce for appeal purposes or for an evidentiary

6   hearing, discovery that they were never entitled to to

7   begin with so that we can all review it post verdict and

8   see if there was some way to nitpick at it.

9            And then, Your Honor, finally as Your Honor

10   mentioned a moment ago, even if there was any violation

11   here, which we strongly submit there was not, there

12   would have to be prejudice in order to get anywhere near

13   to overturning the verdict or really even I think to get

14   into an evidentiary hearing, at least have an allegation

15   of prejudice.

16            Now, defense counsel focused in their

17   cross-examination and in their arguments and of course

18   today and in their pleadings about Junior and the

19   various inconsistencies or I think they even called it

20   lies that they caught him in, but that's losing sight of

21   the evidence at trial.

22            The -- Junior, his credibility was hardly at

23   issue when the jury had the actual recordings of what

24   the -- what the defendants said.

25            THE COURT:  I want to -- I disagree with

1    that.  I think that his credibility was at issue

2    throughout the whole trial, tape recordings or not,

3    because --

4            MS. MARTINEZ:  I don't mean -- I apologize

5    Your Honor.  I don't mean it wasn't an issue at trial,

6    but with respect to prejudice, there have to have been

7    actual prejudice shown here.  And in light of the weight

8    of the evidence which included recorded statements by

9    the defendants and eyewitnesses who were not Junior --

10   Junior was not an eyewitness to any of these crimes --

11   eyewitnesses who are, of course, cooperating defendants.

12   None of those two things, the recorded statements of the

13   defendants and the co-conspirators and the statement by

14   the cooperating defendant, none of those things have

15   anything to do with Junior's credibility, and that is

16   our argument there.  And there is more than sufficient

17   evidence and so we would also submit that defense

18   counsel cannot show prejudice here.

19           THE COURT:  All right, thank you.

20           MR. ZIMMERMAN:  Just briefly, Judge, two

21   things.  One, to be clear, that our motion regarding the

22   Junior immigration benefits is actually more specific.

23           You know, I take the government's point

24   about the A files are thick.  On page three of the

25   pleadings, we list five specific things.  For example,

1 the first is the green card application and supporting

2 documents.

3           And again, as I made in my -- the opening

4 argument that this is specifically being where Junior

5 has to fill out and it would be critical for us to see

6 whether he puts in the crime.

7           So, you know, again specifically the

8 pleading asked for information bearing on his

9 credibility such as false statements under oath, his

10 bankruptcy hearings, any materials relating to his

11 credibility.

12           So, for the clarity of what we're

13 requesting, it isn't necessarily the entire A file, but

14 these more specific things that would clearly bear on

15 Junior's credibility.

16           Regarding the summaries, you know, I think

17 that --

18           THE COURT:  Well, Ms. Austin's covered that.

19           Let me -- I'm sorry.  Let me ask you the

20 question about prejudice.  Prejudice.

21           MR. ZIMMERMAN:  Okay.

22           THE COURT:  I'm listening.

23           MR. ZIMMERMAN:  The immigration records, and

24 another thing is such as the bankruptcy records, they go

25 to the heart of Junior's credibility which as the Court

1   just noted for the government was critical to the case.

2          And so, you know, if he -- if he -- if this

3   impeached him, that he lied over and over again in these

4   types of records, we think it would be significant

5   prejudice regarding, um, everything about the case.  I

6   mean, he's the guy who made the recordings that the

7   government relied on.  And if he is simply not credible,

8   um, and if there's serious problems with his credibility

9   we feel could be -- could be reflected in these

10  documents, particularly, his own application and the

11  documents he uses to support that application.  That

12  would be significant impeachment.  It would be

13  significant impeachment of the government's star

14  witness.

15         I think he was on the stand for 3 or 4 days.

16  He was the heart of the case.  And so to suggest that

17  significant impeachment, um, of the star witness of the

18  government wouldn't negligently impact the government's

19  case, to suggest that the ability to do that, um, and

20  the inability to do that and to be hampered in doing

21  that isn't, um, prejudiced to the defendants, I think

22  just doesn't hold up.

23         THE COURT:  All right, thank you.

24         MR. ZIMMERMAN:  Thank you, Judge.

25         Also, just if I might make one point and

1   this is in rebuttal to something Ms. Martinez said.  She

2   suggest that none of the summaries that are done

3   identify any of the defendants.  And I would submit

4   that --

5              THE COURT:  She said the contract monitors

6   at the time they were taking down the summaries did not

7   know the identity of the person unless the person self

8   identified.

9              MR. ZIMMERMAN:  Okay, fair enough.  But at

10  some point, they made that connection.  Otherwise, all

11  of these recordings are irrelevant.  They're -- even the

12  government's investigation, they're just recordings of

13  people we don't know.  So at the point --

14             THE COURT:  Were the summaries --

15             MR. ZIMMERMAN:  I'm sorry, Judge.

16             THE COURT:  Were the summaries admitted in

17  evidence?

18             MR. ZIMMERMAN:  We've never seen the

19  summaries.

20             THE COURT:  So they were never before the

21  jury; is that right?

