```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                   EASTERN DISTRICT OF VIRGINIA
 2                      Alexandria Division

 3   UNITED STATES OF AMERICA,          )
                                        )
 4                     Plaintiff,       )
                                        )   Crim. No. 1:14cr306
 5       vs.                            )
                                        )
 6   JOSE LOPEZ TORRES, ALVIN GAITAN    )   May 4, 2016
     BENITEZ, CHRISTIAN LEMUS CERNA,    )
 7   OMAR DEJESUS CASTILLO, MANUEL      )
     ERNESTO PAIZ GUEVARA, and          )
 8   JESUS ALEJANDRO CHAVEZ,            )
                                        )
 9                     Defendants.      )
     _____      )

10

11

12                          JURY TRIAL

13

14   BEFORE:      THE HONORABLE GERALD BRUCE LEE
                  UNITED STATES DISTRICT JUDGE
15

16
     APPEARANCES:
17
     FOR GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
18                     BY:  JULIA MARTINEZ, AUSA
                            TOBIAS TOBLER, AUSA
19

20                          ---

21

22   OFFICIAL COURT REPORTER:

23                  RENECIA A. SMITH-WILSON, RMR, CRR
                    U.S. District Court
24                  401 Courthouse Square, 5th Floor
                    Alexandria, VA 22314
25                  (703)501-1580
```

1   APPEARANCES (Continued)

2   FOR DEFENDANT JOSE LOPEZ TORRES

3           BYNUM & JENKINS, PLLC
            BY:  ROBERT L. JENKINS, JR., ESQ.
4           THE LEIVA LAW FIRM, PLC
            BY:  MANUEL E. LEIVA, ESQ.
5
    FOR DEFENDANT ALVIN GAITAN BENITEZ
6
            LAW OFFICE OF AMY LEIGH AUSTIN
7           BY:  AMY LEIGH AUSTIN, ESQ.
            SMITH & ZIMMERMAN, PLLC
8           BY:  JEFFREY D. ZIMMERMAN, ESQ.

9   FOR DEFENDANT CHRISTIAN LEMUS CERNA

10          LAW OFFICE OF CHRISTOPHER AMOLSCH
            BY:  CHRISTOPHER AMOLSCH, ESQ.
11          FRANK SALVATO, ESQ.

12  FOR DEFENDANT OMAR DEJESUS CASTILLO

13          FIRSTPOINT LAW GROUP, PC
            BY:  KATHERINE MARTELL, ESQ.
14          OLD TOWN ADVOCATES, PC
            BY:  MEREDITH M. RALLS, ESQ.
15

16  FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

17          LAW OFFICE OF W. MICHAEL CHICK, JR.
            BY:  WILLIAM MICHAEL CHICK, JR., ESQ.
18
    FOR DEFENDANT JESUS ALEJANDRO CHAVEZ
19
            JEROME P. AQUINO, ESQ.
20          ELITA C. AMATO, ESQ.

21
                            ---
22

23

24

25

1                            <u>INDEX</u>

2

3     PRELIMINARY MATTERS                                    4

4     CLOSING ARGUMENT BY DEFENDANT GAITAN BENITEZ           6

5     CLOSING ARGUMENT BY DEFENDANT LEMUS CERNA             36

6     CLOSING ARGUMENT BY DEFENDANT DEJESUS CASTILLO        69

7     CLOSING ARGUMENT BY DEFENDANT CHAVEZ                  92

8     REBUTTAL ARGUMENT BY THE GOVERNMENT                 121

9     FURTHER JURY INSTRUCTIONS BY THE COURT              166

10         (Court recessed)

11

12                          ---

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

(Thereupon, the following was heard in open court at 10:04 a.m.)

(Jury not present.)

THE CLERK:  1:14 criminal 306, United States versus Jose Lopez Torres, Omar Dejesus Castillo, Alvin Gaitan Benitez, Christian Lemus Cerna, Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez, with Spanish interpreters previously sworn.

THE COURT:  Good morning, everyone.

ALL:  Good morning.

THE COURT:  Ready to bring the jury out?

PRELIMINARY MATTERS

MS. AUSTIN:  Your Honor, if I may have 20 seconds.

THE COURT:  Sure.  Absolutely.

MS. AUSTIN:  Thank you.

For the record, Your Honor, I would just like to renew Mr. Gaitan Benitez's motion for severance. We've put it on the record several times throughout the trial.  And given the contents of the closing argument of counsel for Mr. Guevara yesterday, wherein he named our client at least three times as the perpetrator of one of the crimes in the indictment, we would just like

1   to, for the record --

2           THE COURT:  Is that the first time someone

3   has named your client as being involved in the offenses,

4   Ms. Austin?

5           MS. AUSTIN:  No, it is not.

6           THE COURT:  Oh, okay.

7           MS. AUSTIN:  But it was as though we were

8   facing two prosecutors yesterday during closing

9   arguments.  And just for the record, Your Honor, I

10  wanted to renew it.  That's all.

11          THE COURT:  All right.

12          The motion is renewed, and for the reasons

13  previously stated and the opposition of the government,

14  the motion is denied.

15          Ready to bring the jury out?

16          All right.  You can bring our jurors out,

17  Mr. Toliver.  Thank you.

18          (Jury present at 10:06 a.m.)

19          THE COURT:  You may be seated.

20          Good morning, ladies and gentlemen.

21          THE JURORS:  Good morning, Your Honor.

22          THE COURT:  Good morning, Mr. Omar Dejesus

23  Castillo; good morning.

24          Good morning, Mr. Alvin Gaitan Benitez; good

25  morning.

1          Good morning, Mr. Manuel Ernesto Paiz
2    Guevara; good morning.
3          Good morning, Mr. Jesus Alejandro Chavez;
4    good morning.
5          Good morning, Mr. Christian Lemus Cerna;
6    good morning.
7          Good morning, Mr. Jose Lopez Torres.
8          Counsel, are you ready to proceed?
9          You may proceed.
10         MR. ZIMMERMAN:  Thank you, Your Honor.
11    CLOSING ARGUMENT BY DEFENDANT GAITAN BENITEZ
12         MR. ZIMMERMAN:  Good morning, ladies and
13    gentlemen.  I'm Jeff Zimmerman and I, along with Amy
14    Austin, represent Alvin Gaitan Benitez.  Mr. Benitez is
15    sitting with Ms. Austin and our paralegal, Pam Bishop,
16    the defense paralegal, in the second row in the purple
17    shirt.
18         That's the last time you're going to hear me
19    say that, and, in fact, today is likely the last time
20    you're going to hear from any of the lawyers.  Today you
21    are likely to begin the hard work of deliberations.
22         We, generally -- genuinely appreciate your
23    service in this case.  No one jumps for joy when getting
24    a jury summons, and this wasn't just any jury summons.
25    This case has been an unusually significant hardship in

1  terms of length and subject matter, and we understand
2  that.
3          But I hope all of you have gained an inside
4  appreciation of what is so amazing and essential about
5  the American criminal justice system, and that is that
6  no matter how difficult the subject matter, in our
7  system of justice jurors are required to dispassionately
8  consider the evidence.
9          We convict people base only on evidence, not
10  based on emotion.  We don't convict based on a picture
11  of Alvin making the claw in front of his face.  You know
12  the picture I'm talking about.  The government keeps
13  showing it.  And we don't convict based on selfies.  And
14  that's all that picture was.
15          And we don't convict based on gruesome
16  photos.  These were gruesome murders.  No one is
17  claiming that they weren't.
18          And at the end of her closing argument,
19  Ms. Martinez put some gruesome photos up with an
20  impassioned plea for justice.
21          But justice requires more than shocking
22  photographs.  Justice requires reliable evidence.
23  Justice requires proof beyond a reasonable doubt.  It is
24  not justice to convict a roomful of defendants because
25  you are shown some gruesome photos.

1            The government, during closing arguments --
2     and you've heard this -- gets to go first and they get
3     to go last.  The government gets a rebuttal close after
4     all of the defendants have their closing arguments, like
5     this.  They get to address you at the very end, and I
6     and no one else will get a chance to respond to that.
7            So, I ask you to please keep in mind
8     everything that I say during the -- during the
9     government's rebuttal and then when you deliberate.
10    This will be my only chance to address you.
11           Remember during that long jury selection
12    process, Judge Lee emphasized that simply being a member
13    of MS-13 is not a crime.
14           You may also recall early on in the trial --
15    this was way back on March 31st -- it was following the
16    testimony of a law enforcement witness named Robert
17    Hicks.  Judge Lee turned to you and he emphasized that
18    the fact that these defendants are sitting here means
19    nothing until the end of the case, in which you have all
20    the evidence to consider.
21           Judge Lee emphasized that there have been
22    cases in which MS-13 defendants have been acquitted in
23    this courtroom.  And Judge Lee again emphasized this
24    when he instructed you yesterday that it is not a crime
25    to be a member or associated with MS-13.

1            You will get a copy of the jury

2   instructions, and at the top they're numbered.  And if

3   you're taking notes and want to refer, this is jury

4   instruction number 12.

5            Alvin Gaitan Benitez is charged in Count 5

6   and Count 6.  Count 5 is the reburial of Nelson Omar

7   Quintanilla Trujillo, who is known as Lagrima.  And

8   Count 6 is the murder of Gerson Adoni Martinez Aguilar,

9   who is known as Lil Guasón.

10            At the end of my closing argument, I'm going

11  to ask you to find Alvin Gaitan Benitez not guilty,

12  based on the lack of evidence beyond a reasonable doubt

13  against him in this case.

14            The evidence in this case is a contradictory

15  mess, but a number of things are crystal clear.

16            First, it's clear that the government's gang

17  witnesses are all liars who are trying to buy their way

18  out of trouble, out of jail and into lawful status in

19  the U.S., by implicating others.

20            The second thing that is crystal clear and

21  related is that all MS-13 members are liars.  They

22  bluster.  They take credit for things they do not do as

23  a way to protect themselves.  They need to lie to

24  survive.  You've heard that repeatedly.

25            You've heard a number of various roles of

those associated with the gang, as well as various
nicknames for everyone.  Alvin Gaitan Benitez was known
as Pesadilla, or Tuner, as well as some other nicknames.
He was a blusterer.

And in MS-13, his role was to be the fall
guy.  Alvin is the guy gang members left behind when
they fled to Kansas City.  He stayed back, lived at
home, went to work.  Alvin is the guy who the government
gets sent to dig a grave for Lagrima's reburial.  They
claim he was running the gang.  But they also claim he
was just sent as a lowly grave digger.

Lots of homeboys, according to the evidence,
participated in Lagrima's reburial, but only Alvin is
charged with that conduct in Count 5.  He is the fall
guy for the gang and a fall guy for the government.

Alvin wasn't running the gang, ladies and
gentlemen, and he wasn't running off to Kansas City
after Lil Guasón was murdered.  The only thing Alvin was
running was his mouth.  He blustered about things that
he did not do.

Let's turn to the evidence, and I want to
highlight those witnesses relevant to the charges faced
by Mr. Alvin Benitez.

The government's very first witness in this
case was Sergeant Claudio Saa, who is the government's

gang expert.  Sergeant Saa testified that members of
MS-13 advance in the gang through a reputation for
violence.

He testified that tattoos are a way that
violent acts are recognized, and that they are usually
earned for a homicide.  The tattoos reflect status.

Sergeant Saa testified that gang members
always act in their own self-interest.  They lie to
everyone.  They lie to each other.  They lie to enhance
their reputation and status in the gang.

He testified that they lie to conceal the
fact that they failed to complete missions.  They lie by
taking credit for things other homeboys did.  They boast
about violence they did not commit.  False boasting is a
fundamental part of gang life.

Lying is a fundamental part of gang life.
In the gang, your reputation is everything, and so lying
is everything.  Lying keeps you alive.  And once
arrested, gang members keep lying.  They take the stand
and they tell lie after lie.

As if to emphasize this point, almost
immediately, the very next government witness was Osmin
Alfaro Fuentes, who is known as Buso.  Buso, if you
recall, was the government witness that had the huge
"MS" tattooed on his forehead, and he was a liar and a

blusterer.

Buso claimed to be so drunk that he didn't know he was getting "MS" tattooed across the top of his face.  He didn't even realize it was happening.  He just woke up.  There it was.

That's a ridiculous story.  Remember that "MS" tattoo reflects violence and consequently status. But at that time, he had not yet committed any killings. What Buso was doing with the tattoo was false bravado, a claim plastered across his forehead that he had committed killings when, at the time he got the tattoo, he had not.

He knew what he was doing.  His story about getting drunk is a lie.  He wanted the status, so he got the tattoo.  It was false bluster right on his face.

Remember the testimony that over time, MS-13 reduced the use of tattoos because they aided law enforcement.  Buso specifically admitted during cross-examination that blustering, bravado, has replaced tattoos as a way to gain status.  And just as Buso's tattoo was false blustering, so was Alvin's blustering on those phone calls with Junior.  And we'll get to that.

But Buso told another lie.  He testified about a shooting he was involved in, where he wore a

1  visor to cover the huge "MS-13" on his forehead.  He
2  said this allowed him to approach the victim.
3         However, the witness that directly followed
4  Buso -- this was Officer Jay Choi -- contradicted this
5  account.  Officer Choi, who investigated that crime
6  scene, testified that Buso was identified by the victim
7  by the huge "MS-13" on his forehead.  It wasn't covered
8  like a visor -- with a visor.
9         Buso's tattoo was a lie, an example of false
10  bravado plastered across his face.  He obviously lied
11  about how he got it, with that ridiculous story about
12  being drunk.
13         And we know from Officer Choi that Buso lied
14  about how he covered it up with a visor.  It wasn't
15  covered up.  It was how the police found him.
16         Everything Buso told you was a lie, and that
17  was the government's first gang member witness.
18         You learned something else critical to this
19  case during Buso's testimony, something you would see
20  over and over again, week after week.  You learned that
21  such testimony, that the testimony of all of the
22  government's gang member witnesses, is bought and paid
23  for by the government, not with money -- although Junior
24  got money, too -- but with something far more valuable:
25  freedom, a chance to get out of jail.  For someone

facing a life sentence -- and numerous government gang witnesses testified they faced a life sentence -- a chance to get out before they died of old age is worth everything.  It's worth lying about.  They lie about everything.  Homeboys lie to survive in MS-13.  And, of course, they will lie to get out of jail.

And they get much more than that.  They get a shot at life here, with lawful status for themselves and, in some cases, for their families.

And I want to digress a little bit about the process of how a gang member who is a government witness gets a sentence reduced.

As you've heard, these witnesses spend a lot of time with the prosecutors and agents before they take the stand and testify, often, numerous meetings over a period of years.

And there is one part of their testimony that is particularly well-practiced.  A prosecutor will ask:  What are you required to do to get a reduction?

And the gang witness' answer always is:  Tell the truth.

And the next question from the prosecutor is:  Who decides your reduction?

And the well-practiced answer is:  The judge.

1           But the reality is that to get a reduction,
2   the prosecutors have to be of the opinion that the
3   witness cooperated with the government.  They have to
4   feel that the government member helped them -- helped
5   their case, supported their theory, their story.  To get
6   a reduction, the prosecutors have to file a motion.
7   Otherwise, it never gets back before the judge.  And if
8   it never gets back before the judge, they will never get
9   out of jail.
10          Let's pull up on the screen, please, Buso's
11  plea agreement.  This is Government's Exhibit 125, page
12  one.
13          Is it up?  I don't see it on the screen.
14  There it is.  Thank you, Pam.
15          You could see this is Buso's plea agreement.
16  This is page one of the plea agreement.
17          Let's go to paragraph 18.  It should be the
18  next slide.
19          It's called "motion for downward departure."
20  You've learned that in this case, this is a reduction,
21  this is a departure from the long sentence.  And it
22  starts off with the legal language that describes
23  technically what the motion is, and it says in the very
24  last sentence that:  The government may seek a reduction
25  if, in its sole discretion, the United States determines

1  that such a departure or reduction of sentence is
2  appropriate.
3          There is identical language in every plea
4  agreement entered in evidence here.  And you can see
5  that for yourself.  The plea agreements for everybody
6  are Government's Exhibit 120 to 125.
7          The plea agreement, this document, is
8  literally a contract between the gang members and the
9  prosecution.  And this, right here, is the fine print.
10 And it is always critical to read the fine print.  This
11 is the real deal, and all the government witnesses know
12 it.
13         They have to give the truth as the
14 government sees it, which means they have to give the
15 version of events that matches the charges in this case.
16         As they answered on cross-examination, the
17 gang member witnesses understand that the prosecutors,
18 through their sole discretion to move for a sentence
19 reduction, hold the key to their jail cells.
20         Judge Lee gave a specific instruction on
21 this issue.
22         Can we please put up excerpts from the jury
23 instruction regarding plea agreements?  The entire
24 instruction, which you have, is 79.
25         One excerpt notes that the government has

the sole discretion to bring the witness's cooperation to the attention of the sentencing court.

Another excerpt emphasizes that a witness who realizes that he may be able to obtain his own freedom or receive a lighter sentence by giving testimony favorable to the prosecution has a motive to testify falsely.

So Buso tells all of his ridiculous lies about his forehead tattoo, and he gets a sentence reduction.

He testified on cross that he received life without parole in 2005, and in 2011, already a government witness, his sentence was reduced to 15 years pursuant to this type of motion by the government. Maybe it will be reduced again as he keeps telling lies. He sure knows how to play this game.

And we know that the gang member witnesses are not reliable.  All of them are liars.  They lie when in the gang, and when caught they have a motive to keep lying, this time to jurors.

Buso tells these dumb lies and he gets rewarded, down to 15 years from life.  Maybe he'll get more.

And as the case got a little further into witnesses, you learned of another kind of reliability in

1   this matter, and that of the phone call translations on
2   which the government relies so heavily in its case
3   against Alvin and others.
4           This is highly subjective, and that's
5   something that you learned.  FBI contract language
6   monitor or CLM, as they were called, Liliana Portwine,
7   testified that when translating terms, it's necessary to
8   skew it one way or the other.
9           You may recall FBI contract language monitor
10  Sandra D'Sa testified that when the translating is a
11  gray area, and that when working closely with the FBI,
12  she felt like she was part of the prosecution team
13  putting the case together.
14          FBI contract language monitor Vania Vargas
15  admitted that CLMs are qualified only to provide the FBI
16  with summary translations, not the transcripts, and
17  not -- they are not qualified to testify.
18          So we learned from all of these CLM
19  witnesses during the cross-examination of each one that
20  they are not certified, and that although their
21  unauthorized translations are subject to review, they
22  can ignore any suggestions made by review.  So this is
23  really just their unauthorized product.
24          And in this case, they sometimes even
25  reviewed each other.  The bottom line is that the

1   accuracy of the transcripts in this case, the ones made
2   of calls by Junior on which the government relies, are
3   highly suspect.
4            And the government says they have a waiver
5   in this case for this, but fundamentally, these
6   individuals were not qualified to do what they did here.
7            Let's move to Junior himself.  The
8   government called FBI Special Agent Brenda Born before
9   Junior.  Special Agent Brenda Born testified that Junior
10  had been working for the FBI as a CHS, a confidential
11  human source, since November 2005, and that she had been
12  his handler from October 2009 to September 2014.
13           Agent Born testified that when the FBI
14  started using Junior, he was just a homeboy, and that
15  during his time as a CHS he worked his way through the
16  ranks to become leader of an MS-13 clique known as
17  Silvas.
18           She testified that Junior was not authorized
19  to commit any crimes and that, except for once bringing
20  a joint to a meeting with another gang member, he did
21  not commit any crimes.
22           Moreover, as far as she knew, he did not
23  commit any acts of violence while a CHS.
24           According to FBI Agent Born, therefore,
25  Junior rose through the ranks of MS-13 based on bluster

1    alone.

2              You then heard from Junior himself, Jose
3    Aparicio Garcia.  He told you he started with the FBI as
4    a CHS in 2005.  And he told you that he testified in a
5    gang case right here in this courthouse in 2006.

6              He told you he became a leader, the first
7    word, of Silvas in 2012.

8              He testified under oath that he did not
9    commit any acts of violence to become first word, and
10   that he became first word after having testified in this
11   courthouse against other gang members.

12             Think about this.  Based on what you've
13   heard throughout the government's case all of these
14   weeks, the prosecution has repeatedly emphasized that
15   gang members get green-lighted for cooperating with the
16   government.  They get killed.

17             Any and all cooperation with the government
18   gets a homeboy killed.  Even the suspicion that a
19   homeboy is cooperating gets him killed.  Homeboys are
20   not allowed to talk to the police at all.  They are not
21   allowed to help the government at all.  They are not
22   allowed to testify at all.  This violates all the top
23   rules of the gang.

24             And yet Junior not only cooperates with the
25   government, he testifies in open court, just like you

1   saw him do, but also back in 2006, in another gang case.

2   He not only does not get killed after being a snitch, he

3   gets promoted.  He works his way from homeboy to first

4   word, after testifying in court for the government, and

5   he does it, according to the government, without

6   committing any of the acts of violence the government

7   says are required to advance in MS-13.

8                    How is that possible?

9                    When asked about this on cross-examination,

10  Junior boasted that he was the smartest one in the gang.

11  He knows how to talk to homeboys, he says.  He knows how

12  to manipulate them.  He is, by his own admission, a

13  master manipulator.  He has to be.  He is living proof,

14  literally living proof, that false bluster can keep you

15  alive and get you status in MS-13.  It can get you from

16  snitch to first word on bluster alone.

17                    Excuse me.

18                    The government repeatedly attempted to

19  dispel the notion that you could lie to advance your

20  reputation by suggesting, through various witnesses,

21  that MS-13 has some sort of verification process, that

22  the defendants can't be blustering.

23                    Junior is living proof that MS-13 does not

24  do its homework.  There are no background checks.  There

25  is no verification process.  There is Junior.  He is

1   proof of that.  Junior is proof that anyone can make it
2   in MS-13 on bluster alone.
3            Here's an example of the bluster.  Let's
4   pull up Government's Exhibit 18A-1.  Here's the first
5   page.  This is a conversation between Junior and
6   Christian Lemus Cerna on May 15th, 2014.
7            And we're at the bottom here, Bates stamp
8   page 16.  "JR" is Junior and "LC" is Lemus Cerna.
9            And Junior says, "That dude that's giving me
10  bullshit, he already pissed me off, dude.  That dude was
11  bullshitting stone, you know.  So we dropped in on him.
12  And the motherfucker was crying, you know.  The rings,
13  the chains, 'Leave me, leave me those, because they
14  belong to my wife.'"
15           Lemus Cerna -- "OV" is over voice -- says,
16  "Oh, yes, yes, yes."
17           Junior says, "All right.  Cool, you know.
18  We, we helped him out, you know.  They gave him the
19  chains and everything, you know."
20           Then the top of the next page, Lemus Cerna
21  says, "Uh-huh."
22           Junior says, "We took his money and
23  everything.  All right, cool.  We told him.  All right,
24  250, I told him, you know.  'Know for sure,' Stone told
25  him, 'I'm going to cut your finger off, you son of a

1   bitch.'

2              "'No, no, no,' said the motherfucker."

3              "'We are going to cut your finger off."

4              "'No, no, no.'"

5              "And the son of a bitch started crying, you

6   know.

7              So, Junior says to Lemus Cerna, "Where can I

8   leave my car around here, dude?"

9              And Lemus Cerna says, "No, keep going

10  further."

11             Junior says, "Oh, all right, then.  Oh, hey,

12  you know, that motherfucker did, fool, that motherfucker

13  pissed me off already, dude.  I'm not kidding, you know,

14  too much ripping off, homeboy.  Too much ripping off."

15  Did you hear what the dude said?  That he already sold

16  him the business."

