```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                        EASTERN DISTRICT OF VIRGINIA
 2                           Alexandria Division

 3     UNITED STATES OF AMERICA,          )
                                          )
 4                        Plaintiff,      )
                                          )  Crim. No. 1:14cr306
 5          vs.                           )
                                          )
 6     JOSE LOPEZ TORRES, ALVIN GAITAN    )  March 30, 2016
       BENITEZ, CHRISTIAN LEMUS CERNA,    )
 7     OMAR DEJESUS CASTILLO, DOUGLAS     )
       DURAN CERRITOS, MANUEL ERNESTO     )
 8     PAIZ GUEVARA, and JESUS ALEJANDRO  )
       CHAVEZ,                            )
 9                                        )
                          Defendants.     )
10     _____)

11

12                             JURY TRIAL

13     ** PRELIMINARY JURY INSTRUCTIONS, OPENING STATEMENTS **

14
       BEFORE:        THE HONORABLE GERALD BRUCE LEE
15                    UNITED STATES DISTRICT JUDGE

16
       APPEARANCES:
17
       FOR GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
18                      BY:  JULIA MARTINEZ, AUSA
                             STEPHEN M. CAMPBELL, AUSA
19                           TOBIAS TOBLER, AUSA

20
                               ---
21

22     OFFICIAL COURT REPORTER:

23                      RENECIA A. SMITH-WILSON, RMR, CRR
                        U.S. District Court
24                      401 Courthouse Square, 5th Floor
                        Alexandria, VA 22314
25                      (703)501-1580
```

APPEARANCES (Continued)

FOR DEFENDANT JOSE LOPEZ TORRES

        BYNUM & JENKINS, PLLC
        BY:  ROBERT L. JENKINS, JR., ESQ.
        THE LEIVA LAW FIRM, PLC
        BY:  MANUEL E. LEIVA, ESQ.

FOR DEFENDANT ALVIN GAITAN BENITEZ

        LAW OFFICE OF AMY LEIGH AUSTIN
        BY:  AMY LEIGH AUSTIN, ESQ.
        SMITH & ZIMMERMAN, PLLC
        BY:  JEFFREY D. ZIMMERMAN, ESQ.

FOR DEFENDANT CHRISTIAN LEMUS CERNA

        LAW OFFICE OF CHRISTOPHER AMOLSCH
        BY:  CHRISTOPHER AMOLSCH, ESQ.
        FRANK SALVATO, ESQ.

FOR DEFENDANT OMAR DEJESUS CASTILLO

        FIRSTPOINT LAW GROUP, PC
        BY:  KATHERINE MARTELL, ESQ.
        OLD TOWN ADVOCATES, PC
        BY:  MEREDITH M. RALLS, ESQ.

FOR DEFENDANT DOUGLAS DURAN CERRITOS

        LAW OFFICE OF J.R. CONTE, PLLC
        BY:  JOSEPH R. CONTE, ESQ.
        LAW OFFICE OF DWIGHT CRAWLEY
        BY:  DWIGHT E. CRAWLEY, ESQ.

FOR DEFENDANT MANUEL ERNESTO PAIZ GUEVARA

        LAW OFFICE OF W. MICHAEL CHICK, JR.
        BY:  WILLIAM MICHAEL CHICK, JR., ESQ.

FOR DEFENDANT JESUS ALEJANDRO CHAVEZ

        JEROME P. AQUINO, ESQ.
        ELITA C. AMATO, ESQ.


                        ---

1                        INDEX

2

3   PRELIMINARY JURY INSTRUCTIONS BY THE COURT          5

4   OPENING STATEMENT BY THE GOVERNMENT               33

5   OPENING STATEMENT BY DEFENDANT LOPEZ TORRES       73

6   OPENING STATEMENT BY DEFENDANT GAITAN BENITEZ     96

7   OPENING STATEMENT BY DEFENDANT LEMUS CERNA       102

8   OPENING STATEMENT BY DEFENDANT DEJESUS CASTILLO  120

9   OPENING STATEMENT BY DEFENDANT DURAN CERRITOS    130

10  OPENING STATEMENT BY DEFENDANT PAIZ GUEVARA      131

11  OPENING STATEMENT BY DEFENDANT CHAVEZ            142

12       (Court recessed)

13

14                        ---

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

(Thereupon, the following was heard in open court at 11:07 a.m.)

(Jury not present.)

THE COURT:  Good morning.

THE CLERK:  1:14 criminal 306, United States versus Jose Lopez Torres, Alvin Gaitan Benitez, Christian Lemus Cerna, Omar DeJesus Castillo, Douglas Duran Cerritos, Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez.

THE COURT:  Good morning, Counsel.

Good morning, Mr. Lopez Torres, Mr. Gaitan Benitez, Mr. Lemus Cerna, Mr. DeJesus Castillo, Mr. Duran Cerritos, Mr. Paiz Guevara and Mr. Chavez.

Good morning, Counsel.

I provided you, not with jury instructions, but I have to tell the jury what the case is about.  And what I tried to do is find some, just basic instructions which I will use during my introduction.

Am I ready to bring the jury out?  Is there anything I need to know before I bring the jury out?

(No response.)

THE COURT:  No?  Okay.

You can bring the jury out.

1          Thank you, Mr. Toliver.

2          Please rise for the jury.

3          (Jury present at 11:08 a.m.)

4          THE COURT:  You may be seated.

5          Good morning, ladies and gentlemen.

6          THE JURORS:  Good morning.

7          THE COURT:  Good morning, Mr. Lopez Torres.

8          Good morning, Mr. Gaitan Benitez.

9          Good morning, Mr. Lemus Cerna.

10          Good morning, Mr. DeJesus Castillo.

11          Good morning, Mr. Duran Cerritos.

12          Good morning, Mr. Paiz Guevara.

13          And good morning, Mr. Alejandro Chavez.

14          Good morning, Counsel.

15          PRELIMINARY JURY INSTRUCTIONS BY THE COURT

16          THE COURT:  Ladies and gentlemen, let me

17  begin by giving you some preliminary instruction.

18          I have notepads and pens for you.  Let me

19  pass those out right now, please.

20          Does everybody have a pad and pen that wants

21  one?

22          (Jurors indicating.)

23          THE COURT:  All right, ladies and gentlemen,

24  you are not required to take notes.  I'm providing you

25  with pads and pens, so if you would like to take notes

1  to help you recall the testimony throughout our lengthy
2  trial, you're permitted to do so.
3              The fact that a juror has something in his
4  or her notes does not mean they're entitled to greater
5  consideration than someone who has not taken notes.
6  Many people are perfectly capable of recalling testimony
7  without taking notes.
8              And please do not become so consumed in your
9  notetaking that you're not paying attention to the
10  person on the stand.  A lot of information is conveyed
11  by the way a person presents themselves.
12             Now, I know that there is an issue of sight
13  line, to be able to see all the individuals on trial.
14  And what I'll have done as I begin the case this morning
15  is have each individual stand, so you will know where
16  they're sitting.  And if you want to make notes about
17  where they are sitting, you can do that.
18             Ladies and gentlemen, this is the case of
19  United States of America versus Mr. Jose Lopez Torres,
20  Alvin Gaitan Benitez, Christian Lemus Cerna, Omar
21  DeJesus Castillo, Douglas Duran Cerritos, Manuel Ernesto
22  Paiz Guevara, and Jesus Alejandro Chavez.
23             Let me have counsel and individuals please
24  stand.
25             Mr. Jose Lopez Torres and counsel.

1          Good morning.  You may be seated.

2          Counsel for Mr. Alvin Gaitan Benitez,

3    Mr. Benitez.

4          Counsel for Mr. Christian Lemus Cerna,

5    Mr. Cerna.

6          Mr. Omar DeJesus Castillo and his counsel.

7          MS. MARTEL:  Good morning.

8          THE COURT:  Mr. Douglas Duran Cerritos and

9    his counsel.

10          MR. CONTE:  Good morning.

11          MR. CRAWLEY:  Good morning.

12          THE COURT:  Mr. Manuel Ernesto Paiz and his

13    counsel.

14          And Mr. Jesus Alejandro Chavez and his

15    counsel.

16          MS. AMATO:  Good morning.

17          THE COURT:  Thank you.

18          Ladies and gentlemen, this is a criminal

19    case, and I want to instruct you that you must presume

20    each defendant to be innocent of the crimes charged.

21    Thus each defendant, although accused of crimes in the

22    indictment, begins the trial with a clean slate, with no

23    evidence against him.

24          The indictment, as you already know, is not

25    evidence of any kind.

1    The defendants are, of course, not on trial
2 for any act or crime not contained in the indictment.
3    The law permits nothing but legal evidence,
4 presented before the jury in court, to be considered by
5 you in support of any charge against any defendant.
6    The presumption of innocence alone,
7 therefore, is sufficient to acquit the defendants.
8    The burden is always upon the government to
9 prove guilt beyond a reasonable doubt.  This burden
10 never shifts to a defendant, for the law never imposes
11 upon a defendant in a criminal case the burden or duty
12 of calling any witnesses or producing any evidence.
13    The defendant is not even obligated to
14 produce any evidence by cross-examining the witnesses
15 for the government.  And, of course, the defendant is
16 not required to testify.  You may not consider that.
17    It is not required that the government prove
18 guilt beyond all possible doubt.  The test is one of
19 reasonable doubt.  A reasonable doubt is a doubt based
20 upon reason and common sense, the kind of doubt that
21 would make a reasonable person hesitate to act.
22    Proof beyond a reasonable doubt must,
23 therefore, be of such convincing character that a
24 reasonable person would not hesitate to rely upon it and
25 act upon it in the most important of his or her own

1  affairs.

2        Unless the government proves beyond a

3  reasonable doubt that a defendant has committed each and

4  every element of the offense charged in the indictment,

5  you must find the defendant not guilty of the offense.

6        If the jury views the evidence in the case

7  as reasonably permitting either two -- either of two

8  conclusions, one of innocence and the other of guilt,

9  the jury must, of course, adopt the conclusion of

10  innocence.

11        You are here to determine whether the

12  government can prove the guilt of the defendants for the

13  charges in the indictment beyond a reasonable doubt.

14  You are not called upon to return a verdict as to guilt

15  or innocence of any other persons.

16        So, if the evidence in the case convinces

17  you beyond a reasonable doubt of the guilt of each

18  defendant for the crimes charged against that defendant

19  in the indictment, you should so find, even though you

20  may believe one or more other unindicted persons are

21  also guilty.

22        But if any reasonable doubt remains in your

23  minds after impartial consideration of all the evidence

24  in the case, it is your duty to find each defendant not

25  guilty of the charge.

1              A separate crime is alleged against one or
2    more of the defendants in each count of the indictment.
3    Each alleged offense and any evidence pertaining to it
4    should be considered separately by the jury.
5              The fact that you find one defendant guilty
6    or not guilty of one of the offenses charged should not
7    control your verdict as to any other offense charged
8    against that defendant.  You must give separate and
9    impartial consideration -- individual consideration for
10   each charge against each defendant.
11             The indictment itself is not evidence.  The
12   indictment is only a formal method used by the
13   government to accuse a defendant of a crime.  It is not
14   evidence of any kind against the defendant.  The
15   defendant is presumed to be innocent of the crimes
16   charged.
17             Even though the indictment has been returned
18   against him, the defendant begins the trial with
19   absolutely no evidence against him.  Each defendant has
20   pled not guilty to this indictment and therefore denies
21   he is guilty of the charges.
22             In this case, there are nine counts to the
23   indictment.  And, let me just read off to you that
24   Mr. Jose Lopez Torres is facing charges in Count 1,
25   Count 2, Count 3, and Count 4.  Jose Lopez Torres is

1    facing Counts 1, 2, 3 and 4.

2              Mr. Omar DeJesus Castillo is facing charges

3    in Counts 4 and 6; 4 and 6 for Castillo.

4              For Mr. Gaitan Benitez, Counts 5 and 6.

5              For Mr. Douglas Duran Cerritos, it's

6    Count 6.

7              For Mr. Christian Lemus Cerna, Count 6.

8              For Mr. Manuel Ernesto Paiz Guevara,

9    Count 6.

10             And for Mr. Jesus Alejandro Chavez,

11   Counts 7, 8 and 9.

12             Ladies and gentlemen, the defendant,

13   Mr. Jose Lopez Torres, along with Mr. Alvin Gaitan

14   Benitez, Douglas Duran Cerritos, Christian Lemus Cerna,

15   Manuel Ernesto Paiz Guevara, and Jesus Alejandro Chavez,

16   are alleged to be members and associates of a criminal

17   organization known as La Mara Salvatrucha, or MS-13.

18             The government alleges that MS-13 is a

19   violent international street gang involved in a variety

20   of criminal activities, including murder, obstruction of

21   justice, drug trafficking and sex trafficking in the

22   Eastern District of Virginia and elsewhere.

23             The government alleges that MS-13 has

24   operated in the Eastern District of Virginia since 1993,

25   at least 1993, and that members are located throughout

1   the United States, including Virginia, Maryland,

2   New York and California.  And it also alleges that the

3   government -- that MS-13 has a large international

4   presence in El Salvador, Guatemala, Honduras and Mexico.

5           The government alleges that from on or about

6   September 29, 2013, through October 1, 2013, in

7   Woodbridge, in the Eastern District of Virginia, and

8   elsewhere, for the purpose of gaining entrance to,

9   maintaining and increasing position in MS-13, an

10  enterprise engaged in racketeering activity, that Jose

11  Lopez Torres, together with others known and unknown to

12  the grand jury, knowingly and intentionally combined,

13  conspired -- meaning entered into a partnership in crime

14  with others -- confederated and agreed together with

15  each other and others to murder DF, in violation of the

16  laws of the Commonwealth of Virginia.

17          The first element of the charges in

18  Counts 1, 2, 4 and 6 and 7, requires the government to

19  prove beyond a reasonable doubt the existence of an

20  enterprise.

21          As used in these instructions, the term

22  "enterprise" includes any individual, partnership,

23  corporation, association, or other legal entity, and any

24  union or groups of individuals associated in fact,

25  although not a legal entity.

The term "enterprise" as used in these instructions may include a group of people associated in fact, even though this association is not recognized as a legal entity.

A group or association of people can be an enterprise if these individuals have joined together for the purpose of engaging in a common course of conduct. Such an association of persons may be established by evidence showing an ongoing organization, formal or informal, and by evidence that the people making up the association function as a continuing unit.

Such an association of individuals may retain a status as an enterprise, even though membership with the association may change by adding or losing individuals during the course of its existence.

The first element of the charge in Counts 1, 2, 4, and 6, 7, further requires that the government prove beyond a reasonable doubt that the alleged enterprise engaged in or affected international or foreign commerce.

"Interstate commerce" means trade or business or travel between the states.

The phrase "engaged in or activities of which affect interstate commerce" as used in these instructions means to be involved in or to affect in

1   some way trade or business or travel between the states.

2               To establish the requisite effect of

3   interstate or foreign commerce, the government is not

4   required to prove a significant or substantial effect on

5   foreign commerce; rather a minimal effect on interstate

6   or foreign commerce is sufficient.

7               An enterprise's effect on interstate or

8   foreign commerce may be established through the effects

9   caused by individual racketeering acts.  However, it is

10   not necessary for the government to prove that the

11   individual racketeering acts themselves affected

12   interstate or foreign commerce.  Rather, it is the

13   enterprise and its activities, considered in their

14   entirety, that must be shown to have that effect.

15               Moreover, it is not necessary for the

16   government to prove that the defendant knew that the

17   enterprise would affect interstate commerce or foreign

18   commerce, that the defendant intended to affect

19   interstate or foreign commerce, or that the defendant

20   engaged in, or his activities affected, interstate or

21   foreign commerce.

22               To satisfy this element, the government need

23   only prove beyond a reasonable doubt either that the

24   activities of the enterprise, considered in their

25   entirety, had some minimal effect on interstate or

foreign commerce, or that the enterprise engaged in interstate or foreign commerce.

The term "conspiracy."  A criminal conspiracy is an agreement or mutual understanding, knowingly made or knowingly entered into, by at least two or more people to violate the law by some joint or common plan or course of action.

A conspiracy is, in a very true sense, a partnership in crime.  A conspiracy or an agreement to violate the law, like any other kind of agreement or understanding, need not be formal, written, or even expressed directly in every detail.

The government must prove that the defendant and at least one other person knowingly and deliberately arrived at an agreement or understanding that they, and perhaps others, would violate some law or laws by means of some common plan or course of action as alleged in Count 1 of the indictment.

It is proof of this conscious understanding and deliberate agreement by the alleged members that should be central to your consideration of the charge of conspiracy.

To prove the existence of a conspiracy or an illegal agreement, the government is not required to produce a written contract between the parties, or even

1  to produce evidence of an express oral agreement
2  spelling out all the details of the understanding.
3          To prove that a conspiracy existed,
4  moreover, the government is not required to show that
5  all of the people named in the indictment as members of
6  the conspiracy were in fact parties to the agreement, or
7  that all the members of the alleged conspiracy were
8  named or charged, or that all the people whom the
9  evidence shows were actually members of the conspiracy
10  agreed to all the means or methods set out in the
11  indictment.
12          Unless the government proves beyond a
13  reasonable doubt that a conspiracy as just explained
14  actually exited, then you must acquit the defendants of
15  the charge in Count 1.
16          Before a jury may find a defendant or any
17  other person became a member of the conspiracy charged
18  in Count 1, the evidence in the case must show beyond a
19  reasonable doubt that the defendant knew the purpose or
20  goal of the agreement or understanding, and then
21  deliberately entered into an agreement, intending in
22  some way to accomplish the goal or purpose of this
23  common plan or joint action.
24          If the evidence establishes beyond a
25  reasonable doubt that the defendant knowingly and

deliberately entered into an agreement to murder DF, as charged in Count 1, the fact that the defendant did not join the agreement at its beginning, or did not know all the details of the agreement, or did not participate in each act of the agreement, or did not play a major role in accomplishing the unlawful goal, is not important to your decision regarding membership in the conspiracy.

Merely associating with others and discussing common goals, mere similarity of conduct between or among such persons, merely being present at the place where a crime takes place or is discussed, or even knowing about a criminal conduct, does not, of itself, make someone a member of a conspiracy or a conspirator.

Count 2 of the third superseding indictment alleges that on or about October 1, 2013, in Woodbridge, Virginia, within the Eastern District of Virginia, and elsewhere, for the purpose of gaining entrance to, and maintaining an increasing position in MS-13, an alleged enterprise engaged in racketeering activity, it's alleged that Defendant Jose Lopez Torres, together with others known and unknown to the grand jury, knowingly and intentionally attempted to murder DF, in violation of the laws of the Commonwealth of Virginia, and did aid, abet, counsel, command, induce and cause another

person to commit said offense.

Count 2 charges the Defendant Jose Lopez
Torres with a violent crime, that is, attempted murder
in aid of racketeering.  To sustain its burden of proof
against the defendant, the government must prove the
following three essential elements beyond a reasonable
doubt:

One, that on or about the date charged in
Count 2 of the indictment, an enterprise engaged in or
the activities which affect interstate or foreign
commerce existed.

Second, that the enterprise was engaged in
racketeering activity.

Third, that the defendant had a position in
the enterprise.

Fourth, that the defendant knowingly and
unlawfully attempted to murder, or aided and abetted the
attempted murder of DF.

And, five, that one of the defendant's
purposes in doing so was to maintain or increase his
position in the enterprise.

As I mentioned before, the first, second,
third and fifth elements of this count are also elements
of racketeering charged in Counts 1, 4, 6, and 7, and my
prior instructions regarding those four elements apply

1   to all of these counts.

2          Now, the fourth element of the charge in

3   Count 2 requires the government to prove beyond a

4   reasonable doubt that the Defendant Jose Lopez Torres

5   unlawfully and knowingly attempted to murder, or aided

6   and abetted the attempted murder of DF.

7          To sustain its burden of proof against the

8   defendant for the crime of attempted murder, the

9   government must prove the following essential elements

10  beyond a reasonable doubt:

11         One, that the defendant intended to commit

12  the crime of murder, and thereafter the defendant did an

13  act constituting a substantial step toward the

14  commission of that crime.

15         Count 3 of the third superseding indictment

16  charges that on or about October 1, 2013, in Woodbridge,

17  Virginia, in the Eastern District of Virginia, that Jose

18  Lopez Torres knowingly possessed a firearm, to wit:  a

19  short-barreled shotgun, in furtherance of a crime of

20  violence, for which he may be prosecuted in a court of

21  the United States, to wit:  conspiracy to commit murder

22  in aid of racketeering as set forth in Count 1 of the

23  indictment, and attempted murder in aid of racketeering

24  as set forth in Count 2 of the indictment, and did aid

25  or abet, counsel, command, induce or cause another to

commit this offense.

Count 4 of the third superseding indictment alleges that on or about October 7, 2013, in Fairfax County, within the Eastern District of Virginia, for the purpose of gaining entrance to, maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, that the Defendants Jose Lopez Torres, Omar DeJesus Castillo, and Douglas Duran Cerritos, together with others known and unknown to the grand jury, knowingly and intentionally murdered Nelson Omar Quintanilla Trujillo, in violation of the laws of the Commonwealth of Virginia, and did aid, abet, counsel, command, induce or cause another to commit said offense.

Count 4.  The essential elements of Count 4 are -- Count 4 charges Jose Lopez Torres, Omar DeJesus Castillo and Douglas Duran Cerritos with a violent crime, that is, murder in aid of racketeering.