22             MR. ZIMMERMAN:  They weren't, Judge.  And

23  were we able to use the summaries to know what we're

24  listening to.  So, at some point -- at some point, the

25  conversations are hooked to people.  And one of those

1   people on most of the recordings, on a large percentage
2   of the recordings, I think 37 or so for our client is
3   them.  And at that point they know it's them.
4           And again, the government has the FBI
5   language department and the Federal Bureau of
6   Investigation at their disposal for this.  We don't --
7   we don't know who is on the recordings.
8           And you know we're always in a sticky
9   situation.  The defendants are presumed innocent, and
10  many defendants were not in multiple counts.
11          So to say, "well, the defendants must know
12  what the recordings are about", they don't know who was
13  on the recordings.  There's recordings that don't
14  involve them but they might exculpatory them.
15          At the point this connection is made, I do
16  think that this is -- it is a contemporaneous recording.
17  They just hooked up the name later as Ms. Austin
18  referred to.
19          Of course they know who is on the
20  recordings.  They wouldn't bother doing it otherwise.
21          As for the fact that we get metadata with
22  lots of phone numbers on it, we don't know who the phone
23  numbers are.
24          I mean, I do that in Google reverse search
25  and I get a lot of offers to spend a lot of money which

1  are probably scams about "who is this, find out who this

2  is".  You know, we all do that when stuff comes on our

3  cellphones, but we don't know who that is.

4          So it's a lot of data that really doesn't

5  help us when it is, there is just a -- when, you know,

6  if we simply had those, there might be significant

7  exculpatory or impeachment evidence in there in the

8  stuff that wasn't produced.

9          THE COURT:  All right.

10          MR. ZIMMERMAN:  And we're entitled to those

11  statements.

12          THE COURT:  Thank you.

13          MR. ZIMMERMAN:  Thank you, Judge.

14          THE COURT:  All right.  Let's take about a

15  ten-minute recess.

16          (Court recessed at 12:34 p.m. and reconvened

17  at 12:52 p.m.)

18          MR. AMOLSCH:  May it please the Court,

19  Christopher Amolsch for Mr. Cerna.  Just is a brief

20  idea, Judge.

21          As it relates to Mr. Zimmerman's request

22  regarding Junior's A file, I believe in his motion, he

23  lets out five discreet pieces of information that he's

24  looking for.

25          I'm very sensitive to the Court's questions

1   about prejudice, about how that might have mattered,

2   which against goes back to the difficulty.  We don't

3   have it, so we don't know.

4           My suggestion would be to the Court that if

5   you would review that in camera and if you decide that

6   there's anything in those five discreet things that

7   Mr. Zimmerman identifies, and if you think an

8   evidentiary hearing is then appropriate to determine

9   whether there is prejudice to the defense for not having

10  that information, that at that point we could then

11  determine what to do next.

12          But it's obviously difficult for us in the

13  absence of information to make a cogent prejudice

14  argument.  That might be a solution for the Court to

15  consider.  And again, it's only five things, Judge.  It

16  isn't a voluminous amount of information.  And then the

17  Court could issue a ruling on that.  We could make that

18  part of the record or not as it goes up on appeal.

19          But that was my only thought as it relates

20  to those five specific things Mr. Zimmerman is

21  requesting -- that we're all requesting through

22  Mr. Zimmerman.

23          THE COURT:  All right.

24          MR. AMOLSCH:  Thank you, Judge.

25          THE COURT:  Thank you.

1     All right, counsel.  This was a lengthy

2 trial and you all have briefed quite sufficiently your

3 post trial motion.

4     The complexity of them is such that I would

5 not rule from the bench and I would not try to do so.

6 I'll issue written opinions, and I thank you for the

7 quality of your presentation.

8     Thank you.  We're in recess.  Can you all

9 remain in place and let the government counsel leave,

10 please.  If you would all remain in, please.  I want the

11 government counsel to leave before you all leave.

12     MS. AUSTIN:  Let government counsel leave

13 first.  Okay.

14     THE COURT:  The reason I'm doing that is

15 because there is ongoing investigation in the case in

16 another matter that involves government counsel, and we

17 rather keep you all separate from her right now.  That's

18 fine.

19     Thank you.

20     MS. AUSTIN:  Thank you.

21     THE COURT:  Not the lawyers, but you know

22 what I'm saying.

23     (Proceedings concluded at 12:56 p.m.)

24

25

```
 1
 2
 3
 4                    CERTIFICATE OF REPORTER
 5
 6                    I, Renecia Wilson, an official court
 7   reporter for the United State District Court of
 8   Virginia, Alexandria Division, do hereby certify that I
 9   reported by machine shorthand, in my official capacity,
10   the proceedings had upon the motions in the case of
11   United States of America vs. Jose Lopez Torres, et al.
12                    I further certify that I was authorized and
13   did report by stenotype the proceedings and evidence in
14   said motions, and that the foregoing pages, numbered 1
15   to 80, inclusive, constitute the official transcript of
16   said proceedings as taken from my shorthand notes.
17                    IN WITNESS WHEREOF, I have hereto
18   subscribed my name this 25th day of December, 2016.
19
20                              _____/s/_____
                               Renecia Wilson, RMR, CRR
21                             Official Court Reporter
22
23
24
25
```