17             In court, Junior testified that "dropped in

18  on him," which was the first part of that quote --

19             We're done with that.

20             -- means to attack or to rob him.  He also

21  testified that he wasn't actually there.  He heard a

22  version of what happened, and he takes credit for it.

23  He takes credit for it as if he was there, but he

24  wasn't.

25             And there's another thing to notice here as

well.  You could see how blustering is the social
currency of MS-13.  When Junior talks about violence,
Lemus Cerna says, "Yes, yes.  Keep going."

And Junior says, "Well, and where do I park
my car?"

And Lemus Cerna says, "No, I want to hear
more.  Keep going."

This is the social currency.  Junior knows
this.  Junior knows this is what MS-13 members like to
talk about, and they like to falsely bluster, just like
he is falsely blustering.  He was not doing any of the
things he said he was, and he's getting gang members to
do the same thing.

Junior succeeds in obtaining exactly the
kind of false bluster that he, himself, employs.  As
you've heard, he gets Alvin Gaitan Benitez to falsely
brag about decapitating Lil Guasón.  But we know this is
all bluster.  There is no evidence, aside from the
blustering calls with Junior, that Alvin decapitated Lil
Guasón.

You've heard in another call in which Junior
gets Leopardo to boast that he decapitated Lil Guasón,
and you've heard that Solitario boasted to Skinny that
he decapitated Lil Guasón.  And Slow, who we will get to
in a minute, testified that Lil Poison -- sorry -- Slow

1    testified that Lil Payaso was the one who decapitated
2    Lil Guasón.  The evidence is a conflicting mess.
3            The government, in their closing, called
4    Junior a hero.  He's not.  He's a liar.  He uses bluster
5    to get bluster out of others, and that's literally
6    Junior's job.  He makes money doing that.  The FBI has
7    paid him tens of thousands of dollars to do that.
8    Blustering gets him a whole lot of benefits.
9            And remember the lie he told about the
10   immigration help -- he got -- help he got from the
11   prosecutors?  He testified on direct that the letter
12   from the prosecutors did not get delivered to the
13   immigration judge, and must have gotten returned, didn't
14   get the benefits.
15           But on cross, it was revealed that he showed
16   the letter from the United States Attorney's Office to
17   the immigration judge.  Obviously, because it got
18   returned, he brought it to court.  And so he sought to
19   stay in the United States.
20           So, even on that small thing he wants to lie
21   about that, and on cross-examination he was caught in
22   that lie.
23           More lies.  Slow testified that Junior
24   punched a young man in the face and left him bleeding,
25   an unprovoked attack.  This is around the summer of

1  2014.

2           Junior, of course, did not report this to

3  his handler, Brenda Born.  He lies to the FBI.  He lies

4  to everyone.  He is a manipulative opportunist.

5           Subsequent to Junior, you heard from Juan

6  Carlos Marquez Ayala, who was known as Skinny.  Skinny

7  was a heavy drug user.  He used marijuana 10 to 15 times

8  a day, often used cocaine, admits to having used crystal

9  meth.

10          He was also a drug dealer.  He sold crystal

11  meth, cocaine, heroin and marijuana.  He smuggled drugs

12  into prison for the homeboys.

13          Skinny testified that almost everyone in the

14  clique went to rebury Lagrima.  He throws everyone into

15  this one.  Skinny says he was there, as was Greñas, Lil

16  Poison, Pesadilla, Lil Evil, Lil Slow, Duende, Leopardo.

17  This count is a mess and they're making Alvin the fall

18  guy for it.

19          And it's not just the prosecution trying to

20  do this.  Yesterday you heard Solitario's lawyer try to

21  blame Lil Guasón's murder on Alvin.  But Solitario told

22  Skinny that he, Solitario, stabbed and decapitated Lil

23  Guasón.  Solitario admitted to Skinny and also told

24  Skinny that he liked it, that he played soccer with Lil

25  Guasón's head.

1          We also know that soon after Lil Guasón's
2   murder, Solitario took off for Kansas City with others,
3   where he was ultimately arrested.
4          In her closing, Ms. Martinez said that this
5   flight by Solitario and others, quote, establishes
6   guilt.
7          But that works both ways.  Not fleeing
8   reflects Alvin's innocence.  Alvin stays at home.  Alvin
9   knows what he says is all bluster.  So why would he need
10  to flee after a murder he did not commit?
11         Skinny also testified that he was not
12  truthful when Junior -- when they, Skinny and Junior,
13  spoke on the phone.  Skinny lied on the phone to Junior.
14  Skinny testified that all homeboys lie, always.  He
15  testified that they lie to each other.  They lie to
16  survive.  They lie to Junior.  Junior lies to them.
17  They lie to him.
18         Also recall it was Skinny who wanted Lil
19  Guasón dead for stealing money from the mother of his
20  child, her money, not the gang's money.  This was not an
21  act in furtherance of racketeering activity.  It wasn't
22  even the gang's money.
23         The next witness you heard from, or you
24  next -- another witness you heard from was Araely
25  Santiago Villanueva.  He was known as Slow or Lil Slow

1    or Spider.  He added to the confusion.  He was the one
2    who said that it was Lil Payaso who cut off Lil Guasón's
3    head.

4            From Slow, you learned that Douglas Duran
5    Cerritos, known as Lil Poison, was the leader of PVLS at
6    the time that Lil Guasón was killed; that Lil Poison
7    participated in the murder of Lil Guasón.  After the
8    murder, he made the decision to go to Kansas City with
9    other gang members to flee the police.  Lil Poison,
10   Slow, Solitario and Leopardo fled to Kansas City.  Alvin
11   did not go with them.

12           Slow testified that they went to Kansas City
13   to flee the police.  Alvin did not flee.

14           Slow testified that while others fled, Alvin
15   stayed at his house and just went to work.  And you can
16   recall, this was actually brought out on redirect by the
17   government, by Ms. Martinez.  She pressed Slow, "Where
18   was Alvin when the others fled?"

19           And Slow said, "Alvin was at home.  Alvin
20   was going to work."  Alvin, the fall guy, the guy who
21   falsely brags about decapitating Lil Guasón, stays at
22   home while others flee.

23           This was later corroborated by Detective
24   Raymond Betts, who testified that he had to go to Kansas
25   to arrest a number of MS-13 members, but he arrested

1   Alvin at home.

2          Also recall how Detective Betts found Alvin.

3   According to his testimony, he surveilled the

4   Fairfax Court when Alvin had a ticket.  Alvin showed up

5   for his traffic ticket, and they followed him home.

6          So to recap, while others fled, Alvin Gaitan

7   Benitez stayed home, worked and showed up in Fairfax for

8   a scheduled court appearance on a traffic citation.

9   These are not the actions of someone who has just

10  committed a murder.

11         One more thing about Slow.  During the

12  prosecution's closing argument, and in an attempt to

13  bolster Slow's testimony, Ms. Martinez suggested that

14  Slow was, well, too slow to be able to consistently lie

15  about the same people.

16         Ladies and gentlemen, we know from weeks and

17  weeks of testimony that the government witnesses spend

18  many, many hours over an extensive period of time being

19  coached by the government before coming here to testify.

20  They just have to learn who is charged and what count

21  and repeat it in court.  That's easy.  No one is that

22  slow.

23         Right after Slow, you heard from Jose Del

24  Cid, known as Duende.  Duende, as you recall is a

25  lifelong brutal killer.  He participated in every

1  murder, as well as the attempted murder charged in this
2  case, and numerous other violent crimes here and in
3  El Salvador.  And he is also a liar who is trying to
4  save himself from dying in prison.
5          Duende testified that he directly
6  participated in three murders in El Salvador over a
7  period of at least six years before coming to the United
8  States.  Once in the United States, over the next two
9  years, from approximately 2012 to 2014, he and Lagrima
10 stabbed a man in Alexandria.  Duende assaulted a
11 one-armed man with a hammer.  He assaulted another man
12 with a bat.  He stabbed a 12-year-old child in the chest
13 in Fairfax.  He pulled a gun on a kid in Alexandria.
14          He was involved in the plan to kill
15 Peligroso.  He participated in the murder of Lagrima.
16 He participated in the murder of Lil Guasón.  And he
17 participated in the murder of Julio Urrutia.
18          Considering this horrifying violent spree in
19 just the two-year period he was in the United States,
20 which ended only upon Duende's arrest, it is impossible
21 to credit Duende's claims that he was involved in merely
22 three murders in El Salvador in the six years prior.  It
23 just doesn't ring true.  He's a liar.  He admits what is
24 already known here, while understating his own level of
25 violence elsewhere.

1           And I want you to notice something else
2   about Duende's testimony.  He deflects blame onto
3   others.  He refuses to take direct personal
4   responsibility for his actions.  It's always someone
5   else who holds the knife.
6           With respect to that stabbing in Chirilagua
7   in 2013, Duende said it was Lagrima who held the knife.
8   It was Lagrima who did the stabbing.  It is always
9   someone else, Duende testified, or it was someone else
10  who told him to do it.  That's what he does.  He
11  deflects blame and he is trying to shift blame to Alvin
12  for his own crimes.
13          If you recall, he was arrested a number of
14  times.  One of those times he gave a fake name for
15  himself, Gabriel Cabrera is what he told the police, and
16  he got released.  They weren't looking for Gabriel
17  Cabrera.  He lies to get out of jail.  He lies to
18  survive.
19          Duende is a six-time murderer, at least.
20  Moreover, he stabs children in the chest.  He sticks
21  guns in their faces.  He has no conscience.
22          But the government presents him as a witness
23  and says, the only reason he is here is to tell the
24  truth.
25          The only reason he is here, ladies and

1  gentlemen, is to save himself, and he will do anything
2  to save himself.  Duende has a lot of violence to work
3  off by cooperating.  His plea agreement in this case --
4  it's Government's Exhibit 123 -- provides immunity from
5  any further prosecution of the crimes charged here.
6        But it goes much further than that.  The
7  United States Attorney's Office obtained immunity for
8  Duende in all the Northern Virginia jurisdictions where
9  all of these crimes and all these other violent acts
10 occurred.
11       And, of course, Duende hopes to get
12 immigration benefits once he reduces his sentence and is
13 ultimately released after testifying here.
14       Duende is ruthless.  He will say and do
15 anything he needs to.  He killed all of those people.
16 He, Lil Poison, Slow and others killed Lil Guasón.
17 Duende did this killing.
18       And he and the other government witnesses
19 now need to throw some blame on Alvin.  They need to
20 make him the fall guy so they can work off their time.
21 Duende's testimony and the testimony of other witnesses
22 cannot be trusted.
23       In her opening and again in her closing,
24 Ms. Martinez says Duende is, quote, no choirboy, as if
25 this claim of what Duende is not somehow makes him

believable.  No, Duende is no choirboy.  He is a
ruthless killer and a habitual liar, who throws blame
everywhere else.  And when that stops working, he signs
a plea deal to work off his time by falsely blaming
others.  And he still deflects blame, even here.

That's not proof beyond a reasonable doubt.
It's not proof at all.  Duende killed Lil Guasón.  But
now, in order to save himself, he needs to cast blame on
others.  He lies to survive.

The final witness called by the government
was Detective Raymond Betts.  As discussed earlier,
Detective Betts testified that he had to go to Kansas
City to arrest Lil Poison and others.  But he arrested
Alvin Gaitan Benitez at his home.  When others fled,
Alvin stayed home.  When others fled, Alvin went to
court to face a traffic ticket.

Alvin knew he was blustering.  He did not
need to leave town.  Blustering is not a crime.

The final witness of the entire trial was
Jose Lopez Torres, also known as Greñas.  He took the
stand without a deal with the government.  Every other
member of MS-13 who took the stand did so in return for
a promise of freedom, a promise that they would not be
prosecuted for their crimes and a promise that once
released from prison, they and their family members

could stay in the country.  Various members got various
promises.

In stark contrast, Jose Lopez Torres, an
MS-13 member, was promised nothing.  His testimony will
not result in his release some day.  His family will not
be given immigration benefits.  He will not go into the
Witness Protection Program.

The best case scenario for Mr. Lopez is that
he will be looking over his shoulder for the rest of the
life while in prison.  The worse case is he will be
killed in short order for taking the stand and
testifying about the gang.

Mr. Lopez Torres knows he isn't going to get
a prize for testifying.  Testifying about MS-13 is not
allowed, period.  MS-13 does not do nuance.  And he
implicated Lil Evil and Marciano and others.  This isn't
going to get him a prize.  It's likely to get him
killed.

His testimony, ladies and gentlemen, was
credible.  He told you that he and Skinny dug a hole for
Lagrima's reburial, and that Skinny, Slow, Duende and
Lil Evil reburied Lagrima.  His credible testimony was
that Alvin was not there.

Ladies and gentlemen, the government carries
a heavy burden of proof beyond a reasonable doubt, and

1  they have not, and cannot, meet that burden with respect

2  to Alvin Gaitan Benitez.  He is just the fall guy.  He

3  stays home when the others flee.

4        Junior played Alvin.  Junior is all bluster

5  and got Alvin to bluster back at him, while Junior knew

6  it was all being recorded.

7        Lil Poison played him, killing Lil Guasón

8  with Duende and then fleeing to Kansas City, leaving

9  Alvin back here to take the fall.  And Duende, one of

10 the real killers, got on the stand and lied and blamed

11 others, including Alvin, for the murders so that --

12 Duende committed, so that Duende himself can go free.

13       The government's case is built on all these

14 lies and bluster.  Every single gang witness the

15 government presented to you was biased and had very

16 powerful motives to lie.

17       And even before they agreed to cooperate,

18 they were liars.  They lie to survive.  They lie to get

19 what they want.  They get the indictment and they

20 conform their testimony to it.

21       We heard that some of the witnesses, such as

22 Duende, had years of meetings with prosecutors and

23 agents to get their story straight.  Testimony that is

24 so obviously biased and shown to be untruthful is not

25 proof beyond a reasonable doubt.

1          For all these reasons, ladies and gentlemen,
2   we would ask you to return the only verdict permitted by
3   law where credible evidence beyond a reasonable doubt is
4   so lacking, as it clearly is in this case, and find
5   Alvin Gaitan Benitez not guilty of Count 5 and Count 6.
6          Thank you.
7          THE COURT:   Thank you.
8          You may proceed.
9          MR. SALVATO:   Thank you, Your Honor.
10      CLOSING ARGUMENT BY DEFENDANT LEMUS CERNA
11         MR. SALVATO:   Good morning, ladies and
12  gentlemen.
13         Good morning, Counsel.
14         Good morning, Mr. Cerna.
15         I just want to echo a couple things that
16  Mr. Zimmerman said, just on a personal level.  I want to
17  thank you for your jury service.  Jury service is --
18  it's a duty and, more importantly for your personal
19  lives, it's a personal inconvenience.  It takes you away
20  from those routines that you have, your kids, your
21  family, your regular phone calls that you might make.
22         So I cannot tell you how much I appreciate
23  you coming every day, going through security twice,
24  coming here and paying close attention, taking notes.
25  And I really appreciate your personal service and

your -- the personal inconvenience that you've taken in this case.

Ladies and gentlemen, Christian Cerna is charged in Count 6 of this indictment.  And I want to emphasize two things during my closing argument. Christian Cerna is not guilty, and he's not guilty for two reasons.

First, as an overall matter, Count 6, the whole event was not in furtherance of an enterprise. The government must prove that the purpose of the actions involved in Count 6 were to gain entrance, maintain or increase someone's position in an enterprise, I'm going to speak about that in a little bit.

The second reason, ladies and gentlemen, that Christian Cerna is not guilty of Count 6 is the government cannot prove to you beyond a reasonable doubt that he is guilty of the murder of Lil Guasón, or that he is guilty of aiding and abetting that murder.  So, for those two overarching reasons, Mr. Cerna is not guilty of Count 6.

And I want to make it very, very clear, because there's been a lot of innuendo and testimony and transcripts, some exhibits, he is not charged in Count 4 -- and the government hasn't argued that -- and

1  he is not charged in Count 5, the reburial.  Okay.

2       So, while there's testimony and transcripts,

3  et cetera, about the reburial and whether Mr. Cerna was

4  involved in the reburial, Mr. Cerna is not even charged

5  in Count 5.

6       He only faces the charge in Count 6.

7       He's not in Count 1.  His notebook with the

8  shapes and containers was found in the car -- not

9  charged in Count 1.  He was only charged with respect to

10  Count 6.  And Count 6, ladies and gentlemen, quite

11  bluntly, is an absolute mess.

12       As an overall matter, the government really

13  can't have it both ways in this case.  And we've seen a

14  lot of that from Ms. Martinez in her closing statement

15  and during the evidence.  They can't tell you that MS-13

16  is very well organized, there are specific rules, you

17  have to follow the rules and, therefore, it's this

18  enterprise, then turn around and say, well, not

19  everybody knows the rules.  The rules can change.

20  Everybody has a different understanding of the rules,

21  and really, anybody that's in a gang who does any

22  criminal act, it must be gang-related or for the purpose

23  that the government must show is part of the RICO

24  statute.

25       That's not the law.  And you've seen this

flip-flopping during the government's case over the past
six weeks and during closing argument.

Ms. Martinez told you, as long as they do
something with the gang in mind, that's good enough.

And you'll see through the jury
instructions, that's not good enough.  That isn't the
standard.  Having the gang in mind does not qualify as a
RICO offense.

Tattoos.  You've seen a lot of testimony
about tattoos.  If you have tattoos, that's really bad.
If you've got the 503, you've got the MS-13, that's
really bad.  That shows something.  That shows your
status in the gang.

But if you don't have tattoos, like
Mr. Cerna doesn't have a tattoo anywhere on his body,
well, that's really bad, because he's a young guy and,
you know, you're not supposed to have tattoos.

So, it's this constant flip-flopping, that
whatever the government has in terms of its witnesses is
good for its case.  And that's not the law.  That
shouldn't be how you consider things.

Detective Saa was the first witness.  And as
Mr. Zimmerman said, he told you right off, right out of
the bat, he said, everybody brags.  MS-13 witnesses are
untrustworthy, and everybody brags and takes credit for

1    stuff that they didn't do.  That's the way you are a big
2    shot.
3                He also told you that MS-13 members, if they
4    cooperate, there's one place they don't want to go back
5    to, which is El Salvador.  It's much easier to kill
6    somebody in El Salvador.  They want freedom and to stay
7    in this country.
8                Detective Saa also told you, importantly,
9    that green lights are authorized for cooperation.  Other
10   rule violations, such as money issues, as the government
11   has alleged in Count 6, are *calentóns,* or beatings.
12   That's the number one rule:  green light for
13   cooperation.
14               Detective Saa also told you, out of the
15   hundred or so cases that he's investigated, that
16   personal beefs do exhibit, that gang members do things
17   outside of the structure of the gang, such as domestic
18   assaults, was his example.
19               Detective Saa never told you that an
20   enterprise, such as the government alleges here, gives
21   green lights for sleeping with a girlfriend or an
22   ex-girlfriend, ever.  Detective Saa, the government's
23   first expert, their gang expert, said that -- he never
24   said that anything like that ever happens.
25               You heard the same thing from Buso.  And

1   it's interesting with Buso, as Mr. Zimmerman touched on

2   for a second there, you kind of see the past and the

3   future in terms of these cooperators, when Buso took the

4   stand.

5            These cooperators are facing life in prison.

6   You saw, Buso got a life sentence with no parole, no

7   possible release.  That was his past.

8            However, the future for him is that he still

9   got in prison -- trouble in prison.  Remember that.  He

10  still got his Rule 35.

11           And that's kind of a slight preview as to

12  what happens with these cooperators.  And they can come

13  up here and preach to you, "Hey, I just got to tell the

14  truth.  That's all I got to do.  It's up to the judge."

15  But you saw in living color what happens to these

16  cooperators.

17           Buso shot a young kid on a bike in the back,

18  in front of the kid's little sister, and he got

19  15 years, and he's expecting immigration help to stay

20  right here in our community.  That's a preview of what

21  happens to these cooperators.

22           And you also saw a preview between the

23  interested witnesses and the disinterested witnesses.

24  The interested witnesses, like Buso, came in and said,

25  "Hey, I'm going to just come here and help the

1  government.  Hey, great, I got my time reduced."  He was
2  very interested in what he had to do to help the
3  government.  And he came in, like Mr. Zimmerman said,
4  and lied his butt off.  Okay.  "Visor, MS-13, I had it
5  pulled down.  Nobody could see that."
6          Disinterested witness, Officer Choi, comes
7  in, says, "Yeah, that was the description.  The guy had
8  a big "MS" on his forehead."
9          Now, nothing happens, though, to Buso.  Is
10  there any evidence that the government intends or has
11  taken his Rule 35 away?
12          Oh, no, wait a second, Buso, you lied about
13  that.  We know you lied, because Choi came in and told
14  us something completely different; the very next
15  witness.
16          Nothing happens.  As long as Buso says what
17  the government wants to hear to get from point A to
18  point B to convict all of these guys, it's okay.  He
19  gets his 15 years, and maybe he stays in the community.
20          And Ms. Martinez talks about justice.
21  There's no justice for the young man that he shot, or
22  the sister that witnessed that, to have Buso's sentence
23  reduced from life to 15 years, and have him in our
24  community.  That's not justice.
25          And the government would have you believe

1  that all these guys can do all of this stuff, right,
2  shoot the kid, try to shoot your own mother, machete a
3  guy, do all of these acts of violence, okay, but they
4  would never lie to get a sentence reduction.  I mean,
5  that would be really wrong, right?
6          I mean, that's basically what the government
7  has told you.  We can do all -- they can do all this
8  stuff, but, lying to you, 18 people -- 12 people?  No,
9  there's no chance they would ever do that to save
10 themselves.
11          That is an absurd, preposterous position to
12 take.
13          A lot of this depends upon the translations
14 and the linguists.  And as Mr. Zimmerman indicated, the
15 linguists are not even qualified to translate.  They got
16 a waiver.  They skewed things for the government.  They
17 admitted that on the stand.
18          These linguists are only to provide
19 summaries, not translations.  Mr. Aguilar told you that
20 he, in fact, was briefed by the agents.
21          And the Court will tell you in its jury
22 instructions -- this is jury instruction 92 out of 109:
23 You were specifically instructed that whether the
24 transcript correctly or incorrectly reflects the content
25 of the conversation, or even the identity of the

speakers, is entirely up to you.  You can use your own
examination of the transcript and all of the evidence
that came in.

So, the government's premise, their basis,
is that these transcripts are completely accurate and
transcribed properly.  And we would submit to you, for
various reasons, and certainly the fact that these
linguists are not even supposed to testify, or qualified
to testify, that the transcripts are not accurate.

And, Ms. Martinez did a great job in beating
up the interpreter or translator that Mr. Castillo
called, did a great job with her.

But she had access to a lot of things that
the defense didn't have, because of what their witnesses
said that they did.

This lady, this defense witness, at least
took notes that were recoverable, that Ms. Martinez
could ask her about.

What did the linguists do in this case?
They erased every note.  They typed over their summaries
to produce these transcripts.  There is no note at all
that's been produced to you from what these linguists
initially or originally heard on these transcripts, not
one note.

Not one note from Agent Uribe, who literally

1   can't go -- and, you know, we've watched him, you've

2   watched him.  He can't go five minutes without

3   scribbling out a note.

4           There's no notes from Uribe to the

5   linguists.  There is nothing from the linguists back to

6   Uribe, because everything has been erased.  That should

7   give you reason to pause about whether these transcripts

8   are accurately transcribed.

9           Drowsy told you again, the leader makes a

10  decision.  Cooperation equals green light.  Nothing

11  about an ex-girlfriend's baby's mother.

12          You heard from Demente.  Demente is really

13  when you first saw that people brag about stuff that

14  they didn't do.

15          He said, um, the clique leaders make the

16  decision, et cetera.  He lied about Leopardo, about

17  Christian.  He portrayed Christian as very

18  sophisticated.