To sustain its burden of proof against the defendant for this crime, the government must prove the following essential elements beyond a reasonable doubt:

One, that on or about the date alleged in Count 4 of the indictment, an enterprise engaged in, or activities which affect interstate or foreign commerce.

Two, that the enterprise was engaged in

1  racketeering activity.

2  Three, that the defendant had a position in

3  the enterprise.

4  Four, that the defendant knowingly and

5  unlawfully murdered, and aided and abetted the murder of

6  Nelson Omar Quintanilla Trujillo.

7  And five, that one of the defendant's

8  purposes in doing so was to maintain or increase his

9  position in the enterprise.

10  As I mentioned before, the first, second,

11  third, and fifth elements of this count are also

12  elements of racketeering as charged in Counts 1, 2, 6

13  and 7.  My prior instructions concerning these four

14  elements apply to these in this count.

15  Count 5 of the third superseding indictment

16  charges that on or about October 2013, in the Eastern

17  District of Virginia, that Alvin Gaitan Benitez

18  knowingly committed an offense against the United

19  States, namely the murder of Nelson Omar Trujillo, on

20  October 7, 2013, as described in Count 4 of the

21  indictment, and knowingly received, relieved, comforted,

22  assisted others in order to hinder and prevent their

23  apprehension, trial, and punishment.  The defendant,

24  together with others known and unknown to the grand

25  jury, reburied the body of Nelson Omar Quintanilla

1    Trujillo.

2           Count 6 alleges that on or about March 29,

3    2014, in the Eastern District of Virginia, for the

4    purpose of gaining entrance to and maintaining and

5    increasing position in MS-13, an enterprise engaged in

6    racketeering activity, that the defendants, Omar DeJesus

7    Castillo, Alvin Gaitan Benitez, Douglas Duran Cerritos,

8    Christian Lemus Cerna, Manuel Ernesto Paiz Guevara,

9    together with others known and unknown, knowingly and

10   intentionally murdered Gerson Adoni Martinez, in

11   violation of the laws of the Commonwealth of Virginia,

12   and did aid and abet, counsel, command, induce another

13   to commit the offense.

14          Count 7 charges that on June 19, 2014, in

15   the City of Alexandria, for the purpose of gaining

16   entrance to and maintaining and increasing position in

17   MS-13, an enterprise engaged in racketeering activity,

18   that the defendant, Jesus Alejandro Chavez, together

19   with others known and unknown to the grand jury,

20   knowingly and intentionally murdered Julio Urrutia, in

21   violation of the laws of the Commonwealth of Virginia,

22   and did aid, abet, counsel, command, induce another to

23   commit said offense.

24          Count 8 charges that on or about June 19,

25   2014, in the City of Alexandria, within the Eastern

1   District of Virginia, that Mr. Jesus Alejandro Chavez

2   knowingly used, carried, brandished, discharged a

3   firearm during, in relation to, and in furtherance of a

4   crime of violence, for which he may be prosecuted in a

5   court of the United States, to wit:  murder in aid of

6   racketeering as set forth in Count 7 of the indictment,

7   and therefore knowingly and willfully caused the death

8   of Julio Urrutia, which killing was murder as defined in

9   the federal code, and that the defendant, with malice

10  aforethought, did unlawfully kill Julio Urrutia by

11  shooting him with a firearm.

12          Count 9 charges that the Defendant Jesus

13  Alejandro Chavez, having been convicted on or about

14  April 10, 2009, of a crime punishable by imprisonment

15  for a term exceeding one year, knowingly possessed a

16  firearm in and affecting commerce, said firearm having

17  been shipped and transported in interstate commerce.

18          This is an overview of the charges.

19          Let me state that as we go forward with the

20  trial -- let me explain to you how the trial will

21  proceed in this courtroom.

22          First, at the very outset, each of the

23  parties have the opportunity to make what's called an

24  opening statement, describing to you the -- I'm sorry.

25          Douglas Duran Cerritos is no longer charged

1    in Count 4.  He's only charged in Count 6; Count 6, not
2    Count 4.  I apologize.
3                Each party will make an opening statement.
4    And the purpose of opening statements is to give you an
5    overview of what they think the evidence will be.
6                Of course, the government will go first at
7    the beginning of the case, describing their theory of
8    the case and what they believe the witnesses will say.
9                Of course, the defendants are not required
10   to prove anything, and each defendant is not required to
11   make any opening statement.  But if they choose to do
12   so, each defendant's counsel may make an opening
13   statement at the conclusion of the government's opening
14   statement.
15               What is said in opening statement is merely
16   an overview and it's not evidence.  It's simply serves
17   as an introduction to the evidence in this case and what
18   the parties think they might produce during trial.
19               After any opening statements, then the
20   government will introduce evidence which it believes
21   supports the charges in the indictment.
22               The government -- after the government has
23   presented its evidence, then the defendants may present
24   evidence.  But again, they are not required to produce
25   any evidence.

1          The burden, as you will be told many times

2    throughout this trial, is for the government to produce

3    evidence to support each and every element of the

4    offense against each defendant beyond a reasonable

5    doubt.  The law never imposes upon a defendant in a

6    criminal case the burden or duty of calling any

7    witnesses or producing any evidence.

8          Fourth, after all the evidence has been

9    received, after all the witnesses have testified and

10   exhibits have been admitted, each party will be given an

11   opportunity to present closing arguments.

12         And before closing arguments, I will

13   describe to you all the legal principles to apply,

14   orally and I will provide them to you in writing.

15         The purpose of closing arguments is for the

16   lawyers to summarize the evidence from their point of

17   view.  And the government will go first, recalling for

18   you what the witnesses' testimony would be from the

19   government's perspective, and providing to you their

20   view of why the evidence supports proof beyond a

21   reasonable doubt for each individual defendant.

22         Following the closing argument by the

23   government, the defendant will make a closing argument.

24   Each defendant will have the opportunity to make their

25   own closing argument, describing what the evidence has

1    been from each defendant's point of view, and why they

2    believe the government has not proven the charges and

3    where there is a reasonable doubt and why they should be

4    acquitted.

5            Throughout the trial, bear in mind that you

6    must keep an open mind and not make up your mind based

7    upon what you see as part of the testimony.  You should

8    hear all the case before you begin formulating any

9    opinion about the case.

10           Your job as jurors is to determine the

11   facts.  And under our principles of criminal law, you

12   are the sole judges of the facts, which means you are to

13   decide, as I told you, individually, what you think the

14   evidence has shown by the witnesses being presented.

15           Additionally, you are the sole judges of all

16   the facts in the case.

17           And the questions asked by the lawyers are

18   not evidence.  Any observation I make is not evidence.

19   And the arguments of counsel, of course, are not

20   evidence.

21           During the course of the testimony of a

22   witness, if a lawyer believes that a question or the

23   answer to it may violate the rules of evidence, that

24   lawyer will stand up and say, "Objection."  I will

25   either acknowledge the lawyer or acknowledge the other

lawyer, and then I will rule.  And I'll either say the objection is sustained, which means the question or the answer to it may violate the rules of evidence.  If I say the objection is overruled, then that means my judgment is that the question or the answer does not violate the rules of evidence.

The rules of evidence, which have been developed over many years, are designed to ensure that what is presented to a jury is reliable and accurate. So, therefore, do not concern yourself with the number of objections made or sustained for one side or the other.

And bear in mind that a lawyer can only obtain a ruling from the judge if they stand and object during the course of the witness's testimony and to break the witness's testimony.

Of course, in deciding the weight to give each individual witness, you may take into consideration the appearance, attitude, and behavior of the witness on the stand, the interest the witness might have in the outcome of the case, the relationship the witness might have to either side of the case, the inclination of the witness to speak truthfully or not, and what you discern to be the probability or improbability of the witness's statement, and all other facts in evidence.  In short,

you may give the testimony of each witness such weight and value you determine it should receive.

Bear in mind that no statement, ruling or remark I may make during the course of the trial is intended in any way to influence you in making your judgment of believability of witnesses.

Now, during the trial it may be necessary from time to time for me to confer with counsel at sidebar.  I'll do everything I can to keep those conferences to a minimum.

But bear in mind, these lawyers have to present the case as they know it.  And because I don't know everything that they know about the case, it may be necessary for me to take a bench conference, or it may be necessary for me to take a recess.

Please be patient with me.  It's not that we're trying to keep anything from you.  We're trying to ensure that what is presented to the jury is reliable and accurate.

Now I want to just give you some other additional instructions, and that is, keep an open mind throughout the case.

Don't discuss the case amongst yourselves. Don't permit the case to be discussed in your presence. You may not discuss the case until I tell you to do so,

1    and that will be at the end of the case.

2            You must not begin or have any conversations
3    with anyone, including your spouses, significant others.
4    It's only natural to want to share what you did for the
5    day, but jury duty is no ordinary day.  And so tell your
6    family or friends, "I cannot discuss the case with you."

7            You have an important responsibility to
8    decide this case according to the evidence that you see
9    and hear in this courtroom only.

10           We will present to you all the evidence you
11   need to hear and see.  If, during the course of a
12   witness's testimony, you believe some question is not
13   asked of a witness, do not concern yourself with it.
14   These lawyers are really highly trained.  They have
15   studied this case and they will ask everything of the
16   witness they think is important.

17           I know that we're all connected to computers
18   and smart phones and the Internet.  Please do not do any
19   research on this case, MS-13, or anything you may hear
20   about in the case.

21           Don't do any posting on any social media
22   like SnapChat, Instagram, Facebook, like, "I'm on jury
23   duty."  That would violate your oath and it would harm
24   this case.

25           Again, don't visit any of the areas you may

1    hear referred to in this case, which may be locations
2    mentioned during the trial, unless you live there.
3    Don't go driving by there.
4               And again, the reasons for this is because
5    all the jurors -- that you see and hear all the evidence
6    presented here in court.  And if you conduct your own
7    investigation you will be violating your oath.
8               To avoid the possible appearance of
9    impropriety, I strongly urge, until the trial is
10   concluded, that you not talk with anyone connected with
11   this case as a party, witness, attorney or, for that
12   matter, me or any of my staff.
13              If we see you in the elevator, we're not
14   going to speak to you.  It's not that we're being rude.
15   We've been told not to do that.
16              If you go to lunch some place and one of the
17   parties or lawyers see you, they are not going to speak.
18   They are trying to avoid being in contact with you.
19              It's a very important case.  What we ask you
20   to do is give the case your complete attention, the kind
21   of attention you would want given to you case or a
22   relative's case if they were in court.  And we will ask
23   you to go forward now and be fair and impartial jurors.
24              We will have an opening statement from each
25   of the lawyers.  The government counsel is asking for

 1   one hour.  And I'll give, for each opening statement,

 2   time estimates will begin.  And we will take a break

 3   after we get started, a little bit later.

 4                Government counsel, are you ready?

 5                MR. CONTE:  Your Honor, may we approach?

 6                THE COURT:  Yes.

 7                MR. CONTE:  Thank you.

 8                (Sidebar conference held as follows:)

 9                MR. CONTE:  Your Honor, I know the Court

10   corrected itself and withdrew Mr. Cerritos' name from

11   Count 4, but it said that Mr. Cerritos was charged in

12   Count 4, and you said it twice.

13                I'm making an objection.  I'm asking for a

14   mistrial.  I think that's a bell that can't be unrung.

15                THE COURT:  Okay.

16                MR. CONTE:  I -- the jurors are taking

17   notes, and I'm sure they noted that Mr. Cerritos was

18   charged in Count 4.

19                MR. JENKINS:  The interpreter can't hear.

20                THE COURT:  All right.  Repeat what you just

21   said.

22                MR. CONTE:  I'm making an objection to the

23   Court's mentioning of my client in Count 4.  It was

24   mentioned twice during the Court's instruction to the

25   jury, and I'm asking for a mistrial because I believe

1    that the statement, Mr. Cerritos -- Cerritos was charged

2    in Count 4, is something that can't be undone.  But the

3    jurors have taken notes.  They've already, I'm sure,

4    noted that.

5          It's now -- we're going to proceed to trial,

6    and any other mention, per the Court's order, that our

7    client is Homeboy One, I think is just going to relate

8    directly back to the Court's instruction and the jury's

9    initial belief that Mr. Cerritos was charged in Count 4.

10          I -- you know, I think the fair thing to do

11    is to -- for the Court to grant a mistrial at this time.

12          THE COURT:  All right.

13          Government's response.

14          MS. MARTINEZ:  Your Honor, we would oppose

15    the motion for a mistrial.  We did note that Your Honor

16    mistakenly included Duran Cerritos twice during the

17    instructions.  We agree with the observation of defense

18    counsel.

19          Your Honor did correct that.  I don't know

20    whether any jurors took note of it or not, but they will

21    hear no other evidence -- they should hear no other

22    evidence throughout this case.

23          Mr. Duran Cerritos will be mentioned in the

24    government's opening solely in connection with Count 6,

25    and not at all in connection with Count 4.  And, the

government would submit that at this point a mistrial is
not warranted.

          THE COURT:  You finished?

          MR. CONTE:  Yes, Your Honor.

          THE COURT:  All right.

          Let the record reflect that I did make a
mistake in my opening discussions to the jury, which I
corrected.  The jury is not going to be given a written
instruction.  They heard orally what I said, and they
were taking notes.

          At the end of the trial they will receive
detailed written instructions about each count of the
indictment, along with the indictment and a verdict
form.  As the government correctly said, there won't be
any evidence concerning Mr. Cerritos in Count 4.

          Therefore, the motion for mistrial is
denied.

          Thank you very much.

          (Thereupon, the side-bar conference was
concluded.)

          THE COURT:  Ready to proceed?

          MS. MARTINEZ:  I am, Your Honor.

          THE COURT:  You may proceed.  Thank you.

        OPENING STATEMENT BY THE GOVERNMENT

         MS. MARTINEZ:  Good morning, ladies and

1   gentlemen.

2           On October 1st, 2013, three members of the
3   gang MS-13 and one new recruit got into a car and drove
4   to Garfield High School in Woodbridge, Virginia.

5           You will learn that one of these gang
6   members was Defendant Jose Lopez Torres, whose gang
7   name, you will hear, is Greñas or Peluca.  You will
8   learn and the evidence will show that these gang members
9   were acting, including Greñas, were acting at the behest
10  of their lead, Payaso, under instructions to go to the
11  high school, locate fellow gang member Peligroso, and
12  kill him.

13          The gang members had with them in the car
14  that night two machetes and a short-barrel 12-gauge
15  shotgun.

16          But you'll learn that fortunately for
17  Peligroso, when they got to Garfield High School that
18  night, they were greeted by the police.  Officers pulled
19  them over, searched the vehicle, found the two machetes
20  and that 12-gauge shotgun, along with gang
21  paraphernalia, and arrested the gang members.

22          Peligroso was fortunate.  He lived.  And the
23  reason, as you will hear, is that unbeknownst to Greñas
24  and unbeknownst to their leader, Payaso, one of the
25  other gang members in the car that night, who you will

1  hear, his nickname was Drowsy, Drowsy had alerted the
2  police to this murder plot.
3         Drowsy had gone to the police.  He had
4  agreed to conduct recorded phone calls.  He had agreed
5  to wear a body wire to a gang meeting the day before, in
6  which the gang members, including Greñas, discussed this
7  murder, and he worked with the police to stop the murder
8  of Peligroso.
9         On the night of October 1st, 2013, that car
10 was under police surveillance from the moment that
11 Drowsy got into it until the defendant was arrested with
12 the other gang members.
13        Peligroso had been warned.  He wasn't at the
14 high school.
15        And Drowsy was wearing a body wire to record
16 what the gang members were saying.
17        Peligroso was so fortunate, because he
18 lived.
19        But what you're going to hear during the
20 course of this trial is that there were three other
21 victims who did not; one attempted murder followed by
22 three murders.
23        The government will prove to you that on
24 October 7th, 2013, gang members killed Nelson Omar
25 Quintanilla Trujillo.  We will prove that this murder

1   was conducted by, again, Defendant Jose Lopez Torres,

2   along with Defendant Omar DeJesus Castillo, and others.

3           The government will prove that on

4   March 29th, 2014, gang members killed Gerson Adoni

5   Martinez Aguilar.  We will prove that this murder was

6   conducted by Defendant Omar DeJesus Castillo, Defendant

7   Douglas Duran Cerritos, Defendant Christian Lemus Cerna,

8   Defendant Alvin Gaitan Benitez, Defendant Manuel Ernesto

9   Paiz Guevara, and others.

10          And we will prove to you that on June 19th,

11   2014, the gang killed Julio Urrutia.  We will prove that

12   this murder was conducted by Defendant Jesus Alejandro

13   Chavez and others.

14          This case is about MS-13.  MS-13, as you

15   will hear in this trial, its full name is La Mara

16   Salvatrucha or, as you will also hear, La Mara.

17          MS-13, you will learn, is a violent street

18   gang with origins in Los Angeles and El Salvador, that

19   has spread across this country, including right here in

20   Virginia.

21          This case is about MS-13.  But more

22   specifically, this case is about these seven defendants

23   seated behind me, each of whom the government will prove

24   through the course of this trial are members or

25   associates of MS-13.

1           But most importantly, this case is about the
2  fact that each one of those seven defendants committed
3  one or more murders on behalf of the gang.
4           You will hear in great detail about four
5  violent offenses that these defendants committed, an
6  attempted murder followed by three murders.
7           The first, chronologically, was the
8  attempted murder, the October 1st, 2013, attempted
9  murder of Peligroso, who you will learn his initials are
10  DF.  That's the first event that happened
11  chronologically.
12           Then the government will prove that on
13  October 7th, 2013, the gang took the life of Nelson Omar
14  Quintanilla Trujillo.
15           Nelson Omar Quintanilla Trujillo was also a
16  gang member.  You'll learn that his nickname, his gang
17  name, was Lagrima.  The evidence will show that the gang
18  believed that Lagrima had violated one of the most
19  important rules in MS-13:  Don't talk to the police.
20           You will hear that because the gang believed
21  that Lagrima was a snitch, or a rat, they plotted to
22  kill him.  And the evidence will show that the gang did
23  just that, that Defendant Jose Lopez Torres, Defendant
24  Omar DeJesus Castillo, and others, lured Lagrima to
25  Holmes Run Park -- this is Jose Lopez Torres, ladies and

1  gentlemen, one of the defendants charged with killing
2  Lagrima.
3          The other defendant charged with killing
4  Lagrima is Omar DeJesus Castillo.  His gang name is Lil
5  Payaso.
6          The evidence will prove, ladies and
7  gentlemen, that these two defendants, along with other
8  gang members, lured Lagrima to Holmes Run Park here in
9  Fairfax, Virginia, where they killed him, brutally,
10 stabbing him with knives, slashing him across the face
11 with a machete, and then they buried him in a shallow
12 grave in the park.
13         The gang struck again on March 30th, 2014 --
14 excuse me -- March 29th, 2014.  And the evidence will
15 prove that this victim, this time, was an associate of
16 the gang, what they call a *chequeo*, someone who is
17 rising up in the gang, Gerson Adoni Martinez Aguilar,
18 whose gang name was Lil Guason.
19         The evidence will show that Lil Guason was
20 killed by Defendants Omar DeJesus Castillo, gang named
21 Lil Payaso; Defendant Douglas Duran Cerritos, gang named
22 Lil Poison or Guason; Defendant Christian Lemus Cerna,
23 gang named Leopardo or Vago; Defendant Alvin Gaitan
24 Benitez, gang named Pesadilla or Lil Tuner; and
25 Defendant Manuel Ernesto Paiz Guevara, gang named

1   Solitario.

2           The evidence will prove that these five
3   defendants, along with others, once again lured their
4   victims -- their victim, Lil Guason, to Holmes Park in
5   Fairfax, Virginia, and brutally slaughtered him,
6   stabbing him repeatedly in the chest, in the back, and
7   cutting off his head.  They buried him in a shallow
8   grave.

9           And then on June 19th, 2014, the evidence
10  will prove that the gang killed Julio Urrutia.  The
11  evidence will show that three gang members, including
12  Defendant Jesus Alejandro Chavez -- whose gang names are
13  Taliban or Chuy -- the evidence will prove that this
14  defendant, along with two others, went out that night on
15  June 19th, on the streets of Alexandria, specifically in
16  the Chirilagua neighborhood, looking for rival gang
17  members; and that while they were out they confronted a
18  group of young men, flashed their gang signs, challenged
19  them about gang affiliation, and then as the altercation
20  increased, Defendant Chavez, Taliban, pulled out a gun
21  and shot the victim point blank in the neck.

22          For these crimes that I just described to
23  you, these defendants are charged with what the law
24  calls violent crimes in aid of racketeering.

25          The judge began describing the law to you

1    prior to my opening statement, and he'll tell you more

2    at the end of the case.  But violent crimes in aid of

3    racketeering are just what they sound, violent crimes

4    committed on behalf of what the law calls a racketeering

5    enterprise.

6             The government will prove that MS-13 is a

7    racketeering enterprise.  The government will prove that

8    each of these defendants committed their respective acts

9    of violence, murders, in order to maintain or increase

10   their position within MS-13.  Because, as you will

11   learn, MS-13 glorifies violence above all else, and

12   MS-13 is a criminal racketeering enterprise.

13            You'll learn a lot about MS-13 through the

14   course of this trial.  We will have a gang expert who

15   will come in and speak to you, and you will hear from a

16   number of current and former gang members who will tell

17   you about the gang.  They'll tell you about the gang's

18   presence, heavy presence, in El Salvador, elsewhere in

19   Latin America, in Central America, and that it has

20   spread across this country.