19          And when I showed him the notebook, I said,

20  "Isn't this a guy just learning his triangles and shapes

21  and seasons?"

22          "No, he's very sophisticated."

23          He still battled me on that, battled me on

24  that, battled me on that.  And it's really the first

25  example of how the cooperators are not only trying to

1    get out of prison early, but they also lie about each
2    other.
3              I asked Demente -- and I think Mr. Aquino
4    did -- tell me about Duende.  Tell me about Del Cid.
5    The good guy?  Okay?
6              Demente told you, he's a good guy, right?
7    Duende, good guy, not violent at all; never saw Duende
8    with a gun, never saw him do anything violent, not a
9    devil worshiper.  That was an absolute, outright lie.
10             And the government took Duende under its
11   wing in opening.  They said Duende's role in Lil Guasón
12   was to chop at his legs after he was dead, and he was
13   there for other murders.
14             Now that's the understatement of, if not
15   this year, of the decade.  And you see this bragging
16   about this very issue.
17             In the government's closing, they put up a
18   transcript from Christian, where Christian said, "Hey, I
19   broke Lil Guasón's legs after he was dead."
20             Well, he didn't do that.  In fact, Duende
21   said from the stand -- and Ms. Martinez said in the
22   opening -- that it was Duende who did that.  So, here's
23   Christian bragging about something in the tapes, if the
24   tapes are even accurate, that he didn't do.
25             Demente also told you that family, his wife,

1    mother, father, sister, and obviously that respect has
2    to be given.
3              Obviously, Duende didn't know that.  And how
4    many times have we seen, "Let the record reflect the
5    hand signs" and "the devil horns" and all that.
6              Well, the government didn't show you, "Let
7    the record reflect Duende holding a shotgun to his
8    mother.  Let the record reflect Duende is chopping at a
9    man's arms while he is tied to a tree."
10             And the final, real proof of the crazy
11   bragging that goes on with Demente is, Demente told you
12   that he parades around the sector, he drives around
13   these four blocks, walks around these four blocks, he
14   sold marijuana twice.
15             But Junior tells you that Demente brags to
16   him that Demente sold $6,000 worth of methamphetamine
17   and cocaine.  That's the amount of crazy bragging that
18   these guys are doing to Junior and to others, to
19   everybody.
20             As to the plea agreements -- and
21   Mr. Zimmerman covered this a little bit, but Judge Lee,
22   with all of his power, where he sits, with all the power
23   of a Federal Court, he cannot, he cannot, on his own,
24   give a reduction in someone's sentence under the
25   criminal rules.

1            The government has the sole discretion to do
2    that.  He can't do it on his own.  So if he's sitting
3    here and watching these witnesses and say, "Wow, I
4    thought this guy was really good.  He should get a
5    reduction in his sentence.  I want to give this guy a
6    reduction in his sentence."  He can't do it.  He is
7    powerless to do it.
8            The government has to, in its sole
9    discretion, come before Judge Lee and say, "Reduce
10   Duende's sentence."  "Reduce the sentence of Buso."  He
11   has no power to do it, which is in a lot of ways a
12   shame.  It's up to the government only.
13           And the Court has told you how you must look
14   at these cooperators' testimony.
15           The jury must determine whether the -- and
16   this is in instruction 78 -- whether the testimony of
17   the alleged accomplice has been affected by
18   self-interest -- yeah, I want to get out of jail and not
19   go to El Salvador -- or by an agreement -- yeah, I've
20   got an agreement where it's up to them to get me out of
21   jail -- or by his own interest in the outcome of this
22   case.
23           Now, Duende has to cast a large net, and I
24   want to get to that in a second.  But Duende has to cast
25   a large net.  If he says, "Listen, you know, yeah, I

1  killed Lil Guasón.  You know, that stuff about the dull
2  knife, that was all ridiculous."
3         I mean, the idea that Duende brought a dull
4  knife, given his resumé in terms of violent acts, to Lil
5  Guasón, that's absurd.
6         Yeah, "but I did it," or, "maybe just
7  Benitez did it."  He has to cast the net as wide as he
8  can, to pull in people like Solitario, to pull in people
9  like Christian, because that gets him out of jail,
10 because the government is going to be happy with that.
11         They're not going to be happy with "he did
12 it" or "Benitez did it alone."  They need a wider net.
13         Which brings me to Junior.  Ms. Martinez
14 indicated that, um, she feels Junior is a hero.
15         I see Junior as a habitual manipulator and
16 liar.  The way he's able to lie and blame others and
17 make up outlandish stories is certainly absurd.  Okay?
18         Just his buying of the marijuana cigarette,
19 spent 20 minutes with him, like, "Yeah, you know, I got
20 it in my neighborhood.  No, actually, I rolled into DC.
21 I don't remember where.  It was southeast DC for sure.
22 Yeah, I remember southeast DC.  But I don't remember how
23 I got there, who I bought it from; just some random dude
24 on the street, I guess."
25         It's a complete absolute lie.  That's not

1   heroic.

2           When he talked about and gave the song and
3   dance to you guys about, "Hey, the letter, I didn't get
4   the letter.  It was undelivered."  That's bull.  He got
5   the letter and he delivered it to the judge.  He's lying
6   about those things, those little things.

7           Ms. Martinez propped him up and said, "Hey,
8   you're employed, aren't you?"

9               "Yeah, full time."

10          That was a lie.  And that was an attempt to
11  ingratiate himself to you guys, to make him look better.
12  But as you saw during my cross-examination, he
13  completely lied to the Federal Bankruptcy Court four
14  blocks away, when he said he had no income, no
15  employment, and nothing, when he was trying to get
16  himself out of massive credit card debt, which got so
17  massive that Ms. Martinez was able to object as
18  cumulative.

19          That's not heroic.  The Bankruptcy Court,
20  I'm sure the bankruptcy judge doesn't believe that's
21  heroic.  The creditors don't believe it's heroic.  That
22  is not a great and heroic person to keep in the
23  community, lying to Federal Courts, running up debt.

24          He also told you that he was just on the
25  phone with Stone during this robbery, that he wasn't

1   really there.

2           I would submit to you, if you look at the

3   transcripts that Mr. Zimmerman put up, that's a

4   bald-faced lie.  So Stone is in there robbing people,

5   cutting finger people -- cutting fingers off, and he's

6   on the phone with Junior while all this is going on?

7           Come on.  I mean, I was born -- not born

8   yesterday, right?  You don't -- when you go through that

9   exit sign, you don't leave your common sense at the

10  door.  "Hey, dog, I'm over here chopping fingers off."

11          "Oh, really?  Hold on one second, man.  I'll

12  be right back."

13          That's baloney.

14          There is no way that Junior, Jose Garcia,

15  put on his green card application that he was in MS-13

16  and committed all these acts of violence, like he told

17  you.

18          Now, you haven't seen the application.

19  There is no way that he said that.

20          If we're allowing these folks to perpetrate

21  that kind of lie, what else is he lying about?

22          He is no hero.  And if he moved in next to

23  you or me, I don't think you guys would open the windows

24  and say, "Junior, what's up?"  Love it that -- the fact

25  that, "Hey, honey, a hero just moved in next door."

1          You know, he's got a lot of weird guys

2     coming over, he's doing some stuff, but don't worry,

3     because he reports everything to the FBI, like when he

4     punched that guy at Tyson's Corner, sure he told Agent

5     Born about that.  Don't -- "Hey, let's have him over.

6     He's heroic."

7          And you see that my guy is trying to be a

8     big shot.  He's trying to brag it up to Junior.  Because

9     that's how -- that's what you do.  You try to brag it

10    up.  He's 18 when he's rolling around the woods with

11    Junior.  Junior's 33 years old.  He's a boy.  Junior's a

12    man.

13         East Coast leader of the clique.  Can you

14    imagine?  You know, you get somewhere, you get some

15    status or some rep or something just by bragging, with

16    no verification, no nothing?  Right?

17         You go from Mr. -- you know, for anybody who

18    knows football, from Mr. Irrelevant in the draft to a

19    top five pick, right?  He's just, "Yeah, I went to the

20    University of Miami.  I caught 80 passes."  You're just

21    bragging, because nobody is looking at what really

22    happened.

23         These grave sites were well-known.  There

24    was 20 guys or so mentioned.  Even down in El Salvador

25    they were well-known.  The FBI knew that there was grave

1   sites.

2           And what the Court said about my guy taking

3   Junior to a grave site that he knew about -- and the

4   Court instructed you on this, it's in your instruction

5   packet -- that that is not to be considered evidence as

6   to Count 6.  I urge you to read that.  Don't let the

7   smoke and mirrors confuse you in terms of what that trip

8   to the grave sites means.  I would ask you to read that

9   instruction in particular.

10          Then we got to Skinny.  Is Skinny really the

11  genesis of Count 6?  No.  Skinny is not even charged in

12  Count 6, right?  Although this is supposedly his

13  girlfriend.

14          Skinny said nothing was ever authorized.

15  Remember, authorization, structure means RICO.  And the

16  government can't have it both ways, crazy organized but

17  not crazy organized.

18          Skinny told you his girlfriend is Rosie, not

19  Belén.  He got a girl pregnant, Belén.  He is not

20  married.  There is no family.  He didn't want Lil Guasón

21  killed.

22          There was no -- there's no RICO.  There's no

23  purpose here.

24          The government's theory is all about it was

25  the money and the girl, and Skinny blows both of them

 1   away.  He didn't care about Belén.  He didn't authorize
 2   anything.  This was Belén's money.  This was not gang
 3   money.  Skinny told you that from the stand.  Okay?
 4   He's closest to this situation.  Skinny told you that
 5   this was not gang money.  This was Belén's money from
 6   legitimate employment.
 7            So, the government told you in opening,
 8   "Hey, he's stealing from the gang."  He wasn't stealing
 9   from the gang.  This isn't RICO.  There's a difference
10   between personal beefs and gang activity.  And just
11   because Christian brags about it afterwards doesn't
12   retroactively mean that was the purpose of any action.
13            Which brings me to Mr. Villanueva.  And I
14   want to talk about Lil Slow in a little bit more detail.
15   Lil Slow -- and I prepared -- and I'm sorry, I don't
16   have a clicker, and Chris has been waiting patiently, so
17   I do have something to put on.  Okay.
18            So, this is my, kind of my summary of I
19   think the main points with Villanueva, okay?  Because
20   now we're really down to, there's no purpose, there's no
21   motive.  Now we're down to the two purported
22   eyewitnesses, which are Villanueva and Duende, or Lil
23   Slow and Duende.
24            Lil Slow told you directly that this was not
25   a gang killing at all.  This was a personal beef.  It

1   was not a gang killing.

2          He also told you -- and I disagree with

3   Mr. Chick, and I know he was focused on his own guy, and

4   I appreciate that.  But he told you under

5   cross-examination that Christian was not at this

6   meeting.

7          Remember, I went through with Duende, how

8   close was Villanueva to Christian?  Went through this

9   whole thing with him.  "Oh, yeah, Christian was there."

10         But Villanueva, who says he was there for

11  the entire meeting, told you that Christian was not at

12  the meeting about Lil Guasón.

13         He also told you Skinny didn't care about

14  the girl.  This was Belén's money.  Lil Slow told you --

15  I think he was hopelessly inconsistent on who actually

16  did what.  He told you that Junior beat up a dude at

17  Tyson's, although Junior denied that.

18         He said, out of the blue, Cerritos wanted it

19  to happen.  He is using meth and marijuana that night.

20  And you will see an instruction about that.  That

21  obviously affects his ability to observe things, and

22  they've got to prove it beyond a reasonable doubt.

23         Other people slept with Belén.  Skinny

24  didn't care about Belén.

25         And he said Guepardo stabbed him in the

 1   neck.  That's different than what Duende says.  And he
 2   said Lil Payaso took his head off, which is different
 3   than what the government says.
 4            Let's not lose sight of the fact, no pun
 5   intended, but the guy -- the man can't see.  Right?
 6   Remember, he's up there.  He's trying to figure out, in
 7   a bright lit courtroom, where are these people?
 8            Is Solitario way back there?  Where is
 9   Christian?
10            The man can't see.  And yet the government
11   puts him up, with all of this testimony, to prove to you
12   beyond a reasonable doubt that Christian was involved?
13   It's not true.
14            Then, we get to Duende.
15            Thank you, Chris.
16            Then we get to Duende.  And, I cannot
17   emphasize to you more of what a liar this guy is.  The
18   dull knife story is absolutely preposterous.
19            And, I want to emphasize one thing to you.
20   And as horrible as this is, right, in Duende's statement
21   of facts, which the government says, "Well, we don't
22   keep every detail in here," but this is a pretty
23   important fact or detail, don't you think?
24            In his statement of facts, which is in
25   evidence -- it's one of our exhibits -- what Duende says

1  about Christian's participation -- which they must show,
2  the purpose and the participation -- his only
3  participation -- what it says in the statement of facts,
4  it says:  After concluding the guy was dead, then his
5  head was taken off, after he was already expired.
6         With all this detail in the case -- and the
7  government is going to get up and say, "You know, we
8  don't have to put everything in the statement of facts.
9  It says it right there."
10        All this detail in this case, you've seen
11  cellphone records and cell towers and blow-ups and
12  transcripts and thousands of calls, all this minutia,
13  and on the one critical fact of whether Christian
14  actually participated in this offense, it says, "After
15  concluding he was dead..."
16        There is no way the government, who wrote
17  that document, would say that unless it was absolutely
18  true.  Nothing happened with this guy's head --
19  unfortunately, anything happened -- but nothing happened
20  with respect to his head on my guy's even alleged
21  actions.  Because, remember, there's like ten different
22  people that are supposedly involved in this.  Nothing
23  happened until after he was concluding he was dead.
24        So, ladies and gentlemen, when you look at
25  Count 6, I would urge to you that Count 6, unlike

perhaps some of the other counts or situations that Lopez Torres told you about, Count 6 is hopelessly inconsistent.  It is hopelessly inconsistent.

Is he at the meeting or not?

Duende says yes.  Lil Slow says no.  But Lil Slow was there.  Duende has killed like five people, you know.

Did he stab him?

Ah, yeah.

Lil Slow said, Guepardo stabbed him in the neck.

Duende doesn't say that.

Skinny said Solitario cut off his head and played soccer with it.

But Lil Slow says it was Lil Payaso.

Duende said it was Christian, after he was already dead.

Lil Slow says it wasn't related to the gang, but Duende says it was related to Skinny; it was actually ordered by Payaso -- which nobody told you.

Skinny himself says, he didn't want the gentleman killed, and it was Belén's money, not gang money.

You've got incredible, like, inconsistency.  And this isn't like, "Hey, was it 10:00 o'clock or was

1  it 11:00 o'clock?"  This is the guts, this is the

2  entirety of the government's case.  These are the

3  elements of the offense.

4          So, the question becomes whether the

5  government can prove to you beyond a reasonable doubt a

6  violation of 1959.  And this is jury instruction number

7  15.  And please don't just focus on my part of the

8  instructions.  You read them all.  The government may

9  stand up and say, "Well, he didn't tell you this or

10  that."  Read them all.  Okay?

11          And what 1959 says -- this is the violation

12  of law, okay?  This is what makes it a federal offense,

13  not a state offense, because these offenses can still be

14  state offenses.

15          But for this particular case, it says:

16  Whoever, for the purpose of gaining entrance to or

17  maintaining or increasing a position in an enterprise,

18  either murders -- or then the instruction goes on and

19  says, aid and abet murder.

20          So, what can the government actually prove

21  with respect to Lil Guasón?  Okay?

22          Thanks.

23          First, if we're ranking them, to use a

24  football example, in draft order, right, the number one

25  pick, probably, to kill Lil Guasón out in that park is

1    probably Duende.  Right?  He's certainly a much more
2    experienced person in this regard than Mr. Benitez,
3    certainly than anybody else here.  Duende has a vast
4    amount of experience in terms of killing.  And the story
5    about the dull knife just is absolutely incredible.
6             So, if I'm looking at my draft board, Duende
7    is number one.  Okay?
8             Secondly, I'd point you to what Duende said
9    initially.  I mean, if I'm comparing Duende and
10   Mr. Benitez, it seems like Duende is the more likely
11   suspect.
12            But what Duende told you in his -- or told
13   Detective Ignacio, the very first time when he sat down
14   to be interviewed by Detective Ignacio, he said,
15   "Benitez did it by himself.  Benitez killed the man."
16   Okay.
17            And when I asked Duende directly on the
18   stand, "Who actually murdered him?  Who killed him?"
19            He said, "It was Alvin Gaitan Benitez."
20            And, you know, the government's theory is
21   that this was all about the girl and this was all about
22   the money.
23            And, you'll see in the phone calls that, at
24   least what Mr. Benitez -- and this is Exhibit, I
25   believe, 10A, page five.

1            Now, remember, this is purportedly all about
2    the girl, all about the money.  But what Mr. Benitez
3    seems to tell Junior -- and I understand Mr. Zimmerman's
4    point about the puffing.  I get that.  And I think that
5    in itself creates a reasonable doubt for Mr. Benitez.
6            But what he told you, where Mr. Benitez
7    seems to say, is that when a -- the first entry by
8    Mr. Benitez, AG.
9            MR. AMOLSCH:  Sorry.
10           MR. SALVATO:  That's okay.
11           -- when a person has your information, you
12   run the risk.  The information.
13           So it seems like if Duende's first statement
14   to Ignacio is to be believed, that Benitez alone was the
15   one that murdered the gentleman, there seems to be an
16   ulterior motive going on here, because out of the blue,
17   Benitez thinks, "Hey, maybe this guy is cooperating
18   against me," when a person has your information.  So it
19   seems like there's an ulterior motive or motivation on
20   the part of Mr. Benitez.
21           When Duende was asked at first by Detective
22   Ignacio, what happened out there, you heard no evidence
23   that he said that Christian did anything with regard to
24   Lil Guasón; nothing.
25           And don't forget the testimony of

1   Mr. Chavarria, okay, that was called, I think, by
2   Castillo's counsel.  Chavarria, who gave the ride that
3   night, told you one person had blood on him.  One
4   person.  Okay?  And remember the testimony of the
5   medical examiner and the testimony of the person from
6   the Smithsonian.  The person from the Smithsonian,
7   again, to backtrack, said he was probably already dead
8   when his head was removed; probably already dead.
9           And the medical examiner said -- and you can
10  look at the report -- the carotid artery were cut, that
11  would result in, I feel, a very quick death and blood
12  everywhere.
13          And what Mr. Chavarria told you is that when
14  anybody came back to the car, that there was only one
15  person that had blood on him.  And Mr. Chavarria told
16  you very specifically that Christian did not have any
17  blood on him.  And, in fact, he sat in the seat next to
18  him.  He didn't have any blood on him.  And the FBI even
19  tested -- the FBI guy, the FBI man, tested that car,
20  tested that front seat, and there was no blood in the
21  front seat.
22          So, is Duende attempting to expand now his
23  universe of people that were involved?
24          Is that a reasonable hypothesis, as that
25  Mr. Chick told you?  Is that a reasonable hypothesis,

1   that Duende is trying to save his own butt by expanding
2   the circle from what he initially told the police?
3            I would submit yes, that is completely
4   reasonable hypothesis.
5            Now, let's turn to the aiding and abetting
6   statute, which is kind of what the government uses as a
7   fallback.
8            The aiding and abetting instruction, ladies
9   and gentlemen, is fairly lengthy.  I want you to read it
10  specifically.  But essentially it says that knowledge
11  that a crime is being committed, or even presence
12  combined with knowledge that a crime is being committed,
13  is not enough.
14           And this is page 57 of the instructions.
15  And the instruction that the Court read is very
16  specific.  Okay.  The instruction is:  The mere presence
17  of a defendant where a crime is being admitted, even
18  coupled with knowledge that -- by a defendant that the
19  crime is being committed, or merely associating or being
20  around people while the crime is being committed, is not
21  aiding and abetting.
22           So, you have to look at three questions that
23  you must answer all three of them affirmatively.  And
24  the government has to prove it to you beyond a
25  reasonable doubt.

1          Did Christian Cerna participate in the crime
2    charged?  Okay?
3          What is the evidence on that?  Okay?  The
4    word of hopelessly inconsistent Villanueva versus
5    hopelessly inconsistent Duende?
6          Did he knowingly associate himself, did he
7    seek by his actions to make the criminal venture
8    succeed?
9          Actions.  Participation.  The government
10   cannot prove that to you beyond a reasonable doubt, for
11   all the reasons that I went through.
12         Finally, we come to Christian's own words to
13   Junior, okay?  And, this is at his bragging highest.
14   This is the highest he can get.  He's sitting in the
15   general manager's office and he is bragging his butt
16   off, okay?
17         And at the worst, at the absolute worst,
18   even if you believe Christian's own bragging to Junior,
19   a 33-year-old dude that he thinks is the East Coast
20   leader of MS-13, says, "Did you even get a chance to" --
21   and the government added in its closing, "to go first?"
22   Those words are not in there.  Okay?  It doesn't say,
23   "Did you get a chance to go first?"  That's not in
24   there.  "Did you get a chance?"
25         And he says, "No, man.  No."

1                But at least I cut his head off -- which
2    five other people have been credited with.  And
3    irregardless, or regardless, the gentleman is already
4    dead, and the medical testimony establishes that.  And
5    mutilation of a corpse, however horrible it is, even if
6    you believe every word of the government's theory, does
7    not make Christian a murderer or an aider and abettor of
8    murder.  The most the government can say is that he was
9    present, perhaps he knew, although he wasn't at the
10   meeting, but they cannot say beyond a reasonable doubt
11   that he participated.
12               Ladies and gentlemen, there's no physical
13   evidence in this case tying Mr. Cerna to this offense.
14   There's no knife.
15               And the government will say, "Well, it's
16   later on."
17               Well, if you believe the government's
18   theory, he's walking around with Junior, not having any
19   idea Junior is with the FBI, so he wouldn't have any
20   idea to hide stuff that's associated with this case.
21               There's no knife recovered from my client.
22   There's no prints on everything that they examine.  And
23   you can look at the Lopez Torres testimony.  There is no
24   blood on any clothes.  There is no blood in Chavarria's
25   car.  There is no physical evidence, not one scintilla,

connecting Christian Lemus Cerna to Count 6.

The only thing you have is Duende and Lil Slow.  And you heard from Detective Betts, Christian was selling, what, 1.6 grams of cocaine, right?  I mean, just a minute amount.  There is no blood, no DNA, nothing.

I'm almost done.  I promise.  But I want to end with just a couple of things.

You know, this burden is so high because of the stakes, okay, in any criminal case.  Not a civil case, where it's preponderance.  It's not a civil case where it might be clear and convincing, or probability, as Mr. Chick so eloquently put out to you.  This is beyond a reasonable doubt.  Okay?

And, there were -- I saw in the newspaper the other day, there was 20 people in the past year that have been exonerated that were convicted by juries in New York, just in the past year.

And I'm sure defense lawyers and prosecutors stood up before juries in that case and they argued their case, and maybe those juries didn't quite adhere to the high standard, or didn't follow the Court's instructions.

But exonerations do happen.  You heard the judge instruct Agent Hicks about that.  That's why it is

1   so vitally important to maintain our proof beyond a
2   reasonable doubt.  If there's any reason to doubt in
3   this case, you must acquit.

4          The Court instructed you on what reasonable
5   doubt is, what's the definition of reasonable doubt.
6   And you can think about it in your own minds, okay, and
7   come up with your own examples.  So please don't take my
8   example as sacrosanct in any way, shape or form.