21            You'll learn that MS-13 has a presence in

22   the country via groups within the gang, which are called

23   cliques, and that there are active cliques here in

24   Virginia, as well as elsewhere, in Maryland, in New

25   York, in California, elsewhere in the United States.

1    You'll learn that MS-13 has an
2    organizational structure.  The big leaders are down in
3    El Salvador.  The cliques here in the United States
4    report to those big leaders.  They send them money.
5    They work with them on drug trafficking.  They work on
6    behalf of the cliques.  You'll hear about defendants and
7    other MS-13 gang members in this case who did just that.
8    You'll learn that here in the United States
9    the leader of the cliques is called the first word.  The
10   second in command is called the second word.  Members of
11   the MS-13 are called homeboys or homies or -- or
12   soldiers.
13   Recruits within the gang, those who aren't
14   yet homeboys, are called *chequeo*, the word that you --
15   the Spanish word that you see there.  A *chequeo* is
16   someone who has not yet earned full status within the
17   gang, hasn't earned full trust and respect within MS-13,
18   but who is trying to.
19   Below a *chequeo* is what's called a *paro*,
20   someone who does favors for the gang.
21   Now in order for a *chequeo* to advance within
22   the gang, to go from *chequeo* to homeboy, you'll learn
23   that they have to earn the respect of the gang.  And
24   you'll learn that there is a number of ways for them to
25   do that.

1           What you'll hear is that traditionally, in
2   El Salvador, in order for a *chequeo* to become a homeboy,
3   he has to commit a murder.  And that's how he earns the
4   respect and level of homeboy in the gang.
5           Now you'll hear that here in the United
6   States, that rule is sometimes applied and sometimes
7   it's not.  But you will also learn about people in this
8   case, gang members in this case, who did just that,
9   committed a murder in order to go from *chequeo* to
10  homeboy.
11          You'll also hear that when a *chequeo* becomes
12  a homeboy, there's a ritual that welcomes him into the
13  gang.  And this ritual involves -- this should come as
14  no surprise -- violence.  When a *chequeo* is to become a
15  homeboy, he is encircled by the other homeboys.  One of
16  them counts to 13, and while that homeboy counts to 13,
17  the others beat the *chequeo* with their fists, their
18  hands, and their feet.  This is something they
19  voluntarily engage in.  And at the end of that 13-second
20  beating, the *chequeo* has become a homeboy.
21          Thirteen is a prominent symbol within MS-13.
22  So is 503.  503 is the Area Code in El Salvador.  You'll
23  hear throughout this case that 13 and 503 are symbols
24  that you'll see on clothing, or on tattoos, graffiti.
25          You will hear that gang members sometimes

1    get tattoos that say these symbols, or MS, or MS-13, or
2    the name of the clique that that person belongs to.
3    Although you will also hear that recently newer members
4    are encouraged not to get tattoos, so as to evade law
5    enforcement.
6              You'll hear about a number of other symbols
7    that the gang uses, as well as hand signs that they
8    flash in order to challenge others or greet members of
9    their own.
10             One of those hand signs is called the *garra*.
11   It symbolizes the devil.  It looks something like this
12   (indicating), with the two fingers that I have up to
13   symbolize the devil's horns.
14             The devil is also a prominent symbol in
15   MS-13, and you'll hear that MS-13 members are thought to
16   work for or worship the devil, whom they also call the
17   beast.
18             Another thing that you will hear about in
19   this case is what's called a *calentón*.  A *calentón* is
20   like that 13-second beating when they jump a *chequeo* as
21   a home -- into being a homeboy.  But a *calentón* -- again
22   it's a 13-second beating -- it's in order to punish a
23   gang member, but for a smaller crime, for breaking a
24   smaller rule within MS-13.
25             So, when a *chequeo* or a homeboy, a member

1  associate of MS-13 breaks a small rule, he gets a
2  *calentón*.  Again, this is something that they
3  voluntarily submit to.
4           *Calentóns* will play a prominent role in the
5  murders of Lagrima and Lil Guason, which I will describe
6  to you in further detail in a moment.
7           There are a lot of rules within MS-13.  You
8  will hear about many of them throughout the course of
9  this case.  One of the most important is, don't snitch.
10  Don't talk to the police.  Don't be a rat.
11           That's the rule that the gang believed that
12  Lagrima broke.  That's the reason that the gang killed
13  him.
14           Some of the other rules that you'll hear
15  about throughout this case are, don't disrespect fellow
16  homeboys.  Don't steal from the gang or from the clique.
17  And homeboys must attack and kill rivals of member
18  gangs -- members of rival gangs, which they call
19  *chavalas*.
20           As I said, the government will prove that
21  MS-13 is what the law calls a racketeering enterprise.
22  In order to do that, we will show you that MS-13 engages
23  in a host of crimes, and that members and associates,
24  including these defendants, engage in crime on behalf of
25  the gang.

1            In addition to the attempted murder and the

2    murders that you will hear about, you will hear that the

3    gang engages in assaults, drug dealing, selling of a

4    variety of drugs -- cocaine, heroin, marijuana, crystal

5    meth.

6            You will hear that they work with other

7    homeboys in other states to move drugs around and to

8    move money around from the drug sales, and that they use

9    the money from drug sales to benefit the clique, to buy

10   weapons and other drugs, to send the money down to the

11   big leaders in El Salvador.

12           You'll also hear that sometimes the cliques

13   and the gang engage in other kinds of money-making

14   enterprises, such as prostitution.

15           In this case, the government will prove that

16   these seven defendants are members and associates of a

17   particular clique within MS-13, a clique here in

18   Virginia.  The name of that clique is Park View Locos

19   Salvatruchas, abbreviated PVLS.

20           Within this clique, you will hear the

21   leader, his name was Payaso.  You'll hear much about

22   Payaso in this case.  He was running the clique from

23   within a prison.  You'll hear that he had a contraband

24   cellphone within Powhatan prison down near Richmond, and

25   that he was running the clique and instructing these

gang members on his contraband cellphone.

You'll hear that the gang members had to call in daily to Payaso, and you'll hear several telling you that they did just that.

You'll hear that when they had gang meetings, clique meetings, they would put Payaso on speaker phone.  And you'll hear about them doing that, for example, when they planned the murder of Peligroso.

Now I would like to introduce these defendants one by one, tell you about their role within this clique, that the evidence will prove, and briefly about the crimes that they are charged with.

Once I go through each of these seven defendants, I'm then going to go through the violent crimes in greater detail to give you a sense of the witnesses that you'll expect to hear from and the facts that the government expects we will prove to you.

I'll start first with Defendant Jose Lopez Torres.  He's seated right here, closest to me, in a blue shirt.  Jose Lopez Torres's nicknames, gang nicknames, are Greñas -- that's the primary one that you'll hear, although you'll also hear the nickname Peluca.

Greñas, as I will call him, was a leader within MS-13.  Now I already told you that Payaso was

1   the leader.  The evidence will show that Payaso was the
2   first word.
3                For the murder of Peligroso, on October 1st,
4   2013, you will hear about someone named Demente.  And at
5   the time of Peligroso's murder, Demente was the second
6   word.  But Demente was the driver of the car.  He was
7   arrested that night, and he has been in jail ever since.
8   And so once the second word was arrested on October 1st,
9   2013, Greñas became the second word, the second in
10  command to Payaso.
11               The evidence will also show that one of
12  Grenas's roles within the clique was to work on the drug
13  sales, to be in charge of coordinating the drugs to the
14  gang and making the money for the gang in that way.
15               The evidence will also show that Greñas
16  murdered Lagrima.
17               Next, Defendant Omar DeJesus Castillo, who
18  is seated at the third table here, wearing a white shirt
19  and a pink checkered tie.  This defendant's gang
20  nickname is Lil Payaso.
21               You will hear that Lil Payaso, at a time,
22  also played somewhat of a leadership role within the
23  clique.  You'll learn that Greñas was arrested sometime
24  after the murder of Lagrima, but before the murder of
25  Lil Guason.  And during that time period, Lil Payaso

1   took on somewhat of a leadership role.

2           You'll also learn that one of his roles

3   within the clique was to be one of the bigger guys.

4   Frankly, none of these guys sitting behind me are very

5   big, but Lagrima was one of the largest.

6           That victim was a -- was -- he was taller.

7   He was broader shouldered.  He was bigger than most of

8   the other gang members.  And Lil Payaso was one of the

9   next biggest.  And you will learn that his size and his

10  ability to take on Lagrima played a prominent role in

11  the murder of Lagrima.

12          You will also learn that Lil Payaso went on

13  to also commit the murder of Lil Guason.

14          Next is Defendant Douglas Duran Cerritos.

15  He's seated at this first table here, towards the end.

16  He's wearing a blue shirt and dark-rimmed glasses today.

17          This defendant's gang name is Lil Poison.

18  You will also hear him referred to as Guason,

19  G-u-a-s-o-n, Guason.

20          You will learn that at the time of the

21  murder of Lil Guason, this defendant, Guason, was the

22  second word of the clique.  You'll hear throughout this

23  case that these defendants became arrested one by one.

24  And as their leaders are arrested, others rise up to

25  take their place.  And so at the time of the murder of

1   Lil Guason, Lil Poison was second word.

2           You will also learn that Lil Poison played a
3   prominent role in the gang with the drug dealings; that
4   at the time of the murder of Lil Guason, he was
5   essentially in charge of that, in charge of running the
6   drugs, of getting people to sell the drugs, of obtaining
7   the supplies.

8           You will also learn that he played a
9   prominent role in recruiting into MS-13.  And that's one
10  thing you will hear about MS-13, that they recruit very
11  young men.  And you will hear that Lil Poison recruited
12  these young men at J.E.B. Stuart High School, where he
13  was a high school student.

14          Next, Defendant Christian Lemus Cerna.  He's
15  seated at this last table here -- he was just looking
16  right at me -- white shirt, short sleeves.  His gang
17  name is Leopardo.  You will also hear him referred to as
18  Bago, B-a-g-o, or Vago, V-a-g-o.

19          Leopardo was also a homeboy within the
20  clique.  He was also rising up towards leadership, which
21  you will learn.  And you will hear about the eager role
22  he played in the murder of Lil Guason.

23          You will also learn that he was somewhat of
24  the clique's bookkeeper, that when there were clique
25  meetings, the members would have to pay dues, and he

1    would keep track of it in a notebook.  You'll see one of
2    these notebooks during the course of the trial.

3            Next, Alvin Gaitan Benitez, gang named
4    Pesadilla.  This defendant is seated here at the second
5    table.  He just pointed to himself when I said his name.
6    He's wearing a white shirt.  He's looking at me now.
7    Pesadilla was also a homeboy.

8            The evidence will show that Pesadilla wasn't
9    there the night of Lagrima's murder, but he was there a
10   short time later when the gang decided that someone
11   might find the body, and so, the evidence will show,
12   gang members, including some who were there for the
13   murder, and Pesadilla, went back, dug up the body and
14   reburied it in another location in the park.

15           The evidence will also show Pesadilla's
16   eager and prominent role in the murder of Lil Guason.

17           Next, Defendant Manuel Ernesto Paiz Guevara,
18   gang name Solitario.  Solitario is seated at the last
19   table at the back.  He's wearing a black shirt, half
20   zipped, sitting right now with his hand on his face.

21           Solitario, the evidence will show, was not
22   yet a homeboy at the time of the murder of Lil Guason.
23   Solitario was a *chequeo*, a recruit within the gang.  And
24   the evidence will show that he was eagerly learning the
25   rules of La Mara and rising up within the gang.  He was

1   a *chequeo* who, the evidence will show, participated in
2   the murder of Lil Guason.
3           And finally, Defendant Jesus Alejandro
4   Chavez, seated here at the middle table, towards the
5   back.  He's wearing a green shirt, a sports jacket, and
6   dark-rimmed glasses.
7           Defendant Chavez, whose gang names are Chuy,
8   you'll also hear Taliban -- the evidence will show that
9   Taliban was in jail for most of these activities, that
10  he had only been out for about a week at the time of the
11  murder of Julio Urrutia.
12          But the evidence will show that he lost no
13  time, once he got out of jail, trying to get in good
14  with this clique, hanging out with gang members in the
15  Chirilagua neighborhood of Alexandria, Virginia, and on
16  June 19th, 2014, shooting Julio Urrutia point blank in
17  the neck.
18          This case is about MS-13.  This case is
19  about these defendants, members and associates of MS-13.
20  But most importantly, this case is about those four
21  violent events, the attempted murder and the three
22  murders.
23          In order to tell you -- in order to prove to
24  you beyond a reasonable doubt that these defendants
25  committed those offenses, I have to tell you how we

1    solved them.

2              Starting with the attempted murder of

3    Peligroso, I already told you about Drowsy.  Drowsy, the

4    homeboy who went to the police and helped stop the plot

5    to kill Peligroso, whose initials are DF.

6              As I said, he recorded phone calls.  He wore

7    a body wire and recorded the gang members, including

8    Defendant Greñas, talking about the murder, and he wore

9    a body wire in the car that night.

10             Now these defendants speak in Spanish when

11   they speak to each other in person and on the phone, and

12   so the recordings, of course, are in Spanish.

13             The government will present those recordings

14   to you, along with English transcripts of the

15   recordings.  And you'll hear from Spanish language

16   linguists who will tell you that they listened to these

17   recordings and transcribed them into English.

18             You'll also hear some of the recordings,

19   short clips of them.  You won't be able to understand

20   them, but they will help you hear the tone of voice and

21   the way that the defendants spoke.  But you will always

22   have an English transcript to read along.

23             You will read in this English transcript

24   about the defendants, including Greñas, and his leader,

25   Payaso, discussing how they were going to kill

1    Peligroso, discussing the machetes, discussing the

2    12-gauge shotgun.

3              You will hear Greñas, in a recording,

4    advocate for the use of a firearm, for the 12, referring

5    to the 12-gauge shotgun.

6              And you'll hear the leader, Payaso, berating

7    the driver, Demente -- who I will get to in a moment --

8    on his way to the high school for not having the

9    machetes sharp enough.

10             You will also hear from Demente.  Demente

11   was the driver of the car that night.  His full name is

12   Jaime Rosales Villegas.  He was the second word of the

13   clique.  He was a homeboy.  And he has pled guilty to

14   conspiracy to commit murder in aid of racketeering,

15   attempted murder in aid of racketeering, and the use of

16   a firearm in the aid of a crime of violence.

17             Demente is what we call a cooperating

18   defendant.  Demente's testimony, in which he will

19   describe the gang's plan and what they did that night,

20   corroborated by the recordings that Drowsy made, will

21   prove beyond a reasonable doubt that Greñas and others

22   conspired and attempted to kill Peligroso.

23             But Peligroso lived.  Peligroso was

24   fortunate.

25             Our three murder victims were not nearly so

1   fortunate.  No one came forward and told the police that
2   these victims were going to die.  No one stopped those
3   murder plots.  But fortunately, we were able to solve
4   them, and we were able to do that with the aid of yet
5   more recordings by these defendants.

6           Another witness you will hear from during
7   this trial is someone whose gang name, whose nickname,
8   is Junior.  Junior, to these defendants, was a trusted
9   member of MS-13 in another clique.  But in reality,
10  Junior was working with the FBI.

11          Junior was what the FBI calls a confidential
12  human source, a CHS.  And Junior had been a confidential
13  human source for years, long before the attempted murder
14  of Peligroso, long before the three murders I've talked
15  about today.  Junior had been working with the FBI for
16  quite some time.  In fact, you'll even hear Junior has
17  testified in open court before.

18          And yet, these gang members believed that he
19  was a gang member, that he was a trusted gang member,
20  that he was someone whom they could open up to.

21          And so you'll hear from Junior, and from the
22  FBI agents who worked with him, that Junior started
23  hearing more and more about this clique, about PVLS, and
24  the violent crimes that they were engaging in.  And as
25  he began hearing more, Junior, working with the FBI,

1  came up with a plan to put a consensual wiretap on
2  Junior's phone, a wiretap, just what it sounds like,
3  just like you see on TV.  It records every phone call
4  and every text message.  And again, this is with
5  Junior's consent.  Junior knew this was happening.
6             So over the next ten months, over the course
7  of ten months, every single phone call, every single
8  text message, you will learn, was recorded and was
9  logged.
10             And you'll hear from Junior that he began
11  talking to these defendants, and that over time they
12  spoke to him more and more, they trusted him, and they
13  opened up to him.
14             Sadly, none of them told Junior in advance
15  of these murders.  The FBI was not able to stop the
16  murders from happening.
17             But they did brag about it after it
18  happened, and they did tell Junior the details, and they
19  did tell Junior who, what, when and where.  And it was
20  with these recordings that we were able to solve the
21  three murders.
22             You will hear and see English transcripts of
23  these recordings.  Again, the defendants and Junior all
24  spoke in Spanish, and so there will be tapes admitted
25  with the recorded calls, and there will be English

transcripts of the recorded calls.

Junior also on occasion wore body wires to
meetings with these defendants and other gang members,
and you will see some transcripts, again in English, of
what the defendants said during these recorded meetings.

In addition to the transcripts and the calls
and Junior's testimony, you will also hear from
cooperating defendants.

Now, none of these cooperating defendants
were like Drowsy.  None of them alerted the police or
the FBI in advance of the murders.  But what they did
do, after they were charged, is take responsibility,
plead guilty, and agree to cooperate with law
enforcement.

These cooperating defendants will tell you
all about the gang, about MS-13, about the clique, about
the rules, the leadership structure, all of that stuff
about the gang that I spoke about earlier.

They will also tell you about the murders.
And let me be clear, you will hear a lot about these
cooperating defendants.  I imagine you'll hear about
them during defense counsel's opening statements.
You'll hear about them throughout this case.

I'm not going to mince words.  These are bad
people.  They're murderers.  They're people who have

1   pled guilty to murder.  They are people who at one point
2   thought it was a good idea to brutally slaughter a
3   victim in a park and bury him in a shallow grave, or to
4   shoot someone in the face on the streets of Alexandria.
5   They're murderers.

6          But they were there.  They had front row
7   seats.  They saw what happened.  You will have to judge
8   their credibility for yourselves, ladies and gentlemen.
9   When they sit on that witness stand and they tell you
10  what they did and what these defendants did, you will
11  have to judge their credibility.

12         But I'll submit to you that what they will
13  tell you, what they will describe, will be credible.  It
14  will be credible because you will hear from more than
15  one cooperating defendant for each of the charged
16  violent offenses.

17         And you will hear the details from one
18  cooperating defendant to another.  Not every single
19  detail will be the same, which I submit would not be
20  believable.  But the primary details, the big details,
21  the who, what, when, where, why, and how, will be the
22  same.

23         And in addition to corroborating each other,
24  the cooperating defendants' testimony will be
25  corroborated by those recorded calls, by these

1    defendants' own admissions to Junior.

2              Now, as I said, you will hear from Demente.

3    Demente will talk to you about the attempted murder of

4    Peligroso.  Demente was the driver of the car that

5    night.

6              He will describe to you the fact that the

7    gang plotted to kill Peligroso, that the plan was either

8    machetes or a firearm, that he got into the -- the car

9    that night with Drowsy and with Greñas and with the

10   recruit, that they drove to the high school, and that

11   they were going to kill Peligroso.

12             In addition to Demente, you will hear from

13   four other cooperating defendants, starting first with

14   Skinny.

15             Skinny's full name is Juan Carlos Marquez

16   Ayala.  Skinny was a homeboy in the clique, in the PVLS

17   clique, and he did a lot of drug dealing:  marijuana,

18   cocaine, crystal meth, heroin.  He sold a lot of drugs

19   for the clique.

20             In fact, that's how he earned respect within

21   the clique.  That's how he earned the respect of the

22   leader, Payaso.  It's how he was able to rise up to the

23   level of homeboy.

24             Skinny will also tell you somewhat about the

25   attempted murder of Peligroso.  He also knew about the

plot.  He also knew the who, when, where, why and how, and he will testify about that attempted murder.

He will also testify about the murder of Lagrima, which he participated in, and for which he pled guilty to murder in aid of racketeering.

Skinny will tell you that after the attempted murder of Peligroso, and after Demente was arrested, that Greñas, who was arrested but let out -- that Greñas was determined to figure out who had alerted the police, who snitched.

Luckily for Drowsy, Greñas didn't suspect Drowsy.  He suspected Lagrima.  Skinny will tell you that Greñas grew obsessed with the idea that Lagrima was a snitch, that he had ratted out Greñas and Demente to the police; that he opened what the gang calls an investigation, and that he presented his evidence to the leaders and obtained what MS-13 calls a green light.  A green light is an order to kill.

You will hear that all four of the victims, Peligroso, Lagrima, Little -- well, not all four, excuse me -- three of the four victims -- Peligroso, Lagrima and Lil Guason -- all had green lights on them.

Skinny will tell you that after Greñas decided that Lagrima was a rat, the gang got together and made a plan.  They made a plan about how they would

1  kill Lagrima.  And they'll tell you that the plan was
2  that they would lure Lagrima to Holmes Run Park by
3  telling him that he had violated some of those minor
4  rules that I mentioned, and that because he had violated
5  a minor rule, he had to have a *calentón.*

6          So going back to a *calentón*, a *calentón* is
7  that 13-second beating to punish someone for violating a
8  minor rule of MS-13.