9          But as the Court instructed you, a
10  reasonable doubt is a doubt that would cause you to
11  hesitate in a matter of importance in your own affairs,
12  not, you know, are we ordering from the courthouse
13  cafeteria?  Are we going to go to the Patent Office?
14  Are we going to go to Pot Belly's?  Okay?  In a matter
15  of importance in your own affairs.

16         So let's put all of this stuff aside, right,
17  all of this stuff aside, and let's say this case is
18  about whether a child, your child, my child, should have
19  heart surgery.  Would the quality and quantity of the
20  government's evidence convince you, without any
21  hesitation, to have your child have that surgery?

22         And not to be flip, but would Dr. Del Cid
23  and Dr. Villanueva convince you, without any hesitation,
24  for your child to roll into that emergency -- to that
25  operating room?

1       If you say, "Hey, yeah, of course, that's
2  good, no second opinion.  I don't hesitate to act.  Why
3  would I hesitate?"  If the quality of the proof doesn't
4  rise to that level of a matter in your personal
5  affairs -- and you guys don't really know them, you
6  don't really know us, you don't know the government --
7  but your personal affairs, if it doesn't rise to that
8  standard and you hesitate, you hesitate to act, then you
9  have reasonable doubt.
10      Hesitation is doubt.  Doubt means not
11  guilty.  Horrible as it could be and how maybe
12  gut-wrenching it could be on all fronts, the only proper
13  verdict in this case is not guilty as to Christian Lemus
14  Cerna.
15      Thanks for your time and attention.  Thanks,
16  guys.
17      Thank you, Your Honor.
18      THE COURT:  Thank you.
19      Ladies and gentlemen, we will take the
20  morning recess now for 15 minutes.  Remember what I said
21  not to discuss the case.  And we will return in
22  15 minutes.
23      Thank you.
24      (Court recessed at 11:28 a.m. and reconvened
25      at 11:49 a.m.)

1        THE COURT:  Ready to bring the jury out?

2        MS. MARTELL:  Yes, Your Honor.

3        THE COURT:  You can bring the jury out,

4   Mr. Toliver.  Thank you.

5        (Jury present.)

6        THE COURT:  You may be seated.

7        All right, Counsel, you may proceed.

8        MS. MARTELL:  Thank you, Your Honor.

9      CLOSING ARGUMENT BY DEFENDANT DEJESUS CASTILLO

10       MS. MARTELL:  May it please the Court;

11  Mr. Castillo, government counsel, ladies and gentlemen

12  of the jury.

13       I want to reiterate what's been said today

14  about thanking you for your service and thanking you for

15  paying attention during this case and doing your civic

16  duty.  Mr. Castillo wants to thank you.  And on behalf

17  of myself and Mrs. Ralls, my cocounsel, we thank you as

18  well.

19       Omar Castillo was not there.  He isn't

20  guilty.  And ladies and gentlemen, the government didn't

21  prove it.

22       You do not have to believe that my client is

23  innocent.  You only have to find that there is

24  reasonable doubt as to whether he is guilty.

25       Let's remember that the defense is under no

1   obligation to offer any proof of innocence or to create
2   reasonable doubt.  That is the system that we have in
3   this country.  That is the system that's been developed
4   in order to protect all of our rights.
5           That's why the government has to overcome
6   the presumption of innocence and remove any and all
7   reasonable doubt.  Ladies and gentlemen, I submit to you
8   that they have not done that.
9           If you convict Mr. Castillo, that decision
10  is final.  There's no opportunity for second thoughts.
11  There's no change of heart down the road.  So, before
12  you convict him, you should make sure that he has been
13  proven guilty to the exclusion of, and beyond any and
14  all, reasonable doubt.
15          So, what is that?  It's a belief so firmly
16  rooted in the evidence that you don't have to worry
17  about waking up in the middle of the night, thinking
18  whether you convicted an innocent man.
19          By your oath as jurors, you do not -- you
20  cannot convict Mr. Castillo when, after careful
21  consideration of the evidence, there still remains even
22  one reasonable doubt as to whether he's guilty of these
23  charges.
24          Reasonable doubt may be that feeling that
25  the evidence just doesn't convince you.  Reasonable

doubt can be that feeling that causes you to think, "I wish Ms. Martinez had shown me more evidence."

I have watched you all during this trial as you listened to the witnesses and as you took notes and paid close attention.  You are reasonable people.  And if you have doubts, then that is reasonable doubt.

I submit to you, ladies and gentlemen, that these charges have not been proven, and I'm going to go through each of the witnesses and the evidence presented to you.

First of all, the only evidence that you've heard connecting Mr. Castillo to these crimes comes in two forms.  The first, the audio recordings that were made by Junior, a confidential informant for the FBI. The second is the witnesses that came here and testified, all who have a plea agreement with the government and are receiving a reduction in their life sentences in order to come here and testify.

I want to address these recordings first. In these recordings, it's true, both murders are mentioned.  And the government wants to stand up here and tell you that these recordings are some kind of confession and reliable evidence.

But it is not.  Ladies and gentlemen, all I hear on these tapes is my client restating what everyone

1   else was talking about.

2         The expert who testified in this case, the

3   first witness, Claudio Saa, told you that bragging is

4   part of the MS-13 culture, and that fellow gang members

5   brag to each other about things that they didn't do.

6         It's funny that the government doesn't want

7   to acknowledge that, when Junior, their informant, has

8   been doing just that for ten years.  As the other

9   defense counsel told you, he rose up the ranks to become

10  leader of a well-known MS-13 clique, known as the

11  Silvas, and he did so by mere bragging and boasting

12  about things he didn't do.

13        Another point that I want you to take a look

14  at is the dates of these calls.  These recordings with

15  Junior and my client, they take place months, months

16  after everyone else was already talking about these

17  murders and everyone else already knew what had

18  happened.

19        I want to point to that one specific call

20  that Ms. Martinez showed you yesterday during her

21  closing, the one that she says where Mr. Castillo is

22  talking about how Lagrima begged for his life.  Ladies

23  and gentlemen, that call was dated January 29th, 2014,

24  which is months after Mr. Lopez Torres had already told

25  Junior the same thing.

1          The government might tell you:  Well, who
2    brags about these things?
3          Certainly, we would not, but we're not in
4    MS-13, where you have to lie to survive.
5          And here's what they want you to ignore:
6    Junior is the leader of the Silvas clique.  He has a
7    direct line, not only to the leadership of PVLS here in
8    Virginia, but he also has a direct line to the
9    leadership in El Salvador, ladies and gentlemen.
10          If my client were to talk to Junior and not
11    let him know -- and not tell him that he knew about the
12    things that were going on within the clique, then he
13    might be the rat.  That might give Junior suspicion.
14    And we all know what happens to rats.  They can die.
15    Those are the rules.
16          Everything that my client talks about -- and
17    Junior told you this during cross-examination -- are
18    things that Junior already knew.  He already knew
19    because it was what everybody was talking about.  It was
20    what everybody was bragging about.
21          And homeboys lie.  That's what the
22    government's own witnesses told you.  It's one of the
23    few things they all agreed on.  Homeboys lie.  They lie
24    to each other and they lie to survive.
25          The other issue with the government relying

1   on these audio recordings is that they're trying to use
2   them to prove my client guilty beyond any and all
3   reasonable doubt.  And that means you need to be sure
4   what's on those recordings.
5           It's undisputed that the quality of these
6   recordings is poor.  They're hard to hear.  There's
7   background noise.  There's people talking over each
8   other.  And even in the transcripts provided by the
9   government, you'll see many instances where it says
10  "U/I" or "unintelligible," meaning that even the person
11  listening to them could not decipher what's on those
12  calls, what's being said.
13          Go beyond the snippets that Ms. Martinez is
14  presenting to you in trial in those transcripts, and
15  what you will see is Junior and my client merely
16  bragging and talking about what's going on within the
17  clique.
18          I also want to point out that in those
19  calls, my client never goes into details about what
20  happened.  He uses words like "we" and "they," not
21  giving specific details.  "We took him to the
22  restaurant."
23          Ladies and gentlemen, he's not giving
24  details because he doesn't know them, because he wasn't
25  there.

1        Everything you have before you tells you not
2    to trust these calls.  You have audio recordings where
3    people are claiming things that just didn't happen.
4        Excuse me.
5        You have people like Pesadilla on the audio
6    recordings claiming that he cut off Lil Guasón's head.
7    And he says that in multiple recordings.
8        That's not true.  That didn't happen.  And
9    the government isn't alleging that that happened.  But
10   they want you to ignore that part of the call because it
11   doesn't fit their case.
12       Mr. Lopez Torres says on the call -- on one
13   of the calls with Junior that Lagrima was dismembered
14   twice.  That didn't happen, either.  But again, they
15   want you to ignore that part of the calls.  Don't trust
16   that part, because that part isn't true.
17       Junior's been bragging and talking about
18   things he didn't do for over ten years.  So these
19   recordings really don't prove that Mr. Castillo is
20   guilty of murder beyond any and all reasonable doubt.
21       My client is charged with two counts, and I
22   want to discuss these separately.  He's charged with
23   Count 4 and Count 6.
24       The first charge is Count 4 in the
25   indictment, the murder of Nelson Quintanilla Trujillo,

who we also have heard referred to as Lagrima.  Let's talk about the government's witnesses that you heard during this trial in regards to Count 4.

Skinny.  He's the first witness that testified about the Lagrima murder.  Well, Skinny was high on marijuana laced with crystal meth that night.  And you have an instruction from Your Honor about the testimony of witnesses that admit that they were under the influence of drugs.

Now Skinny tells you that he was there.  He was at the Lagrima murder, but he only held down his arms.

The other witnesses that the government brought do not say that.  They say differently.

Ms. Martinez also told you yesterday that Lil Payaso helped Skinny knock down Lagrima.  That's what she said.

But that's not what happened.  That's not what Skinny testified to.  Skinny said he knocked down Lagrima, not Mr. Castillo.  He didn't say Mr. Castillo helped him.  He said he did it.  But Mr. -- but Ms. Martinez wants to gloss over that.

Skinny also says that Lil Payaso, my client, Mr. Castillo, held down Lagrima's feet.  But, the other government witnesses say no, that it was Skinny who held

1    down Lagrima's feet, not Mr. Castillo.

2             Skinny tells you Lil Payaso stabbed him.

3             Where?  Why doesn't he give details?  Why

4    doesn't he tell you where he stabbed him?  When?  Was he

5    first?  Was it second?  How did this murder actually go

6    down?  He doesn't give you any of those details.

7             He also tells you that Mr. Castillo dragged

8    the body to the grave.  Lil Slow doesn't say that.

9    Duende doesn't say that, either.

10            Ladies and gentlemen, the witnesses are

11    inconsistent.

12            Skinny tells you that Mr. Castillo wasn't

13    there during the planning of the Lagrima murder.  But

14    that's different than what Duende says.

15            Skinny tells you that Little -- that Lil

16    Payaso was at the murder.  That's what he testified to

17    here in court.  But remember when we asked him, he had

18    previously stated, when he first spoke to law

19    enforcement, that Mr. Castillo wasn't there.

20            It was only after he received the

21    indictment -- and you heard about this yesterday.  It

22    was only after he received the evidence of what the

23    government wanted to prove that he added people.  That's

24    when he mentions, "Oh, Lil Payaso was there.  He stabbed

25    him."  But that's not what he first said.

1        Skinny also tells you that Lil Payaso was
2  not at the reburial of Lagrima.  In fact, he wasn't
3  there.  He's not charged with that crime.  But you'll
4  see later on that one of the government's witnesses says
5  he was there.
6        So, Lil Slow testifies next, and I want to
7  mention that Lil Slow's testimony was inconsistent, not
8  only with what he had said before to law enforcement,
9  but it was inconsistent with the other government
10  witnesses.
11        Mr. Villanueva, Lil Slow, testified that he
12  was also high on crystal meth.  In fact, Mr. Villanueva
13  told you that he was pretty much high every single day
14  up until the time he was arrested.
15        He says that Skinny was the one holding
16  Lagrima's legs, not Mr. Castillo.
17        What else did he say that's different?  He
18  says that, well, it was Mr. Castillo that knocked down
19  Lagrima, not Skinny.
20        But, that's not all the inconsistencies.  He
21  also testifies that Mr. Castillo stabbed Lagrima.
22        Well, that's pretty much what all the
23  witnesses say, is that, "Yeah, he was there, and he
24  stabbed him, we think, but we don't know where.  We're
25  not going to testify where he stabbed him, when he

1  stabbed him," and it's pretty much inconsistent about

2  the details.

3           When Lil Slow first was interviewed by

4  police, he told the police that he had no recollection

5  of any actions by Mr. Castillo.  He denied that on the

6  stand.

7           But Detective Betts, when he testified,

8  confirmed that, that Lil Slow initially could not

9  recollect Mr. Castillo's actions during the murder.

10          Ms. Martinez wants you to believe that:

11  Well, he doesn't have the capacity to lie.

12          Well, he certainly had the capacity from

13  sometime after he received evidence in this case, in

14  order to include Mr. Castillo, because when he met with

15  the government, Ms. Martinez, the agents and Detective

16  Betts, he had a different recollection.

17          Duende was the following witness that

18  testified about the Lagrima murder.  Ladies and

19  gentlemen, I submit to you, someone who kills without

20  remorse cannot tell the truth about anything.

21          Duende's testimony did not match up with any

22  of the other witnesses.  In fact, he pretty much was

23  just roping people in as he saw them in the courtroom

24  and just making things up while he was on the stand.

25          He says, Mr. Castillo stabbed Lagrima in the

1    stomach.

2              Take a look at the autopsy report.   Nobody

3    stabbed Lagrima in the stomach.

4              He says that Mr. Castillo helped rebury the

5    body, that he was at the reburial.

6              Skinny pretty much named everybody at the

7    reburial except Mr. Castillo.   And Lil Slow didn't tell

8    you that Mr. Castillo was at the reburial, either.

9              He also said that Mr. Castillo was at the

10   Peligroso -- was part of the plan to murder Peligroso.

11   Ladies and gentlemen, we didn't hear from any of the

12   witnesses, Demente, Drowsy, about Mr. Castillo being

13   involved in the attempted murder of Peligroso.   Duende

14   just made that up.

15             There was another person that we heard

16   talked about that didn't testify in this trial, and that

17   was Lil Evil.   And you heard the witnesses say that Lil

18   Evil was present during the Lagrima murder.

19             Well, Lil Evil, when interviewed by law

20   enforcement -- and Detective Betts testified to this --

21   at some point law enforcement interviewed him and showed

22   him a picture of Mr. Castillo.   And Lil Evil could not

23   100 percent identity Mr. Castillo as being at the

24   Lagrima murder.   That was Detective Betts's testimony.

25             Mr. Lopez Torres also testified about the

1  Lagrima murder.  And a lot has been said about his

2  testimony, and you don't have to believe he's telling

3  the truth if you don't want to.  It's enough that his

4  testimony gives you a reason to doubt the evidence

5  presented by the government.

6          Remember, the defense doesn't have to prove

7  anything.  And I want to say this about Mr. Lopez

8  Torres's testimony:  At some point the government seemed

9  to allege that he was testifying so that he could run

10 the clique inside the Federal Bureau of Prisons.

11          I agree with Mr. Jenkins.  That's

12 ridiculous.  If Mr. Lopez Torres wanted to run a clique

13 within the prison system, he wouldn't have gotten on the

14 stand and testified.  There's plenty of MS-13 members

15 not sitting in this room.

16          Mr. Lopez took the stand and admitted to

17 guilt and told you what happened during the Lagrima

18 murder.  He also told you that he's going away for life

19 for that, and that he has a mother and a family that he

20 won't ever see again, because he's not getting a plea

21 agreement.  He's not getting a reduction in his

22 sentence.

23          Another thing that stood out to me about his

24 testimony that made it believable was the way he

25 testified during cross-examination about those other

1    incidents that Ms. Martinez asked him about.

2              Remember when Ms. Martinez asked him about

3    that .22, and he wouldn't name the person, but he said

4    that a homeboy sent it to him.

5              Ladies and gentlemen, he didn't lie about

6    it.  He didn't want to name the individual.  But I

7    submit to you that if there had been other people at the

8    Lagrima murder, he would have testified that there were

9    other homeboys there.  He might not have named them, but

10   he would have told you other homeboys were there.  He

11   didn't do that, because there wasn't.

12             Regardless, the testimony of Mr. Lopez

13   Torres is just one more reason to doubt this case.  It's

14   not who do you believe.  While it's true that not

15   everybody can be telling the truth, that's not the

16   proper way of looking at it.  The real issue is whether

17   you believe the government witnesses beyond any and all

18   reasonable doubt, if you believe their inconsistencies

19   and the fact that their testimonies cannot agree on any

20   of the details of this murder.

21             The second charge against my client is

22   Count 6, the murder of Gerson Martinez Aguilar, which

23   you also heard referred to as Lil Guasón.  And Skinny

24   was the first -- when Skinny testified, he wasn't at the

25   murder of Lil Guasón, but he did testify about it.

1          And Skinny's testimony is important, because
2    in this case, like Mr. Salvato told you, the government
3    has to prove purpose.  And you'll see that in your jury
4    instructions.  The government has to prove why this
5    murder was committed, because they've charged it as
6    murder in aid of racketeering.
7          And Skinny gives us some insight as to why
8    the government hasn't proven purpose beyond a reasonable
9    doubt.  He tells you that it was the money of Belén, his
10   baby mother, not the gang's money.
11         And he also tells you that he had no issue
12   with Lil Guasón and Belén, because that had already been
13   settled.  That wasn't his girlfriend any more.  He was
14   with someone else.  That issue had already been taken
15   care of, and him and Lil Guasón, before he went away to
16   prison, were on good terms.
17         Skinny also testified that during his
18   incarceration he was incarcerated with Lil Poison,
19   Douglas Duran Cerritos, and that Lil Poison told Skinny
20   that Lil Payaso, Mr. Castillo, wasn't there.  He didn't
21   mention him when he told Skinny about the murder of
22   Gerson Aguilar Martinez.  He didn't mention Mr. Castillo
23   as being there.
24         Lil Slow was the next witness that testified
25   about the murder of Gerson Aguilar Martinez.  And Lil

Slow tells you that it was Duende who broke Lil Guasón's leg with a pickax.

Now, that's the opposite of what Duende says.  Duende tells you that it wasn't him.  It was Mr. Castillo.

Lil Slow also tells you that it was Mr. Castillo who cut off Gerson Aguilar Martinez's head.  That's not what Duende said either.

And I would suggest that's not a minor detail, ladies and gentlemen, and the two government witnesses who came and testified about that murder cannot agree -- cannot even agree on that point.

Lil Slow, under cross-examination, could not keep his story straight about who stabbed who, when, and who did what.

When Duende testified, he completely contradicted everything that Lil Slow had said.  Duende says that it was Leopardo and Solitario who cut off his head; didn't mention Mr. Castillo.  He also says that it wasn't him who broke Duende's (sic) legs with the pickax, that that was Mr. Castillo.

Now, another thing that's interesting about Duende's testimony is that you can't believe Lil Slow and Duende.  They're contradicting each other.  They're inconsistent with one another, and not on minor details,

1   like Ms. Martinez wants you to believe.

2          But Duende tells you -- and Mr. Salvato

3   discussed this -- that he showed up to the murder of

4   Gerson Aguilar Martinez with a dull knife, that he

5   didn't get a chance to stab him because he had a dull

6   knife.

7          Ladies and gentlemen, if you believe the

8   government's theory of the case, that there was a plan

9   to kill Lil Guasón, a plan where they had several

10  meetings, then why would Jose Del Cid, Duende, show up

11  with a dull knife?

12         That goes against their case, so they don't

13  want you to focus on that.  But it doesn't make sense.

14  It's not consistent with the crime they've charged.

15         Duende testifies about things that no other

16  witness can confirm.

17         We brought a witness who testified.  His

18  name was Hector Chavarria.  Ladies and gentlemen, that

19  is what we call an unbiased witness, doesn't have a plea

20  agreement, wasn't getting anything for his testimony.

21  You didn't hear that he was being paid.  You didn't hear

22  that he had some kind of deal.

23         What did he tell you about that night?  He

24  told you that he saw members of PVLS, of MS-13's PVLS

25  clique, the night that Gerson was killed, at Holmes Run

1    Park.  He was there on two separate occasions.

2              And, Mr. Salvato asked him.  He was there

3    because he drove people to the park that night.  He saw

4    somebody with blood.  But he told you without a doubt

5    that he did not see Omar Castillo that night.

6              Ladies and gentlemen, that is reasonable

7    doubt.  Lil Payaso, Mr. Castillo, he wasn't there that

8    night.  All of the inconsistencies by the government's

9    witnesses raise reasonable doubt as to their testimony.

10             But again, Ms. Martinez told you yesterday,

11   ignore the inconsistencies in this case, ladies and

12   gentlemen, because the core details are the same.

13             Ladies and gentlemen, the fact that a

14   witness says this person was there, is not enough to

15   convict someone beyond a reasonable doubt.  These

16   inconsistencies cannot be overlooked, if you are to

17   prove this case beyond a reasonable doubt.

18             The truth, ladies and gentlemen, does not

19   have different versions.  Who cut the head off is a core

20   detail.  The fact that all the witnesses couldn't even

21   agree on that shows that they could not prove this case

22   beyond a reasonable doubt.

23             The evidence you heard that connects

24   Mr. Castillo to these crimes is based on the testimony

25   of other individuals.  Some of them had made previous

1   inconsistent statements.  Some of them had previously

2   said they couldn't remember his actions.  They gave

3   inconsistent stories about the murder.

4           And the government wants you to avoid all

5   these details, why?  Because the details don't match,

6   because he wasn't there and he didn't commit these

7   murders.

8           Yesterday, Ms. Martinez gave you an excuse

9   about that, and that's what it was.  It was an excuse.

10  She said:  These guys aren't choirboys.  Gang members

11  don't kill unless it's in front of other gang members.

12          Ladies and gentlemen, we sat here and we

13  heard the instructions that the judge gave you.  There

14  was no gang member exception.  There was nothing that

15  said that you treat a witness differently because, well,

16  he's a gang member, he's a liar, so we don't have to

17  hold him to the same standard.  That's not our system.

18  That's not the law.

19          Reasonable doubt can arise both from the

20  evidence and also the lack of evidence, and I want to go

21  through the lack of evidence in this case.

22          There is no DNA or forensic evidence in this

23  case that you heard connecting Mr. Castillo to the

24  murders of either Lagrima or Lil Guasón.

25          What's the reason we want DNA and forensic

1  evidence?  Is because it speaks for itself.  It's not

2  biased.  It's not prejudice.  It has no ulterior motive.

3  It's not corrupt.  It's pure.  And the lack of forensic

4  evidence in this case raises reasonable doubt.  You

5  can't disregard that.

6           No one said that Mr. Castillo sold drugs.

7  That wasn't mentioned in the notebooks.  There's a lot

8  in the notebooks that Ms. Martinez wants you to

9  overlook.  Mr. Castillo is not mentioned as a drug

10  dealer, as a drug user, during this case.

11           But there's something else in those

12  notebooks, when you look through them in the jury room.

13  A lot of people owed money to the gang.  It's part of

14  the business that the gang had.  You'll see that some

15  gang members owed $500, $400.

16           So when the government tells you that that

17  was the reason that Lil Guasón got killed, take a look

18  at the evidence that you have.  It's not a reason for

19  murder, because a lot of the PVLS cliques were selling

20  drugs and owed money, took money, borrowed money.

21  You'll see that in the notebooks.

22           There was no evidence that Mr. Castillo kept

23  any weapons or had any weapons.  They didn't find any --

24  There were no weapons because they didn't find any

25  weapons on him.