9          And then the plan would be that when Lagrima
10  submitted to the *calentón,* instead of just beating him,
11  they would kill him.

12          And Skinny will tell you that they carried
13  out this plan, this plan that was hatched by Defendant
14  Greñas, and which Defendant Lil Payaso knew full well
15  about.  On the night of October 7th, 2013, the gang
16  carried out that plan.

17          Skinny will tell you that Lagrima came to
18  the park that night, that they had a gang meeting, that
19  Greñas was there, that Lil Payaso was there, that Skinny
20  was there, that two of the other cooperating
21  defendants -- who I'll get to in a moment -- were there,
22  and that others were there.  And at this gang meeting,
23  the gang told Lagrima he had to have a *calentón*.

24          So then he got to the center, and they began
25  hitting him.  And here is where -- remember I told you

1   Lil Payaso is one of the bigger members of MS-13.  Here
2   is where his role came in, along with Skinny, who was
3   also a little bit larger.
4           The plan was that these two would engage in
5   the *calentón*, because Lagrima was so large they were
6   afraid they wouldn't be able to knock him down quickly.
7   But with the help of Skinny and Lil Payaso, knock him
8   down, they did.
9           And in the words of Lil Payaso in a recorded
10  call after the murder, a while after the murder, to
11  Junior, quote, "When he fell, I went at him with
12  everything, homey, took him down fast.  I knocked the
13  air out of him."
14          Skinny will tell you that once Lagrima was
15  on the ground, one of the homeboys jumped forward and
16  stabbed him in the stomach with a knife, and then
17  slashed him across the face with a machete.
18          He will tell you that as they were stabbing
19  him and slashing him, Greñas told him that he would die
20  for being a rat; that he begged for his life while they
21  were killing him.
22          In the words of Greñas in a recorded call
23  with Junior later -- and excuse my language -- "Son of a
24  bitch was saying, 'No man.  If I messed up, I swear to
25  you I will tell you.  But don't kill me.  I know that I

ratted on you guys, but spare my life.  I'll go very far
away.'  'Yes, you're going far,' I told him.  'Kill him,
son of a bitch,' I told him at the end"; followed by
laughter.

    After the gang had killed Lagrima, they
carried his body to a hole that they had dug earlier as
part of the plan.  They put him in the hole and they
buried him underneath rocks and dirt.

    And then afterwards, they celebrated by
jumping in another *chequeo* to be a homeboy.  This
chequeo's name is -- his nickname was Slow.  He's
another one of the cooperating defendants that you'll
hear from.

    And so after they murdered Lagrima and
buried Lagrima, they celebrated by making Slow a
homeboy.

    Then you will hear, from Skinny and from
others, that after the murder of Lagrima, the gang
members on occasion visited the grave to check on it, to
see whether someone might find it.  And eventually, they
decided that someone might find it.

    And so they decided they needed to dig up
the body and move it to another hole, which the evidence
will show they did, along with Defendant Pesadilla, who
participated in reburying Lagrima's body, as did Greñas.

And in his words, in another recorded call to Junior,
"We dismembered him.  Two times we dismembered him.  We
reburied him, and then we went and took him out, and we
dismembered him and we reburied him again."

The second -- well, the third cooperating
defendant you will hear from is Lil Slow, whom I
mentioned earlier, the *chequeo* who became a homeboy with
the murder of Lagrima.

Slow's full name is Araely Santiago
Villanueva.  You will hear him called both Slow and Lil
Slow.

Lil Slow was a *chequeo* for the murder of
Lagrima, which meant that he wasn't involved in planning
the murder.  He didn't know in advance.  But he knew
that night.  The gang told him, and he participated.
And as I said, and as he will tell you, and as Skinny
will tell you, after the murder he was jumped into the
gang as a homeboy.  And as a homeboy, Slow participated
in the murder of Lil Guason.

Slow has pled guilty in murder in aid of
racketeering, and he will testify here on that stand as
a cooperating defendant.

In addition to telling you about the murder
of Lagrima, corroborating the testimony that you will
hear from Skinny, he will tell you about the murder of

1   Lil Guason.  He will tell you that Lil Guason, Gerson
2   Adoni Martinez Aguilar, was a *chequeo* in the gang.  Slow
3   was a *chequeo* at the time of the murder of Lagrima, and
4   Lil Guason was a *chequeo* at the time of his murder.
5            Slow will tell you that at the time of the
6   murder of Lil Guason, Lil Poison was running the gang --
7   was running the clique.  Excuse me.  And he will tell
8   you that Lil Poison and others came up with a plot to
9   kill Lil Guason.
10           Now, Lil Guason was not accused of being a
11  snitch like Lagrima, but he was accused of violating
12  other gang rules.  Here were his offenses.  He was
13  selling drugs for the gang and he failed to give them
14  $600, and he was suspected of sleeping with the
15  girlfriend of Skinny, who by this time was in jail.  So,
16  for stealing $600 from the clique and sleeping with
17  another homeboy's girlfriend, the gang decided to kill
18  him.
19           So Slow will tell you about the plan that
20  they hatched to kill Lil Guason.  And Slow will tell you
21  that involved in this plan, involved in making the plan,
22  in addition to Slow, were Lil Poison, Leopardo, Lil
23  Payaso, Pesadilla, and another cooperator you will hear
24  about in a moment named Duende.
25           The plan was very similar to the plan to

kill Lagrima.  Once again, the gang planned to lure the
victim to Holmes Run Park, telling him that there would
be a gang meeting, that he had violated various minor
rules -- even more minor than the $600 and sleeping with
someone's girlfriend -- and that he should have a --
that he should have a *calentón*.  And then instead of the
*calentón*, instead of beating him, they would kill him.

And Slow will tell you that that is exactly
what they did, that on the night of March 29th, 2014,
they lured Lil Guason to Holmes Run Park.  Slow was
there.  Lil Poison was there.  Leopardo was there.  Lil
Payaso was there.  Pesadilla was there.  And Solitario
was there.

Solitario was another *chequeo* at the time.
He was rising up in the gang, just like Slow had been
rising up in the gang at the time of Lagrima's murder.

And with these gang members all there, in
addition to Slow and Duende, the other cooperator you
will hear about, they told Lil Guason that he was to
receive a *calentón*.  And so Lil Guason got to the center
of the group, someone began counting, they began beating
him, and then they began stabbing him.

They jumped on him, starting first with
Pesadilla.  Pesadilla attacked him and, in his own words
in a recorded call later with Junior, "We dropped in on

1   him with the excuse that we were going to correct him,

2   you know, right?  Because he needed to, to take care of

3   the 600 bucks that day, you know.  And then, that's when

4   we hit him.  I was calm with the knife in my hand."

5            Pesadilla stabbed him.  Lil Poison stabbed

6   him.  Leopardo stabbed him.  Lil Payaso stabbed him.

7   Solitario stabbed him.  And Slow stabbed him.  They

8   stabbed him again and again in the back and in the neck.

9   And then they cut off his head.

10           As Leopardo said, in a recording with

11  Junior -- and forgive the language -- "We chopped that

12  fucker's head off."

13           Once he was dead, they took his severed

14  head, they put it in a canvas bag, and they carried his

15  body and the head to a shallow grave that they dug

16  earlier.  You'll hear that they dumped in his lifeless

17  body.  They dumped in the head; and that although he was

18  small, he didn't fit in the hole.  And so Duende took a

19  pickax and chopped at his legs so they could bend them

20  over on top of the body.  They buried him beneath dirt

21  and rocks.

22           You'll learn that the FBI was able to

23  recover these bodies, the bodies of Lagrima and Lil

24  Guason.  The FBI was able to do this with the help of

25  Junior.

1          Junior will tell you that as he heard more

2     and more about these murders, as he began to believe

3     that they had actually happened, he grew determined to

4     find the bodies for their families.  And so he began

5     talking more and more to these defendants, and

6     particularly Leopardo, who lost no opportunity to

7     describe the murder of Lil Guason in great detail.

8          And eventually, Leopardo was able --

9     eventually, Junior was able to convince Leopardo to lead

10    him to the place where they had killed Lil Guason and to

11    the location where the gang had reburied Lagrima.

12         You'll get to see some of this on tape,

13    because that day Junior wore a body wire with a video

14    camera.  And on video, you will see Leopardo leading

15    Junior to these burial sites in Holmes Run Park.

16         After Junior successfully convinced Leopardo

17    to do this, the FBI recovered the bodies.  They dug them

18    up.  You'll see pictures, the rocks and the dirt and the

19    mutilated bodies, Lil Guason's head in a bag.

20         Drs. (sic) DiAngelo and Drs. (Sic) Hunt, who

21    did the autopsy and examined the body, the medical

22    examiner and the forensic pathologist, they'll describe

23    these injuries to you.  They'll describe how Lagrima's

24    jaw was slashed off his face from being slashed with

25    that machete.

1        They'll tell you about stab wounds so hard
2  and so deep that they cracked bone; that Lagrima's skull
3  was cracked; the numerous, countless stab wounds on Lil
4  Guason's back and neck; the severed head; his broken,
5  mutilated legs.
6        You will also hear about these murders from
7  someone named Duende.  Duende is another cooperating
8  defendant.  His full name is Jose Del Cid.
9        Duende, ladies and gentlemen, is no
10  choirboy.  He will testify he has pled guilty to murder
11  in aid of racketeering.  And he will tell you himself
12  that he was recruited into the gang as a young boy in El
13  Salvador, that he has committed a great number of
14  murders, that he has engaged in significant acts of
15  violence on behalf of this gang, including the murders I
16  described, but others as well.
17        Duende is no choirboy.  But he was there.
18  He knew -- he was there for everything.  He knew about
19  the plot on Peligroso.  He was there for the murder of
20  Lagrima and Lil Guason, and he was there for the third
21  murder of Julio Urrutia.
22        Duende will sit on that stand and he will
23  describe the murders of Lagrima and Lil Guason.  His
24  testimony will corroborate Skinny and Slow.  He will
25  tell you the who, what, when, where, why, and how.

1         And then he will tell you about the murder
2   of Julio Urrutia.  He will tell you that on the night of
3   June 19th, 2014, he was in Alexandria, in the Chirilagua
4   neighborhood, which is up near the intersections of
5   Russell Road and Mount Vernon.
6         He will tell you that night he was out with
7   a group of MS-13 members and recruits and general
8   associates.  These people included Genaro Sen Garcia,
9   nicknamed Gatuso, who is the last cooperating defendant
10   you will hear from.
11         In addition to Duende and Gatuso, with them
12   that night was Defendant Jesus Alejandro Chavez, Taliban
13   or Chuy; also, Taliban's sister, Lala, and a *chequeo*
14   named Sixto Solano.
15         Duende and Gatuso will tell you that they
16   went out that night in the Chirilagua neighborhood of
17   Alexandria looking for rival gang members, whom the gang
18   calls *chavalas*.  They went out looking for a fight.
19   You'll hear that the defendant, Taliban, and Gatuso,
20   were both armed with knives.
21         You will hear that they saw some people that
22   they thought were members of 18th Street, one of the
23   rival gangs of MS-13; that they tried to challenge these
24   members.  But after trying to challenge them, they
25   failed.

1        And so they saw some other young kids, and
2   they gave chase to them.  They chased them down the
3   street.

4        At this point the four people involved were
5   Duende and Gatuso, Defendant Taliban, and the *chequeo,*
6   Sixto Solano.  They gave chase, but they lost the people
7   that they were chasing.

8        And so then, Defendant Taliban brought the
9   other three to a nearby apartment building.  Taliban,
10  Chuy, went inside, went into an apartment, and came out
11  with a gun.  He came out with a gun and black gloves,
12  which he was wearing on a hot June night.  And you'll
13  hear that he said something like, "Now they'll know who
14  they're dealing with."

15       And so the group of these four young men
16  continued back towards Russell Road, where they had been
17  giving chase to the young boys.  You'll hear that
18  Duende, Gatuso and Taliban told the *chequeo*, Sixto
19  Solano, to get lost, to take off.  Because luckily for
20  Sixto Solano, for whatever reason, this time, in this
21  murder, the *chequeo* wasn't invited.

22       So Sixto left, and Taliban, Duende and
23  Gatuso, continued down the street.  In front of them
24  they saw a group of young men, which includes the
25  victim, Julio Urrutia.  As they approached, they flashed

1   their gang signs and they challenged the group about

2   their gang affiliation.

3               They argued with this group, including Julio

4   Urrutia and an innocent bystander, Vidal Jimenez.  And

5   then as the altercation increased, Taliban took out the

6   gun and shot Julio Urrutia point blank in the neck.  He

7   died at the hospital two days later.

8               Now, you'll hear that the police were unable

9   to recover that gun or the bullet or the shell casing.

10  But both Duende and Gatuso, and Vidal Jimenez, their

11  testimony will establish and prove beyond any reasonable

12  doubt that the shooter that night, the person who

13  murdered Julio Urrutia, was Defendant Jesus Alejandro

14  Chavez.

15              They will all agree that the bigger guy --

16  and you'll hear and see that Taliban was bigger than

17  Gatuso and Duende -- that the bigger guy with the black

18  gloves, Taliban, shot and killed Julio Urrutia.

19              And then you will hear that after the

20  murder, Taliban lost no time talking about being jumped

21  into this clique of PVLS, and you'll hear about that in

22  another recorded call with Junior.

23              Over the course of this trial, the

24  government will prove to you that these defendants,

25  these seven defendants, members and associates of MS-13

and the PVLS clique, along with other gang members,
committed the four violent offenses I've described, the
murder (sic) and the three murders.

We will prove beyond any reasonable doubt
that Greñas, along with Payaso, Demente and others
conspired to kill Peligroso with machetes or a firearm;
and that Greñas committed that murder -- or, excuse
me -- attempted to commit that murder on October 1st,
2013.

We will prove that Greñas, Lil Payaso, along
with Skinny, Slow, Duende and others, then murdered
Lagrima.

And we will prove that Lil Payaso, Lil
Poison, Leopardo, Pesadilla and Solitario, along with
Slow and Duende, murdered Lil Guason.

And finally, we will prove that Taliban,
along with Duende and Gatuso, murdered Julio Urrutia.

We will prove that each of these defendants
committed their respective acts of violence, their
murders, for the gang to gain, maintain or increase
their status in a gang that glorifies violence above all
else and rewards those who engage in it.

For that, these defendants are charged with
violent crimes in aid of racketeering.  And at the end
of this case, we will come to you and we will ask you to

do justice for Peligroso, who lived, and for Nelson Omar
Quintanilla Trujillo, Gerson Adoni Martinez Aguilar, and
Julio Urrutia, who did not.  We will ask you to do
justice for the victims and to find these defendants
guilty.

            Thank you.

            THE COURT:  Why don't we all get a stretch
before the next argument, which is about 20 minutes, and
then we will take a break.

            You can stand.  I just want to give you a
chance to stretch.  I need to stretch myself.  The next
argument is about 20 minutes.

            (Pause.)

            THE COURT:  You may be seated.

            Counsel, you may proceed.

            MR. LEIVA:  Thank you.  May it please the
Court.

      OPENING STATEMENT BY DEFENDANT LOPEZ TORRES

            MR. LEIVA:  Good morning, ladies and
gentlemen of the jury.  Once again, my name is Manuel
Leiva.  My co-counsel is Robert Jenkins, and we
represent Mr. Lopez Torres.

            Back in 1980, a small country in
El Salvador -- in Central America, El Salvador, a civil
war started.  The country is about the size of

1    Massachusetts.  And at the time the civil war started,

2    there were about 5 million people living in El Salvador.

3                   The country was controlled by a ruthless and

4    very oppressive government that used its military, its

5    police force and death squads to terrorize the

6    population, to quell any opposition and to maintain

7    power.

8                   Most of the population of El Salvador lived

9    in poverty.  El Salvador's economy was based on

10   agriculture, so most of the people who lived in poverty

11   were farmers.  And the people who owned the wealth in

12   the country were rich landowners, who the government

13   supported, and they in turn supported the government.

14                  A segment of the population rose up in arms

15   against this oppressive government, and a civil war

16   started.  Two years into the civil war, the

17   insurgency -- or people called them guerrillas back in

18   the '70s and '80s -- were about to take power from this

19   oppressive government.  The United States intervened,

20   propped up the government, and sent military advisors,

21   weapons and aid totaling about a million dollars a day

22   to this small impoverished nation.  As a result of that,

23   the war extended for another ten years, and the El

24   Salvadoran civil war lasted for 12 years.

25                  With the infusion of the money from the

1   U.S., the government became more ruthless.  Death squads

2   became more active.  Any political opposition was

3   executed.  Nuns were killed.  The archbishop of El

4   Salvador was murdered in cold blood.  Foreign

5   journalists were executed.

6            As a result, thousands, tens of thousands of

7   Salvadorans fled the civil war.  And a segment of that

8   population of refugees that fled the civil war landed in

9   California, specifically in Los Angeles.

10           Given that they were refugees and were of

11  poor means, they lived in neighborhoods in Los Angeles

12  that were economically deprived, that were controlled by

13  gangs, and that had high crime rates.

14           These new arrivals, these new Salvadoran

15  refugees, found themselves in these neighborhoods, being

16  victimized once again, but this time by a different

17  force, the force being these gangs, these entrenched LA

18  gangs.

19           So what they did is, they decided to form

20  their own group to defend themselves.  This new group

21  that formed morphed into what is now MS-13.

22           Now, the government made a mention of the

23  horn that you will see displayed, I'm assuming, by some

24  of the government's witnesses, and you may see some

25  pictures of it.  And they make reference that MS-13 is

1   involved in satanic rituals.

2           But you will hear from the government's own
3   witness, if indeed that person is an expert in MS-13,
4   that this core group of individuals that formed MS-13 in
5   LA were hardcore -- hardcore metal fans, or what we
6   called back in my day, head-bangers, and they listened
7   to hard rock music.  And they adapted into their lexicon
8   and nomenclature certain symbols that were prevalent
9   back in the days of heavy metal.  And one of those was
10  this particular sign.  And I'm expecting that the
11  government's witness will explain that to you.

12          So, we had these refugees that escaped from
13  the civil war.  Twelve years later, the war ends in
14  El Salvador.  In the early '90s -- and that's around the
15  time, '92, when the war ended, around that time the U.S.
16  started mass deportations of these individuals who were
17  involved in criminal activity.  And there were mass
18  deportations of gang members, be they 18th Street gang
19  members or MS-13 gang members.

20          After the war in El Salvador, El Salvador
21  was basically left in ruins.  Its economy was in
22  shambles.  The societal infrastructure was in shambles,
23  and the safety nets that once existed in El Salvador
24  were no longer there.

25          The government of El Salvador was

1    ill-prepared to absorb these vast numbers of people that
2    were being deported from the United States and who were
3    bringing this gang culture with them that was foreign to
4    El Salvador.  Foreign did not -- El Salvador did not
5    have a gang problem until the mass deportations from the
6    United States, specifically from LA.
7                So, why am I telling you this?  Why am I
8    giving you this brief historical perspective?
9                Because Lopez -- Mr. Lopez Torres was born
10   and raised into this culture of a country that was
11   recuperating from a destructive civil war and was now
12   being hit with gang culture that did not exist before.
13               And as the government mentioned in opening
14   statements, it's a gang culture which held up violence.
15   And as a result of being raised in that culture, you had
16   to be a tough guy.  You had to exhibit a sense of
17   bravado.  You had to, in other words, talk a big game.
18   Because that is what is respected and expected in that
19   kind of culture.
20               Why am I telling you this?
21               Because you're going to hear evidence,
22   you're going to hear witnesses give testimony of
23   statements that my client made, or allegedly made, which
24   to some of you will -- will sound violent in nature.
25               But what I would submit to you is that all

1  this bravado that he talks, all this tough talk that he
2  talks, all this persona of him being this big shot, was
3  just that.
4          You will hear no evidence whatsoever from a
5  witness that Mr. Lopez Torres stabbed anybody, that he
6  cut anyone, or that he otherwise wounded anyone.  You
7  will also have forensic evidence which will show that
8  nothing could be tied to him.
9          The people that did the stabbing, the people
10  that participated in the mutilation, are now the
11  government's witnesses, whereas Mr. Lopez did not
12  participate in that activity.
13          And just to refresh your memory -- because I
14  know the government had a very lengthy opening
15  statement -- Mr. Lopez Torres is only charged with four
16  counts.  The first three counts deal with an attempted
17  murder of a guy name Peligroso, which in Spanish means
18  danger, who is an MS-13 member.
19          The last count deals with a murder of
20  Lagrima, which Lagrima in Spanish means teardrop.  And
21  I'm assuming you're going to hear evidence that the
22  reason they called him that is because he had a teardrop
23  on his face and, of course, Lagrima was also a very
24  notorious MS-13 gang member.
25          The first three counts, as I mentioned, deal

1  with an attempted murder of Peligroso, or Danger, as he
2  was called.

3           The government told you that Drowsy -- and
4  the way they brought it up was that Drowsy, out of the
5  goodness of his heart, came forward and said that he
6  wanted to go ahead and work as a confidential informant
7  for the police, because he did not want this hit to go
8  down, or this *calentón* or whatever it was, to go down
9  against Peligroso.