1      There's also no evidence that he fled
2  anywhere.  Ms. Martinez talked about going to Kansas
3  City shows that these people -- you never heard anything
4  about Mr. Castillo going anywhere.  He didn't flee to
5  Kansas City.  He didn't flee anywhere.
6      You didn't hear any evidence about him
7  worshiping the devil.  You didn't hear him being
8  involved in other gang-related crimes, did you?
9      That shooting that Ms. Martinez talked
10  about, where there was a bunch of people, he wasn't
11  there.  You didn't hear that.
12      She showed you pictures of MS-13 members at
13  a party, just having a good time.  She wants to say that
14  means something.  Well, guess what?  He wasn't there,
15  either.
16      Junior shows pictures that are taken outside
17  of hotel rooms where Junior says general meetings took
18  place.
19      Did Junior testify about what went on in
20  those meetings?  No.
21      Did he even tell you that Omar went inside
22  those meetings?  No.
23      You didn't see any cellphone records
24  belonging to Mr. Castillo.  They had an FBI expert that
25  came in and talked about satellite triangulation and the

1   CAS system, how they can drive around and find out if
2   your cellphone was in an area.
3            How come they didn't do that for
4   Mr. Castillo, to prove he was in the park that night?
5            Later on today, Ms. Martinez will have
6   another chance to speak with you.  I won't have that
7   other opportunity.  But think, when she's talking to
8   you, think about the inconsistencies in the witnesses'
9   testimony.  Think about the parts of the recordings that
10  she has with Junior and other people in this room that
11  are inconsistent with her story.
12            What do you do with that evidence?
13            At the end, you'll be asked to return one of
14  two verdicts.  There's only two verdicts in our legal
15  system; that's guilty and not guilty.  And our system
16  puts the burden of proof on the prosecution to prove
17  that someone is guilty beyond any and all reasonable
18  doubt.  And if they can't do that, then that means
19  they're not guilty.  And by your oath, that mandates you
20  to return a verdict of not guilty.
21            What that means is that in our legal system,
22  not guilty means a lot of different things.  It means,
23  I'm not a hundred percent sure about this evidence.  It
24  means, maybe they did it, maybe they didn't, but I'm not
25  convinced beyond a reasonable doubt.  All of those

1   states of mind are not guilty.

2            Ladies and gentlemen, vote reasonable doubt.

3   I'm not here to beg you for a verdict, and I'm not here

4   to plead.  I'm simply going to ask that you respectfully

5   do your duty and vote the reasonable doubt that you know

6   exists in this case.

7            No one will second-guess you or challenge

8   you.  If you return a verdict of what justice demands,

9   "We had reasonable doubt," that verdict, ladies and

10  gentlemen, is not guilty.  Mr. Castillo is not guilty on

11  Count 4 and Count 6.

12           Thank you for your attention.

13           THE COURT:  Ladies and gentlemen, the next

14  argument would be approximately 50 minutes to an hour.

15  I think that the prudent thing to do is break now for

16  lunch.  And I normally break at 1:00, but I would like

17  to break now.

18           And I remind you not to discuss the case,

19  nor permit the case to be discussed in your presence.

20  Don't do any research on the case.  And leave your notes

21  in the jury deliberation room.

22           We will resume -- it looks like it's

23  12:30 -- 1:30.  Come back at 1:30.  Thank you.

24           (Court recessed at 12:28 p.m. and reconvened

25            at 1:34 p.m.)

1            THE COURT:  Ready to bring the jury out?
2    Okay.
3            Mr. Toliver you can bring our jury out.
4    Thank you.
5            (Jury present.)
6            THE COURT:  You may be seated.
7            All right, Counsel, you may proceed.
8         CLOSING ARGUMENT BY DEFENDANT CHAVEZ
9            MR. AQUINO:  Good afternoon.  Let's get
10   right to it.
11           The government alleges in Counts 7, 8 and 9
12   that our client, Jesus Chavez, was the shooter who
13   killed Julio Urrutia on June 19th of 2014.
14           In fact, the government is not confident in
15   who killed Mr. Urrutia.  They are mistaken in trying to
16   lay the blame at Jesus Chavez's feet.  They are wrong.
17   And the government's good judgment has become impaired
18   and damaged in the process.
19           Now, the government case.  The government
20   claims that Jesus shot and killed Julio Urrutia, and
21   that conclusion revolves around several factors.  First,
22   the testimony of Jose Del Cid, Duende, and Sen Genaro
23   Garcia, Gatuso, both of whom testified that Jesus was
24   the shooter.
25           Now, as a general rule, we know an awful lot

1    about MS-13, about gang members who lie.  And a lot of
2    lawyers already addressed that issue.  But I would like
3    to add just one additional thing.
4              We know that these guys are really crafty
5    and skilled liars.  And it stands to reason.  For
6    example, the more you hit a baseball, the more you hit a
7    tennis ball, the more you hit a golf ball, you become
8    better at it.  And these guys have been lying their
9    entire lives.  As Mr. Torres says, they are taught to
10   lie.
11             Now let's get to the specifics, Jose Del
12   Cid.  Detective Ignacio admits that Del Cid said that
13   Gatuso was the shooter, and that Gatuso took the weapon
14   following the shooting.
15             To be clear, if you accept that as a true
16   statement, that's the end of the case.  Because clearly,
17   the government's theory is, is that Jesus was the
18   shooter.
19             So you have a choice.  Do you believe that
20   statement that Del Cid made to Detective Ignacio or not?
21   If the answer to that question is yes, then that's it.
22   If the answer to that question is no, then we know that
23   he lied about a material aspect of this case.  And let's
24   face it, you can't get more material than who the
25   shooter was, right?

1          Now, what else do we know about Del Cid?  We
2    know that Del Cid has given false names to the police
3    prior to the shooting.
4          Why do you do that?  You do that to trick
5    people, namely the police, in an effort to conceal your
6    identity.  So we know that about Del Cid.
7          Now, I don't know who the shooter was.  I
8    wasn't there.  You weren't there.  And the government
9    lawyers were not there, to be clear.
10          But what we do know is that Del Cid is a
11    likely candidate for that.  What do we know about Del
12    Cid?
13          I mean, that is truly, truly evil guy that
14    took that witness stand, I mean, evil in the flesh,
15    right in front of you.
16          We know that he attempted to shoot and kill
17    his own mother.  We know that he had his hand in several
18    other murders.
19          And what else do we know about him?  We know
20    that he had tattoos on both of his arms.
21          Now, to be fair to the evidence, we heard
22    from Vidal Jimenez and we heard from Detective Buckley.
23    And what did Detective Buckley say about Vidal Jimenez?
24    He said that within two hours of the shooting, within
25    two hours of the shooting, that Vidal Jimenez said that

1   the shooter had tattoos on both of his forearms, both of
2   his forearms.  And we know that Del Cid has tattoos on
3   both of his arms, truly not a perfect fit, not his
4   forearm, necessarily, but both of his arms.
5           In addition, what else do we know that Vidal
6   Jimenez stated to Detective Buckley within two hours of
7   the shooting?  Within two hours of the shooting, he said
8   that the shooter was 5 foot 8 to 5 foot 9 and
9   165 pounds.
10          Now, to be clear, in this courtroom Vidal
11  Jimenez says that the shooter was 5 foot 11 and
12  180 pounds.
13          The point I'm making is, is that the
14  description given within two hours of the shooting as to
15  height and weight more closely resembles Del Cid than it
16  does Jesus Chavez.
17          In addition, we know through Mr. Torres,
18  that is Greñas, that he had discussions with Duende at
19  the Alexandria Jail about the case and the evidence in
20  the case.  And it's clear that the inmates shared
21  information through a series of notes.  Torres states
22  that those notes went between him and Duende, and it
23  also suggests that Duende was communicating with other
24  people at the jail.
25          I submit that he was communicating likewise

1   with Gatuso.  We know that both were at the jail,
2   according to Duende, for an extended period of time.  We
3   know that Duende says that he saw Gatuso at the jail.

4            I submit that in light of those notes that
5   we heard Torres talk about, that Gatuso and Duende had
6   an opportunity and a motive to align their stories.  And
7   we know that Duende admits, by the way, that on at least
8   one occasion he communicated with Gatuso.

9            Now, the government has spent a lot of time
10  talking about the transcripts in this case, transcripts,
11  transcripts, and they've highlighted two, two in
12  particular, as to my client, Jesus Chavez.  They cited a
13  June 27th, 2014, telephone call and a June 29th, 2014,
14  telephone call.

15           Let's work backwards.  The June 29th
16  telephone call is between Talibán and it includes Junior
17  and others.

18           Now, the threshold issue is, on that call,
19  the government contends that Talibán is Jesus Chavez.
20  The threshold issue on that is, is it?  Is Talibán Jesus
21  Chavez?

22           Now, we know two things about that call.  We
23  know that Junior, he doesn't know who Talibán is.  He
24  admitted in cross-examination he never meet the guy
25  before.  He had never spoken to the guy before.  So

1   Junior is not in position to authenticate that call.  He
2   doesn't know the guy.
3           And, so who is the government relying upon
4   to make the connection that Talibán is Jesus Chavez?
5   Jose Del Cid, the killer, liar.
6           Now, what else do we know about that call?
7   There was a lot of testimony in this case about
8   bragging, and that's how you advance your role in the
9   gang.  If you kill somebody, for example, you tell
10  people about it and you brag about it and you talk about
11  it.
12          Would be a rough equivalency, a football
13  game in the NFL, a running back scores a touchdown,
14  spikes the footballs, makes a big deal, and everybody
15  attracts attention to him.
16          Well, that's what these MS-13 guys do,
17  except murder is their goal, and they want to attract
18  attention to themselves when they kill someone.
19          Now what's interesting and what's applicable
20  in the case about that telephone call, the June 29th
21  telephone call, is that Junior indicates that Talibán
22  never talks about killing Mr. Urrutia, nor does Talibán
23  ever indicate that he was with Gatuso or Del Cid at the
24  time of the shooting.
25          Again, I want to underline this one point:

1   Mr. Torres emphasized in his testimony that Duende

2   bragged about the killing of Mr. Gerson.  There was no

3   discussion in that telephone call about killing

4   Mr. Urrutia or being with Duende and Gatuso.

5           We simply say that the government

6   mischaracterizes that telephone call.

7           Now, let's get to the next telephone call,

8   June 27, 2014, involving Del Cid, Duende and Junior.

9           And the government says:  Ha-ha, look, Del

10  Cid is talking about the murder and what happened in the

11  Urrutia murder.

12          Not so fast.  The gist of that telephone

13  call was Duende making Del Cid aware:  Man, you've got a

14  problem and you got a big problem, and here's why.  That

15  was an unauthorized killing without notice to the gang

16  prior to the shooting.

17          In addition, Junior makes it crystal clear

18  that that was an MS-13 member that got killed, and

19  El Salvador is not happy and you've got some real

20  explaining to do, Del Cid, about that killing.

21          And, in addition, Junior indicates that the

22  shooting occurred in Chirilagua.  But, Duende's area to

23  patrol was Culmore.  And that was confirmed by Del Cid

24  in his testimony.

25          The shooting occurred, of Mr. Urrutia, in

1   Pinos' territory.  And the bottom line is, is that that
2   was not Duende's area to patrol.  So, in those three
3   respects, Duende had some real concerns.
4                  Now, we know through Junior and we know
5   through Sergeant Saa that a problem shooting like this
6   one could result in a green light.
7                  And, every -- Del Cid had every single
8   motive to shift the blame.  He did not want to be
9   subject to a green light for an unauthorized killing of
10  an MS-13 member.
11                 And it's crystal clear from Sergeant Saa
12  that the gang does not want police attention unless it's
13  absolutely necessary.  It was easy to shift the blame
14  onto Talibán.  Why?  According to Junior, he came
15  recommended by the gang from Blackie, who was in jail.
16  The gang thought Blackie was a rat.
17                 According to Junior, Talibán was not a gang
18  member.  He was not a chequeo or a *paro*.  In other
19  words, Talibán was an easy guy for Del Cid to dump on in
20  this case, to avoid himself being the subject of a green
21  light for an unauthorized killing of an MS-13 member.
22                 Now, you heard testimony from Sen Genaro
23  Garcia -- again, that's Gatuso -- numerous stories he
24  gave to the police, again, consistent with all the other
25  MS-13 members that we heard from, a liar.

1          For example, he told Detective Ignacio, "I
2    don't remember much because I was under the influence of
3    drugs."
4          He told Detective Ignacio, "I really
5    couldn't tell you who shot Julio Urrutia."
6          And keep in mind, the government tried to
7    pretty him up by saying, "Well, he met with his pastor
8    prior to the time he turned himself in," as a way of
9    saying he turned over a new leaf.  But these statements
10   that he made to Ignacio were after he met the pastor and
11   after he turned himself in.  In other words, he
12   continued to lie.
13         In addition, the government lawyer said
14   yesterday that Gatuso heard the sound of a bullet being
15   placed in the chamber of a gun.
16         We dispute that.  We dispute that.
17         He testified to that, but on
18   cross-examination Ms. Amato cross-examined him about his
19   specific location when he claims to have heard this.
20   And what he claims to have heard is, and saw, was that
21   supposedly Talibán went upstairs to an apartment to get
22   the gun, supposedly, and he claims that according -- in
23   his cross-examination, that he went inside an adjoining
24   building and shut the door.
25         In other words, it was impossible for him to

1    hear what he claims to have heard about the bullet being
2    chambered in a gun.
3            In addition, what else do we know?  We know
4    according to Junior that Gatuso was doing everything he
5    possibly could to get that gun back.  He was desperate
6    to get that gun back.
7            And keep in mind, Del Cid again initially
8    identified Gatuso as the shooter and the guy that
9    removed the gun from the scene.
10           Now, Gatuso was so desperate to find that
11   gun that he was willing to have Junior commit a crime
12   and kill somebody, and Gatuso himself was willing to
13   kill somebody to get that back -- gun back and shut
14   somebody up.
15           Now, why would he be so desperate?
16           Again, like Del Cid, Gatuso in some respects
17   likewise fits the physical description of the shooter.
18   We know he has tattoos on his right hand.  We know that
19   he likewise fits the size and weight of the shooter,
20   five eight to five nine, 165 pounds, according to Vidal
21   Jimenez within two hours of the shooting.
22           What else do we know about Gatuso?
23           We know that given two opportunities in this
24   courtroom, right in front of you, he was not able to
25   identify our client, Jesus Chavez.  And he was only able

to identify Jesus Chavez when the government showed him
a picture up on the screen and basically led him into
identifying Jesus.

Now, you also heard, in regard to the
government's case, testimony from Detective Ignacio, and
he interviewed three, three relevant witnesses:  Duende,
Gatuso and Vidal Jimenez.

Detective Ignacio admits to a lying to
arrestees, admits to being a cop who committed a crime
of moral turpitude, that is, involving lying, cheating
or stealing -- and I emphasize, while he was a police
officer.

He admits that he tried to detect -- excuse
me -- that he tried to direct Gatuso, in a photo spread
of my client, as to who to pick.  Ignacio admitted that.
He was trying to direct him who to pick.

What also do we know?  That Ignacio was
present when Vidal Jimenez made his July 7th, 2014,
selection from the photo spread.  In other words, you
see my point:  Ignacio was involved in an attempt to
steer the photo spread identification of Gatuso, and I
submit that he was likewise involved in Vidal Jimenez's
selection on July 14th.

Moreover, he had an opportunity to
coordinate the stories of the three relevant witnesses.

1   And again, we know these witnesses met at the Alexandria
2   Jail, between Duende and Gatuso.
3           Devil worship.  You've heard a lot of
4   testimony in this case about devil worship.  The
5   government wants to portray these guys, Gatuso and
6   Duende, as truth-tellers.
7           We disagree.  The fact is, they would throw
8   grandma and grandpa over the side of the boat if they
9   could to save themselves.  And what they want in this
10  case is to get out of jail.
11          The government can make that happen, and
12  they're going to make that happen, for a price.  And
13  that price is their testimony.  I submit that the
14  government is really engaged in a true pact with the
15  devil in this case.
16          And I mean that in every sense of the word,
17  because they are essentially allowing two really evil
18  guys to get out of jail and back into our community.  It
19  may not be tomorrow, may not be next year, may not be
20  five years from now, but it's happening.
21          And consistent with that, what do we know
22  about the government's behavior in this case?
23          We know that Del Cid admitted that the
24  U.S. Attorney's Office went to the Commonwealth
25  Attorney's Office in Prince William County, in an

1   effort -- and that was on Del Cid's behalf -- and they

2   agreed not to prosecute Del Cid for his behavior in a

3   crime occurring in the fall of 2013.

4            What else do we know?

5            We know that the U.S. Attorney's Office went

6   to the Commonwealth Attorney's Office in Fairfax County,

7   so that Duende would not be prosecuted for his role in

8   the stabbing of a juvenile in Fairfax County.

9            What else do we know?

10            On his behalf, the U.S. Attorney's Office

11  went to the Commonwealth Attorney's Office in the City

12  of Alexandria, so that Duende would not be prosecuted

13  for his role in another assault-stabbing of someone in

14  the City of Alexandria.

15            Effectively, the United States Attorney's

16  Office has become Duende's personal lawyer in

17  negotiating these deals on his behalf.

18            And why are these -- they negotiating these

19  deals?

20            They're greasing the skids, ultimately, so

21  that Duende can get back out of jail.  There's just no

22  doubt about that.

23            Now, you can see how -- what I'm trying to

24  say about how the government's judgment has become

25  impaired in the process of this case.  They're so

determined to fit a square peg into a round hole,
insofar as Jesus is concerned, they're willing to engage
in this type of behavior of becoming his, Duende's,
lawyer.

Now, also something else that caught my
attention that disturbed me.  Did you notice a quiet
attempt on behalf of government to blame Judge Lee?

I thought that was kind of interesting.
They asked Gatuso and Duende:  It's the judge is the one
that's going to be sentencing you, isn't it?

As if to say:  You're blood is not on our
hands.  Your blood's -- the mud is not going to get on
us, the government lawyers.

But what became evident, crystal clear, in
cross-examination is, Judge Lee has no power to affect
their sentence unless the government moves for the
reduction.

Effectively, the government is going to be
the ones that are allowing these people back into our
community.  And I thought it was wrong that they tried
to hide behind Judge Lee's robes rather than just accept
responsibility for their behavior.  Again, I submit to
you their judgment has become impaired in the process of
this case.

Vidal Jimenez.  Let me ask you:  The

government called him.  Is he a government witness, or
is he a defense witness?

I think he's a defense witness in this case.
Let's go over his testimony.

We know that Vidal Jimenez was with a rival
gang, called the Latin Homies, for three years.
According to Sergeant Saa, that gang engaged in thefts,
drug distribution, and assaults.

I submit that he had a motive to assign
blame to what he perceived to be an MS-13 member.  And
it's not all that surprising that he picked Jesus out of
that photo spread in July -- on July 7th of 2014.
According to Detective Buckley, they presented six
similarly looking individuals.

And we also know that Victor Ignacio,
Detective Ignacio, was present during that selection
process, just as he was present during the Gatuso
process when he tried to steer the identification of
Jesus Chavez.

But more importantly, again, to be clear,
what do we know?

Within two hours of the shooting, he gives
two specific facts, Vidal Jimenez, to Detective Buckley
says the height and weight, five eight to five nine,
165 pounds.  Again, to be clear, that was different from

1   what he testified up on that witness stand, in which he
2   said that the shooter was 5 foot 11, 180 pounds.  But he
3   also gave a description of the tattoos, the tattoos on
4   both forearms of the shooter.
5           Now, what do we know about Vidal Jimenez?
6           There's a guy that knows tattoos.  He's a
7   former gang member, according to him.  He says:  I knew
8   tattoos from seeing it on people in gangs.  I knew
9   tattoos from people in middle school that I went to
10  middle school with.  My friends have tattoos.  I knew
11  tattoos because I went to high school with people that
12  had tattoos on them.
13          In fact, he -- Vidal mentioned he, himself,
14  had tattoos.
15          And I asked him specifically:  You've seen
16  hundreds of tattoos in your lifetime.
17          Yep.  Yes, I have.
18          And, also, he testified that he had a clear
19  vision of the shooting.  He was right there.  And he
20  gave that description within two hours of the shooting;
21  two hours.
22          According to Detective Betts, my client
23  doesn't have tattoos on his forearms; no way.
24          Show them your arms.
25          (Defendant Chavez complies.)

1          MR. AQUINO:  That's good.

2          You know if the government could put tattoos

3  on his arms, they would.  But they can't.  He doesn't

4  have tattoos on his arms.

5          What else do we know about Vidal Jimenez?

6          Did you notice how he tried to kind of, sort

7  of lie about that incident that occurred in the early

8  morning hours of June 19th?

9          By the way, that was the day of the

10  shooting, right?  June 19th.

11          At around 12:15 a.m. -- I said, "Isn't it

12  true, you were convicted" -- or you were arrested" --

13  and ultimately he pled guilty to -- "marijuana

14  possession?"

15          What did he say?  "No."

16          And it was only when I showed him the actual

17  evidence of the conviction he said, "Oh, okay.  Yes."

18          Now, the government also cites cellphone

19  evidence and they say, "Well, Jesus's phone was in the

20  area where the shooting occurred, the rough area."

21          Well, that's not all that surprising.  His

22  sister lived in the Chirilagua area.

23          From these facts, the government asks that

24  you find Jesus guilty of being the shooter, the man who

25  killed Julio Urrutia.  We disagree.

1          Now, sometimes what you don't hear in
2     evidence is just as important as what you do hear.  For
3     example, we know the government has no gun, no bullet,
4     no shell casing.  Detective Ignacio said they did not
5     recover a bullet or shell casing from the scene.
6          What did they do to look?
7          Did they look for five seconds?
8          Did they look for five minutes?
9          Did they look for five hours?
10         Who knows?
11         In addition, according to the government --
12    according to Duende, the gun was received from Oscar,
13    Slick, Mickey Mouse -- that's all the same person, by
14    the way, Oscar, Slick, Mickey Mouse, according to
15    Duende.  The gun was received from Duende -- excuse me,
16    I'm sorry -- returned -- received from Oscar and
17    returned to Oscar.
18         Where is it?
19         Have you heard from Oscar?  No.
20         You heard evidence that Sonia Chavez, my
21    client's sister, shared and apartment for a period of
22    time with Duende.  We know from Detective Betts they
23    conducted searches in this whole case.
24         Did they conduct a search of Sonia Chavez's
25    apartment to determine if there was any evidence that

1    might be relevant to this investigation?

2              No.  We haven't heard of any.

3              Duende said he spent the week prior to his

4    arrest on July 2nd in my client's mother's home.

5              Have we heard any evidence that the police

6    might have wanted to investigate, through a search of

7    his mother's home?  Have you heard anything about that?

8              No.

9              You heard evidence from Duende that

10   following the shooting, that my client and Duende went

11   to Blanco Reyes's apartment and spent time there.

12             Have you heard from Blanco?

13             No.

14             Counsel said yesterday that my client

15   ordered Sixto Solano to leave the area immediately prior

16   to the shooting.

17             Have you heard from Sixto Solano?

18             No.

19             In addition, we know from Detective Ignacio

20   that my client's cellphone was seized.  Did the

21   government offer any messages in regard to the cellphone

22   as to text messages or -- or e-mails?

23             Wouldn't they want to know, between

24   June 19th and July 2nd, what was going on relative to

25   text messages and e-mails?