10          What the government doesn't tell you, and we
11  expect will come out in the evidence, is that Drowsy is
12  the one that planned that attempted hit.  Drowsy is the
13  one who submitted Peligroso's or Danger's name as a
14  person who should be hit.  Drowsy is the one who had
15  every motive in the world to make sure that something
16  was done to Peligroso.

17          Why?  Because Drowsy suspected that the
18  reason why he was sent to prison for a number of years
19  was because Peligroso was a snitch.

20          And in any of these calls that you will
21  hear, you will not hear Mr. Lopez Torres at all mention
22  that Peligroso should be hit.  You do not hear
23  Mr. Lopez Torres at all mention any motive why he thinks
24  they should punish Peligroso at all.  It's all Drowsy.
25  And Drowsy held a very high position in MS-13 because of

1   his length of membership in MS-13, but because he also
2   served prison time for a crime, which he suspected
3   Peligroso had snitched or, you're going to hear the
4   word, ratted him out.

5          You're going to hear Drowsy on the phone
6   with other leaders of MS-13.  And you'll hear that the
7   way MS-13 is structured, if you're a low-level player in
8   MS-13, you can't voice opposition or objection to
9   something that's being planned.  Because if you do,
10  that's viewed as weakness on your part, and then you may
11  have a target on your back, if you say, "You know what,
12  why are we doing this?"

13         And you'll hear these phone conversations
14  where it's Drowsy that's pushing this, Drowsy is pushing
15  it.  And some of you will maybe wonder, while this is
16  going on, why would Drowsy do this and then at the same
17  time go to the police and uncover this plot?

18         Because of the benefits that Drowsy's going
19  to receive.  And you're going to hear of the benefits
20  that not only Drowsy has been promised, and is
21  receiving, but also the benefits that the other
22  co-defendants in this case have been promised and, I'm
23  assuming, are receiving right now.

24         The last count that Mr. Lopez Torres is
25  charged with is the murder of Lagrima.  The government's

witness -- and this is a case where the government has really scraped the bottom of the barrel as far as witnesses go.

Ms. Martinez mentions Mr. Jose Del Cid, known as Duende, and she says that Duende is no choirboy.

Duende is a pathological serial killer. Duende has been involved in two murders in this country, and he will tell you that before the age of 18 he was involved in four or five murders in El Salvador.

But Duende is not going to serve life in prison.  And you'll hear that Duende may never even face the charges in El Salvador for the murders that he's committed.  You'll hear that he's in witness protection, and you'll hear of other benefits that he is receiving.

And Duende, if -- and I know Ms. Martinez threw a lot out there to give you kind of a guide of what's going to be presented -- Duende is involved in every single aspect of this case.  He's involved during the planning stages of the Peligroso hit.  He's involved in the murder of Lagrima.  He's involved in the murder of Gerson Martinez.  He's involved in the shooting in Chirilagua.

But he's got a deal.  He's going to walk out of prison.  And we'll hear more about what kind of

1   benefit he's going to get.  And the government is using
2   him to point the finger at someone who you're not -- who
3   you're going to hear -- or you're not going to hear
4   evidence of -- person who did not stab anyone, did not
5   hit anyone with the machete, did not wound anyone.
6           But the government chooses who they're going
7   to cut deals with, and the government chooses how
8   they're going to present their case, and they decided to
9   cut a deal with Duende.
10          You'll also hear about another co-defendant,
11  Skinny, who the government cut a deal with, who is going
12  to testify.  Skinny was involved in the Lagrima murder,
13  and Skinny had an active role in the Lagrima murder.
14          You'll hear that Skinny was involved in the
15  shooting that happened in the Culmore neighborhood.
16  You'll hear that Skinny was a main narcotics guy for
17  this clique, meaning that he sold drugs.  He sold
18  weapons.
19          But more shocking and more important about
20  Skinny is that while Skinny is in jail for some other
21  crimes that, again, he's not going to be charged with,
22  because that's the deal that he cut with the government,
23  while he's in jail, you're going to hear that Skinny
24  ordered the hit of Gerson Martinez.
25          And Gerson Martinez is the young man who was

1   decapitated.  That hit was given by Skinny because

2   Skinny at the time was the leader of this group.  But

3   again, Skinny is going to get a deal.

4            That's just basically a very rough overview

5   of some of these players and what you're going to hear.

6   And the reason why I focused on some of the cooperating

7   co-defendants is because when you assess credibility,

8   you're looking at who you should believe, and you look

9   at the motive to fabricate.

10            And Duende and Skinny combined have so much

11   blood on their hands that they have every motive in the

12   world to cooperate and to fabricate, to exaggerate,

13   because their level of cooperation depends on how much

14   information the government deems valuable.  The more

15   valuable your information, the better the deal you get.

16            And specifically referring to Mr. Lopez

17   Torres, again, you'll see or you'll hear that he is the

18   one who didn't do any of that stuff that Duende, Mr. Del

19   Cid or Skinny or other people were involved with.

20            Judge Lee instructed you early on --

21            THE CLERK:  Five minutes.

22            MR. LEIVA:  Yes.

23            -- to withhold your judgment until the case

24   is done.  And, of course, we ask that you do that.

25            And I also ask that you remember the

1   presumption of innocence.  That's a word that's so

2   thrown around, I think, that some of us sometimes don't

3   appreciate what that really means.

4              And, our founding fathers were wise to make

5   sure that every person tried in our system enjoyed the

6   presumption of innocence.

7              Why?  Because the state has enormous

8   resources.  And to hold that someone accused of a crime

9   has to prove their innocence would pit an individual

10  against the vast resources that a government has.  So,

11  our founding fathers were wise in that sense.

12             And as we go through this trial, you need to

13  ask yourself -- and, of course, once you get the case

14  submitted to you, you need to ask yourself whether the

15  government has, indeed, proven the case beyond a

16  reasonable doubt against Mr. Lopez Torres.

17             So, once again, ladies and gentlemen of the

18  jury, it's going to be a long trial.  There's going to

19  be some pretty graphic evidence that's going to be

20  submitted.  But we just ask that, as triers of fact,

21  that you just withhold your judgment until the case is

22  submitted to you.

23             Thank you.

24             THE COURT:  Ladies and gentlemen, we have

25  several more opening statements to go through.  We're

1   going to break for lunch now for one hour.

2          Please listen to me very carefully.  Do not

3   discuss the case.  Don't permit the case to be discussed

4   in your presence.  Leave your notes in the jury

5   deliberation room.

6          Remember what I said about seeing people on

7   the elevator.  They're not going to speak.

8          We will resume at 2:00 o'clock.  Thank you.

9          (Jury not present.)

10          THE COURT:  Counsel, the Fourth Circuit just

11   ruled on one of the appeals we have.  You should all

12   read the opinion.  We will talk about it when we come

13   back.  Thank you.

14          (Court recessed at 12:59 p.m. and reconvened

15          at 2:07 p.m.)

16          (Jury not present.)

17          THE COURT:  Mr. Aquino, do you have a

18   request?

19          MR. AQUINO:  We do, Judge.

20          We are having another witness issue.  I

21   don't know if the Court remembers, on the October 20th

22   depositions in this case, there was a gentleman that the

23   Court recognized by the name of Luis Rodriguez.

24          THE COURT:  Right.

25          MR. AQUINO:  And he is not here.  And so I

 1   would ask the Court to instruct the marshals to find
 2   him.
 3              I don't have an address to give them.  If
 4   you remember, the government was the one that subpoenaed
 5   him last time, per the Court's order.  So, they have an
 6   address to give the marshals to direct them to.
 7              THE COURT:  All right.
 8              Can you all do that?
 9              MS. MARTINEZ:  Your Honor, I can inquire,
10   but I'm not sure that we have a valid address for him.
11   And we have not been in touch with him since that
12   deposition, Your Honor.
13              THE COURT:  Okay.
14              Well, my plan would be to issue a rule to
15   show cause and to ask the U.S. Marshals to serve him,
16   and ask the government to see if you have any
17   identification address for him.
18              MS. MARTINEZ:  Yes.  If we have anything, we
19   will certainly pass it on.
20              THE COURT:  And let Mr. Aquino -- let me
21   know as well.
22              There are two observations I want to make.
23   One has to do with screening.
24              I made a judgment to screen everybody that
25   comes in and out of the courtroom.  And when I say

everybody, that means law clerks, that means jurors, and
that means all the parties and the lawyers in the case.

The only exception that would be, that there
are, I think, two law enforcement officers who have been
screened downstairs, and no weapons are in the
courtroom, and so I'm not making them go through the
second screening.  But everybody else is going to be
screened.  That's just the way it's going to be.  Given
what taken place at the Capitol yesterday, I'm just not
taking any chances.  This is the world we live in now.

The second thing is, I understand that I
should offer every juror a headset, and I will do that,
to see if anybody wants to take it.

Is there anything else I need to take up
before I bring the jury out?

MR. ZIMMERMAN:  Two things, Your Honor.  One
was, the Court had asked us to consider the Fourth
Circuit's ruling.

THE COURT:  It really only applied to
Mr. Salvato's and Mr. Amolsch's client.  It doesn't
apply to everybody else.  It has to do with a juvenile
appeal.  But it's been -- the opinion is -- is unsealed.
It's published.  We're happy to give you a copy.  It has
nothing to do with your clients.

MR. ZIMMERMAN:  If I might?

1          THE COURT:  Sure.

2          MR. ZIMMERMAN:  I think it was just

3   unsealed, Your Honor, so I haven't had a chance to read

4   it, but I'm familiar with the substance and the long

5   fight.  And I appreciate that, Judge.

6          THE COURT:  Let him have it.

7          MR. ZIMMERMAN:  You know, in the pleading

8   practice -- and there was significant pleading practice

9   in this -- and the ruling to refer to Cerritos and Cerna

10  as Homeboy One and Homeboy Two with respect to Count 4,

11  my concern based on this ruling and based on the

12  government's opening today, is that the joinder of us in

13  this trial is Count 5 is unfairly prejudicial.

14         So, what I'm doing is I'm moving the Court

15  to sever our client and Count 5 -- Count 5 is the

16  reburial of Lagrima -- from this trial.

17         My concern is that the two murders and

18  burials in the same park, Lagrima and Gerson, are so

19  closely related and, in fact, were sort of closely tied

20  together and somewhat conflated in the government's

21  opening, that there's a risk of confusing that our

22  client, who is not charged in the Count 4 murder -- he

23  is charged in the reburial -- could nonetheless be

24  prejudiced by the misperception that he was present at

25  the murder.

1        THE COURT:  Mr. Zimmerman, do you recall I
2  had motions scheduled in this case?
3        MR. ZIMMERMAN:  I do, Your Honor.
4        THE COURT:  And, the motions are now over.
5  You do realize that, don't you?
6        MR. ZIMMERMAN:  I do that, Your Honor.
7  But --
8        THE COURT:  So this is not new information
9  to you, is it, what the charges are for your client?
10       MR. ZIMMERMAN:  Well, the two things that
11 are new that have happened today is that we have this
12 Fourth Circuit ruling, and --
13       THE COURT:  That has nothing to do with your
14 client.
15       MR. ZIMMERMAN:  Well, it does in the sense
16 that -- and we have the ruling by the Court of Homeboy
17 One and Homeboy Two, so we have the dismissal against
18 Cerritos.
19       My concern is that -- is that my client --
20 he could be smeared, if somewhat implicated, in Count 4.
21 And so, for example, if we ask the witnesses testifying
22 about Count 4, "Was my client there?  Was Mr. Gaitan
23 Benitez there," would that contravene the Court's orders
24 in any sense or spirit?
25       Because, by process of elimination, those of

1   us who are not Cerritos and Cerna could ask each

2   witness, "Well, my client wasn't there.  My client is

3   not Homeboy One and Homeboy Two."

4               THE COURT:  Are you asking me for advice

5   about what to ask --

6               MR. ZIMMERMAN:  I'm asking if the Court

7   would see that as a violation of its order.

8               THE COURT:  It doesn't seem to be to me.

9               Does the government think -- I don't think

10  it is.  There are several individuals who are not before

11  the Court who were charged, so I don't think that that

12  necessarily points to any particular individual in the

13  courtroom.

14              MR. ZIMMERMAN:  Okay, Your Honor.  I

15  guess -- I guess for the record, our concern is that --

16              THE COURT:  Wait a minute.  Ms. Martinez

17  wants to say something.

18              MS. MARTINEZ:  Your Honor, I just want to

19  add that in addition to individuals who were charged in

20  the indictment, within the murder of Lagrima, Count 4,

21  there was at least one additional individual there who

22  wasn't charged in this indictment and isn't going to be

23  present in this case, but will be spoken about.  His

24  nickname is Lil Evil.

25              There will be testimony about other people

1   involved in this.  And so I don't think that saying

2   Homeboy One or Homeboy Two, or adding from Mr. Zimmerman

3   that Homeboy One and Homeboy Two aren't Pesadilla, is

4   going to imply that Homeboy One or Homeboy Two are any

5   of these individuals sitting here.

6              So, I don't -- I don't see that Your Honor's

7   orders or the Fourth Circuit in any way affects

8   Mr. Zimmerman's client, Mr. Gaitan Benitez, nor is there

9   any grounds whatsoever to sever.

10             Count 5 is an entirely separate count.  It's

11  about the reburial, the digging up of a body and

12  reburying in a different location.  It's separate from

13  the murder.  It happened on an entirely separate day.

14  And all of the government's evidence will establish

15  that.

16             THE COURT:  All right.

17             MR. ZIMMERMAN:  Your Honor, I guess I would

18  just add, with regard to that redaction, a concern -- I

19  mean, one way to make it cleaner and -- would be to call

20  them Person One and Person Two.  That would be both

21  gender neutral.  And I know there's some case law, I

22  think it's *United States versus Gray* --

23             THE COURT:  Mr. Zimmerman, motions are over.

24  I told you all before, we're in trial.  I'm in trial.

25  I'm not going to have the jury sitting while we're doing

motions.  I gave you all motions days.  I gave you lots of time.

Let's bring the jury out.

Have a seat.  We're done.

I'm sorry.  Yes?

MR. CRAWLEY:  One question.  Dwight Crawley.

THE COURT:  Yes, Mr. Crawley.

MR. CRAWLEY:  I just want to know, is the Court ordering a running transcript, such that we can have the transcripts produced daily.

THE COURT:  Oh, absolutely not.  No, I don't have any -- I just have a screen.  I don't have any transcripts.  No, I don't have a daily copy for you.

MR. CRAWLEY:  Okay.  Your Honor, our concern on behalf of Mr. Cerritos is the issue we raised earlier today.

We would like to get a copy of the transcript as relates to what was said specifically about our client in Count 4 as quickly as possible, because we would like to potentially brief that issue.

We can do it tonight, Your Honor.  But I know that's --

THE COURT:  I'm not going to have any emergency transcript done.  You were here.  I was here.  I've admitted what I did.  If you have another motion to

1   file, please file it.  But I'm not going to do it during
2   trial.
3            If you want to have a motions hearing on
4   Fridays, go ahead.  But I've given you all this time to
5   file motions.  I'm ready to try the case now.
6            So, your request is -- if you want to file a
7   motion for a transcript, go ahead.  If you want to file
8   a motion about the mistrial again, go ahead, and I'll
9   hear it on a Friday.  But I'm not going to do it right
10  now at trial.
11           Thank you very much for your patience.
12           MR. ZIMMERMAN:  The only other issue, the
13  second issue, Judge, briefly, is that my client believes
14  he saw Junior in the courtroom during the government's
15  opening.  And I wonder if there is any --
16           THE COURT:  Well, did you see him?
17           MR. ZIMMERMAN:  I wouldn't be able to
18  recognize Junior.  And, I mean, the gallery has a number
19  of people --
20           THE COURT:  I don't know who Junior is.
21           MR. ZIMMERMAN:  The government's witness.
22           THE COURT:  Was there a request for rule on
23  witnesses in the case made?
24           MR. ZIMMERMAN:  I believe there was.
25           THE COURT:  I didn't hear one.  Is there one

now, a request for rule on witnesses?

I never heard one.  Did you hear one?  I didn't hear one.

MR. ZIMMERMAN:  I believe there was.  We are certainly making it now.

THE COURT:  Oh, you're making it now.

MR. ZIMMERMAN:  I believe there was.

THE COURT:  Mr. Amolsch, I didn't hear one at the beginning of the trial.  Did you?

MR. AMOLSCH:  I believe you issued a rule on witnesses a few days ago.  I believe --

THE COURT:  During jury selection?

All right.  Are there any witnesses in the courtroom?  I don't --

Are there any witnesses in the courtroom, Ms. Martinez?

MS. MARTINEZ:  No, I don't think so.

Your Honor, you did put the rule on witnesses in place.

THE COURT:  Okay.

MS. MARTINEZ:  And I can attest that, no, the government's witnesses are not present in the courtroom.

THE COURT:  Okay.

Anything else?

1             MR. ZIMMERMAN:  Is the government's
2  representation that they weren't present during opening,
3  or they're not present now?
4             THE COURT:  There are no witnesses were
5  present in the courtroom, is what she said.  You want to
6  ask her again?  Ask her again.  Go ahead.
7             MR. ZIMMERMAN:  Well, the question is
8  whether or not Junior was here during her opening
9  statement, not whether there's any government witness
10  here now.  That's my question.  Because that's what my
11  client believes he saw.
12             THE COURT:  Okay.
13             Ms. Martinez, was any government witness in
14  the courtroom during opening statement?
15             MS. MARTINEZ:  To my knowledge, no
16  government witness was here during the opening
17  statement, with the exception of one of the law
18  enforcement agents who are sitting at the counsel table
19  with Your Honor's permission.
20             And, to my knowledge and to our law
21  enforcement officers' knowledge -- I just checked with
22  them -- the individual who Mr. Zimmerman is referring to
23  as Junior was not present in this courtroom during any
24  part of these proceedings, including opening statement.
25             THE COURT:  Thank you.

1        MR. ZIMMERMAN:  Thank you, Your Honor.

2        THE COURT:  You can bring our jury out,

3   Mr. Toliver.  Thank you.

4        (Jury present.)

5        THE COURT:  You may be seated.

6        Counsel for Alvin Gaitan Benitez, you may

7   proceed.

8      OPENING STATEMENT BY DEFENDANT GAITAN BENITEZ

9        MS. AUSTIN:  Your Honor, counsel for the

10  government.

11       Good afternoon, ladies and gentlemen.  As

12  I've stated before many times now, my name is Amy

13  Austin, and together with Jeff Zimmerman we represent

14  Alvin Gaitan Benitez.

15       THE COURT:  Ms. Austin, let me just offer --

16  my court reporter is wearing a headset.  If anyone is

17  having trouble, we have headset we can all use.  Would

18  anyone would like to have one?

19       No?

20       Yes, two.  Okay.  Just a second.  I have a

21  little speaker up here for me to hear it, so, a headset

22  is great.

23       Sorry, Ms. Austin.

24       (Pause).

25       THE COURT:  They don't work?  None of them

1  work?

2              I'm asking, do any of them work?

3              Everybody's okay?  All right.

4              Counsel, you may proceed.

5              MS. AUSTIN:  Thank you, Your Honor.

6              By now you know that this case involves

7  allegations of a very serious nature.  The government

8  has alleged that heinous crimes have been committed:

9  murders, burying of bodies, and other violent gang

10 activity.

11             But I implore you, do not let the nature of

12 the allegations cause you to presume anything about my

13 client, Mr. Gaitan Benitez.  Instead, listen to the

14 evidence; not the allegations, but the evidence.

15             And what the government is going to present

16 to you by way of evidence consists of testimony by

17 witnesses that they have referred to as murderers.

18 They're government witnesses.  Some of them are paid

19 government witnesses.

20             Some of them have received thousands of

21 dollars, and continue to receive that kind of money to

22 come into court and testify on behalf of the government.

23             Their motivation is self-preservation.

24 They've all committed crimes and they're all testifying

25 in an effort to escape punishment.  So, listen to their

1    testimony and weigh it against the motivation they have.

2              Now, the government has charged Mr. Gaitan

3    Benitez with just two crimes, Count 5 and Count 6.  And

4    the government outlined in detail for you, Count 5 is

5    alleged to have occurred in October of 2013.

6              And the government went down the list of

7    people who were in charge of the PVLS clique during that

8    period of time.  Mr. Gaitan Benitez was not mentioned.

9              And the government outlined in detail for

10   you who was in charge of the PVLS clique in March of

11   2014.  Mr. Gaitan Benitez was not mentioned.

12             Let's go through some of the witnesses that

13   the government is going to present.  One of them is

14   named Junior.  The government has already referred to

15   him.  He's been testifying now for a number of years,

16   cooperating with the government, being allowed to stay

17   here in this country as long as he continues to

18   cooperate with the government.  He's paid sums of money

19   to come in here and testify.

20             But, what's more important than those

21   factors is that he does not have first-hand knowledge of

22   anything that happened in this case.  All he knows is

23   what people have told him and what -- the conversations

24   he had on the telephone with members of the gang.

25             My client is on the phone with Junior one

1   time.  And the government has already described to you

2   gang culture, that it involves a lot of bragging.  It

3   involves a lot of blustering, trying to promote

4   yourself, increase your reputation in the gang.

5           And consider the one phone call that

6   Mr. Gaitan Benitez is on.  It falls right in line with

7   gang culture of blustering and bolstering and false

8   bravado.

9           Now let's talk about another witness, Jose

10  Del Cid, also known as Duende.  He is certainly a

11  murderer.  He was involved in two of the murders in this

12  case.  He was involved in other murders not charged in

13  this case.  He has his hand in almost every crime

14  alleged in this indictment.