1        Have they offered you any information about
2    what was said?
3                No.
4                Now, I've cited instances to you about
5    witnesses you would expect to hear from or information
6    you would expect to see.
7                So let me pose this question to you:  Whose
8    case is it?
9                It's not my case.  It's not my colleague,
10   Ms. Amato's case.  It's not Judge Lee's case.  This is
11   one of maybe 15 cases that he'll try in 2016.  And it's
12   not your case.
13               Well, whose case is it?
14               I'm looking right at them.  This is their
15   case.  They're why all of us is here.  And they're
16   accusing Jesus Chavez of as serious a crime as you could
17   possibly accuse anybody of, murder.
18               Now, if that's the case -- and I promise you
19   it is their case, they're the moving party in this
20   case -- shouldn't they just not put forward evidence,
21   but evidence of such a character as to allow you to make
22   an informed and educated decision about a man's very
23   future?
24               I submit that's not too much to ask.
25               I submit that their behavior even goes

1  further to underline that point.  Just -- their
2  investigation appears that they're not all that
3  interested in this case, despite what they contend.
4         For example, if you judge people by their
5  deeds and not their words, what is evident from their
6  failure to call witnesses, or their lack of using
7  investigative techniques in this case, is that they
8  don't seem all that interested in this case or all that
9  interested in doing justice as they profess to be.
10         Now, the defense's evidence and testimony.
11         You heard a lot about tattoos.  I'm not
12  going to spend any more time on that.  It's crystal
13  clear, that issue.
14         But you also had additional evidence,
15  because we're not done with that tattoos -- we're not
16  stopping there.
17         Remember the guy named Cosmo Gonzalez,
18  through the video?  And we had -- we weren't able to get
19  the sound right in the first attempt, but ultimately we
20  did.  He had absolutely no stake in this case, zero.
21  And he came and told you what he saw and what he heard.
22         Let's go over what Cosmo Gonzalez said and
23  testified to.  He got home around 11:20 the night of the
24  shooting, 11:20 p.m.  He sees a shirtless man confront
25  Mr. Urrutia, the decedent.  An argument ensues over a

1  drug deal.

2          Now, we know from Officer Garcia who that

3  shirtless man was, right?  The shirtless man was

4  David Jimenez.

5          Cosmo enters his apartment.  Within seconds

6  he hears a shot, comes back out.

7          And what does he see?

8          David Jimenez, the shirtless man, standing

9  over the decedent, Mr. Urrutia, who was on the ground.

10 David runs into the woods, appears to leave something in

11 the woods, and returns.

12         What's even more interesting about that,

13 who's David's brother?  Vidal Jimenez.

14         And as I mentioned earlier to you, we know

15 that in the early morning hours of June 19th, he was in

16 possession of marijuana.  First he tried to deny it, but

17 then he admitted it.

18         And I submit to you the Jimenez family was

19 running a marijuana business in the Chirilagua area, to

20 service the poor people there, and they were unhappy

21 with Mr. Urrutia, the decedent.

22         Now, this is a completely, completely

23 different set of facts relative to the shooting and how

24 it occurred.  For example, you've heard testimony over

25 here from Vidal Jimenez, Duende, and Gatuso, and you've

1    got testimony over here from Cosmo Gonzalez.

2              You can't reconcile those two scenarios.  In

3    other words, to say it a different way, sometimes you

4    could kind of round testimony.  Somebody says a shirt

5    was black; another person says the shirt was white.

6    Okay, the shirt becomes blackish or whitish.  You can

7    round that testimony.  You can't reconcile those two

8    stories.

9              So, let's do this:  Let's examine how the

10   government makes their sausage, how they procure

11   testimony and compare it to Cosmo Gonzalez and his

12   testimony.

13             What do we know?

14             We know in this case -- you've heard

15   testimony how the government pays people.  $40,000 was a

16   figure that's been thrown around.

17             I haven't paid anybody.

18             What else do we know?

19             They give out immigration benefits like

20   candy.

21             Do I have the power to give out immigration

22   benefits?

23             No.

24             And let me stop right there, because this

25   really bothered me, that I want to -- yesterday, the

government lawyers tried to anoint Junior as a hero.
That guy is no hero, no way, no how.  He was looking for
something from the government.

           A hero is someone who is selfless, who acts
in the interest of other people.  That guy is no hero.
He is not selfless.  He was looking for help from the
government, for immigration benefits and money.  And
that's exactly what he got.

           But also, what do we know that the
government gives out?

           They give out people their freedom.  They
get out of jail.

           Can I do that?

           No.

           So, I ask that you compare and contrast how
the government makes their sausage and compare it to
Cosmo Gonzalez's testimony.  He is going to get
something from me.  You know what he's going to get?  A
firm handshake, if I ever see him again; a firm
handshake.

           I've been practicing law since I was 24.
I'll turn 59 this summer.  And I learned a long time
ago, sometimes that's it.  That's all you got.  And
that's what Cosmo is going to get from me, a firm
handshake.

1          Now, the judge mentioned to each of you,
2   when you were selected for the jury, how would you
3   evaluate a person's testimony?
4          And there's a jury instruction on the
5   credibility of witnesses that he gave you already.  I
6   ask that you consider that when you're weighing the
7   testimony of these people -- Del Cid, Gatuso, Vidal
8   Jimenez.  Compare it to the testimony of Mr. Cosmo.  Big
9   difference, big, big difference.
10          Now, there hasn't been much talk in this
11   courtroom about the decedent, Mr. Urrutia.  There are
12   certain things all of us agree on, all of us.  That guy
13   does not deserve -- he did not deserve to die.  He was a
14   young guy with a family.  And the shooter of Mr. Urrutia
15   should be held accountable for his behavior.  Everyone
16   agrees with that.
17          But there's a second part.  There's a second
18   part that sometimes gets lost in the equation when the
19   government gets aggressive -- and they have been
20   aggressive in this case -- and that is, we want the
21   right person to be held accountable, not the wrong
22   person.  Because that would compound the tragedy of this
23   guy's death, Mr. Urrutia.
24          Now to illustrate the point of aggressive
25   government behavior, I highlight to you and remind you

1  their attempt to blame Judge Lee, the behavior of
2  Detective Ignacio in trying to steer the selection
3  process during the photo spread, and the behavior of the
4  government lawyer in the same -- with the same witness,
5  Gatuso, when he was on the witness stand, that caused
6  Judge Lee to reprimand the government lawyer for her
7  behavior in the identification process.
8         Do you see again what I mean?
9         It illustrates my point that the
10  government's good judgment has been damaged in this
11  case.  They're so determined to fit the square peg in a
12  round hole that they have acted in an aggressive,
13  aggressive fashion.
14         Burden of proof.  There's been a lot of
15  hoo-ha that you've heard from all the lawyers.  I'm not
16  going to rehash burden of proof, except for this reason:
17  The government's burden is to prove their case to you by
18  proof beyond a reasonable doubt.
19         Now, remember when you heard from the
20  linguists up there?  They talked about context.  Got --
21  context.  So, let's give context on the issue of burden
22  of proof and reasonable doubt.
23         Let's pretend on your way home today, you
24  turned your ankle on a curb and you said, "I'm going to
25  sue the City of Alexandria for the damage I suffered."

1          No problem.  You come into a courthouse just
2    like this, in front of a judge just like Judge Lee, and
3    to prove and prevail your case, you have to prove your
4    case by a preponderance of the evidence.
5    "Preponderance" means is it more probably than not that
6    the city was negligent in some manner in failing to
7    maintain the curbing or the sidewalk that you tripped
8    on?
9          To give it a math formula, at least -- at
10   least 51 percent of the evidence would have to be in
11   your favor.  Again, the standard of proof in a personal
12   injury case, by a preponderance of the evidence.
13         Now, let's change the facts of the case.
14   Microsoft sues Apple Computer, alleges actual fraud,
15   actual fraud.  No problem.  To prevail in the case like
16   that, they have to come into a courthouse just like
17   this, in front of a judge just like Judge Lee, and prove
18   their case to you by a higher standard than the
19   preponderance, that is, by clear and convincing
20   evidence, a higher standard.
21         But in a criminal case, the government must
22   prove their case to you by the highest legal standard,
23   by proof beyond a reasonable doubt.
24         So, that begs the question:  Why do we do
25   this?  Why do we hold the government accountable to this

1  highest legal standard and this heavy, heavy burden that
2  they have?
3          In the DNA of every American are two real
4  strains, one, a profound and deep respect for individual
5  liberty, like nowhere else, really.  We want people to
6  be able to say what they want to say, associate with who
7  they want to associate, worship who they want to
8  worship.  And that's fine.  That is definitely part of
9  our body politic.
10          But there's a second aspect, a second strain
11 in our DNA, which is a deep suspicion of those who wield
12 power in our country.
13          Now you can deny it and say, "No way,
14 Aquino, that's just not true."
15          If you do deny it, how do you explain the
16 Bill of Rights -- which is not a set of rights at all?
17 Forget about what your high school teacher told you.
18 It's a set of limitations on the power of the federal
19 government.  They cannot do this to you.  They cannot do
20 that to you.
21          So, in light of that, we've reached an
22 agreement to hold the government to this heavy burden,
23 and that agreement runs from President Washington to
24 President Lincoln to President Roosevelt to President
25 Reagan, to you and your families.

1        Now, you know, in a little while, in a few
2   minutes, the government lawyer has an opportunity to get
3   back up here, and that's consistent with the heavy
4   burden of proof.  Again, they're the moving party in
5   this case, and that's why she gets the opportunity to
6   address you again.

7        If I tried to get up here and respond, Judge
8   Lee would reprimand me, just like he remanded the
9   government lawyer in that whole identification mess with
10  Gatuso.  So, I can't get back up here, and I won't get
11  back up here.

12       But if I could get back up here, I want you
13  to keep in mind -- I know you don't know me very well --
14  I would respond to every single thing that she says.  So
15  keep that in mind when she's addressing you again.  If
16  Aquino had the chance to get back up there, he would
17  respond.

18       So, to sum up, in light of the unreliable,
19  unreliable government evidence in this case, in light of
20  the lack of evidence, evidence you would reasonably
21  expect to hear from in terms of people or searches, for
22  example, or other evidence, in light of the defense
23  issues on the tattoos, and Mr. Cosmo, and in light of
24  the heavy burden of proof that the government has to
25  bear, I ask that you find Jesus Chavez not guilty of

1    each of the charges.

2            Thank you.

3            REBUTTAL ARGUMENT BY THE GOVERNMENT

4            MS. MARTINEZ:  Let's go back to the

5    beginning, Greñas and the closing arguments made by

6    Greñas's attorneys.

7            Greñas got on the stand last week and he

8    admitted to you that he killed Lagrima, but he denied

9    his involvement in the attempted murder and the

10   conspiracy to murder Peligroso.

11           And Greñas attorney got up yesterday and he

12   gave a great argument.  He gave a great closing argument

13   with what he had to work with.  And he tried to tell you

14   that his client, everything that he said on the stand

15   was true.  It was true that he killed Lagrima, but it

16   was also true that he was not involved in that other

17   thing a week earlier with Peligroso.

18           And he told you that you should believe him

19   because he doesn't have a plea agreement, because all of

20   the government's witnesses, they all have plea

21   agreements, and those plea agreements give them an

22   incentive to lie.  And his client didn't have a plea

23   agreement, and so he only had an incentive to tell the

24   truth.

25           I submit to you that that is not logical.

1   The existence or lack of existence of a plea agreement
2   does not give Greñas a motivation to lie or to tell the
3   truth.
4           But look at the other evidence in the case.
5   Let's talk about the cooperating defendants who had plea
6   agreements.  I'm not going to argue to you that you
7   should believe that they're telling the truth because
8   they had plea agreements.
9           No.  We talked at length yesterday about
10  corroboration.  You should believe their testimony, I
11  submit to you, because it is consistent with the other
12  evidence you have seen.
13          So, let's look at Greñas's testimony about
14  his role in the Peligroso incident.  That testimony is
15  not corroborated by phone calls.  It is not corroborated
16  by the testimony of other witnesses.  In fact, it is
17  contradicted by both.  It is contradicted by the
18  recordings that Drowsy was able to obtain by wearing a
19  body wire and by recording phone calls, recordings in
20  which Greñas is involved.
21          Go back and look at the transcripts.
22  There's his name right there, while they're talking
23  about the plan.  There is his name right there, while
24  they're talking about the machetes.  There's his name
25  right there, while they're talking about the shotgun.

There he is in the calls advocating to use the 12.  His
testimony is not corroborated.  It is contradicted.

And then it's contradicted again by his own
statements two months later in that December call that
we looked at yesterday, where he says, "We were going to
do a hit, and they caught him" -- Demente -- "with the
12."  "We were going to do a hit."  Because that's
exactly what it was that he was going to go do, a hit on
Peligroso.

Now the other thing that Greñas's attorney
said is that by getting on the stand and by testifying
as a member of MS-13, he faces a death sentence.  Those
were his words, a death sentence.

So that's what he has argued to you, that
his client got up on the stand and now that's it.  Now
he's going to be green lit, now he's going to be killed
and, I guess, what, it was a brave thing that he did?

No, no, absolutely not.  Here is why you
know that's not true.  Because on cross-examination,
when he was asked to talk about other homeboys, when he
was asked about Poison and El Tigre down in El Salvador,
when he was asked about who sent him that gun from
California, when he was asked about who sent the drugs,
each time he said, "A homeboy," "I can't say," "I don't
know," "I won't say."

1          Yeah, exactly.  He won't say.  He won't say
2   because that would be snitching.  That could get him
3   green lit.  That could be a death sentence.  He was not
4   willing to do that.
5          The only people he was willing to name are
6   the people whom he perceives to already be snitches.  He
7   would only snitch on the snitches, because he sees that
8   as different.
9          And I submit to you that he either knows or
10  hopes or believes that the rest of the gang sees that
11  differently, too.  And so he got up on that stand and he
12  snitched on the snitches, and then he claims that no one
13  else had anything to do with it.
14         The other thing that Greñas's attorney said
15  is, you know, "Ms. Martinez, she says in her closing
16  that he's trying to exonerate all of these people, but
17  that's silly because he only knows about the first few
18  things, and then he gets himself arrested before the
19  murder of Lil Guasón."
20         No, no, no, no, no; that argument is silly.
21  Because what Greñas was doing on that stand was trying
22  to tell you that all of the government's witnesses, and
23  in particular the five cooperating defendants, that
24  they're all lying.
25         Well, if you believe that they're all lying,

1   then you will acquit these people sitting behind me, Not
2   just the ones about whom Greñas has direct knowledge,
3   not just them, but the others, too, right?  That would
4   be the logical conclusion.  If you think that all of the
5   evidence we presented was just false, was just lies, you
6   would acquit them all.

7           And so think of that benefit to Greñas if
8   these guys all get back out on the street, and he's in
9   jail, like Payaso, who was running the clique from
10  inside.  Think of the benefit to him when you think
11  about what his motivations were and what he said on the
12  stand.

13          Next, Solitario.  His attorney made a number
14  of arguments about why he says that his client should
15  not be convicted.  He seems to concede that he was
16  there.  He seems to concede that he was involved.  But
17  he says that you should not convict him.  So let's look
18  at that.

19          First of all, one of the things that
20  Solitario's attorney argued about was the evidence that
21  he claims that we didn't present.  And, you've actually
22  heard that argument from a number of defense attorneys,
23  so let me just address that head on.  I have two things
24  to say about that.

25          First of all, the jury instructions do not

1  tell you that there's any particular kind of evidence
2  that we have to present to you.  You do not have to see
3  DNA evidence in order to convict.  You do not have to
4  see fingerprints in order to convict.  What we have to
5  do is prove every element of every charge beyond a
6  reasonable doubt.
7          And I submit that we did that to you.  We
8  can do that, per the jury instructions, per Judge Lee's
9  instructions, with direct or circumstantial evidence.
10 And we have given you quit a bit of all of that.
11         There's nothing that requires us to put on a
12 particular witness, nothing.  There's nothing that says
13 that every single person who might know something about
14 every single thing that happened has to testify.
15         No.  We simply have to prove our case to you
16 beyond a reasonable doubt, which I submit that we did.
17         And, here's the second thing I have to say
18 about these arguments that we didn't put on certain
19 evidence, and that's this:  Now, the burden is with us.
20 It is always with the government.  It never shifts to
21 the defense.  And I am not trying to say that at all.
22 And defense counsel and the defendants, they don't have
23 to do anything.  That's -- that's our system.  That's
24 our Constitution.  I believe in that.  They do not have
25 to put on evidence.  They do not have to call witnesses.

1    They do not -- certainly do not have to testify.  That

2    is their constitutional right.  It's something that we

3    uphold and we protect.

4              That being said, they are allowed to put on

5    witnesses and they are allowed to put on evidence, and

6    they did that in this case.  They called witnesses to

7    the stand to testify.  They introduced exhibits that you

8    will have back in your deliberations, along with all of

9    the government exhibits.  They are able to do that.

10             And so, if there was evidence that they knew

11   about that they thought was important, they were able to

12   present it to you.

13             So, let's go back to Solitario, and

14   Solitario's defense attorney.  He says that there was a

15   call or calls, transcripts that should have been

16   presented, that would have exonerated his client.

17             Well, if there were, he could have put that

18   evidence in.

19             Defense attorneys can call linguists.  In

20   fact, they did.  They put a linguist on the stand, who

21   listened to those recordings and talked about what was

22   in those recordings and translated those recordings.

23   They have the ability to do that, if that's what they

24   wanted to do.

25             Now, as many of these lawyers said, there

1   were thousands of calls on Junior's wire.  It's true, we
2   did not bring it -- bring you all in here and have you
3   sit here for months and months and months and look at
4   transcripts of thousands of calls.  I submit that that
5   would have been a waste of your time --
6              MR. CHICK:  Your Honor, I'm going to object
7   to -- can we approach?
8              MS. AUSTIN:  Yes.
9              MR. SALVATO:  Yes, please.
10             THE COURT:  Come to sidebar.
11             (Thereupon, the following sidebar conference
12  was held:)
13             MR. CHICK:  Your Honor, the government is
14  improperly and unconscionably commenting on our failure
15  to produce evidence in this case.  It is absolutely,
16  absolutely improper for them to do that.  And I would
17  ask that they be admonish for it and that it stop now.
18  It's completely inappropriate for them to do that, and
19  they know it.
20             THE COURT:  Ms. Austin.
21             MS. AUSTIN:  I would ask Your Honor to
22  reinforce the instruction that we are not required to
23  present any evidence.  The argument of government
24  counsel went way over the line on this issue, and it was
25  highly improper.

1          MS. MARTINEZ:  Your Honor, I disagree.  I
2    actually said very clearly that they are not required to
3    present any evidence, they're not required to put on any
4    testimony, and they're not required to testify.  That's
5    what our Constitution says.  And that's -- and that's
6    what we all here believe in.

7          And then I added that they can, if they want
8    to -- and they made arguments directly that there was
9    evidence -- that they think there was evidence the
10   government didn't put on.  Well, they have that
11   evidence.

12          I should be allowed to respond to that.
13   Otherwise, it's left with the implication there's
14   evidence out there that they know about, but, hey, the
15   government didn't put it on, so that means that -- that
16   there's exculpatory evidence that the government hid
17   from the jury.

18          And if that's -- that is an improper
19   argument, without the ability of the government to
20   respond to that.

21          MS. AMATO:  Your Honor, excuse me --
22   Ms. Amato -- it's improper for the government to put the
23   burden on us.  And what they're doing is, they're
24   putting in the jury's minds that we have a burden.

25          And I understand she tried to gear it up, as

1    if to hide that, but the problem is, it comes to the

2    jury that the defense should have done something, and

3    they didn't.  And that's just improper, because she is

4    shifting the burden to us.  We don't have to do

5    anything.  But we can argue that the government should

6    have done things.

7             MR. JENKINS:  Your Honor, I would join in

8    and echo Ms. Amato's comments.  While I understand the

9    government counsel feeling as though it places her in an

10   unenviable position, that she has to listen to defense

11   counsel point out about what the government did not

12   produce, as the Court has already instructed this

13   jury -- and I also join my fellow defense attorneys --

14   if the Court is not inclined to grant my request for a

15   mistrial as a consequence of the government stepping

16   over the line, Your Honor, that what the government

17   counsel did was improper.

18            The defense does not have the burden of

19   proof or production.  And, even though she said what she

20   said, prior to crossing the line she did make an

21   argument to this jury that suggests to them that we had

22   an obligation to produce evidence.

23            THE COURT:  All right.

24            MR. SALVATO:  We all join, Your Honor.

25            THE COURT:  I'm sure you do.

1          Go ahead.

2          MR. LEIVA:  Not all defense counsel raised

3    that issue in closing.  And if the government believes

4    that one or two may have invited that, she basically

5    generalized it to everyone who is involved in this case.

6    So that would also be a basis for our objection and our

7    request for a mistrial as well, Your Honor.

8          MS. MARTINEZ:  May I respond to that part,

9    Your Honor?

10         THE COURT:  I want to make sure everybody

11   had a chance to say what they want to say.

12         MS. MARTELL:  Katherine Martell on behalf of

13   Mr. Castillo.  We also join in the motion for a

14   mistrial.  I think at this point, although government

15   counsel, like Ms. Amato said, did try to hide the fact

16   that she was burden shifting -- she stated the law

17   correctly -- but after that, she -- what she did after

18   stating the law was shift the burden onto these

19   defendants.

20         Specifically, she said for people who raise

21   the issue of lack of evidence -- which is an issue that

22   defense counsel raises in every case, the lack of

23   evidence -- she went on to say that the defense could

24   have put the lack of evidence in front of this jury.

25         That is not our burden.  If there is a lack

1   of evidence, they are to look to the government, not to
2   the defense to put that evidence on.  We don't have a
3   burden to prove innocence here.  They have the only
4   burden.
5           And I would ask, Your Honor, if you deny a
6   mistrial at this point, that you instruct this jury as
7   to what the burden is, and that Ms. Martinez be
8   admonished for what she tried to do.
9           THE COURT:  Everybody finished?
10          MS. MARTINEZ:  Your Honor, with respect to
11  the argument Mr. Leiva raised, I was actually very
12  specific in talking about Mr. Chick, in his argument,
13  said that there was a call, that there was a call, and
14  that that call would have exonerated his client.
15          I was very specific that if that -- that he
16  could have put that call on if he wanted to do that.
17  That is a -- that is a proper argument, I submit, Your
18  Honor, because it responds directly to a very specific
19  argument raised by defense counsel.
20          With respect to what -- what Ms. Martell
21  just said, my broader argument about lack of evidence,
22  again, I was very clear about that, that there's no
23  instruction that we have to give certain types of
24  evidence.
25          Those are two separate arguments that I

1   made, one about not being required to put on DNA or

2   fingerprint, that sort of thing; and then specifically,

3   with respect to Mr. Chick's argument, about a particular

4   call that he says exists, that he could have put on

5   testimony about --

6               MR. CHICK:  The difference is, we are

7   allowed --

8               THE COURT:  One person is talking.

9               MS. MARTINEZ:  And to be clear, Your Honor,

10  I teed that up with the burden and the Constitution and

11  the fact that the defense never has to put on any

12  evidence.  I was very clear.  I spent more time on that

13  part than I did on the subsequent argument.

14              I do not think that a line was crossed.  And

15  I apologize if Your Honor does, but I do think it was a

16  proper argument.

17              THE COURT:  Let the record reflect this

18  matter is before the Court through an objection in

19  closing argument about whether the government somehow

20  invited error by argument that the defense could have

21  called witnesses, and, specifically, the argument

22  addressed to Solitario's closing argument wherein

23  Solitario's counsel claimed to the jury that there was a

24  call that could have exonerated his client.

25              I made note of that in my notes.  That was

1   something that he said.  And I think that the government

2   certainly had the right to respond to it.

3              I think the government set forth a preface

4   for the argument about the burden of proof that was more

5   than sufficient.

6              And bear in mind, throughout this entire

7   trial, from jury selection through opening, preliminary

8   instruction, through the 108 pages of instructions that

9   I read yesterday, this jury ha been fully informed of

10  the burden of proof.  And they've also been informed

11  that the arguments of counsel are not evidence.