15          And when it looked like his future was

16  pretty grim, he decided that he was going to testify for

17  the government.  All of a sudden a person who spent a

18  lifetime killing is now a star witness for the

19  government, and is here because he does not want to

20  spend the rest of his life behind razor wire.

21          Another witness, known as Buso, will be

22  brought in here by the government to testify.  Buso

23  knows nothing about this case, does not know who

24  Mr. Gaitan Benitez is; but he was involved in a murder

25  back in 2005, was prosecuted, and received a life

1   sentence.

2          But because he has begun to cooperate with
3   the government and appear as a witness in cases, he is
4   now serving a 15-year sentence.  He has around four
5   years before he's released.  But he's still paying off
6   his debt to the government, so his motivation for coming
7   in here and testifying is self-preservation.

8          And, I also submit to you that he's also
9   being brought in here for effect.  Once you see him,
10  you'll understand what I'm saying.  But don't let his
11  appearance sway you in your weighing of the evidence
12  that the government presents in this case.

13         Some key evidence to look for with regard to
14  Mr. Gaitan Benitez and the charges against him -- again,
15  as I stated, the government has outlined who the people
16  were in charge, who was calling the shots.  And
17  Mr. Gaitan Benitez is not mentioned during the periods
18  of time for the crimes that he's charged with.

19         After the murder of Gerson in March 2014,
20  many individuals who were involved in that crime fled
21  the State of Virginia.  Mr. Gaitan Benitez did not go
22  anywhere.

23         You're going to hear inconsistent testimony.
24  You're going to hear many people on the telephone, in
25  conversations, taking responsibility for some of the

1  crimes alleged in this case; the witnesses coming in

2  here giving their version of what happened in each of

3  the different crimes in this case.

4          The government's burden is to prove to you

5  beyond a reasonable doubt that my client committed the

6  very serious charges contained in Count 5 and Count 6.

7          Inconsistent testimony, lack of direct

8  evidence, lack of physical evidence, and testimony from

9  witnesses who are doing nothing but saving themselves

10  does not amount to proof beyond a reasonable doubt.

11          As jurors in this case, I'm sure you suspect

12  by now that this is not going to be easy.  The jury

13  selection process was very long and involved.  The trial

14  is going to be long.  The evidence, the photographs, the

15  testimony is going to be difficult to hear at times, and

16  very difficult to see at times.

17          But, please, once the dust has settled, once

18  you're able to digest the evidence and get past the

19  natural emotional response you're going to have to a lot

20  of evidence that you see, consider whether the

21  government has proven its case of Count 5 and Count 6

22  against Mr. Gaitan Benitez.

23          And I submit to you that the evidence will

24  fall woefully short of showing that he's guilty and, in

25  fact, it will show that he was not involved in these

1   crimes, and you will return a verdict of not guilty.

2              Thank you.

3              THE COURT:  Counsel for Christian Lemus

4   Cerna.

5              MR. AMOLSCH:  May I move the podium a little

6   bit, Judge?

7              I'm sorry.  May I move the podium?

8              THE COURT:  I don't think it moves.

9              MR. AMOLSCH:  It rolls a little bit.

10             THE COURT:  Okay.  You can angle it, sure.

11             MR. AMOLSCH:  To make it easier for

12  everybody.

13             THE COURT:  All right.

14       OPENING STATEMENT BY DEFENDANT LEMUS CERNA

15             MR. AMOLSCH:  Good afternoon, ladies and

16  gentlemen.  My name is Christopher Amolsch and I

17  represent Mr. Cerna, who is right there --

18             Please stand.

19             -- in the back row, along with my

20  co-counsel, Mr. Salvato.

21             Mr. Cerna is charged in only one count of

22  this indictment.  He's charged in Count 6, which, as the

23  government told you, is murder in aid of racketeering of

24  Gerson Aguilar.

25             The judge read you some preliminary

1  instructions about what the government has to show and

2  the elements involved, and I'm going to read to you from

3  that instruction.

4          The judge read to you that on or about

5  March 29th, 2014 for the purpose of gaining entrance,

6  maintaining, increasing position in MS-13, that my

7  client murdered or aided and abetted in the murder of

8  Gerson Aguilar.

9          Now, there's two parts to that.  They don't

10  just have to prove to you beyond a reasonable doubt that

11  Mr. Cerna murdered or aided and abetted in the murder of

12  Gerson Aguilar.  They have to show you that he did it

13  for a particular purpose, murder in aid of racketeering,

14  which again is gain entrance, maintain position,

15  increase position.

16          I want to talk about this last part first,

17  as it relates to Mr. Aguilar's murder, because not every

18  murder is a federal murder.

19          The government has already told you, and

20  will allege, that my client, Mr. Cerna, was allegedly a

21  member of MS-13 at the time of Mr. Aguilar's death.

22          He did not -- the evidence will show he did

23  not gain entrance by murdering anybody, but that he was

24  beaten into -- I believe the government's evidence will

25  show this -- back in 2012, 2013, along those lines.

        Now, the evidence will show that the purpose
and the reason for Mr. Aguilar's murder was not to
maintain, increase his position within the gang.

        The reason that he was murdered, as the
government alluded to, is the oldest reason in the book.
It's because Mr. Aguilar made the mistake of sleeping
with the wrong woman.

        The evidence will show that Mr. Aguilar was
associated with MS-13.  I believe the government said
they will show you that he was a *chequeo*, somebody who
was associated the group but not a full-on member yet;
and that his day-to-day duty, I believe the government
said or the evidence will show, was selling drugs, that
that's what he did.

        The evidence will also show that he was
pretty bad as this, that he would lose the money, that
he would take the drugs that he was supposed to be
selling and he would use them, and as a result he would
be punished for this.

        Now, the government mentioned a little -- or
the government will mention, I believe, evidence
relating to another alleged member of the group, Lil
Evil.  Lil Evil had the same issue.  He would lose the
money, or the evidence will show he would smoke up the
marijuana that he was supposed to be selling; and that

1   he would be punished, he would be corrected, for doing
2   this.  And the punish was generally a beating, as the
3   government said, a *calentón,* for 13 seconds.
4           Now, the evidence will also show you that at
5   some point Aguilar came into contact with a woman named
6   Belen.  Her name is B-e-l-e-n.  I think it's Belen,
7   Belen, I'm not sure how it's pronounced.  She's the
8   girlfriend -- or was the girlfriend of one of the
9   government's witnesses, Skinny, Ayala Marquez.
10          Now, Mr. Aguilar not only got to know Belen,
11  but he eventually started using drugs with her.  And
12  Skinny found out about this, came home one day found
13  them locked in the bathroom together.  Belen wouldn't
14  open up the door.  Skinny finally managed to get in and
15  saw Mr. Aguilar running out the window.  He had just
16  escaped.
17          And this agitated and necessarily made
18  Skinny angry, and he asked that Mr. Aguilar be punished.
19  But for whatever reason, he wasn't.
20          Things settled down, and at some point
21  Skinny goes to jail.  I believe it was for selling
22  drugs, but he's in jail.  And while he's in jail, it's
23  decided that Aguilar will move in with Belen and look
24  out for her while Skinny is locked up, because he can no
25  longer take care of her.

1          And the evidence will show that before

2    Skinny goes in, he gives Belen money to pay the rent.

3    Takes his personal funds and says, "While I'm gone, here

4    is money for you to live on while I'm gone."

5          And the evidence will show that Aguilar did

6    two things:  that he took that money and used it to buy

7    drugs and smoke it with Belen, and that he started

8    sleeping with her.

9          Now when Skinny found out about this,

10   understandably, he took it very personally.  And he made

11   a phone call from the jail, which the government alluded

12   to, and he called, I believe the evidence will show,

13   Omar Castillo.

14          And I believe the government will play that

15   tape for you.  And in that conversation you will hear a

16   lot of talk about how Skinny is angry, but there is

17   no -- there should not be any discussion about gang

18   activity, but he is mad that Aguilar is sleeping with

19   his girlfriend while he's locked up.

20          So, he does what guys do.  He calls his

21   buddies, because he's going to solve it.  Now his

22   buddies are in the gang.  So, that's who he calls.  So,

23   he calls Mr. Castillo.

24          Now when he calls Mr. Castillo, Mr. Castillo

25   happens to be with another one of the government's star

1    witnesses, Jose Del Cid, who you will hear lots about.
2    Jose Del Cid was with Mr. Castillo when he got the phone
3    call from Skinny at the Fairfax jail, and he hears
4    Skinny talk about how mad he is at Aguilar, and that his
5    boys need to punish him and beat him for sleeping with
6    the wrong woman.
7                But you will not hear anything in that phone
8    call relating to the fact that Aguilar needs to be
9    killed for this.  This is not a green light situation.
10   This is, you're sleeping with the wrong woman.
11               And the government appears to agree
12   from (sic) this, because from the evidence it appears
13   that Skinny has not been charged with Aguilar's murder,
14   like not now, not ever.  It appears the only thing he
15   was charged with was another murder in this case, but
16   not this one.
17               So, in September of 2014, Mr. Del Cid is
18   interviewed by Detective Ignacio from the Alexandria
19   Police Department, and he's interviewed by a great
20   number -- about a number of things, because he's a
21   really bad guy.
22               In the conversation, they talk about
23   Aguilar's murder.  And during this interview, he says to
24   Detective Ignacio that the plan was never to kill
25   Skinny -- Aguilar; the plan was to beat him.  That was

1   the plan.

2           And he said this before he was facing

3   anything approaching the penalties he is facing here

4   now.  This is a conversation with Ignacio before he was

5   ever charged in Federal Court, before he ever pleaded

6   guilty to two counts of murder.  This is what he said

7   happened.

8           And he did say -- did agree that Aguilar

9   ending up getting killed.  And he talked about how that

10  happened.  But he never said anything about Mr. Cerna

11  stabbing him or executing any of the blows that led to

12  his death.

13          Now, Del Cid is what's known as an old head,

14  meaning, as the government told you, he has been around

15  forever.  He started in El Salvador, where I believe the

16  government will say the evidence will show that he like

17  dismembered a kid when he was like 12 years old.  And

18  this is a guy who has been in the gang for a long time.

19          And one of the government's -- one of the

20  instructions the government -- the judge read to you is,

21  again, the merely associating with others, discussing

22  common goals, mere similarity of conduct between and

23  among such persons, merely being present at a place

24  where a crime takes place or is discussed, or even

25  knowing about criminal conduct, in and of itself, does

1   not make someone a member of a conspiracy, does not make
2   them guilty.
3              As the evidence will show -- the government
4   will put into evidence a plea agreement between
5   Mr. Del Cid and the government, in which Mr. Del Cid has
6   pleaded guilty to two counts of murder, and that he is
7   facing two life sentences for that.
8              In addition to that, the government will
9   introduce evidence of what's called a statement of
10  facts.  A statement of facts is an agreed-upon factual
11  basis for the plea.  It's what the government agreed
12  happened and what Mr. Del Cid agreed happened as it
13  relates to the crimes for which he pleaded guilty.
14             Now, in this plea agreement -- in this
15  statement of facts, Mr. Del Cid and the government agree
16  that Aguilar did, in fact, get decapitated, but that it
17  happened after Aguilar was already dead.  That's what
18  the statement of facts says.  Mr. Aguilar was killed,
19  and after he was dead he was then decapitated.
20             So, any evidence you may hear about
21  Mr. Cerna allegedly taking off somebody's head, you will
22  know that everybody agrees that Mr. Aguilar was already
23  dead when that happened, and Mr. -- and that
24  decapitation did not cause Mr. Aguilar's death.
25             The government has described Mr. Del Cid as

1   a cooperating witness, meaning he's here.  He signed an
2   agreement to cooperate with the government.
3               They didn't tell you what Mr. Del Cid is
4   expecting from them.  The other side of that, which
5   Ms. Austin alluded to, is he is expecting to be rewarded
6   at the end of the day for this.  This is not for free.
7               As you will see, this is one of the worst
8   human beings you're ever going to meet.  And he's not
9   here because he's good person.  He's here because he has
10  an expectation.  And he understands that the only way he
11  can not spend the rest of his life in prison is if the
12  government files a motion saying he has substantially
13  cooperated with them, and that he should go home early.
14  That's it.  That's his only out.
15              Because he is a cooperating witness, the
16  judge will also give you another instruction regarding
17  how it is you judge the credibility of cooperating
18  witnesses.
19              The government told you how important your
20  job is, judging the credibility of witnesses.  When
21  Mr. Del Cid, Slow, Skinny -- these are all people who
22  are cooperating witnesses, and the judge will tell you
23  that when judging their credibility, their credibility
24  must always be examined and weighed with greater care
25  and caution than the testimony of ordinary witnesses.

1   The law recognizes that these witnesses are different,

2   and you are to judge their credibility with greater care

3   and caution than you would with anybody else up there

4   testifying.

5            So, keep that in mind when you're judging

6   the credibility of the government's witnesses,

7   especially those testifying pursuant to cooperation

8   agreements and those who have testified and pleaded

9   guilty to murder.

10           Now, Mr. Del Cid has given many different

11  statements to the government as part of their

12  investigation.  You will hear about that.  So, I don't

13  know what he's going to say when he gets up on the

14  stand.  Maybe he'll say the plan was to kill Aguilar the

15  whole time.  Maybe he'll say everybody knew about it

16  beforehand.  Maybe he'll say there were way more people

17  involved than he said before.

18           But, remember, before he had any of this

19  hanging over his head, before he had two life sentences,

20  he told Detective Ignacio the plan was to beat Aguilar

21  up.  And the government and Del Cid have already agreed

22  that Mr. Aguilar was dead by the time his head was

23  allegedly taken off.

24           This is all you can tell from Del Cid.

25  That's it.  That's the credibility.

And this makes sense, given how you will hear the experts talk about how MS-13 operates.  I expect that you will hear experts from the government talk to you about how the operation is set up.  And these are professional witnesses.

Mr. Buso -- another gentleman named Detective Saa, who will tell you that they are -- they are experts in MS-13, and how this whole thing works, and they will tell you that it's regimented, and that there are rules.  And among the most important rules, as the government told you, are the rules related to green lights.  How is it that a hit is taken out on somebody?

And their testimony, if it's consistent with what it was before, will be that there is three real reasons that you get green-lighted:  for cooperating with the government, for snitching on a fellow gang member, and trying to leave the gang without permission.  Because once you're in the gang, you are in the gang.

The green light allegedly on Peligroso was because he decided to leave without permission.  That's why he was green-lighted.

And the green light, the evidence will show, was approved by local leadership here.  It was approved by Payaso, I believe, but it was also approved by a guy named Big Poison in El Salvador, and a guy named Tigre

1  in El Salvador.  This was run up the chain before they
2  decided to issue a green light.

3          Now, none of those things are present with
4  Aguilar.  There is no evidence that Aguilar was
5  snitching.  There is no evidence that he was leaving the
6  gang.  There is no evidence that any of this was
7  sanctioned by MS-13 leadership.

8          The evidence will show that this was not at
9  all murder in aid of racketeering, that this was a
10 personal beef that got out of hand because the guy was
11 sleeping with the wrong woman.  And that's not murder in
12 aid of racketeering.

13         You may also hear that in some instances,
14 local leadership can, on occasion, approve a green light
15 without the approval of the higher-ups.  I believe they
16 talked about the first word and the second word.  And
17 you can actually get some approval in certain instances.

18         One of the other government's witnesses will
19 be Villanueva, Lil Slow.  He was a member of the clique
20 at the time of Aguilar's murder.  He pleaded guilty to
21 murder.

22         And when he was arrested for that murder, he
23 spent some time locked up, and he spent some time locked
24 up with a man named Romero Cruz, who was Payaso.

25         The government acknowledges and agrees that

1    Payaso was the East Coast leader of MS-13, and that he

2    was part of local leadership, as they told you, here in

3    the area.

4              And Mr. Slow should testify that when he was

5    locked up with Romero Cruz, that they discussed the

6    green light on Peligroso and how that worked, and how he

7    received the permission from Poison and El Tigre.

8              But that Romero Cruz will tell you that no

9    one, no one, asked him about the green light for

10   Aguilar, and that he, Romero Cruz, would not have

11   approved this, because it's against the rules of the

12   gang.

13             So while the evidence will show, I believe,

14   that Aguilar was, in fact, murdered, and that members of

15   MS-13 were present when this happened, the evidence will

16   also show that the dispute that led to his death was not

17   sanctioned by MS-13; it was personal, not gang related,

18   and that the plan was to beat him up, not kill him.

19             Now, let's talk about who actually killed

20   Aguilar.  In addition to showing that it was a murder in

21   aid of racketeering, they've got to show you that

22   Mr. Cerna either committed the murder or aided and

23   abetted in the commission of the murder.

24             And here, the government's evidence is all

25   over the place.  You will hear, I expect, from somebody

1   named Hector, either because the government calls him as
2   a witness or because we do.
3            Hector was a *paro* for MS-13.  You heard that
4   term, earlier, somebody not in the gang, but who helps
5   out.  Hector, the evidence will show, drove various
6   members of this clique to a park or a community center
7   on the night of Aguilar's murder; and that afterwards,
8   about two hours later, he came back to pick everybody
9   up, or at least some of the people up.
10           Hector, as far as I know, has not been
11  charged in any crime as has been related to this.
12           Now, when Hector dropped everyone off, he
13  saw many people walk into the woods, some of which he
14  knew, some of which he didn't, some of which are charged
15  in this case and some of which are not.
16           When he came back to pick people up, several
17  people got into his car, including Mr. Cerna and others.
18  And at the time, when Mr. Cerna got in, he sat in the
19  passenger seat -- according to him, Mr. Cerna sat in the
20  passenger seat next to Hector, who was driving.  And
21  Hector noticed that some people, when he picked up,
22  were, in fact, covered with blood, but not Mr. Cerna.
23  There was no blood on him anywhere, according to Hector.
24           Hector was also present a few days later in
25  an apartment with Mr. Cerna and others, discussing the

1   Aguilar situation.  And while he was there, he heard at
2   least one person claim responsibility for Aguilar,
3   saying, "I killed him once, and if I see him I'll kill
4   him again."  And again, that person was not Mr. Cerna.
5           Hector should also tell you that Big Poison
6   in El Salvador has approval over everything in Virginia,
7   and that Belen may have actually slept with somebody
8   else in the gang, but they didn't kill him.
9           Del Cid will probably be asked to testify
10  about the manner of Aguilar's death, because he seems to
11  be present every time someone gets kill.  But the
12  evidence will show there were many people present at
13  Aguilar's murder, not just him.
14          The attack took place at midnight or around
15  thereabouts, dark, in the middle of a park, in the back,
16  very little lighting; and that while Mr. Cerna may have
17  helped remove his head, he only did so after he was
18  dead.
19          Lil Slow will testify about the manner of
20  Aguilar's death as well, because he was present.  As I
21  said, Mr. Villanueva is also facing a mandatory life
22  sentence, and so his testimony should be equally
23  suspect, because he is testifying in agreement with a
24  cooperation as well.
25          It appears that he has not even -- he has

1   already been rewarded to a certain degree, because the

2   government has not even charged him with the Trujillo

3   murder, even though you heard that he was present there.

4   So it appears he has already escaped one life sentence

5   already, just by coming here and agreeing to talk to

6   you.

7           So, I don't know what he's going to say,

8   either.  Maybe he's going to say Mr. Cerna was

9   completely involved in it, and he was hacking and

10  slashing and doing all this bad stuff.

11          But when you listen to that, I want you to

12  remember what Hector should tell you, which is that when

13  he got back to the car and Mr. Cerna sat right down next

14  to him, there was no blood on him anywhere.

15          And the government told you a little bit

16  about Junior, Jose Roberto Aparicio Garcia, goes by

17  Junior.  Junior is a paid informant.  And according to

18  the government, he has been a paid informant for the

19  government for about ten years, having received

20  approximately $43,000 in fees, some expenses, some

21  earnings, and an additional $6,000 owed to deal with his

22  family.

23          But, as Ms. Austin alluded to -- or maybe

24  one of my other co-counsel alluded to -- he gets far

25  more than money.  Mr. -- Junior has no status in this

country.  The only status he has is the one that the
government gives him.

He has what's called an S visa.  That means
he gets to stay only as long as he assists law
enforcement, and only as long as law enforcement asks
that he stay.  And this is a revolving one-year visa.
It's not forever.  He has to continue to produce if he
wants to stay here.

And you will see that Junior is a
professional liar at this point.  You heard Mr. Leiva
talk to you about what he expects the government's
experts to tell you about the braggadocio nature of
MS-13.  And Junior has been doing this for ten years,
and Junior lies to everybody he talks to on these tapes.
And as a result, people lie back to him.

He talks about all the murders he's done,
the places he's been, the women he's been with, the
things that he has done.  And people respond, "Yeah,
I've done that, too.  I did this.  I'm as bad as you
are."

It's a conversation going back and forth.
It's a conversation between MS-13 members about who is
the badest guy in the room, and none of it, as far as I
can tell, or almost none of it, is corroborated at all.
It's just guys talking, whether it's guys talking about

1   women or fish they've caught or whatever, when someone

2   brags, you brag back.  So you're going to get a lot of

3   that on the tape.

4           And as Ms. Austin said, he was there for

5   none of this.  He -- all he knows is what people have

6   told him.