12             So the motion for mistrial will be denied.

13             Thank you.

14             (Thereupon, the side-bar conference was

15  concluded.)

16             THE COURT:  You may proceed.

17             MS. MARTINEZ:  As I was saying, defense

18  counsel for Solitario told you that there is a call out

19  there that you didn't get to see that somehow exculpates

20  his client.

21             But he had the ability to put on evidence.

22  He did not have the requirement to do so.  That's -- all

23  of those defendants have the right to not put on

24  evidence.  They have the right to hold the government to

25  its burden, as -- and the government always has the

1  burden.  But, they can put on evidence.  They can.

2         And so, defense counsel for Solitario, he --

3  what he basically argued was:  If you look at the

4  transcripts that the government did put in, yeah, that

5  makes my client look guilty.  But, what about the one

6  that they didn't put?

7         Well, what about that?  We don't have that

8  in front of us.  Neither party presented that alleged

9  evidence.

10        What we do have, and what you do have, is

11 the evidence that was presented during trial.  And that

12 is the evidence that you should consider, that you must

13 consider when you deliberate and when you determine

14 whether, in fact, the government did meet its burden of

15 proving each and every element of each and every crime

16 that was charged.

17        Now, the other thing that the defense

18 counsel for Solitario said was -- and I wrote it down --

19 he said that his client was never given the opportunity

20 to do the right thing.

21        Really?  He was never given the opportunity

22 to do the right thing?

23        Who was it that was supposed to give him

24 that opportunity?

25        He had the opportunity to do the right thing

1   for quite some time.  He was a *chequeo* at the time that

2   he murdered his friend, Lil Guasón.  You know about the

3   gang.  You know about the levels in the gang.  He was a

4   *chequeo*.  So before that, he must have been a *paro*.  And

5   before that, he wasn't associated with the gang.

6           So he had the opportunity to do the right

7   thing by not associating with the gang.  He had the

8   opportunity to do the right thing by not advancing from

9   *paro* to *chequeo*.  He had the opportunity to do the right

10  thing as he learned more and more about the gang, as he

11  learned what they did, who they are, what they do.  He

12  had that opportunity.

13          You all know, and I submit that they, those

14  defendants, all know, what this gang is about, and that

15  includes Solitario.

16          You've heard countless testimony about how

17  violent this gang is, how violence is the bread and

18  butter of MS-13, and how the *paros* and the *chequeos* and

19  the homeboys are taught that.  They're taught the rules

20  and they're taught about violence.

21          Look at this call from Leopardo on May 8th.

22  At the bottom of the screen he says, "Everyone knows

23  what they got themselves into, you know.  And they know

24  the rules and they know everything."

25          Yes, exactly.  When you're in the gang, you

know what the gang is.  You know about the violence.

And with respect to Solitario specifically, it's not just that we know generally that those in the gang know.  We know that he, in particular, knew.  We know because we know that he was involved in the December 21st shooting in Culmore.

You heard about that from Skinny, when Lil Poison fired a gun into a window at someone who had disrespected the gang.

Now, I'm not saying that Solitario was the shooter, not at all.  No one said that.  That's not what Skinny said.  But he was there.  He was involved.  So, in December of 2013, three months before he helped kill his friend, he was directly involved in a crime of violence as part of the gang.

He also knew that the gang, that this clique, that these defendants, murder people.  He knew that because he knew about Lagrima.  No, he wasn't there for the murder of Lagrima.  I'm not arguing that he knew about it in advance and that anyone involved him.  He was a *chequeo*.  He was still a *chequeo* in March of 2014, when he killed Lil Guasón.

But, he was a *chequeo* who was trusted enough within the gang, who was respected enough within the gang, that the clique told him what they did to Lagrima.

They told him what they did.  They told him where they
did it.  And they told him why they did it.  And they
told him that before he was involved in the murder of
Lil Guasón.  And, in fact, they took him to the grave
site, again, before the murder of Lil Guasón.

So think about that for a minute.  When he
went into that park on March 29th, 2014, he had been
there before.  He had been there to visit the grave site
of Lagrima.

And then he goes in on March 29th, 2014, and
what do you know?  He's involved in a murder, with the
same MO.  He knew what they did to Lagrima.  He knew
that they lured him to the park on the premise of a gang
meeting, told him they would give him a *calentón*, and
then killed him instead.  And that's what they did with
Lil Guasón.

And, by the way, the other thing that you
heard testimony about with Solitario and what he knew
about Lagrima was that he expressed approval, that he
said that he liked what the gang had done because
Lagrima was a snitch.

You know, you have evidence of Solitario's
guilt, of the malice that he held when he helped kill
Lil Guasón, and of the intent that he had when he did
it.  You know that from evidence before, during, and

1   after the murder.

2           Before, we've just covered, him being

3   brought up within the gang, him knowing the rules, his

4   involvement in previous violent -- at least one previous

5   violent crime, and his knowledge of Lagrima.  But, you

6   also know about what happened during, during the murder.

7   Okay?

8           And so, let's -- again, let's talk about

9   that.  He walks into Holmes Run Park.  He knows that

10  Holmes Run Park is where they killed Lagrima.  He knows

11  that Holmes Run Park is where Lagrima is buried.  And he

12  walks in.

13          And so does Lil Guasón, right?  He walks

14  into Holmes Run Park.  You also heard that Lil Guasón

15  knew what the gang did to Lagrima.

16          Here's the other thing.  There's evidence

17  that Lil Guasón knew that he was going to be killed.

18          Look at this transcript.  This is Leopardo

19  talking about Lil Guasón.  "We talked, you know, like

20  indirectly, you know, but everything was for him, you

21  know what would happen if you fuck a homeboy's

22  girlfriend.  You know what would happen to you."

23          So then Junior is asking, "Well, the son of

24  a bitch should have realized, then."

25          And Leopardo responds at the bottom of the

1  screen, "No man, the dude already knew.  The dude

2  already knew that -- that we were going to hit him.  The

3  dude already knew that we were going to roll him up."

4          Yeah, that's what he's saying.  He's saying

5  that Lil Guasón knew that he had broken so many rules,

6  that he had slept with Skinny's girlfriend, that he

7  wasn't paying back the money, that he was disrespecting

8  the homeboys, the clique, and the gang.  And so he knew

9  what the consequences of that would be.

10          And Solitario, Lil Guasón's friend, who was

11  also a *chequeo*, who was in the same status as Lil

12  Guasón, I submit to you that you can conclude that he

13  knew as well.

14          If he was really his best friend, you don't

15  think he knew that Lil Guasón was in trouble with the

16  gang?

17          He's with the gang.  You don't think he knew

18  that Lil Guasón was breaking these rules?

19          Now, as I told you yesterday, you've heard

20  testimony in both directions about whether or not

21  Solitario was actually told and involved in the planning

22  of the murder.  You've heard both sets of testimony.

23          I submit to you, that's irrelevant.  It is

24  not relevant whether or not he was at some meeting where

25  they specifically planned what they were going to do

1   with Lil Guasón.  You can disregard that.  You don't
2   need premeditation in order to convict; first or second
3   degree murder, either one, either one results in guilt,
4   and this was certainly second degree murder.
5          Now, the other thing -- well, let's -- and
6   let's talk about why it's second degree murder.  Second
7   degree murder requires malice, and, Solitario's attorney
8   spent a long time talking to you about what malice is
9   and why his client didn't have malice.
10         But if you look at the jury instructions,
11  one of the things that the instructions say is that you
12  can infer malice from the use of a deadly weapon.
13         A knife is a deadly weapon.  And Solitario's
14  attorney basically admitted that his client did stab Lil
15  Guasón.  Well, that's not evidence, but we have
16  evidence, we have lots of witnesses and we have lots of
17  calls, that say just that.  Solitario stabbed Lil
18  Guasón.  He used a deadly weapon.  You can infer malice
19  just from that.
20         So -- so, Solitario's attorney tells you:
21  But he panicked.  He panicked.
22         Right?  That's the version.  He panicked.
23  He panicked, and so he didn't want to do it.  He
24  panicked, but he was threatened.  He panicked, and so
25  then he didn't have the requisite intent.  He didn't

have malice.

I submit to you that is not actually what the evidence shows.  It's not.  It's not exactly what the witnesses testified to, and it's not exactly what the calls say.

Here's one call about that, all right?  So this is two days, just two days, after the murder, and here's what Lil Poison is saying about Solitario:  "That -- that he proved to us who he really is.  Our recruit proved it to us."

Yeah, he proved it.  He proved that he was a solid recruit.  He proved that he could participate in a murder.

And what Pesadilla said:  "The homeboy is already wet, you know."  Again, two days after the murder.  And you heard testimony from Junior about what that means, "already wet."  "Already wet" means he's already committed a murder, which he had done two days ago.

So, like I said, you have evidence from before, during and after.  Right?  And we're getting close to the after part.  This is two days after.

And here is the thing that you know, is that afterwards, the gang still included Solitario in activities.  He was still in with the homeboys.  In the

1   calls with Junior, they're talking about how Solitario

2   is ready to be jumped in because of that murder, and

3   he's just waiting for Friday the 13th.

4           If he had actually panicked, if he had said,

5   "No, I don't want to," if he had chickened out, he

6   wouldn't still be in with the gang.

7           And let's go back to that, he didn't have an

8   opportunity to do the right thing.  Sure he did, and he

9   didn't.  Right?

10          I mean, not only did he not walk away from

11  the murder that night, he didn't walk away from the gang

12  afterwards.  He could have done that.  He could have

13  been like Drowsy.  But he didn't.  He stayed with the

14  gang.  He continued selling drugs for the gang.

15          You heard Detective Betts.  He stopped him

16  sometime after the murder.  He still had drugs on him.

17  He was still hanging out with the gang members.

18          You know that what he did after the murder

19  was he continued hanging out in Culmore, continued

20  selling drugs.  And then when it got too hot, he fled to

21  Kansas City with the people whom his attorney says were

22  threatening him.  Really?

23          With Slow, with Leopardo, with Lil Poison,

24  he goes to Kansas City to, as Slow told you, both get

25  away from the police and to help build up their clique

1   down in Kansas City.

2          So let's get back to this whole "he

3   panicked" argument.  Because you actually have seen some

4   evidence of someone, of a *chequeo*, initially panicking

5   during a murder.  Solitario was the *chequeo* at the Lil

6   Guasón murder.  Slow was the *chequeo* at the Lagrima

7   murder.

8          And here's what Greñas says about Slow at

9   the Lagrima murder.  Junior says at the top there, "None

10  of them panicked?"

11         And then Greñas says, "Fuck, he panicked.

12  He panicked.  And I told him, 'Oh, today you leave, son

13  of a bitch.  From here, nothing has to come out.'  He

14  grabbed the knife from me, homie, and started to cut him

15  up all over, without mercy."

16         And again, at the bottom of the screen, you

17  can see in the middle there, Junior helps clarify who

18  we're talking about, Slow.  And then at the bottom of

19  the screen, "Respect for that son of a bitch, because

20  that son of a bitch has turned out to be solid for us.

21  He grabs the knife without mercy, too, son of a bitch."

22         So, in other words, Slow, the *chequeo*, who's

23  at this murder in order to get wet, in order to prove

24  that he can be a homeboy, when the murder starts, he

25  panics.  He initially panics.  But then he grabs the

knife and he stabs him without mercy.

And after that murder, he gets to become a homeboy and he stays with the gang, just like Solitario did, and the gang continues to respect and trust him, just like they did with Solitario; the difference being, of course, that then Solitario got arrested.  Slow, it took longer to arrest him, and so, after getting wet, after being jumped in, after his initial panic with the Lagrima murder, he went on to kill someone else.

And I submit to you that, if anything, is how -- is how Solitario's behavior that night would best be described.

The fact that he initially panicked, if that is indeed what happened, that he initially panicked while watching someone be killed, well, okay, I guess that makes him better than, I don't know, Leopardo, who really, really seemed to enjoy it.  But it doesn't make him not guilty.

Because, when he then choose to participate, when he choose to participate, when he used a deadly weapon on his friend, that was murder.  That was aiding and abetting the murder of Lil Guasón.

And so, like I said, afterwards, for a couple months afterwards, he continues hanging out with the gang, continues selling drugs, goes down to Kansas

City with his buddies to flee.  And on that point, about
the going to Kansas City to flee, you don't have to flee
from the police in order to be guilty, right?

I mean, you've heard some argument about
that, that Pesadilla didn't flee.  Well, he kind of did.
He moved to Gaithersburg, Maryland.  But you also heard,
for example, that Lil Payaso didn't leave the area.

Well, I'll just remind you, neither did
Duende.  And I don't think anyone in this room is saying
that Duende wasn't guilty.  Duende was certainly guilty.
He also didn't leave the area.  So fleeing from the
police, yes, that can be evidence of guilt.  And I
submit that for Solitario, it was.  But, you don't have
to flee in order to be guilty, just like Duende.

All right.  Let's talk about some of the
arguments that multiple defense counsel made with
respect to Count 6, the murder of Lil Guasón.  Many of
them made this argument that even if there was a murder,
it wasn't a murder in aid of racketeering.  There was no
purpose that was required.

I submit to you that that argument is
ridiculous in light of the evidence.  Look at what these
defendants said about why they killed Lil Guasón.

Leopardo, "The one that steals from the
clique, homeboy, you know, the one that breaks the

rules, you know, of the hood, you know, that dude is trash.  For stealing from the clique, you know, for bullshitting, for bullshitting all the homeboys and making fools of all the homeboys, you know."

That's why they killed Lil Guasón.  That is absolutely in relation to the gang.  It's directly in relation to the gang.

In fact, here's what Pesadilla says, "The Mara's train has taken you, you son of a bitch, for being a fool."

The Mara, the Mara has taken you; not, you know, we did it out of some personal vengeance or because -- and how does that make sense, anyway?

What's the, it's a personal crime?

Why, because Skinny was mad at him over something, or there was some personal money involved?

Well, then, why were Leopardo and Pesadilla involved?  There was nothing alleged there that they had some personal animus against Lil Guasón.  No.  They were involved because this was a gang hit.  This was a gang murder.

Now, you also heard a lot of argument about how there was all this contradiction about who cut off Lil Guasón's head, and somehow that means that the government witnesses aren't believable or aren't

1   credible.

2          But -- and I'm sorry to have to talk about

3   that, because it's disgusting, but we have to talk about

4   it.  Okay?  They did cut off his head.  You know that

5   they cut off his head, just like they said in the calls,

6   because when the FBI found that body, his head was

7   underneath him.  It was severed from his body.

8          And you also know what weapons were used

9   during that murder.  It was knives.  You know that

10  because that's what the people who were there told you.

11  But you also know that because that's what the forensic

12  evidence, the examination of the body, showed.  It was

13  knives that killed him.  Right?

14         So, it wasn't a guillotine.  Think about how

15  his head was chopped off.  It wasn't one chop and it's

16  gone.  I'm sorry, I'm sorry to have to talk about it,

17  but think about it.  It was not one chop.  There wasn't

18  even a machete involved in that murder.  It was not one

19  chop and the head is off.  It was stabbing, repeatedly,

20  in the back of the neck and in the side of the neck.

21         Look at the autopsy report.  Look at Dr.

22  Hunt's report.  Recall the testimony of those doctors.

23  Recall when Dr. Hunt said that the vertebrae way at the

24  top, way at the base of the skull, was so damaged that

25  someone had to have been shoving a knife way up in there

1   in order to cause that damage.

2               Lil Guasón's head was cut off over a period

3   of time with multiple stab wounds.

4               So, I submit to you that when people say

5   this person or this person helped cut off the head,

6   yeah, that makes sense.  That makes a lot of sense,

7   because it probably took multiple people to sever his

8   head from his helpless body.  And every single one of

9   the people who were there for that murder committed

10  murder or aided and abetted murder.

11              And you've heard all these arguments about

12  how, you know, if they were just there, then they're not

13  guilty.  Or if they -- I mean, really, this argument was

14  made:  If they cut off his head after he was dead, then

15  they're not guilty.

16              Well, I have good news for you.  The law

17  doesn't have that kind of loophole.  I hope that you are

18  glad to hear that it's not a defense to say, "Hey, yeah,

19  I showed up for this murder, and I just stood and

20  watched.  I watched while the murder happened.  And then

21  I waited.  And then when I was, you know, pretty

22  confident that he was dead, then I helped cut his head

23  off.  But guess what.  I'm not guilty.  That makes me

24  not guilty."

25              No, no, no, no, no, that's not what the law

1   says.  That is absolutely not what the law says.

2           Each of these defendants, the four who were
3   charged with murdering Lil Guasón, as well as those who
4   are charged with the other crimes, are charged with
5   either committing the act itself or aiding and abetting,
6   And either one results in guilt.

7           So, let's talk about what aiding and
8   abetting is.  Now, they're -- defense attorneys are
9   right, mere presence isn't sufficient, and that is what
10  the jury instructions say.  But if you look at the
11  evidence, there is no evidence that any of these were --
12  any of these defendants were merely present for the
13  crime.

14          They all participated, all of them; and
15  that's aiding and abetting.  Stabbing is aiding and
16  abetting.  Helping dig the hole is aiding and abetting.
17  Encouraging is aiding and abetting.  Any sort of
18  involvement with that murder is aiding and abetting.
19  And, I submit to you that the evidence is abundantly
20  clear that all four of them, at a bare minimum, aided
21  and abetted that murder.

22          All right.  Next, Talibán.  His attorney
23  just argued just before me, and he argued that we had
24  contradictory evidence, and that it doesn't make any
25  sense and that we didn't prove that Jesus Alejandro

1  Chavez, Talibán, committed that murder.

2                  I submit to you that, no, in fact, we did.

3  So let's talk about what the defense attorney said about

4  why he thinks the evidence is confusing.

5                  Well, he basically prepared two different

6  theories of the murder to you.  First, that either

7  Duende or Gatuso was the actual shooter; and second,

8  that David Jimenez was the shooter.

9                  Let's deal with that second argument first,

10  because it's the most ridiculous.  Really?  David

11  Jimenez was the shooter?

12                  Well, if David Jimenez was the shooter, that

13  exculpates Duende and Gatuso, right?  They're not guilty

14  of aiding and abetting the murder of Julio Urrutia if,

15  in fact, Julio Urrutia was shot and killed by David over

16  some drug deal gone wrong.

17                  Why in the world would Duende and Gatuso

18  plead guilty, then?

19                  That theory makes no sense.  And one of the

20  things that you get to do when you evaluate the evidence

21  is you get to use your common sense.  You should use

22  your common sense.  That argument makes no sense.

23  There's no support for it.

24                  What did he cite?  He cited the testimony

25  that you saw in the videotape deposition of someone who

was inside, heard, but didn't see the shot, so didn't
see who shot, but did see David Jimenez before and
after.

Well, yeah, sure, David was there.  We know
that.  We know that from Vidal.  We know that from the
detectives who reported to the scene.  David was there.
David was bending over the victim and trying to help,
Both when Vidal got back and when the detectives got to
the scene.  David was not the shooter.

And you heard something about maybe he went
and put something in the woods.  Okay, sure.  Yeah, I
mean, you heard some information about David being
involved in drug deals.  You also heard information
about David's little brother involved in a drug deal.
In fact, that's why they chased him that night.
Remember?

When the four of them -- Talibán, Duende,
Gatuso and Sixto -- chased those two kids, it was
because they thought they saw two kids, including David
and Vidal's younger brother, engaging in a drug
transaction that wasn't permitted in MS territory.

So, I don't know, did David go hide
something in the woods?  Maybe.  Maybe it was drugs.
But that's irrelevant to the question of who actually
shot the victim.  Because you know by your common sense

1    it wasn't David.  If it had been David, he wouldn't have

2    stuck around.  And if it had been David, Duende and

3    Gatuso would not have pled guilty to aiding and abetting

4    that murder, right?

5            So let's look at the next theory, the theory

6    that it was either Duende or Gatuso.  And so, defense

7    counsel starts talking about tattoos.

8            And I think that's ironic.  I think it's

9    ironic that the defense counsel spent so much time

10   talking about tattoos -- well, some tattoos, arm

11   tattoos -- when he skipped his client's own tattoos.

12           Some of the most incriminating evidence

13   against his client -- this guy (indicating), by the

14   way -- is this:  The same slide that I showed you

15   yesterday, that shows pictures of Jesus Chavez's

16   tattoos, and excerpts from a transcript where Duende

17   tells Junior, two weeks after the murder, who did the

18   murder by describing his tattoos.  Right?  He describes

19   the seal on his stomach and he describes the writing,

20   "Sorry Mother for your tears," in Spanish across his

21   chest.

22           And Duende is not the only one who describes

23   these tattoos.  Gatuso, on the stand, when he testified,

24   when he was asked if he remembers Talibán having any

25   tattoos, he described the seal on his stomach, as well.

1          Defense counsel made much of the fact that
2    Gatuso was not able to identify his client in court.
3    Well, first of all, this picture, this comes from the
4    lineup that Vidal did.  This is the picture that Vidal
5    identified as the shooter, and this picture is of Jesus
6    Alejandro Chavez.  This is what Vidal was able to
7    recognize as the person who shot Julio Urrutia that
8    night.
9          So, take a look at what he looked like then
10   and take a look at what he looks like now.  It's been
11   two years.  Gatuso spent eight days with him.  But you
12   know from testimony -- in fact, testimony that was
13   brought out on cross-examination -- that Gatuso was able
14   to pick Talibán, Chavez's photo from a lineup that
15   night, and he was able to tell you about Talibán's
16   tattoos, and he was able to recognize him from a
17   photograph that we showed as well.
18         There's no question that Gatuso and Duende,
19   in their testimony, were talking about the same person.
20   There's no question that Duende, in that call with
21   Junior, was talking about the same person.
22         So, let's talk about the series of
23   coincidences that would have had to have happened for
24   Chavez to not be the shooter.  Here are all the things
25   that you would have to believe to believe that he's not

1    the shooter, right?

2              So, you have to believe that Duende is lying

3    in that call on June 27th when he says that the

4    shooter -- that people involved were him and Gatuso and

5    Talibán, and that Talibán was the shooter.  You have to

6    believe that Duende was lying then, 13 days after the

7    shooting.

8              But why would you believe that?

9              What motivation did Duende possibly have to

10   lie at that point?

11             Now, defense counsel says:  Well, because he

12   thought he was going to get in trouble with the gang.

13             I submit that's ridiculous.  All the

14   testimony you've heard shows that you actually rise up

15   in the gang, you gain respect, you gain status, when you

16   kill someone.  You don't get in trouble.

17             Now he says, well, but it wasn't authorized

18   or it wasn't approved or it wasn't sanctioned in

19   advance.

20             That doesn't mean that you don't gain

21   respect in the gang when you do something like that.

22   Look what Duende said in that call.  "Remember, when one

23   gets an opportunity like that, dog, you know, hey,

24   you're not going to let it pass."

25             And that's exactly right.  Talibán did not

let that opportunity pass.

So, you would have to believe that Duende
was lying in that call.

Also, you would have to believe that when
he's lying, he came up with a particular person to lie
about, right?  Because he's clearly talking about Jesus
Chavez.  He describes his tattoos.  There's no question
that's the person he's talking about.  Right?

And it's also clear that that's who Gatuso
is talking about, the guy who just got out of jail.
Duende and Gatuso told you that.  And he did.  He had
been out of jail, out of prison, for eight days before
he shot Julio Urrutia; eight days, and he shoots someone
point blank in the face.

Okay.  So, Duende -- so here's the theory, I
guess, that Duende is lying about who it was.  He's
thinking about this particular person, and, oh, I don't
know, coincidentally that particularly person's phone
was in the area that night, as you know from the cell
site analysis, and that particular person, Jesus Chavez,
was also who Duende was with when he's arrested on
July 2nd, right?  You heard testimony about that.