7           And this is especially true for people like

8   Mr. Cerna, who is young.  He is 18 years old.

9   Mr. Rivera -- sorry -- Junior is 30.  He's a guy who's

10  been around almost twice as long as Mr. Cerna has been

11  on this planet, and he understands how this is played,

12  and he gets Mr. Cerna and others to say things, in the

13  context of bragging about MS-13, that are difficult to

14  listen to; but that doesn't mean they're in any remote

15  way true.

16          So, that's really it.  At the end of the

17  day, as the judge said, they have to prove two things

18  beyond a reasonable doubt:  that this was really a

19  murder in aid of racketeering, and not a personal beef;

20  and that Mr. Cerna, who had no blood on him at all, took

21  part in this murder.

22          Del Cid will tell you it was never murder,

23  and he will tell you that Aguilar was already dead when,

24  as the government said, Mr. Cerna said he chopped that

25  fucker's head off.

1          The evidence doesn't support the charges

2    against Mr. Cerna.  I'm asking you to find him not

3    guilty of the only count he's charged in, which is

4    Count 6.  At the end of the day, the government's

5    evidence simply doesn't match.

6          Thank you.

7          THE COURT:  Good afternoon, counsel for Omar

8    DeJesus Castillo.

9          You may proceed.

10          MS. MARTELL:  Thank you, Your Honor.

11      OPENING STATEMENT BY DEFENDANT DeJesus CASTILLO

12          MS. MARTELL:  May it please the Court, my

13    fellow attorneys, government counsel.

14          Ladies and gentlemen of the jury, first of

15    all, good afternoon.  I'd like to start off by

16    introducing myself.  My name is Katherine Martell.  And

17    together with my co-counsel in this case, Meredith

18    Ralls, we represent Omar DeJesus Castillo.

19          I'm not sure if everybody can see him from

20    where he is, so I'm going to actually show him -- a

21    picture of him that I took in the courtroom yesterday.

22          Ladies and gentlemen, I want to first start

23    off by thanking you all for being here today.  I know

24    that it took a process to get you here and to get you

25    seated on this jury.  And the reason for that is, is

1 that your service ensures that all of our rights are
2 upheld and that they remain intact.
3 You, ladies and gentlemen, are entrusted
4 with the power to decide this case.  And that's a very
5 important honor, because you are going to determine
6 whether justice is served.
7 Ms. Martinez touched on that, and I believe
8 in that.  But, ladies and gentlemen, justice will only
9 be served if the government proves this case beyond a
10 reasonable doubt against my client, Omar Castillo.
11 In this open, while I'm speaking to you, and
12 at every single point in this trial, I'm going to talk
13 to you about one person only, and that's Omar Castillo.
14 There's a lot of evidence in this case.
15 We're going to be here for a long time and we're going
16 to listen to a lot of witnesses.  And, I want you to
17 listen carefully to everything that's said, because a
18 lot of it is not going to involve my client.  A lot of
19 what you hear will have nothing to do with Omar
20 Castillo.
21 And sometimes, myself or my co-counsel may
22 cross-examine witnesses and ask them questions just to
23 show you that it has nothing to do with my client.
24 When you hear evidence in this case, when
25 you hear witnesses testify, please ask yourselves:  Who

1   does this evidence apply to?  And, is this evidence

2   connected to Omar Castillo?

3            The judge suggested that you may want to

4   take notes during this trial.  And I urge you to take

5   that suggestion and to take notes and write down what

6   you hear and how it relates specifically to my client,

7   Mr. Castillo.

8            Now, Ms. Martinez mentioned a lot of

9   horrible things about MS-13, scary things.  And, I'm not

10  going to sit here and tell you that MS-13 is not a scary

11  gang.  I'm not going to do that.  Because I think that

12  most people that hear about a gang are going to think

13  that they're related to bad things.

14           I'm also not going to deny that my client,

15  Mr. Castillo, was associated with members of MS-13.  But

16  I am going to deny that he's guilty of the accusations

17  against him.

18           And, just like sometimes in the media, you

19  know, they want to show you the scariest, the most

20  shocking scene to grab your attention -- and that's what

21  the government is going to do in this case.  They're

22  going to show you the scariest things and tell you about

23  the scariest things that MS-13 does all around the

24  world.

25           And you're going to hear that none of that

evidence has anything to do with Mr. Castillo.

You heard some of my other fellow colleagues talk about one of the individuals that they're going to bring.  Ms. Austin mentioned him a moment ago.  They're going to refer to him as Buso.

And he's going to come in here, and ladies and gentlemen, the evidence is going to show that he doesn't know who my client, Mr. Castillo, is.  In fact, I'll tell you he doesn't know who any of these individuals are, and he never heard of them until he was asked to testify in this case.

But, he has now become a professional witness for the government, testifying, and you'll hear, in many cases about MS-13.

And why?  Because he's a scary guy.  He's got a tattoo on his face.  And he's going to talk to you very casually about killing people, and people that he's killed.  And the government thinks that that's going to shock you, and that that's going to leave an impression.

But just like Ms. Austin told you, look at the evidence in this case and ask yourselves:  What does this have to do with Omar Castillo?

Now, they are going to bring witnesses to talk about Mr. Castillo and to talk about some of the allegations that they raised to you a moment ago.

1    These people -- and you've heard some of my
2  colleagues talk about them -- known liars, known
3  murderers and known criminals.  That's what you have to
4  know about them.

5    I want you to think about the government's
6  case almost like you're building a house, because that's
7  what they're going to try to do during this trial.  And,
8  think about it like they're building the house brick by
9  brick.  It's their burden to prove this case beyond a
10  reasonable doubt.

11    So, think about how sturdy that house has to
12  be, and think about each of their witnesses.  That's who
13  they're going to use as bricks to build this case, to
14  try to prove this case beyond a reasonable doubt.

15    But who's their case built on?  Well, you've
16  heard a little bit about them.  Jose Del Cid, known as
17  Duende, a known liar, a known murderer and a known
18  criminal.

19    He lied to police.  That's going to be
20  proven to you here in this courtroom.  He's killed many
21  people.  He'll probably tell you that very matter of
22  fact himself.  He's a devil worshipper.  He said that,
23  too.

24    But yet the government is going to bring him
25  here and they're going to tell you that his testimony,

1    along with other liars and murderers, that that's the

2    foundation that their house is built on, and that that's

3    enough to sustain their evidence beyond a reasonable

4    doubt.

5              Each of the government's witnesses is going

6    to be the same.  Skinny, a leader who planned and

7    ordered killings, was a drug dealer.

8              One by one, ladies and gentlemen, you're

9    going to hear these witnesses, and you're going to hear

10   their testimony.  And it's your job, it's your job and

11   your job alone, to weigh their credibility.

12             Look at their biases.  Why are they doing

13   this?  Why are they coming here to testify?

14             One of the other witnesses that has been

15   mentioned is Junior, someone that the government is

16   going to bring in, like my colleagues have said, a paid

17   confidential human source, as the government will refer

18   to him.  He's being paid -- he's been paid by the

19   government to come here and testify.  But, even more

20   than that, and of greater benefit, and like Mr. Amolsch

21   said a moment ago, is that he gets a visa for being

22   here.

23             And, Ms. Martinez didn't tell you that when

24   she talked about Junior and how great he is, he's

25   getting all these recordings.

1             Well, like Mr. Amolsch told you, and
2    Mr. Leiva mentioned, there's this sense that he's
3    talking himself up.  He's a guy from another clique,
4    and, he's trying to get the guys to brag.  And some of
5    them do.
6             But, you're never going to hear my client
7    say that he killed somebody.
8             And, when you think about it, and after you
9    hear these witnesses and what they're getting out of
10   this, you're going to -- I want you to think back on
11   that house that we're talking about, and think about
12   what it's built on, what evidence there is, and what
13   there isn't.
14            There's no physical evidence tying my client
15   to either of these charges.  You're never going to hear
16   him say that -- or you're not going to hear him planning
17   the murders.
18            And the government will bring -- as it
19   relates to one of the murders, they're going to bring
20   individuals that were involved in the planning, and
21   they'll tell you that my client wasn't there for the
22   planning.
23            I'm going to speak specifically about the
24   two counts that my client is charged in, and that is
25   Count 4, the murder of Nelson Quintanilla Trujillo, who

1    they will refer to as Lagrima.

2              The government's evidence, again, is going

3    to be that there were several people involved in the

4    planning of that murder.  They're going to bring some of

5    them here.  And they're going to tell you them (sic),

6    along with other unnamed individuals -- but not my

7    client -- were involved in planning the murder of

8    Lagrima, and carrying it out.  And the people that are

9    going to come and testify are going to admit to that.

10             But, I want you to pay attention to, also,

11   how their testimony -- how the details of their

12   testimony are going to conflict with one another.

13             There's going to be no evidence that my

14   client lured him there, or lured anybody there.  There's

15   going to be conflicting evidence that my client was even

16   there.

17             The government said he played a prominent

18   role.  But, you're going to learn that some of the

19   individuals who said that they were there, who said that

20   they were involved in the murder, don't even mention him

21   as being there.

22             Remember, when Ms. Martinez talked about

23   reburying Lagrima's body, my client is not there for

24   that, either, although most of the people who were there

25   for the murder of Lagrima seemed to be there also for

1    the reburial, according to their evidence.

2              As it relates to Count 6, which my client is

3    also charged in -- and that's the murder of Gerson Adoni

4    Martinez, also referred to as Lil Guason -- the

5    government told you about him.

6              But -- and Mr. Amolsch just talked in great

7    detail about that murder.  You're not going to hear my

8    client on any phone calls admitting to the murder or

9    admitting to doing anything in relation to Lil Guason.

10             And, I agree with Mr. Amolsch that the

11   evidence is going to be that if anybody knew anything,

12   it was that Lil Guason, they wanted to -- Skinny wanted

13   to beat him up.

14             And you're going to hear a phone call where

15   Skinny calls my client, and that's all he says.  He

16   doesn't use the word "green light" or any of the other

17   terms that you're going to hear the government tell you

18   about that mean killing somebody.  He just says that he

19   wants him to get beat up.

20             And, my client doesn't even agree to this.

21   He kind of just brushes him off about it.  But, there's

22   definitely no planning about killing Lil Guason.

23             Your Honor -- ladies and gentlemen, counsel,

24   I've told you just simply what we believe the evidence

25   will be in this case.  But the burden of proof is on the

1   government to prove this case beyond a reasonable doubt.

2   We don't have the burden of proving anything.

3            And if, at the end of the day, if, after

4   we're done with all of the testimony and all of the

5   witnesses, if you feel that there are things missing,

6   this is where you need to look at the government's case,

7   because if there's anything missing, it's not our

8   responsibility to show or prove it.

9            And at the end of this trial, I will stand

10  before you again, and we'll talk about all the ways in

11  which the government did not meet their burden of proof.

12  And at that time, I'm going to ask you to do what

13  justice requires, and that's to find my client not

14  guilty, because the government has not proved their case

15  beyond a reasonable doubt.

16            Thank you.

17            THE COURT:  Counsel for Douglas Duran

18  Cerritos.

19      OPENING STATEMENT BY DEFENDANT DURAN CERRITOS

20            MR. CRAWLEY:  May it please the Court, Your

21  Honor, government.

22            Good afternoon, ladies and gentlemen.  My

23  name is Dwight Crawley, and I, along with Joseph Conte,

24  represent Douglas Duran Cerritos.  I'm going to be very

25  brief.

1           Mr. Cerritos is charged in Count 6.  He pled
2     guilty -- he pled not guilty to Count 6 because, in
3     fact, he is not guilty of Count 6.
4           The government has told you a lot about what
5     its evidence will be in this case.  I welcome that
6     evidence.  I welcome each and every one of those
7     witnesses that they claim will take that witness stand
8     to come forward and testify in this case.
9           And when they take that witness stand and
10    when they testify, you will watch each and every one of
11    those witnesses contradict himself as he attempts to
12    secure his own beneficial reward from the government.
13          It's not going to take a long time to prove
14    that those witnesses are natural-born killers, but more
15    importantly, natural-born liars.  It will be very simple
16    to you, ladies and gentlemen.  It won't take a long
17    time.
18          At the end of this case, my co-counsel,
19    Joseph Conte, and I are going to ask you to do the only
20    just things as it relates to Mr. Cerritos, and that's
21    find him not guilty.
22          THE COURT:  Thank you.
23          Counsel for Mr. Manuel Ernesto Paiz Guevara.
24          MR. CHICK:  Good afternoon, ladies and
25    gentlemen.  My name is Mike Chick and I'm the attorney

1   for Mr. Manuel Ernesto Paiz Guevara.  He is seated in
2   the very back corner.  He's got like a black sweater
3   on.
4           Manny, can you stand up, just really
5   briefly?
6           (Defendant Paiz Guevara complies.)
7           MR. CHICK:  That's my client.  Some of you
8   may have a problem seeing him.  But I represent him.
9           Let me at the outset say, you may notice
10  during the course -- during the course of this trial
11  that my client is the only person here who has just one
12  lawyer.
13          And I just want to ask for your commitment
14  to not hold that against him in any way, not to assume
15  that that means that, you know, somehow, you know,
16  things aren't as serious for him as they are for
17  everybody else.  The stakes are serious, despite the
18  number of lawyers that he has compared to everybody
19  else.
20          You may hear him referred to by a bunch of
21  different names.  I call him Manny most of the time.
22  His name is Manuel Ernesto Paiz Guevara.  You may hear
23  him referred to as Mr. Paiz Guevara.  You may hear him
24  referred to as Mr. Guevara.  And you might hear him
25  refer to by a nickname, which is Solitario.

1          And, I don't know that you're going to hear
2   who -- who gave him that nickname, but I would submit
3   that the nickname is actually a pretty -- a pretty
4   accurate reflection of who he is, of his personality.
5   The name Solitario essentially means somebody who sort
6   of keeps to themselves.  And that, I think, describes
7   him in a pretty accurate way, very shy, kind of
8   keep-to-himself kind of a person.
9          As far as this case goes, he is charged with
10  one count.  He is charged with Count 6.  That is not the
11  murder of Lagrima.  I guess I can call the murder of
12  Lagrima murder number one.
13         And then this one we can call murder number
14  two, Count 6.  That is the murder of Gerson or Gerson --
15  it's G-e-r-s-o-n -- Aguilar Martinez.  Sometimes he's
16  called Lil Guason, G-u-a-s-o-n.  So he's charged with
17  murdering Lil Guason and participating in that murder.
18         But before I get into talking about that,
19  let me just talk really briefly about MS-13, because
20  that's really what this whole case is about.  That's
21  what brings us here into Federal Court.
22         And, the government obviously talked about
23  this.  I think some of the other previous attorneys
24  maybe sort of glossed over it a little bit, but, I know
25  you know it.  MS-13 is -- it's really, really bad.  It's

1   a really, really bad gang.

2            And, they -- I don't know that the

3   government talked a lot about this, but one of the

4   things that they do is they -- they prey -- they prey on

5   poor, vulnerable, at-risk young men.  They prey on

6   people like my client, and they lure them, and they

7   groom them and they try to, you know -- maybe you're

8   lured in initially by:  Oh, hey, you know, maybe I'm

9   going to smoke some marijuana with this guy or with

10  these guys, and you're introduced to different people,

11  and it kind of goes from there.

12           And then for you and for me, it's

13  probably -- it's hard to see or to accept how somebody

14  could -- could fall into, "Okay, I'm just going to smoke

15  marijuana" -- which is fairly normal teenage behavior --

16  to, "Okay, maybe I'll sell some marijuana," to, all of a

17  sudden, like you're getting lured in further and

18  further, and they try to kind of bring you to what I

19  would call sort of a point of no return, where you're

20  sort of forced to be -- to be all in.

21           I think that you'll hear evidence that that

22  is the culture of this gang, and that's one of the ways

23  that they operate.

24           Obviously, yes, you're going to hear that

25  they're really violent, that they get what they want by

1   violence, by threats, by intimidation, by striking fear

2   into people.

3          But, this is really important:  My client, I

4   believe he is the only person in this courtroom who is

5   not a member of MS-13.  He is -- he is not a member.  He

6   has never been a member.

7          He has never been initiated into this gang.

8   He has never been -- gone through this ritual that

9   Ms. Martinez described as being jumped in.  And I

10  think -- I think he's the only one that hasn't -- hasn't

11  gone through that process.  But by the government's

12  evidence, I think that's what you're going to learn.

13         He is somebody that the government will call

14  a *chequeo*.  He's somebody who is going through that

15  recruitment process, that, what I call the grooming

16  process, for a lack of a better word.  And I think he's

17  the only one who has that role, by the government's

18  allegations.

19         And I think that that makes him pretty --

20  pretty different compared to some of the other people

21  that you're being asked to look at here.

22         Sort of taking that and moving into talking

23  a little bit about Count 6, I'm not going to go into

24  tons of details.  You've heard everybody talking.

25  You're going to hear a lot of evidence.  But Count 6 is

1   the alleged murder of Gerson Aguilar Martinez, Lil
2   Guason.
3          And, I believe that the evidence -- well, to
4   be honest with you, I don't know what all the evidence
5   is going to be.  I don't know what all these witnesses
6   are going to say when they come in.  I've not had an
7   opportunity to interview them.  I don't get to talk to
8   them like the government does.  But I think I have a
9   good idea about what -- what some of the evidence is
10  going to be.
11          And more importantly, I certainly -- I know
12  what the truth is, and I am very hopeful that the truth
13  is going to come out from this evidence.
14          One of the things that I believe you're
15  going to find out is that Manny, Solitario, Mr. Guevara,
16  I think by the government's evidence, you're going to
17  find out -- and I don't think they actually said this to
18  you, but I think that their witnesses are going to say
19  this.  I think they're going to say that there was a
20  plan to murder Mr. Martinez.  I think their witnesses
21  are going to say that.
22          Now, whether that plan was for purposes of
23  the gang or for personal revenge because he's sleeping
24  with his girlfriend or, you know, whatever it is,
25  that's -- that's -- that's an issue for you guys to

consider, and some of the attorneys were talking about
that.  But I think there was a plan.

And I think, even though they didn't tell
you this, I believe that their witnesses are going to
say that my client was the only person at that murder
scene who did not know that there was a plan to murder
Gerson, who was my client's best friend.  He was his
best friend.

I think the evidence is going to be that my
client was duped, along with Gerson, into going into
this situation under the guise that it was going to be
something else, under the guise that it was going to be
some kind of discipline, that he was duped into going,
that he didn't know his best friend was going to be
murdered, that he didn't know there was a plan to murder
his best friend.

I believe that that's what their witnesses
are going to say.  And I think that that's really,
really important, because he's the only person who, by
the government's evidence, went in to this meeting, what
was supposed to be a meeting, not knowing that his best
friend was going to be murdered.  He wasn't in on the
plan.

And that's incredibly important for you to
know during the course of this case.  And, quite

1    frankly, that and some of the other evidence that I
2    think you're going to hear really, really suggests that
3    he shouldn't be here in this courtroom.  He shouldn't be
4    here with these other guys.
5              Is there maybe something else they can try
6    to charge him with, about marijuana or about, you know,
7    maybe try to charge him with accessory after the fact,
8    since he didn't -- you know, after all this stuff
9    happened he didn't go to the police and do all this kind
10   of stuff.  Maybe there is.  But, he shouldn't be here
11   for this.  And I think that the evidence is going to
12   support that.
13             The government talked about -- a little bit
14   about one of their witnesses, who I'll just mention, a
15   guy, his name is Lil Slow.  I think it's actually Lil
16   Slow, that's how the kids say it, L-i-l.
17             And so, he was a part of murder number one,
18   the murder of Lagrima, and he was a part of murder
19   number two, the murder that my client is charged with.
20             Now, I think the government said that Lil
21   Slow is going to be -- when he was part of murder one,
22   that he -- he initially didn't know there was a plan.
23   He was a *chequeo* at the time, like my client was a
24   *chequeo*; that he didn't know that there was a plan
25   initially.  He wasn't part of the planning process to

murder Lagrima, just like my client wasn't part of the murder plan to murder his best friend.

But, I think what I heard the government say and what I think their witnesses are going to say is that by the time the murder actually was going to happen, not just when the murder sprung, but by the time the murder, you know, they were there and they were walking to where the scene was and all that, he was told about what his expected role was going to be -- this is Lil Slow in the first murder -- that he was told what his expected role was going to be, and that he was going to do this.

And then right afterwards, you know, he was a *chequeo*, he was a recruit, there was this big celebration and he was apparently jumped in, like right after that whole thing happened.

If you can -- and, I don't believe that that individual -- the facts are fairly similar, as far as he's concerned, to the situation that my client was in. I don't think that individual was ever charged with that murder, the Lagrima murder, that he didn't participate in the planning of.

But, if you compare those two situations, the circumstances my client was in are far, far less aggravating than the circumstances he was in.

1       Number one, my client not only didn't know
2  about the planning, he was purposely kept in the dark
3  all the way up until the time.  He didn't know that
4  these guys are going to spring out and start stabbing
5  his best friend.
6       And, I think that when that first murder
7  happened, I think that the evidence is going to be that
8  Lil Slow actually did know by that time that that was
9  going to happen, and what his expected role was.
10       My client was never told -- that's not the
11  situation for him.  He was literally thrown into this
12  situation of complete fear, shock, and surprise.  And he
13  knows what these people do and he knows what these
14  people are capable of, and he's put there in that
15  situation.
16       I don't think he killed anybody.  I do not
17  think he killed anybody, and I think that the evidence
18  is going to show that.
19       And I'm talking about my client being preyed
20  on by this gang.  I don't want to give you the
21  impression that I'm saying he is this complete,
22  complete, innocent angel, okay?
23       Is he guilty of hanging around people that
24  he probably -- that none of us would want our kids to
25  hang around?  Yeah, he is.  But he's not guilty of

murder.