So, Duende tells you, he looked at -- you
listened to the calls, and he says:  Yeah, I had those
calls.  Yeah, I was with Talibán, and I was with Lala at

1    that -- at their mom's house up on Duke Street.

2                Yes, that is where he was.  You know that

3    that's true because that's where the police found him.

4                You would also have to believe, in addition

5    to Duende making up this whole lie, that Gatuso came up

6    with the same lie.

7                Now, Gatuso didn't turn himself in until

8    August.  It was more than a month later.  And yet

9    somehow he has the exact same story as Duende?

10                Now, they didn't point the finger at each

11    other, right?  Duende didn't say, "Gatuso did it."

12    Gatuso, "Duende did it."  No, no.  They both -- at the

13    end of the day they both say Talibán say it.  They both

14    say that this guy did it, this guy, whom Vidal Jimenez

15    also said did it.

16                So, that would be another coincidence that

17    you would have to believe, that somehow Vidal manages to

18    pick this photo, this photo, this person, the same

19    person as the cooperating witnesses said.  Duende said

20    it two weeks before -- after the murder.  Gatuso said it

21    in August.  Vidal picked that photo.  The evidence all

22    points to Talibán, Jesus Chavez.  His phone was in the

23    area.  And he was with Duende on July 2nd when he and

24    Duende were arrested.

25                Now, I've talked about a lot of Duende just

1   now and a little bit about Gatuso, but I want to talk,

2   generally speaking, about the cooperating defendants

3   that you've heard from, because you've heard a lot of

4   argument about why you shouldn't believe them, and

5   you've heard a lot of argument about how dirty the

6   government is for making deals with murderers like this,

7   and I want to address that head on.

8           Because, here's the thing:  They committed

9   these murders, two of them, in a dark park at night,

10  with only gang members there.  And then the shooting was

11  random and it was quick.

12          The witnesses to these crimes, and to the

13  Peligroso crime as well, the witnesses are gang members.

14  They are.  They're gang members.  They're criminals.

15  They're murderers; yes, absolutely.  We put multiple

16  murderers on the stand.  Yes.

17          We made deals with multiple murderers, yes.

18  We entered into plea agreements with multiple murderers,

19  yes.

20          What would you have us do?

21          Would you have believed the evidence if none

22  of those witnesses testified?

23          If all you had was the calls, would it be

24  enough?

25          Or would you be forced to acquit some or all

of these defendants?

So what's better?  What's better?

Defense counsel talks about us putting some of these murderers back on the street after they serve significant sentences.

Yeah, I get that.  I understand that that's distasteful.  But what is more distasteful, I submit, is letting someone who committed one of these crimes be found not guilty when they are, in fact, guilty.

In order for you to find these defendants guilty, I, Mr. Tobler, the government, has to prove to you beyond a reasonable doubt that they did it.  And that requires witnesses.  It just does.

And the witnesses that we had, the witnesses who existed, they were people engaged in these crimes. Because with the exception of the murder of Julio Urrutia, on which there were actually innocent bystanders like Vidal Jimenez, who you heard from, with that exception, there weren't those kinds of witnesses. There was not that kind of witness to the murder of Lagrima or the murder of Lil Guasón.  And so, that's who we had.

All right.  So, if defense counsel also says:  Well, actually, you know, if you think about it, probably these cooperating witnesses all got together

1   and read the indictment together and talked about it,
2   and that's how they came up with their stories that are
3   so similar.
4           Because they are, really, quite similar.  I
5   mean, there's a lot of details that are different, but
6   not the big ones, not the who, what, when, where, why
7   and how.  Those match:  who, what, when, where, why, and
8   how.
9           So, as -- as defense counsel has invited you
10  to do, go ahead and read the indictment.  Please.  See
11  if it says all of the who, what, when, why and how,
12  because it does not.
13          Lil Evil is not mentioned in that
14  indictment.  Who severed Lil Guasón's head is not
15  mentioned in the indictment.  There are a lot of details
16  that were testified to by witness after witness after
17  witness that appear nowhere in that indictment.  They
18  didn't learn those details from the indictment.  They
19  learned those details from their own experience, because
20  they participated in this crime.
21          Defense counsel said that I want you to
22  believe that there's no chance that those witnesses
23  would lie.
24          No, I don't want you to believe that, that
25  there's no chance that they would lie?  They're

1    murderers.  They're criminals.

2              Is there a chance that they would?  Sure.

3              What I want you -- what I am asking you to

4    believe, because I think you should believe it's true,

5    is that what they testified to was true; not that there

6    wasn't some chance that they could lie, not that they

7    didn't ever lie in their life, not that they don't have

8    motivations to lie; but that what they actually

9    testified to here in front of you, that that was true.

10             And you know that it was true.  It was true

11   because it's corroborated again and again and again.

12   They corroborated each other.  They didn't get it from

13   the indictment.  But, most importantly of all, these

14   calls corroborate it.

15             And defense counsel, for the most part,

16   ignored that.  Right?  They talked about the bragging

17   and the exaggerating in their closing arguments, but the

18   calls do a lot more than that.

19             Yeah, there are a lot of calls where

20   Leopardo brags about his involvement, where Pesadilla

21   brags about his involvement, or Greñas brags about his

22   involvement.  Yes, yes, those exist, and I submit to you

23   that they're bragging about things that they actually

24   did.

25             But there are also calls where one or more

1    of these defendants, or the cooperators, named the other

2    people involved.  Right?  That's why that's convincing.

3              I mean, the most convincing of all is that

4    call from Lil Slow, Lil Slow, right, and Junior says,

5    "Hey, buddy, can you tell me everyone who was there?"

6              And Lil Slow, he obliges, right?  And he

7    says:  Here's the people who were there when we killed

8    Lagrima.  Here's the people who were there when we

9    reburied Lagrima -- Pesadilla, right?  Here's the people

10   who were there when we killed Lil Guasón.

11             How is it that he magically, in May of 2014,

12   before the indictment, before anyone is arrested, when

13   he's talking to Junior, how is it that he gets those

14   names right unless it's true?

15             And the same thing goes for so many others.

16   Lil Payaso, on the murder of Lagrima.  In addition to

17   his own admissions in the calls, Slow names him.  That's

18   Government's Exhibit 19A-1, pages one to three.

19             Pesadilla, the reburial of Lagrima.  In

20   addition to his own admission, Slow names him, same

21   exhibit, 19A-1, page one.

22             Leopardo, also in a call talks about

23   Pesadilla's involvement in the reburial; Government's

24   Exhibit 14A-1, page nine; and again, 16A-1, page five.

25             Lil Payaso, with respect to the Lil Guasón

murder, Slow again, 19A-1, page 5 to 6.

But also Pesadilla says that Lil Payaso is involved in the murder of Lil Guasón, in Government Exhibit 10A-1, at page nine.

Pesadilla's role in the murder of Lil Guasón, in addition to his admission, Slow says it, again, 19A-1, page five to six.

Leopardo also says that Pesadilla was involved in the murder of Lil Guasón; Government Exhibit 18A-1, page seven.

And Lil Payaso also says that Pesadilla was involved in the murder of Lil Guasón; Government Exhibit 23A-1, page 30.

Leopardo's role in the murder of Lil Guasón; in addition to his many, many admissions, Slow says it, 19A-1, page six, as does Lil Payaso; 23A-1, page 30.

Solitario, no recorded admissions, just the testimony about what else he said.

But Pesadilla says Solitario is involved. Government Exhibit 10A-1, page eight.

Lil Poison says that Solitario is involved. Government's Exhibit 11A-1, page ten.

And of course, Slow, 19A-1, page six.

And then Talibán, you saw those calls, too, right?  The July -- or the June 27th call and the

June 29th call.  Duende says that Talibán is involved.
Talibán admits his own involvement when he says that
they seen his photo, the shooting.

The calls aren't just bragging.  They aren't
just exaggerating.  And the witnesses who testified,
they weren't bragging or exaggerating, either.  The
calls tell the truth and those witnesses told the truth,
And it all corroborates itself.  It all comes back to
the same list of participants for each of these four
events.

Now, there's a lot said about Duende.  Let's
talk about Duende for a minute and think about that.
Yeah, Duende, multiple murderer, bad dude; absolutely, I
completely agree with that.

But man, talk about corroboration.  He --
his testimony was corroborated again and again and
again, because, yeah, he was involved in everything --
which makes him really bad, but he was involved in
everything, which means he had testimony about
everything, testimony that was corroborated.

He talks about the attempted murder.  That's
corroborated by Demente and by Drowsy.  He talks about
the murder of Lagrima.  That's corroborated by Slow and
Skinny.  He talks about the -- the reburial of Lagrima,
corroborated by Slow and Skinny.  He talks about the

1   murder of Lil Guasón, corroborated by Slow, and the
2   murder of Julio Urrutia, corroborated by Gatuso and
3   corroborated, again, in all of these calls.
4               Yeah, he's a bad dude.  But, you know, one
5   of the things that defense counsel -- and they're really
6   stretching when they're trying to talk about how bad he
7   is, because they want to tell you he is so bad he tried
8   to shoot his own mom.
9               He was nine years old.  He was nine years
10  old; kicked out of the house because his mom liked his
11  other brother better, and at nine, yeah, at nine, he
12  fired a gun at his mom.
13              I'm not going to defend him.  I'm not going
14  to say he's not a bad dude.  But really?  Really?
15  That's the best thing they can come after Duende on?
16              At least Duende accepted responsibility.  At
17  least he told you about what it is that he did.
18              You've heard weeks of evidence in this case.
19  You've heard witnesses.  You've seen pictures of the
20  bodies.  You've heard experts and you've seen these
21  calls.  And I submit to you that this evidence, this
22  wealth of evidence, proves to you that we proved to you,
23  that I proved to you, beyond a reasonable doubt that
24  each and every one of these defendants sitting behind me
25  is guilty.

1            And now it's your turn.  It's your turn to
2   go discuss and to go deliberate and to decide.  I'm
3   asking you to do justice.  Do justice for the victims.
4   Do justice for all of us, for our community, and render
5   the only just verdict in light of all of the evidence, a
6   verdict of guilty on every single count.
7            Thank you, Your Honor.
8            THE COURT:  Thank you.
9         FURTHER JURY INSTRUCTIONS BY THE COURT
10           THE COURT:  Ladies and gentlemen, you've
11  heard all the evidence you're going to hear in
12  connection with this case, and now I want to acknowledge
13  the Sixth Amendment to the United States Constitution,
14  which I think I told you about at the beginning of the
15  trial, which says that in all criminal prosecutions, the
16  accused shall enjoy the right to a speedy and public
17  trial by an impartial jury, the right to be informed of
18  the nature and cause of the accusation, to be confronted
19  with the witnesses against him, and to have compulsory
20  process of obtaining witnesses in his favor, and have
21  the assistance of counsel in his defense.
22           This trial has embodied that.  And only in
23  America can any voter be summoned to court to sit in
24  judgment on their fellow human beings and to apply the
25  law as given to you by the Court.  Only in America can

1   you, from any walk of life, be summoned for jury duty.

2          Jury duty brings home to you the vital role

3   that you play in the administration of justice, fairness

4   in following the law.

5          In this case, I selected jurors who were

6   fully engaged, who have been fully alert and have paid

7   attention to all the evidence and have taken copious

8   notes.  And I have also selected jurors whose

9   responsibility it was to be fully engaged and to

10  participate in the trial in case we suffered the

11  unfortunate incident of a juror becoming incapacitated

12  or a juror, because of whose family member had some

13  tragedy or emergency, was called away from jury duty.

14  And those jurors are called alternate jurors.

15         Alternate jurors play a very vital role, and

16  they stand ready to step in to ensure that we have a

17  fair trial.  And even now, alternate jurors stand in at

18  the ready should any of our jurors become incapacitated

19  during deliberations.

20         So, first, I want to knowledge my alternate

21  jurors and say to each of you that you have, still, a

22  vital role to play as this trial continues.  The

23  instructions I have given you throughout the trial and

24  that I will reiterate now remain with you, and that is

25  that you not discuss the case nor permit the case to be

1 discussed in your presence, that you don't do any

2 posting on social media, that you don't do any reading

3 or any media reports that might be made of this case,

4 that you not visit any of the areas locations mentioned

5 in the trial, and that you leave your notes in the jury

6 deliberation room, where they will be separated from the

7 jury room from the other jurors.

8 　　　　　The reason for this is because if, during

9 our deliberations, it becomes necessary to insert you

10 into the deliberations, you must remain at the ready.

11 　　　　　Your role remains vital.  And you will hear

12 from us in two ways:  one, to ask you to come back to

13 court, if necessary; and two, to report to you the final

14 judgment reached in this case.

15 　　　　　So, I would like to acknowledge my alternate

16 jurors.

17 　　　　　You can help check and double-check.

18 　　　　　Is that right?  Okay, thank you.

19 　　　　　Ms. Ann Ward.  Here is the juror

20 appreciation certificate.  Remember, your service is not

21 done.  Thank you very much.  Go out with Mr. Toliver --

22 wait.  You can go together.

23 　　　　　Mr. Daniel Freeze.  Mr. Freeze, I appreciate

24 your service.  It's not done yet.  Maintain my

25 instructions.  Here is your certificate.

1          Mr. Thomas Clines.  Thank you for your
2  service; not done yet.  Thank you.
3          Ms. Terri Ann Foster.  Ms. Foster, again, we
4  appreciate your service.  Thank you.
5          Ms. Lisa Gameos.  Your work is not done.
6  Thank you so much.
7          Mr. William Robert Mason.  Thank you for
8  your service.  It's not over yet.
9          (Discussion off the record with alternates.)
10          THE COURT:  You may be seated.
11          MS. AUSTIN:  Your Honor?
12          THE COURT:  Yes.
13          MS. AUSTIN:  May we approach while we're
14  waiting for --
15          THE COURT:  Yes.
16          MS. AUSTIN:  Thank you.
17          (Thereupon, the following side-bar
18  conference was had:)
19          MS. AUSTIN:  Your Honor, I would like to
20  renew our objection to counsel for the government's
21  argument during her closing; again, what she stated
22  about, the defendant should have presented evidence if
23  they had evidence.
24          And then later on in her argument --
25          MR. ZIMMERMAN:  Right at the head.

1          MS. AUSTIN:  -- she said Jose Del Cid, at

2     least he took responsibility and came in here and told

3     you what he did.

4          So, it's one more statement by the

5     government about a defendant who didn't present any

6     evidence or didn't take the stand in his own behalf, and

7     it is improper.  It's burden shifting.

8          And I don't care what it's prefaced with,

9     the statements were made, and they are improper, and

10    it's grounds for a mistrial.

11         I'm sure the Court is not inclined to grant

12    it at this point.  But I would ask the Court to

13    reinstruct the jury that no matter what counsel for the

14    government might have said in her closing, a defendant

15    is not required to present any evidence.  And the fact

16    that they didn't cannot be used against him.  And he's

17    not required to take the stand or testify on his own

18    behalf, and that factor cannot be held against him.

19         I know the Court has instructed that

20    already, but because of that out-of-line arguments by

21    government's counsel, it needs to be reiterated.  And

22    that's my request.

23         MR. SALVATO:  I think we all join in that,

24    Your Honor.  I think it was over the line for

25    Ms. Martinez to say, at least they accepted

1    responsibility.

2             THE COURT:  She was addressing the

3    cooperators --

4             MR. SALVATO:  I understand.

5             THE COURT:  -- not the defendant's on trial.

6    She was addressing the cooperators and the testimony.

7             MS. AUSTIN:  Her words were, "At least he

8    came in here and took responsibility."

9             THE COURT:  That's after the defense, all

10   the attacks, a mother killer and a murderer, which is

11   what he was.  But, that's fine.  I mean, I appreciate

12   you're making your record.

13            Anything more anyone else want to say?  I'm

14   listening.

15            MR. ZIMMERMAN:  I think what's improper is

16   the suggestion that -- that -- that since Duende pled

17   guilty, that the defendants here should have pled

18   guilty.  At least he pled guilty, and they should have

19   pled guilty.  And I think that is beyond the burden of

20   evidence.  That's an improper suggestion -- that's an

21   additional improper suggestion that was made.

22            MS. AMATO:  And, Your Honor, as to

23   Mr. Chavez, in our closing argument, we had also brought

24   out many things, as well as many witnesses, that the

25   government could have brought or could have presented

testimony.

And my concern is, although should they not specifically -- Ms. Martinez did not specifically address Mr. Chavez, he, too, could have brought in these witnesses.

The point is, it's out there now in front of the jury, based on what she did say regarding Mr. Chick and what he could have done, that the jury may, as they deliberate, think, "Well, you know, that's right.  Why didn't Mr. Aquino and Ms. Amato present such and such witness, or why didn't they present such and such testimony or evidence?"

And so, there is this concern, it's out there.  And so we would ask the Court to reinstruct.

THE COURT:  All right.

Has everyone had a chance?

MS. MARTELL:  On behalf of Mr. Castillo, we join the arguments of counsel.

THE COURT:  All right.  I'm prepared to say that you all join unless you opt out.  No one opts out?  Okay.

MS. MARTINEZ:  Your Honor, to repeat the arguments that we made in the middle of my rebuttal -- although I stand by those as well -- but just to address the additional objection that counsel has lodged about

1   the statement at the end, specifically about Duende, I

2   think that in context, it's very clear that was

3   responsive to the attacks on his credibility and the

4   attacks on his very violent actions, which he certainly

5   took.

6           And "at least he took responsibility" was,

7   at least he took responsibility for those actions, and

8   he told the truth about his actions.  It was not a

9   comparison to the other defendants.  I think in context,

10  that's extraordinarily clear.

11          Your Honor has instructed the jury

12  repeatedly about what the Constitution holds, and that

13  it does not require any defendant to testify.  And, in

14  fact, I said the same thing in my rebuttal.

15          I think that in context it was very clear

16  that I was not intending to, and I was not intending to,

17  draw a comparison to the defendants.  It was a response

18  to very specific arguments made by defense counsel about

19  the cooperators in general, and about one cooperator in

20  particular.

21          THE COURT:  The record should reflect that a

22  motion for mistrial has been made based upon the

23  arguments made by government counsel.

24          This has been a very long trial.  Thousands

25  and thousands of words were recorded by my court

1  reporter.  And I believe that I have at least 14 lawyers

2  in front of me who objected to a brief statement made by

3  the prosecutor.

4          That is giving entirely too much power to

5  the government, that I'm sure that this jury is not any

6  more focused on Ms. Martinez's comments, trying to

7  respond to attacks made by every single defense counsel

8  on the cooperators -- as you should, as you were

9  expected to do -- and somehow elevate that to some level

10  of jury instruction.

11          I assure you, government counsel does not

12  have such power.  I assure you, you do not have such

13  power.  The instructions, and I have given each juror

14  their own copy -- let me see how many pages this is.

15          MR. TOBLER:  100, Your Honor.

16          THE COURT:  Only me.  109 pages of

17  instructions.

18          I do not think that what has occurred, in my

19  view -- the context of the statement had to do with the

20  attacks on Jose Del Cid, who is a multiple murderer, who

21  fired a gun at his mother, and who has done other, many

22  very vicious acts to other individuals and as a gang

23  member, who testified at this trial -- and so did all

24  the others, as far as I'm concerned, in terms of being

25  cooperators or gang members.

1          The defense has legitimately, as they
2  should, attacked the credibility and motivation of these
3  witnesses.  And the government certainly had an
4  opportunity to respond.
5          So the motion for mistrial will be denied.
6          I'm going to send the jury out.  You all
7  stay in place.  I'm going to send the jury out.  Thank
8  you.
9          (Thereupon, the side-bar conference was
10  concluded.)
11          THE COURT:  Ladies and gentlemen, you've
12  heard all the evidence you're going to hear in
13  connection with this case.  Now you've heard the
14  instructions of the Court and the arguments of counsel.
15  It is now your duty to deliberate and arrive at a
16  unanimous verdict.
17          My suggestion about your first order of
18  business ought to be the election of your foreperson.
19  The foreperson will preside over your deliberations and
20  ensure that each juror has an opportunity to speak, and
21  each juror's views are fully considered.
22          If, during the course of your deliberations,
23  someone has to step out the use to facilities, then stop
24  your deliberations until everybody is in the room.  Do
25  not deliberate at lunch or any place outside the jury

1   deliberation room.

2            Give us a little bit of time, and we will

3   give you back the written instructions, and soon you

4   will have all the exhibits that have been admitted into

5   evidence for your consideration.

6            There are certain exhibits you won't get,

7   like drugs and things like that.  We don't send those

8   back.  If you want to see them, you will have to ask for

9   them.

10            So what we ask you to do now is retire and

11   return a unanimous verdict.  Thank you.

12            (Jury excused to deliberate.)

13            THE COURT:  Be seated.

14            All right, Counsel, two instructions.

15            The first is to each of you, review the

16   exhibits that have been admitted into evidence to make

17   sure that what's placed in the cart to go back to the

18   jury room is what was admitted.

19            It's very important that you do so

20   meticulously.  You may not know this story, but I've had

21   a capital case here where ultimately, during

22   deliberations, a document which I excluded from evidence

23   went back, and it created great havoc in the court.

24            I don't want to have that happen here.  And

25   so, I expect you as officers of the Court to do that

1   review and sign my certification that you've done that.

2          Let me also say that this is a very complex

3   case, probably an epic and historic case for this Court,

4   and so I realize that a lot of time and effort was

5   devoted to it by each of you to prepare this case as

6   officers of the court.

7          I have presided over many trials, and this

8   one was one that will stand out for me, and hopefully it

9   will stand out for you, where we tried to deliver

10  fairness to everyone.

11          We're in recess now.  Thank you.

12          (Court recessed at 3:25 p.m. and reconvened

13          at 5:05 p.m.)

14          THE COURT:  Are you ready to bring the jury

15  out?

16          (Counsel indicating.)

17          THE COURT:  You can bring the jury out,

18  Mr. Toliver.  Thank you.

19          (Jury present.)

20          THE COURT:  You may be seated.

21          All right, ladies and gentlemen, I've

22  received your schedule, and your schedule for

23  deliberation is fine.

24          I just want to remind you, as I do each day

25  at the end of the day, that you do not discuss the case

1  with anyone nor permit the case to be discussed in your

2  presence.

3            Don't do any research on the case on the

4  Internet or anything like that, dictionaries, nothing

5  like that.  Don't do any posting on social media.

6            There may be some media reports, so please

7  do not watch any media reports or don't read anything in

8  the paper about it or on the Internet.  And don't visit

9  any of the locations mentioned during the trial.

10            Leave your notes in the jury deliberation

11  room.

12            I understand you all will resume tomorrow at

13  10:00 o'clock.  And Mr. Toliver will tell you which jury

14  room to report to directly.

15            You will begin your deliberations as soon as

16  all the jurors are in the room.  We're not going to come

17  back to court until the end of the day.  Okay?

18            Thank you.

19            (Jury out.)

20            THE COURT:  We're in recess.

21            (Proceedings concluded at 5:08 p.m.)

22

23                        ---

24

25

1

2                          CERTIFICATE OF REPORTER

3

4              I, Renecia Wilson, an official court

5      reporter for the United States District Court of

6      Virginia, Alexandria Division, do hereby certify that I

7      reported by machine shorthand, in my official capacity,

8      the proceedings had upon the jury trial in the case of

9      UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

10             I further certify that I was authorized and

11     did report by stenotype the proceedings in said jury

12     trial, and that the foregoing pages, numbered 1 to 179,

13     inclusive, constitute the official transcript of said

14     proceedings as taken from my shorthand notes.

15

16             IN WITNESS WHEREOF, I have hereto

17     subscribed my name this _29th_ day of _November_, 2016.

18

19                          ___/s/_____

                                 Renecia Wilson, RMR, CRR
20                               Official Court Reporter

21

22

23

24

25