Is he guilty of smoking weed or selling weed with one or more of these guys on occasion?  Yes.  Yes, he is.  But he's not guilty of murder.  And that doesn't make him guilty of murder.

I think that's also really important for you to know and to think about.  And I think you're probably going to hear that kind of stuff about all the defendants.

Also, when -- when we're talking about the evidence, I think it's been pointed out to you during this whole process who all these people are here at the table.

We have -- right here, the guy that I'm pointing to in the middle with the shaved head, on -- sitting at the government counsel table, he is Detective Betts from the Fairfax County Police Department.  He's one of the lead -- he's basically in charge of the -- he does the gang stuff for Fairfax County Police.

And this other guy, Fernando Uribe, he is the lead -- as far as I know, he is the lead federal investigator on this case.  He is the investigator from the FBI who is in charge of this case, of investigating this case, of working up this case.

If I was on the jury, I would definitely

1   want to be hearing from both of these people.

2                 So, I would expect that the government is
3   going to call Agent Uribe as the lead investigator on
4   the case.  And if they decide not to, I would certainly
5   ask myself, why.  So we'll see -- we'll see how that
6   goes.

7                 So, there's a lot more that I can talk
8   about, but I'm not going to.  The bottom line is this:
9   That's the -- that's the murder that my client is
10  charged with.  I don't believe that the evidence is
11  going to show that he's guilty of murder.  He did not
12  murder his best friend.  He did not murder Gerson.  He
13  shouldn't be here in this courtroom.  And I think that
14  the evidence is going to show that.

15                And at the end of the day -- they talked
16  about a lot of stuff, but it seemed like they sort of --
17  they didn't talk about all those things that I just told
18  you, which are really, really important.  So you can
19  decide for yourself at the end of the case whether what
20  I'm saying is true, or whether what they're saying about
21  my client being part of all this and being part of this
22  plan and all this kind of stuff, whether that's true.
23  And so I ask you to pay close attention.

24                I thank you for your time and for your
25  consideration.  Thanks.

1          THE COURT:  Counsel for Jesus Alejandro

2   Chavez, please.

3          MS. AMATO:  Thank you, Your Honor.

4          OPENING STATEMENT BY DEFENDANT CHAVEZ

5          MS. AMATO:  Good afternoon, ladies and

6   gentlemen.  May name is Elita Amato, and I, along with

7   my co-counsel, Jerome Aquino, represent Mr. Jesus

8   Chavez.

9          If you can both stand, please.

10          (Defendant Chavez complies.)

11          MS. AMATO:  Thank you.

12          June 19th of 2011, around 11:00 p.m. that

13   night, Julio Urrutia was hanging out with his

14   brother-in-law, Luis Rodriguez, when Julio decided he

15   wanted to buy some marijuana.

16          Now, he had smoked some marijuana earlier

17   that night, but he was ready for more.  And he knew who

18   to contact.  He had a regular supplier whose name was

19   David Jimenez.  And so he contacted his regular

20   supplier, and that's who he and his brother-in-law, Luis

21   Rodriguez, went to see that night.

22          Now the Jimenez brothers, they were -- David

23   Jimenez lived with his younger brother, Jose Molina, and

24   they also lived with their mother and other siblings.

25   They lived in the same apartment complex which you will

1   hear a lot about during a part of this trial.

2            The apartment complex was called the

3   Presidential Greens, and it was a group of different

4   buildings, all low-rise, that had different entrances,

5   and some of the buildings were connected and some

6   weren't.  The Jimenez brothers lived in that complex, as

7   did Julio Urrutia.

8            Now, Julio Urrutia and his brother-in-law,

9   Luis Rodriguez, when they first went to seek out the

10  Jimenez brothers, the brothers were busy and they

11  weren't ready for them.  But when they came back, they

12  observed Jose Molina and David Jimenez outside, in the

13  area, not far from their apartment.  And they approached

14  them, they spoke with them, and an argument ensued

15  between Julio Urrutia and David Jimenez.

16           A drug debt was owed.  Julio Urrutia owed

17  money to David Jimenez.  David Jimenez told Julio

18  Urrutia he wasn't going to sell him any more drugs until

19  the drug debt was paid.

20           Now another individual that was out there

21  that you will hear from, his name is Cosmo Gonzalez.

22  And Cosmo Gonzalez also lived in this apartment complex,

23  in one of the apartments.

24           And, he was out in his front -- basically

25  the front steps of the building, and he was smoking a

1   cigarette.  And he was on the phone, but he was also

2   listening to what was going on and he was observing.

3   And he -- he recognized David Jimenez and Jose Molina

4   because they lived in the same apartment complex, and he

5   knew that David Jimenez sold drugs out of his apartment

6   complex.  And he will come and he will tell you what he

7   heard and what he saw.

8            Now, while this argument was going on with

9   David Jimenez and Julio Urrutia, two other people came

10  upon the scene.  One of them, you've already heard the

11  name, Jose Del Cid, also goes by the name of Duende, and

12  another guy by the name of Sen Garcia, also goes by the

13  name of Gatuso.

14           And those guys were in the mood to fight

15  that night.  They had been looking for trouble that

16  whole night, out and about looking for trouble.

17           First, they accompanied Christopher

18  Fernandez.  He was supposed to fight a guy named Herlin

19  (phonetics).  And Herlin never showed up.

20           Then, they came upon another group of young

21  guys, and these young guys looked like they wanted to

22  fight them.  And they were gearing up to fight them, but

23  police came through.

24           Then they saw Jose Molina.  And Jose Molina

25  was out there with a buddy of his, and they decided to

1    run after Jose Molina and his friend.  But the friend
2    got away, and then Jose Molina ran to his apartment.
3             And that's when Duende -- Del Cid -- and
4    Gatuso -- Sen Garcia -- came upon Julio Urrutia, and
5    they took their aggressions towards him.  An argument
6    ensued between them.
7             Julio Urrutia -- excuse me.  Duende threw a
8    punch at Julio Urrutia.  Julio Urrutia started to fight
9    back, when a shot was heard, and Julio Urrutia fell to
10   the ground.  He had been hit.
11            At this time, Cosmo Gonzalez was no longer
12   out on that front step.
13            And actually, Ms. Bishop, can you just show
14   a photo?
15            But Mr. Cosmo Gonzalez -- and you can see
16   from -- he was -- he lived in this area of the apartment
17   complex.  And from that apartment complex, he was able
18   to look out the window, and he saw David Jimenez.  He
19   will also tell you that later, he observed David Jimenez
20   take something out of his pocket and hide it.
21            Police were called to the scene.  Police
22   came to Presidential Greens.  And they spoke with
23   people, and they were informed and they learned that the
24   shooter had tattoos on his arms.
25            I would now like to play a recording that

1   the police gave of the shooter's description.

2              MS. MARTINEZ:  Objection, Your Honor.

3              MS. AMATO:  Your Honor, I'll move on.

4              THE COURT:  All right.

5              MS. AMATO:  But I would ask that Mr. Chavez

6   take his jacket off.  He should have a short-sleeve

7   shirt on.  And I'd like him to stand.

8              (Defendant Chavez complies.)

9              MS. AMATO:  The evidence in this case will

10  show that Mr. Chavez does not have tattoos on his arms.

11  He does not have tattoos on his hands.

12              Thank you, Mr. Chavez.

13              Del Cid and Sen Garcia will both come and

14  they will take the witness stand over there, and they

15  will testify in front of all of you.  And they will tell

16  you that Jesus Chavez was out there with them, and Jesus

17  Chavez was the shooter.

18              You will learn that these two witnesses,

19  these two guys, Del Cid and Sen Garcia, are not

20  believable.  They are not to be trusted.  They have

21  reasons to lie.  They have reasons to put the blame on

22  Jesus Chavez.  They are not to be trusted.

23              These guys were gang members, violent gang

24  members, who had to point the finger at someone else,

25  someone who was not a full-fledged gang member, someone

1   who no one would care about.

2          They were able to speak -- they were able to

3   communicate with each other after the shooting.  They

4   were able to concoct a story that they could tell other

5   gang members, they could tell the police, and now they

6   could tell you.  They agreed to put the blame on Jesus

7   Chavez, to plead guilty and to cooperate with the

8   prosecution.  They are not to be trusted.

9          They have entered into plea agreements with

10  the prosecution in which they have agreed to assist the

11  prosecution and testify against Mr. Jesus Chavez, all in

12  hopes that by doing that, the prosecution will return

13  the favor and go before their sentencing judge and

14  convince their sentencing judge to give them a less

15  severe sentence.

16         Be alert for these words from these

17  witnesses:  "I'm here just to tell the truth."

18         No, ladies and gentlemen.  The evidence will

19  show that they're here to try to get out of jail as soon

20  as they can.

21         Now, you will also hear from other

22  witnesses -- the government will also put on witnesses

23  who either lived in Presidential Greens or who were

24  there, more or less, that night.  Some of these people

25  may be Christopher Fernandez.  You may hear from Sixto

1  Solano, maybe from Christian Flores, maybe Jefferson
2  Amaya.
3           But the evidence will show -- and these
4  people will also maybe say that Jesus Chavez was with
5  them at some point that night.  But the evidence will
6  show, ladies and gentlemen, that none of these
7  individuals were there outside at the location at the
8  time of the shooting.  None of these individuals can
9  tell you at the time of the shooting who had the gun and
10 who shot the bullet that hit Urrutia.
11          You will also hear from at least one or two
12 of the Jimenez brothers.  And they, too, will point the
13 fingers away from themselves.  They, too, have a stake
14 in the outcome.
15          Now, today, earlier, Judge Lee read to you
16 some jury instructions.  And at the end of the trial,
17 Judge Lee will also read to you again these and other
18 jury instructions.  And these instructions are for all
19 of you to consider and to use to guide you in terms of
20 how you consider the evidence and come back with your
21 verdicts.
22          And one of the instructions that Judge Lee
23 read -- and I believe also one of my colleagues read it
24 to you as well, but I would like to repeat it, because
25 it is pertinent --

1        THE CLERK:  Five minutes.

2        MS. AMATO:  Thank you.

3        -- as to Mr. Chavez, and that is that merely

4   associating with others, and merely being present at the

5   place where a crime takes place or is discussed, does

6   not, of itself, make someone a member of a conspiracy or

7   a conspirator.

8        Now, that comes into play as to Mr. Chavez.

9   If, for whatever reason, you believe that Mr. Chavez was

10  at Presidential Greens that night, his mere presence

11  alone is insufficient to find him guilty.

12       Mr. Chavez had reasons for being at

13  Presidential Greens.  You see, his sister also lived

14  there.  She had an apartment there, and he used to go

15  visit with her.  Mr. Chavez had recently finished a jail

16  sentence.  He had recently been released from jail, and

17  he used to go spend time with his sister.

18       Now there's a lot of evidence in this case

19  you all will hear that has nothing to do with

20  Mr. Chavez.  I know you have already heard that from

21  other counsel.  But again, as to Mr. Chavez, there is a

22  lot of evidence that you will hear that has nothing to

23  do with him.  He was incarcerated from January 1st of

24  2009 until June 11th of 2014.

25       As Mr. Chavez sits before all of you, ladies

1   and gentlemen, he is innocent.  As he sat before all of

2   you when you all came in here and you were questioned

3   during the jury voir dire process, he was innocent.

4            As each witness in this trial comes before

5   all of you, Mr. Chavez remains innocent.  And, while you

6   go back and deliberate after all the evidence is heard

7   in this case, he remains innocent unless and until all

8   of you find him guilty.

9            And we submit to you, ladies and gentlemen,

10  that after you hear all the evidence, you will find that

11  the government cannot meet their burden of proving

12  Mr. Chavez guilty beyond a reasonable doubt.

13           And the burden, ladies and gentlemen, in

14  this case, stays on this table (indicating).  It stays

15  with the prosecution.  The burden never shifts to this

16  table (indicating), to this side of the room.  It always

17  stays on this side.

18           And what that means is Mr. Chavez does not

19  have to present any witnesses.  He does not have to take

20  the stand.  He does not have to introduce a single piece

21  of document or photograph into evidence, and you cannot

22  hold that against him.  Again, the burden always stays

23  on this table.

24           And even if Mr. Chavez does present

25  witnesses, take the stand or present a photograph or

1   some other document, again the burden never shifts.  It

2   stays always on this table.

3            At the end of the trial, ladies and

4   gentlemen, my counsel and I -- Mr. Aquino -- will have

5   another chance to come and speak before all of you.  And

6   at that time, we will ask that you find the government

7   has not been able to meet their burden of proving beyond

8   a reasonable doubt that Mr. Chavez is guilty as to all

9   counts, and we will ask that you find Mr. Chavez not

10  guilty of the murder in aid of racketeering, which is

11  Count 7, the use of a firearm during a crime of violence

12  causing death, which is Count 8, and felon in possession

13  of a firearm, Count 9.

14           Thank you.

15           THE COURT:  All right.  Ladies and

16  gentlemen, we'll take the afternoon recess now for

17  15 minutes.

18           Remember, do not discuss the case.  Don't

19  permit the case to be discussed in your presence.

20           We will return in 15 minutes.

21           Thank you.

22           (Thereupon, court recessed from 3:34 p.m.

23           to 3:57 p.m.)

24           (Jury not present.)

25           THE COURT:  Counsel, two things.  I'm going

1    the bring out juror, Mr. C████, and I believe he is

2    Juror Number 4.  He thinks he might recognize somebody.

3              Bring him out.

4              I'll have him take the stand.

5              (Juror present.)

6              THE COURT:  You may be seated.

7              THE JUROR:  Yes, sir.

8              THE COURT:  Tell me your name again.

9              THE JUROR:  R████ C████.

10             THE COURT:  Mr. C████, you sent me a

11   note, so I wanted to know what the note was and I want

12   everybody to hear what the note was.  Go ahead.

13             THE JUROR:  Yes.  There was -- basically, I

14   was saying that I potentially may have seen some of the

15   defendants.  So I didn't know if that was an issue or

16   not an issue --

17             THE COURT:  All right.

18             THE JUROR:  -- in the past.

19             THE COURT:  Stand up and take a look, see if

20   you recognize somebody.  Tell me who you think you

21   recognize.

22             THE JUROR:  I think I recognized this

23   gentleman here, this one, and the gentleman in the white

24   shirt.

25             MR. CRAWLEY:  Stand?

1           THE COURT:  Yes, would you stand?

2           THE JUROR:  Yes.

3           THE COURT:  This is Mr. --

4           MR. CRAWLEY:  Cerritos.

5           THE COURT:  -- Cerritos and Mr. --

6           MR. ZIMMERMAN:  Gaitan Benitez.

7           THE COURT:  Okay.  Have a seat.

8           Tell me how you saw them, or where you think

9   you've seen them.

10          THE JUROR:  I think I've see then maybe a

11  year or so ago, potentially in the gym.

12          THE COURT:  You can have a seat.

13          What gym did you see them in?

14          THE JUROR:  Potentially in LA Fitness and

15  Landmark.

16          THE COURT:  Did you see -- who did you see?

17  One or both?

18          THE JUROR:  I think I seen both of them.

19  I'm not a hundred percent sure.  I think I've seen them.

20  I'm not sure at all.  I just wanted to make sure it was

21  known.

22          THE COURT:  Okay.  Let me ask you to step

23  out and I'll make further inquiry.  Thank you.

24          (Juror not present.)

25          MR. CRAWLEY:  No issue.

1          THE COURT:  Mr. Crawley?

2          MR. CRAWLEY:  No issue.  You know where

3  they've been.

4          THE COURT:  I hadn't thought of that.

5          MS. AUSTIN:  I don't think it's an issue, as

6  long as the extent of his comments are, "I think I've

7  seen them."

8          Did he see them and he thinks they were

9  doing something they shouldn't have been doing, or was

10 it just, he thinks he may have seen them in passing at

11 the gym, and that's the end of it?

12         MR. ZIMMERMAN:  Right.

13         MS. AUSTIN:  Well, if he thinks he saw

14 them --

15         MR. ZIMMERMAN:  If he thinks -- we know --

16 if he thinks that he saw them, and he now -- we don't

17 know if he has a positive or negative impression, if he

18 thinks he saw them, even if he is mistaken -- he

19 couldn't have seen them at Landmark Mall.  He believes

20 he does.  So I'm concerned about whether or not --

21 what -- I'm concerned that he might have a negative

22 impression.  I mean, all we have is, I guess, he saw

23 them at LA Fitness at Landmark Mall.

24         MS. AUSTIN:  And if it was last year, the

25 judge -- or Your Honor, the Court, could instruct him

1    that:  Trust me when I tell you they weren't in that
2    area at the time you believe you saw them.  So...
3                MR. ZIMMERMAN:  I know.  It's getting sticky
4    now.
5                THE COURT:  No, I don't think -- I don't
6    think I'll do that.
7                Ms. Martinez, I'm open to suggestions.  Go
8    ahead.
9                MS. MARTINEZ:  I just was going to say, the
10   government's preference would be that Your Honor not
11   instruct him that.  The point of all these procedures
12   are to not tell the jury that they're all incarcerated.
13   So...
14               THE COURT:  No.  I think what I'll do is
15   just say that we've had counsel inquire whether these
16   individuals recall seeing him at LA Fitness -- or have
17   ever been to LA Fitness, and their indication is that
18   they have not been there.
19               But let me find out from him what context he
20   saw them, like you asked.
21               MR. CRAWLEY:  I have reason to believe that
22   my client, Mr. Cerritos, has never been in a -- in a gym
23   in his entire life.
24               THE COURT:  Okay.
25               MR. ZIMMERMAN:  But I would like the inquiry

1    as to what he believes he saw.

2              THE COURT:  All right.  I thought -- were

3    you going to say something about the gym, too, or you're

4    not going to say anything about the gym?

5              MR. ZIMMERMAN:  No, I have no representation

6    on that.

7              THE COURT:  All right.  Thank you.  Let's

8    bring him back.

9              (Juror present.)

10             THE COURT:  Mr. C▮▮▮▮▮▮, can you tell me

11   about the context in which you think you might have

12   scene either individual?

13             THE JUROR:  Yes, sir.  I think I seen them

14   in the gym.  That's pretty much it.  I don't know them

15   or anything like that.

16             THE COURT:  Describe what was taking place

17   when you saw them.

18             THE JUROR:  They were working out.

19             THE COURT:  Working out?

20             THE JUROR:  Yes, sir.

21             THE COURT:  Okay.  Well, what I did was I

22   asked each individual lawyer to determine from their

23   client, and the information I have is neither have been

24   to that gym.  And so, if your basis is LA Fitness, you

25   might be mistaken.  But --

1          THE JUROR:  It's a possibility.

2          THE COURT:  Well, you've done the right

3  thing by bringing it to my attention, which I hope you

4  would do.  You've done nothing wrong.  And what I hope

5  to do in a moment, when you all come back, is to resume

6  the trial.  But thank you for bringing that to my

7  attention.  Thank you very much.

8          THE JUROR:  Yes, sir.

9          THE COURT:  You're very kind.  Thank you.

10         (Juror not present.)

11         THE COURT:  Counsel, with your permission I

12  would like to give the jury a seating chart, the same

13  one that my court staff prepared for me that I have.  It

14  has no pictures, no drawings, just names.

15         MS. MARTINEZ:  No objection from the

16  government, Your Honor.

17         MS. AUSTIN:  We're fine, Your Honor.

18         MR. ZIMMERMAN:  I'm getting oriented, Judge.

19  We're fine.

20         THE COURT:  Hearing no objection, you can

21  bring our jury out, Mr. Toliver.  Thank you.

22         Who is going to pass them out?  Thank you.

23         (Jury present.)

24         THE COURT:  You may be seated.  Thank you.

25         Ladies and gentlemen, I had my staff --

1    normally when I have a trial -- prepare a seating chart
2    for me.  And I'm going to give you a copy of it so --
3    now this seating chart is just a seating chart of the
4    way I see the courtroom.  It's not evidence of any kind.
5    It is just to assist you in recognizing the names of the
6    individual lawyers and the parties in the courtroom.
7            Put your own name on your seating chart and
8    keep it with your notes.
9            (End of excerpt at 4:05 p.m.)
10
11                          ---
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2                        CERTIFICATE OF REPORTER

3

4              I, Renecia Wilson, an official court

5    reporter for the United States District Court of

6    Virginia, Alexandria Division, do hereby certify that I

7    reported by machine shorthand, in my official capacity,

8    the proceedings had upon the jury trial in the case of

9    UNITED STATES OF AMERICA v. JOSE LOPEZ TORRES, et al.

10             I further certify that I was authorized and

11   did report by stenotype the proceedings in said jury

12   trial, and that the foregoing pages, numbered 1 to 158,

13   inclusive, constitute the official transcript of said

14   proceedings as taken from my shorthand notes.

15

16             IN WITNESS WHEREOF, I have hereto

17   subscribed my name this __28th_ day of _November_, 2016.

18

19                      ___/s/_____
                                Renecia Wilson, RMR, CRR
20                              Official Court Reporter

21

22

23

24

25